EXHIBIT 1

Peter Juni                                        September 21, 2010

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ALASKA ELECTRICAL PENSION
FUND,

        Plaintiff,

    V.                    CIVIL ACTION
                          NO. 03-15-19 (AET)
PHARMACIA CORP., et al.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF
PETER JUNI, M.D.

September 21, 2010
10:39 a.m.

Robbins, Geller, Rudman & Dowd, LLP
1100 Connecticut Avenue
Washington, D.C. 20036

Lori Goodin Mackenzie, RPR, CLR, CRR
Case Number 2688
Assignment Number 172652

---

**Page 2**

APPEARANCES OF COUNSEL

For the Plaintiff:
ROBBINS, GELLER, RUDMAN & DOWD, LLP
SCOTT H. SAHAM, ESQUIRE
655 West Broadway
Suite 1900
San Diego, California 92101
619-231-1058
ssaham@rgrdlaw.com
AND
SCOTT & SCOTT
MATTHEW MONTGOMERY, ESQUIRE
800 B Street
Suite 1500
San Diego, California 92101
619-233-4565
mmontgomery@scott-scott.com
AND
MOTLEY RICE
JOSHUA C. LITTLEJOHN, ESQUIRE
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
843-216-9447
littlejohn@motleyrice.com

For the Defendants:

CADWALADER, WICKERSHAM & TAFT, LLP
JOSHUA R. WEISS, ESQUIRE
One Financial Center
New York, New York 10281
212-504-6228
joshua.weiss@cwt.com

Also Present:
Jasmine Rice, Videographer

---

**Page 3**

INDEX OF EXAMINATION

WITNESS:  PETER JUNI, M.D.

| EXAMINATION | PAGE |
| --- | --- |
| By Mr. Saham | 8 |
| By Mr. Weiss | 92 |
| By Mr. Saham | 380 |
| By Mr. Weiss | 386 |
| By Mr. Saham | 390 |

* * *

---

**Page 4**

Plaintiff's

| Exhibit | Description | Page |
| --- | --- | --- |
| 160 | Dr. Juni's curriculum vitae | 10 |
| 161 | Response to Steven Geis' statements and comment to editorial published in BMJ, USA, December 2002 | 69 |

Defendants'

| Exhibit | Description | Page |
| --- | --- | --- |
| 1 | Copies of Letters to the Editor in JAMA, November 21, 2001 edition | 135 |
| 2 | Statistical Reviewer Briefing Document for the Advisory Committee | 143 |
| 3 | Printout of Rapid Responses posted on BMJ's website | 166 |
| 4 | Article published The Lancet, "Are the Clinical Effects of Homeopathy Placebo Effects?, Comparative Study of Placebo-Controlled Trials of Homeopathy and Allopathy" | 229 |

Peter Juni                                    September 21, 2010

**5**

1         INDEX OF EXHIBITS (Continued)
2    Defendants'
3    Exhibit     Description         Page
4     5    Article entitled "Homeopathy and
5         The Lancet"                    230
6     6    Series of letters published in
7         The Lancet, December 17, 2005     248
8     7    Letter published in The Lancet from
9         Flavio Dantas                  268
10     8    Second page of Dr. Juni's reply to
11         letter in The Lancet           271
12     9    Article published in Arthritis and
13         Rheumatism, December 2007, entitled
14         "Hylan Versus Hyaluronic Acid for
15         Osteoarthritis of the Knee:  A
16         Systematic Review and Meta-Analysis" 285
17    10    Reproduction of letters published in
18         Annals of Internal Medicine in 2007  288
19
20
21
22

**6**

1         INDEX OF EXHIBITS (Continued)
2    Defendants'
3    Exhibit     Description         Page
4    11    Article in Arthritis & Rheumatism
5         entitled "Efficacy and Safety of
6         Intraarticular Hylan or Hyaluronic
7         Acids for Osteoarthritis of the Knee,
8         a Randomized Controlled Trial"     303
9    12    Letters published in Arthritis &
10         Rheumatism                     305
11    13    Correspondence published in
12         The Lancet, January 1, 2005     321
13    14    Article published in Age and Aging
14         entitled "Older people should NOT be
15         prescribed 'coxibs' in place of
16         conventional NSAIDs"           345
17    15    Abstract from The Lancet, "Celecoxib
18         versus Omeprazole and Diclofenac in
19         Patients with Osteoarthritis and
20         Rheumatoid Arthritis (CONDOR)"   352
21         (Original Exhibits included with original
22    transcript.)

**7**

1         DEPOSITION OF PETER JUNI, M.D.
2           September 21, 2010
3
4         THE VIDEOGRAPHER:  Here begins
5    Videotape Number 1 in the deposition of Peter
6    Juni in the matter of Alaska Electrical Pension
7    Fund versus Pharmacia Corporation, et al. in the
8    United States District Court, the District of New
9    Jersey, Civil Action Number which is 03-15-19
10    (AET).
11         Today's date is September 21st, 2010
12    and the time is 10:39 a.m.
13         The videographer is Jasmine Rice,
14    here on behalf of Esquire Deposition Solutions,
15    and the court reporter is Lori Mackenzie, also
16    with Esquire.
17         Will counsel and all present please
18    identify yourselves and state whom you represent.
19         MR. SAHAM:  Scott Saham for the
20    plaintiff.
21         MR. MONTGOMERY:  Matt Montgomery for
22    the Plaintiff.

**8**

1         MR. LITTLEJOHN:  Josh Littlejohn for
2    the Plaintiff.
3         MR. WEISS:  Josh Weiss for the
4    defendant.
5         THE VIDEOGRAPHER:  Would the court
6    reporter please swear in the witness.
7         PETER JUNI, M.D.,
8    having been first duly sworn, testified as
9    follows:
10         EXAMINATION
11    BY MR. SAHAM:
12    Q.    Good morning, Dr. Juni.
13    A.    Good morning.
14    Q.    And where do you reside?
15    A.    I am residing in Bern, Switzerland.
16    Q.    Okay.  And what do you do in Bern,
17    Switzerland?
18    A.    I'm heading the Division of Clinical
19    Epidemiology and Biostatistics at the Institute
20    of Social and Preventive Medicine at the local
21    university.  And I'm the director of the clinical
22    trials at the University Hospital in Bern.

Peter Juni                                          September 21, 2010

9

1    Q.   And what is your educational
2   background?
3    A.   I'm a physician, graduated in
4   medicine and then I had an education in internal
5   medicine and rheumatology and went on in clinical
6   epidemiology where I did my Venia Docendi, that's
7   the right to teach --
8    Q.   If you can speak a little slower for
9   the court reporter.
10    A.   Okay.  It's a difficult term, it's
11   called a right to teach.  It's like an associate
12   professorship in clinical epidemiology.
13        It's called Venia Docendi, which is
14   V-E-N-I-A, second word, D-O-C-E-N-D-I.  It's
15   Latin, sorry about that, that's confusing and
16   European.
17    Q.   And rheumatology in layman's terms,
18   what is that?
19    A.   Rheumatology is the specialty about
20   musculoskeletal health, so affecting problems
21   affecting the bones and joints and muscles.
22    Q.   And you're currently on faculty at

10

1   the University of Bern; is that correct?
2    A.   Yes.  I've got a tenured position
3   currently as the head of division and associate
4   professor and I'm a designated full professor
5   from the 1st of November onwards, tenured.
6    Q.   And how long have you been a
7   professor at the University of Bern?
8    A.   I can't remember how much is this.
9   I will be one year and something that I have been
10   a professor there.  And I've been with University
11   of Bern from 2002 onwards.
12        (Exhibit Number 160
13        marked for identification.)
14   BY MR. SAHAM:
15    Q.   And I would like to show you what
16   I'm marking as Plaintiff's Exhibit 160.  Could
17   you please take a look at that document?
18    A.   Yes.
19    Q.   And do you recognize what I have
20   marked as Plaintiff's Exhibit 160?
21    A.   That is my curriculum vitae.
22    Q.   And is this a current curriculum

11

1   vitae?
2    A.   Yes, it is.
3    Q.   And does it discuss, at least in
4   general, your research and grant funding history?
5    A.   Yes, it does.
6    Q.   And do you have a particular area of
7   research you've concentrated in as a professor of
8   medicine?
9    A.   Yes.  Two areas.  One is
10   cardiovascular health so surrounding coronary
11   artery disease.
12        And the other one is musculoskeletal
13   health, as we've just specified, surrounding
14   osteoarthritis mainly and to a certain extent
15   also back pain.
16    Q.   And have you published a number of
17   peer-reviewed articles in those areas?
18    A.   Yes, I did.
19    Q.   And approximately do you recall how
20   many articles you have published?
21    A.   In these areas or overall?
22    Q.   Well, let's start with overall?

12

1    A.   Well, approximately overall original
2   articles it will be around 70 now plus several
3   editorials, commentaries, lectures, so overall
4   the number of articles I have published will be
5   approximately 180.
6    Q.   Okay.  And do some number of those,
7   and you don't need to recall the exact number,
8   deal with issues of rheumatology?
9    A.   Yes.  There will be at least --
10   well, I'd estimate 25 or so, 30 articles relating
11   directly to rheumatology, yes.
12    Q.   And does your curriculum vitae also
13   summarize your peer-reviewed grant history?
14    A.   Yes, it does.
15    Q.   And in layman's terms, what's a peer
16   reviewed grant?
17    A.   That's a research contribution
18   coming from not-for-profit institutions,
19   typically foundations or governmental agencies.
20        And the research grant is actually
21   provided based on a thorough review of the
22   research plan you are submitting in a competitive

Peter Juni                                      September 21, 2010

13

1  manner.
2      Q.   And does your curriculum vitae also
3  summarize your teaching experience?
4      A.   Yes, I think so.  Yes, it does.
5      Q.   And do you have a full-time teaching
6  position as part of your duties as a professor of
7  medicine?
8      A.   Indeed so, yes.
9      Q.   And do you teach medical students?
10     A.   I teach medical students.  I teach
11 students of biomedical sciences.  I do a lot of
12 postgraduate teaching in master's courses, in
13 several master's courses and director of
14 postgraduate teaching for clinical colleagues.
15     Q.   And do you do teaching in the area
16 of clinical design and trials?
17     A.   I do mainly regular teaching in this
18 area, clinical epidemiology.  This is mainly
19 related to problems in randomized controlled
20 trials and other clinical studies to systematic
21 errors, how they could occur, why they could
22 occur to a research fraud.

14

1          And then if it comes to a specific
2  clinical topic, it's mainly again about
3  musculoskeletal health, rheumatology and
4  cardiovascular health, cardiology.
5      Q.   And approximately how many articles
6  have you published in the area of clinical
7  epidemiology?
8      A.   It depends on how you calculate and
9  assign this actually, but I'd say about 50.
10     Q.   And you regularly lecture in this
11 area?
12     A.   Yes, I do.
13     Q.   And have you ever received any
14 honors or awards in your medical or research
15 career?
16     A.   Yes.  Well, I've been awarded at
17 several scientific conferences for best
18 contributions or runner-up contributions
19 including twice awards from the Cochrane
20 Collaboration, which is an international
21 organization dedicated to summarize the effects
22 of health care intervention.

15

1      Q.   Okay.  And I would like to show you
2  what has been previously marked in this case as
3  Plaintiff's Exhibit 32.
4          Could you please take a look at
5  Plaintiff's Exhibit 32.
6      A.   Yes.  This is an editorial we
7  published in the June 1st Edition of 2002 in the
8  British Medical Journal.
9      Q.   And it's entitled "Are Selective
10 COX 2 Inhibitors Superior to Traditional
11 Nonsteroidal Antiinflammatory Drugs, Adequate
12 Analysis of the CLASS Trial Indicates that this
13 may not be the Case."
14     A.   Correct.
15     Q.   Okay.  And what were the
16 circumstances that led you to submit this
17 editorial to the British Medical Journal?
18     A.   At the time, when I came back from a
19 research fellowship in the United Kingdom, which
20 was purely academic, not a clinical setting, I
21 was surprised to find a lot of enthusiasm for a
22 novel class of drugs called COX 2 Selective

16

1  Inhibitors in Switzerland.
2          And just out of pure academic
3  research just went into the literature a bit and
4  quite quickly became aware of an article in The
5  Washington Post in August 2001, and the two
6  lectures published in JAMA, that's the Journal of
7  the American Medical Association, in
8  November 2001, indicating that the pivotal trial
9  of one of the available COX 2 Selective
10 Inhibitors, celecoxib, may actually have been
11 reported in a misleading manner in the major
12 publication.
13         And I was surprised to find that at
14 that time and when probably a few weeks later I
15 was invited to give a workshop about the
16 treatment of osteoarthritis to clinical
17 colleagues in Switzerland, and when I was
18 bringing this topic up and showed a comparison of
19 what was published with what was available at
20 that time at -- publicly available at the Food
21 and Drug Administration, the U.S. Food and Drug
22 Administration's website at the time, and

Peter Juni                                    September 21, 2010

17

1    actually what was available at the FDA's website
2    did not exactly compare with what was published
3    in JAMA.
4           I was surprised that nobody actually
5    was aware of this problem.  And this made me then
6    suggest to my colleague, Paul Dieppe, who was at
7    that time a professor of rheumatology at the
8    University of Bristol, and Anne Rutjes, who was a
9    research fellow and working in Amsterdam, that we
10   should actually write this up just to make our
11   clinical colleagues aware of the issues related
12   to this publication.
13        Q.   And you basically had made some
14   comparisons between documents that were posted on
15   the FDA website and the Journal of American
16   Medical Association article from September
17   of 2000 which purported to report the results of
18   the CLASS Studies; is that correct?
19        MR. WEISS:  Object to the form of
20   the question.
21   BY MR. SAHAM:
22        Q.   He can make objections and you can

18

1    still answer the question.
2         A.   Okay.  Good.  So, yes, it was
3    basically a comparison with it, between the paper
4    published in JAMA in 2000, I wouldn't know the
5    exact month of it, so but the paper by
6    Silverstein and colleagues published in JAMA
7    2000, Volume 284, pages 1247 through 55 with the
8    medical reviewers' and statistical reviewers'
9    report as published on the FDA's website.
10        Q.   And I want to show you what's
11   previously been marked in this case as Wolfe
12   Exhibit 3, could you please take a look at this
13   document.
14        A.   Exhibit 3 is exactly the article I
15   was referring to by Silverstein and colleagues.
16   This is the main report of the pivotal CLASS
17   Study in the Journal of the American Medical
18   Association, published December 13th, 2000 as I
19   have just noted.
20        Q.   And turning your attention back to
21   Exhibit 32, your British Medical Journal
22   editorial, you noted that -- and I'm looking at

19

1    the third paragraph on the front page, you noted
2    that "Complete information available to the
3    United States Food and Drug Administration
4    contradicted these conclusions."
5           And when you're talking about these
6    conclusions, were you referring to conclusions
7    published in the Journal of American Medical
8    Association?
9         MR. WEISS:  Object to the form of
10   the question.
11        THE WITNESS:  Correct.  I was
12   referring to the conclusions S, for example,
13   stipulated in the abstract of the article
14   published in the Journal of the American Medical
15   Association by Silverstein and colleagues.
16        Shall I read the conclusions that I
17   was referring to?
18   BY MR. SAHAM:
19        Q.   Sure.
20        A.   In this study, meaning the CLASS
21   study, celecoxib, at dosages greater than those
22   indicated clinically was associated with the low

20

1    residence of symptomatic ulcers and ulcer
2    complications combined, as well as other
3    clinically important toxic effects compared with
4    NSAIDs, at standard dosages.
5         Q.   And what were the specific
6    contradictions you noted in your comparison?
7         A.   There were several.  First of all,
8    what was most striking is that the CLASS study as
9    published was described as one single trial in
10   which patients are randomly assigned to receive
11   treatment celecoxib, ibuprofen or diclofenac on a
12   2:1:1 basis.
13        This description in the article was
14   inaccurate, since the documents on the FDA
15   website indicate that actually the data included
16   in this report were referring to two randomized
17   controlled trials.
18        One trial randomized comparison of
19   celecoxib with diclofenac and the other trial a
20   randomized comparison of celecoxib with
21   ibuprofen.
22        These two trials had different

Peter Juni                                        September 21, 2010

21

1   protocols.  These protocols were specified and
2   submitted at different time points and basically
3   were, for the purpose of the negotiations with
4   the Food and Drug Administration, submitted
5   together.  But actually it was clear from the
6   beginning that the paper should have described
7   two rather than one trial.  This was the first
8   misleading point.
9       Q.   Was there anything disclosed in the
10  JAMA article, which is Wolfe Exhibit 3, with
11  respect to comparisons between celecoxib and
12  diclofenac?
13      A.   You mean results that were directly
14  available in the article where we could make a
15  direct comparison just with diclofenac, but not
16  with the combined traditional NSAIDs, the
17  combined drugs, meaning ibuprofen and diclofenac
18  together.  That's what you're referring --
19      Q.   Well, let me ask you a question.
20           Did you become aware that certain
21  comparisons were made between celecoxib and
22  diclofenac as a part of the clinical trial?

22

1           MR. WEISS:  Object to the form of
2   the question.
3           THE WITNESS:  I became aware that it
4   was impossible, from the report, to distinguish
5   between the comparisons that I just was referring
6   to celecoxib versus diclofenac and celecoxib
7   versus ibuprofen.
8   BY MR. SAHAM:
9       Q.   When you looked at materials on the
10  FDA website, were comparisons in fact made
11  between celecoxib and diclofenac as part of the
12  CLASS trial?
13      A.   Very much so.  This was prespecified
14  in the protocols.  Naturally had to be
15  prespecified, because we had two protocols.
16           Scientifically it does absolutely
17  make no sense in this situation to undermine the
18  randomized comparison that you're setting up and
19  just do a comparison of celecoxib versus these
20  combined NSAIDS that were actually evaluated in
21  different randomized trials.
22      Q.   And did the evaluation of celecoxib

23

1   and diclofenac show any advantage for celecoxib?
2       A.   The evaluation of celecoxib versus
3   diclofenac did not show any advantage of
4   celecoxib on the primary outcome of the study.
5       Q.   And were there, in fact, two primary
6   outcomes of the study?
7           MR. WEISS:  Object to the form of
8   the question.
9   BY MR. SAHAM:
10      Q.   I'll ask that differently.
11           Were there two primary end points
12  set out in the protocol to be looked at with
13  respect to each of the comparator drugs?
14           MR. WEISS:  Object to the form of
15  the question.
16           THE WITNESS:  My statement will
17  refer to the description of the protocol as was
18  available in the reports in the statistical and
19  medical reports at the FDA's website.
20           According to these reports, there
21  was one single primary outcome but with two
22  different definitions.

24

1           This single primary outcome was
2   called ulcer complications.  This means an ulcer
3   of the gastrointestinal tract that leads either
4   to a perforation, so a hole in your stomach or in
5   your gut that needs -- that will result in an
6   operation, a severe bleeding, or an obstruction.
7           Now, there was a traditional
8   definition at that time well established.  In
9   addition, according to the material available on
10  the FDA's website, there was a second definition
11  that was required by the Food and Drug
12  Administration which was more stringent, meaning
13  the second definition had higher thresholds to
14  define something as an ulcer complication,
15  because it required more severe bleeding in the
16  case of a bleeding event defining the ulcer
17  complication.
18           And this did not compare with the
19  impression the reader got when he or she actually
20  was reading the article by Silverstein and
21  colleagues published in JAMA, Exhibit 3.
22  BY MR. SAHAM:

Peter Juni                                                September 21, 2010

25

1       Q.   And now turning back to your
2   article, Exhibit 32, Figure 1 --
3           MR. MONTGOMERY:  Just to clarify the
4   record, sorry to interrupt, it's Wolfe Exhibit 3.
5   BY MR. SAHAM:
6       Q.   So turning back to your article,
7   Exhibit 32 --
8       A.   Yes.
9       Q.   -- and on the first page there are
10  two figures that are described as Figure 1; is
11  that correct?
12      A.   Correct.
13      Q.   And what are you communicating to
14  the reader in the graphs that are part of
15  Figure 1?
16      A.   The Upper Panel N refers to the main
17  outcome measures in inverted comas as they were
18  published in the JAMA article in Exhibit 3, which
19  were two and hierarchically equal outcome
20  measures, one ulcer complications and the other
21  one ulcer complications plus symptomatic ulcers,
22  meaning gastrointestinal ulcers that lead to

26

1   symptoms in patients.
2       Q.   And looking at the JAMA article,
3   Wolfe Exhibit 3, the main outcome measure is
4   defined in the abstract on the front page of that
5   article; is that correct?
6       A.   Correct.
7       Q.   And it's defined as, quote,
8   "Incidence of prospectively defined symptomatic
9   upper GI ulcers and ulcer complications (bleeding
10  perforation and obstruction) and other adverse
11  effects during the six-month treatment period."
12      A.   This is correct.
13      Q.   And did you, in comparing that main
14  outcome measure to the information available on
15  the FDA website, determine whether the main
16  outcome measure differed from the primary outcome
17  measures described in the trial protocols?
18          MR. WEISS:  Object to the form of
19  the question.
20          THE WITNESS:  Indeed, the primary
21  outcome measures, as described in the protocols
22  and referred to by the FDA's reviewers, were

27

1   different from the main outcome measures as
2   published in Exhibit 3.
3           The primary end points, as defined
4   in the protocols, were just the ulcer
5   complications, full stop, with, as I was
6   referring to, either the traditional definition
7   or the more stringent alternate definition as we
8   outline it in the lower panel of Figure 1 of
9   Exhibit 32.
10  BY MR. SAHAM:
11      Q.   So the main outcome measure
12  addressed in the JAMA article is different from
13  the primary outcome measures defining the CLASS
14  trial?
15      A.   This is correct.
16          MR. WEISS:  Object to the form of
17  the question.
18  BY MR. SAHAM:
19      Q.   And the lower panel of Figure 1 in
20  your article, Exhibit 32, what is that
21  communicating to the reader?
22      A.   This is communicating to the reader

28

1   that the differences between celecoxib and the
2   combined NSAIDs as published didn't have to do
3   anything with the difference between celecoxib
4   and the individual comparator drugs, diclofenac
5   and dibuprofane as should have been analyzed and
6   presented to the readers.
7           So we had robust contrast benefits
8   in favor of celecoxib as published and these
9   ones -- for the main outcome measures and these
10  ones were entirely lacking in the analysis as
11  should have been performed according to the
12  protocol, according to the prespecified protocol.
13      Q.   And in the bottom portion of
14  Figure 1 with the traditional definition, what
15  does that reveal to the reader?
16      A.   It reveals that there were -- there
17  was no statistical evidence for a benefit of
18  celecoxib as compared with diclofenac or
19  ibuprofen with P values that by no means reached
20  statistical significance.
21          And that according to the more
22  stringent alternate definition that was required

Peter Juni                                          September 21, 2010

29

1  by the FDA, there was even a nonsignificant trend
2  in favor of diclofenac as compared to celecoxib.
3      Q.   And does that mean in layman's terms
4  that there was no advantage from a
5  gastrointestinal -- or strike that question.
6          There was no advantage shown with
7  respect to the incidence of complicated ulcers
8  under the traditional definition?
9          MR. WEISS:  Object to the form of
10  the question.
11         THE WITNESS:  There was no evidence
12  to support an advantage of celecoxib over these
13  two NSAIDs, according to the traditional
14  definition or according to the alternate more
15  stringent definition regarding ulcer
16  complications, correct.
17  BY MR. SAHAM:
18     Q.   And under the alternate definition,
19  which drug out of the three involved in the two
20  trials showed an advantage?
21     A.   It is difficult to directly compare
22  diclofenac with ibuprofen because they were not

30

1  randomly compared in the same trial.
2          The results are from two different
3  trials, but the figure shows and this also was
4  specified or stated like that in the FDA
5  reviewer's reports that there was a
6  nonsignificant advantage and statistical trend
7  towards a higher benefit of diclofenac over
8  celecoxib.
9      Q.   And was that reported in the JAMA
10  article which has been marked as Wolfe Exhibit 3?
11     A.   No.
12     Q.   And did that -- was that a omission
13  in your view important -- or strike that.
14         Would that fact be important to a
15  medical doctor in analyzing the gastrointestinal
16  advantage of celecoxib compared to diclofenac?
17         MR. WEISS:  Object to the form of
18  the question.
19         THE WITNESS:  Without any doubt that
20  would be important.
21  BY MR. SAHAM:
22     Q.   Okay.  And why would it be

31

1  important?
2      A.   The article, Wolfe Exhibit 3,
3  clearly provides the impression that there is a
4  advantage of celecoxib over the two comparator
5  drugs used in the CLASS studies, which is
6  clinically relevant and will lead to a change in
7  clinical decision-making.
8      Q.   And under -- and based on your
9  review of the reports available on the FDA
10  website as of February 7th, 2001, was that an
11  accurate picture of celecoxib as compared to
12  diclofenac?
13     A.   No.  It clearly wasn't.
14     Q.   Turning back specifically to
15  Exhibit 32, what was the -- what was the process
16  under which you wrote this article?
17     A.   This was based on several iterations
18  I described before, that the first time I looked
19  into that in more depth was when I presented the
20  data in a preliminary fashion to my colleagues
21  during this workshop in Bern.
22         And after that we decided to write

32

1  the editorial and then we thoroughly inspected
2  all the material available on the FDA website.
3      Q.   And how long did that process take
4  to thoroughly inspect the FDA website materials?
5      A.   Currently I couldn't be exactly
6  sure, but I think it must have taken at least two
7  working weeks full-time equivalent of somebody.
8          There was a lot of material we had
9  to make sure that we now consistently understood
10  was going on, had to make sure that we didn't
11  miss any detail and it was quite a lot of
12  dedicated work actually.
13     Q.   And what materials, as you sit here
14  today, do you recall reviewing from the FDA
15  website?
16     A.   Well, basically we reviewed
17  everything which was available on celecoxib at
18  the time.  So the early -- the later reports that
19  were going on, all the correspondence, et cetera,
20  from our point of view this was so extraordinary
21  what we saw there that we really needed to be
22  sure what was going on.

Peter Juni                                    September 21, 2010

33

1    And this only could have been made
2    by a thorough inspection of all of the material
3    and all of the information available and by a
4    recalculation of all of the effects that were
5    presented, all of the treatment effect estimates
6    presented by the FDA.
7         Q.   And this process of analysis took
8    you and your two colleagues approximately two
9    working weeks?
10        MR. WEISS:  Objection.
11        THE WITNESS:  Yes.  I would estimate
12   it would be around two working weeks, indeed.
13   BY MR. SAHAM:
14        Q.   And, if you recall, what reports or
15   other materials specifically did you review from
16   the FDA website?
17        A.   It's a very long time ago.  So it's
18   difficult to remember what we looked at apart
19   from what I still keep in mind, you know, the
20   statistical reviewer's comments and the medical
21   reviewer's comments.
22        There were loads of medical

34

1    reviewers' comments related to the earlier phase
2    of the development of the drug and the drug
3    approval process, actually we reviewed all of
4    that.  There were pharmaceutical experts that had
5    reports posted, et cetera.
6         So there were many tables available
7    at just, you know, relating to the CLASS Trial,
8    but there was also additional material hidden,
9    you know, just in other, in other files like
10   the -- how does one call that, the transcript.
11        Some transcripts of discussions led
12   between probably as, if I remember that
13   correctly, representatives of the -- of the
14   Pharmacia/Pfizer and the FDA.  So we also went
15   through all of these transcripts naturally.
16        Q.   And would it be readily available,
17   readily -- strike that.
18        Would it be readily determinable by
19   a layman who looked at the data on the website
20   versus the JAMA article, which has been marked as
21   Wolfe Exhibit 3, that there were contradictions
22   between those two.

35

1         A.   Absolutely not.
2         Q.   And what's the basis for that
3    statement?
4         A.   It needs quite a lot of insight
5    into, you know, clinical epidemiology and medical
6    statistics to make sense of what is being
7    stipulated.
8         For instance, a description, you
9    know, of the power calculation and the
10   description of decision rules, when to stop these
11   trials, et cetera, as a layman, you will not be
12   able to understand that.  Not at all.
13        Q.   And, in your opinion, were the
14   omissions from the JAMA article that you
15   discussed in your editorial misleading to the
16   reader?
17        MR. WEISS:  Objection.
18        THE WITNESS:  Clearly they were
19   misleading to the reader.  We also stipulate that
20   in the editorial, and we still underscore that
21   this is the case.  We were talking about, you
22   know, selling two randomized trials as one.

36

1         We were talking about a change of
2    definitions of main outcome measures.  We haven't
3    addressed yet that we were also talking about and
4    presenting six-month results in Wolfe Exhibit 3
5    in the JAMA article to the reader, while at the
6    time point of the submission and of the
7    publication, there were 12 to 15-month results
8    available to the FDA, to the authors of the
9    study, and, according to the protocol, these 12
10   to 15-month results should have been published.
11   That's how the FDA describes the procedure
12   specified in the two trial protocols.
13   BY MR. SAHAM:
14        Q.   And the two trials were -- one was
15   12 months and one was 15 months; is that correct?
16        A.   That is correct, yes.
17        Q.   And the data being reported in the
18   JAMA article, Wolfe Exhibit 3, only reports
19   six-month's data?
20        A.   The Wolfe Exhibit 3 article just
21   reports six-month data indeed.  Whereas the
22   protocols specified that the trials -- the two

Peter Juni                                    September 21, 2010

37

1  trials would be closed when all of the patients
2  had had the opportunity to undergo at least six
3  months of treatment and was indicating that all
4  of the data should have been included up to the
5  maximum follow-up duration I was referring to,
6  which was 12 months in one trial and 15 months in
7  the second trial, correct.
8       Q.   And from your review of the
9  materials on the FDA website, did you learn
10 whether the second half of the trial was less
11 favorable to celecoxib than the first portion of
12 the trial?
13      MR. WEISS:  Object to the form of
14 the question.
15      THE WITNESS:  We indeed learned
16 this, and looking at Figure 2 of Exhibit 32 we
17 find a couple of Meier estimates for the primary
18 outcome, that's a way of reporting over time,
19 describing over time the pattern of events
20 accumulating.
21      And what was striking is that at six
22 months there was a rather prominent difference

38

1  also for this primary outcome measure as
2  specified in the protocol and in favor of
3  celecoxib.
4       After six months the additional
5  events that accumulated, these events mainly
6  accumulated in the celecoxib arms, arms plural,
7  and if I remember correctly, there were six
8  additional events that weren't censored.  That's
9  an analytical technique to exclude some events.
10 Six additional events in the celecoxib arms, but
11 only one additional event in one of the two NSAID
12 arms, which was ibuprofen if I remember
13 correctly.
14      So it was striking that at six
15 months there was quite a pronounced difference in
16 favor of celecoxib and this entirely disappeared
17 when you looked at the entire data available up
18 to the maximum follow-up.
19 BY MR. SAHAM:
20      Q.   So, based on your review of the
21 website, it was clear that six of the seven
22 complicated ulcers that occurred in the second

39

1  half of the trial were in the celecoxib treatment
2  group?
3       MR. WEISS:  Object to the form of
4  the question.
5       THE WITNESS:  Based in our review,
6  it was clear that the six events occurred after
7  the time window that is Wolfe Exhibit 3 actually
8  was reporting as the main analysis, yes.
9  BY MR. SAHAM:
10      Q.   And that was not disclosed in Wolfe
11 Exhibit 3, the JAMA article?
12      MR. WEISS:  Object to the form of
13 the question.
14      THE WITNESS:  This was a striking
15 finding, also when looking at the correspondence
16 then that was available on JAMA's website or as
17 letters.
18      And during a discussion with one of
19 the editors of JAMA, we found out that JAMA was
20 not informed.  The reader was not informed.  The
21 public was not informed through this publication.
22      The editors were not being put into

40

1  a position to make an informed decision, because
2  nobody actually knew about the longer term data
3  available at the time point, this Wolfe
4  Exhibit 3, the basis for this was submitted to
5  the editors or at the time point when it was
6  published.
7  BY MR. SAHAM:
8       Q.   And is there any explanation as to
9  why that additional data was left out of the JAMA
10 article?
11      A.   Are you referring to a justifiable
12 explanation or to an explanation how it was
13 subsequently given by the authors of the article.
14      Q.   Well, let's start with the JAMA
15 article.  Is there any explanation in the JAMA
16 article as to why only six months of data were
17 reported?
18      A.   The JAMA article does not state
19 anything that makes reference to longer term data
20 being available at the time point, you know, and
21 amenable to analysis at the time point when this
22 was published.  There is absolutely no statement

Peter Juni                                        September 21, 2010

41

1    relating to that.
2        Q.    Is that proper?
3        A.    This is clearly inadequate and is
4    not justifiable from a scientific viewpoint.
5        Q.    And why is that?
6        A.    Because the article does not follow
7    internationally established guidelines on
8    reporting of randomized controlled trials and it
9    does not follow the prespecified trial protocol.
10       It is clear that any research plan
11   that has been stipulated in the way the two
12   research plans were, you know, being stipulated
13   for the two trial protocols that led to this
14   publication, that this -- these research plans
15   need to be followed.
16       It is possible that in addition to
17   following the full research plan, you include
18   sensitivity analyses, that's additional analysis
19   that were decided upon post hoc and you
20   transparently say, okay, that's the main
21   analysis, that's the preplanned one with the
22   preplanned duration, the preplanned number of

42

1    ulcer complications accumulating.
2        In addition, based on experience we
3    have or had, you know, during the trial, et
4    cetera, we decided to do a secondary analysis.
5        If the authors would have done that,
6    you know, disclosing all the results and in
7    addition also would have done their analysis that
8    they published in here, things would have been
9    Kosher with the distinction between prespecified
10   and post hoc.
11       They didn't do that and this is
12   scientifically inacceptable.
13       Q.    And what impact did their failure to
14   do that have on a reader of the JAMA article?
15       MR. WEISS:  Object to the form of
16   the question.
17   BY MR. SAHAM:
18       Q.    Let me ask that differently.
19       Did their failure to include the
20   information you just described impact the --
21   strike that question.
22       What impact -- strike that.

43

1        The failure to disclose that
2    information, did that change the impression of
3    Celebrex described in the article which is Wolfe
4    Exhibit 3?
5        MR. WEISS:  Object to the form of
6    the question.
7        THE WITNESS:  The way the
8    comparisons were described in Wolfe Exhibit 3,
9    will lead to opposite conclusions, opposites in
10   terms of, you know, potential benefits of
11   Celebrex as compared with traditional NSAIDs as
12   compared with what could have been known and
13   presented and analyzed, actually, when the
14   protocol -- if the protocol had been followed.
15       So opposite conclusions, if you look
16   at the full data available at the FDA website as
17   compared to what was published.  So I would say
18   clearly this has clinical implications, yes,
19   based on this article, Wolfe Exhibit 3, a
20   clinician will conclude okay, Celebrex has a
21   gastrointestinal advantage and this has been
22   reasonably established.  Based on the data that

44

1    were at the same time were available at the FDA's
2    website one would say, well, you know, the trial
3    failed to show any advantage in terms of the
4    primary end points and we're uncertain, so we
5    need to have additional trials and we need to
6    await what's coming.
7    BY MR. SAHAM:
8        Q.    And when you're talking about the
9    materials available on the FDA website, you
10   didn't discover them until 2002 when you were
11   doing your research, correct?
12       A.    I wouldn't be --
13       MR. WEISS:  Object to the form of
14   the question.
15       THE WITNESS:  I wouldn't be exactly
16   sure when we started to look into that.  But we
17   were clearly triggered, as we describe it in the
18   editorial, by the JAMA correspondence in November
19   2001, and, you know, the article in The
20   Washington Post in August 2001.
21       So, you know, these things are not
22   obviously there.  So you need to start to take --

Peter Juni                                          September 21, 2010

45

1   you can't -- it just doesn't jump into your eyes.
2   BY MR. SAHAM:
3       Q.   My question is, do you dispute -- or
4   strike that.
5           Do you know when the materials were
6   posted on the FDA website?
7       A.   I can't remember that.  But I may be
8   able to tell you this from the editorial.  No, I
9   wouldn't be -- let me see.  I probably wouldn't
10  be able to --
11      Q.   My question is simply, you don't
12  know that the FDA materials were made
13  available -- you wouldn't dispute that the FDA
14  materials weren't posted on their website until
15  February of 2001, some approximately six months
16  after the JAMA article was published?
17      A.   This could -- well, I certainly
18  wouldn't dispute that and this could well be the
19  time window when it comes up.
20          We accessed them in December of 2001
21  and this could well be about six to 10 months
22  after they were actually formally published on

46

1   the website.
2       Q.   And you write at the bottom of the
3   first page of Exhibit 32 your British Medical
4   Journal editorial, quote, "Almost all of the
5   ulcer complications that had occurred during the
6   second half of the trials were in the users of
7   celecoxib."  Is that an accurate statement?
8       A.   This is -- there were, if I remember
9   that correctly, seven ulcer complications that
10  were not censored, that were included in the
11  principal analysis as submitted to the FDA.
12          Six of these were in celecoxib arms
13  and one of them was in a comparator arm, if I
14  remember correctly.  Let me just check whether
15  this is right.  This was in the -- probably in
16  the ibuprofen arm, but I couldn't be sure whether
17  it was in the ibuprofen or in the diclofenac arm,
18  but six versus one.
19      Q.   And was that information disclosed
20  in the JAMA article, Wolfe Exhibit 3?
21      A.   No.
22      Q.   And did that render the article

47

1   misleading?
2       A.   This was one of the parts that
3   rendered the article misleading.  I was already
4   referring to two others, but there is one more
5   that was quite problematic in my view.
6       Q.   And what was that, sir?
7       A.   They also changed the statistical
8   analysis plan.  And the plan of combining
9   initially the results of the two trials into one
10  analysis was part of a venture that was carefully
11  trying to control something we call Type 1 error.
12          That's an error to conclude there is
13  a difference between two drugs when in reality
14  there is not.
15          So, in this case, an error to
16  conclude, for example, that celecoxib is more
17  beneficial, statistically more beneficial than
18  the comparator drugs when in reality this is not
19  the case.
20          So what they actually aimed at is a
21  two-step procedure.  Step 1 would be we do a
22  statistical testing comparing all the celecoxib

48

1   patients with all of the comparator patients with
2   ibuprofen and diclofenac.
3           If this comparison on the primary
4   outcome, on the primary end point, ulcer
5   complications reaches a prespecified level which
6   is international acceptance of statistical
7   significance 0.05, then they do a second step.
8           And in this second step they do a
9   (inaudible) comparison in one of the protocols,
10  the comparison of diclofenac and the other
11  protocol the comparison with ibuprofen.
12          And only if -- and that's crucial,
13  only if the first step leads to statistical
14  significance and the second step leads to
15  statistical significance, they would stipulate
16  that there is an advantage of celecoxib over
17  either of the two comparator drugs.
18          That's how it was prespecified in
19  the protocols, okay.  It hasn't got to do
20  anything with what was published.
21      Q.   And were those facts as you've
22  described them disclosed in Wolfe Exhibit 3, the

Peter Juni                                        September 21, 2010

49

1  September JAMA article?
2      A.   Unfortunately not.  They just were
3  sticking with this, you know, shorter term,
4  shorter time window of six months.  They were
5  just sticking to Step 1 to compare celecoxib with
6  the NSAIDS combined and that's where they
7  stopped.
8          And based on that, they made the
9  conclusions that they initially just was
10 referring to when reading them from the abstract.
11     Q.   And was that one of the bases for
12 your conclusion that the JAMA article was, in
13 fact, misleading?
14         MR. WEISS:  Object to the form of
15 the question.
16         THE WITNESS:  This was actually also
17 one of the bases, as well together with the other
18 ones that I was already referring to, yes.
19 BY MR. SAHAM:
20     Q.   And does the JAMA article disclose
21 anything about Type 1 error as you described it?
22     A.   I'm not sure whether I understand

50

1  the question about the attempts to control the
2  Type 1 error or about, you know, the Type 1 error
3  that they used for the analysis.
4      Q.   Was there any description in the
5  JAMA article of the methods and the protocol to
6  control for Type 1 error?
7      A.   No.  The way of this segue analysis,
8  segue analysis that I was just referring to was
9  not described in Wolfe Exhibit 3.
10     Q.   And was that proper?
11     A.   No.
12     Q.   Was that misleading?
13     A.   Yes.
14     Q.   And what's a Kaplan-Meier curve?
15     A.   A Kaplan-Meier curve is a graphical
16 way to display the accumulation of events over a
17 period of time.
18         So it will just use certain
19 statistical methods to estimate the cumulative
20 percentage of events occurring just over a
21 certain time period, like in this case here, 12
22 to 15 months.

51

1      Q.   And are you referring to Figure 2 of
2  your British Medical Journal editorial?
3      A.   Yes.  I'm referring to Figure 2 of
4  Exhibit 32, yes.
5      Q.   And what is the basis for the data
6  in the -- in Figure 2, your Kaplan-Meier curves
7  in your article?
8      A.   The basis for that is the analysis
9  presented by the FDA's medical and statistical
10 reviewers.  So this is basically just adopted
11 directly from what was published on the FDA's
12 website.
13     Q.   And is this information included in
14 Wolfe Exhibit 3, the JAMA article we've been
15 discussing?
16     A.   No.
17     Q.   And what impact did that have on the
18 overall validity of the article?
19         MR. WEISS:  Object to the form of
20 the question.
21         THE WITNESS:  Since the prespecified
22 analysis plan was not respected in Silverstein

52

1  and colleagues' article, Wolff Exhibit 3, and this
2  means that the report that we're looking at by
3  Silverstein and colleagues is statistically
4  invalid.
5  BY MR. SAHAM:
6      Q.   And does the Figure 2, the
7  Kaplan-Meier curves for celecoxib, diclofenac and
8  ibuprofen, from looking at that, was there a
9  point in time during the trial where celecoxib
10 looked the best in comparison to the other drugs?
11         MR. WEISS:  Object to the form of
12 the question.
13         THE WITNESS:  As I pointed out
14 before, it is quite surprising to find that at
15 this follow-up duration of six months, the
16 difference between celecoxib and the other two
17 drugs is most pronounced and after that it
18 decreases.
19 BY MR. SAHAM:
20     Q.   And what does that mean, that it
21 decreases?
22     A.   And that the potential advantage of

Peter Juni                                          September 21, 2010

53

1   celecoxib over the two comparator drugs
2   disappears over the second time window of seven
3   to 12 months and it disappears entirely.
4        Q.   And is that disclosed in the JAMA
5   article?
6        A.   No, unfortunately not.
7        Q.   And does that render the JAMA
8   article misleading?
9        A.   Yes.
10       Q.   Turning back to the first page of
11   the British Medical Journal, and I should ask
12   you, when this was submitted to the British
13   Medical Journal, was it subject to internal
14   review at the journal?
15       A.   Yes.
16       Q.   And what does that mean to be
17   subject to internal review?
18       A.   So first of all, this was not a
19   commissioned editorial.  Normally editorials get
20   commissioned by the editors and they will then
21   have -- well, quite a superficial review process
22   internally.

54

1        This editorial was submitted to the
2   editors of the British Medical Journal without
3   being invited and it was read and reviewed by
4   several editors internally and it was also
5   evaluated by legal advisors.
6        Q.   And then it was published by the
7   journal?
8        A.   Yes.
9        Q.   And with respect to your review of
10   the FDA materials, did it become apparent to you
11   whether or not six months was a -- or strike
12   that.
13        From looking at the FDA materials,
14   was six months -- a six-month analysis a
15   prespecified end point to be evaluated per the
16   protocols?
17        MR. WEISS:  Object to the form of
18   the question.
19   BY MR. SAHAM:
20        Q.   And if you don't understand my
21   question, I can ask it better, because that
22   wasn't quite a great question.

55

1        A.   Okay.
2        Q.   So my question is, from your review
3   of the FDA materials, did it become clear whether
4   there was supposed to be an analysis of the data
5   at six months as prespecified in the protocols?
6        MR. WEISS:  Object to the form of
7   the question.
8        THE WITNESS:  I'm not 100 percent
9   sure whether the arguments, some of the arguments
10   brought up in favor of now having an additional
11   analysis, not the main analysis, that's beyond
12   any question, that the main analysis was not
13   relating to six months, full stop.
14        But I wouldn't be 100 percent sure
15   whether there was any information indicating on
16   the FDA website that some of the points made in
17   favor of a six-month analysis would be reasonable
18   and whether this was specified just beforehand
19   rather than post hoc.
20        I'm 99 percent sure that all of the
21   arguments in favor of the six-month analysis were
22   brought up by the trialists and the company at

56

1   the time point of submitting the material to the
2   FDA.
3        So the arguments brought up and
4   vividly and transparently discussed by the FDA's
5   reviewers were, in my view, mostly post hoc
6   arguments in favor of the six-month analysis.
7        They provided the six months
8   analysis to the FDA in addition to the main
9   analysis which covered the full-time windows.
10   BY MR. SAHAM:
11        Q.   But the protocol itself would
12   indicate when the analysis was supposed to occur?
13        MR. WEISS:  Object to the form of
14   the question.
15        THE WITNESS:  Indeed.  The protocol
16   had a power analysis and this is a sample size
17   calculation included.  Now this sample size
18   calculation was based on the estimated number of
19   ulcer complications accumulating over time in the
20   two protocols.
21        And the protocols specified that
22   there needed to be at least 45 ulcer

Peter Juni                                          September 21, 2010

57

1    complications that would have occurred -- would
2    have to occur in the two protocols or at least 20
3    each, in each of the two protocols, so that the
4    trial would be stopped, the patient recruitment
5    and follow-up would be stopped, okay.
6         So this means actually then after
7    the trial was stopped there, there was, you know,
8    no way out there.  They needed to use the entire
9    follow-up duration to accumulate the necessary or
10   approximately the necessary number of events.
11        If they would truncate the time
12   window just to six months, they would miss the
13   target number of events they would have to
14   include in the analysis to have enough
15   statistical precision.
16   BY MR. SAHAM:
17        Q.   Now, the main outcome measure
18   described on the first page of Wolfe Exhibit 3,
19   the JAMA article, was that prespecified in the
20   protocol?
21        A.   No.
22        Q.   And how do you know that?

58

1         A.   The FDA reviewers describe how the
2    primary end point in the protocols were specified
3    and how the definitions were made, and they
4    explicitly refer to ulcer complications and
5    nothing else as the primary end point.
6         And this does not compare to what we
7    have here as an impression of the main outcome
8    measures so that the two terms, primary end point
9    and main outcome measures, are used mostly
10   synonymously in clinical epidemiology.
11        It's not the same sort of main
12   outcome measure that is published in Wolfe
13   Exhibit 3 as compared with the protocols
14   described by the FDA reviewers.
15        Q.   And was that misleading?
16        A.   Yes.
17        Q.   And why is that?
18        A.   If you start to change the rules
19   during a horse race, to use this analogy, and you
20   just say, okay, you know, I have different
21   criteria for success than just, you know, the
22   time the horse takes until it reaches the goal or

59

1    the final line, and you just change the criteria
2    of success during the horse race, then you will
3    bias your results and may bias them just in
4    favor, you know, to -- in favor of -- of your own
5    needs and your own horse that you're actually
6    favoring.
7         So, to come back from this analogy
8    to this, if you just change the criteria during a
9    randomized trial or during two randomized trials,
10   you are likely to be influenced by your
11   statistical and clinical needs.
12        And it is -- it's well possible that
13   you endanger the analysis and that you then will
14   wrongly conclude, based on the post hoc criteria
15   that you changed over time, that they will
16   wrongly conclude that there is a benefit of the
17   experimental drug, when, in fact, there is no
18   statistical evidence that suggests that.
19        So changing the rules during a trial
20   is never a good idea.
21        Q.   And is that what happened in this
22   case?

60

1         A.   Yes.
2         Q.   Now, on the first page of your
3    article, which has been marked as Exhibit 32,
4    down towards the bottom, the last full paragraph
5    you write, quote, "The Food and Drug
6    Administration was concerned that selective COX 2
7    inhibitors would interfere with the benefits of
8    COX 2 in ulcer healing.  This could lead to a
9    long-term increase of ulcer-related complications
10   that occur without warning symptoms."
11        Is that accurate?
12        A.   Yes.
13        Q.   And what's the significance of that
14   statement in your article?
15        A.   At that time point, it wasn't clear
16   whether there were systematic differences between
17   the symptoms experienced by a patient who takes a
18   traditional anti-inflammatory drug like
19   diclofenac and a patient who takes a COX 2
20   selective inhibitor like celecoxib.
21        And it was discussed that it could
22   be that the novel mechanism, the more selective

Peter Juni                                    September 21, 2010

61

1    mechanism of celecoxib would lead to a decrease
2    in experiencing symptoms. So it could
3    theoretically be that you have an ulcer, a hole
4    in your stomach, and no symptoms.
5          So, if this is the case, this ulcer
6    could get worse and worse, theoretically since
7    you don't have symptoms, the symptoms don't
8    protect you, you know, from continuing taking the
9    drug and they don't trigger you to go to your
10   doctor and ask him, hey, what shall I do.
11         So it may well be, at that time
12   point it was the argument of that. It may well
13   be then, okay, that for severe complications like
14   the ulcer complications that were the primary end
15   point of the two trials described in CLASS, that
16   for these ulcer complications they are indeed
17   could be even a detrimental effect against, you
18   know, which would speak against actually the
19   COX 2 selective inhibitors, against celecoxib,
20   because the warning signs could lack.
21         Q.   And was that disclosed in Wolfe
22   Exhibit 3, the JAMA article?

62

1          A.   I wouldn't be sure, as far as I
2    remember no. And we had a subsequent discussion
3    about these issues when the authors -- or, well,
4    Steven Geis, as the senior author of Wolfe
5    Exhibit 3 actually was debating our editorial.
6          And I think it was not disclosed in
7    the JAMA article and would be surprised if it
8    was, from my point of view, for the first time
9    part of it was disclosed when they replied to our
10   editorial.
11         Q.   And we'll talk about that in a
12   minute.
13         But, if that information was not
14   brought to light, could that be dangerous to
15   patients using celecoxib?
16         A.   What I'm talking about here is a
17   mechanistic explanation which again is based on
18   theory and on post hoc analysis that also we
19   performed.
20         I could easily live with, you know,
21   them not discussing it in the discussion section,
22   et cetera, if they would have followed the

63

1    protocol.
2          But, if you then just, you know, go
3    on and start to justify the decision to report
4    this just in the light of these aspects, then you
5    probably would just also need to discuss the
6    issues we were just talking about here.
7          Q.   And on the second page of your
8    article, the British Medical Journal article,
9    which has been marked as Plaintiff's Exhibit 32,
10   the first full paragraph, the second sentence you
11   write, quote, "They failed to justify the
12   post hoc changes in design outcomes and analysis
13   and provided an unconvincing explanation for
14   considering the six-month follow-up only."
15         Was that an accurate statement when
16   you wrote it?
17         A.   Yes.
18         Q.   And is it an accurate statement
19   today?
20         A.   Yes.
21         Q.   And what is the significance of that
22   statement?

64

1          A.   In their reply to the letters
2    published in JAMA, the authors of the CLASS
3    study, Wolfe Exhibit 3, were explaining that the
4    decision to restrict the analysis to six-month --
5    to the six-month time window only was based on
6    the observation of differences in the way
7    patients were lost in the study and the way
8    patients withdrew from the study.
9          And they were describing that based
10   on these differences that were systematic
11   actually everything else extending over six
12   months in the analysis would have been biased
13   against celecoxib and would have made the
14   analysis, the subsequent analysis misleading.
15         Q.   And was there any attempt to
16   describe that theory in the JAMA article, Wolfe
17   Exhibit 3?
18         A.   No.
19         Q.   And was that proper?
20         A.   No, it wasn't.
21         Q.   And why not?
22         A.   If you -- and that's not part of,

Peter Juni                                    September 21, 2010

65

1  you know, promoting scientific debate.  If you
2  believe that, indeed, and this can always happen,
3  you know, a trial went wrong, there were things
4  that clinical research were doing, things that
5  were not happening as expected.
6          And you need to describe your
7  hypothesis, you are able to test the hypothesis,
8  and to provide, you know, the outcomes of the
9  statistical tests you did, you know, addressing
10 your hypothesis.
11         And then you give the reader the
12 opportunity actually to decide for him or herself
13 whether the hypothesis, as a basis for the
14 decision to have an additional analysis of six
15 months, you know, is valid or not.  They just
16 didn't do anything like that.
17         First of all, they just provided the
18 six-month results and provided the impression
19 that that's the only analysis available.
20         They did not discuss the issues that
21 they subsequently brought up as arguments in
22 favor of the six-month results, of course, and

66

1  they did not provide any tests of their
2  hypothesis that indeed what they were stipulating
3  was right.
4      Q.   And did that circumvent the peer
5  review process?
6          MR. WEISS:  Object to the form of
7  the question.
8          THE WITNESS:  Since neither the
9  editors nor the peer reviewers, I assume, you
10 know, would know anything about the available of
11 longer term data of the issues that were
12 subsequently discussed, and this could have not
13 been subjected to any peer review or to any
14 editorial review.
15         The editors and probably also the
16 peer reviewers were just totally unaware of these
17 issues at that time.
18 BY MR. SAHAM:
19     Q.   And was that misleading?
20     A.   Yes.
21     Q.   Why?
22     A.   There were post hoc changes to the

67

1  protocol and these post hoc changes necessarily,
2  there's absolutely no question about that, need
3  to be brought to the attention of the editors and
4  to the attention of the peer reviewers, because
5  all post hoc changes done like that will endanger
6  the scientific validity of a publication.
7          If an editor and the peer reviewer
8  doesn't know about that, this is misleading.
9      Q.   And was it proper to not tell or not
10 disclose in the JAMA article the results of the
11 second six months?
12         MR. WEISS:  Object to the form of
13 the question.
14         THE WITNESS:  No.  No.  It was
15 improper -- it was inadequate to do so.
16 BY MR. SAHAM:
17     Q.   And did you analyze at some point
18 the post hoc justifications that Dr. Geis and
19 others associated with the JAMA article put
20 forward as an explanation for their publication
21 of six months data?
22     A.   Yes, we did so.  And you can, as I

68

1  indicated before, statistically test, you know,
2  the sorts of statements that they made.  And you
3  can statistically test whether the patterns you
4  observe in terms of rates of withdrawal and
5  losses to follow-up, the patterns of side
6  effects, gastrointestinal symptoms the patients
7  observed, et cetera, whether they actually are in
8  accordance with the hypothesis that they just
9  brought up as a justification for their decision
10 here.
11         And from our point of view we did
12 not find any statistical evidence to support the
13 notion.
14         So that is important, you know, this
15 just means that, you know, in the absence of such
16 evidence, you don't have then any clear momentum
17 to justify even the sensitivity analysis, you
18 know, restricted to six months.
19     Q.   And did you discuss that in a
20 subsequent submission to the British Medical
21 Journal?
22     A.   Yes, we did.  There was a

Peter Juni                                    September 21, 2010

69

1  correspondence section dedicated partially to
2  responses to this editorial and this included
3  also a response of Steven Geis at that time, I
4  assume from Pharmacia, discussing these issues
5  and we replied to that, yes.
6              (Exhibit Number 161
7         marked for identification.)
8  BY MR. SAHAM:
9     Q.   I want to show you what I've marked
10 as Plaintiff's Exhibit 161.  Could you take a
11 look at that document.
12    A.   Uh-huh.
13    Q.   And do you recognize Plaintiff's
14 Exhibit 161?
15    A.   Yes.  That is our response to Steven
16 Geis' statements and comment to our editorial as
17 was published in BMJ, USA in December of 2002.
18    Q.   And this article which was published
19 by the British Medical Journal or this -- strike
20 that.
21         This submission, which was published
22 by the British Medical Journal, contains your

70

1  analysis of their biased justification; is that
2  correct?
3         MR. WEISS:  Object to the form of
4  the question.
5  BY MR. SAHAM:
6     Q.   Let me ask it again.  What was the
7  purpose of your submitting Exhibit 161?
8     A.   This was part of a response to all
9  of the correspondence that were addressing our
10 editorial initially electronically on BMJ's
11 website.  And then subsequently also just in
12 print form, here on BMJ USA, but also just on the
13 regular BMJ journal in the UK.
14         And what we were doing, we were
15 addressing just the different specific points
16 that were being brought up by Geis.
17         So there was a point that it was
18 appropriate, you know, to describe the trials as
19 one trial with a 2:1:1 randomization and we were
20 addressing that, that this wasn't appropriate.
21         There were systematic differences
22 between the patients included in one trial

71

1  protocol compared with the patient included in
2  the second protocol.  It's beyond any question
3  that this is inappropriate.
4         Then we were addressing the point of
5  aspirin use.  We haven't talked about that yet.
6  This was also, you know, an additional point made
7  by the authors of Wolfe Exhibit 3, the
8  Silverstein article and the CLASS study published
9  in JAMA, that the effects, probably the
10 beneficial effects of celecoxib were less
11 pronounced in the CLASS study as compared to
12 other situations because a considerable
13 proportion of patients would have had aspirin
14 mainly for cardiovascular protection, you know,
15 at the low dose of 100 milligrams.
16         And we also looked into that, they
17 would stipulate, okay, that the presence of
18 aspirin, if I take aspirin, this leads to
19 something we call effect modification meaning
20 there is a beneficial effect to be seen in
21 patients taking celecoxib as compared with
22 patients taking one of the comparator drugs.

72

1         If these patients do not have
2  aspirin and there is no beneficial effect to be
3  seen in celecoxib versus diclofenac or ibuprofen
4  in patients taking aspirin, that's what they were
5  stipulating.
6         And that's also how they were
7  specifying and describing it in the manuscript.
8  We were addressing that and again you can test
9  this, you know, you can test this hypothesis by
10 doing a test for interaction and this test for
11 interaction was negative and, you know, the
12 confidence intervals actually that were shown in
13 Figure 1 of Exhibit 161 were all overlapping
14 widely, indicating that again the authors did not
15 have any evidence to suggest that this, indeed,
16 was the case.
17         It can be the case, but they need to
18 establish it statistically and they haven't done
19 so.
20    Q.   And did that render the JAMA article
21 misleading?
22    A.   It's a frequently made mistake.  And

Peter Juni                                        September 21, 2010

73

1  I would expect from a knowledgeable group as this
2  group to do a better job and to formally do tests
3  for interaction and indicate that actually they
4  don't have statistical evidence to support their
5  notion, they haven't done so.
6          I would say it contributes to my
7  discomfort that I have, but I wouldn't, you know,
8  emphasize -- I wouldn't put my focus as strongly
9  on that as on the other issues.
10     Q.   And the JAMA article presents a
11  nonaspirin analysis; is that correct?
12     A.   I think the JAMA article, let me
13  just quickly check, presents both an aspirin and
14  a nonaspirin analysis, let me just quickly see.
15          Toxicity with aspirin use is a
16  paragraph included in the JAMA article on
17  Page 1251 in the middle column.
18     Q.   And my question is, the
19  aspirin/nonaspirin analysis in JAMA, that was not
20  prespecified in the protocol or was the
21  presentation of an analysis for nonaspirin users
22  specified in the protocol?

74

1      A.   I can't remember.  I can't remember.
2  But what I see here is just that this is -- has
3  been given quite some emphasis, this presence or
4  absence of aspirin being an effect modifier.  We
5  talk about that and that it has not been properly
6  addressed in statistical terms.
7      Q.   Now, looking back at Plaintiff's
8  Exhibit 161, your September 2002 response to
9  Dr. Geis, you write on the second page of your
10  article, quote, "While there were some
11  significant differences between celecoxib and
12  ibuprofen, there were none between celecoxib and
13  diclofenac and effect estimates were scattered
14  around the null effect."  Is that an accurate
15  statement?
16     A.   Yes, indeed.
17     Q.   And what's the basis for that
18  statement?
19     A.   Well, the striking pattern we see in
20  Figure 1 of Exhibit 161 and on the left-hand side
21  of -- on this figure, you see all of the effect
22  estimates comparing celecoxib with diclofenac.

75

1          And for all of these effect
2  estimates, the 95 percent confidence interval
3  will overlap the null effect at one.  One
4  indicates there's absolutely no different between
5  celecoxib and diclofenac, absolutely nothing.
6          The outcomes are identical.  If a
7  95 percent confidence interval overlaps this null
8  effect line, this indicates we don't have any
9  statistical evidence that celecoxib is better
10  than diclofenac.
11         And it is striking, you know, that
12  we have all of these comparisons by pure chance
13  one actually could turn out to be, you know,
14  statistically significant if we have how many
15  were there, two, four, six, eight, 10, 12, 14,
16  16, 18, I would expect that probably one would
17  come out or would nearly come out.
18         None of them is coming out of
19  statistical significance.  So we have a saying
20  among epidemiologists, you know, torture the data
21  until they confess.
22         That's what we did actually, you

76

1  know, with all these analyses.  By pure chance
2  one would have to come out even perhaps with an
3  advantage for celecoxib or so.  We don't see
4  anything.
5          That's a clear cut null effect, you
6  know.  In this analysis for everything, celecoxib
7  appears to be equivalent to diclofenac, full
8  stop.  If somebody wants to suggest the opposite,
9  he or she needs to provide additional data, full
10  stop.
11     Q.   And was the equivalence of
12  diclofenac and celecoxib disclosed in the JAMA
13  article, Wolff Exhibit 3?
14     A.   No.
15     Q.   And did it render that article
16  misleading?
17     A.   Yes.
18     Q.   We need to actually change the tape
19  now so we have to go off the record.
20     A.   Okay.
21         THE VIDEOGRAPHER:  Off the record at
22  11:53 a.m.

77

1          (Recess -- 11:53 a.m.-12:00 p.m.)
2          THE VIDEOGRAPHER:  This is the
3    beginning of Tape Number 2.  Back on the record
4    at 12:00 p.m.
5    BY MR. SAHAM:
6      Q.   Dr. Juni, we're still looking at
7    your submission to the BMJ of September of 2002,
8    which we've marked as Exhibit 161, and on the
9    second page you write, quote, "The wide
10   confidence intervals indicate that the trials
11   were under powered, reflect uncertainty about the
12   gastrointestinal benefits of celecoxib, and
13   underscore the need for a meta-analysis of
14   individual patient data."  Is that an accurate
15   statement?
16     A.   Yes.
17     Q.   And was that information disclosed
18   in the JAMA article, which is Wolfe Exhibit 3?
19     A.   Probably not.  I wouldn't remember
20   that.  I wouldn't give this too much emphasis,
21   you know, we're -- it's actually -- this is the
22   trial, a description of the two trials sold as

78

1    one, unfortunately.
2          And this statement here now refers,
3    you know, to a meta level to the entire body of
4    evidence being available.  So I can easily live
5    without this being stated in this article.
6      Q.   And moving onto the next, next
7    paragraph on the next column, you write, quote,
8    "We evaluated a narrative review of the 44 CLASS
9    patients who experienced ulcer complications.
10   None had a symptomatic ulcer as a precursor.
11   Only 11 patients (25%) developed gastrointestinal
12   symptoms before the ulcer complication occurred.
13   The remainder experiencing either no symptoms,
14   (39%) or symptoms on the same day as the ulcer
15   complication (36%).  Thus, gastrointestinal
16   adverse events were at best sentinel symptoms."
17        Is that accurate as you wrote it?
18     A.   Yes.
19     Q.   And what's the significance of that
20   statement?
21     A.   One of the arguments of the trial
22   was to present the six-month data, that the

79

1    second period of the trial of seven to
2    12/15 months was dominated by withdrawals of
3    patients because of gastrointestinal symptoms.
4          And that this was, you know,
5    happening in an asymmetrical fashion and that
6    since this would be or could be a precursor, you
7    know, to withdrawal because of gastrointestinal
8    symptoms of ulcer complications.  So when I'm
9    experiencing gastrointestinal symptoms, I'm at
10   increased risk of having a subsequent ulcer
11   complication.  That's the fact of this asymmetry
12   in withdrawals because of gastrointestinal
13   symptoms would bias results.
14     Q.   And was there any --
15     A.   Sorry -- and make the trial results
16   after six months invalid.
17          Now, we looked into that asking,
18   okay, are gastrointestinal symptoms, that's a
19   very preliminary analysis we did, that's just as
20   good as it gets based on the narratives that were
21   available at the website of the FDA.
22          We looked into that asking whether,

80

1    indeed, experiencing gastrointestinal symptoms
2    makes you more likely to have a subsequent ulcer
3    complication, and we did not find statistical
4    evidence supporting this notion.
5          Actually we found the opposite.  We
6    found that gastrointestinal symptoms, once you
7    experience them, actually appear to have even a
8    protective effect, so you're less likely to
9    experience a subsequent ulcer complication when
10   you have initial gastrointestinal symptoms, which
11   again is in line with what I stipulated before.
12          If I, as a patient, have
13   gastrointestinal symptoms, it gives me the
14   opportunity to visit my physician and tell him,
15   hey, do I really tolerate these painkillers here
16   or should we do something and gives the physician
17   actually the possibility also to make an
18   evaluation like an endoscopy for instance.
19     Q.   Was there a basis for the authors of
20   the JAMA article to not include the full study
21   data?
22          MR. WEISS:  Object to the form of

Peter Juni                                    September 21, 2010

81

1  the question.
2          THE WITNESS:  There was absolutely
3  no scientific basis for that.
4          If they would have wanted to stick
5  to the point of view, which is a point of view
6  that can be, you know, openly discussed, they
7  could have presented the main analysis as
8  specified in the protocol and done a secondary
9  analysis, as they did it also, you know, for the
10  FDA, restrict it to six months, and they could
11  have transparently reported all of their
12  arguments.
13          This would have put the clinical
14  colleagues, the reader, et cetera, into a
15  position to decide for him or herself.  This has
16  not been done.  This cannot be justified.
17  BY MR. SAHAM:
18      Q.    And, based on your analysis, you
19  disagree with the claim of bias?
20      A.    Based on our analysis, I disagree
21  with the statement that the pattern here clearly
22  indicates that the results extending beyond six

82

1  months are biased against celecoxib.
2          We don't have statistical evidence
3  to support this notion.  It can be debated.  It
4  can be openly discussed, but there is absolutely
5  no evidence to suggest that this, indeed, would
6  be valid and that this would justify what has
7  been done with Wolfe Exhibit 3 to just publish
8  the time window up to six months.
9      Q.    And in the next paragraph of
10  Exhibit 161 you write, quote, "For the time
11  being, there is no evidence that celecoxib is
12  superior to diclofenac and insufficient evidence
13  favoring celecoxib over ibuprofen."  Is that
14  accurate?
15      A.    Yes.
16      Q.    And was that disclosed in the JAMA
17  article?
18      A.    No.
19      Q.    And did that omission render the
20  JAMA article misleading?
21      A.    Yes.
22      Q.    Skipping down, you write, "We

83

1  conclude that CLASS' failure to demonstrate the
2  superiority of celecoxib may have more to do with
3  the drug's shortcomings as a selective COX 2
4  inhibitor than with the shortcomings of the
5  trial."  Is that an accurate statement?
6      A.    At that time point it was.  Today I
7  would phrase it differently, because I know more,
8  because we did additional research.
9          Today I believe that still, you
10  know, the trial had shortcomings, and I -- this
11  could have -- these shortcomings could have been
12  transparently reported, of course, but I think
13  that the celecoxib as a drug, perhaps not
14  compared to diclofenac, but compared to other
15  nonselective antiinflammatory drugs, actually
16  might have a point.
17          But not at that time point and not
18  based on what was included there.  So today I
19  would rephrase it, but based on additional eight
20  years of research activity.
21      Q.    Now, looking back at the British
22  Medical Journal June 2002 editorial which we've

84

1  marked as Exhibit 32, on the second page you
2  write, quote, "About 30,000 reprints of CLASS
3  were bought from the publisher (W. Bartolotta,
4  Personal Communications) and a recent search of
5  the Science Citations Index yielded 169 articles
6  citing it."  Is that an accurate statement?
7      A.    Yes.
8      Q.    And what's the basis for that
9  statement?
10      A.    We were concerned about, you know,
11  the distribution of this misleading article in
12  the community and the distribution can happen
13  clearly electronically, especially at that time
14  point, but probably still today also through
15  reprints distributed by the manufacturer of the
16  drug.
17          And we actually were contacting the
18  JAMA's editorial office to find out about the
19  number of ordered reprints, that's the numbers we
20  got.  The other thing which is important is how
21  frequently an article is cited.
22          So, you know, you distribute

Peter Juni                                          September 21, 2010

85

1 knowledge also -- or knowledge is being
2 distributed also by now being cited by other
3 articles.  And it was clear that this article at
4 that time point has had, you know, major numbers
5 of citations already rather early on.
6         So this just indicates that the
7 article and not the material on the FDA website
8 was just actively and massively distributed, made
9 its way into the mind of clinical colleagues and
10 into the mind of decision makers, et cetera, and
11 certainly not, you know, just the material that
12 would theoretically have been in a cryptic way be
13 available on the FDA website unfortunately.
14     Q.   And what is the significance of that
15 material being distributed -- or strike that.
16     What's the significance of the JAMA
17 article being widely distributed to clinicians?
18         MR. WEISS:  Object to the form of
19 the question.
20         THE WITNESS:  To publish a pivotal
21 trial in one of the major journals is a major
22 driver of credibility for a manufacturer of drugs

86

1 or medical devices.
2         And, you know, that this has the
3 seal of, you know, being peer-reviewed, being in
4 one of the high impact journals, et cetera.
5         And this really just, how does one
6 call that in English, lends credibility to your
7 product and to your study and this has a lot of
8 significance to have a paper like that.  That's
9 clear.
10 BY MR. SAHAM:
11     Q.   Would it lead to more prescriptions
12 of Celebrex?
13     A.   This would lead to more and more
14 people concluding that there is an advantage of
15 Celebrex over the two comparator drugs,
16 including, as you said clinicians and including
17 decision makers, perhaps at the health insurance
18 companies and also other people clearly, yes.
19         Looking at the pattern, you know,
20 that I see in this paper, and looking at the, you
21 know, the bar charts that are presented on
22 Page 1253 of Wolfe Exhibit 3 -- sorry, that's not

87

1 these ones.
2         Actually I've got the wrong ones I
3 take it back.  I'm talking about Figure 2 on
4 Page 1251.
5         I would readily believe everything
6 which is stipulated in the abstract, you know,
7 not knowing -- with my background in clinical
8 epidemiology and clinical medicine, not knowing
9 that there is alternative material available
10 somewhere else, I look into that and say, oh,
11 okay, they sort of missed statistical
12 significance for one of the two primary end
13 points, one of the two main outcomes.
14         But actually the pattern is so clear
15 and, yes, it could well be that aspirin has
16 mitigated some of the benefits of celecoxib full
17 stop.  Yes, based on this trial, celecoxib is
18 better than the comparators.
19         That's what I conclude as an
20 educated reader actually with 15 years of
21 clinical epidemiology background and quite a lot
22 of clinical background.  So this has an impact

88

1 beyond any doubt.
2     Q.   And was that impact misleading?
3     A.   Yes.
4     Q.   Now, turning back to your article,
5 the June 2002 British Medical Journal, which
6 we've marked as Exhibit 32, you write, towards
7 the bottom of the first column, the last
8 paragraph there on the second page, quote,
9         "Publishing and distributing
10 overoptimistic short-term data using post hoc
11 changes to the protocol, while omitting
12 disappointing long-term data of two trials, which
13 involved large numbers of volunteers, is
14 misleading."  Is that an accurate statement?
15     A.   Yes.
16     Q.   And what is the basis for that
17 statement?
18     A.   The basis of that statement is that
19 many patients volunteered to participate in
20 these, you know, in these trials, in the belief
21 actually that the trials would be analyzed in a
22 scientifically valid manner without any selective

Peter Juni                                September 21, 2010

89

1  reporting of data.
2        And it is also ethically totally
3  unjustifiable then just to selectively report,
4  based on the post hoc implications and post hoc
5  criteria, the data the way these authors of Wolfe
6  Exhibit 3 did.
7        Q.   And you refer in your editorial to
8  quote "something being" -- or, strike that.
9        What's industry independence?
10       A.   Industry independence is a construct
11 of -- for clinical trials now of performing
12 clinical trials or well any other research in the
13 absence of support and influence of commercial
14 institutions.
15       Q.   And was Wolfe Exhibit 3 industry
16 independent in your view?
17       A.   Well, it clearly wasn't.
18       Q.   And why not?
19       A.   This trial was part of the approval
20 process of celecoxib.  It was funded by the
21 company.  There were authors on the author list,
22 especially the senior author of the paper, which

90

1  is in a prominent position that they are actually
2  affiliated with the company.
3        And this is the, you know, the
4  opposite example of industry independence
5  clearly.
6        Q.   And in your view was exhibit, Wolfe
7  Exhibit 3, an accurate depiction of the true
8  benefits of celecoxib?
9        MR. WEISS:  Object to the form of
10 the question.
11 BY MR. SAHAM:
12       Q.   I'll ask that -- I'll withdraw that
13 question.  In your view, was Wolfe Exhibit 3
14 misleading?
15       A.   Wolfe Exhibit 3 --
16       MR. WEISS:  Object.  Asked and
17 answered.
18       THE WITNESS:  Excuse me?
19       MR. WEISS:  You can go ahead and
20 answer the question.
21 BY MR. SAHAM:
22       Q.   You can answer.  He was just saying

91

1  that I asked the question before.
2        A.   Oh, okay.
3        Q.   But, I'll ask it yet again.  In your
4  view --
5        MR. WEISS:  We haven't heard you
6  answer that question 15 times.
7  BY MR. SAHAM:
8        Q.   -- was Wolfe Exhibit 3 misleading?
9        A.   Wolfe Exhibit 3 was a misleading
10 representation of the results of the two CLASS
11 studies, yes.
12       MR. SAHAM:  And subject to redirect,
13 I have no further questions.  It may be
14 beneficial just to take a break, so we can --
15       MR. WEISS:  I'm ready to go.
16       MR. SAHAM:  You're ready to go.  Do
17 you need to go to the bathroom?
18       THE WITNESS:  I will quickly go to
19 the bathroom now.
20       THE VIDEOGRAPHER:  Off the record at
21 12:15 p.m.
22       (Recess -- 12:15-12:19 p.m.)

92

1        THE VIDEOGRAPHER:  Back on the
2  record at 12:19 p.m.
3        EXAMINATION
4  BY MR. WEISS:
5        Q.   Good afternoon, Dr. Juni.
6        A.   Good afternoon.
7        Q.   Why are you here today?
8        A.   I'm here today because I was
9  contacted by the plaintiff's attorney by e-mail a
10 few weeks ago whether I would be ready to
11 stipulate or to give my testimony one says I
12 think, regarding this case.
13       Q.   You understand that you have no
14 obligation to be here?
15       A.   I understand that I have no
16 obligation, yes.  I was here for a Congress in
17 Cardiology and I said, okay, that's fine, I do
18 it, yes.
19       Q.   Okay.  And why were you willing to
20 come here and give testimony?
21       A.   Well, I, from my point of view was
22 that the case we're looking at here was

Peter Juni                                    September 21, 2010

93
1  problematic and I heard, you know, the issues
2  brought up by the attorneys one says here,
3  whatever brought up what the debate was and for
4  me it was okay that I could contribute, you know,
5  to the discussion here and just give my
6  testimony.
7       Q.   So you wanted to contribute to the
8  discussion is that what you're saying?
9       A.   Well, after I was asked, I agreed on
10  it, yes.  I didn't actively seek.
11       Q.   Sure, I understand, but you were
12  anxious to come here and give your testimony
13  about your editorial.
14            MR. SAHAM:  Objection to form.
15            THE WITNESS:  No, I wasn't anxious.
16  But, from my point of view, it was okay just to
17  give it.  This was just to share the experience
18  that we had at that time.  I wasn't anxious, no.
19  BY MR. WEISS:
20       Q.   But you were willing to take four or
21  five hours out of your day to come here and give
22  your testimony in a case which you have nothing

94
1  to do with?
2            MR. SAHAM:  Objection to form.
3            THE WITNESS:  Indeed I have nothing
4  to do with the case.  It had to do with the
5  scientific issues here.
6            Since today is not particularly busy
7  at TCT for me personally, I don't have to chair
8  meetings or do anything else, it was okay.
9            I gave -- I gave your colleagues or
10  your opponents here just a time slot which would
11  be convenient and that they accepted it.
12  BY MR. WEISS:
13       Q.   When did you first tell them about
14  the time slot that you would be available?
15       A.   Oh, God, when was that.  I would
16  need to look that up with my secretary.  This was
17  about probably two to three weeks ago.  It was
18  very short term, actually two weeks probably ago.
19       Q.   Okay.
20       A.   As I just indicated, okay, by the
21  way, after they contacted me, I will be in
22  Washington and then they organized it.

95
1       Q.   When was the first time that
2  somebody from the plaintiff's law firm contacted
3  you?
4       A.   I think there was a first e-mail
5  several weeks ago that I didn't reply to if I
6  remember correctly.  And then we had an e-mail
7  contact and after that one telephone call.
8       Q.   And who did you speak to on the
9  telephone call that you referred to?
10       A.   I assumed that -- yes, I'm sure
11  actually it was Scott Saham, who is sitting here.
12       Q.   And during that phone call, what did
13  Mr. Saham -- I'm sorry, Sam, right?
14            MR. SAHAM:  Yes, thank you.
15  BY MR. WEISS:
16       Q.   I had some pronunciation issues.
17  What did he tell you about this case during the
18  course of that phone call?
19       A.   He explained to me -- I need to be
20  careful now.  I, you know, I couldn't say
21  verbatim what he said.
22            But he explained to me that this is

96
1  about, you know, a lawsuit looking at whether,
2  you know, the presentation of the CLASS study in
3  this main publication, Wolfe Exhibit 3, actually
4  was misleading or not for individuals actually
5  who were involved in the decisions on, you know,
6  buying or selling stocks from a party that I
7  actually forgot again what this party was because
8  it's actually not important for me.
9            So there was this, this Alaska
10  whatever, it was, some, you know, this -- just
11  the plaintiffs.
12       Q.   I understand.  You said that you
13  needed to be careful about this in giving your
14  answer, what did you mean by that?
15       A.   Because I don't exactly remember
16  what the wording was.
17       Q.   Uh-huh.  Did he tell you anything
18  else about why he wanted you to testify?
19       A.   Well, he was referring to my
20  editorial --
21       Q.   Uh-huh.
22       A.   -- in the BMJ and he indicated that

Peter Juni                                        September 21, 2010

97

1  this would be about testifying about the contents
2  of the editorial and what led to the editorial.
3      Q.  Did you have a subsequent
4  conversation with Mr. Saham about this
5  deposition?
6      A.  We had this telephone call and
7  yesterday in the evening we met in the hotel
8  lobby for about 40 minutes or so, 45 minutes,
9  where I was informed about, you know, the setup
10 here, how this would work out.
11          And that you would be present and
12 what I would need to do, that I need to swear and
13 so on, just all of that stuff.
14     Q.  Did he discuss your testimony with
15 you?
16     A.  No.
17     Q.  Did he suggest to you any questions
18 that he would ask you during the deposition?
19     A.  He was -- no, he didn't suggest any
20 questions.  But, we were perhaps for 10 minutes
21 or so going through just the editorial, just to
22 gather and look at these four major points.

98

1          But there weren't any specific
2  questions that he asked me at that time, no.
3      Q.  Uh-huh.  Did he suggest to you any
4  questions that you could anticipate that I would
5  ask you?
6      A.  No.
7      Q.  No.  Did he describe to you any
8  subjects that I might inquire about?
9      A.  Subjects you might inquire about?
10     Q.  Yes.
11     A.  He said that you might look at my CV
12 as well and look at the other papers, et cetera,
13 that could well be that you bring up, you know,
14 other topics than just the research here.
15         Or he said that you might want to
16 imply that I'm formally against pharmaceutical
17 industry, et cetera.  He said that.
18     Q.  Did he tell you I was a nice guy?
19     A.  Sorry?
20     Q.  Did he tell you I was a nice guy?
21     A.  He didn't tell me anything about
22 your personality.

99

1          MR. SAHAM:  I forgot.  I forgot to
2  mention that.
3          THE WITNESS:  I felt -- I felt very
4  much, you know, something.  I never did something
5  like that before, and for me to appear, to see a
6  bit, you know, to get the feel for the setting.
7  BY MR. WEISS:
8      Q.  Did you at any time discuss with
9  Mr. Saham or anyone at his firm whether or not
10 you should have a lawyer to represent you?
11     A.  Yesterday -- yesterday that was also
12 something that was being brought up that you
13 might want to -- that you might actually ask
14 that, whether I needed a representative or not.
15         And I was -- I actively thought
16 about that when we had the first discussion over
17 the phone and I didn't feel that I needed
18 somebody to represent me.
19     Q.  Okay.  Are you being compensated in
20 any way for giving testimony here today?
21     A.  No.
22     Q.  Have any of your travel expenses

100

1  been covered by the plaintiffs in this case?
2      A.  No.
3      Q.  Have any promises been made to you
4  about compensation or any --
5      A.  No.  I actively don't want that,
6  because for such a minor issue I don't want to
7  end up in conflicts of interest.
8          I don't have any financial liaisons
9  with the industry at all and why should I, for
10 something like that, you know, have conflicts of
11 interest.
12     Q.  Uh-huh.
13     A.  So I do that just for free, my free
14 time.
15     Q.  Okay.  Did you have any
16 communications with your coauthors, Professor
17 Dieppe or Ms. -- I'm sorry, I can't pronounce her
18 last name?
19     A.  Dr. Rutjes.
20     Q.  Rutjes.  Did you have any
21 conversations with them about the fact that you
22 were coming here to give testimony today?

Peter Juni                                          September 21, 2010

101

1      A.   I think, when I remember correctly,
2  that it was Dr. Rutjes who was first contacted
3  and then she discussed it with, just with Paul
4  Dieppe and myself and it was decided, if
5  anything, that I shall go forward, because I was
6  the first author.
7      Q.   And did Ms. -- did Dr. Rutjes or
8  Dr. Dieppe express to you any reservations about
9  coming and giving testimony?
10     A.   No.
11     Q.   Did they -- were they not inclined
12 to come and give testimony?
13     A.   Sorry?
14     Q.   Did they refuse to come and give
15 testimony?
16     A.   No.  They didn't actively refuse.
17 This was a very relaxed discussion and I was
18 actually just then following the agreement that I
19 would, you know, enter into contact with the
20 plaintiffs' attorneys and that's it.  There
21 wasn't any active --
22     Q.   Were you aware that the plaintiffs

102

1  in this case made an application to the court in
2  the United States to try, as part of a process,
3  to compel Dr. Dieppe to be deposed in the United
4  Kingdom?
5      A.   No.  I wasn't.  Compelling means
6  that he was obligated to, no, I wasn't.
7      Q.   Have you ever been retained by any
8  party as an expert witness in a litigation in the
9  United States or anywhere else?
10     A.   No.
11     Q.   Have you ever been a party to a
12 litigation before?
13     A.   A party to a litigation?
14     Q.   Yes.  Have you been a plaintiff or a
15 defendant in a lawsuit?
16     A.   No.
17     Q.   Have you ever been a witness in a
18 lawsuit?
19     A.   No.
20     Q.   Now, in describing your experience,
21 I understood you to say that essentially you're a
22 rheumatologist; is that fair?

103

1      A.   No.
2      Q.   Okay.
3      A.   I'm a clinical epidemiologist.
4      Q.   Okay.  And then your training is --
5  what training do you have in rheumatology?
6      A.   I had an -- well, I had three years
7  of internal medicine and I was one and a half
8  years of rheumatology in -- just in clinics in
9  Switzerland.
10     Q.   Is that the equivalent of a
11 residency?
12     A.   Yes, residency.  And then I went to
13 Bristol and was working again between clinical
14 and academic rheumatology for another year.
15     Q.   Okay.  Have you ever been a
16 clinician, meaning have you had a practice where
17 you treated patients?
18     A.   Well, I have worked in a practice
19 treating patients, but I did never have my own
20 practice.
21          I had an accumulated -- let me see,
22 three -- I have approximately an accumulated five

104

1  years of a clinical experience and changed to an
2  academic career in the early 2000s.
3      Q.   Okay.  And where were you involved
4  in clinical experience?  Where did that happen
5  when you treated patients?
6      A.   In first the District Hospital
7  between Bern and Olten and then a city hospital
8  in Bern, and then in Bristol within the framework
9  of the clinical research with it, in several
10 hospitals in the Bristol area, and then back at
11 the Bern University Hospital.
12     Q.   Now, when you were engaging in this
13 clinical practice, did you have a specialty?
14     A.   No.
15     Q.   And so what kind of patients did you
16 see?  What kind of problems did you treat?
17     A.   Well, my background was in internal
18 medicine and rheumatology so when I was, you
19 know, at the clinics that I was working in were
20 dominating the patient spectrum.
21          And so was also, you know, the
22 situation when I was acting as a tenens one says,

Peter Juni                                    September 21, 2010

105

1   probably, a tenens in a practice, this was then a
2   practice in internal medicine.
3           So the patients I saw were
4   representing the spectrum of patients in internal
5   medicine broad and in rheumatology it was, you
6   know, a lot of patients with musculoskeletal pain
7   or with inflammation.
8       Q.   Okay.  Do you have any formal
9   training in epidemiology?
10      A.   A formal training in epidemiology?
11      Q.   Did you do any course work in
12  epidemiology?
13      A.   Course work.  Well, I attended
14  formal courses, yes, but I don't have a master's
15  degree in epidemiology.
16          I did -- I did -- my right to teach
17  was in clinical epidemiology.  And I got my full
18  professorship now in clinical epidemiology that I
19  will be attending first for -- starting 1st of
20  November.
21      Q.   Okay.  You said that you attended
22  courses in epidemiology, at what stage of your

106

1   professional career or education did you attend
2   courses in epidemiology?
3       A.   Well, when I was -- during my time
4   when I was at Bristol University as you can see
5   on my CV.
6       Q.   You did formal course work in
7   epidemiology at Bristol?
8       A.   Well, I attended just, you know,
9   short courses as other people also do, but I
10  never attended the full master's courses.
11      Q.   Okay.  And then what about
12  gastroenterology, do you have any training in
13  gastroenterology?
14      A.   No.
15      Q.   Do you have any training in
16  cardiology?
17      A.   Only scientific training.  I'm not a
18  trained cardiologist, no.
19      Q.   What is scientific training in
20  cardiology, what does that mean?
21      A.   Well, I -- well, I take it back.  So
22  I probably I need to call it differently.  I take

107

1   it back.
2           And call it that I've been working
3   now for six years just in clinical research in
4   cardiology.
5           And I have been involved in
6   teaching, et cetera, also as a teacher, et
7   cetera, in there.  And I was attending clinical
8   research courses while also teaching in
9   cardiologic research.
10      Q.   Okay.  So you didn't do a residency
11  in cardiology?
12      A.   No.
13      Q.   You didn't do a fellowship in
14  cardiology?
15      A.   No.
16      Q.   And you didn't do a residency in
17  gastroenterology?
18      A.   No.
19      Q.   And you didn't do a fellowship in
20  gastroenterology?
21      A.   Correct.
22      Q.   Now, you talked in the past, I think

108

1   you talked with Mr. Saham about industry
2   independence, do you recall that?
3       A.   Yes.
4       Q.   Okay.  What is the source of funding
5   for the trials and the research that you do?
6       A.   That I do?
7       Q.   Yes.
8       A.   Most of the research that I'm
9   involved with is funded by the Swiss National
10  Science Foundation.
11          And I'm involved in randomized
12  control trials as an unpaid member of the
13  steering group that our industry founded.
14          And currently this involves a trial
15  by Biosentis (ph.), a trial by Sentruds (ph.),
16  that is still just at the beginning of patient
17  recruitment.
18          A trial by Johnson & Johnson, they
19  are -- well, they're not on the short CV, they're
20  on my long CV, a trial by Johnson & Johnson
21  (inaudible) two.  And what else, and that's it
22  currently, and now just very recently, a trial

Peter Juni                                         September 21, 2010

109

1   that is in the planning phase by Medtronics.
2         So I'm not accepting any money, et
3   cetera, and I stay unpaid there.
4         Q.   So you're not accepting any money
5   personally, but the trials are funded by
6   industry?
7         A.   The trials are funded by industry.
8   These are typically approval trials used for
9   medical device approval.
10        Q.   And do you consider those to be
11  industry independent trials?
12        A.   No.
13        Q.   And you said that a majority of your
14  research is funded by the Swiss National Science
15  Foundation.  What is the Swiss National Science
16  Foundation?
17        A.   The Swiss National Science
18  Foundation is a governmental body that is funding
19  in clinical and basic research in Switzerland.
20        Q.   And do you make -- in order to get
21  funding from them, do you have to make grant
22  proposals to the Swiss National Science

110

1   Foundation?
2         A.   Yes.
3         Q.   And what about the Swiss Association
4   of Health Insurers, have you ever received
5   funding from the Swiss Association of Health
6   Insurers?
7         A.   I have received funding from health
8   insurance companies directly through payments,
9   through compensation payments within the
10  framework of the randomized control trials.
11        We developed a new funding model at
12  that time and for each patient who was included
13  in the trial received just a fee to treat the
14  patient.  Part of the fee was being forwarded to
15  the treating physician and part of the fee was
16  used to fund the randomized trial.
17        Q.   And what trial was that?
18        A.   This was a trial on
19  viscosupplementation agents.  That's hyaluronic
20  acids or a multiplication of hyaluronic acids
21  being injected into osteoarthritic knees.
22        Q.   And is that the only trial that

111

1   you've been involved with that received funding
2   from the Swiss Association of Health Insurers?
3         A.   Let me just think.  Yes, it's the
4   only trial.
5         Q.   Have you been -- have you published
6   papers with coauthors who take money from the
7   industry?
8         A.   Yes.  Most likely.
9         Q.   Do you have any reservations about
10  health insurance companies funding clinical
11  trials?
12        A.   Yes, I do.
13        Q.   And what are those reservations?
14        A.   I think that we all have conflicts
15  of interests and the health insurers have as many
16  conflicts of interest in the ultimate direction
17  as a pharmaceutical company or a medical device
18  company has.
19        And I would very much like to have a
20  strong industry independent health services
21  research that also includes performance of large
22  randomized trials, fully independent, also

112

1   meaning independent of the health insurers.
2         Q.   And when you said that the insurance
3   companies have an incentive that's opposite of
4   the industry, what did you mean by that?
5         A.   Well, I, you know, they're actually
6   the ones who pay --
7         Q.   Uh-huh.
8         A.   -- the health services.  And, for
9   instance, they will have probably a natural
10  interest of prices of medical services of medical
11  interventions being not too high and that's also,
12  you know, that's the conflict of interest.
13        Q.   Meaning somebody could argue that
14  they would be interested in discrediting more
15  expensive therapies, "they" being insurance
16  companies?
17        A.   Somebody could argue, yes.
18        Q.   And that would be the perceived
19  conflict of interest?
20        A.   Correct.
21        Q.   In 2002, what was your academic
22  position, if you had one?

Peter Juni                                          September 21, 2010

113

1       A.   In 2002, I was a senior research
2   fellow who -- well, it depends on what time this
3   was.  Let me see.  I'm actually not sure I need
4   to look into my CV.
5           I just started a fellowship that I
6   received from the Swiss National Science
7   Foundation.  Let me just quickly see when this
8   was, January 2002 I started this.
9           So this was a senior fellowship
10  within the program of social and preventative
11  medicine of the Swiss National Science
12  Foundation.
13          And I had within the framework of
14  the senior fellowship, I had the position at the
15  University of Bern in rheumatology and social and
16  preventive medicine and at the University of
17  Bristol.
18      Q.   And what were your responsibilities
19  in that position?
20      A.   I had the research group in Bern and
21  the research group in Bristol.
22      Q.   You said you had a research group,

114

1   meaning that you were overseeing research groups?
2       A.   I was overseeing these research
3   groups.
4       Q.   Okay.
5       A.   Yes, I was the supervisor.
6       Q.   Okay.  And did those research groups
7   have a particular focus?
8       A.   Yes.  This was a musculoskeletal
9   health, osteoarthritis mainly.  So we set up and
10  follow-up of a cord study in Bristol at that
11  time.  And we set up a meta epidemiology study on
12  bias in osteoarthritis research in Bern.
13      Q.   In 2002, at the time that you wrote
14  the editorial to BMJ, which is Plaintiff's
15  Exhibit 32, how much experience had you had in
16  designing and administering clinical trials?
17      A.   I designed -- let me see, I should
18  have my CV now just to be sure that this is the
19  case.
20          And designing, probably I designed
21  two randomized controlled trials at that time.
22  And I was involved in clinical epidemiological

115

1   research including meta-analysis and
2   methodological research for six years.
3           .  So, during my clinical time, I
4   started with performing clinical research and
5   methodological research in 1995.
6       Q.   Okay.  So let me make sure I'm
7   clear.
8           I think you testified, and please
9   correct me if I'm wrong, that as of roughly June
10  of 2002, your involvement in designing the
11  randomized control trials was that you were --
12  you had been involved in designing two randomized
13  control trials up to that point?
14      A.   Correct.  Correct.
15      Q.   Okay.  And what were those two
16  trials?
17      A.   Well, one was -- one was the design
18  of the viscosupplementation trial that we were
19  talking about and the other one was a trial in
20  alcohol addiction comparing acupuncture with sham
21  acupuncture.
22      Q.   Approximately how many patients were

116

1   enrolled in the viscosupplementation trial?
2       A.   660.
3       Q.   And how long did that trial last?
4       A.   In terms of the patient recruitment
5   or overall?
6       Q.   Overall.
7       A.   I can't remember.  I would need to
8   look it up.
9       Q.   Okay.  And the alcohol addiction
10  study, how many patients were enrolled in that
11  study?
12      A.   This was approximately 45 or 50
13  patients.  It was a pilot trial.
14      Q.   And could either of these trials be
15  described as outcomes trials?
16      A.   I'm not sure what you mean with
17  outcomes trials.
18      Q.   Well, is it a term of art that you
19  use in your industry?
20      A.   We hardly ever use it.  I get
21  confused by the term, because I never understand
22  what it is.  These trials had clinical outcomes

Peter Juni                                    September 21, 2010

117

1  patient-relevant outcomes.  I'm not sure whether
2  you want to describe them as outcome trials or
3  not.
4        Q.   Okay.  And what about, would you
5  consider these safety trials?
6             These weren't -- well, let me put it
7  this way, the viscosupplementation study wasn't
8  designed to assess the safety of the agents?
9        A.   Correct.  This was an effectiveness
10 trial.
11       Q.   Okay.  And is that -- was the
12 alcohol addiction trial also an effectiveness
13 trial?
14       A.   Correct.  Safety was the secondary
15 end point.
16       Q.   And what was the
17 viscosupplementation trial essentially designed
18 to study?
19       A.   Sorry, I didn't understand the
20 question.
21       Q.   What was the study designed to do?
22       A.   The study was designed to do -- to

118

1  compare three active interventions and two
2  regular hyaluronic acids with a chemical modified
3  cross-linked hyaluronic acid.
4        Q.   And what were you testing with the
5  acid?
6        A.   We were testing whether the
7  chemically modified hyaluronic acid, the
8  cross-linked hyaluronic acid, was superior to the
9  comparators.
10       Q.   And in the alcohol addiction trial,
11 what were you testing there?
12       A.   We were testing the two types of
13 interventions, acupuncture interventions were
14 superior to sham acupuncture intervention using
15 laser.
16       Q.   Do you have any training in
17 acupuncture?
18       A.   No.
19       Q.   Do you have any training in the
20 treatment of alcohol addiction?
21       A.   No.  I was the methodologist.
22       Q.   Pointing you to Wolfe Exhibit 3,

119

1  which is the JAMA article, in the list of authors
2  there I'm going to take you down the list, Fred
3  Silverstein, are you familiar with
4  Dr. Silverstein?
5        A.   Personally you mean?
6        Q.   No, no.  I mean, either personally
7  or by reputation.
8        A.   No, no.  You know, these lists, when
9  I just look at the list here, I was faced with
10 these authors because of this article.
11            And I was never personally, as I was
12 aware of or just in terms of looking into their
13 CVs or so just confronted with them.
14       Q.   Excuse me.  Sorry.  So, just to be
15 clear, the authors listed here were not people
16 who you had encountered before in the course of
17 your career?
18       A.   No.
19       Q.   Okay.  And you didn't do any --
20       A.   I -- I need to qualify that.
21       Q.   Sure.
22       A.   Not I know consciously encountered.

120

1  So I don't know whether --
2        Q.   Fair enough.  But you didn't do any
3  research to try and determine what their
4  background, experience was before you wrote the
5  editorial?
6        A.   Nothing.  Nothing.
7        Q.   Okay.  Have you learned anything
8  about these individuals subsequent to the time
9  that you wrote the BMJ editorial?
10       A.   I'm just looking at the authors list
11 and just trying to remember.
12            I encountered some of the names like
13 Simon and Pinkus just when looking at different
14 randomized control trials so that they were
15 involved in this.
16       Q.   Okay.  Now, the word misleading was
17 thrown around a lot during the course of your
18 testimony and I want to know whether when you, in
19 your BMJ article, when you suggested that the
20 article was misleading, whether you intended to
21 convey that you believed that the authors of the
22 CLASS article had purposefully misled?

Peter Juni                                          September 21, 2010

121

1        MR. SAHAM:  Objection to form.
2        THE WITNESS:  I wasn't talking about
3   the authors, I was talking about -- well, not I,
4   you know, we.  So me and my colleagues, you know,
5   the three of us with, you know, Paul Dieppe
6   having just incidentally a lot of experience in
7   clinical trials, considerably more at that time
8   than I had, and we were referring to the article
9   and not to the people.
10  BY MR. WEISS:
11       Q.   I understand.  But, the people wrote
12  the article, correct?
13       A.   That's frequently the case, not
14  always.  I wasn't -- I'm actually not sure about
15  this article whether there were ghost writers
16  involved or not, I don't know.
17       Q.   Uh-huh.  Well, let me ask you it
18  this way, whoever it was that wrote the article,
19  was it your intention to suggest by writing the
20  BMJ editorial that that person or those people
21  purposefully intended to mislead either the
22  investing public or clinicians?

122

1        A.   Purposely intended to mislead.  I
2   just need a moment to digest that.
3        Q.   Take all of the time you need.
4        A.   May I ask a clarification of this?
5        Q.   Sure.
6        A.   Does this imply any -- well, I'm not
7   sure what the term for this is.
8        Does this imply any, you know,
9   criminal intent or does it just imply, you know,
10  any active intention to optimize results and to
11  show results, you know, over-optimistic compared
12  with what also could be existing.
13       What does it imply your question?
14       Q.   Let me restate my question.
15       A.   Good.
16       Q.   My question is simply this.  You
17  wrote that you believed that the CLASS article
18  was misleading.
19       A.   Correct.
20       Q.   Okay.  When you said it was
21  misleading, did you mean that well it happened to
22  be misleading by virtue of things that were said

123

1   or not said, or did you mean that the people who
2   wrote that article intended to mislead the
3   readers of that article?
4        MR. SAHAM:  Objection to form.
5        THE WITNESS:  I meant the first.
6   BY MR. WEISS:
7        Q.   Okay.  So you weren't expressing any
8   view as to whether or not the authors intended to
9   deceive anybody or mislead anybody?
10       A.   No.  Because I was not in a position
11  to determine on that.  I was in a position to
12  determine what the paper says that's a scientific
13  debate.
14       Q.   Fair enough.  Now, this article
15  ultimately, the BMJ editorial, ultimately
16  represents nothing more than your and your
17  coauthors' opinions, correct?
18       MR. SAHAM:  Objection to form.
19       THE WITNESS:  No.  That's incorrect.
20  It also represents data that were presented and
21  analyzed on the FDA's website.
22  BY MR. WEISS:

124

1        Q.   Okay.  But it's your opinion of what
2   that data reflects?
3        A.   Well, clearly it's an editorial,
4   it's our opinion, yes.
5        Q.   So, when Mr. Saham asked you a
6   number of questions about whether statements in
7   this article were accurate and you answered yes,
8   all you meant was that it's an accurate statement
9   of your opinion?
10       MR. SAHAM:  Objection to form.
11  BY MR. WEISS:
12       Q.   Correct?
13       A.   I'm not accustom to that so I need
14  to think again about your question.
15       Q.   If you would like, you can ask the
16  court reporter to read the question back.
17       A.   Okay.  That's good.
18       MR. SAHAM:  And are you referring --
19  I mean, it's a compound question, are you
20  referring to a particular question?
21       THE WITNESS:  Okay.  So basically
22  when I said that this is correct and this is

Peter Juni                                    September 21, 2010

125

1    adequate in terms of these statements, this
2    was -- that this is my opinion, but I believe
3    that this is a fact, you know, so I would state
4    this as a fact indeed.
5    BY MR. WEISS:
6        Q.   Okay.  A number of times throughout
7    the course of your testimony you testified that
8    certain things that were done by the JAMA authors
9    were improper, inappropriate and scientifically
10   not valid.
11          Do you recall that testimony
12   generally?
13       A.   Uh-huh.  I recall actively the
14   scientifically invalid statement, yes.
15       Q.   And when you say something is
16   scientifically invalid, that's according to you,
17   correct?
18       A.   This is in accordance with
19   international-accepted guidelines including the
20   consort statements.
21          This is in accordance with good
22   clinical practice guidelines and this is in

126

1    accordance with my personal opinion.
2        Q.   Okay.  And what good practice
3    guidelines are you referring to?
4        A.   I said, the good clinical practice
5    guidelines.
6        Q.   Yes.
7        A.   GCP, ICH.
8        Q.   Okay.
9        A.   And, you know, that refers also to,
10   you know, to the Helsinki statement indicating
11   that results have to be published, completely
12   published.
13          I'm referring to consort, which is
14   the consolidated standards of reporting trial
15   statements that has been adopted by the major
16   journals, including JAMA.
17       Q.   Do you always follow internationally
18   recognized standards when you publish documents
19   or journals or articles in journals?
20       A.   Yes.
21       Q.   And have you ever been accused of
22   not following internationally-recognized

127

1    standards in your methodologies in articles and
2    journals?
3        A.   That's a good question.  I need to
4    think about that.
5        Q.   Okay.
6        A.   Whether I ever had, you know, in a
7    correspondence section, somebody accusing me of
8    that.  I wouldn't be sure.  I know that we always
9    try to follow it.
10          So we, you know, there are the
11   different statements that are actually being --
12   being used consort, starch, et cetera, just for
13   the different kind of studies and we always try
14   to follow that and that's just a part of our
15   standard procedures.
16       Q.   And you try to follow it based on
17   your interpretation and understanding of what
18   those guidelines provide, correct?
19          MR. SAHAM:  Objection to form.
20   Misstates prior testimony.
21          THE WITNESS:  Indeed what I, my
22   colleagues and the editors and the peer reviewers

128

1    of the journals that is submitting the article
2    understand by these guidelines.
3    BY MR. WEISS:
4        Q.   Sure.  And certainly somebody could
5    have a different interpretation or understanding
6    of what certain guidelines provide.
7        A.   To a certain extent, yes.
8        Q.   Okay.  Now, you, in your testimony,
9    a number of times you referenced or testified
10   about what the protocols for the CLASS study
11   provided, do you recall that?
12       A.   I stipulated that, based on the
13   information we had, that was information provided
14   by the reviewers of the medical and statistical
15   reviewers and the reports that were provided on
16   FDA's website, I concluded that indeed.
17       Q.   Okay.  But you've never actually
18   seen the protocols for the CLASS study, correct?
19       A.   At the time point of the editorial,
20   no.  I'm not sure about then subsequent, the
21   subsequent process.
22       Q.   Right.

Peter Juni                                    September 21, 2010

129

1    A.   I couldn't be sure.  I couldn't
2    swear to that.
3    Q.   Fair enough.  But, at the time you
4    wrote the BMJ article and the time it was
5    published, you hadn't seen the protocols for the
6    CLASS study, correct?
7    A.   Correct.  I only had seen the
8    statements made by statistical and medical
9    reviewers as we also reference it in this
10   editorial.
11   Q.   Okay.  So, in your testimony when
12   you testified about what the protocol provides or
13   what should have been done pursuant to the
14   protocol, you were only testifying about that
15   based on the information that was available in
16   the FDA website, correct?
17   MR. SAHAM:  Objection to form.
18   THE WITNESS:  Correct.  I was
19   testifying based on the information on the
20   website as I was pointing out.  I was careful of
21   pointing out indeed testimony.
22   BY MR. WEISS:

130

1    Q.   Okay.  Now, I want to take you to
2    Exhibit 3 -- I'm sorry, Exhibit 32, which is your
3    BMJ editorial.
4    A.   Yes.
5    Q.   I'll ask you to pick that back up.
6    Now who actually drafted this article, who did
7    the physical labor in actually drafting the
8    article?
9    A.   Mainly me.
10   Q.   Okay.  And does everything, all of
11   the language in this article, is that all of the
12   original language from -- strike that question.
13   It's a horrible question.
14   Well, let's start with this:  At the
15   on the first page towards the bottom of the first
16   column --
17   A.   Uh-huh.
18   Q.   -- you say "The protocols of these
19   trials differ markedly from the published paper
20   in design, outcomes, duration of follow up and
21   analysis."  Do you see that?
22   A.   Yes.

131

1    Q.   Is that your own language there?
2    Did you write that?
3    A.   Well, I don't know anymore.  This is
4    very much a teamwork.  It could well be that I
5    wrote it.  I think my written English is pretty
6    okay.
7    Q.   Uh-huh.
8    A.   And I couldn't be sure whether, you
9    know, the final statement as it is here was
10   written by me, by Anne Rutjes or Paul Dieppe.
11   Q.   Okay.
12   A.   That's why we're three authors of
13   the paper.
14   Q.   I understand and this question you
15   can understand when I ask it I'm asking -- when I
16   say in that regard, I mean you and your
17   coauthors, but I'll try and be more clear.
18   A.   Okay.  Yes.
19   Q.   Now, that language that I just read,
20   "The protocols of these trials differed markedly
21   from the published paper in design, outcomes,
22   duration of follow up and analysis."  Is that

132

1    language original language from you or your
2    coauthors?
3    A.   I don't know.  Either it is original
4    language from me or my coauthors or it went
5    through copy editing as is the case for BMJ,
6    JAMA, Lancet, et cetera, sometimes quite
7    aggressively and some changes could have been
8    made.
9    Q.   Okay.  And then I want to take you
10   down to the next paragraph which begins -- the
11   second sentence of the next paragraph which
12   begins, quote, "The Food and Drug Administration
13   was concerned that selective COX 2 inhibitors
14   could interfere with the benefits of COX 2 in
15   ulcer healing.  This could lead to a long-term
16   increase of ulcer related complications that
17   occur without warning symptoms."  Close quote.
18   Is that language original language
19   from either you or your coauthors?
20   A.   From either me or my coauthors,
21   potentially adapted by BMJ's copy editors.
22   Q.   Okay.  Now, before you wrote this

Peter Juni                                        September 21, 2010

133

1  article, you had read the letters to the editor
2  that were published in JAMA in November of 2001,
3  correct?
4      A.   Correct.
5      Q.   Okay.  And, let me ask you now to --
6      A.   That's why I referred to them and it
7  could well be, you know, that when we referred to
8  them that we adopted the statements of these
9  authors, that's why I referenced actually, that's
10 possible.
11     Q.   Right.  Okay.  Well, in the first
12 quote that I read you, "The protocols of these
13 trials differed markedly from the published paper
14 in design, outcomes, duration of follow up and
15 analysis."  There is no citation there, is there?
16     A.   Sorry?
17     Q.   There's no citation after that
18 sentence.
19     A.   No.
20     Q.   Is it possible that you copied that
21 language from somebody else?
22         MR. SAHAM:  Objection to form.

134

1          THE WITNESS:  Well, I cannot rule
2  that out that this evidence came from somewhere.
3  That's possible.
4  BY MR. WEISS:
5      Q.   Uh-huh.  Is it inappropriate for you
6  to have copied language from somebody else
7  without citing it?
8      A.   If we hadn't referred to this
9  language and, you know, in the entire article, it
10 would be inappropriate.
11     Q.   Uh-huh.  But you didn't cite to
12 somebody, you didn't cite to anybody else for
13 that proposition, did you?
14     A.   Not this -- so there -- there's a
15 citation lacking they come up just before and
16 after that.
17     Q.   Uh-huh.
18     A.   So References 4 and 5 actually were
19 just referring to the letters.
20     Q.   Okay.
21     A.   And Reference 3 was referring to The
22 Washington Post article.  So I wouldn't know.

135

1      Q.   Okay.
2          MR. WEISS:  I'm going to ask that
3  the court reporter mark this as Exhibit 160 --
4          MR. SAHAM:  Don't mark on ours, just
5  mark your own.
6          MR. WEISS:  I'm sorry.  Then we will
7  mark this as Defendants' exhibit -- has this
8  already been marked, the Letters to the Editor of
9  JAMA.
10         MR. SAHAM:  It may have been marked,
11 I don't know.
12         MR. WEISS:  Let's mark it as
13 Defendants' Exhibit, let's start at 50, just so
14 we're -- well, let's just start at one.  We will
15 worry about harmonizing them later.
16         (Defendants' Exhibit Number 1
17         marked for identification.)
18 BY MR. WEISS:
19     Q.   Now, what I'm showing you what has
20 just been marked as Exhibit 1 are copies of the
21 letters to the editor of JAMA which were
22 published in the November 21, 2001 edition.

136

1          And I'll ask you, Dr. Juni, looking
2  back at your BMJ editorial and the third
3  paragraph on the first page reads, "An article in
4  The Washington Post in August 2001 and two
5  letters published in JAMA in November 2001 drew
6  attention to the fact that complete information
7  available to the United States Food and Drug
8  Administration contradicted those conclusions."
9  Do you see that?
10     A.   Yes.
11     Q.   Are these letters that I've just
12 handed you as Defendants' Exhibit 1 the letters
13 that you're referring to in the language that
14 I've just read?
15     A.   Yes.
16     Q.   Okay.  And then I will ask you to
17 look at the first letter, which is the letter
18 from Jennifer Berg Hrachovec and Mark Mora, and I
19 will ask you to take a look on the first
20 paragraph, one, two, I believe it's the third
21 sentence which begins, "As described on the FDA
22 website."  Do you see that?

Peter Juni                                    September 21, 2010

137

1   A.  Uh-huh.  Yep.
2   Q.  Okay.  And it goes on to read, "As
3   described on the FDA website, the published CLASS
4   trial differs from the original protocol and
5   primary outcome statistical analyses trial
6   durations and conclusions."  Do you see that?
7   A.  Yes.
8   Q.  Okay.  And then I'll ask you to look
9   back at your BMJ editorial to the language that I
10  have pointed you to earlier, which reads "The
11  protocols of these trials differed markedly from
12  published paper and design outcomes, duration of
13  follow up and analyses."  That's almost identical
14  language isn't it?
15  A.  It's not the same language.  It
16  states the facts and we refer to the two letters
17  just several lines above.
18  Q.  Uh-huh.
19  A.  You're trying to imply something
20  that I can't see.
21  Q.  All right.  I'm not trying to imply
22  anything.  I'm just asking you where you got that

138

1   language from?
2   A.  Okay.  Well, again, you know, if,
3   you know, if you talk about a BMW you need to
4   call it BMW.
5       There were some constructs included
6   in there.  We were clear in just indicating our
7   sources that was The Washington Post article and
8   the two letters in JAMA, and then we were
9   referring to the facts, and that's what we did.
10      That is also what Jennifer Berg
11  Hrachovec and colleagues did and that's fair
12  enough.
13  Q.  Okay.  So you -- that language you
14  are -- the language in here, "the protocols of
15  these trials differed markedly from published
16  paper in design, outcomes, duration of follow up
17  and analysis."
18      THE REPORTER:  I'm sorry --
19  BY MR. WEISS:
20  Q.  I'm sorry.  I'm talking about the
21  BMJ editorial, "The protocols of these trials
22  differed markedly from the published paper in

139

1   design, outcomes, durations of follow-up and
2   analyses."  You didn't take that out of Jennifer
3   Berg Hrachovec's letter, is that your testimony?
4   A.  No.  I'm saying that's the content
5   that we were referring to was Washington
6   Post and the two JAMA letters and that's actually
7   what we then start to summarize and we do that
8   scientifically within this editorial.
9   Q.  Okay.  I'll then point you to the
10  next paragraph of the BMJ editorial and it is the
11  second sentence and it reads quote, "The Food and
12  Drug Administration was concerned that selective
13  COX 2 inhibitors could interfere with the
14  benefits of COX 2 in ulcer healing.  This could
15  lead to a long-term increase of ulcer related
16  complications that occur without warning
17  symptoms."  Do you see that?
18  A.  Yes.
19  Q.  Okay.  And then I'll ask you to turn
20  back to Defendants' Exhibit 1, and I'll ask you
21  to look at the second paragraph in the first
22  column, which says, quote "Scientists at the FDA

140

1   were concerned that Cox 2 inhibition would
2   interfere with the beneficial role of COX 2 in
3   the final stages of ulcer healing and actually
4   increase the number of complicated ulcers that
5   occur without symptomatic warnings."  Do you see
6   that?
7   A.  I haven't looked at it, but I
8   believe you when you read it.  That's fine.
9   Q.  And do you agree with me that that
10  language that appears in Jennifer Berg's letter
11  is substantially similar to the language that
12  appears in the BMJ editorial that you wrote?
13  A.  Well, again, we're stipulating the
14  facts that are referring to her letter.  I assume
15  that the Reference 4 is Berg Hrachovec, and it's
16  just okay as it was indicated here.
17      That's a different language.  It's
18  the same facts, and that's just fair enough and
19  we refer to it.
20  Q.  You didn't quote -- you didn't use
21  quotes in the language that you used?
22  A.  No, sorry.  It's not a quote.  It's

Peter Juni                                        September 21, 2010

141

1  not a quote.
2      Q.    Uh-huh.
3      A.    And that's the way many of us,
4  probably all of us actually deal with just, you
5  know, the papers of others.  We refer to them.
6  We do it correctly and we don't use the -- the
7  language 1:1 as it is in there, and this is about
8  the content of the letters, and we credit them,
9  which is fair enough.
10     Q.    Do you believe that in the BMJ
11 editorial you reached any conclusions or said
12 anything that had not already been said by
13 others?
14         MR. SAHAM:  Objection to form.
15         THE WITNESS:  I don't know.  I would
16 need to -- I don't remember how it was.  I would
17 need to look at --
18 BY MR. WEISS:
19     Q.    Uh-huh.  Well, let me point you to
20 somebody specific.  You say in your editorial,
21 and I'm on the second page now of Defendants'
22 Exhibit 32 --

142

1      A.    Yes.
2      Q.    -- and I'm in the first column about
3  halfway down and there's a sentence which begins,
4  quote, "However, the absolute number of dropouts
5  and withdrawals, both overall and due to
6  gastrointestinal adverse events, increased
7  gradually without any sudden increase after six
8  months and withdrawal rates stayed roughly
9  constant in different treatment groups during the
10 entire follow-up period," close quote.
11         Was that a conclusion that you and
12 your colleagues reached independently?
13     A.    No.  This was again based on the
14 statistical and medical reviewer's comments
15 published on the FDA's website, as again pointed
16 out in the editorial.
17     Q.    Uh-huh.  So basically all you were
18 doing was restating what she had already stated?
19     A.    Of course, that's what we actually
20 indicate.  This is a summary of the facts in a
21 more prominent way.
22     Q.    Uh-huh.

143

1      A.    And this is not primary research.
2  We didn't generate additional data.
3      Q.    Uh-huh.
4      A.    And we were actually open about
5  that.
6      Q.    You didn't generate original data,
7  is that what you said?
8      A.    For this one.
9      Q.    Okay.
10     A.    For this one, we did -- how could we
11 generate original data if we had randomized
12 patients.
13     Q.    Uh-huh.  Okay.
14         (Defendants' Exhibit Number 2
15         marked for identification.)
16 BY MR. WEISS:
17     Q.    I'm going to hand you the
18 "Statistical Reviewer Briefing Document for the
19 Advisory Committee," which I'll ask the reporter
20 to mark as Defendants' Exhibit 2.
21         And I'm going to ask you to turn to
22 Page 9 of that, of Defendants' Exhibit 2, and I'm

144

1  going to ask you to take a look at the top of the
2  page.  There's a sentence that begins, quote, "As
3  presented in Table 11, the dropout rates due to
4  GIAE were increased gradually without sudden
5  increase at Month 6 (Week 26) in any of the
6  treatment groups.
7          "The numerical order of the dropout
8  rates stayed the same across the entire study
9  period."  Do you see that?
10     A.    Yes.
11     Q.    And that's basically just cribbed
12 right, your statement and your article that I
13 read earlier is basically just a carbon copy of
14 that statement, correct?
15         MR. SAHAM:  Objection to form.
16         THE WITNESS:  Let me quickly see
17 where you are.
18 BY MR. WEISS:
19     Q.    I'm looking at the BMJ editorial,
20 the second page about halfway down, the sentence
21 beginning, "However," as compared with Page 9 of
22 Defendants' Exhibit 2, the sentence that begins

Peter Juni                                          September 21, 2010

145

1  "As presented in Table 11," at the top.
2       A.  Well, no.  It's not basically a
3  carbon copy and again we reference to it,
4  References 7 and 8, which is Lu and Witter.
5       Q.  Uh-huh.  Okay.  Is there a reference
6  after the sentence that ends, "Withdrawal rate
7  stayed roughly constant in different treatment
8  groups during the entire follow-up period"?
9       A.  It's at the end of the paragraph.
10 If we put after every single sentence a reference
11 like that, we were rather in trouble with the
12 copy editors.
13      Q.  Uh-huh.  And then when you made that
14 reference, you didn't actually make a page
15 reference to the Lu review, did you?
16      A.  No.  We referred to them as a entire
17 document, Reference 7 and 8, without a page
18 reference.  You may have noticed that you have a
19 limitation in number of references in editorials,
20      Q.  Okay.  So you still contend, though,
21 that that's your own original analysis?
22          MR. SAHAM:  Objection to form.

146

1          THE WITNESS:  Again, I never
2  contended that.  I indicated that this is based
3  on the material provided on the FDA website and
4  on the material provided by Wolfe Exhibit 3
5  originally.  We summarized this and we referenced
6  it appropriately.
7  BY MR. WEISS:
8       Q.  So you're here to tell us that you
9  basically just regurgitated what the FDA
10 reviewers said on their website in their reviews,
11 correct?
12          MR. SAHAM:  Objection to form.
13          THE WITNESS:  I'm here to tell you
14 that we summarized, based on a concern that we
15 had that the information was not adequately
16 distributed, what was readily available on the
17 FDA website, correct.
18 BY MR. WEISS:
19      Q.  And this concern that you had, I
20 think you testified that it grew out of a
21 presentation that you made to certain clinicians
22 in Switzerland; is that fair?

147

1       A.  Correct.
2       Q.  And looking at your editorial,
3  Defendants' Exhibit 32, in the -- towards the
4  bottom of the second page, there's a sentence and
5  I read, quote, "For example, most of 58
6  physicians attending an osteoarthritis workshop
7  in Bern, Switzerland in December of 2001 had not
8  realized that CLASS was seriously biased."  Close
9  quote.  Do you see that?
10      A.  Yes.
11      Q.  And that is what you're referring to
12 when you talk about the workshop that you gave
13 that gave rise to this concern?
14      A.  Correct.
15      Q.  And that's what led you to draft
16 this article?
17      A.  Correct.
18      Q.  And, of those 58 physicians that
19 were attending the workshop, how many of them
20 expressed to you that they hadn't realized that
21 CLASS was, quote, "seriously biased," close
22 quote?

148

1       A.  I had them raise their hands who
2  didn't know about that and apart from, I wouldn't
3  know anymore, apart from four or five, and that's
4  just I didn't do anything that I wouldn't
5  actively know whether they knew about the point
6  here, the others just didn't know anything about
7  that.
8          So the majority, the point of, you
9  know, the majority here is correctly stated.
10      Q.  So it's a majority of 58 people,
11 that's what you're testifying to?
12      A.  Yes.  Indeed.
13      Q.  Okay.  And that's what led you to
14 conclude that, quote, "Most still believe the
15 findings published originally."  Close quote?
16          MR. SAHAM:  Objection to the form.
17          THE WITNESS:  Where are you?
18 BY MR. WEISS:
19      Q.  Which is the sentence that appears
20 right above that.
21      A.  Sorry, I'm lost.  You just need to
22 tell me where that is.

Peter Juni                                      September 21, 2010

149

1    Q.   On Page 2, right above the sentence
2  that begins "for example" there's a sentence that
3  says "In our experience most still believe the
4  findings published originally."
5    A.   In our experience, so that's
6  experience of me and my colleagues.  At this
7  workshop of 58 people, this was one of my
8  experience, not the only one.
9         We then discussed it in the clinical
10 setting and especially my colleague, Paul Dieppe,
11 had, you know, many contacts with clinical
12 colleagues during that time.
13        It was in our experience that that
14 is subjective and we stipulated that it is
15 subjective.
16   Q.   Do you think 58 people is a
17 statistically significant sample?
18   A.   That's the wrong question.  You
19 can't talk about statistical significance
20 samples.
21   Q.   Okay.  Do you think it's an adequate
22 sample size, to draw a conclusion about the

150

1  extent of the people who either know or don't
2  know about the full CLASS results?
3    A.   The sample size is actually pretty
4  okay.  If you think about, perhaps, five or six
5  people not answering -- well, we are not aware,
6  it could calculate the confidence interval around
7  that will exclude zero so the sample size is
8  okay.
9         The sample is a graph sample and the
10 sampling, per se, is not a sample that would
11 correspond, you know, to our epidemiological
12 sampling strategies.
13   Q.   Uh-huh.
14   A.   And, again, this is an example, we
15 gave it.  Let me quickly see what we said, we
16 said -- I'm lost again, where was it?
17   Q.   It's on the bottom of Page 2.
18   A.   On the bottom of Page 2.  "For
19 example, most of 58 physicians," we gave it as an
20 example and we didn't imply here that this has,
21 you know, a ultimate scientific validity.  This
22 is an example as part of the discussion at issue.

151

1    Q.   Uh-huh.  But that's one of the bases
2  for your conclusions, is it not, that in your
3  experience most still believe the findings
4  published originally; is it not?
5    A.   No.
6    Q.   You don't list --
7    A.   This was an example and in our
8  experience, when we talked to colleagues during
9  workshops, et cetera, that the clinical
10 colleagues weren't aware of anything else than
11 the CLASS study.
12   Q.   But you don't list any other
13 examples in here?
14   A.   No, we don't.  As you can see.
15   Q.   Okay.  And you referred to other
16 workshops that you gave as other examples, what
17 other workshops are you referring to?
18   A.   Sorry?  Where do I refer to other
19 workshops?
20   Q.   In your --
21   A.   I was saying that Paul Dieppe at
22 that time was, you know, had many interfacing

152

1  activities with clinical colleagues, discussed
2  these issues as well.
3         We did it, you know, also at Bristol
4  University.  We continuously we're talking about,
5  these are our experiences talking to clinical
6  colleagues, talking about that and people were
7  not aware of this.
8    Q.   How many clinical colleagues did you
9  talk to at Bristol University?
10   A.   I don't know.  So there, I think we
11 would, the cumulative experience that we have, I
12 don't know.  I talked perhaps to 20, 25 or so
13 during another workshop.  I don't know when it
14 was.  I'm not sure how many Paul Dieppe had.
15   Q.   Uh-huh.  And of those 20 or 25 at
16 this other workshop that you referred to, how
17 many of those people indicated that they weren't
18 aware of the information published on the FDA
19 website?
20   A.   I can't tell you how many indicates
21 they had weren't aware, but I'm totally sure that
22 nobody indicated that he was aware.

Peter Juni                                September 21, 2010

153

1    Q.   Uh-huh.
2    A.   So people were surprised, totally
3  surprised, and were indicating in general, but we
4  didn't count, et cetera, that they were not aware
5  of these issues.
6    Q.   Okay.  Now you say here quote,
7  "That, for example, most of 58 physicians
8  attending an osteoarthritis workshop in Bern,
9  Switzerland had not realized that CLASS was
10  seriously biased," close quote.
11       When you say they hadn't realized it
12  was seriously biased, that's your interpretation
13  of what they either realized or did not realize,
14  correct?
15       MR. SAHAM:  Objection to form.
16  BY MR. WEISS:
17    Q.   Let me ask it this way, didn't you
18  really mean to say that they hadn't realized that
19  there was more data available on the FDA website
20  about CLASS?
21       MR. SAHAM:  Objection to form.
22       THE WITNESS:  I just need to think,

154

1  sorry, what I meant by that.  And I could have,
2  or we could have put it neutrally that there were
3  serious discrepancies between the material
4  available on the FDA website and what is in here.
5       The form of the editorial means that
6  there is not a formal results section and that
7  indeed statements like that which are an
8  interpretation will not be explicitly put into a
9  discussion in a clinical conclusions section
10  where they would be put in an original article.
11  BY MR. WEISS:
12    Q.   Did any of the 58 physicians
13  attending this osteoarthritis workshop tell you
14  that they agreed with you that the results of
15  CLASS were, quote, "seriously biased," close
16  quote?
17    A.   I can't remember that.  I just can't
18  remember it.  It is too long ago.
19    Q.   But your testimony is that you asked
20  them whether they were aware that there was more
21  data on the website and a number of them raised
22  their hands indicating that they were not so

155

1  aware, correct?
2    A.   And I asked who was aware -- well,
3  actually, who actually was just knowing the CLASS
4  study, but, you know, was not aware of anything
5  of that that I presented in terms of a
6  discrepancy between the protocol and the CLASS
7  study as published, and that is when people
8  raised their hands.
9    Q.   But, by raising their hands, those
10  people were indicating that they agreed that the
11  CLASS was, quote, "seriously biased," close
12  quote?
13    A.   I didn't use this phrasing and
14  therefore they weren't indicating that they
15  agreed on the term seriously biased.
16    Q.   Okay.  So what you say here in your
17  editorial is really not accurate is it?
18       That these -- that most of these 58
19  individuals had not realized that CLASS was
20  seriously biased, that's not what they told you,
21  correct?
22    A.   That's correct.

156

1       MR. SAHAM:  Objection to form.
2  BY MR. WEISS:
3    Q.   Okay.  Now, going back --
4       MR. WEISS:  Actually, you know what,
5  let's change the tape.  We have a couple of
6  minutes to go.
7       THE VIDEOGRAPHER:  Off the record at
8  1:18 p.m.
9       (Recess -- 1:18-1:23 p.m.)
10       THE VIDEOGRAPHER:  This is the
11  beginning of Tape Number 3.  Back on the record
12  at 1:23 p.m.
13  BY MR. WEISS:
14    Q.   Now, Dr. Juni, one of your
15  criticisms of the JAMA article was that the
16  authors didn't follow what you understood to be
17  the prespecified statistical analysis plan set
18  forth in the protocol; is that correct?
19    A.   Yes.  And very transparent about it.
20    Q.   Okay.  And I think you acknowledged
21  before that the protocols for the two trials, the
22  035 and the 102 trial prespecified that they

Peter Juni                                             September 21, 2010

157

1   would be pooled for analysis; is that correct?
2       A.   As a first step, yes, but not as the
3   ultimate step.
4       Q.   Uh-huh.  And so in terms -- when
5   they went ahead and pooled the comparator groups
6   or the trials for comparison, that was according
7   to protocol?
8       A.   That was according to the first step
9   of the protocol, provided that they had used the
10  entire follow-up duration, which they didn't.
11      Q.   And where does it specify in the
12  protocol that they were required to have used the
13  entire follow-up duration?
14      A.   Again, I haven't seen the protocol.
15  I can just follow the FDA reviewer's discussion
16  and the power calculation was based on a, an
17  accumulated number of ulcer complications of 45
18  across the two protocols of twice 20 -- on
19  either -- and on both protocols, each 20 that
20  would have accumulated that's how the FDA
21  reviewers describe it.
22      Q.   Uh-huh.

158

1       A.   Taking this into account and taking
2   into account how the power calculation was set
3   up, it is totally clear that the entire follow-up
4   duration should have been reported.
5       Q.   It is entirely clear to you that the
6   entire follow-up duration should have been
7   reported.  Is that your testimony?
8       MR. SAHAM:  Objection to form.
9       THE WITNESS:  It's entirely clear to
10  me and to many of my colleagues, many of them
11  with, you know, international reputations, that
12  this should have been the case.
13  BY MR. WEISS:
14      Q.   Uh-huh.  What other colleagues are
15  you referring to?
16      A.   By names you mean -- by names, okay.
17      Q.   If you want to describe them to me,
18  you can go ahead physically.
19      A.   This was an inappropriate statement
20  of yours, just the last one.
21      Q.   Oh, excuse me.
22      A.   So Professor Multio Secker (ph.),

159

1   University of Bern.  Professor Christian Glout
2   (ph.), University of Copenhagen.
3       Let's see, you want names where I
4   really discussed this.  Dr. Paul Creamer,
5   University of Bristol.  Let me see who else would
6   you -- do you have time because I need to think a
7   bit who I discussed that with.
8       Q.   Okay.  Well, let's just start with
9   the few that you've mentioned so far.  You
10  discussed with them the issues that you raise in
11  your editorial before publishing it?
12      A.   No.  I didn't specify that.  I said
13  that my -- I discussed it after or before, I
14  don't know that anymore, this with them and, you
15  know, after having published it or before having
16  published it, but not at the time of the
17  editorial.
18      I wouldn't be sure with whom I
19  discussed it before and whom after.
20      Q.   Uh-huh.  And they agreed with you,
21  with your interpretation of the data?
22      A.   They agreed with my interpretation

160

1   of the discrepancies.
2       Q.   Okay.
3       A.   With our interpretation of the
4   discrepancies.
5       Q.   Okay.  Now, am I correct that you
6   were not present at the time that the authors of
7   the CLASS trial unblinded the data from the CLASS
8   study?
9       A.   You're correct in that, yes.
10      Q.   And am I correct that you were not a
11  participant in any of the discussions that the
12  authors of the CLASS paper had regarding what
13  data set to publish?
14      A.   Correct.
15      Q.   And am I correct that you are not
16  aware of any of the analyses that the authors of
17  the CLASS study had done prior to making a
18  decision to publish the JAMA article?
19      A.   I need to think about this last
20  statement.  I think I am aware of some of the
21  analysis that I described as a justification for
22  their decision.

Peter Juni                                    September 21, 2010

161

1    But I'm not aware of all of their
2  analyses. How could I be?
3    Q.   Fair enough. And have you ever had
4  a conversation with any of the authors of the
5  CLASS study about their decision to publish six
6  months of data?
7    A.   As we already have figured out,
8  because I don't know any of the authors
9  personally, I couldn't have had a discussion with
10  them.
11    Q.   Have you ever had any discussions
12  with any representatives of Pfizer or Pharmacia
13  or Searle regarding the JAMA article?
14    A.   I personally or members of my group?
15    Q.   Let's start with you personally.
16    A.   Me personally, no.
17    Q.   Okay.
18    A.   Not that I was aware of. I couldn't
19  rule out that members of my group, including
20  Stefan Reisenbach (ph.) and Sven Treller (ph.)
21  did have some discussions, but I'm not sure about
22  that.

162

1    Q.   Why do you think they may have had
2  some discussions?
3    A.   Because they had contact with Pfizer
4  regarding published and unpublished data of the
5  celecoxib trials.
6    Q.   Who did they contact at Pfizer?
7    A.   I don't know.
8    Q.   And at what point did they have this
9  contact?
10    A.   I would say this must be -- I'm not
11  sure about that. I would estimate this must have
12  been three to four years ago.
13    Q.   So it would have been after the
14  editorial?
15    A.   Yes. Yes. Yes, of course. After
16  the editorials. It doesn't have anything to do
17  with the editorials, but with subsequent studies.
18    Q.   Okay. I'm going to ask you to turn
19  back to your editorial, which is Defendants'
20  Exhibit 32, and I'm going to point you to the
21  middle of the first column, the last sentence.
22    The sentence reads, quote, "In

163

1  addition, there was no robust evidence that
2  gastrointestinal adverse events were actually a
3  risk factor for ulcer related complications."
4  Close quote. Do you see that?
5    A.   Let me see, no, I can't see it.
6  First page?
7    Q.   Second page.
8    A.   Sorry, second page.
9    Q.   Second page, first column.
10    A.   Okay.
11    Q.   And it is about halfway down the
12  page, or halfway down the column.
13    A.   "In addition, there was no robust
14  evidence that gastrointestinal adverse events
15  were actually a risk factor for ulcer related
16  complications.
17    Q.   Right. And what was the basis for
18  that statement?
19    A.   Well, here we refer to the reports
20  of the FDA so we would need to look at these.
21    Q.   Uh-huh.
22    A.   In addition, what we did that

164

1  subsequently we only had looked at the narratives
2  and hadn't formally analyzed that, there will be
3  the subsequent formal analysis that we did.
4    At that time, we just had looked at
5  the narratives and followed the statements or the
6  interpretation of the FDA medicals and
7  statistical reviewers.
8    Q.   So you didn't independently assess
9  the conclusions of the FDA medicals, just the
10  reviewers at that point in time?
11    A.   No, as indicated here, we didn't do
12  that. We just summarized what was available.
13    Q.   Okay. But this sentence doesn't say
14  that the FDA reviewers thought that there was no
15  robust evidence, it puts that forward as your own
16  conclusion, does it not?
17    A.   Well, actually we refer to that in
18  References 7 and 8, which are the statistical and
19  medical reviewer's comments.
20    And this is customary how we
21  actually just, you know, draw your conclusions
22  and state your conclusions. We refer to these

Peter Juni                                        September 21, 2010

---

165

1   papers where this information comes from.
2       Q.   Is it customary to present somebody
3   else's conclusions as your own?
4       A.   We didn't do that.  We just state
5   here what was a fact and refer to the two
6   references that led us to state this.
7       Q.   Okay.  Before making this statement,
8   did you do any literature review?
9       A.   On what?
10      Q.   On whether or not there's evidence
11  that gastro adverse -- gastrointestinal adverse
12  events were a risk factor for ulcer related
13  complications?
14      A.   This was referring to what was found
15  in the CLASS trial.  Now it's up to you to decide
16  whether we should have phrased it differently.
17          I would be totally in favor to do an
18  amendment here and say in addition there was no
19  robust evidence in the CLASS trial that
20  gastrointestinal adverse events were --
21      Q.   Uh-huh.
22      A.   If you go back to the medical and

---

166

1   statistical reviewers' reports, you will find
2   that they were referring to the CLASS trial.
3       Q.   Uh-huh.  But did you do any
4   independent assessment of that conclusion?
5       A.   As I pointed out before, no.  That's
6   why I referenced these two.
7       Q.   Now, Mr. Saham introduced your reply
8   to Dr. Geis as an exhibit.  I'm going to
9   supplement that by introducing Dr. Geiss' letter
10  to BMJ to which you responded.
11          MR. WEISS:  If you could mark this
12  as Defendants' Exhibit 3.
13          (Defendants' Exhibit Number 3
14          marked for identification.)
15          MR. SAHAM:  Josh, just for the
16  record, you keep calling Exhibit 32 as
17  Defendants' Exhibit 32.
18          MR. WEISS:  I'm sorry, I certainly
19  don't mean to do that.
20          MR. SAHAM:  So just for the record,
21  I think we should stipulate that, whenever anyone
22  is referring to what's been marked as Exhibit 32

---

167

1   on January 12, 2007, we're referring to the BMJ,
2   June 1, 2002 editorial that bears Bates numbers
3   DEFS 00111312 through 313; is that right?
4           MR. WEISS:  So stipulated.
5           MR. SAHAM:  Okay.  I just wanted to
6   make sure that was clear.
7   BY MR. WEISS:
8       Q.   Dr. Juni, I'll ask you to take a
9   look at the first page of what I've just handed
10  you, which is exhibit -- Defendants' Exhibit 3.
11  Do you recognize this document?
12      A.   I think so.  It is a printout of the
13  rapid responses posted on BMJ's website.
14      Q.   Okay.  So, is this Dr. Geis' letter
15  in response to your editorial?
16      A.   Correct.
17      Q.   Okay.  Now I'm going to ask you to
18  turn to your letter in response to Dr. Geis'
19  letter, which is Defendants' Exhibit 161, I
20  think.
21      A.   Wait.
22          MR. SAHAM:  Or Plaintiff's

---

168

1   Exhibit 161.
2   BY MR. WEISS:
3       Q.   Plaintiff's Exhibit 161.
4       A.   This is the extended version which
5   may be longer than what we are -- I'm actually
6   not sure --
7       Q.   Okay.
8       A.   -- if it's the same.  I wouldn't be
9   sure whether this is the same as the one we had
10  before.
11      Q.   Okay.  Let's do this.  I've included
12  both letters in the exhibit so we can just use --
13      A.   Good.  We refer to this in
14  Defendants' Exhibit 3 just our response,
15  electronically.
16      Q.   Sure.  Sure.  Okay.  So, if you
17  turn -- if you turn, what I've just handed you,
18  Defendants' Exhibit 3.
19      A.   Uh-huh.
20      Q.   If you turn the pages you will
21  eventually get to your letter in response to
22  Dr. Geis's letter.  It's entitled "Pharmacia

Peter Juni                                    September 21, 2010

169

1   addresses June 1 Editorial Regarding CLASS's
2   Study, Author's Response." Do you see that?
3       A.   Right. I see that, yes.
4       Q.   And then --
5           MR. SAHAM: What page are you on?
6           THE WITNESS: 16 of 25.
7           MR. WEISS: Yes.
8           MR. SAHAM: And just, Josh, this is
9   a different date. This is 12 July 2002, the one
10  I submitted is as 161 I think is what was
11  actually published on September 2002. I don't
12  think they're the same thing.
13          MR. WEISS: Okay. That's fair
14  enough.
15  BY MR. WEISS:
16      Q.   But is this a letter that you
17  submitted to BMJ?
18      A.   Provided that this is a printout
19  that was posted -- material posted on BMJ's
20  website, yes.
21      Q.   Just so we're clear, how did it come
22  to be, if it's true, that there were two separate

170

1   versions of the letter?
2       A.   Yes. That depends on the system of
3   the journal there. So basically BMJ has a rapid
4   response system.
5           And you are -- you may or may not
6   reply to the rapid responses, and then, based on
7   that, BMJ decides which of the rapid responses
8   will be edited as full letters.
9           And invites us, or invites the
10  authors based on what they wrote, to actually
11  provide a compiled version that satisfies certain
12  criteria in terms of word count and number of
13  display items.
14      Q.   And then that subsequent version may
15  or may not be physically published in the volume
16  of BMJ?
17      A.   Correct.
18      Q.   Okay. Okay. So, as of now, we're
19  looking at what I guess I understand to be the
20  rapid response version of your response to
21  Dr. Geis's letter?
22      A.   Correct.

171

1       Q.   Okay. I'm going to point you to the
2   first paragraph, or actually the second paragraph
3   of the letter, which begins, quote, "According
4   to Dr. Geis, CLASS was a single study and it was
5   presented as such in the JAMA article which
6   reported patients to be 'randomly assigned on a
7   2:1:1 basis.'
8           "This description is misleading. As
9   acknowledged by Dr. Geis, there were two separate
10  trials with two separate patient recruitment and
11  randomization procedures." Do you see that?
12      A.   Uh-huh.
13      Q.   I'm going to ask you to turn back to
14  Dr. Geis' letter, which is the first page of
15  Defendants' Exhibit 3.
16          And could you show me where it is
17  that Dr. Geis supposedly acknowledges that there
18  were two separate trials with two separate
19  patient recruitment and randomization procedures?
20      A.   I'm not sure whether I can and I'm
21  not sure whether this could also refer, and then
22  we didn't cite it, which was a mistake, to his

172

1   statement that he made in the JAMA. I don't
2   know, so let's see where this is.
3           So just the first read through,
4   which was superficial, doesn't read through any
5   part of his response which indicates that I'm not
6   sure whether, you know, the -- and I'm actually
7   supposing that, but I couldn't be sure and I
8   would need to have a look at that whether to
9   respond to the JAMA correspondence, was including
10  that.
11          And if this was the case, we should
12  have referenced the JAMA response, which we
13  haven't, which was a mistake.
14      Q.   Okay. So at least it's clear that
15  your contention that Dr. Geis acknowledged that
16  there were two separate trials and two separate
17  patient recruitment and randomization procedures
18  is not a reference to Dr. Geis's letter of the
19  25th of June 2002?
20          MR. SAHAM: Objection to form.
21  Misstates prior testimony.
22          THE WITNESS: Okay. Let me, if you

Peter Juni                                      September 21, 2010

173

1    want an answer to that, I read it thoroughly then
2    I can give you an answer.  Then you need some
3    patience.
4    BY MR. WEISS:
5        Q.   Sure.
6        A.   No.  He actually -- so I disagree
7    with your statement.  Geis points out the need
8    for two protocols was prespecified to ensure
9    blinding of starting medications.  One protocol
10   included celecoxib 400 milligrams, we're talking
11   about Page 10 of 25, third paragraph.
12           So he acknowledges there were two
13   protocols.  If there were two protocols, there
14   were two separate randomization processes and by
15   definition two trials, so our statement was
16   correct.
17       Q.   Uh-huh.  Did you ever see the
18   patient recruitment and randomization procedures
19   in the protocols for the trials?
20       A.   If you have two different protocols,
21   you need to have --
22       Q.   Dr. Juni, with all due respect, I

174

1    asked you a question.  Did you ever see the
2    recruitment and randomization procedures in the
3    protocols?
4            MR. SAHAM:  Objection to form.
5    BY MR. WEISS:
6        Q.   Did you ever see it, simple
7    question.
8        A.   No.
9        Q.   Thank you.
10           MR. SAHAM:  Badgering the witness.
11   You've got to let him finish answering the
12   question.
13           MR. WEISS:  Well, when you do your
14   examination, you can do it however you want.
15           MR. SAHAM:  The objection to form is
16   reiterated.
17   BY MR. WEISS:
18       Q.   Now, in your letter dated the 12th
19   of July 2002, you say, in the middle of the
20   paragraph here, "However, patients --
21       A.   Which page please?
22       Q.   This is the first page.  "However,

175

1    patients in trial # 102 comparing celecoxib
2    versus diclofenac were older" and then you give a
3    P value of 0.015, "had higher global assessment
4    scores (P<0.00001), had lower pain scores
5    (P-0.01), were more frequently white (P<0.0001),
6    were more likely to have a history of
7    gastrointestinal NSAID intolerance (P<0.0001) and
8    were more frequently alcohol users (P<0.0001)
9    than patients in trial # 035 comparing celecoxib
10   against ibuprofen."  Do you see that?
11       A.   Yes.
12       Q.   Where did these numbers come from?
13       A.   You mean the P values?
14       Q.   Yes.
15       A.   I can't remember.  There are two
16   possibilities.  It was eight years ago.  One
17   possibility is that they were directly available
18   in the FDA reports.  The other possibility is
19   that, based on the information we had in the FDA
20   reports, we derived them.
21       Q.   Uh-huh.  Okay.  Well, I'm going to
22   show you what's previously been marked as Wolfe

176

1    Exhibit 15.  I'm going to ask you to turn to
2    Page 27 of that document.  And Wolfe Exhibit 15
3    is the Medical Officer Review from Dr. James
4    Witter.
5        A.   Yes.
6        Q.   So Page 27, I'd ask you to look at a
7    table, which is Table 5, it's entitled "Baseline
8    Demographic Characteristics ITT cohort."  Do you
9    see that?
10       A.   I do.
11       Q.   Okay.  And so I'm referring back to
12   the first page of your letter, where you say
13   "patients in trial # 102 comparing celecoxib
14   versus diclofenac were older" and you give a
15   P value of "0.015," do you see that?
16       A.   Yes.
17       Q.   Now if I turn back to Page 27, and I
18   look on Table 5 under "Age," do you see that
19   which, is about the third row down?
20       A.   Yes.
21       Q.   And then under the P value column
22   the P value is "0.017."  Do you see that?

Peter Juni                                    September 21, 2010

177

1      A.   Yes.
2      Q.   What explains the difference between
3  the P value that you give in your letter versus
4  the P value in Dr. Witter's table?
5      A.   I don't know.  That could be several
6  explanations.  One is that we were not referring
7  to this.  This is what we're talking about here,
8  it's probably analysis of these means here.
9           That may be, I don't know.  It could
10 be that there is another source in this or in the
11 statistical reviewer's one.
12          It could be that we did some
13 recalculations based on the standard deviations
14 that there were or it could be that it's a typo.
15     Q.   Okay.  Well, to rule out that it's a
16 typo, or to try to, let's go to the next
17 comparison, which is that the patients had higher
18 global assessment scores and you have a P value
19 of <0.0001.
20          Do you see patient global assessment
21 which is about the third row from the bottom on
22 Page 27 of Defendants -- of Wolff Exhibit 15?

178

1      A.   Yes, I see that.
2      Q.   And do you see in the right-hand
3  column under P value that the P value there is
4  .965?
5      A.   Yes.  I see that, too.
6      Q.   And that's different from the P
7  value presented in your letter, correct?
8      A.   That is correct.
9      Q.   Okay.  And you don't have an
10 explanation, as you sit here today, for the
11 difference in that P value?
12     A.   Well, the most likely explanation is
13 that our statement was not referring to this
14 Table 5.  Again, we can sort it out, if you give
15 me an hour.
16     Q.   Yes.  Well, we don't have an hour.
17 I'm just trying to see if you -- I'm trying to
18 understand where you got these P values from.
19     A.   I would need to look that up.  If
20 you -- I would need to find that out.
21     Q.   Okay.
22     A.   And I'm unable right now after eight

179

1  years, you know, to just tell you
2  straightforwardly.
3      Q.   Okay.  Well, then, let's -- we'll
4  come back to this if we have some time later.
5      A.   Okay.  That's good.
6      Q.   But you would agree with me, though,
7  if you take a quick look at this Table 5 that all
8  of the P values that you reference in your letter
9  are different from the P values in Table 5 of
10 Dr. Witter's table.
11          And you can take a quick look to see
12 if you agree with me about that.
13     A.   I would agree with you and my
14 conclusion is that probably we were not referring
15 to Table 5, but I couldn't be sure about that,
16 correct.
17     Q.   Okay.  Fair enough.  Incidentally,
18 do you have any formal training in biostatistics?
19     A.   A formal training in terms of a
20 master's degree or are you talking a Ph.D.?
21     Q.   Have you done any course work in
22 biostatistics?

180

1      A.   I have done course work in
2  biostatistics, but I don't have a formal degree
3  in biostatistics.
4      Q.   Okay.  Do you consider yourself a
5  biostatistician?
6      A.   No.  I consider myself a clinical
7  epidemiologist, as I pointed out before.
8      Q.   Okay.  And in connection to BMJ
9  article, which is Exhibit 32, who did the
10 bioanalysis to the extent it was?
11     A.   It was Dr. Rutjes and myself,
12 Dr. Rutjes is a Ph.D. in epidemiology, not a
13 biostatistician.
14     Q.   And does Dr. Dieppe have a degree in
15 biostatistics?
16     A.   No.
17     Q.   Looking back at your letter of the
18 12th of July on the first page, you go on to say
19 that quote, "Considering these differences as
20 well as different follow-up durations, and
21 different COX-2 selectivities and
22 gastro-intestinal side-effects of the comparator

Peter Juni                                          September 21, 2010

---

181

1  drugs, simple pooling of the data by adding up is
2  clearly misleading and potentially drowns
3  important differences in effect between estimates
4  between the two trials."  Do you see that?
5      A.  Yes.
6      Q.  Okay.  You understand that a pooling
7  of the data was prespecified in the protocols,
8  correct?
9      A.  As a first step, which is not the
10  final step, that's fair enough.
11     Q.  Okay.
12     A.  But not as an ultimate step.
13     Q.  And would simple pooling, even for
14  the first step, which was prespecified, have been
15  misleading and drowned out important differences
16  in effect estimates between the two trials?
17     A.  I didn't understand the question.
18     Q.  Well, you said that you understood
19  that the protocol prespecified that the two
20  trials would be pooled in the first step of the
21  statistical analysis, correct?
22     A.  Uh-huh.

---

182

1      Q.  And so would pooling for that
2  purpose, for that purpose, have led to misleading
3  and potentially drown out important differences
4  in effect estimates between the two trials?
5      A.  Now this is a scientific debate and
6  in my view clearly yes.
7      Q.  And are there people who would
8  disagree with you?
9      A.  I'm sure there are.
10     Q.  Okay.  And would they have a
11  reasonable basis to disagree with you?
12     A.  No.
13     Q.  Okay.  Do you think that the head of
14  the biostatistics department at Yale University
15  has more knowledge about biostatistics than you?
16         MR. SAHAM:  Objection to form.
17         THE WITNESS:  And who is it?
18  BY MR. WEISS:
19     Q.  Robert Makuch?
20     A.  I don't know him personally.  We
21  could personally meet and find out.
22     Q.  Uh-huh.  But do you have an opinion

---

183

1  at this point whether somebody who holds a full
2  professorship at Yale in biostatistics, has a
3  Ph.D. in biostatistics and is head of that
4  department has more knowledge of biostatistics
5  than you?
6         MR. SAHAM:  Objection to form.  Lack
7  of foundation.
8         THE WITNESS:  To be honest, no.  The
9  point there is, I experienced a lot of professors
10  of biostatistics, who have a Ph.D. in
11  biostatistics also from very good universities
12  who were mediocre at best.
13         I wouldn't imply that he is mediocre
14  at best, but I don't know about that, so we could
15  find out.
16  BY MR. WEISS:
17     Q.  Okay.
18     A.  It could well be that he is more
19  knowledgeable than I am, but I wouldn't rule out
20  that we have the same sort of knowledge, I don't
21  know.
22     Q.  Okay.  So you, without any formal

---

184

1  training or degree in biostatistics, could
2  potentially be as knowledgeable as he in
3  biostatistics?
4         MR. SAHAM:  Objection to form.
5  Misstates prior testimony.
6         THE WITNESS:  You could try, you
7  know, if this is -- it's not all about formal
8  degrees.  It's also a lot about, you know,
9  experiences and about research activities and
10  having just the adequate environment.
11  BY MR. WEISS:
12     Q.  Uh-huh.
13     A.  I wouldn't know, we could find out,
14  and I wouldn't have a problem with admitting that
15  he's more knowledgeable, could well be.
16  BY MR. WEISS:
17     Q.  Uh-huh.  Now you mentioned
18  experience as a factor in determining the extent
19  of somebody's knowledge and proficiency in
20  biostatistics.
21         At the point that you wrote this
22  article, you were how old?

Peter Juni                                      September 21, 2010

185

1      A.   Let's see, how old was I there, 35?
2      Q.   Okay.  And how much experience did
3  you have to that date in clinical trials?
4      A.   You pointed that out.  I had at that
5  time planned two randomized trials and a cohort
6  study and I had done quite a lot of analyses at
7  that time.
8           But, I still, you know, eight years
9  down the line, I still stick to my conclusions
10  with -- well considerably more experience, but --
11      Q.   Okay.
12      A.   -- inexperience doesn't make things
13  wrong per se, so it depends.  You know, to have
14  an open debate is fair enough.
15      Q.   Fair enough.  On the second page of
16  your June -- I'm sorry, your July 12 letter,
17  which is part of Defendants' Exhibit 3, it says
18  in the second paragraph, "It was explicitly
19  stipulated that first the overall hypothesis had
20  to be tested whether celecoxib and the pooled
21  NSAIDs were different in terms of the incidence
22  of ulcer complications.

186

1  "If the test used for this
2  comparison resulted in nonsignificant P values,
3  the null hypothesis would be retained and the
4  procedure stopped."  Do you see that?
5      A.   Yes.
6      Q.   Okay.  Did you have an understanding
7  at the time that you wrote the BMJ editorial that
8  the CLASS study had failed to meet its primary
9  end point?
10      A.   When I wrote the editorial?
11      Q.   Uh-huh.
12      A.   Of course, when I wrote the
13  editorial, I had understood it.
14      Q.   Okay.  And before you wrote the
15  editorial -- I'm sorry strike that.
16          Before you read the -- strike that.
17          When was the first time that you
18  read the JAMA article recording the results of
19  the CLASS trial?
20      A.   I can't remember.
21      Q.   Okay.  Was it before you reviewed
22  the information on the FDA website?

187

1      A.   No, certainly after.
2      Q.   Okay.  And did you have an
3  understanding that as early as April --
4      A.   Sorry, what did I say.  Sorry, I
5  take it back.
6      Q.   You said it had to be after.
7      A.   I first read the -- no, I was wrong.
8  I was confused with your timelines, okay?
9      Q.   Okay.
10      A.   So I -- the first thing I read at
11  that time point was the article with the letters.
12  That's the first thing I have read.
13      Q.   Okay.  Before you read the JAMA
14  article with the letters, had you read the
15  article in The Washington Post from August 5th,
16  2001?
17      A.   I'm 95 percent sure that I read the
18  article in The Washington Post after the
19  manuscript and the letters.
20      Q.   Okay.  In your view, does the JAMA
21  article disclose that the CLASS trial failed its
22  primary end point?

188

1      A.   Sorry -- in our editorial?
2      Q.   No.  In your view, does the JAMA
3  article disclose that the CLASS trial failed to
4  meet its primary end point?
5      A.   No.
6      Q.   No.  Do you, did you read the
7  editorial by Dr. Michael Wolfe which accompanied
8  the CLASS article in JAMA in September of 2000?
9      A.   I'm sure I read it, but I don't
10  remember its content.
11      Q.   Okay.  Now, I'm going to hand you
12  what's previously been marked as Wolfe Exhibit 4.
13      A.   Uh-huh.
14      Q.   This is -- I just ripped it off.
15  There are copies attached.  Dr. Juni, do you
16  recognize this document?
17      A.   What do you mean by recognize?
18      Q.   Have you seen it before?
19      A.   I have certainly seen it before, but
20  I wouldn't recognize it optically, no.
21      Q.   Okay.  Now, I'm going to ask you to
22  look at the first page of what I've just handed

Peter Juni                                    September 21, 2010

189

1  you, which is Wolfe Exhibit 4.
2        And on the first page, the second --
3  the right-hand column, last paragraph, I'm going
4  to read a sentence into the record, which is,
5  quote, "However, even though the combined
6  incidence of symptomatic ulcers or POBs
7  associated with celecoxib was significantly lower
8  than with the comparator drugs, careful
9  examination of the data shows that the rate of
10 ulcer complications alone, the primary end point
11 of the study, was not."
12       Do you see that?
13    A.  Yes.
14    Q.  Okay.  Does that indicate to you
15 that Dr. Wolfe understood when he read the JAMA
16 article that the study had failed to meet its
17 primary end point?
18       MR. SAHAM:  Objection to form.
19 Misstates what the document says.
20       THE WITNESS:  No.  It doesn't
21 indicate that.  It indicates that Dr. Wolfe
22 understood the situation differently than I did.

190

1        This could be based just on the JAMA
2  article or based on additional documents he
3  looked at, potentially also including some
4  unpublished material at the time, I don't know.
5  BY MR. WEISS:
6     Q.  Uh-huh.
7     A.  So, if he understands it
8  differently, that's fair enough.
9     Q.  Okay.  And anyone who would have
10 read the Wolfe article, of course, or editorial,
11 would have understood that the study failed its
12 primary end point, correct?
13       MR. SAHAM:  Objection to form.
14       THE WITNESS:  Correct.
15 BY MR. WEISS:
16    Q.  Okay.  So did you -- do you recall
17 reading the Wolfe editorial and understanding
18 that the study had failed its primary end point
19 when you read the CLASS article at the same time?
20       MR. SAHAM:  Objection to form.
21       THE WITNESS:  I don't recall that.
22 I just -- I perceived that he describes exactly

191

1  what is described in the JAMA article meaning
2  that, you know, he's having two values, one
3  reaching statistical significance, the other one
4  showing a strong trend in favor of celecoxib.
5        And based on that even if the study
6  missed the primary end point, that I can't
7  remember or know whether I understood it at the
8  time what he has written here, and that it
9  clearly indicates a benefit of celecoxib that I
10 would not have concluded having seen the entire
11 data not just the first six months.
12 BY MR. WEISS:
13    Q.  Okay.  Well, if you had read the
14 JAMA article when it came out -- well, strike
15 that.
16       Is your view of the extent to which
17 the JAMA article is quote, unquote, "misleading,"
18 affected by whether or not the company disclosed
19 that the study failed its primary end point?
20       MR. SAHAM:  Objection to form.
21       THE WITNESS:  My statement on
22 whether the article is misleading, whether this

192

1  is affected by that, no, it's not.
2  BY MR. WEISS:
3     Q.  It's not.  So you wouldn't review
4  the JAMA article in a different light if you
5  understood that the study had failed its primary
6  end point than you would if you didn't understand
7  that?
8        MR. SAHAM:  Objection to form.
9        THE WITNESS:  Can I -- would you
10 repeat the question, please.
11       (Record read.)
12       THE WITNESS:  I would still conclude
13 that the four discrepancies were not -- that we
14 have pointed out earlier, were not justifiable.
15 And, no, I wouldn't view it in a different light,
16 no.
17 BY MR. WEISS:
18    Q.  Now going back to your letter of the
19 12th of July in 2002, on the second page, in the
20 language that I read into the record previously
21 about the fact that the -- it was stipulated that
22 the overall hypothesis had to be tested against

Peter Juni                                        September 21, 2010

193

1    the pooled NSAIDs and if this test was a
2    nonsignificant P value, the null hypothesis would
3    be retained.
4            My question is do you have any
5    understanding of whether or not this analysis was
6    followed with respect to the primary end point of
7    the CLASS trial?
8        A.   The primary end point, including all
9    of the events that had occurred up to 15 months,
10   which were not censored or the primary end point
11   or the main outcome measures as specified in the
12   paper?  What are you referring to?
13       Q.   No.  What I'm referring to is the
14   primary end point at six or 12 months, either
15   way.
16       A.   That's not the same.  When I talk
17   about the primary end point, I want -- I refer to
18   the definition of the outcome measure and I refer
19   to a time point which could be up to 12 or
20   15 months or not.
21       Q.   The study failed its primary end
22   point, correct?

194

1        A.   The study failed its primary end
2    point.
3        Q.   And they reached the conclusion that
4    the study failed its end point, primary end
5    point, by performing the analysis that you
6    describe here, correct?
7            MR. SAHAM:  Objection to form and
8    foundation.
9            THE WITNESS:  Let me see.
10   BY MR. WEISS:
11       Q.   It was explicitly stipulated that
12   the first overall hypothesis had to be tested
13   whether celecoxib and the pooled NSAIDs were
14   different in terms of the incidence of ulcer
15   complications.  That's what I'm referring to.
16       A.   Yes.  I understood that.  They did
17   not follow the prespecified approach, because
18   they did not include the entire body of data, and
19   they did not follow the prespecified manner of
20   interpreting the results, because they concluded
21   that celecoxib was superior to the NSAIDs and
22   this did not follow the specified process.

195

1        Q.   How could they have concluded that
2    the study failed its primary end point unless
3    they followed the prespecified analysis?
4        A.   If I look into the paper, I'm not
5    talking about the editorial now, I'm talking
6    about the paper, I see two main outcomes, the
7    composite of symptomatic ulcers or ulcer
8    complications and ulcer complications.  And I see
9    that there was a sample size consideration based
10   on the less -- least frequent of the two primary
11   outcome measures, the main outcome measures.
12           And when I then look into the
13   comment section of the paper, I find that the two
14   main outcome measures are actually given equal
15   rights and that they will just, you know, refer
16   to both of these outcome measures by reporting
17   that one reached and the other reached not
18   statistical significance, also pointing out that
19   there was a clear-cut trend.
20           Now, many people who will look into
21   that, will look into this pattern and indicate
22   then, okay, even so, the -- for one of the two

196

1    end points of equal rights statistical
2    significance was missed, the overall pattern of
3    the results we're seeing indicates that there is
4    a benefit.
5        Q.   Dr. Wolfe and others understood that
6    the trial had failed its primary end point as
7    evidenced by Dr. Wolfe's editorial, correct?
8            MR. SAHAM:  Objection to form.
9            THE WITNESS:  Let me just quickly
10   see.  That's this one.
11   BY MR. WEISS:
12       Q.   Uh-huh.
13       A.   Dr. Wolfe understood that, correct.
14       Q.   And, if he understood that the study
15   failed its primary end point -- well, strike
16   that.
17           How could anyone have determined
18   that the study failed its primary end point
19   unless they followed the prespecified statistical
20   analysis plan to make that determination?
21       A.   Well, I don't know what he is
22   referring to.  Is he referring to the six-month

Peter Juni                                    September 21, 2010

197
1    data or is he referring to the full data?
2         He could refer just to the six-month
3    data and stipulate that it failed the primary end
4    point, which wasn't.  The primary end point was
5    also complications as we indicated with, you
6    know, the maximum of accumulated follow-up
7    durations.
8         I'm not sure whether Dr. Wolfe
9    understood that or not.  I'm not in a position to
10   determine that.
11        Q.   The study failed to meet its primary
12   end point at six months and at 12 months,
13   correct?
14        A.   Yes.
15        Q.   So you're drawing a distinction
16   without a difference, correct?
17        MR. SAHAM:  Objection to form,
18   argumentative.
19        THE WITNESS:  Sorry, could you
20   repeat the question?
21   BY MR. WEISS:
22        Q.   You're making a distinction without

198
1    a difference as to whether or not Dr. Wolfe
2    understood this, it failed its end point at six
3    months or 12 months?
4         MR. SAHAM:  Objection to form.
5         THE WITNESS:  This is a statement
6    which looks at medical statistics as if they were
7    just, you know, nonsignificant or significant
8    results.
9         If we look at the point estimates of
10   the relative risks, the difference between the
11   six-month and the full results is considerable in
12   that the relative risk at 12 months is very much
13   near to one.
14        Whereas the relative risk at six
15   months is still quite below one with a confidence
16   interval still overlapping the null effect the P
17   value not reaching statistical significance.
18        But the most likely estimate and the
19   most typical estimate for the study being the
20   relative risks that Silverstein and colleagues
21   estimated.  At 12 months, this is not the case.
22   And this is not about statistical significance.

199
1         MR. SAHAM:  Are you finished?
2    BY MR. WEISS:
3         Q.   How about you listen and try my
4    question, which is -- Dr. Wolfe understood the
5    studies --
6         MR. SAHAM:  Josh, you can't
7    interrupt the witness.
8         MR. WEISS:  He's not your witness.
9         MR. SAHAM:  It doesn't matter.  I
10   can object.  You're improperly examining him.
11        MR. WEISS:  Okay, object all you
12   want.
13   BY MR. WEISS:
14        Q.   Dr. Wolfe understood that the study
15   failed to meet its primary end point, correct?
16        A.   Yes.
17        Q.   Okay.  Yes.  And whether he
18   understood --
19        MR. SAHAM:  Josh, it's completely
20   improper to interrupt the witness.  You're
21   interrupting the witness.
22        MR. WEISS:  It's improper for you to

200
1    make loud speaking objections --
2         MR. SAHAM:  Interruption of a
3    witness.
4         MR. WEISS:  -- somebody who is not
5    even your witness.
6         MR. SAHAM:  It doesn't matter whose
7    witness it is.  He has the right to complete his
8    answer.
9         MR. WEISS:  Stop.  You know, you sat
10   here and asked 400 leading questions.  I didn't
11   give speaking objections, okay.  So I'd
12   appreciate the same courtesy.
13        MR. SAHAM:  I would appreciate that
14   you let him finish answers to your question.
15        MR. WEISS:  He finished his answer,
16   whatever you say.
17        MR. SAHAM:  -- because that's
18   improper and I move to strike the next question.
19        MR. WEISS:  I'm continuing in my
20   examination.
21        THE WITNESS:  It's okay.  It's okay.
22   BY MR. WEISS:

Peter Juni                                    September 21, 2010

201

1    Q.   Is he your lawyer?
2    A.   No.
3    Q.   Do you take instruction from him?
4    A.   No.
5    Q.   Okay, good.  Dr. Wolfe understood
6    that the study failed to meet its primary end
7    point, correct?
8            MR. SAHAM:  Objection to form,
9    foundation.
10           THE WITNESS:  Dr. Wolfe specified in
11   here that the study failed its primary end point,
12   and based on the statement he makes, I'm not in a
13   position to determine whether he really meant the
14   primary end point meaning, you know, the relative
15   risks actually being calculated just using all of
16   the events that have accumulated, all meaning
17   what was published in this article.
18   BY MR. WEISS:
19   Q.   The relative risks aren't part of
20   the analysis of whether or not a study fails its
21   primary end point, are they?
22           MR. SAHAM:  Objection to form,

202

1    foundation.
2            THE WITNESS:  The relative risks are
3    not part of the analysis of whether or not the
4    trial fails its primary end point.  However, they
5    are part of any reasonable interpretation of the
6    overall pattern of trial results.
7    BY MR. WEISS:
8    Q.   Correct.  But, if the study fails
9    its primary end point regardless of what the
10   relative risks are, you don't proceed to do any
11   further analysis, correct?  That's what the
12   protocol says.
13           MR. SAHAM:  Objection to form,
14   foundation.
15           THE WITNESS:  The protocol says you
16   don't proceed to do any further analysis and you
17   do not conclude that celecoxib is more beneficial
18   than the comparator drugs.
19   BY MR. WEISS:
20   Q.   Now, with respect to the primary end
21   point, they didn't conclude that celecoxib was
22   different than the comparator drugs, did they?

203

1    A.   Well, they were just cryptic.
2    Q.   They were cryptic.
3    A.   Indeed.
4    Q.   Did anyone ever say in the JAMA
5    article or otherwise that celecoxib in the CLASS
6    trial met or satisfied the primary end point?
7    A.   Did anyone say in the CLASS trial
8    that celecoxib did not meet the primary end
9    point?
10   Q.   No.  No.  No.  No.  No.
11   A.   They didn't talk about the primary
12   end point.  Yes.  Yes.  Yes.  Yes.  Yes.
13   Q.   That's not the question I asked you.
14           MR. WEISS:  If you could read back
15   my question.
16           MR. SAHAM:  Josh, your record,
17   you're talking over each other and the record is
18   going to be unclear.
19           MR. WEISS:  That will be my problem.
20           (Record read.)
21   BY MR. WEISS:
22   Q.   Okay.  Strike that.

204

1    A.   Oh, can you strike?
2    Q.   I can strike my own question.
3    A.   That's interesting.
4            MR. SAHAM:  It doesn't get stricken,
5    but you just start -- but he is indicating he's
6    starting a new question and you're responding to
7    it.
8            THE WITNESS:  Okay.
9    BY MR. WEISS:
10   Q.   Did anybody indicate in the CLASS --
11   in the JAMA article recording the results of the
12   CLASS trial, that celecoxib had satisfied the
13   primary end point of the trial?
14   A.   No.
15   Q.   Okay.  Let's move on.
16        You go on to say in your July 12th
17   letter that you evaluated, quote, "Evaluated a
18   narrative review of the 44 patients who
19   experienced ulcer complications in CLASS?
20        "Only 11 patients (25%) developed
21   gastrointestinal symptoms before the actual ulcer
22   complication occurred."  Do you see that?

Peter Juni                                          September 21, 2010

205

1    A.   Yes.
2    Q.   Okay.  That analysis requires the
3  application of clinical judgment does it not?
4    A.   Indeed it does.
5    Q.   Okay.  And you applied your own
6  clinical judgment to that analysis, correct?
7    A.   Well, the three authors did.
8    Q.   Fair enough.
9    A.   Indeed.
10   Q.   And none of the three authors are
11 gastroenterologists, correct?
12   A.   This is correct.
13   Q.   And somebody could certainly, a
14 gastroenterologist, for example, have a different
15 view of whether or not a symptom constituted a
16 sentinel symptom or did not, correct?
17   A.   Depending on the results, he could
18 have a different view whether there were symptoms
19 presented before the actual ulcer complication
20 occurred or not.  This depends on the narrative.
21 The rest is statistics.
22   Q.   Right.  But I could, for example,

206

1  say that I think symptoms that happen 24 hours in
2  advance of an ulcer complication are sufficient
3  and somebody could say, no, it has to be at least
4  48 hours before the ulcer complication in my
5  view, correct?
6        MR. SAHAM:  Objection to form.
7        THE WITNESS:  Correct.  However, the
8  protocol prespecified certain rules about when an
9  event would be censored and the definitions about
10 this will need to respect these rules.
11       So it's within, you know, the
12 48-hour time frame actually in there was
13 prespecified in the protocol.
14 BY MR. WEISS:
15   Q.   Okay.  With all due respect --
16   A.   Again, with all due respect, and all
17 of these issues that we're talking about include
18 subjective judgement and in a situation in which
19 all of the trial results had been openly
20 discussed, and the subjective judgement would
21 have been distinguished and post hoc positions
22 like all we see here would have been

207

1  distinguished from prespecified positions, all of
2  the study results would have been on the table,
3  everybody would have been in a position to openly
4  lead this debate.
5        Q.   Okay.  You talked about the
6  censoring rules and I think you mentioned a
7  48-hour censoring rule.
8            Correct me if I'm wrong, but doesn't
9  the censoring rule only address whether or not an
10 event is counted as an end point in a trial?
11       A.   Indeed, but, if you then define
12 outcomes or events, you need to be concordant,
13 you know, with the censoring rules.
14       So there are certain -- you need
15 some concordance in there and it would need to be
16 discussed here and the way we classified the
17 events is debatable.
18       It's one way of looking at and if
19 somebody disagrees on the way and reclassifies it
20 and shows me whether the results were
21 systematically different, I would be able to, you
22 know, to appreciate that and just understand

208

1  whether they are, indeed, systematically
2  different.  I haven't seen a reanalysis of that.
3        Q.   Okay.  And even assuming that you
4  were right here, that only 11 patients or
5  25 percent developed gastrointestinal symptoms
6  before the actual ulcer complication occurred,
7  that would lead potentially to a conclusion that
8  25 percent of the patients who withdrew for
9  symptoms would have gone on to develop a
10 complicated ulcer if they had not withdrawn.
11       MR. SAHAM:  Objection to form.
12       THE WITNESS:  Let me see, I need the
13 question to be repeated.
14       (Record back.)
15       THE WITNESS:  Yes, indeed.  And
16 75 percent of patients would have not.
17 BY MR. WEISS:
18   Q.   Okay.  Did you do any analysis to
19 determine whether applying that 25 percent number
20 to the number of patients who withdrew in the
21 diclofenac arm would have yielded a statistically
22 significant result on the primary end point

Peter Juni                                          September 21, 2010

209

1  compared to celecoxib?
2      A.  We most certainly did not do that,
3  because we were not in a position to do that.
4      Q.  Okay.  You go on to say at the end
5  of this paragraph, notably -- quote, "Notably,
6  none of the 44 patients who experienced ulcer
7  complications had a symptomatic ulcer as a
8  precursor."  Do you see that?
9      A.  Yes.
10     Q.  Okay.  Are you aware that the
11  protocol prespecified that patients who had a
12  symptomatic ulcer had to be withdrawn from the
13  trial?
14     A.  Yes.
15     Q.  Okay.  So, in that regard, you would
16  never have known or nobody would ever have known
17  if a patient who had a symptomatic ulcer later
18  experienced a complicated ulcer in the trial,
19  other than outside the follow-up period?
20     A.  Yes.  There again, I think there
21  was -- but, we would need to look into the
22  protocol into these documents here to see what

210

1  the censoring rules were.
2          If I remember correctly, we were
3  talking about two weeks after withdrawal of a
4  patient that he would still be included, you
5  know, in the trial.
6      Q.  Right.  Well, assuming that were the
7  follow-up period, two weeks, and assuming that
8  somebody presented with a symptomatic ulcer, was
9  withdrawn from the trial, and was followed up for
10  two weeks, other than during that two-week
11  period, you would never know if they went on to
12  develop an ulcer complication?
13     A.  Yes, of course.  And it's
14  interesting that then, you know, these arguments
15  are being brought up by the trialists to justify
16  their decisions.
17          I'm not, you know, I don't have to
18  bring in anything.  I'm just -- we were trying
19  there to understand their way of arguments, their
20  line of arguments.
21          And we didn't find that, based on
22  the data we had available, we could support these

211

1  arguments by evidence, that's all.
2      Q.  Well, yes, that's all and all I'm
3  trying to find out is how that statement makes
4  any sense in light of the fact that the protocol
5  provides if you have a symptomatic ulcer, you
6  have to be withdrawn from the trial.
7          MR. SAHAM:  Objection to form.
8          THE WITNESS:  And, again, if we go
9  back to Geis, we can find out whether that makes
10  sense.  Shall we do that, because I would like to
11  have a look at the way he stipulates this point.
12          Give me a moment, and then we can
13  figure out whether it makes sense or not.  So --
14  okay, also the withdraw rate.
15          And so Geis stipulates on
16  Defendants' Exhibit 3, Page 11 out of 25, last
17  paragraph.  "Also, the withdrawal rate of
18  patients due to symptomatic ulcers was
19  statistically greater in the NSAID group versus
20  celecoxib group and the difference was most
21  apparent after the first six months of the study.
22          "Since symptomatic ulcers are

212

1  precursors of ulcer complications, clearly
2  high-risk patients were being depleted from the
3  NSAID group more quickly than from the celecoxib
4  group.
5  BY MR. WEISS:
6      Q.  Uh-huh.
7      A.  This implies that as a result of the
8  selective withdrawal of patients -- through this
9  selective withdrawal of patients results would be
10  biased against celecoxib.
11     Q.  Uh-huh.
12     A.  When making this statement, we
13  tested whether it made sense or not and you just
14  correctly stipulated that the statement didn't
15  make sense because patients with symptomatic
16  ulcers were, as was defined in the study,
17  actually not more likely to experience the
18  subsequent ulcer complication.
19          This is entirely related to the
20  study design and of the way -- with the way
21  actually that patients were dealt that had a
22  symptomatic ulcer.

Peter Juni                                      September 21, 2010

213

1        So his point that this could have
2    biased results against celecoxib is invalid and
3    that's what we're showing.
4        Q.   And you're purporting to show that
5    it's invalid by arguing that you didn't note any
6    patients who withdrew for a symptomatic ulcer
7    went on to develop an ulcer complication?
8        A.   Exactly that's how he argues.
9        Q.   Okay.  How could anyone have gone on
10   to develop an ulcer complication after being
11   withdrawn from the trial?
12       A.   Do you realize that your argument is
13   a tautological one?
14       Q.   Do you realize that yours is a
15   tautological one -- do you understand the
16   argument that Dr. Geis is making?
17       A.   Do you have a medical degree?
18       Q.   No.  I'm asking you.
19       A.   Do you have a clinical epidemiology
20   degree?
21       Q.   Let's get something straight here.
22   I'm here to ask the question, you're here to

214

1    answer them.
2        A.   Okay.
3        Q.   You volunteered to be here.
4        A.   That's fine.
5        Q.   If you don't want to be here, we can
6    strike all your testimony.
7        A.   Okay.  Good.  So let's continue.
8        Q.   Okay.
9        A.   The point is --
10            MR. SAHAM:  And Josh, you're
11   starting to border on badgering the witness.
12   Whether he's mine or not, your comment is
13   inappropriate.
14            MR. WEISS:  When the witness is
15   asking me questions --
16            MR. SAHAM:  Ask him questions and
17   let him answer them.
18            MR. WEISS:  Okay.  I'm curious how
19   you respond when you have a witness starting to
20   ask you questions and not responding to your
21   questions.
22            THE WITNESS:  Good.  Okay.  He

215

1    doesn't have to find out, perhaps.  So basically
2    in Geis' argument here is that patients with
3    symptomatic ulcers were predominantly depleted
4    within the NSAID group.
5    BY MR. WEISS:
6        Q.   Okay.  Let's stop for a second.  Do
7    you believe that that statement is true?
8        A.   I don't know.
9        Q.   Okay.
10       A.   The evidence that we had, the
11   statistical tests with it, did not yield
12   statistical significant results with the first
13   six months or the later six months and that's
14   also in line with the FDA reviewers.
15            Whether this was the case or not,
16   I'm not in a position to tell.
17       Q.   Okay.
18       A.   However, it goes on.  Since
19   symptomatic ulcers are precursors, and that's
20   what we get, he suggests in here symptomatic are
21   precursors of an event and he suggests that this
22   may have biased the trial result.

216

1        Q.   Uh-huh.
2        A.   And if we now look at the analysis,
3    we find, well, based on the results we're having,
4    on the data we're having, generated from the
5    CLASS trial, we do not have any evidence to
6    suggest that they are indeed precursors.
7            And the reason for that could,
8    indeed, be what you are suggesting, that
9    patients, when they developed the symptomatic
10   ulcer, are withdrawn they changed therapy, which
11   is in line with clinical decision making, so they
12   did not experience this ulcer complication.
13       Q.   Right.  Right.  So then do you
14   understand that the thesis that the authors
15   offered as a result of that was that those people
16   were no longer in the diclofenac arm so they
17   could not go on to develop a complicated ulcer
18   and that's why the results were divergent?
19            MR. SAHAM:  Objection to form.
20            THE WITNESS:  We don't have evidence
21   for that.  We're just testing the evidence we
22   have in the trial.  It's just, you know, that's

Peter Juni                                          September 21, 2010

                                                                    217

1   just a black/white hypothesis.  There's the
2   hypothesis (inaudible).  I'm testing this and I
3   don't find evidence.  I don't pursue that, after
4   it --
5   BY MR. WEISS:
6       Q.   Okay.  What I'm asking you is, how
7   could your test possibly prove or disprove that
8   theory if the patient had to have been withdrawn
9   upon developing a symptomatic ulcer?
10      MR. SAHAM:  Objection to form.
11  Asked and answered.
12      THE WITNESS:  I can only -- I can
13  only do a test with the data that are available.
14  Based on the data that are available we don't
15  find evidence to support Geis's hypothesis.
16  That's all I'm saying.
17      I can't prove the negative, but I
18  don't find evidence to suggest that this point
19  was right.  That's all.
20  BY MR. WEISS:
21      Q.   Okay.  Now, turning to the last page
22  of your July 12 letter.  And the paragraph that

                                                                    218

1   begins "Finally, Dr. Geis states that."  Do you
2   see that?
3       A.   No, sorry, I'm lost.
4       Q.   Okay.  It is the Page 18 of 25.
5       A.   So -- 18 to 25.  Yes.
6       Q.   So in the first full paragraph, the
7   second paragraph on the page, the second sentence
8   says, "After considering CLASS' results, the FDA
9   actually refused to change celecoxib's labeling."
10  Do you see that?
11      A.   Yes.
12      Q.   That's not a true statement is it?
13      A.   Could you explain what --
14      Q.   Well, the FDA did --
15      A.   -- makes you suggest --
16      Q.   The FDA incorporated data from the
17  CLASS study into the celecoxib label, did it not?
18      MR. SAHAM:  Objection.  Form and
19  foundation.
20      THE WITNESS:  Okay.  So what we're
21  talking about here and we qualified that
22  afterwards is that the labeling still states in

                                                                    219

1   its revised version that "Serious
2   gastrointestinal toxicity such as bleeding,
3   ulceration, and perforation of the stomach, small
4   intestine or large intestine, can occur at any
5   time with or without warning symptoms."
6       We were -- so we're qualifying what
7   we mean by change of celecoxib's labeling and for
8   this qualified statement, what we stipulate here
9   is true.  And if this has to be, you know,
10  referred to then it's, as I remember it, I would
11  need to look that up, just go to the
12  correspondence between the FDA and Pharmacia.
13      And the point was, indeed, just
14  related to this serious gastrointestinal
15  toxicity.  There could be other aspects that were
16  changed in the labeling, but we were qualifying
17  what we meant with this second part of the
18  sentence.
19  BY MR. WEISS:
20      Q.   Uh-huh.  But the statement, "The FDA
21  actually refused to change Celecoxib's labeling,"
22  that in and of itself is not true, correct?

                                                                    220

1       MR. SAHAM:  Objection.  Form and
2   foundation.
3       THE WITNESS:  And that's your
4   personal opinion, I disagree with that because
5   we qualified the statement with the next
6   (inaudible).
7   BY MR. WEISS:
8       Q.   Are you aware that the FDA
9   ultimately included data from the CLASS trial
10  based on nine months of exposure?
11      A.   Yes.  I am aware of that.
12      Q.   Okay.  And do you think that
13  decision was -- strike that.
14      Do you think that the FDA's decision
15  to include nine months of data in the label was
16  misleading?
17      A.   No.  I didn't think about that.
18      Q.   Uh-huh.  But the nine months is
19  certainly less than the full study duration,
20  correct?
21      A.   Exactly.
22      Q.   And the FDA made a determination

Peter Juni                                    September 21, 2010

221

1   that that was an appropriate cut of data to
2   include in the label, correct?
3       A.   The nine-month is certainly longer
4   than the six months published, correct.
5           And I'll just need to have a look
6   quickly at Kaplan-Meier estimates to tell you
7   whether they would be there.  So here probably.
8       I think the nine months are, you
9   know, debatable.  It could be that they're okay.
10  It could be that they are not.
11          We don't have strong statistical
12  evidence to suggest that there is anything more
13  justified than the primary analysis, because all
14  of the interaction tests of treatment effects by
15  time were negative at that time point -- at when
16  we were writing this article.
17          And, again, I wouldn't have any
18  argument against, you know, having the full data
19  disclosed and then having post hoc six-month and
20  nine-month analysis.
21          And based on that just an overall
22  discussion of the results, this would have been

222

1   fine.
2           So, whether or not they were okay
3   with the nine months, I can't tell.  In terms of
4   the statistical evidence there was in favor of,
5   you know, this decision or against, they didn't
6   have any strong, in my view any strong evidence
7   in favor of this decision because the
8   interactions were negative.
9       Q.   So do you think the FDA was wrong to
10  include nine-month data in the label?
11          MR. SAHAM:  Objection to form.
12          THE WITNESS:  No.  I don't think
13  there was.  They did this objective decision and
14  that there were arguments in favor and against.
15  BY MR. WEISS:
16      Q.   Do you think it was inappropriate
17  for the FDA to include data in the label which
18  was not consistent with the prespecified trial
19  duration, as you believe?
20      A.   I would need to have a look.
21  Perhaps you have this as an exhibit, at the label
22  and then I can answer your question.  Before I

223

1   can't.
2       Q.   Well, let me just -- it's a very
3   simple question which is, do you think it is
4   inappropriate to include less than the full data
5   set in the label?
6       A.   It depends on how you qualify your
7   statements.
8       Q.   Whose statements?
9       A.   The statement -- just the statements
10  that are included in the label  So, if the label
11  indicates the entire problem of the study and
12  what was believed and then you include nine-month
13  data, but you're transparent that there are
14  12-month data available and at 12-months it
15  looked like that, et cetera, I think that's
16  entirely appropriate.
17          If you just refer to nine-months
18  data and then you stop and you're not being
19  transparent about what was available at the time
20  point these analysis were done, then I think it
21  can be problematic.  So it depends on the
22  statement that they --

224

1       Q.   So somebody could reasonably make a
2   determination that less than the full data set
3   was the most valid or representative data?
4           THE WITNESS:  Can you read that?
5           (Record read.)
6           THE WITNESS:  That's the major point
7   here.  No, nobody could do that.  Why, because
8   the trial was problematic -- the two trials,
9   don't interrupt me, otherwise you have trouble
10  with him.  I would like to finish, please.
11  BY MR. WEISS:
12      Q.   Yes.  But the way this works is I
13  ask questions and you give me answers.
14      A.   But you interrupted me.
15      Q.   No.  But you don't get to answer
16  whatever it is that you feel like saying.  You
17  get to answer my question.  If you need to
18  elaborate --
19      A.   Don't patronize me.
20          MR. SAHAM:  Josh, you are badgering
21  the witness.  Ask him a question.  Give him the
22  right to answer the question, and ask another

Peter Juni                                    September 21, 2010

225

1  question.
2  BY MR. WEISS:
3      Q.  I asked you a question.
4      A.  Yes.  And then I want to give you an
5  answer.
6      Q.  But you're not giving me an answer.
7  And you're not limited to --
8      A.  You don't like the answer I give
9  you.
10     Q.  You're giving me a speech and it's
11 what you want to say, which is not to answer my
12 question.
13         MR. WEISS:  So could you read back
14 my question?
15         MR. SAHAM:  And give him a chance to
16 answer it.
17         (Record read.)
18         THE WITNESS:  The answer is no,
19 nobody could do that.
20 BY MR. WEISS:
21     Q.  I'm not talking about with respect
22 to the CLASS trial per se.  I'm talking about any

226

1  trial in general.
2          Somebody could reasonably come to a
3  conclusion that less than the full data set would
4  be the most representative or valid set of data.
5      A.  No.
6      Q.  No.  So you could never have a
7  circumstance where somebody said, you know what,
8  there were tons of confounders which made the,
9  you know, last three months of a trial completely
10 unrepresentative and not worth analyzing, and in
11 my clinical judgment, I don't think they're worth
12 looking at?
13         MR. SAHAM:  Objection to form.
14 Incomplete hypothetical.
15         THE WITNESS:  There are hypothetical
16 examples where this could be the case.  CLASS is
17 not one of these.
18 BY MR. WEISS:
19     Q.  But there are hypothetical examples?
20     A.  Correct.
21     Q.  Right.  And so a clinician --
22     A.  False education, for instance.

227

1      Q.  But a clinician or a scientist in
2  their judgment could make that determination.
3      A.  A clinician not, a scientist only
4  based on statistical evidence that is valid.
5      Q.  Okay.  Now, you have accused the
6  CLASS authors of being misleading, correct?
7      A.  No.  I have accused the manuscript
8  of being misleading, the publication.
9      Q.  I'm sure the manuscript is duly
10 offended.
11     A.  Perhaps.
12     Q.  You yourself and your coauthors in
13 the past have been accused by others of being
14 misleading, yes?
15     A.  You need to be a bit more specific.
16 I'm not sure.  Well, yes, but we were accused by
17 homeopaths that we have a misleading analysis of
18 homeopathics.
19     Q.  Uh-huh.
20     A.  We were accused by Merck Sharp &
21 Dohme to have had a misleading meta-analysis of
22 Vioxx on their rofecoxib.

228

1      Q.  Uh-huh.
2      A.  I'm sure there are other examples.
3  We take that as part of the scientific debate.
4      Q.  Uh-huh.  Uh-huh.  And when those
5  people accused you of being misleading, part of
6  their criticism was that you didn't include a
7  number of studies in your meta-analysis that they
8  thought should have been included, correct?
9      A.  I'm not aware of such an example,
10 no.
11     Q.  Okay.
12     A.  But, you -- meaning that I'm not
13 aware, you would need to point out which what you
14 are referring to.
15     Q.  Well, people --
16     A.  It could have happened.
17     Q.  You have been criticized for a lack
18 of transparency in the reporting of analyses that
19 you did, correct?
20     A.  That's not the point you made just
21 before.  But, probably you refer to a lecture
22 that was referring to our meta-analysis in The

Peter Juni                                    September 21, 2010

229

1   Lancet on rofecoxib.
2        Could this be, I'm not sure.  I
3   don't remember exactly.  I would need to see it.
4        Q.   Well, why don't we start with this.
5           MR. WEISS:  I'm going to ask
6   reporter to mark this as Defendants' Exhibit 4.
7           (Defendants' Exhibit Number 4
8           marked for identification.)
9   BY MR. WEISS:
10       Q.   Dr. Juni, Exhibit 4 is an article
11  which I understand was an article published in
12  the Lancet and is entitled, "Are the Clinical
13  Effects of Homoeopathy Placebo Effects?
14  Comparative Study of Placebo-Controlled Trials of
15  Homoeopathy and Allopathy."
16           Is this an article that you
17  coauthored?
18       A.   This is correct, yes.
19       Q.   And what was the thesis of this
20  article?
21       A.   Excuse me?
22       Q.   What was the -- what were you

230

1   studying, what were you reporting in this
2   article?
3        A.   We analyzed trials of homeopathy and
4   conventional medicine and estimated its treatment
5   effects across all treatments and conditions in
6   trials least likely to be affected by bias.  It
7   is an entirely comparative study.
8           This study has pure, you know, is a
9   theoretical study looking at the statement of
10  whether homoeopathy may have effect, systematic
11  effect from the placebo effect.
12       Q.   And what did you conclude?
13       A.   We concluded that biases are present
14  in both.  Placebo controls of homeopathy and of
15  conventional medicine, when we took into account
16  these biases there was weak evidence of specific
17  aspects of homeopathy over and above the placebo
18  effect, but still strong evidence of specific
19  effects of conventional interactions.
20           MR. WEISS:  I'm going to mark this
21  as Defendants' Exhibit Number 5.
22           (Defendants' Exhibit Number 5

231

1           marked for identification.)
2        THE WITNESS:  Thank you.
3   BY MR. WEISS:
4        Q.   Now, Defendants' Exhibit 5 is an
5   article entitled:  "Commentary.  Homeopathy and
6   The Lancet," by Peter Fisher, who is the director
7   of research, Royal London Homeopathy Hospital,
8   Great Ormond Street, London, UK.
9           Have you seen this document before,
10  Dr. Juni?
11       A.   I don't know.  I wouldn't be sure.
12       Q.   Okay.  Now, does this article refer
13  to the homeopathy article that you published in
14  The Lancet?
15       A.   Let me just see, a cluster of
16  articles.  Yes, uh-huh.
17       Q.   And I think in the first paragraph
18  it reads, quote, "The centerpiece was a
19  meta-analysis of clinical trials of homeopathy
20  compared with clinical trials of allopathy
21  (conventional medicine).
22           "The first author is Aijing Shang,

232

1   but the leader of the research group is Prof.
2   Matthias Egger of the Department of Social and
3   Preventive Medicine, University of Bern,
4   Switzerland."  Do you see that?
5        A.   Yes, I see that.
6        Q.   And that refers to the article that
7   we previously marked?
8        A.   Correct.
9        Q.   And you were coauthor?
10       A.   Indeed.
11       Q.   Okay.  Thank you.  I'm going to
12  point to the bottom of the first page on the
13  right-hand side where the heading is "The
14  Meta-Analysis."
15       A.   Yes.
16       Q.   Do you see that?  And it reads,
17  quote "The meta-analysis at the center of the
18  controversy is based on 110 placebo-controlled
19  clinical trials of homeopathy and 110 clinical
20  trials of allopathy (conventional medicine) which
21  are said to be matched.
22           "These were reduced to 21 trials of

Peter Juni                                           September 21, 2010

233

1   homeopathy and 9 of conventional medicine of
2   'higher quality' and further reduced to 8 and 6
3   trials respectively, which were, quote 'larger,
4   higher quality,' close quote.  The final analysis
5   which concluded that, quote 'the clinical effects
6   of homeopathy are placebo effects' are based on
7   just the eight, quote 'larger, higher quality'
8   close quote, clinical trials of homeopathy.
9          "The Lancet's press release did not
10  mention this, instead giving the impression that
11  the conclusions were based on all 110 trials.
12         "The criteria for the matching of
13  the homeopathy and conventional trials were not
14  clearly stated, and it is evident from the
15  numbers above that the clinical trials of
16  homeopathy and conventional medicine were not as
17  claimed, well matched -- the homeopathic trials
18  were of generally of better quality," close
19  quote.  Do you see that, Dr. Juni?
20      A.  Yes.
21      Q.  Have you read this criticism before?
22      A.  I don't think so, no.

234

1       Q.  Okay.  And, in fact.  Peter Fisher
2   is accusing you of being misleading, is he not?
3       A.  No.  He is accusing The Lancet's
4   press release of misleading.
5       Q.  Uh-huh.  And when he talks about the
6   criteria for the matching of the homeopathic and
7   conventional trials, the fact they were not
8   clearly stated and the fact that the trials were
9   not generally of better quality, you don't
10  construe that as a criticism of you or an
11  accusation that you're being misleading?
12         MR. SAHAM:  Objection to form.
13         THE WITNESS:  Indeed I do.  But we
14  were in line with our methodology.  We were
15  transparent and we didn't match for quality.  So
16  everything was in line there.  And we
17  transparently as specified in the methods.
18  BY MR. WEISS:
19      Q.  Okay.  Well, moving onto the next
20  section on the second page, it says
21  "Transparency, Sensitivity and External
22  Validity."

235

1          And I'm quoting from the next
2   paragraph, quote "One of the most serious
3   criticisms is the complete lack of transparency;
4   we have no idea which eight trials were included
5   in the final, damning, analysis.
6          "The literature references are not
7   given, nor any information on the diagnoses,
8   numbers of patients, etc., nor can we be deduced
9   from the article.
10         "Prof. Egger has refused several
11  requests to disclose the identity of the eight
12  trials.  This is not even a matter of scientific
13  method, but of that natural justice:  the accused
14  has the right to know the evidence against him.
15         "Meta-analysis should incorporate
16  sensitivity analysis.  In this case the obvious
17  sensitivity analysis is to look at the 21 trials
18  of, quote 'higher quality,' particularly since it
19  appears at the criterion, quote 'larger' appears
20  to have been added retrospectively to a 'higher
21  quality.'  But the result of this analysis was
22  not published."

236

1          Do you see that, Dr. Juni?
2       A.  Sorry, but the results of this
3   analysis was not published.  Yes, I see that.
4       Q.  You see that.  And, of course, Peter
5   Fisher is accusing you of a lack of transparency,
6   correct?
7       A.  And we addressed that, but -- well,
8   first of all, I'm not able to talk about the
9   contact Peter Fisher had with Matthias Egger.  So
10  I am not able to talk about that.
11      Q.  I haven't asked you about that.
12      A.  I know that as a reaction of several
13  reactions we had from homeopaths, that we posted
14  additional material on our institute's website.
15      Q.  Uh-huh.
16      A.  And I'm currently not in a position
17  to indicate what the level of detail was, I
18  forgot.  I was involved in that, but we would
19  need to look into that.
20      Q.  Right.  But when you wrote that
21  article, you made the decision about what
22  information to disclose and what information not

Peter Juni                                        September 21, 2010

237

1　to disclose, correct?
2　　　　MR. SAHAM:  Objection to form.
3　　　　THE WITNESS:  In a meta-analysis,
4　yes, because we have restricted space.
5　BY MR. WEISS:
6　　　Q.　Okay.  But you made a decision about
7　what information you were going to disclose to
8　the public and what information you were not
9　going to disclose about the methodology of your
10　analysis?
11　　　A.　Not about the methodology, but about
12　the identity of the trials included.
13　　　Q.　Okay.
14　　　A.　We did that in a subsequent opinion.
15　　　Q.　And people thought that your failure
16　to do so was misleading, correct?
17　　　　MR. SAHAM:  Objection to form.
18　　　　THE WITNESS:  Amid homeopaths.
19　BY MR. WEISS:
20　　　Q.　Right.  And you don't agree with
21　them, correct?
22　　　A.　No, I think it's a fair comment that

238

1　they want more transparency and that's part of
2　the scientific debate.  And I would need to look,
3　or we would need to look and we can also do that
4　now, what is probably still posted on our
5　website.
6　　　　I think that we actually have
7　posted, have disclosed just the full details of
8　the trials.  But, I wouldn't be sure.
9　　　Q.　But, that was -- you disclosed those
10　details only after you published the article,
11　correct?
12　　　A.　Indeed, yes.
13　　　Q.　Okay.  And when you failed to
14　disclose those details when you wrote the
15　article, was it your intention to be misleading?
16　　　A.　No.
17　　　Q.　Okay.  And --
18　　　A.　That's not a randomized trial,
19　though.
20　　　Q.　Oh, okay.  Okay.  One more question
21　and then we'll take a break to change the tape.
22　　　A.　Okay.

239

1　　　Q.　In the second paragraph under the
2　heading "Transparency, Sensitivity and External
3　Validity," do I correctly read Peter Fisher's
4　criticism to indicate that you added
5　retrospectively criteria to your analysis?
6　　　A.　Where is this, can you read it,
7　please.
8　　　　MR. SAHAM:  Objection to form.
9　BY MR. WEISS:
10　　　Q.　I'm reading it, quote,
11　"Meta-analysis should incorporate sensitivity
12　analysis.  In this case the obvious sensitivity
13　analysis is to look at the 21 trials of, quote
14　'higher quality,' particularly since it appears
15　that the criterion, quote, 'larger' appears to
16　have been added retrospectively to, quote 'higher
17　quality.'  But the results of this analysis was
18　not published."  Do you see that?
19　　　A.　I see that, yes.
20　　　Q.　And he's accusing you of adding,
21　retrospectively adding criteria to your analysis?
22　　　A.　Yes.  Which I'm -- which I'm sure we

240

1　didn't.
2　　　Q.　You're sure that you didn't?
3　　　A.　Yes.
4　　　Q.　Okay.  So he's wrong?
5　　　A.　He's wrong, yes.
6　　　Q.　He is just wrong.
7　　　　MR. WEISS:  All right.  Let's change
8　the tape.
9　　　　THE VIDEOGRAPHER:  Off the record at
10　2:39 p.m.
11　　　　(Recess -- 2:39-3:14 p.m.)
12　　　　THE VIDEOGRAPHER:  This is the
13　beginning of Tape Number 4.  Back on the record
14　at 3:14 p.m.
15　BY MR. WEISS:
16　　　Q.　Dr. Juni, where we last left off, we
17　were discussing Exhibit 5 and I'd like to go back
18　to Exhibit 5 and I'd like you to look on the
19　second page of Exhibit 5, there's a heading
20　"Upper Respiratory Tract Infections."  Do you see
21　that?
22　　　A.　Uh-huh.

Peter Juni                                    September 21, 2010

241

1    Q.   Okay.  And then the second paragraph
2    of that, under that heading reads, quote, "But
3    perhaps the most single telling criticism of this
4    meta-analysis is that it fails, on multiple
5    accounts, to meet the generally accepted
6    standards for meta-analysis, the QUORUM statement
7    (Quality of Reports of Meta-Analyses of
8    Randomized Closed Trials), published in The
9    Lancet itself in 1999 (12).  The main failings
10   are those outlined above although there are
11   others."  Do you see that?
12   A.   Yes.
13   Q.   Are you familiar with the QUORUM
14   statement which was published in The Lancet in
15   1999?
16   A.   Indeed I am.
17   Q.   And do you endeavor to follow the
18   generally accepted standards as set forth in
19   QUORUM in publishing your meta-analyses?
20   A.   Yes, we do.
21   Q.   Okay.
22   A.   So I assume here he was referring

242

1    mainly to the tabulation of individual trials
2    that in the first place didn't make it into the
3    paper.
4        That we then subsequently, and I
5    fully agreed that this was a mistake,
6    subsequently only published on our institute's
7    website.
8        Now, what I can't tell you is how
9    the process went there, whether we initially
10   submitted it but they decided not to publish it
11   as a web appendix, or whether we didn't, whether
12   we failed to submit, you know, the individual
13   trial details.
14   Q.   Uh-huh.
15   A.   Whether he refers to anything else,
16   I can't see, because if I look at the other
17   comments, they don't refer to the QUORUM
18   statement.  So I think it's mainly this, what I
19   just stated.
20   Q.   Okay.
21   A.   The trials.
22   Q.   And I think earlier in your

243

1    testimony you testified that one of your
2    criticisms of the JAMA article was that it didn't
3    follow internationally-accepted standards for
4    publishing clinical trials, is that fair?
5    A.   Indeed, yes.
6    Q.   And that's exactly what you're being
7    accused of doing in connection with your -- with
8    Exhibit 4, which was your homeopathic study.
9    A.   Indeed we were accused by a
10   homeopath not to follow international accepted
11   standards.  I think we followed them by 90,
12   95 percent, made certainly a mistake with this
13   one.
14       My point of view is that the
15   dimension, you know, of their mission is
16   different.  But, again, that's a matter of debate
17   and different people will look at it differently.
18   Q.   Okay.  Do you think that Paul Fisher
19   was wrong in his accusation that you didn't
20   follow the QUORUM standards?
21   A.   Well, he was wrong that we didn't
22   follow, because I know we followed, but we didn't

244

1    fully satisfy it.
2    Q.   Do you think you could have a
3    legitimate difference of opinion with Mr. Fisher
4    about whether or not you, in fact, followed the
5    QUORUM standards?
6    A.   I would need to look at the QUORUM
7    statement now to determine how it was at that
8    time.  The statement has now been updated and is
9    different and I only have this in mind.
10       So I would need to look at it, but
11   probably I would agree with him that we failed to
12   include references of individual trials.
13   Q.   Okay.
14   A.   And he made that up afterwards.  He
15   corrected that.
16   Q.   Okay.  Did your failure to include
17   those references to other trials and your failure
18   to comply with the QUORUM statements render your
19   article on homeopathy misleading?
20   A.   No.  Not in my view.
21   Q.   In Mr. Fisher's view was it
22   misleading?

Peter Juni                                    September 21, 2010

245

1         MR. SAHAM:  Objection to form.
2         THE WITNESS:  In Mr. Fisher's view,
3    being a homeopath and not liking the results,
4    this matter now is, per se, is misleading.
5    BY MR. WEISS:
6         Q.   So you think that Mr. Fisher's
7    criticisms were motivated by his status as a
8    homeopath?
9         MR. SAHAM:  Objection to form.
10        THE WITNESS:  I don't know.  I can't
11   read minds, but it would, you know, we were
12   hassled at that time by many homeopaths,
13   including him, apparently.
14        And things got very personal
15   sometimes and we -- I've sort of given up a bit
16   just on this debate there, just because things
17   got very personal.
18        So there was a lot of well, contra
19   (ph.), I think that's an English term as well,
20   coming into that, and I couldn't tell how Peter
21   Fisher actually was coming to his conclusion.
22   BY MR. SAHAM:

246

1         Q.   Do you think that the criticisms are
2    less valid by virtue of the fact that they come
3    from a homeopath?
4         A.   No, not the criticisms.  But I think
5    you can -- you can qualify a bit criticisms from
6    where they're coming and whether they are
7    consistent criticisms, et cetera, or not and
8    that's always the case.
9         And this is -- this should be, you
10   know, criticisms should trigger scientific
11   debate.  And this was the case here with, you
12   know, with a formal commentary, that's fine.
13        Some of them were also very, you
14   know, informal and difficult, that's what we like
15   less.  So that's fair enough.  He makes his
16   points, we tried to amend some parts, that's it.
17        Q.   Okay.  And so you think that his
18   criticism represents an aspect of scientific
19   debate?
20        A.   I think so.
21        Q.   Okay.  And you said that -- you said
22   I think you can qualify criticisms from where

247

1    they are coming and whether they are consistent
2    criticisms.
3         There were additional criticisms
4    about this article that you published in Lancet
5    about homeopathy, correct?
6         Fisher wasn't the only one?
7         A.   No.  Fisher wasn't the only one.
8    But I wouldn't say that 15 published comments
9    overall mainly by homeopaths indicates that the
10   field is consistently criticizing.
11        Q.   Okay.  And that would hold true even
12   if the criticisms were of the same nature?
13        MR. SAHAM:  Objection to form.
14        THE WITNESS:  I don't know.  It
15   depends on what the criticisms are.  If they
16   asked this one, you know, that was referring to
17   the identity of these 110 trials, that's a valid
18   criticism, can be addressed and dealt with it
19   subsequently.
20   BY MR. WEISS:
21        Q.   Okay.
22        A.   Research is never perfect.  And, you

248

1    know, it's always difficult, and being a trialist
2    myself, I know how difficult it is to perform
3    trials.
4         Q.   Uh-huh.
5         MR. WEISS:  These are organized
6    different than I had them originally.  Let's mark
7    this as Defendants' Exhibit 6.
8         (Defendants' Exhibit Number 6
9         marked for identification.)
10   BY MR. WEISS:
11        Q.   Exhibit 6 is a series of letters
12   which were, as I understand it published in
13   Lancet, December 17th, 2005.
14        The title under which these letters
15   appear are "Are The Clinical Effects of
16   homeopathy Placebo Effects"?
17        Dr. Juni, I will ask you to refer to
18   the first letter which is authored by Harald
19   Walach, Wayne Jonas and George Lewith, you see
20   that?
21        A.   Yes.
22        Q.   And the first paragraph of that

Peter Juni                                    September 21, 2010

249

1    letter says: "Aijing Shang and colleagues show
2    that a small-study bias pervades all clinical
3    research. They suggest that, for homeopathy,
4    this observation is a mortal blow because the
5    combined odds ratios of the largest homeopathy
6    trials converged to zero. We believe that there
7    are some flaws in this argument." Do you see
8    that?
9        A.   Yes.
10       Q.   Is that referring to the article
11   that we previously marked as Defendants'
12   Exhibit 4?
13       A.   Correct.
14       Q.   Okay. And I'm going to read from
15   the next paragraph which says, quote "First, the
16   argument hinges on the fact that the studies
17   chosen are representative of homeopathy in
18   practice and therefore externally valid.
19            "As far as we are aware, none of the
20   studies assess individualized classic homeopathy
21   as commonly practiced in the UK and Europe.
22            However, Shang and colleagues have

250

1    not disclosed details of the eight largest
2    homoeopathic studies." Do you see that?
3        A.   Yes.
4        Q.   And is that consistent with the
5    criticism that Mr. Fisher offered about your
6    failure to disclose details of the trials that
7    you considered in your analysis?
8        A.   Correct.
9        Q.   Okay. And the second paragraph, or
10   the next paragraph reads, quote: "Second, the
11   six studies of conventional interventions are, by
12   comparison, highly selected," close quote.
13            Do you have any understanding of
14   what the authors mean by highly selected?
15            MR. SAHAM: Objection to form.
16            THE WITNESS: I'm just reading it,
17   sorry.
18   BY MR. SAHAM:
19       Q.   Sure. Sure. Sure.
20       A.   Well, the answer is no. And I know
21   how we selected them and -- well, I know what
22   they mean, but I don't think that they have a

251

1    point. I have an understanding of what they
2    mean, I don't think they have a point.
3        Q.   Okay. What do you understand that
4    they mean?
5        A.   I think they mean that these set
6    trials are evaluating interventions that have
7    gone through rigorous clinical testing, you know,
8    through admission processes -- approval
9    processes, et cetera and that they're referring
10   to that.
11       Q.   Okay. Are they essentially saying
12   that you are purposefully picked trials because
13   you knew that they would lead to a particular
14   result?
15       A.   No. They're not saying that.
16       Q.   Okay.
17       A.   They say the trials are highly
18   selected because of the nature of their clinical
19   interventions, the conventional interventions
20   that they actually addressed.
21       Q.   Uh-huh. But you don't think that
22   that is what they're saying here is that you

252

1    chose trials because you wanted to achieve a
2    particular result and you knew those trials would
3    help you get there?
4        A.   I don't think that they're saying
5    that.
6        Q.   Okay.
7        A.   No.
8        Q.   Okay.
9        A.   Incidentally, I know many of these
10   people here personally pretty well and we
11   discussed quite a lot of these criticisms with
12   them and I know Walach, I know Klaus Linde on the
13   next page, quite well, and I consider Klaus Linde
14   even a friend, and this is part of the scientific
15   debate that's going on.
16       Q.   Hmm.
17       A.   Also something which is important
18   is, and this was a mistake, that this was not
19   part of the abstract, it's only in the text.
20            We did two different types of
21   analysis to address small study effects, okay.
22   One is the restriction to large trials of higher

Peter Juni                                          September 21, 2010

253
1  quality and the other is that we modeled the
2  effect based on all 110 trials.
3       So we included all of the 110 trials
4  in the analysis and based on that we developed a
5  statistical model to estimate the effects in
6  large scale trials.
7       Q.  Uh-huh.
8       A.  So we did both.
9       Q.  Uh-huh.
10      A.  And that if these documents that are
11 coming up, they all consistently were interest,
12 you know, dealing with these eight and six trials
13 and that's it.  And we were rather unhappy about
14 our decision at that time, you know, we were
15 smarter afterwards not to include the modeled
16 effects also in the abstract.
17      Q.  Okay.
18      A.  That's the scientists.
19      Q.  Okay.  And then the next letter,
20 which I think you reference was for Klaus Linde
21 and Wayne Jonas.
22      A.  Uh-huh.

254
1       Q.  I'll point you to the middle of the
2  first paragraph, which is the third column on the
3  first page and it reads "However, there are major
4  problems with the way Shang and colleagues
5  present and discuss their results as well as how
6  The Lancet reviewed and interpreted this study We
7  will point out two.
8       "First, Shang and colleagues do not
9  follow accepted and published guidelines for
10 representing meta-analyses."  Do you see that?
11      A.  Yes.
12      Q.  Is that consistent with the
13 criticism that was offered by Mr. Fisher in the
14 previous document we looked at?
15      A.  Yes.  With the criticism I
16 acknowledged to be correct that we amended
17 afterwards, yes.
18      Q.  Okay.
19      A.  Addressed and amended.
20      Q.  Right.  And then they reference the
21 QUORUM statement and then going down a few
22 sentences, it reads, quote "The QUORUM statement

255
1  clearly requires that meta-analyses 'present
2  descriptive data for each trial' and 'data needed
3  to calculate effect sizes and confidence
4  intervals,'" close quote.
5       Is that consistent with your
6  understanding of what the QUORUM statement
7  requires?
8       A.  Yes, indeed.  Now it depends on
9  whether you considered this part here as a
10 clinical meta-analysis or not.
11      The QUORUM statement was established
12 for clinical meta-analyses and not for the
13 purpose we did here.
14      So the sheer volume of data made it
15 at the time made it quite difficult, even though
16 I agree, it should have been more transparent and
17 we compensated for that subsequently.
18      Q.  So when these people are criticizing
19 you, they're just wrong?
20      A.  No.  I was indicating that they are
21 not wrong, that's fine, fair enough.  That's
22 research and you can get better.

256
1       Q.  Okay.  Fair enough.  It goes on to
2  say quote, "Shang and colleagues do not report
3  the trials excluded from the review, the quality
4  assessments and odds ratios of all trials
5  included in the review, nor which eight trials
6  were included in the final metaanalysis.
7       "This lack of detail is unacceptable
8  on a paper drawing a strong clinical conclusion,"
9  close quote.  Do you see that?
10      A.  Yes.  I see it.
11      Q.  Do you agree that the lack of detail
12 that is described there is unacceptable in a
13 paper drawing such as strong conclusion?
14      A.  A strong clinical conclusion.
15      Q.  Yes.
16      A.  I don't agree on that, because we
17 didn't draw any clinical conclusions.  So I don't
18 agree on the statement on the strong clinical
19 conclusions.
20      Q.  Okay.
21      A.  And again, you know, to have a web
22 appendix which includes the state of what we

Peter Juni                                          September 21, 2010

257

1    subsequently did, as far as I remember that
2    correctly, and you may have as an additional
3    exhibit our response to that, that we could check
4    actually what we did exactly and how we argued
5    there.
6        Q.   Uh-huh.  Uh-huh.  Uh-huh.
7        A.   And just, you know, to specify that,
8    then correct and just show all of the data,
9    that's fair enough.  The point is none of these
10   omissions will change any of the results we made.
11           So the results -- first of all, the
12   analysis were still according to the protocol we
13   submitted to the Swiss government when this
14   analysis actually was set up, was planned,
15   actually, and none of the criticisms that were
16   brought up changed anything in terms of the
17   results.
18           And there wasn't, you know, just an
19   additional analytical approach that we should
20   have made that we didn't report that showed
21   different results.  This wasn't the case.
22       Q.   So just because Dr. Linde, I think

258

1    who you described as relatively eminent and well
2    regarded, says that something that you did was
3    unacceptable, that doesn't make it so, does it?
4        MR. SAHAM:  Objection to form.
5        THE WITNESS:  Well, I didn't say
6    it's -- let me, see where does it say that?
7    BY MR. WEISS:
8        Q.   Where does it say what?
9        A.   The term unacceptable, I would like
10   you to --
11       Q.   If you look at the third column.
12       A.   Yes.  That's fine.
13       Q.   If you look at the last sentence,
14   before the last paragraph.
15       A.   "This lack of detail is inacceptable
16   in a paper drawing a strong clinical conclusion."
17           So the point I'm making there is
18   that from our point of view this wasn't about the
19   strong clinical conclusion, that's it.
20           And if Klaus Linde is indicating
21   that, and again -- well, it depends on the
22   perspective, how acceptable or inacceptable this

259

1    is in here.
2            But, again, I stipulate
3    repetitively, we tried to address it by providing
4    additional information.
5        Q.   Okay.  So the fact that -- well,
6    strike that.
7            Klaus Linde's opinion that what you
8    did was unacceptable was nothing more than his
9    opinion, am I right?
10       A.   No.  He has a point that we
11   addressed.
12       Q.   Uh-huh.
13       A.   Now, you know, the statement or the
14   qualifying term inacceptable or, you know, the
15   choices of using, you know, a term like
16   unacceptable or using a different term, I think
17   that's his subjective choice.
18       Q.   Uh-huh.
19       A.   The problem he brings up is an issue
20   and we tried to address it.
21       Q.   Okay.  Now, if you turn to the next
22   page.

260

1        A.   Yes.
2        Q.   I'll see if I can follow.  There's
3    another letter and this one is authored again by
4    Peter Fisher, Brian Berman, Jonathan Davidson,
5    David Reilly, Trevor Thompson on behalf of 29
6    other signatures.
7        A.   Yes.
8        Q.   Okay.  And I'm going to read you
9    from the top of the second column on the second
10   page and it says, quote "We wish to raise
11   concerns about the meta-analysis of homeopathy by
12   Aijing Shang and colleagues.  It is based on 110
13   trials of homeopathy and 110 of conventional
14   medicine, which are said to be matched although
15   the criteria are not clearly stated.
16           "They were not well matched for at
17   least one crucial parameter--trial quality--which
18   was higher for the homeopathy studies.
19           "The conclusion that, quote 'the
20   clinical effects of homeopathy are placebo
21   effects' is based on only eight, anonymous,
22   clinical trials.

Peter Juni                                          September 21, 2010

261
1       "These studies are not referenced
2    and no information is given about them.  The
3    quality criteria are standard measures of
4    internal validity, but before reaching their
5    conclusion, Shang and colleagues added a further
6    criterion--study size."  Do you see that?
7       A.  Yes.
8       Q.  Is that true that after -- before
9    reaching your conclusion, you and your colleagues
10   added a further criteria to the analysis?
11      A.  In my opinion, no.  We -- our forum
12   actually defined the study size, you know, as one
13   of the issues to look at.
14      Q.  Uh-huh.
15      A.  Which also makes sense, you know,
16   knowing that the final plots, the plots you're
17   seeing in Exhibit --
18      Q.  Four.
19      A.  -- four, Figure 2, that's the final
20   plot looking at the association of effect size
21   versus study size.  This final plot was mainly
22   introduced in the medical literature by the

262
1    senior author of this paper.
2       Q.  Uh-huh.
3       A.  And that is something we routinely
4    do and our institute routinely has been doing
5    since actually my colleague, M. Becker and I came
6    to Bern in 2002, again from Bristol.
7           So that's why we were able to
8    perform meta-analysis.
9       Q.  Okay.
10      A.  Now, if we wanted to know
11   specifically, we would need to look into, you
12   know, the protocol that was submitted to the
13   Swiss government, but to a high degree of
14   certainty, I'm convinced that we have actually
15   included this criterion in a prespecified manner.
16      Q.  So, again, Mr. Fisher is just wrong?
17      A.  Well, again, does he cite where he
18   has the information from.  I mean, there was the
19   protocol just submitted to the Swiss government.
20   That's it.
21      Q.  Uh-huh.
22      A.  So -- and I'm not sure where he has

263
1    this information from.
2       Q.  Uh-huh.  But you didn't --
3       A.  And I would like to -- and I would
4    like to have a look because I can't remember that
5    exactly.  I would like to have a look at our
6    reply to, you know, to further qualify my
7    statements and to amend my memory.
8           If you -- if we wanted to pursue
9    that more specifically, we would need to look at
10   our reply.
11      Q.  Right.  Okay.  The next paragraph
12   down, or the last sentence of that paragraph
13   says, quote "The opacity of this paper means that
14   it fails a key test of a good scientific report;
15   that the reader should, in principle, be able to
16   reproduce it."  Do you see that?
17      A.  Yes.
18      Q.  Do you agree with that criticism?
19      A.  Again, yes, I do, because we didn't
20   include the web appendix with the trials.
21      Q.  Okay.  And do you think that your
22   failure to include the web appendix with the

264
1    trials rendered your paper misleading?
2       A.  No.
3       Q.  Okay.  The next paragraph reads,
4    quote "We also have some concerns about the
5    literature review; some studies seem to have been
6    inappropriately included and excluded, although
7    the lack of clarity in the paper makes it
8    impossible to be certain."  Do you see that?
9       A.  I see that, yes.
10      Q.  Okay.  When you do an analysis of
11   the type that's represented in Defendants'
12   Exhibit 4, the trialists or the study authors
13   have to exercise their judgment about which
14   trials to include and which trials not to
15   include, correct?
16      A.  Indeed.
17      Q.  And, in doing the study that is
18   reflected in Defendants' Exhibit 4, you and your
19   colleagues exercise your judgment about what
20   trials to include and not to include in your
21   analysis?
22      A.  Correct.  Yes.

Peter Juni                                      September 21, 2010

265

1        Q.   And then when you published a paper
2   about the results, you didn't disclose which
3   trials you had decided to include and which
4   trials you had decided to exclude, correct?
5        A.   We didn't disclose with reference,
6   which is as a matter of fact something which is
7   very common just in standard mainstream papers.
8        So it's different if you look at the
9   reviews of the Cochrane Collaboration, you know,
10  where they have extensive space, up to 80, 90
11  pages or so.
12       But it's quite common that these
13  exclusions are not, you know, referred to with
14  references.  So we will find many of these and I
15  don't think that this comment is, you know,
16  particularly a worrying one.
17       Q.   Okay.  Well, do you, you know, all
18  of the authors -- well, strike that.
19       All of the commentary that we
20  referred to didn't seem to think that your
21  failure to include those citations was so
22  standard, did they?

266

1        MR. SAHAM:  Objection to form.
2        THE WITNESS:  Well, they criticized
3   this indeed and if you want know how standard it
4   is, you would need to do a quality assessment of,
5   you know, of systematic views published at that
6   time.
7        And then my educated guess would be
8   that very few of the paper-based systematic
9   reviews would provide references for the papers
10  that are being excluded.  This would be to --
11  this would be very rare to find.
12  BY MR. WEISS:
13       Q.   Uh-huh.  So, then, for example,
14  Peter Fisher, Brian Berman, Jonathan Davidson
15  David Reilly, Trevor Thompson on behalf of 29
16  other signatories, all of those people just don't
17  have any understanding of how standard of a
18  practice that actually is?
19       MR. SAHAM:  Objection to form.
20       THE WITNESS:  I can't judge their
21  understanding of things.  I see what they write
22  and this, you know, that's, you know, if we would

267

1   like to know, we would need to have -- to have a
2   systematic review on that the methodological
3   study.
4        And I'm rather convinced that it
5   would not be established as standard, that's the
6   exception.  And so to speak they criticize it,
7   that's fair enough, but I wouldn't consider this
8   to be a standard.
9   BY MR. WEISS:
10       Q.   Uh-huh.
11       A.   And I think it is important to keep
12  in mind there that, you know, our institute in
13  Bern, who did -- who was in charge, you know, of
14  coordinating this meta-analysis has an
15  international reputation in systematic review.
16       So we know pretty well how to do or
17  how not to do things.  Nobody is perfect.  There
18  were omissions in that, but now this particular
19  omission that you were referring to would not be
20  considered as a standard.
21       Q.   Uh-huh.  Okay.  Well, do you think
22  all of these people, who criticized your failure

268

1   to include those references thought that it was
2   standard to not include references, they would
3   have written these commentaries to The Lancet?
4        MR. SAHAM:  Objection to the form.
5        THE WITNESS:  I'm not in a position
6   to read their minds.  And I'm not -- I wasn't
7   there when it was decided to actually what was on
8   the paper or not.
9   BY MR. WEISS:
10       Q.   Okay.  Okay.  The next letter is
11  from Flavio Dantas.
12       A.   Where do I have that?
13       Q.   Maybe that is not included in yours.
14  Let me see if I have the next one.
15       MR. WEISS:  Please mark this one
16  separately as Defendants' Exhibit 7.
17       (Defendants' Exhibit Number 7
18       marked for identification.)
19  BY MR. WEISS:
20       Q.   So we're now at Defendants'
21  Exhibit 7, which is another letter that was
22  published in Lancet and it is from a gentleman by

Peter Juni                                      September 21, 2010

269

1  the name of Flavio Dantas.
2        And I will direct your attention to
3  the top of the second column where it reads,
4  quote "Shang, and his colleagues played the
5  'substitution game' and selected eight
6  higher-quality trials of homeopathy and six
7  trials of allopathy with the largest samples.
8        "Were all of the types of homeopathy
9  represented in this sample?  I assume that only
10  non-individualized homoeopathic trials were
11  included, but I cannot be sure since Shang and
12  colleagues have not informed us."
13        Do you agree with Mr. Dantas'
14  criticism that you and your colleagues "played
15  the substitution game"?
16        MR. SAHAM:  Objection to form.
17        THE WITNESS:  I don't understand
18  what he means by substitution games so I can't
19  agree with that because I don't understand it.  I
20  don't disagree either.
21  BY MR. WEISS:
22        Q.   Okay.  In the third column, in the

270

1  middle of the paragraph, Mr. Dantas goes on to
2  say, quote, "It is time for doctors to be humble,
3  honest, and balanced in their appraisal of
4  homeopathy and to join peacefully with
5  homoeopathic researchers in doing more rigorous
6  clinical trials."
7        Do you interpret that to be an
8  accusation that your article was not honest?
9        MR. SAHAM:  Objection to form.
10        THE WITNESS:  No.
11  BY MR. WEISS:
12        Q.   No?
13        A.   No, I don't.
14        Q.   And he says "It's time for doctors
15  to be humble, honest and balanced in their
16  appraisals of homeopathy," you don't think that
17  he is referring to you and your colleagues who
18  wrote the --
19        A.   No, I don't.
20        Q.   Okay.  Now, you wrote a reply,
21  correct, to that?
22        A.   This would be well appreciated, yes.

271

1        Q.   Okay.
2        A.   Because I need to --
3        MR. WEISS:  Let's mark this as
4  Defendants' Exhibit 8.
5        (Defendants' Exhibit Number 8
6        marked for identification.)
7  BY MR. WEISS:
8        Q.   Now, I'm going to ask you to turn to
9  the second page of your reply.
10        A.   Yes.
11        Q.   And I'll ask you to look in the
12  second column or the middle column and just above
13  the last paragraph, or the second to the last
14  paragraph it says, quote, "Contrary to the claims
15  of Peter Fisher and colleagues, we clearly stated
16  the matching criteria and made all of the
17  references available in webappendices and
18  provided information on outcomes in a webtable.
19        "A list of excluded studies, and
20  further details on the included studies, are also
21  now available from" and it gives a website.
22        Now, when you say that you clearly

272

1  stated the matching criteria and made all of the
2  references available in webappendices, was that
3  before or after you published the article?
4        A.   Well, if you look at the article,
5  the article, you know, I just -- I wasn't aware
6  of that anymore.  I knew that we published
7  additional stuff, additional information on our
8  webpage.
9        Now, if you look at the article, you
10  will find this sign here.  This indicates
11  probably at that time that there is additional
12  information available.  I'm not entirely sure
13  about this, they changed the symbols, but,
14  probably this indicates.
15        So we will be -- it will not be a
16  problem to look that up entirely and just see
17  what we do -- did.  And I can also quickly just
18  have a look here just to find out what was going
19  on.  Let me quickly see.
20        So, first of all, in the paper we
21  write, in the results section, which confirms
22  that there was this web appendix, I couldn't

Peter Juni                                    September 21, 2010

273

1  remember that before, so I was even too humble in
2  addressing the issues comment.
3         We included 105 publications that
4  reported on the total of 110 independent
5  trials -- 110 independent trials of homeopathy,
6  Web Appendix 1, and 110 publications of 110
7  matched trials of conventional medicine, Web
8  Appendix 2.
9         The references were included there.
10  This is fair enough.
11     Q.   Oh, okay.
12     A.   Then we go on and we still have the
13  problem with the trials of higher methodological
14  quality.  We amend that in our letter, that's
15  part of the scientific debate, called post
16  publication peer review.
17         And just indicate that all of the
18  references that refer to the trials that were of
19  high methodological quality and we just have
20  included that in there.
21     Q.   Okay.
22     A.   In addition, we also now just

274

1  provided, then, to compensate for that additional
2  material.
3         So thinking about what Fisher said,
4  and also some of the comments here, they didn't
5  do their homework properly.
6         We followed more, you know, the
7  QUORUM statement than I initially thought,
8  because I would have forgotten about these web
9  appendices.
10     MR. SAHAM:  Professor Juni, if you
11  could just speak a little more slow slowly, I
12  think it would be helpful for the court reporter.
13     THE WITNESS:  Yes.
14  BY MR. WEISS:
15     Q.   Okay.  So all of the information was
16  available so then --
17     A.   Not all.
18     Q.   -- I'm just confused.  And how is it
19  that all of these people, including Peter Fisher,
20  the 29 signatories to his letter and the other
21  people who provided commentary felt that they
22  were misled?

275

1     A.   Again, not all of the information
2  was available.  The information on which
3  reference we were referring to, the trials of
4  higher quality was lacking.  We amended that,
5  fair enough.
6     Q.   Okay.
7     A.   But, the -- most of the rest was
8  included and we then just provided additional
9  information on outcomes in a webtable.
10     Q.   Okay.  So even --
11     A.   So we didn't follow all of it, but
12  we tried.
13     Q.   Uh-huh.
14     A.   And you need to keep in mind there
15  we're talking about rather lengthy documents, you
16  know, like twice 110 references for a scientific
17  paper.  This is never accepted normally.
18     Q.   Uh-huh.
19     A.   So you need to be careful what you
20  bring, but we could have done better and we tried
21  to amend it.
22     Q.   Uh-huh.  Uh-huh.  So you're saying

276

1  at that least some of the information was there,
2  but all of the scientists and clinicians who
3  wrote commentaries, they just didn't see it?
4     MR. SAHAM:  Objection to form.
5  Misstates the testimony.
6     THE WITNESS:  No.
7  BY MR. WEISS:
8     Q.   Well, I thought you said that
9  actually there was a web appendices which had the
10  information which people accused you of not
11  disclosing.
12     A.   There was information on the
13  references of the 110 trials included.  There was
14  not information on the, how many was it, 57
15  trials excluded and this was also part of the
16  information we gave off the bat on the
17  institute's website even though it is not
18  methodological standards for conventional
19  systematic views published in paper journals.
20     Q.   Okay.  Did you take any sort of poll
21  or do any investigating as to the extent to which
22  clinicians were misled by your publication?

Peter Juni                                          September 21, 2010

277

1      A.  No.  There wasn't a clinical
2   conclusion behind that.  This paper, if you look
3   at it, hasn't got any clinical implications
4   because of us looking at the broad range of
5   clinical -- clinical indications.
6         So this is not a paper about
7   clinical implications.  This is a paper that has
8   implications for science theory, that's the
9   paper.
10     Q.  Uh-huh.  So you mean it wouldn't
11  suggest to a clinician that homeopathy has no
12  benefit at all?
13     A.  Well, of course, it suggests that
14  and these conclusions were not altered by any of
15  the information we provided subsequently, because
16  the nature of the analysis was not changed.
17        And we followed the prespecified
18  processes in the protocol when we performed the
19  analysis.  So this is a fundamentally different
20  situation than what we had in the CLASS trial.
21     Q.  Uh-huh.  So, even if you failed to
22  disclose something that should have been

278

1   disclosed initially, as long as it doesn't change
2   the result, then it's not misleading?
3         MR. SAHAM:  Objection to form.
4         THE WITNESS:  We haven't failed to
5   disclose any of the results of the trials.
6   BY MR. WEISS:
7      Q.  Can you --
8      A.  Sorry, I can't do that.
9      Q.  Just focus on my question.
10     A.  Good.  So basically all of the data
11  points that were included in the analysis were
12  disclosed, but they were not related to
13  specifically with the reference.
14        So there was no information that was
15  excluded from the analysis, which is different
16  from the situation we had here where some
17  statistical data in the CLASS trial were excluded
18  from the analysis.
19     Q.  So you say.  So the people who were
20  reading your article, because they didn't have
21  the information about the trials, couldn't make
22  their own conclusion about the validity of your

279

1   analysis, could they?
2         MR. SAHAM:  Objection to form.
3         THE WITNESS:  And formerly, since
4   they had the references of all of the trials,
5   they could reproduce our quality assessment
6   according to the same criteria.
7         It would cost them some time as
8   clinical research does and it's based on these
9   references to be able to produce or reproduce our
10  results doing exactly the same quality assessment
11  and using the same selection criteria as we did.
12        Actually, based on the references,
13  they could obtain all of the trials that we
14  included and do all of these steps.
15  BY MR. WEISS:
16     Q.  Okay.  Let me ask you something, in
17  the second paragraph, second column, second
18  paragraph it says, quote "We agree that the
19  larger trials of higher methodological quality,"
20  and then there are references, "should have been
21  identified and are grateful for the opportunity
22  to rectify this oversight."  Do you see that?

280

1      A.  Exactly.
2      Q.  Okay.  So you acknowledged that you
3   should have included that information in your
4   paper?
5      A.  I did that repetitively during the
6   last 15 minutes and do it so again.
7      Q.  Okay.  And so when you failed to
8   disclose information in a paper, that's an
9   oversight on your part, correct?
10        MR. SAHAM:  Objection to form.
11  Misstates prior testimony.  Asked and answered.
12  BY MR. WEISS:
13     Q.  And when other people do it, it's
14  misleading; is that right?
15        MR. SAHAM:  Objection to form.
16  Misstates prior testimony.  Lack of foundation.
17        THE WITNESS:  This is -- it has not
18  the same magnitude in terms of what's here not
19  providing additional information just on
20  references.
21        Whereas in the other situations,
22  there were data points omitted.  We did not omit

Peter Juni                                    September 21, 2010

281

1  any data points in this analysis and this is a
2  fundamental difference.
3  BY MR. WEISS:
4      Q.  Uh-huh.  So when people accuse you
5  of being misleading, it's just because of an
6  oversight on your part?
7      A.  I'm not sure, do I have to answer to
8  such a statement?  That's an unqualified
9  statement.
10     MR. SAHAM: I'm sorry.  Could you
11 read the question back.  I had a soda distraction
12 and I didn't get the question.
13     (Record read.)
14     MR. SAHAM: Objection to form.
15 Foundation.  Incomplete hypothetical.  I mean, if
16 you understand the question, you can answer.
17 But, if you don't understand his question, you
18 don't have to answer.
19     MR. WEISS:  Are you instructing this
20 witness?
21     MR. SAHAM: I'm making an objection.
22     MR. WEISS:  Well, that's not making

282

1  an objection.
2      THE WITNESS:  Okay.  Shall I reply
3  or shall I not?
4  BY MR. WEISS:
5      Q.  I asked you a question.  If you can
6  answer it, answer it.
7      A.  Okay.  So you need to read it again.
8      MR. SAHAM:  And certainly, if you
9  don't understand his question, tell him that.
10     THE WITNESS:  Okay.  Read it again
11 and then I can see what I can do.
12     (Record read.)
13     MR. SAHAM:  Objection to form.
14 Foundation.  Incomplete.  Misleading.
15 Hypothetical.
16     THE WITNESS:  Okay, I will answer
17 despite that.  If this question is referring to
18 our reply to the paper we had on homeopathy,
19 Defendants' Exhibit Number 4, then we are
20 referring to this as an oversight because we
21 really and truly just did not, and should have
22 done, just included these references.

283

1      Since we haven't omitted any data
2  points, this has a fundamentally different
3  quality from what you are discussing before for
4  the CLASS trial.
5  BY MR. WEISS:
6      Q.  Okay.  So it was just an oversight
7  on your part, is that it?
8      MR. SAHAM:  Objection to form.
9      THE WITNESS:  If you mean with me --
10 BY MR. WEISS:
11     Q.  Yes.
12     A.  -- me and my colleagues who authored
13 that.
14     Q.  Yes.
15     A.  Then, indeed, yes, this was an
16 oversight related to the reporting not to the
17 analysis.
18     Q.  Oh, okay, good.
19     A.  Yes.
20     Q.  All right.  That's not the only time
21 that you've been accused of not including
22 information and data in a study and for being

284

1  misleading, is it?
2      MR. SAHAM:  Objection to form.
3  Misstates prior testimony.  Lack of foundation.
4  Relevance.
5      MR. WEISS:  That's interesting since
6  I didn't characterize his testimony, but --
7      THE WITNESS:  I'm not sure what
8  you're referring to, but I'm interested to find
9  out if you could just show me the exhibit and
10 then I can answer your question.
11 BY MR. WEISS:
12     Q.  Well, do you have any recollection
13 in the past of having been accused of being
14 misleading, other than with respect to the
15 homeopathy article?
16     MR. SAHAM:  Objection to form.
17     THE WITNESS:  I can give you
18 examples where I expect this could have been the
19 case.  One is when we were publishing the
20 meta-analysis that I was referring to earlier on
21 rofecoxib.
22 BY MR. WEISS:

Peter Juni                                    September 21, 2010

285

1    Q.   Okay.
2    A.   This could have happened.
3    Q.   Uh-huh.
4    A.   Then it could have happened with the
5  randomized control trial, comparing different
6  risks of supplementation agents.  Again, this was
7  again the results were null and this was debated
8  a lot.
9         So these are certainly different --
10 different points in time when this happened.
11 Interestingly enough, these statements were made
12 mostly by people who had vested conflicts of
13 interest.
14       MR. WEISS:  Let's take a five-minute
15 break.
16       THE VIDEOGRAPHER:  Off the record at
17 3:53 p.m.
18       (Recess -- 3:53-4:00 p.m.)
19       THE VIDEOGRAPHER:  Back on the
20 record at 4:00 p.m.
21       (Defendants' Exhibit Number 9
22         marked for identification.)

286

1        MR. WEISS:  Back on the record?
2        THE VIDEOGRAPHER:  Uh-huh.
3  BY MR. WEISS:
4    Q.   Dr. Juni, I've just handed you
5  what's been marked as Defendants' Exhibit 9.
6  It's an article that was apparently published in
7  Arthritis and Rheumatism in December of 2007.
8        It's an article entitled "Hylan
9  Versus Hyaluronic Acid for Osteoarthritis of the
10 Knee:  A Systematic Review and Meta-Analysis,"
11 now excepting my pronunciation of some of the
12 terms --
13   A.   It wasn't that bad actually.
14   Q.   -- is this an article which you
15 co-authored?
16   A.   Indeed.
17   Q.   Okay.  And what is the thesis or
18 conclusions of this article?
19   A.   This article looks at a comparison
20 of a cross-link, hyaluronic acid, chemically
21 modified hyaluronic acid, which is a constituent
22 of the knee joint, normally it's the liquid of

287

1  the knee joints.
2        And that this cross-link separations
3  are called a hylan as compared with more
4  traditional chemically non-modified or
5  (inaudible) modified hyaluronic acid.
6        We performed a systematic review of
7  direct randomized, comparisons, but also looked
8  at indirect comparisons using specific
9  methodological approaches.
10       And we found that there was little
11 evidence to suggest that the hylan would be
12 superior in effectiveness as compared with the
13 hyaluronic acid, but conversely that the hylan
14 was associated with an increase in the risk of
15 blood clot adverse events, such as flare-up, you
16 know, redness and inflammation and liquid in the
17 knee.
18       And because of this, we discouraged
19 the use of intra-articular hylan in patients with
20 knee arthritis in research or practice.
21   Q.   Okay.  In connection with performing
22 what you described as a systematic review, did

288

1  you and your colleagues, co-authors, exercise
2  your judgment about which trials to review for
3  purposes of your analysis?
4    A.   We exercised our judgment about
5  which trials would satisfy the prespecified
6  selection criteria for the analysis.
7    Q.   Okay.  But the prespecified
8  selection criteria for the analysis were criteria
9  which were determined by you and your colleagues?
10   A.   Exactly, yes, according to a
11 protocol.
12   Q.   Okay.
13   A.   We have a standard, you know,
14 protocol for all of our systematic reviews in
15 these fields.
16   Q.   Okay.
17       MR. WEISS:  I'm going to ask the
18 court reporter to mark this as Defendants'
19 Exhibit 10.
20       (Defendants' Exhibit Number 10
21         marked for identification.)
22 BY MR. WEISS:

Peter Juni                                                September 21, 2010

289

1      Q.   Dr. Juni, Defendants' Exhibit 10 is
2   a reproduction of letters that were published in
3   the Annals of Internal Medicine in 2007.
4           I'm going to ask you to turn to the
5   second page of this document and sort of in the
6   middle of the page, in the left-hand column
7   there's a heading that reads "Chondroitin for
8   Osteoarthritis of the Knee or Hip."  Do you see
9   that?
10      A.   No.  I don't -- yes, I do, yes.
11      Q.   Okay.
12      A.   May I just quickly stipulate that
13   this hasn't got anything to do with this, this is
14   correct, I assume.
15      Q.   I'm sorry, what did you say?
16      A.   That's two, you know, different
17   pieces of work.
18      Q.   Okay.
19      A.   And we can cover both.
20      Q.   Okay.  So when you -- the article
21   here which is -- the first author is Reichenbach?
22      A.   Reichenbach is the first author.

290

1      Q.   Okay.
2      A.   And this was published in the Annals
3   of Internal Medicine, the one that is
4   referring -- that is related to this
5   correspondence section --
6      Q.   Uh-huh.
7      A.   -- whereas this was published in the
8   Arthritis and Rheumatism Arthritis Care and
9   Research.
10      Q.   Okay.
11      A.   So we need to look at the
12   chondroitin meta-analysis first if we want to
13   discuss that.
14      Q.   This is a different study than is
15   referred to here?
16      A.   Correct.
17      Q.   Okay.  Well, let's stick with what
18   we've just marked as Defendants' Exhibit 10 and
19   then.  Why don't you tell me which study this
20   Defendants' Exhibit 10 refers to.
21      A.   This study refers to a meta-analysis
22   of randomized controlled trials comparing

291

1   chondroitin, a substance which typically is
2   ingested but also can be injected with placebo on
3   non-intervention controls.
4      Q.   And, again a meta-analysis requires
5   the input of the people doing the study to decide
6   which trials to include?
7      A.   What do you mean doing the study,
8   doing the meta-analysis these people.
9      Q.   Yes.
10      A.   Yes, of course.  They use their
11   judgment based on predeveloped extraction sheets,
12   data extraction sheets.
13           They will then decide upon whether a
14   trial satisfies the prespecified selection
15   criteria or not.
16      Q.   Okay.  Were you one of the
17   co-authors on the study which is described or
18   discussed here on Defendants' Exhibit 10?
19      A.   Yes, I was.
20      Q.   Okay.  I'm going to point you to the
21   first paragraph which reads:  "TO THE EDITOR:
22   Reichenbach and colleagues' meta-analysis on

292

1   chondroitin for osteoarthritis of the knee or hip
2   (1) is both timely and important.
3           "However, we are concerned that the
4   author's sweeping conclusions are not well
5   grounded in their methodology."  Do you see that?
6      A.   Uh-huh.
7      Q.   Okay.  Do you agree with that
8   criticism?
9      A.   No.
10      Q.   Okay.  The third paragraph reads,
11   quote, "The prespecified 'large trial' cutoff of
12   200 participants included five trials with a
13   summary small to moderate effect size of
14   borderline significance, but the authors base
15   their conclusions of 'no effect' on only 3 of
16   these trials (citing, in addition, reporting of
17   an intention-to-treat analysis), circumventing
18   the most important benefit of systematic reviews
19   that discourages a focus on a selective subset of
20   studies."  Do you see that?
21      A.   Yes.
22      Q.   And do you agree with that

Peter Juni                                      September 21, 2010

293

1   criticism?
2      A.  No.
3      Q.  Okay.  It goes on to say, quote, "It
4   is of great concern that the author's choice to
5   base their conclusions on only these 3 studies
6   was almost certainly made without being blinded
7   to these studies results (because the authors
8   read all of the papers at the outset.)"  Do you
9   see that?
10     A.  Yes.
11     Q.  And do you agree with that
12  criticism?
13     A.  That we weren't blinded, no, we
14  weren't blinded indeed.
15     Q.  Uh-huh.  And so again are you being
16  accused here of gerrymandering data for inclusion
17  in studies?
18     A.  I don't know the definition of
19  gerrymandering.
20         MR. SAHAM:  Objection to form.
21  Foundation.
22  BY MR. WEISS:

294

1      Q.  Fair enough.  Are you -- do you
2   understand that this writer, Harley Goldberg and
3   others, are accusing you of selecting data to
4   drive your result?
5          MR. SAHAM:  Objection to form.
6   Foundation.
7          THE WITNESS:  No.  They are not
8   accusing us of selecting data to drive the
9   results.  They're accusing us of basing our main
10  conclusions onto a soft sample of randomized
11  control trials that we believed is the least
12  biased.
13  BY MR. WEISS:
14     Q.  Uh-huh.
15     A.  That's what they're accusing us and
16  this needs some additional explanation.  Can I
17  give that, this explanation, in refers to the
18  I squared of 92.
19     Q.  Let me just ask you another
20  question.
21     A.  Yes.
22     Q.  They've suggested that you

295

1   circumvented the most important benefit of
2   systematic reviews that discourages a focus on a
3   selective subset of studies.
4          Do you agree that systematic reviews
5   discourage a focus on a selective subset of
6   studies?
7          MR. SAHAM:  Objection to form.
8          THE WITNESS:  No, I don't agree with
9   that.  Systematic reviews encourage inclusion of
10  all studies in the first place, and if you follow
11  international guidelines, like the Cochrane
12  Handbook that actually is the major
13  methodological guidelines, these guidelines say
14  that the main conclusion should be based on
15  trials of higher methodological quality.
16          And, this paper is one of the papers
17  that actually is the basis for these statements.
18          We had major problems in these -- in
19  this paper with the interpretation of the overall
20  data, because there was so much variation between
21  the trials.
22          They were all scattered all over the

296

1   place that it was impossible to derive one single
2   pooled estimate.  That is why we did something
3   subsequent.
4          So your attempts of making analogies
5   between systematic reviews and randomized
6   controlled trials is entirely inappropriate
7   because these are really two different fields
8   with different ways of, you know, looking at the
9   data.
10          Here we tried to understand
11  variation, and based on that, we also will need
12  to restrict an analysis just to larger trials of
13  higher quality, as was the case here.
14  BY MR. WEISS:
15     Q.  Uh-huh.
16     A.  We have demonstrated that about two
17  months ago in an article published in the British
18  Medical Journal (inaudible) so all the aspects
19  that we have anticipated here already are then
20  there repeated in the ultimate sample of
21  meta-analysis.  You can look at this.
22  BY MR. WEISS:

Peter Juni                                    September 21, 2010

297

1      Q.   So, once again, when people accuse
2  you of not following appropriate methodology,
3  they're just wrong.
4          MR. SAHAM:  Objection to form.
5  Foundation.  Misstates prior testimony.
6  BY MR. WEISS:
7      Q.   Is that what you're telling me?
8      A.   If it comes to meta-analysis, we're
9  one of the international leading groups.  If
10  somebody, you know, criticizes this metaanalysis
11  here, that's fine.  That's part of the debate and
12  that's why we ongoingly, you know, reiterate, we
13  do additional studies, et cetera.
14          The decisions we made were
15  scientifically grounded you say, scientifically
16  founded, whatever.
17      Q.   Uh-huh.
18      A.   Clearly any decision that you do in
19  these situations, systematic views are
20  observational in nature that they may be post hoc
21  decisions.  They are also subjective elements.
22          They can always be criticized, but

298

1  the situation here about explaining heterogeneity
2  between studies, explaining variation between
3  studies and making a decision based on the
4  pattern you observe is a decision which is
5  internationally established.
6      Q.   Uh-huh.  But these writers here
7  didn't agree that what you did was either
8  internationally established or scientifically
9  grounded, did they?
10      A.   No, they didn't, no.
11      Q.   But, they're --
12      A.   I wouldn't say they are high flyers
13  in systematic reviews, sir.
14      Q.   Okay.  And that would influence
15  legitimacy of the criticism.
16      A.   I think the content influences the
17  legitimacy of the criticism.
18      Q.   Uh-huh.
19      A.   So what they indicate just shows
20  that they rather prefer an overall pooled
21  estimate which is biased as opposed to an
22  estimate that is based on highest quality

299

1  evidence.
2          This can be a continuous discussion.
3  I think that many internationally reputated
4  groups actually will agree on our evaluative
5  approach in that.
6          And this meta-analysis actually also
7  made it as an example into the update of the
8  QUORUM statement that you were referring to in
9  the explanation of the collaboration document.
10  This is used as an example of how to, you know,
11  approach these aspects.
12      Q.   When you say these people aren't
13  high flyers in systematic review, what did you
14  mean by that?
15      A.   You know, they are -- there are --
16  and as you could correctly point out with me in
17  the 2002, people who have a long track record of
18  methodological research and of systematic
19  reviews.
20          And there are other people that have
21  shorter track records.  And I wouldn't be aware
22  of Goldberg, Obens and Bent having particularly

300

1  long track records of systematic reviews, you
2  know, that they performed methodological research
3  to look into these aspects.
4      Q.   So you don't think that they had a
5  lot of experience which would enable them to
6  criticize your work?
7      A.   I don't think that -- of course,
8  they can criticize our work and we can address
9  this, this is called scientific debate.
10      Q.   Uh-huh.
11      A.   But, you know, if this post
12  publication peer review has a point.  So that if
13  there are things unclear, et cetera, that can be
14  a debate being promoted and based on this debate
15  actually one can come to just the next
16  conclusions.
17      Q.   Uh-huh.
18      A.   If you do research that is, you
19  know, published in the major journals as the
20  CLASS trial was or as this paper was behind that,
21  you assume that you generate some debate and the
22  point is then just to do this debate in a

Peter Juni                                    September 21, 2010

301

1  hopefully transparent fashion.
2       All of the data that were used for
3  this study were published.  Everything was
4  published, there's a long appendix in the paper.
5  The formulae were published.
6       You can't do a better reporting, I
7  think, or not much better than what we did at
8  that time point.
9       But the decisions, all of the
10 decisions are debatable.  They remain subjective,
11 but if somebody dislikes the decision, he can go
12 for the main results of all of the 20 trials.
13     It's published.  Everything is
14 there.  It can be reproduced and based on that
15 can make his or her own opinion.  That's what
16 these authors do and that is fair enough.
17     Q.   Uh-huh.  Uh-huh.  But when you said
18 these people are not high flyers in systematic
19 review, did you mean to suggest that their
20 criticism was less valid as a result of their
21 lack of experience?
22     A.   I was -- I was relating to that --

302

1  let me see now, you have me, huh?  Okay.  I think
2  there are two aspects.  One is the content of the
3  line of arguments that they have and one is their
4  experience.
5       Now, if the content that they -- the
6  point that they are making is a valid point, then
7  it's -- I would see no reason not to qualify it
8  as a valid point.  That's fine, that's fair
9  enough.
10     If the -- if the content, you know,
11 is already problematic, as I think is the case
12 here, and the track record of the people is
13 limited, then perhaps I take things slightly less
14 seriously.
15     And again, you know, that's highly
16 subjective, how serious I take that or not.  And
17 I think the case of the CLASS trial, now we're
18 here in a lawsuit, of course.
19     But, if this was referring to this,
20 you know, we can have scientific debates and we
21 can disagree and that's fair enough.  I disagree
22 with these authors.  Geis disagreed with me and

303

1  with us, okay.
2       Q.   Okay.  Did you also do a controlled
3  trial involving hyaluronic acid?
4       A.   Very much, indeed.
5       Q.   Okay.
6       A.   And I'm sure we were criticized
7  there for omissions.
8       Q.   Why are you so sure that you were
9  criticized for omissions?
10     A.   Because the statements made by the
11 correspondents actually were quite particular to
12 say it's, you know, very timidly and not founded.
13     Q.   So you don't think that the
14 criticisms were valid?
15     A.   I don't think that the criticisms
16 were valid, as much as I have them in my mind
17 right now.  But I'm keen to look at them again
18 and to specify what I think was invalid.
19     Q.   Okay.
20         MR. WEISS:  Let's mark this as
21 Defendants' Exhibit 11.
22         (Defendants' Exhibit Number 11

304

1           marked for identification.)
2        THE WITNESS:  It's nice to review
3  all of my work.
4  BY MR. WEISS:
5       Q.   I certainly enjoyed it.  I'm handing
6  you what's been marked as Defendants' Exhibit 11.
7  And this an article published in Arthritis &
8  Rheumatism, which is entitled Efficacy and Safety
9  of Intraarticular Hylan or Hyaluronic Acids for
10 Osteoarthritis of the Knee.  A Randomized
11 Controlled Trial.
12     Dr. Juni, are you one of the authors
13 of this trial?
14     A.   Yes, I am.
15     Q.   In fact, you are the first author of
16 this trial.
17     A.   Correct.
18     Q.   And does that have any significance?
19     A.   It has.  I was the prime
20 investigator of this trial.
21     Q.   What does that mean?
22     A.   That I was chairing the steering

Peter Juni                                    September 21, 2010

305

1   group.  That I had main responsibility for
2   planning and conduct of the trial and for the
3   interpretation of the analysis.
4       Q.  Did you design or help design this
5   trial?
6       A.  Yes.  I had minor responsibility for
7   designing the trial.
8       Q.  Okay:
9           MR. WEISS:  I'm going to ask the
10  reporter to mark this as Defendants' Exhibit 12.
11          (Defendants' Exhibit Number 12
12           marked for identification.)
13  BY MR. WEISS:
14      Q.  And Defendants' Exhibit 12 is some
15  letters that I believe were also published in
16  Arthritis & Rheumatism.
17          And I'm going to turn your -- ask
18  you to turn your attention, Dr. Juni, to the
19  second column on the first page under the heading
20  "Comparison of hylan and hyaluronic acid for knee
21  osteoarthritis," and the article by Juni, et al.
22  Do you see that?

306

1       A.  Yes.
2       Q.  And do you understand that this
3   letter refers to Defendants' Exhibit 11?
4       A.  Correct.  Correct.
5       Q.  And do you understand that this is a
6   letter to the editor that was published and
7   represents commentary on your article?
8       A.  I do.
9       Q.  Okay.  I'll ask you to take a look
10  at the second paragraph and it reads, quote, "We
11  would take issue with several aspects of the
12  methodology of this trial.
13          "The sample size used in this
14  superiority trial was calculated on a difference
15  in effect size on ~0.4SD units between hylan and
16  HA, defined from a meta-analysis performed in
17  2003.
18          "However, several meta-analyses,
19  including new controlled trials and comparison
20  studies between viscosupplements (with
21  conflicting results) have been published since
22  2003.

307

1       "A recent trial (not supported by a
2   pharmaceutical firm), demonstrated superiority of
3   hylan compared with HA (notably in terms of
4   duration of action) but without a huge difference
5   in terms of the magnitude of response.
6           "Therefore, the difference in effect
7   size between hylan and HA used in the study by
8   Juni, et al. is probably overestimated."
9           Dr. Juni, do you understand that
10  this letter by Xavier Chevalier and others is at
11  least in part accusing you again of not including
12  relevant information in your meta-analyses?
13      A.  You're confusing things.  That's a
14  randomized trial.
15      Q.  I'm sorry, in your --
16      A.  And I don't understand it like that.
17  He is accusing us of having wrong assumptions for
18  the power calculation.
19      Q.  Uh-huh.  And that is because you
20  failed to include certain information?
21      A.  No.
22      Q.  No?

308

1       A.  No, not at all.  We were indicating
2   in the sample size calculation what our
3   assumptions were and we correctly specified
4   everything as it was in the protocol.
5       Q.  But is Chevalier not suggesting that
6   if you had included other trials in your
7   calculation of the sample size, you would have
8   reached a different result?
9       A.  That's just an inadequate question
10  because you can't change your assumption of the
11  sample size calculation when your results become
12  available.  Nobody can do that, neither Geis with
13  CLASS nor we with SVISCOT.
14      Q.  Besides your characterization of my
15  question as inadequate --
16      A.  Sorry about that.
17      Q.  -- and it may well be, is that a
18  fair statement of the criticism that's being
19  offered by Chevalier?
20      A.  He's saying that basically we were
21  underpowered to detect realistic effect sizes.
22  And we addressed that then in our response that,

309

1  in fact, this trial at the time point when --
2  when the trial was published was among the
3  largest trials anyway and that we had ample
4  statistical power to detect any small scale, even
5  so still clinically relevant aspects.
6          We had ample power to do that.  So
7  the statement they made is not grounded on facts.
8      Q.   So, again, one of your critics is
9  just wrong?
10     A.   Well, yes.  You know, something
11 which I think is important just to see.  This is
12 about publishing results and then opening the
13 debate.  And there are all of these people who
14 disagree and you address, you know, the points
15 they make.
16         Sometimes they have points that are,
17 you know, okay, should be made.  And sometimes
18 things look a bit -- look a bit different and you
19 just tend to disagree with them.  That's part of
20 the scientific debate.
21     Q.   Uh-huh.
22     A.   But the sample size calculation was

310

1  Kosher.
2      Q.   In your opinion.
3      A.   I think in opinion of most
4  methodologists it will show that if you have 20
5  just independently review that, I'm convinced
6  that the vast majority will agree on that.  There
7  is not much subjectivity in there.
8      Q.   So then Chevalier and Marin,
9  basically they just don't know what they're
10 talking about?
11     A.   Well, again, I cannot read minds.
12 If I look at the second paragraph of this
13 statement, they could have repeated the sample
14 size calculation including these new results and
15 used different margins for superiority and could
16 have found that we still had above 80 percent
17 power.
18     Q.   Uh-huh.
19     A.   And we also address that in our
20 answers as far as I remember.  We would need to
21 look at it.
22     Q.   And would above 80 percent power

311

1  have been sufficient?
2      A.   That's an established cutoff at the
3  80 percent.  But, when I just look at our
4  results -- let me just read to see what we have
5  included in the first page.  "Power for the
6  analysis of these random sample" -- let me see,
7  no, no, that's not that.
8          Okay.  "The effect size by Raman et
9  al. was 1 standard deviation unit rather than one
10 (inaudible) for SVISCOT-1 to detect
11 this effect size was 100%."  You know, there is
12 actually after rounding it was 100 percent.  It
13 was clearly sufficient, yes.
14     Q.   So are you saying that even when you
15 did what they said you should have done, the
16 result wasn't different?
17     A.   Even if they said -- if we did what
18 they said we should have done, we have, you know,
19 we would have had a sample size which was so
20 large that we still would have -- that we really
21 would have achieved enough power.
22         So the power to detect the effects

312

1  of this study they're referring to is
2  100 percent.  The power to detect the effects you
3  assumed in the power calculation was 96 percent.
4          So our power even increased
5  according to their criteria.
6      Q.   I see.
7      A.   So they didn't understand the
8  magnitude of the effects.
9      Q.   I see.  Okay.  And then the next
10 paragraph says, quote, "The decision to assess
11 the primary outcome measures (standardized
12 Western Ontario and McMaster Universities OA
13 Index pain score) at a single end point (6
14 months) is also questionable, because it is now
15 recognized that differences should be tested
16 throughout the observation period.
17         "From a patient's point of view, it
18 is better to be symptomatically improved for a
19 period "of" six months rather than only "at" six
20 months."
21         Now, I want to ask you, do you agree
22 that it is now recognized that differences should

Peter Juni                                     September 21, 2010

313

1  be tested throughout an observation period with
2  respect to the OA index pain score?
3       A.   Recognized by whom and when?
4       Q.   Well, as stated by Chevalier and
5  Morin in their paper.  Do you agree with that
6  statement?
7            MR. SAHAM:  Objection to form.
8            THE WITNESS:  No.
9  BY MR. WEISS:
10      Q.   No.
11      A.   And I wouldn't agree with this
12 statement in that when we actually planned this
13 study, it was rather well established to have one
14 or two time points.  We had two time points, one
15 of three months and one at six months.
16           The one measured at three months was
17 measured in a random sample of patients, and a
18 truly random sample of patients that is
19 representative for the entire trial.
20           So, given the limited resources we
21 had for this trial, we did our best to have at
22 least the time point at baseline, three months

314

1  and six months.
2  BY MR. WEISS:
3       Q.   Okay.  So when they say something
4  like "it's now recognized that differences should
5  be tested throughout the observation period,"
6  that's just like you saying that something is
7  improper or proper or scientifically invalid is
8  it not?
9            MR. SAHAM:  Objection to form.
10 Calls for speculation.  Foundation.
11           THE WITNESS:  Again, this is about
12 the content and I think that it's always open for
13 discussion which time points to use, if you
14 measure a continuous outcome.
15           And the most important aspect is
16 that once you have stipulated in the protocol and
17 have submitted to the authorities or the Research
18 Ethics Commissions, et cetera, your protocol, you
19 need to stick to what was specified in the
20 protocol.
21           So it's always a question when
22 should you measure and it will always be

315

1  debatable.  So, we have, you know, we have trials
2  sometimes where we have diaries measuring things
3  daily or weekly.
4            And other trials we decided on
5  having this approach, we followed the protocol
6  that we prespecified the protocol was approved
7  and agreed upon.  That's all.
8  BY MR. WEISS:
9       Q.   So do you attach any significance to
10 their statement that it is now recognized that
11 differences should be tested throughout the
12 observation period?
13           MR. SAHAM:  Objection to form.
14           THE WITNESS:  No, I don't.  I don't
15 assign much significance to that because they --
16 I would expect them to provide me with, you know,
17 a consensus of a large body like ARC or like
18 OMERACT that really formally had established
19 that.
20           And, at the time point we planned
21 this trial, which was in 2002, actually this
22 certainly wasn't the case.

316

1  BY MR. WEISS:
2       Q.   Okay.  On the next page on the top
3  of says, quote "The authors claim that an
4  intermediate visit at three months did not show
5  any difference between the three treatment
6  groups.  At this point, however, a random sample
7  of only 50 percent of patients was evaluated.
8  Why?"  Do you see that?
9       A.   Yes.
10      Q.   And are they basically criticizing
11 you for reporting on less than all of the
12 available data?
13      A.   No.  They are criticizing us for
14 prespecifying a random sample of patients in
15 which -- in whom we measured the outcome.
16           And those that we measured the
17 outcome, those patients were actually included in
18 the analysis.  All of them, as you can see in the
19 carefully designed flow chart on Page 3612 of
20 Exhibit 11, where everything is actually fully
21 reported, including the number of patients
22 randomly sampled and the random sampling used to

Peter Juni                                    September 21, 2010

317

1  select these patients is actually included in the
2  method section.
3      Q.   Uh-huh.  So the bottom line though
4  is that you ultimately did not report on
5  50 percent of the patients who were included in
6  the trial?
7          MR. SAHAM:  Objection to form.
8  Foundation:
9          THE WITNESS:  The bottom line is
10 that we ultimately reported on all of the
11 patients that were randomly selected for a
12 three-month follow-up in the study and this is
13 methodologically fully (inaudible).
14 BY MR. WEISS:
15     Q.   Okay.  But that was less than
16 100 percent of the patients who were in the
17 trial, correct?
18     A.   This was less than 100 percent of
19 the patients included in the trial according to a
20 prespecified selection process, yes.
21     Q.   And then in the last paragraph it
22 says, quote, "In their study, Juni et al.

318

1  attempted to answer a relevant question.
2  However, there are too many ambiguities in the
3  trial methodology.  May we, therefore, suggest to
4  the authors that they should be more cautious in
5  drawing their conclusions regarding the relative
6  safety and efficacy of different
7  viscosupplements."  Do you see that?
8      A.   I see it.
9      Q.   Do you take their suggestion to
10 heart?
11     A.   It's a ridiculous statement.  There
12 is -- this -- I know this now sounds rather
13 straight and rather strong, but there are very
14 few trials in my opinion that follow the Consort
15 statement as closely as this trial.
16         If you compare this to what should
17 be included, you know, in a trial report
18 according to Consort, you will find that the vast
19 mass majority of information is in here.
20         So this statement actually clearly
21 lacks, you know, any evidence.  That's just a
22 statement and the statement is inaccurate.

319

1      Q.   So once again your critics are --
2  they're just wrong?
3      A.   Not all of my critics are wrong.
4  You know, it's fine, I take what Wallach said and
5  say, okay, we should have referenced these
6  studies.
7          But, we're doing, you know, I think
8  like many groups, we're trying to do decent
9  research and it's not always optimal, but I think
10 it's rather robust what we're doing and that is
11 why we are internationally recognized.
12     Q.   Okay.  Now, you replied to that
13 criticism as well, correct?
14     A.   I did, yes.  Or we did, my
15 colleagues and I.
16     Q.   Right.  And in -- and you also
17 replied to the criticisms that were offered
18 regarding the homeopathy article, correct?
19     A.   I was part of the replying authors,
20 yes.
21     Q.   Right.
22     A.   I think there were four of the

320

1  group.
2      Q.   Uh-huh.  Do you think that your
3  decision to defend your results undermined the
4  validity of your initial presentation in any way?
5      A.   No.
6      Q.   No.  And the fact that you decided
7  to defend what you had originally written and
8  stand by it, should that indicate to anyone that
9  there's no less reason to believe the results of
10 your papers?
11     A.   No.  Since we followed the protocol
12 and, you know, were sticking to the protocol
13 exactly, there's no reason why we shouldn't stick
14 to our results and continue to underscore our
15 conclusions.
16     Q.   Uh-huh.  Okay.  Now you mentioned
17 before your meta-analysis on Vioxx.  Do you
18 recall that?
19     A.   Yes.
20     Q.   And you received some criticism with
21 respect to that meta-analyses as well, correct?
22     A.   Yes.

Peter Juni                                            September 21, 2010

321

1      Q.   I'm going to ask you to -- sorry.
2          MR. WEISS:  Let's just aggregate all
3    of these.  I'm going to give you a bunch and then
4    we can just mark it as one exhibit.  There's no
5    need to -- I don't know why they are done this
6    way.
7          But you can mark this all once I
8    hand them out in the right order as one exhibit.
9    So that's Page 25.  That's Page 24.  You can just
10   get rid of that page, because this is 24 and 25.
11   So don't worry about that page.
12         MR. MONTGOMERY:  We have to go off
13   the record in five minutes.
14         MR. WEISS:  Okay.  Let's go off the
15   record so I can get this organized.
16         THE VIDEOGRAPHER:  Off the record at
17   4:35 p.m.
18         (Recess -- 4:35-4:41 p.m.)
19         THE VIDEOGRAPHER:  This is the
20   beginning of Tape Number 5.  Back on the record
21   at 4:41 p.m.
22         (Defendants' Exhibit Number 13

322

1          marked for identification.)
2    BY MR. WEISS:
3      Q.   Dr. Juni, I'm now showing you what
4    has been marked as Defendants' Exhibit 13.  This
5    is a reproduction of some correspondence that was
6    published in The Lancet, Volume 365, January 1,
7    2005.
8          In the top left-hand corner the
9    title reads "Discontinuation of Vioxx" and it
10   goes on to say, quote "The analysis by Peter Juni
11   and colleagues, (Dec 4, p 2021) contravenes the
12   basic principle of meta-analyses to combine like
13   with like, and thus arrives at flawed
14   conclusions."
15         Dr. Juni, does that refer to your
16   meta-analysis of Vioxx?
17     A.   Correct.
18     Q.   Okay.  And this letter from Peter
19   Kim and Alise Reicin goes on to say, quote
20   "Moreover, Juni and colleagues ignore data
21   included in previous analyses available on the US
22   Food and Drug Administration's website for large

323

1    placebo-controlled studies in about 2000 patients
2    with Alzheimer's disease.  The results of these
3    trials show no difference between rofecoxib
4    (Vioxx) and placebo."  Do you see that?
5      A.   Uh-huh.
6      Q.   Once again you're being accused of
7    ignoring and failing to include relevant data in
8    your analyses, correct?
9          MR. SAHAM:  Objection to form.
10         THE WITNESS:  We're accused but this
11   accusation is inappropriate.  Again, we followed
12   the protocols to include trials in patients with
13   musculoskeletal conditions.  So the Alzheimer
14   trials did not qualify.  It is prespecified.
15   BY MR. WEISS:
16     Q.   Okay.  It goes on to say, quote "The
17   conclusions of their article are inappropriately
18   driven by their choice of method, involving
19   pooling of results for placebo, non-naproxen
20   non-steroidal anti-inflammatory drugs (NSAIDs),
21   and naproxen.
22         "This approach ignores

324

1    pharmacodynamic differences between naproxen and
2    other NSAIDs and placebo.
3          "Also ignored are data from the
4    TARGET study (the other large outcomes study of a
5    cyclo-oxygenase 2 [COX 2] inhibitor compared with
6    naproxen."  Do you see that?
7      A.   Yes.
8      Q.   And are these accusations or
9    criticisms also inappropriate?
10     A.   "Also ignored are data from the
11   TARGET study," this accusation is inappropriate
12   because the TARGET study did not qualify, that
13   was a different intervention.
14         And the pooling of results from
15   different trials with different controls, that's
16   a correct statement.  So we did an overall
17   analysis and then we did analysis stratified
18   according to type of control.
19         So we carefully explored whether it
20   was scientifically valid to do this overall
21   analysis of comparing Vioxx in a therapeutic or
22   supertherapeutic doses with any type of control

Peter Juni                                            September 21, 2010

325

1  and we showed both types of analysis in the
2  paper.
3      Q.  Uh-huh.  But when they say that your
4  conclusions are inappropriately driven by their
5  choice of method, do they mean that you designed
6  the study in a manner that would drive a
7  particular result?
8      A.  Well, I don't know what they mean.
9      Q.  Is that how you interpret it?
10     A.  Let me see.  Where is it?
11     Q.  On the --
12     A.  In the first paragraph.
13     Q.  No.  The second full paragraph,
14 which begins "Juni and colleagues."
15     A.  No.  They just say that the methods
16 we used actually drove the conclusions in a
17 certain direction and this was associated with
18 the method we choose.
19         They did not tell us here that we,
20 you know, did some post hoc changes of the
21 approaches, et cetera, which we didn't actually.
22         I can't see that and they're not

326

1  suggesting that.  They're far too professional to
2  suggest that.
3      Q.  They're far too professional to
4  suggest what?
5      A.  To suggest that you were changing
6  methodology or so post hoc.
7      Q.  Who --
8      A.  Well, the -- you know people,
9  researchers of Merck, Sharp & Dohme.
10     Q.  I'm sorry, researcher what?
11     A.  Researchers of Merck, Sharp & Dohme,
12 you know, the people who were actually signing
13 this letter were with Merck, the manufacturer of
14 rofecoxib at that time.
15     Q.  Uh-huh.
16     A.  I basically indicated something, you
17 know, the statement, it was about at the same
18 time when we had the homeopathy papers, within a
19 year.
20         And the debate we had with Merck,
21 Sharp & Dohme was let considerably more
22 professionally than the debate we had with

327

1  homeopaths, you know.
2      Q.  Uh-huh.
3      A.  You know, this was done at a very
4  professional level actually, and again, you could
5  say we disagreed, we fundamentally disagreed with
6  some aspects.  That's clear, but it was dealt
7  with by Merck, Sharp & Dohme, in my view, in a
8  rather professional way.
9      Q.  Uh-huh.  Well, if you read the last
10 paragraph it says, quote "Finally, we believe
11 that to print a comment in a scientific journal
12 criticizing Merck's ethical standards on the
13 basis of unfounded allegations printed in the lay
14 press, without even the pretense of investigation
15 into their accuracy or completeness, is
16 inappropriate.
17         "Merck's activities with respect to
18 Vioxx before its withdrawal were ethical and
19 reflected Merck's belief in the safety of its
20 product."  Do you see that?
21     A.  Yes.
22     Q.  And do you think that in light of

328

1  this concern that is being voiced by the authors
2  here -- well, strike that question.
3         Do you agree with the criticism that
4  is being offered by Peter Kim and Alise Reicin in
5  that paragraph?
6      A.  With this paragraph, I'm not sure
7  whether I'm in a position to agree or disagree.
8  They're criticizing The Lancet editor who was
9  actually writing this comment about the
10 withdrawal of Vioxx and its aftermath.
11         And we were surprised that The
12 Lancet editor actually wrote this.  This was
13 Richard Horton wrote this comment which was a
14 rather strong statement.
15         And this probably contributed to our
16 piece of work becoming more controversial at that
17 time.
18     Q.  Uh-huh.  Uh-huh.  Do you think that
19 the comment by Mr. Horton was of the same
20 character or same nature as your comment in BMJ
21 about the CLASS study?
22     A.  I would need to look at the comment

Peter Juni                                    September 21, 2010

329

1   again and no, I would say not, it wasn't of the
2   same nature.
3           And Richard Horton at the time, when
4   I remember this correctly, was also referring to
5   no lawsuits potentially.  You know, potentially
6   being, you know, Merck, Sharp & Dohme being
7   threatened with.
8           And that actually our meta-analysis
9   was just one piece in the jigsaw to, you know, to
10  contribute to a rather problematic outcome for
11  Merck, Sharp & Dohme.
12          And I think this is a comment that
13  may come from an editor of a major journal and
14  that a regular editorialist, as I am sometimes,
15  would not be in a position anyway to have such a
16  comment.
17          These were strong statements, and in
18  my view, these statements were stronger than our
19  statement on the BMJ on the CLASS.
20          So, again, that's open for debate
21  and that one would need to have a qualitative
22  comparison of the statements you need to discuss

330

1   it with people.  That's just my view.
2       Q.  Uh-huh.  In light of the criticisms
3   that have been leveled at you subsequent to 2002
4   with respect to the homeopathy trial, with
5   respect to the chondroitin article, with respect
6   to Vioxx, with respect to hylan, does that change
7   your view of how -- well, strike that.
8           In light of all of those criticisms,
9   if you were to write the BMJ editorial today, the
10  one about the CLASS study, would you have written
11  it the same way?
12          MR. SAHAM:  Objection to form.
13          THE WITNESS:  I need to look at it
14  just a moment.  In between my -- just my general
15  attitude is towards this is we're publishing
16  papers hopefully sometimes in major journals and
17  we're generating debate.
18          And the point that something is to a
19  certain extent controversial actually indicates
20  that we have some echo and some impact, which I
21  take as a good sign.
22          So I personally take a

331

1   correspondence section which controversially
2   discusses my work as a compliment.
3   BY MR. WEISS:
4       Q.  Uh-huh.  But then do you use words
5   like misleading when describing other people's
6   work in order to generate controversy?
7           MR. SAHAM:  Objection to form.
8           THE WITNESS:  No.  I use words like
9   misleading, but I'll have a look at the article
10  then in a moment to tell you whether I would
11  still phrase it the same way.
12          And I use words like misleading in
13  situations where I believe that the decisions to
14  deviate from the protocol cannot be justified.
15          I'm very careful also when it comes
16  to publication rights.  I never sign a
17  confidentiality agreement when I'm, you know, a
18  member of a steering group of a pharmaceutical
19  trial or of an intervention drug.
20          I never sign, for instance, a
21  confidentiality agreement which prevents me from
22  being able to publish the full trial results,

332

1   because I think when it comes to itemized control
2   trials, you need to be more catholic than the
3   Pope, it's a bad example nowadays with what
4   happened, but you know what I mean.
5   BY MR. WEISS:
6       Q.  Uh-huh.
7       A.  And in terms of really following the
8   protocol, there's no other study design where you
9   need to -- where we need to be that uptight.  We
10  always should be uptight, but especially if it
11  comes to --
12      Q.  Uh-huh.
13      A.  But let me quickly have a look and,
14  you know, tell you what I think actually --
15      Q.  Uh-huh.  And two things, I'm not
16  asking about your substantive conclusions.
17      A.  Not about my --
18      Q.  Your substantive conclusions.
19      A.  Okay.  What are the substantive
20  conclusions?  What do you mean by that, the main
21  conclusions?
22      Q.  Generally I'm not asking about what

Peter Juni                                September 21, 2010

333

1  you're trying to convey.
2       A.  Uh-huh.
3       Q.  I'm asking about how you convey it.
4       A.  Uh-huh.  You mean just the specific
5  statements, the quality of the --
6       Q.  The language that you use, so on and
7  so forth.
8       A.  Okay.  But, let me -- if you give me
9  two minutes or so, that's good.
10      Q.  Sure.
11          MR. SAHAM:  Objection to form.
12          THE WITNESS:  Okay.  I'm ready.
13  Looking at that, I notice that I became less
14  rebellious than perhaps eight years ago.  I'm not
15  sure whether this is actually related to the work
16  and the feedbacks I got.
17          This is more related to, you know,
18  eight years later basically after my wife fell
19  ill, et cetera.  I just was shown that there are
20  just, you know, more important aspects to life
21  than clinical research, that life is basically
22  too short.

334

1           I would look at things perhaps more
2  moderate.  So, for instance, in the second page I
3  wrote "Two issues cause concern, first is the
4  author's explanation for these serious
5  irregularities were inadequate" and I would drop
6  the serious.
7           Then I would probably just be more
8  humble in indicating -- where was that,
9  "publishing and distributing overoptimistic
10  short-term data using post hoc changes, et
11  cetera, is misleading."  Today I would say is
12  problematic, you know, just be a bit more
13  conservative there.
14          And, the last I would again drop the
15  seriously biased and say in December of 2001, for
16  example, "most of 58 physicians attending an
17  Osteoarthritis Workshop in Bern, Switzerland in
18  December of 2001 had not realized that CLASS was
19  biased or may have been biased."
20  BY MR. WEISS:
21      Q.  Okay.
22      A.  I think that's the statements that I

335

1  would slightly make nowadays.  But, in the light
2  of life, but not in the light of clinical
3  research, I think.
4       Q.  Uh-huh.  Well, let me ask you this
5  and moving on, back to Exhibit 13, the next
6  letter is a letter from Michel Lievre and Eric
7  Abadie on behalf of the French Marketing
8  Authorizing Committee.  Do you see that?
9       A.  Uh-huh, yes.
10      Q.  And they say, quote "Peter Juni and
11  colleagues conclude health authorities should
12  have withdrawn rofecoxib several years before the
13  APPROVe study results were made available in
14  September, 2004.
15          "Since we have been involved in the
16  assessment of the cardiovascular safety of
17  rofecoxib the request of the Agence Francaise de
18  Securite Sanitaire des Produits de Sante" -- I'm
19  just going to say AFSsPS, "We feel compelled to
20  respond to what could be interpreted as an
21  accusation of incompetence.
22          "In fact, that the available

336

1  evidence proves that the risk of myocardial
2  infarction is increased by rofecoxib compared
3  with placebo is unclear."
4           So do you understand that they're
5  disagreeing with the conclusions of your
6  meta-analysis?
7       A.  Unsurprisingly so they feel accused,
8  yes.
9       Q.  They go on to say at the bottom,
10  "Juni and colleagues excluded from their analyses
11  the placebo-controlled studies done in patients
12  with Alzheimer's disease which is not acceptable.
13          "The files submitted by Merck, by
14  request of the French authorities, contained the
15  results of three studies in Alzheimer's disease,
16  which contributed 28 myocardial infarctions,
17  compared with the total of 64 in the
18  meta-analysis (including probably 24 from
19  VIGOR)."  Do you see that?
20      A.  Yes.
21      Q.  And do you understand them to be
22  suggesting that your decision not to include

Peter Juni                                        September 21, 2010

337

1  these trial results affected the results of your
2  meta-analysis?
3        A.   No.  They didn't suggest that this
4  affected it, but they were suggesting that not to
5  include Alzheimer's disease was inacceptable.
6        Q.   Uh-huh.
7        A.   Again, if we had included the
8  Alzheimer's disease trial, we would have deviated
9  from our protocol.  Our protocol was prespecified
10  to include only natural (inaudible).
11           In the response to these trials, we
12  did an additional analysis.  Also, as far as I
13  remember, I would have to look at the, you know,
14  at the exhibit, but, as far as I remember, there
15  we also included the Alzheimer trials to show
16  what actually was happening and we found the same
17  sort of pattern in terms of the signal.
18        Q.   Uh-huh.  So you're saying that your
19  failure to include the results from the
20  Alzheimer's trial didn't affect your conclusion?
21        A.   Well, I don't know.  I would need to
22  look first at our -- at our response.  But, the

338

1  point is it wasn't the failure, but it was the
2  prespecified selection criteria that we had to
3  follow.
4        Q.   Uh-huh.
5        A.   We couldn't deviate from the
6  protocol.  We couldn't violate our own protocol.
7        Q.   Did you know that these studies
8  existed at the time that you were doing the
9  study?
10        A.   Yes.  Yes.
11        Q.   You could have amended the protocol,
12  correct?
13        A.   Yes.  But this is something which is
14  considered by certain people to be quite
15  problematic, you know.  We talk about the
16  systematic review which is already observational
17  in nature.
18           And that just based on inspection of
19  the data, to deviate from the protocol and have
20  an amendment of the protocol is deemed to be
21  quite problematic because of that.
22           We could have, you know, accused of

339

1  having inspected the data first and then based on
2  that do the amendment.
3        Q.   And you think that people would
4  consider that inappropriate, to amend your
5  protocol to include additional data, even where
6  you believe that that data was highly relevant
7  and important to the analysis that you were
8  doing?
9           MR. SAHAM:  Objection to form.
10           THE WITNESS:  We -- you know, for us
11  it was clear that we just follow the protocol as
12  it was.  We weren't considering that.  And we
13  were ready then in the correspondence section of
14  The Lancet to address this point.
15           But, at the time that we planned
16  this analysis, this meta-analysis, we never ever
17  thought about that, because the scope of this
18  analysis was patients with musculoskeletal
19  conditions and that's all.
20  BY MR. WEISS:
21        Q.   So, if you were doing a study and
22  just before you published that study a different

340

1  study was released which completely contradicted
2  your conclusion, would you nevertheless go ahead
3  and publish your study?
4           MR. SAHAM:  Objection to form.
5           THE WITNESS:  Are we talking about
6  primary study, a clinical trial, or a
7  meta-analysis?
8  BY MR. WEISS:
9        Q.   Fair enough.  We're talking about a
10  meta-analysis.
11        A.   A meta-analysis.  And I would still
12  publish it, because we have performed it and
13  there is an obligation to publish.  There's an
14  ethical obligation, yes.
15        Q.   You think there's an ethical
16  obligation to publish a meta-analysis?
17        A.   When you finish it and when it's
18  there, I think that we should have -- just an
19  obligation to make results available to the
20  public.  I mean, if it's just on a website as a
21  PDF or whatever, so be it.
22           But -- or that you then just do an

Peter Juni                                    September 21, 2010

341

1  update of the analysis, it's a meta-analysis.
2  But, once you finish the work and have written it
3  up, I think you should continuously also try to
4  publish it, yes.
5       Q.   Uh-huh.  So that you think you
6  should publish it even if you knew, for example,
7  that the results of a trial that had just been
8  published would materially alter the results of
9  your study?
10      A.   Ah, you mean now -- I thought you
11  were referring to another meta-analysis, you
12  know, that wasn't complicated.
13          So you say, there's -- we have
14  finished our meta-analysis, there is a new trial
15  coming up.
16      Q.   A new clinical trial has just been
17  reported.
18      A.   Okay.  And now, we have frequently
19  this problem that we then say -- I should then
20  say, okay we do an update search.
21          The trial still, you know, fulfills
22  our selection criteria.  But do an update search

342

1  so my people then moan and groan actually and
2  say, okay, another two months of work and we
3  still include it or we don't include it.
4          And we -- it's correctly stipulated
5  that the search date, you know, when we closed
6  the search, it was then, and then.  And in the
7  discussion section, we just indicate that after,
8  you know, we have closed the searches, this trial
9  was becoming available, et cetera.
10      Q.   Uh-huh.  In your meta-analysis
11  regarding Vioxx, did you disclose the existence
12  of these other trials that people have criticized
13  you for not including?
14      A.   I don't know.  They didn't -- that's
15  important, they didn't qualify, because they were
16  not a patient.  So they were beyond our study
17  selection.  I wouldn't know.  I would need to
18  look at our paper on how we acknowledged it.
19      Q.   Okay.  Finally, I'll ask you to turn
20  to Page 25, and this is a letter from Jack
21  Nyberg, and the last paragraph says "If further
22  evidence shows that Merck had information that

343

1  should have been made public, then they should be
2  held accountable.
3          "But this meta-analysis does not
4  provide such evidence and is an example of
5  retrospective data manipulation," close quote.
6      A.   Okay.
7      Q.   Do you agree with that criticism?
8      A.   Sorry.
9      Q.   Do you agree with that criticism?
10     A.   No.
11     Q.   Okay.  So you don't think that you
12  retrospectively manipulated the date?
13     A.   Well, I know that we didn't
14  retrospectively manipulate the data.
15     Q.   Uh-huh.
16     A.   I know we processed data in a
17  prespecified way and did not deviate from the
18  protocol.  There wasn't any data in that
19  information.  Some of these statements are really
20  rather rich, so you need to have skin like an
21  elephant.
22     Q.   And you know that, of course,

344

1  because you are involved in doing the analysis
2  for the meta-analysis, correct, that you
3  published?
4      A.   Let me see who did this analysis.
5  Let me quickly see where who was on there.
6      Q.   I'm talking about your
7  meta-analysis.
8      A.   Yeah, yeah.  But I'm just thinking
9  about who was involved in the analysis.  It
10  was -- the meta-analysis was performed by me and
11  Matthias Egger.
12     Q.   Right.  So you testified that you
13  know that there was no retrospective data
14  manipulation, and I'm asking you, you know that
15  because you were involved in the process that led
16  to the publication of that paper, correct?
17     A.   Correct.
18     Q.   Correct.  And you know because you
19  were involved in writing the paper, correct?
20     A.   Uh-huh.
21     Q.   And you were involved in following
22  the protocol, correct?

Peter Juni                                    September 21, 2010

345

1    A.   Correct.
2    Q.   And you were in the room when you
3  and your colleagues were discussing what the
4  publication should look like or what information
5  should be included, correct?
6    A.   Correct.
7    Q.   Okay.
8        MR. WEISS:  I ask the reporter to
9  mark as Defendants' Exhibit 14 this document.
10       THE WITNESS:  At least somebody
11 knows my work, that's nice, okay.  Good.
12       (Defendants' Exhibit Number 14
13       marked for identification.)
14 BY MR. WEISS:
15   Q.   Dr. Juni, we've just marked, as
16 Defendants' Exhibit 14, an article published in
17 Age and Aging called, "Older people should NOT be
18 prescribed 'coxibs' in place of conventional
19 NSAIDs."  Is this a document that you authored?
20   A.   Yes.  I coauthored this with my
21 colleague, Paul Dieppe.
22   Q.   Okay.  And I'm going to ask you to

346

1  turn to the bottom of the first column on the
2  first page, which says, "In our view, the
3  pharmaceutical industry, presumably driven by the
4  massive market for NSAIDs (they are now worth
5  over US$30 billion per year), have made several
6  important mistakes during the development of
7  coxibs, these include" and I'm going to go down
8  to bullet "iii.  Excluding older people and those
9  at high risk of side-effects from the majority of
10 trials, i.e. the practice of protectionism rather
11 than inclusivity."  Do you see that?
12   A.   Yes.
13   Q.   Is that criticism accurate with
14 respect to the CLASS trial?
15   A.   I would need to look at Exhibit
16 Wolfe 15 to have a look at that how what the age
17 spectrum, et cetera, was.
18       Out of my mind, I would assume that
19 yes, but we quickly can have a look if you want
20 me to.
21   Q.   Please.  I think the table that I
22 referred you to earlier was on Page 27.

347

1    A.   Okay.  Let's have a look.  If it
2  comes to age, I think that's correct.  It's
3  something that we're currently trying randomized
4  trials also to include the very elderly patients,
5  very elderly patients.
6        As to, you know, represent the
7  clinical spectrum actually receiving the therapy
8  in routine clinical practice.  We call that
9  all-comer trials.
10   Q.   What is the mean age of the patients
11 that were included in the CLASS trial according
12 to Wolfe Exhibit 15, Page 27?
13   A.   The mean age is 60.
14   Q.   Okay.  And so you don't consider
15 those to be older people?
16   A.   Well, they're not very old and they
17 do not, you know, represent -- are not, you know,
18 reflecting the fact that probably the average age
19 one would need to look at observational studies
20 like the one by Ray and colleagues and Delong,
21 the average age of patients who actually took
22 these drugs would be more like 75 rather than 60.

348

1    Q.   And you're not testifying that 60 is
2  the new 40, right?
3    A.   No.  I'm not.  But --
4    Q.   Now, the next criticism is that it
5  excluded those of high risk of side effects.
6        Is that criticism inaccurate with
7  respect to the CLASS trial?
8    A.   I wouldn't remember how the event
9  rates were for cardiovascular complications.  I
10 would need to look that up indeed.  It depends a
11 bit on that.
12       It's clear that the event rates we
13 had from myocardial infarction that are in the
14 Merck, Sharp & Dohme trials in rofecoxib had
15 about, you know, were about 10 times lower event
16 rates in the trials as compared with the routine
17 clinical populations.
18       Whether the same is the case in
19 here, I wouldn't know out of my heart.
20   Q.   Was that something that you analyzed
21 before making that statement in this article,
22 Defendants' Exhibit 14?

Peter Juni                                        September 21, 2010

349

1    A.   Well, here we are talking about
2  coxibs in general.  So we knew, or I know now,
3  and I certainly knew at that time, that this was
4  the case for rofecoxib.
5       Whether this was also the case for
6  celecoxib and whether I knew that at that time, I
7  can't remember.
8    Q.   In the fourth bullet there you say,
9  "In at least in one case, and possibly more,
10 publishing data from trials that include analyses
11 that are different from those specified in the
12 protocol, and widely disseminating the resulting,
13 misleading information."  Do you see that?
14   A.   Yes.
15   Q.   That's the reference -- the
16 reference is a Footnote 9.  That's a reference to
17 your BMJ?
18   A.   Exactly.
19   Q.   Is it common practice in your
20 industry to cite to yourself?
21   A.   Well, if you're referring to work
22 that is relevant, indeed so, yes.

350

1    Q.   Okay.  And then on Page 102 of this
2  document, the page numbers on the bottom
3  left-hand corner.
4    A.   Yes.
5    Q.   It says -- and I'm looking at the
6  second column on the right-hand column, first
7  full paragraph, last sentence, "Based on results
8  by Warner et al, presented in Figure 3, there is
9  no reason to presume different rates of serious
10 cardiovascular events associated with celecoxib
11 or diclofenac use, nor is there any reason for
12 presume different rates of serious
13 gastrointestinal events."
14      Now, with respect to the last clause
15 of that statement, is that still your view today,
16 that there is no reason to presume different
17 rates of serious gastrointestinal events between
18 celecoxib and diclofenac?
19   A.   Actually I quickly need to find the
20 sentence and read it.
21   Q.   Sorry.  It's just above the
22 paragraph that begins "Figure 4 presents."

351

1    A.   Based on results by Warner and
2  colleagues, which is lab research related to the
3  COX 2 selectivity, the answer is yes, that there
4  is no reason to expect, to presume different
5  rates of serious gastrointestinal events.
6    Q.   Okay.
7    A.   Based on results that we are
8  currently just summarizing and writing up, it
9  could well be that there is an advantage.  Again,
10 that's research now, you know, eight years down
11 the line, that there might be some advantage of
12 celecoxib even over diclofenac despite this lab
13 research.
14   Q.   Uh-huh.
15   A.   So, based on the overall body of
16 data that has accumulated, you know, up to now --
17   Q.   Uh-huh.
18   A.   -- this is still preliminary.
19   Q.   Would that include the results of
20 the CONDOR trial?
21   A.   This would include -- well, I'm not
22 sure I'm confused now.  CONDOR you say?

352

1    Q.   Are you familiar with the CONDOR
2  trial?
3    A.   I'm not sure anymore.  Who was the
4  first author -- was this the one which was
5  recently published in The Lancet?
6    Q.   Uh-huh.
7    A.   So I wasn't aware of the acronym
8  CONDOR.
9    Q.   Uh-huh.
10   A.   And I would need to look at the
11 trial just to indicate that to you.  I'm not --
12 I'm not responsible.
13   Q.   The first author of Chan.
14   A.   Yes.  Yes.  Yes.  Can I quickly
15 have -- could you make an exhibit out of that --
16      MR. WEISS:  Why don't we mark this
17 as Defendants' Exhibit 15.
18      (Defendants' Exhibit Number 15
19      marked for identification.)
20      THE WITNESS:  Then I can tell you
21 whether it would qualify for this analysis.
22 BY MR. WEISS:

Peter Juni                                    September 21, 2010

|     | 353 |
| --- | --- |
| 1 | Q.   This is just an abstract. |
| 2 | A.   That's fair enough. |
| 3 | Q.   Exhibit 15 is an abstract from The |
| 4 | Lancet, of an article entitled "celecoxib Versus |
| 5 | Omeprazole and Diclofenac in Patients With |
| 6 | Osteoarthritis and Rheumatoid Arthritis (CONDOR): |
| 7 | a Randomized Trial." |
| 8 | A.   So the trial was not qualified for |
| 9 | this analysis.  So the answer is it was not |
| 10 | included by, because it was looking at diclofenac |
| 11 | plus proton-pump inhibitor, omeprazole, also for |
| 12 | a upper gastroprotective agent versus celecoxib, |
| 13 | which would disfavor celecoxib in terms of, you |
| 14 | know, our aim in this analysis of a pure |
| 15 | comparison of COX 2 selective inhibitors with |
| 16 | traditional NSAIDs, so it wasn't included. |
| 17 | Q.   So you have not reviewed the results |
| 18 | of the CONDOR trial? |
| 19 | A.   I think my colleagues have actually |
| 20 | reviewed results of the CONDOR trial.  But I |
| 21 | would not be sure that the manuscript, which is |
| 22 | not completed, which is about to be completed in |

|     | 354 |
| --- | --- |
| 1 | the next few weeks or the next month or so, so I |
| 2 | would not be sure about the destiny of this |
| 3 | article. |
| 4 | But, just based on what I see here |
| 5 | and what I heard, you know, from my colleagues, |
| 6 | that it is the selection, that this trial would |
| 7 | not have qualified. |
| 8 | Q.   Okay.  But, besides whether or not |
| 9 | it would have qualified for your analysis, would |
| 10 | it have changed the view that you express in |
| 11 | Defendants' Exhibit 14 that there is no reason to |
| 12 | believe that Celebrex is safer than diclofenac in |
| 13 | terms of serious gastrointestinal injury? |
| 14 | A.   So it's patients with a previous |
| 15 | gastroduodenal observation -- let me quickly see. |
| 16 | I am unable to tell from the abstract what the |
| 17 | end point was. |
| 18 | So -- and the interpretation of the |
| 19 | data provided at the time point the pivotal CLASS |
| 20 | trials were published would not have changed. |
| 21 | My view into the safety profiles of |
| 22 | different NSAIDs, including COX 2 selective |

|     | 355 |
| --- | --- |
| 1 | inhibitors, has changed since the publication of |
| 2 | the CLASS trial and since the publication of the |
| 3 | the RICO (ph.) trial. |
| 4 | Q.   And in what respect has it changed? |
| 5 | A.   It has changed in that respect that, |
| 6 | first of all, that I believe that all of the |
| 7 | NSAIDs, whether COX 2 selective or not, have, to |
| 8 | a certain extent, a problem with cardiovascular |
| 9 | and with gastrointestinal toxicity. |
| 10 | I think that at that time one |
| 11 | overestimated the advantage that Rofecoxib had |
| 12 | over traditional NSAIDs because naproxen is |
| 13 | basically, in terms of gastrointestinal safety, |
| 14 | the worst NSAID that you can have which really, |
| 15 | you know, punches holes in a stomach in a way to |
| 16 | a large extent. |
| 17 | And that basically there may be for |
| 18 | celecoxib, based on the results readdressed and |
| 19 | included in the, in this network meta-analysis, |
| 20 | that there may be just some advantage on |
| 21 | gastrointestinal outcome spots.  I can't remember |
| 22 | right now out of my head what our results |

|     | 356 |
| --- | --- |
| 1 | actually indicated for ulcer complications. |
| 2 | Q.   Uh-huh. |
| 3 | A.   So, in terms of ulcer complications, |
| 4 | it could well be that still the book is open, |
| 5 | that, you know, the estimates are too imprecise |
| 6 | to come to firm conclusions. |
| 7 | But by all means celecoxib would be |
| 8 | among the safer, gastrointestinally safer in |
| 9 | terms of NSAIDs, COX 2 selective or not, whereas |
| 10 | naproxen clearly is the worst.  But they all have |
| 11 | trouble. |
| 12 | Q.   And one of the criticisms -- in your |
| 13 | reply to the criticisms offered by many about |
| 14 | your homeopathy article, you said and I quote "We |
| 15 | also need to be prepared to accept the results of |
| 16 | well-designed studies, even if they challenge our |
| 17 | own fervently held beliefs." |
| 18 | Do you subscribe to that admonition? |
| 19 | A.   Oh, yes, very much so.  That's the |
| 20 | reason why we are now writing up this network |
| 21 | meta-analysis.  This is research.  Research is |
| 22 | progressing. |

Peter Juni                                    September 21, 2010

357

1    And the answers we get based on one
2  single study will never be the ultimate answers.
3  Things change over time and that's why we
4  actually progress in the medical field.
5    Q.   Okay.  Now, referring back to Wolfe
6  Exhibit 3, which is the JAMA article, I think you
7  testified earlier in sum or in substance that the
8  JAMA authors and the peer reviewers had no
9  information that there was more than six months
10  of data; is that correct?
11    MR. SAHAM:  Objection to form.
12    THE WITNESS:  That there was more
13  than six months data amenable to analysis at the
14  time the manuscript was submitted, that is
15  correct.
16  BY MR. WEISS:
17    Q.   Well, could you explain to me what
18  you mean by more than six months data that was
19  amenable to analysis?
20    A.   Well, that actually the protocol was
21  allowing for a longer term analysis and that the
22  data actually was ready, meaning the monitoring

358

1  was finished, the events were adjudicated and the
2  data was ready to go for the analysis.
3    Q.   Okay.  So you agree with me that
4  the CLASS article actually discloses that there
5  is more than six months of data from the trial?
6    MR. SAHAM:  Objection to form.
7  Misstates prior testimony.  Mischaracterizes the
8  testimony.
9    MR. WEISS:  I didn't even
10  characterize the testimony.  I said do you agree
11  with me.
12    MR. SAHAM:  Asked and answered.
13    THE WITNESS:  Okay.  I will have a
14  look and tell you whether I agree or disagree
15  with this statements.  Okay.  How was the
16  question again?
17    (Record read.)
18    THE WITNESS:  And I would need you
19  to be more specific or I can -- I -- I answer the
20  question with a qualifying remark there.
21    And I disagree with you that the
22  article makes clear that at the time point this

359

1  paper was published, that there was longer term
2  data available that could have been included in
3  the analysis.
4    I disagree with this notion.  The
5  article makes clear, however, that the protocol
6  specified continuous follow-up and is not clear,
7  as far as I remember, but let me just see how
8  long this takes, they write "after a baseline
9  visit, follow-up clinic visits took place at
10  weeks four, 13, and 26 after the initial dose of
11  medication and every 13 weeks thereafter."
12    Now, this is a situation we are
13  having in many trials here.  In our stent trials,
14  we're following patients up, up to five years.
15  The primary end point is typical at nine months.
16    So the primary publication we do is
17  for nine months and everybody knows that we
18  follow-up patients after five years and many
19  clinical epidemiologists would have interpreted
20  these statements accordingly.
21  BY MR. WEISS:
22    Q.   Do you see the next sentence, it

360

1  says "All patients were provided an opportunity
2  to complete a minimum of six months of
3  treatment."  Do you see that?
4    A.   Yes.
5    Q.   Does that indicate to you that
6  patients in the trial had more than six months of
7  treatment?
8    A.   Well, it's not specific.  And it
9  indicates that they could have longer durations
10  of treatment, yes.
11    Q.   Just by use of the word minimum,
12  correct?
13    A.   Yes.  Indeed.  Indeed.
14    Q.   Okay.  Have you ever been a peer
15  reviewer for any journals?
16    A.   Yes, I have.
17    Q.   And let me ask you this question:
18  If you had received this manuscript and you had
19  read the language that you just pointed to,
20  "Beginning after a baseline visit, follow-up
21  clinic visits took place at Weeks 4, 13, 26,
22  after the initial dose of medication and every

Peter Juni                                    September 21, 2010

361

1  13 weeks thereafter, all patients were provided
2  an opportunity to complete a minimum of six
3  months of treatment," how would you have
4  responded?
5      A.   I don't know.
6      Q.   Would you have asked a question
7  about that?
8      A.   Let me quickly see.  You know, for
9  me, it's very difficult to respond to this
10 question in an unbiased manner, knowing what I
11 know today.
12         I can tell you perhaps and then I
13 have a look at the statement here that quite
14 frequently when I peer review, I ask myself do I
15 miss something in terms of, you know, data being
16 not reported.
17         I ask that myself nowadays.  If I
18 had been the peer reviewer at that time, I think
19 I would have missed it in 2001.
20     Q.   You don't think, as a peer reviewer,
21 this would have indicated to you that there was
22 more data?

362

1      A.   Well, that's things, you know, we're
2  doing a lot of peer reviews and it is notoriously
3  difficult to bring everything to the point and to
4  grasp every single potential criticisms.
5          I'm not sure whether I would have
6  picked it up or not.  I generally answer it and I
7  can't tell.  I always hope and I know
8  peer-reviewing major trials that I pick up these
9  things.  I can't be sure.
10     Q.   Okay.  You testified earlier, in sum
11 or in substance, that the JAMA editors were
12 completely unaware that there was more than six
13 months of data?
14     A.   Yes.
15     Q.   How do you know that?
16     A.   Because I was talking to presumably
17 it was Drum and Drennan, about this.  So this was
18 a personal statement for one, when I remember
19 that correctly.
20         But I think there was also -- they
21 could also have been a statement actually in
22 JAMA.  I wouldn't be sure about that.

363

1      Q.   Okay.  Well, do you have any
2  knowledge of the communications between the
3  authors and the editors at JAMA at the time that
4  the article was submitted?
5      A.   That's why we ask -- that's why I,
6  you know, I directly discuss the points, the
7  notion with Drum and Drennan at that time.
8      Q.   But, what about Margaret Winker,
9  have you ever talked to her?
10     A.   No.
11     Q.   No.  And so you've never seen the
12 communications from the authors and the JAMA
13 editors?
14     A.   No.
15     Q.   Okay.
16     A.   This was --
17     Q.   Would your view or would your
18 testimony be different if hypothetically a JAMA
19 editor had asked one of the authors whether there
20 was more than six months of data and the answer
21 to that question was yes?
22         MR. SAHAM:  Objection to form.

364

1          THE WITNESS:  I quickly have to look
2  at how we stipulated that and then I answer your
3  question.
4          When we state here, and I'm not sure
5  whether this was an appropriate reference, that
6  they were neither referred to in the article nor
7  reported to JAMA, we actually refer to the reply
8  Silverstein and colleagues made in JAMA, when six
9  versus 12-month data were actually discussed
10 there.
11         So I would need to have a look into
12 that.
13 BY MR. WEISS:
14     Q.   Right.  But I'm -- what I'm asking
15 you is simply to assume that it's true.
16     A.   Yes.
17     Q.   That one of the authors told one of
18 the JAMA copy editors that there was, in fact,
19 more than six months of data.
20         MR. SAHAM:  Objection to form.
21 Foundation.  Improper hypothetical.
22         THE WITNESS:  So is it the copy

Peter Juni                                    September 21, 2010

365

1   editor or is it the editor?  If it was one of the
2   editor or deputy editors who are academically in
3   charge --
4   BY MR. WEISS:
5       Q.   Uh-huh.
6       A.   -- that's a different situation from
7   that what you've just indicated that it was one
8   of the copy editors.  Who are you referring to?
9           MR. SAHAM:  Objection to form,
10  foundation.
11  BY MR. WEISS:
12      Q.   Let's take either, let's start with
13  the editors or the deputy editors.
14          MR. SAHAM:  Objection to form,
15  foundation.
16          THE WITNESS:  Okay.  So these
17  were -- so if this is about an academically
18  trained editor who is in charge academically of
19  the journal like Drum and Drennan as I've just
20  indicated, if some of them would have known, I
21  would look at this differently.
22  BY MR. WEISS:

366

1       Q.   Let me ask you this question.
2       A.   If it's a copy editor, I would say
3   no.  It's not different because the copy editor
4   isn't qualified to understand the problem.
5       Q.   Okay.  Just explain to me the
6   process regarding the incorporation of peer
7   review comments.
8           When you're a peer reviewer and you
9   pose some questions about an article that you
10  want the authors to answer and it's presumably
11  transmitted through the editors to the authors,
12  correct?
13      A.   Correct.
14      Q.   And then their -- the authors'
15  replies to your questions, are they routed back
16  to you from the authors so that you see the
17  authors' answers to your questions?
18          MR. SAHAM:  Objection to form.
19          THE WITNESS:  It depends on the
20  journal.  So typically the large journals, like
21  BMJ, JAMA, Lancet, don't do a second round.  So
22  they're not routed back to the peer reviewers.

367

1           Whereas the smaller specialist
2   journals, typically or quite frequently do a
3   second round.  So all the authors' peer review
4   comments come back and then they will be sent out
5   again to the peer reviewers.
6   BY MR. WEISS:
7       Q.   But what's the point of having peer
8   reviewer comments and responses from the authors,
9   if the peer reviewers don't get to comment on the
10  authors' responses.
11          MR. SAHAM:  Objection to form.
12          THE WITNESS:  The point is, in my
13  point of view at least, that the degree of
14  professionalism, this also means this exposition
15  time an editor has with a specific manuscript
16  that is considered for publication, is
17  considerably higher in the major journals like
18  JAMA, Lancet or BMJ as compared to the specialist
19  journals.
20          So, if I'm doing my editing tasks,
21  you know, for the specialists' journals, I
22  typically do that in my free time.  I have very

368

1   little time.
2           If you submit a paper in the New
3   England Journal of Medicine, the editor has an
4   exposition time of 20 hours, perhaps, for a
5   specific piece of work.  And something which is
6   also important is the time frame that is rather
7   short for the major journals.
8           So the normally, probably the
9   assumption is, that's my interpretation, I've
10  never been an editor of one of the major
11  journals, the assumption is that there is not
12  enough time to have a second round of peer
13  reviewer comments and that the editor himself or
14  herself has enough resources, time and experience
15  to appropriately weigh the answers to reviewers
16  comments.
17  BY MR. WEISS:
18      Q.   But who's responsible for taking the
19  authors' responses to the peer reviewer's
20  comments and addressing them in the article
21  somehow?
22      A.   Sorry.  Can you repeat the question.

Peter Juni                                    September 21, 2010

369

1   Who's responsible --
2       (Record read.)
3       THE WITNESS:  So basically
4   responsible for taking aboard the peer reviewer
5   comments of the authors, who should do a
6   point-by-point discussion and a track change
7   version of the manuscript and these should be
8   sent back to editors.
9       And it is ultimately the editor who
10  decides A, whether the second round of peer
11  reviews is necessary and whether the comments
12  were addressed appropriately and see whether, in
13  the light of everything which is known about the
14  manuscript now, the manuscript deserves
15  consideration for publication in the journal.
16      Q.   Have you ever had a conversation
17  with Joy Jaeger of JAMA?
18      A.   What's her name?
19      Q.   Joy Jaeger, J-A-E-G-E-R.
20      A.   No.  I don't know who this is.
21      Q.   Okay.  Have you ever done any
22  research on the issue of informative censoring?

370

1       A.   Research, methodological research on
2   the issue of informative censoring --
3       Q.   Yes.
4       A.   No.
5       Q.   Have you ever written any articles
6   on informative censoring?
7       A.   To a certain extent, yes.  Let me
8   qualify this statement.  We recently had a BMJ
9   paper on attrition bias, meaning bias introduced
10  by exclusion of patients from the analysis.
11      And some of that could also address
12  informative censoring.  But I never did a piece
13  of research that particularly looked into
14  informative censoring.
15      Q.   Right.  But the paper that you've
16  just described really had to do with attrition as
17  a result of censoring, correct?
18      A.   Our paper?
19      Q.   Yes.
20      A.   No.  This paper was about any
21  exclusions of patients from the analysis.  But
22  this could also, you know, address the problem of

371

1   informative censoring.  That's one of the
2   aspects.
3       Q.   Was that addressed specifically in
4   the paper that you refer to?
5       A.   No.  No.  No.  Just as one of the
6   points.
7       Q.   Okay.  Earlier we talked, or you and
8   Mr. Saham talked, about the alternate definition
9   that was in the protocol for the primary end
10  point.  Do you recall that?
11      A.   Yes.
12      Q.   And do you recall what the protocol
13  said about that analysis and when it was to be
14  done?
15      A.   No.
16      Q.   Okay.  Do you recall that the
17  protocol provided that if you failed to meet the
18  primary end point with respect to the traditional
19  definition, you didn't proceed to do an analysis
20  of the alternative end point?
21      MR. SAHAM:  Objection to form.
22  Foundation.

372

1       THE WITNESS:  I think I remember
2   that, that the -- if it failed, I -- I'm about
3   90 percent sure.  If it failed for the
4   traditional definition, that one wouldn't pursue
5   for the alternate definition, full stop.
6   BY MR. WEISS:
7       Q.   Okay.  And then just getting back to
8   your, the issue that you raised about the
9   homogeneity and the heterogeneity issues that
10  might have resulted from the pooling of the
11  trials.
12      A.   Yes.
13      Q.   Do you recall reviewing what the
14  FDA's statistical reviewer had to say about that
15  issue?
16      A.   Well, I recall having reviewed
17  extensively the FDA's statistical reviewer's
18  report, but I don't recall specifically what
19  you're referring to right now.
20      Q.   Uh-huh.  Do you recall that she did
21  not have a concern about any statistical issues
22  as a result of the pooling?

Peter Juni                                          September 21, 2010

373

1     A.   No, I don't recall that.  And I
2   would like to, if possible, like to have a look
3   at that.
4     Q.   Okay.  I will -- this has probably
5   been marked before, but, so be it.  My new review
6   folder happens to be empty.
7          MR. MONTGOMERY:  Wasn't it already
8   entered today?
9   BY MR. WEISS:
10    Q.   Here it is, I'm sorry, it was.
11  You're right, it was already entered as --
12    A.   Oh, yes, here it is.  Statistical
13  Review.  Sorry.
14    Q.   Okay.  I'll ask you to turn to
15  Page 3.
16    A.   Okay.
17    Q.   And you see it says "III.2
18  Demographics."  And I'll read that into the
19  record, it says "Baseline demographic
20  characteristics, vital signs and GI risk factors
21  are generally balanced between the treatment
22  groups, detailed demographic information

374

1   summarized in Tables A1 through A4 in
2   Appendix A."  Do you see that?
3     A.   Yes.
4     Q.   Okay.  And that is -- that
5   contradicts your conclusion that there were a
6   number of statistically significant differences
7   in the demographics between the studies?
8     A.   This is a comparison of the two
9   celecoxib arms with the diclofenac arm and the
10  ibuprofen arm that it's referring to there.  So
11  it would not be the appropriate one to look at.
12    Q.   And what would be the appropriate
13  one to look at?
14    A.   I don't know.  I would need to
15  look -- honestly for this I would need to have
16  more time and look into our own files and then I
17  could tell you what this is referring to.
18    Q.   Okay.  And do you have any
19  understanding of what statistical adjustments may
20  have been made in connection with the CLASS
21  authors' analysis of the data to account for
22  statistical problems that might result as -- by

375

1   virtue of the pooling of the two trials?
2     A.   Whether I have any idea about the
3   way they used the statistical adjustments you're
4   saying.  That's the problem and by just pooling
5   the way they did it, you know, the results, you
6   may just end up in trouble there because a
7   patient who was in Protocol 35 did have a zero
8   probability to be randomized to diclofenac.
9          Whereas a patient who was included
10  in Protocol 102 did have a zero probability to be
11  randomized to ibuprofen, and that's the basic
12  problem that we're having.
13         So, you know, this wasn't a random
14  process that led people to one or the other
15  protocol which makes things complicated.
16         Now, if this is a first step towards
17  the analysis in an approval process, even though
18  we advise against it when we design a trial.
19         I just had a discussion yesterday at
20  the university about this.  I strongly advised
21  against this sort of approach there.  And, you
22  know, it can -- it's viable, it can be done as

376

1   long as this is just the first and not the final
2   step of it and as long as it follows the
3   protocol.
4     Q.   Did you do any analysis or do you
5   have any understanding of the clinical
6   significance of the apparent or purported
7   differences in the demographics that you
8   identified in your letter to the editor of JAMA?
9          MR. SAHAM:  Objection to form.
10         THE WITNESS:  There is no clinical
11  significance.  There is methodological
12  significance to that.
13         Meaning since the -- this process
14  was not a random process, you know, to end up in
15  one trial or the other it would have been
16  important just, you know, to separately as was,
17  you know, following the protocol, to report and
18  analyze just separately what was going on while
19  fully respecting the approach towards controlling
20  Type I error.
21  BY MR. WEISS:
22    Q.   But, for example, if there was a

Peter Juni                                    September 21, 2010

377

1  statistically significant difference in the
2  number of patients with alcoholism in one trial
3  versus the other trial --
4       A.   Yes.
5       Q.   -- and assuming that's not a risk
6  factor for GI ulceration, why does it matter?
7       A.   It only matters because it indicates
8  that these two trials were not part of the same
9  randomization process.  It doesn't matter
10  clinically.
11           It matters that these were two
12  separate randomizations against two separate
13  drugs that had different pharmacokinetics and
14  pharmacodynamics as we know.
15       Q.   But the point is it doesn't
16  necessarily bias or affect the results of the
17  trial?
18       A.   Of the two trials?
19       Q.   The final analysis in whatever
20  comparisons you want to draw.
21       A.   I disagree with this statement.
22  Why, because these were not just, you know, two

378

1  stratified parts of the same trial.
2           And the trial was analyzed as if
3  it -- the trials were analyzed as if it were one
4  single three on trial with one randomization
5  process, so the patients having equal probability
6  or at least some nominal probability to end up
7  with any of the three treatments, and this wasn't
8  the case for these patients and for this, for
9  methodological reasons actually, it would be
10  inappropriate to stick just to this first part
11  without transparently reporting just the results
12  separately for the two protocols.
13           I'm not talking about the full
14  statistical testing, you know, the hypothesis
15  testing that they're doing.  If they had stick to
16  the first part and say, we failed, so we don't go
17  on, they could still have reported just the
18  results separately for the two randomized
19  comparisons.  These are separate randomized
20  comparisons.
21       Q.   Right.  But, if you would agree with
22  me, and we'll say it hypothetically that alcohol,

379

1  the use of alcohol, is not a risk factor for
2  ulcer complication, then the fact that there were
3  more alcohol users in one trial than in another
4  trial would not affect the result?
5       MR. SAHAM:  Objection to form.
6       THE WITNESS:  Which result?
7  BY MR. WEISS:
8       Q.   Whether -- whether or not there was
9  a difference in the number of ulcer
10  complications.
11       A.   I can't answer this question because
12  the question doesn't address the problem.  This
13  analysis that we did on difference between the
14  trials was only in view of demonstrating that
15  there were two different randomization processes
16  going on for Protocol 35 and Protocol 102.
17           And that because of this very fact
18  of the two different randomization processes
19  naive adding up of events in the light of having
20  different comparator drugs would be
21  inappropriate.
22       Q.   Okay.

380

1       MR. WEISS:  For the moment, subject
2  to just some cleanup, I'm done with my
3  examination.
4               EXAMINATION
5  BY MR. SAHAM:
6       Q.   I just have a few additional
7  questions, Dr. Juni.
8           You are -- are you an associate
9  professor of clinical epidemiology tenured on the
10  faculty of Bern University?
11       A.   Yes.
12       Q.   And what does it mean to be a
13  clinical epidemiologist?
14       A.   It means that I'm being involved in
15  the planning, conduct, analysis, and write-up of
16  major clinical trials including randomized
17  control trials, also approval trials, and
18  diagnostic occurrences studies, cohort studies,
19  methodological research and meta-analyses.
20       Q.   And how many peer-reviewed
21  publications have you had in this area,
22  approximately?

Peter Juni                                    September 21, 2010

381

1      A.   In the area of clinical
2  epidemiology, peer-reviewed original articles now
3  must be around 75 or 80.
4      Q.   And who is Paul Dieppe?
5      A.   Paul Dieppe is one of the major
6  rheumatologists.  He used to be the editor of the
7  reference textbook in rheumatology, and is one of
8  the most eminent rheumatologists worldwide.
9      Q.   And he was one of your co-authors of
10 Exhibit 32, the BMJ article?
11     A.   Correct.
12     Q.   And who is Anne Rutjes?
13     A.   Anne Rutjes is a clinical
14 epidemiologist from Amsterdam Medical Center.
15     Q.   And approximately, turning back to
16 yourself personally, how many times have you been
17 cited in peer-reviewed journals?
18     A.   Overall, let me just check.  This
19 has increased I think we've had these numbers.
20 Probably overall right now it will have
21 approximated 4,800 to 5,000 times.
22     Q.   And do you know if Professor Dieppe

382

1  has been similarly cited in academic journals?
2      A.   Well, probably he has cited -- has
3  been cited considerably more, yes.
4      Q.   And turning your attention back to
5  the JAMA article we were discussing, were there
6  facts omitted from that article?
7      A.   Yes.  There were facts omitted.
8      Q.   And what facts were omitted from
9  that article?
10     A.   It was omitted that there were --
11 that the presented design and analysis was
12 deviating from what was originally specified in
13 two different protocols.
14         In terms of A, the number of trials,
15 one being published as a three-arm trial versus
16 two being available as two-arm trials, the
17 specification of the outcome, the length of
18 follow-up, and the analytical approach towards
19 controlling Type I error.
20     Q.   Looking at Wolfe Exhibit 3, the main
21 outcome measure, is it accurate to describe the
22 treatment period of the CLASS trial as a

383

1  six-month treatment period?
2      A.   What is striking in the abstracts is
3  that they're talking about during "the" six-month
4  treatment period, not during "a" six-month
5  treatment period.
6         The six-month treatment period, in
7  my view just indicates, for the purpose of the
8  abstract we're talking about, that this was the
9  prespecified treatment period that was to be
10 looked at in the analysis.
11     Q.   And is it accurate that Wolfe
12 Exhibit 3 does not disclose that almost all of
13 the complicated ulcers experienced during the
14 CLASS trial after six months were in the
15 celecoxib treatment group?
16     A.   It is accurate to state so, yes.
17     Q.   And in your opinion was that
18 misleading?
19     A.   In my opinion, this was misleading.
20 It should have been, at the very least, reported
21 in the publication to open up scientific debate.
22     Q.   Is it also accurate that Wolfe

384

1  Exhibit 3 does not disclose that there was no
2  difference with diclofenac in any of the
3  comparisons looked at as part of the CLASS trial?
4         MR. WEISS:  Asked and answered.
5         THE WITNESS:  It is accurate, this
6  statement, yes.
7  BY MR. SAHAM:
8      Q.   And is that omission, in your
9  opinion, also render -- strike that.
10         Does that omission also, in your
11 opinion, render the article misleading?
12     A.   Yes.
13     Q.   And does -- is it also accurate that
14 Wolfe Exhibit 3, the JAMA article, does not
15 disclose that diclofenac had a lower complicated
16 ulcer event rate than Celebrex when you looked at
17 the FDA alternative definition of complicated
18 ulcer?
19     A.   That is correct, yes.
20     Q.   And, in your opinion, did that
21 render Exhibit 3, the JAMA article, misleading?
22     A.   I'm just thinking quickly.  In my

Peter Juni                                    September 21, 2010

385

1  opinion, it does render the article misleading,
2  keeping in mind that I'm referring to, especially
3  if it comes to this point with the alternate
4  definition, just to the FDA officer's written
5  reports.
6          And I haven't had, as correctly
7  pointed out by this man, I haven't had access
8  directly to the protocol.  I couldn't be
9  100 percent sure how the protocol dealt with this
10 alternate definition.
11      Q.   And why did you write the British
12 Medical Journal article, Exhibit 32, that we've
13 been discussing today?
14      A.   We wrote it as a means of
15 communicating potential problems and as of a
16 means of promote -- as a means to promoting the
17 scientific debate and clinical debate about the
18 potential safety or the potential problems of
19 COX 2 selective inhibitors in general and
20 celecoxib in particular.
21          MR. SAHAM:  I have no additional
22 questions.

386

1          MR. WEISS:  Okay.  I have two
2  minutes of just additional questions.
3          MR. SAHAM:  Well, Josh, I mean,
4  you've already had, I mean, if you want to take
5  two more minutes, but you've already had five
6  hours.
7          You know, typically the examining
8  party gets to redirect and there's not a
9  reredirect.
10         But if it's only going to be two
11 minutes, go ahead.
12              EXAMINATION
13 BY MR. WEISS:
14      Q.   You testified that you thought it
15 was misleading not to describe the results for
16 the alternative definition of the primary end
17 point and protocol, correct?
18      A.   I testified that, but qualified it
19 as you have heard.
20      Q.   Yes.  I understand your
21 qualification.
22          And you also agreed with me before

387

1  that the protocol prespecified that the
2  alternative definition was not to be analyzed if
3  the study failed the primary end point at the
4  traditional definition, correct?
5          MR. SAHAM:  Objection to form.
6  Foundation.
7          THE WITNESS:  Was not to be -- was
8  not to be fully -- sorry, I'm a bit tired.
9  BY MR. WEISS:
10      Q.   I don't know why.
11      A.   Was not to be undergoing statistical
12 testing.  So I think it's two different aspects
13 whether or not you want to present the results,
14 the counts, and whether or not you want to do
15 formal statistical testing and just adhere to
16 conclusions, just do that.
17      Q.   So then I think before you have
18 offered criticisms of the JAMA article on the
19 basis that the authors didn't follow the
20 prespecified statistical analysis, correct?
21      A.   Yes.
22      Q.   And now you're criticizing the

388

1  authors of using misleading -- for following the
2  prespecified statistical analysis, correct?
3          MR. SAHAM:  Objection to form.
4          THE WITNESS:  I would need to look
5  at the medical and statistical reviewer's
6  comments just relating to this point.
7  BY MR. WEISS:
8       Q.   Okay.
9       A.   So, you know, I think it was
10 important just that I make this qualification to
11 my statement.
12          So it could well be that in the
13 light of statistical and medical reviewers that I
14 would, you know, qualify it further and then --
15 and disregard this point entirely.  This is not
16 the major point.
17      Q.   Fair enough.  Last two questions.
18          Your position as a professor, you've
19 held that for one year, is that correct?
20      A.   My -- let me just quickly see.
21 Where do I have it, somewhere here.
22      Q.   Just -- you don't have to be exact,

Peter Juni                                  September 21, 2010

389

1  just roughly.
2      A.   Okay.  No, here it is.  So my
3  position as an associate professor I've held for
4  one year and four months now.
5      Q.   Okay.  And then last question, as of
6  the papers that you have written, the
7  peer-reviewed publications that you have, what
8  would you say is your estimate of the percentage
9  of those papers that are write-ups of
10 meta-analyses and statistical reviews on the one
11 hand, versus write-ups of clinical trials that
12 you were engaged in?
13     A.   It's difficult to estimate.  I would
14 need to have a look at my PubMed citations.  Let
15 me see.  Currently I would say it's two-thirds
16 original research and one-third meta-analyses.
17     Q.   And when you say original research,
18 you say --
19     A.   This includes cohort studies,
20 randomized controlled trials, diagnostic
21 occurrences studies and methodological work,
22 whereas about one-third is systematic reviews of

390

1  meta-analysis.
2      MR. WEISS:  Okay.  I have no further
3  questions, thank you very much.
4              EXAMINATION
5  BY MR. SAHAM:
6      Q.   Dr. Dieppe, just a couple more
7  questions -- Dr. Juni.
8      Is it accurate that the bottom
9  portion of Figure 1 of your British Medical
10 Journal article, that that information regarding
11 the lower complicated ulcer event rate for
12 diclofenac under the FDA alternative definition,
13 that that information was not disclosed in the
14 JAMA article we've been discussing today?
15     A.   This is correct, yes.
16     Q.   And is it also accurate that the
17 JAMA article did not disclose that the -- that --
18 strike that.
19     Is it also accurate that the JAMA
20 article did not disclose that Celebrex failed to
21 demonstrate a significantly different
22 complicated -- or strike that question -- is it

391

1  also accurate that --
2      MR. WEISS:  I'll make it easy.
3  We'll stipulate that the JAMA article says what
4  it says and we can all go home.
5  BY MR. SAHAM:
6      Q.   Well, I'll ask the question again.
7      Is it accurate that the JAMA article
8  failed to disclose that there was any difference
9  between diclofenac and celecoxib in any of the
10 comparisons made in CLASS?
11     A.   That there was not any difference.
12 It failed to disclose that there was not any
13 statistical difference -- statistically
14 significant difference between celecoxib and
15 diclofenac.  This is correct.
16     MR. SAHAM:  Thank you very much for
17 your time today, sir.
18     THE WITNESS:  Thank you.
19     THE VIDEOGRAPHER:  Off the record at
20 5:50 p.m.
21     (Whereupon, signature not having been
22 waived, the deposition concluded at 5:50 p.m.)

392

1      ACKNOWLEDGEMENT OF DEPONENT
2  I, PETER JUNI, M.D., do hereby acknowledge I have
3  read and examined the foregoing pages of
4  testimony, and the same is a true, correct and
5  complete testimony given by me, and any changes
6  or corrections, if any, appear in the attached
7  errata sheet signed by me.
8
9  _____    _____
10 Peter Juni, M.D.          Date
11
12
13
14
15
16
17
18
19
20
21
22

Peter Juni                                          September 21, 2010

393

1           CERTIFICATE OF COURT REPORTER
2     UNITED STATES OF AMERICA     )
3     DISTRICT OF COLUMBIA     )
4          I, LORI G. MACKENZIE, the reporter before
5     whom the foregoing deposition was taken, do
6     hereby certify that the witness whose testimony
7     appears in the foregoing deposition was sworn by
8     me; that the testimony of said witness was taken
9     by me in machine shorthand and thereafter
10    transcribed by computer-aided transcription; that
11    said deposition is a true record of the testimony
12    given by said witness; that I am neither counsel
13    for, related to, nor employed by any of the
14    parties to the action in which this deposition
15    was taken; and, further, that I am not a relative
16    or employee of any attorney or counsel employed
17    by the parties hereto, or financially or
18    otherwise interested in the outcome of this
19    action.
20    _____
            LORI G. MACKENZIE
21          Notary Public in and for the
            District of Columbia
22

      My Commission expires April 14, 2011

394

1     September 27, 2010
2     PETER JUNI, M.D.
      c/o ROBBINS, GELLER, RUDMAN & DOWD, LLP
3     SCOTT H. SAHAM, ESQUIRE
      655 West Broadway
4     Suite 1900
      San Diego, California  92101
5
6     Re:  ALASKA ELECTRICAL PENSION FUND V. PHARMACIA
      Witness:  PETER JUNI, M.D.
7     Date taken:  September 21, 2010
8     Dear Dr. Juni,
9     We enclose for your review and signature a copy
      of the above-referenced transcript.  We ask that
10    you read the transcript carefully.  If it is
      necessary to make any corrections, please do so
11    on the enclosed errata sheet, indicating the
      page, line number, correction, and reason for
12    such correction.  The errata sheet must be signed
      and dated.  Also, you must sign the certificate
13    of deponent enclosed in the transcript.
14    If you do not complete the reading and signing
      within 30 days, you will be deemed to have waived
15    your right to make corrections.  Please return
      the certificate of deponent and errata sheet to
16    Esquire Deposition Solutions, 1020 19th Street,
      N.W., Suite 620, Washington, D.C., 20036.
17
18    Very truly yours,
19
20    _____
21    Esquire Deposition Solutions
22

395

1           DEPOSITION ERRATA SHEET
2
3     Our Assignment No. 172652
4     Case Caption:  Alaska Electrical Pension Fund
5     vs. Pharmacia Corp., et al.
6
7         DECLARATION UNDER PENALTY OF PERJURY
8          I declare under penalty of perjury
9     that I have read the entire transcript of
10    my Deposition taken in the captioned matter
11    or the same has been read to me, and
12    the same is true and accurate, save and
13    except for changes and/or corrections, if
14    any, as indicated by me on the DEPOSITION
15    ERRATA SHEET hereof, with the understanding
16    that I offer these changes as if still under
17    oath.
18        Signed on the _____ day of
19    _____, 20___.
20
21    _____
22        Peter Juni, M.D.

396

1           DEPOSITION ERRATA SHEET
2     Page No.____Line No._____Change to:_____
3     _____
4     Reason for Change:_____
5     Page No.____Line No._____Change to:_____
6     _____
7     Reason for Change:_____
8     Page No.____Line No._____Change to:_____
9     _____
10    Reason for Change:_____
11    Page No.____Line No._____Change to:_____
12    _____
13    Reason for Change:_____
14    Page No.____Line No._____Change to:_____
15    _____
16    Reason for Change:_____
17    Page No.____Line No._____Change to:_____
18    _____
19    Reason for Change:_____
20
21    SIGNATURE:_____DATE:_____
22        Peter Juni, M.D.

Peter Juni                                              September 21, 2010

397

1           DEPOSITION ERRATA SHEET

2       Page No._____Line No._____Change to:_____

3       _____

4       Reason for Change:_____

5       Page No._____Line No._____Change to:_____

6       _____

7       Reason for Change:_____

8       Page No._____Line No._____Change to:_____

9       _____

10      Reason for Change:_____

11      Page No._____Line No._____Change to:_____

12      _____

13      Reason for Change:_____

14      Page No._____Line No._____Change to:_____

15      _____

16      Reason for Change:_____

17      Page No._____Line No._____Change to:_____

18      _____

19      Reason for Change:_____

20

21      SIGNATURE:_____DATE:_____

22          Peter Juni, M.D.

# EXHIBIT 2

1

2          UNITED STATES DISTRICT COURT

           DISTRICT OF NEW JERSEY

3    _____

4    ALASKA ELECTRICAL PENSION FUND, et al.,

5                        Plaintiffs,

6            -against-

7    PHARMACIA CORPORATION, et al.,

8                        Defendants.

9    Civil No. 03-1519 (AET)

     _____

10

11              September 22, 2010

                9:24 a.m.

12

13

14

15          DEPOSITION of ETHAN WEINER,

16   taken by Plaintiffs, pursuant to Notice,

17   held at the offices of CADWALADER,

18   WICKERSHAM & TAFT LLP, One World Financial

19   Center, New York, New York before Wayne

20   Hock, a Notary Public of the State of New

21   York.

22

23

24

25

                                                Page 1

1
2   A P P E A R A N C E S :
3
    ROBBINS GELLER RUDMAN & DOWD LLP
4   Attorneys for Plaintiffs
        655 West Broadway
5       San Diego, California 92101
        (619) 231-1058
6
    BY:    SCOTT H. SAHAM, ESQ.
7       ssaham@rgrdlaw.com
8
9   MOTLEY RICE LLC
    Attorneys for Plaintiffs
10      28 Bridgeside Boulevard
        Mt. Pleasant,
11      South Carolina 29464
12  BY:    JOSHUA C. LITTLEJOHN, ESQ.
        jlittlejohn@motleyrice.com
13
14
    SCOTT & SCOTT LLC
15  Attorneys for Plaintiffs
        600 B Street
16      San Diego, California 92101
17  BY:    MATTHEW MONTGOMERY, ESQ.
18
19
20
21
22
23
24
25
                                        Page 2

1
2   A P P E A R A N C E S : (Continued)
3
4   CADWALADER, WICKERSHAM & TAFT LLP
    Attorneys for Defendants
5       One World Financial Center
        New York, New York 10281
6
    BY:    JOSHUA R. WEISS, ESQ.
7       joshua.weiss@cwt.com
8
9   ALSO PRESENT:
10      ADAM DICOLA, Videographer
11              *    *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                        Page 3

1
2       THE VIDEOGRAPHER: Good morning.          09:25:52
3   We are now on the record.  The time is       09:25:57
4   9:24 a.m. on September 22, 2010.             09:26:02
5       My name is Adam DiCola here with         09:26:04
6   the court reporter, Wayne Hock, of           09:26:11
7   Veritext National Deposition and             09:26:13
8   Litigation Services.                         09:26:16
9       This deposition is being held at         09:26:17
10  the office of Cadwalader Wickersham          09:26:20
11  and Taft, LLP, located at One World          09:26:22
12  Financial Center in New York, New            09:26:26
13  York.                                        09:26:27
14      The caption of this case is              09:26:27
15  Alaska Electrical Pension Fund, et           09:26:30
16  al., versus Pharmacia Corporation, et        09:26:34
17  al., in the United States District           09:26:37
18  Court, the District of New Jersey,           09:26:37
19  civil action number 03-1519.                 09:26:39
20      This is the videotaped                   09:26:43
21  deposition of Dr. Ethan Weiner.              09:26:46
22      Please note that the audio and           09:26:48
23  video recording will take place unless       09:26:51
24  all parties agree to go off the              09:26:54
25  record.  Microphones are sensitive and       09:26:56
                                        Page 4

1
2   may pick up any whispers or any              09:26:58
3   private conversations.                       09:26:59
4       At this time will counsel and            09:26:59
5   all present please identify themselves       09:27:01
6   for the record.                              09:27:03
7       MR. SAHAM: Scott Saham for the           09:27:04
8   plaintiffs.                                  09:27:06
9       MR. MONTGOMERY: Matt Montgomery          09:27:07
10  for the plaintiffs.                          09:27:08
11      MR. LITTLEJOHN: Josh Littlejohn          09:27:10
12  for the plaintiffs.                          09:27:11
13      MR. WEISS: Josh Weiss for the            09:27:11
14  defendants and the witness.                  09:27:13
15      THE VIDEOGRAPHER: Thank you.             09:27:18
16      The witness will now be sworn in         09:27:19
17  and then we can proceed.                     09:27:21
18  E T H A N   W E I N E R, having              09:27:22
19      been first duly sworn by a Notary Public 09:27:22
20      of the State of New York, upon being     09:27:22
21      examined, testified as follows:          09:27:23
22  EXAMINATION BY                               09:27:23
23  MR. SAHAM:                                   09:27:24
24  Q.   Good morning, Dr. Weiner.              09:27:24
25  A.   Good morning.                          09:27:34
                                        Page 5

E. Weiner

1
2    Q.    What is your educational          09:27:35
3  background?                               09:27:37
4    A.    I got my M.D. from Johns          09:27:37
5  Hopkins, did a residency in internal      09:27:42
6  medicine at Montefiore Hospital in New    09:27:45
7  York, and a rheumatology fellowship at the 09:27:47
8  University of Connecticut.                09:27:51
9    Q.    When did you get your M.D.?       09:27:52
10   A.    1980.                             09:27:54
11   Q.    And then you did a rheumatology   09:27:55
12 fellowship after your residency?          09:27:58
13   A.    Yes.                              09:28:00
14   Q.    When did you start working for    09:28:00
15 Pfizer?                                   09:28:02
16   A.    1989.                             09:28:02
17   Q.    And you've worked there           09:28:03
18 continuously since then?                  09:28:05
19   A.    Up until May of 2009.             09:28:05
20   Q.    Did you recently retire?          09:28:09
21   A.    Yes.                              09:28:11
22   Q.    So you're currently retired?      09:28:11
23   A.    Yes.                              09:28:13
24   Q.    And in 2009 when you retired,     09:28:13
25 what was your position?                   09:28:18

Page 6

E. Weiner

1
2    A.    I was senior vice president in    09:28:19
3  the development organization.             09:28:23
4    Q.    And what were your                09:28:24
5  responsibilities?                         09:28:26
6    A.    They were a mix of things at      09:28:27
7  that time that included development of     09:28:30
8  antiinflammatory drugs and responsibility  09:28:31
9  for all the drugs developed in Japan for   09:28:35
10 Pfizer and a couple of special projects.  09:28:40
11   Q.    And bringing you back to the      09:28:44
12 2000/2001 time frame, what was your       09:28:48
13 position then?                            09:28:51
14   A.    I was head of the inflammation    09:28:51
15 therapeutic area.                         09:28:57
16         Originally, before the Warner     09:28:59
17 Lambert acquisition, which I believe was   09:29:02
18 in the middle of 2000, that was for the    09:29:06
19 United States and after that that was      09:29:09
20 pretty much worldwide.                    09:29:11
21   Q.    Okay.                             09:29:13
22         What was your title at that       09:29:13
23 point in time, if you can recall?         09:29:16
24   A.    Probably either executive         09:29:17
25 director or vice president.               09:29:20

Page 7

E. Weiner

1
2    Q.    And I should ask you, could you   09:29:20
3  just state your address for the record.   09:29:23
4    A.    Current?                          09:29:25
5    Q.    Yes, your current address.        09:29:27
6    A.    20 Chapman Drive, East Lyme,      09:29:29
7  Connecticut.                              09:29:32
8    Q.    And is there any reason today,    09:29:33
9  medical or otherwise, why you can't       09:29:33
10 provide truthful and accurate testimony?  09:29:35
11   A.    No.                               09:29:35
12   Q.    So moving back to that 2000/2001  09:29:36
13 time frame, who did you report to?        09:29:41
14   A.    Steve Ryder.                      09:29:42
15   Q.    And what was his job?             09:29:44
16   A.    He was responsible prior to the   09:29:45
17 merger for all development and regulatory  09:29:49
18 activities in the U.S.; after the merger   09:29:52
19 for all development activities worldwide   09:29:56
20 after early development, after proof of    09:30:00
21 concept.                                  09:30:02
22   Q.    And do you recall what his title  09:30:04
23 was?                                      09:30:05
24   A.    He at that point would have been  09:30:06
25 -- might be senior vice president.        09:30:11

Page 8

E. Weiner

1
2    Q.    And who did you report to?        09:30:12
3    A.    Either depending again on the     09:30:13
4  time frame Craig Saxton or John Lamattina. 09:30:16
5    Q.    And Craig Saxton was in charge    09:30:20
6  of developed at Pfizer?                   09:30:23
7    A.    At the time, yes.                 09:30:25
8    Q.    And who did Mr. Saxton or Dr.     09:30:26
9  Saxton report to?                         09:30:29
10   A.    He reported to the head of        09:30:30
11 research and development who, prior to the  09:30:32
12 merger, was George Milne and post merger   09:30:38
13 would have been Peter Corr.               09:30:43
14   Q.    During that 2002/2001 time        09:30:45
15 frame, did you have some responsibilities  09:30:47
16 with respect to Celebrex?                 09:30:51
17   A.    Yes, I had responsibilities for   09:30:52
18 the Pfizer side of the alliance with       09:30:53
19 Searle and Pharmacia.                     09:30:57
20   Q.    And you're referring to the       09:31:00
21 COX-2 alliance?                           09:31:02
22   A.    Yes.                              09:31:03
23   Q.    And who reported to you in your   09:31:03
24 capacity as supervising the Celebrex       09:31:07
25 activities?                               09:31:08

Page 9

3 (Pages 6 to 9)

E. Weiner

1
2    A.    At various times Leland Loose,          09:31:09
3  Mark Fletcher, people reported into Leland      09:31:13
4  one of which was Sam Zwillich.  Mona           09:31:16
5  Wahba.                                09:31:21
6    Q.    Mona Wahba as well?             09:31:21
7    A.    Reported to Leland, yes.            09:31:24
8    Q.    Who then reported up to you?        09:31:26
9    A.    Yes.                          09:31:28
10    Q.    And did you also serve on what       09:31:28
11  was called the COX-2 operations committee?    09:31:30
12    A.    Yes.                          09:31:32
13    Q.    And what was that?               09:31:33
14    A.    There was a series of              09:31:33
15  committees.  That one was responsible for     09:31:36
16  both the development committee and the       09:31:41
17  commercialization committee or whatever it    09:31:43
18  was called.  It was sort of an            09:31:45
19  intermediate committee where most of the     09:31:48
20  decisions were made and only the most        09:31:51
21  important decisions got passed up to the      09:31:54
22  executive committee that was on top of       09:31:58
23  that one.                            09:32:00
24    Q.    Did you meet on a monthly basis?     09:32:00
25    A.    I think it was either monthly or      09:32:02

Page 10

E. Weiner

1
2  every three months or something in         09:32:05
3  between.                            09:32:06
4    Q.    And do you recall who else sat       09:32:07
5  on that committee?                    09:32:09
6    A.    A lot of people came and went.       09:32:10
7  So if you name someone, I probably could     09:32:15
8  tell you whether they were on it.          09:32:24
9    Q.    In a few minutes we can look at      09:32:24
10  a document that I think will refresh your     09:32:24
11  recollection on that.                   09:32:24
12        Do you recall having in the 2000      09:32:24
13  or in the I'll say the 1998 to 2001 time      09:32:26
14  frame having any interactions with Fred      09:32:30
15  Hassan?                            09:32:34
16    A.    No, no direct ones, no.            09:32:35
17    Q.    Have you ever met Dr. Hassan?       09:32:37
18    A.    I believe I did at one meeting,       09:32:39
19  you know, that we were in the CEO's        09:32:43
20  office.  It was a fairly large meeting.  I      09:32:47
21  was just one of the people in the          09:32:50
22  audience.                           09:32:52
23    Q.    What about a woman by the name      09:32:52
24  of Carrie Cox, did you ever interact with     09:32:54
25  her?                              09:32:57

Page 11

E. Weiner

1
2    A.    I met her once or twice.  We        09:32:57
3  really didn't have any meaningful          09:32:57
4  interaction.                         09:32:58
5    Q.    What about Steven Geis?           09:32:58
6    A.    Yes, I worked with Steve Geis.       09:33:00
7    Q.    Was he on the operations           09:33:03
8  committee?                          09:33:05
9    A.    Yes.                          09:33:05
10    Q.    So you interacted with him at        09:33:05
11  least on a monthly basis?                09:33:08
12    A.    (No verbal response).             09:33:09
13    Q.    You have to answer verbally.         09:33:11
14    A.    Sorry.  Yes, I did.               09:33:12
15    Q.    I want to show you what has been     09:33:15
16  previously marked in this litigation as       09:33:21
17  Plaintiff's Exhibit 77.                  09:33:22
18        Could you please take a look at       09:33:38
19  Plaintiff's Exhibit 77.  And I'd ask you       09:33:41
20  if you recognize this document.           09:33:42
21    A.    Yeah, this is the CLASS           09:33:43
22  protocol.                           09:33:46
23    Q.    And what's the CLASS protocol?      09:33:47
24    A.    This embodies the design and        09:33:52
25  high level analysis plan for the large       09:33:56

Page 12

E. Weiner

1
2  outcomes trial that Pharmacia conducted     09:33:58
3  along with Pfizer comparing Celebrex to      09:34:03
4  NSAIDs for GI outcomes.                09:34:07
5    Q.    Was this document required by        09:34:09
6  the FDA for setting up a clinical trial of      09:34:14
7  this type?                          09:34:19
8    A.    Well, a protocol's required for       09:34:19
9  any preclinical trial, so yes.             09:34:22
10    Q.    Would you have participated in       09:34:25
11  reviewing this document before it was        09:34:30
12  ultimately submitted to the Food and Drug    09:34:33
13  Administration?                       09:34:36
14    A.    Yes.                          09:34:36
15    Q.    And I'd like to turn your           09:34:38
16  attention to page ten of thirty-six of        09:34:39
17  Exhibit 77, of the revised clinical          09:34:48
18  protocol and heading 2.1, primary          09:34:52
19  objectives.  The document states "the        09:34:57
20  primary objective of this study is to         09:35:03
21  compare the instance of clinically          09:35:07
22  significant upper gastrointestinal adverse    09:35:09
23  events, a composite safety endpoint         09:35:15
24  comprised of perforation, bleeding, or        09:35:18
25  gastric outlet obstruction associated with    09:35:21

Page 13

4 (Pages 10 to 13)

E. Weiner

1  E. Weiner
2  SC58635400 mg BID to that associated with   09:35:23
3  diclofenac seventy-five mg BID in patients   09:35:32
4  with OA or RA."   09:35:36
5      Does that meet with your   09:35:37
6  recollection that the primary objective of   09:35:39
7  the CLASS trial was to test for   09:35:41
8  complicated ulcers or CSUGIEs?   09:35:45
9      A.  Yes.   09:35:49
10     Q.  And just for the purposes of   09:35:49
11  today's deposition, are you comfortable   09:35:51
12  with referring to CSUGIEs or POBs as   09:35:52
13  complicated ulcers?   09:36:00
14     A.  Sure.   09:36:01
15     Q.  That's a fair characterization   09:36:01
16  of what they are?   09:36:03
17     A.  Yes.   09:36:04
18     Q.  And what, in your understanding,   09:36:04
19  was a complicated ulcer?   09:36:06
20     A.  A complicated ulcer was one that   09:36:07
21  had a medical complication, such as   09:36:09
22  bleeding, perforation, gastric outlet   09:36:12
23  obstruction.   09:36:16
24     Q.  And the CLASS trial was powered   09:36:17
25  and designed to test for that outcome?   09:36:20

Page 14

1  E. Weiner
2      A.  Yes.  Technically two protocols,   09:36:26
3  but yes, that's correct.   09:36:29
4      Q.  And this document, just to be   09:36:29
5  clear, there were two protocols; is that   09:36:31
6  correct?   09:36:33
7      A.  Yes.   09:36:33
8      Q.  And there were two comparisons   09:36:34
9  being conducted as part of the CLASS   09:36:36
10  trial; is that correct?   09:36:38
11     MR. WEISS: I object to the form   09:36:39
12  of the question.   09:36:39
13     Q.  And again, you have to answer   09:36:40
14  verbally.   09:36:43
15     A.  The major comparison was to the   09:36:43
16  pooled -- pooling of the NSAIDs, that was   09:36:45
17  what was agreed with the FDA.   09:36:48
18     Q.  But there were two arms of the   09:36:49
19  trial, one was being a comparison between   09:36:51
20  Celebrex and diclofenac; is that correct?   09:36:57
21     A.  Well, again, the trial was   09:36:58
22  designed to compare Celebrex to the two   09:37:02
23  NSAIDs collectively.  That's how it was   09:37:06
24  designed.   09:37:09
25     Q.  All I'm trying to establish,   09:37:10

Page 15

1  E. Weiner
2  there's two protocols, one setting out the   09:37:12
3  comparison between Celebrex and diclofenac   09:37:15
4  and then a second protocol setting out the   09:37:18
5  comparison between Celebrex and ibuprofen;   09:37:22
6  is that correct?   09:37:25
7      A.  I would just refine that to say   09:37:26
8  that one set out the instructions for   09:37:27
9  conducting the part where patients either   09:37:29
10  got Celebrex or diclofenac and the other   09:37:34
11  where patients got either Celebrex or   09:37:36
12  ibuprofen.   09:37:40
13     Q.  And this particular protocol   09:37:41
14  that's been marked as Exhibit 77 that's   09:37:42
15  sitting in front of you, this is the   09:37:45
16  protocol that deals with the comparisons   09:37:46
17  between Celebrex and diclofenac; is that   09:37:49
18  correct?   09:37:51
19     A.  Yes.   09:37:51
20     Q.  And I'd like to turn your   09:37:52
21  attention to page twenty of thirty-six of   09:37:58
22  Exhibit 77, 4.3, treatment period.  And   09:38:01
23  per the protocol, the treatment period is   09:38:13
24  defined as the fifty-two-week interval   09:38:15
25  during which study medication is taken or   09:38:19

Page 16

1  E. Weiner
2  until the trial officially concludes,   09:38:19
3  whichever occurs first; is that correct,   09:38:22
4  sir?   09:38:24
5      A.  Yes.   09:38:25
6      Q.  And does that meet with your   09:38:25
7  recollection of what the treatment period   09:38:26
8  was defined in the protocol?   09:38:29
9      A.  Yes.   09:38:31
10     Q.  I'd like to turn your attention   09:38:34
11  to page thirty of thirty-six of   09:38:39
12  Exhibit 77.  The top paragraph sets out,   09:38:46
13  "a stepwise procedure will be used to   09:38:56
14  strongly control the type one error."   09:38:59
15     Do you see that?   09:39:02
16     A.  Yes.   09:39:03
17     Q.  And what's type one error?   09:39:04
18     A.  Type one error is where one --   09:39:06
19  where one finds statistical significance   09:39:11
20  where it doesn't exist or conversely   09:39:15
21  actually -- there are two types.  You can   09:39:18
22  find -- I always forget which type goes   09:39:20
23  with which.  But in one case you can   09:39:23
24  wrongly conclude that there's an effect or   09:39:27
25  you can wrongly conclude that there's not   09:39:30

Page 17

5 (Pages 14 to 17)

E. Weiner

1
2  an effect and this was a procedure to          09:39:32
3  correct for multiple comparisons.             09:39:34
4      Q.    And is one point of setting out      09:39:35
5  in a protocol before you conduct the study    09:39:38
6  how the comparison is to be conducted is      09:39:41
7  that to hopefully prevent type one error      09:39:44
8  from occurring?                               09:39:49
9          MR. WEISS: I object to the form       09:39:50
10     of the question.                          09:39:51
11     A.    The analysis plan and design are    09:39:51
12  designed really to prevent both type one     09:39:54
13  and type two error so that one does not      09:39:57
14  either wrongly conclude the drug works       09:40:00
15  when it doesn't or wrongly conclude that     09:40:04
16  it doesn't work when it really does.         09:40:06
17     Q.    And is one way to correct for       09:40:06
18  type one error to pre-specify the outcome    09:40:08
19  prior to the initiation of the trial?        09:40:13
20         MR. WEISS: Objection.                 09:40:14
21     A.    That's really formulating the       09:40:15
22  hypothesis, so that comes first, you have    09:40:20
23  a hypothesis that drug A has more of an      09:40:23
24  effect than drug B, let's say.  And then     09:40:28
25  you design the study to test the             09:40:30

Page 18

E. Weiner

1
2  hypothesis.  And the two errors again you     09:40:32
3  don't want to make are either wrongly         09:40:35
4  concluding the hypothesis is correct or       09:40:38
5  wrongly concluding the hypothesis is          09:40:42
6  incorrect.                                    09:40:44
7      Q.    Was one thing the protocol does     09:40:45
8  is to set forward the appropriate power of    09:40:45
9  the study so that the statistical analysis    09:40:49
10  can be conducted in a way that would avoid   09:40:53
11  type one error?                              09:40:57
12         MR. WEISS: I object to the form       09:40:58
13     of the question.                          09:40:59
14     A.    One uses past data to arrive at     09:41:01
15  the best estimate how many subjects would    09:41:05
16  be required to avoid both types of error,    09:41:09
17  minimize the probability of both types of    09:41:13
18  error depending on how much variability      09:41:16
19  there is in the endpoint and how big an      09:41:19
20  effect one believes the study will show.     09:41:23
21     Q.    And reading along in the same       09:41:27
22  paragraph on page thirty of thirty-six of    09:41:30
23  Exhibit 77, the protocol states, "if the     09:41:33
24  test is not significant, the null            09:41:37
25  hypothesis is retained and the procedure     09:41:41

Page 19

E. Weiner

1
2  stops," and that's referring to the           09:41:42
3  comparison with the pooled NSAIDs; is that    09:41:47
4  correct?                                      09:41:51
5      A.    Yes.                                09:41:51
6      Q.    And what is the null hypothesis?    09:41:51
7      A.    That means that there would be      09:41:54
8  no significant difference between             09:41:56
9  celecoxib and pooled NSAIDs.                  09:41:58
10     Q.    So if there was no statistically    09:42:02
11  significant difference for complicated       09:42:06
12  ulcers when celecoxib was compared to the    09:42:07
13  pooled NSAIDs, the null hypothesis would     09:42:12
14  be retained, that correct?                   09:42:14
15     A.    That's correct.                     09:42:16
16     Q.    And is that, in fact, what          09:42:16
17  happened when the CLASS trial went           09:42:18
18  forward?                                     09:42:20
19     A.    Yes.  However, you need to          09:42:20
20  qualify that question because there's a      09:42:24
21  formal statistical approach to the primary   09:42:26
22  endpoint that does not preclude many other   09:42:32
23  analyses which, in fact, are discussed in    09:42:35
24  the statistical analysis plan.               09:42:38
25     Q.    Is it fair to say, as a result      09:42:39

Page 20

E. Weiner

1
2  of the CLASS trial, the null hypothesis       09:42:41
3  was retained?                                 09:42:44
4      A.    For the primary endpoint.           09:42:44
5  Clinical data, especially in a large trial    09:42:50
6  like this one, is very nuanced and rich       09:42:53
7  and there are many conclusions to be made     09:42:56
8  in trials that either do or don't even        09:43:00
9  reach their primary endpoint.  Trials can     09:43:04
10  reach their primary endpoint but yet not     09:43:08
11  have many other attributes looked at         09:43:12
12  secondarily and conversely trials can fail   09:43:12
13  their primary endpoint but still provide a   09:43:17
14  richness of useful data.                     09:43:20
15     Q.    But that aside, just following      09:43:22
16  the language in the protocol where it        09:43:24
17  states, "if the test is not significant,     09:43:26
18  the null hypothesis is retained and the      09:43:28
19  procedure stops," per that statement in      09:43:31
20  the protocol, after the data was unblinded   09:43:36
21  and analyzed with respect to the pooled      09:43:39
22  NSAIDs, the null hypothesis was retained;    09:43:42
23  is that correct?                             09:43:46
24     A.    Yes.                                09:43:46
25     Q.    Dropping down to the next           09:43:47

Page 21

6 (Pages 18 to 21)

E. Weiner

1
2  paragraph in Exhibit 77 on page thirty of        09:43:50
3  thirty-six it states that "two endpoints        09:43:54
4  will be analyzed."        09:44:00
5        Do you see that?        09:44:02
6    A.  Yes.        09:44:03
7    Q.    And does that meet with your        09:44:05
8  recollection that per the protocol two        09:44:05
9  endpoints would be analyzed, one being the        09:44:06
10 traditional definition of complicated        09:44:07
11 ulcer and the second being the FDA        09:44:10
12 alternative definition of complicated        09:44:12
13 ulcer?        09:44:16
14   A.  Yes.        09:44:16
15   Q.    And then dropping down to the        09:44:16
16 bottom of page thirty it states,        09:44:19
17 "symptomatic UGI ulcers documented by        09:44:24
18 endoscopy or UGI barium x-ray with no        09:44:24
19 evidence of perforation, bleeding, or        09:44:29
20 obstruction will be categorized and        09:44:32
21 summarized separately."        09:44:35
22       Do you see that?        09:44:36
23   A.  Yes.        09:44:38
24   Q.    And is a symptomatic ulcer, did        09:44:38
25 you refer to those as PUBs or GDUs?        09:44:43

Page 22

E. Weiner

1
2    A.  PUBs, yes.  I guess you could        09:44:51
3  also refer to them as GDUs.        09:44:58
4    Q.    And for the purposes of today's        09:44:58
5  deposition, are you comfortable with        09:44:58
6  referring to those as symptomatic ulcers?        09:44:58
7    A.  Sure.        09:44:58
8    Q.    And is it accurate that an        09:44:58
9  endpoint which included both complicated        09:44:59
10 ulcers and symptomatic ulcers together was        09:45:02
11 not a prespecified endpoint for this        09:45:06
12 protocol?        09:45:10
13   A.    It was not the primary endpoint,        09:45:10
14 but it was prespecified that symptomatic        09:45:12
15 ulcers would be looked at, would be        09:45:17
16 categorized.        09:45:20
17   Q.    They'd be categorized where with        09:45:21
18 respect to the two endpoints specified        09:45:24
19 above, those were to be analyzed; is that        09:45:27
20 correct?        09:45:29
21   A.    Well, I think the intent was to        09:45:29
22 analyze these ulcers as well.        09:45:31
23   Q.    But the protocol just says they        09:45:34
24 would be categorized and summarized; is        09:45:36
25 that correct?        09:45:39

Page 23

E. Weiner

1
2    A.    The protocol is somewhat vague        09:45:39
3  on that point, but anything that's not the        09:45:42
4  primary analysis can still be looked at        09:45:44
5  statistically.        09:45:49
6    Q.    Whether or not it could be        09:45:49
7  looked at statistically, it's not a        09:45:52
8  prespecified endpoint per the protocol and        09:45:55
9  analysis of combined complicated ulcers        09:45:59
10 and symptomatic ulcers; is that correct?        09:46:01
11      MR. WEISS: I object to the form        09:46:04
12 of the question.        09:46:05
13   A.    Well, there are many endpoints        09:46:05
14 in the protocol.  The fact that it's in        09:46:08
15 here in a sense makes it prespecified.        09:46:10
16 It's not the primary analysis to be done.        09:46:13
17   Q.    But they're referencing        09:46:16
18 categorizing the symptomatic ulcers by        09:46:17
19 themselves, not analyzing them along with        09:46:21
20 the complicated ulcers in a new combined        09:46:23
21 group; is that correct?        09:46:27
22      MR. WEISS: I object to the form        09:46:27
23 of the question.        09:46:29
24   A.    The latter would be implied        09:46:29
25 because analyzing them by themselves is        09:46:31

Page 24

E. Weiner

1
2  not of much medical use.  In other words,        09:46:34
3  as a physician, giving one of these drugs        09:46:36
4  I would be worried about is this patient        09:46:41
5  going to have a GI bleed or a CSUGIE.  I'd        09:46:43
6  also be worried about whether they're        09:46:50
7  going to have a symptomatic ulcer or        09:46:53
8  worse.  In other words, if you said, well,        09:46:56
9  the chance of getting an ulcer is X        09:46:56
10 percent, that doesn't include something        09:46:56
11 worse than an ulcer but that's not        09:46:59
12 terribly meaningful to me in trying to        09:47:02
13 describe the risk to the patient.  It's        09:47:05
14 the combination of the two that I'd want        09:47:07
15 to be able to keep track of.        09:47:09
16   Q.    Now, there's nothing in the        09:47:10
17 protocol setting out it that there's going        09:47:12
18 to be an analysis at six months; is that        09:47:14
19 correct?        09:47:16
20   A.  Yes.        09:47:16
21   Q.    You're agreeing with me that        09:47:19
22 there's nothing in the protocol that        09:47:20
23 states that the --        09:47:22
24      MR. SAHAM: Strike that question.        09:47:27
25   Q.    The protocol does not set out        09:47:29

Page 25

7 (Pages 22 to 25)

E. Weiner

1    that there's going to be an analysis of       09:47:33
2    data for six months; correct?                09:47:35
3        MR. WEISS: I object to the form          09:47:38
4    of the question.                             09:47:38
5        A.    The protocol does not set out      09:47:39
6    specific which time points will be           09:47:45
7    analyzed.                                    09:47:48
8        Q.    But it does list the treatment     09:47:48
9    period as fifty-two weeks; correct?          09:47:51
10       A.    The maximum possible treatment     09:47:53
11   period, yes.                                 09:47:55
12       Q.    And the protocol does not set      09:47:56
13   out that there's going to be an analysis     09:47:58
14   of patients who were not taking aspirin;     09:48:00
15   is that correct?                             09:48:05
16       A.    I don't see it here.  I don't      09:48:05
17   recall.                                      09:48:19
18       (Whereupon, an e-mail dated              09:48:21
19   April 17, 2000 was marked Plaintiff's        09:48:21
20   Exhibit 162 for identification.)             09:48:22
21       Q.    I want to show you what I'm        09:48:22
22   marking as Plaintiff's Exhibit 162.          09:48:23
23       Mr. Weiner, please take a look           09:49:27
24   at what I've marked as Plaintiff's           09:49:30

Page 26

E. Weiner

1    Exhibit 162.                                 09:49:32
2        MR. SAHAM: And for the record,           09:49:33
3    Plaintiff's Exhibit 162 bears Bates          09:49:35
4    numbers DEFS 00170973 through 976.           09:49:35
5    And it's an e-mail attaching a Searle        09:49:44
6    Pfizer operations committee April 6,         09:49:50
7    2000 videoconference minutes.  And the       09:49:52
8    top e-mail or actually the second            09:50:10
9    e-mail in the chain is from Maritza          09:50:12
10   Moncayo, M O N C A Y O, to Ethan             09:50:15
11   Weiner, Gary Jortner, George Geis, Guy       09:50:21
12   Buckland, Joe Feczko, and some other         09:50:24
13   individuals.                                 09:50:26
14       Q.    Do you recognize this document?    09:50:29
15       A.    From ten years ago, no, but I      09:50:30
16   see that it's an e-mail with my name on      09:50:35
17   it.                                          09:50:37
18       Q.    So this is an e-mail you would     09:50:37
19   have received in the ordinary course of      09:50:38
20   your employment at Pfizer on or about        09:50:40
21   April 17, 2000?                              09:50:43
22       MR. WEISS: I object to the form          09:50:44
23   of the question.                             09:50:45
24       A.    That would be likely, yes.         09:50:45

Page 27

E. Weiner

1        Q.    And it -- the subject of the       09:50:48
2    e-mail is ops comm 400 minutes/500 draft     09:50:54
3    agenda; is that correct?                     09:51:00
4        A.    Yes.                               09:51:04
5        Q.    Would you have attended the        09:51:04
6    April, 2000 operations committee meeting     09:51:06
7    videoconference that these minutes are       09:51:10
8    for?                                         09:51:12
9        A.    It's very likely that I would      09:51:13
10   have.                                        09:51:15
11       Q.    And is it also likely that Dr.     09:51:15
12   Jortner, Dr. Geis, and Dr. Feczko would      09:51:18
13   have been there?                             09:51:21
14       A.    Jortner and Geis I believe were    09:51:22
15   on the ops comm so I would have expected     09:51:26
16   them there.  I believe that -- again, this   09:51:29
17   is ten years ago -- Dr. Feczko was on the    09:51:31
18   executive committee, so he may have          09:51:36
19   attended.  It would be speculative on my     09:51:38
20   part unless you have an attendance record.   09:51:41
21       Q.    Well, he did receive the e-mail    09:51:43
22   as one of the individuals listed there; is   09:51:46
23   that correct?                                09:51:48
24       A.    Yes.                               09:51:48

Page 28

E. Weiner

1        Q.    And turning to the second page     09:51:48
2    of this document which is the                09:52:00
3    videoconference minutes from the April 6,    09:52:00
4    2000 Searle/Pfizer operations committee,     09:52:00
5    are you with me?                             09:52:01
6        A.    Yes.                               09:52:02
7        Q.    And Roman numeral three is         09:52:02
8    entitled Priority Issues Updates.            09:52:05
9        Do you see that?                         09:52:07
10       A.    Yes.                               09:52:08
11       Q.    And under that it says, "T1        09:52:08
12   Celebrex CLASS action," C L A S S action.    09:52:12
13       Do you see that?                         09:52:17
14       A.    Yes.                               09:52:18
15       Q.    And under that it says, "summary   09:52:18
16   analysis presented by Geis?"                 09:52:21
17       A.    Yes.                               09:52:22
18       Q.    Is it fair to say that on or       09:52:22
19   about April 6 Dr. Geis presented summary     09:52:25
20   analysis of the unblinded CLASS data?        09:52:29
21       MR. WEISS: I object to the form          09:52:32
22   of the question.                             09:52:34
23       A.    It was -- yes, it was presented    09:52:34
24   at that ops comm.                            09:52:37

Page 29

8 (Pages 26 to 29)

E. Weiner

1
2    Q.    And the data was unblinded        09:52:38
3  approximately around March 17, 2000; is    09:52:42
4  that correct?                              09:52:46
5    A.    As best I can recall.             09:52:46
6    Q.    And under -- there was a          09:52:48
7  presentation and some discussion of the   09:52:50
8  data in this meeting?                      09:52:51
9    A.    Yes.                              09:52:53
10   Q.    And you would have attended that   09:52:53
11 in the ordinary scope of your employment  09:52:55
12 at Pfizer?                                 09:52:57
13   A.    Yes.                              09:52:57
14        MR. WEISS: I object to the form    09:52:57
15 of the question.                           09:52:58
16   A.    Yes.                              09:52:59
17   Q.    And under the discussion          09:52:59
18 heading, the third bullet point states,   09:53:03
19 "Geis and Montwill are reviewing data with 09:53:07
20 lead investigator today," paren, "4/6,"    09:53:12
21 closed paren.                              09:53:15
22        Who's Montwill?                    09:53:16
23   A.    I honestly do not recall.         09:53:18
24   Q.    And then under the next heading    09:53:21
25 is action items and the first bullet point 09:53:23

Page 30

E. Weiner

1
2  says, "Geis to forward the current slide   09:53:25
3  set to Jortner.  Restricted distribution   09:53:28
4  to need-to-know basis only."               09:53:33
5        Again, who was Dr. Jortner?         09:53:35
6    A.    It was Mr. Jortner was one of     09:53:38
7  the commercial people at Pfizer.           09:53:42
8    Q.    And was he an executive vice      09:53:43
9  president at this time?                     09:53:45
10   A.    That sounds right.                09:53:45
11   Q.    And do you know why the           09:53:49
12 distribution was to be restricted to      09:53:51
13 need-to-know basis only?                   09:53:52
14   A.    I can only speculate.  In         09:53:55
15 general, when there are immediately just   09:53:58
16 breaking results, distribution is usually  09:54:02
17 limited for a matter of days until the     09:54:05
18 results can be checked, more detail        09:54:11
19 analyses done, and things verified and     09:54:14
20 then they're more widely distributed.      09:54:19
21   Q.    Turning to the next page of the   09:54:25
22 April 6, 2000 videoconference minutes from 09:54:32
23 the operations committee, there's a        09:54:35
24 heading towards the bottom that says, "T2  09:54:37
25 Celebrex differentiation," paren,          09:54:41

Page 31

E. Weiner

1
2  "Buckland," closed paren.                  09:54:44
3        Do you know who the Buckland is     09:54:46
4  that's being referred to here?            09:54:48
5    A.    Guy Buckland.                     09:54:50
6    Q.    Who is he?                        09:54:52
7    A.    He was one of the Pfizer         09:54:53
8  commercial people, I believe reported to   09:54:54
9  Gary Jortner.                              09:54:57
10   Q.    And the bullet point under that   09:54:59
11 says, "deferred to next ops comm.  Project 09:54:59
12 is on track and there is alignment."       09:55:02
13        Do you know what that's            09:55:05
14 referring to?                              09:55:06
15   A.    I don't recall.  I could          09:55:07
16 speculate.                                 09:55:08
17   Q.    Well, what do you think that's    09:55:11
18 referring to?                              09:55:13
19   A.    It probably -- I mean, one of     09:55:13
20 the -- in the marketing of any drug,      09:55:17
21 things that differentiate that drug from   09:55:20
22 others are -- is a key factor and         09:55:22
23 marketing people are always coming up with 09:55:25
24 programs and plans.  It's an ongoing       09:55:32
25 discussion item that they have.  So I      09:55:34

Page 32

E. Weiner

1
2  don't recall the details of this specific  09:55:35
3  project, but clearly there's one ongoing   09:55:38
4  at that time that they were reporting into 09:55:42
5  the ops comm.                              09:55:44
6    Q.    Was one of the purposes of doing  09:55:45
7  the CLASS trial was to get the safety      09:55:47
8  label upgraded for GI for Celebrex?        09:55:50
9    A.    That was one of the goals.        09:55:53
10   Q.    And was the ultimate goal of      09:55:54
11 trying to get the safety upgrade to        09:55:57
12 hopefully be able to sell more Celebrex?   09:56:00
13        MR. WEISS: I object to the form    09:56:04
14 of the question.                           09:56:04
15   A.    That would be one of the aims.    09:56:05
16   Q.    And how long were you on the ops  09:56:08
17 committee?                                 09:56:19
18   A.    Probably until 2003 when it       09:56:19
19 ceased to exist when we acquired           09:56:24
20 Pharmacia.  I believe that was 2003.       09:56:31
21   Q.    And the purpose of the ops        09:56:33
22 committee was to coordinate between Pfizer 09:56:33
23 and Searle and Pharmacia, depending on the 09:56:35
24 point in time the marketing and            09:56:37
25 medical-related issues with respect --     09:56:46

Page 33

9 (Pages 30 to 33)

E. Weiner

1    MR. SAHAM: Well, that's a really    09:56:48
2  bad question.                          09:56:49
3    Q.    The purpose of the operations   09:56:50
4  committee was to coordinate business    09:56:52
5  decisions and medical decisions between 09:56:54
6  the two companies; is that correct?     09:56:55
7    MR. WEISS: I object to the form      09:56:57
8  of the question.                        09:56:58
9    A.    Yes.                            09:56:58
10   Q.    And you served in that capacity  09:56:59
11 in --                                    09:57:05
12   MR. SAHAM: Strike that.              09:57:06
13   Q.    And you served on the operations 09:57:06
14 committee in your capacity as an employee 09:57:08
15 of Pfizer; is that correct?             09:57:11
16   A.    That's correct.                 09:57:12
17   Q.    I want to show you what's       09:57:12
18 previously been marked as Plaintiff's    09:57:15
19 Exhibit 107.  Could you please take a look 09:57:26
20 at Plaintiff's Exhibit 107.  And         09:57:29
21 specifically this document is entitled    09:57:31
22 COX-2 Alliance.  I specifically want to   09:57:33
23 refer you to page six of the document.    09:57:37
24   A.    Can I ask you when this was      09:57:40

Page 34

E. Weiner

1  created?                               09:57:43
2    Q.    You know, unfortunately -- let's 09:57:43
3  see if I can answer your question.  I    09:57:48
4  don't think we have the specific date but 09:57:50
5  perhaps from the names of the folks, you  09:57:52
6  know, that will help you put it into time. 09:57:54
7  But I want to turn your attention to page 09:57:58
8  six of the document which is a slide and  09:58:02
9  it's entitled Pfizer/Pharmacia Alliance   09:58:02
10 Organizational Chart.                    09:58:13
11   Do you see that?                      09:58:13
12   A.    Yes.                            09:58:13
13   Q.    And at the top is the executive 09:58:13
14 management committee?                    09:58:13
15   A.    Uh-huh.                         09:58:13
16   Q.    What was the purpose of the     09:58:13
17 executive management committee?          09:58:14
18   A.    Technically -- well, two things, 09:58:15
19 really.  One was for the operations       09:58:18
20 committee periodically to report its      09:58:20
21 progress and I don't recall how often that 09:58:23
22 was but not frequently, probably twice a  09:58:26
23 year.  And secondly if there were issues  09:58:29
24 between companies that cannot be resolved 09:58:35

Page 35

E. Weiner

1  at the operations committee, they would be 09:58:38
2  kicked upstairs to the executive          09:58:40
3  committee.                               09:58:41
4    Q.    And do you know how often the    09:58:42
5  executive management committee met?       09:58:44
6    A.    As I said, I think about twice a 09:58:46
7  year.                                    09:58:48
8    Q.    And did you ever attend one of   09:58:48
9  these meetings?                          09:58:51
10   A.    Yes.                            09:58:52
11   Q.    And when was that?              09:58:52
12   A.    I attended most of them or some 09:58:53
13 of them, but I don't recall, you know,    09:58:56
14 over the course -- this was a decade ago. 09:58:59
15 I really can't remember which I was at and 09:59:03
16 which I wasn't or even when they met.      09:59:05
17   Q.    And you recall Dr. Hassan as the 09:59:06
18 CEO of Pharmacia was on that committee?   09:59:08
19   A.    Yes.                            09:59:12
20   Q.    And do you recall that Carrie    09:59:12
21 Cox was on that committee?                09:59:15
22   A.    Well, I do now that I read it.   09:59:16
23   Q.    Who is P. Needleman?            09:59:17
24   A.    Phil Needleman was the head of   09:59:21

Page 36

E. Weiner

1  research and development at Searle.  He   09:59:24
2  stayed on for a brief period of time under 09:59:25
3  Pharmacia.  I do not know his exact        09:59:29
4  responsibilities during that period of     09:59:29
5  time.                                    09:59:33
6    Q.    And if the Pharmacia merger      09:59:33
7  closed -- and I'll represent to you in     09:59:33
8  closed in April of 2000 -- would this      09:59:36
9  indicate that this document is probably    09:59:38
10 from 2000 if Dr. Needleman is still listed 09:59:40
11 as an executive management committee       09:59:42
12 member?                                   09:59:44
13   MR. WEISS: I object to the form      09:59:45
14 of the question.                          09:59:46
15   Which Pharmacia merger?              09:59:46
16   A.    The Warner Lambert merger closed 09:59:49
17 in April, 2000.  Pharmacia was sometime in 09:59:52
18 2003.                                    09:59:54
19   Q.    And that's my fault.            09:59:56
20   I'm talking about -- Searle and       09:59:58
21 Pharmacia merged.                         09:59:59
22   Do you recall that?                   10:00:02
23   A.    Yes.                            10:00:02
24   Q.    And then ultimately Pfizer took  10:00:03

Page 37

10 (Pages 34 to 37)

E. Weiner

1  over or merged with Pharmacia in -- we      10:00:06
2  can't talk over each other.       10:00:09
3      A.   I don't remember exactly when      10:00:11
4  Searle and Pharmacia merged, but if you      10:00:12
5  say it's April of 2000, I'll take your      10:00:13
6  word for it.       10:00:16
7      Q.   And he's got to write down       10:00:16
8  everything we say so we can't talk over      10:00:19
9  each other.  And that was my fault, but      10:00:21
10  I'll try and do better.  It makes it very      10:00:22
11  hard for this gentleman.       10:00:24
12      But just to clarify that, you do      10:00:27
13  recall that Pharmacia merged with Searle      10:00:30
14  at some point in approximately 2000?      10:00:32
15      A.   Yes.       10:00:34
16      Q.   And then ultimately in 2003      10:00:35
17  Pfizer took over Pharmacia which at that      10:00:38
18  time also included Searle; is that      10:00:43
19  correct?       10:00:44
20      A.   Correct.       10:00:44
21      Q.   So I'm referring to the fact --      10:00:44
22  you said Dr. -- you're talking about Dr.      10:00:47
23  Needleman, when you say he stayed on      10:00:50
24  briefly after the Searle merger --      10:00:54
25

Page 38

E. Weiner

1      A.   I'm talking about the       10:00:55
2  Pharmacia/Searle merger.  He was never a      10:00:58
3  part of Pfizer.       10:01:02
4      Q.   I know it's hard because usually      10:01:05
5  you're having a conversation, but we just      10:01:05
6  have to be careful about not talking over      10:01:05
7  each other, so just maybe wait until I'm      10:01:06
8  done before you answer.       10:01:10
9      So the fact that Dr. Needleman      10:01:12
10  is listed here -- and I'll represent to      10:01:14
11  you that the Pharmacia/Searle merger      10:01:16
12  occurred in April of 2000 -- since you      10:01:19
13  recall him only staying for a short time      10:01:23
14  after that, does this indicate that this      10:01:24
15  org chart is probably from the 2000 time      10:01:25
16  frame or thereabouts?       10:01:27
17      A.   My guess would be as good as      10:01:29
18  yours.  That sounds reasonable.       10:01:33
19      Q.   And then who is J. Papa, if you      10:01:34
20  recall?       10:01:38
21      A.   The name is vaguely familiar.  I      10:01:38
22  did not recall what his responsibilities      10:01:44
23  were.       10:01:47
24      Q.   And what about T. Rothwell?      10:01:48
25

Page 39

E. Weiner

1      A.   The name doesn't even sound      10:01:50
2  familiar to me.       10:01:53
3      Q.   And H. McKinnell refers to Hank      10:01:53
4  McKinnell?       10:01:56
5      A.   Correct.       10:01:57
6      Q.   And he was the CEO of Pfizer for      10:01:58
7  a time?       10:02:02
8      A.   That's right.       10:02:02
9      Q.   And J. Niblack, do you know who      10:02:03
10  that is?       10:02:05
11      A.   Yes, he was head of R&D.       10:02:05
12      Q.   And what about K. Katen?       10:02:08
13      A.   She was the senior-most      10:02:10
14  marketing person at that time.       10:02:12
15      Q.   And those were the individuals      10:02:12
16  in the executive management committee?      10:02:13
17      A.   Correct.       10:02:13
18      Q.   Moving down the org chart to the      10:02:15
19  operations committee, that's the committee      10:02:15
20  we were referring to earlier today?      10:02:21
21      A.   Yes.       10:02:21
22      Q.   And you were on that committee?      10:02:21
23      A.   Yes.       10:02:23
24      Q.   And Gary Jortner was the      10:02:23
25

Page 40

E. Weiner

1  co-chair of that committee?       10:02:27
2      A.   Yes.       10:02:28
3      Q.   And J. Feczko, that refers to      10:02:28
4  Joe Feczko; is that correct?       10:02:32
5      A.   Yes.       10:02:34
6      Q.   And he was the chief medical      10:02:34
7  officer at Pfizer?       10:02:36
8      A.   Yes.  So I guess he was on that      10:02:37
9  committee then, at least at that time.      10:02:39
10      Q.   And Dr. Geis was on that      10:02:43
11  committee as well?       10:02:45
12      A.   Yes.       10:02:45
13      Q.   And do you know who M.      10:02:46
14  Cunnington is?       10:02:50
15      A.   He was one of the marketing      10:02:50
16  people at Searle and/or Pharmacia.      10:02:53
17      Q.   Do you know who P. Isakson was?      10:03:02
18      A.   Yes.       10:03:05
19      Q.   And who was he?       10:03:05
20      A.   He was one of the research and      10:03:07
21  development people and had been at Searle,      10:03:09
22  stayed on again for some period of time      10:03:11
23  after the merger.       10:03:14
24      Q.   And would generally each of the      10:03:14
25

Page 41

11 (Pages 38 to 41)

E. Weiner

```
1          E. Weiner
2   individuals who were members of the      10:03:16
3   committee attend the meetings either via  10:03:17
4   videoconference or in person?          10:03:22
5          MR. WEISS: I object to the form  10:03:24
6   of that question.                    10:03:25
7      A.   In general, yes.              10:03:25
8      Q.   And these would generally occur  10:03:27
9   on approximately a monthly basis; is that  10:03:29
10  correct?                          10:03:31
11     A.   As I said, I believe they were a  10:03:31
12  little less frequent than that. It could   10:03:33
13  have been as infrequent as every three     10:03:36
14  months.                          10:03:40
15     Q.   And were there minutes taken at   10:03:40
16  these meetings?                    10:03:54
17     A.   Generally, yes.               10:04:01
18     Q.   And who would take those        10:04:01
19  minutes?                          10:04:01
20     A.   That probably -- well, again     10:04:01
21  I'll speculate, my memory sort of fails me  10:04:03
22  there, but usually there's a project      10:04:07
23  manager type person that comes to these    10:04:09
24  and they change from time to time.        10:04:11
25     Q.   And generally would they be      10:04:12
```
Page 42

E. Weiner

```
1   circulated to members of the committee?   10:04:14
2      A.   Yes.                     10:04:15
3      Q.   And you would receive those in   10:04:16
4   the ordinary course of your employment?    10:04:18
5          MR. WEISS: I object to the form  10:04:19
6   of the question.                    10:04:20
7      A.   That's likely, yes.           10:04:20
8      Q.   And do you know where they would  10:04:21
9   be stored?  Would they have been stored on 10:04:22
10  your e-mail server?                  10:04:26
11     A.   Formally, I have no idea.  I     10:04:27
12  don't know.                        10:04:31
13     Q.   But you would regularly receive  10:04:31
14  them after the meetings?              10:04:33
15     A.   As a rule, I recall that that   10:04:34
16  would be the case.                  10:04:37
17     Q.   And do you know if there were    10:04:38
18  meetings of the executive committee --    10:04:42
19  minutes of the executive committee        10:04:45
20  meetings?                          10:04:46
21     A.   I would assume so, but again     10:04:47
22  that's speculative on my part.  If you     10:04:52
23  showed me some, I wouldn't be surprised.   10:04:55
24     Q.   Would you have received those?   10:04:58
```
Page 43

E. Weiner

```
1      A.   If they were written, it's       10:05:00
2   likely that I would have received them.     10:05:02
3      Q.   Well, if the ops committee had    10:05:03
4   minutes --                         10:05:05
5      A.   So it's likely, yes.  I just     10:05:06
6   don't firmly recollect actually ever       10:05:08
7   seeing one.                        10:05:11
8      Q.   But it would be logical to       10:05:13
9   conclude since the --                10:05:16
10     A.   I wouldn't be surprised.        10:05:17
11     Q.   It would be logical to conclude  10:05:19
12  that, since the operations committee has    10:05:21
13  minutes, that the executive committee      10:05:23
14  would as well?                     10:05:23
15         MR. WEISS: I object to the form  10:05:24
16  of the question.                    10:05:25
17     A.   Yes.                     10:05:26
18         (Whereupon, an e-mail dated     10:05:32
19  April 16, 2000 was marked Plaintiff's      10:05:32
20  Exhibit 163 for identification.)         10:05:33
21     Q.   I want to show you what I'm      10:05:33
22  marking as Plaintiff's Exhibit 163.       10:05:34
23         Could you please take a look at   10:05:54
24  Plaintiff's Exhibit 163.              10:05:56
```
Page 44

E. Weiner

```
1          MR. SAHAM: And for the record,   10:05:58
2   Plaintiff's Exhibit 163 bears Bates        10:05:59
3   numbers DEFS 00392115 through 176.         10:06:02
4   The first page is an e-mail from         10:06:10
5   Leland Loose to Ethan Weiner and         10:06:13
6   others dated April 16, 2000 and it        10:06:17
7   attaches slides for the ACP            10:06:20
8   presentation of the CLASS data.          10:06:24
9      Q.   And I'd ask you, do you          10:06:29
10  recognize this document?              10:06:31
11     A.   I have no independent            10:06:32
12  recollection of it.  But again, it's an    10:06:34
13  e-mail that I would likely have received   10:06:37
14  and read.                         10:06:39
15     Q.   And you would have received it   10:06:40
16  and read it in the ordinary scope of your  10:06:41
17  employment at Pfizer?               10:06:43
18     A.   Correct.                  10:06:44
19         MR. WEISS: I object to the form  10:06:45
20  of the question.                    10:06:46
21     Q.   And the heading or the text of   10:06:46
22  the e-mail states, "this is the ACP       10:06:53
23  presentation of the CLASS data;" correct?  10:06:55
24     A.   Yes.                     10:06:58
```
Page 45

12 (Pages 42 to 45)

E. Weiner

1
2     Q.    And what is the ACP?           10:06:59
3     A.    I believe it's the American    10:07:00
4   College of Physicians, at least that's    10:07:03
5   commonly what the acronym is.  As I    10:07:06
6   recall, shortly after the results came    10:07:09
7   out, they were presented at various    10:07:11
8   scientific meetings and so it's likely    10:07:13
9   that this was the American College of    10:07:15
10  Physicians at which it was presented.    10:07:19
11    Q.    The CLASS results were presented    10:07:20
12  there?                    10:07:22
13    A.    Yes.                10:07:22
14    Q.    And the e-mail then continues    10:07:22
15  on, "this is a little different format    10:07:25
16  than what was shown at the ops comm in    10:07:28
17  that this highlights the        10:07:31
18  thromboembolic/cardiorenal data."      10:07:40
19       Is the ops comm there, is that    10:07:41
20  referring to the operations committee    10:07:43
21  which you served on?            10:07:44
22    A.    Yes.                10:07:46
23    Q.    So is it accurate that a set of    10:07:46
24  slides with respect to the CLASS data was    10:07:49
25  shown at the ops committee in early April    10:07:52

Page 46

E. Weiner

1   of 2000?                  10:07:54
2       MR. WEISS: I object to the form    10:07:56
3     of the question.            10:07:56
4     A.    Yes, that would be the committee    10:07:58
5   we discussed previously.          10:07:59
6     Q.    And you received these slides    10:08:01
7   again from Dr. Loose on or about April 16,    10:08:05
8   2000?                    10:08:07
9     A.    Yes.                10:08:08
10    Q.    And you received them in the    10:08:09
11  ordinary scope of your employment at    10:08:10
12  Pfizer?                   10:08:12
13      MR. WEISS: I object to the form    10:08:13
14    of the question.            10:08:15
15    A.    Yes.                10:08:16
16    Q.    I'd like to turn your attention    10:08:16
17  specifically to slide number twenty-two of    10:08:18
18  the deck of slides which make up      10:08:24
19  Plaintiff's Exhibit 163.          10:08:28
20    A.    Okay.               10:08:30
21    Q.    And that slide states,        10:08:31
22  "six-month ulcer application and      10:08:36
23  symptomatic ulcer rate-non-ASA users."    10:08:38
24      What's being communicated in    10:08:45

Page 47

E. Weiner

1   that slide?                10:08:47
2     A.    Those are the combined -- well,    10:08:48
3   those complicated and complicated plus    10:08:51
4   symptomatic ulcers among those subjects in    10:08:54
5   the study who were not taking aspirin    10:08:57
6   concomitantly.              10:09:02
7     Q.    So the table on the left is for    10:09:03
8   ulcer complications at six months for    10:09:07
9   patients that were not taking aspirin; is    10:09:10
10  that correct?                10:09:14
11    A.    Yes.                10:09:14
12    Q.    And that shows a statistically    10:09:14
13  significant result; is that correct?      10:09:16
14    A.    Yes.                10:09:17
15    Q.    And it's statistically        10:09:17
16  significant because it's less than .05; is    10:09:19
17  that correct?                10:09:20
18    A.    That's the level that's        10:09:20
19  generally deemed to divide significant    10:09:22
20  from non-significant.            10:09:25
21    Q.    And what does it mean for a    10:09:26
22  result to be statistically significant?    10:09:28
23    A.    That's been the subject of    10:09:31
24  debate for many years, but in general    10:09:32

Page 48

E. Weiner

1   what's taken as significant most of the    10:09:35
2   time is if a finding is deemed by whatever    10:09:37
3   statistical analysis a test is used to    10:09:42
4   have less than one in twenty chance of    10:09:45
5   being a random finding.          10:09:49
6     Q.    And if it's not statistically    10:09:52
7   significant, you can't claim a difference    10:09:54
8   for a scientific purpose; correct?      10:09:57
9       MR. WEISS: I object to the form    10:10:04
10    of the question.            10:10:04
11    A.    It's not that black and white.    10:10:04
12  Oftentimes results that are somewhere    10:10:04
13  between one in ten, one in twenty are    10:10:07
14  reported out and discussed and people need    10:10:11
15  to evaluate that on its merits.  So the    10:10:14
16  .05 level is used for regulatory purposes    10:10:19
17  most of the time and it's very widely used    10:10:23
18  in scientific circles, but things that are    10:10:26
19  between .1 and .05 oftentimes are looked    10:10:29
20  at as being possibilities or possibly have    10:10:33
21  meaning, perhaps something that should be    10:10:39
22  tested in further clinical studies.      10:10:42
23    Q.    Per the CLASS protocol, if you    10:10:44
24  didn't achieve a P value below a .05, you    10:10:47

Page 49

13 (Pages 46 to 49)

E. Weiner

1  couldn't claim a difference; is that        10:10:53
2  correct?                                    10:10:55
3       MR. WEISS: I object to the form        10:10:55
4  of the question.                            10:10:56
5       A.   In the stepdown procedure in the  10:10:56
6  formal analysis plan for the primary        10:10:59
7  endpoint, that was correct.  That did not   10:11:01
8  in any way mean that results can't be       10:11:03
9  reported or discussed or that they have no  10:11:08
10  meaning.                                    10:11:10
11       Q.   But you couldn't claim            10:11:10
12  statistical significance if you didn't     10:11:10
13  achieve .05; is that correct?              10:11:11
14       A.   At the .05 level, yes, that's     10:11:14
15  correct.                                    10:11:19
16       Q.   I'd like to turn your attention   10:11:19
17  to the slide on page forty-two of the      10:11:21
18  Exhibit 163.                                10:11:26
19       MR. WEISS: Did you say                 10:11:31
20  forty-two?                                  10:11:34
21       MR. SAHAM: Yes, on the bottom          10:11:34
22  right-hand corner.                          10:11:36
23       Q.   It's the slide that's labeled     10:11:38
24  twelve-month data.                          10:11:40

Page 50

E. Weiner

1       Do you see that?                        10:11:41
2       A.   Yes.                               10:11:41
3       Q.   And what's being communicated      10:11:42
4  here?                                        10:11:44
5       A.   It is the same set of              10:11:44
6  comparisons as previously.                   10:11:50
7       Q.   But it's for twelve months         10:11:52
8  instead of six months; is that correct?      10:11:54
9       A.   Yes.                               10:11:56
10       Q.   And the left column is for ulcer   10:11:56
11  complications; is that correct?             10:12:00
12       A.   That is correct.                   10:12:01
13       Q.   And with respect to non-ASA at     10:12:01
14  twelve months for complicated ulcers, the   10:12:05
15  comparison between celecoxib and the        10:12:08
16  pooled NSAIDs was not statistically         10:12:08
17  significant; is that correct?               10:12:13
18       A.   It was more than .05, yes.         10:12:14
19       Q.   So the statistical significance    10:12:17
20  of the comparison that was shown at six      10:12:21
21  months did not hold at twelve months; is    10:12:23
22  that correct?                                10:12:25
23       A.   At the .05 level, yes, that's      10:12:25
24  correct.                                     10:12:27

Page 51

E. Weiner

1       Q.   And turn to the page before        10:12:27
2  this, page forty-one, do you see that        10:12:30
3  slide?                                        10:12:32
4       A.   Yes.                                10:12:32
5       Q.   And what does that say?             10:12:38
6       A.   That's the divider, I guess,        10:12:39
7  between the first set of slides and the      10:12:41
8  second set.                                   10:12:43
9       Q.   And the word "and" appears on       10:12:44
10  page forty-one; is that correct?             10:12:49
11       A.   Yes.                               10:12:49
12       Q.   And is that because the slides      10:12:50
13  forty-two through sixty-one were not         10:12:52
14  shared publicly with the attendees at the    10:12:55
15  American College of Physicians?              10:12:57
16       MR. WEISS: I object to the form         10:12:58
17  of the question.                             10:12:59
18       A.   Well, I wasn't there and I         10:12:59
19  wasn't presenting, so I can offer you what   10:13:01
20  I think is going on, but it's my opinion.    10:13:03
21       Q.   What do you think it's going on?    10:13:05
22       A.   That these are backup slides to    10:13:07
23  answer questions.  And so if somebody had    10:13:10
24  asked, well, do you have additional data,    10:13:13

Page 52

E. Weiner

1  what do you think's going on after that,     10:13:15
2  these slides would have been shown.  Did     10:13:18
3  someone ask that and was it shown?  I        10:13:21
4  don't know not having been there.            10:13:24
5       Q.   But you were privy to the           10:13:25
6  twelve-month data; is that correct?          10:13:28
7       A.   At that time I -- again, I don't    10:13:30
8  exactly recall what I knew when.  It's       10:13:35
9  likely that I was because probably that      10:13:38
10  was presented at the operations committee,   10:13:40
11  but I don't have that presentation in        10:13:43
12  front of me and it was ten years ago so I    10:13:44
13  don't know exactly what was and what         10:13:47
14  wasn't presented.                            10:13:49
15       Q.   But you received this complete      10:13:50
16  deck of slides from Dr. Loose?              10:13:52
17       A.   At the time that I saw this --     10:13:54
18  and again, I'm also speculating because my   10:13:56
19  independent recollection is not good after   10:13:59
20  ten years, but it looks as if I received     10:14:02
21  it after the fact.                           10:14:05
22       Q.   But according to this, you         10:14:06
23  received it on April 16, 2000; correct?      10:14:08
24       A.   Right.  Or at least after the      10:14:11

Page 53

14 (Pages 50 to 53)

E. Weiner

1  fact in terms of not necessarily when it       10:14:13
2  was given but input into it and in that        10:14:14
3  the e-mail doesn't say comments are            10:14:18
4  requested.  This is sort of a fete             10:14:20
5  accompli.                                      10:14:23
6      Q.   And as we observed in the             10:14:23
7  minutes from the April 6, 2000 operations      10:14:26
8  committee meeting, the distribution of the     10:14:30
9  slides presented there were restricted to      10:14:32
10  need-to-know basis; correct?                  10:14:35
11     A.   Yes.                                  10:14:37
12     Q.   And that means they weren't           10:14:37
13  publicly distributed; correct?                10:14:39
14         MR. WEISS:  I object to the form       10:14:40
15     of the question.                           10:14:41
16     A.   Outside of the company?  They         10:14:41
17  would not have been.  The first public        10:14:45
18  distribution would have been several days     10:14:47
19  later at the scientific meetings.             10:14:49
20     Q.   And turning to page forty-three       10:14:52
21  of Exhibit 163, the slide states, "ulcer      10:14:55
22  complication rates all over twelve            10:15:03
23  months."                                      10:15:06
24         What's being communicated there?      10:15:06

E. Weiner

1      A.   This is a graph of the crude         10:15:08
2  rate of ulcers which I presume the            10:15:11
3  complication rate is in percentage on the     10:15:15
4  Y axis versus time on the X axis for          10:15:17
5  celecoxib versus the pooled NSAIDs.           10:15:25
6      Q.   And it's comparing the crude         10:15:29
7  ulcer rate between celecoxib and the crude    10:15:29
8  rate --                                       10:15:31
9          MR. SAHAM:  Strike that.              10:15:31
10     Q.   It's comparing the crude ulcer       10:15:32
11  complication rate between celecoxib and       10:15:32
12  the pooled NSAIDs over time; is that          10:15:37
13  correct?                                      10:15:37
14     A.   Yes.                                  10:15:40
15     Q.   And it shows that there's a           10:15:40
16  larger difference at six months than at       10:15:43
17  twelve months between the two drugs; is       10:15:45
18  that correct?                                 10:15:47
19         MR. WEISS:  I object to the form       10:15:47
20     of the question.                           10:15:48
21     A.   Yes.                                  10:15:49
22     Q.   Looking at the next page of          10:15:49
23  Exhibit 163, page forty-four, the slide's     10:16:01
24  entitled Ulcer Complication Rates, paren,     10:16:01

E. Weiner

1  Non-ASA, closed paren, Over Twelve Months.    10:16:04
2          Do you see that?                      10:16:08
3      A.   Yes.                                  10:16:09
4      Q.   What's being communicated there?     10:16:09
5      A.   The same thing as in previous        10:16:10
6  slides except that it is a subset of          10:16:12
7  patients that were not taking aspirin.        10:16:14
8      Q.   And again, the difference in the     10:16:18
9  crude rate between celecoxib and the          10:16:19
10  comparator NSAIDs at six months is greater   10:16:22
11  than the difference at twelve months; is      10:16:25
12  that correct?                                 10:16:27
13     A.   Not strikingly so but yes, to a      10:16:27
14  small degree.                                 10:16:33
15     Q.   Where it was strikingly              10:16:33
16  different in the prior slide, page            10:16:33
17  forty-three of Exhibit 163; is that           10:16:34
18  correct?                                      10:16:37
19         MR. WEISS:  I object to the form       10:16:37
20     of the question.                           10:16:38
21     A.   That I wouldn't go so far as to      10:16:38
22  say, but it's certainly more of a             10:16:42
23  difference between six and twelve for that    10:16:44
24  slide than this one.                          10:16:47

E. Weiner

1      Q.   Looking at page forty-three of       10:16:48
2  the exhibit, the difference between the       10:16:50
3  two drugs is approximately .3 at six          10:16:51
4  months and closer to .1 at twelve months;    10:16:56
5  is that correct?  And I'm looking at page    10:17:06
6  forty-three.                                  10:17:10
7      A.   Yes, for the crude rate, that        10:17:10
8  would be correct.                             10:17:13
9      Q.   Turning your attention to page       10:17:14
10  forty-five of Exhibit 163, the slide        10:17:17
11  that's entitled Ulcer Complication Rates,    10:17:20
12  paren, ASA Users, closed paren, Over         10:17:23
13  Twelve Months, what's being communicated     10:17:27
14  there?                                        10:17:30
15     A.   Again, it's a crude rate versus      10:17:30
16  time for the subpopulation that was using    10:17:31
17  aspirin.                                      10:17:33
18     Q.   And at six months the rates          10:17:37
19  between celecoxib and the comparator         10:17:40
20  NSAIDs was approximately the same; is that   10:17:42
21  correct?                                      10:17:43
22     A.   That's correct.                       10:17:43
23     Q.   And at twelve months the rates       10:17:44
24  for celecoxib is actually greater than the   10:17:46

E. Weiner

1  E. Weiner
2  pooled NSAIDs; is that correct?          10:17:49
3     A.   I would say, considering the      10:17:50
4  vagaries of clinical trials in          10:17:52
5  variability, that they are the same at    10:17:56
6  both three and twelve months.  So I      10:17:57
7  wouldn't say that Celebrex is better at   10:17:57
8  three nor would I say that it's worse at  10:18:00
9  twelve.                                   10:18:03
10    Q.   But the crude rate is higher for  10:18:04
11 Celebrex than the comparator NSAIDs at   10:18:04
12 twelve months; is that correct?          10:18:06
13    A.   Trivially higher.  But that's     10:18:07
14 probably one patient or something like   10:18:09
15 that.                                     10:18:12
16    Q.   There are only approximately      10:18:12
17 forty patients that suffered complicated 10:18:15
18 ulcers in the entire trial; is that      10:18:17
19 correct?                                 10:18:19
20    A.   I believe that's so.             10:18:19
21       (Whereupon, an e-mail dated        10:18:19
22 April 17, 2000 was marked Plaintiff's    10:18:19
23 Exhibit 164 for identification.)         10:18:31
24    Q.   I want to show you what I'm       10:18:31
25 marking as Plaintiff's Exhibit 164.      10:18:33

Page 58

1  E. Weiner
2     Could you please take a look at        10:18:47
3  Plaintiff's Exhibit 164.                 10:18:49
4     MR. SAHAM: And for the record,         10:18:54
5  Plaintiff's Exhibit 164 bears the        10:18:55
6  Bates numbers DEFS 00392205              10:18:56
7  through 246.  Again, it's a one-page     10:19:03
8  cover e-mail attaching slides.  It's     10:19:07
9  from Leland Loose to Ethan Weiner and    10:19:11
10 others.  And the e-mail is dated         10:19:14
11 September 17, 2000 and it states,        10:19:18
12 "this is the 'final' slide set shown     10:19:20
13 at the ACP meeting in Philadelphia on    10:19:24
14 April 25, Leland."                       10:19:27
15    Q.   Would you have received these    10:19:32
16 slides in the ordinary course of your    10:19:35
17 employment at Pfizer?                    10:19:37
18    A.   Yes.                             10:19:37
19    MR. WEISS: I object to the form        10:19:38
20 of that question, please.                10:19:38
21    Q.   And this indicates that this is  10:19:39
22 the actual final set shown at the ACP    10:19:41
23 presentation; is that correct?          10:19:45
24    A.   Yes.                             10:19:46
25    Q.   And in fact, this slide set does 10:19:47

Page 59

1  E. Weiner
2  not include the twelve-month data in the  10:19:49
3  slides we just discussed; is that correct? 10:19:55
4     A.   Yes.  However, what's not         10:19:57
5  included here either are any backup slides 10:20:08
6  and I can't tell you that's because they  10:20:11
7  don't exist or because they just weren't  10:20:13
8  included in what was intended as the      10:20:15
9  presentation as opposed to the materials  10:20:18
10 used to answer questions.                 10:20:20
11    Q.   But the final slide set that was  10:20:21
12 sent to you on April 17, 2000 does not    10:20:23
13 include twelve-month data; is that        10:20:27
14 correct?                                  10:20:31
15    MR. WEISS: I object to the form        10:20:31
16 of the question.                          10:20:32
17    A.   Yes, but as I said, the           10:20:33
18 distinction between this and the previous 10:20:33
19 slide deck is that that had the backup    10:20:35
20 slides at the end of it.  I can't tell you 10:20:37
21 whether there were no backup slides       10:20:40
22 created or they were just circulating what 10:20:43
23 they actually intended to present barring 10:20:45
24 any questions being asked.  In other      10:20:48
25 words, were there additional slides with  10:20:50

Page 60

1  E. Weiner
2  twelve-month data that they would have    10:20:53
3  reserved to answer questions as appeared  10:20:55
4  to be the intent in the previous slide    10:20:57
5  deck or not and I can't not -- I don't    10:20:59
6  have any independent recollection of that. 10:21:02
7  It would have an assumption on my part to  10:21:05
8  say that there were no backup slides with 10:21:08
9  twelve-month data.  It would also be an   10:21:10
10 assumption on my part to say that there   10:21:14
11 were.  I just don't know.                 10:21:14
12    Q.   You didn't attend the ACP         10:21:14
13 meeting in Philadelphia?                  10:21:14
14    A.   No, I did not.                    10:21:18
15    Q.   So you don't know whether         10:21:18
16 twelve-month data was presented there?    10:21:21
17    A.   That's correct.                   10:21:23
18    Q.   But you do know that the JAMA     10:21:24
19 article published in September, 2000, that 10:21:24
20 didn't include any twelve-month data;     10:21:26
21 correct?                                  10:21:27
22    A.   Yes.                              10:21:28
23    Q.   So would it be consistent if the  10:21:29
24 data was being presented in the same      10:21:32
25 manner that it was being presented to JAMA 10:21:36

Page 61

16 (Pages 58 to 61)

E. Weiner

1
2    that only the six-month data was presented    10:21:36
3    at ACP?                                         10:21:38
4          MR. WEISS: I object to the form    10:21:38
5       the question.                              10:21:39
6       A.    There's one big difference    10:21:40
7    between a journal article and a        10:21:43
8    presentation in that there's no question    10:21:44
9    and answer available when one reads a    10:21:46
10   journal article. Here there is. So as I    10:21:53
11   said, they may have had twelve-month data    10:22:01
12   as backup material. Someone may have    10:22:01
13   asked a question that may have been    10:22:01
14   presented or they may, in fact, not have    10:22:03
15   brought any with them. I don't know.    10:22:06
16   This slide deck does not definitely tell    10:22:09
17   me one way or the other whether that was    10:22:12
18   the case.                                      10:22:13
19      Q.    But you're not testifying under    10:22:14
20   oath that twelve-month data was presented    10:22:14
21   at the ACP?                                    10:22:15
22      A.    No, I have no way of knowing.    10:22:15
23   That's what I'm testifying. But I'm also    10:22:17
24   saying that I have no way of knowing that    10:22:21
25   it positively wasn't based on what you're    10:22:23

Page 62

E. Weiner

1
2    showing me.                                    10:22:26
3       Q.    Did you participate in the    10:22:26
4    decision to present only the six-month    10:22:28
5    data at JAMA?                                  10:22:31
6       A.    No.                                   10:22:32
7       Q.    Do you know who made that    10:22:33
8    decision?                                      10:22:34
9       A.    No.                                   10:22:34
10      Q.    Did you participate in the    10:22:34
11   decision to utilize six-month data as part    10:22:37
12   of a press release discussing CLASS that    10:22:41
13   went out publicly on April 17, 2000,    10:22:44
14   approximately the same time?    10:22:47
15          MR. WEISS: I object to the form    10:22:49
16      of the question.                            10:22:49
17      A.    I do not recall seeing that    10:22:50
18   press release before it went out. It's    10:22:56
19   possible that it went by my desk, but I    10:22:59
20   don't recall.                                  10:23:02
21      Q.    Did you participate in the    10:23:02
22   decision to utilize six-month data in    10:23:03
23   the press release that went out on    10:23:06
24   April 17, 2000?                                10:23:10
25          MR. WEISS: I object to the form    10:23:11

Page 63

E. Weiner

1
2       of the question.                            10:23:12
3       A.    I do not recall reviewing it or    10:23:12
4    being asked to decide on that issue, so    10:23:14
5    I'd have to say no.                            10:23:15
6       Q.    Did you participate in any    10:23:17
7    decision at Pfizer to utilize only    10:23:19
8    six-month data as opposed to twelve-month    10:23:22
9    data for any purpose?                          10:23:24
10          MR. WEISS: I object to the form    10:23:26
11      of that question.                           10:23:28
12      A.    I'm trying to think where that    10:23:29
13   would have come up besides the instances    10:23:36
14   that you -- I was -- yes, in terms of    10:23:40
15   which data we were going to emphasize at    10:23:45
16   the advisory committee, I was involved in    10:23:48
17   those discussions.                             10:23:50
18      Q.    Were you involved in any such    10:23:51
19   discussions in the April, 2000 time frame?    10:23:53
20      A.    Not that I recall in terms of a    10:23:55
21   decision-making capacity, in other words    10:24:00
22   you know, asked to should we present this    10:24:04
23   or present that. I think at that point    10:24:06
24   that was mostly being driven by the    10:24:10
25   Searle/Pharmacia side of things.    10:24:17

Page 64

E. Weiner

1
2       Q.    Would that decision have been    10:24:20
3    made at the operations committee meeting?    10:24:23
4       A.    To the extent that the    10:24:26
5    operations committee I suppose could have    10:24:29
6    taken up debate on that issue at that    10:24:31
7    time, then yes. Do I recall formal    10:24:34
8    discussion six versus twelve? No.    10:24:38
9       Q.    Would there be minutes    10:24:41
10   reflecting that discussion?    10:24:43
11      A.    Yes, if a discussion had taken    10:24:44
12   place, it would have been in the minutes.    10:24:47
13      Q.    Do you recall whether that    10:24:48
14   discussion occurred at any executive    10:24:50
15   committee meeting you were attending?    10:24:52
16      A.    I don't recall that.    10:24:53
17      Q.    I want to show you what's    10:25:13
18   previously been marked as Plaintiff's    10:25:14
19   Exhibit 115.                                   10:25:17
20          Could you please take a look at    10:25:24
21   that document.                                 10:25:26
22          MR. SAHAM: And for the record,    10:25:30
23   Plaintiff's Exhibit 115 bearing Bates    10:25:31
24   numbers DEFS 00723820 through 033.    10:25:35
25   And the first page is a cover e-mail    10:25:47

Page 65

17 (Pages 62 to 65)

E. Weiner

1  from Leland Loose to Ethan Weiner and        10:25:49
2  others and it appears to be dated        10:25:54
3  April 28, 2000.  No, I'm sorry,        10:25:59
4  April 30, 2000.        10:26:04
5  Q.   Would you have received this        10:26:06
6  document, this e-mail which included the        10:26:10
7  final report for a multi-center        10:26:13
8  double-blind parallel group study        10:26:17
9  comparing the incidence of clinically        10:26:19
10 significant upper gastrointestinal events        10:26:19
11 between celecoxib four hundred mg BID and        10:26:22
12 ibuprofen eight hundred mg TID or        10:26:28
13 diclofenac seventy-five mg BID on or about        10:26:29
14 April 30, 2000?        10:26:34
15 A.   Yes.        10:26:36
16 Q.   And you would have received it        10:26:36
17 in the ordinary scope of your employment        10:26:37
18 at Pfizer?        10:26:38
19 MR. WEISS: I object to the form        10:26:39
20 of the question.        10:26:40
21 A.   Yes.        10:26:41
22 Q.   And what is this document?        10:26:41
23 A.   This is the textural part of the        10:26:47
24 study report.        10:26:53

Page 66

E. Weiner

1  Q.   And the study dates listed on        10:26:55
2  the second page of the document indicate        10:26:59
3  that the study ended on March 17, 2000; is        10:27:01
4  that correct?        10:27:05
5  A.   Yes.        10:27:05
6  Q.   And does that indicate that the        10:27:10
7  data would have been unblinded on about        10:27:13
8  March 17, 2000?        10:27:16
9  A.   Usually the unblinding comes        10:27:17
10 after database lock which is some variable        10:27:21
11 amount of time after the last study -- the        10:27:25
12 last patient, last visit.  I do not recall        10:27:27
13 whether their definition of the end date        10:27:31
14 here is last patient, last visit or        10:27:33
15 database lock.        10:27:36
16 Q.   So if March 17 was the database        10:27:37
17 lock, that would mean that is when the        10:27:39
18 data was unblinded?        10:27:41
19 A.   You could then analyze it and        10:27:43
20 see what was going on which also takes        10:27:45
21 some amount of time.  If it was last        10:27:48
22 patient, last visit, then it would be a        10:27:50
23 matter of weeks, sometimes longer, to        10:27:52
24 clean the database, lock it, and then        10:27:55

Page 67

E. Weiner

1  unblind it.        10:28:00
2  Q.   And turning your attention to up        10:28:01
3  in the top right-hand corner page five of        10:28:01
4  two hundred thirteen.        10:28:05
5  Are you with me?        10:28:06
6  A.   Yes.        10:28:08
7  Q.   And there's two tables on this        10:28:08
8  page; correct?        10:28:10
9  A.   Yes.        10:28:11
10 Q.   And the first table is summary        10:28:12
11 of CSUGIE incidents first six months; is        10:28:15
12 that correct?        10:28:21
13 A.   Yes.        10:28:21
14 Q.   And the second table is summary        10:28:21
15 of CSUGIE incidents the entire study        10:28:24
16 period; is that correct?        10:28:27
17 A.   Yes.        10:28:28
18 Q.   In looking at the first column        10:28:28
19 is the number of CSUGIEs suffered by        10:28:32
20 celecoxib; is that correct?        10:28:40
21 A.   Yes, that's correct.        10:28:40
22 Q.   And after six months there were        10:28:41
23 eleven uncensored CSUGIEs in the celecoxib        10:28:43
24 treatment group; is that correct?        10:28:48

Page 68

E. Weiner

1  A.   Uncensored.        10:28:49
2  Q.   So there were eleven uncensored        10:28:55
3  CSUGIEs in the celecoxib group as of six        10:28:55
4  months?        10:29:01
5  A.   Yes, that's correct.        10:29:01
6  Q.   And as of the entire study        10:29:02
7  period, there were seventeen of those        10:29:08
8  events?        10:29:09
9  A.   Yes.        10:29:09
10 Q.   So there were approximately six        10:29:10
11 of the seventeen celecoxib CSUGIEs or        10:29:12
12 complicated ulcers occurred in the -- or        10:29:16
13 after six months of the trial; is that        10:29:19
14 correct?        10:29:21
15 A.   Yes.        10:29:21
16 Q.   And next to that is the number        10:29:21
17 of CSUGIEs for diclofenac; is that        10:29:24
18 correct?        10:29:26
19 A.   Yes.        10:29:26
20 Q.   And there were nine of those        10:29:27
21 after six months for diclofenac; is that        10:29:32
22 correct?        10:29:34
23 A.   Yes.        10:29:34
24 Q.   And there were ten after the        10:29:34

Page 69

18 (Pages 66 to 69)

E. Weiner

1
2  entire study period; is that correct?        10:29:36
3      A.   Yes.                    10:29:37
4      Q.   So only one CSUGIE was suffered    10:29:38
5  in the diclofenac group after six months    10:29:42
6  of treatment; is that correct?         10:29:44
7      A.   Yes.                    10:29:45
8      Q.   And next to that is the        10:29:45
9  ibuprofen column and there were eleven    10:29:46
10  CSUGIEs after six months of treatment; is    10:29:51
11  that correct?                 10:29:54
12      A.   Yes.                    10:29:54
13      Q.   And there were still eleven      10:29:54
14  CSUGIEs at the end of the entire study; is    10:29:56
15  that correct?                 10:29:59
16      A.   Yes.                    10:29:59
17      Q.   So there were no CSUGIEs        10:29:59
18  suffered after six months in the ibuprofen    10:30:00
19  treatment group; is that correct?        10:30:02
20      A.   Yes.                    10:30:04
21      Q.   So looking at that data with      10:30:04
22  respect to uncensored CSUGIEs, it's      10:30:07
23  accurate to state that six of the seven    10:30:10
24  CSUGIEs that were suffered after six      10:30:12
25  months occurred in the celecoxib treatment    10:30:13

Page 70

E. Weiner

1
2  group; is that correct?            10:30:16
3      A.   Yes.                    10:30:17
4      Again, that -- I imagine a lot      10:30:18
5  of the report seeks to place that in      10:30:25
6  context because there's a lot of other    10:30:27
7  data that speaks to just more than crude    10:30:29
8  events.                    10:30:34
9      Q.   But six of the seven events that    10:30:34
10  were being tested for under the        10:30:35
11  traditional definition that occurred after    10:30:37
12  six months occurred in the celecoxib      10:30:39
13  treatment group; is that correct, sir?    10:30:42
14      A.   Yes, that's correct.          10:30:44
15      Q.   Now moving to the columns for P    10:30:45
16  values for celecoxib which is the right    10:30:48
17  side of both tables.              10:30:51
18      Do you see that?            10:30:52
19      A.   Yes.                    10:30:53
20      Q.   What does that mean?          10:30:55
21      A.   So that's the statistical      10:30:56
22  significance of the difference between the    10:30:59
23  rate for celecoxib versus either        10:31:03
24  diclofenac, ibuprofen, for the        10:31:06
25  combination.                 10:31:10

Page 71

E. Weiner

1
2      Q.   And in the combination        10:31:11
3  comparison for non-aspirin users, there's    10:31:15
4  a statistically significant P value after    10:31:18
5  six months of drug use; is that correct?    10:31:21
6  For non-aspirin users.             10:31:23
7      A.   That is correct.            10:31:26
8      Q.   And that finding of statistical    10:31:26
9  significance does not hold for the entire    10:31:28
10  study period; is that correct?        10:31:30
11      MR. WEISS: I object to the form    10:31:32
12  of the question.               10:31:33
13      A.   Yes.                    10:31:35
14      Q.   And that's because the P value    10:31:37
15  increases above .05 by the end of the    10:31:39
16  study for that comparison?          10:31:44
17      A.   That's correct.            10:31:44
18      Q.   Turning to the next page of the    10:31:44
19  document which is page six of two hundred    10:31:48
20  thirteen.                   10:31:51
21      Are you with me?            10:31:51
22      A.   Yes.                    10:31:52
23      Q.   And table three reports summary    10:31:53
24  of CSUGIEs/GDU incident first six months;    10:31:55
25  is that correct?               10:32:01

Page 72

E. Weiner

1
2      A.   Yes.                    10:32:01
3      Q.   And what is that, CSUGIE/GDU?    10:32:01
4      A.   That's an endpoint that looks at    10:32:06
5  the previous endpoint plus symptomatic    10:32:09
6  ulcers.                    10:32:12
7      Q.   And that was not the primary      10:32:12
8  endpoint of the CLASS trial; correct?    10:32:13
9      A.   That's correct.            10:32:13
10      Q.   And it was not prespecified as a    10:32:14
11  primary endpoint in the protocol?      10:32:16
12      A.   It was not prespecified as a      10:32:17
13  primary endpoint.               10:32:20
14      Q.   And we had some disagreement      10:32:20
15  earlier about whether it was going to be    10:32:22
16  categorized or summarized or analyzed; is    10:32:24
17  that correct?                 10:32:28
18      A.   That's correct.            10:32:28
19      Q.   But it certainly was not the      10:32:29
20  primary endpoint of the study?        10:32:31
21      A.   No.                    10:32:32
22      Q.   And the study was not powered to    10:32:35
23  test for a combination of CSUGIEs/GDUs; is    10:32:36
24  that correct?                 10:32:38
25      A.   It was powered on the primary    10:32:38

Page 73

19 (Pages 70 to 73)

E. Weiner

1  endpoint, that's correct.                    10:32:40
2
3      Q.    And do you recall that Merck        10:32:41
4  went through the VIGOR trial with its         10:32:45
5  COX-2 inhibitor Vioxx around the same time    10:32:48
6  frame?                                        10:32:48
7      A.    Yes.                                10:32:48
8      Q.    And do you recall what the          10:32:48
9  primary endpoint of their study was?         10:32:49
10     A.    It was very similar to what this    10:32:53
11 endpoint is, which is a combination of        10:32:56
12 complicated and symptomatic ulcers.           10:32:58
13     Q.    And did you participate in the      10:32:58
14 decision when the protocol was being          10:33:01
15 drafted to use complicated ulcers as          10:33:03
16 opposed to this combined endpoint as the      10:33:06
17 primary endpoint for CLASS?                   10:33:08
18     A.    I was consulted, so yes.            10:33:09
19     Q.    And why was the other endpoint      10:33:11
20 chosen?                                       10:33:13
21     A.    The other -- I think the other      10:33:17
22 endpoint was chosen because it was felt to    10:33:19
23 be the most severe possible endpoint that     10:33:25
24 one could choose.  I think there was a lot    10:33:28
25 of thought given to both, they were both      10:33:31

Page 74

E. Weiner

1  felt to be clinically meaningful.  Merck      10:33:33
2  went in one direction.  I think it was        10:33:37
3  also felt that probably it would make the     10:33:40
4  regulatory path forward with FDA somewhat     10:33:44
5  smoother using the more severe of the two     10:33:49
6  endpoints.                                    10:33:52
7      Q.    And Vioxx Celebrex's main           10:33:53
8  competitor for this type of drug?            10:33:56
9      A.    At this time, yes.                  10:33:58
10     Q.    And one reason to pick the more     10:33:58
11 difficult endpoint to try and distinguish     10:33:59
12 the drug from Vioxx?                          10:34:01
13     A.    I don't think that would have       10:34:05
14 entered into it.  Again, I'm trying to        10:34:07
15 reconstruct all this.  If only because of     10:34:10
16 Vioxx could have subselected that endpoint    10:34:13
17 out and presented that as one of their        10:34:17
18 secondary analyses.  I do not recall --       10:34:20
19 and at least the discussions I was in --      10:34:27
20 what Merck was doing as being a major         10:34:29
21 factor.                                       10:34:32
22     Q.    Why did the FDA allow Merck to      10:34:32
23 use this combined endpoint as their           10:34:36
24 primary endpoint in VIGOR and suggested       10:34:37

Page 75

E. Weiner

1  that Pfizer and Searle needed to use the      10:34:41
2  complicated ulcer endpoint for CLASS?         10:34:48
3          MR. WEISS: I object to the form       10:34:48
4      of the question.  Lacks foundation.       10:34:48
5      Assumes facts not in evidence.            10:34:52
6      A.    It's a really good question to      10:34:53
7  which I wish I knew the answer.  I just       10:34:55
8  don't know.                                   10:34:59
9      Q.    Did you participate in any          10:35:00
10 discussions with the FDA regarding what       10:35:01
11 endpoint was going to be used in the CLASS    10:35:04
12 protocol?                                     10:35:07
13     A.    I did not directly participate      10:35:07
14 in those.  I was sent reports of those        10:35:10
15 discussions.                                  10:35:13
16     Q.    At the operations committee         10:35:15
17 meeting did you often discuss or discuss      10:35:17
18 Celebrex commercially and/or medically        10:35:23
19 with Vioxx?                                   10:35:26
20         MR. WEISS: I object to the form       10:35:27
21     of the question.                          10:35:28
22     A.    In some context or other that       10:35:28
23 occurred fairly frequently.                   10:35:30
24     Q.    Now turning your attention back     10:35:35

Page 76

E. Weiner

1  specifically to tables three and four on      10:35:37
2  page six of Exhibit 115, there are -- the     10:35:40
3  first table is comparing both all patients    10:35:51
4  for this combined endpoint at six months      10:35:54
5  and then also patients not taking aspirin     10:35:57
6  at six months; is that correct?              10:36:00
7      A.    Yes.                                10:36:01
8      Q.    And then the second table is        10:36:01
9  comparing the combined endpoint for both      10:36:04
10 all patients and patients not taking          10:36:04
11 aspirin for the entire study; is that         10:36:10
12 correct?                                      10:36:11
13     A.    Yes.                                10:36:12
14     Q.    And the third column from the       10:36:12
15 right moving inward lists the P values for    10:36:16
16 diclofenac; is that correct?                 10:36:19
17     A.    Yes.                                10:36:20
18     Q.    And that was one of the two         10:36:20
19 comparators that Celebrex was being           10:36:22
20 compared to as part of CLASS; is that         10:36:26
21 correct?                                      10:36:27
22     A.    Yes.                                10:36:27
23     Q.    In looking at all the tables,       10:36:27
24 tables one, two, three, and four comparing    10:36:32

Page 77

20 (Pages 74 to 77)

E. Weiner

1
2  celecoxib to diclofenac, not one of those          10:36:36
3  eight comparisons are statistically               10:36:41
4  significant; is that correct?                     10:36:42
5      A.   Yes.                        10:36:43
6      Q.   I want to turn your attention to    10:36:43
7  page two -- I'm sorry, page one hundred           10:36:46
8  forty-eight of Exhibit 115 and it's table         10:36:54
9  8P, summary of CSUGIE incidents, alternate        10:37:00
10 definition entire study period.                   10:37:06
11          Now, do you know why the FDA            10:37:17
12 insisted on having an alternate definition        10:37:20
13 of CSUGIE?                               10:37:22
14          MR. WEISS: I object to the form       10:37:24
15 of the question.  Assumes facts not in            10:37:25
16 evidence.                          10:37:27
17     A.   Again, I didn't participate        10:37:27
18 directly in those discussions.  I know            10:37:29
19 that they asked for it.  I think why they         10:37:31
20 preferred their definition over the one           10:37:35
21 that was offered I don't know.                    10:37:37
22     Q.   In looking at table 8P, the        10:37:41
23 event rate for celecoxib on the                   10:37:45
24 alternative definition of CSUGIE is .68           10:37:48
25 percent; is that correct?                         10:37:53

Page 78

E. Weiner

1
2      A.   Yes.                        10:37:53
3      Q.   And the event rate for          10:37:53
4  diclofenac with respect to the alternative    10:37:57
5  definition is .35 percent; is that            10:38:00
6  correct?                           10:38:02
7      A.   Yes.                        10:38:02
8      Q.   So the celecoxib alternative       10:38:04
9  definition of CSUGIE event rate is nearly     10:38:08
10 double that of diclofenac, is that            10:38:13
11 correct, according to table 8P?                   10:38:15
12     A.   Yes, but again, that's the crude  10:38:21
13 rate, it doesn't take censoring into             10:38:24
14 account and doesn't take many of the other    10:38:27
15 factors into account which again are          10:38:30
16 discussed in the body of the study report.    10:38:34
17     Q.   Did you participate in any        10:38:35
18 decision not to publicly reveal the              10:38:36
19 differences between celecoxib and the            10:38:42
20 other drugs on the alternative definition     10:38:44
21 of CSUGIE?                               10:38:47
22     A.   Those were -- well, I don't know  10:38:48
23 that they were not -- they were publicly         10:38:53
24 revealed as much as they are in the body      10:38:56
25 of the advisory committee material which      10:38:59

Page 79

E. Weiner

1
2  was in the public domain.                   10:39:02
3      Q.   And that went in the public       10:39:04
4  domain on February 7, 2001; correct?            10:39:08
5      A.   Yes.                        10:39:11
6      Q.   And that is approximately six     10:39:11
7  months after the ACP presentation was made    10:39:13
8  in April of 2000?                            10:39:16
9      A.   Yes.                        10:39:17
10     Q.   And that's several months after   10:39:17
11 the JAMA article was published in                10:39:21
12 September of 2000?                           10:39:22
13     A.   Yes.  But again, this was not     10:39:24
14 one of the primary analyses to be done.     10:39:26
15 And even in FDA's evaluations of the CLASS    10:39:28
16 trial, they don't do any statistical            10:39:35
17 inference testing on these numbers.             10:39:38
18     Q.   My question is to you prior to    10:39:41
19 the submission to the FDA which was              10:39:44
20 ultimately made public on February 7,           10:39:45
21 2001, did you participate in any decisions    10:39:49
22 not to communicate the information               10:39:50
23 contained in table 8P publicly?                  10:39:53
24          MR. WEISS: I object to the form   10:39:56
25 of the question.  Asked and answered.       10:39:56

Page 80

E. Weiner

1
2      A.   There was no formal decision not  10:39:58
3  to communicate those data.  I think they     10:40:01
4  were felt not to be as important as the      10:40:04
5  major CSUGIE endpoint that was                   10:40:08
6  communicated and there was a whole -- I      10:40:12
7  mean, this study report, which is what, an    10:40:15
8  inch thick, is actually top level summary     10:40:18
9  further supported by about five or six       10:40:22
10 big, fat volumes.  There's many, many         10:40:26
11 analyses and data that are not presented     10:40:28
12 when one has to pick and choose when one     10:40:30
13 is going to present.  And in terms of its     10:40:33
14 scientific importance in the grand scheme     10:40:36
15 of the various things that were presented,    10:40:38
16 I think this was a fairly minor one.         10:40:40
17     Q.   The alternative definition of     10:40:43
18 CSUGIE as defined by the FDA was one of      10:40:46
19 the two primary endpoints of the CLASS       10:40:47
20 trial; correct?                          10:40:50
21     A.   But it was also one that was not  10:40:51
22 tested if the first endpoint failed.         10:40:53
23     Q.   The alternative definition of     10:40:56
24 CSUGIE was one of the two primary            10:40:58
25 endpoints of the study; is that correct?     10:41:00

Page 81

21 (Pages 78 to 81)

E. Weiner

1
2     A.    That's correct, but as things          10:41:02
3   came out in the study, I think it ended up      10:41:04
4   being a fairly minor one.  And even in the      10:41:06
5   FDA's report, it's buried fairly deeply         10:41:09
6   because I don't think they felt it              10:41:19
7   contributed meaningfully to a different         10:41:19
8   conclusion than what the major CSUGIE           10:41:19
9   endpoint would lead one to think.               10:41:19
10     Q.    And the combination of CSUGIEs         10:41:23
11   and GDUs, that was not a primary endpoint      10:41:24
12   of the study; correct?                         10:41:25
13     A.    That's correct.                        10:41:25
14          MR. WEISS: Asked and answered.          10:41:26
15          MR. SAHAM: We need to take a            10:41:28
16   break to change the tape now.                  10:41:30
17          THE VIDEOGRAPHER: Please stand          10:41:32
18   by.                                            10:41:34
19          We are going off the record.            10:41:34
20   The time is 10:39 a.m.                         10:41:35
21          This is the end of tape one.            10:41:39
22          (Whereupon a break was taken)           10:41:41
23          THE VIDEOGRAPHER: We are back on        10:41:41
24   the record.  The time is 10:49 a.m.            10:51:44
25          This is the beginning of tape           10:51:47

Page 82

E. Weiner

1
2   number two.                                     10:51:48
3     Q.    Dr. Weiner, you retired from            10:51:49
4   Pfizer in 2009?                                 10:51:51
5     A.    Yes.                                     10:51:52
6     Q.    And what have you been doing            10:51:52
7   since then?                                     10:51:55
8     A.    I did consulting for                    10:51:55
9   pharmaceutical companies.                       10:51:57
10     Q.    Is one of those companies              10:51:58
11   Pfizer?                                         10:51:59
12     A.    No.                                     10:51:59
13     Q.    What companies?                         10:52:00
14     A.    Well, most of my clients               10:52:00
15   consider that confidential information.  I     10:52:04
16   can tell you it's a range of large and         10:52:06
17   small companies.                               10:52:09
18     Q.    But no Pfizer?                          10:52:09
19     A.    No.                                     10:52:10
20     Q.    Do you have any financial ties         10:52:11
21   to Pfizer right now?                           10:52:13
22     A.    Only those ties that a retiree         10:52:15
23   has to a company that he worked at for         10:52:17
24   twenty years, which is pension and things     10:52:21
25   like that.                                     10:52:22

Page 83

E. Weiner

1
2     Q.    So you haven't received any            10:52:23
3   consulting agreement recently with Pfizer?     10:52:24
4     A.    No.                                     10:52:26
5     Q.    I'd like to show you what's            10:52:26
6   previously been marked as Plaintiff's          10:52:30
7   Exhibit 67.                                     10:52:33
8          Could you please take a look at         10:52:43
9   that document.                                  10:52:46
10          MR. SAHAM: For the record,             10:52:48
11   Plaintiff's Exhibit 67 bears Bates            10:52:48
12   numbers DEFS 00404977 through 980.            10:52:51
13   And it's entitled New Findings                10:52:59
14   Presented on Celebrex Safety and              10:53:01
15   Tolerability From Long-Term Outcome           10:53:06
16   Study of Eight Thousand Arthritis             10:53:08
17   Patients, and it's dated April 17,            10:53:11
18   2000.                                          10:53:14
19     Q.    I'd ask you if you recognize          10:53:15
20   this document.                                 10:53:17
21     A.    Yes.                                   10:53:19
22     Q.    What is it?                            10:53:20
23     A.    This was a press release that         10:53:21
24   was issued by Pharmacia and Pfizer after      10:53:22
25   -- about the results of the CLASS trial.      10:53:28

Page 84

E. Weiner

1
2     Q.    And turning your attention to          10:53:29
3   the second page of Exhibit 67, the third       10:53:34
4   paragraph, the first sentence reads, "the      10:53:36
5   study funded by Searle and Pfizer, Inc.        10:53:41
6   found that Celebrex patients experienced       10:53:44
7   significantly fewer symptomatic GI ulcers      10:53:49
8   and ulcer complications compared with          10:53:52
9   ibuprofen or diclofenac."                       10:53:56
10          That statement with respect to         10:53:58
11   diclofenac itself is inaccurate; is that       10:54:02
12   correct?                                       10:54:04
13     A.    I interpret that to be the            10:54:04
14   combination of ibuprofen and diclofenac,       10:54:08
15   which the comparative two end sets.  And       10:54:11
16   if one considers it versus the                 10:54:15
17   combination, which was again the primary       10:54:17
18   analysis stipulated, then it was not --        10:54:21
19   then it's correct.                             10:54:24
20     Q.    But you couldn't make that            10:54:25
21   statement as to diclofenac alone?             10:54:27
22     A.    That's correct.  I don't know         10:54:29
23   that the press release does that though.       10:54:30
24   I think that it does not.                      10:54:33
25     Q.    So when you read "or," you're         10:54:34

Page 85

22 (Pages 82 to 85)

E. Weiner

1
2    reading ibuprofen and diclofenac together?    10:54:38
3         MR. WEISS: I object to the form    10:54:41
4    of the question.    10:54:43
5    A.    Yes, that's how I read it.    10:54:44
6    Q.    And that's the way you would    10:54:46
7    usually use the word "or?"    10:54:47
8         MR. WEISS: I object to the form    10:54:47
9    of the question.    10:54:48
10   A.    It's not the most precise usage,    10:54:50
11   but that's the context I viewed that in.    10:54:54
12   Q.    Could somebody interpret that as    10:54:54
13   saying that it had fewer symptomatic GI    10:54:56
14   ulcers than ibuprofen or diclofenac?    10:55:01
15        MR. WEISS: I object to the form    10:55:05
16   of the question.    10:55:06
17   A.    Or meaning each one    10:55:06
18   individually.    10:55:12
19   Q.    Correct.    10:55:12
20   A.    One could read it that way, I    10:55:13
21   suppose.    10:55:15
22   Q.    And if you read it that way, the    10:55:15
23   statement would be inaccurate?    10:55:17
24   A.    That's correct.  But if you read    10:55:18
25   it the other way, then it is not.  So at    10:55:20

Page 86

E. Weiner

1
2    worst it's ambiguous.    10:55:22
3         (Whereupon, an e-mail dated    10:55:27
4    March 1, 2001 was marked Plaintiff's    10:55:27
5    Exhibit 165 for identification.)    10:55:28
6    Q.    I want to show you what I'm    10:55:28
7    marking as Plaintiff's Exhibit Number 165.    10:55:30
8         Could you please take a look at    10:55:46
9    that document.    10:55:49
10        MR. SAHAM: And for the record,    10:55:56
11   Plaintiff's Exhibit 165 is a two-page    10:55:58
12   document bearing Bates numbers    10:56:01
13   DEFS 00028999 through 9000.  And it's    10:56:05
14   an e-mail chain, the top e-mail is    10:56:13
15   from Ethan Weiner dated March 1, 2001    10:56:15
16   to Lori Shafner.    10:56:18
17   Q.    Do you know who Lori Shafner is?    10:56:22
18   A.    Yes.  She was one of the -- at    10:56:24
19   the time I think the project manager for    10:56:29
20   Pfizer's part of the COX-2 alliance.    10:56:31
21   Q.    And you would have sent this    10:56:34
22   e-mail to her in the ordinary course of    10:56:35
23   your employment at Pfizer?    10:56:38
24        MR. WEISS: I object to the form    10:56:39
25   of the question.    10:56:40

Page 87

E. Weiner

1
2    A.    Yes.    10:56:40
3    Q.    In the first line of the e-mail    10:56:41
4    you write, "everybody rejected the idea    10:56:44
5    that the combined analysis meant    10:56:47
6    anything."    10:56:50
7    A.    Let me just familiarize myself    10:56:50
8    with the rest of the e-mail string.    10:56:53
9         (Reviewing).    10:56:56
10        And this postdates the advisory    10:56:57
11   committee; is that correct?    10:57:06
12   Q.    It's dated March 1, 2001.    10:57:07
13   A.    The advisory committee --    10:57:10
14   Q.    February 7.  So it's    10:57:13
15   approximately one month after the advisory    10:57:14
16   committee.    10:57:17
17        But my first question is just a    10:57:17
18   very simple one.  You wrote on March 1,    10:57:17
19   2001, "everybody rejected the idea that    10:57:18
20   the combined analysis meant anything;" is    10:57:21
21   that correct, sir?    10:57:25
22   A.    Yes.  I'm just trying to see    10:57:25
23   what the combined referred to.    10:57:30
24   Q.    And the first bullet point under    10:57:38
25   that you wrote, "for the chosen endpoint    10:57:38

Page 88

E. Weiner

1
2    we beat IBU only."    10:57:38
3         That's referring to ibuprofen    10:57:40
4    only; correct?    10:57:44
5    A.    Yes.    10:57:45
6    Q.    And for the tables we looked at    10:57:47
7    earlier, celecoxib in the CLASS trial only    10:57:47
8    beat ibuprofen, it did not beat    10:57:48
9    diclofenac; correct?    10:57:49
10   A.    When one looked at the two    10:57:50
11   separately, that's correct.    10:57:52
12   Q.    And you wrote on March 1, 2001    10:57:53
13   that everybody rejected the idea that the    10:57:55
14   combined analysis meant anything; is that    10:57:57
15   correct, sir?    10:58:00
16   A.    Yes.    10:58:01
17   Q.    And you're referring to the    10:58:01
18   combined analysis between celecoxib and    10:58:01
19   the two pooled NSAIDs together; correct?    10:58:05
20   A.    I believe so.    10:58:09
21   Q.    And in the last line of your    10:58:10
22   e-mail you wrote, "I am strongly opposed    10:58:14
23   to say we beat the aggregated NSAIDs as    10:58:17
24   well as IBU individually.  It's    10:58:21
25   misleading."    10:58:24

Page 89

23 (Pages 86 to 89)

E. Weiner

1
2      You wrote that; correct?        10:58:24
3      A.   Well, yes.  And what I meant by      10:58:26
4  that is if you say we beat the aggregated    10:58:29
5  NSAIDs, that was in the analysis plan and    10:58:33
6  we did, in fact, for many of those          10:58:35
7  analyses even at the twelve-month time       10:58:38
8  point.  If you say we beat the combined      10:58:41
9  NSAIDs and also, by the way, we beat         10:58:44
10  ibuprofen without saying about diclofenac,  10:58:48
11  then one would probably, if you look at     10:58:51
12  the numbers, would be able to backfill but  10:58:53
13  I felt it wouldn't -- if you're going to    10:58:55
14  say that you beat ibuprofen individually,   10:58:58
15  then you need to say that you didn't beat   10:59:01
16  diclofenac individually.  If you want to    10:59:04
17  say you beat the aggregated NSAIDs which    10:59:06
18  again was a primary analysis but I'm        10:59:09
19  saying further above it it was not a        10:59:09
20  particularly convincing one after the       10:59:12
21  advisory committee.  But if you want to     10:59:14
22  say you beat the pooled, then that's okay   10:59:17
23  because that was the primary analysis and   10:59:20
24  that is, in fact, the case.                 10:59:22
25      Q.   And celecoxib failed to beat the   10:59:23

Page 90

E. Weiner

1
2  pooled NSAIDs on either of the two primary   10:59:28
3  outcome measures; correct?                   10:59:31
4      A.   If you mean the CSUGIEs as          10:59:33
5  defined by the protocol and also as         10:59:38
6  defined by FDA or the two CSUGIE            10:59:42
7  definitions, that's correct.  However, it   10:59:44
8  did beat pooled NSAIDs for CSUGIEs plus      10:59:46
9  symptomatic ulcers at both six and twelve   10:59:51
10  months for the pooled NSAIDs.              10:59:57
11      Q.   But it didn't beat it, the        10:59:58
12  combined NSAIDs, for the primary outcome;  10:59:58
13  correct?                                   11:00:02
14      A.   Not for CSUGIEs without           11:00:02
15  uncomplicated ulcers.                      11:00:05
16      Q.   Which was the primary endpoint    11:00:06
17  of the trial; correct?                     11:00:08
18      A.   Yes, it did not make the primary  11:00:09
19  endpoint.  And I think that fact was       11:00:11
20  widely known from the very beginning.      11:00:13
21      Q.   Do you recall telling anybody     11:00:14
22  else other than Lori Shafner that you were 11:00:30
23  strongly opposed to say we beat the        11:00:34
24  aggregated NSAIDs as well as IBU           11:00:36
25  individually because it's misleading?      11:00:41

Page 91

E. Weiner

1
2      A.   Again, I don't have an            11:00:43
3  independent recollection.  I can speculate  11:00:45
4  that in the conduct of business I probably  11:00:47
5  would have to Leland Loose and others.  I   11:00:51
6  probably would have said it at meetings     11:00:55
7  with Pharmacia as well.                     11:00:58
8      Q.   During the operations committee    11:01:00
9  meetings?                                   11:01:01
10      A.   Among others, I would suppose.    11:01:02
11  But again, I have no independent           11:01:04
12  recollection.                              11:01:07
13      Q.   Do you recall telling anyone      11:01:07
14  else other than Lori Shafner that          11:01:08
15  everybody rejected the idea that the       11:01:08
16  combined analysis meant anything?          11:01:12
17      A.   I don't recall who I did or did   11:01:13
18  not discuss the outcome of the advisory    11:01:16
19  committee with.  But I suspect for those I 11:01:19
20  did discuss it probably had a similar      11:01:24
21  opinion.                                   11:01:27
22      Q.   And that may have been discussed  11:01:27
23  at the operations committee meetings?      11:01:29
24      A.   It may have been.                 11:01:32
25      Q.   And those discussions would have  11:01:32

Page 92

E. Weiner

1
2  occurred in the ordinary course of your    11:01:34
3  employment at Pfizer?                       11:01:35
4      MR. WEISS:  I object to the form        11:01:36
5  of the question.                           11:01:37
6      A.   Yes.                              11:01:37
7      Q.   And you understand when I'm       11:01:38
8  asking you in the ordinary course of your  11:01:43
9  employment, I mean when you were at work?  11:01:44
10      A.   Right.                           11:01:48
11      And again, I have to, this being      11:01:48
12  ten years ago, somewhat guess at that.  If 11:01:49
13  I could remember everyone I talked to      11:01:50
14  about everything, I'd probably be          11:01:53
15  something different right now.             11:01:56
16      Q.   Right.                           11:01:57
17      But all I'm saying is that, when       11:01:57
18  you're discussing Celebrex or these other  11:01:57
19  issues, you're doing it as part of your    11:01:58
20  job; correct?                              11:02:00
21      A.   Yes.                             11:02:00
22      Q.   I want to show you what I'm       11:02:05
23  marking as Plaintiff's Exhibit 166.        11:02:07
24      Actually, before I mark                11:02:21
25  Exhibit 166, could you go back to          11:02:23

Page 93

24 (Pages 90 to 93)

E. Weiner

1
2  Exhibit 67, the press release.  And again    11:02:26
3  on the second page where we were looking    11:02:35
4  before, the next sentence states,    11:02:36
5  "Celebrex was also associated with    11:02:40
6  numerically fewer ulcer complications than    11:02:42
7  the NSAID comparators among all patients    11:02:45
8  and sixty-four percent fewer of these    11:02:51
9  serious events among non-aspirin users-a    11:02:53
10  statistically significant difference."    11:02:59
11       That statement is only accurate    11:03:01
12  at six months; correct?    11:03:03
13       A.    For CSUGIEs among non-aspirin    11:03:04
14  users, that's correct.  And that was the    11:03:09
15  analysis that very likely this was based    11:03:10
16  on.    11:03:13
17       Q.    Because for the entire study it    11:03:13
18  was no longer statistically significant at    11:03:16
19  that comparison; correct?    11:03:19
20       A.    That's correct.    11:03:20
21       Q.    And if you look at the first    11:03:20
22  page of Exhibit 67 under the bolded    11:03:21
23  heading groundbreaking study reflects real    11:03:27
24  world practice, it states, "the celecoxib    11:03:30
25  long-term arthritis safety study, an    11:03:34

Page 94

E. Weiner

1
2  approximately thirteen-month multi-center    11:03:41
3  randomized double-blind outcomes trial of    11:03:41
4  about eight thousand arthritis patients,    11:03:44
5  fifty-three hundred with OA and two    11:03:47
6  thousand two hundred with rheumatoid    11:03:50
7  arthritis," paren, "RA," closed paren,"    11:03:52
8  was designed to mirror everyday clinical    11:03:55
9  practice by enrolling a broad spectrum of    11:03:58
10  patients including adult patients of all    11:04:04
11  ages and disease severity in patients    11:04:06
12  taking low dose aspirin for cardio    11:04:07
13  protection."    11:04:10
14       Do you see that?    11:04:10
15       A.    Yes.    11:04:12
16       Q.    And that indicates that the    11:04:12
17  study was a thirteen-month study; correct?    11:04:13
18       A.    Yes.    11:04:16
19       Q.    It doesn't say it was a    11:04:16
20  six-month study; correct?    11:04:19
21       A.    That's correct.    11:04:21
22       Q.    And it doesn't say that the data    11:04:21
23  being discussed in this press release is    11:04:24
24  only six months of the entire study; does    11:04:26
25  it, sir?    11:04:28

Page 95

E. Weiner

1
2       A.    No, and I think that's because    11:04:29
3  that's a press release, it's an extremely    11:04:33
4  high level document.  I think at that    11:04:33
5  point six-month data had been reviewed and    11:04:36
6  felt to be the most scientifically valid.    11:04:42
7  The reasons for that are laid out I think    11:04:42
8  quite clearly in the FDA briefing book    11:04:45
9  that is publicly disclosed several months    11:04:50
10  after this breaking press release and goes    11:04:55
11  into all the reasons for that.  I think    11:04:59
12  that's a hundred, one hundred fifty-page    11:05:01
13  document, something of that order,    11:05:05
14  obviously not suitable for a very high    11:05:06
15  level one or two-page press release that    11:05:09
16  is intended to give the big picture.    11:05:12
17       Q.    The fact that there was more    11:05:14
18  than six months data and only six months    11:05:16
19  was being used is not disclosed in    11:05:18
20  Exhibit 67; is that correct?    11:05:21
21       A.    No, that's correct.    11:05:23
22       Q.    And the explanation that you're    11:05:23
23  talking about that was publicly disclosed    11:05:26
24  on February 7 at the advisory committee,    11:05:29
25  that information is not referenced in    11:05:32

Page 96

E. Weiner

1
2  Exhibit 67; is it?    11:05:35
3       A.    Which would have been    11:05:36
4  inappropriate for a press release.    11:05:37
5       Q.    And it's not referenced in the    11:05:39
6  JAMA article either; is it?    11:05:41
7       A.    No.    11:05:42
8       Q.    So this whole informative    11:05:43
9  censoring business is not discussed in the    11:05:45
10  JAMA article; correct?    11:05:48
11       A.    That's correct.    11:05:49
12       Q.    And it's not discussed in    11:05:49
13  Exhibit 67?    11:05:51
14       A.    Well, one wouldn't expect it to    11:05:51
15  be discussed in a press release.    11:05:54
16       Q.    And it's not disclosed publicly    11:05:56
17  until February 7, 2001; correct?    11:05:59
18       MR. WEISS: I object to the form    11:05:59
19  of the question.    11:06:02
20       A.    Yes.    11:06:03
21       (Whereupon, an e-mail dated    11:06:03
22  March 26, 2001 was marked    11:06:03
23  Plaintiff's Exhibit 166    11:06:03
24  for identification.)    11:06:03
25       Q.    I want to show you what I'm    11:06:08

Page 97

25 (Pages 94 to 97)

E. Weiner

| | | |
|---|---|---|
| 1 | E. Weiner | |
| 2 | marking as Plaintiff's Exhibit 166. | 11:06:10 |
| 3 | Could you please take a look at | 11:06:25 |
| 4 | one hundred sixty-six, Dr. Weiner. | 11:06:28 |
| 5 | MR. SAHAM: And for the record, | 11:06:30 |
| 6 | Exhibit 166 is a multiple page | 11:06:31 |
| 7 | document bearing Bates numbers | 11:06:35 |
| 8 | DEFS 01001151 through 1188. And the | 11:06:38 |
| 9 | first two pages are an e-mail from | 11:06:49 |
| 10 | Mona Wahba to Ethan Weiner dated | 11:06:53 |
| 11 | March 26, 2001 and it attaches the | 11:06:58 |
| 12 | revised draft USPI for CLASS. | 11:07:01 |
| 13 | Q. And I'd ask you if you recognize | 11:07:06 |
| 14 | this document. | 11:07:08 |
| 15 | A. Yes. | 11:07:08 |
| 16 | Q. And what is it? | 11:07:09 |
| 17 | A. It's a cover e-mail attached to | 11:07:09 |
| 18 | a draft label. | 11:07:14 |
| 19 | Q. And you would have received this | 11:07:16 |
| 20 | in the ordinary scope of your employment | 11:07:19 |
| 21 | at Pfizer? | 11:07:21 |
| 22 | MR. WEISS: I object to the form | 11:07:22 |
| 23 | of the question. | 11:07:23 |
| 24 | A. Yes. | 11:07:23 |
| 25 | Q. And I'd like to turn your | 11:07:24 |

Page 98

E. Weiner

| | | |
|---|---|---|
| 1 | E. Weiner | |
| 2 | attention specifically to page eight of | 11:07:26 |
| 3 | the label. It says proposed label changes | 11:07:33 |
| 4 | on the right-hand column. | 11:07:36 |
| 5 | Are you with me? | 11:07:45 |
| 6 | A. Yes. | 11:07:46 |
| 7 | Q. And it states next to I guess a | 11:07:46 |
| 8 | circled one, it states, "the lower | 11:07:48 |
| 9 | instance of symptomatic GI ulcers and | 11:07:50 |
| 10 | ulcer complications was seen predominantly | 11:07:54 |
| 11 | in patients not taking aspirin," paren, | 11:07:56 |
| 12 | "sixty-four percent decrease celecoxib | 11:07:59 |
| 13 | versus ibuprofen P less than 0.001," | 11:08:03 |
| 14 | closed paren. | 11:08:09 |
| 15 | Do you see that? | 11:08:10 |
| 16 | A. Yes. | 11:08:12 |
| 17 | Q. Could you turn back to | 11:08:12 |
| 18 | Exhibit 67, the second page of the press | 11:08:14 |
| 19 | release. And the sentence we were just | 11:08:16 |
| 20 | talking about that reads "Celebrex was | 11:08:26 |
| 21 | also associated with numerically fewer | 11:08:30 |
| 22 | ulcer complications than the NSAID | 11:08:32 |
| 23 | comparators among all patients and | 11:08:34 |
| 24 | sixty-four percent fewer of these serious | 11:08:38 |
| 25 | events among non-aspirin users-a | 11:08:39 |

Page 99

E. Weiner

| | | |
|---|---|---|
| 1 | E. Weiner | |
| 2 | statistically significant difference." | 11:08:41 |
| 3 | Is the sixty-four percent in the | 11:08:42 |
| 4 | press release the sixty-four percent being | 11:08:46 |
| 5 | referenced here in the proposed label | 11:08:48 |
| 6 | change? | 11:08:50 |
| 7 | A. Off the top of my head, I don't | 11:08:50 |
| 8 | know. I would have to -- I don't know | 11:08:55 |
| 9 | where the sixty-four percent in the press | 11:08:57 |
| 10 | release is coming from. | 11:09:01 |
| 11 | Q. If the press release is | 11:09:03 |
| 12 | referring to the same sixty-four percent, | 11:09:05 |
| 13 | would that be misleading? | 11:09:07 |
| 14 | MR. WEISS: I object to the form | 11:09:08 |
| 15 | of the question. | 11:09:09 |
| 16 | A. Well, if it were and it implies | 11:09:09 |
| 17 | that it's to both and it's only to | 11:09:12 |
| 18 | ibuprofen, yes. Again, I do not know | 11:09:15 |
| 19 | where the sixty-four percent in the press | 11:09:17 |
| 20 | release came from. | 11:09:19 |
| 21 | Q. Turning back to Exhibit 115, | 11:09:20 |
| 22 | which is the big final report, looking at | 11:09:25 |
| 23 | pages five and six, the tables -- and | 11:09:37 |
| 24 | really, you could look anywhere -- do you | 11:09:40 |
| 25 | -- from looking at these tables, can you | 11:09:44 |

Page 100

E. Weiner

| | | |
|---|---|---|
| 1 | E. Weiner | |
| 2 | determine where the sixty-four percent | 11:09:47 |
| 3 | number came from in the press release? | 11:09:49 |
| 4 | A. If I had a lot of time and a | 11:09:54 |
| 5 | calculator, perhaps. But I -- I mean, | 11:10:00 |
| 6 | these tables are not presenting percent | 11:10:01 |
| 7 | reduction, they're just presenting raw | 11:10:04 |
| 8 | numbers and statistical significance. So | 11:10:06 |
| 9 | you'd have to look at all those ratios to | 11:10:09 |
| 10 | see if any of them were .64. | 11:10:12 |
| 11 | Q. But the document I've marked as | 11:10:15 |
| 12 | Exhibit 166, the proposed label change, | 11:10:17 |
| 13 | that is -- | 11:10:20 |
| 14 | A. That clearly identifies where | 11:10:20 |
| 15 | it's coming from. | 11:10:22 |
| 16 | Q. And it's talking about percent | 11:10:23 |
| 17 | reduction; correct? | 11:10:26 |
| 18 | A. Yes. | 11:10:27 |
| 19 | Q. And it's percent reduction only | 11:10:27 |
| 20 | for ibuprofen; correct? | 11:10:30 |
| 21 | A. That's correct. | 11:10:31 |
| 22 | Q. So if that is the same number | 11:10:32 |
| 23 | being used, that statement which implies | 11:10:32 |
| 24 | it's for both comparators together would | 11:10:34 |
| 25 | be misleading; correct? | 11:10:38 |

Page 101

26 (Pages 98 to 101)

E. Weiner

1    E. Weiner
2        MR. WEISS: I object to the form      11:10:39
3    of the question.                         11:10:40
4        A.   I just want to re-read where    11:10:41
5    that is in the press release again.      11:10:43
6        Q.   It's the third paragraph, second  11:10:45
7    sentence of the second page on Exhibit 67.  11:10:47
8        A.   (Reviewing).                    11:10:58
9        Yes, if that sixty-four percent      11:10:58
10   is the same, sixty-four percent, then    11:10:59
11   you're right.                            11:11:00
12       Q.   And how would you calculate the  11:11:01
13   percentages using the tables that we were  11:11:03
14   just referring to in Exhibit 115?        11:11:05
15       A.   Well, first of all, not being a  11:11:08
16   statistician, I don't know that I would  11:11:15
17   necessarily calculate that off of the raw  11:11:17
18   rates.  There are statistical models that  11:11:20
19   -- and all those Kaplan-Meier curves which  11:11:22
20   I'm sure you've seen many of at this point  11:11:26
21   are based on a probability of an event   11:11:29
22   happening at a certain period of time.   11:11:29
23   It's more complex in the raw rate.  It   11:11:32
24   takes censoring into account and things  11:11:35
25   like that.  So I don't know that the     11:11:40

Page 102

1    E. Weiner
2    sixty-four percent was calculated off of  11:11:41
3    the raw rates.                           11:11:44
4        If it was, and that's a big          11:11:45
5    caveat, then one would look at the rate --  11:11:47
6    again whether crude or adjusted -- of    11:11:50
7    events for a given time period on        11:11:54
8    Celebrex, the rate of that same event on  11:12:01
9    the comparator -- again, whether it's    11:12:03
10   pooled or one of the NSAIDs or whatever --  11:12:05
11   and take the ratio.                      11:12:08
12       If you look at every ratio here      11:12:08
13   and you don't find .64 though, as I said,  11:12:22
14   I wouldn't be surprised because there are  11:12:22
15   a lot of complex statistical functions   11:12:25
16   that take place.                         11:12:29
17       Q.   Well, looking at --             11:12:32
18       A.   And that's true for all clinical  11:12:33
19   trials.                                  11:12:37
20       Q.   Well, looking at Exhibit 166,   11:12:37
21   the page -- I believe it was page eight  11:12:39
22   that we were looking at, do you know how  11:12:41
23   that number was calculated or what was   11:12:43
24   used as the starting numbers to calculate  11:12:46
25   that sixty-four percent decrease?        11:12:49

Page 103

1    E. Weiner
2        A.   No.  I don't know if it was the  11:12:51
3    raw rates or whether it was for the      11:12:54
4    Kaplan-Meier curve.                      11:12:57
5        Q.   And would you use annualized    11:12:58
6    rates to calculate the percentage?       11:13:02
7        A.   One could or one couldn't.  It  11:13:07
8    doesn't matter.  If the time period was  11:13:11
9    the same for the two treatments I used, I  11:13:13
10   wouldn't.  If it was different, the mean  11:13:15
11   treatment duration was different between  11:13:15
12   two treatment groups, then you have to   11:13:17
13   normalize for that use and use an        11:13:18
14   annualized trade, which again is why the  11:13:20
15   crude numbers wouldn't give you that.    11:13:22
16       (Whereupon, a document entitled      11:13:22
17   U.S. Collaboration Agreement             11:13:22
18   was marked Plaintiff's Exhibit 167       11:13:22
19   for identification.)                     11:13:29
20       Q.   I want to show you what I'm     11:13:29
21   marking as Plaintiff's Exhibit 167.      11:13:31
22       Could you please take a look at      11:13:46
23   Plaintiff's Exhibit 167.                 11:13:48
24       MR. SAHAM: And for the record,       11:13:50
25   Plaintiff's 167 is a multiple-page       11:13:54

Page 104

1    E. Weiner
2    document dated February 18, 1998         11:13:57
3    bearing Bates numbers DEFS 00509082      11:13:58
4    through 9121.  And it's the U.S.         11:14:03
5    collaboration agreement, celecoxib.      11:14:07
6    And it's an agreement between Pfizer     11:14:11
7    and the Monsanto Company and GD          11:14:14
8    Searle.                                  11:14:18
9        Q.   Do you recognize this document?  11:14:20
10       A.   Yes.                            11:14:21
11       Q.   And what is it, in your words?  11:14:22
12       A.   This is one of a series of      11:14:23
13   contracts between Pfizer and Searle      11:14:25
14   regarding the alliance around celecoxib  11:14:29
15   and valdecoxib.                          11:14:33
16       Q.   This document, looking at the   11:14:35
17   page thirty-five of the document, it's   11:14:41
18   executed and signed by Henry A. McKinnell,  11:14:43
19   executive vice president for Pfizer.     11:14:48
20       A.   At that point I guess he wasn't  11:14:51
21   CEO yet.  Okay.  Yes.                    11:14:53
22       Q.   And then it's executed on behalf  11:14:55
23   of GD Searle and Company by Dr. Schutter?  11:14:59
24       A.   Rick De Schutter.              11:15:03
25       Q.   Do you know who he is?          11:15:06

Page 105

27 (Pages 102 to 105)

E. Weiner

1
2    A.   I believe he was the CEO of      11:15:07
3   Searle at that time.              11:15:09
4    Q.   And it's also executed in his      11:15:09
5   name on behalf of Monsanto as well?       11:15:13
6    A.   Right, Searle a subsidiary of      11:15:13
7   Monsanto.                    11:15:19
8    Q.   And this sets out contractually      11:15:19
9   some of the agreements between Pfizer and    11:15:22
10  Searle?                     11:15:24
11   A.   Yes.                  11:15:24
12   Q.   And turning to page thirty-three   11:15:24
13  of the document, specifically 12.14,      11:15:31
14  publicity.                    11:15:35
15       Are you with me?             11:15:45
16   A.   Yes.                  11:15:46
17   Q.   The contract states, "neither     11:15:46
18  party shall originate any news release or   11:15:49
19  public announcement written or oral       11:15:53
20  relating to this agreement without the     11:15:54
21  prior written approval of the other party   11:15:57
22  except as otherwise required by law.  Such  11:16:00
23  approval shall not be unreasonably       11:16:03
24  withheld."                    11:16:07
25       The contract makes that         11:16:07

Page 106

E. Weiner

1
2   statement; correct?              11:16:11
3    A.   Yes.                  11:16:11
4    Q.   I'd also like to turn your       11:16:12
5   attention to page twenty-eight of the      11:16:14
6   contract, 9.2, publications.  The contract  11:16:16
7   states, "subject to CCC approval, if      11:16:33
8   either party," paren, "the publishing      11:16:37
9   party," closed paren, "desires to disclose  11:16:41
10  any new information," paren, "as defined    11:16:50
11  in the global agreement," closed paren,     11:16:50
12  "in scientific journals, publications, or   11:16:50
13  scientific presentation, the publishing     11:16:54
14  party shall provide the other party an      11:16:55
15  advanced copy of any proposed publication   11:16:58
16  relating to the or new information prior    11:17:02
17  to submission for publication."          11:17:05
18       The contract makes that         11:17:08
19  statement; correct?              11:17:10
20   A.   Yes.                  11:17:10
21   Q.   And it was executed by both Dr.   11:17:11
22  McKinnell for Pfizer and Dr. Schutter for   11:17:14
23  Searle and Monsanto?              11:17:17
24   A.   Yes.                  11:17:18
25   Q.   I want to show you what's        11:17:51

Page 107

E. Weiner

1
2   previously been marked as Wolf Exhibit     11:17:53
3   Number 3.                    11:17:59
4       Could you please take a look at    11:18:10
5   that document.                  11:18:13
6       MR. SAHAM: And for the record,     11:18:15
7    it's the September 13, 2000 JAMA,       11:18:16
8    journal of the American Medical        11:18:22
9    Association, article Entitled         11:18:24
10   Gastrointestinal Toxicity With        11:18:27
11   Celecoxib Versus Nonsteroidal         11:18:29
12   Antiinflammatory Drugs For          11:18:34
13   Osteoarthritis and Rheumatoid         11:18:36
14   Arthritis, the CLASS Study, a         11:18:40
15   Randomized Control Trial.           11:18:43
16   Q.   And I'd ask you if you recognize   11:18:46
17  this document.                  11:18:48
18   A.   Yes.                  11:18:49
19   Q.   And did you see this document     11:18:49
20  before it was submitted for publication?    11:18:52
21   A.   No, not that I recall.          11:18:53
22   Q.   Did you see it before it was      11:18:56
23  published?                    11:18:59
24   A.   Not that I recall either.  I may  11:19:00
25  have, the latter.  I don't think the     11:19:04

Page 108

E. Weiner

1
2   former.                     11:19:06
3    Q.   Would you have reviewed         11:19:07
4   iterations of this article before it was   11:19:10
5   published?                    11:19:13
6       MR. WEISS: I object to the form    11:19:13
7    of the question.  He just said he      11:19:15
8    doesn't recall.               11:19:16
9    A.   I don't recall doing it.  I      11:19:17
10  suspect others at Pfizer would have.  I    11:19:20
11  was not on the publications subcommittee.   11:19:22
12   Q.   Was that one of the           11:19:25
13  responsibilities of Dr. Loose?          11:19:27
14   A.   It may well have been.          11:19:28
15   Q.   And he reported up to you?       11:19:31
16   A.   Yes.                  11:19:32
17   Q.   Looking at the front page of     11:19:32
18  Wolf Exhibit 3, the main outcome measure    11:19:45
19  or main outcome measures, are you with me?  11:19:49
20   A.   Yes.                  11:19:53
21   Q.   It states, "incidence of        11:19:53
22  prospectively defined symptomatic upper GI  11:19:56
23  ulcers and ulcer complications," paren,     11:19:58
24  "bleeding, perforation, and obstruction,"   11:20:01
25  closed paren, "and other adverse effects    11:20:04

Page 109

28 (Pages 106 to 109)

E. Weiner

1 during the six-month treatment period." 11:20:07
2 Do you see that? 11:20:09
3 A. Yes. 11:20:11
4 Q. Is it accurate that the main 11:20:11
5 outcome measure is different than the 11:20:12
6 primary outcome measures as defined in the 11:20:14
7 protocol we looked at earlier? 11:20:17
8 MR. WEISS: I object to the form 11:20:19
9 of the question. 11:20:20
10 A. Yes. 11:20:21
11 Q. And in fact, what's being 11:20:21
12 reported here as the main outcome measure 11:20:22
13 is the combined measure of complicated 11:20:23
14 ulcers and symptomatic ulcers together? 11:20:27
15 A. That is correct. 11:20:30
16 Q. And that was not a primary 11:20:30
17 outcome measure of the CLASS trial; 11:20:33
18 correct? 11:20:36
19 A. Yes. 11:20:36
20 Q. And it defines here the 11:20:36
21 treatment period as being six months; 11:20:41
22 correct? 11:20:43
23 A. Yes. 11:20:43
24 Q. It does not reveal to the reader 11:20:44

Page 110

E. Weiner

1 specifically that the treatment period 11:20:46
2 defined in the protocol was fifty-two 11:20:50
3 weeks; correct? 11:20:52
4 A. No, but it does in the methods 11:20:53
5 section go on to discuss that there were 11:20:55
6 patients treated longer than six months. 11:20:58
7 Q. But it doesn't say that the 11:21:01
8 treatment period was, in fact, fifty-two 11:21:01
9 weeks; correct? 11:21:05
10 A. No, it doesn't. 11:21:05
11 Q. And it doesn't disclose that six 11:21:07
12 of the seven complicated ulcers suffered 11:21:09
13 after the six months reported here were 11:21:12
14 suffered in the celecoxib treatment group? 11:21:15
15 A. No, it does not discuss anything 11:21:17
16 that happened after six months. 11:21:19
17 Q. And referring to page -- looking 11:21:21
18 at the internal JAMA page numbers 1251. 11:21:30
19 Are you with me? Figure two. 11:21:36
20 The middle table is labeled B, patients 11:21:43
21 not taking aspirin; correct? 11:21:45
22 A. Yes. 11:21:45
23 Q. And the left side of that 11:21:47
24 reports says, "a statistically significant 11:21:48

Page 111

E. Weiner

1 result of .04 for patients not taking 11:21:50
2 aspirin for complicated ulcers;" correct? 11:21:54
3 A. That's correct. 11:21:59
4 Q. And that level of statistical 11:21:59
5 significance was not maintained for the 11:22:00
6 entire study period; correct? 11:22:02
7 A. That's correct. 11:22:04
8 Q. And the informative censoring 11:22:04
9 issue that we discussed earlier, that's 11:22:07
10 not revealed or discussed in any way in 11:22:09
11 the JAMA article which is Wolf Exhibit 3; 11:22:12
12 correct? 11:22:15
13 MR. WEISS: I object to the form 11:22:16
14 of the question. 11:22:16
15 A. It's not discussed. 11:22:17
16 Q. I want to show you what I'm 11:22:26
17 marking as Plaintiff's 168. No, I want to 11:22:28
18 show you what's previously been marked as 11:22:34
19 Plaintiff's Exhibit 131. 11:22:37
20 A. Which one is that? 11:22:38
21 Q. I haven't shown it to you yet. 11:22:40
22 It was marked in a prior deposition. 11:22:43
23 MR. SAHAM: Just to make it 11:22:58
24 clear, I'm showing you now what's been 11:22:58

Page 112

E. Weiner

1 marked previously as Plaintiff's 11:22:58
2 Exhibit 131. 11:22:58
3 For the record, Plaintiff's 131 11:22:58
4 is a two-page e-mail string bearing 11:23:00
5 Bates numbers DEFS 02561540 11:23:02
6 through 541. And the top e-mail 11:23:06
7 starting from the top is from Kenneth 11:23:11
8 Bahrt to Mitchell Gandelman and 11:23:14
9 Elizabeth Kitsis dated January 10, 11:23:14
10 2001. 11:23:14
11 Q. Do you know who Kenneth Bahrt 11:23:20
12 is? 11:23:21
13 A. He was one of the medical 11:23:21
14 affairs or medical marketing people who 11:23:23
15 worked for Liz Kitsis at the time. 11:23:26
16 Q. What was Liz Kitsis' title? 11:23:31
17 A. Senior director maybe. I don't 11:23:34
18 remember. 11:23:35
19 Q. And just under that there's an 11:23:35
20 e-mail from you to Mona Wahba, Lori 11:23:38
21 Shafner, and a bunch of other folks. 11:23:40
22 Do you see that? 11:23:42
23 A. Yes. 11:23:43
24 Q. And it's dated January 10, 2001? 11:23:43

Page 113

29 (Pages 110 to 113)

E. Weiner

1
2    A.    Yes.                              11:23:46
3    Q.    And it also cc's Leland Loose?    11:23:47
4    A.    Yes.                              11:23:50
5    Q.    Would you have sent this e-mail   11:23:50
6    in the ordinary scope of your employment    11:23:53
7    at Pfizer?                              11:23:54
8         MR. WEISS: I object to the form    11:23:55
9    of the question.                        11:23:55
10   A.    Yes.                              11:23:56
11   Q.    You sent it while you were at     11:23:56
12   work?                                   11:23:59
13   A.    Yes.                              11:24:07
14   Q.    And it's about work-related       11:24:07
15   issues?                                 11:24:07
16   A.    That's correct.                   11:24:07
17   Q.    And the last sentence of your     11:24:07
18   e-mail to Dr. Wahba and Dr. Loose and   11:24:07
19   others states, "certain things should be    11:24:07
20   openly stated, not buried in the        11:24:11
21   presentation, i.e.," bullet point, "we did   11:24:13
22   not achieve our primary efficacy parameter   11:24:17
23   but here's why the results are still    11:24:22
24   good," bullet point, "we did not see any   11:24:25
25   difference between celecoxib and NSAID   11:24:28

Page 114

E. Weiner

1
2    after six months but here is why and here    11:24:30
3    is why the initial six-month analysis is   11:24:34
4    the critical one," and so on.           11:24:37
5         Did you write that in the          11:24:40
6    ordinary course of your employment on or   11:24:42
7    about January 10, 2001?                 11:24:44
8         MR. WEISS: I object to the form    11:24:45
9    of the question.                        11:24:47
10   A.    Yes, I wrote that in reference    11:24:47
11   to rehearsals that were being carried on   11:24:49
12   or what are called mock advisory        11:24:51
13   committees, which is a very common      11:24:53
14   practice in the industry where those    11:24:55
15   presenting at an advisory committee     11:24:58
16   present to a panel of both inside and   11:25:00
17   outside people to have their presentations   11:25:02
18   critiqued.                              11:25:06
19   Q.    And one thing you pointed out in   11:25:07
20   the scope of these rehearsals is that   11:25:10
21   certain things should not be buried in the   11:25:12
22   presentation?                           11:25:16
23   A.    That's correct.                   11:25:16
24   Q.    Would you agree with respect to   11:25:16
25   a journal article being submitted to a   11:25:17

Page 115

E. Weiner

1
2    peer-reviewed journal that you shouldn't   11:25:20
3    bury things in the journal?             11:25:23
4         MR. WEISS: I object to the form    11:25:25
5    of the question.                        11:25:27
6    A.    As a rule, yes.                   11:25:27
7    Q.    Looking back at Wolf Exhibit 3,   11:25:29
8    the JAMA article, would you agree with me   11:25:32
9    that any possible disclosure that       11:25:35
10   treatment was in addition to the, quote,   11:25:39
11   six-month treatment period is buried in   11:25:42
12   the JAMA article?                       11:25:45
13   A.    It's certainly not obvious.  I    11:25:47
14   do think that the six months analysis was   11:25:51
15   the most valid analysis.  And I also think   11:25:55
16   that the advisory committee is the most   11:25:59
17   appropriate venue to present that and why   11:26:02
18   it is.  That said, it could have been made   11:26:04
19   more clear in the article that it is one   11:26:09
20   of several possibly analyses that the data   11:26:12
21   would have supported.  But I don't think   11:26:15
22   anybody changed their view that that was   11:26:22
23   the most scientifically valued and       11:26:25
24   informative analysis.                   11:26:27
25   Q.    So you as a physician in reading   11:26:28

Page 116

E. Weiner

1
2    the JAMA article, if you weren't privy to   11:26:30
3    the information you were as a member of   11:26:34
4    the operations committee, when you saw the   11:26:35
5    main outcome measure listing the        11:26:37
6    "six-month treatment period," you might   11:26:41
7    have concluded that there was only six   11:26:41
8    months of treatment; correct?          11:26:41
9         MR. WEISS: I object to the form    11:26:43
10   of the question.                        11:26:43
11   A.    I would have read the methods     11:26:44
12   section and I always do when I read     11:26:47
13   journal articles, and so I would have seen   11:26:51
14   that it says patients were seen in X, X,   11:26:53
15   and X time periods up until six months   11:26:58
16   after which they were seen, and that would   11:27:00
17   have raised the question in my mind so   11:27:01
18   what happened after that.  And so I would   11:27:04
19   have probably realized that the study went   11:27:08
20   on for more than six months.            11:27:11
21   Q.    But you wouldn't have known that   11:27:13
22   there was a fifty-two-week treatment    11:27:15
23   period specified in the protocol; is that   11:27:17
24   correct?                                11:27:20
25   A.    That's correct.                   11:27:20

Page 117

30 (Pages 114 to 117)

E. Weiner

1                 E. Weiner
2     Q.   And you wouldn't have known that   11:27:20
3  six of the seven patients suffering an   11:27:21
4  uncensored complicated ulcer were in the   11:27:21
5  celecoxib group --   11:27:24
6       MR. SAHAM: Strike that.   11:27:25
7     Q.   You wouldn't have known that six   11:27:27
8  of the seven patients who suffered a   11:27:29
9  complicated ulcer after the six months   11:27:31
10  discussed in paper were in the celecoxib   11:27:31
11  group; correct?   11:27:34
12     A.   You're right, I'd have to read   11:27:34
13  the briefing book.   11:27:36
14     Q.   Which didn't even become   11:27:37
15  available until February 7, 2001; is that   11:27:39
16  correct?   11:27:43
17     A.   That's correct.   11:27:43
18     Q.   The paper also -- I'm again,   11:27:49
19  talking about the JAMA article, Wolf   11:27:51
20  Exhibit 3, it buries that -- at best it   11:27:56
21  buries the fact that the primary endpoint   11:27:59
22  of the study wasn't met; correct?   11:28:02
23       MR. WEISS: I object to the form   11:28:04
24   of the question.   11:28:06
25     A.   I think, if I'm not mistaken, it   11:28:06

Page 118

1                 E. Weiner
2  does make clear -- if you look at   11:28:15
3  annualized I think in figure two among all   11:28:24
4  patients, it does show that the   11:28:30
5  complicated ulcers, which is at the left   11:28:33
6  panel I think of figure eight, is not   11:28:40
7  significant at .09.   11:28:42
8     Q.   Right.   11:28:43
9       But does it state anywhere in   11:28:44
10  the journal that that measure was the   11:28:46
11  primary endpoint of the CLASS trial?   11:28:47
12     A.   No.   11:28:52
13     Q.   The second bullet point that you   11:28:56
14  say in your e-mail which is Exhibit 131   11:29:00
15  which should not be buried is, "we did not   11:29:03
16  see any difference between celecoxib and   11:29:07
17  NSAID after six months but here is why and   11:29:09
18  here is why the initial six-month analysis   11:29:12
19  is the critical one," and so son.   11:29:15
20       Are you referring there that the   11:29:17
21  why, is that the informative censoring   11:29:17
22  analysis?   11:29:20
23     A.   Yes.   11:29:20
24     Q.   And that of course is not   11:29:21
25  disclosed in Wolf Exhibit 3; correct?   11:29:23

Page 119

1                 E. Weiner
2     A.   Right, because you would have to   11:29:26
3  talk about things beyond six months for   11:29:28
4  that to come into play.   11:29:31
5     Q.   So a reader of the journal   11:29:31
6  article would not know that the reason   11:29:34
7  Pfizer and Pharmacia thought it best to   11:29:36
8  report six months is because of this   11:29:38
9  informative censoring bias; correct?   11:29:40
10     A.   That's correct.   11:29:42
11     Q.   So that wasn't subject to peer   11:29:42
12  review as part of the submission of the   11:29:44
13  JAMA article which is Wolf Exhibit 3;   11:29:47
14  correct?   11:29:50
15     A.   That is correct.  However, the   11:29:50
16  peer reviewers again, reading the methods   11:29:52
17  section, have the opportunity I think to   11:29:55
18  inquire what happened after six months.   11:30:04
19     Q.   But they weren't given that   11:30:04
20  information up front in a clear way;   11:30:05
21  correct?   11:30:08
22       MR. WEISS: I object to the form   11:30:08
23   of the question.   11:30:09
24     A.   Well, again, I think the methods   11:30:09
25  section -- they do have the opportunity to   11:30:11

Page 120

1                 E. Weiner
2  ask questions.  And I was not included on   11:30:13
3  correspondence to and from the journal so   11:30:16
4  I don't know if they asked or not or what   11:30:20
5  they were told.  But they do have the   11:30:23
6  opportunity to ask for further data.   11:30:25
7     Q.   But as a Johns Hopkins trained   11:30:28
8  medical doctor, would you have submitted   11:30:32
9  the JAMA article in that form describing   11:30:33
10  "the treatment period as six months?"   11:30:37
11       MR. WEISS: I object to the form   11:30:39
12   of the question.   11:30:40
13     A.   I think that's a highly   11:30:40
14  hypothetical question.   11:30:43
15       MR. WEISS: Just can we qualify,   11:30:45
16   do you mean sitting here knowing what   11:30:48
17   he knows today about the controversy   11:30:49
18   that resulted or at the time?   11:30:52
19     Q.   Would you have done it if it was   11:30:55
20  up to you, Dr. Weiner?  Would you have   11:30:57
21  submitted six months of the fifty-two-week   11:30:57
22  trial without expressly stating that   11:31:00
23  you're only putting in part of the data   11:31:04
24  and explaining why?   11:31:07
25       MR. WEISS: I object to the form   11:31:08

Page 121

31 (Pages 118 to 121)

E. Weiner

1  E. Weiner
2      of the question.                        11:31:09
3      A.   It's difficult to answer with      11:31:10
4  20/20 hindsight.  I think today, no.  Back  11:31:15
5  then, if I were very convinced that the     11:31:17
6  six-month data really was the only thing    11:31:20
7  that was meaningful, I probably would have  11:31:23
8  focused on that very intently.  It's very   11:31:27
9  difficult for me to say whether or not --   11:31:31
10 to second-guess the authors on what else    11:31:34
11 could have been said after six months.      11:31:36
12 Because I mean, if you look at the panel    11:31:41
13 of authors, besides people from the         11:31:43
14 company, there are a lot of well respected  11:31:45
15 people from academia and I think they as    11:31:49
16 well must have felt there was a lot of      11:31:52
17 face validly to the six-month analysis.     11:31:55
18     Q.    The other authors were all being  11:31:56
19 paid by Pfizer and/or Pharmacia or Searle;  11:31:57
20 correct?                                     11:31:59
21     A.   Yes, that's correct.               11:31:59
22     Q.    And Dr. Wahba, who worked for     11:32:03
23 you, didn't believe in the informative      11:32:05
24 censoring bias; correct?                     11:32:09
25          MR. WEISS: I object to the form    11:32:11

Page 122

1  E. Weiner
2      of the question.                        11:32:12
3      A.   There was -- no, she didn't.       11:32:13
4  And again, it was not my role to enforce    11:32:13
5  orthodoxy but rather to actually encourage  11:32:15
6  debate, which we did a lot of in preparing  11:32:18
7  for the advisory committee.  Personally, I  11:32:21
8  found it fairly convincing.                 11:32:24
9      Q.    Dr. Zwillich didn't find it       11:32:24
10 convincing?                                  11:32:27
11     A.   Yes, I realize that as well.       11:32:27
12 But Dr. Zwillich and I didn't agree on      11:32:27
13 everything but we still respect each         11:32:29
14 other's opinions.                            11:32:32
15     Q.    The FDA ultimately didn't agree   11:32:33
16 with the informative censoring bias         11:32:33
17 either; correct?                             11:32:37
18          MR. WEISS: I object to the form    11:32:37
19 of the question.                             11:32:37
20     A.   That's true, they did not.         11:32:38
21     Q.    And ultimately, even before the   11:32:40
22 February 7 committee meeting, the day       11:32:42
23 before the companies jointly decided to     11:32:45
24 not present the informative censoring       11:32:47
25 argument to the FDA at the advisory         11:32:49

Page 123

1  E. Weiner
2  committee; correct?                         11:32:50
3          MR. WEISS: I object to the form    11:32:51
4      of the question.  Assumes facts not in  11:32:52
5      evidence.  Lack of foundation.          11:32:53
6      A.    Yes, and the reason for that I    11:32:54
7  think was not -- well, there are two        11:32:56
8  things.  First of all, from a regulatory    11:32:59
9  prospective, I think FDA will view things   11:33:01
10 differently than what is considered         11:33:05
11 scientifically valid.  In other words, for  11:33:09
12 labeling purposes there is a very high      11:33:12
13 bar.  That's why two convincing studies     11:33:14
14 are required to get a drug approved in the  11:33:17
15 first place, not just one.  So whether or   11:33:20
16 not they felt that there was any            11:33:22
17 scientific merit to the informative         11:33:24
18 censoring, if I were a regulator I'd        11:33:28
19 probably say -- if I believed in the        11:33:32
20 argument, I'd probably say, okay, that      11:33:34
21 sounds pretty convincing, go out and do     11:33:34
22 another study to show me that it's really   11:33:36
23 true.  Because the data you have, although  11:33:38
24 it's plausible, neither prove nor disprove  11:33:42
25 that that's going on and I need proof if    11:33:44

Page 124

1  E. Weiner
2  I'm going to put it in your label.          11:33:47
3          So they were going to focus on     11:33:48
4  the twelve-month data and I think in the    11:33:50
5  company we felt that whether or not we      11:33:53
6  believed in informative censoring -- I      11:33:58
7  think the majority of people felt that      11:34:00
8  argument had scientific validity but not    11:34:02
9  everyone.  If FDA was going to be           11:34:05
10 discussing one set of data and we were      11:34:09
11 discussing another set of data, then that   11:34:11
12 leaves the committee with nothing --        11:34:14
13 nothing for them to weigh one thing         11:34:16
14 against the other.  It would have made for  11:34:18
15 a very difficult and non-productive         11:34:20
16 advisory committee which was neither in     11:34:23
17 our interests nor the agency for that to    11:34:26
18 happen.  So I think as a matter of          11:34:29
19 practicality, the agency came out very      11:34:32
20 strongly that we're going to be talking     11:34:35
21 about twelve-month data, your arguments     11:34:36
22 about why six-month is important            11:34:42
23 notwithstanding, just so you know where     11:34:42
24 we're coming from.  And I think we felt at  11:34:44
25 that point it didn't -- it would not        11:34:49

Page 125

32 (Pages 122 to 125)

E. Weiner

| | |
|---|---|
| 1 | |
| 2 | benefit anybody for us to keep focusing on    11:34:50 |
| 3 | six-month data under those circumstances.    11:34:53 |
| 4 | Q.    It's accurate that the entire    11:34:56 |
| 5 | study data was less favorable to celecoxib    11:34:57 |
| 6 | than the six-month data; correct?    11:35:00 |
| 7 | MR. WEISS: I object to the form    11:35:02 |
| 8 | of the question.    11:35:03 |
| 9 | A.    Subject to just on face value    11:35:03 |
| 10 | without trying to explain it, that's    11:35:07 |
| 11 | correct.    11:35:08 |
| 12 | Q.    And there were other    11:35:08 |
| 13 | explanations that possibly explained the    11:35:10 |
| 14 | difference between six months and twelve    11:35:15 |
| 15 | months other than informative censoring;    11:35:18 |
| 16 | correct?    11:35:20 |
| 17 | A.    Right.  And again, neither could    11:35:20 |
| 18 | be proven -- none of them could be proven    11:35:23 |
| 19 | or disproven and it's a matter of opinion,    11:35:31 |
| 20 | I think, as to which people felt was the    11:35:31 |
| 21 | most plausible.    11:35:32 |
| 22 | Q.    And one explanation was just    11:35:32 |
| 23 | that celecoxib over twelve months was not    11:35:35 |
| 24 | safer than the comparator NSAIDs; correct?    11:35:37 |
| 25 | A.    Well, that explanation, a    11:35:40 |

Page 126

E. Weiner

| | |
|---|---|
| 1 | |
| 2 | corollary of that would have to be that    11:35:42 |
| 3 | the ulcer rate for the other NSAIDs    11:35:44 |
| 4 | declines over time but that for celecoxib    11:35:50 |
| 5 | it remains constant over time.  That would    11:35:53 |
| 6 | fly in the face of most of the previous    11:35:57 |
| 7 | literature which had found after an    11:36:00 |
| 8 | initial one or two months that there's    11:36:00 |
| 9 | what's called a constant hazard function.    11:36:07 |
| 10 | In other words, you risk getting an ulcer    11:36:08 |
| 11 | is the same over time that if I treat ten    11:36:11 |
| 12 | people for ten years or fifty people for    11:36:15 |
| 13 | two years, I'm going to see the same    11:36:17 |
| 14 | number of ulcers either way.  So that    11:36:19 |
| 15 | argument has its own issues.  The argument    11:36:23 |
| 16 | of informative censoring has its issues as    11:36:28 |
| 17 | well and is much -- and none of them can    11:36:32 |
| 18 | be proven or disproven.  I think    11:36:35 |
| 19 | ultimately that's why FDA said we can't    11:36:38 |
| 20 | use six months or labeling because you    11:36:42 |
| 21 | can't prove or disprove that what happened    11:36:45 |
| 22 | in the second six months is informative    11:36:47 |
| 23 | censoring.    11:36:51 |
| 24 | Q.    There was some literature or    11:36:51 |
| 25 | some trial evidence to suggest that with    11:36:54 |

Page 127

E. Weiner

| | |
|---|---|
| 1 | |
| 2 | respect to ibuprofen the ulcer rate was    11:36:56 |
| 3 | higher in the initial months than it was    11:37:00 |
| 4 | over time; is that correct?    11:37:03 |
| 5 | A.    Yeah, but I think that was    11:37:04 |
| 6 | limited to one or two months and in at    11:37:07 |
| 7 | least the majority of the literature -- at    11:37:07 |
| 8 | least for most answers.  I don't know    11:37:14 |
| 9 | specifically about ibuprofen.    11:37:14 |
| 10 | I think the other point is that    11:37:17 |
| 11 | within -- and the reason that I felt there    11:37:21 |
| 12 | was a lot of face validity to the    11:37:23 |
| 13 | informative censoring argument was that    11:37:26 |
| 14 | within the -- what's laid out in the    11:37:29 |
| 15 | briefing book, it points out that among    11:37:32 |
| 16 | those subjects in the CLASS study that had    11:37:35 |
| 17 | symptoms -- because they split it up into    11:37:39 |
| 18 | ulcer risk if you're over sixty-five,    11:37:43 |
| 19 | under sixty-five, if you took aspirin,    11:37:45 |
| 20 | didn't take aspirin.  And one of the    11:37:49 |
| 21 | splits was symptoms versus no symptoms.    11:37:49 |
| 22 | And among those with symptoms the ulcer    11:37:51 |
| 23 | risk was higher than those without    11:37:54 |
| 24 | symptoms.  Again, I don't recall the exact    11:37:56 |
| 25 | way that that was calculated but I do    11:38:00 |

Page 128

E. Weiner

| | |
|---|---|
| 1 | |
| 2 | recall reading in that briefing book.    11:38:03 |
| 3 | So again, that, to my mind, gave    11:38:05 |
| 4 | some validity to the argument.  So at the    11:38:09 |
| 5 | end of the day, I felt that was a    11:38:12 |
| 6 | plausible argument.  It's probably the    11:38:13 |
| 7 | most plausible of any to explain what's    11:38:14 |
| 8 | going on.  But certainly it was not one --    11:38:15 |
| 9 | the data just don't support either proving    11:38:18 |
| 10 | or disproving it.    11:38:21 |
| 11 | Q.    Okay.    11:38:22 |
| 12 | Now, you said there were some    11:38:23 |
| 13 | issues with the informative censoring    11:38:24 |
| 14 | hypothesis.    11:38:27 |
| 15 | What were those?    11:38:27 |
| 16 | A.    Well, again I think the main    11:38:28 |
| 17 | thing is that you can't prove that    11:38:30 |
| 18 | something else wasn't going on.  And how    11:38:32 |
| 19 | much informative censoring was taking    11:38:37 |
| 20 | place could not be quantified.  That's    11:38:40 |
| 21 | sort of a guess, an estimate.  Attempts    11:38:45 |
| 22 | were made in the briefing book to actually    11:38:48 |
| 23 | estimate what that effect would be, but    11:38:51 |
| 24 | that's very assumption-dependent.  Again,    11:38:53 |
| 25 | it all gets back to the fact that the data    11:38:55 |

Page 129

33 (Pages 126 to 129)

E. Weiner

1
2  can't tell you for sure that that's going        11:38:59
3  on and it can't tell you for sure that it        11:39:01
4  isn't.  Clearly something is going on        11:39:05
5  inasmuch as the shape of those        11:39:06
6  Kaplan-Meier curves is different between        11:39:07
7  the NSAIDs and Celebrex, so something that        11:39:09
8  could be random chance, that could be        11:39:12
9  informative censoring, that could be        11:39:14
10  something strange about COX-2        11:39:18
11  pharmacology, and there are probably five        11:39:21
12  or six other things that we could sit        11:39:23
13  around and think about.  But of the ideas        11:39:25
14  that were kicked around, I still felt the        11:39:25
15  most likely explanation for that was        11:39:30
16  informative censoring.        11:39:32
17     Q.    But informative censoring wasn't        11:39:32
18  put to the test in the JAMA article,        11:39:35
19  wasn't put to the peer review test;        11:39:37
20  correct?        11:39:40
21        MR. WEISS: I object to the form        11:39:40
22     of the question.        11:39:41
23     A.    Because it's something that        11:39:41
24  applies primarily after the first six        11:39:43
25  months of treatment and the article        11:39:46

Page 130

E. Weiner

1
2  focuses on the first six, there would have        11:39:48
3  been no opportunity for it to have come        11:39:49
4  up.        11:39:51
5     Q.    Well, wouldn't the opportunity        11:39:52
6  have been we're given six months and        11:39:54
7  here's the reasons why because there        11:39:56
8  actually is more data, there's over two        11:39:58
9  thousand patients who were treated for        11:39:58
10  longer than six months but here's why        11:40:02
11  we're using the six-month cutoff?        11:40:03
12     A.    And then it would have come up        11:40:05
13  in debate just as it did in the advisory        11:40:07
14  committee.        11:40:10
15     Q.    But it come out months earlier;        11:40:10
16  correct?        11:40:14
17        MR. WEISS: I object to the form        11:40:14
18     of the question.        11:40:15
19     A.    If it had happened, it would        11:40:15
20  have come out a couple of months sooner.        11:40:18
21     Q.    And physiologic adaptation is        11:40:20
22  another explanation for why Celebrex was        11:40:22
23  less beneficial at twelve months than it        11:40:24
24  was at six months; correct?        11:40:26
25     A.    Right, you'd have to hypothesize        11:40:28

Page 131

E. Weiner

1
2  that there's adaptation to NSAIDs but not        11:40:31
3  adaptation to Celebrex.        11:40:31
4     Q.    And you were talking about the        11:40:33
5  various comparisons that were made aspirin        11:40:34
6  sometimes without just a little earlier.        11:40:38
7        With respect to the aspirin        11:40:40
8  comparisons, those were not prespecified        11:40:44
9  in the protocol; correct?        11:40:48
10     A.    No, but there should have been a        11:40:49
11  statistical analysis plan which I do not        11:40:52
12  recall seeing or not seeing, for that        11:40:57
13  matter, but there were I'm sure somewhere        11:40:59
14  specified many other sub cuts of the data        11:41:02
15  because it's standard practice in any        11:41:04
16  large clinical trial to divide by all        11:41:06
17  kinds of things: Race, age, oftentimes        11:41:11
18  body mass index, certain aspects of        11:41:20
19  medical history, abuse of key medications.        11:41:20
20  So A, it probably is specified somewhere        11:41:23
21  but even if not, it's standard practice.        11:41:27
22     Q.    Did you say earlier if you did        11:41:29
23  twenty different analyses just at random,        11:41:32
24  you'd expect one of them to be        11:41:35
25  statistically significant?        11:41:38

Page 132

E. Weiner

1
2     A.    That's with what the P value        11:41:39
3  of .05 means.        11:41:42
4     Q.    So basically if, after        11:41:43
5  unblinding, you had thirty-four different        11:41:47
6  analyses of the CLASS data were done,        11:41:47
7  would you expect at least one and maybe        11:41:48
8  two of those to be statistically        11:41:50
9  significant at random?        11:41:53
10        MR. WEISS: I object to the form        11:41:54
11     of the question.        11:41:54
12     A.    No, because the twenty would        11:41:55
13  have to be independent of one another for        11:41:57
14  that to apply.  And these things are all        11:41:59
15  interrelated.  So complicated ulcers are a        11:42:02
16  subset of uncomplicated ulcers.  There        11:42:06
17  seems to be a relationship, or at least        11:42:09
18  evidence presented of that to symptoms.        11:42:11
19  If you're looking at totally different        11:42:13
20  things, blood loss, for instance, was one        11:42:16
21  of the things that came up which also is        11:42:19
22  related to GI bleeding, GI irritation, so        11:42:21
23  they're all intertwined.        11:42:25
24        If you're looking a twenty        11:42:25
25  different labs, say I'm looking at        11:42:27

Page 133

34 (Pages 130 to 133)

E. Weiner

1
2    hemoglobin and sodium and creatinine and,        11:42:30
3    you know, they're all independent things.        11:42:34
4    A change in one is not -- doesn't impact        11:42:38
5    the other, then that rule would apply.        11:42:42
6        Q.    What's the role of multiplicity?        11:42:45
7        A.    Well, that's basically what        11:42:48
8    you're trying to correct for is that, if        11:42:50
9    you do enough comparisons, you will, by        11:42:52
10   random chance, find one that is        11:42:58
11   statistically significant.  But again,        11:42:59
12   they have to be independent things that        11:43:02
13   are not affected by one another for that        11:43:03
14   to work.        11:43:03
15       Q.    And is that, in fact, why        11:43:04
16   scientists set out a prespecified protocol        11:43:07
17   to help avoid falling afoul of the rule of        11:43:08
18   multiplicity?        11:43:13
19       MR. WEISS: I object to the form        11:43:14
20   of the question.        11:43:15
21       A.    For normal statistical inference        11:43:15
22   testing, yes.        11:43:19
23       Q.    And here the primary endpoint        11:43:20
24   was the complicated ulcers; correct?        11:43:22
25       A.    Right.  And so -- yeah, we        11:43:23

Page 134

E. Weiner

1
2    acknowledge that the primary endpoint, as        11:43:26
3    prespecified, was not net.  But that        11:43:31
4    doesn't detract from either the validity        11:43:34
5    or affect the necessity of doing all these        11:43:34
6    subanalyses and it's standard practice.        11:43:37
7    It would actually be remiss with a large        11:43:40
8    clinical trial database of this size not        11:43:45
9    to do that.  It's a disservice to the        11:43:48
10   people that participated in the study.        11:43:50
11       Q.    But if you're going to publish        11:43:52
12   data on that, don't you have to correct        11:43:56
13   the P values or adjust the P values as a        11:43:57
14   result of the fact that the study wasn't        11:43:57
15   powered for those endpoints?        11:44:00
16       A.    I suspect that -- again, I did        11:44:02
17   not do the statistical -- you'd need to        11:44:04
18   talk to the statisticians.  But I'm pretty        11:44:07
19   sure that those corrections or adjustments        11:44:10
20   were put into place.        11:44:13
21       Q.    So when the non-aspirin subgroup        11:44:14
22   and the combined subgroup are referenced        11:44:18
23   in the JAMA article, they're still using        11:44:20
24   .05, correct, as the statistical        11:44:25
25   significant --        11:44:26

Page 135

E. Weiner

1
2        A.    Right, but you don't know how        11:44:26
3    the statistical test -- I mean, there are        11:44:29
4    many different statistical tests that you        11:44:29
5    could use to get that .05 and there are        11:44:31
6    actual analysis, co-variance models and        11:44:35
7    other things that take into account        11:44:39
8    multiplicity, they take into account        11:44:42
9    differences between the populations, and        11:44:45
10   many other factors.  And again, all of        11:44:48
11   those statistical tests as part of the FDA        11:44:51
12   review they have a statistician that        11:44:55
13   carefully reviews all of that stuff to be        11:44:58
14   sure they would agree that that's the        11:45:01
15   appropriate test and the appropriate        11:45:03
16   adjustment for all of those things.        11:45:04
17       Q.    If those adjustments were not        11:45:06
18   made as part of the data that is reported        11:45:08
19   in Wolf Exhibit 3, figure two, would that        11:45:10
20   data be misleading?        11:45:13
21       MR. WEISS: I object to the form        11:45:15
22   of the question.        11:45:15
23       A.    If the adjustments were not        11:45:16
24   made?  I think -- you know, I wouldn't        11:45:18
25   know because that also is a matter of --        11:45:24

Page 136

E. Weiner

1
2    I'm not a statistician so I can't tell you        11:45:27
3    that.  I would think that if you -- some        11:45:29
4    people would accuse you if you make        11:45:33
5    adjustments that you're doctoring the        11:45:35
6    data, although that again is carefully        11:45:38
7    reviewed by FDA and not all statisticians        11:45:42
8    agree on things.  If you don't make        11:45:44
9    adjustments, others would feel that there        11:45:46
10   might be confounding factors you're not        11:45:50
11   taking into account, so there's no hard        11:45:54
12   and fast rule.  But in general adjustments        11:45:56
13   are made, the statistical tests are fairly        11:45:58
14   complex, and it's a source of fairly        11:46:01
15   intense discussion between the sponsor and        11:46:03
16   regulatory agencies about the most        11:46:06
17   appropriate tests and how they're applied.        11:46:08
18       Q.    When you say it was reviewed by        11:46:09
19   the FDA, Wolf Exhibit 3, the JAMA article,        11:46:11
20   that wasn't reviewed by the FDA before it        11:46:15
21   was submitted for publication?        11:46:18
22       A.    No, but presumably the same        11:46:18
23   statistical analyses were used there as        11:46:19
24   were used in what was submitted to FDA.        11:46:21
25       Q.    Looking back to Plaintiff's        11:46:25

Page 137

35 (Pages 134 to 137)

E. Weiner

1
2   Exhibit 131, the e-mail chain below the        11:46:28
3   one we were just discussing that's from        11:46:32
4   Mona Wahba to several individuals and          11:46:41
5   you're cc'd on it on January 10, 2001.         11:46:41
6        Do you see that?                          11:46:42
7   A.   Yes.                                      11:46:43
8        Q.   And you would have received that     11:46:43
9   in the ordinary scope of your employment?      11:46:45
10       MR. WEISS: I object to the form           11:46:46
11  of the question.                               11:46:47
12  A.   Yes.                                      11:46:48
13       Q.   And Dr. Wahba writes about study     11:46:48
14  design for the CLASS trial and the first       11:46:53
15  thing she writes, "where is the entire 12M     11:46:55
16  analysis for the primary secondary P           11:46:58
17  values.  Did the study meet its primary        11:47:01
18  endpoint."                                     11:47:03
19       Do you see that?                          11:47:04
20  A.   Yes.                                      11:47:05
21       Q.   Do you know what she's referring     11:47:05
22  to?                                            11:47:07
23  A.   She's probably referring to that         11:47:07
24  draft presentation that was made at the        11:47:14
25  mock advisory committee.  Which again, the     11:47:16

Page 138

E. Weiner

1
2   role of the people attending it is to          11:47:20
3   savage the presenter even if you agree         11:47:24
4   with them and to poke holes in all of          11:47:28
5   their arguments, make sure that those          11:47:30
6   arguments get shored up, and also make         11:47:33
7   sure they can answer all types of              11:47:35
8   questions the advisory panel will ask.         11:47:39
9   Because the advisory panel's job, the real     11:47:41
10  one, is to be sceptical as well.               11:47:45
11       Q.   And the second question is, "was     11:47:47
12  the 6M analysis planned in the protocol;"      11:47:48
13  correct?                                       11:47:48
14  A.   Yes.                                      11:47:48
15       Q.   And the answer to that is that       11:47:48
16  it was not planned in the protocol;            11:47:51
17  correct?                                       11:47:53
18  A.   That's correct.                          11:47:53
19       Q.   Point five is, "how can you          11:47:54
20  label CLASS as a long-term study if you        11:47:59
21  are showing only 6M results."                  11:48:01
22       Do you see that?                          11:48:05
23  A.   Yes.                                      11:48:06
24       Q.   How can you label CLASS as a         11:48:07
25  long-term study if you're only reporting       11:48:10

Page 139

E. Weiner

1
2   six months?                                    11:48:13
3   A.   There's no regulatory definition         11:48:13
4   of what long and short-term is.  And           11:48:16
5   again, I think this question has to be         11:48:21
6   taken in the context of rehearsal for an       11:48:21
7   advisory committee and that is one of the      11:48:23
8   things that she is saying you need             11:48:25
9   strength in your arguments to justify.         11:48:29
10       Q.   And do you recall there being        11:48:31
11  some discussion or concern that if you         11:48:32
12  only presented six months of data either       11:48:35
13  in JAMA or to the FDA that you would be at      11:48:37
14  risk of no longer having a long-term           11:48:40
15  trial?                                         11:48:43
16  A.   Well, six months is not as long          11:48:43
17  as a year; is it?  So it certainly             11:48:45
18  increases that risk.                           11:48:49
19       Q.   Who other than Dr. Wahba             11:48:50
20  expressed that position?                       11:48:52
21  A.   I don't know.  I don't know who          11:48:53
22  said what back then.                           11:48:57
23       (Whereupon, an e-mail dated               11:48:57
24  January 16, 2001 was marked                    11:48:57
25  Plaintiff's Exhibit 168                        11:48:57

Page 140

E. Weiner

1
2   for identification.)                           11:49:06
3        Q.   I want to show you what I'm          11:49:06
4   marking as Plaintiff's Exhibit 168.            11:49:08
5        Could you please take a look at           11:49:30
6   that document.                                 11:49:32
7        MR. SAHAM: And for the record,            11:49:32
8   Plaintiff's Exhibit 168 is a                   11:49:33
9   multiple-page document.  The first             11:49:39
10  page is an e-mail and it attaches what         11:49:40
11  appear to be January 9 advisory               11:49:45
12  committee rehearsal questions and             11:49:54
13  comments.  The entire document bears          11:49:56
14  Bates numbers DEFS 00656588                    11:50:01
15  through 592 and it's from Olivia              11:50:07
16  Coughlin to Ethan Weiner and others.          11:50:13
17       Q.   Do you know who Olivia Coughlin      11:50:16
18  is?                                            11:50:19
19  A.   She was a project manager at             11:50:19
20  Searle/Pharmacia.                              11:50:22
21       Q.   For the Celebrex issue?              11:50:23
22  A.   Yes.                                      11:50:24
23       Q.   And you would have received this     11:50:25
24  document from her on or about January 16,      11:50:27
25  2001?                                          11:50:29

Page 141

36 (Pages 138 to 141)

E. Weiner

1
2     A.   Yes.                          11:50:29
3     Q.   And you would have received it        11:50:30
4  in the ordinary scope of your employment       11:50:31
5  at Pfizer?                          11:50:33
6        MR. WEISS: I object to the form      11:50:33
7  of the question.                     11:50:35
8     A.   Yes.                          11:50:35
9     Q.   And she writes, "Fior tomorrow's     11:50:36
10 rehearsal."                         11:50:40
11    A.   That's probably a typo.            11:50:42
12    Q.   Yes, it's probably "for            11:50:45
13 tomorrow's rehearsal," I think we could     11:50:45
14 agree, "you had agreed to act in the role    11:50:45
15 of advisory committee members in addition    11:50:47
16 to some other consultants."              11:50:49
17       Did you participate, as you         11:50:51
18 testified earlier, in these rehearsals for   11:50:55
19 the advisory committee meeting?           11:50:58
20    A.   Yes.                          11:51:00
21    Q.   And you would have received this     11:51:01
22 document as a part of that process?         11:51:03
23    A.   Yes. And again, our role was to      11:51:05
24 tear apart everything that the presenter    11:51:08
25 was doing, poke holes in it whether we      11:51:08

Page 142

E. Weiner

1
2  believed it or not, to be as adversarial     11:51:12
3  as we possibly could be and unreasonably     11:51:12
4  so in order that they are well prepared      11:51:16
5  and can answer all kinds of bizarre         11:51:19
6  questions from left field.                11:51:23
7     Q.   And the second page of this         11:51:24
8  rehearsal questions and comments, it's       11:51:25
9  talking about diclofenac; is that correct?   11:51:26
10    A.   Yes.                          11:51:31
11    Q.   And then the fourth question         11:51:32
12 down it says, "diclofenac is as safe as      11:51:34
13 celecoxib in regards to ulcer complication   11:51:38
14 or is this a failed study."                11:51:42
15       That's what it says; correct?        11:51:43
16    A.   Yes.                          11:51:45
17    Q.   And if you just go by the entire     11:51:45
18 study results of CLASS --                  11:51:48
19       MR. SAHAM: Strike that.            11:51:49
20    Q.   If you look at the results of        11:51:50
21 CLASS, diclofenac and celecoxib are no       11:51:51
22 different with respect to any of the eight   11:51:55
23 measures addressed in Exhibit 115, the      11:51:57
24 final report; correct?                    11:52:01
25    A.   Yes.                          11:52:02

Page 143

E. Weiner

1
2     Q.   So that statement is accurate if     11:52:02
3  you only go with the CLASS data, correct,    11:52:05
4  that diclofenac is as safe as celecoxib?     11:52:08
5     A.   It's not so much a statement as      11:52:13
6  to challenging the presenter to say why      11:52:15
7  isn't this the case.                      11:52:17
8     Q.   But CLASS showed that the two        11:52:17
9  were comparable in any of the GI measures    11:52:19
10 looked at; correct?                       11:52:23
11    A.   Yes.                          11:52:24
12    Q.   So either they're as safe or        11:52:24
13 it's a failed study, according to this      11:52:27
14 question; correct?                       11:52:29
15    A.   Well, then -- the point is that     11:52:29
16 the presenter needs to try to address       11:52:33
17 those issues and I think that the way that   11:52:35
18 they would do that or did do that was       11:52:38
19 again to look at confounders, look at       11:52:50
20 informative censoring, and assess the role   11:52:50
21 of all that.                            11:52:50
22    Q.   And a potential question of that     11:52:50
23 is how do you know that the people who      11:52:52
24 dropped out would have gotten ulcers;       11:52:54
25 correct?                              11:52:56

Page 144

E. Weiner

1
2     A.   Yes, that's correct.             11:52:56
3     Q.   And there was no proof or           11:52:58
4  evidence that could be used to make that    11:52:59
5  determination at that time?               11:53:02
6     A.   Yes, we talked about that          11:53:03
7  previously.                            11:53:04
8     Q.   So there was no scientific          11:53:04
9  evidence that could establish that         11:53:07
10 informative censoring was at work here;     11:53:08
11 correct?                              11:53:09
12       MR. WEISS: I object to the form      11:53:09
13 of the question.                        11:53:10
14    A.   Right, and there's no evidence      11:53:10
15 that could rule that out.                 11:53:13
16       Again, as I said, many of us        11:53:14
17 believed that to be the most plausible     11:53:15
18 explanation.                           11:53:18
19    Q.   And it was also an explanation      11:53:19
20 that would be favorable to Celebrex out in   11:53:21
21 the marketplace; correct?                 11:53:25
22    A.   Yes. Again, I think what we        11:53:25
23 were trying to do, at least in the R&D      11:53:31
24 part of things, was to try and understand   11:53:33
25 what was going on and figure out what we    11:53:36

Page 145

E. Weiner

1    -- again, we talked about what the various       11:53:39
2    explanations were and to many of us we        11:53:42
3    felt that this still best explains the        11:53:47
4    data.  It could not be proven but -- and      11:53:49
5    that was one of the flaws of the database,    11:53:52
6    I suppose.  But we still felt it was the      11:53:54
7    most plausible explanation.                   11:53:58
8        Q.    But Pfizer's in the business of      11:54:00
9    selling drugs; correct?                       11:54:03
10       A.    Yes.                                 11:54:04
11       Q.    The more drugs they sell, the        11:54:04
12   more money Pfizer makes; correct?             11:54:06
13       A.    Yes.                                 11:54:08
14       Q.    And the more Celebrex that would     11:54:08
15   be sold, the better it would be for           11:54:08
16   Pfizer; correct?                              11:54:10
17       A.    Yes.                                 11:54:10
18       Q.    So it would be better for Pfizer     11:54:10
19   if the six-month data that was more           11:54:12
20   favorable to Celebrex could be used as        11:54:14
21   opposed to the entire study data; correct?    11:54:18
22       A.    Yes, but I think you stressed        11:54:22
23   could be used, so is there validity for       11:54:25
24   using it, and I think we felt that there      11:54:26

Page 146

E. Weiner

1    was based on the good arguments as to why     11:54:28
2    those data were useful and informative        11:54:30
3    data.                                         11:54:33
4        Q.    Now looking down to study design     11:54:36
5    which is just on the first page of the        11:54:41
6    January 9 advisory committee rehearsal        11:54:44
7    questions and comments, under study design    11:54:48
8    it says, "two separate studies analyzed       11:54:51
9    together: Make that clear."                   11:54:54
10       The journal article did not make          11:54:56
11   that clear; did it?                           11:55:00
12       A.    No.  But again, I think that        11:55:01
13   what the aim -- originally it was going to    11:55:05
14   be one study.  It was split into two          11:55:08
15   studies largely if not exclusively for        11:55:11
16   reasons of practicality; that one trying      11:55:15
17   to double-blind and double-mask a study       11:55:18
18   with a two-time-a-day drug and a              11:55:22
19   three-time-a-day drug would require five      11:55:24
20   sets of pills for everybody in the study      11:55:25
21   to take unless you split it up.               11:55:27
22       Q.    Now, who attended this meeting,     11:55:30
23   to the extent you can recall?                 11:55:34
24       A.    Well, types of people that would    11:55:35

Page 147

E. Weiner

1    attend -- well, clearly the people in the     11:55:38
2    to of this e-mail are the people from         11:55:39
3    Pfizer.                                        11:55:41
4        Q.    Would Dr. Geis have been at this     11:55:41
5    meeting?                                       11:55:44
6        A.    Yes, he or -- he might have even     11:55:44
7    been presenting at it, although I think it    11:55:53
8    was Jim Lefkowith that was presenting.  He    11:55:56
9    certainly would have been at it.  There       11:56:00
10   would have been maybe Phil Needleman.          11:56:02
11   Again, I'm speculating.  But similar           11:56:05
12   counterparts -- and actually, we know that     11:56:07
13   Peter Isakson from Searle went.  And           11:56:09
14   usually outside consultants went as well.      11:56:12
15       Q.    Who at Pfizer more senior to you     11:56:14
16   would have gone to this?                       11:56:18
17       MR. WEISS: I object to the form            11:56:20
18   of the question.                               11:56:21
19       A.    I believe at one of them Steve       11:56:21
20   Ryder may have gone, but I think he was        11:56:24
21   probably -- it's even possible Craig           11:56:28
22   Saxton.  I sort of remember Steve being at     11:56:32
23   one.  Actually, I sort of remember Craig       11:56:35
24   being at one, also.                            11:56:36

Page 148

E. Weiner

1        Q.    And again, Craig Saxton, what       11:56:36
2    was his job?                                   11:56:40
3        A.    He was Steve Ryder's boss.           11:56:40
4        Q.    And he was like the head of R&D?     11:56:41
5        A.    Head of development.                 11:56:43
6        Q.    And he was an executive vice         11:56:44
7    president?                                     11:56:46
8        A.    Yes.  And I only remember that       11:56:46
9    because we got stuck at O'Hare together.       11:56:46
10       Q.    Down at the second page where we     11:56:52
11   were looking at before, if you go under        11:56:54
12   extrapolation, the last comment or             11:56:56
13   question says, "do symptoms predict            11:56:59
14   ulcers.  The presentation is conflicted."      11:57:02
15       Do you recall there being                  11:57:05
16   discussion that the presentation may have      11:57:07
17   been at odds on that issue?                    11:57:09
18       A.    Yeah, I don't recall discussion      11:57:10
19   around that.                                   11:57:12
20       Q.    Did you ever -- prior to the         11:57:12
21   submission to the FDA on February 7, 2001,     11:57:16
22   did anyone present any sort of evidence --     11:57:20
23       MR. SAHAM: Strike that question.           11:57:24
24       (Whereupon, an e-mail dated                11:57:35

Page 149

38 (Pages 146 to 149)

E. Weiner

1
2        January 20, 2001 was marked        11:57:35
3    Plaintiff's Exhibit 169.        11:57:35
4    for identification.)        11:57:36
5        Q.    I want to show you what I'm        11:57:36
6    marking as Plaintiff's Exhibit 169.        11:57:38
7            Could you please take a look at        11:58:07
8    that document.        11:58:09
9        MR. SAHAM: And for the record,        11:58:11
10    Plaintiff's Exhibit 169 is an e-mail        11:58:11
11    with an attachment dated January 20,        11:58:14
12    2001.  It bears Bates numbers        11:58:17
13    DEFS 00490867 through 877.  The e-mail        11:58:22
14    is from Ethan Weiner to Steven W.        11:58:29
15    Ryder and Peter Corr with cc's to        11:58:32
16    Leland Loose and Mona Wahba.        11:58:36
17        Q.    Is this an e-mail you would have        11:58:39
18    sent in the ordinary scope of your        11:58:41
19    employment on or about January 20, 2001?        11:58:42
20        MR. WEISS: I object to the form        11:58:46
21    of the question.        11:58:46
22        A.    Yes.        11:58:47
23        Q.    And Steven Ryder was your        11:58:47
24    supervisor?        11:58:49
25        A.    That's correct.        11:58:50

Page 150

E. Weiner

1
2        Q.    And he was a vice president at        11:58:50
3    Pfizer?        11:58:52
4        A.    Yes.        11:58:53
5        Q.    And you may have been a vice        11:59:00
6    president at this point in time; correct?        11:59:00
7        A.    Right.        11:59:00
8        Q.    So was he considered a senior        11:59:00
9    vice president?        11:59:02
10        A.    Probably.  He's a bigger vice        11:59:02
11    president than me.        11:59:04
12        Q.    But you were both vice        11:59:05
13    president?        11:59:07
14        A.    Or I was an executive director.        11:59:07
15    I could go back at my CV and look, but --        11:59:10
16        Q.    Did you bring your CV here        11:59:12
17    today?        11:59:15
18        A.    No.  I have it on my laptop but        11:59:15
19    it would take most of our lunch period to        11:59:19
20    boot it up.        11:59:24
21        Q.    Because I don't think we got        11:59:24
22    your CV, but I could be wrong.        11:59:26
23            Okay.        11:59:29
24            So turning our attention back to        11:59:29
25    what we've marked as Exhibit 169, do you        11:59:31

Page 151

E. Weiner

1
2    recognize this document?        11:59:33
3        A.    Yes.        11:59:34
4        Q.    And what is it?        11:59:35
5        A.    So the top page at least is an        11:59:36
6    e-mail that I sent summarizing the next        11:59:42
7    seven or eight or whatever pages after        11:59:46
8    that.        11:59:48
9        Q.    And what are the pages attached        11:59:51
10    to the e-mail?        11:59:52
11        A.    This is probably the sort of FDA        11:59:53
12    summary -- their review of CLASS        11:59:59
13    submission in advance of the advisory        12:00:02
14    committee.        12:00:06
15        Q.    So the FDA would have sent this        12:00:06
16    discussion document to representatives of        12:00:08
17    Pharmacia and Pfizer?        12:00:10
18        A.    And then they would have posted        12:00:11
19    it on their Web site as well.  But they        12:00:14
20    usually send -- the usual course of these        12:00:17
21    things is that the sponsor sends        12:00:19
22    everything about a month in advance, the        12:00:21
23    FDA sends a sponsor their materials a few        12:00:23
24    days in advance, and then about one day in        12:00:25
25    advance of the meeting they all go up on        12:00:28

Page 152

E. Weiner

1
2    the Internet.        12:00:31
3        Q.    So it doesn't get put in the        12:00:32
4    Internet until right immediately before        12:00:32
5    the meeting?        12:00:34
6        A.    A day or two before, pretty        12:00:34
7    close.  That's just because people are        12:00:36
8    writing until the last minute.        12:00:39
9        Q.    So on January 20, you would have        12:00:40
10    had this as a Pfizer employee but the        12:00:43
11    world wouldn't have; correct?        12:00:45
12        A.    Probably for another five or six        12:00:46
13    days.        12:00:49
14        Q.    And do you know whether or not        12:00:49
15    anything was disclosed prior to February 6        12:00:51
16    or February 7, 2001?        12:00:54
17        MR. WEISS: I object to the form        12:00:57
18    of the question.        12:00:58
19        A.    By Pfizer, Pharmacia, or the        12:00:58
20    FDA?        12:01:01
21        Q.    The FDA.        12:01:01
22        A.    I don't know their exact        12:01:02
23    disclosure dates.        12:01:04
24        Q.    You're just speculating on that?        12:01:05
25        A.    Yeah.        12:01:07

Page 153

39 (Pages 150 to 153)

E. Weiner

1
2     Q.    You write here to Dr. Ryder and        12:01:10
3     others, "FDA sent two documents yesterday,        12:01:15
4     fairly large for advisory briefing        12:01:15
5     documents, summarizing their review of        12:01:17
6     CLASS." And then you write, "I'm about        12:01:19
7     halfway done plodding through them but        12:01:23
8     wanted to send on as soon as possible,"        12:01:26
9     and then you attempt to summarize what the        12:01:26
10    FDA said; is that correct?        12:01:29
11        A.    Yes.        12:01:31
12        Q.    And the first thing or not the        12:01:31
13    first thing but in that first paragraph        12:01:33
14    you write, "all drugs look similar to me        12:01:36
15    as well."        12:01:40
16        Do you see that? It's right        12:01:41
17    before the block blacking out or        12:01:44
18    redaction. The second sentence after        12:01:47
19    that.        12:01:50
20        A.    Oh, this was -- yeah, this was        12:01:50
21    their post-marketing surveillance where        12:01:54
22    you can't tell anything about anything        12:01:57
23    because there are no denominators. So you        12:01:59
24    don't know how much a drug is used        12:02:03
25    relative to how many events there are.        12:02:05

Page 154

E. Weiner

1
2     And I don't even know why they bother        12:02:07
3     sometimes, at least with that report.        12:02:11
4     These days they have their ARIS database,        12:02:15
5     which I think does actually attempt to        12:02:15
6     find what the denominators are, in other        12:02:21
7     words how many people used the drug. But        12:02:22
8     as I recall of this report, it's just        12:02:24
9     looking at, you know, we saw this many        12:02:26
10    ulcers on Vioxx out in the marketplace        12:02:30
11    were reported to us, this many on        12:02:33
12    Celebrex, this many on ketorolac, this        12:02:34
13    many on diclofenac, and so on without        12:02:39
14    knowing how many prescriptions were        12:02:41
15    written, how many people took it for how        12:02:43
16    long. What do you do with that?        12:02:45
17        Q.    But also just looking at the        12:02:47
18    primary endpoint for CLASS, all the drugs        12:02:49
19    looked similar; correct?        12:02:52
20        A.    I think I'm talking there about        12:02:53
21    the post-marketing surveillance review.        12:02:58
22        Q.    But I'm just talking about if        12:03:00
23    you just look at the primary endpoint for        12:03:00
24    CLASS, all the drugs look similar because        12:03:01
25    there was no statistically significant        12:03:03

Page 155

E. Weiner

1
2     difference --        12:03:04
3         A.    That's not what I was saying        12:03:04
4     there and I would not agree with that. I        12:03:07
5     certainly think there's a lot of        12:03:09
6     differences between celecoxib and        12:03:11
7     ibuprofen. But what my e-mail is talking        12:03:15
8     about is that part of it, the first        12:03:15
9     document is the epidemiology piece. The        12:03:18
10    second piece is the next paragraph.        12:03:22
11        Q.    So when you write, "overall the        12:03:24
12    number of each type of event was        12:03:27
13    comparable for both coxibs and probably        12:03:28
14    represents a roughly similar number of        12:03:31
15    patient years use," paren, "probably        12:03:33
16    somewhat greater for celecoxib," what are        12:03:35
17    you referring to?        12:03:38
18        A.    That's the number of GI events        12:03:39
19    reported to FDA from the marketplace on        12:03:42
20    rofecoxib and celecoxib.        12:03:48
21        Q.    And rofecoxib --        12:03:50
22        A.    Not a study but Vioxx.        12:03:50
23        Q.    Rofecoxib is Vioxx?        12:03:51
24        A.    Yes.        12:03:51
25        Q.    And so this is one of the        12:03:51

Page 156

E. Weiner

1
2     examples that you referenced earlier that        12:03:55
3     there would be comparisons between        12:03:57
4     Celebrex and Vioxx?        12:04:00
5         A.    There's several levels of        12:04:01
6     evidence. The highest level of evidence        12:04:06
7     is a clinical trial where there would have        12:04:08
8     been a direct comparison, which was not,        12:04:10
9     in fact, done. They did VIGOR, we did        12:04:11
10    CLASS. They are different studies in many        12:04:14
11    ways.        12:04:14
12        The next level of evidence are        12:04:15
13    epidemiologic studies where -- and there        12:04:19
14    are various designs of that but generally        12:04:21
15    you know how many events there were and        12:04:23
16    how many people took the drug. It's a        12:04:26
17    real life setting. It's not as good        12:04:29
18    clinical trial for a whole host of        12:04:37
19    reasons, it's retrospective, it's not        12:04:37
20    prospective, it's not blinded, you're        12:04:37
21    relying on people's memory rather than        12:04:37
22    investigators' notes and filling out a        12:04:39
23    case report form, many other things.        12:04:41
24        And a level of evidence that is        12:04:45
25    beneath that even is just post-marketing        12:04:47

Page 157

40 (Pages 154 to 157)

E. Weiner

1
2   surveillance where you don't even know          12:04:47
3   what the denominators are.  All you know         12:04:47
4   is how many events were reported to FDA or       12:05:00
5   European agencies and you don't even know        12:05:00
6   how many people took the drug that could         12:05:03
7   have reported something.                         12:05:05
8       Q.   All I'm getting at -- this is an        12:05:06
9   example of one of the instances where you        12:05:06
10  guys internally at Pfizer were discussing        12:05:09
11  Celebrex in comparison to Vioxx; correct?        12:05:10
12      A.   Right.                                  12:05:13
13      Q.   And that was common?                    12:05:13
14      A.   Yes.                                     12:05:14
15      Q.   And then moving down to the             12:05:19
16  second paragraph it states, "the second          12:05:20
17  document is a summary of the CLASS               12:05:22
18  submission.  The seven-page summary of           12:05:25
19  their review is in the attached document,        12:05:27
20  key issues."                                     12:05:30
21       So now you're describing the               12:05:31
22  attached document; correct?                      12:05:33
23      A.   Right.                                  12:05:35
24       So this is summarizing what FDA            12:05:35
25  is saying.                                       12:05:35

Page 158

E. Weiner

1
2       Q.   And the first they say is, "did        12:05:35
3   not achieve primary endpoint;" correct?         12:05:36
4       A.   Yes.                                    12:05:39
5       Q.   And the second thing they say          12:05:39
6   is, "no statistical superiority to              12:05:41
7   diclofenac at any endpoint;" correct?           12:05:43
8       A.   Yes.                                    12:05:45
9       Q.   And that's consistent with the         12:05:46
10  results we reviewed in the final report;        12:05:49
11  correct?                                        12:05:54
12      A.   Yes.                                    12:05:54
13      Q.   Then it states that the FDA            12:05:54
14  questioned sponsor's informative censoring      12:05:59
15  explanation; correct?                           12:06:05
16      A.   Right.  And again, we discuss          12:06:05
17  the reasons for that.  From a regulatory        12:06:07
18  viewpoint, if you can't prove something,        12:06:08
19  it didn't happen.                               12:06:10
20      Q.   And ultimately the FDA rejects         12:06:11
21  the explanation; correct?                       12:06:14
22       MR. WEISS: I object to the form            12:06:15
23  of the question.                                12:06:16
24      A.   Yes, for regulatory purposes,          12:06:16
25  they couldn't use it.                           12:06:19

Page 159

E. Weiner

1
2       Q.   And dropping down to the last          12:06:20
3   bullet point above the blacked-out area,        12:06:23
4   it says, "they did not raise big concerns       12:06:30
5   over six months versus twelve months            12:06:33
6   analysis," paren, "at least in the              12:06:36
7   conclusions.  I need to go through the          12:06:37
8   rest of the document as I would afraid          12:06:39
9   they would."                                    12:06:42
10       When you actually go through the          12:06:43
11  document, they do raise issues of the six       12:06:46
12  months versus twelve months; correct?          12:06:46
13      A.   Yes, they raised some.  But I          12:06:47
14  think they ultimately ended up agreeing         12:06:50
15  with us that there was some -- there            12:06:52
16  weren't huge differences between six and        12:06:56
17  twelve months in many of the things, that       12:06:58
18  they're sort of giving the same message.        12:07:01
19      Q.   There was certainly a difference       12:07:03
20  in the non-aspirin users as published in        12:07:05
21  the JAMA article at that figure; correct?       12:07:08
22      A.   Yeah, we've been through that.         12:07:09
23      Q.   And do you know why stuff is           12:07:11
24  blocked out here?  Is that talking about        12:07:13
25  myo and cardio infractions (sic) or             12:07:17

Page 160

E. Weiner

1
2   something?                                      12:07:22
3       A.   I didn't redact these so I don't       12:07:22
4   know what they were looking for.                12:07:23
5       Q.   Do you recall --                        12:07:23
6       A.   All I know is at the time they         12:07:24
7   take my laptop, they download all the           12:07:29
8   e-mails, and they, you know, I get my           12:07:32
9   laptop back the next day.  I don't know         12:07:36
10  what their criteria for redacting things        12:07:38
11  are.                                            12:07:41
12      Q.   And you recall discussing               12:07:42
13  myocardial infarctions in this e-mail?          12:07:45
14      A.   It would be speculative because,       12:07:49
15  I mean, it's an e-mail I wrote ten and a        12:07:51
16  half years ago.                                 12:07:54
17       MR. SAHAM: We all need --                  12:07:54
18      Q.   Finish your answer.                    12:07:59
19      A.   No, I'm done.                          12:08:01
20       MR. SAHAM: They're informing me            12:08:02
21  the tape needs to be changed so we are          12:08:04
22  going off the record.                           12:08:06
23       THE VIDEOGRAPHER: Stand by.                12:08:07
24       We are going off the record.              12:08:08
25  The time is 12:06 p.m.                          12:08:10

Page 161

41 (Pages 158 to 161)

E. Weiner

1
2     This is the end of tape number        12:08:12
3   two.                                    12:08:14
4       (Lunch recess taken at 12:06        12:08:14
5   p.m.)                                   12:08:14
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 162

E. Weiner

1
2     A F T E R N O O N   S E S S I O N     12:08:14
3       September 22, 2010                  12:08:14
4         12:47 p.m.                        12:48:59
5       THE VIDEOGRAPHER: We are back on    12:48:59
6   the record.  The time is 12:47 p.m.     12:49:03
7     This is the beginning of tape         12:49:07
8   number three.                           12:49:08
9   E T H A N   W E I N E R, having
10      been previously duly sworn by a Notary
11      Public of the State of New York,
12      upon being examined,
13      testified as follows:
14  EXAMINATION CONTINUED BY                12:49:09
15  MR. SAHAM:
16    Q.   Okay.                            12:49:09
17       We were looking at Plaintiff's     12:49:10
18  Exhibit 169 in the document that you    12:49:12
19  received from the FDA.                  12:49:17
20       I'd like to turn your attention    12:49:20
21  to -- the document appears to start on  12:49:22
22  page seventy-four and I want to refer you 12:49:26
23  to page seventy-six of that document.  And 12:49:28
24  the second full paragraph states, "why was 12:49:39
25  celecoxib as given under these exaggerated 12:49:45
                                          Page 163

E. Weiner

1
2   dosing multiples not able to show       12:49:49
3   statistical superiority to diclofenac." 12:49:52
4       Was that a question coming from     12:49:54
5   the FDA?                                12:49:56
6    A.   Yes.                              12:49:57
7    Q.   So it was accepted that, as we    12:49:59
8   discussed earlier, that it did not show a 12:50:00
9   statistical superiority -- that Celebrex 12:50:02
10  did not show statistical superiority to 12:50:04
11  diclofenac?                             12:50:07
12   A.   Yes.                              12:50:08
13   Q.   And was there an explanation      12:50:08
14  provided to the FDA as to why it couldn't 12:50:13
15  provide a statistical superiority to    12:50:17
16  diclofenac?                             12:50:19
17      MR. WEISS: I object to the form     12:50:19
18  of the question.                        12:50:21
19   A.   Well, the company had provided    12:50:21
20  in its briefing document the informative 12:50:23
21  censoring discussion and that was I think 12:50:27
22  the main argument that was provided.    12:50:31
23   Q.   And the FDA responded that there  12:50:32
24  are a variety of possible explanations -- 12:50:35
25   A.   That's correct.                   12:50:38
                                          Page 164

E. Weiner

1
2    Q.   -- in addition to informative     12:50:39
3   censoring?                              12:50:41
4    A.   Which, as I said earlier, we      12:50:42
5   knew as well, we just felt that to be the 12:50:46
6   most plausible.                         12:50:51
7    Q.   And one of those additional       12:50:52
8   explanations, at least according to the 12:50:54
9   FDA, was that the use of multiples of the 12:50:57
10  X dose of celecoxib resulted in more    12:51:01
11  clinically important UGI adverse events  12:51:03
12  than would have occurred with an X dose  12:51:05
13  alone?                                  12:51:14
14   A.   Yes.                              12:51:14
15   Q.   And what's that referring to?     12:51:14
16   A.   That refers to the fact that the  12:51:14
17  dose in osteoarthritis was two hundred   12:51:14
18  milligrams a day or even one hundred, one 12:51:16
19  to two hundred, and rheumatoid arthritis 12:51:19
20  could go as high as four hundred and yet 12:51:23
21  the study used eight hundred.  It was one 12:51:26
22  hundred for OA, two hundred for RA, and  12:51:29
23  then this was four hundred in the study. 12:51:34
24   Q.   And that was a possible           12:51:35
25  explanation for the differential?       12:51:36
                                          Page 165

42 (Pages 162 to 165)

E. Weiner

1
2     A.    Well, if you give twice as much,    12:51:38
3  you're going to probably have more side    12:51:41
4  effects.                          12:51:44
5     Q.    But that was prespecified in the    12:51:44
6  protocol that that was what the --        12:51:44
7     A.    That that was the dose, yes, the    12:51:44
8  dose was double the RA dose, four times    12:51:45
9  the OA dose.                        12:51:49
10     Q.    And as you remarked earlier,     12:51:51
11  this hypothesis was not testable based on    12:51:52
12  the trial data?                     12:51:53
13     A.    Right.  So we agreed with them    12:51:55
14  on that.                          12:51:58
15     Q.    And the second explanation      12:51:58
16  provided down here is differential        12:52:03
17  adaptation, and that's in the next        12:52:05
18  paragraph?                        12:52:10
19     A.    Yes.                      12:52:10
20     Q.    And another explanation is just    12:52:10
21  that celecoxib was not, in fact, safer on    12:52:12
22  this comparison with diclofenac?         12:52:16
23     A.    Right.  But again, you'd have to    12:52:21
24  say that two to fourfold the dose of      12:52:24
25  celecoxib versus onefold the dose of      12:52:27

Page 166

E. Weiner

1
2  diclofenac.                        12:52:31
3     Q.    Right.                    12:52:31
4         But that was the dosage being      12:52:32
5  used?                            12:52:34
6     A.    Yes, that was the dosage being    12:52:34
7  used.                            12:52:37
8     Q.    And with this data you couldn't    12:52:37
9  tell whether at a lower dosage the same    12:52:37
10  result would have occurred?            12:52:38
11     A.    That's correct.              12:52:40
12     Q.    And then moving down to the last    12:52:40
13  full paragraph on this page, the middle of    12:52:44
14  that paragraph, the FDA writes, "however,    12:52:47
15  it is unclear that the potential for       12:52:49
16  informative censoring represented a        12:52:52
17  significant bias in assessment of the      12:52:55
18  outcome of the CSUGIE as defined in this    12:52:57
19  trial."                           12:53:01
20         Do you see that?             12:53:01
21     A.    Yes.                      12:53:02
22     Q.    And do you agree that's an       12:53:03
23  accurate statement?                 12:53:05
24     A.    Sorry, I was reading ahead.      12:53:06
25     Q.    The statement, "however, it is    12:53:11

Page 167

E. Weiner

1
2  unclear that the potential for informative    12:53:13
3  censoring represented a significant bias    12:53:14
4  in assessment of the outcome of the CSUGIE    12:53:16
5  as defined in this trial," that's what the    12:53:19
6  FDA said; correct?                  12:53:22
7     A.    Right.                    12:53:23
8     Q.    And do you believe that's an      12:53:24
9  accurate statement?                 12:53:25
10     A.    I would paraphrase that as to     12:53:26
11  what I said earlier and what they say     12:53:28
12  further up the page inasmuch as that you    12:53:30
13  can't prove that.  Data will not support    12:53:31
14  proving it.                       12:53:34
15     Q.    So since you can't prove it,     12:53:35
16  it's unclear whether that was the impact    12:53:37
17  at work?                          12:53:39
18     A.    It may be.  Maybe it wasn't.     12:53:40
19     Q.    So it's unclear?             12:53:43
20     A.    Right.                    12:53:44
21     Q.    Now, the -- go ahead.         12:53:44
22     A.    The -- no, go ahead.          12:53:48
23     Q.    The last sentence on the bottom    12:53:50
24  of the page says, "the timing of the UGI    12:53:52
25  events may also hold clues to           12:53:55

Page 168

E. Weiner

1
2  understanding any role for informative     12:53:57
3  censoring.  For example, both crude and    12:54:01
4  Kaplan-Meier event rates in the first six    12:54:05
5  months," paren, "table seven," closed     12:54:07
6  paren, "showed that for celecoxib seven of    12:54:11
7  the eleven uncensored events occurred in    12:54:14
8  the first three months.  However, in the    12:54:15
9  diclofenac group, all nine events occurred    12:54:17
10  in the first hundred days with a cluster    12:54:20
11  of five events within the first fifteen    12:54:22
12  days and four more events occurring       12:54:25
13  sporadically through approximately day    12:54:27
14  eighty-five."                      12:54:29
15         What's being expressed there?    12:54:31
16     A.    Just the time at which the       12:54:33
17  events occurred in the different treatment    12:54:37
18  groups.                          12:54:38
19     Q.    And what does a Kaplan-Meier      12:54:38
20  curve illustrate?                  12:54:46
21     A.    Well, it is a graph of time      12:54:47
22  versus the probability of an event        12:54:53
23  occurring by that time and it's the       12:54:54
24  standard output for event-driven clinical    12:55:00
25  trials.                           12:55:04

Page 169

43 (Pages 166 to 169)

**Page 170**

E. Weiner

2    Q.  And do you recall that the     12:55:04
3  Kaplan event curves comparatively amongst   12:55:06
4  Celebrex and the other NSAIDs were most    12:55:10
5  favorable to Celebrex at six months as     12:55:13
6  opposed to the entire study?          12:55:16
7      MR. WEISS: I object to the form   12:55:20
8   of the question.             12:55:21
9    A.  They were the furthest apart at   12:55:21
10  six months.  In fact, what informative   12:55:24
11  censoring seeks to address and the various  12:55:26
12  other explanations on the previous page of  12:55:29
13  the FDA review is the shape of the curves.  12:55:31
14  And that's, in fact, the top of page    12:55:34
15  seventy-seven paragraph you just read, a   12:55:39
16  similar thing, that Kaplan-Meier curve,   12:55:40
17  because of these early events with      12:55:43
18  diclofenac, rises quickly and then     12:55:45
19  flattens out whereas the Celebrex curve   12:55:48
20  rises slowly.              12:55:51
21    Q.  And the FDA writes at the bottom  12:55:52
22  of that graph, "therefore, although it    12:55:55
23  does seem that more patients dropped out   12:55:57
24  of the diclofenac group due to GI      12:56:00
25  symptoms, this does not seem to be an    12:56:02

**Page 171**

E. Weiner

2  adequate explanation for the observed UGI  12:56:04
3  results between diclofenac and celecoxib." 12:56:08
4      That was the FDA's view?      12:56:10
5    A.  Yes, and I think adequacy by   12:56:12
6  their definition is a high level proof   12:56:15
7  they're comfortable in putting in a label  12:56:18
8  as opposed to what is a plausible or the  12:56:20
9  most plausible explanation.       12:56:22
10    Q.  And that was also Dr. Zwillich's  12:56:25
11  view?                  12:56:28
12    A.  Yes.  There were other people at  12:56:29
13  Pfizer who felt that informative censoring  12:56:31
14  was not the most plausible explanation,   12:56:32
15  but most of us did.            12:56:34
16    Q.  And that was also Dr. Wahba's   12:56:34
17  view?                  12:56:37
18    A.  Yes.               12:56:37
19    Q.  And who other than Drs. Zwillich  12:56:37
20  and Dr. Wahba expressed that opinion at   12:56:42
21  either than Pfizer or Pharmacia or Searle? 12:56:51
22    A.  To my knowledge, I think they   12:56:51
23  were the only ones.            12:56:51
24    Q.  Do you know if any of the     12:56:51
25  outside consultants expressed that     12:56:53

**Page 172**

E. Weiner

2  opinion?                 12:56:55
3    A.  I don't recall.         12:56:55
4    Q.  You don't know one way or the   12:56:56
5  other?                 12:56:58
6    A.  Right.             12:56:58
7    Q.  What if you go down to the    12:56:58
8  middle of page seventy-seven, the FDA    12:57:05
9  writes, "was informative censoring an    12:57:07
10  important component in the CLASS trial.   12:57:10
11  One way to attempt to answer this question 12:57:12
12  is with a clinical trial designed to do   12:57:15
13  so."                  12:57:19
14      Do you know if a clinical trial   12:57:19
15  was ever designed to test this hypothesis? 12:57:19
16    A.  Well, there were subsequent    12:57:21
17  trials that were done the design of which  12:57:23
18  I've long since forgotten, but things such  12:57:27
19  as CONDOR which I think partially were    12:57:31
20  meant to address that.  But I think it's   12:57:34
21  an important paragraph because again it   12:57:35
22  gets to the idea that FDA also felt this   12:57:38
23  is plausible, it just couldn't be proven  12:57:41
24  and they can't accept from a regulatory   12:57:45
25  viewpoint unproven things but it's      12:57:48

**Page 173**

E. Weiner

2  sufficiently plausible to become the    12:57:51
3  hypothesis of another trial to be tested.  12:57:55
4    Q.  If you turn to page eighty-two   12:57:56
5  of this document in the conclusions,     12:57:58
6  conclusion number two, the FDA writes,    12:58:03
7  "celecoxib did not demonstrate statistical 12:58:05
8  superiority to NSAIDs," paren, "pooled or  12:58:08
9  either comparator," paren, "diclofenac and 12:58:13
10  ibuprofen with regards to the primary    12:58:17
11  safety endpoint of CSUGIEs at any point in 12:58:20
12  the time although there were trends that   12:58:24
13  favored celecoxib."            12:58:26
14      Is that an accurate statement?   12:58:27
15    A.  Yes.  That again gets to the   12:58:29
16  primary endpoint.             12:58:32
17    Q.  And that point number two that I  12:58:34
18  just read, that's different than what was  12:58:38
19  published in the JAMA article; correct?   12:58:40
20    A.  The JAMA article didn't focus on  12:58:42
21  the primary endpoint.          12:58:45
22    Q.  Do you think it's proper to    12:58:47
23  publish a paper --            12:58:56
24      MR. SAHAM: Strike that.      12:58:56
25    Q.  Have you ever published a paper  12:58:57

44 (Pages 170 to 173)

E. Weiner

1
2   related to a clinical trial where the main      12:58:58
3   outcome measure discussed in the paper was      12:59:04
4   not the primary outcome measure?      12:59:08
5        MR. WEISS: I object to the form      12:59:10
6   of the question.      12:59:11
7        A.   No, but of my publications, I      12:59:11
8   think very few were actually clinical      12:59:15
9   trial subjects.      12:59:18
10       Q.   But you've never published such      12:59:18
11  a paper?      12:59:21
12       A.   No.      12:59:22
13           (Whereupon, a document entitled      12:59:22
14  FDA CLASS Assessment was marked      12:59:22
15  Plaintiff's Exhibit 170      12:59:22
16  for identification.)      12:59:30
17       Q.   I want to show you what I'm      12:59:30
18  marking as Plaintiff's Exhibit 170.      12:59:31
19  Could you please take a look at      12:59:58
20  Plaintiff's Exhibit 170.      12:59:59
21       MR. SAHAM: And for the record,      13:00:02
22  Plaintiff's Exhibit 170 is a      13:00:03
23  multi-page document, at the top it      13:00:05
24  says FDA CLASS assessment, and it      13:00:08
25  bears Bates numbers DEFS 00799475      13:00:11

Page 174

E. Weiner

1
2   through 483 and then attached at the      13:00:16
3   last page is a metadata report that      13:00:24
4   indicates that this document came out      13:00:26
5   of your custodial file.      13:00:29
6        A.   So I don't know who wrote it,      13:00:32
7   when they wrote it, why they wrote, or who      13:00:32
8   they sent it to.  I'm not even sure what      13:00:35
9   it is.      13:00:37
10       Q.   So you don't recognize it?      13:00:37
11       A.   No.      13:00:38
12       Q.   But you're not disputing that it      13:00:39
13  came out of your electronic files?      13:00:41
14       A.   I would have no basis to dispute      13:00:43
15  that.      13:00:46
16       Q.   And do you recall receiving any      13:00:47
17  summaries of the FDA reviewers' opinions      13:00:50
18  before the advisory committee?      13:00:54
19       MR. SAHAM: Strike that.      13:00:56
20       Q.   Do you recall receiving      13:00:57
21  summaries of the FDA reviewers' reports      13:00:59
22  prior to the advisory committee meeting?      13:01:02
23       A.   Well, you showed me an e-mail      13:01:08
24  where I wrote one.  I don't recall getting      13:01:11
25  them from others.  But I clearly saw the      13:01:14

Page 175

E. Weiner

1
2   FDA documents.      13:01:19
3        Q.   And some of the FDA documents,      13:01:20
4   there's a report from Dr. Witter; is that      13:01:23
5   correct?      13:01:26
6        A.   I believe so.      13:01:26
7        Q.   And a report from Dr. Goldkind?      13:01:26
8        A.   Yes.      13:01:30
9        Q.   And a report from Dr. Lu?      13:01:31
10       A.   I don't recall that one.      13:01:33
11       Q.   She was the statistician.      13:01:34
12       A.   Okay.      13:01:36
13       Q.   So you recall there were at      13:01:36
14  least three reports generated prior to the      13:01:37
15  advisory committee meeting?      13:01:40
16       A.   Yes.      13:01:43
17       Q.   And you would have received them      13:01:43
18  in advance of the meeting?      13:01:44
19       A.   They were available to me.  I      13:01:45
20  probably did not read Dr. Lu's, I don't      13:01:45
21  think.  I would have left that to the      13:01:47
22  statisticians.      13:01:49
23       Q.   Looking at the first page of      13:01:56
24  what I've marked as Exhibit 170, under Dr.      13:01:56
25  Witter it says, "FDA comment, subset ASA      13:01:57

Page 176

E. Weiner

1
2   analysis not a prospectively designed      13:02:01
3   endpoint."      13:02:04
4        You would agree with me that the      13:02:05
5   ASA analysis was not a prospectively      13:02:06
6   designed endpoint in the protocol; is that      13:02:10
7   correct?      13:02:13
8        A.   This is that very first line;      13:02:13
9   right?  Okay.  I agree with that.  It      13:02:16
10  still was -- okay.      13:02:23
11       Q.   And then looking at the second      13:02:26
12  box, the second sentence, it says, "for      13:02:28
13  non-aspirin C versus NSAID or C versus D      13:02:32
14  not statistically different," that's      13:02:34
15  accurate; correct?      13:02:37
16       A.   At twelve months.  That's true      13:02:37
17  at twelve months.      13:02:49
18       Q.   And then it says, "but C versus      13:02:49
19  I different?"      13:02:52
20       A.   Yes.      13:02:53
21       Q.   So the only claim that could      13:02:53
22  have been made there is that --      13:02:56
23       MR. SAHAM: Strike that.      13:03:00
24       Q.   Turning to the third page of      13:03:01
25  Plaintiff's Exhibit 170 -- and again, this      13:03:21

Page 177

45 (Pages 174 to 177)

E. Weiner

1
2 is talking about the FDA comment of Laura      13:03:24
3 Lu.                                            13:03:27
4        Do you see that at the top?             13:03:27
5    A.  Yes.                                     13:03:29
6    Q.  And in the first box it says,           13:03:30
7 "imputation of CSUGIEs and adjustment for      13:03:38
8 informative censoring not valid."              13:03:38
9        Do you see that?                         13:03:38
10   A.  Yes.                                     13:03:39
11   Q.  And that's what the FDA                  13:03:40
12 expressed at the advisory committee            13:03:41
13 hearing?                                       13:03:43
14   A.  Yes.                                     13:03:44
15       MR. WEISS: I object to the form         13:03:44
16 of the question.                               13:03:45
17   Q.  And then going down to the              13:03:45
18 bottom, the last sentence on that page in      13:03:49
19 that middle box says, "post hoc ASA            13:03:52
20 analysis not prespecified."                    13:03:53
21       Do you see that?                         13:03:56
22   A.  Yes.                                     13:03:57
23   Q.  And the FDA expressed that, when        13:04:02
24 they looked at the protocol, that the ASA      13:04:07
25 analysis that was presented by the             13:04:10

Page 178

E. Weiner

1
2 sponsors at the committee hearing was a        13:04:12
3 post hoc analysis; correct?                    13:04:15
4        MR. WEISS: I object to the form         13:04:17
5 of the question.                               13:04:18
6    A.  Yes, although I believe that            13:04:19
7 parts of that analysis ended up in the         13:04:23
8 final agreed label.                            13:04:26
9    Q.  But it was a post hoc analysis;         13:04:27
10 correct?                                       13:04:30
11   A.  Yes, but FDA still felt it              13:04:30
12 usable enough to label for it at the end       13:04:34
13 of the day.                                    13:04:37
14   Q.  Then turning to the next page of        13:04:41
15 the document under the FDA comment of          13:04:43
16 Larry Goldkind, at the bottom in the           13:04:45
17 middle box it states, "rationale for           13:04:50
18 six-month has a meaningful endpoint not        13:04:50
19 convincing."                                   13:04:53
20       Do you see that?                         13:04:54
21   A.  Which page are you on?                   13:04:56
22   Q.  I'm on page four.  The middle           13:04:57
23 box.                                           13:05:03
24   A.  Number seven?                            13:05:03
25   Q.  Page four, if you go all the way        13:05:05

Page 179

E. Weiner

1
2 down to the bottom under the middle            13:05:07
3 column, FDA comment Larry Goldkind, it         13:05:10
4 says, "rationale for six-month as a            13:05:11
5 meaningful endpoint not convincing."           13:05:13
6        Do you see that?                         13:05:15
7    A.  Yes.                                     13:05:17
8    Q.  And that was the view of the            13:05:17
9 FDA; correct?                                   13:05:20
10       MR. WEISS: I object to the form         13:05:20
11 of the question.                               13:05:22
12   A.  Apparently so, yes.                      13:05:22
13   Q.  Turning to the next page of the         13:05:24
14 document, we're still under the comment        13:05:38
15 middle box of Larry Goldkind, next to          13:05:41
16 twenty-three, the second to last box in        13:05:42
17 the middle, do you see that?                   13:05:44
18   A.  Yes.                                     13:05:46
19   Q.  It says, "multiple subanalyses         13:05:47
20 produce serious multiplicity issues that       13:05:50
21 the sponsor has not addressed."                13:05:54
22       Do you see that?                         13:05:55
23   A.  Yes.                                     13:05:56
24   Q.  And that again was the opinion         13:05:57
25 of the FDA?                                     13:05:58

Page 180

E. Weiner

1
2        MR. WEISS: I object to the form         13:05:59
3 of the question.                               13:06:00
4    A.  Yes.  I also note that whoever          13:06:00
5 the author of this document is felt that        13:06:02
6 these things were addressable.  In other        13:06:04
7 words -- and again, the context is             13:06:07
8 difficult.  If this is a summary of             13:06:10
9 queries from FDA to be answered, that's        13:06:13
10 different than a summary of a final            13:06:18
11 opinion from the FDA and I don't know          13:06:20
12 which of those this actually is.               13:06:22
13   Q.  But Dr. Witter wrote a report;          13:06:24
14 correct?                                        13:06:28
15   A.  Yes.                                     13:06:28
16   Q.  And Dr. Goldkind wrote a report;        13:06:28
17 correct?                                        13:06:31
18   A.  Yes.                                     13:06:31
19   Q.  And Dr. Lu wrote a report;              13:06:32
20 correct?                                        13:06:34
21   A.  Yes.                                     13:06:34
22   Q.  And those were posted on the FDA        13:06:34
23 Web site immediately prior to the advisory     13:06:37
24 committee meeting on February 7?               13:06:41
25   A.  Yes.  But between the advisory           13:06:44

Page 181

46 (Pages 178 to 181)

E. Weiner

```
1              E. Weiner
2   committee and the labeling, there was back    13:06:49
3   and forth and part of that was the           13:06:52
4   opportunity to address some of the issues    13:06:56
5   raised in the report.  Just because an       13:06:58
6   issue is raised doesn't mean it's not        13:07:00
7   necessarily addressable.                     13:07:03
8         (Whereupon, an e-mail dated            13:07:05
9         January 23, 2001 was marked            13:07:05
10        Plaintiff's Exhibit 171                13:07:05
11        for identification.)                   13:07:06
12   Q.   I want to show you what I'm            13:07:06
13   marking as Plaintiff's Exhibit 171.         13:07:09
14        Could you please take a look at        13:07:28
15   that document.                              13:07:30
16        MR. SAHAM: And for the record,         13:07:31
17   Plaintiff's Exhibit 171 bears the           13:07:33
18   Bates numbers DEFS 00309959                 13:07:37
19   through 960.  And the top e-mail in         13:07:44
20   the e-mail chain is from Ethan Weiner       13:07:50
21   dated January 23, 2001 to Mona Wahba.       13:07:54
22   Q.   Did you write this e-mail on or        13:07:58
23   about January 23, 2001?                     13:08:00
24   A.   Yes.                                   13:08:01
25   Q.   And you did so in the ordinary         13:08:02
```
Page 182

E. Weiner

```
1              E. Weiner
2   scope of your employment at Pfizer?          13:08:03
3         MR. WEISS: I object to the form        13:08:06
4   of the question.                             13:08:06
5   A.   Yes.                                    13:08:07
6   Q.   And you write, "thanks.                 13:08:07
7   Obviously the six versus twelve months is    13:08:09
8   a big issue, also, as outlined in the rest   13:08:13
9   of the document.  I have told that to        13:08:17
10  Ryder and Corr."                             13:08:19
11        What can you discussing there in       13:08:21
12  this e-mail?                                 13:08:25
13  A.   Well, if you look back at the           13:08:26
14  earlier e-mail that I had written, which I   13:08:28
15  think is one of the previous exhibits as     13:08:30
16  well, it's a summary of the things that      13:08:32
17  FDA put up on their Web site just prior to   13:08:34
18  the advisory committee.  And clearly as      13:08:39
19  we've been through in much of this           13:08:41
20  questioning they had raised the issue of     13:08:44
21  six versus twelve months.                    13:08:47
22  Q.   And you had discussed this issue        13:08:48
23  with Ryder and Corr?                         13:08:50
24  A.   Well, it was clear that that was        13:08:52
25  one of the things that was in play in        13:08:53
```
Page 183

E. Weiner

```
1              E. Weiner
2   terms of the evaluation.                     13:08:55
3   Q.   And it was a big issue to the           13:08:58
4   FDA whether to use the six or twelve         13:09:00
5   months of data?                              13:09:03
6   A.   Well, it was an important issue.        13:09:03
7   We had been through previous discussions,    13:09:05
8   rehearsals that we had, that the agency      13:09:09
9   had mentioned that they were going to        13:09:12
10  focus on twelve months, we had to decide     13:09:14
11  whether they were going to focus on twelve   13:09:16
12  months or still focus on six months, so      13:09:18
13  that was one of the more important things    13:09:21
14  to decide in the days leading up to the      13:09:23
15  advisory committee, which is the time        13:09:25
16  frame from which this e-mail comes.          13:09:35
17  Q.   And prior to this time at least,        13:09:35
18  publicly the company had focused on the      13:09:35
19  six-month data; correct?                     13:09:35
20        MR. WEISS: I object to the form        13:09:36
21  of the question.                             13:09:36
22  A.   Yes.                                    13:09:37
23  Q.   And that six-month data was more        13:09:37
24  favorable to Celebrex; correct?             13:09:40
25  A.   Yes.                                    13:09:41
```
Page 184

E. Weiner

```
1              E. Weiner
2         (Whereupon, an e-mail dated            13:09:41
3         January 26, 2001 was marked            13:09:41
4         Plaintiff's Exhibit 172                13:09:41
5         for identification.)                   13:09:43
6   Q.   I want to show you what I'm             13:09:43
7   marking as Plaintiff's Exhibit 172.         13:09:44
8         Could you please take a look at        13:10:12
9   that document.                              13:10:15
10        MR. SAHAM: And for the record,         13:10:16
11  this document bears the Bates numbers        13:10:31
12  DEFS 00078937 through 939 and it's an        13:10:34
13  e-mail that appears to attach               13:10:41
14  Kaplan-Meier curves comparing CLASS         13:10:47
15  and VIGOR.                                   13:10:51
16  Q.   Did you write this e-mail on or         13:10:53
17  about January 26, 2001?                      13:10:57
18  A.   Yes.                                    13:10:58
19  Q.   And you did so as part of your          13:10:59
20  job at Pfizer?                               13:11:00
21  A.   Yes, but I did so pretty much           13:11:01
22  totally out of intellectual curiosity.  As  13:11:04
23  I note in the e-mail, nobody would accept    13:11:08
24  this as a valid comparison really, no        13:11:11
25  journal or anything.  You can't take two     13:11:14
```
Page 185

47 (Pages 182 to 185)

E. Weiner

1
2  studies and superimpose them.  But          13:11:17
3  sometimes it's fun and interesting to do     13:11:20
4  that just to see what you might learn and    13:11:21
5  what future studies you might design.         13:11:23
6      Q.   And it's obvious that comparing      13:11:27
7  how Celebrex was doing on various --          13:11:29
8          MR. SAHAM: Strike that.              13:11:32
9      Q.   Comparing Celebrex and Vioxx is      13:11:33
10  something that you regularly did at          13:11:36
11  Pfizer; correct?                            13:11:38
12         MR. WEISS: I object to the form       13:11:39
13  of the question.                            13:11:39
14      A.   Yes, I think it was part of my      13:11:40
15  role to do that.                            13:11:42
16      Q.   And here you were looking at how    13:11:42
17  would CLASS have been different if we were   13:11:45
18  to use the primary outcome measure that     13:11:47
19  VIGOR used?                                 13:11:50
20      A.   Partly that.  What if we had        13:11:50
21  used naproxen instead of ibuprofen and      13:11:53
22  diclofenac.  There's a lot of things that   13:11:56
23  would could possibly learn from this.       13:11:58
24         But again, as I said in the          13:12:01
25  e-mail, you have to take all of this with   13:12:03

Page 186

E. Weiner

1
2  a grain of salt.  It's comparing apples      13:12:06
3  and oranges.                                13:12:09
4      Q.   And then when you look at the       13:12:10
5  first attachment, CLASS all versus VIGOR,    13:12:11
6  for PUB plus POB, and that's the combined    13:12:13
7  endpoint that is referenced at tables        13:12:16
8  three and four of Exhibit 115, the final     13:12:18
9  report?                                     13:12:20
10      A.   Right.                            13:12:22
11      Q.   And what does this Kaplan-Meier    13:12:22
12  graph reveal?                              13:12:26
13      A.   Well, it's really hard to read,   13:12:28
14  for one thing, inasmuch as I can't really   13:12:30
15  read the key.  I mean, you see naproxen at  13:12:35
16  the top, so that's clearly having the       13:12:39
17  highest rate of ulcers.  You see rofecoxib  13:12:41
18  somewhere in the middle, so it's not the    13:12:45
19  lowest.  I don't know what the other three  13:12:46
20  are, I could guess, but I can't possibly    13:12:51
21  read that tiny little key.  You know, I     13:12:54
22  don't remember from ten years ago where     13:12:57
23  they all fell into place.                   13:12:59
24      Q.   When did you first become aware    13:13:01
25  that Vioxx was also going to be up for      13:13:04

Page 187

E. Weiner

1
2  safety evaluation at the same advisory      13:13:08
3  committee meeting at Celebrex?              13:13:11
4      A.   Whenever I first heard that        13:13:13
5  there would be an advisory committee        13:13:13
6  meeting, and I suspect that was probably a  13:13:13
7  couple -- three months before it actually   13:13:15
8  took place, but I don't remember when I     13:13:18
9  found out.                                  13:13:19
10      Q.   And commercially, did you view     13:13:25
11  Vioxx getting a safety upgrade as being     13:13:28
12  bad for Celebrex sales?                    13:13:31
13         MR. WEISS: I object to the form     13:13:32
14  of the question.                          13:13:33
15      A.   It depended on what that upgrade  13:13:33
16  looked like relative to what -- you know,   13:13:40
17  ultimately what is the Vioxx label after    13:13:43
18  all of this, and the dust settles look      13:13:48
19  like as compared to the Celebrex label and  13:13:51
20  where is one drug possibly safer than       13:13:55
21  another and where isn't it.  But clearly    13:13:57
22  we were competing for largely the same      13:14:00
23  markets, so it would have been important.   13:14:03
24      Q.   So is it fair to say the          13:14:06
25  relative comparison between Vioxx and       13:14:10

Page 188

E. Weiner

1
2  Celebrex with respect to a safety upgrade   13:14:13
3  was important to you?                      13:14:16
4      A.   It was important to the company.  13:14:16
5      Q.   And at the bottom of the e-mail    13:14:18
6  on the first page of 1752, Exhibit 172,     13:14:23
7  you write, "one can see the early NSAID      13:14:26
8  blip in CLASS not apparent in VIGOR."       13:14:30
9         What are you referring to there?    13:14:33
10      A.   Remember the other previous       13:14:35
11  exhibit, the FDA review where they talked   13:14:36
12  about those early events on diclofenac?     13:14:38
13  That's probably what I was referring to.    13:14:40
14      Q.   Because naproxen didn't have a     13:14:42
15  cluster of early events?                   13:14:45
16      A.   It doesn't appear that way.       13:14:47
17      Q.   Where diclofenac did?             13:14:49
18      A.   Right.                            13:14:50
19         (Whereupon, an e-mail dated        13:15:00
20  January 27, 2001 was marked                13:15:00
21  Plaintiff's Exhibit 173                    13:15:00
22  for identification.)                      13:15:01
23      Q.   I want to show you what I'm        13:15:01
24  marking as Plaintiff's Exhibit 174.        13:15:05
25         MR. WEISS: One hundred             13:15:07

Page 189

48 (Pages 186 to 189)

E. Weiner

1  
2  seventy-three?                          13:15:07  
3      MR. SAHAM: Oh, one hundred       13:15:08  
4  seventy-three.  Thank you.              13:15:09  
5      Q.   I want to show you what I'm    13:15:10  
6  marking as Plaintiff's Exhibit 173.      13:15:12  
7      Could you please take a look at    13:15:33  
8  that document.                          13:15:36  
9      MR. SAHAM: And for the record,   13:15:36  
10  Plaintiff's Exhibit 173 is a            13:15:37  
11  three-page e-mail chain bearing Bates    13:15:42  
12  numbers DEFS 00291345 through 347.    13:15:44  
13  And specifically the e-mail in the      13:16:00  
14  chain is from you to Mona Wahba dated   13:16:03  
15  January 26, 2001 and the e-mail before   13:16:05  
16  that is dated January 25, 2001 and      13:16:08  
17  it's from Mona Wahba to you and        13:16:11  
18  others.                                13:16:15  
19      Q.   Do you recognize this e-mail   13:16:15  
20  chain?                                 13:16:25  
21      A.   Yes.                         13:16:25  
22      Q.   And what is it?               13:16:25  
23      A.   Well, again it's summarizing   13:16:25  
24  very long day that they spent before the  13:16:27  
25  advisory committee finalizing their      13:16:30  

Page 190

E. Weiner

1  
2  preparations.                           13:16:33  
3      Q.   And you would have sent and    13:16:33  
4  received this e-mail in the ordinary scope  13:16:35  
5  of your employment at Pfizer?           13:16:37  
6      MR. WEISS: I object to the form    13:16:38  
7  of the question.                        13:16:39  
8      A.   Yes.                          13:16:39  
9      Q.   And Dr. Wahba wrote to you on   13:16:39  
10  January 25, 2001 -- and I'm looking at --  13:16:47  
11  under number -- point number two, do you  13:16:54  
12  see where she has -- actually points one   13:16:57  
13  through four, I'm looking at point two.    13:17:00  
14      Do you see that?                    13:17:03  
15      A.   Uh-huh, yes, I do.            13:17:03  
16      Q.   And towards the bottom of that   13:17:04  
17  she writes, it is a safe route to take     13:17:07  
18  then.  The informative censoring issue,   13:17:09  
19  especially after knowing the FDA's       13:17:13  
20  position, "imputation of CSUGIEs and     13:17:16  
21  adjustment for informative censoring is    13:17:20  
22  not valid."                             13:17:23  
23      Do you see that?                    13:17:24  
24      A.   Where are you looking, I'm     13:17:25  
25  sorry?                                 13:17:27  

Page 191

E. Weiner

1  
2      Q.   I'm looking at number 2C, point   13:17:27  
3  number two --                           13:17:29  
4      A.   "No BE with the used diclo?"    13:17:30  
5      Q.   Right, right.                  13:17:33  
6      But then if you move on, it's       13:17:34  
7  talking about the FDA's position with    13:17:35  
8  respect to informative censoring.  And she  13:17:38  
9  says if the FDA's position is "imputation   13:17:40  
10  of CSUGIEs and adjustment for informative   13:17:45  
11  censoring is not valid?"                 13:17:49  
12      Do you see that?                    13:17:50  
13      A.   Yes.                          13:17:51  
14      Q.   And that accurately reflects the   13:17:51  
15  FDA's position?                         13:17:54  
16      MR. WEISS: I object to the form    13:17:55  
17  of the question.                        13:17:55  
18      A.   Yeah, again, for all the reasons   13:17:56  
19  that we talked about in terms of the     13:17:59  
20  burden of proof.                        13:18:02  
21      Q.   And that also accurately        13:18:03  
22  reflects Dr. Wahba and Dr. Zwillich's    13:18:05  
23  expressed view on this issue?            13:18:05  
24      MR. WEISS: I object to the form    13:18:08  
25  of the question.  It assumes facts not    13:18:09  

Page 192

E. Weiner

1  
2  in evidence.                            13:18:11  
3      A.   Yes, it does.                  13:18:12  
4      Q.   And then point number three it    13:18:13  
5  says, "we will drop the six-month analysis   13:18:15  
6  and the imputation."                     13:18:19  
7      Do you see that?                    13:18:20  
8      A.   Yes.                          13:18:22  
9      Q.   And is it correct that the       13:18:22  
10  company or neither of the companies,     13:18:22  
11  Pharmacia nor Pfizer, argued or made the   13:18:24  
12  informative censoring point at the open    13:18:26  
13  advisory committee meeting on February 7   13:18:31  
14  or February 8?                          13:18:32  
15      A.   I believe that's the case       13:18:33  
16  because we focused on the twelve-month    13:18:35  
17  data.  But I don't recall if it still came   13:18:38  
18  up or not.  I know that we made the      13:18:43  
19  decision to focus on twelve-month data but  13:18:45  
20  I do not know for sure that we didn't talk  13:18:48  
21  at all about informative censoring.       13:18:51  
22      Q.   And if you turn to the second   13:18:53  
23  page of the document, there is an e-mail   13:18:56  
24  from Mona Wahba to Leland Loose and      13:18:58  
25  yourself.                              13:19:02  

Page 193

49 (Pages 190 to 193)

E. Weiner

1
2      Do you see that?                    13:19:02
3   A.   Yes.                    13:19:04
4   Q.   And it's dated January 22, 2001?   13:19:04
5   A.   Right.                    13:19:07
6   Q.   And you would have received this   13:19:09
7   in the ordinary scope of your employment   13:19:10
8   at Pfizer?                    13:19:13
9      MR. WEISS: I object to the form   13:19:13
10   of the question.                13:19:14
11   A.   Yes.                    13:19:14
12   Q.   And Dr. Wahba writes to you,      13:19:15
13   "rationale for six-month analysis is not   13:19:19
14   convincing for the following reasons.   13:19:22
15   Number one, a trend of disproportionate   13:19:25
16   withdraws of patients during the entire   13:19:28
17   study, not just the first six months."   13:19:31
18      Do you see that?                13:19:35
19   A.   Yes.                    13:19:36
20   Q.   And that was Dr. Wahba's view?   13:19:36
21   A.   Yes.                    13:19:39
22      MR. WEISS: I object to the form   13:19:39
23   of question.  Mischaracterizes the   13:19:40
24   document.                    13:19:42
25   Q.   And that accurately reflects the   13:19:42

Page 194

E. Weiner

1
2   fact that the trend that was being      13:19:45
3   referenced with respect to the informative   13:19:47
4   censoring claim was apparently during the   13:19:49
5   entire trial, not just during the first   13:19:52
6   six months?                    13:19:55
7      MR. WEISS: I object to the form   13:19:56
8   of the question.                13:19:57
9   A.   I think that's one of her         13:19:57
10   arguments as to why she doesn't think that   13:19:59
11   the informative censoring is the most   13:20:02
12   plausible explanation.            13:20:05
13      As I said earlier, one could   13:20:08
14   neither prove nor disprove informative   13:20:11
15   censoring with the data at hand so one had   13:20:14
16   to make arguments as to what makes it more   13:20:16
17   or less plausible.  These are all valid   13:20:19
18   scientific points.  My own view was taking   13:20:21
19   everything into account, I still at the   13:20:25
20   end of the day felt it to be the most   13:20:28
21   plausible explanation for what was going   13:20:30
22   on, clearly not the only one and clearly   13:20:33
23   nothing that could be proven.  One could   13:20:36
24   marshal arguments and say that it was more   13:20:39
25   or less likely depending upon one's point   13:20:42

Page 195

E. Weiner

1
2   of view.  So I think Dr. Loose and others   13:20:44
3   agreed with me and I agreed with people   13:20:47
4   that had devised that argument.  Dr. Wahba   13:20:50
5   and Dr. Zwillich didn't and they all had   13:20:54
6   valid scientific reasons, as did we.      13:20:58
7      So I acknowledge that she         13:21:01
8   disagreed with that and is marshalling   13:21:04
9   some of the reasons why she did, but   13:21:06
10   that's what scientific debate is all   13:21:08
11   about.                    13:21:11
12   Q.   And who are the people that      13:21:12
13   devised that argument, the informative   13:21:14
14   censoring argument?                13:21:17
15   A.   Well, it originated I think      13:21:19
16   from, I would suspect -- well, the people   13:21:22
17   at Pharmacia.  Which people actually had   13:21:24
18   the idea of looking for that first I don't   13:21:28
19   know.                    13:21:31
20   Q.   Did Dr. Geis ever express that   13:21:32
21   he was in favor of the informative   13:21:35
22   censoring hypothesis?                13:21:37
23   A.   Well, he believed it, yes.      13:21:38
24   Q.   And do you recall whether -- Dr.   13:21:48
25   Geis worked for Searle before the merger;   13:21:48

Page 196

E. Weiner

1
2   correct?                    13:21:48
3   A.   Yes.                    13:21:48
4   Q.   And do you know or were you      13:21:48
5   privy to any discussions between Searle   13:21:51
6   and Pharmacia regarding the CLASS data   13:21:53
7   prior to the merger?                13:21:54
8   A.   No.                    13:21:55
9   Q.   Now, point number two in Dr.      13:21:56
10   Wahba's e-mail to you, she writes, "in the   13:22:01
11   diclo group, all nine uncensored events   13:22:04
12   occurred in the first hundred days with a   13:22:08
13   cluster of five events in the first   13:22:10
14   fifteen days and the other four occurring   13:22:13
15   sporadically through day eighty-five."   13:22:15
16      Why does that point argue         13:22:18
17   against the informative censoring   13:22:20
18   hypothesis?                    13:22:24
19      MR. WEISS: I object to the form   13:22:25
20   of the question.                13:22:26
21   A.   It doesn't really, in my mind.   13:22:26
22   I mean, she says informative censoring was   13:22:30
23   going on before six months, and that may   13:22:33
24   well be the case.  Because I think if you   13:22:37
25   look at the diclofenac Kaplan-Meier curve,   13:22:39

Page 197

50 (Pages 194 to 197)

E. Weiner

```
 1             E. Weiner
 2   it flattens out fairly early.  It starts      13:22:42
 3   out going up fast and then falls off, and      13:22:47
 4   that would be the effect of informative       13:22:49
 5   censoring for that to happen.  So to me        13:22:52
 6   that early blip if anything adds rather        13:22:55
 7   than subtracts weight to the informative       13:22:55
 8   censoring argument.                13:23:04
 9        Q.   But you couldn't have claimed        13:23:04
10   long-term if you used any data less than      13:23:06
11   six months of data; correct?            13:23:09
12        MR. WEISS: I object to the form          13:23:10
13   of the question.                13:23:11
14        A.   In a long-term trial, you're        13:23:12
15   looking at everything that happens in         13:23:15
16   until the end of the trial.  So early        13:23:17
17   events are important, it's just that later     13:23:19
18   events are important, also.            13:23:23
19        Q.   But the later events were not        13:23:24
20   reported in the JAMA article; correct?        13:23:26
21        A.   Again, for the reasons that         13:23:27
22   we've been through in terms of what was       13:23:29
23   believed to be the most valid argument.       13:23:31
24   But certainly the events happening up         13:23:35
25   through this little blip were in there.       13:23:38
                                       Page 198
```

E. Weiner

```
 1             E. Weiner
 2        (Whereupon, an e-mail dated       13:23:38
 3   January 27, 2001 was marked         13:23:38
 4   Plaintiff's Exhibit 174         13:23:38
 5   for identification.)           13:23:53
 6        Q.   I want to show you what I'm     13:23:53
 7   marking as Plaintiff's Exhibit 174.     13:23:55
 8        Could you please take a look at    13:24:20
 9   Plaintiff's Exhibit 174.          13:24:22
10        MR. SAHAM: For the record, this    13:24:24
11   is a multiple page e-mail chain       13:24:26
12   bearing Bates numbers DEFS 00028977    13:24:29
13   through 980 and the top e-mail is from  13:24:37
14   Ethan Weiner to Leland Loose.        13:24:44
15        Q.   Do you recognize this e-mail   13:24:48
16   chain?                 13:24:50
17        A.   Yes.              13:24:50
18        Q.   And are these e-mails you would 13:24:51
19   have sent and received at Pfizer during   13:24:54
20   January of 2001?              13:24:58
21        A.   Yes.              13:24:59
22        Q.   And you would have sent and    13:25:01
23   received these e-mails in the ordinary   13:25:02
24   scope of your employment there?        13:25:04
25        MR. WEISS: I object to the form    13:25:04
                                       Page 199
```

E. Weiner

```
 1             E. Weiner
 2   of the question.                13:25:06
 3        A.   Yes.              13:25:06
 4        Q.   And at the top e-mail you write  13:25:07
 5   to Leland Loose, "I don't know what you    13:25:11
 6   think but I feel Mona has really stepped   13:25:13
 7   up to the plate on CLASS.  In my view, she 13:25:17
 8   has a clear handle on the issues and is    13:25:21
 9   doing all the right things in a         13:25:23
10   constructive way.  I'm very encouraged by   13:25:25
11   this.  What do you think."             13:25:28
12        You wrote that on January 27,       13:25:29
13   2001?                  13:25:32
14        A.   Right.            13:25:32
15        Q.   And you thought Dr. Wahba was    13:25:33
16   doing a good job with respect to her CLASS 13:25:35
17   assignments?                13:25:39
18        A.   Right.  That doesn't mean I     13:25:39
19   agreed with her on informative censoring.   13:25:41
20   As I said earlier, there's room for       13:25:44
21   legitimate scientific debate.          13:25:44
22        Q.   But you felt she was doing a     13:25:45
23   good job on her CLASS responsibilities?    13:25:47
24        A.   Yes.              13:25:51
25        Q.   Do you know what DeLap is?       13:25:51
                                       Page 200
```

E. Weiner

```
 1             E. Weiner
 2        A.   He's one of the people at FDA.   13:25:56
 3   I don't recall what his responsibility was  13:26:00
 4   relative to Witter, Lu, and Goldkind.     13:26:01
 5        Q.   And down at the bottom paragraph 13:26:07
 6   on this first page Dr. Wahba writes to you  13:26:10
 7   and Dr. Loose and others and states, "if   13:26:13
 8   CX had beaten the NSAIDs on primary       13:26:18
 9   endpoint, would we still have taken the    13:26:22
10   same approach re informative censoring."    13:26:26
11        Do you see that?             13:26:29
12        A.   Yes.              13:26:30
13        Q.   Do you think the companies would  13:26:30
14   have taken the same approach if they would  13:26:31
15   have met their primary endpoint?         13:26:34
16        MR. WEISS: I object to the form    13:26:36
17   of the question.                13:26:38
18        A.   It's a very hypothetical       13:26:38
19   question.  I think what you're trying to   13:26:38
20   ask is, if things looked good, would you   13:26:39
21   still do this.  But things looked good.    13:26:39
22   It may have well been that there was no    13:26:43
23   informative censoring going on.  I mean,   13:26:44
24   it's an impossible hypothetical to answer.  13:26:47
25        I mean, if the trial results       13:26:55
                                       Page 201
```

51 (Pages 198 to 201)

E. Weiner

1      were different but there was evidence for      13:26:57
2      informative censoring, then we probably      13:27:00
3      would have pointed that out. If there was      13:27:03
4      no evidence, then we wouldn't. I mean,      13:27:04
5      there's so many thousands of permutations      13:27:12
6      and combinations. It's an imponderable      13:27:16
7      question.      13:27:19
8         Q.   Do you recall anyone ever      13:27:19
9      claiming or stating that --      13:27:21
10        MR. SAHAM: Strike that.      13:27:21
11        Q.   Do you recall anyone ever      13:27:22
12     stating that informative censoring was      13:27:23
13     just a pretext for explaining why Celebrex      13:27:26
14     didn't separate from the comparator      13:27:29
15     NSAIDs?      13:27:33
16        A.   Can you repeat the question?      13:27:33
17        MR. SAHAM: Can you read that      13:27:34
18     back, please.      13:27:35
19        (Whereupon the requested portion      13:27:36
20     was read back by the reporter)      13:27:50
21        A.   I would conjecture that many      13:27:50
22     people probably said that, but that      13:27:53
23     doesn't -- has no impact on whether I      13:27:59
24     think it's plausible or not.      13:28:04

Page 202

E. Weiner

1         Q.   Who do you recall --      13:28:06
2         A.   No one specific. I mean,      13:28:07
3      there's probably lots of people at Merck.      13:28:09
4      But I have no specific recollection of      13:28:13
5      having a conversation with somebody about      13:28:15
6      that.      13:28:17
7         Q.   Looking at the next page of      13:28:17
8      Exhibit 174, the e-mail at the bottom from      13:28:30
9      Mona Wahba to yourself, Dr. Loose, and      13:28:33
10     others dated January 25, 2001, do you see      13:28:42
11     that?      13:28:42
12        A.   Yes.      13:28:42
13        Q.   And she writes down towards the      13:28:42
14     bottom, "after nine hours of debate, we      13:28:42
15     agreed on the following for tomorrow's      13:28:44
16     meeting. We will inform that we missed on      13:28:46
17     the primary endpoint."      13:28:48
18        Do you see that?      13:28:50
19        A.   Yes.      13:28:51
20        Q.   Who is she saying there you're      13:28:52
21     going to inform that we missed on the      13:28:54
22     primary endpoint?      13:28:55
23        A.   Presumably this is what's going      13:28:55
24     into the advisory committee presentation,      13:28:58

Page 203

E. Weiner

1      so that will be in the presentation.      13:29:01
2         Q.   So is that saying it won't be      13:29:03
3      buried, it will be expressed right at the      13:29:07
4      beginning that we missed the primary      13:29:07
5      endpoint?      13:29:09
6         MR. WEISS: I object to the form      13:29:09
7      of the question.      13:29:10
8         A.   Yes.      13:29:10
9         Q.   And that's something different      13:29:11
10     than what occurred in the JAMA article      13:29:13
11     that's Wolf Exhibit 3?      13:29:15
12        MR. WEISS: I object to the form      13:29:16
13     of the question.      13:29:17
14        A.   This was in response to previous      13:29:17
15     presentations that were being constructed      13:29:19
16     for the advisory committee. That had      13:29:23
17     nothing to do with the JAMA article.      13:29:26
18        Q.   But in the JAMA article, there's      13:29:28
19     no statement up front that says, quote      13:29:28
20     unquote, we missed the primary endpoint?      13:29:30
21        A.   Yes, that's correct.      13:29:30
22        MR. WEISS: You're not talking      13:29:33
23     about Wolf's editorial; right?      13:29:34
24        Q.   Then looking at point number      13:29:41

Page 204

E. Weiner

1      three in this same e-mail, Dr. Wahba      13:29:43
2      writes, "we will drop the six-month      13:29:45
3      analysis and the imputation."      13:29:48
4         Is that referring to the      13:29:50
5      abandonment of the informative censoring      13:29:51
6      argument before the FDA?      13:29:55
7         MR. WEISS: I object to the form      13:29:57
8      of the question.      13:30:00
9         A.   Yes.      13:30:04
10        Q.   And that argument was made in      13:30:04
11     the briefing material submitted to the FDA      13:30:07
12     that were posted on the Web site prior to      13:30:08
13     the hearing?      13:30:10
14        A.   Yes.      13:30:11
15        Q.   But it was not followed up upon      13:30:11
16     at the February 7 advisory committee in      13:30:14
17     the open session?      13:30:18
18        MR. WEISS: I object to the form      13:30:19
19     of the question.      13:30:20
20        MR. SAHAM: Strike that. That's      13:30:20
21     a bad question. Your objection's      13:30:21
22     noted.      13:30:23
23        Q.   You just testified that the      13:30:23
24     informative censoring explanation was in      13:30:27

Page 205

52 (Pages 202 to 205)

E. Weiner

1  
2 the briefing document that was posted for        13:30:31  
3 the Web site, the FDA Web site,        13:30:33  
4 immediately before the advisory committee        13:30:36  
5 hearing; is that correct?        13:30:37  
6     A.    Yes.        13:30:38  
7     Q.    And is decision was made prior        13:30:38  
8 to February 7 not to aggressively pursue        13:30:40  
9 that argument at the open session; is that        13:30:43  
10 correct?        13:30:45  
11         MR. WEISS: I object to the form        13:30:45  
12 of the question.        13:30:47  
13     A.    Yes, the reason again being that        13:30:47  
14 the FDA was going to focus on twelve-month        13:30:52  
15 data and the informative censoring was the        13:30:56  
16 argument why the six-month data would be        13:31:00  
17 the most useful time point. And again, it        13:31:03  
18 was decided -- the company's weighing        13:31:08  
19 presenting that versus, which we felt to        13:31:13  
20 be the most useful presentation of the        13:31:17  
21 data, but if FDA's going to be presenting        13:31:19  
22 twelve months when it just detracted from        13:31:23  
23 the function of the advisory committee to        13:31:25  
24 be talking about totally different cuts of        13:31:27  
25 the data between us and the FDA.        13:31:29  

Page 206

E. Weiner

1  
2         (Whereupon, an e-mail dated        13:31:29  
3 April 19, 2001 was marked        13:31:29  
4 Plaintiff's Exhibit 175        13:31:29  
5 for identification.)        13:31:33  
6     Q.    I'm showing you what I'm marking        13:31:33  
7 as Plaintiff's Exhibit 175.        13:31:35  
8         Could you please take a look at        13:31:37  
9 that document.        13:31:40  
10         MR. SAHAM: Which, for the        13:31:41  
11 record, bears Bates numbers        13:31:42  
12 DEFS 00170697 through 698. It's an        13:31:47  
13 e-mail from Stephen Cristo to yourself        13:31:50  
14 and others dated April 19, 2001 with        13:31:53  
15 an attachment.        13:31:58  
16     Q.    And I'll ask you if you        13:32:01  
17 recognize this document.        13:32:03  
18     A.    Yes.        13:32:03  
19     Q.    And what is it?        13:32:04  
20     A.    Well, it's just a summary of the        13:32:05  
21 -- one of the labeling meetings held with        13:32:09  
22 FDA.        13:32:11  
23     Q.    And you would have received this        13:32:11  
24 in the ordinary scope of your employment        13:32:13  
25 at Pfizer?        13:32:15  

Page 207

E. Weiner

1  
2         MR. WEISS: I object to the form        13:32:16  
3 of the question.        13:32:17  
4     A.    Yes.        13:32:18  
5     Q.    And the attached document        13:32:18  
6 states, "the meeting got off to a rocky        13:32:22  
7 start with Tom Abrams from DDMAC stating        13:32:24  
8 that it is unacceptable to make claims        13:32:30  
9 based on post hoc analyses, especially        13:32:34  
10 when you did not meet the primary        13:32:37  
11 endpoint."        13:32:39  
12         Who is Tom Abrams?        13:32:40  
13     A.    Well, according to this, he's        13:32:42  
14 somebody from DDMAC.        13:32:45  
15     Q.    What's DDMAC?        13:32:46  
16     A.    It's a part of the FDA. They        13:32:48  
17 deal with monitoring advertisements from        13:32:51  
18 drug companies, basically.        13:32:56  
19     Q.    And do you agree that it's        13:32:57  
20 unacceptable to make claims based on post        13:32:58  
21 hoc analyses when you didn't meet the        13:33:02  
22 primary endpoint?        13:33:04  
23     A.    I would not state that as a        13:33:05  
24 categorical rule. It depends on the        13:33:08  
25 strength of the data. Occasionally that,        13:33:11  

Page 208

E. Weiner

1  
2 if it's compelling, has ended up in        13:33:13  
3 labeling. And the next sentence points        13:33:15  
4 out that actually Rick Spivey, who was the        13:33:19  
5 Pharmacia regulatory person, took issue        13:33:23  
6 with that comment anyway.        13:33:26  
7     Q.    And then dropping down to the        13:33:28  
8 third paragraph on this page, the second        13:33:28  
9 sentence says, "FDA expressed concerns        13:33:29  
10 about slippery slope in allowing details        13:33:32  
11 of a secondary analysis further evaluated        13:33:36  
12 by comparator NSAID and then analyzed by        13:33:39  
13 subset of non-aspirin users."        13:33:43  
14         Do you see that?        13:33:46  
15     A.    Yes.        13:33:47  
16     Q.    And is that the FDA being        13:33:48  
17 critical of the multiple non-prespecified        13:33:51  
18 endpoints being presented as part of the        13:33:56  
19 labeling discussions?        13:33:58  
20         MR. WEISS: I object to the form        13:34:00  
21 of the question.        13:34:01  
22     A.    I don't think they're critical        13:34:09  
23 of that having been done, I think they're        13:34:09  
24 critical or concerned about putting it        13:34:09  
25 into a label. Again, there's a very        13:34:09  

Page 209

53 (Pages 206 to 209)

E. Weiner

| | |
|---|---|
| 1 | different standard of what is suitable for |
| 2 | labeling and what is suitable for valid |
| 3 | scientific discussion. So I think what |
| 4 | they're saying here is that they don't say |
| 5 | that those post hoc analyses are wrong or |
| 6 | of no clinical meaning, but they do not |
| 7 | make the standard of, you know, of |
| 8 | rigorous proof that would be required to |
| 9 | put in a label. |
| 10 | Q. And again, that was one of the |
| 11 | purposes of the CLASS trial was to try and |
| 12 | get the label changed? |
| 13 | A. Yes. |
| 14 | Q. And who is Stephen Cristo? |
| 15 | A. He was one of the regulatory |
| 16 | people from Pfizer. |
| 17 | Q. And what was his job, more |
| 18 | specifically? |
| 19 | A. Vis-a-vis the others I don't |
| 20 | remember. Obviously part of it was to go |
| 21 | to this meeting and report back. |
| 22 | (Whereupon, an e-mail dated |
| 23 | August 28, 2001 was marked |
| 24 | Plaintiff's Exhibit 176 |

13:34:12
13:34:14
13:34:17
13:34:22
13:34:24
13:34:28
13:34:31
13:34:33
13:34:37
13:34:38
13:34:40
13:34:43
13:34:45
13:34:45
13:34:47
13:34:49
13:34:54
13:34:56
13:34:56
13:35:00
13:35:01
13:35:01
13:35:01
13:35:01

Page 210

E. Weiner

| | |
|---|---|
| 1 | for identification.) |
| 2 | Q. I want to show you what I'm |
| 3 | marking Plaintiff's Exhibit 176. |
| 4 | Could you please take a look at |
| 5 | Plaintiff's Exhibit 176. |
| 6 | MR. SAHAM: And for the record, |
| 7 | Plaintiff's Exhibit 176 is a four-page |
| 8 | e-mail chain with Bates numbers |
| 9 | DEFS 03825679 through 682. |
| 10 | Q. And I'd ask you if you recognize |
| 11 | this e-mail chain. |
| 12 | A. Yes. |
| 13 | Q. And what is it? |
| 14 | A. This is an e-mail discussion |
| 15 | back and forth with the design of a |
| 16 | potential study to follow up on CLASS. |
| 17 | Q. And these are e-mails you would |
| 18 | have sent and received in the ordinary |
| 19 | course of your employment at Pfizer? |
| 20 | A. Yes. |
| 21 | Q. And the top e-mail is from Mark |
| 22 | Fletcher to you dated August 28, 2001? |
| 23 | A. Yes. |
| 24 | Q. And who is Mark Fletcher? |

13:35:50
13:35:50
13:35:51
13:36:08
13:36:10
13:36:12
13:36:13
13:36:16
13:36:22
13:36:34
13:36:35
13:36:37
13:36:37
13:36:39
13:36:44
13:36:47
13:36:50
13:36:52
13:36:54
13:36:55
13:36:56
13:37:01
13:37:04
13:37:04

Page 211

E. Weiner

| | |
|---|---|
| 1 | A. Mark was one of the people who |
| 2 | reported to me. |
| 3 | Q. And it says subject, summary of |
| 4 | third telecon on CLASS II issues? |
| 5 | A. Yes. |
| 6 | Q. Was there potentially going to |
| 7 | be a CLASS II trial? |
| 8 | A. Yes. |
| 9 | Q. And was there a CLASS II trial? |
| 10 | A. Well, there was CONDOR. Whether |
| 11 | that was CLASS II or not, I don't know. |
| 12 | But clearly further GI work was done. |
| 13 | Q. And what is CONDOR? |
| 14 | A. That was a study, I was very |
| 15 | peripherally involved with it but it's |
| 16 | completed, at this point, I think. It was |
| 17 | looking at celecoxib versus I think |
| 18 | diclofenac plus omeprazole, if I'm not |
| 19 | mistaken. But it was looking not at |
| 20 | CSUGIEs but rather at GI blood loss. |
| 21 | Q. And do you know if that study |
| 22 | was initiated after this lawsuit was |
| 23 | filed? |
| 24 | A. I have no idea. |

13:37:06
13:37:10
13:37:11
13:37:13
13:37:17
13:37:18
13:37:19
13:37:19
13:37:19
13:37:22
13:37:24
13:37:27
13:37:31
13:37:32
13:37:35
13:37:37
13:37:40
13:37:44
13:37:50
13:37:55
13:37:58
13:37:59
13:38:00
13:38:00

Page 212

E. Weiner

| | |
|---|---|
| 1 | Q. And who was involved in the |
| 2 | CONDOR trial? |
| 3 | A. It would have probably been |
| 4 | Mitch Gandelman and his group. Liz Kitsis |
| 5 | was gone by then, I think. |
| 6 | Q. Where did she go? |
| 7 | A. She left the company, left the |
| 8 | industry entirely. |
| 9 | Q. Do you know why she left? |
| 10 | A. I think she just, you know, it's |
| 11 | a stressful, stressful kind of work. I |
| 12 | think she just kind of had enough of it. |
| 13 | Q. Did she ever express any |
| 14 | negative opinions about how the CLASS data |
| 15 | was presented? |
| 16 | A. Not that I recall. |
| 17 | Q. Do you know where Ms. Kitsis or |
| 18 | Dr. Kitsis is now? |
| 19 | A. I believe she lives in |
| 20 | Westchester someplace. |
| 21 | Q. Do you know where she works? |
| 22 | A. No, I don't even know what she |
| 23 | does. |
| 24 | Q. Do you know if it was her |

13:38:02
13:38:07
13:38:08
13:38:10
13:38:14
13:38:16
13:38:18
13:38:20
13:38:21
13:38:23
13:38:28
13:38:31
13:38:33
13:38:33
13:38:36
13:38:36
13:38:40
13:38:43
13:38:46
13:38:47
13:38:49
13:38:51
13:38:53
13:38:53

Page 213

54 (Pages 210 to 213)

E. Weiner

1
2  decision or the company's decision for her    13:38:55
3  to leave?                                     13:38:57
4      A.   I'm pretty sure it was hers, but     13:38:57
5  I should probably just say I don't know       13:39:00
6  because I don't have that --                  13:39:02
7      Q.   And do you know approximately        13:39:03
8  when she left?                                13:39:05
9      A.   2003 or four.                        13:39:05
10     Q.   Do you know why -- so is CONDOR      13:39:17
11 and CLASS II, are those synonymous or are     13:39:19
12 those different?                              13:39:23
13     A.   No, not really.                      13:39:24
14         CLASS II would have been a study      13:39:24
15 that looked at the same endpoints as CLASS    13:39:24
16 I, I would suspect, and CONDOR doesn't.       13:39:28
17     Q.   And that was never done; right?      13:39:31
18     A.   Right.                               13:39:33
19     Q.   And you write on August 28, 2001     13:39:33
20 to Mark Fletcher, "having shown with CLASS    13:39:36
21 that six-month results can look different     13:39:39
22 from one-year results, will anything less     13:39:42
23 than a year," paren, "especially three        13:39:45
24 months," closed paren, "ever be taken         13:39:48
25 seriously.  I doubt it."                      13:39:53

Page 214

E. Weiner

1
2      You wrote that on August 28,             13:39:54
3  2001?                                        13:39:58
4      A.   Yes.                                13:39:58
5      Q.   And you did so in the ordinary      13:39:58
6  course of your employment at Pfizer?         13:40:01
7      A.   Yes.                                13:40:03
8         MR. WEISS: I object to the form       13:40:03
9  of the question.                             13:40:04
10     Q.   And it's accurate that the          13:40:05
11 twelve-month results for CLASS look          13:40:07
12 different than the six-month results;        13:40:09
13 correct?                                     13:40:11
14     A.   Well, I think that we've gone       13:40:12
15 through the ways that they're different.     13:40:14
16 Again, that does not detract from, in my     13:40:15
17 view, the validity of the six-month         13:40:18
18 results but clearly if I was designing       13:40:21
19 another study, I would not want to have      13:40:24
20 people asking what happens after six         13:40:27
21 months and not have any data to say so.      13:40:29
22     Q.   And you agree with me the data      13:40:32
23 looked different; correct?                   13:40:35
24     A.   In the ways that we have            13:40:36
25 discussed.  And we've been through that.     13:40:38

Page 215

E. Weiner

1
2      Q.   And the six-month data was more     13:40:40
3  favorable to Celebrex than the entire        13:40:43
4  study data; correct?                         13:40:47
5      A.   Yes.                                13:40:48
6         (Whereupon, an e-mail dated           13:40:48
7  April 8, 2001 was marked Plaintiff's         13:40:48
8  Exhibit 177 for identification.)             13:41:01
9      Q.   I'm going to show you what I'm      13:41:01
10 marking as Plaintiff's Exhibit 177.          13:41:09
11         Could you please take a look at      13:41:27
12 that document.                               13:41:29
13         MR. SAHAM: And for the record,       13:41:29
14 Plaintiff's Exhibit 177 is a one-page        13:41:31
15 e-mail chain bearing Bates numbers           13:41:34
16 DEFS 00029027.  And the top e-mail --        13:41:38
17 actually, the top e-mail is from Ethan       13:41:45
18 Weiner to Steven W. Ryder dated              13:41:49
19 April 8, 2001.                               13:41:52
20     Q.   Do you recognize this document?     13:41:55
21     A.   Yes.                                13:41:56
22     Q.   And what is it?                      13:41:57
23     A.   It's an e-mail, a series of         13:41:58
24 e-mails, I guess, from just bringing my      13:42:03
25 boss up-to-date on the CLASS negotiations,   13:42:06

Page 216

E. Weiner

1
2  label negotiations.                          13:42:13
3      Q.   And who was involved in those       13:42:13
4  negotiations?                                13:42:15
5      A.   Well, it was various people from    13:42:16
6  Pfizer and Pharmacia.  I was not one of      13:42:18
7  the ones directly involved.  I do not        13:42:21
8  recall if Leland was going to those or       13:42:23
9  Mona or who was.                             13:42:26
10     Q.   And again, here you're             13:42:28
11 discussing differences between Vioxx and     13:42:29
12 Celebrex; is that correct?                   13:42:32
13     A.   Yes.                                13:42:34
14     Q.   And one of the things as a          13:42:34
15 positive you're pointing out is the 2.5      13:42:37
16 percent increase of MIs, myo -- I can't      13:42:41
17 even say, but those are heart problems;      13:42:49
18 right?                                       13:42:50
19     A.   Myocardial infarctions.            13:42:50
20         Where do you see that though?        13:42:50
21 On the very top.                             13:42:52
22     Q.   Yes.                                13:42:52
23         Do you see that?                     13:42:52
24     A.   Yeah, let me just read it first.    13:42:53
25     Q.   Take as much time as you need.      13:42:55

Page 217

55 (Pages 214 to 217)

E. Weiner

1    A.    (Reviewing).
2    Okay.                       13:43:00
3                                13:43:02
4    Q.    So you're pointing out that one    13:43:21
5  of the things comparatively that Celebrex    13:43:23
6  looked better with Vioxx with was the fact    13:43:25
7  that there was a 2.5 increase in MIs with    13:43:28
8  respect to Vioxx; correct?              13:43:33
9    A.    Right.  It would be a little    13:43:34
10 oversimplification to say Celebrex looks    13:43:37
11 better than Vioxx.  That would imply a    13:43:40
12 direct comparison.  But what I was saying    13:43:43
13 is that compared to the -- when you look    13:43:47
14 at Celebrex versus the two NSAIDs it    13:43:48
15 compared itself to in CLASS, that those    13:43:51
16 events were at a similar level and in fact    13:43:52
17 some of them even favorable for Celebrex.    13:43:57
18         When you look at VIGOR, a    13:43:57
19 separate study now, so you're comparing    13:44:01
20 Vioxx to the one NSAID naproxen it went    13:44:05
21 against, they had two and a half times the    13:44:06
22 number of MIs that naproxen had.    13:44:08
23         So GI issues aside, this is    13:44:12
24 purely cardiac, that we had an attractive    13:44:15
25 safety profile relative to the    13:44:19

Page 218

E. Weiner

1  nonsteroidals and Vioxx did not.    13:44:21
2    Q.    And you discussed these    13:44:24
3  comparisons between Vioxx and Celebrex in    13:44:26
4  this e-mail which you sent in the ordinary    13:44:29
5  scope of your employment at Pfizer?    13:44:31
6         MR. WEISS: I object to the form    13:44:32
7    of the question.                13:44:33
8    A.    Yes.                   13:44:34
9    Q.    And at the bottom of the page in    13:44:35
10 the e-mail you're sending to your boss on    13:44:43
11 April 1, 2001 at 10:58 a.m., you write,    13:44:45
12 "the warning looks at present just like if    13:44:49
13 not worse than the standard NSAID GI    13:44:52
14 warning.  This was what I was afraid of as    13:44:55
15 soon as we knew we didn't make our primary    13:44:59
16 endpoint.  Hopefully, we'll be able to    13:45:02
17 soften this somewhat with negotiations but    13:45:05
18 probably not."                    13:45:07
19         What are you saying there?    13:45:07
20   A.    The original celecoxib label    13:45:09
21 quotes -- okay, well, I'll go back further    13:45:13
22 in history.                      13:45:16
23         The standard nonsteroidal GI    13:45:16
24 warning talks about I believe something on    13:45:21
25

Page 219

E. Weiner

1  the order of a four percent rate of ulcers    13:45:24
2  in NSAIDs.  No matter what NSAID you were,    13:45:27
3  the warning says, whether it's going to    13:45:27
4  happen or not, roughly four percent.    13:45:29
5         When we got the original label    13:45:32
6  for celecoxib, the number they put in that    13:45:34
7  warning was the actual number that was    13:45:37
8  observed in the celecoxib database for    13:45:40
9  celecoxib prior to CLASS in the NDA    13:45:44
10 database.  That was lower than four    13:45:48
11 percent.  So the warning, rather than    13:45:51
12 saying four percent, had a lower number in    13:45:53
13 there.  And it was unique -- I don't know    13:45:56
14 if Vioxx had a similar label but maybe it    13:45:58
15 did.  But other than that, those labels    13:45:58
16 were unique.                     13:46:00
17         When we were negotiating CLASS    13:46:02
18 label in the warning section, regardless    13:46:05
19 of any of the other stuff, FDA reverted    13:46:08
20 back to the standard number that they give    13:46:11
21 to all NSAIDs.  And again, in the -- to    13:46:14
22 get labeling, regardless of what is the    13:46:20
23 outcome of the clinical trial, there's    13:46:25
24 much to be learned whether or not you meet    13:46:28
25

Page 220

E. Weiner

1  your primary endpoint, but generally for    13:46:30
2  labeling you need to meet your primary    13:46:33
3  endpoint to get that in the label    13:46:33
4  someplace.  So having failed to meet that    13:46:37
5  endpoint, one concern was that FDA would    13:46:39
6  default back to the original standard    13:46:44
7  boilerplate number which is, in fact, what    13:46:46
8  they did.                       13:46:49
9    Q.    So as a result of CLASS, the    13:46:49
10 safety label got worse for Celebrex as    13:46:50
11 opposed to better?                13:46:54
12         MR. WEISS: I object to the form    13:46:55
13   of the question.                13:46:56
14   A.    Overall I think it got better,    13:46:57
15 it certainly got more informative which I    13:46:59
16 think is a good thing, but that particular    13:47:03
17 part of it got worse.               13:47:05
18   Q.    So this particular part that    13:47:06
19 you're addressing in the e-mail, as a    13:47:07
20 result of CLASS, you got a safety    13:47:07
21 downgrade as opposed to a safety upgrade?    13:47:08
22         MR. WEISS: I object to the form    13:47:11
23   of the question.                13:47:11
24   A.    In that one piece.  I think we    13:47:12
25

Page 221

E. Weiner

1
2  netted out with an upgrade.                    13:47:14
3     Q.   But with respect to this           13:47:17
4  issue --                                              13:47:18
5     A.   But with respect to that one        13:47:18
6  sentence and warning, then this was less      13:47:22
7  favorable than what was there before.         13:47:25
8     Q.   And less favorable to Celebrex's     13:47:26
9  safety profile?                                    13:47:38
10        MR. WEISS: I object to the form       13:47:38
11  of the question.                                  13:47:38
12        MR. SAHAM: I'll ask a better          13:47:38
13  question.                                            13:47:38
14     Q.   You're saying -- when you say       13:47:38
15  less favorable, you're talking about on       13:47:38
16  the GI side it makes Celebrex sound worse     13:47:38
17  than the other label did?                        13:47:38
18     A.   In the warning part.  As I said,    13:47:40
19  I think we netted out better on GI and        13:47:42
20  everything else, but the netting out is        13:47:43
21  some things are better and some are not       13:47:43
22  better and this is not better.                  13:47:48
23     Q.   And all I'm getting out when        13:47:48
24  you're using the term "better" and            13:47:51
25  "worse," worse means the label was saying    13:47:53

Page 222

E. Weiner

1
2  it was less safe?                                 13:47:55
3     A.   Less favorable looking.              13:47:55
4        MR. WEISS: Are you going to need      13:48:01
5  a bathroom break?                               13:48:03
6        MR. SAHAM: Sure, we can take a        13:48:04
7  break.                                                13:48:06
8        THE VIDEOGRAPHER: Please stand       13:48:07
9  by.                                                    13:48:08
10     We are going off the record.           13:48:08
11  The time is 1:46 p.m.                          13:48:10
12     This is the end of tape number          13:48:12
13  three.                                               13:48:14
14     (Whereupon a break was taken)           13:48:14
15        THE VIDEOGRAPHER: We are back on     13:48:15
16  the record.  The time is 1:53 p.m.           13:54:55
17     This is the beginning of tape           13:54:58
18  number four.                                      13:55:00
19     Q.   Dr. Weiner, do you know who        13:55:00
20  Goran Ando is?                                    13:55:04
21     A.   Yes.                                     13:55:05
22     Q.   Who is he?                              13:55:06
23     A.   He at the time was the head of      13:55:07
24  R&D for Pharmacia.                             13:55:10
25     Q.   And did you have any                 13:55:12

Page 223

E. Weiner

1
2  interactions with him?                          13:55:13
3     A.   Quite limited.                         13:55:14
4     Q.   And what interactions do you         13:55:16
5  recall with Mr. Ando or Dr. Ando?            13:55:18
6     A.   We were at the same meetings        13:55:19
7  together.  For instance, at the time of       13:55:23
8  the merger, there was a big portfolio         13:55:26
9  review or everything in the two -- well,      13:55:29
10  particularly in Pharmacia's portfolio.  He   13:55:31
11  was there.  He may have been at some of       13:55:31
12  the -- actually, there were no alliance       13:55:38
13  meetings.  Yeah, he may have been at some     13:55:42
14  of the appliance meetings for the COX-2      13:55:44
15  alliance.  He probably was at some of         13:55:48
16  those rehearsals.  But I don't recall the     13:55:52
17  exact context.                                    13:55:56
18     Q.   So he may have been at some of      13:55:57
19  the operations committee meetings?            13:55:59
20     A.   Possibly.                              13:56:00
21     Q.   And do you recall ever having       13:56:00
22  any discussions with him about the CLASS     13:56:04
23  data?                                               13:56:05
24     A.   I recall participating in            13:56:06
25  teleconferences about the CLASS              13:56:12

Page 224

E. Weiner

1
2  publication, not discussions about the        13:56:16
3  data per se.                                       13:56:19
4     Q.   What do you mean by the CLASS       13:56:20
5  publication?                                       13:56:23
6     A.   There were a series of               13:56:23
7  teleconferences that were held I think        13:56:27
8  regarding the -- after the Juni editorial     13:56:31
9  in terms of, you know, what the company's     13:56:38
10  position was.                                     13:56:42
11     Q.   And Mr. Ando or Dr. Ando express   13:56:42
12  an opinion at those meetings?                  13:56:46
13     A.   I don't recall him expressing       13:56:49
14  any clear opinions.  It was I think more     13:56:51
15  tactical types of things.  I very vaguely     13:56:54
16  recall those.                                     13:56:58
17     Q.   What do you mean by tactical?       13:56:58
18     A.   Well, in terms of, you know, the    13:57:00
19  company's response to the editorial and       13:57:02
20  what that should look like, things of that    13:57:05
21  nature.                                             13:57:09
22     Q.   Did you have any opinion on that    13:57:09
23  issue?                                               13:57:10
24     A.   I was pretty peripherally           13:57:11
25  involved.  I called into those because I      13:57:14

Page 225

57 (Pages 222 to 225)

E. Weiner

1
2   was in the invitation list, but I was          13:57:15
3   usually multi-tasking.          13:57:15
4       Q.    Did anyone express an opinion          13:57:17
5   that Dr. Juni was correct in his          13:57:18
6   editorial?          13:57:21
7       A.    Not that I recall.          13:57:22
8       Q.    Did anyone express concern about          13:57:23
9   the editorial?          13:57:30
10      A.    I think people were concerned          13:57:31
11  that it portrayed the company in a bad          13:57:32
12  light, obviously, and that is what they          13:57:36
13  were trying to respond to.          13:57:37
14      Q.    And you referenced earlier a          13:57:38
15  meeting you had with Dr. Hassan, Fred          13:57:41
16  Hassan, or that you were at where he was          13:57:44
17  at?          13:57:48
18      A.    Yeah.  I had no direct          13:57:48
19  interaction with him.          13:57:50
20      Q.    What do you remember about that          13:57:51
21  meeting?          13:57:53
22      A.    Not much, other than that he was          13:57:53
23  there.  I don't even know what we          13:57:53
24  discussed.          13:57:53
25      Q.    Was it a CLASS meeting?          13:57:53

Page 226

E. Weiner

1
2       A.    I don't think so but I don't          13:57:56
3   remember.          13:57:58
4       Q.    And what about Carrie Cox, any          13:57:58
5   memories of interactions with her?          13:58:01
6       A.    Nothing substantive.  Again,          13:58:03
7   that was at a couple of meetings.  I don't          13:58:09
8   recall her saying anything.  Nothing she          13:58:11
9   said sticks in my memory.          13:58:14
10      Q.    Do you recall her being at any          13:58:16
11  meetings involving CLASS?          13:58:18
12      A.    I neither recall her being or          13:58:21
13  not being at them.          13:58:27
14      Q.    And could the meeting you were          13:58:27
15  at with Hassan had to do with -- could          13:58:30
16  that have had to do with CLASS?          13:58:31
17          MR. WEISS:  I object to the form          13:58:31
18      of the question.          13:58:32
19      Q.    Celebrex?          13:58:33
20      A.    It's conjecture.  It might have          13:58:33
21  but I don't -- I don't think it did just          13:58:40
22  because it was with McKinnell and CEOs          13:58:41
23  meeting and usually they -- I don't think          13:58:49
24  they would have talked about something          13:58:49
25  that specific, but I don't recall.          13:58:50

Page 227

E. Weiner

1
2          (Whereupon, an e-mail dated          13:58:50
3      May 10, 2001 was marked Plaintiff's          13:58:50
4      Exhibit 178 for identification.)          13:58:54
5       Q.    I want to show you what I'm          13:58:54
6   marking as Plaintiff's Exhibit 178.          13:58:55
7          Could you please take a look at          13:59:18
8   Plaintiff's Exhibit 178.          13:59:20
9          MR. SAHAM:  Which, for the          13:59:22
10     record, is a multiple-page document          13:59:23
11     bearing Bates numbers DEFS 00801105          13:59:28
12     through 1132.  And the cover e-mail is          13:59:38
13     from Ethan Weiner to Steven W. Ryder          13:59:43
14     dated May 10, 2001.          13:59:49
15      Q.    I ask you if you recognize this          13:59:50
16  document.          13:59:51
17      A.    Yes.          13:59:51
18      Q.    And what is it?          13:59:52
19      A.    It's just me updating Steve          13:59:53
20  Ryder about the label negotiations for          13:59:56
21  CLASS.          13:59:58
22      Q.    And you updated him in the          13:59:59
23  ordinary scope of your employment?          14:00:02
24      A.    Yes.          14:00:04
25      Q.    And you drafted this e-mail in          14:00:04

Page 228

E. Weiner

1
2   the ordinary scope of your employment?          14:00:10
3          MR. WEISS:  I object to the form          14:00:11
4      of the question.          14:00:12
5       A.    Yes, just as a cover for Mona's          14:00:12
6   e-mail.          14:00:19
7       Q.    And what does Mona's e-mail do?          14:00:21
8          MR. WEISS:  I object to the form          14:00:23
9      of the question.          14:00:24
10         MR. SAHAM:  I'll ask that          14:00:24
11     differently.          14:00:26
12      Q.    Mona Wahba had sent you an          14:00:26
13  attachment which you then forwarded on to          14:00:28
14  Dr. Ryder?          14:00:31
15      A.    She summarizes what's in the          14:00:32
16  attachment.          14:00:34
17      Q.    And what's in the attachment?          14:00:35
18      A.    The attachment is one of the          14:00:45
19  versions of the draft label, I guess FDA's          14:00:45
20  most recent proposal.          14:00:45
21      Q.    So FDA sent a proposed label and          14:00:45
22  then the company commented on it?          14:00:48
23      A.    That's correct.          14:00:50
24      Q.    And you write in your e-mail to          14:00:50
25  Dr. Ryder, "a significant step backwards          14:00:53

Page 229

E. Weiner

1
2 because we no longer get to quote the rate    14:00:56
3 of complicated ulcers plus systematic    14:00:59
4 ulcers in which we were better than    14:01:04
5 ibuprofen although not better than    14:01:05
6 diclofenac."    14:01:07
7      What are you referring to there?    14:01:07
8      A.   I guess in one of the earlier    14:01:09
9 labels we had for the CLASS study the rate    14:01:12
10 of complicated and symptomatic ulcers for    14:01:19
11 celecoxib and then the various comparators    14:01:23
12 which I guess from the context of this was    14:01:27
13 split up by the specific NSAID and    14:01:30
14 apparently that's no longer in this label.    14:01:35
15      Q.   And again, that would be less    14:01:38
16 favorable for Celebrex?    14:01:39
17      A.   Yes.    14:01:39
18          MR. WEISS: I object to the form    14:01:39
19 of the question.    14:01:40
20      Q.   And dropping down a few    14:01:41
21 sentences, you write, "I had a call from    14:01:44
22 Joe Feczko before I even have a chance to    14:01:47
23 read this because Fred Hassan had told    14:01:49
24 McKinnell negotiations were not going well    14:01:49
25 and Hank called Joe."    14:01:53

Page 230

E. Weiner

1
2      What are you referring to there?    14:01:54
3      A.   Well, I guess from his side --    14:01:56
4 and again, just to paraphrase what I said    14:02:00
5 here, is that things went up this food    14:02:05
6 chain in Pharmacia to the CEO who calls up    14:02:08
7 our CEO and says, well, I hear these label    14:02:12
8 negotiations aren't good.  He gets Joe    14:02:14
9 Feczko on the phone and says Joe, what's    14:02:16
10 the deal.  Joe hadn't heard yet so he    14:02:18
11 calls me up and I haven't even had a    14:02:21
12 chance to read this yet.  It's a typical    14:02:22
13 corporate event, I suppose.    14:02:26
14      Q.   Would the executive management    14:02:28
15 committee have been given a summary of the    14:02:30
16 CLASS results shortly after unblinding?    14:02:34
17          MR. WEISS: I object to the form    14:02:38
18 of the question.    14:02:39
19      A.   Again, I would guess that it    14:02:40
20 would be likely, but I can't -- I have no    14:02:44
21 factual recollection of him getting it but    14:02:47
22 I assume that they did.    14:02:50
23      Q.   Celebrex was one of Pharmacia's    14:02:52
24 largest drugs; correct?    14:02:54
25      A.   Yes.  I'm pretty sure that they    14:02:55

Page 231

E. Weiner

1
2 got it.  Again, do I ironclad remember    14:02:59
3 that it?  No.  Do I have a document that    14:03:02
4 proves it?  No.    14:03:03
5      Q.   And why are you sure that they    14:03:03
6 got it?    14:03:06
7          MR. WEISS: I object to the form    14:03:06
8 of the question.  It mischaracterizes    14:03:07
9 the witness' testimony.    14:03:07
10      A.   It would reasonable that they    14:03:07
11 got it.    14:03:08
12      Q.   And why?    14:03:08
13      A.   Because for the reasons that you    14:03:08
14 said, it was an important study.    14:03:09
15      Q.   And it was an important drug for    14:03:12
16 Pharmacia?    14:03:13
17      A.   Yes.    14:03:14
18          (Whereupon, an e-mail dated    14:03:40
19 January 18, 2001 was marked    14:03:40
20 Plaintiff's Exhibit 179    14:03:40
21 for identification.)    14:03:41
22      Q.   I want to show you what I'm    14:03:41
23 marking as Plaintiff's Exhibit 179.    14:03:43
24          Could you please take a look at    14:04:00
25 Plaintiff's Exhibit 179.    14:04:02

Page 232

E. Weiner

1
2          MR. SAHAM: For the record,    14:04:04
3 Plaintiff's Exhibit 179 bears Bates    14:04:05
4 numbers DEFS 00776376 through 384.    14:04:08
5      Q.   And I'd ask you if you recognize    14:04:21
6 this document.    14:04:24
7      A.   Not really because I don't know    14:04:25
8 who the author is and I'm not one of the    14:04:27
9 recipients.  It looks like it's all    14:04:32
10 Pharmacia people on the list.    14:04:35
11      Q.   And looking at the second page    14:04:37
12 of the document, it says, "CLASS senior    14:04:38
13 management rehearsal January 17, 2001?"    14:04:41
14      A.   Okay.    14:04:44
15          So it was one of the rehearsals    14:04:45
16 then which I probably was at, but I'm not    14:04:49
17 one of the recipients.    14:04:52
18      Q.   Looking at the second page of    14:04:54
19 the summary it says, "Weiner: Was the    14:04:57
20 cutoff" --    14:05:01
21          MR. SAHAM: Strike that.    14:05:01
22      Q.   It says, "Weiner: Was the cutoff    14:05:02
23 at the first six months a naproxy cutoff    14:05:06
24 or was that determined after the results    14:05:06
25 were known."    14:05:11

Page 233

59 (Pages 230 to 233)

E. Weiner

1
2      Could that have been a question      14:05:11
3  you asked at this rehearsal?      14:05:13
4      A.   Where do you see that?      14:05:15
5      Q.   Do you see where your name is      14:05:17
6  listed maybe like the fifth line down      14:05:20
7  on --      14:05:22
8      A.   The first page?      14:05:23
9      Q.   Second page.      14:05:25
10      Do you see your name there?      14:05:27
11      A.   Yes, yes.      14:05:28
12      Q.   Could that have been a question      14:05:29
13  you asked at the rehearsal?      14:05:31
14      MR. WEISS: Why don't you ask him      14:05:34
15  if it was.  Could it?  Anything is      14:05:35
16  possible.      14:05:37
17      A.   The document would suggest that,      14:05:37
18  so yes, it would be very plausible that I      14:05:39
19  did.      14:05:41
20      Q.   And what does that mean?      14:05:41
21      A.   Well, again, the rehearsals we      14:05:43
22  tried to get the presenter to deal with      14:05:48
23  all of the tough questions and one of the      14:05:50
24  tough questions was where did the      14:05:52
25  six-month cutoff come from, how can you      14:05:55

Page 234

E. Weiner

1
2  justify it.  Somebody was likely to ask      14:06:00
3  that.      14:06:02
4      Should I finish?      14:06:04
5      Q.   Go ahead.      14:06:05
6      A.   Somebody was likely to ask that      14:06:06
7  at the advisory committee so can these      14:06:08
8  people who are practicing for it, how are      14:06:08
9  they going to address that, what are they      14:06:11
10  going to say.      14:06:12
11      Q.   My question's a little bit      14:06:13
12  simpler.      14:06:13
13      What's a naproxy cutoff?      14:06:14
14      A.   That's a typo.  I have no idea      14:06:17
15  what they're saying.      14:06:19
16      Q.   So naproxy is not a word that      14:06:20
17  you're familiar with?      14:06:23
18      A.   Oh, you know what?  All right.      14:06:26
19  And again, it's guesswork on my part      14:06:28
20  because it's a typo and I suspect they      14:06:33
21  meant a priori.      14:06:39
22      Q.   And what did that mean?      14:06:40
23      A.   Beforehand.      14:06:42
24      Q.   So it was not prespecified in      14:06:43
25  the protocol that there was going to be a      14:06:45

Page 235

E. Weiner

1
2  six-month analysis; correct?      14:06:47
3      A.   Right, we've established that.      14:06:55
4      I was asking the speaker to      14:06:55
5  justify the six-month analysis because      14:06:55
6  that's a likely question to come up at the      14:06:57
7  advisory committee and I felt there was      14:07:01
8  reasonable justification for it, but      14:07:03
9  people presenting need to be able to      14:07:06
10  justify these things.      14:07:09
11      Q.   And that was just a likely      14:07:10
12  question, a question that was likely the      14:07:12
13  FDA would ask?      14:07:13
14      A.   Right.  Again, as I said      14:07:15
15  earlier, in these things it's our job to      14:07:18
16  put ourselves in an adversarial role and      14:07:18
17  ask all the tough questions.      14:07:21
18      Q.   And was it likely the FDA was      14:07:23
19  going to ask that question because the      14:07:25
20  protocol said there was to be to be a      14:07:25
21  fifty-two-week treatment period and if      14:07:28
22  you're only going to use six months or      14:07:30
23  twenty-six weeks of data they would want      14:07:32
24  to know why?      14:07:34
25      MR. WEISS: I object to the form      14:07:35

Page 236

E. Weiner

1
2  of the question.      14:07:36
3      A.   At the time I felt it likely      14:07:36
4  that one of the advisory committee members      14:07:39
5  would ask that.  And whether I felt it      14:07:41
6  likely or not, it was a question that      14:07:43
7  could be asked.  Generally the advisory      14:07:43
8  committee members ask questions, not FDA,      14:07:44
9  and it was one of the possible questions.      14:07:48
10  One tries to throw at them the whole      14:07:54
11  universe of possible questions so they can      14:07:57
12  answer anything they get.      14:08:00
13      (Whereupon, an e-mail dated      14:08:00
14  April 8, 2001 was marked Plaintiff's      14:08:00
15  Exhibit 180 for identification.)      14:08:11
16      Q.   I'm going to show you what I'm      14:08:11
17  marking Plaintiff's Exhibit 180.      14:08:12
18      Could you please take a look at      14:08:39
19  that document.      14:08:41
20      MR. SAHAM: And for the record,      14:08:41
21  Plaintiff's Exhibit 180 bears Bates      14:08:42
22  numbers DEFS 00029021 through 026.      14:08:45
23  And the cover e-mail is from Ethan      14:08:54
24  Weiner to Steven W. Ryder dated      14:08:57
25  April 8, 2001.      14:09:00

Page 237

60 (Pages 234 to 237)

E. Weiner

1      E. Weiner
2      Q.   And we may have looked at the      14:09:01
3   text of this e-mail in Exhibit 177, but I      14:09:28
4   just quickly ask you if you recognize this      14:09:31
5   document.                              14:09:33
6      A.   Yes.                           14:09:33
7      Q.   And what's attached or what is      14:09:34
8   this document?                         14:09:39
9      A.   This is -- so the attached      14:09:40
10   document appears to be a summary, which      14:09:43
11   the cover e-mail says it's produced by      14:09:47
12   Pharmacia, of what's different about or      14:09:50
13   the changes in the most recent round of      14:09:53
14   labels back and forth or back from FDA.      14:09:57
15      Q.   And you would have sent this to      14:09:59
16   Dr. Ryder on or about April 8, 2001?      14:10:01
17      A.   Yes.                           14:10:05
18      Q.   And you would have done so in      14:10:06
19   the ordinary course of your employment at      14:10:08
20   Pfizer?                               14:10:11
21         MR. WEISS: I object to the form      14:10:11
22   of the question.                       14:10:13
23      A.   Yes.                           14:10:13
24      Q.   Was it clear after unblinding      14:10:13
25   when it became apparent that the primary      14:10:16

Page 238

E. Weiner

1   endpoint was not made that you weren't      14:10:19
2   going to get the safety upgrade that was      14:10:21
3   hoped for as a result of CLASS when it was      14:10:24
4   designed?                             14:10:27
5         MR. WEISS: I object to the form      14:10:27
6   of the question.                       14:10:29
7      A.   It was clear I think that the      14:10:29
8   warning would not be rescinded. Whether      14:10:33
9   there was going to be more favorable      14:10:36
10   labeling or not or how much more favorable      14:10:39
11   I think was not clear at all.          14:10:43
12      Q.   When you say rescinded, you mean      14:10:44
13   they weren't going to remove the GI      14:10:44
14   warning that all other NSAIDs had?      14:10:47
15      A.   Right, that's correct.        14:10:50
16      Q.   And if that warning was removed,      14:10:50
17   it would have been a commercial advantage      14:10:52
18   to the companies?                     14:10:54
19      A.   Yes.                          14:10:55
20      Q.   Do you ever recall being at a      14:10:55
21   meeting where anyone estimated the      14:10:59
22   monetary benefit of such a warning      14:11:01
23   removal?                             14:11:04
24      A.   I don't recall absolutely being      14:11:05

Page 239

E. Weiner

1   at one. I'm sure that I probably was. I      14:11:12
2   don't remember what they were.          14:11:15
3      Q.   Do you recall it being discussed      14:11:15
4   that it would be worth approximately $300      14:11:17
5   million a year to the company?          14:11:20
6      A.   I don't recall what they came up      14:11:21
7   with.                                 14:11:23
8      Q.   Would that number surprise you?      14:11:23
9      A.   No.                           14:11:25
10         (Whereupon, an e-mail dated      14:11:30
11   April 3, 2001 was marked Plaintiff's      14:11:30
12   Exhibit 181 for identification.)        14:11:31
13      Q.   I want to show you what I'm      14:11:31
14   marking as Plaintiff's Exhibit 181.      14:11:32
15         Could you please take a look at      14:11:56
16   that document.                        14:11:58
17         MR. SAHAM: And for the record,      14:12:00
18   Bates number 181 -- I'm sorry, for the      14:12:01
19   record, Exhibit 181 bears Bates          14:12:05
20   numbers DEFS 00125726 through 730.      14:12:08
21   The tap e-mail is from Peter Corr, C O      14:12:21
22   R R, to Ethan Weiner, Steven W. Ryder,      14:12:25
23   and Mona Wahba, and it's dated          14:12:29
24   April 3, 2001.                        14:12:33

Page 240

E. Weiner

1      Q.   Who is Peter Corr?            14:12:34
2      A.   Head of R&D at the time. The      14:12:35
3   head of development, I'm sorry.          14:12:41
4      Q.   And he was a senior Pfizer      14:12:43
5   executive?                            14:12:46
6      A.   Yes.                          14:12:46
7      Q.   And he sent you this e-mail on      14:12:49
8   or about April 3, 2001?               14:12:54
9      A.   He sent it to Mark, actually,      14:12:56
10   and copied me.                        14:13:00
11      Q.   And you would have received it      14:13:01
12   in the ordinary scope of your employment      14:13:02
13   at the company?                       14:13:04
14      A.   Yes.                          14:13:05
15         MR. WEISS: I object to the form      14:13:05
16   of the question.                      14:13:06
17      Q.   And what was Mr. or Dr. Corr's      14:13:06
18   involvement in the Celebrex development?      14:13:12
19      A.   Not intense or consistent. But      14:13:16
20   as head of development with labeling      14:13:20
21   negotiations, he occasionally would want      14:13:23
22   to know what was going on.             14:13:26
23      Q.   And Mark Fletcher worked for      14:13:27
24   you?                                 14:13:29

Page 241

61 (Pages 238 to 241)

E. Weiner

1
2    A.   Right.                              14:13:29
3    Q.   And he had sent an e-mail to       14:13:30
4    Peter Corr on April 2, 2001 in which you     14:13:35
5    were cc'd?                              14:13:40
6    A.   Yes.                               14:13:40
7    Q.   And he wrote, "we transmitted      14:13:40
8    your request to PHA but after careful    14:13:44
9    consideration the team felt it was still  14:13:49
10   best not to include the ibuprofen data    14:13:51
11   here because to do so would have also     14:13:55
12   required inclusion of the diclofenac      14:13:58
13   ulceration rate which was no different    14:14:01
14   than Celebrex."                          14:14:13
15        Do you see that?                    14:14:13
16   A.   How far down the page?              14:14:13
17   Q.   It's in the middle of the page      14:14:13
18   in Dr. Fletcher's e-mail to Dr. Corr.    14:14:14
19   A.   I see it.                           14:14:18
20   Q.   And you would have received that    14:14:19
21   in the ordinary course of your employment  14:14:20
22   at Pfizer?                              14:14:23
23   A.   Yes.                               14:14:24
24        MR. WEISS: I object to the form     14:14:25
25   of the question.                         14:14:25

Page 242

E. Weiner

1
2    Q.   Apparently, at least from the       14:14:26
3    text of this e-mail, Dr. Corr wanted to   14:14:28
4    illustrate more in the FDA warning label  14:14:30
5    that in CLASS Celebrex did better than    14:14:35
6    ibuprofen?                              14:14:40
7    A.   Yes.                               14:14:41
8    Q.   And that's something you said,      14:14:41
9    in concert with also referencing the     14:14:46
10   pooled data, would be misleading?        14:14:52
11   A.   Without putting in diclofenac as    14:14:56
12   well.                                   14:14:58
13   Q.   Because Celebrex showed no          14:14:58
14   difference from diclofenac?              14:15:02
15   A.   Right.                             14:15:03
16   Q.   And pursuant to the protocol,       14:15:03
17   you couldn't make a claim against either  14:15:06
18   of the two drugs individually if you      14:15:10
19   didn't beat the combined pool first?      14:15:12
20        MR. WEISS: I object to the form     14:15:17
21   of the question.                         14:15:19
22   A.   Well, that's one reason.  The       14:15:20
23   other reason is just fair balance.        14:15:22
24        (Whereupon, an e-mail dated         14:15:39
25   September 5, 2001 was marked             14:15:39

Page 243

E. Weiner

1
2    Plaintiff's Exhibit 182                  14:15:39
3    for identification.)                     14:15:41
4    Q.   I want to show you what I'm         14:15:41
5    marking Plaintiff's Exhibit 182.         14:15:42
6        Do you know Lee Simon?               14:15:47
7    A.   Yes.                               14:15:50
8    Q.   What did you think about him?       14:15:50
9    A.   Well, I had mixed feelings about    14:15:52
10   him.  I thought he was a very bright guy.  14:15:55
11   I had had earlier dealings with him on    14:15:55
12   something unrelated to Celebrex where I   14:15:59
13   found him to be inconsistent in his       14:16:00
14   approach to things.                      14:16:02
15   Q.   Do you think he was dishonest?      14:16:05
16   A.   Not frankly dishonest, but I        14:16:08
17   think he would change his views depending  14:16:11
18   upon circumstances.                      14:16:15
19   Q.   And one of the circumstances if     14:16:15
20   somebody would pay him would he change his  14:16:18
21   views?                                  14:16:22
22   A.   I don't think it was that           14:16:22
23   direct, but he did want to I think        14:16:24
24   generally please the people that he was   14:16:27
25   consulting with or working with.         14:16:30

Page 244

E. Weiner

1
2    Q.   And one of those entities he was    14:16:32
3    consulting for was Pharmacia during this  14:16:34
4    time frame?                             14:16:38
5    A.   Right, but I had very little        14:16:38
6    interaction with him in the context of the  14:16:40
7    CLASS trial.                             14:16:42
8    Q.   But in another context, he          14:16:43
9    seemed overly willing to please his       14:16:46
10   employer?                               14:16:49
11        MR. WEISS: I object to the form     14:16:49
12   of the question.  Mischaracterizes the    14:16:50
13   witness' testimony.                      14:16:52
14   A.   Yes.                               14:16:53
15   Q.   In what context was that?           14:16:53
16   A.   It was an earlier drug candidate    14:16:55
17   exclusively at Pfizer in the mid 1990s.   14:16:58
18   He had been on the advisory committee at  14:17:03
19   the FDA, had a very negative review of the  14:17:08
20   drug.  We did a postmortem subsequent to   14:17:12
21   that to figure out where to go from there,  14:17:14
22   what was wrong, and at that point he had a  14:17:17
23   very positive view of the drug and really  14:17:20
24   that was not helpful for us because the    14:17:22
25   whole point of the exercise was tell us    14:17:25

Page 245

62 (Pages 242 to 245)

E. Weiner

1
2   all the bad things, we'll see what we can      14:17:28
3   address and what we can't address.  And       14:17:31
4   the divergence of views from the same         14:17:33
5   person in a relatively short period of        14:17:39
6   time was extremely striking.                  14:17:41
7       Q.   You mean he had positive views       14:17:42
8   when he was being paid?                       14:17:44
9       MR. WEISS: I object to the form           14:17:45
10   of the question.                             14:17:46
11       A.   Well, I don't know if that was      14:17:46
12   he was paid so much in that his assignment   14:17:49
13   was to work with us and he wanted to make    14:17:52
14   us happy.  Whether that's because he's       14:17:55
15   being paid or he likes to be agreeable       14:17:58
16   when he's with a bunch of people, I don't    14:18:01
17   know.                                        14:18:03
18       Q.   We were at a deposition with him    14:18:03
19   a few days ago and he didn't seem all that   14:18:06
20   agreeable.                                   14:18:10
21       MR. SAHAM: I'll strike that.            14:18:11
22       Q.   Do you know that he was accused     14:18:14
23   of plagiarism at some point?                 14:18:15
24       A.   Yes.                                14:18:17
25       Q.   And do you know that he had to      14:18:18

Page 246

E. Weiner

1
2   resign or resign from his faculty position   14:18:20
3   at Harvard or not faculty position, his      14:18:24
4   unpaid faculty position at Harvard Medical   14:18:26
5   School as a result?                          14:18:28
6       A.   I had heard that, yes.              14:18:30
7       Q.   I want to show you what I am        14:18:36
8   marking as Plaintiff's Exhibit 182.         14:18:37
9       Could you please take a look at         14:18:58
10   Plaintiff's Exhibit 182.                    14:19:00
11       MR. SAHAM: And for the record,         14:19:03
12   Plaintiff's 182 is a three-page e-mail      14:19:05
13   chain bearing Bates numbers                 14:19:09
14   DEFS 00801243 through 1245.  And the        14:19:15
15   top e-mail is an e-mail from you to         14:19:19
16   Steven W. Ryder dated September 5,          14:19:21
17   2001.                                       14:19:25
18       Q.   Do you recognize this document?    14:19:28
19       A.   Yes.                               14:19:30
20       Q.   And what is it?                    14:19:30
21       A.   Well, Steven Ryder had asked me    14:19:31
22   what my personal views on the assignment    14:19:33
23   were.  I wrote back pretty much consistent  14:19:37
24   with what I've told you, although perhaps   14:19:41
25   my choice of words was not as careful.      14:19:43

Page 247

E. Weiner

1
2       Q.   And with respect to cons you       14:19:46
3   write, "somewhat arrogant.  A little bit     14:19:48
4   of a sleaze factor.  Absolutely can't be     14:19:49
5   trusted;" correct?                           14:19:51
6       A.   Yes.                                14:19:52
7       Q.   That's what you wrote?             14:19:53
8       A.   Again, that was perhaps a          14:19:54
9   somewhat harsh judgment but it was based    14:19:56
10   on that prior experience.  As I said, I     14:20:00
11   had very little interaction with him on     14:20:03
12   CLASS.                                      14:20:04
13       Q.   But you wrote about him on         14:20:04
14   September 5, 2001 that he absolutely can't  14:20:06
15   be trusted; correct?                        14:20:09
16       A.   That's what I wrote.              14:20:10
17       Q.   Were you surprised when the        14:20:26
18   Simon plagiarism issue subsequently arose?  14:20:29
19       MR. WEISS: I object to the form        14:20:33
20   of the question.                            14:20:35
21       A.   Nothing surprises me.             14:20:35
22       Q.   I'm going to show you what's       14:20:55
23   previously been marked Plaintiff's         14:21:05
24   Exhibit 120.                                14:21:05
25       Do you recognize this document?        14:21:05

Page 248

E. Weiner

1
2   In the top e-mail on the chain is an        14:21:23
3   e-mail from Mona Wahba to Leland Loose and  14:21:26
4   yourself and directly under that is a       14:21:27
5   e-mail from Leland Loose to you and Dr.     14:21:30
6   Wahba dated February 16, 2000.              14:21:34
7       Do you see that?                        14:21:34
8       A.   Yes.                               14:21:36
9       Q.   And do you recognize that          14:21:36
10   e-mail?                                     14:21:38
11       A.   Yes.                              14:21:38
12       Q.   And what is it?                    14:21:38
13       A.   It's just an e-mail exchange       14:21:40
14   back and forth about when will we actually  14:21:42
15   see what the CLASS results look like.      14:21:46
16       Q.   And you would have received this   14:21:47
17   e-mail in the ordinary scope of your       14:21:48
18   employment at Pfizer?                       14:21:50
19       MR. WEISS: I object to the form        14:21:51
20   of the question.                            14:21:52
21       A.   Yes.                              14:21:52
22       Q.   And Dr. Loose wrote to you and     14:21:53
23   Dr. Wahba, "believe it or not, a draft     14:21:56
24   manuscript has already been written with   14:21:59
25   the sort of fill in the blanks depending   14:22:02

Page 249

63 (Pages 246 to 249)

E. Weiner

1
2  on what actually happens.  Gutsy, Leland."   14:22:05
3     Do you think it was gutsy to       14:22:09
4  draft the CLASS manuscript prior to      14:22:16
5  unblinding of the data?            14:22:18
6     MR. WEISS: I object to the form    14:22:20
7  of the question.               14:22:21
8     A.   It depends on what they actually   14:22:21
9  drafted.  It's standard practice in the    14:22:25
10 industry, for instance, to have table     14:22:25
11 shells for a study report before you know   14:22:26
12 what the numbers are so you can structure   14:22:28
13 the tables and know what they're going to   14:22:32
14 look like and make sure they're consistent  14:22:34
15 with the statistical analysis plan.  If     14:22:37
16 they wrote conclusions, that would have    14:22:41
17 been, but I didn't see what they actually   14:22:43
18 put together so I don't know.         14:22:43
19    Q.   Do you think it would be       14:22:45
20 inappropriate to write conclusions in a    14:22:47
21 draft manuscript before the data's       14:22:47
22 unblinded?                   14:22:51
23    A.   I think conclusions it would be,   14:22:53
24 certainly not to write the methodology    14:22:54
25 section and think about what tables and    14:22:57

Page 250

E. Weiner

1
2  figures you're going to want to put in.    14:23:00
3  And again, I didn't see the document so I   14:23:02
4  don't know which of those things they're    14:23:06
5  actually doing.               14:23:08
6     (Whereupon, an e-mail dated       14:23:08
7  June 4, 2001 was marked Plaintiff's      14:23:08
8  Exhibit 183 for identification.)        14:23:15
9     Q.   I want to show you what I'm     14:23:15
10 marking as Plaintiff's Exhibit 183.       14:23:17
11    Could you please take a look at     14:24:12
12 what I've marked as Plaintiff's         14:24:14
13 Exhibit 183.                  14:24:16
14    MR. SAHAM: For the record --       14:24:16
15    MR. WEISS: One hundred         14:24:19
16 eighty-four.                  14:24:21
17    MR. SAHAM: Pardon?           14:24:21
18    MR. WEISS: One hundred         14:24:21
19 eighty-four.                  14:24:21
20    MR. SAHAM: One hundred         14:24:26
21 eighty-three.                 14:24:27
22    MR. WEISS: I thought the last     14:24:27
23 one was one hundred eighty-three.      14:24:31
24    MR. SAHAM: No, I thought the      14:24:31
25 last one was one hundred eighty-two.     14:24:31

Page 251

E. Weiner

1
2     Did we --                14:24:35
3     MR. WEISS: Oh, my bad, you're     14:24:35
4  right.                     14:24:37
5     MR. SAHAM: So am I right, it's     14:24:38
6  one hundred eighty-three?           14:24:39
7     MR. WEISS: You're right.        14:24:41
8     MR. SAHAM: So just for the       14:24:42
9  record, I'm showing you what's been     14:24:43
10 marked as Plaintiff's Exhibit 183       14:24:45
11 which is a two-page-Bates number -- or    14:24:46
12 a two-page document bearing Bates      14:24:50
13 numbers DEFS 00029180 through 181.     14:24:53
14    Q.   And I'd ask you if you recognize  14:25:00
15 this document.                14:25:02
16    A.   It's an e-mail exchange between   14:25:02
17 myself and Mark Fletcher.          14:25:08
18    Q.   And is this an e-mail or e-mails   14:25:09
19 you would have sent and received at your   14:25:12
20 job at Pfizer?                14:25:17
21    A.   Yes.                14:25:17
22    Q.   And you would have sent and     14:25:19
23 received these e-mails in the ordinary    14:25:22
24 scope of your employment there?       14:25:23
25    MR. WEISS: I object to the form    14:25:25

Page 252

E. Weiner

1
2  of the question.               14:25:25
3     A.   Yes.                14:25:26
4     Q.   And you would have sent --      14:25:27
5  received the e-mail from Mr. Fletcher on   14:25:33
6  June 3, 2001?                 14:25:36
7     A.   Yeah, Dr. Fletcher.         14:25:37
8     Q.   And you would have responded to   14:25:40
9  Dr. Fletcher on June 4, 2001?         14:25:42
10    A.   Yes.                14:25:45
11    Q.   And the subject of these e-mails   14:25:45
12 are draft minutes from June 1 CLASS FDA   14:25:48
13 meeting?                   14:25:51
14    A.   Yes.                14:25:52
15    Q.   And what's being discussed here?   14:25:52
16    A.   Well, it's the next round of     14:25:54
17 labeling negotiations.             14:25:56
18    Q.   And was there some suggestion    14:25:58
19 that the sNDA be withdrawn altogether so   14:26:02
20 you could stick with the old warning?     14:26:02
21    A.   It looks from Mark's note as if    14:26:05
22 it's something that Phil Needleman was    14:26:20
23 thinking about.                14:26:23
24    Q.   And who is Phil Needleman?      14:26:24
25    A.   Phil Needleman at that time was   14:26:26

Page 253

64 (Pages 250 to 253)

E. Weiner

1       E. Weiner
2 -- had a role in R&D at Pharmacia having    14:26:31
3 been head of R&D at Searle.    14:26:32
4     I don't know that other than    14:26:36
5 that there was serious discussion about    14:26:39
6 that. I don't recall that being the big    14:26:41
7 theme in the label negotiations.    14:26:43
8    Q.   And did you have any other    14:26:46
9 interactions with Dr. Needleman regarding    14:26:48
10 CLASS?    14:26:50
11    A.   This is not even a direct    14:26:51
12 interaction. He was at many of the    14:26:56
13 rehearsals so he weighed in on issues. I    14:26:57
14 don't remember what point of view    14:27:03
15 specifically he had.    14:27:05
16    Q.   Did anyone ever express to you    14:27:06
17 internally that it was inappropriate to    14:27:08
18 submit the six-month data to JAMA?    14:27:11
19    A.   No. I think people were not    14:27:14
20 happy that there was not a lot of    14:27:27
21 opportunity to review the manuscript    14:27:30
22 before it went out, but I don't think    14:27:33
23 anybody complained to me that it was    14:27:36
24 grossly inappropriate.    14:27:38
25    Q.   Did Pfizer want to do that,    14:27:41

Page 254

---

E. Weiner

1       E. Weiner
2 submit the six-month data to JAMA?    14:27:43
3    A.   I don't know -- I don't recall    14:27:47
4 any specific forum where it was actually    14:27:57
5 actively discussed back and forth, so I    14:28:02
6 think Pfizer accepted that that's what was    14:28:09
7 submitted.    14:28:13
8    Q.   Do you know who made the    14:28:13
9 ultimate decision to submit the six-month    14:28:14
10 data?    14:28:18
11    A.   No.    14:28:18
12    Q.   Did you know Paul Dieppe, D I E    14:28:24
13 P P E?    14:28:28
14    A.   He is a European rheumatologist.    14:28:30
15    Q.   And is he well respected?    14:28:34
16    A.   Reasonably, yes.    14:28:36
17    Q.   And do you know of his work?    14:28:37
18    A.   I'm not recalling it at this    14:28:42
19 moment.    14:28:45
20    Q.   What do you know of Dr. Dieppe?    14:28:45
21    A.   That he's a British    14:28:48
22 rheumatologist in academia. I don't know    14:28:56
23 what his research interests were.    14:28:56
24    Q.   Do you know that he's coauthored    14:28:56
25 the British Medical Journal editorial with    14:28:57

Page 255

---

E. Weiner

1       E. Weiner
2 Dr. Juni that you referred to earlier?    14:29:01
3    A.   I didn't recall that fact.    14:29:04
4    Q.   In looking at Exhibit 183 at the    14:29:05
5 bottom of the first page and top of the    14:29:17
6 second page, the e-mail you wrote to Dr.    14:29:20
7 Fletcher on June 3, 2001 at 5:05 p.m.    14:29:24
8    Do you see that?    14:29:29
9    A.   Yes.    14:29:30
10    Q.   And you wrote, "we are still    14:29:30
11 back at square one."    14:29:32
12    What did you mean by that?    14:29:33
13    A.   (Reviewing).    14:29:36
14    I think it's just commenting on    14:30:33
15 the lack of progress we're making in the    14:30:57
16 negotiations because Dr. Temple said,    14:30:59
17 well, we agree on everything except these    14:31:02
18 three issues and those were the major    14:31:06
19 issues that were on the table in the first    14:31:09
20 place.    14:31:09
21    (Whereupon, an e-mail dated    14:31:09
22    June 12, 2001 was marked Plaintiff's    14:31:09
23    Exhibit 184 for identification.)    14:31:13
24    Q.   I want to show you what I'm    14:31:13
25 marking as Plaintiff's Exhibit 184.    14:31:14

Page 256

---

E. Weiner

1       E. Weiner
2    Could you please take a look at    14:31:43
3 that document.    14:31:45
4    MR. SAHAM: And for the record,    14:31:46
5    Plaintiff's Exhibit 184 is a    14:31:47
6    multi-page e-mail chain bearing Bates    14:31:50
7    numbers DEFS 01903073 through 76.    14:31:52
8    Q.   I'd ask if you recognize this    14:32:00
9 document.    14:32:00
10    A.   This is an e-mail chain between    14:32:02
11 Mark Fletcher and a bunch of other people    14:32:18
12 and it goes back quite a ways.    14:32:22
13    Q.   And looking at the second e-mail    14:32:24
14 on the first page, that's an e-mail you    14:32:27
15 were cc'd on from Mona Wahba on June 7,    14:32:30
16 2001?    14:32:34
17    A.   Right.    14:32:34
18    Q.   And you would have received that    14:32:36
19 in the course of your job at Pfizer?    14:32:38
20    A.   Yes.    14:32:40
21    Q.   And she writes, "I learned today    14:32:40
22 from my market colleagues at the    14:32:47
23 cross-functional team meeting that it will    14:32:50
24 be even more damaging to have the CLASS    14:32:53
25 results where the primary endpoint in the    14:32:55

Page 257

65 (Pages 254 to 257)

E. Weiner

1    E. Weiner
2    GI warning section."                14:32:58
3         What does that mean?           14:33:00
4    A.   I'm not sure exactly what she  14:33:01
5    means here.                    14:33:03
6    Q.   Does it mean that the marketing  14:33:04
7    people think the warning that announces  14:33:05
8    that you missed the primary endpoint in  14:33:08
9    CLASS will make it more difficult to sell  14:33:11
10   Celebrex than it had previously been?  14:33:13
11   A.   The FDA wouldn't put that type  14:33:15
12   of thing in a warning anyway.  Study  14:33:18
13   results don't go into warnings, so I'm  14:33:21
14   really not sure what she's talking about  14:33:24
15   there.                    14:33:26
16   Q.   Didn't some of the CLASS trial  14:33:26
17   results make its way into the warning  14:33:30
18   modification or the safety label  14:33:32
19   modification?                    14:33:33
20   A.   The label modification, yes.  14:33:34
21   But there's a section for clinical trial  14:33:36
22   results and the warnings don't have  14:33:38
23   clinical trial results in them.  I mean,  14:33:41
24   she's talking here about CLASS results in  14:33:44
25   the GI warning section and that just --  14:33:46

Page 258

1    E. Weiner
2    labels are not structured that way so I'm  14:33:50
3    not sure what she means.           14:33:53
4    Q.   So she may have been referring  14:33:54
5    to a different portion of the label?  14:33:55
6    A.   Maybe.  I don't know.           14:33:58
7    Q.   And who is Mitchell Gandelman?  14:33:59
8    A.   Mitchell worked for Liz Kitsis.  14:34:08
9    He's one of the medical marketing people.  14:34:12
10   Q.   And what was Kitsis' job?  14:34:14
11   A.   She was the lead medical  14:34:18
12   marketing person for Celebrex and Bextra.  14:34:19
13   Q.   Turning to the second page, the  14:34:26
14   bottom of the first page and top of the  14:34:29
15   second page, that's an e-mail from Mark  14:34:32
16   Fletcher to yourself, Peter Corr, and  14:34:36
17   Steven W. Ryder; is that correct?  14:34:40
18   A.   (Reviewing).                14:34:42
19        MR. SAHAM: Can you read back the  14:35:50
20        question, please.           14:35:51
21        (Whereupon the requested portion  14:35:52
22        was read back by the reporter)  14:36:07
23   A.   Yes.                    14:36:07
24   Q.   And this is an e-mail you would  14:36:07
25   have received on or about June 6, 2001?  14:36:10

Page 259

1    E. Weiner
2    A.   Yes.                    14:36:13
3    Q.   And you would have received it  14:36:14
4    as part of your job functions at Pfizer?  14:36:15
5    A.   Yes.                    14:36:17
6    Q.   And on the second page, page two  14:36:18
7    of Exhibit 184, Dr. Fletcher writes to  14:36:23
8    yourself, Dr. Corr, and Dr. Ryder, "the  14:36:28
9    numbers by themselves would be misleading  14:36:33
10   and potentially very damaging."  14:36:35
11        Do you know what he's referring  14:36:37
12   to there?                    14:36:39
13   A.   Well, he's quoting Eric Sirota,  14:36:40
14   so that's Eric's opinion, not necessarily  14:36:44
15   Mark's.                    14:36:46
16   Q.   Who is Eric Sirota?           14:36:47
17   A.   He was one of the commercial  14:36:50
18   people.                    14:36:52
19   Q.   And what was his opinion being  14:36:52
20   expressed?                    14:36:54
21   A.   I guess apparently he felt that  14:36:54
22   having just the -- and I'm not sure what  14:36:57
23   numbers they're talking about, is that  14:37:01
24   CSUGIEs, is that CSUGIEs plus symptomatic  14:37:04
25   ulcers, but basically he wants the P  14:37:11

Page 260

1    E. Weiner
2    values with the combined endpoint rather  14:37:14
3    than just I guess no P values there.  14:37:17
4    Q.   And then if you skip down a  14:37:20
5    little bit it says, "we should remove any  14:37:22
6    information about CLASS."           14:37:25
7        Do you know what's being  14:37:26
8    referred to there?           14:37:28
9    A.   Not exactly.  That's not  14:37:29
10   feasible anyway.                14:37:33
11        (Whereupon, an e-mail dated  14:37:41
12        July 2, 2001 was marked Plaintiff's  14:37:41
13        Exhibit 185 for identification.)  14:37:42
14   Q.   I want to show you what I'm  14:37:42
15   marking as Plaintiff's Exhibit 185.  14:37:43
16        Could you please take a look at  14:38:12
17   that document.                14:38:15
18        MR. SAHAM: And for the record,  14:38:15
19        Exhibit 185 is a two-page e-mail chain  14:38:16
20        bearing Bates numbers DEFS 03824859  14:38:20
21        through 60.                14:38:25
22   Q.   I'll ask you if you recognize  14:38:30
23   this e-mail chain.           14:38:31
24   A.   Yes.                    14:38:34
25   Q.   And what is it?           14:38:34

Page 261

66 (Pages 258 to 261)

E. Weiner

1
2     A.    It's an exchange between me and     14:38:41
3  Mark Fletcher.                   14:38:41
4     Q.    And this exchange occurred on or    14:38:41
5  about July 2, 2001?              14:38:41
6     A.    Yes.              14:38:43
7     Q.    And you would have sent and        14:38:44
8  received these e-mails in the ordinary    14:38:48
9  scope of your employment at Pfizer?      14:38:51
10       MR. WEISS: I object to the form     14:38:52
11  of the question.              14:38:53
12     A.    Yes.              14:38:53
13     Q.    And what are you discussing in     14:38:54
14  this e-mail?  The top e-mail I'm referring   14:38:59
15  to, the one you wrote.           14:39:05
16     A.    Well, it's about the CLASS     14:39:06
17  label, latest versions at that time.     14:39:09
18     Q.    And towards the bottom of your     14:39:11
19  e-mail you write, "the numbers currently    14:39:13
20  quoted look horrible, much worse than the   14:39:15
21  standard labeling for NSAID because       14:39:18
22  they're looking at symptomatic plus      14:39:21
23  complicated ulcers from CLASS whereas they  14:39:24
24  should only be looking at the complicated   14:39:27
25  ulcer rate."                 14:39:29

Page 262

E. Weiner

1
2     What did you mean by that?         14:39:30
3     A.    Well, the prior label focused on   14:39:33
4  -- which is based on the NDA database, the  14:40:13
5  warning section -- remember I told you     14:40:16
6  there was a number quoted and that was the  14:40:18
7  complicated ulcers, the rate of          14:40:20
8  complicated ulcers that was in the NDA     14:40:23
9  database.  This iteration of the label,    14:40:25
10  which I don't think is what ended up being  14:40:27
11  the final one, had -- was quoting the      14:40:29
12  number of complicated plus symptomatic     14:40:33
13  ulcers which is of course a much bigger    14:40:38
14  number in the warning section as derived   14:40:42
15  from the CLASS trial.  So this is a larger  14:40:46
16  number than certainly the previous number  14:40:51
17  which was complicated ulcers from the NDA  14:40:54
18  database and also, as I said earlier, a    14:40:58
19  larger number than the standard NSAID      14:41:02
20  warning that predates CLASS or celecoxib   14:41:04
21  or any of these things.          14:41:07
22     Q.    And in order to get that out of   14:41:08
23  the label, did you point out to the FDA    14:41:11
24  that that was not even the primary        14:41:13
25  endpoint of CLASS?               14:41:16

Page 263

E. Weiner

1
2     A.    I don't recall -- again, I was     14:41:17
3  not at the negotiations so I don't recall   14:41:19
4  what argument they used.         14:41:21
5     Q.    Would that be an argument that    14:41:22
6  would come to mind?              14:41:24
7       MR. WEISS: I object to the form     14:41:27
8  of the question.              14:41:28
9     A.    Well, yeah, it would be a      14:41:28
10  reasonable argument.             14:41:30
11     (Whereupon, an e-mail dated         14:41:33
12  December 31, 2002 was marked           14:41:33
13  Plaintiff's Exhibit 186            14:41:33
14  for identification.)            14:41:34
15     Q.    I want to show you what I'm      14:41:34
16  marking as Plaintiff's Exhibit 186.       14:41:35
17     Could you please take a look at     14:42:04
18  Plaintiff's Exhibit 186, which is a      14:42:06
19  three-page e-mail chain bearing Bates     14:42:12
20  numbers DEFS 00029482 through 484.        14:42:15
21     A.    (Reviewing)            14:42:30
22     Q.    Do you recognize this document?   14:42:35
23     A.    Yes.              14:42:37
24     Q.    And what is it?            14:42:37
25     A.    Let me read it first.         14:42:38

Page 264

E. Weiner

1
2     (Reviewing)              14:42:40
3     Well, presumably it's commentary    14:43:22
4  on a study that was done that found that   14:43:26
5  diclofenac plus omeprazole -- omeprazole   14:43:30
6  is a proton pump inhibitor, it's used to   14:43:37
7  prevent or treat ulcers -- that the GI     14:43:39
8  safety of celecoxib alone was roughly      14:43:43
9  comparable to diclofenac plus omeprazole.  14:43:46
10     Q.    And is this part of CONDOR or     14:43:49
11  something that was explored in CONDOR?     14:43:52
12     A.    This is sort of pre-CONDOR, I     14:43:54
13  think.  That's I think some of the        14:43:57
14  thinking that led them to design that      14:44:00
15  study.                   14:44:01
16     Q.    And this e-mail, at least the     14:44:02
17  top e-mail, you sent to Dr. Fletcher,      14:44:05
18  Sirota, and Mr. Gandelman on or about      14:44:10
19  December 31, 2002?               14:44:12
20     A.    Yes.              14:44:13
21     Q.    And you did so as part of your    14:44:14
22  job at Pfizer?               14:44:17
23     A.    Yes.              14:44:17
24     Q.    Down at the bottom of this       14:44:19
25  e-mail you write, "the editors of NEJM     14:44:20

Page 265

67 (Pages 262 to 265)

E. Weiner

1  didn't think it was flawed since they          14:44:22
2  published it and they have much better          14:44:24
3  credibility than anybody from industry."        14:44:27
4       What does that mean?                       14:44:31
5  A.   Well, generally editors of                 14:44:32
6  medical journals have a high degree of          14:44:38
7  credibility in the medical community,           14:44:41
8  sometimes that's deserved, sometimes not,       14:44:43
9  but the fact is that they certainly have        14:44:43
10 more credibility than industry does.            14:44:47
11    Q.   And does the industry have less         14:44:49
12 credibility because generally there's some      14:44:52
13 bias because, if a drug performs well, the      14:44:54
14 industry has a -- or a company may have a       14:44:57
15 financial gain as a result?                     14:45:00
16    MR. WEISS: I object to the form              14:45:01
17 of the question.                                14:45:02
18    A.   That's a perception. I mean,            14:45:03
19 one has to balance that with the fact that      14:45:05
20 academia people's careers depend on             14:45:10
21 publishing whereas in industry they don't       14:45:13
22 and that industry studies are audited and       14:45:15
23 so there can't be any fraud with the data       14:45:19
24 whereas studies in academia aren't. There       14:45:24

Page 266

E. Weiner

1  are also instances of journals I think          14:45:28
2  having an axe to grind. So I don't              14:45:31
3  necessarily believe that industry is            14:45:34
4  inherently -- inherently has less              14:45:39
5  credibility than anyone else, but I don't       14:45:42
6  dispute that that's the public perception.      14:45:45
7     Q.   But there is certainly a                14:45:46
8  potential issue of bias. I'm not saying         14:45:48
9  that the bias actually corrupts anybody in      14:45:48
10 any particular case.                            14:45:50
11    A.   There's always a potential issue        14:45:50
12 of bias. All I'm saying is that it's not        14:45:53
13 unique to industry. Everybody wrestles          14:45:56
14 with that.                                      14:45:59
15    Q.   But one at least issue of bias          14:45:59
16 or --                                           14:46:02
17    MR. SAHAM: Strike that.                      14:46:04
18    Q.   One potential bias of a sponsor         14:46:04
19 of a drug, an industry sponsor of a drug        14:46:08
20 in putting forward research is the fact         14:46:13
21 that if it's more positive, the company         14:46:16
22 would make or could make more money; is         14:46:23
23 that correct?                                   14:46:23
24    A.   That's a potential source of            14:46:23

Page 267

E. Weiner

1  bias.                                           14:46:24
2       (Whereupon, an e-mail dated                14:46:24
3  July 27, 2001 was marked Plaintiff's           14:46:24
4  Exhibit 187 for identification.)               14:46:37
5     Q.   I want to show you what I'm             14:46:37
6  marking as Plaintiff's Exhibit 187.            14:46:39
7       Could you please take a look at           14:47:04
8  that document.                                  14:47:06
9     MR. SAHAM: And for the record,              14:47:09
10 one hundred eighty-seven bears Bates           14:47:09
11 numbers DEFS 01723273 through 274.             14:47:12
12    Q.   And I'd ask you if you recognize       14:47:18
13 this document.                                  14:47:19
14    A.   (Reviewing).                           14:47:20
15       Yes.                                      14:47:23
16    Q.   And what is it?                         14:47:36
17    A.   Just Mark updating us on a             14:47:37
18 couple of issues with the COX-2 program        14:47:43
19 including a second events trial, CLASS II,      14:47:46
20 if you will.                                    14:47:50
21    Q.   And ultimately the CLASS II            14:47:51
22 trial was not conducted?                       14:47:53
23    A.   Not in the form that they were         14:47:54
24 talking about here.                            14:47:56

Page 268

E. Weiner

1     Q.   And it was sent -- this e-mail         14:47:58
2  was sent to you and to Steven Ryder and to     14:48:00
3  Peter Corr?                                     14:48:03
4     A.   Yes.                                    14:48:04
5     Q.   On or about July 27, 2001?             14:48:04
6     A.   Yeah. It was actually sent to          14:48:06
7  Ryder and Corr with me copied in.              14:48:09
8     Q.   And then you responded to this         14:48:15
9  e-mail on July 27, 2001?                       14:48:18
10    A.   Yes.                                    14:48:19
11    Q.   And you wrote, "I think CLASS II       14:48:20
12 is a bad idea?"                                 14:48:22
13    A.   Yes.                                    14:48:24
14    Q.   And why did you write that?            14:48:24
15    A.   Well, because if we -- and you         14:48:27
16 know, again, with any clinical trial, you      14:48:32
17 can make your endpoint or not. And of          14:48:35
18 course they're much more complex than just     14:48:41
19 binary, but consider the possibilities.        14:48:43
20 If you come out looking the way you want       14:48:45
21 to look and you've used naproxen, I don't      14:48:48
22 think anybody would be very impressed with     14:48:52
23 that. Because it's well acknowledged           14:48:55
24 there's a spectrum of GI toxicity for the      14:48:56

Page 269

68 (Pages 266 to 269)

E. Weiner

1
2   various NSAIDs out there and, you know, a          14:48:57
3   particularly bad actor, for instance, is          14:48:59
4   indomethacin.  Naproxen is probably in           14:49:03
5   sort of middle to bad end of the spectrum.        14:49:10
6   Ibuprofen and diclofenac are sort of on          14:49:14
7   the benign end of the spectrum.  And all         14:49:18
8   that was known long before any COX-2             14:49:20
9   agents came out.                                  14:49:22
10      So if you pick naproxen, what              14:49:24
11  are you getting if you're better than           14:49:26
12  naproxen?  I think everybody at that point      14:49:28
13  believed that we were better than               14:49:33
14  naproxen.  And if you look at the               14:49:35
15  epidemiology data and other things where        14:49:36
16  there was some comparisons, they would          14:49:40
17  certainly support that.  So if we win, it       14:49:43
18  doesn't tell anybody anything they didn't       14:49:46
19  already pretty much know to be the case.        14:49:49
20  And if things get screwed up in clinical        14:49:52
21  trials, as they always have a possibility       14:49:54
22  of doing, then you really lose.  So how         14:49:59
23  can this possibly be a benefit.                 14:50:03
24      Q.   Is it accurate that the VIGOR         14:50:05
25  hurdle for Merck and Vioxx was a lot lower      14:50:09

Page 270

E. Weiner

1
2   because they used naproxen and then they         14:50:13
3   used the combined endpoint of complicated       14:50:16
4   and symptomatic ulcers?                          14:50:17
5      A.   I don't know if it's accurate or        14:50:17
6   not but I certainly agree with that             14:50:18
7   proposition.                                     14:50:21
8      Q.   So you guys sort of swung for           14:50:23
9   the fences with a tougher endpoint as           14:50:27
10  compared to Merck that played it safe with      14:50:29
11  VIGOR using a more easily achieved              14:50:32
12  endpoint?                                        14:50:36
13     A.   Well, I think it's fair to say          14:50:36
14  that CLASS was a more ambitious trial.          14:50:38
15     Q.   And then at the end you write,          14:50:44
16  "why should we spend lots of money only to      14:50:48
17  at best end up where we started."              14:50:52
18          What did you mean there?                14:50:52
19     A.   Well, again, if you win, it's          14:50:53
20  sort of so what.                                14:50:56
21          (Whereupon, an e-mail dated            14:50:56
22  August 27, 2003 was marked Plaintiff's          14:50:56
23  Exhibit 188 for identification.)                14:51:08
24     Q.   I want to show you what I'm            14:51:08
25  marking as Plaintiff's Exhibit 188.            14:51:09

Page 271

E. Weiner

1
2          Could you please take a look at         14:51:36
3   Plaintiff's Exhibit 188.                        14:51:38
4          MR. SAHAM:  And for the record,         14:51:40
5      Plaintiff's Exhibit 188 is a                14:51:42
6      three-page e-mail chain bearing Bates       14:51:44
7      numbers DEFS 02953679 through 681.          14:51:48
8      Q.   And I'd ask you if you recognize       14:51:58
9   this document.                                  14:52:00
10     A.   Yes.                                    14:52:01
11     Q.   And what is it?                         14:52:01
12     A.   Just an e-mail correspondence          14:52:02
13  about some research that was done showing       14:52:05
14  that some of the drugs, particularly           14:52:07
15  ibuprofen, can interfere with the              14:52:11
16  cardioprotective activities of aspirin.        14:52:16
17     Q.   And the top e-mail is from Dr.         14:52:19
18  Wahba to Mitch Gandelman and yourself?         14:52:23
19     A.   Yes.                                    14:52:25
20     Q.   And Dr. Wahba writes, "the story       14:52:26
21  with ASA and COX-2 is very complicated.        14:52:30
22  With the fourfold increase in ulcer            14:52:34
23  complications in CLASS and the new Vioxx        14:52:37
24  label change, we are facing a lot of           14:52:40
25  challenges re the risk/benefits."              14:52:43

Page 272

E. Weiner

1
2          Do you know what she's referring        14:52:45
3   to there?                                       14:52:47
4      A.   I don't know what the fourfold         14:52:47
5   refers to.                                      14:52:49
6      Q.   Well, was there an increase in         14:52:54
7   ulcer complication rates in CLASS as           14:52:57
8   compared to earlier studies with respect       14:52:59
9   to Celebrex?                                    14:53:01
10     A.   Yes, but I don't know whether          14:53:02
11  she's referring to there or whether she        14:53:04
12  was referring to the complications on          14:53:07
13  CLASS plus aspirin versus no aspirin and       14:53:12
14  it's not really clear from this e-mail.        14:53:15
15  It might have been at the time but I'm not     14:53:17
16  sure what she's talking about.                 14:53:20
17     Q.   But there was definitely an           14:53:21
18  increase in the ulcer complication rate in     14:53:23
19  CLASS as compared to prior study?             14:53:26
20          MR. WEISS:  I object to the form       14:53:28
21  of the question.                                14:53:30
22     A.   That's a totally different            14:53:30
23  question.  I don't know if that's what she     14:53:40
24  means.                                          14:53:40
25     Q.   Well, I'm just asking if that's       14:53:40

Page 273

69 (Pages 270 to 273)

E. Weiner

1          E. Weiner
2  true or not.             14:53:40
3     A.   It's true if you compare the   14:53:40
4  rate of complicated ulcers in CLASS with   14:53:40
5  the rate of complicated ulcers in the   14:53:43
6  database, in the NDA database that   14:53:46
7  preceded it, but again that database   14:53:50
8  wasn't designed as an outcomes trial so   14:53:52
9  I'm not sure it's a totally valid   14:53:52
10  comparison.           14:53:56
11     Q.   What is the NDA database that   14:53:56
12  you're referring to?       14:53:58
13     A.   Well, that's where the original   14:53:59
14  label came from.  What was done in the NDA   14:54:01
15  database is that all GI events were   14:54:04
16  adjudicated by a committee, but it was   14:54:09
17  just pooling all the studies that were   14:54:10
18  done for various reasons, mostly for   14:54:13
19  arthritis, and it was not specifically   14:54:18
20  designed or powered as any kind of GI   14:54:20
21  outcomes trial.         14:54:23
22     Q.   And you would have received this   14:54:24
23  e-mail in the ordinary scope of your   14:54:27
24  employment at Pfizer?      14:54:28
25     MR. WEISS: I object to the form   14:54:29

Page 274

E. Weiner

1  of the question.         14:54:30
2     MR. SAHAM: Let's take a short   14:54:31
3  break because I think we're getting   14:54:32
4  pretty close to the end and we just   14:54:35
5  want to sort through the last few   14:54:35
6  documents and see where we are.   14:54:36
7     THE VIDEOGRAPHER: Stand by.   14:54:36
8  We are going off the record.   14:54:37
9  The time is 2:52 p.m.     14:54:39
10     This is the end of tape number   14:54:41
11  four.             14:54:43
12     (Whereupon a break was taken)   14:54:44
13     (Whereupon, an e-mail dated   15:04:35
14  February 16, 2000 was marked   15:04:35
15  Plaintiff's Exhibit 189     15:04:35
16  for identification.)      15:04:37
17     (Whereupon, an e-mail dated   15:04:37
18  August 20, 2001 was marked   15:04:37
19  Plaintiff's Exhibit 190     15:04:37
20  for identification.)      15:04:37
21     THE VIDEOGRAPHER: We are back on   15:04:37
22  the record.  The time is 3:02 p.m.   15:04:38
23     This is the beginning of tape   15:04:40
24  number five.          15:04:44

Page 275

E. Weiner

1     Q.   Dr. Weiner, I'm showing you what   15:04:44
2  I've marked as Plaintiff's Exhibit 189.   15:04:49
3     Could you please take a look at   15:04:52
4  that document.        15:04:54
5     MR. SAHAM: For the record, it   15:04:55
6  bears Bates numbers DEFS 00081653   15:04:56
7  through 654.         15:05:00
8     Q.   And I'd ask you if you recognize   15:05:03
9  that.             15:05:05
10     A.   Yes.         15:05:06
11     Q.   And what is it?     15:05:06
12     A.   It's an e-mail exchange between   15:05:07
13  myself and Mona Wahba.     15:05:10
14     Q.   And Dr. Wahba writes at the top,   15:05:11
15  "the database will be locked at 3/17.  We   15:05:13
16  will see then."        15:05:17
17     Do you see that?     15:05:17
18     A.   Yes.         15:05:21
19     Q.   And does that refresh your   15:05:21
20  recollection that the database was locked   15:05:23
21  on March 17, 2000?      15:05:25
22     A.   Yes.         15:05:26
23     Q.   And when we looked at the final   15:05:27
24  report, the second page of I believe it's   15:05:29

Page 276

E. Weiner

1  Exhibit 115 where you weren't sure whether   15:05:33
2  that March 17 date was when it was   15:05:38
3  unlocked -- I'm sorry, when the database   15:05:42
4  was locked or when the last patient was   15:05:44
5  treated?          15:05:46
6     And would it be accurate to say   15:05:47
7  that the database, as you just testified,   15:05:49
8  was locked on March 17?     15:05:51
9     A.   Yes.  Yes, it was.    15:05:52
10     Q.   And then the data was unblinded   15:05:54
11  at that point?       15:05:57
12     A.   Yes.        15:05:57
13     Q.   And this document you received   15:06:03
14  in the ordinary scope of employment   15:06:05
15  at Pfizer?         15:06:07
16     A.   Yes.        15:06:07
17     MR. WEISS: I object to the form   15:06:08
18  of the question.       15:06:09
19     Q.   I want to show you what I've   15:06:20
20  marked as Plaintiff's Exhibit 190.   15:06:22
21     Could you take a look at that   15:06:24
22  document.         15:06:26
23     MR. SAHAM: And for the record,   15:06:30
24  Plaintiff's Exhibit 190 bears Bates   15:06:30

Page 277

70 (Pages 274 to 277)

E. Weiner

1
2      numbers DEFS 03752026 through 28. And      15:06:32
3      it's an e-mail chain.                      15:06:41
4      Q.    And I ask you if you recognize       15:06:43
5      it.                                        15:06:45
6      A.    Yes.                                 15:06:45
7      Q.    And what is it?                       15:06:46
8      A.    It's an e-mail exchange about         15:06:47
9      letters to the editor of JAMA.             15:06:52
10     Q.    And in what context were these       15:06:56
11     letters generated?                         15:06:59
12     A.    Let me just read through this a      15:06:59
13     minute.                                     15:07:05
14          (Reviewing).                          15:07:05
15          Oh, it was about two editorials      15:07:08
16     that I think were critical of the use of   15:07:41
17     the six-month data in the JAMA -- original 15:07:44
18     JAMA article.                              15:07:51
19     Q.    And in your August 20, 2001          15:07:52
20     e-mail you write at the bottom, "JAMA      15:07:53
21     stuck with the six-month analysis."        15:07:57
22          Do you see that?                      15:08:00
23     A.    Yes.                                 15:08:02
24     Q.    Well, JAMA was only given the        15:08:02
25     six-month analysis, they weren't given the 15:08:05

Page 278

E. Weiner

1
2      full data; correct?                        15:08:08
3      A.    Yes.                                 15:08:09
4      Q.    And then you write, "without         15:08:10
5      step two, the reader will still assume     15:08:11
6      that somehow we selectively sent one       15:08:14
7      analysis to JAMA and another to FDA and    15:08:14
8      this is not the case."                     15:08:18
9          That was the case though;             15:08:19
10     correct?                                    15:08:21
11          MR. WEISS: I object to the form       15:08:21
12     of the question.                           15:08:22
13     A.    Well, to be fair, a couple of        15:08:23
14     things.                                     15:08:26
15          I was never exactly privy to         15:08:26
16     what was sent to JAMA and what wasn't. I   15:08:29
17     think at the time I wrote this letter I    15:08:32
18     assumed that they at least having read the 15:08:35
19     methods section were aware of the one-year 15:08:40
20     data. And we clearly sent both to FDA.     15:08:44
21     We certainly didn't just send the          15:08:49
22     twelve-month data to FDA.                   15:08:53
23     Q.    You assumed that your colleagues     15:08:55
24     at Pharmacia and the individual authors on 15:08:57
25     Wolf Exhibit 3 had submitted the entire    15:08:59

Page 279

E. Weiner

1
2      data to JAMA; isn't that correct?          15:09:02
3          MR. WEISS: I object to the form       15:09:04
4      the question.                              15:09:05
5      A.    Well, I assume that they would      15:09:07
6      have made it available had JAMA requested  15:09:08
7      it.                                        15:09:09
8      Q.    And you assume they made it          15:09:10
9      available because it was improper not to;  15:09:11
10     correct?                                    15:09:13
11          MR. WEISS: I object to the form      15:09:13
12     of the question.                           15:09:14
13     A.    Well, I would assume that           15:09:16
14     because I would have thought during the    15:09:18
15     peer review process, if nothing else,      15:09:18
16     somebody would have said, well, the study  15:09:21
17     goes on more than six months, you say      15:09:22
18     right in your methods section, so what     15:09:23
19     happened.                                   15:09:28
20     Q.    And have you ever been involved     15:09:28
21     in a situation with a medical journal      15:09:30
22     where only part of the data was provided   15:09:32
23     without an explanation as to why?          15:09:35
24          MR. WEISS: I object to the form      15:09:37
25     of the question.                           15:09:38

Page 280

E. Weiner

1
2      A.    No. But as I said, my               15:09:40
3      involvement in submitting clinical data is 15:09:51
4      fairly limited.                            15:09:51
5          MR. SAHAM: I don't have any          15:09:51
6      additional questions.                      15:09:51
7          MR. WEISS: I just have one or        15:09:51
8      two questions.                             15:09:53
9          MR. SAHAM: Subject to I may have     15:10:02
10     some questions after him.                  15:10:04
11     EXAMINATION BY                             15:10:06
12     MR. WEISS:                                 15:10:07
13     Q.    Dr. Weiner, I ask you to pull       15:10:07
14     out from your pile of exhibits Exhibit     15:10:13
15     Number 173. Let me know when you've       15:10:21
16     located it.                                15:10:59
17     A.    I'm getting close. Okay, I got      15:11:00
18     it.                                        15:11:10
19     Q.    Could you take a look at the        15:11:10
20     second e-mail in the chain which is -- I'm 15:11:13
21     sorry, could you take a look at the second 15:11:16
22     page of the document which is -- which     15:11:19
23     bears Bates number 00291346 and the e-mail 15:11:23
24     at the top is from Mona Wahba to Leland    15:11:29
25     Loose and yourself dated January 22, 2001. 15:11:32

Page 281

71 (Pages 278 to 281)

E. Weiner

1  E. Weiner
2  And I'd ask you to take a look at the          15:11:36
3  subject line of the e-mail.                     15:11:39
4      Do you see what that says?          15:11:40
5      A.   Meeting FDA tomorrow regarding    15:11:42
6  CLASS advisory committee.                      15:11:43
7      Q.   I'm sorry, let me ask you again    15:11:50
8  to turn to the second page of the              15:11:52
9  document.                                       15:11:54
10     A.   Oh, okay.  The top of the second   15:11:54
11 page.                                           15:11:58
12     Q.   Right, and that's the e-mail --     15:11:58
13     A.   Comments on FDA CLASS advisory    15:11:59
14 committee briefing document.                   15:12:02
15     Q.   And do you recall you had some    15:12:03
16 discussion with Mr. Saham about the           15:12:04
17 content of this e-mail?                         15:12:07
18     A.   Yes.                                15:12:08
19     Q.   And reviewing this e-mail, do     15:12:08
20 you have any view as to whether the           15:12:12
21 information being expressed in this e-mail    15:12:16
22 represents Mona Wahba's opinions?             15:12:20
23     MR. SAHAM: Objection to form.         15:12:24
24     MR. WEISS: Strike that.  Let me       15:12:28
25 ask it this way.                               15:12:29

Page 282

E. Weiner

1  E. Weiner
2      Q.   Looking at this e-mail, what is    15:12:30
3  your view as to what Mona Wahba is           15:12:35
4  conveying to you?                              15:12:39
5      A.   Well, she's conveying a summary   15:12:40
6  of the briefing book written by FDA.          15:12:43
7      Q.   Do you have an understanding as   15:12:46
8  to whether or not what is reflected in        15:12:47
9  this e-mail reflects Mona Wahba's            15:12:50
10 opinions?                                      15:12:53
11     A.   I think the only place her        15:12:53
12 opinions come in is what she chose to         15:12:57
13 exert but then what's in here is her best     15:13:02
14 assessment of what FDA is saying.            15:13:08
15     Q.   So to the extent that you         15:13:11
16 previously characterized anything she said    15:13:12
17 in this e-mail, anything Mona said in this    15:13:15
18 e-mail as her opinion, that would not be      15:13:19
19 correct?                                       15:13:22
20     MR. SAHAM: Objection to form.         15:13:22
21     Misstates prior testimony.              15:13:24
22     A.   Well, yes.  I mean, we -- I       15:13:25
23 guess to the extent that we talk about the    15:13:28
24 merits of these arguments, it would be        15:13:32
25 what FDA is saying through Mona's summary  15:13:35

Page 283

E. Weiner

1  E. Weiner
2  rather than through what Mona's saying       15:13:40
3  herself.                                        15:13:48
4      Q.   You were asked some questions     15:13:50
5  about Mr. Saham some comments you          15:13:52
6  made in an e-mail to Steven Ryder about      15:13:56
7  Lee Simon.                                     15:14:00
8      Do you remember that?                 15:14:01
9      A.   Yes.                                15:14:01
10     Q.   And in that e-mail, I believe      15:14:02
11 you said that Dr. Simon absolutely could     15:14:04
12 not be trusted.                                 15:14:08
13     Do you recall that?                    15:14:09
14     A.   Yes.                                15:14:10
15     Q.   And I'm referring now to what's    15:14:10
16 been marked as Exhibit 182.                   15:14:13
17     And I would just ask you, is it        15:14:17
18 your opinion that Dr. Simon's clinical        15:14:19
19 judgments absolutely can't be trusted?       15:14:24
20     A.   No, no, his clinical judgments    15:14:29
21 were very sharp and, as I said in that        15:14:31
22 e-mail, he had a lively intellect.             15:14:34
23     MR. WEISS: I have no further          15:14:49
24 questions.                                      15:14:50
25     MR. SAHAM: I don't have anything     15:14:50

Page 284

E. Weiner

1  E. Weiner
2  further.                                        15:14:52
3      Dr. Weiner, I would ask that you       15:14:54
4  review the transcript and make any          15:14:57
5  corrections and submit that back to          15:15:00
6  your counsel if there are any               15:15:03
7  corrections once you get the                 15:15:04
8  transcript.                                    15:15:07
9      Could you do that for us?             15:15:07
10     THE WITNESS: Sure.                    15:15:08
11     THE VIDEOGRAPHER: Please stand       15:15:09
12 by.                                            15:15:11
13     This concludes today's                15:15:11
14 deposition.  The time is 3:13 p.m. and      15:15:12
15 we are off the record.                        15:15:16
16     (TIME NOTED:  3:13 p.m.)
17
18
19
20
21 _____
22 (Signature of witness)
23
24
25

Page 285

72 (Pages 282 to 285)

```
1
2                    *    *    *
3
4                 I N D E X
5   WITNESS       EXAMINED BY      PAGE
6   E. Weiner    Mr. Saham        5
7              Mr. Weiss      281
8
9             E X H I B I T S
10  PLAINTIFF'S    DESCRIPTION      PAGE
11  Exhibit 162 E-mail dated
12        April 17, 2000      26
13  Exhibit 163 E-mail dated
14        April 16, 2000      44
15  Exhibit 164 E-mail dated
16        April 17, 2000      58
17  Exhibit 165 E-mail dated
18        March 1, 2000      87
19  Exhibit 166 E-mail dated
20        March 26, 2000      97
21  Exhibit 167 Document entitled
22        U.S. Collaboration
23        Agreement      104
24  Exhibit 168 E-mail dated
25        January 16, 2001      140
```
Page 286

```
1
2             I N D E X (continued)
3          E X H I B I T S (continued)
4   PLAINTIFF'S     DESCRIPTION      PAGE
5   Exhibit 169 E-mail dated
6        January 20, 2001      149
7   Exhibit 170 Document entitled
8        FDA CLASS Assessment      174
9   Exhibit 171 E-mail dated
10        January 23, 2001      182
11  Exhibit 172 E-mail dated
12        January 26, 2001      185
13  Exhibit 173 E-mail dated
14        January 27, 2001      189
15  Exhibit 174 E-mail dated
16        January 27, 2001      199
17  Exhibit 175 E-mail dated
18        April 19, 2001      207
19  Exhibit 176 E-mail dated
20        August 28, 2001      210
21  Exhibit 177 E-mail dated
22        April 8, 2001      216
23  Exhibit 178 E-mail dated
24        May 10, 2001      228
25
```
Page 287

```
1
2             I N D E X (continued)
3          E X H I B I T S (continued)
4   PLAINTIFF'S     DESCRIPTION      PAGE
5   Exhibit 179 E-mail dated
6        January 18, 2001      232
7   Exhibit 180 E-mail dated
8        April 8, 2001      237
9   Exhibit 181 E-mail dated
10        April 3, 2001      240
11  Exhibit 182 E-mail dated
12        September 5, 2001      243
13  Exhibit 183 E-mail dated
14        June 4, 2001      251
15  Exhibit 184 E-mail dated
16        June 12, 2001      256
17  Exhibit 185 E-mail dated
18        July 2, 2001      261
19  Exhibit 186 E-mail dated
20        December 31, 2002      264
21  Exhibit 187 E-mail dated
22        July 27, 2001      268
23  Exhibit 188 E-mail dated
24        August 27, 2003      271
25
```
Page 288

```
1
2             I N D E X (continued)
3          E X H I B I T S (continued)
4   PLAINTIFF'S     DESCRIPTION      PAGE
5   Exhibit 189 E-mail dated
6        February 16, 2000      275
7   Exhibit 190 E-mail dated
8        August 20, 2001      275
9
10
11             *    *    *
12                         15:15:35
13
14
15
16
17
18
19
20
21
22
23
24
25
```
Page 289

73 (Pages 286 to 289)

```
 1        CERTIFICATION BY REPORTER
 2
 3      I, Wayne Hock, a Notary Public of the
 4   State of New York, do hereby certify:
 5      That the testimony in the within
 6   proceeding was held before me at the
 7   aforesaid time and place;
 8      That said witness was duly sworn
 9   before the commencement of the testimony,
10   and that the testimony was taken
11   stenographically by me, then transcribed
12   under my supervision, and that the within
13   transcript is a true record of the
14   testimony of said witness.
15      I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, that I am not
18   interested directly or indirectly in the
19   matter in controversy, nor am I in the
20   employ of any of the counsel.
21      IN WITNESS WHEREOF, I have hereunto
22   set my hand this 5th day of October
23   , 2010.
24      _____
25        Wayne Hock
```

Page 290

74 (Page 290)

# EXHIBIT 3

CONFIDENTIAL

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

_____

ALASKA ELECTRICAL PENSION FUND,
et al.,

      Plaintiffs,           Civil No. 03-1519(AET)

   - against -

PHARMACIA CORPORATION, et al.,

      Defendants.
_____
        October 28, 2011
        9:05 a.m.

     CONFIDENTIAL

    Deposition of KENNETH M. LEHN, taken

by Plaintiffs, pursuant to Notice, held at

the offices of Simpson Thacher & Bartlett

LLP, 425 Lexington Avenue, New York, New

York, before Todd DeSimone, a Registered

Professional Reporter and Notary Public of

the State of New York.

Pages 1 - 398

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

| Page 2 |
| --- |

1
2  A P P E A R A N C E S :
3  ROBBINS GELLER RUDMAN & DOWD LLP
    665 West Broadway
4   Suite 1900
    San Diego, California 92101
5      Attorneys for Plaintiffs
    BY:   SCOTT H. SAHAM, ESQ.
6        ssaham@rgrdlaw.com
         LUCAS F. OLTS, ESQ.
7        lolts@rgrdlaw.com
8
9
   SCOTT & SCOTT
10   707 Broadway
    Suite 1000
11  San Diego, California 92101
       Attorneys for Plaintiffs
12  BY:   MATTHEW MONTGOMERY, ESQ.
        mmontgomery@scott-scott.com
13
14
15  MOTLEY RICE LLC
    28 Bridgeside Boulevard
16  Mt. Pleasant, South Carolina 29464
       Attorneys for Plaintiffs
17  BY:  JOSHUA LITTLEJOHN, ESQ.
        jlittlejohn@motleyrice.com
18
19
20  SIMPSON THACHER & BARTLETT LLP
21  425 Lexington Avenue
    New York, New York 10017
22     Attorneys for Defendants
    BY:   GEORGE S. WANG, ESQ.
23        gwang@stblaw.com
          SHANNON McGOVERN, ESQ.
24        smcgovern@stblaw.com
25

| Page 3 |
| --- |

1
2  A P P E A R A N C E S :  (Continued)
3  DLA PIPER LLP (US)
    1251 Avenue of the Americas
4   New York, New York 10020-1104
       Attorneys for Defendants
5  BY:   MICHAEL S. WIGOTSKY, esq.
        michael.wigotsky@dlapiper.com
6
7
8
9
   ALSO PRESENT:
10
    PETER COOPER, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 4 |
| --- |

1      LEHN - CONFIDENTIAL
2        THE VIDEOGRAPHER:  Good morning.  09:05:21AM
3  We are now on the record.  Please note     09:05:22AM
4  that the microphones are sensitive and may  09:05:25AM
5  pick up whispering and private             09:05:27AM
6  conversations.  Please turn off all cell   09:05:29AM
7  phones or place them away from the         09:05:31AM
8  microphones as they can interfere with the 09:05:33AM
9  deposition audio.  Recording will continue 09:05:35AM
10 until all parties agree to go off the      09:05:37AM
11 record.                    09:05:38AM
12        My name is Pete Cooper   09:05:39AM
13 representing Veritext Los Angeles.  The    09:05:40AM
14 date today is October 28th, 2011 and the   09:05:42AM
15 time is approximately 9:05 a.m.            09:05:45AM
16        This deposition is being held  09:05:49AM
17 at Simpson Thacher & Bartlett, located at  09:05:50AM
18 425 Lexington Avenue in New York, New York 09:05:56AM
19 and is being taken by counsel for the      09:05:58AM
20 plaintiffs.  The caption of this case is   09:06:00AM
21 Alaska Electrical Pension Fund, et al,     09:06:02AM
22 versus Pharmacia Corporation, et al.  This 09:06:07AM
23 case is filed in the United States         09:06:10AM
24 District Court, District of New Jersey,    09:06:12AM
25 Civil Action Number 03-1519.  The name of  09:06:15AM

| Page 5 |
| --- |

1      LEHN - CONFIDENTIAL
2  the witness is Ken Lehn.               09:06:20AM
3        At this time the attorneys       09:06:22AM
4  present in the room and attending remotely 09:06:23AM
5  will identify themselves and the parties   09:06:25AM
6  they represent.                09:06:27AM
7        MR. WANG:  George Wang, counsel 09:06:28AM
8  for defendants.                09:06:30AM
9        MR. WIGOTSKY:  Mike Wigotsky,   09:06:31AM
10 counsel for defendants.            09:06:32AM
11        MS. McGOVERN:  Shannon McGovern 09:06:33AM
12 for defendants.                09:06:34AM
13        MR. LITTLEJOHN:  Josh          09:06:37AM
14 Littlejohn for the plaintiffs.          09:06:39AM
15        MR. MONTGOMERY:  Matt          09:06:39AM
16 Montgomery for the plaintiffs.           09:06:40AM
17        MR. OLTS:  Lucas Olts for the   09:06:41AM
18 plaintiffs.                    09:06:42AM
19        MR. SAHAM:  Scott Saham for the 09:06:43AM
20 plaintiffs.                    09:06:44AM
21        THE VIDEOGRAPHER:  Our court    09:06:45AM
22 reporter, Todd DeSimone, representing      09:06:46AM
23 Veritext, will swear in the witness and we 09:06:48AM
24 can proceed.                   09:06:49AM
25      * * *

2  (Pages 2 to 5)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 6

1        LEHN - CONFIDENTIAL
2    K E N N E T H   M.   L E H N,
3    called as a witness, having been first
4    duly sworn, was examined and testified
5    as follows:
6    EXAMINATION BY MR. SAHAM:              09:06:56AM
7      Q.    Good morning, Dr. Lehn.        09:06:56AM
8      A.    Good morning.                  09:06:58AM
9      Q.    I want to show you what I have 09:06:59AM
10   marked as Plaintiffs' Exhibit 500.  Could  09:07:00AM
11   you take a look at that document.       09:07:03AM
12         (Plaintiffs' Exhibit 500 marked  09:07:05AM
13   for identification.)                   09:07:07AM
14     Q.    And do you recognize what I    09:07:23AM
15   have marked as Plaintiffs' Exhibit 500?  09:07:24AM
16     A.    Right.  This is my report that 09:07:26AM
17   I filed on June 7th, 2011, with the one 09:07:28AM
18   caveat that I haven't checked every page,  09:07:31AM
19   but it does appear to be my full report.  09:07:33AM
20     Q.    And why did you prepare this   09:07:35AM
21   report?                                09:07:38AM
22     A.    I was retained by counsel for  09:07:38AM
23   the defendants to offer opinions in this  09:07:40AM
24   matter.                                09:07:43AM
25     Q.    And does this report set forth 09:07:43AM

Page 7

1        LEHN - CONFIDENTIAL
2    your opinions on that page?            09:07:45AM
3      A.    It did as of the date of June  09:07:46AM
4    7th, 2011, and then subsequent to that I  09:07:49AM
5    formed opinions as to the work that Dr.  09:07:52AM
6    Feinstein has done.                    09:07:55AM
7      Q.    And are those opinions         09:07:57AM
8    expressed in your rebuttal report?     09:07:59AM
9      A.    They are.                      09:08:00AM
10     Q.    And do the reports, both what I 09:08:01AM
11   have marked as 500 and your rebuttal   09:08:05AM
12   report, do those set out the bases for  09:08:07AM
13   your opinions that you are going to be  09:08:09AM
14   offering in this case?                 09:08:12AM
15     A.    They do.                       09:08:12AM
16     Q.    And the methodologies as well? 09:08:13AM
17     A.    They do.                       09:08:15AM
18     Q.    In addition to the opinions and 09:08:16AM
19   bases and methodologies set out in those  09:08:19AM
20   reports, do you intend to offer any other  09:08:21AM
21   opinions in this case?                 09:08:23AM
22     A.    Not unless I'm asked to by     09:08:25AM
23   counsel.                               09:08:28AM
24     Q.    And as we sit here today you   09:08:28AM
25   have not been asked to offer any other 09:08:31AM

Page 8

1        LEHN - CONFIDENTIAL
2    opinions?                              09:08:32AM
3      A.    That's correct.                09:08:33AM
4      Q.    And looking at your report,    09:08:33AM
5    which I have marked as Exhibit 500, could  09:08:35AM
6    you turn to Exhibit 4 of the report.  And  09:08:37AM
7    could you just tell me what Exhibit 4 is?  09:08:58AM
8      A.    Exhibit 4 summarizes the       09:09:00AM
9    residual returns that I calculated for  09:09:02AM
10   Pharmacia's common stock using the event  09:09:05AM
11   study methodology during the class period  09:09:08AM
12   of April 17th, 2000 through August 5th,  09:09:10AM
13   2001.                                  09:09:14AM
14     Q.    And can you briefly describe   09:09:14AM
15   what the event study methodology is and  09:09:16AM
16   why you used it in this case.          09:09:18AM
17     A.    Sure.  The event study         09:09:20AM
18   methodology is a technique that is widely  09:09:21AM
19   used in the academic literature and one  09:09:23AM
20   that I've used frequently in the academic  09:09:25AM
21   literature as well as in the context of  09:09:28AM
22   litigation, and it is a technique that  09:09:30AM
23   allows one to determine the relation   09:09:33AM
24   between the release of information on a  09:09:37AM
25   given day and changes in the underlying  09:09:39AM

Page 9

1        LEHN - CONFIDENTIAL
2    security price on that date.           09:09:43AM
3           And it allows you to not only   09:09:46AM
4    quantify the potential impact that the  09:09:49AM
5    release of information had on a security  09:09:52AM
6    price, but to determine whether or not the  09:09:54AM
7    change in the security price was        09:09:57AM
8    statistically significant.             09:09:58AM
9      Q.    And is your event study that   09:10:00AM
10   you did in this case, does that form the  09:10:04AM
11   bases for your opinions regarding       09:10:06AM
12   materiality and loss causation that you  09:10:07AM
13   are offering?                          09:10:09AM
14     A.    It does.  There's additional   09:10:16AM
15   work that I did as well.  But it is the  09:10:18AM
16   basis for the opinion, that is correct.  09:10:21AM
17     Q.    And if you didn't do the event 09:10:25AM
18   study in regression analysis, would you  09:10:26AM
19   have been able to offer an opinion      09:10:30AM
20   regarding loss causation and materiality  09:10:32AM
21   in this case?                          09:10:33AM
22         MR. WANG:  Objection to form.    09:10:34AM
23     A.    Well, it is my opinion that the 09:10:36AM
24   most appropriate way to test for loss  09:10:43AM
25   causation in a securities matter is to  09:10:45AM

3  (Pages 6 to 9)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 10

1           LEHN - CONFIDENTIAL
2    conduct event study analysis.  If in fact   09:10:47AM
3    one was unable to do an event study, as I   09:10:53AM
4    sit here, I'm not aware of how one could   09:10:56AM
5    form an opinion that would be consistent   09:10:59AM
6    with accepted practice in the scientific   09:11:01AM
7    literature.                                 09:11:03AM
8        Q.    So you are not aware of any   09:11:04AM
9    other reliable methodology that would   09:11:05AM
10   allow one to opine regarding loss   09:11:08AM
11   causation and materiality in the context   09:11:11AM
12   of a securities lawsuit such as this one?   09:11:13AM
13           MR. WANG: Objection to form.   09:11:16AM
14       A.    Again, the way that I approach   09:11:17AM
15   these matters is to conform with accepted   09:11:21AM
16   practice in the scientific literature and   09:11:24AM
17   finance, which is where my expertise lies.   09:11:27AM
18   Now, whether or not there are other ways   09:11:30AM
19   to do it using other expertise is   09:11:32AM
20   something I don't have an opinion on.   09:11:35AM
21       But within the area of my   09:11:37AM
22   expertise, event study analysis is the   09:11:40AM
23   only way that I know of to scientifically   09:11:44AM
24   test whether there is loss causation.   09:11:46AM
25       Q.    And are you aware of any other   09:11:48AM

Page 11

1           LEHN - CONFIDENTIAL
2    peer-reviewed methodologies that could be   09:11:50AM
3    utilized to test for loss causation in   09:11:53AM
4    this context?                               09:11:56AM
5        A.    No.                               09:11:56AM
6        Q.    Now, looking at Exhibit 4, the   09:11:56AM
7    summary of your residual returns, there is   09:12:01AM
8    various columns up at the top; is that   09:12:04AM
9    correct?                                    09:12:06AM
10       A.    That's correct.                   09:12:06AM
11       Q.    And just starting at the left   09:12:07AM
12   where it says date, I think that one may   09:12:09AM
13   be self-explanatory.  But can you just   09:12:12AM
14   describe what each of the columns report?   09:12:17AM
15       A.    Sure.  The first column is the   09:12:18AM
16   date, so that's the date on which I'm   09:12:19AM
17   measuring the residual return.  The second   09:12:21AM
18   column is Pharmacia's closing stock price   09:12:23AM
19   on that date.  And then the next column is   09:12:27AM
20   the trading volume in Pharmacia's common   09:12:29AM
21   stock on that date.  The next column is   09:12:36AM
22   Pharmacia's stock return on that date,   09:12:39AM
23   which is the percentage change in its   09:12:41AM
24   closing price, stock price, as compared to   09:12:44AM
25   the closing stock price on the previous   09:12:46AM

Page 12

1           LEHN - CONFIDENTIAL
2    day.                                        09:12:47AM
3        The NYSE index return is the   09:12:49AM
4    percentage change in the value of the NYSE   09:12:51AM
5    composite index on that date.  The   09:12:55AM
6    industry index return is the percentage   09:12:58AM
7    change in the industry index that I used   09:13:01AM
8    in my analysis.  The PHA residual return   09:13:05AM
9    is derived from the regression model which   09:13:11AM
10   basically is tracking how Pharmacia's   09:13:17AM
11   stock typically moves with both the New   09:13:22AM
12   York Stock Exchange index and the peer   09:13:25AM
13   index, and then based on that and based on   09:13:26AM
14   the percent changes in the two indexes,   09:13:28AM
15   one can calculate the residual return, and   09:13:30AM
16   effectively it's the difference between   09:13:33AM
17   the actual return on that date and the   09:13:35AM
18   return predicted by the regression model.   09:13:38AM
19   And the way that I've identified it in   09:13:42AM
20   this case is by using indicator variables   09:13:43AM
21   for each day, so a dummy variable that   09:13:47AM
22   identifies what the residual return is   09:13:49AM
23   that day.                                   09:13:51AM
24       And then the last column is a   09:13:52AM
25   t-statistic, which is -- which tells you   09:13:54AM

Page 13

1           LEHN - CONFIDENTIAL
2    whether or not the residual return that   09:13:58AM
3    you've estimated is statistically   09:14:00AM
4    significant, meaning whether or not it is   09:14:02AM
5    within the bounds of normal variation or   09:14:05AM
6    whether it is outside the bounds of normal   09:14:07AM
7    variation.  And a t-statistic of 1.96 or   09:14:09AM
8    greater, in the case of a negative   09:14:13AM
9    t-statistic, 1.96 or even more negative,   09:14:17AM
10   would allow one to conclude that the   09:14:22AM
11   residual return is statistically   09:14:23AM
12   significant at the 5 percent level.   09:14:25AM
13       Q.    Could you calculate a p-value   09:14:28AM
14   from the information on this table?   09:14:31AM
15       A.    You could -- you would -- most   09:14:35AM
16   people would need to refer to a table that   09:14:41AM
17   would map the t-statistic into a p-value,   09:14:43AM
18   or when you run the computer model, the   09:14:46AM
19   computer will give you the t-statistic and   09:14:48AM
20   the p-value.                                09:14:51AM
21       So you could do it, but you   09:14:52AM
22   can't -- you can only guess at it based on   09:14:53AM
23   the data that I have here in Exhibit 4.   09:14:56AM
24       Q.    But you certainly could   09:14:58AM
25   calculate that if you were inclined?   09:14:59AM

4  (Pages 10 to 13)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 14

1        LEHN - CONFIDENTIAL
2       A.    Sure, absolutely.  It is        09:15:01AM
3   calculated.  I did calculate it.  It is     09:15:02AM
4   just that I didn't report it in this        09:15:04AM
5   particular exhibit.  The t-statistic is     09:15:05AM
6   sufficient for determining whether or not   09:15:09AM
7   the residual return is significant at the   09:15:10AM
8   5 percent level.                            09:15:13AM
9       Q.    And then you said you would       09:15:14AM
10  need 1.96 either negative or positive to    09:15:15AM
11  be statistically significant at a 0.05      09:15:20AM
12  threshold?                                  09:15:26AM
13      A.    Correct.                          09:15:26AM
14      Q.    And what about to                 09:15:26AM
15  statistically significant at a 0.1          09:15:28AM
16  threshold, what t-statistic would that      09:15:32AM
17  correlate with?                             09:15:34AM
18          MR. WANG:  Objection to form.       09:15:35AM
19      A.    And 0.1 meaning a 10 percent      09:15:36AM
20  significance level?                         09:15:39AM
21      Q.    Correct.                          09:15:39AM
22      A.    Then it would be roughly using    09:15:40AM
23  a so-called two-tailed test, 1.65.          09:15:42AM
24      Q.    And did you use a two-tailed      09:15:45AM
25  test or a one-tail test?                    09:15:47AM

Page 15

1        LEHN - CONFIDENTIAL
2       A.    Two-tailed test here.            09:15:49AM
3       Q.    So then if you were looking to   09:15:50AM
4   determine whether something was            09:15:51AM
5   statistically significant at a 10 percent  09:15:53AM
6   threshold, you would need a 1.65 or a      09:15:55AM
7   negative 1.65 in the t-stat on your table? 09:15:58AM
8          MR. WANG:  Objection to form.       09:16:02AM
9       A.    Can you repeat the question?     09:16:03AM
10      Q.    My question -- I'm sorry if it    09:16:04AM
11  was a bad question -- if you were looking  09:16:06AM
12  to determine whether something was         09:16:07AM
13  statistically significant at a 10 percent  09:16:09AM
14  threshold level, you would need to         09:16:11AM
15  determine whether the t-statistic was      09:16:13AM
16  greater than 0.165 or, if in a negative    09:16:16AM
17  context, more negative than 1.65; is that  09:16:20AM
18  accurate?                                  09:16:24AM
19          MR. WANG:  Objection to form.       09:16:24AM
20      A.    Again, the t-statistic for the   09:16:25AM
21  10 percent confidence level using a        09:16:27AM
22  two-tailed test would be 1.65.             09:16:29AM
23      Q.    And could you look at page 6 of  09:16:31AM
24  Exhibit 4.  You have the page numbers down 09:16:34AM
25  in the bottom right-hand corner.  And      09:16:37AM

Page 16

1        LEHN - CONFIDENTIAL
2   specifically looking at the returns for --  09:16:46AM
3   starting with February 6th, is it accurate 09:16:50AM
4   that the real decline for Pharmacia stock  09:16:52AM
5   on the day of February 6th is a little bit 09:16:58AM
6   over 1 percent or negative 1.08 percent;   09:17:00AM
7   is that correct?                           09:17:04AM
8       A.    Correct.  The return for         09:17:04AM
9   Pharmacia on February 6th is a negative    09:17:06AM
10  1.08 percent.                              09:17:10AM
11      Q.    And that's because the stock     09:17:11AM
12  declined 63 cents that day; is that        09:17:12AM
13  correct?                                   09:17:18AM
14      A.    That is correct.                 09:17:18AM
15      Q.    And the return for February 7th  09:17:19AM
16  is a negative 2.64 percent; is that        09:17:23AM
17  correct?                                   09:17:26AM
18      A.    That is correct.                 09:17:26AM
19      Q.    And that's because the stock     09:17:27AM
20  declined $1.52 that day; is that correct?  09:17:28AM
21      A.    That is correct.                 09:17:32AM
22      Q.    And for February 8th the         09:17:32AM
23  decline was negative 5.58 percent; is that 09:17:34AM
24  correct?                                   09:17:37AM
25      A.    That is correct.                 09:17:37AM

Page 17

1        LEHN - CONFIDENTIAL
2       Q.    And that is because the stock    09:17:39AM
3   declined $3.13 on February 8th, 2001?      09:17:41AM
4       A.    That is correct.                 09:17:44AM
5       Q.    You did, at some point during    09:17:48AM
6   your engagement in this case, you did an   09:17:50AM
7   analysis of the three-day window February  09:17:55AM
8   6th through February 8th; is that correct? 09:17:57AM
9          MR. WANG:  Objection to form.       09:17:59AM
10      A.    I don't recall offhand whether   09:18:00AM
11  I did a three-day window.                  09:18:01AM
12      Q.    In your rebuttal report I think  09:18:03AM
13  you looked at a three-day window.  Does    09:18:05AM
14  that refresh your recollection?            09:18:07AM
15      A.    That is correct.                 09:18:08AM
16      Q.    And is it correct when you look  09:18:08AM
17  at the three-day window from February 6th  09:18:10AM
18  to February 8th the decline in Pharmacia   09:18:12AM
19  stock is statistically significant for     09:18:15AM
20  those three days?                          09:18:17AM
21      A.    That is correct.                 09:18:18AM
22      Q.    And what does it mean to be      09:18:18AM
23  statistically significant?                 09:18:20AM
24      A.    It means that you can be         09:18:21AM
25  confident that what you are observing is   09:18:23AM

5  (Pages 14 to 17)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 18

```
 1         LEHN - CONFIDENTIAL
 2   not random and if it is not random the      09:18:27AM
 3   inference that is typically drawn is that   09:18:31AM
 4   the change in the company's securities      09:18:34AM
 5   price was associated with the release of    09:18:36AM
 6   information during that, in this case,       09:18:39AM
 7   three-day window.                            09:18:41AM
 8        Q.    So it is your opinion that        09:18:42AM
 9   looking at the three days between February  09:18:44AM
10   6th and February 8th the decline in         09:18:46AM
11   Pharmacia stock was not due to random       09:18:49AM
12   fluctuation; is that correct?               09:18:51AM
13        MR. WANG:  Objection to form.          09:18:53AM
14        A.    I wouldn't quite put it that     09:18:54AM
15   way.  I think that what you can say is      09:18:57AM
16   that using the three-day window there was   09:18:59AM
17   a statistically significant decline, but    09:19:02AM
18   when you decompose the three-day window     09:19:05AM
19   into individual days I find that there's    09:19:08AM
20   only one day that is statistically          09:19:11AM
21   significant and that is February 8th.       09:19:13AM
22        Q.    But if you were going to look    09:19:15AM
23   at the three days as a whole, and I         09:19:17AM
24   understand it is your opinion that you      09:19:19AM
25   don't believe that that is correct, but if  09:19:20AM
```

Page 19

```
 1         LEHN - CONFIDENTIAL
 2   you were going to look at the three days,   09:19:21AM
 3   it would be your opinion, or if the court   09:19:23AM
 4   required you to look at the three days,     09:19:27AM
 5   say, you would be of the opinion that the   09:19:29AM
 6   decline cumulatively over those three days  09:19:31AM
 7   was not due to random fluctuation; is that  09:19:34AM
 8   correct?                                     09:19:36AM
 9        MR. WANG:  Objection to form.          09:19:36AM
10   Asked and answered.                          09:19:38AM
11        A.    Taken as a whole, that would be  09:19:39AM
12   correct.  But, again, I think the more      09:19:41AM
13   relevant issue is within that three-day     09:19:43AM
14   window what can you say about the           09:19:46AM
15   likelihood of price movements being random  09:19:48AM
16   or nonrandom, and the only day that you     09:19:51AM
17   could be confident that what you are        09:19:54AM
18   observing was not random would be February  09:19:56AM
19   8th.                                         09:19:58AM
20        Q.    Now, could you turn to           09:19:58AM
21   paragraph 72 of your report.  And           09:20:05AM
22   specifically at paragraph 72 you recount I  09:20:15AM
23   believe five facts that plaintiffs allege   09:20:20AM
24   were not disclosed prior to February 6th,   09:20:23AM
25   2001; is that correct?                      09:20:26AM
```

Page 20

```
 1         LEHN - CONFIDENTIAL
 2        A.    In the second interrogatory      09:20:27AM
 3   response, that's correct.                    09:20:29AM
 4        Q.    So you took these five facts     09:20:30AM
 5   from plaintiffs' interrogatory response     09:20:32AM
 6   describing the plaintiffs' allegations in   09:20:34AM
 7   this case; is that correct?                 09:20:36AM
 8        A.    That is correct.                  09:20:37AM
 9        Q.    And as part of your engagement,  09:20:38AM
10   did you review the media and other          09:20:42AM
11   publicly available materials that --        09:20:44AM
12   strike that.                                 09:20:48AM
13        As part of your engagement, did        09:20:49AM
14   you look at what was disclosed during the   09:20:50AM
15   class period prior to February 6th, 2001?   09:20:52AM
16        A.    I did, yes.                       09:20:55AM
17        Q.    And did you find in any          09:20:56AM
18   publicly available document a disclosure    09:20:59AM
19   of any of these five facts listed here in   09:21:02AM
20   paragraph 72 prior to February 6th, 2001?   09:21:04AM
21        MR. WANG:  Objection to form.          09:21:07AM
22        A.    Not that I recall.  There was    09:21:08AM
23   information in the public press and          09:21:32AM
24   analyst reports that this was more than a   09:21:34AM
25   six-month trial, but in terms of the        09:21:36AM
```

Page 21

```
 1         LEHN - CONFIDENTIAL
 2   language in point number 1, I don't recall  09:21:40AM
 3   seeing news stories to that effect.         09:21:42AM
 4        Q.    And on the first day of the      09:21:46AM
 5   class period, the press release that        09:21:48AM
 6   plaintiffs allege was false and             09:21:50AM
 7   misleading, that document actually          09:21:52AM
 8   discloses that the trial was longer than    09:21:54AM
 9   13 months, or, I'm sorry, longer than six   09:21:56AM
10   months, that it was a 13-month trial?       09:22:00AM
11        A.    That is correct.                  09:22:01AM
12        Q.    And what it doesn't disclose     09:22:02AM
13   and what plaintiffs allege it doesn't       09:22:03AM
14   disclose is what the post six-month data    09:22:04AM
15   revealed; is that correct?                  09:22:07AM
16        A.    That's my understanding.          09:22:08AM
17        Q.    And you are not offering an      09:22:09AM
18   opinion in this case that the post          09:22:11AM
19   six-month data was available to the public  09:22:13AM
20   prior to February 6th, 2001; is that        09:22:16AM
21   correct?                                     09:22:19AM
22        A.    That is correct.  I'm not        09:22:19AM
23   offering such an opinion.                    09:22:20AM
24        Q.    And you are not offering an      09:22:22AM
25   opinion that any of these specific five     09:22:24AM
```

6  (Pages 18 to 21)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 22

1           LEHN - CONFIDENTIAL
2    facts listed in paragraph 72 were        09:22:27AM
3    available to the marketplace prior to      09:22:29AM
4    February 6th, 2001, correct?           09:22:31AM
5        A.    That is correct.            09:22:33AM
6        Q.    And in paragraph 73, you state, 09:22:33AM
7    and I will just read from the report,      09:22:38AM
8    "Each of these facts" -- the facts listed   09:22:40AM
9    in paragraph 72 -- "was ascertainable from  09:22:42AM
10   the information posted on the FDA website  09:22:45AM
11   on the morning of February 6th, 2001."    09:22:48AM
12       Is that at least a portion of    09:22:52AM
13   your opinion in this case?             09:22:55AM
14       A.    That is correct.            09:22:55AM
15       Q.    And you used the word        09:22:56AM
16   "ascertainable"; is that correct?         09:22:57AM
17       A.    That is correct.            09:22:58AM
18       Q.    And why did you use the word  09:22:59AM
19   "ascertainable"?                   09:23:00AM
20       A.    Well, in the sense that I don't 09:23:01AM
21   recall seeing in the FDA briefing         09:23:03AM
22   materials that were released on the       09:23:05AM
23   morning of February 6th language that     09:23:07AM
24   directly corresponded to the language in  09:23:09AM
25   the five points in paragraph 72.         09:23:11AM

Page 23

1           LEHN - CONFIDENTIAL
2        But there was statistical          09:23:14AM
3    information in the tables, primarily in    09:23:16AM
4    the statistical review briefing document,  09:23:20AM
5    that would have allowed anyone to        09:23:23AM
6    basically infer the information that was   09:23:26AM
7    contained in paragraph 72.             09:23:29AM
8        Q.    I want to show you what I'm   09:23:31AM
9    marking as Plaintiffs' Exhibit 501.       09:23:39AM
10       (Plaintiffs' Exhibit 501 marked 09:23:47AM
11   for identification.)                  09:23:49AM
12       Q.    Dr. Lehn, Exhibit 501, this is 09:24:22AM
13   a journal article that you reference in    09:24:53AM
14   your report; is that correct?            09:24:54AM
15       A.    That is correct.            09:24:56AM
16       Q.    And you are not, again, and I  09:24:56AM
17   think this is just retracing ground we     09:24:59AM
18   just already covered, you are not offering  09:25:01AM
19   an opinion that what I've marked as       09:25:02AM
20   Exhibit 501 discloses any of the five      09:25:05AM
21   facts that are listed in Exhibit 72,       09:25:07AM
22   correct?                        09:25:10AM
23       A.    That is correct.            09:25:10AM
24       Q.    I want to show you what I'm   09:25:10AM
25   marking as Plaintiffs' Exhibit 502.       09:25:20AM

Page 24

1           LEHN - CONFIDENTIAL
2        (Plaintiffs' Exhibit 502 marked 09:25:22AM
3    for identification.)                  09:25:24AM
4        Q.    Could you please take a look at 09:25:33AM
5    Exhibit 502. And, similarly, Exhibit 502  09:25:35AM
6    is another journal article you referenced  09:25:41AM
7    in your report; is that correct?          09:25:43AM
8        A.    That is correct.            09:25:44AM
9        Q.    And, again, you are not        09:25:44AM
10   offering an opinion in this case that this  09:25:46AM
11   journal article discloses any of the five  09:25:49AM
12   facts referenced in paragraph 72 of your   09:25:51AM
13   report?                         09:25:53AM
14       A.    That's correct.             09:25:53AM
15       Q.    I want to show you what I'm   09:25:53AM
16   marking as Plaintiffs' Exhibit 503.       09:26:16AM
17       (Plaintiffs' Exhibit 503 marked 09:26:20AM
18   for identification.)                  09:26:22AM
19       Q.    Could you please take a look at 09:27:28AM
20   Exhibit 503 which, for the record, is a    09:27:29AM
21   Journal of Financial Economics article    09:27:34AM
22   from 1984 by Patell and Wolfson titled    09:27:37AM
23   "The Intraday Speed of Adjustment of Stock 09:27:42AM
24   Prices to Earnings and Dividend          09:27:45AM
25   Announcements."                   09:27:47AM

Page 25

1           LEHN - CONFIDENTIAL
2        Do you recognize this journal      09:27:48AM
3    article?                         09:27:49AM
4        A.    I do.                    09:27:49AM
5        Q.    And this is a journal article  09:27:50AM
6    that you relied on in your report at least 09:27:51AM
7    in part for the bases of your opinion; is  09:27:55AM
8    that correct?                     09:27:58AM
9        A.    I cite the article, that's    09:27:58AM
10   correct.                         09:28:00AM
11       Q.    And is this a well-known piece 09:28:00AM
12   of economic literature in the area of, you 09:28:02AM
13   know, that you are opining on here today?  09:28:06AM
14   That's a really bad question.            09:28:08AM
15       Could you just briefly describe 09:28:10AM
16   this article and why you cited it?        09:28:11AM
17       A.    Sure. This was an article that 09:28:14AM
18   Patell and Wolfson published in 1984, and  09:28:17AM
19   it was one of the first, if not the first,  09:28:20AM
20   systematic study of how quickly stock     09:28:23AM
21   prices react within a trading day to the   09:28:26AM
22   release of information, and the          09:28:29AM
23   information that they were looking at      09:28:31AM
24   were -- was information about earnings and 09:28:33AM
25   dividends.                       09:28:35AM

7 (Pages 22 to 25)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 26

1          LEHN - CONFIDENTIAL
2     Q.     And specifically the public     09:28:36AM
3   announcement of earnings and dividends?     09:28:39AM
4     A.     That is correct.          09:28:41AM
5     Q.     And what form does a dividend     09:28:42AM
6   announcement usually take?          09:28:44AM
7     A.     I've never studied the form of     09:28:47AM
8   the announcement, but, you know, typically     09:28:50AM
9   boards of directors would approve a change     09:28:53AM
10  in dividend policy and it has always been     09:28:56AM
11  my understanding that that information     09:29:00AM
12  would be released typically through a     09:29:02AM
13  press release issued by the company.     09:29:04AM
14    Q.     And do you have just sort of,     09:29:06AM
15  given your expertise and the number of     09:29:09AM
16  years you have been working in the finance     09:29:11AM
17  and securities realm, how long a dividend     09:29:13AM
18  press release usually is?          09:29:17AM
19    A.     You know, it is often     09:29:20AM
20  commingled with other information. So if     09:29:23AM
21  it was only a dividend announcement, it     09:29:26AM
22  may not be very long.  But if it is     09:29:31AM
23  commingled with other information, it     09:29:33AM
24  could be a lengthy press release.     09:29:35AM
25    Q.     And the information about a     09:29:36AM

Page 27

1          LEHN - CONFIDENTIAL
2   dividend, it is usually the -- the core     09:29:38AM
3   information is just the dollar per share     09:29:42AM
4   or cents per share number; is that     09:29:43AM
5   correct?               09:29:46AM
6     A.     That's the basic information     09:29:46AM
7   about a dividend.  There may be language     09:29:50AM
8   about the reason for the dividend as well.     09:29:52AM
9   And, again, a dividend change can be     09:29:57AM
10  either an increase or a decrease.  So     09:29:59AM
11  often you would see additional language     09:30:02AM
12  indicating the basis for the dividend     09:30:04AM
13  change.               09:30:05AM
14    Q.     But the core information, say     09:30:05AM
15  if IBM had a dollar per share dividend and     09:30:07AM
16  was going to change it to $1.50 per share     09:30:11AM
17  dividend, that the main metric being     09:30:14AM
18  communicated there is the quantification     09:30:17AM
19  of the dividend change; is that accurate?     09:30:20AM
20         MR. WANG:  Objection to form.     09:30:23AM
21  Vague and ambiguous.          09:30:25AM
22    A.     I think it would vary from case     09:30:25AM
23  to case.  Under basic finance theory there     09:30:27AM
24  is a famous article that Merton Miller     09:30:30AM
25  wrote many years ago on the irrelevance of     09:30:34AM

Page 28

1          LEHN - CONFIDENTIAL
2   dividends claiming that a dividend change     09:30:38AM
3   per se, you know, in a world in which you     09:30:40AM
4   abstract away from taxes and other     09:30:43AM
5   considerations, doesn't change the value     09:30:45AM
6   of the equity because what it does is it     09:30:46AM
7   just moves more cash out but now the firm     09:30:49AM
8   has greater -- has less capital     09:30:51AM
9   appreciation.               09:30:54AM
10         So for years Microsoft never     09:30:55AM
11  paid a dividend, but there was a lot of     09:30:57AM
12  equity value there because of the capital     09:30:59AM
13  appreciation.  So the dividend per se may     09:31:01AM
14  not be what matters to the market in     09:31:06AM
15  revaluing the security, but what matters     09:31:09AM
16  is the reason for the dividend change,     09:31:11AM
17  does the dividend change signal something     09:31:13AM
18  about the future.  And that can be     09:31:16AM
19  potentially the main reason why the market     09:31:21AM
20  reacts to the dividend as opposed to the     09:31:24AM
21  dividend change itself.          09:31:26AM
22    Q.     But the core information being     09:31:27AM
23  communicated at least in a dividend change     09:31:29AM
24  is the actual quantification of that     09:31:32AM
25  change; is that accurate?          09:31:35AM

Page 29

1          LEHN - CONFIDENTIAL
2         MR. WANG:  Objection to form.     09:31:36AM
3   Asked and answered.  Vague and ambiguous     09:31:37AM
4   still.               09:31:39AM
5     A.     And I'm not sure what you mean     09:31:39AM
6   by the core information, because, again,     09:31:42AM
7   there is a wide body of thought that the     09:31:44AM
8   change in the dividend in and of itself     09:31:48AM
9   doesn't create value, but it is the     09:31:52AM
10  information that might be signaled by the     09:31:55AM
11  dividend which one -- and, again, I'm not     09:31:56AM
12  getting into a semantic debate -- but one     09:32:01AM
13  could argue is that is the core     09:32:04AM
14  information, what's the reason why the     09:32:06AM
15  company is changing the dividend and what     09:32:07AM
16  can that tell us about the future cash     09:32:09AM
17  flows of the company.  And that can be a     09:32:11AM
18  fairly complicated thing for outsiders to     09:32:12AM
19  infer.               09:32:15AM
20    Q.     So getting the dividend number     09:32:15AM
21  certainly could trigger other analysis; is     09:32:19AM
22  that what you are saying?          09:32:21AM
23         MR. WANG:  Objection to form.     09:32:22AM
24    Q.     That would be important to the     09:32:23AM
25  company?               09:32:25AM

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 30

1    LEHN - CONFIDENTIAL
2        MR. WANG:  Misstates his        09:32:25AM
3    testimony.                          09:32:26AM
4        A.    What I'm saying is one has to  09:32:26AM
5    look beyond what simply the dividend     09:32:30AM
6    change is, if the issue is how is this   09:32:33AM
7    going to change the stock price of the   09:32:36AM
8    company.  And, for example, if a company  09:32:38AM
9    was a very high-growth company, typically  09:32:43AM
10   high-growth companies don't pay very large  09:32:47AM
11   dividends because rather than pay cash out  09:32:50AM
12   they would rather keep the cash in the    09:32:52AM
13   firm and invest in their growth           09:32:54AM
14   opportunities.                            09:32:57AM
15       So often when companies that     09:32:57AM
16   were believed to be high-growth companies  09:32:59AM
17   announced that they are suddenly going to  09:33:02AM
18   start paying a dividend, their stock      09:33:04AM
19   prices often will go down because the     09:33:07AM
20   market will say we thought you had more    09:33:09AM
21   good internal projects, and the fact that  09:33:11AM
22   you are paying cash out is signaling that  09:33:14AM
23   you may not have the growth opportunities  09:33:17AM
24   that we thought you had.                  09:33:19AM
25       So, again, I think it is a       09:33:22AM

Page 31

1    LEHN - CONFIDENTIAL
2    misstatement to say that the core      09:33:23AM
3    information is simply what happens to the  09:33:27AM
4    dividend, what matters is the reason and  09:33:29AM
5    the expectations that investors have about  09:33:32AM
6    why the company is changing the dividend.  09:33:36AM
7        Q.    And the Patell and Wolfson   09:33:37AM
8    article that we have marked as Exhibit    09:33:40AM
9    503, what they are studying here, I think  09:33:42AM
10   you have already testified to it, is      09:33:45AM
11   earnings and dividend announcements; is   09:33:45AM
12   that correct?                             09:33:48AM
13       A.    That is correct.            09:33:48AM
14       Q.    They are not studying the   09:33:49AM
15   release on the Internet of FDA reviewer   09:33:50AM
16   reports from a clinical trial; is that    09:33:54AM
17   correct?                                  09:33:56AM
18       A.    That's my recollection.  That's  09:33:56AM
19   correct.                                  09:34:03AM
20       Q.    So from a scientific        09:34:03AM
21   perspective, this article -- well, strike  09:34:05AM
22   that question.                            09:34:12AM
23       Could you turn to the second     09:34:12AM
24   page of Exhibit 503, which is -- at the   09:34:14AM
25   top is page 224 of the article.  And in   09:34:18AM

Page 32

1    LEHN - CONFIDENTIAL
2    the middle of the first full paragraph, it  09:34:22AM
3    says "However, for the earnings           09:34:24AM
4    announcements, we also find significantly  09:34:27AM
5    elevated returns during the overnight     09:34:30AM
6    period following the release and at the   09:34:32AM
7    opening of trading the next day."         09:34:35AM
8        Patell and Wolfson in their      09:34:39AM
9    study found that earnings announcements   09:34:40AM
10   often had a statistically significant     09:34:44AM
11   impact on the company's stock being       09:34:45AM
12   studied the following day after the       09:34:48AM
13   announcement; is that correct?            09:34:50AM
14       MR. WANG:  Objection to form.     09:34:52AM
15       A.    I wouldn't quite put it that  09:34:52AM
16   way.  What they find is that there is an  09:34:55AM
17   immediate reaction that in some cases does  09:34:57AM
18   persist to the open of the following day.  09:35:02AM
19   I don't believe they show evidence, nor do  09:35:08AM
20   they state that there is no reaction on    09:35:10AM
21   the day of the earnings announcement or   09:35:13AM
22   the dividend announcement and then        09:35:15AM
23   suddenly there is a delayed reaction the  09:35:16AM
24   next morning.                             09:35:18AM
25       And I think Dr. Feinstein        09:35:19AM

Page 33

1    LEHN - CONFIDENTIAL
2    actually mischaracterizes them when he    09:35:21AM
3    claims they support his view.  They talk  09:35:24AM
4    about how it may persist, but persist     09:35:26AM
5    implies that there was a reaction on the  09:35:28AM
6    day that the information was released and  09:35:30AM
7    that's the main upshot of their paper is  09:35:32AM
8    that most of the price adjustment occurs  09:35:35AM
9    immediately and in some cases it may spill  09:35:37AM
10   over to the open the next day.            09:35:40AM
11       Q.    But they did articulate in this  09:35:41AM
12   article that they observed statistically  09:35:45AM
13   significant returns after earnings        09:35:47AM
14   announcements oftentimes on the day       09:35:50AM
15   following the earnings release; is that   09:35:54AM
16   correct?                                  09:35:57AM
17       MR. WANG:  Objection to form.     09:35:57AM
18   That misstates the document, I think.     09:35:58AM
19       A.    If you can direct me to the  09:36:01AM
20   specific language.                        09:36:02AM
21       Q.    Well, they state here that "For  09:36:03AM
22   earnings announcements, we also find      09:36:07AM
23   significantly elevated returns during the  09:36:09AM
24   overnight period following the release and  09:36:11AM
25   at the opening of trading on the next     09:36:15AM

9  (Pages 30 to 33)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 34

LEHN - CONFIDENTIAL
1
2    day."                          09:36:17AM
3         That's what the article says,   09:36:18AM
4    correct?                        09:36:19AM
5    A.    That is what it says, correct.   09:36:19AM
6    Q.    And they seem to be       09:36:21AM
7    articulating that in certain instances    09:36:22AM
8    they observed elevated -- statistically   09:36:24AM
9    significantly elevated returns on the day   09:36:27AM
10   following an earnings announcement; is   09:36:29AM
11   that correct?                   09:36:31AM
12   A.    That is correct. But, again,   09:36:31AM
13   in the context of a significant return on   09:36:32AM
14   the day that the earnings information was   09:36:35AM
15   released. And, again, in the context of   09:36:37AM
16   their statement that most of the price   09:36:39AM
17   effect of the earnings announcement occurs   09:36:41AM
18   within minutes of the announcement. And I   09:36:45AM
19   don't think one should separate those two   09:36:50AM
20   facts.                          09:36:52AM
21   Q.    And did you look at their data   09:36:53AM
22   to see that in every instance there was a   09:36:55AM
23   statistically significant decline on the   09:36:58AM
24   day of the announcement when there was   09:37:01AM
25   also a statistically significant decline   09:37:03AM

Page 35

LEHN - CONFIDENTIAL
1
2    the following day?                09:37:05AM
3         MR. WANG: Objection to form.   09:37:06AM
4    A.    No, for two reasons. One is   09:37:08AM
5    that this paper was published in 1984 and   09:37:11AM
6    I'm not aware that their data is publicly   09:37:17AM
7    available. But even if it were, it   09:37:21AM
8    wouldn't matter because when one is   09:37:23AM
9    testing scientifically, you are looking   09:37:25AM
10   for central tendencies.           09:37:27AM
11        And the central tendency here   09:37:30AM
12   is that when information is released it is   09:37:31AM
13   rapidly absorbed into the stock price of   09:37:33AM
14   the companies that were issuing the   09:37:37AM
15   earnings and dividend announcements.   09:37:38AM
16   Q.    Now, in your -- you've   09:37:40AM
17   previously articulated that it is   09:37:49AM
18   perfectly appropriate to use a multi-day   09:37:54AM
19   window in certain contexts in the   09:37:57AM
20   securities litigation realm?       09:38:00AM
21   A.    That is correct.          09:38:01AM
22   Q.    And how many times have you   09:38:02AM
23   offered that type of opinion that a   09:38:03AM
24   multi-day window is appropriate?   09:38:05AM
25   A.    I've never offered it as a   09:38:07AM

Page 36

LEHN - CONFIDENTIAL
1
2    unilateral opinion that a multi-day window   09:38:09AM
3    is appropriate. But if the facts of the   09:38:12AM
4    case dictate a multiple day window then it   09:38:14AM
5    can be appropriate.              09:38:19AM
6    Q.    So you are not -- you would   09:38:20AM
7    agree with me that it is perfectly   09:38:21AM
8    appropriate to use a multi-day window in   09:38:23AM
9    certain circumstances when analyzing loss   09:38:26AM
10   causation and materiality?        09:38:28AM
11        MR. WANG: Objection to form.   09:38:30AM
12   A.    Depending on the facts of a   09:38:30AM
13   case. For example, Dr. Feinstein and I   09:38:32AM
14   were involved in a previous matter   09:38:35AM
15   involving a company called Apollo   09:38:37AM
16   Securities, or Apollo Group, and my   09:38:39AM
17   recollection is that there were allegedly   09:38:43AM
18   corrective disclosures in that case on   09:38:46AM
19   consecutive days, in which case to examine   09:38:48AM
20   loss causation it would be appropriate to   09:38:54AM
21   use a two-day window because allegedly   09:38:56AM
22   there were two corrective disclosures back   09:39:00AM
23   to back.                        09:39:02AM
24        In some cases hypothetically if   09:39:02AM
25   you had a corrective disclosure that came   09:39:04AM

Page 37

LEHN - CONFIDENTIAL
1
2    out at 3:15 p.m. on a given day, one might   09:39:06AM
3    argue that, to be cautious, rather than   09:39:11AM
4    just use the 45 minutes remaining in that   09:39:15AM
5    trading day, let's look at the two-day   09:39:18AM
6    return, so we would allow the market the   09:39:20AM
7    benefit of a full trading day to absorb   09:39:24AM
8    the information. So it may depend on the   09:39:26AM
9    facts of the case. But none of that   09:39:28AM
10   applies to this case.             09:39:31AM
11   Q.    And in certain circumstances   09:39:32AM
12   the publication of analyst reports on the   09:39:34AM
13   second day of an event you found to be   09:39:36AM
14   important in utilizing -- or important to   09:39:39AM
15   support your analysis of using a multi-day   09:39:43AM
16   window; is that correct?          09:39:46AM
17        MR. WANG: Objection to form.   09:39:47AM
18   A.    I don't recall as I sit here.   09:39:48AM
19   Q.    I want to direct your attention   09:39:50AM
20   to what I'm marking as Plaintiffs' Exhibit   09:39:54AM
21   504.                            09:39:57AM
22        (Plaintiffs' Exhibit 504 marked   09:39:59AM
23   for identification.)              09:40:02AM
24   Q.    Could you please take a look at   09:40:38AM
25   Plaintiffs' Exhibit 504, which is the   09:40:39AM

10  (Pages 34 to 37)

Page 38

1        LEHN - CONFIDENTIAL
2   expert witness report of Kenneth M. Lehn   09:40:42AM
3   designated by defendants Ernst & Young LLP   09:40:45AM
4   in the matter entitled Ohio Public         09:40:49AM
5   Employees Retirement System v. Richard D.   09:40:53AM
6   Parsons.                          09:40:56AM
7        I guess I will just ask you, do 09:40:57AM
8   you recognize this as being a report that   09:40:59AM
9   you offered in that case that I just   09:40:59AM
10  referenced?                        09:41:01AM
11   A.     It appears to be.  It has been  09:41:01AM
12  several years.  But it does appear to be   09:41:03AM
13  my report.                        09:41:05AM
14   Q.     And if you look at the last   09:41:05AM
15  page, or page 30 of Exhibit 504, is that   09:41:06AM
16  your signature?                    09:41:09AM
17   A.     It is, yes.               09:41:10AM
18   Q.     And you signed it on October   09:41:10AM
19  20th, 2006; is that correct?       09:41:12AM
20   A.     That is correct.          09:41:13AM
21   Q.     And I would like to turn your   09:41:14AM
22  attention to pages 19 and 20 of the   09:41:16AM
23  report.                           09:41:26AM
24        And you are describing       09:41:27AM
25  events -- or an event that began on July   09:41:29AM

Page 39

1        LEHN - CONFIDENTIAL
2   25th, 2002 regarding the disclosure --   09:41:31AM
3   disclosure related to AOL Time Warner; is   09:41:35AM
4   that correct?                      09:41:39AM
5    A.     That is correct.          09:41:39AM
6    Q.     And in paragraph 72, you write  09:41:40AM
7   "However, the market continued to digest   09:41:42AM
8   the earnings announcement and SEC   09:41:46AM
9   investigation on July 26th.  The Wall   09:41:48AM
10  Street Journal published an article   09:41:51AM
11  anticipating a possible rebound in AOL   09:41:52AM
12  Time Warner shares."               09:41:55AM
13        Do you see that?            09:41:56AM
14   A.     I do.                     09:41:57AM
15   Q.     And that is part of the opinion 09:41:57AM
16  you formed in the AOL Time Warner case?   09:42:00AM
17        MR. WANG:  Well, you haven't   09:42:03AM
18  given him a chance to look at his opinion   09:42:04AM
19  yet.                              09:42:06AM
20   A.     Can you repeat the question?   09:42:08AM
21   Q.     You wrote that as part of your   09:42:09AM
22  report in the AOL Time Warner case; is   09:42:11AM
23  that correct?                      09:42:15AM
24   A.     The words are there, that's   09:42:15AM
25  correct.  Again, I don't recall the   09:42:16AM

Page 40

1        LEHN - CONFIDENTIAL
2   context and the inference that was drawn   09:42:18AM
3   from that.                        09:42:20AM
4    Q.     And certainly in this case you  09:42:21AM
5   are offering an opinion that a two-day   09:42:23AM
6   window is the appropriate window to   09:42:28AM
7   examine with respect to the AOL Time   09:42:30AM
8   Warner disclosures on July 25th, 2002; is   09:42:33AM
9   that correct?                      09:42:36AM
10        MR. WANG:  Objection to form.   09:42:36AM
11   A.     I don't recall that I did that. 09:42:37AM
12  If you can refer me to where I say that I   09:42:39AM
13  would be happy to consider that.   09:42:43AM
14   Q.     I will certainly attempt to   09:42:44AM
15  refresh your recollection here.  If you   09:42:47AM
16  look at paragraph 73 of the report -- and   09:42:48AM
17  feel free to examine this whole section   09:42:50AM
18  from paragraph 70 to 74, if that would be   09:42:52AM
19  helpful, to take a moment or two to do   09:42:56AM
20  that.                             09:43:00AM
21        (Witness perusing document.)   09:43:01AM
22   A.     Okay.                     09:43:06AM
23   Q.     Is it accurate that you are   09:43:06AM
24  offering an opinion that the appropriate   09:43:08AM
25  window to look at in this case was a   09:43:09AM

Page 41

1        LEHN - CONFIDENTIAL
2   two-day window; is that correct?   09:43:11AM
3    A.     Well, I don't -- again, I'm   09:43:13AM
4   looking at just this one section which is   09:43:15AM
5   referring to information that came out   09:43:18AM
6   around July 25th, so information disclosed   09:43:22AM
7   after the market closed on July 24th.  And   09:43:25AM
8   then a Wall Street Journal article that   09:43:29AM
9   occurred on July 26th.             09:43:34AM
10        And then I report in paragraph   09:43:36AM
11  73 the cumulative residual over the two   09:43:39AM
12  days and document that it is not   09:43:42AM
13  significant.                      09:43:44AM
14        And the only thing I see in   09:43:46AM
15  paragraph 74 is what is an accurate   09:43:48AM
16  statement given what was reported, which   09:43:50AM
17  is the alleged misrepresentations by E&Y   09:43:53AM
18  did not result in a statistically   09:43:57AM
19  significant decline in AOL Time Warner   09:43:59AM
20  stock price during this window.   09:44:02AM
21   Q.     So you examined a window that   09:44:03AM
22  lasted from the close of trading on July   09:44:05AM
23  24th through the close of trading on July   09:44:09AM
24  26th; is that correct?             09:44:11AM
25   A.     That is correct.  But, again,   09:44:13AM

11  (Pages 38 to 41)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 42

```
 1          LEHN - CONFIDENTIAL
 2  this describes two pieces of information,   09:44:15AM
 3  if you will, that were disclosed, one in   09:44:19AM
 4  paragraph 71. "After market close on July   09:44:23AM
 5  24th, AOL Time Warner announced second   09:44:26AM
 6  quarter results and said the SEC was   09:44:30AM
 7  conducting a 'fact-finding mission' into   09:44:32AM
 8  alleged accounting improprieties."   09:44:36AM
 9          Then the next paragraph   09:44:41AM
10  describes additional related information,   09:44:42AM
11  but different information, namely the Wall   09:44:44AM
12  Street Journal publishing an article and   09:44:48AM
13  quotes from a commentator.   09:44:49AM
14          And, again, I don't recall the   09:44:50AM
15  exact context in which I conducted this   09:44:52AM
16  analysis. But what is described there is   09:44:56AM
17  accurate that over that two-day window   09:44:58AM
18  there was not a statistically significant   09:45:01AM
19  decline in AOL Time Warner stock price.   09:45:04AM
20      Q.    But when you look at paragraph   09:45:06AM
21  70, the decline on July 25th of over 10   09:45:08AM
22  percent, that was statistically   09:45:11AM
23  significant, correct?   09:45:13AM
24      A.    That is correct.   09:45:13AM
25      Q.    So in this case if you would   09:45:14AM
```

Page 43

```
 1          LEHN - CONFIDENTIAL
 2  have looked at a one-day window the   09:45:15AM
 3  conclusion you would have come to was the   09:45:18AM
 4  decline was statistically significant; is   09:45:19AM
 5  that correct?   09:45:24AM
 6      A.    Again, it has been a while   09:45:24AM
 7  since I've thought about the AOL Time   09:45:26AM
 8  Warner case. But reading what I have   09:45:29AM
 9  here, the conclusion in paragraph 74 would   09:45:33AM
10  be the same, that, you know, over a   09:45:35AM
11  two-day window, for whatever purpose it   09:45:38AM
12  was being used, there was no statistically   09:45:40AM
13  significant decline.   09:45:42AM
14      Q.    But over one day the decline   09:45:44AM
15  was statistically significant, correct?   09:45:46AM
16      A.    On the day of July 25th, that's   09:45:48AM
17  correct.   09:45:51AM
18      Q.    And looking at paragraph 73 of   09:45:51AM
19  your report, in justifying the use of the   09:45:53AM
20  two-day window or the multi-day window,   09:45:57AM
21  you write "As the analyst reports and   09:45:59AM
22  public press indicate, the market was   09:46:03AM
23  continuing to evaluate the impact of the   09:46:05AM
24  earnings announcement and the SEC   09:46:08AM
25  investigation. It is appropriate to   09:46:10AM
```

Page 44

```
 1          LEHN - CONFIDENTIAL
 2  measure the impact of this information   09:46:12AM
 3  over the course of both July 25 and July   09:46:14AM
 4  26, 2002."   09:46:18AM
 5          You wrote that in paragraph 73   09:46:20AM
 6  of your report which I've marked as   09:46:21AM
 7  Plaintiffs' Exhibit 504; is that correct?   09:46:24AM
 8          MR. WANG: Objection to form.   09:46:27AM
 9      A.    That's correct.   09:46:28AM
10      Q.    And the next sentence, you   09:46:28AM
11  write "The cumulative residual return over   09:46:30AM
12  these two days was negative" -- I'm sorry,   09:46:33AM
13  I'll say that again.   09:46:38AM
14          You write in the next sentence   09:46:39AM
15  "The cumulative residual return over these   09:46:42AM
16  two days was negative 0.68 percent and is   09:46:45AM
17  not significant."   09:46:48AM
18          You wrote that as part of your   09:46:48AM
19  report which I have marked as Exhibit 504,   09:46:50AM
20  correct?   09:46:52AM
21      A.    That is correct.   09:46:53AM
22      Q.    I want to show you what I'm   09:46:59AM
23  marking as Plaintiffs' Exhibit 505.   09:47:01AM
24          (Plaintiffs' Exhibit 505 marked   09:47:03AM
25  for identification.)   09:47:05AM
```

Page 45

```
 1          LEHN - CONFIDENTIAL
 2      Q.    Do you recognize Exhibit 505 as   09:47:25AM
 3  being the transcript of deposition   09:47:33AM
 4  testimony you provided in the AOL Time   09:47:35AM
 5  Warner litigation on March 30th, 2007?   09:47:38AM
 6      A.    I don't recall it as such, but   09:47:41AM
 7  it does appear to be that.   09:47:43AM
 8      Q.    And you were designated as an   09:47:45AM
 9  expert in that litigation by the   09:47:46AM
10  defendants; is that correct?   09:47:48AM
11      A.    That is correct.   09:47:49AM
12      Q.    And you recall testifying?   09:47:49AM
13      A.    I recall having a deposition,   09:47:52AM
14  that's correct.   09:47:53AM
15      Q.    And that testimony was under   09:47:53AM
16  oath?   09:47:55AM
17      A.    That's correct.   09:47:55AM
18      Q.    And it was before a court   09:47:55AM
19  reporter such as we have today?   09:47:57AM
20      A.    That is correct.   09:47:58AM
21      Q.    And you swore to testify   09:47:59AM
22  truthfully in that case?   09:48:01AM
23      A.    That is correct.   09:48:02AM
24      Q.    Could you please turn to page   09:48:03AM
25  124 and 125 of your deposition. That   09:48:07AM
```

12 (Pages 42 to 45)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 46

```
 1         LEHN - CONFIDENTIAL
 2   would be the 32nd page of the Minuscript.   09:48:09AM
 3   Are you with me?                09:48:13AM
 4      A.   I am.                   09:48:14AM
 5      Q.     And you were asked at the     09:48:15AM
 6   bottom of page 124, specifically at line   09:48:17AM
 7   23, you were asked by the lawyer examining  09:48:21AM
 8   you "But the event in fact can be an event  09:48:23AM
 9   window, it could be more than one day in    09:48:30AM
10   which you analyze the effect of any       09:48:33AM
11   information on a particular stock price,    09:48:35AM
12   correct?"                       09:48:37AM
13         And you responded "If the       09:48:38AM
14   information is released on a given day and  09:48:39AM
15   there is so-called follow-on information    09:48:43AM
16   the next day, then it is perfectly         09:48:45AM
17   appropriate to use a multi-day window as    09:48:47AM
18   you say."                       09:48:50AM
19         You provided that testimony on   09:48:50AM
20   March 30th, 2007; is that correct?         09:48:54AM
21      A.   That is correct.          09:48:56AM
22      Q.     And you testified truthfully   09:48:57AM
23   and accurate that day?           09:48:59AM
24      A.   That is correct.          09:49:00AM
25      Q.     And you were subsequently asked 09:49:00AM
```

Page 47

```
 1         LEHN - CONFIDENTIAL
 2   "That multi-day window can also be      09:49:04AM
 3   referred to as an event window, correct?"   09:49:06AM
 4   And you responded "Correct."  Is that     09:49:08AM
 5   accurate?                       09:49:10AM
 6      A.   That is correct.          09:49:11AM
 7      Q.     And this accurately reflects   09:49:11AM
 8   your testimony from the AOL litigation; is  09:49:12AM
 9   that correct, sir?               09:49:15AM
10      A.   That is correct.  But, again,  09:49:15AM
11   the word "follow-on information" has      09:49:17AM
12   particular meaning, meaning that it is     09:49:20AM
13   more information, new information, that     09:49:23AM
14   follows the information that had been      09:49:26AM
15   released the previous day.        09:49:27AM
16      Q.     And that follow-on information 09:49:28AM
17   can take the form of an analyst report; is  09:49:30AM
18   that correct?                   09:49:33AM
19      A.   Depending on what is in the    09:49:33AM
20   analyst report, that is correct.  If there  09:49:35AM
21   is new information in the analyst report,   09:49:37AM
22   that could be potentially considered       09:49:38AM
23   follow-on information.            09:49:40AM
24      Q.     Turning your attention back to 09:49:42AM
25   the Patell and Wolfson article which we    09:49:46AM
```

Page 48

```
 1         LEHN - CONFIDENTIAL
 2   have marked as Exhibit 503, could you turn  09:49:48AM
 3   your attention to page 250 of the article   09:49:57AM
 4   and specifically the first full paragraph,  09:50:10AM
 5   the third sentence, where Patell and       09:50:12AM
 6   Wolfson write "It is possible that the     09:50:14AM
 7   adjustment intervals would be     09:50:18AM
 8   significantly longer for smaller firms or   09:50:20AM
 9   for other less regular announcements made   09:50:24AM
10   by our sample firms."            09:50:26AM
11         Do you see that?           09:50:28AM
12      A.   I do.                   09:50:29AM
13      Q.     And do you have an         09:50:29AM
14   understanding of what Patell and Wolfson    09:50:30AM
15   mean by "less regular announcements"?      09:50:32AM
16      A.   I suppose what they are       09:50:36AM
17   referring to are less regular than         09:50:40AM
18   dividend and earnings announcements.       09:50:42AM
19      Q.     Now, an earnings announcement  09:50:44AM
20   is a quarterly event for publicly traded    09:50:46AM
21   companies; is that correct?        09:50:48AM
22      A.   That is correct.          09:50:49AM
23      Q.     So not to oversimplify, but it 09:50:49AM
24   occurs four times a year, every year?      09:50:53AM
25      A.   That is correct.          09:50:56AM
```

Page 49

```
 1         LEHN - CONFIDENTIAL
 2      Q.     You are familiar with       09:50:57AM
 3   securities analysts who follow public      09:50:59AM
 4   companies; is that correct?       09:51:00AM
 5      A.   That is correct.          09:51:01AM
 6      Q.     And you are basically, although 09:51:01AM
 7   you are not practicing as one, you would    09:51:03AM
 8   be qualified to perform that job function;  09:51:05AM
 9   is that correct?                09:51:07AM
10      A.   You know, I let my          09:51:09AM
11   qualifications speak for myself.   09:51:11AM
12      Q.     You are a certified financial  09:51:13AM
13   analyst?                        09:51:15AM
14      A.   I am not.               09:51:15AM
15      Q.     But what do securities analysts 09:51:15AM
16   do, just generally?              09:51:19AM
17      A.   Well, they do a variety of    09:51:21AM
18   things.  They issue reports probably being  09:51:24AM
19   the most important.  And the reports       09:51:26AM
20   provide commentary as well as projections   09:51:27AM
21   and estimates of target prices, investment  09:51:30AM
22   recommendations, and so forth.     09:51:33AM
23         And then they work often with    09:51:36AM
24   the institutional and retail salespeople    09:51:39AM
25   in their firms and provide them with       09:51:41AM
```

13  (Pages 46 to 49)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 50

1      LEHN - CONFIDENTIAL
2    advice internally.  And then obviously      09:51:45AM
3    also provide marketing for the firm by      09:51:47AM
4    going out and speaking at conferences and   09:51:51AM
5    so forth.                    09:51:53AM
6        Q.     And is one thing they do, they   09:51:53AM
7    often issue earnings estimates going       09:51:56AM
8    forward for companies they are following?   09:51:59AM
9        A.     They do.              09:52:00AM
10       Q.     And is it fair to say that one   09:52:01AM
11   sort of regularly followed event for       09:52:03AM
12   securities analysts are the quarterly      09:52:07AM
13   earnings announcements of the companies     09:52:09AM
14   they are following?              09:52:10AM
15       A.     That would be one, that's      09:52:11AM
16   correct.                    09:52:12AM
17       Q.     And they are specifically      09:52:12AM
18   trained and become very familiar with that  09:52:15AM
19   type of announcement; is that fair to say?  09:52:19AM
20       MR. WANG:  Objection to form.         09:52:22AM
21       A.     When you say "very familiar    09:52:23AM
22   with that kind of announcement," earnings   09:52:26AM
23   announcements can vary a lot from quarter   09:52:28AM
24   to quarter within a firm or across firms.   09:52:31AM
25   So certainly they are familiar with       09:52:34AM

Page 51

1      LEHN - CONFIDENTIAL
2    receiving earnings information, but the    09:52:36AM
3    earnings that a given company issues in a   09:52:40AM
4    quarter can have nuances and complications  09:52:42AM
5    that may be new to the analyst.          09:52:46AM
6        Q.     But certainly utilizing       09:52:47AM
7    earnings information is one of the things   09:52:50AM
8    that analysts typically do as part of      09:52:52AM
9    their job; is that fair to say?          09:52:55AM
10       A.     That I think would be fair to   09:52:56AM
11   say.                       09:52:58AM
12       Q.     And is it also accurate that    09:52:58AM
13   the revelation or the disclosure of       09:53:02AM
14   results from a clinical trial, a one-time   09:53:05AM
15   clinical trial, is by definition less      09:53:08AM
16   regular than a quarterly earnings         09:53:10AM
17   announcement?                  09:53:13AM
18       A.     Well, mathematically, if you   09:53:19AM
19   are saying one trial, by definition one is  09:53:21AM
20   less than the four quarterly earnings      09:53:24AM
21   numbers.  So the number would be         09:53:26AM
22   numerically less.               09:53:28AM
23       But, again, if you are a          09:53:30AM
24   pharmaceutical analyst, you know,        09:53:31AM
25   understanding information that is        09:53:35AM

Page 52

1      LEHN - CONFIDENTIAL
2    contained in a new drug application and    09:53:39AM
3    understanding the way in which the FDA     09:53:43AM
4    releases materials and when they schedule   09:53:47AM
5    meetings is something that I would view    09:53:49AM
6    most pharmaceutical analysts to believe is  09:53:52AM
7    a fairly regular event.            09:53:54AM
8        Q.     In your opinion, is the       09:53:56AM
9    announcement of a clinical trial less      09:53:58AM
10   regular than a company's quarterly        09:54:02AM
11   earnings announcement?             09:54:04AM
12       MR. WANG:  Objection to form.         09:54:05AM
13       A.     Again, as a general matter, I   09:54:07AM
14   would.  But I think one has to place that   09:54:17AM
15   in context, that in the pharmaceutical     09:54:20AM
16   industry, you know, the results of        09:54:21AM
17   clinical trials are things that analysts   09:54:25AM
18   would, I believe, are trained to         09:54:30AM
19   understand and analyze the way analysts    09:54:34AM
20   would also analyze earnings announcements   09:54:37AM
21   of companies.                  09:54:39AM
22       Q.     But as a general matter you    09:54:40AM
23   would agree with me that the release of    09:54:42AM
24   data from a clinical trial is less regular  09:54:43AM
25   than a company's quarterly earnings       09:54:46AM

Page 53

1      LEHN - CONFIDENTIAL
2    announcement?                  09:54:48AM
3        MR. WANG:  Objection to form.         09:54:49AM
4        A.     Again, by "regular," you mean   09:54:50AM
5    less frequent?                 09:54:59AM
6        Q.     Well, my question, you know,   09:55:01AM
7    you relied on this article, and         09:55:03AM
8    Dr. Feinstein relied on it as well, the    09:55:06AM
9    Patell and Wolfson article, and they      09:55:08AM
10   specifically used this term "less regular   09:55:10AM
11   announcement."                 09:55:12AM
12       Do you have an understanding as      09:55:13AM
13   to how Patell and Wolfson were using it at  09:55:14AM
14   page 250, the second paragraph of their    09:55:17AM
15   seminal 1984 article?              09:55:20AM
16       A.     The understanding I would have  09:55:23AM
17   is that they are less frequent.          09:55:25AM
18       Q.     So given your understanding    09:55:29AM
19   that it is less frequent, you would agree   09:55:32AM
20   with me that the release of information    09:55:34AM
21   regarding a clinical trial is less regular  09:55:37AM
22   than a company's earnings announcement; is  09:55:40AM
23   that correct, sir?               09:55:43AM
24       A.     My hesitancy is that I don't   09:55:45AM
25   know the frequency with which          09:55:50AM

14  (Pages 50 to 53)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

---

Page 54

1           LEHN - CONFIDENTIAL
2    pharmaceutical companies would release      09:55:52AM
3    results of clinical trials over the course   09:55:54AM
4    of a year, and I can't rule out the          09:55:56AM
5    possibility that some pharmaceutical         09:55:59AM
6    companies might release the results of       09:56:00AM
7    clinical trials more than four times a       09:56:03AM
8    year.                                        09:56:05AM
9       Q.    Let's make it more specific,        09:56:05AM
10   just so we are not -- we make sure we are    09:56:07AM
11   understanding each other, and I will use     09:56:11AM
12   the specific exactly that is germane to      09:56:12AM
13   this case, the release of the results --     09:56:15AM
14   or the initial release of the results of     09:56:18AM
15   the CLASS trial relating to Celebrex, and    09:56:21AM
16   you recall that occurred in April of 2000?   09:56:24AM
17      A.    That's correct.                     09:56:27AM
18      Q.    The release of the CLASS data,      09:56:27AM
19   the initial release of the CLASS data,       09:56:30AM
20   would you agree with me that that was less   09:56:32AM
21   regular than a company's quarterly           09:56:34AM
22   earnings announcement as that term is        09:56:36AM
23   utilized at page 250 of the Patell and       09:56:39AM
24   Wolfson report?                              09:56:42AM
25           MR. WANG:  250 refers to             09:56:43AM

---

Page 55

1           LEHN - CONFIDENTIAL
2    earnings and dividends announcements. You   09:56:45AM
3    have already established that's what the     09:56:47AM
4    article discusses. So that                   09:56:48AM
5    mischaracterizes the document. Objection     09:56:50AM
6    to form.                                     09:56:53AM
7       Q.    Do you understand the question      09:56:53AM
8    or do you want me to ask it again?           09:56:54AM
9       A.    Can you repeat that?                09:56:56AM
10      Q.    Is it correct that the release      09:56:57AM
11   of the CLASS data in April of 2000 was       09:56:58AM
12   less regular than an earnings announcement   09:57:02AM
13   as that term is utilized by Patell and       09:57:06AM
14   Wolfson?                                     09:57:09AM
15           MR. WANG:  Objection to form.        09:57:10AM
16      A.    Well, the way you phrase your       09:57:11AM
17   question, I think the answer is no. If       09:57:12AM
18   you say it is less frequent than an          09:57:14AM
19   earnings announcement, if you are only       09:57:17AM
20   talking about one earnings announcement      09:57:20AM
21   and one release of the CLASS data, then      09:57:21AM
22   one is equal to one.                         09:57:23AM
23           Now, if you are talking more         09:57:24AM
24   generally that companies issue earnings      09:57:26AM
25   more frequently than Pharmacia released      09:57:27AM

---

Page 56

1           LEHN - CONFIDENTIAL
2    the results of the CLASS study by            09:57:31AM
3    definition I think that's correct, that      09:57:32AM
4    there are more earnings announcements than   09:57:35AM
5    there was release of the CLASS data. But    09:57:37AM
6    I don't frankly think that is relevant for   09:57:44AM
7    the speed with which the market would        09:57:47AM
8    reflect that information.                    09:57:47AM
9       Q.    I'm sorry if I misspoke, and I      09:57:48AM
10   will ask the question again.                 09:57:50AM
11           If you look at the sentence we       09:57:52AM
12   were just discussing in the Patell and       09:57:53AM
13   Wolfson in the middle of the second          09:57:55AM
14   paragraph of page 250, and I'm just          09:57:57AM
15   quoting the three words towards the end of   09:58:02AM
16   that sentence where it says "less regular    09:58:05AM
17   announcements," plural.  I might have said   09:58:07AM
18   "announcement," not "announcements."         09:58:10AM
19           And my question is, would you        09:58:12AM
20   agree with me that the release of the        09:58:13AM
21   CLASS data or the press release describing   09:58:15AM
22   the CLASS data that was issued in April of   09:58:18AM
23   2000, that that announcement was less        09:58:23AM
24   regular than a company's earnings            09:58:27AM
25   announcements as described by Patell and     09:58:31AM

---

Page 57

1           LEHN - CONFIDENTIAL
2    Wolfson in their article?                    09:58:34AM
3           MR. WANG:  Objection to form.         09:58:35AM
4       A.    Well, again, given that that        09:58:36AM
5    only occurred once, then that obviously is   09:58:41AM
6    a lower -- smaller number than the number    09:58:45AM
7    of earnings announcements that Pharmacia     09:58:48AM
8    had.                                         09:58:51AM
9       Q.    And would you similarly agree       09:58:51AM
10   with me that the posting on the website by   09:58:53AM
11   the FDA of the full or entire study data     09:58:55AM
12   or results of the entire CLASS study that    09:59:01AM
13   occurred on February 6th, 2001, that that    09:59:03AM
14   was also by definition less regular than     09:59:06AM
15   the company's quarterly earnings             09:59:11AM
16   announcements?                               09:59:13AM
17           MR. WANG:  Objection to form.        09:59:15AM
18      A.    Again, by definition, if that       09:59:16AM
19   only occurred one time, then that would be   09:59:22AM
20   less regular than a quarterly earnings       09:59:24AM
21   announcement. But, again, I don't see the    09:59:26AM
22   relevance of that for this particular        09:59:28AM
23   matter.                                      09:59:30AM
24      Q.    And I want to show you now what     09:59:30AM
25   I'm marking as Plaintiffs' Exhibit 506.      09:59:33AM

---

15  (Pages 54 to 57)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 58

1           LEHN - CONFIDENTIAL
2           (Plaintiffs' Exhibit 506 marked 09:59:35AM
3   for identification.)              09:59:37AM
4       Q.      I should say, Dr. Lehn, I know 09:59:41AM
5   we really didn't discuss, I know you have 09:59:44AM
6   been deposed multiple times; is that    09:59:45AM
7   correct?                      09:59:47AM
8       A.      That is correct.       09:59:47AM
9       Q.      And if at any time you want to 09:59:48AM
10  take a break or whatever just please let  09:59:50AM
11  me know.                      09:59:52AM
12      A.      I will.              09:59:52AM
13      Q.      Could you please take a look at 10:00:08AM
14  what I have marked as Plaintiffs' Exhibit 10:00:20AM
15  506, which, just for the record, is an    10:00:21AM
16  affidavit of Howard R. Philips of the     10:00:23AM
17  United States Food and Drug Administration 10:00:28AM
18  and it attaches four exhibits, the first  10:00:30AM
19  three of which are the FDA reviewer       10:00:33AM
20  reports that were posted on the Internet  10:00:37AM
21  in February of 2001.              10:00:38AM
22          But please take a look through 10:00:41AM
23  and I would ask you if you have seen this  10:00:44AM
24  document before.                 10:00:46AM
25          (Witness perusing document.)  10:00:47AM

Page 59

1           LEHN - CONFIDENTIAL
2       A.      And I have, yes.       10:01:20AM
3       Q.      And before we get into that 10:01:21AM
4   document, you can leave it there, is it   10:01:24AM
5   accurate that before an earnings          10:01:28AM
6   announcement there is usually a press     10:01:30AM
7   release that's issued saying exactly when 10:01:33AM
8   the earnings are going to be released?    10:01:39AM
9           MR. WANG: Objection to form. 10:01:42AM
10      A.      Again, I'm not sure what the 10:01:44AM
11  form is, whether it is a press release or 10:01:46AM
12  some other means. But it is generally     10:01:48AM
13  known to the market when a company will   10:01:50AM
14  announce their quarterly earnings.        10:01:52AM
15      Q.      And is that usually done in 10:01:54AM
16  what is called a conference call?         10:01:55AM
17          MR. WANG: Objection to form. 10:01:57AM
18      A.      There typically would be a   10:01:59AM
19  conference call associated with an        10:02:01AM
20  earnings announcement.            10:02:02AM
21      Q.      And there is generally a press 10:02:03AM
22  release issued in advance of that         10:02:05AM
23  conference call providing analysts with   10:02:07AM
24  dial-in information so they can           10:02:09AM
25  participate in the conference call; is    10:02:11AM

Page 60

1           LEHN - CONFIDENTIAL
2   that correct?               10:02:13AM
3       A.      That's my understanding, that's 10:02:13AM
4   correct.                     10:02:14AM
5       Q.      And in order to do that     10:02:14AM
6   would need to know exactly what time the 10:02:16AM
7   conference call was going to occur?      10:02:18AM
8       A.      That's correct.        10:02:19AM
9       Q.      And that's something that    10:02:20AM
10  didn't happen with respect to the release 10:02:21AM
11  or the posting of these three reports that 10:02:24AM
12  are part of Exhibit 506, there was no     10:02:31AM
13  press release issued indicating exactly   10:02:33AM
14  when those would be posted on the         10:02:35AM
15  Internet; is that correct?            10:02:37AM
16          MR. WANG: Objection to form. 10:02:38AM
17      A.      I don't know about that. I do 10:02:39AM
18  know that the Federal Register in December 10:02:41AM
19  27, 2000 issued the date at which there  10:02:45AM
20  would be the meeting and at which the FDA 10:02:50AM
21  Advisory Panel would take up the potential 10:02:53AM
22  label change for both Celebrex and Vioxx. 10:02:56AM
23  So the meeting date was known.        10:03:01AM
24          And it is my understanding that 10:03:04AM
25  it is general practice of the FDA to      10:03:05AM

Page 61

1           LEHN - CONFIDENTIAL
2   release the briefing materials one day    10:03:08AM
3   prior to the actual meeting. So whether  10:03:09AM
4   or not there was a press release, it would 10:03:12AM
5   certainly be my understanding that        10:03:15AM
6   analysts were anticipating the briefing   10:03:16AM
7   materials on February 6th.            10:03:18AM
8       Q.      And what's the basis of your 10:03:19AM
9   opinion that the materials would be posted 10:03:21AM
10  on the website one day prior to the       10:03:24AM
11  meeting?                      10:03:28AM
12      A.      I don't recall whether it was 10:03:30AM
13  Dr. Fiorino's report, but I do recall     10:03:32AM
14  seeing some reference to the fact that    10:03:39AM
15  typically the FDA would post the briefing 10:03:40AM
16  materials the day prior to the meeting,   10:03:42AM
17  the relevant meeting.             10:03:44AM
18      Q.      Do you know if it could have 10:03:45AM
19  been posted two days before?          10:03:46AM
20      A.      I don't.              10:03:47AM
21      Q.      And do you have any basis for 10:03:48AM
22  your opinion other than relying on        10:03:49AM
23  Dr. Fiorino as to when the briefing       10:03:51AM
24  materials would be posted on the Internet? 10:03:55AM
25      A.      No.                 10:03:58AM

16 (Pages 58 to 61)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 62

```
 1          LEHN - CONFIDENTIAL
 2     Q.    So if Dr. Fiorino, say, was    10:03:59AM
 3  wrong about that, you wouldn't have any    10:04:02AM
 4  basis to opine as to when these materials,    10:04:04AM
 5  which are part of the Philips affidavit,    10:04:08AM
 6  Plaintiffs' Exhibit 506, would be posted    10:04:11AM
 7  on the Internet?              10:04:13AM
 8     MR. WANG:  Objection to form.    10:04:15AM
 9     A.    Again, I thought you were    10:04:16AM
10  asking prospectively prior to that date    10:04:18AM
11  would analysts know when precisely the    10:04:20AM
12  information would be posted.         10:04:22AM
13         We do know that on the morning    10:04:24AM
14  of February 6th, Bloomberg had an article    10:04:26AM
15  at roughly 10 o'clock in the morning with    10:04:30AM
16  a link to the FDA website, which is still    10:04:32AM
17  a live link, that contained these    10:04:35AM
18  materials.                   10:04:36AM
19     Q.    I understand that.  And, again,    10:04:36AM
20  that's my fault and I thank you for    10:04:39AM
21  correcting me.               10:04:41AM
22         Obviously I am talking about    10:04:42AM
23  prospectively without the benefit of    10:04:43AM
24  having those events occurred and been    10:04:45AM
25  recorded in the public record and news    10:04:48AM
```

Page 63

```
 1          LEHN - CONFIDENTIAL
 2  media and so forth, you don't have an    10:04:49AM
 3  independent personal basis to opine other    10:04:52AM
 4  than relying on what Dr. Fiorino said that    10:04:55AM
 5  these documents, the briefing materials,    10:04:58AM
 6  would be posted on the Internet one day    10:05:00AM
 7  prior to the February 7th, 2001 Advisory    10:05:02AM
 8  Committee meeting?             10:05:05AM
 9     MR. WANG:  Objection to form.    10:05:07AM
10     A.    That is correct.        10:05:08AM
11     Q.    And would you agree with me,    10:05:21AM
12  looking at Exhibit 506, there is these    10:05:23AM
13  three FDA reviewer reports that are    10:05:26AM
14  Exhibits A, B and C, the first one I    10:05:28AM
15  believe is approximately 100 pages; is    10:05:31AM
16  that correct?                10:05:49AM
17     MR. WANG:  I think that's not    10:05:49AM
18  right.                     10:05:50AM
19     MR. SAHAM:  Actually, I think I    10:05:50AM
20  have them out of order.           10:05:51AM
21     Q.    The first one is about 22    10:05:52AM
22  pages; is that correct?           10:05:55AM
23     A.    That's correct.         10:05:56AM
24     Q.    And the second one is about 93    10:05:56AM
25  pages?                     10:05:59AM
```

Page 64

```
 1          LEHN - CONFIDENTIAL
 2     A.    That's correct.         10:05:59AM
 3     Q.    And then the third one is 100    10:06:00AM
 4  pages?                     10:06:02AM
 5     A.    That appears to be correct.    10:06:04AM
 6     Q.    And the first one is the FDA    10:06:05AM
 7  statistical reviewer's report?        10:06:08AM
 8     A.    Correct.             10:06:10AM
 9     Q.    And that's a Ph.D. statistician    10:06:11AM
10  who issued statistical analysis regarding    10:06:13AM
11  the entire CLASS study data; is that an    10:06:17AM
12  accurate description of what that report    10:06:19AM
13  does?                      10:06:21AM
14     A.    I would agree, yes.       10:06:23AM
15     Q.    And then the second report,    10:06:24AM
16  Exhibit B to the Philips affidavit, is the    10:06:26AM
17  gastrointestinal doctor's review of the    10:06:29AM
18  entire CLASS study data; is that fair to    10:06:31AM
19  say?                      10:06:34AM
20     A.    That is correct.        10:06:37AM
21     Q.    And then the third one is    10:06:38AM
22  another medical reviewer's analysis of the    10:06:39AM
23  entire study data?             10:06:42AM
24     A.    Correct.             10:06:46AM
25     Q.    And these are, would you agree    10:06:46AM
```

Page 65

```
 1          LEHN - CONFIDENTIAL
 2  with me, that these are highly-trained    10:06:49AM
 3  professionals, the two medical doctors and    10:06:52AM
 4  then the Ph.D. statistician, and that    10:06:54AM
 5  their analysis is certainly derived from    10:06:57AM
 6  their expertise in their given fields?    10:07:00AM
 7     A.    I would presume that.      10:07:03AM
 8     Q.    And you are not a          10:07:04AM
 9  gastroenterologist?            10:07:07AM
10     A.    That is correct.        10:07:09AM
11     Q.    And you are not -- although I    10:07:09AM
12  know you are a professor who has training    10:07:12AM
13  in statistics; is that fair to say?     10:07:14AM
14     A.    That is correct.        10:07:16AM
15     Q.    But you are not a statistical    10:07:18AM
16  expert?  Would you hold yourself out as a    10:07:20AM
17  statistical expert?            10:07:21AM
18     A.    I don't teach statistics.  I    10:07:21AM
19  use them a lot.               10:07:23AM
20     Q.    And would you say most    10:07:24AM
21  financial analysts, although not all, most    10:07:28AM
22  of them are not Ph.D. statisticians; is    10:07:30AM
23  that fair to say?             10:07:33AM
24     A.    As a general statement, that    10:07:37AM
25  would be fair.               10:07:39AM
```

17 (Pages 62 to 65)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 66

1          LEHN - CONFIDENTIAL
2      Q.     And most of them aren't,        10:07:39AM
3  although some are, most of them aren't       10:07:40AM
4  medical doctors; is that fair to say?        10:07:43AM
5      A.     As a general matter, that's       10:07:45AM
6  correct. In the pharmaceutical industry,    10:07:47AM
7  I don't know whether they mostly would or   10:07:49AM
8  mostly would not have M.D.s.                10:07:53AM
9      Q.     And you would agree with me       10:07:55AM
10 that the information contained -- and        10:07:57AM
11 maybe I shouldn't ask it that way because   10:07:59AM
12 I'm not sure whether you agree with me.      10:08:01AM
13          Is it your opinion that the         10:08:03AM
14 information contained in Exhibits A          10:08:04AM
15 through C of Exhibit 506 are relatively     10:08:06AM
16 complex information?                         10:08:09AM
17          MR. WANG: Objection to form.       10:08:11AM
18      A.     Well, I'm sure there would be    10:08:11AM
19 complexities in some of the data. But       10:08:14AM
20 with respect to the salient issues here,    10:08:18AM
21 which are the alleged corrective            10:08:20AM
22 disclosures, they are not complicated at    10:08:22AM
23 all.                                         10:08:25AM
24          And somebody who is an analyst     10:08:25AM
25 following Pharmacia and pharmaceutical       10:08:27AM

Page 67

1          LEHN - CONFIDENTIAL
2  companies more generally would very         10:08:30AM
3  quickly be able to go through the           10:08:32AM
4  statistical reviewer briefing document and  10:08:34AM
5  identify the information that plaintiffs     10:08:37AM
6  claim was misrepresented in the second      10:08:41AM
7  interrogatory.                              10:08:45AM
8      Q.     Are you an expert on depletion   10:08:45AM
9  of susceptibles in clinical trials as a     10:08:48AM
10 result of informative censoring?            10:08:51AM
11     A.     No.                              10:08:53AM
12     Q.     Do you think most of the         10:08:53AM
13 financial analysts -- strike that.           10:08:57AM
14          Have you ever met an analyst       10:08:59AM
15 who was an expert in depletion of           10:09:03AM
16 susceptibles in a clinical trial due to     10:09:06AM
17 informative censoring?                       10:09:09AM
18     A.     Well, given the work I do, I     10:09:10AM
19 normally wouldn't have an occasion to meet  10:09:12AM
20 such an analyst. But I would think that     10:09:14AM
21 analysts who are covering companies like    10:09:16AM
22 Pharmacia are going to know what they need  10:09:18AM
23 to know and it has been my experience that  10:09:20AM
24 analysts very quickly can process            10:09:24AM
25 information.                                 10:09:25AM

Page 68

1          LEHN - CONFIDENTIAL
2      I teach my students in a            10:09:27AM
3  valuation course that if they take a job   10:09:29AM
4  as an analyst, they are going to have a    10:09:32AM
5  valuation model effectively programmed in  10:09:34AM
6  their head and they are going to know       10:09:37AM
7  salient questions to ask and they are      10:09:39AM
8  going to know how to go through documents   10:09:41AM
9  and quickly cut to the chase and take that 10:09:43AM
10 information and process it through their    10:09:45AM
11 valuation model either formally or          10:09:47AM
12 literally through just thinking it          10:09:49AM
13 through, what are the implications of this  10:09:52AM
14 information and how does it affect my        10:09:54AM
15 valuation of the company.                   10:09:55AM
16          And as I said, if you look at     10:09:57AM
17 the alleged misrepresentations as            10:10:00AM
18 identified in the second interrogatory       10:10:03AM
19 and then you look at the statistical         10:10:05AM
20 reviewer briefing document, in my opinion   10:10:07AM
21 it wouldn't take long for someone to         10:10:10AM
22 identify those alleged corrective           10:10:12AM
23 disclosures.                                 10:10:15AM
24     Q.     When an earnings announcement    10:10:15AM
25 is released, is there a conflicting         10:10:17AM

Page 69

1          LEHN - CONFIDENTIAL
2  earnings announcement released at the same  10:10:19AM
3  time in your understanding?                  10:10:21AM
4          MR. WANG: Objection to form.       10:10:22AM
5  Vague and ambiguous.                         10:10:23AM
6      Q.     That was a bad question.         10:10:24AM
7          When a company releases its        10:10:25AM
8  earnings, right, it is describing what it   10:10:27AM
9  earned the prior quarter?                    10:10:28AM
10     A.     That's correct.                  10:10:29AM
11     Q.     And usually the company issues  10:10:30AM
12 a press release in that regard?             10:10:32AM
13     A.     Usually, that's correct.        10:10:33AM
14     Q.     And are you aware of any         10:10:35AM
15 occasion when a company issues an earnings  10:10:36AM
16 press release that some other entity        10:10:39AM
17 offers an earnings release that is          10:10:41AM
18 contradictory to the earnings release       10:10:45AM
19 issued by the company?                       10:10:49AM
20          MR. WANG: Objection to form.      10:10:50AM
21     A.     I don't know about another       10:10:51AM
22 entity issuing a contradictory earnings     10:10:53AM
23 number, but within an earnings              10:10:56AM
24 announcement there can be all sorts of      10:10:58AM
25 complexities, and you see this in           10:11:00AM

18  (Pages 66 to 69)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 70

1        LEHN - CONFIDENTIAL
2  conference calls where there are all sorts  10:11:03AM
3  of questions that the analysts have about   10:11:04AM
4  the earnings, you know, what's the source   10:11:06AM
5  of the earnings change, you know, is it a   10:11:08AM
6  recurring item, is it related to            10:11:10AM
7  accounting convention or your revenue       10:11:13AM
8  recognition policy, what implications does  10:11:17AM
9  this have for growth.                       10:11:20AM
10        There are all sorts of              10:11:21AM
11  complexities that come out when a company  10:11:23AM
12  issues earnings, and very often when a      10:11:25AM
13  company issues disappointing earnings, you  10:11:28AM
14  have management trying to place a positive  10:11:31AM
15  spin, their color, saying things aren't as  10:11:34AM
16  bad as the earnings numbers look.           10:11:39AM
17        So the market has to process        10:11:40AM
18  through all of that information. It is      10:11:42AM
19  not -- it is not simply robotically         10:11:43AM
20  responding to an earnings number.           10:11:46AM
21    Q.    My question is a little            10:11:47AM
22  different. I'm talking about                10:11:49AM
23  contradictions. Usually when a company     10:11:53AM
24  issues its earnings it says what its        10:11:56AM
25  revenue is; is that correct? That's one     10:11:58AM

Page 71

1        LEHN - CONFIDENTIAL
2  of the items they issue a number on?        10:11:59AM
3    A.    Usually, that's correct.           10:11:59AM
4    Q.    And then they will also issue      10:12:00AM
5  maybe an earnings per share amount?         10:12:02AM
6    A.    Correct.                           10:12:04AM
7    Q.    And there is usually, it is        10:12:04AM
8  just one number, the company issues that    10:12:06AM
9  number, correct, for each of the            10:12:08AM
10  categories?                                10:12:10AM
11        MR. WANG: Objection to form.        10:12:10AM
12    Q.    That's a bad question. Thank       10:12:11AM
13  you for the objection.                      10:12:13AM
14        What I'm getting at is the raw      10:12:13AM
15  information is provided by the company in   10:12:20AM
16  an earnings announcement; is that           10:12:21AM
17  correct?                                    10:12:24AM
18        MR. WANG: Objection to form.        10:12:24AM
19    A.    I'm not sure what you mean by      10:12:28AM
20  "the raw information."                      10:12:30AM
21    Q.    Well, the revenue information      10:12:30AM
22  and the earnings number, that's provided   10:12:31AM
23  by the company; is that correct?            10:12:33AM
24    A.    That is correct.                   10:12:34AM
25    Q.    And there is not another entity   10:12:34AM

Page 72

1        LEHN - CONFIDENTIAL
2  saying no, that number that you are         10:12:38AM
3  reporting is not correct, it is really      10:12:39AM
4  instead of a dollar per share, it is 42     10:12:42AM
5  cents per share?                            10:12:45AM
6        MR. WANG: Objection to form.        10:12:47AM
7    A.    As a general matter, that would   10:12:48AM
8  be correct.                                 10:12:50AM
9    Q.    So generally there is just        10:12:51AM
10  one -- for revenue there is just one       10:12:55AM
11  number provided by the company and for      10:12:57AM
12  earnings there is one number provided by a  10:12:59AM
13  company and then it is for the analysts    10:13:01AM
14  and/or other market participants to figure  10:13:04AM
15  out for themselves what that means for the  10:13:07AM
16  future valuation of the company; is that    10:13:09AM
17  fair to say?                                10:13:11AM
18        MR. WANG: Objection to form.        10:13:11AM
19    A.    Right, but analysts -- again,     10:13:12AM
20  it is similar to the dividend discussion,   10:13:14AM
21  it is not simply the earnings number, but   10:13:16AM
22  it is the reason for the earnings number    10:13:18AM
23  and there are lots of complications that    10:13:20AM
24  go into revising a forecast or revising a   10:13:23AM
25  valuation model when a company reports its  10:13:26AM

Page 73

1        LEHN - CONFIDENTIAL
2  earnings.                                   10:13:29AM
3    Q.    Would it be more difficult for    10:13:29AM
4  an analyst to analyze an earnings number,   10:13:31AM
5  say, we will just pick, say IBM issues an   10:13:35AM
6  earnings announcement that they made a      10:13:39AM
7  billion dollars that year in revenue,       10:13:41AM
8  would it be more difficult for an analyst   10:13:43AM
9  to absorb that information if on the very   10:13:46AM
10  same day at the exact same time the SEC     10:13:48AM
11  issued an earnings release about IBM that   10:13:53AM
12  said they only earned $750 million per      10:13:56AM
13  share?                                      10:13:59AM
14        MR. WANG: Objection to form.        10:13:59AM
15  Incomplete hypothetical.                    10:14:00AM
16    Q.    Could that confuse the market's   10:14:02AM
17  ability to digest information?              10:14:04AM
18        MR. WANG: Same objection.          10:14:06AM
19  Vague and ambiguous, too.                   10:14:08AM
20    A.    Well, I think if the SEC were    10:14:09AM
21  to make such an announcement, I don't       10:14:12AM
22  think that would be all that confusing to   10:14:15AM
23  the market. It would say this company is   10:14:16AM
24  in trouble, the SEC is about to launch      10:14:18AM
25  some sort of action basically accusing      10:14:21AM

19  (Pages 70 to 73)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 74

1        LEHN - CONFIDENTIAL
2   them of lying about their financials, and   10:14:23AM
3   that could be viewed by analysts as       10:14:25AM
4   perhaps a simpler way for it to revalue a   10:14:28AM
5   company than other earnings announcements.   10:14:32AM
6        Q.    What if -- let's change my       10:14:35AM
7   hypothetical a little bit -- what if a     10:14:37AM
8   minority shareholder in IBM on that same   10:14:39AM
9   day that the company said they earned a    10:14:43AM
10  billion dollars a share issued a press      10:14:44AM
11  release, let's say a well-respected, like   10:14:46AM
12  a Buffett sort of guy, issued his own       10:14:48AM
13  revenue and earnings numbers for IBM and   10:14:51AM
14  said it was double what the company        10:14:54AM
15  reported.                    10:14:55AM
16        Would that confuse the market's   10:14:55AM
17  ability to process the information?         10:14:58AM
18        MR. WANG: Objection to form.       10:14:59AM
19        A.    I don't know what you mean by   10:15:00AM
20  "confuse." That if there was additional    10:15:02AM
21  information, then the market would process   10:15:04AM
22  that additional information and if the     10:15:06AM
23  market for the underlying security is      10:15:09AM
24  efficient that process would occur very    10:15:11AM
25  quickly.                     10:15:13AM

Page 75

1        LEHN - CONFIDENTIAL
2        Q.    Could it, in your opinion, take   10:15:13AM
3   longer for the market to absorb two         10:15:15AM
4   contrary earnings announcements like I've   10:15:18AM
5   described, one by IBM and one by Buffett   10:15:21AM
6   about IBM, could that delay the market's   10:15:25AM
7   reaction and make it take longer for the   10:15:28AM
8   market to process the meaning of that      10:15:30AM
9   information?                   10:15:31AM
10        MR. WANG: Same objections.        10:15:31AM
11        A.    Not if one has opined that the   10:15:33AM
12  market for the security is efficient,       10:15:35AM
13  which means that as information comes out,   10:15:37AM
14  it is processed rapidly and fairly          10:15:39AM
15  reflected in the security price.           10:15:42AM
16        Now, if you stray from the         10:15:45AM
17  assumption that the market for the         10:15:47AM
18  security is efficient, then sure, there    10:15:48AM
19  could be a delayed reaction.              10:15:50AM
20        Q.    Such as what you observed in   10:15:53AM
21  the AOL Time Warner context, it took two   10:15:56AM
22  days for the market to fully absorb that   10:15:59AM
23  information?                   10:16:01AM
24        MR. WANG: Objection to form.      10:16:02AM
25        A.    I don't recall forming an       10:16:03AM

Page 76

1        LEHN - CONFIDENTIAL
2   opinion that there were delayed reactions   10:16:04AM
3   in AOL Time Warner, but I will refresh my   10:16:05AM
4   memory as to the context of that analysis.   10:16:08AM
5        Q.    But you do agree with me and   10:16:10AM
6   you testified earlier that in AOL it was   10:16:11AM
7   appropriate to examine a two-day window or   10:16:13AM
8   a multi-day window to accurately analyze   10:16:16AM
9   loss causation and materiality in that     10:16:18AM
10  context?                     10:16:21AM
11        MR. WANG: Objection to form.       10:16:21AM
12        A.    I would have to go back and    10:16:22AM
13  review both the assignment in AOL and the   10:16:24AM
14  facts in AOL before I would agree with     10:16:27AM
15  that.                       10:16:29AM
16        Q.    But as we sit here today, the   10:16:31AM
17  testimony that I read you previously, that   10:16:33AM
18  was truthful and accurate when you gave    10:16:34AM
19  it?                         10:16:36AM
20        A.    And it is truthful and accurate   10:16:36AM
21  today as I indicated, that if there was    10:16:38AM
22  legitimate follow-on information, then it   10:16:40AM
23  can be appropriate to use a two-day       10:16:42AM
24  window.                     10:16:44AM
25        Q.    And one form of follow-on     10:16:45AM

Page 77

1        LEHN - CONFIDENTIAL
2   information can be the publication of an   10:16:47AM
3   analyst report; is that correct?          10:16:49AM
4        A.    Not just the publication of an   10:16:50AM
5   analyst report, but new information in the   10:16:52AM
6   analyst report, new factual information in   10:16:55AM
7   the analyst report.                10:16:57AM
8        MR. WANG: If you are moving        10:16:59AM
9   off your hypos, can we take a break or     10:17:00AM
10  take a break soon?               10:17:03AM
11        MR. SAHAM: Sure. We will          10:17:05AM
12  definitely take a break in a minute or     10:17:06AM
13  two.                        10:17:08AM
14        Q.    Could the source of           10:17:12AM
15  information, could that be important and   10:17:14AM
16  make the information new if it was coming   10:17:19AM
17  from a different source?              10:17:21AM
18        MR. WANG: Objection to form.      10:17:22AM
19        A.    I'm not sure I understand.      10:17:23AM
20        Q.    Well, if there was information   10:17:24AM
21  related to the same topic on one day and   10:17:26AM
22  then it came from a different source the   10:17:29AM
23  second day, could that be considered new   10:17:31AM
24  information that the market would react to   10:17:33AM
25  in your opinion?                 10:17:34AM

20  (Pages 74 to 77)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 78

LEHN - CONFIDENTIAL

1          LEHN - CONFIDENTIAL
2          MR. WANG: Objection to form.  10:17:36AM
3     A.    Again, I'm not following the  10:17:37AM
4  question.              10:17:40AM
5     Q.    Okay.  If you have got      10:17:40AM
6  information, you know, like in this case  10:17:43AM
7  we've got some data, you know, that those  10:17:44AM
8  five facts are ascertainable from -- are  10:17:47AM
9  you with me?              10:17:49AM
10     A.    Uh-huh.              10:17:50AM
11     Q.    And I think your opinion is  10:17:51AM
12  that the data was -- those five facts were  10:17:52AM
13  ascertainable from the data that's      10:17:55AM
14  contained in those three reports, Exhibits  10:17:58AM
15  A through C of Exhibit 506; is that      10:18:00AM
16  correct?              10:18:03AM
17     A.    Uh-huh, that's correct.      10:18:03AM
18     Q.    And if on the following day  10:18:05AM
19  information was amplified or provided in a  10:18:08AM
20  different form or from a different source,  10:18:12AM
21  could that be considered new information  10:18:15AM
22  in your opinion?              10:18:17AM
23          MR. WANG: Objection to form.  10:18:19AM
24     A.    Not in this case.  It is very  10:18:20AM
25  clear that the alleged corrective      10:18:24AM

Page 79

LEHN - CONFIDENTIAL

1          LEHN - CONFIDENTIAL
2  disclosures were made early in the morning  10:18:26AM
3  of February 6th and they were readily      10:18:28AM
4  ascertainable from the statistical      10:18:32AM
5  reviewer briefing documents and it was      10:18:35AM
6  factual information that was provided in      10:18:38AM
7  this briefing document.          10:18:41AM
8          So opinions about that the next  10:18:44AM
9  day or reactions to that information in my  10:18:47AM
10  opinion may be related, but they are      10:18:49AM
11  distinct from the alleged corrective      10:18:52AM
12  disclosures, all of which were released on  10:18:54AM
13  the morning of February 6th.          10:18:56AM
14     Q.    And what do you mean by      10:18:57AM
15  "distinct"?              10:18:59AM
16     A.    Different.  Information the      10:18:59AM
17  next day might be related in the sense      10:19:04AM
18  that it is associated with everything that  10:19:06AM
19  was released on the morning of the 6th,      10:19:08AM
20  but related, but distinct.          10:19:11AM
21          So for purposes of loss      10:19:14AM
22  causation, looking at how stock prices      10:19:15AM
23  react to related information the next day  10:19:19AM
24  is irrelevant because that's different      10:19:22AM
25  information.              10:19:25AM

Page 80

LEHN - CONFIDENTIAL

1          LEHN - CONFIDENTIAL
2     Q.    And when you say "distinct,"  10:19:26AM
3  could that be new information?      10:19:27AM
4          MR. WANG: Objection to form.  10:19:29AM
5     Q.    You used the term "distinct."  10:19:30AM
6     A.    Distinct is different,      10:19:32AM
7  different information, that in my opinion  10:19:33AM
8  the alleged corrective disclosures were      10:19:36AM
9  made on the morning of February 6th.      10:19:39AM
10          I think even Dr. Feinstein      10:19:42AM
11  agrees that there was no additional      10:19:45AM
12  corrective disclosure.  His view is that  10:19:47AM
13  it just took the market a long time to      10:19:49AM
14  process this information, which means that  10:19:50AM
15  he is not assuming that the market for      10:19:52AM
16  Pharmacia stock is efficient.          10:19:53AM
17          MR. SAHAM: Okay, we can take a  10:19:56AM
18  break now.  I think your counsel wants to  10:19:57AM
19  take a break.              10:19:59AM
20          MR. WANG: Yeah, that would be  10:20:00AM
21  great.              10:20:02AM
22          THE VIDEOGRAPHER: The time is  10:20:02AM
23  approximately 10:19 a.m.  This is the end  10:20:03AM
24  of media number one.  We are off the      10:20:05AM
25  record.              10:20:07AM

Page 81

LEHN - CONFIDENTIAL

1          LEHN - CONFIDENTIAL
2          (Recess taken.)              10:20:08AM
3          THE VIDEOGRAPHER: The time is  10:36:32AM
4  approximately 10:36 a.m.  This is the      10:36:41AM
5  beginning of media number two.  We are on  10:36:43AM
6  the record.              10:36:46AM
7  BY MR. SAHAM:              10:36:47AM
8     Q.    Dr. Lehn, focusing on those  10:36:47AM
9  five facts in paragraph 72 of your report  10:36:49AM
10  that plaintiffs allege weren't disclosed  10:36:52AM
11  until February 2001, do you have any      10:36:54AM
12  evidence or have you seen any evidence in  10:36:57AM
13  the form of an analyst report, media      10:36:59AM
14  report or any other, that an analyst or a  10:37:02AM
15  media outlet did ascertain those five      10:37:05AM
16  facts on February 6th, or any of those      10:37:08AM
17  five facts?              10:37:13AM
18          MR. WANG: Objection to form.  10:37:13AM
19     A.    Well, I don't recall that they  10:37:14AM
20  specifically addressed each of those five  10:37:24AM
21  points, and I would have to go back and      10:37:26AM
22  refresh my memory by looking at the      10:37:29AM
23  analyst reports that did come out and see  10:37:30AM
24  what they said that might have touched on  10:37:32AM
25  any of those five points.          10:37:34AM

21 (Pages 78 to 81)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 82

1         LEHN - CONFIDENTIAL
2        But, again, that would be      10:37:37AM
3    irrelevant as well because if they didn't   10:37:39AM
4    say anything about it, it usually is      10:37:41AM
5    indicative that they didn't think it was    10:37:44AM
6    particularly important.  Analysts tend to   10:37:46AM
7    write about what they think is important.   10:37:49AM
8        Q.    And analysts certainly wrote   10:37:51AM
9    about the CLASS trial after the close of    10:37:53AM
10   the market on February 7th and on February   10:37:55AM
11   8th, 2001; is that correct?      10:37:57AM
12       MR. WANG:  Objection to form.   10:37:58AM
13       A.    There were analyst reports that   10:37:59AM
14   refer to that, correct.      10:38:02AM
15       Q.    And one of them even was    10:38:02AM
16   entitled CLASS Flunks Out; is that      10:38:06AM
17   correct?      10:38:08AM
18       A.    I recall seeing that one, yes.   10:38:08AM
19       Q.    There was no similar analyst   10:38:10AM
20   report directly addressing those five    10:38:12AM
21   facts that are listed in paragraph 72 on   10:38:14AM
22   February 6th; is that correct?      10:38:18AM
23       MR. WANG:  Objection to form.   10:38:19AM
24       A.    Again, I don't recall an    10:38:22AM
25   analyst report that went through those    10:38:25AM

Page 83

1         LEHN - CONFIDENTIAL
2    five points and systematically said      10:38:27AM
3    something about it.  But there may have    10:38:29AM
4    been things in the analyst reports that    10:38:33AM
5    touched on some of those points.      10:38:35AM
6        Q.    But as we sit here today, you   10:38:37AM
7    don't have one particular analyst report   10:38:39AM
8    in your mind that addresses those -- any   10:38:40AM
9    of those five points on February 6th?      10:38:43AM
10       A.    As I sit here, that's correct.  10:38:44AM
11   But, again, that would be irrelevant      10:38:46AM
12   certainly for my opinions in this case.   10:38:50AM
13       Q.    Is there anything you could do   10:38:52AM
14   to refresh your recollection to see if you   10:38:53AM
15   could -- I guess actually let me withdraw   10:38:55AM
16   that question.      10:38:59AM
17       My question is, you are not      10:38:59AM
18   offering an opinion that there were any   10:39:02AM
19   analyst reports on February 6th that      10:39:04AM
20   address any of those five facts; is that   10:39:07AM
21   correct?      10:39:10AM
22       MR. WANG:  Objection to form.   10:39:10AM
23       Q.    "Address" is a bad question.   10:39:11AM
24       You are not offering an opinion   10:39:13AM
25   that on February 6th of 2001 there was an   10:39:14AM

Page 84

1    analyst report or a media article that was   10:39:18AM
2    evidence that the market ascertained any   10:39:22AM
3    of those five facts that are listed in    10:39:25AM
4    paragraph 72 on February 6th, 2001?      10:39:27AM
5        MR. WANG:  Objection.      10:39:30AM
6        A.    As I indicated, I can't recall   10:39:32AM
7    an analyst report that directly addressed   10:39:38AM
8    those five issues, but that, in my      10:39:40AM
9    opinion, is not a test as to whether or    10:39:43AM
10   not the information was ascertainable.  It   10:39:46AM
11   is a factual issue as to whether it was    10:39:47AM
12   ascertainable.  And it was.      10:39:50AM
13       Q.    But there is no evidence that   10:39:51AM
14   an analyst through a written publication   10:39:53AM
15   or some other form of direct evidence      10:39:57AM
16   actually ascertained those five facts; is   10:39:59AM
17   that correct, sir?      10:40:03AM
18       MR. WANG:  Objection to form.   10:40:03AM
19       A.    Again, as I indicated, I'm not   10:40:08AM
20   aware of an analyst report that directly   10:40:09AM
21   addressed those five facts.      10:40:11AM
22       Q.    And are you offering an opinion   10:40:13AM
23   in this case that the reports, Exhibit A,   10:40:16AM
24   B and C of Exhibit 506, are not complex?   10:40:19AM

Page 85

1         LEHN - CONFIDENTIAL
2        A.    Well, you know, as I indicated   10:40:29AM
3    earlier, there is a level of complexity in   10:40:34AM
4    all sorts of announcements that companies   10:40:36AM
5    make, including earnings announcements,   10:40:38AM
6    dividend announcements.  So there are      10:40:40AM
7    always complexities associated with      10:40:43AM
8    information releases.  Very little      10:40:44AM
9    information is devoid of complexity.      10:40:47AM
10       The relevant information with      10:40:51AM
11   respect to the alleged corrective      10:40:52AM
12   disclosures, in my opinion, is not      10:40:54AM
13   complex, that it was reviewed rather      10:40:58AM
14   succinctly in the first few pages of the   10:41:00AM
15   statistical reviewer's briefing document.   10:41:02AM
16       So whereas there may be complex   10:41:04AM
17   nuances associated with some of these      10:41:07AM
18   documents, what's relevant is whether the   10:41:09AM
19   information pertaining to the alleged      10:41:11AM
20   corrective disclosures were ascertainable;   10:41:15AM
21   and they were.      10:41:19AM
22       And, furthermore, if one opines   10:41:20AM
23   that the market for the security is      10:41:24AM
24   efficient, that means that all information   10:41:29AM
25   released on a given day would ultimately   10:41:30AM

22  (Pages 82 to 85)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 86

1           LEHN - CONFIDENTIAL
2    affect the underlying security price on    10:41:35AM
3    that day, regardless of the complexity of    10:41:37AM
4    the information.                10:41:40AM
5        Q.    Are you an offering an opinion    10:41:43AM
6    comparatively whether the information    10:41:57AM
7    contained in the FDA reviewer reports was    10:41:59AM
8    more or less complex than a typical        10:42:03AM
9    earnings announcement?        10:42:06AM
10        MR. WANG: Objection to form.    10:42:07AM
11        A.    I'm not making a comparison as    10:42:08AM
12    to which is more or less complex. What I    10:42:19AM
13    am saying is that Dr. Feinstein is        10:42:22AM
14    incorrect when he assumes that earnings    10:42:25AM
15    announcements are not complex or are less    10:42:28AM
16    complex than the information contained in    10:42:33AM
17    these briefing materials. He has no basis    10:42:34AM
18    for saying that.            10:42:36AM
19        Q.    You are not going to offer an    10:42:37AM
20    opinion at trial that the information    10:42:39AM
21    contained in Exhibit 506 is not complex?    10:42:41AM
22        MR. WANG: Objection to form.    10:42:46AM
23    Asked and answered.            10:42:47AM
24        A.    I haven't been asked to offer    10:42:47AM
25    any opinion of that sort.        10:42:50AM

Page 87

1           LEHN - CONFIDENTIAL
2        Q.    And have you formulated one?    10:42:52AM
3        A.    I haven't formulated an opinion    10:42:54AM
4    as to the complexity of the information in    10:42:58AM
5    its totality. And the reason I haven't is    10:43:01AM
6    that that's irrelevant for purposes of my    10:43:05AM
7    opinion, that if the market for an        10:43:07AM
8    underlying security is efficient, then    10:43:10AM
9    when information is released, that        10:43:12AM
10    information would be rapidly reflected in    10:43:14AM
11    that security price.            10:43:17AM
12        Q.    Even if it was confounded by    10:43:18AM
13    other information?        10:43:20AM
14        MR. WANG: Objection to form.    10:43:23AM
15    Vague and ambiguous.            10:43:24AM
16        A.    Again, there are two issues.    10:43:24AM
17    If there is confounding information that    10:43:28AM
18    may affect the magnitude of the price    10:43:30AM
19    change, if it is truly confounding, and it    10:43:35AM
20    is new confounding information, not simply    10:43:41AM
21    information that had previously been    10:43:44AM
22    disclosed, then that potentially can have    10:43:45AM
23    an effect on the security price.        10:43:50AM
24        But there is no reason to    10:43:54AM
25    believe that that would result in a    10:43:55AM

Page 88

1           LEHN - CONFIDENTIAL
2    delayed reaction of the sort that        10:43:57AM
3    Dr. Feinstein discusses.        10:43:58AM
4        Q.    Can confounding information    10:44:01AM
5    affect or impact the rapidity of the price    10:44:06AM
6    adjustment to corrective information?    10:44:08AM
7        MR. WANG: Objection to form.    10:44:11AM
8    Vague and ambiguous.            10:44:12AM
9        A.    Not if one, again, assumes that    10:44:19AM
10    the market for the underlying security is    10:44:21AM
11    efficient. If it is, by definition it    10:44:23AM
12    means the market has processed that        10:44:26AM
13    information rapidly and done so in an    10:44:28AM
14    unbiased fashion.        10:44:31AM
15        Dr. Feinstein has opined that    10:44:34AM
16    the market for Pharmacia stock is        10:44:35AM
17    efficient and yet he makes a delayed    10:44:37AM
18    reaction into the analysis, which by    10:44:43AM
19    definition means the market for the    10:44:45AM
20    security is not efficient.        10:44:46AM
21        Q.    Would you agree that the    10:44:47AM
22    company would have been in a good position    10:44:49AM
23    to determine whether or not the        10:44:50AM
24    information released on February 6th was    10:44:53AM
25    complex or not? The "company" being    10:44:55AM

Page 89

1           LEHN - CONFIDENTIAL
2    Pharmacia.            10:44:57AM
3        A.    Again, I think it is important    10:45:08AM
4    to understand what you are referring to by    10:45:14AM
5    "complex." Complex in some absolute sense    10:45:17AM
6    or complex in some relative sense? I'm    10:45:20AM
7    not sure how you are using the phrase.    10:45:25AM
8        Q.    Complex as far as difficult --    10:45:26AM
9    well, what's your definition of "complex"?    10:45:28AM
10        A.    Complicated.        10:45:31AM
11        Q.    Would the company be in a    10:45:32AM
12    position to determine whether or not the    10:45:35AM
13    information released in February -- on    10:45:37AM
14    February 6th and 7th regarding the CLASS    10:45:40AM
15    data, whether or not that information was    10:45:42AM
16    complicated?            10:45:44AM
17        MR. WANG: Objection. Vague    10:45:46AM
18    and ambiguous.            10:45:47AM
19        A.    Well, again, I assume that    10:45:47AM
20    there is a level of complication    10:45:49AM
21    associated with some information in this    10:45:51AM
22    document. But as I indicated before,    10:45:53AM
23    there is complication associated with    10:45:56AM
24    earnings announcements. There is    10:45:57AM
25    complications associated with dividend    10:45:59AM

23  (Pages 86 to 89)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 90

LEHN - CONFIDENTIAL
1
2    announcements, that most information is      10:46:01AM
3    released by companies, especially          10:46:05AM
4    companies the size of Pharmacia, has its    10:46:06AM
5    complications.                              10:46:10AM
6          But if the market for that           10:46:11AM
7    security is efficient by definition,        10:46:13AM
8    notwithstanding the complications, that     10:46:17AM
9    information is processed and it is          10:46:19AM
10   processed rapidly by the market.            10:46:20AM
11        Q.    Now, are you offering an         10:46:23AM
12   opinion relatively whether or not -- have   10:46:24AM
13   you formulated an opinion relatively        10:46:27AM
14   whether the release of the CLASS data on    10:46:29AM
15   February 6th, whether that was more or      10:46:32AM
16   less complex than an earnings announcement  10:46:34AM
17   as addressed by Patell and Wolfson in       10:46:38AM
18   their study?                                10:46:41AM
19        MR. WANG:  Objection.                  10:46:42AM
20        A.    As I indicated earlier, I'm not  10:46:43AM
21   making a comparative statement there, no.   10:46:45AM
22        Q.    So you are not going to be       10:46:47AM
23   offering that sort of opinion at trial, at  10:46:49AM
24   least as you sit here today you do not      10:46:50AM
25   plan on offering an opinion to the jury     10:46:52AM

Page 91

LEHN - CONFIDENTIAL
1
2    that comparatively the information          10:46:55AM
3    disclosed in Exhibit 506 was more or less   10:46:58AM
4    or equally complex as compared to the       10:47:01AM
5    earnings and dividends announcements that   10:47:03AM
6    Patell and Wolfson discussed?               10:47:05AM
7        MR. WANG:  Objection to form.           10:47:07AM
8    Misstates his testimony.                    10:47:08AM
9        A.    I'm not planning on making a      10:47:10AM
10   statement of that sort.  But it is          10:47:11AM
11   important to note that Dr. Feinstein        10:47:15AM
12   builds his assumption of a delayed          10:47:20AM
13   reaction on the purported complexity of     10:47:22AM
14   the information released on February 6th    10:47:25AM
15   and tries to draw that as a distinguishing  10:47:28AM
16   characteristic of this information as       10:47:30AM
17   opposed to the earnings and dividend        10:47:33AM
18   information that Patell and Wolfson point   10:47:35AM
19   to.                                         10:47:38AM
20        And it is my opinion that              10:47:39AM
21   Dr. Feinstein has no basis for concluding   10:47:41AM
22   that this information was more complex      10:47:44AM
23   than the information contained in earnings  10:47:47AM
24   announcements and dividend announcements.   10:47:49AM
25        And, furthermore, regardless of        10:47:52AM

Page 92

LEHN - CONFIDENTIAL
1
2    whether it is complex, it is irrelevant,    10:47:54AM
3    because if he has assumed that the market   10:47:57AM
4    for this stock is efficient, regardless of  10:47:58AM
5    the complexity, that information would be   10:48:01AM
6    reflected in Pharmacia's stock price and    10:48:03AM
7    it would be reflected quickly.              10:48:05AM
8        Q.    And what do you mean by           10:48:07AM
9    "quickly"?                                  10:48:08AM
10       A.    Certainly within one trading      10:48:09AM
11   day.                                        10:48:11AM
12       Q.    And is it your opinion that       10:48:11AM
13   regardless of the complexity of             10:48:13AM
14   information in an efficient market, the     10:48:15AM
15   information will always be reflected --     10:48:19AM
16   I'm sorry, the market will have always --   10:48:22AM
17   I have to start that question over.  It     10:48:25AM
18   was a bad question.                         10:48:27AM
19        Is it your testimony that              10:48:28AM
20   regardless of the complexity of             10:48:30AM
21   information in an efficient market, a       10:48:33AM
22   stock price will always adjust within one   10:48:37AM
23   trading day?                                10:48:40AM
24       A.    You know, I try to avoid the      10:48:41AM
25   word "always," that when I refer to having  10:48:44AM

Page 93

LEHN - CONFIDENTIAL
1
2    a scientific basis, what that means is      10:48:49AM
3    based on accepted practice in the           10:48:52AM
4    peer-reviewed literature, it is our         10:48:55AM
5    understanding, and it is not just a         10:48:58AM
6    theoretical understanding, it is based on   10:49:00AM
7    hundreds of empirical studies, that         10:49:03AM
8    securities prices react quickly to the      10:49:06AM
9    release of new information.  And it is not  10:49:08AM
10   only new information about earnings and      10:49:11AM
11   dividends, but takeovers and various other  10:49:12AM
12   pieces of information.                       10:49:16AM
13        Now, does that mean that there         10:49:17AM
14   is never an exception?  There probably are  10:49:20AM
15   exceptions.  But you don't base an opinion  10:49:23AM
16   on exceptions if you are trying to adhere   10:49:28AM
17   to the scientific practice.  And the        10:49:31AM
18   scientific literature would argue and the   10:49:34AM
19   evidence shows that even complex            10:49:38AM
20   information, when it is released, is         10:49:41AM
21   quickly reflected in securities prices if   10:49:44AM
22   the market for the underlying security is   10:49:46AM
23   efficient.                                  10:49:49AM
24       Q.    Is the complexity of             10:49:49AM
25   information a factor that you would         10:49:51AM

24  (Pages 90 to 93)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 94

1          LEHN - CONFIDENTIAL
2    consider in determining how long a price   10:49:52AM
3    reaction would take?                          10:49:55AM
4          MR. WANG: In an efficient      10:49:58AM
5    market?                                 10:49:59AM
6          MR. SAHAM: Yes, in an     10:49:59AM
7    efficient market.                       10:50:00AM
8       A.   I'm not aware of any literature 10:50:01AM
9    that shows that when the market for     10:50:06AM
10   security is efficient the speed of price   10:50:10AM
11   adjustment depends upon how complex the   10:50:12AM
12   information is. As far as I'm aware,   10:50:15AM
13   there is no scientific evidence to support 10:50:16AM
14   that.                                  10:50:19AM
15          And given that, it is my    10:50:20AM
16   opinion that regardless of the level of   10:50:24AM
17   complexity there would be a price impact.   10:50:29AM
18   Now, oftentimes when people think about   10:50:36AM
19   market efficiency, they think that that   10:50:39AM
20   initial price impact would sort of not be   10:50:42AM
21   affected by subsequent information   10:50:49AM
22   releases that correct what had been    10:50:52AM
23   released on the relevant day. So it may   10:50:56AM
24   be that you get a price reaction and then   10:50:58AM
25   the market learns more and then reacts to   10:51:01AM

Page 95

1          LEHN - CONFIDENTIAL
2    that new information, so you get    10:51:03AM
3    subsequent price changes.            10:51:05AM
4          And those subsequent price   10:51:07AM
5    changes may be additional information   10:51:09AM
6    releases that clarify some complexities on   10:51:11AM
7    a given day. But that's different than   10:51:14AM
8    how the market reacts to the release of   10:51:20AM
9    complex information on a given day.   10:51:22AM
10      Q.   So clarification of the   10:51:25AM
11   information on a subsequent day could be   10:51:26AM
12   something that would prolong the stock   10:51:28AM
13   price reaction?                       10:51:31AM
14          MR. WANG: Objection to form.   10:51:33AM
15      A.   No, not to the release of the   10:51:34AM
16   information on day one; that if there is a   10:51:35AM
17   subsequent announcement that is relevant   10:51:38AM
18   that maybe corrects the information that   10:51:43AM
19   was released on the first day, the market   10:51:45AM
20   may react to that and then it would be   10:51:48AM
21   appropriate to consider both price   10:51:51AM
22   reactions in tandem as being relevant.   10:51:53AM
23      Q.   So if there is a clarification   10:51:57AM
24   the next day, that could be a subsequent   10:51:59AM
25   piece of information that could be   10:52:01AM

Page 96

1          LEHN - CONFIDENTIAL
2    considered in analyzing the stock price;   10:52:02AM
3    is that correct?                       10:52:06AM
4          MR. WANG: Objection to form.   10:52:06AM
5       A.   It depends on the facts of the   10:52:07AM
6    case. But if there is new information   10:52:09AM
7    about the information that had been   10:52:12AM
8    disclosed on the prior day, then   10:52:14AM
9    potentially depending on the facts of the   10:52:17AM
10   case that would be relevant.            10:52:19AM
11      Q.   I want to show you what has   10:52:21AM
12   previously been marked as Goldkind   10:52:22AM
13   Plaintiffs' 2. Can you take a look at   10:52:26AM
14   that document, please.                 10:52:28AM
15          (Witness perusing document.)   10:52:32AM
16      Q.   And Goldkind Exhibit 2 is the   10:52:36AM
17   Gastrointestinal Review Highlights of the   10:52:38AM
18   CLASS Study, Lawrence Goldkind, M.D.   10:52:40AM
19          Is this a document you    10:52:44AM
20   considered in formulating your opinions in   10:52:45AM
21   this case?                            10:52:47AM
22      A.   I don't know if this is -- I   10:52:51AM
23   don't remember seeing this as a standalone   10:52:53AM
24   document, but it might have been attached   10:52:55AM
25   to some of the briefing materials that I   10:52:56AM

Page 97

1          LEHN - CONFIDENTIAL
2    reviewed.                              10:52:58AM
3       Q.   Do you know that Dr. Goldkind   10:52:59AM
4    made a presentation on the morning of   10:53:00AM
5    February 7th, 2001 regarding the CLASS   10:53:02AM
6    study, the entire study results?    10:53:03AM
7       A.   I didn't know about the morning 10:53:05AM
8    per se, but I know he made a presentation   10:53:06AM
9    on the 7th.                           10:53:08AM
10      Q.   And could that potentially --   10:53:09AM
11   if he clarified some of the information   10:53:11AM
12   disclosed on February 6th, could that   10:53:14AM
13   possibly impact your opinions in this   10:53:15AM
14   case?                                 10:53:17AM
15          MR. WANG: Objection to form.   10:53:17AM
16   Vague and ambiguous.                   10:53:18AM
17      A.   Not at all. Because the   10:53:19AM
18   information that was the alleged   10:53:21AM
19   corrective disclosure was released on the   10:53:24AM
20   morning of February 6th, and as I've   10:53:26AM
21   indicated the statistical review made it   10:53:30AM
22   clear to whoever wanted to look at it   10:53:32AM
23   that information that was allegedly   10:53:34AM
24   misrepresented was corrected in the   10:53:36AM
25   statistical review briefing document.   10:53:39AM

25  (Pages 94 to 97)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 98

1          LEHN - CONFIDENTIAL
2     Q.    That information was          10:53:42AM
3 ascertainable from the statistical          10:53:43AM
4 reviewer's briefing document; that's your   10:53:44AM
5 opinion, correct?                           10:53:46AM
6     A.    That is correct.               10:53:47AM
7     Q.    And you don't know whether      10:53:47AM
8 analysts embodied in their reports          10:53:49AM
9 actually ascertained that information, you  10:53:52AM
10 are not offering an opinion in this case    10:53:53AM
11 to that regard, are you, sir?              10:53:55AM
12     A.    But, again, that is irrelevant, 10:53:56AM
13 that if the market for the security is      10:53:58AM
14 efficient, then that information which was  10:54:00AM
15 released on February 6th would be           10:54:02AM
16 reflected in Pharmacia's stock price on     10:54:04AM
17 February 6th.                               10:54:06AM
18     Q.    Could you take a look at the    10:54:07AM
19 second to last page of Goldkind Exhibit 2,  10:54:08AM
20 it is the last three Bates numbers 233 for  10:54:11AM
21 the record.  And this page is labeled       10:54:14AM
22 Overall Conclusions.  Do you see that?      10:54:18AM
23     A.    I do.                  10:54:20AM
24     Q.    And Dr. Goldkind's overall      10:54:21AM
25 conclusions that he made in his             10:54:23AM

Page 99

1          LEHN - CONFIDENTIAL
2 presentation on the morning of February     10:54:25AM
3 7th, his second bullet point says "No       10:54:26AM
4 conclusions regarding safety of Celebrex    10:54:30AM
5 compared to traditional less selective COX  10:54:33AM
6 inhibitors as a group are possible."        10:54:36AM
7     Do you see that?             10:54:39AM
8     A.    Yes.                   10:54:39AM
9     Q.    Would you consider that new     10:54:39AM
10 information compared to what was released   10:54:40AM
11 on February 6th?                   10:54:43AM
12     MR. WANG:  Objection to form.  10:54:44AM
13 Vague and ambiguous.              10:54:45AM
14     A.    Again, with respect to the     10:54:53AM
15 information released on February 6th, the   10:54:55AM
16 relevant information for purposes of my     10:54:57AM
17 analysis were the alleged corrective        10:55:00AM
18 disclosures.                       10:55:02AM
19     And this bullet point, as I sit 10:55:04AM
20 here, doesn't add to that information, the  10:55:06AM
21 alleged corrective disclosures on February  10:55:10AM
22 6th.                               10:55:12AM
23     Q.    Well, is one of the bullet     10:55:13AM
24 points that plaintiffs point out and you    10:55:14AM
25 reference in Exhibit 2 of your report that  10:55:18AM

Page 100

1          LEHN - CONFIDENTIAL
2 there is no difference between Celebrex      10:55:19AM
3 and diclofenac on any of the eight          10:55:22AM
4 endpoints considered as part of the JAMA    10:55:27AM
5 article?                           10:55:32AM
6     MR. WANG:  Objection to the     10:55:32AM
7 form.                              10:55:33AM
8     A.    That that was one of the      10:55:34AM
9 statements that plaintiffs made in the      10:55:34AM
10 second interrogatory response.              10:55:36AM
11     Q.    And here, Dr. Goldkind is      10:55:36AM
12 emphasizing that there is no conclusions    10:55:38AM
13 regarding safety as a result of CLASS that  10:55:40AM
14 can -- and let me just read it.  I was      10:55:44AM
15 paraphrasing and your counsel will          10:55:46AM
16 probably object.                   10:55:48AM
17     Dr. Goldkind here states "No    10:55:49AM
18 conclusions regarding safety of Celebrex    10:55:51AM
19 compared to traditional, less selective     10:55:54AM
20 COX inhibitors as a group are possible."    10:55:56AM
21     That's what he says, right, in 10:55:56AM
22 this bullet point?                 10:56:02AM
23     A.    That's correct.             10:56:02AM
24     Q.    If you turn back a few pages   10:56:02AM
25 before, last three Bates numbers 229, do    10:56:04AM

Page 101

1          LEHN - CONFIDENTIAL
2 you see that?  Again, it is labeled          10:56:11AM
3 Overall Conclusions.               10:56:12AM
4     The second bullet point, the    10:56:13AM
5 last sentence, Dr. Goldkind states "No      10:56:15AM
6 reference was seen between Celebrex and      10:56:17AM
7 diclofenac."  Do you see that?              10:56:20AM
8     A.    I do.                  10:56:21AM
9     Q.    Do you consider this new       10:56:21AM
10 information that went into the market on     10:56:23AM
11 the morning of February 7th?               10:56:25AM
12     A.    Not that sentence, because that 10:56:27AM
13 information was ascertainable from the      10:56:29AM
14 statistical reviewer's briefing document.   10:56:33AM
15     Q.    But the fact that it is stated 10:56:35AM
16 in plain, simple English, could that be     10:56:37AM
17 called a clarification in your --           10:56:39AM
18     A.    No, no.  It doesn't clarify    10:56:41AM
19 factual information that was contained in    10:56:43AM
20 the statistical review.  So there is no     10:56:44AM
21 basis to believe that that would be         10:56:47AM
22 relevant information.              10:56:48AM
23     Q.    Now, did you do some intraday  10:56:49AM
24 stock price analysis in this case?          10:56:52AM
25     A.    I presented intraday stock     10:56:54AM

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 102

1              LEHN - CONFIDENTIAL
2    price data, correct.              10:56:56AM
3        Q.    And you did so for February    10:56:56AM
4    8th, 2001, correct?              10:56:59AM
5        A.    That is correct.          10:56:59AM
6        Q.    You did not present any      10:57:00AM
7    intraday stock price analysis for February  10:57:02AM
8    7th, 2001?                  10:57:03AM
9        A.    That is correct.          10:57:04AM
10       Q.    Why didn't you provide any    10:57:05AM
11   intraday analysis for February 7th, 2001?  10:57:08AM
12       A.    Well, for a couple of reasons.  10:57:10AM
13   One is I don't think February 7th, 2001 is  10:57:11AM
14   a relevant date for determining        10:57:13AM
15   materiality and loss causation for reasons  10:57:15AM
16   that I make clear in my report.        10:57:17AM
17            Secondly, there were two    10:57:21AM
18   pieces of information, at least two pieces  10:57:25AM
19   of information on February 7th that      10:57:27AM
20   potentially could affect the intraday    10:57:31AM
21   stock price movements.            10:57:34AM
22            And Dr. Feinstein, who is    10:57:36AM
23   affirming that that stock price movement  10:57:38AM
24   on February 7th is relevant for        10:57:41AM
25   materiality and loss causation, he ignores  10:57:43AM

Page 103

1              LEHN - CONFIDENTIAL
2    it completely.  And that information was    10:57:45AM
3    the release of the Vioxx briefing        10:57:47AM
4    materials on the morning of February 7th  10:57:49AM
5    and then the Advisory Panel's vote, which  10:57:51AM
6    was released to the market in the        10:57:54AM
7    afternoon of February 7th.          10:57:56AM
8            And that's different, there are  10:57:59AM
9    two pieces of information there that I    10:58:01AM
10   point out in my rebuttal report that      10:58:03AM
11   Dr. Feinstein ignores.  On February 8th    10:58:05AM
12   the most dramatic information was the fact  10:58:12AM
13   that the Advisory Panel recommended a    10:58:14AM
14   label change for Vioxx, and in the context  10:58:18AM
15   of my report I thought that was worth    10:58:22AM
16   noting as a likely contributor to the    10:58:24AM
17   decline in Pharmacia stock price, which we  10:58:27AM
18   both agree was statistically significant  10:58:30AM
19   on February 8th.                10:58:32AM
20       Q.    Looking back at the Patell    10:58:33AM
21   Wolfson article, Plaintiffs' Exhibit 503,  10:58:35AM
22   on the second page, page 224, where Patell  10:58:37AM
23   and Wolfson write "However, for the      10:58:55AM
24   earnings announcements, we also find      10:58:57AM
25   significantly elevated returns during the  10:58:59AM

Page 104

1              LEHN - CONFIDENTIAL
2    overnight period following the release and  10:59:01AM
3    at the opening of trading on the next    10:59:03AM
4    day."                    10:59:06AM
5        A.    I'm sorry, what page, sir?    10:59:07AM
6        Q.    It is on the second page of the  10:59:08AM
7    article, page 224, the middle of the first  10:59:10AM
8    paragraph where they are talking about    10:59:12AM
9    elevated returns at the opening on the    10:59:14AM
10   next trading day.  Do you see that?      10:59:17AM
11       A.    I do.                10:59:19AM
12       Q.    If I tell you -- you are not    10:59:20AM
13   disputing that at the opening of trading  10:59:22AM
14   on February 7th, 2001 that Pharmacia's    10:59:24AM
15   share price declined approximately $1.50;  10:59:26AM
16   are you disputing that fact evidentially  10:59:30AM
17   in this case?                  10:59:33AM
18       A.    Not as a factual matter.  I    10:59:34AM
19   haven't done a statistical analysis of    10:59:35AM
20   that as to whether that was a          10:59:38AM
21   statistically significant decline.      10:59:40AM
22       Q.    But that decline, a decline at  10:59:41AM
23   the opening is of the same type that is    10:59:44AM
24   being described on page 224 of the Patell  10:59:46AM
25   and Wolfson article, Exhibit 503; is that  10:59:50AM

Page 105

1              LEHN - CONFIDENTIAL
2    correct?                  10:59:53AM
3        A.    It is not the same type in the  10:59:53AM
4    sense that you can't divorce that sentence  10:59:54AM
5    from the prior sentences.  And it goes    10:59:58AM
6    back to what I said before, that Patell    11:00:00AM
7    and Wolfson find that the major portion of  11:00:03AM
8    the stock price movement occurs within    11:00:05AM
9    minutes of the announcement and then they  11:00:06AM
10   claim that some of it can spill over      11:00:09AM
11   through the open the next day.        11:00:11AM
12            But that's quite different from  11:00:13AM
13   the so-called delayed reaction where the  11:00:15AM
14   information comes out in the morning of    11:00:17AM
15   February 6th, there is no reaction, and    11:00:18AM
16   then the delayed reaction manifests itself  11:00:21AM
17   at a lower open the next day.  That's not  11:00:24AM
18   what they are saying.            11:00:26AM
19       Q.    Did you discount as unimportant  11:00:27AM
20   the fact that that $1.50 price decline at  11:00:28AM
21   the opening on February 7th corresponded  11:00:34AM
22   almost exactly with the same time, timing  11:00:37AM
23   wise, as the time that Dr. Goldkind was    11:00:39AM
24   making this presentation to the FDA      11:00:42AM
25   Advisory Committee?              11:00:44AM

27 (Pages 102 to 105)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 106

1      LEHN - CONFIDENTIAL
2      MR. WANG:  Are you representing 11:00:45AM
3  that was a change or can you show him    11:00:46AM
4  something that establishes that was a    11:00:48AM
5  change?                    11:00:49AM
6      Q.    Did you review the transcript 11:00:49AM
7  of the -- I will break this down for you   11:00:51AM
8  because your counsel has objected.       11:00:54AM
9      Did you review the transcript    11:00:55AM
10  of the Advisory Committee hearing relating 11:00:57AM
11  to Celebrex from February 7th, 2001?     11:01:00AM
12      A.    I skimmed through it, but I   11:01:03AM
13  didn't read it that carefully.          11:01:05AM
14      Q.    You didn't read it that     11:01:06AM
15  carefully?                 11:01:07AM
16      A.    Right.             11:01:08AM
17      Q.    Did you discount that      11:01:08AM
18  transcript as unimportant for some reason, 11:01:10AM
19  why you didn't read it more carefully?   11:01:11AM
20      A.    Well, again, in my opinion, the 11:01:13AM
21  relevant date for determining materiality 11:01:14AM
22  and loss causation is February 6th, and   11:01:16AM
23  after conducting my event study analysis, 11:01:19AM
24  I concluded that there was no         11:01:21AM
25  statistically significant change in     11:01:23AM

Page 107

1      LEHN - CONFIDENTIAL
2  Pharmacia's stock price on February 6th.   11:01:25AM
3      With respect to critiquing what 11:01:28AM
4  Dr. Feinstein has done, whereas I skimmed  11:01:31AM
5  through the transcript, I didn't feel it   11:01:34AM
6  was necessary to read it with a fine eye   11:01:37AM
7  at this stage because I was simply      11:01:43AM
8  pointing out things that he did not      11:01:46AM
9  consider in his analysis, and he's the one 11:01:47AM
10  who thinks that February 7th and February  11:01:50AM
11  8th are relevant dates in this matter.    11:01:52AM
12      Q.    And you do point out an article 11:01:54AM
13  that references the Pharmacia Advisory    11:01:56AM
14  Committee's vote at 2:25 p.m.; is that    11:02:00AM
15  correct?                   11:02:04AM
16      A.    That is correct.         11:02:04AM
17      Q.    And you would agree with me   11:02:05AM
18  just as a matter of reason and logic that 11:02:06AM
19  the vote that occurred at 2:25 p.m. could  11:02:09AM
20  not have caused any stock decline at the  11:02:12AM
21  open on February 7th because it was      11:02:14AM
22  subsequent in time?             11:02:17AM
23      A.    That particular information   11:02:23AM
24  release could not have, but whether or not 11:02:25AM
25  there was any basis for believing that the 11:02:29AM

Page 108

1      LEHN - CONFIDENTIAL
2  committee might vote that way or early in  11:02:32AM
3  the morning is something I haven't       11:02:34AM
4  investigated.                11:02:36AM
5      Q.    Right.  But the actual vote at 11:02:36AM
6  2:25 could not have caused a stock decline 11:02:38AM
7  at, say, approximately between 9:30 and   11:02:41AM
8  10:30 a.m.; is that correct?         11:02:43AM
9      A.    The actual vote could not have. 11:02:45AM
10  Anticipation of a vote might have.       11:02:49AM
11      Q.    But the actual vote could not 11:02:51AM
12  have been a factor in the opening $1.50   11:02:52AM
13  decline on February 7th; is that correct,  11:02:55AM
14  sir?                    11:02:57AM
15      MR. WANG:  Objection to form.  11:02:59AM
16      A.    Again, not the actual vote.   11:02:59AM
17  But as a theoretical possibility the      11:03:01AM
18  anticipation of the vote could have been.  11:03:04AM
19      Q.    I want to show you what      11:03:11AM
20  previously has been marked as Goldkind    11:03:13AM
21  Exhibit 3.  Can you please take a look at  11:03:15AM
22  that document.               11:03:22AM
23      And, again, is this the        11:03:23AM
24  transcript that you skimmed or reviewed,   11:03:24AM
25  not that closely -- I will strike that   11:03:26AM

Page 109

1      LEHN - CONFIDENTIAL
2  question.                  11:03:29AM
3      Is this the transcript from    11:03:29AM
4  February 7th, 2001 that you have       11:03:30AM
5  previously reviewed in some form?       11:03:32AM
6      A.    That is correct.         11:03:33AM
7      Q.    And specifically I would turn  11:03:34AM
8  your attention to -- well, the first page, 11:03:37AM
9  it says that it is a transcript and it    11:03:45AM
10  says that this Advisory Committee hearing  11:03:47AM
11  started at 8 a.m.; is that correct?      11:03:49AM
12      A.    That's correct.         11:03:52AM
13      Q.    And it was taking place in    11:03:52AM
14  Gaithersburg, Maryland; is that correct?   11:03:55AM
15      A.    That's correct.         11:03:57AM
16      Q.    And that would be on the east  11:03:58AM
17  coast of the United States?          11:03:59AM
18      A.    That's right.          11:04:00AM
19      Q.    In the eastern time zone?     11:04:01AM
20      A.    That's right.          11:04:03AM
21      Q.    If you turn to page 96 of the  11:04:04AM
22  transcript, that indicates that        11:04:07AM
23  Dr. Lawrence Goldkind's presentation began 11:04:10AM
24  on page, at least transcript page 96,     11:04:14AM
25  there is not a corresponding time; is that 11:04:16AM

28 (Pages 106 to 109)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 110

```
1            LEHN - CONFIDENTIAL
2  correct?                      11:04:20AM
3     A.    Again, it says FDA      11:04:20AM
4  Presentation, Lawrence Goldkind.  So I   11:04:24AM
5  will accept your assumption this is the   11:04:27AM
6  beginning of his presentation.      11:04:30AM
7     Q.    If you turn to page 103 -- or,  11:04:31AM
8  actually, at page 104, at line 9,     11:04:49AM
9  Dr. Goldkind is quoted in the transcript  11:04:53AM
10 as saying "Finally, in the analysis of   11:04:56AM
11 aspirin users, no difference between    11:04:58AM
12 Celebrex and diclofenac were shown."  Is  11:05:03AM
13 that accurate?                 11:05:03AM
14    A.    That's correct.          11:05:07AM
15    Q.    And then if you turn to    11:05:07AM
16 next page, page 105 of the transcript   11:05:08AM
17 starting at line 7, Dr. Goldkind again,  11:05:09AM
18 after -- it appears he is showing slides  11:05:12AM
19 -- and at line 7 he is quoted as saying  11:05:14AM
20 pursuant to the transcript "There was no  11:05:17AM
21 meaningful difference between the      11:05:19AM
22 diclofenac and Celebrex group with a very 11:05:20AM
23 strong trend in favor of Celebrex compared 11:05:24AM
24 to ibuprofen.  Once again, this is a    11:05:26AM
25 nominal p-value for analysis that was not  11:05:30AM
```

Page 111

```
1            LEHN - CONFIDENTIAL
2  prespecified."                11:05:33AM
3            Do you see that?        11:05:35AM
4     A.    I do.                 11:05:35AM
5     Q.    Again, did you discount those 11:05:35AM
6  two statements in any way as not being   11:05:37AM
7  important to your analysis of loss     11:05:39AM
8  causation and materiality in this case?   11:05:40AM
9        MR. WANG:  Objection to form.  11:05:43AM
10    A.    Well, I didn't really focus on  11:05:44AM
11 his statements in the transcript when I   11:05:45AM
12 did skim it.                  11:05:47AM
13    But as I read it now it is    11:05:48AM
14 totally irrelevant because that       11:05:49AM
15 information was contained in the      11:05:51AM
16 statistical reviewer's briefing document  11:05:52AM
17 released on the morning of February 6th.  11:05:54AM
18    I'm not a medical person, but I I  11:05:57AM
19 do understand statistics.  And when I look 11:05:58AM
20 through the tables, I was able to      11:06:01AM
21 ascertain what Dr. Goldkind is saying   11:06:03AM
22 there about the comparison of diclofenac  11:06:05AM
23 and Celebrex.  And it is contained in the  11:06:12AM
24 tables in the first several pages of the  11:06:16AM
25 statistical review.            11:06:19AM
```

Page 112

```
1            LEHN - CONFIDENTIAL
2     Q.    Is it accurate that you can't  11:06:19AM
3  point to a single analyst report or news  11:06:21AM
4  article that predates Dr. Goldkind's    11:06:23AM
5  statements on the morning of the 7th that 11:06:26AM
6  publicly stated what you were able to   11:06:29AM
7  ascertain; is that correct, sir?      11:06:31AM
8        MR. WANG:  Objection to form.  11:06:32AM
9     A.    I don't recall an analyst    11:06:33AM
10 report that stated that, sir.  But I think 11:06:34AM
11 it is absolutely ludicrous to think that  11:06:36AM
12 analysts that cover Pharmacia and receive 11:06:40AM
13 that information would have any difficulty 11:06:41AM
14 understanding that from the first several 11:06:45AM
15 pages of the statistical review.      11:06:46AM
16    Q.    But, again, just to clarify the 11:06:49AM
17 record, you are unable to point to a    11:06:51AM
18 particular analyst report that indicates  11:06:54AM
19 that an analyst had, in a written form,   11:06:59AM
20 publicly disseminated that view; is that  11:07:02AM
21 correct, sir?                 11:07:04AM
22        MR. WANG:  Objection to form.  11:07:06AM
23    A.    As I stated before, I'm not   11:07:07AM
24 aware of any such analyst report.  But,   11:07:08AM
25 again, I think it is ludicrous to think   11:07:10AM
```

Page 113

```
1            LEHN - CONFIDENTIAL
2  that they would not have been aware of   11:07:11AM
3  this, and the fact that they didn't write 11:07:13AM
4  about it also is consistent with the fact 11:07:15AM
5  that they didn't think it was particularly 11:07:16AM
6  important.                   11:07:18AM
7     Q.    But they did write about it the 11:07:18AM
8  afternoon of the February 7th and the   11:07:21AM
9  morning of February 8th; is that correct? 11:07:23AM
10       MR. WANG:  Objection to form.  11:07:24AM
11 Misstates the evidence.          11:07:25AM
12    A.    I would have to go back and see 11:07:26AM
13 specifically what they say about      11:07:28AM
14 Dr. Goldkind's presentation, or this    11:07:31AM
15 particular point.  But when they did write 11:07:33AM
16 about it, it was in the context of new   11:07:35AM
17 information, namely the Advisory Panel   11:07:36AM
18 decision and the events of February 8th.  11:07:40AM
19    Q.    But analysts do comment on what 11:07:42AM
20 you've described as being ascertainable  11:07:46AM
21 information after the close of trading on  11:07:48AM
22 February 7th, and during the morning of   11:07:50AM
23 February 8th, there are analyst reports   11:07:52AM
24 published regarding that information that  11:07:55AM
25 you said was ascertainable from the data  11:07:56AM
```

29 (Pages 110 to 113)

CONFIDENTIAL

Page 114

1          LEHN - CONFIDENTIAL
2    on the 6th; is that correct, sir?          11:07:58AM
3          MR. WANG: Objection to form.    11:08:00AM
4    Assumes facts not in evidence still.       11:08:01AM
5       A.    You would have to direct me to  11:08:03AM
6    the specific statements that you have in    11:08:05AM
7    mind when you say that. I don't recall      11:08:07AM
8    any analyst on February 7th or February    11:08:09AM
9    8th directly addressing the alleged        11:08:11AM
10   corrective disclosures.              11:08:15AM
11      Q.    I want to show you what I'm     11:09:01AM
12   marking as Plaintiffs' Exhibit 507.        11:09:03AM
13         (Plaintiffs' Exhibit 507 marked 11:09:05AM
14   for identification.)                 11:09:07AM
15      Q.    Could you please take a look at 11:09:09AM
16   Plaintiffs' Exhibit 507. For the record,   11:09:11AM
17   Exhibit 507 bears Bates numbers DEFEX      11:09:15AM
18   005589 through 597. And it is a CIBC       11:09:22AM
19   World Markets equity research report dated 11:09:28AM
20   February 8th, 2001, and it is labeled      11:09:31AM
21   "Pharmacia Corporation, CLASS Flunks Out." 11:09:34AM
22   Do you see that?                   11:09:38AM
23      A.    I do.                11:09:38AM
24      Q.    And have you reviewed this     11:09:38AM
25   analyst report as part of formulating your 11:09:40AM

Page 115

1          LEHN - CONFIDENTIAL
2    opinions in this case?              11:09:43AM
3       A.    I have.               11:09:44AM
4       Q.    And did you discount it as    11:09:44AM
5    unimportant for some reason?          11:09:46AM
6          MR. WANG: Objection to form.    11:09:47AM
7       A.    It is unimportant, in my      11:09:48AM
8    opinion, for purposes of my opinion        11:09:50AM
9    regarding materiality and loss causation.  11:09:52AM
10      Q.    And can you explain why it is  11:09:54AM
11   unimportant to you, sir?             11:09:55AM
12      A.    Well, again, if one assumes, as 11:09:56AM
13   Dr. Feinstein has assumed, that the market 11:09:58AM
14   for Pharmacia stock is efficient, an       11:10:00AM
15   analyst report by CIBC on February 8th     11:10:06AM
16   that contains no new information about the 11:10:09AM
17   alleged corrective disclosures is          11:10:11AM
18   irrelevant because it occurs two days      11:10:14AM
19   after the alleged corrective disclosures   11:10:16AM
20   were publicly disseminated.           11:10:18AM
21      Q.    But this report is certainly   11:10:20AM
22   discussing and is describing information   11:10:22AM
23   that was ascertainable from posting the    11:10:24AM
24   web postings that are attached to Exhibit  11:10:29AM
25   506 that were posted on February 6th,      11:10:31AM

Page 116

1          LEHN - CONFIDENTIAL
2    2001; is that correct?              11:10:34AM
3          MR. WANG: Objection to form.    11:10:37AM
4    Assumes facts not in evidence.        11:10:38AM
5       A.    I would have to review the     11:10:42AM
6    report in order to reach that judgment.    11:10:44AM
7    But it may or may not be.            11:10:45AM
8       Q.    And looking at Exhibit 11 to   11:10:47AM
9    your report, which I think is the second   11:10:48AM
10   to last page of the exhibits of your       11:10:50AM
11   initial report which we have marked as     11:10:53AM
12   Exhibit 500, and this is summarizing some  11:10:55AM
13   of your intraday analysis; is that         11:11:06AM
14   correct?                       11:11:08AM
15      A.    "This" meaning the exhibit?    11:11:08AM
16      Q.    Exhibit 11, yes.          11:11:09AM
17      A.    Exhibit 11, correct.        11:11:11AM
18      Q.    And according to your intraday 11:11:12AM
19   analysis in this table in Exhibit 11 there 11:11:14AM
20   is approximately a $2 stock drop at the    11:11:17AM
21   opening; is that correct?            11:11:19AM
22         MR. WANG: Objection to form.    11:11:21AM
23      A.    I'm not sure where you are     11:11:26AM
24   reading. The previous close had been      11:11:28AM
25   $56.13 and it opened at $55.90.        11:11:31AM

Page 117

1          LEHN - CONFIDENTIAL
2       Q.    And by the time you get to     11:11:34AM
3    10:35 a.m. or approximately the first hour 11:11:36AM
4    of trading, the stock is down at about $54 11:11:38AM
5    a share; is that correct?            11:11:41AM
6       A.    Approximately, that's correct. 11:11:42AM
7       Q.    So from opening to 10:30,      11:11:43AM
8    specifically the first hour of trading,    11:11:46AM
9    the stock declined approximately $2 per    11:11:47AM
10   share?                        11:11:49AM
11      A.    That's correct. Then it       11:11:49AM
12   increased subsequent to that.         11:11:50AM
13      Q.    And you are not offering an    11:11:52AM
14   opinion in this case that the Merck        11:11:54AM
15   Advisory Committee vote or recommendation  11:11:55AM
16   that's reported in the afternoon, that     11:12:00AM
17   that actual occurrence caused this $2      11:12:03AM
18   stock decline in the morning of February   11:12:06AM
19   8th; is that correct?              11:12:09AM
20      A.    I'm not prepared to offer an   11:12:11AM
21   opinion as to what might have caused that  11:12:13AM
22   decline as I sit here today.         11:12:16AM
23      Q.    But certainly an event that    11:12:17AM
24   occurred either at, depending on whether   11:12:19AM
25   you are right or Dr. Feinstein is right,   11:12:23AM

30  (Pages 114 to 117)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 118

1      LEHN - CONFIDENTIAL
2  an event that occurred somewhere between 1  11:12:26AM
3  and 3 o'clock in the afternoon could not    11:12:29AM
4  have been the cause of a stock decline      11:12:31AM
5  that occurred between 9:30 and 10:30 a.m.  11:12:33AM
6  that morning; is that correct?  Because it  11:12:37AM
7  hadn't occurred yet, sir; is that right?    11:12:40AM
8      A.     The event itself.  But, again,  11:12:42AM
9  there can be anticipation about an event   11:12:45AM
10 that potentially could.                     11:12:47AM
11     Q.     But the event itself could not  11:12:49AM
12 have caused that $2 stock decline; is that  11:12:50AM
13 right?                                      11:12:53AM
14     A.     By definition, that's correct.  11:12:53AM
15     Q.     And that $2 stock decline in    11:12:56AM
16 the morning could have been caused by the  11:12:59AM
17 issuance of analyst reports after the       11:13:02AM
18 close on February 7th and/or during the    11:13:04AM
19 morning of February 8th, that's a           11:13:10AM
20 possibility theoretically because of the    11:13:12AM
21 timing; is that correct, sir?               11:13:14AM
22     A.     Theoretically.  But, again, the 11:13:17AM
23 relevant question is whether there was new  11:13:20AM
24 information about the alleged corrective    11:13:23AM
25 disclosures in the analyst reports.         11:13:25AM

Page 119

1      LEHN - CONFIDENTIAL
2  Analyst reports can affect company stock   11:13:30AM
3  prices.                                     11:13:32AM
4        But, again, in this case we          11:13:33AM
5  have the alleged corrective disclosures    11:13:35AM
6  made on February 6th.  You know,           11:13:37AM
7  Dr. Feinstein I think agrees with me that  11:13:40AM
8  there were no additional corrective        11:13:42AM
9  disclosures after February 6th, in which   11:13:44AM
10 case an analysis of analyst reports on     11:13:47AM
11 February 8th would be irrelevant for       11:13:49AM
12 establishing loss causation in this        11:13:52AM
13 matter.                                     11:13:54AM
14     Q.     Now, Exhibit 507 is entitled    11:13:54AM
15 "CLASS Flunks Out," correct?               11:13:56AM
16        MR. WANG:  Objection to form.       11:14:00AM
17     A.     That is the title.              11:14:00AM
18     Q.     In your experience, are         11:14:01AM
19 analysts generally more guarded in their   11:14:02AM
20 language given that they have a            11:14:05AM
21 relationship they are cultivating with     11:14:08AM
22 management of a company that they follow   11:14:10AM
23 because they depend on them for lines of   11:14:10AM
24 communication?                              11:14:14AM
25        MR. WANG:  Objection to form.       11:14:14AM

Page 120

1      LEHN - CONFIDENTIAL
2      A.     I have never done a study of    11:14:15AM
3  that.  I mean, it is a fairly colorful     11:14:16AM
4  title, but I have seen other colorful      11:14:22AM
5  titles, too.                                11:14:24AM
6      Q.     You would agree with me it is a 11:14:25AM
7  colorful title, correct?                   11:14:26AM
8      A.     Correct.                         11:14:28AM
9      Q.     And probably out of the         11:14:28AM
10 ordinary with respect to looking at        11:14:29AM
11 analyst reports generally as how they      11:14:32AM
12 refer to company information?              11:14:36AM
13     A.     I've seen other in the past,    11:14:38AM
14 other colorful titles.                     11:14:40AM
15     Q.     But you've also seen a lot of   11:14:41AM
16 them that are sort of not colorful, right? 11:14:43AM
17     A.     That's correct.                  11:14:45AM
18     Q.     And you have seen a lot more    11:14:46AM
19 non-colorful than colorful; is that fair   11:14:48AM
20 to say?                                     11:14:51AM
21     A.     I've never done a tally, so...  11:14:52AM
22     Q.     Just as a guy, a professor of   11:14:54AM
23 finance who has looked at a lot of analyst 11:14:56AM
24 reports in your time, would you say that   11:14:58AM
25 this is unusually colorful?                11:15:00AM

Page 121

1      LEHN - CONFIDENTIAL
2      A.     Again, I've never really        11:15:04AM
3  focused on the titles of analyst reports   11:15:06AM
4  and I don't like to answer unless I have   11:15:09AM
5  an empirical basis, so, you know, I'm      11:15:11AM
6  not prepared to say that as I sit here.    11:15:17AM
7      Q.     And "flunks out" is definitely  11:15:19AM
8  a negative connotation as referring to the 11:15:21AM
9  CLASS trial; is that correct?              11:15:23AM
10     A.     It certainly seems to be -- or  11:15:24AM
11 seems to have negative connotation.        11:15:30AM
12     Q.     Now, I want to show you what I  11:15:39AM
13 have previously marked -- or what has      11:15:41AM
14 previously been marked in this case as     11:15:42AM
15 Plaintiffs' Exhibit 314.  Could you please 11:15:44AM
16 take a look at that document.              11:15:51AM
17        And, for the record,                11:15:55AM
18 Plaintiffs' Exhibit 314 appears to be a    11:15:56AM
19 press release, and it's entitled           11:16:00AM
20 "Pharmacia/Pfizer, Inc. Statement on the  11:16:06AM
21 FDA Arthritis Advisory Committee Meeting,  11:16:10AM
22 February 7th, 2001, Gaithersburg,          11:16:13AM
23 Maryland."                                  11:16:19AM
24        Does this appear to be a press      11:16:19AM
25 release being issued by Pharmacia and      11:16:21AM

31 (Pages 118 to 121)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 122

1            LEHN - CONFIDENTIAL
2    Pfizer; is that correct?          11:16:23AM
3        A.    It appears to be, yes.      11:16:24AM
4        Q.    Do you know why Pharmacia and  11:16:24AM
5    Pfizer would be jointly issuing a press    11:16:27AM
6    release?                    11:16:29AM
7        A.    Well, I know Pfizer co-marketed 11:16:29AM
8    Celebrex with Pharmacia and then       11:16:32AM
9    ultimately Pfizer acquired Pharmacia.    11:16:34AM
10       Q.    So since they were          11:16:36AM
11   co-marketing, that may explain why they    11:16:38AM
12   are jointly issuing the press release?    11:16:40AM
13          MR. WANG: Objection to form.  11:16:42AM
14   Calls for speculation.           11:16:43AM
15       A.    I would only be speculating,   11:16:44AM
16   but it seems like a reasonable inference.  11:16:46AM
17       Q.    And the press release is dated  11:16:47AM
18   February 7th, 2001?              11:16:49AM
19       A.    That's correct.          11:16:50AM
20       Q.    And if you look at the last    11:16:50AM
21   sentence in the second paragraph, it says  11:16:52AM
22   "This was an extremely rigorous and     11:16:54AM
23   complex trial which made it difficult for  11:16:56AM
24   the committee to analyze." Do you see    11:16:58AM
25   that?                       11:17:00AM

Page 123

1            LEHN - CONFIDENTIAL
2        A.    I do.                11:17:00AM
3        Q.    Did you discount that statement 11:17:01AM
4    by the company in any way in formulating   11:17:02AM
5    your opinions?                11:17:04AM
6          MR. WANG: Objection to form.  11:17:05AM
7        A.    That statement would be      11:17:06AM
8    irrelevant for my opinions. It has no    11:17:08AM
9    bearing on issues relating to materiality  11:17:12AM
10   and loss causation.              11:17:15AM
11       Q.    Is it your opinion that       11:17:16AM
12   complexity of information is not a factor  11:17:18AM
13   to be considered in determining how     11:17:18AM
14   quickly the market will digest          11:17:22AM
15   information?                 11:17:23AM
16          MR. WANG: Objection to form.  11:17:24AM
17   Asked and answered.              11:17:25AM
18       A.    Not as a general matter. But  11:17:25AM
19   if one has determined that the market for  11:17:27AM
20   security is efficient by definition, that  11:17:29AM
21   means that all public information is     11:17:32AM
22   reflected in the security price and new    11:17:34AM
23   information is rapidly reflected in the    11:17:35AM
24   security price. And the alleged        11:17:37AM
25   complexity of the information would be    11:17:40AM

Page 124

1            LEHN - CONFIDENTIAL
2    irrelevant for making that judgment.     11:17:41AM
3        Q.    And I just want to make sure I  11:17:43AM
4    understand your opinion.           11:17:45AM
5          Is your opinion that you are   11:17:46AM
6    offering today, and if questioned about at  11:17:48AM
7    trial, will be offering it then, that the  11:17:51AM
8    complexity of information is not a factor  11:17:53AM
9    to be considered in an efficient market    11:17:56AM
10   for determining how rapidly the market    11:17:58AM
11   will digest the information?          11:18:01AM
12          MR. WANG: Objection to form.  11:18:03AM
13       A.    Can you repeat the question?   11:18:04AM
14          MR. SAHAM: Could you read it  11:18:11AM
15   back to him.                 11:18:12AM
16          (The record was read.)       11:18:33AM
17       A.    Again, it is my opinion that if 11:18:35AM
18   one has opined that the market for       11:18:37AM
19   security is efficient, using the commonly  11:18:40AM
20   accepted definition of market efficiency   11:18:43AM
21   in the academic arena, that means that all  11:18:46AM
22   public information is reflected in the    11:18:49AM
23   security price and new information is     11:18:50AM
24   rapidly reflected in the security price.   11:18:53AM
25          And the complexity of such    11:18:57AM

Page 125

1            LEHN - CONFIDENTIAL
2    information is then irrelevant for       11:18:59AM
3    determining whether it would take one    11:19:01AM
4    trading day or more trading days for that  11:19:03AM
5    information to be reflected in the       11:19:06AM
6    security price. If it takes more than one  11:19:08AM
7    trading day, by definition you don't have  11:19:10AM
8    an efficient market.             11:19:12AM
9        Q.    Now, if conflicting information 11:19:13AM
10   is issued at the exact same time,        11:19:16AM
11   information that conflicts with itself,    11:19:21AM
12   could that cause the market to take, in an  11:19:23AM
13   efficient market, to take longer time to   11:19:26AM
14   adjust?                     11:19:29AM
15          MR. WANG: Objection to form.  11:19:30AM
16   Vague and ambiguous. And incomplete      11:19:31AM
17   hypothetical.                 11:19:34AM
18       A.    And I don't know what you mean  11:19:35AM
19   by "conflicting information" in the      11:19:37AM
20   context of the alleged corrective        11:19:39AM
21   disclosures.                 11:19:40AM
22       Q.    Well, let's break it down.     11:19:41AM
23          If there is two pieces of     11:19:42AM
24   information that come out at the exact    11:19:44AM
25   same time that say the exact opposite     11:19:48AM

32  (Pages 122 to 125)

CONFIDENTIAL

Page 126

```
 1        LEHN - CONFIDENTIAL
 2   thing, could that cause the market to take  11:19:50AM
 3   longer to fully correct and adjust to the   11:19:52AM
 4   new information that was simultaneously      11:19:55AM
 5   released?                        11:19:57AM
 6        MR. WANG: Objection to form.  11:19:58AM
 7   Incomplete hypothetical.              11:20:00AM
 8        A.    The market will react quickly  11:20:01AM
 9   to both pieces of information as they are   11:20:04AM
10   released. And if down the road new         11:20:06AM
11   information emerges that indicates that    11:20:10AM
12   that party was wrong and this party is     11:20:14AM
13   right, then there would be a subsequent    11:20:16AM
14   event that perhaps would resolve that      11:20:19AM
15   conflict.                        11:20:23AM
16        But there are additional        11:20:24AM
17   questions one has to ask. One is whether  11:20:25AM
18   both pieces of conflicting information are  11:20:29AM
19   new or is one piece of conflicting        11:20:33AM
20   information stuff that had previously been  11:20:37AM
21   said, in which case the only incremental   11:20:40AM
22   information is the new information that    11:20:42AM
23   takes an opposing position.            11:20:45AM
24        And this is all just a          11:20:47AM
25   theoretical discussion at this point. It   11:20:48AM
```

Page 127

```
 1        LEHN - CONFIDENTIAL
 2   has no relevance to the particular matter  11:20:50AM
 3   at hand.                         11:20:52AM
 4        Q.    Did you consider the company's  11:20:53AM
 5   briefing document that was released on     11:20:54AM
 6   February 6th, 2001 prior to formulating    11:20:56AM
 7   your opinions in this matter?           11:20:59AM
 8        A.    I did, yes.            11:21:00AM
 9        Q.    And did you discount the     11:21:01AM
10   information contained in the company's     11:21:02AM
11   briefing document as unimportant --       11:21:04AM
12        MR. WANG: Objection to form.  11:21:06AM
13        Q.    -- to your opinions?       11:21:07AM
14        MR. WANG: Objection to form.  11:21:10AM
15        A.    Again, there was nothing in the  11:21:11AM
16   briefing documents that would have called  11:21:12AM
17   into question the information which served  11:21:15AM
18   as the alleged corrective disclosures, all  11:21:17AM
19   of which are contained in the early pages  11:21:21AM
20   of the statistical reviewer's briefing    11:21:22AM
21   document.                        11:21:24AM
22        Q.    Do you understand that in the  11:21:25AM
23   briefing document the company argued that  11:21:26AM
24   as a result of informative censoring, that  11:21:28AM
25   the six-month data was the valid data to   11:21:31AM
```

Page 128

```
 1        LEHN - CONFIDENTIAL
 2   be considered for the CLASS trial?        11:21:33AM
 3        A.    Yes. And there can be    11:21:34AM
 4   legitimate methodological debate about the  11:21:36AM
 5   appropriateness of the length of a trial,  11:21:39AM
 6   and we have these debates in the finance   11:21:41AM
 7   arena as well in the academic literature   11:21:43AM
 8   about how do you construct your sample,     11:21:46AM
 9   over what time period. There can be       11:21:48AM
10   reasonable debate among people as to what  11:21:50AM
11   to do.                          11:21:52AM
12        With respect to the alleged      11:21:53AM
13   corrective disclosures, they are all laid  11:21:54AM
14   out in the statistical reviewer's briefing  11:21:58AM
15   document, and all this complexity         11:22:01AM
16   discussion is a red herring with respect   11:22:04AM
17   to those corrective disclosures. They     11:22:07AM
18   weren't complex. They were very readily    11:22:10AM
19   ascertainable in the tables.            11:22:13AM
20        Q.    You don't consider         11:22:14AM
21   Dr. Goldkind's presentation on the morning  11:22:15AM
22   of February 7th a clarification as to      11:22:16AM
23   whether or not the company's view that the  11:22:19AM
24   six-month data was more appropriate was    11:22:22AM
25   rejected on February 7th by the FDA at the  11:22:25AM
```

Page 129

```
 1        LEHN - CONFIDENTIAL
 2   Advisory Committee hearing?             11:22:29AM
 3        MR. WANG: Objection to form.  11:22:31AM
 4        A.    Nothing that I saw in what you  11:22:32AM
 5   presented from Dr. Goldkind's presentation  11:22:34AM
 6   would have corrected the alleged          11:22:36AM
 7   corrective disclosures. That information   11:22:39AM
 8   was intact. It was released on the        11:22:41AM
 9   morning of February 6th and it is not as   11:22:45AM
10   if Dr. Goldkind went back and said "I want  11:22:46AM
11   to correct some of the empirical         11:22:49AM
12   information contained in those tables."    11:22:52AM
13        So in that sense, it was not   11:22:55AM
14   clarifying with respect to the alleged    11:22:57AM
15   corrective disclosures.               11:22:59AM
16        Q.    Do you know whether the company  11:23:00AM
17   persisted in its informative censoring    11:23:02AM
18   argument in the presentation of the       11:23:04AM
19   six-month data at the hearing on February  11:23:06AM
20   7th?                            11:23:07AM
21        A.    I don't recall. But if they   11:23:09AM
22   did, that would be irrelevant as well     11:23:11AM
23   because it doesn't affect the alleged     11:23:12AM
24   corrective disclosures.               11:23:14AM
25        Q.    What about the fact that the  11:23:15AM
```

33 (Pages 126 to 129)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 130

1          LEHN - CONFIDENTIAL
2    company did not persist in insisting on      11:23:16AM
3    the use of the six-month data on the      11:23:20AM
4    morning of February 7th, would that be      11:23:22AM
5    considered new information to the market?   11:23:24AM
6         A.    It would be irrelevant with    11:23:26AM
7    respect to alleged corrective disclosures.   11:23:27AM
8    All of that information was laid out in    11:23:30AM
9    the statistical reviewer's briefing      11:23:31AM
10   documents, and as far as I understand none   11:23:33AM
11   of that was corrected.          11:23:35AM
12        Q.    Would you agree that the      11:23:38AM
13   publication of an article in a          11:23:42AM
14   peer-reviewed format has some impact on   11:23:47AM
15   practitioners in that particular field?   11:23:53AM
16        A.    Well, I'm not sure a lot of   11:23:57AM
17   finance peer-reviewed publications have    11:24:02AM
18   that much impact, but I presume that      11:24:05AM
19   perhaps the rate would be higher in the    11:24:08AM
20   medical area. But I don't know, I've      11:24:09AM
21   never done a study of that.          11:24:11AM
22        Q.    And are you offering an opinion   11:24:12AM
23   in this case as to whether the market      11:24:14AM
24   aware that the editors of JAMA did not    11:24:17AM
25   receive the entire data prior to          11:24:22AM

Page 131

1          LEHN - CONFIDENTIAL
2    publishing the JAMA article regarding the   11:24:24AM
3    CLASS trial on September 13th, 2000?      11:24:29AM
4         A.    I'm sorry, can you repeat that?   11:24:32AM
5         Q.    Are you offering an opinion as   11:24:33AM
6    to when the market became aware that the   11:24:35AM
7    editors of the Journal of American Medical   11:24:40AM
8    Association were not aware of the fact    11:24:43AM
9    that the CLASS trial had data -- well,    11:24:47AM
10   strike that question.          11:24:53AM
11          MR. SAHAM: Can you actually   11:24:53AM
12   read back my prior question, because now I   11:24:54AM
13   can't remember it due to my lack of      11:24:57AM
14   memory.                11:25:00AM
15          (The record was read.)      11:25:20AM
16        A.    I'm not sure I understand what   11:25:21AM
17   you mean by "offering an opinion." I'm    11:25:22AM
18   not offering an opinion as to that.      11:25:25AM
19   My understanding is that the      11:25:27AM
20   Washington Post article that was published   11:25:28AM
21   on August 5th, 2001 was the first time    11:25:30AM
22   that the market became aware of issues    11:25:35AM
23   concerning the submission to JAMA.      11:25:38AM
24        Q.    So your opinion, then -- and   11:25:41AM
25   I'm going to restate it, correct me if I'm   11:25:44AM

Page 132

1          LEHN - CONFIDENTIAL
2    stating it improperly -- as of February   11:25:48AM
3    6th, 2001 the market was not aware that   11:25:50AM
4    the JAMA editors believed that they were   11:25:56AM
5    misled into publishing the six-month data   11:26:00AM
6    because they didn't know about the entire   11:26:02AM
7    study data?                11:26:04AM
8          MR. WANG: Objection to form.   11:26:05AM
9    That misstates his prior testimony.      11:26:06AM
10        A.    Well, you know, as I indicated,   11:26:10AM
11   to my knowledge, the first time that the    11:26:14AM
12   market became aware of issues related to   11:26:15AM
13   the submission to JAMA were in the      11:26:18AM
14   Washington Post article of August 5th,    11:26:22AM
15   2001.                  11:26:24AM
16        Q.    So therefore they weren't aware   11:26:24AM
17   of the information you are discussing in    11:26:26AM
18   your answer on February 6th, 2001,      11:26:27AM
19   correct, the market?          11:26:29AM
20          MR. WANG: Objection to form.   11:26:30AM
21        A.    I'm not aware of any factual   11:26:31AM
22   basis for believing that the market was    11:26:33AM
23   aware as of February 2001. But I also am   11:26:36AM
24   aware of when you do an event study on    11:26:41AM
25   August 5th, 2001 that there was no      11:26:43AM

Page 133

1          LEHN - CONFIDENTIAL
2    statistically significant change in      11:26:46AM
3    Pharmacia's stock price.          11:26:48AM
4         Q.    Now, is it your testimony and   11:26:50AM
5    opinion that the complexity of a      11:26:51AM
6    corrective disclosure is irrelevant to    11:26:54AM
7    determining how rapidly new information is   11:26:56AM
8    incorporated into a company's stock price?   11:26:59AM
9          MR. WANG: Objection to form.   11:27:01AM
10   Asked and answered.          11:27:02AM
11          MR. SAHAM: That question came   11:27:05AM
12   from a note, so it cannot be          11:27:06AM
13   objectionable. But could you repeat the    11:27:09AM
14   question for me, please.          11:27:12AM
15          (The record was read.)      11:27:26AM
16        A.    Well, again, as a general   11:27:28AM
17   matter, I don't want to say it is      11:27:30AM
18   irrelevant. But if one has opined that    11:27:31AM
19   the market for a security is efficient,    11:27:34AM
20   then regardless of the complexity of the    11:27:37AM
21   information, that information will be      11:27:39AM
22   absorbed into a company's stock price and   11:27:42AM
23   it will be absorbed quickly.          11:27:44AM
24        Now, is quickly a matter of ten   11:27:47AM
25   minutes or a matter of a couple of hours?   11:27:49AM

34  (Pages 130 to 133)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 134

```
1            LEHN - CONFIDENTIAL
2    I'm not here to tell you the bright line.  11:27:51AM
3    But if the market for the security is    11:27:54AM
4    efficient, it certainly will be within one  11:27:56AM
5    trading day.              11:27:58AM
6        Q.   I'm going to show you what has  11:28:19AM
7    previously been marked as Plaintiffs'   11:28:22AM
8    Exhibit 70.               11:28:23AM
9        Could you please take a look at  11:28:29AM
10   that document, and please feel free to   11:28:30AM
11   review it, but I will represent to you   11:28:32AM
12   that this is the CLASS Advisory Committee  11:28:34AM
13   briefing document that was posted on the   11:28:36AM
14   FDA website simultaneously with the three  11:28:38AM
15   reports in Exhibit 506 on February 6th --  11:28:41AM
16   or on or about -- or in early February    11:28:46AM
17   2001.                    11:28:49AM
18        Do you recognize this document? 11:28:51AM
19       A.   I do.               11:28:52AM
20       Q.   And would you agree that this  11:28:53AM
21   is the company briefing document that was  11:28:55AM
22   posted along with the three FDA reviewer   11:28:57AM
23   reports?                 11:29:01AM
24       A.   Correct.            11:29:01AM
25       Q.   And does this document have any 11:29:02AM
```

Page 135

```
1            LEHN - CONFIDENTIAL
2    impact on your opinions in this case?     11:29:04AM
3        MR. WANG: Objection to form.  11:29:08AM
4        A.   It certainly doesn't have any  11:29:12AM
5    affect on my opinions regarding       11:29:17AM
6    materiality and loss causation.        11:29:19AM
7        Q.   Now, you've issued opinions in 11:29:21AM
8    your rebuttal report regarding certain   11:29:23AM
9    factors being confounding information that  11:29:26AM
10   came into the market?            11:29:28AM
11       A.   That's correct.        11:29:29AM
12       Q.   And what does that mean?     11:29:29AM
13       A.   Confounding information would  11:29:30AM
14   be information other than the information  11:29:32AM
15   at issue that potentially could be     11:29:34AM
16   affecting the stock price or security    11:29:37AM
17   price of a company.           11:29:38AM
18       Q.   And you believe that Exhibit 70 11:29:40AM
19   is not confounding information; is that   11:29:41AM
20   your opinion, sir?              11:29:44AM
21       A.   With respect to the alleged   11:29:46AM
22   corrective disclosures, that's correct.  I 11:29:57AM
23   mean, the issue at hand is the alleged    11:29:59AM
24   corrective disclosures that were released  11:30:01AM
25   on the morning of February 6th.       11:30:03AM
```

Page 136

```
1            LEHN - CONFIDENTIAL
2        I'm not aware of anything in   11:30:07AM
3    the briefing documents that alters the    11:30:08AM
4    information that was released with respect 11:30:12AM
5    to the alleged corrective disclosures on   11:30:13AM
6    the morning of February 6th.        11:30:16AM
7        Q.   Are you aware of any      11:30:17AM
8    articulation of the informative censoring  11:30:19AM
9    hypothesis or depletion of susceptibles    11:30:22AM
10   hypothesis prior to February 6th, 2001    11:30:27AM
11   publicly?                11:30:30AM
12       A.   I don't recall discussions of  11:30:34AM
13   that prior to February 6th in the public   11:30:35AM
14   domain, no.               11:30:38AM
15       Q.   Could the articulation of an   11:30:39AM
16   explanation regarding informative       11:30:40AM
17   censoring and depletion of susceptibles be 11:30:42AM
18   information that would have potentially    11:30:46AM
19   confounded the information contained in    11:30:48AM
20   the FDA reports?             11:30:50AM
21       MR. WANG: Objection to form.  11:30:52AM
22   Vague and ambiguous.            11:30:53AM
23       A.   I don't see why it would, if  11:30:56AM
24   the focus is did the alleged corrective   11:31:00AM
25   disclosures affect Pharmacia's stock price 11:31:02AM
```

Page 137

```
1            LEHN - CONFIDENTIAL
2    and affect it on February 6th, and for a   11:31:06AM
3    couple of reasons.            11:31:13AM
4        One is that these briefing      11:31:13AM
5    materials were released on the morning of  11:31:15AM
6    February 6th.  The market had a full day   11:31:18AM
7    to process all the information.        11:31:21AM
8        But, more importantly, I'm not   11:31:24AM
9    aware of anything in the briefing       11:31:26AM
10   documents that would contradict the     11:31:27AM
11   alleged corrective disclosures that were   11:31:29AM
12   made as reflected in the early pages of    11:31:31AM
13   the statistical reviewer's briefing      11:31:35AM
14   document.                11:31:37AM
15       Q.   Can we look back at your      11:31:37AM
16   report, paragraph 72, where you are      11:31:39AM
17   recounting the interrogatory response.    11:31:41AM
18   And that's on page 23 of your report.     11:31:45AM
19       And specifically number 1,      11:32:01AM
20   subparagraph 1 of paragraph 72 says that  11:32:03AM
21   "The entire study data was less favorable  11:32:05AM
22   to Celebrex than the publicly reported    11:32:07AM
23   six-month data with virtually every GI    11:32:09AM
24   comparison worsening after six months."   11:32:12AM
25       Do you see that?          11:32:14AM
```

35  (Pages 134 to 137)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 138

```
1           LEHN - CONFIDENTIAL
2      A.    I do.              11:32:14AM
3      Q.    And you say that fact is     11:32:15AM
4  ascertainable from, you know, the three   11:32:16AM
5  FDA reports, correct?           11:32:18AM
6      A.    That is correct, and in     11:32:19AM
7  particular the statistical reviewer.    11:32:21AM
8      Q.    Now, the company's explanation  11:32:23AM
9  in Exhibit 70 that the reason for that    11:32:24AM
10 informative censoring or depletion of    11:32:27AM
11 susceptibles, could that be confounding   11:32:29AM
12 information that would have needed to be  11:32:33AM
13 considered in determining how quickly the 11:32:35AM
14 market would adjust to the fact number 1  11:32:37AM
15 that you said was ascertainable from the  11:32:41AM
16 FDA briefing documents?         11:32:45AM
17     MR. WANG:  Objection to form.    11:32:46AM
18 Vague and ambiguous.             11:32:47AM
19     A.    Again, on the assumption that  11:32:48AM
20 the market for the security is efficient,  11:32:50AM
21 there is no scientific basis to believe it 11:32:53AM
22 would take more than one trading day for  11:32:55AM
23 the market to absorb this information in  11:32:57AM
24 its totality.                11:33:01AM
25     Now, with respect to the five   11:33:02AM
```

Page 139

```
1           LEHN - CONFIDENTIAL
2  alleged corrective disclosures, there's   11:33:04AM
3  nothing in the briefing document that    11:33:07AM
4  alters the factual information that would  11:33:09AM
5  have served as a corrective disclosure.   11:33:10AM
6  If there is additional discussion of that  11:33:12AM
7  by the company, I don't see how that     11:33:14AM
8  affects the ability of the market to     11:33:18AM
9  process the information that had been     11:33:20AM
10 released.  That's another piece of      11:33:22AM
11 information.                 11:33:24AM
12     But, you know, there were      11:33:25AM
13 roughly 4 million shares that traded on   11:33:27AM
14 February 6th.  There were a lot of      11:33:29AM
15 investors that were actively buying and   11:33:32AM
16 selling shares of Pharmacia stock.  We   11:33:35AM
17 know from what Dr. Feinstein has concluded 11:33:39AM
18 the market for this stock is efficient.   11:33:42AM
19 And I think it is ludicrous to think that  11:33:44AM
20 additional information that was disclosed  11:33:47AM
21 would somehow impede the ability of the   11:33:49AM
22 market to process the alleged corrective  11:33:52AM
23 disclosures.                11:33:54AM
24     Q.    The fact that the company did  11:33:55AM
25 not argue for the validity of the      11:33:58AM
```

Page 140

```
1           LEHN - CONFIDENTIAL
2  six-month data at the February 7th      11:34:00AM
3  Advisory Committee, could that have been  11:34:02AM
4  new information that the market would have 11:34:04AM
5  processed on February 7th, 2001?        11:34:06AM
6      A.    But, again, where I'm having   11:34:13AM
7  trouble understanding your question is    11:34:16AM
8  that it is completely irrelevant for    11:34:18AM
9  whether the alleged corrective disclosures 11:34:20AM
10 were reflected in Pharmacia's stock price  11:34:22AM
11 as of the close on February 6th.        11:34:25AM
12     Q.    Well, there were discussions   11:34:26AM
13 about the CLASS trial and whether or not  11:34:28AM
14 it was successful on the morning of     11:34:30AM
15 February 7th; would you agree with me?    11:34:33AM
16     A.    My recollection is there was   11:34:37AM
17 discussion of that.  But, again, the     11:34:38AM
18 alleged corrective disclosures were made  11:34:41AM
19 on the morning of February 6th.        11:34:42AM
20     Q.    And the fact that Dr. Goldkind 11:34:43AM
21 said that there were no safety-related   11:34:46AM
22 conclusions that could be derived from the 11:34:49AM
23 CLASS trial on the morning of February   11:34:51AM
24 7th, you don't view that as corrective   11:34:53AM
25 information?                 11:34:56AM
```

Page 141

```
1           LEHN - CONFIDENTIAL
2      A.    Certainly not corrective of the 11:34:57AM
3  alleged misrepresentations.  And, again,  11:35:00AM
4  going back to the second interrogatory   11:35:02AM
5  response, and going to my paragraph 72, I  11:35:04AM
6  think Dr. Feinstein has a very similar   11:35:08AM
7  paragraph where we lay out our       11:35:11AM
8  understanding of what the allegations are  11:35:14AM
9  effectively and the alleged          11:35:17AM
10 misrepresentations.  That was all       11:35:19AM
11 corrected on the morning of February 6th.  11:35:22AM
12     Q.    Were you aware that there was a 11:35:24AM
13 global pharmaceutical medical and device  11:35:27AM
14 and biotechnology conference sponsored by  11:35:30AM
15 Merrill Lynch on February 6th, 2001?     11:35:33AM
16     A.    I have a vague reference to   11:35:37AM
17 recollection that there was some        11:35:42AM
18 conference on February 6th.          11:35:43AM
19     Q.    And are you aware that Fred    11:35:44AM
20 Hassan, the CEO of Pharmacia, presented at 11:35:46AM
21 that conference?              11:35:50AM
22     A.    Yes.                11:35:50AM
23     Q.    And are you aware that he     11:35:51AM
24 presented the six-month JAMA results on   11:35:52AM
25 February 6th, 2001?             11:35:55AM
```

36 (Pages 138 to 141)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 142

LEHN - CONFIDENTIAL
1
2     A.     I am aware of that, yes.      11:35:56AM
3     Q.     And were there market analysts   11:35:57AM
4   in attendance at the Merrill Lynch      11:35:59AM
5   conference?                11:36:00AM
6     A.     I presume there were.       11:36:01AM
7     Q.     And what was the purpose of    11:36:02AM
8   that conference?              11:36:03AM
9     A.     I don't -- you know, I haven't   11:36:04AM
10   read what the purpose of the conference   11:36:07AM
11   was.                  11:36:08AM
12     Q.     And do you have any        11:36:09AM
13   understanding of why Mr. Hassan would be   11:36:09AM
14   presenting before analysts at a Merrill   11:36:13AM
15   Lynch pharmaceuticals conference?       11:36:16AM
16     A.     I don't have any firsthand     11:36:18AM
17   information as to why he was there.     11:36:20AM
18     Q.     Could you speculate on why he   11:36:21AM
19   would be presenting?            11:36:23AM
20     A.     I prefer not to.          11:36:24AM
21     Q.     Do you think maybe he was     11:36:25AM
22   touting the company's products and     11:36:27AM
23   results?                 11:36:29AM
24     A.     You know, again, "touting" is a 11:36:29AM
25   loaded word and I try to avoid that.  He   11:36:31AM

Page 143

LEHN - CONFIDENTIAL
1
2   was presumably conveying information.    11:36:34AM
3     Q.     Conveying information that     11:36:36AM
4   investors may consider important about his 11:36:38AM
5   company?                 11:36:40AM
6     A.     I would presume as the CEO that 11:36:41AM
7   that's what he would be doing.       11:36:43AM
8     Q.     And Celebrex at the time was    11:36:44AM
9   Pharmacia's largest-selling drug?      11:36:45AM
10     A.     I believe that's right.       11:36:47AM
11     Q.     So it is not unreasonable that   11:36:49AM
12   he would talk about Celebrex and how it   11:36:50AM
13   was impacting the company's business?    11:36:52AM
14     A.     That's correct.          11:36:53AM
15     Q.     And did you consider the      11:36:54AM
16   presentation or the slides from the     11:36:59AM
17   presentation that Mr. Hassan made on    11:37:00AM
18   February 6th, 2001 in formulating your   11:37:03AM
19   opinions in this case?           11:37:05AM
20     A.     I did.              11:37:06AM
21     Q.     And did you discount those     11:37:06AM
22   slides as unimportant for some reason?   11:37:08AM
23     MR. WANG:  Objection to form.    11:37:10AM
24     A.     They are, again, irrelevant in  11:37:12AM
25   the sense that all of the information that  11:37:14AM

Page 144

LEHN - CONFIDENTIAL
1
2   was corrective was released on the morning 11:37:17AM
3   of February 6th.              11:37:19AM
4     And given the assumption that   11:37:23AM
5   the market for the security is efficient,  11:37:24AM
6   that information would have been fully   11:37:26AM
7   reflected in Pharmacia's stock price by   11:37:27AM
8   the close on February 6th.         11:37:30AM
9     Q.     I'm going to show you Exhibit  11:37:31AM
10   391.  Could you please take a look at that  11:37:33AM
11   document.                11:37:35AM
12     And I would ask you if you     11:37:42AM
13   recognize this as the slides that you    11:37:44AM
14   looked at in formulating your opinion with 11:37:45AM
15   respect -- strike that.  That's a bad    11:37:47AM
16   question.                11:37:50AM
17     Are these the slides you were   11:37:50AM
18   referring to a moment ago?         11:37:52AM
19     A.     You know, I can't recall     11:37:54AM
20   whether every slide is here, but it does   11:37:55AM
21   appear to be, you know, the same document  11:37:57AM
22   I've reviewed.               11:38:00AM
23     Q.     And if you go to the last three 11:38:01AM
24   Bates numbers 626 in the middle of the   11:38:03AM
25   document which I have marked as Exhibit   11:38:05AM

Page 145

LEHN - CONFIDENTIAL
1
2   391, there's a picture of some naked women 11:38:07AM
3   and it says "JAMA, September 13th, 2000,  11:38:14AM
4   Gastrointestinal Toxicity with Celecoxib  11:38:18AM
5   versus NSAID Drugs for Osteoarthritis and  11:38:22AM
6   Rheumatoid Arthritis, the CLASS Study"; do 11:38:22AM
7   you see that?               11:38:28AM
8     A.     I do.              11:38:28AM
9     Q.     Is it fair to say that this    11:38:28AM
10   slide is referring to the September 13th,  11:38:30AM
11   2000 JAMA publication that is at the     11:38:32AM
12   center or at least in part at the center   11:38:34AM
13   of this case?               11:38:37AM
14     MR. WANG:  Objection to form.    11:38:37AM
15     A.     It appears to be.         11:38:38AM
16     Q.     And there are certain bullet   11:38:39AM
17   points to the left of the picture of the   11:38:42AM
18   JAMA article or JAMA journal, and the    11:38:43AM
19   fourth bullet point down says "48 percent  11:38:46AM
20   to 66 percent reduction in ulcer      11:38:48AM
21   complications."  Do you see that?      11:38:51AM
22     A.     I do.              11:38:52AM
23     Q.     And did you make any attempt to 11:38:52AM
24   determine whether the 48 to 68 percent    11:38:55AM
25   reduction, whether that corresponds to the 11:38:59AM

37  (Pages 142 to 145)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 146

LEHN - CONFIDENTIAL
1    LEHN - CONFIDENTIAL
2  six-month data, or the entire study data?  11:39:01AM
3      A.   I did not.            11:39:04AM
4      Q.   So it would not impact your    11:39:05AM
5  opinion that Mr. Hassan at the same exact   11:39:06AM
6  time or the same day that the FDA Advisory  11:39:11AM
7  Committee -- I'm sorry, the review reports  11:39:17AM
8  that are Exhibit 506 and the briefing     11:39:22AM
9  document, Exhibit 70, were posted on the   11:39:24AM
10  Internet, that Mr. Hassan was making a    11:39:27AM
11  presentation discussing the JAMA results,  11:39:29AM
12  which I think we can all concede that the  11:39:34AM
13  JAMA results were -- well, strike that.    11:39:37AM
14  I've got to start over.            11:39:40AM
15       You've come to an understanding 11:39:41AM
16  in your preparations in this case that the  11:39:42AM
17  JAMA article presented the six-month data  11:39:45AM
18  as opposed to the entire study data; is    11:39:48AM
19  that correct?               11:39:50AM
20      A.   That's my understanding.     11:39:50AM
21      Q.   And does it impact your opinion 11:39:51AM
22  in any way that the same day that the     11:39:53AM
23  company briefing document was posted and   11:39:58AM
24  the FDA reviewer documents were posted,    11:40:00AM
25  that Mr. Hassan was making a presentation  11:40:03AM

Page 147

1    LEHN - CONFIDENTIAL
2  to analysts where he communicated or     11:40:04AM
3  reiterated information about the JAMA     11:40:07AM
4  article?                  11:40:10AM
5      A.   Not at all. This would be    11:40:10AM
6  stale information at this point. Assuming  11:40:12AM
7  there were analysts in attendance, as we  11:40:15AM
8  both reasonably assume, those very same   11:40:18AM
9  analysts would have had access to the full  11:40:21AM
10  CLASS data that was released on the      11:40:23AM
11  morning of this presentation.          11:40:25AM
12       And, you know, to believe that  11:40:27AM
13  analysts and more importantly investors   11:40:28AM
14  just blindly follow what CEOs say and    11:40:30AM
15  don't look at other data is an        11:40:34AM
16  unreasonable assumption.           11:40:37AM
17       So the fact that it is not new 11:40:39AM
18  and the fact that the market had the     11:40:41AM
19  benefit of all the CLASS data released    11:40:44AM
20  that morning makes this particular      11:40:46AM
21  presentation in my opinion completely    11:40:48AM
22  irrelevant.                11:40:50AM
23      Q.   The market was not aware on   11:40:51AM
24  February 6th, 2001, though, that the     11:40:52AM
25  editors of JAMA believed that they were   11:40:55AM

Page 148

1    LEHN - CONFIDENTIAL
2  misled into publishing this article; is   11:40:57AM
3  that correct?               11:40:59AM
4       MR. WANG: Objection to form.  11:40:59AM
5      A.   I don't have any basis for    11:41:06AM
6  believing the market was aware of that,    11:41:08AM
7  but, again, that is totally irrelevant as  11:41:08AM
8  well, that if I look at the allegations in  11:41:10AM
9  this case and then I look at the alleged  11:41:11AM
10  corrective disclosures on February 6th,    11:41:12AM
11  they were made and the market did       11:41:15AM
12  react.                   11:41:17AM
13       MR. WANG: Scott, whenever you 11:41:25AM
14  shift gears.                11:41:27AM
15       MR. SAHAM: Yes, we can take a 11:41:27AM
16  break.                   11:41:29AM
17       THE VIDEOGRAPHER: The time is 11:41:29AM
18  approximately 11:41 a.m. This is the end  11:41:30AM
19  of media number two. We are off the     11:41:33AM
20  record.                  11:41:35AM
21       (Recess taken.)         11:41:39AM
22       THE VIDEOGRAPHER: The time is 12:02:11PM
23  approximately 12:02 p.m. This is the      12:02:18PM
24  beginning of media number three. We are  12:02:20PM
25  on the record.               12:02:23PM

Page 149

1    LEHN - CONFIDENTIAL
2  BY MR. SAHAM:                12:02:23PM
3      Q.   Dr. Lehn, would you agree with 12:02:23PM
4  me that the Internet, back in 2001,      12:02:26PM
5  February 2001, was sort of a different    12:02:28PM
6  animal than it is today?           12:02:30PM
7       MR. WANG: Objection to form.  12:02:34PM
8      A.   I'm not sure what you mean by  12:02:34PM
9  "a different animal."            12:02:36PM
10      Q.   Was it used differently by    12:02:37PM
11  people?                  12:02:40PM
12       MR. WANG: Same objection.    12:02:43PM
13      A.   Can you be more specific?     12:02:44PM
14  Differently in what context?         12:02:48PM
15      Q.   Well, have you considered the  12:02:49PM
16  posting of these documents on the Internet 12:02:51PM
17  by the FDA on February 6th, 2001, is it   12:02:56PM
18  your opinion or have you formulated an    12:02:59PM
19  opinion whether the ability to be       12:03:01PM
20  accessed, the timing of access, the      12:03:06PM
21  utilization of those materials or ease of  12:03:08PM
22  access would be different today than they  12:03:11PM
23  were in 2001?               12:03:13PM
24      A.   Well, I think, you know, as a  12:03:17PM
25  general matter, communications technology  12:03:19PM

38 (Pages 146 to 149)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 150

1           LEHN - CONFIDENTIAL
2    has made it easier over time to retrieve    12:03:23PM
3    information.  So, for example, the Patell    12:03:26PM
4    and Wolfson study that we were talking    12:03:28PM
5    about, you know, used data I think from    12:03:29PM
6    the 1970s, and they were finding even back    12:03:32PM
7    then you were getting most of the price    12:03:37PM
8    reaction within the first five to ten    12:03:40PM
9    minutes.                    12:03:42PM
10          So insofar as            12:03:42PM
11   telecommunications technology has improved 12:03:44PM
12   over time, then directionally at least    12:03:46PM
13   markets should be even more efficient at    12:03:48PM
14   processing information today than they    12:03:50PM
15   were when Patell and Wolfson wrote this    12:03:51PM
16   study.                      12:03:54PM
17          So at a high level I would    12:03:54PM
18   to agree with that.  Whether or not the    12:03:56PM
19   incremental change from 2000 to today has    12:03:59PM
20   been sufficiently important, you know, I    12:04:03PM
21   don't know.                   12:04:07PM
22      Q.    But you agree with me, and I    12:04:07PM
23   think you agreed earlier, that earnings    12:04:09PM
24   and dividends announcements were usually    12:04:11PM
25   preceded by a very specific press release   12:04:14PM

Page 151

1           LEHN - CONFIDENTIAL
2    revealing to the market when the        12:04:16PM
3    announcement would occur; is that       12:04:17PM
4    accurate?                   12:04:19PM
5           MR. WANG:  Objection to form.   12:04:20PM
6    That is compound and misstates your prior  12:04:21PM
7    questions and his answers.          12:04:24PM
8       A.    Certainly investors would be   12:04:30PM
9    aware of when the quarterly earnings    12:04:32PM
10   announcement would be.  But investors in   12:04:34PM
11   this case were aware of when the Advisory  12:04:36PM
12   Panel would be meeting.  So I'm not sure   12:04:40PM
13   of the relevance of it.             12:04:42PM
14      Q.    Well, with respect to an       12:04:43PM
15   earnings announcement, you would get a    12:04:45PM
16   precise press release saying exactly what  12:04:47PM
17   time the announcement was going to occur,  12:04:49PM
18   right?                      12:04:53PM
19          MR. WANG:  Objection to form.   12:04:54PM
20      A.    You are referring to the       12:04:56PM
21   conference call?                12:04:57PM
22      Q.    Yes, when the information     12:04:58PM
23   relating to earnings would first be made  12:05:00PM
24   public via conference call or a second    12:05:03PM
25   press release.                 12:05:05PM

Page 152

1           LEHN - CONFIDENTIAL
2           MR. WANG:  Objection to form.  12:05:05PM
3       A.    With respect to a conference  12:05:08PM
4    call, obviously you would have to notify   12:05:11PM
5    the analyst community so they know when to 12:05:15PM
6    call in, if they wished to call in.  I'm   12:05:18PM
7    not sure you are right in the sense that   12:05:22PM
8    it is always the case that the conference  12:05:24PM
9    call would be when the earnings would be   12:05:26PM
10   released.  I think it is frequently the    12:05:28PM
11   case, if not mostly the case, that the     12:05:31PM
12   earnings would be released prior to the    12:05:33PM
13   conference call and then you would have    12:05:35PM
14   the conference call subsequent to the    12:05:36PM
15   earnings release.               12:05:38PM
16          Whether or not analysts know   12:05:40PM
17   the precise time at which the earnings    12:05:42PM
18   would be released, I don't know.        12:05:44PM
19      Q.    In your experience, the prior  12:05:46PM
20   press release doesn't usually state we are 12:05:49PM
21   going to release our earnings at such and  12:05:52PM
22   such a point subsequent to the press    12:05:54PM
23   release?                    12:05:58PM
24      A.    I just don't know whether -- I 12:05:58PM
25   mean, certainly for the conference call    12:06:02PM

Page 153

1           LEHN - CONFIDENTIAL
2    the time would be there.  But in terms of  12:06:04PM
3    when the exact time in the day, the exact  12:06:05PM
4    minute at which the earnings would be    12:06:07PM
5    released, I'm not sure that that's the    12:06:08PM
6    case.  And maybe I just don't know.      12:06:11PM
7       Q.    And back in 2001 a lot of      12:06:13PM
8    people had dial-up Internet connections;   12:06:15PM
9    is that fair to say?               12:06:17PM
10      A.    I presume.               12:06:19PM
11      Q.    Do you remember what kind of   12:06:19PM
12   Internet connection you had in 2001?     12:06:20PM
13      A.    I don't.                12:06:24PM
14      Q.    Is it fair to say your Internet 12:06:24PM
15   connection is much quicker today than it   12:06:26PM
16   was in 2001?                  12:06:28PM
17      A.    It probably is, yes.          12:06:31PM
18      Q.    And is it also fair to say     12:06:32PM
19   given the progression of Google and other  12:06:35PM
20   search engines it is much easier to find   12:06:37PM
21   information on the Internet today than it  12:06:40PM
22   was in 2001?                  12:06:42PM
23      A.    Yeah, but, again, I think all   12:06:44PM
24   of that is irrelevant.  The early studies  12:06:47PM
25   on market price efficiency were based on   12:06:50PM

39  (Pages 150 to 153)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 154

1           LEHN - CONFIDENTIAL
2    stock price data from the 1960s, I think    12:06:51PM
3    some even went back to the 1950s, and the    12:06:54PM
4    studies found even then, when technology    12:06:56PM
5    was quite different, that information was    12:06:58PM
6    rapidly reflected in securities prices.    12:07:00PM
7           I mean, 25 some-odd years ago I    12:07:03PM
8    worked at the Securities and Exchange    12:07:05PM
9    Commission, and it was before EDGAR and    12:07:07PM
10   before the Internet technology, and I    12:07:09PM
11   remember there used to be people from the    12:07:12PM
12   major banks who would have people    12:07:13PM
13   stationed at desks waiting for the latest    12:07:17PM
14   filing, and they would go through the    12:07:19PM
15   filing and immediately get on the phone    12:07:20PM
16   calling people up in New York, and    12:07:23PM
17   presumably some of them were traders, and    12:07:24PM
18   that was before the Internet.    12:07:27PM
19           And back when I was looking at    12:07:30PM
20   stock price data when I was at the SEC, we    12:07:31PM
21   were seeing that stock prices reacted very    12:07:34PM
22   rapidly to the release of new information,    12:07:36PM
23   frankly, regardless of the complexity if    12:07:39PM
24   the market for the security was efficient.    12:07:42PM
25      Q.    Now, you are not relying on any    12:07:44PM

Page 155

1           LEHN - CONFIDENTIAL
2    peer-reviewed journal articles that    12:07:45PM
3    studied the reaction of the market to the    12:07:49PM
4    release of information relating to    12:07:55PM
5    clinical trials; is that correct?    12:07:57PM
6      A.    Can you restate the question?    12:08:01PM
7      Q.    Yeah, I would be glad to.    12:08:02PM
8           You have referred to, you know,    12:08:04PM
9    Patell and Wolfson and other journal    12:08:05PM
10   articles talking about the efficiency with    12:08:07PM
11   which the market processes information; is    12:08:09PM
12   that fair to say?    12:08:12PM
13      A.    That is correct.    12:08:13PM
14      Q.    None of the articles that you    12:08:13PM
15   are referencing in your report or relying    12:08:15PM
16   on here today are articles that studied    12:08:18PM
17   the processing of information relating to    12:08:22PM
18   clinical trials, medical clinical trials;    12:08:26PM
19   is that correct?    12:08:29PM
20      A.    That's correct. But as a    12:08:30PM
21   backdrop, again, remember that the    12:08:32PM
22   efficient markets hypothesis is not unique    12:08:33PM
23   to earnings and dividends, it says all    12:08:37PM
24   publicly available information is    12:08:39PM
25   reflected in securities prices if the    12:08:40PM

Page 156

1           LEHN - CONFIDENTIAL
2    market is efficient and new information is    12:08:42PM
3    rapidly reflected in securities prices.    12:08:45PM
4           It doesn't circumscribe the    12:08:48PM
5    information, say but it only applies to    12:08:50PM
6    this kind of information. It is    12:08:54PM
7    information.    12:08:55PM
8      Q.    But Patell and Wolfson are    12:08:55PM
9    referring to earnings and dividends    12:08:57PM
10   releases though, correct?    12:08:59PM
11      A.    That is correct.    12:08:59PM
12      Q.    And they state in their article    12:09:00PM
13   that other types of information may be    12:09:01PM
14   processed more slowly; is that correct?    12:09:03PM
15           MR. WANG: Objection to form.    12:09:05PM
16      A.    Right. But, again, you have to    12:09:06PM
17   also be aware that Patell and Wolfson were    12:09:08PM
18   looking at a large sample study, and it is    12:09:10PM
19   typical in the academic arena, as a matter    12:09:13PM
20   of fact, I'm not even aware of anyone in    12:09:16PM
21   the academic arena, when you are looking    12:09:17PM
22   at a large sample of companies, you make a    12:09:21PM
23   determination as to whether the market for    12:09:23PM
24   each individual security in your large    12:09:24PM
25   sample is efficient, and that that's one    12:09:26PM

Page 157

1           LEHN - CONFIDENTIAL
2    of the reasons why longer windows are    12:09:29PM
3    typically used in the academic arena for    12:09:31PM
4    large sample studies, is you are not    12:09:34PM
5    making a determination that every stock    12:09:37PM
6    trades in an efficient market.    12:09:38PM
7           So that's sort of an important    12:09:41PM
8    consideration. If one is assuming that    12:09:44PM
9    the market is efficient, then by    12:09:45PM
10   definition all public information is    12:09:47PM
11   reflected in the price and new information    12:09:50PM
12   is quickly reflected in the price.    12:09:51PM
13      Q.    But you are not disagreeing    12:09:53PM
14   with Patell and Wolfson that less regular    12:09:55PM
15   information, information less regular than    12:09:57PM
16   earnings and dividends would take longer    12:10:00PM
17   to process than earnings and dividend    12:10:01PM
18   information?    12:10:04PM
19      A.    If the market for a security is    12:10:05PM
20   not efficient, then I would agree that    12:10:07PM
21   potentially, I wouldn't agree    12:10:12PM
22   categorically, but potentially that might    12:10:13PM
23   be a consideration that would affect the    12:10:16PM
24   speed of adjustment.    12:10:17PM
25           But, again, if you are making    12:10:18PM

40  (Pages 154 to 157)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 158

1          LEHN - CONFIDENTIAL
2    the assumption that the market is        12:10:19PM
3    efficient, you have no basis saying, well,  12:10:21PM
4    for this kind of information I think there   12:10:24PM
5    are going to be delayed reactions, because  12:10:26PM
6    then effectively what you are saying is I   12:10:28PM
7    don't think the market for the security is  12:10:30PM
8    efficient.                    12:10:30PM
9        Q.    Well, Patell and Wolfson      12:10:31PM
10   observed reactions that continued into the  12:10:32PM
11   next day in efficient markets, correct?   12:10:34PM
12        MR. WANG:  Objection to form.   12:10:38PM
13        A.    Again, you know, we can go back 12:10:39PM
14   and look, I don't think they made a       12:10:42PM
15   determination as to whether every security  12:10:43PM
16   in their sample traded in an efficient     12:10:46PM
17   market.  I mean, there were no camera     12:10:49PM
18   factors back then.               12:10:52PM
19        But I think they just had a       12:10:53PM
20   large sample of companies and they looked  12:10:54PM
21   at the aggregate results, which is not to   12:10:57PM
22   say that every security traded in an       12:10:59PM
23   efficient market.               12:11:02PM
24        Q.    But you are not relying on any  12:11:03PM
25   particular study relating to the          12:11:04PM

Page 159

1          LEHN - CONFIDENTIAL
2    revelation of information relating to     12:11:07PM
3    clinical trials and how quickly that       12:11:11PM
4    information would be processed in an     12:11:14PM
5    efficient market; is that correct?        12:11:16PM
6        MR. WANG:  Asked and answered.  12:11:18PM
7        A.    Not specifically.  But, again,   12:11:19PM
8    the efficient market hypothesis says all   12:11:22PM
9    public information, all, not just earnings  12:11:25PM
10   or dividends or not just supposedly        12:11:28PM
11   information that's easier to process.  It   12:11:30PM
12   says all public information is reflected    12:11:33PM
13   in the security price and new public       12:11:36PM
14   information is rapidly reflected in the     12:11:38PM
15   price.  That's what the theory says.       12:11:40PM
16        And that's been tested and        12:11:43PM
17   that's been tested with lots of data for    12:11:45PM
18   different events.  So there is no          12:11:47PM
19   scientific basis for believing there is     12:11:50PM
20   something unusual about information on     12:11:52PM
21   clinical trials that would affect that      12:11:54PM
22   conclusion.                   12:11:57PM
23        Q.    Now, with respect to February  12:12:02PM
24   7th, 2001, is it your opinion that the     12:12:07PM
25   stock price decline on February 7th, 2001  12:12:10PM

Page 160

1          LEHN - CONFIDENTIAL
2    was due to random volatility?         12:12:13PM
3        A.    Again, when one conducts a     12:12:17PM
4    test, which is what the event study does,  12:12:23PM
5    it allows you to make a determination as   12:12:28PM
6    to whether you have a scientific basis for  12:12:30PM
7    believing that the stock price moved      12:12:32PM
8    because of an information release.        12:12:36PM
9        And after conducting the test,   12:12:39PM
10   it is my opinion that you can't reject the  12:12:40PM
11   hypothesis, this is just random          12:12:44PM
12   volatility.  It is not necessarily        12:12:47PM
13   endorsing it and saying that it was, it is  12:12:48PM
14   just saying you can't reject that.        12:12:50PM
15        Q.    And you would agree with me   12:12:52PM
16   that there was negative information       12:12:53PM
17   related to Pharmacia that was released    12:12:56PM
18   into the market on February 7th?        12:12:58PM
19        A.    There was information released 12:13:00PM
20   that potentially could be viewed as      12:13:15PM
21   negative for Pharmacia, that's correct.   12:13:17PM
22        Q.    And because there was negative 12:13:19PM
23   Pharmacia information, would that allow   12:13:21PM
24   you to use a one-tail test instead of a    12:13:23PM
25   two-tail test if you wanted to, or under   12:13:25PM

Page 161

1          LEHN - CONFIDENTIAL
2    certain circumstances?              12:13:28PM
3        A.    It would depend on what your   12:13:30PM
4    test was, whether you were testing --     12:13:33PM
5    whether you had a prior that all of the    12:13:35PM
6    information released on that day would be  12:13:38PM
7    negative or whether your prior is it would  12:13:41PM
8    be positive, or whether your prior is it   12:13:44PM
9    could have gone either way.           12:13:46PM
10        Q.    But you are not offering an    12:13:48PM
11   opinion, you haven't, for the purposes of  12:13:49PM
12   your assignment in this case, ruled out    12:13:51PM
13   that the stock price movement on February  12:13:53PM
14   7th was not due to -- was not due to      12:13:55PM
15   random fluctuation?  That's a bad        12:13:58PM
16   question.  I guess I need to break it      12:14:02PM
17   down.                       12:14:03PM
18        You are not offering an opinion 12:14:04PM
19   that the stock price movement on February  12:14:06PM
20   7th was due to random volatility; is that  12:14:07PM
21   correct?                     12:14:11PM
22        MR. WANG:  Objection to form.   12:14:11PM
23        A.    Well, again, I conducted a test 12:14:13PM
24   and the test indicated that the residual   12:14:18PM
25   return on February 7th was not          12:14:23PM

41  (Pages 158 to 161)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 162

1        LEHN - CONFIDENTIAL
2   statistically significant, which means     12:14:25PM
3   that you can't have confidence that what     12:14:27PM
4   you are observing was nothing more than     12:14:29PM
5   just random variation.          12:14:31PM
6       Q.   In looking at Exhibit 4 of your 12:14:36PM
7   report that we looked at earlier with the   12:14:43PM
8   t-statistics, the residual return on     12:14:46PM
9   February 7th was negative 0.29, is that   12:14:58PM
10  correct, for February 7th, 2001?       12:15:06PM
11      A.   The residual return was a     12:15:08PM
12  negative 0.290 percent.         12:15:09PM
13      Q.   And there is different     12:15:11PM
14  thresholds of statistical significance; is 12:15:14PM
15  that correct?            12:15:17PM
16          MR. WANG: Objection to form. 12:15:17PM
17      A.   That is correct.        12:15:18PM
18      Q.   And what are some of the    12:15:18PM
19  typical thresholds that are utilized for   12:15:20PM
20  statistical significance?        12:15:22PM
21      A.   Well, the two that are most  12:15:23PM
22  prominently used in the academic       12:15:27PM
23  literature are the 1 percent and the 5    12:15:29PM
24  percent.            12:15:32PM
25      Q.   And this one -- 1 percent being 12:15:33PM

Page 163

1        LEHN - CONFIDENTIAL
2   99 percent?            12:15:35PM
3       A.   Correct.            12:15:37PM
4       Q.   So you wouldn't say that --   12:15:37PM
5   because this one you said that you would   12:15:39PM
6   need a 1.69 t-stat under at least your    12:15:43PM
7   calculations to reach statistical       12:15:46PM
8   significance on the 10 percent threshold? 12:15:47PM
9           MR. WANG: Objection to form. 12:15:50PM
10      A.   That's correct.         12:15:51PM
11      Q.   And what would it mean if you 12:15:51PM
12  reached statistical significance on a 10   12:15:53PM
13  percent threshold?         12:15:55PM
14          MR. WANG: Objection to form. 12:15:57PM
15      A.   Well, similar to the FDA where 12:15:58PM
16  the, you know, the p-values at issue in   12:15:59PM
17  this case were, you know, what was       12:16:02PM
18  relevant was whether it was the 5 percent 12:16:06PM
19  or not, and in the academic arena it is   12:16:08PM
20  generally understood that 5 percent     12:16:12PM
21  significance is sort of the gold standard. 12:16:16PM
22          Now, it is also true that in   12:16:18PM
23  academic publications editors and referees 12:16:21PM
24  for completeness sake often want authors  12:16:24PM
25  to report 10 percent as well as 5 percent 12:16:27PM

Page 164

1        LEHN - CONFIDENTIAL
2   and 1 percent. But I always view that as  12:16:30PM
3   more for completeness.  If your key result 12:16:33PM
4   was only significant at the 10 percent    12:16:36PM
5   level, you probably wouldn't stand much   12:16:39PM
6   chance of getting published.         12:16:41PM
7           So, in short, 1 percent and 5  12:16:43PM
8   percent are, you know, the gold standards 12:16:45PM
9   for statistical significance.        12:16:48PM
10      Q.   And on February 7th the      12:16:50PM
11  Pharmacia stock price declined in raw     12:16:52PM
12  terms 2.64 percent?         12:16:54PM
13      A.   In raw terms, that's correct. 12:16:57PM
14      Q.   And the index which you used as 12:16:58PM
15  a comparator, the industry index increased 12:17:01PM
16  about a half a percent; is that that?      12:17:05PM
17      A.   That's correct.         12:17:07PM
18      Q.   So on February 7th Pharmacia  12:17:07PM
19  was moving in a different direction than   12:17:11PM
20  the index that you compared it to; is that 12:17:14PM
21  correct?            12:17:16PM
22      A.   Factually, that's correct. But 12:17:16PM
23  it was moving in the same direction as the 12:17:19PM
24  market index, and the most important thing 12:17:21PM
25  is that the residual return of minus 2.90 12:17:25PM

Page 165

1        LEHN - CONFIDENTIAL
2   percent was not significantly different   12:17:28PM
3   from zero.            12:17:30PM
4       Q.   And is there a difference     12:17:32PM
5   between -- and you said it needed to be   12:17:33PM
6   1.98 in order to reach a 0.05 threshold;   12:17:37PM
7   am I stating that correctly?        12:17:42PM
8       A.   1.96 on a two-tail test, that's 12:17:43PM
9   correct.            12:17:46PM
10      Q.   And that's the test you       12:17:46PM
11  conducted?            12:17:46PM
12      A.   Correct.            12:17:48PM
13      Q.   And if you would have conducted 12:17:48PM
14  a one-tail test, the numbers would have   12:17:51PM
15  been different though?         12:17:52PM
16      A.   Well, the threshold for      12:17:53PM
17  statistical significance at the 5 percent 12:17:54PM
18  level using a one-tail test is I think    12:17:56PM
19  about 1.65.  So it would fail to meet that 12:17:59PM
20  too.               12:18:02PM
21      Q.   And what's the threshold for   12:18:02PM
22  using a one-tailed as opposed to a      12:18:05PM
23  two-tailed?            12:18:08PM
24      A.   I'm sorry, threshold for?     12:18:09PM
25      Q.   If you see that there is      12:18:11PM

42  (Pages 162 to 165)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 166

1           LEHN - CONFIDENTIAL
2    negative news about Pharmacia that morning  12:18:12PM
3    it could justify the use of a one-tailed  12:18:15PM
4    test; is that correct?            12:18:17PM
5          MR. WANG: Objection to form.  12:18:18PM
6      A.   Well, that's sort of quite -- I 12:18:18PM
7    don't mean this in a pejorative sense, but  12:18:20PM
8    that is kind of cheating, that's not the   12:18:23PM
9    way you go about a scientific test where   12:18:23PM
10   you look at the data and then you       12:18:25PM
11   determine what kind of -- what you want to  12:18:26PM
12   do is say looking at the totality of the  12:18:29PM
13   information released that day, do I have a  12:18:32PM
14   prior belief that it would have been     12:18:34PM
15   negative or positive.  And I had no such  12:18:36PM
16   prior belief based on all the information  12:18:38PM
17   released that day.              12:18:42PM
18      Q.   Did you review Professor      12:19:11PM
19   Feinstein's analysis regarding using your  12:19:12PM
20   methodology and applying it to February   12:19:15PM
21   7th where he came up with a p-value of    12:19:17PM
22   0.0675 applying your analysis to February  12:19:25PM
23   7th, do you recall looking at that in the  12:19:30PM
24   rebuttal reports?  Is that something     12:19:32PM
25   you've been asked to opine on?        12:19:34PM

Page 167

1           LEHN - CONFIDENTIAL
2          MR. WANG: Objection to form.  12:19:36PM
3      A.   If you can refer me to that in  12:19:37PM
4    his report.                   12:19:38PM
5      Q.   I think I can.            12:19:40PM
6          (Plaintiffs' Exhibit 508 marked  12:20:08PM
7    for identification.)            12:20:12PM
8      Q.   This is Dr. Feinstein's       12:20:12PM
9    rebuttal report.  It will take me a minute  12:20:14PM
10   to find.                    12:20:18PM
11          I'm looking at page 7 and 8 of  12:20:30PM
12   Dr. Feinstein's rebuttal report.      12:20:35PM
13          Have you formulated an opinion  12:20:37PM
14   about what Dr. Feinstein discusses at   12:20:39PM
15   paragraphs 29 through 32, specifically   12:20:44PM
16   that when you run the regression for     12:20:46PM
17   February 7th that you come up with a    12:20:51PM
18   p-value of 0.0675?              12:20:54PM
19      A.   If I can just refresh my       12:20:57PM
20   memory.                     12:20:58PM
21      Q.   Sure, go right ahead.  Take as  12:20:59PM
22   much time as you need.            12:21:01PM
23          (Witness perusing document.)   12:21:02PM
24      A.   Yeah, and, again, the opinion  12:21:31PM
25   that I have based on what he has written  12:21:33PM

Page 168

1           LEHN - CONFIDENTIAL
2    in paragraph 29 is it is all irrelevant.  12:21:35PM
3    I mean, you know, it either is        12:21:37PM
4    statistically significant or it is not,  12:21:39PM
5    and I don't argue with the 6.75 percent  12:21:41PM
6    p-value.                    12:21:44PM
7          But the rest of the language,  12:21:48PM
8    frankly, I think is unscientific when he  12:21:49PM
9    says that I found the residual stock price  12:21:51PM
10   decline to be severe.  That's a phrase   12:21:54PM
11   that typically is not used in the      12:21:57PM
12   scientific literature, that you stick to  12:21:59PM
13   whether it is statistically significant or  12:22:02PM
14   not.                       12:22:04PM
15      Q.   Let's stick with the p-value of  12:22:04PM
16   0.0675, and that is also referred to as a  12:22:07PM
17   6.75 percent; is that correct?        12:22:11PM
18      A.   That's correct.           12:22:13PM
19      Q.   And what does that mean for the  12:22:13PM
20   layman that when you develop a p-value of  12:22:15PM
21   0.0675, what does that mean?         12:22:19PM
22      A.   What it means, we see in all  12:22:21PM
23   fields, including the clinical trial with  12:22:25PM
24   the FDA, if you have a p-value of 6.75   12:22:27PM
25   percent, it means there's a 6.75 percent  12:22:30PM

Page 169

1           LEHN - CONFIDENTIAL
2    that what you are observing is random and  12:22:35PM
3    unrelated to the issue at hand.       12:22:37PM
4          If it is random, if it has that  12:22:40PM
5    degree of probability of being random, you  12:22:43PM
6    don't have a scientific basis for saying  12:22:45PM
7    that this was a significant day.      12:22:48PM
8      Q.   But the inverse would be true,  12:22:50PM
9    there is a 93.25 percent chance that the  12:22:52PM
10   stock price movement on the 7th was not  12:22:56PM
11   due to random volatility; is that correct?  12:22:59PM
12      A.   That's correct.  But, again,  12:23:01PM
13   you know, the appropriate standard in    12:23:02PM
14   scientific analysis is a fairly high bar  12:23:05PM
15   and that's why the 5 percent threshold is  12:23:08PM
16   the one that is the gold standard, because  12:23:10PM
17   in order to have a scientific basis, to be  12:23:13PM
18   confident that you have something, you   12:23:15PM
19   need to have a threshold of 95 percent   12:23:17PM
20   confidence.                  12:23:19PM
21      Q.   But on the 10 percent threshold  12:23:20PM
22   the movement on February 7th was       12:23:22PM
23   statistically significant; is that     12:23:24PM
24   correct?                    12:23:26PM
25          MR. WANG: Objection to form.  12:23:26PM

43  (Pages 166 to 169)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 170

```
1          LEHN - CONFIDENTIAL
2      A.    I'm sorry, say it again.      12:23:28PM
3      Q.    If you used the 10 percent     12:23:30PM
4  threshold for statistical significance,  12:23:31PM
5  the stock price movement on February 7th  12:23:33PM
6  was statistically significant; is that    12:23:35PM
7  correct?                         12:23:37PM
8      MR. WANG:  Objection to form.   12:23:37PM
9  Vague and ambiguous.              12:23:40PM
10     A.    You know, I think that      12:23:44PM
11 Dr. Feinstein here might have been using a 12:23:50PM
12 one-tail test in paragraph 29 when he    12:23:52PM
13 stated that.  Because the threshold for 5  12:23:55PM
14 percent significance on a one-tail test is 12:24:00PM
15 a t-statistic of minus 1.65.          12:24:02PM
16     And I had a t of minus 1.50,   12:24:07PM
17 which on a one-tail test would probably   12:24:10PM
18 translate to about 6.75 percent.  So he   12:24:12PM
19 must be using a one-tail test in his     12:24:16PM
20 discussion in paragraph 29.           12:24:18PM
21     Q.    So you would agree, then, if  12:24:19PM
22 you used a one-tail test the stock price   12:24:20PM
23 movement on February 7th, 2001 of        12:24:25PM
24 Pharmacia was statistically significant at 12:24:28PM
25 the 10 percent threshold?             12:24:30PM
```

Page 171

```
1          LEHN - CONFIDENTIAL
2      A.    Using my event study results, 12:24:32PM
3  that is correct.  And in my opinion, that  12:24:36PM
4  would not be sufficient for establishing a 12:24:37PM
5  scientific basis that there was an unusual 12:24:40PM
6  decline that day.                12:24:43PM
7      Q.    And in certain circumstances  12:24:44PM
8  there are peer-reviewed -- there is      12:24:45PM
9  peer-reviewed literature where a 10      12:24:48PM
10 percent threshold is utilized to determine 12:24:50PM
11 significance; is that correct?        12:24:52PM
12     A.    Well, it is not -- again, I   12:24:54PM
13 don't want to say it never has been, but I 12:24:56PM
14 used to edit a journal for about ten years 12:24:58PM
15 and we published a lot of papers, and I    12:25:00PM
16 can't remember anywhere the key result of  12:25:05PM
17 the paper was significant at only a 10    12:25:07PM
18 percent level.                  12:25:09PM
19     Now, for completeness sake, it   12:25:10PM
20 is appropriate for editors to ask authors  12:25:12PM
21 to report significance at different levels 12:25:15PM
22 and let readers make their own judgment.   12:25:18PM
23 But certainly the currency in the academic 12:25:21PM
24 community and the currency with the FDA    12:25:25PM
25 apparently is that what determines       12:25:27PM
```

Page 172

```
1          LEHN - CONFIDENTIAL
2  statistical significance is the 95 percent 12:25:28PM
3  confidence, not the 90 percent confidence. 12:25:31PM
4      Q.    Did you do any statistical    12:25:40PM
5  analysis to determine whether any of the   12:25:42PM
6  intraday trading, if you just took a      12:25:45PM
7  particular hour or two of intraday       12:25:49PM
8  trading, was statistically significant on  12:25:51PM
9  either the 7th or the 8th?            12:25:53PM
10     A.    No.              12:25:55PM
11     Q.    And why didn't you do that?   12:25:55PM
12     A.    Well, there are a couple of   12:25:57PM
13 reasons.  Again, for purposes of my      12:25:58PM
14 analysis with respect to materiality and   12:26:01PM
15 loss causation, in my opinion, the       12:26:05PM
16 appropriate day to look at was February    12:26:08PM
17 6th because that's the day the alleged     12:26:09PM
18 corrective disclosures were made.         12:26:12PM
19     When it comes to February 7th   12:26:15PM
20 and February 8th, I don't think either one 12:26:17PM
21 of them is relevant for forming an opinion 12:26:20PM
22 as to materiality and loss causation.  But 12:26:23PM
23 Dr. Feinstein apparently does believe they 12:26:26PM
24 are.  So especially in my rebuttal report  12:26:29PM
25 I felt it was necessary to critique his    12:26:33PM
```

Page 173

```
1          LEHN - CONFIDENTIAL
2  assumption that February 7th and February  12:26:36PM
3  8th were relevant, and one of the        12:26:38PM
4  critiques was that he didn't account for   12:26:41PM
5  other information that was released on     12:26:43PM
6  February 7th and 8th that was distinct     12:26:45PM
7  from the alleged corrective disclosures.   12:26:47PM
8      But I at this point at least     12:26:51PM
9  didn't find it necessary to do anything    12:26:54PM
10 other than point that out.           12:26:56PM
11     Q.    Now, just a second ago you    12:26:58PM
12 testified that it was important with      12:27:02PM
13 respect to editors to present multiple     12:27:03PM
14 p-values so readers could use their own    12:27:07PM
15 judgment; is that correct?           12:27:10PM
16     A.    That's correct.         12:27:11PM
17     Q.    And why is it important to let 12:27:11PM
18 readers make their own judgment about     12:27:13PM
19 those types of information?           12:27:15PM
20     A.    Well, I think it is just in the 12:27:16PM
21 spirit of transparency is to let people    12:27:18PM
22 see the full results.              12:27:22PM
23     Q.    Now, the JAMA article at issue 12:27:26PM
24 in this case, that didn't let people see   12:27:30PM
25 the full results, did it, sir?         12:27:32PM
```

44  (Pages 170 to 173)

CONFIDENTIAL

Page 174

1      LEHN - CONFIDENTIAL
2          MR. WANG: Objection to form.  12:27:34PM
3      A.   You know, I haven't read the  12:27:35PM
4  JAMA article with an eye towards that and  12:27:38PM
5  I don't know exactly what you mean by "the  12:27:42PM
6  full results."  If you mean all of the  12:27:44PM
7  CLASS data that was released on February  12:27:46PM
8  6th, that's correct.          12:27:49PM
9      Q.   Let's just take a look at the  12:27:50PM
10  CLASS article.  It has been previously  12:27:53PM
11  marked in this case as Wolfe Exhibit 3.  12:27:55PM
12          And specifically looking at the  12:27:59PM
13  first page of Wolfe Exhibit 3, the JAMA  12:28:00PM
14  article from September 13th, 2000, which  12:28:02PM
15  is at the center of this case, if you look  12:28:05PM
16  at the abstract and the results down  12:28:07PM
17  towards the bottom, do you see that?  12:28:10PM
18          MR. WANG: Objection to form.  12:28:12PM
19      A.   I do.              12:28:13PM
20      Q.   Where it says Results.  And I  12:28:14PM
21  think you reference the p-value of 0.09 in  12:28:16PM
22  your report.  Do you recall that?  12:28:19PM
23      A.   That's correct.        12:28:20PM
24      Q.   And the p-value here of 0.09 is  12:28:21PM
25  based on the six-month data; is that  12:28:24PM

Page 175

1      LEHN - CONFIDENTIAL
2  correct?                  12:28:26PM
3      A.   That's my recollection.  12:28:26PM
4      Q.   And the p-value, if you would  12:28:27PM
5  have looked at the entire study data,  12:28:30PM
6  turns into 0.45; is that correct?  12:28:32PM
7      A.   I forget the exact number, but  12:28:35PM
8  I know it does go up.        12:28:36PM
9      Q.   Why don't you look at the 506,  12:28:39PM
10  which is the statistical reviewer's  12:28:42PM
11  report.  It is Exhibit A to 506 and  12:28:46PM
12  specifically if you turn to page 4 of the  12:28:50PM
13  statistical reviewer's report.  12:28:52PM
14      A.   I'm sorry, which table?  12:29:16PM
15      Q.   If you go to page 4 of the  12:29:18PM
16  first report, which is the statistical  12:29:20PM
17  reviewer's report, Exhibit A, there is a  12:29:22PM
18  Table 2, Summary of CSUGIE Incidents.  12:29:22PM
19  That's reporting the, we will call them  12:29:39PM
20  complicated ulcers; are you okay with  12:29:41PM
21  that?                  12:29:43PM
22      A.   Sure.            12:29:43PM
23      Q.   Then we don't have to use an  12:29:43PM
24  acronym.  That is reporting the  12:29:44PM
25  complicated ulcer incidents over the  12:29:44PM

Page 176

1      LEHN - CONFIDENTIAL
2  entire study; is that correct?  12:29:46PM
3      A.   Which one now, which table?  12:29:47PM
4      Q.   2?              12:29:49PM
5      A.   Table 2, correct.        12:29:50PM
6      Q.   And it provides a p-value for  12:29:51PM
7  both -- Celebrex being compared to both  12:29:53PM
8  diclofenac and ibuprofen jointly as 0.45,  12:29:56PM
9  do you see that?            12:29:56PM
10      A.   Correct.            12:30:03PM
11      Q.   That 0.45 number was not  12:30:03PM
12  communicated in the JAMA article, was it?  12:30:05PM
13      A.   I don't believe so, no.  12:30:07PM
14      Q.   So the JAMA article didn't give  12:30:09PM
15  readers the ability to look at all of the  12:30:12PM
16  data and make their own determination, did  12:30:14PM
17  it?                  12:30:18PM
18          MR. WANG: Objection.  12:30:18PM
19      A.   Yeah.  But, again, just in  12:30:19PM
20  context, you know, when I edited a journal  12:30:21PM
21  we wouldn't require all of the data to be  12:30:26PM
22  published, you would have to make  12:30:28PM
23  editorial decisions as to what was  12:30:33PM
24  published.  I don't want to leave the  12:30:34PM
25  impression that it is the norm in the  12:30:36PM

Page 177

1      LEHN - CONFIDENTIAL
2  scientific community that all of the  12:30:37PM
3  underlying data gets published with the  12:30:39PM
4  particular paper being published.  12:30:41PM
5      Q.   The JAMA editors didn't even  12:30:43PM
6  get all of the data, did they?  12:30:45PM
7          MR. WANG: Objection to form.  12:30:48PM
8      A.   They didn't get to make a  12:30:49PM
9  decision about whether they published the  12:30:52PM
10  twelve or the six, they just got the six?  12:30:54PM
11          MR. WANG: Objection.  12:30:54PM
12      A.   I don't really know factually  12:30:54PM
13  what they knew and what they didn't know  12:30:56PM
14  and what transpired between them and the  12:30:58PM
15  authors of the article.        12:31:00PM
16      Q.   Did you review the testimony of  12:31:01PM
17  Catherine DeAngelis in this case?  12:31:04PM
18      A.   I may have.  It doesn't -- it  12:31:09PM
19  doesn't ring a bell as I sit here.  12:31:12PM
20      Q.   Did you review the deposition  12:31:14PM
21  testimony of Drummond Rennie?  12:31:15PM
22      A.   Again, I have reviewed a lot of  12:31:20PM
23  documents.  I don't recall that particular  12:31:22PM
24  one.                  12:31:23PM
25      Q.   Do you recall that either of  12:31:23PM

45 (Pages 174 to 177)

CONFIDENTIAL

Page 178

1         LEHN - CONFIDENTIAL
2    the two editors of JAMA having testified   12:31:25PM
3    that they were lied to and misled by        12:31:27PM
4    receiving only the six-month data and not   12:31:29PM
5    the entire study data?              12:31:31PM
6         MR. WANG: Objection.           12:31:32PM
7         A.   I do recall quotes attributed   12:31:33PM
8    to Mr. Wolfe I think, or Dr. Wolfe to that   12:31:35PM
9    effect.                   12:31:37PM
10        Q.   And do you recall that three of   12:31:37PM
11   the authors of the JAMA article wrote a   12:31:41PM
12   letter to JAMA many months after, I think   12:31:43PM
13   it was in November of 2001, where they      12:31:48PM
14   conceded that they only provided the       12:31:50PM
15   six-month data to the JAMA editorial       12:31:52PM
16   board?                 12:31:56PM
17        MR. WANG: Objection.           12:31:57PM
18        A.   I don't recall that        12:31:58PM
19   specifically as I sit here.  I may have     12:31:58PM
20   been aware of it at some point.  But it    12:32:00PM
21   doesn't ring a bell.          12:32:02PM
22        Q.   In comparing a p-value of 0.09   12:32:05PM
23   to a p-value of 0.45, would you agree that   12:32:08PM
24   those are quantitatively different        12:32:12PM
25   p-values?                12:32:14PM

Page 179

1         LEHN - CONFIDENTIAL
2         MR. WANG: Objection.           12:32:16PM
3         A.   By definition they are       12:32:16PM
4    quantitatively different, correct.        12:32:18PM
5         Q.   What does it mean to have a    12:32:20PM
6    p-value of 0.45, what does that mean with   12:32:22PM
7    respect to quantifying the chance that any   12:32:25PM
8    difference between the two things being    12:32:28PM
9    compared is due to random volatility or    12:32:29PM
10   randomness?              12:32:32PM
11        A.   Well, it would mean that there   12:32:34PM
12   is a 45 percent chance that what you are   12:32:35PM
13   observing is random.           12:32:39PM
14        Q.   And 0.09 p-value would mean    12:32:39PM
15   there is only a 9 percent chance of the    12:32:42PM
16   observation being random?          12:32:44PM
17        A.   That's correct.          12:32:45PM
18        Q.   Would you agree that        12:32:46PM
19   quantitatively 45 percent chance of random   12:32:51PM
20   occurrence compared to 9 percent chance of   12:32:56PM
21   randomness, that those are numerically     12:32:59PM
22   different?               12:33:03PM
23        MR. WANG: Objection.           12:33:03PM
24        A.   By definition they are       12:33:04PM
25   numerically different.  None of that has   12:33:06PM

Page 180

1         LEHN - CONFIDENTIAL
2    any bearing on any opinions regarding      12:33:09PM
3    materiality and loss causation.          12:33:11PM
4         Q.   Now, who defined your         12:33:27PM
5    assignment in this case with respect to    12:33:30PM
6    which days you would look at the intraday   12:33:32PM
7    trading for?               12:33:37PM
8         A.   Can you repeat that?        12:33:40PM
9         Q.   Who defined your assignment --   12:33:41PM
10   you looked at intraday trading I think at   12:33:43PM
11   the 6th and the 8th, correct?          12:33:46PM
12        A.   I mean, I've looked at it on    12:33:49PM
13   all three days now.            12:33:51PM
14        Q.   But you didn't look at the     12:33:52PM
15   intraday trading on the 7th until after    12:33:54PM
16   you saw Dr. Feinstein's rebuttal report,   12:33:57PM
17   correct?                 12:33:59PM
18        A.   That is correct.          12:33:59PM
19        Q.   And even subsequent to that --   12:34:00PM
20        A.   Let me just take that back.  I   12:34:02PM
21   might have looked at it since I had data,   12:34:04PM
22   but I didn't feel it was relevant when I    12:34:06PM
23   filed my initial report.  It became more    12:34:07PM
24   relevant after Dr. Feinstein filed his     12:34:11PM
25   report and I was asked to file a rebuttal   12:34:13PM

Page 181

1         LEHN - CONFIDENTIAL
2    report.                 12:34:15PM
3         Q.   And who defined your assignment   12:34:16PM
4    with respect to which intraday trading you   12:34:17PM
5    would comment on in your report?        12:34:20PM
6         A.   I did.               12:34:21PM
7         Q.   And did you have any          12:34:22PM
8    consultation with counsel before you made   12:34:24PM
9    that decision?              12:34:26PM
10        A.   No consultation with respect to   12:34:27PM
11   what I would look at.  At some point I     12:34:29PM
12   obviously circulated a draft and received   12:34:33PM
13   editorial comments from counsel.         12:34:35PM
14        Q.   Would it be possible in your    12:34:36PM
15   mind to calculate the statistical        12:34:39PM
16   significance of the $1.50 decline between   12:34:42PM
17   9:30 and 10:30 on February 7th, is that    12:34:46PM
18   something you could do?          12:34:49PM
19        A.   I'm sorry, the $1.50 decline    12:34:51PM
20   from 9:30 --              12:34:53PM
21        Q.   We looked at the table before.   12:34:55PM
22   I think we agreed that there was         12:34:57PM
23   approximately a $1.50 decline between      12:34:59PM
24   opening and 10:35 a.m. on February 7th,    12:35:02PM
25   2001; do you remember that?          12:35:05PM

46  (Pages 178 to 181)

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 182

LEHN - CONFIDENTIAL
1
2      MR. WANG: Objection to form.   12:35:06PM
3 I don't believe that's correct or that we  12:35:08PM
4 have discussed that before.        12:35:10PM
5      Q.    You would agree with me we   12:35:11PM
6 talked about that earlier, correct?   12:35:13PM
7      A.    "That" being?         12:35:14PM
8      Q.    The $1.50 decline between the  12:35:15PM
9 opening of trading on February 7th and   12:35:18PM
10 10:35 a.m.                 12:35:20PM
11      MR. WANG: Objection to form.   12:35:22PM
12 Misstates the evidence and prior      12:35:23PM
13 testimony.                12:35:25PM
14      A.    We discussed the decline. And, 12:35:25PM
15 again, I think there is an issue as to   12:35:30PM
16 whether it is $1.50 or is it --      12:35:32PM
17      Q.    $1.48?            12:35:34PM
18      A.    -- or some other number. But I 12:35:35PM
19 do recall that discussion.        12:35:38PM
20      Q.    And we can look at it again.   12:35:39PM
21 But it is somewhere in the range of $1.50,  12:35:40PM
22 give or take a few pennies; is that fair?   12:35:43PM
23      MR. WANG: Objection to the     12:35:46PM
24 form. Misstates the evidence.       12:35:47PM
25      A.    And if you could identify   12:35:48PM

Page 183

LEHN - CONFIDENTIAL
1
2 exactly what time period you are looking   12:35:50PM
3 at, from what minute to what minute?   12:35:52PM
4      Q.    I was just looking up to about 12:35:54PM
5 10:35 in the morning. Pharmacia traded on 12:35:56PM
6 the New York Stock Exchange in 2001?   12:35:58PM
7      A.    It did.          12:36:00PM
8      Q.    And the New York Stock    12:36:00PM
9 Exchange, I think last time -- it opens   12:36:02PM
10 around 9:30?              12:36:05PM
11      A.    That's correct.       12:36:06PM
12      Q.    So the opening of trading at   12:36:06PM
13 approximately 9:30, if you look at 9:30 to 12:36:09PM
14 10:30, that would be approximately an   12:36:12PM
15 hour?                  12:36:14PM
16      A.    That's correct. It would be  12:36:14PM
17 exactly an hour.           12:36:15PM
18      Q.    That's just laying the     12:36:16PM
19 foundation for my question.        12:36:18PM
20      Is there a way as an economist,  12:36:19PM
21 a scientist, a learned man, that you could 12:36:21PM
22 calculate the statistical significance of  12:36:25PM
23 the stock price decline over that hour   12:36:26PM
24 window based on the intraday data?     12:36:28PM
25      A.    There is a way to do that   12:36:32PM

Page 184

LEHN - CONFIDENTIAL
1
2 conceptually. The issue often and the   12:36:36PM
3 thorniness in doing intraday analyses is  12:36:40PM
4 often the data limitations, the extent one 12:36:45PM
5 can get the necessary data to do the    12:36:48PM
6 analysis. But at least at a conceptual   12:36:50PM
7 level there is no reason why you couldn't  12:36:53PM
8 do an equivalent event study type analysis 12:36:55PM
9 on intraday data.            12:36:58PM
10      Q.    And you haven't done that in  12:36:59PM
11 this case though?            12:37:00PM
12      A.    I haven't felt it necessary to 12:37:01PM
13 this point, that's correct.        12:37:03PM
14      Q.    So you don't, as we sit here   12:37:03PM
15 today, you can't or are not planning on   12:37:06PM
16 offering an opinion that the stock price  12:37:10PM
17 decline on February 7th between 9:30 a.m.  12:37:12PM
18 and 10:30 a.m. was not statistically    12:37:16PM
19 significant?              12:37:18PM
20      MR. WANG: Objection to form.   12:37:19PM
21      A.    I haven't been asked by counsel 12:37:20PM
22 to do that. And in my initial report and  12:37:25PM
23 in my rebuttal report I didn't find it   12:37:29PM
24 necessary to do that.          12:37:31PM
25      Q.    And, similarly, you are also   12:37:32PM

Page 185

LEHN - CONFIDENTIAL
1
2 not offering an opinion that the      12:37:35PM
3 approximately $2 stock decline on February 12:37:37PM
4 8th in the morning, the first hour or two  12:37:39PM
5 of trading, we can look at your -- I    12:37:43PM
6 believe it is Exhibit 11, the        12:37:46PM
7 approximately $2 decline between the    12:37:52PM
8 opening and 10:35ish, that you haven't   12:37:54PM
9 done an analysis to determine whether that 12:38:00PM
10 stock decline was statistically      12:38:02PM
11 significant, correct?          12:38:04PM
12      A.    As of this date, I have not,   12:38:04PM
13 that's correct.            12:38:06PM
14      Q.    And counsel has not asked you  12:38:07PM
15 to do that?              12:38:08PM
16      A.    To this date, they have not   12:38:09PM
17 asked me to do that.          12:38:10PM
18      Q.    And as we sit here today, you   12:38:12PM
19 are not planning on testifying about that  12:38:13PM
20 at trial, correct?           12:38:15PM
21      MR. WANG: Objection to form.   12:38:17PM
22      A.    Again, if counsel asks me to   12:38:18PM
23 consider doing that, then I will consider  12:38:20PM
24 doing that.               12:38:22PM
25      Q.    But you have some         12:38:23PM

47 (Pages 182 to 185)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 186

LEHN - CONFIDENTIAL

1           LEHN - CONFIDENTIAL
2    understanding, I mean, you have been doing    12:38:24PM
3    this a long time, you know, if you got --    12:38:26PM
4    for fairness, you have to put in your        12:38:28PM
5    report what you are going to testify at      12:38:30PM
6    trial unless the court blesses, you know,    12:38:32PM
7    the use of some additional testimony that    12:38:34PM
8    hadn't previously been discussed; is that    12:38:37PM
9    your understanding of how the game works?    12:38:38PM
10          MR. WANG: Objection. Calls    12:38:41PM
11   for a legal conclusion.                      12:38:42PM
12   A.    I'm not a lawyer.                       12:38:43PM
13   Q.    That's fair. I will withdraw    12:38:44PM
14   that question.                                12:38:46PM
15          The FDA committee meeting on    12:39:02PM
16   February 7th, that was an open meeting,      12:39:04PM
17   correct?                                      12:39:06PM
18   A.    That's my understanding.               12:39:06PM
19   Q.    And analysts could have been in    12:39:08PM
20   attendance at the meeting?                   12:39:10PM
21   A.    That's my understanding.               12:39:11PM
22   Q.    And the analysts during that    12:39:12PM
23   morning could have had conversations with    12:39:13PM
24   members of the committee or presenters; is    12:39:16PM
25   that fair?                                    12:39:19PM

Page 187

1           LEHN - CONFIDENTIAL
2    A.    I would presume so.              12:39:19PM
3    Q.    Now, you used dummy variables    12:39:21PM
4    in this case for your regression analysis;    12:39:32PM
5    is that correct?                          12:39:35PM
6    A.    That's correct.                     12:39:35PM
7    Q.    What is a dummy variable?          12:39:36PM
8    Explain to the dummy what a dummy variable    12:39:38PM
9    is.                                       12:39:41PM
10   A.    It basically is an indicator    12:39:41PM
11   variable that you turn on, by assigning a    12:39:43PM
12   value of 1 on the relevant date, and then    12:39:47PM
13   on all other dates that particular dummy    12:39:50PM
14   variable takes on the value of zero.      12:39:54PM
15          If in a regression over the    12:39:56PM
16   class period you are trying to identify    12:39:57PM
17   whether the residual return on a given day    12:39:58PM
18   was statistically significant, you would    12:40:02PM
19   put a dummy variable in for that day, and    12:40:03PM
20   then the coefficient on that is the    12:40:05PM
21   residual return and there would be a    12:40:07PM
22   t-statistic corresponding to that    12:40:11PM
23   coefficient or residual return.           12:40:12PM
24   Q.    And the dummy variable you used    12:40:14PM
25   in this case was a three-day dummy    12:40:16PM

Page 188

1           LEHN - CONFIDENTIAL
2    variable; is that correct?    12:40:18PM
3    A.    That's correct.    12:40:19PM
4    Q.    And why did you choose a    12:40:20PM
5    three-day dummy variable?    12:40:22PM
6          MR. WANG: Objection to form.    12:40:23PM
7    A.    Well, first, to start, it is a    12:40:24PM
8    decision that in effect lowers the    12:40:28PM
9    standard error from the regression because    12:40:31PM
10   you are controlling for more days    12:40:33PM
11   effectively, and what that does is it    12:40:35PM
12   makes it easier to find statistical    12:40:37PM
13   significance.    12:40:39PM
14          So as someone who has been    12:40:41PM
15   retained by counsel for defendants, it is    12:40:43PM
16   a conservative assumption in that, if    12:40:47PM
17   anything, it biases in favor of finding    12:40:50PM
18   more statistically significant days, and    12:40:53PM
19   on the day of the alleged corrective    12:40:56PM
20   disclosure basically biases in favor of    12:40:57PM
21   finding a statistically significant    12:41:00PM
22   return.    12:41:02PM
23          The second is a couple of    12:41:03PM
24   practical considerations. One is that    12:41:06PM
25   often there are disputes in litigation    12:41:09PM

Page 189

1           LEHN - CONFIDENTIAL
2    about the timing of different information    12:41:11PM
3    releases, as we are seeing here, whether a    12:41:14PM
4    one-day window or a two-day window is    12:41:18PM
5    appropriate.    12:41:21PM
6          And recognizing that was likely    12:41:22PM
7    going to be the case to mitigate potential    12:41:24PM
8    criticism of the underlying regression    12:41:27PM
9    model, I decided to err on the side of    12:41:29PM
10   being conservative and include three    12:41:33PM
11   separate daily dummy variables, one    12:41:35PM
12   before, one the day of, and one the day    12:41:38PM
13   after.    12:41:41PM
14          But I've also replicated it,    12:41:42PM
15   the analysis, by using only the dummy    12:41:45PM
16   variable for the relevant day and none of    12:41:48PM
17   the results change appreciably.    12:41:50PM
18   Q.    Now, you are offering an    12:41:51PM
19   opinion, or at least I think you are    12:41:52PM
20   offering an opinion that the corrective    12:41:54PM
21   disclosure occurred on February 6th, 2001;    12:41:56PM
22   is that correct?    12:41:59PM
23   A.    That is correct.    12:41:59PM
24   Q.    Could you just give me the full    12:41:59PM
25   bases for that opinion --    12:42:01PM

48  (Pages 186 to 189)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 190

1          LEHN - CONFIDENTIAL
2    A.    For the opinion --        12:42:02PM
3    Q.    -- that it occurred on February 12:42:03PM
4  6th?                    12:42:05PM
5    A.    Sure.  When I look at the      12:42:06PM
6  allegations, and originally I looked at  12:42:09PM
7  the allegations in the complaint, and then 12:42:13PM
8  I secondarily looked at the allegations in 12:42:15PM
9  the second interrogatory response, and     12:42:18PM
10  basically that laid out the specifics as   12:42:23PM
11  to what the plaintiffs were alleging were  12:42:25PM
12  false and misleading about various         12:42:27PM
13  statements made by defendants during the   12:42:29PM
14  class period.                12:42:31PM
15          I then took those allegations     12:42:33PM
16  as in the second interrogatory response    12:42:39PM
17  and then I looked at the materials, the    12:42:42PM
18  FDA briefing materials that were released  12:42:44PM
19  on the morning of February 6th and I saw   12:42:47PM
20  in the statistical reviewer's briefing     12:42:51PM
21  document that all of the information that   12:42:54PM
22  would be necessary to correct the alleged  12:42:57PM
23  misrepresentations was contained therein. 12:43:00PM
24    Q.   And I guess I should ask my       12:43:02PM
25  question more specifically.          12:43:04PM

Page 191

1          LEHN - CONFIDENTIAL
2     What's the basis of your belief      12:43:06PM
3  that the briefing materials were posted on 12:43:07PM
4  February 6th, 2001?              12:43:09PM
5    A.    Well, I know that Bloomberg      12:43:12PM
6  issued a release that morning around 10    12:43:18PM
7  o'clock, on the morning of the 6th, and    12:43:21PM
8  they had a link and still have a link, it  12:43:25PM
9  is still a live link to the FDA briefing   12:43:27PM
10  materials, and they were citing from the   12:43:30PM
11  briefing materials at 10 a.m. in the       12:43:33PM
12  morning, which indicates that that link    12:43:36PM
13  was available prior to the Bloomberg       12:43:40PM
14  article.                 12:43:43PM
15          I don't know precisely what      12:43:44PM
16  time, but sometime prior to the        12:43:45PM
17  publication of the Bloomberg article.      12:43:47PM
18    Q.   Other than the Bloomberg link, 12:43:48PM
19  is there any other basis for your opinion  12:43:51PM
20  that the corrective disclosure occurred on 12:43:52PM
21  February 6th, 2001?              12:43:54PM
22          MR. WANG:  Objection to form.  12:44:06PM
23  But go ahead.                12:44:08PM
24    A.    I don't recall whether -- as I 12:44:08PM
25  sit here, I'm not aware of anything       12:44:11PM

Page 192

1          LEHN - CONFIDENTIAL
2  definitive.  I'm hesitating because I      12:44:13PM
3  don't recall whether Dr. Fiorino makes     12:44:16PM
4  reference to when that information was      12:44:19PM
5  released.  I just don't recall one way or  12:44:20PM
6  the other.                12:44:22PM
7    Q.    So other than Bloomberg and      12:44:23PM
8  possibly Dr. Fiorino, is there any other   12:44:24PM
9  bases for your opinion that the corrective 12:44:27PM
10  disclosure occurred on February 6th, 2001? 12:44:29PM
11    A.    There are also -- I mean, there 12:44:34PM
12  was a news article the day where I believe 12:44:37PM
13  an analyst, Ira Loss, with I think         12:44:40PM
14  Washington Analysis, was quoted, and was   12:44:45PM
15  quoted in the context of the hearing the   12:44:49PM
16  next day.  And my recollection is that the 12:44:51PM
17  quote certainly implied that he was aware  12:44:55PM
18  of materials that had been released that   12:44:59PM
19  day.                    12:45:01PM
20          And there may have been other   12:45:02PM
21  analysts that make reference to releases   12:45:04PM
22  of information on February 6th.        12:45:06PM
23    Q.    And those are analysts that      12:45:07PM
24  published their reports on the 7th and 8th 12:45:09PM
25  though, correct?              12:45:11PM

Page 193

1          LEHN - CONFIDENTIAL
2    A.    Well, again, the Ira Loss quote 12:45:12PM
3  that I'm thinking of was not an analyst    12:45:14PM
4  report per se, but it was a news story     12:45:16PM
5  that came across the wires I believe on    12:45:18PM
6  the afternoon of the 6th and he was quoted 12:45:21PM
7  in that article.              12:45:24PM
8    Q.    But you are not aware of any    12:45:25PM
9  analyst reports being published regarding  12:45:28PM
10  the CLASS trial on February 6th; is that   12:45:29PM
11  correct?                 12:45:32PM
12    A.    That's correct.          12:45:32PM
13    Q.    And you are aware of multiple   12:45:32PM
14  analyst reports being published on the 7th 12:45:34PM
15  and 8th?                 12:45:36PM
16          MR. WANG:  Objection to form.  12:45:38PM
17  Vague and ambiguous.            12:45:39PM
18    A.    I am aware that -- again, the   12:45:39PM
19  only thing I'm going on is the date on the 12:45:43PM
20  analyst reports.  Sometimes analyst        12:45:47PM
21  reports might be distributed to        12:45:49PM
22  institutional clients before they are      12:45:50PM
23  released to the broader public.  So we say 12:45:51PM
24  not published on the 6th.  I don't know    12:45:55PM
25  firsthand whether some of that analyst     12:45:56PM

49  (Pages 190 to 193)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 194

LEHN - CONFIDENTIAL

1
2  information had not been distributed to        12:45:59PM
3  clients of the respective firms.                  12:46:02PM
4       Q.    But you don't have any evidence  12:46:04PM
5  that the reports weren't -- that the            12:46:05PM
6  reports were distributed on a day other      12:46:07PM
7  than the date that they are dated; is that   12:46:09PM
8  correct?                                        12:46:12PM
9          MR. WANG: Objection to form.     12:46:12PM
10      A.    I don't have any factual           12:46:13PM
11 evidence of it, that's correct.                12:46:14PM
12      Q.    Now, did you discount any       12:46:16PM
13 evidence as unimportant in your             12:46:20PM
14 determination that the corrective            12:46:24PM
15 disclosure occurred on February 6th, 2001?  12:46:24PM
16         MR. WANG: Objection.               12:46:26PM
17      A.    I'm sorry, did I discount --      12:46:27PM
18      Q.    Did you discount any evidence  12:46:29PM
19 to the contrary as unimportant in making   12:46:30PM
20 your determination that the briefing          12:46:30PM
21 documents were made available on February  12:46:36PM
22 6th, 2001?                                      12:46:38PM
23         MR. WANG: Objection.               12:46:39PM
24      A.    Well, as I sit here, I don't       12:46:40PM
25 recall any contrary evidence that would    12:46:45PM

Page 195

LEHN - CONFIDENTIAL

1
2  rise to the level that it would cause me      12:46:47PM
3  to question the assumption, which seems    12:46:49PM
4  rather unambiguous in light of the            12:46:53PM
5  Bloomberg story.                               12:46:54PM
6       Q.    Could you take a look back at    12:46:56PM
7  Philips' affidavit, Exhibit 506. And          12:46:58PM
8  specifically on the third page of the          12:47:10PM
9  Philips affidavit, paragraph 8, where         12:47:12PM
10 Mr. Philips, the representative of the          12:47:18PM
11 FDA, states "The documents referred to in  12:47:20PM
12 paragraphs A through C of paragraph 3" --  12:47:23PM
13 which are the three FDA reviewer            12:47:26PM
14 reports -- "were posted on the FDA          12:47:28PM
15 website," and then it gives the link, on      12:47:31PM
16 or about February 7th, 2001.                  12:47:33PM
17        Do you see that?                      12:47:35PM
18      A.    I see the language on or about  12:47:36PM
19 February 7th, 2001.                           12:47:38PM
20      Q.    And did you consider the FDA    12:47:40PM
21 representative's affidavit in making your    12:47:42PM
22 assessment that the corrective disclosure   12:47:45PM
23 occurred on February 6th, 2001, not         12:47:47PM
24 February 7th, 2001?                           12:47:50PM
25      A.    Well, based on the language     12:47:51PM

Page 196

LEHN - CONFIDENTIAL

1
2  here, it seems perfectly consistent with     12:47:53PM
3  what Mr. Philips said, because February     12:47:56PM
4  6th is on or about February 7th, and in      12:47:57PM
5  light of the Bloomberg story at 10 a.m. on  12:48:01PM
6  the morning of February 6th, this does not  12:48:04PM
7  cause me any hesitancy in assuming that    12:48:06PM
8  the corrective disclosure was made on the   12:48:09PM
9  morning of February 6th.                      12:48:11PM
10      Q.    Other than the date on the       12:48:12PM
11 Bloomberg link, have you done any other    12:48:13PM
12 independent investigation to determine      12:48:15PM
13 that the documents were actually posted on  12:48:17PM
14 the Internet on February 6th as opposed to  12:48:20PM
15 February 7th?                                 12:48:22PM
16      A.    Well, that is pretty compelling  12:48:24PM
17 evidence from my point of view. But no, I  12:48:27PM
18 haven't done any additional investigative   12:48:30PM
19 work to determine that.                        12:48:32PM
20      Q.    Now, is it fair to say that you   12:48:38PM
21 considered analyst reports in coming up      12:48:41PM
22 with your opinions in this case?               12:48:42PM
23      A.    More for texture and context.   12:48:44PM
24 I don't think that analyst reports in and     12:48:48PM
25 of themself are probative of materiality     12:48:50PM

Page 197

LEHN - CONFIDENTIAL

1
2  or loss causation.  But, you know, I do     12:48:55PM
3  find it is often helpful to see what          12:48:58PM
4  analysts are saying to provide a context    12:49:02PM
5  for the actual empirical analysis.            12:49:04PM
6       Q.    And can you turn to paragraph  12:49:07PM
7  36 of your report.                            12:49:08PM
8          And in paragraph 36, you say       12:49:28PM
9  "In order to provide additional context     12:49:31PM
10 and insight regarding how the market        12:49:32PM
11 perceives certain announcements, I          12:49:34PM
12 examined commentary by securities analysts  12:49:38PM
13 who followed Pharmacia."  Is that correct?  12:49:40PM
14      A.    That's correct.                   12:49:42PM
15      Q.    And is it accurate that           12:49:42PM
16 analysts can have an impact on the          12:49:45PM
17 market's view of a particular company?      12:49:47PM
18      A.    They certainly can with respect  12:49:51PM
19 to, you know, changes in projections, and   12:49:54PM
20 there is some academic literature            12:50:01PM
21 suggesting that what particular matters to   12:50:03PM
22 the market are changes in their target       12:50:07PM
23 prices for the companies.                     12:50:09PM
24        So yeah, as a general matter,        12:50:13PM
25 what analysts say can be informative to     12:50:14PM

50  (Pages 194 to 197)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 198

1          LEHN - CONFIDENTIAL
2   the market.                    12:50:17PM
3      Q.     And you referenced the camera  12:50:18PM
4   factors earlier?               12:50:20PM
5      A.     Correct.             12:50:22PM
6      Q.     What are the camera factors?  12:50:22PM
7      A.     Well, the camera factors are  12:50:23PM
8   criteria used by one court to determine  12:50:26PM
9   whether or not the market for a security  12:50:33PM
10  is efficient.                  12:50:35PM
11     Q.     And one of those camera factors 12:50:36PM
12  is whether or not there is analyst       12:50:39PM
13  coverage; is that correct?     12:50:42PM
14     A.     I think not only -- and again,  12:50:42PM
15  I'm not a lawyer -- but not only whether  12:50:44PM
16  there is analyst coverage, but I think it  12:50:46PM
17  is the number of analysts that under the  12:50:48PM
18  camera court matter.           12:50:51PM
19     Q.     And here there are -- you are  12:50:52PM
20  not disputing the efficiency of the       12:50:56PM
21  market, correct?               12:50:57PM
22     A.     Say again.           12:50:58PM
23     Q.     You are not disputing the  12:50:58PM
24  market for Pharmacia stock in 2000-2001  12:51:00PM
25  was efficient, correct?        12:51:02PM

Page 199

1          LEHN - CONFIDENTIAL
2      A.     That's correct.      12:51:03PM
3      Q.     And part of the basis for that  12:51:03PM
4   conclusion is the fact that there is      12:51:05PM
5   significant analyst coverage, correct?  12:51:07PM
6      A.     No. I mean, I consistently,  12:51:09PM
7   when asked about the camera factors, say  12:51:11PM
8   that the only one that really is          12:51:14PM
9   determinative of market efficiency is the  12:51:15PM
10  last one, which is whether new information  12:51:17PM
11  is reflected in a company's security price  12:51:19PM
12  and how quickly does it get reflected in  12:51:22PM
13  the security's price.          12:51:24PM
14         The other factors, including  12:51:26PM
15  number of analysts, are correlated with  12:51:29PM
16  market efficiency but not determinative in  12:51:32PM
17  and of itself.                 12:51:34PM
18         So, for example, it is       12:51:35PM
19  perfectly conceivable to me that you could  12:51:36PM
20  have some companies where there are no     12:51:38PM
21  analysts and yet the market will react     12:51:40PM
22  quickly to new information.     12:51:43PM
23     Q.     And analyst coverage is  12:51:46PM
24  correlated with market efficiency because  12:51:47PM
25  the analysts can help disseminate  12:51:49PM

Page 200

1          LEHN - CONFIDENTIAL
2   information quickly?           12:51:53PM
3         MR. WANG: Objection. Asked  12:51:54PM
4   and answered.                  12:51:55PM
5      A.     Not so much that in my opinion. 12:51:56PM
6   I think Dr. Feinstein and I agree a bit on  12:51:58PM
7   another issue, where in talking about why  12:52:01PM
8   the analysts didn't change their          12:52:03PM
9   projections, I think in his deposition     12:52:05PM
10  made reference to the fact that they are  12:52:07PM
11  sluggish in that, more sluggish perhaps  12:52:09PM
12  than the market, I forget exactly how he  12:52:12PM
13  put it.                        12:52:16PM
14         You know, I view the analysts'  12:52:16PM
15  commentary more as a surrogate for how the  12:52:19PM
16  market is perceiving information. But it  12:52:21PM
17  is not as if -- and this is probably where  12:52:24PM
18  we disagree -- it is not as if the market  12:52:26PM
19  just waits for the analyst to weigh in     12:52:28PM
20  before they start buying and selling       12:52:30PM
21  shares.                        12:52:32PM
22     Q.     Well, that may be true, the  12:52:32PM
23  start of that process may precede analyst  12:52:35PM
24  reports, but analyst reports can certainly  12:52:39PM
25  influence investors' decision to buy or  12:52:41PM

Page 201

1          LEHN - CONFIDENTIAL
2   sell stock; is that correct?   12:52:44PM
3      A.     As I indicated, it depends on  12:52:45PM
4   what you mean by the analyst reports. The  12:52:48PM
5   recommendations have been found to be      12:52:51PM
6   associated with significant stock price  12:52:53PM
7   reactions, and so when an analyst          12:52:56PM
8   downgrade or upgrade stocks, on average,  12:53:00PM
9   it doesn't mean all the time, but on       12:53:02PM
10  average there tend to be price reactions.  12:53:05PM
11         And, as I mentioned, more       12:53:07PM
12  recent research is finding that what       12:53:08PM
13  particular matters in the recommendation  12:53:10PM
14  are the target price recommendations.  12:53:13PM
15     Q.     And the whole premise of an  12:53:14PM
16  analyst's job, if they weren't -- if the  12:53:18PM
17  information they were communicating was  12:53:22PM
18  not impacting investors' decisions to buy  12:53:23PM
19  and sell, what else would they -- what     12:53:26PM
20  would be the point of having analysts?  12:53:28PM
21         MR. WANG: Objection.           12:53:31PM
22     A.     Well, as I indicated before,  12:53:32PM
23  analysts play multiple roles. I mean, one  12:53:34PM
24  is the report, and that's a big part. But  12:53:36PM
25  they also, you know, they speak at  12:53:38PM

51  (Pages 198 to 201)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 202

LEHN - CONFIDENTIAL

1
2  conferences and they engage in marketing.   12:53:40PM
3  So we ask what is the point of having   12:53:43PM
4  analysts.  I think they play multiple   12:53:46PM
5  roles within these firms.   12:53:48PM
6      Q.     But one of the roles is to get   12:53:49PM
7  information to market participants to help   12:53:51PM
8  them make a decision about whether to buy   12:53:53PM
9  or sell the security the analyst is   12:53:55PM
10  covering; is that correct?   12:53:57PM
11     A.     As a general matter, that's   12:53:58PM
12  correct.   12:54:00PM
13     Q.     And can you turn back to   12:54:00PM
14  Exhibit 504, that's your AOL report and   12:54:04PM
15  specifically page 20, paragraph 73.   12:54:32PM
16     A.     I'm sorry, which paragraph?   12:54:43PM
17     Q.     If you could turn to page 20,   12:54:44PM
18  paragraph 73.   12:54:46PM
19          And in paragraph 73, you wrote   12:54:48PM
20  "As the analyst reports and public press   12:54:52PM
21  indicate the market was continuing to   12:54:55PM
22  evaluate the impact of the earnings   12:54:58PM
23  announcement and the SEC investigation, it   12:55:00PM
24  is appropriate to measure the impact of   12:55:03PM
25  this information over the course of both   12:55:05PM

Page 203

LEHN - CONFIDENTIAL

1
2  July 25 and July 26, 2002."   12:55:08PM
3          You wrote that in your report   12:55:11PM
4  on October 20th, 2006, correct?   12:55:12PM
5      A.     That's correct.   12:55:16PM
6      Q.     Now, turning back to your   12:55:17PM
7  report in this case, on paragraph 37 on   12:55:21PM
8  page 10 -- I'm sorry for making you go   12:55:25PM
9  back and forth.   12:55:35PM
10     A.     Okay.   12:55:40PM
11     Q.     You wrote "Hence, the views of   12:55:40PM
12  security analysts provide additional   12:55:42PM
13  context that can inform an opinion as to   12:55:44PM
14  whether information is material."   12:55:47PM
15          You wrote that, correct?   12:55:49PM
16     A.     I did.   12:55:49PM
17     Q.     And you believe that to be   12:55:50PM
18  correct?   12:55:51PM
19     A.     That's correct.   12:55:51PM
20     Q.     And also in your report you   12:55:52PM
21  have an exhibit here, which is Exhibit 2A,   12:55:56PM
22  and it is a 12-page exhibit.  And that   12:56:02PM
23  exhibit is entitled Analyst Reports   12:56:16PM
24  Considered; is that correct?   12:56:19PM
25     A.     That is correct.   12:56:21PM

Page 204

LEHN - CONFIDENTIAL

1
2      Q.     And you considered these   12:56:22PM
3  analyst reports in developing your opinion   12:56:23PM
4  in this case?   12:56:24PM
5      A.     That is correct.   12:56:25PM
6      Q.     Now, I want to show you what   12:56:27PM
7  I'm marking as Plaintiffs' Exhibit 509.   12:56:31PM
8          (Plaintiffs' Exhibit 509 marked 12:56:34PM
9  for identification.)   12:56:36PM
10          MR. WANG:  When you are   12:56:55PM
11  finished with this document, do you want   12:56:55PM
12  to break for lunch?   12:56:57PM
13          MR. SAHAM:  Sure, let's just   12:56:58PM
14  finish this document.   12:57:00PM
15          MR. WANG:  That would be   12:57:00PM
16  perfect.   12:57:01PM
17     Q.     And for the record, Exhibit 509 12:57:01PM
18  is a Bear Stearns analyst report dated   12:57:03PM
19  February 7th, 2001 and it bears Bates   12:57:05PM
20  numbers BEAR 00023 through 25.   12:57:08PM
21          And is this one of the analyst   12:57:14PM
22  reports you considered in this case?   12:57:17PM
23     A.     It is, yes.   12:57:18PM
24     Q.     And the report is dated   12:57:19PM
25  February 7th, 2001, but it has the closing   12:57:21PM

Page 205

LEHN - CONFIDENTIAL

1
2  price of $56.13 up at the top.  Do you see   12:57:25PM
3  that?   12:57:29PM
4      A.     I do.   12:57:29PM
5      Q.     Does this indicate that the   12:57:29PM
6  report was not published until sometime   12:57:30PM
7  after the close of trading on February   12:57:34PM
8  7th?   12:57:36PM
9      A.     I believe that's correct.  I   12:57:38PM
10  believe that was the closing price on the   12:57:41PM
11  7th.   12:57:43PM
12     Q.     And when does the New York   12:57:43PM
13  Stock Exchange close?   12:57:46PM
14     A.     At 4 p.m. eastern time.   12:57:46PM
15     Q.     So this report has to have been 12:57:48PM
16  written and disseminated at some point   12:57:52PM
17  after 4 o'clock on the 7th; is that   12:57:54PM
18  correct?   12:57:57PM
19          MR. WANG:  Objection.   12:57:57PM
20     Q.     Because it indicates the   12:57:58PM
21  closing price?   12:58:00PM
22          MR. WANG:  Compound.   12:58:02PM
23     A.     Again, I don't know factually.   12:58:02PM
24  But I certainly believe that to be the   12:58:04PM
25  case.   12:58:06PM

52  (Pages 202 to 205)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 206

1        LEHN - CONFIDENTIAL
2       Q.     Fair enough.  I'll take that.  12:58:06PM
3       And there is certain        12:58:08PM
4   information in here about Pharmacia      12:58:11PM
5   Corporation, in fact, it is in the title,  12:58:13PM
6   Pharmacia Corp.; is that correct?      12:58:15PM
7       A.     That's correct.        12:58:17PM
8       Q.     And if you look down under the  12:58:17PM
9   Key Points, and then there is like three  12:58:22PM
10  stars next to each of the key points, do  12:58:25PM
11  you see that on the first page?        12:58:27PM
12      A.     I do.        12:58:28PM
13      Q.     And the second key point says  12:58:28PM
14  "In reviewing Celebrex, consensus among  12:58:35PM
15  the Advisory Panel members was that     12:58:38PM
16  PHA/PFE's Celebrex did not establish a    12:58:45PM
17  meaningful safety advantage in comparison  12:58:47PM
18  to NSAIDs (ibuprofen and diclofenac)."   12:58:50PM
19      Now, would you agree that that  12:58:55PM
20  is negative information for Pharmacia   12:58:57PM
21  Corporation?        12:58:59PM
22      MR. WANG:  Objection.        12:59:00PM
23      A.     Well, I think to be cautious I  12:59:03PM
24  would go as far as to say that it doesn't  12:59:06PM
25  appear to be positive, and the question   12:59:09PM

Page 207

1        LEHN - CONFIDENTIAL
2   is, you know, is it negative or how    12:59:10PM
3   negative.  It may be.        12:59:13PM
4       Q.     But you would agree with me it  12:59:15PM
5   is not good news?        12:59:17PM
6       A.     I would agree that it is not  12:59:19PM
7   positive news.        12:59:23PM
8       Q.     So if it is not positive news,  12:59:24PM
9   it is -- the only other alternative is bad  12:59:27PM
10  news?        12:59:29PM
11      A.     Or neutral.        12:59:30PM
12      Q.     So it is either neutral or bad.  12:59:31PM
13      In reading this, could you view  12:59:33PM
14  it as neutral that they did not establish  12:59:35PM
15  a meaningful safety advantage?  Isn't the  12:59:37PM
16  whole point of the CLASS trial to     12:59:40PM
17  establish a meaningful safety advantage  12:59:41PM
18  that your product is better or safer than  12:59:43PM
19  the ones it is being compared to?  Isn't  12:59:45PM
20  that the point of CLASS?        12:59:47PM
21      A.     Again, it depends on the     12:59:54PM
22  context in which you are asking, is it  12:59:55PM
23  positive, negative or neutral.  And in the  12:59:57PM
24  context of the total mix of information in  12:59:59PM
25  the market at that point, it could be    01:00:01PM

Page 208

1        LEHN - CONFIDENTIAL
2   neutral in the sense that this was sort of  01:00:03PM
3   already known.  In a sense, that is not  01:00:07PM
4   new information.        01:00:12PM
5       Q.     We ruled out it is not good  01:00:13PM
6   news, though, we are on the same page   01:00:15PM
7   there, right?        01:00:17PM
8       A.     It doesn't appear to be    01:00:17PM
9   positive news, that's correct.    01:00:18PM
10      Q.     And you just personally sitting  01:00:20PM
11  here, would you characterize it as bad    01:00:21PM
12  news?        01:00:23PM
13      MR. WANG:  Objection to form.  01:00:24PM
14      Q.     The fact that they didn't    01:00:27PM
15  establish a meaningful safety advantage in  01:00:28PM
16  comparison to ibuprofen and diclofenac,    01:00:30PM
17  would you characterize that as negative    01:00:33PM
18  news for Pharmacia?        01:00:35PM
19      MR. WANG:  Objection.  Asked  01:00:36PM
20  and answered.        01:00:37PM
21      A.     But, again, I'm not sure it is  01:00:37PM
22  news.  You are asking is it negative news.  01:00:39PM
23  It may not be news.  The briefing    01:00:41PM
24  materials on the morning of February 6th  01:00:43PM
25  had the statistical data that would allow  01:00:47PM

Page 209

1        LEHN - CONFIDENTIAL
2   investors, analysts, or anyone else to    01:00:51PM
3   reach their judgment as to this, and this  01:00:55PM
4   is simply describing the feeling among the  01:00:58PM
5   Advisory Panel members.        01:01:01PM
6       And if this was after the close  01:01:03PM
7   on the 7th, which seems a reasonable    01:01:07PM
8   presumption, then the market already knew  01:01:10PM
9   the Advisory Panel decision as of this    01:01:14PM
10  point in time.        01:01:17PM
11      Q.     And you referenced earlier in  01:01:17PM
12  the day that the Vioxx reports were posted  01:01:19PM
13  on the Internet on the morning of February  01:01:22PM
14  7th; is that correct?        01:01:24PM
15      A.     That's correct.        01:01:25PM
16      Q.     And looking at the third set of  01:01:26PM
17  key points, the last sentence, the Bear  01:01:29PM
18  Stearns analyst -- the three Bear Stearns  01:01:32PM
19  analysts who co-authored this report wrote  01:01:35PM
20  "Because Vioxx has a less favorable CV    01:01:39PM
21  side effect profile, the possibility    01:01:43PM
22  exists that a warning informing physicians  01:01:45PM
23  of the CV risk could be added to Vioxx's  01:01:48PM
24  label.  A negative Vioxx label revision    01:01:52PM
25  would provide Pharmacia/Pfizer a major    01:01:55PM

53  (Pages 206 to 209)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 210

1      LEHN - CONFIDENTIAL
2  competitive marketing advantage."         01:02:01PM
3        Do you see that?           01:02:02PM
4   A.    I do see that.            01:02:03PM
5   Q.    And is it fair to say that       01:02:04PM
6  would be good news for Pharmacia at least  01:02:05PM
7  as characterized by the three Bear Stearns 01:02:07PM
8  analysts?                    01:02:10PM
9        MR. WANG:  Objection.       01:02:11PM
10   A.    When you say "that," meaning   01:02:12PM
11  what?                       01:02:14PM
12   Q.    The sentence that I just read   01:02:14PM
13  to you that Pharmacia and Pfizer would    01:02:15PM
14  have a major competitive marketing        01:02:17PM
15  advantage.                   01:02:19PM
16        MR. WANG:  Objection.       01:02:20PM
17   Q.    Would you characterize that as 01:02:20PM
18  good news or bad news?             01:02:21PM
19   A.    Again, is what you are asking  01:02:23PM
20  me to characterize the opinion of Bear    01:02:25PM
21  Stearns or if we simply accept the fact   01:02:28PM
22  that it was a major competitive marketing  01:02:30PM
23  advantage, is that good or bad?          01:02:34PM
24        The fact that Bear Stearns is  01:02:36PM
25  saying it in and of itself doesn't say    01:02:38PM

Page 211

1      LEHN - CONFIDENTIAL
2  that is good news because the market might 01:02:41PM
3  be discounting Bear Stearns' opinion.     01:02:43PM
4   Q.    These three Bear Stearns      01:02:43PM
5  analysts in this February 7th, 2001 report 01:02:47PM
6  are characterizing the Vioxx CV side       01:02:50PM
7  effects as positive news for Pharmacia.   01:02:54PM
8  That is their opinion, correct?         01:02:56PM
9        MR. WANG:  Objection.       01:02:58PM
10  Misstates the document.             01:02:58PM
11   A.    It says -- I think it is saying 01:02:59PM
12  that if there is a negative Vioxx label    01:03:03PM
13  revision, that would provide Pharmacia    01:03:05PM
14  with a major competitive marketing        01:03:09PM
15  advantage.                   01:03:11PM
16   Q.    And a major competitive       01:03:11PM
17  marketing advantage would be good news for 01:03:13PM
18  Pharmacia, correct?              01:03:15PM
19   A.    According to what Bear Stearns 01:03:17PM
20  is suggesting in this one part of their    01:03:20PM
21  report, that would presumably be positive  01:03:25PM
22  news.                       01:03:28PM
23   Q.    And then looking at the last   01:03:29PM
24  page of Exhibit 509, there's a box or a   01:03:31PM
25  table labeled Financial Importance of     01:03:37PM

Page 212

1      LEHN - CONFIDENTIAL
2  COX-2 Drugs for Respective Companies, and 01:03:41PM
3  it is in U.S. millions of dollars.  Do you 01:03:44PM
4  see that?                    01:03:47PM
5   A.    I do.                  01:03:47PM
6   Q.    And on the left-hand column it  01:03:47PM
7  has the company, you know, Pharmacia,     01:03:50PM
8  Pfizer and Merck; do you see that?       01:03:52PM
9   A.    I do.                  01:03:54PM
10   Q.    And then under that it has the  01:03:54PM
11  Percentage of Pharma Revenues.  Do you see 01:03:56PM
12  that?                       01:03:59PM
13   A.    I do.                  01:03:59PM
14   Q.    And here it appears that the   01:04:00PM
15  Bear Stearns analysts are breaking out the 01:04:03PM
16  percentage of revenue for just the        01:04:06PM
17  pharmaceutical portions of each of these   01:04:09PM
18  three companies' business; is that       01:04:12PM
19  correct?                     01:04:13PM
20   A.    It appears to be.          01:04:13PM
21   Q.    And that would be revenues that 01:04:14PM
22  would be not the entire company's revenue, 01:04:17PM
23  but just the company's             01:04:20PM
24  pharmaceutical-based revenues; is that    01:04:23PM
25  correct?                     01:04:24PM

Page 213

1      LEHN - CONFIDENTIAL
2   A.    I would have to read how       01:04:24PM
3  exactly they calculated it.  But I presume 01:04:27PM
4  that to be the case.               01:04:29PM
5   Q.    And Pharmacia did have a       01:04:30PM
6  substantial agriculture and chemicals     01:04:31PM
7  business; is that correct?           01:04:34PM
8   A.    They had an agriculture and    01:04:35PM
9  chemicals business.  In terms of         01:04:38PM
10  substantial, I don't know if you are      01:04:42PM
11  referring to value or sales.  But they did 01:04:43PM
12  have an ag and chemical business.        01:04:46PM
13   Q.    And Dr. Feinstein removed that  01:04:48PM
14  from his regression in order to get a     01:04:50PM
15  picture of their pharmaceutical business?  01:04:53PM
16        MR. WANG:  I object.        01:04:56PM
17   A.    Inappropriately so.         01:04:56PM
18   Q.    I understand you have a       01:04:58PM
19  disagreement about that, correct?        01:04:59PM
20   A.    Yes.                   01:05:01PM
21   Q.    But these analysts, these three 01:05:01PM
22  Bear Stearns analysts, seem to be doing    01:05:03PM
23  the same thing that Dr. Feinstein did,    01:05:05PM
24  they broke out, when they were looking at  01:05:07PM
25  the percentage of revenues, they just     01:05:09PM

54  (Pages 210 to 213)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 214

LEHN - CONFIDENTIAL

1
2     looked at it as a percentage of the        01:05:10PM
3     pharmaceuticals business, correct?        01:05:12PM
4             MR. WANG:  Objection.        01:05:14PM
5        A.    Again, I would have to go back  01:05:14PM
6     and look at their calculations.  But it     01:05:17PM
7     appears that they are doing that.        01:05:19PM
8        Q.    And the reason -- what they are  01:05:20PM
9     communicating here in this box is they are  01:05:23PM
10    trying to show the percentage of        01:05:25PM
11    pharmaceutical-based revenues derived from  01:05:27PM
12    Vioxx, Pharmacia and Pfizer's sale of     01:05:30PM
13    COX-2s, correct?        01:05:36PM
14       A.    That appears to be what they     01:05:37PM
15    are doing.        01:05:39PM
16       Q.    And here, Merck, you understand  01:05:40PM
17    Merck was the maker of Vioxx, correct?     01:05:42PM
18       A.    Correct.        01:05:45PM
19       Q.    And in 2000, about 10.7 of     01:05:45PM
20    Merck's pharmaceutical sales were derived  01:05:48PM
21    from Vioxx sales, is that correct,        01:05:50PM
22    according to this box or table?        01:05:54PM
23       A.    According to the table, that's  01:05:55PM
24    right.        01:05:57PM
25       Q.    And the analysts were        01:05:57PM

Page 215

LEHN - CONFIDENTIAL

1
2     estimating that approximately 15.4 percent  01:05:58PM
3     of Merck's pharmaceutical revenues would     01:06:00PM
4     be derived from the sale of Vioxx in 2001;  01:06:03PM
5     is that correct?        01:06:07PM
6        A.    It appears to be the case.     01:06:08PM
7        Q.    And for 2002 they were        01:06:09PM
8     estimating that the percentage of        01:06:10PM
9     pharmaceutical revenues that Merck would     01:06:14PM
10    derive from Vioxx would rise to 17.1        01:06:16PM
11    percent; is that correct?        01:06:19PM
12       A.    That appears to be correct.     01:06:20PM
13       Q.    And then it also breaks out the  01:06:21PM
14    numbers for Pharmacia and Pfizer, what     01:06:23PM
15    percentage of their revenues would come     01:06:26PM
16    from COX-2s in those three years, or were  01:06:27PM
17    estimated to be expected to come from        01:06:31PM
18    COX-2s in those three years?        01:06:34PM
19       A.    I'm sorry, was that a question?  01:06:36PM
20       Q.    It is also estimating the same  01:06:37PM
21    proportion of pharmaceutical revenues that  01:06:39PM
22    were expected to be derived from COX-2s     01:06:41PM
23    for Pharmacia and Pfizer as well, correct?  01:06:44PM
24       A.    Apparently.        01:06:46PM
25       Q.    And, you know, the numbers are  01:06:47PM

Page 216

LEHN - CONFIDENTIAL

1
2     the numbers.  You could compare the        01:06:50PM
3     percentages of COX-2 derived        01:06:54PM
4     pharmaceutical revenues between Merck,     01:06:57PM
5     Pfizer and Pharmacia from looking at this  01:07:00PM
6     table?        01:07:02PM
7        A.    Correct.        01:07:02PM
8             MR. SAHAM:  Okay, we can take a  01:07:23PM
9     break now.        01:07:25PM
10            THE VIDEOGRAPHER:  The time is  01:07:26PM
11    approximately 1:07 p.m.  This is the end     01:07:27PM
12    of media number three.  We are off the     01:07:30PM
13    record.        01:07:32PM
14            (Luncheon recess:  1:07 p.m.)  01:07:32PM
15
16
17
18
19
20
21
22
23
24
25

Page 217

LEHN - CONFIDENTIAL

1
2     A F T E R N O O N   S E S S I O N   01:07:32PM
3         1:54 p.m.        01:07:32PM
4     K E N N E T H   M.  L E H N, resumed.     01:53:57PM
5             THE VIDEOGRAPHER:  The time is  01:53:57PM
6     approximately 1:54 p.m.  This is the        01:54:24PM
7     beginning of media number four.  We are on  01:54:27PM
8     the record.        01:54:29PM
9     CONTINUED EXAMINATION        01:54:29PM
10    BY MR. SAHAM:        01:54:30PM
11       Q.    Dr. Lehn, can you turn back to  01:54:30PM
12    Exhibit 11 of your report, which we have     01:54:33PM
13    marked as Exhibit 500, and this is for     01:54:34PM
14    Pharmacia intraday trading for February     01:54:41PM
15    8th.        01:54:43PM
16       A.    Okay.        01:54:45PM
17       Q.    And you have that box there at  01:54:45PM
18    about 3:05 p.m. or 3:06 p.m. where you say  01:54:54PM
19    "a federal panel recommended that Merck     01:54:57PM
20    would get a label change"?        01:55:00PM
21       A.    That's correct.        01:55:02PM
22       Q.    And what was the basis for your  01:55:03PM
23    opinion that the announcement regarding     01:55:05PM
24    the recommendation occurred at 3:06 p.m.?  01:55:08PM
25       A.    Well, that's certainly when the  01:55:13PM

55  (Pages 214 to 217)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 218

LEHN - CONFIDENTIAL

1        LEHN - CONFIDENTIAL
2   news came across the Dow Jones newswire.    01:55:15PM
3        Q.    Did you discount any other    01:55:20PM
4   media as unimportant or somehow inaccurate  01:55:21PM
5   on the timing of this information?        01:55:25PM
6        MR. WANG:  Objection to form.       01:55:28PM
7        A.    No, I did not.                01:55:29PM
8        Q.    Did you consider the Washington  01:55:29PM
9   AP "Scientists Advise on New Drug," that    01:55:33PM
10  is timed at 12:51, did you consider that   01:55:41PM
11  news report?                              01:55:45PM
12        A.    I considered it.  As I sit    01:55:46PM
13  here, I know Dr. Feinstein raises that.    01:55:49PM
14  But I have to refresh my memory as to the  01:55:52PM
15  contents of that.                         01:55:54PM
16        Q.    Let me show you what I'm      01:55:55PM
17  marking as Plaintiffs' Exhibit 510.  If    01:55:56PM
18  you would take a look at that.            01:55:58PM
19        (Plaintiffs' Exhibit 510 marked 01:56:00PM
20  for identification.)                      01:56:02PM
21        (Witness perusing document.)        01:56:06PM
22        Q.    And, for the record,          01:56:10PM
23  Plaintiffs' Exhibit 510 is a one-page AP    01:56:11PM
24  wire, "Scientists Advise On New Drug       01:56:17PM
25  Vioxx," February 8, 2001, and the time     01:56:21PM

Page 219

1        LEHN - CONFIDENTIAL
2   stamp is 12:51 and 32 seconds.            01:56:25PM
3        And the first sentence of the         01:56:30PM
4   article -- well, it says "Washington AP"    01:56:31PM
5   and then it says "The arthritis drug Vioxx  01:56:35PM
6   appears to cause fewer ulcers than the      01:56:38PM
7   older painkiller naproxen and its label    01:56:41PM
8   should say so, the government's scientific  01:56:43PM
9   advisors decided Thursday in a boon for    01:56:45PM
10  maker Merck & Company."                   01:56:48PM
11        And then if you drop down to         01:56:50PM
12  the third full paragraph, it says "The     01:56:51PM
13  recommendation comes as Vioxx and         01:56:55PM
14  competitor Celebrex, two popular arthritis  01:56:58PM
15  painkillers, jockey for sales."           01:57:01PM
16        Do you see that?                    01:57:04PM
17        A.    That's correct.              01:57:05PM
18        Q.    Does it appear that information 01:57:05PM
19  reached the market at 12:51 p.m., that the  01:57:09PM
20  scientific advisors had decided to         01:57:13PM
21  recommend the label change for Vioxx;      01:57:20PM
22  isn't that what this newspaper article     01:57:26PM
23  appears to indicate?                      01:57:27PM
24        A.    It is.  My recollection is it  01:57:28PM
25  wasn't the actual vote at that point, it   01:57:30PM

Page 220

1        LEHN - CONFIDENTIAL
2   was more of an informal vote.             01:57:32PM
3        Q.    But to the extent this reporter 01:57:35PM
4   or other individuals at the Advisory       01:57:39PM
5   Committee hearing learned earlier in the   01:57:43PM
6   day that that vote was going to occur,     01:57:47PM
7   couldn't that have been impacting -- allow  01:57:50PM
8   the market to absorb that information?     01:57:54PM
9        MR. WANG:  Objection to form.       01:57:57PM
10        A.    It could.  And if you back up  01:57:58PM
11  if you look at Exhibit 11, you will see    01:58:00PM
12  that around 12:51 there is a point at      01:58:02PM
13  which it is higher than it was later in    01:58:08PM
14  the day, so the decline subsequently was    01:58:10PM
15  actually even larger than it was based on  01:58:13PM
16  the 3:06 data.                            01:58:16PM
17        Q.    But in Exhibit 11 you indicate 01:58:18PM
18  that this information reached the market   01:58:20PM
19  at 3:06, not 12:51; is that correct?       01:58:23PM
20        A.    Well, this particular         01:58:26PM
21  information did reach the market at 3:06   01:58:28PM
22  from the Dow Jones News Service.          01:58:31PM
23        Q.    But the fact that this article 01:58:33PM
24  reports using past tense that the advisory 01:58:35PM
25  committee had decided and that the         01:58:37PM

Page 221

1        LEHN - CONFIDENTIAL
2   recommendation comes, referring to it in   01:58:38PM
3   past tense, does this impact your opinion  01:58:41PM
4   in any way?                               01:58:44PM
5        MR. WANG:  Objection, misstates 01:58:46PM
6   the document.                             01:58:49PM
7        A.    When you say "this article,"   01:58:50PM
8   meaning which article?                    01:58:52PM
9        Q.    What I have marked as Exhibit  01:58:52PM
10  510, the Washington Post AP article dated  01:58:52PM
11  -- or time stamped 12:51 on February 8th,  01:58:53PM
12  2001.                                     01:58:56PM
13        A.    When you say changed my       01:58:56PM
14  opinion, my opinion about what?           01:58:58PM
15        Q.    About what was causing the    01:59:00PM
16  decline in Pharmacia stock on February    01:59:01PM
17  8th, 2001.  Well, let me strike that       01:59:07PM
18  question.                                 01:59:11PM
19        Are you offering an opinion as      01:59:11PM
20  to what caused the decline in Pharmacia   01:59:13PM
21  stock price on February 8th, 2001?        01:59:14PM
22        A.    Well, again, I haven't done a  01:59:16PM
23  formal analysis with statistical testing   01:59:18PM
24  to allow me to opine as to what the cause  01:59:22PM
25  was.                                     01:59:25PM

56  (Pages 218 to 221)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 222

1       LEHN - CONFIDENTIAL
2     But Dr. Feinstein apparently   01:59:26PM
3 believes that there was this delayed    01:59:28PM
4 reaction to the alleged corrective    01:59:31PM
5 disclosure on February 6th, and he uses   01:59:32PM
6 the stock price decline on February 8th   01:59:35PM
7 for his materiality and loss causation   01:59:38PM
8 analysis.               01:59:41PM
9     And I pointed out in my    01:59:43PM
10 rebuttal report that there was other    01:59:44PM
11 information released on this day and he   01:59:46PM
12 did not properly account for other    01:59:49PM
13 information released on this day, which is  01:59:51PM
14 one of the criticisms I have of his    01:59:54PM
15 analysis.               01:59:57PM
16   Q.   And, again, neither this 12:51 01:59:58PM
17 Washington AP story nor the 3:06 news   02:00:01PM
18 story that you reference in Exhibit 11,   02:00:04PM
19 neither of those two publications could   02:00:08PM
20 have caused the approximately $2 stock   02:00:10PM
21 drop between 9:30 a.m. and 10:35 a.m., is  02:00:14PM
22 that correct, given that they occurred   02:00:19PM
23 subsequent in time?       02:00:21PM
24   A.   And, again, as we talked about 02:00:21PM
25 earlier, obviously the events themselves  02:00:23PM

Page 223

1       LEHN - CONFIDENTIAL
2 could not have. One can't rule out at   02:00:25PM
3 least theoretically that anticipation of  02:00:29PM
4 those events might have.     02:00:32PM
5   Q.   So if an event is anticipated, 02:00:33PM
6 would that prevent that event from being  02:00:35PM
7 intervening if the market takes account of 02:00:37PM
8 it before it happens?      02:00:40PM
9     MR. WANG: Objection.    02:00:43PM
10   A.   I'm not sure what you mean by  02:00:43PM
11 "intervening." But by anticipating it   02:00:45PM
12 means that you anticipate it with a    02:00:48PM
13 certain probability and then when the   02:00:51PM
14 event actually occurs it is the     02:00:53PM
15 realization of that event.     02:00:55PM
16     So you can have both     02:00:58PM
17 anticipation, and then when the event   02:00:59PM
18 occurs, you can have another price    02:01:01PM
19 reaction, similar to takeovers, that often 02:01:02PM
20 there is speculation before a takeover bid 02:01:07PM
21 and you see a run-up in the target    02:01:09PM
22 company's stock price, and then when the  02:01:11PM
23 bid is announced, you get another pop in  02:01:12PM
24 the stock price because now the     02:01:15PM
25 probability is one that that they received 02:01:16PM

Page 224

1       LEHN - CONFIDENTIAL
2 a bid.              02:01:18PM
3   Q.   So the price can be impacted by 02:01:18PM
4 anticipation of the probability of an   02:01:20PM
5 event occurring; is that correct?    02:01:22PM
6     MR. WANG: Objection.    02:01:24PM
7   A.   Conceptually, that's correct.  02:01:24PM
8   Q.   So if the market on the morning 02:01:26PM
9 of February 7th, after seeing -- or    02:01:28PM
10 incorporating Dr. Goldkind's remarks   02:01:32PM
11 lowered its assessment of the probability  02:01:37PM
12 of the Advisory Committee voting to revise 02:01:40PM
13 the Celebrex label, that presentation   02:01:47PM
14 could have impacted the Pharmacia stock  02:01:51PM
15 price on the morning of February 7th; is  02:01:54PM
16 that correct?          02:01:57PM
17   A.   As a purely theoretical matter, 02:01:57PM
18 anything that might have caused the market 02:02:03PM
19 to believe that the Advisory Panel would  02:02:04PM
20 vote against recommending a label change,  02:02:09PM
21 theoretically could have an impact on   02:02:13PM
22 Pharmacia stock price.      02:02:16PM
23     But that is separate from the  02:02:18PM
24 issue at hand which is whether investors  02:02:20PM
25 suffered a loss when the alleged     02:02:24PM

Page 225

1       LEHN - CONFIDENTIAL
2 corrective disclosures occurred and all of 02:02:25PM
3 that occurred on February 6th.    02:02:27PM
4   Q.   Did you do anything to test to  02:02:29PM
5 rule out the possibility that the    02:02:39PM
6 publication of the analyst report "CLASS  02:02:44PM
7 Flunks Out" and the publication of the   02:02:49PM
8 Bear Stearns analyst report, Exhibit 509  02:02:52PM
9 that we just looked at after the close on  02:02:55PM
10 February 7th, 2001, that the publication  02:02:58PM
11 of those reports caused the $2 stock price 02:03:00PM
12 decline at the open between 9:30 and 10:30 02:03:07PM
13 a.m. on February 8th?      02:03:10PM
14   A.   No. And, again, that wasn't  02:03:12PM
15 relevant for my opinion.      02:03:14PM
16   Q.   But you do agree that analyst  02:03:16PM
17 reports can in certain circumstances move  02:03:20PM
18 the market price of a stock; is that   02:03:22PM
19 correct?           02:03:24PM
20   A.   Under certain circumstances  02:03:24PM
21 But not because they are simply    02:03:29PM
22 regurgitating information that has been   02:03:33PM
23 previously released, but instead because  02:03:34PM
24 they either reveal new information which  02:03:36PM
25 the market previously hadn't had, or they  02:03:39PM

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 226

1          LEHN - CONFIDENTIAL
2    might be changing their target prices,      02:03:43PM
3    their recommendations, and that's known in  02:03:45PM
4    the academic literature to be associated    02:03:47PM
5    with price changes.              02:03:49PM
6          So in the AOL report that you    02:03:50PM
7    presented to me before, as I was going      02:03:53PM
8    through looking at how AOL's stock price     02:03:56PM
9    reacted to key events throughout, I used a  02:04:00PM
10   one-day window.  When it came to that one   02:04:03PM
11   event there was speculation about an SEC    02:04:05PM
12   investigation on day one, and then the      02:04:08PM
13   next day there was a Sanford Bernstein      02:04:10PM
14   report that revealed new information based  02:04:14PM
15   on conversations with management that       02:04:16PM
16   provided additional information to the      02:04:18PM
17   information that had been revealed the day  02:04:19PM
18   before.                          02:04:22PM
19          In a sense it was correcting    02:04:23PM
20   the information that had been presented     02:04:25PM
21   the day before, and you basically saw the   02:04:27PM
22   price go up on one day and then go down     02:04:31PM
23   the next day and the combined effect was    02:04:33PM
24   not significant.                 02:04:35PM
25          That's very different than what 02:04:37PM

Page 227

1          LEHN - CONFIDENTIAL
2    we have here, the alleged corrective        02:04:38PM
3    disclosure occurred on the morning of       02:04:40PM
4    February 6th and there was no correction    02:04:42PM
5    to that correction.              02:04:44PM
6     Q.    You don't think Goldkind's       02:04:46PM
7    statements that there is no material        02:04:47PM
8    difference between these drugs was          02:04:49PM
9    corrective of the company's briefing        02:04:52PM
10   document and Mr. Hassan's presentation of   02:04:54PM
11   the JAMA article on February 6th?          02:04:57PM
12    A.    It did not correct the          02:04:59PM
13   allegations beyond what was corrected in    02:05:04PM
14   the briefing materials that was released    02:05:07PM
15   publicly on February 6th.            02:05:09PM
16          You know, as I have indicated    02:05:12PM
17   several times, if you look at the           02:05:13PM
18   plaintiffs' allegations in the second       02:05:15PM
19   interrogatory response and then you look    02:05:19PM
20   at the statistical reviewer's briefing      02:05:21PM
21   document released on February 6th, all of   02:05:23PM
22   those alleged misrepresentations were       02:05:27PM
23   corrected within the first several pages    02:05:29PM
24   of that statistical reviewer's briefing     02:05:31PM
25   document.                        02:05:33PM

Page 228

1          LEHN - CONFIDENTIAL
2          And Dr. Goldkind did not, with  02:05:34PM
3    all due respect, from what I've seen, did   02:05:36PM
4    not add anything beyond what had been       02:05:39PM
5    revealed the day before.            02:05:42PM
6     Q.    If the market had fully         02:05:43PM
7    absorbed the information in the briefing    02:05:44PM
8    documents, why did so many analysts feel    02:05:47PM
9    that they needed to publish their reports   02:05:49PM
10   on the 7th and 8th, in your opinion?        02:05:51PM
11    A.    There was a lot happening that   02:05:54PM
12   week.  You had the Advisory Panel vote and  02:05:56PM
13   then you had the Vioxx vote and you had     02:05:59PM
14   the Vioxx briefing materials.        02:06:01PM
15          And I'm not an analyst, but if  02:06:03PM
16   there was something really important        02:06:06PM
17   released on the morning of the 6th,         02:06:08PM
18   knowing how competition in markets occurs   02:06:10PM
19   especially among analysts, you can bet      02:06:13PM
20   your bottom dollar that reports would have  02:06:16PM
21   been out there and they are on days the     02:06:18PM
22   company announces earnings, you see lots    02:06:21PM
23   of analysts commenting.              02:06:25PM
24          But in case you had the         02:06:26PM
25   information released on February 6th, no    02:06:28PM

Page 229

1          LEHN - CONFIDENTIAL
2    significant stock price reaction, over 4    02:06:30PM
3    million shares traded, so people were       02:06:33PM
4    trading, but there was no significant       02:06:35PM
5    revaluation of Pharmacia.  And then you     02:06:37PM
6    have these two important hearings back to   02:06:39PM
7    back.                            02:06:42PM
8          And it seems to me that a        02:06:44PM
9    reasonable response would be if the         02:06:45PM
10   information that came out on the 6th is      02:06:47PM
11   not that important, but you've got a lot     02:06:49PM
12   of other stuff happening in the next two    02:06:52PM
13   days, they are going to issue the reports    02:06:54PM
14   in the next two days.                02:06:56PM
15    Q.    Would you agree that the        02:06:57PM
16   information in the disclosure on February   02:06:58PM
17   6th was discussed at length on February     02:07:00PM
18   7th at the Advisory Committee meeting?      02:07:02PM
19    A.    Again, I haven't read the        02:07:05PM
20   transcript word for word, but yes, I think  02:07:07PM
21   it is fair to say it was discussed.         02:07:11PM
22    Q.    And would you agree that the     02:07:12PM
23   vote of the Advisory Committee on the       02:07:14PM
24   afternoon of the 7th was based on the       02:07:17PM
25   entire study data?               02:07:19PM

Veritext National Deposition & Litigation Services
866 299-5127

CONFIDENTIAL

Page 230

```
 1         LEHN - CONFIDENTIAL
 2      A.    But that's irrelevant.  That is    02:07:20PM
 3   a distinct event.  That is actions of        02:07:22PM
 4   individuals on the information that had       02:07:26PM
 5   been disclosed.  The actual corrective        02:07:28PM
 6   disclosure occurred on the 6th.  How other  02:07:30PM
 7   people, third parties, react to that        02:07:34PM
 8   information in my opinion is not             02:07:36PM
 9   appropriate to look at if one is trying to  02:07:38PM
10   determine whether there is loss causation.  02:07:40PM
11      Q.    Did you consider the               02:07:42PM
12   internal -- internally what the people      02:07:44PM
13   close to CLASS at Pharmacia and Pfizer      02:07:46PM
14   thought about the likelihood of a label     02:07:49PM
15   change after they saw the entire study      02:07:52PM
16   data in early March or April of 2000?       02:07:53PM
17      A.    I don't recall seeing it, nor      02:07:56PM
18   would it be relevant.  It is totally        02:07:58PM
19   irrelevant for purposes of loss causation   02:08:01PM
20   and materiality because what you want to    02:08:03PM
21   know for purposes of loss causation is      02:08:04PM
22   what did the market know, when did they     02:08:07PM
23   know it, and how did it react.  And         02:08:09PM
24   internal communications are completely      02:08:11PM
25   irrelevant to that issue.                   02:08:13PM
```

Page 231

```
 1         LEHN - CONFIDENTIAL
 2      Q.    Are you offering an opinion        02:08:15PM
 3   that the Advisory Committee vote on         02:08:17PM
 4   February 7th is an intervening event that   02:08:19PM
 5   would sever any additional stock price      02:08:22PM
 6   reaction to the disclosures in the          02:08:26PM
 7   Advisory Briefing Committee reports posted  02:08:31PM
 8   and the discussion at the Advisory          02:08:36PM
 9   Committee in the morning and early          02:08:37PM
10   afternoon of the 7th?                       02:08:39PM
11         MR. WANG:  Objection.                 02:08:41PM
12      A.    I'm sorry, I'm not sure I          02:08:41PM
13   understand the question.                    02:08:43PM
14      Q.    Are you offering an opinion        02:08:43PM
15   that the vote of the Advisory Committee on  02:08:44PM
16   February 7th is an intervening event that   02:08:46PM
17   severs any causation from the facts that    02:08:49PM
18   were revealed to the market on February     02:08:53PM
19   6th and earlier in the day on February      02:08:55PM
20   7th?                                        02:08:57PM
21         MR. WANG:  Objection, vague.          02:08:58PM
22      A.    I don't understand what you        02:08:59PM
23   mean by an intervening event.  Intervening  02:09:02PM
24   of what?                                    02:09:05PM
25      Q.    Well, you offered an opinion       02:09:05PM
```

Page 232

```
 1         LEHN - CONFIDENTIAL
 2   about the Advisory Committee vote on the    02:09:07PM
 3   afternoon of February 7th, correct?  You    02:09:11PM
 4   are offering an opinion in this case?       02:09:13PM
 5      A.    That is correct.                   02:09:14PM
 6      Q.    And what is your opinion as to     02:09:15PM
 7   how that impacted the company's stock       02:09:16PM
 8   price?                                      02:09:18PM
 9      A.    Well, again, I haven't done a      02:09:18PM
10   statistical analysis, nor did I think it    02:09:22PM
11   was necessary to form an opinion, because   02:09:24PM
12   it is irrelevant to my opinion as to loss   02:09:26PM
13   causation and materiality.  It is a         02:09:30PM
14   separate event.                             02:09:31PM
15         The corrective disclosure --         02:09:32PM
16   the alleged corrective disclosure was made  02:09:33PM
17   on February 6th.  Dr. Feinstein and I       02:09:35PM
18   agree that the market for Pharmacia stock   02:09:40PM
19   is efficient.  The appropriate day to look  02:09:41PM
20   at is February 6th.  That's the day the     02:09:44PM
21   alleged corrective disclosure occurred.     02:09:47PM
22   If some third party acted on that           02:09:49PM
23   information the next day, that is a          02:09:51PM
24   discrete, separate event.  It is distinct   02:09:54PM
25   from the alleged corrective disclosure.     02:09:56PM
```

Page 233

```
 1         LEHN - CONFIDENTIAL
 2   It might have some association with it      02:09:59PM
 3   because maybe that decision was based on    02:10:01PM
 4   that disclosure, but it is a separate       02:10:02PM
 5   event.                                      02:10:05PM
 6         And to commingle that with the       02:10:06PM
 7   alleged corrective disclosure, in my        02:10:08PM
 8   opinion, it is inappropriate and it         02:10:10PM
 9   results in an unreliable opinion with       02:10:12PM
10   respect to loss causation.                  02:10:15PM
11      Q.    If the evidence is presented       02:10:16PM
12   and the jury or the trier of fact accepts   02:10:20PM
13   that the company was aware as of the first  02:10:22PM
14   day of the class period that they would be  02:10:25PM
15   unable based on the entire study data, the  02:10:28PM
16   entire CLASS data that was concealed from   02:10:32PM
17   the market, that they would be unable to    02:10:34PM
18   get the label change that they were asking  02:10:36PM
19   for, or they were going to be unable to     02:10:39PM
20   get the removal of the GI NSAID warning,    02:10:41PM
21   would that type of evidence in any way      02:10:44PM
22   impact your opinion that the vote was an    02:10:46PM
23   intervening event that could not be         02:10:51PM
24   predicted by the company and could not be   02:10:53PM
25   considered for loss causation purposes?     02:10:55PM
```

Page 234

```
1          LEHN - CONFIDENTIAL
2      A.   It wouldn't affect it at all.   02:10:59PM
3   Because what I look to is what the      02:11:00PM
4   plaintiffs allege were the             02:11:02PM
5   misrepresentations, and what you just  02:11:03PM
6   described as far as I recall was not   02:11:05PM
7   contained in either the complaint or in 02:11:06PM
8   the second interrogatory response.     02:11:08PM
9          And as a loss causation person  02:11:11PM
10  I look at what the allegations are and 02:11:14PM
11  then I look at the alleged corrective  02:11:15PM
12  disclosures.  And I don't consider new 02:11:17PM
13  allegations that are now thrown in if they 02:11:21PM
14  are not in the complaint or in the second 02:11:24PM
15  interrogatory response.                02:11:26PM
16     Q.   What if the court instructed   02:11:27PM
17  you to consider certain evidence, you  02:11:29PM
18  still wouldn't consider it?            02:11:31PM
19          MR. WANG:  Objection.          02:11:32PM
20     A.   Well, obviously if counsel or  02:11:32PM
21  the court were to ask me to consider that, 02:11:35PM
22  I would consider it.                   02:11:37PM
23     Q.   Well, have you testified at    02:11:38PM
24  trial before?                          02:11:40PM
25     A.   I have.                        02:11:41PM
```

Page 235

```
1          LEHN - CONFIDENTIAL
2      Q.   And was the complaint involved 02:11:41PM
3   in any way in your testimony at trial, or 02:11:43PM
4   did you testify about the facts as they 02:11:45PM
5   came in before the jury in the courtroom? 02:11:48PM
6      A.   Well, I've testified at trial  02:11:50PM
7   in a number of cases.  As I sit here, I 02:11:53PM
8   obviously can't recall with precision all 02:11:56PM
9   the cases and all the facts in those   02:11:58PM
10  cases.  But it certainly is my practice to 02:12:02PM
11  look to the complaint or interrogatory  02:12:07PM
12  responses to identify what is being    02:12:10PM
13  alleged and then to do proper loss     02:12:13PM
14  causation analysis.                    02:12:16PM
15          I take those allegations and   02:12:18PM
16  determine whether there is a scientific 02:12:20PM
17  basis to conclude that investors suffered 02:12:23PM
18  losses because of those allegations.   02:12:25PM
19     Q.   But you didn't consider        02:12:27PM
20  evidence as to whether the company     02:12:28PM
21  believed internally that the entire study 02:12:30PM
22  data would not support a label change? 02:12:35PM
23     A.   That was irrelevant given the  02:12:38PM
24  allegations.                           02:12:40PM
25     Q.   I want to show you what has    02:12:40PM
```

Page 236

```
1          LEHN - CONFIDENTIAL
2   been marked previously in this case as 02:12:44PM
3   Plaintiffs' Exhibit 414.               02:12:46PM
4          Could you take a look at that   02:12:49PM
5   document.  And this is an e-mail chain 02:12:50PM
6   between two Pharmacia -- I'm sorry, two 02:12:57PM
7   Pfizer medical doctors/scientists, and 02:13:01PM
8   Mona Wahba, who was a Pfizer medical   02:13:05PM
9   director, writes -- on the first day of 02:13:08PM
10  the class period, April 17th, 2000, writes 02:13:11PM
11  "The data won't support the original    02:13:14PM
12  intent of modify the GI warning, agree  02:13:16PM
13  with you need to be communicated."      02:13:20PM
14          And that's in response to an    02:13:22PM
15  e-mail from Lori Shafner where she says 02:13:23PM
16  "If we know that we will not achieve the 02:13:26PM
17  original intent to modify the NSAID GI  02:13:28PM
18  warning, should we communicate to Pfizer 02:13:29PM
19  senior management?"                     02:13:31PM
20          And I just want to clarify that 02:13:31PM
21  it's irrelevant to your opinion whether or 02:13:35PM
22  not Pharmacia/Pfizer internally knew that 02:13:38PM
23  they wouldn't get a label change on the 02:13:43PM
24  first day of the class period.          02:13:44PM
25     A.   It is irrelevant to my opinion 02:13:46PM
```

Page 237

```
1          LEHN - CONFIDENTIAL
2   with respect to materiality and loss   02:13:48PM
3   causation, that's correct.             02:13:50PM
4      Q.   Earlier you referenced that the 02:13:51PM
5   market could be assessing earlier in the 02:13:55PM
6   day the probability of how the vote would 02:13:58PM
7   occur.  Do you recall that?            02:14:00PM
8      A.   Correct.                       02:14:01PM
9      Q.   And we also talked about there 02:14:02PM
10  was a $1.50 stock price decline in the 02:14:04PM
11  early morning hours of February 7th.  Do 02:14:09PM
12  you remember that?                     02:14:11PM
13     A.   Correct.                       02:14:11PM
14     Q.   And you are not testifying     02:14:12PM
15  that -- strike that.                   02:14:20PM
16          You haven't done any sort of   02:14:20PM
17  scientific work to rule out that the stock 02:14:22PM
18  price decline early on February 7th, that 02:14:25PM
19  that stock price decline was in         02:14:29PM
20  anticipation of a negative vote.  Have you 02:14:33PM
21  formed any opinion as to whether that   02:14:37PM
22  stock price decline is related to the   02:14:39PM
23  market's anticipation of the company    02:14:41PM
24  getting a negative vote?                02:14:43PM
25          MR. WANG:  Objection.          02:14:46PM
```

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 238

LEHN - CONFIDENTIAL

1       A.     As I indicated, I haven't done  02:14:47PM
2   any statistical analysis that would allow   02:14:49PM
3   me to opine as to the cause of the        02:14:52PM
4   movements in Pharmacia stock price on      02:14:59PM
5   February 7th, which, again, I indicate was  02:15:00PM
6   not statistically significant according to  02:15:05PM
7   my event study.                      02:15:07PM
8       But even if one were to assume  02:15:08PM
9   that the decline in Pharmacia stock price   02:15:11PM
10  on the morning of February 7th was in      02:15:13PM
11  anticipation of an adverse vote by the     02:15:16PM
12  Advisory Panel and if one were to         02:15:19PM
13  hypothetically assume that that was        02:15:21PM
14  statistically significant, it would have    02:15:22PM
15  no bearing on my opinion because that      02:15:24PM
16  would be a price response to an event that  02:15:26PM
17  is distinct from the alleged corrective     02:15:29PM
18  disclosures, all of which occurred on the   02:15:32PM
19  morning of February 6th.               02:15:34PM
20      Q.     And it is your opinion that    02:15:36PM
21  under no circumstances can a -- well,      02:15:38PM
22  strike that question.                  02:15:43PM
23      I want to show you what I'm        02:15:44PM
24  marking as Plaintiffs' Exhibit 511.        02:15:52PM

Page 239

LEHN - CONFIDENTIAL

1       (Plaintiffs' Exhibit 511 marked 02:15:54PM
2   for identification.)                    02:15:56PM
3       Q.     Could you take a look at that 02:16:38PM
4   document and tell me if you recognize it.  02:16:39PM
5       A.     It looks familiar.          02:16:41PM
6       Q.     And this is an article you   02:16:42PM
7   authored entitled "CEO Turnover After     02:16:43PM
8   Acquisitions: Are Bad Bidders Fired?"      02:16:46PM
9       A.     That's correct.            02:16:52PM
10      Q.     And this is an analysis you did 02:16:52PM
11  looking at market reaction to CEO turnover 02:16:54PM
12  information?                         02:16:59PM
13      A.     Not so much that, but it was  02:17:02PM
14  looking at stock price reactions to         02:17:04PM
15  announcements of takeovers and then seeing 02:17:06PM
16  whether or not those stock price reactions  02:17:10PM
17  were associated with subsequent firings of  02:17:13PM
18  chief executive officers.  So do CEOs who  02:17:16PM
19  make, quote, bad acquisitions            02:17:20PM
20  systematically get fired subsequently.     02:17:24PM
21      Q.     And one of the things you did  02:17:27PM
22  as part of this paper is you did an        02:17:28PM
23  analysis, a regression type analysis       02:17:30PM
24  looking at cumulative abnormal returns     02:17:34PM

Page 240

LEHN - CONFIDENTIAL

1   over time?                           02:17:38PM
2       A.     Again, not exactly.  I       02:17:40PM
3   estimated the cumulative abnormal returns  02:17:42PM
4   around takeover announcements for         02:17:46PM
5   companies in the sample.  In the course of 02:17:50PM
6   doing an event study you use regression    02:17:53PM
7   analysis.  So I did use regression        02:17:55PM
8   analysis, but that was used to estimate    02:17:57PM
9   the cumulative abnormal returns.          02:17:59PM
10      Q.     And as part of the regression  02:18:01PM
11  analysis you selected an event window,     02:18:03PM
12  correct?                            02:18:06PM
13      A.     For the takeovers, correct.   02:18:06PM
14      Q.     And in this case you used a    02:18:09PM
15  multiple-day event window; is that        02:18:11PM
16  correct?                            02:18:12PM
17      A.     I believe so.  And, again, as I 02:18:12PM
18  indicated earlier, that is the norm when   02:18:14PM
19  you have a large sample.  I think I had --  02:18:16PM
20  we had about 714 acquisitions here.        02:18:19PM
21      Q.     And you utilized a five-day    02:18:23PM
22  event window in assessing the cumulative   02:18:26PM
23  abnormal return following the events at    02:18:28PM
24  issue?                              02:18:30PM

Page 241

LEHN - CONFIDENTIAL

1       A.     I would have to refresh my    02:18:30PM
2   memory.  If you can direct me to the page. 02:18:32PM
3       Q.     Sure.  There is the Empirical  02:18:34PM
4   Design, Section C, starting at page 1768   02:18:35PM
5   on to 1769.                          02:18:39PM
6       A.     Right.  Okay.              02:18:46PM
7       Q.     And I guess you said "right."  02:18:55PM
8   Is that in response to my question or do   02:18:57PM
9   you want me to read the question back?     02:18:59PM
10      A.     You can read it back.        02:19:00PM
11      (The record was read.)            02:19:19PM
12      A.     Well, there are multiple      02:19:20PM
13  windows.  The one-day window, day zero, a  02:19:22PM
14  three-day window, minus one/plus one, a    02:19:28PM
15  seven-day window, minus one/plus five, an  02:19:33PM
16  11-day window, minus five/plus five, and   02:19:37PM
17  then a 26-day window, minus five/plus 20.  02:19:41PM
18      Q.     So you looked at several      02:19:46PM
19  different windows in writing this article,  02:19:48PM
20  correct?                            02:19:49PM
21      A.     That is correct.            02:19:50PM
22      Q.     And all of them except for one 02:19:50PM
23  involved multiple days; is that correct?   02:19:53PM
24      A.     That is correct.            02:19:55PM

61  (Pages 238 to 241)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 242

```
1         LEHN - CONFIDENTIAL
2      Q.     So at least for the purposes of  02:19:56PM
3   your design, your empirical design for the  02:19:58PM
4   research involved in this paper, you did    02:20:01PM
5   utilize multi-day windows; is that          02:20:03PM
6   correct?                    02:20:06PM
7      A.     Right.  And as I indicated        02:20:06PM
8   earlier there is nothing wrong with using   02:20:08PM
9   multi-day windows if the facts and          02:20:10PM
10  circumstances dictate it.  So it is not a   02:20:14PM
11  dogma that you should never use a           02:20:16PM
12  multi-day window.  But there is a reason    02:20:19PM
13  why in a large sample study in an academic  02:20:21PM
14  journal that I and others use long          02:20:25PM
15  windows, notwithstanding the efficient      02:20:28PM
16  market hypothesis that says new             02:20:30PM
17  information should be rapidly absorbed in   02:20:32PM
18  companies' stock prices.                    02:20:37PM
19          The first reason is when you        02:20:38PM
20  are doing a large sample study before, as   02:20:39PM
21  I indicated before with Patell and          02:20:41PM
22  Wolfson, the researcher, and certainly      02:20:45PM
23  this researcher, didn't make a              02:20:46PM
24  determination as to the efficiency of the   02:20:47PM
25  market for each one of those 714 stocks.    02:20:49PM
```

Page 243

```
1         LEHN - CONFIDENTIAL
2   And therefore it is normal in the academic  02:20:53PM
3   literature for large samples to report the  02:20:56PM
4   one-day event, and then insofar that the    02:20:58PM
5   market for some of the securities is        02:21:04PM
6   inefficient, to replicate the result over   02:21:05PM
7   longer windows.                    02:21:08PM
8          But if a researcher determined      02:21:09PM
9   that the market for every security here     02:21:12PM
10  was efficient and the only purpose of the   02:21:14PM
11  study was to see how quickly the market     02:21:17PM
12  absorbed that information, a one-day        02:21:19PM
13  window would be fine.  But that's not the   02:21:22PM
14  case here.                    02:21:24PM
15          Second is when you've got a         02:21:24PM
16  large sample, in this case 714 companies,   02:21:26PM
17  unlike in litigation where a lot of         02:21:29PM
18  resources are spent trying to find the      02:21:32PM
19  time of certain information releases,       02:21:34PM
20  academics for the most part with large      02:21:37PM
21  samples don't try to track down the time    02:21:40PM
22  at which information was released.  And so  02:21:42PM
23  that means that you might have a date, a     02:21:47PM
24  calendar date on which a takeover was       02:21:49PM
25  announced, but as an academic you don't     02:21:52PM
```

Page 244

```
1         LEHN - CONFIDENTIAL
2   know whether it occurred before the market  02:21:55PM
3   opened, during the trading day, or after    02:21:57PM
4   the market closed, in which case your day   02:21:59PM
5   zero might not be the appropriate day, it   02:22:02PM
6   might be day plus one, the first day that   02:22:04PM
7   the market had to absorb the information.   02:22:06PM
8   So that's a second reason.                  02:22:08PM
9          A third reason is the research      02:22:09PM
10  question, and the research question         02:22:12PM
11  sometimes dictates a long window.  Here we  02:22:16PM
12  were looking at the market's overall        02:22:19PM
13  assessment of takeover decisions company    02:22:23PM
14  by company.  So we would estimate the       02:22:27PM
15  abnormal returns for each company and then  02:22:30PM
16  see the extent to which that was            02:22:33PM
17  associated with the firing of CEOs.  It     02:22:35PM
18  wasn't to simply test how quickly the       02:22:38PM
19  market absorbed information that came out    02:22:40PM
20  on the takeover announcement date.          02:22:43PM
21          So, for example, in takeovers       02:22:45PM
22  you often have a release that a company is  02:22:49PM
23  making a bid for another company on day     02:22:52PM
24  zero.  And then additional information      02:22:54PM
25  comes out in the ensuing days or weeks      02:22:56PM
```

Page 245

```
1         LEHN - CONFIDENTIAL
2   where the company may revise the bid,       02:23:00PM
3   maybe another bidder comes in and they      02:23:02PM
4   have to pay more.  Maybe they change the    02:23:04PM
5   terms of the merger agreement.              02:23:08PM
6          And for purposes of this            02:23:10PM
7   research where we were looking at takeover  02:23:11PM
8   decisions and how does that correspond to   02:23:14PM
9   CEO turnover, we wanted more than just the  02:23:16PM
10  one-day return.  We wanted to also see      02:23:20PM
11  what happened over longer windows where     02:23:23PM
12  additional information, new information      02:23:25PM
13  came out.                    02:23:28PM
14          So it's not that it took the        02:23:28PM
15  market a long period to process it, but     02:23:30PM
16  maybe there is additional information that  02:23:32PM
17  would be relevant in judging whether this   02:23:35PM
18  acquisition was a good or bad acquisition.  02:23:39PM
19     Q.     The explanation you just gave     02:23:41PM
20  about the large samples and so forth in     02:23:44PM
21  your research, those would not be           02:23:46PM
22  applicable to the AOL situation, though,    02:23:48PM
23  correct, where you opined in litigation?    02:23:50PM
24     A.     Right.  But, again, as I          02:23:52PM
25  indicated before, that is very different    02:23:54PM
```

62 (Pages 242 to 245)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 246

```
 1          LEHN - CONFIDENTIAL
 2   than this case as well.            02:23:56PM
 3       In that case, and I refreshed   02:23:57PM
 4   my memory over lunch and reviewed it, I   02:23:59PM
 5   was asked to opine as to what contributed   02:24:02PM
 6   to the decline in AOL stock price over a   02:24:04PM
 7   certain period.  And I looked at the      02:24:08PM
 8   contribution of the overall market, the   02:24:11PM
 9   contribution of an industry index, and    02:24:12PM
10   then firm-specific information where I    02:24:14PM
11   identified days in which there was a      02:24:19PM
12   statistically significant decline.       02:24:20PM
13       And for most of the dates, I         02:24:23PM
14   think almost all of them, I looked only on   02:24:25PM
15   the day where the negative residual return   02:24:28PM
16   occurred.  And then I got to that one day,   02:24:30PM
17   July 25th, or whatever it was, and there   02:24:33PM
18   was a negative residual return on that day   02:24:37PM
19   and it was based on speculation about an   02:24:40PM
20   SEC investigation and then the next day   02:24:43PM
21   that negative residual return was almost   02:24:46PM
22   completely offset and there was a Sanford   02:24:49PM
23   Bernstein report that revealed new       02:24:52PM
24   information to the market based on        02:24:54PM
25   conversations with management.           02:24:56PM
```

Page 247

```
 1          LEHN - CONFIDENTIAL
 2   Now, it was related to the         02:24:58PM
 3   prior day and it was offsetting the prior   02:25:00PM
 4   day effectively, so that the two-day      02:25:03PM
 5   return was not significant, which means   02:25:06PM
 6   that taken together that was effectively a   02:25:07PM
 7   correction of what had occurred the day   02:25:10PM
 8   before, and taken together there was no   02:25:13PM
 9   significant return.                02:25:15PM
10       So the purpose there was very   02:25:15PM
11   different than the purpose here.  Here we   02:25:17PM
12   have an alleged corrective disclosure on   02:25:19PM
13   the morning of February 6th, and         02:25:21PM
14   Dr. Feinstein and I both agree that there   02:25:23PM
15   was no additional corrective disclosure   02:25:25PM
16   made after the FDA briefing materials were   02:25:28PM
17   posted to the website on February 6th.   02:25:31PM
18       That's a very different       02:25:34PM
19   situation than the AOL.  In the AOL case   02:25:35PM
20   it wasn't that I used two days because it   02:25:38PM
21   took the market a second day to process   02:25:40PM
22   what had come out the day before, it was   02:25:42PM
23   there was more information coming out.   02:25:44PM
24       Q.    But in AOL if you would have   02:25:45PM
25   stuck with the one-day window, there was a   02:25:47PM
```

Page 248

```
 1          LEHN - CONFIDENTIAL
 2   statistically significant decline that   02:25:49PM
 3   day?                       02:25:51PM
 4       A.    There was.  But, again, what   02:25:53PM
 5   I'm saying is that one doesn't have a      02:25:55PM
 6   dogma that you should never use a         02:25:57PM
 7   multiple-day window.  You have to have a   02:25:58PM
 8   reason for it and a sound reason.  An      02:26:01PM
 9   unsound reason is to believe that you      02:26:04PM
10   think the market is efficient, but you   02:26:06PM
11   think in this case it took two or three   02:26:11PM
12   days for the market to figure it out.   02:26:11PM
13   That's not a good reason.              02:26:11PM
14       But there are other good      02:26:14PM
15   reasons, including the ones that I have   02:26:15PM
16   given in terms of large sample research   02:26:16PM
17   and in what I have given with respect to   02:26:18PM
18   AOL.                       02:26:19PM
19       Q.    You also used a multi-day   02:26:20PM
20   window in Apollo, I think you referenced   02:26:22PM
21   earlier?                   02:26:24PM
22       A.    Again, I haven't looked at that   02:26:25PM
23   in a while, but my recollection is that   02:26:26PM
24   the allegation there was that there were   02:26:27PM
25   two separate corrective disclosures and I   02:26:29PM
```

Page 249

```
 1          LEHN - CONFIDENTIAL
 2   think they followed on consecutive days,   02:26:33PM
 3   as I recall.  And if that's the case, then   02:26:35PM
 4   you use a two-day window because the      02:26:37PM
 5   allegation is there is two corrective      02:26:40PM
 6   disclosures.                02:26:41PM
 7       Q.    Do you have an estimate of how   02:26:42PM
 8   many times you have used multiple-day   02:26:44PM
 9   windows in litigation to asses loss      02:26:46PM
10   causation and materiality?          02:26:46PM
11       A.    I don't.  And when it is   02:26:46PM
12   appropriate to do so and there is a      02:26:46PM
13   scientific basis for doing so, I'm not   02:26:54PM
14   reluctant to do so.  There is not a      02:26:55PM
15   scientific basis for doing so in this   02:26:56PM
16   case.                      02:26:58PM
17       Q.    So we know of two times that   02:26:59PM
18   you have done it.  As we sit here today,   02:27:00PM
19   you can't rule out that there were other   02:27:02PM
20   times that you used multi-day windows?   02:27:04PM
21       A.    Again, sir, I can't.  But,   02:27:09PM
22   again, the reason is not that I think if   02:27:11PM
23   one opines that the market is efficient   02:27:11PM
24   that is appropriate to use multi-day      02:27:16PM
25   windows because you feel the market takes   02:27:18PM
```

63  (Pages 246 to 249)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 250

```
 1          LEHN - CONFIDENTIAL
 2   a long time to process the information.      02:27:20PM
 3   That would be a contradiction.        02:27:21PM
 4         So there may be cases where       02:27:23PM
 5   there was no opinion with respect to       02:27:24PM
 6   market efficiency, in which case it may be  02:27:26PM
 7   perfectly appropriate to use multiple-day   02:27:28PM
 8   windows.  It may be that you have two      02:27:30PM
 9   corrective disclosures back to back in     02:27:35PM
10   which case it is appropriate to use a      02:27:38PM
11   multi-day window.  Or it may be that you    02:27:40PM
12   have information come out on day one and    02:27:44PM
13   then there's new information that comes     02:27:46PM
14   out that corrects the prior day           02:27:49PM
15   information.  And that would be           02:27:52PM
16   appropriate as well.  But none of that is   02:27:54PM
17   going on in this case.               02:27:55PM
18         Q.    How many times have you served  02:27:56PM
19   as an expert in a securities action        02:27:58PM
20   involving a civil action involving        02:28:01PM
21   investors and a company accused of        02:28:05PM
22   violations of 10b, or Section 11 of the     02:28:08PM
23   Securities Act?                   02:28:11PM
24         A.    Probably -- I've been doing it  02:28:14PM
25   for roughly 20 years, so probably 40 to 50  02:28:18PM
```

Page 251

```
 1          LEHN - CONFIDENTIAL
 2   times.                        02:28:22PM
 3         Q.    And roughly do you know what   02:28:22PM
 4   percentage of your retentions have been    02:28:24PM
 5   for the defendants?                 02:28:26PM
 6         A.    The majority, clear majority   02:28:31PM
 7   have been.  But I also have been retained   02:28:36PM
 8   by the government, the SEC and DOJ on      02:28:39PM
 9   probably more than a dozen times.         02:28:44PM
10         Q.    And with respect to the times  02:28:46PM
11   you've used multiple-day windows, you      02:28:48PM
12   would agree with me that both in the       02:28:51PM
13   AOL -- well, strike that.             02:28:54PM
14         Let's start with the AOL         02:28:55PM
15   instance.  You would agree that it was     02:28:56PM
16   beneficial to the company's position in    02:28:58PM
17   that case, the articulation of the        02:29:00PM
18   multi-day window in that instance?        02:29:04PM
19         A.    You know, I would have to go   02:29:05PM
20   back and look again at the full context of  02:29:08PM
21   the report.  I don't make my decisions    02:29:10PM
22   based on whether it is beneficial for the   02:29:12PM
23   defendant.  I make it based on whether it   02:29:15PM
24   makes sense from a scientific perspective.  02:29:16PM
25   And in that case it did.  In this case it   02:29:19PM
```

Page 252

```
 1          LEHN - CONFIDENTIAL
 2   doesn't.                       02:29:22PM
 3         And I wouldn't even view it as     02:29:22PM
 4   a multi-day window in that case.  It was a  02:29:24PM
 5   two-day window, but you had two different   02:29:26PM
 6   pieces of information coming out on day     02:29:28PM
 7   one and day two, both of which were       02:29:30PM
 8   relevant in that case.               02:29:32PM
 9         Q.    Now, you didn't do a regression  02:29:40PM
10   analysis in this case looking at Merck's   02:29:42PM
11   stock, correct?                   02:29:44PM
12         A.    I did not.  When you say     02:29:46PM
13   "regression analysis," meaning event       02:29:49PM
14   study?                        02:29:51PM
15         Q.    Yeah, you didn't do the event  02:29:51PM
16   study regression analysis for Merck stock   02:29:53PM
17   in February of 2001 or any other dates,    02:29:56PM
18   correct?                       02:29:57PM
19         A.    That is correct.          02:29:58PM
20         Q.    And why not?            02:29:58PM
21         A.    Well, again, I didn't view it  02:29:59PM
22   as necessary for -- certainly for my first  02:30:01PM
23   report because it wouldn't matter for loss  02:30:05PM
24   causation and materiality.            02:30:07PM
25         With respect to Dr. Feinstein,     02:30:12PM
```

Page 253

```
 1          LEHN - CONFIDENTIAL
 2   he is the one who is alleging that the      02:30:14PM
 3   information that was disclosed on February  02:30:17PM
 4   6th was affecting Pharmacia stock price on  02:30:20PM
 5   February 8th, and I simply pointed out     02:30:24PM
 6   that there was other information released   02:30:28PM
 7   on February 8th, including information     02:30:30PM
 8   about Vioxx, that he chose to ignore, and   02:30:32PM
 9   pointed to that as information that       02:30:38PM
10   potentially could have been the cause of   02:30:40PM
11   Pharmacia's stock price decline on        02:30:43PM
12   February 8th.                     02:30:45PM
13         Q.    You would agree that good news  02:30:46PM
14   for Vioxx relative to Celebrex would be     02:30:47PM
15   expected to move Pharmacia and Merck's     02:30:49PM
16   stock price in opposite directions?        02:30:52PM
17         A.    I can't make that determination  02:30:55PM
18   for the following reason:  If you mean by   02:30:58PM
19   a statistically significant amount, the    02:31:02PM
20   answer is no, and for the following       02:31:04PM
21   reason:  Merck, I think its market cap was  02:31:09PM
22   about two and a half to three times that   02:31:12PM
23   of Pharmacia in 2001, which means that,    02:31:16PM
24   you know, a given dollar change in value    02:31:22PM
25   would have a bigger impact percentage-wise  02:31:25PM
```

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 254

```
 1          LEHN - CONFIDENTIAL
 2   for Pharmacia than it would for Merck.    02:31:28PM
 3          And it is a fallacy, actually,    02:31:31PM
 4   in Dr. Feinstein's reasoning when he says    02:31:34PM
 5   well, the fact that Merck's stock price    02:31:36PM
 6   did not increase significantly on February    02:31:37PM
 7   8th means that it couldn't have been the    02:31:39PM
 8   reason for Pharmacia's decline.  And    02:31:41PM
 9   that's just not true.    02:31:43PM
10          If you have Merck being much    02:31:44PM
11   bigger than Pharmacia, you may not find a    02:31:46PM
12   statistically significant increase in    02:31:48PM
13   Merck, but you will find a decline in    02:31:50PM
14   Pharmacia, at least theoretically, simply    02:31:54PM
15   because it is smaller.  And the same    02:31:56PM
16   dollar amount will represent a larger    02:31:58PM
17   proportion of value for the smaller    02:32:00PM
18   company than it will for the larger    02:32:02PM
19   company.    02:32:03PM
20      Q.   Did you eyeball Merck's stock    02:32:03PM
21   price movement in this time frame prior to    02:32:05PM
22   writing your rebuttal report?    02:32:09PM
23      MR. WANG:  Objection.    02:32:14PM
24      A.   I don't believe I did, no.    02:32:14PM
25      Q.   You didn't think it was    02:32:15PM
```

Page 255

```
 1          LEHN - CONFIDENTIAL
 2   important to your opinions?    02:32:17PM
 3      A.   No.    02:32:18PM
 4      Q.   And I would like you to turn    02:32:18PM
 5   your attention to paragraph 45 on page 12    02:32:20PM
 6   of your report, footnote 15.    02:32:23PM
 7          And on the last line of page    02:32:32PM
 8   12, at the bottom of footnote 15, you    02:32:34PM
 9   write "Good news for Vioxx relative to    02:32:37PM
10   Celebrex would be expected to move    02:32:41PM
11   Pharmacia and Merck's prices in the    02:32:43PM
12   opposite direction."    02:32:46PM
13          You wrote that as part of your    02:32:47PM
14   report?    02:32:49PM
15      A.   That's correct.    02:32:49PM
16      Q.   And do you believe that to be    02:32:49PM
17   true and accurate?    02:32:50PM
18      A.   I do.    02:32:51PM
19      Q.   And then looking at paragraph    02:32:52PM
20   46, on page 13, the second to last    02:32:54PM
21   sentence of paragraph 46, you write "If    02:32:59PM
22   the information released on a particular    02:33:01PM
23   day is both new and material to investors,    02:33:03PM
24   then the residual return to the event date    02:33:05PM
25   should be significantly different from    02:33:08PM
```

Page 256

```
 1          LEHN - CONFIDENTIAL
 2   zero."    02:33:09PM
 3          Do you see that?    02:33:11PM
 4      A.   I'm sorry?    02:33:13PM
 5      Q.   It is the second to last    02:33:15PM
 6   sentence of paragraph 46 on page 13.    02:33:18PM
 7      A.   Oh, 46, I'm sorry.  That's    02:33:21PM
 8   correct.    02:33:25PM
 9      Q.   So given those two statements    02:33:25PM
10   in your report, don't you think you should    02:33:28PM
11   have looked to see at a minimum whether    02:33:30PM
12   Merck's stock price moved on Vioxx-related    02:33:32PM
13   information before you concluded that that    02:33:37PM
14   could have been a possible mover of    02:33:39PM
15   Pharmacia stock price?    02:33:41PM
16      A.   No.  And, again, I was simply    02:33:43PM
17   pointing out information that    02:33:46PM
18   Dr. Feinstein chose to ignore, and he is    02:33:47PM
19   the one who is claiming that February 8th    02:33:50PM
20   is relevant for a loss causation opinion    02:33:52PM
21   in this case.  And he just simply chose to    02:33:54PM
22   ignore the Vioxx information in his    02:33:58PM
23   analysis.  He claims he considered it, but    02:34:01PM
24   he didn't do any analysis, he just    02:34:03PM
25   asserted that he didn't think it was    02:34:06PM
```

Page 257

```
 1          LEHN - CONFIDENTIAL
 2   important.    02:34:07PM
 3          So for purposes of my initial    02:34:08PM
 4   report and my rebuttal report, I didn't    02:34:09PM
 5   think it was necessary and still don't    02:34:12PM
 6   think it was necessary to do an event    02:34:13PM
 7   study on Merck.    02:34:15PM
 8      Q.   Would you agree that it would    02:34:16PM
 9   support the hypothesis if you had the    02:34:18PM
10   hypothesis -- do you have the hypothesis    02:34:21PM
11   that you think it was Vioxx's vote on    02:34:24PM
12   February 8th that was moving Pharmacia's    02:34:26PM
13   stock, is that your hypothesis?    02:34:29PM
14      MR. WANG:  Objection.    02:34:32PM
15      A.   Again, I've simply described    02:34:33PM
16   the events on February 8th and I've    02:34:35PM
17   described the stock price movements, the    02:34:39PM
18   raw stock price movements of Pharmacia on    02:34:41PM
19   February 8th, and I pointed out    02:34:44PM
20   information that Dr. Feinstein chose to    02:34:47PM
21   ignore that very well could be the cause    02:34:52PM
22   of Pharmacia's stock price movement on    02:34:55PM
23   February 8th and the fact that he's the    02:34:56PM
24   one who believes that February 8th is    02:35:00PM
25   relevant and he chose to ignore that was    02:35:02PM
```

65 (Pages 254 to 257)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 258

LEHN - CONFIDENTIAL

1     LEHN - CONFIDENTIAL
2  worth mentioning in my rebuttal report.  02:35:05PM
3     Q.    But you are not offering the  02:35:07PM
4  opinion that it was the Vioxx vote that  02:35:09PM
5  caused the stock decline on February 8th,  02:35:11PM
6  that's not an opinion you are going to be  02:35:14PM
7  offering before the jury?  02:35:16PM
8     MR. WANG:  Objection.  02:35:16PM
9     A.    Again, as I sit here today, I  02:35:17PM
10  haven't done the analysis nor have I been  02:35:19PM
11  asked to do the analysis to form that  02:35:21PM
12  opinion.  But if between now and the time  02:35:23PM
13  of trial I'm asked, then certainly that's  02:35:26PM
14  something I would consider.  02:35:28PM
15     Q.    But as we are sitting here  02:35:30PM
16  today that's not an opinion you are  02:35:31PM
17  offering as of today's date?  02:35:33PM
18     MR. WANG:  Objection.  02:35:34PM
19     A.    Can you repeat that again?  02:35:35PM
20     Q.    The opinion that the Vioxx vote  02:35:36PM
21  on February 8th is what caused Merck's  02:35:40PM
22  stock price decline -- sorry, I misstated  02:35:43PM
23  that.  Strike that question.  02:35:48PM
24     You are not offering the  02:35:49PM
25  opinion as we sit here today that the  02:35:51PM

Page 259

1     LEHN - CONFIDENTIAL
2  Vioxx Advisory Committee vote is what  02:35:53PM
3  caused Pharmacia's stock decline on  02:35:56PM
4  February 8th; is that correct?  02:35:58PM
5     MR. WANG:  Objection.  02:36:01PM
6     A.    Again, I haven't done the  02:36:02PM
7  analysis that would be necessary to form  02:36:06PM
8  an opinion as to the cause, but in my  02:36:10PM
9  opinion as I sit here today I think it  02:36:14PM
10  very likely could be a cause.  And in  02:36:17PM
11  order to form an opinion definitively I  02:36:21PM
12  would have to do more analysis.  02:36:23PM
13     Q.    But that is not an opinion that  02:36:25PM
14  you are offering as part of this  02:36:27PM
15  litigation as we sit here today?  02:36:28PM
16     MR. WANG:  Objection.  02:36:30PM
17     A.    The opinion that I just  02:36:31PM
18  described is the opinion that I have as of  02:36:32PM
19  today.  But to form an opinion based on  02:36:34PM
20  the statistical analysis that would be  02:36:39PM
21  necessary, I haven't done that analysis.  02:36:42PM
22     Q.    And it certainly would support  02:36:45PM
23  this hypothesis that you are articulating,  02:36:47PM
24  it would be support for that hypothesis if  02:36:49PM
25  Merck's stock moved in a statistically  02:36:52PM

Page 260

1     LEHN - CONFIDENTIAL
2  significant upward manner that day?  02:36:54PM
3     A.    No, I think that part of it is  02:36:57PM
4  just fundamentally wrong by Dr. Feinstein.  02:36:59PM
5     You know, a very simple  02:37:02PM
6  example, hypothetical to illustrate the  02:37:06PM
7  point if it is not clear:  Suppose you  02:37:07PM
8  have one company that is worth $100 and  02:37:09PM
9  another company that is worth $1,000 and  02:37:12PM
10  you are looking at a transfer of value of  02:37:16PM
11  $20.  Well, $20 for the smaller company,  02:37:18PM
12  worth $100, that's a 20 percent change,  02:37:24PM
13  whereas the $20 for the company that is  02:37:28PM
14  worth $1,000, it is a 2 percent change.  02:37:31PM
15     And in my hypothetical a 20  02:37:34PM
16  percent change in the value of one company  02:37:37PM
17  might be statistically significant, but  02:37:38PM
18  the 2 percent change in the value of the  02:37:41PM
19  other company might not.  02:37:43PM
20     So you can't draw the  02:37:48PM
21  conclusion that Dr. Feinstein is drawing  02:37:50PM
22  from what he claims is the absence of a  02:37:53PM
23  statistically significant change in  02:37:57PM
24  Merck's stock price on February 8th.  02:37:59PM
25     Q.    My question, though, was  02:38:06PM

Page 261

1     LEHN - CONFIDENTIAL
2  slightly different.  02:38:08PM
3     Would you agree if,  02:38:09PM
4  hypothetically, Merck's stock had gone up  02:38:11PM
5  statistically significantly on February  02:38:13PM
6  8th that that would be supportive of a  02:38:16PM
7  hypothesis that Merck-related news was  02:38:18PM
8  driving Pharmacia's price decline?  02:38:22PM
9     A.    Again, it would depend on a lot  02:38:27PM
10  of other facts, did you account for other  02:38:29PM
11  information that might have been coming  02:38:31PM
12  out.  You know, I haven't done that  02:38:33PM
13  analysis.  I'm not sure how carefully  02:38:35PM
14  Dr. Feinstein has done the analysis.  02:38:38PM
15     But I don't think an  02:38:42PM
16  examination of Merck's stock price in and  02:38:44PM
17  of itself in a vacuum by itself would be  02:38:48PM
18  probative as to whether or not this was  02:38:52PM
19  the cause of Pharmacia's stock price  02:38:55PM
20  decline on February 8th.  02:38:57PM
21     Q.    I'm not asking you if it was  02:38:58PM
22  solely or wholly, I'm saying, is that a  02:39:01PM
23  factor that would have supported a  02:39:03PM
24  hypothesis if Merck's stock went up  02:39:05PM
25  statistically significantly on February  02:39:08PM

66  (Pages 258 to 261)

CONFIDENTIAL

Page 262

1          LEHN - CONFIDENTIAL
2   8th, would that be a supportive fact of    02:39:10PM
3   the conclusion that Merck-related Vioxx    02:39:13PM
4   news was what was driving Pharmacia's      02:39:15PM
5   share price on that same day?              02:39:19PM
6          MR. WANG:  Objection.  Asked    02:39:20PM
7   and answered.                              02:39:22PM
8       A.     Again, without having looked   02:39:22PM
9   into all the other considerations, such as 02:39:29PM
10  information that was occurring, and, you   02:39:30PM
11  know, the peer index for Merck the         02:39:33PM
12  same as the peer index for Pharmacia, what 02:39:36PM
13  was happening in the peer index for        02:39:38PM
14  Merck's cohorts.  There are a lot of other 02:39:42PM
15  things that would have to be taken into    02:39:44PM
16  consideration.                             02:39:46PM
17         So as I sit here, I can't          02:39:46PM
18  definitively answer that.                  02:39:47PM
19      Q.     Are you offering an opinion     02:39:47PM
20  that Vioxx's performance was not material  02:39:48PM
21  to Merck?                                  02:39:51PM
22      A.     No.                             02:39:54PM
23      Q.     And I want to show you what I'm 02:39:59PM
24  marking as Plaintiffs' Exhibit 512.        02:40:00PM
25         (Plaintiffs' Exhibit 512 marked    02:40:03PM

Page 263

1          LEHN - CONFIDENTIAL
2   for identification.)                       02:40:04PM
3       Q.     Could you please take a look at 02:40:05PM
4   that document.  And, for the record,       02:40:07PM
5   Exhibit 512 is a Reuters article dated     02:40:09PM
6   April 21st, 1999 by Lisa Richwine.  If you 02:40:13PM
7   look at the last sentence on the first     02:40:19PM
8   page, it says "Merck is counting on Vioxx  02:40:21PM
9   to help the company weather upcoming       02:40:24PM
10  patent expirations on three of its         02:40:26PM
11  best-selling drugs."                       02:40:29PM
12         And I think you just testified     02:40:30PM
13  that you are not offering an opinion that  02:40:32PM
14  Vioxx was not material to Merck.           02:40:34PM
15         Did you look at the                02:40:36PM
16  contributions to the bottom line of Merck  02:40:37PM
17  from Vioxx sales in the 2000 through 2001  02:40:40PM
18  time frame?                                02:40:44PM
19      A.     I haven't studied that, no.     02:40:45PM
20      Q.     And we looked at that Bear      02:40:47PM
21  Stearns analyst report earlier where the   02:40:50PM
22  Merck related pharmaceutical sales were in 02:40:52PM
23  the 15 to 20 percent range estimated for   02:40:54PM
24  2001 and 2002?                             02:40:57PM
25         MR. WANG:  Objection.              02:40:58PM

Page 264

1          LEHN - CONFIDENTIAL
2       A.     I don't recall the numbers      02:40:59PM
3   offhand.                                   02:41:00PM
4       Q.     We can put that one back in     02:41:01PM
5   front of you.  I think it was Exhibit 509. 02:41:03PM
6   If you could take a look at it.  It is the 02:41:12PM
7   February 7th Bear Stearns analyst report,  02:41:14PM
8   the last page of 509.                      02:41:20PM
9          And is it accurate that the        02:41:45PM
10  Merck pharmaceutical revenues derived from 02:41:47PM
11  Vioxx in 2000 were estimated to be 10.7    02:41:49PM
12  percent at least by the Bear Stearns       02:41:54PM
13  analyst?                                   02:41:55PM
14         MR. WANG:  Objection.              02:41:56PM
15      A.     That's right.                   02:41:57PM
16      Q.     And the Bear Stearns analysts   02:41:57PM
17  are estimating that the 2001 contribution  02:42:00PM
18  of pharma revenues from Merck would be     02:42:02PM
19  15.4 percent; is that correct?             02:42:06PM
20      A.     That's what is reported.        02:42:08PM
21      Q.     And then for 2002 the same      02:42:09PM
22  estimate was 17.1 percent?                 02:42:11PM
23      A.     Yes.                            02:42:14PM
24      Q.     Each of those are contributing, 02:42:15PM
25  or at least those estimates, each of them  02:42:16PM

Page 265

1          LEHN - CONFIDENTIAL
2   is over 10 percent, correct?               02:42:18PM
3       A.     That's correct.                 02:42:19PM
4       Q.     You worked for the SEC for a    02:42:20PM
5   while?                                     02:42:22PM
6       A.     I did.                          02:42:22PM
7       Q.     As a commissioner?  Were you a  02:42:22PM
8   commissioner or were you an economist?     02:42:24PM
9       A.     Chief economist.                02:42:26PM
10      Q.     Chief economist, that's a       02:42:27PM
11  pretty big position.                       02:42:27PM
12         Are you aware of any SEC           02:42:28PM
13  rulings or points that a 10 percent        02:42:31PM
14  threshold is often considered as being     02:42:34PM
15  material?                                  02:42:37PM
16      A.     From a regulatory point of      02:42:37PM
17  view, that's correct, but I've never       02:42:39PM
18  accepted that as necessarily being         02:42:41PM
19  material to investors.                     02:42:43PM
20      Q.     Just as a rule of thumb, that   02:42:45PM
21  10 percent is often bandied about as being 02:42:46PM
22  material in certain contexts, though; is   02:42:49PM
23  that correct?                              02:42:55PM
24         MR. WANG:  Objection.              02:42:55PM
25      A.     It may be, but, again, it is    02:42:56PM

67  (Pages 262 to 265)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 266

```
1          LEHN - CONFIDENTIAL
2    not probative -- to me it is not probative  02:42:57PM
3    of whether information is material to      02:42:59PM
4    investors.  It is more a rule of thumb     02:43:01PM
5    used for regulatory purposes.              02:43:04PM
6        Q.   In any event, you are not         02:43:05PM
7    offering an opinion, or as we sit here     02:43:07PM
8    today, you don't plan to offer an opinion  02:43:10PM
9    that Vioxx sales in early 2001 were not    02:43:12PM
10   material to Merck's business?              02:43:14PM
11       A.   I'm sorry, the double             02:43:19PM
12   negatives --                               02:43:21PM
13       Q.   I'm sorry, it is getting late.    02:43:21PM
14         You are not offering an opinion      02:43:22PM
15   that Vioxx was not material -- well, I'm   02:43:24PM
16   doing it again, aren't I?                  02:43:27PM
17         Are you offering an opinion          02:43:29PM
18   that Vioxx sales in 2001 were not material 02:43:30PM
19   to Merck's business?                       02:43:34PM
20       A.   I am not.                         02:43:37PM
21       Q.   We still ended up with a double   02:43:39PM
22   negative, I think.                         02:43:42PM
23         In your opening report you did       02:44:24PM
24   analyze the 6th and 7th cumulatively; is   02:44:26PM
25   that correct?                              02:44:30PM
```

Page 267

```
1          LEHN - CONFIDENTIAL
2        A.   Yes.                              02:44:30PM
3        Q.   And why did you analyze the 6th   02:44:31PM
4    and 7th cumulatively as part of your       02:44:32PM
5    opening report?                            02:44:34PM
6        A.   Frankly, anticipating that that   02:44:34PM
7    was potentially going to be an area of     02:44:37PM
8    inquiry by the parties in this litigation, 02:44:39PM
9    I thought it was prudent to look at the    02:44:43PM
10   two days.                                  02:44:46PM
11       Q.   But you didn't look at the        02:44:47PM
12   three days, 6th, 7th and 8th, as part of   02:44:48PM
13   your opening report, correct?              02:44:52PM
14       A.   That is correct.                  02:44:53PM
15       Q.   And you didn't look at it even    02:44:53PM
16   though you were aware there was an analyst 02:44:55PM
17   report published on the 8th entitled       02:44:58PM
18   "CLASS Flunks Out"; is that correct?       02:44:59PM
19       A.   That's correct.  But as I         02:45:00PM
20   indicated earlier, that is irrelevant for  02:45:01PM
21   my consideration of loss causation and     02:45:03PM
22   materiality.                               02:45:05PM
23       Q.   And when you eyeballed the        02:45:05PM
24   decline on February 8th, it looked like it 02:45:08PM
25   was a statistically significant decline,   02:45:11PM
```

Page 268

```
1          LEHN - CONFIDENTIAL
2    correct?                                   02:45:13PM
3        MR. WANG:  Objection.                  02:45:13PM
4        A.   I'm not sure I ever actually      02:45:14PM
5    eyeballed it per se.  It certainly had no  02:45:16PM
6    bearing on decisions I made about the      02:45:22PM
7    proper way to study this issue.            02:45:24PM
8        Q.   But ultimately your regression    02:45:25PM
9    analysis and event study revealed that the 02:45:27PM
10   decline on February 8th was statistically  02:45:28PM
11   significant, correct?                      02:45:31PM
12       A.   That's correct.                   02:45:32PM
13       Q.   And it also revealed that the     02:45:32PM
14   three-day window of February 6th through   02:45:33PM
15   February 8th was also statistically        02:45:36PM
16   significant, correct?                      02:45:38PM
17       A.   Again, as I indicated before,     02:45:39PM
18   that if you look at the three days in      02:45:40PM
19   tandem, but then when you look at the      02:45:43PM
20   individual days, the only day that was     02:45:45PM
21   statistically significant was February     02:45:45PM
22   8th, and that, again, was irrelevant for   02:45:47PM
23   my opinions regarding loss causation and   02:45:50PM
24   materiality.                               02:45:54PM
25       Q.   Would you also agree that --      02:45:54PM
```

Page 269

```
1          LEHN - CONFIDENTIAL
2    and I'm moving on to a new topic now, so I 02:45:57PM
3    will ask the question differently -- would 02:46:01PM
4    you agree that alleged misrepresentations  02:46:02PM
5    in the context of a securities suit and an 02:46:06PM
6    analysis of whether it impacted the        02:46:10PM
7    market, that misrepresentations can in     02:46:12PM
8    certain circumstances maintain inflation   02:46:14PM
9    as opposed to introducing new inflation    02:46:16PM
10   into the marketplace?                      02:46:19PM
11       A.   Sure.                             02:46:20PM
12       Q.   And when you look at alleged      02:46:21PM
13   misrepresentations in a particular case    02:46:25PM
14   such as this one, it doesn't rule out      02:46:28PM
15   materiality and loss causation just        02:46:31PM
16   because the stock price didn't increase on 02:46:34PM
17   the date of the misrepresentations; is     02:46:36PM
18   that correct?                              02:46:38PM
19       A.   That is correct.  Again, I        02:46:38PM
20   think there is a distinction between       02:46:41PM
21   affirmative misrepresentations and         02:46:43PM
22   omissions.                                 02:46:46PM
23       Q.   So if there are facts like in     02:46:47PM
24   this case where there are five facts       02:46:51PM
25   alleged to be omitted, you would agree     02:46:53PM
```

68  (Pages 266 to 269)

CONFIDENTIAL

Page 270

1          LEHN - CONFIDENTIAL
2    that you could still have loss causation    02:46:55PM
3    and materiality -- or strike that.        02:46:56PM
4          You would agree that in an       02:47:00PM
5    omissions case the appropriate way or an    02:47:02PM
6    appropriate way to test for materiality    02:47:04PM
7    and loss causation is to look when the     02:47:07PM
8    allegedly omitted facts are disclosed to    02:47:09PM
9    the marketplace and analyze the stock      02:47:12PM
10   price movement after the disclosure of the  02:47:15PM
11   omitted facts; is that correct?          02:47:17PM
12      A.    That's correct.             02:47:18PM
13      Q.    And if -- and, again, this will  02:47:19PM
14   be a hypothetical context, because I don't  02:47:24PM
15   want to get into a big debate -- if you     02:47:26PM
16   have a decline, a statistically         02:47:28PM
17   significant decline following the        02:47:32PM
18   revelation of allegedly omitted facts, you  02:47:34PM
19   can have loss causation and materiality    02:47:37PM
20   regardless of whether on the dates of the   02:47:40PM
21   alleged misrepresentations the stock price  02:47:43PM
22   moved upwardly; is that correct?        02:47:45PM
23      A.    As a theoretical matter, that's  02:47:47PM
24   correct.                        02:47:50PM
25      Q.    I want to show you what I'm     02:47:50PM

Page 271

1          LEHN - CONFIDENTIAL
2    marking as Plaintiffs' Exhibit 513.       02:48:24PM
3          (Plaintiffs' Exhibit 513 marked  02:48:26PM
4    for identification.)               02:48:28PM
5      Q.    Could you please take a look at  02:48:51PM
6    that document.  For the record,        02:48:53PM
7    Plaintiffs' Exhibit 513 is a Salomon Smith  02:48:58PM
8    Barney analyst report dated February 7th,  02:49:03PM
9    2001 and it bears Bates numbers DEFEX     02:49:05PM
10   005603 through 606.               02:49:11PM
11          I would ask you if you        02:49:25PM
12   recognize this as an analyst report you    02:49:26PM
13   considered as part of your opinions in    02:49:28PM
14   this case.                      02:49:29PM
15      A.    I do.                  02:49:29PM
16      Q.    And this is an analyst report   02:49:30PM
17   that was dated February 7th, 2001 and it   02:49:33PM
18   was issued by Mark Striker and George     02:49:37PM
19   Grofik of Salomon Smith Barney?        02:49:41PM
20      A.    Yes, that's correct.         02:49:46PM
21      Q.    And in the summary at the      02:49:47PM
22   beginning of the report there's six arrows  02:49:49PM
23   or bullet points; is that correct?       02:49:53PM
24      A.    That's correct.            02:49:55PM
25      Q.    And the fifth bullet point says 02:49:56PM

Page 272

1          LEHN - CONFIDENTIAL
2    "These results will likely slow the growth  02:49:59PM
3    of the COX-2 class until more conclusive   02:50:01PM
4    scientific evidence is demonstrated."     02:50:05PM
5          Would you agree that that would  02:50:07PM
6    be bad news for Pharmacia?           02:50:08PM
7      A.    You know, as a general matter,  02:50:14PM
8    it would not be -- presumably would not be  02:50:29PM
9    good news.  Whether it is bad news depends  02:50:33PM
10   on whether it's news, was this new       02:50:36PM
11   information or was it simply reiterating    02:50:41PM
12   what the market already had anticipated,   02:50:45PM
13   in which case it may be neutral or bad,    02:50:47PM
14   but it is not necessarily new.         02:50:51PM
15      Q.    Now, Pharmacia's biggest       02:50:53PM
16   selling drug was Celebrex at this time    02:50:56PM
17   period, right?                  02:50:58PM
18      A.    That's my understanding.      02:50:58PM
19      Q.    And if you were going to have   02:50:59PM
20   the growth of your biggest-selling drug    02:51:01PM
21   slowed, that's bad -- I won't use the word  02:51:03PM
22   "news" -- that's bad, not good, correct?   02:51:06PM
23      A.    Again, not to nitpick, but     02:51:08PM
24   there is one caveat just as a purely      02:51:14PM
25   conceptual matter.  There is not an      02:51:16PM

Page 273

1          LEHN - CONFIDENTIAL
2    absolute answer to that, because I teach a  02:51:17PM
3    valuation course, and one of the things I   02:51:19PM
4    teach students is that if you have a       02:51:21PM
5    product that is destroying value, meaning   02:51:23PM
6    that the returns you are getting on it are  02:51:27PM
7    not beating the cost of capital for that    02:51:30PM
8    product line, then slow growth can        02:51:32PM
9    actually be a good thing, you will be      02:51:34PM
10   destroying value at a lesser rate.       02:51:36PM
11          So as an absolute answer,       02:51:38PM
12   growth is not always good.  Now, I'm not   02:51:40PM
13   saying that that was the case here.  But   02:51:43PM
14   I'm just saying I can't give you an       02:51:44PM
15   absolute answer to your question.       02:51:46PM
16      Q.    Let's confine our answer, then, 02:51:47PM
17   to Celebrex, Pharmacia, 2001.  The fact   02:51:49PM
18   that the growth of Celebrex was being     02:51:54PM
19   slowed, that was bad for Pharmacia,       02:51:59PM
20   correct?                       02:52:01PM
21      A.    I would presume that          02:52:04PM
22   expectations of lower growth would not be  02:52:07PM
23   viewed as a positive event.           02:52:10PM
24      Q.    Okay, I will take that.       02:52:11PM
25          MR. WANG:  Do you want to take  02:52:44PM

69 (Pages 270 to 273)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 274

1          LEHN - CONFIDENTIAL
2    a break if you are shifting topics?        02:52:45PM
3          MR. SAHAM:  Sure, we can take a 02:52:47PM
4    break.                    02:52:49PM
5          THE VIDEOGRAPHER:  The time is 02:52:50PM
6    approximately 2:52 p.m.  This is the end   02:52:51PM
7    of media number four.  We are off the      02:52:53PM
8    record.                   02:52:55PM
9          (Recess taken.)           02:52:55PM
10         THE VIDEOGRAPHER:  The time is 03:09:43PM
11   approximately 3:09 p.m.  This is the       03:09:45PM
12   beginning of media number five.  We are on 03:09:48PM
13   the record.               03:09:50PM
14   BY MR. SAHAM:                03:10:18PM
15      Q.    Dr. Lehn, I want to show you     03:10:18PM
16   what I'm marking as Plaintiffs' Exhibit    03:10:21PM
17   514.  Could you please take a look at that 03:10:23PM
18   document.                 03:10:27PM
19         (Plaintiffs' Exhibit 514 marked 03:10:28PM
20   for identification.)         03:10:30PM
21      Q.    And, for the record,          03:10:33PM
22   Plaintiffs' Exhibit 514 is an analyst      03:10:35PM
23   report from Credit Suisse First Boston     03:10:38PM
24   dated February 8th, 2001 and it bears      03:10:42PM
25   Bates numbers DEFEX 005572 through 76.     03:10:45PM

Page 275

1          LEHN - CONFIDENTIAL
2    And I ask you if you recognize 03:10:55PM
3    this as one of the analyst reports you     03:10:56PM
4    looked at as part of the preparation of    03:10:58PM
5    your opinions in this case.         03:11:00PM
6       A.    Yes, it is.            03:11:01PM
7       Q.    And turning to page -- the     03:11:02PM
8    bottom of page 83 and the top of page 84   03:11:09PM
9    of the report, the bottom sentence on 83   03:11:12PM
10   says "Celebrex shows significant           03:11:16PM
11   statistical improvement in            03:11:18PM
12   gastrointestinal side effects, principally 03:11:20PM
13   on the non-aspirin ibuprofen treatment     03:11:24PM
14   arm."                     03:11:27PM
15         Do you see that?          03:11:27PM
16      A.    I do.               03:11:28PM
17      Q.    And is it your opinion that    03:11:28PM
18   that was not new information disseminated   03:11:30PM
19   on February 8th, 2001?          03:11:32PM
20      A.    Well, my recollection is that  03:11:36PM
21   the data that was released on the morning  03:11:51PM
22   of February 6th certainly would have the   03:11:55PM
23   underlying evidence for that statement.    03:11:58PM
24      Q.    But prior to this analyst      03:12:02PM
25   report do you recall there being any other 03:12:04PM

Page 276

1          LEHN - CONFIDENTIAL
2    analyst reports that made that distinction 03:12:06PM
3    that the main benefit to Celebrex was in   03:12:09PM
4    non-aspirin using -- when in comparison to 03:12:14PM
5    non-aspirin using -- that's a bad         03:12:18PM
6    question.                 03:12:20PM
7          Do you recall seeing that       03:12:20PM
8    anywhere earlier than February 8th, 2001   03:12:22PM
9    being disseminated to the market that the  03:12:24PM
10   main benefit of Celebrex was when it was   03:12:26PM
11   compared to non-aspirin using ibuprofen    03:12:28PM
12   takers?                   03:12:31PM
13      A.    Well, again, the materials that 03:12:33PM
14   were posted on the FDA website on February 03:12:36PM
15   6th had the information that would         03:12:38PM
16   basically be relevant to that issue.       03:12:44PM
17      Q.    And in what form did it have   03:12:46PM
18   that information?            03:12:48PM
19      A.    Well, my recollection is it was 03:12:49PM
20   in the statistical reviewer's briefing     03:12:50PM
21   document.                 03:12:53PM
22      Q.    And certainly in reading the   03:12:55PM
23   JAMA article you wouldn't know that; is    03:12:58PM
24   that correct?               03:13:00PM
25         MR. WANG:  Objection.        03:13:00PM

Page 277

1          LEHN - CONFIDENTIAL
2       Q.    Reading the September 30th,    03:13:01PM
3    2000 JAMA article you wouldn't know that   03:13:03PM
4    any benefit was in non-aspirin using       03:13:05PM
5    ibuprofen takers?           03:13:07PM
6          MR. WANG:  Objection.        03:13:08PM
7       A.    I would have to review the JAMA 03:13:09PM
8    article again.              03:13:11PM
9       Q.    And reading down a couple of   03:13:13PM
10   paragraphs here on page 84, it says "After 03:13:15PM
11   nearly seven hours of discussion, the FDA  03:13:18PM
12   panel decided that the current label for   03:13:21PM
13   Celebrex appears to adequately describe    03:13:23PM
14   relative gastrointestinal properties       03:13:25PM
15   relative to NSAIDs."  Do you see that?     03:13:28PM
16      A.    I do.               03:13:30PM
17      Q.    Do you think it has any --     03:13:31PM
18   strike that.              03:13:32PM
19         Does it have any impact on your 03:13:33PM
20   loss causation and materiality opinions    03:13:34PM
21   that a panel of FDA experts took seven     03:13:37PM
22   hours to determine whether or not they     03:13:40PM
23   were going to make a recommendation with   03:13:42PM
24   respect to a Celebrex label change?        03:13:44PM
25      A.    It has no impact on my opinion. 03:13:47PM

70 (Pages 274 to 277)

CONFIDENTIAL

Page 278

1          LEHN - CONFIDENTIAL
2     Q.    So the fact that it took seven   03:13:50PM
3   hours for experts to figure out what      03:13:53PM
4   particular information meant as far as a    03:13:55PM
5   label change, that couldn't be a factor to   03:13:58PM
6   consider in determining how quickly the     03:14:00PM
7   market could absorb this information?      03:14:02PM
8     MR. WANG:  Objection.        03:14:04PM
9   Mischaracterizes the evidence.        03:14:05PM
10    A.    I think one thing that one has   03:14:06PM
11  to be careful about is when you say this    03:14:12PM
12  information, for purposes of loss        03:14:14PM
13  causation, this information is actually     03:14:16PM
14  rather straightforward and it was in the    03:14:19PM
15  early pages of the statistical reviewer's    03:14:20PM
16  briefing document and it was the        03:14:23PM
17  information that corrected the five      03:14:24PM
18  alleged misrepresentations as described in  03:14:28PM
19  the second set of interrogatory responses.  03:14:29PM
20    That wasn't very complicated.      03:14:32PM
21  And one can quickly realize that that     03:14:34PM
22  information was in the tables of the      03:14:38PM
23  statistical review.  I'm sure that the FDA  03:14:40PM
24  panel, with the different objective, they   03:14:43PM
25  had to make a decision with respect to    03:14:45PM

Page 279

1          LEHN - CONFIDENTIAL
2   making a label change prudently, wanted to  03:14:47PM
3   have a lot of discussion.  That is a      03:14:50PM
4   separate issue as to the information      03:14:52PM
5   pertaining to the alleged corrective      03:14:55PM
6   disclosures.              03:14:56PM
7     Q.    And you are not offering an    03:14:57PM
8   opinion as to the order -- if someone was   03:14:58PM
9   to put themselves in the shoes of someone   03:15:01PM
10  trying to download the information from     03:15:03PM
11  the FDA website, on or about February 6th,  03:15:05PM
12  2001, you are not offering an opinion that  03:15:09PM
13  the statistical reviewer's report was like   03:15:12PM
14  the top document that you would get if you  03:15:14PM
15  were downloading the information relating   03:15:16PM
16  to the Celebrex Advisory Committee that    03:15:19PM
17  was made available on or about February    03:15:22PM
18  6th, 2001?              03:15:24PM
19    A.    I'm not sure what you mean by  03:15:25PM
20  "the top document."            03:15:27PM
21    Q.    Well, if an analyst or anybody  03:15:28PM
22  else was clicking on the FDA website to    03:15:30PM
23  get the Advisory Committee materials, they  03:15:32PM
24  wouldn't necessarily get the statistical    03:15:35PM
25  reviewer's report first, they wouldn't     03:15:37PM

Page 280

1          LEHN - CONFIDENTIAL
2   read that necessarily first, correct?     03:15:39PM
3     A.    Well, you know, again, I think  03:15:42PM
4   that you have to think about what analysts  03:15:46PM
5   do.  They would have an eye towards what   03:15:48PM
6   they think is the salient information and   03:15:52PM
7   they are not viewing this information in a  03:15:54PM
8   vacuum.  They have some cumulative       03:15:57PM
9   knowledge of the issues, and they       03:15:59PM
10  presumably, if they are good analysts, are  03:16:00PM
11  going to know the history of the issues.    03:16:03PM
12    And when they suddenly see       03:16:05PM
13  these documents, I'm this way when it      03:16:07PM
14  comes to finance reports, you often get    03:16:08PM
15  big, thick valuation reports, but you can   03:16:10PM
16  quickly cut to the chase by going to the    03:16:12PM
17  salient information and you don't have to   03:16:14PM
18  wade through every word of every page to   03:16:20PM
19  understanding what is going on.        03:16:23PM
20    And with respect to the        03:16:24PM
21  punchlines of the materials and the FDA    03:16:25PM
22  materials with respect to the alleged     03:16:28PM
23  corrective disclosures, it wasn't all that  03:16:30PM
24  complicated.              03:16:32PM
25    Q.    And you are not a medical     03:16:33PM

Page 281

1          LEHN - CONFIDENTIAL
2   doctor, though, correct?          03:16:34PM
3     A.    I am not.            03:16:36PM
4     Q.    You are not a          03:16:36PM
5   gastroenterologist?            03:16:37PM
6     A.    That's correct.         03:16:39PM
7     Q.    You are not an expert in FDA   03:16:39PM
8   advisory proceedings?            03:16:41PM
9     A.    That's correct.  But I do     03:16:42PM
10  understand what the allegations are and I  03:16:45PM
11  do understand where the corrective      03:16:47PM
12  disclosures were.            03:16:50PM
13    Q.    There were no iPhones in 2001,  03:16:51PM
14  correct?                03:16:55PM
15    A.    I don't believe so.        03:16:57PM
16    Q.    Were there BlackBerries in    03:16:58PM
17  2001?                  03:17:02PM
18    A.    I don't know.  I know there    03:17:02PM
19  were cell phones back in 2001.        03:17:03PM
20    Q.    Those big ones though, right,  03:17:05PM
21  those big gray ones?            03:17:07PM
22    A.    I don't recall.          03:17:07PM
23    Q.    But there were no iPhones back  03:17:11PM
24  in 2001, we can agree on that?        03:17:13PM
25    MR. WANG:  Objection, lacks    03:17:15PM

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 282

1          LEHN - CONFIDENTIAL
2   foundation.                03:17:17PM
3       A.    I don't think there were, no.  03:17:17PM
4       Q.    And if you were an analyst that 03:17:18PM
5   was sitting listening to Mr. Hassan on     03:17:22PM
6   February 6th at the Merrill Lynch          03:17:28PM
7   conference, you couldn't have been back at 03:17:30PM
8   your desktop clicking on the Internet to   03:17:31PM
9   try to get the Advisory Committee reports, 03:17:34PM
10  correct?                   03:17:36PM
11      A.    I don't know.  I don't know    03:17:40PM
12  what the technology of the analysts were   03:17:41PM
13  at that point in time.  But analysts also  03:17:45PM
14  have staffs, and there could be a staff    03:17:47PM
15  person in New York tracking information    03:17:50PM
16  down for the analyst if he was unable to   03:17:52PM
17  access the particular site at that moment  03:17:55PM
18  in time.                   03:17:59PM
19          And I think it is just, again,  03:18:01PM
20  ludicrous to think that for a company with 03:18:03PM
21  a market cap of Pharmacia and the analyst  03:18:05PM
22  coverage that it has, that somehow the     03:18:08PM
23  information that was released on the FDA    03:18:10PM
24  website would escape unnoticed for several 03:18:12PM
25  days.  That to me is just not a credible   03:18:14PM

Page 283

1          LEHN - CONFIDENTIAL
2   position.                  03:18:17PM
3       Q.    Is it your opinion that the    03:18:17PM
4   company briefing document escaped          03:18:18PM
5   unnoticed or had no impact on the market's 03:18:20PM
6   view of the disclosure on February 6th?    03:18:22PM
7       MR. WANG: Objection, compound.  03:18:25PM
8       A.    That briefing document was part 03:18:26PM
9   of the total mix of information in the     03:18:29PM
10  market on that day.  But what matters is    03:18:33PM
11  the alleged corrective disclosures.  They  03:18:37PM
12  would be relatively easy for certainly an  03:18:41PM
13  analyst who covers this industry to        03:18:44PM
14  observe and they wouldn't have to labor    03:18:47PM
15  through hundreds of pages to identify that 03:18:49PM
16  information.               03:18:51PM
17      Q.    If the company was still       03:18:52PM
18  espousing the six-month data as being the  03:18:54PM
19  appropriate data and JAMA, a peer-reviewed 03:18:57PM
20  journal, had previously published the      03:19:02PM
21  six-month data, would those facts be       03:19:03PM
22  relevant to how quickly the market would   03:19:05PM
23  disseminate information relating to        03:19:07PM
24  another data set or a longer data set?     03:19:09PM
25      A.    Well, again, we talked about   03:19:12PM

Page 284

1          LEHN - CONFIDENTIAL
2   this earlier, there was no, as far as I    03:19:14PM
3   know, no new information that was being    03:19:17PM
4   released by Mr. Hassan in that conference  03:19:21PM
5   that he was -- insofar that he was         03:19:23PM
6   reporting the results from the JAMA        03:19:27PM
7   publication that was information that had  03:19:29PM
8   already been in the public domain.         03:19:30PM
9          Secondarily is if one assumes   03:19:36PM
10  that the market for the security is        03:19:38PM
11  efficient, by definition that means that   03:19:39PM
12  all public information is reflected in the 03:19:40PM
13  security price and new information is      03:19:43PM
14  rapidly reflected in the security price.   03:19:45PM
15      Q.    You are not offering an opinion 03:19:47PM
16  in this case that the company's            03:19:49PM
17  informative censoring, depletion of        03:19:52PM
18  susceptibles rationale for the six-month   03:19:55PM
19  data that was posted on the Internet on    03:19:58PM
20  February 6th, that that information was    03:20:00PM
21  not material?  Are you offering that       03:20:01PM
22  opinion?                   03:20:07PM
23      A.    I haven't formed an opinion as 03:20:07PM
24  to whether that was material or not.  But  03:20:09PM
25  it is irrelevant for determining whether   03:20:13PM

Page 285

1          LEHN - CONFIDENTIAL
2   or not the alleged corrective disclosures  03:20:17PM
3   caused losses to the investors in          03:20:20PM
4   Pharmacia.                 03:20:22PM
5       Q.    Well, if it was material,       03:20:23PM
6   hypothetically, since you haven't figured  03:20:24PM
7   it out one way or the other, if you went   03:20:26PM
8   back and you determined that that          03:20:28PM
9   informative censoring stuff that the       03:20:30PM
10  company said in the briefing document was  03:20:33PM
11  material, the fact that the next day the   03:20:34PM
12  company no longer articulated or no longer 03:20:38PM
13  presented the six-month data, it was just  03:20:41PM
14  the twelve-month data that was presented   03:20:44PM
15  at the Advisory Committee, could that be a 03:20:47PM
16  corrective disclosure correcting the       03:20:49PM
17  material impact of the informative         03:20:54PM
18  censoring hypothesis that was put forth in 03:20:56PM
19  the company's briefing document on         03:21:00PM
20  February 6th?              03:21:01PM
21      MR. WANG: Objection to form.  03:21:02PM
22      A.    I'm sorry to make you do this, 03:21:03PM
23  but I didn't understand the question.      03:21:06PM
24      Q.    You would agree with me if the 03:21:07PM
25  company's rationale on February 6th, they  03:21:11PM

72  (Pages 282 to 285)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 286

1           LEHN - CONFIDENTIAL
2   said that the six-month data -- and let's   03:21:14PM
3   do it in little chunks to make sure we are   03:21:16PM
4   on the same page.                03:21:16PM
5           In Exhibit 70, the briefing       03:21:18PM
6   document, they say because of informative   03:21:19PM
7   censoring, they -- being the company --    03:21:22PM
8   say because of informative censoring and   03:21:25PM
9   because of depletion of susceptibles, the   03:21:26PM
10  six-month data is the valid data; are you   03:21:30PM
11  with me on that?                03:21:31PM
12     A.   I am.                 03:21:32PM
13     Q.    So if the market viewed that   03:21:32PM
14  informative censoring rationale as being   03:21:34PM
15  material, and materially positive, because   03:21:37PM
16  it was an explanation as to why the JAMA   03:21:39PM
17  data was the right data to focus on, if   03:21:41PM
18  the market on the 6th viewed that as      03:21:44PM
19  positive, the fact that that explanation   03:21:47PM
20  was no longer articulated or maintained at   03:21:50PM
21  the Advisory Committee by either the      03:21:52PM
22  company or the FDA, would that fact on     03:21:54PM
23  February 7th be corrective of the        03:21:58PM
24  informative censoring information that was   03:22:02PM
25  articulated in the company's briefing      03:22:05PM

Page 287

1           LEHN - CONFIDENTIAL
2   document?                    03:22:06PM
3           MR. WANG: Objection.        03:22:07PM
4      A.   I'm not sure what you mean by   03:22:08PM
5   "corrective" in that context. It is       03:22:13PM
6   certainly not corrective of the alleged   03:22:17PM
7   corrective disclosures released on        03:22:19PM
8   February 6th.                 03:22:21PM
9      Q.    But could it be new information   03:22:22PM
10  that would be salient in analyzing whether   03:22:23PM
11  the six-month data or twelve-month data   03:22:25PM
12  was the appropriate data to take account   03:22:28PM
13  of in determining whether or not the      03:22:30PM
14  company was going to get a label change?   03:22:31PM
15     A.    Well, at a purely theoretical   03:22:34PM
16  level, perhaps. But that's irrelevant for   03:22:39PM
17  determining whether the alleged corrective   03:22:41PM
18  disclosures caused losses for investors.   03:22:43PM
19  That's a separate issue, distinct issue.   03:22:46PM
20          MR. WANG: Can we go off the   03:23:04PM
21  record for a second.             03:23:06PM
22          THE VIDEOGRAPHER: The time is   03:23:07PM
23  approximately 3:23 p.m. We are off the   03:23:08PM
24  record.                     03:23:10PM
25          (Discussion off the record.)   03:23:10PM

Page 288

1           LEHN - CONFIDENTIAL
2           THE VIDEOGRAPHER: The time is   03:24:08PM
3   approximately 3:24 p.m. We are back on   03:24:09PM
4   the record.                  03:24:12PM
5   BY MR. SAHAM:                  03:24:12PM
6      Q.    Dr. Lehn, I'm showing you what   03:24:12PM
7   I'm marking as Plaintiffs' Exhibit 515,   03:24:14PM
8   which, for the record, bears Bates numbers   03:24:19PM
9   DEFEX 009148 through 149. And this is a   03:24:21PM
10  UBS Warburg February 8th, 2001 analyst   03:24:27PM
11  report.                     03:24:30PM
12          (Plaintiffs' Exhibit 515 marked   03:24:30PM
13  for identification.)             03:24:32PM
14     Q.    Is this, again, one of the   03:24:33PM
15  analyst reports you considered in reaching   03:24:35PM
16  your opinions in this case?          03:24:37PM
17     A.   Yes, it is.             03:24:38PM
18     Q.    And I would like to direct your   03:24:39PM
19  attention to the second page of the      03:24:41PM
20  analyst report, Exhibit 1. Do you see   03:24:42PM
21  that?                      03:24:44PM
22     A.   I do.                03:24:44PM
23     Q.    And there's a table there and   03:24:45PM
24  it is comparing VIGOR and CLASS, is that   03:24:49PM
25  correct, and the data derived from each?   03:24:52PM

Page 289

1           LEHN - CONFIDENTIAL
2      A.   It appears to be doing that.   03:24:55PM
3      Q.    And if you look at primary   03:24:56PM
4   endpoint, do you see that, it is maybe the   03:24:59PM
5   sixth one down?                03:25:01PM
6      A.   I do, yes.             03:25:02PM
7      Q.    And then if you go over to   03:25:03PM
8   CLASS, it says that the p-value is 0.09?   03:25:05PM
9      A.   Yes.                 03:25:08PM
10     Q.    And this analyst from UBS   03:25:09PM
11  Warburg even on February 8th is utilizing   03:25:12PM
12  the p-value from six months; do you see   03:25:14PM
13  that?                      03:25:16PM
14     A.   I do.                03:25:16PM
15     Q.    Because before we looked at the   03:25:17PM
16  actual p-value, if you look at the entire   03:25:19PM
17  study data was 0.45?             03:25:21PM
18     A.   Yes.                 03:25:25PM
19     Q.    So is it fair to say that the   03:25:25PM
20  fact that this analyst is still recounting   03:25:27PM
21  the six-month p-value three days after the   03:25:29PM
22  disclosure of the actual entire study   03:25:35PM
23  p-value of 0.45 in the FDA reviewer      03:25:39PM
24  reports, that there may have been some   03:25:43PM
25  confusion among analysts and market      03:25:44PM

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 290

LEHN - CONFIDENTIAL
1
2    participants as to what the study data        03:25:47PM
3    revealed?                                     03:25:49PM
4          MR. WANG: Objection.                    03:25:50PM
5          A.    Well, two things. One is that    03:25:51PM
6    I would have to go back and refresh my        03:25:53PM
7    memory and look at the context in which       03:25:55PM
8    this analyst was using that data. That's      03:25:57PM
9    number one.                                   03:26:00PM
10         Number two is that for whatever         03:26:01PM
11   purpose this analyst is using the data,       03:26:06PM
12   one can infer from this anecdote that         03:26:08PM
13   analysts systematically ignored               03:26:13PM
14   information that was released on February     03:26:15PM
15   6th pertaining to the CLASS study. It is      03:26:18PM
16   just, I think, again, a ludicrous             03:26:20PM
17   inference to draw from this.                  03:26:22PM
18         Q.    Well, not all analysts ignored    03:26:24PM
19   it, because one analyst at least published    03:26:26PM
20   an analyst report that said "CLASS Flunks     03:26:29PM
21   Out" as a result of the analyst's -- or as    03:26:33PM
22   a result of the data that was revealed on     03:26:35PM
23   the 6th and discussed on the 7th;  is that    03:26:36PM
24   correct, sir?                                 03:26:38PM
25         MR. WANG: Objection.                    03:26:38PM

Page 291

LEHN - CONFIDENTIAL
1
2          A.    Are you asking whether it is      03:26:39PM
3    correct factually that one analyst wrote      03:26:40PM
4    such a report?                                03:26:41PM
5          Q.    Correct.                          03:26:42PM
6          A.    There was a report titled         03:26:43PM
7    "CLASS Flunks Out" published on February      03:26:45PM
8    8th, correct.                                 03:26:47PM
9          Q.    And you understand that the       03:26:49PM
10   CLASS it was referring to was the CLASS       03:26:50PM
11   study for which the data was revealed by      03:26:51PM
12   the FDA for the first time, the full data     03:26:54PM
13   was revealed on February 6th, 2001?           03:26:56PM
14         A.    I'm sorry, can I get the          03:27:00PM
15   question again?                               03:27:02PM
16         Q.    The question is, when it is       03:27:02PM
17   referring to CLASS and saying it flunked      03:27:03PM
18   out, it is referring to the CLASS trial       03:27:05PM
19   for which the entire study data was first     03:27:08PM
20   made available on February 6th, 2001 on       03:27:10PM
21   the FDA website, correct?                     03:27:13PM
22         MR. WANG: Objection.                    03:27:15PM
23         A.    That is correct.                  03:27:15PM
24         Q.    And it is certainly not           03:27:17PM
25   referring to the rendition of CLASS that      03:27:18PM

Page 292

LEHN - CONFIDENTIAL
1
2    was put forward in the JAMA article on        03:27:20PM
3    September 30th -- or September 13th, 2000,    03:27:22PM
4    correct?                                      03:27:28PM
5          MR. WANG: Objection.                    03:27:28PM
6          A.    That's my recollection.          03:27:29PM
7          Q.    Because when you look at that     03:27:29PM
8    JAMA article from September 13th, 2000,       03:27:31PM
9    you wouldn't conclude that it flunked out     03:27:33PM
10   because it is claiming that Celebrex is       03:27:35PM
11   superior to NSAIDs?                           03:27:37PM
12         MR. WANG: Objection.                    03:27:41PM
13         Q.    Is that correct, sir?             03:27:42PM
14         MR. WANG: Objection to form.            03:27:43PM
15         A.    I would have to go back and       03:27:43PM
16   look at the precise language in JAMA.         03:27:45PM
17         Q.    Okay. Well, let's look at         03:27:45PM
18   Exhibit 3. I think you have it there in       03:27:47PM
19   your pile.                                    03:27:49PM
20         MR. WANG: Which one is this?            03:27:52PM
21         MR. SAHAM: This is Wolfe                03:27:54PM
22   Exhibit 3. We looked at it previously.        03:27:55PM
23   It is the JAMA article.                       03:27:57PM
24         Q.    And specifically I would refer    03:28:01PM
25   you to last three Bates numbers 885, the      03:28:06PM

Page 293

LEHN - CONFIDENTIAL
1
2    third column, where the journal article      03:28:16PM
3    reports "Despite these caveats, however,     03:28:20PM
4    our results demonstrate that celecoxib at    03:28:24PM
5    a dosage of 2 to 4-fold greater than the     03:28:27PM
6    maximum therapeutic dosages and those        03:28:30PM
7    approved for labeling for RA and OA is       03:28:33PM
8    associated with lower rate of upper GI       03:28:37PM
9    toxic effects compared with standard         03:28:43PM
10   therapeutic dosages of NSAIDs."              03:28:45PM
11         Do you see that?                        03:28:47PM
12         A.    I do.                             03:28:47PM
13         Q.    And the analyst report on        03:28:48PM
14   February 8th that says "CLASS Flunks Out"     03:28:49PM
15   seems to be inconsistent with the            03:28:53PM
16   conclusion here in the JAMA article; is      03:28:54PM
17   that correct?                                 03:28:58PM
18         MR. WANG: Objection.                    03:28:58PM
19         A.    Again, I would have to go back    03:28:59PM
20   and juxtapose the analyst report with this   03:29:00PM
21   to see whether there is a close              03:29:03PM
22   correspondence between the two.              03:29:04PM
23         Q.    But certainly the sentence I     03:29:05PM
24   just read to you would not correspond with   03:29:06PM
25   the conclusion that CLASS had flunked out,   03:29:08PM

74 (Pages 290 to 293)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 294

```
1         LEHN - CONFIDENTIAL
2    would it?                    03:29:10PM
3         MR. WANG: Objection.        03:29:12PM
4    A.    Well, this is where, again, I   03:29:13PM
5    don't want to parse words. But it was    03:29:14PM
6    clear to the market and I believe in the   03:29:17PM
7    JAMA article that Celebrex didn't meet the   03:29:20PM
8    primary endpoint and a p of 0.09 is not   03:29:24PM
9    the 5 percent gold standard that we were   03:29:28PM
10   talking about earlier.            03:29:30PM
11        So, you know, whether that   03:29:33PM
12   constitutes flunking out because you   03:29:35PM
13   didn't meet the primary endpoint or   03:29:37PM
14   whether flunking out refers to something   03:29:41PM
15   more generally is something I would have   03:29:43PM
16   to go back and refresh my memory on.   03:29:45PM
17   Q.    And certainly a reader of the   03:29:47PM
18   JAMA article would not be aware that the   03:29:49PM
19   entire study data, when you looked at the   03:29:51PM
20   entire study period, the p-value was 0.45   03:29:53PM
21   not 0.09, correct?            03:30:00PM
22   A.    That is my recollection, that's   03:30:00PM
23   correct.                    03:30:01PM
24   Q.    Let's look back at "CLASS   03:30:02PM
25   Flunks Out," which is in this pile   03:30:08PM
```

Page 295

```
1         LEHN - CONFIDENTIAL
2    somewhere.                    03:30:11PM
3         And, for the record, when we   03:30:45PM
4    are talking about "CLASS Flunks Out," this   03:30:47PM
5    is Exhibit 507. That bears Bates numbers   03:30:49PM
6    DEFEX 005589 through 597.          03:30:53PM
7         And looking at this document,   03:31:11PM
8    this is clearly -- it is dated February   03:31:13PM
9    8th, 2001, correct?            03:31:16PM
10   A.    Correct.                03:31:17PM
11   Q.    So it is not close in time to   03:31:17PM
12   the JAMA article, it is close in time to   03:31:19PM
13   the disclosures relating to CLASS that   03:31:21PM
14   occurred on February 6th and February 7th,   03:31:23PM
15   2001; is that correct?            03:31:26PM
16   A.    That's correct.            03:31:26PM
17   Q.    And if you look at the third   03:31:27PM
18   bullet point of this analyst report, the   03:31:29PM
19   CIBC authors, Mara Goldstein, Steven   03:31:31PM
20   Gerber and Adam Sohn write "Market share   03:31:38PM
21   growth is stable. Concern over slowing   03:31:41PM
22   market share is likely to manifest in   03:31:43PM
23   share price weakness." Do you see that?   03:31:44PM
24   A.    I do.                    03:31:46PM
25   Q.    And would you agree that that   03:31:47PM
```

Page 296

```
1         LEHN - CONFIDENTIAL
2    would be bad news? And I know you don't   03:31:48PM
3    like the word "news," but bad information   03:31:51PM
4    for Pharmacia?                03:31:53PM
5    A.    Again, it would appear to be   03:31:55PM
6    not positive, yeah.            03:31:57PM
7    Q.    And this analyst report is at   03:31:58PM
8    least closely associated in time with the   03:32:03PM
9    disclosures that occurred on February 6th   03:32:05PM
10   and February 7th regarding the CLASS   03:32:07PM
11   trial, correct?                03:32:09PM
12   A.    Correct.                03:32:09PM
13        MR. WANG: Objection.        03:32:12PM
14   Q.    Now, I want to switch gears   03:32:19PM
15   slightly.                    03:32:23PM
16        One of the purposes of the   03:32:25PM
17   event study and regression analysis is to   03:32:26PM
18   control for market effects; is that   03:32:29PM
19   correct?                    03:32:31PM
20   A.    That's correct.            03:32:31PM
21   Q.    And what does that mean?   03:32:32PM
22   A.    Well, what it means is that you   03:32:33PM
23   can think about three sets of factors that   03:32:38PM
24   might affect a company's stock price on a   03:32:42PM
25   given day. One would be the movement of   03:32:44PM
```

Page 297

```
1         LEHN - CONFIDENTIAL
2    the overall market. One would be the   03:32:46PM
3    movement of an industry or a peer index.   03:32:49PM
4    And third would be information that's   03:32:53PM
5    unique to the company itself.         03:32:56PM
6         So the inclusion of a market   03:32:59PM
7    index is an attempt to control for the   03:33:00PM
8    fact that the fortunes of most stocks tend   03:33:02PM
9    to rise and fall with the fortunes of the   03:33:06PM
10   overall market and to different degrees   03:33:09PM
11   and not on every day, but as a general   03:33:12PM
12   matter that's true.            03:33:14PM
13   Q.    Now, is another item that you   03:33:17PM
14   control for in your regression analysis an   03:33:21PM
15   event study as you control for sector   03:33:23PM
16   effects?                    03:33:26PM
17   A.    You can. It depends on the   03:33:27PM
18   facts of a particular case and also   03:33:29PM
19   depends upon empirically whether there is   03:33:32PM
20   a case to be made for that. And in this   03:33:34PM
21   case there was.                03:33:36PM
22   Q.    And what was the purpose of   03:33:37PM
23   controlling for sector effects in this   03:33:39PM
24   case?                        03:33:41PM
25   A.    Again, similar line of   03:33:41PM
```

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 298

1        LEHN - CONFIDENTIAL
2    reasoning, that the fortunes of an        03:33:43PM
3    individual company on a given day, you        03:33:46PM
4    know, often will be dependent upon the        03:33:48PM
5    fortunes of the industry.  So if some        03:33:51PM
6    information comes out, it might affect all  03:33:55PM
7    firms in the industry, and you want to        03:33:57PM
8    attempt to control for that.        03:33:59PM
9        Q.    And you have a difference in    03:34:00PM
10   opinion with Professor Feinstein as to        03:34:01PM
11   whether or not you should further control  03:34:04PM
12   or further focus the event study by        03:34:08PM
13   removing nonpharmaceutical-related        03:34:10PM
14   businesses from the regression?        03:34:14PM
15       A.    Correct.        03:34:16PM
16       Q.    And why do you think it        03:34:17PM
17   wouldn't be helpful to look at just        03:34:18PM
18   Pharmacia's pharmaceutical business and    03:34:22PM
19   focusing the regression even further?        03:34:24PM
20       A.    Well, there is several reasons. 03:34:27PM
21   The first, and it almost seems to be        03:34:28PM
22   most self-evident, is that the plaintiffs    03:34:32PM
23   in this case are alleging that they        03:34:35PM
24   suffered losses through their investments  03:34:36PM
25   in Pharmacia stock, which means that        03:34:40PM

Page 299

1        LEHN - CONFIDENTIAL
2    should be the unit of analysis that one        03:34:44PM
3    examines for both materiality and loss        03:34:46PM
4    causation.        03:34:49PM
5        And what Dr. Feinstein has done 03:34:51PM
6    is he has sort of concocted a fictitious    03:34:53PM
7    company that doesn't exist, which is        03:34:57PM
8    Pharmacia sans its holdings in new        03:35:00PM
9    Monsanto, and then he sets off to do his    03:35:05PM
10   event study analysis based on this        03:35:08PM
11   fiction, which not just as a legal matter,  03:35:10PM
12   I'm not a lawyer, but as an economics        03:35:18PM
13   matter, if the point of the exercise is to  03:35:20PM
14   determine whether information is material  03:35:22PM
15   for Pharmacia, the entire entity, and        03:35:23PM
16   whether there were losses suffered by        03:35:27PM
17   investors in Pharmacia stock, then as a    03:35:29PM
18   matter of economics that's what one should  03:35:33PM
19   be looking at.        03:35:35PM
20       Q.    Do you agree that your event    03:35:36PM
21   study does not control for potential        03:35:37PM
22   information that came into the market on    03:35:40PM
23   the relevant days regarding agricultural    03:35:42PM
24   or chemical-related businesses?        03:35:44PM
25       A.    Well, I wouldn't agree with    03:35:46PM

Page 300

1        LEHN - CONFIDENTIAL
2    that in the sense that what I did was I        03:35:53PM
3    identified peer companies as identified by  03:35:57PM
4    analysts that cover Pharmacia, and I kept  03:36:00PM
5    replicating my model by adding more        03:36:03PM
6    companies based on the frequency with        03:36:05PM
7    which analysts cited its peers and kept        03:36:07PM
8    adding until the adjusted r-squared        03:36:11PM
9    started to go down, which means now if you  03:36:15PM
10   add this particular company it detracts        03:36:18PM
11   from the explanatory power of the model.    03:36:19PM
12   And no agriculture or chemical companies    03:36:21PM
13   met that screen.        03:36:25PM
14       Furthermore, when you run        03:36:26PM
15   Dr. Feinstein's model, not his concocted    03:36:27PM
16   fictitious model, but he runs a second        03:36:31PM
17   model where he looks at what he should be  03:36:35PM
18   looking at, Pharmacia, the entire entity,  03:36:37PM
19   and when you add the chemical index, it is  03:36:39PM
20   not significantly associated with the        03:36:42PM
21   returns on Pharmacia, and in fact when you  03:36:44PM
22   add the chemical index, the adjusted        03:36:47PM
23   r-squared goes down a bit, which means        03:36:52PM
24   that the data is telling you that it adds    03:36:53PM
25   nothing to the explanatory power of the    03:36:55PM

Page 301

1        LEHN - CONFIDENTIAL
2    returns in Pharmacia.        03:36:57PM
3        So from my point of view what  03:36:59PM
4    Dr. Feinstein has done is unscientific, it  03:37:01PM
5    is contrived, and with respect to the        03:37:04PM
6    chemical index, it adds nothing to the        03:37:06PM
7    explanatory power of the returns for        03:37:09PM
8    Pharmacia.        03:37:12PM
9        Q.    You would agree that if the    03:37:12PM
10   jury accepted or the court accepted that    03:37:14PM
11   the three-day window is the appropriate    03:37:16PM
12   window to look at regardless of whether        03:37:18PM
13   you excluded the Monsanto portion of the    03:37:20PM
14   business, that three-day window is        03:37:23PM
15   statistically significant whether Monsanto  03:37:26PM
16   is included or not?        03:37:28PM
17       MR. WANG:  Objection.        03:37:29PM
18       A.    What I would agree is that    03:37:30PM
19   February 8th is statistically significant,  03:37:32PM
20   and I think it is misleading to say that    03:37:34PM
21   the three-day window was statistically        03:37:38PM
22   significant because the first two days        03:37:40PM
23   were not.        03:37:42PM
24       Q.    Well, to break that down, you  03:37:43PM
25   would agree that whether Monsanto is in or  03:37:44PM

76  (Pages 298 to 301)

CONFIDENTIAL

Page 302

1          LEHN - CONFIDENTIAL
2    out, February 8th is statistically          03:37:47PM
3    significant on either regression analysis?  03:37:49PM
4       A.    "Either" meaning?          03:37:51PM
5       Q.    With Monsanto or without        03:37:53PM
6    Monsanto.                          03:37:55PM
7       A.    That is correct.              03:37:55PM
8       Q.    And you would also agree, and   03:37:56PM
9    I'm not trying to be Perry Mason here or    03:37:59PM
10   anything, I'm just asking you if the court  03:38:04PM
11   articulated in a written opinion that the   03:38:06PM
12   appropriate window to consider for the      03:38:08PM
13   purposes of statistical significance in     03:38:10PM
14   determining loss causation was a three-day  03:38:11PM
15   window, it wouldn't matter whether          03:38:14PM
16   Monsanto was included or excluded, those    03:38:16PM
17   three days, the returns, the cumulative     03:38:19PM
18   returns over those three days was           03:38:21PM
19   statistically significant whether Monsanto  03:38:24PM
20   is included or excluded; is that correct,   03:38:26PM
21   sir?                               03:38:30PM
22       MR. WANG: Objection.            03:38:31PM
23       A.    Using Dr. Feinstein's two    03:38:32PM
24   models or --                       03:38:33PM
25       Q.    Well, let's look at his two  03:38:36PM

Page 303

1          LEHN - CONFIDENTIAL
2    models. They would be statistically         03:38:38PM
3    significant whether Monsanto is included    03:38:39PM
4    or excluded, correct?              03:38:41PM
5       MR. WANG: Objection.            03:38:42PM
6       A.    I'm just hesitating because I  03:38:43PM
7    forget the precise finding on that with     03:38:46PM
8    respect to the second regression model,     03:38:48PM
9    but I believe that's the case.          03:38:50PM
10      Q.    And you have an exhibit in your  03:38:51PM
11   rebuttal report where -- I might as well    03:38:52PM
12   mark this as Exhibit 516.          03:38:55PM
13       (Plaintiffs' Exhibit 516 marked  03:38:57PM
14   for identification.)               03:38:59PM
15      Q.    Could you please take a look at  03:39:10PM
16   516. That appears to be your rebuttal       03:39:11PM
17   report; is that correct?           03:39:14PM
18      A.    Without checking every page, it  03:39:15PM
19   appears to be.                     03:39:18PM
20      Q.    And it has your signature there  03:39:20PM
21   somewhere? Let's be precise. On page 25,   03:39:22PM
22   does that appear to be your signature?      03:39:27PM
23      A.    It is, yes.                03:39:28PM
24      Q.    And if we look at Exhibit 3 of  03:39:29PM
25   your rebuttal report, Statistical          03:39:31PM

Page 304

1          LEHN - CONFIDENTIAL
2    Significance of Dr. Feinstein's Cumulative  03:39:35PM
3    Residual Price Declines Following the       03:39:37PM
4    Release of FDA Briefing Documents on        03:39:39PM
5    February 6th, 2001, if you look at the      03:39:40PM
6    three days, you have that dashed line of    03:39:45PM
7    being where statistical significance would  03:39:48PM
8    need to be?                        03:39:49PM
9       A.    Correct.                  03:39:50PM
10      Q.    And it well exceeds that when   03:39:50PM
11   you look at the three days?         03:39:52PM
12      A.    That is correct.              03:39:53PM
13      Q.    And would that refresh your    03:39:53PM
14   recollection, since the r-squared, when     03:39:54PM
15   you put the chemical companies in there,    03:39:57PM
16   didn't do much, that it is statistically    03:39:59PM
17   significant either way, whether you         03:40:01PM
18   include Monsanto or exclude Monsanto under  03:40:03PM
19   Dr. Feinstein's analysis?          03:40:06PM
20      A.    Again, I would have to see the  03:40:07PM
21   underlying calculations, but I believe      03:40:09PM
22   that's correct.                    03:40:10PM
23      Q.    And it is interesting, here in  03:40:10PM
24   Exhibit 3 you say the title of your         03:40:12PM
25   exhibit is Statistical Significance of      03:40:15PM

Page 305

1          LEHN - CONFIDENTIAL
2    Dr. Feinstein's Cumulative Residual Price   03:40:17PM
3    Declines Following the Release of FDA       03:40:21PM
4    Briefing Documents on February 6th, 2001.   03:40:23PM
5       How come you didn't include the    03:40:27PM
6    company briefing document in the title of   03:40:28PM
7    Exhibit 3?                         03:40:30PM
8       MR. WANG: Objection to form.    03:40:31PM
9       A.    Well, the alleged corrective  03:40:32PM
10   disclosures were contained in the FDA       03:40:35PM
11   briefing documents.                03:40:38PM
12      Q.    But the FDA briefing documents  03:40:38PM
13   were simultaneously posted in the same      03:40:40PM
14   posting with the company briefing          03:40:43PM
15   document, correct?                 03:40:45PM
16      A.    Correct.                  03:40:45PM
17      Q.    Is it possible that you didn't  03:40:46PM
18   consider the company briefing document      03:40:47PM
19   prior to signing your rebuttal report on    03:40:49PM
20   July 15th of 2011?                 03:40:53PM
21      A.    Consider in what way, sir?    03:40:56PM
22      Q.    Well, did you read it before   03:40:57PM
23   then?                              03:40:59PM
24      A.    I believe so, yes. But it's    03:41:02PM
25   not relevant, frankly, for the analysis     03:41:06PM

77 (Pages 302 to 305)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 306

```
 1        LEHN - CONFIDENTIAL
 2   that I've done.                03:41:08PM
 3   Q.    So your opinion today is that  03:41:08PM
 4   the briefing document has no impact on   03:41:12PM
 5   your analysis of loss causation or    03:41:14PM
 6   materiality?              03:41:16PM
 7   A.    The company briefing document?  03:41:17PM
 8   Q.    The company briefing document.  03:41:18PM
 9   A.    That's correct.          03:41:20PM
10   Q.    And it is similarly your     03:41:20PM
11   opinion that you think that Hassan's   03:41:21PM
12   presentation on February 6th also has no  03:41:26PM
13   impact on your opinion regarding loss   03:41:28PM
14   causation and materiality?        03:41:29PM
15   A.    That is correct.         03:41:30PM
16   Q.    And same with the fact that   03:41:31PM
17   JAMA peer-reviewed journal had published  03:41:33PM
18   the six-month study in a peer-reviewed   03:41:38PM
19   form after peer review in September 13th,  03:41:42PM
20   2000, that again also does not impact your  03:41:47PM
21   loss causation analysis and materiality   03:41:51PM
22   analysis?                03:41:54PM
23   A.    That's correct.          03:41:55PM
24   Q.    And what did you do, what were  03:41:55PM
25   your methods to rule out that those three  03:41:57PM
```

Page 307

```
 1        LEHN - CONFIDENTIAL
 2   documents had no impact on the way the   03:42:00PM
 3   stock moved or the causation and      03:42:03PM
 4   materiality of the revelations occurring  03:42:06PM
 5   on February 6th, what did you do to rule  03:42:08PM
 6   those documents out as being important?  03:42:11PM
 7   A.    Well, in terms of Dr. Hassan's  03:42:13PM
 8   comments, my recollection is there was no  03:42:20PM
 9   new information disclosed in his      03:42:22PM
10   presentation as it pertains to the issues  03:42:25PM
11   in hand here.              03:42:27PM
12        With respect to the JAMA     03:42:29PM
13   article, that had been published in    03:42:31PM
14   September.  So there is no new information  03:42:33PM
15   regarding JAMA.             03:42:35PM
16        And with respect to the company  03:42:37PM
17   briefing materials, I have no basis to   03:42:39PM
18   believe that anything in there would have  03:42:41PM
19   been relevant for the loss causation    03:42:45PM
20   analysis.                03:42:47PM
21   Q.    Are there any other bases for   03:42:48PM
22   your opinion that those three documents   03:42:49PM
23   are not relevant to your consideration?  03:42:52PM
24        MR. WANG:  Objection to form.  03:42:55PM
25   A.    I can't think of any as I sit  03:42:56PM
```

Page 308

```
 1        LEHN - CONFIDENTIAL
 2   here.                  03:43:00PM
 3   Q.    There is no peer-reviewed     03:43:00PM
 4   literature that supports that opinion?   03:43:02PM
 5        MR. WANG:  Objection.      03:43:04PM
 6   A.    Well, there is plenty of     03:43:05PM
 7   peer-reviewed literature that talks about  03:43:07PM
 8   how if the market for a security is    03:43:09PM
 9   efficient, repeating information that had  03:43:11PM
10   been previously disclosed, is not expected  03:43:13PM
11   to affect the company's stock price.  So  03:43:15PM
12   in a general sense, there is peer-reviewed  03:43:19PM
13   literature to support that.        03:43:22PM
14   Q.    Let's focus on Exhibit 70, the  03:43:23PM
15   briefing document.  That didn't      03:43:25PM
16   communicate old information, but      03:43:27PM
17   communicated new information, the      03:43:29PM
18   informative censoring, depletion of    03:43:31PM
19   susceptibles hypothesis.          03:43:33PM
20        Is there any peer-reviewed    03:43:35PM
21   literature that supports your opinion that  03:43:37PM
22   that shouldn't be considered as part of   03:43:38PM
23   the loss causation and materiality     03:43:40PM
24   analysis?                03:43:41PM
25        MR. WANG:  Objection.      03:43:42PM
```

Page 309

```
 1        LEHN - CONFIDENTIAL
 2   A.    Well, the peer-reviewed      03:43:43PM
 3   literature doesn't get as specific as a  03:43:45PM
 4   particular document in a particular case.  03:43:47PM
 5   But in my opinion there is no scientific  03:43:49PM
 6   basis to believe that that would be    03:43:52PM
 7   relevant for determining whether or not  03:43:54PM
 8   there was loss causation on the day that  03:43:57PM
 9   the alleged corrective disclosures were  03:44:00PM
10   made.                  03:44:02PM
11   Q.    But you can't point to a     03:44:02PM
12   particular journal article or piece of   03:44:04PM
13   peer-reviewed literature that supports   03:44:06PM
14   your opinion in that regard?        03:44:07PM
15   A.    Well, I wouldn't expect that   03:44:08PM
16   there would be a peer-reviewed article   03:44:10PM
17   that would be so specific that would say  03:44:12PM
18   the company briefing document would be   03:44:15PM
19   immaterial on this date.         03:44:18PM
20   Q.    But what about confounding    03:44:20PM
21   information, information that says the   03:44:22PM
22   opposite of what the disclosure says?   03:44:24PM
23   A.    That happens frequently in the  03:44:26PM
24   markets.  The very events that we were   03:44:29PM
25   talking about earlier, like earnings    03:44:32PM
```

78  (Pages 306 to 309)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 310

1      LEHN - CONFIDENTIAL
2   announcements that Patell and Wolfson look  03:44:33PM
3   at very frequently when companies report  03:44:36PM
4   disappointing earnings, the earnings      03:44:40PM
5   numbers are going down less than what the  03:44:42PM
6   market expected, and yet very often        03:44:45PM
7   management puts a very positive face on    03:44:47PM
8   the earnings. And they try to take the     03:44:49PM
9   bad news and present it as best they can.  03:44:51PM
10      The market is able to               03:44:56PM
11  discriminate, especially in an efficient   03:44:57PM
12  market, that is the essence of an          03:45:00PM
13  efficient market, it can cut through and   03:45:02PM
14  cut to the chase and process the           03:45:04PM
15  information and process it efficiently.    03:45:05PM
16      And the same with corporate         03:45:08PM
17  takeovers, you know, companies make an     03:45:09PM
18  announcement of a bid, the stock price     03:45:12PM
19  goes down, the market doesn't like the     03:45:15PM
20  acquisition, and management comes out and  03:45:17PM
21  says you know, there are great synergies   03:45:19PM
22  here.                                   03:45:22PM
23      The paper that you pointed me        03:45:22PM
24  to before with Zhao in the Journal of      03:45:23PM
25  Finance we used as an anecdote to AOL Time  03:45:26PM

Page 311

1      LEHN - CONFIDENTIAL
2   Warner, that when AOL bought Time Warner,  03:45:30PM
3   the stock price went down, Steve Case      03:45:31PM
4   talked about how great the synergies were  03:45:33PM
5   in the acquisition, and yet the market was  03:45:35PM
6   able to properly assess the information,   03:45:39PM
7   cut through what you are calling           03:45:41PM
8   confounding information.                03:45:44PM
9      And it is not confounding           03:45:44PM
10  information in the sense that we have been  03:45:46PM
11  talking about it on February 7th and 8th.  03:45:48PM
12  What you are talking about is maybe sort   03:45:51PM
13  of additional color on the information     03:45:53PM
14  that was released. But the essence of an   03:45:54PM
15  efficient market is that it is able to     03:45:57PM
16  pierce through that.                    03:46:01PM
17      Q.    And what paper are you          03:46:01PM
18  referring to? Are you referring to the    03:46:03PM
19  paper that you co-authored with Zhao,      03:46:07PM
20  Exhibit 511?                            03:46:10PM
21      A.    Correct.                      03:46:11PM
22      Q.    Now, are you offering an        03:46:17PM
23  opinion as to what caused the stock price  03:46:18PM
24  increase that occurred on April 19th,      03:46:21PM
25  2000?                                   03:46:24PM

Page 312

1      LEHN - CONFIDENTIAL
2      A.    No.                          03:46:26PM
3      Q.    So you are not offering an      03:46:26PM
4   opinion either way what had caused that   03:46:28PM
5   increase?                               03:46:31PM
6      A.    Well, again, I know one thing   03:46:31PM
7   that didn't cause it, and that was the    03:46:34PM
8   press release on April 17th. I'm          03:46:36PM
9   confident of that based, again, on the    03:46:39PM
10  fact that the assumption is that the       03:46:41PM
11  market for the security is efficient, and  03:46:44PM
12  the information in the April 17th press    03:46:46PM
13  release would therefore be fully reflected  03:46:48PM
14  in Pharmacia's stock price by the close of  03:46:53PM
15  trading on the 17th.                    03:46:55PM
16      Q.    Could you take a look at        03:46:56PM
17  Exhibit 4, again, of your report, the     03:46:58PM
18  first page of Exhibit 4.                03:47:00PM
19      Q.    You would agree with me that    03:47:25PM
20  the return on April 19th of 13.87 percent  03:47:27PM
21  is statistically significant?           03:47:31PM
22      A.    Highly significant.            03:47:37PM
23      Q.    And it was not the result of    03:47:38PM
24  random volatility?                      03:47:39PM
25      A.    Well, again, one can never say  03:47:40PM

Page 313

1      LEHN - CONFIDENTIAL
2   definitively it was not, but you can be    03:47:42PM
3   confident, highly confident, that it was   03:47:45PM
4   not likely to be a random event.         03:47:48PM
5      But having said that, the whole      03:47:51PM
6   essence of a statistical test acknowledge  03:47:53PM
7   that things do happen randomly. So if you  03:47:58PM
8   have a 5 percent significance level, that  03:48:00PM
9   means that five times in a hundred you are  03:48:04PM
10  going to observe an unusual price movement  03:48:08PM
11  that just occurs randomly. So it is not    03:48:11PM
12  as if weird stuff doesn't occasionally     03:48:14PM
13  happen even if efficient markets, it is    03:48:17PM
14  the whole essence of statistical testing.  03:48:19PM
15      Q.    But this one does meet the gold  03:48:22PM
16  standard of the 0.05 statistical           03:48:24PM
17  significance, the 13.87 increase on April  03:48:26PM
18  19th, 2000?                            03:48:29PM
19      A.    Well, it does. But that's my    03:48:30PM
20  point, is that when the gold standard is   03:48:31PM
21  based on a level of significance, so let's  03:48:34PM
22  say the 95 percent confidence level, which  03:48:36PM
23  means that if you observe a price movement  03:48:39PM
24  of a given magnitude in t-statistic with a  03:48:39PM
25  certain level, there's only a five in 100  03:48:43PM

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 314

1         LEHN - CONFIDENTIAL
2    chance that what you are observing is    03:48:46PM
3    random.                      03:48:48PM
4         One exercise in the past that I 03:48:49PM
5    have had students do is take any company,   03:48:51PM
6    Walt Disney, General Electric, take any    03:48:53PM
7    company and do the event study over a long   03:48:56PM
8    enough window, you are going to find over   03:48:58PM
9    a period of maybe 100 days five days in     03:49:01PM
10   which the stock price is going to move     03:49:03PM
11   significantly statistically and there is   03:49:06PM
12   no information. That's the whole essence   03:49:08PM
13   of a random movement.            03:49:10PM
14        But those days are rare, and   03:49:11PM
15   most of the time when you see a movement   03:49:13PM
16   of this magnitude there is an information   03:49:15PM
17   release you can tie it to. But stuff does 03:49:19PM
18   happen that often results in price        03:49:22PM
19   movements without information.           03:49:24PM
20        Q.    And you just need a 1.96     03:49:25PM
21   t-statistic to get statistical         03:49:28PM
22   significance at the 0.05 threshold?       03:49:30PM
23        A.    In a two-tail test, correct   03:49:34PM
24        Q.    And here you have a 7.15 on a 03:49:34PM
25   two-tailed?                      03:49:36PM

Page 315

1         LEHN - CONFIDENTIAL
2         A.    Correct.              03:49:37PM
3         Q.    So this is probably like 99   03:49:37PM
4    percent, right, it is like a 1 percent    03:49:39PM
5    statistical significance?            03:49:43PM
6         A.    Even more, 99 plus.        03:49:44PM
7         Q.    Give me the ballpark. Help me 03:49:45PM
8    a little bit. 99.5, 99.3?            03:49:47PM
9         A.    It would be 0.99, probably a 03:49:50PM
10   few nines there.                 03:49:53PM
11        Q.    So here you could conclude that 03:49:54PM
12   there is like a 99 point something chance   03:49:55PM
13   that this was not due to random         03:49:58PM
14   volatility, correct?              03:50:01PM
15        A.    You could. But that always    03:50:01PM
16   allows that there is still some        03:50:03PM
17   probability, and if you have a large     03:50:05PM
18   enough sample you are going to have --     03:50:07PM
19   every now and then you are going to have a 03:50:10PM
20   day like that.                  03:50:12PM
21        Q.    But here it is like if you    03:50:12PM
22   looked at 100 days, there would be like -- 03:50:12PM
23   strike that.                   03:50:12PM
24        You would testify that there is 03:50:15PM
25   a 99.5 degree of certainty that this was   03:50:17PM

Page 316

1         LEHN - CONFIDENTIAL
2    not due to random volatility, correct?    03:50:22PM
3         A.    Correct.              03:50:24PM
4         Q.    You can't rule it out, but you 03:50:24PM
5    have come pretty close?             03:50:26PM
6         A.    You can't rule it out, though. 03:50:27PM
7         Q.    And did you do -- as part of   03:50:30PM
8    your event study, did you look at the     03:50:32PM
9    information that came in the market,     03:50:34PM
10   say, between April 17th and April 19th?    03:50:36PM
11        A.    I had the information and I    03:50:41PM
12   probably skimmed it, but not with an eye   03:50:45PM
13   towards trying to explain the return on   03:50:47PM
14   April 19th, which would be irrelevant,    03:50:48PM
15   again, for my opinion on materiality and   03:50:51PM
16   loss causation.                 03:50:55PM
17        Q.    Did you look at how the       03:50:55PM
18   market -- what the market's view or what   03:50:58PM
19   they were anticipating with respect to the 03:51:00PM
20   CLASS release prior to April 15th?       03:51:02PM
21        A.    Not systematically. Again, I  03:51:05PM
22   reviewed articles, but not particularly    03:51:13PM
23   with an eye towards that issue.         03:51:17PM
24        Q.    And did it appear, you know,   03:51:19PM
25   from your look at that information that    03:51:21PM

Page 317

1         LEHN - CONFIDENTIAL
2    the market was anticipating positive CLASS 03:51:23PM
3    results to be released in the April time   03:51:25PM
4    frame?                        03:51:27PM
5         A.    It is my general impression. I 03:51:27PM
6    don't recall whether I got it from       03:51:31PM
7    reviewing those articles or whether it is 03:51:32PM
8    something that I learned later when       03:51:33PM
9    reading analyst reports.            03:51:35PM
10        Q.    But from your review of those   03:51:36PM
11   analyst reports there was some expectation 03:51:38PM
12   built into the market that the CLASS data   03:51:40PM
13   was going to be favorable?           03:51:42PM
14        A.    I recall there were some       03:51:43PM
15   excerpts in analyst reports to that      03:51:45PM
16   effect.                       03:51:47PM
17        Q.    And I want to show you what I'm 03:51:48PM
18   marking as Plaintiffs' Exhibit 517.       03:51:51PM
19        (Plaintiffs' Exhibit 517 marked 03:51:54PM
20   for identification.)              03:51:57PM
21        Q.    Could you take a look at that   03:51:57PM
22   document, please.                03:52:17PM
23        And, for the record,            03:52:18PM
24   Plaintiffs' Exhibit 517 is a Morgan      03:52:19PM
25   Stanley Dean Witter analyst report       03:52:22PM

80  (Pages 314 to 317)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 318

```
 1        LEHN - CONFIDENTIAL
 2   regarding Pharmacia dated April 18th,      03:52:25PM
 3   2000, and it is entitled "Positive Results  03:52:28PM
 4   of Celebrex CLASS Trial Released," and it   03:52:30PM
 5   bears Bates numbers DEFEX 006443 through    03:52:34PM
 6   46.                                         03:52:41PM
 7        And is this one of the analyst         03:52:43PM
 8   reports you perused in looking at -- you    03:52:44PM
 9   know, what -- strike that.                  03:52:47PM
10        Is this one of the analyst            03:52:50PM
11   reports you looked at in preparing your     03:52:52PM
12   initial report in this case?               03:52:54PM
13   A.   It is.                                 03:52:54PM
14   Q.   And this analyst report is             03:52:55PM
15   dated April 18th, 2000; is that correct?    03:52:58PM
16   A.   That's correct.                        03:53:01PM
17   Q.   And that's one day after the           03:53:01PM
18   April 17th press release that plaintiffs    03:53:03PM
19   alleged to be false and misleading; is      03:53:05PM
20   that correct?                               03:53:08PM
21   A.   That's correct.                        03:53:08PM
22   Q.   And the title, in pretty large         03:53:09PM
23   type, says "Positive Results of Celebrex    03:53:11PM
24   CLASS Trial Released"; is that correct?     03:53:13PM
25   A.   That's correct.                        03:53:15PM
```

Page 319

```
 1        LEHN - CONFIDENTIAL
 2   Q.   And this document goes on, on          03:53:15PM
 3   the second page, again titled "Positive     03:53:19PM
 4   Results of Celebrex CLASS Trial Released,"  03:53:22PM
 5   it goes on to break down some of the        03:53:24PM
 6   findings of the CLASS trial; is that        03:53:26PM
 7   correct?                                    03:53:31PM
 8   A.   It appears to, yes.                     03:53:31PM
 9   Q.   And it trumpets the p-value,            03:53:32PM
10   and I know you are not going to like the    03:53:35PM
11   word "trumpets," so I will ask the          03:53:36PM
12   question again.                             03:53:39PM
13        It reiterates the p-value of           03:53:40PM
14   0.09 for ulcer complications in the table   03:53:44PM
15   on the right-hand side?                     03:53:46PM
16   A.   Correct, which is not                   03:53:47PM
17   statistically significant.                  03:53:48PM
18   Q.   But is certainly a much                 03:53:50PM
19   superior p-value than the 0.45 that was     03:53:54PM
20   revealed for the entire study data,         03:53:59PM
21   correct, on February 6th, 2001?             03:54:00PM
22        MR. WANG:  Objection.                  03:54:02PM
23   A.   It is a higher level of                 03:54:03PM
24   significance, that's correct.               03:54:05PM
25   Q.   And also there's a box at the          03:54:06PM
```

Page 320

```
 1        LEHN - CONFIDENTIAL
 2   bottom talking about incidence of ulcer     03:54:11PM
 3   complications in symptomatic ulcers; do     03:54:15PM
 4   you see that?                               03:54:18PM
 5   A.   I do.                                   03:54:18PM
 6   Q.   And it reports a p-value of             03:54:19PM
 7   0.03?                                       03:54:21PM
 8   A.   Correct.                                03:54:21PM
 9   Q.   And if you go to the next page,         03:54:21PM
10   there is a box that says incidence of       03:54:23PM
11   ulcer complications, and it is for          03:54:25PM
12   patients not taking aspirin.  Do you see    03:54:29PM
13   that up at the top?  You have to read the   03:54:31PM
14   text.                                       03:54:33PM
15        It says "When a subset analysis        03:54:34PM
16   is conducted to approve the patients        03:54:36PM
17   taking aspirin, Celebrex showed            03:54:38PM
18   statistically significant superiority over  03:54:39PM
19   NSAIDs on both endpoints."                  03:54:39PM
20        Do you see that?                       03:54:43PM
21   A.   I do.                                   03:54:43PM
22   Q.   And it reports a p-value of             03:54:44PM
23   0.037. Do you see that?                      03:54:46PM
24   A.   I do.                                   03:54:46PM
25   Q.   And do you know whether that           03:54:48PM
```

Page 321

```
 1        LEHN - CONFIDENTIAL
 2   p-value held when you went and looked at    03:54:50PM
 3   the entire study results, or that finding   03:54:53PM
 4   of statistical significance held when you   03:54:55PM
 5   looked at the entire study results?         03:54:59PM
 6   A.   I think it did not hold.  For           03:55:00PM
 7   the entire study results, I think the       03:55:05PM
 8   p-value increases.                          03:55:07PM
 9   Q.   And it is approximately 0.185           03:55:08PM
10   when you look at the statistical            03:55:11PM
11   reviewer's report?                          03:55:13PM
12        MR. WANG:  Objection.                  03:55:13PM
13   A.   I haven't committed that to             03:55:14PM
14   memory, but that is easily verified by      03:55:15PM
15   looking at the report.                      03:55:18PM
16   Q.   And this information regarding          03:55:19PM
17   the CLASS trial is information in addition  03:55:23PM
18   to what was found in the April 17th press   03:55:26PM
19   release that plaintiffs allege is false     03:55:29PM
20   and misleading in this case; is that        03:55:32PM
21   correct?                                    03:55:36PM
22   A.   Can you repeat the question?           03:55:36PM
23   Q.   Well, there is information in          03:55:37PM
24   this analyst report detail that is not      03:55:38PM
25   found in the April 17th press release; is   03:55:42PM
```

81 (Pages 318 to 321)

CONFIDENTIAL

Page 322

```
 1         LEHN - CONFIDENTIAL
 2   that correct?  Have you compared the two?  03:55:46PM
 3       A.    I haven't stacked them up       03:55:47PM
 4   against each other.  But I don't recall,   03:55:49PM
 5   for example, seeing the numbers in the     03:55:52PM
 6   boxes in the press release, so that would  03:55:55PM
 7   be one difference, one level of detail     03:55:59PM
 8   that -- unless it was presented in a       03:56:01PM
 9   narrative form in the press release.       03:56:05PM
10       Q.    Now, can you look back at        03:56:14PM
11   Exhibit 503, the Patell and Wolfson        03:56:23PM
12   article, specifically page 235.            03:56:26PM
13            And in the first full paragraph 03:56:42PM
14   in the middle of page 235, Patell and      03:56:43PM
15   Wolfson write "The evening following the   03:56:46PM
16   announcement provides an opportunity for   03:56:50PM
17   news to be disseminated to investors who   03:56:51PM
18   are unable to execute intraday trading     03:56:54PM
19   strategies, and their actions may affect   03:56:57PM
20   the overnight price change and the opening 03:56:59PM
21   trades on the next day."                   03:57:03PM
22            Do you see that?                  03:57:05PM
23       A.    I do.                            03:57:05PM
24       Q.    Is it possible -- strike that.   03:57:05PM
25            Have you done anything to rule    03:57:07PM
```

Page 323

```
 1         LEHN - CONFIDENTIAL
 2   out that investor reaction on April 19th   03:57:08PM
 3   to having read this analyst report, this   03:57:11PM
 4   Morgan Stanley analyst report on April     03:57:13PM
 5   18th, is not what caused the statistically 03:57:16PM
 6   significant stock increase on April 19th?  03:57:20PM
 7       A.    I have not, and, again, it       03:57:23PM
 8   would not be relevant for my opinion.      03:57:25PM
 9       Q.    Well, if you did do an analysis 03:57:28PM
10   that revealed that the reaction on April   03:57:31PM
11   19th was a result of this article, how     03:57:34PM
12   would that impact your opinions?           03:57:36PM
13       MR. WANG:  Objection to form.          03:57:40PM
14       A.    It wouldn't impact it at all,    03:57:41PM
15   because the alleged misrepresentation      03:57:44PM
16   occurred on April 17th, and the            03:57:45PM
17   presumption that the market for Pharmacia  03:57:49PM
18   stock was efficient, that information      03:57:51PM
19   would have been fully reflected in         03:57:54PM
20   Pharmacia's stock price by the close on    03:57:56PM
21   April 17th.                                03:57:58PM
22            And if an analyst issued a        03:58:00PM
23   report, well, that is additional           03:58:02PM
24   information, but it is separate from the   03:58:04PM
25   alleged misrepresentation that it had      03:58:07PM
```

Page 324

```
 1         LEHN - CONFIDENTIAL
 2   occurred on April 17th.                    03:58:10PM
 3       Q.    And you have no alternative      03:58:11PM
 4   explanation as to what caused the          03:58:13PM
 5   statistically significant price increase   03:58:15PM
 6   on April 19th though, correct?             03:58:16PM
 7       A.    I don't.  But, again, I think,   03:58:18PM
 8   keep in mind, one is it is not relevant    03:58:21PM
 9   from my point of view as to materiality    03:58:24PM
10   and loss causation.  Second is that if you 03:58:27PM
11   just inspect the data, what you observe is 03:58:30PM
12   that there's a statistically significant   03:58:33PM
13   increase on April 19th and then a large    03:58:35PM
14   statistically significant decrease on      03:58:40PM
15   April 25th of minus 8.05 percent, which    03:58:43PM
16   has a t-statistics of minus 4.11.          03:58:49PM
17            And my recollection is that was   03:58:55PM
18   the day that Pharmacia issued an earnings  03:58:56PM
19   report, and the earnings were              03:58:58PM
20   disappointing, and the market took 8.05    03:59:01PM
21   percent of value away on a residual basis. 03:59:06PM
22            And the reason I mention that     03:59:09PM
23   is it is not unusual, and I haven't done a 03:59:10PM
24   study of it in this case, but it is not    03:59:13PM
25   unusual prior to an earnings announcement  03:59:15PM
```

Page 325

```
 1         LEHN - CONFIDENTIAL
 2   for there to be speculation about the      03:59:18PM
 3   earnings being, you know, better than had  03:59:20PM
 4   been expected or worse than had been       03:59:22PM
 5   expected.                                  03:59:25PM
 6            And when you see a pattern like   03:59:25PM
 7   this of 13.87 percent days before the      03:59:28PM
 8   earnings announcement and then a major     03:59:30PM
 9   decline when the earnings came out, it     03:59:32PM
10   certainly is consistent with expectations  03:59:34PM
11   that earnings were going to be better than 03:59:37PM
12   what they actually reported on April 25th. 03:59:38PM
13            So there could be other           03:59:42PM
14   reasons, but it is not my objective to     03:59:45PM
15   determine what the reason was.             03:59:47PM
16       Q.    But the earnings announcement    03:59:48PM
17   was on April 25th, not April 18th,         03:59:49PM
18   correct?                                   03:59:53PM
19       A.    Correct.  But it is not unusual 03:59:53PM
20   for major corporate events, whether it be  03:59:55PM
21   earnings announcements or takeover         03:59:57PM
22   announcements, for speculation to start in 03:59:59PM
23   the market prior to the actual             04:00:02PM
24   announcement, rumors spreading that things 04:00:03PM
25   are better than we thought and the market  04:00:05PM
```

82 (Pages 322 to 325)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 326

LEHN - CONFIDENTIAL

1       LEHN - CONFIDENTIAL
2   might then -- you often find that the      04:00:08PM
3   market is more volatile for a stock prior   04:00:11PM
4   to a major announcement because there is    04:00:14PM
5   such speculation.                04:00:16PM
6       Q.   Do you have any evidence that    04:00:17PM
7   you can point to as we sit here today that  04:00:18PM
8   there was speculation about the earnings    04:00:20PM
9   announcement on April 25th that was moving  04:00:22PM
10  the market on April 18th?             04:00:24PM
11      A.   No.  But, again, I haven't set  04:00:26PM
12  out to determine the cause of the increase  04:00:29PM
13  on April 19th and I don't think it was     04:00:31PM
14  relevant.                   04:00:33PM
15      I was trying to be responsive      04:00:33PM
16  to your question about do I have any other  04:00:35PM
17  explanation, and I'm saying as I sit here   04:00:36PM
18  without having done analysis to be        04:00:40PM
19  responsive to your question, one possible   04:00:42PM
20  explanation would be speculation about the  04:00:44PM
21  earnings report that proved to be wrong.    04:00:46PM
22      Q.   But there was not a specific   04:00:49PM
23  analyst report or news article that you     04:00:50PM
24  would point to to refer to such          04:00:52PM
25  speculation?                 04:00:55PM

Page 327

1       LEHN - CONFIDENTIAL
2       A.   I haven't looked for it, again,  04:00:55PM
3   because I don't think it is relevant for    04:00:58PM
4   my opinion.                  04:00:59PM
5       Q.   Now, at paragraph 16 of your   04:01:00PM
6   report, you are offering an opinion about   04:01:09PM
7   insider sales.  I guess that's the       04:01:12PM
8   summary.  You say "Based on the results of  04:01:14PM
9   the event study analysis, I conclude that   04:01:16PM
10  there is no scientific basis to conclude    04:01:18PM
11  that Ms. Cox and Dr. Geis sold Pharmacia    04:01:21PM
12  stock during the class period at stock     04:01:25PM
13  prices that were artificially inflated     04:01:27PM
14  because of the alleged             04:01:29PM
15  misrepresentations."             04:01:30PM
16      What are the bases of that        04:01:30PM
17  opinion?                    04:01:32PM
18      A.   Well, again, the fact that    04:01:33PM
19  after conducting my analysis I've        04:01:37PM
20  concluded there is no scientific basis to   04:01:40PM
21  believe that the alleged            04:01:43PM
22  misrepresentations were material, and by   04:01:43PM
23  implication there is no scientific basis    04:01:46PM
24  to believe that Pharmacia's stock price    04:01:48PM
25  was artificially inflated because of the   04:01:50PM

Page 328

1       LEHN - CONFIDENTIAL
2   alleged misrepresentations.          04:01:53PM
3       And, therefore, regardless of,    04:01:56PM
4   you know, how many shares Ms. Cox and      04:01:58PM
5   Dr. Geis were selling during this period,   04:02:01PM
6   there is no scientific basis to conclude    04:02:03PM
7   that they were selling those shares at     04:02:05PM
8   artificially inflated prices.         04:02:08PM
9       Q.   So your opinion relates to the  04:02:08PM
10  inflation, not to whether they sold based   04:02:09PM
11  on inside information; is that correct?     04:02:11PM
12      A.   My only hesitancy is when you  04:02:19PM
13  say "based on inside information," inside   04:02:21PM
14  information concerning what?          04:02:23PM
15      Q.   Well, let's talk about CLASS.  04:02:25PM
16      You are not offering an opinion   04:02:27PM
17  that Dr. Geis or Ms. Cox were not in      04:02:29PM
18  possession of the entire study data at the  04:02:33PM
19  time they sold; are you offering that      04:02:36PM
20  opinion, sir?                04:02:38PM
21      A.   I don't have an opinion either  04:02:40PM
22  way on that.  That's a factual matter that  04:02:42PM
23  goes beyond my expertise.          04:02:44PM
24      Q.   Because you are just testifying  04:02:45PM
25  or you are just offering an opinion that   04:02:47PM

Page 329

1       LEHN - CONFIDENTIAL
2   the price -- you don't believe the price   04:02:49PM
3   was inflated at the time they sold, at the  04:02:51PM
4   dates they sold, your opinion is that the   04:02:52PM
5   stock was not inflated on those dates as a  04:02:54PM
6   result of the alleged fraud here?        04:02:57PM
7       A.   Not to parse words, but to be  04:02:58PM
8   specific, though, my position, my opinion,  04:03:01PM
9   is that there is no scientific basis to    04:03:03PM
10  conclude that there was artificial        04:03:05PM
11  inflation in Pharmacia's stock price, and   04:03:07PM
12  therefore there is no scientific basis to   04:03:10PM
13  conclude that Ms. Cox and Dr. Geis were    04:03:12PM
14  selling shares at a time when Pharmacia's   04:03:16PM
15  stock price was artificially inflated.     04:03:18PM
16      Q.   But you don't have an opinion   04:03:20PM
17  as to whether or not they were in        04:03:22PM
18  possession of material nonpublic         04:03:23PM
19  information at the time they sold the      04:03:25PM
20  stock?                     04:03:27PM
21      A.   I don't know what they were in  04:03:28PM
22  possession of at the time they sold the    04:03:30PM
23  stock.                     04:03:31PM
24      Q.   You didn't take any steps to   04:03:31PM
25  interview them or ask them about what they  04:03:33PM

83  (Pages 326 to 329)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 330

LEHN - CONFIDENTIAL

1
2    knew at the time they sold, correct?        04:03:35PM
3        A.    That is correct.          04:03:36PM
4        Q.    You didn't review the documents 04:03:37PM
5    to determine whether they were in        04:03:39PM
6    possession of the entire study data at the 04:03:41PM
7    time that they sold, correct?          04:03:43PM
8        A.    That is correct. But what I    04:03:44PM
9    did know is what the allegations were in   04:03:47PM
10   this matter, and after conducting my       04:03:50PM
11   analysis I concluded that there is no       04:03:53PM
12   scientific basis to conclude that the       04:03:54PM
13   alleged misrepresentations artificially     04:03:57PM
14   inflated Pharmacia stock price.          04:04:04PM
15       Q.    Now, is it accurate that       04:04:06PM
16   Exhibits 500 and 516, your report and your 04:05:03PM
17   rebuttal report, fully set forth the      04:05:06PM
18   opinions that you intend to offer in this  04:05:09PM
19   case as of today's date?            04:05:11PM
20       MR. WANG: Objection to form.    04:05:13PM
21       A.    As of today's date, that is    04:05:14PM
22   correct, with at least one qualification,   04:05:19PM
23   and that is that I haven't had a chance to  04:05:25PM
24   fully review Dr. Feinstein's deposition     04:05:28PM
25   transcript, and insofar that there is      04:05:30PM

Page 331

LEHN - CONFIDENTIAL

1
2    trial testimony from Dr. Feinstein, I may  04:05:35PM
3    be asked to opine as to his trial         04:05:38PM
4    testimony as well.                04:05:40PM
5        Q.    And are there any other areas  04:05:40PM
6    that you have been asked by the defense    04:05:44PM
7    lawyers in this case to provide opinions   04:05:47PM
8    other than what's in your two reports?    04:05:48PM
9        MR. WANG: Objection to form.   04:05:51PM
10       A.    Not as I sit here today.       04:05:52PM
11       Q.    And is the bases for your      04:05:55PM
12   opinions expressed, regarding loss        04:05:57PM
13   causation and materiality, fully set forth  04:06:00PM
14   in the two reports?              04:06:02PM
15       MR. WANG: Objection to form.   04:06:04PM
16       A.    They are, yes.            04:06:06PM
17       Q.    And are there any assumptions  04:06:07PM
18   underlying your opinions regarding       04:06:10PM
19   causation and materiality?            04:06:12PM
20       A.    Well, there are a lot of pieces 04:06:14PM
21   of the analysis that I did, but perhaps     04:06:22PM
22   the most salient assumption is that for     04:06:25PM
23   purposes of assessing materiality and loss  04:06:28PM
24   causation, I assume that the alleged       04:06:30PM
25   misrepresentations occurred.          04:06:32PM

Page 332

LEHN - CONFIDENTIAL

1
2        Q.    Any other assumptions?       04:06:33PM
3        A.    I can't think of any that would 04:06:38PM
4    be particularly relevant.            04:06:47PM
5        Q.    And is there any literature     04:06:49PM
6    that you reviewed that contradicts your    04:06:51PM
7    opinions in any way?             04:06:52PM
8        A.    No.              04:06:55PM
9        Q.    Is there any evidence that you 04:06:58PM
10   reviewed and discounted?           04:07:00PM
11       MR. WANG: Objection to form.   04:07:04PM
12       A.    Discounted in forming my      04:07:05PM
13   opinion or discounted because I didn't      04:07:07PM
14   think it was particularly good evidence?   04:07:08PM
15       Q.    Was there any particular       04:07:11PM
16   evidence that you disregarded as        04:07:13PM
17   unimportant in coming up with your       04:07:14PM
18   opinions?                   04:07:16PM
19       MR. WANG: Objection.        04:07:17PM
20       A.    I'm not sure I -- I mean,      04:07:20PM
21   obviously one sets out to do a thorough    04:07:23PM
22   job that one is asked to form an opinion    04:07:30PM
23   on. I'm not sure what you mean by        04:07:32PM
24   "disregard information."            04:07:37PM
25       Q.    Well, for instance, could I    04:07:42PM

Page 333

LEHN - CONFIDENTIAL

1
2    refer you to page 29 of your report,       04:07:44PM
3    specifically paragraph 40 -- or footnote   04:07:47PM
4    40. And you are referring to -- you said   04:07:50PM
5    "I am aware of only one analyst, Enskilda  04:07:56PM
6    Securities, that revised its EPS         04:07:59PM
7    projections downward by almost 9 percent." 04:08:02PM
8        Why do you discount the         04:08:03PM
9    reduction in EPS projections of the       04:08:05PM
10   Enskilda analyst?               04:08:08PM
11       MR. WANG: Objection.        04:08:11PM
12       Q.    In footnote 40.            04:08:12PM
13       A.    Well, it is anecdotal, it is    04:08:13PM
14   one analyst of many. As I indicated, if    04:08:16PM
15   you look at the exhibit, you will see that  04:08:18PM
16   Enskilda was well above the other analysts  04:08:21PM
17   in their projected EPS for Pharmacia, and  04:08:24PM
18   what they did was they revised the EPS     04:08:28PM
19   number downward and into line with the     04:08:31PM
20   other analysts. But that's a lot         04:08:33PM
21   different than having all analysts or       04:08:36PM
22   almost all analysts dramatically changing  04:08:38PM
23   their EPS projections, which does happen   04:08:41PM
24   around some corporate events.          04:08:44PM
25       So, you know, I reported it and 04:08:46PM

84  (Pages 330 to 333)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 334

```
1          LEHN - CONFIDENTIAL
2   I disclosed it, but I wouldn't put much    04:08:48PM
3   weight on this if it were an academic      04:08:51PM
4   paper and I don't place much weight on it  04:08:54PM
5   in this report.                 04:08:56PM
6      Q.    And there were other analysts  04:08:56PM
7   that revised their earnings downward less  04:08:58PM
8   than 9 percent; is that correct?        04:09:00PM
9      A.    Well, I think right around this 04:09:01PM
10  date, we can look, I think they were the   04:09:03PM
11  only one. I mean, it is best probably     04:09:06PM
12  just to look directly at the data.       04:09:13PM
13     Q.    I'm just wondering why it is   04:09:13PM
14  worded as "I'm aware of only one analyst,  04:09:15PM
15  Enskilda, that revised its EPS projections 04:09:18PM
16  downward by almost 9 percent."          04:09:18PM
17          Are you saying that there were  04:09:20PM
18  others that revised it less than 9 percent 04:09:21PM
19  or are you just commenting on the amount   04:09:24PM
20  of the Enskilda revision in footnote 40?   04:09:26PM
21     A.    My recollection is they were   04:09:30PM
22  the only one to revise downward at all,    04:09:33PM
23  and the amount by which they revised down  04:09:36PM
24  was 9 percent.                 04:09:39PM
25     Q.    And did you consider the       04:09:45PM
```

Page 335

```
1          LEHN - CONFIDENTIAL
2   process by which a label would be revised  04:09:53PM
3   by the FDA in your consideration of the    04:09:56PM
4   revisions by the analysts during the class 04:10:00PM
5   period?                   04:10:04PM
6          MR. WANG: Objection. Vague    04:10:04PM
7   and ambiguous.                04:10:06PM
8      Q.    Well, do you understand that on 04:10:08PM
9   February 7th there was an Advisory        04:10:09PM
10  Committee meeting, right?           04:10:11PM
11     A.    Correct.              04:10:12PM
12     Q.    And by definition an Advisory  04:10:13PM
13  Committee is giving advice about the      04:10:15PM
14  potential for an FDA label change in the   04:10:17PM
15  future, correct?               04:10:21PM
16     A.    Correct.              04:10:22PM
17     Q.    And did you consider the       04:10:22PM
18  process of how long it would take if there 04:10:23PM
19  was a positive recommendation by the      04:10:25PM
20  Advisory Committee, that wouldn't        04:10:29PM
21  immediately come into law and change the   04:10:31PM
22  label, correct, there would have to be     04:10:33PM
23  action by the FDA subsequent to that date  04:10:35PM
24  to actually change the label; is that      04:10:38PM
25  correct?                  04:10:40PM
```

Page 336

```
1          LEHN - CONFIDENTIAL
2      A.    That's correct. And there    04:10:40PM
3   presumably would be some intermediary     04:10:43PM
4   steps.                   04:10:45PM
5          My recollection is that shortly 04:10:46PM
6   after the February 7th Advisory Committee  04:10:47PM
7   recommendation, Pharmacia received an      04:10:51PM
8   approval letter from the FDA that was in   04:10:55PM
9   April of 2001, and then my recollection is 04:10:57PM
10  that the label change was approved in June 04:11:01PM
11  of 2002. And I presume there were several  04:11:04PM
12  steps obviously along the way there.      04:11:08PM
13     Q.    But that label change, it     04:11:09PM
14  didn't remove the NSAID GI warning,       04:11:11PM
15  correct?                  04:11:14PM
16     A.    It modified the label and     04:11:14PM
17  incorporated I believe nine months of data 04:11:18PM
18  and referred to the data of Celebrex      04:11:22PM
19  versus the symptomatic ulcers and the     04:11:25PM
20  ulcer complications. And my recollection   04:11:27PM
21  is it also excluded the people taking     04:11:30PM
22  aspirin.                  04:11:32PM
23     Q.    But it didn't include        04:11:32PM
24  comparative p-values, correct?         04:11:34PM
25     A.    I don't recall as I sit here.  04:11:36PM
```

Page 337

```
1          LEHN - CONFIDENTIAL
2      Q.    And it didn't remove the black 04:11:38PM
3   box NSAID GI warning?              04:11:41PM
4          MR. WANG: Objection.        04:11:45PM
5      A.    I'm not sure what you mean by  04:11:46PM
6   "the black box."               04:11:47PM
7      Q.    You are not an expert in FDA   04:11:48PM
8   labeling?                  04:11:50PM
9      A.    I'm not an expert in FDA      04:11:50PM
10  labeling.                  04:11:52PM
11     Q.    And you don't know what the    04:11:52PM
12  black box warning is?             04:11:54PM
13     A.    It is a term of art that goes  04:11:55PM
14  beyond my expertise in finance.        04:11:57PM
15     Q.    And since you don't know what  04:12:01PM
16  it is, you can't offer an opinion as to    04:12:02PM
17  whether it was removed or not, correct?    04:12:04PM
18     A.    Well, I have an exhibit that   04:12:06PM
19  compares the old label to the new label,   04:12:08PM
20  the new label being the June 2002 label.   04:12:11PM
21  As I sit here, I would just to have        04:12:13PM
22  refresh my memory.              04:12:17PM
23     Q.    And we can look at that and    04:12:17PM
24  tell whether p-values are included,       04:12:19PM
25  correct?                  04:12:21PM
```

85  (Pages 334 to 337)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 338

LEHN - CONFIDENTIAL

1
2    A.    Correct.                    04:12:21PM
3    Q.    And once the FDA, the full FDA  04:12:22PM
4  or the relevant individual or individuals  04:12:27PM
5  at the FDA make a decision that a label is  04:12:29PM
6  going to be revised, there is also some  04:12:31PM
7  time after that before the label is     04:12:33PM
8  reprinted and redistributed?            04:12:34PM
9    A.    Again, I'm not an expert on the  04:12:37PM
10  FDA processes here.                    04:12:39PM
11    Q.    But the company would have to  04:12:41PM
12  incorporate that label change, put it in  04:12:43PM
13  the packaging and disseminate it before  04:12:45PM
14  anyone would be able to see it, correct?  04:12:47PM
15    A.    It seems like a reasonable    04:12:51PM
16  assumption.                            04:12:52PM
17    Q.    So it is fair to say that there  04:12:53PM
18  would be some lag time even if the      04:12:55PM
19  Advisory Committee was going to vote on a  04:12:56PM
20  label change positively on February 7th,  04:13:00PM
21  there would be some lag time before that  04:13:03PM
22  label made its way into the marketplace in  04:13:05PM
23  the packaging and could actually impact  04:13:10PM
24  sales in the future; is that a fair     04:13:12PM
25  assumption?                            04:13:15PM

Page 339

LEHN - CONFIDENTIAL

1
2    A.    Well, the first part seems    04:13:17PM
3  reasonable.  Again, it is not my area of  04:13:19PM
4  expertise.  But the first part seems     04:13:21PM
5  reasonable.                            04:13:23PM
6        In terms of impacting sales,    04:13:23PM
7  I'm not sure, because presumably people  04:13:25PM
8  get information from more than just a    04:13:29PM
9  label, and if there had been publicity to  04:13:31PM
10  this effect, that could affect sales prior  04:13:34PM
11  to the label change.                   04:13:36PM
12    Q.    My point is that the label    04:13:37PM
13  change wouldn't have an immediate impact  04:13:38PM
14  on sales, or the recommendation of the  04:13:40PM
15  Advisory Committee wouldn't have an     04:13:42PM
16  immediate impact on future sales because  04:13:45PM
17  there are several steps that would have to  04:13:47PM
18  occur subsequently before that label could  04:13:49PM
19  be incorporated and ultimately impact   04:13:55PM
20  ultimate users of the drug in their     04:13:55PM
21  purchasing decision?                   04:14:00PM
22        MR. WANG:  Objection.         04:14:00PM
23    A.    Again, I'm not an expert on   04:14:02PM
24  this particular topic, but as a matter of  04:14:03PM
25  economics it seems to me that you could  04:14:05PM

Page 340

LEHN - CONFIDENTIAL

1
2  have an impact on sales prior to the     04:14:07PM
3  actual label change being included with  04:14:08PM
4  the medication.                        04:14:15PM
5        If there is publicity and       04:14:18PM
6  people learn of this and the doctor      04:14:19PM
7  community is aware of all this, I see no  04:14:22PM
8  reason why you wouldn't see potentially at  04:14:26PM
9  least theoretically an increase in sales  04:14:29PM
10  prior to the actual implementation of the  04:14:32PM
11  label change.                          04:14:35PM
12    Q.    But if the FDA wasn't going to  04:14:36PM
13  make a decision until, say, three months,  04:14:38PM
14  we will just take that as an arbitrary   04:14:41PM
15  number, until three months after the    04:14:43PM
16  Advisory Committee vote, that would not  04:14:44PM
17  have impact in the current quarter because  04:14:46PM
18  there wouldn't be a label change at the  04:14:48PM
19  earliest until three months later, so the  04:14:50PM
20  Advisory Committee vote wouldn't directly  04:14:52PM
21  impact at least the next quarter's      04:14:55PM
22  projected sales; is that correct?       04:14:58PM
23    A.    Again, with the caveat that I'm  04:15:01PM
24  not portraying myself as an expert in this  04:15:04PM
25  area, but factually we do know that with  04:15:07PM

Page 341

LEHN - CONFIDENTIAL

1
2  the old label, the initial label, Celebrex  04:15:12PM
3  was the most successful drug launch, from  04:15:16PM
4  what I've read and understand.  From 1998  04:15:20PM
5  to 2000 sales increased with that initial  04:15:26PM
6  label, which means presumably doctors and  04:15:30PM
7  perhaps others, you know, believed that  04:15:36PM
8  this product was worth the higher price  04:15:38PM
9  presumably because of their belief that it  04:15:41PM
10  was a safer product.                   04:15:45PM
11        And so when it comes to your    04:15:47PM
12  question about could you get sales        04:15:48PM
13  increasing immediately if additional     04:15:50PM
14  information is produced and generates    04:15:56PM
15  additional confidence in the medical    04:15:58PM
16  community, I don't see why you couldn't  04:15:59PM
17  prior to the actual label change going   04:16:02PM
18  into effect.                           04:16:05PM
19    Q.    Has your testimony ever been --  04:16:05PM
20  strike that.                           04:16:08PM
21        Have you ever had opinions      04:16:08PM
22  rejected by a court in any previous case  04:16:09PM
23  that you've worked on?                 04:16:13PM
24    A.    Not that I'm aware of.        04:16:15PM
25    Q.    Have you ever been subject to a  04:16:17PM

86  (Pages 338 to 341)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 342

1    LEHN - CONFIDENTIAL
2    Daubert challenge?                    04:16:19PM
3        A.    I've been subject to them a    04:16:20PM
4    couple of times, or maybe more than a    04:16:22PM
5    couple of times. As far as I know it has    04:16:24PM
6    never been upheld.                   04:16:28PM
7        Q.    Any particular opinions you've    04:16:29PM
8    ever put forward, have you ever been    04:16:32PM
9    denied the right to offer those opinions    04:16:34PM
10   in court?                            04:16:35PM
11       A.    Not that I recall, no.        04:16:36PM
12       Q.    Have your opinions ever been    04:16:38PM
13   criticized by a court?                04:16:40PM
14       A.    Not that I'm aware of.        04:16:42PM
15       Q.    Can you break down -- and maybe    04:16:43PM
16   you have done this already, but I don't    04:16:45PM
17   think you have done it precisely -- the    04:16:47PM
18   percentage of your testimony that has been    04:16:50PM
19   on behalf of defendants as opposed to    04:16:51PM
20   plaintiffs in securities cases?       04:16:54PM
21       A.    By "securities cases," meaning    04:16:56PM
22   class action cases?                  04:16:57PM
23       Q.    Yes, correct.              04:16:59PM
24       A.    Not SEC cases?             04:16:59PM
25       Q.    Let's just do class actions    04:17:01PM

Page 343

1    LEHN - CONFIDENTIAL
2    where there is two independent, you know,    04:17:03PM
3    civil parties, as opposed to a government    04:17:05PM
4    entity.                              04:17:08PM
5        A.    Sure.                     04:17:09PM
6            With respect to class action    04:17:09PM
7    securities matters, 100 percent of the    04:17:12PM
8    time has been on behalf of the defendants.    04:17:14PM
9    There have been other securities cases    04:17:19PM
10   where I've worked for -- been retained by    04:17:21PM
11   counsel for plaintiffs, but they were not    04:17:26PM
12   class action matters.                04:17:30PM
13       Q.    So in individual cases you have    04:17:31PM
14   worked for the plaintiffs?           04:17:33PM
15       A.    I have. And I've worked for    04:17:34PM
16   the government, as I indicated, the    04:17:38PM
17   Securities and Exchange Commission and the    04:17:40PM
18   Department of Justice where they were the    04:17:42PM
19   plaintiffs probably at least a dozen    04:17:45PM
20   times.                               04:17:48PM
21       Q.    And you are being compensated    04:17:49PM
22   at $950 an hour in this case?         04:17:52PM
23       A.    That is correct.           04:17:55PM
24       Q.    And what is your total        04:17:55PM
25   compensation to date?                04:17:58PM

Page 344

1    LEHN - CONFIDENTIAL
2        A.    In this matter?            04:17:58PM
3        Q.    Yes, in this matter.        04:17:59PM
4        A.    Going back to the 2006 class    04:18:01PM
5    cert stuff?                          04:18:05PM
6        Q.    Yeah, just in this case, the    04:18:06PM
7    Alaska Electrical versus Pharmacia, this    04:18:09PM
8    actual case, what is your total       04:18:11PM
9    compensation to the best of your     04:18:13PM
10   recollection?                        04:18:14PM
11       A.    And I apologize, but that would    04:18:14PM
12   include then the work I had done at the    04:18:17PM
13   class certification stage?           04:18:19PM
14       Q.    Yes.                      04:18:21PM
15       A.    Well, on two counts I can't    04:18:21PM
16   tell you definitively. I don't recall,    04:18:25PM
17   frankly, what my billings were in the    04:18:27PM
18   first stage, but that was five years ago,    04:18:33PM
19   I had a different rate and I forget the    04:18:37PM
20   number of hours, so I would only be    04:18:39PM
21   guessing, but my guess is it would    04:18:41PM
22   probably be somewhere in the vicinity of    04:18:44PM
23   maybe $50,000. That's just a rough, rough    04:18:47PM
24   estimate.                            04:18:53PM
25       Q.    $50,000 for the class cert?    04:18:53PM

Page 345

1    LEHN - CONFIDENTIAL
2        A.    For the class cert.        04:18:55PM
3        Q.    What about in the later phase    04:18:56PM
4    and these two reports and whatever other    04:18:58PM
5    work you have done in 2010-2011 time    04:18:59PM
6    frame?                               04:19:03PM
7        A.    Right. I recall sending an    04:19:03PM
8    invoice a few months ago, and I think it    04:19:05PM
9    was around $85,000, somewhere in the 85 to    04:19:09PM
10   $90,000 range, and I haven't sent an    04:19:14PM
11   invoice for the work I've done in    04:19:18PM
12   preparing for the deposition and for the    04:19:20PM
13   deposition. But I would suspect that    04:19:22PM
14   would be an additional, you know, 40 to    04:19:24PM
15   $50,000.                             04:19:28PM
16       Q.    And what about for the        04:19:28PM
17   preparation of the initial report in March    04:19:29PM
18   of this year?                        04:19:33PM
19       A.    Well, that's what I was        04:19:33PM
20   referring to, is the invoice that I    04:19:34PM
21   submitted two or three months ago was for    04:19:37PM
22   everything at this stage, all the work I    04:19:39PM
23   had done in preparing my initial report    04:19:41PM
24   and the rebuttal report.             04:19:43PM
25       Q.    And is that invoice still    04:19:44PM

87  (Pages 342 to 345)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 346

1          LEHN - CONFIDENTIAL
2  outstanding?                    04:19:46PM
3     A.   It is, as a matter of fact.   04:19:47PM
4     Q.   Do you have an understanding   04:19:48PM
5  why you haven't been paid on that yet?   04:19:49PM
6     A.   I'm not maybe as aggressive in   04:19:53PM
7  pursuing it, but it has only been probably   04:19:56PM
8  two months or so, two to three months.   04:19:59PM
9     Q.   And you have an equity holding   04:20:01PM
10 in -- are you still at Cornerstone or have   04:20:03PM
11 you switched, or have you switched to   04:20:06PM
12 Cornerstone?  Where are you employed now,   04:20:10PM
13 sir?                          04:20:13PM
14    A.   The University of Pittsburgh.   04:20:13PM
15    Q.   Other than that?          04:20:14PM
16    A.   I'm an independent contractor.   04:20:15PM
17 I never had a formal contractual        04:20:17PM
18 arrangement with Cornerstone in the sense   04:20:21PM
19 of a written contract of any sort.  But I   04:20:24PM
20 did work with Cornerstone, I still do work   04:20:27PM
21 with Cornerstone.  But about two years ago   04:20:31PM
22 I also affiliated with Compass Lexecon,   04:20:34PM
23 which is a subsidiary of FTI.         04:20:36PM
24    Q.   And is this engagement through   04:20:38PM
25 Cornerstone or Compass Lexecon?         04:20:40PM

Page 347

1          LEHN - CONFIDENTIAL
2     A.   This is with Cornerstone.     04:20:42PM
3     Q.   And do you have a            04:20:44PM
4  profit-sharing arrangement with         04:20:46PM
5  Cornerstone where you get some percentage   04:20:48PM
6  of the profits on a quarterly or annual   04:20:50PM
7  basis?                         04:20:52PM
8          MR. WANG:  Objection.      04:20:53PM
9     A.   It is not a profit-sharing     04:20:53PM
10 arrangement and it is nothing formal,    04:20:55PM
11 there is no specified amount that I       04:20:59PM
12 receive, but Cornerstone, as Compass      04:21:02PM
13 Lexecon and others do, it is pretty common   04:21:06PM
14 practice that when an independent        04:21:11PM
15 contractor is working with their staff,    04:21:13PM
16 that they provide the independent        04:21:16PM
17 contractor with some compensation for    04:21:17PM
18 managing the staff.  And it goes actually   04:21:20PM
19 beyond that, it is not only managing the   04:21:25PM
20 staff, but Cornerstone would often ask me   04:21:27PM
21 to speak at a conference or some kind of   04:21:31PM
22 recruiting function.              04:21:33PM
23         So the compensation was not    04:21:36PM
24 only for working with their staff and     04:21:38PM
25 managing their staff on projects, but for   04:21:40PM

Page 348

1          LEHN - CONFIDENTIAL
2  providing other services as well.      04:21:42PM
3     Q.   Now, the bills that you       04:21:44PM
4  referenced earlier, the invoices, would   04:21:45PM
5  that include others that have assisted you   04:21:47PM
6  in your engagement?                04:21:49PM
7     A.   No.  I bill separately from     04:21:50PM
8  Cornerstone.  So I bill the client       04:21:54PM
9  directly, and as far as I know they don't   04:21:57PM
10 know how much my invoice is, and I       04:21:59PM
11 certainly don't know how much their      04:22:02PM
12 invoices are.                    04:22:03PM
13    Q.   But you rely on individuals at   04:22:04PM
14 Cornerstone to provide support services to   04:22:06PM
15 you in providing these opinions?        04:22:09PM
16    A.   I do.                    04:22:10PM
17    Q.   And who are the individuals you   04:22:11PM
18 relied on?                      04:22:12PM
19    A.   In this case?              04:22:13PM
20    Q.   In this case.              04:22:13PM
21    A.   Well, the two principal ones    04:22:15PM
22 were -- and, again, we are talking about   04:22:16PM
23 this stage or the class cert stage       04:22:20PM
24    Q.   Let's talk about this stage    04:22:22PM
25 right now.                      04:22:24PM

Page 349

1          LEHN - CONFIDENTIAL
2     A.   The two principal ones at this   04:22:24PM
3  stage are Ravi, R-a-v-i, Sinha, S-i-n-h-a,   04:22:27PM
4  and Dan Garrett, G-a-r-r-e-t-t.         04:22:32PM
5     Q.   And you don't know how much    04:22:36PM
6  they have billed or how much time they    04:22:37PM
7  have spent in their engagement on this    04:22:39PM
8  case?                         04:22:41PM
9     A.   I do not.                 04:22:41PM
10    Q.   And they are Cornerstone       04:22:42PM
11 employees?                      04:22:46PM
12    A.   They are.                 04:22:46PM
13    Q.   And they aren't doing the work   04:22:46PM
14 for free, correct?                04:22:48PM
15    A.   I don't know factually, but I   04:22:49PM
16 presume they are not.             04:22:51PM
17    Q.   And Cornerstone is billing the   04:22:52PM
18 defendants in this case for the work of   04:22:54PM
19 Mr. Sinha and Mr. Garrett?            04:22:56PM
20    A.   I can only presume they are,    04:22:59PM
21 but I don't have any firsthand knowledge   04:23:02PM
22 as to that.                     04:23:03PM
23    Q.   And what have you relied on    04:23:04PM
24 Mr. Sinha to do in this case?          04:23:05PM
25    A.   Well, several things.  One is,   04:23:08PM

88  (Pages 346 to 349)

CONFIDENTIAL

Page 350

1        LEHN - CONFIDENTIAL
2    you know, initially when asked to form      04:23:13PM
3    opinions and submit a report, I talked to      04:23:18PM
4    him about the work that I wanted to do,      04:23:20PM
5    and in the context of this report there      04:23:24PM
6    were some parallels obviously to the      04:23:27PM
7    report submitted at the class      04:23:30PM
8    certification stage, but there also were      04:23:32PM
9    some differences that required some      04:23:34PM
10   changes in the empirical methodology, most      04:23:36PM
11   notably changing the class period.      04:23:40PM
12        So, anyway, I talked to him      04:23:45PM
13   about that. I sent him an outline of the      04:23:47PM
14   work that would be reflected in the      04:23:50PM
15   report. And he I presume managed some      04:23:56PM
16   research assistants to gather data and      04:23:59PM
17   information and perform the empirical work      04:24:01PM
18   under my direction and provided me with      04:24:05PM
19   the results of the empirical work that I      04:24:08PM
20   asked to have done, and we had some phone      04:24:10PM
21   calls and talked about it, and then I      04:24:13PM
22   typically suggest more work or different      04:24:15PM
23   work.      04:24:18PM
24        And so he basically was      04:24:22PM
25   managing the work flow at Cornerstone in      04:24:23PM

Page 351

1        LEHN - CONFIDENTIAL
2    response to my request. And then in      04:24:26PM
3    addition --      04:24:29PM
4        Q.    Could I just stop you there,      04:24:30PM
5    I'm sorry.      04:24:31PM
6        A.    Sure.      04:24:31PM
7        Q.    Mr. Sinha and others at      04:24:32PM
8    Cornerstone did the empirical portion of      04:24:35PM
9    the regression analysis that formed the      04:24:38PM
10   basis for your opinions; is that correct?      04:24:41PM
11       A.    I wouldn't say they did it. I      04:24:42PM
12   mean, it was my regression. I told them      04:24:44PM
13   how I wanted to approach it and they would      04:24:47PM
14   do work and share it with me, and as in      04:24:50PM
15   all empirical work, I mean, it happens at      04:24:56PM
16   the university as well, you refine the      04:24:58PM
17   work and then ultimately you are satisfied      04:25:00PM
18   with the final results and you are ready      04:25:04PM
19   to start writing the results up.      04:25:06PM
20       Q.    And those individuals were      04:25:08PM
21   being -- they worked at Cornerstone and      04:25:09PM
22   Cornerstone was billing the defendants for      04:25:12PM
23   that work; is that your understanding?      04:25:15PM
24       A.    Again, I presume they were, but      04:25:17PM
25   I don't have any firsthand knowledge as to      04:25:20PM

Page 352

1        LEHN - CONFIDENTIAL
2    that.      04:25:22PM
3        Q.    Cornerstone is a business,      04:25:22PM
4    right?      04:25:24PM
5        A.    It is, correct.      04:25:25PM
6        Q.    And they want to make money      04:25:25PM
7    just like any other business?      04:25:27PM
8        A.    I presume they do.      04:25:30PM
9        Q.    So you would expect that they      04:25:31PM
10   are billing the defendants, correct?      04:25:33PM
11       A.    That would be my expectation.      04:25:35PM
12   I just don't have factual knowledge.      04:25:36PM
13       Q.    You would probably be shocked      04:25:38PM
14   if they weren't; is that fair to say?      04:25:39PM
15       A.    I would be surprised, yes.      04:25:41PM
16       Q.    And you were going on to      04:25:43PM
17   describe before I rudely interrupted you      04:25:45PM
18   the other things that Mr. Sinha did.      04:25:47PM
19       A.    Right.      04:25:49PM
20        And then, you know, I asked      04:25:50PM
21   him, I submitted the first draft and gave      04:25:52PM
22   him direction on that and asked him to      04:25:54PM
23   fill in and draft some sections of the      04:25:58PM
24   report. He would then do that and send it      04:26:03PM
25   to me, and I would then edit it and mark      04:26:05PM

Page 353

1        LEHN - CONFIDENTIAL
2    it up and put in placeholders and requests      04:26:09PM
3    and send it back, and then ultimately that      04:26:13PM
4    resulted in the final report which is my      04:26:15PM
5    report. But he did assistance on drafting      04:26:18PM
6    as well.      04:26:21PM
7        Q.    And what about Mr. Garrett?      04:26:22PM
8        A.    Mr. Garrett basically did a lot      04:26:24PM
9    of what Mr. Sinha did. He was on several      04:26:30PM
10   of the phone calls, and when I would be      04:26:36PM
11   indicating the type of work that I would      04:26:41PM
12   like to be done, he was on that call.      04:26:42PM
13        So I presume that he also      04:26:44PM
14   managed some of the work in Cornerstone on      04:26:46PM
15   this matter. I don't recall whether he      04:26:50PM
16   did any drafting of sections of the      04:26:52PM
17   report. He might have. But I don't have      04:26:56PM
18   firsthand knowledge of that.      04:26:58PM
19       Q.    Who prepared the initial draft      04:26:59PM
20   of your original report?      04:27:01PM
21       A.    I did.      04:27:02PM
22       Q.    And then you -- did you      04:27:02PM
23   circulate it for comment?      04:27:05PM
24       A.    I did, with placeholders, and,      04:27:06PM
25   you know, type of work that needed to be      04:27:08PM

89 (Pages 350 to 353)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 354

1          LEHN - CONFIDENTIAL
2   done at Cornerstone's end based on the      04:27:11PM
3   calls that we had.                04:27:15PM
4      Q.     And did you circulate it to     04:27:16PM
5   counsel for defense?               04:27:17PM
6      A.     I don't think initially.  I      04:27:18PM
7   think it was much further along before I    04:27:19PM
8   circulated it to counsel.              04:27:21PM
9      Q.     And who did you circulate it to 04:27:22PM
10  at counsel for defense?              04:27:24PM
11     A.     I think it was Joshua Weiss at  04:27:25PM
12  Cadwalader.                   04:27:32PM
13     Q.     And did he provide you       04:27:33PM
14  comments?                    04:27:35PM
15     A.     Yes.  I think they were oral   04:27:35PM
16  comments.  I remember at least one.  There  04:27:37PM
17  probably were more than one phone calls,    04:27:41PM
18  there weren't that many, but maybe two or   04:27:44PM
19  three calls where he provided comments on   04:27:46PM
20  the phone.                    04:27:49PM
21     Q.     And did you input some of      04:27:49PM
22  defense counsel's comments?            04:27:51PM
23     A.     Not anything -- with all due    04:27:52PM
24  respect to Mr. Weiss, nothing of         04:27:56PM
25  substance, but if there were some factual   04:28:00PM

Page 355

1          LEHN - CONFIDENTIAL
2   errors that I made, or, you know, just     04:28:03PM
3   wording type issues, my recollection is     04:28:07PM
4   that I did incorporate some of those.       04:28:10PM
5      Q.     Did your engagement or the     04:28:12PM
6   objectives of your engagement change at     04:28:16PM
7   any point over the last -- since, say,      04:28:18PM
8   2010?                      04:28:22PM
9        MR. WANG:  Objection, vague.   04:28:27PM
10     Q.     Did they ask you for certain   04:28:28PM
11  opinions and then asked to have you       04:28:31PM
12  comment on other opinions at a later      04:28:35PM
13  point?  Just describe how the engagement   04:28:36PM
14  changed.                     04:28:38PM
15     A.     It was pretty clear-cut from   04:28:39PM
16  the outset, as I recall, that counsel was   04:28:41PM
17  interested in my opinions regarding       04:28:44PM
18  materiality and loss causation, and by     04:28:48PM
19  implication whether there was artificial   04:28:51PM
20  inflation in Pharmacia's stock price       04:28:54PM
21  because of the alleged misrepresentations.  04:28:56PM
22        And I think from the outset of  04:28:58PM
23  this assignment there was interest in any   04:28:59PM
24  opinion I would offer with regard to      04:29:04PM
25  Ms. Cox and Dr. Geis' stock sales in the    04:29:07PM

Page 356

1          LEHN - CONFIDENTIAL
2   context of the allegations.            04:29:09PM
3      Q.     And what about the rebuttal    04:29:10PM
4   report, who drafted the first draft of     04:29:12PM
5   that?                       04:29:14PM
6      A.     I did as well.            04:29:14PM
7      Q.     And then you circulated it to  04:29:15PM
8   Cornerstone first?                04:29:16PM
9      A.     Correct.               04:29:17PM
10     Q.     And then got commentary from  04:29:18PM
11  Cornerstone?                   04:29:21PM
12     A.     Correct.               04:29:21PM
13     Q.     And you incorporated some of  04:29:21PM
14  it?                       04:29:23PM
15     A.     Not only commentary, you know,  04:29:23PM
16  but there would be placeholders and      04:29:25PM
17  requests for information, and they would    04:29:27PM
18  furnish that and then send it back and I    04:29:28PM
19  would mark it up and write more and send    04:29:31PM
20  it back maybe with more placeholders and    04:29:34PM
21  more requests.                 04:29:37PM
22     Q.     Is it fair to say that they    04:29:37PM
23  did -- and I forget the word you used -- a  04:29:39PM
24  lot of the empirical work in both reports,  04:29:41PM
25  the mathematical work?               04:29:44PM

Page 357

1          LEHN - CONFIDENTIAL
2        MR. WANG:  Objection.       04:29:45PM
3      A.     I wouldn't say they did it, I  04:29:46PM
4   think the accurate way to portray it is     04:29:49PM
5   that I did it.  I mean, they executed      04:29:51PM
6   under my direction, but, you know, the     04:29:54PM
7   empirical work was work that I wanted done  04:29:54PM
8   because it formed the bases of my        04:29:59PM
9   opinions.                     04:30:01PM
10     Q.     And do you have an          04:30:01PM
11  approximation of how many hours Mr. Sinha   04:30:02PM
12  and Mr. Garrett spent in preparation of     04:30:05PM
13  the two reports?                 04:30:07PM
14     A.     I have no idea.            04:30:07PM
15     Q.     Do you think it was more or    04:30:11PM
16  less than the amount of hours you spent?    04:30:13PM
17     A.     I wouldn't even hazard a guess.  04:30:15PM
18     Q.     And how many hours did you     04:30:17PM
19  prepare -- spend in preparing for the      04:30:19PM
20  deposition today?                 04:30:21PM
21     A.     I would say probably 30 to 40   04:30:22PM
22  hours.                      04:30:32PM
23     Q.     And how much time did you spend 04:30:32PM
24  with counsel?                  04:30:34PM
25     A.     Probably about a day, a little  04:30:35PM

CONFIDENTIAL

Page 358

```
 1          LEHN - CONFIDENTIAL
 2  more than a day and a half.        04:30:46PM
 3      Q.    On how many occasions?    04:30:47PM
 4      A.    On two separate occasions,  04:30:48PM
 5  Monday of this week for about maybe four  04:30:53PM
 6  or five hours and then Wednesday of this  04:30:55PM
 7  week for six, seven hours, something like  04:30:58PM
 8  that.                              04:31:02PM
 9      Q.    And who did you meet with?  04:31:02PM
10      A.    I met with Mr. Wang and Michael  04:31:04PM
11  and Shannon and John Dougherty, and I  04:31:09PM
12  think very, very briefly with Wang in  04:31:15PM
13  here.  And then Ravi Sinha from    04:31:19PM
14  Cornerstone was here for the Monday and  04:31:21PM
15  Wednesday meetings.                04:31:23PM
16      Q.    And Mr. Sinha, he attended  04:31:25PM
17  Dr. Feinstein's deposition; is that  04:31:27PM
18  correct?                           04:31:29PM
19      A.    I believe so, yes.        04:31:29PM
20      MR. WANG:  Unless you are     04:31:37PM
21  finishing up soon, can we take a break?  04:31:38PM
22      MR. SAHAM:  Sure.  We are     04:31:41PM
23  closing in on the end, but we can take a  04:31:42PM
24  break.                             04:31:45PM
25      THE VIDEOGRAPHER:  The time is  04:31:45PM
```

Page 359

```
 1          LEHN - CONFIDENTIAL
 2  approximately 4:31 p.m.  This is the end  04:31:46PM
 3  of media number five.  We are off the  04:31:49PM
 4  record.                            04:31:51PM
 5      (Recess taken.)                04:31:51PM
 6      THE VIDEOGRAPHER:  The time is  04:41:51PM
 7  approximately 4:41 p.m.  This is the  04:42:00PM
 8  beginning of media number six.  We are on  04:42:02PM
 9  the record.                        04:42:05PM
10  BY MR. SAHAM:                      04:42:05PM
11      Q.    Dr. Lehn, who described your  04:42:05PM
12  assignment initially in this case?  04:42:07PM
13      MR. WANG:  Objection, vague.  04:42:11PM
14      A.    My recollection is that it was  04:42:16PM
15  counsel for the defendants as of the time  04:42:18PM
16  that I was engaged in this matter.  04:42:20PM
17      Q.    And who specifically do you  04:42:23PM
18  recall giving you the assignment?  04:42:25PM
19      A.    I believe it was -- I think it  04:42:26PM
20  was Jonathan Hoff and Joshua Weiss at  04:42:30PM
21  Cadwalader.                        04:42:35PM
22      Q.    And what did they communicate  04:42:36PM
23  the assignment was?                04:42:37PM
24      A.    Well, basically as I described  04:42:38PM
25  in the report, which was they were  04:42:41PM
```

Page 360

```
 1          LEHN - CONFIDENTIAL
 2  interested in having me form an opinion  04:42:44PM
 3  with respect to materiality, and by  04:42:46PM
 4  implication whether Pharmacia's stock  04:42:49PM
 5  price was artificially inflated by the  04:42:52PM
 6  alleged misrepresentations, loss  04:42:55PM
 7  causation, and then finally the issue of  04:42:58PM
 8  Ms. Cox and Dr. Geis' stock sales in the  04:43:02PM
 9  context of the allegations.        04:43:06PM
10      Q.    And why did you provide the  04:43:07PM
11  opinion as opposed to just saying that the  04:43:08PM
12  stock wasn't inflated during the class  04:43:10PM
13  period, why did you offer the additional  04:43:12PM
14  opinion about their insider sales?  Like  04:43:14PM
15  what's added -- your opinion is just that  04:43:17PM
16  the stock price wasn't inflated, correct?  04:43:18PM
17      MR. WANG:  Objection.          04:43:21PM
18      A.    Well, it is not just that,  04:43:22PM
19  because the opinion with respect to their  04:43:25PM
20  stock sales is a separate standalone  04:43:27PM
21  opinion and may be related to the opinion  04:43:31PM
22  as to artificial inflation or the absence  04:43:33PM
23  of artificial inflation.  But they did ask  04:43:34PM
24  me to form an opinion with respect to  04:43:39PM
25  their stock sales and I did.       04:43:41PM
```

Page 361

```
 1          LEHN - CONFIDENTIAL
 2      Q.    But you don't have any basis  04:43:42PM
 3  for that opinion other than your analysis  04:43:44PM
 4  and conclusions and opinions that the  04:43:47PM
 5  stock price wasn't inflated during the  04:43:48PM
 6  class period, correct?             04:43:50PM
 7      A.    There is no other analysis that  04:43:51PM
 8  I conducted, that's correct.       04:43:53PM
 9      Q.    Now, looking at your curriculum  04:43:56PM
10  vitae, which is Exhibit 1 to Exhibit 500,  04:43:59PM
11  is there any additional testimony or  04:44:03PM
12  reports that you have written subsequent  04:44:06PM
13  to the compilation of your CV in Exhibit 1  04:44:08PM
14  with respect to the initial report?  04:44:14PM
15      A.    I'm sorry, you are looking at  04:44:17PM
16  the initial report?               04:44:19PM
17      Q.    Yes, I'm looking at the  04:44:20PM
18  report, 500, the initial report.  04:44:22PM
19      A.    I did attach a CV to the  04:44:24PM
20  rebuttal report and I know there was at  04:44:26PM
21  least one additional testimony on that CV.  04:44:28PM
22      Q.    So is the rebuttal report up to  04:44:30PM
23  date?  Is there anything that's not on  04:44:32PM
24  the, you know, initial report CV and the  04:44:34PM
25  rebuttal report CV that would be  04:44:36PM
```

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 362

1          LEHN - CONFIDENTIAL
2    responsive to the requirements of the      04:44:39PM
3    federal rules of testimony and reports     04:44:40PM
4    issued in the last four years?             04:44:42PM
5          MR. WANG:  Objection.                04:44:45PM
6       A.   I don't think so.  I mean,         04:44:46PM
7    certainly the CV was up to date as of      04:44:49PM
8    time I submitted the rebuttal report in    04:44:53PM
9    July, and as I sit here I can't think of   04:44:56PM
10   any testimony I've given since that time.  04:45:00PM
11      Q.   In looking at page 7 of the CV,    04:45:04PM
12   Exhibit 1 to the opening report, the       04:45:08PM
13   testimony and expert witness in the last   04:45:09PM
14   four years, Securities and Exchange        04:45:11PM
15   Commission versus Angelo Mozilo and David  04:45:14PM
16   Sambol and the other Countrywide folks,    04:45:18PM
17   who were you retained for in that case?    04:45:20PM
18      A.   I was retained by counsel for      04:45:22PM
19   Mr. Mozilo, and I believe that the         04:45:25PM
20   codefendants also had some representation  04:45:34PM
21   in some of the meetings, but I was         04:45:40PM
22   officially retained by counsel for         04:45:42PM
23   Mr. Mozilo.                                04:45:43PM
24      Q.   And what opinions did you offer    04:45:44PM
25   on behalf of Mr. Mozilo?                   04:45:45PM

Page 363

1          LEHN - CONFIDENTIAL
2       A.   It has been more than a year       04:45:47PM
3    since I really thought about that case,    04:45:55PM
4    but my recollection is that the SEC was    04:45:57PM
5    alleging misrepresentations concerning the 04:46:03PM
6    risk of certain products that Countrywide  04:46:05PM
7    was originating and selling, and I was     04:46:09PM
8    asked, as I recall, to form opinion as to  04:46:14PM
9    whether or not those alleged               04:46:17PM
10   misrepresentations were material, and then 04:46:18PM
11   the SEC, as I recall, also was alleging    04:46:22PM
12   that Mr. Mozilo engaged in insider selling 04:46:25PM
13   in violation of the U.S. securities laws.  04:46:31PM
14          And I was asked to analyze his      04:46:34PM
15   trading behavior and form an opinion as to 04:46:37PM
16   whether that was consistent or not         04:46:41PM
17   consistent with the allegations that the   04:46:43PM
18   SEC had made.                              04:46:47PM
19      Q.   And did you form such an           04:46:48PM
20   opinion?                                   04:46:49PM
21      A.   My recollection is that I did.     04:46:49PM
22      Q.   And what was that opinion?         04:46:51PM
23      A.   This is where the words can be     04:46:53PM
24   important.  My recollection is that        04:46:57PM
25   without opining as to whether he did or    04:47:00PM

Page 364

1          LEHN - CONFIDENTIAL
2    did not trade on the basis of inside       04:47:02PM
3    information, there were several features   04:47:04PM
4    of his trading that was inconsistent with  04:47:08PM
5    the SEC's allegations.                     04:47:12PM
6       Q.   So did you form an opinion on      04:47:16PM
7    whether Mr. Mozilo traded based on inside  04:47:18PM
8    information?                               04:47:21PM
9       A.   Well, I think I stopped short      04:47:21PM
10   of that on grounds that I didn't know what 04:47:23PM
11   the basis of his trading was, but I was    04:47:27PM
12   able to observe based on his trading       04:47:30PM
13   behavior whether his trading behavior was  04:47:32PM
14   consistent with what one would expect if   04:47:34PM
15   one was trading on the basis of inside     04:47:37PM
16   information.                               04:47:39PM
17      Q.   So was that opinion offered by     04:47:39PM
18   Mr. Mozilo in his defense?                 04:47:42PM
19      A.   I'm sorry?                         04:47:44PM
20      Q.   The opinion, your opinion that     04:47:45PM
21   you just described, was that offered by    04:47:47PM
22   Mr. Mozilo's attorney in his defense to    04:47:49PM
23   allegations levied by the SEC that he      04:47:51PM
24   unlawfully traded based on inside          04:47:55PM
25   nonpublic information?                     04:47:58PM

Page 365

1          LEHN - CONFIDENTIAL
2       A.   Again, not being a lawyer, I'm     04:48:00PM
3    not sure what constitutes "offered," but   04:48:01PM
4    certainly my report was filed and I had a  04:48:05PM
5    deposition and it was scheduled to go to   04:48:08PM
6    trial I believe last October and I was     04:48:11PM
7    prepared to testify accordingly, and then  04:48:15PM
8    the case settled.                          04:48:17PM
9       Q.   And it settled because -- and      04:48:18PM
10   Mr. Mozilo paid a significant fine as a    04:48:21PM
11   result of the settlement?                  04:48:24PM
12      A.   I frankly don't remember what      04:48:25PM
13   the fine was.                              04:48:27PM
14      Q.   It was in the millions of          04:48:28PM
15   dollars, though, correct?                  04:48:30PM
16      A.   I just don't recall.               04:48:31PM
17      Q.   And you testified -- you were      04:48:34PM
18   deposed by lawyers from the SEC?           04:48:38PM
19      A.   Correct.                           04:48:40PM
20      Q.   Now, on the next page of your      04:48:40PM
21   CV, page 8, the DVI Securities litigation, 04:48:54PM
22   you provided deposition testimony?         04:48:58PM
23      A.   That's correct.                    04:49:01PM
24      Q.   In 2009?                           04:49:02PM
25      A.   Correct.                           04:49:03PM

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 366

1        LEHN - CONFIDENTIAL
2      Q.    And was that on behalf of the   04:49:03PM
3    defendants?              04:49:05PM
4      A.    It was, or at least a       04:49:05PM
5    defendant. I forget whether there were   04:49:08PM
6    codefendants.            04:49:10PM
7      Q.    And do you recall that that   04:49:10PM
8    case made its way up to the appellate   04:49:11PM
9    courts and there was an opinion issued by   04:49:13PM
10   the Third Circuit Court of Appeals in the   04:49:15PM
11   DVI case?               04:49:17PM
12     A.    I do.              04:49:18PM
13     Q.    And do you recall that the   04:49:19PM
14   Third Circuit accepted a two-day window in   04:49:21PM
15   that case?              04:49:23PM
16        MR. WANG: Objection.        04:49:24PM
17     A.    I would have to go back and   04:49:25PM
18   look at the precise language. I       04:49:26PM
19   believe -- my recollection is there was   04:49:31PM
20   reference to the fact that most of the   04:49:32PM
21   time information is fully reflected within   04:49:33PM
22   one trading day and made reference to   04:49:37PM
23   sometimes it can take two days, or words   04:49:44PM
24   to that effect.           04:49:47PM
25     Q.    And did you issue an opinion in   04:49:48PM

Page 367

1        LEHN - CONFIDENTIAL
2    that case?              04:49:49PM
3      A.    I did. I submitted a report in   04:49:49PM
4    that case.              04:49:51PM
5      Q.    And did you provide testimony   04:49:52PM
6    or an opinion as to whether -- what the   04:49:55PM
7    appropriate window length was that a court   04:49:58PM
8    should view in a securities litigation   04:50:01PM
9    context?               04:50:04PM
10        MR. WANG: Objection, vague.    04:50:06PM
11     A.    It was a loss causation case.   04:50:07PM
12   So I presume that I did, but as I sit   04:50:13PM
13   here, I can't recall precisely whether I   04:50:15PM
14   did.                  04:50:17PM
15     Q.    And do you recall that you said   04:50:17PM
16   that the appropriate window length was a   04:50:18PM
17   one-day window, a one-day event window,   04:50:20PM
18   similar to what you proffered in this   04:50:24PM
19   case?                 04:50:25PM
20     A.    I didn't remember that       04:50:25PM
21   precisely. But as I indicated before,   04:50:27PM
22   depending on the facts and circumstances   04:50:30PM
23   of the case, the window could be one day   04:50:31PM
24   or it might be more than one day. It   04:50:33PM
25   doesn't surprise me that that was my   04:50:36PM

Page 368

1        LEHN - CONFIDENTIAL
2    opinion in the DVI matter.        04:50:38PM
3      Q.    And in DVI the court found that   04:50:40PM
4    the stock price sometimes took up to two   04:50:44PM
5    days to incorporate new information; is   04:50:46PM
6    that correct?            04:50:49PM
7        MR. WANG: Objection.        04:50:49PM
8      A.    That's my recollection.      04:50:50PM
9      Q.    So the court rejected your   04:50:52PM
10   application of strictly a one-day event   04:50:55PM
11   window; is that correct, sir?       04:50:58PM
12        MR. WANG: Objection.        04:50:59PM
13     A.    I don't know if they rejected   04:51:00PM
14   it. I don't know if they cited it and   04:51:02PM
15   said we reject what Professor Lehn has   04:51:04PM
16   said. I don't recall ever seeing that.   04:51:06PM
17     Q.    In the Apollo Securities      04:51:10PM
18   Litigation, you offered testimony on   04:51:12PM
19   behalf of the defendants at trial; is that   04:51:14PM
20   correct?               04:51:14PM
21     A.    I'm sorry, which one?       04:51:14PM
22     Q.    The Apollo Securities        04:51:14PM
23   Litigation on page 9. In January 2008,   04:51:19PM
24   did you offer trial testimony?       04:51:21PM
25     A.    I did.             04:51:22PM

Page 369

1        LEHN - CONFIDENTIAL
2      Q.    And Professor Feinstein,      04:51:22PM
3    interestingly, was on the other side of   04:51:25PM
4    that case?              04:51:26PM
5      A.    That's correct.          04:51:26PM
6      Q.    And Professor Feinstein offered   04:51:27PM
7    a multi-day event window analysis; is that   04:51:29PM
8    correct?               04:51:34PM
9      A.    Again, it has been a while    04:51:34PM
10   since I have thought about that case. My   04:51:37PM
11   recollection is that he and I agreed on   04:51:38PM
12   the alleged corrective disclosure dates as   04:51:48PM
13   identified by the plaintiffs, and, as I   04:51:50PM
14   indicated before, my recollection is that   04:51:54PM
15   there were two alleged corrective       04:51:55PM
16   disclosure dates I think on consecutive   04:51:57PM
17   days, roughly, and we both looked at that   04:52:00PM
18   and we both treated those as corrective   04:52:03PM
19   disclosures I think over a two-day window,   04:52:07PM
20   but there were two separate disclosures.   04:52:10PM
21        He then proceeded, as I recall   04:52:13PM
22   in that case, to look at an analyst       04:52:15PM
23   report, I think it was six trading days   04:52:17PM
24   later, and use that as effectively as a   04:52:20PM
25   corrective disclosure as well. So he and   04:52:24PM

93  (Pages 366 to 369)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 370

1         LEHN - CONFIDENTIAL
2   I had disagreement about the length of the  04:52:26PM
3   event window in that matter.        04:52:29PM
4        Q.    And you both testified before  04:52:30PM
5   in the jury trial?            04:52:32PM
6        A.    We did.            04:52:33PM
7        Q.    And ultimately the jury found  04:52:33PM
8   for the plaintiffs?            04:52:35PM
9        A.    I believe so.  But I believe it  04:52:36PM
10  was reversed by the judge.        04:52:37PM
11       Q.    And then ultimately it was    04:52:39PM
12  appealed to the Ninth Circuit Court of  04:52:40PM
13  Appeals; is that correct?        04:52:42PM
14       A.    Correct.            04:52:43PM
15       Q.    And the judge's overturning of  04:52:43PM
16  the jury's finding was itself overturned  04:52:47PM
17  by the appellate court?        04:52:52PM
18       A.    I'm not a lawyer, so I haven't  04:52:53PM
19  kept track of the state of that        04:52:55PM
20  litigation.            04:52:56PM
21       Q.    Do you understand that the    04:52:57PM
22  judge's overturning of the jury verdict  04:52:58PM
23  was reversed by the Ninth Circuit?    04:53:01PM
24       A.    I may have been told.  It    04:53:04PM
25  doesn't register with me.        04:53:05PM

Page 371

1         LEHN - CONFIDENTIAL
2        Q.    Did you testify in some form in  04:53:08PM
3   the Cardinal Health Securities Litigation?  04:53:10PM
4        A.    I did.  That was a mediation  04:53:14PM
5   hearing.                04:53:16PM
6        Q.    And who were you retained by?  04:53:16PM
7        A.    My recollection is by Cardinal  04:53:18PM
8   Health.                04:53:21PM
9        Q.    In looking at -- just in an    04:53:22PM
10  attempt to refresh your recollection,    04:53:24PM
11  looking at pages 7, 8 and 9 of your CV    04:53:26PM
12  which is Exhibit 1 to the opening report,  04:53:37PM
13  are there any of these other cases that we  04:53:40PM
14  haven't discussed where you opine that a  04:53:42PM
15  multiple-day window was appropriate by    04:53:44PM
16  looking at -- you know, going through    04:53:47PM
17  there, and we can go through them with    04:53:49PM
18  you, but if you just want to identify    04:53:50PM
19  anywhere you provided testimony that a    04:53:53PM
20  multiple-day window was appropriate.    04:53:55PM
21       The first one is the Lisa Berry  04:53:57PM
22  matter.  Would you have used a        04:54:01PM
23  multiple-day window there?        04:54:02PM
24       A.    You know, I am not going to be  04:54:03PM
25  able to recall on a case by case basis    04:54:05PM

Page 372

1         LEHN - CONFIDENTIAL
2   without refreshing my memory and looking  04:54:09PM
3   at cases what I would have advised in    04:54:12PM
4   those matters.            04:54:18PM
5        As I have indicated before,    04:54:19PM
6   depending on the facts and circumstances  04:54:20PM
7   of a particular case, a multi-day window  04:54:22PM
8   might very well be appropriate.  So there  04:54:26PM
9   is no dogma that one should never use a  04:54:28PM
10  multi-day window.            04:54:31PM
11       But in this matter where one    04:54:34PM
12  has formed the opinion that the market for  04:54:36PM
13  the security is efficient and there's a  04:54:38PM
14  date on which the alleged corrective    04:54:42PM
15  disclosure occurs with no subsequent    04:54:43PM
16  additional corrective disclosure, which  04:54:47PM
17  Dr. Feinstein and I agree on, there is no  04:54:49PM
18  basis for using a multiple-day window.    04:54:51PM
19       Q.    Now, can we take a look at    04:54:56PM
20  Exhibit 3 of your opening report.  I think  04:54:58PM
21  that was the label you were talking about  04:55:01PM
22  earlier.                04:55:02PM
23       And why did you think it was    04:55:09PM
24  important to put this version with the    04:55:11PM
25  label changes in it as an exhibit to your  04:55:14PM

Page 373

1         LEHN - CONFIDENTIAL
2   report?  How does it support your        04:55:17PM
3   opinions?                04:55:19PM
4        A.    Well, it is simply descriptive  04:55:19PM
5   information that indicates there was    04:55:24PM
6   a label change, and it is simply        04:55:26PM
7   highlighting the differences between the  04:55:29PM
8   old label and the new label.        04:55:30PM
9        Q.    Does it form a basis for any of  04:55:32PM
10  your loss causation or materiality        04:55:34PM
11  opinions?                04:55:35PM
12       A.    No.  It is just additional    04:55:37PM
13  context, but it is not -- I would reach my  04:55:41PM
14  opinion regardless of whether or not    04:55:44PM
15  Exhibit 3 was in the report.        04:55:46PM
16       Q.    So is it fair to say it is not  04:55:47PM
17  directly relevant to your opinions?    04:55:49PM
18       A.    It certainly doesn't affect my  04:55:53PM
19  opinions regarding materiality and loss  04:56:00PM
20  causation, but it is additional factual  04:56:03PM
21  information which may or may not be        04:56:06PM
22  relevant depending upon statements that  04:56:11PM
23  Dr. Feinstein may make at trial.        04:56:14PM
24       Q.    And when you look through here,  04:56:20PM
25  are there any p-values from CLASS that are  04:56:25PM

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

Page 374

1          LEHN - CONFIDENTIAL
2  contained in Exhibit 3, the revised label   04:56:28PM
3  from June 7th, 2002?              04:56:32PM
4      A.    I don't see any as I sit here,   04:56:49PM
5  no.                    04:56:53PM
6      Q.    And do you know why there isn't  04:56:53PM
7  any p-values?              04:56:55PM
8      A.    No.              04:56:55PM
9      Q.    You are not offering an opinion  04:56:57PM
10 as to the reason there is no p-values in   04:56:58PM
11 there?                   04:57:01PM
12     A.    I'm certainly not offering an    04:57:02PM
13 opinion as to that.           04:57:03PM
14     Q.    And that would be outside your   04:57:04PM
15 expertise?                04:57:06PM
16     A.    Well, when you say "opinion,"    04:57:06PM
17 it would seem to be potentially a factual   04:57:11PM
18 issue as to why there are no p-values as   04:57:15PM
19 opposed to an opinion, and it may be in    04:57:17PM
20 the course of preparing for a trial I will  04:57:20PM
21 learn such information. But I wouldn't    04:57:22PM
22 categorize it as an opinion.         04:57:24PM
23     Q.    And as we sit here today, you    04:57:25PM
24 haven't learned that information yet,    04:57:28PM
25 correct?                  04:57:29PM

Page 375

1          LEHN - CONFIDENTIAL
2      A.    That's correct.         04:57:30PM
3      Q.    Could you take a look at     04:57:31PM
4  Exhibit 516, your rebuttal report.       04:57:34PM
5          And as of the date of your     04:58:02PM
6  signing of this rebuttal report, the     04:58:04PM
7  rebuttal report and the opening report     04:58:06PM
8  contained all the opinions that you plan   04:58:09PM
9  to offer in this case?           04:58:12PM
10     A.    Well, again, with two caveats.  04:58:15PM
11 One is that subsequent to filing the     04:58:17PM
12 rebuttal report, Dr. Feinstein has been    04:58:21PM
13 deposed, and it may be that upon closer   04:58:26PM
14 inspection of his deposition testimony I   04:58:30PM
15 will have additional opinions about his   04:58:34PM
16 analysis. And then, similarly, depending  04:58:36PM
17 upon what he testifies to at trial, there  04:58:40PM
18 may be some additional opinions.       04:58:43PM
19         And then, I guess, finally, if  04:58:46PM
20 counsel does ask me to form additional   04:58:47PM
21 opinions, then I would certainly consider  04:58:50PM
22 doing that.               04:58:52PM
23     Q.    Looking at page 5 of your     04:58:55PM
24 rebuttal report, letter B of paragraph 14,  04:58:58PM
25 you and Dr. Feinstein have a difference of  04:59:06PM

Page 376

1          LEHN - CONFIDENTIAL
2  opinion as to the -- and I'm probably    04:59:08PM
3  going to use the wrong word, so you can   04:59:10PM
4  correct me -- as to the duration and     04:59:13PM
5  placement of the event window that's     04:59:17PM
6  appropriate to use to analyze this case;   04:59:19PM
7  is that correct?             04:59:22PM
8      A.    I think what you are referring  04:59:23PM
9  to, if you are referring to letter B on   04:59:25PM
10 page 5, is the estimation period --     04:59:28PM
11     Q.    That's it, the estimation     04:59:31PM
12 period, that's what I was looking for.    04:59:33PM
13         So you and Dr. Feinstein have a  04:59:35PM
14 disagreement about what the appropriate   04:59:36PM
15 estimation period is; is that correct?    04:59:38PM
16     A.    We do.            04:59:40PM
17     Q.    And what's the estimation     04:59:41PM
18 period that you chose?          04:59:42PM
19     A.    I use the class period of April 04:59:43PM
20 17th, 2000 through August 5th, 2001.    04:59:46PM
21     Q.    And do you always use the class 04:59:49PM
22 period in formulating your estimation    04:59:51PM
23 period in these types of cases?        04:59:53PM
24     A.    Not always. It is usually the  04:59:55PM
25 case. But, again, it depends on the facts  04:59:58PM

Page 377

1          LEHN - CONFIDENTIAL
2  of the particular matter and the reasons   05:00:00PM
3  for using a different period.         05:00:03PM
4      Q.    If it is an omissions case    05:00:04PM
5  where the main focus is going to be the   05:00:06PM
6  disclosure events, is it best practice to   05:00:08PM
7  bracket the disclosure events as close to  05:00:13PM
8  the middle of the estimation period as    05:00:15PM
9  possible?                05:00:18PM
10     A.    It, again, depends upon the    05:00:22PM
11 facts of a particular case and the reasons  05:00:24PM
12 for choosing an estimation period.      05:00:29PM
13         My issue with Dr. Feinstein's   05:00:31PM
14 estimation period is that he, in a sense,   05:00:32PM
15 artificially selects it. Because of his   05:00:36PM
16 decision to strip Pharmacia's stock of the  05:00:42PM
17 value of its new Monsanto holdings, he    05:00:45PM
18 began his period on October 19, 2000. So  05:00:50PM
19 the beginning of his estimation period is   05:00:53PM
20 dictated by what I think is a faulty     05:00:57PM
21 methodology. That's the only reason why   05:00:59PM
22 he picked October 19, 2000. And then he   05:01:02PM
23 took that through October 18, 2001. So    05:01:06PM
24 his estimation period is straddling a     05:01:09PM
25 period within the class period and then    05:01:11PM

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 378

LEHN - CONFIDENTIAL

1
2    sometime after the class period.          05:01:14PM
3         More importantly, because        05:01:17PM
4    reasonable people can disagree about     05:01:19PM
5    estimation period, but, more importantly,  05:01:21PM
6    is if you simply take my estimation      05:01:23PM
7    period, which I think is eminently       05:01:26PM
8    reasonable, it is the class period, and    05:01:30PM
9    you keep everything else the same in his   05:01:31PM
10   model, his model doesn't find a         05:01:34PM
11   statistically significant decline in       05:01:36PM
12   Pharmacia stock price on February 7th,    05:01:38PM
13   which he believes is important, I don't    05:01:40PM
14   think it is important. I mean, it is       05:01:42PM
15   important to note that he doesn't get it,  05:01:43PM
16   but it is not relevant in my opinion to    05:01:45PM
17   loss causation.                 05:01:47PM
18        So the bottom line here is that  05:01:48PM
19   his estimation period in my judgment is    05:01:51PM
20   very artificial, it is driven by a factor   05:01:53PM
21   that shouldn't even be in play here,      05:01:56PM
22   namely the stripping of new Monsanto      05:01:58PM
23   holdings from Pharmacia. But, more       05:02:01PM
24   importantly, it is not robust with respect  05:02:04PM
25   to another estimation period, in my       05:02:07PM

Page 379

LEHN - CONFIDENTIAL

1
2    opinion a much more reasonable one. So    05:02:11PM
3    his results are not robust with respect to  05:02:13PM
4    a reasonable change in the estimation     05:02:16PM
5    period.                   05:02:17PM
6         Q.   His estimation period does more  05:02:17PM
7    closely bracket the crucial February 6th   05:02:20PM
8    through February 8th events than yours    05:02:23PM
9    does; is that correct?          05:02:25PM
10        MR. WANG: Objection.        05:02:26PM
11        A.   When you say "more closely   05:02:27PM
12   brackets," I'm not sure if you mean       05:02:31PM
13   calendar time.              05:02:33PM
14        Q.   Puts it right in the middle.  05:02:34PM
15        A.   But there are other ways you   05:02:35PM
16   can test whether there were structural    05:02:37PM
17   changes within the estimation period, and  05:02:39PM
18   I tested that and there aren't any. So it   05:02:40PM
19   is a red herring.             05:02:42PM
20        I mean, it may be descriptively  05:02:43PM
21   true that it is closer in time, but my     05:02:45PM
22   choice of the class period does not in any  05:02:47PM
23   way undermine the power of the test that I  05:02:49PM
24   conducted versus the power of the test    05:02:53PM
25   that he conducted. And the fact that his   05:02:55PM

Page 380

LEHN - CONFIDENTIAL

1
2    results using everything else the same in   05:02:59PM
3    his model, but my estimation period, his   05:03:01PM
4    result on February 7th is no longer      05:03:05PM
5    significant, I think is quite telling. He   05:03:07PM
6    has got a very, very fragile model.      05:03:09PM
7         Q.   But the exact same would be   05:03:11PM
8    true if you used your analysis and applied  05:03:13PM
9    his estimation period, your analysis would  05:03:16PM
10   say February 7th is statistically        05:03:18PM
11   significant as well, isn't that correct,    05:03:20PM
12   sir?                    05:03:22PM
13        A.   Well, there are two things.   05:03:22PM
14   I'm not sure of that. I haven't done      05:03:24PM
15   that. There is that. But, second, is      05:03:26PM
16   that in attempting to achieve statistical   05:03:29PM
17   significance or show statistical         05:03:34PM
18   significance, the burden is particularly   05:03:36PM
19   high to show that when you have a       05:03:38PM
20   statistically significant result, it is     05:03:40PM
21   robust to alternative reasonable        05:03:42PM
22   specifications.             05:03:44PM
23        And if you can only get        05:03:48PM
24   statistical significance by a contrived    05:03:49PM
25   estimation period, whether with my model  05:03:51PM

Page 381

LEHN - CONFIDENTIAL

1
2    or his model, that's not a robust result.  05:03:53PM
3         Q.   And the same would be true   05:03:58PM
4    about using six months of data from a     05:04:03PM
5    clinical trial that lasted over 12 months,  05:04:06PM
6    that you would only get statistical       05:04:08PM
7    significance at six months as opposed to   05:04:10PM
8    12 months, that would not be a full      05:04:11PM
9    disclosure of information that would be    05:04:13PM
10   robust and subject to scientific        05:04:18PM
11   criticism; is that correct, sir?        05:04:20PM
12        MR. WANG: Objection.        05:04:21PM
13        A.   Well, you can't answer that in  05:04:22PM
14   the abstract because there is a legitimate  05:04:24PM
15   issue and I'm not a pharmaceutical expert.  05:04:26PM
16        But as one who works with stock  05:04:30PM
17   price data, we often confront issues about  05:04:32PM
18   how long a period should you track a      05:04:35PM
19   sample of companies. I did a paper a few   05:04:35PM
20   years ago on boards of directors and it   05:04:42PM
21   was a very thorny issue. I was looking at  05:04:44PM
22   boards of directors from 1930 to        05:04:47PM
23   2000, and you have this issue of companies  05:04:50PM
24   coming and going, some going bankrupt,    05:04:54PM
25   some going private, some being taken over.  05:04:56PM

96  (Pages 378 to 381)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 382

1       LEHN - CONFIDENTIAL
2       So your population is changing  05:04:59PM
3   over time. And that can, depending on the  05:05:01PM
4   research question, create some issues such  05:05:04PM
5   that one might want a more abbreviated  05:05:07PM
6   sample period that gives rise to a more  05:05:10PM
7   uniform sample such that you can make more  05:05:13PM
8   meaningful comparisons.  05:05:16PM
9       And I'm not weighing in on the  05:05:17PM
10  merits of this issue with respect to the  05:05:18PM
11  CLASS study, but I am saying that you  05:05:20PM
12  can't jump to the conclusion that you just  05:05:22PM
13  reached that reporting data for six  05:05:25PM
14  months, but not for twelve months,  05:05:28PM
15  inherently is misleading or whatever the  05:05:30PM
16  word was you used. It is not. It depends  05:05:34PM
17  upon the nature of the sample and the  05:05:35PM
18  reason that one might give for reporting  05:05:37PM
19  data over a shorter period versus a longer  05:05:39PM
20  period.  05:05:41PM
21       Q.    The reader of the JAMA article  05:05:41PM
22  wouldn't be able to make that assessment  05:05:44PM
23  because they were only provided the  05:05:45PM
24  six-month data, though, correct?  05:05:47PM
25       MR. WANG: Objection.  05:05:48PM

Page 383

1       LEHN - CONFIDENTIAL
2       A.    Again, I don't know firsthand  05:05:49PM
3   what JAMA was provided with.  05:05:50PM
4       Q.    But I'm saying, a reader, if  05:05:52PM
5   you read the JAMA article, you wouldn't be  05:05:53PM
6   able to make the assessment you just  05:05:56PM
7   described because you wouldn't have the  05:05:57PM
8   six and twelve-month data to compare?  05:05:59PM
9       MR. WANG: Objection.  05:06:01PM
10      A.    Well, by definition, if you  05:06:02PM
11  didn't have the results from that data,  05:06:03PM
12  you couldn't compare.  05:06:05PM
13      Q.    So you would be in the dark?  05:06:06PM
14      A.    Well, you would still know  05:06:07PM
15  that, from public information, that this  05:06:12PM
16  was more than a six-month trial and that  05:06:13PM
17  there were some people in the study for  05:06:15PM
18  more than six months. But obviously if  05:06:17PM
19  the actual results are not reported, then  05:06:21PM
20  you can't make a direct comparison.  05:06:23PM
21      Q.    Now, you said you used the  05:06:26PM
22  class period for your estimation period.  05:06:28PM
23  We are going back to that now.  05:06:29PM
24      Any other basis for using the  05:06:31PM
25  class period -- or for using your  05:06:32PM

Page 384

1       LEHN - CONFIDENTIAL
2   estimation period other than that was the  05:06:34PM
3   class period?  05:06:36PM
4       A.    Well, Pharmacia began trading  05:06:36PM
5   shortly before the beginning of the class  05:06:40PM
6   period, which pretty much rules out using  05:06:42PM
7   a period prior to the class period. And  05:06:45PM
8   in my opinion, given that there was, you  05:06:50PM
9   know, roughly 16 months of class period  05:06:53PM
10  data, the most appropriate period to use  05:06:58PM
11  then was that class period.  05:07:01PM
12      Q.    And is there any peer-reviewed  05:07:02PM
13  literature that supports your estimation  05:07:05PM
14  period over Dr. Feinstein's estimation  05:07:06PM
15  period, that supports your opinion here?  05:07:08PM
16      A.    Well, as I indicated,  05:07:11PM
17  reasonable people can disagree about the  05:07:13PM
18  estimation period. But I think there are  05:07:15PM
19  two things to keep in mind with respect to  05:07:17PM
20  Dr. Feinstein. One is it is the tail  05:07:19PM
21  wagging the dog. The reason for his  05:07:23PM
22  estimation period is this artificial  05:07:25PM
23  construction of a new fictitious company  05:07:29PM
24  that only consists of Pharmacia's  05:07:32PM
25  pharmaceuticals operations. And that's a  05:07:34PM

Page 385

1       LEHN - CONFIDENTIAL
2   bad reason for selecting your estimation  05:07:38PM
3   period, because that's not a proper way to  05:07:41PM
4   conduct an event study analysis in this  05:07:44PM
5   matter.  05:07:46PM
6       And then the second reason,  05:07:47PM
7   again, is that his result is not robust  05:07:51PM
8   with respect to using the class period as  05:07:53PM
9   the estimation period.  05:07:56PM
10      Q.    Now, why do you think the  05:07:59PM
11  period you chose as your estimation period  05:08:00PM
12  is the class period?  05:08:03PM
13      A.    Well, it is the period of April  05:08:05PM
14  17th, 2000 through August 5th, 2001.  05:08:08PM
15      Q.    And what leads you to believe  05:08:12PM
16  that that's the class period in this case?  05:08:15PM
17      A.    My recollection is that that  05:08:16PM
18  was laid out in the complaint.  05:08:22PM
19      Q.    The complaint, actually, as you  05:08:23PM
20  recall from your work on class  05:08:27PM
21  certification, had a class period that  05:08:29PM
22  ended in June of 2002, is that correct,  05:08:32PM
23  and that was one of the modifications --  05:08:34PM
24      A.    That was one of the  05:08:34PM
25  modifications. I'm trying to recall the  05:08:35PM

97 (Pages 382 to 385)

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 386

1           LEHN - CONFIDENTIAL
2    basis for that.                    05:08:37PM
3       Q.    Did you review the Third    05:08:39PM
4    Circuit opinion in order to come up with   05:08:40PM
5    that class period of August?        05:08:41PM
6       A.    I don't recall as I sit here.   05:08:43PM
7       Q.    You may have reviewed the Third 05:08:44PM
8    Circuit opinion?                    05:08:46PM
9       A.    It is possible.           05:08:47PM
10      Q.    And are you aware that the   05:08:48PM
11   Third Circuit assessed a three-day window 05:08:49PM
12   of February 6th through February 8th in   05:08:52PM
13   coming to its conclusions regarding   05:08:55PM
14   materiality in this case?           05:08:56PM
15          MR. WANG: Objection.         05:08:58PM
16      A.    I have seen reference to that, 05:08:59PM
17   correct.                           05:09:01PM
18      Q.    And in fact the Third Circuit 05:09:01PM
19   said that materiality is self-evident    05:09:03PM
20   based on the 9 percent stock decline    05:09:06PM
21   between February 6th and February 8th; is 05:09:08PM
22   that correct?                      05:09:11PM
23          MR. WANG: Objection.         05:09:11PM
24      A.    I've seen reference to that,   05:09:12PM
25   yes.                               05:09:13PM

Page 387

1           LEHN - CONFIDENTIAL
2       Q.    And do you understand that the 05:09:13PM
3    Third Circuit opinion is controlling     05:09:14PM
4    opinion in this case?               05:09:17PM
5          MR. WANG: Objection, calls for 05:09:18PM
6    a legal conclusion.                 05:09:19PM
7       A.    I'm not a lawyer.          05:09:21PM
8       Q.    But you are in disagreement   05:09:22PM
9    with the court's legal findings?    05:09:23PM
10         MR. WANG: Objection.          05:09:25PM
11      A.    You know, I'm not here to offer 05:09:26PM
12   a legal opinion. So the court's opinion   05:09:27PM
13   obviously is a legal opinion, and you    05:09:30PM
14   know, there are a number of factors to   05:09:34PM
15   consider.                          05:09:36PM
16         One is that I'm not telling the 05:09:36PM
17   court what materiality is from a legal   05:09:38PM
18   point of view, but I am here to offer an 05:09:43PM
19   opinion as to whether information is    05:09:45PM
20   material to investors, and insofar that   05:09:48PM
21   informs the court, then that's the limit 05:09:51PM
22   of what I'm doing.                  05:09:55PM
23         Second is I don't know that the 05:09:57PM
24   Third Circuit made a judgment as to     05:09:59PM
25   whether the market for Pharmacia stock is 05:10:02PM

Page 388

1           LEHN - CONFIDENTIAL
2    efficient. And if the efficiency of that 05:10:05PM
3    market had not been established as of the 05:10:08PM
4    time that the Third Circuit rendered its 05:10:10PM
5    opinion, then perhaps its opinion would be 05:10:13PM
6    different.                         05:10:16PM
7          Third, and, again, I'm not a   05:10:18PM
8    legal scholar, I'm not sure at the time of 05:10:20PM
9    the Third Circuit opinion that there was 05:10:24PM
10   agreement as to what the alleged    05:10:28PM
11   corrective disclosures in this matter are. 05:10:30PM
12   And both Dr. Feinstein and I agree that   05:10:32PM
13   the alleged corrective disclosures were   05:10:34PM
14   made on February 6th and there was no    05:10:36PM
15   subsequent alleged corrective disclosure. 05:10:38PM
16         And if that was not a premise   05:10:41PM
17   of the Third Court's opinion -- the Third 05:10:43PM
18   Circuit's opinion, then perhaps that would 05:10:47PM
19   be -- their opinion would be different if 05:10:50PM
20   in fact that was the agreed-upon alleged 05:10:52PM
21   corrective disclosures.            05:10:54PM
22      Q.    And how did you select your    05:10:55PM
23   peer index in this case?            05:10:58PM
24      A.    Well, again, what I do in --   05:10:59PM
25   typically do in matters such as this is I 05:11:04PM

Page 389

1           LEHN - CONFIDENTIAL
2    like to let the data tell me the best    05:11:06PM
3    group of peer companies, and I start by   05:11:09PM
4    reviewing analyst reports and creating a 05:11:13PM
5    matrix of companies that are most    05:11:16PM
6    frequently identified as peer companies,  05:11:20PM
7    as the company at hand. And then you get 05:11:23PM
8    a count, and these companies were the ones 05:11:25PM
9    most frequently mentioned, and you start  05:11:28PM
10   putting in a regression model.       05:11:31PM
11         So the ones that are most       05:11:31PM
12   frequently mentioned in the peer index,   05:11:35PM
13   you record the adjusted r-squared and then 05:11:35PM
14   you bring in the next most frequently    05:11:38PM
15   group, bring them in, and if the adjusted 05:11:41PM
16   r-squared goes up, it means these    05:11:43PM
17   additional companies are adding      05:11:45PM
18   explanatory power to the regression, which 05:11:47PM
19   is good, and if the adjusted r-squared    05:11:48PM
20   goes down, which it does if you add the   05:11:50PM
21   chemical index, you say this is not adding 05:11:52PM
22   explanatory power, and at that point I    05:11:55PM
23   then truncate my peer index.        05:11:56PM
24         In this case, there were nine   05:11:58PM
25   companies that -- whose inclusion improved 05:12:01PM

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 390

1          LEHN - CONFIDENTIAL
2   the adjusted r-squared of the model, and    05:12:06PM
3   then I excluded Pfizer and Merck simply    05:12:10PM
4   because Pfizer co-markets Celebrex and    05:12:13PM
5   there is controversy about Vioxx and    05:12:16PM
6   Merck. But I also replicated the model    05:12:20PM
7   using Pfizer and Merck and my results are    05:12:22PM
8   largely unaffected and certainly don't    05:12:27PM
9   affect my opinion.    05:12:29PM
10       Q.    Somewhere roughly around 15 or    05:12:29PM
11   20 percent of Pharmacia's business was    05:12:32PM
12   agricultural and chemical though; is that    05:12:33PM
13   correct?    05:12:36PM
14       A.    I don't recall. It is always a    05:12:36PM
15   question of what do you mean by    05:12:41PM
16   "business." Are you talking about --    05:12:42PM
17       Q.    Revenues.    05:12:44PM
18       A.    Yeah, but that's -- I don't    05:12:44PM
19   know the answer to that.    05:12:46PM
20       Q.    And you don't know because of    05:12:47PM
21   the way you did your peer index whether    05:12:48PM
22   there was agricultural or chemical-related    05:12:51PM
23   news pouring into the marketplace on    05:12:54PM
24   particular dates that may have -- that    05:12:58PM
25   they are not factored -- since you didn't    05:13:02PM

Page 391

1          LEHN - CONFIDENTIAL
2   use any chemical companies or any    05:13:04PM
3   agricultural companies, you didn't do    05:13:08PM
4   anything to control for chemical or    05:13:10PM
5   agricultural-related news that may have    05:13:12PM
6   affected some of the relevant dates; is    05:13:14PM
7   that correct?    05:13:16PM
8       A.    Again, there are two things    05:13:16PM
9   that stand out. One is that I based the    05:13:19PM
10   identity of the peer companies on what    05:13:22PM
11   analysts identified as the peer companies    05:13:24PM
12   of Pharmacia, and then I let the    05:13:26PM
13   regression -- I did a lot of sensitivities    05:13:29PM
14   to see which model of peer companies    05:13:31PM
15   provided the most explanatory power.    05:13:35PM
16       Second, as I indicated, is if    05:13:38PM
17   you add the chemical index to    05:13:39PM
18   Dr. Feinstein's model, you see the    05:13:41PM
19   adjusted r-squared actually goes down and    05:13:43PM
20   the inclusion of the chemical index does    05:13:46PM
21   not have a statistically significant    05:13:48PM
22   coefficient, which means that there is no    05:13:50PM
23   scientific basis to believe that there is    05:13:52PM
24   a direct relation between the returns on    05:13:56PM
25   Pharmacia's stock and the returns on the    05:13:59PM

Page 392

1          LEHN - CONFIDENTIAL
2   chemical index.    05:14:01PM
3       Q.    Are there any other bases for    05:14:02PM
4   your choice of peer index?    05:14:03PM
5       A.    Any other bases?    05:14:08PM
6       Q.    Is there any other support for    05:14:10PM
7   why you chose the peer index you chose    05:14:12PM
8   other than what you just described to me?    05:14:16PM
9       A.    Again, I think it is the most    05:14:17PM
10   objective way to determine the    05:14:18PM
11   specification of the model, the regression    05:14:20PM
12   model for doing the event study, is to let    05:14:23PM
13   the data tell you which peer companies    05:14:25PM
14   provide the best fit.    05:14:27PM
15       Q.    Why didn't you use -- the    05:14:28PM
16   company, in its 10-K, described a peer    05:14:30PM
17   index. Why didn't you use that as the    05:14:34PM
18   peer index?    05:14:36PM
19       A.    Because, again, the criterion    05:14:39PM
20   that I was looking at was the adjusted    05:14:42PM
21   r-squared. I'm not casting aspersions on    05:14:44PM
22   companies identified in peer companies,    05:14:47PM
23   but I do know that as a general rule you    05:14:49PM
24   should let the data tell you who the best    05:14:51PM
25   index is, which collection of companies is    05:14:53PM

Page 393

1          LEHN - CONFIDENTIAL
2   the best index.    05:14:55PM
3       I'm not saying Pharmacia did    05:14:57PM
4   this. But companies have been known to    05:14:58PM
5   strategically pick peer companies based on    05:15:00PM
6   relative performance, and that isn't    05:15:03PM
7   exactly what you want if you are    05:15:05PM
8   estimating a regression model where you    05:15:08PM
9   are trying to get a good fit.    05:15:10PM
10       Q.    Looking at paragraph 23 on page    05:15:11PM
11   7 of your rebuttal report, which is    05:15:15PM
12   Exhibit 516, you say "It also was known    05:15:17PM
13   that the FDA Advisory Panel's briefing    05:15:20PM
14   documents would be posted to the FDA's    05:15:23PM
15   website the day prior to the hearing and    05:15:26PM
16   analysts were ready to promptly evaluate    05:15:28PM
17   such documents in order to estimate any    05:15:30PM
18   changes in the drug's prospects from    05:15:33PM
19   current market expectations."    05:15:36PM
20       And then you quote Dr. Fiorino;    05:15:37PM
21   is that correct?    05:15:40PM
22       A.    That's correct.    05:15:40PM
23       Q.    Other than Dr. Fiorino's    05:15:40PM
24   report, is there any other basis for your    05:15:43PM
25   statement in paragraph 23 that I just read    05:15:44PM

99 (Pages 390 to 393)

CONFIDENTIAL

Page 394

1       LEHN - CONFIDENTIAL
2   to you?                          05:15:46PM
3       A.    That's the only one that I can  05:15:46PM
4   think of as I sit here.          05:16:02PM
5       Q.    And what's confounding   05:16:06PM
6   information? How do you define    05:16:09PM
7   confounding information in the context of  05:16:13PM
8   your event study regression analysis with  05:16:15PM
9   respect to determining loss causation and  05:16:16PM
10  materiality in the securities context?  05:16:21PM
11      MR. WANG: Objection.         05:16:21PM
12      A.    Well, confounding information  05:16:22PM
13  would be information other than the    05:16:24PM
14  information at issue that might have   05:16:26PM
15  affected the stock price on the relevant  05:16:28PM
16  day.                            05:16:31PM
17      MR. SAHAM: Why don't we take  05:16:54PM
18  just like a two-minute break. I think we  05:16:55PM
19  are pretty much done. I would like to  05:16:57PM
20  confer with my colleagues very briefly.  05:16:59PM
21      THE VIDEOGRAPHER: The time is  05:17:01PM
22  approximately 5:16 p.m. We are off the  05:17:02PM
23  record.                         05:17:05PM
24      (Recess taken.)             05:17:05PM
25      THE VIDEOGRAPHER: The time is  05:20:11PM

Page 395

1       LEHN - CONFIDENTIAL
2   approximately 5:20 p.m. We are back on  05:20:29PM
3   the record.                     05:20:32PM
4       MR. SAHAM: We are done.      05:20:32PM
5   Dr. Lehn, thank you very much for your  05:20:34PM
6   testimony today. And I would just like  05:20:35PM
7   to -- plaintiffs are going to designate  05:20:37PM
8   the transcript as confidential.  05:20:39PM
9       THE WITNESS: Thank you.      05:20:43PM
10      THE VIDEOGRAPHER: The time is  05:20:44PM
11  approximately 5:20 p.m. This concludes  05:20:45PM
12  media number six as well as today's  05:20:47PM
13  deposition. We are off the record.  05:20:50PM
14
15      [TIME NOTED: 5:20 p.m.]
16
17
18
19
20
21
22
23
24
25

Page 396

1
2       I N D E X
3
    WITNESS   EXAMINATION BY    PAGE
4
    LEHN   SAHAM           6
5
6
7       E X H I B I T S
8
    PLAINTIFFS' DESCRIPTION   PAGE
9   Exhibit 500 Expert report of Lehn   6
    Exhibit 501 Article entitled    23
10      Comparison of Upper
        Gastrointestinal
11      Toxicity of Rofecoxib
        and Naproxen in Patients
12      with Rheumatoid
        Arthritis
13  Exhibit 502 Article entitled    24
        Celecoxib clinical
14      profile
    Exhibit 503 Article entitled The   24
15      Intraday Speed of
        Adjustment of Stock
16      Prices to Earnings
        and Dividend
17      Announcements
    Exhibit 504 Expert report Lehn   37
18      in Ohio Public
        Employees Retirement
19      System v. Parsons
    Exhibit 505 Transcript of Lehn   44
20      dated 3/30/07
    Exhibit 506 Affidavit of Howard   58
21      R. Philips
    Exhibit 507 CIBC research report  114
22  Exhibit 508 Rebuttal report   167
        of Feinstein
23  Exhibit 509 Bear Stearns   204
        research report
24  Exhibit 510 Article entitled   218
        Scientists Advise On
25      New Drug Vioxx

Page 397

1
2       E X H I B I T S
3   PLAINTIFFS' DESCRIPTION   PAGE
4   Exhibit 511 Article entitled    239
        CEO Turnover after
5       Acquisitions: Are Bad
        Bidders Fired?
6   Exhibit 512 Article from Reuters  262
        dated 4/21/99
7   Exhibit 513 Salomon Smith Barney  272
        research report
8   Exhibit 514 Morning Meeting Note  274
        from The Investext
9       Group
    Exhibit 515 UBS Warburg   288
10      research note
    Exhibit 516 Rebuttal report   303
11      of Lehn
    Exhibit 517 Morgan Stanley Dean  317
12      Witter research
        report
13
14
15  DIRECTIONS NOT TO ANSWER
16  Page   Line
17      (NONE)
18
19  REQUESTS
20  Page   Line
21      (NONE)
22
23
24
25

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

CONFIDENTIAL

Page 398

```
 1
 2          CERTIFICATION
 3
 4    I,  TODD DeSIMONE, a Notary Public for
 5   and within the State of New York, do
 6   hereby certify:
 7     That the witness whose testimony as
 8   herein set forth, was duly sworn by me;
 9   and that the within transcript is a true
10   record of the testimony given by said
11   witness.
12    I further certify that I am not related
13   to any of the parties to this action by
14   blood or marriage, and that I am in no way
15   interested in the outcome of this matter.
16    IN WITNESS WHEREOF, I have hereunto set
17   my hand this 28th day of October, 2011.
18
19
            _____
20          TODD DESIMONE
21
22       *   *   *
23
24
25
```

101 (Page 398)

Veritext National Deposition & Litigation Services
866 299-5127

5ed0b330-63d3-4f6b-bb66-079dfc8185ca

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALASKA ELECTRICAL PENSION FUND, CITY OF SARASOTA FIREFIGHTERS' PENSION FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 132 PENSION PLAN, NEW ENGLAND HEALTH CARE EMPLOYEES PENSION FUND, CHEMICAL VALLEY PENSION FUND OF WEST VIRGINIA, and PACE INDUSTRY UNION-MANAGEMENT PENSION FUND, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) |
| PHARMACIA CORPORATION, FRED HASSAN, G. STEVEN GEIS, CARRIE COX, and PFIZER, INC., | ) ) ) |
| Defendants. | ) |

NO. 03-1519 (AET)
(Consolidated)

<u>CLASS ACTION</u>

# REBUTTAL EXPERT REPORT OF DR. ANTHONY FIORINO
# IN RESPONSE TO THE EXPERT REPORT OF DR. STEVEN P. FEINSTEIN, DATED JUNE 6, 2011

# JULY 15, 2011

1

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... 2

A.    Summary .................................................................................................. 3
B.    The Response of Market Participants to the Public Release of Advisory
Committee Briefing Documents is Immediate.......................................... 6
  1.    The Assumptions Underlying Dr. Feinstein's Three Day Theory Have No
Basis In Fact............................................................................................ 6
    a.    The Timing Of The Corrective Disclosure Was Not "Irregular" But Was
Expected................................................................................................ 7
    b.    The New Information From The CLASS Study Was Neither "Complex"
Nor "Voluminous" ............................................................................... 11
    c.    The FDA Review Was Of Far Greater Interest Then The Newly Released
CLASS Data......................................................................................... 18
    d.    The Content Of Analyst Reports Does Not Support Dr. Feinstein's Claim
That Analyst-Driven Dissemination of the CLASS Results Took Three Days 19
  2.    Stock Price Movements in Response to Advisory Committee Briefing
Documents and Meetings Are Confined to a Single Day ...................... 23
    a.    Briefing Document-Driven Stock Reactions ............................................ 31
    b.    The Day After, Part 1 – Stock Price Changes Between the Briefing
Documents and Advisory Committee.................................................... 32
    c.    Advisory Committee-Driven Stock Reactions.......................................... 35
    d.    The Day After, Part 2 – Stock Price Changes the Day Following the
Advisory Committee ............................................................................. 37
    e.    Examining the Pattern of Pharmacia's Stock Price Movement ............... 39
  3.    Intraday Reactions to the Posting of Advisory Committee Briefing
Documents Demonstrates the Stock Response is Immediate ............................ 43
  4.    Conclusion Regarding the Three Day Theory ............................................. 45
C.    The Advisory Committee Vote on Vioxx Drove the February 8 Stock Price
Decline .................................................................................................. 47
D.    Pharmacia Stock Price Reaction to Initial CLASS Disclosures ...................... 53
E.    The Attempt to Exclude The Monsanto Agricultural Business Is Highly
Questionable .......................................................................................... 54
  1.    Stripping Out Monsanto Made Pharmacia Less Comparable To Other
Pharmaceutical Companies................................................................... 56
  2.    Dr. Feinstein's Valuation Of Monsanto Is Inaccurate And Unreliable ........ 57
F.    Conclusion ................................................................................................. 59

**REBUTTAL EXPERT REPORT OF DR. ANTHONY FIORINO**

**IN RESPONSE TO THE EXPERT REPORT OF DR. STEVEN P. FEINSTEIN,**

**DATED JUNE 6, 2011**

**A.     Summary**

Dr. Feinstein's expert report[1] analyzes the movement of Pharmacia's stock price in relation to various news and events, including those related to the disclosures of data from and results of the CLASS study during and after the Class Period.  I will not dispute Dr. Feinstein's finding that the market for Pharmacia's stock was efficient, which leaves only a single finding of import in Dr. Feinstein's report – his claim that the decline in Pharmacia's stock price over the three day period February 6-8, 2001 was significant and was caused by the disclosure of material and previously undisclosed results of the CLASS study.   Based on this claim, he calculates that investors who purchased Pharmacia stock during the Class Period acquired the stock at a price that was inflated by up to $5.92 per share, and that "No detectable inflation remained after 8 February 2001."[2] Dr. Feinstein arrives at the figure of $5.92 by adjusting the Pharmacia stock price decline of $5.28 from February 6-8, 2001 for market and sector performance and attempts to remove any contribution from Pharmacia's stake in Monsanto.[3]  Because "the residual decline was too great to be attributable to random volatility,"[4] concludes Dr. Feinstein, "the loss in value must have been caused by Company-specific information."[5] That

---

[1] Report on Market Efficiency, Loss Causation, and Damages: Steven P. Feinstein, Ph.D., CFA, June 6, 2011 ("Feinstein Report").

[2] Feinstein Report at ¶ 21.

[3] *Id.* at ¶¶ 176 – 203, 251 – 255, 272 – 280 & Exhibit-13.

[4] *Id.* at ¶ 251.

[5] *Id.*

3

Company-specific information being, according to Dr. Feinstein, the results of the CLASS study that were allegedly not initially disclosed.

Dr. Feinstein is wrong.  The fully curative disclosure of the initially undisclosed CLASS results occurred on February 6, 2001.  As Dr. Feinstein concedes, this disclosure provoked no reaction in the Pharmacia stock price; therefore, he must rely on a contrived, arbitrary and unsupported concept that the newly disclosed CLASS results took three days to be assimilated by the market into Pharmacia's stock price.  The assumptions underlying his concept are invalid and the historical record counters his speculative theory that the dissemination of information contained in FDA briefing documents takes three days.  Dr. Feinstein's errors result in part from his summary dismissal, without any stated rationale, of the February 8, 2001 FDA Advisory Committee vote in favor of a Vioxx label change, a material adverse development for Pharmacia that was unrelated to the disclosure of the entire CLASS data on February 6, 2001.  In my expert report submitted June 7, 2011,[6] I detailed the abundant evidence proving this to be the critical factor in driving a price decline in Pharmacia's stock on February 8 – which constitutes 59% of the overall decline in Pharmacia's stock price over the 3-day period from February 6 to February 8, which Dr. Feinstein relies upon to establish loss causation.[7]  Dr. Feinstein also repeats an error made by the Plaintiffs in their initial complaint: that Pharmacia's stock price rose in response of the initial April 15, 2000 release of the CLASS data over the course of April 17-19, 2000.  Finally, Dr. Feinstein's attempt to remove the impact of Monsanto from the market's valuation of Pharmacia shares is unjustified and is laden with potential bias and error.

---

[6] Expert Report of Dr. Anthony Fiorino, June 7, 2011 ("Fiorino Report").

[7] *See* Fiorino Report at pp. 32-38.

4

In this report I reveal multiple factual errors that undermine the assumptions Dr. Feinstein relies upon in developing his theory that the February 6, 2001 disclosures took three days to disseminate to the market.  I further provide data from nearly a decade of FDA Advisory Committee meetings demonstrating that the information contained in FDA briefing documents is immediately assimilated by the market, eliminating any reasonable possibility that the disclosure of the initially undisclosed CLASS results could have contributed to the Pharmacia stock price declines on February 7 and 8, 2001.  I will also present, in summary form, my findings previously submitted to the Court demonstrating that the Pharmacia stock price decline on February 8, 2001 was caused by the FDA Advisory Committee vote to recommend a label change for Vioxx.  I will also refute Dr. Feinstein's claim that Pharmacia's stock price rose in response to the initial release of the CLASS data.  Finally, I will expose real and theoretical problems with his attempt to isolate the market's valuation of Pharmacia's pharmaceutical business by breaking Pharmacia into component parts (*i.e.*, removing the Monsanto agriculture business) for the purposes of his report.  It is my opinion that Dr. Feinstein's conclusions are so far-fetched and moreover so obviously contrary to reality that his report does not represent a valid expert opinion but rather an artifice to support a pre-defined goal of demonstrating loss causation.[8]

---

[8] In forming the opinions expressed herein, I have considered the documents referred to in the Fiorino Report, documents referred to in the Feinstein Report, documents referred to in the Expert Report of Debra Bowen, M.D., FACAAI, and the documents referred to in this report.  Additional facts and data considered are identified in Exhibit 1.  I reserve the right to modify my opinions in light of additional facts or data, if such are presented to me.

**B.**   **The Response of Market Participants to the Public Release of Advisory Committee Briefing Documents is Immediate**

Over the course of the decade I spent on Wall Street, including approximately three years as a sell-side analyst covering the U.S. pharmaceutical industry, and seven as an investor in the pharmaceutical and biotechnology industries, I have had many personal encounters with rapid market responses to material news emerging for pharmaceutical and biotechnology stocks, including stock volatility driven by the release of FDA Advisory Committee briefing documents and the Advisory Committee meetings themselves.   My real-life experience with these matters is wholly inconsistent with Dr. Feinstein's theoretical construct, and the analyses set forth in this report definitively establish that Dr. Feinstein's conclusions are wrong, as a matter of fact and irrefutable empirical evidence.

**1.**   **The Assumptions Underlying Dr. Feinstein's Three Day Theory Have No Basis In Fact**

Dr. Feinstein's opinion that it took three days for the market to incorporate the corrective disclosures made on February 6, 2001 is based, largely, on three assertions: that the corrective disclosures were (1) "irregular," (2) "complex" and (3) "voluminous."[9] All of these assertions are patently erroneous.   The timing of the corrective disclosures was known precisely and well in advance, the incrementally new information alleged by the Plaintiffs to be highly material consisted of five simply and easily accessible data points, and moreover the relevance of these data points was inconsequential in light of the other newly disclosed information—the opinions of the FDA reviewers. Finally, Dr.

---

[9] Feinstein Report at ¶ 73 ("The new information provided to the market was complex, voluminous, and irregular in that it ran contrary to prior representations and that its time of release was not scheduled with precision.  Consequently, it took some time for the market to process the new information.")

Feinstein erroneously claims that analyst reports continued to disseminate the initially undisclosed CLASS results on February 8, 2001, a blatantly false claim, as will be shown below.

    a.    **The Timing Of The Corrective Disclosure Was Not "Irregular" But Was Expected**

According to Dr. Feinstein, the timing of the corrective disclosure – the posting of the FDA briefing documents on the FDA website – was "irregular" and this "irregularity" caused it to take more time for the market to digest the corrective information than it would have taken if the disclosure were "regular" or anticipated.

> Not only were the disclosure events in this case complex, but their timing was irregular.  Neither the posting of the FDA briefing reports on the agency's website, nor the publication of the *Washington Post* exposé, conformed to a preannounced schedule.[10]

This factual contention is demonstrably false.  As a matter of indisputable fact, the market knew months in advance when the briefing documents would be posted on the FDA website and analysts were poised to immediately review and digest the information contained in those documents.

The FDA publishes a notice in the Federal Register announcing the date of a scheduled advisory committee meeting.  On December 27, 2000, Federal Register Vol. 65, No. 249 announced that a public hearing of the Arthritis Advisory Committee would be held on February 7, 8 and 9, 2001 and listed as the "Agenda" for February 7, 2001: "The discussion is for modification of the [Celebrex] label based on the results of the

---

[10] *Id.* at ¶165.

CLASS Trial, a study of the incidence of significant upper gastrointestinal effects."[11] Even prior to this, industry publications such as The Pink Sheet of December 18, 2000, had publicized the February 7, 2001 FDA Arthritis Advisory Committee review of Celebrex.[12] Pharmaceutical industry analysts and other market observers were well aware of the fact that such notices were routinely published in industry publications and in the Federal Register and, like my team at J.P. Morgan, actively monitored these sources for such notices. Further, my team was well aware, as was the entire market, that Pharmacia had filed an sNDA in June 2000 seeking a label change based on CLASS and so we actively monitored these sources for specific notice of an Advisory Committee meeting on Pharmacia's sNDA.

Dr. Feinstein contrasts the disclosure of the Advisory Committee briefing documents with earnings announcements, which he accurately states "are generally scheduled and are therefore expected."[13] However, as a matter of fact, Advisory Committee meeting dates are known further in advance of the event than are earnings announcements. This means that the market can be more prepared for an Advisory Committee meeting, which affects just a single drug out of a pharmaceutical company's entire profile, than it can be for an earnings announcement, which relates to every aspect of the company's business.

---

[11] Federal Register, Vol. 65, No. 249, Wednesday, December 27, 2000 at pp. 81875-76, available at  http://www.gpo.gov/fdsys/pkg/FR-2000-12-27/pdf/FR-2000-12-27.pdf (last visited July 15, 2011). According to the Federal Register, "Notice of this meeting is given under the Federal Advisory Committee Act (5 U.S.C. app. 2)."

[12] "Celebrex, Vioxx GI Safety Data To Be Reviewed By FDA Committee Feb. 7-8," The Pink Sheet, December 18, 2000.

[13] Feinstein Report at ¶162.

Not only was the date of the Arthritis Advisory Committee meeting known well in advance, but the date of the posting of the briefing documents was also known. During the period in question, securities analyst and investors were well aware that it was the pattern and practice of the FDA to post Advisory Committee briefing documents on its website one day in advance of the scheduled Advisory Committee meeting.[14] Indeed, the posting of briefing documents is an eagerly awaited event. I personally recall, on several occasions, repeatedly refreshing my internet browser, which was pointed to the FDA's Advisory Committee website, every few minutes over a period of hours in an attempt to catch briefing documents the moment that they were posted. In this case, the posting of the briefing documents was completely disseminated no later than 10:05 AM on February 6, 2001, the time at which a Bloomberg newswire story described "a U.S. government review" as finding that Celebrex "isn't significantly less likely to cause stomach problems than older, cheaper painkillers" and added that the

---

[14] *See* Guidance for Industry: Disclosure of Materials Provided to Advisory Committees in Connection with Open Advisory Committee Meetings Convened by the Center for Drug Evaluation and Research Beginning on January 1, 2000, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm079679.pdf (last visited July 15, 2011); *see also*  December 1999 draft Guidance for Industry: Disclosing Information Provided to Advisory Committees in Connection with Open Advisory Committee Meetings Related to the Testing or Approval of New Drugs and Convened by the Center for Drug Evaluation and Research, Beginning on January 1, 2000, available at http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm079675.pdf (last visited July 13, 2011) which states that briefing documents will be posted on the FDA web site 24 hours prior to the Advisory Committee meeting, as was, in fact, FDA's practice. This policy went into effect in January 2000 as a result of an FDA settlement of a lawsuit (Public Citizen Health Research Group v. FDA, Civ. No. 99-0177(JR), 2000 WL 34262802 (D.D.C. Jan. 19, 2000). The guidance was updated in August, 2008, available at: http://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM125650.pdf (last visited July 13, 2011), to extend the time for posting briefing documents to two days prior to the Advisory Committee meeting. It is my recollection that in 2001 briefing documents were rarely, if ever, posted more than 24 hours prior to the Advisory Committee meeting.

FDA's review "could mean problems for Pharmacia . . . when it asks an FDA advisory panel to support changes to the drug's label."[15]

Because, as described immediately above, the date of Advisory Committee meetings are known in advance and because the briefing documents are posted to the FDA website one or two days prior to the meeting, there is ample time for analysts and investors to prepare for these two events.  The moment the briefing documents are posted triggers a crucial race to digest the salient points as quickly as possible and for sell-side analysts to communicate those points to the sales force and clients (*e.g.*, portfolio managers, buy-side analysts, retail and other investors). Similarly, investors and traders reviewing the documents may choose to buy, sell or hold a position on the basis of their own analysis.  The questions on which the FDA is seeking advisory committee input and voting are also reviewed, as the scope of the questions can indicate the FDA's general approach and whether certain issues have already been taken "off the table."  This initial review is enough, generally, to indicate whether expectations are likely to be met, missed or exceeded and, if missed, by what magnitude.  Analysts distribute the data, their interpretations and their investment conclusions to investors via multiple channels including institutional and retail sales forces, phone calls, emails, and issuance of notes through services such as First Call.  Analyst comments and views are frequently cited in coverage by financial news media as well.  This reality is utterly incompatible with Dr. Feinstein's imaginary extended three day market response.

---

[15] February 6, 2001, Bloomberg News , "Pharmacia Hasn't Shown Celebrex Safety Benefit, FDA Review Says" (reflecting time stamp of 10:05:02).

**b.**   **The New Information From The CLASS Study Was Neither "Complex" Nor "Voluminous"**

Second, Dr. Feinstein contends that it took three days to assimilate the corrective information into Pharmacia's stock price because the volume and complexity of information in the briefing documents necessarily required substantial time for the market to digest.  In this regard, he notes that "the staff reports span over 250 pages of highly complex scientific and statistical analysis."[16]  This argument is a classic red-herring because the entirety of the briefing documents – containing perhaps thousands of data points and analyses not at issue in this matter – did not constitute the allegedly corrective disclosure in this matter.  Rather, the allegedly corrective disclosure here consisted of only *five data points* contained in the briefing documents.[17]  Indeed, as set forth in Dr. Feinstein's report, which echoes Plaintiffs' Response to Interrogatory No. 20,[18] the corrective disclosures here were that:

> (1) "the entire study results were far less favorable to Celebrex than the publicly reported six-month results, as 6 of the 7 complicated ulcers occurring after the first six months of the CLASS trial were suffered by patients being treated with Celebrex,"
>
> (2) "the reported GI comparisons worsened after six months,"
>
> (3) "the statistically significant benefit for Celebrex users not taking aspirin that Defendants reported based upon six months of data for complicated ulcers did not hold for the entire study period."

---

[16] Feinstein Report at ¶164 (*citing Pharmacia*, 554 F.3d at 349 (internal citations omitted)).

[17] As explained in my initial expert report, the initially undisclosed information was completely immaterial.  The discussion here, or anywhere else in this report, should not be read as a concession that the initially undisclosed information was material.

[18] Plaintiffs' Response to Defendants Pharmacia Corporation, Fred Hassan, G. Steven Geis, Carrie Cox, and Pfizer, Inc.'s Second Set of Interrogatories, dated March 31, 2011.

11

(4) "Celebrex failed to establish any statistically significant difference with diclofenac on any of the GI endpoints considered," and

(5) "diclofenac was actually numerically superior to Celebrex on one of the two co-primary endpoints of the study."[19]

Each of these data-points is included in Dr. Witter's Medical Officer Review, in an eight-page section entitled "Study Results," "Endpoint (CSUGIE) results."[20]  This is one of the first places that an analyst or investor would look when reviewing the briefing documents since that section would contain the topline results (meaning, a summary of the study findings) of the trial.  Similarly, in the ten pages comprising the Statistical Reviewer's Briefing Document for the Advisory Committee (exclusive of Appendices) each of the five allegedly omitted data points is discussed.[21]  By way of example, it would take an analyst or investor but moments to compare Table 2 of the Statistical Reviewer's Briefing Document, which reflects the "Summary of CSUGIE Incidence" for the entire study period:

Table 2. Summary of CSUGIE Incidence

| | Celebrex 400 mg BID | Diclofenac 75 mg BID | Ibuprofen 800 mg TID | Log-Rank P Values for Celebrex vs. | | |
| | | | | Diclofenac | Ibuprofen | Both |
|---|---|---|---|---|---|---|
| No. of Patients | n=3987 | n=1996 | n=1985 | | | |
| No. of CSUGIE | | | | | | |
| Uncensored | 17 | 10 | 11 | | | |
| Censored* | 3 | 1 | 2 | | | |
| Total | 20 | 11 | 13 | | | |
| Week 52 crude rate | 0.43% | 0.50% | 0.55% | 0.640 | 0.414 | 0.450 |

*Occurred before 48 hours after midnight of the first dose day or more than 48 hours after midnight of the last dose day (unless occurred within two weeks after last dose and was determined by GEC to be treatment-related).

with Table 5, which reflects the "Summary of CSUGIE Incidence – First Six Months,"

---

[19] Feinstein Report at ¶45.

[20] June 14, 2000 Medical Officer Review by James Witter, P. Ex. 15, at pp. 28-35.

[21] Statistical Reviewer Briefing Document for the Advisory Committee by Hong Laura Lu, P. Ex. 71, DEFS 03054471 – DEFS 03054492.

12

**Table 5. Summary of CSUGIE Incidence – First Six Months**

| | Celebrex 400 mg BID | Diclofenac 75 mg BID | Ibuprofen 800 mg TID | Log-Rank P Values for Celebrex vs. | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Diclofenac | Ibuprofen | Both |
| | n=3987 | n=1996 | n=1985 | | | |
| No. of CSUGIEs | | | | | | |
| Uncensored | 11 | 9 | 11 | | | |
| Censored* | 2 | 0 | 2 | | | |
| Total | 13 | 9 | 13 | | | |
| Week 26 crude rate | 0.28% | 0.45% | 0.55% | 0.264 | 0.073 | 0.092 |

*Occurred before 48 hours after midnight of the first dose day or more than 48 hours after midnight of the last dose day (unless occurred within two weeks after last dose and was determined by GEC to be treatment-related).

and thus to determine that the crude rates and p-values were different for the same comparisons at 6 and 12 months.[22] Similarly, it would also take but moments for one to conclude that Celebrex was not statistically significantly superior to diclofenac at either 6 or 12 months.[23]

It would take an analyst or investor even less time to review Table 6 of the Statistical Reviewer's Briefing Document, which reflects "CSUGIE Incidence in Patients not Taking Aspirin," for both the "Entire Study Period" and the "First 6 Months" and determine that, while there was a statistically significant result in favor of Celebrex for the "First 6 Months," that result was not statistically significant for the "Entire Study Period."[24]

---

[22] This addresses the allegedly omitted data points described in Points (1) and (2) on page 11, *supra*.

[23] This addresses the allegedly omitted data point described in Point (4) on page 12, *supra*. A further exposition of this allegedly omitted data point is contained Tables 6 and 7.

[24] This addresses the allegedly omitted data points described in Point (3) on page 11, *supra*.

13

**Table 6. CSUGIE Incidence in Patients not  Taking Aspirin**

| | Celebrex 400 mg BID | Diclofenac 75 mg BID | Ibuprofen 800 mg TID | Log-Rank P Values for Celebrex vs. | | |
| | | | | Diclofenac | Ibuprofen | Both |
|---|---|---|---|---|---|---|
| **Entire Study Period** | | | | | | |
| | n=3105 | n=1551 | n=1573 | | | |
| No. of CSUGIEs | | | | | | |
|   Uncensored | 8 | 4 | 10 | | | |
|   Censored* | 1 | 0 | 1 | | | |
|   Total | 9 | 4 | 11 | | | |
| Week 52 crude rate | 0.26% | 0.26% | 0.64% | 0.972 | 0.037 | 0.185 |
| **First 6 Months** | | | | | | |
| | n=3154 | n=1567 | n=1602 | | | |
| No. of  CSUGIEs | | | | | | |
|   Uncensored | 5 | 4 | 10 | | | |
|   Censored* | 1 | 0 | 1 | | | |
|   Total | 6 | 4 | 11 | | | |
| Week 26 crude rate | 0.16% | 0.26% | 0.62% | 0.476 | 0.005 | 0.037 |

*Occurred before 48 hours after midnight of the first dose day or more than 48 hours after midnight of the last dose day (unless occurred within two weeks after last dose and was determined by GEC to be treatment-related).

It would also take an analyst 30 seconds or less to recognize that, according to Table 3 of the Statistical Reviewer's Briefing Document, which reflects the "Summary of CSUGIE Incidence: Alternate Definitions," diclofenac had a lower crude rate of the incidence of CSUGIE's than Celebrex, according to the FDA's alternate definition of the primary endpoint.[25]

**Table 3. Summary of CSUGIE Incidence:  Alternate Definitions**

| | Celebrex 400 mg BID (n=3987) | Diclofenac 75 mg BID (n=1996) | Ibuprofen 800 mg TID (n=1985) |
|---|---|---|---|
| No. of CSUGIEs | | | |
|   Uncensored | 17 | 5 | 9 |
|   Censored | 2 | 1 | 1 |
|   Total | 19 | 6 | 10 |
| Week 52 crude rate | 0.43% | 0.25% | 0.45% |

In my personal experience reviewing, analyzing and digesting information from FDA briefing documents on dozens of occasions, the information at issue in this case could not have been presented in a more clear or accessible manner.  As

---

[25] This addresses the allegedly omitted data points described in Point (5) on page 12, *supra*. Statistical Reviewer Briefing Document for the Advisory Committee by Hong Laura Lu, P. Ex. 71, DEFS 03054471 – DEFS 03054492 at DEFS 03054474.

demonstrated by the examples given immediately above, various summary tables in the briefing documents – which are the primary tables reviewed by securities analysts and investors – clearly and unequivocally conveyed the five allegedly omitted data points.  In this light, Dr. Feinstein's contention that it took the market three days to incorporate this information is absurd and reflects that fact that he has absolutely no practical experience or understanding of how market participants seek out and incorporate such information.[26]

Contemporaneous analyst reports make it indisputably clear that these allegedly omitted data points were, in fact, almost immediately understood and assimilated by the market – long before the market close on February 8, 2001. Specifically, a comparison of the allegedly omitted data points with the content of a February 7, 2001 report published by the J.P. Morgan team, of which I was a member, is set forth below in Table 1:

---

[26] To dispel any notion that, due to my qualifications as an M.D. and a Ph.D., I was uniquely able to rapidly comprehend or digest information from FDA briefing documents, I note that many Wall Street pharmaceutical securities analyst teams had (and have) one or more members that were also either M.D.s or Ph.Ds.  For example:  Lenoard S. Yaffe of Bank of America Securities (M.D.), Steve B. Gerber of CIBC World Markets (M.D.), Lara Palevitz of PaineWebber (Ph.D.), Wayne G. Holman of Merrill Lynch (M.D.), Rodney Nathan of Bear Stearns (M.D.), Tony Butler of Lehman Brothers (Ph.D.). I should add that an advanced medical or science degree is not required to comprehend the FDA's conclusions as recorded in a set of briefing documents, including the FDA's review of the CLASS study.

**Table 1. Key Pharmacia Disclosures Reviewed in J..P. Morgan Report**

| Allegedly Omitted Data Points Per ¶ 45 of The Feinstein Report | J.P. Morgan Report February 7, 2001[27] |
|---|---|
| **(1)** Pharmacia did not disclose that "the entire study results were far less favorable to Celebrex than the publicly reported six-month results, as 6 of the 7 complicated ulcers occurring after the first six months of the CLASS trial were suffered by patients being treated with Celebrex." | "The four main issues raised by the FDA are: (1) Pharmacia's analysis of data at only the 26 week time point, rather than the 52 week time point, is unjustified and invalid (*and the data is even less robust at 52 weeks*)" (emphasis mine) |
| **(2)** Pharmacia did not disclose that "the reported GI comparisons worsened after six months" | "Because the event rates for diclofenac and ibuprofen plateaued after 26 weeks *but continued to rise for Celebrex, the differences between Celebrex and the comparators was less robust at the end-of-study time point.*" (emphasis mine) |
| **(3)** Pharmacia did not disclose that "the statistically significant benefit for Celebrex users not taking aspirin that Defendants reported based upon six months of data for complicated ulcers did not hold for the entire study period." | "The statistically significant reduction in the primary endpoint (serious upper GI events) seen in the non-aspirin subgroup at 26 weeks is not statistically significant at 52 weeks." |
| **(4)** Pharmacia did not disclose that "Celebrex failed to establish any statistically significant difference with diclofenac on any of the GI endpoints considered." | "Celebrex failed to show any statistically significant benefit over one of the comparator NSAIDs (diclofenac)." "Celebrex was not statistically superior to diclofenac on any measure at any point in any subgroup." |

Moreover, the February 7, 2001 J.P. Morgan report contained a summary table of the topline data from CLASS, and again includes four out of the five allegedly initially omitted data points:

**Table 1: Statistical Significance in the FDA's Analysis of the CLASS Trial**

| Comparator | Time Point | Population | Primary Endpoint (POBs) | Secondary Endpoint (PUBs) |
|---|---|---|---|---|
| Ibuprofen + diclofenac | 26 weeks | Total study | Not significant | p = 0.023 |
| | | Not taking aspirin | p = 0.037 | p = 0.017 |
| | End-of-study | Total study | Not significant | p = 0.040 |
| | | Not taking aspirin | Not significant | p = 0.020 |
| Ibuprofen | 26 weeks | Total study | Not significant | p = 0.005 |
| | | Not taking aspirin | p = 0.020 | p < 0.001 |
| | End-of-study | Total study | Not significant | p = 0.017 |
| | | Not taking aspirin | p = 0.037 | p < 0.001 |
| Diclofenac | 26 weeks | Total study | Not significant | Not significant |
| | | Not taking aspirin | Not significant | Not significant |
| | End-of-study | Total study | Not significant | Not significant |
| | | Not taking aspirin | Not significant | Not significant |

Source: FDA Medical Officers Review

---

[27] February 7, 2001, J.P. Morgan Securities Inc., "FDA Review of Celebrex More Negative Than Expected—Panel Could Be Controversial," DEFEX 003862 – DEFEX 003865.

16

As noted, the "Source" for this table was "FDA Medical Officers Review."  It is plain from the content of the J.P. Morgan report that it did not take three days for the market to digest and assimilate the five allegedly omitted data points from the FDA briefing documents.  In that regard, it is critical to note that, although the J.P. Morgan report is dated February 7, 2001, it was prepared on February 6, 2001 and published prior to the market open.  More importantly, the information in the report had already been communicated to traders, the sales force and clients (*i.e.*, investors and money managers, certainly including those hired by the Plaintiffs) during the course of the day on February 6, 2001.  This process of analyzing the briefing documents, drawing conclusions about the likely impact on Pharmacia, and communicating that information to investors occurred in parallel at each of the 20 or more brokers that covered Pharmacia (and, to a lesser extent, Pfizer and Merck). Though records of intraday communications between analysts and investors are not available at this time (ten years after the event), I can state with a high degree of confidence that the sell-side analyst teams covering Pharmacia, of which there were at least twenty, issued and discussed with investors their views on the briefing documents intraday February 6, and furthermore, many Pharmacia investors would themselves have reviewed the briefing documents.[28] Thus, if one were to take an extremely conservative position and rely solely on analyst reports as a gauge of when information was fully disseminated to the market, the time when the analyst reports were published would reflect the latest point at which the information contained in the

---

[28] For example, Ira Loss, an analyst at Washington Analysis, a boutique research firm, was quoted as viewing the chances of a major label revision as small in a Reuters article published mid-day on February 6, 2001.  Reuters News, February 6, 2001, "HD Update 1-Safety of popular arthritis drugs under US review." ("Ira Loss, a drug industry analyst with Washington Analysis, said the FDA's reviews made him skeptical that the agency would support a major revision. 'I don't see what's in it for the FDA to make a big change in the [Celebrex] label.'")

report could be said to have been incorporated into the price of Pharmacia stock. However, based on my experience regarding how sell-side analysts communicate with investors, it is my opinion that long before the time a formal analyst report was published the information would have been already incorporated into the price of Pharmacia stock.[29] And, as I will demonstrate below with empirical data, the information contained in Advisory Committee briefing documents is, in fact, assimilated by the market almost instantaneously.

The J.P. Morgan report reflects my experience, and my expert opinion based on that experience, that the dissemination of the information contained in Advisory Committee briefing documents is immediate; the lack of response in the market (as indicated by Pharmacia's stock price as shown below) to the intraday release of the briefing documents on February 6 is consistent with only one interpretation – that market participants, upon digesting the previously undisclosed results of the CLASS study, and the FDA's review of the study, found nothing material.

c.    **The FDA Review Was Of Far Greater Interest Then The Newly Released CLASS Data**

A third issue plaguing Dr. Feinstein's argument is that his lack of practical experience leads him to incorrectly presume that market observers were more interested in, and placed more emphasis on, specific data-points from CLASS than on the overall conclusions of the FDA reviewers.   When analysts and investors review briefing

---

[29] It is also important to note that in its presentation of the FDA review, including the initially undisclosed CLASS results, J.P. Morgan acknowledged that although "this meeting is not likely to be clear sailing for Celebrex" and "the degree of label improvement may be less dramatic than hoped," they "still view similar label revisions for both products [Celebrex and Vioxx] . . . as the 'most likely' outcome." February 7, 2001, J.P. Morgan Securities Inc., "FDA Review of Celebrex More Negative Than Expected—Panel Could Be Controversial," DEFEX 003862 – DEFEX 003865 at DEFEX 003863.

18

documents their primary interest is in assessing the direction and nature that the subsequent day's Advisory Committee discussion will take given the FDA's review of the submitted data and the questions the FDA will post to the Committee members; for example, the likelihood of a recommendation for or against FDA approval of the request being made in the applicable NDA.  This interest is best informed by examining the FDA reviewers' views on the topline data, and their conclusions and recommendations, rather than trying to digest a broad range of specific data points that contribute, to a greater or lesser extent, to the reviewer's conclusions and recommendations.   The data are subsumed in, and to a certain extent, rendered irrelevant by the FDA's conclusions and recommendations.  Therefore, when faced with freshly disclosed briefing documents, it is possible to gauge the tenor of the FDA review and understand the critical issues within minutes. Although further review of the documents and, specifically, the data and results themselves over several hours may reveal additional information of relevance, it would be extremely unusual to find material information buried in the FDA reviews that was not addressed up-front by the FDA reviewers in their summaries and conclusions.

> **d.   The Content Of Analyst Reports Does Not Support Dr. Feinstein's Claim That Analyst-Driven Dissemination of the CLASS Results Took Three Days**

Dr. Feinstein contends that the propriety of using a 3-day window is supported by the fact that analysts published reports on February 7 and 8, 2001 discussing the Advisory Committee meetings for Celebrex and Vioxx:

> [I]n this case, several analyst reports that facilitated the processing and dissemination of the new information about Celebrex that was released on 6 February 2001 and 7 February 2001 were published on 8 February 2001.  The time required for analysts to digest the new information speaks to the complexity and volume of the information.

> Moreover, the time required by analysts to write and distribute their reports extended the time it took the market to fully comprehend the import of the new information.[30]

But, again, Dr. Feinstein is wrong because he elides the distinction between the "processing and dissemination" of the *five allegedly omitted data points* and the "processing and dissemination" of the developments at the Arthritis Advisory Committee meetings for Celebrex and Vioxx on February 7 and 8, 2001, respectively, and commercial implications thereof for Pharmacia – which are the subject of the February 8, 2001 analyst reports. In fact, while many analyst reports and notes issued from February 7-9, 2001 made mention of the CLASS study and a few present some summary results, I can identify only a single report that discusses the initially undisclosed CLASS results— the J.P. Morgan Analyst Report that was prepared on February 6 and published prior to the market open on February 7.[31]

I have reviewed nineteen analyst notes and reports regarding Celebrex dated February 7-9, 2001.[32]  Almost all of the notes mention the FDA review of and Advisory Committee meeting for Celebrex and the CLASS results in general, and half make explicit mention of the failure of CLASS to achieve its primary endpoint (with several indicating this as having been the key factor in Advisory Committee vote). In striking contrast, only one note, the previously mentioned J.P. Morgan report (published prior to the market open on February 7) provides any discussion of the initially undisclosed CLASS results, indicating that analysts for the most part found these initially

---

[30] Feinstein Report at ¶168.

[31] February 7, 2001, J.P. Morgan Securities Inc., "FDA Review of Celebrex More Negative Than Expected—Panel Could Be Controversial," DEFEX 003862 – DEFEX 003865.

[32] These nineteen documents represent every analyst note and report regarding Celebrex dated February 7-9, 2001 that I was able to obtain. The nineteen documents are identified in Appendix C.

undisclosed CLASS too insignificant to bother mentioning, much less discussing in detail. Yet the Plaintiffs allege these results were material and the cause of a significant Pharmacia price decline over three days, and Dr. Feinstein claims these results were so complex that "the time required by analysts to write and distribute their reports extended the time it took the market to fully comprehend the import of the new information."[33] On the contrary – the analyst reports can in no way be said to have "extended the time it took the market to fully comprehend the import of the new information" because the analyst reports *do not even mention or discuss* the new information – i.e., the five allegedly omitted data points.[34]  Further undermining the plausibility of Dr. Feinstein's concept is the fact that a single aspect of the initially undisclosed data – that Celebrex was statistically superior to ibuprofen – is mentioned in two notes as a positive result that could potentially make its way to the Celebrex label.[35]

To reiterate – not one of the reports cited by Dr. Feinstein discloses, refers to, analyzes or in any way discusses any of the five allegedly omitted data points upon which Plaintiffs' claims are based, a fact directly contradicting Dr. Feinstein's assertion that "several analyst reports that facilitated the processing and dissemination of the new information about Celebrex that was released on 6 February 2001 and 7 February 2001 were published on 8 February 2001."[36] In particular, none of the February 8, 2001 analyst

---

[33] Feinstein Report at ¶ 168.

[34] In my opinion, this fact simply reflects the fact that the newly disclosed results were viewed as immaterial by the sell-side analysts that were following the COX-2 inhibitor Advisory Committee meetings.

[35] February 8, 2001, Credit Suisse First Boston, "No Change Recommended for Celebrex Labeling" and February 8, 2001 Salomon Smith Barney Analyst Report "Vioxx & Celebrex at FDA (Day 2)."

[36] Feinstein Report at ¶ 168.

reports discuss anything new about the CLASS data; rather, the February 8 reports published in the morning are focused on the outcome of the Celebrex Advisory Committee meeting, and those published in the afternoon or night are focused on the outcome of the Vioxx Advisory Committee meeting. The very idea that analysts would still be writing about a handful of specific data points from the CLASS study after the Advisory Committee had voted against a potential label change for Celebrex is ludicrous, as is Dr. Feinstein's claim that analyst reports released on February 8 "facilitated the processing and dissemination of the new information about Celebrex"[37] when those reports in fact contain no mention whatsoever of the initially undisclosed CLASS results.[38]

Ultimately, Dr. Feinstein is confounded by his lack of appreciation of how analysts and the markets for pharmaceutical stocks operate. The relevance of the briefing documents to investors ended once the Advisory Committee meeting was underway; at that point, the discussion amongst Pharmacia, the FDA and the Committee members was more relevant. Analyst notes and commentary published intraday, or after the close, February 7 and prior to the open February 8 were focused on the Celebrex Advisory

---

[37] *Id.*

[38] Moreover, Dr. Feinstein's reliance on analyst reports from February 8, 2001 to support his three day proposal further underscores the gross error he makes by not considering the Advisory Committee's vote on February 8, 2001 to recommend the inclusion of safety data from Merck's VIGOR trial on the Vioxx label as confounding information (which will be discussed in detail below). Not only does Dr. Feinstein completely ignore the implications for Pharmacia's stock price of the Arthritis Advisory Committee's decision regarding the Vioxx label, he actually relies upon the very analyst reports which, by discussing those implications as potentially detrimental to Pharmacia, reveal his decision to ignore the confounding effect of the Advisory Committee vote for Vioxx to be a farce. The primary focus of the analyst reports published February 8, 2001 after the Vioxx Advisory Committee vote is on Merck and Vioxx and the competitive position of Celebrex in light of the Advisory Committee vote in favor of a label change for Vioxx, as discussed in more detailed below.

Committee meeting and the vote against recommending a label change for Celebrex. Similarly, commentary and notes published intraday February 8 and prior to the open on February 9 focused on the Vioxx Advisory Committee meeting and vote in favor of a label change for Vioxx.  His depiction of analyst commentary relating to the previously undisclosed data rolling out over a three day period is, once again, a figment of his imagination, and contradicted by the very content of analyst notes and reports he relies upon.

Accordingly, the fact that analysts published reports on February 7 and 8, 2001 reported on the results of the two Advisory Committee meetings has no bearing on the question of how long it took the market to assimilate the five corrective data-points in the briefing documents; the lack of explicit reference of any kind to those data points in the analyst reports underscores that analysts viewed these newly disclosed data as irrelevant.

2. **Stock Price Movements in Response to Advisory Committee Briefing Documents and Meetings Are Confined to a Single Day**

FDA Advisory Committee meetings are one of several kinds of events creating volatility and trading opportunities in stocks and are carefully followed by investors, analysts and the financial media.  Because, as discussed above, the meeting dates are known well in advance, market participants can be extremely well prepared for the possible outcomes, although many times the outcomes are difficult to predict.  It is my personal experience that stock price changes in response to the posting of briefing documents is extremely rapid and cannot in any way be said to extend over a three day period.  Below, I will supplement my experience-driven opinion with quantitative data.

23

The FDA Advisory Committee meetings that are typically of high interest to investors relate to New Drug Applications ("NDAs"), since the potential approval of a new drug may be highly material to the business of the company in question. When a company has an important drug being reviewed at an Advisory Committee, prior to the meeting, the price of the company's stock represents, at least in part, the sum of investor sentiment, which could be almost unanimous in expecting success or failure, or could be more equally split (for this reason, biotechnology stocks represent a particularly pure environment for studying the market response to Advisory Committee reviews since the value of these companies in the stock market is often determined by a single drug; thus, the meeting outcome can almost entirely determine the value of the company). Although investor interest in such reviews is always high, a meaningful price move in response to the briefing documents or Advisory Committee hearing itself is generally triggered by an outcome that differs substantially from expectations or, alternatively, when there is significant uncertainty regarding the outcome of the meeting (*e.g.*, when sentiment is strongly positive or negative and the Advisory Committee review goes the other way, or when sentiment is mixed and the Advisory Committee review establishes the outcome).

Dr. Feinstein's construct holds that it took three days to incorporate into Pharmacia's stock price just a handful of twelve month data points, February 6, the day of the disclosure, February 7, the day of the Advisory Committee review of CLASS and the release of the Vioxx briefing documents, and February 8, the day of the Advisory Committee review of VIGOR. I have already explained in my initial expert report of June 7, 2011 that these must be viewed as three separate events affecting Pharmacia's stock, and that the curative disclosure occurred on, and was complete on, February 6, 2001. February 7 and 8 each represent distinct events, in which the market assimilated

new information completely distinct from the curative disclosures of February 6; namely, the Advisory Committee review of Celebrex on February 7 with the Advisory Committee vote not to recommend any label change for Celebrex and the disclosure of the FDA's views on the VIGOR study of Vioxx, then the February 8 Advisory Committee review of Vioxx and vote in favor of the VIGOR data being included on the Vioxx label.[39]   To reiterate – Dr. Feinstein's proposal of a three day reaction to the relatively small amount of data new to the market in the Celebrex briefing documents bears no semblance to the reality of how the market actually reacts to Advisory Committee briefing documents and meetings.

In order to address Feinstein's three day proposal, I undertook a study of stock price reactions to Advisory Committee briefing documents and votes for 2001 through 2010.  My study demonstrates, unequivocally that:

1.      Stock price changes in response to the posting of briefing documents are completely distinct from stock price changes in response to the subsequent Advisory Committee meetings; the market views these as discrete events;

2.      Stock price changes to either event (release of briefing documents or the Advisory Committee meeting) are confined to a single trading day, with no suggestion of a three or even two day reaction to a single event;

3.      The pattern of Pharmacia's stock price change over February 6-8, 2001, in which the majority of the decline came on the third day following the release of the briefing documents, is inconsistent with the typical pattern of stock price changes responding to the posting of the briefing documents and holding of the Advisory Committee hearing, indicating an external factor drove the February 8 decline; and

[39] To be abundantly clear, the events of February 7 and 8 are not only separate and distinct from the events of February 6, but they are also separate and distinct events vis-à-vis each other.

4.      Intraday stock price movements in response to the release of briefing documents demonstrate that the market immediately assimilates the newly disclosed information.

To conduct this study I created a sample set of companies (restricted to companies with US stock listings) applying for FDA approval of new drugs that would be important for the applicant company, and then eliminated those cases in which I could not identify the date on which the briefing documents were posted.  I also eliminated those cases in which there was no stock volatility around the Advisory Committee, as I was specifically interested in a sample in which a changing stock price could be identified and correlated with the release of briefing documents and/or the Advisory Committee meeting itself.   Not unexpectedly, the sample consists mainly of biotechnology stocks, for which Advisory Committee meetings tend to highly material, though it includes some pharmaceutical companies as well.   The sample includes 39 stocks, covering 34 Advisory Committee meetings (some meetings discuss more than one drug application).

A couple of introductory points are in order.   First, although each Advisory Committee meeting in my sample set concerned a different product and a different set of data about that product, all of the samples involved complex clinical, scientific and statistical issues (regarding drugs or biotechnology products) no less complicated in degree from those presented by the CLASS trial.  Second, the magnitude of the stock price moves is not of particular interest for the purposes of this study (we fully expect that for biotechnology companies, the price changes will be large); rather, we are interested in the *pattern*, that is, on what days the price changes occur and in response to what information, is there any evidence that the market reaction to briefing documents is extended beyond a single trading day, and does the pattern observed for Pharmacia

26

match the pattern observed for other stocks.  The magnitude of the stock price change reflects how important the approval of the particular drug under review (or supplemental approval of an already approved drug) is to the company; clearly for biotechnology companies seeking their first product approval, the materiality is much greater (and hence the stock volatility much larger) than for our case, a supplemental approval for an already successful drug sold by a diversified pharmaceutical company.

The figures included in the following pages include stock price/return information for the sample set companies in the following categories: The baseline stock price is set as the closing price on the day prior to the posting of the briefing documents (*e.g.*, in our case, that corresponds to February 5, 2001).  The next data point is the percentage change at the market close on the day the briefing documents are posted (*e.g.*, in our case, that corresponds to February 6).[40]  The next data point represents the return on the day prior to the Advisory Committee, assuming that there was an interim day – however in many cases, including our case, the day that the briefing documents are posted *is* the day prior to the Advisory Committee meeting, so in these cases no return is calculated for the day prior to the Advisory Committee.  The subsequent day on the chart represents the return generated at the first close after the Advisory Committee meeting

---

[40] For clarity, I note that it is my contention that the Pharmacia stock price change on the day the briefing documents were posted (February 6, 2001) represents the only day in which a change in stock price could potentially be attributed to the disclosure of the information in the briefing documents.

has concluded (*e.g.*, in our case, that corresponds to February 7, 2001).[41]  Finally, the last time point on the chart is the return at the close of the subsequent trading day.[42]

    In looking at the pair of discrete events comprising an Advisory Committee meeting, (*i.e.*, first, the posting of the briefing documents on the FDA website, and subsequently the Advisory Committee public hearing and the Committee vote at the close of the public hearing), it is apparent that there are a limited number of patterns.  The briefing documents and Advisory Committee recommendation can both be negative (meaning, both go against the desired drug or labeling approval), which is the pattern observed in the review of the CLASS results.  Conversely, the briefing documents and Advisory Committee recommendation can both be positive, that is, supporting approval.  Sometimes, the documents and Advisory Committee can be reversed (that is, negative documents but an Advisory Committee vote for approval, or the reverse), and other times the briefing documents are mixed and do not give a strong sense for what the FDA's position is.  Of the 39 total events, in 19 events the Advisory Committee briefing documents and the Advisory Committee vote matched directionally (in 12 cases both were negative and in 7 cases both were positive) and in only four events did the Advisory Committee vote represent a true reversal of the position espoused by FDA reviewers in the briefing documents.  For the remaining 16 events, either the briefing documents or the

--------------------------------------------------

[41] Because many biotechnology stocks are halted on the day of an Advisory Committee review, and other times the Advisory Committee meeting ends (or voting occurs) after the close, in those cases this return is calculated using the close on the trading day after the Advisory Committee actually met.

[42] I should note that I did not perform a detailed event study in an attempt to exclude confounding events, although, again, for the majority of examples in the sample set, any other information in the market would have been insignificant in comparison to an FDA Advisory Committee vote on their first potential drug approval.

Advisory Committee vote was mixed.  In Appendix A, we provide several representative examples of stock reactions to Advisory Committee briefing documents/meetings.

Figure 1 below illustrates the returns, measured by the percentage of stock price movement, over the trading days described above, for those cases in which the briefing documents and the Advisory Committee vote were both negative.  For those cases in which there was no interim day between the day the briefing documents were posted and the Advisory Committee meeting (*i.e.*, there was no interim day), a dashed line indicates that no price change could have occurred for this period.

**Figure 1.  Stock Returns When Briefing Documents and Advisory Committee Results are Negative**



There are several observations that will be further explored below. First, as reflected in the shaded area labeled "1," unlike in the case of Pharmacia, the posting of briefing documents with negative information causes an immediate and substantial decline in the

stock price.   Second, the interim day return, indicated by the area labeled "2" on the figure, is quite small relative to the briefing document driven price decline.   Third, marked by the shaded area labeled "3," there is an independent stock price reaction to a negative Advisory Committee vote distinct from the stock price decline driven by the release of the briefing documents. Fourth, there is no additional stock price move subsequent to the Advisory Committee vote, as indicated by the shaded area labeled "4."

Focusing not on the magnitude of price change, understandably larger for biotechnology companies in which the Advisory Committee meeting is in reference to their only product, we can see that a large portion of the negative return, or price decline, generated by these stocks over this period is caused by the disclosure of the briefing documents – in contrast to the insignificantly small price movement for Pharmacia on February 6, 2001.   When there is an intermediate trading day (after the briefing documents and before the Advisory Committee meeting, not the case for Pharmacia), there is little change in the stock prices.  If, as Dr. Feinstein hypothesizes, it took the market time to digest "complex" information from the negative briefing documents one would expect to see the briefing document driven price decline carried over into the next day.   The second large decline in stock prices is driven by the Advisory Committee meeting itself, and clearly, the day after the Advisory Committee (corresponding to February 8, 2001 for Pharmacia) there is no additional meaningful price movement – this too stands in sharp contrast to the behavior of Pharmacia's stock, which showed a relatively large decline only on the day after its Advisory Committee meeting.  As will be discussed in further detail below, Pharmacia's deviation from the typical pattern of stock movements can be explained by the development of an unrelated material adverse event

30

on February 8, 2001 – the February 8, 2001 Advisory Committee Meeting regarding Vioxx – a characteristic not shared by the other stocks in this sample.

      a.      **Briefing Document-Driven Stock Reactions**

In this sample, the mean and median returns on the day the briefing documents were posted are ±21% and ±17%, respectively (calculated by using the magnitude of the return, regardless of the direction). In the 12 examples in which the briefing documents and Advisory Committee vote were both negative (corresponding to the Pharmacia case), mean and median returns on the day the briefing documents are posted are -31% and -39%. For the seven examples in which both events were positive, mean and median returns on the day the briefing documents are posted are 27% and 21%. Looking at all 19 examples in which the briefing documents and Advisory Committee vote were directionally the same (either both negative or both positive), mean and median returns on the day the briefing documents are posted are ±30% and ±21% (using the absolute value of the return to calculate mean and median).

In stark contrast, Pharmacia's stock price change on the day the briefing documents were posted was -1.1%. Again, the point is not to compare the magnitude of the Pharmacia return to these averages, but rather to understand the typical distribution of returns over the multi-day, multi-event phenomenon that is an Advisory Committee review. This 1.1% ($0.63) decline in Pharmacia's stock price (not a statistically significant change according to Dr. Lehn[43]) on February 6, 2001, the day the Celebrex briefing-documents were posted, represents just 12% of the total loss of $5.28 in Pharmacia's shares from the close on February 5, 2001 ($58.28/share) until the close on

---

[43] Kenneth M. Lehn, Expert Report Concerning Materiality, Loss Causation and Damages, June 7, 2011 at ¶¶ 12, 61, 70-74.  ("Lehn Report")

February 8, 2001 ($53.00/share)[44].  This is in striking contrast to the other comparable historical examples, where the change in stock price in response to the briefing documents constitutes **65%** of the total return earned over the comparable time frame for the examples in which both documents and Advisory Committee were negative, and **54%** of the total return for the examples in which both documents and Advisory Committee were positive.

Thus, we can conclude that the market response to the information within briefing documents typically captures over half the return (or change in stock price), positive or negative, that a stock will generate over the course of the independent events comprising an Advisory Committee review.  The burden is on the Plaintiffs to explain why Pharmacia should have deviated from this pattern, with the response to the briefing documents constituting such a small price move. Dr. Feinstein has offered none.  Of course, there is a readily apparent explanation: the Pharmacia pattern is highly consistent with the fact that the information in the Celebrex briefing documents posted on February 6, 2001, including the fully curative disclosure of the full CLASS results, and the FDA's negative view on the Defendants' six month analysis, was not viewed as material by the market.

### b.   The Day After, Part 1 – Stock Price Changes Between the Briefing Documents and Advisory Committee

As mentioned earlier, the FDA typically posts briefing documents to its website one to two days prior to the Advisory Committee meeting.  This means that in some cases, there is a trading day between these two events – a day in which the briefing

---

[44] To be completely clear: Pharmacia's stock declined by $5.28 (9.1%) over the course of February 6-8, 2001.  The decline of $0.63 of February 6, 2001 accounts for 12% of the decline ($0.63 is 12% of $5.28).

document materials can be further reviewed and digested ahead of the following day's Advisory Committee meeting.  There was no such intermediate day for Pharmacia in this case; the documents were posted in the morning of February 6, 2001 and the Advisory Committee meeting began prior to the market open the next morning.

If Dr. Feinstein's theory is correct that the information contained in FDA Advisory Committee briefing documents is "complex, voluminous, and irregular" and that it takes "some time for the market to process the new information,"[45] then this intermediate day should be one in which the continued "processing" of information from the briefing documents into the market continues to affect the stock price of the company whose drug is up for Advisory Committee review.   However, the data unequivocally show that there is not any meaningful continued "processing" of the briefing documents – there is little change in the stock price on the day after the briefing documents are posted. Figure 2 shows the returns only for those examples in which there was a trading day separating the posting of the briefing documents and the advisory committee meeting.

---

[45] Feinstein Report at ¶ 73.

**Figure 2. Stock Returns in Cases in Which an Intermediate Trading Day Occurs Between the Briefing Documents and Advisory Committee Meeting**



For the entire sample of 26 instances in which there was trading day between the day that the briefing documents were released and the day of the Advisory Committee hearing (shown in the grey area on the chart), the mean and median magnitude of the stock price change on that day were just 5% and 3%, respectively, compared to a mean and median magnitude of price change in response to the briefing documents of 20% and 15%, respectively.  In ten of the 26 examples, the stock price change in the day after the briefing documents were posted was in the opposite direction of the prior day's stock price change.  These data, as illustrated in Figure 2 above constitute potent, empirical evidence that Dr. Feinstein's theory that it takes the market multiple days to understand the "complex, voluminous, and irregular"[46] information contained in Advisory

---

[46] *Id.*

Committee briefing documents is simply wrong.  If his view had any basis in reality, then there should be continued stock price movement on the day after briefing documents are posted, reflecting the market's ongoing digestion of the material contained in the briefing documents.  Instead, there are small and dramatically reduced stock price excursions on the day after the briefing documents were made public (and frequently in the opposite direction of the prior day's move).  Of course, Dr. Feinstein is forced to take a position that the market needed three days to process the Celebrex briefing documents because by far the largest Pharmacia price move came on February 8, 2001, the third trading day after the curative disclosures.

### c.        Advisory Committee-Driven Stock Reactions

In this sample, the mean and median magnitude of return as of the first close after the Advisory Committee meeting are ±28% and ±22%, respectively. Excluding the four examples in which the Advisory Committee outcome was reversed from what would have been expected from the briefing documents, on average the stock price move generated by the Advisory Committee review is approximately half that of the entire stock price move from the close prior to the posting of the briefing documents. From an investor's perspective, that makes sense – the briefing documents are not a perfect predictor of the Advisory Committee outcomes, and in the dynamics of the Advisory Committee meeting, a company may end up faring better or worse than what the briefing documents might imply.  Thus, after the briefing documents are released, market participants will continue to buy and sell based on their assessment of the possible outcomes of the Advisory Committee meeting and, of course, based on their perception

of the risk-reward since the stock price has most likely changed, perhaps dramatically, since before the briefing document information was released.

In our case, Pharmacia's stock declined $1.52 or 2.6% (also not a significant change according to Dr. Lehn[47]) on February 7, the day of the Advisory Committee. In contrast to the other examples, in which half of the overall price change was driven by the Advisory Committee, this accounts for just 29% of the $5.28 that Pharmacia's stock declined over February 6-8, 2001. Dr. Feinstein's theory would attribute Pharmacia's loss on February 7, 2001 to the ongoing assimilation by the market of the handful of CLASS results that Plaintiff's allege were material and disclosed on February 6. I have already presented substantial evidence arguing against the possibility that the market takes even two days to process Advisory Committee briefing documents. To that, I will add the additional observations that on February 7, the Advisory Committee voted not to recommend a label change for Celebrex, which was a disappointing outcome from the meeting. Also, prior to the market open on February 7, the briefing documents for Merck's Vioxx Advisory Committee meeting were posted to the FDA website.[48] In those briefing documents, the FDA reviewers recommended against a label change for Vioxx. It is likely that this too was confounding information that negatively affected the price of Pharmacia stock. Specifically, the fact that the FDA reviewers recommended against a label change for Vioxx, even though the VIGOR trial, unlike CLASS, had met its primary endpoint, would have implications on Celebrex's chances for obtaining a label change.

---

[47] Lehn Report at ¶¶ 12, 75 – 82.

[48] February 7, 2001, Bloomberg News, "Merck's Vioxx Safety Warning Should Remain, FDA Review Says" (reflecting time stamp of 09:03:51).

**d.     The Day After, Part 2 – Stock Price Changes the Day Following the Advisory Committee**

A claim central to Dr. Feinstein's argument is that the Pharmacia price decline on February 8, 2001, a drop of $3.13 or almost 6% (and representing 59% of the Pharmacia stock price decline over his three-day period of February 6-8, 2001) was driven by the curative disclosure of the full CLASS results two days earlier, on February 6, 2001.[49]  I explained at length in my expert report submitted June 7, 2011 (and summarized below) the price decline on February 8, 2001 can only be viewed as resulting from the February 8, 2001 Advisory Committee vote to recommend inclusion of the VIGOR comparative GI safety data on the Vioxx label.  The behavior of other stocks after Advisory Committee meetings provides further refutation of Dr. Feinstein's theory.

The mean and median magnitude of stock price change in this sample, from the last close of trading prior to the briefing documents being posted, until the first close of trading after the Advisory Committee vote, are ±36% and ±22%, respectively.  If one includes the subsequent trading day in order to calculate the magnitude of the stock price change, the result is virtually unchanged, with a mean and median magnitude of stock price change of ±36% and ±25%.  In other words, there is no additional return to even contemplate attributing to the briefing document disclosures and Advisory Committee meeting the day after the first market close after the Advisory Committee.  As illustrated in Figure 3 below, specifically in the area highlighted in grey, in our entire

---

[49] *See, e.g.,* Feinstein Report at ¶¶ 195 – 203, 245 – 255.

sample, stock prices demonstrate almost no meaningful, directional movement the day after an Advisory Committee meeting.[50]

**Figure 3. Stock Price Changes One Day After Advisory Committee Meetings**



For the entire sample, the mean daily return on the day following the first post-Advisory Committee close is -3%, and in just 18 of the 39 stocks studied was the stock price movement on the second day in the same direction as the movement generated on the prior day because of the Advisory Committee meeting.

The contrast with Pharmacia is striking.  One would expect, based on the empirical data presented, to have seen little or no price change in Pharmacia's stock on February 8, 2001, the day after the Celebrex Advisory Committee meeting.  But instead,

---

[50] Again, in the case of biotechnology stocks that do not trade on the day of the Advisory Committee, or cases in which the Advisory Committee vote occurs after the close, this represents the second day after the meeting.

Pharmacia's stock dropped by $3.13 or almost 6% (a statistically significant decline[51]) – this accounts for 59% of the $5.28 decline if Pharmacia's stock price from February 6-8, 2001.   Again, the onus is on Dr. Feinstein to account for this stock price decline that deviates so dramatically from the expected behavior of a stock after an Advisory Committee meeting.   And again, the only answer he can provide in order to create the illusion of loss causation, materiality and damages, is that this stock price decline must have been related to the February 6, 2001 curative disclosure that took three full trading days to become incorporated in Pharmacia's stock price.   Consistent with the empirical data that I have presented, this price decline was driven by a materially negative development for Pharmacia on February 8, 2001, completely unrelated to the initially undisclosed CLASS results.

> ### e.   Examining the Pattern of Pharmacia's Stock Price Movement

The usual behavior of biotechnology and pharmaceutical stocks across the individual days of the briefing document-Advisory Committee sequence of events has provided empirical *evidence* contradicting Dr. Feinstein's *theory* that it takes three days for the market to "process" the information contained in FDA Advisory Committee briefing documents.   The results presented suggest that each event (the briefing document release and the Advisory Committee meeting) is discrete, separate and contained, and that there is no ongoing response carrying over into a second or third trading day.   This finding becomes even more apparent when comparing the performance of Pharmacia's stock over the several days comprising the Advisory Committee and related events to the pattern established by other stocks navigating these same waters.   For these analyses, the

---

[51] Lehn Report at ¶¶ 83 – 87.

comparator groups are those examples in which the briefing documents and Advisory Committee outcomes were similar (either both negative or both positive), or those in which both events were negative.

Figure 4 below charts the performance of Pharmacia stock versus the average performance of the other stocks in which negative briefing documents were followed by a negative Advisory Committee meeting – that is, the grey line represents the average stock price movement of a composite of the twelve individual stocks (other than Pharmacia) reflected in Figure 1 above.[52]  As Figure 4 clearly reiterates, there is a two-step pattern in which there is a stock response to the briefing documents, which is entirely confined to the day upon which the briefing documents are made public, then a separate stock response to the Advisory Committee meeting and vote, which again is completely confined to the day upon which the vote occurs.[53]  In contrast, Pharmacia's stock price movement demonstrates a very different pattern.   There is *no* response to the briefing document release, a modest decline on the day of the Advisory Committee meeting, and a majority of the total stock price decline on the following day.[54] The pattern of the decline in Pharmacia stock price in this period indicates that a material event unrelated to the briefing documents or Advisory Committee occurred on the day *after* the February 7 Advisory Committee Celebrex review.

---

[52] Again, the relative magnitude of the performance is unimportant; we are interested in the pattern.

[53]   In the case of biotechnology stocks that were halted during their respective Advisory Committee meeting, the stock price response is evident on the following trading day.

[54] There was no possible return for Pharmacia between the posting of the briefing documents and the Advisory Committee meeting, since the documents were made public on the day immediately prior to the Advisory Committee meeting; this is indicated by the dashed red line.

**Figure 4. Performance of Pharmacia Compared to Other Stocks Declining During Advisory Committee Meetings**



Figure 5 takes the total return, measured as a percentage of stock price movement, over a period of three or four trading days[55], including (1) the return generated in response to the briefing documents, (2) the return generated on the day between the briefing documents posting and the Advisory Committee panel (in those cases in which there was an interim day), (3) the return generated in response to the Advisory Committee vote, (4) the return on the following day and attributes a percentage of the total return over that total period to each of those days (as indicated on the lower axis).[56]  For Pharmacia, these days would correspond to February 6 (briefing documents

---

[55] The period would be four days if there was an intermediate day between the posting of the briefing documents and the Advisory Committee meeting.

[56] The total difference between the stock price on the day the briefing documents are posted verses the second day after the Advisory Committee vote is defined as "100%" of the stock price movement over that period. Accordingly, the percentage return earned on each day will, accordingly, sum to 100% over the period in question. For example, Pharmacia's stock price declined a total of $5.28 between February 6-8, 2001.  12% of that decline occurred on February 6, when the briefing documents were posted. 29% of that decline occurred on February 7, the day of the Advisory Committee. And the lion's share of the decline, 59%, occurred on February 8, the day after the Celebrex Advisory Committee meeting.

posted), February 7 (Advisory Committee) and February 8 (day subsequent to Advisory Committee)[57] The difference in return profile between Pharmacia and the other stocks in which there were negative briefing documents and a negative Advisory Committee meeting is remarkable – 59% of Pharmacia's return over the three-day period was generated <u>the day *after* the Advisory Committee</u>, whereas the typical pattern is that the entire return for this time period is generated on the combination of the day that the briefing documents are posted and the day of the Advisory Committee.

**Figure 5. Distribution of Returns Generated by Briefing Document Posting and Advisory Committee Meeting**



The observation that the majority of Pharmacia's return occurred the day after the Advisory Committee (in contrast to the other stocks in this sample), is again,

---

[57] Pharmacia did not have an intermediary day between the posting of the briefing documents on the FDA website and the Advisory Committee meeting.

compelling empirical evidence that there was a material event affecting Pharmacia stock on February 8.  This will be discussed in detail below.

**3.** **Intraday Reactions to the Posting of Advisory Committee Briefing Documents Demonstrates the Stock Response is Immediate**

Generally, FDA Advisory Committee briefing documents are posted one to two days prior to the Advisory Committee meeting, in most cases before the market opens.  In some cases, however, the documents are posted during the trading day, which provides an opportunity to examine the speed of the market reaction to the information contained in the briefing documents.  Figure 6 below is a representative intraday chart.[58] An FDA Advisory Committee was scheduled to review Auxilium Pharmaceuticals' drug Xiaflex on September 16, 2009; at approximately 10:15 AM on September 14, 2009, the briefing documents, which contained an FDA review supportive of approval, were posted.  As the chart indicates, the market reaction was immediate.

---

[58]  Additional examples can be found in Appendix B.

**Figure 6. Intraday Activity of Auxilium (AUXL) in Response to Briefing Documents**



Note: Thick black line represents the stock price; the blue line cumulative volume

Market responses are similar in onset and quickness when the news is negative.  For example, Allos Therapeutics received a negative FDA review of its cancer compound RSR13; the briefing documents were public by about 10:00 AM on April 30, 2004.  Again, the market reaction to the briefing documents was immediate (Figure 7).

**Figure 7. Intraday Activity of Allos Therapeutics (ALTH) in Response to Briefing Documents**



Note: Thick black line represents the stock price; the blue line cumulative volume

What is notable about the market response to the posting of briefing documents is the nearly instantaneous manner in which the stock price adjusts to the new information. Often within minutes to an hour, at the most, the stock price is already stabilizing. These events are veritable "poster children" for market efficiency. This rapid and efficient response is highly inconsistent with Dr. Feinstein's concept that it takes three days for the market to "process" the "complex" and "voluminous" information contained in FDA Advisory Committee briefing documents.

**4.      Conclusion Regarding the Three Day Theory**

Unfortunately for the Plaintiffs, their argument for loss causation, materiality and damages is untenable in light of the fact that the disclosure of the full

45

CLASS results on February 6, 2001 did not result in a sell-off of Pharmacia's stock.  If Plaintiffs' claim that Defendants had misled the market were accurate, the February 6 disclosures ought to have cured the market of any alleged materially false impressions it held of CLASS or the odds that Celebrex would gain a label modification, and therefore cause a significant decline in Pharmacia's stock price.  Though Occam's Razor would demand the most simple explanation of this observation, which is that the initially undisclosed CLASS data were immaterial, the Plaintiffs have chosen a less parsimonious interpretation, which is that the newly disclosed data in the briefing documents was indeed material – however it took not one, not two but three days for the importance and materiality of that information to be contemplated and assimilated by the market.  And, says Dr. Feinstein, never mind that other material adverse developments occurred on the second and third day of this conjectured three day period, including the release of Vioxx briefing documents, an Advisory Committee vote against a Celebrex label modification and then, critically, a subsequent vote in favor of an improved label for Celebrex's key competitor, Vioxx.

Not only does Dr. Feinstein's hypothesis violate Occam's Razor, it is demonstrably inconsistent with the empirical evidence.  This report presents an analysis of the typical performance of biotechnology and pharmaceutical stocks during the period of time that briefing documents are made public and Advisory Committees meet, discuss and vote.  Whether the results are positive, negative or mixed; whether the Advisory Committees endorse the sentiments of the FDA reviewers or reject them, the historical track record demonstrates unequivocally that the market does not take three days to assimilate the information contained in FDA briefing documents, and that the response to briefing documents is an event distinct from the response to the subsequent Advisory

Committee meeting.  The market reaction to the posting of briefing documents is immediate and rapid, and when there is a trading day between the posting of the briefing documents and the Advisory Committee meeting, the stock performance on that interim day is muted.  So too for the trading on the day after the Advisory Committee, which does not reflect the volatility and direction of the Advisory Committee vote from the prior trading day.  These data indicate that for both discrete events – the briefing document posting, and the Advisory Committee meeting – the market response is contained within that day's trading.  Yet Dr. Feinstein asks us to believe that in this case, it took an additional two days for the market to respond (and even more ridiculously, that the lion's share of that response occurred within one hour of the close of trading on the third trading day, as will be shown below).  Is it plausible, as would have to be the case under Dr. Feinstein's theory, that the market suddenly realized, after "processing" for nearly three full trading days after the briefing documents were released, that the information learned was negative for Pharmacia, even though there is no other example that I can find in which this trading pattern has been observed? In my opinion it is not and all of the evidence contradicts this untenable theory.

**C.**     **The Advisory Committee Vote on Vioxx Drove the February 8 Stock Price Decline**

I preface this section of the report by noting that Dr. Feinstein devoted a total of two sentences in his report to the consideration that Advisory Committee discussion and vote on Vioxx would have been material to Pharmacia analysts and investors.  These two sentences, which are worth citing in their entirety, summarily state: "I considered whether news over this timeframe about Pfizer and about Merck's COX-2

inhibitor Vioxx was confounding information.  I determined that it was not."[59]  This casual dismissal stands in stark contrast to the nearly three and one-half pages of his report devoted to determining whether other Pharmacia-related news during this time could have contributed to the stock return over this period, all of which are obviously not material items on their face, in my opinion.[60]  It is not only my expert opinion that a development potentially delivering a meaningful marketing advantage to Celebrex's competitor would have been considered materially adverse by a Pharmacia investor, I believe this would be obvious to anyone, expert or not.  Therefore, I can only conclude that either Dr. Feinstein (a) has no understanding of the dynamics of the market for COX-2 inhibitors, or so much as the simple fact that Pharmacia and Merck were in direct competition with one another, or (b) he deliberately failed to discuss this event because he knew that its materiality would be obvious and would undermine his far-fetched three day thesis.  Either way, his failure to address this issue in any meaningful way leaves his report entirely unreliable and his conclusions fundamentally flawed.

At approximately 3:00 p.m. on February 8, 2001, the FDA Arthritis Advisory Committee voted to recommend incorporation of new safety data from Merck's VIGOR trial into the Vioxx label.  This event, which came on the heels of the Committee's prior day vote not to recommend a label change for Celebrex, created a real possibility that Celebrex would now be at a meaningful competitive disadvantage.  This new risk – completely unrelated to the CLASS results that had been disclosed in the Advisory Committee briefing documents on February 6 – caused a decline in Pharmacia's stock price.  The intraday chart (Figure 8) clearly demonstrates that

---

[59] Feinstein Report at ¶ 271.

[60] *Id.* at  ¶¶ 256 – 271.

immediately upon the Advisory Committee's vote to recommend a label change for Vioxx, Pharmacia's stock price began to drop on a surge in the trading volume. This sharp decline on escalating volume cannot reasonably be attributed to anything other than the immediately preceding event, which was the FDA Arthritis Advisory Committee vote to recommend a Vioxx label change, which the market perceived as creating new risks for Celebrex sales growth: [61]

**Figure 8. Pharmacia Intraday Stock Price and Trading Volume, February 8, 2001**



Note: Stock price data represents the last transaction price of a five minute increment. Trading volume data represents the cumulative volume traded in a five minute increment.

In addition to the intraday trading, analyst reports make it abundantly clear that the February 8 decline in Pharmacia's share price was driven by concerns over competition with Vioxx, as opposed to the February 6 disclosure of additional CLASS data. As I discussed extensively in my initial expert report, prior to this point, analysts

---

[61] For a fuller, more detailed discussion, see my expert report dated June 7, 2011, from which these findings are summarized.

had generally believed that the FDA would consider Celebrex and Vioxx as a single class of drug and would treat both drugs similarly with respect to any label change (see the multiple analyst comments cited there).  After February 8, 2001, however, for the first time many (if not most) analysts were considering the possibility that the FDA would not treat these agents as a single drug class with regard to GI safety data and that Celebrex could emerge with a label inferior to that of Vioxx:

> Salomon Smith Barney, Merck note, February 8, 2001. MRK's Vioxx had a good day at the FDA.  The FDA committee recommended the inclusion of gastrointestinal safety data on the Vioxx label.  However, the committee also recommended that the cardiovascular risk data be added to the Vioxx label, but in a toned down way.  Many investors interpreted this as a win for Vioxx in its battle vs Celebrex.[62]

> Enskilda Securities, Pharmacia note, February 9, 2001. Amid labeling concerns over Celebrex, Pharmacia shed more than 5% yesterday . . . . While the FDA has advised on new labeling for Merck's Vioxx (key competitor for Celebrex), Celebrex's new labeling will probably not look materially different from before.[63]

> CIBC World Markets, Pharmacia note, February 8, 2001

> **Relative Victory.** We had assumed that Vioxx's (MRK) and Celebrex's (PHA) labels would be altered to include safety data, but not remove [the] GI warning, as well as risks.  Vioxx has won this endorsement, handing MRK a victory . . . . **Too Late for Celebrex?**  With changes to Vioxx's label, Celebrex could be disadvantaged..[64]

> Lehman Brothers, Merck note, February 9, 2001.  [W]e expect Vioxx to become the dominant COX-2 inhibitor in

---

[62] February 8, 2001, Salomon Smith Barney, "Merck & Co., Inc," DEFEX 009956 – DEFEX 009958 at DEFEX 009956.

[63] February 9, 2001, Enskilda Securities, "Pharmacia Corp, Labelling [sic] concerns continue for Celebrex,' DEFEX 010131 – DEFEX 010132 at DEFEX 010131.

[64] February 8, 2001, CIBC World Markets, "Pharmacia Corporation," DEFEX 010013 – DEFEX 010021.

the market. Most recently, new Rxs were virtually split 50/50 in the US between Vioxx and Celebrex. We now expect a divergence, with Vioxx moving significantly ahead of Celebrex in new script share. This is based on the assumption that Vioxx, but not Celebrex, gains the aforementioned positive GI label change . . . . Pharmacia claims that it will likely receive a comparable claim with respect to Celebrex's GI safety superiority to ibuprofen. Based on Wednesday's meeting, that statement appears aggressive.[65]

A.G. Edwards, Pharmacia note, February 12, 2001.   The Vioxx label probably will indicate a stronger GI safety profile than the Celebrex label.[66]

Raymond James, Pharmacia note, February 13, 2001. Celebrex could face tougher competition from Merck's Vioxx after a panel of medical experts last week concluded that Vioxx caused fewer stomach problems than an older drug, naproxen.  Regulators rejected a similar claim by Pharmacia[67].

Beyond these analyst reports, coverage of the Advisory Committee outcome in the popular press echoed the seeming Vioxx advantage emerging from the review.  The February 9 Wall Street Journal coverage of the FDA Arthritis Advisory Committee led with the statement that "A federal advisory panel concluded that Merck & Co.'s popular arthritis drug is safer on the stomach than older painkillers, giving Merck a slight but important edge over a rival pill marketed by both Pfizer Inc. and Pharmacia

---

[65] February 9, 2001, Lehman Bros., "Merch & Co. (MRK-$81.85) 1 – Strong Buy," DEFEX 009141 – DEFEX 009142 at DEFEX 009142.

[66] February 12, 2001, A.G. Edwards & Sons, Inc., Equity Research-Pharmaceuticals, "Pharmacia Corporation (PHA: $54.23), DEFEX 009135 – DEFEX 009140 at DEFEX 00936.

[67] February 13, 2001, Raymond James, "Pharmacia Corp.", located in Pharmacia Corporation Analyst Reports for the Period 10/19/00 - 2/13/01, DEFEX 005492 – DEFEX 005861 at DEFEX 005537.  This is, of course, a factual error.  The FDA Advisory Committees are not "regulators" and the recommendations of the Committees to the FDA cannot be viewed as decisions made by regulators.

Corp."[68]  *Businessweek* similarly reported that a Vioxx advantage had emerged from the FDA Arthritis Advisory Committee, with an April 19, 2001 article ("Mortal Combat for the Painkillers" by David Shook) stating "[t]he results of Merck's latest Vioxx trials appear to be more compelling to doctors and regulators than Pharmacia's Celebrex studies."[69]  *Heartwire*, a cardiologist-oriented newsletter published by theheart.org, reported on February 9, 2001 that "Vioxx® (rofecoxib - Merck) came out a qualified winner while Celebrex® (celecoxib - GD Searle division of Pharmacia Inc/Pfizer Inc) lost, in their respective bids before the FDA Arthritis Advisory Committee to have the standard NSAID warnings that appear on their labels removed."[70]

I reiterate my finding that after the FDA Arthritis Advisory Committee review of the VIGOR study and subsequent positive vote for a Vioxx label change, analysts and investors seriously considered for the first time the materially negative possibility that Vioxx would have a label superior to that of Celebrex, a new, previously unexpected risk that the market rapidly assimilated, as evidenced by the sell-off of Pharmacia stock.  Given that the allegedly initially undisclosed CLASS results had been completely disseminated to the market on February 6, and that there is a very clear independent reason for the February 8 Pharmacia stock price decline, any attempt to associate the release of allegedly initially undisclosed CLASS data on February 6 with the February 8 stock price decline defies logic and is indefensible.

---

[68] February 9, 2001, Wall Street Journal, "Panel Approves Merck's Claim For Label on Arthritis Drug."

[69] April 19, 2001, Bloomberg Businessweek, "Mortal Combat for the Painkillers," DEFEX 007331 – DEFEX 007333.

[70] February 9, 2001, *Heartwire* (www.theheart.org), "Shot through the heart: COX-2 inhibitor wars."

### D.    Pharmacia Stock Price Reaction to Initial CLASS Disclosures

The Plaintiffs have contended that the failure to disclose certain data from the CLASS study allowed the maintenance of a falsely elevated stock price during the Class Period.  They have also claimed that Pharmacia's stock price rose 12.5% from April 17 through 19, 2000 in response to the CLASS data, a perspective also shared by and cited by Dr. Feinstein in his report.[71]  We can dismiss this claim for substantively the same reasons as those expressed in connection with the three-day information dissemination theory regarding the Advisory Committee briefing documents.  My brief discussion of this issue in my expert report did not include the intraday stock price data for Pharmacia for April 17-19, 2000, which are presented in Figure 9.

**Figure 9. Pharmacia Intraday Stock Price, April 17-19, 2000**



---

[71] See Feinstein Report at ¶ 49.

It is apparent that Pharmacia's stock had no reaction to the April 15, 2000 release of the CLASS data on April 17 – though the event was well covered by Wall Street analysts. Even the announcement of the approval of Zyvox, a novel and important antibiotic, late in the morning on April 18 had no lasting impact on Pharmacia's stock. It is only in the late morning of April 19, 2000, that Pharmacia's stock price begins to move significantly upward. It is beyond reason to even imagine that this sudden stock price move, two and one-half trading days after the presentation of the CLASS data, was caused by the disclosure of the CLASS results. The stock price move is coincident with another event however – late in the morning of April 19, 2000, Bristol-Myers Squibb announced that it was withdrawing its NDA for a new hypertension drug, Vanlev. Vanlev would have been a major competitor to Pharmacia's important pipeline compound, the drug eplerenone. In my opinion, therefore, the reasonable explanation for the stock move was the Vanlev announcement and not Plaintiffs' suggestion that the market pondered the CLASS data for two and one half days and then determined the results were materially positive for Pharmacia.

## E.   The Attempt to Exclude The Monsanto Agricultural Business Is Highly Questionable

In his event study, Dr. Feinstein employs certain methodologies that render his conclusions highly unreliable. To calculate a residual return for Pharmacia over the period of February 6-8, 2001, Dr. Feinstein attempts to strip out from Pharmacia the value of its ownership stake in Monsanto (the agricultural and chemicals business), and he corrects the Pharmacia stock price changes for total stock market and pharmaceutical sector moves.

54

According to Dr. Feinstein, he decided to strip out the value of Monsanto in order to better gauge the effect of the alleged misrepresentations and corrective disclosures on Pharmacia's pharmaceuticals business"

> Removing the value of Pharmacia's holdings in New Monsanto focused the event study analysis on the pharmaceuticals business and eliminated the potential for the unrelated business to obscure the impact of pharmaceuticals news.  That is, if the value of the New Monsanto holdings were not removed, information about Celebrex, for example, might impact the valuation of the pharmaceuticals portion of Pharmacia's business, but this impact could be obscured, or muted, by the weight of the chemicals and agricultural portion of the business.[72]

From an *investor's* perspective, focusing on only the "pharmaceuticals business" to determine whether or not information is material makes no sense – an investor could not invest in Feinstein's hypothetical "Pharmacia Pharmaceuticals," but only in Pharmacia, which also includes Monsanto, and therefore, any investor in Pharmacia would necessarily have to consider the risks, upside and downside of Pharmacia's agricultural and chemicals business.  Therefore, materiality (or lack thereof) to "Pharmacia" during the Class Period can only mean Pharmacia as a whole (*i.e.*, the pharmaceutical business *and* Monsanto's agricultural business).  Put another way, what would be material to an investor in Pharmacia if it were a pure pharmaceutical business is irrelevant because that business did not exist as a publicly traded entity available for investors.

There are additional problems with Dr. Feinstein's attempt to strip out from Pharmacia the value of its Monsanto holdings in order to eliminate "the effect that

---

[72] *Id.* at ¶ 177.

any chemicals and agricultural related news might have wielded on the value of Pharmacia stock."[73]

**1.      Stripping Out Monsanto Made Pharmacia Less Comparable To Other Pharmaceutical Companies**

As part of his event study, Dr. Feinstein compared movements in Pharmacia's stock price to movements in the stock prices of other pharmaceutical companies that, like Pharmacia, were components of the Dow Jones U.S. Pharmaceutical index.  Dr. Feinstein apparently believes that stripping out the Monsanto business from Pharmacia to make it a "pure" pharmaceutical company made for a more accurate comparison to the other companies in his index.  In fact, stripping out Monsanto made his comparison less accurate because many of the peer companies in Dr. Feinstein's index were also diversified healthcare companies that had *substantial non-pharmaceutical businesses*.

For example, based on full year 2000 financial results, these companies generated the following percentage of total revenue from pharmaceutical sales: 41% (Johnson and Johnson), 76% (American Home Products), 79% (Bristol-Myers Squibb), 85% (Schering-Plough) and 94% (Eli Lilly),[74] with the remainder of revenues generated from diverse businesses including consumer healthcare, medical devices, nutrition and animal health.  With 70% of its revenues generated by pharmaceutical sales, Pharmacia is not distinct from its peer group in this respect – as was well known and understood by the

---

[73] *Id.*at ¶176.

[74] *See* February 2001, Merrill Lynch Analyst Report, "Pharmaceuticals: U.S. Major Pharmaceutical Model and Pipeline Book: 4th Quarter 2000 Issue" and January 23, 2001 Johnson & Johnson Press Release, "Johnson & Johnson Fourth Quarter EPS Rose 16.1% on Sales Increase of 3.4% 2000 EPS Rose 15.2% on Sales Increase of 6.1," available at http://www.investor.jnj.com/releasedetail.cfm?releaseid=63881 (last visited July 15, 2011).

market.  This severely undermines the rationale for Dr. Feinstein to attempt to compare the value of Pharmacia's pharmaceutical business only against a peer group of diversified healthcare businesses.

Moreover, unlike Dr. Feinstein, investors considered Pharmacia to be and treated it as a pharmaceutical company, notwithstanding its agricultural and chemicals business.  Indeed, as discussed above, Pharmacia was a component of the Dow Jones U.S. Pharmaceutical index, which is comprised of the stocks of a variety of biopharmaceutical companies, including all large U.S. pharmaceutical companies, as well as some generics, specialty pharmaceutical and biotechnology companies.  Moreover, as reflected in the multiple securities analyst reports discussed in my initial report and here, the Wall Street securities analysts who covered Pharmacia, were pharmaceutical industry analysts, not agricultural or chemicals industry analysts.

### 2.   Dr. Feinstein's Valuation Of Monsanto Is Inaccurate And Unreliable

There is a critical, untested assumption underlying Dr. Feinstein's process in stripping out the value of Monsanto, which is that the stock market valuation of Monsanto can be considered an accurate reflection of the value of the Monsanto agricultural business.  Dr. Feinstein has not shown that trading in Monsanto was efficient – therefore, we have no idea whether Monsanto's stock price on any given day accurately reflected "any chemicals and agricultural related news" relevant to Monsanto's business. Moreover, and more concerning, it was well known that Pharmacia intended to jettison its remaining holdings in Monsanto as soon as it could execute such a transaction.  In this circumstance, the eventual sale or distribution of the vast majority of Monsanto shares could or would have acted as a damper on Monsanto stock price performance –investors

knew that the majority of Monsanto shares would in the not-so-distant future become freely trading, creating a risk of significant excess supply of Monsanto stock, which would of course result in negative pressure on the stock price.

There are yet additional concerns with Dr. Feinstein's process.  Given the size of Pharmacia's stake in Monsanto, all of Monsanto's financial statements were consolidated into Pharmacia's.  It is an untested assumption that the market's view of Pharmacia's financial performance, as reflected in its stock price, can be calculated by treating the value of Monsanto's stock as if it were simply cash sitting on the Pharmacia balance sheet that could be ignored in order to calculate the value of the underlying pharmaceutical business.  Unlike cash, the market had expectations for a potentially changing value of Monsanto's price, an expectation that cannot possibly be captured in Dr. Feinstein's analysis.

All of these factors, in my opinion, suggest that any process that attempts to extract a reliable value for Pharmacia's drug business are too fraught with uncertainty and untested underlying assumptions to make the process anything more than a mathematical exercise in futility.  On the one hand, we have an actual daily stock price that reflects the sum of all market forces operating on the stock that day.  Dr. Feinstein abandons reality for a hypothetical construct of uncertain need that replaces reality with an estimated price generated by a process that introduces unquantified and unexamined error and bias into the calculation.  His choice is inscrutable to me.

Thus, in my opinion the methods used by Dr. Feinstein to calculate a statistically significant residual per share loss for Pharmacia of $5.92 during February 6-8, 2001 are suspect and opaque because he unjustifiably substitutes potentially error-laden estimates for actual historical stock price data.

**F.**     **Conclusion**

Dr. Feinstein, in opining for the Plaintiffs, has constructed an imaginary world in which information eagerly anticipated by the analysts and investors[75] takes three days to be slowly digested by the market.  Dr. Feinstein's opinions are unreliable because he completely misunderstands, and therefore, fails to capture the nature of how investors and analysts approach FDA Advisory Committee meetings and their associated briefing documents.  The fact that Dr. Feinstein made no attempt to validate his theory by examining the behavior of actual stocks in response to other Advisory Committee briefing document disclosures and meetings highlights the infirmity of his conclusions.

Further, Dr. Feinstein's theory that it took the market a full three trading days to incorporate the corrective disclosures lacks a logical, empirical or scientific basis and is contrary to my long experience with the market for pharmaceutical company stocks.  In light of Pharmacia's intraday stock price movements in response to the disclosures at issue – both the alleged misrepresentations on April 17, 2000 and the corrective disclosures on February 6, 2001 – it becomes apparent that his already fanciful theory actually requires the market to have been asleep at the switch for two and one-half days after material news was disclosed for Pharmacia, and then suddenly driving Pharmacia's stock higher (Figure 9) or lower (Figure 8).  Thus, while he claims it takes three days for the market to "process" complex data, what he really means is that the market mulls over the data for two and one-half days before reacting.  There is, of course,

---

[75] In the case of the FDA Arthritis Advisory Committee briefing documents for the CLASS study, this consisted of a relatively modest amount of incrementally new information – indeed, five specific results of the CLASS study that Plaintiffs allege were material and intentionally withheld from the market.

no theoretical support or explanation for this manner of information dissemination and market reaction for stocks that trade efficiently.

But what I find particularly problematic about Dr. Feinstein's report is his summary dismissal of the materiality for Pharmacia of the February 8, 2001 FDA Arthritis Advisory Committee vote in favor of a label change for Vioxx, which defies common sense and ignores critical pieces of information – direct statements from analysts and the intraday trading pattern.  His lack of rationale for ignoring this event is underscored by the pages he devotes to other events that are obviously immaterial.  In my opinion, the only possible explanation for Dr. Feinstein's refusal to address the materiality of the February 8, 2001 Vioxx vote is that he knows it completely undermines his theory.

## Appendix A: Examples of Stock Price Movements in Response to

## Advisory Committee Briefing Documents and Meetings

The title of each chart indicates the nature of first the briefing documents (either negative or positive) and then the Advisory Committee vote (either negative or positive).[76]



**United Therapeutics (UTHR)
8/9/2001 Advisory Committee (Negative/Positive)**

---

[76] For example, with respect to United Therapeutics chart above, "(Negative/Positive)" signifies that the briefing documents were "negative" and the Advisory Committee vote was "positive".







Genta (GNTA)
5/3/2004 Advisory Committee (Negative/Negative)

GPC Biotherapeutics (GPCB)
7/24/2007 Advisory Committee (Negative/Negative)

**Arena Pharmaceuticals (ARNA)**
**9/16/2010 Advisory Committee (Negative/Negative)**



**Savient Pharmaceuticals (SVNT)**
**June 16, 2009 (Positive/Positive)**

63













**Intermune (ITMN)**
**3/9/2010 Advisory Committee (Positive/Positive)**

**Acorda Therapeutics (ACOR)**
**10/14/2009 Advisory Committee (Negative/Positive)**

AstraZeneca (AZN)
9/10/2004 Advisory Committee (Negative/Negative)
$48.00
$47.00
$46.00
$45.00
$44.00
$43.00
$42.00
$41.00
$40.00
Day Before Briefing Documents Posted
Day Briefing Documents Posted
Day Between Posting and Committee Meeting
Day after Committee Vote
Second Day After Committee Vote

Vivus (VVUS)
10/16/2010 Advisory Committee (Positive/Negative)
$14.00
$13.00
$12.00
$11.00
$10.00
$9.00
$8.00
$7.00
$6.00
$5.00
$4.00
Day Before Briefing Documents Posted
Day Briefing Documents Posted
Day Between Posting and Committee Meeting
Day after Committee Vote
Second Day After Committee Vote

### Appendix B: Intraday Stock Reactions to Posting of Briefing Documents



Briefing Documents Posted between 10-11 AM





## **Appendix C**

Listed below are the nineteen analyst notes and reports regarding Celebrex dated February 7-9, 2001 that I reviewed in connection with this expert report.

| Broker | Date | Time | Title |
|---|---|---|---|
| JP Morgan | Feb 7 | AM | FDA Review of Celebrex More Negative than Expected - Panel Could be Controversial |
| UBS (Japan) | Feb 7 | AM | Yamanouchi Pharmaceutical (4503) |
| Salomon Smith Barney | Feb 7 | 8:41 PM | FDA Reviews Celebrex & Vioxx Safety Data |
| Bear Stearns | Feb 7 | PM | FDA Unlikely to Improve Celebrex Label |
| Enskilda | Feb 7 | PM | Pharmacia Corp., Celebrex sees no further labeling support from FDA |
| Credit Suisse First Boston | Feb 8 | 8:29 AM | No Change Recommended for Celebrex Labeling |
| CIBC | Feb 8 | AM | CLASS Flunks Out |
| UBS | Feb 8 | AM | Disappointing FDA Review of GI Safety Data for Celebrex |
| Merrill Lynch | Feb 8 | AM | CLASS Trial - Something Ventured, Nothing Gained |
| Robertson Stephens | Feb 8 | AM | No GI Warning Change Recommended For Celebrex; Vioxx Up Next |
| CIBC | Feb 8 | PM | Vioxx Prevails, Celebrex Uncertain |
| Salomon Smith Barney | Feb 8 | 8:59 PM | Vioxx & Celebrex at FDA (Day 2) |
| Lehman Brothers | Feb 9 | n/a | How Do You Spell Relief? "VIOXX" |
| UBS | Feb 9 | n/a | FDA Review of Vioxx: GI Safety (+), Cardiac Risk (-), Net Result Neutral |
| Enskilda | Feb 9 | n/a | Pharmacia Corp., Results Preview With Consensus |
| Merrill Lynch | Feb 9 | n/a | U.S. Major Pharmaceuticals: Scenario Analysis Favors PHA's Celebrex Over MRK's Vioxx |
| Robertson Stephens | Feb 9 | n/a | FDA Arthritis Panel: Modest Label Change Suggested For Vioxx; No Change To Estimates |
| Credit Suisse First Boston | Feb 9 | n/a | FDA Gives Ground on Improving Vioxx GI Label |
| Sanford Bernstein | Feb 9 | n/a | VIOXX v. Celebrex: Distinction Without A Difference; Bet on Valdecoxib |

Note: Where indicated explicitly on the analyst note, the time is provided; in some cases, the note content can identify the time of publication (e.g., a February 8, 2001 note that states "this morning, the Advisory Committee will discuss Vioxx" is consistent only with publication on the morning of February 8.)  "PHA" = Pharmacia, "PFE" = Pfizer, "MRK" = Merck.

**Exhibit 1**

**ADDITIONAL FACTS AND DATA
CONSIDERED BY DR. ANTHONY FIORINO**

| P. Ex. 124 (DEFS 00125685 – 86) | |
|---|---|
| | Center for Drug Evaluation and Research, Application Number: 20-505/S-002, 20-884/S-010, Statistical Review (Topamax) |
| | Center for Drug Evaluation and Research, Application Number: 20-505/S-002, 20-884/S-010, Medical Review (Topamax) |
| | February 7, 2001, UBS Warburg, Yamanouchi Pharmaceutical (4503) |
| | February 8, 2001, UBS Warburg, Pharmaceuticals: Disappointing FDA Review of GI Safety Data for Celebrex |
| | February 8, 2001, Raymond James Equity Research, "Piper: Schering-Plough, Eli Lilly Get Improved Ratings" |
| | February 8, 2001, Robertson Stephens, "Pfizer Inc: No GI Warning Change Recommended For Celebrex; Vioxx Up Next" |
| | February 8, 2001, Salomon Smith Barney, "MRK: Vioxx & Celebrex at FDA (Day 2)" |
| | February 8, 2001, CIBC World Markets, "Merck & Co.: Vioxx Prevails, Celebrex Uncertain" |
| | February 28, 2001, Credit Suisse First Boston, Health Care Daily Rounds |
| | February 9, 2001, UBS Warburg, "FDA Review of Vioxx: GI Safety (+), Cardiac Risk (-), Net Result Neutral" |
| | February 8, 2001, Credit Suisse First Boston, "PHA: No Change Recommended for Celebrex Labeling – Pt 1" |
| | February 8, 2001, Credit Suisse First Boston, "PHA: No Change Recommended for Celebrex Labeling – Pt 2" |
| | February 9, 2001, Bernstein Research Call, "Vioxx v. Celebrex Distinction without a Difference; Bet on Valdecoxib" |
| | February 9, 2001 Credit Suisse First Boston, "MRK: FDA Gives Ground on Improving Vioxx GI Label" |
| | February 9, 2001, Robertson Stephens, "Merck & Co., Inc.: FDA Arthritis Panel: Modest Label Change Suggested for Vioxx; No Change To Estimates" |
| | Guidance for Industry: Advisory Committee Meetings— Preparation and Public Availability of Information Given to Advisory Committee Members, August 2008 |
| | Guidance for Industry: Disclosing Information Provided to Advisory Committees in Connection with Open Advisory Committee Meetings Related to the Testing or Approval of New Drugs and Convened by the Center for Drug Evaluation and Research, Beginning on January 1, 2000, December 1999 |
| | Public Citizen Health Research Group v. FDA, No. Civ. A 99-0177(JR), 2000 WL 34262802 (D.D.C. Jan 19, 2000) |

|  | Deposition Transcript of Leland Loose |
|---|---|
|  | Deposition Transcript of Kenneth Verburg |
|  | Deposition Transcript of Samuel Zwillich |
|  | Deposition Transcript of Catherine DeAngelis |
|  | Deposition Transcript of G. Steven Geis |
|  | Deposition Transcript of Fred Silverstein |

Dated: July 15, 2011

Dr. Anthony Fiorino