EXHIBIT 5



*Equity Research*

February 8, 2001

## Pharmaceuticals

Mara Goldstein      (212) 667-4327
Steven B. Gerber, M.D.      (310) 446-7456
Adam Sohn      (212) 667-4061

# Pharmacia Corporation

CLASS Flunks Out

## Investment Conclusion

- **FDA Panel Rejects Label Change.** An FDA Advisory Committee rejected the notion that Celebrex, a COX-2 inhibitor, has a better safety profile NSAIDs. PHA shares sold off (3+%) based on concerns that Celebrex's growth will stagnate without a label change. In addition, it appears unlikely that Merck's Vioxx will win a label change as well.

- **Implications of the Panel's Decision.** As we did not expect a wholesale label change both for Celebrex and Vioxx, we are not changing our 2001 sales estimates for Celebrex ($3.6 billion) or Vioxx ($3.1 billion). While a label change could have boosted growth near term, physicians have already embraced the safety potential.

- **Market Share Growth Is Stable.** Concern over slowing market share is likely to manifest in share price weakness. However, given the tremendous initial ramp-up of COX-2s, we're not surprised. We note that share is increasing at one percentage point per month, a similar trend observed for drugs like Lipitor and Neurontin (Pfizer).

- **Room to Grow.** Celebrex and Vioxx have yet to be fully launched in Europe and Japan, suggesting growth to come, particularly given the lack of innovation in this area. Market growth, though, is likely to be driven by more drugs (2002E). While COX-2s have slim advantages over NSAIDs, promotion and demographics should boost use.

- **Potential Share Weakness.** Shares of MRK and PHA could be pressured (MRK in particular, as the panel meets 2/8, grappling with cardiovascular inconsistencies in VIGOR's database), COX-2s will continue to generate growth. Share price weakness affords an opportunity as we believe Celebrex and Vioxx's growth trends are not likely to change materially. MRK and PHA are rated Buy.

| **Rating: BUY** | |
| --- | --- |
| PHA-NYSE (2/7/2001): | $56 1/8 |
| 52-week Range: | $64-35 1/16 |
| Shares Outstanding: | 1.3 Billion |
| Float: | 1 Billion Shares |
| Market Capitalization: | $73 Billion |
| Dividend/Yield: | $0.48/0.9% |
| Fiscal Year Ends: | December |
| Book Value: | $4.16 per Share |
| 2000E ROE: | 0.0% |
| LT Debt: | $5.3 Billion |
| Preferred: | Nil |
| Common Equity: | $5.3 Billion |

| **Earnings per Share** | |
| --- | --- |
| 1999 | $1.11* |
| 2000E | $1.45* |
| 2001E | $1.75 |
| 2002E | $2.08 |
| **P/E Ratio** | |
| 1999 | 50.6X* |
| 2000E | 38.7X* |
| 2001E | 32.1X |
| 2002E | 27.0X |

\* Excludes all one-time charges and gains.

**Company Description:**
*Pharmacia was created through the merger of Pharmacia & Upjohn and Monsanto in 1Q00. The company markets Celebrex, a leading antiarthritic and Xalatan, for glaucoma. In 4Q00, 13.7% of Monsanto was spun-off.*



PLAINTIFF'S EXHIBIT NO. S07 FOR IDENTIFICATION
DATE: 10/28/11 RPTR: TD
PENGAD 800-631-6989

01-1813 © 2001

---

CIBC World Markets Inc., P.O. Box 500, 161 Bay Street, BCE Place, Toronto, Canada M5J 2S8 • (416) 594-7000
CIBC World Markets Corp., One World Financial Center, New York, NY 10281 • (212) 667-7000 (800) 999-6726

98

DEFEX 005589

**Our quarterly EPS estimates are shown below.**

|       |         | 1 Qtr.  | 2 Qtr.  | 3 Qtr.  | 4 Qtr.  | Year    |
|-------|---------|---------|---------|---------|---------|---------|
| 1999  | Actual  | $0.26   | $0.40   | $0.21   | $0.24   | $1.11   |
| 2000E | Current | $0.33A  | $0.47A  | $0.33A  | $0.32E  | $1.45E  |
| 2001E | Current | ---     | ---     | ---     | ---     | $1.75E  |
| 2002E | Current | ---     | ---     | ---     | ---     | $2.08E  |

**Stock prices (as of 2/07/01) of companies mentioned in this report:**

Merck & Co. (MRK-NYSE $81.85, Buy) (1)
Pfizer, Inc. (PFE-NYSE $44.50, Hold)

(1) The CIBC World Markets Corp. analyst(s) who covers this company also has a position in its securities.

This report is issued and approved for distribution by (i) in the US, CIBC World Markets Corp., a member of the NYSE and SIPC, (ii) in Canada, CIBC World Markets Inc., a member of the IDA and CIPF, (iii) in the UK, CIBC World Markets plc, which is regulated by the SFA, and (iv) in Australia, CIBC World Markets Australia Limited, a member of the Australian Stock Exchange and regulated by the ASIC. Any questions should be directed to your sales representative.

Every state in the United States, province in Canada and most countries throughout the world have their own laws regulating the types of securities and other investment products which may be offered to their residents, and the process for doing so. As a result, some of the securities discussed in this report may not be available to every interested investor. Accordingly, this report is provided for informational purposes only, and does not constitute an offer or solicitation to buy or sell any securities discussed herein in any jurisdiction where such would be prohibited. No part of any report may be reproduced in any manner without the prior written permission of CIBC World Markets.

The information and any statistical data contained herein have been obtained from sources which we believe to be reliable, but we do not represent that they are accurate or complete, and they should not be relied upon as such. All opinions expressed and data provided herein are subject to change without notice. A CIBC World Markets company or its shareholders, directors, officers and/or employees, may have a long or short position or deal as principal in the securities discussed herein, related securities or in options, futures or other derivative instruments based thereon. A CIBC World Markets company may have acted as initial purchaser or placement agent for a private placement of any of the securities of any company mentioned in this report, may from time to time solicit from or perform financial advisory, investment banking or other services for such company, or have lending or other credit relationships with the same. The securities mentioned in this report may not be suitable for all types of investors; their prices, value and/or income they produce may fluctuate and/or be adversely affected by exchange rates. Since the levels and bases of taxation can change, any reference in this report to the impact of taxation should not be construed as offering tax advice; as with any transaction having potential tax implications, clients should consult with their own tax advisors. Past performance is no guarantee of future results.

This document and any of the products and information contained herein are not intended for the use of private investors in the UK. Such investors will not be able to enter into agreements or purchase products mentioned herein from CIBC World Markets plc.

The comments and views expressed in this document are meant for the general interests of clients of CIBC World Markets Australia Limited. In preparing the advice given in this document, CIBC World Markets did not take into account the investment objectives, financial situation and particular needs of any particular client of CIBC World Markets. Before making an investment decision on the basis of any recommendation made in this document, the recipient should consider how appropriate the recommendation is to their particular investment needs, objectives and financial circumstances. To allow CIBC World Markets to take into consideration a recipient's objectives, financial situation and particular needs, CIBC World Markets requests that, prior to acting on any of the recommendations herein, you contact one of our client advisors to discuss your particular circumstances.

Although each company issuing this report is a wholly owned subsidiary of Canadian Imperial Bank of Commerce ("CIBC"), each is solely responsible for its contractual obligations and commitments, and any securities products offered or purchased or recommended or sold in any client accounts (i) will not be insured by the Federal Deposit Insurance Corporation, the Canada Deposit Insurance Corporation or other similar deposit insurance, (ii) will not be deposits or other obligations of CIBC, (iii) will not be endorsed or guaranteed by CIBC, and (iv) will be subject to investment risks, including possible loss of the principal invested. The CIBC trademark is used under license.

© 2001 CIBC World Markets Corp. and CIBC World Markets Inc. All rights reserved.

*99*

DEFEX 005590

Pharmacia Corporation                                                    CIBC World Markets

### Exhibit 1

| Pharmacia Corporation: Pro Forma Income Statement By Year | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ($ in millions, except EPS) | | | | | | | | | | |
| | | | | | | | Year Ended December | | | |
| | 2002E | % Chg. | 2001E | % Chg. | 2000E | % Chg. | 1999A | % Chg. | 1998A | % Chg. |
| Revenue: | | | | | | | | | | |
| Pharmaceuticals and Consumer | $15,900 | 12.7% | $14,105 | 14.4% | $12,330 | 15.4% | $10,681 | 34.9% | $7,919 | 3.5% |
| Agriculture | 5,850 | 5.5 | 5,545 | 2.7 | 5,400 | 2.9 | 5,248 | 23.1 | 4,264 | 36.4 |
| Other | 500 | 3.1 | 485 | 5.4 | 460 | (7.3) | 496 | 21.6 | 408 | NM |
| Total sales | $22,250 | 10.5% | $20,135 | 10.7% | $18,190 | 10.7% | $16,425 | 7.4% | $15,293 | NM |
| Cost of sales | 6,375 | 6.9 | 5,965 | 6.5 | 5,600 | 5.7 | 5,299 | 7.2 | 4,943 | 59.9 |
| Gross profit | $15,875 | 12.0% | $14,170 | 12.5% | $12,590 | 13.2% | $11,126 | 7.5% | $10,350 | 7.8% |
| Gross profit margin | 71.3% | | 70.4% | | 69.2% | | 67.7% | | 67.7% | |
| SG&A | 8,315 | 11.2 | 7,480 | 12.3 | 6,663 | 13.7 | 5,859 | 25.2 | 4,681 | 131.4 |
| SG&A/sales | 37.4% | | 37.1% | | 36.6% | | 35.7% | | 30.6% | |
| R&D | 3,340 | 9.9 | 3,040 | 10.7 | 2,745 | (1.5) | 2,786 | 9.6 | 2,542 | 143.5 |
| R&D/sales | 15.0% | | 15.1% | | 15.1% | | 17.0% | | 16.6% | |
| EBITD | $4,220 | 15.6% | $3,650 | 14.7% | $3,182 | 28.2% | $2,481 | (20.6%) | $3,127 | (52.2%) |
| EBITD margin | 19.0% | | 18.1% | | 17.5% | | 15.1% | | 20.4% | |
| Amortization | 100 | (35.5) | 155 | (35.1) | 239 | (0.4) | 240 | (37.5) | 384 | 122.0 |
| Operating income | $4,120 | 17.9% | $3,495 | 18.8% | $2,943 | 31.3% | $2,241 | (18.3%) | $2,743 | (56.9%) |
| Operating margin | 18.5% | | 17.4% | | 16.2% | | 13.6% | | 17.9% | |
| Interest & other income, net | (125) | NM | (135) | NM | (247) | NM | (180) | NM | 94 | (170.7) |
| Pretax income | $3,995 | 18.9% | $3,360 | 24.6% | $2,696 | 30.8% | $2,061 | (27.3%) | $2,837 | (54.5%) |
| Taxes | 1,199 | 18.9 | 1,008 | 24.1 | 812 | 29.1 | 629 | (30.7) | 908 | 201.6 |
| Tax rate | 30.0% | | 30.0% | | 30.1% | | 30.5% | | 32.0% | |
| Net income, continuing ops | $2,797 | 18.9% | $2,352 | 24.8% | $1,884 | 31.5% | $1,432 | (25.8%) | $1,929 | (67.5%) |
| Net margin | 12.6% | | 11.7% | | 10.4% | | 8.7% | | 12.6% | |
| Consolidated EPS | $2.14 | 18.7% | $1.80 | 24.1% | $1.45 | 30.1% | $1.11 | NM | $1.52 | (68.4%) |
| Minority Interest | 0.06 | 20.0 | 0.05 | NM | 0.00 | NM | 0.00 | NM | 0.00 | NM |
| Earnings per share | $2.08 | 18.7% | $1.75 | 20.7% | $1.45 | 30.1% | $1.11 | NM | $1.52 | NM |
| Discontinued operations | 0.00 | NM | 0.00 | NM | (0.02) | NM | 0.06 | NM | 0.00 | NM |
| Earnings per share | $2.08 | 18.7% | $1.75 | 22.4% | $1.43 | 21.8% | $1.17 | NM | $1.52 | NM |
| Diluted shares outstanding | 1,308.0 | 0.2 | 1,306.0 | 0.6 | 1,298.6 | 1.2 | 1,283.5 | NM | 1,270.0 | NM |

Source: Pharmacia Corporation, CIBC World Markets estimates.

3

*100*

DEFEX 005591

CIBC World Markets                                                                    Pharmacia Corporation

**Exhibit 2**

| Pharmacia Corporation: Product Revenues By Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) | | | | | | | | | |
| | Year Ended December | | | | | | | | |
| Revenues: | 2002E | % Chg. | 2001E | % Chg. | 2000E | % Chg. | 1999A | % Chg. | 1998A | % Chg. |
| **Focus Products** | | | | | | | | | |
| Celebrex | $4,275 | 22.1% | $3,500 | 37.3% | $2,550 | 73.4% | $1,471 | NM | $0 | NM |
| Camptosar | 975 | 39.3 | 700 | 52.2 | 460 | 56.8 | 293 | 51.2 | 194 | 26.0 |
| Detrol | 730 | 20.7 | 605 | 33.0 | 455 | 38.3 | 329 | 163.2 | 125 | NM |
| Zyvox | 220 | 91.3 | 115 | 155.6 | 45 | NM | 0 | NM | 0 | NM |
| **Oncology** | | | | | | | | | |
| Pharmarubicin | 160 | 0.0 | 160 | (8.6) | 175 | (12.1) | 199 | 12.4 | 177 | (9.7) |
| Adriamycin | 50 | (9.1) | 55 | (8.3) | 60 | (7.0) | 65 | (3.7) | 67 | (16.3) |
| Ellence | 60 | 50.0 | 40 | 166.7 | 15 | NM | 7 | NM | 0 | NM |
| Aromasin | 75 | 50.0 | 50 | 100.0 | 25 | NM | 0 | NM | 0 | NM |
| **Inflammation** | | | | | | | | | |
| Cytotec | $20 | (20.0%) | $25 | (37.5%) | $40 | (50.0%) | $80 | (40.7%) | $135 | (27.0%) |
| Arthrotec | 200 | (20.0) | 250 | (18.0) | 305 | (10.3) | 340 | (1.7) | 346 | 235.9 |
| Daypro | 40 | (38.5) | 65 | (48.0) | 125 | (43.7) | 222 | (27.2) | 305 | (7.9) |
| Parecoxib | 225 | 309.1 | 55 | NM | 0 | NM | 0 | NM | 0 | NM |
| Valdecoxib | 115 | NM | 0 | NM | 0 | NM | 0 | NM | 0 | NM |
| **Metabolic disease** | | | | | | | | | |
| Genotropin | $575 | 6.5% | $540 | 8.0% | $500 | 8.5% | $461 | 16.7% | $395 | 13.2% |
| Fragmin | 270 | 8.0 | 250 | 11.1 | 225 | 5.5 | 213 | 17.8 | 181 | 9.7 |
| Micronase/Glynase | 60 | (7.7) | 65 | (7.1) | 70 | (5.1) | 74 | (19.8) | 92 | 9.5 |
| **CNS** | | | | | | | | | |
| Vestra | $15 | NM | $0 | NM | $0 | NM | $0 | NM | $0 | NM |
| Xanax | 275 | (9.8) | 305 | (4.7) | 320 | (0.1) | 320 | (0.2) | 321 | 18.5 |
| Mirapex | 85 | (5.6) | 90 | 5.9 | 85 | 4.4 | 81 | 66.1 | 49 | 145.0 |
| **Infectious disease** | | | | | | | | | |
| Cleocin | $395 | 3.9% | $380 | 4.1% | $365 | 6.5% | $343 | 9.2% | $314 | 5.0% |
| Vantin | 35 | (12.5) | 40 | (11.1) | 45 | (5.1) | 47 | (8.8) | 52 | (18.8) |
| Lincocin | 35 | (12.5) | 40 | (20.0) | 50 | 0.4 | 50 | (2.4) | 51 | (7.3) |
| **Genitourinary** | | | | | | | | | |
| Depo-Provera | $255 | (1.9%) | $260 | 2.0% | $255 | 1.2% | $252 | 11.0% | $227 | 13.8% |
| Provera | 80 | (5.9) | 85 | (5.6) | 90 | (5.1) | 95 | (5.2) | 100 | 5.3 |
| **Cardiovascular** | | | | | | | | | |
| Calan | $20 | (20.0%) | $25 | (28.6%) | $35 | (30.0%) | $50 | (28.6%) | $70 | NM |
| Covera HS | 190 | 2.7 | 185 | 5.7 | 175 | 8.7 | 161 | 98.8 | 81 | 47.3 |
| Spironolactone | 150 | (14.3) | 175 | (12.5) | 200 | (10.7) | 224 | 12.0 | 200 | NM |
| **Other** | | | | | | | | | |
| Medrol | $250 | (7.4%) | $270 | (1.8%) | $275 | (7.5%) | $297 | 12.6% | $264 | 9.5% |
| Xalatan | 1,075 | 15.0 | 935 | 29.9 | 720 | 41.9 | 507 | 52.8 | 332 | 102.3 |
| Ambien | 810 | 8.0 | 750 | 11.1 | 675 | 29.1 | 523 | 14.2 | 458 | 15.4 |
| **Total Pharmaceuticals** | $15,225 | 13.4% | $13,430 | 15.1% | $11,670 | 16.7% | $9,996 | 30.8% | $7,644 | 20.5% |
| **Consumer Health Care** | $675 | 0.0% | $675 | 2.3% | $660 | (3.6%) | $685 | 0.3% | $683 | 6.2% |
| Rogaine | 130 | (7.1) | 140 | 3.7 | 135 | (2.9) | 139 | 4.5 | 133 | 3.1 |
| Nicorette | 225 | 2.3 | 220 | 2.3 | 215 | (8.1) | 234 | 9.9 | 213 | 26.8 |
| **Animal Health** | $500 | 3.1% | $485 | 5.4% | $460 | 9.3% | $421 | 3.2% | $408 | 1.2% |
| **Agriculture** | $5,850 | 5.5% | $5,545 | 2.7% | $5,400 | 2.9% | $5,248 | 23.1% | $4,264 | 36.4% |
| **Total Product Revenue** | $22,250 | 10.3% | $20,135 | 10.7% | $18,190 | 10.7% | $16,425 | 7.4% | $15,293 | NM |

Source: Pharmacia Corporation, CIBC World Markets Corp. estimates.

DEFEX 005592

Pharmacia Corporation | CIBC World Markets

## Exhibit 3

| Merck & Co.: Income Statement By Year | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ($ in millions, except EPS) | | | | | | | | | | |
| | Year Ended December | | | | | | | | | |
| | 2002E | % Chg. | 2001E | % Chg. | 2000A | % Chg. | 1999A | % Chg. | 1998A | % Chg. |
| **Revenue:** | | | | | | | | | | |
| Pharmaceuticals | $25,075 | 10.7% | $22,655 | 12.0% | $20,225 | 15.7% | $17,480 | 14.3% | $15,297 | 12.1% |
| Medco | 27,750 | 18.0 | 23,520 | 16.8 | 20,140 | 32.2 | 15,235 | 31.3 | 11,602 | 22.9 |
| **Total sales** | $52,825 | 14.4% | $46,175 | 14.4% | $40,365 | 23.4% | $32,715 | 21.6% | $26,898 | 13.8% |
| Cost of sales | 31,125 | 17.4 | 26,520 | 18.2 | 22,444 | 28.0 | 17,534 | 25.9 | 13,925 | 18.1 |
| **Gross profit** | $21,700 | 10.4% | $19,655 | 9.7% | $17,922 | 18.1% | $15,181 | 17.0% | $12,973 | 9.5% |
| *Gross profit margin* | *41.1%* | | *42.6%* | | *44.4%* | | *46.4%* | | *48.2%* | |
| SG&A | 7,640 | 10.9 | 6,890 | 11.7 | 6,168 | 18.6 | 5,200 | 15.3 | 4,511 | 4.9 |
| *SG&A/sales* | *14.5%* | | *14.9%* | | *15.3%* | | *15.9%* | | *16.8%* | |
| R&D | 3,000 | 12.1 | 2,675 | 14.1 | 2,344 | 13.3 | 2,068 | 13.6 | 1,821 | 8.2 |
| *R&D/sales* | *5.7%* | | *5.8%* | | *5.8%* | | *6.3%* | | *6.8%* | |
| **Operating income** | $11,060 | 9.6% | $10,090 | 7.2% | $9,410 | 18.9% | $7,912 | 19.2% | $6,641 | 13.2% |
| *Operating margin* | *20.9%* | | *21.9%* | | *23.3%* | | *24.2%* | | *24.7%* | |
| Interest & other income, net (a) | 355 | (30.4) | 510 | 22.6 | 416 | (41.2) | 707 | 18.9 | 595 | (0.6) |
| **Pretax income** | $11,415 | 7.7% | $10,600 | 7.9% | $9,826 | 14.0% | $8,620 | 19.1% | $7,235 | 12.0% |
| Taxes | 3,425 | 5.9 | 3,233 | 7.7 | 3,002 | 10.0 | 2,729 | 37.2 | 1,989 | 7.6 |
| *Tax rate* | *30.0%* | | *30.5%* | | *30.6%* | | *31.7%* | | *27.5%* | |
| **Net income** | $7,991 | 8.5% | $7,367 | 8.0% | $6,824 | 15.8% | $5,891 | 12.3% | $5,246 | 13.7% |
| *Net margin* | *15.1%* | | *16.0%* | | *16.9%* | | *18.0%* | | *19.5%* | |
| **Earnings per share, diluted** | $3.58 | 11.0% | $3.22 | 11.2% | $2.98 | 18.5% | $2.45 | 13.9% | $2.15 | 15.0% |
| Diluted shares outstanding | 2,233.0 | (2.3) | 2,284.7 | (2.9) | 2,353.2 | (2.2) | 2,407.0 | (1.4) | 2,441.2 | (1.1) |

(a) Includes goodwill and net profits (loss) from joint ventures.

Sources: Merck & Co., CIBC World Markets estimates.

*102*

DEFEX 005593

CIBC World Markets                                                                    Pharmacia Corporation

**Exhibit 4**

| Merck & Co.:  Product Revenues By Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ($ in millions) | | | | | | | | | |
| Revenues: | 2002E | % Change | 2001E | % Change | 2000A | % Change | 1999A | % Change | 1998A | % Change |
| **Focus Products** | | | | | | | | | | |
| Zocor | $5,605 | 5.0% | $5,340 | 1.1% | $5,280 | 17.5% | $4,495 | 13.9% | $3,945 | 10.5% |
| Cozaar | 2,315 | 15.8 | 2,000 | 16.6 | 1,715 | 23.8 | 1,385 | 30.7 | 1,060 | 55.7 |
| Fosamax | 1,750 | 15.9 | 1,510 | 18.4 | 1,275 | 22.0 | 1,045 | 34.8 | 775 | 45.7 |
| Singulair | 1,795 | 38.1 | 1,300 | 51.2 | 860 | 72.0 | 500 | 157.7 | 194 | NM |
| Vioxx | 4,305 | 41.1 | 3,050 | 41.2 | 2,160 | 357.6 | 472 | NM | 0 | NM |
| **Cardiovascular** | **$9,980** | **(0.4%)** | **$10,025** | **(5.1%)** | **$10,560** | **8.5%** | **$9,730** | **9.2%** | **$8,907** | **4.5%** |
| Vasotec | 735 | (21.0) | 930 | (48.0) | 1,790 | (22.3) | 2,305 | (4.0) | 2,400 | (4.4) |
| Mevacor | 150 | (50.0) | 300 | (42.3) | 520 | (13.3) | 600 | (19.5) | 745 | (32.1) |
| Prinivil | 900 | (26.8) | 1,230 | 14.4 | 1,075 | 31.9 | 815 | 18.1 | 690 | 17.9 |
| Aggrastat | 230 | 27.8 | 180 | 38.5 | 130 | 62.5 | 80 | 247.8 | 23 | NM |
| **Anti-infectives** | **$1,085** | **(2.3%)** | **$1,110** | **(5.1%)** | **$1,170** | **(8.6%)** | **$1,280** | **(11.8%)** | **$1,452** | **7.0%** |
| Crixivan | 380 | (10.6) | 425 | (19.8) | 530 | (20.3) | 665 | (1.5) | 675 | 16.0 |
| Primaxin | 675 | 3.1 | 655 | 8.3 | 605 | 5.2 | 575 | 9.5 | 525 | (0.9) |
| **Metabolic** | **$4,740** | **15.5%** | **$4,105** | **12.3%** | **$3,655** | **18.3%** | **$3,090** | **19.7%** | **$2,581** | **21.9%** |
| Pepcid | 400 | (27.3) | 550 | (35.3) | 850 | (6.6) | 910 | (18.0) | 1,110 | (5.9) |
| Proscar | 525 | 5.0 | 500 | 6.4 | 470 | 5.6 | 445 | 7.2 | 415 | 3.8 |
| Propecia | 265 | 10.4 | 240 | 23.1 | 195 | 5.4 | 185 | 122.9 | 83 | NM |
| **Vaccines** | **$870** | **(2.2%)** | **$890** | **(5.8%)** | **$945** | **9.9%** | **$860** | **1.6%** | **$847** | **15.4%** |
| Hepatitis vaccines | 280 | (6.7) | 300 | (13.0) | 345 | 15.0 | 300 | (4.8) | 315 | 2.6 |
| Viral vaccines | 525 | 1.0 | 520 | 0.0 | 520 | 6.1 | 490 | 4.3 | 470 | 17.5 |
| **Other Pharmaceuticals** | **$8,400** | **28.7%** | **$6,525** | **67.5%** | **$3,895** | **54.6%** | **$2,520** | **66.8%** | **$1,511** | **65.5%** |
| Timoptic XL | 200 | (13.0) | 230 | (9.8) | 255 | (13.6) | 295 | (7.8) | 320 | (9.9) |
| Trusopt/Cosopt | 440 | 6.0 | 415 | 13.7 | 365 | 10.6 | 330 | 24.5 | 265 | 18.3 |
| Maxalt | 255 | 24.4 | 205 | 7.9 | 190 | 81.0 | 105 | 288.9 | 27 | NM |
| **Total Pharmaceuticals** | **$25,075** | **10.7%** | **$22,655** | **12.0%** | **$20,225** | **15.7%** | **$17,480** | **14.3%** | **$15,297** | **12.1%** |
| Medco (b) | **$27,750** | **18.0%** | **$23,520** | **16.8%** | **$20,140** | **32.2%** | **$15,235** | **31.3%** | **$11,602** | **22.9%** |
| **Total Product Revenue** | **$52,825** | **14.4%** | **$46,175** | **14.4%** | **$40,365** | **23.4%** | **$32,715** | **21.6%** | **$26,898** | **13.8%** |

(a)  Does not reflect discounts and rebates.  These are netted in "other, net".

(b)  Medco sales of Merck products are reflected in individual product sales categories.

Sources:  Merck & Co., CIBC World Markets estimates.

DEFEX 005594

104

DEFEX 005595

Exhibit 5

## Pharmacia Corporation: Selected New Product Pipeline

| Drug | Therapeutic Category: Indication | Description | Stage of Development | |
|------|----------------------------------|-------------|----|----|
| | | | US | Europe |
| Vestra | CNS: depression | Norepinephrine reuptake inhibitor | Approvable | Market |
| Aromasin | Oncology: post menopausal breast cancer | Type I aromatase inhibitor | Approved | Filed |
| Zyvox | Infectious disease: gram positive infections | Oxazolidinone | Approved | Phase III |
| Xalcom | Ophthalmology: glaucoma | Prostanoid FP-r agonist & beta blocker | Approvable | Filed |
| Axert | CNS: migraine headache | 5HT₁ receptor agonist | Filed | ** |
| Celebrex (a) | Inflammation: pain (CLASS data) | COX-2 inhibitor | Filed | Filed |
| Parecoxib | Inflammation: pain relief | COX-2 inhibitor injectable | Filed | Phase III |
| Valdecoxib | Inflammation: arthritis, pain relief | COX-2 inhibitor | Phase III | Phase III |
| Eplerenone | Cardiovascular: hypertension, congestive heart failure | Selective aldosterone receptor antagonist | Phase III | Phase III |
| SnEt2 | Ophthalmology: macular degeneration (wet) | Photodynamic therapy | Phase III | Phase III |
| Camptosar (a) | Oncology: small cell lung cancer | Topoisomerase I inhibitor | Phase III | Phase III |
| Xalatan (a) | Ophthalmology: first line glaucoma, combination | Prostanoid FP-r agonist | Phase III | Phase III |
| Tifacogin | Infectious disease: sepsis | TFP antagonist | Phase III | Phase III |
| Trelstar | Female Health Care: endometriosis | LHRH agonist | Phase III | Phase III |
| Trelstar | Oncology: advanced prostate cancer | LHRH agonist | Phase III | Phase III |
| TPO | Oncology: advanced non-small cell lung cancer | Thrombopoietin | Phase II | Phase II |
| SU5416 | Oncology: solid tumors | Angiogenesis inhibitor | Phase II | Phase II |
| Regltzane | Metabolic: type II diabetes | Insulin sensitizer | Phase II | Phase II |
| Camptosar (a) | Oncology: advanced non-small cell lung cancer | Topoisomerase I inhibitor | Phase II | ** |
| Celebrex (a) | CNS: Alzheimer's disease | COX-2 inhibitor | Phase II | Phase II |
| Celebrex (a) | Oncology: colon cancer | COX-2 inhibitor | Phase II | Phase II |
| PNU 95666 | CNS: Parkinson's disease | D₂ agonist | Phase II | Phase II |
| PNU 101387 | CNS: schizophrenia | D₄ antagonist | Phase II | Phase II |
| PNU 83757 | Metabolic: erectile dysfunction | Calcium channel opener | Phase II | Phase II |

(a) Line extension/supplemental indication.
Source: Pharmacia Corporation, CIBC World Markets estimates.

DEFEX 005596

105

Exhibit 6

## Merck & Co.: Selected New Product Pipeline

| Drug | Therapeutic Category: Indication | Description | Stage of Development US | Europe |
|---|---|---|---|---|
| Cancidas | Infectious disease: candida, aspergillus infections | Glucansynthase inhibitor | Approved | Phase III |
| Invanz | Infectious disease: complicated infections | Carbapenem antibiotic | Filed | Filed |
| Fosamax (a) | Metabolic: male osteoporosis | Aminobisphosphonate | Approved | Filed |
| Fosamax (a) | Metabolic: once-weekly | Aminobisphosphonate | Approved | Filed |
| Vioxx (a) | Inflammation: rheumatoid arthritis | COX-2 inhibitor | Phase III | Phase III |
| Etoricoxib | Inflammation: osteoarthritis, RA, pain | COX-2 inhibitor | Phase III | Phase III |
| Singulair/Claritin (b) | Respiratory: asthma/allergies | Leukotriene antagonist/antihistamine | Phase III | Phase III |
| Zocor/ezetimibe (b) | Cardiovascular: cholesterol lowering | Statin/cholesterol absorption inhibitor | Phase III | Phase III |
| Proscar (a) | Oncology: prevention of prostate cancer | 5-alpha reductase inhibitor | Phase III | Phase III |
| Vioxx (a) | CNS: Alzheimer's disease | COX-2 inhibitor | Phase III | Phase III |
| KRP-297 | Metabolic: diabetes | Thiazolidinedione | Phase II | Phase II |
| J-104132 | Cardiovascular: congestive heart failure | Endothelin antagonist | Phase II | Phase II |
| Substance P | CNS: depression | Second generation substance P antagonist | Phase II | Phase II |
| MK-869 | CNS: chemotherapy-induced nausea | Substance P antagonist | Phase II | Phase II |
| HPV vaccine | Infectious disease: human papilloma infection | Vaccine | Phase II | Phase II |
| Rotavirus vaccine | Infectious disease: rotaviral infections | Vaccine | Phase II | Phase II |

(a) Line extension/new indication.
(b) Co-development with Schering-Plough.
Sources: Merck & Co., CIBC World Markets estimates.

# Pharmaceutical Industry – EPS Estimates and Valuation

| Company | Ticker Symbol | Rating | Price 02/07/01 | 52 Week High | 52 Week Low | EPS 1999A | EPS 2000A | EPS 2001E | EPS 2002E | 99-'03 % EPS Growth | P/E 1999A | P/E 2000E | P/E 2001E | P/E 2002E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Home Products Corp. (a) | AHP | B | 61 2/5 | 65 1/4 | 40 1/2 | 1.75 | 1.90 | 2.18 * | 2.50 | 13 | 35.1 | 32.3 | 28.2 | 24.6 |
| AstraZeneca PLC (a) | AZN | H | 44 46/73 | 52 27/73 | 30 32/97 | 1.41 | 1.63 | 1.80 * | 1.75 | 8 | 31.7 | 27.4 | 24.8 | 25.5 |
| Bristol-Myers Squibb Co. (b) | BMY | SB | 64 49/50 | 74 67/77 | 42 3/7 | 2.06 | 2.36 | 2.63 | 2.95 | 13 | 31.5 | 27.5 | 24.7 | 22.0 |
| GlaxoSmithKline PLC (c) | GSK | H | 53 3/4 | 64 40/93 | 45 1/4 | NA | 1.85 | 2.10 | 2.25 | 10 | NM | 29.1 | 25.6 | 23.9 |
| Johnson & Johnson | JNJ | B | 94 9/10 | 105 40/43 | 66 32/25 | 2.97 | 3.42 | 3.85 * | 4.35 | 12 | 32.0 | 27.7 | 24.6 | 21.8 |
| Eli Lilly & Co. | LLY | B | 78 19/20 | 109 | 54 | 2.28 | 2.65 | 2.83 | 3.00 | 10 | 34.6 | 29.8 | 27.9 | 26.3 |
| Merck & Co. (d) | MRK | B | 81 17/20 | 96 17/25 | 52 | 2.45 | 2.90 | 3.22 | 3.58 | 12 | 33.4 | 28.2 | 25.4 | 22.9 |
| Pfizer Inc. (e) | PFE | H | 44 1/2 | 49 1/4 | 30 | 0.79 | 1.02 | 1.27 * | 1.56 | 18 | 56.3 | 43.6 | 35.0 | 28.5 |
| Pharmacia Inc. | PHA | B | 56 3/23 | 64 | 35 3/50 | 1.11 | 1.45 | 1.75 * | 2.08 | 14 | 50.6 | 38.7 | 32.1 | 27.0 |
| Schering-Plough Corp. | SGP | H | 50 24/25 | 60 | 30 1/2 | 1.42 | 1.64 * | 1.88 * | 2.14 | 13 | 35.9 | 31.1 | 27.1 | 23.8 |
| Share Weighted Average | | | | | | | | | | 13.4 | NM | 33.7 | 28.8 | 25.3 |
| S & P Industrials (f) | SPTI | | 1569.19 | 1947.79 | 1454.66 | 58.00 | 60.53 | 62.23 | 64.75 | | 27.1 | 25.9 | 25.2 | 24.2 |
| S & P 500 (f) | SPX | | 1340.89 | 1553.11 | 1254.26 | 50.82 | 57.06 | 59.39 | 65.38 | | 26.4 | 23.5 | 22.6 | 20.5 |

| Company | Ticker Symbol | 1 Mo. | 3 Mo. | 13 Mo. | YTD | Net Debt ($ Bil) | Market Value ($ Bil) | Sales | EBITDA | Gross Profit | 1999A | 2000A | 2001E | 2002E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Home Products Corp. | AHP | (3.4%) | (2.0%) | 36.4% | (1.6%) | 1,255 | 80.5 | 6.0 | 19.1 | 8.0 | 1.33 | 1.38 | 1.25 | 1.20 |
| AstraZeneca PLC | AZN | (13.3) | (5.0) | 20.6 | (2.3) | (2,205) | 78.9 | 5.1 | 17.0 | 6.9 | 1.20 | 1.17 | 1.10 | 1.24 |
| Bristol-Myers Squibb Co. | BMY | (12.1) | 2.5 | 0.5 | (9.1) | (1,183) | 129.1 | 6.3 | 19.6 | 8.7 | 1.20 | 1.17 | 1.09 | 1.07 |
| GlaxoSmithKline PLC | GSK | NM | NM | NM | (3.8) | 1,079 | 163.2 | 12.0 | 35.2 | 15.0 | NM | 1.24 | 1.13 | 1.16 |
| Johnson & Johnson | JNJ | (9.7) | 4.3 | 11.9 | (7.0) | (0.064) | 134.7 | 4.9 | 18.3 | 7.1 | 1.21 | 1.18 | 1.09 | 1.06 |
| Eli Lilly & Co. | LLY | (15.2) | (13.2) | 20.4 | (13.7) | (0.963) | 86.5 | 8.6 | 23.0 | 10.9 | 1.31 | 1.27 | 1.24 | 1.28 |
| Merck & Co. | MRK | (12.6) | (8.8) | 6.6 | (12.0) | 2,801 | 192.8 | 6.0 | 21.6 | 12.9 | 1.27 | 1.20 | 1.13 | 1.11 |
| Pfizer Inc. | PFE | (3.3) | 2.3 | 20.3 | (3.5) | 2,487 | 283.4 | 10.4 | 27.2 | 12.9 | 2.13 | 1.86 | 1.55 | 1.39 |
| Pharmacia Inc. | PHA | (8.0) | (2.3) | 46.0 | (6.5) | 6,399 | 73.0 | 8.7 | 35.3 | 13.5 | 1.92 | 1.65 | 1.42 | 1.32 |
| Schering-Plough Corp. | SGP | (10.2) | (3.1) | 12.8 | (6.1) | (1,142) | 75.1 | 8.1 | 31.2 | 10.0 | 1.36 | 1.32 | 1.20 | 1.16 |
| Share Weighted Average | | (7.2%) | (1.2%) | 15.7% | (6.6%) | | | 8.4 | 25.7 | 11.4 | NM | 1.44 | 1.28 | 1.23 |
| S & P Industrials | SPTI | 2.7 | (4.1) | (10.5) | 5.9 | | | | | | | | | |
| S & P 500 | SPX | 1.6 | (1.7) | (4.5) | 4.5 | | | | | | | | | |

(a) EPS figures are pro forma for the divestiture of agriculture (b) Pro forma EPS for the two divestitures are $2.12 and $2.35 (c) EPS translated @ $1.57 (d) The CIBC World Markets analyst() that covers this company also has a position in its securities. (e) 1999 includes one-time items. (f) First Call estimates.

* Actual reported EPS.

Source: CIBC World Markets Corp. estimates, Company reports, Factset, ILX, First Call

DEFEX 005597

# EXHIBIT 6

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ALASKA ELECTRICAL PENSION FUND, *et al.*, On Behalf of Themselves and All Others Similarly Situated,<br><br>               Plaintiffs,<br><br>vs.<br><br>PHARMACIA CORPORATION, *et al.*,<br><br>               Defendants. | Civil Action No. 3:09-1519 (AET) (Consolidated)<br><br><u>CLASS ACTION</u> |

REPORT ON MARKET EFFICIENCY, LOSS CAUSATION, AND DAMAGES

STEVEN P. FEINSTEIN, PH.D., CFA

JUNE 6, 2011

# TABLE OF CONTENTS

SCOPE OF PROJECT AND REPORT ........................................................................ 1

CREDENTIALS ..................................................................................................... 1

CONCLUSIONS ..................................................................................................... 4

FACTUAL BACKGROUND ...................................................................................... 5

   About the Company ........................................................................................... 5

   Background Information ..................................................................................... 6

   Timeline of Important Events .............................................................................. 9

      17 April 2000:  Pharmacia Announces the CLASS Results ................................. 9

      25 April 2000:  Q1 2000 Earnings and Conference Call ..................................... 12

      22-23 May 2000:  Presentation of CLASS Results at the Digestive Disease Week
      Conference and Press Release ........................................................................ 13

      13 September 2000:  *JAMA* Publishes Article Authored by Pharmacia Employees and
      Consultants ................................................................................................ 16

      6-7 February 2001:  FDA Posting of Review Reports and Advisory Committee Meeting .. 18

      5 August 2001: *Washington Post* Exposé States Defendants Misled *JAMA* Editors and the
      Public ...................................................................................................... 20

      Post-Class Period:  Confirmation of Deception .................................................. 21

EFFICIENT MARKET DEFINED .............................................................................. 22

      The *Cammer* Factors ................................................................................... 24

      The *Krogman* Factors .................................................................................. 26

EFFICIENCY OF THE MARKET FOR PHARMACIA COMMON STOCK .......................... 27

   Trading Volume ............................................................................................... 27

   Analyst Coverage and Other Avenues of Information Dissemination ....................... 28

      Analyst Coverage ........................................................................................ 28

      Institutional Ownership and Buy-Side Analysis ................................................. 29

      News Coverage and Other Information Dissemination Vehicles ............................ 30

   Market Makers and Listing on the New York Stock Exchange ............................... 30

   S-3 Registration Eligibility ............................................................................... 32

      Float ......................................................................................................... 33

      Reporting ................................................................................................... 33

      Eligibility ................................................................................................... 34

   *Krogman* Factors .......................................................................................... 34

      Market Capitalization ................................................................................... 34

Outstanding Float Ratio ................................................................................. 35

Bid-Ask Spread ........................................................................................... 35

EMPIRICAL EVIDENCE OF PHARMACIA COMMON STOCK MARKET EFFICIENCY . 36

Special Importance of the Empirical Factor .......................................................... 36

Event Study Analysis .................................................................................... 37

Event Selection Criterion ........................................................................... 38

Disclosure Events..................................................................................... 39

Length of Event Window ............................................................................. 40

Controlling for Potentially Confounding Factors:  Removing Factors that Impact the
Chemicals and Agricultural Business of New Monsanto ...................................... 45

Controlling for Potentially Confounding Factors:  Removing the Market and Sector Effects
................................................................................................................. 46

*t*-test................................................................................................... 48

Event Study Results:  6-8 February 2001 ......................................................... 49

Event Study Results:  6-8 August 2001 ........................................................... 51

Event Study on Pharmacia Stock Returns without Removing New Monsanto ....................... 51

Results of Alternative Event Study................................................................. 53

Market Efficiency Summary and Conclusion................................................................ 53

LOSS CAUSATION........................................................................................ 54

Company Statements Confirm the Materiality of the Alleged Misrepresentations and
Omissions........................................................................................................ 54

Importance of Celebrex to Pharmacia............................................................. 54

The Importance of CLASS to Celebrex ........................................................... 56

Analysts and the Financial Media Deemed the Alleged Misinformation Material .................. 58

Analysts Considered Celebrex Important to Pharmacia ......................................... 58

The Financial Press Reported on the Importance of Celebrex ............................... 60

Analysts Considered CLASS Important to Celebrex............................................. 62

The Financial Press Reported on the Importance of CLASS ............................... 66

The Court Concluded that the CLASS Results and Related Statements Were Material.......... 67

EMPIRICAL CONFIRMATION OF LOSS CAUSATION ................................................ 68

Events of 6-8 February 2001................................................................................ 69

The Corrective Disclosure ......................................................................... 69

The Corrective Disclosure Dissipated Artificial Inflation ................................... 70

Accounting for Potentially Confounding Information........................................... 70

Xalatan Sales and Somavert Application Announcements.................................... 71

APBiotech IPO ........................................................................................................ 72

Alcon Laboratories Patent Lawsuit ........................................................................ 72

FDA Warning Letter about Celebrex and Coumadin Combination ...................... 73

Conclusion About Confounding Information ......................................................... 74

DAMAGE COMPUTATION ...................................................................................... 74

The Inflation Ribbon .............................................................................................. 74

Per Share Damage Formula .................................................................................... 75

AGGREGATE DAMAGES ......................................................................................... 77

Two-Trader Proportional Trading Model ............................................................... 78

Published Literature, Wide Use, and Acceptance by Courts .................................. 78

Construction of the Two-Trader Model ................................................................. 80

Analysis of the Two-Trader Model ........................................................................ 82

Aggregate Damages Assuming the 90-Day Bounce-Back Period Begins on 8 February 2001 ....................................................................................................... 83

Aggregate Damages Estimated from the Institutional Holdings Data ................... 84

LIMITING FACTORS ................................................................................................ 86

APPENDIX:  LOGARITHMIC RETURNS ............................................................... 87

## SCOPE OF PROJECT AND REPORT

1.   I was asked by Robbins Geller Rudman & Dowd LLP, counsel for the Plaintiffs, to determine whether or not the common stock of Pharmacia Corporation ("Pharmacia" or the "Company") traded in an efficient market during the Class Period, 17 April 2000 to 5 August 2001. I was also asked to determine whether investors suffered losses as a result of the Defendants' alleged misdeeds described in Plaintiffs' Consolidated Complaint for Violation of the Federal Securities Laws, filed 27 October 2003 ("Complaint"). I was also asked to quantify damages sustained, if any, on a per share basis and to provide an estimate of aggregate damages.

2.   Toward these ends, I analyzed the market for Pharmacia common stock, the price behavior of the stock, and the factors that are generally accepted to be indicative of market efficiency. I examined Company press releases, conference call transcripts, equity analyst reports, news articles, Company documents obtained through discovery, SEC filings, trading volume, FDA reviewer reports, the performance of the overall stock market, and the performance of Pharmacia's peers, as well as other pertinent data and documents. Exhibit-1 lists the documents I reviewed and relied upon in the course of this engagement.

3.   This report presents my methodology, findings, and conclusions.

4.   I understand that expert discovery is ongoing in this case. I may revise my report as additional information becomes available and as I conduct further analyses.

## CREDENTIALS

5.   I, Steven P. Feinstein, am an Associate Professor of Finance at Babson College, and the president of Crowninshield Financial Research, Inc., a financial economics consulting firm.

6.   I hold a Ph.D. in Economics from Yale University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College. I also hold the Chartered Financial Analyst ("CFA") designation, granted by the CFA Institute.

7.   At Babson College I have taught undergraduate and MBA level courses in Valuation, Investments, Equity Analysis, Fixed Income Analysis, Financial Management, Risk Management, Capital Markets, and Quantitative Methods. I have also taught executive

courses on investments and corporate financial management for numerous corporations. Other courses I have taught are listed in my curriculum vitae, which is attached as Exhibit-2.

8.  At Babson College, I have held the Chair in Applied Investments and served as the Director of the Stephen D. Cutler Investment Management Center, a research and education center dedicated to the study and teaching of investments and capital markets.

9.  Prior to my joining the faculty at Babson College, I taught finance at Boston University. Previously, I was an Economist at the Federal Reserve Bank of Atlanta where my primary responsibilities were to monitor financial markets, analyze proposed regulation, and advise the Bank President in preparation for his participation in meetings of the Federal Open Market Committee – the government body responsible for monetary policy in the United States.

10. I have published extensively in the field of finance. My finance articles have appeared in *The Journal of Forensic Economics*, *Atlanta Federal Reserve Bank Economic Review*, *Derivatives Quarterly*, *Derivatives Weekly*, *The Engineering Economist*, *The Journal of Risk*, *The American Bankruptcy Institute Journal*, *The Journal of Financial Planning*, *Risk Management*, and *Primus*. A recent article has been accepted for publication and is forthcoming in *Managerial Finance*. I am the author of *Finance and Accounting for Project Management*, published by the American Management Association. I wrote two chapters in the book *The Portable MBA in Finance and Accounting* – one on corporate financial planning and the other on risk management. I have presented research at the annual conventions of the American Finance Association, the Academy of Financial Services, the Multinational Finance Society, the Financial Management Association, and the International Conference on Applied Business Research. Co-authored papers of mine have been presented at the Eastern Finance Association meetings and the Midwestern Finance Association meetings.

11. I have been selected to review papers for numerous finance journals and conferences, and I have reviewed finance textbook manuscripts for Prentice-Hall, Elsevier, Blackwell, and Southwestern Publishing. I have been quoted on matters relating to finance and investments in *The Wall Street Journal*, *The Washington Post*, *The New York Times*, *The Financial Times, Bloomberg News*, and *The Boston Globe*, and my research relating to financial

analysis and valuation has been discussed in *The Wall Street Journal*, *Bond Buyer*, and *Grant's Municipal Bond Observer*.

12. I am a member of the American Finance Association, the Financial Management Association, the North American Case Research Association, the CFA Institute, and the Boston Security Analysts Society, where I have served as a member of the education committee and ethics subcommittee. I served on the Fixed Income Specialization Examination Committee of the CFA Institute.

13. The CFA designation is the premier credential for financial analysts, worldwide. In order to receive this credential, applicants must pass a series of three exams covering such topics as equity analysis, financial valuation, business analysis, quantitative methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards. For over ten years I taught in the Boston University CFA Review Program and the Boston Security Analysts Society CFA Review Program – two of the leading review programs that prepared candidates for the CFA exams. In both of these programs I taught candidates at the most advanced level.

14. In addition to my teaching, research, CFA, and academic community responsibilities, I practice extensively as a financial consultant. Past and present clients include the United States Securities and Exchange Commission, the Internal Revenue Service, the Attorney General of the State of Illinois, and the National Association of Securities Dealers. As a financial consultant, I have conducted analyses and presented opinions related to market efficiency, artificial inflation, loss causation, and damages in over 50 securities cases. Exhibit-3 lists my prior testimony appearances over the past four years.

15. My firm is being compensated at a rate of $675 per hour for my work on this matter, and my compensation is not contingent on my findings or on the outcome of this matter. I am the president and founder of the consulting firm Crowninshield Financial Research, which receives compensation for the work performed by analysts who assist me on this case.

## <u>CONCLUSIONS</u>

16. Pharmacia stock traded in an efficient market over the course of the Class Period.

17. Pharmacia common stock satisfied the *Cammer* and *Krogman* factors, which were adopted and applied by the *DVI* Court, and which consistent with financial economic principles and empirical research indicate market efficiency.

18. Statistical tests prove that there was a cause and effect relationship between the release of new material information and movements in the Pharmacia stock price. This empirical result not only indicates market efficiency, but demonstrates the essence of market efficiency.

19. Over the course of the Class Period, the alleged misrepresentations and omissions caused the price of Pharmacia stock to be artificially inflated. This conclusion is based on an analysis of Company statements, FDA reviewer reports, analyst reports, news articles, and on event study analysis.

20. Event study analysis, which considered and accounted for potentially confounding information, proves that the alleged misrepresentations and omissions caused the price of Pharmacia stock to be artificially inflated. The corrective disclosures caused the inflation to dissipate, which in turn caused the stock price drop and investor losses.

21. As a result of the Defendants' misrepresentations and omissions, the market price of Pharmacia stock was artificially inflated by $5.92 per share throughout most of the Class Period, and by amounts ranging up to $5.92 as inflation dissipated between 6 February and 8 February 2001. No detectable inflation remained after 8 February 2001.

22. Any investor who purchased Pharmacia stock when the price was artificially inflated and held that stock beyond a corrective disclosure date suffered a loss that was caused by the alleged misrepresentations and omissions. The loss ranged up to $5.92 per share, depending on the timing of the stock purchase and sale.

23. Aggregate damages estimated by a two-trader proportional trading model, incorporating conservative assumptions, and assuming the 90-day PSLRA "bounce-back" period begins on 8 February 2001, amount to $1.38 billion, excluding prejudgment interest. When computed with the 90-day bounce-back period commencing on 5 August 2001, the last day of the Class Period, the estimate of aggregate damages is $1.59 billion. The conservative nature of these estimates is confirmed by comparisons with the aggregate damage estimates

computed by a model based on institutional holdings. The institutional damage estimates were substantially higher than the estimates computed by the proportional trading model.

## FACTUAL BACKGROUND

### About the Company

24. Throughout the Class Period, Pharmacia was in the business of developing, manufacturing, and marketing pharmaceuticals.[1]

25. Pharmacia Corporation was the product of the 31 March 2000 merger (the "Merger") of Pharmacia & Upjohn, Inc. ("PNU") and the Monsanto Company ("Old Monsanto"). Old Monsanto was renamed Pharmacia Corporation and PNU became a subsidiary of the combined Company.[2] Shares of PNU were converted into 1.19 shares of the newly formed entity.[3] Pharmacia's common stock began trading on the New York Stock Exchange ("NYSE") on 4 April 2000, under the ticker symbol PHA.

26. On 18 October 2000, Pharmacia Corporation spun-off 14.7% (the "Spin-Off") of the new Monsanto subsidiary ("New Monsanto"), through an initial public offering ("IPO") of New Monsanto shares. New Monsanto comprised the Company's chemicals and agricultural business. Later, on 13 August 2002, Pharmacia completed a spin-off of its remaining 85.3% stake in New Monsanto through a tax-free dividend.[4]

27. Excluding the revenue generated by New Monsanto, the Company produced operating revenue of $12.7 billion in 2000 and $13.8 billion in 2001.[5] Net earnings were $717 million in 2000 and $1.5 billion in 2001, excluding the earnings derived from New Monsanto.[6]

28. As of the close of trading on 14 April 2000, the trading day prior to the start of the Class Period, Pharmacia's market capitalization (the aggregate value of all outstanding common shares) was $66.3 billion,[7] according to share price data obtained from the Center for

---

[1] Pharmacia Corporation Form 10-K405 for the Fiscal Year Ended 31 December 2001, filed 5 March 2002, p. 4.
[2] *Ibid.*, p. 3.
[3] Monsanto Company Form 8-K, filed 25 January 2000.
[4] "Pharmacia Completing Monsanto Spinoff Tuesday," *Reuters News*, 13 August 2002; and Pharmacia Corporation Form 10-K405 for the Fiscal Year Ended 31 December 2001, filed 5 March 2002, p. 3.
[5] Pharmacia Corporation Form 10-K405 for the Fiscal Year Ended 31 December 2001, filed 5 March 2002, p. 46.
[6] *Ibid.*
[7] Shares outstanding data were obtained from the Company's SEC filings. For the first 12 trading days of the Class Period, I used the 1,248.1 million shares reportedly outstanding as of the completion of the March 31 merger.

Research in Security Prices ("CRSP").[8] The market capitalization climbed to a Class Period peak of $78.7 billion on 29 December 2000. By 6 August 2001, the day following the end of the Class Period, the Company's market capitalization had fallen to $57.2 billion. The decline in market capitalization from the peak during the Class Period to the day after the Class Period was $21.4 billion,[9] representing a loss of 27.2% of the Company's equity value.

29.    On 14 April 2000, the trading day prior to the start of the Class Period, Pharmacia's common stock price was $53.13 per share. The peak share price during the Class Period was $61.00 per share on 29 December 2000. By 6 August 2001, the day after the Class Period, the stock price had fallen to $44.00 per share. This drop represents a decline of 17.2% over the course of the Class Period and a decline of 27.9% from the Class Period high.

30.    Pharmacia stock prices, dividends, trading volume, and logarithmic returns are shown in Exhibit-4.

31.    After the Class Period, on 13 July 2002, Pharmacia entered into a definitive merger agreement with Pfizer. Upon completion of the transaction, Pharmacia shareholders received 1.4 shares of Pfizer stock for each share of Pharmacia.[10]


**Background Information**

32.    The drug Celebrex (celecoxib) is a painkiller of the type known as a selective COX-2 inhibitor. Developed for sufferers of arthritis, Celebrex was intended to be a safer alternative to traditional non-steroidal anti-inflammatory drugs ("NSAIDs") such as ibuprofen, diclofenac, and aspirin, whose long-term use has been associated with ulcers and other gastrointestinal ("GI") problems.

33.    The COX-1 enzyme helps protect the GI system. Because traditional NSAIDs block both COX-1 and COX-2 enzymes non-selectively, they diminish this protection. As a selective COX-2 inhibitor, Celebrex was intended to preserve the COX-1 enzyme's protection of the GI system while providing pain and inflammation relief comparable to that of traditional NSAIDs. Potentially free of the negative GI side effects, Celebrex was intended to offer a

---

[8] CRSP is the preeminent provider of historical stock market databases used in academic financial research.
[9] The slight arithmetic discrepancy is due to rounding.
[10] Pharmacia Corporation Form 10-K for the Fiscal Year Ended 31 December 2002, filed 25 March 2003, p. 3.

superior long-term treatment for patients suffering from osteoarthritis ("OA"), rheumatoid arthritis ("RA"), and other ailments.[11]

34.   Celebrex was developed by Searle, the pharmaceuticals division of Old Monsanto. The drug was approved by the U.S. Food and Drug Administration ("FDA") on 31 December 1998 to treat RA and OA.[12] It was launched in early 1999 and co-marketed with Pfizer. The launch was highly successful. Nearly 56,000 prescriptions were filled for Celebrex in its first three weeks on the market, and Celebrex sales totaled $1.4 billion in 1999. At the time, Celebrex was the most successful drug launch ever.[13]

35.   Celebrex quickly became Pharmacia's largest revenue producer and was an important contributor to its revenue and earnings growth. Celebrex represented 20.7% and 22.5% of Pharmacia's pharmaceuticals sales for the fiscal years 2000 and 2001, respectively.[14] In those same years, sales of Celebrex were 3.7 and 3.5 times greater, respectively, than sales of Pharmacia's second best selling drug, Ambien.[15]

36.   In spite of the drug's potentially improved GI safety profile, the FDA required that, until Searle performed more studies, Celebrex carry a warning label about bleeding, ulcers, and stomach perforations. [16] This was similar to the label required for traditional NSAIDs.

37.   To provide the FDA with sufficient data to potentially remove Celebrex's GI warning label, Searle conducted the Celecoxib Long-Term Arthritis Safety Study ("CLASS"). The CLASS study was a double-blind outcomes trial involving approximately 8,000 arthritis patients, some of whom were given doses of Celebrex while control groups were given either ibuprofen or diclofenac, over a time span up to 15 months in length. The study was

---

[11] "Executive Summary:  Celebra Life Cycle Plan 1998-1999 Budget," 21 June 1998, Exhibit-126 [DEFS 01380796].
[12] "DJBN Health-Care Report:  FDA Clears Monsanto's Arthritis Drug," *Dow Jones Business News,* 31 December 1998.
[13] "Pain, Pain Go Away Is Celebrex – the New Arthritis Drug – All It's Cracked Up To Be?" by Andrea Rock, *Money Magazine*, 1 April 1999, and "Chief Scientist Has Built His Reputation on Success," by Adam Goodman, *St. Louis Post-Dispatch*, 26 December 1999.
[14] Pharmacia Corporation Form 10-K405 for the Fiscal Year Ended 31 December 2001, filed 5 March 2002, p. 32.
[15] *Ibid.*
[16] "Pain, Pain Go Away; Is Celebrex – the New Arthritis Drug – All It's Cracked Up To Be?" by Andrea Rock, *Money Magazine*, 1 April 1999, and "Chief Scientist Has Built His Reputation On Success," by Adam Goodman, *St. Louis Post-Dispatch*, 26 December 1999.

designed to assess the safety of Celebrex and compare the drug's safety with that of ibuprofen and diclofenac, two traditional and commonly used NSAIDs.[17]

38.    When designing CLASS, the Company anticipated the study would achieve several beneficial objectives. Company planning materials indicated that regulatory objectives included facilitating a favorable label change that would differentiate Celebrex from traditional NSAIDs on the basis of GI safety.

> "Far and away, the single largest item in the budget is the CLASS trials. These are large, GI event-based studies with the potential for major regulatory and commercial benefits.
>
> Regulatory:
> Such a study would:
> - provide the basis for requesting a modification of the GI warning in the U.S. label in the event that that NSAID class warning is imposed on SCI labeling by FDA
> - set a precedent for qualification of other compounds into the SCI Class
> - be endorsed by the FDA Advisory Committee"
> **"Executive Summary:  Celebra Life Cycle Plan 1998-1999 Budget," dated 21 June 1998, Exhibit-126, [DEFS 01380797].**

39.    The same Company planning document indicated that the CLASS study was intended to produce commercial benefits, quantified as an approximately $300 million increase in peak sales.

> "Commercial:
> Such a study would:
> - provide a publication in a high quality journal
> - provide pharmacoeconomic data required in markets like Canada and Australia
> - health care resource utilization which is of importance to managed care organizations
>
> An outcome study is in keeping with best practices of competitors like Merck
>
> It is estimated that such a study could contribute ~$300 million change in peak sales based on:

---

[17] "Incidence of Clinically Significant UGI Adverse Events vs Diclofenac (Revision 1)," 26 October 1998, Exhibit-77 [DEFS 00064858 – 00064941], and "Incidence of Clinically Significant UGI Adverse Events vs Ibuprofen," 18 August 1998, Exhibit-78 [DEFS 00064942 – DEFS 00065016].

- deletion of class warning
- participants in outcome studies have higher prescribing practices"
**"Executive Summary: Celebra Life Cycle Plan 1998-1999 Budget," dated 21 June 1998, Exhibit-126, [DEFS 01380798].**

## Timeline of Important Events

40.   Among the important events relevant to an understanding of the Company's experience over the course of the Class Period and of the Plaintiffs' allegations are the following.

### 17 April 2000:  Pharmacia Announces the CLASS Results

41.   A joint press release issued by Pharmacia and Pfizer on 17 April 2000 announced the results of CLASS. The statement used glowing terms to characterize CLASS as "a landmark study," "groundbreaking," and a "rigorous outcomes trial [that] set the bar higher than any previous study of its kind."[18]

42.   Celebrex's performance in the study was also described in exceptionally positive terms.

> "In a landmark study to assess the overall long-term safety of the COX-2 specific inhibitor Celebrex(R) (celecoxib capsules), arthritis patients taking four times the recommended osteoarthritis (OA) dose of the drug experienced fewer symptomatic gastrointestinal (GI) ulcers and ulcer complications than patients taking ibuprofen and diclofenac – a difference that was statistically significant based on a combined analysis of Celebrex versus these two traditional nonsteroidal anti-inflammatory drugs (NSAIDs).
> …
> The study, funded by Searle and Pfizer Inc, found that Celebrex patients experienced significantly fewer symptomatic GI ulcers and ulcer complications compared with ibuprofen or diclofenac. Celebrex was also associated with numerically fewer ulcer complications than the NSAID comparators among all patients, and 64 percent fewer of these serious events among non-aspirin users – a statistically significant difference."
> **"New Findings Presented on Celebrex(R) Safety and Tolerability from Long-Term Outcomes Study of 8,000 Arthritis Patients," Pharmacia and Pfizer joint press release, *PR Newswire*, 17 April 2000.**

43.   According to the press release, Celebrex proved superior with respect to the frequency of ulcer complications when patients taking aspirin were excluded. Moreover, according to

---

[18] "New Findings Presented on Celebrex(R) Safety and Tolerability From Long-Term Outcomes Study of 8,000 Arthritis Patients," Pharmacia and Pfizer joint press release, *PR Newswire*, 17 April 2000.

the press release, when grouping ulcer complications together with symptomatic ulcers, Celebrex proved statistically superior to ibuprofen or diclofenac.

44. The press release quoted medical researchers validating the study, its results, and the implication that CLASS proved Celebrex to be safer with respect to GI effects.

> "'No previous study has examined such a broad range of GI side effects – which encompass events ranging from serious and often devastating GI ulcers and ulcer complications, to silent but medically important damage to the lining of the intestine, to symptoms like abdominal pain,' said Lee S. Simon, M.D., associate professor of medicine, Harvard Medical School. 'We've known the serious risks of traditional NSAIDs for some time, but these long-term findings show that patients taking Celebrex, in contrast to those on ibuprofen or diclofenac, experienced fewer treatment-related side effects in a number of important areas. These side effects often limit patients' ability to maintain their therapy and get the arthritis pain relief they require.'
> …
> 'This rigorous outcomes trial set the bar higher than any previous study of its kind. It included a large number of patients who received four times the recommended OA dose of Celebrex for up to 13 months. It also compared Celebrex with commonly used traditional NSAIDs – ibuprofen, one of the most well tolerated; and diclofenac, extensively used throughout the world,' said Fred Silverstein, M.D., chairperson of the study's external review board. 'Even at these very high doses, Celebrex showed sustained safety and tolerability in organ systems often affected by NSAIDs. As such, these are compelling findings for physicians to consider when treating arthritis patients.'"
> **"New Findings Presented on Celebrex(R) Safety and Tolerability From Long-Term Outcomes Study of 8,000 Arthritis Patients," Pharmacia and Pfizer joint press release, *PR Newswire*, 17 April 2000.**

45. The press release did not disclose that the entire study results were far less favorable to Celebrex than the publicly reported six-month results, as 6 of the 7 complicated ulcers occurring after the first six months of the CLASS trial were suffered by patients being treated with Celebrex, the reported GI comparisons worsened after six months, and the statistically significant benefit for Celebrex users not taking aspirin that Defendants reported based upon six months of data for complicated ulcers did not hold for the entire study period. Furthermore, Celebrex failed to establish any statistically significant difference with diclofenac on any of the GI endpoints considered, and diclofenac was

actually numerically superior to Celebrex on one of the two co-primary endpoints of the study.[19]

46.    Morgan Stanley discussed the results of CLASS in an analyst report titled "Positive Results of Celebrex CLASS Trial Released," published the day following the joint press release. The Morgan Stanley analysts reported exactly what the release had represented, *i.e.*, that Celebrex patients experienced fewer symptomatic ulcers and ulcer complications compared to the NSAID treatment groups, and that the study had successfully differentiated the GI safety profile of Celebrex from that of the traditional NSAIDs.

> **"PHA and PFE announced positive results of the CLASS trial**
> In most respects, the study served its purpose of differentiating the long-term safety profile of Celebrex from NSAIDs.
>
> **Celebrex patients experienced fewer symptomatic ulcers**
> and ulcer complications than patients taking the comparator NSAIDs, ibuprofen and diclofenac."
> **"Positive Results of Celebrex CLASS Trial Released," by Jami Rubin, Mark Wiltamuth and Nancy Yu, Morgan Stanley Dean Witter, analyst report, 18 April 2000, p. 1 (emphasis in original).**

47.    Notwithstanding the fact that the CLASS trial "fell short" of its primary endpoint – establishing statistically significantly fewer ulcer complications among all patients taking Celebrex – the Morgan Stanley analysts commented that they had "anticipated the study to corroborate" the GI safety profile of Celebrex. For this reason, they would not change their sales forecasts for the drug.

> "We are making no change to our forecasts, as we had anticipated the study to corroborate the strong safety profile of the product."
> **"Positive Results of Celebrex CLASS Trial Released," by Jami Rubin, Mark Wiltamuth and Nancy Yu, Morgan Stanley, analyst report, 18 April 2000.**

48.    The analysts concluded that, on the basis of the result achieved when grouping ulcer complications with symptomatic ulcers and on the basis of the result achieved among non-aspirin patients, the study "served its purpose of differentiating the long-term safety profile of Celebrex from NSAIDs."

---

[19] "New Findings Presented on Celebrex(R) Safety and Tolerability From Long-Term Outcomes Study of 8,000 Arthritis Patients," Pharmacia and Pfizer joint press release, 17 April 2000, Exhibit-67 [DEFS 00404977 – DEFS 00404980]; and Affidavit of Howard R. Philips, 18 October 2010, Attachments A – C.

49. From the close of trading on Friday, 14 April 2000, to the close of trading on Wednesday, 19 April 2000, the price of Pharmacia stock rose $6.62 per share, from $53.13 to $59.75 per share, an increase of 12.5%.

25 April 2000:  Q1 2000 Earnings and Conference Call

50. On 25 April 2000, Pharmacia announced Q1 2000 financial results and held a conference call with investors. During the call, Company executives reiterated the CLASS study results and their implications. Referring to CLASS, Pharmacia CEO Fred Hassan claimed that "new data" showed Celebrex's "exceptional safety profile."

51. Further, Executive VP Alan Heller touted the results of the "long-term" study and Celebrex's "broad safety profile" when compared against traditional NSAIDs, including diclofenac.

> "[Alan Heller, Head of Searle Units, Pharmacia Corporation:] The top line take-away is that our landmark long-term arthritis study provides compelling evidence of the broad safety profile of Celebrex across a full spectrum of GI measures and in major organ systems versus the traditional NSAID comparators ibuprofen and diclofenac.
> …
> When we focus only [on] the most serious GI events, meaning ulcer complications, which include perforations, gastric obstructions and GI bleeds, among all patients including those using low-dose aspirin, Celebrex resulted in 52% fewer ulcer complications, a finding that was just under statistical significance. Among non-aspirin users, the difference was 65%, which was statistically significant."
> **"Pharmacia Corporation First Quarter Earnings Release Conference Call," 25 April 2000, Exhibit 336, [DEFS 01221352].**

52. Investors and analysts were still not made aware of the facts set forth above in paragraph 45. They were not informed that the results for the entire CLASS study were far less favorable for Celebrex than what Defendants represented.

53. Responding to Pharmacia's Q1 2000 financial results, analyst reports were positive about the impact that the CLASS study would have on the Celebrex franchise. They anticipated that the new research would enable Pharmacia to remove the GI warning from the Celebrex label. Among other benefits, the label change would enable more widespread usage and reimbursement approval by managed care providers.

"Celebrex sales were impressive, although somewhat lower than we had expected. However, we continue to believe that Celebrex will show impressive growth during the coming quarters, fuelled by new research data."
**"Ready for a Pick-Up Later This Year!" by Peter Sellei and Kristofer Liljeberg-Svensson, Carnegie, analyst report, 25 April 2000, p. 1.**

"PHA will expand upon the recently announced GI safety data with a more complete presentation at the Digestive Disease Week Conference May 21-24. This data is expected to show much lower incidence of GI complications than traditional NSAID's, and an FDA filing this quarter could remove the NSAID warning label as soon as late 2000. This occurrence would open the door for more widespread usage at managed care facilities."
**"Celebrex Poised to Bounce; AG Weakness Less Important," ABN AMRO, analyst report, 25 April 2000, p. 2.**

"The 'next big thing' in the Celebrex story should take place around mid-year, when PHA and PFE are expected to submit a supplemental NDA (sNDA) with the results of their outcomes trial (the CLASS trial). Positive results of the trial were recently presented, demonstrating that OA and RA patients taking four times the recommended OA dose of the drug (800 mg/day) experienced fewer symptomatic gastrointestinal ulcers and ulcer complications than patients taking the other two drugs. The objective in submitting these trials to the FDA is to convince the agency to revise the label on Celebrex, which currently includes the standard NSAID warning. Removal, or even significant revision, of this warning would likely have a major positive impact on reimbursement practices and sales of the product."
**"Ag Off to a Slow Start, but 2000 EPS In Tact," by Jami Rubin, Mark Wiltamuth and Nancy Yu, Morgan Stanley Dean Witter, analyst report, 26 April 2000, p. 3.**

"We believe the long-term safety data generated by the CLASS (Celebrex) and VIGOR (Merck's Vioxx) trials will re-accelerate the coxibs' penetration of the NSAID market by removing the NSAID side effects warning label."
**"Ag. Franchise in a Q1 Drought:  Pharma Will Pick Up the Slack," by Ian Sanderson *et al.*, SG Cowen, analyst report, 26 April 2000, p. 3.**

<u>22-23 May 2000:  Presentation of CLASS Results at the Digestive Disease Week Conference and Press Release</u>

54.   On the evening of 22 May 2000, at the Digestive Disease Week conference, Defendants once again presented findings drawn from the CLASS trial data.

55. The next day, Pharmacia and Pfizer issued a joint press release reiterating many of the initially reported findings.

> "Under the real-world conditions of the study, significant decreases in the use of medical resources were shown in the Celebrex group versus the other NSAIDs studied. … This amounted to 25 percent fewer office visits and complex work-ups for patients taking Celebrex."
> **"Findings from Celebrex(R) Safety Study Show Traditional NSAID Comparators Can Cause Serious GI Complications Within First Few Days of Treatment, No Increased Risk of GI Complications Observed for H. Pylori Positive Patients on Celebrex," Pharmacia and Pfizer joint press release, *PR Newswire*, 23 May 2000.**

> "Among non-aspirin users, patients on Celebrex taking four times the recommended dose for OA experienced significantly fewer ulcer complications compared with ibuprofen and diclofenac."
> ***Ibid.***

56. In the press release Defendants labeled aspirin as an "independent risk factor for ulcers" and stated that removing aspirin patients from the analysis "offers a clearer picture" of Celebrex's GI safety profile.

> "Patients who needed aspirin were allowed to participate in this study since a large number of patients with arthritis take low-dose aspirin for cardioprotection, as did one-in-five patients in this study. Excluding aspirin patients from the analysis, however, offers a clearer picture of the impact of Celebrex on GI safety since aspirin is an independent risk factor for GI complications. These patients experienced three-fold fewer (64 percent) ulcer complications, a statistically significant difference from the NSAID comparators. When patients taking aspirin for cardioprotection were added to the analysis, those on Celebrex experienced two-fold fewer ulcer complications versus the traditional NSAID comparators, narrowly missing statistical significance."
> **"Findings from Celebrex(R) Safety Study Show Traditional NSAID Comparators Can Cause Serious GI Complications Within First Few Days of Treatment; No Increased Risk of GI Complications Observed for H. Pylori Positive Patients on Celebrex," Pharmacia and Pfizer joint press release, *PR Newswire*, 23 May 2000.**

57. Investors were still left unaware of the facts described above in paragraph 45.

58. Morgan Stanley analysts reported on the conference presentation. It appears they were under the impression that the data Defendants presented at the conference constituted all of the data generated by the CLASS study.

"The full data from the VIGOR and CLASS clinical outcomes studies were presented this week at the Digestive Disease Week (DDW) conference in San Diego.

Both studies successfully differentiated the long-term GI safety profile of the COX-2 inhibitors, Vioxx and Celebrex, relative to traditional NSAIDs."

**"Positive Clinical Outcomes Studies Presented at DDW," by Jami Rubin, Mark Wiltamuth and Nancy Yu, Morgan Stanley Dean Witter, analyst report, 25 May 2000, p. 1.**

59.   These analysts apparently believed the data confirmed the superior GI safety of Celebrex. They anticipated that the positive study results would be included on the product label, and that submitting the data to the FDA could ultimately result in removal of the GI warning.

"In our opinion, the data presented this week at the Digestive Disease Week conference serve to further validate the COX-2 inhibitors' differentiated safety profile in the GI tract. Both the VIGOR trial for Vioxx and the CLASS trial for Celebrex produced robust data documenting a significant reduction in symptomatic ulcers and ulcer complications relative to commonly prescribed NSAIDs. Though there were some differences in study designs and the results of the trials, neither product emerges as clearly superior to the other, in our opinion. At a minimum, we expect the labels of both products to be augmented to include this exciting new safety data, which should prove valuable in bolstering the marketing messages of both agents. Obviously, the ultimate goal of submitting these data is removal of the GI warning which appears in both products' labels (as well as those of all traditional NSAIDs)."

**"Positive Clinical Outcomes Studies Presented at DDW," by Jami Rubin, Mark Wiltamuth and Nancy Yu, Morgan Stanley Dean Witter, analyst report, 25 May 2000, pp. 5-6.**

60.   Internal Pfizer communications acknowledged that Defendants' representations related to the CLASS results and the GI safety profile of Celebrex had been accepted. In an email referring to the 23 May 2000 press release, Samuel Zwillich wrote:

"They swallowed our story, hook, line and sinker…"

**"CBX-0082360_RE:  Good News on Celebrex," Company email from Samuel H. Zwillich to Mona M. Wahba, dated 23 May 2000, Exhibit-214, [DEFS 00728751] (ellipses in original).**

15

<u>13 September 2000:  *JAMA* Publishes Article Authored by Pharmacia Employees and
Consultants</u>

61.   From the early planning stages, one stated goal of the CLASS study was to "provide a
publication in a high quality journal."[20] Defendants considered that such an article
publicizing the positive GI safety profile of Celebrex would be commercially valuable.[21]

62.   On 13 September 2000, an article about the CLASS study, written by Pharmacia employees
and paid consultants, was published in the *Journal of the American Medical Association*
(*JAMA*).

63.   The article reported clinical results only from the first six months of the study. It
concluded, based only on the 6-month data, that Celebrex was safer than traditional
NSAIDs.

> "**Participants:**  A total of 8059 patients (≥18 years old) with osteoarthritis
> (OA) or rheumatoid arthritis (RA) were enrolled in the study, and 7968
> received at least 1 dose of study drug. A total of 4573 patients (57%)
> received treatment for 6 months.
> …
> **Main Outcome Measures:**  Incidence of prospectively defined
> symptomatic upper GI ulcers and ulcer complications (bleeding,
> perforation, and obstruction) and other adverse effects during the 6-month
> treatment period.
> …
> Time-to-event analyses of upper GI ulcer complications alone or
> combined with symptomatic ulcers were performed based on cumulative
> event rates (symptomatic ulcers and/or ulcer complications) for the
> 6-month study period and are expressed as annualized incidence rates
> (number of events per 100 patient-years of exposure or percentage).
> …
> The incidences of treatment-emergent adverse effects or clinical
> laboratory changes in the different treatment groups during the 6 months
> were compared using the Fisher exact test.
> …
> [O]ur results demonstrate that celecoxib, at a dosage 2- to 4-fold greater
> than the maximum therapeutic dosages and those approved for labeling for
> RA and OA, is associated with a lower rate of upper GI toxic effects

---

[20] "Executive Summary:  Celebra Life Cycle Plan 1998-1999 Budget," 21 June 1998, Exhibit-126, [DEFS
01380798].
[21] *Ibid.*

compared with standard therapeutic dosages of NSAIDs. This finding supports the COX-2 hypothesis that COX-2–specific agents exhibit decreased GI toxic effects."

**"Gastrointestinal Toxicity with Celecoxib vs Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis; the CLASS Study:  A Randomized Controlled Trial," by Fred E. Silverstein, M.D.,** *et al.***,** *Journal of the American Medical Association***, 13 September 2000.**

64.   The *JAMA* article stated that the main outcome measure for the CLASS study was the incidence of, collectively, ulcer complications, symptomatic ulcers, and other adverse effects. The article reported that on this basis Celebrex proved superior to the comparator NSAIDs, statistically significantly so. The article also reported that when the patients taking aspirin were excluded, Celebrex "was associated with a significantly lower incidence of symptomatic ulcers and/or ulcer complications compared with NSAIDs."

65.   The same *JAMA* issue included an editorial written by medical expert M. Michael Wolfe, a gastroenterologist at Boston University. Based on the findings reported in the article, Wolfe commented favorably on the CLASS study and Celebrex as a treatment option. The editorial described CLASS as "a 6-month randomized, double-blind, controlled trial."[22]

66.   On 13 September 2000, the date the publication appeared, Defendants issued a press release drawing attention to the *JAMA* article, the editorial, and the study findings as presented in the *JAMA* article.[23]

67.   Neither the article, nor the editorial, nor the press release made investors aware of the facts described above in paragraph 45.

68.   The press reported on the publication of the *JAMA* article and its finding that Celebrex was found to be safer than traditional NSAIDs.

"For the first time, a major medical study showed that the hot-selling arthritis drug Celebrex is associated with less clinically significant gastrointestinal bleeding and fewer ulcers than are older arthritis drugs."
**"Gastrointestinal Benefit Cited for Celebrex," by Thomas M. Burton,** *Wall Street Journal***, 13 September 2000.**

---

[22] "COX-2-Selective NSAIDs:  New and Improved?" by David R. Lichtenstein and M. Michael Wolfe, *Journal of the American Medical Association*, 13 September 2000, Exhibit-4, [WOLFE 00001].

[23] "JAMA Study Shows Arthritis Medication Causes Fewer Gastrointestinal Problems than Traditional Drugs," Pharmacia, Pfizer, and the University of Illinois at Chicago College of Medicine press release, *PR Newswire,* 12 September 2000.

<u>6-7 February 2001:  FDA Posting of Review Reports and Advisory Committee Meeting</u>

69.   On or about 6 February 2001, prior to a meeting of the FDA's Arthritis Advisory
Committee, the reports written by FDA reviewers that contained and analyzed CLASS data
for the entire study were posted on the FDA's website. The postings included a 22-page
"Statistical Reviewer Briefing Document for the Advisory Committee," a 93-page
"Medical Officer's Gastroenterology Advisory Committee Briefing Document," a 100-
page "Medical Officer Review,"[24] and a 103-page "Sponsor Briefing Document."[25]

70.   While Defendants' earlier press releases, conference call statements, and conference
presentations touted clinical results drawn from only the first six months of the CLASS
study, and the *JAMA* article was similarly restricted to the first six months of the CLASS
study, the FDA committee reviewed the entire approximately 13 months of CLASS data.

71.   Late in the afternoon on 7 February 2001, the Advisory Committee released its conclusion
that based on the full data set there was no significant GI safety advantage between the
traditional NSAIDs and Celebrex. As a result, the Committee did not recommend that the
FDA approve the label change Defendants sought.

> "Scientific studies do not show that Pharmacia Corp.'s blockbuster
> arthritis treatment Celebrex is safer than traditional painkillers, a U.S.
> advisory panel said on Wednesday.
>
> A Food and Drug Administration advisory committee said a study by
> Pharmacia unit Searle did not find that Celebrex caused fewer stomach-
> related side effects than other pain remedies known as NSAIDs, or
> nonsteroidal anti-inflammatory drugs.
>
> 'The consensus of the panel is there is no clinically meaningful safety
> advantage in upper (gastrointestinal) safety,' said acting panel Chairman
> E. Nigel Harris."
> **"No safety edge seen for Pharmacia's Celebrex-panel,"** *Reuters News*, **7 February
> 2001.**

72.   Commentary from the medical community and the financial media continued after the
close of trading on 7 February 2001 and carried over to 8 February 2001.

---

[24] Affidavit of Howard R. Philips, 18 October 2010, Attachments A – C, and "UPDATE 1-Safety of Popular
Arthritis Drugs Under US Review," by Lisa Richwine, *Reuters News*, 6 February 2001.
[25] "CLASS Advisory Committee; Briefing Document," G.D. Searle & Co., dated 7 February 2001.

"'A seemingly magical bullet seems to have self-destructed ... It appears to have been grossly exaggerated and oversold,' said Dr. Sidney Wolfe, head of the Health Research Group at consumer group Public Citizen."
**"Update 2-US Panel Sees No Safety Edge for Celebrex," by Lisa Richwine, *Reuters News*, 7 February 2001.**

"Celebrex shows a benefit in reducing 'symptomatic ulcers' vs other NSAIDs. Overall, Celebrex may be safer than the 'old NSAIDs', but the CLASS trial (at a dose 2-4x normal) did not convince the FDA committee."
**"PHA:  FDA Reviews Celebrex & Vioxx Safety Data," by Mark Striker and George Grofik, Salomon Smith Barney, analyst report, 7 February 2001, p. 1.**

"FDA Panel Rejects Label Change. An FDA Advisory Committee rejected the notion that Celebrex, a COX-2 inhibitor, has a better safety profile NSAIDs. PHA shares sold off (3+%) based on concerns that Celebrex's growth will stagnate without a label change."
**"CLASS Flunks Out," by Mara Goldstein, Steven Gerber, M.D., and Adam Sohn, CIBC, analyst report, 8 February 2001, p. 1.**

73.  The new information provided to the market was complex, voluminous, and irregular in that it ran contrary to prior representations and that its time of release was not scheduled with precision. Consequently, it took some time for the market to process the new information.

74.  With sufficient time, on account of acquiring and processing the reports posted on the FDA website, on account of statements from the FDA Advisory Committee, and facilitated by media reports and analyst commentary, the market learned what had previously been concealed. In particular, the market learned that the entire study results were far less favorable to Celebrex than the publicly reported six-month results, as 6 of the 7 complicated ulcers occurring after the first six months of the CLASS trial were suffered by patients being treated with Celebrex, the reported GI comparisons worsened after six months, and the statistically significant benefit for Celebrex users not taking aspirin that Defendants reported based upon six months of data for complicated ulcers did not hold for the entire study period. The market also learned that Celebrex failed to establish any statistically significant difference with diclofenac on any of the GI endpoints considered,

19

and that diclofenac was actually numerically superior to Celebrex on one of the two co-primary endpoints of the study.[26]

75. From the close of trading on Monday, 5 February 2001, to the close on Thursday, 8 February 2001, the price of Pharmacia stock fell $5.28 per share, from $58.28 to $53.00 per share, a 9.1% decline. As shown below, this is a statistically significant three-day stock price decline. Moreover, the single-day stock price declines on February 7th and 8th were statistically significant individually.

5 August 2001:  *Washington Post* Exposé States Defendants Misled *JAMA* Editors and the Public

76. In a 5 August 2001 article, the *Washington Post* revealed that, at the time Defendants touted the GI safety purportedly demonstrated by the CLASS study, they actually possessed the full set of data indicating that Celebrex held no such advantage after the first six months.

77. M. Michael Wolfe, the gastroenterology expert whose favorable editorial about Celebrex had accompanied the *JAMA* article, was quoted as saying he was "flabbergasted" to learn that the study had lasted a year rather than just six months. While the six-month data appeared to show that Celebrex's GI safety profile was superior, most of the ulcer complications developed by CLASS patients in the latter half of the study were in Celebrex patients, eliminating the purported GI safety advantage.

> "The study – already completed at the time he wrote the editorial – had lasted a year, not six months as he had thought, Wolfe learned. Almost all of the ulcer complications that occurred during the second half of the study were in Celebrex users. When all of the data were considered, most of Celebrex's apparent safety advantage disappeared."
> **"Missing Data on Celebrex; Full Study Altered Picture of Drug," by Susan Okie, *Washington Post*, 5 August 2001.**

78. Dr. Wolfe expressed that he had been misled, and the editor of *JAMA* stated that Defendants' actions had perhaps broken a level of trust.

> "'I am furious. … I wrote the editorial. I looked like a fool,' said Wolfe, a Boston University gastroenterologist. 'But ... all I had available to me was the data presented in the article.'

---

[26] Affidavit of Howard R. Philips, 18 October 2010, Attachments A – C.

*JAMA*'s editor, Catherine D. DeAngelis, said the journal's editors were not informed about the missing data. 'I am disheartened to hear that they had those data at the time that they submitted [the manuscript] to us,' she said. 'We are functioning on a level of trust that was, perhaps, broken.'"
**"Missing Data on Celebrex; Full Study Altered Picture of Drug," by Susan Okie, *Washington Post*, 5 August 2001.**

79.   The *Washington Post* exposé noted that the *JAMA* article, though apparently the result of deception, was commercially valuable to Pharmacia.

"Meanwhile, the JAMA article and editorial have likely contributed to Celebrex's huge sales. 'When the JAMA article comes out and confirms the hype, that probably has more impact than our labeling does,' said Robert J. Temple, director of medical policy at the FDA's Center for Drug Evaluation and Research."
**"Missing Data on Celebrex; Full Study Altered Picture of Drug," by Susan Okie, *Washington Post*, 5 August 2001.**

Post-Class Period:  Confirmation of Deception

80.   On 1 June 2002, after the end of the Class Period, the *British Medical Journal* published an article which, among other things, raised concerns about the conclusions and representations made in the 13 September 2000 *JAMA* article that touted the results of the CLASS study and the GI safety of Celebrex. Moreover, the authors believed that the "misleading" conclusions and "flawed findings" published in *JAMA*, along with the subsequent distribution of the article to physicians, coincided with approximately $500 million of increased sales of Celebrex.

"[T]he flawed findings published in the original article appear to be widely distributed and believed. About 30,000 reprints of CLASS were bought from the publisher (W Bartolotta, personal communication), and a recent search of the Science Citation Index yielded 169 articles citing it, more than 10 times as many citations as for any other article published in the same issue. This wide distribution and citation has coincided with the sales of celecoxib increasing from $2,623m in 2000 to $3,114m in 2001.

Publishing and distributing overoptimistic short term data using post hoc changes to the protocol, while omitting disappointing long term data of two trials, which involved large numbers of volunteers, is misleading."
**"Are Selective COX 2 Inhibitors Superior to Traditional Non Steroidal Anti-Inflammatory Drugs?" by Peter Juni, Anne W S Rutjes, and Paul A Dieppe, *British Medical Journal*, 1 June 2002, 324, 7349, p. 1288.**

81. According to an article titled, "The Credibility Gap in Drug Research," published in *BusinessWeek* on June 24, 2002, *JAMA* deputy editor Drummond Rennie stated that he was misled by Pharmacia executives into publishing incomplete and contradicted results.

> "*The British Medical Journal* says the article was misleading because it omitted data that found no safety benefit for Celebrex. (The additional data were later made public at a Food & Drug Administration advisory committee meeting.)
>
> G. Steven Geis, Pharmacia's vice-president for research, says information was omitted only because it was not reliable. On June 7, however, the FDA decided, using all the data, that the study 'did not show a safety advantage in upper gastrointestinal events for Celebrex.'
> …
> [Drummond Rennie, deputy editor at JAMA] is still rankled, however, by *JAMA*'s publication of the Celebrex study. The study's authors, including Pharmacia, 'were not open with us,' he says. 'They signed letters saying the studies have all the relevant stuff,' but 'they had contradictory results when they sent us this paper, and they should have revealed them to us. And they didn't.'"
> **"The Credibility Gap in Drug Research," by Paul Raeburn, *BusinessWeek*, 24 June 2002.**


## **EFFICIENT MARKET DEFINED**

82. In a March 2011 decision in the case *In DVI, Inc.* No. 08-8033, 2011 U.S. App. LEXIS 6302 (3rd Cir. March 29, 2011) ("*DVI*"), the Third Circuit Court of Appeals ("*DVI* Court") reviewed and affirmed the determination made by the District court that the common stock and senior notes of DVI, Inc. traded in efficient markets.

83. For the definition of an efficient market, the *DVI* Court cited the Supreme Court's *Basic Inc. v. Levinson* 485 U.S. 224 (1988), decision.

> "'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. … Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. …' This hypothesis is known as the efficient capital market hypothesis."
> ***DVI*, 2011 U.S. App. LEXIS 6302, at \*10-\*13 (quoting *Basic*, 485 U.S. at 241-42).**

84. This definition adopted by the *DVI* Court is consistent with the definition generally accepted by the academic finance community.

85. The *DVI* Court upheld the District court's analysis of market efficiency, which relied in large part on the factors identified in *Cammer v. Bloom* 711 F. Supp. 1264 (D.N.J. 1989), a case which is frequently cited as a legal authority for establishing the meaning of market efficiency in securities cases.

> "The District court considered efficiency factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) …"
> **DVI, 2011 U.S. App. LEXIS 6302, \*17 n. 14.**

86. The definition of market efficiency set forth by Judge Alfred J. Lechner, Jr. in the *Cammer* decision in the New Jersey District Court ("*Cammer* Court") is similarly consistent with the definition generally accepted by the academic finance community:

> "As relevant here, courts have permitted a rebuttable presumption of reliance in the case of securities traded in 'efficient markets' (*i.e.*, markets which are so active and followed that material information disclosed by a company is expected to be reflected in the stock price)."
> **Cammer, 711 F. Supp. at 1273 n. 11 (parentheses as in original).**

87. Judge Lechner in the *Cammer* case cited the definitions offered by commentators Alan R. Bromberg and Lewis D. Lowenfels, and by finance professor Eugene Fama:

> "An efficient market is one which rapidly reflects new information in price."
> **Cammer, 711 F. Supp. at 1276 n. 17 (quoting Bromberg and Lowenfels, *Securities Fraud and Commodities Fraud*, §8.6, 1988).**

> "A market in which prices always 'fully reflect' available information is called 'efficient.'"
> **Cammer, 711 F. Supp. at 1280 n. 25 (quoting "Efficient Capital Markets:  A Review of Theory and Empirical Work," by Eugene F. Fama, *Journal of Finance*, 1970).**

88. The definitions are consistent with one another. An efficient market, as defined by the *DVI* Court, the *Cammer* Court, The Supreme Court in *Basic*, Bromberg and Lowenfels, and Fama, is a market in which available information is rapidly incorporated into the prices of securities such that the trading price reflects all available information.

89. Market efficiency is relevant to a securities case as it addresses the question of whether or not false information (be it in the form of an alleged misrepresentation or an omission) would have impacted the prices at which investors bought and sold.

The *Cammer* Factors

90. The *Cammer* opinion lays out five factors that would suggest the market for a security is efficient. As elaborated below, economic rationales support each factor as an indicator of market efficiency. The five factors are:  1) trading volume, 2) coverage by securities analysts, 3) number of market makers, 4) eligibility for S-3 registration, and 5) empirical evidence that the security price reacts to material information. These factors were adopted by the District court in the *DVI* case for evaluating the efficiency of the market for DVI securities. Their use was deemed by the *DVI* Court to be proper:

> "The District court considered efficiency factors set forth in *Cammer v. Bloom*:  (1) the average weekly trading volume; (2) the number of security analysts following and reporting on the security; (3) the extent to which market makers traded the security; (4) the issuer's eligibility to file an SEC registration Form S-3; and (5) the cause-and-effect relationship between material disclosures and changes in the security's price."
> **DVI, 2011 U.S. App. LEXIS 6302, at * 21 n. 14 (internal citations omitted).**

> "We have noted the *Cammer* factors may be instructive depending on the circumstances. Many of our sister circuits have also approved of their use."
> **DVI, 2011 U.S. App. LEXIS 6302, at *24 n. 16.**

91. Empirical research has confirmed that volume, number of market makers, and analyst coverage are indicative of market efficiency:

> "Consistent with the efficiency indicators used recently by the courts, the inefficient firms have lower mean trading volume, fewer market makers, lower analyst following, and lower institutional ownership (number and percentage) than efficient firms."
> **"The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," by Brad M. Barber, Paul A. Griffin, and Baruch Lev, *Journal of Corporation Law*, 1994, p. 302.**

92. Barber, Griffin, and Lev [1994] did not test S-3 registration eligibility as an indicator of market efficiency, but it is noteworthy that the S-3 eligibility criteria include a minimum

market capitalization requirement, and large firm size is correlated with high institutional ownership, a factor which Barber, *et al.* did find to be indicative of market efficiency. With respect to the empirical factor, Barber, *et al.* used empirical tests as the standard for market efficiency by which to judge the significance of the other variables. Consequently, they acknowledge the importance of the empirical factor.

93.   Consistent with financial economic theory and empirical research, the language used by the *Cammer* Court describes the factors not as five **necessary** factors, but rather as indicative of the degree to which the security market is expected to be efficient:

> "There are several different characteristics pertaining to the markets for individual stocks which are probative of the degree to which the purchase price of a stock should reflect material company disclosures."
> ***Cammer*, 711 F. Supp. at 1283.**

94.   In fact, the way the five factors are described in the *Cammer* opinion suggests that these five conditions are more akin to sufficient conditions individually, rather than necessary conditions collectively – again, consistent with economic theory. The *Cammer* opinion describes the nature of the five factors as follows:

> "There are several types of facts which, if alleged, might give rise to an inference that Coated Sales traded in an efficient market. It is useful to set forth an explanation of how the existence of such facts would cause the understanding that disclosed company information (or misinformation) would be reflected in the company's stock price, the underpinning of the fraud on the market theory. *Peil, supra,* 806 F.2d at 1160."
> ***Cammer*, 711 F. Supp. at 1285-86 (footnote omitted).**

> "First, plaintiffs could have alleged there existed an average weekly trading volume during the class period in excess of a certain number of shares."
> ***Cammer*, 711 F. Supp. at 1286.**

> "Second, it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period."
> ***Cammer*, 711 F. Supp. at 1286.**

> "Third, it could be alleged the stock had numerous market makers."
> ***Cammer*, 711 F. Supp. at 1286.**

"Fourth, as discussed, it would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings …"
**Cammer, 711 F. Supp. at 1287.**

"Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."
**Cammer, 711 F. Supp. at 1287.**

"As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate over time, a cause and effect relationship between company disclosures and resulting movements in stock price."
**Cammer, 711 F. Supp. at 1291.**

The *Krogman* Factors

95.   In addition to the five *Cammer* factors that indicate market efficiency, the court in *DVI* also examined two factors set forth by the District court in *Krogman v. Sterritt* 202 F.R.D. 467 (N.D. Tex. 2001):  1) the company's market capitalization, and 2) the stock's float:

"In analyzing DVI's common stock, the court also examined two factors set forth in *Krogman v. Sterritt*, (1) the company's market capitalization; and (2) the size of the public float for the security."
**DVI, 2011 U.S. App. LEXIS 6302, \*24 n. 14 (internal citations omitted).**

96.   Market capitalization, the total value of all outstanding shares, equals the number of shares outstanding times the price per share. Reasonably, the larger the market capitalization, the more prominent and well known the company will be. Larger companies tend to attract wider analyst and news media coverage, and gain the attention of greater numbers of investors, including very large institutional investors. All of these characteristics, which accompany a large market capitalization, promote market efficiency.

97.   The stock's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities.[27] It is generally the number of shares available for trading by outside investors in the open market. Of course, float is highly correlated with market capitalization, but it focuses on the shares available for trading rather than all shares

---

[27] For a discussion of the generally accepted definitions of shares outstanding and float, see *Float Adjustment Methodology*, Standard & Poor's, August 2006.

outstanding. Stocks with large levels of float tend to trade more actively, attract more analyst and news media coverage, and garner the attention of greater numbers of investors, including large institutional investors. All of these characteristics, which accompany a high float level, promote market efficiency.

98.   The District court in *Krogman*, and subsequently the Court of Appeals for the Fifth Circuit in *Unger v. Amedisys Inc.*, 401 F.3d 316 (5th Cir. 2005), evaluated one additional factor considered to be indicative of market efficiency, the typical bid-ask spread.

99.   The bid-ask spread is the difference between the price at which market makers are offering to buy a security and the price at which they are offering the security for sale. For a security that is actively traded and for which information is readily available, the bid-ask spread will tend to be narrow. Moreover, a narrow bid-ask spread makes trading in the security less costly for investors, and thereby tends to attract greater interest, greater coverage, and greater volume. These conditions, in turn, are generally considered to promote market efficiency.

## EFFICIENCY OF THE MARKET FOR PHARMACIA COMMON STOCK

100.   To assess whether or not the market for Pharmacia common stock was an efficient market, I analyzed the market and behavior of Pharmacia common stock, focusing on factors that are generally accepted to be indicative of market efficiency for a publicly traded security. These include the five *Cammer* factors and the three *Krogman* factors.

## Trading Volume

101.   Throughout the Class Period, Pharmacia's common stock traded regularly and actively. On average, 4.6 million shares changed hands daily.[28] On one day alone, 16 July 2001, over 13.3 million shares traded.

102.   In addition to average daily trading volume, another volume metric to consider in determining market efficiency is the percentage of outstanding shares that turn over each week. During the Class Period, the average weekly trading volume was 1.8% of shares

---

[28] Financial data provided by CRSP.

outstanding.[29] This level of trading activity exceeds levels accepted by courts as being indicative of market efficiency for common stocks.[30] In the case of the common stock of Coated Sales, Inc., the *Cammer* Court cited the conclusion of Alan R. Bromberg and Lewis D. Lowenfels that "weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[31] Trading volume for Pharmacia common stock during the Class Period was well above the threshold for a substantial presumption of its market efficiency, and closer to the 2% threshold for a strong presumption.

103.  Both in terms of average daily trading volume and on the basis of the percentage of outstanding shares traded weekly, the market for Pharmacia common stock was very active. Consistent with the *Cammer* opinion and economic theory, the active trading volume in Pharmacia's common stock evinces the efficiency of the market for Pharmacia common stock over the course of the Class Period.

**Analyst Coverage and Other Avenues of Information Dissemination**

Analyst Coverage

104.  Securities analysts disseminate and interpret information about the companies they cover. Conducting research and providing valuation opinions, they help market participants acquire relevant information and understand its implications for valuation and investment decisions. Consequently, securities analysts facilitate the flow of information and the digestion of information within the marketplace. These functions promote market efficiency.

105.  Pharmacia was the subject of broad analyst coverage during the Class Period. The Thomson Research database provides access to analyst reports on Pharmacia published by 18 different firms during the Class Period:  ABN AMRO; Argus Research; Bear Stearns; Carnegie Group; CIBC; Credit Suisse First Boston; Deutsche Bank Securities; DLJ; ING Barings; Morgan Stanley; Paine Webber; PNC Advisors; Prudential; Raymond James; Robertson Stephens; SG Cowen; Solomon Smith Barney; and UBS Warburg.

---

[29] Estimated by dividing the average daily volume by the average number of shares outstanding, times 5 (the number of trading days in a typical week).
[30] *Cammer*, 711 F. Supp. at 1286.
[31] *Cammer*, 711 F. Supp. at 1293 (internal citation omitted).

106. The Company's conference call transcripts for 25 April 2000, 25 July 2000, 30 October 2000, 12 February 2001, 25 April 2001, and 25 July 2001 show an additional 10 firms that were covering Pharmacia:  Alliance Capital; Bank of America; BT Alex.Brown; Brown Brothers; Capital Research; Goldman Sachs; JP Morgan; Lincoln Capital; Merrill Lynch; and Oppenheimer.

107. Consequently, at least 28 firms covered Pharmacia during the Class Period.

108. Consistent with the *Cammer* opinion and financial economic principles, the widespread analyst coverage of Pharmacia is evidence of the efficiency of the market for Pharmacia's common stock during the Class Period.

Institutional Ownership and Buy-Side Analysis

109. Large investment firms generally employ financial analysts who conduct internal research on the stocks they buy. This internal research augments the more broadly disseminated research produced by investment banks and brokers. Consequently, institutional ownership of a company's stock indicates greater analyst coverage.

110. Moreover, published empirical research has established that high levels of institutional ownership are another indicator of market efficiency:

> "Stocks with greater institutional ownership are priced more efficiently, and we show that variation in liquidity does not drive this result.
> …
> We find that greater institutional holdings are associated with improved efficiency, and this result is robust across different measures of efficiency, different econometric specifications, and a variety of controls. … Overall, our findings imply that the presence of institutional investors improves the information environment of a firm."
> **"Institutional Investors and the Informational Efficiency of Prices," by Ekkehart Boehmer and Eric K. Kelley, *The Review of Financial Studies*, 2009, pp. 3563, 3592.**

111. Vickers Stock Research Corporation ("Vickers") provides data on institutional ownership of Pharmacia common stock. The data are compiled from the 13-F filings that major investment institutions are required to submit to the SEC. Major institutions are defined as firms or individuals that exercise investment discretion over the assets of others in excess of $100 million. Large investment firms generally employ financial analysts who conduct

their own research on the stocks they buy. According to the Vickers data, at least 1,573 major institutions owned Pharmacia common stock during the Class Period.[32]

News Coverage and Other Information Dissemination Vehicles

112.  The news media also facilitate the flow of material information to the marketplace thereby promoting market efficiency. In the case of Pharmacia, coverage by the news media was extensive. A search of the Factiva database established that at least 2,770 articles about the Company were published during the 476-day Class Period.[33]

113.  The articles obtained from Factiva include published news articles and press releases. Information also emerged throughout the Class Period in the form of SEC filings, conference calls, and Company presentations. Therefore, during the Class Period, information about Pharmacia was readily available to market participants as there was a consistent flow of news issuing from news media, analysts, and various other sources.

114.  Pharmacia was not an obscure company, escaping the notice of the news media, analysts, and investors. Rather, Pharmacia was large, well known, widely covered, and widely held. These facts strongly support a finding that the market for Pharmacia common stock was an efficient market during the Class Period.


**Market Makers and Listing on the New York Stock Exchange**

115.  The number of market makers is one of the factors the *Cammer* Court determined indicates market efficiency. The subject company of the lawsuit in the *Cammer* case, Coated Sales, Inc., was listed on the NASDAQ, an electronic stock exchange that makes use of multiple competing market makers. Market makers are financial intermediaries who trade in a particular security, standing ready to buy and sell with investors and institutions. Consequently, for a NASDAQ-listed stock, a large number of market makers implies that many market participants are trading that particular stock. It further implies a high degree of liquidity. With a large number of market makers it is generally easy for investors to execute trades in a timely fashion and with reasonable transaction costs.

---

[32] At least 1,573 institutional investors held Pharmacia common stock according to filings that reported holdings as of 30 June 2000, 30 September 2000, 31 December 2000, 31 March 2001, and 30 June 2001. Additional institutions may have held Pharmacia common stock during the Class Period, though not on these quarterly reporting dates.
[33] Based on a Factiva search of "All Sources" for articles published during the Class Period where "Pharmacia Corporation" was the "Company" search field parameter.

116. The *Cammer* Court's understanding that the market-making infrastructure of a stock market is indicative of its efficiency, or lack thereof, makes the fact that Pharmacia common stock traded on the venerable New York Stock Exchange highly relevant.

117. The NYSE is one of the most renowned, most liquid, and most efficient forums for trading stocks in the world. Stocks on the NYSE are traded under the supervision of a lead market maker known as a "specialist." Specialists are responsible for maintaining a fair and orderly market for each security to which they are assigned.[34]

118. In fact, citing Bromberg and Lowenfels, the *Cammer* Court explicitly acknowledged the importance of an NYSE listing and the implications of such a listing on market efficiency.

> "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there:  the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."
> **Cammer, 711 F. Supp. at 1292 (quoting Bromberg and Lowenfels, *Securities Fraud and Commodities Fraud*, §8.6, 1988).**

119. The *DVI* Court concurred that a listing on the New York Stock Exchange generally indicates market efficiency.

> "Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."
> **DVI, 2011 U.S. App. LEXIS 6302, at *23.**

120. While specialists are the most important market makers for NYSE stocks, they are not the only market makers. Generally, numerous brokers and dealers also make markets in NYSE-listed stocks, and the exchange specialist facilitates their market making activity.

121. The fact that it traded on the NYSE is strong evidence that Pharmacia common stock traded in an efficient market. Pharmacia's listing on the NYSE gave its stock access to a highly developed network of brokers and dealers and the oversight of an NYSE-designated specialist. These facts are important evidence of the efficiency of the market for Pharmacia stock.

---

[34] "Organization and Functioning of Securities Markets," by Frank Reilly and Keith Brown, in *Equity and Fixed Income CFA Program Curriculum*, vol. 5, Pearson Custom Publishing, 2008.

**S-3 Registration Eligibility**

122. The *Cammer* opinion noted that S-3 registration is indicative of market efficiency because a company is entitled to S-3 registration when, among other things, it has filed Exchange Act reports for a specified length of time and has outstanding float above a certain value. At the time of the *Cammer* opinion, the conditions for S-3 registration were that a company filed financial reports with the SEC for 36 months and had outstanding float over $150 million held by non-affiliates, or $100 million of float coupled with annual trading volume exceeding 3 million shares. The *Cammer* court noted that the filing requirement ensured that financial data were available to market participants, and the size and volume requirements indicated that many market participants would have examined the information.

> "Proposed Form S-3 recognizes the applicability of the efficient market theory to the registration statement framework with respect to those registrants which usually provide high quality corporate reports, including Exchange Act reports, and whose corporate information is broadly disseminated, because such companies are widely followed by professional analysts and investors in the market place. Because of the foregoing observations made by the SEC, the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient."
> *Cammer*, **711 F. Supp. at 1284-85 (internal citation omitted).**

> "The 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed document."
> *Cammer*, **711 F. Supp. at 1285.**

> "Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."
> *Cammer*, **711 F. Supp. at 1287.**

123. The rules as of today grant S-3 eligibility to companies that have at least 12 months of filings and $75 million of float.[35]

---

[35] "Eligibility of Smaller Companies to Use Form S-3 or F-3 for Primary Securities Offerings," by the U.S. Securities and Exchange Commission, 28 January 2008.

Float

124. A company's float is the number or value of shares that can potentially trade freely in the marketplace. It is generally defined as the number or value of outstanding shares, minus insider holdings and shares owned by affiliated corporate entities.

125. I computed Pharmacia's common stock float from share data reported in Pharmacia's SEC filings and stock price data provided by CRSP.[36]

126. Pharmacia common stock float averaged $68.2 billion during the Class Period, far exceeding the level required for S-3 registration. The Company's float ranged between $78.4 billion and $54.4 billion during the Class Period. Even at its minimum, Pharmacia's common stock float was well over the threshold for S-3 registration under both the current rules and the more stringent original rules applicable at the time of the *Cammer* opinion.

Reporting

127. While Pharmacia, in its merged incarnation, was created just prior to the Class Period, both Old Monsanto and PNU, its constituent entities, had been filing financial reports with the SEC for a sufficient number of years prior to the Class Period to satisfy the S-3 requirement. Post-merger, Pharmacia remained current with SEC filings. Consequently, many years of past financial data on the Company's components were available to investors throughout the Class Period.

128. That Pharmacia satisfied the reporting requirement throughout the Class Period is evident in the Form S-3A the Company filed on 2 November 2000 to amend its Form S-3, filed on 20 September 2000. In the amendment, Pharmacia cited and incorporated by reference its Form 10-K for the year ended 31 December 1999, filed on 20 March 2000, as well as quarterly reports on Form 10-Q/A for the quarters ended 31 March 1999 through 30 September 1999. [37] In the same S-3A filing, the Company cited and incorporated by reference three years of audited Monsanto financial statements.

> "The financial statements of Monsanto Company (subsequently renamed
> Pharmacia Corporation) as of December 31, 1999 and 1998, and for each

---

[36] According to Proxy Statements filed 22 May 2000 and 16 March 2001, insiders held 4,609,723 and 2,202,778 shares as of 4 May 2000 and 5 March 2001, respectively. For the first 12 days of the Class Period, I used the 4,609,723 shares reportedly held as of 4 May 2000 as the approximate number of shares held by insiders after the merger.

[37] Pharmacia Corporation Form S-3A, filed 2 November 2000, pp. 14-15.

of the three years in the period ended December 31, 1999, incorporated by reference in this prospectus/registration statement have been audited by Deloitte & Touche LLP, independent auditors, as stated in their report which is incorporated herein by reference, and have been so incorporated by reference in reliance upon the report of such firm given upon their authority as experts in accounting and auditing."
**Pharmacia Corporation Form S-3A, filed 2 November 2000, pp. 13-14.**

Eligibility

129.  Not only was Pharmacia eligible to undertake S-3 registration during the Class Period, it did file a Form S-3 registration on 20 September 2000 followed by a Form S-3A on 2 November 2000.[38]

130.  Consistent with the *Cammer* opinion, Pharmacia's eligibility to file an S-3 registration is evidence of the efficiency of the market for Pharmacia common stock during the Class Period.

### ***Krogman* Factors**

131.  In addition to the five *Cammer* factors that indicate market efficiency, I also examined Pharmacia stock and its market with respect to the three additional *Krogman* factors.

Market Capitalization

132.  During the Class Period, Pharmacia's market capitalization averaged over $68.4 billion.

133.  The Ibbotson *Stocks, Bonds, Bills & Inflation* (*SBBI*) publications present annual statistics that rank the size of all public companies by market capitalization. Ibbotson groups public companies into deciles, so that the 1st decile contains the largest 10% of all public companies listed on the NYSE, American Stock Exchange, and NASDAQ, while the 10th decile contains the smallest 10%.

134.  Pharmacia's average market capitalization of $68.4 billion ranked in the 1st decile relative to all other publicly-traded companies in 2000 and 2001. This position means that

---

[38] Pharmacia Corporation Form S-3, filed 20 September 2000; Pharmacia Corporation Form S-3A, filed 2 November 2000.

Pharmacia's market capitalization was larger than the market capitalizations of more than 90% of all other publicly-traded companies in the United States. [39]

135. Consistent with the *Krogman* Court opinion, Pharmacia's large average market capitalization is further evidence of the efficiency of the market for Pharmacia stock.

Outstanding Float Ratio

136. The magnitude of Pharmacia's float, as discussed above in relation to the S-3 eligibility factor, is likewise indicative of market efficiency.

137. For Pharmacia, the number of insider shares was a relatively small percentage of all outstanding shares. The maximum number of insider shares over the course of the Class Period divided by the minimum number of shares outstanding is 0.37%. This ratio implies that Pharmacia's float comprised nearly all its outstanding shares throughout the Class Period.

138. The *Krogman* opinion cited a high ratio of float to outstanding shares as an indicator of market efficiency. With respect to this measure, Pharmacia clearly exhibited market efficiency.

Bid-Ask Spread

139. From CRSP I obtained daily closing bid and ask quotes for Pharmacia stock.

140. I measured the percentage bid-ask spread as the difference between the ask and bid quotes, divided by the average of the bid and ask quotes, which is the standard way of measuring percentage bid-ask spreads in the finance literature. Exhibit-5 presents Pharmacia's bid-ask spread data.

141. The average bid-ask spread for Pharmacia stock over the course of the Class Period was 1.17%.

142. By comparison, the average month-end bid-ask spread over the course of the Class Period for all stocks in the CRSP database was 3.93%. Therefore, Pharmacia's average bid-ask spread was narrower than the mean level among all other CRSP stocks, which comprised stocks traded on the NYSE, Amex, NASDAQ, and NYSE Arca.

---

[39] *Ibbotson 2000 Stocks, Bonds, Bills & Inflation (SBBI) 2000 Yearbook,* Ibbotson Associates, 2000, and *Ibbotson 2001 Stocks, Bonds, Bills & Inflation (SBBI) 2001 Yearbook,* Ibbotson Associates, 2001.

143. On only one day (20 April 2001) out of the Class Period's 328 trading days was Pharmacia's bid-ask spread wider than the 3.93% average for all other CRSP stocks. Even then, at 3.98%, Pharmacia's bid-ask spread was only marginally higher than the average among other CRSP stocks. Moreover, Pharmacia's trading volume on that day was 7.48 million shares, indicating that the slightly higher bid-ask spread did not impede active trading.

144. The bid-ask spread in the market for Pharmacia stock over the course of the Class Period was lower than the typical bid-ask spreads exhibited by other publicly-traded stocks. Pharmacia's narrow bid-ask spreads support a conclusion of market efficiency.

## EMPIRICAL EVIDENCE OF PHARMACIA COMMON STOCK MARKET EFFICIENCY

### Special Importance of the Empirical Factor

145. Of the five *Cammer* factors, the empirical factor was cited by the *Cammer* Court as "one of the most convincing ways to demonstrate efficiency":

> "As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price."
> **Cammer, 711 F. Supp. at p. 1291.**

146. The *DVI* Court agreed with the importance of the empirical factor:

> "However, because an efficient market is one in which 'information important to reasonable investors ... is immediately incorporated into stock prices,' the cause-and-effect relationship between a company's material disclosures and the security price is normally the most important factor in an efficiency analysis."
> **DVI, 2011 U.S. App. LEXIS 6302, at \*24 (internal citation omitted).**

147. The special weight the *Cammer* and *DVI* Courts accorded the empirical factor is justified by economic principles, for the empirical factor focuses on the essence of market efficiency whereas the other factors are indicators that generally signal market efficiency.

**Event Study Analysis**

148. In order to investigate the empirical efficiency of the market for Pharmacia common stock, I conducted an event study. An event study examines whether a security price reacts appropriately to the release of new information. An appropriate and significant cause and effect relationship between the release of new material information and stock price movements demonstrates market efficiency.

149. The event study is the paramount tool for testing market efficiency, as Eugene Fama attests:

> "The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies give a clear picture of the speed of adjustment of prices to information."
> **"Efficient Capital Markets:  II," by Eugene F. Fama, *Journal of Finance*, 1991, p. 1607.**

150. Event study analysis is one of the most commonly used analytic methodologies employed by finance researchers. MacKinlay [1997] presents an excellent description and examples of the methodology and writes about how it is generally accepted and widely used in academic research.[40] Tabak and Dunbar [2001] write about how the methodology is generally accepted and widely used in forensic applications.[41]

151. An event study measures how much a stock price rises or falls in response to new information. It first determines how much of a stock price change cannot be explained by market and sector factors. The portion of a stock price change that cannot be attributable to market and sector factors is called the residual stock price movement or "residual return." The event study isolates the residual return and also tests whether or not the residual return can reasonably be explained as merely a random fluctuation.

152. If the stock return is deemed statistically significant, it means that the stock price movement cannot be attributed to market and sector factors, or to random volatility, but rather was likely caused by company-specific information. Such proof of a cause and effect

---

[40] "Event Studies in Economics and Finance," A. Craig MacKinlay, *Journal of Economic Literature*, March 1997.
[41] "Materiality and Magnitude:  Event Studies in the Courtroom," by David Tabak and Frederick Dunbar, in *Litigation Services Handbook*, 3rd edition, John Wiley & Sons, New York, 2001.

relationship between new material information and the reaction in the stock price establishes market efficiency.

<u>Event Selection Criterion</u>

153. Not only did the *DVI* Court single out the empirical factor as most important, but it also recognized the special importance of the disclosure events:

> "[T]he cause-and-effect relationship between a company's material disclosures and the security price is normally the most important factor in an efficiency analysis."
> **DVI, 2011 U.S. App. LEXIS 6302, at \*24.**

154. The *Cammer* Court also recognized the special importance of the disclosures and the specific information allegedly misrepresented or omitted that is the subject of the litigation:

> "The central question under the fraud on the market theory is whether the stock price, *at the time a plaintiff effected a trade*, reflected the 'misinformation' alleged to have been disseminated."
> **Cammer, 711 F. Supp. at 1282 (emphasis in original).**

> "As previously noted, one of the most convincing ways to demonstrate efficiency would be to illustrate over time, a cause and effect relationship between company *disclosures* and resulting movements in stock price."
> **Cammer Opinion, 711 F. Supp. at p. 1291 (emphasis added).**

155. Consequently, the empirical behavior of Pharmacia common stock following the curative disclosures warrants focus in the event study testing the efficiency of the market for Pharmacia stock.

156. Forensic financial analysts David Tabak and Frederick Dunbar concur that disclosure events are reasonable choices for the focus of the event study:

> "Many texts discuss how to perform an event study. While there are some differences in exposition, there is a uniform agreement in the literature on the necessary steps and general procedures to be followed. First, one must identify the event or events to be studied. In securities fraud cases, the events of interest usually include all the alleged disclosures of fraud and/or the dates when fraudulent statements were made."
> **"Materiality and Magnitude:  Event Studies in the Courtroom," by David Tabak and Frederick Dunbar, in *Litigation Services Handbook*, 3rd ed., John Wiley & Sons, New York, 2001, p. 7.**

157. Though Tabak and Dunbar suggest that either disclosures or misrepresentations can be selected as events for testing market efficiency, I elected to test the disclosure events. Disclosures, by their nature, generally entail the release of new information that changes the market's understanding of material facts, and therefore could reasonably be expected to move the security price. Misrepresentations, on the other hand, are often omissions or announcements that conceal adverse developments. As such, misrepresentations may introduce or maintain artificial inflation by preventing a security price from falling rather than causing the price to rise significantly. Consistent with this analysis, courts have accepted a focus on disclosure events:

> "Given the common-law roots of the securities fraud action (and the common-law requirement that a plaintiff show actual damages), it is not surprising that other Courts of Appeals have rejected the Ninth Circuit's 'inflated purchase price' approach to proving causation and loss. See, *e.g.*, *Emergent Capital*, 343 F.3d, at 198 (inflation of purchase price alone cannot satisfy loss causation); *Semerenko*, 223 F.3d, at 185 (same); *Robbins*, 116 F.3d, at 1448 (same); cf. *Bastian*, 892 F.2d, at 685. Indeed, the Restatement of Torts, in setting forth the judicial consensus, says that a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts ... become generally known' and 'as a result' share value 'depreciate[s].' § 548A, Comment *b*, at 107."
> **Dura Pharms. Inc. v Broudo, 544 U.S. 336, 344, 125 S. Ct. 1627 (2005).**

> "And, of course, the materiality of the alleged misrepresentations is self-evident when we look at the market's negative reaction – to the tune of a nine-percent drop in stock price in three days – when defendants' analysis of the CLASS study was questioned in February 2001."
> **Alaska Electrical Pension Fund v. Pharmacia Corp., 554 F.3d 342, 352 (3rd Cir. 2009).**

<u>Disclosure Events</u>

158. I reviewed the Complaint, the Third Circuit Opinion, and a wide variety of information sources, including news articles, press releases, FDA reviewer reports, equity analyst reports, and SEC filings to determine when corrective information related to the alleged misrepresentations and omissions was disseminated. The following is a list of the event dates selected using this criterion:

    i.   6-8 February 2001 – The FDA posted its reviews of the CLASS study results on the FDA website. According to the FDA Advisory Committee, the full CLASS trial did not show Celebrex to have a "meaningful safety advantage" over ibuprofen or diclofenac. The FDA panel consequently did not recommend any change to the GI warning on the Celebrex label.

   ii.   6-8 August 2001 – The *Washington Post* reported on Sunday, 5 August 2001, that the CLASS results presented in the *JAMA* article were drawn from only six months of data, whereas the CLASS study had produced more than a year of data. The article indicated that the misrepresentations and omissions related to the CLASS study may have been committed fraudulently.

<u>Length of Event Window</u>

159.  The finance literature acknowledges that the market requires different amounts of time to process different types of information. When the timing of the information delivery is expected and when the type of information conforms to what is commonly analyzed, the processing tends to be quicker.

160.  The Patell and Wolfson [1984] study is often cited as an authoritative examination of the normal speed of price adjustments for publicly traded stocks.[42] Patell and Wolfson focused their study on large companies that were actively traded and closely watched, representing firms whose markets are most likely efficient. They examined price reactions to earnings and dividend announcements.

> "We should emphasize that our sample firms are large, actively traded, and closely watched."
> **"The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," by James M. Patell and Mark A. Wolfson, *Journal of Financial Economics*, 1984, p. 250.**

> "This paper examines the effects of earnings and dividend announcements on the intraday behavior of stock prices."
> ***Ibid.*, p. 223.**

---

[42] "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," by James M. Patell and Mark A. Wolfson, *Journal of Financial Economics*, 1984.

161. Nonetheless, Patell and Wolfson found reactions to earnings announcements often persisted into the second day following the announcement event. They noted that for less regular news, the price adjustment interval could be "significantly longer."

> "However, for the earnings announcements we also find significantly elevated returns during the overnight period following the release and at the opening of trading on the next day."
> **"The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," by James M. Patell and Mark A. Wolfson, *Journal of Financial Economics*, 1984, p. 224.**

> "The evening following the announcement provides an opportunity for news to be disseminated to investors who are unable to execute intraday trading strategies, and their actions may affect the overnight price change and the opening trades of the next day."
> ***Ibid*., p. 235.**

> "It is possible that the adjustment intervals would be significantly longer for smaller firms, or for other, less regular announcements made by our sample firms."
> ***Ibid.*, p. 250.**

162. Earnings announcements are generally scheduled and are therefore expected. The core information such announcements deliver – earnings, revenues, and outlook – is of the type that analysts anticipate, are accustomed to receiving, and generally focus upon. Because it meets the timing and type criteria, earnings information is of the sort that would be processed by the market most rapidly. Patell and Wolfson stated that less regular announcements could take longer.

163. Unlike typical earnings announcements, the reports and analyses of the CLASS study comprised voluminous and complex scientific, medical, and statistical information. Company documents acknowledge this fact:

> "The Advisory Board seemed to experience difficulty in analyzing and providing their advice on these large complex trials."
> **"FW:  FDA Advisory Board Meetings on Celebrex and Vioxx, Feb. 7th and 8th," email from Alicia Byer, 14 February 2001, Exhibit-316 at [DEFS 03101711].**

"Due to the complexity of the CLASS data, the advisory panel on day one (February 7) experienced difficulty interpreting the results."
**"Q&A:  FDA Advisory Committee Hearing on Proposed GI Safety Label Revisions for Celebrex®," dated 9 February 2001, Exhibit-262 at [DEFS 00754326].**

"This was an extremely rigorous and complex trial, which made it difficult for the committee to analyze."
**"Pharmacia/Pfizer Inc Statement on the FDA Arthritis Advisory Committee Meeting," dated 7 February 2001, Exhibit-314 at [DEFS 03101545].**

164.  The Circuit Court in this case likewise noted that the CLASS data at the center of the present case were highly complex and voluminous.

"But the staff reports span over 250 pages of highly complex scientific and statistical analysis."
***Pharmacia*, 554 F.3d at 349 (internal citations omitted).**

165.  Not only were the disclosure events in this case complex, but their timing was irregular. Neither the posting of the FDA briefing reports on the agency's website, nor the publication of the *Washington Post* exposé, conformed to a preannounced schedule.

166.  Consistent with Patell and Wolfson's conclusions, therefore, the complex and irregularly timed disclosure events in the present case should take the market longer to process than typical earnings announcements. Accordingly, the price reaction would be more protracted.

167.  Patell and Wolfson noted that some of the price adjustment interval is attributable to the time it takes for the news to be disseminated.[43] The *Cammer* and *DVI* Courts acknowledged that analyst coverage facilitates market efficiency. It follows logically that when analysts require more time to analyze a particular release of information, perhaps because it is complex or unexpected, the efficient market price response will also require additional time.

168.  In fact, in this case, several analyst reports that facilitated the processing and dissemination of the new information about Celebrex that was released on 6 February 2001 and 7 February 2001 were published on 8 February 2001. The time required for analysts to digest

---

[43] Patell and Wolfson stated, "the evening following the announcement provides an opportunity for news to be disseminated to investors who are unable to execute intraday trading strategies, and their actions may affect the overnight price change and the opening trades of the next day." "The Intraday Speed of Adjustment of Stock Prices To Earnings and Dividend Announcements," by James M. Patell and Mark A. Wolfson, *Journal of Financial Economics*, 1984, p. 235.

the new information speaks to the complexity and volume of the information. Moreover, the time required by analysts to write and distribute their reports extended the time it took the market to fully comprehend the import of the new information.

169.  The *DVI* Court recognized that an efficient market does not necessarily require that market participants be able to fully process complex information instantaneously. The *DVI* Court held:

> "We have addressed the speed with which information is incorporated into market price and explained that because a perfectly efficient market is not attainable, we do not require that public information be absorbed 'instantaneously.' Applying this standard, we have held that a market is inefficient when a price does not decrease within four days following an alleged corrective disclosure."
> **DVI, 2011 U.S. App. LEXIS 6302, at \*27 (internal citations omitted).**

> "That some information took two days to affect the price does not undermine a finding of efficiency."
> **DVI, 2011 U.S. App. LEXIS 6302, at \*28.**

170.  The position of the *DVI* Court is consistent with the academic and professional finance literature explaining that event windows should not necessarily be limited to a single day, but rather, as circumstances dictate, may extend to multiple days.

> "In securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement."
> **"Materiality and Magnitude:  Event Studies in the Courtroom," David I. Tabak and Frederick C. Dunbar in *Litigation Services Handbook, The Role of the Financial Expert*, 3rd ed., edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons, Inc., 2001, p. 19.4.**

> "The initial task of conducting an event study is to define the event of interest and identify the period over which the security prices of the firms involved in this event will be examined – the event window. For example, if one is looking at the information content of an earnings with daily data, the event will be the earnings announcement and the event window will include the one day of the announcement. It is customary to define the event window to be larger than the specific period of interest. This permits

43

> examination of periods surrounding the event. In practice, the period of
> interest is often expanded to multiple days, including at least the day of the
> announcement and the day after the announcement."
> **"Event Studies in Economics and Finance," A. Craig MacKinlay,** *Journal of*
> *Economic Literature***, March 1997, pp. 14-15.**

171. Recognizing that stock price reactions may persist beyond the first or even second day following an event, published empirical studies commonly examine event windows longer than one day and run "cumulative event studies" on the multiday windows. There are many examples of such event studies in the academic literature. In fact, one of the very first published event studies, conducted by recognized leaders in academic finance, was a cumulative event study. "The Adjustment of Stock Prices to New Information," by Eugene Fama, Lawrence Fisher, Michael Jensen, and Richard Roll, which appeared in the *International Economic Review* in 1969, examined the reaction of stock prices to stock splits. These researchers ran a cumulative event study that aggregated stock price reactions over time and across different companies.

172. The seminal Fama, Fisher, Jensen, and Roll [1969] article spawned a great many academic studies using their cumulative event study methodology. These publications are well represented and respected in the scholarly literature.

173. In a survey of academic studies, Robert Bruner looked at numerous publications that utilized the cumulative event study methodology. Of the 21 articles he reviewed, 16 used event windows of five days or longer.[44]

174. In a cumulative event study, the threshold for statistical significance rises as the length of the event window is increased. Therefore, the price reaction necessary to prove significance for a multiday event window is considerably higher than for a one-day event window.

175. Given the facts and circumstances of the disclosure events at issue in this case, to be consistent with generally accepted financial principles and practice, and consistent with the Third Circuit Court in *DVI*, I examined three-day windows following the disclosure events. I tested the price reactions on a cumulative basis as well as single days individually.

---

[44] "Does M&A Pay? A Survey of Evidence for the Decision-Maker," by Robert F. Bruner, *Journal of Applied Finance*, Spring/Summer 2002.

Controlling for Potentially Confounding Factors:  Removing Factors that Impact the Chemicals
and Agricultural Business of New Monsanto

176.  As discussed above, over the course of the Class Period, Pharmacia's businesses included
not only the pharmaceuticals business at issue in this case, but also the chemicals and
agricultural business that was ultimately spun off with New Monsanto. From 18 October
2000 onward, New Monsanto stock was issued and traded freely in the marketplace,
making it possible to observe that company's value on an aggregate and per share basis. It
was further possible, therefore, to remove from the value of Pharmacia the value of its
holdings in New Monsanto. In this way, the effect that any chemicals and agricultural
related news might have wielded on the value of Pharmacia stock would be removed.

177.  Removing the value of Pharmacia's holdings in New Monsanto focused the event study
analysis on the pharmaceuticals business and eliminated the potential for the unrelated
business to obscure the impact of pharmaceuticals news. That is, if the value of the New
Monsanto holdings were not removed, information about Celebrex, for example, might
impact the valuation of the pharmaceuticals portion of Pharmacia's business, but this
impact could be obscured, or muted, by the weight of the chemicals and agricultural
portion of the business.

178.  The October 2000 Spin-Off initiated trading in New Monsanto stock even though
Pharmacia maintained ownership of approximately 85.3% of that company. Using the
market values of the New Monsanto stock, I computed the value of Pharmacia's aggregate
holdings in New Monsanto, subtracted this value from Pharmacia's market capitalization,
and then divided the remaining value by the number of Pharmacia shares outstanding. The
result of these computations is the per share value of Pharmacia's pharmaceuticals business
alone.

179.  For example, on 15 November 2000, the price of New Monsanto stock was $24.375 per
share. Pharmacia owned 220 million shares of New Monsanto, representing a stake worth
$5,362,500,000 (equal to 220,000,000 shares times $24.375 per share). The market
capitalization of Pharmacia as a combined company was $73,938,181,250, equal to the
1,269,325,000 outstanding shares of Pharmacia times the market price of $58.25 per share.
Subtracting the $5,362,500,000 value of the New Monsanto stake from the
$73,938,181,250 market capitalization indicates that the value of Pharmacia stock

excluding New Monsanto was $68,575,681,250. Per Pharmacia share, the value of the Company excluding New Monsanto was therefore $54.03 ($68,575,681,250 divided by 1,269,325,000 shares).

180. For convenience of exposition, I term the per share value of Pharmacia's pharmaceuticals business, thusly computed, the "Pharmacia Pharmaceutical Stock Price." Exhibit-6 presents the time series of the Pharmacia Pharmaceuticals Stock Price along with the logarithmic returns based on these prices.

Controlling for Potentially Confounding Factors:  Removing the Market and Sector Effects

181. One component of an event study is to determine how much of a company's stock returns are attributable to market and sector effects, so that these factors can be isolated and removed.

182. The method, which is generally accepted and widely used in econometric modeling, first involves running a regression to determine how the company's stock price typically behaved in relation to the overall stock market and its industry sector. Then, the regression model is used to determine how much of each event day's actual return is explained by the market and sector factors (the "explained return"). The actual return minus the explained return is the residual return.

183. In this case, the regression analysis removed from the returns on the Pharmacia Pharmaceuticals Stock Price that portion explained by the overall stock market and pharmaceuticals sector, thereby isolating the Pharmacia Pharmaceuticals Stock Price residual returns.

184. I ran the regression modeling the Pharmacia Pharmaceuticals Stock Price returns as a function of:  1) a constant term, 2) the returns of the overall stock market, and 3) the returns of a pharmaceuticals sector index. For the overall stock market factor I used the CRSP Market Total Return Index ("Market Index"), which is a generally accepted and widely used measure of the overall stock market performance. The Market Index appropriately incorporates payment of dividends by the constituent companies.

185. For the pharmaceuticals industry sector, I constructed an index ("Pharmaceutical Index") identical to the Dow Jones U.S. Pharmaceutical Index ("DJ Pharma Index"), with Pharmacia, Pfizer, and Merck removed. That is, I obtained from Dow Jones the

constituents of the DJ Pharma Index in 2000 and 2001 and computed a value-weighted index of the remaining constituents.

186. Pharmacia was excluded from the sector index because it is the subject company, and the study aims at identifying rather than controlling for the impact of news about Pharmacia. Pfizer co-marketed Celebrex. Because the study aims at identifying rather than controlling for the impact of news about Celebrex, it is necessary to remove Pfizer from the sector index. Similarly, Merck was excluded because it sold a competing COX-2 inhibitor, Vioxx.

187. The levels and returns of the Market Index and the Pharmaceutical Index are presented in Exhibit-7.

188. I ran the regression on daily returns covering the period 19 October 2000 through 18 October 2001. The estimation period begins on 19 October 2000 as this was the second day on which New Monsanto traded in the marketplace, which was therefore the first day on which the Pharmacia Pharmaceutical Stock Price return could be computed. The end of the estimation period was selected to be consistent with the widely accepted standard of using a one-year estimation period, when possible.

189. I used dummy variables for each day in the three-day window of each disclosure event to control for potentially abnormal returns on the disclosure dates being tested in the event study. Using an estimation period that surrounds the events of interest, and using dummy variables to control for the event dates in the regression estimation so that the model parameters properly reflect typical stock price movements, is a widely used and generally accepted methodology.[45]

---

[45] See also: "Event Studies with a Contaminated Estimation Period," by Nihat Aktas, Eric de Bodt and Jean-Gabriel Cousin, *Journal of Corporate Finance*, 2007; "Measuring the Effects of Regulation with Stock Price Data," by John J. Binder, *The RAND Journal of Economics*, 1985; "Intervention Analysis with Applications to Economic and Environmental Problems," by G. E. P. Box and G. C. Tiao, *Journal of the American Statistical Association*, 1975; "Testing for Market Efficiency:  A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," by David F. Larcker, Lawrence A. Gordon, and George E. Pinches, *Journal of Financial & Quantitative Analysis*, 1980; "Measuring Abnormal Performance:  The Event Parameter Approach Using Joint Generalized Least Squares," by Paul H. Malatesta, *The Journal of Financial and Quantitative Analysis*, 1986; "Conditioning the Return-Generating Process on Firm-Specific Events:  A Discussion of Event Study Methods," by Rex Thompson, *The Journal of Financial and Quantitative Analysis*, 1985.

"Three general choices for the placement of an estimation window are before the event window, surrounding the event window, and after the event window."
**"Materiality and Magnitude:  Event Studies in the Courtroom," David I. Tabak and Frederick C. Dunbar in *Litigation Services Handbook:  The Role of the Financial Expert*, 3rd ed., edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons, Inc., 2001, p. 19.19.**

" ... [O]ne might consider creating a dummy [variable] to model the timing of important news announcements,"
*Market Models:  A Guide to Financial Data Analysis*, **Carol Alexander, John Wiley & Sons Ltd, 2001, p. 440.**

190.   All returns used in the event study are logarithmic returns – that is, the natural logarithm of the ratio of the current day's closing price plus dividends to the previous day's closing price. Logarithmic returns are commonly used in event studies and equity analysis. Analysts and researchers generally use logarithmic returns instead of percent price changes because of various computational advantages.[46]

191.   The regression results, presented in Exhibit-8, show that returns on the Pharmacia Pharmaceutical Stock Price were significantly related to the returns of the Pharmaceutical Index, but not to the Market Index. The non-significance of the market index is not uncommon in stock return modeling that includes a sector index, as the sector index often captures the market effect as well as the sector effect.

192.   I computed the explained portion of the Pharmacia Pharmaceutical Stock returns by adding:  1) the estimated regression intercept term, 2) the respective day's Market Index return multiplied by the regression's Market Index coefficient, and 3) the Pharmaceutical Index return multiplied by the regression's Pharmaceutical Index coefficient. The residual return is the actual return minus the explained return.

*t*-test

193.   For each event, a statistical test called a *t*-test was conducted to determine whether the residual return can be explained by random volatility, or alternatively must have been caused by Company-specific information. A *t*-test compares the residual return following an event date to the typical residual returns exhibited in the estimation period. If the event residual return is far greater (positively or negatively) than the typical residual return, the *t*-

---

[46] The Appendix presents the mathematical formula for the logarithmic return and a discussion of the measure.

test indicates that the residual return in question cannot have been caused by random volatility alone – *i.e.*, it is statistically significant.[47]

194. The event study results are presented below and summarized in Exhibit-9.

Event Study Results:  6-8 February 2001

195. On or about 6 February 2001, the FDA posted on its website results from the CLASS trials from the entire study period and its analysis of the results. The following day, 7 February 2001, the FDA Advisory Committee, on the basis of the results from the full CLASS study, recommended that the agency not approve the label change for Celebrex that Pharmacia had requested.

196. Over the three-day period, 6-8 February 2001, the Pharmacia Pharmaceutical Stock Price fell 11.18% (on a logarithmic return basis). Over the same period, the Market Index return was -1.48%, and the Pharmaceutical Index return was 1.00%. The three-day explained return for the Pharmacia Pharmaceutical Stock Price according to the regression model is positive 0.64%, which is the change one would expect in the value of the Pharmacia Pharmaceutical Stock Price on account of market and sector effects, absent any Company-specific information.

197. The difference between the actual three-day return of -11.18% and the explained return of 0.64% is -11.81%, which is the residual three-day return for the Pharmacia Pharmaceutical Stock Price.[48] This three-day residual return of -11.81% from 6 February through 8 February 2001 is associated with a *t*-statistic value of -3.54. The likelihood of obtaining a residual return of this magnitude as a result of random volatility alone is only 0.05% (p-value equals 0.0005). Because it is so unlikely that the -11.81% residual return could have been caused by random volatility, the random volatility explanation can be ruled out. At the 0.05% significance level (equivalent to a 99.95% confidence level) therefore, the three-day residual return is statistically significant.

---

[47] The test is called the *t*-test because it involves the computation of a *t*-statistic.  For a 1-day event window, the t-statistic is the one-day residual return divided by the standard error of the regression residual returns.  For multiday event windows, the t-statistic is the cumulative residual return over the event window divided by the product of the standard error of the regression residuals multiplied by the square-root of the number of trading days in the event window. In either case, if the absolute value of the *t*-statistic is greater than the critical *t*-statistic value (1.96 for large samples), the likelihood that the residual return could have been caused by random volatility alone is less than 5%, which is generally accepted to be so unlikely that the random volatility explanation can be rejected.

[48] The slight arithmetic discrepancy is due to rounding.

198. Since market and sector effects were controlled for, effects of information related to the New Monsanto business were eliminated, and the random volatility explanation was rejected, it follows that the price decline must have been caused by Company-specific news related to Pharmacia's pharmaceuticals business.

199. In addition to the three-day price decline being statistically significant, so are the price declines on February 7th and 8th when considered individually. These results are confirmation of the reliability and accuracy of my analysis.

200. On 7 February 2001, the Pharmacia Pharmaceutical Stock Price declined 3.15%. The Market Index declined 0.88%, and the Pharmaceutical Index rose 1.19%. According to the regression model, the Pharmacia Pharmaceutical Stock residual return that day was -4.17%. This is an unusually large one-day residual decline. With a $t$-statistic of -2.16, this residual return is statistically significant at the 3.1% significance level (p-value equals 0.031, confidence level is 96.9%).

201. The following day, 8 February 2001, the Pharmacia Pharmaceutical Stock Price declined 6.61%. The Market Index declined 0.65%, and the Pharmaceutical Index rose 0.43%. According to the regression model, the Pharmacia Pharmaceutical Stock residual return that day was -6.91%. This is an unusually large one-day residual decline in the Pharmacia Pharmaceutical Stock Price. With a $t$-statistic of -3.59, this residual return is statistically significant at the 0.04% significance level (p-value equals 0.0004, confidence level is 99.96%).[49]

202. That the residual returns on February 7th and February 8th each were statistically significant means that the magnitudes of the residual returns were so extreme that they could not reasonably have been caused by random volatility. By construction, the market factor, sector factor, and information related to the New Monsanto business were also eliminated as possible causes of the price declines. Therefore, each price decline must have been caused by Company-specific information about Pharmacia's pharmaceuticals business.

203. These event study results prove that there was a cause and effect relationship between the release of new material information and changes in the stock price – the essence of market efficiency.

---

[49] The Pharmacia Pharmaceutical Stock Price declined $0.75 on 6 February 2001. The residual decline was $0.39, equivalent to 0.74%, which was not statistically significant.

<u>Event Study Results:  6-8 August 2001</u>

204. On Sunday, 5 August 2001, the *Washington Post* reported that the CLASS results presented in the *JAMA* article a year earlier were based on only six months of data, whereas the CLASS study actually had over a year's worth of data. The article noted that the *JAMA* publication and accompanying editorial were likely contributors to Celebrex's high sales. The Court of Appeals for the Third Circuit considered this event to be the final disclosure of the fraud and the end of the Class Period.[50]

205. Over the next three trading days, 6 August 2001 through 8 August 2001, the Pharmacia Pharmaceutical Stock Price rose 1.51%. The three-day cumulative residual return was 2.73%.

206. A residual return of 2.73% for the three-day period is a relatively modest price movement for the Pharmacia Pharmaceutical Stock Price. That residual return is associated with a *t*-statistic value of 0.82 (p-value equals 0.414), which indicates that the residual return over the three-day period following the news on 5 August 2001 was not statistically significant. The single-day returns on the Pharmacia Pharmaceutical Stock Price over the period 6-8 August 2001 were not individually significant either.

207. The lack of a statistically significant return following the news on 5 August 2001 is reasonable. Although this was the first public discussion suggesting that Defendants may have had the intent to mislead, the results of the complete CLASS study had been released to the market six months earlier along with the FDA Advisory Committee reports. In the interim, the market had already revalued Pharmacia stock to reflect the negative economic impact of the CLASS results.

208. Since only new valuation-relevant information should cause a stock price reaction in an efficient market, the lack of significant movement following this event is consistent with market efficiency.

**<u>Event Study on Pharmacia Stock Returns without Removing New Monsanto</u>**

209. While it is appropriate and correct to computationally remove New Monsanto from the Pharmacia stock price as in the event study described above, in order to determine whether

---

[50] *Pharmacia*, 554 F.3d 342.

the event study results depend on this adjustment, I re-ran the event study on the actual Pharmacia stock prices and returns, which combine the New Monsanto business with the pharmaceuticals business.

210. In this alternate event study, I included two sector indexes in the regression model, one to account for Pharmacia's pharmaceuticals business and the other to account for its chemicals business. In its year 2000 Proxy, the Company similarly compared its performance to pharmaceutical peers and chemical industry peers.[51]

211. For the chemicals portion of Pharmacia's business, I used the S&P Chemicals Index ("Chemicals Index"). Among other constituents, the Chemicals Index includes E.I. DuPont de Nemours and Company ("DuPont") and Dow Chemical, which were specifically cited by Old Monsanto and New Monsanto as being peer companies.[52]

212. The index levels and returns of the Chemicals Index are presented in Exhibit-10.

213. I ran a regression modeling the return of Pharmacia stock as a function of: 1) a constant term, 2) the returns of the Market Index, 3) the returns of the Pharmaceutical Index, and 4) the returns of the Chemicals Index.

214. The regression was run on daily returns covering the period 19 October 2000 through 18 October 2001, the same estimation period used in the original event study. I again used dummy variables to control for 6-8 February 2001 and 6-8 August 2001.

215. The results of this estimation of the regression modeling of Pharmacia's stock returns are presented in Exhibit-11.

216. For the event dates, I computed the explained portion of the Pharmacia common stock return by adding: 1) the estimated regression intercept term, 2) the respective day's Market Index return multiplied by the Market Index coefficient estimated by the regression, 3) the Pharmaceutical Index return multiplied by the regression's Pharmaceutical Index coefficient, and 4) the Chemicals Index return multiplied by the regression's Chemicals Index coefficient.

217. The residual return for each date is the actual return minus the explained return.

---

[51] Pharmacia Corporation – Form DEF 14A, filed 22 May 2000.
[52] Monsanto Corporation – Form DEF 14A, filed 15 March 1999; Monsanto Corporation – Form DEF 14A, filed 16 March 2001.

<u>Results of Alternative Event Study</u>

218. The results of the event study on the Pharmacia stock price inclusive of New Monsanto are presented in Exhibit-12.

219. As was the case with the Pharmacia Pharmaceutical Stock Price, the unadjusted Pharmacia stock price fell on each of the three days 6 February 2001 through 8 February 2001. The cumulative three-day decline in response to the corrective disclosure was statistically significant. The single-day declines on 7 February 2001 and 8 February 2001 were also individually statistically significant.

220. Again as before, there was no statistically significant return following the publication of the *Washington Post* article on 5 August 2001.

221. Regardless of the test specification, the corrective disclosure event that occurred 6-8 February 2001 caused the price of Pharmacia stock to fall significantly.


**<u>Market Efficiency Summary and Conclusion</u>**

222. Pharmacia stock traded on the NYSE where trading is facilitated by a specialist who is a lead market maker. The Company was widely covered by analysts and the news media. Institutional ownership of Pharmacia stock was widespread. Trading was active. Market capitalization and float were high. Current and historical financial information about the Company were readily available to investors and analysts. The stock's bid-ask spread was narrow. The event studies proved that there was a cause and effect relationship between the release of new material information and movements in the Pharmacia stock price.

223. Pharmacia stock satisfied the *Cammer* and *Krogman* factor tests that indicate market efficiency. The *DVI* Court had also adopted these indicators. It is particularly noteworthy that Pharmacia stock satisfied the empirical *Cammer* factor, which the *DVI* Court had emphasized, as this factor demonstrates the essence of market efficiency.

224. Given these facts, I conclude that Pharmacia common stock traded in an efficient market over the course of the Class Period.

## LOSS CAUSATION

225. Over the course of the Class Period, the alleged misrepresentations and omissions caused the price of Pharmacia stock to be artificially inflated. When the truth about the CLASS study emerged, the artificial inflation dissipated, causing the stock price to decline and investors to suffer losses.

226. These conclusions are based on a careful analysis of Defendants' statements, FDA reports, equity analyst reports, event study analysis focusing on the empirical reaction of the Pharmacia stock price to corrective disclosures, and analysis of potentially confounding information, as described next.

## Company Statements Confirm the Materiality of the Alleged Misrepresentations and Omissions

227. Both prior to and during the Class Period, the Company acknowledged the importance of Celebrex to Pharmacia as well as the importance of the CLASS trial to Celebrex's future growth prospects.

228. Given the importance of the Celebrex franchise to Pharmacia's financial performance, misrepresentations and omissions that overstate the economic potential of the product would also inflate the value of the Company.

### Importance of Celebrex to Pharmacia

229. Celebrex was the Company's largest product as measured by annual sales and was a strong contributor to Pharmacia's revenue and earnings growth. Celebrex represented 20.7% and 22.5% of Pharmacia's pharmaceuticals sales for the fiscal years 2000 and 2001, respectively.[53] For those same respective years, sales of Celebrex were 3.7 and 3.5 times greater than sales of Pharmacia's second best selling drug, Ambien.[54]

230. That Pharmacia recognized Celebrex's extreme importance to its business and future prospects is illustrated in the following:

> "Sales growth in the first quarter was driven by a 14% increase in U.S. pharmaceutical sales led by Celebrex (celecoxib), the leading prescription

---

[53] Pharmacia Corporation Form 10-K405 for the Fiscal Year Ended 31 December 2001, filed 5 March 2002, p. 32.
[54] *Ibid.*

arthritis medicine. Celebrex recorded sales of $534 million in the quarter and has surpassed $2 billion in total sales since its launch in the first quarter of 1999. …Celebrex continues to gain sales after the best launch in pharmaceutical history. Physicians have now written more than 21 million prescriptions for Celebrex since its initial launch in the U.S. in 1999."
**"Pharmacia Corporation Reports 27% Increase in First-Quarter Earnings-Per-Share," Company press release, *PR Newswire*, 25 April 2000.**

"[Alan Heller, Head of Searle Units, Pharmacia Corporation:] In the U.S. Celebrex continues to enjoy a substantial advantage versus Vioxx in refill rate, capsules per prescription, and average days of therapy per prescription meaning that every Celebrex new prescription leverages into substantially more sales for Pharmacia than Merck gets from a Vioxx new prescription."
**"Pharmacia Corporation First Quarter Earnings Release Conference Call," 25 April 2000, Exhibit 336 at [DEFS 01221351].**

"Commenting on the company's results, Pharmacia Chief Executive Officer Fred Hassan said:  'Our performance this quarter was driven by solid contributions from both our pharmaceutical and agricultural businesses. In our pharmaceutical business, we remain pleased with the acceptance of Celebrex by patients and doctors, and our agricultural business continues to grow satisfactorily.'"
**"Pharmacia Reports 18% Increase in Second Quarter Earnings per Share," Company press release, *PR Newswire*, 25 July 2000.**

"Celebrex, the number one selling prescription arthritis medication worldwide had sales of $630 million in the quarter and $1.2 billion in the first half. Celebrex is being launched in several key European markets in the second half. Celebrex is now benefiting from cross-selling opportunities through the combined sales forces of the new company."
***Ibid.***

"[Fred Hassan, CEO:] As planned, the engines of this growth were our key global products, led by Celebrex. Carrie will talk in detail about our product performance so I'll highlight just a few points. Regarding Celebrex, we continue to be pleased with the strong U.S. performance as well as the expanding international performance. Underlying the good numbers is a very positive response to Celebrex by physicians and by patients."
**"Pharmacia Teleconference:  Second-Quarter Results and Outlook," transcribed from audio obtained from Bloomberg, 25 July 2000.**

"[Carrie Cox, President of Global Business Management:] During the quarter, Celebrex clearly moved into the number one position as America's most prescribed arthritis product, surpassing Ibuprofen, the

long-time gold standard. Our goal is for Celebrex to keep a firm hold on the number one position in the market."
*Ibid.*

"Among Pharmacia's many important innovations is Celebrex, the world's leading prescription arthritis medicine."
**"Pharmacia Corporation Reports 19% Increase in First-Quarter Earnings-Per-Share," Company press release, *PR Newswire*, 25 April 2001.**

The Importance of CLASS to Celebrex

231.  As Celebrex was highly important to Pharmacia, so the CLASS trial was highly important to Celebrex. If CLASS were to demonstrate improved GI safety over traditional NSAIDs, Celebrex could gain greater acceptance among managed care providers, which would boost the product's sales.

232.  Prior to Celebrex's approval and its attaining blockbuster status, the Company anticipated that successful CLASS study results would likely lead to FDA removal of the GI warning on Celebrex's label. Elimination of the warning was estimated to be worth approximately $300 million in additional peak sales.

"It is estimated that such a study could contribute $300 million change in peak sales based on:
– deletion of class warning
– participants in outcome studies have higher prescribing practices."
**"Executive Summary:  Celebra Life Cycle Plan 1998-1999 Budget," dated 21 June 1998, Exhibit-126 at [DEFS 01380798].**

233.  The following public statements made by the Company further indicate the importance that was placed on the CLASS trial and its results.

"[Fred Hassan, CEO:] I would just like to underscore some key highlights. With Celebrex, we now have exciting new data that shows that Celebrex has a truly exceptional safety profile. This makes us feel good at a time when other products have been affected by safety concerns."
**"Pharmacia Corporation First Quarter Earnings Release Conference Call," 25 April 2000, Exhibit 336 at [DEFS 01221348].**

"[Alan Heller, Head of Searle Units, Pharmacia Corporation:] In addition to our European launches, another major growth driver will be the Celebrex long-term safety outcome study. The data presented to date is top line and first cut, but already a powerful story has emerged. … The top

line take-away is that our landmark long-term arthritis study provides compelling evidence of the broad safety profile of Celebrex across a full spectrum of GI measures and in major organ systems versus the traditional NSAID comparators ibuprofen and dyclofenac."
***Ibid.*, at [DEFS 01221352].**

"[Fred Hassan, CEO:] As you may remember, we had mentioned that there are five engines of growth that will add $4.5 billion in sales over the next three years. These five engines being Celebrex, Xalatan, Detrol, Camptosar and Zyvox. … We are also very pleased with the CLASS data which has now come out for Celebrex and the European approval of Celebrex."
***Ibid.*, at [DEFS 01221357].**

"[Fred Hassan, CEO:] As a result of the new data that's coming out from Searle, as well as from Merck, we believe that the market is poised for major expansion over the next three or four years. And it will become very difficult for managed care to prevent access to these products, especially when you look at figures like 2 pints of blood loss with the older NSAIDs."
***Ibid.*, at [DEFS 01221358].**

"[Alan Heller, Head of Searle Units, Pharmacia Corporation:] Well, the only thing that I might add to that is that you have to recognize that something like 65% of the marketplace is still in the traditional NSAIDs. I think the strength of the data that we're showing, particularly with our outcome study, really speak to not only perhaps confirming some of the known dangers of the traditional NSAIDs but also points out some new and unexpected dangers such as the blood loss. That's really going be a powerful tool for us to penetrate that 65% of the business. I share Fred's confidence that some of the flatness in the prescriptions growth rate you saw in the first quarter will definitely be accelerating going forward."
***Ibid.*, at [DEFS 01221358].**

"[Alan Heller, Head of Searle Units, Pharmacia Corporation:] I obviously can't speak to the Vioxx label change, if they will get one at all, but our expectations is to have our sNDA filed before the end of the second quarter. And I think that the data is so significantly compelling to request from the FDA that they look at it on an expedited basis."
***Ibid.*, at [DEFS 01221358].**

"[Carrie Cox, President of Global Business Management:] Based on the efficacy and safety data from the CLASS, VIGOR, and recent head-to-head trials, we are more convinced than ever that Celebrex is a superior product to Vioxx with equal efficacy and a better safety profile. Celebrex

can also be used at higher doses for the severe pain of rheumatoid arthritis because there are no dose limiting safety issues. Moving forward, we plan to leverage the range of strong new data on Celebrex to create even more powerful support and momentum for the continuing conversion of traditional NSAIDs to Celebrex prescriptions."
**"Pharmacia Teleconference: Second-Quarter Results and Outlook," transcribed from audio obtained from Bloomberg, 25 July 2000.**

"[Carrie Cox, President of Global Business Management:] So, there is significant growth opportunities still there. We are, in fact, expecting growth in all major markets, next year, including the US. As you know, the long-term data is now available through publication. It has been submitted to the FDA for consideration. There is a significant data stream of new information coming to support the very strong profile of Celebrex both now for the rest of this year and coming into next year."
**"Pharmacia Teleconference: Third-Quarter Results and Outlook," transcribed from audio obtained from Bloomberg, 30 October 2000.**

"[Carrie Cox, President of Global Business Management:] In terms of the situation for Celebrex moving forward, the *JAMA* paper, as mentioned, was published in September, and that contains the results from the long-term outcomes studies. I think we've had lot of benefit in the marketplace of being able to use the data."
**"Pharmacia Corporation 4Q 2000 Conference Call, 12 February 2001," Exhibit-401 at [DEFS-01221430 - DEFS-01221431].**

234.   As the above excerpts indicate, Defendants acknowledged that Celebrex was an important driver of the Company's sales and growth, and the CLASS study results were an important factor in promoting Celebrex's success.

**Analysts and the Financial Media Deemed the Alleged Misinformation Material**

235.   Investment analysts and the financial press understood and commented on the importance of Celebrex to Pharmacia and the importance to Celebrex of the CLASS trial.

Analysts Considered Celebrex Important to Pharmacia

236.   As is evident in the following excerpts from analyst reports published prior to and during the Class Period, analysts covering Pharmacia viewed Celebrex as highly important to Pharmacia's business and valuation:

"Pharmaceutical earnings were propelled by the highly successful Celebrex, as expected, with EBIT jumping $42 million (23%) to $223 million, even with partnering down year-to-year."
**"Fourth Quarter Earnings on Target," by William R. Young and Nancy F. Traub, Donaldson, Lufkin & Jenrette, analyst report, 11 February 2000, p. 1.**

"Pharmacia & Upjohn's board might have looked at Monsanto principally for its recently launched blockbuster product Celebrex. If anything had been noticeably absent from the Pharmacia & Upjohn product line, it was a blockbuster."
**"A Comprehensive, Step-by-Step Analysis Going into the Merger with Pharmacia & Upjohn," by Andrew Cash, *et al.*, PaineWebber, analyst report, 16 March 2000, p. 8.**

"Celebrex Franchise:  Shifting Into Overdrive. Simply put, Celebrex proved to be the single most successful new product launch in the history of the pharmaceutical industry, and it exceeded everyone's expectations."
**"Creation of New 'Porsche Pharma' Offers Potential To Be Better Than Biotech," by Richard Stover, Arnhold & Bleichroeder, Inc., analyst report, 22 March 2000, p. 15.**

"Monsanto's Coxib Franchise Drives 40-45% Of Pharmacia's Revenue Growth."
**"Pharmacia Corp. Starts Trading Today – Great Prospects on Tap," by Ian Sanderson, *et al.*, SG Cowen, analyst report, 3 April 2000, p. 2.**

"Celebrex, the COX-II inhibitor for the treatment of osteoarthritis and rheumatoid arthritis, is the crown jewel of Searle and remains the most important product in the Pharmacia portfolio."
**"Initiating Coverage with an Outperform Rating," by Jami Rubin, *et al.*, Morgan Stanley Dean Witter, analyst report, 4 April 2000, p. 5.**

"Additionally, Celebrex's rapid ascent to a $2+ billion product this year (just two years post launch), should significantly boost cash flow, impacting the EPS line."
**"1Q00 EPS; Concerns over Top Line," by Mara Goldstein and Steven B. Gerber, CIBC World Markets, analyst report, 25 April 2000, p. 1.**

"Newer products continue to drive growth – Celebrex, the market leading antiarthritic, co-promoted with Pfizer, recorded worldwide revenue of $534 million (up 92%) in 1Q00."
**"1Q00 EPS In Line; Sales Disappointing with Just Modest Growth," by Jeffrey Chaffkin, *et al.*, PaineWebber, analyst report, 26 April 2000, p. 2.**

"The Cox-II franchise, which includes Celebrex, remains the most important franchise for Pharmacia."
**"PHA Power Brunch with Dr. Goran Ando," by Jami Rubin, *et al.*, Morgan Stanley Dean Witter, analyst report, 30 May 2000, p. 2.**

"Celebrex and the follow-up compounds that should sustain Pharmacia's COX-2 group of drugs beyond 2001 are expected to become a multi-billion dollar franchise able to support the company growth for at least the next five years."
**"Initiating with a Strong Buy; A Blue Chip in the Making," by Sergio Traversa and Sena P. Lund, ING Barings, analyst report, 21 July 2000, p. 1.**

"U.S Pharmaceuticals sales jumped 26% in Q2, to $1,710MM, aided by $548MM (+92%) of Celebrex sales."
**"Ag. Products a Big Surprise (Positive) in Q2 – EPS on Target," by Ian Sanderson, *et al.*, SG Cowen, analyst report, 25 July 2000, p. 1.**

"Pharmacia is benefiting from increasing sales of painkiller Celebrex."
**"Initiating Coverage on Pharmacia Corp.," by Mike Krensavage and Michael Hearl, Raymond James & Associates, analyst report, 8 November 2000, p. 8.**

"Pharmaceuticals is the main driver, with sales growth potential in the mid-teens this year and next, driven largely by Celebrex."
**"PHA – Monsanto Provides Transparency on Rx Value," by Jami Rubin and Mark Wiltamuth, Morgan Stanley Dean Witter, analyst report, 16 November 2000, p. 1.**

"Pharmacia is a compelling growth story driven by:  the success of the blockbuster Celebrex."
**"A Solid Product-Driven Growth Story," by Sergio Traversa and Sena P. Lund, ING Barings, analyst report, 17 November 2000, p. 1.**

The Financial Press Reported on the Importance of Celebrex

237.  The financial press understood and reported the importance of Celebrex to Pharmacia's business, as is evident in the following quotes published prior to and during the Class Period:

"S&P also said that many of Monsanto's product lines enjoy above-average profitability and solid cash flow generation. It said Monsanto's G.D. Searle pharmaceuticals unit has staged a good profit recovery in recent years, led by the successful launch of its COX-2 drug, Celebrex, in early 1999."
**"Pharmacia & Upjohn on S&P Watch-Negative," *Dow Jones Newswires*, 20 December 1999.**

60

"Saks said Pharmacia would win immediate prominence by obtaining Monsanto's hot-selling Celebrex, which he expects to generate annual sales of over $3 billion by 2002."
**"Focus-Monsanto, Pharmacia & Upjohn Agree to Merge," by Emily Kaiser,** *Reuters News***, 20 December 1999.**

"After Monsanto developed Celebrex, executives decided that Searle's sales force was too small to realize the arthritis drug's full potential. They formed a partnership with Pfizer Inc., a larger drug company, to market Celebrex. Even so, Celebrex's success was enough to turn Searle from an underperformer to a star. Many Wall Street analysts were urging Monsanto to jettison the drug business a few years ago. They now say it's the most attractive part of the company."
**"Monsanto, Pharmacia Will Merge," by David Nicklaus,** *St. Louis Post-Dispatch***, 20 December 1999.**

"Searle and Pfizer Inc. reported that Celebrex (celecoxib capsules) in its first year generated an unprecedented 19 M prescriptions, a volume unrivalled by any other prescription drug in its first year. In fact, Celebrex prescriptions now rival generic ibuprofen, the long-established leader in the arthritis market. Further, new prescriptions of Celebrex exceeded those of the next two leading blockbusters combined, Viagra (sildenafil citrate) and Lipitor (atorvastatin calcium), during the same post-launch period."
**"Celebrex at One Year – Helping Many Return to Daily Activities,"** *Factiva Press Release Service***, 29 February 2000.**

"The company said sales growth in the first quarter was driven by a 14% increase in U.S. pharmaceutical sales led by Celebrex, an arthritis medicine."
**"Pharmacia Corp. 1st Quarter Operating Net 33 Cents a Diluted Share Vs 26 Cents,"** *Dow Jones Newswires***, 25 April 2000.**

"Analysts agreed that Celebrex, the COX-2 inhibitor for treating osteoarthritis and rheumatoid arthritis, is the key driver for Pharmacia."
**"Pharmacia Posts Profit Growth Despite Slower Sales Rise," by Beth M. Mantz,** *Dow Jones Newswires***, 25 April 2000.**

"The company's main earnings driver was a 92 per cent increase in sales of its anti-arthritic drug Celebrex."
**"Pharmacia Posts 27% First-Quarter Rise," by Adrian Michaels,** *Financial Times***, 26 April 2000.**

"'I don't think he was forced out, because he did a great job with Celebrex - which is by far the most important drug in the combined organization,' [Ian] Sanderson [SG Cowen pharmaceuticals analysts] said."
**"Pharmacia Says Former Monsanto Exec De Schutter to Retire," *Reuters News*, 4 May 2000.**

"Pharmacia boasts one of the strongest profit growth outlooks of any major drug company, owing in part to Monsanto's Celebrex, the popular painkiller."
**"Microsoft Ruling Fails To Deter Further Tech Gains," by Andrew Bary, *Barron's*, 12 June 2000.**

"SG Cowen analyst Ian Sanderson raised his rating on drug company Pharmacia Corp. to strong buy from buy on Friday. … [C]alled Pharmacia 'a top pick.' … 'Competitive position of the Celebrex/Valdecoxib franchise looks solid.'"
**"Research Alert-SG Cowen Ups Pharmacia," *Reuters News*, 4 August 2000.**

"The accounting issue seems it will translate to higher expense levels in the future, said ABN AMRO analyst Mario Corso, citing that the milestones now were being used to offset sales and marketing expenses and research and development costs. But 'with big products like Celebrex ... those payments aren't too much of a concern,' he added."
**"Pharmacia 3rd Quarter Earns Story Overtaken by Co Future Guidance," by Beth M. Mantz, *Dow Jones Newswires*, 30 October 2000.**

"Pharmacia's previous offering in this class is Celebrex, its largest-selling drug."
**"Pharmacia Files for Pain Drug FDA Approval," *Reuters News*, 30 October 2000.**

"Celebrex is hugely important to Pfizer, of New York, and Pharmacia, of Peapack, N.J. Celebrex had one of the most successful drug launches ever; sales for the first three quarters of this year exceeded $1.8 billion."
**"Pharmacia Corp., Pfizer Are Warned on Celebrex Ads," by Chris Adams, *Wall Street Journal*, 12 December 2000.**

"Industry analysts expect its best-selling COX-2 drug Celebrex to help drive strong fourth-quarter growth when the firm reports on February 12."
**"Davos-Pharmacia Seeks Acquisitions in Cancer Field," by Ben Hirschler, *Reuters News*, 28 January 2001.**

Analysts Considered CLASS Important to Celebrex

238. The following statements from analyst reports published prior to and during the Class

Period demonstrate that analysts covering Pharmacia regarded the CLASS trial as a very

positive development for Celebrex. Moreover, analysts apparently accepted Defendants' representations and remained uninformed about the alleged omissions.

> "Dr. Needleman [Co-President and Chief Scientist of Monsanto] stated that the 'next big thing' for Celebrex is likely to be the submission of the long-term clinical outcome data. The data is currently being analyzed and the sNDA could be filed during the first half of this year. According to Dr. Needleman, these studies are being conducted in hopes that they will lead to a meaningful label revision - with the best case being a removal of the standard NSAID warning on gastrointestinal events from Celebrex's label."
> **"Summary of Comments by Phil Needleman," by Jami Rubin, *et al.*, Morgan Stanley Dean Witter, analyst report, 31 January 2000, p. 3.**

> "The imminent completion of the CLASS study, conducted to demonstrate a reduction in the incidence of severe GI side effects of ulcers and bleeds, should result in a supplemental filing to remove the NSAID class warning from the label. ***This should prove to be the single most important event driving the expansion of the COX-2 inhibitors to a dominant position in arthritis treatment.*** Further, the CLASS study evaluated the 800mg. dose (twice the maximum approved arthritis dose) which should add to expanding clinical evidence that Celebrex causes no dose-related increase in side effects.
> …
> In the final analysis, Celebrex is still very early in its life cycle and removal of the traditional NSAID class warnings from approved labeling should catapult the COX-2's to a dominant position in the prescription NSAID market. Further we believe, it will provide the ammunition for effective direct-to-consumer advertising to cannibalize much more rapidly on OTC NSAIDs and expand the prescription segment of the market."
> **"Creation of New 'Porsche Pharma' Offers Potential To Be Better Than Biotech," by Richard Stover, Arnhold & Bleichroeder, Inc., analyst report, 22 March 2000, p. 16 (emphasis added).**

> "More significant Celebrex-related catalysts are slated for 2000. The next big thing in the Celebrex story should take place around midyear, when the companies are expected to submit a supplemental NDA (sNDA) with the results of their outcomes trial (the CLASS trial). These trials compare the incidence of serious gastrointestinal side effects (such as perforations, ulcers, and GI bleeds) experienced by patients on Celebrex versus traditional nonsteroidal anti-inflammatory drugs (NSAIDs). The objective in submitting these trials is to persuade the FDA to revise the label on Celebrex, which currently includes the standard NSAID warning.

Removal, or even significant revision, of this warning would likely have a major positive impact on reimbursement practices and sales of the product."
**"Initiating Coverage with an Outperform Rating," by Jami Rubin, *et al.*, Morgan Stanley Dean Witter, analyst report, 4 April 2000, p. 5 (emphasis added).**

"'The data was extremely positive,' said Barbara Ryan, a drug industry analyst at BT Alex. Brown, adding that it confirmed what had been presented from earlier, shorter-term studies. The real issue, she said, was whether the drug companies could convince the FDA to change the Celebrex labeling to indicate that it was safer than nonsteroidal anti-inflammatory drugs (NSAIDs)."
**"Update 1-Long-Term Data Show New Arthritis Drug Safer," by Kathy Fieweger, *Reuters News*, 17 April 2000.**

"On Monday before the market opened, PHA and PFE ($38) announced positive results of their eagerly anticipated CLASS study. … In most respects, the study served its purpose of differentiating the long-term safety profile of Celebrex from NSAIDs."
**"Positive Results of Celebrex CLASS Trial Released," by Jami Rubin, *et al.*, Morgan Stanley Dean Witter, analyst report, 18 April 2000, p. 2.**

"PHA and PFE plan to submit these data to the FDA in hopes of revising (or best case, removing) the standard NSAID warning about GI events that currently appears in the label. A revision of the label is likely to have a positive impact on reimbursement and sales of Celebrex."
***Ibid*.**

"[W]e continue to believe that Celebrex will show impressive growth during the coming quarters, fuelled by new research data."
**"Ready for a Pick-Up Later This Year!," by Peter Sellei and Kristofer Liljeberg-Svensson, Carnegie, analyst report, 25 April 2000, p. 3.**

"We believe that Celebrex offers potential upside to PHA's stock price. … PHA will expand upon the recently announced GI safety data with a more complete presentation at the Digestive Disease Week Conference May 21-24. This data is expected to show much lower incidence of GI complications than traditional NSAID's, and an FDA filing this quarter could remove the NSAID warning label as soon as late 2000. This occurrence would open the door for more widespread usage at managed care facilities."
**"Celebrex Poised to Bounce; AG Weakness Less Important," ABN AMRO, analyst report, by Maria Corso and Scott Henry, 25 April 2000, p. 2.**

"Several significant Celebrex-related catalysts are slated for 2000. The 'next big thing' in the Celebrex story should take place around mid-year,

when PHA and PFE are expected to submit a supplemental NDA (sNDA) with the results of their outcomes trial (the CLASS trial). …The objective in submitting these trials to the FDA is to convince the agency to revise the label on Celebrex, which currently includes the standard NSAID warning. Removal, or even significant revision, of this warning would likely have a major positive impact on reimbursement practices and sales of the product."
**"Ag Off to a Slow Start, but 2000 EPS in Tact," by Jami Rubin, *et al.*, Morgan Stanley Dean Witter, analyst report, 26 April 2000, p. 3.**


"We believe the long-term safety data generated by the CLASS (Celebrex) and VIGOR (Merck's Vioxx) trials will re-accelerate the coxibs' penetration of the NSAID market by removing the NSAID side effects warning label. Pharmacia plans to file the CLASS data this quarter, with an FDA-approved label modification possible by late this year."
**"Ag. Franchise in a Q1 Drought:  Pharma Will Pick Up the Slack," by Ian Sanderson, *et al.*, SG Cowen, analyst report, 26 April 2000, p. 2.**


"The two COX-2 drugs (including MRK's Vioxx) should capture a significant share of the anti-arthritic market, reflecting the increasing awareness that these agents cause far fewer GI problems than the older NSAIDs. Should the FDA accept the results of recently completed safety studies that PHA and MRK have conducted on their respective products, the warning labels of Celebrex and Vioxx could be softened somewhat. In our opinion, the odds of such a development in 2H'00 are about 50/50. Such a labeling change would obviously have a favorable effect on the sales of both products, and could make our Celebrex domestic revenue forecast somewhat conservative."
**"2Q Pharma Sales To Show Accelerated Growth," by Kent Blair, *et al.*, Donaldson, Lufkin & Jenrette, analyst report, 12 June 2000, p. 3.**


"A key going forward will be to see how the FDA views the new safety and whether or not it is rewarded with a meaningful label change."
**"Prospects for Growth," by Jeffrey Chaffkin, *et al.*, PaineWebber, analyst report, 6 July 2000, p. 4.**


"We believe that Celebrex will continue to show impressive growth during the coming quarters, fuelled by new research data and its launch in major European markets."
**"Impressive Top-Line Growth!," by Peter Sellei and Kristofer Liljeberg-Svensson, Carnegie, analyst report, 25 July 2000, p. 1.**


"There remains huge market expansion potential for Celebrex and Merck's Vioxx, as 60% of arthritis pain patients still are on traditional NSAIDs. We believe the long-term safety data generated by the CLASS (Celebrex) and VIGOR (Merck's Vioxx) trials may accelerate the coxibs'

penetration of the NSAID market by removing the NSAID adverse events
warning label."
**"H2 Earnings Growth Acceleration on Tap Post a Convincing Q2," by Ian
Sanderson, *et al.*, SG Cowen, analyst report, 26 July 2000, p. 2.**

"Sometime in '01, the FDA is expected to relax the side effect warnings
on Celebrex and Vioxx. Those moves should further enhance the COX-2s'
share of the overall anti-arthritic market."
**"Strong Volume Gains and Synergies To Fuel Rapid EPS Growth," by Kent Blair,
*et al.*, Donaldson, Lufkin & Jenrette, analyst report, 23 August 2000, p. 1.**

"Our Q3(00) forecasts indicate impressive growth for Celebrex, fuelled by
numerous research data indicating that COX-2 inhibitors are superior to
the older class of drugs, the so-called NSAID's, and that the COX-2
inhibitors might be prescribed for new indications."
**"9M(00) Previews," by Peter Sellei and Kristofer Liljeberg-Svensson, Carnegie,
analyst report, 26 October 2000, p. 1.**

"While this marketing and positioning battle will continue to rage, we
believe the longer-term opportunity for the COX-2 class will be the
potential removal of gastrointestinal warning labels that appear on both
Celebrex and Vioxx labeling, a consideration that would lead to another
significant growth leg to the class."
**"Uniquely Positioned Pharmaceutical Growth Platforms," by Kenneth Kulju, *et al.*,
Credit Suisse First Boston, analyst report, 5 December 2000, p. 8.**

"These labeling revisions will also be important in driving prescription
conversion with larger managed care accounts."
**"4Q Preview," by Kenneth Kulju, *et al.*, Credit Suisse First Boston, analyst report, 5
January 2001, p. 1.**

"We believe the label improvements resulting from the long-term safety
data generated by the CLASS (Celebrex) and VIGOR (Vioxx) studies,
should support growth beginning in H2:2001."
**"Pharmacia Corporation," Steve Scala, *et al.*, SG Cowen, analyst report, 11 January
2001, p. 2.**

The Financial Press Reported on the Importance of CLASS

239. As is evident in the following excerpts from the financial media published during the Class
Period, the CLASS trial was considered to be highly important to Celebrex:

"'No previous study has examined such a broad range of (gastrointestinal -
GI) side effects - which encompass events ranging from serious and often
devastating GI ulcers and ulcer complications, to silent but medically

important damage to the lining of the intestine, to symptoms like abdominal pain,' said Lee Simon, a professor at Harvard Medical School. 'I'm incredibly excited about this data set,' he added. 'These drugs are just basically safer.'"

**"Update 1-Long-Term Data Show New Arthritis Drug Safer," by Kathy Fieweger, *Reuters News*, 17 April 2000.**

"Two new rival arthritis drugs that have already become blockbusters, Merck & Co.'s Vioxx and Pharmacia Corp.'s Celebrex, aim to propel sales into higher orbit by convincing U.S. regulators in coming months that their medicines are far safer than standard treatments. A key step in that campaign comes this week, when the firms will unveil data from separate clinical trials they say prove their medicines are overwhelmingly safer than older ulcer-causing arthritis remedies known as nonsteroidal anti-inflammatory drugs (NSAIDs)."

**"Vioxx, Celebrex Aim To Profit from Improved Safety Labels," by Ransdell Pierson, *Reuters News*, 22 May 2000.**

"The problem arises from the labeling for both Vioxx and Celebrex. The label alludes to the need for these long-term safety studies about gastrointestinal effects because only those side effects occurring with NSAIDs are known. 'If the GI (gastrointestinal) warning section on the label were removed, it would greatly help these drugs in further penetrating the NSAID market,' said Ryan Beck Southeast Research analyst Neil Sweig."

**"Safety Data May Not Affect Who Leads Arthritis Market," by Beth M. Mantz, *Dow Jones Newswires*, 24 May 2000.**

## The Court Concluded that the CLASS Results and Related Statements Were Material

240.  In its Memorandum Opinion dated 22 January 2007, the Court concluded that the CLASS results and the 17 April 2000 press release about the CLASS results were material information.

"Given the weight attached to CLASS results by Defendants and various stock analysts, and the fact that CLASS was widely reported in the financial and mainstream media, the Court finds the statements cited by Plaintiffs, including Defendants' April 17 press release … to be material."

***Alaska Electrical Pension Fund v. Pharmacia Corp.*, No. 03-01519 (AET), 2007 U.S. Dist. Lexis 5410, at \*7-\*8 (D.N.J. January 22, 2007).**

241.  Not only did the Court find the initial release of the incomplete CLASS results to be a material event, but the Court concluded that the FDA's data release and the Advisory

Committee's decision not to recommend a label change, on 6-7 February 2001, constituted a "curative disclosure" event that caused the Pharmacia stock price to decline:

> "The Court finds that the FDA's data release and the advisory committee ruling ('FDA Release') constituted a curative disclosure as they were substantial, widely-reported, and contradicted the Defendants' conclusions about the results of CLASS. … Further, it is uncontested that this regulatory action caused a precipitous drop in Pharmacia's common stock price, which is evidence of its curative effect."
> **Pharmacia, 2007 U.S. Dist. Lexis 5410, at \*13.**

242. As such, the Court determined that the disclosed information was material and its prior concealment had caused the stock price to be inflated.

243. Furthermore, the Court of Appeals for the Third Circuit concurred that alleged misrepresentations were material and caused the Pharmacia stock price to be inflated, and that the corrective disclosure in February 2001 caused the stock price to decline:

> "And, of course, the materiality of the alleged misrepresentations is self-evident when we look at the market's negative reaction – to the tune of a nine-percent drop in stock price in three days – when defendants' analysis of the CLASS study was questioned in February 2001."
> **Pharmacia, 554 F.3d at 352.**

244. The Court's findings are consistent with statements made by Defendants during the Class Period, and by analysts and the financial press. The facts of this case indicate that the alleged misrepresentations and omissions artificially inflated the price of Pharmacia stock. The disclosure event of February 2001 was a curative disclosure that caused the artificial inflation to dissipate, resulting in investor losses. Therefore, the alleged misrepresentations and omissions caused investor losses.

## EMPIRICAL CONFIRMATION OF LOSS CAUSATION

245. The significant decline in the Pharmacia Pharmaceutical Stock Price (and in the unadjusted Pharmacia stock price) on 6-8 February 2001, in reaction to the corrective disclosures, empirically confirms the materiality of the misrepresentations and omissions. This empirical result, coupled with an analysis of potentially confounding information, proves

68

that the misrepresentations and omissions had artificially inflated the price of Pharmacia stock during the Class Period and that, when corrected, they caused investors to suffer losses.

### Events of 6-8 February 2001

The Corrective Disclosure

246.  As described above, prior to the 7 February 2001 FDA's Arthritis Advisory Committee meeting, on or about 6 February 2001, reports written by FDA reviewers that contained and analyzed CLASS data from the entire study were posted on the FDA's website. The new information provided to the market was voluminous and complex scientific, medical, and statistical information, but corrected Defendants' prior false or misleading statements about the CLASS study.

247.  Late in the afternoon on 7 February 2001, the Advisory Committee stated that the full CLASS trial results indicated no significant GI safety advantage of Celebrex over traditional NSAIDs. As a result, the Committee did not recommend that the FDA approve a label change with respect to GI safety.

248.  Reportage and commentary about the disclosure by medical professionals, the financial press, and analysts were extensive – continuing after the close of trading on 7 February 2001 and carrying over to 8 February 2001.

249.  For example, in a report titled "CLASS Flunks Out," published on February 8th, CIBC analysts wrote that Pharmacia's stock price declined on 7 February 2001 on concerns that Celebrex's growth would stagnate without the label change and noted the potential for additional share price weakness on 8 February 2001.[55] After the close of trading on February 7th, Salomon Smith Barney analysts issued a report stating that the CLASS results would slow the growth of COX-2 inhibitors.[56]

250.  The information about the CLASS study that was provided by the FDA reviewers and subsequently disseminated by news and analyst coverage was precisely the information that Defendants had been concealing throughout the Class Period. The market now knew the

---

[55] "CLASS Flunks Out," by Mara Goldstein, Steven Gerber, M.D. and Adam Sohn, CIBC, analyst report, 8 February 2001.
[56] "PHA:  FDA Reviews Celebrex & Vioxx Safety Data," by Mark Striker and George Grofik, Salomon Smith Barney, analyst report, 7 February 2001.

facts described above in paragraph 45. Consequently, the events of 6-8 February 2001 clearly constituted a corrective disclosure.

The Corrective Disclosure Dissipated Artificial Inflation

251. Over the three-day period, 6-8 February 2001, the residual decline in the Pharmacia Pharmaceutical Stock Price was a statistically significant $5.92 per share, or 11.81% on a logarithmic return basis. This residual return controls for the market effect, the pharmaceutical sector effect, and any information related to the New Monsanto business. Moreover, the residual decline was too great to be attributable to random volatility. Therefore, the loss in value must have been caused by Company-specific information related to the pharmaceuticals business.

252. The three-day decline in the unadjusted Pharmacia stock price (*i.e.*, without removing New Monsanto) is statistically significant as well, proving that the result is robust to event study design.

253. The single-day residual Pharmacia Pharmaceutical Stock Price declines were also individually statistically significant on February 7th and 8th. The decline was 4.17% on February 7th and 6.91% on February 8th, equivalent to declines of $2.14 per share and $3.39 per share, respectively.

254. These single-day declines are also statistically significant in the event study conducted on the unadjusted Pharmacia stock price, proving that the results are robust to event study design.

255. That the single-day and cumulative residual returns were statistically significant indicates that the Company-specific news that emerged at this time caused the price decline.

Accounting for Potentially Confounding Information

256. To determine whether any information other than the CLASS disclosure contributed to the 6-8 February residual stock price decline, I examined all other Company-related news that emerged over those days and assessed the valuation effect, if any, of that potentially confounding information.

257. Four additional pieces of Company-specific information transpired on 6-8 February 2001:

    i.  On 6 February 2001, Pharmacia announced that its drug Xalatan had become the top-selling treatment for open-angle glaucoma in Japan and that it had launched Zyvox in the U.K. Pharmacia also submitted an application for Somavert (a treatment for acromegaly).[57]

   ii.  Also on 6 February 2001, Nycomed Amersham plc announced that it would proceed with an IPO of its life sciences unit, APBiotech.[58] Pharmacia owned 45% of APBiotech.[59]

  iii.  After the close of trading on 6 February 2001, news emerged that Pharmacia had initiated a lawsuit against Alcon Laboratories for patent infringement regarding the manufacturing of Xalatan.[60]

  iv.  After the close of trading that same day, the FDA posted a warning issued to Pharmacia about downplaying the risks of using Celebrex in conjunction with Coumadin (an anticoagulant). The FDA letter noted that this was the fourth letter dealing with Coumadin in Pharmacia's promotional materials for Celebrex.[61]

258. I analyzed each of these news items to determine whether or not they constituted new valuation-relevant information that may have contributed to Pharmacia's stock price decline beginning on 6 February 2001.

<u>Xalatan Sales and Somavert Application Announcements</u>

259. Pharmacia's announcement about Xalatan at the Merrill Lynch Global Pharmaceutical, Medical Device, and Biotechnology Conference did not include any quantitative information about the current level or projected growth of Xalatan sales. Therefore, it was unlikely that investors could have gleaned sufficient information from the announcement to change their assessment of Pharmacia's value.

260. Moreover, to the extent that the announcement did provide valuation-relevant information, it would have had a positive influence on Pharmacia's stock returns. This effect would have slightly reduced the overall stock price decline, offsetting the decline caused by the release

---

[57] "Pharmacia's Xalatan Becomes the Number-One Selling Glaucoma Treatment in Japan," Company press release, *PR Newswire*, 6 February 2001.
[58] "Nycomed Pushes Ahead With Life Science IPO," *Reuters News*, 6 February 2001.
[59] Pharmacia Corporation Form 10-K for the Year Ended December 31, 2000, filed 25 March 2001, p. 8.
[60] "Pharmacia Sues Alcon over Patent for Glaucoma Drug," *Reuters News*, 6 February 2001.
[61] "Pharmacia Again Warned about Celebrex Promotion," by Lisa Richwine, *Reuters News*, 6 February 2001.

of the CLASS data. The news about the Somavert application submission was similarly positive.

261. Factoring in the countervailing positive price impact of this news, if any, would indicate that the valuation impact of the CLASS disclosure was even more negative than the net effect observed. I conservatively elected to assume there was no such offsetting price impact from the positive Xalatan and Somavert news.

APBiotech IPO

262. The news of Nycomed Amersham's plan to proceed with an IPO of APBiotech informed the market that Pharmacia's previously unmarketable asset, *i.e.* its 45% stake in the company, would become marketable. Since marketability enhances the value of an asset, this development, too, was positive.

263. Moreover, Pharmacia's 2000 Form 10-K mentioned APBiotech only once, indicating that it was not a major component of Pharmacia's business.

264. To the extent that the APBiotech announcement did provide any valuation-relevant information, it would likely have had a positive influence on Pharmacia's returns, thus slightly offsetting the decline caused by the CLASS data release. Accounting for the countervailing positive price impact of this development, if any, would indicate that the valuation impact of the CLASS disclosure was even more negative than the net effect observed. I conservatively elected to assume that the APBiotech IPO news caused no such offsetting price impact.

Alcon Laboratories Patent Lawsuit

265. News of Pharmacia's Xalatan patent infringement suit against Alcon Laboratories can be viewed as either a positive or negative. The suit could potentially have signaled that Pharmacia was concerned about the potential impact on Xalatan's sales of the competing drug, Travatan. Alternatively, if the market was already accounting for the potential impact of Travatan's launch, the lawsuit could be viewed as a positive, as the suit could either result in monetary compensation or a delay in Travatan's launch, both of which would benefit Pharmacia.

266. I searched analyst reports and news articles for commentary about the lawsuit. Other than one *Reuters* article, there was no additional news coverage or analyst commentary. I

therefore determined that the news of the lawsuit was considered too minor to have a meaningful impact on the valuation of Pharmacia's stock.

<u>FDA Warning Letter about Celebrex and Coumadin Combination</u>

267. After the close of trading on 6 February 2001, the FDA posted on its website a fourth warning to Pharmacia for downplaying the risks associated with concurrent use of Celebrex and Coumadin, an anticoagulant known generically as warfarin.[62] Specifically, the FDA's warning cited five audio conferences given by Dr. McMillen, on behalf of the Company, in March and May of 2000.

268. Two of the FDA's previous three warnings, issued in October 1999 and April 2000, involved promotional materials distributed by the Company. The third warning concerned a television ad and was issued in November of 2000.[63]

269. Potential complications arising from the interaction of Celebrex and Coumadin was not new information. In fact, the FDA had previously required the Company to add this information to the "Precautions" section of the Celebrex label as a result of reported bleeding events in patients taking Celebrex and warfarin concurrently. The "Precautions" section included the following:

> "(a)nticoagulant activity should be monitored, particularly in the first few days, after initiating or changing CELEBREX therapy in patients receiving warfarin or similar agents, since these patients are at an increased risk of bleeding complications ... in post-marketing experience, bleeding events have been reported, predominately in the elderly, in association with increases in prothrombin time in patients receiving CELEBREX concurrently with warfarin."
> **"RE:  NDA 20-998, Celebrex (celecoxib) capsules; 'Warning Letter,'" dated 1 February 2001, Food and Drug Administration, posted 6 February 2001.**

270. Additionally, among the analyst reports I was able to review from the Class Period, not one discussed either the February 2001 warning letter or any of the three previous warning letters. Consequently, I conclude that the warning letter issuance had *de minimis*, if any, valuation impact, and that it caused none of the stock price decline on 6-8 February 2001.

---

[62] "Pharmacia Again Warned About Celebrex Promotion," by Lisa Richwine, *Reuters News*, 6 February 2001.
[63] *Ibid.*

Conclusion About Confounding Information

271. Carefully considering information that emerged between 6 February and 8 February 2001 indicates that no potentially confounding information significantly contributed to the Pharmacia stock price decline that occurred during that timeframe. I considered whether news over this timeframe about Pfizer and about Merck's COX-2 inhibitor Vioxx was confounding information. I determined that it was not. The decline in the Pharmacia stock price was caused by the corrective disclosure of information about the CLASS study.


## DAMAGE COMPUTATION

### The Inflation Ribbon

272. An inflation ribbon is a time series indicating how much artificial inflation caused by the alleged fraud was in the stock price on each day of the Class Period.

273. On account of the close mirroring of the information concealed at the start of the Class Period and then disclosed on 6-8 February 2001, the event study results in this case constitute essentially a controlled experiment. The value of Pharmacia Pharmaceutical Stock with the information concealed is observed just prior to 6 February 2001, while the value of the Pharmacia Pharmaceutical Stock with the information disclosed is observed just after the three-day adjustment ending on 8 February 2001. The residual change in the Pharmacia Pharmaceutical Stock Price over this period therefore measures the value of the information at issue.

274. The cumulative residual decline in the Pharmacia Pharmaceutical Stock Price over the three days, 6-8 February 2001, amounted to $5.92 per share. Prior to 6 February 2001, therefore, the price of Pharmacia's stock was artificially inflated by $5.92 per share.

275. The inflation ribbon is constructed by working chronologically backwards from the end of the three-day disclosure event window, in this case 8 February 2001, and adding fraud-related residual price declines as they occurred. No artificial inflation remained in the stock price as of 8 February 2001, a day when the residual decline in the Pharmacia Pharmaceutical Stock Price was $3.39 per share. This means that a day earlier, as of 7 February 2001, the artificial inflation in the Pharmacia stock price was $3.39 per share.

74

276. On February 7th, the residual stock price decline was $2.14 per share. Therefore, as of February 6th, the artificial inflation amounted to $5.53 per share, equal to the $2.14 that dissipated on February 7th plus the $3.39 per share that remained afterwards.

277. On February 6th, the residual decline in the Pharmacia Pharmaceutical Stock Price was $0.39 per share. Therefore, a day earlier, on February 5th, the artificial inflation in the Pharmacia stock price amounted to $5.92 per share, the $0.39 that dissipated on February 6th, plus the $5.53 per share that remained afterwards.

278. Prior to 6 February 2001, there were no corrective disclosures that observably dissipated artificial inflation during the Class Period. Consequently, the artificial inflation in the Pharmacia stock price was unchanged since the start of the Class Period.

279. The Court of Appeals for the Third Circuit held:

> "Plaintiffs' own expert acknowledges that the announcement of the results of the CLASS study 'had little measurable effect on [Pharmacia's] stock price.' But that fact does not negate a finding of materiality when the market was expecting that the results of the study would be positive, and plaintiffs have presented evidence indicating precisely that. (citing Morgan Stanley report written the day after the CLASS study results were released that states, 'we are making no change to our forecasts, as we had anticipated the study to corroborate the strong safety profile of the product'). And, of course, the materiality of the alleged misrepresentations is self-evident when we look at the market's negative reaction – to the tune of a nine-percent drop in stock price in three days – when defendants' analysis of the CLASS study was questioned in February 2001."
> ***Pharmacia*, 554 F.3d 342, \*352 (internal citations omitted).**

280. Exhibit-13 presents the inflation ribbon.

## Per Share Damage Formula

281. The measure of damages generally applied in 10b-5 cases is the reduction in the dollar inflation over an investor's holding period (the economic/inflation loss).

282. For shares sold after the final corrective disclosure, the Private Securities Ligation Reform Act of 1995 ("PSLRA 1995") limits the damages subject to an investment loss cap based on the price paid for the stock and the market prices prevailing subsequent to the disclosure:

> "[T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."
> **15 U.S.C. § 78u-4(e) (2).**

283. To provide a conservative measure of damages, I applied an investment loss cap to shares sold during the Class Period and not just to shares sold afterwards. For any particular holding period, damages are the lesser of the decline in the inflation ribbon and the decline in the share price.

284. According to PSLRA 1995, the investment loss cap for shares sold during the 90-day period following the final corrective disclosure ("the bounce-back period") are a function of the average of the closing prices from the date of disclosure to the date of sale:

> "… if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."
> **15 U.S.C. § 78u-4(e) (2).**

285. Thus, damage on any share purchased during the Class Period and sold within 90 days of the final corrective disclosure is the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the stock price (the investment loss), where the terminal stock price is deemed to be the average price from the final corrective disclosure date to the sale date.

286. Damage on any share purchased during the Class Period and held 90 days or more beyond the final corrective disclosure equals the lesser of the reduction in the dollar inflation over the investor's holding period (the economic/inflation loss) or the decline in the stock price (the investment loss), where the terminal stock price is deemed to be the average price over the 90 days following the final corrective disclosure.

287. Even though according to the news analysis and event study analysis all artificial inflation dissipated with the 6-8 February 2001 corrective disclosure, the final corrective informational disclosure took place on 5 August 2001 with the publication of the *Washington Post* exposé. The Court of Appeals for the Third Circuit considered this event to be the final disclosure of the fraud and the end of the Class Period.[64] Under this scenario, the 90-day bounce-back period stretches from 5 August 2001 through 2 November 2001. The average price for Pharmacia stock over this 90-day period, based on closing prices, was $41.25 per share.

288. As an example of how per share damages are computed for a particular investor, consider an investor who purchased Pharmacia stock on 2 January 2001 for $60.00 per share and sold those shares at the close of trading on 8 February 2001 for $53.00 per share. The inflation on 2 January 2001 was $5.92 per share, and at the close on 8 February 2001 it was zero. According to the inflation ribbon, this investor's economic/inflation loss is $5.92 per share, equal to the decline in inflation over his holding period ($5.92 - $0.00). The investment loss is $7.00 per share, equal to the $60.00 purchase price minus the $53.00 per share sale price. The per share damages are the lesser of the economic/inflation loss and the investment loss, which is $5.92 per share.

289. Based on the foregoing analysis and statutory formulas, Rule 10b-5 damages per share range from $0 to $5.92 per share, excluding prejudgment interest. A particular investor's damages depend on when during the Class Period each share was purchased and if and when each respective share was subsequently sold. Investors who purchased after 8 February 2001, or sold their shares prior to 6 February 2001, suffered no damages on those shares.

## **AGGREGATE DAMAGES**

290. Counsel for the Plaintiffs asked me to provide an estimate of the aggregate damages suffered by all investors who bought Pharmacia stock during the Class Period. To estimate aggregate damages, it is necessary to estimate how many Pharmacia shares were bought on each day of the Class Period and to estimate if and when those same shares were

---

[64] *Pharmacia*, 554 F.3d 342.

subsequently sold. This information is relevant, because the damage on each particular share depends on when it was bought and when it was sold.

291. The two-trader proportional trading model estimates the requisite purchase and sale dates for all shares traded during the Class Period, and is commonly used to provide estimates of aggregate damages in securities cases.

**Two-Trader Proportional Trading Model**

292. The two-trader proportional trading model recognizes that most trading volume is attributable to a relatively small subset of traders, while the remaining investors tend to have longer holding periods. Accordingly, market participants are divided into two groups – "traders," who trade frequently, and "holders," who trade less frequently.

293.  The model employs parameter estimates for the percentages of outstanding shares held by each of the two groups, and the greater frequency of "trader" trades relative to "holder" trades.

294. The model then uses reported trading volume to estimate when share purchases were subsequently sold. Essentially, the model estimates the probability of any particular share being traded on a particular day. Next, it applies this probability to estimate the number of shares purchased on each prior day that are re-traded on each respective subsequent day. The model's construction and operation are further detailed below.

Published Literature, Wide Use, and Acceptance by Courts

295. A proportional trading model such as the two-trader proportional trading model I used is a "representative agent" model, which is a generally accepted model in finance and economics research. There are a multitude of seminal articles based on representative agent models. The groundbreaking article by Nobel Prize winner Robert E. Lucas, "Asset Prices in an Exchange Economy," published in the leading journal *Econometrica* [November 1978],[65] is but one such example that demonstrates the profession's acceptance of such models.

---

[65] "Asset Prices in an Exchange Economy" by Robert E. Lucas, Jr., *Econometrica*, November 1978.

296. The basic one-trader and two-trader proportional trading models are presented in the *Litigation Services Handbook*, 3rd edition.[66]

297. In my experience I have observed that the two-trader proportional trading model and its variants are widely used both by plaintiff and defense experts for calculating aggregate damages in the course of litigation, in settlement discussions, and for drafting plans of allocation subsequent to settlement.

298. Published studies, such as Cone and Laurence [1994][67] and Furbush and Smith [1994][68], have examined the model's use in securities litigation and have shown that two-trader models are more conservative and more accurate in estimating damages than are single trader proportional trading models.

299. Finnerty and Pushner [2003][69] and Barclay and Torchio [2001][70] are two more examples of published research on the model and its variants.

300. Bassin [2000][71] and Beaver, Malernee, and Keeley [1993][72] empirically tested two-trader models. Bassin and Beaver, *et al.*, used actual trading records to calibrate the parameters of two-trader models. I utilized the modeling and parameter estimates presented in the Beaver, *et al.* model, which I have observed to be widely used both by plaintiff and defense experts to estimate aggregate damages.

301. In the following cases, courts have reviewed and accepted proportional trading models for estimating aggregate damages:  *In re Oxford Health Plans, Inc.*, 244 F. Supp. 2d 247, 249-52 (S.D.N.Y. 2003); *Robbins v. Deloitte & Touche, LLP*, No. 90-896- -Civ-J-10, 1995 U.S. Dist. LEXIS 22424, at *1 (M.D. Fla. June 28, 1995), *rev'd on other grounds*, 116 F.3d

---

[66] "Securities Act Violations:  Estimation of Damages," by Nicholas I. Crew, Patrick G. Goshtigian, Marnie A. Moore, and Atulya Sarin, chapter 17 in *Litigation Services Handbook*, 3rd edition, edited by Roman L. Weil, Michael J. Wagner, and Peter B. Frank, John Wiley & Sons Inc., 2001.

[67] "How Accurate Are Estimates of Aggregate Damages in Securities Fraud Cases?," by Kenneth R. Cone and James E. Laurence, *Business Law*, 1994.

[68] "Estimating the Number of Damaged Shares in Securities Fraud Litigation:  An Introduction to Stock Trading Models," by Dean Furbush and Jeffrey W. Smith, *Business Law*, 1994.

[69] "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," by John Finnerty and George Pushner, *Stanford Journal of Law, Business and Finance*, 2003.

[70] "A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation", by Michael Barclay and Frank C. Torchio, *Law & Contemporary Problems*, 2001.

[71] "A Two Trader Population Share Retention Model for Estimating Damages in Shareholder Class Action Litigations," by William M. Bassin, *Stanford Journal of Business and Finance*, 2000.

[72] *Stock Trading Behavior and Damage Estimation in Securities Cases*, by William H. Beaver, James K. Malernee, and Michael C. Keeley, Cornerstone Research, 1993.

1441 (11th Cir. 1997); *In re Worldcom, Inc.*, No. 02 civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 3143 at *5-*15 (S.D.N.Y. March 4,2005).

Construction of the Two-Trader Model

302. I constructed a 389 row by 328 column matrix whose entries show the estimates of how many shares purchased on each of the 328 trading days in the Class Period were sold on each of the 388 trading days up through 2 November 2001, which is the last trading day of the 90-calendar-day period commencing 5 August 2001.

303. The 389th row of the matrix shows how many shares purchased within the Class Period were still held beyond the end of the 90-day period.

304. Based on the parameters in the Beaver, *et al.* study, I assumed that 15.3% of outstanding shares were held by "traders" and the remaining 84.7% were held by "holders." Also based on their study, I assumed that a trader's share is 29 times more likely to be traded than is a holder's share. As noted above, the Beaver, *et al.* study arrived at these estimates by analyzing actual trade data.

305. Pharmacia was traded on the New York Stock Exchange. Since specialists at the NYSE trade in order to maintain an orderly market rather than for investment purposes, trading volume was adjusted to remove the effect of the exchange specialists' trades. Specialist participation data were provided by the NYSE and is presented in Exhibit-14. The proper adjustment is to remove the specialist participation rate times the daily volume.[73] This adjustment removed 13.2% to 15.9% of daily trading volume, depending on the particular month.

306. Share float for the Company was calculated by adding short interest to total shares outstanding and reducing this amount by insider holdings and by the shares that the institutional holdings data indicated were owned by institutions and not traded during the Class Period. Short interest data are presented in Exhibit-15 and institutional holdings are presented in Exhibit-16. Insider holdings were obtained from Pharmacia's annual proxy statements filed with the SEC.[74]

---

[73] The data provided by the NYSE quote the specialist participation rate as the percentage of volume attributed to specialists rather than the percentage of trades in which specialists participated as buyers or sellers.

[74] According to Proxy Statements filed 22 May 2000 and 16 March 2001, insiders held 4,609,723 and 2,202,778 shares as of 4 May 2000 and 5 March 2001, respectively. For the first 12 days of the Class Period, I used the

307. To make the institutional holdings adjustment to float, I examined each institutions reported holdings on each quarterly reporting date from 31 March 2000 through 31 December 2001. I assumed that, for each institution, the respective minimum level of shares held across those reporting dates was the amount each institution owned prior to the Class Period and continued to hold throughout the Class Period and the subsequent 90 days. I then summed these held shares across institutions to arrive at an aggregate estimate of shares owned by institutions prior to the Class Period and not traded during the Class Period and subsequent 90 days. This is the same methodology described by Barclay and Torchio [2001], among others. The number of shares arrived at through this approach amounted to 407.3 million shares, which I removed from the public float quantity.

308. Reducing the float to account for institutional holdings in this manner is a conservative methodological approach – *i.e.* one that lowers estimated damages – for it reduces the number of shares that could have been damaged and increases the estimate of turnover among the remaining shares. That is, this float reduction attributes reported volume to a smaller number of shares being traded, thereby limiting the number of unique shares that were purchased during the Class Period and hence damaged.

309. This method for excluding shares held by institutions is a conservative approach also because it is possible that some institutions may have sold and then repurchased shares between the quarterly reporting dates. Having been bought at artificially inflated prices, such repurchased shares would have been damaged, and yet my approach excludes them. Furthermore, the removal of held shares from float is conservative in that the trading frequency parameters estimated by Beaver, *et al.*, which I likewise applied, were derived empirically from data that did not remove such float held by institutions.

310. The share float for Pharmacia was divided into shares owned by "traders" and shares owned by "holders" using the Beaver, *et al.* model parameters. For example, on 17 April 2000, total float was 856,581,033 shares. Of this amount 15.3%, equal to 131,056,898 shares, belonged to "traders" and the remaining 84.7%, or 725,524,135 shares, belonged to "holders." As shares outstanding changed, the number of shares owned by each group was adjusted using these same percentages.

---

4,609,723 shares reportedly held as of 4 May 2000 as the approximate number of shares held by insiders after the merger.

311. On each trading day, the probability of any particular trader's share being traded (or re-traded) is estimated as the ratio of traders' volume divided by the number of traders' shares. The probability of any particular holder's share being traded (or re-traded) is estimated as the ratio of holders' volume divided by the number of holders' shares.

312. Using these estimated probabilities for each day in the Class Period, the model indicates when shares that were previously purchased were later sold.

313. Using the two-trader proportional trading model, I constructed a 389 by 328 element matrix whose entries show how many traders' shares purchased on each day were sold on each of the subsequent days. Another 389 by 328 element matrix shows how many holders' shares purchased on each day were sold on each subsequent day. A third matrix, the "buy/sell" matrix, sums the two.

314. To arrive at the estimate of total damages, I multiplied each element of the buy/sell matrix by the Rule 10b-5 per share damage corresponding to the respective buy and sell dates. Total damage to investors in the Plaintiff Class is found by summing the damages for all of the buy/sell dates. Estimated using this model, total damages suffered by Class members amounted to $1.59 billion. This damage figure is exclusive of prejudgment interest.

Analysis of the Two-Trader Model

315. Analysis of the two-trader model with alternative parameters indicates that the model parameters I applied provide one of the most conservative estimates of aggregate damages among estimates derived with alternative parameter value choices.

316. Recall that the parameter values I applied are those presented by Beaver, *et al.* [1993]. Barclay and Torchio [2001] analyzed these parameters and found them to generate nearly the lowest aggregate damage estimates from among the range of potential parameter values.

317. My own analysis of the model as it pertains to the present case confirms the Barclay and Torchio conclusion:  the two-trader proportional trading model with the Beaver, *et al.* parameters produces a conservative estimate of aggregate damages. For my analysis, I varied the parameter representing the proportion of shares held by traders versus holders to assess how such variation changed the aggregate damage estimate.

318. Using a 10% value for the proportion of all shares owned by "traders" rather than "holders," for example, aggregate damages are estimated to be $1.62 billion. This figure is

higher than the $1.59 billion I estimated using the Beaver, *et al.* parameter value of 15.3%. With a 20% value, aggregate damages are estimated to be $1.64 billion, also higher than the $1.59 billion estimated using the 15.3% parameter value. The table below shows estimated aggregate damages for a range of parameter value choices.

| Percent Held by Traders | Aggregate Damages ($ Millions) |
|---|---|
| 0% | 3,035.9 |
| 3% | 2,177.0 |
| 5% | 1,902.4 |
| 10% | 1,622.7 |
| 15% | 1,584.7 |
| 15.3% | 1,586.1 |
| 20% | 1,639.4 |
| 30% | 1,843.4 |
| 40% | 2,071.8 |
| 50% | 2,285.9 |
| 60% | 2,477.1 |
| 70% | 2,645.2 |
| 80% | 2,792.5 |
| 90% | 2,921.8 |
| 100% | 3,035.9 |

319. Note that from among the possible values for the model parameter value, the 15.3% input value I used gives an estimate of aggregate damages that is among the lowest. The use of the 15.3% parameter value therefore produces a conservative estimate of aggregate damages. As shown below, other analysis further confirms that the aggregate damages estimate is conservative.

Aggregate Damages Assuming the 90-Day Bounce-Back Period Begins on 8 February 2001

320. As discussed above, I estimated damages for all purchasers of Pharmacia stock through the final corrective disclosure on 5 August 2001 and began the 90-day bounce-back period on that date. The model with this specification estimated aggregate damages to be $1.59 billion. However, the final corrective disclosure on 5 August 2001 was not the date of the final dissipation of inflation, which occurred on 8 February 2001. Because it may be

determined that the 90-day bounce-back period should commence with the final dissipation of inflation rather than the final corrective disclosure, I performed an alternate estimation of aggregate damages with the 90-day bounce-back period starting on 8 February 2001.

321. The 90-day period beginning 8 February 2001 ends 8 May 2001. The average price for Pharmacia stock over this 90-day period, based on closing prices, was $50.11 per share.

322. For this alternative aggregate damage estimation, I utilized the same methodology and model parameters as were used in the original calculation.

323. With the 90-day bounce-back period beginning 8 February 2001, total damages suffered by Class members are estimated to be $1.38 billion, exclusive of prejudgment interest.

## Aggregate Damages Estimated from the Institutional Holdings Data

324. An alternative estimate of aggregate damages can be derived from the holdings data that institutions report quarterly to the SEC.

325. The reporting dates for these data correspond to the end of each calendar quarter. Therefore, to observe institutional holdings during the time spanning the Class Period and subsequent 90 days, I examined institutional holdings data reported for the quarters ending 31 March 2000 through 31 December 2001. These data are presented in Exhibit-16.

326. I observed whether holdings of Pharmacia stock increased or decreased for each respective institution in each quarter. If holdings increased, I assumed the increase equaled the number of shares purchased during the quarter. If holdings decreased, I assumed the decline equaled the number of shares sold during the quarter. If a particular institution's holdings remained the same, I assumed that institution neither bought nor sold shares during the quarter. This is a conservative method for estimating the number of shares traded by institutions, as it equates purchases with net purchases and sales with net sales. In fact, there may have been offsetting purchases and sales within a quarter that would not be captured by the end-of-quarter snapshots.

327. Next, for each institution, I assumed that transactions occurred on a daily basis throughout each respective quarter in proportion to the ratio of each day's market trading volume relative to the total quarterly market trading volume. That is, if on a particular day 5% of the quarter's total trading volume occurred, I assumed that 5% of each institution's trading during the quarter occurred on that day.

328. I then constructed a buy/sell matrix for each institution, similar to the buy/sell matrix described above for the proportional trading model. Initially, I used FIFO (first in, first out) accounting to match sales with buys, but repeated the exercise using LIFO (last in, first out). Under FIFO, the assumption is that when an institution sells shares, those shares sold are the shares that were the first purchased, meaning they would be the oldest shares held at the time of the sale. Under LIFO, the assumption is that the shares an institution sells are those shares that were the most recently purchased. Consequently, for each institution I constructed two alternative buy/sell matrices indicating when shares were purchased and if/when those shares were subsequently sold – one matrix based on FIFO and the other on LIFO.

329. Summing the buy/sell matrices for all institutions produces an aggregate institutional buy/sell matrix that indicates when all institutions as a group bought shares, and if/when those particular shares were later sold.

330. I assigned the appropriate per share damage amount to each purchased share depending on its purchase and sale dates as identified by the aggregate institutional buy/sell matrix. Summing across all purchased shares and all institutions provides a measure of damages suffered by all institutions.

331. Based on this methodology, using FIFO accounting, and assuming the 90-day bounce-back period starts 5 August 2001, I estimated that institutions suffered damages of $2.25 billion. Using LIFO accounting, institutional damages were $1.85 billion.

332. Assuming the 90-day bounce-back period begins 8 February 2001, using FIFO accounting, the institutional damage model indicates aggregate institutional damages of $1.76 billion. Using LIFO accounting, damages amount to $1.48 billion.

333. Both the FIFO and LIFO institutional damage figures for the later bounce-back period scenario substantially exceed the $1.59 billion aggregate damage figure estimated by the two-trader proportional trading model, even though this model includes only damages suffered by institutions who must report their holdings to the SEC. Smaller institutions and individual investors are excluded from the holdings data, and are therefore excluded from this damage estimate. Similarly, both the FIFO and LIFO institutional damage figures for the earlier bounce-back period scenario exceed the two-trader proportional trading model's estimate of $1.38 billion. Based on the greater magnitude of the damage estimates indicated

by the institutional damage model – despite that model's investor exclusions – I conclude that the estimates provided by the two-trader proportional trading model are extraordinarily conservative.

## **LIMITING FACTORS**

334. This report is furnished solely for the purpose of court proceedings in the above named matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.


Steven P. Feinstein, Ph.D., CFA

## APPENDIX:  LOGARITHMIC RETURNS

Logarithmic returns, rather than percent change returns, are commonly used in stock return regressions and event study analysis. The formula for a logarithmic return is:

$$R_t = \ln\left(\frac{P_t + d_t}{P_{t-1}}\right)$$

where:

$R_t$ is the logarithmic return on day t;
$P_t$ is the stock price at the end of day t;
$P_{t-1}$ is the stock price from the previous day, day $t$-1; and
$d_t$ is the dividend on day t, if any.

The formula for converting a logarithmic return into a dollar return is:

$$DR_t = P_{t-1} \cdot (e^{R_t} - 1)$$

where:

$DR_t$ is the dollar return on day t;
$P_{t-1}$ is the stock price from the previous day, day $t$-1;
e is natural e (approximately 2.7); and
$R_t$ is the logarithmic return on day t.

If a stock falls from $20 to $18, the percent change in price is -10%, equal to the $2 decline divided by the original $20 price. The logarithmic return, however, is -10.54%, equal to ln($18/$20).

The logarithmic return relates a price change to an average of the original, final, and intervening prices over the course of a price decline. As such, for large price declines, it is possible for a logarithmic price decline to exceed 100%, since the decline may be greater than the average of the beginning and ending prices.

An attractive feature of a logarithmic return is that it can be decomposed into contributing factors linearly. That is, the portion of a logarithmic return caused by company-specific information is isolated by subtracting from the total logarithmic return the portion of the total return caused by market and sector factors.

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

## LEGAL DOCUMENTS

- Plaintiffs' Consolidated Class Action Complaint for Violations of the Federal Securities Laws, filed 27 October 2003.
- Plaintiffs' Response To Defendants Pharmacia Corporation, Fred Hassan, G. Steven Geis, Carrie Cox, and Pfizer, Inc.'s Second Set of Interrogatories, dated 31 March 2011.
- *Alaska Electrical Pension Fund v. Pharmacia Corp*., No. 03-01519 (AET), 2007 U.S. Dist. Lexis 5410, (D.N.J. January 22, 2007).
- *Alaska Electrical Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3rd Cir. 2009).
- *Basic Inc. v. Levinson* 485 U.S. 224 (1988).
- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J., 1989).
- *Dura Pharmaceuticals, Inc., v Broudo*, 544 U.S. 336, 341 (2005).
- *In DVI, Inc.* No. 08-8033, 2011 U.S. App. LEXIS 6302 (3rd Cir. March 29, 2011).
- *In re Oxford Health Plans, Inc.*, 244 F. Supp. 2d 247, 249-52 (S.D.N.Y. 2003).
- *In re Worldcom, Inc.*, No. 02 civ. 3288 (DLC), 2005 U.S. Dist. LEXIS 3143 at *5-*15 (S.D.N.Y. March 4, 2005).
- *Krogman v. Sterritt,* 202 F.R.D. 467 (N.D. Tex. 2001).
- *Robbins v. Deloitte & Touche, LLP*, No. 90-896- -Civ-J-10, 1995 U.S. Dist. LEXIS 22424, at *1 (M.D. Fla. June 28, 1995), *rev'd on other grounds*, 116 F.3d 1441 (11th Cir. 1997).
- *Unger v. Amedisys Inc.,* 401 F.3d 316 (5th Cir. 2005).

## NEWS ARTICLES / PRESS RELEASES

- *Factiva* news articles (3,628) from 15 December 1999 to 14 August 2002, downloaded on 7 September 2010, using the following search parameters: Company Field: Pharmacia Corporation; Sources Field: *Reuters Newswires* OR *Dow Jones Newswires* OR Major News and Business Publications OR Press Release Wires.
- *Factiva* news articles (100) from 9 July 2000 to 15 February 2001, downloaded using the following search parameters: Company Field: Merck Sharp & Dohme Corp.; Sources Field: *Reuters Newswires* OR *Dow Jones Newswires* OR Major News and Business Publications OR Press Release Wires; Free Text Field: VIOXX.
- "Pain, Pain Go Away Is Celebrex – The New Arthritis Drug – All It's Cracked Up to Be?" by Andrea Rock, *Money Magazine*, 1 April 1999.
- "New Findings Presented on Celebrex(R) Safety and Tolerability From Long-Term Outcomes Study of 8,000 Arthritis Patients," Pharmacia and Pfizer joint press release, *PR Newswire*, 17 April 2000.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- "Pharmacia Corporation Reports 27% Increase In First-Quarter Earnings-Per-Share," Company press release, *PR Newswire*, 25 April 2000.
- "Findings from Celebrex(R) Safety Study Show Traditional NSAID Comparators Can Cause Serious GI Complications Within First Few Days of Treatment," Pharmacia and Pfizer joint press release, *PR Newswire*, 23 May 2000.
- "Microsoft Ruling Fails to Deter Further Tech Gains," by Andrew Bary, *Barron's*, 12 June 2000.
- "Pharmacia Reports 18% Increase in Second Quarter Earnings per Share," Company press release, *PR Newswire*, 25 July 2000.
- "JAMA Study Shows Arthritis Medication Causes Fewer Gastrointestinal Problems than Traditional Drugs," Pharmacia, Pfizer, and the University of Illinois at Chicago College of Medicine press release, *PR Newswire,* 12 September 2000.
- "Pharmacia's Xalatan Becomes the Number-One Selling Glaucoma Treatment in Japan," Company press release, *PR Newswire*, 6 February 2001.
- "Merck's Vioxx Safety Warning Should Remain, FDA Review Says," *Bloomberg News*, 7 February 2001.
- "Pharmacia Corporation Reports 19% Increase in First-Quarter Earnings-Per-Share," Company press release, *PR Newswire*, 25 April 2001.
- "Missing Data on Celebrex; Full Study Altered Picture of Drug," by Susan Okie, *The Washington Post*, 5 August 2001.
- "Are Selective COX 2 Inhibitors Superior To Traditional Non Steroidal Anti-Inflammatory Drugs?" by Peter Juni, Anne W S Rutjes, and Paul A Dieppe, *British Medical Journal*, 1 June 2002, 324, 7349, p. 1288.
- "The Credibility Gap in Drug Research," by Raeburn, Paul, *BusinessWeek*, 24 June 2002.

## ANALYST REPORTS

- Deutsche Bank Securities, "Pharmacia & UpJohn," 11 October 1999.
- PaineWebber, "Pharmacia & UpJohn," 14 October 1999.
- PaineWebber, "Pharmacia & UpJohn," 25 October 1999.
- SG Cowen Securities, "Pharmacia & UpJohn," 25 October 1999.
- D. Carnegie A.B., "Pharmacia & UpJohn," 26 October 1999.
- Deutsche Bank Securities, "Pharmacia & UpJohn," 28 October 1999.
- CIBC, "Pharmacia & UpJohn," 29 October 1999.
- Credit Suisse First Boston, "Pharmacia & UpJohn," 29 October 1999.
- D. Carnegie A.B., "Pharmacia & UpJohn," 29 October 1999.
- PaineWebber, "Pharmacia & UpJohn," 29 October 1999.
- Morgan Stanley, "Pharmacia & UpJohn," 11 November 1999.
- PaineWebber, "Pharmacia & UpJohn," 18 November 1999.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- PaineWebber, "Pharmacia & UpJohn," 16 December 1999.
- PaineWebber, "Monsanto," 20 December 1999.
- Donaldson, Lufkin & Jenrette Securities, "Monsanto," 21 December 1999.
- Duff & Phelps, "Monsanto," 21 December 1999.
- Sutro & Co., "Monsanto," 22 December 1999.
- ING Financial Markets, "Monsanto," 29 December 1999.
- Donaldson, Lufkin & Jenrette Securities, "Monsanto," 5 January 2000.
- PaineWebber, "Monsanto," 13 January 2000.
- Cholet-Dupont, "Pharmacia & UpJohn," 26 January 2000.
- Morgan Stanley, "Monsanto," 31 January 2000.
- Sutro & Co., "Monsanto," 2 February 2000.
- Morgan Stanley, "Pharmacia & UpJohn," 2 February 2000.
- Credit Suisse First Boston, "Pharmacia & UpJohn," 3 February 2000.
- PaineWebber, "Monsanto," 7 February 2000.
- PaineWebber, "Monsanto," 8 February 2000.
- CIBC, "Pharmacia & UpJohn," 10 February 2000.
- D. Carnegie A.B., "Pharmacia & UpJohn," 10 February 2000.
- Donaldson, Lufkin & Jenrette Securities, "Monsanto," 11 February 2000.
- Morgan Stanley, "Pharmacia & UpJohn," 11 February 2000.
- PaineWebber, "Pharmacia & UpJohn," 11 February 2000.
- PNC, "Monsanto," 15 February 2000.
- Deutsche Bank Securities, "Pharmacia & UpJohn," 15 February 2000.
- Morgan Stanley, "Pharmacia & UpJohn," 16 February 2000.
- PaineWebber, "Pharmacia & UpJohn," 17 February 2000.
- SG Cowen Securities, "Pharmacia & UpJohn," 22 February 2000.
- SG Cowen Securities, "Pharmacia & UpJohn," 1 March 2000.
- SG Cowen Securities, "Pharmacia & UpJohn," 9 March 2000.
- PaineWebber, "Pharmacia & UpJohn," 15 March 2000.
- PaineWebber, "Monsanto," 16 March 2000.
- PaineWebber, "Monsanto," 17 March 2000.
- Natixis, "Pharmacia & UpJohn," 22 March 2000.
- Credit Suisse First Boston, "Pharmacia & UpJohn," 27 March 2000.
- RBS, "Pharmacia & UpJohn," 27 March 2000.
- SG Cowen Securities, "Pharmacia & UpJohn," 27 March 2000.
- PNC, "Monsanto," 30 March 2000.
- Aragon Fondkommission, "Pharmacia," 1 April 2000.
- SG Cowen Securities, "Pharmacia," 3 April 2000.
- Morgan Stanley, "Pharmacia," 4 April 2000.
- PNC, "Pharmacia," 4 April 2000.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Salomon Smith Barney, "Monsanto," 6 April 2000.
- Bear, Stearns & Co., "Pharmacia," 10 April 2000.
- Credit Suisse First Boston, "Pfizer," 11 April 2000.
- RBS, "Pfizer," 11 April 2000.
- Credit Suisse First Boston, "Pfizer," 12 April 2000.
- Salomon Smith Barney, "Pharmacia," 12 April 2000.
- RBS, "Pharmacia," 12 April 2000.
- PaineWebber, "Pfizer," 13 April 2000.
- PaineWebber, "Pfizer," 13 April 2000.
- PaineWebber, "Pharmacia," 13 April 2000.
- PNC, "Pfizer," 14 April 2000.
- Natixis, "Pharmacia," 14 April 2000.
- SG Cowen, "Pfizer," 17 April 2000.
- Credit Suisse First Boston, "Pfizer," 18 April 2000.
- PaineWebber, "Pfizer," 18 April 2000.
- RBS, "Pfizer," 18 April 2000.
- Sanford C. Bernstein & Co., "Pfizer," 18 April 2000.
- Salomon Smith Barney, "Pfizer," 18 April 2000.
- Salomon Smith Barney, "Pfizer," 18 April 2000.
- Salomon Smith Barney, "Pfizer," 18 April 2000.
- Morgan Stanley, "Pharmacia," 18 April 2000.
- CIBC, "Pfizer," 19 April 2000.
- Morgan Stanley, "Pfizer," 19 April 2000.
- PaineWebber, "Pfizer," 19 April 2000.
- RBC, "Pfizer," 19 April 2000.
- Sutro & Co., "Pfizer," 19 April 2000.
- Tucker Anthony Sutro Capital Markets, "Pfizer," 19 April 2000.
- PNC, "Pfizer," 25 April 2000.
- CIBC, "Pharmacia," 25 April 2000.
- Salomon Smith Barney, "Pharmacia," 25 April 2000.
- D. Carnegie A.B., "Pharmacia," 25 April 2000.
- RBS, "Pharmacia," 25 April 2000.
- SG Cowen Securities, "Pharmacia," 25 April 2000.
- Cowen And Company, "Pharmacia," 26 April 2000.
- Credit Suisse First Boston, "Pharmacia," 26 April 2000.
- Donaldson, Lufkin & Jenrette Securities, "Pharmacia," 26 April 2000.
- Morgan Stanley, "Pharmacia," 26 April 2000.
- PaineWebber, "Pharmacia," 26 April 2000.
- Morgan Stanley, "Pfizer," 27 April 2000.

**Exhibit-1**

## Documents and Other Information Reviewed and Relied Upon

- Deutsche Bank Securities, "Pfizer," 2 May 2000.
- Brown Brothers Harriman & Co., "Pharmacia," 12 May 2000.
- PaineWebber, "Pharmacia," 18 May 2000.
- Credit Suisse First Boston, "Pharmacia," 24 May 2000.
- Credit Suisse First Boston, "Pharmacia," 25 May 2000.
- Morgan Stanley, "Pharmacia," 25 May 2000.
- Morgan Stanley, "Pharmacia," 30 May 2000.
- PaineWebber, "Pharmacia," 5 June 2000.
- PNC, "Pharmacia," 8 June 2000.
- Donaldson, Lufkin & Jenrette Securities, "Pharmacia," 12 June 2000.
- PaineWebber, "Pharmacia," 15 June 2000.
- PaineWebber, "Pharmacia," 23 June 2000.
- Morgan Stanley, "Pharmacia," 26 June 2000.
- PaineWebber, "Pharmacia," 6 July 2000.
- PaineWebber, "Pharmacia," 13 July 2000.
- ING Financial Markets, "Pharmacia," 18 July 2000.
- ING Financial Markets, "Pharmacia," 21 July 2000.
- CIBC, "Pharmacia," 25 July 2000.
- Credit Suisse First Boston, "Pharmacia," 25 July 2000.
- D. Carnegie A.B., "Pharmacia," 25 July 2000.
- SG Cowen Securities, "Pharmacia," 25 July 2000.
- Donaldson, Lufkin & Jenrette Securities, "Pharmacia," 26 July 2000.
- Morgan Stanley, "Pharmacia," 26 July 2000.
- PaineWebber, "Pharmacia," 26 July 2000.
- SG Cowen Securities, "Pharmacia," 26 July 2000.
- SG Cowen Securities, "Pharmacia," 31 July 2000.
- Salomon Smith Barney, "Pharmacia," 7 August 2000.
- SG Cowen Securities, "Pharmacia," 14 August 2000.
- Morgan Stanley, "Pharmacia," 15 August 2000.
- PaineWebber, "Pharmacia," 16 August 2000.
- PaineWebber, "Pharmacia," 17 August 2000.
- PaineWebber, "Pharmacia," 18 August 2000.
- Donaldson, Lufkin & Jenrette Securities, "Pharmacia," 23 August 2000.
- Argus Research, "Pharmacia," 6 September 2000.
- PaineWebber, "Pharmacia," 7 September 2000.
- PaineWebber, "Pharmacia," 13 September 2000.
- PaineWebber, "Pharmacia," 14 September 2000.
- RBS, "Pharmacia," 19 September 2000.
- D. Carnegie A.B., "Pharmacia," 22 September 2000.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- SG Cowen Securities, "Pharmacia," 18 October 2000.
- PaineWebber, "Pharmacia," 19 October 2000.
- Salomon Smith Barney, "Pharmacia," 20 October 2000.
- D. Carnegie A.B., "Pharmacia," 26 October 2000.
- Salomon Smith Barney, "Pharmacia," 27 October 2000.
- Salomon Smith Barney, "Pharmacia," 30 October 2000.
- D. Carnegie A.B., "Pharmacia," 30 October 2000.
- PaineWebber, "Pharmacia," 30 October 2000.
- CIBC, "Pharmacia," 31 October 2000.
- Salomon Smith Barney, "Pharmacia," 31 October 2000.
- Morgan Stanley, "Pharmacia," 31 October 2000.
- PaineWebber, "Pharmacia," 31 October 2000.
- PNC, "Pharmacia," 7 November 2000.
- Raymond James & Associates, "Pharmacia," 8 November 2000.
- Morgan Stanley, "Pharmacia," 16 November 2000.
- UBS, "Pharmacia," 16 November 2000.
- ING Financial Markets, "Pharmacia," 17 November 2000.
- Credit Suisse First Boston, "Pharmacia," 29 November 2000.
- Credit Suisse First Boston, "Pharmacia," 5 December 2000.
- UBS, "Pharmacia," 14 December 2000.
- Credit Suisse First Boston, "Pharmacia," 5 January 2001.
- SG Cowen Securities, "Pharmacia," 11 January 2001.
- UBS, "Pharmacia," 18 January 2001.
- RBC, "Glaxosmithkline," 1 February 2001.
- HSBC Global Research, "Pharma Monthly Digest - January: At The Mercy Of Wall Street," 1 February 2001.
- CIBC, "A Weekly Dose Of Pharmaceutical News," 2 February 2001.
- Salomon Smith Barney, "Drugs: Scrip Picture Book, December Audited Sales," 2 February 2001.
- Morgan Stanley, "Healthcare: Fda Cox-2 Panel: Expectations For MRK, PHA," 2 February 2001.
- Credit Suisse First Boston, "Pharma Valuations - A Weekly Valuation And Performance Monitor," 2 February 2001.
- J.J.B. Hilliard, W.L. Lyons, "Pharmaceutical Industry - 2000 Fourth Quarter Review," 2 February 2001.
- Salomon Smith Barney, "Scrip Picture Book, December Audited Sales," 2 February 2001.
- Credit Lyonnais Securities, "French Small Cap Pharmaceuticals," 5 February 2001.
- Credit Suisse First Boston, "Health Care Daily Rounds - 2/5/2001," 5 February 2001.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Credit Suisse First Boston, "Pharma Valuations - A Weekly Valuation And...," 5 February 2001.
- Credit Suisse First Boston, "Pharmaceuticals: Weekly Perscription Trends Fbc," 5 February 2001.
- Robertson Stephens, "Script Sense Weekly - 1/26/01," 5 February 2001.
- UBS, "Pfizer," 6 February 2001.
- Morgan Stanley, "Pharmaceuticals: Prescription Data Overview: Us Market (Decemb," 6 February 2001.
- Morgan Stanley, "2001 Biotech Preview: Expecting A Product Encore," 7 February 2001.
- Pacific Growth, "Adolor Corp.," 7 February 2001.
- Robertson Stephens, "Merck & Co," 7 February 2001.
- RBC, "Pfizer," 7 February 2001.
- Salomon Smith Barney, "PHA: FDA Reviews Celebrex & Vioxx Safety Data," 7 February 2001.
- Salomon Smith Barney, "Pharmacia Corp.," 7 February 2001.
- Credit Suisse First Boston, "Prescription Trend Monitor January 2001," 7 February 2001.
- Salomon Smith Barney, "Pharmacia," 7 February 2001.
- UBS, "FDA Review Of Vioxx: Gi Safety (+), Cardiac Risk (-), Net Resu," 8 February 2001.
- Credit Suisse First Boston, "Health Care Daily Rounds - 2/8/2001," 8 February 2001.
- CIBC, "Merck & Co," 8 February 2001.
- Salomon Smith Barney, "Merck & Co," 8 February 2001.
- Salomon Smith Barney, "MRK: Vioxx & Celebrex At Fda (Day 2)," 8 February 2001.
- Robertson Stephens, "Pfizer," 8 February 2001.
- Credit Suisse First Boston, "PHA: No Change Recommended For Celebrex Labeling - ...," 8 February 2001.
- Credit Suisse First Boston, "PHA: No Change Recommended For Celebrex Labeling - ...," 8 February 2001.
- Raymond James & Associates, "Pharmaceutical Industry Brief," 8 February 2001.
- UBS, "Pharmaceuticals: Disappointing Fda Review Of Gi Safety Data Fo," 8 February 2001.
- CIBC, "Pharmacia Corp.," 8 February 2001.
- UBS, "Yamanouchi Pharmaceutical Co.," 8 February 2001.
- CIBC, "Pharmacia," 8 February 2001.
- Credit Suisse First Boston, "Pharmacia," 8 February 2001.
- Morgan Stanley, "Astrazeneca Plc," 9 February 2001.
- Credit Suisse First Boston, "CSFB Tech Daily - 2/9/01 Fbc," 9 February 2001.
- Credit Suisse First Boston, "Health Care Daily Rounds - 2/9/2001," 9 February 2001.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Landsbanki - Kepler, "Healthcare Weekly: Pharma, Biotech And Medtech News," 9 February 2001.
- Robertson Stephens, "Merck & Co," 9 February 2001.
- Credit Suisse First Boston, "MRK: Fda Gives Ground On Improving Vioxx Gi Label...," 9 February 2001.
- Credit Suisse First Boston, "MRK: Fda Gives Ground On Improving Vioxx Gi Label...," 9 February 2001.
- Salomon Smith Barney, "PHA: Eps Prep Pack, 4Q 2000," 9 February 2001.
- Salomon Smith Barney, "Pharmacia Corp.," 9 February 2001.
- Sanford C. Bernstein & Co., "Vioxx V. Celebrex: Distinction Without A Difference; Bet On Va," 9 February 2001.
- Salomon Smith Barney, "Pharmacia," 9 February 2001.
- Salomon Smith Barney, "ADR Focus List: Adding Astrazeneca On... Part 2," 12 February 2001.
- Credit Suisse First Boston, "Health Care Daily Rounds - 2/12/2001," 12 February 2001.
- SG Cowen, "Pfizer," 12 February 2001.
- Deutsche Bank Securities, "Pharmaceuticals Daily - Ward Rounds," 12 February 2001.
- UBS, "Pharmaceuticals: Weekly Trends - February 12, 2001," 12 February 2001.
- D. Carnegie A.B., "Pharmacia Corp.," 12 February 2001.
- D. Carnegie A.B., "Pharmacia," 12 February 2001.
- Credit Suisse First Boston, "Pharmacia," 13 February 2001.
- Morgan Stanley, "Pharmacia," 13 February 2001.
- Raymond James & Associates, "Pharmacia," 13 February 2001.
- UBS, "Pharmacia," 13 February 2001.
- Salomon Smith Barney, "Pharmacia," 15 February 2001.
- RBS, "Pharmacia," 21 February 2001.
- UBS, "Pharmacia," 26 February 2001.
- Credit Suisse First Boston, "Pharmacia," 6 March 2001.
- Morgan Stanley, "Pharmacia," 6 March 2001.
- Salomon Smith Barney, "Pharmacia," 8 March 2001.
- Salomon Smith Barney, "Pharmacia," 13 March 2001.
- Credit Suisse First Boston, "Pharmacia," 13 March 2001.
- UBS, "Pharmacia," 13 March 2001.
- Raymond James & Associates, "Pharmacia," 15 March 2001.
- UBS, "Pharmacia," 15 March 2001.
- Salomon Smith Barney, "Pharmacia," 19 March 2001.
- SG Cowen Securities, "Pharmacia," 19 March 2001.
- Salomon Smith Barney, "Pharmacia," 26 March 2001.
- CIBC, "Pharmacia," 29 March 2001.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Salomon Smith Barney, "Pharmacia," 29 March 2001.
- Credit Suisse First Boston, "Pharmacia," 4 April 2001.
- Credit Suisse First Boston, "Pharmacia," 5 April 2001.
- UBS, "Pharmacia," 19 April 2001.
- Salomon Smith Barney, "Pharmacia," 24 April 2001.
- CIBC, "Pharmacia," 26 April 2001.
- Credit Suisse First Boston, "Pharmacia," 26 April 2001.
- Morgan Stanley, "Pharmacia," 26 April 2001.
- Raymond James & Associates, "Pharmacia," 26 April 2001.
- UBS, "Pharmacia," 26 April 2001.
- Morgan Stanley, "Pharmacia," 30 April 2001.
- Morgan Stanley, "Pharmacia," 7 May 2001.
- Credit Suisse First Boston, "Pharmacia," 14 May 2001.
- Morgan Stanley, "Pharmacia," 14 May 2001.
- Credit Suisse First Boston, "Pharmacia," 15 May 2001.
- Credit Suisse First Boston, "Pharmacia," 16 May 2001.
- UBS, "Pharmacia," 17 May 2001.
- PNC, "Pharmacia," 18 May 2001.
- Credit Suisse First Boston, "Pharmacia," 21 May 2001.
- Morgan Stanley, "Pharmacia," 21 May 2001.
- UBS, "Pharmacia," 22 May 2001.
- Bear, Stearns & Co., "Pharmacia," 24 May 2001.
- Prudential Equity Group, "Pharmacia," 13 June 2001.
- UBS, "Pharmacia," 14 June 2001.
- SG Cowen Securities, "Pharmacia," 1 July 2001.
- SG Cowen Securities, "Pharmacia," 13 July 2001.
- Salomon Smith Barney, "Pharmacia," 16 July 2001.
- Morgan Stanley, "Pharmacia," 16 July 2001.
- Robertson Stephens, "Pharmacia," 16 July 2001.
- UBS, "Pharmacia," 16 July 2001.
- UBS, "Pharmacia," 19 July 2001.
- Salomon Smith Barney, "Pharmacia," 23 July 2001.
- Credit Suisse First Boston, "Pharmacia," 25 July 2001.
- Deutsche Bank Securities, "Pharmacia," 25 July 2001.
- Bear, Stearns & Co., "Pharmacia," 26 July 2001.
- Salomon Smith Barney, "Pharmacia," 26 July 2001.
- Deutsche Bank Securities, "Pharmacia," 26 July 2001.
- Morgan Stanley, "Pharmacia," 26 July 2001.
- Ohman Fondkommission, "Pharmacia," 26 July 2001.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Raymond James & Associates, "Pharmacia," 26 July 2001.
- UBS, "Pharmacia," 26 July 2001.
- Deutsche Bank Securities, "Pharmacia," 27 July 2001.
- Aragon Fondkommission, "Pharmacia," 30 July 2001.
- Morgan Stanley, "Pharmacia," 6 August 2001.
- PNC, "Pharmacia," 14 August 2001.
- Robertson Stephens, "Pharmacia," 17 August 2001.
- UBS, "Pharmacia," 17 August 2001.
- CIBC, "Pharmacia," 22 August 2001.
- Deutsche Bank Securities, "Pharmacia," 22 August 2001.
- Ohman Fondkommission, "Pharmacia," 23 August 2001.
- Credit Suisse First Boston, "Pharmacia," 29 August 2001.
- Credit Suisse First Boston, "Pharmacia," 30 August 2001.
- PNC, "Pharmacia," 14 September 2001.
- UBS, "Pharmacia," 20 September 2001.
- Bear, Stearns & Co., "Pharmacia," 27 September 2001.
- Salomon Smith Barney, "Pharmacia," 5 October 2001.
- Credit Suisse First Boston, "Pharmacia," 15 October 2001.
- Morgan Stanley, "Pharmacia," 15 October 2001.
- UBS, "Pharmacia," 18 October 2001.
- Ohman Fondkommission, "Pharmacia," 19 October 2001.
- Salomon Smith Barney, "Pharmacia," 22 October 2001.
- CIBC, "Pharmacia," 23 October 2001.
- Salomon Smith Barney, "Pharmacia," 23 October 2001.
- Deutsche Bank Securities, "Pharmacia," 23 October 2001.
- PNC, "Pharmacia," 23 October 2001.
- Deutsche Bank Securities, "Pharmacia," 24 October 2001.
- Morgan Stanley, "Pharmacia," 24 October 2001.
- Raymond James & Associates, "Pharmacia," 24 October 2001.
- UBS, "Pharmacia," 24 October 2001.
- Ohman Fondkommission, "Pharmacia," 25 October 2001.
- Morgan Stanley, "Pharmacia," 30 October 2001.
- RBC Capital Markets, "Pharmacia," 30 October 2001.
- Salomon Smith Barney, "Pharmacia," 12 November 2001.
- Bear, Stearns & Co., "Pharmacia," 13 November 2001.
- Ohman Fondkommission, "Pharmacia," 13 November 2001.
- UBS, "Pharmacia," 15 November 2001.
- Bear, Stearns & Co., "Pharmacia," 19 November 2001.
- Credit Suisse First Boston, "Pharmacia," 19 November 2001.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- CIBC, "Pharmacia," 20 November 2001.
- Morgan Stanley, "Pharmacia," 20 November 2001.
- UBS, "Pharmacia," 20 November 2001.
- Ohman Fondkommission, "Pharmacia," 22 November 2001.
- Bear, Stearns & Co., "Pharmacia," 28 November 2001.
- Bear, Stearns & Co., "Pharmacia," 29 November 2001.
- CIBC, "Pharmacia," 29 November 2001.
- Salomon Smith Barney, "Pharmacia," 29 November 2001.
- Credit Suisse First Boston, "Pharmacia," 29 November 2001.
- Deutsche Bank Securities, "Pharmacia," 29 November 2001.
- Morgan Stanley, "Pharmacia," 29 November 2001.
- Raymond James & Associates, "Pharmacia," 29 November 2001.
- RBS, "Pharmacia," 29 November 2001.
- Sanford C. Bernstein & Co., Inc., "Pharmacia," 29 November 2001.
- UBS, "Pharmacia," 29 November 2001.
- Salomon Smith Barney, "Pharmacia," 3 December 2001.
- Credit Suisse First Boston, "Pharmacia," 3 December 2001.
- Deutsche Bank Securities, "Pharmacia," 6 December 2001.
- UBS, "Pharmacia," 6 December 2001.
- Salomon Smith Barney, "Pharmacia," 7 December 2001.
- UBS, "Pharmacia," 13 December 2001.
- Argus Research, "Pharmacia," 19 December 2001.
- RBS, "Pharmacia," 16 January 2002.
- UBS, "Pharmacia," 17 January 2002.
- Credit Lyonnais Securities (Uk), "Pharmacia," 30 January 2002.
- D. Carnegie A.B., "Pharmacia," 30 January 2002.
- ABG Sundal Collier, "Pharmacia," 4 February 2002.
- Salomon Smith Barney, "Pharmacia," 4 February 2002.
- CIBC, "Pharmacia," 5 February 2002.
- Salomon Smith Barney, "Pharmacia," 5 February 2002.
- Credit Suisse First Boston, "Pharmacia," 5 February 2002.
- D. Carnegie A.B., "Pharmacia," 5 February 2002.
- Deutsche Bank Securities, "Pharmacia," 5 February 2002.
- ABG Sundal Collier, "Pharmacia," 6 February 2002.
- Bear, Stearns & Co., "Pharmacia," 6 February 2002.
- Deutsche Bank Securities, "Pharmacia," 6 February 2002.
- Morgan Stanley, "Pharmacia," 6 February 2002.
- Raymond James & Associates, "Pharmacia," 6 February 2002.
- RBS, "Pharmacia," 6 February 2002.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- UBS, "Pharmacia," 6 February 2002.
- D. Carnegie A.B., "Pharmacia," 7 February 2002.
- Credit Suisse First Boston, "Pharmacia," 13 February 2002.
- RBS, "Pharmacia," 19 February 2002.
- Credit Suisse First Boston, "Pharmacia," 20 February 2002.
- Credit Suisse First Boston, "Pharmacia," 15 March 2002.
- Morgan Stanley, "Pharmacia," 18 March 2002.
- Credit Suisse First Boston, "Pharmacia," 20 March 2002.
- Natixis, "Pharmacia," 27 March 2002.
- Salomon Smith Barney, "Pharmacia," 28 March 2002.
- Sanford C. Bernstein & Co., Inc., "Pharmacia," 16 April 2002.
- UBS, "Pharmacia," 18 April 2002.
- ABG Sundal Collier, "Pharmacia," 19 April 2002.
- Bernstein Research, "Pharmacia," 19 April 2002.
- Salomon Smith Barney, "Pharmacia," 22 April 2002.
- CIBC, "Pharmacia," 23 April 2002.
- Credit Suisse First Boston, "Pharmacia," 23 April 2002.
- D. Carnegie A.B., "Pharmacia," 23 April 2002.
- Deutsche Bank Securities, "Pharmacia," 23 April 2002.
- ABG Sundal Collier, "Pharmacia," 24 April 2002.
- Bear, Stearns & Co., "Pharmacia," 24 April 2002.
- Morgan Stanley, "Pharmacia," 24 April 2002.
- Raymond James & Associates, "Pharmacia," 24 April 2002.
- UBS, "Pharmacia," 24 April 2002.
- Danske Equities (Esn), "Pharmacia," 2 May 2002.
- Morgan Stanley, "Pharmacia," 13 May 2002.
- Credit Suisse First Boston, "Pharmacia," 14 May 2002.
- UBS, "Pharmacia," 16 May 2002.
- CIBC, "Pharmacia," 20 May 2002.
- Credit Suisse First Boston, "Pharmacia," 20 May 2002.
- Deutsche Bank Securities, "Pharmacia," 20 May 2002.
- D. Carnegie A.B., "Pharmacia," 3 June 2002.
- UBS, "Pharmacia," 3 June 2002.
- Credit Suisse First Boston, "Pharmacia," 7 June 2002.
- Deutsche Bank Securities, "Pharmacia," 10 June 2002.
- Salomon Smith Barney, "Pharmacia," 12 June 2002.
- Credit Suisse First Boston, "Pharmacia," 12 June 2002.
- UBS, "Pharmacia," 13 June 2002.
- PNC, "Pharmacia," 26 June 2002.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Morgan Stanley, "Pharmacia," 11 July 2002.
- CIBC, "Pharmacia," 15 July 2002.
- PNC, "Pharmacia," 15 July 2002.
- Sanford C. Bernstein & Co., Inc., "Pharmacia," 16 July 2002.
- Stephens, "Pharmacia," 16 July 2002.
- D. Carnegie A.B., "Pharmacia," 18 July 2002.
- Morgan Stanley, "Pharmacia," 18 July 2002.
- UBS, "Pharmacia," 18 July 2002.
- Salomon Smith Barney, "Pharmacia," 22 July 2002.
- D. Carnegie A.B., "Pharmacia," 23 July 2002.
- Deutsche Bank Securities, "Pharmacia," 23 July 2002.
- CIBC, "Pharmacia," 24 July 2002.
- Credit Suisse First Boston, "Pharmacia," 24 July 2002.
- Danske Equities (Esn), "Pharmacia," 24 July 2002.
- Deutsche Bank Securities, "Pharmacia," 24 July 2002.
- Morgan Stanley, "Pharmacia," 24 July 2002.
- Natixis, "Pharmacia," 24 July 2002.
- Raymond James & Associates, "Pharmacia," 24 July 2002.
- UBS, "Pharmacia," 24 July 2002.
- Deutsche Bank Securities, "Pharmacia," 30 July 2002.
- Credit Suisse First Boston, "Pharmacia," 13 August 2002.
- Credit Suisse First Boston, "Pharmacia," 14 August 2002.
- PNC, "Pharmacia," 14 August 2002.
- UBS, "Pharmacia," 15 August 2002.
- Bernstein Research, "Pharmacia," 3 September 2002.
- Bernstein Research, "Pharmacia," 6 September 2002.
- Credit Suisse First Boston, "Pharmacia," 24 September 2002.
- Deutsche Bank Securities, "Pharmacia," 1 October 2002.
- Credit Suisse First Boston, "Pharmacia," 2 October 2002.

### SEC FILINGS

- Monsanto Company Form DEF 14A, filed 15 March 1999.
- Monsanto Company Form 10-Q for the Fiscal Quarter Ended 31 March 1999, filed 19 May 1999.
- Monsanto Company Form 10-Q for the Fiscal Quarter Ended 30 June 1999, filed 16 August 1999.
- Monsanto Company Form 10-Q for the Fiscal Quarter Ended 30 September 1999, filed 15 November 1999.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Monsanto Company Form 10-KA for the Fiscal Year Ended 31 December 1998, filed 21 January 2000.
- Monsanto Company Form 10-QA for the Fiscal Quarter Ended 31 March 1999, filed 21 January 2000.
- Monsanto Company Form 10-QA for the Fiscal Quarter Ended 30 June 1999, filed 21 January 2000.
- Monsanto Company Form 10-QA for the Fiscal Quarter Ended 30 September 1999, filed 21 January 2000.
- Monsanto Company Form 8-K, dated 25 January 2000.
- Monsanto Company Form PREM 14A, filed 28 January 2000.
- Pharmacia & Upjohn, Inc. Form 10-K for the Fiscal Year Ended 31 December 1999, filed 20 March 2000.
- Monsanto Company Form 10-K for the Fiscal Year Ended 31 December 1999, filed 20 March 2000.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 31 March 2000, filed 15 May 2000.
- Pharmacia Corporation Form DEF 14A, filed 22 May 2000.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 30 June 2000, filed 14 August 2000.
- Pharmacia Corporation Form S-3, filed 20 September 2000.
- Pharmacia Corporation Form S-3A, filed 2 November 2000.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 30 September 2000, filed 14 November 2000.
- Monsanto Company Form 10-Q for the Fiscal Quarter Ended 30 September 2000, filed 30 November 2000.
- Monsanto Company Form DEF 14A, filed 16 March 2001.
- Pharmacia Corporation Form DEF 14A, filed 19 March 2001.
- Pharmacia Corporation Form 10-K for the Year Ended 31 December 2000, filed 26 March 2001.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 31 March 2001, filed 15 May 2001.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 30 June 2001, filed 14 August 2001.
- Pharmacia Corporation Form 10-QA for the Fiscal Quarter Ended 30 June 2001, filed 21 August 2001.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 30 September 2001, filed 13 November 2001.
- Pharmacia Corporation Form 10-K405 for the Year Ended 31 December 2001, filed 5 March 2002.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Monsanto Company Form 10-K for the Year Ended 31 December 2001, filed 5 March 2002.
- Pharmacia Corporation Form DEF 14A, filed 25 March 2002.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 31 March 2002, filed 15 May 2002.
- Pharmacia Corporation Form DEF 14A, filed 12 August 2002.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 30 June 2002, filed 13 August 2002.
- Pharmacia Corporation Form DEF 14A, filed 5 November 2002.
- Pharmacia Corporation Form DEF 14A, filed 14 November 2002.
- Pharmacia Corporation Form 10-Q for the Fiscal Quarter Ended 30 September 2002, filed 15 November 2002.
- Pharmacia Corporation Form DEF 14A, filed 5 December 2002.
- Pharmacia Corporation Form 10-K for the Year Ended 31 December 2002, filed 25 March 2003.


## ACADEMIC AND PROFESSIONAL LITERATURE

- Aktas, Nihat, Eric de Bodt, and Jean-Gabriel Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, 2007.
- Alexander, Carol, *Market Models: A Guide to Financial Data Analysis*, Carol Alexander, John Wiley & Sons: 2001.
- Barber, Brad M., Paul A. Griffin, and Baruch Lev, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporation Law*, 1994.
- Barclay, Michael, and Frank C. Torchio, "A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation," *Law & Contemporary Problems*, 2001.
- Bassin, William M., "A Two Trader Population Share Retention Model for Estimating Damages in Shareholder Class Action Litigations," *Stanford Journal of Business and Finance*, 2000.
- Beaver, William H., James K. Malernee, and Michael C. Keeley, *Stock Trading Behavior and Damage Estimation in Securities Cases*, Cornerstone Research, 1993.
- Binder, John J., "Measuring the Effects of Regulation with Stock Price Data," *The RAND Journal of Economics*, 1985.
- Boehmer, Ekkehart and Eric K. Kelley, "Institutional Investors and the Informational Efficiency of Prices," *The Review of Financial Studies*, 2009, pp. 3563, 3592.
- Box, G. E. P. and G. C. Tiao, "Intervention Analysis with Applications to Economic and Environmental Problems," *Journal of the American Statistical Association*, 1975.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Bruner, Robert F., "Does M&A Pay?  A Survey of Evidence for the Decision-Maker," *Journal of Applied Finance*, Spring/Summer 2002.
- Cone, Kenneth R., and James E. Laurence, "How Accurate are Estimates of Aggregate Damages in Securities Fraud Cases?" *Business Law*, 1994.
- Crew, Nicholas I., Patrick G. Goshtigian, Marnie A. Moore, and Atulya Sarin, "Securities Act Violations: Estimation of Damages," *Litigation Services Handbook*, 3rd edition, John Wiley & Sons, Inc., 2001.
- Fama, Eugene F, "Efficient Capital Markets: II," *Journal of Finance*, 1991.
- Finnerty, John, and George Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," *Stanford Journal of Law, Business and Finance*, 2003.
- Furbush, Dean, and Jeffrey W. Smith, "Estimating the Number of Damaged Shares in Securities Fraud Litigation: An Introduction to Stock Trading Models," *Business Law*, 1994.
- Juni, Peter, Anne W S Rutjes, and Paul A Dieppe, *British Medical Journal*, 1 June 2002, 324, 7349, p. 1288.
- Larcker, David F., Lawrence A. Gordon and George E. Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial & Quantitative Analysis*, 1980.
- Lucas, Robert E. Jr., "Asset Prices in an Exchange Economy," *Econometrica*, November 1978.
- MacKinlay, Craig A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, 1997.
- Malatesta, Paul H., "Measuring Abnormal Performance: The Event Parameter Approach Using Joint Generalized Least Squares," *The Journal of Financial and Quantitative Analysis*, 1986.
- Patell, James M., and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices To Earnings and Dividend Announcements," *Journal of Financial Economics*, 1984.
- Reilly, Frank, and Keith Brown, "Organization and Functioning of Securities Markets," in *Equity and Fixed Income CFA Program Crriculum*, vol. 5, Pearson Custom Publishing, 2008.
- Silverstein, Fred E. M.D., *et al*., "Gastrointestinal Toxicity With Celecoxib vs Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis; The CLASS Study: A Randomized Controlled Trial," *Journal of the American Medical Association*, 13 September 2000.
- Tabak, David, and Frederick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook*, 3rd edition, John Wiley & Sons, 2001.

**Exhibit-1**

### Documents and Other Information Reviewed and Relied Upon

- Thompson, Rex, "Conditioning the Return-Generating Process on Firm-Specific Events: A Discussion of Event Study Methods," *The Journal of Financial and Quantitative Analysis*, 1985.
- Wolfe, Michael, M., and David R. Lichtenstein, "COX-2-Selective NSAIDs:  New and Improved?" by *Journal of the American Medical Association*, 13 September 2000, Exhibit-4, [WOLFE 00001 – WOLFE 00003].


## CONFERENCE CALL TRANSCRIPTS

- "Pharmacia Teleconference:  Second-Quarter Results and Outlook," transcribed from audio obtained from Bloomberg, 25 July 2000.
- "Pharmacia Teleconference:  Third-Quarter Results and Outlook," transcribed from audio obtained from Bloomberg, 30 October 2000.
- "Pharmacia Teleconference:  Fourth-Quarter Results and Outlook," transcribed from audio obtained from Bloomberg, 12 February 2001.
- "Q1 2001 Pharmacia Corporation Earnings Conference Call – Final," Fair Disclosure Wire, 25 April 2001.
- "Pharmacia Teleconference:  Second-Quarter Results and Outlook," transcribed from audio obtained from Bloomberg, 25 July 2001.
- "Pharmacia Teleconference:  Third-Quarter Results and Outlook," transcribed from audio obtained from Bloomberg, 23 October 2001.


## DATA AND DATABASES

- Bloomberg
- Capital IQ
- CRSP (Center for Research in Security Prices)
- Dow Jones
- Factiva
- *Ibbotson 2000 Stocks, Bonds, Bills & Inflation (SBBI) 2000 Yearbook,* Ibbotson Associates, 2000.
- *Ibbotson 2001 Stocks, Bonds, Bills & Inflation (SBBI) 2001 Yearbook,* Ibbotson Associates, 2001.
- LexisNexis
- NYSE (New York Stock Exchange) Technologies Market Data [http://www.nyxdata.com/Data-Products/Facts-and-Figures]
- Thomson Financial
- Standard & Poor's
- Vickers Stock Research Corp

**Exhibit-1**

## Documents and Other Information Reviewed and Relied Upon

## COMPANY DOCUMENTS

- "Executive Summary: Celebra Life Cycle Plan 1998-1999 Budget," 21 June 1998, Exhibit-126, [DEFS 01380795 – DEFS 01380805].
- "Incidence of Clinically Significant:  UGI Adverse Events vs Ibuprofen," 18 August 1998, Exhibit-77, [DEFS 00064942 – DEFS 00065016].
- "Incidence of Clinically Significant:  UGI Adverse Events vs Diclofenac (Revision 1)," 26 October 1998, Exhibit-78, [DEFS 00064858 – DEFS 00064941].
- "New Findings Presented on Celebrex(R) Safety and Tolerability From Long-Term Outcomes Study of 8,000 Arthritis Patients," Pharmacia and Pfizer joint press release, 17 April 2000, Exhibit-67 [DEFS 00404977 – DEFS 00404980].
- "Pharmacia Corporation First Quarter Earnings Release Conference Call," 25 April 2000, Exhibit 336, [DEFS 01221347 – DEFS 01221364].
- "CBX-0082360_RE:  Good News on Celebrex," Company email from Samuel H. Zwillich to Mona M. Wahba, dated 23 May 2000, Exhibi-214, [DEFS 00728751 – DEFS 00728754].
- "Pharmacia/Pfizer Inc Statement on the FDA Arthritis Advisory Committee Meeting," dated 7 February 2001, Exhibit-314, [DEFS 03101545].
- "Q&A:  FDA Advisory Committee Hearing on Proposed GI Safety Label Revisions for Celebrex®," dated 9 February 2001, Exhibit-262, [DEFS 00754326 – DEFS 00754329].
- "Pharmacia Corporation 4Q 2000 Conference Call, 12 February 2001," Exhibit-401, [DEFS-01221420 – DEFS-01221436].
- "FW:  FDA Advisory Board Meetings on Celebrex and Vioxx, Feb. 7th and 8th," Email from Alicia Byer, 14 February 2001, Exhibit-316, [DEFS 03101711 – DEFS 03101714].
- "Celebrex Earnings Report," [DEFS 03753688 – DEFS 03753690].

## OTHER

- Affidavit of Howard R. Philips, 18 October 2010, Attachments A – D.
- "FDA Arthritis Advisory Committee Hearing Transcript; re: NDA 20-988/S009, Celebrex, (celecoxib, Searle)," dated 7 February 2001.
- "FDA Arthritis Advisory Committee Hearing Transcript; re: NDA 21-042/S007, Vioxx (Rofecoxib, Merck)," dated 8 February 2001.
- *Float Adjustment Methodology*, Standard & Poor's, August 2006.
- Private Securities Ligation Reform Act of 1995.
- "RE:  NDA 20-998, Celebrex (celecoxib) capsules; 'Warning Letter,'" dated 1 February 2001, Food and Drug Administration, posted 6 February 2001.
- Vioxx Reviewer Report Published to the FDA website on 7 February 2001 including: "Medical Officer's Advisory Committee GI Briefing Document," Vioxx GI Review, by

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon**

Lawrence Goldkind; "Memorandum:  Consultation NDA 21-042, S-007 Review of Cardiovascular Safety Database," Vioxx Cardiovascular Safety Review; "Statistical Reviewer Briefing Document for the Advisory Committee," Vioxx Statistical Review; "FDA Advisory Committee Briefing Document, NDA 21-042, s007, VIOXX Gastrointestinal Safety," Vioxx Medical Officers Review, 8 February 2001; "FDA Advisory Committee Background Information," Merck Vioxx Briefing Document, 8 February 2001.

- Any other documents and data cited in the report.

**Exhibit-2**

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

Babson College
Finance Division
Babson Park, MA  02457
781-239-5275
Feinstein@Babson.edu

## EDUCATION

1989   YALE UNIVERSITY
Ph.D. in Economics (Concentration in Finance)

1986   YALE UNIVERSITY
M.Phil. in Economics

1983   YALE UNIVERSITY
M.A. in Economics

1981   POMONA COLLEGE
B.A. in Economics (Phi Beta Kappa, *cum laude*)

## TEACHING EXPERIENCE

1996 - present        BABSON COLLEGE
Babson Park, MA
Full-time Faculty, Finance Division
Associate Professor (2000-present)
Donald P. Babson Chair in Applied Investments (2002-2010)
Faculty Director of the Babson College Fund (2002-2009)
Director of the Stephen D. Cutler Investment Management
Center (2002-2007)
Assistant Professor (1996-2000)

1990 - 1995           BOSTON UNIVERSITY SCHOOL OF MANAGEMENT
Boston, MA
Full-time Faculty, Department of Finance

1993 - 1994           WASHINGTON UNIVERSITY, OLIN SCHOOL OF BUSINESS
St. Louis, MO
Visiting Assistant Professor, Department of Finance

**Exhibit-2**

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

## BUSINESS EXPERIENCE

2008 - present CROWNINSHIELD FINANCIAL RESEARCH, INC.
      Wellesley, MA
      President and Senior Expert

1996 - 2008  THE MICHEL-SHAKED GROUP
      Boston, MA
      Senior Expert (2001 - 2008)
      Affiliated Expert (1996 - 2001)

1987 - 1990  FEDERAL RESERVE BANK OF ATLANTA
      Economist

## PROFESSIONAL DESIGNATIONS

1998 Awarded the Chartered Financial Analyst designation by the Association for Investment Management and Research.

## RESEARCH AWARDS

1999 Greater Boston Real Estate Board/Real Estate Finance Association – Research Grant and Featured Speaker at Real Estate Finance Association Meetings.

## PAPERS AND PUBLICATIONS

"Distortion in Corporate Valuation: Implications of Capital Structure Changes" (with Allen Michel and Jacob Oded) *Managerial Finance* (forthcoming).

"Market Signals of Investment Unsuitability" (with Alexander Liss and Steven Achatz) Law360.com, June 3, 2010.  Available from http://www.law360.com/articles/170690.

"Planning Capital Expenditure," in The Portable MBA in Financing and Accounting, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 3rd edition 2001, and 4th edition 2009.

"Financial Management of Risks," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 2nd edition 1997, 3rd edition 2001, and 4th edition 2009.

**Exhibit-2**

## Curriculum Vitae
## Steven P. Feinstein, Ph.D., CFA

"Fraud-on-the-market Theory: Is a Market Efficient?" (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, May 2005.

"Valuation of Credit Guarantees" (with Allen J. Michel and Israel Shaked).  *Journal of Forensic Economics* 17(1), pp. 17-37, 2005.

"A Better Understanding of why NPV Undervalues Managerial Flexibility," (with Diane Lander) in *The Engineering Economist*, 2002, Volume 47, Number 4.

"Teaching the Strong-Form Efficient Market Hypothesis: A Classroom Experiment," *Journal of Financial Education*, fall 2000.

*A Future for Real Estate Futures: Potential Applications of Derivatives in Real Estate Investment and Finance* (with Linda Stoller). Monograph. Boston: Real Estate Finance Association / Greater Boston Real Estate Board, May 2000.

"The Risk Budget: Using Your Human Resources," (with John Marthinsen and John Edmunds) *Risk Management*, April 2000.

"Scenario Learning: A Powerful Tool for the 21st Century Planner," (with Jeffrey Ellis and Dennis Stearns) *The Journal of Financial Planning*, April 2000.

"Protecting Future Product Liability Claimants in the Case of Bankruptcy," (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, January 2000.

"Measuring Risk with the Bodie Put When Stocks Exhibit Mean Reversion," *The Journal of Risk*, Vol. 1, No. 3, 1999.

"Just-in-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) *Primus*, Vol. IX, No. 2, June 1999.

*Atlanta Park Medical Center v. Hamlin Asset Management.* (with Natalie Taylor). Babson Case Collection, Harvard Business School Press, 1998.

"Dealing with Delta," *Derivatives Week*, VII, No. 44, November 2, 1998.

"Expected Return in Option Pricing: A Non-Mathematical Explanation," *Derivatives Week*, VII, No. 35, August 31, 1998.

"When Hedges Fail: The Put Paradox and its Solution," *Derivatives Quarterly*, Vol. 4, No. 2, Winter 1997.

*Finance and Accounting for Project Management*.  New York: American Management Association, 1996.

**Exhibit-2**

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"International Investing," in *Irwin's Directory of Emerging Market Brokerages*.  New York: Irwin, 1996.

"The Hull and White Implied Volatility." Boston University Working Paper #92-51, 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) in *Financial Systems and Risk Management*, the proceedings of the US-Japan Forum on Financial Strategy in the 1990s, sponsored by Osaka Foundation of International Exchange and Boston University, August 1991.

"Covered Call Options: A Proposal to Ease LDC Debt," (with Peter Abken) *Federal Reserve Bank of Atlanta Economic Review*, March/April 1990.  Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Forecasting Stock-Market Volatility Using Options on Index Futures," *Federal Reserve Bank of Atlanta Economic Review*, May/June 1989.  Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"The Black-Scholes Formula is Nearly Linear in Sigma for At-the-Money Options; Therefore Implied Volatilities from At-the-Money Options are Virtually Unbiased." Federal Reserve Bank of Atlanta Working Paper #88-9, December 1988.

"The Effect of the 'Triple Witching Hour' on Stock Market Volatility," (with William Goetzmann) *Federal Reserve Bank of Atlanta Economic Review*, September/October 1988.  Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Stock Market Volatility," *Federal Reserve Bank of Atlanta Economic Review*, November/December 1987.

Book review of *In Who's Interest: International Banking and American Foreign Policy*, by Benjamin J. Cohen, Yale University Press, in *Federal Reserve Bank Of Atlanta Economic Review*, Summer 1987.

**PRESENTATIONS**

"Determining the Defendant's Ability to Pay," at Taxpayers Against Fraud Education Fund Conference, October 2010.

"The Computation of Damages in Securities Fraud Cases," at the Grant and Eisenhofer Institutional Investor Conference, December 2002.

**Exhibit-2**

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"The Role of the Financial Expert in Complex Litigation," at the Financial Management Association Conference, October 2000.

"Entrepreneurial Incentives and Resource Allocation Among Corporate Venturing Initiatives," (with Joel Shulman and U. Srinivasa Rangan), Babson Entrepreneurship Research Conference, May 2000.

"Application of Real Options in Purchasing Strategies," (with Juan Orozco), presented at the International Applied Business Research Conference, March 2000.

"A Future for Real Estate Futures," (with Linda Stoller) at the Fairfield County chapter of the Real Estate Finance Association, November 1999, and at the Greater Boston Real Estate Board, November 2000.

"Atlanta Park Medical Center v. Hamlin Asset Management," (with Natalie Taylor) at the 1999 convention of the North American Case Research Association.

"Using Future Worlds™ in the Financial Planning Process," (with Jeffrey Ellis) at the Institute of Certified Financial Planners Masters Retreat, October 1999.

"Toward a Better Understanding of Real Options: A Weighted Average Discount Rate Approach," at the 1999 Financial Management Association Conference, the 1999 European Financial Management Association Conference, and the 1999 Multinational Finance Society Conference.

"Just-In-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) at the 1999 Financial Management Association Conference.

"Alternative Dow Investments for the Individual Investor: Diamonds, Synthetics, and the Real Thing," at the 1999 Academy of Financial Services Convention.

"Evidence of Yield Burning in Municipal Refundings" at Financial Management Association Convention, October 1997; Government Finance Officers Association, 1997; and Northeast Regional Convention of the National Association of State Treasurers, 1997.

"Teaching the Strong-Form Efficient Market Hypothesis" at Conference on Classroom Experiments in the Teaching of Economics at University of Virginia, September 1995.

"Efficient Consolidation of Implied Standard Deviations," (with Shaikh Hamid) at Midwest Finance Association, March 1995.

**Exhibit-2**

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"A Test of Intertemporal Averaging of Implied Volatilities," (with Shaikh Hamid) at Eastern Finance Association, April 1995.

"Taking Advantage of Volatility:  Non-linear Forecasting and Options Strategies," (with Hassan Ahmed) at Chicago Board of Trade / Chicago Board Options Exchange Conference on Risk Management, February 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) at Japan-U.S. Conference on Financial Strategies in the 1990s, Osaka, Japan, August 1991.

"The Hull and White Implied Volatility," at American Finance Association Convention, December 1990.


**REVIEWED ARTICLES AND BOOKS FOR:**

Harvard Business School Publishing
Elsevier
Journal of Economic Education
Journal of Forensic Economics
Journal of Risk
Financial Review
North American Case Research Association
Financial Management
Journal of Business
Journal of Money, Credit and Banking
Quarterly Review of Economics and Finance
Blackwell
Prentice Hall
Southwestern Publishing


**COURSES TAUGHT**

Capital Markets
Mod B: Decision Making and Applications, Finance stream (MBA)
Financial Reporting and Corporate Finance (MBA)
Valuation (MBA)
Investments (MBA and Executive)
Equity Markets (MBA)
Fixed Income Analysis (Undergraduate and MBA)
Babson College Fund (Undergraduate and MBA)
Options and Futures (Undergraduate)

**Exhibit-2**

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

Advanced Derivative Securities (MBA)
Corporate Finance (MBA and Executive)
Financial Management (MBA)
Risk Management (MBA)
Corporate Financial Strategy (MBA)
Integrated Management (Undergraduate)
Cross-Functional Management (Integrated curriculum, Undergraduate)
Continuous-Time Finance (Doctoral)
Portfolio Theory / Management Information Systems (Executive)
Quantitative Methods for Investment Management (Undergraduate and MBA)
Introduction to Derivatives Securities (Executive)
International Finance (Executive)


## TEACHING AWARDS

Reid Teaching Award, Washington University, Olin School of Business, 1993-94.


## SELECT LIST OF MEDIA CITATIONS

"Bankers Rigging Municipal Contract Bids Admit to Cover-Up Lies," by William Selway and Martin Z. Braun, *Bloomberg Markets Magazine*, November 24, 2010.

"Hospital Move Presents Buy-Out Groups with New Risks," by Francesco Guerra, Christopher Bowe, and Rebecca Knight, *Financial Times*, July 15, 2006.

"Funds of Knowledge Add Value," by Rebecca Knight, *Financial Times*, March 12, 2006.

"City's Financial Picture Worse Than Ever, Sanders Says," by Matthew T. Hall, *San Diego Union-Tribune*, January 7, 2006.

"Downer: Stock Market Takes Another Dive," by John Chesto, *Boston Herald*, July 23, 2002.

"Banks, Developers, Are Main Beneficiaries," [editorial column] by Steven Feinstein, *The Boston Globe*, March 31, 2002, p. C4.

"Washington Investing: What Michael Saylor is Really Worth," by Jerry Knight, *The Washington Post*, March 6, 2000.

"IBM Retools Pensions," by Stephanie Armour, *USA Today*, May 4, 1999.

**Exhibit-2**

**Curriculum Vitae**
**Steven P. Feinstein, Ph.D., CFA**

"L.A. MTA's Law Firm Says Lissack Strategy Will be a Replay," by Andrea Figler, *Bond Buyer,* September 30, 1998.

"Fed Key Player in Rescue of Floundering Hedge Fund," by Andrew Fraser, Associated Press, September 25, 1998.

"Top Banks Plan Bailout for Fund," by Andrew Fraser, Associated Press, September 24, 1998.

"Clarion Call to the Small Investor," by Jo-Ann Johnston, *The Boston Globe*, March 4, 1998.

"L.A. Authority Study Shows Rampant Yield Burning Abuse," by Michael Stanton, *The Bond Buyer*, April 22, 1997.

"Dispute Over Yield Burning Dominates GFOA Session," by Michael Stanton, *The Bond Buyer*, January 29, 1997.

"Men Behaving Badly (Yield Burning)," *Grants Municipal Bond Observer*, January 24, 1997.

"Municipal Bond Dealers Face Scrutiny," by Peter Truell, *The New York Times*, December 17, 1996.

"Iowa Market Takes Stock of Presidential Candidates," by Stanley W. Angrist, *The Wall Street Journal*, August 28, 1995.

"Looking for Clues in Options Prices," by Sylvia Nasar, *The New York Times*, July 18, 1991.

"For Fed, A New Set of Tea Leaves," by Sylvia Nasar, *The New York Times*, July 5, 1991.


**MEMBERSHIP IN PROFESSIONAL SOCIETIES**

American Finance Association
Boston Security Analysts Society
Chartered Financial Analyst Institute
Financial Management Association
Foundation for Advancement of Research in Financial Economics (founding member)
North American Case Research Association

114

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony in the Last 4 Years**


In Re Veeco Instruments, Inc. Securities Litigation
United States District Court
Southern District of New York
Case No.: 7:05-md-1695 (CM)
Deposition Testimony
June 2007

Ellington Overseas Partners. LTD. and Ellington Long Term Fund. LTD. vs.
HSBC Securities (USA) Inc.
United States District Court
Southern District of New York
06-CV-02353
July 2007

Carpenters Health & Welfare Fund, *et al.* vs. The Coca-Cola Company
United States District Court
Northern District of Georgia
Atlanta Division
File No. 1:00-CV-2838-WBH
Deposition Testimony
August 2007

In Re Schering-Plough Corporation Securities Litigation
United States District Court
For The District of New Jersey
Master File No. 01-CV-0829 (KSH/MF)
Deposition Testimony
September 2007

In Re ProQuest Company Securities Litigation
United States District Court
Eastern District Of Michigan
Master File No. 2:06-cv-10619
Deposition Testimony
May 2008

Marvin Overby, *et al.* vs. Tyco International, Ltd., *et al.*
United States District Court
District of New Hampshire
Case No. 02-CV-1357-B
Deposition Testimony
May 2008

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony in the Last 4 Years**

Franz Schleicher, *et al.* vs. Gary C. Wendt, *et al.*
(Conseco, Inc.)
United States District Court
Southern District of Indiana
Indianapolis Division
No. 02 CV 1332 DFH-TAB
Deposition Testimony
July 2008

In Re The Mills Corporation Securities Litigation
United States District Court
For The Eastern District of Virginia
Alexandria Division
Civil Action No. 1:06-cv-00077 (LO/TJR)
Deposition Testimony
September 2008

In Re Cooper Companies, Inc. Securities Litigation
United States District Court
Central District of California, Southern Division
No. SACV-06-00169-CJC(RNBx)
Deposition Testimony
October 2008 and December 2009

Debra Hall, *et al.* vs. The Children's Place Retail Stores, Inc., *et al.*
United States District Court
Southern District of New York
Civil Action No. 1:07-cv-08252-SAS
Deposition Testimony
December 2008

Robert Ross, *et al.* vs. Abercrombie & Fitch Company, *et al.*
United States District Court
Southern District of Ohio
Eastern Division
No. 2:05-cv-00819-EAS-TPK
Deposition Testimony
February 2009

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony in the Last 4 Years**

In Re Comcast Corporation ERISA Litigation
United States District Court
Eastern District of Pennsylvania
Master File No. 2:08-cv-00773-HB
Deposition Testimony
July 2009

John Richard Beach, *et al.* vs. Healthways Inc., *et al.*
United States District Court
Middle District of Tennessee
Nashville Division
Civil Action No. 3:08-cv-00569
Deposition Testimony
July 2009

Jan Buettgen, *et al.* vs. Katherine J. Harless, *et al.*
United States District Court
Northern District of Texas
Dallas Division
Civil Action No. 3:09-cv-00791-K
Deposition Testimony
December 2010

Vasili Tsereteli, *et ano.*, vs. Residential Asset Securitization Trust 2006-A8, *et al.*
Civil Action No. 1:08-cv-10637-LAK
In Re IndyMac Mortgage-Backed Securities Litigation
Civil Action No. 1:09-cv-04583-LAK
United States District Court
Southern District of New York
Deposition Testimony
January 2011

In Re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation
United States District Court
District of New Jersey
Civil Action No. 05-2369(SRC)
Deposition Testimony
May 2011

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony in the Last 4 Years**

The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan, vs.
The Bank of New York Mellon Corporation and BNY Mellon, National Association.
United States District Court
Southern District of New York
Civil Action No. 1:09-cv-06273-RMB-AJP
Deposition Testimony
March 2011 and May 2011

**Exhibit-4**

**Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns**

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 4/14/2000 | $53.13 | - | | 4,713,599 |
| 4/17/2000 | $54.13 | - | 1.86% | 5,782,199 |
| 4/18/2000 | $53.06 | - | -1.98% | 4,932,099 |
| 4/19/2000 | $59.75 | - | 11.87% | 9,619,099 |
| 4/20/2000 | $58.25 | - | -2.54% | 7,218,000 |
| 4/24/2000 | $58.06 | - | -0.32% | 5,731,599 |
| 4/25/2000 | $54.00 | - | -7.25% | 7,264,899 |
| 4/26/2000 | $52.75 | - | -2.34% | 8,837,599 |
| 4/27/2000 | $52.50 | - | -0.48% | 3,947,599 |
| 4/28/2000 | $49.94 | - | -5.00% | 7,654,101 |
| 5/1/2000 | $49.63 | - | -0.63% | 7,083,799 |
| 5/2/2000 | $50.00 | - | 0.75% | 5,329,099 |
| 5/3/2000 | $51.00 | - | 1.98% | 4,598,199 |
| 5/4/2000 | $52.25 | - | 2.42% | 5,897,799 |
| 5/5/2000 | $54.00 | - | 3.29% | 4,814,399 |
| 5/8/2000 | $55.56 | - | 2.85% | 4,452,500 |
| 5/9/2000 | $55.56 | - | 0.00% | 5,655,399 |
| 5/10/2000 | $54.13 | - | -2.62% | 5,801,199 |
| 5/11/2000 | $54.38 | - | 0.46% | 3,496,399 |
| 5/12/2000 | $53.50 | - | -1.62% | 2,908,299 |
| 5/15/2000 | $55.19 | - | 3.11% | 3,332,899 |
| 5/16/2000 | $53.75 | - | -2.64% | 2,754,099 |
| 5/17/2000 | $52.94 | - | -1.52% | 3,043,000 |
| 5/18/2000 | $52.50 | - | -0.83% | 3,359,399 |
| 5/19/2000 | $54.94 | - | 4.54% | 3,669,000 |
| 5/22/2000 | $53.19 | - | -3.24% | 3,192,199 |
| 5/23/2000 | $53.50 | - | 0.59% | 4,210,000 |
| 5/24/2000 | $51.81 | - | -3.21% | 4,142,500 |
| 5/25/2000 | $52.13 | - | 0.60% | 3,535,699 |
| 5/26/2000 | $51.75 | - | -0.72% | 2,479,699 |
| 5/30/2000 | $50.50 | - | -2.45% | 2,267,000 |
| 5/31/2000 | $51.94 | - | 2.81% | 2,329,199 |
| 6/1/2000 | $51.81 | - | -0.24% | 3,032,099 |
| 6/2/2000 | $49.31 | - | -4.95% | 4,790,899 |
| 6/5/2000 | $50.00 | - | 1.38% | 3,188,299 |
| 6/6/2000 | $48.94 | - | -2.15% | 3,843,299 |

## Exhibit-4

## Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 6/7/2000 | $50.50 | - | 3.14% | 3,185,899 |
| 6/8/2000 | $50.13 | - | -0.75% | 1,660,699 |
| 6/9/2000 | $52.06 | - | 3.79% | 2,561,699 |
| 6/12/2000 | $52.13 | - | 0.12% | 2,616,799 |
| 6/13/2000 | $53.13 | - | 1.90% | 3,531,199 |
| 6/14/2000 | $54.75 | - | 3.01% | 3,313,399 |
| 6/15/2000 | $55.75 | - | 1.81% | 3,407,799 |
| 6/16/2000 | $56.06 | - | 0.56% | 4,275,699 |
| 6/19/2000 | $56.50 | - | 0.78% | 3,241,699 |
| 6/20/2000 | $56.56 | - | 0.11% | 3,541,599 |
| 6/21/2000 | $55.44 | - | -2.01% | 3,573,199 |
| 6/22/2000 | $51.75 | - | -6.88% | 5,667,199 |
| 6/23/2000 | $53.06 | - | 2.50% | 3,784,299 |
| 6/26/2000 | $53.38 | - | 0.59% | 3,396,599 |
| 6/27/2000 | $53.56 | - | 0.35% | 3,731,899 |
| 6/28/2000 | $51.81 | - | -3.32% | 3,028,099 |
| 6/29/2000 | $50.50 | - | -2.57% | 7,798,500 |
| 6/30/2000 | $51.69 | $0.12 | 2.56% | 8,765,898 |
| 7/3/2000 | $52.88 | - | 2.27% | 1,583,699 |
| 7/5/2000 | $53.50 | - | 1.18% | 3,074,899 |
| 7/6/2000 | $54.13 | - | 1.16% | 2,130,399 |
| 7/7/2000 | $54.81 | - | 1.26% | 5,106,599 |
| 7/10/2000 | $56.06 | - | 2.25% | 4,132,099 |
| 7/11/2000 | $57.31 | - | 2.21% | 4,020,899 |
| 7/12/2000 | $56.69 | - | -1.10% | 3,299,799 |
| 7/13/2000 | $55.56 | - | -2.00% | 4,241,599 |
| 7/14/2000 | $55.75 | - | 0.34% | 3,934,199 |
| 7/17/2000 | $55.75 | - | 0.00% | 2,026,799 |
| 7/18/2000 | $55.00 | - | -1.35% | 2,037,199 |
| 7/19/2000 | $53.50 | - | -2.77% | 3,989,299 |
| 7/20/2000 | $52.56 | - | -1.77% | 4,741,699 |
| 7/21/2000 | $52.00 | - | -1.08% | 4,450,000 |
| 7/24/2000 | $52.50 | - | 0.96% | 4,751,099 |
| 7/25/2000 | $55.63 | - | 5.78% | 11,599,000 |
| 7/26/2000 | $55.88 | - | 0.45% | 5,709,699 |
| 7/27/2000 | $55.88 | - | 0.00% | 5,811,299 |

## Exhibit-4

## Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 7/28/2000 | $55.81 | - | -0.11% | 5,220,699 |
| 7/31/2000 | $54.75 | - | -1.92% | 3,084,000 |
| 8/1/2000 | $55.75 | - | 1.81% | 4,171,599 |
| 8/2/2000 | $57.56 | - | 3.20% | 4,055,799 |
| 8/3/2000 | $57.00 | - | -0.98% | 7,304,099 |
| 8/4/2000 | $56.88 | - | -0.22% | 4,803,599 |
| 8/7/2000 | $57.63 | - | 1.31% | 5,488,500 |
| 8/8/2000 | $58.81 | - | 2.04% | 7,390,500 |
| 8/9/2000 | $57.56 | - | -2.15% | 5,188,899 |
| 8/10/2000 | $55.75 | - | -3.20% | 4,389,500 |
| 8/11/2000 | $56.19 | - | 0.78% | 2,875,899 |
| 8/14/2000 | $56.13 | - | -0.11% | 1,571,299 |
| 8/15/2000 | $56.81 | - | 1.22% | 2,588,199 |
| 8/16/2000 | $57.75 | - | 1.64% | 3,075,299 |
| 8/17/2000 | $59.69 | - | 3.30% | 4,408,299 |
| 8/18/2000 | $58.00 | - | -2.87% | 3,603,000 |
| 8/21/2000 | $57.88 | - | -0.22% | 2,489,899 |
| 8/22/2000 | $57.31 | - | -0.98% | 2,175,399 |
| 8/23/2000 | $57.50 | - | 0.33% | 2,690,899 |
| 8/24/2000 | $58.56 | - | 1.83% | 2,845,099 |
| 8/25/2000 | $59.00 | - | 0.74% | 2,174,799 |
| 8/28/2000 | $58.13 | - | -1.49% | 2,199,799 |
| 8/29/2000 | $58.88 | - | 1.28% | 3,132,599 |
| 8/30/2000 | $58.56 | - | -0.53% | 2,806,299 |
| 8/31/2000 | $58.56 | - | 0.00% | 3,195,199 |
| 9/1/2000 | $58.38 | - | -0.32% | 2,648,899 |
| 9/5/2000 | $56.44 | - | -3.38% | 4,011,000 |
| 9/6/2000 | $55.94 | - | -0.89% | 3,528,599 |
| 9/7/2000 | $56.69 | - | 1.33% | 3,376,399 |
| 9/8/2000 | $54.81 | - | -3.36% | 2,849,599 |
| 9/11/2000 | $54.44 | - | -0.69% | 2,878,399 |
| 9/12/2000 | $54.50 | - | 0.11% | 3,009,699 |
| 9/13/2000 | $55.25 | - | 1.37% | 4,533,199 |
| 9/14/2000 | $54.75 | - | -0.91% | 3,041,699 |
| 9/15/2000 | $54.00 | - | -1.38% | 6,498,500 |
| 9/18/2000 | $53.00 | - | -1.87% | 2,753,899 |

**Exhibit-4**

**Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns**

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 9/19/2000 | $53.94 | - | 1.75% | 2,146,699 |
| 9/20/2000 | $54.31 | - | 0.69% | 2,812,000 |
| 9/21/2000 | $56.00 | - | 3.06% | 6,654,000 |
| 9/22/2000 | $58.94 | - | 5.11% | 8,865,599 |
| 9/25/2000 | $58.94 | - | 0.00% | 5,727,399 |
| 9/26/2000 | $58.00 | - | -1.60% | 5,462,799 |
| 9/27/2000 | $58.44 | - | 0.75% | 5,316,099 |
| 9/28/2000 | $60.06 | - | 2.74% | 9,734,399 |
| 9/29/2000 | $60.19 | - | 0.21% | 5,099,000 |
| 10/2/2000 | $57.56 | - | -4.46% | 4,511,699 |
| 10/3/2000 | $57.69 | $0.12 | 0.42% | 3,499,599 |
| 10/4/2000 | $57.06 | - | -1.09% | 3,007,000 |
| 10/5/2000 | $57.50 | - | 0.76% | 4,217,199 |
| 10/6/2000 | $56.88 | - | -1.09% | 4,069,000 |
| 10/9/2000 | $56.31 | - | -0.99% | 2,791,500 |
| 10/10/2000 | $58.00 | - | 2.95% | 7,317,899 |
| 10/11/2000 | $57.81 | - | -0.32% | 5,049,899 |
| 10/12/2000 | $57.50 | - | -0.54% | 7,451,599 |
| 10/13/2000 | $54.94 | - | -4.56% | 8,388,000 |
| 10/16/2000 | $55.19 | - | 0.45% | 4,728,599 |
| 10/17/2000 | $56.44 | - | 2.24% | 4,890,899 |
| 10/18/2000 | $55.00 | - | -2.58% | 4,933,599 |
| 10/19/2000 | $53.56 | - | -2.65% | 5,454,799 |
| 10/20/2000 | $50.75 | - | -5.39% | 8,127,500 |
| 10/23/2000 | $53.88 | - | 5.98% | 6,452,599 |
| 10/24/2000 | $55.00 | - | 2.07% | 4,979,799 |
| 10/25/2000 | $56.88 | - | 3.35% | 5,221,599 |
| 10/26/2000 | $55.81 | - | -1.89% | 6,032,000 |
| 10/27/2000 | $54.63 | - | -2.15% | 4,177,099 |
| 10/30/2000 | $52.63 | - | -3.73% | 11,539,000 |
| 10/31/2000 | $55.00 | - | 4.41% | 8,070,199 |
| 11/1/2000 | $57.44 | - | 4.34% | 5,603,099 |
| 11/2/2000 | $58.00 | - | 0.97% | 5,588,000 |
| 11/3/2000 | $56.25 | - | -3.06% | 4,446,500 |
| 11/6/2000 | $57.56 | - | 2.31% | 3,430,799 |
| 11/7/2000 | $57.50 | - | -0.11% | 3,826,399 |

**Exhibit-4**

**Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns**

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 11/8/2000 | $59.44 | - | 3.31% | 6,637,299 |
| 11/9/2000 | $59.25 | - | -0.32% | 4,484,799 |
| 11/10/2000 | $59.25 | - | 0.00% | 3,749,399 |
| 11/13/2000 | $57.25 | - | -3.43% | 3,507,899 |
| 11/14/2000 | $58.75 | - | 2.59% | 3,606,799 |
| 11/15/2000 | $58.25 | - | -0.85% | 2,386,799 |
| 11/16/2000 | $57.00 | - | -2.17% | 2,853,199 |
| 11/17/2000 | $59.81 | - | 4.82% | 7,119,599 |
| 11/20/2000 | $59.50 | - | -0.52% | 2,864,699 |
| 11/21/2000 | $59.63 | - | 0.21% | 2,743,599 |
| 11/22/2000 | $58.06 | - | -2.66% | 3,336,000 |
| 11/24/2000 | $57.69 | - | -0.65% | 889,900 |
| 11/27/2000 | $59.50 | - | 3.09% | 3,540,699 |
| 11/28/2000 | $59.25 | - | -0.42% | 3,945,000 |
| 11/29/2000 | $60.94 | - | 2.81% | 5,749,800 |
| 11/30/2000 | $61.00 | - | 0.10% | 9,965,398 |
| 12/1/2000 | $57.50 | - | -5.91% | 7,264,700 |
| 12/4/2000 | $59.06 | - | 2.68% | 4,419,100 |
| 12/5/2000 | $59.75 | - | 1.16% | 3,993,000 |
| 12/6/2000 | $57.75 | - | -3.40% | 5,372,600 |
| 12/7/2000 | $58.00 | - | 0.43% | 2,373,200 |
| 12/8/2000 | $59.00 | - | 1.71% | 3,680,600 |
| 12/11/2000 | $58.69 | - | -0.53% | 2,979,100 |
| 12/12/2000 | $57.81 | - | -1.50% | 4,880,500 |
| 12/13/2000 | $58.56 | - | 1.29% | 5,442,000 |
| 12/14/2000 | $59.31 | - | 1.27% | 6,172,700 |
| 12/15/2000 | $59.63 | - | 0.53% | 6,385,500 |
| 12/18/2000 | $59.38 | - | -0.42% | 2,876,400 |
| 12/19/2000 | $58.00 | - | -2.34% | 3,827,800 |
| 12/20/2000 | $59.94 | - | 3.29% | 2,814,700 |
| 12/21/2000 | $58.06 | - | -3.18% | 6,079,400 |
| 12/22/2000 | $57.44 | - | -1.08% | 3,402,100 |
| 12/26/2000 | $58.63 | - | 2.05% | 2,102,900 |
| 12/27/2000 | $60.00 | - | 2.32% | 6,231,100 |
| 12/28/2000 | $60.94 | - | 1.55% | 2,514,100 |
| 12/29/2000 | $61.00 | - | 0.10% | 2,363,600 |

# Exhibit-4

## Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 1/2/2001 | $60.00 | - | -1.65% | 4,105,100 |
| 1/3/2001 | $57.00 | - | -5.13% | 6,933,200 |
| 1/4/2001 | $55.31 | $0.12 | -2.79% | 11,038,100 |
| 1/5/2001 | $56.38 | - | 1.90% | 5,976,800 |
| 1/8/2001 | $56.50 | - | 0.22% | 4,151,600 |
| 1/9/2001 | $55.69 | - | -1.45% | 4,075,500 |
| 1/10/2001 | $55.50 | - | -0.34% | 4,415,200 |
| 1/11/2001 | $54.94 | - | -1.02% | 5,852,800 |
| 1/12/2001 | $55.50 | - | 1.02% | 4,405,200 |
| 1/16/2001 | $56.31 | - | 1.45% | 3,630,100 |
| 1/17/2001 | $55.88 | - | -0.78% | 3,061,100 |
| 1/18/2001 | $56.81 | - | 1.66% | 3,596,500 |
| 1/19/2001 | $56.25 | - | -1.00% | 4,558,500 |
| 1/22/2001 | $56.19 | - | -0.11% | 3,709,800 |
| 1/23/2001 | $55.56 | - | -1.12% | 4,311,200 |
| 1/24/2001 | $55.38 | - | -0.34% | 4,685,400 |
| 1/25/2001 | $55.50 | - | 0.23% | 6,199,700 |
| 1/26/2001 | $55.81 | - | 0.56% | 3,374,100 |
| 1/29/2001 | $55.40 | - | -0.74% | 3,325,000 |
| 1/30/2001 | $55.18 | - | -0.40% | 3,597,100 |
| 1/31/2001 | $56.02 | - | 1.51% | 3,670,100 |
| 2/1/2001 | $57.08 | - | 1.87% | 3,962,200 |
| 2/2/2001 | $57.81 | - | 1.27% | 3,231,600 |
| 2/5/2001 | $58.28 | - | 0.81% | 3,308,400 |
| 2/6/2001 | $57.65 | - | -1.09% | 4,159,500 |
| 2/7/2001 | $56.13 | - | -2.67% | 5,008,600 |
| 2/8/2001 | $53.00 | - | -5.74% | 12,338,600 |
| 2/9/2001 | $54.00 | - | 1.87% | 8,808,500 |
| 2/12/2001 | $54.23 | - | 0.43% | 4,268,000 |
| 2/13/2001 | $51.63 | - | -4.91% | 10,655,100 |
| 2/14/2001 | $51.90 | - | 0.52% | 7,716,600 |
| 2/15/2001 | $52.02 | - | 0.23% | 5,844,100 |
| 2/16/2001 | $51.16 | - | -1.67% | 3,813,800 |
| 2/20/2001 | $49.95 | - | -2.39% | 5,150,600 |
| 2/21/2001 | $48.85 | - | -2.23% | 9,971,500 |
| 2/22/2001 | $49.25 | - | 0.82% | 5,719,300 |

**Exhibit-4**

**Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns**

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|------|-------------------|--------------|------------------------|------------|
| 2/23/2001 | $49.05 | - | -0.41% | 5,176,600 |
| 2/26/2001 | $49.40 | - | 0.71% | 5,414,500 |
| 2/27/2001 | $50.25 | - | 1.71% | 7,799,800 |
| 2/28/2001 | $51.70 | - | 2.84% | 5,935,900 |
| 3/1/2001 | $51.97 | - | 0.52% | 6,849,300 |
| 3/2/2001 | $52.79 | - | 1.57% | 3,626,700 |
| 3/5/2001 | $54.05 | - | 2.36% | 4,273,500 |
| 3/6/2001 | $52.85 | - | -2.25% | 5,783,400 |
| 3/7/2001 | $51.01 | - | -3.54% | 3,820,300 |
| 3/8/2001 | $50.74 | - | -0.53% | 4,733,300 |
| 3/9/2001 | $51.19 | - | 0.88% | 2,698,700 |
| 3/12/2001 | $50.22 | - | -1.91% | 3,619,900 |
| 3/13/2001 | $49.10 | - | -2.26% | 5,754,000 |
| 3/14/2001 | $47.80 | - | -2.68% | 5,247,500 |
| 3/15/2001 | $47.46 | - | -0.71% | 4,981,100 |
| 3/16/2001 | $45.18 | - | -4.92% | 7,619,200 |
| 3/19/2001 | $47.16 | - | 4.29% | 5,121,400 |
| 3/20/2001 | $47.12 | - | -0.08% | 4,104,900 |
| 3/21/2001 | $46.58 | - | -1.15% | 4,898,200 |
| 3/22/2001 | $44.00 | - | -5.70% | 9,557,500 |
| 3/23/2001 | $46.99 | - | 6.57% | 8,103,300 |
| 3/26/2001 | $48.28 | - | 2.71% | 5,072,200 |
| 3/27/2001 | $49.60 | - | 2.70% | 5,115,800 |
| 3/28/2001 | $49.80 | - | 0.40% | 3,598,000 |
| 3/29/2001 | $49.87 | - | 0.14% | 4,030,700 |
| 3/30/2001 | $50.37 | - | 1.00% | 3,566,700 |
| 4/2/2001 | $49.25 | - | -2.25% | 3,026,000 |
| 4/3/2001 | $48.76 | - | -1.00% | 2,918,000 |
| 4/4/2001 | $49.23 | - | 0.96% | 3,589,500 |
| 4/5/2001 | $51.04 | - | 3.61% | 3,244,000 |
| 4/6/2001 | $50.65 | $0.12 | -0.53% | 3,769,000 |
| 4/9/2001 | $52.25 | - | 3.11% | 3,376,300 |
| 4/10/2001 | $51.20 | - | -2.03% | 3,937,400 |
| 4/11/2001 | $50.11 | - | -2.15% | 4,380,200 |
| 4/12/2001 | $50.70 | - | 1.17% | 3,141,400 |
| 4/16/2001 | $50.45 | - | -0.49% | 2,848,300 |

## Exhibit-4

## Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 4/17/2001 | $52.08 | - | 3.18% | 3,791,700 |
| 4/18/2001 | $50.75 | - | -2.59% | 5,343,200 |
| 4/19/2001 | $49.70 | - | -2.09% | 7,118,000 |
| 4/20/2001 | $48.55 | - | -2.34% | 7,475,300 |
| 4/23/2001 | $48.50 | - | -0.10% | 3,386,700 |
| 4/24/2001 | $48.01 | - | -1.02% | 3,410,400 |
| 4/25/2001 | $49.10 | - | 2.24% | 4,814,600 |
| 4/26/2001 | $51.51 | - | 4.79% | 4,426,700 |
| 4/27/2001 | $52.25 | - | 1.43% | 2,984,600 |
| 4/30/2001 | $52.26 | - | 0.02% | 3,965,500 |
| 5/1/2001 | $51.72 | - | -1.04% | 4,293,200 |
| 5/2/2001 | $51.00 | - | -1.40% | 3,609,900 |
| 5/3/2001 | $50.00 | - | -1.98% | 3,218,800 |
| 5/4/2001 | $50.00 | - | 0.00% | 5,909,100 |
| 5/7/2001 | $48.95 | - | -2.12% | 4,486,100 |
| 5/8/2001 | $48.20 | - | -1.54% | 4,003,700 |
| 5/9/2001 | $47.49 | - | -1.48% | 7,355,300 |
| 5/10/2001 | $46.98 | - | -1.08% | 6,307,000 |
| 5/11/2001 | $46.15 | - | -1.78% | 5,216,500 |
| 5/14/2001 | $46.28 | - | 0.28% | 5,616,800 |
| 5/15/2001 | $45.99 | - | -0.63% | 6,999,900 |
| 5/16/2001 | $48.38 | - | 5.07% | 5,860,000 |
| 5/17/2001 | $49.49 | - | 2.27% | 6,453,000 |
| 5/18/2001 | $49.60 | - | 0.22% | 4,609,500 |
| 5/21/2001 | $50.02 | - | 0.84% | 4,937,700 |
| 5/22/2001 | $49.50 | - | -1.05% | 4,866,700 |
| 5/23/2001 | $48.74 | - | -1.55% | 5,012,900 |
| 5/24/2001 | $48.69 | - | -0.10% | 4,140,700 |
| 5/25/2001 | $48.56 | - | -0.27% | 2,923,100 |
| 5/29/2001 | $48.01 | - | -1.14% | 5,039,200 |
| 5/30/2001 | $48.25 | - | 0.50% | 3,489,900 |
| 5/31/2001 | $48.56 | - | 0.64% | 3,689,800 |
| 6/1/2001 | $49.35 | - | 1.61% | 3,187,800 |
| 6/4/2001 | $49.66 | - | 0.63% | 1,390,700 |
| 6/5/2001 | $49.60 | - | -0.12% | 2,973,600 |
| 6/6/2001 | $49.35 | - | -0.51% | 2,981,800 |

## Exhibit-4

## Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 6/7/2001 | $49.81 | - | 0.93% | 2,215,200 |
| 6/8/2001 | $49.70 | - | -0.22% | 1,902,900 |
| 6/11/2001 | $49.06 | - | -1.30% | 3,249,600 |
| 6/12/2001 | $48.97 | - | -0.18% | 2,681,100 |
| 6/13/2001 | $48.75 | - | -0.45% | 2,321,000 |
| 6/14/2001 | $48.15 | - | -1.24% | 2,933,200 |
| 6/15/2001 | $48.80 | - | 1.34% | 5,873,000 |
| 6/18/2001 | $49.19 | - | 0.80% | 2,145,100 |
| 6/19/2001 | $49.51 | - | 0.65% | 2,424,300 |
| 6/20/2001 | $50.75 | - | 2.47% | 5,422,200 |
| 6/21/2001 | $51.50 | - | 1.47% | 5,958,600 |
| 6/22/2001 | $48.79 | - | -5.41% | 8,505,200 |
| 6/25/2001 | $48.85 | - | 0.12% | 5,650,700 |
| 6/26/2001 | $48.43 | - | -0.86% | 4,608,100 |
| 6/27/2001 | $47.22 | - | -2.53% | 4,714,000 |
| 6/28/2001 | $47.12 | - | -0.21% | 6,102,500 |
| 6/29/2001 | $45.95 | - | -2.51% | 6,675,900 |
| 7/2/2001 | $46.58 | - | 1.36% | 4,884,500 |
| 7/3/2001 | $46.59 | - | 0.02% | 1,798,700 |
| 7/5/2001 | $46.50 | - | -0.19% | 2,140,900 |
| 7/6/2001 | $46.00 | - | -1.08% | 2,736,800 |
| 7/9/2001 | $46.81 | $0.14 | 2.03% | 3,451,300 |
| 7/10/2001 | $46.95 | - | 0.30% | 3,696,500 |
| 7/11/2001 | $46.70 | - | -0.53% | 4,581,600 |
| 7/12/2001 | $46.22 | - | -1.03% | 3,947,400 |
| 7/13/2001 | $46.85 | - | 1.35% | 3,385,400 |
| 7/16/2001 | $42.84 | - | -8.95% | 13,389,600 |
| 7/17/2001 | $42.60 | - | -0.56% | 8,441,000 |
| 7/18/2001 | $43.15 | - | 1.28% | 8,254,300 |
| 7/19/2001 | $43.35 | - | 0.46% | 6,450,200 |
| 7/20/2001 | $43.65 | - | 0.69% | 3,305,400 |
| 7/23/2001 | $43.41 | - | -0.55% | 3,079,400 |
| 7/24/2001 | $42.00 | - | -3.30% | 5,424,100 |
| 7/25/2001 | $42.12 | - | 0.29% | 5,279,100 |
| 7/26/2001 | $41.85 | - | -0.64% | 7,593,600 |
| 7/27/2001 | $42.12 | - | 0.64% | 6,397,300 |

**Exhibit-4**

**Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns**

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|------|------|------|------|------|
| 7/30/2001 | $43.28 | - | 2.72% | 5,863,100 |
| 7/31/2001 | $44.62 | - | 3.05% | 7,969,900 |
| 8/1/2001 | $44.55 | - | -0.16% | 4,041,000 |
| 8/2/2001 | $43.90 | - | -1.47% | 4,655,500 |
| 8/3/2001 | $44.00 | - | 0.23% | 4,137,400 |
| 8/6/2001 | $44.00 | - | 0.00% | 3,648,100 |
| 8/7/2001 | $45.10 | - | 2.47% | 5,126,200 |
| 8/8/2001 | $44.32 | - | -1.74% | 3,071,800 |
| 8/9/2001 | $44.35 | - | 0.07% | 3,727,600 |
| 8/10/2001 | $44.68 | - | 0.74% | 2,782,500 |
| 8/13/2001 | $45.35 | - | 1.49% | 2,690,600 |
| 8/14/2001 | $44.90 | - | -1.00% | 2,344,100 |
| 8/15/2001 | $44.87 | - | -0.07% | 2,625,700 |
| 8/16/2001 | $45.00 | - | 0.29% | 2,813,600 |
| 8/17/2001 | $44.44 | - | -1.25% | 1,600,000 |
| 8/20/2001 | $44.25 | - | -0.43% | 2,631,400 |
| 8/21/2001 | $44.16 | - | -0.20% | 3,786,500 |
| 8/22/2001 | $43.20 | - | -2.20% | 7,656,400 |
| 8/23/2001 | $42.40 | - | -1.87% | 7,543,800 |
| 8/24/2001 | $41.81 | - | -1.40% | 8,482,100 |
| 8/27/2001 | $41.83 | - | 0.05% | 4,196,700 |
| 8/28/2001 | $41.30 | - | -1.28% | 3,438,500 |
| 8/29/2001 | $40.51 | - | -1.93% | 3,176,200 |
| 8/30/2001 | $39.90 | - | -1.52% | 5,528,200 |
| 8/31/2001 | $39.60 | - | -0.75% | 4,955,000 |
| 9/4/2001 | $40.00 | - | 1.01% | 5,743,900 |
| 9/5/2001 | $40.80 | - | 1.98% | 5,735,600 |
| 9/6/2001 | $40.81 | - | 0.02% | 6,356,600 |
| 9/7/2001 | $40.27 | - | -1.33% | 6,231,300 |
| 9/10/2001 | $40.15 | - | -0.30% | 6,080,100 |
| 9/17/2001 | $39.50 | - | -1.63% | 10,071,800 |
| 9/18/2001 | $39.60 | - | 0.25% | 6,603,000 |
| 9/19/2001 | $40.00 | - | 1.01% | 10,466,500 |
| 9/20/2001 | $38.91 | - | -2.76% | 7,281,500 |
| 9/21/2001 | $38.35 | - | -1.45% | 7,366,400 |
| 9/24/2001 | $37.60 | - | -1.98% | 5,716,800 |

**Exhibit-4**

**Pharmacia Corp. (PHA) Stock Prices, Dividends, Volume, and Returns**

14 April 2000 through 2 November 2001

| Date | PHA Closing Price | PHA Dividend | PHA Logarithmic Return | PHA Volume |
|---|---|---|---|---|
| 9/25/2001 | $37.86 | - | 0.69% | 8,235,400 |
| 9/26/2001 | $38.74 | - | 2.30% | 5,562,600 |
| 9/27/2001 | $40.06 | - | 3.35% | 5,128,700 |
| 9/28/2001 | $40.56 | - | 1.24% | 5,020,200 |
| 10/1/2001 | $40.75 | - | 0.47% | 3,580,300 |
| 10/2/2001 | $41.31 | - | 1.36% | 3,445,800 |
| 10/3/2001 | $40.98 | - | -0.80% | 4,166,000 |
| 10/4/2001 | $40.05 | - | -2.30% | 3,524,100 |
| 10/5/2001 | $40.38 | - | 0.82% | 3,847,600 |
| 10/8/2001 | $39.94 | - | -1.10% | 2,758,500 |
| 10/9/2001 | $40.00 | $0.14 | 0.49% | 3,808,900 |
| 10/10/2001 | $40.41 | - | 1.02% | 3,605,600 |
| 10/11/2001 | $41.02 | - | 1.50% | 6,738,100 |
| 10/12/2001 | $41.03 | - | 0.02% | 3,214,900 |
| 10/15/2001 | $41.00 | - | -0.07% | 4,211,000 |
| 10/16/2001 | $41.20 | - | 0.49% | 4,598,100 |
| 10/17/2001 | $41.80 | - | 1.45% | 6,338,400 |
| 10/18/2001 | $41.90 | - | 0.24% | 4,196,300 |
| 10/19/2001 | $41.59 | - | -0.74% | 3,905,500 |
| 10/22/2001 | $42.76 | - | 2.77% | 5,941,600 |
| 10/23/2001 | $38.39 | - | -10.78% | 22,797,900 |
| 10/24/2001 | $39.61 | - | 3.13% | 15,942,700 |
| 10/25/2001 | $39.55 | - | -0.15% | 10,879,300 |
| 10/26/2001 | $39.34 | - | -0.53% | 9,652,300 |
| 10/29/2001 | $40.09 | - | 1.89% | 8,786,400 |
| 10/30/2001 | $40.20 | - | 0.27% | 7,081,800 |
| 10/31/2001 | $40.52 | - | 0.79% | 7,177,900 |
| 11/1/2001 | $40.88 | - | 0.88% | 5,173,400 |
| 11/2/2001 | $40.85 | - | -0.07% | 4,547,400 |

**Source:** CRSP

# Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|------|-----------------|-----------------|----------|----------|
| 4/17/2000 | $53.88 | $54.38 | 0.92% | $0.50 |
| 4/18/2000 | NA | NA | NA | NA |
| 4/19/2000 | NA | NA | NA | NA |
| 4/20/2000 | NA | NA | NA | NA |
| 4/24/2000 | $57.88 | $58.19 | 0.54% | $0.31 |
| 4/25/2000 | $53.81 | $54.13 | 0.58% | $0.31 |
| 4/26/2000 | $52.75 | $53.06 | 0.59% | $0.31 |
| 4/27/2000 | $52.63 | $53.00 | 0.71% | $0.38 |
| 4/28/2000 | $48.88 | $50.13 | 2.53% | $1.25 |
| 5/1/2000 | $49.38 | $49.75 | 0.76% | $0.38 |
| 5/2/2000 | $49.81 | $49.94 | 0.25% | $0.13 |
| 5/3/2000 | $50.75 | $51.13 | 0.74% | $0.38 |
| 5/4/2000 | $52.25 | $52.63 | 0.72% | $0.38 |
| 5/5/2000 | $53.75 | $54.13 | 0.70% | $0.38 |
| 5/8/2000 | $55.38 | $55.75 | 0.67% | $0.38 |
| 5/9/2000 | $55.38 | $55.75 | 0.67% | $0.38 |
| 5/10/2000 | $53.88 | $54.25 | 0.69% | $0.38 |
| 5/11/2000 | $54.19 | $54.56 | 0.69% | $0.38 |
| 5/12/2000 | $53.38 | $53.69 | 0.58% | $0.31 |
| 5/15/2000 | $54.94 | $55.31 | 0.68% | $0.38 |
| 5/16/2000 | $53.56 | $53.88 | 0.58% | $0.31 |
| 5/17/2000 | $52.69 | $53.06 | 0.71% | $0.38 |
| 5/18/2000 | $52.25 | $52.63 | 0.72% | $0.38 |
| 5/19/2000 | $54.69 | $55.06 | 0.68% | $0.38 |
| 5/22/2000 | $53.00 | $53.38 | 0.71% | $0.38 |
| 5/23/2000 | $53.25 | $53.63 | 0.70% | $0.38 |
| 5/24/2000 | $51.63 | $51.94 | 0.60% | $0.31 |
| 5/25/2000 | $52.00 | $52.38 | 0.72% | $0.38 |
| 5/26/2000 | $51.63 | $52.06 | 0.84% | $0.44 |
| 5/30/2000 | $50.31 | $50.69 | 0.74% | $0.38 |
| 5/31/2000 | $51.44 | $52.44 | 1.93% | $1.00 |
| 6/1/2000 | $51.81 | $51.94 | 0.24% | $0.13 |
| 6/2/2000 | $49.06 | $49.44 | 0.76% | $0.38 |
| 6/5/2000 | $49.81 | $50.13 | 0.63% | $0.31 |
| 6/6/2000 | $48.94 | $49.25 | 0.64% | $0.31 |
| 6/7/2000 | $50.38 | $50.75 | 0.74% | $0.38 |

130

## Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|---|---|---|---|---|
| 6/8/2000 | $49.94 | $50.25 | 0.62% | $0.31 |
| 6/9/2000 | $51.88 | $52.44 | 1.08% | $0.56 |
| 6/12/2000 | $51.63 | $52.19 | 1.08% | $0.56 |
| 6/13/2000 | $52.94 | $53.13 | 0.35% | $0.19 |
| 6/14/2000 | $54.56 | $54.81 | 0.46% | $0.25 |
| 6/15/2000 | $55.63 | $55.94 | 0.56% | $0.31 |
| 6/16/2000 | $55.94 | $56.25 | 0.56% | $0.31 |
| 6/19/2000 | $56.31 | $56.50 | 0.33% | $0.19 |
| 6/20/2000 | $56.25 | $56.56 | 0.55% | $0.31 |
| 6/21/2000 | $55.13 | $55.38 | 0.45% | $0.25 |
| 6/22/2000 | $51.31 | $51.81 | 0.97% | $0.50 |
| 6/23/2000 | $53.00 | $53.19 | 0.35% | $0.19 |
| 6/26/2000 | $53.19 | $53.38 | 0.35% | $0.19 |
| 6/27/2000 | $53.38 | $53.69 | 0.58% | $0.31 |
| 6/28/2000 | $51.63 | $51.94 | 0.60% | $0.31 |
| 6/29/2000 | $50.38 | $50.50 | 0.25% | $0.13 |
| 6/30/2000 | $51.13 | $51.81 | 1.34% | $0.69 |
| 7/3/2000 | $52.50 | $52.81 | 0.59% | $0.31 |
| 7/5/2000 | $53.38 | $53.69 | 0.58% | $0.31 |
| 7/6/2000 | $54.00 | $54.25 | 0.46% | $0.25 |
| 7/7/2000 | $54.69 | $54.88 | 0.34% | $0.19 |
| 7/10/2000 | $55.94 | $56.13 | 0.33% | $0.19 |
| 7/11/2000 | $57.19 | $57.25 | 0.11% | $0.06 |
| 7/12/2000 | $56.56 | $56.88 | 0.55% | $0.31 |
| 7/13/2000 | $55.44 | $55.56 | 0.23% | $0.13 |
| 7/14/2000 | $55.50 | $55.69 | 0.34% | $0.19 |
| 7/17/2000 | $55.69 | $55.94 | 0.45% | $0.25 |
| 7/18/2000 | $55.00 | $55.19 | 0.34% | $0.19 |
| 7/19/2000 | $53.50 | $53.75 | 0.47% | $0.25 |
| 7/20/2000 | $52.50 | $52.69 | 0.36% | $0.19 |
| 7/21/2000 | $51.88 | $52.06 | 0.36% | $0.19 |
| 7/24/2000 | $51.75 | $52.50 | 1.44% | $0.75 |
| 7/25/2000 | $55.50 | $55.81 | 0.56% | $0.31 |
| 7/26/2000 | $55.50 | $55.94 | 0.79% | $0.44 |
| 7/27/2000 | $55.56 | $56.00 | 0.78% | $0.44 |
| 7/28/2000 | $55.75 | $56.00 | 0.45% | $0.25 |

## Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|---|---|---|---|---|
| 7/31/2000 | $54.88 | $55.06 | 0.34% | $0.19 |
| 8/1/2000 | $55.50 | $55.75 | 0.45% | $0.25 |
| 8/2/2000 | $57.38 | $57.69 | 0.54% | $0.31 |
| 8/3/2000 | $56.75 | $57.13 | 0.66% | $0.38 |
| 8/4/2000 | $56.63 | $56.81 | 0.33% | $0.19 |
| 8/7/2000 | $57.31 | $57.63 | 0.54% | $0.31 |
| 8/8/2000 | $58.88 | $59.00 | 0.21% | $0.13 |
| 8/9/2000 | $57.50 | $57.69 | 0.33% | $0.19 |
| 8/10/2000 | $55.63 | $55.75 | 0.22% | $0.13 |
| 8/11/2000 | $56.19 | $56.31 | 0.22% | $0.13 |
| 8/14/2000 | $56.06 | $56.25 | 0.33% | $0.19 |
| 8/15/2000 | $56.75 | $56.94 | 0.33% | $0.19 |
| 8/16/2000 | $57.69 | $57.88 | 0.32% | $0.19 |
| 8/17/2000 | $59.31 | $59.63 | 0.53% | $0.31 |
| 8/18/2000 | $57.81 | $58.00 | 0.32% | $0.19 |
| 8/21/2000 | $57.63 | $57.88 | 0.43% | $0.25 |
| 8/22/2000 | $57.38 | $57.56 | 0.33% | $0.19 |
| 8/23/2000 | $57.44 | $57.56 | 0.22% | $0.13 |
| 8/24/2000 | $58.69 | $58.88 | 0.32% | $0.19 |
| 8/25/2000 | $58.81 | $59.06 | 0.42% | $0.25 |
| 8/28/2000 | $58.00 | $58.31 | 0.54% | $0.31 |
| 8/29/2000 | $58.81 | $58.94 | 0.21% | $0.13 |
| 8/30/2000 | $58.56 | $58.69 | 0.21% | $0.13 |
| 8/31/2000 | $58.31 | $58.44 | 0.21% | $0.13 |
| 9/1/2000 | $58.25 | $58.38 | 0.21% | $0.13 |
| 9/5/2000 | $56.31 | $56.56 | 0.44% | $0.25 |
| 9/6/2000 | $55.81 | $56.00 | 0.34% | $0.19 |
| 9/7/2000 | $56.50 | $56.69 | 0.33% | $0.19 |
| 9/8/2000 | $54.75 | $54.94 | 0.34% | $0.19 |
| 9/11/2000 | $54.38 | $54.50 | 0.23% | $0.13 |
| 9/12/2000 | $54.38 | $54.50 | 0.23% | $0.13 |
| 9/13/2000 | $55.13 | $55.25 | 0.23% | $0.13 |
| 9/14/2000 | $54.63 | $54.81 | 0.34% | $0.19 |
| 9/15/2000 | $53.44 | $53.69 | 0.47% | $0.25 |
| 9/18/2000 | $52.88 | $53.00 | 0.24% | $0.13 |
| 9/19/2000 | $53.81 | $54.06 | 0.46% | $0.25 |

## Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|---|---|---|---|---|
| 9/20/2000 | $54.13 | $54.38 | 0.46% | $0.25 |
| 9/21/2000 | $55.94 | $56.13 | 0.33% | $0.19 |
| 9/22/2000 | $58.81 | $59.00 | 0.32% | $0.19 |
| 9/25/2000 | $58.81 | $59.00 | 0.32% | $0.19 |
| 9/26/2000 | $57.94 | $58.06 | 0.22% | $0.13 |
| 9/27/2000 | $58.44 | $58.56 | 0.21% | $0.13 |
| 9/28/2000 | $59.94 | $60.06 | 0.21% | $0.13 |
| 9/29/2000 | $60.06 | $60.38 | 0.52% | $0.31 |
| 10/2/2000 | $57.06 | $58.06 | 1.74% | $1.00 |
| 10/3/2000 | $57.19 | $58.19 | 1.73% | $1.00 |
| 10/4/2000 | $56.56 | $57.56 | 1.75% | $1.00 |
| 10/5/2000 | $57.00 | $58.00 | 1.74% | $1.00 |
| 10/6/2000 | $56.38 | $57.38 | 1.76% | $1.00 |
| 10/9/2000 | $55.81 | $56.81 | 1.78% | $1.00 |
| 10/10/2000 | $57.31 | $58.31 | 1.73% | $1.00 |
| 10/11/2000 | $57.31 | $58.31 | 1.73% | $1.00 |
| 10/12/2000 | $57.00 | $58.00 | 1.74% | $1.00 |
| 10/13/2000 | $54.44 | $55.44 | 1.82% | $1.00 |
| 10/16/2000 | $54.69 | $55.69 | 1.81% | $1.00 |
| 10/17/2000 | $55.94 | $56.94 | 1.77% | $1.00 |
| 10/18/2000 | $54.50 | $55.50 | 1.82% | $1.00 |
| 10/19/2000 | $53.06 | $54.06 | 1.87% | $1.00 |
| 10/20/2000 | $50.25 | $51.25 | 1.97% | $1.00 |
| 10/23/2000 | $53.38 | $54.38 | 1.86% | $1.00 |
| 10/24/2000 | $54.50 | $55.50 | 1.82% | $1.00 |
| 10/25/2000 | $56.38 | $57.38 | 1.76% | $1.00 |
| 10/26/2000 | $55.31 | $56.31 | 1.79% | $1.00 |
| 10/27/2000 | $54.13 | $55.13 | 1.83% | $1.00 |
| 10/30/2000 | $52.13 | $53.13 | 1.90% | $1.00 |
| 10/31/2000 | $54.50 | $55.50 | 1.82% | $1.00 |
| 11/1/2000 | $56.94 | $57.94 | 1.74% | $1.00 |
| 11/2/2000 | $57.50 | $58.50 | 1.72% | $1.00 |
| 11/3/2000 | $55.75 | $56.75 | 1.78% | $1.00 |
| 11/6/2000 | $57.06 | $58.06 | 1.74% | $1.00 |
| 11/7/2000 | $57.00 | $58.00 | 1.74% | $1.00 |
| 11/8/2000 | $58.94 | $59.94 | 1.68% | $1.00 |

# Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|---|---|---|---|---|
| 11/9/2000 | $58.75 | $59.75 | 1.69% | $1.00 |
| 11/10/2000 | $58.75 | $59.75 | 1.69% | $1.00 |
| 11/13/2000 | $56.75 | $57.75 | 1.75% | $1.00 |
| 11/14/2000 | $58.25 | $59.25 | 1.70% | $1.00 |
| 11/15/2000 | $57.75 | $58.75 | 1.72% | $1.00 |
| 11/16/2000 | $56.50 | $57.50 | 1.75% | $1.00 |
| 11/17/2000 | $59.31 | $60.31 | 1.67% | $1.00 |
| 11/20/2000 | $59.00 | $60.00 | 1.68% | $1.00 |
| 11/21/2000 | $59.13 | $60.13 | 1.68% | $1.00 |
| 11/22/2000 | $57.56 | $58.56 | 1.72% | $1.00 |
| 11/24/2000 | $57.19 | $58.19 | 1.73% | $1.00 |
| 11/27/2000 | $59.00 | $60.00 | 1.68% | $1.00 |
| 11/28/2000 | $58.75 | $59.75 | 1.69% | $1.00 |
| 11/29/2000 | $60.44 | $61.44 | 1.64% | $1.00 |
| 11/30/2000 | $60.50 | $61.50 | 1.64% | $1.00 |
| 12/1/2000 | $57.00 | $58.00 | 1.74% | $1.00 |
| 12/4/2000 | $58.56 | $59.56 | 1.69% | $1.00 |
| 12/5/2000 | $59.25 | $60.25 | 1.67% | $1.00 |
| 12/6/2000 | $57.25 | $58.25 | 1.73% | $1.00 |
| 12/7/2000 | $57.50 | $58.50 | 1.72% | $1.00 |
| 12/8/2000 | $58.50 | $59.50 | 1.69% | $1.00 |
| 12/11/2000 | $58.50 | $58.88 | 0.64% | $0.38 |
| 12/12/2000 | $57.31 | $58.31 | 1.73% | $1.00 |
| 12/13/2000 | $58.06 | $59.06 | 1.71% | $1.00 |
| 12/14/2000 | $58.81 | $59.81 | 1.69% | $1.00 |
| 12/15/2000 | $59.13 | $60.13 | 1.68% | $1.00 |
| 12/18/2000 | $58.88 | $59.88 | 1.68% | $1.00 |
| 12/19/2000 | $57.50 | $58.50 | 1.72% | $1.00 |
| 12/20/2000 | $59.44 | $60.44 | 1.67% | $1.00 |
| 12/21/2000 | $57.56 | $58.56 | 1.72% | $1.00 |
| 12/22/2000 | $56.94 | $57.94 | 1.74% | $1.00 |
| 12/26/2000 | $58.13 | $59.00 | 1.49% | $0.88 |
| 12/27/2000 | $59.50 | $60.50 | 1.67% | $1.00 |
| 12/28/2000 | $60.44 | $61.44 | 1.64% | $1.00 |
| 12/29/2000 | $60.50 | $61.50 | 1.64% | $1.00 |
| 1/2/2001 | $59.50 | $60.50 | 1.67% | $1.00 |

# Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|------|-----------------|-----------------|----------|----------|
| 1/3/2001 | $56.50 | $57.50 | 1.75% | $1.00 |
| 1/4/2001 | $54.81 | $55.81 | 1.81% | $1.00 |
| 1/5/2001 | $55.88 | $56.88 | 1.77% | $1.00 |
| 1/8/2001 | $56.00 | $57.00 | 1.77% | $1.00 |
| 1/9/2001 | $55.19 | $56.19 | 1.80% | $1.00 |
| 1/10/2001 | $55.00 | $56.00 | 1.80% | $1.00 |
| 1/11/2001 | $54.44 | $55.44 | 1.82% | $1.00 |
| 1/12/2001 | $55.00 | $56.00 | 1.80% | $1.00 |
| 1/16/2001 | $55.81 | $56.81 | 1.78% | $1.00 |
| 1/17/2001 | $55.38 | $56.38 | 1.79% | $1.00 |
| 1/18/2001 | $56.31 | $57.31 | 1.76% | $1.00 |
| 1/19/2001 | $55.75 | $56.75 | 1.78% | $1.00 |
| 1/22/2001 | $55.69 | $56.69 | 1.78% | $1.00 |
| 1/23/2001 | $55.06 | $56.06 | 1.80% | $1.00 |
| 1/24/2001 | $54.88 | $55.88 | 1.81% | $1.00 |
| 1/25/2001 | $55.00 | $56.00 | 1.80% | $1.00 |
| 1/26/2001 | $55.31 | $56.31 | 1.79% | $1.00 |
| 1/29/2001 | $54.90 | $55.90 | 1.81% | $1.00 |
| 1/30/2001 | $54.68 | $55.68 | 1.81% | $1.00 |
| 1/31/2001 | $55.51 | $56.51 | 1.79% | $1.00 |
| 2/1/2001 | $56.58 | $57.58 | 1.75% | $1.00 |
| 2/2/2001 | $57.31 | $58.31 | 1.73% | $1.00 |
| 2/5/2001 | $57.78 | $58.78 | 1.72% | $1.00 |
| 2/6/2001 | $57.15 | $58.15 | 1.73% | $1.00 |
| 2/7/2001 | $55.63 | $56.63 | 1.78% | $1.00 |
| 2/8/2001 | $53.00 | $53.50 | 0.94% | $0.50 |
| 2/9/2001 | $53.50 | $54.50 | 1.85% | $1.00 |
| 2/12/2001 | $53.73 | $54.73 | 1.84% | $1.00 |
| 2/13/2001 | $51.13 | $52.00 | 1.69% | $0.87 |
| 2/14/2001 | $51.40 | $52.40 | 1.93% | $1.00 |
| 2/15/2001 | $51.52 | $52.52 | 1.92% | $1.00 |
| 2/16/2001 | $50.66 | $51.66 | 1.95% | $1.00 |
| 2/20/2001 | $49.45 | $50.45 | 2.00% | $1.00 |
| 2/21/2001 | $48.35 | $49.35 | 2.05% | $1.00 |
| 2/22/2001 | $48.75 | $49.75 | 2.03% | $1.00 |
| 2/23/2001 | $48.55 | $49.55 | 2.04% | $1.00 |

## Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|------|-----------------|-----------------|----------|----------|
| 2/26/2001 | $48.90 | $49.90 | 2.02% | $1.00 |
| 2/27/2001 | $49.75 | $51.00 | 2.48% | $1.25 |
| 2/28/2001 | $51.20 | $52.20 | 1.93% | $1.00 |
| 3/1/2001 | $51.47 | $52.47 | 1.92% | $1.00 |
| 3/2/2001 | $52.29 | $53.29 | 1.89% | $1.00 |
| 3/5/2001 | $53.55 | $54.55 | 1.85% | $1.00 |
| 3/6/2001 | $52.35 | $53.35 | 1.89% | $1.00 |
| 3/7/2001 | $50.51 | $51.51 | 1.96% | $1.00 |
| 3/8/2001 | $50.24 | $51.24 | 1.97% | $1.00 |
| 3/9/2001 | $50.69 | $51.69 | 1.95% | $1.00 |
| 3/12/2001 | $49.72 | $51.00 | 2.54% | $1.28 |
| 3/13/2001 | $48.60 | $49.60 | 2.04% | $1.00 |
| 3/14/2001 | $47.30 | $48.30 | 2.09% | $1.00 |
| 3/15/2001 | $46.96 | $47.96 | 2.11% | $1.00 |
| 3/16/2001 | $44.68 | $45.68 | 2.21% | $1.00 |
| 3/19/2001 | $47.17 | $47.66 | 1.03% | $0.49 |
| 3/20/2001 | $46.62 | $47.62 | 2.12% | $1.00 |
| 3/21/2001 | $46.08 | $47.08 | 2.15% | $1.00 |
| 3/22/2001 | $43.50 | $44.50 | 2.27% | $1.00 |
| 3/23/2001 | $46.49 | $47.49 | 2.13% | $1.00 |
| 3/26/2001 | $47.78 | $48.78 | 2.07% | $1.00 |
| 3/27/2001 | $49.10 | $50.10 | 2.02% | $1.00 |
| 3/28/2001 | $49.30 | $50.30 | 2.01% | $1.00 |
| 3/29/2001 | $49.37 | $50.37 | 2.01% | $1.00 |
| 3/30/2001 | $49.87 | $50.87 | 1.99% | $1.00 |
| 4/2/2001 | $48.75 | $49.75 | 2.03% | $1.00 |
| 4/3/2001 | $48.26 | $49.26 | 2.05% | $1.00 |
| 4/4/2001 | $48.73 | $49.73 | 2.03% | $1.00 |
| 4/5/2001 | $50.54 | $51.54 | 1.96% | $1.00 |
| 4/6/2001 | $50.15 | $51.15 | 1.97% | $1.00 |
| 4/9/2001 | $51.75 | $52.75 | 1.91% | $1.00 |
| 4/10/2001 | $50.70 | $51.70 | 1.95% | $1.00 |
| 4/11/2001 | $49.61 | $50.61 | 2.00% | $1.00 |
| 4/12/2001 | $50.20 | $51.20 | 1.97% | $1.00 |
| 4/16/2001 | $49.95 | $50.95 | 1.98% | $1.00 |
| 4/17/2001 | $51.58 | $52.58 | 1.92% | $1.00 |

## Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|------|-----------------|-----------------|----------|----------|
| 4/18/2001 | $50.25 | $51.25 | 1.97% | $1.00 |
| 4/19/2001 | $49.58 | $50.50 | 1.84% | $0.92 |
| 4/20/2001 | $48.05 | $50.00 | 3.98% | $1.95 |
| 4/23/2001 | NA | NA | NA | NA |
| 4/24/2001 | $47.51 | $48.51 | 2.08% | $1.00 |
| 4/25/2001 | $48.60 | $49.60 | 2.04% | $1.00 |
| 4/26/2001 | $51.01 | $52.01 | 1.94% | $1.00 |
| 4/27/2001 | $51.75 | $52.75 | 1.91% | $1.00 |
| 4/30/2001 | $51.76 | $52.76 | 1.91% | $1.00 |
| 5/1/2001 | $51.22 | $52.22 | 1.93% | $1.00 |
| 5/2/2001 | $50.50 | $51.50 | 1.96% | $1.00 |
| 5/3/2001 | $49.50 | $50.50 | 2.00% | $1.00 |
| 5/4/2001 | $49.50 | $50.50 | 2.00% | $1.00 |
| 5/7/2001 | $48.45 | $49.45 | 2.04% | $1.00 |
| 5/8/2001 | $47.70 | $48.70 | 2.07% | $1.00 |
| 5/9/2001 | $46.99 | $47.99 | 2.11% | $1.00 |
| 5/10/2001 | $46.48 | $47.48 | 2.13% | $1.00 |
| 5/11/2001 | $45.65 | $46.65 | 2.17% | $1.00 |
| 5/14/2001 | $45.78 | $46.78 | 2.16% | $1.00 |
| 5/15/2001 | $45.49 | $46.49 | 2.17% | $1.00 |
| 5/16/2001 | $47.88 | $48.88 | 2.07% | $1.00 |
| 5/17/2001 | $48.99 | $49.99 | 2.02% | $1.00 |
| 5/18/2001 | $48.00 | $49.00 | 2.06% | $1.00 |
| 5/21/2001 | $49.96 | $50.13 | 0.34% | $0.17 |
| 5/22/2001 | $49.42 | $49.64 | 0.44% | $0.22 |
| 5/23/2001 | $48.57 | $48.84 | 0.55% | $0.27 |
| 5/24/2001 | $48.63 | $48.79 | 0.33% | $0.16 |
| 5/25/2001 | $48.50 | $48.67 | 0.35% | $0.17 |
| 5/29/2001 | $48.00 | $48.05 | 0.10% | $0.05 |
| 5/30/2001 | $48.17 | $48.29 | 0.25% | $0.12 |
| 5/31/2001 | $48.45 | $48.67 | 0.45% | $0.22 |
| 6/1/2001 | $49.22 | $49.46 | 0.49% | $0.24 |
| 6/4/2001 | $49.50 | $49.77 | 0.54% | $0.27 |
| 6/5/2001 | $49.47 | $49.71 | 0.48% | $0.24 |
| 6/6/2001 | $49.22 | $49.46 | 0.49% | $0.24 |
| 6/7/2001 | $49.65 | $49.93 | 0.56% | $0.28 |

# Exhibit-5

## Pharmacia Corp. Bid-Ask Spread

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|---|---|---|---|---|
| 6/8/2001 | $49.55 | $49.81 | 0.52% | $0.26 |
| 6/11/2001 | $48.95 | $49.16 | 0.43% | $0.21 |
| 6/12/2001 | $48.81 | $49.10 | 0.59% | $0.29 |
| 6/13/2001 | $48.60 | $48.90 | 0.62% | $0.30 |
| 6/14/2001 | $48.03 | $48.25 | 0.46% | $0.22 |
| 6/15/2001 | $48.70 | $48.91 | 0.43% | $0.21 |
| 6/18/2001 | $49.01 | $49.24 | 0.47% | $0.23 |
| 6/19/2001 | $49.40 | $49.67 | 0.55% | $0.27 |
| 6/20/2001 | $50.63 | $50.86 | 0.45% | $0.23 |
| 6/21/2001 | $51.35 | $51.65 | 0.58% | $0.30 |
| 6/22/2001 | $48.67 | $48.90 | 0.47% | $0.23 |
| 6/25/2001 | $48.70 | $48.96 | 0.53% | $0.26 |
| 6/26/2001 | $48.31 | $48.53 | 0.45% | $0.22 |
| 6/27/2001 | $47.11 | $47.33 | 0.47% | $0.22 |
| 6/28/2001 | $47.01 | $47.24 | 0.49% | $0.23 |
| 6/29/2001 | $45.75 | $46.10 | 0.76% | $0.35 |
| 7/2/2001 | $46.47 | $46.69 | 0.47% | $0.22 |
| 7/3/2001 | $46.42 | $46.70 | 0.60% | $0.28 |
| 7/5/2001 | $46.36 | $46.61 | 0.54% | $0.25 |
| 7/6/2001 | $45.97 | $46.17 | 0.43% | $0.20 |
| 7/9/2001 | $46.70 | $46.92 | 0.47% | $0.22 |
| 7/10/2001 | $46.84 | $47.05 | 0.45% | $0.21 |
| 7/11/2001 | $46.56 | $46.81 | 0.54% | $0.25 |
| 7/12/2001 | $46.11 | $46.34 | 0.50% | $0.23 |
| 7/13/2001 | $46.73 | $46.95 | 0.47% | $0.22 |
| 7/16/2001 | $42.74 | $42.95 | 0.49% | $0.21 |
| 7/17/2001 | $42.47 | $42.71 | 0.56% | $0.24 |
| 7/18/2001 | $43.05 | $43.30 | 0.58% | $0.25 |
| 7/19/2001 | $43.24 | $43.46 | 0.51% | $0.22 |
| 7/20/2001 | $43.51 | $43.75 | 0.55% | $0.24 |
| 7/23/2001 | $43.30 | $43.52 | 0.51% | $0.22 |
| 7/24/2001 | $41.80 | $42.10 | 0.72% | $0.30 |
| 7/25/2001 | $41.97 | $42.23 | 0.62% | $0.26 |
| 7/26/2001 | $41.73 | $41.97 | 0.57% | $0.24 |
| 7/27/2001 | $42.02 | $42.30 | 0.66% | $0.28 |
| 7/30/2001 | $43.14 | $43.37 | 0.53% | $0.23 |

**Exhibit-5**

**Pharmacia Corp. Bid-Ask Spread**

17 April 2000 through 3 August 2001

| Date | PHA Closing Bid | PHA Closing Ask | % Spread | $ Spread |
|------|-----------------|-----------------|----------|----------|
| 7/31/2001 | $44.44 | $44.69 | 0.56% | $0.25 |
| 8/1/2001 | $44.35 | $44.53 | 0.41% | $0.18 |
| 8/2/2001 | $43.74 | $43.97 | 0.52% | $0.23 |
| 8/3/2001 | $43.89 | $44.09 | 0.45% | $0.20 |
| **Average** | **$52.82** | **$53.44** | **1.17%** | **$0.62** |

**Source:** CRSP

# Exhibit-6

## Pharmacia Pharmaceuticals Stock Price

(Pharmacia Stock Price Less Per Share Value of New Monsanto Holdings)

18 October 2000 through 18 October 2001

| Date | PHA Share Price | PHA Shares Outstanding | MON Share Price | MON Shares Owned by PHA | Value of MON per PHA Share | PHA Adjusted for MON |
|------|-----------------|------------------------|-----------------|-------------------------|----------------------------|----------------------|
| 10/18/2000 | $55.00 | 1,269,325 | $21.50 | 220,000 | $3.73 | $51.27 |
| 10/19/2000 | $53.56 | 1,269,325 | $24.00 | 220,000 | $4.16 | $49.40 |
| 10/20/2000 | $50.75 | 1,269,325 | $23.13 | 220,000 | $4.01 | $46.74 |
| 10/23/2000 | $53.88 | 1,269,325 | $22.00 | 220,000 | $3.81 | $50.06 |
| 10/24/2000 | $55.00 | 1,269,325 | $22.13 | 220,000 | $3.83 | $51.17 |
| 10/25/2000 | $56.88 | 1,269,325 | $22.94 | 220,000 | $3.98 | $52.90 |
| 10/26/2000 | $55.81 | 1,269,325 | $23.44 | 220,000 | $4.06 | $51.75 |
| 10/27/2000 | $54.63 | 1,269,325 | $23.94 | 220,000 | $4.15 | $50.48 |
| 10/30/2000 | $52.63 | 1,269,325 | $24.63 | 220,000 | $4.27 | $48.36 |
| 10/31/2000 | $55.00 | 1,269,325 | $25.50 | 220,000 | $4.42 | $50.58 |
| 11/1/2000 | $57.44 | 1,269,325 | $23.75 | 220,000 | $4.12 | $53.32 |
| 11/2/2000 | $58.00 | 1,269,325 | $23.06 | 220,000 | $4.00 | $54.00 |
| 11/3/2000 | $56.25 | 1,269,325 | $22.94 | 220,000 | $3.98 | $52.27 |
| 11/6/2000 | $57.56 | 1,269,325 | $23.31 | 220,000 | $4.04 | $53.52 |
| 11/7/2000 | $57.50 | 1,269,325 | $23.25 | 220,000 | $4.03 | $53.47 |
| 11/8/2000 | $59.44 | 1,269,325 | $23.06 | 220,000 | $4.00 | $55.44 |
| 11/9/2000 | $59.25 | 1,269,325 | $23.00 | 220,000 | $3.99 | $55.26 |
| 11/10/2000 | $59.25 | 1,269,325 | $22.50 | 220,000 | $3.90 | $55.35 |
| 11/13/2000 | $57.25 | 1,269,325 | $22.56 | 220,000 | $3.91 | $53.34 |
| 11/14/2000 | $58.75 | 1,269,325 | $23.44 | 220,000 | $4.06 | $54.69 |
| 11/15/2000 | $58.25 | 1,269,325 | $24.38 | 220,000 | $4.22 | $54.03 |
| 11/16/2000 | $57.00 | 1,269,325 | $23.81 | 220,000 | $4.13 | $52.87 |
| 11/17/2000 | $59.81 | 1,269,325 | $24.13 | 220,000 | $4.18 | $55.63 |
| 11/20/2000 | $59.50 | 1,269,325 | $23.31 | 220,000 | $4.04 | $55.46 |
| 11/21/2000 | $59.63 | 1,269,325 | $23.13 | 220,000 | $4.01 | $55.62 |
| 11/22/2000 | $58.06 | 1,269,325 | $22.81 | 220,000 | $3.95 | $54.11 |
| 11/24/2000 | $57.69 | 1,269,325 | $23.44 | 220,000 | $4.06 | $53.63 |
| 11/27/2000 | $59.50 | 1,269,325 | $23.56 | 220,000 | $4.08 | $55.42 |
| 11/28/2000 | $59.25 | 1,269,325 | $23.88 | 220,000 | $4.14 | $55.11 |
| 11/29/2000 | $60.94 | 1,269,325 | $25.00 | 220,000 | $4.33 | $56.60 |
| 11/30/2000 | $61.00 | 1,288,998 | $25.06 | 220,000 | $4.28 | $56.72 |
| 12/1/2000 | $57.50 | 1,288,998 | $24.81 | 220,000 | $4.23 | $53.27 |
| 12/4/2000 | $59.06 | 1,288,998 | $25.25 | 220,000 | $4.31 | $54.75 |

## Exhibit-6

## Pharmacia Pharmaceuticals Stock Price

(Pharmacia Stock Price Less Per Share Value of New Monsanto Holdings)

18 October 2000 through 18 October 2001

| Date | PHA Share Price | PHA Shares Outstanding | MON Share Price | MON Shares Owned by PHA | Value of MON per PHA Share | PHA Adjusted for MON |
|---|---|---|---|---|---|---|
| 12/5/2000 | $59.75 | 1,288,998 | $25.25 | 220,000 | $4.31 | $55.44 |
| 12/6/2000 | $57.75 | 1,288,998 | $25.31 | 220,000 | $4.32 | $53.43 |
| 12/7/2000 | $58.00 | 1,288,998 | $24.94 | 220,000 | $4.26 | $53.74 |
| 12/8/2000 | $59.00 | 1,288,998 | $24.88 | 220,000 | $4.25 | $54.75 |
| 12/11/2000 | $58.69 | 1,288,998 | $25.69 | 220,000 | $4.38 | $54.30 |
| 12/12/2000 | $57.81 | 1,288,998 | $25.13 | 220,000 | $4.29 | $53.52 |
| 12/13/2000 | $58.56 | 1,288,998 | $25.25 | 220,000 | $4.31 | $54.25 |
| 12/14/2000 | $59.31 | 1,288,998 | $25.38 | 220,000 | $4.33 | $54.98 |
| 12/15/2000 | $59.63 | 1,288,998 | $25.38 | 220,000 | $4.33 | $55.29 |
| 12/18/2000 | $59.38 | 1,288,998 | $25.63 | 220,000 | $4.37 | $55.00 |
| 12/19/2000 | $58.00 | 1,288,998 | $25.38 | 220,000 | $4.33 | $53.67 |
| 12/20/2000 | $59.94 | 1,288,998 | $25.06 | 220,000 | $4.28 | $55.66 |
| 12/21/2000 | $58.06 | 1,288,998 | $23.94 | 220,000 | $4.09 | $53.98 |
| 12/22/2000 | $57.44 | 1,288,998 | $23.69 | 220,000 | $4.04 | $53.39 |
| 12/26/2000 | $58.63 | 1,288,998 | $24.06 | 220,000 | $4.11 | $54.52 |
| 12/27/2000 | $60.00 | 1,288,998 | $25.19 | 220,000 | $4.30 | $55.70 |
| 12/28/2000 | $60.94 | 1,288,998 | $26.19 | 220,000 | $4.47 | $56.47 |
| 12/29/2000 | $61.00 | 1,288,998 | $27.06 | 220,000 | $4.62 | $56.38 |
| 1/2/2001 | $60.00 | 1,288,998 | $28.25 | 220,000 | $4.82 | $55.18 |
| 1/3/2001 | $57.00 | 1,288,998 | $31.38 | 220,000 | $5.35 | $51.65 |
| 1/4/2001 | $55.31 | 1,288,998 | $30.50 | 220,000 | $5.21 | $50.11 |
| 1/5/2001 | $56.38 | 1,288,998 | $29.69 | 220,000 | $5.07 | $51.31 |
| 1/8/2001 | $56.50 | 1,288,998 | $29.69 | 220,000 | $5.07 | $51.43 |
| 1/9/2001 | $55.69 | 1,288,998 | $29.38 | 220,000 | $5.01 | $50.67 |
| 1/10/2001 | $55.50 | 1,288,998 | $29.63 | 220,000 | $5.06 | $50.44 |
| 1/11/2001 | $54.94 | 1,288,998 | $29.25 | 220,000 | $4.99 | $49.95 |
| 1/12/2001 | $55.50 | 1,288,998 | $30.00 | 220,000 | $5.12 | $50.38 |
| 1/16/2001 | $56.31 | 1,288,998 | $30.19 | 220,000 | $5.15 | $51.16 |
| 1/17/2001 | $55.88 | 1,288,998 | $30.50 | 220,000 | $5.21 | $50.67 |
| 1/18/2001 | $56.81 | 1,288,998 | $30.81 | 220,000 | $5.26 | $51.55 |
| 1/19/2001 | $56.25 | 1,288,998 | $29.13 | 220,000 | $4.97 | $51.28 |
| 1/22/2001 | $56.19 | 1,288,998 | $28.81 | 220,000 | $4.92 | $51.27 |
| 1/23/2001 | $55.56 | 1,288,998 | $28.50 | 220,000 | $4.86 | $50.70 |

# Exhibit-6

## Pharmacia Pharmaceuticals Stock Price

(Pharmacia Stock Price Less Per Share Value of New Monsanto Holdings)

18 October 2000 through 18 October 2001

| Date | PHA Share Price | PHA Shares Outstanding | MON Share Price | MON Shares Owned by PHA | Value of MON per PHA Share | PHA Adjusted for MON |
|---|---|---|---|---|---|---|
| 1/24/2001 | $55.38 | 1,288,998 | $28.94 | 220,000 | $4.94 | $50.44 |
| 1/25/2001 | $55.50 | 1,288,998 | $29.31 | 220,000 | $5.00 | $50.50 |
| 1/26/2001 | $55.81 | 1,288,998 | $30.19 | 220,000 | $5.15 | $50.66 |
| 1/29/2001 | $55.40 | 1,288,998 | $30.85 | 220,000 | $5.27 | $50.13 |
| 1/30/2001 | $55.18 | 1,288,998 | $31.03 | 220,000 | $5.30 | $49.88 |
| 1/31/2001 | $56.02 | 1,288,998 | $31.51 | 220,000 | $5.38 | $50.64 |
| 2/1/2001 | $57.08 | 1,288,998 | $31.01 | 220,000 | $5.29 | $51.79 |
| 2/2/2001 | $57.81 | 1,288,998 | $30.00 | 220,000 | $5.12 | $52.69 |
| 2/5/2001 | $58.28 | 1,288,998 | $30.00 | 220,000 | $5.12 | $53.16 |
| 2/6/2001 | $57.65 | 1,288,998 | $30.71 | 220,000 | $5.24 | $52.41 |
| 2/7/2001 | $56.13 | 1,288,998 | $31.32 | 220,000 | $5.35 | $50.78 |
| 2/8/2001 | $53.00 | 1,288,998 | $32.00 | 220,000 | $5.46 | $47.54 |
| 2/9/2001 | $54.00 | 1,288,998 | $33.37 | 220,000 | $5.70 | $48.30 |
| 2/12/2001 | $54.23 | 1,288,998 | $34.40 | 220,000 | $5.87 | $48.36 |
| 2/13/2001 | $51.63 | 1,288,998 | $35.50 | 220,000 | $6.06 | $45.57 |
| 2/14/2001 | $51.90 | 1,288,998 | $33.98 | 220,000 | $5.80 | $46.10 |
| 2/15/2001 | $52.02 | 1,288,998 | $33.73 | 220,000 | $5.76 | $46.26 |
| 2/16/2001 | $51.16 | 1,288,998 | $31.78 | 220,000 | $5.42 | $45.74 |
| 2/20/2001 | $49.95 | 1,288,998 | $28.75 | 220,000 | $4.91 | $45.04 |
| 2/21/2001 | $48.85 | 1,288,998 | $29.90 | 220,000 | $5.10 | $43.75 |
| 2/22/2001 | $49.25 | 1,288,998 | $29.99 | 220,000 | $5.12 | $44.13 |
| 2/23/2001 | $49.05 | 1,288,998 | $28.20 | 220,000 | $4.81 | $44.24 |
| 2/26/2001 | $49.40 | 1,288,998 | $30.05 | 220,000 | $5.13 | $44.27 |
| 2/27/2001 | $50.25 | 1,288,998 | $29.90 | 220,000 | $5.10 | $45.15 |
| 2/28/2001 | $51.70 | 1,288,998 | $32.00 | 220,000 | $5.46 | $46.24 |
| 3/1/2001 | $51.97 | 1,288,998 | $32.35 | 220,000 | $5.52 | $46.45 |
| 3/2/2001 | $52.79 | 1,288,998 | $32.65 | 220,000 | $5.57 | $47.22 |
| 3/5/2001 | $54.05 | 1,288,998 | $33.62 | 220,000 | $5.74 | $48.31 |
| 3/6/2001 | $52.85 | 1,288,998 | $34.51 | 220,000 | $5.89 | $46.96 |
| 3/7/2001 | $51.01 | 1,288,998 | $33.90 | 220,000 | $5.79 | $45.22 |
| 3/8/2001 | $50.74 | 1,288,998 | $34.11 | 220,000 | $5.82 | $44.92 |
| 3/9/2001 | $51.19 | 1,288,998 | $33.48 | 220,000 | $5.71 | $45.48 |
| 3/12/2001 | $50.22 | 1,288,998 | $33.00 | 220,000 | $5.63 | $44.59 |

# Exhibit-6

## Pharmacia Pharmaceuticals Stock Price

(Pharmacia Stock Price Less Per Share Value of New Monsanto Holdings)

18 October 2000 through 18 October 2001

| Date | PHA Share Price | PHA Shares Outstanding | MON Share Price | MON Shares Owned by PHA | Value of MON per PHA Share | PHA Adjusted for MON |
|---|---|---|---|---|---|---|
| 3/13/2001 | $49.10 | 1,288,998 | $32.95 | 220,000 | $5.62 | $43.48 |
| 3/14/2001 | $47.80 | 1,288,998 | $32.60 | 220,000 | $5.56 | $42.24 |
| 3/15/2001 | $47.46 | 1,288,998 | $33.75 | 220,000 | $5.76 | $41.70 |
| 3/16/2001 | $45.18 | 1,288,998 | $33.68 | 220,000 | $5.75 | $39.43 |
| 3/19/2001 | $47.16 | 1,288,998 | $33.05 | 220,000 | $5.64 | $41.52 |
| 3/20/2001 | $47.12 | 1,288,998 | $33.05 | 220,000 | $5.64 | $41.48 |
| 3/21/2001 | $46.58 | 1,288,998 | $33.19 | 220,000 | $5.66 | $40.92 |
| 3/22/2001 | $44.00 | 1,288,998 | $33.01 | 220,000 | $5.63 | $38.37 |
| 3/23/2001 | $46.99 | 1,288,998 | $33.02 | 220,000 | $5.64 | $41.35 |
| 3/26/2001 | $48.28 | 1,288,998 | $34.00 | 220,000 | $5.80 | $42.48 |
| 3/27/2001 | $49.60 | 1,288,998 | $33.25 | 220,000 | $5.67 | $43.93 |
| 3/28/2001 | $49.80 | 1,288,998 | $33.10 | 220,000 | $5.65 | $44.15 |
| 3/29/2001 | $49.87 | 1,288,998 | $33.85 | 220,000 | $5.78 | $44.09 |
| 3/30/2001 | $50.37 | 1,299,800 | $35.46 | 220,000 | $6.00 | $44.37 |
| 4/2/2001 | $49.25 | 1,299,800 | $35.65 | 220,000 | $6.03 | $43.22 |
| 4/3/2001 | $48.76 | 1,299,800 | $35.02 | 220,000 | $5.93 | $42.83 |
| 4/4/2001 | $49.23 | 1,299,800 | $35.48 | 220,000 | $6.01 | $43.22 |
| 4/5/2001 | $51.04 | 1,299,800 | $36.80 | 220,000 | $6.23 | $44.81 |
| 4/6/2001 | $50.65 | 1,299,800 | $36.00 | 220,000 | $6.09 | $44.56 |
| 4/9/2001 | $52.25 | 1,299,800 | $35.99 | 220,000 | $6.09 | $46.16 |
| 4/10/2001 | $51.20 | 1,299,800 | $35.51 | 220,000 | $6.01 | $45.19 |
| 4/11/2001 | $50.11 | 1,299,800 | $34.85 | 220,000 | $5.90 | $44.21 |
| 4/12/2001 | $50.70 | 1,299,800 | $34.69 | 220,000 | $5.87 | $44.83 |
| 4/16/2001 | $50.45 | 1,299,800 | $34.55 | 220,000 | $5.85 | $44.60 |
| 4/17/2001 | $52.08 | 1,299,800 | $35.80 | 220,000 | $6.06 | $46.02 |
| 4/18/2001 | $50.75 | 1,299,800 | $34.51 | 220,000 | $5.84 | $44.91 |
| 4/19/2001 | $49.70 | 1,299,800 | $34.80 | 220,000 | $5.89 | $43.81 |
| 4/20/2001 | $48.55 | 1,299,800 | $35.10 | 220,000 | $5.94 | $42.61 |
| 4/23/2001 | $48.50 | 1,299,800 | $34.91 | 220,000 | $5.91 | $42.59 |
| 4/24/2001 | $48.01 | 1,299,800 | $33.59 | 220,000 | $5.69 | $42.32 |
| 4/25/2001 | $49.10 | 1,299,800 | $34.20 | 220,000 | $5.79 | $43.31 |
| 4/26/2001 | $51.51 | 1,299,800 | $31.93 | 220,000 | $5.40 | $46.11 |
| 4/27/2001 | $52.25 | 1,299,800 | $30.30 | 220,000 | $5.13 | $47.12 |

143

## Exhibit-6

### Pharmacia Pharmaceuticals Stock Price

(Pharmacia Stock Price Less Per Share Value of New Monsanto Holdings)

18 October 2000 through 18 October 2001

| Date | PHA Share Price | PHA Shares Outstanding | MON Share Price | MON Shares Owned by PHA | Value of MON per PHA Share | PHA Adjusted for MON |
|------|------|------|------|------|------|------|
| 4/30/2001 | $52.26 | 1,299,800 | $30.95 | 220,000 | $5.24 | $47.02 |
| 5/1/2001 | $51.72 | 1,299,800 | $32.00 | 220,000 | $5.42 | $46.30 |
| 5/2/2001 | $51.00 | 1,299,800 | $32.54 | 220,000 | $5.51 | $45.49 |
| 5/3/2001 | $50.00 | 1,299,800 | $32.62 | 220,000 | $5.52 | $44.48 |
| 5/4/2001 | $50.00 | 1,299,800 | $32.30 | 220,000 | $5.47 | $44.53 |
| 5/7/2001 | $48.95 | 1,299,800 | $32.20 | 220,000 | $5.45 | $43.50 |
| 5/8/2001 | $48.20 | 1,299,800 | $32.00 | 220,000 | $5.42 | $42.78 |
| 5/9/2001 | $47.49 | 1,299,800 | $32.20 | 220,000 | $5.45 | $42.04 |
| 5/10/2001 | $46.98 | 1,299,800 | $32.50 | 220,000 | $5.50 | $41.48 |
| 5/11/2001 | $46.15 | 1,299,800 | $33.27 | 220,000 | $5.63 | $40.52 |
| 5/14/2001 | $46.28 | 1,299,800 | $33.40 | 220,000 | $5.65 | $40.63 |
| 5/15/2001 | $45.99 | 1,299,800 | $34.58 | 220,000 | $5.85 | $40.14 |
| 5/16/2001 | $48.38 | 1,299,800 | $36.00 | 220,000 | $6.09 | $42.29 |
| 5/17/2001 | $49.49 | 1,299,800 | $36.40 | 220,000 | $6.16 | $43.33 |
| 5/18/2001 | $49.60 | 1,299,800 | $36.51 | 220,000 | $6.18 | $43.42 |
| 5/21/2001 | $50.02 | 1,299,800 | $36.30 | 220,000 | $6.14 | $43.88 |
| 5/22/2001 | $49.50 | 1,299,800 | $35.42 | 220,000 | $6.00 | $43.50 |
| 5/23/2001 | $48.74 | 1,299,800 | $35.25 | 220,000 | $5.97 | $42.77 |
| 5/24/2001 | $48.69 | 1,299,800 | $35.47 | 220,000 | $6.00 | $42.69 |
| 5/25/2001 | $48.56 | 1,299,800 | $35.60 | 220,000 | $6.03 | $42.53 |
| 5/29/2001 | $48.01 | 1,299,800 | $35.00 | 220,000 | $5.92 | $42.09 |
| 5/30/2001 | $48.25 | 1,299,800 | $34.85 | 220,000 | $5.90 | $42.35 |
| 5/31/2001 | $48.56 | 1,300,973 | $35.50 | 220,000 | $6.00 | $42.56 |
| 6/1/2001 | $49.35 | 1,300,973 | $35.82 | 220,000 | $6.06 | $43.29 |
| 6/4/2001 | $49.66 | 1,300,973 | $37.31 | 220,000 | $6.31 | $43.35 |
| 6/5/2001 | $49.60 | 1,300,973 | $36.40 | 220,000 | $6.16 | $43.44 |
| 6/6/2001 | $49.35 | 1,300,973 | $35.70 | 220,000 | $6.04 | $43.31 |
| 6/7/2001 | $49.81 | 1,300,973 | $35.95 | 220,000 | $6.08 | $43.73 |
| 6/8/2001 | $49.70 | 1,300,973 | $36.58 | 220,000 | $6.19 | $43.51 |
| 6/11/2001 | $49.06 | 1,300,973 | $36.30 | 220,000 | $6.14 | $42.92 |
| 6/12/2001 | $48.97 | 1,300,973 | $37.35 | 220,000 | $6.32 | $42.65 |
| 6/13/2001 | $48.75 | 1,300,973 | $38.12 | 220,000 | $6.45 | $42.30 |
| 6/14/2001 | $48.15 | 1,300,973 | $37.20 | 220,000 | $6.29 | $41.86 |

## Exhibit-6

## Pharmacia Pharmaceuticals Stock Price

(Pharmacia Stock Price Less Per Share Value of New Monsanto Holdings)

18 October 2000 through 18 October 2001

| Date | PHA Share Price | PHA Shares Outstanding | MON Share Price | MON Shares Owned by PHA | Value of MON per PHA Share | PHA Adjusted for MON |
|---|---|---|---|---|---|---|
| 6/15/2001 | $48.80 | 1,300,973 | $37.52 | 220,000 | $6.34 | $42.46 |
| 6/18/2001 | $49.19 | 1,300,973 | $37.54 | 220,000 | $6.35 | $42.84 |
| 6/19/2001 | $49.51 | 1,300,973 | $36.50 | 220,000 | $6.17 | $43.34 |
| 6/20/2001 | $50.75 | 1,300,973 | $36.74 | 220,000 | $6.21 | $44.54 |
| 6/21/2001 | $51.50 | 1,300,973 | $35.87 | 220,000 | $6.07 | $45.43 |
| 6/22/2001 | $48.79 | 1,300,973 | $35.29 | 220,000 | $5.97 | $42.82 |
| 6/25/2001 | $48.85 | 1,300,973 | $35.00 | 220,000 | $5.92 | $42.93 |
| 6/26/2001 | $48.43 | 1,300,973 | $35.00 | 220,000 | $5.92 | $42.51 |
| 6/27/2001 | $47.22 | 1,300,973 | $35.99 | 220,000 | $6.09 | $41.13 |
| 6/28/2001 | $47.12 | 1,300,973 | $36.05 | 220,000 | $6.10 | $41.02 |
| 6/29/2001 | $45.95 | 1,300,973 | $37.00 | 220,000 | $6.26 | $39.69 |
| 7/2/2001 | $46.58 | 1,300,973 | $38.00 | 220,000 | $6.43 | $40.15 |
| 7/3/2001 | $46.59 | 1,300,973 | $37.90 | 220,000 | $6.41 | $40.18 |
| 7/5/2001 | $46.50 | 1,300,973 | $37.20 | 220,000 | $6.29 | $40.21 |
| 7/6/2001 | $46.00 | 1,300,973 | $36.70 | 220,000 | $6.21 | $39.79 |
| 7/9/2001 | $46.81 | 1,300,973 | $36.47 | 220,000 | $6.17 | $40.64 |
| 7/10/2001 | $46.95 | 1,300,973 | $36.90 | 220,000 | $6.24 | $40.71 |
| 7/11/2001 | $46.70 | 1,300,973 | $36.91 | 220,000 | $6.24 | $40.46 |
| 7/12/2001 | $46.22 | 1,300,973 | $35.28 | 220,000 | $5.97 | $40.25 |
| 7/13/2001 | $46.85 | 1,300,973 | $33.37 | 220,000 | $5.64 | $41.21 |
| 7/16/2001 | $42.84 | 1,300,973 | $33.35 | 220,000 | $5.64 | $37.20 |
| 7/17/2001 | $42.60 | 1,300,973 | $34.02 | 220,000 | $5.75 | $36.85 |
| 7/18/2001 | $43.15 | 1,300,973 | $33.60 | 220,000 | $5.68 | $37.47 |
| 7/19/2001 | $43.35 | 1,300,973 | $33.70 | 220,000 | $5.70 | $37.65 |
| 7/20/2001 | $43.65 | 1,300,973 | $33.65 | 220,000 | $5.69 | $37.96 |
| 7/23/2001 | $43.41 | 1,300,973 | $33.60 | 220,000 | $5.68 | $37.73 |
| 7/24/2001 | $42.00 | 1,300,973 | $32.04 | 220,000 | $5.42 | $36.58 |
| 7/25/2001 | $42.12 | 1,300,973 | $34.26 | 220,000 | $5.79 | $36.33 |
| 7/26/2001 | $41.85 | 1,300,973 | $33.89 | 220,000 | $5.73 | $36.12 |
| 7/27/2001 | $42.12 | 1,300,973 | $33.84 | 220,000 | $5.72 | $36.40 |
| 7/30/2001 | $43.28 | 1,300,973 | $34.04 | 220,000 | $5.76 | $37.52 |
| 7/31/2001 | $44.62 | 1,300,973 | $35.20 | 220,000 | $5.95 | $38.67 |
| 8/1/2001 | $44.55 | 1,300,973 | $35.90 | 220,000 | $6.07 | $38.48 |

## Exhibit-6

### Pharmacia Pharmaceuticals Stock Price

(Pharmacia Stock Price Less Per Share Value of New Monsanto Holdings)

18 October 2000 through 18 October 2001

| Date | PHA Share Price | PHA Shares Outstanding | MON Share Price | MON Shares Owned by PHA | Value of MON per PHA Share | PHA Adjusted for MON |
|------|------|------|------|------|------|------|
| 8/2/2001 | $43.90 | 1,300,973 | $36.85 | 220,000 | $6.23 | $37.67 |
| 8/3/2001 | $44.00 | 1,300,973 | $37.00 | 220,000 | $6.26 | $37.74 |
| 8/6/2001 | $44.00 | 1,300,973 | $36.51 | 220,000 | $6.17 | $37.83 |
| 8/7/2001 | $45.10 | 1,300,973 | $35.07 | 220,000 | $5.93 | $39.17 |
| 8/8/2001 | $44.32 | 1,300,973 | $35.50 | 220,000 | $6.00 | $38.32 |
| 8/9/2001 | $44.35 | 1,300,973 | $33.50 | 220,000 | $5.66 | $38.69 |
| 8/10/2001 | $44.68 | 1,300,973 | $34.60 | 220,000 | $5.85 | $38.83 |
| 8/13/2001 | $45.35 | 1,300,973 | $34.95 | 220,000 | $5.91 | $39.44 |
| 8/14/2001 | $44.90 | 1,300,973 | $34.98 | 220,000 | $5.92 | $38.98 |
| 8/15/2001 | $44.87 | 1,300,973 | $35.00 | 220,000 | $5.92 | $38.95 |
| 8/16/2001 | $45.00 | 1,300,973 | $34.55 | 220,000 | $5.84 | $39.16 |
| 8/17/2001 | $44.44 | 1,300,973 | $34.66 | 220,000 | $5.86 | $38.58 |
| 8/20/2001 | $44.25 | 1,300,973 | $34.79 | 220,000 | $5.88 | $38.37 |
| 8/21/2001 | $44.16 | 1,300,973 | $34.49 | 220,000 | $5.83 | $38.33 |
| 8/22/2001 | $43.20 | 1,300,973 | $34.43 | 220,000 | $5.82 | $37.38 |
| 8/23/2001 | $42.40 | 1,300,973 | $34.60 | 220,000 | $5.85 | $36.55 |
| 8/24/2001 | $41.81 | 1,300,973 | $34.80 | 220,000 | $5.88 | $35.93 |
| 8/27/2001 | $41.83 | 1,300,973 | $34.65 | 220,000 | $5.86 | $35.97 |
| 8/28/2001 | $41.30 | 1,300,973 | $34.28 | 220,000 | $5.80 | $35.50 |
| 8/29/2001 | $40.51 | 1,300,973 | $34.11 | 220,000 | $5.77 | $34.74 |
| 8/30/2001 | $39.90 | 1,300,973 | $34.00 | 220,000 | $5.75 | $34.15 |
| 8/31/2001 | $39.60 | 1,301,517 | $34.11 | 220,000 | $5.77 | $33.83 |
| 9/4/2001 | $40.00 | 1,301,517 | $33.70 | 220,000 | $5.70 | $34.30 |
| 9/5/2001 | $40.80 | 1,301,517 | $33.80 | 220,000 | $5.71 | $35.09 |
| 9/6/2001 | $40.81 | 1,301,517 | $34.25 | 220,000 | $5.79 | $35.02 |
| 9/7/2001 | $40.27 | 1,301,517 | $33.39 | 220,000 | $5.64 | $34.63 |
| 9/10/2001 | $40.15 | 1,301,517 | $32.95 | 220,000 | $5.57 | $34.58 |
| 9/17/2001 | $39.50 | 1,301,517 | $31.26 | 220,000 | $5.28 | $34.22 |
| 9/18/2001 | $39.60 | 1,301,517 | $31.76 | 220,000 | $5.37 | $34.23 |
| 9/19/2001 | $40.00 | 1,301,517 | $32.00 | 220,000 | $5.41 | $34.59 |
| 9/20/2001 | $38.91 | 1,301,517 | $32.85 | 220,000 | $5.55 | $33.36 |
| 9/21/2001 | $38.35 | 1,301,517 | $33.20 | 220,000 | $5.61 | $32.74 |
| 9/24/2001 | $37.60 | 1,301,517 | $32.41 | 220,000 | $5.48 | $32.12 |

**Exhibit-6**

**Pharmacia Pharmaceuticals Stock Price**

(Pharmacia Stock Price Less Per Share Value of New Monsanto Holdings)

18 October 2000 through 18 October 2001

| Date | PHA Share Price | PHA Shares Outstanding | MON Share Price | MON Shares Owned by PHA | Value of MON per PHA Share | PHA Adjusted for MON |
|---|---|---|---|---|---|---|
| 9/25/2001 | $37.86 | 1,301,517 | $33.86 | 220,000 | $5.72 | $32.14 |
| 9/26/2001 | $38.74 | 1,301,517 | $33.81 | 220,000 | $5.72 | $33.02 |
| 9/27/2001 | $40.06 | 1,301,517 | $33.61 | 220,000 | $5.68 | $34.38 |
| 9/28/2001 | $40.56 | 1,301,517 | $33.73 | 220,000 | $5.70 | $34.86 |
| 10/1/2001 | $40.75 | 1,301,517 | $34.00 | 220,000 | $5.75 | $35.00 |
| 10/2/2001 | $41.31 | 1,301,517 | $34.00 | 220,000 | $5.75 | $35.56 |
| 10/3/2001 | $40.98 | 1,301,517 | $34.44 | 220,000 | $5.82 | $35.16 |
| 10/4/2001 | $40.05 | 1,301,517 | $34.75 | 220,000 | $5.87 | $34.18 |
| 10/5/2001 | $40.38 | 1,301,517 | $33.96 | 220,000 | $5.74 | $34.64 |
| 10/8/2001 | $39.94 | 1,301,517 | $33.64 | 220,000 | $5.69 | $34.25 |
| 10/9/2001 | $40.00 | 1,301,517 | $33.20 | 220,000 | $5.61 | $34.39 |
| 10/10/2001 | $40.41 | 1,301,517 | $34.95 | 220,000 | $5.91 | $34.50 |
| 10/11/2001 | $41.02 | 1,301,517 | $36.60 | 220,000 | $6.19 | $34.83 |
| 10/12/2001 | $41.03 | 1,301,517 | $36.75 | 220,000 | $6.21 | $34.82 |
| 10/15/2001 | $41.00 | 1,301,517 | $36.67 | 220,000 | $6.20 | $34.80 |
| 10/16/2001 | $41.20 | 1,301,517 | $36.98 | 220,000 | $6.25 | $34.95 |
| 10/17/2001 | $41.80 | 1,301,517 | $37.00 | 220,000 | $6.25 | $35.55 |
| 10/18/2001 | $41.90 | 1,301,517 | $36.34 | 220,000 | $6.14 | $35.76 |

**Sources:** CRSP
Monsanto Company Form 10-Q, filed 30 November 2000.
Monsanto Company Form 10-K, filed 5 March 2002.

**Exhibit-7**

**CRSP Market Total Return Index (Market Index) and Peer Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Market Index Level | Pharma Index Level | Market Index Logarithmic Return | Pharma Index Logarithmic Return |
|---|---|---|---|---|
| 10/18/2000 | 2,762.66 | 111.45 | | |
| 10/19/2000 | 2,865.05 | 109.81 | 3.64% | -1.48% |
| 10/20/2000 | 2,892.85 | 110.37 | 0.97% | 0.50% |
| 10/23/2000 | 2,893.15 | 112.56 | 0.01% | 1.97% |
| 10/24/2000 | 2,890.21 | 111.89 | -0.10% | -0.60% |
| 10/25/2000 | 2,810.93 | 113.84 | -2.78% | 1.73% |
| 10/26/2000 | 2,812.50 | 112.64 | 0.06% | -1.05% |
| 10/27/2000 | 2,836.76 | 111.46 | 0.86% | -1.06% |
| 10/30/2000 | 2,855.80 | 112.78 | 0.67% | 1.18% |
| 10/31/2000 | 2,936.84 | 111.83 | 2.80% | -0.85% |
| 11/1/2000 | 2,924.07 | 112.96 | -0.44% | 1.00% |
| 11/2/2000 | 2,953.48 | 112.01 | 1.00% | -0.84% |
| 11/3/2000 | 2,955.11 | 111.27 | 0.05% | -0.67% |
| 11/6/2000 | 2,958.82 | 112.48 | 0.13% | 1.08% |
| 11/7/2000 | 2,955.94 | 111.31 | -0.10% | -1.04% |
| 11/8/2000 | 2,899.98 | 113.42 | -1.91% | 1.88% |
| 11/9/2000 | 2,871.61 | 113.29 | -0.98% | -0.12% |
| 11/10/2000 | 2,795.74 | 113.99 | -2.68% | 0.62% |
| 11/13/2000 | 2,758.42 | 109.37 | -1.34% | -4.14% |
| 11/14/2000 | 2,830.43 | 112.04 | 2.58% | 2.42% |
| 11/15/2000 | 2,846.02 | 112.48 | 0.55% | 0.39% |
| 11/16/2000 | 2,799.23 | 111.72 | -1.66% | -0.68% |
| 11/17/2000 | 2,786.59 | 113.02 | -0.45% | 1.16% |
| 11/20/2000 | 2,719.98 | 113.11 | -2.42% | 0.07% |
| 11/21/2000 | 2,720.82 | 114.89 | 0.03% | 1.56% |
| 11/22/2000 | 2,663.90 | 113.26 | -2.11% | -1.43% |
| 11/24/2000 | 2,720.16 | 112.44 | 2.09% | -0.73% |
| 11/27/2000 | 2,730.10 | 116.17 | 0.36% | 3.26% |
| 11/28/2000 | 2,683.81 | 117.65 | -1.71% | 1.27% |
| 11/29/2000 | 2,685.58 | 119.68 | 0.07% | 1.71% |
| 11/30/2000 | 2,633.89 | 118.12 | -1.94% | -1.31% |
| 12/1/2000 | 2,650.32 | 115.23 | 0.62% | -2.48% |
| 12/4/2000 | 2,660.04 | 116.90 | 0.37% | 1.44% |
| 12/5/2000 | 2,780.65 | 116.34 | 4.43% | -0.48% |
| 12/6/2000 | 2,734.85 | 112.98 | -1.66% | -2.93% |

**Exhibit-7**

**CRSP Market Total Return Index (Market Index) and Peer Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Market Index Level | Pharma Index Level | Market Index Logarithmic Return | Pharma Index Logarithmic Return |
|---|---|---|---|---|
| 12/7/2000 | 2,718.68 | 114.05 | -0.59% | 0.94% |
| 12/8/2000 | 2,796.12 | 114.88 | 2.81% | 0.73% |
| 12/11/2000 | 2,829.54 | 114.71 | 1.19% | -0.15% |
| 12/12/2000 | 2,798.73 | 114.80 | -1.09% | 0.08% |
| 12/13/2000 | 2,766.32 | 116.87 | -1.16% | 1.79% |
| 12/14/2000 | 2,719.52 | 116.57 | -1.71% | -0.26% |
| 12/15/2000 | 2,671.32 | 115.93 | -1.79% | -0.55% |
| 12/18/2000 | 2,685.66 | 116.23 | 0.54% | 0.26% |
| 12/19/2000 | 2,643.05 | 117.54 | -1.60% | 1.12% |
| 12/20/2000 | 2,550.03 | 118.82 | -3.58% | 1.09% |
| 12/21/2000 | 2,563.86 | 118.11 | 0.54% | -0.60% |
| 12/22/2000 | 2,641.22 | 116.54 | 2.97% | -1.34% |
| 12/26/2000 | 2,655.70 | 118.84 | 0.55% | 1.95% |
| 12/27/2000 | 2,692.69 | 119.85 | 1.38% | 0.85% |
| 12/28/2000 | 2,718.06 | 122.23 | 0.94% | 1.97% |
| 12/29/2000 | 2,687.41 | 122.43 | -1.13% | 0.16% |
| 1/2/2001 | 2,595.30 | 118.75 | -3.49% | -3.04% |
| 1/3/2001 | 2,732.67 | 113.07 | 5.16% | -4.90% |
| 1/4/2001 | 2,700.38 | 108.86 | -1.19% | -3.79% |
| 1/5/2001 | 2,622.49 | 108.89 | -2.93% | 0.02% |
| 1/8/2001 | 2,613.50 | 108.98 | -0.34% | 0.08% |
| 1/9/2001 | 2,626.28 | 111.57 | 0.49% | 2.35% |
| 1/10/2001 | 2,662.61 | 109.91 | 1.37% | -1.50% |
| 1/11/2001 | 2,702.45 | 107.05 | 1.49% | -2.64% |
| 1/12/2001 | 2,692.95 | 109.17 | -0.35% | 1.96% |
| 1/16/2001 | 2,709.73 | 111.25 | 0.62% | 1.89% |
| 1/17/2001 | 2,721.97 | 108.17 | 0.45% | -2.81% |
| 1/18/2001 | 2,755.49 | 109.71 | 1.22% | 1.41% |
| 1/19/2001 | 2,744.18 | 108.21 | -0.41% | -1.37% |
| 1/22/2001 | 2,744.96 | 109.23 | 0.03% | 0.94% |
| 1/23/2001 | 2,788.40 | 109.38 | 1.57% | 0.14% |
| 1/24/2001 | 2,797.56 | 108.37 | 0.33% | -0.93% |
| 1/25/2001 | 2,776.43 | 110.08 | -0.76% | 1.57% |
| 1/26/2001 | 2,774.49 | 109.57 | -0.07% | -0.47% |
| 1/29/2001 | 2,799.38 | 108.20 | 0.89% | -1.26% |

**Exhibit-7**

**CRSP Market Total Return Index (Market Index) and Peer Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Market Index Level | Pharma Index Level | Market Index Logarithmic Return | Pharma Index Logarithmic Return |
|------|-----|-----|-----|-----|
| 1/30/2001 | 2,817.82 | 107.94 | 0.66% | -0.24% |
| 1/31/2001 | 2,799.03 | 108.09 | -0.67% | 0.14% |
| 2/1/2001 | 2,809.77 | 109.55 | 0.38% | 1.35% |
| 2/2/2001 | 2,757.46 | 110.68 | -1.88% | 1.03% |
| 2/5/2001 | 2,763.15 | 109.79 | 0.21% | -0.81% |
| 2/6/2001 | 2,764.56 | 109.14 | 0.05% | -0.60% |
| 2/7/2001 | 2,740.28 | 110.43 | -0.88% | 1.18% |
| 2/8/2001 | 2,722.45 | 110.90 | -0.65% | 0.42% |
| 2/9/2001 | 2,683.62 | 110.99 | -1.44% | 0.08% |
| 2/12/2001 | 2,711.47 | 112.13 | 1.03% | 1.02% |
| 2/13/2001 | 2,687.95 | 109.97 | -0.87% | -1.95% |
| 2/14/2001 | 2,687.68 | 108.03 | -0.01% | -1.78% |
| 2/15/2001 | 2,711.75 | 107.75 | 0.89% | -0.26% |
| 2/16/2001 | 2,655.80 | 105.16 | -2.08% | -2.43% |
| 2/20/2001 | 2,605.83 | 106.07 | -1.90% | 0.85% |
| 2/21/2001 | 2,557.98 | 106.49 | -1.85% | 0.40% |
| 2/22/2001 | 2,546.42 | 104.85 | -0.45% | -1.55% |
| 2/23/2001 | 2,536.47 | 104.60 | -0.39% | -0.24% |
| 2/26/2001 | 2,585.16 | 106.46 | 1.90% | 1.77% |
| 2/27/2001 | 2,555.59 | 106.25 | -1.15% | -0.21% |
| 2/28/2001 | 2,520.48 | 107.72 | -1.38% | 1.38% |
| 3/1/2001 | 2,521.38 | 106.99 | 0.04% | -0.68% |
| 3/2/2001 | 2,508.91 | 107.18 | -0.50% | 0.17% |
| 3/5/2001 | 2,522.57 | 106.75 | 0.54% | -0.40% |
| 3/6/2001 | 2,551.51 | 104.78 | 1.14% | -1.87% |
| 3/7/2001 | 2,566.98 | 102.47 | 0.60% | -2.23% |
| 3/8/2001 | 2,563.74 | 104.15 | -0.13% | 1.63% |
| 3/9/2001 | 2,501.31 | 104.99 | -2.46% | 0.80% |
| 3/12/2001 | 2,395.50 | 102.44 | -4.32% | -2.46% |
| 3/13/2001 | 2,431.24 | 102.01 | 1.48% | -0.42% |
| 3/14/2001 | 2,370.35 | 99.53 | -2.54% | -2.45% |
| 3/15/2001 | 2,378.24 | 98.99 | 0.33% | -0.54% |
| 3/16/2001 | 2,328.72 | 96.54 | -2.10% | -2.51% |
| 3/19/2001 | 2,372.02 | 98.60 | 1.84% | 2.11% |
| 3/20/2001 | 2,317.30 | 97.04 | -2.33% | -1.60% |

## Exhibit-7

## CRSP Market Total Return Index (Market Index) and Peer Index Levels and Returns

18 October 2000 through 18 October 2001

| Date | Market Index Level | Pharma Index Level | Market Index Logarithmic Return | Pharma Index Logarithmic Return |
|---|---|---|---|---|
| 3/21/2001 | 2,274.00 | 93.47 | -1.89% | -3.75% |
| 3/22/2001 | 2,263.94 | 93.59 | -0.44% | 0.13% |
| 3/23/2001 | 2,310.40 | 95.08 | 2.03% | 1.58% |
| 3/26/2001 | 2,336.14 | 95.98 | 1.11% | 0.94% |
| 3/27/2001 | 2,389.89 | 97.00 | 2.27% | 1.06% |
| 3/28/2001 | 2,327.65 | 99.10 | -2.64% | 2.14% |
| 3/29/2001 | 2,315.14 | 99.37 | -0.54% | 0.27% |
| 3/30/2001 | 2,343.18 | 99.28 | 1.20% | -0.09% |
| 4/2/2001 | 2,306.75 | 97.25 | -1.57% | -2.06% |
| 4/3/2001 | 2,223.88 | 95.04 | -3.66% | -2.30% |
| 4/4/2001 | 2,216.55 | 96.42 | -0.33% | 1.44% |
| 4/5/2001 | 2,318.33 | 98.72 | 4.49% | 2.36% |
| 4/6/2001 | 2,271.65 | 98.67 | -2.03% | -0.06% |
| 4/9/2001 | 2,292.59 | 99.85 | 0.92% | 1.20% |
| 4/10/2001 | 2,359.02 | 100.34 | 2.86% | 0.49% |
| 4/11/2001 | 2,357.12 | 97.75 | -0.08% | -2.62% |
| 4/12/2001 | 2,394.65 | 99.46 | 1.58% | 1.74% |
| 4/16/2001 | 2,382.79 | 100.34 | -0.50% | 0.88% |
| 4/17/2001 | 2,407.74 | 102.92 | 1.04% | 2.53% |
| 4/18/2001 | 2,503.29 | 101.96 | 3.89% | -0.94% |
| 4/19/2001 | 2,540.04 | 100.51 | 1.46% | -1.43% |
| 4/20/2001 | 2,518.62 | 100.05 | -0.85% | -0.46% |
| 4/23/2001 | 2,476.48 | 100.10 | -1.69% | 0.05% |
| 4/24/2001 | 2,449.65 | 98.41 | -1.09% | -1.70% |
| 4/25/2001 | 2,489.69 | 101.03 | 1.62% | 2.62% |
| 4/26/2001 | 2,502.15 | 102.48 | 0.50% | 1.43% |
| 4/27/2001 | 2,538.45 | 103.18 | 1.44% | 0.69% |
| 4/30/2001 | 2,540.37 | 103.61 | 0.08% | 0.42% |
| 5/1/2001 | 2,574.04 | 103.52 | 1.32% | -0.09% |
| 5/2/2001 | 2,582.72 | 103.42 | 0.34% | -0.10% |
| 5/3/2001 | 2,543.36 | 103.00 | -1.54% | -0.40% |
| 5/4/2001 | 2,578.86 | 103.94 | 1.39% | 0.91% |
| 5/7/2001 | 2,570.68 | 104.84 | -0.32% | 0.86% |
| 5/8/2001 | 2,569.02 | 104.13 | -0.06% | -0.68% |
| 5/9/2001 | 2,557.81 | 104.53 | -0.44% | 0.38% |

**Exhibit-7**

**CRSP Market Total Return Index (Market Index) and Peer Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Market Index Level | Pharma Index Level | Market Index Logarithmic Return | Pharma Index Logarithmic Return |
|---|---|---|---|---|
| 5/10/2001 | 2,556.68 | 103.50 | -0.04% | -0.99% |
| 5/11/2001 | 2,537.53 | 103.68 | -0.75% | 0.17% |
| 5/14/2001 | 2,539.97 | 104.00 | 0.10% | 0.31% |
| 5/15/2001 | 2,543.62 | 103.90 | 0.14% | -0.10% |
| 5/16/2001 | 2,612.96 | 106.84 | 2.69% | 2.79% |
| 5/17/2001 | 2,628.22 | 108.41 | 0.58% | 1.46% |
| 5/18/2001 | 2,635.33 | 107.52 | 0.27% | -0.82% |
| 5/21/2001 | 2,684.28 | 108.47 | 1.84% | 0.87% |
| 5/22/2001 | 2,679.81 | 107.79 | -0.17% | -0.63% |
| 5/23/2001 | 2,635.08 | 106.71 | -1.68% | -1.01% |
| 5/24/2001 | 2,645.96 | 106.58 | 0.41% | -0.12% |
| 5/25/2001 | 2,619.73 | 106.57 | -1.00% | -0.01% |
| 5/29/2001 | 2,592.58 | 107.78 | -1.04% | 1.13% |
| 5/30/2001 | 2,547.08 | 107.38 | -1.77% | -0.37% |
| 5/31/2001 | 2,566.52 | 107.65 | 0.76% | 0.25% |
| 6/1/2001 | 2,580.32 | 109.65 | 0.54% | 1.84% |
| 6/4/2001 | 2,593.43 | 110.87 | 0.51% | 1.10% |
| 6/5/2001 | 2,630.35 | 112.63 | 1.41% | 1.57% |
| 6/6/2001 | 2,605.51 | 111.70 | -0.95% | -0.83% |
| 6/7/2001 | 2,619.40 | 111.51 | 0.53% | -0.17% |
| 6/8/2001 | 2,594.42 | 110.87 | -0.96% | -0.57% |
| 6/11/2001 | 2,569.50 | 109.59 | -0.97% | -1.17% |
| 6/12/2001 | 2,569.97 | 109.20 | 0.02% | -0.35% |
| 6/13/2001 | 2,544.35 | 108.51 | -1.00% | -0.64% |
| 6/14/2001 | 2,495.49 | 108.47 | -1.94% | -0.04% |
| 6/15/2001 | 2,483.32 | 108.40 | -0.49% | -0.06% |
| 6/18/2001 | 2,466.78 | 108.31 | -0.67% | -0.09% |
| 6/19/2001 | 2,471.18 | 108.71 | 0.18% | 0.37% |
| 6/20/2001 | 2,495.33 | 109.54 | 0.97% | 0.76% |
| 6/21/2001 | 2,519.96 | 109.26 | 0.98% | -0.26% |
| 6/22/2001 | 2,497.25 | 106.73 | -0.91% | -2.34% |
| 6/25/2001 | 2,485.07 | 105.63 | -0.49% | -1.03% |
| 6/26/2001 | 2,484.76 | 105.56 | -0.01% | -0.07% |
| 6/27/2001 | 2,479.63 | 104.02 | -0.21% | -1.48% |
| 6/28/2001 | 2,510.82 | 105.22 | 1.25% | 1.15% |

**Exhibit-7**

**CRSP Market Total Return Index (Market Index) and Peer Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Market Index Level | Pharma Index Level | Market Index Logarithmic Return | Pharma Index Logarithmic Return |
|---|---|---|---|---|
| 6/29/2001 | 2,521.76 | 103.39 | 0.43% | -1.76% |
| 7/2/2001 | 2,535.26 | 105.08 | 0.53% | 1.62% |
| 7/3/2001 | 2,530.81 | 105.20 | -0.18% | 0.11% |
| 7/5/2001 | 2,500.13 | 104.55 | -1.22% | -0.62% |
| 7/6/2001 | 2,444.71 | 103.70 | -2.24% | -0.81% |
| 7/9/2001 | 2,458.65 | 105.91 | 0.57% | 2.11% |
| 7/10/2001 | 2,423.55 | 105.52 | -1.44% | -0.38% |
| 7/11/2001 | 2,418.04 | 105.82 | -0.23% | 0.29% |
| 7/12/2001 | 2,475.03 | 104.55 | 2.33% | -1.21% |
| 7/13/2001 | 2,488.32 | 105.69 | 0.54% | 1.08% |
| 7/16/2001 | 2,459.40 | 105.43 | -1.17% | -0.25% |
| 7/17/2001 | 2,485.55 | 107.22 | 1.06% | 1.69% |
| 7/18/2001 | 2,468.56 | 108.71 | -0.69% | 1.38% |
| 7/19/2001 | 2,481.31 | 108.88 | 0.52% | 0.15% |
| 7/20/2001 | 2,474.06 | 109.48 | -0.29% | 0.55% |
| 7/23/2001 | 2,437.79 | 108.04 | -1.48% | -1.32% |
| 7/24/2001 | 2,398.15 | 105.93 | -1.64% | -1.97% |
| 7/25/2001 | 2,430.99 | 107.11 | 1.36% | 1.11% |
| 7/26/2001 | 2,458.96 | 108.01 | 1.14% | 0.83% |
| 7/27/2001 | 2,467.04 | 108.17 | 0.33% | 0.15% |
| 7/30/2001 | 2,464.12 | 108.70 | -0.12% | 0.48% |
| 7/31/2001 | 2,476.18 | 110.63 | 0.49% | 1.76% |
| 8/1/2001 | 2,488.64 | 109.82 | 0.50% | -0.73% |
| 8/2/2001 | 2,496.69 | 109.58 | 0.32% | -0.21% |
| 8/3/2001 | 2,485.12 | 109.28 | -0.46% | -0.28% |
| 8/6/2001 | 2,457.76 | 108.84 | -1.11% | -0.40% |
| 8/7/2001 | 2,463.25 | 109.42 | 0.22% | 0.53% |
| 8/8/2001 | 2,421.98 | 108.26 | -1.69% | -1.07% |
| 8/9/2001 | 2,421.59 | 107.96 | -0.02% | -0.27% |
| 8/10/2001 | 2,431.97 | 109.35 | 0.43% | 1.28% |
| 8/13/2001 | 2,437.69 | 110.06 | 0.23% | 0.64% |
| 8/14/2001 | 2,431.68 | 110.64 | -0.25% | 0.53% |
| 8/15/2001 | 2,415.13 | 110.41 | -0.68% | -0.21% |
| 8/16/2001 | 2,419.73 | 109.21 | 0.19% | -1.09% |
| 8/17/2001 | 2,381.16 | 108.14 | -1.61% | -0.99% |

## Exhibit-7

## CRSP Market Total Return Index (Market Index) and Peer Index Levels and Returns

18 October 2000 through 18 October 2001

| Date | Market Index Level | Pharma Index Level | Market Index Logarithmic Return | Pharma Index Logarithmic Return |
|---|---|---|---|---|
| 8/20/2001 | 2,397.40 | 110.00 | 0.68% | 1.70% |
| 8/21/2001 | 2,369.91 | 109.84 | -1.15% | -0.14% |
| 8/22/2001 | 2,387.49 | 111.02 | 0.74% | 1.07% |
| 8/23/2001 | 2,380.76 | 111.81 | -0.28% | 0.71% |
| 8/24/2001 | 2,424.17 | 112.76 | 1.81% | 0.85% |
| 8/27/2001 | 2,415.12 | 112.08 | -0.37% | -0.61% |
| 8/28/2001 | 2,380.38 | 110.65 | -1.45% | -1.28% |
| 8/29/2001 | 2,357.54 | 109.56 | -0.96% | -0.98% |
| 8/30/2001 | 2,320.75 | 109.17 | -1.57% | -0.36% |
| 8/31/2001 | 2,330.26 | 107.67 | 0.41% | -1.39% |
| 9/4/2001 | 2,326.39 | 110.65 | -0.17% | 2.73% |
| 9/5/2001 | 2,318.84 | 112.58 | -0.32% | 1.73% |
| 9/6/2001 | 2,270.76 | 110.90 | -2.10% | -1.51% |
| 9/7/2001 | 2,230.41 | 108.78 | -1.79% | -1.92% |
| 9/10/2001 | 2,238.24 | 109.85 | 0.35% | 0.98% |
| 9/17/2001 | 2,124.74 | 109.53 | -5.20% | -0.29% |
| 9/18/2001 | 2,107.11 | 107.05 | -0.83% | -2.29% |
| 9/19/2001 | 2,071.17 | 104.77 | -1.72% | -2.15% |
| 9/20/2001 | 2,007.72 | 102.65 | -3.11% | -2.05% |
| 9/21/2001 | 1,970.37 | 99.98 | -1.88% | -2.63% |
| 9/24/2001 | 2,044.80 | 101.05 | 3.71% | 1.06% |
| 9/25/2001 | 2,060.34 | 102.98 | 0.76% | 1.90% |
| 9/26/2001 | 2,047.91 | 105.17 | -0.61% | 2.11% |
| 9/27/2001 | 2,069.83 | 107.91 | 1.06% | 2.57% |
| 9/28/2001 | 2,116.94 | 108.59 | 2.25% | 0.62% |
| 10/1/2001 | 2,107.55 | 109.92 | -0.44% | 1.22% |
| 10/2/2001 | 2,131.93 | 110.73 | 1.15% | 0.74% |
| 10/3/2001 | 2,179.16 | 109.05 | 2.19% | -1.53% |
| 10/4/2001 | 2,178.59 | 108.73 | -0.03% | -0.30% |
| 10/5/2001 | 2,179.50 | 110.07 | 0.04% | 1.23% |
| 10/8/2001 | 2,162.73 | 109.76 | -0.77% | -0.28% |
| 10/9/2001 | 2,152.31 | 109.20 | -0.48% | -0.52% |
| 10/10/2001 | 2,202.16 | 110.86 | 2.29% | 1.51% |
| 10/11/2001 | 2,240.42 | 109.68 | 1.72% | -1.07% |
| 10/12/2001 | 2,228.37 | 109.85 | -0.54% | 0.15% |

**Exhibit-7**

**CRSP Market Total Return Index (Market Index) and Peer Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Market Index Level | Pharma Index Level | Market Index Logarithmic Return | Pharma Index Logarithmic Return |
|---|---|---|---|---|
| 10/15/2001 | 2,226.84 | 110.74 | -0.07% | 0.81% |
| 10/16/2001 | 2,244.31 | 111.59 | 0.78% | 0.77% |
| 10/17/2001 | 2,200.81 | 111.00 | -1.96% | -0.54% |
| 10/18/2001 | 2,185.49 | 111.00 | -0.70% | 0.01% |

**Sources:** CRSP
Dow Jones

**Exhibit-8**

**Pharmacia Pharmaceuticals Stock Regression Results**

Estimation Period:  19 October 2000 through 18 October 2001

| Regression Statistics | |
|---|---|
| Multiple R | 0.605 |
| R Square | 0.366 |
| Adjusted R Square | 0.345 |
| Standard Error | 1.93% |
| Observations | 248 |
| F-Statistic | 17.24 |
| F-Statistic Significance Level | ~0.00% |

| | Coefficients | Standard Error | $t$-statistic |
|---|---|---|---|
| Intercept | -0.10% | 0.12% | -0.812 |
| Market Index | 0.012 | 0.083 | 0.141 |
| Pharmaceutical Index | 0.953 | 0.090 | 10.570 |
| 6 February 2001 | -0.74% | 1.93% | -0.381 |
| 7 February 2001 | -4.17% | 1.93% | -2.155 |
| 8 February 2001 | -6.91% | 1.93% | -3.578 |
| 6 August 2001 | 0.71% | 1.93% | 0.368 |
| 7 August 2001 | 3.09% | 1.93% | 1.599 |
| 8 August 2001 | -1.07% | 1.94% | -0.551 |

**Exhibit-9**

**Pharmacia Pharmaceuticals Stock Event Study Results**

| Date | PHA Pharma Stock Closing Price | PHA Pharma Stock Closing Price on Previous Trading Day | PHA Pharma Stock Logarithmic Return | Market Index Logarithmic Return | Pharma Index Logarithmic Return | PHA Pharma Stock Explained Return | PHA Pharma Stock Residual Return | t-statistic | p-value | Statistically Significant | Dollar Residual Return |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 February 2001 | $52.41 | $53.16 | -1.42% | 0.05% | -0.62% | -0.69% | -0.74% | -0.38 | 0.7027 | No | ($0.39) |
| 7 February 2001 | $50.78 | $52.41 | -3.15% | -0.88% | 1.19% | 1.02% | -4.17% | -2.16 | 0.0314 | Yes | ($2.14) |
| 8 February 2001 | $47.54 | $50.78 | -6.61% | -0.65% | 0.43% | 0.30% | -6.91% | -3.59 | 0.0004 | Yes | ($3.39) |
| **3-Day** | | | **-11.18%** | **-1.48%** | **1.00%** | **0.64%** | **-11.81%** | **-3.54** | **0.0005** | **Yes** | **($5.92)** |
| 6 August 2001 | $37.83 | $37.74 | 0.22% | -1.11% | -0.40% | -0.49% | 0.71% | 0.37 | 0.7122 | No | $0.27 |
| 7 August 2001 | $39.17 | $37.83 | 3.49% | 0.22% | 0.53% | 0.40% | 3.09% | 1.60 | 0.1102 | No | $1.19 |
| 8 August 2001 | $38.32 | $39.17 | -2.20% | -1.69% | -1.06% | -1.13% | -1.07% | -0.55 | 0.5802 | No | ($0.42) |
| **3-Day** | | | **1.51%** | **-2.57%** | **-0.94%** | **-1.22%** | **2.73%** | **0.82** | **0.4135** | **No** | **$1.04** |

157

# Exhibit-10

## S&P Chemicals Index Levels and Returns

18 October 2000 through 18 October 2001

| Date | Chemicals Index Level | Chemicals Index Logarithmic Return |
|---|---|---|
| 10/18/2000 | 155.33 | |
| 10/19/2000 | 152.07 | -2.12% |
| 10/20/2000 | 152.39 | 0.21% |
| 10/23/2000 | 152.69 | 0.20% |
| 10/24/2000 | 161.25 | 5.45% |
| 10/25/2000 | 159.00 | -1.40% |
| 10/26/2000 | 160.09 | 0.68% |
| 10/27/2000 | 162.67 | 1.60% |
| 10/30/2000 | 174.10 | 6.79% |
| 10/31/2000 | 176.24 | 1.22% |
| 11/1/2000 | 172.91 | -1.91% |
| 11/2/2000 | 172.78 | -0.07% |
| 11/3/2000 | 173.74 | 0.55% |
| 11/6/2000 | 172.48 | -0.73% |
| 11/7/2000 | 174.40 | 1.11% |
| 11/8/2000 | 177.82 | 1.94% |
| 11/9/2000 | 174.80 | -1.71% |
| 11/10/2000 | 171.08 | -2.15% |
| 11/13/2000 | 171.86 | 0.45% |
| 11/14/2000 | 173.28 | 0.83% |
| 11/15/2000 | 175.82 | 1.45% |
| 11/16/2000 | 169.62 | -3.59% |
| 11/17/2000 | 172.01 | 1.40% |
| 11/20/2000 | 168.54 | -2.04% |
| 11/21/2000 | 167.61 | -0.55% |
| 11/22/2000 | 166.69 | -0.56% |
| 11/24/2000 | 167.75 | 0.64% |
| 11/27/2000 | 165.73 | -1.21% |
| 11/28/2000 | 164.40 | -0.81% |
| 11/29/2000 | 169.78 | 3.22% |
| 11/30/2000 | 169.92 | 0.09% |
| 12/1/2000 | 175.31 | 3.12% |
| 12/4/2000 | 186.10 | 5.97% |
| 12/5/2000 | 188.46 | 1.26% |
| 12/6/2000 | 182.10 | -3.43% |
| 12/7/2000 | 176.73 | -2.99% |

**Exhibit-10**

**S&P Chemicals Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Chemicals Index Level | Chemicals Index Logarithmic Return |
|------|------------------------|-------------------------------------|
| 12/8/2000 | 178.91 | 1.22% |
| 12/11/2000 | 175.84 | -1.73% |
| 12/12/2000 | 175.73 | -0.07% |
| 12/13/2000 | 176.14 | 0.24% |
| 12/14/2000 | 177.69 | 0.87% |
| 12/15/2000 | 172.86 | -2.75% |
| 12/18/2000 | 178.94 | 3.45% |
| 12/19/2000 | 183.61 | 2.58% |
| 12/20/2000 | 179.69 | -2.16% |
| 12/21/2000 | 187.37 | 4.18% |
| 12/22/2000 | 194.62 | 3.80% |
| 12/26/2000 | 195.84 | 0.63% |
| 12/27/2000 | 200.04 | 2.12% |
| 12/28/2000 | 201.44 | 0.70% |
| 12/29/2000 | 197.21 | -2.12% |
| 1/2/2001 | 192.84 | -2.24% |
| 1/3/2001 | 194.29 | 0.75% |
| 1/4/2001 | 200.35 | 3.08% |
| 1/5/2001 | 194.24 | -3.10% |
| 1/8/2001 | 195.87 | 0.84% |
| 1/9/2001 | 187.86 | -4.18% |
| 1/10/2001 | 187.82 | -0.02% |
| 1/11/2001 | 182.08 | -3.10% |
| 1/12/2001 | 178.59 | -1.94% |
| 1/16/2001 | 183.41 | 2.67% |
| 1/17/2001 | 181.82 | -0.87% |
| 1/18/2001 | 180.69 | -0.62% |
| 1/19/2001 | 175.99 | -2.64% |
| 1/22/2001 | 174.79 | -0.68% |
| 1/23/2001 | 175.74 | 0.54% |
| 1/24/2001 | 175.89 | 0.09% |
| 1/25/2001 | 177.73 | 1.04% |
| 1/26/2001 | 175.01 | -1.54% |
| 1/29/2001 | 175.44 | 0.25% |
| 1/30/2001 | 183.06 | 4.25% |
| 1/31/2001 | 185.43 | 1.29% |

**Exhibit-10**

**S&P Chemicals Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Chemicals Index Level | Chemicals Index Logarithmic Return |
|---|---|---|
| 2/1/2001 | 185.45 | 0.01% |
| 2/2/2001 | 183.59 | -1.01% |
| 2/5/2001 | 186.55 | 1.60% |
| 2/6/2001 | 185.07 | -0.80% |
| 2/7/2001 | 186.09 | 0.55% |
| 2/8/2001 | 183.17 | -1.58% |
| 2/9/2001 | 182.03 | -0.62% |
| 2/12/2001 | 182.19 | 0.08% |
| 2/13/2001 | 184.16 | 1.08% |
| 2/14/2001 | 183.28 | -0.48% |
| 2/15/2001 | 188.61 | 2.87% |
| 2/16/2001 | 184.54 | -2.18% |
| 2/20/2001 | 183.73 | -0.44% |
| 2/21/2001 | 181.83 | -1.04% |
| 2/22/2001 | 182.45 | 0.34% |
| 2/23/2001 | 177.94 | -2.50% |
| 2/26/2001 | 187.21 | 5.08% |
| 2/27/2001 | 187.81 | 0.32% |
| 2/28/2001 | 188.63 | 0.44% |
| 3/1/2001 | 189.23 | 0.31% |
| 3/2/2001 | 192.68 | 1.81% |
| 3/5/2001 | 196.05 | 1.73% |
| 3/6/2001 | 196.10 | 0.03% |
| 3/7/2001 | 202.36 | 3.14% |
| 3/8/2001 | 204.98 | 1.29% |
| 3/9/2001 | 202.73 | -1.10% |
| 3/12/2001 | 195.73 | -3.51% |
| 3/13/2001 | 192.41 | -1.71% |
| 3/14/2001 | 186.70 | -3.01% |
| 3/15/2001 | 183.65 | -1.65% |
| 3/16/2001 | 182.80 | -0.46% |
| 3/19/2001 | 188.17 | 2.90% |
| 3/20/2001 | 185.76 | -1.29% |
| 3/21/2001 | 182.06 | -2.01% |
| 3/22/2001 | 175.47 | -3.69% |
| 3/23/2001 | 177.30 | 1.04% |

# Exhibit-10

## S&P Chemicals Index Levels and Returns

18 October 2000 through 18 October 2001

| Date | Chemicals Index Level | Chemicals Index Logarithmic Return |
|------|------|------|
| 3/26/2001 | 180.67 | 1.89% |
| 3/27/2001 | 183.11 | 1.34% |
| 3/28/2001 | 181.49 | -0.89% |
| 3/29/2001 | 180.56 | -0.51% |
| 3/30/2001 | 179.17 | -0.77% |
| 4/2/2001 | 181.44 | 1.26% |
| 4/3/2001 | 177.32 | -2.29% |
| 4/4/2001 | 182.27 | 2.75% |
| 4/5/2001 | 189.24 | 3.75% |
| 4/6/2001 | 185.84 | -1.81% |
| 4/9/2001 | 188.29 | 1.31% |
| 4/10/2001 | 196.03 | 4.03% |
| 4/11/2001 | 192.40 | -1.87% |
| 4/12/2001 | 193.72 | 0.69% |
| 4/16/2001 | 194.08 | 0.18% |
| 4/17/2001 | 193.98 | -0.05% |
| 4/18/2001 | 201.09 | 3.60% |
| 4/19/2001 | 197.92 | -1.59% |
| 4/20/2001 | 194.81 | -1.59% |
| 4/23/2001 | 192.32 | -1.28% |
| 4/24/2001 | 193.84 | 0.79% |
| 4/25/2001 | 192.53 | -0.68% |
| 4/26/2001 | 197.73 | 2.66% |
| 4/27/2001 | 198.10 | 0.19% |
| 4/30/2001 | 194.32 | -1.93% |
| 5/1/2001 | 195.27 | 0.49% |
| 5/2/2001 | 198.11 | 1.45% |
| 5/3/2001 | 197.37 | -0.37% |
| 5/4/2001 | 201.75 | 2.19% |
| 5/7/2001 | 199.62 | -1.06% |
| 5/8/2001 | 201.87 | 1.12% |
| 5/9/2001 | 202.53 | 0.33% |
| 5/10/2001 | 206.25 | 1.82% |
| 5/11/2001 | 203.87 | -1.16% |
| 5/14/2001 | 206.19 | 1.13% |
| 5/15/2001 | 206.55 | 0.17% |

**Exhibit-10**

**S&P Chemicals Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Chemicals Index Level | Chemicals Index Logarithmic Return |
|---|---|---|
| 5/16/2001 | 215.97 | 4.46% |
| 5/17/2001 | 217.77 | 0.83% |
| 5/18/2001 | 214.76 | -1.39% |
| 5/21/2001 | 215.52 | 0.35% |
| 5/22/2001 | 213.65 | -0.87% |
| 5/23/2001 | 208.63 | -2.38% |
| 5/24/2001 | 202.50 | -2.98% |
| 5/25/2001 | 202.24 | -0.13% |
| 5/29/2001 | 204.86 | 1.29% |
| 5/30/2001 | 201.10 | -1.85% |
| 5/31/2001 | 203.50 | 1.19% |
| 6/1/2001 | 202.27 | -0.61% |
| 6/4/2001 | 205.05 | 1.36% |
| 6/5/2001 | 205.34 | 0.14% |
| 6/6/2001 | 204.70 | -0.31% |
| 6/7/2001 | 206.41 | 0.83% |
| 6/8/2001 | 205.18 | -0.59% |
| 6/11/2001 | 203.86 | -0.65% |
| 6/12/2001 | 202.93 | -0.46% |
| 6/13/2001 | 203.44 | 0.25% |
| 6/14/2001 | 198.62 | -2.40% |
| 6/15/2001 | 197.16 | -0.74% |
| 6/18/2001 | 197.79 | 0.32% |
| 6/19/2001 | 200.10 | 1.16% |
| 6/20/2001 | 201.78 | 0.84% |
| 6/21/2001 | 200.57 | -0.60% |
| 6/22/2001 | 195.55 | -2.54% |
| 6/25/2001 | 193.35 | -1.13% |
| 6/26/2001 | 195.42 | 1.06% |
| 6/27/2001 | 197.02 | 0.82% |
| 6/28/2001 | 197.44 | 0.22% |
| 6/29/2001 | 198.71 | 0.64% |
| 7/2/2001 | 200.99 | 1.14% |
| 7/3/2001 | 198.54 | -1.22% |
| 7/5/2001 | 199.00 | 0.23% |
| 7/6/2001 | 195.75 | -1.65% |

## Exhibit-10

## S&P Chemicals Index Levels and Returns

18 October 2000 through 18 October 2001

| Date | Chemicals Index Level | Chemicals Index Logarithmic Return |
|---|---|---|
| 7/9/2001 | 197.64 | 0.96% |
| 7/10/2001 | 196.29 | -0.69% |
| 7/11/2001 | 195.04 | -0.64% |
| 7/12/2001 | 197.44 | 1.22% |
| 7/13/2001 | 196.70 | -0.38% |
| 7/16/2001 | 194.82 | -0.96% |
| 7/17/2001 | 194.62 | -0.10% |
| 7/18/2001 | 197.98 | 1.72% |
| 7/19/2001 | 200.82 | 1.42% |
| 7/20/2001 | 198.49 | -1.17% |
| 7/23/2001 | 193.69 | -2.45% |
| 7/24/2001 | 188.43 | -2.75% |
| 7/25/2001 | 191.82 | 1.78% |
| 7/26/2001 | 192.62 | 0.41% |
| 7/27/2001 | 189.75 | -1.50% |
| 7/30/2001 | 189.18 | -0.30% |
| 7/31/2001 | 193.76 | 2.39% |
| 8/1/2001 | 191.83 | -1.00% |
| 8/2/2001 | 194.49 | 1.38% |
| 8/3/2001 | 194.47 | -0.01% |
| 8/6/2001 | 193.80 | -0.34% |
| 8/7/2001 | 192.76 | -0.54% |
| 8/8/2001 | 189.01 | -1.96% |
| 8/9/2001 | 188.50 | -0.27% |
| 8/10/2001 | 191.58 | 1.62% |
| 8/13/2001 | 191.59 | 0.00% |
| 8/14/2001 | 191.48 | -0.05% |
| 8/15/2001 | 191.35 | -0.07% |
| 8/16/2001 | 188.64 | -1.43% |
| 8/17/2001 | 188.20 | -0.24% |
| 8/20/2001 | 187.65 | -0.29% |
| 8/21/2001 | 189.02 | 0.73% |
| 8/22/2001 | 189.56 | 0.28% |
| 8/23/2001 | 189.92 | 0.19% |
| 8/24/2001 | 194.74 | 2.51% |
| 8/27/2001 | 194.99 | 0.13% |

**Exhibit-10**

**S&P Chemicals Index Levels and Returns**

18 October 2000 through 18 October 2001

| Date | Chemicals Index Level | Chemicals Index Logarithmic Return |
|------|------------------------|-------------------------------------|
| 8/28/2001 | 192.08 | -1.50% |
| 8/29/2001 | 190.40 | -0.88% |
| 8/30/2001 | 188.38 | -1.07% |
| 8/31/2001 | 190.53 | 1.14% |
| 9/4/2001 | 192.68 | 1.12% |
| 9/5/2001 | 191.95 | -0.38% |
| 9/6/2001 | 189.63 | -1.21% |
| 9/7/2001 | 184.59 | -2.70% |
| 9/10/2001 | 182.14 | -1.34% |
| 9/17/2001 | 164.43 | -10.23% |
| 9/18/2001 | 166.10 | 1.01% |
| 9/19/2001 | 163.21 | -1.76% |
| 9/20/2001 | 157.43 | -3.61% |
| 9/21/2001 | 154.51 | -1.87% |
| 9/24/2001 | 165.35 | 6.78% |
| 9/25/2001 | 165.93 | 0.35% |
| 9/26/2001 | 165.13 | -0.49% |
| 9/27/2001 | 167.95 | 1.70% |
| 9/28/2001 | 174.24 | 3.68% |
| 10/1/2001 | 173.41 | -0.48% |
| 10/2/2001 | 173.99 | 0.33% |
| 10/3/2001 | 175.76 | 1.01% |
| 10/4/2001 | 174.76 | -0.57% |
| 10/5/2001 | 175.90 | 0.65% |
| 10/8/2001 | 173.30 | -1.49% |
| 10/9/2001 | 174.72 | 0.82% |
| 10/10/2001 | 179.97 | 2.96% |
| 10/11/2001 | 187.83 | 4.28% |
| 10/12/2001 | 185.64 | -1.17% |
| 10/15/2001 | 183.95 | -0.92% |
| 10/16/2001 | 185.36 | 0.76% |
| 10/17/2001 | 182.31 | -1.66% |
| 10/18/2001 | 182.37 | 0.03% |

**Source:** Capital IQ

**Exhibit-11**

**Pharmacia Stock Regression Results**

Estimation Period:  19 October 2000 through 18 October 2001

| Regression Statistics | |
|---|---|
| Multiple R | 0.612 |
| R Square | 0.375 |
| Adjusted R Square | 0.351 |
| Standard Error | 1.71% |
| Observations | 248 |
| F-Statistic | 15.85 |
| F-Statistic Significance Level | ~0.00% |

| | Coefficients | Standard Error | *t*- statistic |
|---|---|---|---|
| Intercept | -0.07% | 0.11% | -0.659 |
| Market Index | 0.015 | 0.088 | 0.172 |
| Pharmaceutical Index | 0.849 | 0.081 | 10.483 |
| Chemicals Index | 0.053 | 0.067 | 0.790 |
| 6 February 2001 | -0.45% | 1.72% | -0.261 |
| 7 February 2001 | -3.62% | 1.72% | -2.104 |
| 8 February 2001 | -5.94% | 1.72% | -3.452 |
| 6 August 2001 | 0.44% | 1.72% | 0.259 |
| 7 August 2001 | 2.12% | 1.72% | 1.234 |
| 8 August 2001 | -0.64% | 1.72% | -0.371 |

165

**Exhibit-12**

**Pharmacia Stock Event Study Results**

| Date | PHA Closing Stock Price | PHA Closing Stock Price on Previous Trading Day | PHA Logarithmic Return | Market Index Logarithmic Return | Pharma Index Logarithmic Return | Chemicals Index Logarithmic Return | PHA Explained Return | PHA Residual Return | *t*-statistic | p-value | Statistically Significant | Dollar Residual Return |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 February 2001 | $57.65 | $58.28 | -1.09% | 0.05% | -0.62% | -0.80% | -0.64% | -0.45% | -0.26 | 0.7933 | No | ($0.26) |
| 7 February 2001 | $56.13 | $57.65 | -2.67% | -0.88% | 1.19% | 0.55% | 0.95% | -3.62% | -2.11 | 0.0355 | Yes | ($2.05) |
| 8 February 2001 | $53.00 | $56.13 | -5.74% | -0.65% | 0.43% | -1.58% | 0.20% | -5.94% | -3.47 | 0.0006 | Yes | ($3.24) |
| **3-Day** | | | **-9.50%** | **-1.48%** | **1.00%** | **-1.83%** | **0.51%** | **-10.01%** | **-3.37** | **0.0009** | **Yes** | **($5.55)** |
| 6 August 2001 | $44.00 | $44.00 | 0.00% | -1.11% | -0.40% | -0.34% | -0.44% | 0.44% | 0.26 | 0.7954 | No | $0.20 |
| 7 August 2001 | $45.10 | $44.00 | 2.47% | 0.22% | 0.53% | -0.54% | 0.35% | 2.12% | 1.24 | 0.2170 | No | $0.94 |
| 8 August 2001 | $44.32 | $45.10 | -1.74% | -1.69% | -1.06% | -1.96% | -1.11% | -0.64% | -0.37 | 0.7095 | No | ($0.29) |
| **3-Day** | | | **0.72%** | **-2.57%** | **-0.94%** | **-2.85%** | **-1.20%** | **1.93%** | **0.65** | **0.5168** | **No** | **$0.85** |

166

# Exhibit-13

## Inflation Ribbon

| Dates | Inflation |
|-------|-----------|
| 17 April 2000 - 6 February 2001 | $5.92 |
| 6 February 2001 | $5.53 |
| 7 February 2001 | $3.39 |
| 8 February 2001* - 2 November 2001 | $0.00 |

**Note:** [*] As of Market Close

**Exhibit-14**

**New York Stock Exchange Specialist Participation Rates**

April 2000 through November 2001

| Date | NYSE Specialist Participation Rate |
|------|-----------------------------------|
| April 2000 | 14.8% |
| May 2000 | 14.3% |
| June 2000 | 13.4% |
| July 2000 | 14.0% |
| August 2000 | 13.8% |
| September 2000 | 13.2% |
| October 2000 | 13.5% |
| November 2000 | 13.5% |
| December 2000 | 13.2% |
| January 2001 | 13.3% |
| February 2001 | 15.5% |
| March 2001 | 15.4% |
| April 2001 | 15.3% |
| May 2001 | 15.2% |
| June 2001 | 15.0% |
| July 2001 | 15.4% |
| August 2001 | 15.9% |
| September 2001 | 13.9% |
| October 2001 | 15.8% |
| November 2001 | 15.4% |

**Source:** NYSE Technologies Market Data
[http://www.nyxdata.com/Data-Products/Facts-and-Figures]

**Exhibit-15**

**Pharmacia Short Interest**

April 2000 through November 2001

| Date | Short Interest |
|------|----------------|
| 4/14/2000 | 17,960,007 |
| 5/15/2000 | 11,920,988 |
| 6/15/2000 | 10,693,712 |
| 7/14/2000 | 11,690,459 |
| 8/15/2000 | 11,481,697 |
| 9/15/2000 | 12,248,375 |
| 10/13/2000 | 11,723,874 |
| 11/15/2000 | 13,239,407 |
| 12/15/2000 | 13,266,336 |
| 1/12/2001 | 13,236,718 |
| 2/15/2001 | 11,469,643 |
| 3/15/2001 | 12,362,266 |
| 4/12/2001 | 14,117,564 |
| 5/15/2001 | 10,245,493 |
| 6/15/2001 | 11,098,435 |
| 7/13/2001 | 14,029,817 |
| 8/15/2001 | 16,481,198 |
| 9/10/2001 | 14,219,380 |
| 10/15/2001 | 11,198,438 |
| 11/15/2001 | 15,933,075 |

**Source:**    Bloomberg

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | As of the Quarter Ended | | | | |
| 1838 Investment Advisors | 2,912,532.9 | 394,207.1 | 161,549.3 | 110,455.0 | 69,344.3 | 48,775.0 | 42,672.1 | 40,917.1 |
| 3Bridge Capital LLC | - | - | - | - | - | - | 223,884.3 | 229,859.3 |
| 3I Investments PLC | - | - | - | - | - | - | - | 45,635.7 |
| A I M Management Group Inc. | 2,690,400.0 | 2,749,970.0 | 4,074,270.0 | 7,140,070.0 | 9,083,235.7 | 6,447,940.0 | 4,517,654.3 | 2,851,284.3 |
| Aberdeen Asset Management PLC | - | - | 283,700.0 | 374,900.0 | 338,300.0 | 33,300.0 | - | 325,400.0 |
| ABN AMRO Asset Management Holdings, Inc. | - | - | - | - | 37,850.7 | 26,779.3 | 20,179.3 | 10,279.3 |
| Abner, Herrman & Brock, Inc. | 54,082.9 | 88,750.0 | 106,964.3 | 104,507.9 | 104,780.7 | 102,045.7 | 103,470.0 | 119,564.3 |
| Acadia  Trust NA | 10,300.0 | 10,657.1 | 10,569.3 | 10,469.3 | 9,394.3 | 10,644.3 | 10,644.3 | 11,019.3 |
| Acadian Asset Management | - | - | 2,200.0 | - | - | - | - | - |
| Adage Capital Partners Gp, L.L.C. | - | - | - | - | - | - | - | 940,310.0 |
| Adams Express Company | 310,000.0 | 368,900.0 | 368,900.0 | 368,900.0 | 368,900.0 | 368,900.0 | 368,900.0 | 368,900.0 |
| Adams, Harkness & Hill, Inc. | - | 2,600.0 | 2,022.1 | - | - | - | - | - |
| Advanced Investment Management LP | 10,870.0 | 10,869.3 | 34,647.1 | 34,647.1 | 15,302.9 | 5,484.3 | 5,484.3 | - |
| Advantus Capital Management | 50,002.1 | 541,642.9 | 756,850.7 | 871,152.1 | 983,410.7 | 234,430.0 | 334,067.9 | 353,375.0 |
| Advest Bank And Trust Company | - | - | 14,079.3 | - | 14,119.3 | 15,049.3 | 14,034.3 | 15,717.9 |
| Advest Group, Inc. (The) | 17,239.3 | 15,687.1 | 14,837.1 | 15,582.1 | 15,932.1 | 15,155.0 | 13,450.7 | 20,547.1 |
| Advisory Research, Inc. | 3,935.0 | - | - | - | - | 27,210.0 | 27,520.7 | 27,317.9 |
| Aeltus Investment Management Inc. | 753,219.3 | 1,857,482.9 | 3,521,385.7 | 3,937,937.1 | 900,627.1 | 918,575.0 | 2,496,912.1 | 1,302,440.0 |
| Agf Investments Inc. | - | - | - | - | - | 79,300.0 | 81,300.0 | 3,500.0 |
| Albion Financial Group | - | - | - | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Alger (Fred) Management Inc | - | - | - | 970,300.0 | 881,860.0 | - | - | - |
| Alleghany Corp | 18,167.9 | 19,694.3 | 25,097.9 | 33,950.7 | - | - | - | - |
| Allegiant Investment Counselors | - | - | - | 116,312.1 | 116,200.7 | 103,800.7 | 101,664.3 | 114,564.3 |
| Allen Holding Inc. | - | 190,700.0 | 353,000.0 | 353,000.0 | - | - | - | - |
| Allianz Dresdner Asset Management of America, Inc. | 27,068,259.3 | 19,105,347.1 | 4,155,455.7 | 3,776,135.0 | 3,910,395.0 | 4,035,872.1 | 1,880,427.1 | 1,369,002.1 |
| Allianz of America | - | - | - | - | - | 1,306,000.0 | 1,252,700.0 | 1,284,600.0 |
| Allied Irish Banks, P.L.C. | 291,525.0 | 284,795.7 | 272,207.1 | 270,910.7 | 201,367.1 | 215,930.7 | 212,562.9 | 234,577.9 |
| Allstate Insurance Co | 163,000.0 | - | - | 195,152.9 | 243,752.9 | 110,930.7 | 445,830.7 | 649,630.7 |
| Allstate Life Insurance Co | 11,700.0 | - | - | 14,615.7 | 14,715.7 | 7,689.3 | 15,589.3 | - |
| Allstate Pension Plan | 25,800.0 | - | - | 36,925.0 | 26,825.0 | - | 57,600.0 | 92,800.0 |
| Allstate Retirement Plan | 74,400.0 | - | - | 83,057.1 | 60,857.1 | - | 137,200.0 | 221,200.0 |
| Altrinsic Global Advisors, LLC | - | - | - | - | - | - | - | 63,500.0 |
| Amalgamated Bank of New York | 426,522.9 | 433,142.9 | 438,842.9 | 454,942.9 | 441,642.9 | 432,042.9 | 428,242.9 | 446,242.9 |
| Amarillo National Bank | - | - | - | - | - | 21,159.3 | 31,842.9 | 43,565.7 |
| Amcore Bank, N.A. | 19,860.0 | 26,010.0 | 25,897.9 | 25,697.9 | 15,997.9 | 15,997.9 | 15,812.9 | 14,959.3 |
| American Century Investment Management Inc. | 249,900.0 | 215,600.0 | 1,447,900.0 | 11,401,100.0 | 12,718,000.0 | 12,551,267.9 | 10,175,097.1 | 6,185,829.3 |
| American Express Financial Corp | 4,450,987.9 | 6,641,295.7 | 10,104,262.9 | 6,186,967.9 | 2,363,839.3 | 4,065,825.0 | 5,496,302.1 | 4,831,980.0 |
| American Fund Advisors, Inc | 16,189.3 | - | - | - | - | - | - | - |

170

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | As of the Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| American International Group, Inc | 792,900.0 | 919,509.3 | 2,686,380.0 | 992,087.1 | 1,406,627.9 | 1,162,897.9 | 1,085,277.9 | 1,867,979.3 |
| American National Bank & Trust Company | 5,000.0 | 9,395.0 | 10,227.9 | 10,227.9 | 10,227.9 | 10,227.9 | 5,000.0 | 5,000.0 |
| American Re Asset Management | 186,105.7 | - | - | - | - | - | - | - |
| Ameriserv Trust & Financial Services | 23,225.0 | 22,225.0 | - | - | - | - | - | - |
| Ameritas Life Insurance Corporation | 2,162.9 | 43,884.3 | 35,250.0 | - | - | - | - | - |
| AMI Investment Management, Inc. | - | - | - | - | - | - | - | - |
| Amsouth Bancorporation | 889,449.3 | 908,052.1 | 904,472.1 | 734,957.9 | 745,015.7 | 424,935.0 | 935,574.3 | 898,939.3 |
| Analytic Asset Management, Inc. | - | - | - | - | - | - | 500.0 | - |
| Analytic Investors, LLC | 15,057.9 | - | - | - | 10,815.7 | 19,157.9 | 575,254.3 | 541,495.0 |
| Anchor Capital Advisors, Inc. | 165,317.1 | 96,385.7 | 92,417.1 | 95,530.7 | 99,072.1 | 100,760.0 | 100,282.9 | 116,979.3 |
| Appleton Partners, Inc./Ma | 19,727.1 | 22,834.3 | 14,427.1 | 21,002.9 | 21,002.9 | 19,002.9 | 8,775.7 | 8,775.7 |
| Arcadia Investment Management Corporation | 45,564.3 | 47,789.3 | 62,560.7 | 61,882.9 | 59,635.7 | 59,584.3 | 60,730.0 | 59,057.1 |
| Arden Group (The) | - | 6,970.0 | 7,370.0 | 7,370.0 | 7,165.0 | 6,570.0 | 6,570.0 | 17,855.0 |
| Area Trust Company | - | - | - | - | - | 4,637.9 | - | 4,637.9 |
| Argent Capital Management | - | - | 15,737.1 | - | 14,112.1 | 13,660.0 | 13,905.7 | - |
| Argus Management LLC | - | - | - | - | - | - | - | 200,000.0 |
| Ark Asset Management Company, Inc. | 396,900.0 | - | 28,132.9 | 99,792.1 | 161,492.1 | 163,492.1 | 117,192.1 | 1,641,359.3 |
| Arnhold & S. Bleichroeder, Inc. | 141,310.0 | 8,810.0 | 8,810.0 | 5,310.0 | 5,310.0 | 5,310.0 | 10,310.0 | 10,310.0 |
| Arrowstreet Capital, Limited Partnership | - | - | - | - | - | - | - | 9,900.0 |
| Artisan Partners Limited Partnership | 683,200.0 | 1,789,589.3 | 2,199,689.3 | 2,795,889.3 | 3,910,589.3 | - | - | - |
| Ashfield & Company, Inc. | 10,490.0 | 14,100.7 | 19,225.7 | 19,100.7 | 38,325.7 | 20,685.7 | 20,729.3 | 18,132.9 |
| Asset Advisors Corporation | 1,780.0 | 2,582.1 | 2,455.7 | 3,035.7 | 3,035.7 | 3,035.7 | 3,035.7 | 3,035.7 |
| Asset Management Inc/Md | - | - | - | 4,584.3 | 5,834.3 | 5,834.3 | 5,334.3 | 5,649.3 |
| Asset Management Partners, Inc. | 19,000.0 | 13,000.0 | 12,000.0 | - | - | - | - | - |
| Associated Banc-Corp | 19,262.9 | 19,662.9 | 16,870.7 | 22,115.0 | 24,375.0 | 25,005.7 | 28,255.7 | 29,772.9 |
| Atalanta/Sosnoff Capital LLC | - | - | - | - | 30,000.0 | - | - | - |
| Atlanta Capital Management Company LLC | - | - | - | - | - | - | - | 2,175.0 |
| Atlantic Trust Company National Association | 74,789.3 | 50,772.1 | 45,470.7 | 39,150.0 | 34,494.3 | 863,805.7 | 894,742.9 | 197,865.0 |
| Avery Capital Management, L.L.C. | - | 18,500.0 | - | 18,500.0 | 18,500.0 | 18,500.0 | 18,500.0 | 18,500.0 |
| Aviva PLC | - | - | - | - | 887,980.7 | 1,616,450.7 | 1,676,085.0 | 1,471,022.9 |
| AXA | 13,599,129.3 | 17,961,387.1 | 17,646,157.9 | 43,340,449.3 | 92,891,760.7 | 107,105,530.7 | 65,344,522.9 | 38,632,709.3 |
| Axe-Houghton Associates, Inc. | 142,535.0 | 139,535.0 | 137,035.0 | 137,035.0 | 137,035.0 | 137,035.0 | 137,035.0 | 164,635.0 |
| Ayco Company, LP(The) | 25,697.1 | 31,812.1 | 30,102.9 | 20,742.9 | 21,330.0 | 20,712.9 | 20,437.9 | 20,532.9 |
| Babson Capital Management LLC | 3,363,800.7 | 3,075,177.9 | 2,955,710.7 | 2,488,040.7 | 440,270.7 | 386,042.9 | 389,059.3 | 361,864.3 |
| Babson-United Investment Advisors, Inc. | - | - | - | - | 4,144.3 | - | - | - |
| Back Bay Advisors, L.P. | 19,300.0 | 14,337.1 | 14,337.1 | 14,337.1 | 14,337.1 | - | - | - |
| Bahl & Gaynor, Inc. | 8,810.0 | 14,977.9 | - | 10,377.9 | 9,377.9 | 8,377.9 | 8,377.9 | 6,877.9 |
| Baird (Robert W.) & Company, Inc. | 16,630.0 | 17,070.0 | 15,037.1 | 10,504.3 | 7,714.3 | 7,517.1 | 4,937.1 | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | As of the Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Baker Investment Group, LLC | - | - | - | - | 5,000.0 | | | |
| Baldwin Brothers, Inc. | 6,255.0 | 8,900.0 | 5,140.0 | 5,640.0 | 5,640.0 | 5,640.0 | 5,492.1 | 5,385.0 |
| Bancorpsouth, Inc. | 23,740.0 | 22,040.0 | 22,240.0 | 22,240.0 | 20,090.0 | | | |
| Bank Julius Baer & Company, New York Branch | 4,005.7 | 4,965.7 | 4,965.7 | 4,965.7 | 4,965.7 | 10,665.7 | 7,080.7 | 5,580.7 |
| Bank of America Corporation | 5,856,169.3 | 673,575.0 | 708,090.0 | 895,220.7 | 971,700.0 | 9,722,555.7 | 5,846,795.7 | 6,359,430.7 |
| Bank of Hawaii | 32,450.0 | 32,380.7 | 31,655.7 | 30,365.7 | 27,855.7 | 28,205.7 | 27,892.9 | 26,277.1 |
| Bank of New York Co | 1,680,187.9 | 1,657,267.9 | 1,294,364.3 | 1,253,582.1 | 1,221,990.0 | 1,158,385.0 | 1,152,747.1 | 1,170,352.1 |
| Bank of New York Trust Company of Florida, N.A. | 7,719.3 | 7,250.0 | 6,650.0 | 6,550.0 | 7,000.0 | 6,500.0 | 6,500.0 | 5,500.0 |
| Bank of Oklahoma, N.A. | 13,435.0 | | | | | | | |
| Bank of The West | 9,150.0 | 10,985.7 | 10,985.7 | 10,772.1 | 10,172.1 | 10,172.1 | 10,472.1 | 10,472.1 |
| Bank One Corporation | 3,428,535.7 | 760,334.3 | 5,094,034.3 | 2,643,282.1 | 2,522,692.9 | 2,646,592.1 | 3,295,267.9 | 3,597,092.1 |
| Bankers Trust Company (Iowa) | - | - | - | 3,935.0 | - | | | |
| Bankmont Financial Corp. | 548,905.0 | - | 555,362.1 | 585,492.9 | 667,492.9 | 663,487.9 | 1,052,347.1 | 698,942.1 |
| Banknorth Investment Management Group | 12,795.0 | 74,837.1 | 71,052.1 | 69,014.3 | 65,444.3 | 62,250.0 | 59,737.9 | 50,717.1 |
| Barclays Bank PLC | 31,923,520.0 | 37,882,657.9 | 37,859,845.7 | 38,138,292.1 | 38,805,485.0 | 40,721,334.3 | 41,502,545.7 | 45,921,295.7 |
| Baring Asset Management, Inc. | - | - | - | - | - | | 5,690.0 | 13,790.0 |
| Barrett Associates, Inc. | 7,445.7 | 24,135.0 | 23,842.9 | 23,842.9 | 23,900.7 | - | - | - |
| Barrow, Hanley Mewhinney & Strauss, Inc. | 1,476,067.9 | 1,354,732.9 | 971,715.7 | 549,115.7 | 547,274.3 | 548,475.0 | 553,575.0 | 546,765.0 |
| BBT Fund, LP | - | - | - | - | - | 57,300.0 | 55,600.0 | 41,000.0 |
| Beach Investment Counsel, Inc./PA | 19,000.0 | 19,000.0 | - | - | - | - | - | - |
| Beacon Fiduciary Advisors | 4,370.0 | 4,870.0 | 6,870.0 | 7,970.0 | 8,315.0 | 8,315.0 | 11,552.1 | 13,552.1 |
| Beacon Investment Company | - | - | - | 4,795.0 | 4,795.0 | 4,795.0 | | |
| Beacon Trust Company | 23,017.1 | 22,667.1 | 22,332.9 | 22,417.1 | 22,242.1 | 20,900.0 | 20,900.0 | 20,900.0 |
| Bear Stearns & Company | 1,006,862.1 | 1,262,992.1 | 1,280,075.7 | 1,392,060.7 | 1,284,455.0 | 1,397,217.1 | 1,366,280.0 | 1,264,375.0 |
| Bear Stearns Asset Management, Inc. | - | 654.3 | 654.3 | 354.3 | - | - | - | - |
| Beck, Mack & Oliver | 7,950.0 | 3,950.0 | - | - | - | - | - | - |
| Becker Capital Management Inc. | 12,000.0 | 12,000.0 | 12,000.0 | 10,000.0 | 8,642.9 | 8,142.9 | 8,142.9 | 8,392.9 |
| Beese, Fulmer & Pincoe, Inc. | 50,802.1 | 54,874.3 | 54,949.3 | 54,422.9 | 54,672.9 | 47,195.0 | 48,112.1 | 48,837.1 |
| Bel Air Investment Advisors LLC | - | 5,015.7 | 3,815.7 | 5,015.7 | - | - | - | - |
| Bennicas (Georgia) dba Bennicas And Associates | 8,700.0 | 8,700.0 | 9,057.1 | 9,057.1 | 9,057.1 | 9,057.1 | 9,057.1 | 8,700.0 |
| Berkeley Capital Management | 640.0 | 200.0 | 375.0 | 717.1 | 375.0 | 494.3 | 460.0 | 390.7 |
| Bessemer Group, Incorporated | 263,170.0 | 74,140.7 | 67,975.0 | 61,480.0 | 55,805.0 | 65,652.9 | 77,737.9 | 104,545.0 |
| Beta Management Ltd | 24,500.0 | - | - | 47,300.0 | 46,800.0 | - | - | - |
| Bidwell (C.M.) & Associates, Ltd. | - | 43,490.0 | - | - | - | - | - | - |
| Birinyi Associates Inc. | 5,550.0 | 5,550.0 | 5,550.0 | 5,800.0 | 7,100.0 | - | - | - |
| Blackhill Capital, Inc. | 47,600.0 | 84,400.0 | 84,400.0 | 82,400.0 | - | 72,400.0 | 106,700.0 | 70,267.9 |
| Blackrock Inc. | 576,400.0 | 730,677.9 | 812,814.3 | 325,064.3 | 302,064.3 | 218,024.3 | - | - |
| Blair (William) & Company, L.L.C. | 1,318,105.0 | 1,367,432.1 | 1,407,752.9 | 1,357,860.0 | 1,060,739.3 | 259,674.3 | 221,102.9 | 202,345.7 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| Blair, Christopher, R. | 24,600.0 | - | - | - | - | 7,500.0 | 6,900.0 | - |
| Blue Ridge Capital, L.L.C. | - | - | - | - | - | - | 500,000.0 | 680,000.0 |
| BNP Paribas Arbitrage, Sa | - | - | - | - | - | - | - | 135,322.9 |
| BNP Paribas Asset Management, Sas | - | 104,925.0 | 150,347.9 | 133,935.0 | 137,935.0 | 146,080.0 | 147,400.0 | 353,520.7 |
| BNP Paribas Equity Strategies Snc | 190,990.0 | 202,400.7 | 278,917.1 | 331,452.9 | 461,459.3 | 471,015.0 | 444,785.7 | 249,879.3 |
| Boone County National Bank | 8,795.0 | 9,907.1 | 16,182.1 | 20,682.1 | 20,707.1 | 21,457.1 | 21,917.1 | 23,087.9 |
| Boone National Svgs & Ln Assoc-dba Edward Jones Tr Co | 14,619.3 | 24,584.3 | 24,839.3 | 20,289.3 | 18,624.3 | 17,952.1 | 17,492.1 | 15,642.1 |
| Boston Advisors, Inc. | 511,342.9 | 355,900.0 | 321,000.0 | 208,400.0 | 172,600.0 | 136,100.0 | 177,600.0 | 167,500.0 |
| Boston Family Office, LLC | 15,395.0 | 16,359.3 | 16,859.3 | 21,209.3 | 21,709.3 | 23,784.3 | 25,734.3 | 17,859.3 |
| Boston Partners-Asset Management, L.P. | - | - | - | - | - | - | - | 403,955.0 |
| Bourgeon Capital Management LLC | - | - | - | 10,710.0 | 10,710.0 | 12,760.0 | 15,360.0 | 7,110.0 |
| Bourne Stenstrom Lent Asset Management | - | - | 4,100.0 | - | 4,100.0 | - | - | - |
| Bowman Financial Management Co Inc. | 300.0 | - | - | - | - | - | - | - |
| Boyd Watterson Asset Management LLC | - | - | - | 7,020.0 | - | - | - | - |
| Boys, Arnold & Company, Inc. | 4,500.0 | 6,607.9 | 6,922.1 | 9,564.3 | 13,429.3 | 13,830.0 | 14,137.1 | 10,582.1 |
| BP P.L.C. | 285,000.0 | 327,750.0 | 327,750.0 | 202,750.0 | 252,750.0 | 262,750.0 | 262,750.0 | 131,150.0 |
| BPI Global Asset Management LLP | - | - | - | 63,700.0 | - | 163,900.0 | 167,900.0 | 114,700.0 |
| Bradley, Foster And Sargent, Inc. | 14,650.0 | 16,267.9 | 16,435.0 | 18,722.1 | 23,749.3 | 24,349.3 | 17,527.9 | 11,767.9 |
| Branch Banking & Trust Company (South Carolina) | 11,190.7 | 9,220.0 | 9,112.9 | 18,225.7 | 19,482.1 | 18,612.1 | 9,305.7 | - |
| Branch Banking And Trust Company (North Carolina) | 64,262.9 | 91,667.1 | 106,709.3 | 160,080.7 | 150,464.3 | 125,280.0 | 65,940.7 | 56,570.7 |
| Brandywine Trust Company | - | - | - | 68,635.7 | 68,635.7 | 68,635.7 | 68,635.7 | 68,635.7 |
| Brencourt Advisors, LLC | - | - | - | - | - | - | - | 4,750.0 |
| Brenton Investments | 11,440.0 | 10,802.1 | 9,162.1 | 8,425.7 | 8,375.7 | - | - | - |
| Bricoleur Capital Management, LLC | - | - | - | - | - | 106,000.0 | 130,500.0 | - |
| Bridger Management LLC | - | - | - | - | - | - | - | 119,400.0 |
| Bridges Investment Counsel | 29,425.0 | 30,220.0 | 31,220.0 | 31,220.0 | 30,520.0 | 30,470.0 | 30,170.0 | 29,270.0 |
| Broadmark Asset Management LLC | - | - | - | - | - | - | 8,000.0 | - |
| Brown (Alex.) Investment Management, LLC | 81,550.0 | 81,550.0 | 81,550.0 | 81,550.0 | 81,550.0 | 171,550.0 | 171,550.0 | 151,550.0 |
| Brown Brothers Harriman & Co | 1,497,622.1 | 1,497,622.1 | 1,538,867.9 | 1,616,555.7 | 1,607,392.9 | 1,643,345.0 | - | 1,425,527.9 |
| Brown Investment Advisory & Trust Company | 5,730.0 | 6,257.1 | 6,257.1 | 21,997.1 | 21,997.1 | 19,407.1 | - | 442,392.1 |
| Bryn Mawr Trust Company | 20,215.0 | 22,337.1 | 21,854.3 | 21,725.7 | 21,725.7 | 21,725.7 | 21,859.3 | 21,450.0 |
| Bufka & Rodgers, LLC | 4,400.0 | - | - | - | - | - | 7,075.0 | 7,895.7 |
| Bunker Capital, L.L.C. | - | - | 21,487.9 | 24,087.9 | 21,387.9 | 20,087.9 | 10,572.9 | - |
| Burke & Herbert Bank And Trust Company | 10,300.0 | 11,837.9 | 11,837.9 | 9,037.9 | 6,837.9 | 6,837.9 | 6,837.9 | 6,837.9 |
| Burney Company (The) | - | - | 7,065.7 | 5,919.3 | 5,267.1 | - | - | - |
| Burnham Asset Management Corporation | 4,600.0 | - | - | - | - | - | - | - |
| Burnham Sullivan & Associates | 12,000.0 | - | 13,050.0 | 12,750.0 | 11,550.0 | 11,000.0 | 11,300.0 | 11,600.0 |
| Burridge Group LLC  (The) | 63,704.3 | 85,027.9 | 107,142.9 | 393,617.1 | 438,932.9 | 453,337.1 | 616,910.0 | 748,249.3 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| Bush (J.) & Company, Incorporated | 6,000.0 | 6,000.0 | 5,000.0 | 96,875.0 | - | 136,600.0 | - | - |
| Bush O'Donnell Investment Advisors Inc | - | - | - | - | - | 12,160.0 | 12,160.0 | 12,160.0 |
| Butler Wick Asset Management | - | - | - | 22,415.0 | 16,720.7 | 15,950.7 | 15,950.7 | 15,950.7 |
| Cadinha & Company, Inc. | - | - | - | - | - | - | - | - |
| California State Teachers Retirement System | 3,559,410.0 | 3,444,405.0 | 3,483,240.0 | 3,597,360.0 | 3,693,560.0 | 3,569,760.0 | 3,421,090.0 | 3,773,254.3 |
| California, University of-Regents | 7,520,542.1 | 8,461,514.3 | 8,461,514.3 | 8,462,445.7 | 8,462,445.7 | 8,564,545.7 | 8,564,545.7 | 9,234,545.7 |
| Calpers (California-Public Employees Retirement System) | 2,795,000.0 | 827,699.3 | 857,399.3 | 858,699.3 | 4,983,499.3 | 4,873,299.3 | 4,737,299.3 | 4,981,099.3 |
| Camden Asset Management, L.P. | 100,000.0 | - | - | - | - | - | - | - |
| Campbell, Newman Asset Management, Inc. | 26,705.7 | 26,704.3 | 26,704.3 | 26,704.3 | 26,704.3 | 26,704.3 | 20,704.3 | 21,204.3 |
| Canada Life Assurance Company | - | - | - | - | - | - | 50,700.0 | 39,800.0 |
| Canandaigua National Bank & Trust Corporation | 5,000.0 | 6,207.1 | 6,207.1 | 6,207.1 | - | - | - | - |
| Cape Ann Savings Bank | - | - | - | - | - | 9,115.0 | 9,115.0 | 9,115.0 |
| Cape Cod Bank & Trust Company | - | - | 3,450.0 | 3,450.0 | - | - | - | - |
| Capital City Trust Company | 1,450.0 | 450.0 | 450.0 | 450.0 | 550.0 | 322.9 | - | 200.0 |
| Capital Guardian Trust Company | - | 4,830.0 | 14,430.0 | 3,945.0 | 6,945.0 | 13,475.7 | 13,715.7 | 13,555.7 |
| Capital International, S.A. | 11,700.0 | - | - | - | - | - | - | - |
| Capital Investment Services of America, Inc. | - | - | - | - | - | - | - | 5,520.0 |
| Capital Management Associates Inc./FL | 4,530.0 | 5,067.1 | 5,087.1 | 5,027.1 | 5,027.1 | 1,695.0 | 1,730.0 | 1,705.0 |
| Capital Management Corporation | 7,350.0 | 6,350.0 | 6,350.0 | 7,050.0 | 23,750.0 | 17,010.0 | 18,635.0 | 17,500.7 |
| Capital Research And Management Company | 75,088,650.0 | 84,003,297.9 | 74,300,095.0 | 58,990,295.0 | 55,690,295.0 | 55,887,595.0 | 59,803,595.0 | 69,982,657.9 |
| Capital West Asset Management LLC | - | 47,350.0 | 1,080.0 | - | - | - | - | - |
| Capstone Asset Management Company | 126,280.0 | 138,209.3 | 144,607.9 | 147,237.9 | 149,297.9 | 152,577.9 | 157,227.9 | 158,552.9 |
| Carlson (DL) Investment Group, Inc. | 12,242.9 | 12,242.9 | 11,792.9 | 11,792.9 | 11,600.0 | 10,200.0 | 6,400.0 | 7,000.0 |
| Carlson Capital. L.P. | 492,410.0 | 492,282.9 | 492,282.9 | 476,105.0 | 476,105.0 | - | 165,000.0 | 120,000.0 |
| Carret Asset Management | 123,850.0 | 137,767.9 | 142,437.1 | 8,352.1 | 121,190.0 | 46,887.1 | 44,235.7 | 53,052.9 |
| Castleark Management,L.L.C. | - | - | - | 122,000.0 | - | - | - | - |
| Catalyst Investment Management LLC | 58,269.3 | - | - | - | - | - | - | - |
| Catawba Capital Management | 7,340.0 | 6,205.0 | 5,615.0 | 5,615.0 | 4,715.0 | 4,765.0 | - | 4,765.0 |
| Caterpillar Investment Management Ltd | - | 34,084.3 | 33,384.3 | 33,884.3 | 33,884.3 | 33,484.3 | 33,884.3 | 33,684.3 |
| Caxton Associates, L.L.C. | - | - | - | 240,000.0 | 166,800.0 | - | - | - |
| Cazenove Fund Management Ltd | - | - | - | - | 302,327.9 | 325,262.9 | 315,177.9 | 351,244.3 |
| CCM Partners | 14,404.3 | 15,670.7 | 15,670.7 | 15,670.7 | 15,670.7 | 15,670.7 | 16,870.7 | 16,870.7 |
| CDC Investment Management Corp | - | 28,385.0 | 25,885.0 | 14,585.0 | 27,000.0 | 33,400.0 | - | - |
| Central Bank & Trust Company | - | - | - | - | - | - | - | - |
| Central Trust Bank/Mo | 3,840.0 | 4,152.9 | 4,332.9 | 4,642.9 | 5,142.9 | 5,642.9 | 4,895.0 | 4,895.0 |
| Centura Bank | 28,400.0 | 28,225.0 | 28,225.0 | 28,225.0 | 23,225.0 | 22,525.0 | - | - |
| CGU Asset Management Inc | 383,500.0 | 456,365.0 | 473,865.0 | 362,500.0 | 17,500.0 | 317,500.0 | - | - |
| Chapman Capital Management, Inc. | 5,500.0 | 3,700.0 | 30,100.0 | 23,300.0 | 26,200.0 | 21,000.0 | - | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | | As of the Quarter Ended | | | |
| Charter Oak Partners | - | - | - | - | - | - | 600,000.0 | 600,000.0 |
| Chartwell Investment Partners | - | 35,090.0 | 10,590.0 | - | 1,938,600.0 | 1,324,825.0 | 2,005,590.7 | 2,456,750.7 |
| Chemical Bank And Trust Company | 9,317.1 | 13,584.3 | 13,584.3 | 13,484.3 | 13,484.3 | 13,484.3 | 15,855.7 | 15,747.1 |
| Chesapeake Partners Management Co Inc./MD | 218,614.3 | - | 281,482.9 | 281,482.9 | - | - | - | - |
| Chevy Chase Bank | - | - | - | 61,452.9 | 62,052.9 | 466,065.0 | 915,655.0 | 453,414.3 |
| Chicago Asset Management Company | 780,545.0 | 497,062.1 | 433,730.0 | 428,987.1 | - | - | - | - |
| Chicago Equity Partners, LLC | - | 6,450.0 | 5,950.0 | 21,000.0 | 594,700.0 | 36,900.0 | 39,900.0 | 34,600.0 |
| Chilton Capital Management, L.P. | 92,845.0 | 96,412.9 | - | 115,802.9 | 102,677.9 | 56,385.0 | 56,832.1 | 54,570.7 |
| Chilton Investment Co. Inc. | - | - | - | - | - | - | - | 2,007,470.0 |
| Chittenden Corporation | 28,720.0 | 29,887.9 | 31,072.9 | 30,497.9 | 36,857.9 | 27,447.1 | 24,697.9 | 24,010.0 |
| Chubb Corporation (The) | - | 60,000.0 | 60,000.0 | 40,000.0 | 40,000.0 | 40,000.0 | 40,000.0 | - |
| Church Capital Management, Inc. | - | - | - | - | 4,135.7 | - | - | 5,065.0 |
| Churchill Management Corp | - | - | - | 3,685.0 | - | - | - | - |
| CIBC World Market Corporation | 290,440.7 | 202,495.7 | 324,335.0 | 325,140.7 | - | 306,410.7 | 295,514.3 | 318,720.7 |
| Cigna Corporation | 527,719.3 | 582,197.9 | 604,649.3 | - | - | - | - | - |
| Citadel Advisors LLC | 3,612,500.0 | - | - | - | - | 336,392.1 | 287,515.0 | - |
| Citigroup Inc. | 17,016,000.0 | 15,949,859.3 | 10,524,552.9 | 11,514,864.3 | 13,084,069.3 | 14,709,859.3 | 15,800,542.1 | 16,098,984.3 |
| Citizens Bank Wealth Management, N.A. | 58,722.1 | 73,147.9 | 259,877.9 | 63,155.7 | 165,140.0 | 162,680.0 | 162,374.3 | 162,134.3 |
| City Capital Inc. | - | - | - | - | 26,709.3 | 29,304.3 | 47,440.0 | 46,710.0 |
| City National Bank, City National Investments | - | 30,579.3 | 10,120.0 | 9,705.7 | 11,130.7 | 11,130.7 | 12,869.3 | 11,860.7 |
| Claiborne Capital Management, L.P. | - | - | - | - | - | - | - | 150,000.0 |
| Clifford Associates, Inc. | 4,100.0 | 4,000.0 | 4,000.0 | 4,000.0 | 4,000.0 | - | - | - |
| Cna Financial Corporation | - | 80,000.0 | 80,000.0 | 80,000.0 | 90,000.0 | 70,000.0 | - | - |
| Cobblestone Capital Advisors LLC | - | - | 3,584.3 | 4,227.1 | 4,227.1 | - | - | 9,565.7 |
| Cogan, John F. Jr., Trustee/Hale And Dorr | 9,965.0 | 7,960.0 | 7,960.0 | 7,555.0 | 2,765.0 | 2,765.0 | 2,765.0 | 2,765.0 |
| Cohen, Klingenstein & Marks Incorporated | 2,596,555.0 | 2,565,877.1 | 2,478,034.3 | 2,358,555.0 | 2,300,335.7 | 2,235,929.3 | 2,253,042.1 | 2,461,270.7 |
| Colonial Management Associates, Inc | 50,575.0 | 52,885.0 | 54,275.0 | 36,425.0 | - | - | 183,800.0 | 1,349,900.0 |
| Colorado Public Employees Retirement Assn (Pera) | 861,600.0 | 947,092.1 | 1,153,592.1 | 939,492.1 | 896,492.1 | 870,592.1 | 941,992.1 | 853,300.0 |
| Colorado State Bank And Trust | 5,500.0 | 4,800.0 | 4,800.0 | 6,180.0 | 6,180.0 | 5,150.0 | - | 5,075.0 |
| Columbia Management Co | 370,327.9 | 4,473,782.9 | 5,851,354.3 | 5,047,049.3 | 5,381,080.0 | 3,956,305.0 | 3,513,630.0 | 2,570,855.0 |
| Columbus Circle Investors | - | 373,100.0 | 1,172,700.0 | 1,287,375.0 | 8,085.0 | - | - | - |
| Comerica, Inc. | 541,292.1 | - | - | - | - | - | - | - |
| Commerce Bank N.A. (Missouri) | 328,950.0 | 316,415.7 | 293,150.7 | 233,977.9 | 230,370.7 | 228,422.9 | 233,107.1 | 224,562.1 |
| Commerce Bank N.A. (Peoria, Illinois) | 8,442.9 | 8,242.1 | 8,242.1 | 8,587.1 | 8,587.1 | 8,587.1 | 1,110.0 | 1,110.0 |
| Commerce Bank N.A. (Wichita, Kansas) | - | 90.0 | 90.0 | - | - | - | - | - |
| Compass Bank | 8,315.0 | 9,130.7 | 10,000.7 | 10,000.7 | 17,500.7 | 18,005.7 | 13,105.0 | 12,655.0 |
| Concord Investment Company | 342,815.0 | 344,255.7 | 35,960.0 | 36,127.1 | 36,127.1 | 38,655.0 | - | - |
| Condor Capital Management | 32,580.7 | 5,455.0 | - | - | - | - | - | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | As of the Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Conestoga Capital Advisors, LLC | - | - | - | - | - | - | - | 5,325.7 |
| Connable Office, Inc. (The) | 239,505.7 | 240,005.7 | 242,002.9 | 232,047.1 | 232,247.1 | 231,985.7 | 232,485.7 | 231,760.7 |
| Conning Asset Management Company | 93,587.9 | 216,915.0 | 172,645.0 | 190,570.0 | 132,039.3 | 134,010.0 | 132,634.3 | 130,087.9 |
| Connors Investor Services, Inc. | 117,795.0 | 118,945.7 | 115,310.7 | 112,512.1 | 111,010.7 | 107,810.0 | 107,450.0 | 112,187.9 |
| Conseco Inc. | - | 23,810.0 | 42,730.0 | - | - | - | - | - |
| Cooke & Bieler, LLC | 1,000.0 | 1,000.0 | - | - | - | - | - | - |
| Coolidge, Francis L. | 12,325.0 | 28,465.0 | 28,465.0 | 28,465.0 | 28,465.0 | 18,112.9 | 18,112.9 | 18,112.9 |
| Copper Mountain Trust Company | 60,829.3 | 43,254.3 | 16,625.0 | 10,997.1 | - | - | - | - |
| Cornercap Investment Counsel, Inc. | - | - | - | - | - | - | - | 10,000.0 |
| Cornerstone Advisors, Inc. | - | - | - | - | - | - | - | 11,900.0 |
| Cornerstone Capital Management, Inc. | - | - | - | - | - | - | 26,880.0 | - |
| Cornish, John M. | 37,840.0 | 40,237.9 | 40,237.9 | 40,562.9 | 40,282.9 | 40,282.9 | 79,565.7 | 37,832.1 |
| Courier Capital Coporation | 26,925.0 | - | - | 20,512.1 | - | - | - | - |
| Crawford Investment Counsel, Inc. | 39,187.9 | 39,575.0 | 54,575.0 | 59,627.9 | 61,925.0 | 64,812.9 | 64,812.9 | 67,112.9 |
| Credit Suisse Asset Management | 6,257,465.7 | 5,598,977.1 | 5,822,767.1 | 4,585,989.3 | 4,530,427.9 | 4,424,977.9 | 4,821,445.7 | 4,348,457.9 |
| Credit Suisse First Boston Corporation | 1,457,864.3 | 1,708,045.7 | 1,956,115.0 | 1,300,522.9 | 1,060,195.7 | 982,557.9 | 916,269.3 | 1,648,630.7 |
| CSI Capital Management Inc. | 26,400.0 | 26,400.0 | 26,400.0 | 26,400.0 | 26,400.0 | 28,500.0 | 29,000.0 | 29,000.0 |
| Cullen/Frost Bankers, Inc | 77,734.3 | 65,147.9 | 275,640.7 | 331,592.1 | 294,374.3 | 287,864.3 | 287,345.0 | 166,087.9 |
| Cutler & Company, LLC | 4,000.0 | 7,504.3 | 7,504.3 | 7,504.3 | - | - | - | - |
| Cypress Asset Management, Inc. | 27,310.0 | 55,830.0 | 62,940.0 | 67,490.0 | 79,325.0 | 76,725.0 | 59,915.0 | 19,845.0 |
| D.A. Davidson & Co. | - | - | - | - | - | - | - | 6,555.0 |
| Dai-Ichi  Life Insurance Company Limited | 349,985.0 | 312,529.3 | 310,462.1 | 350,857.9 | 312,137.9 | 309,207.1 | 356,022.9 | 71,199.3 |
| Dane, Falb, Stone & Company, Inc. | 24,514.3 | 24,395.0 | 23,680.7 | 21,267.9 | 21,267.9 | 21,267.9 | 20,910.7 | 20,910.7 |
| Dassori (F. Davis), Jr. | 40,962.9 | 38,634.3 | - | 38,634.3 | 37,442.1 | 37,442.1 | 37,442.1 | 28,592.1 |
| Davenport & Company LLC/VA | 25,227.9 | 26,124.3 | 22,845.0 | 27,340.0 | 25,995.0 | 26,642.9 | 18,994.3 | 20,385.0 |
| Davidson & Garrard Inc | 39,305.7 | 36,155.0 | 35,937.1 | 34,625.7 | 34,517.9 | 32,687.9 | 25,242.9 | 27,454.3 |
| Davidson Investment Advisors | 206,302.1 | - | - | - | - | - | - | - |
| Davidson Trust Company | - | - | - | - | - | - | - | 45,099.3 |
| Davidson Trust Company/Pa | 6,300.0 | 6,580.7 | 6,580.7 | 6,480.7 | 6,124.3 | 6,124.3 | 5,444.3 | 5,444.3 |
| Davis Selected Advisers, LP | 1,595,000.0 | 1,619,105.0 | 1,583,432.1 | 1,615,809.3 | 1,580,440.0 | 1,625,822.1 | 3,296,772.1 | 3,469,950.0 |
| Davis, R.M., Inc. | 5,960.0 | 4,800.0 | 5,000.0 | 5,315.0 | 5,309.3 | - | - | - |
| DCF Capital, L.L.C. | 524,655.0 | 277,315.0 | 412,315.0 | 207,315.0 | 12,315.0 | 12,315.0 | 125,315.0 | - |
| De Garmo & Kelleher | 4,500.0 | 4,635.0 | 4,635.0 | 4,635.0 | 4,705.0 | 4,705.0 | 6,699.3 | 7,067.1 |
| Dean (C.H.) & Associates, Inc. | - | - | - | - | - | - | 14,652.9 | 13,030.0 |
| Dearden, Maguire, Weaver & Barrett Inc. | 4,670.7 | - | - | 4,270.7 | 5,790.7 | 5,855.7 | 5,357.1 | 15,282.1 |
| Deephaven Capital Management, LLC | - | - | - | - | - | - | 39,000.0 | 44,400.0 |
| Deere & Company | 117,647.1 | 117,647.1 | 117,647.1 | 165,047.1 | 165,047.1 | 165,047.1 | 165,047.1 | 165,047.1 |
| Delaware Capital Management | 155,087.9 | - | - | - | - | - | - | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| | | | | | As of the Quarter Ended | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Delaware Management Business Trust | 2,325,500.0 | 90,800.0 | 98,367.1 | 63,680.7 | 62,515.0 | 88,115.0 | 90,925.0 | 131,180.0 |
| Deltec Asset Management LLC | - | - | - | - | - | 1,250.0 | 1,250.0 | 1,250.0 |
| Denver Investment Advisors LLC | 12,990.0 | 37,640.0 | 45,690.0 | 46,347.1 | 50,184.3 | 58,520.0 | 52,239.3 | 74,787.9 |
| Deprince, Race & Zollo, Inc. | 158,925.7 | - | - | - | - | - | 126,100.0 | 347,900.0 |
| DG Capital Management, Inc. | - | - | - | - | - | - | - | 160,000.0 |
| Diamond Capital Management Inc. | - | - | - | - | - | - | - | - |
| Dimensional Fund Advisors LP | - | 338,100.0 | 341,600.0 | 346,500.0 | 346,200.0 | 363,500.0 | 361,900.0 | 392,582.9 |
| Disciplined Investment Advisors | 92,500.7 | 108,632.1 | 126,292.1 | 33,519.3 | 300.0 | - | - | - |
| Dixon, Hubard & Feinour & Brown Inc. | 11,125.0 | 11,860.0 | 11,860.0 | 11,560.0 | 11,560.0 | 10,760.0 | 8,575.0 | 7,250.0 |
| Dlibj Asset Management Co., Ltd. | - | 147,614.3 | 152,415.0 | 158,590.7 | 196,215.0 | 194,362.1 | 186,652.1 | 99,257.1 |
| DNB Nor Asset Management (Us), Inc. | - | - | - | - | 1,111,060.0 | 1,134,190.0 | 685,600.0 | 717,300.0 |
| Dodge & Cox Inc | 7,290,590.7 | 8,933,967.1 | 6,314,305.7 | 6,256,969.3 | 6,109,872.1 | 6,441,927.9 | 8,422,510.0 | 9,005,642.1 |
| Doerge & Smith Private Advisory, LLC | - | - | - | - | - | - | 900.0 | 1,405.0 |
| Doolittle (William G) Investment Counselor | - | 4,730.7 | 4,730.7 | 4,730.7 | 4,730.7 | 4,730.7 | - | - |
| Dowling & Yahnke Inc. | - | - | - | 15,132.1 | 15,269.3 | 19,584.3 | 20,557.9 | 19,925.7 |
| Dreman Value Management, L.L.C. | 8,972.9 | 8,972.1 | 8,972.1 | 8,972.1 | 8,972.1 | 8,972.1 | 8,972.1 | 19,472.1 |
| Dresdner Bank AG | 316,947.1 | 414,010.7 | 652,092.9 | 1,370,567.1 | 1,194,809.3 | 1,211,300.7 | 1,793,480.0 | 1,877,190.7 |
| Dresdner Rcm Global Investors LLC | - | 2,650,797.9 | 5,435,790.7 | 8,063,197.1 | 9,848,222.1 | 10,730,195.7 | 11,519,910.0 | 12,583,952.1 |
| Duff & Phelps Investment Management Company | - | 5,925.0 | 6,310.0 | 6,310.0 | 6,230.0 | 6,660.0 | 6,930.0 | 6,930.0 |
| Duncan-Hurst Capital Management | - | 230.0 | - | - | - | - | - | - |
| Duncker, Streett & Co., Inc. | - | 11,640.0 | 11,640.0 | 11,640.0 | - | 7,000.0 | 7,000.0 | - |
| Dupont Capital Management | - | - | 58,500.0 | 17,200.0 | 29,000.0 | 53,900.0 | 605,700.0 | 927,700.0 |
| Duquesne Capital Management, LLC | - | - | 400,000.0 | 100,000.0 | - | - | - | - |
| Eagle Asset Management, Inc. | 334,335.7 | 337,800.0 | 590,397.9 | 618,575.0 | 741,524.3 | 649,144.3 | 1,083,192.9 | 990,137.1 |
| Eastern Bank & Trust Company | - | - | - | 3,700.0 | - | - | - | 5,092.1 |
| Eaton Vance Management | 2,523,594.3 | 2,525,455.0 | 2,591,335.0 | 2,613,402.9 | 2,611,727.9 | 2,604,867.9 | 2,604,867.9 | 3,396,549.3 |
| Edgewood Management Company | 4,000.0 | 5,475.0 | 5,475.0 | 5,475.0 | 5,475.0 | 5,475.0 | 5,475.0 | 5,725.0 |
| Edinburgh Fund Managers PLC | 102,912.9 | 101,309.3 | 264,984.3 | 290,499.3 | 300,189.3 | 298,359.3 | 300,859.3 | 295,945.0 |
| Edwards, A.G., Inc. | 15,994.3 | 67,390.0 | 90,147.9 | 85,850.0 | 77,544.3 | 81,032.9 | 84,347.1 | 84,322.9 |
| EGM Capital | - | - | - | - | - | 28,500.0 | 29,000.0 | 29,000.0 |
| Ehrman (William) | 28,760.7 | 21,225.0 | 21,225.0 | - | 25,000.0 | - | - | - |
| Elias Asset Management Inc. | 3,535.0 | - | - | - | - | - | - | - |
| Elliott & Associates, Inc. | 41,500.0 | 41,017.1 | 36,200.0 | 36,270.7 | 34,270.7 | 33,070.7 | - | - |
| Employees Retirement System of Texas | - | 458,102.9 | 813,702.9 | 1,368,202.9 | 1,559,500.0 | 1,185,500.0 | 1,182,100.0 | 1,266,100.0 |
| Endex Capital Management LLC | 17,612.1 | 17,562.1 | 17,612.1 | 11,190.7 | 11,190.7 | 11,190.7 | 11,190.7 | - |
| Engebretson Capital Management, Inc. | - | - | - | - | - | - | - | 385.0 |
| Engemann Asset Management | 2,019,994.3 | 2,376,282.1 | 3,929,904.3 | 3,967,195.7 | 4,153,985.0 | 2,510,337.1 | 2,308,702.9 | 2,195,237.9 |
| Entrust Capital Inc. | - | - | 4,195.0 | 4,195.0 | 4,195.0 | 4,545.0 | - | - |

177

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| | | | | As of the Quarter Ended | | | | |
|---|---|---|---|---|---|---|---|---|
| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Equinox Capital Management | - | - | - | - | - | - | 309,400.0 | 68,500.0 |
| Equitrust Investment Management Services, Inc. | - | - | - | - | - | 46,577.1 | 67,105.0 | 71,872.1 |
| Essex Investment Management Co Inc | - | - | - | - | - | - | - | - |
| Estabrook Capital Managemen  LLC | 23,697.1 | 23,797.1 | 25,585.0 | 26,457.1 | 25,487.1 | 26,289.3 | 24,305.7 | 24,370.7 |
| Eveans, Bash, Magrino & Klein, Inc. | 98,817.9 | - | 95,520.7 | 74,470.0 | 67,492.9 | 62,477.9 | 88,245.7 | 83,994.3 |
| Exxonmobil Investment Management, Inc. | 241,695.0 | 241,195.0 | 226,805.7 | 229,790.7 | 254,102.9 | 250,202.9 | 251,582.9 | 256,325.0 |
| Fahnestock & Company | 9,162.9 | 8,799.3 | 9,199.3 | 14,829.3 | 14,629.3 | 8,629.3 | 38,902.9 | - |
| Fairfield Research Corp | - | 1,014.3 | 1,004.3 | 1,004.3 | - | - | - | - |
| Fairport Asset Management, LLC | - | 19,925.0 | 48,525.0 | 78,025.0 | 77,325.0 | 69,375.0 | 57,372.9 | - |
| Family Capitl Fiduciary LLC | - | - | - | - | - | - | 2,260.0 | 2,260.0 |
| Farallon Capital Management LLC | 1,400,184.3 | - | 830,424.3 | 730,300.0 | 730,300.0 | - | - | - |
| Farrell Sl Investment Management Inc. | - | - | 18,700.0 | 18,700.0 | - | - | - | - |
| FCA Corporation | - | - | - | - | - | - | - | 15,150.0 |
| Federated Investors, Inc. | 2,468,255.0 | 2,530,412.1 | 2,630,012.1 | 2,871,312.1 | 2,101,622.9 | 1,894,110.7 | 1,653,612.1 | 3,292,270.0 |
| Ferguson, Wellman, Rudd, Purdy & Van Winkle, Inc | 17,015.0 | 18,829.3 | 17,820.0 | 17,620.0 | 18,829.3 | 17,140.7 | 16,595.7 | 16,695.7 |
| Fidgeon, Timothy F. | - | - | - | 13,920.0 | 13,920.0 | 13,920.0 | 13,720.0 | 13,720.0 |
| Fiduciary Asset Management, LLC | 11,662.1 | 8,900.0 | 112,939.3 | 20,089.3 | 18,889.3 | 24,689.3 | 24,689.3 | 137,314.3 |
| Fiduciary Management Associates Inc | 119,000.0 | 68,950.0 | 152,325.0 | 153,825.0 | 96,155.0 | - | - | - |
| Fiduciary Services Corporation | 15,027.1 | 16,280.0 | 15,377.9 | 15,377.9 | 14,782.9 | 14,782.9 | 14,690.7 | 14,345.7 |
| Fiduciary Trust Company (Mass) | 101,467.1 | 101,797.9 | 105,005.0 | 103,537.1 | 103,490.0 | 104,592.1 | 104,992.1 | 104,990.7 |
| Fifth Third Bancorp | 307,495.0 | 304,194.3 | 306,857.9 | 314,835.0 | 5,544,527.1 | 4,846,300.0 | 4,697,647.9 | 2,719,487.1 |
| Fifth Third Bank/Mi | 4,316,745.7 | 5,115,725.7 | 5,114,372.1 | 5,064,970.0 | 5,001,425.0 | 4,292,429.3 | 4,145,717.1 | - |
| FIL Ltd | 56,340.0 | 154,310.0 | 41,532.1 | 91,340.0 | 76,485.7 | 521,085.0 | 143,200.0 | 143,200.0 |
| Financial Counselors, Inc. | 5,000.0 | 5,000.0 | 5,000.0 | 5,000.0 | 7,100.0 | 7,200.0 | 7,325.0 | 7,194.3 |
| Financial Management Advisors, Inc. | - | - | - | - | - | 83,750.0 | 74,425.0 | 30,450.0 |
| First American Trust Company | 52,062.9 | 48,587.9 | - | 38,410.7 | 36,335.7 | - | - | - |
| First Citizens Bank & Trust Company | 18,920.0 | - | 682,245.0 | - | 627,845.0 | 666,555.7 | 934,139.3 | 311,757.1 |
| First Financial Bank, N.A. | 17,105.7 | - | 16,855.7 | 18,030.0 | 16,910.0 | 100,007.1 | 103,862.1 | 123,862.1 |
| First Horizon National Corp | 47,382.9 | 46,515.0 | 58,059.3 | 77,292.1 | 115,597.1 | 147,992.1 | 191,792.1 | 168,175.0 |
| First Interstate Bank | 15,315.0 | 16,840.0 | 17,365.0 | 16,547.1 | 19,822.1 | 17,897.1 | 19,847.1 | 19,790.7 |
| First Investors Management Company, Inc | 150,715.0 | 141,214.3 | 141,214.3 | 219,814.3 | 232,000.0 | - | 335,000.0 | 324,800.0 |
| First Manhattan Company | - | 70,612.1 | 29,612.1 | 6,612.1 | 47,962.1 | 54,637.9 | 1,121,942.1 | 1,131,895.0 |
| First National Bank of Chester County | - | - | - | - | - | - | - | - |
| First National Bank of Omaha | 5,945.0 | - | 7,309.3 | 7,309.3 | 7,309.3 | 6,359.3 | 55,819.3 | 10,025.0 |
| First National Trust Company | - | 3,890.0 | 3,890.0 | - | - | - | - | 5,735.0 |
| First Quadrant L.P. | 78,500.0 | 130,630.0 | 29,140.0 | 29,240.0 | 124,140.0 | 31,140.0 | 31,340.0 | 34,965.0 |
| First Security Bank | 124,815.0 | 123,635.7 | 150,694.3 | - | - | - | - | - |
| First Source Bank | 16,484.3 | 15,760.0 | 15,860.0 | 15,310.0 | 15,310.0 | 15,037.9 | 15,037.9 | 15,037.9 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| First State Investment Management Uk Ltd | - | - | 6,820.0 | - | - | - | - | - |
| First Virginia Bank | - | 7,975.0 | 10,452.9 | 9,952.9 | 14,752.9 | 21,662.9 | 25,462.9 | 27,987.9 |
| Firstmerit Bank N.A., Trustee | 137,032.9 | 135,710.7 | 133,922.1 | 148,060.7 | 157,952.1 | 161,027.9 | 168,155.7 | 157,054.3 |
| Fisher Investments, Inc. | 16,980.7 | 16,580.7 | 16,592.1 | 19,279.3 | 15,244.3 | 15,365.7 | 15,990.7 | 15,410.7 |
| Fishman (Jay A.), Ltd. | 1,688,647.9 | 1,706,880.7 | 1,675,762.1 | 1,671,485.0 | 1,660,172.1 | 1,895,090.0 | 1,928,129.3 | 1,907,974.3 |
| Fleetboston Financial Corporation | 3,346,872.1 | 2,745,045.0 | 3,626,720.7 | 3,653,542.1 | 4,490,357.1 | 4,969,080.7 | 5,043,495.7 | 4,880,597.1 |
| Fleiss, Karen M. | - | - | - | 20,000.0 | - | - | - | - |
| Florida State Board of Administration | 1,427,302.1 | 1,691,100.7 | 1,832,100.7 | 2,359,100.7 | 2,508,000.7 | 2,508,500.7 | 2,533,300.7 | 3,165,800.7 |
| FMR LLC | 2,137,735.0 | 18,141,742.9 | 29,225,312.1 | 30,424,514.3 | 14,737,792.1 | 20,990,450.0 | 17,879,055.0 | 27,834,129.3 |
| Forbes, J.M. & Company | 33,665.7 | - | - | - | 20,809.3 | - | - | - |
| Forstmann Asset Management LLC | - | - | - | - | - | - | - | 50,500.0 |
| Forstmann-Leff Associates LLC | 29,750.0 | 313,655.7 | 28,440.7 | 36,440.7 | - | - | - | - |
| Fort Washington Investment Advisors, Inc. | - | - | - | 49,700.0 | 72,025.0 | - | 20,725.0 | 22,725.0 |
| Franklin Resources, Inc | 6,379,485.7 | 6,088,554.3 | 4,412,589.3 | 4,427,847.1 | 5,418,739.3 | 5,689,394.3 | 10,197,664.3 | 10,513,045.0 |
| Franklin Street Advisors, Inc. | 246,404.3 | 3,870.0 | - | 6,440.0 | - | - | - | - |
| Freeman Associates Investment Management, LLC | 17,434.3 | 97,842.9 | 159,342.9 | 79,872.1 | 60,772.1 | 60,772.1 | 55,172.1 | 54,072.1 |
| Fremont Investment Advisors, Inc. | - | 23,000.0 | 29,000.0 | 35,970.0 | 32,970.0 | 40,970.0 | 34,832.9 | 32,760.7 |
| Friends Ivory & Sime, Inc. | - | - | 94,100.0 | 647,250.0 | 815,040.0 | - | - | - |
| Froley, Revy Investment Company Inc | - | - | - | - | - | - | - | 98,724.3 |
| Frontier Capital Management Company Inc | - | - | 8,505.0 | 45,205.0 | 39,805.0 | 6,400.0 | 18,600.0 | 24,200.0 |
| Frye-Louis Capital Management, Inc. | 22,197.9 | 21,679.3 | 22,110.0 | 23,867.1 | 25,780.0 | 24,325.7 | 23,740.7 | 13,840.7 |
| Fulton Breakefield Broenniman, LLC | - | 0.7 | - | - | - | - | - | - |
| Fulton Financial Advisors, NA | 33,207.9 | 40,577.1 | 41,614.3 | 20,749.3 | 17,297.1 | 17,374.3 | 18,402.9 | 18,202.9 |
| Fund Asset Management Inc | 10,403,915.0 | 54,817.9 | 53,307.1 | - | - | - | - | - |
| Furman Selz Capital Management, LLC. | 192,600.0 | - | - | - | - | - | 141,902.9 | 156,002.1 |
| Gabelli Funds, LLC | 2,367,800.0 | 80,000.0 | 80,000.0 | 75,000.0 | 72,000.0 | 72,000.0 | 72,000.0 | 72,000.0 |
| Gabriel Capital Corp. | - | - | 176,865.7 | - | 187,544.3 | 276,295.7 | 284,704.3 | - |
| Galleon Management L.P. | 357,000.0 | 150,000.0 | - | 500,000.0 | - | - | 195,000.0 | 200,000.0 |
| GAM USA, Inc. | 79,000.0 | - | - | - | - | - | 79,000.0 | 79,000.0 |
| Gamble Jones Investment Counsel | 49,940.0 | 49,065.0 | 59,432.1 | 59,315.0 | 57,627.1 | 57,227.1 | 57,035.7 | 56,972.1 |
| Gamco Investors Inc | 213,730.0 | - | - | 7,457.1 | - | - | - | - |
| Gannett Welsh & Kotler, Inc. | 11,000.0 | 11,000.0 | 11,000.0 | 11,297.1 | 11,297.1 | 11,297.1 | 11,297.1 | 11,297.1 |
| Gardner Lewis Asset Management, Inc. | - | 4,132.1 | 7,232.1 | 7,232.1 | 9,032.1 | - | - | - |
| Gardner Russo & Gardner | - | - | - | - | - | 200.0 | 200.0 | 500.0 |
| Garrison Institutional Asset Management | 30,205.0 | 54,965.0 | 58,265.7 | 84,465.7 | 88,360.7 | 89,585.7 | 53,510.7 | 83,310.7 |
| Garrison, Bradford & Associates, Inc. | 4,750.0 | 4,750.0 | 4,750.0 | 4,500.0 | - | - | - | - |
| Gartmore Investment Management, PLC | - | 244,972.9 | 239,944.3 | 1,778,725.7 | 626,357.9 | 310,429.3 | 441,254.3 | 454,699.3 |
| Gartmore Mutual Fund Capital Trust | 1,348,600.0 | 787,165.7 | 803,699.3 | 1,481,799.3 | 420,729.3 | 96,039.3 | 183,409.3 | 191,705.7 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | | As of the Quarter Ended | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Gateway Investment Advisors, Inc. | 198,299.3 | 204,764.3 | 223,730.0 | 223,237.9 | 242,682.1 | 231,515.7 | 228,087.9 | 206,620.0 |
| Geewax, Terker & Company | 26,440.0 | 34,662.1 | 34,552.1 | 1,823,155.7 | 1,278,430.0 | 805,440.0 | 205,050.0 | - |
| General Electric Company | 1,941,475.7 | 2,144,840.0 | 1,845,860.0 | 1,816,365.7 | 1,797,642.9 | 1,809,645.0 | 2,118,697.1 | 3,451,019.3 |
| General Motors Investment Management Corporation | 305,815.7 | 363,494.3 | 192,210.7 | 192,284.3 | 193,584.3 | 192,384.3 | 116,684.3 | 33,984.3 |
| General Re-New England Asset Management, Inc. | 2,300.0 | - | 4,100.0 | 3,690.0 | 2,490.0 | 5,890.0 | 5,890.0 | 8,712.9 |
| Gilkison Patterson Investment Advisors Inc | 18,235.7 | 18,532.1 | 18,532.1 | 18,460.0 | 18,460.0 | 18,287.9 | 18,287.9 | 21,132.1 |
| Glenmede Trust Company (The) | 176,310.0 | - | 178,480.7 | 381,812.9 | 348,132.9 | 263,975.0 | 226,209.3 | 202,647.1 |
| Glens Falls National Bank & Trust Company | 7,070.0 | 6,970.0 | 7,770.0 | 7,370.0 | 6,670.0 | 5,670.0 | 5,470.0 | - |
| Glenview Capital Management, LLC | - | - | - | - | - | - | - | 705,000.0 |
| Global Strategy Financial Inc. | - | - | - | 92,000.0 | - | - | - | - |
| Globeflex Capital, L.P. | - | - | 35.0 | 35.0 | 3,110.0 | - | - | - |
| Glynn (J.A.) & Co. | 11,812.1 | 11,192.1 | 11,942.1 | - | - | - | - | - |
| Gofen & Glossberg LLC | 78,072.1 | 73,669.3 | 72,319.3 | 69,632.9 | 70,767.1 | 69,194.3 | 66,394.3 | 66,094.3 |
| Golden Capital Management, LLC | - | - | - | - | - | 3,500.0 | - | 3,500.0 |
| Goldman Sachs Group Inc | 2,267,462.9 | 1,540,452.1 | 1,621,392.9 | 1,975,309.3 | 1,942,442.9 | 1,698,040.0 | 1,038,449.3 | 1,063,517.1 |
| Grantham Mayo Van Otterloo & Company | 122,960.0 | 146,959.3 | 353,759.3 | 746,559.3 | 608,740.7 | 23,540.7 | 43,240.7 | 10,000.0 |
| Greenleaf Trust | 161,560.0 | 191,817.9 | 189,837.1 | 187,497.1 | 209,797.9 | 396,100.7 | 364,975.0 | 2,036,319.3 |
| Greenwood Capital Associates, Inc. | - | - | 3,425.0 | - | - | - | - | - |
| Greystone Investment Management, LLC | - | - | - | - | - | - | - | - |
| Gries Financial Inc | - | - | - | 12,200.0 | 12,300.0 | 12,300.0 | - | - |
| Griffin Asset Management LLC | 12,820.0 | 15,254.3 | 15,254.3 | 19,025.0 | 19,025.0 | 19,025.0 | 20,625.0 | - |
| Gruntal & Co., L.L.C. | - | 15,225.0 | 15,609.3 | 23,344.3 | 23,162.9 | 23,769.3 | 19,079.3 | 19,747.9 |
| Guaranty Trust Company of Missouri (The) | 134,369.3 | 139,027.9 | 138,689.3 | 140,487.1 | 137,947.9 | 137,294.3 | 143,665.7 | 144,720.7 |
| Guardian Investor Services LLC | 15,515.0 | 31,472.1 | 51,025.0 | 51,025.0 | 51,025.0 | 74,035.7 | 78,884.3 | 78,884.3 |
| Guyasuta Investment Advisors Incorporated | 5,450.0 | 5,450.0 | 5,050.0 | 5,050.0 | 5,922.9 | 7,902.9 | 8,412.9 | 10,372.9 |
| Gw Capital Management, LLC | 306,152.1 | 361,722.9 | 372,097.9 | 359,172.9 | 325,855.0 | 276,650.7 | 263,454.3 | 248,979.3 |
| Haberer Registered Investment Advisor, Inc. | 5,725.0 | 7,227.9 | 7,227.9 | 6,967.9 | 7,022.9 | 6,687.9 | 6,687.9 | 6,204.3 |
| Hale & Dorr Capital Management, LLC | - | - | - | - | - | - | - | - |
| Halsey Associates, Inc. | 42,460.0 | 74,960.0 | 75,985.0 | 75,435.0 | 75,485.0 | 75,585.0 | 92,360.0 | 99,760.0 |
| Hammer (Roy A.) Esq | 12,700.0 | 13,400.0 | 23,780.7 | 23,537.9 | 23,232.9 | 21,524.3 | 18,024.3 | - |
| Hancock Bank Trust Department | 8,240.0 | 8,240.0 | 8,240.0 | 8,990.0 | 8,890.0 | 8,890.0 | 8,740.0 | - |
| Handelman (Meyer) Company | - | 395,255.7 | 393,297.9 | 392,897.9 | 379,597.9 | 372,112.9 | 372,112.9 | 372,112.9 |
| Hansberger Global Investors, Inc. | 79,730.0 | 4,165.0 | 4,165.0 | 4,165.0 | 4,165.0 | 48,665.0 | 51,265.0 | 69,165.0 |
| Harbor Capital Management Inc | - | 11,480.0 | 16,980.0 | 16,980.0 | 16,400.0 | 16,400.0 | 18,700.0 | 16,400.0 |
| Harris,Bretall,Sullivan & Smith, L.L.C. | - | - | 11,900.0 | - | 1,865,860.7 | 1,673,895.7 | 1,652,182.1 | 498,739.3 |
| Hartford Investment Management Company Inc. | 343,715.0 | 375,217.9 | 375,817.9 | 399,817.9 | 367,717.1 | 370,917.1 | 368,917.1 | 427,075.7 |
| Harvard College (President & Fellows of) | 1,175,427.9 | 1,426,310.0 | 1,326,310.0 | 532,310.0 | 283,310.0 | 792,910.0 | 652,600.0 | 157,047.9 |
| Harvest Management, LLC | 495,600.0 | - | - | - | - | - | - | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | As of the Quarter Ended | | | | |
| Haven Capital Management Inc | 22,134.3 | 22,134.3 | 25,134.3 | 23,349.3 | 17,349.3 | 17,349.3 | 17,349.3 | 18,149.3 |
| Henderson Fund Management PLC | - | - | - | - | - | - | 1,198,237.1 | - |
| Henssler (G.W.) & Associates, Ltd. | - | - | - | - | - | - | - | - |
| Heritage Investors Management Corporation | 3,420.0 | - | - | - | - | - | - | - |
| Hermes Pensions Management Ltd | - | 438,837.9 | 389,947.1 | 365,552.9 | 365,552.9 | - | - | - |
| Hester Capital Management, L.L.C. | 28,600.7 | 34,930.7 | 33,770.0 | 34,270.0 | 34,920.0 | 34,820.0 | - | - |
| Hibernia National Bank | 152,032.9 | 124,815.7 | 87,825.0 | 71,270.0 | 60,870.0 | 55,025.0 | 43,257.9 | 37,702.9 |
| High Point Bank & Trust Company | - | - | - | - | - | 7,122.1 | 7,122.1 | 6,922.1 |
| Highland Capital Management Corporation | 18,314.3 | 18,020.0 | 47,170.0 | 567,410.0 | 904,065.0 | 1,235,695.0 | 1,525,552.1 | 1,599,167.1 |
| Highline Capital Management, LLC | - | - | - | - | - | - | - | 146,700.0 |
| Hintz, Holman & Hecksher, Inc. | - | - | 569,700.0 | - | - | - | - | - |
| Holderness Investments Company | - | - | - | - | - | - | 33,204.3 | 36,425.0 |
| Holland Capital Management, LLC | - | 73,687.9 | 73,837.9 | 78,087.9 | 78,137.9 | 99,940.0 | 174,265.0 | 306,450.0 |
| Horizon Asset Management, Inc./NY | 10,320.7 | 10,620.7 | 10,620.7 | 10,545.7 | 9,945.7 | 13,245.7 | 35,430.0 | 47,589.3 |
| Howard Capital Management | 8,060.0 | 8,000.0 | 35,400.0 | 54,700.0 | 51,300.0 | 51,300.0 | 26,500.0 | 23,200.0 |
| Howard Hughes Medical Institute | 416,500.0 | 70,000.0 | 120,000.0 | 60,000.0 | - | - | - | - |
| Howland Capital Management | - | 3,940.0 | 3,640.0 | 3,640.0 | - | - | - | - |
| HSBC Bank USA - IM | - | - | 3,550.0 | 3,550.0 | - | - | - | - |
| HSBC Holdings PLC | 365,785.0 | 279,195.0 | 278,417.9 | 307,722.9 | 326,709.3 | 437,865.7 | 497,325.0 | 591,622.1 |
| Hughes Investment Management Company | - | 2,000.0 | 2,000.0 | 2,000.0 | 2,000.0 | 1,000.0 | - | - |
| Huntington National Bank | 238,240.7 | 263,842.1 | 254,594.3 | 185,745.7 | 146,890.0 | 134,635.0 | 135,910.7 | 141,705.0 |
| Husic Capital Management | - | 6,300.0 | - | - | - | - | - | - |
| HVB Capital Management, Inc | 16,699.3 | - | - | 10.7 | 10.7 | - | - | - |
| I.G. Investment Management, Ltd | 18,400.0 | 21,895.7 | 21,895.7 | 21,895.7 | 23,195.7 | 21,895.7 | 49,395.7 | 88,845.7 |
| IBM Retirement Plan | 1,009,714.3 | 942,072.1 | 943,985.7 | 959,182.1 | 1,011,865.7 | 991,390.0 | 1,009,510.0 | 1,001,499.3 |
| ICC Capital Management, Inc. | 137,000.0 | 117,000.0 | 68,200.0 | - | - | - | 1,132.1 | - |
| Independence Investment LLC/Ma    . | 5,012,247.9 | 4,670,355.7 | 5,902,914.3 | 3,064,870.0 | 2,025,900.0 | 1,819,500.0 | 2,989,300.0 | 2,654,900.0 |
| INGg Advisors, Inc. | - | - | - | - | 11,717.9 | 11,717.9 | 8,917.9 | - |
| ING Investment Management Advisors B.V. | - | - | - | 2,700.0 | 2,200.0 | - | - | 630.0 |
| ING Investment Management, LLC. | 45,000.0 | - | - | 92,220.0 | 52,700.0 | - | - | - |
| ING Investments, LLC | 120,500.0 | 157,679.3 | 34,700.0 | 39,420.0 | 25,400.0 | 27,800.0 | 179,900.0 | 179,420.0 |
| Ingalls & Snyder | 101,577.1 | 88,740.0 | 17,015.7 | 16,615.7 | 16,550.7 | 17,455.7 | 17,180.7 | 21,120.7 |
| Innovest Capital Management | - | 18,600.0 | 27,600.0 | 29,000.0 | 32,100.0 | 32,100.0 | 31,800.0 | 65,000.0 |
| Institutional Capital Corporation | 3,186,300.0 | 6,081,714.3 | 5,701,705.7 | 5,267,785.0 | 6,918,160.7 | 7,855,470.7 | 8,733,777.9 | - |
| Insurance Company of The West | - | - | - | - | - | - | - | - |
| Integra Bank N.A. | - | 4,337.9 | 4,337.9 | 4,337.9 | 4,100.0 | - | - | - |
| Intel Corporation | 220,972.1 | 277,829.3 | 278,129.3 | 278,129.3 | 332,929.3 | 380,829.3 | 405,229.3 | 395,729.3 |
| Intrepid Capital Management Inc/NY | 170,365.0 | 155,745.7 | 113,137.1 | 105,490.7 | 121,800.0 | 139,712.9 | 157,115.7 | 174,404.3 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | As of the Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Inverness Counsel, LLC | 5,040.0 | 5,897.9 | 5,607.9 | - | - | 5,707.9 | - | 4,707.9 |
| Invesco Asset Management Ltd. | - | - | - | 1,178,977.9 | 2,512,250.0 | 2,229,817.9 | 1,828,527.1 | 2,077,317.9 |
| Invesco Funds Group, Inc. | 3,141,100.0 | 2,298,222.9 | 5,360,522.9 | 5,829,122.9 | 5,776,162.9 | 3,606,667.1 | 2,885,994.3 | 5,050,774.3 |
| Invesco Institutional (N.A.), Inc. | 989,307.9 | 1,531,702.9 | 5,777,100.0 | 4,935,435.0 | 5,558,725.7 | 5,172,730.0 | 4,397,599.3 | 4,317,275.0 |
| Investment Counselors of Maryland | 16,450.0 | 7,450.0 | 15,450.0 | 15,450.0 | 15,450.0 | 15,450.0 | 15,450.0 | 6,350.0 |
| Investment Management of Virginia LLC | - | - | - | - | - | - | - | 6,120.0 |
| Irvine Capital Management, LLC | - | - | - | - | - | 10,000.0 | 15,000.0 | - |
| Jacobs & Company          , | 16,172.1 | 17,367.1 | 17,367.1 | 17,367.1 | 17,267.1 | 16,367.1 | 16,134.3 | 13,509.3 |
| Jacobs Levy Equity Management, Inc. | 87,800.0 | 821,954.3 | - | 8,700.0 | 27,300.0 | 16,700.0 | 8,100.0 | 1,034,170.0 |
| JAM Asset Management, L.P. | 54,859.3 | 39,204.3 | - | - | - | - | - | - |
| Janus Capital Management, LLC | 1,356,650.0 | 15,208,625.0 | 14,463,075.0 | 11,651,310.0 | 11,455,937.9 | 7,678,182.9 | 5,455,827.1 | 3,786,964.3 |
| Jemmco Investment Management LLC | - | - | - | - | 11,600.0 | - | 6,000.0 | |
| Jennison Associates LLC | 8,724,000.0 | 17,773,254.3 | 13,785,255.0 | 14,782,735.0 | 14,722,872.1 | 13,794,547.9 | 13,512,837.1 | 12,633,907.9 |
| Jensen Investment Management, Inc. | 2,610.0 | - | 2,160.0 | 2,160.0 | 2,160.0 | 2,535.0 | 2,235.0 | 2,235.0 |
| JL Advisors, LLC | - | - | - | - | - | - | - | 292,395.7 |
| Jmc Capital Management, Inc. | 24,150.0 | - | - | - | - | - | - | - |
| John Hancock Advisers, Inc. | 587,720.0 | 625,782.9 | 1,076,270.0 | 917,704.3 | 1,180,357.1 | 789,780.7 | 1,205,092.1 | 1,202,012.1 |
| Johnson (Tom) Investment Management, Inc. | 4,765.0 | - | - | - | - | - | - | - |
| Johnson Investment Counsel, Inc. | 22,790.7 | 23,895.7 | 24,715.7 | 24,402.9 | 24,227.9 | 25,130.7 | 25,105.7 | 25,300.7 |
| Johnston, Reid & Mitchell, Inc. | 25,402.1 | 28,397.9 | - | 24,697.9 | 25,097.9 | 24,097.9 | 24,097.9 | 23,097.9 |
| JP Morgan Chase & Company | 31,933,790.7 | 28,847,570.7 | 27,173,600.0 | 20,733,352.1 | 18,135,282.9 | 24,070,240.7 | 22,596,182.9 | 17,270,927.9 |
| Jundt Associates, Inc. | 1,009,395.0 | 887,995.0 | 900,554.3 | 894,754.3 | 339,654.3 | 336,154.3 | 382,554.3 | 382,654.3 |
| Jurika & Voyles LP | 457,905.0 | 423,739.3 | 408,712.1 | 390,872.1 | 413,907.1 | 433,375.7 | 768,592.1 | 750,357.9 |
| Kahn Brothers & Company, Inc. | 196,619.3 | 190,524.3 | 173,030.7 | 171,995.7 | 170,699.3 | 171,114.3 | 170,422.9 | 169,090.7 |
| Kayne Anderson Rudnick Investment Management LLC | 7,140.0 | 5,700.0 | 6,092.1 | - | - | - | 5,185.0 | 4,992.1 |
| KBW Asset Management Inc. | - | - | - | - | 1,000.0 | - | - | - |
| KCM Investment Advisors LLC | 6,500.0 | 17,380.0 | 18,080.0 | 16,565.7 | 34,240.0 | 30,240.0 | 30,240.0 | 8,100.0 |
| Keating Investment Counselors | 37,100.0 | 35,600.0 | 35,600.0 | 34,440.0 | 34,440.0 | 32,940.0 | 32,705.0 | 32,705.0 |
| Keller Group Investment Management, Inc. | - | - | 3,500.7 | - | 26,394.3 | 214,200.7 | 284,715.0 | 280,059.3 |
| Kellner, Dileo & Company | 205,700.0 | - | - | - | - | - | - | - |
| Kelly (Lawrence W.) & Associates Inc. | - | - | - | - | - | - | - | 46,000.0 |
| Kennedy Associates, Inc | 303,687.9 | 228,114.3 | - | - | - | - | - | - |
| Kentucky (State Of) Teachers Retirement System | 864,742.9 | 578,842.9 | 578,842.9 | 578,842.9 | 676,342.9 | 626,342.9 | 580,742.9 | 593,142.9 |
| Keybank National Association | 63,972.9 | 1,177,847.9 | 1,259,517.1 | 1,167,132.1 | 1,471,335.7 | 2,863,715.0 | 3,541,239.3 | 5,301,270.0 |
| Keydel, Frederick, R. | 6,960.0 | 8,282.1 | 8,282.1 | 8,282.1 | - | - | - | - |
| Killian Asset Management Corporation | 65,120.0 | 77,492.1 | 75,055.7 | - | - | 74,580.0 | 96,580.0 | - |
| Kinetics Asset Management Inc. | 21,539.3 | 22,539.3 | 27,539.3 | 29,539.3 | 29,539.3 | 29,539.3 | 29,539.3 | 32,539.3 |
| Kingdon Capital Management LLC | - | - | - | - | - | 4,500.0 | - | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | As of the Quarter Ended | | | | |
| Kirkbride Asset Management, Inc. | 11,160.0 | 11,160.0 | 11,160.0 | 11,160.0 | 11,160.0 | 11,000.0 | 10,900.0 | 17,700.0 |
| Klingenstein, Fields & Company, LLC | 256,890.0 | 271,365.0 | 274,215.0 | 273,897.1 | 279,547.1 | 283,497.1 | 280,197.1 | 309,580.7 |
| Kobrick Capital Management, L.P. | - | - | 74,300.0 | - | - | - | - | - |
| Kobrick Funds LLC | - | - | 62,600.0 | 56,500.0 | - | - | - | - |
| Kramer Capital Management, Inc. | - | - | - | - | - | - | - | 1,400.0 |
| Lafer Management Corp. | - | - | - | - | - | 110,000.0 | - | - |
| Laird, Norton Tyee Trust Company | 32,135.0 | 20,435.0 | 19,160.0 | 17,660.0 | 16,360.0 | 16,360.0 | 35,277.9 | 43,147.9 |
| Lane (Douglas, C.) & Associates, Inc. | - | 112,637.1 | 121,662.9 | 126,682.9 | 129,622.9 | 140,704.3 | 163,477.1 | 194,587.1 |
| Lasalle Bank N.A. | 544,604.3 | 564,107.1 | 481,289.3 | 558,980.7 | 568,754.3 | 595,925.0 | 15,095.7 | 61,025.0 |
| Lateef Investement Management | - | - | - | - | - | - | - | 5,025.0 |
| Lawson Kroeker Investment Management, Inc. | 69,675.0 | 74,700.0 | 87,650.0 | 88,060.0 | 88,160.0 | 93,535.0 | 92,685.0 | 92,335.0 |
| Lazard Freres & Co LLC | 2,775,209.3 | 2,840,882.1 | 2,110,932.1 | 1,193,967.9 | 3,240,500.0 | 3,478,790.7 | 3,931,984.3 | 3,703,982.9 |
| Leavell Investment Management, Inc. | 22,457.1 | 30,882.9 | 24,457.1 | 24,457.1 | 28,127.1 | 28,957.1 | 21,457.1 | 20,215.7 |
| Ledyard National Bank | 5,637.1 | 5,637.1 | 5,637.1 | 6,037.1 | 5,680.0 | 6,099.3 | 5,780.0 | 6,077.1 |
| Lee, Danner & Bass, Inc. | 10,240.0 | 10,907.9 | - | - | - | - | - | - |
| Legal & General Group PLC | 755,550.0 | 21,140.7 | 20,377.1 | 26,377.9 | 26,407.9 | 7,986,817.9 | 24,610.7 | - |
| Legg Mason Inc. | 718,679.3 | 652,655.0 | 611,429.3 | 550,645.0 | 662,750.7 | 656,005.0 | 673,787.1 | 862,039.3 |
| Lehman Brothers Holdings Inc. | 20,654.3 | 31,012.9 | 43,427.1 | 69,549.3 | 90,675.7 | 72,495.0 | 139,212.9 | 189,542.9 |
| Lepercq, De Neuflize & Co Incorporated | 56,644.3 | 62,907.1 | 62,907.1 | 39,257.1 | - | - | - | - |
| Levin (John A.) & Company, Inc. | 3,632,732.9 | 3,195,870.7 | 3,424,455.7 | 3,590,222.9 | 3,980,482.1 | 4,555,387.9 | 4,831,734.3 | 5,042,330.0 |
| Liberty Mutual Group Inc. | 27,500.0 | 33,825.0 | 36,425.0 | 36,425.0 | 4,500.0 | 4,500.0 | 4,500.0 | - |
| Lilley & Company | 11,250.0 | 11,875.0 | 10,712.1 | 11,912.1 | 13,232.1 | 14,332.1 | 14,362.1 | 14,712.1 |
| Lincoln Capital Management Co | 18,942,100.0 | 7,489,500.0 | 8,746,499.3 | 5,579,899.3 | - | - | - | - |
| Lindner Asset Management Inc. | 7,972.9 | 51,800.0 | 52,200.0 | 110,000.0 | 28,900.0 | - | - | 1,600.0 |
| Lipper, Kenneth | - | - | - | 340,500.0 | - | 37,400.0 | - | - |
| Lloyds Banking Group PLC | - | - | - | - | - | - | - | 631,157.9 |
| Lodestar Investment Counsel Inc/IL | 16,165.7 | 15,875.7 | 13,875.7 | 13,875.7 | - | - | - | - |
| Loeb Arbitrage Management Inc. | 49,200.0 | 72,394.3 | - | - | - | - | - | - |
| Logan Capital Management, Inc. | - | 92,584.3 | 92,584.3 | 92,584.3 | 92,645.7 | 92,685.7 | 92,990.7 | 91,677.1 |
| Lomax, Edgar Company (The) | 7,700.0 | 15,650.7 | 22,250.7 | - | - | - | - | - |
| Lone Pine Capital, LLC | - | 535,000.0 | 535,000.0 | 535,000.0 | - | - | - | - |
| Longwood Investment Advisors, Inc. | - | - | - | - | - | - | 700.0 | - |
| Loomis Sayles & Co L P | 2,360,905.7 | 2,616,902.9 | 2,708,805.7 | 2,193,915.7 | 750,472.9 | 560,410.7 | 282,764.3 | 151,439.3 |
| Lord Abbett & Co | 5,508,934.3 | 4,594,240.0 | 4,668,312.1 | - | 2,192,424.3 | 2,265,830.0 | 1,752,127.9 | 1,770,490.7 |
| Loring, Wolcott & Coolidge Fiduciary Advisors | 40,855.7 | 37,350.0 | 37,245.7 | 36,465.0 | 38,245.7 | 38,979.3 | 35,379.3 | 36,402.9 |
| Los Angeles Capital Management & Equity Research, Inc. | 115,320.0 | 95,965.7 | 81,065.7 | 95,965.7 | 95,865.7 | 409,365.7 | 448,500.0 | 438,400.0 |
| Lotsoff Capital Management | - | - | - | - | 252.9 | 252.9 | 12,152.9 | 15,597.1 |
| Lowe, Brockenbrough & Company, Inc. | - | 5,275.0 | 5,000.0 | 5,000.0 | 4,900.0 | 4,900.0 | 199,150.0 | 289,045.0 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| Lowell, William A. | 39,560.0 | 17,890.0 | 47,890.0 | 17,890.0 | 17,890.0 | 17,702.9 | 17,702.9 | 17,567.9 |
| LSV Asset Management | 804,797.1 | 576,895.7 | - | - | - | 16,100.0 | 800.0 | 800.0 |
| Lunn Partners, LLC | 20,700.0 | 24,632.9 | 24,632.9 | - | - | - | - | - |
| Luther King Capital Management | 2,045,260.7 | 2,407,494.3 | 2,490,367.9 | 1,984,945.0 | 1,283,695.0 | 1,190,212.9 | 1,052,699.3 | 990,720.7 |
| LVM Capital Management Ltd/MI | - | 4,244.3 | 4,937.9 | 5,490.7 | - | 4,712.1 | 5,989.3 | 6,352.1 |
| M&T Bank | 178,030.0 | 168,902.9 | 174,277.1 | 112,042.1 | 120,830.7 | 112,597.1 | 96,885.0 | 119,259.3 |
| Mackenzie Financial Corporation | 26,900.0 | 49,247.1 | 146,827.1 | 160,537.9 | 162,182.9 | - | 104,539.3 | 113,200.0 |
| Mainstream Investment Advisers, LLC | - | - | - | 15,000.0 | - | - | - | - |
| Mairs & Power Inc | 6,120.0 | 6,120.0 | 6,120.0 | 6,120.0 | 6,120.0 | 7,575.7 | 6,975.7 | 5,590.7 |
| Manning & Napier Advisors Inc | 18,487.1 | - | 249,390.7 | 1,724,597.1 | 2,972,272.1 | 3,207,457.1 | 3,651,132.1 | 3,580,107.1 |
| Manufacturers Life Insurance Co | 530,822.9 | 246,484.3 | 248,100.7 | 123,337.1 | 408,399.3 | 223,442.9 | 245,879.3 | 264,370.7 |
| Manulife Asset Management (North America) Limited | 182,384.3 | 18,475.0 | 20,729.3 | 89,829.3 | 312,805.0 | 201,410.7 | 264,367.9 | 271,030.7 |
| Marco Investment Management LLC | - | - | - | 65.0 | 4,115.0 | 3,415.0 | 3,415.0 | 3,415.0 |
| Markel Gayner Asset Management Corporation | - | 15,900.0 | 15,900.0 | 15,900.0 | 15,900.0 | 33,920.0 | 33,920.0 | 33,920.0 |
| Markston International, LLC | 120,020.0 | 120,019.3 | 104,819.3 | 86,919.3 | 78,435.0 | 78,435.0 | 78,435.0 | 78,435.0 |
| Marque Millennium Capital Management Ltd | 15,000.0 | - | 15,000.0 | 15,000.0 | 15,000.0 | 15,000.0 | - | - |
| Marshall & Isley Corporation | 82,817.9 | 43,842.1 | 43,389.3 | 48,644.3 | 46,075.7 | 41,670.0 | 43,637.9 | 170,619.3 |
| Marshfield Associates | 1,050.0 | - | - | - | - | - | - | - |
| Martin Currie Inc | - | - | - | - | 33,000.0 | 15,000.0 | 17,200.0 | 8,600.0 |
| Martin Currie Investment Management Limited | - | - | - | - | 184,100.0 | 115,225.0 | 74,300.0 | 74,300.0 |
| Martingale Asset Management, L.P. | - | 80,100.0 | 65,500.0 | - | 9,000.0 | 26,000.0 | 25,700.0 | - |
| Marvin & Palmer Associates, Inc. | - | - | - | 172,900.0 | - | - | - | - |
| Massachusetts Financial Services Co - Other | 30,455,669.3 | - | 26,161,882.1 | 20,308,255.0 | 21,693,657.9 | 12,276,732.9 | 15,189,460.7 | 2,823,180.7 |
| Massachusetts Institute of Technology | 2,575.0 | - | - | - | - | - | - | - |
| Mastrapasqua & Associates | 475,134.3 | 650,047.1 | 771,412.1 | 1,025,952.9 | 1,135,835.0 | 1,156,075.7 | 1,077,972.1 | 480,502.1 |
| Matrix Asset Advisors, Inc. | 110,992.9 | 133,772.1 | 133,112.1 | 132,270.7 | 148,985.7 | 154,485.0 | 171,735.7 | 176,782.9 |
| Maverick Capital Ltd. | - | - | - | - | - | - | - | 4,750,000.0 |
| Mc Lean Budden Ltd | - | - | - | - | - | 2,500.0 | - | - |
| Mcgahan Greene Mchugh Capital Management, LLC | 78,100.0 | 138,100.0 | 138,100.0 | 138,100.0 | 138,100.0 | 138,100.0 | 138,100.0 | 138,100.0 |
| Mcglinn Capital Management, Inc. | 15,090.0 | - | 7,142.9 | - | - | - | - | 142,700.0 |
| McKee (C.S.) L.P. | 45,339.3 | 130,989.3 | 106,035.0 | 98,872.1 | - | - | 136,100.0 | 223,400.0 |
| McKinley Capital Management, Inc. | - | - | - | 663,720.7 | 666,690.7 | 652,070.7 | 546,420.7 | 264,270.0 |
| McMillion Capital Management, Inc. | 600.0 | 3,284.3 | 44,515.7 | 44,787.1 | 45,789.3 | - | - | - |
| McMorgan & Company | 2,117,225.0 | 2,132,500.0 | 2,104,035.7 | 2,149,985.7 | 2,173,835.7 | 2,205,235.7 | 2,658,235.7 | 2,669,685.7 |
| McRae Capital Management | - | 4,212.9 | 3,812.9 | 3,812.9 | - | - | - | - |
| Mechanics Bank-John Rubin | 5,657.9 | 5,657.1 | 5,657.1 | 5,657.1 | 5,657.1 | 5,657.1 | 8,007.1 | 8,007.1 |
| Media One Group Inc. | 556,925.7 | 595,090.0 | - | - | - | - | - | - |
| Meeder Asset Management, Inc. | 3,680.0 | 7,180.0 | 7,180.0 | 7,370.0 | 8,340.0 | 8,450.0 | 5,980.0 | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | | | | As of the Quarter Ended | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Mellon Bank, N.A. | 11,301,517.1 | 16,057,135.0 | 17,937,555.0 | 17,736,984.3 | 18,319,715.0 | 17,716,834.3 | 21,807,024.3 | 21,145,625.7 |
| Members Capital Advisors, Inc. | 746,694.3 | 864,164.3 | 403,282.9 | 410,782.9 | 513,182.9 | 703,382.9 | 915,282.9 | 959,482.9 |
| Mercantile Bankshares Corporation | 25,290.0 | 33,452.1 | 31,287.1 | 32,562.9 | 36,845.0 | 39,347.9 | 40,272.1 | 35,280.0 |
| Mercantile National Bank of Indiana | - | - | 10,359.3 | 14,680.0 | 18,900.0 | 16,302.9 | 13,112.9 | 16,912.9 |
| Merlin Biomed Group, L.L.C. | 155,000.0 | - | - | - | - | - | - | - |
| Merrill Lynch & Co., Inc. | 773,175.0 | 643,152.9 | 770,632.1 | 2,031,354.3 | 1,222,744.3 | 1,632,385.7 | 1,482,132.9 | 1,480,372.9 |
| Merrill Lynch Investment Managers Co. Ltd. (Japan) | 64,084.3 | - | - | - | 692,349.3 | 783,879.3 | 659,457.1 | 720,157.1 |
| Merrill Lynch Investment Managers Group Limited | 1,138,812.9 | 95,822.1 | 102,962.1 | 98,162.1 | 2,915,162.9 | 3,309,282.1 | 3,327,865.7 | 1,225,547.9 |
| Merrill Lynch Investment Managers, LLC | - | 6,126,330.0 | 10,521,527.1 | 10,863,549.3 | 6,633,137.1 | 5,306,480.0 | 4,981,292.9 | 4,951,495.0 |
| Mesirow Asset Management, Inc. | - | - | 1,975.0 | 1,975.0 | - | - | - | - |
| Messner & Smith Theme/Value Investment Management | - | 4,000.0 | - | 4,000.0 | 4,000.0 | - | - | - |
| Metlife | 585,335.0 | 893,760.0 | 909,735.0 | 900,819.3 | 784,809.3 | 804,862.1 | 937,272.1 | 793,620.7 |
| Metropolitan West Capital Management, LLC | 322,585.7 | 465,492.9 | 11,792.1 | 10,347.9 | - | - | - | - |
| Michigan (State of) State Treasurer | 1,114,979.3 | 5,000,372.1 | 5,008,972.1 | 5,029,672.1 | 5,034,002.1 | 5,040,122.9 | 5,040,122.9 | 5,059,822.9 |
| Midas Management Corporation | - | - | - | 30,900.0 | - | - | - | - |
| Middleton & Company, Inc. | - | - | 3,600.0 | 3,600.0 | - | - | - | - |
| Milbank Winthrop & Co. | 4,360.0 | 5,787.9 | 5,787.9 | 5,787.9 | 5,787.9 | 5,787.9 | 5,787.9 | 9,537.9 |
| Millennium Partners LP | - | - | - | 135,659.3 | - | - | - | 282,874.3 |
| Minis & Company, Inc. | 16,140.0 | 16,140.0 | 16,140.0 | 16,140.0 | 16,140.0 | 15,740.0 | 15,740.0 | 15,740.0 |
| Missouri State Employees' Retirement System | 149,130.0 | 166,845.7 | 168,245.7 | 167,045.7 | 161,845.7 | 161,845.7 | 135,545.7 | 114,890.0 |
| Missouri Valley Partners, Inc. | - | - | - | 4,860.7 | 5,965.7 | 4,465.7 | - | - |
| Monetary Management Group, Inc. | - | - | - | 5,625.0 | - | - | - | - |
| Monroe Bank & Trust Company, Mi | 20,617.9 | 23,715.7 | 22,970.7 | 12,039.3 | 11,909.3 | 11,909.3 | 8,952.1 | 8,952.1 |
| Montag & Caldwell, Inc. | - | - | 9,489,260.0 | 18,140,087.1 | 20,261,472.1 | 14,708,229.3 | 9,260,575.7 | 11,180,627.1 |
| Montag (A) & Associates | - | - | 3,517.1 | 3,517.1 | - | - | - | - |
| Montana Board of Investments | - | - | 521,600.0 | 521,600.0 | 621,600.0 | - | - | 871,600.0 |
| Montgomery Asset Management, LLC | 123,425.0 | 143,985.7 | 139,385.0 | 166,985.7 | - | 50,170.7 | - | - |
| Moody National Bank Trust Division | - | - | - | - | - | - | - | - |
| Moody, Lynn & Co. | 7,979.3 | 45,590.0 | 135,845.0 | 134,564.3 | 49,049.3 | 42,710.7 | 41,505.7 | 139,457.1 |
| Moore Capital Management, LLC | - | 314,400.0 | - | - | - | - | - | - |
| Morgan Stanley | 2,720,027.1 | 15,321,452.9 | 16,203,872.9 | 18,066,720.7 | 15,181,255.7 | 13,704,055.0 | 12,628,024.3 | 15,257,344.3 |
| Morgens Waterfall Vintiadis & Co. Inc. | - | - | - | 66,400.0 | - | - | - | - |
| Morse, Williams & Company, Inc. | 24,400.0 | - | 10,500.0 | 14,300.0 | 17,700.0 | 21,600.0 | 15,200.0 | 16,700.0 |
| Mott (Charles, S.) Foundation | 154,270.0 | 165,910.7 | 165,910.7 | 165,910.7 | 165,910.7 | 165,910.7 | 165,910.7 | 165,910.7 |
| Munder Capital Management, Inc. | 2,113,339.3 | 1,433,717.1 | 1,405,927.9 | 1,498,085.7 | 1,514,017.9 | 1,309,920.7 | 1,316,120.0 | 1,316,120.0 |
| Munich Re Capital Management Corp | - | 55,975.0 | 55,975.0 | 56,000.0 | 74,300.0 | 280,087.1 | 316,387.1 | 339,287.1 |
| Murphy Capital Management Inc. | 6,082.9 | 1,205.0 | 5,055.0 | 7,227.9 | 5,527.9 | 4,227.9 | 1,992.1 | 1,292.1 |
| Murray Johnstone International Ltd | - | - | 20,000.0 | 46,000.0 | - | - | - | - |

185

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | | As of the Quarter Ended | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Mutual of America Capital Management Corp | 139,990.0 | 236,537.1 | 269,755.7 | 132,560.0 | 128,487.1 | 131,122.1 | 128,077.1 | 130,604.3 |
| MWN Ltd. | - | - | - | - | - | 103,000.0 | 23,500.0 | 4,840.7 |
| Myers (James M.) Research, Inc. | - | - | - | - | 180,859.3 | 173,669.3 | 154,705.7 | 92,475.0 |
| Nagle (Garrett) & Co., Inc. | 10,865.0 | 7,140.0 | 7,140.0 | 7,140.0 | - | - | - | - |
| Narragansett Management, LP | - | - | - | - | - | - | - | 100,000.0 |
| National Asset Management | - | - | - | 2,790.0 | 79.3 | - | - | - |
| National Bank of Indianapolis Corp | - | - | 882.1 | 2,587.1 | 2,687.1 | 3,407.9 | 3,232.9 | 4,027.9 |
| National City Corporation | 6,419,157.1 | 8,237,017.9 | 7,639,799.3 | 7,676,389.3 | 7,792,327.1 | 7,523,625.0 | 7,635,040.0 | 7,015,672.1 |
| National Commerce Financial Corp | 41,640.0 | 55,752.1 | 113,717.9 | 62,365.7 | 69,790.7 | 78,150.7 | 84,730.0 | 88,489.3 |
| National Fiduciary Services, N.A. | 10,024.3 | 25,122.9 | 28,042.9 | 32,842.9 | 35,897.9 | 20,277.9 | 20,667.9 | 18,147.9 |
| National Investment Services, Inc. | - | - | 178,400.0 | 60,400.0 | - | - | - | - |
| National Life Insurance Co | 1,252,712.9 | 853,210.7 | 606,480.7 | 396,222.9 | 341,532.1 | 26,162.9 | 25,307.1 | 419,407.1 |
| National Rural Electric Cooperative Association | 395,000.0 | 470,050.0 | 134,450.0 | - | - | - | - | - |
| Nationwide Mutual Insurance Co | 541,600.0 | - | - | - | - | - | - | - |
| NBT Bank, N.A. | 35,382.9 | 34,887.1 | 34,887.1 | 34,887.1 | 33,387.1 | 33,387.1 | 33,387.1 | 33,737.1 |
| NCM Capital Management Group, Inc. | - | - | 210,067.1 | 401,630.7 | 412,259.3 | 606,227.1 | 228,000.0 | 228,000.0 |
| Needelman Asset Management, Inc. | - | - | - | 17,900.0 | 22,900.0 | - | - | - |
| Nelson Capital Management Inc./Ca | - | 4,775.0 | 4,377.1 | 4,032.1 | - | - | - | - |
| Neuberger Berman Group, LLC | 1,536,845.0 | 1,925,744.3 | 1,838,972.1 | 930,217.1 | 1,254,652.9 | 1,540,912.1 | 1,771,359.3 | 3,593,142.1 |
| Neville, Rodie & Shaw, Inc | 15,875.0 | 15,872.9 | 15,907.9 | 15,610.7 | 15,280.0 | 15,180.0 | 15,080.0 | 15,215.0 |
| New Mexico Educational Retirement Board | 157,374.3 | 154,374.3 | 154,374.3 | 154,374.3 | 172,674.3 | 345,347.9 | - | 188,074.3 |
| New York Life Investment Management LLC | 190,509.3 | 1,192,795.0 | 1,314,912.1 | 2,725,075.7 | 1,354,847.9 | 1,267,735.7 | 1,260,080.7 | 1,189,310.0 |
| New York State Common Retirement Fund | 5,749,485.0 | 6,600,020.0 | 5,294,025.7 | 5,208,525.7 | 5,439,925.7 | 5,524,185.7 | 3,790,820.0 | 4,162,679.3 |
| Newell Associates | 678,994.3 | 751,339.3 | 569,537.9 | 544,437.9 | 544,437.9 | 544,437.9 | 544,437.9 | 546,737.9 |
| Niagara Investment Advisors, Inc. | 13,892.9 | 15,902.1 | 16,060.0 | 24,417.1 | 26,025.7 | 24,887.9 | 24,127.1 | 21,232.1 |
| Nicholas Company, Inc. | 423,000.0 | 825,470.0 | 825,470.0 | 823,370.0 | 812,870.0 | 812,070.0 | 803,770.0 | 803,770.0 |
| Nichols & Pratt Advisors, LLP | - | - | - | - | - | - | 7,315.0 | 7,315.0 |
| Nippon Life Insurance Company | 495,800.0 | - | - | 1,494,487.9 | 1,809,415.0 | 1,703,899.3 | 1,591,609.3 | - |
| Nisa Investment Advisors, L.L.C. | 86,545.7 | 102,555.7 | 104,755.7 | 112,555.7 | 137,170.7 | 147,170.7 | 138,735.7 | 175,835.7 |
| Nli International Incorporated | - | - | - | 61,300.0 | 69,400.0 | 57,900.0 | 62,100.0 | - |
| Nomura Asset Management Company Limited | 22,122.1 | 17,320.7 | 17,320.7 | 21,220.7 | 75,750.7 | 101,734.3 | 138,344.3 | 192,222.9 |
| Nomura Asset Management U.S.A. Inc. | - | - | - | - | 89,900.0 | 98,300.0 | 143,700.0 | 106,500.0 |
| Nomura Holdings Inc. | 284,834.3 | 581,772.9 | 757,660.0 | 856,475.7 | 907,825.0 | 1,024,635.0 | 804,044.3 | 358,752.9 |
| Norges Bank Investment Management | - | - | - | - | 69,137.1 | 182,890.7 | 213,890.7 | 639,774.3 |
| Norris Perne & French LLP/Mi | 4,349.3 | 5,957.1 | 5,957.1 | 5,957.1 | 5,657.1 | 5,657.1 | 5,657.1 | 5,622.9 |
| North American Management Company | 4,600.0 | 2,200.0 | 2,200.0 | 2,200.0 | 2,200.0 | 2,200.0 | 2,200.0 | 39,570.0 |
| North Fork Bank | 11,800.0 | 11,655.0 | 10,277.9 | 10,802.9 | 11,895.0 | 12,480.0 | 8,380.0 | 9,480.0 |
| North Peak LLC | 959,400.0 | - | - | - | - | - | - | - |

186

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | | As of the Quarter Ended | | | |
| Northeast Investment Management, Inc. | 35,350.0 | 39,240.7 | 39,640.7 | 40,655.0 | 40,297.9 | 40,297.9 | 32,447.9 | 32,495.0 |
| Northern Capital Management LLC | 9,075.0 | - | - | - | - | - | - | - |
| Northern Oak Capital Management, Inc. | - | - | - | - | 5,645.0 | 5,645.0 | 5,145.0 | 5,145.0 |
| Northern Trust Company of Connecticut | 219,129.3 | 238,549.3 | 169,649.3 | 132,849.3 | 70,749.3 | 103,349.3 | 192,949.3 | 163,267.1 |
| Northern Trust Corporation | 6,833,765.0 | 6,785,697.9 | 6,693,489.3 | 6,446,887.1 | 5,849,782.1 | 6,219,012.9 | 6,279,920.7 | 6,321,617.9 |
| Northrop Grumman Investment Management Company | 17,000.0 | - | - | - | - | 13,000.0 | 13,000.0 | - |
| Northstar Investment Advisors, L.L.C. | 32,200.0 | 32,200.0 | 31,200.0 | 31,200.0 | - | - | - | - |
| Northwestern Mutual Investment Services, Inc. | 643,335.0 | 627,117.1 | 628,517.1 | 653,617.1 | 601,317.1 | 621,117.1 | 541,917.1 | 528,217.1 |
| Northwestern Mutual Life Insurance Co | 75,000.0 | 89,250.0 | 89,250.0 | 104,250.0 | 104,250.0 | 104,250.0 | 117,650.0 | - |
| Norwest Bank Minnesota North, N.A. | 25,062.1 | 25,062.1 | - | - | - | - | - | - |
| Norwest Bank Minnesota, N.A. | 91,197.9 | 81,247.1 | - | - | - | - | - | - |
| Norwest Bank South Dakota, National Association | 6,720.7 | 6,720.0 | - | - | - | - | - | - |
| Numeric Investors, LLC | - | 9,400.0 | - | - | - | - | - | - |
| NWQ Investment Management Company, LLC | 708,652.1 | 572,107.9 | 510,980.0 | 7,477.1 | - | - | - | - |
| Nye (Richard B.) | 363,700.0 | 87,852.9 | - | - | - | - | - | - |
| Nye, Parnell & Emerson Capital Management Inc. | 62,955.0 | 83,244.3 | 84,480.0 | 100,360.0 | 102,212.9 | 110,135.0 | 74,712.9 | 44,390.0 |
| Oak Associates | 9,920.7 | - | - | - | - | - | - | - |
| Oakmont Corporation | - | - | 3,300.0 | - | - | - | - | - |
| Oam Avatar, LLC | - | - | - | - | - | - | 110,055.0 | 101,962.1 |
| Ocean Fund Advisors LLC | - | - | 126,187.1 | 126,187.1 | 221,837.1 | - | 256,650.0 | - |
| Offitbank | 8,377.9 | 8,377.1 | 3,747.1 | 3,747.1 | 4,445.7 | 3,484.3 | 4,017.1 | 4,295.0 |
| Ohio National Life Insurance Co | 33,700.0 | 33,700.0 | 24,700.0 | 24,700.0 | 24,700.0 | - | 24,700.0 | 24,400.0 |
| Ohio-Public Employees Retirement System (Pers) | 1,702,869.3 | 1,858,279.3 | 1,991,230.7 | 2,005,699.3 | 2,312,452.9 | 2,416,517.9 | 2,784,970.7 | 3,490,490.0 |
| Ohio-State Teachers Retirement System | 2,356,532.1 | 2,388,282.1 | 2,444,380.7 | 2,532,382.1 | 2,722,347.9 | 2,859,447.9 | 2,838,447.9 | 2,700,947.9 |
| Old Mutual Asset Managers (Uk) Limited | - | - | - | - | 7,600.0 | 21,900.0 | 31,600.0 | - |
| Old National Trust Company | 20,547.9 | 20,715.7 | 19,767.1 | 19,667.1 | 24,525.0 | 25,050.0 | 20,449.3 | 22,720.7 |
| Omega Advisors Inc. | - | - | - | - | - | 381,600.0 | - | - |
| Onyx Capital Management, L.L.C. | 35,000.0 | - | - | - | - | - | - | - |
| Oppenheimer Funds, Inc. | 7,604,500.0 | 5,112,037.9 | 4,538,637.9 | 3,400,937.9 | 3,015,802.1 | 2,280,287.1 | 2,140,787.1 | 1,342,569.3 |
| Opus Investment Management, Inc. | 113,987.1 | 112,785.7 | 111,385.7 | 105,785.7 | 100,585.7 | 83,985.7 | 78,085.7 | 78,285.7 |
| Oracle Investment Management, Inc. | 450,000.0 | - | 100,000.0 | - | - | - | - | - |
| Orbimed Advisors LLC. | 1,391,000.0 | 1,385,300.0 | 1,684,500.0 | 1,987,500.0 | 2,270,500.0 | 2,855,000.0 | 3,060,600.0 | 3,980,200.0 |
| Orbitex Management, Inc. | - | - | - | - | - | 12,000.0 | 12,000.0 | - |
| Origin Capital Management LLC | - | - | - | - | - | - | - | 200,000.0 |
| Orleans Capital Management | 45,200.0 | 45,300.0 | 23,800.0 | 8,900.0 | 7,400.0 | 7,400.0 | 7,400.0 | - |
| Osborne Partners Capital Management | 10,420.0 | 10,420.0 | 10,420.0 | 10,420.0 | 7,720.0 | 7,520.0 | 7,520.0 | 7,520.0 |
| Osterweis Capital Management, Inc. | 2,000.0 | 2,000.0 | - | - | - | - | - | - |
| P. Schoenfeld Asset Management | 707,200.0 | 282,149.3 | 246,210.7 | 239,070.7 | 239,070.7 | - | - | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | As of the Quarter Ended | | | | |
| PA Commonwealth of Public School Employees Retirement Sy | - | 2,029,657.1 | 1,919,272.9 | 1,421,590.7 | 1,664,910.7 | 1,640,560.7 | 1,528,060.7 | 835,529.3 |
| Pacific Assets Management, LLC | 19,950.0 | 7,002.1 | | | | | | |
| Pacific Capital Bancorp/Ca | - | 71,342.9 | 71,042.9 | 57,542.9 | 56,920.7 | - | 57,220.7 | 49,520.7 |
| Pacific Income Advisers, Inc. | - | 48,555.0 | 51,795.0 | - | - | - | - | - |
| PADCO Advisors Ii, Inc. | - | - | 1,255.0 | 1,455.0 | 2,475.0 | 3,285.0 | 4,685.0 | 4,935.0 |
| PADCO Advisors, Inc. | - | - | 148,027.1 | 150,230.7 | 71,632.1 | 95,600.0 | 71,790.0 | 76,175.7 |
| Palisade Capital Management, L.L.C. | 12,100.0 | 14,445.0 | 12,445.0 | 9,512.1 | - | - | - | 15,500.0 |
| Palm Beach Investment Advisers LLC | 4,200.0 | 49,125.0 | 52,800.0 | 14,050.0 | 8,840.0 | 10,590.0 | - | - |
| Panagora Asset Management, Inc. | 406,265.7 | 539,255.7 | 513,177.1 | 615,950.7 | 728,712.9 | 750,912.9 | 755,312.9 | 749,612.9 |
| Papp (L. Roy) & Associates | 850.0 | 7,750.7 | 7,750.7 | 9,179.3 | 7,219.3 | 7,219.3 | 7,219.3 | 7,219.3 |
| Para Advisors, LLC | - | - | - | - | - | 126,094.3 | - | 212,532.9 |
| Paradigm Asset Management Company, LLC | 301,230.7 | 290,807.1 | 281,397.9 | 306,175.0 | 299,580.7 | 389,635.0 | 224,170.7 | 226,785.7 |
| Parametric Portfolio Associates | - | - | - | - | - | 410,757.1 | 441,662.9 | 476,189.3 |
| Paramount Biocapital Asset Management, Inc. | 22,650.0 | - | - | - | - | - | - | - |
| Park National Corp/Oh | 19,967.1 | 25,327.9 | 6,812.1 | 6,547.9 | 7,820.0 | 7,270.0 | 7,167.1 | 7,467.1 |
| Parker/Hunter, Inc. | 4,080.0 | 4,855.0 | 4,625.0 | 4,069.3 | - | - | - | - |
| Parsons Capital Management, Inc. | 60,952.9 | 60,642.9 | 59,587.9 | 59,687.9 | 55,142.9 | 53,330.7 | 48,330.7 | 46,230.7 |
| Parthenon Capital Management, LLC | 2,380.0 | 2,380.0 | 2,380.0 | 4,760.0 | 4,760.0 | 4,960.0 | 4,990.0 | 4,990.0 |
| PASCO Investment Advisors Inc. | - | - | - | - | - | - | - | 475.0 |
| Payden & Rygel Investment Group | - | - | - | - | - | - | - | - |
| Payson (H.M.) & Company | 14,674.3 | 14,249.3 | 14,149.3 | 13,934.3 | 11,734.3 | - | - | 11,115.7 |
| Peapack Gladstone Financial Corp. | - | - | - | - | 9,885.7 | 9,985.7 | 10,362.1 | 9,710.0 |
| Pekin, Singer & Shapiro Asset Mgt, Inc. | - | 77,130.0 | 63,630.0 | 58,930.0 | 47,330.0 | 43,735.0 | 41,330.0 | 66,737.1 |
| Penn Mutual Life Insurance Co | - | 8,695.7 | - | 298,660.0 | 9,319.3 | 8,830.7 | 10,060.0 | 7,750.0 |
| Peoples Mutual Holdings | 87,837.9 | 73,704.3 | 73,704.3 | 84,922.9 | 84,127.9 | 82,427.9 | 88,442.9 | 83,712.9 |
| Pequot Capital Management, Inc. | - | - | - | - | - | - | 1,481,300.0 | 3,466,800.0 |
| Perigee Investment Counsel, Inc. | 30,820.7 | - | - | - | - | - | - | - |
| Perry Corporation | 873,600.0 | - | - | - | - | - | - | - |
| Perseus, L.L.C. | 10,000.0 | - | - | - | - | - | - | - |
| Petersen, Flynn & Dinsmore, Inc. | - | - | - | - | - | 10,000.0 | 31,515.0 | 80,200.0 |
| Philadelphia Investment Management Company | - | 35,960.0 | 32,250.0 | 33,100.0 | 33,060.0 | 32,990.0 | 32,250.0 | 28,365.0 |
| Pilgrim Baxter & Associates Ltd. | 17,400.0 | 123,065.7 | - | 472,519.3 | 682,700.0 | - | 1,723,300.0 | 512,400.0 |
| Pinnacle Associates, Ltd. | 5,985.7 | 6,292.9 | 5,837.1 | 5,837.1 | 5,030.7 | 5,132.1 | 5,810.0 | 8,422.1 |
| Pinnacle International Management LLC | - | - | - | - | - | - | - | 8,722.1 |
| Pinnacle Management And Trust Company | 300.0 | 357.1 | 357.1 | 357.1 | 357.1 | 357.1 | - | 40.0 |
| Pioneer Investment Management Inc. | 2,050,417.9 | 2,297,777.9 | 2,247,782.9 | 2,262,782.9 | 1,192,702.9 | 1,194,535.0 | 812,580.7 | 1,497,060.0 |
| Pitcairn Group L.P. | 6,130.0 | 8,027.1 | 26,877.9 | 32,550.7 | 32,232.1 | 31,555.7 | 26,547.9 | 27,077.1 |
| PNC Financial Services Group, Inc. | 1,362,450.7 | 1,312,745.0 | 1,270,889.3 | 1,263,072.1 | 1,251,634.3 | 1,287,492.9 | 1,203,725.0 | 1,217,842.1 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | | As of the Quarter Ended | | | |
| Portola Group, Inc. | - | - | 4,222.9 | 4,104.3 | 4,104.3 | - | - | - |
| Prescott Group Capital Management, L.L.C. | - | - | - | - | - | - | - | 7,140.0 |
| Price (T.Rowe) Associates Inc | 10,750,242.1 | 10,876,507.9 | 9,135,715.7 | 7,668,437.9 | 7,756,717.9 | 7,403,247.1 | 3,793,912.1 | 3,274,340.0 |
| Primecap Management Company | 43,336,157.9 | 41,085,377.1 | 33,823,082.9 | 33,015,694.3 | 30,877,444.3 | 30,445,507.1 | 30,405,007.1 | 31,146,004.3 |
| Principal Financial Group, Inc. | 1,524,819.3 | 2,117,724.3 | 2,668,775.0 | 1,664,585.7 | 1,550,902.9 | 2,265,197.9 | 1,359,589.3 | 1,201,514.3 |
| Private Asset Management, Inc. | 85,255.0 | 85,904.3 | 83,872.9 | 81,652.9 | 147,030.0 | 64,600.0 | 58,240.7 | 50,370.0 |
| Provident Investment Advisors, Inc. | 4,100.7 | 4,000.7 | 3,850.0 | 3,510.7 | 37,857.9 | 17,137.9 | 13,277.1 | 9,152.9 |
| Provident Investment Counsel Inc | - | 4,915,550.0 | 4,634,255.7 | 5,380,312.1 | 4,268,497.1 | 761,727.1 | 720,927.1 | 346,727.1 |
| Provident Trust Company | - | - | - | - | - | - | 750.0 | - |
| Prudential Equity Group, Inc. | - | 299,132.1 | 306,442.9 | 377,890.7 | 75,549.3 | 472,280.0 | 709,055.0 | 765,560.7 |
| Prudential Financial, Inc. | 2,554,942.1 | 3,576,982.9 | 3,230,837.1 | 2,656,729.3 | 2,861,867.1 | 2,848,500.0 | 2,802,667.9 | 2,685,082.1 |
| Prudential PLC | - | - | - | 4,495.0 | 4,495.0 | 5,100.0 | 5,100.0 | 8,500.0 |
| Putnam (FL) Investment Management Company | 9,545.0 | 9,154.3 | 9,154.3 | 8,935.0 | 8,935.0 | 8,757.9 | 7,907.9 | 7,832.9 |
| Putnam Investment Management, LLC | 150,910.7 | 50,982,165.7 | 55,288,450.0 | 51,596,604.3 | 32,137,994.3 | 30,031,300.0 | 32,382,975.7 | 30,374,760.0 |
| Quaker Partners LLC | - | - | - | - | 23,100.0 | - | 8,800.0 | - |
| Qwest Asset Management | 556,925.7 | 595,090.0 | 564,242.1 | 518,080.7 | 493,687.1 | 493,087.1 | 457,335.0 | 408,624.3 |
| Rainier Investment Management | 775,880.0 | 740,375.0 | 747,590.0 | 690,027.9 | 1,012,427.9 | 871,477.9 | 719,702.9 | - |
| Rampart Investment Management Company, Inc. | - | - | - | - | - | - | 1,050.0 | - |
| Ramsey Quantitativ Systems | - | - | - | - | - | 51,900.0 | 19,500.0 | 72,600.0 |
| Ray (Gerald L) & Associates | 268,717.9 | 270,815.0 | 270,815.0 | 269,377.1 | 268,950.7 | 268,050.7 | 274,025.7 | 270,325.7 |
| Raymond James Trust Company | 7,577.1 | 9,542.9 | 11,442.1 | 11,582.9 | 12,572.9 | 12,872.9 | 12,572.9 | 7,440.7 |
| RBC Dain Rauscher | 16,562.1 | 133,972.9 | 158,580.7 | 33,470.7 | 151,097.9 | 106,890.0 | 59,772.1 | 59,962.1 |
| RE Advisers Corp. | 243,950.0 | 243,950.0 | 26,200.0 | - | - | - | - | - |
| Regions Financial Corporation | 194,470.7 | 198,870.7 | 197,315.7 | - | 264,874.3 | 318,434.3 | 312,029.3 | 254,512.9 |
| Renaissance Group, LLC | - | - | - | - | - | - | 80,950.0 | 118,675.7 |
| Renaissance Technologies, LLC | - | - | - | 306,400.0 | 411,400.0 | 758,400.0 | 936,900.0 | 1,441,900.0 |
| Renberg Capital Management, Inc. | 3,000.0 | 3,000.0 | 4,000.0 | 3,000.0 | 3,000.0 | 3,000.0 | 3,000.0 | 3,000.0 |
| Retirement Capital Advisors | - | - | - | - | - | 175.0 | 175.0 | 175.0 |
| Rice, Hall, James & Associates | - | - | 3,400.0 | 3,400.0 | - | - | - | - |
| Richards & Tierney, Inc/Il | 8,955.7 | 10,502.9 | 12,602.9 | 9,402.9 | 9,402.9 | 9,802.9 | 8,602.9 | 13,402.9 |
| Riggs Bank N.A./Wa | 159,815.7 | 159,690.7 | 153,515.7 | 153,315.7 | 74,590.7 | 75,150.7 | 68,975.7 | 68,410.7 |
| Rightime Econometrics, Inc. | 23,007.9 | 21,535.7 | 36,094.3 | 17,394.3 | 14,537.1 | 16,565.7 | 13,612.1 | - |
| Rittenhouse Trust Company (The) | 11,250.0 | 12,130.7 | 12,880.0 | 13,237.1 | 13,387.1 | 13,387.1 | 14,027.9 | 14,967.9 |
| Riverbridge Partners LLC | - | - | - | 8,900.0 | 9,400.0 | 8,600.0 | 9,260.0 | 8,940.0 |
| Rnc Capital Management LLC | - | - | - | - | - | - | - | 8,275.0 |
| Rochdale Investment Management Inc | - | 6,167.1 | 6,132.1 | 6,332.1 | 6,489.3 | 6,574.3 | 7,495.0 | 7,547.9 |
| Rockefeller Financial Services, Inc. | 55,100.0 | 373,412.1 | 373,412.1 | 427,512.1 | 389,912.1 | 344,312.1 | 42,012.1 | 11,500.0 |
| Roll And Ross Asset Management Corp. | - | 5,600.0 | 37,700.0 | - | - | 32,500.0 | 31,700.0 | 39,500.0 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| Roosevelt Investment Group Inc. | - | - | - | 142,737.1 | 63,259.3 | - | - | - |
| Rorer Asset Management LLC/Pa | 1,558,392.9 | - | - | - | - | - | - | - |
| Rothschild Investment Corporation | 71,392.9 | 70,997.9 | 71,297.9 | 69,305.7 | 67,805.7 | 69,859.3 | 64,859.3 | 61,414.3 |
| Roxbury Capital Management | - | 1,545,857.1 | 4,400,494.3 | 4,395,284.3 | 4,470,327.9 | 4,454,389.3 | 4,327,309.3 | 3,958,470.7 |
| Royal Bank of Scotland Group, PLC | 293,874.3 | 28,952.1 | 16,560.7 | 83,189.3 | 82,284.3 | 75,550.7 | 69,985.7 | 61,485.7 |
| Royal London Mutual Insurance Society Limited (The) | 78,350.0 | 79,055.7 | 100,245.7 | 110,445.7 | 229,045.7 | - | - | - |
| Ruane, Cunniff & Goldfarb Inc. | 5,200.0 | 6,187.9 | 6,187.9 | 6,187.9 | 6,387.9 | 6,387.9 | 7,532.9 | 7,594.3 |
| Russell (Frank) Company Inc | 433,432.1 | - | - | - | 2,402,072.9 | 2,108,964.3 | 1,373,480.0 | 1,099,797.9 |
| S & Co., Inc. | 2,425.0 | 38,920.7 | 2,425.0 | - | 2,425.0 | 2,425.0 | 2,425.0 | 452,055.0 |
| S&T Bank/Pa | 862.1 | 860.7 | - | - | - | - | - | - |
| S.A.C. Capital Advisors, LLC | - | 57,500.0 | 75,160.0 | - | - | - | 491,500.0 | 1,304,500.0 |
| Safeco Corporation | 120,487.9 | - | - | - | - | - | - | - |
| Salem Investment Counselors, Inc. | - | 6,332.9 | 7,712.9 | 7,712.9 | 7,712.9 | 7,712.9 | - | 8,124.3 |
| San Francisco Sentry Investment Group | 11,540.0 | 11,540.0 | 11,540.0 | 11,540.0 | 5,429.3 | 12,040.0 | 12,040.0 | 12,040.0 |
| Santa Barbara Asset Management | - | - | - | - | - | - | 10,999.3 | 7,017.1 |
| Sarofim, Fayez | 14,935.0 | 18,377.9 | 18,377.1 | 19,655.7 | 19,655.7 | 19,155.7 | 19,155.7 | 19,580.7 |
| Sass (M.D.) Investors Services, Inc. | - | - | - | 8,000.0 | - | - | - | - |
| Satellite Asset Management | 3,000,600.0 | 465,240.7 | 465,240.7 | 465,240.7 | 465,240.7 | - | - | - |
| Schroder Investment Management Group | 1,793,164.3 | 1,974,412.1 | 789,035.7 | 711,905.0 | 708,139.3 | 698,780.0 | 1,381,344.3 | 4,531,339.3 |
| Schulhoff & Company, Inc. | 21,670.0 | 21,670.0 | 21,670.0 | 21,670.0 | 21,670.0 | 17,990.0 | 19,490.0 | 19,490.0 |
| Schupf (H.A.) & Co., Inc. | - | - | - | - | - | - | - | 8,000.0 |
| Schwab (Charles) Investment Management, Inc. | 1,193,107.9 | 1,628,345.0 | 1,730,547.9 | 1,732,585.0 | 1,727,810.0 | 1,780,035.0 | 1,845,164.3 | 1,834,489.3 |
| Schwartz Investment Counsel, Inc. | 6,400.0 | 7,984.3 | 5,967.9 | 6,182.1 | 6,182.1 | 6,182.1 | 6,682.1 | 7,682.1 |
| Sears Investment Management Co | 159,500.0 | 80,337.9 | 55,700.0 | 34,100.0 | - | - | - | - |
| Seaward Management Corporation | - | - | - | - | - | - | - | 89,285.0 |
| Securities Mgmt & Research | - | 44,700.0 | 44,700.0 | 44,700.0 | 44,700.0 | 175,850.0 | 176,500.0 | 177,300.0 |
| Security Asset Management | 3,915.0 | - | 5,817.9 | - | 5,817.9 | 4,657.9 | 80,647.9 | - |
| Security Management Company, LLC | 190,055.7 | 376,402.9 | 479,015.0 | 276,015.0 | 314,215.0 | 255,715.0 | 387,342.1 | 416,442.1 |
| Security National Bank of South Dakota | 11,240.0 | 5,500.0 | 5,500.0 | 5,500.0 | 5,500.0 | 5,500.0 | 5,500.0 | 5,500.0 |
| Segall Bryant & Hamill Investment Counsel | 14,200.0 | 13,289.3 | 12,517.1 | 12,000.0 | 12,000.0 | 11,800.0 | 11,800.0 | 11,800.0 |
| Seligman J.W.&Co Incorporated | - | - | 648,300.0 | 648,300.0 | 14,599.3 | 1,670.0 | 1,830.0 | 116,385.0 |
| Seminole Management Company, Inc. | - | - | - | - | - | 300,000.0 | - | - |
| Seneca Capital Advisors LLC | 175,000.0 | 174,930.0 | 174,930.0 | - | - | 174,930.0 | 174,930.0 | 174,930.0 |
| Seneca Capital Management LLC | 150.0 | - | 302.1 | - | 170.0 | - | - | - |
| Sentinel Trust Company, Lba | 5,300.0 | 5,300.0 | 5,300.0 | 5,300.0 | 5,300.0 | - | - | - |
| Sentry Investment Management Inc | - | - | - | 36,500.0 | 67,100.0 | 69,600.0 | 69,600.0 | 69,600.0 |
| Sequoia Analytical Investors, LLC | - | - | - | 39,940.0 | 23,800.0 | 44,160.0 | 51,570.0 | 17,930.0 |
| SG Cowen & Company, LLC | 101,175.0 | 172,409.3 | 176,492.1 | 148,482.9 | 128,682.9 | 86,482.9 | 96,277.1 | 96,970.7 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | | As of the Quarter Ended | | | |
| Shaw (George T.) | 18,980.7 | 12,042.9 | - | - | - | - | - | - |
| Shaw D.E. & Co., Inc. | - | - | 188,600.0 | - | - | - | - | - |
| Shoreline Investment Management | - | - | 155,000.0 | 155,000.0 | 80,000.0 | - | - | - |
| Shufro, Rose & Co., LLC | 44,770.0 | 34,185.7 | 28,824.3 | 29,024.3 | 28,299.3 | 28,732.1 | 27,574.3 | 27,259.3 |
| Simmons First Trust Company, N.A. | 660.0 | 860.0 | 860.0 | 860.0 | 860.0 | 1,287.1 | 360.0 | 360.0 |
| Sirach Capital Management, Inc. | - | - | 35,000.0 | 18,000.0 | 18,000.0 | 18,000.0 | 18,000.0 | - |
| SIT Investment Associates Inc | 315,600.0 | 467,600.0 | 564,200.0 | 565,700.0 | 568,700.0 | 571,750.0 | 550,250.0 | 562,750.0 |
| SKBA Capital Management, LLC | - | 139,735.0 | 66,405.7 | 27,430.0 | - | - | - | - |
| Sloate, Weisman, Murray & Company, Inc. | - | 107,385.0 | - | - | - | - | - | - |
| Smith Asset Management Group, L.P. | 100.0 | 150.0 | 150.0 | 150.0 | - | - | - | - |
| Smoot, Miller, Cheney & Company | 40,380.0 | 25,350.0 | 25,200.0 | 24,400.0 | 118,300.0 | 102,650.0 | 103,800.0 | 52,000.0 |
| Snyder Capital Management, LP | - | - | - | 8,460.0 | - | - | - | - |
| Snyder, Jennifer, C. | - | - | - | - | 11,790.0 | 18,080.0 | 15,700.0 | 15,700.0 |
| Soros Fund Management LLC | 6,860.0 | 250,000.0 | 250,000.0 | - | - | - | - | - |
| Sound Shore Management, Inc. | - | - | - | - | - | - | 2,357,300.0 | 1,468,100.0 |
| Southtrust Asset Management Company | 42,577.1 | - | - | - | - | - | - | - |
| Spears (W.G.), Grisanti & Brown, LLC | - | 6,750.0 | 6,750.0 | 6,750.0 | 6,750.0 | 6,850.0 | 6,850.0 | 6,850.0 |
| SSI Investment Management Inc. | - | - | - | - | 27,850.0 | 125.0 | 125.0 | - |
| St Paul Travelers Companies, Inc. | - | - | - | 352,510.0 | 249,680.0 | 99,820.0 | 2,780.0 | 2,780.0 |
| St. Germain (D.J.) Company, Inc. | - | - | - | 3,962.1 | 3,962.1 | - | - | - |
| Standard Life Investments (Usa) Limited | - | - | - | 340,127.1 | 587,910.7 | 696,119.3 | 717,632.1 | 779,942.9 |
| Starbuck, Tisdale & Associates | 9,145.7 | 9,145.7 | 9,245.7 | 9,967.9 | 10,427.9 | 9,867.9 | 11,867.9 | 11,867.9 |
| State Farm Mutual Automobile Insurance Co | 1,740,000.0 | 2,070,600.0 | 2,070,600.0 | 2,077,300.0 | 2,077,300.0 | 2,077,300.0 | 2,077,300.0 | 2,077,300.0 |
| State Street Corporation | 16,077,570.7 | 26,425,730.7 | 26,964,022.9 | 28,684,042.9 | 29,770,454.3 | 31,053,502.1 | 31,860,317.9 | 32,775,235.7 |
| State Street Research & Management Company - Other | 8,080,550.0 | 9,211,405.0 | 10,316,237.1 | 8,320,274.3 | 8,644,460.0 | 8,507,245.0 | 8,450,342.1 | 6,617,025.7 |
| Stein Roe & Farnham Incorporated | 386,007.9 | 342,474.3 | 338,355.7 | 335,135.0 | 33,535.0 | - | 72,100.0 | 406,400.0 |
| Steinberg Global Asset Management, Ltd. | 9,710.0 | 10,520.7 | 10,680.0 | 11,830.0 | 11,882.1 | 10,582.1 | 10,382.1 | 9,035.0 |
| Steinroe Investment Counsel, LLC | - | - | - | - | 239,289.3 | 227,319.3 | 207,055.0 | 166,485.0 |
| Stephens Inc. | - | - | - | - | - | - | - | 100.0 |
| Sterne Agee & Leach Group, Inc. | 15,925.0 | 1,037.9 | 6,209.3 | 4,899.3 | - | - | - | - |
| Stevenson Capital Management | 4,629.3 | 4,937.9 | 4,937.9 | - | 4,500.0 | 4,500.0 | 3,000.0 | 3,000.0 |
| Stichting Pensi0Enfonds Abp | - | - | - | - | - | 359,897.1 | 519,497.1 | 1,125,005.0 |
| Stock Yards Bank And Trust Company | - | - | - | - | - | - | - | - |
| Stonebridge Capital Management Inc | - | - | 6,490.0 | 16,640.0 | 25,290.0 | 28,690.0 | 30,090.0 | 15,700.0 |
| Stoneridge Investment Partners, L.L.C. | 151,620.0 | 203,980.0 | 187,025.0 | - | 125,785.0 | 127,310.0 | 109,970.0 | 109,620.0 |
| Storie Advisors, LLC | - | - | - | - | - | 10,000.0 | - | - |
| Stratton Management Company | 25,174.3 | 22,865.7 | 20,787.9 | 20,487.9 | 18,304.3 | 17,304.3 | 16,685.0 | 17,085.0 |
| Strong Capital Management, Inc. | 114,475.0 | 217,055.7 | 1,213,355.7 | 2,385,597.9 | 1,179,637.1 | 402,797.9 | 94,017.1 | 413,139.3 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | | | | As of the Quarter Ended | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Sturdivant & Company, Inc. | - | - | 44,172.1 | 44,772.1 | 44,772.1 | - | 24,600.0 | - |
| Suffolk Capital Management Inc. | 637,720.7 | - | - | - | - | - | - | - |
| Sumitomo Life Insurance Company | - | - | 178,240.0 | 260,620.0 | 217,330.7 | 138,567.9 | 123,080.7 | 129,732.1 |
| Summit Investment Partners, Inc. | 81,569.3 | 61,195.0 | 47,634.3 | 31,460.7 | 32,014.3 | 32,879.3 | 31,419.3 | 31,419.3 |
| Sun Life Assurance Company of Canada | 150,900.0 | 97,595.7 | 11,317,602.9 | 84,122.9 | 17,427.9 | 64,092.9 | 125,492.9 | 95,125.7 |
| Sunrise Partners Limited Partnership | 641,600.0 | 8,835.0 | - | 31,447.9 | 85,112.9 | 228,112.9 | 273,412.9 | 109,967.9 |
| Suntrust Banks, Inc. | 1,226,562.1 | 1,548,759.3 | 1,516,654.3 | 1,321,917.1 | 1,425,119.3 | 1,421,295.0 | 1,459,579.3 | 1,337,562.1 |
| Susquehanna Trust & Investment Company | - | - | - | - | - | 5,240.0 | - | - |
| Swan (Philip) V. Associates Inc. | 9,440.0 | 20,724.3 | 26,974.3 | 27,974.3 | 28,674.3 | 30,299.3 | 30,674.3 | 37,119.3 |
| Swarthmore Group (The) | - | - | - | 169,177.9 | 212,075.0 | 212,075.0 | 212,075.0 | 220,825.0 |
| Swiss Re Asset Management Americas, Inc. | 110,000.0 | 115,400.0 | 120,000.0 | 110,000.0 | - | 96,800.0 | - | 135,000.0 |
| Synovus Financial Corporation | 283,045.0 | 158,064.3 | 322,169.3 | 221,309.3 | 93,812.9 | 164,562.1 | 16,049.3 | 39,325.0 |
| Systematic Financial Management, L.P. | 414,019.3 | 103,325.0 | 104,610.7 | 106,350.0 | 52,935.7 | 34,767.1 | 35,295.7 | 33,920.0 |
| T/F Partners | 60,800.0 | - | - | - | - | - | - | - |
| Taconic Capital Advisors, L.L.C. | 188,000.0 | 187,900.7 | 187,900.7 | 187,900.7 | 180,400.7 | 187,900.7 | - | - |
| Talon Asset Management | - | 4,500.0 | 4,500.0 | 4,500.0 | 4,500.0 | 4,500.0 | - | 91,900.7 |
| Taunus Corporation | 16,143,675.0 | 12,955,765.0 | 11,471,090.7 | 13,775,037.9 | 13,703,444.3 | 14,713,319.3 | 17,611,267.9 | 22,148,915.0 |
| Tcw Group, Inc. (The) | 337,580.7 | 363,517.9 | 468,242.9 | 710,105.0 | 780,802.1 | 827,505.7 | 1,470,270.0 | 867,365.0 |
| Td Asset Management, Inc | 381,387.9 | 395.0 | - | 957,475.0 | 911,482.9 | 766,582.9 | 619,472.1 | 696,145.7 |
| Teachers Advisors, Inc. | 179,950.0 | 205,345.0 | 255,045.0 | 281,145.0 | 464,010.0 | 518,380.7 | 681,320.0 | 889,220.0 |
| Terre Haute First National Bank | 1,690.0 | 1,690.0 | 1,490.0 | 1,390.0 | 1,390.0 | 1,390.0 | 1,390.0 | 1,390.0 |
| Tewksbury Capital Management Ltd | - | - | - | 5,400.0 | - | - | - | - |
| Texas - Teacher Retirement System | 3,889,787.1 | 3,792,787.1 | 3,866,227.1 | 3,866,227.1 | 4,031,227.1 | 4,000,227.1 | 4,142,227.1 | 4,047,000.0 |
| Thales Fund Management, L.L.C. | - | 237,600.0 | - | - | - | - | - | 256,000.0 |
| Third Point Management Company LLC | 68,369.3 | 90,000.0 | - | - | - | - | - | - |
| Thomas White International Ltd | - | - | - | - | - | - | - | 16,684.3 |
| Thompson, Siegel & Walmsley, Inc. | 53,247.9 | 50,040.7 | 53,410.7 | 48,725.7 | 48,769.3 | 46,179.3 | 47,675.0 | 38,249.3 |
| Thompson/Rubinstein Investment Management, Inc. | - | - | - | - | 7,800.0 | - | - | - |
| Thornburg Investment Management Inc. | 33,320.0 | 50,760.0 | 70,760.0 | 121,474.3 | 108,405.0 | 71,995.0 | - | - |
| Thrivent Financial For Lutherans | 613,582.1 | 928,832.1 | 1,049,502.1 | 1,373,982.1 | 1,052,840.7 | 1,419,092.1 | 1,791,852.9 | 1,920,052.9 |
| Thrivent Investment Management Inc | 134,915.0 | 144,814.3 | 149,514.3 | 152,914.3 | 155,614.3 | 156,214.3 | 153,314.3 | 154,714.3 |
| TIAA-CREF Trust Company FSB/MO | 15,700.0 | 16,182.1 | 16,955.0 | 21,670.7 | 21,270.0 | 23,307.1 | 60,699.3 | 64,172.1 |
| TIAA-CREF Investment Management, LLC | 8,306,357.1 | 9,596,255.0 | 9,500,555.0 | 9,666,755.0 | 12,229,045.0 | 12,820,459.3 | 14,708,652.9 | 16,921,652.9 |
| Times Square Capital Management | - | - | - | 579,049.3 | 564,449.3 | 562,949.3 | 557,049.3 | 552,449.3 |
| Tobias, Seth | 35,000.0 | - | - | - | 20,000.0 | 20,000.0 | - | - |
| Todd Investment Advisors Inc | 10,300.0 | 10,000.0 | 9,800.0 | 9,800.0 | 9,800.0 | 9,800.0 | - | - |
| Tompkins Trustco Inc | 15,550.7 | 15,944.3 | 11,802.9 | 11,802.9 | 11,927.9 | 12,102.9 | 12,147.9 | 11,827.9 |
| Tower Asset Management LLC | - | - | 46,470.7 | 103,377.1 | 50,410.0 | 48,027.1 | 42,862.9 | 63,062.1 |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | As of the Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
| Tradition Capital Management LLC | - | - | - | - | - | - | 35,475.7 | 58,425.7 |
| Train, Babcock Advisors LLC | 40,485.0 | 118,644.3 | 115,607.1 | 113,357.1 | 113,107.9 | 108,514.3 | 111,665.7 | 75,080.7 |
| Trainer, Wortham & Company | 5,160.0 | 8,900.0 | 104,442.9 | 96,270.0 | 64,735.7 | 64,007.9 | 63,857.9 | 63,507.9 |
| Transamerica Investment Management LLC | - | 39,844.3 | 44,190.7 | 40,790.7 | 41,912.1 | 40,412.1 | 42,412.1 | 2,361,987.9 |
| Trees Front Associates Inc | - | - | 5,825.0 | 6,039.3 | 5,100.0 | 4,745.0 | - | 12,195.0 |
| Trellus Management Company, LLC | - | - | - | - | - | 40,000.0 | - | 66,000.0 |
| Trilogy Advisors, LLC | - | - | - | - | - | - | - | 1,046,307.1 |
| Trinity Investment Management Corporation | 13,565.7 | 620,482.1 | 574,882.1 | 575,582.1 | 532,044.3 | 299,117.9 | 229,517.9 | 135,717.9 |
| Trust & Fiduciary Management Services Inc | - | - | - | - | - | 2,260.0 | 2,260.0 | 2,260.0 |
| Trust Company of Oklahoma (Tulsa) | - | 8,932.1 | 7,052.1 | 6,945.0 | 6,045.0 | 6,825.0 | 11,825.0 | - |
| Trust Company of Toledo, N.A. | 21,700.0 | 5,555.0 | 5,555.0 | 5,555.0 | - | - | - | - |
| Trust Company of Vermont | - | - | - | - | - | - | - | 310.0 |
| Trust Company of Virginia | - | - | - | - | - | 5,100.0 | 8,550.0 | 19,815.0 |
| Trustmark National Bank, Trust Department | - | 5,912.1 | 8,142.1 | 7,792.1 | 8,067.1 | 8,067.1 | 5,552.1 | 5,522.1 |
| Tudor Investment Corporation | - | - | - | - | - | 151,300.0 | - | - |
| Turner Investment Partners, Inc. | 323,970.0 | 450,332.9 | 770,267.1 | 1,900.0 | - | - | - | - |
| Tweedy Browne Company, L.L.C. | 5,858,905.7 | 5,687,914.3 | 5,660,507.1 | 5,564,887.9 | 5,696,064.3 | 5,696,110.7 | 5,768,099.3 | 5,782,095.7 |
| Twin Capital Management, Inc. | - | 75,650.0 | 10,300.0 | - | - | 35,110.0 | 110,820.0 | 38,920.0 |
| U.S. Bancorp (Minnesota) | 3,198,887.1 | 4,466,420.7 | 4,899,492.1 | 4,827,729.3 | 4,586,064.3 | 4,604,490.7 | 4,776,794.3 | 5,336,732.9 |
| U.S. Global Investors, Inc. | 4,500.0 | 5,070.0 | 5,070.0 | 35,070.0 | 5,070.0 | 20,070.0 | 15,000.0 | 13,000.0 |
| UBS Ag, New York Branch | 137,439.3 | | | | | | | |
| UBS Americas Inc. | 865,832.1 | 2,328,999.3 | 3,505,882.1 | 2,148,240.7 | 2,305,137.9 | 2,933,917.9 | 2,772,977.9 | 2,389,084.3 |
| UBS Global Asset Management (Americas) Inc | 914,660.0 | 884,199.3 | 1,326,199.3 | 1,364,152.1 | 724,552.1 | 732,952.1 | 230,452.1 | 124,785.0 |
| UBS Global Asset Management (Uk) Limited | 217,165.7 | 125,212.1 | 128,112.1 | 132,462.1 | 137,989.3 | 253,389.3 | 245,237.1 | 228,260.7 |
| UBS O'Connor LLC | - | - | - | - | 64,800.0 | 55,000.0 | 332,400.0 | 246,000.0 |
| UBS Securities LLC | 285,230.0 | 884,719.3 | 1,695,864.3 | 1,028,855.7 | 1,835,467.1 | 1,746,335.0 | 2,533,630.7 | 1,773,650.0 |
| Ullman (John G.) & Associates, Inc. | 94,149.3 | 42,987.9 | 38,164.3 | 37,482.9 | 37,195.0 | 36,415.0 | 41,165.0 | 52,607.9 |
| UMB Bank N/A/MO | 374,629.3 | 366,694.3 | 375,534.3 | 367,050.7 | 310,702.9 | 290,492.1 | 287,507.9 | 274,527.1 |
| Union Planters Bank, N.A. | 190,250.7 | 183,374.3 | 218,377.1 | 221,674.3 | 225,582.1 | 231,905.0 | 231,095.7 | 224,720.7 |
| Unionbancal Corp | 537,005.0 | 536,990.0 | 493,057.9 | 426,350.0 | 418,365.0 | 432,475.7 | 457,865.7 | 482,115.0 |
| United National Bank/WV | 33,714.3 | 28,679.3 | 26,142.9 | 24,450.7 | 24,510.7 | - | - | 22,009.3 |
| United States Trust Company of New York | 1,194,847.9 | 1,427,135.0 | 1,408,852.1 | 1,373,072.9 | 1,665,922.9 | 1,735,099.3 | 1,768,302.1 | 1,447,615.0 |
| United Trust Bank/NJ | 11,900.0 | 10,700.0 | 26,150.0 | 44,787.9 | 48,534.3 | 39,887.9 | 14,887.9 | 10,587.9 |
| Unizan Financial Services Group N.A. | 35,467.1 | 33,967.1 | 31,967.1 | 26,145.7 | 22,520.0 | 20,820.0 | 20,820.0 | 57,927.9 |
| Ursus Capital Management, L.L.C. | - | - | - | - | - | - | - | 20,000.0 |
| USAA Investment Management Company | 1,363,300.0 | 1,535,962.1 | 1,492,855.0 | 1,388,420.7 | 1,216,897.9 | 1,165,432.9 | 1,975,590.0 | 2,310,190.0 |
| Vanguard Group, Inc. (The) | 16,847,205.7 | 18,124,782.1 | 18,632,344.3 | 20,475,549.3 | 20,672,757.1 | 20,966,890.7 | 20,941,509.3 | 22,362,729.3 |
| Vantage Global Advisors, Inc. | 118,162.1 | 9,089.3 | 9,089.3 | 232.9 | - | - | - | - |

193

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| Vaughan Nelson Investment Management, L.P. | 41,704.3 | 24,885.0 | 24,885.0 | 13,585.0 | 13,585.0 | 30,247.1 | 43,547.1 | 60,547.1 |
| Vaughan, David Investments, Inc. | 141,305.0 | 149,372.9 | 147,762.1 | 146,485.0 | 146,749.3 | 152,247.1 | 154,750.7 | 157,545.7 |
| Vector Capital Management | - | - | - | 900.0 | - | 32,300.0 | 49,400.0 | 12,700.0 |
| Verizon Investment Management Corp | 202,312.1 | 512,642.1 | 410,307.9 | 421,880.7 | 839,022.9 | 848,122.9 | 875,622.9 | 858,377.9 |
| Vestor Capital Corp | - | - | - | - | - | - | 102,380.0 | 103,955.0 |
| Virginia Investment Counselors, Inc. | 31,752.9 | 32,115.0 | 31,885.7 | 32,040.7 | 31,897.1 | 31,162.1 | 31,162.1 | 30,187.1 |
| Virginia Retirement System | 387,925.0 | 281,024.3 | 281,224.3 | 280,324.3 | 353,524.3 | 340,355.0 | 345,155.0 | 370,755.0 |
| Voyageur Asset Management Inc | - | - | 8,115.0 | 8,115.0 | 8,115.0 | 8,115.0 | 8,415.0 | 8,115.0 |
| Voyageur Asset Management/MA | 121,045.0 | 120,117.1 | 145,262.9 | 18,502.9 | 87,307.1 | 175,302.1 | 176,252.1 | 78,239.3 |
| Wachovia Bank N.A./VA | 599,377.1 | 609,085.0 | 589,940.7 | 572,822.9 | 563,524.3 | 559,105.7 | 553,954.3 | 550,152.9 |
| Wachovia Corp New | 4,877,725.0 | 7,650.0 | 5,150,360.7 | - | 4,755,315.0 | 2,666,525.0 | 5,488,707.1 | 5,363,777.1 |
| Waddell & Reed Financial Inc. | 4,366,315.0 | 8,244,920.0 | 6,875,937.1 | 4,291,577.1 | 5,347,832.9 | 5,560,287.9 | 7,647,460.7 | 7,423,190.7 |
| Wade, G W Inc. | - | - | - | 1,074.3 | 200.0 | - | - | - |
| Walnut Asset Management LLC | - | - | - | - | 22,412.1 | 22,412.1 | 21,140.0 | 20,047.1 |
| Washington Capital Management, Inc. | 60,570.7 | 29,675.0 | 24,400.0 | - | - | - | - | - |
| Washington Trust Bank Trust & Inv. Services Division | 3,970.0 | - | - | - | - | - | - | 5,472.9 |
| Washington Trust Company | 43,980.0 | 40,625.0 | 41,072.9 | 40,672.9 | 40,072.9 | 47,550.0 | 47,500.0 | 49,637.1 |
| Waters, Parkerson & Company | - | - | - | 7,710.0 | 7,782.1 | 5,392.1 | 5,582.1 | 5,857.1 |
| WB Capital Management, Inc. | - | 5,119.3 | - | - | - | 7,624.3 | 7,739.3 | 7,589.3 |
| WCM Investment Management | 93,890.7 | - | - | - | - | - | - | - |
| Webster Bank NA | - | - | - | - | - | - | 15,487.1 | 14,834.3 |
| Wedgewood Investors, Inc. | - | - | - | - | 4,500.0 | 6,700.0 | 6,600.0 | 12,200.0 |
| Wedgewood Partners, Inc. | - | - | - | - | - | - | 66,925.0 | 71,125.0 |
| Weintraub Capital Management LLC | - | - | - | - | - | - | - | 175,000.0 |
| Weisberg & Fields, Inc. | 25,100.0 | 24,100.0 | 24,100.0 | 24,100.0 | 22,219.3 | 22,219.3 | 22,219.3 | 19,999.3 |
| Weiss, Peck & Greer LLC | 91,500.0 | 586,190.7 | 580,037.1 | 495,550.7 | 529,139.3 | 191,192.9 | 46,467.9 | 29,097.9 |
| Welch & Forbes, LLC | 185,867.9 | 205,960.0 | 176,439.3 | 227,462.1 | 240,412.1 | 212,097.1 | 133,570.0 | 133,902.1 |
| Welch Capital Partners, LLC | 15,700.0 | 15,700.0 | 15,700.0 | 15,700.0 | 15,700.0 | 94,800.0 | 288,720.0 | 372,690.0 |
| Wellington Management Company, LLP | 64,739,892.9 | 427,804.3 | 515,944.3 | 534,644.3 | 485,044.3 | 67,811,305.0 | 76,437,819.3 | 88,859,857.9 |
| Wellington, H.G. & Co., Inc. | - | 4,260.7 | 4,292.1 | 4,292.1 | 19,090.7 | 9,290.0 | - | - |
| Wells Capital Management Inc. | 4,732.1 | 4,845.0 | 121,070.7 | 75,300.0 | 284,555.7 | - | - | - |
| Wells Fargo & Company | 26,415.0 | 18,015.0 | 3,705,455.0 | 2,753,345.7 | 2,990,910.7 | 3,397,589.3 | 3,032,649.3 | 3,708,842.1 |
| Wells Fargo Bank Arizona, N.A. | 17,869.3 | 16,410.0 | 13,985.0 | 9,960.0 | 5,700.0 | - | - | - |
| Wells Fargo Bank Indiana, N.A. | 67,250.7 | 67,050.7 | 61,382.1 | 61,127.1 | 57,827.1 | - | - | - |
| Wells Fargo Bank Iowa, N.A. | - | 62,302.9 | 53,800.7 | 49,192.1 | 49,047.1 | - | - | - |
| Wells Fargo Bank Minnesota, N.A. | 116,260.0 | 106,309.3 | 154,065.7 | 120,274.3 | 146,529.3 | - | - | - |
| Wells Fargo Bank Montana, N.A. | 39,190.7 | 38,329.3 | 37,219.3 | 36,609.3 | 36,174.3 | - | - | - |
| Wells Fargo Bank N A | 1,785,485.7 | 2,996,409.3 | 2,925,082.1 | 2,125,594.3 | 2,192,479.3 | - | - | - |

**Exhibit-16**

**Shares Held by Institutions During the Class Period**

| Institution Name | 3/31/2000 | 6/30/2000 | 9/30/2000 | 12/31/2000 | 3/31/2001 | 6/30/2001 | 9/30/2001 | 12/31/2001 |
|---|---|---|---|---|---|---|---|---|
| | | | | | As of the Quarter Ended | | | |
| Wells Fargo Bank Nebraska, N.A. | 5,240.0 | 7,240.0 | 6,940.0 | 6,940.0 | 6,100.0 | - | - | - |
| Wells Fargo Bank New Mexico, NA | - | 1,532.9 | - | - | - | - | - | - |
| Wells Fargo Bank South Dakota, National Association | 6,720.7 | 6,720.0 | 5,457.9 | 5,385.0 | 5,385.0 | - | - | - |
| Wells Fargo Bank Texas, N.A. | 24,065.7 | 109,024.3 | 100,039.3 | 32,195.0 | 31,050.0 | - | - | - |
| Wells Fargo Bank West, N.A. | 31,032.9 | 28,499.3 | 27,714.3 | 21,464.3 | 15,014.3 | - | - | - |
| Wells Fargo Bank Wisconsin, N.A. | 6,235.0 | 5,385.0 | 2,570.0 | 2,570.0 | 2,287.1 | - | - | - |
| Wells Fargo Bank Wyoming, N.A. | - | - | - | 15,100.0 | - | - | - | - |
| Wells Fargo Investments, LLC | 22,884.3 | 22,812.1 | - | 27,119.3 | 27,060.7 | 37,139.3 | - | - |
| Wendell (David) Associates, Inc. | - | - | 6,842.1 | 8,652.1 | 8,652.1 | 8,652.1 | 8,652.1 | 8,352.1 |
| Wentworth, Hauser And Violich | 28,955.0 | 27,175.0 | 23,820.0 | 24,645.0 | 24,450.0 | 339,477.9 | 608,510.0 | 827,282.1 |
| Wesbanco Bank Inc. | 23,150.0 | 25,810.7 | 26,355.0 | 26,145.0 | 26,175.7 | 24,475.7 | 23,647.9 | 23,647.9 |
| West Ellis Investment Management Inc. | 11,782.9 | 11,550.0 | 11,550.0 | 11,520.0 | 11,520.0 | 11,360.0 | 11,450.0 | 11,432.1 |
| Western National Trust Company | 16,059.3 | 15,559.3 | 15,999.3 | 15,999.3 | 46,785.0 | 52,929.3 | 60,687.1 | 48,690.0 |
| Westfield Capital Management Company | 15,120.0 | 15,120.0 | 15,120.0 | 14,945.0 | 14,945.0 | 14,945.0 | 14,945.0 | 14,945.0 |
| Weston Asset Management, Inc/Az | - | - | - | 21,500.0 | 20,900.0 | 21,400.0 | 20,900.0 | 14,300.0 |
| Westpeak Global Advisors, L.P. | 169,690.0 | 255,395.0 | 330,369.3 | 405,969.3 | 486,169.3 | 147,170.7 | 200,789.3 | 356,189.3 |
| Westport Asset Management Inc. | 9,800.0 | 9,520.0 | 9,520.0 | 9,520.0 | 9,520.0 | 9,520.0 | 9,520.0 | 9,520.0 |
| Westridge Capital Management, Inc. | - | 7,765.0 | 7,765.0 | 7,765.0 | - | - | - | - |
| Westwood Management Corp.,(Dallas, Texas) | 933,260.7 | 1,112,502.1 | 1,018,250.7 | - | - | 1,367,049.3 | 1,390,417.1 | 5,920.7 |
| Whelan And Gratny Capital Management | 16,000.0 | 16,000.0 | 16,000.0 | 16,000.0 | 16,000.0 | 16,000.0 | 16,000.0 | - |
| White Oak Capital Management, Inc. | - | - | - | - | 5,327.1 | 5,327.1 | 5,327.1 | 5,327.1 |
| White Pine Capital, LLC | - | - | - | 5,257.1 | 5,257.1 | 4,457.1 | - | - |
| White River Global Fund Management, Inc. | - | - | - | - | - | - | - | - |
| Whitman, M.J. Advisors Inc./NY | - | - | - | - | 32.1 | - | - | - |
| Whitney, Thomas H.P. Jr. | - | 50,982.9 | 51,182.9 | 48,722.9 | 49,122.9 | 49,122.9 | 49,122.9 | 47,522.9 |
| Wilbanks, Smith & Thomas Asset Management, Inc. | 47,635.7 | 83,107.1 | 219,577.9 | 238,815.7 | 263,675.7 | 273,504.3 | 276,820.7 | 282,604.3 |
| Williams, Jones & Associates, Inc. | 20,335.0 | 23,440.0 | 23,640.0 | 24,457.1 | 25,760.0 | 26,585.0 | 24,925.0 | 24,425.0 |
| Wilmington Trust Company | 343,337.1 | 128,905.0 | 113,075.7 | 81,322.9 | 73,507.1 | 70,030.7 | 75,899.3 | 76,742.1 |
| Wilmington Trust FSB | 7,340.0 | 10,234.3 | 12,365.0 | 12,732.1 | 17,670.7 | 17,715.0 | 20,084.3 | 33,794.3 |
| Wilson/Bennett Capital Management | - | 400.0 | 400.0 | 400.0 | 400.0 | 745.0 | 745.0 | 745.0 |
| Windham Capital Management | 63,040.0 | - | - | - | - | - | - | - |
| Winslow Capital Management | - | 106,830.0 | 111,430.0 | - | 67,550.0 | 35,700.0 | - | - |
| Wisconsin (State of) Investment Board | 593,310.7 | 602,900.0 | 109,500.0 | 127,400.0 | 160,600.0 | 224,600.0 | 224,600.0 | 222,700.0 |
| Wisconsin Capital Management | 12,860.0 | 13,895.7 | 13,895.7 | 14,395.7 | 14,395.7 | 18,745.7 | 18,879.3 | 17,414.3 |
| Woodford Capital Management, L.L.C. | 18,800.0 | - | - | 3,300.0 | - | 61,650.0 | - | - |
| Woodmont Investment Counsel | - | - | - | 3,819.3 | - | - | - | - |
| Woodstock Corporation | 26,517.1 | 26,557.9 | 26,557.9 | 26,740.0 | 26,740.0 | 26,740.0 | 26,740.0 | 19,062.1 |
| Wright Investors' Service | 4,124.3 | - | 3,420.7 | 3,420.7 | 4,420.7 | 2,920.7 | 2,920.7 | 8,097.1 |

# EXHIBIT 7

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALASKA ELECTRICAL PENSION FUND, *et al.*, On Behalf of Themselves and All Others Similarly Situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>PHARMACIA CORPORATION, *et al.*,<br><br>      Defendants. | Civil Action No. 3:09-1519 (AET) (Consolidated)<br><br>CLASS ACTION |

REBUTTAL REPORT OF

STEVEN P. FEINSTEIN, PH.D., CFA

JULY 15, 2011

# TABLE OF CONTENTS

SCOPE OF PROJECT AND REPORT ................................................................................ 1

CONCLUSIONS................................................................................................................. 1

DR. LEHN SEES NO SCIENTIFIC BASIS ..................................................................... 2

A STOCK PRICE NEED NOT RISE ON AN INFLATIONARY  MISREPRESENTATION DATE ................................................................................................................................. 2

    Nonetheless, Dr. Lehn's Event Study Indicates a Significant Stock Price Increase Following the Announcement of CLASS Results in April 2000 ................................................... 4

DR. LEHN'S EVENT STUDY IS FLAWED  AND HIS CONCLUSION ABOUT 7 FEBRUARY 2001 IS WRONG........................................................................................... 5

    Dr. Lehn Fails to Control for the Chemical Sector Effect ......................................... 5

    Dr. Lehn's Anomalous Choice of Peers and Index Construction Methodology ....................... 7

    Despite Its Flaws, Dr. Lehn's Event Study Detects an Unusually Large Stock Price Decline on 7 February 2001 ......................................................................................................... 7

DR. LEHN'S TOO NARROW WINDOW LENGTH ...................................................... 8

    Dr. Lehn's Window Premise is Inconsistent with His Three-Day Dummy Variables ............. 11

    Dr. Lehn Conducts a Two-Day Cumulative Test .................................................... 12

    Dr. Lehn Adopts Multiday Event Windows in His Published Research ................................ 13

THE CORRECTIVE DISCLOSURE ON 6 FEBRUARY 2001 WAS PARTIALLY COUNTERVAILED BY COMPANY STATEMENTS ................................................... 13

    Defendants Briefing Document Presented and Advocated the Six-Month Data ..................... 14

    Pharmacia's Presentation at the Merrill Lynch Conference .................................... 15

    Dr. Lehn Ignores the Defendants' Countervailing Briefing Document Posted on  February 6th .............................................................................................................................. 15

DR. LEHN'S CONTENTION THAT THE ADVISORY COMMITTEE'S DECISION WAS AN UNFORESEEN DEVELOPMENT IS INCORRECT AND CONTRARY TO THE FACTS..... 16

    Defendants Knew At the Beginning of the Class Period That the Complete CLASS Data Did Not Support Deletion of the NSAID GI Warning .................................................... 19

DR. LEHN'S CONTENTION ABOUT STOCK PRICE ADJUSTMENT SPEED IS INCONSISTENT WITH HIS DESCRIPTION OF THE ROLE OF ANALYST REPORTS ..... 19

ANALYZING THE EFFECT OF VIOXX-RELATED INFORMATION THAT EMERGED ON 8 FEBRUARY 2001 ........................................................................................................ 22

    Merck Event Study Results.................................................................................... 25

INTRADAY PRICE MOVEMENTS ON 8 FEBRUARY 2001 ................................... 26

    Factual Errors in Dr. Lehn's Intraday Analysis .................................................... 27

        Dr. Lehn Measures the Price Changes Incorrectly ......................................... 27

        Dr. Lehn Sets the Time of the Vioxx News Incorrectly ................................. 27

        Price Response Following the *Associated Press* Wire ................................. 31

Pharmacia Stock Had Declined Prior to the Vioxx Announcement ...................................... 32

Methodological Errors in Dr. Lehn's Intraday Analysis .......................................... 32

Dr. Lehn Neglects to Control for Market and Peer Effects, Or for the Value of New Monsanto.......................................................................................................................... 32

Dr. Lehn Ignores the Noise and Errors in Intraday Price Data .............................................. 33

Dr. Lehn Ignores the Special Statistical Testing that Intraday Price Analysis Requires ...... 34

Dr. Lehn Fails to Consider Pharmacia Stock's Intraday Price Movement On 7 February 2001 .................................................................................................................................. 35

THE SCIENTIFIC BASES DR. LEHN OVERLOOKED ...................................................... 37

CRITIQUE OF THE FIORINO REPORT .............................................................................. 38

Dr. Fiorino Draws Loss Causation Conclusions, But Runs No Event Study .......................... 38

Dr. Fiorino's Assumptions About Stock Return Significance Are Incorrect .......................... 40

Dr. Fiorino Contradicts His Own Argument About What Moves Stock Prices ...................... 41

Dr. Fiorino's Attribution of the Pharmacia Stock Price Decline to the Vioxx Announcement is Unsupported, Inconsistent, and Incorrect.......................................................................... 43

Dr. Fiorino Disregards the Academic Literature on Reputation Effects ................................. 44

Dr. Fiorino's Opinions About Analyst Coverage and the Materiality of the CLASS Disclosure Are Belied by the Analyst Report He Coauthored.................................................................... 46

Dr. Fiorino and His Team Did Not Issue Another Analyst Report Covering the Subsequent FDA Committee Announcements ............................................................................................ 47

Dr. Fiorino's Opinion About the Speed of Price Adjustment is Belied by His Own Analyst Report ...................................................................................................................................... 47

Dr. Fiorino's Analyst Report Illustrates That the February 6th Disclosure Was Complex and Confounded.............................................................................................................................. 48

Dr. Fiorino's Attempt to Attribute the Price Decline to Other Events is Misguided............... 50

Dr. Fiorino's Intraday Analysis is Improperly Selective and Factually and Methodologically Flawed...................................................................................................................................... 51

Factual Errors in Dr. Fiorino's Analysis of Intraday Prices On 8 February 2001 ................ 51

Methodological Errors in Dr. Fiorino's Intraday Analysis .................................................... 52

Dr. Fiorino Fails to Consider Pharmacia Stock's Intraday Price Movement On 7 February 2001 ........................................................................................................................................ 52

Dr. Fiorino's Representations of Select Investment Manager Recollections is Unscientific and Irrelevant.................................................................................................................................. 52

Dr. Fiorino Misinterprets the Investment Professionals' Testimony.................................... 53

The Market Aggregates Disparate Views ............................................................................. 53

LIMITING FACTORS .......................................................................................................... 54

## <u>SCOPE OF PROJECT AND REPORT</u>

1.    In my expert report dated 6 June 2011 ("Feinstein June Report" or "June Report"), I determined that Pharmacia stock traded in an efficient market over the course of the Class Period. I also determined that alleged misrepresentations and omissions caused the price of Pharmacia stock to be artificially inflated over the course of the Class Period. Corrective disclosures caused the inflation to dissipate, the stock price to fall, and investors to suffer losses of up to $5.92 per share. I determined that aggregate damages estimated by a two-trader proportional trading model using a 90-day bounce-back period that commences on 8 February 2001 amount to $1.38 billion, or $1.59 billion assuming the 90-day bounce-back period begins 5 August 2001. Both estimates exclude prejudgment interest.

2.    Subsequently, I was asked by Robbins Geller Rudman & Dowd LLP, counsel for the Plaintiffs, to consider and evaluate the arguments and conclusions in the Expert Report of Dr. Kenneth M. Lehn ("Lehn Report") and the Expert Report of Dr. Anthony Fiorino ("Fiorino Report") submitted by the Defendants in this matter. This report presents my analysis, findings, and conclusions relating to those two reports.

3.    The documents I have reviewed and relied upon in the course of this engagement in addition to those cited in my previous report are listed in Exhibit-1. My credentials and compensation are presented in my June Report, as are prior testimonies provided as of the date of that report. Testimony I have provided since the submission of my first report is identified in Exhibit-2.

## <u>CONCLUSIONS</u>

4.    Neither the Lehn Report nor the Fiorino Report provide a basis for revising my conclusions of market efficiency, loss causation, and estimated aggregate damages.

5.    Dr. Lehn errs in a number of important respects, rendering his analysis unreliable.

6.    Dr. Fiorino's conclusions are based principally on conjecture and are unsupported by the generally accepted methodologies that are widely used to analyze stock return attribution and loss causation.

## DR. LEHN SEES NO SCIENTIFIC BASIS

7.   Dr. Lehn states that he observed no scientific basis indicating that the alleged misrepresentations and omissions about the CLASS data inflated Pharmacia's stock price.

> "Based on my review of information that was in the public domain and event study analyses of Pharmacia's stock price that I conducted, it is my opinion that there is no scientific basis to conclude that the alleged misrepresentations in this matter were material. Therefore, there is no scientific basis to conclude that the alleged misrepresentations caused Pharmacia's stock price to be artificially inflated during the class period." **Lehn Report, paragraph 9.**

8.   As discussed in my June Report, proper analysis proves the misrepresentations and omissions were material and caused Pharmacia's stock price to be inflated over the course of the Class Period, and that corrective disclosures caused the inflation to dissipate, thereby causing investor losses. Dr. Lehn's numerous methodological errors, oversights of important facts, and misconceptions about fundamental financial principles obscured his view of this scientific evidence.

## A STOCK PRICE NEED NOT RISE ON AN INFLATIONARY MISREPRESENTATION DATE

9.   Dr. Lehn asserts that Pharmacia's non-significant stock returns on certain misrepresentation dates are "inconsistent" with Plaintiffs' allegations that the misrepresentations inflated the Pharmacia stock price, and therefore indicate that the alleged misrepresentations and omissions did not cause the Pharmacia stock price to be artificially inflated.

> "The event study analysis finds that Pharmacia's residual return on April 17, 2000 is *negative* 0.43% and not statistically significant. This result is inconsistent with the plaintiffs' allegation that the April 15-17, 2000 announcements artificially inflated Pharmacia's stock price." **Lehn Report, paragraph 49 (emphasis in original).**

> "The event study analysis shows that Pharmacia's residual return on April 25, 2000 was *negative* 8.05% and statistically significant, which is inconsistent with Plaintiffs' claim that the alleged false statements made

during the analyst conference call artificially inflated Pharmacia's stock price."
*Ibid.*, **paragraph 62 (emphasis in original).**

10.    Dr. Lehn, however, is wrong. Material misrepresentations need not cause a statistically significant stock price rise, because misrepresentations may introduce artificial inflation by preventing a security price from falling rather than by causing the price to increase. The absence of a statistically significant stock price increase is therefore not inconsistent with there having been a new material misrepresentation or omission.

11.    A review of the analyst commentary around the time the CLASS study results were released in April 2000 indicates that the market expected the CLASS study to demonstrate Celebrex's GI safety:

> "The imminent completion of the CLASS study, conducted to demonstrate a reduction in the incidence of severe GI side effects of ulcers and bleeds, should result in a supplemental filing to remove the NSAID class warning from the label. This should prove to be the single most important event driving the expansion of the COX-2 inhibitors to a dominant position in arthritis treatment."
> **"Creation of New 'Porsche Pharma' Offers Potential to Be Better Than Biotech," by Richard Stover, Arnhold and S. Bleichroeder, Pharmacia analyst report, 22 March 2000, p. 16.**

> "The next big thing in the Celebrex story should take place around midyear, when the companies are expected to submit a supplemental NDA (sNDA) with the results of their outcomes trial (the CLASS trial)."
> **"Initiating Coverage With an Outperform Rating," by Jami Rubin, *et al.*, Morgan Stanley Dean Witter, Pharmacia analyst report, 4 April 2000, p. 5.**

> "Nevertheless, we would expect COX-2 sales to accelerate after the release of the [CLASS and VIGOR] data, which could occur at DDW in May 2000."
> **"MRK's:  VIOXX GI Outcomes Data – Details Part 1," by Christina Heuer and Mark Striker, Salomon Smith Barney, Merck analyst report, 28 March 2000, p. 3.**

12.    Given the market's expectation that the CLASS study would show Celebrex's superior GI safety profile relative to NSAIDs, truthful contradictory data would have cause a price decline, but confirmatory data would reasonably maintain the prior price level. The spread between the maintained price level and the lower level the price would have fallen to with

correct information is the artificial inflation introduced by the alleged misrepresentations and omissions.

**Nonetheless, Dr. Lehn's Event Study Indicates a Significant Stock Price Increase Following the Announcement of CLASS Results in April 2000**

13. Dr. Lehn contends the Pharmacia stock price did not rise significantly in reaction to the initial announcement about CLASS results on 17 April 2000. However, he only reports event study results for that one day, and does not consider that the complex information reported may have taken multiple days to be fully understood by the market and incorporated into the stock price.

14. According to the results of Dr. Lehn's own event study, as presented in Exhibit 4 of his report, the Pharmacia residual return on 19 April 2000 was positive and highly statistically significant. The three-day cumulative return on Pharmacia stock from 17 April to 19 April 2000 was also positive, large, and statistically significant.

15. The returns in Dr. Lehn's event study are not logarithmic returns, but rather are percent price changes. In order to compute cumulative returns, estimate the standard deviation of cumulative returns, and determine whether or not the three-day return on 17-19 April 2000 was statistically significant, it was necessary to replicate Dr. Lehn's regression analysis using logarithmic returns. For this exercise, I used the same market and peer group data that Dr. Lehn used, the same dummy variables, and the same estimation period. The results of this regression estimation are presented in Exhibit-3, and the corresponding event study results are presented in Exhibit-4.

16. As shown in Exhibit-4, the three-day cumulative return was 11.75%. The cumulative residual return was 8.92%, which corresponds to a $t$-statistic value of 2.67. This cumulative three-day residual price rise following the initial announcement of the CLASS results on 17 April 2000 was statistically significant at the 0.4% significance level, equivalent to a 99.60% confidence level, when computed using the same one-tailed test approach that Dr. Lehn uses in his event study (p-value equals 0.004). Using a two-tailed test, the price rise is significant at the 0.79% significance level, corresponding to a 0.0079 p-value and 99.21% confidence level.

17.   No other information that emerged over the 17-19 April 2000 timeframe, aside from the reported CLASS results, explains the large significant stock price increase. Had Dr. Lehn appropriately widened the event study window, he would have observed this statistically significant stock price increase that followed the allegedly misleading initial CLASS results announcement.

## DR. LEHN'S EVENT STUDY IS FLAWED
## AND HIS CONCLUSION ABOUT 7 FEBRUARY 2001 IS WRONG

18.   Among the scientific bases that Dr. Lehn fails to observe for the conclusion that the misrepresentations and omissions caused investor losses is the statistical significance of the Pharmacia stock price decline that occurred on 7 February 2001 as the market disseminated and processed the corrective disclosure about the CLASS data.

19.   As noted in my June Report, the Pharmacia stock price declined 2.67% on 7 February 2001. Appropriately accounting for the market effect and the pharmaceuticals sector, and factoring out the New Monsanto chemicals and agricultural business, the residual return on the Pharmacia Pharmaceuticals Stock Price was -4.17% that day. This is an unusually large one-day residual decline. With a *t*-statistic of -2.16, this residual return is statistically significant at the 3.1% significance level (p-value equals 0.031, confidence level is 96.9%).

20.   Dr. Lehn fails to observe the statistical significance of the decline in Pharmacia value on 7 February 2001.

> "Pharmacia's residual return on February 7, 2001 was negative 2.90% and not statistically significant."
> **Lehn Report, paragraph 79.**

21.   Dr. Lehn's incorrect event study finding is the result of the numerous flaws in his event study, as detailed next.

## Dr. Lehn Fails to Control for the Chemical Sector Effect

22.   Dr. Lehn acknowledges that controlling for sector effects is important in the execution of an event study.

> "To perform event study analyses in this matter, I examined the relation between Pharmacia's stock returns and the stock returns of general market indices and Pharmacia's industry peers."
> **Lehn Report, paragraph 44.**

23. However, the peer companies Dr. Lehn includes in his peer group index are exclusively pharmaceutical companies.

> "The Competitor Index is an equal-weighted index comprised of Bristol-Myers Squibb Co., Eli Lilly & Co., Schering-Plough Corp., AstraZeneca plc, GlaxoSmithKline plc, Abbott Laboratories, Novartis AG, American Home Products Corp. and Johnson & Johnson."
> **Lehn Report, paragraph 45, footnote 15.**

24. Dr. Lehn neglects to consider that over the course of the Class Period, Pharmacia's businesses included not only the pharmaceutical business, but also a chemical and agricultural business. The Company noted that its peers include both pharmaceutical companies and chemical industry companies:

> "Because Pharmacia continues in the pharmaceutical business and, through its ownership in new Monsanto, the agricultural business, and since Pharmacia stock has only been publicly traded since April 3, 2000, Pharmacia has continued to use the former Monsanto peer group. This peer group index includes AstraZeneca plc, Aventis, Bayer AG ADR, Dow Chemical Company, E.I. DuPont de Nemours and Company, and Novartis AG."
> **Pharmacia Corporation – Form DEF 14A, filed 13 March 2001, p. 13.**

25. Dr. Lehn makes no effort to control for the effect of the chemical business on the Pharmacia stock price. He omits from his peer group Dow Chemical and DuPont, both of which Pharmacia cited as peers. His failure to appropriately account for peer effects reduces the power of Dr. Lehn's statistical tests to detect statistically significant price movements.

26. Dr. Lehn could have focused the event study more precisely on the pharmaceuticals portion of Pharmacia's business. He could have eliminated the chemical sector effect and the effect of any information related to the chemical and agricultural business by factoring out from Pharmacia's stock price the value of the New Monsanto business, as I did. But, he did not. Nor did he control for the chemical sector effect by including an appropriate

sector index in his event study regression. These deficiencies weaken his tests and distort his entire analysis, rendering his conclusions invalid.

**Dr. Lehn's Anomalous Choice of Peers and Index Construction Methodology**

27. Another anomaly in the design of Dr. Lehn's event study, which renders his statistical results highly questionable, is the inconsistency between the construction of his selected market index and the construction of his pharmaceuticals peer index. The NYSE market index, which Dr. Lehn used, is a value-weighted index. However, Dr. Lehn built his pharmaceuticals index as an equal-weighted index.[1] Dr. Lehn offers no explanation for this inconsistency.

28. Additionally, Dr. Lehn provides no explanation for how he chose the companies to include in his pharmaceuticals peer group index. His index is neither as comprehensive as the Dow Jones U.S. Pharmaceutical Index, which I used as the basis for my peer index, nor does it even include the same pharmaceutical companies Pharmacia identified as its peers in its Proxy statement.

**Despite Its Flaws, Dr. Lehn's Event Study Detects an Unusually Large Stock Price Decline on 7 February 2001**

29. Notwithstanding the errors in his event study methodology, Dr. Lehn finds the residual stock price decline that occurred on 7 February 2001 to be severe and unusual. The $t$-statistic Dr. Lehn's test associates with the Pharmacia residual stock return on 7 February 2001 is -1.50. A Pharmacia stock price decline of this magnitude, with such an extreme negative $t$-statistic, is relatively rare. The probability that a randomly selected residual stock price decline would be of the magnitude observed, or greater, is only 6.75% (p-value equals 0.0675).[2] The residual decline, as Dr. Lehn measures it, would be among the top 6.75% worst residual declines experienced by Pharmacia stock. The rarity of declines this severe reasonably indicates that the observed 7 February 2001 stock price decline was not the result of random volatility, but rather was likely caused by Company-specific information concerning CLASS.

---

[1] Lehn Report, paragraph 45, footnote 15.
[2] Based on a one-tailed $t$-test, the methodology utilized by Dr. Lehn.

30.   Generally, the alternative to an event study conclusion that a particular stock return was caused by company-specific information is the conclusion that the stock return was the result of random volatility. For a date on which a large stock price decline occurred, such a conclusion could potentially be justified if the date in question were selected arbitrarily. However, if the date was not selected arbitrarily, but was examined because it followed a major news announcement, attributing a large stock decline solely to random volatility becomes less reasonable.

31.   This fundamental principle about statistical hypothesis testing is discussed in Shanken [1987].

> "These examples demonstrate that the interpretation of a given p-value can vary substantially from one context to another. Although sample size is an important consideration, the mapping into a 'reasonable degree of belief' also depends on one's prior belief about the relevant alternative(s). Given this assessment, the evidence favors the hypothesis under which it is more 'likely' to have been observed."
> **"A Bayesian Approach to Testing Portfolio Efficiency," by Jay Shanken, *Journal of Financial Economics*, 1987, pp. 201-202.**

32.   The 7 February 2001 date was not selected arbitrarily, but was a date on which the market processed corrective information about the CLASS data. The large residual stock price decline that even Dr. Lehn's flawed test detected therefore cannot reasonably be attributed to coincidental random volatility. Rather, the proper conclusion based on the scientific evidence is that the disseminated information concerning CLASS caused the residual stock price decline observed that day.

### DR. LEHN'S TOO NARROW WINDOW LENGTH

33.   Dr. Lehn posits incorrectly that the effect on the Pharmacia stock price of the 6 February 2001 data posting was limited to the stock price decline that occurred that day. He wrongly assumes that the disclosure had no effect on the stock price on February 7th and 8th.[3] While the stock price declines on February 7th and 8th were statistically significant, and the cumulative return from February 6th through the 8th was also statistically

---

[3] Lehn Report, paragraphs 70-87.

significant, Dr. Lehn erroneously fails to associate these declines with the corrective disclosures because they did not occur on February 6th.

34.     Apparently, Dr. Lehn's failure to properly attribute the 6-8 February stock price decline to the corrective disclosure that began on 6 February and continued on 7 February 2001 stems in part from his misreading of the academic literature on proper window length, in particular, the Patell and Wolfson [1984] study. In his report, Dr. Lehn provides an incomplete (and therefore misconstrued) portion of a comment Brealey and Myers made about the Patell and Wolfson study:

> "As discussed in Brealey and Myers, 'prices will adjust immediately to public information' in an efficient market. Brealey and Myers cite a study by Patell and Wolfson (1984), which examined how companies' stock prices reacted to public announcements of earnings and dividends and found that the major part of the adjustment in price occurs within 5 to 10 minutes of the announcement.'"
> **Lehn Report, paragraph 41 (internal citations omitted).**

35.     The complete quote from Brealey and Myers, including the portion Dr. Lehn omitted, states specifically that the rapid speed of stock price adjustment Patell and Wolfson observed pertains only to announcements of earnings and dividends:

> "A study by Patell and Wolfson shows just how fast prices move when new information becomes available. They found that, when a firm published its latest earnings or announces a dividend change, the major part of the adjustment in price occurs within 5 to 10 minutes of the announcement."
> ***Principles of Corporate Finance***, **7**[th] **edition, by Richard A. Brealey and Stewart C. Myers, McGraw-Hill Irwin, 2007, p. 353 (internal citations omitted).**

36.     As I noted in my June Report, Patell and Wolfson explained that less regular information releases – like the CLASS data – could impact stock prices over a more protracted period:

> "It is possible that the adjustment intervals would be significantly longer for smaller firms, or for other, less regular announcements made by our sample firms."
> **"The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," by James M. Patell and Mark A. Wolfson,** ***Journal of Financial Economics***, **1984, p. 250.**

37.    Not only do Patell and Wolfson state that less regular announcements could elicit more protracted stock price adjustments, but they find that even for earnings and dividend announcements, the price reaction persists beyond the first day.

> "Finally, we must consider the relation between the mean return tests where trading profits largely disappear in five to ten minutes (although we do detect significant mean returns in the overnight period and at the opening of trading on the following day), and the variance and serial correlation tests where disturbances persist for several hours after public disclosure and extend well into the following day."
> **"The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," by James M. Patell and Mark A. Wolfson, *Journal of Financial Economics*, 1984, p. 250.**

> "We find large disturbances in the correlation pattern immediately following the release of earnings numbers and dividend changes; the major portion of the announcement effect dissipates within sixty to ninety minutes, although, as in the variance tests, ***statistically significant departures continue into the following day***."
> ***Ibid.*, p. 224 (emphasis added).**

38.    Moreover, as noted in my original report, the use of multiday event windows, which inherently recognize that stock responses may span multiple days, is common in the academic literature. Of the 21 articles reviewed in the Bruner [2002] survey article that utilized the cumulative event study methodology, as shown in Table-1 (below) 17 were found to use event windows of three days or longer.

39.    Dr. Lehn's failure to recognize that stock price reactions persist beyond the day of the announcement is at odds with the authoritative literature that even he cites. Moreover, he fails to consider that the corrective disclosure in this case was the type of information that Patell and Wolfson noted could have a more protracted effect.

| Table-1 | | |
| --- | --- | --- |
| **Study** | **Event Window** | **Length of Window** |
| Langetieg (1978) | (-120,0) | 121 Days |
| Bradley, Desai & Kim (1988) | (-5,5) | 11 Days |
| Jarrell & Poulsen (1989) | (-20,10) | 31 Days |
| Lang, Stultz & Walkling (1989) | (-5,5) | 11 Days |
| Franks, Harris & Titman (1991) | (-5,5) | 11 Days |
| Healy, Palepu & Ruback (1992) | (-5,5) | 11 Days |
| Kaplan & Weisbach (1992) | (-5,5) | 11 Days |
| Berkovitch & Narayanan | (-5,5) | 11 Days |
| Smith & Kim (1994) | (-5,5) | 11 Days |
| Schwert (1996) | (-42,126) | 169 Days |
| Loughran & Vijh (1997) | (-2,1250) | 1,253 Days |
| Maquieira, Megginson & Nail (1998) | (-60,60) | 121 days |
| Eckbo & Thorburn (2000) | (-40,0) | 41 Days |
| Leeth & Borg (2000) | (-40,0) | 41 Days |
| DeLong (2001) | (-10,1) | 12 Days |
| Houston et al. (2001) | (-4,1) | 6 Days |
| Mulherin & Boone (2000) | (-1, +1) | 3 Days |

### Dr. Lehn's Window Premise is Inconsistent with His Three-Day Dummy Variables

40.     Contrary to his contention that stock price reactions occur "within 5 to 10 minutes of the announcement,"[4] in his event study design Dr. Lehn implicitly acknowledges that stock price reactions often extend beyond the first day of an information release. For his event study regression, Dr. Lehn explains it is necessary to use dummy variables (which he calls "indicator variables") to "remove any influence that the Complaint Days might otherwise have had on the regression model's results."[5]

41.     Dr. Lehn does not control only for each of the "Complaint Days" on which the Complaint states relevant news emerged. Rather, Dr. Lehn employs dummy variables to control for the "Complaint Day," the trading day prior, and the trading day after – a three-day window.

> "To control for the Complaint Days in the regression model used in the event study analysis, I included indicator variables for the date of each Complaint Day, as well as the day before and the day after each Complaint

---

[4] Lehn Report, paragraph 41.
[5] *Ibid.*, paragraph 45.

> Day. The indicator variables remove any influence that the Complaint Days might otherwise have had on the regression model's results."
> **Lehn Report, paragraph 45.**

42. Due to the timing of certain "Complaint Days," Dr. Lehn applies dummy variables for up to six consecutive trading days. If Dr. Lehn truly believes information effects are confined to the first five or ten minutes after an announcement, he would not have found it necessary to dummy out three days for each announcement mentioned in the Complaint.

**Dr. Lehn Conducts a Two-Day Cumulative Test**

43. Dr. Lehn further acknowledges that information may impact a stock price beyond the first day when he runs a two-day cumulative event study test for the period 6-7 February 2001.[6]

> "Pharmacia's residual return on February 7, 2001 was negative 2.90% and not statistically significant. Pharmacia's two-day residual return on February 6–7, 2001 was negative 3.10% and not statistically significant."
> **Lehn Report, paragraph 79.**

44. That Dr. Lehn considers it important to test for a significant reaction over the two days, 6-7 February 2001, implies that he accepts that a stock price reaction may extend beyond the first few minutes on the day of the announcement. Given this fact, his failure to detect the significant stock price reaction of 7 February 2001, or to extend the cumulative event study test to include 8 February 2001 (which three-day cumulative return was statistically significant), renders his analysis incomplete and his conclusion misguided.

---

[6] While he attempts to conduct a 2-day cumulative event study for 6-7 February 2001, Dr. Lehn computes the single-day and cumulative residual returns incorrectly. The returns in Dr. Lehn's event study are percent price changes rather than logarithmic returns. Unlike logarithmic returns, percent price changes do not aggregate residual and explained returns additively. For percent price changes, the residual return is not simply the actual return minus the explained return. As such, Dr. Lehn's single-day residual returns are computed incorrectly. Similarly, while two logarithmic residual returns can be summed to arrive at a cumulative 2-day residual return, the percentage price changes that Dr. Lehn uses cannot be added thusly. Consequently, his cumulative residual return is also computed incorrectly.

**Dr. Lehn Adopts Multiday Event Windows in His Published Research**

45.    While in the current case Dr. Lehn confines potential stock price reactions to short intervals following the corrective disclosures, in his published work he examines very long event windows to investigate price responses to announcements.

> "This paper employs event study methodology to measure the stock price effects associated with merger and acquisition announcements. … We estimate the abnormal returns for the acquiring firms on each day during the period of 5 trading days before the merger and acquisition announcements through 20 days after the announcements (i.e. [-5, 20]). As reported below, we estimate cumulative abnormal returns for acquiring firms over several windows surrounding the announcement dates."
> **"CEO Turnover after Acquisitions:  Are Bad Bidders Fired?" by Kenneth M. Lehn and Mengxin Zhao, *Journal of Finance*, August 2006, p. 1768.**

> "CAR is the cumulative abnormal return to acquiring firms around the announcements of their respective mergers and acquisitions, measured over several event windows, including the abnormal return on the announcement date [0], the CAR measured one trading day before through one trading day after the announcement date [-1,1], the CAR measured one trading day before through five trading days after the announcement date [-1, 5], the CAR measured five trading days before through five trading days after the announcement date [-5, 5], and the CAR measured 5 trading days before through 20 trading days after the announcement date [-5, 20]."
> ***Ibid.*, p. 1769.**

46.    In the article from which these quotes were taken, Dr. Lehn considered event windows extending 20 days after the announcements. This treatment is inconsistent with his premise in the current case that a stock price fully adjusts to new information within minutes of an announcement.

## THE CORRECTIVE DISCLOSURE ON 6 FEBRUARY 2001 WAS PARTIALLY COUNTERVAILED BY COMPANY STATEMENTS

47.    One reason why the corrective disclosure that began on 6 February 2001 took multiple days to be processed by the market and incorporated into the Pharmacia stock price is that the Company's briefing document, which was posted with the three FDA reports, partially confounded the disclosure, slowing the processing of the new information.

48. While investors would have ultimately arrived at the conclusion that the full CLASS data did not support the requested label modification, the subsequent FDA analysis and discussion facilitated that process.

49. These facts support the three-day window as the most appropriate event study timeframe.

**Defendants Briefing Document Presented and Advocated the Six-Month Data**

50. The Company's briefing document, which was posted on the FDA website concurrently with three FDA reviewer reports, contained the 6-month results as well as a justification for analyzing the six-month CLASS results. The Company's briefing document stated that due to the number of patients that withdrew from the study, the standard analysis may be "misleading" and the six-month CLASS results are more reliable to determine the safety profile of Celebrex.

> "Confounding due to this differential loss of high-risk patients from the study is minimized in the six-month analysis."
> **CLASS Advisory Committee Briefing Document, dated 7 February 2001, p. 40.**

> "Withdrawals due to moderate-to-severe GI symptoms were also significantly higher in the diclofenac group versus the other treatment arms (9.5% for diclofenac vs.7.5% for celecoxib and ibuprofen, p<0.05 for diclofenac vs. celecoxib). This significantly higher withdrawal rate due to moderate-to-severe GI symptoms for the diclofenac group thus led to the early withdrawal of patients at risk of an endpoint event within this treatment arm, biasing the observed event rates associated with diclofenac (i.e., informative censoring). Therefore, standard analysis and interpretation of the event rates associated in this study with diclofenac may be misleading."
> ***Ibid.*, pp. 42-43.**

51. Rather than correcting their alleged misrepresentations, by advocating for the conclusions based on the six-month data, the Company's briefing document perpetuated the alleged misinformation, which impeded or slowed the market's complete and correct evaluation of the CLASS results contained in the three FDA reviewer reports, which had been simultaneously posted on the FDA website on or about 6 February 2001.[7]

---

[7] Affidavit of Howard R. Philips, 18 October 2010, Attachments A – C.

14

52.  The market was further slowed or impeded in its evaluation of the entire CLASS data on 6 February 2001, because at that time it appeared to investors that the editors at *JAMA* endorsed defendants' six month analysis, having published that analysis five months earlier. It was not until August of 2001 that investors learned Defendants had deceived *JAMA* into publishing the six month analysis.

## Pharmacia's Presentation at the Merrill Lynch Conference

53.  Also on 6 February 2001, during the Merrill Lynch Global Pharmaceutical, Medical Device & Biotechnology Conference, Pharmacia CEO Fred Hassan ("Hassan") appears to have made a presentation about Pharmacia. As part of the presentation, Mr. Hassan appears to have highlighted the six-month CLASS results, citing the *JAMA* article touting Celebrex's 48%-66% reduction in ulcer complications.[8] Those results, based only on the six-month CLASS data, suggested a Celebrex safety advantage, while the full data set did not.

54.  Consequently, the analysts and investors received a mixed message on February 6th. The corrective disclosure in the FDA reports, explaining that it was unjustified and inappropriate to conclude from the six month data that Celebrex had a safety advantage, was confounded by the Company's briefing document and possibly the Merrill Lynch presentation.

## Dr. Lehn Ignores the Defendants' Countervailing Briefing Document Posted on February 6th

55.  In his discussion of Pharmacia's stock price reaction to the release of the FDA briefing documents, Dr. Lehn asserts that "all of the allegedly material false and misleading information that the plaintiffs contend should have been revealed on April 17, 2000 was known by the market no later than February 6, 2001."[9] Dr. Lehn stated that he "found no other information released about Pharmacia on February 6, 2001 that conceivably could have affected Pharmacia's stock price."[10]

---

[8] Exhibit 391 at DEFS 04133626.
[9] Lehn Report, paragraph 73.
[10] *Ibid.*, paragraph 74.

56. Dr. Lehn is wrong. He disregarded the Company's countervailing representations that day, including those in the Company's briefing document, which reasonably would have confused the market.

57. Considering the confounding representations made on February 6th, the complexity of the data in the posted documents, and Defendants' prior misrepresentations and omissions about the CLASS results, it is reasonable to conclude that the market required multiple days to analyze the information and fully and correctly incorporate it into the Pharmacia stock price, particularly given the complex and scientific nature of the CLASS data.

## DR. LEHN'S CONTENTION THAT THE ADVISORY COMMITTEE'S DECISION WAS AN UNFORESEEN DEVELOPMENT IS INCORRECT AND CONTRARY TO THE FACTS

58. In his discussion of 7 February 2001, Dr. Lehn contends that the Advisory Committee's decision not to recommend a label change for Celebrex was an unforeseen intervening event, and still would have been so even if the full CLASS results had been disclosed at the beginning of the Class Period.

> "It is inappropriate to use the entirety of the residual decline in Pharmacia's stock price on February 7, 2001 as a measure of alleged damages for several reasons. … Second, any use of the February 7, 2001 residual stock price decline to measure alleged stock price inflation due to the alleged misstatements during the class period rests on a false assumption that the news on February 7, 2001 could have been disclosed earlier (e.g., at the start of the class period). Even if during the class period Pharmacia had described the CLASS study results as Plaintiffs alleged it should have, Pharmacia could not have predicted the specific reaction by the Committee in the February 7, 2001 hearing. Nor could the market have predicted the specific reaction under those circumstances."
> **Lehn Report, paragraph 80.**

59. The Advisory Committee's recommendation was not an event that was completely unforeseen and unrelated to the alleged fraud, as Dr. Lehn asserts. Rather, the recommendation was the natural consequence of the disclosure of the previously omitted facts. As such, the deliberations and recommendation served to clarify the disclosure.

60. Plaintiffs allege that Defendants concealed the full CLASS study data in order to falsely claim a GI safety advantage for Celebrex over other NSAIDs. The alleged fraud concealed the truth, *i.e.*, the full CLASS study data, in order to publish the favorable truncated data to lead investors to believe Pharmacia was likely to obtain a favorable label change from the FDA. But as Defendants knew by the beginning of the Class Period, since they had the full CLASS data at that time, and as was finally revealed to investors in February 2001, the full CLASS data showed no safety advantage to Celebrex which would merit the requested label change. Thus, the Advisory Committee's recommendation was an event that the market could have predicted before 7 February 2001 if the market had been in possession of the full CLASS data.

61. If the market had access to the full CLASS data, free of Defendants' attempts to conceal it and/or obfuscate it before 7 February 2001, the Advisory Committee's actions would have been anticipated. The Advisory Committee's recommendation on 7 February 2001 was based upon consideration of the entire study period results (including comparisons with diclofenac) which were publicly disclosed for the first time on 6 February 2001 in the form of the three FDA reports posted on the FDA's website (although this information was obfuscated by the Company's briefing document posted the same day). The full data showed no Celebrex safety advantage, and therefore indicated that the requested label modification was not warranted.

62. Indeed, after evaluating results from the entire study period including comparisons with diclofenac, the members of the Advisory Committee reached the same conclusions that the market would have reached at the beginning of the Class Period had the full CLASS data been disclosed then. The full CLASS study data did not prove Celebrex to be safer than traditional NSAIDs.

> "After looking at the data presented,[11] I can come to the conclusion that I can't conclude that at the present time, so I would have to say at the present time, from what I have seen, the upper GI toxicity we are talking about—and that is a question to ask—upper GI safety appears to be similar to those, to at least again to the different presentations, I cannot say that it is different from the standard NSAIDs.
> …

---

[11] Data from the entire study period including comparisons with diclofenac were presented at the advisory committee hearing on 7 February 2001. See Affidavit of Howard R. Philips, 18 October 2010, Attachments A – C.

> Again, the sponsors have said this is one study with two comparator NSAIDs. Therefore, putting the data together, I can't come up with a difference."
> **Dr. Michael Wolfe, Transcript of the FDA Arthritis Advisory Committee, 7 February 2001, pp. 169-170.**

> "I agree if you are going to combine both NSAID comparators together, you didn't see a difference…"
> **Dr. James Williams, Transcript of the FDA Arthritis Advisory Committee, 7 February 2001, p. 170.**

> "It is certainly clear that no difference has been shown for the complicated ulcer. … So, I think that if one is talking about an advantage, it ought to show up clear through all adverse events, and not just when we look at some specific category of adverse event."
> **Dr. Janet Elashoff, Transcript of the FDA Arthritis Advisory Committee, 7 February 2001, pp. 171-172.**

63. The Advisory Committee (because of the timing of the meeting shortly after the posting of the reports) announced its recommendation before analysts were able to fully understand the reports. Unlike the analysts who saw the entire study period results for the first time on 6 February 2001, the FDA had access to the full data set for months prior to the meeting. An unhurried, thorough consideration of the full data set revealed that Pharmacia would not get a removal of the NSAID GI warning as the full data set revealed that Celebrex had not proven a GI safety advantage. Thus the Advisory Committee recommendation was based upon the same information that was publicly disclosed for the first time on 6 February 2001, and was the natural and logical consequence of that disclosure.

64. Had the market had all the CLASS data at the beginning of the Class Period, it would have known then that Celebrex had not proven a GI safety advantage over the comparator NSAIDs. The market would therefore have understood that the Advisory Committee would have no basis for recommending the desired label change.

65. Dr. Lehn's depiction of the Advisory Committee's actions as being a closely contested decision, or an adjudication of a query about which reasonable people might disagree, is not supported by the evidence. Given the full CLASS data, the event was more a foregone conclusion than an unforeseen development.

**Defendants Knew At the Beginning of the Class Period That the Complete CLASS Data Did Not Support Deletion of the NSAID GI Warning**

66. Further supporting my conclusion that the market would have known the Advisory Committee would have recommended against a label change at the beginning of the Class Period if it had the full CLASS data, are internal communications by the Defendants. Internal communications reveal that Defendants knew from the start of the Class Period that the full CLASS study results did not support the desired label change.

> "[Lori Shafner] *If we know that we will not achieve the original intent to modify the NSAID GI Warning* should we communicate to Pfizer Sr. Mgmt?
> …
> [Mona Wahba] The *data won't support the original intent of modify the GI warning*, agree with you need to be communicated."
> **Internal Email, dated 16-17 April 2000, Exhibit 414 at DEFS 00122679 (emphasis added).**

> "As you review this label, we would like you to consider the following:
> - Previous discussions with management regarding potential labeling scenarios once the CLASS data was available included an option to remove the GI warning.
> - *Based on the results of the trial, this approach no longer seems appropriate*."
> **Internal Memorandum, "Label Review Meeting," dated 27 April 2000, Exhibit 130 at DEFS 01433613 (emphasis added).**

67. Defendants knew from the start of the Class Period that the entire CLASS study results did not support deletion of the NSAID GI warning on the Celebrex product label.

**DR. LEHN'S CONTENTION ABOUT STOCK PRICE ADJUSTMENT SPEED IS INCONSISTENT WITH HIS DESCRIPTION OF THE ROLE OF ANALYST REPORTS**

68. Dr. Lehn acknowledges that the market for Pharmacia stock was efficient. As noted in my June Report, the academic literature and courts have observed that analyst coverage promotes market efficiency.

69. Dr. Lehn concurs that analysts play an important role in processing information and disseminating it to the marketplace.

"In order to provide additional context and insight regarding how the market perceived certain announcements, I examine commentary by securities analysts who followed Pharmacia. Securities analysts are investment professionals who follow a specific company (or set of companies) closely. Their 'primary responsibility' is:

'…the publication of regular written reports covering the investment attributes of specific companies. These research reports have several functions. First, they review new corporate information such as earnings announcements and management changes. Second, they suggest investment ideas for stocks in the analyst's industry, based, in part, on the new information. Third, they provide written earnings projections to the reader and present formal buy/sell recommendations to the firm's clients.'

Hence, the views of securities analysts provide additional context that can inform an opinion as to whether information is material."
**Lehn Report, paragraphs 36-37 (internal citation omitted).**

70.   It follows that if analysts required multiple days to process the corrective disclosures about the CLASS data, the complete market price reaction would take at least that same amount of time.

71.   While Dr. Lehn accepts the principles that analyst coverage facilitates the processing and dissemination of information, and that analyst reports indicate the market's understanding of information, he fails to consider that some analysts published their analysis of the CLASS data disclosures on 7 February and 8 February 2001.

"The FDA's written review of the Celebrex sNDA seeking modification or elimination of the NSAID class label was issued yesterday (in advance of today's FDA Advisory Panel Meeting). These reports are more negative than anticipated, raising the possibility of a contentious Advisory Panel review today.

The FDA raised four key issues:  (1) Pharmacia's choice to analyze the 26 week data exclusively (vs. 52 week data) is incorrect; (2) Celebrex failed to show any statistically significant benefit over one of the comparator NSAIDs (diclofenac); (3) Pharmacia failed to adjust for multiple subgroup analyses, rendering even those P values less than 0.05 in doubt; and (4) ibuprofen plus aspirin was statistically superior to either Celebrex or diclofenac plus aspirin (and better than ibuprofen alone).
…
Both the Gastrointestinal Reviewer and the Statistical Reviewer so strongly disagreed with Pharmacia's analysis of the data at the 26 week time

point that both specifically did not discuss or treat those results, focusing instead their entire discussion on the end-of-study data.

Because the event rates for diclofenac and ibuprofen plateaued after 26 weeks but continued to rise for Celebrex, the differences between Celebrex and the comparators was less robust at the end-of-study time point. In particular, the statistically significant reduction in the primary endpoint (serious upper GI events) seen in the non-aspirin subgroup at 26 weeks is not statistically significant at 52 weeks (Table I)."

**"FDA Review Of Celebrex More Negative Than Expected Panel Could Be Controversial," by Carl Seiden, *et al.*, J.P. Morgan Securities, analyst report, 7 February 2001, at JPMC 001610-12.**

"In reviewing Celebrex, consensus among the Advisory Panel members was that PHA/PFE's Celebrex did not establish a 'meaningful safety advantage' in comparison to NSAIDs (ibuprofen and diclofenac). With the data available, the committee could not justify a change in Celebrex's label."

**"FDA Unlikely to Improve Celebrex Label," by Joseph P. Riccardo, *et al.*, Bear Stearns, analyst report, 7 February 2001, at DEFEX 008229.**

"Celebrex shows a benefit in reducing 'symptomatic ulcers' vs other NSAIDs. Overall, Celebrex may be safer than the 'old NSAIDs', but the CLASS trial (at a dose 2-4x normal) did not convince the FDA committee."

**"PHA:  FDA Reviews Celebrex & Vioxx Safety Data," by Mark Striker and George Grofik, Salomon Smith Barney, analyst report, 7 February 2001 (effective date is 2/8), p. 1.**

"FDA Panel Rejects Label Change. An FDA Advisory Committee rejected the notion that Celebrex, a COX-2 inhibitor, has a better safety profile NSAIDs. PHA shares sold off (3+%) based on concerns that Celebrex's growth will stagnate without a label change."

**"CLASS Flunks Out," by Mara Goldstein, *et al.*, CIBC, analyst report, 8 February 2001, p. 1.**

"Yesterday, Pharmacia presented data on Celebrex from the CLASS (Celecoxib Long-term Arthritis Safety Study) to the FDA advisory committee. The panel rejected the drug's claim that it is gentler on the stomach than the older nonsteroidal medications (NSAIDs) and recommended that the FDA deny Pharmacia's request for an improved label that would differentiate it from the older NSAIDs, which contain a warning for gastrointestinal toxicity."

**"Pharmaceuticals:  Disappointing FDA Review of GI Safety Data for Celebrex," by Jeffrey Chaffkin and C.J. Sylvester, UBS Warburg, analyst report, 8 February 2001, at DEFEX 009148.**

"The FDA Arthritis Advisory Committee recommended no change in Celebrex's label during discussions Wednesday. This labeling posture resulted from statistical complications within the CLASS clinical trial, including Celebrex's failure to achieve a statistically significant improvement in its complicated ulcer primary endpoint and FDA requests for further study on the effects of COX-2 in combination with aspirin." **"No Change Recommended for Celebrex Labeling: 'Status Quo' Mildly Disappointing, but Manageable," by Kenneth Kulju, *et al*., Credit Suisse First Boston, analyst report, 8 February 2001, p. 1.**

72.    While Dr. Lehn was aware of these analyst reports,[12] he fails to appreciate that they indicate that the CLASS data disclosure was voluminous and complex to an extent that the market required the time through 8 February 2001 to digest it and incorporate it into the Pharmacia stock price.

73.    Dr. Lehn contends the price movements on February 7th and 8th were unrelated to the disclosure that began on February 6th and continued on February 7th. His contention is inconsistent with the facts of this case, with financial principles, with the literature Dr. Lehn cites, with his own methodology in this case, and with his prior published work. The price reaction to the CLASS disclosure extended to February 7th and 8th. The fact that the Pharmacia Pharmaceuticals Stock Price movements on those days and cumulatively over 6-8 February 2001 were statistically significant proves that the misrepresentations and omissions about the CLASS data inflated the Pharmacia stock price and caused investor losses.

## ANALYZING THE EFFECT OF VIOXX-RELATED INFORMATION THAT EMERGED ON 8 FEBRUARY 2001

74.    Dr. Lehn contends that Pharmacia's statistically significant stock price decline on 8 February 2001 was caused by the news that Merck's competing product, Vioxx, received approval from the FDA for a favorable label change. Dr. Lehn reasons that significant good news for Merck and Vioxx would be significant bad news for Pharmacia and Celebrex.

---

[12] See for example:  Lehn Report, paragraph 78.

"Good news about Cox-2 Inhibitors would move Pharmacia and Merck's prices in the same direction; good news for Vioxx relative to Celebrex would be expected to move Pharmacia and Merck's prices in the opposite direction."
**Lehn Report, paragraph 45, footnote 15.**

75.     To assess whether the Pharmacia stock price decline on 8 February 2001 was caused by the positive development pertaining to Vioxx, I conducted an event study on Merck stock to determine if the new Vioxx information was significant. Dr. Lehn stated that this is the correct approach to determine whether the information is both new and important to investors.

"If the information released on a particular day is both new and material to investors, then the residual return on the event date should be significantly different from zero."
**Lehn Report, paragraph 46.**

76.     In particular, one would reasonably expect that material news about Vioxx would have a significant impact on the price of Merck stock because Vioxx was extremely important to Merck. Merck was bracing for impending patent expirations and was counting on Vioxx to maintain company revenues and profit.

"Merck is counting on Vioxx to help the company weather upcoming patent expirations on three of its best-selling drugs."
**"FOCUS-FDA Panel Backs Merck's Vioxx Painkiller," by Lisa Richwine, *Reuters News*, 21 April 1999.**

"Merck needs Vioxx to be a winner. After years of rapid sales and profit growth, patents on some of its biggest sellers will soon expire, opening the door to less-expensive generic versions. The company is also grappling with a slowdown in sales growth of its big cholesterol-drug franchise and was recently hit with a delay in developing a new antidepressant."
**"Merck's Financial Health Hinges on Sales of Its New Arthritis Pill," by Robert Langreth, *Dow Jones Business News*, 14 April 1999.**

"But Dr. Scolnick [the president of Merck Research Labs] gives plenty of credit to the way things broke Merck's way during Vioxx's development. 'If those first two compounds had failed in human trials and we had had

23

by chance to rely on the fifth or sixth one' years later, he says, 'we would be a very different company.'"
**"The Cure:  With Big Drugs Dying, Merck Didn't Merge – It Found New Ones – Some Inspired Research, Aided By a Bit of Luck, Saves Company's Independence – The Path to a Novel Painkiller," by Gardiner Harris, *Wall Street Journal*, 10 January 2001.**

77.     In 2001, Vioxx accounted for 13% of Merck's sales.[13] Analysts estimated the gross profit margin on Vioxx to be in excess of 90%.[14] With that profit margin, Vioxx accounted for approximately 13.1% of Merck's gross profit in 2001.[15] Bear Stearns analysts anticipated that Vioxx would account for 17.1% of Merck's revenue in 2002.[16] Consequently, Merck relied on Vioxx for a substantial portion of its current and forecasted sales.

78.     Nonetheless, as explained next, the news about Vioxx that emerged on 8 February 2001 had no statistically significant impact on the price of Merck stock.

79.     I constructed the Merck event study in the same fashion as I conducted the Pharmacia Pharmaceuticals Stock Price event study in my June Report. I used the same Market Index for the market factor, and I used the Pharmaceutical Index (which had Pharmacia, Pfizer, and Merck removed) for the sector index.[17] I ran the regression over the same control period, 19 October 2000 through 18 October 2001.

80.     I utilized dummy variables for each day from 6 February through 12 February 2001 to control for the potential effects of both Vioxx- and Celebrex-related news that was released during this period.

81.     On 7 February 2001, in addition to the Advisory Committee's decision on Celebrex, the FDA posted reviewer reports on its website that contained and analyzed the VIGOR study data. Similar to the CLASS briefing documents, these reviewer reports were posted prior to the Advisory Committee's review of the VIGOR study that would occur the following day.

82.     Merck stock prices, dividends, and returns are presented in Exhibit-5. The regression results are presented in Exhibit-6. The event study results are shown in Exhibit-7.

---

[13] Deutsche Banc Alex. Brown, Merck analyst report, 29 January 2001, p. 5.
[14] Natexis Bleichroeder Inc., Merck analyst report, 1 October 2004, p. 13.
[15] Merck & Co., Inc. Form 10-K for the Fiscal Year Ended 31 December 2003, filed 10 March 2004, p. 21.
[16] "FDA Unlikely to Improve Celebrex Label," by Joseph P. Riccardo, *et al*., Bear Stearns, Pharmacia analyst report, 7 February 2001, at DEFEX 008231.
[17] In its Proxy statement Merck compared its performance to the Dow Jones Pharmaceutical Index. See:  Merck & Co., Inc. Form DEF 14A, filed 22 March 2001, p. 22.

83.　As described next, the news about Vioxx, which Dr. Lehn considers positive enough to cause the price of Pharmacia stock to decline significantly, had no significant impact on the price of Merck stock. Merck's stock price did not rise significantly on 8 February 2001, over the three-day period beginning on 7 February 2001, or over the three-day period beginning 8 February 2001. By Dr. Lehn's reasoning, the Vioxx news was not new material good news for Vioxx, therefore this news could not have been responsible for Pharmacia's decline.

84.　Thus, as I concluded in my June Report, the cause of the statistically significant decline in Pharmacia's stock price on 8 February 2001 was news specific to Pharmacia and the disclosures about CLASS.

**Merck Event Study Results**

85.　On 8 February 2001, Merck's stock price increased 1.36%. The Market Index declined 0.65%, and the Pharmaceutical Index rose 0.43%. According to the regression model, the Merck stock residual return that day was 0.95%. This is not an unusually large one-day residual increase. With a $t$-statistic of 0.65, this residual return is not statistically significant at the standard 5.0% significance level, or any other acceptable level (p-value equals 0.517).

86.　The following day, 9 February 2001, Merck's residual return was -0.46%. This too is not an unusually large one-day residual return. With a $t$-statistic of -0.32, this residual return is not statistically significant at the standard 5.0% significance level, or any other reasonable significance level (p-value equals 0.752).

87.　The following trading day, 12 February 2001, Merck's residual return was -0.48%, again, not an unusually large one-day residual return. With a $t$-statistic of -0.33, this residual return is not statistically significant at the standard 5.0% significance level, or any other reasonable significance level (p-value equals 0.743).

88.　Over the three-trading-day period, 8-12 February 2001, Merck's stock price increased 1.37%. Over the same period, the Market Index return was -1.06%, and the Pharmaceutical Index return was 1.54%. The three-day explained return for Merck's stock according to the regression model is positive 1.37%, which is the change one would

expect in the price of Merck stock on account of market and sector effects absent any Merck-specific information.

89. The residual three-day return for Merck stock was 0.01%. On a residual return basis, Merck stock barely budged over the three day period. This three-day residual return is associated with a *t*-statistic value of virtually zero. The residual return is not statistically significant at the standard 5.0% significance level, or any other reasonable level (p-value equals 0.998).

90. As shown in Exhibit-7, Merck's residual return over the three days beginning on February 7th was similarly not significant.

91. Nonetheless, Dr. Lehn attributes 94% of Pharmacia's gross stock price decline on 8 February 2001 to the Vioxx news.[18] However, if the Vioxx news was not measurably beneficial for Merck, following Dr. Lehn's logic it could not have been so material as to be responsible for the large and highly statistically significant decline in the price of Pharmacia stock that occurred on 8 February 2001.

## INTRADAY PRICE MOVEMENTS ON 8 FEBRUARY 2001

92. Dr. Lehn relies on intraday stock price data to support his argument that the significant decline in the Pharmacia stock price on 8 February 2001 was due to that day's news about Vioxx labeling rather than the corrective disclosures about CLASS.

93. According to Dr. Lehn, the Advisory Committee released its decision to recommend that Merck be allowed to amend the Vioxx label at 3:06 p.m. on 8 February 2001. He also contends that a major portion of the full day's decline in the price of Pharmacia stock occurred after 3:00 p.m., and therefore must have been the result of the FDA Advisory Committee's decision pertaining to the Vioxx label.

> "Pharmacia's residual return on February 8, 2001 was negative 5.59%, which is statistically significant. The major news about the February 8, 2001 Vioxx hearing was that the FDA Advisory Panel was going to allow Merck to add safety data from its study to the Vioxx label. When this information was released at approximately 3:00 p.m., Pharmacia's stock price declined by approximately $2.50, or 4.45%."
> **Lehn Report, paragraph 84.**

---

[18] Lehn Report, paragraph 84.

94.     There are numerous flaws in Dr. Lehn's argument that Pharmacia's intraday price changes indicate the Vioxx news was responsible for the large decline that day. In addition to the fact that the Vioxx news did not cause a statistically significant change in the Merck stock price, and that Dr. Lehn did no comparable analysis on Merck's intraday stock prices, Dr. Lehn's analysis of Pharmacia's intraday prices is rife with factual and methodological errors.

**Factual Errors in Dr. Lehn's Intraday Analysis**

Dr. Lehn Measures the Price Changes Incorrectly

95.     According to Dr. Lehn, the price decline between 3:06 p.m. and the close of trading on February 8th was $2.50. I attempted to confirm Dr. Lehn's quantitative conclusion by examining the intraday stock price data obtained from the Trade and Quote ("TAQ") database. According to the TAQ data, the highest price for Pharmacia stock after 3:06 p.m. was $55.40 per share. Pharmacia's closing stock price was $53.00 per share, or $2.40 per share lower than the highest price after 3:00 p.m. (which occurred at 3:10 p.m.).[19] Consequently, Pharmacia's stock price fell at most $2.40 per share after the time Dr. Lehn contends the Vioxx announcement was made, not the $2.50 per share he reports.

96.     The price decline from the precise time when Dr. Lehn contends the announcement was made was even less than $2.40 per share. The last trade prior to 3:06 p.m. occurred at a price of $55.02 per share. From this price to the closing price, the decline was $2.02 per share – again, not the $2.50 per share Dr. Lehn claims. This decline is $0.48 per share, or 19%, less than the drop that Dr. Lehn attributes to the Vioxx news.

Dr. Lehn Sets the Time of the Vioxx News Incorrectly

97.     It appears that Dr. Lehn is mistaken about when the market learned that the Advisory Committee would recommend a Vioxx label change. On page 27 of his report, Dr. Lehn states the information was released at approximately 3:00 p.m. on 8 February 2001. In his Exhibit 11, he times it more precisely at 3:06 p.m.

        "The major news about the February 8, 2001 Vioxx hearing was that the FDA Advisory Panel was going to allow Merck to add safety data from its

---

[19] Closing and opening stock price data obtained from CRSP.

study to the Vioxx label. When this information was released at approximately 3:00 p.m., Pharmacia's stock price declined by approximately $2.50, or 4.45%."
**Lehn Report, paragraph 27.**

"3:06 PM - A federal panel recommended that Merck & Co.'s (MRK) Vioxx add information to its label saying the drug causes fewer ulcers than naproxen."
**Lehn Report, Exhibit 11, citing *Dow Jones Newswires*.**

98.   While a show of hands recapping the morning's deliberations was taken at approximately 3:00 p.m., the transcript of the Committee's deliberations shows that the meeting's participants had expressed their views about Vioxx labeling earlier in the day.

"[Dr. Lawrence Goldkind, Gastrointestinal Review]:  To briefly review the results, these have been shown previously, just formatted differently. Vioxx compared to naproxen, the rate, either per 100 patient years or cumulative rate, did show a risk reduction, 0.46, with a highly statistical significant p value."
**"FDA Arthritis Advisory Committee Hearing Transcript; re:  NDA 21-042/S007, Vioxx (Rofecoxib, Merck)," dated 8 February 2001, p. 103, prior to the 12:20 p m. lunch break at p. 146.**

"[Dr. Goldkind]:  In terms of the generalizability of GI safety, as the sponsor has noted, Vioxx did have a substantial decrease in risk for the PUBs and complicated PUBs, as noted here."
***Ibid*., p. 106, prior to the 12:20 p m. lunch break at p. 146.**

"[Dr. Maria Lourdes Villalba, Medical Officer]:  My answer would be that we have a label that has a GI warning for non-steroidals and, based on this study, the sponsor is proposing to downgrade that label and move it to the precautions section, and be different from the other NSAIDs, and I think that the fact that we still have reports in postmarketing of these kinds of events supports the fact that we shouldn't be changing well, ***I mean modifying the label, yes***, but a dramatic change in the label, I think that is not warranted."
***Ibid*., p. 129, prior to the 12:20 p m. lunch break at p. 146 (emphasis added).**

"[Dr. Steven Nissen, Cardiovascular And Renal Drugs Advisory Committee Member]:  If I could just amplify on that for a moment, we saw a very strong message about some reduced incidence of GI effects and I happen to share Dr. Wolfe's perspective that these are not trivial events."
***Ibid*., p. 168.**

"[Dr. M. Michael Wolfe, Gastrointestinal Drugs Advisory Committee Member]:  I am comment only on the GI because that is what I am here for. I am a firm believer in setting forth the hypothesis, designing a study appropriately, checking the results, and if the results match your hypothesis your primary goal has been achieved. I think the data both presented by Merck and by the FDA show that there is, indeed, a decreased risk of GI toxicity associated with the use of this drug. No matter what arguments can be made about, well, was it because of naproxen being the comparator I don't know. The study was designed. It was approved by the FDA. I think we have to go with what the results showed. I think in that regard I have to say that there is decreased risk of GI events. Endoscopically as well as outcomes show a parallel decrease in the rate of GI complications."
***Ibid*., pp. 185-186.**

"[Dr. James H. Williams, Jr., Advisory Committee Member]:  I agree with Dr. Wolfe that I think they have met the burden of proof. Now, I don't think a single comparison is generalizable to all NSAIDs but I think they do have to change the label to say that in the one study that was done it was shown to make a difference.
***Ibid*., p. 186.**

"[Dr. Steven Nissen:] Well, I am just a poor cardiologist so I don't have a lot of sophistication about the GI tract, but it seems to me that we can't make this like it is in the Olympics. When you pole vault, you know, you go over a height and then somebody comes around and says, 'well, okay, you made that height; we're going to put another bar up for you to go over.' I mean, it seems to me the sponsor here did a very large, probably pretty expensive study, with the advice and consent of the FDA. They created this template. They made those goals very clear from the very beginning. They achieved not a marginal amount of statistical significance on the GI side but an unequivocal statistical significance. ***So, the statement that rofecoxib is safer, from the gastrointestinal point of view, with respect to the endpoints that were used over naproxen is a fact, in my view, and not a marginal one, and I think that should be reflected in the product literature.***"
***Ibid*., p. 188 (emphasis added).**

"[Dr. David Wofsy, Consultant and Expert Arthritis Advisory Committee Consultant]:  I have been convinced by this morning's data that, at least with respect to some of the other non-steroidals on that continuum, they have less GI toxicity."
***Ibid*., p. 190.**

"[Dr. Ileana Pina, Cardiovascular And Renal Drugs Advisory Committee Member]:  I agree that the sponsor has proven what they meant to prove in a restricted population of rheumatoid arthritis patients who had no aspirin."
***Ibid*., p. 192.**

"[Dr. Byron Cryer, Guest Expert]:  But I actually also fall in agreement with my colleague here, Dr. Wolfe, and that is that with respect to these labeling considerations what drives the label is a process, a process that you define ahead of time, and there are rules that are inherent in that process that drives the label."
***Ibid*., pp. 197-198.**

"[Dr. Steven Nissen:] I would change the label."
***Ibid*., p. 199.**

"[Wendy McBrair, Consumer Representative]:  I think the label should reflect exactly what we know and what we learned from the study that was done."
***Ibid*.**

"[Dr. James H. Williams]:  I will give Dr. Wofsy's yes."
***Ibid*., p. 202.**

99.   At approximately 3 o'clock there was a show of hands recapping the morning's deliberations, but the meeting participants had already expressed their opinions earlier.

"[Dr. E. Nigel Harris, Acting Chairperson]:  What I am going to do is just to carry that message that, in fact, one does have to weigh the benefits of one organ system compared to sort of the overall risk benefit, whatever. I will actually ask for a vote with respect to whether or not we actually should advise that there might be some way of framing that benefit in one system and the issue of overall benefit. Do I get a sense from the committee that we agree that there should be some mention made of that? Let me have a show of hands, yes or no.

[Show of hands]

Is there any disagreement?

[No show of hands]

Any abstentions?

[No show of hands]

So, that was unanimous. There are two general questions that have been posed, and I want to read the first of them yes, Dr. DeLap?"
***Ibid.*, pp. 213-214.**

100.   That the Committee members had already expressed their opinions on the matter prior to the show of hands was noted explicitly by Dr. Harris.

"[Dr. Harris]:  What I am going to ask now is whether or not in your opinion as I am going around the room, you believe the warning label should be changed with respect to GI toxicity. Keep your remarks brief, please, because I think ***most of you have had an opportunity to make a statement***."
**"FDA Arthritis Advisory Committee Hearing Transcript; re:  NDA 21-042/S007, Vioxx (Rofecoxib, Merck)," dated 8 February 2001, p. 197.**

101.   That the market learned of the Committee's intentions hours prior to the time Dr. Lehn claims the Vioxx news arrived is evident in an *Associated Press* wire, made available on *Bloomberg*, which was time stamped 12:51 p.m. (eastern time).

"The arthritis drug Vioxx appears to cause fewer ulcers than the older painkiller naproxen and its label should say so, the government's scientific advisers decided Thursday in a boon for maker Merck & Co. But the panel didn't have all good news for Merck:  Vioxx should retain its strong warning that it can cause ulcers just like some other older, cheaper painkillers – and doctors and patients should be warned that it might carry a heart risk, too."
**"Scientists Advise on New Drug Vioxx," *Associated Press Wire*, 8 February 2001, 12:51:32 (17:51 GMT).**

Price Response Following the *Associated Press* Wire

102.   As shown in Exhibit-8, the announcement at 12:51 p.m. was followed immediately by an *increase* in the price of Pharmacia stock, not a decrease. The first trade prior to 12:51:32 p.m. was at a price of $55.49 per share. Between that time and 1:09:18 p.m. the price of Pharmacia stock rose $0.56 per share to $56.05 per share. The immediate price response following the *Bloomberg* article about the Advisory Committee's decision was therefore a rise in price of more than 1%, not a decline as Dr. Lehn contends.

103. To be consistent with his prior opinion that information is assimilated in five to ten minutes, this price movement would indicate to Dr. Lehn that the Vioxx news reported by *Bloomberg* caused the Pharmacia stock price to rise and therefore could not be responsible for the day's decline.

<u>Pharmacia Stock Had Declined Prior to the Vioxx Announcement</u>

104. Dr. Lehn also neglects to analyze movements that occurred in the price of Pharmacia stock prior to 3:00 p.m., and thus fails to observe that Pharmacia stock declined from the closing price of $56.13 per share on 7 February 2001 to $54.30 per share by 10:40 a.m. on 8 February 2001, indisputably before the Vioxx announcement on 8 February. From the prior day's close to this mid-morning point, the price declined $1.83 per share, or 3.3%, which amounted to 58.5% of the total decline for the day.

105. If Dr. Lehn had controlled for the chemical and agricultural business by factoring out the value of New Monsanto, as I did when I derived the Pharmacia Pharmaceuticals Stock Prices, he would have observed an even steeper price decline occurring prior to the Vioxx announcement. The opening Pharmacia Pharmaceuticals Stock Price that day was $50.48 per share. This represents a 0.6% decline from the previous day's closing price of $50.78. Between the opening of trading and 10:40 a.m., the Pharmacia Pharmaceuticals Stock Price continued to decline, reaching a low of $48.87, or a 3.8% decline from the previous day's close. A 3.8% decline represents approximately 60% of the total decline experienced that day.

106. Dr. Lehn fails to consider the stock price slide in morning trading on February 8th, which appears to be a continuation of the previous day's reaction to the corrective disclosure.

**<u>Methodological Errors in Dr. Lehn's Intraday Analysis</u>**

<u>Dr. Lehn Neglects to Control for Market and Peer Effects, Or for the Value of New Monsanto</u>

107. Dr. Lehn's purported intraday stock price analysis suffers from his lack of control for market and peer group effects. In his discussion of event study analysis in general, Dr. Lehn rightfully acknowledged that it is necessary to control for market and peer group effects.

> "To perform event study analyses in this matter, I examined the relation between Pharmacia's stock returns and the stock returns of general market indices and Pharmacia's industry peers."
> **Lehn Report, paragraph 44.**

> "In this case, I used the NYSE Index ("NYSE index") and a Competitor Index of peer firms to control for movements in the market and peer company indexes during the control period."
> ***Ibid.***, **paragraph 45.**

108.    While he accepts that controlling for market and peer effects is a necessary and important step, in his intraday analysis Dr. Lehn makes no effort to control for these factors. Nor does Dr. Lehn control for information affecting Pharmacia's chemical and agricultural business, by factoring out the value of New Monsanto as I did, or in any manner whatsoever.

109.    Consequently, Dr. Lehn cannot rule out that the Pharmacia stock price movements he observes after the Vioxx announcement may have been caused by price movements in the overall stock market or peer group, or information relating to New Monsanto. Similarly, Dr. Lehn did not examine Pharmacia's residual returns prior to the Vioxx announcement. Consequently, Dr. Lehn did not do the requisite analysis to attribute the intraday price movements on 8 February 2001 to any one particular factor as opposed to another.

<u>Dr. Lehn Ignores the Noise and Errors in Intraday Price Data</u>

110.    The academic literature addresses numerous unique problems and challenges associated with intraday data. Dr. Lehn, however, ignores these. For example, as the observational frequency of pricing data increases from daily to intraday, the ratio of noise-to-information in computed returns generally increases.

> "***Raw returns measurement***
> The presence of noise in the price data and the fact that stocks trade at discrete time intervals means that returns are measured with error and are frequently unobservable. This affects both how returns are calculated and how to deal with nontrading intervals. Although these issues also exist at the daily level, they are more important at the intraday level.

33

**Logarithmic vs. proportional returns**

There are two standard methods for calculating returns:  the proportional return ($[(P_t + D_t)/P_{t-1}] - 1$) and logarithmic return ($ln[(P_t + D_t)/P_{t-1}]$), where $P$ and $D$ are the price and dividends, respectively.

When proportional returns are calculated, any noise present in observed prices will cause the measured security returns to be biased upward. At the intraday level, two systematic sources of noise can be identified:  the bid/ask spread and price discreteness (see Dravid 1988). Blume and Stambaugh (1983) find that when daily returns are calculated, the magnitude of the bias for low-priced stocks (averaging ~ \$5) is 0.051 percent, which is approximately one-third of the average daily return of 0.141 percent. The effect of the bias caused by the bid/ask spread and price discreteness on higher-priced stocks at the daily level is negligible. For shorter time periods, however, the effect of this bias will become greater, even for relatively high-priced stocks if the magnitude of the 'true' return decreases. Therefore, at the intraday level, it seems appropriate to be concerned with this issue. In this paper, log returns are used because they eliminate the bias in returns induced by the bid/ask spread and price discreteness (see Mucklow 1991)."

**"Market Microstructure:  Effects on Intraday Event Studies," by Belinda Mucklow,** *Contemporary Accounting Research***, Spring 1994, p. 357 (internal citations omitted, emphasis in original).**

111.   The statistical problems arising from noise in intraday data are well documented and discussed widely in the literature.

"Unfortunately, unlike those low frequency time series that are homogeneously spaced, tick-by-tick transactions of different assets usually occur randomly and asynchronously; in addition, with high frequency data comes market microstructure noise."

**"High-Frequency Covariance Estimates With Noisy and Asynchronous Financial Data," by Yacine Aït-Sahalia,** *et al.***,** *Journal of the American Statistical Association***, December 2010, p. 1504.**

112.   Not only did Dr. Lehn ignore these problems described in the literature, but he used proportional returns rather than logarithmic returns, which as noted by Mucklow [1994], exacerbates the problem.

<u>Dr. Lehn Ignores the Special Statistical Testing that Intraday Price Analysis Requires</u>

113.   The statistical properties of intraday returns are known to differ from those of daily returns, in ways that require specialized statistical testing.

> "Little is known about the distribution of intraday stock returns, especially the distribution of returns conditional on some event like a new equity issue announcement. Thus, it is appropriate to test the robustness of the parametric results discussed above with nonparametric tests. The bootstrap, developed by Efron (1982) and others, is one of several resampling plans that can be applied in situations where standard parametric techniques for statistical inference are inappropriate."
> **"Announcement Effects of New Equity Issues and The Use of Intraday Price Data," by Michael J. Barclay and Robert H. Litzenberger, *Journal of Financial Economics*, 1988, p. 79.**

114.  Not only did Dr. Lehn not conduct the specialized testing required when working with intraday data according to Barclay and Litzenberger [1988] (e.g. bootstrapping or non-parametric tests), he did no formal statistical testing at all. For these reasons as well, Dr. Lehn cannot conclude that the intraday price movements on 8 February 2001 were caused by any one particular factor as opposed to another.

## Dr. Lehn Fails to Consider Pharmacia Stock's Intraday Price Movement On 7 February 2001

115.  If Dr. Lehn believes that the best way to determine a stock's reaction to specific news is to informally analyze intraday trading data, which I disagree with, it follows logically that in order to determine what news Pharmacia's stock price reacted to on 7 February 2001 he should have examined Pharmacia stock's intraday price data on that day as well.

116.  To test Dr. Lehn's incorrect conclusion that Pharmacia's large stock price decline on 7 February 2001 was caused by the FDA Advisory Committee's announcement, which "entered the public press at 2:25 p.m.,"[20] I examined the intraday trading data of the Pharmacia Pharmaceuticals Stock Price in the same manner Dr. Lehn attempted to analyze the February 8th intraday data. As shown in Exhibit-9, and detailed below, the majority of the Pharmacia Pharmaceuticals Stock Price decline occurred hours before the FDA Advisory Committee's announcement.

117.  On 7 February 2001, the Pharmacia Pharmaceutical Stock Price declined 3.15%, or $1.62 per share. That day, the opening Pharmacia Pharmaceuticals Stock Price was $51.09 per

---

[20] Lehn Report, paragraph 76.

share, representing a decline of $1.32 per share from the previous day's closing price of $52.41 per share.

118. By 10:25 a.m. (four hours prior to 2:25 p.m. when according to Dr. Lehn the FDA Advisory Committee decision was released to the public) the Pharmacia Pharmaceuticals Stock Price was $50.90 per share, or $1.51 per share lower than the previous day's closing price. The $1.51 decline in the Pharmacia Pharmaceuticals Stock Price represents 92.9% of the observed stock price decline on 7 February 2001.

119. While the Pharmacia Pharmaceuticals Stock Price is the more appropriate variable to analyze for assessing the impact of news related to Celebrex, for comparison purposes and because Dr. Lehn focused on the Pharmacia stock price without removing the value of New Monsanto, I also analyzed the intraday trading data for Pharmacia stock. On 7 February 2001, Pharmacia's stock price declined $1.52 per share, or 2.7%. By 10:25 a.m. the Pharmacia stock price declined $1.50 per share (or 2.6%) from the previous day's closing price. This early decline represents 98.7% of the total decline in the Pharmacia stock price that occurred that day. It is particularly noteworthy that from 2:30 p.m. (the first five minutes after the 2:25 p.m. announcement) to the close of trading, Pharmacia's stock price *increased* from $55.75 per share to $56.13 per share, a rise of $0.38 per share.

120. The intraday data clearly show that the declines in Pharmacia Pharmaceuticals and Pharmacia occurred prior to the Advisory Committee's 2:25 p.m. decision regarding Celebrex.

121. If one were to accept Dr. Lehn's analysis of intraday data as reliable, which I do not, then it would follow that the intraday data from February 7th contradicts Dr. Lehn's conclusion about what caused the price drop that day. Dr. Lehn would have to conclude that the Advisory Committee's decision did not cause the day's price decline.

122. While Dr. Lehn embraces intraday price analysis for his purpose of arguing that the February 8th price declines were caused by Merck news, he fails to apply that same analysis to February 7th, when such analysis would contradict his conclusions.

123. Nonetheless, for the methodological reasons stated above, the manner in which Dr. Lehn analyzes intraday return data is unreliable. The flaws in Dr. Lehn's analysis as well as the facts of this case support event study analysis with a three-day window as the appropriate analytic methodology.

## THE SCIENTIFIC BASES DR. LEHN OVERLOOKED

124.  Dr. Lehn states that he observes no scientific basis indicating that the alleged misrepresentations and omissions about CLASS inflated Pharmacia's stock price. As shown in this report, numerous scientific bases are present, but overlooked or ignored by Dr. Lehn.

125.  Dr. Lehn fails to observe the statistical significance of the Pharmacia stock price decline that occurred on 7 February 2001 due to numerous flaws in his analysis. His event study fails to appropriately control for the effects of Pharmacia's chemical and agricultural business on the Company's stock price. His choice of peer companies is neither comprehensive nor consistent with the peers identified by the Company. Dr. Lehn inappropriately dismisses the large residual stock price decline on 7 February 2001 that even his flawed test detects. Consequently, he overlooks the inescapable conclusion that the Pharmacia stock price decline on 7 February 2001 was caused by information concerning CLASS.

126.  Dr. Lehn fails to associate the statistically significant declines on February 7th, February 8th, and cumulatively from February 6th through the 8th to the corrective disclosures due to his improperly short event window.

127.  Dr. Lehn's conclusion that the statistically significant decline in Pharmacia stock on 8 February 2001 was caused by Vioxx news is at odds with his own logic and analysis. Due to the fact that the Vioxx news was not measurably beneficial for Merck, it could not have been so material as to be responsible for the large and highly statistically significant decline in the price of Pharmacia stock that occurred on 8 February 2001.

128.  Not only does Dr. Lehn's analysis of intraday stock price data have numerous fatal factual and methodological errors, which render his conclusions unreliable, but Dr. Lehn's failure to examine the intraday stock price data on 7 February 2001 renders his analysis incomplete. Applying the same analysis to February 7th that he applied to February 8th, leads to findings incompatible with his loss causation conclusions.

129.  Dr. Lehn fails to consider how the Company's briefing document that was posted on or about 6 February 2001 confounded the corrective disclosure, slowing the market's revaluation of Pharmacia stock.

130.  Dr. Lehn's depiction of the Advisory Committee's actions on 7 February 2001 as being an unforeseen and unrelated event is not supported by the facts of the case.

131.  Dr. Lehn's flawed analysis presents no basis to alter my conclusion that the alleged misrepresentations and omissions caused the price of Pharmacia stock to be artificially inflated over the course of the Class Period, and caused investor losses when ultimately corrected.

## CRITIQUE OF THE FIORINO REPORT

132.  Dr. Fiorino contends that the allegedly undisclosed CLASS results were "not material," that Pharmacia's stock was not "falsely elevated" during the Class Period, and that the release of the entire CLASS results did not "cause a decline" in Pharmacia's stock price.[21]

133.  However, Dr. Fiorino supports none of his conclusions with generally accepted scientific analysis. Rather, his conclusions are essentially conjecture. Moreover, his opinions are internally inconsistent and run contrary to established empirical facts.

### Dr. Fiorino Draws Loss Causation Conclusions, But Runs No Event Study

134.  Dr. Fiorino opines that the CLASS disclosures "did not result in a meaningful change in Pharmacia's stock price."

> "[T]he disclosure of the allegedly withheld results from CLASS did not cause a decline in Pharmacia's stock price."
> **Fiorino Report, p. 6.**

> "The disclosure and complete dissemination of the allegedly previously undisclosed results of CLASS study on February 6, 2001 in the FDA Arthritis Advisory Committee briefing documents (what should have been, in the Plaintiffs' construction, the end of the 'alleged scheme'), did not change analysts' forecasts for future Celebrex sales or Pharmacia's

---

[21] Fiorino Report, p. 6.

future earnings, did not alter the prescription trends for Celebrex, and did not result in a meaningful change in Pharmacia's stock price."
***Ibid.***

"Moreover, the disclosure of those results was not associated with a decline in Pharmacia's stock price on February 6 and did not cause or contribute to the Pharmacia stock price decline on February 7, 2001; rather, the Advisory Committee vote was the cause of the February 7 stock price decline."
***Ibid.*, p. 32.**

"Specifically, Pharmacia's stock price declined on February 7 because the FDA Arthritis Advisory Committee vote against a Celebrex label change, and Pharmacia's stock price declined on February 8 because the same Committee voted in favor of a label change for Vioxx, Celebrex's competitor."
***Ibid.*, pp. 27-28.**

135. While he draws conclusions about what did and did not cause the Pharmacia stock price to decline, Dr. Fiorino ran no event study – the analysis generally accepted to be the appropriate methodological tool for determining whether or not specific information caused a stock price movement.

136. Authoritative articles in the finance literature are clear that event study analysis is the proper tool for the job. For example:

"Economists are frequently asked to measure the effects of an economic event on the value of firms. On the surface this seems like a difficult task, but a measure can be constructed easily using an event study. Using financial market data, an event study measures the impact of a specific event on the value of a firm."
**"Event Studies in Economics and Finance," by A. Craig MacKinlay, *Journal of Economic Literature*, March 1997, p. 13.**

137. Event studies are also generally accepted as the appropriate tool in forensic settings to answer questions of causation and materiality.

"The most important reason to consider the use of an event study is that it is likely to provide a highly objective methodology for calculating the magnitude of damages and the materiality of the event that may have caused the damages."
**"Materiality and Magnitude:  Event Studies in the Courtroom," by David Tabak and Frederick Dunbar, in *Litigation Services Handbook*, 3rd Edition, John Wiley & Sons, New York, 2001.**

138.  Dr. Fiorino acknowledges that the event study methodology is the generally accepted methodology for assessing causation and materiality, and that his approach is different.

"I understand that the typical method used for assessing materiality in securities litigation is the 'event study.' Whereas an event study attempts to assess materiality quantitatively by analyzing stock price movements in response to disclosures that are alleged to be misleading or corrective, my approach analyzes the contemporaneous views of sell-side analysts in response to the disclosures that are alleged to be misleading or corrective."
**Fiorino Report, p. 10.**

## Dr. Fiorino's Assumptions About Stock Return Significance Are Incorrect

139.  Despite having run no event study to properly analyze the empirical movements of the Pharmacia stock price, Dr. Fiorino draws conclusions about the empirical movements of the Pharmacia stock price.

"Furthermore, this finding of immateriality is supported by the lack of change in Pharmacia's stock price as a result of the disclosure of the allegedly previously undisclosed CLASS results."
**Fiorino Report, p. 18.**

"Consistent with this finding that the allegedly previously undisclosed CLASS results were immaterial, the dissemination of these results had no impact on Pharmacia's stock price (Figure 5). As reflected in Figure 5, Pharmacia stock closed just $0.63 lower on February 6, 2001 than the prior day's close."
**_Ibid._, p. 24.**

"In conclusion, I find that the results of the CLASS study undisclosed by the Defendants in April 2000 cannot be viewed as material (and consequently the cause of a falsely elevated stock price) because the full and widespread disclosure of those results on February 6, 2001 did not

result in changes to Pharmacia forward EPS estimates, Celebrex sales forecasts or the Celebrex prescription growth trend, ***nor was there a decline in Pharmacia's stock price***."
***Ibid.*, p. 26 (emphasis added).**

"Moreover, the disclosure of those results was not associated with a decline in Pharmacia's stock price on February 6 and did not cause or contribute to the Pharmacia stock price decline on February 7, 2001 …"
***Ibid.*, p. 32.**

"I noted earlier that there was no change in the stock price on February 6; on February 7, with the FDA Arthritis Advisory Committee voting against a Celebrex label change, Pharmacia's stock declined by 2.6%. In contrast, after the Advisory Committee voted in favor of a Vioxx label change on February 8, Pharmacia's stock ended the day down 5.6%."
***Ibid.*, p. 33.**

140. Because Dr. Fiorino fails to conduct the proper event study analysis, he draws incorrect conclusions about the magnitudes of Pharmacia residual returns and the factors that caused them. He contends that the February 6th disclosure caused no price movement, but he fails to consider the price change over the next two days as investors and analysts (including himself at the time[22]) processed the newly disclosed information. He fails to control for the market effect, peer group effect, and the effect of information on the value of the New Monsanto business (which he admits was important[23]). He fails to consider that the Pharmacia Pharmaceutical Stock Price fell a statistically significant 4.17%, 6.91%, and 11.81% on February 7th, February 8th, and over the three day window 6-8 February 2001, respectively.

## Dr. Fiorino Contradicts His Own Argument About What Moves Stock Prices

141. Dr. Fiorino argues that the CLASS disclosures were not material and could not have caused the Pharmacia stock price decline because he contends analysts' forecasts of sales and earnings did not change after the disclosure.

---

[22] "FDA Review of Celebrex More Negative Than Expected – Panel Could Be Controversial," by Carl Seiden, Roopesh Patel, Tony Fiorino, and Gloria Tsuen, JP Morgan, analysts report, 7 February 2001, JPMC 001610 - 13.
[23] Fiorino Report, p. 9.

"Therefore, if the Plaintiffs' allegation regarding the materiality of the allegedly initially undisclosed CLASS results is correct, then upon learning of these results, analysts would have viewed the prospects for Celebrex as materially worse and would have lowered their Celebrex sales forecasts and reduced their Pharmacia EPS estimates. Furthermore, were these results material, their dissemination to physicians would have resulted in a change in Celebrex prescription trends. Yet as discussed below, there were no such changes. Therefore, I conclude that the results of the CLASS study undisclosed in April 2000 and subsequently disclosed in February 2001 cannot be considered material."
**Fiorino Report, pp. 17-18.**

"The lack of adjustment in Celebrex sales forecasts and Pharmacia EPS estimates means that analysts did not find the allegedly previously undisclosed results to be material with regard to their expectations for Celebrex."
***Ibid.*, p. 19.**

142.   The earnings forecasts Dr. Fiorino presents compare forecasts before February 6th with forecasts made up to 12 February 2001.[24] Dr. Fiorino does not give the dates of the sales forecasts he presents in his Table 1, however my review of the analysts' sales forecasts indicates that the "after" forecasts may be as late as May 2001. Consequently, analyst forecasts remained steady past February 8th and not just past February 6th as Dr. Fiorino suggests.

143.   Surprisingly, while Dr. Fiorino argues that the steady forecasts rule out the information disclosed on February 6th as having been material and causative of a Pharmacia stock price decline, he concludes that the Advisory Committee's announcement on February 8th pertaining to Vioxx, despite it too having no apparent impact on analysts' reported sales and earnings forecasts, was material and responsible for a decline in the Pharmacia stock price.

"In contrast to the previous day's results, at approximately 3:00 p.m. on February 8, 2001, the same advisory committee voted to recommend incorporation of new safety data from Merck's VIGOR trial into the Vioxx label. A change for Vioxx but no change for Celebrex would put Celebrex at a competitive disadvantage, and this risk – which was completely unrelated to the allegedly initially undisclosed CLASS results

---

[24] *Ibid.*, p. 18.

> that had been disclosed in the Advisory Committee briefing documents on February 6 – caused a decline in Pharmacia's stock price."
> **Fiorino Report, pp. 32-33.**

> "Specifically, Pharmacia's stock price declined on February 7 because the FDA Arthritis Advisory Committee vote against a Celebrex label change, and Pharmacia's stock price declined on February 8 because the same Committee voted in favor of a label change for Vioxx, Celebrex's competitor."
> ***Ibid.*, pp. 27-28.**

144.  Dr. Fiorino's arguments are inconsistent and internally contradictory. If he believes that the Vioxx decision, though it caused no change in analysts' earnings and sales forecasts, caused the Pharmacia stock price decline, then certainly he cannot argue that the CLASS disclosures were immaterial and caused no price decline on account of the same steady forecasts.

<u>Dr. Fiorino's Attribution of the Pharmacia Stock Price Decline to the Vioxx Announcement is Unsupported, Inconsistent, and Incorrect</u>

145.  Dr. Fiorino's contention that the Vioxx announcement on February 8th caused the decline in Pharmacia's stock price is not only unsupported, but runs contrary to his own opinion about what indicates materiality.

146.  As noted, Dr. Fiorino argues that to be material, information must impact analysts' sales and earnings forecasts. But, as Dr. Fiorino states on page 19 of his report, the Vioxx announcement did not change the Merck sales and earnings forecast of a "highly respected buy-side pharmaceuticals analyst."

> "In an internal note dated February 9, 2001, Norm Fidel, the highly respected buy-side pharmaceuticals analyst at Alliance, provides evidence of an identical process from one major institutional investor that managed portfolios for the Plaintiffs, noting the panel outcomes and writing '[t]here are ***no changes to sales estimate [sic], earnings estimates or ratings*** of the three companies' (referring to Pharmacia, Pfizer and ***Merck***)."
> **Fiorino Report, p. 19, footnote 20 (emphasis added).**

147.  Moreover, Dr. Fiorino neglects to consider that the Vioxx announcement caused no significant movement in the Merck stock price, which according to Dr. Lehn, renders the news immaterial.

**Dr. Fiorino Disregards the Academic Literature on Reputation Effects**

148.   Dr. Fiorino's premise that in order for a disclosure to be material it must change analysts' forecasts of sales and earnings is inaccurate and contradicted by abundant academic research. Published research has demonstrated that the impact of a corrective disclosure on management's reputation can have a significant negative effect on a company's stock price. For example:

> "Risk/uncertainty likely increases and future prospects may well decrease when management integrity and competence are called into question.
> …
> This may be due to an increase in the discount rate because fraud creates uncertainty about the reliability and credibility of management representations, which increases the perceived information asymmetry between management and stockholders."
> **"Determinants of Market Reactions to Restatement Announcements," by Zoe-Vonna Palmrose, *et al*., *Journal of Accounting and Economics*, 2004, p. 63.**

> "Our results show that reputation helps discipline financial misrepresentations – indeed, the evidence indicates that market-imposed reputation losses are of *primary* importance. One way to illustrate the importance of the reputation loss is to consider the average impact on a firm that inflates its market value by $1 through deceptive financial reporting practices. When the deception is uncovered, the point estimates from Panel A of Table 9 indicate that the firm loses this dollar, *plus* an additional $3.08 in expected legal penalties and lost reputation. (Since the readjustment effect equals 24.53% of the total dollar loss, a $1.00 readjustment implies a total dollar loss of $4.08 (= $1.00/0.2453).) Of the additional loss, only $0.36 represents the expectation of legal penalties. The remaining $2.71 is the present value of the expected higher financing and contracting costs or reduced cash flows that result from the firm's misconduct. This is an empirical estimate of one portion of Jensen's (2005) agency cost of overvalued equity, namely, the reputational cost of cooking the books (and being apprehended).

> Prior research indicates that reputation losses are important for some other types of corporate misconduct, including false advertising (Peltzman (1981)), product recalls (Jarrell and Peltzman (1985)), air safety disasters

44

(Mitchell and Maloney (1989)), frauds of private parties (Karpoff and Lott (1993), Alexander (1999), and Murphy, Shrieves, and Tibbs (2009)), investigations of IPO underwriters (Beatty, Bunsis, and Hand (1998)), and defense procurement fraud (Karpoff, Lee, and Vendrzyk (1999)))."
**"The Cost to Firms of Cooking the Books," by Jonathan M. Karpoff, *et al.*, *Journal of Financial and Quantitative Analysis*, 2008, p. 601.**

149.  As the quotes above explain, the negative reputational effects of corporate misdeeds can reduce a company's valuation by increasing risk and uncertainty, and raising financing costs. These factors are not necessarily reflected in analysts' sales and earnings forecasts, contrary to Dr. Fiorino's premise that only sales and earnings matter.

150.  Additionally, Pharmacia considered reputation effects to be important. During a Pharmacia Board of Directors meeting, held on or about 25 September 2001, the Board discussed CLASS and the issue surrounding the 6-month versus 12-month data. This issue, according to Pharmacia's CEO, Fred Hassan, was important enough to discuss with the Board of Directors because it "brought the integrity of the Company into question."

> "Q. And then the next bullet point says, 'CLASS'. That's referring to the CLASS trial that we've been discussing today?
>
> A.  Yes.
>
> Q. And then next to that it says 6-month versus 12-month reporting?
>
> A. Yes.
>
> Q. And then under that it says 'Integrity of company'?
>
> A. Yes.
>
> Q. And is it fair to say that you thought this was important enough to discuss with the board the 6-month versus 12-month issue in the middle 2001?
>
> A.  Yes.
>
> Q. And you thought it was important because it brought the integrity of the company into question?
>
> A.  Yes."
> **Deposition Transcript of Fred Hassan, dated 22 February 2011, p. 217.**

151.   Dr. Fiorino either ignores or is unaware of the vast academic literature on reputation effects.[25] He also ignores that Defendants concurred about the value of the Company's perceived integrity. Dr. Fiorino is wrong to contend that for purposes of valuing a company, only revenue and earnings matter.

## Dr. Fiorino's Opinions About Analyst Coverage and the Materiality of the CLASS Disclosure Are Belied by the Analyst Report He Coauthored

152.   Dr. Fiorino asserts that analysts generally only write reports about material news. He also contends that the CLASS disclosure on February 6th was immaterial.

> "First, analysts infrequently publish reports or change estimates based on immaterial news … ."
> **Fiorino Report, p. 11.**

> "In conclusion, I find that the results of the CLASS study undisclosed by the Defendants in April 2000 cannot be viewed as material (and consequently the cause of a falsely elevated stock price) … ."
> ***Ibid.*, p. 26.**

153.   However, as a member of JPMorgan's analyst team covering Pharmacia, on 7 February 2001, Dr. Fiorino coauthored a report titled, "FDA Review of Celebrex More Negative Than Expected – Panel Could Be Controversial." In this analyst report, Dr. Fiorino and his team analyzed and disseminated the corrective information posted on the FDA website. As

---

[25] In *Corporate Finance:  Creating Value While Doing Right*, 2005, authors Jonathan M. Karpoff, Timothy J. Gallager, and Joseph D. Andrew review this literature and cite to the following articles which analyze and quantify the valuation effects of management reputation:  Cindy R. Alexander, "On the Nature of the Reputational Penalty for Corporate Crime:  Evidence," *Journal of Law and Economics* 42, 1999, p. 489 (for frauds of related parties) (see also Alan K. Reichert, Michael Lockett, and Ramesh P. Rao, "The Impact of Illegal Business Practice on Shareholder Returns, *The Financial Review,* 1996, pp. 67-85; and J.L. Strachan, D.B. Smith, and W.L. Beedles, "The Price Reaction to (Alleged) Corporate Crime*," The Financial Review* 18, 1983, pp. 121-132); Sam Peltzman, "The Effects of FTC Advertising Regulation," *Journal of Law and Economics* 24, 1981, p. 403 (for product recalls); Jonathan M. Karpoff, D. Scott Lee, and Valaria Vendrzyk, "Defense Procurement Fraud, Penalties, and Contractor Influence," *Journal of Political Economy* 107, 1999, p. 809 (for defense procurement frauds); Terrance R. Skantz, Dale O. Cloninger, and Thomas H. Strickland, "Price-Fixing and Shareholder Returns," *The Financial Review* 1, 1990, p. 153 (for price fixing); Deborah L. Murphy, Ronald E. Shrieves, and Samuel L. Tibbs, "Determinants of the Stock Price Reaction to Allegations of Corporate Misconduct:  Earnings, Risk, and Firm Size Effects," University of Tennessee working paper (for bribery); Jonathan M. Karpoff and John R. Lott, Jr., "On the Determinants and Importance of Punitive Damages Awards," *Journal of Law and Economics* 62, 1999, p. 527 (for punitive damage lawsuits); Jonathan M. Karpoff, John R. Lott, Jr., and Eric Wehrly, "The Reputational Penalties for Environmental Violations:  Empirical Evidence," *Journal of Law and Economics*, 2005; and Kari Jones and Paul H. Rubin, "Effects of Harmful Environmental Events on Reputations of Firms," *Advances in Financial Economics*, Volume VI, ed. by Mark Hirschey, Kose John, and Anil Makhija, 2001, pp. 161-182 (for environmental violations).

the report title indicates, Dr. Fiorino and his team viewed the posted reports and CLASS data to be unexpected, contrary to prior information, and negative. Clearly then, Dr. Fiorino believed the news to be material.

154. To be consistent with his current opinion about what news analysts cover, Dr. Fiorino should still conclude the February 6th corrective disclosure was material.

<u>Dr. Fiorino and His Team Did Not Issue Another Analyst Report Covering the Subsequent FDA Committee Announcements</u>

155. Not only does Dr. Fiorino assert that analysts rarely publish about immaterial events, but he also states that they do publish when new material information emerges.

> "First, analysts infrequently publish reports or change estimates based on immaterial news, but ***almost always publish reports or notes on events they deem relevant or material to investors*** … ."
> **Fiorino Report, p. 11 (emphasis added).**

156. In the report he submitted for this case, Dr. Fiorino contends that the FDA Advisory Committee decisions about Celebrex and Vioxx, on February 7th and 8th respectively, were intervening events and responsible for Pharmacia stock price declines. However, Dr. Fiorino's JPMorgan report published on February 7th (which covered the posting of the reviewer reports containing the negative CLASS data) was issued prior to the FDA Advisory Committee meeting that day. His team did not issue another report covering the February 7th Advisory Committee meeting or the February 8th Vioxx announcement. Apparently, at the time, Dr. Fiorino did not assess these follow-on events to be material.

**Dr. Fiorino's Opinion About the Speed of Price Adjustment is Belied by His Own Analyst Report**

157. Dr. Fiorino argues that the February 7th stock price decline was not caused by the disclosure that began on February 6th, because it is his opinion that stock price reactions are always fully completed within a few hours of an announcement. He bases his opinion not on published research or rigorous analysis, but rather on his unverifiable and unreplicable personal experiences.

"Based on my experience as a sell-side analyst and as an investor in pharmaceutical and biotechnology stocks, any contention by Plaintiffs that the stock price decline on February 7, 2001 can be associated with the disclosure of the full CLASS data because the market did not fully appreciate or incorporate the data disclosed on February 6 until sometime during the trading day on February 7, must be rejected out-of-hand. Contrary to such a contention, it takes minutes, at most a few hours, for data from Advisory Committee briefing documents to be incorporated into stock prices."
**Fiorino Report, pp. 30-31.**

158. This opinion too is contradicted by Dr. Fiorino's analyst report publication record. While Dr. Fiorino contends the FDA reviewer reports were posted on 6 February 2001, he and his team did not publish their report covering this event until the next day. If analysts play any useful role in analyzing and disseminating information (another opinion held by Dr. Fiorino[26]), then the timing of his own report covering the February 6th corrective disclosure indicates that the process takes longer than a few hours.

<u>Dr. Fiorino's Analyst Report Illustrates That the February 6th Disclosure Was Complex and Confounded</u>

159. Dr. Fiorino argues, without any rigorous analysis or citation to authoritative literature, that the Pharmacia stock price decline over the three days, 6-8 February 2001, was not caused by the corrective disclosure that began on 6 February 2001.

"As discussed in greater detail below, there is absolutely no basis to claim that a stock price decline after February 6, 2001 had any causal relation to the disclosure of the full CLASS data."
**Fiorino Report, p. 27.**

160. Dr. Fiorino arrives at this incorrect conclusion because he disregards that the information disclosed on February 6th was complex and confounded by the Company's briefing document.

161. As noted in my original report, the academic literature explains that price reactions to complex and unexpected announcements may be protracted.

---

[26] "Second, sell-side pharmaceutical analysts are highly focused on the industry and are relied upon by their clients, investors of varying capacities, to apply their industry knowledge and expertise in quickly addressing the financial implications of new developments regarding important drugs for the companies developing or marketing those drugs." Fiorino Report, p. 11.

162.   That the CLASS disclosures fit this description is undeniable, and evident even in the analyst report Dr. Fiorino and his team published on February 7th. That report described the new information as being contrary to prior expectations, and described the statistical analysis of the CLASS data to be "thornier than we initially thought."

163.   Also, the report reflected Defendants' countervailing obfuscation, as the report related Defendants' "informed censoring" argument and presented the issue as an unsettled debate.

> "Often the FDA review of data is gloomier than the Advisory Committee dialogue (to occur later today), so we will have to wait for the meetings today and tomorrow (for Vioxx) to get clear punchlines."
> **"Celebrex CLASS Trial Confirms GI Safety (With Slight Wrinkle) – No Cardiovascular Risk," by Carl Seiden, Roopesh Patel, Tony Fiorino, and Gloria Tsuen, JP Morgan, analyst report, 17 April 2000, p. 2, Exhibit 17.**

> "Pharmacia's rationale for looking at the 26 week data only was that the greater withdrawal of patients from the diclofenac arm 'censored' later events (i.e., patients on diclofenac were more likely to develop symptoms and thus were disproportionately removed from the trial before having a chance to develop a serious upper GI events.)"
> ***Ibid.*, p. 3.**

164.   Had there been full disclosure of the CLASS data with no obfuscation, the artificial inflation in the Pharmacia stock price may have dissipated more rapidly. But given the complexity of the data, coupled with Defendants' countervailing representations, which were reflected in Dr. Fiorino's analyst report, the process took three days.

165.   On February 6th, the full CLASS data was posted, but were complex and accompanied by countervailing obfuscation. On February 7th, analysts and investors continued to analyze the data and were aided by the clarification provided by the FDA Advisory Committee's deliberations. Analyst reports published on February 7th, including Dr. Fiorino's, facilitated the market's digestion of the new information. The price revaluation process continued visibly on February 8th as additional analyst reports were published. Observable facts prove that the market's revaluation of Pharmacia stock in response to the CLASS disclosures took three days, from 6 February to 8 February 2001.

166.   Dr. Fiorino's contention that this and all price reactions must be instantaneous is baseless, and contrary to financial principals and the observable facts in this case.

**Dr. Fiorino's Attempt to Attribute the Price Decline to Other Events is Misguided**

167. Dr. Fiorino contends that numerous issues unrelated to Celebrex caused Pharmacia's stock price to decline.

> "Investors had significant concerns over a number of non-Celebrex components of Pharmacia's business during and after the Class Period, clouding any attempt to attribute a declining stock price over time to any single cause."
> **Fiorino Report, p. 7.**

168. On pages 66-67 of his report, Dr. Fiorino lists the other events and issues he contends contributed to the stock price decline. These events and issues included tightening EPS guidance, Xalatan competition, competition with Ditropan XL, volatility in the Monsanto agriculture business, "lost revenues from the reversion of marketing rights to Ambien back to Sanofi in 2002," among others.

169. None of these issues emerged during the 6-8 February 2001 window when the Pharmacia stock price declined due to the corrective disclosures about Celebrex. In fact, Dr. Fiorino admits that these issues arose subsequently.

> "Thus, multiple new risks to Pharmacia's business came to the market's attention after the fourth quarter/full year 2000 earnings report … ."
> **Fiorino Report, p. 67.**

170. The Q4 2000 earnings announcement was made on 12 February 2001. That Dr. Fiorino attempts to attribute the price reaction over the three days following the CLASS corrective disclosure to numerous issues and events that occurred a week later underscores the weakness in his analysis stemming from his lack of legitimate stock return attribution methodology.

**Dr. Fiorino's Intraday Analysis is Improperly Selective and Factually and Methodologically Flawed**

171.   Dr. Fiorino concludes that the Pharmacia stock price decline on 8 February 2001 "cannot reasonably be attributed to anything other than" the FDA Advisory Committee announcement about Vioxx.

> "The intraday chart (Figure 7) clearly demonstrates that the drop in Pharmacia's stock price began within minutes of the Advisory Committee's recommendation to grant a label change for Vioxx, accompanied by a large surge in the trading volume of Pharmacia's stock. This sharp decline on escalating volume cannot reasonably be attributed to anything other than the immediately preceding event, which was the FDA Arthritis Advisory Committee vote to recommend a Vioxx label change, which the market perceived as potentially detrimental to Celebrex's sales. …"
> **Fiorino Report, p. 33.**

Factual Errors in Dr. Fiorino's Analysis of Intraday Prices On 8 February 2001

172.   Dr. Fiorino's conclusion rests on factually flawed analysis. As described above, (similar to the factual errors contained in the Lehn Report) Dr. Fiorino uses the wrong time and prices to measure the decline immediately following the announcement. *Bloomberg* carried an *Associated Press* report of the Advisory Committee's decision at 12:51 p.m., more than two hours before the 3:06 p.m. time at which Dr. Fiorino places the announcement. As shown in Exhibit-8, the announcement at 12:51 p.m. was followed immediately by an increase in the price of Pharmacia stock, not a decrease.

173.   Similarly, Dr. Fiorino neglects to analyze movements that occurred in the price of Pharmacia stock prior to 3:00 p.m., and thus fails to observe that Pharmacia stock declined from the closing price of $56.13 per share on 7 February 2001 to $54.30 per share by 10:40 a.m. on 8 February 2001, indisputably before the Vioxx announcement. From the prior day's close to this mid-morning point, the price declined $1.83 per share, or 3.3%, which amounted to 58.5% of the total decline for the day.

174.   Dr. Fiorino fails to consider the stock price slide in morning trading on February 8th, which appears to be a continuation of the previous day's reaction to the corrective disclosure.

Methodological Errors in Dr. Fiorino's Intraday Analysis

175.   Dr. Fiorino's intraday analysis is riddled with methodological errors and oversights. The following is a list of the errors that render Dr. Fiorino's conclusions unreliable:

     i.    Failure to control for market and peer group effects;
    ii.    Failure to control for information affecting Pharmacia's chemical and agricultural business (which he stated was an important factor);
   iii.    Failure to consider the statistical problems arising from noise in intraday data that are well documented in the literature; and
   iv.    Failure to conduct the specialized testing required when working with intraday data.

Dr. Fiorino Fails to Consider Pharmacia Stock's Intraday Price Movement On 7 February 2001

176.   On page 24 of his report, Dr. Fiorino examines intraday prices on February 6th. While Dr. Fiorino examines intraday pricing data on both February 6th and 8th, he chooses not to examine the intraday data on February 7th. Had he applied the same analysis on the February 7th data that he applies to the February 6th and 8th data (which I do not accept as reliable nevertheless), he would have noticed that the declines in Pharmacia Pharmaceuticals and Pharmacia stock occurred prior to the Advisory Committee's 2:25 p.m. decision regarding Celebrex, undermining his conclusion that the Committee announcement was responsible for the day's stock price decline.

177.   While Dr. Fiorino embraces intraday price analysis for his purposes of arguing that the February 8th price declines were caused by Merck news, and that there was no stock price reaction to the news on February 6th, he fails to apply that same analysis to February 7th, when such analysis would contradict his stated loss causation opinion.

**Dr. Fiorino's Representations of Select Investment Manager Recollections is Unscientific and Irrelevant**

178.   On pages 70 through 74 of his report, Dr. Fiorino relates the deposition testimony given by four individuals who worked for "Plaintiffs' money managers." Dr. Fiorino represents that these individuals share his opinion about the immateriality of the CLASS disclosures.

> "I have reviewed the deposition transcripts of those individuals and was not surprised to find that the Plaintiffs' own investment managers share

> what this report has found to have been the market's perspective on the
> COX-2 inhibitors."
> **Fiorino Report, p. 70.**

179. There are at least two major flaws in Dr. Fiorino's argument pertaining to the testimony of these particular investment managers. First, Dr. Fiorino appears to have misinterpreted what they said. Second, Dr. Fiorino fails to appreciate the generally accepted financial principal that the market comprises and aggregates a wide range of often divergent views. Whereas rigorous event study analysis, which Dr. Fiorino eschews, scientifically gauges the materiality of information to the market as a whole, unscientific anecdotal sampling, which Dr. Fiorino relies upon, does not.

### Dr. Fiorino Misinterprets the Investment Professionals' Testimony

180. While Dr. Fiorino contends that the excerpted testimony from the select individuals he cites support his contention that the CLASS data disclosure was immaterial, none of the investment professionals said that.

181. In fact, the quote from Jane Davenport's testimony that Dr. Fiorino presents on page 72 of his report specifically links the Pharmacia stock price decline to Celebrex not receiving the label modification, which was the inevitable fallout from the disclosed data. As discussed above, the full CLASS data was responsible for the Advisory Committee not recommending the label change.

> "'The stock has sold off recently, probably due mainly to the FDA
> advisory committee's recommendations suggesting that the new label for
> Celebrex will not be as advantageous as some have hoped.'"
> **Fiorino Report, p. 72, citing Deposition of Davenport, dated 27 June 2006, pp. 61-62.**

### The Market Aggregates Disparate Views

182. Moreover, Dr. Fiorino's reliance on statements from select individuals relating their recollections of their prior opinions cannot substitute for the rigorous analysis of market data that he does not conduct.

183. It is a fundamental and generally accepted financial economic principle that the market accommodates diversity of opinion and information, and aggregates divergent opinions

into a consensus price. A finance textbook co-authored by Economics Nobel Prize winner Robert Merton explains the concept thusly.

> "To see how the current market price of the stock is determined, we look at the aggregation of all analysts' estimates, and assume that on average the market is in equilibrium (i.e. on average, the price will be such that the total (desired) demand equals total supply. ... Hence, the market price of the stock will reflect a weighted average of the opinions of all analysts."
> **Finance, by Zvi Bodie and Robert Merton, Prentice Hall, 2000, pp. 206-207.**

184. There will always be individual market participants who do not share exactly the consensus view. This fact is precisely why it is necessary to apply rigorous scientific analysis to gauge market opinion (*e.g.* event study analysis) rather than relying primarily on the expressed opinions of unscientifically selected individuals. This fact is precisely why Dr. Fiorino's approach is unreliable.

## LIMITING FACTORS

185. This report is furnished solely for the purpose of court proceedings in the above named matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report, including in the event additional information becomes available.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon in Addition to Documents Cited in the Feinstein June Report**

## EXPERT REPORTS

- Expert Report of Dr. Kenneth M. Lehn, dated 7 June 2011.
- Expert Report of Dr. Michael Fiorino, dated 7 June 2011.

## NEWS ARTICLES / PRESS RELEASES

- "Merck's Financial Health Hinges on Sales of Its New Arthritis Pill," by Robert Langreth, *Dow Jones Business News*, 14 April 1999.
- "FOCUS-FDA Panel backs Merck's Vioxx Painkiller," by Lisa Richwine, *Reuters News*, 21 April 1999.
- "The Cure: With Big Drugs Dying, Merck Didn't Merge – It Found New Ones – Some Inspired Research, Aided By a Bit of Luck, Saves Company's Independence –The Path to a Novel Painkiller," by Gardiner Harris, *Wall Street Journal*, 10 January 2001.
- "Scientists Advise on New Drug Vioxx," *Associated Press Wire*, 8 February 2001.

## ANALYST REPORTS

- "MRK's: VIOXX GI Outcomes Data – Details Part 1," by Christina Heuer and Mark Striker, Salomon Smith Barney, Merck analyst report, 28 March 2000.
- "Celebrex CLASS Trial Confirms GI Safety (With Slight Wrinkle) – No Cardiovascular Risk," by Carl Seiden, *et al.*, JP Morgan, analyst report, 17 April 2000, Exhibit 17.
- "Much Ado About Nothing!!! Fundamentals on Track, Stock Weakness Creates Buying Opportunity," by Barbara A. Ryan, *et al*., Deutsche Banc Alex. Brown, Merck analyst report 29 January 2001.
- "FDA Review Of Celebrex More Negative Than Expected Panel Could Be Controversial," by Carl Seiden, *et al*., J.P. Morgan Securities, Pharmacia analyst report 7 February 2001, [JPMC 001610-12].
- "FDA Unlikely to Improve Celebrex Label," by Joseph P. Riccardo, *et al*., Bear Stearns, Pharmacia analyst report, 7 February 2001, [DEFEX 008229-31].
- "PHA: FDA Reviews Celebrex & Vioxx Safety Data," by Mark Striker and George Grofik, Salomon Smith Barney, Pharmacia analyst report, 7 February 2001.
- "Pharmaceuticals: Disappointing FDA Review of GI Safety Data for Celebrex," by Jeffrey Chaffkin, *et al*., UBS Warburg, Pharmacia analyst report, 8 February 2001 [DEFEX 009148].

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon in Addition to Documents Cited in the Feinstein June Report**

- "Initiating Coverage: Vioxx Withdrawal Could Present An Opportunity," by Jon Lecroy, M.D., *et al*., Natexis Bleichroeder, Merck analyst report, 1 October 2004.

## SEC FILINGS

- Merck & Co., Inc. Form DEF 14A, filed 22 March 2001.
- Merck & Co., Inc. Form 10-K for the Fiscal year Ended 31 December 2003, filed 10 March 2004.

## ACADEMIC AND PROFESSIONAL LITERATURE

- Aït-Sahalia, Yacine, Jianqing Fan, and Dacheng Xiu, "High-Frequency Covariance Estimates With Noisy and Asynchronous Financial Data," *Journal of the American Statistical Association*, December 2010.
- Barclay, Michael J., and Robert H. Litzenberger, "Announcement Effects of New Equity Issues and The Use of Intraday Price Data," *Journal of Financial Economics*, 1988.
- Bodie, Zvi and Robert Merton, *Finance*, Prentice Hall, 2000.
- Brealey, Richard A., and Stewart C. Myers, *Principles of Corporate Finance*, 7th edition, McGraw-Hill Irwin, 2007.
- Karpoff, Jonathan M., Timothy J. Gallagher, and Joseph D. Andrew, Chapter 2 of *Corporate Finance: Creating Value While Doing Right*, 2005.
- Karpoff, Jonathan M., D. Scott Lee, and Gerald S. Martin, "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis*, 2008.
- Lehn, Kenneth M., and Mengxin Zhao, "CEO Turnover after Acquisitions: Are Bad Bidders Fired?" *Journal of Finance*, August 2006.
- Mucklow, Belinda, "Market Microstructure:  Effects on Intraday Event Studies," *Contemporary Accounting Research*, Spring 1994.
- Palmrose, Zoe-Vonna, Vernon J. Richardson and Susan Scholz, *Journal of Accoutning and Economics*, 2004.
- Shanken, Jay, "A Bayesian Approach to Testing Portfolio Efficiency," *Journal of Financial Economics*, 1987.

## DATA AND DATABASES

- TAQ (Trade and Quote) database

**Exhibit-1**

**Documents and Other Information Reviewed and Relied Upon in Addition to Documents Cited in the Feinstein June Report**

**COMPANY DOCUMENTS**

- Internal Email, dated 1 February 2001, Exhibit 352, [DEFS 00280719 – 30].
- Company Presentation, Exhibit-391, [DEFS 04133602 – 39].
- Internal Memorandum, Exhibit 125 [DEFS 02524647 – 61].
- Internal Emails, dated 16-17 April 2000, Exhibit 414, [DEFS 00122679 – DEFS 00122680].
- Internal Memorandum, "Label Review Meeting," dated 27 April 2000, Exhibit 130 [DEFS 01433613].
- Deposition Transcript of Erick J. Lucera, 19 June 2006.
- Deposition Transcript of Jane Davenport, 27 June 2006.
- Deposition Transcript of Jeff Silverman, 27 June 2006.
- Deposition Transcript of David Thompson, 29 June 2006.
- Deposition Transcript of Fred Hassan, dated 22 February 2011.

**OTHER**

- Any other documents and data cited in the report.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided Since June Report**

In Re Constar International Inc. Securities Litigation
United States District Court
Eastern District of Pennsylvania
Civil Action No. 2:03-cv-05020-EL
Deposition Testimony
June 2011

**Exhibit-3**

**Replication of Dr. Lehn's Pharmacia Regression Using Logarithmic Returns**

Estimation Period: 17 April 2000 to 6 August 2001

| Regression Statistics | |
|---|---|
| Multiple R | 0.430 |
| Adjusted R Square | 0.335 |
| Standard Error | 1.93% |
| Observations | 329 |
| F-Statistic | 4.512 |
| F-Statistic Significance Level | ~0% |

| | Coefficients | Standard Error | $t$-statistic |
|---|---|---|---|
| Intercept | -0.09% | 0.11% | -0.82 |
| NYSE Index | 0.183 | 0.117 | -1.537 |
| Dr. Lehn Peer Index | 0.907 | 0.088 | 10.323 |
| 17 April 2000 | -0.40% | 1.94% | -0.204 |
| 18 April 2000 | -3.85% | 1.95% | -1.973 |
| 24 April 2000 | -1.74% | 1.93% | -0.899 |
| 25 April 2000 | -8.27% | 1.95% | -4.239 |
| 26 April 2000 | -0.58% | 1.94% | -0.300 |
| 1 May 2000 | -0.60% | 1.93% | -0.311 |
| 2 May 2000 | 1.30% | 1.93% | 0.671 |
| 3 May 2000 | 3.85% | 1.95% | 1.977 |
| 19 May 2000 | 3.88% | 1.94% | 1.995 |
| 22 May 2000 | -2.74% | 1.93% | -1.420 |
| 23 May 2000 | 0.88% | 1.93% | 0.457 |
| 24 May 2000 | -4.23% | 1.93% | -2.189 |
| 8 June 2000 | -0.22% | 1.93% | -0.111 |

59

**Exhibit-3**

**Replication of Dr. Lehn's Pharmacia Regression Using Logarithmic Returns**

Estimation Period: 17 April 2000 to 6 August 2001

| | | | |
|---|---|---|---|
| 9 June 2000 | 3.81% | 1.93% | 1.972 |
| 12 June 2000 | 0.17% | 1.93% | 0.086 |
| 24 July 2000 | -0.19% | 1.94% | -0.100 |
| 25 July 2000 | 6.67% | 1.93% | 3.451 |
| 26 July 2000 | 1.68% | 1.94% | 0.868 |
| 12 September 2000 | -1.06% | 1.93% | -0.546 |
| 13 September 2000 | 0.85% | 1.93% | 0.442 |
| 14 September 2000 | -0.88% | 1.93% | -0.456 |
| 15 September 2000 | -0.22% | 1.93% | -0.116 |
| 18 September 2000 | -1.84% | 1.94% | -0.949 |
| 19 September 2000 | 1.29% | 1.93% | 0.669 |
| 27 October 2000 | -1.87% | 1.94% | -0.965 |
| 30 October 2000 | -5.24% | 1.95% | -2.693 |
| 31 October 2000 | 5.08% | 1.95% | 2.609 |
| 1 November 2000 | 4.19% | 1.93% | 2.171 |
| 5 February 2001 | 0.89% | 1.93% | 0.459 |
| 6 February 2001 | -0.19% | 1.93% | -0.096 |
| 7 February 2001 | -2.92% | 1.93% | -1.513 |
| 9 February 2001 | 1.77% | 1.93% | 0.914 |
| 12 February 2001 | -0.63% | 1.94% | -0.323 |
| 13 February 2001 | -3.39% | 1.93% | -1.752 |
| 24 April 2001 | 0.18% | 1.93% | 0.092 |
| 25 April 2001 | -0.02% | 1.94% | -0.013 |
| 26 April 2001 | 3.82% | 1.93% | 1.975 |
| 29 May 2001 | -1.63% | 1.93% | -0.843 |
| 30 May 2001 | 1.04% | 1.93% | 0.535 |
| 31 May 2001 | 0.91% | 1.93% | 0.469 |

**Exhibit-3**

**Replication of Dr. Lehn's Pharmacia Regression Using Logarithmic Returns**

Estimation Period: 17 April 2000 to 6 August 2001

| | | | |
|---|---|---|---|
| 24 July 2001 | -1.60% | 1.94% | -0.825 |
| 25 July 2001 | -0.28% | 1.94% | -0.142 |
| 26 July 2001 | -1.64% | 1.93% | -0.846 |
| 3 August 2001 | 0.80% | 1.93% | 0.413 |
| 6 August 2001 | 0.98% | 1.93% | 0.508 |

**Exhibit-4**

**Replication of Dr. Lehn's Event Study Using Logarithmic Returns**

**Pharmacia Corporation**

| Date | PHA Logarithmic Return | NYSE Index Logarithmic Return | Dr. Lehn's Peer Index Logarithmic Return | PHA Explained Return | PHA Residual Return | $t$-statistic | p-value 1-tail | p-value 2-tail | Statistically Significant |
|---|---|---|---|---|---|---|---|---|---|
| 17 April 2000 | 1.86% | 1.42% | 2.31% | 2.26% | -0.40% | -0.21 | 41.85% | 83.70% | No |
| 18 April 2000 | -1.98% | 2.33% | 1.69% | 1.86% | -3.85% | -2.00 | 2.35% | 4.70% | Yes |
| 19 April 2000 | 11.87% | -0.24% | -1.28% | -1.30% | 13.17% | 6.83 | 0.00% | 0.00% | Yes |
| 17-19 April 2000 | 11.75% | 3.50% | 2.73% | 2.83% | 8.92% | 2.67 | 0.40% | 0.79% | Yes |

**Exhibit-5**

**Merck & Co., Inc.**

**Common Stock Prices, Dividends and Returns**

| Date | MRK Closing Stock Price | MRK Dividend | MRK Logarithmic Return |
|---|---|---|---|
| 10/18/2000 | $78.19 | | |
| 10/19/2000 | $77.56 | | -0.80% |
| 10/20/2000 | $81.88 | | 5.41% |
| 10/23/2000 | $84.75 | | 3.45% |
| 10/24/2000 | $85.44 | | 0.81% |
| 10/25/2000 | $87.31 | | 2.17% |
| 10/26/2000 | $86.69 | | -0.72% |
| 10/27/2000 | $88.00 | | 1.50% |
| 10/30/2000 | $88.69 | | 0.78% |
| 10/31/2000 | $89.94 | | 1.40% |
| 11/1/2000 | $89.75 | | -0.21% |
| 11/2/2000 | $89.13 | | -0.70% |
| 11/3/2000 | $87.88 | | -1.41% |
| 11/6/2000 | $90.00 | | 2.39% |
| 11/7/2000 | $86.88 | | -3.53% |
| 11/8/2000 | $90.81 | | 4.43% |
| 11/9/2000 | $90.44 | | -0.41% |
| 11/10/2000 | $91.50 | | 1.17% |
| 11/13/2000 | $89.38 | | -2.35% |
| 11/14/2000 | $91.06 | | 1.87% |
| 11/15/2000 | $91.63 | | 0.62% |
| 11/16/2000 | $90.19 | | -1.58% |
| 11/17/2000 | $88.50 | | -1.89% |
| 11/20/2000 | $90.38 | | 2.10% |
| 11/21/2000 | $92.00 | | 1.78% |
| 11/22/2000 | $90.69 | | -1.44% |
| 11/24/2000 | $89.44 | | -1.39% |
| 11/27/2000 | $91.63 | | 2.42% |
| 11/28/2000 | $92.63 | | 1.09% |
| 11/29/2000 | $94.88 | | 2.40% |
| 11/30/2000 | $92.69 | | -2.33% |
| 12/1/2000 | $90.63 | | -2.25% |
| 12/4/2000 | $91.94 | | 1.44% |
| 12/5/2000 | $90.00 | | -2.13% |
| 12/6/2000 | $89.56 | $0.34 | -0.11% |
| 12/7/2000 | $91.06 | | 1.66% |
| 12/8/2000 | $89.56 | | -1.66% |

**Exhibit-5**

**Merck & Co., Inc.**

**Common Stock Prices, Dividends and Returns**

| Date | MRK Closing Stock Price | MRK Dividend | MRK Logarithmic Return |
|---|---|---|---|
| 12/11/2000 | $90.63 | | 1.18% |
| 12/12/2000 | $91.38 | | 0.82% |
| 12/13/2000 | $92.00 | | 0.68% |
| 12/14/2000 | $91.00 | | -1.09% |
| 12/15/2000 | $90.38 | | -0.69% |
| 12/18/2000 | $89.31 | | -1.18% |
| 12/19/2000 | $91.50 | | 2.42% |
| 12/20/2000 | $93.38 | | 2.03% |
| 12/21/2000 | $92.50 | | -0.94% |
| 12/22/2000 | $90.50 | | -2.19% |
| 12/26/2000 | $92.69 | | 2.39% |
| 12/27/2000 | $92.69 | | 0.00% |
| 12/28/2000 | $94.75 | | 2.20% |
| 12/29/2000 | $93.63 | | -1.19% |
| 1/2/2001 | $93.00 | | -0.67% |
| 1/3/2001 | $89.13 | | -4.26% |
| 1/4/2001 | $85.00 | | -4.74% |
| 1/5/2001 | $83.31 | | -2.01% |
| 1/8/2001 | $83.50 | | 0.22% |
| 1/9/2001 | $84.00 | | 0.60% |
| 1/10/2001 | $83.19 | | -0.97% |
| 1/11/2001 | $81.63 | | -1.90% |
| 1/12/2001 | $81.44 | | -0.23% |
| 1/16/2001 | $83.31 | | 2.28% |
| 1/17/2001 | $81.25 | | -2.51% |
| 1/18/2001 | $82.88 | | 1.98% |
| 1/19/2001 | $82.44 | | -0.53% |
| 1/22/2001 | $82.31 | | -0.15% |
| 1/23/2001 | $79.56 | | -3.40% |
| 1/24/2001 | $78.94 | | -0.79% |
| 1/25/2001 | $81.88 | | 3.65% |
| 1/26/2001 | $82.25 | | 0.46% |
| 1/29/2001 | $80.31 | | -2.39% |
| 1/30/2001 | $81.00 | | 0.86% |
| 1/31/2001 | $82.18 | | 1.45% |
| 2/1/2001 | $84.48 | | 2.76% |
| 2/2/2001 | $83.97 | | -0.61% |

64

**Exhibit-5**

**Merck & Co., Inc.**

**Common Stock Prices, Dividends and Returns**

| Date | MRK Closing Stock Price | MRK Dividend | MRK Logarithmic Return |
|------|------|------|------|
| 2/5/2001 | $84.48 | | 0.61% |
| 2/6/2001 | $84.36 | | -0.14% |
| 2/7/2001 | $81.85 | | -3.02% |
| 2/8/2001 | $82.97 | | 1.36% |
| 2/9/2001 | $82.72 | | -0.30% |
| 2/12/2001 | $82.98 | | 0.31% |
| 2/13/2001 | $80.75 | | -2.72% |
| 2/14/2001 | $79.63 | | -1.40% |
| 2/15/2001 | $78.10 | | -1.94% |
| 2/16/2001 | $77.29 | | -1.04% |
| 2/20/2001 | $77.90 | | 0.79% |
| 2/21/2001 | $78.71 | | 1.03% |
| 2/22/2001 | $77.70 | | -1.29% |
| 2/23/2001 | $77.08 | | -0.80% |
| 2/26/2001 | $79.33 | | 2.88% |
| 2/27/2001 | $79.91 | | 0.73% |
| 2/28/2001 | $80.20 | | 0.36% |
| 3/1/2001 | $79.75 | | -0.56% |
| 3/2/2001 | $80.15 | | 0.50% |
| 3/5/2001 | $79.53 | | -0.78% |
| 3/6/2001 | $77.45 | | -2.65% |
| 3/7/2001 | $74.40 | $0.34 | -3.56% |
| 3/8/2001 | $74.79 | | 0.52% |
| 3/9/2001 | $75.69 | | 1.20% |
| 3/12/2001 | $74.15 | | -2.06% |
| 3/13/2001 | $72.93 | | -1.66% |
| 3/14/2001 | $71.93 | | -1.38% |
| 3/15/2001 | $74.05 | | 2.90% |
| 3/16/2001 | $71.45 | | -3.57% |
| 3/19/2001 | $72.07 | | 0.86% |
| 3/20/2001 | $70.25 | | -2.56% |
| 3/21/2001 | $67.96 | | -3.31% |
| 3/22/2001 | $69.71 | | 2.54% |
| 3/23/2001 | $68.98 | | -1.05% |
| 3/26/2001 | $71.48 | | 3.56% |
| 3/27/2001 | $73.61 | | 2.94% |
| 3/28/2001 | $75.15 | | 2.07% |

## Exhibit-5

## Merck & Co., Inc.

## Common Stock Prices, Dividends and Returns

| Date | MRK Closing Stock Price | MRK Dividend | MRK Logarithmic Return |
|------|------------------------|--------------|------------------------|
| 3/29/2001 | $74.20 | | -1.27% |
| 3/30/2001 | $75.90 | | 2.27% |
| 4/2/2001 | $74.25 | | -2.20% |
| 4/3/2001 | $72.81 | | -1.96% |
| 4/4/2001 | $74.48 | | 2.27% |
| 4/5/2001 | $75.78 | | 1.73% |
| 4/6/2001 | $76.42 | | 0.84% |
| 4/9/2001 | $78.00 | | 2.05% |
| 4/10/2001 | $78.39 | | 0.50% |
| 4/11/2001 | $77.15 | | -1.59% |
| 4/12/2001 | $79.50 | | 3.00% |
| 4/16/2001 | $79.10 | | -0.50% |
| 4/17/2001 | $80.85 | | 2.19% |
| 4/18/2001 | $79.30 | | -1.94% |
| 4/19/2001 | $78.27 | | -1.31% |
| 4/20/2001 | $73.61 | | -6.14% |
| 4/23/2001 | $74.25 | | 0.87% |
| 4/24/2001 | $73.46 | | -1.07% |
| 4/25/2001 | $74.86 | | 1.89% |
| 4/26/2001 | $74.85 | | -0.01% |
| 4/27/2001 | $75.65 | | 1.06% |
| 4/30/2001 | $75.97 | | 0.42% |
| 5/1/2001 | $75.60 | | -0.49% |
| 5/2/2001 | $74.91 | | -0.92% |
| 5/3/2001 | $75.27 | | 0.48% |
| 5/4/2001 | $76.37 | | 1.45% |
| 5/7/2001 | $76.90 | | 0.69% |
| 5/8/2001 | $76.44 | | -0.60% |
| 5/9/2001 | $77.32 | | 1.14% |
| 5/10/2001 | $76.52 | | -1.04% |
| 5/11/2001 | $75.94 | | -0.76% |
| 5/14/2001 | $76.69 | | 0.98% |
| 5/15/2001 | $75.90 | | -1.04% |
| 5/16/2001 | $78.10 | | 2.86% |
| 5/17/2001 | $78.60 | | 0.64% |
| 5/18/2001 | $77.40 | | -1.54% |
| 5/21/2001 | $77.40 | | 0.00% |

## Exhibit-5

## Merck & Co., Inc.

## Common Stock Prices, Dividends and Returns

| Date | MRK Closing Stock Price | MRK Dividend | MRK Logarithmic Return |
|---|---|---|---|
| 5/22/2001 | $75.10 | | -3.02% |
| 5/23/2001 | $74.00 | | -1.48% |
| 5/24/2001 | $72.50 | | -2.05% |
| 5/25/2001 | $72.60 | | 0.14% |
| 5/29/2001 | $74.39 | | 2.44% |
| 5/30/2001 | $73.28 | | -1.50% |
| 5/31/2001 | $72.99 | $0.34 | 0.07% |
| 6/1/2001 | $74.20 | | 1.64% |
| 6/4/2001 | $74.32 | | 0.16% |
| 6/5/2001 | $75.33 | | 1.35% |
| 6/6/2001 | $73.95 | | -1.85% |
| 6/7/2001 | $74.81 | | 1.16% |
| 6/8/2001 | $74.22 | | -0.79% |
| 6/11/2001 | $72.25 | | -2.69% |
| 6/12/2001 | $72.61 | | 0.50% |
| 6/13/2001 | $73.13 | | 0.71% |
| 6/14/2001 | $73.90 | | 1.05% |
| 6/15/2001 | $73.75 | | -0.20% |
| 6/18/2001 | $74.25 | | 0.68% |
| 6/19/2001 | $74.60 | | 0.47% |
| 6/20/2001 | $74.66 | | 0.08% |
| 6/21/2001 | $74.47 | | -0.25% |
| 6/22/2001 | $67.80 | | -9.38% |
| 6/25/2001 | $67.50 | | -0.44% |
| 6/26/2001 | $66.22 | | -1.91% |
| 6/27/2001 | $65.64 | | -0.88% |
| 6/28/2001 | $65.00 | | -0.98% |
| 6/29/2001 | $63.91 | | -1.69% |
| 7/2/2001 | $64.35 | | 0.69% |
| 7/3/2001 | $64.70 | | 0.54% |
| 7/5/2001 | $64.14 | | -0.87% |
| 7/6/2001 | $63.44 | | -1.10% |
| 7/9/2001 | $64.60 | | 1.81% |
| 7/10/2001 | $63.72 | | -1.37% |
| 7/11/2001 | $62.36 | | -2.16% |
| 7/12/2001 | $61.00 | | -2.21% |
| 7/13/2001 | $61.50 | | 0.82% |

**Exhibit-5**

**Merck & Co., Inc.**

**Common Stock Prices, Dividends and Returns**

| Date | MRK Closing Stock Price | MRK Dividend | MRK Logarithmic Return |
|---|---|---|---|
| 7/16/2001 | $62.98 | | 2.38% |
| 7/17/2001 | $64.48 | | 2.35% |
| 7/18/2001 | $67.55 | | 4.65% |
| 7/19/2001 | $67.30 | | -0.37% |
| 7/20/2001 | $66.43 | | -1.30% |
| 7/23/2001 | $65.70 | | -1.10% |
| 7/24/2001 | $64.93 | | -1.18% |
| 7/25/2001 | $64.99 | | 0.09% |
| 7/26/2001 | $64.76 | | -0.35% |
| 7/27/2001 | $65.14 | | 0.59% |
| 7/30/2001 | $66.25 | | 1.69% |
| 7/31/2001 | $67.98 | | 2.58% |
| 8/1/2001 | $67.99 | | 0.01% |
| 8/2/2001 | $67.79 | | -0.29% |
| 8/3/2001 | $68.11 | | 0.47% |
| 8/6/2001 | $67.42 | | -1.02% |
| 8/7/2001 | $68.48 | | 1.56% |
| 8/8/2001 | $67.85 | | -0.92% |
| 8/9/2001 | $67.82 | | -0.04% |
| 8/10/2001 | $69.03 | | 1.77% |
| 8/13/2001 | $69.65 | | 0.89% |
| 8/14/2001 | $70.00 | | 0.50% |
| 8/15/2001 | $68.90 | | -1.58% |
| 8/16/2001 | $69.99 | | 1.57% |
| 8/17/2001 | $69.15 | | -1.21% |
| 8/20/2001 | $70.58 | | 2.05% |
| 8/21/2001 | $70.75 | | 0.24% |
| 8/22/2001 | $71.22 | | 0.66% |
| 8/23/2001 | $68.51 | | -3.88% |
| 8/24/2001 | $69.02 | | 0.74% |
| 8/27/2001 | $68.70 | | -0.46% |
| 8/28/2001 | $68.01 | | -1.01% |
| 8/29/2001 | $67.14 | | -1.29% |
| 8/30/2001 | $65.99 | $0.35 | -1.20% |
| 8/31/2001 | $65.10 | | -1.36% |
| 9/4/2001 | $65.30 | | 0.31% |
| 9/5/2001 | $67.70 | | 3.61% |

**Exhibit-5**

**Merck & Co., Inc.**

**Common Stock Prices, Dividends and Returns**

| Date | MRK Closing Stock Price | MRK Dividend | MRK Logarithmic Return |
|------|------------------------|--------------|------------------------|
| 9/6/2001 | $65.75 | | -2.92% |
| 9/7/2001 | $64.30 | | -2.23% |
| 9/10/2001 | $66.10 | | 2.76% |
| 9/17/2001 | $67.15 | | 1.58% |
| 9/18/2001 | $68.31 | | 1.71% |
| 9/19/2001 | $67.86 | | -0.66% |
| 9/20/2001 | $66.85 | | -1.50% |
| 9/21/2001 | $65.70 | | -1.74% |
| 9/24/2001 | $63.99 | | -2.64% |
| 9/25/2001 | $62.45 | | -2.44% |
| 9/26/2001 | $63.35 | | 1.43% |
| 9/27/2001 | $66.21 | | 4.42% |
| 9/28/2001 | $66.60 | | 0.59% |
| 10/1/2001 | $68.32 | | 2.55% |
| 10/2/2001 | $68.44 | | 0.18% |
| 10/3/2001 | $67.66 | | -1.15% |
| 10/4/2001 | $67.10 | | -0.83% |
| 10/5/2001 | $68.26 | | 1.71% |
| 10/8/2001 | $68.60 | | 0.50% |
| 10/9/2001 | $67.93 | | -0.98% |
| 10/10/2001 | $68.49 | | 0.82% |
| 10/11/2001 | $68.18 | | -0.45% |
| 10/12/2001 | $69.16 | | 1.43% |
| 10/15/2001 | $69.95 | | 1.14% |
| 10/16/2001 | $69.31 | | -0.92% |
| 10/17/2001 | $69.05 | | -0.38% |
| 10/18/2001 | $66.30 | | -4.06% |

Source:
CRSP

## Exhibit-6

## Merck Stock Regression Results

Estimation Period: 19 October 2000 to 18 October 2001

| Regression Statistics | |
|---|---|
| Multiple R | 0.663 |
| R Square | 0.440 |
| Adjusted R Square | 0.424 |
| Standard Error | 1.46% |
| Observations | 248 |
| F-Statistic | 26.93 |
| F-Statistic Significance Level | ~0% |

| | Coefficients | Standard Error | $t$-statistic |
|---|---|---|---|
| Intercept | -0.05% | 0.09% | -0.549 |
| Market Index | -0.096 | 0.063 | -1.521 |
| Peer Index | 0.920 | 0.068 | 13.434 |
| 6 February 2001 | 0.48% | 1.46% | 0.330 |
| 7 February 2001 | -4.14% | 1.47% | -2.825 |
| 8 February 2001 | 0.95% | 1.46% | 0.650 |
| 9 February 2001 | -0.46% | 1.47% | -0.315 |
| 12 February 2001 | -0.48% | 1.47% | -0.328 |

70

**Exhibit-7**

**Merck & Co., Inc.**

**Common Stock Event Study Results**

| Date | MRK Closing Stock Price | MRK Closing Stock Price on Prior Trading Day | MRK Logarithmic Return | Market Index Logarithmic Return | Pharma Index Logarithmic Return | MRK Explained Return | MRK Residual Return | $t$-statistic | p-value | Statistically Significant |
|---|---|---|---|---|---|---|---|---|---|---|
| 7 February 2001 | $81.85 | $84.36 | -3.02% | -0.88% | 1.19% | 1.13% | -4.15% | -2.83 | 0.0050 | Yes |
| 8 February 2001 | $82.97 | $81.85 | 1.36% | -0.65% | 0.43% | 0.41% | 0.95% | 0.65 | 0.5166 | No |
| 9 February 2001 | $82.72 | $82.97 | -0.30% | -1.44% | 0.08% | 0.16% | -0.46% | -0.32 | 0.7518 | No |
| 12 February 2001 | $82.98 | $82.72 | 0.31% | 1.03% | 1.03% | 0.79% | -0.48% | -0.33 | 0.7425 | No |
| 7-9 February 2001 | | | -1.96% | -2.97% | 1.70% | 1.70% | -3.66% | -1.44 | 0.1499 | No |
| 8-12 February 2001 | | | 1.37% | -1.06% | 1.54% | 1.37% | 0.01% | 0.00 | 0.9982 | No |

71



**Exhibit-8**
**Pharmacia Corp.**
**Intraday Stock Price: 8 February 2001**



**Source:** TAQ.
**Note:** For comparison purposes the stock price data represents the last transaction price of each five minute increment.



**Exhibit-9**
**Pharmacia Pharmaceuticals**
**Intraday Stock Price: 7 Febraury 2001**

2:25 p m. Release of FDA decision according to Dr. Lehn. **Lehn Report, paragraph 76.**

**Source:** TAQ.
**Note:** For comparison purposes the stock price data represents the last transaction price of each five minute increment.

# EXHIBIT 8

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALASKA ELECTRICAL PENSION       )
FUND, et al., On Behalf of      )
Themselves and All Others       )   No. 03-1519
Similarly Situated,             )   (AET)
            Plaintiffs,         )
     vs.                        )
PHARMACIA CORPORATION, et al.,  )
            Defendants.         )

     The deposition of STEVEN GEIS, called for
examination, taken before NICOLE SCOLA, CSR
No. 084-004524, a Notary Public within and for the
County of DuPage, State of Illinois, and a Certified
Shorthand Reporter of said state, at Suite 900, One
South Dearborn Street, Chicago, Illinois, on
December 10, 2010, at 9:06 a.m.

**Page 3**

1   ALSO PRESENT:
2
3       MR. KEVIN DAILEY, Legal Videographer,
4       Esquire Deposition Solutions.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   REPORTED BY:  NICOLE M. SCOLA, CSR, RPR,
24       C.S.R. Certificate No. 84-4524.

**Page 2**

1   PRESENT:
2
3       ROBBINS GELLER RUDMAN & DOWD, LLP,
4       (665 West Broadway, Suite 1900,
5       San Diego, California  92101,
6       619-231-1058), by:
7       MR. SCOTT H. SAHAM,
8       MR. LUCAS F. OLTS,
9           -and-
10      SCOTT & SCOTT LLP,
11      (707 Broadway, Suite 1000,
12      San Diego, California  92101,
13      619-233-4565), by:
14      MR. MATTHEW MONTGOMERY,
15          appeared on behalf of the Plaintiffs;
16
17      CADWALADER, WICKERSHAM & TAFT LLP,
18      (One World Financial Center,
19      New York, New York  10281,
20      212-504-6474), by:
21      MR. JONATHAN M. HOFF,
22      MR. JOSHUA R. WEISS,
23          appeared on behalf of the Defendants.
24

**Page 4**

1        THE VIDEOGRAPHER:  Good morning.  We're going
2   on the video record at 9:06 a.m.
3        My name is Kevin Dailey, and I'm a legal
4   videographer in association with Esquire Deposition
5   Solutions.  Our address is 311 West Monroe, Chicago,
6   Illinois.
7        The court reporter is Nicole Scola, also
8   of Esquire Deposition Solutions.
9        Here begins the videotaped deposition of
10  Steven Geis, taking place at One South Dearborn,
11  Chicago, Illinois.
12       Today's date is December 10, 2010.
13       This deposition is being taken in the
14  matter of Alaska Electrical Pension Fund, et al. vs.
15  Pharmacia Corporation, et al., being heard before
16  the United States District Court, the District of
17  New Jersey.
18       Will counsel please state their names for
19  the record.
20   MR. SAHAM:  Scott Saham for the plaintiffs.
21   MR. MONTGOMERY:  Matt Montgomery for the
22  plaintiffs.
23   MR. OLTS:  Lucas Olts for the plaintiffs.
24   MR. HOFF:  Jonathan Hoff for the defendants.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

5

1    MR. WEISS:  Joshua Weiss for the defendants.
2    THE VIDEOGRAPHER:  Will the reporter please
3  swear in the witness.
4        (WHEREUPON, the witness was duly
5        sworn.)
6          STEVEN GEIS,
7  called as a witness herein, having been first duly
8  sworn, was examined and testified as follows:
9        EXAMINATION
10 BY MR. SAHAM:
11   Q.   Good morning, Dr. Geis.
12   A.   Good morning.
13   Q.   Could you please state and spell your
14 name for the record?
15   A.   It's Steven Geis, G-e-i-s.
16   Q.   And what is your current address?
17   A.   1945 North Seminary, Chicago,
18 Illinois 60614.
19   Q.   And is there any reason today why you
20 cannot provide truthful and complete testimony,
21 medical or otherwise?
22   A.   No, there isn't.
23   Q.   Now, bringing you back to the 1998
24 through 2001 time frame, where were you employed?

6

1    A.   I was employed -- from 9 -- 1998, I was
2  employed by G.D. Searle & Company, and then after
3  the merger with Pharmacia into the 2001, I think you
4  said was the later date, I was an employee for
5  Pharmacia.
6    Q.   Okay.  And during that time frame, did
7  you work with respect to a drug called Celebrex?
8    A.   Yes, I did.
9    Q.   Okay.  And what was your job title at
10 G.D. Searle?
11   A.   During that period?
12   Q.   Yeah, during -- well, I'll -- I'll
13 represent to you, and we can show you a document --
14   A.   Sure.
15   Q.   -- later, that the merger with Pharmacia
16 closed on March 31st of the year 2000.
17   A.   Okay.
18   Q.   So in the 1998 through March 31st, 2000,
19 prior to the merger when you worked at
20 G.D. Searle --
21   A.   Okay.
22   Q.   -- what was your job title?
23   A.   My job title changed over that period
24 that you just described.

7

1    Q.   Okay.  Tell me the two job titles.
2    A.   I think there were three.  But in 1998, I
3  was -- and I might have this wrong -- an
4  executive -- an executive director for arthritis,
5  inflammation and pain.
6          In the summer of 1999, I was promoted to
7  vice president for the therapeutic area of
8  arthritis, inflammation and pain.
9          After the merger with Pharmacia, I became
10 the global vice president for arthritis,
11 inflammation and pain, cardiovascular disease and
12 oncology.
13   Q.   And -- and during that time period, did
14 you work on the CLASS trial or CLASS study?
15   A.   Yes, I did.
16   Q.   And what were your responsibilities with
17 respect to CLASS?
18   A.   I provided oversight for the -- the team
19 that conducted the clinical trial.
20   Q.   Okay.  And prior to that, did you work on
21 the NDA for Celebrex or Celecoxib?
22   A.   Yes, I did.
23   Q.   And what was your responsibility with
24 respect to the NDA?

8

1    A.   To provide oversight for the team that
2  were conducting the clinical trials and putting the
3  NDA together.
4    Q.   And were you the first-line manager with
5  respect to those Celebrex NDA and the CLASS trial?
6    MR. HOFF:  Objection to form.
7  BY THE WITNESS:
8    A.   Tell me what you mean by "first-line
9  manager."
10 BY MR. SAHAM:
11   Q.   Well, I --
12   A.   That's not terminology used.
13   Q.   Sure.  I understand that there are
14 individuals at the companies --
15   A.   Sure.
16   Q.   -- ranked above you in the chain of
17 command, but were you the main executive responsible
18 for those projects?
19   A.   The -- the clinical trials were conducted
20 by my team.  The NDA was put together predominantly
21 by my team, and I provided oversight for that team.
22 That's what I can tell you.
23   Q.   That's fine.  That's -- that's all I was
24 trying to understand.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

9

1        And I'd like to show you what I've marked
2    here as Plaintiffs' Exhibit 248.
3        Could you take a look at that document?
4            (WHEREUPON, a certain document was
5            marked Plaintiffs' Deposition
6            Exhibit No. 248, for identification,
7            as of 12/10/2010.)
8    BY MR. SAHAM:
9        Q.    Tell me if you recognize it.
10       MR. SAHAM:  For the record, 248 bears
11   Bates numbers DEFS 00113653 through 69.
12   BY THE WITNESS:
13       A.    Okay.
14   BY MR. SAHAM:
15       Q.    Do you recognize this document?
16       A.    Yes.
17       Q.    And what is it?
18       A.    This is a -- what -- I haven't read every
19   word of it, but it appears to be an old version of
20   what I would call my CV.
21       Q.    Okay.  And that's your curriculum vitae?
22       A.    Yes.
23       Q.    And does it appear to be -- well, strike
24   that question.

11

1        Q.    -- August 1998 to the present.
2        A.    Could you repeat the question?
3        Q.    My question is, this just emphasizes that
4    you were, in part, responsible for submitting the
5    Celecoxib NDA; is that correct?
6        A.    Yes, that was part of my
7    responsibilities.
8        Q.    Okay.  And during this time period that
9    I'm focused on -- and I -- I guess I'd ask the
10   question in two parts.
11       Initially, between August of '98 and the
12   merger in March of -- of 2001, did you report to
13   Dr. Friedman?  Is that correct?
14       A.    So March of 1998?
15       Q.    No, I'm sorry, just -- well -- well,
16   let's make the question simpler.
17       The -- the -- during 1999 and up until
18   March of 2000 when the merger occurred, the end of
19   March of 2000, did you report to Dr. Michael
20   Friedman?
21       A.    On -- yes, in principle, but there may
22   have been a short period of time before that where
23   Michael Friedman's predecessor was John Alexander,
24   and I reported to him, and then Friedman came in.

10

1        It -- what is the purpose of your CV?
2        A.    Well, in our profession, in the medical
3    and scientific communities, we put together, I think
4    what in other circles is called a -- they use a
5    different term, but what this is, is, what is your
6    work experience, historically, what is your
7    educational background and what are the publications
8    that you have -- your -- awards you've received,
9    civic contributions and the publications that you
10   have had published.
11       Q.    And at the beginning of the -- of your
12   CV, it -- there's a section entitled Objective?
13       A.    Yes.
14       Q.    And right at the beginning there, it
15   states that you were at least partly responsible for
16   developing the blockbuster drug Celebrex; is that
17   correct?
18       A.    Let me take a look at this.
19       Yes, that's what that says.
20       Q.    And it also emphasizes that you
21   participated in submitting the Celecoxib NDA?  And
22   I'm moving down to your first job description under
23   Vice President:  Arthritis Clinical Development --
24       A.    Right.

12

1        Q.    Okay.  And then Dr. Friedman reported to
2    Dr. Needleman; is that correct?
3        A.    I believe so, that was the reporting
4    structure.
5        Q.    Okay.  And then once the merger occurred
6    in March of 2000, the end of March of 2000, who did
7    you report to then?
8        A.    Frankly, it got a little bit uncertain as
9    to when the new structure went in place, and I
10   reported to a new boss versus when I was still
11   reporting to Michael Friedman.
12       Q.    Okay.
13       A.    But ultimately, as things evolved, I
14   reported to Mike Tansey at Pharmacia.
15       Q.    And it --
16       A.    And it was probably toward the end of
17   2000 -- mid to end.
18       Q.    Okay.  And then who -- who did Mr. Tansey
19   report to?
20       A.    Dr. Tansey, I believe, reported directly
21   to Dr. Goran Ando.
22       Q.    Okay.  And where was Dr. Needleman in
23   that?
24       A.    I can't say for sure because this -- this



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

13

1  was -- appeared to me, with the merger, an evolving
2  situation as to what the roles and responsibilities
3  would be to -- for the people who were a couple
4  levels above me. So Dr. Needleman was still there.
5  My understanding was, he shared responsibility for
6  R&D with Dr. Ando.
7      Q.   So Dr. Ando and Dr. Needleman were chief
8  of R&D at Pharmacia?
9      A.   I can't say explicitly in terms of how I
10  saw it from where I was. They were both providing
11  guidance to R&D, but I can't tell you I ever saw an
12  organizational structure that said, here's two guys,
13  and this is what they're doing.
14      Q.   Okay. But they were both above you at
15  Pharmacia; is that correct?
16      A.   Oh, yes.
17      Q.   Okay. And -- they both reported to
18  the CEO of the company, Mr. Hassan?
19      A.   Directly reported? See, I don't know.
20      Q.   Okay. Well, if you don't know, you don't
21  know.
22      A.   I don't know.
23      Q.   Okay. And do you recall who -- in that
24  2000 time frame, who -- who was your team of direct

---

14

1  reports, to the extent you can recall them?
2      A.   Wow. So there were many people on the
3  team. And, again, the -- the reporting
4  relationships were moving because the organization
5  was changing and then -- and then we threw on top of
6  that the merger with Pharmacia. So I don't know if
7  I can say explicitly everybody who reported directly
8  to me.
9      Q.   Just to make it easier --
10      A.   I can tell you --
11      Q.   -- who --
12      A.   -- some of them.
13      Q.   -- who do you recall that worked on the
14  Celecoxib team below you in that --
15      A.   Okay.
16      Q.   -- point in time?
17      A.   Okay. So Dr. Ken Verburg, Dr. Jim
18  Lefkowith, Dr. Jeff Kent, Aimee Burr. And that
19  would have been direct reporting to me.
20          Then there were -- were other people --
21  excuse me -- from other departments, such as
22  statistics and data management, who worked on it but
23  did not directly report to me.
24      Q.   Okay. And -- and with respect to the

---

15

1  CLASS trial, is it correct that you signed off on
2  the protocols?
3      A.   You know, I'd have to look at those
4  protocols, because the -- the procedure changed over
5  time, whether or not the director of the team was
6  supposed to sign off.
7          Because for a while, we were supposed to
8  sign off, and then they changed the process and they
9  said the directors don't sign off. The medical guys
10  actually running the studies sign off. So I'd have
11  to look at the actual sign-off page to see.
12      Q.   And I'll show you that in -- momentarily.
13          But it -- it -- it's correct to say that
14  you participated in the design of the CLASS trial?
15      A.   Yes, that's correct.
16      Q.   And it's also correct to say that you
17  participated in the analysis of the data once it was
18  unblinded?
19      A.   Yes.
20      Q.   And you started that process immediately
21  after unblinding?
22      A.   Immediately -- well, shortly after it was
23  unblinded and I was given the data, we started it.
24      Q.   And is it also accurate that you were the

---

16

1  senior author on the JAMA paper that was published
2  in September of 2000 regarding the CLASS trial?
3      MR. HOFF:  Objection to form.
4  BY THE WITNESS:
5      A.   I don't know what you mean by "the senior
6  author."
7  BY MR. SAHAM:
8      Q.   Well, there were 13 authors and you were
9  the last one listed.
10          Is that commonly referred to as the
11  senior author?
12      A.   No.
13      Q.   Okay. You haven't heard the last author
14  being listed as the senior author?
15      A.   No.
16      Q.   Is there any import of being the last
17  person listed or the first person listed on a
18  medical article?
19      A.   I think some people give import to it in
20  some circles. I don't necessarily do it.
21      Q.   Okay. And that import would be, the
22  first and last are the most prestigious places to
23  be?
24      A.   Not to me, but some people would say

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

17

1   that.
2       Q.   One last question about your resume,
3   which is -- or your CV, which is Exhibit 248.
4            On the third page of the document under
5   Awards, you're awarded the Edgar M. Queeny award.
6            Do you see that?
7       A.   Yes.
8       Q.   And what's the Edgar M. Queeny award?
9       A.   In the Monsanto organization, this was an
10  award that was given.
11      Q.   Okay.  And what -- what was the point of
12  the award?
13      A.   My understanding is that it was given to
14  people who played a key role in taking a product
15  from more of the concept or the basic science stage
16  through commercialization.
17      Q.   And you were awarded that for playing a
18  key role with respect to Celebrex; is that correct?
19      A.   I was awarded it with a number of other
20  people, yes.
21      Q.   But with respect to your work on
22  Celebrex?
23      A.   Yes.
24      Q.   Okay.

---

18

1       A.   That's correct.
2       Q.   And I'd like to show you what's
3   previously been marked in this case as -- or before
4   I do that -- actually, I'll strike that question.
5            Additionally, when we were talking about
6   your -- your role with CLASS just a minute ago, you
7   also -- after the -- the data was -- was analyzed
8   and presented to the public, you -- you participated
9   on behalf of Pharmacia in talking about the data in
10  certain circles; is that correct?
11           It's a bad question.  I can ask it
12  differently.
13           You -- you communicated publicly about
14  the CLASS data on behalf of Pharmacia, correct?
15      A.   At -- at some point in time, I did.
16      Q.   And -- and I'm talking about in 2000,
17  after the data was unblinded and you analyzed it,
18  you communicated on behalf of Pharmacia about the
19  data to the public?
20      A.   I think you -- I commun- - I communicated
21  to the public, I guess, as a representative of
22  Pharmacia would be accurate.
23      Q.   Okay.  I want to show you what's
24  previously been marked in this case as Plaintiffs'

---

19

1   Exhibit No. 77.
2            Could you please take a look at
3   Plaintiffs' Exhibit 77.
4            MR. SAHAM:  Do you guys want two, or should I
5   give them one?
6            Thank you, Josh.
7   BY MR. SAHAM:
8       Q.   And just quickly, you don't have to --
9   you know, it's a lengthy document, but could you
10  just tell me what Exhibit 77 is, if you recognize
11  it?
12      A.   The title of it is a revised clinical
13  protocol for the multi-center, double-blind,
14  parallel group study comparing the incidence of
15  clinically significant upper gastrointestinal
16  reverse events associated with SC-58635
17  400 milligrams BID to that of Diclofenac
18  75 milligrams BID in patients with osteoarthritis or
19  rheumatoid arthritis, IDN # 48395, original protocol
20  number N48-98-02-102(sic) (Revision 1).
21      Q.   And do you recognize that -- this as
22  being one of the protocols or amended protocols with
23  respect to the CLASS trial and the comparison to
24  Diclofenac?

---

20

1       A.   Could you repeat the question?
2       Q.   My question is, do you recognize this as
3   being one of the revised protocols with respect to
4   the CLASS trial and the comparison between Celecoxib
5   and Diclofenac?
6       A.   Yes, this is part of the protocol.
7       Q.   Okay.  And if you turn to the second page
8   of the document, is that your signature?
9       A.   Yes, it is.
10      Q.   And what was the purpose of your
11  signature here as vice president of clinical
12  research?
13      A.   To acknowledge that this was the final
14  document to be put to use.
15      Q.   And it's -- you dated the document
16  October 27, 1998?
17      A.   Yes, I did.
18      Q.   Okay.  And I'd like to refer you to --
19  well, let me just ask you generally, what's the
20  purpose of the revised clinical protocol?
21      A.   So first, maybe to tell you what a
22  protocol is, so the protocol is, the instructions as
23  to -- to -- it describes the intent of the study,
24  gives instructions as to how to conduct the study

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                          December 10, 2010

---

21

1   and how we're going to analyze the study.
2          There are circumstances where after the
3   original protocol is signed, that a change is
4   desired to be made.  So a revision is made for the
5   protocol, and in our -- in our practice, although it
6   isn't 100 percent of the case, the protocol is
7   rewritten to incorporate the revisions into the
8   document so there is one document.
9      Q.   Okay.  And I -- I'd like to turn your
10  attention, if I could -- there's numbers in the top
11  right-hand corner -- to page 10 of 36.  And under
12  Objectives, there's listed 2.1 Primary Objective.
13         Do you see that?
14     A.   Yes, I do.
15     Q.   And that lays out the primary objective
16  of the study; is that correct?
17     A.   It lays out the primary objective of this
18  particular protocol, which is part of two that
19  satisfies a larger objective.
20     Q.   Right.  And that's because there's --
21  there's -- and just correct me if I get this
22  wrong -- there's the CLASS trial and there's one arm
23  comparing Celecoxib to Ibuprofen, and then there's a
24  separate arm comparing it to Diclofenac, and this is

---

22

1   the Diclofenac arm protocol?
2      A.   I don't put it in those terms.  When you
3   talk about arms of the study, you talk about one arm
4   is Celecoxib and people who are treated with
5   Celecoxib.  The other arm and the overriding
6   objective of the CLASS trial was the NSAIDs combined
7   in all patients receiving NSAIDs.
8          So there's two arms to the study.  Within
9   the NSAIDs group, there was two different NSAIDs.
10     Q.   And -- and this just spells how the
11  comparison is going to be conducted between
12  Celecoxib and Diclofenac -- this protocol?
13     A.   This protocol describes how to conduct
14  the clinical trial in patients who are going to
15  receive Diclofenac in this trial versus Celebrex.
16  It does, then, give some -- I believe there's a
17  statistical section in here --
18     Q.   We'll get to that in a second.
19     A.   -- which talks about -- because I think
20  your question had to do with analyze, how it'll be
21  analyzed.
22     Q.   No, I'm not -- and I'm not trying to be
23  tricky.  I -- I just --
24     A.   No.

---

23

1      Q.   -- want to lay out to you that there's --
2   there's two separate protocols that are very
3   similar, but one deals with the comparison or the
4   conduct of the study with respect to Celebrex and
5   Diclofenac, and then there's a similar one that
6   deals with Ibuprofen.  That's all I'm trying to
7   understand.
8      A.   Yeah, I think that's a fair description.
9      Q.   Okay.  And this one that we're looking
10  at, Exhibit 77, is the Diclofenac part of that?
11     A.   Yes.
12     Q.   Okay.  And looking at Primary Objective
13  2.1, that lays out that the primary objective of the
14  study is to compare incidence of clinically
15  significant upper gastrointestinal adverse events.
16         And then it goes on to say, A composite
17  safety endpoint comprised of perforation, bleeding
18  or gastric outlet obstruction associated with
19  SC-58635 400 milligram BID to that associated with
20  Diclofenac 75 MG BID in patients with OA or RA.
21         Is -- is that an accurate reading of the
22  primary objective as spelled out in this protocol?
23     A.   The primary objective of this particular
24  protocol, yes --

---

24

1      Q.   Okay.
2      A.   -- that is accurate.
3      Q.   And -- and just to make things easier for
4   the rest of the day, where it's talking about these
5   clinically significant upper gastrointestinal
6   adverse events, you, periodically, and you and your
7   team and the folks at Pharmacia, you refer to those
8   as -- I call them CSUGIEs, C-S-U-G-I-E; is -- is
9   that accurate?  That's one of the ways you refer to
10  these?
11     A.   No.
12     Q.   What -- what would you call them?  I
13  mean --
14     A.   The --
15     Q.   -- the -- the what acronym?
16     A.   That was the team.  The people who were,
17  like, working on them day-to-day called them
18  CSUGIEs.
19     Q.   CSUGIE, but that's C-S-U-G-I-E?
20     A.   Yeah, clinically significant upper GI
21  events.
22     Q.   And when we see that acronym in a
23  document, it's referring to this?
24     A.   Yes.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

25

1    Q.   And you also could call that a
2    complicated ulcer; is that correct?
3    A.   I tend to call it complicated ulcer.
4    Q.   Okay.  Or an ulcer --
5    A.   That's the language I -- I'm used to
6    using.
7    Q.   Or some people call it an ulcer
8    complication, as well?
9    A.   Yeah.
10   Q.   So when we're looking at the documents,
11   we can --
12   A.   Yes.
13   Q.   -- agree that that's all referring to the
14   same thing, unless you say --
15   A.   Yeah.
16   Q.   -- different?
17   A.   Yeah.  There may be times when we have to
18   dissect it apart a bit, but --
19   Q.   Okay.
20   A.   -- yes, in principle, I would say yes.
21   Q.   Okay.  And sometimes people call them a
22   POB or a perforation, obstruction or bleed?
23   A.   Right.
24   Q.   Okay.  Great.

26

1    A.   Right.
2    Q.   And then I'd like to turn your attention
3    now to page 20 of 36, so 10 pages further on.  And
4    there's a Section 4.3 Treatment Period.
5         Do you see that?
6    A.   Yes, I do.
7    Q.   And it says the treatment period is
8    defined as the four -- 52-week interval during which
9    study medication is taken or until the trial
10   officially concludes, which- -- concludes, whichever
11   occurs first.
12        Do you see that?
13   A.   Yes, I do.
14   Q.   And that -- does that accurately describe
15   the treatment period of the study?
16   A.   It describes the maximum period that
17   patients would -- could receive drug.
18   Q.   I'd like to turn your attention to
19   page 30 of 36 -- actually, starting on page 29, 5 --
20   5.5.  It's labeled, Analysis of Clinically
21   Significant UGI Adverse Events.
22        Do you see that?
23   A.   Yes, I do.
24   Q.   So this -- this section, which is two and

27

1    a half pages long, what's the purpose of this
2    section in the protocol, generally?
3    A.   Let me go back.
4         So this section, 5.5, is part of a bigger
5    section called Statistics.
6    Q.   I can ask a more specific question --
7    A.   Sure.
8    Q.   -- if it would be easier.
9    A.   But it is -- it is a -- a -- a shortened
10   version of the overriding statistical analysis plan
11   which will be used for the CLASS trial.
12   Q.   And -- and this lays out that there's --
13   there's two coprimary endpoints to be analyzed; is
14   that correct?
15   A.   I need to --
16   Q.   Specifically --
17   A.   -- look at it.
18   Q.   -- if you look -- I can -- I can help you
19   here.  If you go to page 30, the second paragraph,
20   it states, Two endpoints will be analyzed.  One is
21   based on the traditional definition and the other
22   alternative one is proposed by the FDA.  These two
23   endpoints will be considered as coprimary; is that
24   correct?

28

1    A.   These were two of other -- of more than
2    two endpoints that would be analyzed.
3    Q.   Yeah, but these were the two primary
4    endpoints, correct?
5    A.   No, I don't think that says that.
6    Q.   Well -- well, it does say right here that
7    these two endpoints will be considered as coprimary,
8    correct?
9    A.   Yes.  Okay.  Yeah.
10   Q.   And above that, it says --
11   A.   Yeah.
12   Q.   -- two endpoints will be analyzed --
13   A.   Right.
14   Q.   -- correct?
15   A.   Right.  Coprimary for the purposes of --
16   of the FDA submission, yes.
17   Q.   Right.  And then it -- it talks about --
18   if you go down to the bottom, it talks about
19   "symptomatic UGI ulcers."
20        Do you see that, the bottom paragraph?
21   I'm way at the bottom, but --
22   A.   Okay.
23   Q.   -- feel free to go -- go through it.
24        Now, at the bottom --



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

29

1   A.   Yes --
2   Q.   At the bottom --
3   A.   -- I see that.
4   Q.   I'm sorry.  And we -- I'm -- I'm bad at
5   that, but we just have to --
6   A.   I apologize.
7   Q.   -- make sure we can't talk at the same
8   time or --
9   A.   Agreed.
10  Q.   -- or she's going to get really angry.
11  A.   Sorry.
12  Q.   So symptomatic UGI -- UGI ulcers, those
13  were also referred to as GDUs or gastroduodenal
14  ulcers; is that correct -- by some people on the
15  team?
16  A.   Yes.
17  Q.   Okay.  And do you call those symptomatic
18  ulcers; is that fair?
19  A.   In -- in this -- in the context of this
20  study, yes.
21  Q.   Okay.  Great.  And down here at the
22  bottom here, it says, "Symptomatic UGI ulcers
23  documented by endoscopy or UGI barium X-ray with no
24  evidence of perforation, bleeding or obstruction

---

30

1   will be categorized and summarized separately"; is
2   that accurate?
3   A.   That's accurate.
4   Q.   Okay.  Now, we can put away Exhibit 77
5   for now.
6        I just wanted to ask you -- and I want to
7   take you -- the -- the -- the time period I'm
8   referring to now is the -- the data.  I'll represent
9   to you that the -- and we can look at some documents
10  shortly later, but if this meets with your
11  recollection, we can just go from there -- that the
12  data was unblinded from the CLASS study on or about
13  March 17th of 2000.
14       Does that purport with your recollection?
15  A.   The data was unblinded at that time, yes.
16  Q.   Okay.  And so I'm -- right now I'm
17  referring to the period immediately after that, you
18  know, the -- the weeks and months, you know --
19  A.   Okay.  Immediate, we're going into
20  months?
21  Q.   Yeah, let's -- let's say that -- that,
22  you know, for -- for initial -- for initial
23  purposes, we're talk- -- I'm talking about March and
24  April of 2000.

---

31

1   A.   Okay.
2   Q.   So -- so right after the data gets
3   unblinded.
4   A.   Got you.
5   Q.   Is it accurate that you made some
6   internal presentations -- and -- and I'll -- I'll
7   break them up -- that you -- you made an internal
8   presentation to the Searle SMB in March of 2000
9   regarding the results of CLASS?
10  A.   So, again, things were changing and
11  acronyms for different committees and different
12  groups were changing.
13       So as I recall it, SMB referred to Phil
14  Needleman, his direct reports and people he invited
15  into a meeting.  That would be referred to as an SMB
16  meeting.
17       So in that context, yes, I do remember
18  presenting at that.
19  Q.   Okay.  And let -- let's go a little
20  broader.
21  A.   Yeah.
22  Q.   I'm getting at, you made a presentation
23  of the -- of the data in March of 2000 to the senior
24  managers at Searle, which included Dr. Needleman

---

32

1   and -- what I'm -- I'm about to ask you is, were
2   there any other people senior to Dr. Needleman at
3   that meeting?
4   A.   If we're talking about the same meeting
5   that I remember, which was Dr. Needleman and his
6   reports and then other people for some other
7   departments, I believe, as I recall -- well, I hate
8   to say -- I remember Al Heller being there, and I
9   don't want to say that Al Heller was senior to
10  Dr. Needleman because that might get me in trouble.
11  But a high-level person on the commercial side was
12  there.  Whether he was higher than Dr. Needleman, I
13  don't know.
14  Q.   And who is Al Heller?
15  A.   I believe he was, like I said, a
16  high-level guy on the commercial side, not the
17  president, but pretty high up.
18  Q.   So he'd be like a senior executive vice
19  president?
20  A.   Like it, whatever that means.
21  Q.   Okay.  You don't know his exact title --
22  A.   No, I don't.
23  Q.   -- but he was --
24  A.   I don't.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

33

1    Q.   -- a senior commercial manager?
2    A.   Right.
3    Q.   And would he have reported to -- to the
4    CEO of Searle at that point in time?
5    A.   I don't think there was a CEO because we
6    were a subsidiary of Monsanto.  So the CEO -- there
7    was a CEO of Monsanto, and I think the head guy at
8    Searle was the president.
9    Q.   And who was the president at that point?
10   A.   Dick De Schutter.
11   Q.   And was he --
12   A.   If I'm correct that he was called the
13   president.  I just don't think he was called the
14   CEO.
15   Q.   Okay.  And was De Schutter at this
16   meeting?
17   A.   No.
18   Q.   Did you ever present CLASS to
19   De Schutter?
20   A.   I don't recall ever, you know, seeing him
21   in -- in any presentations.
22   Q.   You just don't know?
23   A.   But he might have been, because sometimes
24   there were -- I presented to big groups.  He could

---

34

1    have been in the room and I just didn't know he was
2    there.
3    Q.   Okay.  So you definitely presented to Al
4    Heller and Needleman, and you may have presented to
5    De Schutter, you just don't recall?
6    A.   Right.
7    Q.   And when you made the presentation in
8    late March, would that have included the entire
9    study data as opposed to just the 6-month data?
10   A.   What do you mean by "the entire study
11   data"?
12   Q.   Okay.  And I -- and I know that term gets
13   confusing, like, because there's lots of things
14   you're looking at.
15   A.   Sure.
16   Q.   But what I'm talking about is just for
17   the GI endpoints, and for right now, we can limit
18   that, if you're comfortable with it, to the
19   complicated ulcers and then the combination of
20   complicated ulcers and the symptomatic ulcers.
21   A.   Yes.
22   Q.   You know, and then you could obviously
23   look at that, cut off at six months, or you could
24   look at it for as long as people were in treatment.

---

35

1        So when I'm talking about the entire
2    study, I'm simply just referring to the entire
3    treatment period without, you know, stopping at a
4    certain point in time; is that fair?
5    A.   Well, I just want to be careful to make
6    this -- make it sure.  So this was a time-to-event
7    study, so the analysis of the time-to-event, the
8    final event was presented for the GI complications
9    and the symptomatic ulcers.
10   Q.   Yeah, and there were a couple thousand
11   people that took the drugs, in total, for more than
12   six months, correct -- or somewhere around there?
13   A.   For more than six months?  I'd have to
14   look at the report to see if I would say it was a
15   couple thousand.
16   Q.   But there were some number of people?
17   A.   Yeah.
18   Q.   I don't want to get caught up --
19   A.   Yeah.
20   Q.   -- in the --
21   A.   Sure.
22   Q.   -- number.
23   A.   Sure.
24   Q.   Okay.  And when you made this

---

36

1    presentation to Needleman and Heller and the other
2    senior folks at Searle, you didn't limit that
3    presentation to just the six months of data,
4    correct?
5    A.   No.
6    Q.   It was the entire study data?
7    A.   The -- the entire study data as I defined
8    the time-to-event until the last event occurred.
9    Q.   Correct.  So if someone took the drug
10   13 months, they would be in that presentation in --
11   in the data, if you know?
12   A.   In the analysis of the ulcer
13   complications and the symptomatic ulcer data that we
14   presented, yes.
15   Q.   Okay.  And -- and all I'm trying to get
16   at is, when you were internally talking about --
17   A.   Sure.
18   Q.   -- it with these folks, you didn't limit
19   it to just --
20   A.   Sure.
21   Q.   -- the six months?
22   A.   It just gets -- you know, there's
23   different definitions for some of this stuff, and I
24   want to make sure I'm accurate.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

37

1    Q.   Yeah.  And that -- and that's -- unless
2    we say different for the rest of this deposition,
3    what I'm -- just for ease and simplicity --
4    A.   Sure.
5    Q.   -- when I'm talking about the entire
6    study, I'm not talking about every -- the
7    26,000 pages.
8    A.   Yes.
9    Q.   I'm just talking about the full --
10   there -- there's not this exclusion at six months --
11   A.   Yeah.
12   Q.   -- it's just all the data for whether
13   it's ulcer complications or the combined endpoint of
14   symptomatic and complicated.
15   A.   Okay.
16   MR. HOFF:  I don't know if that was a question,
17   but --
18   MR. SAHAM:  No, no, that wasn't --
19   MR. HOFF:  -- I -- I object to it.
20   MR. SAHAM:  Okay.
21   MR. HOFF:  I think it would depend on the
22   context of your question.
23   MR. SAHAM:  Okay.
24

38

1    BY MR. SAHAM:
2    Q.   But -- but I -- just -- just to be clear
3    so we can move on --
4    MR. HOFF:  Right.
5    BY MR. SAHAM:
6    Q.   -- this -- this presentation that you
7    made in late -- late March, it wasn't limited to the
8    6-month data?
9    A.   That's correct.
10   Q.   And shortly after that presentation, is
11   it correct that you traveled to New Jersey and made
12   a presentation to the senior Pharmacia folks about
13   the CLASS data?
14   A.   Can you tell me what you mean by shortly
15   thereafter?
16   Q.   In early April of 2000 -- and we can look
17   at documents --
18   A.   Yeah, yeah.
19   Q.   -- approximately early April 2000, did
20   you go to New Jersey to make a presentation
21   regarding CLASS to the senior Pharmacia executives?
22   A.   That time frame sounds about right that I
23   did go and did present to some higher level people
24   from Pharmacia, yes.

39

1    Q.   Okay.  And Mr. Fred Hassan was at that
2    meeting?
3    A.   He was at that presentation, yes.
4    Q.   And was Goran Ando at that presentation?
5    A.   Yes.
6    Q.   And was Carrie Cox at that --
7    A.   Yes.
8    Q.   -- presentation?  Okay.
9    A.   Yes.
10   Q.   And when you made the presentation to
11   those three individuals and other senior Pharmacia
12   managers, did you discuss the entire study data as
13   we just defined it?
14   A.   Well, I don't remember exactly the slide
15   set that was used and what was presented, but the
16   content that I presented there was consistent with
17   the content that I presented at what we earlier
18   talked about the meeting with -- excuse me --
19   Dr. Needleman and -- and -- and the higher
20   management at Searle.
21   So, yes, I would have presented the
22   time-to-event for the -- the entire exposure period
23   or the -- the last event, as well as the analysis --
24   other analyses related to that.

40

1    Q.   Okay.  So that presentation was not
2    limited to the 6-month data?
3    A.   It was not.
4    Q.   And shortly after that time frame, still
5    in April of 2000, early April of 2000, let's say the
6    first couple weeks, did you make a presentation to
7    the operations committee of the joint COX-II
8    alliance?
9    A.   I don't recall.
10   Q.   Okay.  And -- and you recall that Searle
11   had an alliance -- a marketing alliance with Pfizer
12   for selling and marketing Celebrex; is that correct?
13   A.   My understanding, it was a codevelopment
14   and comarketing alliance.
15   Q.   Okay.  And --
16   A.   So, yes, that's what I remember.
17   Q.   And there were certain committees set up
18   where Pfizer people could interact with the Searle
19   people?
20   A.   Yes, there were committees.
21   Q.   And there was an operations committee
22   that you were on?
23   A.   I don't recall.  I mean, the -- the term
24   operations committee sounds familiar, but I -- I --



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

41

1  I don't know if I was on it or not, but I -- I know
2  the -- the term sounds correct and there were
3  committees of people from Pfizer and Searle.
4     Q.   Okay.  And do you recall, in the same
5  time frame, making a presentation of the CLASS data
6  to one of those committees that had Pfizer folks on
7  it?
8     A.   You know, I gave a lot of presentations
9  within the organization during that period to -- to
10  inform people about what we had found in the study,
11  the complexity of having this codevelopment and
12  comarketing thing with Pfizer, you know.  So I can't
13  remember, well, was it that -- were they there, and
14  then you throw on the Pharmacia people?
15         And so there were committees and
16  meetings, if you will, all over the place that I
17  would go to to inform people who wanted or needed to
18  know what we had found.  But I can -- I can't tell
19  you for certain I remember this one and this one and
20  this one.
21     Q.   Okay.  But at some point, you recall
22  providing the CLASS results or some summary of the
23  CLASS results to some of the Pfizer folks?
24     A.   I know it was presented.  I just can't

42

1  tell you I remember the day, remember who was there.
2  I just know it was presented.  That's the best I can
3  tell you.
4     Q.   Okay.  And when you made the presentation
5  or the -- a -- a presentation to the Pfizer folks,
6  would that have included the entire study data as
7  opposed to just the six months?
8     A.   The content of all those presentations
9  was the same as I described earlier for the -- what
10  you had referred to as the SMB.  So it would have
11  been the time-to-event to the last event and other
12  analyses that we did.
13     Q.   But it wouldn't have been limited to six
14  months?
15     A.   Correct.
16     Q.   I'm going to show you what I'm marking as
17  Plaintiffs' Exhibit 249.
18         (WHEREUPON, a certain document was
19         marked Plaintiffs' Deposition
20         Exhibit No. 249, for identification,
21         as of 12/10/2010.)
22  BY MR. SAHAM:
23     Q.   Could you take a look at that document,
24  please.

43

1     MR. SAHAM:  And for the record, Exhibit 249 is
2  a one-page e-mail chain bearing Bates number
3  DEFS 01865173.  The top e-mail is from George S.
4  Geis to various individuals, and it's dated
5  March 26, 2000.
6  BY MR. SAHAM:
7     Q.   Is -- is George your middle name or your
8  first name?
9     A.   George is my first name.
10     Q.   So you sometimes use George, right?  I
11  guess "use" is a bad word.  Sometimes --
12     A.   My mother does, but nobody else does.
13     Q.   Sometimes your e-mails say George as
14  opposed to Steven?
15     A.   I know the -- you know, the IT guys do
16  what they do, but it -- I go by Steve.
17     Q.   Okay.  But a lot of times, your e-mail
18  will say George; is that correct?
19     A.   So I see.  I didn't -- wasn't aware of
20  that.
21     Q.   And I -- my -- my first question is just,
22  would -- do you recognize this e-mail?
23     A.   Let me take a look.
24         I don't recognize it, but it's an e-mail

44

1  with my name.
2     Q.   Right.  So let me -- let me rephrase the
3  question:  Is this an e-mail chain you would have
4  sent and received on or about March 26, 2000?
5     A.   Well, based on this paper, it looks like
6  I did it.  I don't know -- you said "would have
7  sent."  It looks like I did it.
8     Q.   Right.  So you -- you received an e-mail
9  from Richard Marks on March 24th, and then you sent
10  an e-mail to various folks on March 26th --
11     A.   Yeah.
12     Q.   -- is that correct?
13     A.   Yes, that's correct.
14     Q.   And you did this in the ordinary scope of
15  your employment at Pharmacia?
16     A.   Yes.
17     Q.   And in your e-mail at the top, you just
18  indicate that Phil wants us to present CLASS on
19  Wednesday.
20         Do you see that?
21     A.   Yes, I do.
22     Q.   And you're talking about Phil Needleman?
23     A.   Yes, I am.
24     Q.   And is this likely referring to the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

## 45

1 presentation you described a few minutes earlier?
2     A.   It sounds like it's within that time
3 frame, and it sort of logically makes sense, yes.
4     Q.   Okay.  I want to show you what's
5 previously been marked in this case as Plaintiffs'
6 Exhibit 229.
7     MR. SAHAM:  And, John, what I'm doing here -- I
8 don't have the actual one with the stickers, so I'm
9 just going to put a new 229 on it.  You guys are
10 okay with that?  It's the same document.
11     MR. HOFF:  If it's the same document, I don't
12 care.
13 BY MR. SAHAM:
14     Q.   Could you please take a look at that
15 document, sir.
16     MR. SAHAM:  And for the record, Exhibit 229
17 bears Bates numbers DEFS 01620662 through 728.
18 BY MR. SAHAM:
19     Q.   And then the last page, which maybe if
20 you just turn to the last page of the document
21 first, because this is something that's going to
22 occur over and over again at this deposition.
23          The document was produced to us in an
24 electronic format in this case, and they indicate

## 46

1 electronically something called the meta data.  I'm
2 not sure if you're familiar to that, but these
3 documents -- and -- and I'll represent to you, when
4 there's a page like that at the end that says, you
5 know, your name on it, defendants have represented
6 to us in their production of these electronic
7 materials that this document came out of your
8 custodial files.
9          So I'm -- I'm going to represent to you,
10 when you look at this document, that this document's
11 produced to us out of your custodial files at --
12     A.   What does that mean --
13     Q.   I think it means that --
14     A.   -- my custodial files?
15     Q.   -- your Pharmacia was -- was bought by
16 Pfizer later, but your files, when you worked for
17 either Pharmacia or Pfizer, were -- for the purposes
18 of this or other litigations, were collected and
19 formatted electronically and produced --
20     A.   Are you saying it came out of a file
21 cabinet?
22     Q.   It could have been your computer.  It
23 could either be --
24     A.   But it also could be out of some file

## 47

1 cabinet in the hallway with my name on it --
2     Q.   Well --
3     A.   -- I guess.
4     MR. HOFF:  This is meta data, right?
5     MR. SAHAM:  Yes.  Mr. Hoff --
6     MR. HOFF:  It would have been somehow
7 maintained electronically.
8     MR WEISS:  That's the only way you have meta
9 data.
10     MR. HOFF:  Yeah.  You wouldn't have meta data
11 on a hard copy file --
12     THE WITNESS:  Okay.  Okay.  I get it.
13 BY MR. SAHAM:
14     Q.   So it -- so it came from your computers,
15 basically, your computer files?
16     A.   Some file that said it was mine.
17     Q.   Yes, yes, yes.  So I would like you to
18 just -- it's a long document.  I'd like to briefly
19 ask you to look at it and tell me if you can
20 identify what this SlideDeck is.
21          And it's dated -- on the front, it says
22 3/22/00 - CLASS.
23     A.   Uh-huh.  I mean, yes.  I see that that's
24 what it says.

## 48

1     Q.   And I -- I just want to ask you if you
2 can identify it for me.
3     A.   Okay.  Could you repeat the question?
4     Q.   Well, my first question is, do you
5 recognize this SlideDeck?
6     A.   Can I give you sort of a bigger picture?
7 Because this is a lot of stuff to say I recognize
8 the deck.  It suggests I'm answering that I
9 recognize every slide.
10     Q.   Right.  Let me -- let me ask it
11 differently, then --
12     A.   Please.
13     Q.   -- and you -- you'll get a chance to
14 provide it.
15     A.   Sure.
16     Q.   Can you just identify what this is for
17 me?
18     A.   Right.  So let me give you some context
19 about this.  It is common practice -- it was the
20 practice within my team, over a period of years,
21 that when we would get the results of a trial and
22 there would be unblinding, the team would begin to
23 look at the analyses in conjunction with the
24 statisticians and begin to put slides together on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

49

1   how to most effectively present the data.
2           As part of that process, they may do
3   additional analyses and put those in slides.  They
4   would also put together slides that would answer
5   what they thought would be potential questions about
6   the data.
7           So it was a way of communicating their
8   best ideas among one another was to make slide sets
9   and put them together.
10          They -- and that really was the -- the
11  common practice.  So we had slide sets all over the
12  place as a way of sharing ideas.
13          This looks like this was consistent with
14  that as part of a SlideDeck for people sharing ideas
15  as to thoughts about the CLASS trial.  There's
16  design slides.  There's some analysis slides.
17  There's background slides.  There's some slides
18  where it's -- it's not complete.  It's like somebody
19  sort of has an idea and tried to get it on a slide.
20          So in that context, I recognize it as
21  part of a library of communications about ideas on
22  the CLASS data.
23      Q.   And -- and that's something that would
24  have been maintained -- and I'm talking about

---

50

1   Exhibit 229 here -- in the ordinary course of
2   business of your team at Pharmacia; is that correct?
3       A.   The word "maintained" throws me, because
4   they would share it.  They may give it to me.  So
5   it's not -- if it was in my file, I could very well
6   assume somebody said, here, Steve, here's all of our
7   ideas in one big batch.
8       Q.   So -- so you wouldn't quibble with me
9   that this is something that would have been in your
10  electronic files from March of 2000 with respect to
11  your work at Pharmacia on Celecoxib?
12      A.   I don't remember it.  Could it have been?
13  Yeah.
14      Q.   I want to show you what's previously been
15  marked in this case as Plaintiffs' Exhibit 65.
16          Could you please take a look at
17  Plaintiffs' Exhibit 65.
18          And, again, I just want to ask you -- and
19  maybe whether you recognize it is not the right
20  question, but if you could just identify for me what
21  this is.
22          And, again, Plaintiffs' Exhibit 65, if
23  you look at the last page, it also bears that same
24  meta data indication that this came from your

---

51

1   electronic files -- or maybe, actually, this one
2   doesn't.
3           But I would represent to you -- I'm
4   sorry, we don't have the meta data, but there's been
5   an exhibit entered in this case -- or I'll -- I'll
6   strike that.
7           I'll represent to you that this came
8   from -- like the other one, it's -- for some reason,
9   it doesn't have the attachment.
10      A.   Okay.
11      Q.   But I think Dr. -- at Dr. Verburg's
12  deposition, I'm pretty sure we established that this
13  document electronically came from your files.  And
14  if I'm wrong, I'm sure your counsel will correct me.
15      MR. HOFF:  I have no idea.
16  BY THE WITNESS:
17      A.   So is this the -- can I make a comment?
18          I don't know how Dr. Verburg would know
19  what was in my files.
20  BY MR. SAHAM:
21      Q.   Well, no, I think I showed him that
22  little -- it's -- maybe it's an exhibit I marked
23  separately --
24      A.   Okay.

---

52

1       Q.   -- that little --
2       A.   Okay.
3       Q.   -- thing that looked exactly like the
4   other one.  And I'm sorry, I didn't bring it --
5       A.   Okay.
6       Q.   -- here today, but I'm -- I -- I know
7   because I've marked it on --
8       A.   Okay.
9       Q.   -- my document that this, like
10  Exhibit 249, came out of your electronic files.
11      A.   Okay.
12      Q.   And -- and I'd just ask you to -- to --
13  to tell me if -- if you can tell me what this is
14  generally.  Or if it's exactly like 229, you can
15  tell me -- tell me that, as well.
16          And this document is labeled on the front
17  side, CLASS Vignettes, 3/28 version.
18      A.   Uh-huh.
19      Q.   And it's a 3-28-00 CLASS Backup.  So
20  obviously, it's a multipage slide set.
21          But I'd -- I'd ask if you -- if you can
22  identify what Exhibit 65 is?
23      A.   I can tell you what it -- I don't -- I
24  don't recognize this specifically, but what it looks

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

## 53

1  like is consistent with how I described the previous
2  set of slides, which are a group of slides. It
3  seems to be related to the CLASS trial that would be
4  different ideas that people had about analyses,
5  presentation.
6      They're all labeled Draft, I think, in
7  this. And there's even some -- a couple slides in
8  here that are about, it looks like, a -- a
9  commercial rollout strategy or something.
10     Q.   But are these slides that would have been
11  created by you or your team in the ordinary scope of
12  employment at Pharmacia during this period?
13     A.   They look like they could have been. I
14  can't say for sure. I mean, I can't say for --
15  because some -- different people would put together
16  a slide and pass it off and say, here's an idea.
17  Sometimes I put together a slide and put it in a
18  file.
19     Q.   And if they were produced from your
20  electronic files, they'd be something that you would
21  have received in this time period in the ordinary
22  scope of your employment.
23     A.   To say "received," I would say that's not
24  unlikely. Because sometimes my secretary would

## 54

1  receive stuff from people and she'd put it into a
2  file.
3      Q.   But these are documents, they're not --
4  this isn't like a personal e-mail or something, this
5  is a business document; is that fair to say?
6      A.   I'm reluctant to call it a document as
7  though -- that this was put together as one big set
8  at one time. This could have been the amalgamation
9  of, 15 slides are passed off on day 5, 20 more were
10  paid off -- you know, play -- you know, passed off
11  as they got more ideas.
12     So this could have been the amalgamation
13  of several sets of ideas in the form of slides
14  passed off and ended up in my -- my file.
15     Q.   And it would be passed to you by your
16  Celecoxib team members?
17     A.   That would -- that would not be out of
18  the normal course of practice, correct. I can't
19  just say I know that this was.
20     Q.   Okay. I want to show you what I'm
21  marking as Plaintiffs' Exhibit 250.
22
23
24

## 55

1      (WHEREUPON, a certain document was
2      marked Plaintiffs' Deposition
3      Exhibit No. 250, for identification,
4      as of 12/10/2010.)
5  BY MR. SAHAM:
6      Q.   Could you please take a look at
7  Plaintiffs' Exhibit 250.
8      MR. SAHAM:  And for the record, 250 bears
9  Bates numbers DEFS 01348832 through 921, and then it
10  does, on the last page, have the printout that
11  indicates that it came from your custodial files.
12  BY THE WITNESS:
13     A.   Well, the last page says -- has my name,
14  Ken Verburg and Jim Lefkowith, so...
15  BY MR. SAHAM:
16     Q.   And -- and what that means is that it was
17  produced from multiple peoples --
18     A.   Okay.
19     Q.   -- files --
20     A.   Okay.
21     Q.   -- including your own.
22     And, again, I -- I'd like you to look at
23  it, and my -- my question to you is just, can you
24  identify for -- for me what this is? And if it's

## 56

1  the same as what you were talking about before, you
2  can say that, as well.
3      And it's labeled on the front,
4  3/23/00 testing.ppt.
5      A.   Uh-huh, okay. Yes, I -- I see that
6  that's what it says on the front.
7      Can I ask you a question? Is -- are some
8  of these -- it looks like -- is that because they
9  didn't print right, or is this -- can you say that
10  this is really what was in the file?
11     Q.   It could have been a printing -- you
12  know, that foggy one. It could be -- you know, it's
13  ten years ago -- whether the way they were --
14     A.   Okay.
15     Q.   -- captured when they were presented to
16  us.
17     A.   Okay.
18     Q.   But I couldn't say for certain that --
19     A.   Because some of it is, you know, very
20  difficult to look at.
21     Q.   Looking at -- looking at all -- that all
22  the copies have that, I would have to guess that
23  that's the way it was produced.
24     A.   Okay. Could you repeat the question?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

57

1    Q.   Yeah.  I'm just asking if you could tell
2  me what -- what this is, Exhibit 250, I'm referring
3  to?
4    A.   These -- these are hard copies of what
5  appear to be slides, all labeled Draft, that are --
6  appear to be related to the CLASS study in some way,
7  which would have been a way of sharing ideas
8  consistent with what I talked about earlier, about
9  the team putting ideas together, about the study,
10 about the analysis, about the results, and shared in
11 the form of -- of draft slides.
12   Q.   And -- and these would have been in
13 your -- strike that.
14       This would have been something that you
15 received during March of 2000 in your employment at
16 Pharmacia?
17   A.   I don't remember seeing it, but it -- it
18 looks like something I could have received, because
19 this was the process with which the team shared
20 ideas back and forth, was in the form of slides such
21 as these.
22   Q.   I want to show you what's previously been
23 marked in this case as Plaintiffs' Exhibit 220.
24       Could you please take a look at

---

58

1  Plaintiffs' Exhibit 220.
2       MR. SAHAM:  And for the record, 220 is a
3  two-page e-mail chain that -- the second from top
4  e-mail was -- with the rest of the chain below it,
5  was forwarded to you, apparently, by Dr. Friedman
6  who received it, along with Dr. Needleman, from
7  Dr. Ando on April 5th, 2000.  It appears to have
8  been forwarded to you on that same date.
9  BY MR. SAHAM:
10   Q.   And I'd ask you if you recognize this
11 document?
12   A.   Could you repeat the question?
13   Q.   Well, my first question, is this an
14 e-mail that you would have received in the ordinary
15 course of your employment at Pharmacia on or about
16 April 5th, 2000?
17   A.   According to this piece of paper, it came
18 to me through Michael Friedman, yes, but I don't
19 recognize this.
20   Q.   Okay.  And -- and Dr. Friedman was your
21 boss at this time?
22   A.   Correct.
23   Q.   And Dr. Ando was the head and R&D -- head
24 of R&D at Pharmacia?

---

59

1    A.   Well, like I said earlier, at this time,
2  which would have been April 5th, I'm not sure who I
3  would say was head of R&D.
4    Q.   But it was either --
5    A.   Anywhere.
6    Q.   It was either Needleman or Ando, correct?
7    A.   Yeah.  Yes, correct.
8    Q.   So they were either coheads or one was
9  the other's boss?
10   A.   I think that sounds about correct.
11   Q.   Okay.  And this appears to be comments
12 that Dr. Ando shared with Dr. Friedman and
13 Dr. Needleman with respect to your presentation
14 regarding CLASS that had occurred in early April; is
15 that fair to say?
16   A.   Yeah.  The part that's from Dr. Ando --
17 because this is a chain of e-mails, but the part
18 from Dr. Ando to Drs. Friedman and Needleman are his
19 comments on the presentation and thoughts.
20   Q.   And this would help place the date of
21 that presentation as, at least, some point before
22 April 5th of 2000; is that correct?
23   A.   Yeah, that appears to be correct.
24   Q.   And was it your --

---

60

1    A.   Let me -- when you say "that
2  presentation," can I make -- make it clear?
3    Q.   Sure.  I'm talking --
4    A.   Somehow Dr. Ando had this presented to
5  him in order for him to make comments.  If you're
6  referring to "that presentation" being the one we
7  talked about earlier with Carrie Cox, et cetera, you
8  know, I can't say for sure that that's the only
9  place Goran Ando would have heard this.
10   Q.   Okay.
11   A.   So I just want to be -- I just want to be
12 precise about this, that I don't remember.
13   Q.   Appreciate that.
14       But you know what you presented to Cox,
15 Hassan and Ando in early April, correct?
16   A.   Yes.
17   Q.   And you -- there also may have been
18 additional presentations or information provided to
19 Dr. Ando, but you're just not certain of that?
20   A.   Correct.
21   Q.   And was it your practice in this
22 period -- and I'm -- I'm really specifically talking
23 about the presentation to Needleman and his group
24 and the presentation to Hassan, Cox and Ando that

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                December 10, 2010

---

## 61

1  we've discussed earlier.
2       Was it your practice to use PowerPoint
3  slides at those two presentations -- or -- or strike
4  that.  Let me ask it in two parts.
5       Was it your practice to use PowerPoint
6  slides when doing this type of presentation
7  regarding, you know, study data?
8       A.  We used a combination of PowerPoint -- I
9  personally -- so I'm only going to speak for me.  I
10  personally found using PowerPoint slides as very --
11  a way to -- you know, it -- give the presentation
12  effectively, but we also used -- what do you call
13  those things? -- flip charts --
14       Q.  Okay.
15       A.  -- in -- in the course of it.
16       Q.  So in 2000 when you'd make a presentation
17  about a trial, you'd use PowerPoint and flip charts
18  generally?
19       A.  Generally, yes.  I would, yes.
20       Q.  And do you recall -- and I'm going to
21  first refer you to the presentation to Dr. Needleman
22  and his group at Searle.
23       Do you recall using PowerPoint at that
24  presentation?

## 62

1       A.  So if we're referring back to what you
2  talked about as the SMB meeting --
3       Q.  Correct.
4       A.  -- yes, it would have been PowerPoint and
5  flip chart.
6       Q.  And now I want to refer specifically to
7  the Hassan, Cox, Ando meeting in --
8       A.  Uh-huh.
9       Q.  -- early April.
10       Do you recall using PowerPoint at that
11  presentation?
12       A.  I do --
13       Q.  Okay.
14       A.  -- and flip chart.
15       Q.  Okay.  So you did use PowerPoint at both
16  of those meetings?
17       A.  Yes.
18       Q.  I want to show you what's been marked
19  previously as Exhibit 221.
20       Could you please take a look at that
21  document?
22       MR. SAHAM:  And, again, 221 bears Bates numbers
23  DEFS 01216542 through 657.
24  BY MR. SAHAM:

## 63

1       Q.  And this came out of Aimee Burr's
2  custodial file, which I believe you said was one of
3  your reports?
4       Burr worked for you at that period,
5  right?
6       A.  Aimee Burr did not report directly to me,
7  but Aimee Burr was on, if you will, the arthritis,
8  inflammation and pain team and worked on the CLASS
9  trial.
10       Q.  And -- and this set of slides is -- is
11  the draft CLASS Celecoxib long-term arthritis safety
12  study, 4300-CLASS.
13       Do you know -- well, strike that.
14       Could some of these slides been used in
15  your presentation to Dr. Hassan and Dr. Ando and
16  Ms. -- Ms. Cox?
17       A.  If they came out of Aimee's custodial
18  file, no, because I wouldn't have taken something
19  out of someone else's custodial file.
20       Q.  Okay.  And with respect to the other
21  three slide decks we looked at earlier which we've
22  marked -- you know, that are all dated March that
23  we've marked as 250, 65 --
24       A.  I'm sorry, I want to keep up with you.

## 64

1       Q.  Yeah.  Yeah, I'm sorry.  It's exhibits --
2  the -- the three big decks.
3       A.  Right.
4       Q.  250, 65 and 229, those all came out of
5  your files.
6       Is it possible that you borrowed some of
7  those slides or used some of those slides in your
8  presentation to Dr. Hassan in early April -- or
9  Mr. Hassan in early April?
10       A.  I don't remember.
11       Q.  But are those the types of slides that
12  you would have used -- at least some of those?
13       A.  The formats look like what we would have
14  used, but I -- I -- I don't remember.
15       Q.  And -- and these decks are certainly
16  communicating the CLASS results, correct?
17       A.  They're communicating early thoughts
18  about the CLASS study, yes.
19       Q.  Okay.  I want to show you what's
20  previously been marked in this case as Plaintiffs'
21  Exhibit 84.
22       Could you please take a look at that
23  document?
24       MR. SAHAM:  And for the record, Plaintiffs'



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

65

1  Exhibit 84 came out of your custodial files, and
2  it's labeled April 7, 2000 Celebrex Long-Term
3  Arthritis Safety Study, and it says Rollout
4  Strategy. It's a little difficult to read, but...
5  And it bears Bates numbers DEFS 01427984 through
6  008.
7  BY MR. SAHAM:
8      Q.   Okay. And then this, again, came out of
9  your electronic files, and I'd ask if you could
10 identify what it is?
11     A.   No, I cannot.
12     Q.   Okay. Does it, again, seem to be
13 something similar to what you referred to with
14 respect to the other slide decks?
15     A.   No. This is completely different.
16     Q.   Okay. But you're not -- you're not sure
17 what it is?
18     A.   I am not.
19     Q.   Does it appear to be a presentation that
20 you made?
21     A.   I would say absolutely no, it's not a
22 presentation I would have made.
23     Q.   But you're not disputing that it came out
24 of your electronic file?

66

1      A.   Well, whoever wrote this page that said
2  custodian, I -- if they got it right, then it came
3  out of my file.
4      Q.   Okay. And I'd like to refer you to two
5  specific pages of this SlideDeck. The -- there's
6  those little Bates numbers in the bottom right-hand
7  corner. If you can go to the last three that are
8  numbered 995. I'm referring to the last three
9  Bates numbers.
10     A.   Uh-huh.
11     Q.   And this is -- it -- it had an Issues
12 Generated from ACP?
13     A.   Yes.
14     Q.   Is -- ACP, is that referring to the
15 American College of Physicians?
16     A.   I don't know for sure.
17     Q.   But do you recall rolling out the data at
18 the ACP? Was that one of the first places that it
19 was talked about, the CLASS results?
20     A.   A presentation on CLASS was given at ACP.
21     Q.   And was that given by Dr. Silverstein?
22     A.   Yes, it was.
23     Q.   Did you participate in that presentation?
24     A.   I did not give the presentation.

67

1      Q.   Did you help him prepare it, or your
2  team?
3      A.   Yes.
4      Q.   Okay. And so you had input into the
5  slides that he provided or used?
6      A.   Yes.
7      Q.   Okay. And this -- this slide here is
8  labeled Issues Generated from ACP?
9      A.   That's what it says.
10     Q.   Okay. But you're not really sure what
11 it's referring to?
12     A.   No.
13     Q.   Okay. And then I'd like you to turn to
14 the page 997, so a couple more pages further.
15     A.   Uh-huh --
16     Q.   And it says media --
17     A.   -- yes.
18     Q.   -- and analyst post-ACP?
19          Do you see that?
20     A.   I do.
21     Q.   And it says, press release, release
22 issued Monday, April 17th a.m.
23          Do you see that?
24     A.   I do.

68

1      Q.   Do you recollect that the first press
2  release that Pharmacia issued with respect to the
3  CLASS results was issued on April 17th?
4      A.   I don't recall.
5          But -- but could I point something out
6  that's sort of thrown me about this whole set?
7      Q.   Sure.
8      A.   It identifies ACP was on 4/15, but the
9  date on some of these slides is April 7th.
10     Q.   Right. So does this appear to be maybe
11 like a draft or something that may -- was
12 anticipated possibly being used, or you don't know?
13     A.   I don't know, or somebody mislabeled
14 stuff --
15     Q.   Okay.
16     A.   -- or it's just wrong.
17     Q.   And in looking at this 997 page, another
18 thing it says is Media teleconference, 10:00 a.m.
19 Monday morning, Silverstein, Simon, Whelton, medical
20 spokespersons.
21          Do you recall being on a teleconference
22 with -- with the media on or about April 17th?
23     A.   I do not.
24     Q.   But you recall speaking publicly about



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

| 69 | 71 |
|---|---|

**69**

1 the CLASS trial?
2     A.  I didn't give the presentation at ACP --
3     Q.  But --
4     A.  -- no.
5     Q.  -- but do you recall being on conference
6 calls with reporters about the CLASS study?
7     A.  At some point.  I don't -- I don't --  I
8 don't believe it was at this time.
9     Q.  Okay.  And I'm not trying to refer to
10 ACP, I'm just generally saying --
11     A.  Right.  But this -- so if we are talking
12 about right around ACP and very early, I do not
13 re- -- recall talking to reporters at all.
14     Q.  And then the -- the last two bullet
15 points say, Coordinated international distribution
16 of press release, analyst briefing Monday,
17 April 17th, a.m.
18        Do you see that?
19     A.  I do see that.
20     Q.  Do you recall there being briefings of
21 securities analysts in the April time frame?
22     A.  I don't recall any of this.
23     Q.  Okay.  But you -- again, you don't
24 dispute that this was in your electronic files?

**70**

1     A.  I don't dispute that the last page says
2 that.
3     Q.  I want to show you what I'm marking as
4 Plaintiffs' Exhibit 251.
5        (WHEREUPON, a certain document was
6        marked Plaintiffs' Deposition
7        Exhibit No. 251, for identification,
8        as of 12/10/2010.)
9 BY MR. SAHAM:
10     Q.  Could you please take a look at that
11 document.
12     MR. SAHAM:  And, again, this document
13 indicates -- was indicated in the meta data that it
14 came from your electronic files.  It bears
15 Bates numbers DEFS 00115007 through 019, and it's
16 dated April 7th, 2000.  It's from Kerstin Schultz.
17 You're not listed as a cc -- or, no, sorry, it's to
18 Kerstin Schultz from Michael M. Cunnington.  And it
19 says March Management Report.
20 BY MR. SAHAM:
21     Q.  Do you know who Michael M. Cunnington is?
22     A.  Mike Cunning- -- Michael Cunnington was
23 an employee at Searle.
24     Q.  Okay.  And who's Kerstin Schultz?

**71**

1     A.  She's an employee at Searle.
2     Q.  And what -- do you know what their jobs
3 were, generally?
4     A.  They were on the commercial side -- what
5 I call the commercial side of the organization.
6     Q.  Okay.  And do you know why this document
7 would have been in your electronic files?
8     A.  Other than I received tons of e-mails
9 with attachments from different parts of the
10 organization.
11     Q.  Okay.  And this is a document you would
12 have received in your capacity in working for that
13 organization, whether it's Searle or Pharmacia at
14 this point in time?
15     A.  Quite frankly, I'm surprised because this
16 is not something I recognize, like, at all.  So
17 I'm -- it may have come through, but it's not
18 something I would say, yes, I used to see these
19 kinds of documents.  I --
20     Q.  And, again --
21     A.  -- I don't even recognize the font on
22 this.
23     Q.  Okay.  And Al Heller who's a cc, you
24 identified him earlier as being a senior commercial

**72**

1 guy at Searle?
2     A.  Where is Al Heller cc'd on this?
3     Q.  He's, like, the sixth down.
4     A.  Oh, yes.  Correct, yes.
5     Q.  And what about Joe Papa, was he a senior
6 commercial guy?
7     A.  I -- I don't know what his role was.  I
8 know he was on commercial and he was at Searle.
9     Q.  And then looking -- again, I just want to
10 turn you to the last three Bates numbers, 011.  Up
11 at the top, there's a bullet point.
12     A.  I'm on that page.
13     Q.  The top bullet point says, Results from
14 Celebrex long-term safety study are under analysis.
15 Communication of results and commercialization plans
16 will be finalized with senior management on
17 April 7th.
18        Do you recall being involved in that
19 process of the finalization of the communication of
20 the results of CLASS?
21     A.  I'm -- I'm not sure what you mean by the
22 "finalization of the communication."
23        So prior to this time, we were
24 communicating internally to -- to management.  So I



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

**73**

1 don't know what this is referring to.  I don't know
2 what they're even referring to here.
3     Q.   But at some point in April, Pharmacia and
4 Pfizer started communicating about the results of
5 CLASS publicly; is that correct?
6     MR. HOFF:  Objection to form.
7 BY THE WITNESS:
8     A.   Could you repeat the question?
9 BY MR. SAHAM:
10     Q.   Some point in April of 2000, Pharmacia
11 and Pfizer started publicly communicating about the
12 results of the CLASS trial; is that --
13     MR. HOFF:  Objection --
14 BY MR. SAHAM:
15     Q.   -- fair to say?
16     MR. HOFF:  Objection to form.
17 BY THE WITNESS:
18     A.   In April, Fred Silverstein gave a
19 presentation at ACP, and I think it was on
20 April 15th.  That's all I know about the first
21 external presentation of the CLASS data, meaning,
22 external presentation to the public.
23     MR. SAHAM:  Okay.  We need to change the tape
24 now, so we'll take a quick --

---

**74**

1     THE WITNESS:  Okay.
2     MR. SAHAM:  -- break.
3     THE WITNESS:  Sure.
4     THE VIDEOGRAPHER:  Going off the video record
5 at 10:27 a.m.
6         This is the end of Tape No. 1.
7         (WHEREUPON, a short recess was
8         had.)
9     THE VIDEOGRAPHER:  Going back on the video
10 record at 10:42 a.m.
11         This is two beginning of Tape No. 2.
12 BY MR. SAHAM:
13     Q.   Dr. Geis, you -- you talked about
14 Dr. Silverstein who made the presentation at ACP a
15 minute ago.
16         Remember that?
17     A.   I do.
18     Q.   And Dr. Silverstein was a paid consultant
19 of Pharmacia; is that correct?
20     A.   I can't re- -- I can't recall about
21 contracts being paid or, you know, if he was paid or
22 not in what capacity, but he was a consultant to us.
23     Q.   You just don't know how much money he was
24 paid?

---

**75**

1     A.   I don't recall if there was a contract
2 about payment or not.
3     Q.   Okay.  You just didn't deal with that
4 part of it?
5     A.   I -- I don't recall dealing with that
6 part of it.
7     Q.   Do -- do you think he was working on the
8 project for free?
9     A.   I -- I can't recall.  I don't know how
10 that worked.
11     Q.   Okay.  And when he was speaking at ACP,
12 was he asked to do that by Pharmacia as part of his
13 role as a consultant?
14     A.   I'd have to remember how it transpired.
15 I -- I don't recall exactly how the -- the
16 invitation was made and how it -- how it came out.
17     Q.   And earlier, we talked about, you know,
18 various presentations you had made to Pfizer people
19 about CLASS results?
20     A.   Well, I know we had a conversation about
21 it, but I believe I said I don't remember giving
22 presentations to Pfizer people.
23     Q.   Oh, you don't remember any presentations
24 to Pfizer?

---

**76**

1     A.   I don't re- -- no, I don't remember
2 presenting to Pfizer.  I don't remember either way.
3     Q.   Okay.
4     A.   I'm not saying I didn't.  I know there --
5 there were these meetings, but I don't remember
6 presenting at them.
7     Q.   Okay.  I'm going to show you what's been
8 marked as Plaintiffs' Exhibit 162 previously.
9         Could you please take a look at
10 Plaintiffs' Exhibit 162?
11     MR. SAHAM:  And for the record, Exhibit 162
12 bears Bates numbers DEFS 00170973 through 976.  And
13 it's an e-mail chain that attaches the Searle Pfizer
14 operations committee April 6, 2000 video conference
15 minutes.
16         And the e-mail indicates that it was sent
17 to you, Ethan Weiner, Gary Jortner, Guy Buckland,
18 Joe Feczko and others, on or about April 12th, 2000.
19 BY MR. SAHAM:
20     Q.   Would you agree with me this is an e-mail
21 you would have received on or about April 12th, 2000
22 in your capacity as an employee of Pharmacia?
23     A.   Hang on.  Let me just look at it real
24 quick.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

77

1        I don't remember this either way.
2        Q.   Okay.  And -- but you have no reason to
3    believe you didn't receive this e-mail in the
4    ordinary course of your employment at Pharmacia?
5        A.   I mean, it says it was addressed to me.
6    So I don't know either way, but it was addressed to
7    me.
8        Q.   Okay.  And then if you look at the
9    Searle -- the second page -- well, it's the second
10   through fourth page of the document.  It says it's
11   the Videoconference Minutes from April 6, 2000,
12   Searle Pfizer Operations Committee.
13        Do you see that?
14       A.   I do.
15       Q.   And you -- does this refresh your
16   recollection that you would have been on that
17   committee?
18       A.   No, it does not.
19       Q.   Okay.  And do you know who Dr. Feczko is?
20       A.   Dr. Feczko was an employee at Pfizer.
21       Q.   And was he a senior medical officer
22   there -- chief medical officer?
23       A.   I don't know if that's what his role was.
24       Q.   Was he a senior executive at Pfizer?

---

78

1        A.   I don't know.
2        Q.   Do you recall being any -- at any
3    meetings where the CLASS results were discussed with
4    Mr. Feczko?
5        A.   Around this time --
6        Q.   Well, first --
7        A.   -- this time period?
8        Q.   -- just at all, do you remember being at
9    any meetings where he -- the results were discussed
10   with him?
11       A.   No, I don't.
12       Q.   Okay.
13       A.   No, I don't.
14       Q.   And do you know who Montwill is,
15   M-o-n-t-w-i-l-l?
16       A.   Yeah.  I believe -- I think his name was
17   Richard Montwill.  I -- as I recall, he was an
18   employee at Searle on the commercial side.
19       Q.   Okay.  And if you look at the second page
20   of the document, the April 6, 2000 Videoconference
21   Minutes, under 3, it says Priority Issues Update,
22   and it says T1 Celebrex CLASS Action.  And then
23   under that, it says, summary analysis presented by
24   Geis.

---

79

1        Does this -- do these minutes indicate
2    that you presented a summary analysis on April 6th,
3    2000?
4        A.   It says, "Summary analysis presented
5    (Geis)."
6        I don't know that that means I presented.
7    I don't know what it means.
8        Q.   Okay.  But you -- you recall making
9    presentations internally, you just don't recall
10   whether you made one on April 6th to this ops
11   committee?
12       A.   That's correct.
13       Q.   Okay.  But you're not disputing that you
14   did make one, you just don't know one way or the
15   other?
16       A.   And that -- yeah, I don't know -- I don't
17   remember either way.
18       Q.   Okay.  Thank you, sir.
19        I want to show you what I'm marking as
20   Plaintiffs' Exhibit 252.
21            (WHEREUPON, a certain document was
22            marked Plaintiffs' Deposition
23            Exhibit No. 252, for identification,
24            as of 12/10/2010.)

---

80

1    BY MR. SAHAM:
2        Q.   Could you please take a look at that
3    document.
4        MR. SAHAM:  And for the record, Plaintiffs'
5    Exhibit 252 bears Bates numbers DEFS 00392275
6    through 317.  And it's a one-page e-mail that
7    attaches a set of slides.  The middle e-mail on the
8    first page is from George Geis to Leland Loose,
9    dated April 17th of 2000.
10        And then above that is an e-mail chain
11   from Leland Loose to Ethan Weiner and others that
12   says, "These are the final slides shown at the ACP
13   meeting."
14        And then starting at page 2 of the
15   document, there's a set of 42 slides.
16        And I'd ask you generally if you could
17   iden- -- identify this e-mail and presentation for
18   me?
19        Is it correct that these are the slides
20   utilized by Dr. Silverstein at his ACP presentation
21   on April 15th, 2000?
22       A.   I can't say I recall specifically that
23   these are all the slides.  And by the e-mail, it
24   identifies them as such, but I can't say I remember



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

81

1  every slide in here.  And some of them have -- and
2  it may have been the way they were printed -- errors
3  on them.  So I can't imagine a slide that looked
4  like this he presented, so...
5      Q.  But you wrote to Dr. Loose on April 17,
6  2000, "Attached are the slides"?
7      A.  I -- I agree that's what it says, but I
8  don't recall writing this e-mail.
9      Q.  But you don't dispute that you wrote to
10 Leland Loose on April 17, 2000, "I think it went
11 quite well on Saturday night.  Attached are the
12 slides"?
13     A.  As I said, I don't recall this e-mail.  I
14 know what the e-mail says, and it did come --
15 come -- come from me, but I'm just saying I don't
16 remember writing it.
17     Q.  And you say it came from -- but you agree
18 with me it came from you, correct?
19     A.  Yes.
20     Q.  And you sent it in the capacity as an
21 employee at Pharmacia to Dr. Loose in his capacity
22 as an employee at Pfizer on or about April 17, 2000?
23     A.  That's what this looks like, yes.
24     Q.  And then Dr. Loose forwards the e-mail to

82

1  Dr. Weiner, Dr. Wahba and others and says, "These
2  are the final slides shown at the ACP meeting,"
3  correct?
4      A.  That's what the e-mail says, yes.
5      Q.  Okay.  I want to show you -- well, before
6  I do that, do you recall or -- or do -- do you
7  understand that you've been designated by the
8  defendants, or specifically the defendant Pharmacia,
9  as what's called a 30(b)(6) witness?
10     A.  Yes, I do.
11     Q.  And one of the topics that you've been
12 designated to testify about on behalf of Pharmacia
13 is the press release that was issued by Pharmacia on
14 April 17th, 2000; is that correct?
15     A.  Yes.
16     Q.  Okay.  So we're going to talk about that
17 now.  And you understand that your testimony in this
18 regard is being offered both in a personal capacity
19 as well as a representative of Pharmacia, correct?
20     A.  Yes, I understand that.
21     Q.  Okay.  And did you do certain things to
22 prepare for that testimony?
23     A.  Yes.
24     Q.  Okay.  And what did you do?

83

1      A.  I reviewed, just sort of in general, my
2  understanding and my -- my recollection of the press
3  release process, if I had seen the press release or
4  understood it.
5          I subsequently reached out to members of
6  the PR team from Searle, specifically Sally Benjamin
7  Young and Claudia Kovitz, and asked some questions
8  of them to prepare myself.
9      Q.  Okay.  And speaking of the April 17th
10 press release, who drafted that press release?  Do
11 you know?
12     A.  I don't know.
13     Q.  Okay.  Who participated in the approval
14 process for that press release?
15     A.  I don't know.  You mean specific names?
16 I don't know.
17     Q.  Okay.  But you saw it in advance of it --
18 it going out, correct?
19     A.  No, I don't recall having seen it.
20     Q.  It was e-mailed to you, correct?
21     A.  I don't know that.
22     Q.  Do you recall, in your preparations for
23 the 30(b)(6) deposition, reviewing draft e-mails
24 from April 7th, April 11th and April 14th of 2000

84

1  that contained drafts of the press release?
2      A.  No, I don't.
3      Q.  Okay.  So you didn't do that in preparing
4  for today's deposition?
5      A.  I don't recall having done it.
6      Q.  Okay.  Do you under-- do you recall
7  there being, at Searle, something called the
8  regulatory affairs committee?
9      A.  If that refers to RAC, yes.
10     Q.  And what is RAC?
11     A.  So my understanding is, RAC was a team
12 with representatives from a variety of functional
13 areas who re-- -- who reviewed information such as
14 advertisement, press releases, things that went out
15 to the public, and they approved them to be used.
16     Q.  And did they do so -- and they -- strike
17 that.
18         Did they do that as employees of
19 Pharmacia or Searle?
20     A.  Well -- so RAC was specific, in my
21 recollection, for Searle.  That was the terminology
22 for Searle.  And they did that on behalf of Searle,
23 is my understanding.
24     Q.  And do you know who was on that committee



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

85

1  or on the RAC?
2       A.   Some of the members that I can tell you
3  that I know.  I don't know all of them.
4       Q.   Tell me who you recall.
5       A.   Sure.  Catherine Wertjes, Winifred
6  Begley, Jerry Prahl, those are the ones that I
7  remember by name.
8       Q.   Okay.  I want to show you what's
9  previously been marked in this case as
10  Plaintiffs' Exhibit 86.
11            Could you please take a look at
12  Plaintiffs' Exhibit 86, which for the record, is an
13  April 11 e-mail chain which attaches a fax sheet and
14  a draft of the April 17th, 2000 press release.  It
15  bears Bates numbers DEFS 01240062 through 75.
16            And I'd point your attention specifically
17  to the middle e-mail on the first page from Diana E.
18  Smith, and it cc's Dr. Philip Needleman and
19  yourself, George S. Geis.
20       A.   Could you repeat the question?
21       Q.   Sure.  Let me ask a different
22  question, and -- and we'll -- we'll -- we're going
23  to look at this document in just a second.
24       A.   Sure.

86

1       Q.   But you understand that you're testifying
2  on behalf of Pharmacia regarding, quote, The
3  issuance of the press release, including, but not
4  limited to, the process for and individuals involved
5  with drafting, editing and approving the press
6  release, correct?
7       A.   Yes.
8       Q.   You're designated to testify on that
9  topic for Pharmacia?
10       A.   I understand that, yes.
11       Q.   Okay.  And my question is, before we get
12  to this document, who at Pharmacia, starting with
13  the most senior person, approved the issuance of
14  this press release?
15       A.   That, I don't know.  This specific press
16  release, I don't know.
17            Can I give you context about --
18       Q.   We'll get to that in a second.
19       A.   Okay.
20       Q.   But my question is, you understand that
21  you were designated to testify on behalf of
22  Pharmacia --
23       A.   Sure.
24       Q.   -- who approved this, and your testimony

87

1  here today is, you don't know, correct?
2       A.   What I'm -- what I'm saying is that the
3  process, as I understood it, was that -- so I -- I
4  have to put it in the context of what was going on
5  at the time.
6       Q.   Go -- go ahead, sir.
7       A.   So there was Searle who had RAC.  We then
8  had a codevelopment, comarketing agreement with
9  Pfizer.
10            The process was, as described to me by
11  Ms. Young and Kovitz, was that they were -- they
12  were mirror imagines.  There were representatives from
13  the various disciplines on Pfizer and Searle for
14  press releases and things that went public through
15  the commercial side.  That was in place, but we were
16  right in the merger with Pharmacia.  So things began
17  to move.
18            Both Ms. Young and Ms. Kovitz said, at
19  the time, it wasn't actually precise anymore.  That
20  was their best recollection, because we were in the
21  middle of the merger.
22            So the -- the precise process and steps
23  related to this particular press release, they could
24  not say exactly how it went.

88

1            But in -- but having said that, in
2  principle, there was -- there was -- there would
3  have been an agreement between the Searle
4  representatives and the Pfizer representatives and
5  possibly Pharmacia involved.
6       Q.   Okay.  So let's break that down.
7            At Searle, the RAC, or regulatory affairs
8  committee, approved the press release, correct?
9       A.   They would have, yes.
10       Q.   And --
11       A.   That would be a fair --
12       Q.   And you don't know everybody that was on
13  the RAC?
14       A.   Correct, I don't.
15       Q.   Do you know -- other than the people who
16  you named who were on the RAC, do you know whether
17  any other senior Searle individuals approved the
18  press release?
19       A.   No, I don't.
20       Q.   Okay.  Do you know whether Dr. Needleman
21  approved the press release?
22       A.   I don't know.
23       Q.   Do you know whether Mr. Dick De Schutter
24  approved the press release?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

89

1  A. I don't know.
2  Q. Okay. And what have you done to
3  determine whether either De Schutter or Needleman or
4  other Searle senior executives approved the press
5  release?
6  A. When I spoke with -- as I said, when I
7  spoke with Ms. Young and Ms. Kovitz, I asked them
8  who would have approved it. They did not remember
9  specifically who.
10 Q. Did you ask Mr. Needleman if he approved
11 it?
12 A. No, I did not.
13 Q. Did you ask Mr. De Schutter if he
14 approved it?
15 A. I did not.
16 Q. Did you ask any other senior -- who --
17 people who were, at this time, senior Searle
18 executives whether they approved it?
19 A. No, I did not.
20 Q. And why -- why didn't you do that, I
21 guess?
22 A. Well, I went to the people who were
23 responsible for press releases based on my
24 understanding of what went on at Searle. So Sally

90

1  Benjamin Young was the head of PR who would have
2  knowledge of the whole RAC process.
3  Q. Do you know whether there was --
4  MR. HOFF: Wait, wait.
5  MR. SAHAM: Oh, I'm sorry.
6  MR. HOFF: Did you finish?
7  BY MR. SAHAM:
8  Q. I didn't mean to interrupt.
9  A. So I went to the person who understood
10 the process, in my mind, the best. And it was
11 through her department that much of these activities
12 took place. So I went to what I thought was the
13 knowledgeable and responsible source.
14 Q. Do you know whether there's a written
15 protocol or was a written protocol at Searle that
16 described the process by which a press release would
17 be approved, of this type?
18 A. I do not know if there was a -- a written
19 process.
20 Q. And as a -- as a 30(b)(6) deponent, you
21 didn't attempt to determine -- or review documents
22 to determine whether there's a written protocol?
23 A. Like I said, I spoke with the head of PR
24 and the knowledgeable people of the process and

91

1  asked them questions. But they did not talk about a
2  written process.
3  Q. Okay. Did you talk to any lawyers about
4  it, like people that might have been in the legal
5  department at Pharmacia that may have dealt with the
6  protocol for how authorization of press release
7  occurred in this period?
8  A. I did not speak with the legal department
9  at Searle about this.
10 Q. All right. Now, going to Pharmacia, now,
11 separate from Searle -- and I -- I understand you
12 agree with me -- and I can show you the document --
13 that as of April 17th, Searle was part of Pharmacia
14 because the merger closed on March 31st, 2000.
15 Do you -- do you --
16 A. Say that again.
17 Q. Do you agree with that?
18 A. Could you repeat that?
19 Q. The merger closed on March 31st, 2000; is
20 that correct? And I can show you a document if you
21 don't know from your own knowledge.
22 A. I don't know from my -- my own knowledge
23 exactly the date the merger legally existed.
24 Q. Okay. I want to show you what I'm

92

1  marking as Plaintiffs' Exhibit 253.
2  (WHEREUPON, a certain document was
3  marked Plaintiffs' Deposition
4  Exhibit No. 253, for identification,
5  as of 12/10/2010.)
6  BY MR. SAHAM:
7  Q. And Exhibit 253 is what's referred to as
8  an 8-K, a form 8-K that was filed with the SEC. And
9  the second page of the document at the top indicates
10 that "On March 31st, 2000, MP Sub, Incorporated, a
11 Delaware corporation ('Merger Sub') wholly owned by
12 Pharmacia Corporation (formerly Monsanto Company), a
13 Delaware corporation ('Registrant'), merged ('the
14 Merger') with and into Pharmacia & Upjohn, Inc., a
15 Delaware corporation (Pharmacia & Upjohn), pursuant
16 to an Agreement and Plan of Merger, dated as of
17 December 19, 1999, as amended ('the Merger
18 Agreement')."
19 And hopefully, you'll accept my
20 representation that as per this filing with the SEC,
21 that the merger was finalized on March 31st of 2000,
22 for the purposes of my next set of questions?
23 A. Could you repeat that real quick?
24 Q. I'm just saying the merger -- I -- I know



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

## 93

1    it's hard to remember dates.
2          It occurred on March 31st, 2000, the two
3    companies became one, Searle and Pharmacia?
4          A.   So based on this document, yes, I would
5    agree that's what this document says.
6          Q.   Okay.  So as of -- assuming that document
7    is accurate -- and I know you're not a lawyer or
8    work for the SEC, but assuming the merger closed on
9    March 31st, when this press release was being
10   reviewed between April 7th and then went out on
11   April 17th, it was one -- Pharmacia and Searle were
12   one company, correct?
13         A.   I just want to get the dates of where
14   the -- what we're talking about.
15         Q.   Right.  This document -- and we're going
16   to look at other versions of the press release.  The
17   one you're looking at, Exhibit 86, is dated -- the
18   draft is dated April 11, 2000 --
19         A.   Okay.
20         Q.   -- 11 days after --
21         A.   Okay.
22         Q.   -- the merger.
23         A.   I agree that April 11 is after
24   March 31st.

## 94

1          Q.   Right.  Okay.  So for the purposes of
2    these questions, I'm representing to you, if -- if
3    that is accurate that the merger closed on
4    March 31st -- which I know you're not an expert on
5    that -- on April 11th, Pharmacia and Searle are one,
6    correct?
7          A.   Legally speaking, I would agree.
8          Q.   Okay.  So --
9          MR. HOFF:  It's actually Pharmacia & Upjohn and
10   Monsanto are one.
11         MR. SAHAM:  Great.  Great.
12   BY MR. SAHAM:
13         Q.   So now my next set of questions -- you
14   know, I asked you about, you know, what you did to
15   figure out who at Searle approved the press release.
16         Who, starting with the most-senior people
17   at Pharmacia, to your knowledge as the 30(b)(6)
18   deponent, approved the press release at Pharmacia
19   other than the Searle people who you referenced who
20   were legally part of Pharmacia at this point?  But
21   I'm getting at people who were, you know, for -- for
22   lack of a better word, they were -- they were at
23   Pharmacia before the two companies joined.
24         MR. HOFF:  Objection to form.

## 95

1    BY THE WITNESS:
2          A.   Could you please repeat it?  I'm sorry, I
3    just want to get this right.
4    BY MR. SAHAM:
5          Q.   Yeah.  Who at Pharmacia -- we've talked
6    about the Searle RAC and --
7          A.   Right.
8          Q.   -- people like that.
9          A.   Right.
10         Q.   Other than those people who you named
11   already, who -- as a 30(b)(6) witness or with your
12   own knowledge, who at Pharmacia, senior executives,
13   to your knowledge, approved that press release?
14         A.   I don't --
15         MR. HOFF:  Objection to form.
16   BY THE WITNESS:
17         A.   I don't know.
18   BY MR. SAHAM:
19         Q.   Okay.  Do you know if Pharmacia had some
20   sort of similar RAC entity that approved the press
21   release?
22         A.   I don't know.
23         Q.   Okay.  And what did you do to attempt to
24   find that out?

## 96

1          A.   So with counsel, there was an outreach to
2    a couple people who were a part of the Searle
3    organization and the Pharmacia organization.  There
4    was a -- a woman named Diana Morales Smith who was
5    in PR from Searle.  There was an attempt made to
6    reach out to her to ask her questions and she did
7    not respond.
8          There was a gentleman named Craig Tooman
9    who is -- my understanding -- from Pharmacia, who
10   was in PR.  And I don't -- again, I don't know
11   exactly if there was a RAC committee or whatever,
12   but he -- his -- his -- he was involved in PR and in
13   press releases.
14         Through Dr. Ando, there was an outreach
15   to Mr. Tooman to ask questions, and Mr. Tooman did
16   not respond.  So there was an outreach to a couple
17   people who -- who, I think, were intimately
18   involved.  And I shouldn't say that, but I think,
19   and they did not respond.
20         Q.   Would you agree with me -- and this is a
21   very simple question -- that the company, Pharmacia,
22   issued this press release?  Is that an accurate
23   statement?
24         A.   The company did issue this.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

97

1      Q.    And Pfizer jointly issued this?
2      A.    My understanding of the process is that,
3   yes, Pharmacia -- excuse me.  Repeat it.
4            Are you talking about Pharmacia or
5   Pfizer?
6      Q.    Two different questions.
7            I think we just established Pharmacia
8   issued the April 17th press release, correct?
9      A.    Right.
10     Q.    You would agree with me that's accurate?
11     A.    Yes.
12     Q.    And the next question, totally separate
13  question, did Pfizer coissue the press release with
14  Pharmacia?
15     A.    I don't know that.
16     Q.    Okay.
17     A.    I don't know.  Because of the -- as -- as
18  Ms. Young and Kovitz described, at that time, there
19  was this period of change going on where they could
20  not describe exactly what happened and who was at
21  the table for this particular press release.
22     Q.    And you are not designated to testify
23  here today on behalf of Pfizer regarding who issued
24  the press release, correct?

---

98

1      A.    Not that I know of.
2      Q.    Okay.  Somebody else is going to be
3   presumably -- well, you don't know that --
4      A.    I don't know.
5      Q.    -- but you're -- you're not designated
6   for that point?
7      A.    I don't believe so.  It's my
8   understanding --
9      Q.    Just Pharmacia?
10     A.    -- as a designee.
11           That is my understanding.
12     Q.    Now, looking back -- well, before we look
13  back at 86, you -- so you don't know who at Pfizer
14  approved the press release?
15     A.    I do not.
16     Q.    Okay.
17     MR. HOFF:  Objection to form.
18  BY MR. SAHAM:
19     Q.    And looking back at Exhibit 86, you would
20  agree with me that you received the press release in
21  the form attached as part of 86 on or about
22  April 11, 2000, six days before it was issued,
23  correct?
24           And I'd refer you to the middle e-mail.

---

99

1   You're listed as the cc, George S. Geis on the first
2   page.
3      A.    I see that.  I just am trying to see if
4   it makes it clear that the press release was
5   attached to the e-mail, because I don't recognize
6   the e-mail or the press release.  But this e-mail
7   was sent to me.  I'm just trying to see if it says
8   the press release is attached.
9      Q.    Well, it say, "Thank you for the
10  considerable amount of time you spent this morning
11  reviewing the draft CLASS media materials."
12     A.    Well, that's --
13     Q.    "We made a lot of headway and we were
14  able to refine the materials even further this
15  afternoon in a Searle-only RAC session."
16           Then there's three documents attached in
17  Word, the first of which is the Fact Sheet,
18  Celecoxib Long-Term Arthritis Safety Study, which
19  bears a consecutive Bates number to the e-mail, and
20  that is four pages.
21           And then starting at the fifth page,
22  which is last three Bates number 067, there's a
23  Draft 4/11/00 of the April 17th, 2000 press release,
24  and that is -- one, two, three -- four pages long.

---

100

1            And then there's another attachment of
2   the -- entitled Fact Sheet after that, which would
3   correspond with the three word icons on the first
4   page of the e-mail, correct?
5      MR. HOFF:  Is there a question somewhere?
6   BY MR. SAHAM:
7      Q.    Well, is it correct that there's three
8   icons there that are labeled Facts, rac R-e-L,
9   presumably RAC release, and Factsheet 4-11, that
10  those three icons would appear to correspond with
11  the three attachments to the e-mail, correct, sir?
12     MR. HOFF:  Objection to form.
13  BY THE WITNESS:
14     A.    I'm just trying to look at this closely
15  to make sure that the icon does actually match
16  the -- the press release you're referring to.
17  BY MR. SAHAM:
18     Q.    Right.  Like, I'm looking at the middle
19  icon.
20     A.    Yep.
21     Q.    It says CLASSracrel, which would be
22  release in my --
23     A.    Yes.  And at the top of the press
24  release, the top left-hand corner, it says

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                            December 10, 2010

---

101

1    CLASSracrel.
2        Q.   So you would agree with me that you
3    received this draft electronically on or about
4    April 11, 2000?
5        A.   I don't recall having received it, but
6    the e-mail says I was copied.
7        Q.   And it would have been e-mailed to you in
8    the ordinary scope of business at corporation
9    Pharmacia, correct?
10       A.   I don't remember it either way, but it
11   appears it was sent to me.
12       Q.   But it wasn't sent to you in some
13   personal capacity?  You were working for Pharmacia
14   at the time and so were these other individuals?
15       A.   I was.  I can't --
16       Q.   Okay.
17       A.   -- you know --
18       Q.   Diana Smith --
19       A.   -- I can't answer for anybody else.
20       Q.   Do you know who Diana Smith was who sent
21   that e-mail?
22       A.   Diana Smith is the woman I referred to
23   earlier.  Diana -- I believe it was Morales Smith,
24   and at the -- as I remember her, she was an employee

---

102

1    of -- of Searle in the PR department.
2        Q.   And there are several people that it's
3    addressed to in the To line, the e-mail there,
4    Catherine Wertjes, W-e-r-t-j-e-s, who you referred
5    to earlier?
6        A.   Yes, that's correct.
7        Q.   Jerome --
8        A.   Her name is here.
9        Q.   Jerome Prahl, P-r-a-h-l, Al Bello, John
10   G. Fort, Rich Montwill, Deborah D. Armstrong, Alicia
11   Byer, do those people appear to be the Searle RAC
12   committee?
13       A.   I can't state that for certain.
14       Q.   But some --
15       A.   I don't know.  I'm saying I don't know.
16       Q.   But some of those people were on the RAC?
17       A.   Yes.  As I was told, yes.
18       Q.   And then do you know who Guy Buckland
19   was?
20       A.   My remembrance of Guy Buckland --
21       Q.   Was he a Pfizer employee?
22       A.   I can't recall.
23       Q.   You just don't remember?
24       A.   I can't recall.  I remember Guy Buckland,

---

103

1    but I'm not sure whether -- because at the time,
2    again, we have Pfizer and now new people from
3    Pharmacia.  I can't recall --
4        Q.   And here, next to --
5        A.   -- which organization.
6        Q.   I'm sorry, next to his name, it says
7    Non-Monsanto/Off-Site.
8            So he didn't work for Searle, right?
9        A.   The -- correct.  I understand that.  I
10   just --
11       Q.   You just can't remember whether he worked
12   for Pfizer or -- or Pharmacia?
13       A.   Correct.
14       Q.   And I represent to you he worked for --
15   not that that's worth anything, but he did work for
16   Pfizer at the time.
17       A.   Okay.
18       Q.   Do you know who Irene Condon is?
19       A.   I do not.
20       Q.   Celeste Torello?
21       A.   I do not know who that is.
22       Q.   Phyllis Christesen?
23       A.   I remember Phyllis Christesen as an
24   employee of Pfizer.

---

104

1        Q.   Okay.  So at least one Pfizer employee
2    you remember received this, correct, or was --
3        A.   Well, I -- I remember Phyllis Christesen
4    from Pfizer.
5        Q.   And she was -- and -- and she was sent
6    this e-mail, correct, sir?
7        A.   Well, she was copied on this e-mail.
8        Q.   Right, as a To?
9        A.   As a To.
10       Q.   And then Beth Levine, do you know who
11   that is?
12       A.   I do not.
13       Q.   Heidi Chen?
14       A.   Are you asking me, do I know who she is?
15       Q.   Yeah, do you know who she is?
16       A.   I do not.
17       Q.   Leslie Tive?
18       A.   Again, are you asking me, do I know her
19   or if the name --
20       Q.   Yes, do you know who that person is?
21       A.   I do not know her.
22       Q.   And Will Kane, do you know who that is?
23       A.   I do not.
24       Q.   Did you attempt to figure out who any of

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

## 105

1  these people were as part of your 30(b)(6)
2  preparations?
3      A.   No.  I did not reach out to these people
4  and had no reason to because I don't know them.
5      Q.   Right.  No, but I'm saying, did you
6  attempt to figure out who they were so you could
7  testify on behalf of Pharmacia about who approved
8  the press release?
9      A.   I don't recall having seen this list of
10  people.
11      Q.   And I'm just asking you what --
12      A.   Yeah, I don't recall having seen this
13  list of people, so I wouldn't have even made the
14  connection.
15      Q.   And then the first cc listed here as
16  having received this e-mail is Dr. Needleman,
17  correct?
18      A.   His name is on the cc list, yes.
19      Q.   Okay.  So presumably it was sent to him,
20  as well, correct?
21      A.   I don't know either way.  His name
22  appears as the cc --
23      Q.   Okay.
24      A.   -- on the cc list.

## 106

1      Q.   And Dr. Friedman is cc'd, as well?
2      A.   Dr. Friedman's name is on the cc list.
3      Q.   Okay.  I want to show you what I'm
4  marking as Plaintiffs' Exhibit 254.
5          (WHEREUPON, a certain document was
6          marked Plaintiffs' Deposition
7          Exhibit No. 254, for identification,
8          as of 12/10/2010.)
9  BY MR. SAHAM:
10      Q.   Could you please take a look at
11  Plaintiffs' Exhibit 254.
12      MR. SAHAM:  And for the record, Plaintiffs'
13  Exhibit 254 is, again, a one-page e-mail chain dated
14  April 4 -- April 13th and April 14th, 2000, and it
15  attaches drafts of the same three documents we were
16  referring to in the April 11th draft -- or the
17  April 11th exhibit which I'd marked as Exhibit 86.
18  And this document bears Bates numbers DEFS 03835807
19  through 5816.
20          And it -- and the e-mail -- I'm looking
21  at the e-mail from Diana E. Smith down at the bottom
22  of the first page, and it's dated April 13th, 2000,
23  to Philip Needleman and Richard U. De Schutter, D-e,
24  space, S-c-h-u-t-t-e-r, and also Alan Heller, Joseph

## 107

1  Papa and others.
2          And the subject line says RAC-Approved
3  CLASS Press Materials.  And it goes on to state,
4  Attached are the final RAC-approved CLASS press
5  materials.  Pending any other final Pharmacia
6  sign-offs, these materials will be distributed to
7  the media on Monday morning followed by a news
8  teleconference with Drs. Geis, Silverstein, Simon
9  and Whelton at 10:30 a.m. Eastern time.
10          Now, this document indicates, as you just
11  testified earlier, that the press release was
12  proved -- approved by the RAC, correct?
13      A.   That's what this says.
14      Q.   And then it also refers to pending any
15  final Pharmacia sign-offs.
16          What did you do to determine what final
17  Pharmacia sign-offs occurred with respect to the
18  April 17th press release?
19      A.   As I stated earlier, I reached out to
20  Ms. Kovitz and Ms. Young to de- -- to describe the
21  general process of approvals at Searle and at the
22  time -- at this time of the merger and with the
23  presence of Pfizer.
24          We talked specifically about the press

## 108

1  release around this time.  There was outreach to
2  Ms. Smith and Mr. Tooman, who did not respond.  So
3  that's what I did to get an understanding of this.
4      Q.   And this document indi- -- indicates it
5  was sent, the press re- -- the draft of the press
6  release, after it was approved by RAC, was sent to
7  Dr. Needleman and Mr. De Schutter and Mr. Heller,
8  correct?
9      A.   This does say that it's the final
10  RAC-approved CLASS press materials.
11      Q.   And it was also sent to Paul G. Tooman,
12  or Tooman, T-o-o-m-a-n -- or, I'm sorry, Craig
13  Tooman, T-o-o-m-a-n, which is an individual referred
14  to earlier.
15      A.   I'm sorry, I don't see --
16      Q.   If you drop down a few lines, it says
17  Tooman, Craig?
18      A.   Yes, it does.
19      Q.   But you did not -- and I just want to
20  confirm this, you didn't talk to Dr. Needleman,
21  Mr. De Schutter or Mr. Heller to ask them whether
22  they approved the issuance of this press release?
23      A.   No, I did not.
24      Q.   And could you describe what the purpose



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

109

1  of the RAC is?
2      A.   My understanding is that is -- my
3  understanding of the RAC at Searle to look at
4  materials related to commercial -- commercial that
5  were going to the public, including press releases,
6  and that they were acceptable for a variety of
7  perspectives, such as legal, regulatory, et cetera.
8  And that then they would approve it, and then the
9  people in the organization could use them -- those
10 materials.
11     Q.   Okay.  I want to show you what has been
12 previously marked as Plaintiffs' Exhibit 240.
13          Could you please take a look at
14 Plaintiffs' Exhibit 240.
15     MR. SAHAM:  And for the record, Plaintiffs'
16 Exhibit 240 is a one-page e-mail chain from Diana E.
17 Smith that cc's Dr. Needleman, Dr. Friedman and
18 yourself.  It's dated April 7, 2000, and the entire
19 document, it attaches, again, the same three, the
20 two fact sheets and the press release, but this
21 version is dated April 7, 2000, and it bears the
22 Bates numbers DEFS 00589404 through 412.
23 BY MR. SAHAM:
24     Q.   And I'd ask you, do you agree that you

110

1  would have -- that this e-mail would have been sent
2  to you with these attachments as a cc on or about
3  April 7, 2000?
4      A.   I see what's said here.  The problem I
5  have is, the icon at the bottom that references an
6  S RAC rel.doc.  Then you find what appears to be a
7  press release, does not have the same notation.  So
8  I do not know if this is the press release that --
9  that's being referred to in the icon.
10     Q.   But you don't --
11     A.   I -- I see a press release, yes, I see
12 it.  And I see an icon that says something about a
13 press release, but I'm not sure I would say they're
14 accurately connected.
15     Q.   But you don't dispute that you were sent
16 at least some version of the April 17th press
17 release via e-mail on or about April 7, 2000?
18     A.   In the text, it says, specifically, you
19 will find the draft press release.
20          So based on that, I would agree that
21 the -- a press release was attached to the e-mail I
22 was cc'd on.
23     Q.   And you also agree that it was sent to
24 Dr. Needleman, a press release, as well?

111

1      A.   This says he was copied, yes.
2      Q.   And the same with Dr. Friedman and
3  Mr. Papa?
4      A.   This says that Dr. Friedman and Mr. Papa
5  were copied.
6      Q.   And Mr. Heller, as well?
7      A.   That's what -- it does say that
8  Mr. Heller was cc'd on this.
9      Q.   I want to show you what I'm marking as
10 Plaintiffs' Exhibit 255.
11          (WHEREUPON, a certain document was
12          marked Plaintiffs' Deposition
13          Exhibit No. 255, for identification,
14          as of 12/10/2010.)
15 BY MR. SAHAM:
16     Q.   And I'd ask you if you recognize that
17 press release?  This -- this is a different press
18 release.  This is the May 23, 2000 San Diego
19 Digestive Disease Week press release.  It's entitled
20 Findings From Celebrex Safety Study Show Traditional
21 NSAID Comparators Can Cause Serious GI Complications
22 Within First Days of Treatment.
23          And I -- and I just ask you if you
24 recognize that?

112

1      A.   I -- I recently saw this, yes.
2      Q.   Okay.  And it --
3      A.   But recently.
4      Q.   Does it appear to be a press release that
5  was issued regarding CLASS in conjunction with the
6  disease -- Digestive Disease Week in San Diego about
7  a month after the April 17th press release?
8      A.   It says -- in the first paragraph, it
9  refers to data presented during Digestive Disease
10 Week, so it appears that this is referencing what
11 was presented there.
12     Q.   Okay.  Can you turn back to Exhibit 254,
13 which is the April 14th RAC-approved press release.
14          And at the bottom -- I read this earlier
15 but I wanted to ask you a few questions about it --
16 it says -- and I'm just going to read it again, just
17 to refer you back to it.
18          It says, "Pending any other final
19 Pharmacia sign-offs, these materials will be
20 distributed to the media on Monday morning, followed
21 by a news" con- -- "teleconference with Drs. Geis,
22 Silverstein, Simon and Whelton at 10:30 a.m."
23          Does that refresh your recollection that
24 you may have participated in a call with the media

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com



ESQUIRE
an Alexander Gallo Company

113

1  on or about April 17, 2000, regarding the CLASS
2  results?
3      A.  No, it doesn't.
4      Q.  But you don't dispute that you did?
5      A.  I don't recall it.
6      Q.  Okay.  You just don't remember one way or
7  the other?
8      A.  I don't remember one way or another --
9      Q.  You remember talking about CLASS
10  publicly, but you just don't remember the dates that
11  you did so?
12     MR. HOFF:  Objection to form.
13  BY THE WITNESS:
14     A.  You have to be more specific as to, do I
15  remember -- do I remember talking publicly about
16  CLASS -- when?  When are you speaking of?
17  BY MR. SAHAM:
18     Q.  I'm saying, you remember, generally,
19  doing it, you just don't remember the dates?  You
20  remember, at some point, at least, you talked to
21  reporters about CLASS, you just don't know whether
22  you did it on April 17th or not?
23     MR. HOFF:  Objection to form.
24  BY THE WITNESS:

114

1      A.  I talked -- I spoke to reporters at some
2  point about CLASS.  I don't recall doing so this
3  early after we had the results from CLASS.
4  BY MR. SAHAM:
5      Q.  You just don't remember doing it?
6      A.  I don't -- I don't remember doing it --
7      Q.  Okay.
8      A.  -- correct.
9      Q.  Now, I want to show you what's been
10  marked previously as Exhibit 67.  And this is just
11  -- this is the actual press release that was issued
12  on -- well, I -- I strike that.
13     I'm just showing you what's been marked
14  as Plaintiffs' Exhibit 67, and I'd ask you, first,
15  if you recognize what that is?
16     What is this document, Exhibit 67, sir?
17     A.  It is a document that's -- is -- is
18  describing the -- the presentation and elements of
19  the presentation that Dr. Silverstein gave at the
20  American College of Physicians --
21     Q.  And --
22     A.  -- sometime around April 17th.
23     Q.  Okay.  And this is a press release that
24  was issued by Pharmacia on or about April 17, 2000?

115

1      A.  It doesn't say that, specifically.
2      Q.  Well, you were designated as the
3  representative --
4      A.  Right.
5      Q.  -- of Pharmacia --
6      A.  Right.
7      Q.  -- regarding the April 17 press release.
8  So presumably, you can identify whether or not --
9      A.  Yeah.
10     Q.  -- this is it.
11     A.  This looks like it is like the press
12  release I understand had been released.  But, you
13  know, as you saw before, there were drafts of it,
14  and I don't see anything here that says it's stamped
15  final or anything like that.
16     So I'm saying, it looks like it is, but I
17  can't guarantee --
18     Q.  Did you review --
19     A.  -- to you that I know that this thing you
20  handed me was the final that was released that day.
21     Q.  Well --
22     A.  That's all I'm saying.
23     Q.  -- in your preparations as the, you know,
24  corporate representative of Pharmacia --

116

1      MR. HOFF:  Can I save some time --
2  BY MR. SAHAM:
3      Q.  -- to testify --
4      MR. HOFF:  -- and stipulate that this is the
5  press release?
6      MR. SAHAM:  Yeah.  Do you stipulate, then?
7      MR. HOFF:  This is -- this was -- this was the
8  press release that was issued on April 17th.
9      MR. SAHAM:  Okay.  So stipulated.
10     MR. HOFF:  Fine.
11     THE WITNESS:  Okay.
12     MR. HOFF:  So you can now ask --
13     MR. SAHAM:  Okay.
14     MR. HOFF:  -- your real questions.
15     MR. SAHAM:  Now we can all go home, John.
16     MR. HOFF:  Well, I'm okay with that.
17  BY MR. SAHAM:
18     Q.  Okay.  So this -- we've agreed now that
19  this was the press release that was issued on
20  April 17th --
21     A.  Okay.
22     Q.  -- that's been marked as Exhibit 67.
23     A.  Okay.
24     Q.  And I want to turn your attention



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

117

1  specifically to the second page of the document, the
2  third paragraph, the first sentence, and I'll read
3  it into the record.
4       It states, "The study, funded by Searle
5  and Pfizer, Inc., found that Celebrex patients
6  experienced significantly fewer symptomatic GI
7  ulcers and ulcer complications compared with
8  Ibuprofen or Diclofenac."
9       That statement is not accurate with
10 respect to Diclofenac, correct?
11      MR. HOFF:  Objection to form.
12 BY THE WITNESS:
13      A.   I read this -- I read this sentence to
14 indicate that Celebrex was not different than
15 ibupro- -- than the analysis of Ibuprofen and
16 Diclofenac together.
17 BY MR. SAHAM:
18      Q.   You -- you read the word "were" to mean
19 Ibuprofen and Diclofenac together?  And I'm
20 specifically referring to the sentence I just read.
21      A.   Yeah, I -- I -- I see what you are
22 saying.  I am reading the sentence and the context
23 of the -- of the whole document, and I read it as
24 the -- this is Ibuprofen with Diclofenac as a

---

118

1  combined group.
2       Q.   So you read the "or" to mean and,
3  correct?
4       A.   I read it to mean that this -- these two
5  were together in -- in the analysis.
6       Q.   Okay.  This -- this document, though,
7  Exhibit 67, which has been marked as Exhibit 67,
8  does not disclose to the reader that there was no
9  statistically significant comparison between
10 Celebrex and Diclofenac for symptomatic GI ulcers
11 and ulcer complications together; is that correct,
12 sir?
13      A.   Could you repeat it?  I'm sorry.
14      Q.   My question is, this document,
15 Exhibit 67, the press release --
16      A.   Yes.
17      Q.   -- does not disclose to the reader that
18 there was no statistically significant comparison in
19 CLASS with respect to the combined endpoint of
20 symptomatic GI ulcers and complicated ulcers
21 together that were statistically significant?
22      MR. WEISS:  Object to the form.
23 BY THE WITNESS:
24      A.   This document describes what Fred

---

119

1  Silverstein presented.  And -- and, again, if I
2  could hearken back to what I was told by Ms. --
3  Ms. Young and Ms. Kovitz, in the press release, you
4  can only -- by FDA rules or laws, you can only
5  present results that have been presented publicly.
6       And the data that was presented publicly
7  for ulcer complications and the combination of
8  symptomatic ulcers in ulcer complications by
9  Dr. Silverstein was the Ibuprofen plus the
10 Diclofenac.
11      So that's -- that is the basis of this
12 whole -- the data that is presented --
13 BY MR. SAHAM:
14      Q.   Fair --
15      A.   -- here.
16      Q.   Fair enough.
17      My question, then, we -- we presented to
18 you earlier, which is marked as -- you know, the
19 slides, which we marked as 252, the slides that were
20 presented at ACP, so you could put those in front of
21 you, as well.
22      You're saying that the -- the press
23 release goes along with what was presented at ACP?
24      A.   My understand- -- my understanding is the

---

120

1  press release by FDA rules can only present data
2  that was presented in the public.
3       Q.   Okay.  And my question to you, given
4  that, whether you want to look at Exhibit 252 and
5  Exhibit 67 together or just Exhibit 67, the press
6  release, the reader of that press release would not
7  be made aware that there was no statistically
8  significant comparison between Celebrex and
9  Diclofenac as part of the CLASS study with respect
10 to symptomatic GI ulcers and ulcer complications
11 together; is that correct, sir?
12      A.   The read- -- reader is made aware of what
13 was presented by Dr. Silverstein.  These slides,
14 you're saying, are the slides that Dr. Silverstein
15 presented, and this press release is consistent with
16 that, that it is the combined Ibuprofen and
17 Diclofenac analysis together, what is -- that is
18 described here.
19      Q.   I understand that, sir.  But my question
20 to you is a very specific question.
21      MR. HOFF:  Did you finish your answer?
22 BY THE WITNESS:
23      A.   And that -- and -- and by law, that's all
24 they can present.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                    December 10, 2010

|  | 121 |  |  | 123 |
|---|---|---|---|---|

**121**

1  BY MR. SAHAM:
2      Q.   That -- well enough that maybe -- you may
3  be a lawyer, you may not, I don't know.
4      A.   Right.
5      Q.   You may be an expert on it.
6      My question to you -- let's look at
7  Exhibit 67, the press release that was issued on the
8  wire services on April 17, 2000, if somebody read
9  this press release, sir, they would not be made
10 aware that as part of the CLASS trial, there was not
11 a statistically significant comparison between
12 Celebrex and Diclofenac with respect to the endpoint
13 of symptomatic GI ulcers and ulcer complications; is
14 that correct, sir?
15     A.   They would not be aware of analyses that
16 were done outside of what Dr. Silverstein presented.
17 So there's a lot of analyses outside of what
18 Dr. Silverstein presented that were not put in here.
19 I would agree that -- that comparison to Diclofenac
20 is not in here.
21     Q.   Okay.  So if you read this, you wouldn't
22 know that there wasn't a statistically significant
23 comparison between Celebrex and Diclofenac at the
24 symptomatic GI ulcers combined with ulcer

**123**

1  is talking about the combined endpoint, symptomatic
2  GI ulcers and ulcer complications, correct?  That's
3  the combined endpoint of those two endpoints
4  together?
5      A.   I want to make sure we're looking --
6  reading the same line.  So I'm on what appears to be
7  page 2, Paragraph 3.
8      Q.   The first sentence.
9      A.   The study funded experienced
10 significantly fewer symptomatic -- symptomatic GI
11 ulcers and ulcer complications.
12     That combined endpoint, yes, I agree this
13 sentence is referring to that.
14     I also will submit that they are saying
15 the -- the comparison is Celebrex with -- compared
16 to the combined Ibuprofen and Diclofenac.
17     Q.   Okay.  And -- and that's because you're
18 interpreting the "or" to mean the two together?
19     A.   I'm interpreting, yes, in the context of
20 what the first -- this whole document in the
21 first -- in the first paragraph, it talks about that
22 it was a combined --
23     Q.   You -- you'd agree with me that a
24 reasonable person could disagree with you and read

**122**

1  complications endpoint, correct?
2      A.   If -- your question is, if I read this?
3      Q.   Well, let me read -- I'll ask a better
4  question.
5      If by reading this press release, the
6  reader of the press release would not be made aware,
7  by reading this press release, that there was no
8  statistically significant comparison between
9  Celebrex and Diclofenac at the endpoint of GI --
10 symptomatic GI ulcers and ulcer complications
11 combined, correct -- is that correct, sir?
12     A.   So in and of itself, by itself in this
13 press release, they do not talk about that analysis.
14     Q.   Okay.  And they also -- this press
15 release also doesn't reveal that there's no
16 statistically significant comparison between
17 Celebrex and Diclofenac on the ulcer complication
18 endpoint, correct?
19     A.   Could you repeat it?  Because I think you
20 said it in a way that --
21     Q.   Right.  My --
22     A.   -- it's not correct.
23     Q.   -- my first question, which I think we
24 established, the sentence here that we started with

**124**

1  the "or" in its ordinary usage, as meaning Ibuprofen
2  or Diclofenac?
3      MR. HOFF:  Objection to form.
4  BY MR. SAHAM:
5      Q.   Would you agree that that's possible,
6  sir?
7      MR. HOFF:  Objection to form.
8  BY THE WITNESS:
9      A.   Anything's possible, but I wouldn't agree
10 with that.
11 BY MR. SAHAM:
12     Q.   Okay.  Now -- now, we're getting back to
13 my set of questions about what's not in Exhibit 67.
14 And my first question -- and I think you've agreed
15 to this, that this combined endpoint that's being
16 referred to in the sentence we've been reading,
17 that -- and -- and -- and now I'm going to ask --
18 ask my question -- well -- well, strike that.
19     I'm going to ask a different question.  I
20 think I've already asked this and I think you've
21 already answered it, but I just want to make sure.
22     The reader of this press release would
23 not know by just reading this press release that
24 there was no statistically significant difference on



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

125

1  this combined endpoint between Celebrex and
2  Diclofenac alone; is that correct, sir?
3      MR. HOFF:  Objection to form.
4  BY THE WITNESS:
5      A.    That analysis, comparing Celebrex for the
6  combined endpoint of symptomatic ulcers and ulcer
7  complications versus Diclofenac is not referenced
8  here.
9  BY MR. SAHAM:
10     Q.    Okay.  And -- and if it was, it would
11 have to say that there was no statistically
12 significant difference on that comparison, correct,
13 sir?
14     A.    I don't know what you mean by "have to
15 say."
16     Q.    It's accurate that there was no
17 statistically significant difference on this
18 combined endpoint at either six months or for the
19 entire study when Celebrex was compared to
20 Diclofenac?
21     A.    For reference, you'll have to give me the
22 final data, because I don't have it --
23     Q.    I'd be --
24     A.    -- memorized.

---

126

1      Q.    I'd be glad to.  Let me give you what has
2  been marked as Plaintiffs' Exhibit 66.
3          Could you please take a look at
4  Plaintiffs' Exhibit 66.  And obviously, it's a long
5  document, but if you feel comfortable identifying
6  generally what this document is for the record, I'd
7  ask you to do so.
8          And specifically, I think the
9  information, you know, you want to look at is on
10 pages 6 and 7, the summary of CSUGIE incidents, and
11 on the next page, page 7, the summary of the CSUGIEs
12 and GDU incidents combined at six months and the
13 entire study period.
14         And -- and I mean, you -- you certainly
15 have the right to review the whole document, but
16 it's a lengthy document and we were sort of in the
17 middle of a --
18     A.    Right.
19     Q.    -- question.  So --
20     A.    Right.
21     Q.    So if I could ask you, does this appear
22 to be the final -- at least the first 200-and-some
23 pages or -- I'm sorry, let me give you the exact
24 number -- so at least the first 216 pages of the

---

127

1  final study report?
2      A.    It appears to be, have -- not having gone
3  through it page by page.
4      Q.    And it is -- if you turn to the second
5  page, it's signed by James Lefkowith and William W.
6  Zhao?
7      A.    Yes, this document is.
8      Q.    And -- and what's the final study report?
9      A.    Within -- within the pharmaceutical
10 industry, when a clinical trial is completed, the
11 database is locked, secured analyses are run, and
12 the analyses and all the data, what are considered
13 the final data, are put into a document called the
14 final study report.
15         The report describes the intent of the
16 study, the -- a summary of the protocol, a summary
17 of the analysis plan.  The -- the results are
18 presented and the sponsor's interpretation of those
19 results and conclusions.  And that's what this is --
20     Q.    Okay.
21     A.    -- for the CLASS trial.
22     Q.    And looking at pages 6 and 7, those are
23 the -- the summary tables from the synopsis.
24         What's the point of the synopsis and the

---

128

1  summary tables?
2      A.    In our -- in the Searle organization, the
3  purpose of the synopsis is to present the salient
4  features of the study report, meaning the high-level
5  features.
6      Q.    Is that also referred to as top-line
7  data, sometimes?
8      A.    I don't refer to it as top line because
9  as you can see, there's a lot of information in this
10 synopsis.  To call all of it top line is a very
11 subjective comment.
12     Q.    Well, let's look at pages 6 and 7,
13 Tables 1 through 4.
14         Is that the top-line data of the CLASS
15 study?
16     A.    I just don't know -- I don't understand
17 what you mean by "top line."
18     Q.    Okay.  Well, we'll --
19     A.    I can talk to you about other things, but
20 top line isn't a phrase I use --
21     Q.    Okay.  Let's not use it, then.
22     A.    -- when I talk about a study.
23     Q.    Tables 1 through 4, is that the
24 salient -- you know, if you were really going to put

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

129

1  it down to the most important or some of the most
2  important things that occur in the CLASS study,
3  does -- do Tables 1 through 4 summarize much of
4  that?
5       A.   Yes, I would agree.
6       Q.   Okay.  And then Table 1 is a summary of
7  the CSUGIEs or complicated ulcer incidents for the
8  first six months of the trial, correct?
9       A.   Well, to go back to some of our original
10  comments when we started, it's CSUGIEs --
11       Q.   CSUGIEs.
12       A.   -- not CSUGIEs.
13       Q.   Can we just call them complicated
14  ulcers --
15       A.   Fine.
16       Q.   -- even though --
17       A.   Okay.
18       Q.   -- it says CSUGIEs on there?
19       A.   CSUGIEs are --
20       Q.   CSUGIE --
21       A.   Yeah.  Okay.
22       Q.   It -- it -- because it's stuck in my mind
23  to call it that way.
24       A.   I know.

---

130

1       Q.   But you understand Table 1 is a summary
2  of the complicated ulcers at six months; is that
3  correct?
4       A.   For over the first six months, yes.
5       Q.   Right.  And it -- and it breaks down
6  P Values, comparing Celebrex to Diclofenac by
7  itself, Ibuprofen by itself and then the two
8  together?
9       A.   Yes.
10       Q.   And then it also has a table doing the
11  same -- same thing for nonaspirin, the nonaspirin
12  group, the people who didn't also take aspirin?
13       A.   For the -- yes, Table 1 has that for the
14  first six months.
15       Q.   And then Table 2 is the entire study,
16  those same comparisons I just referenced for the
17  entire study period?
18       A.   Yes, Table 2 does that.
19       Q.   So it's got the comparisons, the
20  Diclofenac, Ibuprofen and both, and for everybody
21  and the nonaspirin group for the entire study?
22       A.   Correct.
23       Q.   And then Table 3 is this combined
24  endpoint of the complicated ulcers and the

---

131

1  symptomatic or GDUs together, and Table 3 is the
2  first six months; is that correct?
3       A.   That's correct.
4       Q.   And then Table 4 is the entire study
5  period?
6       A.   That's correct.
7       Q.   And it's got P Values comparing -- all
8  four of these tables have P Values comparing
9  Celebrex to Diclofenac by itself, Ibuprofen by
10  itself and the two NSAIDs together; is that correct?
11       A.   That's correct.
12       Q.   Okay.  And getting back to my question,
13  so if you get back to that sentence in Exhibit 67
14  that we were talking about, the first sentence in
15  the third paragraph, if you look at Tables 1
16  through 4, just the comparison with Diclofenac,
17  there's 8 different comparisons in Tables 1 through
18  4; is that correct, comparing Celebrex to Diclofenac
19  by itself?
20       A.   I'm sorry, say it again.  You're going
21  pretty fast --
22       Q.   Yeah, I'm --
23       A.   -- in terms of throwing numbers out.
24       Q.   I'm real sorry.  Yeah.

---

132

1       So Table 1, 2, 3 and 4, there's -- each
2  one of those -- each one of those four tables has
3  two different comparisons with Diclofenac itself?
4       A.   Right.
5       Q.   And provides a -- a P Value, correct?
6       A.   That's what these tables show.
7       Q.   And what's a Log-Rank P Value?  Can you
8  just give us the simple version of what a Log-Rank
9  P Value is?
10       A.   So I'm not a statistician, so I'm
11  speaking it from a general clinical point of view.
12       A P Value tells you -- gives you an idea
13  of the probability that you are either right or
14  wrong -- or the -- the results you have obtained
15  from the trial are either correct or incorrect in
16  terms of what is really true.
17       Q.   Right.  And for the purposes of CLASS, in
18  order for a P Value to be statistically significant,
19  it had to be less than .05; is that correct?
20       A.   For it to be statistically significantly
21  different, it had to be less than .05, that's
22  correct.
23       Q.   Right.  And if we look in Tables 1
24  through 4 of Exhibit 66, the eight different

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                    December 10, 2010

---

### 133

1  comparisons with Diclofenac, not a single one of
2  those comparisons between Celebrex and Diclofenac
3  were statistically significant; is that correct,
4  sir?
5      A.   These numbers are -- are greater than
6  .05.  But I think it has to be pointed out that
7  P Values, in and of themselves, do not necessarily
8  tell you whether the results of the study are
9  meaningful or not.
10     Q.   Right.  But you could --
11     A.   You have to interpret them in the context
12 of what you know about all of the data.
13     Q.   You -- you couldn't make a claim that the
14 difference was due to something other than chance,
15 the way this study was set up, unless the P Value
16 was less than .05; is that correct, sir?
17     MR. HOFF:  Objection to form.
18 BY THE WITNESS:
19     A.   I'm sorry, could you repeat the question.
20 BY MR. SAHAM:
21     Q.   You couldn't make -- and is it -- is it
22 fair to say if something is not statistically
23 significant, it could have been caused as a result
24 of just chance or a random --

### 134

1      A.   If it's --
2      Q.   -- occurrence?
3      A.   -- not statistically significant, it
4  could have been caused by chance?  No, it could have
5  been caused by imbalances in treatment groups.
6      Q.   Well, but you can't conclude --
7      MR. HOFF:  Wait, wait, wait.
8  BY MR. SAHAM:
9      Q.   -- it was caused --
10     MR. HOFF:  Wait, wait, wait a second.  Wait a
11 second.  You have a habit of doing this.  I know
12 you're eager to answer your -- ask your questions,
13 but I'm not sure if he finished answering --
14 BY MR. SAHAM:
15     Q.   I'm sorry.  Are you done, sir --
16     MR. HOFF:  -- the question.
17 BY MR. SAHAM:
18     Q.   -- with that answer?
19     A.   So what I'm saying is, you can get
20 P Values, whether they're statistically significant
21 or not statistically significant, that -- that are
22 not just by chance alone.  They are due to aspects
23 of the study and things that happened in the study
24 that confounds your ability to determine that

### 135

1  P Value at all.
2      Q.   Right.  All I'm getting at is, per the
3  protocol and per the study, if you didn't have a
4  P Value of less than .05, like when you were
5  comparing Celebrex to Diclofenac, you couldn't
6  claim, at least on that endpoint, that Celebrex was
7  better on the particular endpoint being compared; is
8  that correct, sir?
9      MR. WEISS:  I objection to the form.
10     MR. HOFF:  Objection to form.
11 BY THE WITNESS:
12     A.   What I'm struggling with is the word
13 "claim."  You couldn't say that the P Value was
14 greater than .05.  But I could say, because of
15 confounding circumstances, although that P Value is
16 greater than .05 and for other things that we know
17 about the study, I would -- I could possibly claim I
18 think treatment groups are different.
19 BY MR. SAHAM:
20     Q.   Right.  But you -- you can't make a claim
21 of statistical significance per the protocol unless
22 the P Value was less than .05; is that correct, sir?
23     A.   Statistical significance -- I would agree
24 that you cannot say something is statistically --

### 136

1  that the P Value is less than .05 when the P Value
2  is -- that you see is greater than .05.
3      Q.   So -- so therefore, none of these eight
4  comparisons on pages 6 and 7 have a P Value less
5  than .05 when Celebrex is compared to Diclofenac; is
6  that correct, sir?
7      A.   That is correct.
8      Q.   So therefore, you couldn't claim, for the
9  purposes of CLASS, that there is a statistically
10 significant difference on any of these eight
11 comparisons between Celebrex and Diclofenac; is that
12 correct, sir?
13     A.   Again, I will -- I think the -- the
14 operational word is "statistically significant."
15 But what we do is, when we interpret results, it is
16 not just based on statistical methodology.  It's
17 based on our clinical understanding of all the data.
18     Q.   Right.  That aside -- I'm just talking
19 about statistical significance.
20     A.   Okay.  As long as we understand --
21     Q.   Totally, sir.
22     A.   -- that we're talking about just -- just
23 a P Value and results cannot be interpreted just
24 based on a P Value.  In that context, I would agree.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

137

1    Q.   So you're agreeing with me you couldn't
2  make a claim that there is a statistically
3  significant difference on any of these eight
4  endpoints between Celebrex and Diclofenac?
5    A.   I would rather we not use the word
6  "claim."  We could not say that we were
7  statistically different.
8    Q.   Okay.  I'll -- I'll repeat the question.
9        You can't say, on any of these eight
10 endpoints, that the comparison between Diclofenac
11 and Celebrex was statistically significant; is that
12 correct, sir?
13   A.   I agree.
14   Q.   Okay.  And if you read Plaintiffs'
15 Exhibit 67, the press release, it does not tell the
16 reader that of these eight salient comparisons
17 contained on pages 6 and 7 of Exhibit 66, that there
18 was no statistically significant difference between
19 Celebrex and Diclofenac; is that correct, sir?
20   A.   That is correct, but we couldn't anyway.
21 Because in this press release, my understanding is
22 we can only present results that were presented by
23 Dr. Silverstein at ACP.
24   Q.   And then you -- by that reasoning, you

138

1  would agree with me that Dr. Silverstein didn't tell
2  any of the doctors present at ACP that there was no
3  statistically significant comparison between
4  Celebrex and Diclofenac at either the complicated
5  ulcer endpoint or the combined complicated and
6  symptomatic ulcer endpoint; is that correct, sir?
7    A.   Okay.  Let's -- I need to go back to what
8  was the intent of the presentation --
9    Q.   I'm entitled to an answer to my question.
10   A.   And I'm trying to answer your question.
11       The intent of the -- this -- the ACP
12 presentation by Dr. Silverstein was the first public
13 presentation of the results of CLASS.
14       In the -- in the first public
15 presentation any time of a study, it's, you present
16 what is the -- the primary objective that you are
17 looking at.  And the primary objective, it was
18 always understood, was comparing Celebrex to the
19 group, combined group, of Ibuprofen and Diclofenac.
20 That was the understanding of the overall hypothesis
21 of the study, how does Celebrex look to those
22 combined.
23       It was the intent of that presentation to
24 present, as a focus, the results of that analysis,

139

1  because that's the first thing and the biggest thing
2  and the most important thing about that study, as
3  agreed in the design with the FDA, as agreed with
4  everybody involved.  That is the first thing, the
5  major comparison that we are interested in in this
6  study.
7    Q.   My --
8    A.   As -- as is the case, that is the first
9  thing that you do present when you go public,
10 public, when you present it.
11       And that is what Dr. Silverstein's
12 presentation was the focus of, and that's what he
13 presented.
14   Q.   My question to you, though:
15 Dr. Silverstein didn't tell any of the doctors in
16 his presentation at ACP that there was no
17 statistically significant difference between
18 Celebrex and Diclofenac on either the combined
19 endpoint or the complicated ulcer endpoint; is that
20 correct, sir?
21   A.   In the context of what I just said, that
22 was not part of the presentation, correct.
23       MR. SAHAM:  Okay.  We need to take a break to
24 change the tape now.

140

1        THE WITNESS:  Okay.
2        THE VIDEOGRAPHER:  Going off the video record
3  at 12:03 p.m.
4        This is the end of Tape No. 2.
5        (WHEREUPON, a short recess was
6        had.)
7
8        THE VIDEOGRAPHER:  Going back on the video
9  record at 12:12 p.m.
10       This is the beginning of Tape No. 3.
11       (WHEREUPON, a certain document was
12       marked Plaintiffs' Deposition
13       Exhibit No. 256, for identification,
14       as of 12/10/2010.)
15 BY MR. SAHAM:
16   Q.   Sir, I'm showing you what's been marked
17 as Plaintiffs' Exhibit 256.  It's a one-page
18 document bearing Bates number DEFS 00120490.  And
19 this also indicates that it was produced from your
20 files, your electronic custodial documents.
21       I'd ask you if you recognize it?
22   A.   I do not.
23   Q.   Okay.  But you don't dispute that this
24 came from your files?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

141

1      A.   I -- either way, I don't know if it was.
2      Q.   You may have drafted it or received it?
3  You don't know?
4      A.   I don't know.
5      Q.   Okay.  And I'm -- I want to focus on .5.
6  It says, "How do we defend the pooled analysis of
7  NSAIDs?  Did not beat diclo, therefore cannot imply
8  that we did by the pooled analysis."
9           It is accurate that you didn't -- you
10 didn't beat Diclofenac on any of the four -- or any
11 of the eight comparisons we were looking at on
12 pages 6 and 7 of Exhibit 66, correct?
13     MR. HOFF:  Objection to form.
14 BY MR. SAHAM:
15     Q.   When I say "you," Celebrex didn't beat
16 Diclofenac on any --
17     MR. HOFF:  Objection --
18 BY MR. SAHAM:
19     Q.   -- of those eight comparisons?
20     MR. HOFF:  Objection to form.
21 BY THE WITNESS:
22     A.   I want to go back to what the intent of
23 the study was and how you get to the Diclofenac
24 comparisons.

---

142

1           As I said earlier, that the overriding
2  objective of the study was to compare Celebrex to
3  the combined group of Diclofenac and Ibuprofen in
4  terms of ulcer complications and -- symptomatic
5  ulcers and ulcer complications.  The statistical
6  plan, there were statistical rules for the primary
7  endpoint, which were -- was ulcer complications.
8  BY MR. SAHAM:
9      Q.   I don't want to interrupt you.  Why don't
10 we look at those rules.  If you get out
11 Exhibit 77 and turn to page --
12     MR. HOFF:  Well, wait a second.  You are
13 interrupting him because he's in the middle --
14     MR. SAHAM:  Well, but I'm going to move to
15 strike.  It's nonresponsive.
16     MR. HOFF:  No, you're not the judge, so...
17     MR. SAHAM:  I only got seven hours.
18     MR. HOFF:  Wait.  You don't have robes, so you
19 can move all you want.  It isn't being granted.  He
20 is answering your question.  You should let him
21 finish, then you can follow up with whatever you
22 want to show him.
23     MR. SAHAM:  Okay.  And I'm going to move to
24 strike as nonresponsive.

---

143

1           But go ahead if you've got more to say --
2      MR. HOFF:  You've got a pending motion to
3  strike that some judge some day may consider.
4  BY MR. SAHAM:
5      Q.   And if it would make more sense,
6  Dr. Geis, to actually read what the protocol says
7  about how the comparison's done, will that make this
8  more efficient?  If you don't want to do it, fine,
9  but I would recommend that we do it because we have
10 it right here as a marked exhibit.
11     A.   I'd like to say what I have to say, and
12 I'll try to be, you know, clear.  And then we can
13 possibly move to that.
14          But the -- the -- the rules were that for
15 the primary endpoint of the study, which was the
16 comparison of Celebrex to the combined group of
17 Diclofenac and Ibuprofen for ulcer complications, if
18 you were not statistically different for the
19 combined group and you step down to do the
20 comparison of Celebrex versus Diclo alone and
21 Celebrex versus Ibu alone, you couldn't make the
22 claim.  Even though you were statistically
23 significant for either of those, you could not make
24 that claim.

---

144

1      Q.   And that's because the null hypothesis is
2  maintained if you don't beat the two combined; is
3  that correct, sir?
4      MR. HOFF:  Well, first of all, did you finish
5  ans- --
6      THE WITNESS:  No.
7      MR. HOFF:  -- your answer?
8  BY THE WITNESS:
9      A.   So -- so -- so in that context, when
10 you -- there were rules about stepping down in
11 looking at Celebrex versus the individual NSAIDs and
12 the claims you could make if you did not reach the
13 primary endpoint for the combined group of Ibuprofen
14 and Diclofenac.
15          We did not -- we were not -- we did not
16 beat Ibuprofen and Diclofenac combined for the
17 primary endpoint.  And although we stepped down, as
18 you see, we knew you could not make claims based on
19 the stepdown.
20          So that's what I wanted to say.
21 BY MR. SAHAM:
22     Q.   Could you take a look at Exhibit 77, the
23 protocol that we looked at earlier, and specifically
24 page 30.  And I think this is what you're



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

145

1  describing -- but you can certainly correct me if
2  I'm wrong -- the top paragraph on page 30 of 36.
3        MR. HOFF:  Did you say 67 or 77?
4        MR. SAHAM:  I said 77, yeah.
5        MR. HOFF:  Okay.  Thank you.
6  BY MR. SAHAM:
7        Q.   And the second sentence there says, "A
8  stepwise procedure will be used to strongly control
9  the type-I error.  In this procedure, the first step
10 is to test the overall hypothesis, whether Celecoxib
11 and the pooled NSAIDs are different.  If the test is
12 not significant, then null hypothesis is retained
13 and the procedure stops."
14       Is that -- did I accurately read what the
15 protocol says on the -- at least the first part of
16 the stepwise procedure of analyzing the primary
17 endpoint?
18       A.   Yes, you accurately read that.
19       Q.   Okay.  So that means if you don't beat
20 the two combined, the null hypothesis is retained.
21       And what was the null hypothesis?
22       A.   The null hypothesis for, in this case,
23 the comparison of Celebrex versus the two NSAIDs
24 com-- together for the primary endpoint of ulcer

---

146

1  complications would be that you -- you cannot make
2  the claim -- you would retain the null hypothesis
3  that the two groups, Celebrex versus the NSAIDs
4  together, are not different --
5        Q.   Okay.
6        A.   -- statistically.
7        Q.   Okay.  Is it also correct that as part of
8  the CLASS study -- and specifically we've looked at
9  the combined endpoint and the primary endpoint of
10 complicated ulcers -- that Celebrex did not beat
11 Diclofenac on the eight comparisons talked about on
12 pages 6 and 7 in Tables 1 through 4 of Exhibit 66?
13       MR. HOFF:  Can you read back that question?
14       (WHEREUPON, the record was read by
15       the reporter.)
16       THE WITNESS:  I apologize, could you read it
17 again, really.  I mean, because there's a lot of
18 stuff in there.  There's a lot of things here, and I
19 want to make sure.
20 BY MR. SAHAM:
21       Q.   I -- I can ask it simpler, if that would
22 be better for you, sir.
23       A.   Right.  But I don't want to give an
24 answer that can be generalized that is not accurate

---

147

1  to what our thinking was and what we did.
2        Q.   All I'm trying to say is, if you look at
3  the comparisons, the salient comparisons -- I think
4  you described them -- or some of the salient
5  comparisons that are summarized in the synopsis,
6  Tables 1 through 4 -- and we talked about this
7  earlier -- that Celebrex didn't beat Diclofenac or
8  there couldn't be a claim that Celebrex beat
9  Diclofenac on any of those eight comparisons?
10       A.   Statistically, the P Values for the
11 comparisons -- so, first of all, for the ulcer
12 complications, we were not statistically different.
13       So the stepdown says you can't make any
14 claims once you step down.  Okay.  Even though we
15 did step down, the P Value, in and of itself,
16 statistically, for Diclofenac was greater than .05.
17       Q.   Which means it wasn't statistically
18 significant?
19       A.   Statistically, correct.
20       Q.   Now I would like --
21       A.   But that is not the -- but that's not the
22 only piece of information you use to interpret the
23 results of a study.
24       Q.   But you couldn't say it was statistically

---

148

1  significant?
2        A.   Statistically.  Technically,
3  statistically we could not say that.
4        Q.   Now, moving down to the next sentence, we
5  spent quite a bit of time on that first sentence in
6  the third paragraph, but the next sentence says,
7  number --
8        A.   Help me.
9        Q.   -- Exhibit 67, the press release, what we
10 stipulated is the press release, that Jonathan Hoff,
11 partner at Cadwalader, has stipulated was the press
12 release --
13       A.   Page 2 --
14       Q.   -- page 2, Paragraph 3, sentence 2.
15       A.   Okay.
16       Q.   So the one we were talking about, the
17 first sentence in that paragraph, for a long time.
18       Now we're going to talk about the second
19 sentence, hopefully for not quite as long, but we're
20 still going to talk about it.
21       And that second sentence, I'm going to
22 read it into the record.  It says, "Celebrex was
23 also associated with numerically fewer ulcer
24 complications than the NSAID comparators among all

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

149

1  patients, and 64 percent fewer of these serious
2  events among nonaspirin users, a statistically
3  significant difference."
4        Do you see that?
5     A.  I do.
6     Q.  And that claim is only valid if you
7  looked at the 6-month data, that claim of
8  statistical significance; is that correct, sir?
9     A.  I'd have to look.
10       It appears that this is referring to
11 the -- what people referred to as the 6-month
12 analysis.
13    Q.  And that claim of statistical
14 significance for the nonaspirin group for ulcer
15 complications, that comparison was not statistically
16 significant for the entire study period; is that
17 correct, sir?
18    A.  So let me go back.
19       This press release is presenting what
20 Fred Silverstein presented at American College of
21 Physicians.  So it's based on that.  Fred
22 Silverstein presented numbers related to the 6-month
23 analysis, however, acknowledged that there was data
24 beyond six months.  But due to confounding issues

150

1  related to how this study was conducted, the data
2  beyond six months was not considered valid.
3        So he presented the valid results of the
4  study.  That's what he presented in his
5  presentation.  As I said earlier, my understanding
6  is, you can, in the press release, only talk about
7  the data that was presented in the presentation.
8        So this data reflects Fred Silverstein's
9  presentation, which reflects what is considered the
10 valid analysis of the study.
11    Q.  Okay.  And I've -- I've got sort of two
12 short questions to follow up on that.
13       You would agree with me that this claim
14 of statistical significance with respect to the
15 nonaspirin subgroup for complicated ulcers did not
16 hold for the entire study period; is that correct,
17 sir?
18    A.  If you are just talking about P Values,
19 the P Value for the longer term analysis, which now
20 is almost meaningless because you are including an
21 entire set of data that's invalid, that P Value,
22 yes, was greater than .05.
23    Q.  So therefore, you couldn't say it was
24 statistically significant, correct, sir?

151

1     A.  Statistically, but statistics are not the
2  only thing for interpreting the results of a
3  clinical trial.
4     Q.  But the sentence --
5     A.  The P Value was not considered valid for
6  interpretation in my view, beyond six months.
7     Q.  But the sentence I just read to you, the
8  last phrase says, "A statistically significant
9  difference," correct?
10    A.  With respect to what is presented right
11 here with -- the -- the sentence that says, the
12 numerically fewer ulcer complications than NSAIDs
13 comparators, that's correct, and that is for the set
14 of data that is considered valid.
15       So they're saying we're presenting the
16 valid data.  We have reasons why this is valid.
17 And, oh, by the way, statistically, it was
18 significant.
19    Q.  And this press release doesn't tell
20 anyone who reads it that if you looked at the entire
21 study data, that statistically significant
22 difference did not continue; is that correct, sir?
23    A.  Well, it presents what Dr. Silverstein
24 presented.  Dr. Silverstein presented this 6-month

152

1  analysis, which was the valid analysis.  He
2  acknowledged that data beyond six months was not
3  valid.  So --
4     Q.  Could you look --
5     A.  -- he presented what he -- he presented
6  in his data.
7     Q.  Could you look back at Exhibit 252, the
8  slides from Dr. Silverstein's presentation at -- at
9  American College of Physicians.
10       Can you show me the slide that points out
11 that there was a confounding -- there was
12 confoundings to the data after six months, or that
13 there was biases that required the data to be
14 excluded after six months?
15    A.  So I am on exhibit -- I believe you call
16 these exhibits at the bottom right-hand corner?
17    Q.  252.
18    A.  Yes.  And there is a set of slides which
19 I don't recognize specifically, but based on the
20 e-mail, it appears that these were finals that Fred
21 Silverstein presented.
22       However, I do have some question about
23 the specific set -- the set you gave me because
24 there's something wrong with some of these slides



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

153

1    that I can't believe Silverstein used them.
2          But having said that, there is no slide
3    that shows data beyond six months. However, I was
4    at that presentation, and it was specifically said
5    that the data beyond six months -- there was data
6    beyond six months. There was -- and -- and it was
7    confounded for a variety of reasons.
8          And that was heard by the audience, and
9    it was heard -- I mean, actually, I think there were
10   analyst reports which talk about that Silverstein
11   said there was longer data, but he only presented
12   six months' data.
13         So although there isn't a slide, I'm
14   confident -- I know it was stated and he said it was
15   nonvalid after six months.
16     Q.   You would agree with me that turning back
17   to the press release, Exhibit 67, there's no
18   statement addressing that the data after six months
19   was confounded; is that correct, sir?
20     A.   There is -- he's -- the -- the press
21   release is presenting what Dr. Silverstein
22   presented, and it -- and it refers to data for six
23   months.
24     Q.   But it doesn't say anything that the --

---

155

1    significant on the complicated ulcer primary
2    endpoint, it doesn't in any way reveal the press
3    release itself, in no way reveals that that
4    conclusion could only be based on the 6-month data;
5    is that correct, sir?
6      A.   I disagree because it is -- this data is
7    referring to Fred Silverstein's presentation at ACP.
8      Q.   Fred Silverstein's presentation at ACP
9    was not circulated via the wire services on
10   April 17, 2000, was it, sir?
11     A.   I can't speak to that because I don't
12   know. But I know that the introductory paragraph
13   refers to, as presented at ACP. And so it is the
14   data at ACP that is presented here.
15     Q.   My question to you --
16     A.   And that's what I would do as a
17   reviewer -- or a reader of this, go, what did he
18   present? And that would be --
19     Q.   My question to you, sir -- and I'm
20   entitled to an answer to this question -- a reader
21   of this press release, if you've read it, a
22   securities analyst, whoever, me, anybody who read
23   this off the wire services would not know that the
24   claim of statistical significance -- just based on

---

154

1    the entire study data was not shared because it was
2    confounded; is that correct, sir?
3      A.   This press release -- although Fred
4    Silverstein said it, this press release does not say
5    that.
6      Q.   And this press release, if you look down
7    to the paragraph after the one that we were looking
8    at on page 2, the fourth paragraph, the first
9    sentence says, quote, This rigorous outcomes trial
10   set the bar higher than previous study -- well, let
11   me read that again because I think I misread it.
12         "This rigorous outcomes trial set the bar
13   higher than any previous study of its kind. It
14   included a large number of patients who received
15   four times the recommended OA dose of Celebrex for
16   up to 13 months."
17         That's what the press release says,
18   correct?
19     A.   The press release is quoting what Fred
20   Silverstein said, and, yes, that's what this
21   sentence says.
22     Q.   Okay. So this press release in no way
23   indicates that the sentence we were reading earlier
24   about the nonaspirin subgroup being statistically

---

156

1    this document, the reader would not know that the
2    claim of statistical significance for the nonaspirin
3    subgroup for complicated ulcers, the claim of
4    statistical significance could only be made based on
5    the 6-month data; is that correct, sir?
6      MR. HOFF:  Objection to form.
7    BY THE WITNESS:
8      A.   I can't tell you what someone else would
9    know. I can only tell you, when I read this, what
10   it says to me.
11   BY MR. SAHAM:
12     Q.   The -- the person who conducted the
13   study, you're the person --
14     MR. HOFF:  Objection to form.
15   BY MR. SAHAM:
16     Q.   -- who conducted the study or were -- was
17   a -- were a supervisor of the studies?
18         I'll strike that question.
19         My question to you, Exhibit 67, you've
20   been designated by Pharmacia with respect to the
21   issuance of this press release --
22     MR. HOFF:  Only -- only with respect to the --
23   the process for drafting it and who was involved in
24   it.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

### 157

1    MR. SAHAM:  Well -- well --
2    MR. HOFF:  He's not -- your -- your -- your
3 topic does not contemplate the discussions about the
4 content of the press release.
5 BY MR. SAHAM:
6    Q.    The topic of the press release is -- --
7 or that -- what you've been designated as -- and I
8 think you've testified to this already, but I'll
9 read it into the record -- quote, the issuance of
10 the press release, including, but not limited to,
11 the process for and individuals involved with
12 drafting, editing and approving the press release.
13       You've been designated to testify on that
14 topic, correct, sir?
15    A.   Yes.
16    Q.   And my question to you, sir, as both
17 Steven Geis and as that designee, the text of
18 Exhibit 67, the words contained within Exhibit 67
19 does -- do not disclose that this claim of
20 statistical significance for the nonaspirin subgroup
21 for complicated ulcers is based on 6-month data; is
22 that correct, sir?
23    MR. HOFF:  Objection to form, sir.
24 BY THE WITNESS:

### 158

1    A.   This data, it's my understanding of the
2 process for the -- for writing a press release is,
3 they can only present data that was presented in the
4 press -- they can only present data in the press
5 release that is what was presented at the
6 presentation to the public.  This is consistent with
7 that, and it is the 6-month data.
8 BY MR. SAHAM:
9    Q.   Can you point to me where it says that
10 the -- in this Exhibit 67, can you point to me to
11 any spot in the press release where it says that the
12 claim relating to the statistical significance of
13 the nonaspirin subgroup for complicated ulcers is
14 based on the 6-month data?
15    A.   I would go to Paragraph 1, line -- one,
16 two, three, four, five -- six:  "The findings
17 presented at the American College of Physicians
18 annual meeting," to me, says go to that.
19       That was a focus of the 6-month data, and
20 that's what this is referring to.
21    Q.   And do you know how a reader of this
22 press release could attain the ACP presentation,
23 either a video or slides of it?
24    A.   That, I can't speak to.  I don't know how

### 159

1 they could.  All I know is the process of how press
2 releases are put together, what is appropriate for a
3 press release.
4       And as I read it, and as I have read many
5 press releases before for other companies, when it
6 says, the findings presented at this place, you go
7 to that place to get the detail that you need --
8    Q.   Other than that --
9    A.   -- if you have a question.
10    Q.   Other than that sentence that says, "The
11 findings presented," is there any other spot in the
12 press release that you believe reveals to the reader
13 of the press release that the statement about
14 statistical significance in the nonaspirin subgroup
15 for complicated ulcers was based on 6-month data?
16    A.   I'll have to read this again.
17       That is the spot.  I don't find another
18 reference.
19    Q.   Okay.  Looking at Exhibit 67, there's no
20 reference in this -- you just read it a couple
21 times.
22       There's no reference in here to the FDA
23 alternative definition of complicated ulcer, is
24 there, in this press release or in Dr. Silverstein's

### 160

1 presentation?
2    A.   That's --
3    MR. HOFF:  Could you read back that question.
4       (WHEREUPON, the record was read by
5       the reporter.)
6 BY THE WITNESS:
7    A.   The alternative definition was requested
8 by the FDA, and there was -- the analyses were not
9 completed.  The statistical analyses were not
10 conducted on that endpoint because we missed the
11 primary comparison of Celebrex to NSAIDs for ulcer
12 complications.
13       In the statistical report, it says, if
14 you miss on the -- that one, you can't make a claim
15 on the FDA requested analysis.
16       So that analysis was not done because, as
17 acknowledged, we did not reach our primary endpoint
18 for the primary analysis of Celebrex versus the
19 NSAIDs compared together for ulcer complications.
20 BY MR. SAHAM:
21    Q.   Do you recall that Diclofenac was
22 numerically superior on the alternative definition
23 of complicated ulcer as per the FDA's definition?
24    A.   I don't recall that.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

161

1    Q.   Okay.  Could you turn back to Exhibit 66,
2  the final report, and specifically I'd like to turn
3  your attention to Table 8.v on page 158.
4        And this indicates that there were
5  17 uncensored complicated ulcers in the Celecoxib
6  treatment group using the FDA definition; is that
7  correct, sir?
8    A.   So this table is for the entire study
9  period which includes beyond six months, which is
10  invalid data as determined by consensus of the
11  external authors and the internal people.
12    Q.   Okay.  But it --
13    A.   So in that context, yes, the number
14  is 17.
15    Q.   Okay.  And -- and the number for
16  Diclofenac is five; is that correct?
17    A.   In this table, the number in the
18  Diclofenac column is five.
19    Q.   And there are approximately double the
20  number of people in the Celecoxib group?
21    A.   That's correct.
22    Q.   Okay.  And the -- this table also
23  calculates the crude incident rate, and for
24  Celecoxib, that's --

162

1    A.   Right.
2    Q.   -- .43; is that correct, sir?
3    A.   It is correct that the crude rate on this
4  table for Celebrex is 0.43 percent.
5    Q.   And for Diclofenac, it's .25?
6    A.   It's correct that's what the number
7  reads.
8    Q.   And that's about half of Celecoxib's
9  crude incident rate?
10    A.   When you are looking at an analysis that
11  includes an enormous amount of data that is invalid.
12  So it's meaningless.  The number --
13    Q.   It's the coprimary endpoint in the study,
14  though, correct, sir?
15    A.   It was the co- -- it was predefined as a
16  coprimary endpoint, but for all the reasons that
17  have been described in the report and dis- -- and
18  disclosed to the FDA, there was a bias in the study
19  after six months.  So the data beyond six months is
20  not valid.  The numbers are fundamentally
21  uninterpretable.
22    Q.   But there's six months' data that was
23  communicated regarding the other coprimary endpoint,
24  correct?

163

1    A.   That's correct.
2    Q.   And there's 6-month data that's
3  communicated regarding the combined endpoint, which
4  wasn't even a primary endpoint, correct, of
5  symptomatic ulcers and complicated ulcers together?
6  That's communicated at six months, correct?
7    A.   The -- the -- the primary endpoint of the
8  study was ulcer complications using the definition
9  by the end- -- by Searle.  The coprimary was used,
10  the definition, by FDA.
11        The incidence of symptomatic ulcers was
12  predefined in the protocol to be analyzed.  And it
13  was appropriate, and it was clinically appropriate
14  to do the combined endpoint analysis, which was
15  presented for six months at the ACP meeting.
16    Q.   But the bias you're talking about before,
17  that didn't in any way affect the -- the validity of
18  6-month data for the coprimary endpoint on the FDA
19  alternative definition; is that correct, sir?
20    A.   Repeat the question.
21    Q.   Your whole -- it's the informative
22  censoring, the bias issue that you've been talking
23  about of why you think the post 6-month data is
24  invalid that you've talked about?

164

1    A.   The post 6-month data is invalid.
2    Q.   That -- that whole bias --
3    A.   Right.
4    Q.   -- and validity analysis --
5    A.   Right.
6    Q.   -- wouldn't prevent you from analyzing
7  this --
8    A.   Right.
9    Q.   -- coprimary endpoint at six months,
10  correct?  That wouldn't play into that; am I right
11  about that, sir?
12    A.   It wouldn't have to.
13    Q.   But it wouldn't -- it wouldn't affect the
14  six -- the validity of 6-month data on this
15  coprimary endpoint?
16    A.   I haven't really thought about that in
17  detail, so I -- I don't know.  I'd have to think
18  about that.
19    Q.   But you -- you would agree with me that
20  this coprimary endpoint, which at least, according
21  to this table, Diclofenac was numerically superior,
22  that's not referenced in any way in the press
23  release which is Plaintiffs' Exhibit 67?
24    A.   Ask the question again, please.

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com


ESQUIRE
an Alexander Gallo Company

---

165

1      Q.   This -- this data about the -- any data
2   about the coprimary endpoint, none of that is
3   referenced in Exhibit 67; am I right about that?
4      A.   It's --
5      Q.   Or am I somehow reading Exhibit 67 --
6      A.   It's not --
7      Q.   -- inaccurately?
8      A.   It's not represented in Exhibit 67, which
9   is the press release, because it was not presented
10  by Dr. Silverstein at the American College of
11  Physicians, and it couldn't be by FDA rules.
12     Q.   So Dr. Silverstein was prevented from
13  talking about the coprimary endpoint at the ACP?
14     A.   Dr. Silverstein was not prevented to do
15  anything.
16     Q.   He could have talked about the coprimary
17  endpoint?
18     A.   If people -- he could have.
19     Q.   And he could have talked about the entire
20  study data?  There was nothing preventing him from
21  doing it?
22     A.   The data that Dr. Silverstein presented
23  was the data that was considered the most valid data
24  for the primary analysis of this study --

---

166

1      Q.   And who --
2      A.   -- including -- can I finish, please?
3      Q.   Sure.  Sorry about that.
4      A.   -- including other appropriate analyses
5   to give physicians an understanding of how Celebrex
6   compared to the combined NSAIDs in terms of GI
7   toxicity.  That was the overriding comparison that
8   people were interested when we designed the study,
9   when the study was conducted and at the end.  So
10  that was the focus of the presentation.
11          There are other analyses in -- in a
12  trial, as there always are, that you -- that you
13  just make the clinical judgment that that's not what
14  we're going to present here.
15     Q.   You were involved in the decision to just
16  publicize the 6-month data; is that correct?
17     A.   When you say "publicize," explicitly what
18  are you talking about?
19     Q.   I'm talking about presenting it at the
20  ACP and publicizing it in this press release.  And
21  we're going to get to the JAMA article, but that's
22  what I'm talking about, putting it in press
23  releases, putting -- presenting it at ACP and
24  presenting it in the JAMA article.

---

167

1          Were you involved in the decision to use
2   the 6-month data instead of the entire study data?
3      A.   I was involved in the de- -- in the
4   decision-making as one of the scientists
5   participating in analysis review that the 6-month
6   analysis was valid, and beyond that, it was not
7   valid.
8          As part of that, I was part of -- I
9   endorsed the presentation of the most valid data or
10  the valid data from this study when it was publicly
11  disclosed.
12     Q.   And Dr. Needleman was part of that
13  process, as well?
14     A.   We worked in a collaborative effort.  Our
15  decisions were made with getting scientists and
16  clinicians to look at data together and give their
17  insights into what they think is the results of the
18  trial, interpretation of analyses and hence, what is
19  the most valid data.
20          Dr. Needleman, in that sense,
21  participated in all of those activities.
22     Q.   Okay.  So in addition to yourself and
23  Dr. Needleman, who else that was employed by
24  Pharmacia or Searle participated in those

---

168

1   discussions which resulted in the decision to
2   publicize, as I've described it, the 6-month data as
3   opposed to the entire study data?
4      A.   So I -- I want to break that down.  One
5   thing you said is, who was involved in, I think you
6   asked me, reviewing the data to decide what was the
7   most valid.  And then the second part was, and who
8   decided what to publish, so I'd like to handle them
9   separately.
10     Q.   Well -- well, let's just break it down so
11  it's clear in the record what we're talking about.
12     A.   Okay.
13     Q.   Who -- who made the decision -- let's
14  just stick with you say -- and for the purposes of
15  this question, you say the 6-month data was valid,
16  the rest of the data was invalid.
17          Who -- and -- and I want to exclude
18  external authors for a second.  We can get to them
19  in a second.
20          Who, that was employed by one of these
21  companies, either Pharmacia, Pfizer, Searle -- I
22  believe you testified -- and just want to get this
23  in little bitty steps -- that yourself and
24  Dr. Needleman were involved in that process of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                    December 10, 2010

<table>
<tr><td>

169

1  talking about it and making the decision; am I
2  correct about that, sir?
3       MR. HOFF:  Whoa, whoa.
4  BY THE WITNESS:
5       A.  I didn't --
6       MR. HOFF:  Wait, wait, wait a second.  I'm
7  going to object to the form of the question.
8       MR. SAHAM:  I'll ask a different question.
9  I'll withdraw the question --
10      MR. HOFF:  Please.
11      MR. SAHAM:  -- if you're objecting to it.
12 BY MR. SAHAM:
13      Q.  I -- I want to break this down so we can
14 do this in little steps --
15      A.  Sure.
16      Q.  -- and -- and hopefully get a question
17 that you can answer yes or no.  And then you're
18 going to get a chance to give your explanation, but
19 I just want my simple, straightforward questions so
20 the record's clear:  Is it correct that you
21 personally, you know, Steven George Geis,
22 participated in the decision or the discussions
23 regarding whether to use the 6-month data or the
24 12-month data?

</td><td>

171

1  opportunity to agree or disagree about the validity
2  of the six months.  I never remember anyone saying,
3  I disagree.
4       Q.  Is it correct --
5       A.  So any- -- so anybody who was in the
6  room, I would say, by consensus, agreed the six
7  months was the valid data for the GI complications
8  and the symptomatic ulcers.
9       Q.  Is it correct that Mr. Hassan, then,
10 agreed that the 6-month data was appropriately
11 the -- the valid data as opposed to the entire study
12 data?
13      A.  I would not interpret that that way.
14 Because I wouldn't interpret that presentation in
15 the same light as presenting data to Phil Needleman
16 and other scientists who are intimately involved
17 with this study for two years and compare that to
18 Mr. Hassan who's seeing it for the first time --
19      Q.  But -- but --
20      A.  -- Mr. Hassan, excuse me.
21      Q.  And Mr. Hassan, then, was aware that
22 there was approximately 12 or 13 months of data and
23 that only the valid 6-month data was going to be
24 publicly communicated; is that correct, sir?

</td></tr>
<tr><td>

170

1       A.  I participated in discussions that looked
2  at the data that came to the conclusion the 6-month
3  data was the valid data.  In that sense, yes.
4       Q.  And Dr. Needleman participated in those
5  discussions?
6       A.  Dr. Needleman participated in the
7  discussions that looked at the data and came to the
8  conclusion that the 6-month data for ulcer
9  complications and the -- and the GI endpoints was
10 the valid data.
11      Q.  Who else at Pharmacia participated in
12 those discussions that were senior to you?
13      A.  So if we could hearken back to some of
14 the discussions we had earlier about presentations
15 that went on between the day the database was
16 closed, the blind, broken, and the analysis brought
17 forward, in all of those presentations, how many
18 there may have been, the intent is not -- the intent
19 is for discussion, input and conversation and
20 hopefully coming to a conclusion of what is the most
21 valid data.
22          In any one of those presentations, any --
23 and your question is anybody higher than me at
24 Searle, if they were in the room, they had the

</td><td>

172

1       A.  In the presentation that --
2       MR. HOFF:  Objection to form.
3  BY THE WITNESS:
4       A.  So I gave a presentation in PEPAC.  I
5  think we have, by the documents, assessed or
6  determined that it was in early April where Fred
7  Hassan was present and I presented the data, which
8  included the data beyond the six months, the
9  explanation for why we thought the 6-month data was
10 the valid data.  He was there for that presentation.
11 BY MR. SAHAM:
12      Q.  And -- and Ms. Cox was there, as well?
13      A.  Ms. Cox was at that presentation.
14      Q.  And Dr. Ando was there, as well?
15      A.  He was.
16      Q.  Okay.  And any of those individuals could
17 have certainly spoken up and said, no, you -- you
18 should publish the entire data and an explanation as
19 to why six months is better --
20      MR. HOFF:  Objection.
21 BY MR. SAHAM:
22      Q.  -- or more valid?
23      MR. HOFF:  Objection to form.
24 BY THE WITNESS:

</td></tr>
</table>


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

173

1      A.   I mean, it could or couldn't.  I don't
2  know.  What -- could or couldn't at a meeting?  I
3  don't know what they could or couldn't have said.
4  BY MR. SAHAM:
5      Q.   Let me -- let me ask it this way --
6      A.   These were open meetings for discussions.
7      Q.   Okay.
8      A.   I mean, I don't know what was going on in
9  their heads.  You're asking me to guess what was
10 Fred Hassan thinking.
11     Q.   Let -- let's just break this down.
12          You made a presentation to Hassan, Cox
13 and Ando that made them aware there was data beyond
14 six months; is that correct?
15     A.   Yes, in -- in early April.
16     Q.   And you also made them aware that in your
17 opinion and Dr. Needleman's opinion, that the
18 6-month data was more valid due to the informative
19 censoring issue?
20     A.   I -- I would like to correct you on that.
21 You're making it sound like it was just Needleman
22 and my opinion.  They were made aware that this data
23 had been presented in -- in front of multiple
24 scientists internally.  And I believe, after -- the

174

1  presentation to Mr. Hassan and Ms. Cox was after we
2  had been in front of the -- the external authors.
3          So you had a wide spectrum of scientists
4  and physicians who all had agreed that this 6-months
5  was the most valid, including Dr. Needleman and
6  myself and Mr. Hassan and Ms. Cox heard that that is
7  what had transpired.
8      Q.   Okay.  So they were made aware of the
9  explanation as to why the 6-month data was more
10 valid than the entire study data?
11     A.   I explained the reasons why, yes, in the
12 presentation, as to why we thought the six months
13 was the valid study data.
14     Q.   And that -- just so the record's clear,
15 that presentation was made to Mr. Hassan, Ms. Cox
16 and Dr. Ando, as well as others?
17     A.   Correct.  This is the presentation I'm
18 referring to in the early part of April where
19 multiple people were present, and I do remember
20 those folks being there.
21     Q.   And you made a PowerPoint presentation at
22 that meeting?
23     A.   It included PowerPoint slides and the use
24 of a flip chart.

175

1      Q.   Okay.  And do you know what happened to
2  those PowerPoint slides that you used?
3      A.   No --
4      Q.   Okay.
5      A.   -- I do not.
6      Q.   Have you looked for them?
7      A.   I have.  And I can't find a set that has
8  me convinced I know which ones they were.
9      MR. SAHAM:  It's probably a convenient breaking
10 time for lunch if you guys are hungry.
11     MR. HOFF:  It's a convenient time to break if
12 you want.
13     MR. SAHAM:  Yeah, let's take lunch.
14     THE VIDEOGRAPHER:  Going off the video record
15 at 12:52 p.m.
16          (WHEREUPON, the deposition was
17          recessed until 1:30 p.m.,
18          this date.)
19
20
21
22
23
24

176

1          UNITED STATES DISTRICT COURT
2          DISTRICT OF NEW JERSEY
3
4  ALASKA ELECTRICAL PENSION      )
5  FUND, et al., On Behalf of     )
6  Themselves and All Others      )  No. 03-1519
7  Similarly Situated,            )  (AET)
8          Plaintiffs,     )
9      vs.                     )
10 PHARMACIA CORPORATION, et al.,  )
11         Defendants.      )
12
13          12/10/2010
14          1:34 p.m.
15
16     The deposition of STEVEN GEIS resumed
17 pursuant to recess at Suite 900, One South Dearborn
18 Street, Chicago, Illinois.
19
20
21
22
23
24



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

## 177

1    PRESENT:
2
3        ROBBINS GELLER RUDMAN & DOWD, LLP,
4        (665 West Broadway, Suite 1900,
5        San Diego, California  92101,
6        619-231-1058), by:
7        MR. SCOTT H. SAHAM,
8        MR. LUCAS F. OLTS,
9          -and-
10       SCOTT & SCOTT LLP,
11       (707 Broadway, Suite 1000,
12       San Diego, California  92101,
13       619-233-4565), by:
14       MR. MATTHEW MONTGOMERY,
15         appeared on behalf of the Plaintiffs;
16
17       CADWALADER, WICKERSHAM & TAFT LLP,
18       (One World Financial Center,
19       New York, New York  10281,
20       212-504-6474), by:
21       MR. JONATHAN M. HOFF,
22       MR. JOSHUA R. WEISS,
23         appeared on behalf of the Defendants.
24

## 178

1    ALSO PRESENT:
2
3        MR. KEVIN DAILEY, Legal Videographer,
4        Esquire Deposition Solutions.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23   REPORTED BY:  NICOLE M. SCOLA, CSR, RPR,
24       C.S.R. Certificate No. 84-4524.

## 179

1        THE VIDEOGRAPHER:  Going back on the video
2    record at 1:34 p.m.
3        This is the beginning of Tape No. 4.
4            STEVEN GEIS,
5    called as a witness herein, having been previously
6    duly sworn and having testified, was examined and
7    testified further as follows:
8            EXAMINATION (Resumed)
9    BY MR. SAHAM:
10       Q.   Dr. Geis, can you look at Exhibit 250,
11   specifically slide 43.
12       MR. SAHAM:  Like this one, John.
13   BY MR. SAHAM:
14       Q.   And could you just tell me what's being
15   communicated in that slide?
16       A.   So I just want to make sure I'm on the
17   right 40 -- 43.  It's entitled Complication Rates
18   (All) Over 12 Months?
19       Q.   Correct.
20       A.   And it's also entitled a draft?
21       Q.   Correct.
22       A.   Okay.  This -- this appears to be a draft
23   slide that looks at crude rates calculated at
24   3 months, 6 months and then at 12 months for

## 180

1    Celecoxib versus the combined NSAIDs together.
2        Q.   And when you say "crude rates," that's
3    the crude rate of ulcer complication?
4        A.   It appears to me from the title that it
5    says complication rates.  I -- I'm assuming that
6    it -- they're referring to the ulcer complications.
7        Q.   And this indicates that Celebrex has more
8    of an advantage at 6 months than at 12 months, at
9    least per the slide; is that correct?
10       A.   Well, I mean -- what was your question
11   again?
12       Q.   Well, my question is, the difference
13   between Celecoxib and the NSAIDs, at least according
14   to this graph, is greater at 6 months than it is at
15   12 months; is that a correct statement?
16       A.   If you -- if you're only looking at these
17   data on this slide, but you can't look just at this
18   data because this includes the data beyond six
19   months.  We -- beyond six months, we believe is
20   invalid, and therefore, any of the comparisons, any
21   of the numbers is highly in question.
22       So I look at it and say, beyond six
23   months, frankly, I don't even try to interpret it.
24   It makes no sense to me beyond six months.

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com



ESQUIRE
an Alexander Gallo Company

---

181

1    Q.   Right.  I -- I understand that and I
2    understand that you believe or you've testified --
3    you know, I don't know what you believe, but I
4    understand that you've testified that you don't
5    think that data after six months is -- is valid, but
6    at least according to this table -- well,
7    irrespective of its validity -- and we can debate
8    that -- at least on the complicated ulcer rate, that
9    it's -- Celebrex looks better compared to the two
10   NSAIDs at 6 months than it does at 12, regardless of
11   whether or not the data's valid; is that correct,
12   sir?
13       A.   So based on -- somebody put this
14   together.  I don't even know -- even though I might
15   think it's in -- I believe it's invalid after six
16   months, I don't even know if it's correct.
17           So having said that, the line is, the
18   difference at 6 months looks wider than the
19   difference at 12 months.  But in that context, I
20   don't know if it's accurate.  It's identified as a
21   draft, and beyond six months, it's invalid data.
22       Q.   Okay.  Well, if we look back at
23   Exhibit 66, the signed final study report, pages 6
24   and 7, the Tables 1 through 4, is it accurate that

---

182

1    virtually all of the P Value comparisons, whether
2    it's for Celebrex versus Diclofenac, Celebrex versus
3    Ibuprofen or both, is it a fair characterization
4    that virtually every one of the various P Value
5    comparisons increase for the entire study as
6    compared to the six months?
7        A.   So let me get this straight.  Comparing
8    Table 1, which is six months, versus Table 2, which
9    is entire study, you're asking me if the P Value,
10   these isolated numbers, are -- are higher in the
11   entire study period versus the six months?
12       Q.   Correct.
13       A.   No, that's not true.
14       Q.   Which one is not higher?
15       A.   Oh, I apologize, I -- I read this one
16   wrong.
17           So looking at Table 1 and Table 2, the
18   table that includes all the invalid data that we
19   don't think is interpretable is associated with
20   P Values higher than the table of the data that we
21   think is valid and useful for interpretation.
22       Q.   And also, when you look at this, just the
23   raw numbers, the uncensored CSUGIEs, which is the
24   first column or the uncensored ulcer complications,

---

183

1    which is the first column for Celecoxib anyway, and
2    then the second column for Diclofenac and the third
3    column for Ibuprofen --
4        A.   So --
5        Q.   -- do you see that?
6        A.   -- precisely what is the question?
7        Q.   Well, I haven't asked the question.
8        A.   Okay.  Yes.
9        Q.   I just want to make sure you're looking
10   at that.
11       A.   I'm looking at the raw numbers.
12       Q.   So -- so basically, there were, for the
13   entire study period with respect to Celecoxib, six
14   of the seven uncensored CSUGIEs occurred after six
15   months; is that correct?
16       A.   So you're comparing 11 in Table 1 versus
17   17 in Table 2, and you're asking me, is 17 greater
18   than 11?  Yes.
19       Q.   No.  I'm just asking you, six of the
20   seven complicated ulcers that occurred that were
21   uncensored that occurred in the Celecoxib treatment
22   group occurred after six months; is that correct,
23   sir?
24       A.   I still don't follow you.  Where are you

---

184

1    get -- coming up with the number seven?  I see --
2        Q.   Let me ask it differently.
3            Out of the 17 -- and I apologize
4    greatly -- out of the 17 Celecoxib uncensored
5    complicated ulcers that occurred in the CLASS study,
6    six of those occurred after six months; is that
7    correct, sir?
8        A.   Based on this table, the 17, yes.  The
9    seven of the -- there were 11 that occurred in the
10   first six months, and there were 17 occurred in
11   the -- in the second six, but over the entire
12   period.  So there were six additional ones that
13   occurred after six months --
14       Q.   And --
15       A.   -- in the invalid part of the study.
16       Q.   Right.  And with respect to Diclofenac,
17   that's only -- only one occurred after six months;
18   is that correct?
19       A.   Again, yes.  In the valid part of the
20   study, it was nine.  In the invalid, there was an
21   additional one.
22       Q.   And with respect to Ibuprofen, no
23   additional complicated ulcers occurred after six
24   months?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Steven Geis                                                    December 10, 2010

| 185 | 187 |
|---|---|

**185**

1    A.   Right, which is the invalid part of the
2  study.
3    Q.   So I know this is just plain third-grade
4  math, but --
5    A.   Sure.
6    Q.   -- six of the seven complicated ulcers
7  that occurred after six months were in the Celecoxib
8  treatment group; is that correct?
9    A.   Yes.  In the invalid part of the study,
10  agreed.
11    Q.   Okay.  But you would agree after six
12  months --
13    A.   Which is the invalid part of the study.
14    Q.   -- yeah -- six of those seven complicated
15  ulcers were in the Celecoxib treatment group; is
16  that correct, sir?
17    A.   Six of the seven?  No, there were six.
18    Q.   No.  There were seven total because there
19  was also one in the Diclofenac group that occurred
20  after six months.
21    A.   Oh, I'm sorry.
22    Q.   So there were seven after six months, and
23  six of those seven were in the Celecoxib group,
24  correct?

**186**

1    A.   Yes.  In the invalid part -- in the
2  invalid part of the study, there were seven
3  additional uncensored clinically significant ulcer
4  complications, of which six were in the Celebrex
5  group and one in the Diclofenac.
6    Q.   And mathematically, that caused the
7  P Values to increase from six months to the entire
8  study period, correct?
9    A.   Mathematically?  Math -- ask the question
10  again.
11    Q.   Statistically, because six of the seven
12  complicated ulcers that occurred after six months
13  were in the Celecoxib treatment group, it made those
14  P Values -- when you look, six compared to the
15  entire study, it made them increase; isn't that
16  right?
17    A.   So if we're doing math, I don't know what
18  the math is.  But the reason that the P Values
19  increased is because you had an imbalance in the
20  dropout rates of patients -- you had differential
21  dropout of patients most likely to develop an ulcer
22  complication in the NSAID treatment groups.
23    Now, that may turn into a mathematical
24  equation that you say increases P Values, but

**187**

1  that's -- that's why we believe the second part of
2  this study was invalid.
3    Q.   You -- you never scientifically proved
4  that that's what was happening, that there was a
5  bias that led to the -- or strike that question.
6    You -- you never did any scientific work
7  to determine whether the informative censoring or
8  bias claim was actually what was occurring?  That
9  was a theory, correct?
10    A.   That's incorrect.
11    Q.   What did you do?
12    A.   So let's go back to -- you -- you're
13  using some terms here that I think we need to
14  clarify so we don't get caught.
15    Q.   Well, let me withdraw the question.  I'm
16  going to withdraw the question.
17    My -- my question to you is, was it
18  scientifically proven that the bias that you've
19  described was at work?  Was that proven
20  scientifically?
21    A.   The bias that I am describing is that
22  there is a differential dropout rate in the two
23  treatment groups in patients most likely to develop
24  an ulcer complication.  And there was a higher

**188**

1  dropout rate of people who had symptomatic ulcers in
2  the NSAID group versus the Celebrex group as the
3  study progressed.  That is -- there's numbers.  You
4  can look at the tables.  You can look at the figures
5  and show that.
6    Symptomatic ulcers are -- have been
7  historically correlated to ulcer complications.
8  Recently, FDA had an advisory committee on
9  November 4th where this issue was discussed among
10  experts in the field in front of an advisory
11  committee, and FDA conferred with representatives
12  from the industry that ulcers are surrogates for
13  ulcer complications.
14    So if you have more people who are
15  dropping out in the NSAID group due to symptomatic
16  ulcers than ulcer complications, that creates a
17  bias.  I would submit that that is scientific and --
18  and methodological and that's scientific evidence.
19  That is data that says, yes, there was this
20  differential dropout that made the -- the data after
21  six months invalid.
22    Q.   So -- so I understand it, are you saying
23  it's the occurrence of symptomatic ulcers and the
24  withdrawal rate based on the occurrence of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

189

1  symptomatic ulcers that created the bias; is that
2  correct, sir?
3      A.   What I'm saying is that -- so what I'm
4  saying is that the withdrawal due to symptomatic
5  ulcers, to me, is the most rigorous explanation.
6  But there is also a component of, we know that
7  patients who have GI symptoms, there is a
8  correlation between GI symptoms and an ulcer
9  complication.  And there was a differential dropout
10 rate due to GI symptoms in the NSAIDs group versus
11 the Celecoxib group.
12     Q.   Are you aware of --
13     A.   So the differential dropout rate due to
14 GI symptoms also contributed to the bias after six
15 months, which invalidated the post-6-month data.
16     Q.   Are you aware that there's scientific
17 literature out there that says that there isn't a
18 correlation between symptoms and a bleed?
19     A.   I have -- I mean, over the years, I've --
20 I've studied this quite a bit, and there are people
21 who do say that.
22          However, I disagree, and I think that the
23 history of medicine would disagree because
24 physicians believe and see in their practices that

---

190

1  the more severe symptoms you have, the more likely
2  you are that you're going to have a problem in your
3  GI tract.
4      Q.   Would you concede that reasonable minds
5  could disagree on that point whether symptoms
6  correlate with a bleed?
7      A.   Not anymore.  Maybe years ago, but not
8  anymore because the data has come out in mass and
9  repeatedly in the past ten years, which has
10 basically confirmed this.
11     Q.   At -- at the time of the CLASS trial and
12 the publication of the JAMA article in September of
13 2000, would you say that reasonable minds could have
14 disagreed as to whether symptoms correlated with the
15 bleed?
16     A.   I can't -- I mean, who -- I would highly
17 question whether they were -- were reasonable minds
18 if they disagree, because the data was so
19 compelling.  And there always has been a correlation
20 between GI symptoms and symptomatic ulcers and with
21 ulcer complications.
22     Q.   Okay.  I want to show you what's
23 previously been marked as Plaintiffs' Wolfe
24 Exhibit 3.

---

191

1      I'd ask you if you recognize this
2  document?
3          And I will certainly refer you to the
4  specific sections that I want to ask you about.
5          I'd ask you if you recognize this
6  document?
7      A.   Yes, I do.
8      Q.   And what is it?
9      A.   It is the JAMA publication of the CLASS
10 results from September of 2000.
11     Q.   And you are an author of this article?
12     A.   Correct.
13     Q.   And specifically, my first question is,
14 there's no explanation in this article, Exhibit 3,
15 as to the bias being the reason for utilizing six
16 months of data; is that correct, sir?
17     A.   I haven't read this in a while, but I --
18 so I would say I don't know unless I read it word
19 for word again.
20     Q.   So you -- well, I mean, the -- the
21 document says -- it says what it says.
22          I mean, do you -- do you recall there
23 being an explanation in here of the -- the bias
24 being the -- that you've described earlier today,

---

192

1  being the reason for utilizing the 6-month data?
2      A.   I don't recall that it was in here.
3      Q.   Okay.  And do you recall that you only
4  submitted -- you and the authors only submitted the
5  6-month data to JAMA?
6      A.   We submitted, as we do with any
7  publication, the data that we think is the valid
8  data from a clinical trial.  In this case, it was
9  the 6-month data.
10     Q.   Okay.  But it's your recollection, then,
11 you submitted the 6-month data only to the JAMA
12 editorial board?
13     A.   Again, we -- you know, I think the
14 context that I think is appropriate is, we submitted
15 the valid data, as we always do, for the results of
16 the clinical trial.
17     Q.   Okay.  But the valid data in your mind --
18 the data -- there was no data beyond six months that
19 was submitted to JAMA with respect to these GI
20 endpoints that are discussed in Exhibit 3; is that
21 correct?
22     A.   Correct.
23     Q.   Okay.  And I want to show you what I'm
24 marking here as Plaintiffs' Exhibit 257.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                    December 10, 2010

---

### 193

1          (WHEREUPON, a certain document was
2      marked Plaintiffs' Deposition
3      Exhibit No. 257, for identification,
4      as of 12/10/2010.)
5  BY MR. SAHAM:
6      Q.   And I just quickly -- I represent to you
7  that this is the -- at least a portion of the
8  deposition transcript that was produced in this case
9  where you testified in the PI case, the In Re:
10 Bextra and Celebrex litigation.
11     Do you recall having testified in -- in
12 that case on or about January 24, 2008?
13     A.   I testified -- I gave a deposition at
14 some point that may have been around this time.  I
15 don't know how you described it.  I don't -- I don't
16 recognize that as the -- the case that you're
17 speaking of.
18     Q.   But do you recall giving a -- a -- a
19 videotaped deposition in -- in -- at least -- the
20 title of this deposition is Steven Geis, and it
21 says, In Re: Bextra and Celebrex Marketing Sales
22 Practice and Product Liability Litigation.
23     A.   I don't recognize the title, but I know I
24 gave a deposition.

---

### 194

1      Q.   Okay.  And I -- I turn your attention to
2  page 446.
3          And you were asked the question:  "And
4  only six months of that data was given to JAMA for
5  the publication, correct?"
6          And you answered:  "Well, the six months
7  was considered the valid data which was given to
8  JAMA for publication."
9          You were then asked:  "And who made that
10 decision to only provide six months of data to
11 JAMA?"
12         "Answer:  So the decision to provide the
13 valid data to JAMA, which happened to be six months,
14 was in conjunction with the external authors of the
15 manuscript and the internal people at Searle."
16         Do you see that?
17     A.   Correct.
18     Q.   And you believe that's truthful and
19 accurate testimony?
20     A.   Yes.
21     Q.   Turning your attention back to Wolfe
22 Exhibit 3, the JAMA article in which you're an
23 author, the fact that only the six months -- and I
24 know you like to call it the -- the valid data --

---

### 195

1  given that only the 6-month data was even submitted
2  to JAMA, would that be consistent, now that you look
3  at this article, that there's no reference in here
4  to an explanation as to why only the 6-month --
5  well, that's a bad question.
6          I mean, I guess -- I think what we have
7  to do, sir, if you cannot answer the question
8  without looking at this document, I need an answer
9  to that question whether or not there's an
10 explanation in here as to why the 6-month data was
11 being utilized.
12     MR. HOFF:  So --
13     MR. SAHAM:  My question is simply --
14     MR. HOFF:  -- you want -- you want him to
15 answer that question?
16 BY MR. SAHAM:
17     Q.   Yeah.  My -- my question, sir -- and you
18 can take as much time as you need.  My question to
19 you is, there was no explanation in Exhibit 3
20 explaining that the reason the 6-month data was
21 utilized was because of this bias you've described,
22 and my question to you; is that correct, sir?
23     A.   Okay.  I'd have to take a look through
24 this to make sure that there isn't any reference to

---

### 196

1  that.
2      Q.   And -- and I guess the question -- and
3  I'd accept that as an answer -- is your
4  understanding, as we sit here today, that there was
5  not a reference and you're just not certain?
6      A.   I -- I -- I be- -- I -- as I recall,
7  there was no reference to that.
8      Q.   Okay.  I'll -- I'll accept that.
9      A.   Let me say it again to be complete:
10 There was no reference explaining why the 6-month
11 data was the valid data.
12     Q.   And is it also accurate that
13 Dr. Silverstein, who's the first author on this
14 article, told you that he wanted to include such an
15 explanation?
16     A.   That Dr. Goldstein told me --
17     MR. HOFF:  Silverstein.
18 BY THE WITNESS:
19     A.   Dr. Silverstein told me he wanted an
20 explanation as to why the 6-month data was being
21 presented?
22 BY MR. SAHAM:
23     Q.   Correct.
24     A.   Is that the question?

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

197

1    Q.    That's the question.
2    A.    I don't recall that conversation.
3    Q.    Now, looking at Exhibit 3, is it also
4    accurate that there's no reference in here to the
5    fact that there was not a statistically significant
6    difference with Diclofenac on any of those GI
7    endpoints we've been discussing today?
8        A.    The manuscript described the results of
9    the overall objective of the study to compare
10   Celebrex versus the NSAIDs combined.  For the
11   primary endpoint of ulcer complications, clearly we
12   state we did not reach statistical significance in
13   terms of ulcer complications in comparing Celebrex
14   versus the NSAID group together.
15       Q.    Can you -- can you --
16       A.    I'd --
17       Q.    Oh, sorry.
18       A.    -- like to finish my --
19       Q.    Sorry.
20       A.    -- statement.
21           Per the statistical analysis plan, if
22   you -- so -- so the first big picture was, we're
23   going to present the data the valid data on that
24   overriding comparison of this study, which was

198

1    Celebrex versus the NSAIDs.  We felt that valid data
2    was important for the medical community to see.
3            The -- we missed on the primary endpoint.
4    The stepdown procedure said, if you miss on the
5    primary endpoint, the secondary -- the -- the
6    stepdown comparisons to the individual NSAIDs, you
7    cannot make a claim.
8            So we were consistent with, one,
9    following the statistical analysis plan, and the --
10   the primary objective of presenting the data was to
11   present the overriding comparison of Celebrex versus
12   the NSAIDs together.
13       Q.    Can you show me where in Exhibit 3 it
14   says that ulcer complications was the primary
15   endpoint of CLASS?
16       A.    The phrase "primary endpoint" is not used
17   in this manuscript.
18       Q.    My next question is, could you turn to
19   the bottom right-hand corner of page 1251, and
20   specifically Figure 2.  And I'm looking at
21   Figure 2B, specifically the left-hand comparison
22   of .04.
23           Is that computing -- communicating to the
24   reader that with respect to complicated ulcers in

199

1    the nonaspirin subgroup, that there's a
2    statistically significant result?
3        A.    So in Figure 2, No. B on the left-hand
4    side, we are looking at patients not taking aspirin
5    and looking at ulcer complications.  And as part of
6    the analysis plan, we were going to look at the
7    effect of aspirin on the results of ulcer
8    complications.  And that's what this analysis shows.
9            And in the valid data set, which is the
10   6-month data, the number -- the incidents was lower
11   with Celecoxib versus the NSAIDs together, and the P
12   Value was 0.04.
13       Q.    But the article doesn't reveal that this
14   statistically significant .04 P Value did not hold
15   on this comparison for the entire study period?
16       A.    So once again, the objective of
17   presenting these data was to present -- prevent --
18   present the valid data set to physicians for
19   physicians to understand what we saw in CLASS.
20           That is different than presenting to the
21   FDA.  It's a whole different game.  You present
22   everything to the FDA.  And in my experience, when
23   you do a clinical trial, an animal experiment, you
24   have to make a clinical judgment as to what you put

200

1    in your manuscript.  And what you put in is the most
2    valid information, the most valid analysis for the
3    medical community to get.
4            We present the most valid analysis was
5    the 6-month analysis, and that's what we presented.
6        Q.    But a physician wouldn't know, by just
7    reading this article, that if you went for the
8    entire study period on this comparison, the
9    statistically significant finding that's reported in
10   Figure 2B did not hold.
11       A.    What I --
12       Q.    Regardless of whether the data was valid
13   or not --
14       A.    But I --
15       Q.    -- you wouldn't know that?
16       A.    -- think you're mischaracterizing it.  I
17   think what we don't show is that in an invalid
18   analysis of invalid data, you get a P Value of some
19   number.
20           And I've never known to write a
21   manuscript where you make a point of saying, and oh,
22   by the way, here's an invalid data set with an
23   invalid analysis and here's a number.
24       Q.    But the reader of this article wouldn't



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

201

1   know that there was additional data that was being
2   ex- -- excluded because you believed it to be
3   invalid?
4       A.   I don't know what the reader of this
5   article would have known.  Because at the time that
6   this was published, the -- the CLASS data had been
7   presented in multiple forms, in public.  It had been
8   acknowledged that there was data beyond six months.
9   I believe analyst reports clearly acknowledged it
10  and talked about it.  I believe even the Merck
11  people in a presentation in May of 2000 acknowledged
12  it.
13          So when you say what would the reader
14  know, I don't know what the reader would know.
15      Q.   Can I ask you this:  The invalid data,
16  the post 6-month invalid data, that was less -- even
17  though it was invalid on its face, it was less
18  favorable to Celebrex than the data presented
19  here --
20      A.   No.
21      Q.   -- with respect to the nonaspirin --
22      A.   No, I disagree.
23      Q.   Let me finish --
24      A.   I disagree.

202

1       Q.   -- complete the question, sir --
2       A.   Okay.
3       Q.   -- just so you're answering, you know,
4   the right question.
5           With respect to this comparison in
6   Figure 2B on the left-hand side, reporting a P Value
7   of .04 for the nonaspirin subgroup on the
8   complicated ulcer comparison, with respect to this
9   data, the invalid post 6-month data, the data for
10  the entire study is less favorable to Celebrex than
11  what's reported here; is that correct, sir?
12      MR. HOFF:  Objection to form.
13  BY THE WITNESS:
14      A.   Once you are beyond six months into an
15  invalid data set, to even say something looks worse
16  or better than something else is nonsensical because
17  you're looking at virtually nothing.  It doesn't
18  mean anything.
19  BY MR. SAHAM:
20      Q.   There are individuals at Pfizer that were
21  not persuaded by the informative censoring bias
22  explanation as to why the 12-month data was less
23  favorable than the 6-month data; is that correct,
24  sir?

203

1       A.   I don't recall that.
2       Q.   Do you recall there were some people that
3   thought maybe there was -- physiological adaptation
4   was the reason that the 12-month data was not quite
5   as good for Celebrex as the 6-month data?
6       A.   I have heard of the concept of
7   physiological adaptation.  I don't recall anyone
8   internally at Searle/Pharmacia/Pfizer talking about
9   it.  I do believe it may have been Dr. Goldkind
10  brought it up --
11      Q.   And Dr. --
12      A.   -- when we were at the advisory committee
13  meeting in February of 2001.
14          So long after -- so this was after the --
15  all the data had been submitted to the FDA, multiple
16  presentations had been -- had been made to the
17  public acknowledging there was data beyond six
18  months.  The manuscript had been published.  We're
19  now into February 2001.  That's where I believed
20  I -- I heard it.
21      Q.   And is it correct that Dr. Goldkind was
22  one of the FDA reviewers for the advisory committee
23  on -- on this data?
24      A.   As I recall, he gave a presentation.

204

1   Whether he was officially considered the reviewer, I
2   don't know, but he gave the present- -- a
3   presentation.
4       Q.   And -- and a statistical reviewer by the
5   name of Dr. Lu also gave a presentation?
6       A.   That --
7       Q.   Hong Lu?
8       A.   That sounds familiar.
9       Q.   And they both rejected the bias argument
10  in -- in -- in favor of -- strike that.
11          And they both rejected the use of the
12  6-month data in the informative censoring analysis
13  for the purposes of communicating the data to the
14  FDA?
15      A.   I don't recall exactly what they said.
16      Q.   Do you recall ultimately that the FDA
17  rejected the use of the 6-month data with respect to
18  the SNDA?
19      A.   Rejected the 6-month data?  They did not
20  reject the 6-month data.
21      Q.   They required that the full entire study
22  data be reported at the advisory committee as part
23  of the SNDA to change the label of Celebrex; is that
24  right?

Toll Free: 800.300.1214
Facsimile: 619.239.4117



ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

205

1     A.   They didn't require anything for our
2  presentation at the advisory committee in
3  February of 2001.
4     Q.   They expressed that you should present
5  the entire data, not just the 6-month data; is that
6  correct, sir?
7     A.   We had a premeeting discussion with them.
8  They were now familiar with all the data, as were
9  we.  We all realized it was a complicated data set
10  with a complicated study that no one ever had
11  conducted before.  And we discussed, how do we best
12  present the data so that the audience could fully
13  understand the results of the trial, our logic,
14  the -- and the process we went through for
15  identifying the valid data set.
16         Their suggestion was, start big and then
17  hone in on the 6-month data, as opposed to, start
18  just with the 6-month data and then talk about the
19  12-month data.
20         So really, there was no difference
21  between what they thought and what we thought.  It
22  was just the sequence was up for discussion, and it
23  was a consensus, not a mandate, not a
24  recommendation.  By consensus, we, with the FDA,

206

1  said, yeah, that makes sense.  We'll start this way
2  to present it so the people can understand the
3  study, all the data and our process for identifying
4  the valid data set.
5     Q.   Now, looking at Exhibit 3, the main
6  outcome measure on the first page, which is, I
7  think, the main outcome measure, the combined
8  endpoint of complicated ulcers and symptomatic
9  ulcers together; is that correct?
10     A.   I'm sorry, could you repeat your
11  question?
12     Q.   I'm just looking at the main outcome
13  measure in the -- I guess you call it the abstract
14  in the front of the article.  The main outcome
15  measure, it says, "Incidence of prospectively
16  defined symptomatic upper GI ulcers and ulcer
17  complications (bleeding, perforation, and
18  obstruction) and other adverse effects during the
19  6-month treatment period."
20         Do you see that?
21     A.   I do see that.
22     Q.   And that's not the primary outcome of the
23  CLASS trial, that's the combined endpoint of
24  complicated ulcers and symptomatic ulcers; is that

207

1  correct?
2     A.   That's not how I read this.
3     Q.   So you're --
4     A.   I read --
5     Q.   -- saying the main outcome measure here
6  is --
7     A.   Could I finish?
8     MR. HOFF:  Wait a second.
9  BY THE WITNESS:
10     A.   Could I finish?
11     MR. HOFF:  Let him finish --
12  BY THE WITNESS:
13     A.   Could I finish --
14     MR. HOFF:  -- finish his answer.
15  BY THE WITNESS:
16     A.   -- my comment?
17         What I read here is the --
18     MR. SAHAM:  Move to strike as nonresponsive.
19     MR. HOFF:  He didn't finish his answer.
20     MR. SAHAM:  And he's not answering my question,
21  John.
22     MR. HOFF:  You're not letting him.  You're --
23  you keep interrupting him.
24     MR. SAHAM:  Because my question is very

208

1  straightforward, and he's going --
2     MR. HOFF:  No, you said, doesn't it say this,
3  and he says, that's not how I read it.  And he's
4  going to tell what he -- how he reads it.  So you're
5  getting an answer to this question.
6     MR. SAHAM:  I'll withdraw the question.  See if
7  we can get a -- come to some consensus on what I'm
8  asking.
9  BY MR. SAHAM:
10     Q.   Is it your testimony, sir, that the main
11  outcome measure listed here in Exhibit 3 is the same
12  as the primary outcome measure of the CLASS study or
13  the coprimary endpoints in the CLASS study?
14     A.   As I read this in this manuscript, it
15  says, Incidents of prospectively defined ulcer
16  complications.
17         That is in here, which is consistent with
18  what was identified as the primary endpoint of the
19  protocol.
20     Q.   Wasn't the primary -- but -- but this
21  also includes symptomatic GI ulcers, which are a
22  less severe ulcer than a complicated ulcer; isn't
23  that correct?  This is a combined endpoint of those
24  two endpoints?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

209

1     A.    As I was --
2     MR. WEISS:  Objection --
3     MR. HOFF:  Objection to form.
4   BY THE WITNESS:
5     A.    As I was trying to relate to you earlier,
6   as I read this sentence, I don't read this as
7   prospectively the combined endpoint.  I read it as
8   prospectively defined symptomatic GI ulcers
9   separate, and ulcer complications separate.  And
10  then in the statistical methods, it says, we put
11  those together as a combined endpoint.
12    That's how I read this.
13  BY MR. SAHAM:
14    Q.    But that -- this doesn't -- at least this
15  main outcome measure here and -- and/or the whole
16  article, this doesn't reveal that the primary
17  outcome measure of the CLASS study per the protocol
18  is complicated ulcers by themselves?
19    A.    The pri- -- it does not use that
20  terminology.
21    Q.    Okay.  And -- and do you recall that JAMA
22  required or had a protocol checklist that required
23  if the main outcome measure was something different
24  than the primary objective of a -- a trial, that it

210

1   needed to be disclosed in the article?
2     A.    I -- I'm not familiar with a checklist
3   from JAMA about that type of thing.
4     Q.    I want to show you what I'm marking as
5   Plaintiffs' Exhibit 258.
6          (WHEREUPON, a certain document was
7          marked Plaintiffs' Deposition
8          Exhibit No. 258, for identification,
9          as of 12/10/2010.)
10  BY MR. SAHAM:
11    Q.    Could you please take a look at
12  Plaintiffs' Exhibit 258.
13    MR. SAHAM:  Oh, I gave you two.  Sorry, John.
14  Can you send one back?
15    Thank you.
16    Exhibit 258 is -- appears to be a
17  conglomerate of two letters.  The first letter is
18  dated September 18, 2001, and it's -- it's not
19  signed, but it's from Steven Geis to Stacey Schultz,
20  senior editor U.S. News & World Report.
21    And then the second two pages of the
22  exhibit, last three Bates numbers 037 to 038, is a
23  letter from yourself to M. Michael Wolfe dated
24  August 17th, 2001.

211

1   BY MR. SAHAM:
2     Q.    And I ask you if you recognize these
3   article -- or these letters?
4          The question is, do you recognize these
5   letters?
6     A.    No, I do not.
7     Q.    Do you recall writing letters to -- or
8   drafting letters to an editor at U.S. News & World
9   Report or a Michael Wolfe?
10    A.    No, I do not.
11    Q.    And in this letter, which does bear your
12  signa- -- signatory, although it's not signed, it
13  says it's from you -- it says -- in the first letter
14  on the first page, it says, "All interactions
15  between CLASS study authors and the editors of JAMA
16  concerning this submission were conducted strictly
17  according to standard JAMA protocols."
18         Do you believe that's an accurate
19  statement?
20    A.    Where exactly are you reading at?
21    Q.    The -- it's the first sentence of the
22  first paragraph -- or I'm sorry, it's not the
23  first -- it's the third -- first sentence of the
24  third paragraph.  Do you see, "I would like to set

212

1   the record straight"?
2          And then you say, "All interactions
3   between CLASS study authors and the editors of JAMA
4   concerning this submission were conducted strictly
5   according to standard JAMA protocols"?
6     A.    I'm really sorry, I can't find the
7   sentence.  I'm in paragraph -- the paragraph begins
8   with what?  Oh, I see it.  There.  There.  That's --
9     Q.    You got it?
10    A.    Oh, I see it.
11    Q.    And I'm asking you if you believe that to
12  be an accurate statement?
13    A.    So let me clarify something.  I -- I
14  have -- don't believe I've ever seen this before.
15  Although somebody typed my name at the bottom, I
16  won't acknowledge this came from me.  Okay.
17         Having said that, you're asking me, do I
18  believe that the interactions were conducted
19  according to standard JAMA protocols?  Yes, I do
20  believe that --
21    Q.    Okay.  And turn- --
22    A.    -- to be the case.
23    Q.    -- turning to the second page, the letter
24  that seems to be -- at least has a signature line



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

213

1   for you where you didn't sign, but there is a
2   signature block for G. Steven Geis, Ph.D., M.D.,
3   Group Vice President, Clinical Research.
4        In the third paragraph there, it says,
5   "The interaction with the editors of JAMA concerning
6   this submission follow standard JAMA process?"
7        Do you see that?
8        A.  I do.
9        Q.  Do you believe that to be an accurate
10  statement?
11       A.  So in this letter that I don't -- haven't
12  written or I don't believe I wrote, I don't recall
13  having seen this and didn't sign, that sentence, I
14  believe, is true.
15       Q.  Okay.  Now, I would like to show you what
16  I'm marking as Plaintiffs' Exhibit 259.
17            (WHEREUPON, a certain document was
18            marked Plaintiffs' Deposition
19            Exhibit No. 259, for identification,
20            as of 12/10/2010.)
21       MR. SAHAM:  Could you please take a look at
22  Plaintiffs' Exhibit 259, which for the record, bears
23  Bates numbers DEFS 01714080 through 249.  And it's
24  entitled JAMA Author Instructions, updated

---

214

1   January 5, 2000.
2   BY MR. SAHAM:
3        Q.  And I'd specifically -- I realize it's a
4   lengthy document.  I'd ask you just generally, do
5   you recognize it as a -- as a document you've seen
6   before?
7        A.  I'm a little confused because the
8   first -- this -- you handed me this stack of paper.
9   And the first thing says what you'd described as
10  JAMA Author Instructions, updated January 5, 2000.
11  And it says pages 1 of 10.  So, yes, there are ten
12  pages here.
13            But then behind it, it appears to be a
14  second document saying JAMA checklist, 1999,
15  pages -- page 1 of 2.  So the first says 2000.  The
16  second says 1999.  So I don't know if they're the --
17  together.
18       Q.  Well, I'll represent to you that the
19  Bates numbers in the bottom right-hand corner are
20  all consecutive.
21       A.  Yes.
22       Q.  Whether they're different documents or
23  not, the Bates numbers all run consecutively and we
24  can break down the document, you know, starting with

---

215

1   these first ten pages that you, I believe,
2   accurately pointed out, say 1 of 10.
3        Do you recognize these?
4        A.  Okay.  So do I recognize pages 1
5   through 10?  No, I do not.
6        Q.  Okay.  Now, looking at the next two pages
7   after that, the 1 of 2, so you're looking at
8   Bates number 090 through 091.
9        Do you recognize those?
10       A.  I don't.
11       Q.  Okay.  And those are labeled Checklist
12  for Authors Submitting Reports of --
13       A.  Uh-huh.
14       Q.  -- Randomized Controlled Trials to JAMA?
15       A.  Yes.
16       Q.  You were an author who submitted such an
17  article, correct, or report?
18       A.  I was one of the authors that
19  participated in this submission, yes.
20       Q.  Okay.  And then continuing on,
21  specifically the Bates numbers I want to refer you
22  to, if you -- if you start at Bates number 095,
23  which is entitled JAMA Author Instructions,
24  Preparing Reports of Randomized Controlled Trials --

---

216

1   do you see that?
2        A.  So we're skipping 092 through 094?
3        Q.  Correct.  For now, anyway.
4        A.  Okay.
5        Q.  So I'm looking at 095 --
6        A.  Yes.
7        Q.  -- the next five pages that run
8   through 100, these JAMA Author Instructions.
9        Do you see that?
10       A.  Uh-huh, I do see that.
11       Q.  And specifically, if you turn to the
12  third page of that part of the document,
13  Bates number 097, or page 2 of 5 of the
14  instructions -- do you see that?
15       A.  I do.
16       Q.  And down at the bottom, there's a
17  number 7, Main Outcome Measure(s); is that correct?
18       A.  Yes.
19       Q.  And it says, quote, The primary study
20  outcome measurement(s) should be indicated as
21  planned before data collection began.  If the
22  manuscript does not report the main plan collection
23  of a study, this fact should be stated and the
24  reason indicated.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

## 217

1    And my question to you, in Wolfe
2    Exhibit 3, the JAMA article, is there an
3    explanation, as described here in No. 7, that
4    comports with this JAMA author instruction?
5        A.    The first sentence says, "The primary
6    study outcome measurement(s) should be indicated as
7    planned before data collection began."
8        That is what we did in the protocol on
9    the statistical analysis plan.  We stated what the
10   primary outcome was, and it -- it was indicated as
11   planned before the data collection began.  So we did
12   do that.
13       If the manuscript does not report the
14   main planned outcomes, this fact should be stated.
15   We do report the main planned outcomes in JAMA
16   because we do report the incidents of ulcer
17   complications.  So we did comply with it.
18       Q.    But you didn't describe those complicated
19   ulcers as the primary endpoint in the JAMA article,
20   correct?
21       A.    It doesn't say that.  It doesn't say that
22   that's what -- a must.  They just say, did you
23   identify it before you collected the data, which we
24   did, and if we're not going to include that in the

## 218

1    manuscript, we must tell them why.  But we did
2    include it in the manuscript.
3        Q.    You just didn't identify it as the
4    primary endpoint?
5        A.    It's not identified as the primary
6    endpoint in the manuscript, but we are consistent
7    with this page that appears to be guidelines of --
8    of what you're supposed to do, preparing a report of
9    a randomized control trial.
10       Q.    Turn- -
11       A.    Yes, I think we were consistent with what
12   they requested.
13       Q.    Turning back to Bates number 090 through
14   091, the second part of the document, the JAMA 1999,
15   page 1 of 2, Checklist for Authors Submitting
16   Reports of Randomized Controlled Trials to JAMA.
17       Are you with me?
18       A.    No, I'm not.
19       Q.    Tell me when you're with me.
20       A.    So is the bottom right-hand corner the
21   Bates number?
22       Q.    Yeah.  090, the last three.
23       Are you with me?
24       A.    Yes.

## 219

1        Q.    And this is the document you pointed out,
2    being the second part of this that has one of two,
3    and it's labeled Checklist for Authors Submitting
4    Reports of Randomized Controlled Trials to JAMA.
5        Do you see that?
6        A.    I do.
7        Q.    And if you turn to the second page,
8    specifically No. 20, in the checklist, it says,
9    "State specific interpretation of study findings,
10   including sources of bias and imprecision (internal
11   validity) and discussion of external validity,
12   including appropriate quantitative measures when
13   possible."
14       Now, you didn't comply with this
15   requirement because you didn't describe in the JAMA
16   article, Exhibit 3, that the bias was the reason for
17   excluding the second six months of data; is that
18   correct, sir?
19       MR. HOFF:  Objection to form.
20   BY THE WITNESS:
21       A.    I need to read this to make sure I
22   understand fully what this means.
23       I think we were in compliance with this.
24

## 220

1    BY MR. SAHAM:
2        Q.    How did you describe the bias that you've
3    testified about earlier in Exhibit 3?
4        A.    There are biases in data sets.  Even in
5    what we would consider valid data sets, there were
6    biases.  So, for example, we think that the -- the
7    high level of aspirin use in the -- in the study was
8    a bias against Celebrex, even in the valid data set.
9        So we did describe a bias for what we
10   believed was the valid data set, which is what they
11   asked for.
12       We talked about potential biases when we
13   looked at the baseline demographics comparing the
14   two treatment groups.  So we did talk about biases
15   with respect to what we believed was the valid data
16   set.  So we were in compliance with this.
17       Q.    But the bias you talked about earlier
18   that you believe rendered the second six months of
19   data invalid, that bias is not discussed in Wolfe
20   Exhibit 3, correct?
21       A.    We do not present the data beyond six
22   months because we believe it is invalid.
23       Q.    And you don't explain how the bias led to
24   invalid data that you have described earlier; is



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                    December 10, 2010

---

221

1   that correct, sir?
2       A.   I think it is very common to -- to not
3   present all data from a trial in a publication.  And
4   you don't have to go through a laundry list as to
5   why you aren't presenting the data that you don't
6   think is valid.
7           So we are consistent with precedent.  We
8   are consistent with practice.  And I believe we are
9   consistent with this.
10      Q.   But the reason you didn't present that
11  additional six months of data was because you
12  believed it to be bias, correct, sir?
13      A.   We believe -- we believe that the data
14  beyond six months was bias, yes.
15      Q.   And you --
16      A.   That's why we didn't present it.
17      Q.   And you didn't describe that bias, the
18  bias that caused, in your opinion, the six -- second
19  6-month data to be invalid?  You did not describe
20  that bias in the JAMA article, Wolfe Exhibit 3,
21  correct, sir?
22      A.   We didn't describe that bias, but we did
23  describe biases with respect to the valid data set
24  in compliance with this No. 20.

---

222

1       Q.   But the bias that you testified about
2   earlier is not described in Exhibit 3?
3       MR. HOFF:  Objection to form.
4   BY THE WITNESS:
5       A.   So you -- you'll have to remind me the
6   bias I testified earlier to.
7   BY MR. SAHAM:
8       Q.   I'm just talking about -- we've talked
9   for a long time now about how you believed that the
10  bias after six months rendered that data invalid.
11          Am I correctly summarizing your
12  testimony?
13      A.   Yes, that's correct.
14      Q.   And that bias that rendered the second
15  6-month data invalid is not referenced in Wolfe
16  Exhibit 3, the JAMA article which you coauthored?
17      A.   That's correct.  But I will also say we
18  were in compliance with No. 20 on page 2.
19      Q.   I want to show you what I'm marking as
20  Plaintiffs' Exhibit 260.
21          (WHEREUPON, a certain document was
22          marked Plaintiffs' Deposition
23          Exhibit No. 260, for identification,
24          as of 12/10/2010.)

---

223

1   BY MR. SAHAM:
2       Q.   Could you please take a look at
3   Plaintiffs' Exhibit 260.
4       MR. SAHAM:  And for the record, Plaintiffs'
5   Exhibit 260 is a two-page e-mail chain bearing
6   Bates numbers DEFS 00169725 through 726.  And the
7   top e-mail in the chain is authored by George S.
8   Geis.  And it's dated June 21st, 2002.  It's to
9   Felix Arellano, Goran Ando and others.
10  BY MR. SAHAM:
11      Q.   And specifically, I'd ask you if you
12  recognize Exhibit 260?
13      A.   I don't remember this e-mail and the
14  preceding e-mails.
15      Q.   But this is an e-mail that you would have
16  sent on June 21st, 2002?
17      A.   Well, it is an e-mail that looks like it
18  came from me on 2000 -- June 21st, 2002.
19      Q.   And you would have sent this in the
20  capacity of your employment at Pharmacia?
21      A.   I don't recall either way because I don't
22  remember this.
23      Q.   Okay.  And you write to Felix Arellano
24  and the others listed, But the point I'm trying to

---

224

1   make in the figure is that the NSAID rate decreased
2   with time - which was unexpected.  This, in turn,
3   put in question the validity of the analyses of the
4   longer term data.  The reader needs to understand
5   this point to understand why the CLASS authors
6   published the 6-month analyses as the initial
7   manuscript.
8           Do you believe that that's an accurate
9   statement?
10      A.   So I believe that you read this
11  correctly, but we need to talk about -- I need to
12  answer this in light of when this was written and
13  what it's referred to.
14          So assuming that this is all correct and
15  I wrote this, we are now in June 21st, 2002.  The
16  CLASS manuscript has been published.  It is in
17  around -- and all the data has been submitted to the
18  FDA.  The data has been vetted in public at the
19  advisory committee meeting in February of 2001.  And
20  then in August of 2001, the issue begins to arise in
21  the -- in the lay press about data beyond six
22  months.
23          So now, at this time, the question is
24  being asked, why did you -- specifically, why didn't

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

225

1 you include -- why did you believe the 6-month data
2 was the most valid?
3       Fast forward now to 2002.  A -- letters
4 are written to the editor at BMJ asking, in part,
5 that question.  So now you have a specific question
6 on the table:  Why did you believe the 6-month data
7 was the most valid data?
8       I was going to write the response to that
9 question.  And specifically, in response to that
10 question, I was putting together my response, people
11 were reviewing it.
12       So in the sense that the question was
13 asked, this -- I'm saying, in order for them to
14 understand what I'm saying in my response to the
15 letter, the reader needs to understand X, Y and Z.
16       So this is completely two years after the
17 JAMA manuscript has been published.  But
18 specifically the question has been asked, why do you
19 think the 6-month data is more valid?
20    Q.    And that question is not answered by
21 Wolfe Exhibit 3; is that correct, sir, the JAMA
22 article from September of 2000?
23    A.    We did not put the explanation of why the
24 6-month data was the most valid data in the

226

1 manuscript in the summer of 2000.
2    Q.    And you wrote, in the summer of 2002,
3 that the reader needs to understand this point to
4 understand why the CLASS authors, being yourself,
5 published the 6-month analyses in Exhibit 3; is that
6 correct?
7    A.    So the --
8    MR. HOFF:  Objection to form.
9       Go ahead.
10 BY THE WITNESS:
11    A.    So the -- the 2002 is a completely
12 different audience and completely different setting.
13 When writing the CLASS manuscript, we did what we
14 always do, publish what we believe is the most valid
15 data, which we did.
16       Two years later, someone asked the
17 question:  Why did you consider that the most valid
18 data?  We were writing to answer that question.  And
19 we were saying, how do we effectively communicate
20 that for the reader?
21       That's all this was.
22 BY MR. SAHAM:
23    Q.    Did you ever do a clinical trial, any
24 other clinical trial other than CLASS, where you

227

1 only used six months of, you know -- or not six
2 months, but half of -- approximately half of a data
3 set chronologically?
4    MR. HOFF:  Objection to form.
5 BY THE WITNESS:
6    A.    Could you repeat the question?
7 BY MR. SAHAM:
8    Q.    I'll -- I'll ask a better question.
9       Other than CLASS, do you recall any other
10 clinical trials you did where you, you know, just
11 took, you know, a portion of the entire study period
12 and reported it in a -- an academic journal without
13 saying that's what you were doing?
14    A.    We -- in my experience, as I remember --
15 and I'd have to go through all my manuscripts that
16 I've ever written -- I published and --
17 participating and published what we believed was the
18 most valid data.  And I don't remember ever feeling
19 that what we were doing with CLASS was anywhere
20 different from that.
21    Q.    I'm going to show you what I'm marking as
22 Plaintiffs' Exhibit 261.
23
24

228

1       (WHEREUPON, a certain document was
2       marked Plaintiffs' Deposition
3       Exhibit No. 261, for identification,
4       as of 12/10/2010.)
5 BY MR. SAHAM:
6    Q.    Could you please take a look at
7 Plaintiffs' Exhibit 261.
8    MR. SAHAM:  And for the record, Plaintiffs'
9 Exhibit 261 is a three-page e-mail chain bearing
10 Bates numbers DEFS 01868956 through 58.
11       And the e-mail on the first page, not the
12 top one from Lefkowith that says, "Understood, JL,"
13 but the e-mail below that appears to be from George
14 S. Geis, dated Sunday, April 22, 2001, to James
15 Lefkowith, Kenneth Verburg and also to George S.
16 Geis.  And there's additional e-mails in the chain
17 from Goran Ando and others.
18 BY MR. SAHAM:
19    Q.    I'd ask you -- my first question is, do
20 you recognize this e-mail?
21       I asked you if you recognize this e-mail
22 chain?
23    A.    I do not.
24    Q.    Okay.  And do you believe -- or strike



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

229

1    that question.
2         Is this an e-mail that you -- or an
3    e-mail chain that you received and wrote at
4    Pharmacia on or about April 21st and 22nd, 2001?
5         A.   I don't recall it, but it appears to be.
6         Q.   Okay.  And you have no reason to dispute
7    that this is what -- it is what it appears to be?
8         A.   Either way, I don't remember.
9         Q.   And you wrote -- at least according to
10   the e-mail that has your name on it as an author,
11   you wrote on April 22nd, But a word of caution --
12   we, as clinical, can't get caught in the trap of
13   implying to our folks or to others that the non-ASA
14   analysis was a predefined as a primary analysis.  In
15   fact, I don't think it was defined as secondary.  If
16   we make the implication and are called on it - we
17   will lose a lot of credibility.
18        Do you believe that to be an accurate
19   statement?
20        A.   So I believe you read this correctly.
21   And so the question is, do I believe what was
22   written here is accurate?
23        So let me tell you what I believe was
24   going on at this time in terms -- this appears to be

230

1    in reference to a proposed label change to Celebrex
2    after having made the submission of all the data,
3    after having presented all the data at the
4    February advisory committee meeting in 2001.  And
5    now we were talking about proposed wording -- a
6    proposed label change that we made to the FDA.
7         In those discussions, there was questions
8    of clarity, of -- of precision as to what the
9    analysis plan was and what were the primary
10   endpoints, what was the primary analysis.
11        And so there was a process where we were
12   going through to be as accurate as possible and
13   consistent with the protocol as possible so we
14   did not -- so someone did not get the wrong
15   impression.
16        And this was, as part of that, just
17   saying a word of caution.  We want to make sure that
18   what we state is consistent with what we did in the
19   protocol and the statistical analysis plan.
20        So in that context, yes, this was
21   correct.
22        Q.   And you believed --
23        A.   We wanted to make sure we were consistent
24   with what we said we were going to do.

231

1         Q.   So you believe this is an accurate
2    statement; is that correct, sir?
3         A.   Well, it's an accurate statement in terms
4    of where I believe my -- my mind was at at this
5    time.  We are now in -- in discussions with FDA
6    about the label, and we want to make sure there is
7    precision in understanding the analyses of the
8    study.
9         Q.   So although you don't remember writing
10   this, it's something that you believe to be true?
11        A.   Yes.
12        Q.   And it's certainly under your -- you're
13   attributed to be the author as having sent this
14   e-mail, correct?
15        A.   That's what it appears to be.
16        Q.   Okay.  And the people you sent it to are
17   people who were on your team; is that correct --
18   Dr. Lefkowith and Dr. Verburg?
19        A.   Yes, that's correct.
20        Q.   So you don't have any reason to believe
21   you didn't receive and send this e-mail -- received
22   the prior e-mail and forwarded it on in the ordinary
23   scope of your employment at Pharmacia?
24        A.   Well, I don't remember it either way.

232

1         Q.   But given that it -- it -- it -- it
2    appears to be an e-mail that you received and
3    sent -- I mean, do you have any reason to dispute
4    that?
5         A.   It appears to be -- I don't remember it
6    either way.  It just appears to be a -- a series of
7    e-mails that -- that I was copied on, and I wrote
8    the one at the top.  That's what it appears to me.
9    But I don't remember it.
10        Q.   And it seems to indicate that the non-ASA
11   analysis was not predefined in the protocol as
12   either a primary or a sec- --
13        A.   No, that's not --
14        Q.   -- secondary analysis?
15        A.   -- that's not what this says.  So let's
16   get back to clarity and intent of what these words
17   are.
18        What I was saying was predefined as a
19   primary, not predefined.  It was clearly, as I
20   remembered it, predefined that we were going to do
21   an effective aspirin on the analysis of ulcer
22   complications.  That clearly was predefined.
23        But what I was cautioning is to say, it
24   was not -- as I remembered, it was not predefined as



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

233

1  a primary analysis. And I was basically saying, go
2  back and make sure my mind is correct on this,
3  because we don't want people to think that we were
4  being inconsistent with the protocol.
5      Q.  Right. Let --
6      A.  Let me be clear. Aspirin was -- the
7  effect of aspirin was predefined. And I was saying,
8  make sure people understand it was not predefined as
9  a primary analysis.
10     Q.  And I -- I think you may have misheard my
11 question, so I'm going to have the court --
12     A.  Okay.
13     Q.  -- reporter read it back to you and see
14 if you --
15     A.  Please.
16     Q.  -- can answer it in a yes or no fashion.
17     MR. SAHAM: Would you mind reading back the
18 question.
19         (WHEREUPON, the record was read by
20          the reporter.)
21 BY THE WITNESS:
22     A.  And so my answer is, you're incorrect.
23 BY MR. SAHAM:
24     Q.  It was the primary --

234

1      A.  It --
2      Q.  -- or secondary e-mail?
3      A.  It was predefined as an analysis. In the
4  protocol, we don't specifically use the word
5  secondary.
6      Q.  But it wasn't -- the non-ASA analysis was
7  not predefined as a primary analysis; is that
8  correct, sir?
9      A.  That is correct.
10     Q.  Okay. And, in fact, you wrote here, in
11 fact, I don't think it was defined as a secondary?
12     A.  So we are talking about a year after --
13 how many years after the protocol and the stats plan
14 was written? So -- so let me -- let me give you
15 some context.
16         In the year 2000, I was responsible for
17 two full NDAs and two SNDAs, so I had teams working
18 on results of multiple protocols, multiple results
19 and multiple submissions.
20         I could not remember precisely the
21 wording in any one of those protocols because there
22 were so many. And I had staff working on it. I was
23 saying, go back and check this. I don't remember
24 what wording we used in terms of primary, secondary,

235

1  in the CLASS protocol and statistical analysis plan.
2          So I was just saying, there's so much
3  going on. We're now a year and a half out. I don't
4  want to depend on my memory in terms of this word.
5  You need to check it.
6      Q.  Would you please turn back to Wolfe
7  Exhibit 3, the JAMA article. And specifically, we
8  were looking at Figure 2, Section B on the left-hand
9  side about the nonaspirin subgroup.
10         There's no indication in Wolfe Exhibit 3
11 that this nonaspirin analysis was not predefined as
12 a primary endpoint in the CLASS protocol; is that
13 correct, sir?
14     A.  Could you repeat the question? I'm
15 sorry.
16     MR. SAHAM: Could -- could you read it back,
17 ma'am.
18         (WHEREUPON, the record was read by
19          the reporter.)
20 BY THE WITNESS:
21     A.  That is correct. But I would also point
22 out that in the JAMA manuscript under Main Outcome
23 Measures, we don't talk about aspirin, either.
24     MR. SAHAM: Okay. And I would move to strike

236

1  the second part of the answer as nonresponsive.
2          I want to show you what I'm marking as
3  Plaintiffs' Exhibit 262.
4          (WHEREUPON, a certain document was
5           marked Plaintiffs' Deposition
6           Exhibit No. 262, for identification,
7           as of 12/10/2010.)
8  BY MR. SAHAM:
9      Q.  Could you please take a look at that
10 document, Dr. Geis.
11     MR. SAHAM: And for the record, Plaintiffs'
12 Exhibit 262 is a document bearing Bates numbers
13 DEFS 00754326 through 329. And then the last page
14 of the document, again, indicates that this document
15 was produced from your custodial files, your
16 electronic files.
17 BY MR. SAHAM:
18     Q.  Do you have any reason to believe this
19 document wasn't produced from your files?
20     A.  I don't recall it either way.
21     Q.  Okay. And on the top of the document on
22 the front, it says, For Internal Use Only: Not to
23 be Shown or Given to Any External Audiences -
24 February 9, 2001. Q&A: FDA Advisory Committee



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

### 237

1  Hearing on Proposed GI Safety Label Revisions for
2  Celebrex.
3       Do you recall there being an advisory
4  committee concerning the proposed GI safety label
5  revisions on February -- on or about February 7th of
6  the year 2001?
7       A.  I remember a GI -- FDA GI -- FDA advisory
8  committee meeting taking place.  To say it was
9  specifically about proposed GI safety label
10  revisions, I don't know that I can characterize it
11  that way.
12       Q.  And -- and -- and when you say it took
13  place, do you recall it taking place on or about
14  February 7th, 2001?
15       A.  Yes, I do.
16       Q.  Okay.  And you recall it was a two-day
17  meeting where both Celebrex and VIOXX were discussed
18  over the 7th and the 8th?  Does that comport with
19  your recollection?
20       A.  Well, there was one day where Celebrex
21  was discussed.  The second day was where the VIOXX
22  was discussed.  So it wasn't, like, two days of
23  both.  It was one day for one, one day for the
24  other.

### 238

1       Q.  And was there any VIOXX -- or, sorry, was
2  there any Celebrex discussion on the second day, to
3  the extent you remember?
4       A.  I don't recall if the advisory committee
5  dis- -- referenced what we had presented the day
6  before during the VIOXX discussion.  That, I don't
7  remember.
8       Q.  Okay.  And looking at the second question
9  here, the Q&A, which I've marked as Exhibit 262, it
10  says, "What was the Arthritis Advisory Committee's
11  recommendation regarding the Celebrex label?"
12       And the answer says, "Due to the
13  complexity of the CLASS data, the advisory panel on
14  day one (February 7) experienced difficulty in
15  interpreting the results."
16       Do you believe that's an accurate
17  statement?
18       A.  I don't.
19       Q.  Why not?
20       A.  I mean, I'm trying to remember -- I mean,
21  when you say the advisory panel experienced
22  difficulty, I don't know what -- in the eyes of
23  whoever wrote this, what difficulty looked like.
24       I mean, I think, as we all know, the

### 239

1  CLASS trial was complex.  It was a big trial.  It
2  was a trial that had been conducted -- it was the
3  first of its kind, I think, in the world.
4       So there would be questions about it
5  because it wasn't typical.  It wasn't a typical
6  model.  Because they asked questions and they
7  discussed it, does that mean they were -- it was
8  difficult?  I don't know.
9       Q.  Do you recall generally --
10       MR. HOFF:  Whoa, whoa, whoa, wait a second.
11       Did you finish?
12       THE WITNESS:  No, I didn't.
13  BY THE WITNESS:
14       A.  And I think, once again, we presented all
15  the data and we walked through the process of why we
16  believed the 6-month data was the valid data.
17  BY MR. SAHAM:
18       Q.  Are you done now?
19       A.  I'm not done now.
20       Q.  Sorry, you paused.
21       A.  And I think that they were intently
22  looking at it and trying to understand it.  Does
23  that mean difficulty or does it mean attention and
24  vigilance to do what they were there to do?  I

### 240

1  wouldn't call it -- I guess I would just wouldn't --
2  as I recall it, I wouldn't characterize it as
3  difficult.
4       Q.  And -- and was it common that the company
5  Pharmacia or Searle generated these types of Q&A
6  to -- to deal with, you know, issues of importance
7  regarding drugs at the company?
8       A.  I can't speak to that.
9       Q.  I mean --
10       A.  I don't know.
11       Q.  -- do you ever remember seeing Qs and As
12  when you worked there?
13       A.  There were occasions where, again,
14  they -- there were occasions where the commercial
15  side would put these together, but I don't know if
16  there was a -- it was done systematically, if there
17  was a process or procedure.  But on occasion, these
18  types of things, I did see.
19       Q.  And -- and you're not disputing that this
20  was found in your electronic files?
21       A.  As I said earlier, I don't remember
22  either way.
23       Q.  Okay.
24       MR. SAHAM:  All right.  We -- we need to take a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                    December 10, 2010

---

241

1   break to change the tape, so why don't we take a
2   quick -- quick break.
3       THE VIDEOGRAPHER:  Going off the video record
4   at 2:54 p.m.
5           This is the end of Tape No. 4.
6           (WHEREUPON, a short recess was
7           had.)
8       THE VIDEOGRAPHER:  Going back on the video
9   record at 3:05 p.m.
10          This is the beginning of Tape No. 5.
11          (WHEREUPON, a certain document was
12          marked Plaintiffs' Deposition
13          Exhibit No. 263, for identification,
14          as of 12/10/2010.)
15  BY MR. SAHAM:
16      Q.   Dr. Geis, I'm showing you what's marked
17  as Exhibit 263.
18          Do you recognize this document?
19      A.   No, I don't.
20      Q.   Okay.  Does this appear to be a schedule
21  that reports shares of stock and options that you
22  owned and exercised during the '91 through 2002 time
23  period?
24      A.   Well, it has my name on it.  It's a table

---

242

1   and it talks about options.
2       Q.   Well, let me ask you this --
3       MR. HOFF:  Whoa.
4       MR. SAHAM:  Sorry, he paused.  I thought he was
5   done.  I'm not doing it on purpose.
6       MR. HOFF:  Actually, he didn't pause.
7   BY THE WITNESS:
8       A.   It has data, assuming, related to various
9   options.
10  BY MR. SAHAM:
11      Q.   Okay.  And it says -- it's got your name
12  on it, so you don't have any reason to believe this
13  isn't outlining your options and option transactions
14  in the period specified?
15      A.   I don't know.  I don't -- I don't recall
16  this.
17      Q.   Well -- well, let's do this:  Do you
18  recall selling about $3 million worth of Pharmacia
19  stock between August and October of the year 2000?
20      A.   In 2000, wealth managers -- in early
21  2000, I had a meeting with my tax guy and my wealth
22  managers, and we laid out -- and they were helping
23  me lay out a plan for how to manage my assets.
24  Because they said, you're getting a lot of assets,

---

243

1   how do we want to manage this and you have no plan.
2           We got together in early 2000 to work out
3   a plan.  And as I recall, the -- part of the plan
4   was to set a price to exercise some options.  And
5   when that price was reached, the -- the options -- a
6   number of options would be exercised.
7           And then I recall, at some point during
8   the year, the -- some options were exercised.
9   That's what I recall about that.
10      Q.   Do you recall the name of the wealth
11  manager?
12      A.   The group is currently part of Wachovia.
13  I don't know what they were called before, if they
14  were -- at one time, they were Kemper.  But I don't
15  know if they were Kemper -- they were Kemper in the
16  year 2000.
17      Q.   But do you recall the person's name who
18  you met with?
19      A.   Yes, I do.
20      Q.   What's that person's name?
21      A.   So the person who is the wealth manager
22  is a gentleman named Gary Personette.
23      Q.   And do you recall the approximate date of
24  the meeting?

---

244

1       A.   It was early in 2000, because we -- I had
2   just done the taxes and I knew 2000 was going to be
3   a very busy year with the two NDAs and two SNDAs.
4   And they said, let's get together early and lay out
5   a plan.
6       Q.   And do you know how to spell Personette?
7       A.   P-e-r-s-o-n-e-t-t-e, I think.
8       Q.   Okay.  And you sold -- as a result, you
9   exercised and then sold approximately 75,000 shares
10  of Pharmacia stock for proceeds of over $3 million;
11  is that correct, sir?
12      A.   I don't know if that's correct.
13      Q.   Well, let me ask you this:  In any year
14  other than three -- other than the year 2000, did
15  you ever sell $3 million worth of stock before?
16      A.   I exercised stock options before 2000.  I
17  don't know how much they would have -- I don't know
18  what the word you're using.  I don't know -- you
19  know, I don't know the specifics around it, but I do
20  know I exercised stock options before 2000.
21      Q.   Well, do you know what your
22  approximate --
23      MR. HOFF:  Are you getting that $3 million from
24  this chart (indicating)?

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

245

1    MR. SAHAM:  Yeah.  I'm looking at the second --
2    the -- the shares that were exercised, the 75,000
3    shares that were exercised, the number of options --
4    MR. HOFF:  And you're multiplying --
5    MR. SAHAM:  -- in the year 2000.
6    MR. HOFF:  -- it by the dollar amount there?
7    MR. SAHAM:  Yeah, of all those dollar amounts,
8    and it's about 3.7 million.
9    MR. HOFF:  I just wanted it to be clear --
10   BY MR. SAHAM:
11   Q.   And I don't want to get into your, like,
12   personal business, you know, but --
13   A.   Sure.
14   Q.   -- in the year 2000, what was your net
15   worth, approximately?  I mean, was 3 million a lot
16   for you back then --
17   MR. HOFF:  I'll object --
18   BY MR. SAHAM:
19   Q.   -- or was that just a little bit?
20   MR. HOFF:  -- to the form of the question,
21   unless you're saying, in the abstract, is 3 million
22   a lot of money, you know.
23   BY MR. SAHAM:
24   Q.   I'm just asking you --

246

1    MR. HOFF:  We haven't established that
2    3 million is the right number.
3    BY MR. SAHAM:
4    Q.   Well, what was your -- what was your net
5    worth, to the extent you remember?  And -- and it
6    can be very -- you know, it doesn't have to be
7    exact.
8         But what was your net worth in 2000?
9    A.   I don't know -- how do you figure net
10   worth?  I mean, is it -- like, do you say, how much
11   money in the bank?  How much is your house worth?
12   How much is your car worth?
13   Q.   Okay.
14   A.   I mean, what do you --
15   Q.   You can do that however you want.
16   A.   I don't know.
17   Q.   Just give me a ballpark figure.
18   A.   Wow.  I mean, I was putting the maximum
19   amount that I could into the -- the retirement fund.
20   I don't even remember what my salary was.
21   Q.   Well, I'll show you a document that shows
22   you that soon.
23   A.   Okay.
24   Q.   It was about $250,000 a year.

247

1    A.   Okay.  In 2000?  Or before 2000?  Okay.
2    I have a house.  I don't know what it was worth in
3    2000.  It's in Lincoln Park, which is -- the real
4    estate is pretty good in Lincoln Park, so that may
5    have been worth 2 million, I guess.  I don't know.
6    And then what I had saved.
7    Q.   Okay.  So would you say your net worth
8    was less than 3 million, other than this stock, your
9    other assets?
10        See, I asked a bad question.
11        Were your other assets, other than this
12   Pharmacia stock, the 75,000 shares that you
13   exercised in 2000, would you say your net worth
14   other than that was -- was some amount less than
15   3 million?
16   MR. HOFF:  Objection to form.
17   BY THE WITNESS:
18   A.   Yeah.  So first of all, you said that I
19   exercised 3 million worth of stock, and I don't
20   remember doing that, so I want to make that clear.
21        So before the year 2000, I think it's
22   safe to say my net worth was under 3 million.
23   BY MR. SAHAM:
24   Q.   Okay.  So we're looking here -- and I

248

1    just want to walk you through this document that
2    I've marked as Exhibit 263.  And it has your name on
3    it.
4         And it says down there in the bottom --
5    the bottom part of the chart, it says Number of
6    Options.  And then if you total them all up, it says
7    75,540.
8         Are you with me?
9    A.   I am.
10   Q.   So does that mean you had -- or -- or --
11   and this -- and this is -- the first column says,
12   Activity Date.  It's labeled Option Activity.  You
13   see me?  And it says Activity Date, and it lists,
14   you know, some dates, several -- several
15   transactions that occurred on 10/2/2000.
16        Do you see that?
17   A.   Yes, I do.
18   Q.   And then it also lists --
19   A.   Right.
20   Q.   -- two transactions on 9/29 --
21   A.   Right.
22   Q.   -- 2000?
23   A.   Yes.
24   Q.   And then it lists one transaction on



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

249

1  8/16/2000.  And then it lists the activity.  It says
2  Cash, then it says Grant Type/Grant Code.  And It
3  says PHAM NQC.  And then the next column lists the
4  number of options.
5      A.   Yes.
6      Q.   If you tally all those up, it equals
7  75,540.
8          Do you see that?
9      A.   I do.
10     Q.   And then there's the Grant Date.  And I
11  assume that's the date those options were granted.
12         Does that make sense?
13     A.   As much as I understand that, yes.
14     Q.   And then it has the Exercise Price.
15         Is that your understanding, the exercise
16  price on the option?  That's what you can actually
17  sell it for?
18     A.   No, I don't understand what that means.
19     Q.   Isn't -- isn't that -- you get an -- if
20  you get a stock option, you might be able to buy it
21  for 9, but if the stock's trading at 40 at the time,
22  if you exercise the option, you're going to make
23  some profit because you're only paying 9 of the --
24     A.   Right.

250

1      Q.   -- what it was granted at and stay solid
2  at 40?
3      A.   So is that, the exercise price, the price
4  that is the price of the stock the day you exercise?
5  So is that what that --
6      Q.   I think --
7      A.   -- means?
8      Q.   -- that's what it indicates to me,
9  anyway.
10         Is it logical to you that that's what it
11  means?
12     MR. HOFF:  Well, objection.
13     MR. SAHAM:  We can stipulate, too, if you want,
14  John.
15     MR. HOFF:  I -- no, no.  I'm not going to
16  stipulate.  I think you should just ask him if he --
17  you know, what -- what he knows about the document
18  and what he can tell you about it.
19     MR. SAHAM:  Okay.  Well, I mean, I'm just --
20     MR. HOFF:  This is a -- this is a company
21  document.
22     MR. SAHAM:  Yes.  And -- and I -- maybe I
23  should make this statement on the record.  And I'm
24  going to -- let me mark as Exhibit 264, as well --

251

1  and just keep that in front of you.  We're --
2      THE WITNESS:  Okay.
3      MR. SAHAM:  It's the same thing, it's just a --
4  an idiosyncrasy in the way that the document was
5  produced to me last night that I want to make clear
6  for everyone.
7          (WHEREUPON, a certain document was
8          marked Plaintiffs' Deposition
9          Exhibit No. 264, for identification,
10         as of 12/10/2010.)
11     MR. SAHAM:  So I'm marking this document which
12  bears the Bates number DEFS 001958.  Showing this
13  document to you, which appears to be the same
14  document, but -- that I've marked as 263.  But part
15  of it's cut off.
16     MR. HOFF:  Actually, it's not the same, but
17  that's okay.
18     MR. SAHAM:  Well -- but in any event, you guys
19  produced to me 2 -- what I've marked as 264?
20     MR. HOFF:  That's true.
21     MR. SAHAM:  And then last night, you sent me a
22  document, and I'll represent to you it's this
23  document that's 263.
24     MR. HOFF:  Uh-huh.

252

1      MR. SAHAM:  And it has a Bates number on it
2  when I opened it up electronically, but when I print
3  it out, for some reason the Bates number does not
4  print out.
5      MR. HOFF:  Okay.
6      MR. SAHAM:  And, you know, I -- I'd like there
7  to be some understanding between us, you know, that
8  you guys look at this document and determine it's
9  what you produced.  But the Bates number for some
10  reason does not print.
11     MR. HOFF:  Well, let's --
12     MR. WEISS:  You -- you wouldn't have it unless
13  I produced it to you.
14     MR. SAHAM:  Right.  So -- and that's all I'm
15  getting at.
16     MR. HOFF:  I'm -- I'm -- this looks like what
17  we gave you most recently.  That would be
18  Exhibit 263.  The earlier document is -- I think
19  you're marking 264.
20     MR. SAHAM:  That's what you provided me about a
21  week ago?
22     MR. HOFF:  Correct.
23     MR. SAHAM:  And then 263 is what you provided
24  me last night?



253

1     MR. HOFF: Was it last night?
2     MR. WEISS: Yeah.
3     MR. HOFF: Correct, yeah.
4  BY MR. SAHAM:
5     Q.   So looking back at 263, sir, you know,
6  what I did to come up with that 3 million in
7  proceeds is, I just multiplied all the exercise
8  prices, you know, by the -- by the number of options
9  that were exercised at that price. And I'm not
10 great at math, but I get something over $3 million.
11    MR. WEISS: Could you say -- can you read that
12 back.
13    MR. SAHAM: Well, I'll say it again.
14 BY MR. SAHAM:
15    Q.   Well, I'm just saying that you've got
16 these number of options which are exercised on
17 particular days, and then you have an exercise
18 price.
19        So -- and then you -- and you don't have
20 a total for the exercise price or -- or for the
21 total amount. But what I did is I multiplied the
22 number of shares in each spot times the -- the price
23 and then added them all together and I get something
24 around $3 million.

254

1     MR. WEISS: But you --
2  BY MR. SAHAM:
3     Q.   Is that illogical to you to calculate
4  what this document is saying, sir?
5     A.   I'm not a stock person, so I don't
6  understand this. But what you say is not -- it's
7  not nonsensical.
8     Q.   Okay.
9     A.   I just don't know if you're accurate.
10    Q.   Right. And then what I'm getting at,
11 too, is that you're a guy that was worth less than
12 $3 million in 2000. If you sold $3 million worth of
13 stock, don't -- don't you think you'd remember?
14 Isn't that sort of a big deal?
15    A.   Well, what I remember, as I said, was
16 meeting with the tax fella. So at a time of my
17 life, whatever year 2000 was -- so I'm getting close
18 to 50 -- the tax guy is doing my taxes for 1999 and
19 says, you know, you have a lot of assets. We need
20 to put a plan together for you because -- or do you
21 have a plan for -- for the rest of your life?
22        And I said, yeah, the plan is, work and
23 put the money in the bank. And he says, well, let's
24 get together with these wealth managers and put

255

1  together a game plan.
2     2000, I knew, was going to be a very busy
3  year for me because I was scheduled to submit or
4  oversee the team that was submitting two NDAs and
5  two SNDAs. So the idea was, if we are going to get
6  together and put a plan together, it has to be early
7  in the year.
8     I do remember we got together. We talked
9  about a plan. And -- and -- and one of the --
10 the -- the -- the plans was to, let's exercise some
11 stock options if it is possible and if it is
12 appropriate. And that was part of the plan.
13    And then I do remember, later, hearing
14 that they did exercise them, but I don't remember
15 amounts, numbers or anything like that.
16    Q.   Now, do you remember -- and I know you
17 don't -- you just testified you don't remember the
18 exact amounts, but do you remember selling in the
19 millions of dollars worth of stock -- Pharmacia
20 stock in the year 2000?
21    A.   I don't.
22    Q.   You have no recollection of whether it
23 was $38 worth of stock or a lot?
24    A.   I knew it was a lot. I don't know how

256

1  much it was -- it was.
2     Q.   Okay. And what did you do with the
3  proceeds?
4     A.   The proceeds, I -- the wealth managers
5  created an annuity at some point, whether it was
6  right away or not.
7     Q.   And --
8     A.   Part of the -- part of the proceeds went
9  to an annuity, and I don't know exactly what the
10 other went to.
11    Q.   Okay. And do you still have the annuity?
12    A.   Not that particular annuity, no.
13    Q.   Did you sort of roll it over into
14 something else?
15    A.   As I recall, yes, that's what we did.
16    Q.   And what's the size of that annuity --
17    A.   In terms of --
18    Q.   -- the value?
19    A.   -- what it's worth?
20    Q.   Correct.
21    A.   So I -- well, it depends on what you
22 mean, "what it's worth." Because the -- if I sold
23 it today, I think it's different than if I wait.
24 And I guess you take money out of it when you get so



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                               December 10, 2010

---

257

1  old, something like that. Is that -- isn't that how
2  that works?
3       But anyway, I think the last time I met
4  with the wealth managers, which is now a different
5  group of people, I think -- I think it was, like, a
6  million dollars, a million two.
7       Q.   Okay. And then when you look at the
8  exercise price for each of these shares that we were
9  looking at at that middle column, that number is
10  greater than the option price for each of these
11  entries, each of these -- one, two, three, four,
12  five, six, seven -- eight entries that are listed in
13  this table, correct?
14       A.   That's correct.
15       Q.   And the difference between the option
16  price and the exercise price, that's profit for
17  yourself, correct, sir?
18       MR. HOFF: Well, objection to form.
19  BY MR. SAHAM:
20       Q.   Uncle Sam might take some, but the rest
21  is profit, correct?
22       MR. HOFF: Objection to form.
23  BY THE WITNESS:
24       A.   Well, as you're doing the math and what I

---

258

1  know of these things, that is -- that is what they
2  call the exercise gain. Whether it's profit to me
3  doesn't -- I don't know exactly if that means it's
4  profit to me or not.
5  BY MR. SAHAM:
6       Q.   And if you do that math there, the profit
7  or the exercise gain is over $1.6 million, isn't it?
8       A.   I don't know. I haven't added it.
9       Q.   You're not disputing that it looks
10  about -- to be about $1.6 million, though, are you,
11  sir?
12       MR. HOFF: Objection to form.
13  BY THE WITNESS:
14       A.   Well, help me. Help me with this. Where
15  am I supposed to look?
16  BY MR. SAHAM:
17       Q.   Well, I'm just looking at the --
18       A.   So you --
19       Q.   -- difference between the option price --
20       A.   Right.
21       Q.   -- and the exercise price. And that
22  difference multiplied by the number of options would
23  be the -- you called it the exercise gain and I call
24  it profit, on those particular shares.

---

259

1       A.   I --
2       Q.   And then you add them together
3  cumulatively, and I get 1.6 million.
4       A.   You're adding exercise gain per option
5  and getting 1.6 million?
6       Q.   Yeah.
7       A.   Is that what you're doing?
8       Q.   You have to multiply the exercise gain
9  for each of those number of shares by the number of
10  options.
11       A.   I can't do that in my head and come up
12  with a number.
13       Q.   Okay. But does it look to be a
14  significant number, a number in excess of a million
15  dollars, by eyeballing it?
16       MR. HOFF: Objection to form.
17  BY THE WITNESS:
18       A.   So that would be 2 -- well, it looks like
19  it could be over a million.
20  BY MR. SAHAM:
21       Q.   Okay. And then other than your meeting
22  with the wealth manager, is there any other reason
23  you decided to exercise this stock -- these stock
24  options in the year 2000?

---

260

1       A.   No.
2       Q.   And do you know, out of -- you -- you
3  exercised 75,540 options, and in the table above,
4  some of the options weren't -- weren't given to you,
5  even the option, until after 2000.
6       So out of the ones prior to 2000, do you
7  know which of those or what percentage or how
8  many -- I'm -- I'm sorry, let me ask the question
9  better.
10       You exercised 75,000 options during 2000.
11       Do you know how many options during the
12  year 2000 you had available to you to exercise?
13       MR. HOFF: Objection --
14  BY MR. SAHAM:
15       Q.   Whether it was more than 75,000 options
16  or not -- shares?
17       MR. HOFF: Objection, form.
18  BY THE WITNESS:
19       A.   So I just want to get this straight. So
20  that there could have been options that were
21  available to exercise and I didn't exercise them
22  all, you're suggesting --
23  BY MR. SAHAM:
24       Q.   Yeah. I'm asking you whether you exer- --

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

261

1  whether you know if you exercised all of them or
2  not?
3      A.   I know -- as I recall -- and, again, I
4  don't remember the details of what this was.  As I
5  recall, we did not exercise them all.
6      Q.   Do you know what percentage you
7  exercised?
8      A.   I don't.
9      Q.   Do you know, would you have records or
10 documents that would show that information?
11     A.   I've looked through my documents and do
12 not have any records of -- of this, other than --
13 other than tax returns.
14     MR. SAHAM:  Okay.  And we -- we make a request
15 formally for those documents to the extent they're
16 in Mr. -- or Dr. Geis's possession or the company's
17 possession, that a document be produced to us and
18 that certainly would serve you with an
19 interrogatory, as well.
20          But to the extent there is a document
21 that indicates how many or documents together that
22 indicate how many options were available or had
23 vested in this point in time during 2000, we would
24 like to have them produced.

262

1      MR. HOFF:  We'll consider it.  I'll just say,
2  we have been trying to find the documents that
3  reflect the stock activity, and so far, the best we
4  could come up with is what we've given to you.
5      MR. SAHAM:  Thank you.
6      MR. HOFF:  But we'll -- we'll continue.
7      MR. SAHAM:  Okay.  I want to show you what I'm
8  marking as Plaintiffs' Exhibit 265.
9          (WHEREUPON, a certain document was
10         marked Plaintiffs' Deposition
11         Exhibit No. 265, for identification,
12         as of 12/10/2010.)
13 BY MR. SAHAM:
14     Q.   Could you please take a look at
15 Plaintiffs' Exhibit 265.
16     MR. SAHAM:  And for the record, Plaintiffs'
17 Exhibit 265 is a two-page document bearing
18 Bates numbers DEFS 01605472 through 73.  The first
19 page is an e-mail from George S. Geis to Michael
20 Friedman, dated March 17, 2000.  The subject is
21 CLASS Database Close.  And the attachment, or the
22 second page of the document, is dated 17 March 2000
23 to study file N49-98-02-035 and 102, and it's from
24 Jay Lefkowith, W. Zhao and G. Steven Geis.  And it's

263

1  Re:  Deviation from SOP for above-referenced studies
2  (CLASS trial).
3  BY MR. SAHAM:
4      Q.   I'd ask you if you recognize this
5  document?
6      A.   I don't recall seeing this.
7      Q.   But this is an e-mail that you would
8  have -- or that you sent on March 17, 2000, to
9  Dr. Friedman?
10     A.   I don't recall seeing it, but I don't --
11 I don't recall either way.
12     Q.   And this is a memo that was written to
13 the file that your name's on as a From, on the
14 second page?
15     A.   This is -- it's a memo, and my name's
16 typed on it.  So in that sense, yes.
17     Q.   And the second paragraph on the second
18 page states, "Notification of database closure will
19 be restricted to a limited subset of the Study Team
20 to minimize the potential dissemination of
21 information that might violate SEC regulations
22 regarding disclosure of material information."
23          Do you see that?
24     A.   I do see that.

264

1      Q.   And did you have an understanding in
2  March of 2000 that there was, at least for some
3  point in time, a restriction on trading stock
4  because of the -- the results of the CLASS trial
5  were known internally but not externally to the
6  public?
7      MR. HOFF:  Objection to form.
8  BY THE WITNESS:
9      A.   Could you repeat the question?
10     MR. SAHAM:  Could you read that back, ma'am.
11          (WHEREUPON, the record was read by
12          the reporter.)
13 BY THE WITNESS:
14     A.   I did not know of that.
15 BY MR. SAHAM:
16     Q.   But this document seems to be indicating
17 that the database -- or strike that.
18          This document does indicate that, quote,
19 notification of database closure will be restricted
20 to a limited subset of the Study Team to minimize
21 the potential dissemination of information that
22 might violate SEC regulations regarding disclosure
23 of material information.
24          That's what the document says, correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                      December 10, 2010

---

265

1      MR. HOFF:  Well, why don't you finish the rest
2   of the paragraph?
3   BY THE WITNESS:
4      A.   So the -- rest of the paragraph is,
5   "This period of restriction will be limited to the
6   period of time up to approval of the pending merger
7   between Pharmacia/Upjohn and Monsanto."
8          So it says to me, this is -- this SEC
9   regulation is with respect to the merger --
10  BY MR. SAHAM:
11     Q.   Did you also --
12     A.   -- not about having anything to do with
13  trading stock related to CLASS.
14     Q.   Would -- would you agree that there was
15  material information that was in the possession of
16  yourself and others internally at Pharmacia after
17  the merger before it was disclosed publicly?
18     MR. HOFF:  Object to the form of the question.
19  BY MR. SAHAM:
20     Q.   With respect to the CLASS data.
21     A.   Could you repeat the question?
22     Q.   Okay.  Was there information that you
23  knew internally -- because you were working on the
24  study -- and let's say at least prior to April 17th

---

266

1   when there was some disclosure about it -- prior to
2   that time, you knew some stuff that people on the
3   street didn't know about CLASS, correct?
4      MR. HOFF:  Objection to form.
5   BY THE WITNESS:
6      A.   So prior to Fred Silverstein's
7   presentation, we had the results of the trial.  In
8   that sense -- and that was not publicly available.
9   BY MR. SAHAM:
10     Q.   And even after April 17th, there was some
11  stuff that you knew that the rest of the public
12  didn't know, right?
13     MR. HOFF:  Objection to form.
14  BY THE WITNESS:
15     A.   What do you mean "there was some stuff"?
16  BY MR. SAHAM:
17     Q.   Well, you knew that the -- the rest of
18  the data wasn't being included because you thought
19  it was invalid, and, you know, "Joe Q. public"
20  didn't know that necessarily?
21     A.   Well --
22     MR. HOFF:  Objection to form.
23  BY THE WITNESS:
24     A.   Well, no, that's not true, because Fred

---

267

1   Silverstein did acknowledge there was data beyond
2   six months.  But we believed the data, the 6-month
3   data was valid.
4          That was presented again at DDW in
5   April -- excuse me -- in May.  After Fred
6   Silverstein's presentation, the analyst wrote
7   analyst reports acknowledging there was data beyond
8   the six months, so that was in the public.
9          And Merck, in their presentation at DDW
10  in May of 2000, also acknowledged there was data
11  beyond six months.
12         So the public knew there was data beyond
13  six months through a variety of venues from April,
14  whenever American College of Physicians took place,
15  onward.
16  BY MR. SAHAM:
17     Q.   Did any of those communications at any of
18  those venues inform the public that the data after
19  six months was less favorable to Celebrex than the
20  6-month data, at least on certain endpoints?
21     A.   It was -- they were -- it was
22  acknowledged that it was invalid data.  So to call
23  it less favorable is inaccurate because if it's
24  invalid, any comparison is meaningless.

---

268

1      Q.   But certainly nobody was told that --
2   invalid, not invalid, that statistically significant
3   comparison that's in Figure 2B in your JAMA article,
4   nobody was told that comparison mathematically,
5   statistically, didn't hold for the entire study
6   period; is that correct, sir?
7      A.   So, again, it was invalid data and
8   P Values related to invalid data were not -- were
9   not talked about.  However, all the data was
10  submitted to the FDA in June and was fully vetted in
11  the February advisory committee meeting.
12     Q.   And the FDA did not make that data
13  public, that full data, until February of 2001; is
14  that correct, sir?
15     A.   I don't know for sure.
16     Q.   Okay.  But you don't -- you're not
17  disputing that fact because you don't know?
18     A.   I don't know either way.
19     Q.   Okay.  I want to show you what I'm
20  marking as Plaintiffs' Exhibit 266.
21         (WHEREUPON, a certain document was
22         marked Plaintiffs' Deposition
23         Exhibit No. 266, for identification,
24         as of 12/10/2010.)



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

269

1   BY MR. SAHAM:
2       Q.   Could you please take a look at
3   Plaintiffs' Exhibit 266.
4           And I just ask you, does this document
5   appear to be a spreadsheet entry describing your
6   compensation in the 1999 through 2002 time frame?
7       A.   I don't know what this is.  I've never
8   seen this before, so I -- so I don't know.
9       Q.   Well, it's got your name on it, right?
10  It says Geis, G.S.?
11      A.   Yes.
12      Q.   And then it lists -- and I'm looking at
13  lines 10 through 23 for 2000.  It says you got an
14  Edgar M. Queeny award and they gave you 40 grand; is
15  that right?
16      A.   That sounds familiar.
17      Q.   So that does sound familiar.
18          And then it says, 2000 Annual Incentive
19  Award-Pension-SIP able.  It says 264 and some
20  change?
21      A.   That, I don't know what that means.
22      Q.   And then it says -- but that looks to be
23  like a $264,000?
24      A.   Well, the number is 264, but I don't know

270

1   what Annual Incentive Award-Pen-SIP means.
2       Q.   And then you drop down to Block 13.  It
3   says 2000 Restricted Stock Deferral, 318,000.
4           Do you see that?
5       A.   I see that.
6       Q.   Okay.  And then under that, there's stock
7   options listed, 2 through 7.  And if you add those
8   all up -- one's 269,000; one's 147,000; one's
9   169,000; one's 133,000; one's 344,000; and one's
10  278,000.
11          Do you think that seems like it may
12  correspond with the numbers we had looked at that --
13  the 3 million and the 1.6 million in the -- that we
14  looked at in Exhibit 263 and 264?
15      A.   I -- I don't know what this is referring
16  to.
17      Q.   And then it says, Regular Pay $248,000.
18          Does that seem consistent with what you
19  were being paid in this time frame as an
20  executive -- or as a vice president?
21      A.   It sounds like it's within the range.
22      Q.   And you just don't recognize this
23  document?  You can't dispute it or confirm what it
24  is?

271

1       A.   Well, I -- I'm confident I've never seen
2   this document before.
3       Q.   And do you recall approximately what your
4   total compensation was from Pharmacia in, you
5   know -- if -- you got tax returns from 2000, right?
6       A.   I did.
7       Q.   Do you still have them?
8       A.   I do.
9       Q.   Would you mind giving them to your
10  lawyers to produce?
11      A.   Sure.
12      Q.   Okay.  I'd appreciate it if you could do
13  that, because then we'd be able to, I think,
14  definitively answer how much you were compensated
15  that year.
16      MR. HOFF:  Well, we'll consider --
17      MR. SAHAM:  Okay.
18      MR. HOFF:  -- what --
19      MR. SAHAM:  And if you want to redact Social
20  Security -- Social Security numbers, I'm all right
21  with that.
22      MR. HOFF:  Well, we'll take a look at them and
23  get back to you.
24      MR. SAHAM:  I'd appreciate that, John.  Thank

272

1   you.
2           I want to show you what I'm marking as
3   Plaintiffs' Exhibit 267.
4           (WHEREUPON, a certain document was
5           marked Plaintiffs' Deposition
6           Exhibit No. 267, for identification,
7           as of 12/10/2010.)
8       MR. SAHAM:  Could you please take a look at
9   Exhibit 267.  And for the record, Exhibit 267 is a
10  two page e-mail chain, Bates numbers DEFS 00029529
11  through 530.
12  BY MR. SAHAM:
13      Q.   And you're not on this chain, but what
14  I'm referring to -- well, no, you are.  It -- it --
15  it -- the subject matter of the e-mail at the bottom
16  of the first page from Fletcher to Weiner, it says,
17  Background on request for Joe Feczko to call G.
18  Steven Geis.
19          And then it refers, on the next page,
20  that you're basically giving a consultant agreement
21  when you left Pfizer that could pay you up to
22  $350,000 for that year to talk about CLASS and deal
23  with CLASS and Celebrex issues; is that right?
24      A.   Wait a second.  I -- I need to look at



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                                                    December 10, 2010

---

273

1  this and read it and see what it is.
2       So what's the question?
3       Q.   Well, my question is, do you recall
4  getting a consulting agreement when you left Pfizer
5  in -- I guess, 2003, did you leave Pfizer?
6       A.   So I was never an employee of Pfizer.
7  Pharmacia/Monsanto merger was in 2000.  I retired in
8  August of 2002.  It was still Pharmacia.  When I
9  left Pharmacia, Pharmacia asked me to consult
10  related to helping with the arbitration issues for
11  the Cox-IIs and those types of things.
12       So I had a consulting agreement with
13  Pharmacia, and then I believe it was in 2000 -- was
14  it in 2002 that Pfizer bought Pharmacia?  I don't
15  recall that we ended up with a contract -- I ended
16  up, then, with a contract with Pfizer, but I can't
17  remember.
18       Q.   And what arbitration issues are you
19  referring to?
20       A.   The -- well, I don't know exactly what
21  they're referring to here.  But -- but arbitration
22  with European authorities refers to when you make a
23  submission to the European Union Community of --
24  of -- of Countries like you do to the FDA.

---

274

1       There is a process that you go through
2  where you -- where you review the data, answer
3  questions to the data.  And my understanding is the
4  term is called arbitration.  So it's the interaction
5  with the Health Ministries in Europe regarding your
6  submission.
7       Q.   Okay.  And then at any point in time, did
8  you become a paid consultant of Pfizer?
9       A.   I don't recall.  As I recall, there was a
10  consulting agreement with Pharmacia that went for a
11  year, and I don't think there was another one with
12  Pfizer.
13       Q.   Have -- have you ever been paid by either
14  Pharmacia or Pfizer after 2002 or 2003?
15       A.   Well, in -- so in 2002 -- so it was
16  August 2002 when I retired, and then during 2002, I
17  was consulting for -- for Pharmacia and was -- and
18  did get consulting fees as a result.
19       Q.   I'm talking about after that.
20       Did you ever get paid by either Pharmacia
21  or Pfizer after that?
22       A.   After all the consulting?  After the
23  consulting?
24       Q.   Well, when did the consulting end?

---

275

1       A.   Well, I think it was -- it was a one-year
2  contract that started around August or September
3  of 2002 with Pharmacia to end, if it would be a
4  year, in August or September of 2003.  But then
5  Pfizer bought Pharmacia, and what I don't remember
6  is if there was a new contract written with Pfizer.
7       Q.   When was the last time you received
8  consulting money from either Pharmacia or Pfizer?
9       A.   My best recollection is sometime in 2002.
10       Q.   Okay.  And then what about the depos you
11  gave in 2008, did they pay you to appear at those
12  depos -- depositions?
13       A.   For -- for prep time, I was -- I wasn't
14  paid by the company.  I believe I was -- I was
15  compensated for my time through -- I don't know if
16  it was Sidley or through the other -- another law
17  firm.
18       Q.   And Sidley & Austin, the law firm that
19  we're at today?
20       A.   Yes.
21       Q.   And -- and is it your understanding that
22  Pfizer would have reimbursed Sidley for paying you,
23  or do you think they were just paying you
24  themselves?

---

276

1       A.   I don't know what those arrangements
2  were.
3       Q.   You didn't ask those questions?
4       A.   No.
5       Q.   Okay.  And have you received any payments
6  from any law firms relating to anything having to do
7  with Pharmacia or Pfizer since 2008?
8       A.   No.
9       Q.   And are you getting paid -- did you get
10  paid or are you getting paid for your prep time for
11  today's deposition?
12       A.   No, I'm not.
13       Q.   Okay.  And why is that different than the
14  other deposition?
15       MR. HOFF:  To the extent you have to answer
16  that -- you can answer -- you can answer that
17  question based upon conversations with counsel, I'll
18  instruct you not to answer.
19       Independent information other than
20  conversation with counsel, you can answer to that
21  extent.
22  BY THE WITNESS:
23       A.   So I don't know what all this means.  All
24  I know is I'm not being paid.

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

277

1    BY MR. SAHAM:
2        Q.   And do you think it's because you're a
3    defendant in this case and they don't want to pay a
4    defendant because it would create bias?
5        MR. HOFF:  Objection.
6    BY THE WITNESS:
7        A.   I don't know.
8    BY MR. SAHAM:
9        Q.   And what do you do today?  Like, what --
10   are you still working or are you retired?
11       A.   I do consulting.
12       Q.   And do you do any -- none for Pfizer or
13   Pharmacia -- well, there is no Pharmacia, but
14   anything for Pfizer?
15       A.   No.
16       Q.   Okay.  For other pharmaceutical
17   companies?
18       A.   Yes.
19       Q.   Okay.  Anything related to Cox-II
20   inhibitors?
21       A.   Anything related to Cox-II inhibitors?
22   Some of the companies I deal with are dealing with
23   compounds that -- that may be in the family of
24   NSAIDs where the Cox-II data is pertinent.  So in

---

278

1    that sense, yes, but nothing related specifically to
2    Celecoxib.  None of the companies do anything with
3    Celecoxib.
4        Q.   Okay.  I want to show you some -- a
5    document that I'm marking as Plaintiffs'
6    Exhibit 268.
7            (WHEREUPON, a certain document was
8             marked Plaintiffs' Deposition
9             Exhibit No. 268, for identification,
10            as of 12/10/2010.)
11   BY MR. SAHAM:
12       Q.   And like we have previously, I'll
13   represent to you that this document was produced
14   from your custodial files or indicates that it was
15   produced from your custodial file.
16           Take a look at that document.
17       MR. SAHAM:  And for the record, Plaintiffs'
18   Exhibit 268 bears the Bates numbers DEFS 00675735
19   through 740.
20           And at the top, it says, Draft 6.25.00
21   Minutes Cox-II Inhibitors Clinical Safety Committee
22   Meeting, 7 June 2000, Doubletree Hotel, O'Hare -
23   Rosemont, Executive Summary.
24   BY MR. SAHAM:

---

279

1        Q.   And specifically, I only want to ask you
2    a question about the last page of the document, but
3    I'd ask you just generally, do you recognize this,
4    or is it like all the other documents, you just
5    can't say one way or the other whether you've seen
6    it before?
7        A.   I don't recall seeing this -- having seen
8    this before.
9        Q.   Okay.  But you don't dispute one way or
10   the other that it came out of your custodial
11   electronic files?
12       A.   I can't -- I don't remember either way.
13       Q.   Okay.  Now, I want to refer you to the
14   last page of the document, the second bullet point.
15   And it says, "Make clear when results are presented
16   for data truncated at 6 months."
17           Do you see that?
18       A.   I see that phrase, yes.
19       Q.   Okay.  And that wasn't done in the JAMA
20   article?  It doesn't indicate -- well, strike --
21   strike that.  That's a bad question.
22           Do you believe this is an accurate
23   statement that you should make clear when results
24   are presented for data truncated in six months?

---

280

1        A.   I just want to read this, the context of
2    what they're -- who's saying it and when they're
3    saying it.
4            Okay.  So the question is?
5        Q.   My question to you is -- and I read to
6    you that statement in the bullet point.
7            Do you believe that's an accurate
8    statement?
9        A.   That it's accurate that somebody made the
10   statement?
11       Q.   No.  Do you think that's true that you
12   should make clear when results are presented for
13   data truncated at six months?
14       A.   I'm not sure I didn't understand the
15   phrase, "make clear when results."
16       Q.   Do you -- do you believe that if you're
17   talking about the 6-month data publicly, you should
18   say, look, these results are the 6-month data, not
19   the entire study data?
20       A.   We presented the -- the valid data.  And
21   in every public presentation, we acknowledged that
22   this was valid data from a study no longer than six
23   months.
24       Q.   Well, I want to turn your attention back

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

281

1  to Exhibit 67, the press release we had so much fun
2  with earlier, this one (indicating) probably way at
3  the bottom somewhere.
4      MR. HOFF:  Which one?
5      MR. SAHAM:  It's the press release that we
6  stipulated was the press release, Exhibit 67.
7  BY MR. SAHAM:
8      Q.   Here it is, sir.
9      A.   Thank you.
10     Q.   You would agree with me that Exhibit 67
11 itself does not make clear that some of the data
12 being referred to, specifically this nonaspirin
13 data, is based on the truncated six-months' results;
14 is that correct, sir?
15     A.   The data that is quoted here references
16 Dr. Silverstein, very clearly, of what
17 Dr. Silverstein presented at the American College of
18 Physicians, which was the 6-month data.
19     Q.   But Exhibit 67, specifically other than
20 the reference to Silverstein presentation, doesn't
21 make clear that the sentence, "Celebrex was also
22 associated with numerically fewer ulcer
23 complications than the NSAID comparators among all
24 patients, and 64 percent fewer of these serious

282

1  events among nonaspirin users -- a statistically
2  significant difference," it does not make clear,
3  within the confines of Exhibit 67, that that
4  conclusion is based on the 6-month data, does it,
5  sir?
6      A.   I am saying that it does reference back
7  to Dr. Silverstein, which was the six months.
8          And I'd like to just make a comment that
9  if this is true, the other document you gave me
10 where they were commenting, the -- the data safety
11 board, my interpretation is that they were talking
12 about scientific publications.  Because the data
13 safety monitoring board is a scientific group, not a
14 group that gets involved in press releases.
15         So taking the two -- trying to merge the
16 two as one thing, I don't think, is consistent.
17     Q.   I want to show you what's previously been
18 marked in this litigation as Plaintiffs' Exhibit 27.
19         Could you take a look at that document.
20         And this is a cover e-mail from Carolyn
21 Wilson to George Geis and others.  Subject,
22 Notes/Action Items 3/20/00 CLASS Steering Team
23 Meeting.
24         Do you see that?  And then it has three

283

1  attachments.
2      Do you have any reason to believe you
3  didn't receive this and the attachments on or about
4  March 20, 2000?
5      My question is -- my first question is,
6  do you recognize this?
7      A.   No, I don't.
8      Q.   And do you have any reason to believe you
9  didn't receive the -- this document which has been
10 marked as Exhibit 27 on or about March 20th, 2000?
11     A.   Well -- so I want to distinguish between
12 the e-mail which has my name on -- on it, and then
13 there are attachments which do not match the icons
14 on the e-mail cover page.
15     Q.   Can I turn your attention to the second
16 to the last page of the document?  And that's
17 labeled Updated:  CLASS Steering Committee, correct,
18 2/21/2000?
19     A.   Yes.
20     Q.   And the icon on the front page of the
21 document, the third one is also labeled Steering
22 document 0 -- 000320.
23         Does that appear to be -- or I'm sorry,
24 it says 000320 CLASS Steering.doc?

284

1      A.   Yes.
2      Q.   So does that -- well, certainly, I don't
3  know if that's -- here, it says -- it says in the --
4  in the e-mail there, it says, PR options provided by
5  Mr. Fleming are in 03200 CLASS PR options.
6          So these are all labeled 0000320.  But
7  all I'm getting at is, that last icon says Steering
8  doc, and then the last two pages of Exhibit 27 are
9  also labeled at the top, subject, Updated:  CLASS
10 Steering Committee; is that correct?
11     A.   It's correct, but they don't match.
12     Q.   But it would be consistent that this is
13 the steering document, or you don't know one way or
14 the other?
15     A.   I -- if I had received this and somebody
16 passed it to me, I would say, are you sure that this
17 is the attachment, because it doesn't have the same
18 title.
19     Q.   And you're not disputing -- you just
20 don't know one way or another whether you received
21 this document that is addressed to you as Steven
22 Geis with three attachments?
23     A.   I don't recall having seen this.
24     Q.   And you -- but you're not disputing that



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

285

1  the Bates numbers in the bottom right-hand corner of
2  the document, which bear DEF 0 -- I'm sorry,
3  DEFS 01574807 through 817, that those are
4  consecutively numbered?  You wouldn't dispute me on
5  that, would you, sir?
6      A.   Yes, the -- the numbers go from 07
7  through 17.
8      Q.   And the second to the last page of the
9  document, 816, the one that's labeled Updated:
10  CLASS Steering Committee, it lists the required
11  attendees, and one of them is George S. Geis.
12      Does that appear to be referring to
13  yourself, sir?
14      A.   I would assume so.
15      Q.   And if you drop down to the bottom of
16  this document, which is the Updated CLASS Steering
17  Committee, it appears to be notes or minutes, the --
18  I'm almost to the bottom of the document.  It says,
19  "Worse case:  we have to attack the trial design if
20  we do not see the results we want."
21      Do you see that?
22      A.   I see that.
23      Q.   Do you recall having discussions before
24  the data was unblinded for CLASS that if you didn't

---

287

1      Q.   And those two statements are
2  contradictory of one other, aren't they, sir?
3      MR. HOFF:  Objection to form.
4  BY THE WITNESS:
5      A.   They're contradictory?
6  BY MR. SAHAM:
7      Q.   That if you don't get what you want, you
8  got to attack the design, but if you get what you
9  want, then you need to justify the design.  Isn't
10  that contradictory to you?
11      Is that kosher, in your opinion, to -- to
12  attack the design if you don't like the results and
13  to support the design if you like the results?
14      MR. HOFF:  Objection to form.
15  BY THE WITNESS:
16      A.   So I'm a clinician and a scientist who's
17  been in this industry for 20 years.  And it is my
18  practice and the practice of all the scientists and
19  clinicians I worked with that you do a study, you
20  analyze the study as predicted, you identify the
21  valid results and you report them, and you report
22  the design as it was conducted.
23      Whatever is said here, I don't know who
24  wrote it, what they're thinking and what their

---

286

1  get what you want, you were going to attack the
2  trial design?
3      A.   There were no discussions of that sort
4  that I recall.  And I would like to point out,
5  "required attendees."  I don't know who wrote this,
6  but it was not common practice to require my
7  attendants anywhere, with the exception of through
8  my supervisors.  And none of these people would have
9  been my supervisors.
10      Q.   And you don't --
11      A.   I don't want to give the -- I don't want
12  to give you the impression because somebody said
13  "required," I was there.
14      Q.   It doesn't -- you don't dispute that
15  that's what the document says?  It says, "Worse
16  case:  we have to attack the trial design if we do
17  not see the results we want."
18      It does say that, doesn't it?
19      A.   That is the wording of this document.
20      Q.   And then the next bullet point says,
21  "Best case:  data is all we want and we go forward;
22  will need to justify our trial design."
23      Do you see that?
24      A.   I see that.

---

288

1  intent is.  But it is not consistent with how I
2  think and I have acted in my career.
3  BY MR. SAHAM:
4      Q.   I want to show you what I'm marking as
5  Plaintiffs' Exhibit 269.
6          (WHEREUPON, a certain document was
7          marked Plaintiffs' Deposition
8          Exhibit No. 269, for identification,
9          as of 12/10/2010.)
10  BY MR. SAHAM:
11      Q.   Do you recognize that document?
12      MR. SAHAM:  Plaintiffs' Exhibit 269, for the
13  record, bears Bates numbers DEFS 00416486 through
14  88.  And the first page of the document is an e-mail
15  from Kerstin Schultz to Michael Friedman, George
16  Geis and others.
17  BY MR. SAHAM:
18      Q.   Do you have any reason to believe you
19  didn't -- that this e-mail wasn't sent to you on or
20  about March 21st of 2000?
21      A.   Here, let me take a look.
22      So your question?
23      Q.   Do you have any reason to believe you
24  didn't receive this e-mail in the ordinary course of

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                December 10, 2010

---

289

1   your employment on or about March 21st, 2000, at
2   Pharmacia?
3       A.   I don't recognize it.
4       Q.   Okay.  But you -- you have no reason to
5   believe it wasn't sent to you?
6       A.   Either way, because I don't recognize it.
7       Q.   Okay.  And do you know who Mike C. is?
8       A.   Mike C.?
9       Q.   Yeah, that's referred to in the third
10  bullet point.  It says, "As a contingency in case
11  one arm in the CLASS trial doesn't separate, Mike
12  C/RICH M to look into whether we can lump the CLASS
13  data together and never show the separate arms."
14          Do you see that?
15          Do you know who Mike C. is?
16      A.   I don't know who they're referring to.
17  I'd only be speculating.
18      Q.   Well, who do you think Mike C. is?
19      A.   I -- you know, I really don't know.
20      Q.   Okay.  What about Rich M.?  Would that be
21  Richard Montwill?
22      A.   I don't know if that's who they're
23  referring to.  It's just -- it's the initials, but I
24  don't know if that's who they're referring to.

---

290

1       Q.   And who's Kerstin Schultz?
2       A.   I don't -- I -- I know of a Kerstin
3   Schultz who worked at Searle, but I don't know what
4   her capacity was.
5       Q.   And the subject line of this e-mail is
6   Celebrex War Meeting -- 3/21 Action Items -- and an
7   Updated Rolling Agenda; is that correct?
8       A.   That's what this reads.
9       Q.   Okay.  But you just don't recall seeing
10  this document?
11      A.   I -- that's correct, I don't recall
12  seeing this.
13      Q.   But you don't dispute that it was sent to
14  you?
15      A.   I don't remember either way.
16      Q.   Okay.  I want to show you what's
17  previously been marked in this litigation as
18  Plaintiffs' Exhibit 81.
19          Could you please take a look at that
20  document and tell me if you recognize it?
21      MR. SAHAM:  And it's entitled -- set of slide's
22  entitled Celebrex long-term safety study update
23  March 21, 2000.
24          And, again, I would represent that this

---

291

1   came out of your custodial electronic files, as
2   indicated on the last page of the -- well, actually,
3   again, this one doesn't have it, but I would
4   indicate there is -- there was a marked report that
5   showed that it comes from your files.
6   BY THE WITNESS:
7       A.   Is -- are you asking me --
8   BY MR. SAHAM:
9       Q.   No, I'm telling you --
10      A.   -- a question about it?
11      Q.   -- it was -- well, first, I'm telling you
12  it was produced.  And I'm asking --
13      A.   Okay.
14      Q.   Let me -- let me say it one thing at a
15  time because we're -- so I don't torture the
16  reporter.
17          But I'm -- I'm representing to you this
18  came out of your custodial files, as it was produced
19  by defense counsel as having come from your files.
20          And my question to you is, do you
21  recognize it?
22      A.   I don't recognize it.
23      Q.   Okay.  Do you have any reason to believe
24  this wasn't a document produced from you files?

---

292

1       A.   Well, the only thing I'll say is, some
2   things you give me, you have a page that's -- that
3   acknowledges it, and other times you give me
4   documents without that page but you tell me verbally
5   it is.
6           So in the context that I believe what
7   you're telling me is true --
8       Q.   You just don't have any independent
9   recollection?
10      A.   I don't have any independent
11  recollection --
12      Q.   Okay.  I'd like to --
13      A.   -- of seeing this.
14      Q.   -- turn your attention to page 7 of this
15  document.  And it's a slide that says Contingencies
16  Defend Celebrex Data.
17          Do you see that?
18      A.   I do.
19      Q.   And then the first bullet point says,
20  "Neither arm separates."
21          Do you see that?
22      A.   I do.
23      Q.   And then under that, it says, "Must
24  announce results by June due to stock materiality."

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

---

293

1    Do you recall anyone ever telling you
2 that the CLASS results had to be announced by
3 June of -- of 2000 due to stock materiality?
4    A.   No.
5    Q.   Do you have any understanding as to what
6 that means?
7    A.   No, I don't.
8    Q.   The next bullet point says, "Explain
9 through statistical glitches."
10    Do you recall being any conversations or
11 discussions regarding how to explain the CLASS
12 results through statistical glitches?
13    A.   I never heard the phrase or the words --
14 phrase "statistical glitches."
15    Q.   What about any discussions regarding the
16 need to disclose the CLASS data prior to June 2000
17 due to stock materiality, do you have any
18 recollection of anything like that?
19    A.   None at all.
20    Q.   And you have no idea -- if I'm actually
21 correct -- and you -- I don't know whether you
22 believe me or not, but this document came from your
23 files.
24    Do you have any understanding why this

---

294

1 document would be in your files?
2    A.   No.  It -- I think one thing to just get
3 the context of what was going around at this time
4 with the Pfizer codevelopment, comarketing group
5 with Searle, there were multiple committees related
6 to Cox-II.  Then you have Pharmacia coming in around
7 that time, and other committees were being
8 developed.
9    The CLASS study was of interest to a lot
10 of people and a lot of committees, and because of my
11 role in overseeing the team working on it, I was
12 copied on tons of e-mails, and tons of attachments
13 were sent to me.  So I just want to make sure, for
14 the record, that context is described.
15    Q.   And is it fair to say that those tons of
16 e-mails and tons of reports, et cetera, regarding
17 CLASS that were sent to you, they were sent to you
18 in your business capacity as an employee of
19 Pharmacia; is that correct, sir?
20    A.   Anything that I would have received
21 related to CLASS would have been as an employee of
22 Searle and then Pharmacia.
23    Q.   So they weren't personal -- they weren't
24 sent to you personally in your capacity as a citizen

---

295

1 of the state of Illinois?
2    A.   No.
3    Q.   And it's correct -- I know we've covered
4 this, but it's correct that you were working on
5 Celebrex and the CLASS trial as part of your
6 employment at Pharmacia?
7    A.   Yes, that's true.
8    Q.   I want to show you what's previously been
9 marked as Plaintiffs' Exhibit 79.
10    Could you take a look at Plaintiffs'
11 Exhibit 79, please.
12    MR. SAHAM:  And Plaintiffs' Exhibit 79 is an
13 e-mail from George S. Geis dated March 19, 2000, to
14 Kenneth Verburg, subject, CLASS analyses.
15    And it states -- and then it has an
16 attachment.  But the first page of the document,
17 it's a two-page document, an e-mail from you to Ken
18 Verburg.
19 BY MR. SAHAM:
20    Q.   It states, Ken, here is a list of
21 additional analyses and slides that we might want to
22 do.  Let me know what you think.  Note:  I've
23 included the date and time.  I wrote this for
24 version control.

---

296

1    And then it has an attached -- an icon
2 indicating there's an attached document, and then
3 there's an attached page to it.
4    Do you recognize this document?
5    A.   Let me take a look.
6    I have a vague recollection of this, yes.
7    Q.   And is this a document you would have
8 drafted in the ordinary scope of your employment at
9 Pharmacia?
10    A.   Yes.
11    Q.   Okay.  And if you look at the second page
12 of the document, the analyses 1 through 4 that you
13 describe, C-S-U-G-Is without ASA over 12 months with
14 stats.
15    No. 2, C-S-U-G-Is, without ASA over
16 six months with stats.
17    No. 3, PUBs with and without ASA over
18 12 months with stats.
19    And No. 4, PUBs with and without ASA over
20 six months with stats.
21    If you look at those four, do they match
22 up pretty closely, if not identically, with Tables 1
23 through 4 in Exhibit 66, the final report, the
24 synopsis on pages 6 and 7 of the Exhibit 66, the

---



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

297

1   final report that we looked at earlier?  It's the
2   big fat document in the pile there.
3       A.   So just like you, I want to be precise.
4           So number one, clinically significant
5   upper GI events without aspirin over 12 months, now,
6   our terminology at this time was to sort of,
7   shorthand, call the entire study analysis 12 months,
8   okay, to make -- make -- make that clear.
9           With statistics, that does match with the
10  second portion -- excuse me -- the second portion,
11  the bottom portion of Table 2 in the report.  And
12  it -- and it matches in the sense that we're doing
13  the analysis over six months without aspirin.
14          No. 2 on the list does match Table 1, the
15  second half of it without aspirin with statistics.
16          No. 3 matches Table 4, PUBs with and
17  without aspirin over 12 months.  Again, aspirin as
18  shorthand for the entire study period with stats
19  matches Table 4.
20          And then No. 4 on the list, PUBs with and
21  without aspirin over six months with stats is --
22  matches Table 3.
23      Q.   And the next number there says,
24  Kaplan-Meier of withdrawals for any cause.

298

1           What are you communicating there to
2   Dr. Verburg?
3       A.   A Kaplan-Meier plot is a curve that says,
4   on the abscissa, is time; on the ordinate, is some
5   type of outcome that you're interested.  And I'm
6   saying, on the ordinate, look at withdrawals.
7           So you have time on the abscissa,
8   withdrawals on the ordinate.  And what they do is
9   they plot over time how many -- what -- how many
10  people or what percent of people have withdrawn over
11  time.  And it creates a curve called a Kaplan-Meier
12  curve.
13          And so what I -- what I -- if I can get
14  back into what I was thinking at the time was the
15  idea to say, were most of the -- where were the
16  withdrawals occurring over time in the study?  That
17  was the intent.
18      Q.   And No. 6, that's for early -- to do that
19  for early withdrawals?
20      A.   So No. 6 was so -- again, this is dated
21  March 19th, 2000.  We received the -- the -- the --
22  the -- the first set of analyses from CLASS a couple
23  days before, and this was in the context, as I was
24  describing earlier, of people trying to understand

299

1   the data.
2           And in the -- in -- in that context,
3   trying to understand, were we getting withdrawals in
4   patients who were at risk for developing an ulcer
5   complication.  And that was how the initial thinking
6   was beginning of, is there bias developing in this
7   study over time?
8           So this was in the early stages of
9   understanding the data, asking for analyses that
10  could help us understand it, which ultimately led
11  to, yeah, you were getting not only withdrawals of
12  patients with risk factors, but differential
13  withdrawals in the treatment groups, which rendered
14  the data beyond six months invalid.
15      Q.   And you're -- you're talking about this
16  two days after the data was unblinded?
17      A.   Yes.
18      Q.   Okay.  And the next bullet point under 6
19  says risk factors for C-S-U-G-Is?
20      A.   Yes.  And that's what I was just talking
21  about as I was describing -- what I was -- when I
22  was looking at early withdrawals.
23      Q.   Okay.  And then dropping down to the
24  bottom of the CLASS plan that you drafted on

300

1   March 19, 2000, it says Story.
2           Do you see that?  And then there's
3   three -- three points?
4       A.   I do see this.
5       Q.   In the first point you write, Over first
6   six months, numerically, results are as expected:
7           You wrote that on March 19th, 2000 --
8       A.   If -- if this is -- if this is exactly
9   what I put together.  And, yes, this does look
10  right, but I don't remember exactly this.  But, yes,
11  that's what this says.
12      Q.   Okay.  And then the second point says,
13  "However, high ASA use in early drops in the Diclo
14  group confounded the results."
15          You wrote that on or about March 19,
16  2000?
17      A.   It appears that in this document, that's
18  what this says.
19      Q.   Okay.  And this was a document that was
20  created in the ordinary scope of business at
21  Pharmacia?
22      A.   Assuming that this is the accurate
23  document, yes.
24      Q.   Okay.  And then the bullet point says,



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

---

301

1  Slide of C-S-U-G-Is over six months without ASA use
2  (possibly two panel left side with ASA data, right
3  side without ASA)?
4      A.  Yes.
5      Q.  And then the next bullet point says,
6  Slide of early withdrawals due to GI symptoms (shows
7  much earlier drops in Diclo)?
8      A.  Yes.
9      Q.  And then No. 3, it says, Over second six
10 months, patients in NSAID groups who are at risk of
11 CSUGI have pulled out, therefore all Kaprin --
12 Kaplan-Meier lines merge.
13     Do you see that?
14     A.  I do.
15     Q.  And is that when we were looking at --
16 earlier, we looked at sort of a big PowerPoint slide
17 where the lines were coming together -- or the
18 Celebrex versus the NSAIDs were becoming closer at
19 12 months as compared to 6 months.
20     Is that a -- a simplistic rend- --
21 rend- -- rendering of a Kaplan- -- Kaplan-Meier
22 line?
23     A.  That --
24 MR. HOFF:  Objection to form.

---

302

1  BY THE WITNESS:
2      A.  The -- I'd have to look exactly at the
3  graph.  But this was as you -- in the couple days
4  after we received the data and we were trying to
5  understand the data, this was early attempts to go
6  through the rationale as to what was and was not the
7  valid set of data.  And that's what we were -- what
8  I was attempting to do here.
9      It wasn't the final rendition of our
10 understanding of the data, but an early one, in
11 asking for analyses to help understand the data.
12 BY MR. SAHAM:
13     Q.  If I could ask you to grab 250, the
14 bottom line, and look again at slide 43,
15 Complication Rates (All) Over 12 Months.
16     Are those lines Kaplan-Meier lines?
17     A.  These precisely are not Kaplan-Meier
18 lines, because Kaplan-Meier lines do not record
19 crude rates like this.
20     Q.  What do Kaplan-Meier lines do that's
21 different than this slide?
22     A.  The ordinate -- I'd have to pull one out
23 of the report, but it's in the appendix.  The
24 ordinate is not crude rates.  It is another measure

---

303

1  of -- of -- of, like, the -- the percentage of
2  complications that has occurred.
3      Q.  But Kaplan-Meier rates -- or lines track
4  event rates over time?  I mean, is that an overly
5  simplistic way to say it?
6      A.  It's overly simplistic, but I don't think
7  it's grossly inaccurate.
8      Q.  And -- and then this slide is doing the
9  same thing, it's -- it's tracking crude event rates
10 over time?
11     A.  Yes, it is.
12     Q.  And it's showing that there's less of a
13 difference over time at the 12 months for the NSAIDs
14 as compared to Celebrex as there was at 6 months?
15     A.  Yes, in this portion that we consider the
16 invalid portion of the study.
17 MR. SAHAM:  We got to change the tape.
18 Hopefully the last time we have to change the tape,
19 but we need to take a break.
20 THE VIDEOGRAPHER:  Going off the video record
21 at 4:26 p.m.
22     This is the end of Tape No. 5.
23     (WHEREUPON, a short recess was
24     had.)

---

304

1  THE VIDEOGRAPHER:  Going back on the video
2  record at 4:40 p.m.
3      This is the beginning of Tape No. 6.
4  BY MR. SAHAM:
5      Q.  Showing you what's been previously marked
6  in this litigation as Plaintiffs' Exhibit 80.  It's
7  a two-page document.  The first page is an e-mail
8  bearing Bates number DEFS 00886542.  The second page
9  bears Bates number same, but last two are 43.  And
10 it's an attachment labeled CLASS, March 20, 2000,
11 CLASS Analyses - Other considerations.
12     The e-mail is from George Geis -- George
13 S. Geis, March 21, 2000, to James Lefkowith.  And it
14 cc's various other individuals on your team.
15     And I'd ask you if you recognize this
16 document which has been marked as Plaintiffs'
17 Exhibit 80?
18     A.  So the question is?
19     Q.  Do you recognize it?
20     A.  I do vaguely recognize it.
21     Q.  And is this a document that you drafted
22 at your employment at Pharmacia on or about
23 March 21st, 2000?
24     A.  Yes.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Steven Geis                                                    December 10, 2010

---

305

1      Q.   And you did so in the ordinary course of
2  your employment there?
3      A.   It's -- it's -- yes, I did.
4      Q.   Okay.  And you wrote to Dr. Lefkowith and
5  your other team members, "As you heard last evening,
6  Mike and I reviewed the available data and he
7  believes we have a good story; although, not one as
8  simple as we had hoped."
9          Is that Mike referring to Mike Friedman,
10  your boss?
11      A.   It is.
12      Q.   And when you say, have a good story, but
13  not as simple -- simple one as you -- you would have
14  hoped, what -- what did you mean in writing that?
15      A.   So last evening would have been Monday,
16  March 20th, 2000, which would have been, I guess,
17  two or three days after we had received the first
18  set of data from the CLASS trial.
19          And as I discussed earlier, which was our
20  common practice, people sort of sat down, went off
21  site and focused on how to understand the data,
22  how -- and how -- what other analyses might be
23  helpful in understanding the data as it was
24  originally presented.

---

306

1          The team, during that 48 hours, was
2  coming to an appreciation of understanding the
3  confounders of the study and understanding why the
4  first six months was the valid set and data beyond
5  that were complications and symptomatic ulcers was
6  not valid.
7          I presented it to Mike Friedman on the
8  evening of Monday, March 20th.  So it was the first
9  time one of us had a chance to, in our terms, and
10  the language we used was, to tell the story, which
11  is, here's -- was the study objectives, here was the
12  design, here's the results, here's how we understand
13  the data, here's our thoughts on what is the valid
14  set, which wasn't uncommon.
15          The first time you present it, you think
16  it's pretty simple and clear, and your first
17  audience says it's not as simple.  It's not that
18  simple.  It's not that clear.
19          So that's not unexpected in the context
20  of presenting the first set of data to -- to
21  someone.
22          Also, I'd like to point out, Mike
23  Friedman was new to Searle in a matter of months,
24  and his appreciation of all of our understanding of

---

307

1  Celebrex, the understanding of the design of the
2  trial, the interactions with the FDA, he was new to
3  it all.
4          So his -- he did not have the history to
5  understand our presentation like some other people
6  who were involved historically would be.  So he had
7  some questions.  He had some recommendations.  He
8  asked for us to consider other analyses.
9          And this e-mail was to honor his
10  questions, honor his request for analyses for the
11  team to consider to get a -- the best understanding
12  possible of the CLASS data.
13      Q.   When did Dr. Silverstein and Dr. Simon
14  and the other external authors receive the data?
15      A.   So in terms of receive the data, no one,
16  as I recall, received it.  What we did is -- and I
17  believe the date was around March 31st -- we had a
18  meeting with the -- if you will, the external
19  authors at a hotel where we presented the data and
20  presented all the various analyses that we had and
21  our interpretation and understanding of the data.
22          So in the sense, did they receive it?  No
23  one got hard copies of anything.  No one
24  electronically was sent anything.  So that was

---

308

1  around March 31st.
2          As I recall, all the external authors
3  were there with the exception of Fred Silverstein.
4  And Fred Silverstein, I went through things by phone
5  with him around the same time period.
6      Q.   Okay.  When you say no one received it,
7  none of the external authors received the data, but
8  you and the folks at Pharmacia internally, you've
9  had the data, correct?
10      A.   Yes, that's correct.
11      Q.   And then you summarized it and
12  presented -- presented it to the external authors?
13      A.   And there were -- so -- so we summarized,
14  but we also presented on overheads, some of the raw
15  data that would have been in appendices of --
16  ultimately be in the appendices of the report.
17          So we had available to them whatever they
18  wanted to see after we presented it.  If they wanted
19  to drill down and see more, we were available to do
20  that.
21          So the idea, which is consistent with our
22  practices, were, we put our best thinking together
23  internally, then we bring it forward to external
24  people who are experts and say, here's what we

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

### 309

1  think. What do you think? Do you need more
2  information? And if you do, let's try to get it to
3  you.
4      Q.    And one of the things you brought forward
5  to them on March 31st is that you thought the -- the
6  data may be biased after six months due to the
7  informative censoring, if you will?
8      A.    We -- we brought forward data in the
9  concept that there was differential withdrawal in
10 the treatment groups due to patients most likely to
11 get an ulcer complication. We brought that forward
12 and showed it to them and showed that we think it --
13 its maximum effect was after the first six months.
14 We brought that forward.
15          The concept of informative censoring, in
16 the phrase, I don't believe, was being used then.
17 Informative censoring was not a term that I was
18 familiar with until after the CLASS data began to be
19 reviewed in a lot more detail.
20          So informative censoring, I -- was not
21 out there. But the concept of differential
22 withdrawal of susceptible patients was presented to
23 the external folks.
24     Q.    So the concept of bias and differential

### 310

1  withdrawal, that was presented by internal Pharmacia
2  folks, including yourself, to the external authors
3  on or about March 31st, 2000?
4      A.    That's correct.
5      Q.    And -- and -- and then it was also around
6  that same time you communicated that concept to
7  Dr. Silverstein over the phone?
8      A.    Around that time, yes. I don't remember
9  exactly the date.
10     Q.    Okay. And looking back to the CLASS --
11 the -- to this document that's been marked as
12 Exhibit 80 that you drafted, the second page where
13 it says, "CLASS Analyses - Other considerations,"
14 No. 1 says, "As per the protocol, what were the
15 defined primary, secondary, exploratory, et cetera,
16 analyses?"
17          Do you see that?
18     A.    I do.
19     Q.    And was that a question Dr. Friedman had
20 for you, like, what's the secondary, primary and
21 exploratory analyses?
22     A.    Yes, it was.
23     Q.    And you wanted to create a slide that
24 answered that for him?

### 311

1      A.    Yeah. We wanted to go back and -- I
2  don't think we said create a slide. It was base --
3  it is basically what we're calling analyses and
4  other considerations.
5          No. 1 isn't -- it was more about, go back
6  to the protocol and statistical analysis plan and
7  make -- make it clear what was defined as primary,
8  secondary, exploratory, if those terms were used.
9      Q.    And we know from looking at the protocol
10 that was Exhibit 77, that the primary -- the
11 coprimary endpoints were the complicated ulcers?
12     A.    That's correct.
13     Q.    And -- and there was no description that
14 those complicated ulcers would be looked at at any
15 point short of the entire study in the protocol?
16          That's a bad question.
17          The protocol didn't say, we're going to
18 look at these complicated ulcers at six months and
19 for the entire study because it was a
20 time-to-completion study?
21     MR. HOFF: Objection to form.
22 BY MR. SAHAM:
23     Q.    Or an event-to-completion or however you
24 described it.

### 312

1          That's a bad question.
2          My -- my question to you is --
3      MR. WEISS: That's two in a row.
4      MR. SAHAM: There's, like, six bad questions
5  pending, so I'll ask a seventh.
6      MR. HOFF: You've got -- you've got one -- it's
7  three strikes, you're out, I believe, in California,
8  right?
9  BY MR. SAHAM:
10     Q.    But -- but Dr. Geis, it's -- it's
11 after -- the protocol doesn't lay out that you're
12 going to look at some subset of the data at six
13 months for those primary endpoints; is that correct,
14 sir?
15     A.    Well --
16     MR. HOFF: I just want you to read it back
17 because I want to make sure I understand what the
18 question is.
19     MR. SAHAM: But -- but the new question.
20     MR. HOFF: The current one.
21          (WHEREUPON, the record was read by
22          the reporter.)
23     MR. HOFF: Objection to form.
24 BY THE WITNESS:



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

313

1      A.   The protocol outlines that this is
2   going -- this is a time-to-event study and that
3   crude rates would be analyzed and Kaplan-Meier plots
4   would be run.
5         When they run the Kaplan-Meier plots,
6   they also run tables cutting the data at
7   three months, six months.  And I think there's a few
8   others, and you'll find those tables in the report.
9   BY MR. SAHAM:
10      Q.   But the protocol that we were looking at
11  earlier didn't state that it was going to be looked
12  as at six months --
13      MR. HOFF:  Objection to form.
14  BY MR. SAHAM:
15      Q.   -- is that correct, sir?
16      A.   So the precise wording of six months in
17  the analysis plan, I do not believe is there.  But
18  the Kaplan-Meier of time-to-event, as I understand
19  from the statisticians, allows for cuts anywhere
20  between the first event and the last event of the
21  study.
22      Q.   And is that something you learned in your
23  preparation to testify about the topic about
24  informative censoring?  You spoke to statisticians

314

1   and they told you that the Kaplan-Meier
2   time-to-event thing would roll out for six months?
3       A.   No.  This -- this goes back to when
4   this -- when we were first dealing with the data and
5   trying to understand the data, we consulted
6   extensively with the statisticians of, what is it --
7   what are appropriate analyses, and is it appropriate
8   that we can identify and use the 6-month data as the
9   valid data?  And they unanimously agreed that that
10  was consistent with the whole analysis of
11  time-to-event.
12      Q.   But the protocol doesn't lay out that
13  you're going to do an analysis at six months,
14  correct?
15      MR. HOFF:  Objection to form.
16  BY THE WITNESS:
17      A.   The precise wording stating six months, I
18  do not believe, is in the protocol, but the
19  time-to-event analysis is, which they tell me allows
20  for earlier cuts is there.
21  BY MR. SAHAM:
22      Q.   Okay.  Looking back at Exhibit No. 80,
23  you write number -- No. 8 on the second page, you
24  write, "Stats for 6 months (POBs and PUBs) only"?

315

1       A.   Yes.
2       Q.   And -- and why'd you write that?
3       A.   Well, in the con-- -- again, although I
4   remember writing this e-mail, I don't expressly
5   remember exactly each one of these, but this was a
6   list that Mike Friedman had asked for.  And in the
7   spirit of it -- of honoring his request for
8   additional analyses, we gave -- we were going to do
9   this cut.
10        But as you see, earlier, I said you may
11  have done this already.
12        So as the team was working and we -- and
13  we had, before we spoke with Friedman, come to the
14  understanding that there was bias which invalidated
15  the data after six months.  It's highly -- highly
16  likely that we had the stats for six months before I
17  wrote this.
18      Q.   And in No. 11, you write, "Outcomes of
19  POBs and Ulcers"?
20      A.   Yes.
21      Q.   Okay.  I want to turn your attention to
22  what I'm marking as Plaintiffs' Exhibit 270.
23
24

316

1             (WHEREUPON, a certain document was
2             marked Plaintiffs' Deposition
3             Exhibit No. 270, for identification,
4             as of 12/10/2010.)
5   BY MR. SAHAM:
6       Q.   Could you please take a look at
7   Plaintiffs' Exhibit 270.
8       MR. SAHAM:  And for the record, Plaintiffs'
9   Exhibit 270 is a one-page document bearing Bates
10  number DEFS 00113940.  And, again, this one actually
11  has the attachment saying it came from your
12  custodial files.
13  BY MR. SAHAM:
14      Q.   And I'd ask you if you recognize this
15  document which says, Draft 11.23.99, JAMA editorial,
16  Message Points?
17      A.   I don't -- I don't recall seeing this.
18      Q.   But you don't dispute this came from your
19  custodial files?
20      A.   I don't --
21      Q.   Okay.  In looking --
22      A.   -- either way.
23      Q.   Sorry.
24        The bullet point -- I'm looking at the



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

## 317

1  sixth bullet point under JAMA editorial Message
2  Points.  It says, "You can't predict who will and
3  won't have a bleed - and especially not with
4  chronic, lifetime use.  Only 20 percent of people
5  with NSAID-induced bleeds ever have symptoms."
6      Do you agree with that statement?
7      A.  So -- so first of all, I just want to
8  make sure, I don't know who wrote this.  And, again,
9  there were a lot of people writing things and
10  copying me on them, and some were scientists and
11  physicians and some were people within the
12  organization.
13      So I don't know that that's true.  I'd
14  have to look at the data to refresh my memory about
15  20 percent --
16      Q.  You just don't know whether it's accurate
17  or not?
18      A.  No, I don't.
19      Q.  Okay.  I want to show you what I'm
20  marking as Plaintiffs' Exhibit 271.
21          (WHEREUPON, a certain document was
22          marked Plaintiffs' Deposition
23          Exhibit No. 271, for identification,
24          as of 12/10/2010.)

## 318

1  BY MR. SAHAM:
2      Q.  And, again, you're not a -- a
3  gastroenterologist, correct?
4      A.  I was -- I was not trained in
5  gastroenterology; however, I was trained in surgery
6  and so dealt with people with ulcers that perforated
7  and bleeding.
8      Q.  Right.  And I understand you're a medical
9  doctor.
10      A.  I am.
11      Q.  And you did a residency?  Did you
12  complete a residency?
13      A.  I did not.
14      Q.  You did part of a residency?
15      A.  I did.
16      Q.  And then you went into work for
17  Pharmacia?
18      A.  Correct.  I also have a Ph.D. in
19  physiology.
20      Q.  Right.  And -- and -- and my question is,
21  a gastroenterologist, that's like a specialization,
22  correct?
23      A.  That's correct.
24      Q.  You had to do a fellowship to get it?

## 319

1      A.  I believe you do.
2      Q.  Okay.  And you didn't do that?
3      A.  I did not.
4      Q.  I want to show you what I'm marking as
5  Plaintiffs' Exhibit 271.
6      Could you please take a look at
7  Plaintiffs' Exhibit 271.  And this bears the
8  Bates numbers DEFS 00536944 through 955.
9      And it's a two-page e-mail that has an
10  attachment and then -- and the document's from
11  Thomas Krol to numerous people, including Lefkowith,
12  Verburg, Wahba, W-a-h-b-a, and you're cc'd.
13      Do you know who this Thomas Krol fellow
14  is?
15      A.  I don't recall the name at all.
16      Q.  Okay.  And do you have any reason to
17  believe you didn't receive this e-mail on or about
18  May 26, 2000?
19      A.  I don't remember either way.
20      Q.  Okay.  And I'd like to refer your
21  attention to the last three Bates numbers 950, sort
22  of in the middle of the document.  And there's a
23  table, and under it, it says, "GI symptoms are
24  nonetheless poor predictors of serious toxicity."

## 320

1      Do you see that?
2      A.  No.  Let me read this.
3      MR. HOFF:  What page are you on?
4      MR. SAHAM:  It's 950.  There's a table in there
5  and then there's some text.
6  BY THE WITNESS:
7      A.  I see what's written here, yes.
8  BY MR. SAHAM:
9      Q.  Okay.  So I'm just reading you the
10  sentence, "GI symptoms are nonetheless poor
11  predictors of serious toxicity."
12      Do you believe that's an accurate
13  statement?
14      A.  No, I do not.  I -- I just want to point
15  out, I don't know what this is and -- and what these
16  guys were writing, but it looks like who -- whoever
17  Tom Krol is, is -- is taking some data and making
18  conclusions, and I have no -- no recollection of
19  what he's doing or why he's doing it.  But --
20      Q.  Do you know --
21      A.  -- this isn't something that came -- that
22  looks to me like it came out of the medical or the
23  science groups at Searle.
24      Q.  Do you know who Jan Markind is?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

321

1      A.   Jan Markind, as I recall, was a Searle
2   employee, and she was a medical writer for what we
3   call medical affairs, which was connected to the
4   commercial side of the organization.
5      Q.   I want to show you what I'm marking as
6   Plaintiffs' Exhibit 272.
7           (WHEREUPON, a certain document was
8           marked Plaintiffs' Deposition
9           Exhibit No. 272, for identification,
10          as of 12/10/2010.)
11   THE WITNESS:  Can I -- can I go back and
12   just make a -- I just want to clarify a comment
13   about, symptoms are predictors -- are poor
14   predictors.  I just want to be careful with the word
15   "predict."  And in my answer is that there is a
16   correlation between symptoms and -- and -- and
17   clinically significant events.
18           That's what I mean when I disagree with
19   it.  There is a correlation, but it is not a
20   one-to-one association or -- of symptoms versus
21   complications.  I just wanted to clarify that.
22   BY MR. SAHAM:
23      Q.   Thank you, sir.
24           I want to show you Plaintiffs'

322

1   Exhibit 272.
2        MR. SAHAM:  And for the record, Plaintiffs' 272
3   bears Bates numbers DEFS 00362813 through 825.  And
4   the front page of the document is an e-mail, at
5   least the top e-mail, from George S. Geis, dated
6   April 18th, 2000, to Kenneth Verburg, Richard
7   Hubbard and David Recker.  And the subject is CLASS
8   Study Media Coverage 4/17.
9           And below that, there's an e-mail from
10   Diana Smith dated April 17, 2000, subject, CLASS
11   Study Media Coverage, that went to you that then you
12   forwarded to those gentlemen.
13   BY MR. SAHAM:
14      Q.   And I'd ask you, first off, if you
15   recognize either -- or if you recognize this
16   document which consists of the e-mail and the
17   synopsis of CLASS Study Media Coverage, April 17th,
18   2000?
19      A.   I don't recall this e-mail, neither the
20   e-mail nor the attachment.
21      Q.   But you don't have any reason to believe
22   you didn't receive this in the ordinary scope of
23   your employment at Pharmacia?
24      A.   I don't recall it either way.

323

1      Q.   Okay.  And specifically, I want to refer
2   you to the bottom of -- in the bottom right-hand
3   corner, it says page 5, and it's a Bloomberg
4   April 17th, 2000 article by Michelle Fay Cortez
5   entitled Pharmacia's, Pfizer -- Pharmacia's, Pfizer
6   Celebrex Drug Found to Be Safer.
7           Do you see that?
8      A.   I see that.
9      Q.   And then you turn over to the next page,
10   which is the -- most of the body of this April 17th,
11   2000 article, and you go to the third full paragraph
12   on page 6.  It says, "'We really believe the data
13   are sufficiently compelling to warrant discussions
14   with the FDA,' said Dr. Steve Geis, vice president
15   of the arthritis clinical program at Pharmacia's
16   Searle unit.  He wouldn't predict if the results
17   were strong enough to get the warning label
18   revised."
19           Does this refresh your recollection that
20   you spoke to the press on or about April 17th, 2000,
21   regarding the CLASS trial?
22      A.   No, it doesn't.
23      Q.   Do you have any reason to believe that
24   this Bloomberg article is not an article that was

324

1   published by Michelle Fay Cortez on or about
2   April 17th, 2000?
3      A.   In the sense that this is truly her
4   article, I have no reason to believe it's not
5   accurate.
6      Q.   Okay.  So you wouldn't -- you wouldn't
7   testify today that you didn't speak to the press on
8   April 17th --
9      A.   Correct, I don't remember.
10      Q.   Okay.  I want to show you what I'm
11   marking as Plaintiffs' Exhibit 273.
12           (WHEREUPON, a certain document was
13           marked Plaintiffs' Deposition
14           Exhibit No. 273, for identification,
15           as of 12/10/2010.)
16   BY MR. SAHAM:
17      Q.   And, again, this is one of those
18   documents where, unfortunately, I didn't bring the
19   little page on the end, but I would represent to you
20   that this came from your custodial files.  You can
21   take that representation for whatever it's worth.
22           And this document, Exhibit 273, bears
23   Bates numbers DEFS 01015928 through 5935, and it's
24   labeled 4/16, 2000, Draft, Q&A Document/CLASS Trial


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

325

1  Results, For Internal Use Only, Not for External
2  Distribution.
3      I'd ask you if you recognize this
4  document?
5      A.  I don't recall this document.
6      Q.  Okay.  Do you recall seeing similar
7  documents like this during your time at Pharmacia?
8      A.  I have -- I've seen documents that look
9  like this where they have Q and As, but not
10 routinely.
11     Q.  I want to show you what I'm marking as
12 Plaintiffs' Exhibit 274.
13         (WHEREUPON, a certain document was
14         marked Plaintiffs' Deposition
15         Exhibit No. 274, for identification,
16         as of 12/10/2010.)
17     MR. SAHAM:  Ask you to take a look at
18 Plaintiffs' Exhibit 274, which for the record, bears
19 Bates numbers DEFS 00536852 through 6856.
20 BY MR. SAHAM:
21     Q.  I'd ask you if you recognize this
22 document?
23     A.  Could you repeat your question?
24     Q.  I asked you if you recognize this

326

1  document?
2      A.  I do not.
3      Q.  Okay.  But you're listed as having
4  attended a January 26 meeting with the FDA in
5  preparation for the advisory committee meeting?
6      A.  Yes.
7      Q.  And is that the meeting you referred to
8  earlier with Dr. Goldkind and perhaps Dr. Hong Lu?
9      A.  I believe so, yes.
10     Q.  Okay.  And this appears to be a summary
11 of what took place at that meeting?
12     A.  It looks like somebody wrote this up, but
13 I don't know whom.
14     Q.  Again, I would represent to you that this
15 was found in your files.
16     A.  Right.  But, again, it doesn't say who
17 wrote it --
18     Q.  Correct.
19     A.  -- and when it was written.
20     Q.  And I'd like to turn your attention to
21 the last three Bates numbers 855, the second to last
22 page under the label of Informative Censoring.
23     A.  Yes.
24     Q.  Do you see that?

327

1      A.  I do.
2      Q.  The -- the second paragraph there says,
3  "According to FDA, should Celebrex have exhibited
4  superiority over D (which it did not), then it would
5  have been valid to look into the contribution of
6  informative censoring.  However, in the current
7  situation where a negative result was observed, IC
8  could only have been attributed if it was well
9  accepted in the particular field."
10         To your recollection, does that
11 accurately reflect Dr. Goldkind and Dr. Hong Lu, the
12 FDA medical reviewer and statistical reviewer's
13 opinion regarding the, quote-unquote, informative
14 censoring explanation?
15     A.  Let me read this again.
16         I don't understand what this really says,
17 and I don't remember what Dr. Goldkind and Dr. Lu
18 presented at the advisory meeting.  In a way, this
19 doesn't even make sense to me, but...
20     Q.  Do you remember Winifred Begley?
21     A.  I do.
22     Q.  And was she, like, a regulatory affairs
23 person?
24     A.  She was a -- a regulatory affairs person

328

1  at Searle.
2      Q.  And she attended the meetings with the
3  FDA leading up to the advisory committee meeting?
4      A.  It depends on which meetings you're
5  talking about because there were several people in
6  regulatory.  So I'd have to know specifically which
7  meeting we're referring to.
8      Q.  Did she attend that January 26th meeting?
9      A.  According to this, she did.
10     Q.  I want to show you what I'm marking as
11 Exhibit 275.
12         (WHEREUPON, a certain document was
13         marked Plaintiffs' Deposition
14         Exhibit No. 275, for identification,
15         as of 12/10/2010.)
16 BY MR. SAHAM:
17     Q.  I'm going to show you what I'm marking as
18 Plaintiffs' Exhibit 275.
19         Could you please take a look at that
20 document, sir.
21     MR. SAHAM:  And for the record, Plaintiffs'
22 Exhibit 275 is a two-page e-mail chain bearing
23 Bates numbers DEFS 00205502 through 503.  And the
24 middle e-mail on the page is drafted by you, and



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

329

1  the -- and so is the bottom e-mail on the page is
2  also drafted by you.  And then the middle e-mail was
3  drafted by Dr. Lefkowith on September 20, 2001, and
4  was sent to you and Dr. Verburg.  And the subject is
5  ACP GI abstract draft.
6  BY MR. SAHAM:
7      Q.   And I ask if you recognize this e-mail
8  chain?
9           I ask if you recognize this e-mail chain?
10     A.   I do not.
11     Q.   Okay.  But you don't dispute that you
12  received and sent the e-mails as indicated?
13     A.   I -- I just don't remember these e-mails.
14     Q.   Okay.  And Dr. Lefkowith writes to you,
15  "The question then arises why we didn't go with the
16  longer-term data."
17          Do you understand what he's talking about
18  there?
19     A.   Where exactly --
20     Q.   Well, I'm in the middle -- his e-mail in
21  the middle.  It says, "I can revise the abstract to
22  show both analyses, but I am concerned that simply
23  showing that the 6-month and longer-term data are
24  not different isn't a compelling presentation.  The

330

1  question then arises why we didn't go with the
2  longer-term data."
3          Do you see that?
4      A.   I do see that.
5      Q.   Do you know what he's talking about?
6      A.   I don't.
7      Q.   And he's dead, unfortunately, right?
8      A.   Unfortunately, correct.
9      Q.   I want to show you what's previously been
10  marked as Plaintiffs' Exhibit 110.
11          Could you take a look at Plaintiffs'
12  Exhibit 110.
13          And all I want to ask you about this --
14  you've referred before to this statistical analysis
15  plan, and this document, Exhibit 110 is labeled a
16  plan of the final analyses for Celecoxib - Incidents
17  of clinically significant UGI adverse events versus
18  Ibuprofen and Diclofenac in OA or RA, and the
19  documentation date is December 7th, 1999.
20          Is this the statistical analysis plan you
21  were referring to earlier?
22     A.   It appears so, yes.
23     Q.   Okay.  And this is a document that would
24  have been created in the ordinary scope of Parm- --

331

1  or I'm sorry, G.D. Searle's business operation?
2      A.   It was -- this was the practice to do a
3  separate statistical analysis plan for protocols.
4      Q.   And like a protocol, it was submitted to
5  the FDA?
6      A.   Yes.
7      Q.   Okay.  And it would be done so in the
8  ordinary scope of business at G.D. Searle?
9      A.   Yes, it would have.
10     Q.   Okay.  I want to show you what I'm
11  marking as -- or what's previously been marked in
12  this case as Plaintiffs' Exhibit 227.
13          Ask you if you recognize this document?
14     A.   Yes, I do.
15     Q.   And this is the notice of 30(b)(6)
16  deposition, which you're appearing, in part, today
17  to testify on certain topics; is that correct?
18     A.   Yes, it is.
19     Q.   And with respect to Topic 2, issuance of
20  the press release, including, but not limited to,
21  the process for an individuals involved with
22  drafting, editing and approving the press release,
23  you're testifying on behalf of Pharmacia for
24  Topic 2?

332

1      A.   On page 3?
2      Q.   Correct.
3      A.   Yes, I am.
4      Q.   And with respect to Topic 3, the decision
5  to analyze and publish results concerning the first
6  six months of data obtained from the CLASS study,
7  including, without limitation, identification of
8  those individuals who made the decision, when the
9  decision was made and any documents or minutes
10  memorializing the decision, you're testifying on
11  behalf of defendant Pharmacia for that topic, as
12  well?
13     A.   Yes, I am.
14     Q.   And with respect to Topic 4, the
15  individuals responsible for analyzing impact of
16  informative censoring or physiological adaptation on
17  the CLASS results and any analyses undertaken,
18  you're testifying on behalf of Pharmacia for
19  Topic 4, as well?
20     A.   Yes.
21     Q.   And with respect to Topic 5, drafting,
22  review and approval of any presentation made to the
23  American College of Physicians on or about
24  April 17th, 2000, including, without limitation,



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

### 333

1   those individuals involved in the drafting, review
2   and approval process and any documents or minutes
3   memorializing the process, you're testifying on
4   behalf of defendant Pharmacia for Topic 5, as well?
5       A.   Yes.
6       Q.   Any other topics that you understand
7   you're testifying on behalf of Pharmacia for?
8       A.   I believe, as I understand it, those are
9   the ones.
10      Q.   Okay.  And we're virtually out of time
11  for the deposition today, but I would like to ask
12  you, your -- your lawyers will get a copy of the
13  transcript and then send it to you, and will you
14  review it and make corrections and send whatever
15  corrections or additions you think are appropriate
16  on the errata page back to your counsel in a timely
17  fashion?
18      A.   Yes, I will.
19      MR. SAHAM:  Okay.  With that, I --
20      MR. WEISS:  Can I ask just one follow-up
21  question?
22      MR. SAHAM:  Well, then I might have more
23  questions.
24

### 334

1              EXAMINATION
2   BY MR. WEISS:
3       Q.   Dr. Geis, earlier today you were asked
4   some questions about whether or not -- in connection
5   with the 30(b)(6) notice and the topic regarding the
6   press release, whether you had reviewed the drafts
7   of the press release -- the press releases in
8   preparation for your deposition, and you testified
9   that you had not; is that correct?
10      A.   You know, when I think back on that, I
11  saw them but didn't explicitly go through each one
12  and read each one.  But I saw the drafts and that
13  there were drafts, so I'm aware there were drafts
14  before the final.
15      MR. SAHAM:  I don't have any additional
16  questions at this time.
17      THE VIDEOGRAPHER:  That concludes today's
18  deposition of Steven Geis on December 10, 2010.
19  We're going off the video record at 5:23 p.m.
20          FURTHER DEPONENT SAITH NOT.
21
22
23
24

### 335

1   STATE OF ILLINOIS )
2                     ) SS:
3   COUNTY OF DU PAGE )
4       I, Nicole Scola, a Notary Public within
5   and for the County of DuPage State of Illinois, and
6   a Certified Shorthand Reporter of said state, do
7   hereby certify:
8       That previous to the commencement of the
9   examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12      That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony given
16  and the proceedings had;
17      That the said deposition was taken before
18  me at the time and place specified;
19      That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in the
23  outcome of this action.
24      IN WITNESS WHEREOF, I do hereunto set my

### 336

1   hand and affix my seal of office at Chicago,
2   Illinois, this 24th day of December, 2010.
3
4
5       Notary Public, DuPage
6       County, Illinois.
7       My commission expires 08/30/2014.
8
9
10  C.S.R. Certificate No. 084-004524.
11
12
13
14
15
16
17
18
19
20
21
22
23
24



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

337

1        I N D E X
2
3    WITNESS              EXAMINATION
4                    Page   Line
5    STEVEN GEIS
6     Mr. Saham              5   10
7     Mr. Weiss           334    2
8
9
10        E X H I B I T S
11   Plaintiffs' Deposition Exhibit    Page  Line
12       No. 248...................    9    6
13       No. 249...................   42   20
14       No. 250...................   55    3
15       No. 251...................   70    7
16       No. 252...................   79   23
17       No. 253...................   92    4
18       No. 254...................  106    7
19       No. 255...................  111   13
20       No. 256...................  140   13
21       No. 257...................  193    3
22       No. 258...................  210    8
23       No. 259...................  213   19
24       No. 260...................  222   23

339

1            DEPOSITION ERRATA SHEET
2    Assignment No.  179917
        UNITED STATES DISTRICT COURT
3        DISTRICT OF NEW JERSEY
4    ALASKA ELECTRICAL PENSION        )
5    FUND, et al., On Behalf of      )
6    Themselves and All Others      ) No. 03-1519
7    Similarly Situated,         ) (AET)
8          Plaintiffs,     )
9      vs.              )
10   PHARMACIA CORPORATION, et al.,  )
11      Defendants.     )
12      DECLARATION UNDER PENALTY OF PERJURY
13        I declare under penalty of perjury that I
14   have read the entire transcript of my Deposition
15   taken in the captioned matter or the same has been
16   read to me, and the same is true and accurate, save
17   and except for changes and/or corrections, if any,
18   as indicated by me on the DEPOSITION ERRATA SHEET
19   hereof, with the understanding that I offer these
20   changes as if still under oath.
21        Signed on the _____ day of
22   _____, 20___.
23        _____
24        STEVEN GEIS

338

1       E X H I B I T S (Continued)
2    Plaintiffs' Deposition Exhibit    Page   Line
3        No. 261...................  228    3
4        No. 262...................  236    6
5        No. 263...................  241   13
6        No. 264...................  251    9
7        No. 265...................  262   11
8        No. 266...................  268   23
9        No. 267...................  272    6
10       No. 268...................  278    9
11       No. 269...................  288    8
12       No. 270...................  316    3
13       No. 271...................  317   23
14       No. 272...................  321    9
15       No. 273...................  324   14
16       No. 274...................  325   15
17       No. 275...................  328   14
18
19
20
21
22
23
24

340

1            DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24        STEVEN GEIS



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

341

1    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   SIGNATURE:_____DATE:_____

24         STEVEN GEIS



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

EXHIBIT 9

De Angelis, Catherine  1/12/2007  11:00:00 AM

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT

2           DISTRICT OF NEW JERSEY

3    _____

4    ALASKA ELECTRICAL PENSION FUND,  )

5    et al., on behalf of themselves  )

6    and all others similarly situated,)

7        Plaintiffs,          )

8       vs.                  ) No. 03-1519

9    PHARMACIA CORPORATION, et al.,   )

10       Defendants.         )

11   _____)

12

13       Videotaped deposition of CATHERINE

14   DE ANGELIS, at 515 North State Street,

15   Chicago, Illinois, commencing at

16   11:00 a.m. on Friday, January 12,

17   2007, before Donna M. Stifter, RPR,

18   CSR No. 084-003145.

19

20

21

22

23

24
```

**Page 2**

```
1    APPEARANCES OF COUNSEL:

2

3       FOR THE PLAINTIFFS:

4          LERACH COUGHLIN STOIA GELLER

5          RUDMAN & ROBBINS, LLP

6          BY:  MR. MATTHEW MONTGOMERY

7          655 West Broadway

8          Suite 1900

9          San Diego, California 92101-3301

10         (619) 231-1058

11

12

13      FOR THE DEFENDANT PHARMACIA CORPORATION:

14         CADWALADER, WICKERSHAM & TAFT, LLP

15         BY:  MR. JASON M. HALPER

16            MS. KATHERINE A. RITCHIE

17         One World Financial Center

18         New York, New York 10281

19         (212) 504-6605

20

21

22

23

24
```

**Page 3**

```
1    APPEARANCES OF COUNSEL:

2

3       FOR THE DEFENDANT PFIZER CORPORATION:

4          DLA PIPER US LLP

5          BY:  MR. LOREN H. BROWN

6          1251 Avenue of the Americas

7          New York, New York 10020-1104

8          (212) 335-4846

9

10

11      FOR THE DEPONENT:

12         AMERICAN MEDICAL ASSOCIATION

13         BY:  MR. LEONARD A. NELSON

14         515 North State Street

15         Chicago, Illinois 60610

16         (312) 464-5532

17

18   ALSO PRESENT:

19         John Sheehan, Videographer

20

21

22

23

24
```

**Page 4**

```
1        THE VIDEOGRAPHER:  Good morning.  This      11:08

2    is Videotape No. 1 of the deposition of miss

3    Catherine DeAngelis taken in the matter of Alaska

4    Electrical Pension Fund, et al. vs. Pharmacia

5    Corp., et al., in the United States District Court   11:09

6    for Northern Illinois, Case No. --

7        MR. MONTGOMERY:  New Jersey.

8        THE VIDEOGRAPHER:  I'm sorry.  District

9    of New Jersey, Case No. 03-1519.

10       This deposition is being held in      11:09

11   the offices of the American Medical Association

12   located at 515 North State Street, Chicago,

13   Illinois.  The date today is the 12th day of

14   January, 2007.  The time now is approximately

15   11:09.                         11:09

16       At this time I'd like the counsels

17   to please identify themselves and whom they

18   represent.

19       MR. MONTGOMERY:  Matthew Montgomery from

20   Lerach Coughlin for plaintiffs.              11:09

21       MR. HALPER:  Jason Halper, Cadwalader,

22   for the defendants.

23       MR. BROWN:  Loren Brown for Pfizer.

24       MS. RITCHIE:  Katherine Ritchie of
```

5

1    Cadwalader for defendants.                11:10

2        MR. NELSON:  Leonard Nelson representing

3    the witness.

4        THE VIDEOGRAPHER:  And I'd just like to

5    say that those of you that aren't actually miked    11:10

6    up, we can hear everybody very clearly, so there's

7    no problem with that.

8        At this time I'd like the Court

9    Reporter to please administer the oath and we may

10   begin.                                    11:10

11       CATHERINE DE ANGELIS,

12   having been first duly sworn, was examined and

13   testified as follows:

14           EXAMINATION

15       BY MR. MONTGOMERY:                    11:10

16   BY MR. MONTGOMERY:

17   Q.   Could you state your name for the

18   record, please?

19   A.   Catherine DeAngelis.

20   Q.   Good morning, Dr. DeAngelis.        11:10

21   A.   Good morning.

22   Q.   As I told you earlier, my name is Matt

23   Montgomery and I represent the plaintiffs in this

24   case.

6

1        The plaintiffs in this case at this    11:10

2    point are a group of pension funds that bought

3    stock in Pharmacia between 2000 and 2002.

4    A.   Yes.

5    Q.   And the basis of the case is that they    11:11

6    allege that defendants, which are Pharmacia,

7    Pfizer, and some of their employees, made false or

8    misleading statements about Celebrex and data

9    concerning Celebrex during that time.

10   A.   Okay.                               11:11

11   Q.   So the allegation is that by

12   misrepresenting the data regarding Celebrex they

13   inflated the value and the price of the Pharmacia

14   stock that my clients purchased, and when the

15   truth about Celebrex came out, that stock        11:11

16   declined.

17   A.   Okay.

18   Q.   So the reason that the suit was

19   instigated was to try and get that money back.  I

20   just thought you might appreciate the background.    11:11

21       MR. BROWN:  For the record, the

22   defendants disagree with those allegations.

23       MR. MONTGOMERY:  That's safe to say.

24       THE WITNESS:  Okay.

7

1    BY MR. MONTGOMERY:                        11:11

2    Q.   First of all, I'd like to thank you for

3    being here, and I appreciate your time.  My goal

4    is to get the information I need and get you out

5    of here as quickly as possible.          11:11

6    A.   Thank you.  And you're welcome.

7    Q.   We're basically going to go through this

8    stack of documents.  So you can tell where we are

9    in the deposition, at least my part of the

10   deposition, by how far through it we are.    11:12

11   A.   Sure.

12   Q.   Have you ever been deposed before?

13   A.   Yes, sir.

14   Q.   How many times, approximately?

15   A.   Oh, five or six.                    11:12

16   Q.   Okay.  Then I'll skip some of the

17   preliminaries.

18       Do you understand that even though

19   we're in a conference room, the oath you just took

20   has the same force and effect as it would if you    11:12

21   were in a court of law?

22   A.   Yes.

23   Q.   And do you understand that the Court

24   Reporter to my left and your right is typing down

8

1    all my questions and your answers, so we can't    11:12

2    overlap with one another?

3    A.   Yes.

4    Q.   Now, during the course of the deposition

5    your attorney or one of the defense attorneys may    11:12

6    interpose an objection.

7    A.   Okay.

8    Q.   Unless your attorney instructs you not

9    to answer, I'd like you to let them get their

10   objection on the record and then go ahead and        11:12

11   answer.

12   A.   Okay.

13       MR. MONTGOMERY:  Counsel, can we all

14   agree that an objection made by anyone applies to

15   everyone?  In other words, if he objects to form,    11:12

16   you don't have to make the exact same objection.

17       MR. HALPER:  Yes.

18   BY MR. MONTGOMERY:

19   Q.   Before we get into the substantive

20   questions, I wanted to define a few terms so we    11:13

21   can make it easier when we get going.

22       Are you familiar with the drug

23   celecoxib?

24   A.   Yes.

De Angelis, Catherine  1/12/2007  11:00:00 AM

9

1    Q.   And is its commercial name Celebrex?      11:13
2    A.   Yes.
3    Q.   So if I refer to Celebrex, you
4    understand I'm also referring to celecoxib?
5    A.   Yes.                           11:13
6    Q.   Are you familiar with the celecoxib
7    long-term arthritis safety study also called
8    CLASS?
9    A.   Yes.
10   Q.   So if I refer to CLASS, I'd be referring    11:13
11   to that study.
12   A.   I'm familiar at least with the component
13   that we dealt with at JAMA.
14   Q.   JAMA is another example.  That is the
15   Journal of the American Medical Association;    11:13
16   correct?
17   A.   Yes.  But our official name is, our
18   legal name is JAMA, the Journal of the American
19   Medical Association.
20   Q.   Okay.  I did not know that.          11:14
21        As I explained to you earlier, the
22   defendants in this case are Pfizer, Pharmacia, and
23   certain of their employees.  So if I say the
24   "defendants," I mean those companies and their

10

1    employees.                          11:14
2    A.   Yes.
3    MR. HALPER:  Just for the sake of
4    accuracy, the individuals who are defendants in
5    the case are former Pharmacia employees.     11:14
6    THE WITNESS:  I see.
7    MR. MONTGOMERY:  At this point I'd like
8    to ask the Court Reporter to mark what will be
9    Exhibit 17.
10   (WHEREUPON Deposition Exhibit          11:15
11   No. 17 was marked as of
12   1/12/2007.)
13   THE WITNESS:  While the witness is
14   reviewing that, can I ask to go off the record
15   just for technical matters for just a couple    11:15
16   seconds?
17   MR. MONTGOMERY:  Sure.  Go ahead.
18   THE VIDEOGRAPHER:  Thank you very much.
19   We are going off the record at 11:15.
20   (WHEREUPON a recess was taken.)        11:16
21   THE VIDEOGRAPHER:  We are back on the
22   record at 11:15.
23   BY MR. MONTGOMERY:
24   Q.   For the record, Exhibit 17 is the

11

1    subpoena pursuant to which you're here today?    11:16
2    (Document tendered to the witness.)
3    A.   Yes.
4    Q.   Have you seen this before?
5    A.   Yes.                           11:16
6    Q.   I only want to ask you about the last
7    page.
8        And while we're at it, it's a good
9    time to explain:  I'm going to show you several
10   documents today.  Feel free to read all or a part   11:16
11   of whichever document I show you.  But a lot of
12   times I'm only going to be asking you about a
13   small part of the document.  So you might want to
14   let me point you in the direction and then you can
15   read as much of the document as you feel is      11:16
16   necessary to get the context.
17   A.   Okay.
18   Q.   All right.  Looking at Page 9 of Exhibit
19   17, do you see the items under Documents Requested
20   and under Request No. 2, all documents concerning   11:16
21   the CLASS study?  It says Request No. 2.  Do you
22   see that?
23   A.   Yes.
24   Q.   Did you personally do anything to search

12

1    for or produce documents concerning the CLASS    11:17
2    study?
3    A.   I delegated that responsibility but took
4    responsibility for it.
5    Q.   Who did you delegate it to?          11:17
6    A.   Various people who had access to them.
7    MR. MONTGOMERY:  I'd like to ask the
8    Court Reporter to mark what will be Exhibit 18.
9    (WHEREUPON Deposition Exhibit
10   No. 18 was marked as of              11:17
11   1/12/2007.)
12   BY MR. MONTGOMERY:
13   Q.   Is this a copy of your Curriculum Vitae?
14   (Document tendered to the witness.)
15   A.   Yes.                           11:17
16   Q.   Do you know if it's current?
17   A.   It's current as of August 15, 2006.
18   Q.   Has anything changed on it since that
19   time?
20   A.   A few more publications, one more honor.   11:18
21   Q.   Do any of the publications concern
22   Celebrex?
23   A.   No.
24   Q.   If you turn to Page 4 of Exhibit 18,

De Angelis, Catherine  1/12/2007  11:00:00 AM

13

1   please, it indicates towards the top of that page    11:18
2   that beginning in the year 2000 you became the
3   editor in chief of JAMA; is that correct?
4      A.   Yes.
5      Q.   At what point in the year did you    11:18
6   become --
7      A.   January 1st.
8      Q.   And you still have that position today?
9      A.   Yes.
10     Q.   Thinking of the time period of 2000    11:18
11  through 2002, what were your responsibilities as
12  editor in chief generally speaking?
13     A.   I was responsible for all editorial
14  material that appeared in JAMA related
15  specifically to JAMA or anything that appeared    11:19
16  on-line.
17     Q.   From a day-to-day perspective, what were
18  your responsibilities with regard to the contents?
19  Did you personally edit every article that
20  appeared in JAMA?    11:19
21     A.   Did I personally edit, no.  Did I
22  personally read and approve every one after
23  various people edited, yes.
24     Q.   We spoke a little earlier about the

14

1   CLASS study.  Do you recall that?    11:19
2      A.   Yes.
3      Q.   Do you remember the first time you heard
4   of the CLASS study?
5      A.   Probably early in that year.    11:19
6      Q.   2000?
7      A.   Yes.
8      Q.   How did you hear about it?
9      A.   Well, first I knew it was in the matrix
10  of a submitted manuscript, and then I became more    11:20
11  familiar with it when it was discussed at a
12  manuscript meeting.
13     Q.   So the first time you became aware of it
14  was after a manuscript had been submitted to JAMA?
15     A.   Yes, yes.    11:20
16     Q.   And was that approximately the summer of
17  2000?
18     A.   A little before, spring.
19     Q.   Who submitted the manuscript to JAMA?
20     A.   The corresponding author I believe was    11:20
21  someone named Lefkowith.  I believe that was his
22  name.
23     Q.   Did you have any substantive discussions
24  about the CLASS study prior to the meeting that

15

1   you were just talking about?    11:21
2      A.   Repeat that.
3      Q.   Sure.  Did you have any substantive
4   conversations or discussions about the CLASS study
5   before the editorial meeting that you just talked    11:21
6   about a minute ago?
7      A.   I might have discussed it with the
8   editor who was handling it.  But we discuss all
9   kinds of things all the time.  Our offices are all
10  together.    11:21
11     Q.   Sitting here today, do you remember
12  the --
13     A.   No.
14     Q.   -- content of those conversations?
15     A.   No.    11:21
16     Q.   I appreciate your willingness to answer,
17  but you have to make sure and wait until I'm done
18  with my question before you answer, just so she
19  can type it more easily.
20          Okay.  You mentioned an editorial    11:21
21  meeting though which is the first -- I'm sorry,
22  it's not the first time.  You mentioned an
23  editorial meeting?
24     A.   Manuscript meeting.

16

1      Q.   I'm sorry, manuscript meeting.  And what    11:21
2   occurred at that meeting?
3      A.   The paper was presented by the editor
4   who was handling it, it was discussed, and we made
5   a deposition about what, a disposition, excuse me,    11:22
6   about what we were going to do with it.
7      Q.   Who is the editor that was in charge of
8   the article?
9      A.   I am in charge of all articles.  The one
10  who was handling it on a day-to-day basis was    11:22
11  Dr. Margaret Winker.
12     Q.   Who else was at the meeting?
13     A.   I don't remember.
14     Q.   Do you remember anyone else specifically
15  other than yourself and Dr. Winker?    11:22
16     A.   No.
17     Q.   Do you remember any of the discussion
18  that occurred at that meeting regarding the CLASS
19  study?
20     A.   Not specifically, no.    11:22
21     Q.   What was the disposition that resulted
22  from that meeting?
23     A.   Revise and reconsider.
24     Q.   Do you remember approximately when that

De Angelis, Catherine  1/12/2007  11:00:00 AM

17

1   meeting occurred?                          11:23
2      A.  No.
3      Q.  After that meeting when was the next
4   time you considered the manuscript that had been
5   submitted?                                 11:23
6      A.  It was discussed again at another
7   manuscript meeting after the revisions had been
8   made.
9      Q.  Do you recall what revisions had been
10  requested --                              11:23
11     A.  No.
12     Q.  -- from the previous meeting?
13        Do you recall what the conversation
14  was at that second meeting?
15     A.  Not specifically.                   11:23
16     Q.  Was there a disposition of the
17  article --
18     A.  Yes.
19     Q.  -- that resulted from that meeting?
20     A.  Yes.                                11:23
21     Q.  And what was that?
22     A.  Provisional accept, meaning there were
23  certain things that were necessary before we could
24  officially accept it.

18

1      Q.  And sitting here today, do you recall   11:24
2   why you accepted the article?
3      A.  Because we thought that it was well
4   done, it was well reviewed by peers, they had made
5   the changes that we had requested to make it      11:24
6   stronger scientifically, and it was one of the
7   best of the, at that point I think we had about
8   thirty-five hundred to four thousand manuscripts,
9   I guess that year about thirty-five hundred, and
10  it was part of the relatively few that we chose to  11:24
11  publish.
12     Q.  Was there something about the content of
13  it or the subject matter of it specifically that
14  you thought warranted publication in JAMA?
15     A.  It was clinically relevant.          11:24
16     Q.  What do you mean by that?
17     A.  That physicians and clinicians and other
18  medical researchers could use the information to
19  ultimately take better care of patients.
20     Q.  After the second meeting that you just   11:25
21  described, were there any further meetings prior
22  to the article's publication concerning that
23  particular article?
24     A.  Not meetings, no.  Discussions.

19

1      Q.  Did you participate in those          11:25
2   discussions?
3      A.  Some of them.
4      Q.  Who did you speak with?
5      A.  Dr. Winker.                          11:25
6      Q.  Do you recall what you guys discussed?
7      A.  Mostly I wanted to know what were the
8   alterations that were requested on the edited copy
9   and what were the responses and how to proceed.
10     Q.  Were you satisfied with the changes that   11:26
11  were made?
12     A.  Yes.
13     Q.  I'd like to show the witness now what's
14  previously been marked as Exhibit 3.  (Document
15  tendered to the witness.)                   11:26
16        For the record, this is an article
17  from the September 13, 2000 issue of JAMA entitled
18  "Gastrointestinal Toxicity With Celecoxib vs.
19  Nonsteroidal Anti-inflammatory Drugs for
20  Osteoarthritis and Rheumatoid Arthritis.  The   11:27
21  CLASS Study:  A Randomized Controlled Trial."
22  Catchy.
23     A.  Hey, we try our best.
24     Q.  So is this the article that was

20

1   ultimately published in JAMA concerning the CLASS   11:27
2   study?
3      A.  Yes.
4      Q.  Do you see the individuals listed on the
5   left-hand side of the first page of Exhibit 3?   11:27
6      A.  Yes.
7      Q.  Who are they relative to this article?
8      A.  These are the authors.
9      Q.  And does the order of the authors as
10  they are listed here have any significance?   11:27
11     A.  Usually the first author is called the
12  primary author.
13     Q.  The first person listed on the list you
14  mean?
15     A.  Dr. Silverstein.                     11:28
16     Q.  Okay.
17     A.  But in this case the corresponding
18  author was third from the last, James Lefkowith.
19        On occasion, depending, usually the
20  last author is the senior author but not      11:28
21  necessarily.
22     Q.  What's the difference between a lead
23  author and a corresponding author?
24     A.  The lead author is the first author.

De Angelis, Catherine  1/12/2007  11:00:00 AM

21

1    Q.   Okay.                         11:28
2    A.   That's the person who is considered to
3   be the first person you would call if you had a
4   question about the article once it's published,
5   someone in the audience who would read it.      11:28
6          The corresponding author is the
7   individual with whom we, the editors, correspond
8   regarding the manuscript itestify.  He
9   represents the group.
10   Q.   What is the participation of all the    11:29
11  other people that are listed?
12   A.   Every one of them have to meet our
13  criteria as far as having had a major role in this
14  study and they have a signed document to that
15  effect, we have that document.          11:29
16   Q.   Okay.  I'd like you to put that aside,
17  but we're going to come back to it, so you might
18  want to keep it handy.
19       MR. MONTGOMERY:  I'd like to ask the
20  Court Reporter to mark what will be Exhibit 19.   11:29
21       (WHEREUPON Deposition Exhibit
22        No. 19 was marked as of
23        1/12/2007.)
24

22

1   BY MR. MONTGOMERY:                    11:29
2    Q.   Have you ever seen Exhibit 19 before?
3   (Document tendered to the witness.)
4    A.   No.
5    Q.   For the record, it's a memo on Ruder   11:32
6   Finn stationery dated November 1, 2001, from
7   Elinore White to Debra Charlesworth concerning
8   remarks by Catherine DeAngelis at a Columbia
9   Alliance for Healthcare Management meeting dated
10  10/27/01.                        11:33
11        Do you know what the Columbia
12  Alliance for Healthcare Management is?
13   A.   I don't recall, no.
14   Q.   Do you recall making a presentation in
15  or around 10/27/01 concerning the subject matter   11:33
16  of this memo?
17   A.   Could well be.  I've made so many of
18  these presentations.
19   Q.   Do you know who either Debra
20  Charlesworth or Elinore White are?        11:33
21   A.   No.
22   Q.   Would you turn to the second page of
23  Exhibit 19.  Also I'd like to point out, do you
24  see in the lower right-hand corner there's a set

23

1   of numbers there?  Those are what we call Bates    11:34
2   numbers.
3    A.   Yes.
4    Q.   So in other longer documents I may
5   direct you and I will usually do it by the Bates   11:34
6   number there, and often times I'll just use the
7   last three or four digits instead of reading the
8   entire thing.
9    A.   Okay.
10   Q.   On the second page of Exhibit 19, do you   11:34
11  see there's a number of bullet points there?
12   A.   Yes.
13   Q.   I'd like you to look at the last bullet
14  point that starts "In discussing the CLASS trial."
15  And underneath that there's a series of dashes.    11:34
16  Do you see that?
17   A.   Yes.
18   Q.   I'd like you to look at the first one.
19  It says "In making the case for publication in
20  JAMA, the investigators stated this was a      11:34
21  twelve-month study but they only had six months of
22  data."  Do you see that?
23   A.   Yes.
24   Q.   Do you remember saying that in --

24

1    A.   No.                          11:35
2    Q.   -- a presentation?
3    A.   No.  And I would be surprised if I said
4   that.
5    Q.   Why's that?                    11:35
6    A.   Because the investigators, to my
7   knowledge, and certainly not to me, never said it
8   was a twelve-month study.
9    Q.   What did they say?
10   A.   They said that the goal was to get six   11:35
11  months data, that some of the participants will
12  follow, it was their own decision whether or not
13  they wanted to remain in the study longer if they
14  wanted to.
15   Q.   Let's just wait until the siren goes by.   11:35
16       MR. BROWN:  Just because of the sirens,
17  could you read back the last answer?
18       (WHEREUPON said record was read
19        back as requested.)
20  BY MR. MONTGOMERY:                    11:36
21   Q.   So it was represented to you, just
22  trying to rephrase, it was represented to you that
23  the CLASS study was designed to be a six-month
24  study but that some people may have been

De Angelis, Catherine  1/12/2007  11:00:00 AM

25

1  participating longer?                11:36
2    A.  Yes.
3    Q.  All right.  Would you look at the fourth
4  dash underneath that bullet point.  I'll read it
5  into the record.  It says "In February,        11:37
6  Dr. DeAngelis said she received a call from a
7  colleague informing her that the twelve-month data
8  was posted at the FDA website."  Is that correct?
9        MR. HALPER:  Well, objection.  Are you
10  asking Dr. DeAngelis if she recalls making this   11:37
11  statement or sitting here today if she agrees with
12  the statement?
13        MR. MONTGOMERY:  Good objection.
14  BY MR. MONTGOMERY:
15    Q.  Do you recall making that statement?    11:37
16    A.  Not specifically, no.
17    Q.  In fact, did that occur?  Did you
18  receive a call in February?
19    A.  I can't recall if it was in February,
20  but I did receive a call.                11:37
21    Q.  And who did you receive the call from?
22    A.  I don't, it says "colleague."  I don't
23  recall who it was.
24    Q.  You recall generally speaking though you

26

1  received a call --                  11:37
2    A.  Yes.
3    Q.  -- from a colleague concerning this
4  matter?
5    A.  Yes.                    11:37
6    Q.  And according to this bullet point, it
7  says that that person explained to you that twelve
8  months of data was posted on the FDA website.
9        Is that what occurred in the call
10  that you remember?                11:38
11    A.  Yes.
12    Q.  Did the colleague that called you tell
13  you anything else that you can remember?
14    A.  Not really, no.  That was the main
15  reason he called.  I do remember it was a he.   11:38
16    Q.  All right.  Going back to the document,
17  the next sentence says "After confirming this, she
18  determined she had been misled about the
19  availability of the twelve-month data."
20        Do you recall saying that at any    11:38
21  conference in 2001?
22    A.  I don't recall saying that, but it's not
23  inaccurate.
24    Q.  So you in fact did determine that you

27

1  had been misled?                  11:38
2    A.  Yes.
3    Q.  And why did you conclude that?
4    A.  Because when we asked the question of
5  the corresponding author do you have more than six   11:39
6  months data, the response, and I don't have it
7  here with me, but the correspondence from him via
8  Dr. Winker said this is a six-month study and made
9  no mention that there were more data.  He said the
10  study is closed.  Those are specific words I    11:39
11  remember, the study is closed, and it was a
12  six-month study.
13    Q.  Going back to this document, on that
14  bullet point, the last dash says, and I'll read it
15  into the record again, "She stated that the    11:39
16  pharmaceutical companies involved requested five
17  meetings with her.  She allowed one meeting and
18  they came to an agreement."
19        Do you recall saying that at any
20  time?                      11:40
21    A.  No.
22    Q.  Did, in fact, the pharmaceutical
23  companies involved ask for a meeting with you?
24    A.  The pharmaceutical company did request a

28

1  meeting, yes.                  11:40
2    Q.  Did they request five meetings?
3    A.  No.
4    Q.  And did you, in fact, meet with them?
5    A.  Yes.                    11:40
6    Q.  Do you remember who you met with?
7    A.  These are the cards.  Dr. Michael
8  Friedman, who was senior vice president for
9  Pharmacia, and Dr. Kenneth Verburg, who's the
10  clinical vice president for Pharmacia.  (Document   11:40
11  tendered to counsel.)
12        MR. MONTGOMERY:  I'd like to ask the
13  Court Reporter to now mark what will be Exhibit
14  20.  And I'd like the record reflect that the
15  witness was just reading from Exhibit 20 reciting   11:41
16  those names.
17        (WHEREUPON Deposition Exhibit
18        No. 20 was marked as of
19        1/12/2007.)
20  BY MR. MONTGOMERY:                11:41
21    Q.  Can you tell me what occurred at that
22  meeting?
23    A.  Not specifically, no.  I can tell you
24  when it occurred.

29

1    Q.    When was that?  August 21st?        11:41
2    A.    August 21, 2001.
3    Q.    On Exhibit 20 in the upper left-hand
4    corner there's your name and another doctor
5    underneath you.                           11:41
6    A.    Dr. Fontanarosa.  He's my executive
7    deputy editor.  I wanted him in the room with me.
8    Q.    Why's that?
9    A.    Because it's a precautionary thing I
10   always do.                                11:42
11   Q.    Precautionary against what?
12   A.    Because my memory is only the memory of
13   one brain.  It helps to have two, or more.  But I
14   like him in the room.
15   Q.    Exhibit 19 references an agreement, that  11:42
16   you came to an agreement.  Did that actually
17   occur?
18   A.    I'm sorry?  We came to an agreement?
19   Q.    Right.  Was there any agreement reached
20   at the meeting?                           11:42
21   A.    An agreement to what?
22   Q.    That was my next question.
23   A.    No.  I don't know what the meaning of
24   "agreement" means.

30

1          We had a discussion, and he        11:42
2    understood, I made him understand why I was upset.
3    The reason he had called was because we had sent
4    letters that we received from people making
5    essentially the same allegation that was said  11:43
6    here.
7          When people call and have comments
8    about a particular article, I invite them to
9    please write a letter to the editor and then I ask
10   the author to reply.  This is the scientific way.  11:43
11         There were two letters that we
12   received.  I sent them to Dr. Silverstein, the
13   primary author, and asked for his reply.
14         That I believe is what stimulated
15   the company calling me, once that I recall.  And I  11:43
16   just said to them that there would be every
17   opportunity for Dr. Silverstein to respond to the
18   allegations made in the letters to the editor.  If
19   you call that an agreement --
20   Q.    Prior to the meeting that we're talking  11:44
21   about, had you only communicated with the
22   corresponding author, which was I believe
23   Dr. Lefkowith, concerning the article?
24   A.    Me personally?

31

1    Q.    Yes.                                11:44
2    A.    No.  I personally did not correspond
3    with Dr. Lefkowith.  Dr. Winker did.  But when my
4    editors correspond, they really, everything comes
5    across my name and I take responsibility for it.  11:44
6    So anything out of the ordinary they discuss with
7    me.
8          So while I never directly discussed
9    this with Dr. Lefkowith, I was aware of what was
10   going on.  I never directly discussed anything  11:44
11   with Dr. Silverstein, but he did receive the
12   letter from my letter editor over my name
13   requesting that he reply.
14   Q.    And was that prior to the August 21,
15   2001 meeting?                             11:45
16   A.    Yes.
17   Q.    Prior to the August 21, 2001 meeting, to
18   your knowledge, did anyone from JAMA communicate
19   with anyone from Pharmacia or Pfizer concerning
20   the JAMA article?                         11:45
21   A.    Not to my knowledge.
22   Q.    Do you have an understanding why at this
23   time, August 21, 2001, you were communicating with
24   the company as opposed to the authors of the

32

1    article?                                  11:45
2    A.    It was the first question, I do remember
3    this specifically, it was the first question I
4    asked Dr. Friedman because I fully expected that
5    Dr. Silverstein would be in the meeting and he was  11:46
6    not.
7    Q.    And what was the answer to your
8    question?
9    A.    They didn't think it was necessary.
10   Q.    How did you feel about that response?  11:46
11   A.    I thought it peculiar.
12   Q.    Why is that?
13   A.    Because their concern was about the
14   study and neither of these individuals names was
15   an author.  They didn't partake in this study.  So  11:46
16   it was a little bit peculiar.  It was unusual.
17   But I should say it's unusual for me to meet with
18   anyone about an article after it's published.
19   Q.    Right.  I should have mentioned earlier:
20   If you want to take a break at any time, just let  11:47
21   me know and we'll go off the record.
22         THE VIDEOGRAPHER:  Counsel, could we
23   take a break for just a technical matter?
24         MR. MONTGOMERY:  Sure.

De Angelis, Catherine  1/12/2007  11:00:00 AM

33

1    THE VIDEOGRAPHER:  Just a moment.    11:47
2         (WHEREUPON a recess was taken.)
3    THE VIDEOGRAPHER:  Okay.  We are back on
4   the record.  The time now is 11:50.
5         (WHEREUPON Deposition Exhibit    11:50
6         No. 21 was marked as of
7         1/12/2007.)
8   BY MR. MONTGOMERY:
9    Q.   I had previously asked the Court
10  Reporter to mark what would be Exhibit 21, which I    11:50
11  believe you now have in front of you; is that
12  correct?  Is that correct?  You have Exhibit 21 in
13  front of you?  (Document tendered to the witness.)
14   A.   Yes.
15   Q.   Have you ever seen this document before?    11:50
16   A.   No.
17   Q.   Does it purport to be a final report of
18  the CLASS study?
19   A.   Yes.
20   Q.   Have you seen final study reports before    11:51
21  of other studies?
22   A.   Yes.
23   Q.   Does this look more or less like they
24  usually look?

34

1    A.   Yes.    11:51
2    Q.   What's the date of this document?  It's
3   on the first page, in the middle.
4    A.   The dates, September 23, 1998 through
5   March 17, 2000.  The document date is the 25th of    11:51
6   May, 2000.
7    Q.   Would you turn to the third page, which
8   is Bates number ending 925.  Do you see the
9   Methodology section in the middle of the page?
10   A.   Yes.    11:52
11   Q.   I'd like you to look at the fifth line
12  down in that, beginning "Treatment duration."  Do
13  you see that?
14   A.   Yes I see it.
15   Q.   I'm going to read it into the record.    11:52
16  It says "Treatment duration lasted for at least
17  twenty-six weeks with a maximum potential
18  treatment period of fifty-two or sixty-five
19  weeks."  Do you see that?
20   A.   Yes.    11:52
21   Q.   Were you told that prior to the
22  publication of the JAMA article?
23   A.   No.
24   Q.   As a point of reference, I'm going to be

35

1   referring to Exhibit 3 throughout the deposition    11:52
2   as just "the JAMA article."
3         Had you been told that, would you
4   have understood that the study lasted longer than
5   six months?    11:52
6    A.   Had I been told this, yes.
7    Q.   I'd like you to now look down at the
8   section entitled Number of Patients.  Do you see
9   that?
10   A.   Yes.    11:53
11   Q.   The second sentence in that beginning "A
12  total 8,059."  Do you see that?
13   A.   Yes.
14   Q.   I'm going to read that into the record.
15  It says "A total of 8,059 patients were enrolled,    11:53
16  of whom 4,573 completed six months of treatment
17  and 3,409 completed the study."
18         Do you know whether or not you were
19  told that --
20   A.   I was not.    11:53
21   Q.   -- prior to publication of the JAMA
22  article?
23   A.   No.
24   Q.   And had you been told that, would you

36

1   have understood that the study lasted longer than    11:53
2   six months?
3    A.   Well, yes.
4    Q.   You're reaching for Exhibit 3, which is
5   exactly what I'd like you to look at now, if you    11:53
6   would, please.  I would like to compare the
7   language that we just looked at with the language
8   on Exhibit 3, on the first page under Participants
9   on the first page of Exhibit 3 of the JAMA
10  article.    11:54
11   A.   Right.
12   Q.   The last sentence reads "A total of
13  4,573 patients (fifty-seven percent) received
14  treatment for six months."  Do you see that?
15   A.   Yes.    11:54
16   Q.   Now, reading that, did you understand
17  that the study only lasted six months?
18   A.   Yes.
19   Q.   Had defendants included -- I'm sorry.
20  Had the authors included the language concerning    11:54
21  the number of patients that finished the study, as
22  they did in their final report, would you have
23  understood that the study lasted longer than six
24  months?

De Angelis, Catherine  1/12/2007  11:00:00 AM

37

1    A.  Yes.                    11:54
2    Q.  Do you have any understanding of why the
3    language from the final report was not used in the
4    JAMA article?
5    A.  I have their explanation.          11:55
6    Q.  And what was that?
7    A.  It's what's published in their reply to
8    the letters.
9    Q.  In their letter that was published in
10   JAMA?                      11:55
11   A.  The authors in reply response to the two
12   letters to the editor stating that there was
13   information about twelve months because that's the
14   amount of time it took to get the endpoint which
15   was really forty gastrointestinal bleeding    11:55
16   episodes, which was the real response they were
17   looking for, and it took I believe sixty some
18   weeks to do that.
19   Q.  We're going to look at that letter later
20   on.  But just in general, did you find that    11:56
21   explanation satisfactory?
22   A.  The one by Dr. Silverstein in reply?
23   Q.  Yes.
24   A.  I found it satisfactory in response to

38

1    the two letters.  It provided information for the    11:56
2    readers, the clinicians and scientists, to know
3    what to make of this study.
4    Q.  Did you think that their explanation
5    justified the representations that were made to    11:56
6    JAMA concerning the length of the study?
7    A.  If you will look at the reply that
8    Dr. Silverstein made, he specifically states, or
9    he and the authors who signed it, "In retrospect
10   we should have," and I don't want to paraphrase    11:57
11   him because you have what he said.
12   Q.  Sure.  Okay.
13       MR. MONTGOMERY:  I'd like to ask the
14   Court Reporter to mark what will be Exhibit 22.
15       (WHEREUPON Deposition Exhibit    11:58
16       No. 22 was marked as of
17       1/12/2007.)
18   BY MR. MONTGOMERY:
19   Q.  For the record, Exhibit 22 is an e-mail
20   chain, the top e-mail of which is from Mona Wahba,    11:58
21   W-A-H-B-A, to Stephen Cristo, C-R-I-S-T-O, dated
22   May 22, 2001.  (Document tendered to the witness.)
23       I'd like you to start looking at
24   the second page of Exhibit 22, Bates ending 696.

39

1    Do you see towards the top there's an e-mail    11:59
2    saying "Dear All, please find attached two draft
3    CLASS manuscripts," et cetera?
4    A.  Yes.
5    Q.  Then I'd like you to look at the first    11:59
6    page which is a continuing e-mail chain.  Do you
7    see the second paragraph in the exhibit starting
8    "In my opinion"?
9    A.  Yes.
10   Q.  I'd like you to look at the second    11:59
11   sentence in that.  It says "We are also
12   cherry-picking the data (using six months as study
13   duration)."
14       Are you familiar with the phrase
15   "cherry-picking"?              12:00
16   A.  Quite.
17   Q.  What's your understanding of the phrase?
18   A.  You choose the best looking cherries.
19   Q.  And in your experience is cherry-picking
20   data appropriate in the context of a manuscript    12:00
21   concerning a medical study?
22   A.  No.
23   Q.  Prior to the publication of the JAMA
24   article, did the defendants tell you that they

40

1    were cherry-picking the first six months of data    12:01
2    from the study?
3        MR. HALPER:  Objection to the form.
4        MR. NELSON:  You should answer the
5    question.                    12:01
6        THE WITNESS:  No.  They didn't tell me.
7    BY MR. MONTGOMERY:
8    Q.  Subsequent to the publication of the
9    JAMA article, did defendants ever admit to you
10   that they had cherry-picked the first six months    12:01
11   of data from the CLASS study?
12       MR. HALPER:  Object to form.
13       THE WITNESS:  No.
14       MR. MONTGOMERY:  He's just putting his
15   objections on the record.  You can go ahead and    12:01
16   answer them, unless your attorney instructs you
17   not to.
18       MR. NELSON:  That's correct.  But if you
19   don't understand the question, you can certainly
20   ask that it be rephrased.           12:01
21       THE WITNESS:  No, I understood.  Thank
22   you.
23   BY MR. MONTGOMERY:
24   Q.  I'd like to go back to Exhibit 3.

41

1          We discussed before the sentence      12:02
2   under Participants.
3      A.  Yes.
4      Q.  Let's just say the Participant section
5   on the first page.            12:02
6          Is it correct that having read
7   that, you did not understand that the study lasted
8   longer than six months?
9      A.  Reading this, no, you would not
10  understand.                 12:02
11     Q.  And you did not at the time of the
12  publication of this article; is that correct?
13     A.  The study, right, I did not know that
14  the study went on for more than six months.  I
15  understood that patients could continue at their   12:02
16  own discretion if they wanted to beyond six
17  months.
18     Q.  All right.  I'd like to ask you to look
19  at the second page of Exhibit 3, Bates No. 879.
20         Do you see in the middle of the      12:03
21  page there's a heading called Study Protocol?
22     A.  Yes.
23     Q.  And there's a paragraph right underneath
24  that.  I'd like you to look at the last two

42

1   sentences of that paragraph, and I'm going to read    12:03
2   them into the record.  It says "After a baseline
3   visit, follow-up clinic visits took place at Weeks
4   4, 13, and 26 after the initial dose of
5   medication, and every thirteen weeks thereafter.    12:03
6   All patients were provided an opportunity to
7   complete a minimum of six months of treatment."
8          Did you read this portion of the
9   article before it was published?
10     A.  Yes.              12:03
11     Q.  And having read that, did you understand
12  that the study lasted more than six months?
13     A.  No.  I was specifically told it didn't.
14     Q.  And there's nothing about what I just
15  read that was inconsistent with what you were      12:04
16  told; is that correct?
17     A.  Correct.
18     Q.  Please look at the third page of Exhibit
19  3, ending Bates No. 880.  So there are three
20  columns.  I'd like you to look at the last      12:04
21  paragraph in the middle column starting
22  "Homogeneity."
23         This is too long to read into the
24  record.  Would you please read to yourself

43

1   beginning with "Homogeneity" through the end of      12:04
2   that page.
3          You can continue reading but that's
4   all I needed you to read.  Was there anything in
5   what you just read from Page 880 of Exhibit 3 that   12:05
6   indicated to you that the CLASS study lasted
7   longer than six months?
8      A.  No.
9      Q.  I'd like to now show the witness what's
10  previously been marked Exhibit 8.  (Document      12:05
11  tendered to the witness.)
12         For the record, this is a copy of a
13  Washington Post article dated August 5, 2001
14  headline "Missing Data On Celebrex; Full Study
15  Altered Picture Of Drug."              12:06
16         Have you seen this article before?
17     A.  Yes.
18     Q.  Did you see it when it was originally
19  published?
20     A.  Yes.                12:07
21     Q.  How did you feel about it when you read
22  it when it was originally published?
23     A.  Terrible.
24     Q.  Why is that?

44

1      A.  Because I think it exposed the naivety    12:07
2   of some of us who put trust in people who didn't
3   deserve that trust, and it made me feel very bad
4   that in that trust I had exposed Wolfe, who wrote
5   the editorial, to something that I prefer that I    12:08
6   hadn't asked him to do.
7      Q.  Who did you think it made look naive?
8      A.  I felt naive.  Fool me once.
9      Q.  And who had you put your trust in that
10  you wish you had not?              12:08
11     A.  The authors.
12     Q.  That's the authors of the JAMA article?
13     A.  Yes.
14     Q.  Looking at the first page of Exhibit 8,
15  in the middle of the page there's a quote from      12:09
16  you.  I'd like to read it into the record.  It
17  says "I am disheartened to hear that they had
18  those data at the time that they submitted the
19  manuscript to us.  We are functioning on a level
20  of trust that was perhaps broken."          12:09
21         Do you recall saying that?
22     A.  Yes.
23     Q.  Do you still agree with what you said
24  there?

45

1    A.  Yes.                              12:09
2    Q.  I'd like you to look at the second page
3  of Exhibit 8.  Do you see at the top of that page,
4  this is one of the authors of the article,
5  Dr. Geis, is quoted as saying "The intention      12:09
6  really was not to be deceptive in any way."  Do
7  you see that?
8    A.  Yes.
9    Q.  Sitting here today --
10        MR. HALPER:  I'm going to object and ask    12:10
11  that you read into the record the prior sentence
12  which he also is quoted as saying.
13        MR. MONTGOMERY:  All right.  Well, I'm
14  not going to, but you're welcome to when you have
15  questions.                              12:10
16        MR. HALPER:  Okay.
17  BY MR. MONTGOMERY:
18    Q.  I'll read it again.  "The intention
19  really was not to be deceptive in any way."  Do
20  you see that?                           12:10
21    A.  Yes.
22    Q.  Sitting here today, do you believe that
23  to be true?
24    A.  No.

46

1        MR. MONTGOMERY:  All right.  Let's go      12:10
2  off the record.
3        THE VIDEOGRAPHER:  Okay.  This will
4  conclude Videotape No. 1.  We are going off the
5  record at approximately 12:10.  The deposition    12:11
6  will continue on Videotape No. 2.
7        (WHEREUPON a lunch recess was
8        taken, and said deposition
9        continued as follows:)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

47

1        CATHERINE DE ANGELIS,           12:12
2  having been previously duly sworn, was examined
3  and testified further as follows:
4        EXAMINATION
5        (Resumed)                        12:12
6  BY MR. MONTGOMERY:
7        THE VIDEOGRAPHER:  Good afternoon.  This
8  begins Videotape No. 2 of the deposition of
9  Catherine DeAngelis.  This is Case No. 03-1519 on
10  the 12th of January, 2007.  The time now is        01:14
11  1:14 p.m., and I will remind the witness she
12  remains under oath.
13        MR. MONTGOMERY:  I'd like to ask the
14  Court Reporter to mark what will be Exhibit 23.
15        (WHEREUPON Deposition Exhibit          01:14
16        No. 23 was marked as of
17        1/12/2007.)
18  BY MR. MONTGOMERY:
19    Q.  You can read the whole thing if you
20  want.  I'm only going to ask you about your quote   01:16
21  on the third page.  So it's up to you.  And I
22  apologize for the highlighting.  (Document
23  tendered to the witness.)
24        Do you see the quote from you on

48

1  the third page Bates number ending 870?          01:16
2    A.  Yes.
3    Q.  And it says "I was very upset when I
4  found out that they had a full year's data."  Do
5  you recall saying that?                      01:16
6    A.  Yes.
7    Q.  Is that an accurate quote?
8    A.  Yes.
9    Q.  Before that it paraphrase you saying
10  that you told the reporters "the company's study    01:16
11  authors should have told her," meaning you, "about
12  the extra data and allowed The Journal to decide
13  just what to publish."
14        Did you tell the reporter basically
15  that same thing?                          01:17
16    A.  Yes.
17    Q.  And do you still agree with that?
18    A.  Yes.
19    Q.  I show the witness now what's previously
20  been marked as Exhibit 10.  (Document tendered to   01:17
21  the witness.)
22        Once again, I'm just going to ask
23  you about your quote on the second page, second
24  paragraph, but you're welcome to read the whole

De Angelis, Catherine  1/12/2007  11:00:00 AM

49

1    thing if you'd like.                    01:17
2        A.   Let me put it in context.  This is a
3        Q.   Sure.  For the record, this is a
4    transcript of an interview from WNBC-TV in New
5    York City.                             01:18
6        A.   Yes.
7        Q.   I'd like to direct you to the second
8    page, Bates number ending 653.  The second
9    paragraph at the top of the page has a quote from
10   you.  It says "If they had twelve months of data   01:18
11   and didn't tell me, I'm going to be very upset.
12   If we cannot have a level of trust in the
13   investigators, we might as well pack it in."  Do
14   you see that?
15       A.   Yes.                           01:19
16       Q.   And is that an accurate quote?
17       A.   Yes.
18       Q.   Is it your understanding now that they
19   did, in fact, have twelve months of data?
20       A.   Yes.                           01:19
21       Q.   Why did you say that if you cannot have
22   a level of trust in the investigators you might as
23   well pack it in?
24       A.   Because it is impossible for us to go

50

1    through all the records of any study we get.  I    01:19
2    can't possibly go into the laboratories and check
3    the lab data.  I can't possibly look at the
4    medical records of every patient.  That's just
5    impossible for me to do.                01:19
6            So I have to trust that the
7    authors, the investigators, who send material to
8    me, are telling the truth and providing the data
9    to the best of their ability fully and completely.
10       Q.   And did the defendants do that with     01:20
11   regard to the JAMA article?
12       A.   No.
13       MR. HALPER:  Object as to form.
14       MR. MONTGOMERY:  I'd like to ask the
15   Court Reporter to mark what will be Exhibit 24.   01:20
16       (WHEREUPON Deposition Exhibit
17       No. 24 was marked as of
18       1/12/2007.)
19   BY MR. MONTGOMERY:
20       Q.   For the record, Exhibit 24 is an e-mail   01:20
21   from Joy Dicker, D-I-C-K-E-R, to Mona Wahba dated
22   August 23, 2001.  (Document tendered to the
23   witness.)
24           Have you had a chance to read

51

1    through Exhibit 24 now?                 01:23
2        A.   Yes.
3        Q.   It's a chain of e-mails.  Regarding the
4    last e-mail, does it purport to summarize the
5    meeting between you and Michael Friedman and Ken   01:24
6    Verburg that we discussed earlier that occurred on
7    August 21, 2001?
8        A.   Yes.
9        Q.   And you've read through it now; is that
10   correct?                              01:24
11       A.   Yes, I did.
12       Q.   Does it jog your memory at all about
13   what happened at that meeting?
14       A.   Yes.
15       Q.   Is there anything that you read in this   01:24
16   summary that seems inconsistent with your
17   recollection of the meeting?
18       A.   The part about "suffice it to say, by
19   the end of the meeting both editors expressed
20   greater confidence in our motives and activities."   01:24
21       Q.   And you would say that's not accurate?
22       A.   I don't believe that's accurate at all.
23   Of course, he is, this is what he believes.  It is
24   not what I believe.

52

1        Q.   So at the end of the meeting in your     01:25
2    opinion you had no greater confidence in
3    defendants' motives and activities?
4        A.   I had greater confidence that they
5    understood what the expectation, what my          01:25
6    expectation and the expectation of JAMA and I
7    believe other similar peer-review journals expect,
8    and that they said that they would make sure
9    Dr. Silverstein would respond, not that they would
10   write the letter.                      01:25
11       Q.   When you say that Dr. Silverstein would
12   respond, do you mean that his signature would be
13   on the letter or that he would actually write the
14   letter?
15       A.   I don't sign anything that I don't write   01:26
16   or at least do the first draft or dictate or it's
17   part of a meeting in which we exchange thoughts
18   and I say in general this is what I need.
19           For the most part, I write my own
20   letters but occasionally it will be a group.  But   01:26
21   if I receive something and the signatories had no
22   role in writing the draft and editing the draft, I
23   don't think they should sign it.
24       Q.   When you were talking about the letter

53

1  that you expected to receive, do you mean the one    01:27
2  that would be published in JAMA as a response to
3  the other letters to the editor?
4      A.  Yes.  That's one of the things we
5  discussed.  That's primarily what we discussed, as    01:27
6  a matter of fact, because it was their explanation
7  of why the information came in as such.
8      Q.  I'd like you to please look at the
9  second page of Exhibit 24, Bates number ending
10  631.  Do you see Item No. 5 on that page?    01:27
11      A.  Yes.
12      Q.  I'm going to just read the first
13  sentence into the record.  It says "In order to
14  counter the lack of credibility and cynicism of
15  our critics, she suggested that we have the raw    01:27
16  data set independently analyzed by a statistician
17  unaffiliated with the study."  Do you see that?
18      A.  Yes.
19      Q.  Did you make that suggestion?
20      A.  What I said to her was that one of the    01:28
21  things, or to him, excuse me, that we were
22  contemplating, we JAMA, having a requirement for
23  clinical trials that we would not accept the
24  statistical analysis if it had been performed only

54

1  by the sponsor, especially if it was a for-profit    01:28
2  sponsor, that we would require that if we were
3  going to accept a study it would only be after all
4  the data were provided or whatever data thought
5  necessary by a faculty statistician, that the data    01:29
6  would be provided to him or her and that he or she
7  would re-analyze in any way they thought and that
8  they would then verify that the statistical
9  analysis was accurate.  And we have subsequently,
10  we are the only journal that does that.  We    01:29
11  require a faculty member.  And the reason we do
12  that is because if anyone calls to question the
13  voracity of anything in a paper and it requires
14  more than I have the ability to do, I call the
15  Dean and ask for an investigation.  I have done    01:30
16  that.  And I want that to be something that I can
17  do for the statistical analysis also.
18         It is not because I think that the
19  statisticians or the scientists who work for
20  companies are any less smart, because they're very    01:30
21  smart, or any less honest or any less clever.  It
22  is simply that I can go to a third party who has a
23  stake in assuring the voracity of his or her
24  faculty is assured, and that person has the

55

1  wherewithal to do the investigation and then tell    01:30
2  me that the investigation proved that what I was
3  given was accurate.
4      Q.  Was that a change in policy for JAMA?
5      A.  Yes.    01:31
6      Q.  When did that change in policy occur
7  officially?
8      A.  We had discussed it for a while.  I
9  think it was, I don't know the exact date, but
10  we've had it for maybe two or three years now.    01:31
11      Q.  So it was not in place at the time the
12  JAMA article was published?
13      A.  No.
14      At the time you had the meeting with
15  Dr. Verburg and Dr. Friedman, did you then apply    01:31
16  that requirement to Pharmacia specifically before
17  it was applying to everyone else?
18      A.  No.  I didn't apply, this paper had
19  already been published.  As such, it was not
20  withdrawn because what was in the data, I had no    01:31
21  reason to believe that there was any question
22  about the analysis of the data that were analyzed.
23  And therefore, I couldn't pull this paper because
24  it was false in what was presented.  But I did

56

1  require that the investigators respond to the    01:32
2  statements made in the two letters to the editor,
3  to put this in context.
4      Q.  Did you tell Dr. Verburg and
5  Dr. Friedman that in order for further articles to    01:32
6  be published about the CLASS study, that they
7  would have to meet the independent analysis
8  requirement that you just said?
9      A.  No.
10      Q.  Okay.  Going back to this document,    01:32
11  Exhibit 24, Item 5 on the second page says that
12  you suggested an independent analysis.  I forget
13  at this point.  Did you actually make that
14  suggestion?
15      A.  I said in the future that's something we    01:33
16  might do.  So no one or at least there would be
17  less likelihood that people would call to question
18  the voracity of that aspect of your study.
19      Q.  Did you suggest that such an analysis be
20  done of the CLASS data specifically?    01:33
21      A.  I don't recall I did that.  I might
22  have, but I don't recall.
23      Q.  Do you know whether or not any such
24  analysis was performed?

De Angelis, Catherine  1/12/2007  11:00:00 AM

57

1      A.   No.                          01:33
2          MR. MONTGOMERY:  I ask the Court
3    Reporter to mark what will be Exhibit 25.
4          (WHEREUPON Deposition Exhibit
5          No. 25 was marked as of        01:34
6          1/12/2007.)
7    BY MR. MONTGOMERY:
8      Q.   For the record, Exhibit 25 is an e-mail
9    from James Lefkowith, L-E-F-K-O-W-I-T-H, to
10   Michael Friedman and Kenneth Verburg dated       01:34
11   August 20, 2001.  (Document tendered to the
12   witness.)
13         Have you had a chance to read
14   through Exhibit 25?
15     A.   Yes.                         01:35
16     Q.   Have you ever seen this before?
17     A.   No.  Have I seen those words or words
18   similar to it?
19     Q.   On this document.
20     A.   Yes, but I've never seen this document.   01:35
21     Q.   So were representations essentially
22   similar to what's memorialized in Exhibit 25 made
23   to you at the meeting you had with Drs. Friedman
24   and Verburg?

58

1      A.   Excuse me.  Is this related to, does       01:35
2    this reflect what we discussed with them?
3      Q.   Yes.
4      A.   We didn't discuss this with them.
5          What I discussed with Drs. Friedman     01:35
6    and Verburg was just generally, they were
7    discussing why they did six months and different
8    kinds of words, and I said it's up to you, it's up
9    to your authors, the scientists who did this
10   study, the investigators, to explain why what they   01:36
11   did meets the requirement in reply to the two
12   letters which they had.  They had the letters
13   obviously.  But we didn't discuss words or who was
14   going to write what or anything.
15     Q.   Did you discuss the substance of what     01:36
16   they intended to put in their letter?
17     A.   No, because this letter was to come from
18   the investigators, not from them.
19     Q.   And did they agree to that, that the
20   investigators --                       01:37
21     A.   We never discussed that per se.  I said
22   you better make sure that the investigators
23   respond to the questions raised in the two
24   letters.

59

1      Q.   Okay.  In the third paragraph of Exhibit   01:37
2    25, there's a mention of informative censoring?
3      A.   Did I read this?  Yes.
4      Q.   No, no.  I'm pointing out the phrase
5    "informative censoring."  Are you familiar with    01:37
6    that phrase?
7      A.   I generally know what it means.  I don't
8    know what it means in this particular message.
9      Q.   So do you have an understanding of
10   whether informative censoring is relative to why    01:38
11   defendants did not publish the full CLASS study
12   data in the JAMA article?
13     A.   I have an understanding of how they
14   might believe that informative censoring would be
15   relative to what was published.             01:38
16     Q.   Relevant you mean?
17     A.   Why they might believe it was relative
18   and relevant, not relative, relevant to, why they
19   might believe it was relevant.
20     Q.   And what's that understanding?           01:38
21     A.   That sometimes you have to in your
22   statistical analysis or the way you describe
23   something, to make it easier for the reader to
24   understand the true finding, that you don't go

60

1    into extreme detail and instead you make it       01:39
2    simpler.  That's generally what it means.
3          MR. MONTGOMERY:  I'd like to ask the
4    Court Reporter to mark what will be Exhibit 26.
5          (WHEREUPON Deposition Exhibit        01:40
6          No. 26 was marked as of
7          1/12/2007.)
8    BY MR. MONTGOMERY:
9      Q.   For the record, Exhibit 26 is an
10   unsigned draft of a letter dated September 6,      01:40
11   2001, to Dr. DeAngelis from Steven Geis.
12   (Document tendered to the witness.)
13         Just so you understand, this was
14   produced to us by defendants, and neither
15   defendants or JAMA produced a signed copy.  So my   01:42
16   first question is have you ever received a letter
17   similar to this?
18     A.   I don't recall ever receiving this.
19     Q.   Would you please look at the second page
20   of Exhibit 26, Bates ending 644.  Towards the end   01:42
21   of the paragraph at the top of that page I'll read
22   into the record, it says "In this spirit, I would
23   like to take this opportunity to suggest an
24   independent review of the CLASS data take place to

61

1    address specifically whether the data presented    01:42
2    and conclusions drawn in the JAMA manuscript are
3    accurate and are comparable to the description of
4    GI safety and overall safety obtained from the
5    longer term follow-up results."  Do you see that?    01:42
6        A.    Yes.
7        Q.    Do you have any understanding whether
8    such an independent review ever took place?
9        A.    Not to my knowledge.
10        MR. MONTGOMERY:  I'd like to ask the    01:43
11    Court Reporter to mark what will be Exhibit 27.
12            (WHEREUPON Deposition Exhibit
13            No. 27 was marked as of
14            1/12/2007.)
15    BY MR. MONTGOMERY:    01:43
16        Q.    Once again, this is a long document, so
17    like I said, if you want to read the whole thing,
18    that's fine.  For the record, it's an e-mail with
19    three attachments from Carolyn Wilson to George
20    Geis and a number of other individuals dated    01:43
21    March 20, 2000.  (Document tendered to the
22    witness.)
23            I'm actually only going to ask you
24    about the third attachment, which is the last two

62

1    pages of this document.  I'm actually only going    01:44
2    to ask you about that first page.  You're free to
3    read the rest if you want to.
4            Does this appear to be notes of the
5    meeting of the CLASS steering committee?    01:45
6        A.    That's what it looks like.
7        Q.    Do you see where it says Required
8    Attendees towards the top?
9        A.    Yes.
10        Q.    Do you recognize any of those names?    01:45
11        A.    I'm trying to see if any of these
12    authors were on.  Offhand --
13        Q.    Maybe the simpler question is do you
14    know any of the individuals listed?
15        A.    No.    01:46
16        Q.    What's the purported date of this
17    meeting?
18        A.    February 21, 2000.
19        Q.    And if you recall, was that before the
20    end of the CLASS study, before the study was    01:46
21    completed?
22        A.    I don't know the exact date of
23    completion.  I know that this had to be before,
24    certainly before we presented it at the first

63

1    manuscript meeting.  So it had to be before we got    01:46
2    the manuscript.
3        Q.    I can refresh your memory actually.  The
4    really thick exhibit, Exhibit 21.
5        A.    Oh, May 2000.    01:46
6        Q.    Underneath it, the study dates.
7        A.    September '98 to 17 March 2000.  So
8    this --
9        Q.    So if that is correct, then the meeting
10    memorialized in Exhibit 27, does it appear that    01:47
11    that took place before the CLASS study was
12    completed?
13        A.    Right.
14        MR. HALPER:  I'll object on foundation.
15    BY MR. MONTGOMERY:    01:47
16        Q.    Looking at the second to last page of
17    Exhibit 27, Bates number ending 816, do you see
18    towards the bottom of the page there's a bullet
19    that says "Trial Design Issues"?
20        Q.    And then underneath that the third    01:47
21        Q.    And then underneath that the third
22    bullet down says "Worse case.  We have to attack
23    the trial design if we do not see the results we
24    want."  Do you see that?

64

1        A.    Yes.    01:47
2        Q.    Do you have an understanding of what
3    "attack the trial design" means in that context?
4        MR. HALPER:  Objection, foundation.
5        THE WITNESS:  I don't know specifically    01:47
6    what they mean.  I know what they mean to me, but
7    I may have an inaccurate understanding.
8    BY MR. MONTGOMERY:
9        Q.    What is your understanding of that
10    statement?    01:48
11        A.    We don't like what we find, we fix it.
12        Q.    How would they fix it?
13        A.    Manipulation, attacking data,
14    manipulation.
15        Q.    And in your opinion is that what    01:48
16    defendants ultimately did with regard to the CLASS
17    data?
18        MR. HALPER:  Objection, foundation.
19        THE WITNESS:  I have no idea.
20    BY MR. MONTGOMERY:    01:48
21        Q.    In your opinion is attacking the trial
22    design if you don't get the results you want
23    proper scientific conduct?
24        A.    No.

De Angelis, Catherine  1/12/2007  11:00:00 AM

65

1     MR. MONTGOMERY:  I'd like to ask the     01:48
2   Court Reporter to mark what will be Exhibit 28.
3         (WHEREUPON Deposition Exhibit
4         No. 28 was marked as of
5         1/12/2007.)     01:49
6   BY MR. MONTGOMERY:
7     Q.   This is another rather lengthy document.
8   I can direct you to the part that I'm going to ask
9   you about, but then you can read as much as you
10  want.  It is the third page, Bates number ending     01:49
11  477, and the third full paragraph in that starting
12  "With a bit of data massage."  (Document tendered
13  to the witness.)
14        For the record, Exhibit 28 is an
15  e-mail chain beginning with an e-mail from James     01:49
16  Lefkowith to Emilio Arbe, A-R-B-E, dated
17  September 28, 2000.
18    A.   I read the paragraph, yes.
19    Q.   Have you read enough to understand the
20  context?     01:50
21    A.   I can understand the context, yes.
22    Q.   Okay.  I'll represent to you, this is
23  one of the things you just have to take my word
24  for it, that Emilio Arbe was a medical director in

66

1   the --     01:50
2         MR. HALPER:  No, no, you can't --
3         MR. MONTGOMERY:  I can.
4         MR. HALPER:  No, you can't, unless you
5   want to switch seats and testify.     01:50
6         MR. MONTGOMERY:  I'm going to represent
7   to her whatever I want to represent to her.
8         MR. HALPER:  Well, I don't think there's
9   any basis to do it.  I think it's an improper
10  question.     01:50
11        MR. MONTGOMERY:  I haven't asked her a
12  question -- all right.  Your objection is noted.
13  BY MR. MONTGOMERY:
14    Q.   I'm going to represent to you that he
15  was a medical director at Pfizer at this time.     01:51
16        MR. HALPER:  I'm going to object to that
17  representation.  It's also not correct.
18        MR. MONTGOMERY:  At Pharmacia?
19        MR. HALPER:  Well, you don't seem to
20  care about whether you're correct or not.     01:51
21        MR. MONTGOMERY:  He was a medical
22  director at one of the defendant companies.
23        MR. HALPER:  Do you also want to tell
24  her that he had nothing to do with the study?

67

1         MR. MONTGOMERY:  You can do that.     01:51
2         MR. HALPER:  Yes, right.
3   BY MR. MONTGOMERY:
4     Q.   I'd like you to look at the paragraph
5   beginning "With a bit of data massage."  I'm going     01:51
6   to read it into the record, the first sentence in
7   any event.  "With a bit of data massage, what
8   Steve Geis and his team have done is to focus on
9   the six-month data, for no other reason that it
10  happens to look better, and this time they     01:51
11  concentrate on the nonaspirin-treated patients,
12  and ignore the fact that at no time interval did
13  we see a statistically significant difference with
14  diclofenac, whether one looks at patients taking
15  aspirin or not, at six or at twelve months."     01:52
16        Did defendants disclose any of this
17  information to you prior to the publication of the
18  JAMA article?
19        MR. HALPER:  Objection to form.
20        THE WITNESS:  No.     01:52
21  BY MR. MONTGOMERY:
22    Q.   Did defendants ever disclose this
23  information to you after the publication of the
24  JAMA article?

68

1     A.   No.     01:52
2         MR. HALPER:  Objection to form.
3   BY MR. MONTGOMERY:
4     Q.   In your opinion --
5         MR. NELSON:  When he asks the question,     01:52
6   wait a second so he can object.
7         THE WITNESS:  Excuse me.
8   BY MR. MONTGOMERY:
9     Q.   In your opinion is the conduct described
10  in the language I just read to you proper     01:52
11  scientific behavior?
12        MR. HALPER:  Objection, no foundation,
13  assumes facts not in evidence, and to form.
14        THE WITNESS:  No.
15        MR. MONTGOMERY:  I'd like to ask the     01:52
16  Court Reporter to mark what will be Exhibit 29.
17        (WHEREUPON Deposition Exhibit
18        No. 29 was marked as of
19        1/12/2007.)
20  BY MR. MONTGOMERY:     01:53
21    Q.   Once again, you can read the whole
22  thing.  I'm just going to ask you about your quote
23  at the bottom of the first paragraph.  (Document
24  tendered to the witness.)

De Angelis, Catherine  1/12/2007  11:00:00 AM

69

1        For the record, this is a copy of a    01:53
2   U.S. News & World Report article dated
3   September 17, 2001, entitled "Physicians are
4   putting a stop to the publication of misleading
5   drug data."                    01:53
6        Have you seen this article before?
7   A.  Yes.
8   Q.  Did you read it when it came out?
9   A.  Yes.
10  Q.  I'd like to direct you to your quote at    01:53
11  the bottom of the first paragraph of Exhibit 29.
12  It says "The company had twelve months of data and
13  didn't tell me.  They know how upset I am."  Do
14  you see that?
15  A.  Yes.                    01:54
16  Q.  Is that an accurate quote?
17  A.  Yes.
18  Q.  Do you still believe that the company
19  had twelve months of data and did not tell you?
20  A.  Yes.                    01:54
21       MR. MONTGOMERY:  I'd like to ask the
22  Court Reporter to mark what will be Exhibit 30.
23
24

70

1        (WHEREUPON Deposition Exhibit    01:54
2        No. 30 was marked as of
3        1/12/2007.)
4   BY MR. MONTGOMERY:
5   Q.  Once again, a long document.  I'm only    01:54
6   going to ask you what you were quoted as saying on
7   the third page, Bates number ending 617.
8   (Document tendered to the witness.)
9        For the record, Exhibit 30 is an
10  e-mail chain starting with an e-mail from Mary    01:55
11  Frances Faraji, F-A-R-A-J-I, to George Geis dated
12  January 20, 2002, and includes what appears to be
13  a transcript of an interview from WAMU-FM radio.
14       Do you recall being interviewed by
15  WAMU radio on or around January of 2002?    01:58
16  A.  Yes.
17  Q.  There's a lengthy quote from you on the
18  third and fourth page of Exhibit 30, Bates numbers
19  ending 716 and 618.  Have you had a chance to read
20  through those quotes?    01:58
21  A.  Yes.
22  Q.  Are they accurate?
23  A.  Pretty much, as near as I can remember.
24  It's radio, it's verbal.  It doesn't read very

71

1   nice but it speaks okay I guess.        01:58
2   Q.  Is there anything in the quotes that you
3   read from this transcript that you now disagree
4   with?
5   A.  No.                    01:58
6        MR. MONTGOMERY:  I'd like to ask the
7   Court Reporter to mark what will be Exhibit 31.
8        (WHEREUPON Deposition Exhibit
9        No. 31 was marked as of
10       1/12/2007.)                01:59
11  BY MR. MONTGOMERY:
12  Q.  I'm only going to be asking you about
13  the third paragraph of Dr. Silverstein, Simon, and
14  Faich's letter.  (Document tendered to the
15  witness.)                    01:59
16  A.  One second.
17  Q.  For the record, Exhibit 31 is a number
18  of letters to the editor from the November 21,
19  2001 issue of JAMA?
20  A.  I'm missing a page.            02:00
21       MR. HALPER:  Me too.
22  BY MR. MONTGOMERY:
23  Q.  Are you?  Which page?
24  A.  2399.

72

1        MR. NELSON:  The ones you're talking    02:00
2   about.
3        THE WITNESS:  Of JAMA it would be, well,
4   it's 1957 and then it goes to 1959 and what I was
5   looking for is not here.            02:00
6        MR. HALPER:  We can --
7        MR. MONTGOMERY:  Can we go off the
8   record?
9        THE VIDEOGRAPHER:  We are off the
10  record.  The time now is approximately 2:00 p.m.    02:00
11       (WHEREUPON a recess was taken.)
12       THE VIDEOGRAPHER:  We are back on the
13  record.  The time now is approximately 2:01 p.m.
14       MR. MONTGOMERY:  Are we now looking at
15  page Bates number ending 958 of Exhibit 31?    02:01
16       MR. NELSON:  This doesn't have Bates
17  numbers.
18       THE WITNESS:  This doesn't have page
19  numbers.
20  BY MR. MONTGOMERY:                02:01
21  Q.  Okay, the second page of Exhibit 31.
22  Does this page contain a letter to JAMA from three
23  of the authors of The CLASS, the JAMA article?
24  A.  Yes.

73

1    Q.   I'd like to direct you to the top of the   02:02
2    second column, the sentence starting "Fourth."
3    "Fourth and most important, after the blind was
4    broken it became clear that there was a
5    differential dropout rate of NSAID patients with   02:02
6    GI intolerance or symptomatic ulcers, suggesting
7    that those patients at greatest risk were no
8    longer in the study.  This type of informative
9    censoring leads to a bias, which potentially
10   invalidates statistical analysis of complicated   02:02
11   ulcers by the log rank test."  Do you see that?
12   A.   Yes.
13   Q.   Do you have a general understanding of
14   what that point is?
15   A.   Yes.                          02:02
16   Q.   Can you explain it to me in laymen's
17   terms?
18   A.   It's a statistical argument that because
19   the people who benefit drop out sooner, that those
20   who remain in longer are the ones that don't have   02:03
21   as great a benefit.
22       That's as simple as I can put it
23   without giving you a course in bio-sadistics as
24   it's called.

74

1    Q.   Please don't.                     02:03
2        For the purposes of this
3    deposition, can we just refer to that as
4    defendants' informative censoring theory?
5    A.   Yes, yes.                        02:03
6    Q.   Okay.  Even if the informative censoring
7    theory were correct, in your mind would that
8    justify publishing only six months of data in the
9    JAMA article?
10   A.   Had they informed us that that was what   02:04
11   they were doing, we would have to decide whether
12   we wanted to publish it or not because it's a
13   different way of analyzing data.  And without
14   seeing what the data look like in the various
15   phases of doing this, it's extremely difficult to   02:04
16   see what they did.  I can tell you that in general
17   in a clinical trial this is not an acceptable form
18   of statistical analysis for JAMA.
19   Q.   And why is that?
20   A.   Because I think it portrays a finding   02:05
21   that is not clinically accurate.  And since JAMA,
22   the role of JAMA is to provide information to
23   clinicians and to other medical researchers but to
24   make patient care better.  And because the vast

75

1    majority of our readers are not bio-statisticians   02:06
2    and could not necessarily understand that such
3    analyses may be acceptable statistically to some
4    if you understand.  It's not what you would depend
5    that the average physician or clinician would   02:06
6    understand that these data are what they seem to
7    be.
8        The bottom line is as a physician,
9    I'm not a bio-statistician but I'm a fairly
10   sophisticated physician when it comes to being a   02:07
11   clinical researcher, I would never change my
12   practice or adopt something based on this kind of
13   analysis.  And I seriously doubt that we ever
14   would have published it knowing this.
15   Q.   Knowing that defendants were relying on   02:07
16   the informative censoring theory?
17   A.   Exactly.  But they explained it here.
18   Q.   You can put this aside for now, but
19   we're going to come back to it so you'll want to
20   be able to reach it.                   02:07
21   MR. MONTGOMERY:  I'd like to ask the
22   Court Reporter to mark what will be Exhibit 32.
23
24

76

1        (WHEREUPON Deposition Exhibit   02:08
2        No. 32 was marked as of
3        1/12/2007.)
4    BY MR. MONTGOMERY:
5    Q.   I'm only going to ask you about the   02:08
6    second page of Exhibit 32, but feel free to read
7    as much of it as you feel is necessary.  (Document
8    tendered to the witness.)
9    A.   The entire page you want me to read?
10   Q.   Really the first column.          02:08
11       Okay.  Looking at the second page
12   of Exhibit 32, I'd like you to look at the last
13   full paragraph in the first column that starts
14   "Publishing."  "Publishing and distributing
15   overoptimistic short-term data using post hoc   02:11
16   changes to the protocol, while omitting
17   disappointing long-term data of two trials, which
18   involved large numbers of volunteers, is
19   misleading."  Do you see that?
20   A.   Yes.                          02:11
21   Q.   Do you agree with that assessment?
22   A.   Yes.
23   Q.   Do you understand what "post hoc changes
24   to the protocol" means here?

77

1    A.   It means after the fact.            02:11
2    Q.   Do you agree that this is an accurate
3  description of what defendants did in this case
4  with regard to the JAMA article?
5        MR. HALPER:  Objection to form.        02:11
6        THE WITNESS:  Yes.
7  BY MR. MONTGOMERY:
8    Q.   Okay.  Now, I'd like you to look at the
9  first full paragraph in that column that starts
10  "Two issues."                            02:11
11    A.   Yes.
12    Q.   The third sentence begins "They argued,"
13  and it's talking about the authors.  I'll read it
14  into the record.  It says "They argued that a
15  large and differential dropout rate had occurred    02:12
16  during the later stage of the trial, which
17  depleted patients with gastrointestinal adverse
18  events preferentially in the groups taking
19  nonsteroidal anti-inflammatory drugs and that
20  these patients were at higher risk of developing    02:12
21  ulcer related complications."  Do you see that?
22    A.   Yes.
23    Q.   Is that a restatement of the informative
24  censoring theory we discussed earlier?

78

1    A.   Essentially, yes.              02:12
2    Q.   The next sentence says "However, the
3  absolute number of dropouts and withdrawals, both
4  overall and due to gastrointestinal adverse
5  events, increased gradually, without any sudden    02:12
6  increase after six months, and withdrawal rates
7  stayed roughly constant in different treatment
8  groups during the entire follow-up period."  Do
9  you see that?
10    A.   Yes.                          02:12
11    Q.   Is that relevant to you in the
12  informative censoring theory in your opinion?
13    A.   Yes.
14    Q.   And why is that?
15    A.   Because you would expect to see a      02:13
16  substantial decrease, and it usually would occur
17  in a more rapid dropoff.
18    Q.   At what point?
19    A.   Well, it depends where you are on the,
20  it wouldn't be where the cutoff was made by where    02:13
21  you would analyze.
22        What actually happened was not
23  exactly what was described or what you would
24  assume happened reading the explanation by the

79

1  authors.                              02:13
2    Q.   What actually happened?
3    A.   Well, if you go to the FDA data, this is
4  what they're talking about right here, it says the
5  absolute number of dropouts and withdrawals, both    02:13
6  overall and due to GI adverse events, increased
7  gradually without any sudden increase after six
8  months and withdrawal rates stayed roughly
9  constant in different treatment groups during the
10  entire follow-up period, meaning you would have    02:14
11  expected to see a big change, and that's not what
12  happened.
13    Q.   All right.  I'd like you to look at the
14  next sentence "In addition, there was no robust
15  evidence that gastrointestinal adverse events were    02:14
16  actually a risk factor for ulcer related
17  complications."  Do you see that?
18    A.   Yes.
19    Q.   In your opinion is that relevant to the
20  informative censoring theory?              02:14
21    A.   It could be.
22    Q.   And why is that?
23    A.   By virtue of what it says.  If you don't
24  have robust evidence for something, I mean your

80

1  robust may not be my robust.            02:14
2        MR. MONTGOMERY:  Let's go off the
3  record.
4        THE VIDEOGRAPHER:  We are off the
5  record.  The time now is 2:14.  This will conclude    02:15
6  Videotape No. 3.
7        (WHEREUPON a recess was taken.)
8        THE VIDEOGRAPHER:  This will begin
9  Videotape No. 3 of the videotaped deposition of
10  the Catherine DeAngelis taken on the 12th day of    02:21
11  January 2007, Case No. 03-1519.  The time now is
12  approximately 2:21 p.m., and I'll remind the
13  witness she remains under oath.
14  BY MR. MONTGOMERY:
15    Q.   Looking back at the second page of      02:21
16  Exhibit 32.  In light of what we talked about
17  previously concerning informative censoring, in
18  your opinion is defendants' theory of informative
19  censoring valid?
20        MR. HALPER:  Objection, foundation, and    02:22
21  to form.
22        THE WITNESS:  Is there, I missed the
23  word, is their what of --
24

De Angelis, Catherine  1/12/2007  11:00:00 AM

81

1   BY MR. MONTGOMERY:                02:22
2      Q.   The theory of informative censoring.
3      A.   Is their theory?
4      Q.   Yes.
5         MR. HALPER:   I would also object that   02:22
6   Dr. DeAngelis is here as a fact witness, not an
7   expert witness, and the question goes to expert
8   testimony.
9   BY MR. MONTGOMERY:
10     Q.   You can answer to the extent you are   02:22
11  able to.
12     A.   Well, as a matter of fact, what I was
13  going to say was my understanding, and I am not an
14  expert in statistical analysis, but in my
15  understanding it's an interesting way of applying   02:22
16  it.  Whether it's valid I can't say.  But had I
17  been informed of all this, it may very well have
18  changed the decision whether or not to publish in
19  JAMA.
20     Q.   All right.  Let's keep this one handy   02:23
21  too.  We'll be back to it, but we're done with it
22  for now.
23        MR. MONTGOMERY:   I'd like to ask the
24  Court Reporter to mark what will be Exhibit 33.

82

1         (WHEREUPON Deposition Exhibit   02:23
2         No. 33 was marked as of
3         1/12/2007.)
4   BY MR. MONTGOMERY:
5      Q.   I'm just going to ask you about your   02:23
6   very first quote on the first page.  For the
7   record, Exhibit 33 is a July 14, 2005 transcript
8   from National Public Radio.  (Document tendered to
9   the witness.)
10     I'd like to read a quote into the   02:24
11  record.  It's your first quote on the first page.
12  It says "If a detail person working for a
13  pharmaceutical company can hand a reprint of a
14  publication from a high-powered journal like JAMA
15  or NEJM to a doctor, that has a very significant   02:24
16  effect on the physician."
17        Is that an accurate quote?  Did you
18  say that?
19     A.   Yes.
20     Q.   Do you still agree with it?   02:24
21     A.   Yes.
22     Q.   Why do you agree that has a very
23  significant effect on physicians?
24     A.   Because they know how difficult it is to

83

1   get published, I'll say JAMA because I could speak   02:25
2   about my own journal, or a journal like JAMA, that
3   we go to great pangs to assure that what we
4   published is trustworthy.  And, therefore, if they
5   get it from JAMA, they know it's a very good study   02:25
6   that can be trusted because we place our integrity
7   behind them.
8      Q.   Do pharmaceutical companies have detail
9   persons distribute reprints of some articles from
10  JAMA and other journals?   02:25
11        MR. HALPER:   Objection, no foundation,
12  and I believe it also goes to expert testimony.
13        THE WITNESS:   Well, that I disagree
14  because I was in practice for a long time before I
15  came here.   02:26
16        I know that various pharmaceutical
17  and, well, pharmaceutical companies purchase
18  reprints from JAMA.  I also know and have been
19  handed, when I was at Hopkins in practice, handed
20  reprints from various journals by pharmaceutical   02:26
21  detail people.
22  BY MR. MONTGOMERY:
23     Q.   And in your opinion does that sometimes
24  allow doctors to see articles that they otherwise

84

1   wouldn't have had access to?   02:26
2      A.   Yes.
3      Q.   Would you turn back to Exhibit 32,
4   please.  Looking at the second page at the bottom,
5   there's a sentence that says "Consequently."  Do   02:27
6   you see that sentence in the middle of the last
7   paragraph?
8      A.   Yes, yes.
9      Q.   I'll read it into the record.
10  "Consequently, CLASS may still be relied on by   02:27
11  many physicians without reference to these flaws."
12  Do you see that?
13     A.   Yes.
14     Q.   Do you understand flaws to mean the
15  criticisms that are described earlier in the   02:27
16  paper?
17     A.   That's what he means I assume.
18     Q.   Do you agree that at the time this
19  article was published in the British Medical
20  Journal that that observation was true?   02:28
21        MR. HALPER:   Objection to form.
22        THE WITNESS:   I have no idea.
23        MR. NELSON:   I understand it's okay
24  here, but please let him voice his objection.

---

85

1    MR. MONTGOMERY:  I'd like to have the      02:28
2  Court Reporter mark what will be Exhibit 34.
3        (WHEREUPON Deposition Exhibit
4        No. 34 was marked as of
5        1/12/2007.)      02:28
6  BY MR. MONTGOMERY:
7    Q.  I'm only going to be asking you about
8  the third page.  For the record, Exhibit 34 is a
9  transcript of a National Public Radio broadcast
10  dated December 16, 2005.  (Document tendered to      02:29
11  the witness.)
12        I'd like to direct you to the
13  middle of the third page of Exhibit 34, the middle
14  of the third page.  In the middle there's a quote
15  where you say "They deliberately lied."  Do you      02:31
16  see that?
17    A.  Yes.
18    Q.  Is that an accurate quote?
19    A.  If it's here, I said it.
20    Q.  Do you have any reason to believe you      02:31
21  didn't say it?
22    A.  Oh, I very likely did say it.  In fact,
23  if it's here I believe it, yes, I said it.
24    Q.  And who are you referring to in "they"?

---

86

1    A.  The authors.      02:31
2    Q.  The authors of the JAMA article?
3    A.  Yes.
4    Q.  And how did you mean they lied?
5    A.  Forgive me, but I have to give you an      02:31
6  example.  I'm Catholic, okay, and I was taught
7  that when you admit to stealing something and you
8  say I stole a rope, make sure you also say there
9  was a horse behind the rope.
10        So lying is if you only say I stole      02:32
11  a rope and you neglect to say that there was a
12  horse behind the rope, and in that sense they lied
13  because when we directly asked them, the way we
14  ask the question, the way the question was asked
15  to the author, do you have more than six months      02:32
16  data or do you have more data, because they said
17  the study was complete at six months, they said to
18  us, the way they wrote it to us, we said our
19  understanding is that this study is over, it's six
20  months, is that true, and they said yes, you are      02:33
21  right, the study was finished after six months.
22  When we asked about patient information
23  thereafter, they said patients could be followed
24  further if they wanted to but the study is for six

---

87

1  months.      02:33
2    Q.  In the same sense, do you consider the
3  JAMA article that was printed to be a lie?
4    A.  No.  The study as it exists with six
5  month data arguably is accurate.  If it was a lie      02:33
6  and I could prove that what was in here is wrong,
7  I would have pulled the paper.
8        What is in here is, you notice that
9  the editorial that accompanied this, which is very
10  important, but if you have the editorial it's very      02:34
11  clear in that editorial this is exciting,
12  preliminary news, stay tuned, essentially, he
13  didn't say that, but it said we have to follow and
14  see what happens over time.
15        So these data while the analysis I      02:34
16  think paints a picture that is arguably painted in
17  a positive way, the analysis of the data the way
18  it was done, as far as I can tell, can be argued
19  as legitimate.  Is it cherry-picking?  I don't see
20  the raw data, I have never seen the raw data.  So      02:35
21  I don't know what they meant by cherry-picking.
22  If it meant that they only took the patients they
23  wanted to or they only analyzed the patients they
24  wanted to, then this picture is absolutely false.

---

88

1        If the statistical analysis      02:35
2  performed the way it was is accurate, then it
3  means for six months what is projected in this
4  paper is accurate.
5        However, looking at it twelve      02:36
6  months out, and this study was designed to look at
7  not months it was designed to look at I believe it
8  was forty incidences, it took a little over a
9  year, sixteen months I believe, to get to I think
10  they got finally to forty-four gastrointestinal      02:36
11  bleeding references.  That was the endpoint.  And
12  at that endpoint there was no difference.  But at
13  six months they had not reached that endpoint.
14  And to have said this is a six-month study was an
15  interesting way to look at the data because that's      02:36
16  not, it was not designed as a six-month study, it
17  was designed as a study to look at forty
18  incidences and it took more than a year, twelve
19  months, to reach that point.
20        So extrapolating, they couldn't say      02:37
21  that it was a twelve month, they didn't know how
22  long it would take to reach forty.  It's possible
23  they could have reached forty incidences in six
24  months, but they didn't, it took them a year.  And

---

89

1   at that point there was no difference between this    02:37

2   drug and the others.

3       Q.   Would you agree that the JAMA article

4   was misleading --

5       A.   Yes.                        02:37

6       Q.   -- for failing -- let me finish, please.

7           Would you agree that the JAMA

8   article was misleading for failing to acknowledge

9   the existence of post six-month data?

10      A.   Yes.                        02:37

11      Q.   Okay.  Going back to the third page of

12  Exhibit 34, there's another quote further down the

13  page by you.  It says "When they went out to

14  twelve months, it turned out there was no

15  difference.  And then we got into trouble and we    02:37

16  made them write a letter describing what they had

17  done and admitting that they had lied to us."

18          Is that an accurate quote, as far

19  as you can tell?

20      A.   Yeah.                       02:38

21      Q.   Do you still agree with it?

22      A.   Yes.  Only I don't think we were the

23  only ones.  We got in trouble because we were in

24  trouble with ourselves because integrity means a

90

1   lot to us, and people trust us.             02:38

2           MR. HALPER:  Can I talk to you off the

3   record for a second?

4           MR. MONTGOMERY:  Sure.  Let's go off the

5   record.                             02:38

6           THE VIDEOGRAPHER:  Okay.  We are going

7   off the record.  The time now is approximately

8   2:37.

9           (WHEREUPON a recess was taken.)

10          THE VIDEOGRAPHER:  Okay.  We are back on    02:41

11  the record.  The time now is approximately

12  2:41 p.m.

13          MR. MONTGOMERY:  I'd like to ask the

14  Court Reporter to mark what will be Exhibit 35.

15          (WHEREUPON Deposition Exhibit        02:42

16          No. 35 was marked as of

17          1/12/2007.)

18  BY MR. MONTGOMERY:

19      Q.   For the record, this is an article from

20  the Investor's Business Daily dated June 19, 2006.    02:42

21  (Document tendered to the witness.)

22  I'm just going to ask you about

23  your quote at the bottom of the page, but read as

24  much as you need.  At the bottom of the page

91

1   you're quoted as saying "The authors actually lied    02:42

2   to us."  Is that correct?

3       A.   Yeah.  Is this supposedly something I

4   said to them?

5       Q.   According to, let me read it again, yes.    02:42

6   It says "The authors actually lied to us, said

7   Dr. Catherine DeAngelis, the publication's editor

8   in chief."

9       A.   That's a quote taken from -- when is

10  this?  June of this year?  JAMA wasn't happy.         02:42

11  That's a paraphrase of JAMA's editor isn't happy.

12  The authors actually lied to us --

13      Q.   The quote in the previous document was

14  "they deliberately lied."

15      A.   So all I can say is I do not recall        02:43

16  talking to these people.  It looks like what we

17  say in editing a paraphrase of a previous

18  publication.  I'm not saying that I didn't talk to

19  them because I speak to lots of people every day.

20  But Investor's Business Daily is not, I don't talk    02:43

21  to people usually in this kind of thing.  But it's

22  pretty close to what I said to somebody else.

23      Q.   Would you agree that the authors of the

24  JAMA article did lie to you?

92

1       A.   Yes.                        02:44

2       Q.   Okay.  We'll move on.

3           MR. MONTGOMERY:  I'd like to ask the

4   Court Reporter to mark what will be Exhibit 36.

5           (WHEREUPON Deposition Exhibit        02:44

6           No. 36 was marked as of

7           1/12/2007.)

8   BY MR. MONTGOMERY:

9       Q.   Do you recognize Exhibit 36?  (Document

10  tendered to the witness.)                   02:44

11      A.   Yes.

12      Q.   What is it?

13      A.   This is not the current one but it's

14  close.  This is dated 8/30/2001 so, okay.

15      Q.   And what is this?                02:45

16      A.   This is our authorship form, must be

17  signed, everything on here, all the requirements,

18  must be signed or we won't publish an article.

19  Every author must sign and must indicate that he

20  or she has done enough to be a qualified author.     02:45

21      Q.   So is it your understanding that every

22  author of the JAMA article signed and submitted

23  one of these forms?

24      A.   They had to.

93

1    Q.  Does JAMA still maintain these forms?    02:45
2    A.  We don't have these forms from 2000, no.
3    Q.  How long do you keep them?
4    A.  It depends what kind of document it is.
5    Q.  All right.  I'd like you to look down at    02:46
6    Section D on the first page.  It says "To qualify
7    for authorship, you must check at least one box
8    for each of the three categories of contributions
9    listed below"; is that correct?
10    A.  That's correct.                02:46
11    Q.  So does that mean that in order to
12    qualify as an author for JAMA, an author or a
13    potential author would have to be able to check
14    one box in Category 1, one box in Category 2, and
15    one box in Category 3 of Section D?        02:46
16    A.  Yes.
17    Q.  What's the purpose of these
18    requirements?
19    A.  It's for us to be sure that each name,
20    the name of each person on there, is legitimate to    02:46
21    qualify as an author for JAMA.  They must either
22    participated and take responsibility for either at
23    least part of the content, that they have to
24    either been involved in the conception or design,

94

1    the acquisition of the data or the analysis and    02:47
2    interpretation of it, and that they were involved
3    in either the drafting of the manuscript or
4    critical revision of the manuscript for important
5    intellectual content, and they have to say if they    02:47
6    were involved in any of the others.
7        They don't need to check one of
8    these, they could say no additional contributions,
9    but for us we want to know who said they had the
10    statistical expertise, who obtained the funding,    02:47
11    all that kind of stuff.
12    Q.  As the editor in chief of JAMA, do you
13    think you're familiar with the expectations of
14    JAMA's readership?
15    A.  Yes.                    02:47
16    Q.  At the time the JAMA article was
17    published, do you think that JAMA's readership had
18    expectations regarding the requirements of
19    authorship that were close to, if not exactly the
20    same as, what's in this form?            02:48
21    A.  Yes.  These were available on our line
22    free to anybody in the world.
23        MR. MONTGOMERY:  I'd like to ask the
24    Court Reporter to mark Exhibit 37.

95

1        (WHEREUPON Deposition Exhibit    02:48
2        No. 37 was marked as of
3        1/12/2007.)
4    BY MR. MONTGOMERY:
5    Q.  For the record, Exhibit 37 is an e-mail    02:48
6    from Mona Wahba to Leland Loose dated February 16,
7    2000.  (Document tendered to the witness.)
8        I'm only going to be asking you
9    about the second full paragraph on the page, but
10    read as much as you need to.            02:48
11    A.  "Not for a while yet," that one you
12    mean?
13    Q.  Yes.  I'd like to direct you to the
14    sentence, you can probably guess which one, the
15    second to the last, "Believe it or not, a draft    02:49
16    manuscript has been written with a sort of
17    fill in the blanks depending on what actually
18    happens."  Do you see that?
19    A.  Yes.
20    Q.  In your experience is that a typical    02:49
21    scientific practice?
22    A.  It depends what aspect.  If it's the
23    first part, the introduction, pretty common
24    because you're just setting the background.  If

96

1    it's for the methodology, very common, because you    02:50
2    already know what you did.  After that it is
3    gutsy.
4    Q.  In your opinion would it be
5    scientifically appropriate to draft a fill in the    02:50
6    blanks for all of the analysis?
7        MR. HALPER:  Objection to form.
8        THE WITNESS:  Well, it depends.  I mean
9    at this point if they knew how many patients were
10    in there and all that kind, they were sort of,    02:50
11    they weren't quite sure if it was going to be
12    plus/minus ten because you leave a blank for
13    patients entered and this kind of stuff, but when
14    it gets to anything beyond how many patients did
15    this, this, or this and what the statistical    02:50
16    analysis was, that is gutsy.  It's very unusual.
17    I don't know how they could write it.
18        MR. MONTGOMERY:  I'd like to ask the
19    Court Reporter to mark what will be Exhibit 38.
20        (WHEREUPON Deposition Exhibit    02:51
21        No. 38 was marked as of
22        1/12/2007.)
23        THE WITNESS:  Sir, may I ask who Nancy
24    Tam is, or is that not appropriate?

De Angelis, Catherine  1/12/2007  11:00:00 AM

97

1      MR. MONTGOMERY:  You can ask anything      02:51
2  you want, but I don't know the answer.
3  BY MR. MONTGOMERY:
4      Q.  Do you want me to give you an idea of
5  where we're going so you might know what sections      02:54
6  to read?  Once I ask you a question if you need to
7  read some more of it --
8      A.  No.  I don't need to read anymore.
9      Q.  Having flipped through it, does this
10  appear to be a sort of an example of the fill in      02:54
11  the blanks type of manuscript we just discussed?
12      A.  Yes.
13      MR. HALPER:  Objection to form, calls
14  for speculation.
15  BY MR. MONTGOMERY:      02:54
16      Q.  Would you turn to page what is Bates
17  No. 910 ending.  Looking at this page, does it
18  appear that defendants applied the fill in the
19  blanks methodology to the results of the study at
20  this point?      02:54
21      MR. HALPER:  Objection to form, calls
22  for speculation.
23      THE WITNESS:  Figure 1, that's okay.  I
24  mean you know that you, like I said, you just put

98

1  in the number, and the figure is a standard figure      02:55
2  you use for this sort of study.  But then when you
3  get down into some of the other stuff, it's gutsy.
4  BY MR. MONTGOMERY:
5      Q.  Would you turn to page ending Bates      02:55
6  No. 905.  Do you see Outcome Measures on that
7  page?
8      A.  Yes.
9      Q.  The first sentence there reads "The
10  primary endpoint was the incidence of upper GI      02:56
11  ulcer complications during the period of drug
12  administration (up to sixty-five weeks)."  Do you
13  see that?
14      A.  Uh-huh.
15      Q.  Does this indicate that the analysis in      02:56
16  this manuscript was for the entire study period
17  and not just the first six months?
18      A.  Yes.
19      Q.  And if that language had been included
20  in the JAMA article, would you have understood      02:56
21  that the study lasted longer than six months?
22      A.  Would I --
23      Q.  If that same language that I just read
24  to you had been included in the JAMA article,

99

1  would you have then understood that the study      02:56
2  lasted longer than six months?
3      A.  Oh, yes.
4      Q.  Please turn to page Bates number ending
5  899 of Exhibit 38.  Do you see under Methods?      02:56
6      A.  Yes.
7      Q.  The first sentence reads "Patients with
8  OA or RA were enrolled into one of two studies
9  simultaneously conducted for a period up to
10  sixty-five weeks."  Do you see that?      02:57
11      A.  Yes.
12      Q.  And reading that, would you understand
13  that the study lasted longer than six months?
14      A.  Yes.
15      Q.  And had the authors included that in the      02:57
16  JAMA article, would you have understood that the
17  study lasted longer than six months?
18      A.  Yes.
19      Q.  All right.  I'd like you to turn back to
20  Exhibit 31 briefly.  That is the letter to JAMA.      02:57
21  It's Exhibit 31.
22      On the first page there's a section
23  that says Guidelines For Letters in the lower
24  right-hand corner.  Do you see Guidelines For

100

1  Letters?      02:58
2      A.  Yes.
3      Q.  And then in that it says "A signed
4  statement for authorship criteria and
5  responsibility, financial disclosure, copyright      02:58
6  transfer, and acknowledgment is required for
7  publication."
8      A.  Yes.
9      Q.  Is that the same sort of disclosure or
10  form that we just looked at for authors of      02:58
11  articles?
12      A.  Yes, except most letters are in response
13  to something.  So if they say there was no data
14  collected, then that's okay.  I mean you'd look at
15  it differently, but the expectation is that      02:58
16  everyone who signs would meet certain criteria for
17  the letters and that they, for example, either
18  part or whole of the content, concept, and design,
19  you wouldn't expect data necessarily.  Drafting
20  the manuscript or critical revision and important      02:59
21  intellectual content, those sorts of things all
22  have to be in there and the rest has to be.
23      MR. MONTGOMERY:  I'd like to ask the
24  Court Reporter to mark what will be Exhibit 39.

De Angelis, Catherine  1/12/2007  11:00:00 AM

101

1             (WHEREUPON Deposition Exhibit        02:59
2         No. 39 was marked as of
3         1/12/2007.)
4     BY MR. MONTGOMERY:
5         Q.   For the record, Exhibit 39 is an e-mail        02:59
6     string starting with an e-mail from Goran,
7     G-O-R-A-N, Ando, A-N-D-O, to Philip Needleman and
8     several others dated August 13, 2001.  (Document
9     tendered to the witness.)
10            I'm just going to ask you about the        02:59
11    top e-mail, but you can read as much as you'd
12    like.  And the subject heading is "Re:  JAMA
13    Letters to the Editor."
14            In that paragraph do you see where
15    it says "Once we redraft the letter, we would send        03:00
16    it to the authors and get their buy-in with the
17    intent on making the ten day timeline imposed by
18    JAMA."  Do you see that?
19        A.   Yes.
20        Q.   If all the purported authors of the        03:00
21    letter to JAMA did was buy into a letter that was
22    drafted by someone else, would that meet the
23    authorship criteria that JAMA had at the time?
24        MR. HALPER:  Objection to form.

102

1            THE WITNESS:  It would meet perhaps the        03:00
2     criteria; however, it is what we call ghost
3     writing.  And that is, the people who should have
4     been an author, their names weren't there.
5     Because anyone who meets these criteria should be        03:01
6     an author because they met the criteria for an
7     author.
8            Occasionally there will be people
9     who make significant contributions to manuscript
10    and you see them in the acknowledgments, but it is        03:01
11    stated what that person did.  If we receive
12    material that is obviously ghost written by
13    someone, we will not publish it.
14    BY MR. MONTGOMERY:
15        Q.   So in other words, under JAMA's        03:01
16    requirements it's mandatory for anybody that meets
17    the requirements of authorship to be listed as an
18    author?
19        A.   That's the expectation.
20        Q.   So if the letter to JAMA in Exhibit 31        03:02
21    that we talked about earlier was drafted by
22    somebody at the company and simply approved by the
23    listed authors, then that person should have been
24    listed as an author?

103

1         A.   Yes.                    03:02
2         MR. MONTGOMERY:  I'd like to ask the
3     Court Reporter to mark what will be Exhibit 40.
4             (WHEREUPON Deposition Exhibit
5         No. 40 was marked as of        03:02
6         1/12/2007.)
7     BY MR. MONTGOMERY:
8         Q.   For the record, Exhibit 40 is an
9     editorial from JAMA dated July 12, 2006.
10    (Document tendered to the witness.)        03:02
11            Were you one of the authors of
12    Exhibit 40?
13        A.   Yes.  And I met all the qualifications
14    and I signed the form.
15        Q.   Does this article or editorial        03:03
16    memorialize the changes in the conflict of
17    interest policy that you described earlier?
18        A.   Yes.
19        Q.   And was the JAMA article that we have
20    been discussing one of the reasons why JAMA        03:03
21    changed its conflict of interest policy?
22        A.   There were many reasons, but that was
23    one of many.
24        MR. MONTGOMERY:  I'd like to ask the

104

1     Court Reporter to mark what will be Exhibit 41.        03:03
2             (WHEREUPON Deposition Exhibit
3         No. 41 was marked as of
4         1/12/2007.)
5     BY MR. MONTGOMERY:                03:03
6         Q.   For the record, Exhibit 41 is another
7     editorial from JAMA dated August 23/30, 2006.
8     (Document tendered to the witness.)
9         A.   We do a double issue at the end of the
10    month.  We do four issues a month.        03:04
11        Q.   I see.
12            Did you write Exhibit 41 as well?
13        A.   Yes.
14        Q.   Why did you write Exhibit 41?
15        A.   To make it as clear as possible to our        03:04
16    readers, authors, and reviewers of course I
17    consider our readers, exactly what I thought was
18    going on as far as money influencing what
19    physicians, clinical scientists, institutions, how
20    money was influencing what they did, which I        03:05
21    thought was wrong.
22            It was an advent to some very, it
23    was an explanation of why we were coming down hard
24    on conflict of interest.  People had misconstrued

De Angelis, Catherine  1/12/2007  11:00:00 AM

105

1  why we kept publishing letters of apology from       03:05
2  people when we found that they did not disclose
3  things.  And instead of people understanding that
4  we weren't just publishing a correction, which is
5  what every other journal does, I decided that we       03:06
6  were going to make a big deal out of it.  And
7  people misunderstood that we were being duped and
8  it was just the opposite, and I said I'm not going
9  to tolerate it.  So if you don't disclose, we're
10 going to reveal it and we're going to make you       03:06
11 apologize to our readers, because it's the readers
12 who they apologize to, not to us.
13     Q.   All right.  On the first page of Exhibit
14 41, at the top of the right-hand column, you have
15 a list of different events.       03:06
16     A.   Yes.
17     Q.   One of them says "reporting only six
18 months of data in a trial designed to have twelve
19 months of data as the primary outcome."
20     A.   Yes.       03:06
21     Q.   Does that refer to the JAMA article
22 we've been discussing?
23     A.   The CLASS study, yes.  It's referenced.
24     Q.   Once again, so that was one of the

106

1  reasons, one of the reasons, why you changed --       03:07
2     A.   Yes.
3     Q.   -- JAMA's conflict of interest policy?
4     A.   Yes.
5     Q.   I'd like to show the witness what's been       03:07
6  previously marked as Exhibit 4.  (Document
7  tendered to the witness.)
8         For the record, Exhibit 4 is an
9  editorial from the September 13, 2000 issue of
10 JAMA entitled COX-2-Selective NSAIDs, New and       03:07
11 Improved?"
12         Is this an editorial from the
13 September 13, 2000 issue?
14     A.   Yes.  It was specifically so elicited as
15 the companion piece to the CLASS study.       03:08
16     Q.   Who solicited this editorial?
17     A.   We did, I did ultimately.  I can't
18 remember who made the call.
19     Q.   Did the authors of the JAMA article have
20 an opportunity to see this editorial before it was       03:08
21 published?
22     A.   No.
23     Q.   On the first page of Exhibit 4, the
24 second column, the paragraph starting "Previous

107

1  studies," in the middle of that paragraph there's       03:08
2  a sentence that begins "In this issue of The
3  Journal," do you see that?
4     A.   Yes.
5     Q.   All right.  I'm going to read it into       03:08
6  the record.  It says "In this issue of The
7  Journal, Silverstein, et al., report the results
8  of a six-month randomized, double-blind,
9  controlled trial comparing the ulcerogenic
10 potential and upper GI toxicity of celecoxib in       03:09
11 individuals with osteoarthritis or rheumatoid
12 arthritis."
13         Is the description of the CLASS
14 study as a six-month trial this accurate in your
15 understanding?       03:09
16     A.   That was our understanding at the time.
17 That was the understanding of the editor.  He was
18 given the manuscript that we were to publish and
19 he read it and this is what he took, this is his
20 analysis of what we gave him.       03:09
21     Q.   My question is now with the benefit of
22 hindsight knowing what you know, is that
23 description of the CLASS study accurate?
24     A.   No.

108

1     Q.   And why is that?       03:10
2     A.   Because it was a study that took twelve
3  months, actually more than twelve months, to reach
4  its planned endpoint of forty GI episodes of
5  bleeding.  It was a twelve-month study.       03:10
6         MR. MONTGOMERY:  I'd like to ask the
7  Court Reporter to mark what will be Exhibit 42.
8         (WHEREUPON Deposition Exhibit
9         No. 42 was marked as of
10        1/12/2007.)       03:10
11 BY MR. MONTGOMERY:
12     Q.   Do you recognize Exhibit 42?  (Document
13 tendered to the witness.)
14     A.   I recognize this part and I recognize
15 that part.       03:11
16     Q.   Meaning the first and third pages of
17 Exhibit 42?
18     A.   Yes, excuse me, yes, the first and third
19 page of what you handed me.
20     Q.   Do you recognize the second page?       03:11
21     A.   No.  I mean may I ask where it came
22 from?
23     Q.   Your attorney produced it to me.
24        MR. NELSON:  There's another deponent

De Angelis, Catherine  1/12/2007  11:00:00 AM

109

1   besides you, Dr. DeAngelis.            03:11
2       THE WITNESS:  I'm sorry?
3       MR. NELSON:  You're the witness today
4   but there's going to be another witness in this
5   case from the AMA.                     03:12
6       THE WITNESS:  Excuse me.
7       MR. MONTGOMERY:  That's fine.  If you
8   don't recognize it, you don't recognize it.  Not a
9   problem.
10  BY MR. MONTGOMERY:                     03:12
11      Q.  All right.  We talked before, is it
12  correct to say that you first found out about the
13  post six-month data from the FDA website around
14  February of 2001?
15      A.  I found out about the first six-month --   03:12
16      Q.  The post six-month data.
17      A.  Oh, the post, excuse me.  It came from,
18  and I recognize Dr. Wright because you produced
19  something that jogged my memory, he was the one
20  who called me because he said, he admitted it      03:12
21  there, and I remember he was the one who called.
22  That's when I was told.  I invited him to write a
23  letter to the editor, as I did the other two, and
24  went to the website and they were accurate,

110

1   Dr. Wright and the other two writers were      03:13
2   accurate.
3       Q.  As of February 2001, so I'm asking you
4   about your thought process at that time --
5       A.  February 2001.               03:13
6       Q.  Right, at the time you found out about
7   the data on the FDA website.
8       A.  Yes.
9       Q.  As of February 2001, did you know that
10  the authors of the JAMA article had cherry-picked   03:13
11  data?
12      A.  After I went to the -- I'm not sure I
13  would use the word "cherry-picked."  It isn't in
14  my vernacular usually.
15          It was clear to me that what was      03:13
16  presented to us was not this CLASS study, and that
17  the data that were presented to us had been
18  analyzed in a way that was quite peculiar.
19      Q.  But as of February 2001, did you know
20  even after you saw the data that the authors of    03:14
21  the JAMA article had chosen the first six months
22  of data for no reason other than it made Celebrex
23  look better?
24      MR. HALPER:  Objection to form and calls

111

1   for speculation.                       03:14
2       THE WITNESS:  I know that by choosing
3   that, there had to be a reason.  And when you look
4   at the end of twelve months and you see there's no
5   difference, but when you look at six months and    03:15
6   you see a difference, it made logical sense to me
7   that you'd choose this because it had a result
8   that made a product look like it was something
9   that was a better product to use because it had
10  less GI bleeding.  Whereas, if you had gone to the  03:15
11  endpoint there was no difference.  It was no
12  worse.  It was just no better as far as GI
13  bleeding goes.
14  BY MR. MONTGOMERY:
15      Q.  We went through several articles, these    03:15
16  articles today, but I noticed that in the
17  August 2001 Washington Post, for example, do you
18  recall we looked at your language where you said
19  we were functioning at a level of trust that was
20  perhaps broken, do you recall that?             03:15
21      A.  Yes.
22      Q.  And then do you recall the other
23  articles that we looked at from let's say 2005
24  2006 where your language was the authors lied?

112

1       A.  Yes.                          03:16
2       Q.  Can you explain to me why your portrayal
3   of their conduct, why you characterized their
4   conduct differently from 2001 to 2005?
5       A.  Because after I read their description    03:16
6   of why they had done what they did, I thought that
7   we had been, we had been given misinformation and
8   the only way I could think about it, and believe
9   me, I've thought long and hard about this one, was
10  that it had to be a lie because what they          03:17
11  presented was not the CLASS study data.  It was
12  specific data chosen for a reason.
13          Now, they may have presented the
14  data to me in that way as six months and describe
15  their reasoning for doing it that way.  Had they    03:17
16  done that, I probably, well, I know I wouldn't
17  have published it, but it would have been the same
18  data but with the explanation that it was six
19  months and not twelve and why they had done it and
20  I just wouldn't have bought it.  I would have       03:17
21  thought no, show me what happens when you get to
22  twelve months.
23          But the six month, that's probably
24  an accurate way to look at it.  But the twelve

113

1    month data, which is their endpoint to get the          03:18
2    forty-four bleeding, well, they had forty, forty
3    was their endpoint, they actually end up to
4    forty-four, I'm pretty sure it was forty-four,
5    showed there was no difference.  That's the          03:18
6    endpoint of CLASS, not this.
7        And what they lied to me was I have
8    documentation, e-mail, this was a six-month study.
9    And it was not.  That is a lie.
10   Q.   When you say your opinion of the          03:18
11   authors' conduct changed when you read their
12   written explanation, are you referring to the JAMA
13   letter that's in Exhibit 31?
14   A.   The letter in reply.
15   Q.   Right.  So let's just make sure.          03:18
16       Take a look at Exhibit 31 to make
17   sure we're dealing with the same thing.
18   A.   Yes.  It's the one, yes, it's 31, second
19   page in reply, "In retrospect."
20   Q.   So just to summarize:  In February of          03:19
21   2001, you learned about the post six-month data
22   from the FDA's website; is that correct?
23   A.   Yes.
24   Q.   But it wasn't until --

114

1    A.   Well, I learned about it from the          03:19
2    letters and then went to the site.
3    Q.   But it wasn't until you read the
4    authors' written explanation in JAMA that was
5    published November 21, 2001, that you concluded          03:19
6    that they had lied; is that correct?
7    A.   Yes, because their explanation, in
8    retrospect we acknowledge we could have avoided
9    confusion by explaining why we chose to inform.
10       We ask them.  We didn't ask them to          03:20
11   explain why they did it, we ask them is this a
12   six-month or do you have more data, and they said
13   this is a six-month study.
14       MR. MONTGOMERY:  All right.  I have --
15       THE WITNESS:  That's not what that says.          03:20
16       MR. MONTGOMERY:  I have no more
17   questions for now.  Although I undoubtedly will
18   want to follow up after defendants have had an
19   opportunity to question you.
20       Do you want to go off the record          03:20
21   first?
22       MR. HALPER:  I do.  I need a few
23   minutes.
24       MR. MONTGOMERY:  Sure.  Let's go off the

115

1    record.          03:20
2        THE VIDEOGRAPHER:  All right.  This will
3    conclude Videotape No. 3 of the videotaped
4    deposition, the deposition of Ms. DeAngelis.  We
5    will continue on Videotape No. 4.  The time now is          03:20
6    approximately 3:20.
7        (WHEREUPON a recess was taken.)
8        THE VIDEOGRAPHER:  This will begin
9    Videotape No. 4 of the videotaped deposition of
10   Catherine DeAngelis taken in the matter of Case          03:34
11   No. 03-1519.  Today is the 12th day of January,
12   2007.  The time now is approximately 3:34 p.m.,
13   and I will remind the witness she remains under
14   oath.
15
16
17
18
19
20
21
22
23
24

116

1        EXAMINATION          03:34
2        BY MR. HALPER:
3    BY MR. HALPER:
4    Q.   Good afternoon, Dr. DeAngelis.
5    A.   Hi.          03:34
6    Q.   You testified this morning that the
7    first time you became aware of the CLASS study was
8    when you attended a manuscript meeting.  Do you
9    recall that?
10   A.   Yes.          03:34
11   Q.   Do you recall how long that meeting
12   lasted?
13   A.   Well, the meetings last several hours,
14   but we discuss many manuscripts.
15   Q.   Approximately how long did you discuss          03:35
16   the CLASS manuscript?
17   A.   I don't recall.
18   Q.   Less than half an hour?
19   A.   Probably.
20   Q.   About fifteen minutes?          03:35
21   A.   Probably closer to a half hour.  But
22   this is the summation of many persons' input into
23   this.  This is not just that's the first time
24   anybody discussed.  This is after it has been

De Angelis, Catherine  1/12/2007  11:00:00 AM

117

1    reviewed, sometimes re-reviewed, and the        03:35
2    presentation is by someone who's been living with
3    this manuscript for a long time, and I have the
4    full manuscript in front of me.
5       Q.   Understood.                             03:35
6            But those reviews and re-reviews
7    were not done by you; is that correct?
8       A.   No.
9       Q.   They were done by other people at JAMA?
10      A.   They were done by, no, they were done by   03:35
11   our peer reviewers, people with expertise in the
12   field and statisticians.
13      Q.   Thank you.
14           And the first time you became aware
15   of the study was at this manuscript meeting?    03:36
16      A.   The first time I became aware of the
17   study report.  I knew there was this study going
18   on, but I wasn't sure what it was or anything like
19   that.  People, you know, talk about all different
20   kinds of studies going on.                      03:36
21      Q.   Your first substantive involvement --
22      A.   Yes.
23      Q.   -- was at this manuscript meeting; is
24   that correct?

118

1       A.   Correct.                                03:36
2       Q.   The next time you focused on the CLASS
3    manuscript was at a subsequent manuscript meeting;
4    is that correct?
5       A.   Yes, with some hallway discussions with    03:36
6    Dr. Winker in between.
7       Q.   When you say "hallway discussions," do I
8    take it those were not formal meetings with her?
9       A.   No, right.
10      Q.   You would run into her in the hallway    03:36
11   and mention something?
12      A.   Our offices are in the same area.  We
13   talk all the time.  We see each other, we discuss
14   many, many things.
15      Q.   Do you remember any of the content of    03:37
16   those hallway discussions?
17      A.   Mostly it had to do with the discussion
18   about six month, twelve month, is this
19   preliminary, the whole business.  In fact, we even
20   discussed maybe there should be a preliminary    03:37
21   communication rather than a full, that kind of
22   stuff.
23      Q.   What did she tell you as best you recall
24   regarding the six and twelve month issue?

119

1       A.   I asked her to please, she had discussed   03:37
2    this with Dr. Silverstein and he had said that
3    this was the full data, it was six months, and I
4    said look, make sure that you and I can't recall,
5    that was probably after the second manuscript,    03:37
6    make sure that you put in writing so he
7    understands exactly what you're talking about,
8    what Dr. Lichtenstein meant, is this as it's
9    presented a six-month study or are there more data
10   on these patients, and she did that.            03:38
11      Q.   Let's just make sure we're talking about
12   the right person.
13           Do you understand Dr. Winker to
14   have been talking to the corresponding author?
15      A.   Yes.                                     03:38
16      Q.   And I think you referred earlier to that
17   person as Dr. Lefkowith?
18      A.   Yeah.  I'm not sure if she speak with
19   Dr. Silverstein or Dr. Lefkowith.  It may have
20   been either one of them on the phone.  And she    03:38
21   can't recall, I asked her and she said, you know,
22   this is a long time ago, we do five thousand
23   manuscripts a year.  She spoke to someone, but she
24   can't recall exactly what the words were.

120

1       Q.   At the second manuscript meeting where    03:38
2    you discussed CLASS --
3       A.   Yes.
4       Q.   -- how much time in that meeting did you
5    focus on that manuscript?                        03:39
6       A.   Probably about the same amount of time.
7       Q.   And in either of those manuscript
8    meetings did you have any written work product in
9    front of you besides the manuscript?
10      A.   Like what?                               03:39
11      Q.   If there's nothing, that's fine.  My
12   only question is besides the manuscript, was
13   anything else discussed at either of the
14   manuscript meetings?
15      A.   Pertaining to the CLASS study?           03:39
16      Q.   Yes.
17      A.   No.
18      Q.   Did you discuss the CLASS manuscript at
19   any subsequent manuscript meetings?
20      A.   No.                                      03:39
21      Q.   So prior to publication your involvement
22   in the CLASS manuscript consisted of your
23   participation in the two manuscript meetings and
24   your hallway conversations with Dr. Winker; is

121

1    that correct?                              03:39
2        A.   Several ongoing discussions, especially
3    when we got the response in writing on e-mail.  We
4    went back and forth about what do we do with this.
5    So there were a lot of ongoing discussions.        03:40
6              We discuss manuscripts all the
7    time, and I don't recall how much time or when or
8    where, but some time in between the second
9    manuscript meeting where we decided that we would
10   take this study and publish it but we had to be    03:40
11   sure that this was the end of the study.  And if
12   you look at the edited, the copy edited manuscript
13   that was sent to Dr. Lefkowith, there are specific
14   questions about is this the whole, I don't know
15   the exact wording, I don't have it here with me, I  03:41
16   have it someplace else, but is this a six-month
17   study, is that what you said, is this a six-month
18   study, is that true, what about the others, is
19   there other information.  And the response was you
20   are correct, this is the study, it's complete.      03:41
21   And there were several e-mails back and forth
22   between Dr. Winker and Dr. Lefkowith, and he said
23   there is longer data on the patients, they can
24   remain in the study if they want to, but this is

123

1        MR. NELSON:  The JAMA article?  Is that    03:43
2    what you're talking about?
3        THE WITNESS:  Yes.  I've got it.
4    BY MR. BROWN:
5        Q.   If you turn to the third page, the     03:43
6    second full paragraph.
7        A.   "All documentation"?
8        Q.   The next paragraph.
9        A.   "Adverse"?
10       Q.   Right.  Do you want me to read it to   03:43
11   you?
12       A.   Yes.
13       Q.   "Adverse effect data were collected at
14   each visit and as reported spontaneously using the
15   following question:  Since your last visit have    03:43
16   you experienced or do you currently have any
17   symptoms that are not associated with your
18   arthritis."  Do you see that?
19       A.   Yes.
20       Q.   Doesn't that disclose that data was    03:43
21   being collected for as long as a patient remained
22   in the study?
23       A.   Not necessarily.  If somebody tells me
24   this is a six-month study, what they do outside

122

1    the six-month study.                        03:41
2        Q.   So you knew there was longer data beyond
3    the six months?
4        A.   I knew there were more data on some
5    patients who might have wanted to be studied       03:42
6    further.  But the study protocol, the study was a
7    six-month study.  We specifically asked that.
8        Q.   But those are two different things;
9    correct?
10       A.   No, they're not.  The study is what we   03:42
11   were reporting.
12       Q.   On the issue of whether there was data
13   available for at least some patients for more than
14   six months you knew that there in fact was?
15       A.   I didn't know there were data.  I didn't  03:42
16   know they had the data because once they said
17   yeah, we were following them through, I thought
18   maybe the company wants to know what happens
19   longer.  The study was completed at six months.
20   That was made clear in writing back and forth      03:42
21   questions.
22       Q.   Okay.  If you turn to what was the JAMA
23   publication, so previously marked as Exhibit 3.
24       A.   I'm sorry.  Which exhibit was it?

124

1    the study is not what I'm concerned about.  I'm    03:44
2    concerned about what is in the study.  This was
3    presented as the CLASS study, a randomized
4    controlled trial.  This is not the CLASS study
5    that was reported to us.                     03:44
6        Q.   On Page 2 if you look at the study
7    protocol section.
8        A.   Okay.
9        Q.   And I think this was read to you
10   earlier.  The last two sentences in the first      03:44
11   paragraph in the study protocol section in the
12   manuscript says "After a baseline visit, follow-up
13   clinic visits took place at Weeks 4, 13, and 26
14   after the initial dose of medication and every
15   thirteen weeks thereafter.  All patients were      03:44
16   provided an opportunity to complete a minimum of
17   six months of treatment."  Do you see that?
18       A.   I saw that.
19       Q.   And that's in the study protocol section
20   in the manuscript; correct?              03:45
21       A.   Right.  That's what stimulated our
22   queries about this is a six-month study?  And what
23   we were told was the CLASS study is a six-month
24   study.  I have it in writing.

De Angelis, Catherine  1/12/2007  11:00:00 AM

125

1    Q.   But my question is more narrow.          03:45
2    A.   And we asked them -- you see, a study
3    can go on, for example, you have a study that's
4    finished and then you do post ongoing studies to
5    see, you may contact the patient, who knows how       03:45
6    often.  That's not part of the study.
7    Q.   But it's in the study protocol section.
8    A.   Right.  But when we ask, see, this is
9    why, the answer, if I have that here and I could
10   produce it if you want.                              03:46
11   MR. NELSON:  He has it.
12   THE WITNESS:  Okay.  Specifically says,
13   the answer, if the patients want.  This is a
14   six-month study.  Anything after the six months
15   would be if the patients want to continue, that's    03:46
16   fine.
17   BY MR. HALPER:
18   Q.   Putting aside what you just testified to
19   being told, what is written here in the study
20   protocol section discloses, does it not, that part   03:46
21   of the study protocol was following up and
22   collecting patient data after six months?
23   MR. MONTGOMERY:  Objection.  The
24   document speaks for itself.

126

1    THE WITNESS:  It was this statement in       03:47
2    the protocol that stimulated our questioning where
3    are those data, and we were told this is a
4    six-month study.  Patients were followed
5    thereafter if they wanted to.                        03:47
6    BY MR. HALPER:
7    Q.   Is that what this says?
8    A.   That's not what this says.  It's what
9    the authors responded to us when we queried.
10   Q.   But I'm asking a different question.      03:47
11   A.   Okay.
12   Q.   The statement here in the study protocol
13   section of the manuscript discloses that the study
14   protocol involved following up patients after six
15   months; is that true?                               03:47
16   A.   Yes.
17   Q.   Other than speaking to Dr. Winker prior
18   to the manuscript being published, did you
19   personally speak to any of the seventeen authors
20   listed here?                                         03:48
21   A.   No.  That's not standard procedure.
22   Q.   That's fine.  I'm not challenging.  I'm
23   just asking, okay.
24   A.   Right.

127

1    Q.   So prior to this being published, again,   03:48
2    you didn't speak to any of these seventeen
3    individuals?
4    A.   No.
5    Q.   And as far as you know, Dr. Winker only    03:48
6    spoke with the corresponding author; is that
7    correct?
8    A.   Yes.
9    Q.   Do you have any reason to believe anyone
10   else at JAMA spoke with anyone, any of the other    03:48
11   authors?
12   A.   No.  They would have no reason to, and
13   it would be improper for them to do so without
14   Dr. Winker and I knowing it.
15   Q.   Following the publication of the          03:48
16   article, did you personally speak to any of the
17   seventeen authors?
18   A.   You know, I don't recall.  I remember,
19   see, this is where I can't remember if when I
20   called I wanted to speak with Dr. Silverstein, he   03:49
21   was the one I wanted to talk to, and I kept
22   getting responses from --
23   Q.   I'll tell you in that meeting --
24   A.   Dr. --

128

1    Q.   Verburg.                                   03:49
2    A.   Pardon?
3    Q.   You met with Dr. Verburg.
4    A.   Verburg -- no, it wasn't Dr. Verburg.
5    It was Dr. Friedman.  And that's why I agreed to    03:49
6    meet with them assuming that Dr. Silverstein would
7    be with them.  I never spoke with Dr. or even knew
8    about Dr. Verburg before he came to this meeting.
9    That was the first time that I had ever met him or
10   spoke to him.                                        03:50
11   Q.   Did you ever speak with him after that
12   meeting?
13   A.   Not to my knowledge.  I don't remember
14   speaking with him.
15   Q.   Did you ever speak with Dr. Silverstein   03:50
16   regarding this publication?
17   A.   I spoke to him thereafter, but I can't,
18   once I can recall, and I don't remember what that
19   conversation was about.  It was several months
20   later.  It may have been just before we received    03:50
21   the response or after.  I really don't recall.
22   But I know I spoke to him once after.
23   Q.   Do you think that conversation concerned
24   the reply?

De Angelis, Catherine  1/12/2007  11:00:00 AM

129

1    A.   I really don't remember.            03:50
2    Q.   Other than your conversation with
3  Dr. Verburg and your conversation with
4  Dr. Silverstein, did you have any other
5  conversations at any time regarding CLASS with any    03:50
6  of these seventeen authors?
7    A.   No.
8    Q.   And other than your two manuscript
9  meetings and your hallway interaction with
10  Dr. Winker, did you do anything else regarding the    03:51
11  CLASS publication?
12    A.   Yeah.  I had to approve the final draft.
13  I had to read it and I approved it.
14    Q.   Other than reading it, did you do
15  anything else before approving it?            03:51
16    A.   Like what?
17    Q.   It's just my question.  Did you do
18  anything else?
19    A.   There's nothing else to be done, no.
20    Q.   I think you testified earlier, but    03:51
21  you'll correct me if I'm wrong, that you never
22  examined the underlying data of CLASS?
23    A.   No.
24    Q.   And that's true as of today; correct?

130

1    A.   Yes.            03:52
2    Q.   Sitting here today, do you know what the
3  results were of the trial at any given point in
4  time?
5    A.   No.  I only know what was shown on the    03:52
6  FDA site and was pointed out to me with
7  reference in the letters that we published to
8  which Dr. Silverstein and other authors responded.
9    Q.   What exactly did you see on the FDA
10  website?            03:52
11    A.   Datapoints.  Data that was, I don't
12  recall exactly what was in there because I've seen
13  a lot of stuff on that site for this particular
14  study.
15        All I know is once I saw it, I    03:52
16  realized that the letters that we received, I went
17  there to check to make sure that they were accurate,
18  that what they said was shown there as they
19  reported.
20    Q.   So in other words, what you took away    03:53
21  from it was that there was more data than six
22  months; is that fair?
23    A.   Yes.
24    Q.   You didn't take away any other

131

1  conclusions from looking at the website; did you?    03:53
2    A.   I took away that there was more data and
3  that when you looked at the data after twelve
4  months or the forty-four, I believe it was
5  forty-four incidences, and compared it with six    03:53
6  months, when you looked at that other data there
7  were no differences.  And that was quite different
8  than the differences reported in the study at six
9  months.
10    Q.   Well, it's true, isn't it, that the    03:53
11  manuscript reports that Celebrex did not meet its
12  primary endpoint?
13    A.   Right.
14    Q.   That's disclosed in the manuscript;
15  correct?            03:53
16    A.   Yes.
17    Q.   And that's true at the full study period
18  as well; is that correct?
19    A.   It met the forty-four, they got
20  ultimately forty-four bleeds and they wanted    03:54
21  forty.  Now, what other criteria, I don't know
22  because I don't know what other endpoints they
23  wanted.
24    Q.   Would you agree that the manuscript

132

1  discloses that Celebrex did not demonstrate    03:54
2  statistically significant superiority to the
3  NSAIDs, to the comparators --
4        MR. MONTGOMERY:  Just to be clear, you
5  mean Exhibit 3?            03:54
6        MR. HALPER:  Yes.
7  BY MR. HALPER:
8    Q.   -- on the endpoint of ulcer
9  complications?
10    A.   Let me just be clear.  "In this study    03:54
11  celecoxib at dosages greater than those indicated
12  clinically was associated with a lower incidence
13  of symptomatic ulcers and ulcer complications
14  combined as well as other clinically important
15  toxic effects compared with NSAIDs at standard    03:55
16  dosages.  The decrease in upper GI toxicity was
17  strongest among patients not taking aspirin
18  concomitantly."
19        Now, that sounds like they're
20  saying that this drug is better than the other    03:55
21  drugs, the comparative drugs, at the endpoint
22  which is GI bleeding.  This is straight from the
23  paper.
24    Q.   Do you understand that GI bleeding was

De Angelis, Catherine  1/12/2007  11:00:00 AM

133

1   defined as an ulcer complication in the study?   03:55
2   A.  I know how it was defined, yes.
3   Q.  And that is different than a symptomatic
4   ulcer?
5   A.  Yes.                          03:56
6   Q.  And that there was an endpoint just of
7   complicated ulcers; right?
8   A.  Right.
9   Q.  And an endpoint of combined symptomatic
10  and complicated ulcers?              03:56
11  A.  Yes.
12  Q.  Do you have any reason to believe the
13  statement is not accurate, that Celebrex was
14  superior on the combined endpoint?
15  A.  Yes.                          03:56
16  Q.  That's an accurate statement; isn't it?
17  A.  That's an accurate statement.
18      And it's contrary to what you just
19  asked me that you said it didn't show.  It did
20  show it.  It's accurate.              03:56
21  Q.  I was just focusing on the complicated
22  ulcer endpoint.
23  A.  Ah, but that's not what was reported.
24  I'm just, I'm now an average clinician reading a

134

1   JAMA article that I trust and I read what I just   03:56
2   read to you.  That sure looks like a difference to
3   me.
4   Q.  But in fact that difference is accurate
5   based on the data?                  03:57
6   A.  Yes, as analyzed.
7   Q.  As analyzed.
8       Well, did you ever analyze whether
9   for the full study period Celebrex was
10  significantly superior on the combined endpoint?   03:57
11  A.  Did I?
12  Q.  Yes.
13  A.  I didn't have access to all the data.
14  How would I do that?
15  Q.  Sitting here today, do you know whether   03:57
16  Celebrex was significantly superior to the
17  NSAIDs --
18  A.  No.
19  Q.  -- on a combined endpoint?
20  A.  No.                          03:57
21  Q.  If it were superior to the NSAIDs for
22  the full study period on the combined endpoint, do
23  you have any issue then with that statement in
24  here?

135

1   A.  I have an issue with being told that the   03:57
2   study was a six-month study when it was not a
3   six-month study.
4       I have no issue with the findings
5   as published.  I already said that.  If I had   03:58
6   issue with these studies, this article would be
7   pulled from the literature.  I didn't do that.  As
8   here as stated with the follow-up letters to the
9   editor, with the reply from the authors, it stands
10  in the literature.                  03:58
11      At issue for me is that the CLASS
12  study was not a six-month study as we were told
13  repeatedly by at least Dr. Lefkowith because he's
14  the one that I saw what he wrote.
15  Q.  You didn't talk to Dr. Lefkowith though?   03:58
16  A.  No.  I saw what he wrote.
17  Q.  Before the publication?
18  A.  Yes.
19  Q.  And that was the communication with
20  Dr. Winker; correct?                 03:59
21  A.  Yes.
22  Q.  Okay.  I understand your issue, but I
23  just want to for the record understand what you
24  did and didn't do to arrive at that conclusion,

136

1   and that's why I'm asking these questions.   03:59
2   A.  At the conclusion that -- which
3   conclusion, sir?  I'm sorry.
4   Q.  I understand what you just testified to.
5   What I'm trying to get at by these questions is   03:59
6   what you reviewed, what you looked at, who you
7   spoke to, that led you to the belief you just
8   testified to.  So I'm not trying to shake you off
9   that.  I'm just trying to get at what you did and
10  what you looked at.                  03:59
11  A.  Right.
12  Q.  And what I understand from what you
13  testified to is that before the publication you
14  had the two manuscript meetings; correct?
15  A.  Yes.                          04:00
16  Q.  You had the hallway conversations with
17  Dr. Winker; correct?
18  A.  Yes.  And I carefully read the paper.
19  Q.  After the publication you had a meeting
20  with Dr. Verburg; correct?            04:00
21  A.  Oh, yes.
22  Q.  And a conversation with Dr. Silverstein;
23  correct?
24  A.  Correct.

137

1    Q.   And you --                    04:00
2    A.   I believe it was with Dr. Silverstein.
3    Q.   And you looked at the FDA website;
4    correct?
5    A.   Yes.                          04:00
6    Q.   Did you do anything else to gain an
7    understanding of the CLASS study?
8    A.   Well, when you say in the beginning, you
9    make it sound like I read it in the manuscript
10   meeting, spend a half hour.  We had reviewers who   04:00
11   were peer reviewers who know this area, who know
12   the area of research.  They reviewed it.  We had
13   statistical reviewers.  They reviewed it.  I read
14   those reports.  The revised version contained
15   recommended revisions from those experts.  I read   04:01
16   that and saw how closely those were followed.
17          Now, after we published this study
18   did I do any further analysis beyond what I said,
19   I went to the site, verified that what those two
20   letters were that we were going to publish were   04:01
21   accurate, that's what I did.  I published it, I
22   met with two of the three people I had expected to
23   meet, well, I expected to meet with two but the
24   wrong two, and I published the explanation.  What

138

1    we published stands in the literature.           04:02
2    Q.   Beyond what we've just talked about, you
3    didn't do anything else in connection with CLASS;
4    is that true?
5    A.   That's true.                   04:02
6    Q.   How long did you spend looking at the
7    FDA website?
8    A.   Oh, God, I don't know.
9    Q.   Approximately.
10   A.   Fifteen, twenty minutes, something like   04:02
11   that.  Enough time to verify that what those
12   individuals wrote was based on what they said it
13   was.
14   Q.   That there was more data than six
15   months?                            04:02
16   A.   Exactly.
17   Q.   Okay.  If you pull out Exhibit 24, which
18   was an August 23rd e-mail from Joy Dicker.
19       MR. MONTGOMERY:  24 did you say?
20       MR. HALPER:  Yes.                04:03
21       THE WITNESS:  The August 23, 2001 e-mail
22   from Joy Dicker?
23   BY MR. HALPER:
24   Q.   Yes.

139

1    A.   Uh-huh.  I've got it.           04:03
2    Q.   If you look at the bottom of Page 2 to
3    the top of Page 3, do you recall testifying about
4    that statement earlier where it says "Suffice it
5    to say, by the end of the meeting both editors   04:04
6    expressed greater confidence in our motives and
7    activities"?
8    A.   I'm sorry.  Could you repeat that?
9    Q.   Do you recall testifying earlier about
10   that statement?                     04:04
11   A.   No. 6?
12   Q.   Right.  But it really starts at the very
13   bottom of Page 2 with "Suffice it to say."
14   A.   Oh, yes.
15   Q.   And I believe you testified in effect   04:04
16   that Dr. Verburg appeared to believe that you had
17   greater confidence in his motives; is that
18   correct?
19   A.   Greater confidence in the motives and
20   activities.                        04:04
21   Q.   Right.
22   A.   Yes.
23   Q.   And you said in effect he may have
24   believed that but it wasn't true.  Do you recall

140

1    that?                              04:05
2    A.   I said he may have believed that.  I
3    don't agree with it.  I had no greater confidence
4    about the motives and activities.
5    Q.   So he was wrong, in your mind, when he   04:05
6    was writing about your views and state of mind
7    here; correct?
8    A.   He misinterpreted my politeness to be
9    that I had confidence in the motives and in the
10   activities.                        04:05
11   Q.   Isn't it possible, Dr. DeAngelis, that
12   the study authors here did not act with any intent
13   to deceive anyone?
14   A.   Anything is possible.  I'd like to
15   believe that.                      04:05
16   Q.   Well, the same way Dr. Verburg
17   misinterpreted how you viewed things, is it
18   possible that you have misinterpreted what the
19   CLASS authors' state of mind and intent was in
20   publishing the JAMA piece?           04:06
21       MR. MONTGOMERY:  Objection, calls for
22   speculation.
23       THE WITNESS:  When we ask a
24   straight-forward question in simple English to

De Angelis, Catherine  1/12/2007  11:00:00 AM

141

1    very intelligent, accomplished individual, and the    04:06
2    response we get is not accurate, I can only, in my
3    mind it was not a misunderstanding of our
4    question, he understood perfectly well what we
5    were asking.                    04:06
6    BY MR. HALPER:
7        Q.  How do you know that?
8        A.  May I get the, I'll show it to you, what
9    he said.  I know that --
10        MR. NELSON:  You understand it's in this    04:07
11    room.  He knows exactly what you mean.  He's going
12    to ask the questions.
13        THE WITNESS:  How could he not
14    understand?  My understanding from your answer is
15    that this study is complete at six months, and the    04:07
16    answer is your understanding is correct.  What's
17    not to understand about that?
18    BY MR. HALPER:
19        Q.  That was Dr. Lefkowith's statement;
20    right?  Correct?                04:07
21        A.  Yes, right.
22        Q.  No one ever told you that Dr. Lefkowith
23    confessed to lying; correct?
24        A.  Oh, no.

142

1        Q.  You don't have any contemporaneous    04:07
2    evidence other than how you read the e-mails that
3    Dr. Lefkowith was intentionally deceiving anyone;
4    correct?
5        A.  I have his word that he told us    04:08
6    something that was false.  This was not a
7    six-month study.
8            Did he do it deliberately?  I mean
9    did he, how can you, if I ask you is there water
10    in this bottle and you say no, there's no water in    04:08
11    that bottle?  Now, either you're not very bright,
12    which is not the case with Dr. Lefkowith, you're
13    blind, or you're lying.
14        Q.  You never spoke to Dr. Lefkowith;
15    correct?                    04:08
16        A.  No.
17        Q.  And the e-mails came exclusively from
18    Dr. Lefkowith, correct, that you're talking about?
19        A.  The ones I'm talking about, yes.
20        Q.  And they went to Dr. Winker; correct?    04:09
21        A.  Yes.  But I saw every one because when
22    people send things, everything comes under my name
23    because I'm ultimately responsible.  So the
24    understanding is I will see everything.

143

1        Q.  You don't have any reason to believe    04:09
2    that any of the other sixteen authors listed here
3    saw Dr. Lefkowith's e-mail; do you?
4        A.  No.  But they signed the statement that
5    says that they agree that the corresponding author    04:09
6    will represent them.  It's in the statement that
7    they sign.  So I don't know if they saw it or not.
8        Q.  Let me, just to make things go a little
9    quicker, my question was simply do you have any
10    reason to believe the other sixteen authors saw    04:09
11    Dr. Lefkowith's correspondence with Dr. Winker?
12        A.  I don't know.
13        Q.  So you have no reason to believe they
14    did?
15        A.  Or they didn't.            04:10
16        Q.  Okay.  And your basis for believing at
17    least that Dr. Lefkowith was lying is these
18    e-mails; correct?
19        A.  Malice?  That's a tough word.
20        Q.  I didn't say malice.            04:10
21        A.  I'm sorry.  I misheard you.
22        Q.  That is a tough word.
23        A.  Yes, please.  I would not say that.
24        Q.  Your basis for believing that

144

1    Dr. Lefkowith lied is based on his e-mails.    04:10
2        A.  E-mails, yes.  That's better, yes.
3        Q.  You don't have any basis other than the
4    e-mails for believing that the authors lied to
5    you; isn't that right?            04:10
6        A.  What else do you need?
7        Q.  Please.
8        A.  No.  There's nothing else.
9        Q.  If those other sixteen authors never saw
10    those e-mails, then you have no basis to believe    04:11
11    they intentionally misled you; isn't that right?
12        A.  They signed a statement that the
13    corresponding author represents, them and the
14    paper we have signed by every one of them gives,
15    it says the CLASS study, a randomized controlled    04:11
16    trial, and it reports six months data.
17        Q.  You testified that your basis for
18    believing that Dr. Lefkowith was lying was the
19    e-mail exchange with Dr. Winker; correct?
20        A.  Yes.                    04:11
21        Q.  You had no other basis for concluding
22    that he lied; correct?
23        A.  I need no others.
24        Q.  But you have no others; correct?

Pharmacia                    None                    Page  141 - 144

De Angelis, Catherine  1/12/2007  11:00:00 AM

145

1    A.  I don't need any others.            04:12
2    Q.  But if there are more, I'd like to know
3  about them.
4    A.  I don't know.  No.  There are none.
5    Q.  Okay.  If the other sixteen authors --    04:12
6  let me withdraw that.
7        You understand that when I talk
8  about intent, state of mind, it means someone
9  actually meant to do something.  You understand
10  that?                          04:12
11    A.  I understand.
12    Q.  Okay.  If the other sixteen authors
13  never saw the e-mails that formed the basis for
14  your belief that Dr. Lefkowith lied, then you have
15  no reason to believe that those sixteen people    04:12
16  intended to deceive you; isn't that right?
17    A.  Only in that they gave me a paper that
18  says it's the CLASS study and it is not the CLASS
19  study.
20    Q.  But that is not what you testified that    04:12
21  led you to believe that Dr. Lefkowith had lied.
22  In fact, you testified that the JAMA manuscript is
23  accurate as printed.
24    A.  This is.

146

1    Q.  Right.                      04:13
2    A.  The six-month data are accurate as
3  published.
4    Q.  Right.
5    A.  This is not the CLASS study.  And when    04:13
6  the representative of this group tells me through
7  an e-mail to Dr. Winker that this is a six-month
8  study, that's a lie.
9    Q.  Other than the fact that you believe
10  Dr. Lefkowith represented the other authors, do    04:13
11  you have any reason to attribute his statement to
12  them?
13    A.  They signed this.  This is a six-month
14  study.  It says the CLASS study, a randomized
15  controlled trial.  They signed their names to    04:14
16  this.
17        This is not the CLASS study.  This
18  is a portion of the CLASS study.  And the CLASS
19  study did not stop at six months.  And they are
20  authors.                        04:14
21    Q.  Other than Dr. Lefkowith's e-mail and
22  the fact that all seventeen authors signed the
23  study, do you have any reason to believe that any
24  of those people intended to deceive you --

147

1    A.  No.                        04:14
2    Q.  -- or the public?
3    A.  No.
4    Q.  Again, other than what you testified to,
5  meaning Lefkowith's e-mails and, well, other than    04:15
6  Lefkowith's e-mails and the study, do you have any
7  reason to believe that Cyril intended to deceive
8  anyone?
9    A.  Cyril?
10    Q.  Cyril.  Do you understand that at the    04:15
11  time of the CLASS trial Cyril was the corporate
12  sponsor?
13    A.  Oh, C-Y-R-I-L.  I'm thinking Cyril who?
14  I'm sorry.  No, I don't.
15    Q.  Other than what you testified to, do you    04:16
16  have any reason to believe that Pharmacia intended
17  to deceive anyone?
18    A.  No.
19    Q.  Other than what you testified to, do you
20  have any reason to believe that Pfizer intended to    04:16
21  deceive anyone?
22    A.  Pfizer wasn't even there at the time;
23  were they?
24    Q.  I take it that's a No?

148

1    A.  That's a No.                    04:16
2    Q.  Okay.  If you turn to Exhibit 22, it's a
3  May 22nd e-mail from Mona Wahba.
4        Did you ever see this e-mail before
5  today?                          04:17
6    A.  No.
7    Q.  Do you know who Mona Wahba is?
8    A.  No.
9    Q.  Do you know what company she works for?
10    A.  No.                        04:17
11    Q.  Do you know what position she holds?
12    A.  No.
13    Q.  Do you know what, if any, involvement
14  she had in the CLASS study?
15    A.  No.                        04:17
16        MR. NELSON:  Excuse me a second.  Some
17  of that, the answers to some of your questions are
18  on this document.
19        MR. HALPER:  Well, but I don't think
20  Dr. DeAngelis has an independent recollection.    04:17
21        MR. NELSON:  No, no.  As long as you
22  make it clear other than what she may read on this
23  document.
24        THE WITNESS:  No.  You said before I saw

De Angelis, Catherine  1/12/2007  11:00:00 AM

149

1  this document.                    04:17
2       MR. NELSON:  Oh, okay.  I'm sorry for
3  interrupting.
4  BY MR. HALPER:
5       Q.  As far as you know, Dr. Wahba, well, she    04:17
6  is not in fact one of the authors of the study;
7  correct?
8       A.  That I know.
9       Q.  She didn't correspond with JAMA
10  concerning the study; correct?            04:18
11      A.  No.
12      Q.  Do you recall you were asked earlier if
13  you were ever told that the authors were
14  cherry-picking the data?  Do you recall that
15  question?                          04:18
16      A.  Yes.
17      Q.  And you said you were never told that.
18  Do you recall that?
19      A.  I recall that, yes.
20      Q.  That phrase appears in Mona Wahba's    04:18
21  e-mail; correct?
22      A.  Correct.
23      Q.  Isn't it possible that you were never
24  told that the authors were cherry-picking the data

150

1  because in fact in their minds they were not    04:18
2  cherry-picking the data?
3       A.  Yes.
4       Q.  That is possible.
5       A.  That's possible.                  04:18
6       Q.  If you turn to Exhibit 28, it's an
7  e-mail chain.  It starts with the September 8th
8  e-mail from Lefkowith.
9       A.  Okay.
10      Q.  You were asked about a statement on the    04:19
11  third page of this chain.  It's the third
12  paragraph in the Emilio Arbe e-mail.  Do you see
13  that?
14      A.  I see it.
15      Q.  Do you recall you were asked about the    04:19
16  third paragraph in the e-mail?
17      A.  "With a bit of data massage," that one?
18      Q.  Yes.  It says "With a bit of data
19  massage, what Steve Geis and his team have done is
20  to focus on the six-month data for no other reason    04:19
21  that it happens to look better," and then it goes
22  on.
23          Do you recall being asked about
24  that?

151

1       A.  Yes.                          04:19
2       Q.  You were asked -- well, before I get
3  into that, do you know who Emilio Arbe is?
4       A.  No.
5       Q.  Have you ever heard of him before?    04:19
6       A.  No.
7       Q.  Do you know what company he worked for
8  at the time?
9       A.  No.
10      Q.  Do you know what position he had at the    04:20
11  time?
12      A.  No.
13      Q.  Do you know if he had any involvement in
14  the CLASS study?
15      A.  No.                          04:20
16      Q.  You were asked if it is proper
17  scientific behavior to do what Emilio Arbe alleges
18  was done here.  Do you recall that?
19      A.  Yes.
20      Q.  And you said it was not.  Do you recall    04:20
21  that?
22      A.  That's true.
23      Q.  Do you have any reason to believe that
24  Emilio Arbe in fact knows what was done with the

152

1  data?                          04:20
2       A.  I have no idea.  Obviously he knew a
3  fair amount about the data going into this, but I
4  don't know what happened after.
5       Q.  The fact that it is not generally proper    04:20
6  scientific behavior to do what Emilio Arbe charges
7  does not mean that in fact that's what was done
8  here; isn't that true?
9       A.  That's correct.
10      Q.  Okay.  If you turn to Exhibit 27, which    04:20
11  is a March 20th e-mail from Carolyn Wilson.  You
12  were asked about a statement, the second to last
13  page in the e-mail, 816.
14      A.  Uh-huh.
15      Q.  It's the bullet point under Option 1 and    04:21
16  then under Trial Design Issues, the third bullet
17  point under that, Worst Case.  Do you see that?
18      A.  Yes.
19      Q.  It says "we have to attack the trial
20  design if we do not see the results we want."  Do    04:22
21  you see that?
22      A.  Yes.
23      Q.  And you were asked I believe if that is
24  proper and you testified no.  Do you remember

De Angelis, Catherine  1/12/2007  11:00:00 AM

153

1   that?                          04:22
2      A.   That's correct.
3      Q.   Do you know who authored this document?
4      A.   Rich Montwill?  Oh, I only know by
5   reading.  Do I know who this person is?  Carolyn      04:22
6   Wilson?  I don't know Carolyn Wilson.
7      Q.   Had you ever heard of her before today?
8      A.   No.
9      Q.   Do you know what involvement she had in
10  the CLASS?                      04:22
11     A.   No.
12     Q.   Do you have any idea if anyone actually
13  did what she is suggesting be done here?
14     A.   No.
15     Q.   You don't know?                04:22
16     A.   I don't know.
17     Q.   Do you recall you were asked a number of
18  questions about informative censoring?
19     A.   Yes.
20     Q.   Have you ever heard that concept      04:23
21  referred to as withdrawal of susceptibles?
22     A.   Not in those words but in that meaning,
23  yes.
24     Q.   If you look at Exhibit 31, which is

154

1   Dr. Silverstein's reply, I'm again going to focus      04:23
2   on his reply.
3          In this document is it accurate to
4   say that Dr. Silverstein was explaining why the
5   authors used the six-month dataset?      04:24
6      A.   Yes.
7      Q.   Do you have any basis to argue with
8   whether the six-month data is a valid dataset?
9      A.   No.  That's why I allowed this to be
10  published and why I say the article, the editorial      04:24
11  and this stands and have not been pulled.
12     Q.   He writes in the second paragraph,
13  second sentence, "We submitted only this
14  information because the authors believed the
15  six-month data were the most scientifically and      04:25
16  clinically valid.  Data after six months were so
17  confounded as to be difficult to interpret for
18  assessing a drug-related causal GI toxicity."  Do
19  you see that?
20     A.   Yes.                        04:25
21     Q.   Do you have any basis to disagree with
22  those statements?
23     A.   I have no basis to disagree with those
24  statements.

155

1          My problem is this decision was      04:25
2   made by the authors, I assume, without telling us.
3   And rather than telling us the truth of why they
4   chose six months, they told us the study was six
5   months.                          04:26
6      Q.   Understood.  But you're not saying that
7   Dr. Silverstein is wrong in his view of the post
8   six-month data?
9      A.   No, he's not.
10     Q.   In fact, the data after six months could      04:26
11  be confounded; isn't that right?
12     A.   It could be.
13     Q.   And if the data after six months are
14  confounded, doesn't that mean that that data
15  doesn't tell us anything about the safety of the      04:26
16  drug?
17     A.   If it were presented in the full twelve
18  months with full explanation of why things changed
19  after six months, then the reader could make the
20  decision whether they think that Celebrex is I'll      04:26
21  use the word "better than," as far as GI bleeding
22  goes, than aspirin and NSAIDs.  They didn't do
23  that.
24     Q.   Agreed.  They didn't do that.

156

1          My question though is a little      04:27
2   different, okay.  If the data after six months is
3   confounded or statistically invalid, then doesn't
4   that mean that that data is not instructive
5   regarding the safety or efficacy of the drug?      04:27
6      A.   If I had the opportunity --
7          MR. MONTGOMERY:  Objection, calls for
8   speculation.  I apologize.
9          THE WITNESS:  If I or I with a
10  bio-statistician sat there, saw all the data, and      04:27
11  said oh, this is what happened, and I made the
12  decision, not them, perhaps they're right, perhaps
13  they're not.
14          The issue is they don't give you
15  the data, they just give an explanation, and we      04:28
16  left it at that.
17  BY MR. HALPER:
18     Q.   But as you just said, they saw the data;
19  correct?
20     A.   I assume so.                   04:28
21     Q.   So I'm asking you, I'm freely
22  acknowledging you to assume that the data after
23  six months in fact is confounded and statistically
24  suspect.  Okay?

157

1    A.  I don't know that.          04:28

2    Q.  I'm not saying you know it.  I'm saying

3    assume that Dr. Silverstein is right for a moment.

4    A.  Okay.

5    Q.  If Dr. Silverstein is right, then the     04:28

6    post six-month data are not instructive regarding

7    the efficacy or safety of the drug; isn't that

8    true?

9         MR. MONTGOMERY:  Objection to form,

10   improper hypothetical.          04:29

11        THE WITNESS:  The issue is we put our

12   reputation and our readers believe and trust in us

13   that we were publishing the CLASS study, and

14   that's not what we were given.  And I have no

15   reason one way or the other to know that this is     04:29

16   not just made-up stuff.  I don't know.

17        What I do know, what I do know, is

18   that the data as of six months, the way it was

19   analyzed, is accurate, but it's not the CLASS

20   study.  And after that I don't know.          04:30

21        I've been told by some people who

22   have analyzed it that it shows very clearly that

23   you really shouldn't have used the first six

24   months, and there's arguments, and I understand

158

1    that.  But the problem is this is not the CLASS     04:30

2    study.

3    BY MR. HALPER:

4    Q.  That is your problem; correct?

5    A.  That's my problem.          04:30

6    Q.  You understand I'm here because I have a

7    different problem; correct?

8    A.  I think you've got a lot of problems,

9    God bless you.  Go ahead.

10   Q.  So I hear what you're saying.  Okay?     04:30

11   A.  Yes.

12        MR. NELSON:  He hears your pain.

13   BY MR. HALPER:

14   Q.  You've said that informative,

15   Dr. Silverstein -- let me withdraw that.     04:31

16        You've testified that you have no

17   reason to conclude that Dr. Silverstein is wrong

18   regarding his informative censoring view; correct?

19   A.  That's right.

20   Q.  Knowing your problem, assume he's right.     04:31

21   Doesn't that say if the data after six months is

22   confounded and statistically suspect, then isn't

23   that data, it doesn't instruct anybody regarding

24   efficacy or safety of the drug; isn't that true?

159

1         MR. MONTGOMERY:  Object to form.     04:31

2         THE WITNESS:  If indeed that's true and

3    the people have the opportunity to see it and to

4    say it's confounded and agree, then he's right.

5    But to take his word for it without seeing the     04:32

6    data takes a leap of faith that I'm not willing to

7    give.

8    BY MR. HALPER:

9    Q.  Understood, you're not.  But if he's

10   right and someone is assessing simply the efficacy     04:32

11   or safety of this drug, if he's right, the post

12   six-month data are not going to help; isn't that

13   true?

14        MR. MONTGOMERY:  Object to form.

15        THE WITNESS:  That's true.          04:32

16        But to use this study, to come up

17   with those conclusions that people will read and

18   believe is the CLASS study, is not right because

19   it's not the CLASS study.  And I don't know if the

20   second six months if they're right or not.     04:32

21   BY MR. HALPER:

22   Q.  I understand that you don't know.  I'm

23   not suggesting you do.  I'm only, and you've

24   answered me, but I just want to clarify it, I

160

1    believe your answer was it true that if he is     04:33

2    right then the post six-month data do not instruct

3    us on the efficacy or the safety of the drug;

4    correct?

5         MR. MONTGOMERY:  Object to form.     04:33

6         THE WITNESS:  It's true, but it is wrong

7    to allow the first six months data to be published

8    in a journal like JAMA with those results without

9    also explaining why the second six months data

10   were not published.  And he says it, in retrospect     04:33

11   we acknowledge that we could have avoided

12   confusion, et cetera, et cetera, et cetera.

13   Avoided confusion.  So he says there's confusion

14   about the CLASS study, supposed CLASS study, that

15   was published in JAMA.          04:34

16        THE VIDEOGRAPHER:  This concludes

17   Videotape No. 4.  The time now is approximately

18   4:34 p.m.  The deposition will continue on

19   Videotape No. 5.

20        (WHEREUPON a recess was taken.)     04:34

21        THE VIDEOGRAPHER:  This will begin

22   Videotape No. 5 of the deposition of Catherine

23   DeAngelis taken in the matter of Case No. 03-1519

24   on the 12th day of January, 2007.  The time now is

De Angelis, Catherine  1/12/2007  11:00:00 AM

161

1    approximately 4:40 p.m., and I'll remind the        04:40
2    witness once more that she's under oath.
3         THE WITNESS:  Allow me to clarify what
4    I'm trying to say.
5    BY MR. HALPER:                    04:40
6    Q.   Sure.
7    A.   If a study is designed for a certain
8    point, all the data gathered until you reach that
9    point are valuable and all of it should be
10   analyzed and you can say, all right, at six months   04:40
11   it looks this way but at twelve months it looks
12   this way.  So if you only had six months data and
13   that was your decided endpoint, then it's
14   absolutely legitimate for you to say well, yeah,
15   we follow them thereafter because of whatever,       04:41
16   post hoc whatever, but our study was six months,
17   that's one story.
18        My point is that this was a study
19   endpoint forty bleeds.  It took twelve months
20   essentially to reach that, and therefore, all        04:41
21   twelve months data are valid, not just six months.
22   Even though you say hey, look, the first six
23   months because we got patients following them all
24   along until we get forty bleeds and we didn't get

162

1    the forty bleeds until here, but over here when we   04:41
2    only had twenty-two bleeds, I don't know how many,
3    okay, this is what we found, and this stuff we
4    found less because yada, yada, yada.  That's not
5    valid.                        04:42
6         It's valid only that you report to
7    what you said was your endpoint.  And that's why
8    the six-month data, malice or deliberate or not,
9    six months data in the CLASS study doesn't do it,
10   you have to report all twelve.  You can then         04:42
11   analyze it and say we dropped out the last six
12   months because yada, yada, yada, and then the
13   reader can decide.  But you must report all the
14   data, and that's not what this study did.
15   Q.   And I understand that's your problem       04:42
16   with the study, and I appreciate the
17   clarification.
18        You, if I understand correctly, do
19   not disagree, you have no reason to disagree, with
20   any of the statements made in Dr. Silverstein's      04:43
21   reply?
22   A.   No.  I don't disagree.  I don't have any
23   problem.  I published them.
24   Q.   Right, you published them.  And you

163

1    wouldn't have published them if you disagreed with   04:43
2    them; correct?
3    A.   Right.
4    Q.   Or if you believed he was being
5    deceitful; correct?                04:43
6    A.   In the reply?
7    Q.   Yes.
8    A.   No.  I wouldn't have published.
9    Q.   If you thought he was being deceitful in
10   the reply, you would not have published the reply;   04:43
11   correct?
12   A.   That's true.
13   Q.   You didn't ask him I assume when you
14   spoke to him are you being deceitful?
15   A.   No, of course not.            04:43
16   Q.   And you accepted the reply for
17   publication; correct?
18   A.   Correct.
19   Q.   I just want to clarify something.  You
20   were asked a number of questions earlier by          04:44
21   Mr. Montgomery to give your opinions on various
22   subjects.  Do you recall that?
23   A.   Oh, yes.
24   Q.   Generally.

164

1    A.   Generally, yeah.                04:44
2    Q.   You are an M.D.; correct?
3    A.   Correct.
4    Q.   Do you hold yourself out as an expert in
5    statistics?                      04:44
6    A.   No.
7    Q.   Do you hold yourself out as an expert in
8    gastroenterology?
9    A.   Not in gastroenterology per se, no.
10   Q.   Do you hold yourself out as an expert on   04:44
11   the data underlying the CLASS study?
12   A.   Without having seen it, no.
13   Q.   The views you're giving today are in
14   your role as an editor of a publication; correct?
15   A.   Correct, and as a practicing physician.   04:45
16   Q.   But not as an expert; correct?
17        MR. MONTGOMERY:  Object, calls for a
18   conclusion.
19        THE WITNESS:  Not in those three
20   areas --                        04:45
21   BY MR. HALPER:
22   Q.   Not in those three areas?
23   A.   Not in those three areas that you said.
24        However, in the statistical area I

De Angelis, Catherine  1/12/2007  11:00:00 AM

165

1   am not an expert but I have two statistical       04:45
2   bio-statisticians on my staff who are editors, and
3   we pay about another twenty for their statistical
4   analysis expertise.  I am not a bio-statistician,
5   absolutely not.                                   04:45
6       Q.   Did any of the statisticians on your
7   staff communicate with you regarding the
8   publication of the CLASS study?
9       A.   They had to have approved it or we would
10  never have.                                       04:46
11      Q.   Did you ever discuss with them the
12  informative censoring argument?
13      A.   Not per se, no.
14      Q.   What do you mean "not per se"?
15      A.   Well, because that came up later in the  04:46
16  reply, not to the publication that they had
17  reviewed.
18      Q.   And when it came up in the reply, did
19  you discuss it with your statisticians?
20      A.   No.                                       04:46
21      Q.   So while you have statisticians on your
22  staff, you did not discuss the informative
23  censoring issue with them in connection with the
24  CLASS?

166

1       A.   Not in relation to the CLASS study,      04:46
2   correct.
3       Q.   Just a few more on the same topic.
4            Do you hold yourself out as an
5   expert in rheumatology?                           04:46
6            MR. MONTGOMERY:  Object to form.
7            THE WITNESS:  No.
8   BY MR. HALPER:
9       Q.   Do you hold yourself out as an expert in
10  arthritis drugs?                                   04:47
11           MR. MONTGOMERY:  Object to form.
12           THE WITNESS:  Arthritis drugs, no.  A
13  pharmacologist?  No.  I'm not a pharmacologist.
14  BY MR. HALPER:
15      Q.   How about as an expert in COX-2?          04:47
16           MR. MONTGOMERY:  Object to form.
17           THE WITNESS:  What do you mean by,
18  that's a pharmacologist.  I'm not a
19  pharmacologist.
20  BY MR. HALPER:                                     04:47
21      Q.   You wouldn't try and testify as an
22  expert regarding COX-2.
23      A.   No.
24      Q.   Or regarding arthritis drugs generally.

167

1       A.   No.                                       04:47
2       Q.   Or regarding rheumatology.
3       A.   No.
4       Q.   Or regarding CLASS.
5       A.   No, certainly no.                          04:47
6       Q.   Okay.  Thank you.
7            You talked earlier or referred
8   earlier to my problem and your problem.  But you
9   understand that we're here today in connection
10  with a securities litigation?                       04:48
11      A.   Correct.
12      Q.   Have you read any of the documents filed
13  with the court in that litigation?
14      A.   No.
15      Q.   Do you have any understanding of what     04:48
16  the case is about?
17      A.   In general, yes.
18      Q.   Do you understand that the plaintiffs
19  here are claiming that the price of Pharmacia
20  stock was artificially high because of the JAMA    04:48
21  publication?
22      A.   The claim?  Yes.  I understand that.
23      Q.   That's the claim.  Do you understand
24  that?

168

1       A.   Yes.                                       04:48
2       Q.   Do you have any reason to believe that
3   the price of Pharmacia stock rose based on the
4   JAMA publication?
5       A.   I've seen it before.                       04:48
6       Q.   Do you have any reason to believe it
7   happened here?
8       A.   I have no reason to believe it didn't.
9   When JAMA publishes something about a drug, we see
10  this blip and I scratch my head, and I wondered    04:49
11  about this, and I found that most pharmaceutical
12  companies actually subscribe to JAMA, as they do
13  to the other big journals, they watch, as do
14  lots of people in business.
15           So if they see something in a              04:49
16  journal like JAMA that says something good about a
17  product, they tend to believe it's true.
18      Q.   Your testimony just now was based on
19  your general observations; correct?
20      A.   General observations.  Not to this case.  04:49
21  I have no idea about this case.
22      Q.   You've never been an investment
23  professional --
24      A.   Absolutely, believe me.  I've never

De Angelis, Catherine  1/12/2007  11:00:00 AM

169

1      owned stock in my life.                    04:49
2          Q.   And you're not an expert in the stock
3      markets; correct?
4          A.   No.
5          Q.   Do you know what happened to the price    04:50
6      of Pharmacia stock when the JAMA article was
7      published?
8          A.   No.
9          Q.   And I take it, therefore, you don't know
10     what effect, if any, the publication had on the    04:50
11     price of the Pharmacia stock?
12         A.   I don't follow the stock market.  I
13     don't know.
14         Q.   And you would have no basis for an
15     opinion about the impact of the article on the    04:50
16     price of Pharmacia stock; correct?
17         A.   In this case, no.
18         Q.   Do you have any reason to believe -- let
19     me withdraw that.
20              Do you know of anyone who purchased    04:50
21     or sold Pharmacia stock on the basis of the JAMA
22     publication?
23         A.   No.
24         Q.   Given that, do you have any reason to

170

1      believe people did or did not purchase Pharmacia    04:50
2      stock on the basis of the JAMA publication?
3          A.   I have no reason, I have no knowledge.
4          Q.   If you turn to Exhibit 32, which is the
5      Juni article.                               04:51
6          A.   32?
7          Q.   It's the BMJ article by Peter Juni.
8              MR. NELSON:  Do you want mine?
9              THE WITNESS:  Do you have yours?  That
10     will work.  Yes.                            04:52
11     BY MR. HALPER:
12         Q.   You just testified you have no basis to
13     know whether or not whether the price of Pharmacia
14     stock was influenced by the JAMA publication;
15     correct?                                    04:52
16         A.   That's correct.
17         Q.   Do you see on the second page of Exhibit
18     32, the first full paragraph there's a "Firstly"
19     and a "Secondly"?
20         A.   Yes.                               04:52
21         Q.   It says "Secondly, the flawed findings
22     published in the original article appear to be
23     widely distributed and believed."  Do you see
24     that?

171

1          A.   Yes.                               04:52
2          Q.   You have no reason to believe that the
3      distribution of reprints affected the price of
4      Pharmacia stock; do you?
5          A.   I wouldn't know, no.               04:52
6          Q.   You have no reason to believe that
7      anyone purchased or sold Pharmacia stock based on
8      a reprint of the publication; isn't that right?
9          A.   That's correct.
10         Q.   You testified earlier that soon after    04:53
11     the advisory committee hearings in February of
12     2001 you went and looked at the FDA website;
13     correct?
14         A.   Yes.
15         Q.   And information was posted there;    04:53
16     correct?
17         A.   Correct.
18         Q.   Were those FDA reviewer reports that
19     were published there?
20         A.   Gee, I don't remember.  I really don't    04:53
21     remember.
22         Q.   But as of February of 2001, the full
23     data was available on the FDA website; isn't that
24     true?

172

1          A.   As I recall, yes.  I believe they were    04:53
2      full.
3          Q.   So isn't it also true that as of
4      February of 2001 it was public that this was more
5      than a six-month study?                     04:54
6          A.   If people went to the site, they could
7      see it.
8          Q.   And that's publicly available; correct?
9              MR. MONTGOMERY:  Object to form.
10             THE WITNESS:  Yes.                   04:54
11     BY MR. HALPER:
12         Q.   Had you seen the Juni article before
13     today?
14         A.   I'm sorry?
15         Q.   Exhibit 32.                        04:54
16         A.   BMJ?
17         Q.   Yes, had you seen that before today?
18         A.   You know, I'm looking at it.  I think I
19     saw it.  There were a lot of things published.  I
20     may have seen it.  It didn't surprise me.  So I    04:54
21     probably read it.  I read a lot.
22         Q.   You don't have a specific recollection
23     though?
24         A.   No.

De Angelis, Catherine  1/12/2007  11:00:00 AM

173

1    Q.  Is it fair to say that the first time    04:54
2   you examined it in substance was today?
3    A.  Yes.
4    Q.  And, therefore, is it also true that you
5   have no basis to testify whether there is anything    04:55
6   in the Juni article that is different from what is
7   publicly available or was publicly available on
8   the FDA website as of February 2001?
9        MR. MONTGOMERY:  Object to form.
10       THE WITNESS:  You mean is there anything    04:55
11  in here?
12  BY MR. HALPER:
13   Q.  That's not public.
14       MR. MONTGOMERY:  Object to form.
15       THE WITNESS:  I saw it, so it must have    04:55
16  been, it was publicly available, yeah.
17  BY MR. HALPER:
18   Q.  Do you know whether there is anything in
19  the Juni article that was not publicly available
20  from the FDA website from February '01?    04:55
21   A.  Well, the idea about the --
22       MR. MONTGOMERY:  Object to form.
23       THE WITNESS:  -- the thirty thousand
24  reprints, I didn't even know that until now.

174

1   BY MR. HALPER:    04:55
2    Q.  Anything else?
3    A.  I don't know about the sales.  That
4   wasn't on the FDA site, the amount of sales.
5    Q.  If you read to yourself the "Firstly,"    04:56
6   the few sentences in the Juni article, then my
7   question will be do you know whether anything
8   under "Firstly" was not already on the FDA
9   website.
10       MR. MONTGOMERY:  Object to form.    04:56
11       THE WITNESS:  I believe all that was on
12  the website.  People could have accessed that and
13  analyzed it if they wanted to.
14       MR. HALPER:  Let me take two minutes.  I
15  may be done, but let me just check.    04:56
16       THE VIDEOGRAPHER:  Going off the record
17  at 4:56 p.m.
18       (WHEREUPON a recess was taken.)
19       THE VIDEOGRAPHER:  And we are back on
20  the record.  The time now is approximately    05:02
21  5:02 p.m.
22  BY MR. HALPER:
23   Q.  Dr. DeAngelis, earlier we were
24  discussing a bit the e-mail exchanges between

175

1   Dr. Lefkowith and Dr. Winker.  Do you recall that?    05:02
2    A.  Yes.
3    Q.  Do you know whether Dr. Lefkowith
4   forwarded or communicated his e-mail exchanges
5   with Dr. Winker to anyone else?    05:02
6    A.  No.
7    Q.  You don't know?
8    A.  I don't know.
9        MR. HALPER:  No questions at this time,
10  no further questions.    05:02
11       MR. NELSON:  Neither of you?
12       MR. HALPER:  No, no, no.  Do you have
13  some more?
14       MR. MONTGOMERY:  Yes, but very, very
15  short, although that's the classic.    05:02
16
17
18
19
20
21
22
23
24

176

1        FURTHER EXAMINATION    05:03
2        BY MR. MONTGOMERY:
3   BY MR. MONTGOMERY:
4    Q.  Do you have Exhibit 31?  It's the reply
5   letter.    05:03
6    A.  Here it is.  This is it.
7    Q.  Please look at the second page.  And I
8   want to ask you about that, the paragraph that
9   begins on the bottom of the left column and
10  continues to the top of the right one, it starts    05:03
11  "The problem after six months."
12   A.  Yes.
13   Q.  Do you recall earlier we talked about
14  the phrase "attacking the trial design"?
15   A.  The --    05:04
16   Q.  "Attacking the trial design."
17   A.  Yes.
18   Q.  Do you think that that paragraph that I
19  just identified could be characterized as
20  attacking the trial design of CLASS?    05:04
21       MR. HALPER:  Objection to form,
22  speculation, vague.  By whom?
23       THE WITNESS:  Without knowing exactly
24  what they did, I can't answer that.

De Angelis, Catherine  1/12/2007  11:00:00 AM

---

177

1      MR. MONTGOMERY:  Just a couple more      05:04
2  quick ones.
3  BY MR. MONTGOMERY:
4      Q.   You've been the editor in chief of JAMA
5  now for seven years; is that right?      05:04
6      A.   Correct, seven years and eleven days.
7      Q.   Would you say that experience has left
8  you well qualified to opine about what should and
9  should not be included in medical journal
10  articles?      05:04
11      A.   Yes.
12      Q.   And do you believe that that experience
13  has left you well qualified to opine about what
14  JAMA's readership expects to be included in
15  medical journal articles?      05:04
16      A.   Yes.
17      MR. MONTGOMERY:  No further questions.
18      MR. NELSON:  Are you done?
19
20
21
22
23
24

---

178

1      FURTHER EXAMINATION      05:05
2      BY MR. HALPER:
3  BY MR. HALPER:
4      Q.   Do you know the relationship between
5  JAMA's readership and the investment community?      05:05
6      A.   I know the investment community has
7  subscriptions.  That's all I know.
8      Q.   Do you know the extent of those
9  subscriptions?
10      A.   No.  I don't know numbers.  I do know      05:05
11  they, the reason I know is because I was astounded
12  that they bothered to read it, but they do.
13      Q.   But you can't opine on how whatever that
14  readership is translates into any impact on the
15  stock market; correct?      05:05
16      A.   No, I can't.  I don't know.
17      MR. HALPER:  No further questions.
18      MR. MONTGOMERY:  All right.  We can
19  conclude the deposition at this time.
20      THE VIDEOGRAPHER:  This will conclude      05:05
21  Videotape No. 5 and the videotaped deposition at
22  this time.  The time now is 5:05 p.m.
23      (WHEREUPON said deposition was so
24      concluded.)

---

179

1      IN THE UNITED STATES DISTRICT COURT
2      DISTRICT OF NEW JERSEY
3
4  Alaska Electrical, et al. v. Pharmacia, et al.
5      Case No. 03-1519
6
7      I hereby certify that I have read the
8  foregoing transcript of my deposition given on
9  January 12, 2007, consisting of Pages 1 - 178
10  inclusive, and I do again subscribe and make oath
11  that the same is a true, correct, and complete
12  transcript of my deposition so given as aforesaid, as
13  it now appears.
14
15      PLEASE CHECK ONE:
16      ___ I have no corrections.
17      ___ Number of errata sheets enclosed.
18
19      _____
20      CATHERINE DE ANGELIS
21  Subscribed and sworn to
22  before me this _____ day
23  of _____, 2007.
24  _____

---

180

1      ERRATA SHEET
2  DEPOSITION OF:  CATHERINE DE ANGELIS
3  DATE:  January 12, 2007
4
5  PAGE   LINE NUMBER   COMMENT
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  DATE: _____  SIGNATURE: _____

---

De Angelis, Catherine  1/12/2007  11:00:00 AM

181

1    STATE OF ILLINOIS )
2    COUNTY OF C O O K )
3
4          I, Donna M. Stifter, RPR, CSR No.
5    084-003145, do hereby certify:
6        That the foregoing deposition of CATHERINE DE
7    ANGELIS was taken before me at the time and place
8    therein set forth, at which time the witness was
9    put under oath by me;
10        That the testimony of the witness and all
11   objections made at the time of the examination
12   were recorded stenographically by me, were
13   thereafter transcribed under my direction and
14   supervision and that the foregoing is a true
15   record of same.
16        I further certify that I am neither counsel
17   for nor related to any party to said action, nor
18   in any way interested in the outcome thereof.
19        IN WITNESS WHEREOF, I have subscribed my name
20   this _____ day of January, 2007.
21
22        _____
23        Donna M. Stifter, RPR, CSR 084-003145
24

182

1                    I N D E X
2
3    Friday, January 12, 2007
4
5    WITNESS                        EXAMINATION
6
7    CATHERINE DE ANGELIS
8          (By Mr. Montgomery)      5
9          (By Mr. Halper)          116
10         (By Mr. Montgomery)      176
11         (By Mr. Halper)          178
12
13
14
15
16
17
18
19
20
21
22
23
24

183

1              DEPOSITION EXHIBITS
2             CATHERINE DE ANGELIS
3    NUMBER         DESCRIPTION        PAGE
4
5    17      Subpoena              10
6
7    18      Curriculum Vitae      12
8
9    3       9/13/00 article,
10           "Gastrointestinal Toxicity
11           With Celecoxib vs.
12           Nonsteroidal Anti-inflammatory
13           Drugs for Osteoarthritis
14           and Rheumatoid Arthritis.
15           The CLASS Study:  A
16           Randomized Controlled
17           Trial          19
18
19   19      11/1/01 letter, White
20           to Charlesworth, 00111092
21           - 00111094          21
22
23   20      photocopy of Drs. Friedman
24           and Verburg cards      28

184

1              DEPOSITION EXHIBITS
2             CATHERINE DE ANGELIS
3    NUMBER         DESCRIPTION        PAGE
4
5    21      Final Report of the
6           CLASS study, 01220923 -
7           01221137          33
8
9    22      5/22/01 e-mail chain,
10           Wahba to Cristo,
11           00500695 - 00500697      38
12
13   8       8/5/01 Washington Post
14           article, "Missing Data On
15           Celebrex; Full Study
16           Altered Picture Of Drug"  43
17
18   23      8/22 Wall Street Journal
19           article, "Study Hikes
20           Specter of Arthritis
21           Pills' Side Effect,"
22           00277868 - 00277872      48
23
24

De Angelis, Catherine  1/12/2007  11:00:00 AM

185

DEPOSITION EXHIBITS

CATHERINE DE ANGELIS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 10 | 8/24/01 WNBC-TV transcript of interview, 00710652 - 00710654 | 48 |
| 24 | 8/23/01 e-mail, Dicker to Wahba, 00164630 - 00164632 | 50 |
| 25 | 8/20/01 e-mail, Lefkowith to Friedman and Verburg, 00205151 | 57 |
| 26 | unsigned draft letter, 9/6/01, Geis to DeAngelis, 00053643 - 0053644 | 60 |

186

DEPOSITION EXHIBITS

CATHERINE DE ANGELIS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 27 | 3/20/00 e-mail plus attachments, 01574807 - 01574817 | 61 |
| 28 | 9/8/00 e-mail chain, Lefkowith to Arbe, 00118475 - 00118478 | 65 |
| 29 | 9/17/01 U.S. News & World Report article, "Physicians are putting a stop to the publication of misleading drug data" | 68 |
| 30 | 1/20/02 e-mail chain, Faraji to Geis, 00108615 - 00108618 | 70 |
| 31 | Series of letters to the editor of JAMA, 11/21/01 | 71 |

187

DEPOSITION EXHIBITS

CATHERINE DE ANGELIS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 32 | 6/1/02 BMJ article, "Are selective COX-2 inhibitors superior to traditional nonsteroidal anti-inflammatory drugs, 00111312 - 00111313 | 76 |
| 33 | 7/14/05 NPR transcript | 82 |
| 34 | 12/16/05 NPR transcript | 85 |
| 35 | 6/19/06 Investor's Business Daily article | 90 |
| 36 | JAMA's authorship form, 01714092 - 01714094 | 92 |
| 37 | 2/16/00 e-mail string, Wahba to Loose, 00081770 - 00081772 | 95 |

188

DEPOSITION EXHIBITS

CATHERINE DE ANGELIS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 38 | 4/4/00 e-mail, Tam to Verburg attaching CLASS study, 01064897 - 01064937 | 97 |
| 39 | 8/13/01 e-mail string, Goran to Needleman plus others, 00205104 - 00205105 | 101 |
| 40 | 7/12/06 JAMA editorial: "Update on JAMA's Conflict of Interest Policy | 103 |
| 41 | 8/23-30/06 JAMA editorial:  "The Influence of Money on Medical Science" | 104 |

De Angelis, Catherine  1/12/2007  11:00:00 AM

189

```
1              DEPOSITION EXHIBITS

2              CATHERINE DE ANGELIS

3    NUMBER          DESCRIPTION          PAGE

4

5    4        JAMA article, 9/13/00,

6             "COX-2-Selective

7             NSAIDs, New and

8             Improved,"           106

9

10   42       three-page JAMA

11            document              108

12

13

14

15

16

17

18

19

20

21

22

23

24
```

EXHIBIT 10

Drummond, Rennie  1/18/2007  1:30:00 PM

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT
2           DISTRICT OF NEW JERSEY
    _____
3   ALASKA ELECTRICAL PENSION FUND, )
4   et. al.,                        )
5           Plaintiffs,             )
6      vs.              ) No. 03-1519
7   PHARMACIA CORPORATION, et. al., )
8           Defendants.  )
9   _____)
10
11       Videotaped deposition of DR. DRUMMOND
12   RENNIE, called by the Plaintiffs for examination,
13   taken pursuant to subpoena, and by the provisions
14   of the Rules of Civil Procedure for the United
15   States District Courts pertaining to the taking
16   of depositions, taken before DEBORAH HABIAN,
17   CSR No. 084-002432, a Notary Public within and
18   for the County of Cook, State of Illinois, and a
19   Certified Shorthand Reporter of said State, at
20   the offices of the American Medical Association,
21   515 North State Street, 14th Floor, Chicago,
22   Illinois, on the 18th day of January, 2007, at
23   1:30 p.m.
24

**Page 2**

1   APPEARANCES:
2
3       LERACH COUGHLIN STOIA GELLER
4       RUDMAN & ROBBINS, LLP
5       BY:  MATTHEW MONTGOMERY, ESQ.
6       655 West Broadway, Suite 1900
7       San Diego, California  92101-3301
8       (619) 231-1058
9           on behalf of the Plaintiffs;
10
11      CADWALADER WICKERSHAM & TAFT, LLP
12      BY:  JASON M. HALPER, ESQ.
13         KATHERINE A. RITCHIE, ESQ.
14      One World Financial Center
15      New York, New York  10281
16      (212) 504-6605
17          on behalf of the Defendants
18          Pharmacia Corporation;
19
20
21
22
23
24

**Page 3**

1   APPEARANCES:  (Cnt'd)
2
3       AMERICAN MEDICAL ASSOCIATION
4       BY:  LEONARD A. NELSON, ESQ.
5       515 North State Street
6       Chicago, Illinois  60610
7       (312) 464-5532
8           on behalf of deponent.
9
10   ALSO PRESENT:
11      EASTWOOD-STEIN DEPOSITION MANAGEMENT
12      BY:  DAVID GILLERAN, VIDEOGRAPHER
13      11 South LaSalle Street, Suite 900,
14      Chicago, Illinois  60603
15      (800) 343-0733
16
17
18
19
20
21
22
23
24

**Page 4**

1              I N D E X
2   WITNESS:            DX  CX  RDX  RCX
3   DR. DRUMMOND RENNIE
4   BY:  MR. MATTHEW MONTGOMERY  08     190
5   BY:  MR. JASON M. HALPER    122    ---
6
7
8       PLAINTIFFS EXHIBITS           PAGE
9       No. 3    . . . . . . . . . .   23
        No. 4    . . . . . . . . . .   62
10      No. 21   . . . . . . . . . .   107
        No. 22   . . . . . . . . . .   52
11      No. 24   . . . . . . . . . .   89
        No. 27   . . . . . . . . . .   93
12      No. 28   . . . . . . . . . .   58
        No. 31   . . . . . . . . . .   82
13      No. 32   . . . . . . . . . .   115
        No. 36   . . . . . . . . . .   68
14      No. 37   . . . . . . . . . .   100
        No. 38   . . . . . . . . . .   102
15      No. 39   . . . . . . . . . .   91
        No. 40   . . . . . . . . . .   118
16      No. 42   . . . . . . . . . .   29
        No. 43   . . . . . . . . . .   11
17      No. 44   . . . . . . . . . .   14
        No. 45   . . . . . . . . . .   36
18      No. 46   . . . . . . . . . .   47
        No. 47   . . . . . . . . . .   65
19      No. 48   . . . . . . . . . .   72
        No. 49   . . . . . . . . . .   77
20      No. 50   . . . . . . . . . .   79
21
22
23
24

5

1    THE VIDEOGRAPHER:  For the record my name
2    is David Gilleran.  I'm working in conjunction
3    with Eastwood-Stein Deposition Management, 11
4    South LaSalle Street, Suite 900, Chicago,
5    Illinois.
6        This deposition is being videorecorded
7    pursuant to Federal Rule 30(b) and all other
8    applicable state and local rules.
9        We are at 515 North State Street,
10   Chicago, Illinois to take the videotaped
11   deposition of Dr. Drummond Rennie in the matter
12   of Alaska Electrical Pension Fund Et. Al. vs.
13   Pharmacia Corporation, Et. Al,
14   Court No. 03-1519 in the U.S. District Court,
15   District of New Jersey.
16       Today's date is January 18, 2007, the
17   time is 1:33 p.m.  This is taking place on behalf
18   of Plaintiff; is that correct?
19   MR. MONTGOMERY:  That's correct.
20   THE VIDEOGRAPHER:  This deposition is being
21   videotaped on the behalf of the Plaintiff, it is
22   being taken at the instance of the Plaintiff.
23   And if the court reporter could swear in the
24   witness and if the parties would like to identify

6

1    themselves for the record?
2    THE REPORTER:  Raise your right hand,
3    Doctor.
4            (Witness sworn.)
5    THE REPORTER:  Thank you.
6    MR. MONTGOMERY:  Matthew Montgomery from
7    Lerach, Coughlin representing the Plaintiffs.
8    MR. HALPER:  Jason Halper, Cadwalader, for
9    the Defendants.  And just to clarify, we cross
10   noticed the deposition.
11   MS. RITCHIE:  Katherine Ritchie of
12   Cadwalader for the Defendants.
13   MR. NELSON:  My name is Leonard Nelson.  I'm
14   an employee of the American Medical Association.
15   I represent the deponent.
16   MR. MONTGOMERY:  Good morning, Dr. Rennie.
17   Afternoon.  Could you state your name for the
18   record, please?
19   THE WITNESS:  Drummond Rennie.
20   MR. MONTGOMERY:  All right, just to clarify
21   or so you understand what we're doing here, I
22   represent the Plaintiffs in this case, and there
23   are a number of pension funds that bought stock
24   in Pharmacia Corporation between 2000 and 2002.

7

1    And the reason they brought this suit is that
2    they contend that the Defendants, which are
3    Pharmacia Corporation, Pfizer and some of the
4    employees of those companies, made
5    misrepresentations about the drug Celebrex during
6    that time period, and their contention is that,
7    by misrepresenting the side effects of the drug,
8    they inflated the price of Pharmacia stock so
9    that my clients paid too much money for the
10   stock, and when the truth about Celebrex came
11   out, the price of the stock dropped and my
12   clients lost a lot of money.
13       Now, Defendants in this case dispute
14   all of those allegations, but that's what we're
15   here today about.
16       First of all, I'd like to thank you
17   for being here and let you know I'm going to try
18   and get the information that I need and get you
19   out of here as soon as possible.
20
21
22
23
24

8

1        DR. DRUMMOND RENNIE,
2    called as a witness herein by the Plaintiffs,
3    having been first duly sworn, was examined and
4    testified as follows:
5        DIRECT EXAMINATION
6        BY MR. MONTGOMERY:
7    Q   Have you ever been deposed before?
8    A   Yes.
9    Q   How many times?
10   A   Six times, say, seven, eight.
11   Q   Okay, so have you ever been deposed in
12   a securities fraud action before?
13   A   No.
14   Q   All right, you have done this before,
15   so I'll make this very brief.  Do you understand
16   that the oath that you just took has the same
17   force and effect here as it would in a court of
18   law?
19   A   Yes.
20   Q   All right, you can see the court
21   reporter is going to be typing my questions, any
22   objections and your answers.  So it's important
23   that you let me finish my questions and any
24   objections that one of the other attorneys might

9

1  want to put on the record before you answer it.
2  Do you understand?
3      A   Yes.
4      Q   Okay.  Now, I'd like to define a few
5  terms so it will be easier for us as we go along.
6  Are you familiar with the drug commercially known
7  as Celebrex?
8      A   Yes.
9      Q   And are you aware that its chemical
10  name, if that's the right term, is celecoxib?
11     A   Yes.
12     Q   Okay, so I'm going to use those terms
13  interchangeably if that's okay with you?
14     A   Yes.
15     Q   Are you familiar with the celecoxib
16  Long-Term Arthritis Safety Study?
17     A   Yes.
18     Q   And I'm going to refer to that also as
19  the class study during your deposition, if that's
20  okay?
21     A   Yes.
22     Q   I'm also going to be referring to the
23  Journal of the American Medical Association as
24  JAMA, if that's all right with you?

11

1  establish what we're going to call it.  Can you
2  put on the -- is that all right with you that you
3  understand that?
4      A   Oh, yes, of course.
5      MR. MONTGOMERY:  Okay.  All right, at this
6  point, I would like to ask the court reporter to
7  mark what would be Exhibit 43.
8      THE WITNESS:  Thank you.
9      MR. MONTGOMERY:  For the record, Exhibit 43
10  is the subpoena pursuant to which Dr. Rennie is
11  appearing today.
12          (Deposition Exhibit No. 43
13          was marked for ID)
14     MR. NELSON:  Mr. Montgomery, would it be
15  better if the court reporter were just to keep
16  the originals and I were to give the copies to
17  the witness?
18     MR. MONTGOMERY:  I'd rather have him look at
19  the actual --
20     MR. NELSON:  Okay.
21     MR. MONTGOMERY:  (Continuing) -- exhibits
22  that are attached --
23     MR. NELSON:  Okay.
24     MR. MONTGOMERY:  (Continuing) -- just in

10

1      A   Yes.
2      Q   And as I explained before, the
3  Defendants in this case are Pfizer, Pharmacia and
4  certain of their employees.  So if I refer to
5  Defendants, do you understand that that's who I'm
6  referring to?
7      A   Yes.
8      Q   Okay, to the extent that any of those
9  things might be confusing or might not be
10  applicable in your opinion later on, just let me
11  know, and I can be more specific if something
12  comes up.
13     A   Are we going to get into a discussion
14  of what you mean by familial?
15     Q   Not unless you are confused by the
16  term.  And do you have a general understanding of
17  that term?
18     A   Well, familiarity with a class study
19  could be quite a lot of things, couldn't it?
20     Q   Sure.  For these -- for the purposes
21  of the question that I was just asking, I suppose
22  just being aware of the study.
23     A   I'm aware of the study.
24     Q   Okay, because I was just trying to

12

1  case there's a missing page, accident, anything.
2      MR. NELSON:  Fine.
3  BY MR. MONTGOMERY:
4      Q   Dr. Rennie, have you seen this
5  document before?
6      A   Yes.
7      Q   Would you turn to the last page of
8  Exhibit 43, please?
9      A   (Witness so doing).
10     Q   Do you see under "Document
11  Requested" -- "Documents Requested" on that page
12  there's a Request No. 2?
13     A   Yes.
14     Q   Okay, and that reads, "All documents
15  concerning the class study"?
16     A   Yes.
17     Q   Did you personally do anything to look
18  for documents --
19     A   Yes.
20     Q   Let me -- you got to let me finish my
21  question first.  Did you personally do anything
22  to look for documents responsive to this request?
23  Now you can answer.
24     A   Yes.

13

1    Q    And what did you do?

2    A    I looked for documents concerning the

3    class study.

4    Q    And where did you look for those

5    documents?

6    A    I looked for them in my files, my

7    computer files.

8    Q    Did you find any?

9    A    I found -- yes.

10   Q    And what did you find?

11   A    I found slides.

12   Q    How many approximately?

13   A    Three.

14   Q    Did you find anything else?

15   A    No.

16        MR. MONTGOMERY:  All right, I would now like

17   to ask the court reporter to mark what will be

18   Exhibit 44.

19        THE WITNESS:  Am I allowed to talk to my

20   attorney?

21        MR. MONTGOMERY:  We can take a break at

22   certain points.  You really can't confer during

23   the deposition unless it's a question of whether

24   something's --

14

1        MR. NELSON:  Well, do you want --

2        MR. MONTGOMERY:  Sure.

3        MR. NELSON:  This is not critical.  We're

4    not interrupting anything.

5        MR. MONTGOMERY:  Certainly not.

6        MR. NELSON:  So since the witness has a

7    question, let's take a short break, Dr. Rennie,

8    and I'll step outside with you because if there's

9    a matter of a concern, let's talk about it.

10       MR. MONTGOMERY:  Yeah, let's go off the

11   record, please.

12       (Recess taken off the record.)

13       (Deposition Exhibit No. 44

14       was marked for ID)

15       MR. MONTGOMERY:  All right, back on the

16   record, please.

17       THE VIDEOGRAPHER:  Recording.

18   BY MR. MONTGOMERY:

19       Q    All right, Dr. Rennie, do you

20   understand you're still under oath?

21       A    I do.

22       Q    Okay.  Now, if at any point I ask any

23   question that you're not comfortable with, maybe

24   you don't understand one of the terms I'm using

15

1    like what happened before, feel free to let me

2    know, and I'll clarify or --

3        A    Yeah.

4        Q    -- rephrase the question.  Also if you

5    need to take a break at any time, that's fine.  I

6    would like -- if we're in the middle of a series

7    of questions, I would like to finish those up,

8    but then we can take any breaks that are

9    necessary.

10       All right, now, turning to Exhibit 44

11   in front of you, does this appear to be a copy of

12   your curriculum vitae?

13       A    Yes, but the bottom's legally --

14       Q    Yes.

15       A    -- struck out.

16       Q    Yeah, it's a little cut off, right?

17       A    It's because of legal pages being

18   longer than --

19       Q    I see.

20       A    -- normal pages.

21       Q    Other than that, as far as you know,

22   does it --

23       A    Yeah.

24       Q    -- appear to be up-to-date?

16

1        A    I believe it to be up-to-date.  It --

2    it's the latest version I have.

3        Q    All right, on the bottom of the first

4    page of Exhibit 44, there's a section for

5    "Present Positions Held".  Do you see that?

6        A    Yes.

7        Q    And as you noted, some parts of that

8    have been cut off.  Is one of the positions that

9    would be listed there if it were complete the --

10   a position at JAMA?

11       A    Yes.

12       Q    And what is that position?

13       A    Deputy Editor.

14       Q    And do you currently hold that

15   position?

16       A    Yes.

17       Q    How long have you had it?

18       A    I've had the same job since 1988 or

19   since 1983.  It's a matter of what it was called.

20       Q    What was it called in 1983?

21       A    Associate Editor.

22       Q    And have your responsibilities changed

23   appreciably from 1983 to the present?

24       A    In no way.

17

1    Q    And what are your specific
2  responsibilities at JAMA?
3    A    I -- my first task is to read the
4  manuscripts that are sent in to assess their
5  scientific validity and importance, to have them
6  reviewed or not by experts that I know to assess
7  those and to improve the very few we accept and
8  to, well, select them and to improve them, and
9  then to do a whole slew of other things which
10  have to do with editorial matters, but not
11  administrative ones because I'm at the University
12  of California in San Francisco, and that was the
13  deal.
14    Q    Do you review manuscripts about a
15  particular medical area?
16    A    They tend -- the answer's yes, sort
17  of.  I tend to be sent manuscripts that are
18  within my specialty, which is of renal disease
19  and things that interest me, for example,
20  statistical and epidemiologic problems that we
21  aren't supposed to have in general and of
22  certainly areas like that, areas of particular
23  interest to me.
24    Q    Who chooses the articles that are sent

18

1  to you to review?
2    A    One of the editors in situ here, which
3  I believe is either Dr. Phil Fontanarosa or
4  Dr. Richard Glass.  But I never know in any one
5  week who that is, ever, and for all I know, it
6  may be others.
7    Q    I believe that you said one of your
8  areas of interest is statistical analyses; is
9  that correct?
10    A    The more general way of putting it is
11  that I started an initiative which has to do with
12  the -- examining the quality of articles that
13  come into journals in general and the way these
14  are handled by journals and the quality of
15  journals, and I started that in 1986.
16        And that's become a large deal.  And
17  because of this known enthusiasm, I tend to get
18  sent through JAMA papers, for example, pointing
19  out issues that randomized clinical trials might
20  have or what are called observational studies
21  might have.  They tend to get routed in my
22  direction.
23    Q    Based upon your experience at JAMA and
24  in academia, do you believe that you have an

19

1  understanding of what information should and
2  maybe should not be included in medical journal
3  articles?
4    MR. HALPER:  Objection to form.
5    THE WITNESS:  That's a very full question,
6  and I can expand on that, if you wish.
7  BY MR. MONTGOMERY:
8    Q    Please.
9    A    If I'm being sent an editorial, then I
10  know that's an opinion.  If I'm sent a
11  commentary, that's an opinion, and I'll allow a
12  lot -- my opinion will be to allow a great deal
13  more laxity.
14        If I'm being sent a paper that
15  examines, say, the health effects of
16  post-menopausal hormones on thousands of women,
17  I'll demand much higher, rigorous standards.  If
18  I'm sent one on a randomized trial where
19  everything can be very well defined beforehand,
20  not only can, but must be, I'll demand a higher
21  standard still.
22    Q    Let me be more specific then.  Do you
23  believe, based on your experience, that you have
24  an understanding of what sort of data from

20

1  randomized trials should be included in journal
2  articles?
3    MR. HALPER:  Objection to form.
4    THE WITNESS:  Yes.
5  BY MR. MONTGOMERY:
6    Q    Based on your experience, do you
7  believe you have an understanding of what sorts
8  of data the readers of JAMA expect to be included
9  in articles that are published in the journal?
10    MR. HALPER:  Objection to form.
11    THE WITNESS:  It depends which readers
12  you're talking about.  The answer is yes, and I'd
13  like to think all.  The answer also is it depends
14  on the reader.
15  BY MR. MONTGOMERY:
16    Q    What sorts of readers do you believe
17  you have an understanding of their expectations?
18    A    Perhaps, I should give an illustration
19  here.
20    MR. NELSON:  Well, let him ask for the
21  illustration.  I think you should really say if
22  you can answer the question -- I mean it -- just,
23  you know, it was an obviously difficult question
24  to answer.

21

1    THE WITNESS:  Yeah.

2    MR. NELSON:  And if you said, I don't

3  understand it, I can't formulate an answer the

4  way it's phrased, then it will be Counsel's,  you

5  know, burden to rephrase it.

6    THE WITNESS:  Perhaps -- Mr. Montgomery,

7  perhaps you'd --

8    MR. MONTGOMERY:  Sure.

9    THE WITNESS:  (Continuing) say it again

10  or --

11  BY MR. MONTGOMERY:

12    Q    Maybe it would be easier to approach

13  it from are there specific types of readers of

14  JAMA whose expectations you think you might be

15  unfamiliar with?

16    MR. HALPER:  Objection to form.

17    THE WITNESS:  That, I -- I don't know.  I

18  don't know, but I would have thought, and this is

19  pure speculation, that if you're a patient, you'd

20  have a lot of difficulty reading a trial or

21  critiquing it, which is another issue.

22  BY MR. MONTGOMERY:

23    Q    All right, over the years, have you

24  had regular communications with clinicians that

22

1  read JAMA for their own medical practices?

2    A    Yes.

3    Q    And based upon those conversations, do

4  you feel that you have an understanding of what

5  sorts of data those clinicians expect to be

6  included in JAMA articles about randomized

7  trials?

8    A    No.

9    Q    So do you have any idea what sorts of

10  data they expect --

11    A    Yes.

12    Q    -- to be included?

13    A    Yes.  In a nutshell, the complaint is

14  that medicine is too complicated and getting more

15  so, and they'd like it less so.

16    Q    My question was less about what their

17  preferences would be and more about what their

18  expectations about what is and is not included.

19    A    The two tend to be muddled, don't

20  they?  And their expectation is, of course, that

21  they get absolutely everything, but that's also

22  their complaint.

23    Q    So in your experience, the clinicians

24  that read JAMA expect all relevant clinical data

23

1  to be included in JAMA articles?

2    A    Yes.

3    MR. HALPER:  Object to the form.

4  BY MR. MONTGOMERY:

5    Q    I'd like to show the witness what's

6  previously been marked as Exhibit 3.

7    A    Thank you.

8    Q    Before we turn to Exhibit 3, I'd like

9  to ask one more question along the lines that we

10  were talking about before.

11    You stated that, is it correct, that

12  in your experience clinicians reading JAMA expect

13  all relevant data to be included from clinical

14  trials and articles?  Is that correct?

15    MR. HALPER:  Objection to form.

16    THE WITNESS:  Yeah.

17  BY MR. MONTGOMERY:

18    Q    Do you believe that you're qualified

19  to assess what data in a particular study is

20  relevant and should be included in JAMA articles?

21    A    Yes.

22    MR. HALPER:  Objection to form.

23  BY MR. MONTGOMERY:

24    Q    Okay, turning to Exhibit 3, have you

24

1  seen this before?

2    A    Yes.

3    Q    Is it a copy of an article from JAMA

4  concerning the class study?

5    A    Yes.

6    Q    And for the purposes of our

7  deposition, I'm just going to call this the JAMA

8  article, if that's okay with you?

9    A    Yes.

10    Q    If that gets confusing, if there are

11  other articles, let me know and we'll try to

12  straighten it out as we go along.

13    Do you recall the first time that you

14  heard about the class study?

15    A    Yes.

16    Q    When was that?

17    A    When I read my journal.

18    Q    So the first time you read Exhibit 3

19  was the first time you heard about the class

20  study; is that correct?

21    A    Yes.

22    Q    So I take it then that you did not

23  participate in any of the editorial process

24  regarding Exhibit 3 before it was published in

25

1  JAMA?

2      A   No, I did not.

3      Q   After the publication of Exhibit 3,

4  did you have occasion to speak for JAMA

5  concerning this article in any forum?

6      A   No, and -- yes, I spoke.  I did not

7  speak for JAMA.  I think in every case, I make

8  that very clear.

9      Q   Did you take any steps at the

10  direction of JAMA concerning the JAMA article?

11     A   I don't understand the question.

12     Q   Did anyone at JAMA ask you to do

13  anything having to do with this article,

14  Exhibit 3?

15     A   No.

16     Q   After Exhibit 3 was published, did you

17  have occasion to look into the context in which

18  it was published or the -- let me -- let me

19  rephrase.  Strike that question.

20         After the publication of Exhibit 3,

21  did you have occasion to look into the details of

22  the class study?

23     A   Yes.

24     Q   And what prompted that?

26

1      A   I got -- now, I'm remembering

2  something I have not looked up.  Indeed, I

3  haven't looked this up (indicating).

4         I got an e-mail from somebody in

5  British Columbia called Wright, with a W, who was

6  a member of the Cochrane Collaboration, which is

7  a very large organization from -- in which I take

8  a prominent role.  And on that basis, he -- he

9  claimed there was something wrong with this

10  study, and he demanded because he knew me that

11  something be put right.  I'm trying to remember.

12         And I told him, You're up -- I'm the

13  wrong person, you write a letter to the editor,

14  that's what people do.  And most people who write

15  to editors are very angry, and I expect I asked

16  him what part of write a letter to the editor he

17  didn't understand, and that was that.

18     Q   Subsequent to that conversation, did

19  you have occasion to look into the details of the

20  class study?

21     A   Yes.  That conversa -- that

22  interchange, I believe it was him, but I can't

23  remember, got me or somebody working beside me to

24  look into the FDA -- what the FDA had to say

27

1  about the class study.

2         And I was upset -- no, I was -- well,

3  the technical term I was I was pissed off that

4  there seemed to be a discrepancy.  But, again, I

5  had nothing to do with it, and I was aware that

6  my colleagues were worrying about this, and they

7  were the ones who could do something about it.  I

8  didn't draw this to their attention.

9      Q   What did you do that led you to the

10  conclusion that there was some sort of

11  discrepancy?

12     A   This must be, my guess would be, the

13  beginning of 2001 for one reason or another,

14  and I'm hazarding a guess here, I had the

15  feeling -- I sort of vaguely remember a lawsuit

16  or a -- or perhaps it was just a Freedom of

17  Information Request to the FDA filed by something

18  like Public Citizen or whatever which caused the

19  full details of what was not just one, but two

20  trials of differing lengths and much longer than

21  this to be put in the public domain.  And then it

22  is no surprise at all to find that those who read

23  that blame the editors for not knowing this.

24     Q   When you say --

28

1      A   I seem to remember that, and so I can

2  only suppose, but this is a guess.  I'm guessing

3  how I got there.

4      Q   When you say -- when said "longer than

5  that" in your response, did you mean Exhibit 3,

6  the JAMA article?

7      A   Yeah.  And I'm not guessing about some

8  things because I made a slide around about then,

9  and I'm sure -- it's unlikely, knowing me, I

10  believe, that my slide didn't have some backing

11  to -- to that.  In other words, the FDA disagreed

12  with it.

13     Q   Did you personally look on the FDA's

14  website at any data?

15     A   I'd say I believe so, but I do not

16  know.  The answer is I don't know.

17     Q   Based on that, I assume you don't

18  recall what specific data you might have looked

19  at on the FDA website?

20     A   Well, no.

21     MR. MONTGOMERY:  All right, I'd like to ask

22  the court reporter to mark what will be

23  Exhibit 45.

24     THE WITNESS:  Thank you.

29

1    MR. MONTGOMERY:  I'm sorry, this has
2  previously been marked as Exhibit 42.
3    THE REPORTER:  Want to take it back?
4    MR. MONTGOMERY:  Yes.  If you could hand
5  that back to the court reporter, she'll fix it.
6    THE WITNESS:  (Tendering document)
7  BY MR. MONTGOMERY:
8    Q    Let's see, Exhibit 42 is a reflection
9  of the slides that you were referring to that you
10  created?
11    A    Right.
12    Q    And why did you recreate these slides?
13    A    I'm interested in authorship, which as
14  far as academics is where the rubber hits the
15  road, and I'm interested in an authorship, and
16  I've got many publications on this and I've
17  changed things a lot.
18        Authorship gets one credit.
19  Authorship also means responsibility, without
20  being too pompous about it.  And here, it seemed
21  to me, that the authors had shed their
22  responsibility.
23    Q    And why do you believe that?
24    A    I believe they did it for commercial

30

1  reasons, and that was my guess.
2    Q    I'm sorry, what I meant when I asked
3  you why, I meant what basis do you have for
4  believing that they didn't live up to their
5  responsibilities?
6    A    At this time, and that's why I'm
7  having difficulty remembering exactly what I saw
8  on the FDA website, which I visited for all sorts
9  of reasons at various times, I can't remember --
10  but there was a great deal of publicity about
11  this (indicating), and the central point about
12  all that was that this (indicating) was not a
13  true representation of what had actually
14  happened.
15    Q    By "this", do you mean Exhibit 3, the
16  JAMA article?
17    A    In other words, that my journal had
18  not been provided with a face -- a faithful
19  representation of what happened, and that, seen
20  from the point of view of an editor, is
21  upsetting.
22    MR. MONTGOMERY:  Could you read back his
23  previous response?
24    THE REPORTER:  This one (indicating screen)?

31

1    MR. MONTGOMERY:  Yes.
2    THE REPORTER:  Okay.
3        (Record read.)
4  BY MR. MONTGOMERY:
5    Q    All right, when you said "this was not
6  a true representation" --
7    A    (Indicating document).
8    Q    -- did you mean Exhibit 3, the JAMA
9  article?
10    A    The JAMA article.
11    Q    Okay, so going back to Exhibit 42 for
12  a second, did you create these slides for any
13  particular presentation?
14    A    Yes.
15    Q    And do you recall what it was?
16    A    Well, I'm -- may I just -- I said yes
17  too quickly.  I created this slide for -- I
18  believe, for a -- I got a prize in Washington.
19    Q    Again, it might be on your CV, if you
20  want to refresh your recollection.
21    A    And they -- the Association of
22  American Medical Colleges and so on wanted -- I
23  went up to Washington to get this damn thing, and
24  I -- they wanted me to give a lecture on this, on

32

1  this -- on authorship, the responsibilities of
2  authorship and so on, and I suspect that this was
3  part of that lecture.
4        And when I say "suspect", I have it, I
5  have these slides, not because I had that
6  lecture, but because I've used it since because
7  this is by no means isolated.  This set of
8  occurrences is -- every one is unique, but the
9  general point is I've seen it before.  We have
10  seen it before.  Editors see it.
11    Q    And what is the central point, as you
12  understand it?
13    A    The central point is telling -- giving
14  a faithful representation of what the researchers
15  believe to be the truth to -- the editors were
16  the surrogates for the readers, and therefore, to
17  the readers.
18    Q    And you believe that the JAMA article
19  did not represent a faithful presentation of
20  information?
21    A    Yes, on the basis of what my
22  colleagues told me, my colleagues in this
23  building and what I then read.
24    Q    And what specifically was that?

33

1    A    Well, there were a number of problems
2    with this, which I seem -- which I think I listed
3    on the slide.  The -- I think the FDA made it
4    rather more clear than I did, and that's why, as
5    I recollect, I either copied or used or made some
6    sort of amalgamation of what I thought and what
7    the FDA thought.  I've not looked this up again.
8        Q    Okay, well, let's look at the second
9    page of Exhibit 42, please.
10       A    (Witness so doing).
11       Q    And is that a slide that you
12   personally created?
13       A    Yes.
14       Q    All right, at the bottom, the very
15   last entry, it says, "Sponsors".  Do you see
16   that?
17       A    Yes.
18       Q    And who are you referring to there?
19       A    I think it was Pharmacia.  I can
20   check.  (Reviewing document).  Yes.
21       Q    All right, after that, you say,
22   "laughing to bank"?
23       A    Yes.
24       Q    And what did you mean by that?

34

1    A    The total of what I meant is this:  It
2    took a long time between the publication in JAMA,
3    which is a very difficult thing to get, and the
4    revelation in our Letters to the Editor that
5    something had gone wrong and also the FDA
6    website.
7        And during that time, which may have
8    been six months, nine months, as I remember,
9    there was a very considerable advertising going
10   on, which was relevant to me because I'm a
11   third-rate climber, but I've been on a very large
12   number of big expeditions all over the world,
13   third-rate because I don't climb enough, and I
14   need something for all the things I've damaged.
15   And so it was nice to think I'd be able to skate
16   and do all these other things, which I've never
17   been able to do before, but what I was seeing was
18   an enormous -- on the basis of this (indicating),
19   perhaps, and others, I was seeing a tremendous
20   amount of publicity and sales, in fact.  And I
21   remembered that particularly afterwards when
22   there seemed to be problems with the -- with what
23   we published because --
24       Q    When you say "sales" --

35

1    A    -- that's very painful, indeed, to an
2    editor to think it once published something that
3    doesn't hold up.  Not hold up for scientific
4    reason, but hold up for unscientific reasons.
5        Q    On your slide here -- well, before we
6    move on, following up to your last response, when
7    you said there were tremendous sales, did you
8    mean sales of Celebrex?
9        A    There was a tune, yes.
10       Q    All right, going back to your slide,
11   the second page of Exhibit 42, there's a line
12   item toward the bottom of that page, the second
13   page that says "Editors"?
14       A    Yes.
15       Q    And were you referring to the editors
16   of JAMA?
17       A    Yes.
18       Q    And after that, it says, "exasperated,
19   furious"?
20       A    Yes.
21       Q    Was that characterizing the response
22   of the JAMA editors?
23       A    Well, certainly one of them.  Two of
24   them, actually.

36

1    Q    And who are they?
2    A    Dr. DeAngelis and myself.
3    Q    All right, we're going to go through a
4    lot of documents.  So you can put that one to the
5    side, but I'd like you to keep out Exhibit 3,
6    which is the JAMA article because we're going to
7    keep going back to that one, okay?
8        I'd like to ask the court reporter to
9    mark what will be Exhibit 45.
10       (Deposition Exhibit No. 45
11       was marked for ID)
12   MR. MONTGOMERY:  For the record, Exhibit 45
13   is an article from the Global News Wire dated
14   December 9th, 2005, specifically it's a
15   transcript -- purports to be a transcript of an
16   interview between Maria Bartiromo, yourself and
17   another individual.
18   BY MR. MONTGOMERY:
19       Q    Now, Dr. Rennie, I'm going to be
20   giving you a lot of documents today to look
21   through.  And you're entitled to read every word
22   of every page if you want to, but it may move
23   things along if I just point you to the parts
24   that I want to talk about; and then if you feel

37

1   you need more context, you can read the whole
2   thing.
3          In this particular document, I'm only
4   going to ask you about your quotes -- well, first
5   I'm going to ask you about your quote in the
6   third paragraph of this document.  So if you
7   could take a moment and read through that?
8   A   (Witness so doing).
9   Q   Okay, I'd like to direct you to your
10  quote in the third paragraph.  First of all, do
11  you recall this interview?
12  A   Yes.
13  Q   Okay.  MI'd like to read part of your
14  quote into the record.  It says, "While editors
15  depend on the researchers not lying to them, and
16  that's exactly what they did to the New York --
17  I'm sorry, "the New England Journal of Medicine
18  and that's exactly what the some authors dealing
19  with the paper on Celebrex did to JAMA five years
20  ago."  Do you see that?
21  A   Yes.
22  Q   And as far as you know, is that a
23  correct quote?
24  A   Yes.

38

1   Q   And the paper on Celebrex that you
2   referred to, is that the JAMA article --
3   A   Yeah.
4   Q   -- we've been discussing?
5   A   I guess I got the date wrong, didn't
6   I?
7   Q   But as far as -- it is the JAMA
8   article that you were referring to?
9   A   Yes.
10  Q   Do you still agree with that
11  statement?
12  A   Yes.
13  Q   And why did you believe that the
14  authors of the JAMA article had lied to JAMA?
15  A   Because they knew otherwise.  In other
16  words, as was revealed, in the letter, in the letter
17  that they -- we published -- again, I had no hand
18  in this -- they said, "In retrospect, we
19  acknowledge that we could have avoided
20  confusing -- confusion by explaining to the JAMA
21  editors why we chose to inform them only of the
22  six-month analyses and not the longer term data
23  that were available to us when we submitted the
24  manuscript.  We submitted only this information

39

1   because the authors believed the six-month data
2   were the most scientifically and clinically
3   valid.  The data after six months were so
4   confounded as to be difficult to interpret for
5   assessing a drug-related causal GI toxicity."
6   Q   So to be clear, is it correct to say
7   that you believed that the authors of the JAMA
8   article had lied to JAMA because they had only
9   presented six months of the class study instead
10  of a longer dataset?
11  A   Yes.
12  Q   Why do you believe that that was
13  deceptive?
14  A   Because, as I recollect, they -- there
15  were actually two studies that were amalgamated,
16  and that wasn't made clear.  The one clear -- one
17  study, again, as I recollect, was twelve months
18  and the other was whatever it is, fourteen
19  months, something like that.  The figure I have
20  in my mind is 65 weeks or something.  And above
21  all, they had the results in their pockets.
22         Now, it isn't straight dealing.
23  Science operates -- cannot operate with police in
24  the lab.  It can't be done.  There has to be

40

1   trust, and there has to be trust amongst
2   scientists and scientists with journals.
3          And so you expect straight dealing,
4   and this wasn't straight dealing.  They knew
5   results, which could be interpreted by others as
6   showing no effect, and those were not revealed.
7          The editors weren't even given the
8   chance of saying -- apparently, weren't given the
9   chance of saying, Yes, we agree with you, these
10  are uninterpretable.  They were treated as
11  idiots, and that's what that letter says.
12  Q   As a general matter, do most clinical
13  studies produce an array of datapoints?
14  A   Yes.
15  Q   And, typically, all of those
16  datapoints aren't presented along with every
17  article; is that correct?
18  A   Yes.
19  Q   And that isn't necessarily improper;
20  is that right?
21  A   Definitely not.
22  Q   So what was it about the specific data
23  that was not disclosed in this case in the JAMA
24  article that you found to be deceptive?

41

1    A   I found it deceptive -- and, again, I
2  did not handle this.  All of this happened before
3  I knew, okay?
4        But what I found particularly
5  distasteful was something that had re -- it
6  reminded me of that had happened in 1978 when I
7  was at Harvard and the Deputy Editor of New
8  England Journal, and that was when two authors
9  submitted and published on the same day in two
10  different journals, one of them being JAMA -- one
11  of them being the New England Journal results,
12  which were completely contradictory.
13        And their excuse was, yes, they knew
14  the other results, but they didn't like to refer
15  to unpublished work in a published work, which on
16  the face of it is, of course, ludicrous and
17  disingenuous.
18        Now, I'm just try -- you asked me
19  about my reaction here.  And other editors were
20  more vocal, perhaps, about it then I was, but I
21  felt that if you don't give people a chance to
22  see basic results, like -- basic facts of the
23  design such as how many trials were there and how
24  long did they last and what were they designed

42

1  for and how -- what was that design -- those are
2  basic things -- then you are being deceptive.
3    Q   I don't want to put words in your
4  mouth.  I just want to try and condense that.
5        So would it be fair to say that you
6  found the specific data that was omitted from the
7  JAMA article to be deceptive because it was so
8  fundamental to the article?
9    A   Yes.
10    Q   And is one of the pieces of
11  information we were just referring to the length
12  of the study that was fundamental?
13    A   Yes.
14    Q   And why is that fundamental in your
15  opinion?
16    A   Well, it's a general rule that --
17  well, it's fundamental for quite a few reasons.
18  You might take, for example, the fact that
19  celecoxib, Celebrex, is a drug that's going to be
20  used by elderly fold like me who climb too much
21  for life.  So one year is better than six months.
22  Five years is going to be better than six months
23  too.
24        So that's one aspect to it, but it's

43

1  fundamental that if you design a study that's
2  designed to do certain things, a whole lot of
3  statisticians and clinicians get together and
4  design a study, then you don't chop and change
5  with it en route because you change all sorts of
6  aspects about it including its statistical
7  credibility if you do that.
8        So those are two answers, a clinical
9  one and a meaning answer.
10    Q   Are you familiar with the statistical
11  term "type one error"?
12    A   Yeah.
13    Q   Okay.
14    A   Well, yes, but I'm not a statistician,
15  and I emphasize I am not a statistician.  I
16  definitely am not.
17    Q   Are you -- do you have an
18  understanding of type two error as well?
19    A   I think so.
20    Q   And --
21    A   But I'm not going to enlarge on that.
22    Q   All right, going back to Exhibit 45,
23  would you please look at the second page?
24    A   (Witness so doing).

44

1    Q   In the second full paragraph, there's
2  a quote by you I'm going to read into the record.
3  It says, "That may be so, but the fact is that we
4  have these cases, for example, the class study,
5  for example, the bigger study about which the
6  present fuss is going on, where journals were
7  very directly lied to and misled."  Do you see
8  that?
9    A   Yes.
10    Q   And as far as you know, is that a
11  correct quote?
12    A   No.
13    Q   Well, what is wrong with it?
14    A   "Bigger" should be "VIGOR" --
15    Q   Ah.
16    A   -- V-I-G-O-R.  That concerned
17  rofecoxib or Vioxx.
18    Q   Other than that change, is it a
19  correct quote?
20    A   I imagine.  This was a very trying
21  interview because -- well, it doesn't matter
22  whether it was trying or not, does it?
23    Q   Do you still agree with the statement
24  that I just read into the record with the

45

1    correction that you made?
2    A    Yes.
3    Q    And --
4    A    Yes.
5    Q    -- when you say, "where journals were
6    very directly lied to and misled," were you
7    referring by example to the authors of the JAMA
8    article lying to and misleading JAMA?
9    A    Yes.  And the Advantage VIGOR and
10   approve studies which had to do with rofecoxib and
11   Vioxx.  Actually -- well --
12   Q    Do you mean to say that you had an
13   opinion that the authors of an article about that
14   study had also lied to --
15   A    No.
16   Q    I'm sorry, let me just finish.
17   (Continuing) -- to some journal?  Go ahead.
18   A    Mr. Montgomery, I'm so sorry, I
19   interrupted you.  Would you mind asking your
20   question again?
21   Q    Sure.  I'm just trying to understand
22   the relevance of VIGOR as you were just
23   explaining it in your quote here as distinct from
24   the quote that you made on the previous page.

46

1    A    I'm just saying that in both the class
2    study and the VIGOR study, and indeed in the
3    other ones, misrepresentations were made by the
4    authors to the journals, but the important ones
5    are the class and the VIGOR ones.
6    Q    All right, going back to the quote we
7    just discussed on the second page of Exhibit 45,
8    is the basis for your belief that JAMA was lied
9    to and misled by the authors of the JAMA article
10   the same as what you have already put on the
11   record?
12   A    Cathy DeAngelis and the FDA (nodding).
13   Q    And what about them?
14   A    That's right, they have a basis for
15   these conclusions.
16   Q    What I want to just clarify is you
17   explained regarding your quote on the previous
18   page why you believe that JAMA had been lied to.
19   A    Yes.
20   Q    And I want to confirm that your basis
21   for the statement on the second page that JAMA
22   had been lied to is the same?
23   A    Yes.
24   MR. MONTGOMERY:  Okay.  I'd like to ask the

47

1    court reporter to mark what will be Exhibit 46.
2    (Deposition Exhibit No. 46
3    was marked for ID)
4    THE VIDEOGRAPHER:  If I could just switch
5    tapes here?
6    MR. NELSON:  All right, why don't we take
7    five minutes?
8    MR. MONTGOMERY:  Sure.
9    THE VIDEOGRAPHER:  This is the end of
10   Video 1.  The time is 2:33 p.m.  The running time
11   of this tape is 58 minutes and 59 seconds.
12   (Recess taken.)
13   THE VIDEOGRAPHER:  This is the start of
14   Video No. 2.  The time is 2:41 p.m.
15   MR. MONTGOMERY:  All right, for the record,
16   Exhibit 46 is a transcript of an interview on ABC
17   dated May 29th, 2002.
18   BY MR. MONTGOMERY:
19   Q    It's -- I think it's right there
20   (indicating).  Now, I'm only going to ask you
21   about a quote on Page 79 of the interview, but
22   feel free to look through as much of it as you
23   need.
24   A    On which page, 79?

48

1    Q    79.
2    A    Thank you.
3    Q    All right, do you recall this
4    interview in general?
5    A    Yeah.  Poor Peter Jennings.
6    THE REPORTER:  I'm sorry, what did you say?
7    THE WITNESS:  I'm sorry.  I said, "Poor
8    Peter Jennings."
9    THE REPORTER:  Okay, thank you.
10   THE WITNESS:  He was a nice guy.
11   BY MR. MONTGOMERY:
12   Q    Would you look to the bottom of the
13   page?  It's the second-to-last quote from you
14   starting, "If only the good news".  Do you see
15   that?
16   A    Yes.
17   Q    Okay, I'm going to read it into the
18   record.  It says, "If only the good news about a
19   drug is published and never the bad news, then a
20   false impression is given of the quality and
21   effectiveness of that drug.  It may be entirely
22   false."  As far as you know, is that a correct
23   quote?
24   A    Yes.

49

1    Q    And do you still agree with that

2    statement?

3    A    Yes.

4    Q    Do you believe that that is a fair

5    characterization of the JAMA study at issue here?

6    MR. HALPER:  Objection to form.

7    THE WITNESS:  I'd like you to restate that

8    question, because I never thought of it like

9    that.

10   BY MR. MONTGOMERY:

11   Q    Sure.  All right, I'm going to be

12   asking specifically about the JAMA article --

13   A    Yes.

14   Q    -- and I'll just take it one piece at

15   a time here.

16   A    Yeah.

17   Q    The first part of your quote says, "If

18   only the good news about a drug is published and

19   never the bad news".  So would it be fair to say

20   in your estimation that the JAMA article included

21   the good news, but did not include the bad news?

22   MR. HALPER:  Objection to form.

23   THE WITNESS:  I think it might hurry things

24   up if I say that publication bias, which is the

50

1    tendency of authors to complete, researchers to

2    complete and submit to journals and get published

3    positive results, is a very serious matter that

4    I've worried about since 1989 and have written on

5    it, and it's very serious.

6    But that is not what concerned me

7    about this.  This was a playing of trust and of

8    plain speaking.

9    BY MR. MONTGOMERY:

10   Q    Let's just talk about Exhibit 3 then

11   more specifically.

12   Is it correct to say that you've

13   testified that in your opinion the presentation

14   of data in the JAMA article -- I'm sorry.

15   A    Yeah.

16   Q    I'll wait for you to find it.

17   A    This is 3.

18   Q    All right.  Is it -- in your opinion

19   is the presentation of data in the JAMA article

20   deceptive?

21   A    Yes.

22   Q    To your knowledge, is all of the data

23   that's contained in the JAMA article correct?

24   A    I don't know.

51

1    Q    Do you have any reason to believe that

2    it -- there's any incorrect data in the JAMA

3    article?

4    A    I just don't know.

5    Q    All right, let's assume, if you will,

6    that all of the data in the JAMA article is

7    correct as presented.

8    A    (Nodding).

9    Q    Okay, given that assumption, would you

10   still believe that the presentation was

11   deceptive?

12   A    The issue here -- yes, because the

13   issue has to do with the presentation of how long

14   a study, how many studies and the full results --

15   Q    All right, let me --

16   A    -- or the fuller results.

17   Q    I don't mean to be repetitive, but let

18   me just clarify.

19   Why do you believe that the JAMA

20   article would be deceptive even if all of the

21   data it contains concerning six months was

22   completely accurate?

23   A    Well, if a study went on for a year or

24   whatever and it's represented that the entire

52

1    study is six months and there is other aspects

2    how so, then that is in the nature of things

3    deceptive.

4    Now, there were other things too which

5    I think are detailed in that second slide.  Some

6    of them, anyhow.

7    Q    I'd like to show the witness what's

8    previously been marked as Exhibit 22.

9    For the record, Exhibit 22 is an

10   e-mail chain starting with an e-mail from Mona

11   Wahba, W-A-H-B-A, to Stephen Cristo, C-R-I-S-T-O,

12   dated May 22nd, 2001.

13   Just let me know when you've had a

14   chance to look through it.

15   A    Yeah.

16   Q    All right, do you recognize any of the

17   names on this?

18   A    Yes.

19   Q    Which ones?

20   A    Well, Lefkowith was one of the authors

21   of the prior study, I'd have to go through them,

22   wouldn't I?

23   Q    Yesm I'm actually looking for if you

24   personally know any of the people.

53

1   A   No.

2   Q   Okay.

3   A   No.

4   Q   All right, please take a look at the

5   second page.

6   A   (Witness so doing).

7   Q   The first full email where it says,

8   "Dear All," do you see that?

9   A   Yes.

10   Q   And you see it says "Please find

11   attached two draft CLASS manuscripts (GI and CV)

12   from Jim Lefkowith's group."  Do you see that?

13   A   Yes.

14   Q   All right, now, I'd like to direct you

15   to the first page.  See the first full email

16   there that starts with "Dear All"?

17   A   Yes.

18   Q   And there's a quote, it says, in the

19   second paragraph, second sentence, "We are also

20   cherry picking the data (using six months as --

21   6 m as a study duration)."  Do you see that?

22   A   Yes.

23   Q   Did you see it?

24   A   Yes.

54

1   Q   Okay.  Have you heard the term "cherry

2   picking" in the context of medical studies

3   before?

4   A   Yes.

5   Q   And do you have a general

6   understanding of what it refers to?

7   A   Yes.

8   Q   And, generally speaking, what do you

9   understand it to mean?

10   A   Well, it's what you're told not to do.

11   If you -- you're strongly inclined to find one

12   answer, then you pick those patients, those

13   points that select that answer.  You drop or

14   don't drop outliers, you -- et cetera.  You

15   choose.  You cherry pick.

16   Q   And is that improper scientific

17   contact -- conduct, to cherry pick?

18   A   I think it's rather like a phrase,

19   "with all due respect".  If the term all due

20   respect is used, it can mean with due respect,

21   but we all know when people say "with all due

22   respect", they mean no respect whatsoever, you

23   see.

24   So cherry picking, selection of data

55

1   has to be done all the time.  That's science.

2   You have to make judgments, but cherry picking is

3   rather easier to judge in a trial than most

4   because doing a trial is exceedingly expensive,

5   very tedious, an enormous undertaking, and I have

6   huge sympathy with the pharmaceutical companies

7   that have to undertake this, huge.  It's very

8   difficult to accomplish that task.

9   But the rules were laid out in 1948 by

10   four people, still alive -- well, one died at 106

11   the other day.  The rules for doing a blinded,

12   randomized clinical trial were laid out and have

13   been refined since, but there's no Nobel Prize

14   waiting for anyone who does a good clinical

15   trial.

16   It's all -- there are books about how

17   to do it, and what -- and so selecting data in a

18   clinical trial, you can decide beforehand what

19   you're going to select, for example, and you've

20   got to be exceedingly careful not to select the

21   data in a selective way, positively way.  And

22   it's very difficult.  You have to abandon all

23   your feelings.  It's very difficult.  Boy,

24   that's -- hum.

56

1   Q   So is it your understanding that the

2   rules regarding the conduct of clinical trials

3   prohibit the cherry picking of data?

4   A   Well, it's, as I said with all due

5   respect, cherry picking of the nature, if you use

6   the word "cherry picking", you're using it in a

7   derogatory fashion.  You're saying this was --

8   this selection was improper.

9   Q   So that I mean --

10   A   That's what you're saying.

11   Q   So that, by definition, would cherry

12   picking the data be improper?

13   MR. HALPER:  Objection to form.

14   THE WITNESS:  By nature of -- by the -- the

15   use of the term says it's improper, I would have

16   thought, but, obviously, at this point I'm

17   not a linguist, etymologist, whatever the hell I

18   am not supposed to be --

19   BY MR. MONTGOMERY:

20   Q   All right, just to clarify, I'm only

21   asking your understanding of the term --

22   A   Yes.

23   Q   -- to the best of your ability.

24   A   I've never heard the term cherry

57

1  picking used in an admirable way in statistics or
2  anything else.
3      Q    All right, having read the JAMA
4  article, did -- did it disclose that the authors
5  were cherry picking the data was presented in
6  that article?
7      MR. HALPER:   Objection to form.
8      THE WITNESS:   I'd answer that by saying
9  they chose to disclose the six-month data.  I
10  think that's something slightly different than
11  what I would call cherry picking, but I grew up a
12  physiologist doing a different type of research
13  in general, though I have published a randomized
14  clinical trial, at least one.  I don't know if
15  I've done more.
16  BY MR. MONTGOMERY:
17      Q    Just to clarify your answer there, did
18  you mean to say that it's your understanding that
19  the JAMA article disclo -- actually, can you read
20  his response back?
21      THE REPORTER:   Sure.
22          (Record read.)
23  BY MR. MONTGOMERY:
24      Q    All right, so what you were describing

58

1  there, to be clear, were you saying that's what
2  the JAMA article was saying, that it was
3  presenting certain data as opposed to cherry
4  picking or were you saying in your opinion there
5  was no cherry picking?
6      MR. HALPER:   Objection.
7      THE WITNESS:   I'm not saying anything about
8  cherry picking.  It refers to something slightly
9  different, I believe.  That's my interpretation
10  of this term.  That's what I'm saying.
11  BY MR. MONTGOMERY:
12      Q    Okay, I'd like to show the witness
13  what's previously been marked as Exhibit 28.
14          All right, once again, you can read as
15  much of this document as you want, but I'm only
16  going to ask you about one paragraph on the third
17  page.
18      A    (Witness reviewing document).
19      Q    Well, if -- you can write on it if you
20  want, but we'll just have to mark it -- or we'll
21  just have to say for the record to make it clear
22  that it wasn't there originally.
23          All right, I'd like you to look at the
24  third page of Exhibit 28.  That number in the

59

1  right-hand corner is -- ends 477.  It's a Bates
2  number we refer to those as just in case -- all
3  right, I'd like you to look at the third full
4  paragraph that starts with "a bit of data
5  massage".
6          Okay, I'll read it into the record.
7  "With a bit of data massage, what Steve Geis and
8  his team have done is to focus on the 6 month
9  data, for no other reason that than it happens to
10  look better, and this time they concentrate on
11  the non-aspirin treated patients, and ignore the
12  fact that at no time interval did we see a
13  statistically significant difference with
14  diclofenac, whether one looks at patients taking
15  aspirin or not, at 6 or at 12 months."
16          Have you ever seen this document
17  before?
18      A    No.
19      Q    Okay.  Let's start with the phrase
20  "data massage".  Have you heard that phrase used
21  in the context of clinical studies before?
22      A    Yes.
23      Q    And do you have a general
24  understanding of what it means?

60

1      MR. HALPER:   Objection to the form.
2      THE WITNESS:   Yes.
3  BY MR. MONTGOMERY:
4      Q    Generally speaking, what's your
5  understanding of the term?
6      A    It comes under the same category, of
7  course, as cherry picking.  It means -- well, a
8  statistician -- I've already said I'm not one --
9  might say, If you torture data enough, you can
10  get something out of it.
11          And massaging the data sometimes means
12  leaving things out, saying that's irrelevant
13  and -- or using a different -- an inappropriate
14  statistical test or selecting, well, we'll miss
15  out the first month because everyone was getting
16  used to the pill and whether it's
17  the -- that sort of thing.  It's thought to be a
18  bad -- it is bad.
19      Q    Would it be a fair characterization to
20  call -- define data massage as analyzing data in
21  order to reach a predetermined conclusion?
22      A    It tends to be that.  That's what I
23  would think.  I haven't looked that up.  You
24  know, I'm sure it's in a phrase book somewhere.

61

1    Q    All right, now I'd like to look at the
2    part of the quote that I read into the record
3    which states that, "what Steve Geis has done is
4    to focus on the 6 month data mfor no reason -- no
5    other reason than it happens to look better."
6    Do you see that part?
7    A    Yeah.
8    Q    Now, having read the JAMA article, as
9    you have, to your knowledge, is that fact,
10   assuming it to be true, disclosed in the JAMA
11   article anywhere?
12       MR. HALPER:   Objection. Objection to form,
13   and I think it calls for speculation, but --
14       MR. MONTGOMERY:  All right, I'll rephrase
15   the question, actually.
16   BY MR. MONTGOMERY:
17       Q    Having read the JAMA article, to your
18   knowledge, is that fact, that Steve Geis and his
19   team focused on the six month data, for no other
20   reason than it happens to look better, disclosed
21   in the JAMA article anywhere?
22       MR. HALPER:   Objection to the term "fact".
23       THE WITNESS:  I don't believe so.
24       MR. MONTGOMERY:  I'd like to ask the witness

62

1    to look at what's previously been marked as
2    Exhibit 4.
3        MR. NELSON:   Thank you.
4        MR. MONTGOMERY:  Oh, wait.  I'm sorry, I
5    have the wrong -- can we go off the record for a
6    minute?
7            (Discussion off the record.)
8        MR. MONTGOMERY:  Back on the record.
9        THE VIDEOGRAPHER:  Recording.
10       MR. MONTGOMERY:  At this time, I would like
11   to ask the court reporter to mark what will be --
12   what has previously been marked as Exhibit 4, and
13   I would like to thank defense counsel for
14   generously sharing their copies.
15       THE WITNESS:  Thank you.
16       MR. MONTGOMERY:  For the record, Exhibit 4
17   is an editorial published in the September 13th,
18   2000 issue of JAMA entitled, "COX-2-Selective
19   NSAIDs New and Improved?"
20   BY MR. MONTGOMERY:
21       Q    Is your understanding sitting here
22   today that the class trials, as you've described
23   them, lasted twelve months or longer?
24       A    Yes.

63

1    Q    All right, looking at Exhibit 4, have
2    you seen this before?
3    A    Yes.
4    Q    And is this an editorial that was
5    published, along with what we've been calling the
6    JAMA article, in the September 13th, 2000 issue
7    of JAMA?
8    A    Yes.  I'd forgotten that Lichtenstein
9    was a co-author.  So it's years since I read it,
10   but I read it when it came out at my office at
11   BU, Boston, I think, as I remember.
12   Q    I would like to direct you to just one
13   sentence in this editorial.  It's on the second
14   column of the first page, the first full
15   paragraph that starts "Previous studies".  Do you
16   see that paragraph?
17   A    Yes.
18   Q    All right, in the middle of that
19   paragraph, there's a description of the class
20   study.  It starts, "In this issue".  Do you see
21   that?
22   A    Yeah.
23   Q    All right, I'll read that into the
24   record.  It says, "In this issue of THE JOURNAL,

64

1    Silverstein et. al. report the results of a
2    6-month randomized, double-blind, controlled
3    trial comparing the ulcerogenic potential and
4    upper GI toxicity of celecoxib in individuals
5    with osteoarthritis (OA) or rheumatoid arthritis
6    (RA)."  Do you see that?
7    A    Yes.
8    Q    Is it your understanding that is an
9    incorrect description of the class trial?
10   A    Oh, yes.
11   Q    And would it be fair to say in your
12   opinion that's a false --
13   A    It's a --
14   Q    I'm sorry?
15   A    It's a correct description of the
16   reported -- of the report.  It's incorrect
17   description of what went on.
18   Q    Would it be fair to say that that's --
19   that statement -- that description of the class
20   trial that I just read into the record was false?
21   A    Yes.
22       MR. MONTGOMERY:  I'd like the court reporter
23   to mark what will be Exhibit 47.
24

65

1          (Deposition Exhibit No. 47
2          was marked for ID)
3    BY MR. MONTGOMERY:
4          Q    Once again, you can read as much as
5    you want.  I'm only going to ask you about the
6    quote from you at the bottom of the first page
7    that goes on to the top of the second page.
8          For the record, Exhibit 47 is an
9    article from Business Week dated June 24th, 2002
10   with a headline "The Credibility Gap in Drug
11   Research."
12         A    Yes.
13         Q    All right, I'd like to read part of
14   that into the record starting on the bottom of
15   the first page.  It says, "The studies authors,
16   including Pharmacia 'were not open with us" -- I
17   got to restart that.  Strike what I just said.
18         I'm going to read part of the article
19   into the record.  It says, "The study's authors,
20   including Pharmacia, 'were not open with us,' he
21   says.  'They signed letters saying the studies
22   had all the relevant stuff,' but 'they had
23   contradictory results when they sent us this
24   paper, and they should have revealed them to

66

1    us.'"  "I'm sorry, "'And they didn't.'"  Do you
2    see that?
3          A    Yes.
4          Q    Is the quote from you contained in
5    that excerpt correct?
6          A    I imagine.  It sounds like me.
7          Q    Now, do you remember giving this
8    interview?
9          A    I give a lot of interviews.  I can't
10   specifically remember this.
11         Q    The quote I just read into the record
12   though, that sounds accurate to you?
13         A    Yeah.
14         Q    Okay, do you still agree with it?
15         A    Yes.
16         Q    Where you say, "They signed letters
17   saying the studies have all the relevant stuff,"
18   what are you referring to?
19         A    We have letters -- they keep changing
20   now, but that we haven't sent stuff elsewhere,
21   we're sending you all the relevant stuff, and so
22   on.  I don't have them in front of me now, but
23   that's certainly what we used to do.
24         Q    And that's what you were referring to

67

1    in that quote?
2          A    Yeah.
3          Q    All right, turning --
4          A    However --
5          Q    I'm sorry, go ahead.
6          A    No.
7          Q    All right.  Turning to the second page
8    where you say -- well, starting on the first
9    page, "They had contradictory results when they
10   sent us this paper, and they should have revealed
11   them to us'" --
12         A    Um-hum.
13         Q    Why did you believe that they should
14   have revealed to you the contradictory results?
15         A    Well, for all the reasons that we've
16   discussed.  I'm a -- the only virtue of getting
17   older is that you become a patient or if you
18   bounce off a lot of cliffs, as I've done, and
19   that gives you a different view, and you rather
20   value the idea that the doctor's prescribing hand
21   is guided by fact rather than fiction.
22         Q    And in this case, are you
23   characterizing the JAMA article as fiction?
24         A    No, I was saying I don't think it is

68

1    fiction.  I think it's partial truth.
2          Q    All right, at this time, I'd like to
3    ask the witness to look at what's previously been
4    marked as Exhibit 36.
5          Before we move on to 36, I just want
6    to -- I can't recall whether I asked you -- the
7    quote I read into the record for you from
8    Exhibit 47, do you still agree with everything
9    you said there?
10         A    Yes.
11         Q    Okay.
12         A    And including the -- I'm asking here.
13   Are we talking about the next paragraph as well?
14         Q    No, just the part I read into the
15   record.
16         A    Just the part, yes, because that --
17   yeah.  Thank you.
18         Q    Have you seen Exhibit 36 before --
19         A    Yeah.
20         Q    -- or a copy of that?
21         A    Yeah.
22         Q    And what is it?
23         A    It's the -- authorship criteria,
24   the "Authorship Criteria and Responsibility,

69

1  Financial Disclosure, Copyright Transfer, and
2  Acknowledgment" as of the end of August 2001.
3       So just before this paper came in,
4  which is what you're talking about, or before it
5  was published, though I don't know whether it
6  was -- whether it was the same, earlier that
7  year.
8       Q   All right, actually --
9       A   Because this is a developing document.
10  I'm just being cautious here.
11      Q   Sure.  I'd like to point out the date
12  is actually -- at the lower right-hand corner is
13  actually after the JAMA article was published.
14      A   Oh, I'm sorry.  January 2001, of
15  course.
16      Q   Yes.
17      A   I'm sorry.
18      Q   That's okay.  All right, there's
19  different sections to this document I'd like to
20  talk about.  The first section entitled,
21  "Authorship Responsibility, Criteria, and
22  Contributions", do you see that?
23      A   Yes.
24      Q   Do you have an understanding of what

70

1  that -- the purpose of that section is?
2       A   I should have.  They're there
3  before -- because of me.
4       Q   All right, what is the purpose of that
5  section?
6       A   Not entirely because of me, but the
7  idea is to have people stand up behind what they
8  publish.
9       It was my experience at the New
10  England Journal and then initially at JAMA was
11  things happened after publication of a
12  document -- of an article.  The press conference
13  was held, lots of credit.  When blame came, no
14  one around, lots of pointing of fingers, Not me,
15  everyone else's fault.
16      The idea is to just remind people of
17  their responsibilities.  It's what lawyers call
18  notice, right?  But all it is saying is these are
19  the -- it's drawing attention to the some of the
20  norms of science, that's all.
21      Is this degrading, as I was once
22  asked?  Yes.  It's pathetic we have to do this.
23      Q   And is it your understanding that each
24  of the authors of the JAMA article either signed

71

1  a disclosure such as Exhibit 36 or something
2  substantially similar?
3       A   I have no idea, but I -- I don't know.
4       Q   Let me ask it a different way.  As of
5  2000, were the authors of articles published in
6  JAMA required to sign disclosures similar to
7  Exhibit 36?
8       A   Yes.  I wasn't being cute.  I've seen
9  all authorsh -- one person sign all the
10  signatures.  I've seen the editorial system
11  break down.  That's my understanding.
12      Q   Do you believe that as of 2000 --
13  well, scratch that question.
14      Is it correct to say that, as you
15  testified before, you have some understanding of
16  what clinicians who read JAMA expect of the
17  articles that are published in it?
18      MR. HALPER:  Objection to form.
19      THE WITNESS:  Yeah.
20  BY MR. MONTGOMERY:
21      Q   All right, with regard to authorship,
22  do you believe that the clinicians who read JAMA
23  in general have an understanding that everyone
24  listed as an author in an article published in

72

1  JAMA meets more or less the criteria set forth in
2  Exhibit 36?
3       MR. HALPER:  Objection, calls for
4  speculation.
5       THE WITNESS:  I just don't know.  I would
6  hope so.
7       MR. MONTGOMERY:  I'd like to ask the court
8  reporter to mark what will be Exhibit 48.
9            (Deposition Exhibit No. 48
10            was marked for ID)
11      MR. MONTGOMERY:  For the record, Exhibit 48
12  is an article from the Wall Street Journal Asia
13  dated May 19th, 2004, headline, "Merck Takes
14  Author's Name Off Vioxx Study."  Vioxx has two
15  Xs.
16  BY MR. MONTGOMERY:
17      Q   All right, and I'm only going to ask
18  you about the -- your quote in the fourth full
19  paragraph starting "Throughout".
20      Okay, the quote I'm looking at at the
21  bottom of that paragraph says, "If the people up
22  there in the list of authors aren't responsible
23  for everything in the article, something's wrong.
24  It's completely unethical."  Do you see that?

73

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Does that appear to be an accurate |
| 3 | quote? | |
| 4 | A | Very much so. |
| 5 | Q | And do you still agree with it? |
| 6 | A | Very much so. |
| 7 | Q | When you said "the authors" -- when |
| 8 | you refer to authors being responsible for | |
| 9 | everything in the article, did you mean as you | |
| 10 | said before, willing to take the blame if it's | |
| 11 | found to be defective? | |
| 12 | A | Yes. |
| 13 | Q | Did you -- |
| 14 | A | It -- |
| 15 | Q | I'm sorry, I didn't mean to interrupt |
| 16 | you? | |
| 17 | A | It's apparent to me and to editors |
| 18 | more and more that a disconnect seems to happen | |
| 19 | that's as I've told you. | |
| 20 | I invited a -- Josh Lederberg, who got | |
| 21 | the Nobel Prize for molecular biology, big | |
| 22 | discoveries, and I've asked him what he thought, | |
| 23 | and I got him to say -- I'm trying to get the | |
| 24 | words right, but they went like this: | |

74

| | | |
|---|---|---|
| 1 | "The manuscript submitted for | |
| 2 | publication is a testament under oath.  That's | |
| 3 | how seriously a scientist should take what they | |
| 4 | write.  It's their only product.  It's what they | |
| 5 | make their fame on, fortune, everything else, is | |
| 6 | their -- their scientific article.  It better be | |
| 7 | right.  They have to stand behind it."  And he | |
| 8 | said something that I profoundly believe. | |
| 9 | Q | In addition to being willing to take |
| 10 | responsibility if something's found to be wrong | |
| 11 | with an article, were you also referring to the | |
| 12 | idea that being listed as an author also means | |
| 13 | that you actually contributed to the content of | |
| 14 | whatever article is being published? | |
| 15 | A | Yes.  I've written several articles |
| 16 | and done several studies on exactly that. | |
| 17 | Q | And do you believe it's unethical for |
| 18 | an individual to be listed as an author in a | |
| 19 | journal article who did not actually contribute | |
| 20 | to the contents of the article? | |
| 21 | A | Yes.  That's ghost authorship -- well, |
| 22 | that's guest authorship usually, and ghost | |
| 23 | authorship is when the person who wrote it isn't | |
| 24 | there or up there.  Another bad, bad, bad habit. | |

75

| | | |
|---|---|---|
| 1 | Q | And why is it unethical in your |
| 2 | opinion? | |
| 3 | A | Well, because that person or these -- |
| 4 | those people who are responsible aren't there | |
| 5 | openly being responsible to the reader. | |
| 6 | And believe me, problems arise later | |
| 7 | often.  And I'm not talking just misconduct, | |
| 8 | though that's one of them, but just questions | |
| 9 | about the science. | |
| 10 | Q | Have you published any articles |
| 11 | concerning the ethics of authorship in scientific | |
| 12 | articles? | |
| 13 | A | Yes. |
| 14 | Q | Approximately how many? |
| 15 | A | A dozen. |
| 16 | Q | And where are -- |
| 17 | A | But -- |
| 18 | Q | I'm sorry. |
| 19 | A | -- some of them have been |
| 20 | investigating what people do and things like | |
| 21 | that. | |
| 22 | Q | And if somebody -- |
| 23 | A | I suppose.  I'm guessing.  I don't |
| 24 | know. | |

76

| | | |
|---|---|---|
| 1 | Q | I understand.  I'm just looking for |
| 2 | your best estimate. | |
| 3 | A | Yes. |
| 4 | Q | Have some of those articles been |
| 5 | printed in peer-reviewed journals? | |
| 6 | A | Yes. |
| 7 | Q | Would you characterize the practice of |
| 8 | guest writing, as you've described it, as | |
| 9 | deceptive? | |
| 10 | A | It's a little sin, I suppose.  It's |
| 11 | naughty.  It's not bad.  Bad is when you -- | |
| 12 | you're deceptive about your report.  I think | |
| 13 | asking -- giving somebody a place on the line | |
| 14 | tends to produce terrible effects, but it's a | |
| 15 | little sin. | |
| 16 | Q | Would you think -- would you |
| 17 | characterize it as misleading? | |
| 18 | A | Not in the same way as the -- what |
| 19 | we've been talking about before. | |
| 20 | Q | But -- |
| 21 | A | Yes, it's misleading.  Usually, it's |
| 22 | putting some Puba like me on the line to give the | |
| 23 | thing credibility, which in my case, it doesn't. | |
| 24 | MR. MONTGOMERY:  Does anybody need a break | |

**77**

1  or can we just keep moving forward?
2      MR. NELSON:  I'm okay as long as I can keep
3  standing up.
4      MR. MONTGOMERY:  It's your building.
5      MR. NELSON:  Yeah.
6      THE WITNESS:   Well, as long as the building
7  keeps standing up.
8      THE VIDEOGRAPHER:   The tape will be over in
9  thirteen minutes if you want to use that as --
10     MR. MONTGOMERY:  Perfect.  I would like to
11  ask the court reporter to mark what will be
12  Exhibit 49.
13         (Deposition Exhibit No. 49
14          was marked for ID)
15  BY MR. MONTGOMERY:
16     Q   Have you seen Exhibit 49 before?
17     A   Yes, six years ago.
18     Q   Okay, is it a letter to you from a
19  Jennifer -- I'm going to have to spell this.  I
20  have no idea how to say it.
21     A   Rocovec (phonetic).
22     Q   Rocovec, H-R-A-C-H-O-V-E-C.  And is --
23  did this letter also attach a manuscript or a
24  Letter to the Editor for JAMA?

**78**

1      A   Yeah.
2      Q   Do you know why this was sent to you
3  in particular?
4      A   (Shaking head).
5      Q   Did you play any part in reviewing it?
6      A   No. I have no idea.  I'm embarrassed
7  that I'd forgotten about it.  I handed it on to
8  Letters, as I recollect.  That's it.  And it
9  shows my memory defective.
10     Q   All right, I'd like to ask the witness
11  to look at what's previously been marked as
12  Exhibit 31.
13     A   (Witness so doing).
14     MR. NELSON:  You know, before you get too
15  far into 31, you know it's missing a page?  Just
16  look at the Bates numbers.
17     MR. HALPER:  This is the same problem.
18     MR. MONTGOMERY:  It's the same problem we
19  had before.
20     MR. NELSON:  Yeah.
21     MR. MONTGOMERY:  How much longer on the
22  tape?
23     THE VIDEOGRAPHER:  About nine minutes.
24     MR. MONTGOMERY:  All right, let me go on to

**79**

1  a different exhibit, and we'll try to fix it.  In
2  the meantime, why don't you give that back to the
3  court reporter, and she'll -- we'll find a copy
4  that's got the right -- all the pages.
5      THE WITNESS:  Thank God for that.  Is this
6  (indicating) still on?
7      MR. MONTGOMERY:  Yes.  All right --
8      THE WITNESS:  Well, I guess I'm speaking to
9  the right person.  I thought I'd gone nuts
10  looking at that date.
11     MR. MONTGOMERY:  I apologize.
12     THE WITNESS:  As you saw, I was busy -- all
13  right, continue.
14     MR. MONTGOMERY:  All right, I'd like to ask
15  the court reporter to mark what will be
16  Exhibit 50.
17         (Deposition Exhibit No. 50
18          was marked for ID)
19     MR. MONTGOMERY:  All right, for the record,
20  Exhibit 50 is a Business Week article dated June
21  28th, 2004 entitled "When Medicine and Money
22  Don't Mix".
23  BY MR. MONTGOMERY:
24     Q   I'm just going to ask you about your

**80**

1  quote in the middle of the second page.
2      A   (Witness reviewing document).
3      Q   All right, I'm going to read into the
4  record an excerpt, which is not all a quote from
5  Dr. Rennie.  It says, "It's impossible to know
6  how prevalent ghost writing is.  But Dr. Drummond
7  Rennie, Professor of Medicine at the University
8  of California San Francisco and Deputy Editor of
9  the Journal of the American Medical Association
10  believes it is 'pervasive, deceptive, and
11  disgraceful.'"
12         Does that appear to be an accurate
13  quote to you?
14     A   Yes.
15     Q   Do you still agree with it?
16     A   Yes.
17     Q   Could you explain to me again what the
18  difference is between ghost writing and guest
19  writing in this context?
20     A   Let's do it backwards.  A guest writer
21  is when I, a junior, put Cathy DeAngelis's name
22  on a paper and send it in with the hope that that
23  paper will -- into a journal with the hope that
24  that paper will be published more easily, more

81

1  quickly and get more attention simply because her
2  name is on it even if she did nothing and
3  sometimes without her knowledge, and it's been
4  the downfall of quite a lot of senior people
5  who've had fraudulent articles published in that
6  way with their names attached.
7      Now, your writing is the habit,
8  typically, of paying a contract research
9  organization, the people in it, to write papers
10  and then hand them on to the people whose names
11  are on the paper and without the name of the
12  person who actually wrote the thing.
13      There's one in this connection with
14  the Advantage study published in the Annals of
15  Internal Medicine.  Dr. Liise -- this is on
16  Vioxx -- when interviewed by the New York Times
17  said something along the lines, "Merck is the
18  first author and the principal investigator."  He
19  was -- the study was thought up, designed,
20  conducted, analyzed, the data collected,
21  analyzed, written up, and the paper in full form
22  sent to me to add my name to it.  I didn't know
23  the patients who died, et cetera.  That's ghost
24  writing because the person who wrote that paper

82

1  nowhere appears on the list of authors, and
2  occasionally it comes out in that way.
3      Q    And why do you believe that's
4  deceptive?
5      A    Because there's no connection.  If
6  anyone complains, the author -- the senior
7  authors, as happened in that particular case,
8  says, Don't blame me, I never knew any of the
9  patients, any of the data or anything.
10      MR. MONTGOMERY:  All right, let's go off the
11  record.
12      THE VIDEOGRAPHER:  This is the end of
13  Video 2.  The time is 3:39 p.m.  The running time
14  of this tape is 57 minutes and 48 seconds.
15      (Recess taken.)
16      THE VIDEOGRAPHER:  This is the start of
17  Video No. 3.  The time is 3:45 p.m.
18  BY MR. MONTGOMERY:
19      Q    You understand you're still under
20  oath?
21      A    Yes.
22      Q    Okay, I'd like to ask the witness to
23  look at what's been previously marked as
24  Exhibit 31.

83

1      A    (Witness so doing).
2      Q    On the first page, I'm actually just
3  going to ask you about something in the
4  "Guidelines For Letters" in the lower right-hand
5  corner.
6      A    Yes.
7      Q    All right, in the middle of that
8  paragraph, it says, "A signed statement for
9  authorship criteria and responsibility, financial
10  disclosure, copyright transfer, and
11  acknowledgment is required for publication."  Do
12  you see that?
13      A    Yes.
14      Q    Does that mean that for a Letter to
15  the Editor to be published, the authors have to
16  sign a form substantially similar to what was
17  marked as Exhibit 36?
18      A    Yes, I believe so.
19      Q    And is it for the same reasons?
20      A    Yes.
21      Q    All right, would you turn to the
22  second page of Exhibit 31?
23      A    (Witness so doing).
24      Q    All right, at the top of the second

84

1  column there, there's a sentence beginning,
2  "Fourth and most important".  Do you see that?
3      A    Yes.
4      Q    I would like to read that into the
5  record.  It says, "Fourth and most important,
6  after the blind was broken, it became clear that
7  there was a differential dropout rate of NSAID
8  patients with GI intolerance or symptomatic
9  ulcers, suggesting that those patients at
10  greatest risk were no longer in the study.  This
11  type of informative censoring leads to a bias,
12  which potentially invalidates statistical
13  analysis of complicated ulcers by the log rank
14  test."  Do you see that?
15      A    Yes.
16      Q    All right, I'd like to refer to that
17  theory, as it were, as "informative censoring" as
18  a sort of a shorthand.  Is that all right with
19  you?
20      A    Yes.
21      Q    Do you have a general understanding of
22  what that -- I just read means?
23      A    I think so.
24      Q    Can you explain it to me in sort of

85

1   laymen's terms?
2        MR. HALPER:  Well, I just want to clarify.
3   Are you asking for Dr. Rennie's understanding of
4   informative censoring or what he thinks the
5   authors meant when they used that term here?
6        MR. MONTGOMERY:  Sure, his understanding.
7        MR. HALPER:  Okay.
8        THE WITNESS:  You know, I think I'm going
9   to get into trouble if I start giving -- giving
10  definitions of statistical concepts, and as I've
11  said before, I think it's a bad plan that I get
12  into that.
13  BY MR. MONTGOMERY:
14       Q    All right, and just in the most
15  general laymen's terms, would it be fair to say
16  that the informative censoring theory contends
17  that the class study became more biased as time
18  went on due to the dropout rates?  Would you feel
19  comfortable with that?
20       MR. HALPER:  Object to form.
21       THE WITNESS:  It might, but I don't think
22  that's the point is what I'm saying.
23  BY MR. MONTGOMERY:
24       Q    Sure.  I'm just trying to talk about

86

1   the theory as it's posited by someone else.  Is
2   that enough or is that still not enough?
3        A    I'm not going to say.
4        Q    Okay.  All right, the letter that
5   that's contained in --
6        MR. NELSON:  Let me go --
7        MR. MONTGOMERY:  Sure.
8        MR. NELSON:  Can I just discuss this with
9   the witness?  I mean there's a problem when a
10  witness says, I'm not going to say.  But it may
11  be we can clarify it, so let's just --
12       MR. MONTGOMERY:  Sure.  Let's go off the
13  record.
14       MR. NELSON:  Let's go outside for a second.
15            (Recess taken.)
16       THE VIDEOGRAPHER:  Recording.
17       MR. NELSON:  All right, I've spoken with
18  Dr. Rennie.  He would like to clarify his last
19  comment.  So if you would, please?
20       THE WITNESS:  I don't want you to think I'm
21  uncooperative.  That's far from the case.  I want
22  to be as cooperative as I can.
23            I don't want to make judgments based
24  on an expertise that I know a hundred people

87

1   could make an informed judgment about that, and
2   I'm not going to.  Is that cooperative?
3   BY MR. MONTGOMERY:
4        Q    Yes.  I just want to make clear I'm
5   not asking you for your opinion of the theory
6   itself, the informative censoring --
7        A    Yes.
8        Q    -- whether you think it's valid or not
9   valid, just whether you generally understand
10  what -- what it is.
11       A    Well, I'm going to say no because I've
12  seen it in different guises.  So I'm going to say
13  no.
14       Q    So the -- specifically the portion of
15  the letter that I just read into the record, you
16  don't have a general understanding of what that
17  theory is?
18       MR. HALPER:  That's a different --
19       THE WITNESS:  That's different.
20       MR. HALPER:  You're asking now Dr. Rennie
21  to talk about what the authors meant.
22       MR. MONTGOMERY:  No, no, I'm asking him --
23       MR. HALPER:  Oh.
24       MR. MONTGOMERY:  (Continuing) -- if he has

88

1   an understanding of informative censoring as it's
2   described there.
3        MR. HALPER:  Well, I'll object, and I think
4   it calls for speculation.
5        MR. NELSON:  Well, I mean I think in
6   fairness --
7        MR. MONTGOMERY:  Sure.
8        MR. NELSON:  The objection is well taken.  I
9   think that the earlier objection was, Do you mean
10  A or do you mean B?  And you said, I mean B, and
11  now I think you're asking A again.  And that's
12  fine, it's your prerogative --
13       MR. MONTGOMERY:  Sure.
14       MR. NELSON:  (Continuing) -- but I just
15  think you should make it clear that this is a new
16  question you're asking.
17       MR. MONTGOMERY:  Okay, I don't think it is,
18  but what I'm trying to say is there's a theory
19  described here, we called it informative
20  censoring, and I'm asking if he has an
21  understanding, a general understanding of what
22  that theory is.
23       THE WITNESS:  Well, I certainly understand
24  what's being said here.

89

BY MR. MONTGOMERY:

2   Q   Okay.

3   A   I think that's really -- I don't know

4   what it is you want.

5   Q   Okay.

6   A   I'm -- not want.  What -- okay.

7   Q   All right, let's -- let's just move

8   on.  Actually, before we move on, the letter that

9   we were just discussing and the quotation is from

10   a letter by Fred Silverstein, Lee Simon and

11   Gerald Faich; is that correct?

12   A   Yes.

13   Q   And did you have any role in reviewing

14   that letter prior to publication?

15   A   No.

16   Q   All right, I'd like to ask the witness

17   to look at what has previously been marked as

18   Exhibit 24.  And watch out, I actually ran out of

19   staples in my room last night, so these are

20   loose.

21        For the record, Exhibit 24 is an

22   e-mail string starting with an e-mail from Joy

23   Dicker to Mona Wahba dated August 23rd, 2001.

24        I'm only going to be asking you about

90

1   Item 4 on the second page.  Have you had a chance

2   to look at Exhibit 24?

3   A   Yes.

4   Q   Okay.

5   A   Well, part of it.  I mean --

6   Q   Do you see that it concerns a

7   meeting --

8   A   Yes.

9   Q   -- with Ken Verburg and Michael

10   Friedman with Dr. DeAngelis?

11   A   Yes.

12   Q   And is Dr. DeAngelis the Editor in

13   Chief of JAMA?

14   A   Yes.

15   Q   All right, would you turn to the

16   second page, please?

17   A   (Witness so doing).

18   Q   I'd like to read Item 4 into the

19   record.  It says, "She provided some very useful

20   advice concerning her expectations for our Letter

21   to the Editor responding to criticism -----based

22   on this advice Ken and I drafted a revision that

23   is being reviewed and worked on Tuesday evening

24   and will be circulated for approval."  Do you

91

1   see that?

2   A   Yes.

3   Q   And were -- to your knowledge, were

4   Mr. Verburg -- or Dr. Verburg and Friedman listed

5   as authors in the Letter to the Editor that was

6   eventually published?

7   A   No.  It would be Silverstein, Simon,

8   Faich.

9   Q   Okay, and I'd like you to look at

10   what's previously been marked Exhibit 39.

11   A   Thank you.

12   Q   For the record, Exhibit 39 is an

13   e-mail string starting with an e-mail from Goran

14   Ando, A-N-D-O, first name G-O-R-A-N, to Phillip

15   Needleman and several others dated August 13th,

16   2001.

17   A   Yes.

18   Q   The subject heading is "JAMA Letters

19   to the Editor."  If you would like you

20   to look at the first paragraph on the first page.

21   A   (Witness so doing).

22   Q   The third sentence reads, "Once we

23   redraft the letter we would send it to the

24   authors and get their buy-in with the intent of

92

1   making the 10 day timeline imposed by JAMA."  Do

2   you see that?

3   A   Um-hum.

4   Q   If that statement and the statement I

5   just read to you out of Exhibit 24 are correct,

6   does it appear to you that that letter was -- the

7   letter that was published in JAMA was ghost

8   written?

9   MR. HALPER:  Objection, foundation.

10   THE WITNESS:  Well, if they are correct,

11   the people -- the person who wrote this

12   (indicating) and negotiated with Dr. DeAngelis

13   and Dr. Fontanarosa are at a meeting I knew

14   nothing about until now, they weren't on -- on

15   the letter.

16   BY MR. MONTGOMERY:

17   Q   And is that ghost writing?

18   MR. HALPER:  Objection to form.

19   THE WITNESS:  You'd call it something like

20   that.

21   BY MR. MONTGOMERY:

22   Q   Would you call it something like that?

23   A   Yeah, but -- yes.  Yes, I would.  And

24   I can understand it.

93

1    Q    I'd like to ask the witness to look at
2  what's previously been marked as Exhibit 27.
3    A    (Witness so doing).
4    Q    Now, I'm only going to ask you about
5  the second-to-last page of this document, but
6  you're free to look through it if you wish.
7    A    Yes.
8    Q    For the record, Exhibit 27 is an
9  e-mail with attachments.  The email is from
10  Carolyn Wilson to George Geis and several other
11  individuals dated March 20th, 2000.
12        Just let me know when you get to the
13  second-to-last page.
14    A    Well, I'm on the second-to-last
15  page --
16    Q    So it should -- in the lower
17  right-hand corner --
18    A    But -- but hang on a moment.
19    Q    Okay.
20    A    Clearly I haven't had time to dissect
21  all this stuff (indicating).
22    Q    Sure.
23    A    And I don't know how many pages there
24  are, but it's quite a little lot, it looks.  So

94

1  I'm not quite sure what you mean, but anyhow --
2    Q    Okay, what I propose is that I'll
3  ask -- start asking you questions about this, and
4  to the extent you think maybe you'd like to look
5  at the rest of it, then you can go back and look
6  at it.
7    A    Yes.
8    Q    Does that seem fair?
9    A    (Gesturing).
10    Q    Okay.  Well, starting the
11  second-to-last page, do you see the top of the
12  page, it says, "Updated:  CLASS Steering
13  Committee"?
14    A    Yeah.
15    Q    Okay, then under "Required Attendees",
16  do you see there's several individuals listed
17  there?
18    A    Yes.
19    Q    Do you know any of those individuals
20  personally?
21    A    I don't think so.
22    Q    All right, do you see a few lines
23  underneath that, there's a list of those
24  attending?

95

1    A    Yes.
2    Q    Do you know any of those individuals?
3    A    The answer is I don't think so.  I
4  deal with thousands of people a year, you know.
5  I mean --
6    Q    I'm just looking for your -- your best
7  recollections.
8    A    Yes.
9    Q    Okay, do you see almost in the middle
10  of the page, it says, "Weekly Meeting"?
11    A    Yes.
12    Q    All right, and then underneath there,
13  there's a list of bullet points?
14    A    Yes.
15    Q    I'd like to direct you to one of the
16  bullet points toward the middle of the bottom, it
17  says, "Trial design/Issues"?
18    A    Yes, yes.
19    Q    Then the third bullet underneath that
20  says, "Worse case:  we have to attack the trial
21  design if we do not see the results we want."
22  Do you see that?
23    A    Yes.
24    Q    Have you heard that phrase before

96

1  "attack a trial design"?
2    A    That specific phrase, no.
3    Q    In the context of a clinical trial, do
4  you have an understanding of what that means?
5    A    We have to criticize it.  We have to
6  say it's meaningless, it never will produce an
7  answer, I assume, but that's an assumption.  What
8  else can it mean?
9    Q    All right, I'd like you to take a look
10  at the Letter to the Editor again --
11    A    Yes.
12    Q    -- Exhibit 31.  The second page, the
13  Bates number ending 958, Bates ending 958, the
14  same page we were looking at before --
15    A    All right.
16    MR. NELSON:  I don't know if this has Bates
17  numbers on this version.
18    MR. MONTGOMERY:  Oh, I'm sorry.  The second
19  page.
20    THE WITNESS:  Can you just give me a second,
21  please?
22  BY MR. MONTGOMERY:
23    Q    Sure.  I'm going to ask you about the
24  same quote that we went through before.

97

1    A    (Witness reviewing document).  So now
2    we're going back to the letters?
3    Q    Right.
4    A    Yes.
5    Q    All right, the second page of
6    Exhibit 31 --
7    A    You had me.  I was slightly faked out
8    because they were talking VIGOR, and I'm
9    obviously going to be looking at different things
10   from you.
11   Q    Right.  Okay, so on the second page of
12   Exhibit 31 --
13   A    Yes.
14   Q    Do you remember the language I read
15   into the record earlier that we agreed to call
16   informative censoring?
17   A    Yes.
18   Q    Okay, I'm not going to read it again,
19   but take a look at it again.
20        My question to you is whether or not
21   that theory constitutes attacking the trial
22   design?
23   MR. HALPER:  Objection, calls for
24   speculation.

98

1    THE WITNESS:  I need help here.
2    BY MR. MONTGOMERY:
3    Q    Sure.
4    A    This is talking about the class
5    steering group attacking the steering -- the
6    design of the VIGOR study; is that correct?
7    Q    I can't tell you that.  You have to
8    interpret the document to the best of your
9    ability --
10   A    So I do.
11   Q    -- how you understand it.
12   A    However, it comes under the Trial
13   design/Issues, "Do not want Merck to start with a
14   story."  And the reason I'm asking this is that
15   it seems to be a different design that's being
16   attacked by a different group.
17   Q    Right.
18   A    And so that you're -- the exact way
19   that you've phrased the question sounded a little
20   odd to me.
21   Q    Okay, I think I can simplify it for
22   you.
23   A    Thank you.
24   Q    For the purposes of this question,

99

1    let's disregard Exhibit 27 then, the class
2    steering document that we looked at, but -- we
3    did talk about just the phrase "attacking the
4    trial design" and what you generally understand
5    that to mean.
6    A    Yeah.
7    Q    So I'm not asking with -- you know,
8    anything with regard to the other document.
9    A    Yes.
10   Q    But just looking at the Letter to the
11   Editor and the informative censoring theory in
12   that letter --
13   A    Yeah.
14   Q    -- would you understand that to be
15   attacking the trial design?
16   MR. HALPER:  Objection to form.
17   THE WITNESS:  Well, I said it's critiquing.
18   And, here, the people -- the phrase that you used
19   or the bits that you used are from the people who
20   did the trial, Silverstein and others, but it's
21   basically anything -- any criticism of the
22   design, you could call an attack on the design
23   and could say, Well, that's a criticism we're
24   trying to deal with and so on.

100

1    MR. MONTGOMERY:  I would like to ask the --
2    THE WITNESS:  That --
3    MR. MONTGOMERY:  I'm sorry, go ahead.
4    THE WITNESS:  Okay.  It gives the wrong
5    impression of what I feel about this.
6    BY MR. MONTGOMERY:
7    Q    How is that?
8    A    Well, if you don't report it at all,
9    how can anyone attack what seems not to have been
10   done, least of all the authors.
11   Q    And I do want you to make sure
12   whenever I'm asking you a question that you think
13   that --
14   A    Yeah.
15   Q    -- your answer fully reflects --
16   A    Yes.
17   Q    -- your view.  So, all right, I'd like
18   to ask the court reporter to mark what will be
19   Exhibit 50.  No, what is already Exhibit 37.
20   MR. NELSON:  Excuse me, is this document
21   you just gave us 37 or is it 50?
22   MR. MONTGOMERY:  It's 37.
23   MR. NELSON:  Okay.
24

Drummond, Rennie  1/18/2007  1:30:00 PM

101

1    BY MR. MONTGOMERY:
2        Q    As always, you can read as much of it
3    as you want.  I'm going to only ask you about the
4    second full paragraph in the first page.
5            For the record, Exhibit 37 is an
6    e-mail from Mona Wahba to Leland Loose and Ethan
7    Weiner dated February 16th, 2000.
8        A    (Reviewing document).
9        Q    All right, on the first page of
10   Exhibit 37, the second full paragraph that starts
11   "Not for awhile yet," the second-to-last sentence
12   reads, "Believe it or not a draft manuscript has
13   already been written with a sort of a fill in the
14   blanks depending upon what actually happens."
15   Do you see that?
16       A    Yes.
17       Q    Are you familiar with the practice of
18   drafting a manuscript before the results have
19   been received?
20       A    It doesn't work like that.  Yes and
21   no.  It doesn't work like that.  I am very
22   familiar with the idea that when you -- when you
23   write a grant request, a very convenient thing to
24   do is to rough out tables and rough out possible

102

1    results because you have by -- you have to do
2    what are called power calculations, that is, how
3    much difference might you expect that Celebrex
4    might be compared with Naprosyn, and if that's
5    the case, how many patients will you need because
6    this can mean hundreds of millions of dollars to
7    your company and to the patients, much more
8    importantly.
9            So you have to do a lot of stuff right
10   there beforehand, and writing a paper in rough
11   draft right at the start is a smart thing to do.
12   I don't think it's talking about that, but still
13   he might be.  It's a smart thing to do because it
14   tells you -- it reminds you of all those things
15   you've got to have and have got to be able to
16   justify later.
17           Writing the full thing is a little
18   odd, and, of course -- but if it was done by Fred
19   Silverstein and gang, I'd say fair enough, you
20   had a special look.  I don't know who had the
21   first look here.
22       MR. MONTGOMERY:  I'd like to ask the court
23   reporter to -- well show the witness what's
24   previously been marked as Exhibit 38.

103

1        THE WITNESS:  Obviously, you can -- (witness
2    reviewing document).
3        MR. MONTGOMERY:  For the record, Exhibit 38
4    is an e-mail from Nancy Tam, T-A-M, to Kenneth
5    Verburg dated April 4th, 2000 with an attachment.
6    BU MR. MONTGOMERY:
7        Q    All right, does the attachment to the
8    e-mail in Exhibit 38 appear to be sort of a draft
9    manuscript of the class study?
10       A    Yeah.
11       Q    And is it of the fill in the blanks
12   variety described in Exhibit 37?
13       MR. HALPER:  Objection to form.
14       THE WITNESS:  Yes, along those lines.
15   BY MR. MONTGOMERY:
16       Q    All right, would you look at what's
17   the thirteenth page of the manuscript, Bates
18   number ending 910?  Do you see the section
19   entitled "Results" on that page?
20       A    Yes.
21       Q    And do you see all the Xs with
22   percentages after them?
23       A    Yes.
24       Q    And is the -- is that sort of draft

104

1    manuscript usual in your experience?
2        A    In my ex -- I don't know because I --
3    I would say this is way more than what I was
4    talking about.
5        Q    And you don't know whether that's
6    unusual or not?
7        A    I don't know.
8        Q    Okay, would you please turn to the
9    third page of Exhibit 38?  Did you want to expand
10   on your --
11       A    I don't know because we see the
12   finished result.  We never see this.
13       Q    So it's the -- please turn to the
14   third page of Exhibit 38.  It's the second page
15   of the manuscript.
16       A    (Witness so doing).
17       Q    All right, do you see the section
18   entitled "Methods" on that page?
19       A    (Nodding).
20       Q    All right, I'm going to read the first
21   sentence into the record.  It says, "Patients
22   with OA or RA were enrolled into one of two
23   studies simultaneously conducted for a period of
24   up to 65 weeks."  Do you see that?

105

1      A    Yes.

2      Q    And had that language been included in

3   the JAMA article, would you have understood that

4   the class study lasted longer than six months?

5      MR. HALPER:   Objection, no foundation.

6      THE WITNESS:   Yeah.  Well, yes.

7   BY MR. MONTGOMERY:

8      Q    Would you --

9      A    I was -- forgive me, I was confused by

10  the objection.

11     Q    Sure.  You can -- you can just answer

12  my question.  You don't have to --

13     MR. NELSON:   Dr. Rennie, unless I tell you

14  that you shouldn't answer, then you should answer

15  over the objection, you know.  But always give

16  the guy time to object, time to think about your

17  answer, but then if you with formulate an answer,

18  do so.

19     THE WITNESS:   My problem wasn't that.  My

20  problem was whether 65 weeks was longer than six

21  months, and I thought that that was self-evident,

22  but I could see there was something else going on

23  that I didn't appreciate.  And I wasn't being

24  rude.  I was -- that's what stopped me suddenly.

106

1   BY MR. MONTGOMERY:

2      Q    Sure.  Let me just ask again.  He can

3   object again, and then you can answer again to

4   the extent you can.

5      A    Yes.

6      Q    Had the JAMA article as it was

7   published included the language that I just read

8   into the record, would you have understood that

9   the class study lasted longer than six months?

10     MR. HALPER:   Objection, foundation.

11     THE WITNESS:   Yes.

12  BY MR. MONTGOMERY:

13     Q    Would you turn to the eighth page of

14  the manuscript, Bates number ending 905?

15     A    (Witness so doing).

16     Q    All right, do you see the section

17  entitled "Outcome Measures" on that page?

18     A    Yes.

19     Q    All right, the first sentence of that

20  reads, "The primary end point with the incidence

21  of upper GI ulcer complications during the period

22  of drug administration up to 65 weeks".  Do you

23  see that?

24     A    Yeah.

107

1      Q    Had that language been included in the

2   JAMA article, would you have understood the class

3   study to have lasted longer than six months?

4      A    Yes.

5      Q    I'd like to ask the witness to look at

6   what's previously been marked as Exhibit 21.

7      A    (Witness so doing).

8      Q    Have you ever seen Exhibit 21 before?

9      A    No.

10     Q    Have you seen final reports of other

11  clinical studies before?

12     A    Yes.

13     Q    Does this look like it's the final

14  report of the class study?

15     A    I suppose.

16     Q    All right, can you tell me the

17  document date as it's reported on the first page?

18     A    The 25th of May 2000.

19     Q    And is that prior to when the JAMA

20  article was published?

21     A    Right.  It's a month after the

22  lockdown date, four, all of the data, so --

23     Q    But it is before the publication of

24  the JAMA article; is that correct?

108

1      A    Right.

2      Q    All right, would you take a look at

3   the third page, please, Bates number ending 925?

4      A    Yes.

5      Q    All right, do you see on that page

6   there's a section entitled "Methodology" on the

7   second half of the page?

8      A    Yes.

9      Q    All right, I think it's approximately

10  the third sentence, it begins, "Treatment

11  duration".  Do you see that?

12     A    Yes.

13     Q    I'm going to read it into the record.

14  It says, "Treatment duration lasted for at least

15  26 weeks, with a maximum potential treatment of

16  52 or 65 weeks."

17     A    Yes.  Yes.

18     Q    If that language had been included in

19  the JAMA article, would you have understood that

20  the class study lasted longer than six months?

21     MR. HALPER:   Objection --

22     THE WITNESS:   Yes.

23     MR. HALPER:   (Continuing) -- foundation.

24     THE WITNESS:   Yes.

109

BY MR. MONTGOMERY:

1
2    Q    Yeah.  All right, do you see
3    underneath that there's a section entitled
4    "Number of Patients"?
5    A    Yes.
6    Q    All right, the second sentence of that
7    reads, "A total of 8,059 patients were enrolled,
8    of whom 5 -- 4,573 completed six months of
9    treatment and 3,409 completed the study."  Do
10   you see that?
11   A    Yes.
12   Q    Had that language been included in the
13   JAMA article, would you have understood that the
14   class study lasted longer than six months?
15   MR. HALPER:   Objection, foundation.
16   THE WITNESS:   Yes.
17   BY MR. MONTGOMERY:
18   Q    All right, now I'd like you to go back
19   to the JAMA article, which is Exhibit 3.
20   A    (Witness so doing).
21   Q    All right, I believe you testified
22   before that you read this article when it was
23   originally published; is that correct?
24   A    Yes.  I haven't read it for six years.

110

1    Q    Okay.  I'd like you to look at --
2    A    So nearly six years.
3    Q    -- on the first -- I'd like you to
4    look at the first page under the section entitled
5    "Participants".  Do you see that?
6    A    Yes.
7    Q    The second sentence reads, "A total of
8    4573 patients (57%) received treatment for 6
9    months."  Do you --
10   A    Yes.
11   Q    -- see that?
12   A    Yes.
13   Q    When you read that originally, did you
14   understand that the class study lasted longer
15   than six months?
16   A    I didn't reach an opinion on that.
17   Q    Okay.  Based upon everything that you
18   read in the JAMA article, do you know whether or
19   not you believed that the class study lasted
20   longer than six months?
21   A    I don't know, and I'll tell you why.
22   Because I was told there was something wrong with
23   this, that's the very first reason that I read
24   it.  In other words, I was told it had lasted

111

1    longer, so it became irrelevant.  Do you see what
2    I'm saying?
3    Q    Sure.  Let me rephrase the question
4    then.  As you're sitting here today --
5    A    Yes.
6    Q    -- reading the language that I just
7    read to you --
8    A    Yes.
9    Q    -- does that specific language
10   communicate that the class study lasted longer
11   than six months?
12   A    Not necessarily.
13   Q    Okay.  Could you turn to the second
14   page, please?
15   A    (Witness so doing).
16   Q    Do you see there's a heading "Study
17   Protocol" in the middle of that page?
18   A    Yes.
19   Q    All right, I'd like you to look at the
20   first paragraph there underneath "Study Protocol"
21   at the last sentence.  I'm going to read that
22   into the record.
23   A    Yeah.
24   Q    It says, "After a baseline visit,

112

1    follow-up clinics -- clinic visits took place at
2    weeks 4, 13, and 26 after the initial dose of
3    medication, and every 13 weeks thereafter."
4    A    Hum.
5    Q    "All patients were provided an
6    opportunity to complete a minimum of 6 months of
7    treatment."  Do you see that?
8    A    Yeah, I saw it.
9    Q    Do you recall how you interpreted that
10   sentence the first time you read the document?
11   A    No.
12   Q    All right, sitting here today, does
13   that communicate to you that the class study
14   lasted longer than six months?
15   A    Hang on.  (Reviewing document).
16   I'm trying to determine when the first doses were
17   given, see, because certainly it looks as though
18   it was longer than that there, but -- every 13
19   weeks thereafter, it doesn't add up to 26, but I
20   don't know -- from this, I certainly can't
21   remember what I thought.  What I can see here is
22   that it lasted six months.
23   Q    All right, do you recall in the final
24   report that we just talked about the duration was

113

1    talked about as a maximum period of 52 or 65
2    weeks?
3        A    Yes.
4        Q    Is -- is that disclosed in the --
5        A    I don't see it.
6        Q    -- in the quote that I just read to
7    you from the --
8        A    No, I don't see it.
9        Q    You have to let me finish my question.
10   I'm sorry, let me --
11       A    I apologize.
12       Q    That's okay.  Starting again, the
13   final report, Exhibit 21, that we looked at --
14       A    Yeah.
15       Q    -- indicated that there was a maximum
16   potential treatment period of 52 or 65 weeks; is
17   that right?
18       A    Yes.
19       Q    All right.  Now, the excerpt from the
20   JAMA article that I just read to you, did that
21   disclose that fact?
22       A    Yes.
23       MR. HALPER:  The document speaks for
24   itself.

114

1    BY MR. MONTGOMERY:
2        Q    All right, could you turn to the third
3    page of Exhibit 3, Bates number ending 880?
4        A    Yeah.
5        Q    Do you see the "Statistical Analysis"
6    section?
7        A    Yes.
8        Q    All right, I -- the second paragraph
9    there that starts "Homogeneity" --
10       A    Yes.
11       Q    -- would you read starting from there
12   to the end of the page, please?
13       A    Yes.
14       Q    I'm not going to read it into the
15   record because it's too long.
16       A    Okay, "Homogeneity of the treatment
17   group --
18       Q    No, no, you don't have to read it out
19   loud, just to yourself.
20       MR. NELSON:  No, don't read it.
21   BY MR. MONTGOMERY:
22       Q    But let me know when you're done.
23       A    (Reviewing document.)  Yes.
24       Q    All right, sitting here today, is

115

1    there anything in the language that you just read
2    from the JAMA article that indicates that the
3    trial lasted between 52 and 65 weeks?
4        A    No.
5        Q    I'd like to show the witness what's
6    previously been marked as Exhibit 32.  You can
7    always read the whole thing.  I'm only going to
8    ask you about the second page.
9        A    Yes.
10       Q    If you start in the middle of the
11   first column that says "Secondly" and read
12   through the bottom of that column.
13       A    (Reviewing document).  Okay.
14       Q    All right, have you ever seen
15   Exhibit 32 before?
16       A    Yes.
17       Q    And is it an article from the British
18   Medical Journal dated June 1st, 2002?
19       A    Yes.
20       Q    Did you read it at the time of its
21   publication?
22       A    It's hard to know.  I know Peter Juni
23   fairly well, had a drink with him.
24       Q    And have you read it since that you

116

1    can recall?
2        A    I don't imagine so.  It's in my
3    head --
4        Q    Okay.
5        A    -- mostly.
6        Q    All right, would you turn to the
7    second page of Exhibit 32?
8        A    Yes.
9        Q    The last full paragraph on that -- on
10   the first column that starts "Publishing", do you
11   see that?
12       A    Yes.
13       Q    And I going to read the first
14   sentence into the record.  It says, "Publishing
15   and distributing overoptimistic short term data
16   using post hoc changes to the protocol, while
17   omitting disappointing long term date of two
18   trials, which involved large numbers of
19   volunteers, is misleading."  Do you see that?
20       A    Yes.
21       Q    Would you disagree with that
22   statement?
23       A    Precisely.
24       Q    And do you believe that that's what

117

1  the authors of the JAMA article did in this case?

2  A  Yes.

3  Q  All right, above -- the paragraph

4  right above that --

5  A  Yes.

6  Q  -- it says -- that paragraph begins

7  with the sentence, "Secondly, the flawed findings

8  published in the original article appear to be

9  widely distributed and believed."  Do you see

10  that?

11  A  Yes.

12  Q  And by "original article", do you take

13  that to mean the JAMA article?

14  A  Yes.

15  Q  And do you agree with that statement?

16  A  Yes.

17  Q  All right.  All right, going back to

18  the last full paragraph in that column, in the

19  middle of it, there's a sentence that begins

20  "Consequently".  Do you see that?

21  A  Yes.

22  Q  I'm going to read that into the

23  record.  It says, "Consequently, CLASS may still

24  be relied on by many physicians without reference

118

1  to these flaws."  Do you see that?

2  A  Yes.

3  Q  And do you take "these flaws" to mean

4  the flaws enumerated above in the article?

5  A  Yes.

6  Q  And do you agree with that assessment?

7  A  Yes.

8  Q  All right, I'd like to show the

9  witness what's previously been marked as

10  Exhibit 40.  Have you seen Exhibit 40 before?

11  A  Yes.

12  Q  Is it an editorial from JAMA dated

13  July 12th, 2006?

14  A  Yes.

15  Q  Did you read this editorial when it

16  was published?

17  A  I suppose so.  I've read it.

18  Q  Okay, and does it concern a change in

19  JAMA's conflict of interest policy?

20  A  Yes.

21  Q  And did you have any role in the

22  change in that policy that this editorial

23  discusses?

24  A  Now you're going to embarrass me.  I

119

1  can't remember what the policy was, but it's

2  almost certain that I did.

3  Q  Why don't you take a minute and read

4  through the first page at least and see if it

5  refreshes your recollection?

6  A  Yeah.  Oh, wait a minute, I'm not

7  allowed to -- (gesturing).

8  Q  You can mark up his copy.

9  MR. NELSON:  Yeah, that's true.  Go ahead.

10  THE WITNESS:  Thank you.  (Reviewing

11  document.)  Yeah, well, I've got the sense of

12  what's new, sort of.

13  BY MR. MONTGOMERY:

14  Q  Did you participate in the change of

15  policy that's articulated in Exhibit 40?

16  A  Yes.

17  Q  And what role did you have in that

18  change of policy?

19  A  Well, it's -- it's been a -- I've

20  drawn attention and helped discuss -- I've drawn

21  attention to lots of problems that people have

22  had at my own and other journals, and so we've

23  been -- you know, it's been an internal

24  discussion.  And because I've been working on

120

1  this longer than most, a lot longer than most,

2  despite myself, people listen or --

3  Q  Can you explain what the change in

4  policy was basically?

5  A  "JAMA will begin requiring all authors

6  to disclose all potential conflicts of interest

7  in the Acknowledgement section."

8  The point is to put them all there so

9  that the editors can decide for the readers what

10  are relevant, and since the editors should

11  largely butt out, it's a matter of putting it all

12  out there.

13  This isn't to say that they are wrong,

14  just so that people know, and a lot of it's about

15  the date and so on, and it has to be done at the

16  time of submission.

17  Q  All right.  Now, I'd like to just

18  shift gears for a quick second and ask you --

19  earlier, I believe you testified that you

20  belonged to an organization with Dr. Wright or

21  that Dr. Wright also belongs to?

22  A  Apparently.

23  Q  Do you recall the name of that

24  organization?

121

1     A    Yes, the Cochrane Collaboration,
2     C-O-C-H-R-A-N-E.
3     Q    And what's the purpose of that group?
4     A    The purpose is to examine the
5     evidence, scientifically the evidence for what
6     are called interventions, everything from surgery
7     to every form of treatment for whatever.  And
8     this has required recruiting somewhere between
9     twelve and twenty thousand experts in this from
10    all over the world and getting them to work for
11    nothing, and it's been very successful.
12    Q    Have you worked directly with
13    Dr. Wright on any projects with that group?
14    A    No.
15    Q    Do you know Dr. Wright personally?
16    A    No.
17    Q    Have you ever worked with him
18    professionally?
19    A    No.  And I'm sure that after the
20    letter that I sent him, which I know was biting,
21    we never shall.
22    MR. MONTGOMERY:  All right, I have no
23    further --
24    THE WITNESS:  I know that I never got a

122

1     reply.  That's all I can remember about it.
2     MR. MONTGOMERY:  All right, I have no
3     further questions at this time.  We are going to
4     take a quick break, defense counsel is going to
5     prepare some questions, and then I might have
6     some follow-up, but, otherwise, I'm done.
7     THE WITNESS:  Okay, fine.  Thank you.
8     MR. MONTGOMERY:  Let's go off the record.
9     THE WITNESS:  Thank you.
10    THE VIDEOGRAPHER:  This is the end of
11    Video 3.  The time is 4:45 p.m., and the running
12    time of this tape is 54 minutes and 20 seconds.
13    (Recess taken.)
14    THE VIDEOGRAPHER:  This is the start of
15    Tape 4.  The time is 4:52 p.m.
16    MR. HALPER:  Good evening, Dr. Rennie.  We
17    met earlier, but my name is Jason Halper, and I
18    represent the Defendants in this case.
19    CROSS EXAMINATION
20    BY MR. HALPER:
21    Q    It's true, isn't it, that you did not
22    participate in any way in JAMA's publication of
23    the class article?
24    A    Yes, it's true, I did not.

123

1     Q    You had no responsibility at all for
2     the publication of the article; isn't that right?
3     A    Correct.
4     Q    You'd never heard of the class study
5     prior to publication of the article?
6     A    Correct.
7     Q    You didn't discuss the class study or
8     the article with any of your colleagues at JAMA
9     prior to publication --
10    A    No.
11    Q    -- isn't that true?
12    A    No, absolutely.
13    Q    After the publication of the article
14    in JAMA, what, if anything, did you do to
15    familiarize yourself with the study or the
16    article?
17    A    As I remember, and as I think I've
18    said, I read the article.  I certainly read -- I
19    certainly spoke with my colleagues, particularly
20    Dr. DeAngelis, who told me what had happened.
21    By the way, this is after the -- it
22    was about this time that those letters came, the
23    Wright letter to me which came because of
24    Cochrane, the Hrachovec letter, I have no idea

124

1     why it came to me, both of which went on.  And at
2     that point --
3     Q    I'm sorry, is "that point" about mid
4     2001?
5     A    It was sometime before the publication
6     of the letters, obviously, and the exact date
7     could be pinned down by when the data appeared on
8     the website of the FDA and then people started
9     writing in, Wright and Hrachovec and no -- I
10    don't know if there were others.
11    Q    So your involvement in connection with
12    the class study started after the Advisory
13    Committee hearings in February 2001 when the data
14    was posted on the web -- the FDA website?
15    A    That's right.  And my involvement at
16    that point was put it in a Letter to the Editor
17    or, if it's in a Letter to the Editor, send it to
18    the person dealing with Letters, whom I believe
19    I've seen from one of those was Lurie, Steve
20    Lurie at the time.  I don't know if that was
21    right or not, but I think that makes sense.
22    But -- you know, we have a guy who
23    does Letters.
24    Q    That wasn't your responsibility?

125

1    A    That was not my responsibility.  It
2  used -- one of the many things I did way back,
3  not then.
4    Q    So the letters that were published in
5  JAMA regarding the class article from
6  Silverstein, from Wright, you had nothing to do
7  with; is that right?
8    A    Nothing to do with those.
9    Q    Okay, you didn't review them
10  beforehand?
11    A    No.
12    Q    You didn't approve them?
13    A    No.
14    Q    You didn't discuss them with your
15  colleagues at JAMA?
16    A    No.
17    Q    Okay.
18    A    Dis -- I cannot say whether I
19  discussed them or not, I just don't know.  You
20  see, since they came to me and I forwarded them
21  and I know that I wrote Wright this lengthy email
22  explaining how things worked, I can't say that I
23  didn't discuss these letters, but I had no
24  decision power over them whatsoever.

126

1    Q    Do you recall having any discussion
2  with your colleagues at JAMA regarding the
3  substance of any of those letters?
4    A    No, I don't recall that.
5    Q    So to the extent you're surmising that
6  you might have discussed the letters, is it fair
7  to say that it would have been the fact that you
8  received a letter as opposed to the content of
9  the letter?
10    A    Well, I certainly discussed the fact
11  that I'd received them, and what I can't recall
12  is how much more.
13        Now, I undoubtedly -- it would be
14  pretty weird not to have gone and discussed a bit
15  more.  I can't believe that I didn't, but it's
16  that sort of memory that I have, I can't believe
17  I didn't, but I can't tell you whether I did and
18  with whom and so on.
19    Q    Fair enough.  Okay, so sometime after
20  February of 2001, you read the class article, you
21  have discussions with some of your colleagues.
22  Did you do anything else in connection with
23  class?
24    A    I don't think so except sometime after

127

1  the publication of the letters, these slides
2  (indicating) were made in I imagine 2002 or so
3  because they were made by my ex-assistant, who
4  came on in 2001.
5    Q    And the slides you're referring to,
6  that's what's been marked as Exhibit 42?
7    A    Yes.
8    Q    You didn't prepare these slides?
9    A    "Carol," I said, and then I said,
10  "make one like that (indicating) and with a
11  jagged end at the bottom to indicate just what
12  it's called."
13        The next one I definitely made myself.
14  The next one, she made.  I said again, "Make it."
15  And in the slide, the middle bit is yellowed.  In
16  other words, "In retrospect, we acknowledged that
17  we could have avoided," which is the letter from
18  Silverstein, which it was -- my bias was it was
19  not as frank an admission of -- well, it wasn't
20  right, I suppose.
21    Q    The first and third pages of
22  Exhibit 42 are copies from the class
23  article and the Silverstein reply, correct?
24    A    Correct.

128

1    Q    What you said you prepared is the
2  second page of Exhibit 42, correct?
3    A    Yes.
4    Q    What sources, if any, did you consult
5  to make Exhibit 42, the second page of
6  Exhibit 42?
7    A    It's hard to know exactly, but as I
8  said to Mr. Montgomery, I'm sure that I looked at
9  the FDA website.  I can't believe I didn't is how
10  I'm putting that.  I have no evidence one way --
11  I'm sure I read the paper enough to see how the
12  two things squared.  I may have read the comments
13  of others, I don't know.
14    Q    Everything you're testifying to, I
15  take it you don't have a specific recollection of
16  actually doing any of those things to prepare the
17  second page of Exhibit 42?
18    A    No.
19    Q    What you were testifying to is what
20  you imagined your -- what your practice is
21  typically?
22    A    Yes.
23    Q    Okay, but you don't recall what, if
24  anything, you consulted in preparing the second

129

1  page of Exhibit 42; is that correct?
2      A    No.  This was part of a lecture which
3  gradually developed on authorship.  So that, no
4  doubt, when the -- when the VIGOR study came
5  through, I added that.  That was later.
6      Q    But just so -- I'm sorry, just so I'm
7  clear, you don't recall what you consulted to
8  make Exhibit 42, correct?
9      A    No.  Except I do know "editors
10  exasperated and furious" were definitely
11  Dr. DeAngelis.  And "laughing to the bank", I
12  have no evidence for that beyond that's what it
13  looked like to me.  Still does.
14      Q    Do you have a recollection at any time
15  of looking at the FDA website regarding class?
16      A    No.
17      Q    Do you -- how much time did you spend
18  looking at the FDA website regarding class?
19      A    Well -- I don't know.
20      Q    Sitting here today, do you have any
21  recollection of what the underlying data is
22  regarding the class study?
23      A    No.
24      Q    Do you know the difference in the

130

1  results at six months versus the entire study
2  period?
3      A    Not now, but I am sure that I did.
4  The wooley results, that's why I made the slide
5  or --
6      Q    What I'm talking about is did -- do
7  you know the different P values at six months
8  versus the entire study values?
9      A    No.
10      Q    Do you think you ever knew that?
11      A    I don't know.
12      Q    You don't remember what data you
13  looked at, correct?
14      A    No.
15      Q    And do you know that you ever looked
16  at any data on the FDA website?
17      A    Well, I've said as I think I did.
18      Q    But you don't have a specific
19  recollection of it?
20      A    What was -- this was five years ago.
21  So I guess I can't remember exactly what it was.
22  What I do remember was that I wasn't the only
23  person looking --
24      Q    But talking about you, you don't have

131

1  a recollection?
2      A    -- and that I got information from
3  other people too.
4      Q    Okay.
5      A    My guess might be -- no, I don't --
6  all of this is guess.  Of course, I don't.
7  Otherwise, I'd have said differently.
8      Q    Understood.  Just so we're clear, you
9  don't have a recollection of looking at data on
10  the FDA website regarding class, correct?
11      A    I have a recollection of looking at
12  the FDA data on class, but I cannot tell you
13  whether there were P values, if they're
14  important.  Confidence intervals might be a great
15  deal more interesting to me.  I cannot tell you
16  now exactly what was there.
17           I just -- my bias, as I've said, is
18  I'm unlikely to have made this (indicating) if
19  none of it was true at the time in thea that I
20  could try and confirm, that's all.
21      Q    Again, though, you don't have sitting
22  here today a recollection of going on the FDA
23  website regarding class, do you?
24      A    Well, I have a recollection that I did

132

1  it.
2      Q    Other than having a recollection that
3  you did it, do you have any other recollection
4  about, for instance --
5      A    No, because, as I've said, I've done
6  it frequently with all sorts of drugs.  And
7  that's the problem, you see.  You know, I --
8  (gesturing).
9      Q    Okay, so other than recalling that you
10  went on the website, you don't recall anything
11  else about what was on the website, correct?
12      A    None, not a thing.
13      Q    Okay.  Or how long you spent?
14      A    No.
15      Q    Okay.  You wouldn't hold yourself out
16  as an expert on the data underlying the class
17  study, would you?
18      A    No.
19      Q    Okay, would you hold yourself out as
20  an expert on the class study?
21      A    No.
22      Q    How about an expert on arthritis?
23      A    No.
24      Q    An expert on rheumatology?

133

1    A    No.

2    Q    Are you an expert on statistics?

3    A    No.

4    Q    On COX-2s?

5    A    No.

6    Q    On NSAIDs?

7    A    No.

8    Q    So coming back --

9    A    I've produced a book on how to analyze

10   trials and medical studies.

11   Q    What's the title of that book?

12   A    The Users Guides to the Medical

13   Literature.

14   Q    Okay, when was that published?

15   A    2002, I suppose, and we just finished

16   an update.  It's a fat book and it's a thin book,

17   and it's soon going to be an electronic book

18   because it sold quite well.  I didn't get a penny

19   for --

20   MR. NELSON:  Let the record show that the

21   witness -- the witness let the record show the

22   witness was looking at me, and I was looking away

23   from him.

24   THE WITNESS:  In other words, what I'm

134

1    trying to say is trials tend to be similar,

2    observational studies tend to be similar, and

3    editors of general medical journals tend to be

4    trained in that sort of thing.

5    BY MR. HALPER:

6    Q    How many clinical trials, published

7    clinical trials have you authored?

8    A    One, I believe.  I think that's what I

9    said.

10   Q    When was that?

11   A    1976.

12   Q    What topics?

13   A    It's become a classic.  Hum?

14   Q    In what topic?  What was the subject

15   of the study?

16   A    It's called -- it's in my CV.  It's

17   called the -- well, the subject was acute

18   mountain sickness.  I did the trial in the

19   Himalayas, and that's not as easy as you might

20   think.

21   Q    I don't think it's easy.

22   MR. NELSON:  And it's not even as easy as

23   that.

24

135

1    BY MR. HALPER:

2    Q    Okay, just so we're clear, sometime --

3    A    I have not done this sort (indicating)

4    of trial.  I'm at the other end of the -- I'm at

5    the editing end and publishing end.  I'm not at

6    the doing an end of trials like this.

7    Q    Other than the one time that you

8    testified to?

9    A    I think to compare the two would be

10   like comparing a bicycle with a Ferrari, and this

11   (indicating) we would hope to be a Ferrari.

12   Q    By "this" you mean class?

13   A    That type of trial.

14   Q    Is it fair to say that you've never

15   authored a published study similar to class?

16   A    Correct.

17   Q    Sometime after February 2001, your,

18   for lack of a better word, involvement or

19   investigation of class started, correct?  Is that

20   correct?

21   A    I looked at it, I read it.

22   Q    And that involvement consisted of

23   reading the general publication, right --

24   A    (Nodding).

136

1    Q    You need to give a verbal response.

2    A    Yes.

3    Q    Okay.

4    A    Apologies.  Sorry, Debbie.

5    Q    Thank you.  (Continuing) -- speaking

6    with your colleagues at JAMA, correct --

7    A    Yes.

8    Q    -- and your recollection of going on

9    the FDA website once, correct?

10   A    And then getting these letters --

11   Q    And getting the letters.

12   A    -- which were quite striking.

13   Q    Did you do anything else in connection

14   with class?

15   A    I made three slides.

16   Q    Exhibit 42?

17   A    Yes.

18   Q    Okay, did you do anything else in

19   connection with class?

20   A    Nothing else I could do.

21   Q    Okay.  Speaking with your

22   colleagues --

23   THE VIDEOGRAPHER:  I'm sorry, I was just

24   trying to get Mr. Nelson's attention.  I had to

Drummond, Rennie  1/18/2007  1:30:00 PM

137

1    turn your mic off because handling the mic is
2    something that makes noise on the record.  So
3    you're off until you put it on.
4    BY MR. HALPER:
5        Q    Focusing on what you testified to, you
6    spoke with colleagues, how many colleagues did
7    you speak with regarding class?
8        A    I don't know.
9        Q    Did you speak with anyone besides
10   Dr. DeAngelis?
11       A    I'm sure I did, but I don't know who.
12       Q    Okay.
13       A    My guess -- yeah, certainly I did,
14   certainly.  For all I know, we had a discussion
15   about it.  I talk with colleagues about stuff
16   every day.
17       Q    Do you have a recollection of talking
18   about class with anyone other than Dr. DeAngelis?
19       A    Any editor.
20       Q    I'm sorry, any colleague at JAMA.
21       A    Yeah.  I am certain that I have
22   discussed it with Dr. Phil Fontanarosa.  The
23   others, I can't say.
24       Q    How many times did you discuss class

138

1    with Dr. Fontanarosa?
2        A    I don't know.
3        Q    How long did any of those discussions
4    last?
5        A    I don't know.
6        Q    What was discussed at any of those
7    conversations?
8        A    The reporting of class, what actually
9    happened.
10       Q    Where did these conversations take
11   place?
12       A    Sometimes on the phone, sometimes
13   face-to-face.  I'm usually here once a month or
14   something.
15       Q    But you don't recall whether it was
16   one conversation or more?
17       A    No.
18       Q    And you don't recall how long the
19   conversation lasted?
20       A    No.
21       Q    You don't recall, I assume, what he
22   said to you or what you said to him?
23       A    No.
24       Q    The conversation with Dr. DeAngelis,

139

1    how many conversations did you have with her
2    regarding class?
3        A    I can't say now.
4        Q    How long did any conversation with her
5    last?
6        A    I don't know.
7        Q    Where did any of these conversations
8    occur?
9        A    I imagine -- most, you see, would tend
10   to be in the phone.
11       Q    Just I don't want you to imagine.  If
12   you don't recall, that's fine.
13            What I'm asking you is do you have a
14   recollection of where you were when you spoke to
15   Dr. DeAngelis regarding class?
16       A    No.  But since I'm here for a short
17   amount of time, my imagination wasn't based on
18   just nothing.  I'm just saying likelihoods would
19   tell me that.
20       Q    I take it from your answer, you don't
21   have a specific recollection --
22       A    Correct.
23       Q    -- of the conversation?
24       A    No.

140

1        Q    And you don't recall then what she
2    said to you and what you said to her?
3        A    I recall that she was -- I do recall
4    very, very strongly that she was -- on more than
5    one occasion, she'd said she was exasperated and
6    furious.
7        Q    Did she say anything else?
8        A    She didn't even say that.  She just
9    gave the -- I think Dr. DeAngelis, whom is just a
10   wonderful person, you'll know when she's
11   exasperated and furious.
12       Q    I know.
13       A    Okay.
14       Q    Do you recall her conveying any
15   substantive information regarding class to you?
16       A    Yes.
17       Q    What did she convey?
18       A    Well, she said, "This is the problem,
19   they didn't tell us that data."  I said, "I know
20   because I've had these two letters," the first
21   time we talked.  She said, "One's from British
22   Columbia, one's from Washington.  Are they
23   connected?"  I said, "Oh, come on, Cathy, there's
24   no connection between those places, they're just

141

1   Northwest.  How could they be?"  And then I
2   explained why one of them had come to me and the
3   other one was a mystery.  I think she must have
4   been sitting in the audience, this Hrachovec
5   person.
6       I know that those -- that sequence
7   happened in a conversation with Cathy.  Other
8   than that, I don't know.
9       Q    She didn't tell you anything about the
10  data underlying class, did she?
11      A    No.
12      Q    Did Dr. Fontanarosa ever tell you
13  anything about the data underlying class?
14      A    Well, you've said "or somebody else".
15  You know, I like data.  I mean it's -- and
16  somebody must have done that.
17      Q    But my question was did
18  Dr. Fontanarosa tell you?
19      A    I thought you said "or anyone else".
20      Q    I may have -- I just missed on his
21  name, but I was trying to say Dr. Fontanarosa.
22  Did he tell you anything?
23      A    I don't know.
24      Q    And you don't have a recollection of

142

1   speaking with anyone other than Dr. DeAngelis or
2   Dr. Fontanarosa regarding class, do you?
3       A    Specifically, no.
4       Q    And you don't have a recollection of
5   how long conversations with either Dr. DeAngelis
6   or Dr. Fontanarosa, how long those conversations
7   lasted?
8       A    No.
9       Q    Or how many there were?
10      A    No.  I say specifically no because I
11  may have surely spoken with Peter Juni about this
12  and with his colleague Matt Egger, who's also of
13  Burn & Bristol, and I must surely have
14  spoken -- you know, but I can't give you the date
15  or the time --
16      Q    Or what was discussed?
17      A    -- more than that.  Just the class
18  study, that's all.
19      Q    But you don't recall what specifically
20  about the class study was discussed with any of
21  these individuals, correct?
22      A    What I recall with Dr. Juni as I
23  recollect were two papers of his, one, an older
24  one, which we published in JAMA, the other this

143

1   BMJ one.
2       Q    The one that JAMA --
3       A    In other words, the paper that formed
4   Exhibit whatever, and this would be at a meeting,
5   you know.
6       Q    The meeting --
7       A    It's the British Medical Journal paper
8   that he wrote with this -- the Dutch woman.  I
9   forget her name.
10      Q    You would have had a discussion with
11  Dr. Juni regarding the BMJ editorial after the
12  editorial was published, correct?
13      A    Yes.
14      It's No. 32.  Oh, yes, yes.
15      Q    You don't have a recollection of
16  speaking to Dr. Juni before he published the BMJ
17  editorial, do you?
18      A    Oh, sure, yeah.
19      Q    Regarding class?
20      A    Not about class, no.
21      Q    Is it fair to say, Dr. Rennie, that
22  other than reading the article and going to the
23  FDA website, there were no other sources for your
24  knowledge of substantive information regarding

144

1   class?
2       A    No, it's not fair.  What I'm saying is
3   I don't know.  I'm also saying it is highly
4   likely, probable that I did have other sources,
5   but I don't know what they were at this length of
6   time.
7       Q    And those sources would be your
8   conversations with people?
9       A    Or what they've written.
10      Q    Sitting here today, do you recall
11  reading any other articles regarding class other
12  than Letters to Editors?
13      A    Well, there've been a number that have
14  been written, as you know.  All right, here's
15  one.  I have -- I've discussed the class study
16  with David Henry of the University of New South
17  Wales, who published a -- an obser -- a very big
18  analysis of multiple observational trials of
19  COX-2 inhibitors, coxibs like this, and that
20  specific class came up.  I --
21      Q    When did that conversation occur?
22      A    Last year.  I've discussed the matter
23  with David Graham, who's a physician and an M --
24  a public health person at the FDA.

145

1    Q    Well, let me try and narrow it a
2  little.  Between the publication of the --
3  between February of 2001 and June 2002 -- and
4  I'll tell you June 2002 is when the Juni
5  editorial was published.
6    A    Yeah.
7    Q    (Continuing) -- who did you discuss
8  class with?
9    A    I don't know, but I have certainly
10  discussed it with a number of people since.
11    Q    Since June 2002?
12    A    One remembers most -- most recently.
13    Q    Do you understand that the Plaintiffs
14  in this litigation are claiming that the JAMA
15  publication of class caused Pharmacia's common
16  stock to trade higher, at a higher price than it
17  otherwise would have?
18    A    (Nodding).
19    Q    Do you understand that the Plaintiffs
20  are claiming that?
21    MR. MONTGOMERY:  Object to form.  Go ahead.
22  BY MR. HALPER:
23    Q    Do you understand Plaintiffs are
24  claiming that?

146

1    A    Actually, I thought it was what
2  Mr. Montgomery told me, that -- wasn't that part
3  of your opening remarks?  I thought so.
4       I understood that -- I've just found
5  out that that is what this is all about.
6    Q    Okay, you're not an expert on the
7  stock market, are you?
8    A    Oh, boy, no.
9    Q    You're not an investment professional,
10  correct?
11    A    You got it.  That's, no, I'm not.
12    Q    I take it you have no basis -- let me
13  withdraw that.
14       You don't know whether or not the
15  price of Pharmacia stock was impacted by the JAMA
16  article, do you?
17    A    No, I don't.
18    Q    You don't know whether any investors
19  bought or sold Pharmacia stock based on the JAMA
20  article, do you?
21    A    It's a great deal more than not
22  knowing.  I don't want to know.
23    Q    Okay.
24    A    I can't be involved in that.  That

147

1  would wreck me and wreck my journal.
2    Q    But I take it the answer is you don't
3  know?
4    A    No, I do not know.
5    Q    And you also don't know whether or not
6  Pharmacia's stock was trading at an inflated
7  price due to the JAMA article, correct?
8    A    Haven't a clue.
9    Q    And you don't know whether the
10  reprints of the JAMA article that were
11  distributed had any impact on the Pharmacia stock
12  price, do you?
13    MR. MONTGOMERY:  Object to form.
14    THE WITNESS:  No.  I didn't even know there
15  were any until it came up, I think.  So I don't
16  even know if that's true.
17  BY MR. HALPER:
18    Q    And you don't know whether the JAMA
19  reprints that were distributed caused anyone to
20  buy or sell Pharmacia stock, do you?
21    A    I can't.
22    MR. MONTGOMERY:  Object to form.
23    THE WITNESS:  No.
24    MR. HALPER:  Thank you.

148

1  BY MR. HALPER:
2    Q    If you could take a look at
3  Exhibit 22, which is the email from Mona Wahba to
4  Stephen Cristo?
5    A    Got it.
6    Q    You got it?  Do you recall
7  Mr. Montgomery directing your attention to Mona
8  Wahba's statement, "We are also cherry picking
9  the data"?
10    A    Yes.
11    Q    Do you know Mona Wahba?
12    A    No.
13    Q    Do you know whether she worked for
14  Pfizer or Pharmacia?
15    A    Well -- well, no, of course not, no.
16    Q    And I take it you also don't know --
17    A    Well, I mean I can see what her --
18  what this says, what she's --
19    Q    Her address?
20    A    That's all.
21    Q    Okay.
22    A    And I went by that, actually.  I --
23    Q    But because you don't know her, you
24  don't know anything about her other than what you

Drummond, Rennie  1/18/2007  1:30:00 PM

149

1  see from reading the email, correct?
2  A  Right, grodan.pfizer.com.
3  Q  And when you say "pfizer.com", you're
4  reading the Exhibit 22?
5  A  Yes.
6  Q  But you don't know Ms. Wahba, correct?
7  A  No, I do not.
8  Q  Okay, you don't know whether she had
9  any involvement at all in the class study,
10  correct?
11  A  I don't know anything about her at all
12  apart from what I've been shown in the email.
13  Q  Okay.  And you don't know, do you,
14  whether or not in fact anyone cherry picked data
15  based on Ms. Wahba's email?
16  A  That's putting it backwards, but no is
17  the answer.  I thought Miss -- Miss Wahba was
18  saying that others cherry picked.
19  Q  Okay, do you know if Miss Wahba had
20  any basis to make that statement?
21  A  "Using 6 months as a study duration"
22  is what she puts, and so she provides her own
23  basis for it right there.  That's her definition,
24  I believe, of cherry picking.  And so I'd say,

150

1  yes, I do know.
2  Q  You're reading the email, correct?
3  A  That's all I have.
4  Q  Okay, you don't know Ms. Wahba, right?
5  A  Not at all.
6  Q  You don't know what, if any,
7  involvement she had in class, correct?
8  A  Of course not.
9  Q  You don't know what her basis is for
10  making that statement, do you?
11  A  Yes, I do.  "We are also cherry
12  picking the data," which is the statement she
13  makes.  And she follows it in parentheses "using
14  6 months as study duration."  And that seems to
15  me the basis -- or, perhaps, it's clear I'm --
16  you and I are misunderstanding each other or I'm
17  misunderstanding you.
18  Q  You're reading the email, correct?
19  A  I agree, she might --
20  Q  Based --
21  A  She might be a myth, after all.
22  Q  Based on the email, you're inferring
23  that her rationale for the cherry picking
24  statement is the use of six-month data, correct?

151

1  A  Yes.
2  Q  But we can agree that you don't know
3  Ms. Wahba, right?
4  A  Correct.
5  Q  We did agree that you don't know what,
6  if any, involvement she had in class, correct?
7  A  Yes.
8  Q  So other than reading what's here, you
9  have no basis to know whether or not Ms. Wahba
10  was qualified to make the statement that's here,
11  correct?
12  A  That's -- she's a physician.  That's
13  all I know about her, but I -- but my -- no.
14  Q  You have no basis to know whether
15  she's qualified to make that statement, right?
16  A  No, apart from being a physician.
17  Q  Okay.  If you turn to Exhibit 27,
18  which is sort of the -- one of the somewhat
19  thicker exhibits where you were directed to the
20  second-to-last page, which is an email from
21  Carolyn Wilson -- if you want to show him where
22  it is?
23  MR. NELSON:  Oh, okay, yeah.
24  THE WITNESS:  No, I'll find it in a second.

152

1  Is it 38?
2  MR. NELSON:  It's 27.
3  THE WITNESS:  So -- exactly.  So 25 --
4  MR. MONTGOMERY:  They're not in order,
5  right.
6  THE WITNESS:  No.  No, no, no, I quit.
7  MR. NELSON:  Okay, here it is.
8  THE WITNESS:  27, thank you.
9  MR. NELSON:  Okay.
10  BY MR. HALPER:
11  Q  Do you recall Mr. Montgomery showing
12  you Exhibit 27?
13  A  Yes.
14  Q  And on the page with the Bates stamp
15  ending 816, I believe you testified that you
16  don't know any of the individuals listed as
17  required attendees, correct?
18  A  I believe not.  That's -- it is
19  correct as far as I know.
20  Q  Okay, and you also don't know any of
21  the people listed as attending, correct?
22  A  That's correct.
23  Q  Okay, and I -- just for clarity, I
24  take it you don't know who Carolyn Wilson is?

Drummond, Rennie  1/18/2007  1:30:00 PM

153

1    A    No.  I now know I'm going to be made
2  to look like a clown, but, no, I don't.
3    Q    You don't know, for instance, what her
4  position is?
5    A    No.
6    Q    Do you recall that Mr. Montgomery
7  directed you to a bullet point that says, "Worse
8  case:  We have to attack the trial design if we
9  do not see the results we want"?  Do you recall
10  that statement?
11    A    Yes.
12    Q    In the email, correct?
13    A    Yes.
14    Q    Okay.  You don't have any basis to
15  know whether anyone acted on that statement, do
16  you?
17    A    No.
18    Q    Exhibit 49 is the -- I'll butcher the
19  name -- the Hrachovec.
20    A    46.
21    Q    49.
22    A    49, sorry.
23    Q    The Hrachovec letter.
24    MR. NELSON:  This is it.

154

1    THE WITNESS:  Oh, I'm sorry, yes.  Yeah.
2  BY MR. HALPER:
3    Q    Well, I don't need -- let's see if I
4  can do it without showing it to you.
5    You recall that you received a draft
6  Letter to the Editor from Hrachovec --
7    A    I did.
8    Q    -- correct?
9    A    Yes.
10    Q    You had no role in the publication of
11  that letter --
12    A    Right.
13    Q    -- correct?
14    A    None.
15    Q    If you could turn to Exhibit 48, which
16  is the Wall Street Journal Asia article from May
17  2004?
18    A    This is forty --
19    Q    48.
20    A    Thank you.
21    Q    Okay, and do you recall testifying
22  about your quote in this article?
23    A    Yes.
24    Q    Your quote was in reference to Vioxx;

155

1  isn't that right?
2    A    This was a Merck author who was taken
3  off -- she was on the web version and then was --
4  disappeared.
5    Q    You're --
6    A    And she was a Merck author, right.
7    Q    Right.  It's not about the class
8  study, is it?
9    A    No.
10    Q    Are you aware of --
11    A    I believe not.  This was -- I think
12  the first author was David Solomon, David --
13  Avorn, and various people like that were on it,
14  but she was just offed.
15    Q    This situation that you're quoted
16  talking about --
17    A    Yes.
18    Q    -- in Exhibit 48, that doesn't involve
19  class, does it?
20    A    Not at all.
21    Q    Are you aware of the situation you're
22  describing or commenting on in Exhibit 48
23  applying to class?
24    A    No.

156

1    Q    You talked --
2    A    Except -- except there's the strange
3  business of who signed the letter, but that's
4  often a matter of contention.
5    Q    Silverstein's letter?
6    A    Right, his response.
7    Q    Right.
8    A    His rebuttal, if you like.
9    Q    But you have no reason to believe that
10  what you're commenting on in Exhibit 48 happened
11  in connection with the JAMA article --
12    A    No.
13    Q    -- on class, right?
14    A    No, none.
15    Q    Okay, and do -- do you have a reason
16  to believe it happened with the Silverstein
17  reply?
18    A    Well, we've all seen what happened
19  there.  This was a -- an exceptional case, I'd
20  say, with a carefully negotiated response, as I
21  now find out, because it's not exactly common for
22  authors to come up here and meet with the Editor
23  and the Executive Editor and then for a letter to
24  be generated.

157

1    So my answer to that is it was

2    exceptional, very exceptional, that letter, for

3    that sequence of events to happen, that's all.

4        Q    You're not aware of Dr. Silverstein

5    walking away from that letter, are you?

6        A    No.

7        Q    Are you aware of any of the authors of

8    that letter walking away from the letter?

9        MR. MONTGOMERY:  Objection to form.

10       THE WITNESS:  Well, I haven't had time to

11   read all the documents that I was given by

12   Mr. Montgomery concerning that very issue.  I

13   just -- you know, just didn't -- haven't had

14   time.  So I don't know whether they walked away.

15       I do remember that in one of the -- in

16   one of those specific documents, it says, Here's

17   the letter, we have to send it out to the rest.

18   This was me reading fast as I could.  And that --

19   so that whether they walked away or not is

20   unclear, but I'm -- I seem to remember those

21   words in that little packet to do with the --

22   with the letter itself or if it was a --

23   BY MR. HALPER:

24       Q    Let's take a look at Exhibit 31, which

158

1    is Dr. Silverstein's reply letter.

2        A    No, that wasn't -- of course, of

3    course, I'll do, but that wasn't what I was

4    talking about.

5        Q    Oh.  Well, that's what I was talking

6    about.

7        A    I was talking about -- you asked a

8    question about the preparation of that letter and

9    whether anyone walked -- whether any of the

10   authors walked away from it, and I was about to

11   say it -- and I said I was fed some letters --

12       Q    Um-hum.

13       A    Some -- sorry, some documents.  And in

14   those documents, somebody says, I believe, We'll

15   have to -- here's the letter that we've prepared,

16   we'll have to show it to the other authors or to

17   the authors.

18       Q    Um-hum.

19       A    If that happened and their names don't

20   appear here, I cannot possibly know whether they

21   walked away, weren't shown it or what.

22       Q    Okay.

23       A    But all I can say is that I can't give

24   you a straight answer to that question beyond

159

1    what I've just said.

2        Q    Okay.  Let me try --

3        A    Am I wrong here?

4        Q    No, no.  Let me try and clarify it.  I

5    think I'm being more simplistic than you.

6        A    Well, I was -- I'm desperately trying

7    to help here.

8        Q    In Exhibit 48, which was the Wall

9    Street -- that's okay, you don't have to go

10   there.  It's the Wall Street Journal article.

11       A    I have it.

12       Q    Okay?  You're commenting on a

13   situation of the Merck person asking to be taken

14   off as an author, correct?

15       A    A paper.

16       Q    A paper.  Correct?  And you testified

17   that you're not aware that anything like that

18   happened in connection with the JAMA publication

19   of the class study; is that right?

20       A    I don't know whether she asked to be

21   taken off.  She was taken off.

22       Q    Okay.

23       A    And I am not aware of that exact thing

24   happening, but it's a puzzle for me, given that I

160

1    was given a document that suggested it.

2        Q    Well, I'm focusing now on the

3    September of 2000 publication of the class study,

4    okay?  That's Exhibit 3, where the seventeen

5    authors are listed.  Do you want to get that?

6        A    No, that's all right, I've got it.

7        Q    You understand that the seventeen

8    authors are listed --

9        A    Right.

10       Q    -- correct?  Are you -- do you have

11   any reason to believe that any of those 17

12   authors at any time have in any way attempted to

13   distance themselves or not stand behind the JAMA

14   publication?

15       MR. MONTGOMERY:  Object to form.

16       THE WITNESS:  Well, as a matter of fact, I

17   do.  Until I can look at that, that document that

18   I was provided with, if my recollection is

19   correct -- and I could be wrong.

20   BY MR. HALPER:

21       Q    I think you're referring to

22   Exhibit 39.

23       A    I could be completely wrong, but I

24   feel I've got the right to look --

161

1    Q    Sure.

2    A    -- and check.

3    Q    Exhibit 39, which I think is the Goran

4    Ando email of August 13th, 2001.

5    A    It says, "My recommendation," and "it"

6    is Goran Ando -- or, no, George Geis says, "Once

7    we receive everyone's comments we need to decide

8    the next steps.  My recommendation is that the

9    letter to JAMA come from all the CLASS authors.

10   Once we redraft the letter we would send it to

11   the authors and get their buy-in with the intent

12   of making the 10 day timeline imposed by JAMA.

13   Do you agree?"

14       And then -- and that was the last

15   thing here.  So when I read that, I say they

16   might have walked away or run away or not gone

17   through with his recommendation or anything.  In

18   other words, I have here in my hand something

19   that makes me very uneasy of saying yes to

20   your -- to your question, that's all.

21   Q    Okay.

22   A    And I won't say yes to it.

23   Q    Okay.

24   A    All right, that's all.

162

1    Q    Let me --

2    A    That's what I was remembering.

3    Q    Do you know whether Dr. Geis's

4    suggestion that the letter come from all the

5    authors was acted on?

6    A    No idea.

7    Q    For all you know, it could have been a

8    decision that had come from the three individuals

9    who in fact authored the letter; isn't that true?

10   A    Could well be.

11   Q    You don't know one way or the other,

12   right?

13   A    No idea.

14   Q    Okay.  My question is, and I am taking

15   what you said, apart from Exhibit 39, okay, do

16   you have any reason to believe that any of the

17   seventeen authors of the JAMA article have

18   attempted to distance themselves or disavow in

19   any way the JAMA publication?

20       MR. MONTGOMERY:  Object to form.

21       THE WITNESS:  It's a bigger part.  And the

22   answer is no, I don't, but -- I'm waving this

23   document -- I'd like to know more.

24

163

1    BY MR. HALPER:

2    Q    But my question was, you know,

3    putting -- taking into account what you've said

4    about this document, that was part of my

5    question, do you have any basis to believe that

6    any of those seventeen individuals have attempted

7    to walk away from or disavow the JAMA

8    publication?

9        MR. MONTGOMERY:  Object to form.

10       THE WITNESS:  No, I don't.

11   BY MR. HALPER:

12   Q    Okay, and if you look at the

13   Silverstein reply, Exhibit 31, there are three

14   authors listed Silverstein, Simon and Faich,

15   correct?

16   A    Yes.

17   Q    Do you have any reason to believe that

18   they have disavowed Exhibit 31 in any way?

19   A    No.

20   Q    We -- you testified earlier about

21   guest authorship.  Do you recall that?

22   A    Yes.

23   Q    If guest authorship occurs, does that

24   necessarily mean that the article is incorrect?

164

1        MR. MONTGOMERY:  Object to form.

2        THE WITNESS:  Yes.

3    BY MR. HALPER:

4    Q    If there's guest authorship, does it

5    mean necessarily that -- other than who wrote it,

6    does that -- does it mean that the article, the

7    substance, is incorrect?

8    A    No.

9    Q    And if an article is ghost written,

10   other than that fact, does the fact that it is

11   ghost written mean necessarily that the article

12   in substance is incorrect?

13       MR. MONTGOMERY:  Object to form.

14       THE WITNESS:  Yes.  It's so fundamental.

15   BY MR. HALPER:

16   Q    Do you have a reason to believe that

17   the class publication was ghost written?

18       MR. MONTGOMERY:  Object to form.

19       THE WITNESS:  I have no idea who wrote it.

20   BY MR. HALPER:

21   Q    Okay, and therefore, you don't know --

22   you have no reason to believe it was ghost

23   written?

24   A    I believe the authors must have

165

1   testified that they wrote it, and it definitely
2   wasn't ghost written, therefore, but I --
3        Q    But just if something is ghost
4   written, we assume some article was ghost
5   written --
6        A    Yeah.
7        Q    -- I understand that what you said
8   that it's fundamental.
9        A    Yeah, yeah, yeah.
10       Q    But does that mean that the substance
11  of the article is necessarily incorrect?
12       MR. MONTGOMERY:  Object to form.
13       THE WITNESS:  Well, it depends upon what
14  you mean by incorrect.  It doesn't work like
15  that, I'd say.
16  BY MR. HALPER:
17       Q    Does it mean the data presented in a
18  given article is incorrect?
19       MR. MONTGOMERY:  Object to form.
20       THE WITNESS:  Not necessarily.  It doesn't
21  mean necessarily it's incorrect, that's right,
22  but it may mean that the whole setup or the
23  particular data that are presented or the
24  analysis or whatever are incorrect.

166

1   BY MR. HALPER:
2        Q    But, again, you don't have any reason
3   to believe that ghost writing occurred here,
4   correct?
5        A    No.
6        THE REPORTER:  I'm sorry, what was your
7   answer?
8        THE WITNESS:  No.
9   BY MR. HALPER:
10       Q    If you'd turn to Exhibit 31, which is
11  the Silverstein reply again?
12       A    Yes.
13       Q    You've testified already that you're
14  not an expert in statistics, correct?
15       A    Correct.
16       Q    And you did not perform any
17  independent statistical analysis of the class
18  study data, did you?
19       A    No.
20       Q    Okay.
21       A    No, no.
22       Q    Let me read you a sentence or two from
23  Dr. Silverstein's reply.  If you look at his
24  letter, Page 2 of Exhibit 31, the first full

167

1   paragraph in the second column starting, "This
2   all implies", do you see that?
3        A    Yes.
4        Q    Okay.  "This all implies that the data
5   after 6 months are not valid for examining
6   drug-induced GI toxicities.  Based on these
7   concerns, the authors concluded that the 6-month
8   analyses of complicated ulcers and symptomatic
9   ulcers were less subject to bias and would
10  reflect true drug effects and therefore should be
11  the basis of the report of the trial."  Do you
12  see that?
13       A    Yes.
14       Q    You don't have any basis to disagree
15  with Dr. Silverstein's statement as to whether
16  the post six month data is valid, do you?
17       MR. MONTGOMERY:  Object to form.
18       THE WITNESS:  Yes.
19  BY MR. HALPER:
20       Q    You testified you didn't independently
21  analyze the data, correct?
22       A    But you didn't ask me if it was
23  independent, and it wasn't.  I was told it was
24  incorrect.

168

1        Q    By who?
2        A    I believe Peter Juni, but I can't
3   remember.  I just -- I don't remember now.
4        Q    Okay, other than someone else telling
5   you --
6        A    Right.
7        Q    -- that Dr. Silverstein is wrong --
8        A    Okay.
9        Q    -- do you have an opinion on whether
10  or not Dr. Silverstein's statement that I just
11  read to you is wrong?
12       A    No.  My opinion was they didn't tell
13  us.
14       Q    Understood.  Putting that aside, you
15  don't --
16       A    And, of course, I'm having difficulty
17  putting that aside.  It's huge.  It's the
18  elephant, really.
19       Q    For you.  But you understand we're
20  here on a securities litigation, correct?
21       A    (Nodding).
22       Q    Right?
23       A    I've got it.
24       Q    Okay.  So what I'm asking you is, for

169

1    all you know, Dr. Silverstein's statement could
2    very well be correct; isn't that true?
3         MR. MONTGOMERY:  Object to form.
4         THE WITNESS:  Well, if I'd been told it
5    wasn't correct, how can I answer that in yes?
6    I'd say no.
7    BY MR. HALPER:
8         Q    You have no basis other than what
9    Dr. Juni told you --
10        A    Or --
11        Q    -- to disagree with Dr. Silver --
12        A    Or whoever it was who told me.
13        Q    Sorry, I just need to finish the
14   statement.
15        A    I'm --
16        Q    No.  You have no basis other than what
17   someone told you --
18        A    Yes.
19        Q    -- to disagree with --
20        A    Right.
21        Q    -- Dr. Silverstein's statement?
22        A    Right.
23        MR. MONTGOMERY:  Object to form.
24

170

1    BY MR. HALPER:
2         Q    And you have no independent basis to
3    disagree with Dr. Silverstein's statement,
4    correct?
5         MR. MONTGOMERY:  Object to form.
6         THE WITNESS:  Unless you can count the
7    papers that have been written on it like Uni's
8    and Graham's and so on.  I don't know whether
9    you'd call that independent.  I would, you know.
10        But did it come from my own analysis
11   of the primary data?  The answer is no.
12   BY MR. HALPER:
13        Q    Okay, you didn't do anything to verify
14   or refute Dr. Silverstein's statement, correct?
15        A    No.
16        Q    And therefore, based on your own work,
17   you have no basis to refute Dr. Silverstein's
18   statement, correct?
19        A    Right.
20        MR. MONTGOMERY:  Object to form.
21        THE WITNESS:  Because I'm not the expert of
22   that.
23   BY MR. HALPER:
24        Q    If Dr. Silverstein is correct and the

171

1    results after six months are statistically
2    suspect, if we assume that for a minute, isn't it
3    true that the post six month dataset will not be
4    instructive regarding the safety or efficacy of
5    Celebrex?
6         A    That doesn't follow.
7         MR. MONTGOMERY:  Object to form.
8    BY MR. HALPER:
9         Q    Why not?
10        A    The post six months -- what I have
11   been told is that the post six months results,
12   which are really the only important ones or the
13   long ones are the most important ones, of course,
14   with any drug like this, I'm told that they
15   really overturned.
16   BY MR. HALPER:
17        Q    But you --
18        A    Moreover, they didn't stick to the
19   protocol, they changed it 'round.  And that, of
20   course, introduces a few statistical problems,
21   again, I'm told, very severe statistical problems
22   if you change the thing in -- especially, if you
23   change it in analysis, during analysis.
24        THE VIDEOGRAPHER:  Pardon me, Counselor,

172

1    I'm at the end of the tape.
2         MR. HALPER:  Okay.
3         THE VIDEOGRAPHER:  This the end of Tape 4.
4    The time is 5:52 p.m.  The running time of the
5    tape is 1 hour and 32 seconds.
6         (Recess taken.)
7         THE VIDEOGRAPHER:  This is the start of
8    Tape 5.  The time is 5:58 p.m.
9    BY MR. HALPER:
10        Q    Dr. Rennie, if you'd turn to
11   Exhibit 28 --
12        A    28 is?
13        Q    -- which is the email from James
14   Lefkowith to Emilio Arbe.
15        MR. NELSON:  (Tendering document to
16   witness).
17        THE WITNESS:  Thank you.
18        MR. NELSON:  You're welcome.
19   BY MR. HALPER:
20        Q    And you were shown a statement on the
21   third page of that email in Emilio Arbe's April
22   9th, 2000 email, the third paragraph.  Do you see
23   that?
24        A    Yes.

Drummond, Rennie  1/18/2007  1:30:00 PM

173

1    Q    Okay, that's the "with a bit of data
2    massage" paragraph, right?
3    A    Yes.
4    Q    Okay.  Do you know Emilio Arbe?
5    A    No.
6    Q    Okay, do you know who he worked for at
7    this time?
8    A    No.
9    Q    Do you know what position he held at
10   this time?
11   A    Somewhat junior to Jim Lefkowith or
12   Magnus somebody.
13   Q    But other than looking at the email,
14   you don't know what position he held?
15   A    Oh, no, no.
16   Q    And do you know what, if any,
17   involvement he had in the class study?
18   A    Don't know.
19   Q    And do you know whether or not he
20   actually had any basis for making the statements
21   that appear on Exhibit 28?
22   A    Yes.
23   Q    Why do you say that?
24   A    Well, he writes here, "With a bit of

174

1    data massage, what Steve Geis and his team have
2    done is to focus on the 6 month data", and I
3    would say that that's incontrovertible, although
4    I'm sure that -- well, it's incontrovertible.
5    Q    That Steve Geis and his team focused
6    on the six month data, correct?
7    A    Well, the authors of this paper that
8    we published focused on the six month data.
9    Q    Okay, that's true, right?
10   A    Yes.
11   Q    Okay.
12   A    So you asked me is there a basis, and
13   I said yes.
14   Q    But you don't know whether or not he
15   was involved in the class study, correct?
16   A    No.
17   MR. MONTGOMERY:  Object to form.
18   BY MR. HALPER:
19   Q    So other than reading the email, you
20   don't know whether or not he was qualified to
21   make any of these statements --
22   A    No.
23   Q    -- correct?
24   MR. MONTGOMERY:  Object to form.

175

1    BY MR. HALPER:
2    Q    Okay.  And do you have any reason to
3    believe that --
4    A    Well --
5    Q    -- Arbe is qualified to say whether or
6    not the reason that Geis and his team focused on
7    the six month data is simply to make the -- it'd
8    look better?
9    MR. NELSON:  Do you have to change your
10   further -- your previous question -- or I mean
11   answer?  Do you have to supplement it?
12   THE WITNESS:  Yes.  I was trying to say --
13   you asked if he was qualified.  I don't know his
14   degrees.
15   All I'm saying is that he wasn't
16   completely unqualified because I thought that the
17   points -- and I read this extremely rapidly and
18   only once -- that these were interesting
19   comments.
20   So he's not completely clueless, this
21   guy, and I'd say he was quite a critic.  So
22   qualified, not qualified, I don't know, but I
23   certainly don't know whether he's got a degree.
24

176

1    BY MR. HALPER:
2    Q    Well, you don't know Arbe, correct?
3    A    No, not at all.
4    Q    You don't know his degrees, right?
5    A    No.
6    Q    You don't know his position at this
7    time --
8    A    No.
9    Q    -- correct?  You don't know if he
10   knows Steve Geis, correct?
11   A    Not at all.
12   Q    If he doesn't know Steve Geis, is he
13   qualified to say why Steve Geis focused on the
14   six month data?
15   MR. MONTGOMERY:  Object to form.
16   THE WITNESS:  Well, he's pointing out what
17   they did.
18   BY MR. HALPER:
19   Q    We can all agree that they focused on
20   the six month data, correct?
21   A    Yes.
22   Q    But he, Arbe, goes beyond that to say
23   why he thinks Geis focused on the six month data,
24   right?

Drummond, Rennie  1/18/2007  1:30:00 PM

---

177

1    A    And my experience is that people focus
2    on what they want to focus on, and optimists, as
3    we all are, tend to do that. That's one of the
4    big problems in reporting a medical research.
5    And if Steve Geis did that, as he seems to have
6    done, he's by no means a rarity.
7    Q    Okay, you don't know Steve Geis,
8    correct?
9    A    Not at all.
10   Q    You don't know why he did anything he
11   did in connection with class, right?
12   A    I'm just saying --
13   Q    Well --
14   A    No, I don't.
15   Q    Okay. And you don't know if Arbe
16   knows Steve Geis, right?
17   A    No, I don't.
18   Q    And therefore, if he doesn't, he has
19   no basis to so opine on why Steve Geis did
20   anything he did in connection with class,
21   correct?
22   MR. MONTGOMERY:  Object to form.
23   THE WITNESS:  Well, I can't draw that
24   conclusion.

---

178

1    BY MR. HALPER:
2    Q    Why?
3    A    For the reason I said. There's plenty
4    of evidence for optimistic reporting. I'd say
5    every week we have to change conclusions, and
6    indeed, I know that this is correct because with
7    two others -- I've just finished a study of 124
8    metro analyses, and this will explain it. And
9    the only differences one can see here are that
10   those funded by sponsors with an interest in the
11   answer have the same result as those that don't
12   in the same area, hypertension, but those -- but
13   the conclusions on the same data are optimistic.
14   So when I say -- and that's just --
15   that's my own study done with my own sweat of my
16   own brow. When I say that this is how
17   researchers are, I'd say I know how researchers
18   are because I've studied it, and that's only one
19   study of it.
20   Now, our research was not on Steve
21   Geis, who for all I -- I have no idea what he's
22   like, but I'm just saying that this remark sounds
23   like somebody making a remark that rings true.
24   So when you say you have no reason, I'd say that

---

179

1    isn't true. I do have a reason. This is how
2    researchers behave.
3    Q    You're making a generalization, aren't
4    you?
5    A    Indeed, yes, from evidence.
6    Q    But not regarding Steve Geis, correct?
7    A    No.
8    Q    And not regarding class, correct?
9    A    Correct.
10   Q    And not regarding Emilio Arbe,
11   correct?
12   A    Correct.
13   Q    You don't know any of these people
14   that we're talking about --
15   A    Correct.
16   Q    -- right?
17   A    I've said that.
18   Q    And so you don't know what -- Steve
19   Geis, what he did in connection with class,
20   correct?
21   MR. MONTGOMERY:  Object to form.
22   BY MR. HALPER:
23   Q    I didn't say, Do you have any basis?
24   I said, You don't know why he did what he did?

---

180

1    A    No.
2    MR. MONTGOMERY:  Object to form.
3    BY MR. HALPER:
4    Q    And you don't know if Emilio Arbe has
5    any reason that he knows --
6    A    No.
7    Q    -- why Steve Geis, what he -- did what
8    he did --
9    MR. MONTGOMERY:  Object to form.
10   BY MR. HALPER:
11   Q    (Continuing) -- in connection with
12   class, do you?
13   A    Well, see, there we part company.
14   Q    Do you know --
15   MR. NELSON:  Excuse me, I think he's -- you
16   know, if you ask a question, he's entitled to
17   give an answer.
18   MR. HALPER:  Well, he said, "There we part
19   company."
20   MR. NELSON:  Well, I don't know -- if
21   that's a complete answer, then fine. Otherwise,
22   keep going.
23   BY MR. HALPER:
24   Q    I'm not trying to cut you off.

---

181

1    A    No.

2    Q    If there's more, I'm happy to hear it.

3    A    No, no.  And I'm trying to get across

4    the fact that we make judgments about people

5    about things, not just based on them, but on the

6    circumstances, the context.

7         And the context tells me, just as the

8    context tells me that Arbe, whatever his

9    qualifications or lack of them, is no fool.  The

10   context also tells me that this is the way a lot

11   of researchers behave.

12        What I am saying is, also, I don't

13   know whether Steve Geis did in the case of class,

14   but I am not going to be put in a position of

15   saying I have no basis for saying this is how

16   researchers do behave.

17   Q    Fair enough.

18   A    That's all I'm saying.

19   Q    I hear you.

20   A    Yeah.  I didn't want to be forced in a

21   peculiar position.

22   Q    Okay, and I thought, but maybe I

23   didn't do a good enough job, that I changed my

24   question.

182

1    A    Yeah.

2    Q    Do you know why Steve Geis did what he

3    did in connection with class?

4    A    No.

5    MR. MONTGOMERY:  Object to form.

6    BY MR. HALPER:

7    Q    Do you know whether Emilio Arbe knows

8    what Steve Geis did in connection with class?

9    MR. MONTGOMERY:  Object to form.

10   THE WITNESS:  No.

11   BY MR. HALPER:

12   Q    Do you -- do you know Dr. Wolfe?

13   A    No.

14   Q    Do you know of him?

15   A    He's at BU.  I know of him, and as far

16   as I remember -- and I haven't looked this up --

17   he was at Boston University.  Is that right?

18   Q    It's -- Exhibit 4 is his letter.

19   A    Yeah.  As a matter of fact, I knew his

20   name well enough, and he's a GI person.  And I'd

21   totally forgotten until just now that he had a

22   co-author written with him.

23   MR. NELSON:  (Tendering document to

24   witness).

183

1    THE WITNESS:  Thank you.  Yeah, Boston

2    University, yeah.

3    BY MR. HALPER:

4    Q    Okay, how do you know of Dr. Wolfe?

5    A    Because I may have used him as a

6    reviewer, I may have read something by him.

7    they -- the sort of hot research medical world

8    isn't that big, as I'm sure the law is the same,

9    you know.  All professions are fairly small, and

10   I tend to know because either at the New England

11   Journal where I was or here, you're in the center

12   of a web.  I can't answer more than that.

13   Q    No, that's fine.

14   A    I wouldn't know him in a crowd.

15   Q    What is your opinion of his work?

16   MR. MONTGOMERY:  Object to form.

17   THE WITNESS:  Well, all I can say is he's

18   got a good reputation, and I --

19   BY MR. HALPER:

20   Q    Do you have have any reason to

21   question his integrity?

22   A    None.

23   Q    Do you have any reason to question the

24   quality of his work?

184

1    A    None.

2    Q    In fact, his reputation is good,

3    correct?

4    A    Yes.

5    Q    If you could turn to Exhibit 3, which

6    is the JAMA publication of class, and if you look

7    on the second page, I'm going to direct you to a

8    sentence under "Study Protocol".

9    A    Um-hum.

10   Q    And Mr. Montgomery read it to you, but

11   I'll read it again.  "After a baseline visit,

12   follow-up clinic visits took place at weeks 4,

13   13, and 26 after the initial dose of medication,

14   and every 13 weeks thereafter.  All patients were

15   provided an opportunity to complete a minimum of

16   6 months of treatment."  Do you see that?

17   A    I certainly do.

18   Q    Okay.  Doesn't that indicate that data

19   was collected for more than six months?

20   A    You -- yes.  And you heard me hiccup

21   when you read it.  In fact, my eyes bulged.

22   Q    And why?

23   A    For two reasons.  One, it seems to

24   indicate that there were more data and nobody

185

1    could have noticed, and two, why was it buried
2    there?
3        So it makes me -- this is very sad,
4    isn't it?  Why isn't it here?  Why isn't that one
5    of the main findings?  Why is that not reported?
6    Why is it apparently just there?  I don't know if
7    it's more.
8        Q    But it does disclose, does it not,
9    that the study ran for more than six months --
10   A    Yes.
11   Q    -- and data was collected for more
12   than six months?
13   A    Yes.
14   Q    Both those things are disclosed,
15   correct?
16   A    It discloses that the protocol says
17   that they should be, that's what.  And so -- and
18   what I haven't had time since then is to check
19   that there were absolutely no data.  You see
20   adverse effects during the six month treatment
21   period, and that was the crucial thing here,
22   wasn't it?  At six month, six month, six month.
23       You see, it's like saying, I disclosed
24   my number plate by having it tacked under the

186

1    bottom of my sump pump, you know.  It's not --
2    that's not how you do it.  And it's there in the
3    protocol, apparently, but where is it in the
4    important places?  This (indicating) is what most
5    people read, like 90%.  Where is it in the
6    results?  So I'd say, no, it's not properly
7    disclosed.
8        Q    Let's take it in small bites.  The
9    statement I read to you, you would agree,
10   discloses that the study ran for longer than six
11   months?
12   A    That it does, and I've acknowledged
13   that.
14   Q    And you would agree with me that the
15   statement I read discloses that data was
16   collected for more than six months, correct?
17   A    Yes.
18   Q    Okay, those are my only two questions
19   right now.
20   A    Yeah.
21   Q    Do you have a reason to conclude that,
22   based on six months of data, anything in this
23   publication is inaccurate?
24   A    No.

187

1        Q    If you could turn to Exhibit 32, which
2    is the Juni editorial --
3        MR. NELSON:  (Tendering document to
4    witness).
5        THE WITNESS:  Thank you.
6    BY MR. HALPER:
7        Q    Are you with me?
8        A    Yes, thank you.
9        Q    Okay.  Well, before we get to that,
10   we've talked about the fact that the full study
11   data was posted on the FDA website in February
12   2001; isn't that right?
13       MR. MONTGOMERY:  Object to form.
14       THE WITNESS:  I believe -- I can't say
15   whether it was February, you know, I don't
16   remember, but we certainly talked about that,
17   yes.  I take -- I take your word for it.  I don't
18   know.
19   BY MR. HALPER:
20   Q    In 2001 --
21   A    Yeah.
22   Q    -- at some point, the full dataset --
23   A    Yeah.
24   Q    -- was posted --

188

1    A    Yeah.
2    Q    -- on the FDA website --
3    A    Yeah.
4    Q    -- is that right?
5    A    Yeah.
6        MR. MONTGOMERY:  Object to form.
7    BY MR. HALPER:
8        Q    And do you recall that --
9        A    I believe so, yeah, yeah.  You and I
10   have gone to and fro.  I can't remember what
11   exactly was on there, you know.
12   Q    Well, do you recall that the FDA
13   posted the full dataset in connection with
14   Advisory Committee hearings?
15       MR. MONTGOMERY:  Object to form.
16       THE WITNESS:  No, not particularly.
17   BY MR. HALPER:
18   Q    Do you re -- when the FDA -- when --
19   I'll withdraw that.
20       When the full dataset was posted on
21   the FDA website, what information in fact was
22   disclosed?
23       MR. MONTGOMERY:  Object to form.
24       THE WITNESS:  Well, I -- I've told you I

Drummond, Rennie  1/18/2007  1:30:00 PM

189

1    can't remember.
2    BY MR. HALPER:
3        Q    Okay, if you look at the Juni article,
4    the second page --
5        A    Uh-huh.
6        Q    -- do you see the first full paragraph
7    says, "Two issues cause concern", and then
8    there's a "firstly"?
9        A    Yes.
10       Q    And that continues down through the
11   end of that paragraph?
12       A    Yes.
13       Q    Do you know one way or the other
14   whether anything in this section of the Juni
15   editorial is -- was not already contained in the
16   FDA website postings.
17       MR. MONTGOMERY:  Object to form.
18       THE WITNESS:  No, I didn't -- I didn't
19   check.
20   BY MR. HALPER:
21       Q    So, for all you know, everything in
22   here could have already been disclosed on the FDA
23   website --
24       MR. MONTGOMERY:  Object to form.

190

1    BY MR. HALPER:
2        Q    (Continuing) -- isn't that right?
3        A    Could be.
4        MR. HALPER:  No further questions right
5    now.
6        MR. MONTGOMERY:  Okay.  It really is just a
7    couple.
8           REDIRECT EXAMINATION
9           BY MR. MONTGOMERY:
10       Q    Okay, Exhibit 3, the JAMA article that
11   you were just talking about, do you have that?
12       A    Got it.
13       Q    If you'd look at the second page that
14   you were looking at before where it says "Study
15   Protocol"?
16       A    Yeah.
17       Q    What is a study protocol?
18       A    The protocol is, This is what we're
19   going to do.
20       Q    Is --
21       A    And it can be huge, it can be narrow,
22   it's often debated very strongly, and it sets
23   out, goes through many iterations.
24       Q    Do clinical studies always follow the

191

1    protocol that was established before they were
2    begun?
3        A    No.
4        Q    All right.
5        A    But -- no.  No is the answer.
6        Q    Okay, would you please look at the
7    slides that you prepared, Exhibit 42?
8        A    Yes.
9        MR. NELSON:  (Tendering document to
10   witness).
11       THE WITNESS:  Thank you.
12   BY MR. MONTGOMERY:
13       Q    All right, would you please turn to
14   the third page?
15       A    (Witness so doing).
16       Q    And on that page is an excerpt of the
17   Silverstein letter to JAMA; is that correct?
18       A    Right.
19       Q    All right, in the middle of the first
20   column, do you see the part that you highlighted
21   beginning "In retrospect"?
22       A    Yes.
23       Q    I'm going to read it into the record.
24   "In retrospect, we acknowledge that we could have

192

1    avoided confusion by explaining to the JAMA
2    editors why we chose to inform them only of the
3    six month analyses and not the longer term data
4    that were available to us when we submitted the
5    manuscript.  We submitted only this information
6    because the authors believed the six month data
7    were the most scientifically and clinically
8    valid.  The data after six months were so
9    confounded as to be difficult to interpret for
10   assessing a drug-related causal GI toxicity."
11   Do you see that?
12       A    Yes.
13       Q    Did you believe at the time this was
14   published that it was an an adequate explanation
15   for the authors' conduct who wrote the JAMA
16   article?
17       MR. HALPER:  Objection, foundation.
18       THE WITNESS:  No.
19   BY MR. MONTGOMERY:
20       Q    And why is that?
21       A    I guess I -- I guess I like people to
22   be -- I've climbed all my life.  I like people to
23   be forthright, really forthright.  Silly me.
24       Q    In your opinion, is the quotation I

193

1  just read into the record not fully forthright?

2     A   I don't like -- and I'm not alone in

3  this amongst the JAMA editors -- "we acknowledge

4  that we could have avoided confusion."  We didn't

5  just goof, we kept from you important

6  information.

7        "Because the authors believe the six

8  month data," et cetera, "the data after six

9  months was so confounded as to be difficult to

10  interpret."  Our job is to interpret data.  We

11  found that offensive.  I found it offensive,

12  rather.  I don't --

13     Q   Is there any other reason that you

14  found this explanation insufficient?

15     A   Well, I've already said that we're

16  dealing with drugs that are taken by old crocks

17  who can't do their buttons up, myself, for

18  example, and so that means years.  And so it's a

19  very serious matter how you halve the length of

20  a trial.  I find it inadequate.

21     Q   And just to make sure I understand

22  what you just said, is that because the people

23  taking the medications will often be taking it,

24  Celebrex in this case --

194

1     A   Well, look it --

2     Q   -- for longer than six months?

3     A   Now, I'm just saying -- I'm saying

4  this, that it's always problematic and sponsors

5  have -- the manufacturers have a tremendously

6  difficult problem here, how long to do a trial

7  and in who.

8        And it's very important for a trial

9  like this -- we're not talking about the

10  immediate results of somebody who's had a

11  myocardial infarct, a heart attack.  We're

12  talking about something that they'll have to take

13  for years if it's any good.  With luck, it will

14  be.  So it really matters if people take it six

15  months in the trial or a year in the trial.  So

16  that's a problem that I thought made this all

17  worse, and I wasn't alone in that.

18     Q   Did you have any other reasons for

19  finding this explanation insufficient?

20     A   Well, I spread out they should have

21  dealt with all those (indicating), I think, but I

22  haven't checked off to find out if they were

23  laughing and -- for the trial duration -- of

24  the -- I can't remember what it was, and forgive

195

1  me, I've been up a long time.

2        I can't remember what about -- if

3  there was something odd about the statistical

4  analysis, and I just can't remember now.  I

5  haven't looked this up again.

6     Q   And when you said "those" in your

7  previous answer, were you referring to the items

8  listed on the second page of Exhibit 42?

9     A   Right, right.

10     Q   Okay, I just have a couple questions

11  about the book that you were talking about

12  earlier.  Is it correct that you said you have

13  published a book concerning how to conduct

14  clinical trials?

15     A   No, not how to conduct them.  I'd

16  never do that because I'm not the expert, and I

17  know a bunch of people who've written them.  In

18  fact, I stayed last week with one of them.

19        But on the how to -- most doctors,

20  like about 99%, can't interpret a study at all,

21  and this book is how to interpret every sort of

22  study, put yourself in control of the stuff you

23  can't understand.

24     Q   I see.

196

1     A   And that's why it's called The Users

2  Guides, and it's now become very fat and very

3  popular.

4        MR. NELSON:  But you haven't made a penny

5  out of it.

6        THE WITNESS:  But you've made tons of money

7  from it.

8        MR. NELSON:  There we go.

9  BY MR. MONTGOMERY:

10     Q   Is it generally directed towards

11  clinicians?

12     A   Yes.  The idea is to -- for physicians

13  to -- to take control of -- to understand what it

14  is they're reading because this is sophisticated

15  stuff, some of it.  It should be.

16     Q   And do you have any idea how many

17  copies of the book have been distributed?

18     A   I don't know, about 40,000 or

19  something like that.  I mean it's not that great.

20     Q   And is it -- has it been issued

21  through JAMA?

22     A   No, it was issued through the AMA

23  Press.  The publisher's going to -- that's -- so

24  it's had zero publi -- zero -- now, you asked --

Drummond, Rennie  1/18/2007  1:30:00 PM

197

1    zero publicity.  It's just sold itself.

2          MR. MONTGOMERY:  All right, I have no

3    further questions.

4          MR. HALPER:  No questions.

5          MR. NELSON:  I have no questions.

6          MR. MONTGOMERY:  We will end the deposition

7    at this time.

8          THE VIDEOGRAPHER:   This is the end of the

9    deposition.  This is the end of Tape 5.  The time

10   is 6:26 p.m.  The running time of this tape is

11   28 minutes and 57 seconds.

12         WHEREUPON, FURTHER DEPONENT SAYETH NOT

13

14

15

16

17

18

19

20

21

22

23

24

199

1    STATE OF ILLINOIS   )
                          )  ss:
2    COUNTY OF C O O K   )

3

4          I, Deborah Habian, a Certified
     Shorthand Reporter within and for the State of
     Illinois, do hereby certify:

5

6          That previous to the commencement of the
     examination of the witness, the witness was duly
     sworn to testify the whole truth concerning the
7    matters herein;

8          That the foregoing deposition was reported
     stenographically by me, was thereafter reduced to
9    printed transcript by me, and constitutes a true
     record of the testimony given and the proceedings
10   had;

11         That the said deposition was taken before
     me at the time and place specified;

12

13         That the reading and signing by the
     witness of the deposition transcript was agreed
     upon as stated herein;

14

15         That I am not a relative or employee
     of attorney or counsel, nor a relative or
     employee of such attorney or counsel for any of
16   the parties hereto, nor interested directly or indirectly
17   in the outcome of this action.

18         IN WITNESS WHEREOF, I do hereunto set my
     hand this _____ day of _____, 2007.

19

20

21

22         DEBORAH HABIAN, CSR, RMR, CRR
            Notary Public
23          CSR No. 084-022432

24

198

1          IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF NEW JERSEY

3    ALASKA ELECTRICAL PENSION FUND, )

4    et. al.,                        )

5               Plaintiffs,   )

6         vs.               )  No. 03-1519

7    PHARMACIA CORPORATION, et. al., )

8               Defendants.   )

9

10

11         I hereby certify that I have read the

12   foregoing transcript of my deposition given at

13   the time and place aforesaid, consisting of pages

14   1 to 197, inclusive, and I do again subscribe and

15   make oath that the same is a true, correct, and

16   complete transcript of my deposition so given as

17   aforesaid and includes changes, if any, so made

18   by me.

19

20         _____

              DR. DRUMMOND RENNIE

21

     SUBSCRIBED AND SWORN TO

22   before me this _____ day

     of _____, A.D. _____.

23

     _____

24     Notary Public

Pharmacia                                    None                                    Page  197 - 199

# EXHIBIT 11

From: LEFKOWITH, JAMES B. [PHR/1825]
Sent: Friday, September 08, 2000 8:56 AM
To: ARBE, EMILIO [PHR/5430]
Subject: RE: CLASS Data

Emilio-
I think that it might be a good idea for you to discuss your concerns with me directly before making any more
statements regarding the issues that concern you.  I believe that you do not fully understand the data and the
analysis.
Jim Lefkowith

-----Original Message-----
From: ARBE, EMILIO [PHR/5430]
Sent: Friday, September 08, 2000 6:57 AM
To: SHIELD, MICHAEL J [PHR/5430]; JADERBERG, MAGNUS [PNU/GBMKEPO1];
FORREST, DAVID [PNU/GBMKEPO1]
Cc: LEFKOWITH, JAMES B. [PHR/1825]; HAMELIN, PAUL R. [/1820]
Subject: RE: CLASS Data

The results I quote are lifted from the study report. I will double-check that all the figures are correct and I haven't
made any gross misinterpretations. Emilio

-----Original Message-----
From: SHIELD, MICHAEL J [PHR/5430]
Sent: Thursday, September 07, 2000 8:23 AM
To: JADERBERG, MAGNUS [PNU/GBMKEPO1]; FORREST, DAVID [PNU/GBMKEPO1]
Cc: LEFKOWITH, JAMES B. [PHR/1825]; HAMELIN, PAUL R. [/1820]; ARBE,
EMILIO [PHR/5430]
Subject: RE: CLASS Data

EXHIBIT
28
1·12-07      DS

Magnus,
I haven't seen these data presented in this way before so I cannot judge properly the validity of what Emilio is
stating. I would agree that the analyses reported in JAMA are not exactly as stated in the original protocol. There
are though I understand from the R&D group good reasons for what has been done. In my notes from the
presentation made here last week by Jim Lefkowith I see that he used the term "refined" as applied to the
subsequent data analyses. The six months issue, as explained by Jim was to set a point which all patients had
completed (taking into account earlier withdrawals up to that time). I don't know whether you were at the EULAR
conference(June 2000) but if you were and attended the Searle/Pfizer symposium then you would have heard
the considerable debate there was re what constituted "intent-to-treat". In a true "intent-to-treat" there is actually
a need to follow-up ALL patients for the ENTIRE treatment period (whatever period is defined) whether or not
they have withdrawn from the original test medications. In practice this is rarely done and these debates about
"intent-to-treat" are largely semantic ones. In the real world one wants to know, beyond reasonable doubt,
whether or not a treatment produces a desired effect and whether or not there are undesirable effects of any
consequence.

Emilio's statements that there are no differences between Celebrex and the comparator NSAIDs re serious GI
events I find somewhat surprising, and as indicated above I haven't seen the data portrayed in this way before.
From what I have seen I am satisfied that in the non-aspirin group (which comprises almost 80% of the patients
treated and which is comparable to the VIGOR study in the sense that patients in the Merck study did not use
aspirin, except by protocol violation)
that we have a statistically significant outcome for Celebrex versus Ibuprofen and Diclofenac. When combining
the results for both NSAIDs one does not see statistically significant differences for Celebrex vs NSAID in the
apsirin taking population. My only comments about that are twofold. First, that is what one would expect in that
Celebrex doesn't have any protective effect against aspirin (unlike say the misoprostol component in Arthrotec)
so I would expect to see exactly the same sort of result in takers of a drug like paracetamol which as far as we
know is non-GI damaging. The second point is that I believe our data is actually better than we have currently

nfidential - Subject To Protective Order                                                      DEFS 00118475

presented in the public domain in that when one looks at the separate NSAIDs there is a greater GI-event rate on diclo+aspirin than on celebrex+ aspirin. This, I believe, is readily explicable in terms of the differing pharmacodynamic effects of celebrex and diclofenac on platelet function (beneficial towards Celebrex). This, though,I am happy to set to one side as the R&D folks have done to save unduly complicating the message, though in doing so we do lose to some extent a potential advantageous ppoint.

Consequently in summary re the GI event rates everything I have seen demonstrates, to me at least, that we have clear separation of celebrex from diclo and ibuprofen. The Kaplan-Maier plots which take into account differential exposure times show that very elegantly.

Re the tolerability profile I think it has to be stressed, from the outset, that the CLASS study was never intended to be other than a study to focus on whether or not the drug retained COX-2 specificity CLINICALLY and to demonstrate that it was decided (in fact demanded by the FDA) that twice the maximum therapeutic dose should be used. Consequently if one does obtain reasonable tolerability at this dose that in itself would be remarkable given that no NSAID can be used at twice its maximum therapeutic dose without causing SEVERE intolerance (e.g what tolerability profile would you expect to see at 300mg/day of diclofenac).
Consequently an overall GI symptom profile for Celebrex 800mg/day which was unquestionably better (statistically so) than diclofenac at 150mg/day and which was virtually the same seen with ibuprofen has I think to be regarded as a good result. Additionally re both diclo and ibuprofen Celebrex demonstrated, at this dose, a better profile re biochemistry (LFTs and renal)and on BP and on potential to cause anaemia as detected by Hb changes.

Emilio's point re rash really singles out one item that is very readily dismissed. To take the incidence of rash in the CLASS study as an indicator of tolerability appears to me to be erroneous for the following reasons. As pointed out in the original Integrated Safety Summary (ISS) prepared for registration submissions by R&D (page 332, document N49-98-07-819)and as is reflected in the "Skin" adverse events section (p243/4) of the "Celecoxib Clinical Summary" which I wrote for the EU submission, celecoxib demonstrates a dose-related increase in rash. This is distinct from the LACK of dose response seen, with celecoxib, as far as I am aware, for any other adverse event. The ISS on page 332 states: "There was an increase in incidence of rash at higher celecoxib doses, with the maximal incidence of 3.4% associated with the 400mg BID dose, thus suggesting a dose-response relationship". Emilio certainly has access to, and I thought had seen, both of these documents. If the mechanism, which as yet is unknown, is exposure-duration related then obviously in longer studies at high dose (above the therapeutic dose currently recommended) the incidence will increase. As pointed out above, the CLASS study was not there to examine the overall side effect profile of celecoxib. That was very satisfactorily done in the registration studies. The findings re rash in the CLASS study merely confirm what we already know about the product. I have no hesitation in recommending that on this basis we can focus on the GI-event rates from CLASS without having to focus on the other findings for the reasons stated. THE TOLERABILITY PROFILE and other ADE profile from the extensive database we have at theraputic doses is perfectly satisfactory, and in fact is better than the CLASS data, for our medical & marketing colleagues to use to demonstrate our superiority over NSAIDs.  (I made the latter point at last week's UK marketing meeting with Jim Lefkowith).

I am a great believer in such discussion points being out in the open and also in encouraging people to raise their issues so that they can be addressed. Consequently I think it is only fair that Jim Lefkowith should have the opportunity to see and respond to Emilio's points since Jim has lived with and breathed the CLASS data over the past several months and has seen the data in much greater depth than me –  hence I have copied Jim on this reply to you Magnus. In that way hopefully we can focus on the facts and see exactly where the truth lies. I would hope that in this process discussion can be held without any parties personalising the discussion. A lack of objectivity is always dangerous.

Regards
Michael


——Original Message——
From: JADERBERG, MAGNUS [PNU/GBMKEPO1]
Sent: 07 September 2000 05:01
To: SHIELD, MICHAEL J [PHR/5430]; FORREST, DAVID [PNU/GBMKEPO1]
Subject: CLASS Data

Confidential - Subject To Protective Order

DEFS 00118476

Please see Emilio's comments below - any comments from Michael who has
followed this study from the beginning?
The rest of us have a lot to catch up on and so not that easy to
advice Emilio although it is clearly of concern to hear someone on 'the inside'
express these views.
Magnus

_____ Forward Header _____
Subject: CLASS Data
Author:  EMILIO ARBE at Exchange
Date:   04/09/2000 10:19

Dear Magnus,

Since you brought up the subject this morning, here is what I think about CLASS.
The study was set out to demonstrate that based on a withdrawal rate of up to
35%, patients would experience clinically significant UGI adverse evens at a
rate of 0.3% per year with SC-58635 and 1.2% per year with NSAIDs as a group.
The protocol did not specify that the endpoint would be assessed at 6 months
only. An interim analysis was planned, but this was only to make sure that
enough events had occurred so that the differences would be statistically
significant by the end of the study, which was 12 months.

There are several flaws in the way that we present the data. We claim that we
cannot compare the groups at 12 months because the drop out rate was so much
higher in the diclofenac group. In fact at 26.5 % it was lower than expected and
not that different from celecoxib with 22.4% and ibuprofen 23%. The total number
of events required, which was 37, was actually met as there were 38 in total, 17
with celcoxib, 10 with diclofenac and 11 with ibuprofen. Considering that twice
as many patients had been treated with celecoxib, this equated to annual rates
of 0.43%, 0.50% and 0.55% percent. None of the differences were statistically
significant. If one looks at the subset of patients who did not take aspirin,
which we so much publicise, the rates were 0.26%, 0.26% and 0.64%, again with no
statistically significant differences.

With a bit of data massage, what Steve Geis and his team have done is to focus
on the 6 month data, for no other reason that it happens to look better, and
this time they concentrate on the non aspirin treated patients, and ignore the
fact that at no time interval did we see a statistically significant difference
with diclofenac, whether one looks at patients taking aspirin or not, at 6 or at
12 months. Unfortunately, UK doctors would only be interested in looking at the
rate of GI events with diclofenac since such a high dose of ibuprofen is rarely
used.

In terms of tolerability the results are also disappointed, in that the rates of
withdrawal due to dyspepsia were 3.8%, 4.4% and 3.9% for celebrex, diclofenac
and ibuprofen. To top up the lot we had a 6.2% of rash, which was statistically
significantly greater to that seen for the diclofenac and ibuprofen groups. So
much for our delivering lasting control in arthritis claim based on improved
tolerability and safety profiles.

In my opinion though, these results do not say much about Celebrex used at
therapeutic doses, and hence our interest in collecting some more meaningful
data through a SAMM study. Probably then, the annual complication rate is 0.3%

confidential - Subject To Protective Order

as expected and there is probably a tolerability advantage as seen in the Emery study, celebrex 200 mg bid vs diclofenac 75 mg bid over 6 months in RA.

The point I am trying to make though is that I don't see what is so great about CLASS. Personnally I find it bizarre that we would want to roll out the data to opinion leaders who aren't necessarily dupe and I wouldn't feel too comfortable presenting a fudged version of the facts. Any guidance from your side is of course welcome.

Kind regards,

Emilio

Confidential - Subject To Protective Order

DEFS 00118478

EXHIBIT 12

From:           Wahba, Mona M
Sent:           Tuesday, May 22, 2001 5:17 PM
To:             Cristo, Stephen
Subject:        CBX-0234902_FW: CLASS manuscripts for review: Urgent attention required

Importance:     High

Follow Up Flag: Follow up
Due By:         Monday, May 21, 2001 12:00 PM
Flag Status:    Flagged

      

CBX-0234903_CELEC  CBX-0234904_COX-  CBX-0234905_CLAS
COXIB CV ver2....   2 Inhibitor Up...  S manuscript 2...
                              fyi

-----Original Message-----
From: Wahba, Mona M
Sent: Monday, May 21, 2001 2:03 PM
To: Denton, James; Harris, Andrew; Silber, Beth Ann; Pettitt, Dan;
Sirota, Eric; Bahrt, Kenneth; Shafner, Lori S; Fletcher, Mark P; Cary,
Meg; Gavigan, Michael; Gandelman, Mitchell; McElwee, Newell
Subject: FW: CLASS manuscripts for review: Urgent attention required
Importance: High


Dear All,

Please see my comments attached, i'd recommend to refer to the
conclusions of the second attachment in the CVS ms.

In my opinion, the GI ms is apologetic, weak and not convincing, since
cx did not show statistical difference from Diclo even using the
combined endpoint.   We are also cherry picking the data ( using 6 m as
study duration).
There is a need to sharpen the story around the effect of GI withdrawals
in the diclo group and the effect of ASA as a confounding factor on the
expanded endpoint if we decide to publish this ms.

Do we have the newly created tables supporting these 2 ms to QA the #s?

Mona M. Wahba, M.D.
Pfizer Global Research and Development
Office:  860 441 8950
Mobile: 860 625 9356
Fax:        860 715 8463
<mailto:mona_m_wahba@groton.pfizer.com>

-----Original Message-----
From: Denton, James
Sent: Sunday, May 20, 2001 5:36 PM
To: Sadosky, Alesia; Byer, Alicia; Harris, Andrew; Silber, Beth Ann;
Prestel, Betina; Pettitt, Dan; Nickerson, David F; Alemayehu, Demissie;
Shapiro, Elyse R; Sirota, Eric; Lee, Fleur; Ancona, Frank; Cawkwell,
Gail; Lymburner, Jeffrey; Plofchan, Jennifer N; Goldman, Jonathan;
Dicker, Joy; Bahrt, Kenneth; Levy, Lisa; Shafner, Lori S; Fletcher, Mark
P; Horn, Mark; Cary, Meg; Gavigan, Michael; Gandelman, Mitchell; Wahba,
Mona M; McElwee, Newell; Sobel, Rachel; Reynolds, Robert; Nelson,



EXHIBIT
22
1.12.07   DS

1

Confidential - Subject To Protective Order

DEFS 00500695

Rooney; Miller, Tina; Quinn, Tricia; Leishman, Valarie
Subject: FW: CLASS manuscripts for review: Urgent attention required


Please forward comments to Beth and me by Wednesday May 23.
Jim

-----Original Message-----
From: Cornick, David [mailto:dcornick@hbase.com]
Sent: Thursday, May 17, 2001 4:01 AM
To: Fort, John; Denton, James; 'Tim Walbert'
Cc: Markind, Jan E; 'Jim Lefkowith'; Donovan, Dan
Subject: CLASS manuscripts for review: Urgent attention required
Importance: High


Dear All,

Please find attached two draft CLASS manuscripts (GI and CV) from Jim
Lefkowith's group. I would appreciate it if you could review the attached
documents and return your comments to Jan Markind and I by Thursday 24th May
at the latest.

Jim, I would very much appreciate it if you could consolidate all the Pfizer
comments into one e-mail prior to returning them to Jan and I. Many thanks
for your help.

Look forward to hearing from you all in due course

Regards

Dave Cornick
Editorial Leader
PPS International Communications
Phone +44 (0)1903 288131
Fax    +44 (0)1903 282707
E-mail: dcornick@hbase.com


-----Original Message-----
From: MARKIND, JAN E [GPB/1820] [ mailto:jan.e.markind@pharmacia.com
<mailto:jan.e.markind@pharmacia.com> ]
Sent: 17 May 2001 02:20
To: 'Cornick, David'
Subject: FW:
Importance: High



Dave,

Please send out for review to Jim Denton, John Fort, and Tim Walbert.
Please ask Pfizer to consolidate all comments for each manuscript into 1
e-mail.  Please use the abstracts from these as we discussed; alter as
needed.

Thanks,

Jan
-----Original Message-----

2

onfidential - Subject To Protective Order

From: LEFKOWITH, JAMES B. [PHR/1825]
Sent: Wednesday, May 16, 2001 8:56 AM
To: MARKIND, JAN E [GPB/1820]
Subject:

Jan-
Please distribute these draft copies to the Publication Team.   I would like
to limit the review process to 7 business days.
JL

3

Confidential - Subject To Protective Order

DEFS 00500697

EXHIBIT 13

Fred Silverstein                                    September 29, 2010

---

**Page 1**

                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY


ALASKA ELECTRICAL PENSION FUND,        )
                                       )
                                       )
            Plaintiff                  ) Case No.
                                       )
        vs.                            ) 03-15-19
                                       ) (AEI)
PHARMACIA CORP., et al.,               )
                                       )
                                       )
            Defendants.                )
                                       )


         VIDEOTAPED DEPOSITION OF FRED SILVERSTEIN, M.D.
                      September 29, 2010
                      Seattle, Washington


Reported by:
Connie Recob, CCR, RMR, CRR, CLR
CCR No. 2631
Job No. Seattle 161218/San Diego 335512

---

**Page 2**

                          APPEARANCES

    For the Plaintiffs:
        MATTHEW MONTGOMERY
        Scott & Scott LLP
        Suite 1000
        707 Broadway
        San Diego, California  92101
        (619) 233-4565
        (619) 233-0508 Fax
        mmontgomery@scott-scott.com

        LANCE V. OLIVER
        Motley Rice LLC
        28 Bridgeside Boulevard
        Mt. Pleasant, South Carolina  29464
        (843) 216-9061
        (843) 216-9440 Fax
        loliver@motleyrice.com

    For the Witness:
        JEFFREY J. BUSHOFSKY
        Ropes & Gray LLP
        46th Floor
        111 South Wacker Drive
        Chicago, Illinois  60606
        (312) 845-1200
        (312) 845-5500 Fax
        jeffrey.bushofsky@ropesgray.com

        JOAN McPHEE
        Ropes & Gray LLP
        One International Place
        Boston, Massachusetts  02110
        (617) 951-7000
        (617) 951-7050 Fax
        joan.mcphee@ropesgray.com

---

**Page 3**

                   APPEARANCES CONTINUED

    For the Defendants:
        JOSHUA R. WEISS
        Cadwalader, Wickersham & Taft LLP
        One World Financial Center
        New York, New York  10281
        (212) 504-6225
        (212) 504-6666 Fax
        joshua.weiss@cwt.com

    Also Present:
        Steve Ewing, Videographer


                   EXAMINATION INDEX


    EXAMINATION BY:                    PAGE NO.

    MR. MONTGOMERY                        7
    MR. WEISS                           228
    MR. MONTGOMERY                       252


                     EXHIBIT INDEX

    EXHIBIT NO.    DESCRIPTION           PAGE NO.

    Exhibit 191    Subpoena to Testify at a Deposition
                   in a Civil Action            11
    Exhibit 192    Curriculum Vitae for Fred E.
                   Silverstein, M.D., Bates Nos.
                   Silverstein 00609 through 00631    11
    Exhibit 193    12/21/83 Letter, Bates Nos. DEFS
                   000954 through 000955        13
    Exhibit 194    2/1/02 Letter, Bates Nos. Silverstein
                   00374 through 00375          14

---

**Page 4**

                   EXHIBIT INDEX CONTINUED

    EXHIBIT NO.    DESCRIPTION           PAGE NO.

    Exhibit 195    Income from Searle/Pharmacia, Bates
                   No. Silverstein 00751        15
    Exhibit 196    Annals of Internal Medicine Article
                   titled Misoprostol Reduces Serious
                   Gastrointestinal Complications in
                   Patients with Rheumatoid Arthritis
                   Receiving Nonsteroidal Anti-Inflammatory
                   Drugs                        18
    Exhibit 197    Article titled Improving the
                   Gastrointestinal Safety of NSAIDs
                   The Development of Misoprostol - From
                   Hypothesis to Clinical Practice    42
    Exhibit 198    e-mail string with attachments, Bates
                   Nos. DEFS 03835807 through 03835816    149
    Exhibit 199    e-mail, Bates Nos. DEFS 00390944
                   through 00390946             149
    Exhibit 200    e-mail, Bates Nos. DEFS 00124205
                   through 00124206             154
    Exhibit 201    Comments on January 9 Class Advisory
                   Committee Rehearsal, Bates Nos.
                   DEFS 00656585 through 00656587    191
    Exhibit 202    e-mail with attachment, Bates Nos.
                   DEFS 00392205 through 00392246    192
    Exhibit 203    CLASS PowerPoint Presentation    200
    Exhibit 204    Gastrointestinal Review Highlights
                   of the CLASS study PowerPoint
                   Presentation                 205
    Exhibit 205    COX-2 & 2x:  Improved Safety?
                   PowerPoint Presentation      205
    Exhibit 206    Arthritis Advisory Committee Meeting
                   dated 2/7/01                 206



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                              September 29, 2010

5

EXHIBIT INDEX CONTINUED

EXHIBIT NO.    DESCRIPTION              PAGE NO.

Exhibit 207    Rational for Publishing the CLASS 6
               Month Data, Bates Nos. Silverstein
               00115 through 00123          210
Exhibit 208    e-mail, Bates No. Silverstein 00077  213
Exhibit 209    handwritten notes, Bates Nos.
               Silverstein 00090 through 00094    214

Exhibit 210    Letter, Bates Nos. Silverstein 00128
               through 00134              215
Exhibit 211    Handwritten Notes, Bates Nos.
               Silverstein 00124 through 00127    219

Exhibit 212    Handwritten Notes, Bates Nos.
               Silverstein 00080 through 00082    224

WITNESS INSTRUCTED NOT TO ANSWER

(None)

INFORMATION REQUESTED

(None)

6

1   BE IT REMEMBERED that on Wednesday,
2   September 29, 2010, at 1700 Seventh Avenue, Suite 2200,
3   Seattle, Washington, at 9:00 a.m., before Connie Recob, CCR,
4   RMR, CRR, CLR, appeared FRED SILVERSTEIN, M.D., the witness
5   herein;
6       WHEREUPON, the following proceedings were
7   had, to wit:
8
9           <<<<<<  >>>>>>
10
11      THE VIDEOGRAPHER:  This is Tape No. 1 to
12  the videotaped deposition of Dr. Fred Silverstein in the
13  matter of Alaska Electrical Pension Fund versus Pharmacia
14  Corporation, being heard before the U.S. District Court for
15  the District of New Jersey, Case File No. 03-15-19 (AEI).
16  This deposition is being held at Tousley Brain Stephens, 1700
17  Seventh Avenue, Suite 2200, Seattle, Washington 98101.
18  Today's date is September 29th, 2010 and the time is 9:00.
19      My name is Steve Ewing and I am the videographer.  The
20  court reporter is Connie Recob.  Counsel, will you please
21  introduce yourselves and affiliations and the witness can be
22  sworn.
23      MR. MONTGOMERY:  Matt Montgomery for the
24  plaintiffs.
25      MR. OLIVER:  Lance Oliver with Motley

7

1   Rice for the plaintiffs.
2       MR. WEISS:  Josh Weiss, Cadwalader,
3   Wickersham & Taft for the defendants.
4       MS. McPHEE:  Joan McPhee for Dr. Fred
5   Silverstein.
6       MR. BUSHOFSKY:  And Jeff Bushofsky from
7   Ropes & Gray also for the witness.
8
9   FRED SILVERSTEIN, M.D.,  having been first duly sworn,
10          deposed and testified as
11          follows:
12
13          EXAMINATION
14  BY MR. MONTGOMERY:
15  Q.  Could you state your name and home address for the record,
16      please?
17  A.  Fred Eli Silverstein.  My home address is 1246 15th Avenue
18      East, Seattle, Washington 98112.
19  Q.  Have you ever been deposed before, Dr. Silverstein?
20  A.  I have not.
21  Q.  Okay.  In that case I'll run over a few ground rules.
22  A.  Thank you.
23  Q.  I'm going to ask you a series of questions which hopefully
24      you'll be able to answer.  The attorneys over here may
25      interpose objections so if they make an objection just wait

8

1   for their objection to get on the record and unless your
2   counsel tells you not to answer the question you can then
3   answer the question.
4       It's important that we don't talk over each other
5   because the court reporter here has to type everything we say
6   and she can't type two people speaking at the same time.
7   Also, it's important that you answer all the questions
8   verbally; nodding or uh-huh, huh-uh doesn't translate to the
9   record very well but I'll try and remind you and attorneys
10  may as well.
11      Is there any reason such as illness or medication that
12  you can't give your best testimony today?
13  A.  No.
14  Q.  All right.  I'd like to go over some definitions that will
15      hopefully make the rest of the day go more smoothly.  Are you
16      familiar with a drug called celecoxib?
17  A.  I am.
18  Q.  And is that also called Celebrex?
19  A.  It is.
20  Q.  All right.  Are you familiar with a clinical study called
21      CLASS, C-L-A-S-S?
22  A.  I am.
23  Q.  And is that also known as Celecoxib Long-Term Arthritis
24      Safety Study?
25  A.  It is.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                      September 29, 2010

9

1    Q.  Are you comfortable using the initials GI to refer to
2        gastrointestinal?
3    A.  I am.
4    Q.  Okay.  Are you familiar with nonsteroidal anti-inflammatory
5        drugs?
6    A.  I am.
7    Q.  And are those also referred to as NSAIDs?
8    A.  That's correct.
9    Q.  Are you familiar with the Journal of the American Medical
10       Association?
11   A.  I am.
12   Q.  Is that also sometimes referred to as JAMA?
13   A.  It is.
14   Q.  Are you familiar with a term called "Clinically Significant
15       Upper Gastrointestinal Events"?
16   A.  Yes.
17   Q.  And are those sometimes referred to as CSUGIEs?
18   A.  Yes.
19   Q.  How do you pronounce it?
20   A.  Well, I don't use that expression.  I prefer to use
21       "significant upper GI events."  Some people use that acronym
22       and it's not one that I use or am comfortable with.  So that
23       one I'd like to avoid and use words.
24   Q.  Sure.  That's what I'm trying to do this for.
25   A.  Right.

10

1    Q.  So what are you comfortable with again?
2    A.  Upper GI adverse event, upper GI bleed, upper GI perforation,
3        you know, a little bit more specific.  CSUGIEs is kind of a
4        folky acronym that I don't use.
5    Q.  When you say upper GI event, is that the same as a
6        perforation obstruction and bleed or bleed?
7    A.  No, not necessarily.  In the upper GI tract you can have a
8        significant complication which is usually a bleed, a
9        perforation or obstruction, but you can also have a
10       significant event which is not a complication but which is,
11       for example, a symptomatic ulcer, so somebody who will tell
12       you they have belly pain and they're endoscoped or have an
13       x-ray and they're found to have an ulcer.
14           So generally complications are considered to be
15       bleeding, perforation or obstruction, and the other
16       significant event in that realm would be a symptomatic ulcer.
17   Q.  Okay.  So can we -- is there a distinction between ulcer
18       complications and a symptomatic ulcer then?
19   A.  Yes, there is.  I would say there is.
20   Q.  And are you comfortable with that terminology?
21   A.  Yes, I am.
22   Q.  Okay.
23           MR. MONTGOMERY:  I'd like to ask the
24       court reporter to mark what will be Exhibit 191.
25   ////

11

1           (Exhibit No. 191 marked
2           for identification.)
3    Q.  (BY MR. MONTGOMERY) Have you seen Exhibit 191 before?
4    A.  I believe I have.
5    Q.  And is it your understanding this is a depo subpoena -- I'm
6        sorry -- a deposition subpoena?
7    A.  Yes.
8    Q.  Is it your understanding you're here today pursuant to this
9        subpoena?
10   A.  Yes.
11   Q.  You can just put that to the side.  What we're going to do
12       today, as I give you these, you can just stack them up here.
13   A.  Okay.
14   Q.  There may be some exhibits that I'm going to refer to again
15       later so I'll let you know that and you can maybe put them in
16       a different pile so that they're easier to get.
17   A.  Okay.  Fair enough.
18           MR. MONTGOMERY:  At this point I'd like
19       to ask the court reporter to mark what will be Exhibit 192.
20           (Exhibit No. 192 marked
21           for identification.)
22   Q.  (BY MR. MONTGOMERY) Is Exhibit 192 a copy of your CV or
23       curriculum vitae?
24   A.  That's correct.
25   Q.  And is it the most current version?

12

1    A.  It is.
2    Q.  And are you currently employed?
3    A.  I am not.  I'm retired.
4    Q.  Okay.  Do you do any consulting?
5    A.  I do.
6    Q.  And do you do any consulting for Pfizer?
7    A.  I do not.
8    Q.  Have you done any consulting for Pfizer since you retired?
9    A.  No, I have not.  I retired in about 2005 and I haven't done
10       any consulting for Pfizer since about 2001.
11   Q.  Are you at this point in any talks or negotiations to do
12       consulting with Pfizer in the future?
13   A.  No.
14   Q.  Okay.  Would you turn to Bates No. Silverstein 00623 in
15       Exhibit 192?  Do you know what Bates numbers are?
16   A.  No.
17   Q.  They're just the page numbers in the lower right-hand corner.
18   A.  Okay.
19   Q.  Do you see No. 147 on that page?
20   A.  I do.
21   Q.  And does that refer to an article you coauthored that was
22       published in JAMA?
23   A.  I did.
24   Q.  And can we refer to that for the purposes of the deposition
25       as the JAMA article?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                          September 29, 2010

13

1   A.  Yes.

2   Q.  Okay.

3          MR. MONTGOMERY:  I'd like to ask the

4   court reporter to mark what will be Exhibit 193.

5          (Exhibit No. 193 marked

6              for identification.)

7   Q.  (BY MR. MONTGOMERY) And is Exhibit 193 a consulting agreement

8   between yourself and Searle?

9   A.  That's correct.

10  Q.  And Searle is a pharmaceutical company?

11  A.  That's correct.

12  Q.  Is this the first consulting agreement that you think you

13  entered into with Searle?

14  A.  I'm not positive but I think that is the case.

15  Q.  And after the date of this agreement -- well, first of all

16  the date of this agreement is December 31st, 1983; is that

17  correct?

18  A.  That's correct.

19  Q.  After this agreement did you enter into -- subsequently enter

20  into a series of consulting agreements with Searle over the

21  years?

22  A.  Yes.

23         MR. MONTGOMERY:  I'd like to ask the

24  court reporter to mark what will be Exhibit 194.  Hold on one

25  second.

14

1          (Exhibit No. 194 marked

2              for identification.)

3          MR. WEISS:  Is this two exhibits?

4          MR. MONTGOMERY:  I'm sorry.  There was an

5   issue with the copier.  I gave you the ones I was trying to

6   get rid of.

7   Q.  (BY MR. MONTGOMERY) Is Exhibit 194 a consulting agreement

8   between you and Pharmacia dated February 1st, 2002?

9   A.  Yes.

10  Q.  Is it your understanding that at some point Searle was

11  acquired by Pharmacia?

12  A.  Yes.

13  Q.  And at that point did you enter into a consulting

14  relationship with Pharmacia?

15  A.  Yes.

16  Q.  And were there a number of such agreements over the years?

17  A.  I don't -- I don't know.  That I don't remember.  I never

18  could really follow what was happening with these

19  acquisitions and so -- as far as I know there's this one.  I

20  don't know if there were any others with Pharmacia and

21  there's been nothing recent.

22  Q.  Is it your understanding that at some point Pharmacia was

23  acquired by Pfizer?

24  A.  That's correct.

25  Q.  Prior to that acquisition did you do any consulting work for

15

1   Pfizer?

2   A.  I did not.

3   Q.  After the acquisition did you enter into a consulting

4   relationship with Pfizer?

5   A.  I don't remember.  I think that this -- to the best of my

6   knowledge this was the last consulting agreement I had with

7   Pharmacia and I did not enter into a consulting agreement

8   directly with Pfizer, as far as I remember.

9          MR. MONTGOMERY:  At this point I'd like

10  to ask the court reporter to mark what will be Exhibit 195.

11         (Exhibit No. 195 marked

12             for identification.)

13  Q.  (BY MR. MONTGOMERY) Could you tell me what Exhibit 195 is?

14  A.  In the process of providing information that was requested as

15  part of the subpoena I went back through all of my records,

16  spent hours going through -- old tax files is where I found

17  this, and attempted to summarize the information I had about

18  remuneration I received from Searle and/or Pharmacia from

19  1995 through 2004, and 2004 could be 2010 because there's

20  been no change.  It's been zero since 2002.  And this is a

21  summary of what I could find.

22         Now, in -- about two months ago I was asked to go

23  through things again and I did it again and in a

24  miscellaneous file that I hadn't looked at previously, of

25  course I'm talking about cartons and cartons of tax files, I

16

1   found some additional data.  But nothing that changes any of

2   this, it's just background or backup information.  There was

3   no, to my knowledge, significant new information.

4   Q.  All right.  And to your understanding you never received any

5   money directly from Pfizer then?

6   A.  That's correct.

7   Q.  Okay.  Let's just run through this then.

8          So in 1995 is it your understanding you received

9   somewhat more than $35,000 from Searle?

10  A.  Correct.

11  Q.  In '96 you received somewhat more than $37,000 from Searle?

12  A.  That's correct.

13  Q.  And in 1997 you received somewhat more than $68,000 from

14  Searle?

15  A.  That's correct.

16  Q.  In 1998 did you ever find that information?

17  A.  I don't -- no.

18  Q.  Okay.  In 1999 you received somewhat more than $64,000 from

19  Searle?

20  A.  That's correct.

21  Q.  In 2000 you received $75,000 from either Searle or Pharmacia?

22  A.  That's correct.

23  Q.  And what is the --

24  A.  Expenses.  I just had a separate note that I had $6,167 for

25  expenses.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

17

1  Q. And that's in addition to the 75 --

2  A. In addition to the $75,000.

3  Q. It's important that you let me finish my question before you

4     start.

5  A. Excuse me.

6  Q. I appreciate your willingness to answer, though.

7        Okay. In 2001 it's your understanding you received

8     slightly more than $12,000 from Searle or Pharmacia?

9  A. That's correct.

10 Q. And then beneath that it says 87,000. Do you see that?

11 A. Yes, that's correct.

12 Q. And what does that refer to?

13 A. It's also compensation I received in 2001. And I don't know

14    whether the 87,000 encompassed the 12,000. I am not clear.

15    I'm not sure about that. But I wanted to report both of them

16    because that's what my records had that I received.

17 Q. Okay. So in 2001 you either received $87,000 from Searle --

18 A. Right.

19 Q. -- or Pharmacia, or a little bit more than 99,000; is that

20    right?

21 A. That's correct.

22 Q. And that's in addition to 65 -- somewhat more than $6,500 in

23    expenses, right?

24 A. That's correct.

25 Q. And since 2001 you've received no money from Searle,

18

1     Pharmacia or Pfizer?

2  A. That's correct.

3  Q. Okay.

4        MR. MONTGOMERY: At this point I'd like

5     to ask the court reporter to mark what will be Exhibit 199 --

6     I'm sorry; Exhibit 196.

7              (Exhibit No. 196 marked

8                  for identification.)

9  Q. (BY MR. MONTGOMERY) Is Exhibit 196 an article that you

10    co-authored that was published in the Annals of Internal

11    Medicine on August 15th, 1995?

12 A. It is.

13 Q. And what does this article describe, generally speaking?

14 A. This is, to my knowledge, the first large clinical trial

15    which examined the question of the ability to change the

16    incidence of upper gastrointestinal complications in patients

17    with arthritis, in this case rheumatoid arthritis, taking

18    nonsteroidal anti-inflammatory drugs.

19       What had happened was between about the years 1985 and

20    1990, in that range, there became an increasing appreciation

21    that ulcers and ulcer complications in patients were related

22    to these drugs called nonsteroidal anti-inflammatory drugs of

23    which there are approximately 20 to 25 different drugs, and

24    it had been found out through work of a person named Andre

25    Robert who at the time worked for Searle, that it seemed like

19

1     the nonsteroidal anti-inflammatory drugs interfered with the

2     production of a class of hormones called prostaglandins in

3     the wall of the stomach and duodenum. And Andre Robert was

4     one of the first scientists to show that the protection of

5     the gastrointestinal tract against the formation of ulcers is

6     remediated by prostaglandins and the way it does that is by

7     increasing mucosal blood flow which allows the stomach to get

8     rid of the acid, absorb the acid, by producing mucus which

9     protected the stomach wall and the duodenal wall, and a

10    couple of other mechanisms.

11       So the question was, if you added this prostaglandin, I

12    believe it's prostaglandin E2 drug, misoprostol, to

13    nonsteroidal anti-inflammatory drugs, if you could change the

14    incidence of complications. And this addresses an important

15    part of this whole topic which is how do you study this type

16    of complication. It's easy enough to say that you should do

17    this in 8800 patients which is what this study was done in,

18    but that's a very, very expensive study. And so you can

19    imagine, I mean I have no idea what it costs, but it probably

20    costs $20 million to run a study like this. So there were

21    considerations, including at the FDA, which I attended, on

22    how to design a study, what kind of surrogate markers you

23    could use.

24       In other words, if you said, Well, if you're going to

25    get an ulcer, then you could get an ulcer complication. So

20

1     if you don't have an ulcer, you're not going to get a

2     complication, so maybe instead of studying complications you

3     can study ulcers. And the reason that's important is that in

4     people on nonsteroidal anti-inflammatory drugs they have

5     about a 20 percent incidence of ulcers, so 100 people, 20 of

6     them is going to get an ulcer, but only one of them is going

7     to get an ulcer complication. So if it's 20 out of 100 you

8     could improve on that if you got it down to let's say 10 out

9     of 100 or five out of 100 with a study in 200 people. But if

10    you want to look at the actual complication which is a

11    one percent incidence and you want to improve on that, it has

12    to be a very large trial.

13       And that's why this trial was 8800 patients, it was

14    almost 9,000 patients. And it -- I believe the FDA wanted

15    Searle at the time to do sort of this ultimate trial. They

16    did not want a surrogate like just an ulcer or even before an

17    ulcer, an erosion. They wanted the actual proof about a

18    complicated ulcer with bleeding obstruction, perforation.

19       And so this trial was undertaken in a large group of

20    people by a large group of physicians, 660 physicians, 8800

21    patients, and the design of the trial was to take 10 --

22              (Interruption.)

23          THE WITNESS: It was to take 8800

24    patients and -- with rheumatoid arthritis, which is one type

25    of arthritis, but these people have very bad arthritis and



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                September 29, 2010

21

1    need these drugs to maintain function.  But we're taking one
2    of 10 NSAIDs, so this was a scala of NSAIDs, and then they
3    were randomized to either taking misoprostol with the NSAID
4    or no misoprostol with the NSAID.  And then we examined the
5    incidence of the complications.  And what was shown in this
6    study was that the complications occurred in approximately
7    one percent of patients, which is what we knew.  In fact, the
8    FDA in all of the nonsteroidal drugs in the warning section
9    reports that there's a one to two percent incidence -- well,
10   that the incidence of a GI complication and/or a symptomatic
11   ulcer is three to four percent or two to four percent, and
12   the incidence of a complication is approximately one percent.
13   And that's in fact what we found in this paper, that in the
14   people who were randomized to placebo with the NSAID there
15   was about a one percent incidence of complication.  I think
16   it was .9 percent.  And with the misoprostol, it reduced that
17   to about .5 percent, a 40 percent reduction which was
18   statistically significant at a P value of .049, just
19   below .05 which was the cut off for significance.
20        So in fact, to my knowledge, this was the first large
21   randomized prospective trial, not a metaanalysis or, you
22   know, a compilation of other studies, that actually directly
23   examined patients with arthritis taking nonsteroidal drugs
24   and whether you could reduce the incidence of these serious,
25   potentially life-threatening complications by adding a

22

1    prostaglandin to their nonsteroidal drugs, and it was
2    positive.
3    Q.  So what is Misoprostol?
4    A.  So Misoprostol is a prostaglandin E1 analog.  That's a type
5    of prostaglandin.  There are approximately 25 different
6    prostaglandins in the bodies and they affect all the organs
7    in the body.  Misoprostol is one of these prostaglandins, and
8    it's known to affect the upper gastrointestinal tract with,
9    as I said, increased mucous production, increased blood flow
10   to the lining of the stomach, and to be associated with
11   increased resistance of the stomach wall to ulceration caused
12   by nonsteroidal agents presumably through the COX-1
13   mechanism.
14   Q.  (BY MR. MONTGOMERY) So would it be fair, simply put, that
15   Misoprostol counteracts some of the negative effects in the
16   GI tract of the NSAIDs?
17   A.  Yes, in the upper GI tract.  We didn't actually study the
18   effects which have come up recently as interesting, the
19   effects of these drugs on the small bowel and colon which
20   also have effects, but this was really looking at the upper
21   GI tract.
22   Q.  Okay.  I'd like you to take a look on the first page on
23   Exhibit 196.
24   A.  Right.
25   Q.  The second bullet says Design; do you see that?

23

1    A.  Yes.
2    Q.  I'm just going to read it into the record.  It says, "Design
3    six-month randomized double blind placebo controlled trial."
4        Do you see that?
5    A.  I do.
6    Q.  Is that an accurate description?
7    A.  It is.
8    Q.  And I'm sorry; going back a step.  This whole study that
9    Exhibit 196 discusses, is that also referred to as the mucosa
10   study?
11   A.  It is.
12   Q.  Okay.  Is the language that I just read into the record an
13   accurate description of the mucosa trial?
14   A.  It is.
15   Q.  What does it mean to say it's a six-month trial in that
16   description?
17   A.  The patients were on the trial for six months unless they
18   were taken off the trial for an adverse event, I believe, or
19   of course for noncompliance or some other thing happening to
20   the patient.  That's why not all the patients who were -- I'm
21   trying to remember how many patients actually made it through
22   this trial, but it wasn't the full 8800 for a variety of
23   reasons.
24   Q.  So unless a patient withdrew they were given either an NSAID
25   plus placebo or an NSAID plus Misoprostol for six months; is

24

1    that right?
2    A.  That's correct.
3    Q.  And then after six months they weren't given either drug
4    anymore; is that right?
5    A.  That's correct.
6    Q.  Was there follow up after six months?
7    A.  I don't remember.  If you'll give me one moment to...
8    Q.  Sure.
9    A.  I don't believe so.  I mean patients of course were followed
10   because you're concerned about a patient who might have a
11   complication right at the end of the study, but the study
12   lasted six months.
13   Q.  And did patients enroll in the study on a rolling basis?
14   A.  I don't understand the question.
15   Q.  Sure.  Maybe I'll ask the reverse.
16        Did every single patient in the study start taking the
17   drug on the same day?
18   A.  No, that would be impossible.  These were in a whole bunch of
19   family practice -- family practices in North America, so the
20   United States and Canada; to be specific, 664 practices.  And
21   you need that volume of practice so that each practice can
22   enroll approximately 12 patients so that you have -- well, 14
23   patients so you will have approximately 9,000 patients at the
24   end of it.  So it required that if each practice was
25   enrolling 14 patients, they would wait until a patient with

Toll Free: 800.300.1214
Facsimile: 619.239.4117



ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

25

1    rheumatoid arthritis came in who met the entry criteria and
2    they would enroll -- and if that patient agreed to it with
3    informed consent they would then enroll that patient in the
4    study.
5    Q. So even though it's described here as a six-month trial, the
6    actual conduct of the trial presumably took somewhat longer
7    than six months?
8    A. That's correct.  I believe it took two years.
9    Q. All right.  Going back to Exhibit 196, the same -- on the
10   first page, do you see the bullet point in the first column
11   that says Results?
12   A. Yes, I do.
13   Q. And does that bullet describe in summary the results of the
14   study?
15   A. It does.
16   Q. Were those results for the full six months of the study?
17   A. Yes.
18   Q. Do you know, in this paper, Exhibit 196, did you ever analyze
19   any time period other than six months of data?
20   A. Not that I recall.
21   Q. Outside of the paper, when you got the results of the study,
22   did you ever analyze the results for any time period other
23   than six months?
24   A. Not that I recall.
25   Q. Why not?

26

1    A. The study was designed to be a six-month study.  We got data
2    in patients over a six-month period for each patient and
3    that's what we analyzed.
4    Q. So before you performed the mucosa study, did you have a plan
5    for how you were going to analyze the results once you got
6    them?
7    A. Yes.
8    Q. And did that include analyzing the results for six months?
9    A. Yes.
10   Q. And you followed that plan once you got the results?
11   A. Yes.
12   Q. All right.  Still on the first page of Exhibit 196, on the
13   right-hand column, the second paragraph that starts General
14   Physicians; do you see that?
15   A. I do.
16   Q. I'd like you to take a look at the last sentence in that
17   paragraph.  I'm going to read it into the record.  It says,
18   "Life-threatening events such as perforations or serious
19   hemorrhage from NSAID induced ulcers which also develop with
20   little or no warning are a real problem because of the many
21   patients at risk."
22        Do you see that?
23   A. I do.
24   Q. And was that true at the time this article was published?
25   A. I would say that were I to write it again, I might be a

27

1    little bit more specific about the "little or no warning,"
2    because in fact I think that -- I think that patients who
3    develop NSAID induced ulcers are likely to have antecedent
4    symptoms.  So I think "little or no warning" is a little bit
5    vague.  In other words, if I have an ulcer and if I'm
6    symptomatic, I have -- you're my physician and I go in to see
7    you and I say, I'm taking the drug you gave me but I'm not
8    feeling well, I have pain here (indicating), that would be a
9    symptom, you might endoscope me and see an ulcer.
10        The fact that I was about to develop a massive
11   hemorrhage or a perforation might not give you -- it might
12   not be warning of that until the event occurred.  So I think
13   that from my knowledge most patients who develop an upper GI
14   ulcer complication are in fact symptomatic, not all of them,
15   but somewhere between 50 and 95 percent from the literature
16   of patients who develop a complicated ulcer are in fact
17   symptomatic, but going from the complicated ulcer to the
18   perforation or hemorrhage may occur without any other warning
19   that it's going to happen other than the event occurring
20   itself.
21        And I did -- as part of this question about who's
22   bleeding, I just want to give you a touch of background.  I
23   spent eight years, so 1973 to 1981, looking at the question
24   as to whether an endoscopist who's looking into somebody's
25   stomach and who sees an ulcer and who sees bleeding from the

28

1    ulcer can treat that ulcer right then and there and stop the
2    bleeding.  I did it in association with an engineer who's now
3    fairly famous named David Off and he and I ran an NIH funded
4    group that examined various methods of stopping the bleeding,
5    and that included lasers and heat and cooling and even
6    cyanoacrylate glue and electrocautery, et cetera.  We
7    developed models of bleeding, so this is hands-on, first
8    person experience in upper gastrointestinal bleeding.  We
9    developed models -- because the people before that were using
10   different models and different therapies.  They didn't even
11   know how much therapy was being applied and so we tried to
12   get control over that by, No. 1, understanding the treatment
13   method, and No. 2, understanding the bleeding model.
14        And we in fact did invent, if you will, two devices
15   which are still used today in patients with bleeding to
16   control the bleeding.  But in my reading at the end of that
17   period of time, so this is 10 years of my life almost, at the
18   reading of the end of that time and we wrote 35 papers or so,
19   peer-reviewed papers about the different things we studied,
20   it became clear to me that we had this problem of who was
21   bleeding and who was at risk.  And it goes back to what I
22   said awhile ago about this issue about surrogate markers, you
23   know, how do you know?  I mean if you want to study
24   mortality -- now, we talked about 100 patients, 20 of them
25   will get an ulcer.  One percent will have a complication.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

29

1    But if you have an ulcer complication, one in 10 of those
2    people will die.  But if you look at the numbers then, it's a
3    thousand patients take the drug, 200 get an ulcer, that's
4    20 percent, 10 get a complication, that's one percent, and
5    one will die.
6        So if you think it's difficult to design a trial that
7    looks at a complication, it's that much more difficult to
8    design a trial that looks at mortality, which is really in
9    some ways one of the most important -- one of the most
10   important things to look at.
11       So in the study -- I did another study then in which I
12   worked with the American Society for Gastrointestinal
13   Endoscopy which resulted in four papers, which are in my
14   curriculum vitae, in 1982, in which we looked at 2200
15   patients from 250 doctors and we looked at them prospectively
16   so that means that we did go back and say, Hey, in your
17   practice in the last five how many bleeders have you seen?
18   We didn't do it that way.  We rather asked each physician
19   participating to give us a prospective entry of a patient
20   with upper gastrointestinal bleeding, and we produced what I
21   would say was an unbelievable amount of data.
22       We had six full pages of data on 2200 patients and
23   every one was carefully examined.  And I had a wonderful,
24   very compulsive assistant who sent back about 95 percent of
25   the forms to doctors to get it more completely filled out.

30

1    So in that study, it produced a huge amount of data.  I
2    sometimes refer to it as almost a soapstone, piece of stone
3    data, and the question was what carvings would you make from
4    that?  What would you examine?
5        And in that data the patients with bleeding,
6    approximately 25 percent were from a duodenal ulcer,
7    25 percent were from a gastric ulcer.  20 percent were from
8    erosive disease, which is sort of an early ulcer, it's very
9    shallow, and the other 30 percent were other lesions like
10   esophageal varices which are dilated veins, or
11   Osler-Weber-Rendu which are little bleeding spots, little
12   bleeding spots in the stomach.
13       And also in that study 50 percent of the patients had
14   antecedent symptoms.  So if you just say that 50 percent of
15   patients in this study had antecedent symptoms, I believe --
16   although I did not study this at the time, I didn't ask the
17   technician and the statisticians to look at this -- that of
18   half of the patients who bled from ulcers, either the stomach
19   or duodenum, that these were in fact symptomatic patients.
20   At least 50 percent of them were symptomatic.
21       And then there are articles by other people like
22   Michael Langman and several other authors, Peter Cotton I
23   believe, looking at the same question, showing 70 or
24   90 percent of patients presenting with an upper GI bleed as
25   being symptomatic.

31

1    So I know I digressed a bit but I think it's important
2    to establish my feeling about the fact that if you give
3    people NSAIDs a lot of them get symptoms.  40 percent of
4    people on these drugs get symptoms.  But only a very small
5    number of those go on and get a complication.  And if you
6    look at the complications and look back the other way, then I
7    think that in fact most or a significant portion of people
8    with complications have had symptoms, and therefore if you
9    were to eliminate patients with symptoms you would be
10   eliminating a lot of the patients who go on to develop
11   complications.
12       So I would just say in retrospect now when looking at
13   that sentence you asked me about, I think "with little or no
14   warning" means that you may have stomach upset and I may be
15   treating you with antacids or histamine two receptive blocker
16   while you're taking the drug, the nonsteroidal drug, but the
17   person who's going to come in and suddenly develop a
18   perforation or vomit blood, we don't know that until it
19   occurs, and I think that's what that sentence meant.
20   Q.  Okay.  So approximately how many people that go on to
21   experience ulcer complications have GI symptoms first?
22   A.  That's a good question and I don't know the exact answer but
23   I would say it was somewhere between 50 and 90 percent from
24   the literature and from my own study where we looked at it
25   and found that people with gastric ulcer and duodenal ulcer

32

1    were 50 percent of patients, and 50 percent of patients had
2    symptoms.  And the other diagnoses often don't have symptoms.
3    For example, esophageal varices, dilated veins in the
4    esophagus, do not present with symptoms of an ulcer.  So I
5    think that most of the patients with ulcers had symptoms but
6    I can't give you that exact number.
7    Q.  Somewhere between 50 and 90 percent?
8    A.  That's correct.
9    Q.  Okay.  And did you have that information at the time you
10   wrote Exhibit 196 in 1995?
11   A.  Well, yes, I did.  Some of it.  I had -- certainly I had my
12   own studies which were done 10 years before that.  So I had a
13   large portion of this information, yes.
14   Q.  All right.  And at this time -- well, let me ask it a
15   different way.
16       Are patients who suffer GI symptoms more likely to
17   later on develop ulcer complications?
18   A.  You know, that's a fair question but it's not precise enough.
19   More likely than what?
20   Q.  Oh, okay.  More likely -- let me ask it again then.
21       Are patients who are taking these NSAIDs who experience
22   GI symptoms more likely to develop ulcer complications than
23   the same sorts of patients who don't experience GI symptoms?
24   A.  I would say that's probably true, yes.
25   Q.  Okay.  And why do you say that?

Toll Free: 800.300.1214
Facsimile: 619.239.4117

ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                September 29, 2010

33

1   A. Well, because -- I want to go back again to this question
2       about the surrogate marker.  So in other words, if we were
3       together and we were designing a trial now, somebody might
4       say, Well, let's do this trial with the fewest patients we
5       can.  I mean that's a given.  Because you don't want to put
6       patients through a trial if you don't have to.  From an
7       ethical standpoint you want to do a study with as few
8       patients as you can.  So somebody might say, Well, you know,
9       death.  Well, death, you're going to have to study 90,000
10      patients.  A complication, 8,000 patients.  So death is a
11      tenth of a percent.  A complication is one percent.  A
12      complication and symptomatic ulcers are four percent.
13      Symptoms of 50 percent, 40 percent.
14          So I think if you take 100 people on nonsteroidal
15      agents, about 50 percent of them, 40 percent of them get
16      symptoms.  But I don't think having symptoms predicts that
17      you're going to have a complication.  I think it's too large
18      a group.  It's an order of magnitude more people than are the
19      people that actually develop these things.  So I think what
20      we're saying is -- what I'm saying is, if you have 100 people
21      and 50 of them are going to get symptoms and 50 don't, you
22      can't tell.  You can't use symptoms as a surrogate marker,
23      you've got to go further down the chain.  You've got to
24      either find an ulcer at endoscopy, have symptomatic ulcer or
25      actually have a complication or have mortality.

34

1           So we have to go back to your question again.  Does the
2       presence of symptoms increase an increased likelihood of
3       having a complication?  I think the answer is yes, but it's
4       still not very indicative because so many people get symptoms
5       who don't develop a complication and nobody knows why -- to
6       my knowledge, nobody knows why these people get symptoms.  It
7       may be because of damage.  It may be a cerebral effect.  Some
8       of these drugs may have what's called a central effect,
9       producing nausea or pain.  It may be an effect on motility
10      which means the way your intestine contracts, that may give
11      you some symptoms, and it may be damage further down the GI
12      tract.  Which is I think an important factor with
13      nonsteroidal incidence is injury to the stomach and duodenum
14      but equally injury to the small bowel and colon.
15          So symptoms by themselves I don't think are terribly
16      helpful.
17  Q. Okay.
18  A. Does that make sense?
19  Q. Yes.  I'm just going to have to follow up a little bit.
20          So just to clarify, you believe that GI symptoms are --
21      I'm sorry.  Patients taking NSAIDs that suffer GI symptoms
22      are somewhat more likely to develop ulcer complications than
23      patients that don't?
24  A. I believe that, yes.
25  Q. Okay.  How much more likely?

35

1   A. I don't think I can quantify that because if you have 100
2       people and 50 get symptoms and 50 don't, of the people that
3       get the symptoms it's still only one percent that get a
4       complication.  So it's very hard -- you know, I don't know.
5       It's a fair question but I don't know the answer to that.  I
6       don't know that anybody has ever -- I know that other papers
7       that I have reviewed, and I don't know if they're in the --
8       in the literature or in this paper, but reported that up to
9       90 percent of people with ulcers had symptoms but it -- it
10      tells you that, it doesn't tell you the reverse.  It doesn't
11      tell you if you have symptoms versus not have symptoms the
12      likelihood of getting an ulcer or an ulcer complication.
13          And I think part of the problem, part of the problem
14      with this whole field is you're looking at orders of
15      magnitude of numbers and that's why you have to use so many
16      patients.  I mean nobody in their right mind would do a study
17      in 9,000 patients if you didn't have to.  The reason we did
18      these studies, the mucosa study, the CLASS study, the CONDOR
19      study, the Vioxx study, was in order to improve on one
20      percent you have to have a lot of patients.  So I'm sorry; I
21      don't think I can answer it coming in symptoms versus no
22      symptoms but I can answer it on the other side that most of
23      the people with complications have had symptoms.
24  Q. Okay.  Let's go back to the time period 1995 when you wrote
25      this paper.  At that point did you believe that people --

36

1       patients taking NSAIDs who suffered GI symptoms were more
2       likely to suffer GI complications than patients who didn't
3       suffer symptoms?
4   A. It's 15 years ago but I believe I would answer that yes.
5   Q. Okay.  Now, we're talking about the mucosa trial right now.
6       In that trial did some patients withdraw because of GI
7       symptoms?
8   A. I don't remember.  I'd have to go back and look at the -- at
9       what happened.  I'm sure --
10  Q. All right.  Let's take a look at Page 245 of Exhibit 196.
11  A. Yeah, okay.
12  Q. Do you want to take a look at it for a sec?
13  A. Right.
14  Q. Let me know when you're -- you've had a chance to review it.
15  A. Specifically -- what specifically?
16  Q. Table 2.  I'm sorry.
17  A. Table 2, okay.  (Witness complies.)  Okay.
18  Q. All right.  Does Table 2 set forth the reasons for premature
19      withdrawal from the mucosa study?
20  A. Yes.
21  Q. All right.  And does it indicate that some of the patients
22      that withdrew from the study did so because of GI symptoms?
23  A. It does.
24  Q. And which of these adverse events would you characterize as
25      GI symptoms?



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                    September 29, 2010

37

1  A. Well, under the category of Adverse Events they are all GI
2  symptoms.
3  Q. Okay. And -- I'm sorry. In Table 2 of Exhibit 196 there's a
4  column for the Misoprostol group; do you see that?
5  A. Yes.
6  Q. And is that patients that were taking NSAIDs plus
7  Misoprostol?
8  A. Yes.
9  Q. All right. And the other column says Placebo Group. Is that
10  patients who were taking NSAIDs and a placebo?
11  A. Yes.
12  Q. Okay. Now, just looking at -- comparing the reasons for
13  withdrawal of the Misoprostol group from the placebo group,
14  does it appear that more patients withdrew because of GI
15  symptoms from the Misoprostol group than from the placebo
16  group?
17  A. It does.
18  Q. Okay. If patients who suffer GI symptoms are more likely to
19  go on to suffer ulcer complications, wouldn't the
20  differential withdrawal set forth in Table 2 bias the results
21  of the study?
22  A. Well, before I answer that I want to make an observation.
23  Misoprostol causes some of these events. Misoprostol is
24  known to cause stomach upset. That's one of the drawbacks to
25  my knowledge of the drug, it is not as well tolerated as

38

1  other drugs. So I think some of these are a direct effect of
2  the Misoprostol and not necessarily a symptom caused by early
3  development of an ulcer in the stomach or duodenum.
4  Q. It's -- I'm sorry. Go ahead.
5  A. So it's difficult to separate those. I would have to -- you
6  know, for example, diarrhea, which was a large component of
7  the patients who withdrew and -- much more diarrhea occurred
8  in the Misoprostol group than in the placebo group, that is
9  to my knowledge an effect directly of the Misoprostol, a side
10  effect of the Misoprostol, having nothing to do with damage
11  to the stomach or duodenum that would present as ulcer
12  symptom.
13  Diarrhea -- you asked if it was a GI symptom and the
14  answer is yes. If you want to know if it's an ulcer symptom,
15  the answer is no. It's not an ulcer symptom. It's a symptom
16  of increased motility of the colon producing liquid stools.
17  So that makes this a little bit more difficult in the
18  sense -- and nausea or flatulence, passing excessive gas,
19  which again was more positive in the Misoprostol group, is
20  not a sign of ulcer disease, it's a sign of the same
21  increased motility in the colon and that's a direct effect of
22  the Misoprostol.
23  So I think that these adverse events are different than
24  the adverse events that would be noted in a straight NSAID
25  trial because the Misoprostol produces these motility side

39

1  effects. Which did cause the patient to come off the trial.
2  I mean you would say, Yeah, well, these patients did come off
3  the trial, but they came off because of side effects of the
4  Misoprostol in my opinion, not because they were
5  developing -- for example, the abdominal pain which also can
6  be Misoprostol, there was much less of a difference than in
7  something like the diarrhea which there was a huge
8  difference. You know, there was more than a two-fold, almost
9  a three-fold increase in the Misoprostol group, whereas in
10  the abdominal pain there was just a 30 percent increase.
11  And dyspepsia, which means a sour stomach, you know,
12  sort of -- dyspepsia means a burning sensation here -- and
13  that's one of the typical symptoms of an ulcer also can be
14  from Misoprostol but if you look at that you'll see that it
15  went from 180 to 200. And I think that the big difference in
16  these groups were in the GI side effects that are directly
17  attributable to the Misoprostol on GI motility.
18  Q. Is there any way -- well, let me ask it a different way:
19  Some of the people that withdrew for GI events in the
20  Misoprostol group -- strike that question.
21  Is there any way to determine which of the people in
22  the Misoprostol group withdrew because of adverse GI events
23  caused by the Misoprostol as opposed to caused by the NSAID?
24  A. That's a very fair question and I don't think there is. It's
25  a logical question because from what I'm saying you have side

40

1  effects from Misoprostol which have nothing to do with the
2  NSAID and then -- and so, for example, in a trial like the
3  PPI trial, PPI is a proton pump inhibitor, they pretty well
4  tolerate it. They don't have many sides effects. So there
5  you can say, Well, you know, you can't say it was due -- to
6  my knowledge. I mean when the PPIs first came out we all
7  worried with them because they shut off gastric acid so
8  profoundly. Or an H2 blocker like cimetidine. They don't
9  have much in the way of side effects.
10  So whether you're taking an H2 blocker or not, I don't
11  think you can tell unless you had something like heartburn
12  which got better. But that's not true of Misoprostol.
13  Misoprostol does have more systemic effects than the two
14  agents that are used to control gastric acid, the two classes
15  of agents, H2 blockers and proton pump inhibitors.
16  So although your question is a good question, I don't
17  think there's any way to do that from this, and at the time
18  it didn't seem -- that question didn't occur to us. It's
19  always different when you look at these studies in retrospect
20  than when we're actually up to elbows in the data
21  prospectively.
22  Q. Okay. So going back to Table 2, Exhibit 196, just to
23  confirm, more people withdrew from the Misoprostol group
24  because of GI symptoms, correct?
25  A. That is correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

41

1    Q.  At the time that you got these results for the mucosa trial,
2       did that cause you any concern then that the results of the
3       study might have been biased by that differential withdrawal?
4    A.  You know, it didn't, and I think the reason it didn't was the
5       nature of the reasons for the withdrawal.  In other words,
6       diarrhea, it's like I know they're going to get diarrhea.
7       First of all, patients get diarrhea, that's in the placebo
8       group, but the fact that there was so much more diarrhea in
9       the Misoprostol group is more attributable -- these
10      prostaglandin have effects throughout the body.  They affect
11      every body tissue.  And they do produce these effects like
12      the motility of the colon.
13         So I don't remember thinking about that specifically,
14      but I would have done what I just did which is write the
15      symptoms off -- the difference in the symptoms off in large
16      part to the effect of Misoprostol on the gut and that we
17      were taking patients out of the trial who were more
18      susceptible to developing an ulcer.
19   Q.  By the way, I didn't mention it in our prologue but if you
20      ever want to take a break for any reason --
21   A.  Thank you.
22   Q.  -- let me know and we'll usually follow up whatever question
23      we're on and then we can go off the record.  So any time you
24      need it.
25   A.  Okay.  Thank you.

42

1         MR. MONTGOMERY:  I'd like to ask the
2       court reporter to mark what will be Exhibit 197.
3              (Exhibit No. 197 marked
4              for identification.)
5    Q.  (BY MR. MONTGOMERY)  Is Exhibit 197 an article you published
6       in Digestive Diseases and Science in March of 1998?
7    A.  It is.
8    Q.  Would you turn to the second page of Exhibit 197, please.
9    A.  (Witness complies.)
10   Q.  In the right-hand column on that page, about halfway down the
11      page I'd like to read something into the record.  "58 percent
12      of patients admitted to the hospital with life-threatening
13      complications associated with NSAID ulcers, the first
14      evidence of gastrointestinal disease was the complication
15      itself."
16         Do you see that?
17   A.  Yes.
18   Q.  How is that consistent with what you were saying before that
19      50 to 90 percent of people are symptomatic before suffering a
20      GI complication?
21   A.  Right.  Well, if you look at the flip side of what you just
22      said, 42 percent of patients admitted to the hospital with a
23      threat did have some other warning.  And remember, I said
24      that in my study that I did of the 2200 patients for the
25      ASGE, the national society, it was 50 percent or 47 percent,

43

1       so it's not far off.  I was just reporting that other studies
2       have reported a higher -- and perhaps since then have
3       reported a higher incidence of symptoms in patients with
4       ulcers, but what you just read to me reported that 58 percent
5       did -- first presented with the complication and the
6       corollary of that is 42 percent had symptoms.
7         And the other thing I would mention is that I think
8       there are symptoms and there are symptoms, meaning that it
9       depends on how the person is asked about the symptoms.  When
10      a patient comes in with an upper GI bleed, they're vomiting
11      blood, they've got bloody stools, they're in shock.  The
12      history from that patient I don't think is as reproducible
13      necessarily as the history taken in this room if we were
14      sitting here and I asked you, Have you got any symptoms?  So
15      I'm always a little bit suspect, I don't mean in an evil way,
16      I just -- I'm not as comfortable with the broad category of
17      symptoms prior to a big event because the big event is such a
18      catastrophic event that the patient then, you know, I don't
19      know, I don't know.  Look, I'm just, you know.  And it may
20      not be -- so in other words, if they reported 58 percent
21      didn't have symptoms, I think I would trend to say that would
22      be high.  I think most of them did have symptoms, more than
23      42 percent.  But it's not far off of what I reported from the
24      study that I did.
25         Of interest, just to -- plus I feel like saying it I

44

1       guess, this paper goes on and talks about the fact that
2       Helicobacter pylori has now emerged as -- at this point.  You
3       know, we're working on the chronology of understanding what's
4       happening, this is 1998.  I think it was 1995 when there was
5       an NIH consensus conference chaired by Dr. Yamada which
6       addressed the question of what causes ulcers.  And when I
7       went to medical school at Columbia in 1963 we were taught it
8       was stress, and some people still think that unbelievably.
9       What has emerged is that there are two causes of ulcers,
10      nonsteroidal anti-inflammatory disease and Helicobacter
11      pylori.
12         MR. WEISS:  You might want to slow down
13      and say the name of that bug again for the court reporter.
14         THE WITNESS:  Excuse me.  H pylori.  H,
15      P-Y-L-O-R-I.
16      So by the time I wrote this I was saying that about
17      half of all ulcers are caused by NSAIDs, and mind you, I
18      think there were 90 drugs I found that had aspirin in it,
19      many of which the patients didn't know contained aspirin like
20      222s and Excedrin Plus, I mean all these different types of
21      drugs that had aspirin.  That accounts for about 50 percent
22      of ulcers, and Helicobacter pylori accounts for 50 percent of
23      ulcers.
24         So in the evolution of our knowledge of ulcer disease,
25      by this point, by '98 we had learned that half of the ulcers



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

45

1    were H pylori which is a bug you can pick up and which is
2    treatable with antibiotics, it was a huge advance in our
3    knowledge of ulcer disease.  And the guy who figured it out
4    was an Australian fellow named Barry Marshall who took H
5    pylori himself, nobody would believe him so he swallowed it
6    himself and he got sick.  And he then demonstrated that it
7    was a direct effect.  He didn't get an ulcer but aside from
8    that everything was perfect.  He got really sick.  And he won
9    the Nobel prize for that, so this was a serious
10   accomplishment.
11        So he single-handedly, against all the establishment of
12   gastroenterology, showed that H pylori was a significant
13   agent.  And in 1995 the consensus conference at the NIH,
14   which was three days, hundreds of people were there, 18 of us
15   were on the panel, considered whether H pylori was a major
16   cause of ulcer disease and concluded that it was and really
17   changed the approach to ulcer disease from a pathophysiology
18   standpoint in that we now knew that a lot of ulcers of course
19   were H pylori which were treatable with antibiotics, which
20   was fabulous.  So now we were left with the other half which
21   were NSAIDs, so it continued the focus on NSAIDs and how
22   could you make NSAIDs less injurious.
23   Q.  So did Dr. Marshall win the Nobel prize for medicine or
24   bravery?
25   A.  Yes.  He won it actually for medicine and he started an

46

1    institute.  He's got his own institute and it was -- it was
2    an interesting thing that he did that.
3    Q.  So were you involved in the design of the CLASS study?
4    A.  You know, I was not.  To my recollection I was not involved
5    in the design of the CLASS trial.  It was designed before I
6    was asked to participate.  Again, that was 14 years ago
7    and -- but to the best of my knowledge early on I was not
8    involved.
9    Q.  All right.  Do you know what the purpose of the CLASS study
10   was?
11   A.  I do.
12   Q.  And what was that?
13   A.  So the purpose of the CLASS trial was to examine the
14   hypothesis that if you took a drug which was a mostly
15   selective COX-2 inhibitor that had antiarthritic effects,
16   that you would produce less injury to the GI tract than a
17   standard NSAID which had both COX-1 and COX-2 effects.  So
18   let's go back and explain what that means.
19        There seemed to be two effects, deleterious or -- two
20   effects of NSAIDs and related drugs on the GI tract.  One is
21   to decrease COX-1, and COX-1 is psycho oxygenates which
22   produces the prostaglandins which are helpful to the stomach
23   and duodenum.  They help protect the stomach and duodenum, so
24   you would like to allow that to continue happening.  COX-2
25   are the -- are -- produces the inflammatory chemicals that

47

1    produce erosions, ulcerations, eventually ulcer
2    complications.  So the hypothesis that was being developed
3    at, I believe it was Barnes University where Dr. Needleman
4    was working and I guess there were other people working in
5    the field as well, was that there were two classes of drugs
6    regarding their effect on the Cox enzymes, drugs that
7    affected both and drugs that just affected COX-2.  And so the
8    hypothesis was, if you only affected COX-2 to decrease the
9    inflammation by decreasing that enzyme, but you didn't change
10   to COX-1 which was the protective mechanism, that you might
11   then have less of an injurious effect on the upper GI tract.
12        So that was the -- sort of the overall hypothesis going
13   into the trial.
14            (David Goldberger enters.)
15        THE WITNESS:  Now, what comes up again
16   now is how do you prove that?  Which is what I've been
17   talking about as a recurring theme this morning is this issue
18   about how do you model that.  Now, ultimately you would say,
19   Let's look at mortality.  I mean, you know, My mother is
20   going on the drug, I want to know if she's at risk for dying.
21   Well, I've told you to do that, you're probably at 90,000
22   patients, because it's a piece of a piece of a piece of this.
23   So then you could back up and say, Okay, we can't really do
24   mortality, unless you use the study I did in the '80s and
25   said, Hey, the real mortality is in people with liver disease

48

1    who are over 60.  I mean the purpose of those studies that I
2    did in the late '70s and early '80s was to really be able to
3    define who was at really increased risk.
4        But the more you start to narrow a study, the more you
5    start to cut in on the study, kind of less applicable it is.
6    This will come up later in terms of other parts of the Cox --
7    of the CLASS and other trials.  In other words, if you say
8    it's only in women, not men, and it's only age of 40 to 60,
9    well, the more you close in on it the less applicable the
10   data may be to other groups.  So you don't want to do
11   bleeding.  You don't want to do rather death.  You can back
12   up and say, Let's do complications, and ulcer perforations is
13   a pretty clear complication.  I mean that's known.
14   Obstruction is not quite as clear but it's pretty clear.
15   Bleeding is complex, and we'll probably talk about that in a
16   bit.  But those are complications, bleeding, obstruction and
17   perforation are complications.  And those are one or
18   two percent, not .1 percent death but one or two percent.  So
19   that's -- we could examine that.
20        Symptomatic ulcers, you back up and include that,
21   that's going to be two or four percent.  You can back up from
22   that and say ulcers, you know, endoscope, take 100 people,
23   give them the drug, look down and see who gets an ulcer.  You
24   can back up from that and say an erosion, which is a
25   superficial ulcer, that's not -- that doesn't go deep.  It



Toll Free: 800.300.1214
Facsimile: 619.239.4117

ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

49

1 doesn't involve the submucosal layers of the intestinal wall.

2    I don't think symptoms help for the reasons we

3 discussed a few minutes ago.  I don't think symptoms are good

4 because so many people have symptoms.  So the other thing you

5 could do is you could look at GI bleeding.  You could look at

6 anemia.  You could look at blood in the stool called

7 hemoccult positivity.

8    And what had happened, I think it was 1998 when Searle

9 went to the FDA and got celecoxib approved.  This is 12 years

10 ago so I don't exactly remember the date but I remember that

11 I went.  And I was the person who presented the GI data

12 and -- was that -- anybody know?  Was that 98 when celecoxib

13 was first approved?

14    Okay.  When we made the argument for celecoxib, it was

15 based on about 14 different studies, studies in which you

16 looked down and you said, you know, Hey, you give people

17 Naproxen, Indocin, Butazolidin, about 20 percent of them are

18 getting ulcers, three or four percent with celecoxib.  If you

19 look at erosions, it's much more with the standard NSAIDs

20 than celecoxib.  If you look at blood in the stool, it's more

21 with the standard NSAIDs than celecoxib.  If you look at

22 anemia, it's more with the standard NSAIDs than celecoxib.

23    So there was a body of data which Searle presented to

24 the FDA as part of the following statement:  Celecoxib would

25 appear to be a safe and effective drug from a rheumatic

50

1 standpoint, it works on arthritis and it seems to be safe and

2 effective, but we think it also has less injurious effects on

3 the stomach.  And they used those studies I was just talking

4 about, fewer erosions, fewer ulcerations, fewer patients with

5 bleeding, fewer patients a little bit of bleeding in the

6 stool, fewer patients with anemia.  And Dr. Needleman got up

7 and he said, you know, The standard NSAID is approved with

8 1500 to 2,000 patients.  I have studied 15,000 patients.

9    So there's a huge body of information about celecoxib

10 and its safety.  And he was asking for the indication in

11 the -- whatever the FDA calls it, that celecoxib was less

12 injurious to the GI tract.

13    Now, the FDA said, no, that isn't good enough data yet.

14 You haven't shown -- you got to go further down the chain in

15 order to get us to do that.  And the reason they said that

16 was this is a big issue.  There are so many patients taking

17 nonsteroidal antiinflammatory drugs of all different kinds,

18 and with the numbers that we talked about, there are a lot --

19 hundreds of thousands of patients presenting with bleeds.

20 And so the FDA was dealing with this question, and they're

21 just folks like we are.  I mean they're as smart as we are

22 and we're as smart as they are and you're working on solving

23 problems, so they were pushing for taking it further down the

24 chain even though it was going to take 6- to 8,000 patients,

25 and looking at the actual complication and not surrogates for

51

1 the complication.

2    Now, I personally feel that you aren't going to develop

3 a complicated ulcer if you haven't got an ulcer.  And so if I

4 could take a drug and say, you know, This drug has

5 one percent incidence of ulcers and this drug has 20 percent

6 incidence of ulcers, I'll take the one percent incidence,

7 that's the drug I'd rather take.  But the counter argument to

8 that is, Yeah, well, maybe it's the little ulcers that aren't

9 present.  In other words, in the patients taking NSAID A,

10 they get 20 percent of ulcers, but a lot of them are tiny

11 little ulcers that don't mean anything.  They have one

12 percent of bad ones and this other drug is one percent of bad

13 ones, so you haven't really improved.  And that's the

14 argument -- that's the only argument I can think of against

15 my argument which is, This is crazy.  If I'm going to give

16 this drug to my child and one is one percent and one is

17 20 percent ulceration, and since you got to have an

18 ulceration before you develop a complicated ulceration --

19 there's only one exception to that which is a fountain

20 Dieulafoy which is a whacky GI lesion with a little blood

21 vessel sticking up.  No one knows why it happens, a little

22 blood vessel spurting away.  But those are in less than one

23 percent of bleeders.

24    So a fountain Dieulafoy -- we'll spell it later -- but

25 that's a very rare lesion.  Otherwise the complications are

52

1 all in all ulcers.  You got to have an ulcer before you

2 develop a perforation, a bleed or obstruction.

3    So -- however, the FDA felt, No, that's not good

4 enough.  What they were basically saying was, the importance

5 of this distinction of being able to say that the drug is

6 really safer, from the GI bleeding complication standpoint

7 it's so high that we want you to take it further down the

8 chain and look at actual complications, and so that's how --

9 that was sort of the fundamental part of how the CLASS trial

10 was designed.

11 Q.  So when you met with the FDA in '98, at that point the drug

12    was already approved, correct?

13 A.  Well, yes, the drug was approved.  I had met with the FDA in

14    the late '80s.  We had a very energetic -- actually one of

15    the few sessions I've ever been at where people were yelling

16    at each other.  The doctors were yelling at each other about

17    this issues about surrogates.  Some people were saying,

18    Baloney, you got to have the ulcer, you got to have the

19    bleed.

20    So I went to -- the FDA didn't do that again, maybe

21    because it was such an energized session.  I mean these were

22    the quote, leaders, unquote, in the area and everybody was

23    yelling at each over, it was sort of funny.  But we had that

24    one day which I believe was in the late '80s, then the

25    issue -- Misoprostol was approved -- I mean excuse me --



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                        September 29, 2010

53

1  Celebrex was approved and then we went back to the FDA to
2  discuss the issue about, Okay, the data that we presented at
3  the filing didn't convince the FDA that Misoprostol was less
4  injurious.  What do you have to do to get that?
5  Q.  Did you mean Celebrex?
6  A.  Excuse me.  I meant Celebrex.  That the data we presented
7  when Celebrex was approved -- all of which by the way, one of
8  the compelling things in my mind was every bit of data about
9  Celebrex was positive in the right direction, it wasn't six
10 to two or nine to three, it was all of.  All of them showed
11 less injury.  But the FDA said, No, that's not enough.  This
12 is my read.  If the FDA was sitting here they could say, I
13 don't know where this guy was, but this is my read on it.  So
14 when we went back to the FDA, I went back with Steve Geis,
15 they did insist I believe on a clinical end point study that
16 actually had the end points as the end point.
17 Q.  My question is:  At the time you went back with Steve Geis
18 the drug was already approved, correct?
19 A.  I think so, Matt, yes.
20 Q.  So what were you asking for?
21 A.  The feeling of the people working with the drug, me included,
22 was that it was a safer drug, that it made sense
23 pathophysiologically, and all these other things I mentioned
24 pointed to the fact that it was safer.  So the question was,
25 What do we need to do to have the FDA change the label for

54

1  celecoxib -- what do we have to do to have the FDA change the
2  label for celecoxib to say that it's less injurious than
3  standard NSAIDs?  And that was the question that caused
4  Searle to go back to the FDA.
5  Q.  So Searle was asking the FDA to delete a GI warning from the
6  Celebrex label?
7  A.  I think so.  I don't know what the actual form was but it was
8  basically every NSAID has had this two to four percent of
9  patients taking this drug develop a symptomatic ulcer or a
10 complicated ulcer with a one percent or two percent incidence
11 of a complicated ulcer and I think Searle was saying, It's
12 not true of our drug.  And they had a lot of studies, they
13 had a lot of data that suggested that it wasn't true, but
14 they hadn't done this blinded placebo controlled or whatever
15 comparison.
16      MR. MONTGOMERY:  All right.  I'd like to
17 show the witness what's previously been marked as Exhibit 60.
18      THE WITNESS:  (Witness reviewing
19 document.)
20      MR. MONTGOMERY:  While you're looking at
21 that, we can let the record reflect that David Goldberger of
22 Scott & Scott has appeared on behalf of plaintiffs.
23      THE VIDEOGRAPHER:  Counsel, because of
24 the length of the answers can I suggest that we take a break
25 now and change the tape?

55

1      MR. MONTGOMERY:  Absolutely.
2      THE VIDEOGRAPHER:  I'm worried about
3  running out in the middle of an answer.
4      MR. MONTGOMERY:  Sure.  Go ahead.  Off
5  the record.
6      THE VIDEOGRAPHER:  We are going off the
7  record.  The time is 10:11 a.m.  This is the end of Tape
8  No. 1.
9      (Recess 10:11-10:26.)
10     THE VIDEOGRAPHER:  Okay.  We are back on
11 the record.  The time is 10:26 a.m.  This is the beginning of
12 Tape No. 2.
13
14     EXAMINATION (Continuing)
15 BY MR. MONTGOMERY:
16 Q.  You understand you're still under oath?
17 A.  I do.
18 Q.  All right.  Looking at Exhibit 60, do you have it in front of
19 you?
20 A.  Correct.
21 Q.  All right.  On the first page of Exhibit 60 do you see the
22 heading Gastrointestinal Risk in the upper left-hand corner?
23 A.  I do.
24 Q.  And is that the warning that you were talking about before
25 that Searle was trying to have the FDA remove?

56

1  A.  Fair question.  I don't know because I'm not overly familiar
2  with this format for prescribing information.  It does look
3  as if this is in a black box and is the GI risk and talks
4  about the risk of these events occurring and that they can
5  occur with or without symptoms, so I think it is the box that
6  they were hoping to have changed by the series of studies
7  including the CLASS study.
8  Q.  And just to be clear, Exhibit 60 is a copy of the Celebrex
9  label that we were talking about earlier?
10 A.  Correct.  I don't know -- yes, I'm sorry; that is correct.  I
11 don't know what the date of this is.  Revised in June of '09.
12 And I have -- I have not been involved in consulting on this
13 matter since 2001 so many things have occurred that I'm not
14 aware of because I did not keep up the way I used to with all
15 of the literature about it.  So -- but this is what you
16 described.
17 Q.  All right.  Unfortunately this doesn't have -- Exhibit 60
18 doesn't have page numbers so could you turn to the page that
19 starts with Section 14.7 of Exhibit 60?
20 A.  (Witness complies.)  Okay.
21 Q.  All right.  Do you see the information on that page regarding
22 the CLASS study?
23 A.  I see it.
24 Q.  All right.  Do you see the discussion of the meeting
25 exposure?  It's about the third sentence.  I'll read into



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                         September 29, 2010

57

1    the record.  "Meeting exposure for Celebrex (N equals 3987)
2    and diclofenac (N equals 1196) were nine months while
3    ibuprofen (N equals 1985) was six months."
4         Do you see that?
5    A.  I do.
6    Q.  And as far as you know is that an accurate description of the
7    meeting exposure from the CLASS study?
8    A.  I think it is.  I believe it is because I just read it.  I
9    don't have independent corroboration in my head.
10   Q.  All right.  Earlier you were talking about a presentation you
11   made to the FDA on or around 1998; do you remember that?
12   A.  Yes.
13   Q.  And you talked about 14 different studies; is that correct?
14   A.  That's correct.
15   Q.  And were all those studies about -- or did all those studies
16   include Celebrex?
17   A.  Yes.  All right.  And the No. 14 was a figure of speech.  I
18   don't remember exactly how many it was.  But if I remember
19   there was a series of studies.
20   Q.  Approximately 14?
21   A.  Approximately 10.  10 to 14, I don't remember.
22   Q.  Okay.  And then you said those patients represented about
23   15,000 patients; is that right?
24   A.  Well, no.  The total number of patients studied for the NDA
25   application for Celebrex was 15,000 patients.  That included

58

1    things other than GI studies.  It would have included studies
2    of blood pressure, edema, cardiovascular effects.  I mean, it
3    was -- when you develop one of these drugs the reason it's so
4    expensive is that you have to do a whole variety of different
5    studies of safety and efficacy, so it wasn't all oriented
6    towards the GI tract.  I think Dr. Needleman's point was they
7    looked at a lot of people, 10 times the number of people that
8    were approved for the standard -- for the previously approved
9    NSAIDs.
10   Q.  All right.  And is it standard practice in clinical trials to
11   keep track of -- with people who withdrew from the study
12   while it was being conducted?
13   A.  Yes.
14   Q.  And is it also standard practice to keep track of why they
15   withdrew from the study?
16   A.  Yes.
17   Q.  So would most or all of the 10 to 14 studies we're talking
18   about have kept track of that information?
19   A.  It's a fair question, but what -- what is important here is
20   that the nature of the study might be such that nobody would
21   drop out.  So to clarify that.  If we were doing a study of
22   bleeding and somebody came in and said, I'm having terrible
23   abdominal pain, I as a clinician would say, You're off the
24   study.  I'm not going to keep you on the study, I don't want
25   to put you at risk.  So that would be a person who dropped

59

1    out prematurely because of abdominal pain.
2         But if the purpose of the study was to look at your
3    blood level, your hemoglobin level or your hematocrit, we
4    might keep going.  We might say, Well, we're going to keep
5    drawing the blood.  So a little bit of taking the patient off
6    the study or leaving the patient on the study will be related
7    to what's the nature of the study.
8    Q.  With that qualification is it your understanding that these
9    10 to 14 studies had information regarding the withdrawal of
10   patients taking Celebrex versus NSAIDs?
11   A.  You know, I'm sure the information was available.  I'm not
12   sure I saw it.  Because I think if you are giving a drug for
13   let's say a month and at the end of the month you're doing an
14   endoscopy and looking at the number of the ulcers, it's much
15   less likely to have somebody drop out than if you're doing a
16   six-month or longer study.  So I'm sure they have the data.
17   I'm positive the data is there.  I'm not sure I always saw
18   that data.
19   Q.  Okay.  So I'm not asking you whether you saw it or not.  Let
20   me ask the question again, which is:  Is it your
21   understanding that in these 10 to 14 studies there was some
22   information regarding withdrawals, patient withdrawals both
23   in patients that took Celebrex and patients that took other
24   NSAIDs?
25   A.  Yes, there's information.  It might be zero, but there was

60

1    information.  I'm sure there's information.
2    Q.  Okay.  Are you familiar with the -- generally familiar with
3    the design of the CLASS trial?
4    A.  I am.
5    Q.  All right.  And was it designed as two separate trials?  I'm
6    sorry.  I should have said:  Are you familiar with the design
7    of the CLASS study?
8    A.  Yes.
9    Q.  And was it designed as two separate trials?
10   A.  No.  Let me explain why I say that.  When -- I am not a
11   clinical trial expert but I've done a lot of clinical trials,
12   and -- just like I'm not a statistics expert although I know
13   something about statistics.  And I don't mean to preach.
14   Having said that, the purpose of a clinical trial is to
15   answer a question, and if you don't start with the question
16   everything deteriorates from there.
17        So generally there should be one question that you're
18   trying to answer in a trial and I think the question -- there
19   was only one question, which was:  Is Celebrex less injurious
20   in terms of GI complications than other NSAIDs?  That was the
21   question.
22   Q.  So that's why you consider it one trial?
23   A.  Yes.
24   Q.  Were there two separate arms to the trial?
25   A.  There were.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                  September 29, 2010

61

1   Q. And what were they?

2   A. One was a comparison of Celebrex at fairly high dose to

3   ibuprofen which was selected I believe because it was thought

4   to be one of the least injurious NSAIDs, and the other arm

5   was a comparison of Celebrex to diclofenac which was selected

6   I believe because it was considered to be one of the most

7   injurious NSAIDs. And I believe that in the mucosa trial,

8   which we discussed earlier, there were 10 NSAIDs that were

9   combined. They were never studied independently versus --

10   they were never compared one to the other. Because the

11   original question in the mucosa trial was does Misoprostol

12   change the GI complications in patients taking a variety of

13   NSAIDs; in a similar way I think the question here was, in

14   patients taking different NSAIDs does Celebrex improve the GI

15   outcome? I don't mean to be picking nits, I just think that

16   this is important to understand, that I think there was

17   really just one primary question and then there --

18   Q. Are you --

19   A. -- were two arms. I'm sorry.

20   Q. I'm sorry. I thought you were done.

21       Are you familiar with the term "randomization" as it

22   applies to clinical trials?

23   A. I am.

24   Q. And what is a randomization?

25   A. It usually is seen in context with blinding and sometimes

62

1   with placebo control, although this was not a placebo

2   controlled trial. What randomization means is that as a

3   patient comes in, he or she is randomly applied to one

4   therapy or another therapy so that it decreases the chances

5   of bias where the investigator might say, Hmm, this is a

6   fairly frail patient, I would prefer to see her on ibuprofen

7   than diclofenac. And the investigator might say, Let's put

8   this person on -- you know. That would be sort of a

9   nonrandomized trial. Randomized trial means that you have

10   somebody else adjudicating, Hey, this next patient goes on

11   Arm A, which would be the diclofenac arm, Arm B which would

12   be the ibuprofen arm or the comparative Celebrex.

13   Q. Did each arm of the CLASS study have a separate randomization

14   process?

15   A. That's a good question and I'm not sure. I believe they did

16   but I'm not sure.

17   Q. And there are any -- assume for this purpose that they did.

18   I can -- I'll show you the protocol in a minute and we can

19   talk about it then, but does the two separate randomizations

20   have any implication for the statistical analysis of the

21   results after the study is done?

22   A. I don't know.

23   Q. Okay. How long was the CLASS study? I'm sorry; per the

24   design?

25   A. Okay. Well, the design was to have patients get to six

63

1   months, but patients were allowed to stay on the trial longer

2   and some stayed on for up to 13 months. I believe the mean

3   was seven months in the ibuprofen group and the median for

4   the whole group was nine months, but that's the rough

5   numbers. But I think the -- going into it, six months was

6   picked as the point at which everybody -- we wanted to get

7   everybody through to six months, and that was partially based

8   on the mucosa trial which was a six-month trial.

9   Q. What's the relevance of the median exposure?

10   A. It's just saying that the amount of time patients spent on

11   the trial was varied. I don't know -- I mean I know what

12   median means, but I don't know precisely how that affects the

13   interpretation of the study.

14   Q. So if you looked at the -- in the CLASS trial you said median

15   is nine months. If that had been 12 months would that have

16   given you any more information or would that have impacted

17   your analysis?

18   A. It would have answered a slightly different question. It

19   would have answered the question about what happens over 12

20   months as opposed to what happens over nine months. Whether

21   it would give you additional information, I don't know.

22   Q. All right. Are you familiar with the phrase "primary end

23   point" as it applies to clinical studies?

24   A. I am.

25   Q. And what is a primary end point?

64

1   A. When you design a clinical trial, just as you come up with

2   one question you want to answer, you say, We wanted to find

3   an end point which answers that question. And you put

4   statistical bounds on it so that you're fairly sure that when

5   you get an answer, if it is statistically significant that

6   you can point to it and say, I think there's a real

7   difference here.

8   Q. What was the primary end point of the CLASS study?

9   A. The primary end point of the CLASS study was a GI

10   complication, specifically GI bleeding, perforation or

11   obstruction, and that was the primary -- unless I'm getting

12   lost here, that was the primary end point.

13   Q. And do you have an understanding of why that was chosen as

14   the primary end point?

15   A. I do. As I said, short of death, which can result from

16   bleeding perforation or obstruction, the -- every patient is

17   an individual -- and this is going to sound a little strange

18   perhaps, but every patient is an individual. Physicians try

19   to group patients because they don't know what else to do, so

20   when somebody comes in with flu like symptoms you try to

21   group them into a diagnosis of the flu.

22       In this instance you try to group patients where

23   something has gone amiss with their GI tract into what

24   categories can go wrong, and the categories seem to be partly

25   from the mucosa trial, partly from my ASGE trials and partly



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

65

1  from 300 other trials that the predominant things that happen
2  of an adverse nature in somebody who is taking NSAIDs in the
3  upper GI tract are bleeding, perforation and obstruction.
4  Therefore, those were the end points selected.
5       They did not select the end point for the primary end
6  point of symptomatic ulcers, and I think it raises -- you
7  know, it's the same issue that I've been talking about
8  repeatedly, which is it's a continuum and if you want to be
9  really, really, really, really sure, take mortality.  If you
10  want to be sure just a little short of that, take the three
11  complications.  A little short of that you'd include
12  symptomatic ulcers.  Because as I said, if I were taking care
13  of you and you had a symptomatic ulcer I would take you off a
14  trial, I wouldn't let you keep going because I would consider
15  that to put you at risk of a real serious complication.  But
16  the decision was made and I was not -- to the best of my
17  knowledge I was not part of that decision.  That was done
18  before I joined the CLASS group.  The decision was made to
19  make those three complications the primary end point and not
20  to include symptomatic ulcers as a primary end point.
21  Q.  Do you have an understanding of whether the FDA had an
22  opinion on what the primary end point should be?
23  A.  I don't know that.  I don't know if the FDA did -- you know,
24  said that they wanted symptomatic ulcers in it or not in it,
25  but they weren't in it, and I don't have a clear answer to

66

1  your question.
2  Q.  All right.  I want to ask you a question that's specifically
3  about the year 1999 and your understanding at that point.
4       At that point did you have an understanding of whether
5  or not NSAIDs created GI adverse events sooner than Celebrex?
6  A.  No.  I don't think so.  I mean, the way you'd have to answer
7  that would be tough because it would take -- if you're
8  talking about the three events you'd have to do a time to
9  event analysis of how long it's taking for the different
10  groups.  If you're trying to look at ulcers you'd have to do
11  serial endoscopies.  And that's not so easy to do from an
12  ethical standpoint.  You know, an endoscopy every week,
13  that's putting a patient through a lot.  So I don't think
14  there was information available about that, to my knowledge.
15  Q.  All right.
16       MR. MONTGOMERY:  I'd like to show the
17  witness now what is Exhibit 61, has been previously marked as
18  Exhibit 61.
19  Q.  (BY MR. MONTGOMERY) Is Exhibit 61 a protocol for the CLASS
20  study?
21  A.  It would appear to be, yes.
22  Q.  And what's the purpose of a protocol?
23  A.  To define how the study is designed and how the study should
24  be conducted.
25  Q.  Does a protocol also set forth how the results of the study

67

1  should be analyzed after the study's finished?
2  A.  I would think so.
3  Q.  And why not just get the data and then decide how to analyze
4  it afterwards?
5  A.  Well, you could do that if you had very carefully specified
6  your primary and secondary end points.  You could get the
7  data and say let's look at the primary end points and
8  secondary end points.  They're sort of linked together.  If
9  you say the primary end point is to look at serious adverse
10  GI events, then that's what we're going to look at in the two
11  different groups, so they're kind of together.
12  Q.  But do you define -- before you start the trial do you define
13  how you're going to analyze the primary end points?
14  A.  This is really a statistical question and I am not a
15  statistician, but to the best of my knowledge the answer
16  would be yes.
17  Q.  And why is that?
18  A.  Because you want to conduct a trial and look at the data to
19  answer the question.  You don't want to conduct a trial, look
20  at the data and then decide what kind of questions you want
21  to answer.  In general you would like to design a trial
22  and have the trial then answer the question that you started
23  with.
24  Q.  All right.  Would you turn to page Bates number ending 850 of
25  Exhibit 61.

68

1  A.  (Witness complies.)  Okay.
2  Q.  Do you see Section 4.3 on that page?
3  A.  Yeah.
4  Q.  All right.  And it says "Treatment period," correct?
5  A.  Correct.
6  Q.  And is that a common term when discussing clinical studies?
7  A.  Yes.
8  Q.  And what does it mean?
9  A.  It means that's the period of time that the patients will be
10  exposed to whatever you're going to treat them with while
11  you're looking for the end event.
12  Q.  And what was the treatment period in -- per this protocol?
13  A.  Oh, I believe it was at least 26 weeks which is six months,
14  up to 52 weeks, it looks like to me.
15  Q.  All right.  And that just describes the minimum and maximum
16  amount of time that the patients on the study are exposed to
17  the drug, correct?
18  A.  Correct.
19  Q.  Okay.
20       MR. MONTGOMERY:  At this point I'd like
21  to show the witness what's previously been marked as
22  Exhibit 63.
23       MS. McPHEE:  I'm sorry; what was the
24  exhibit number?
25       MR. MONTGOMERY:  63.  You'll recognize



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                      September 29, 2010

69

1   it.
2   Q. (BY MR. MONTGOMERY) Have you seen Exhibit 63 before?
3   A. No, I have not seen this entire exhibit although I have seen
4       portions of the exhibit.
5   Q. Per the first page it's called an All Committee Manual,
6       correct?
7   A. Right.
8   Q. Do you have an understanding of what an All Committee Manual
9       is?
10  A. No. I mean it's -- appears to be obvious that it has the
11      three committees that we used to help run the trial listed
12      and then the references that were sought and used during
13      especially the drug safety and monitoring portion.
14  Q. But you don't have an understanding of what this particular
15      document was to be used for; is that right?
16  A. Do you mean the entire document?
17  Q. Yeah.
18  A. I -- I think I'm confusing the times you're talking about. I
19      mean this is -- these are the reports of what happened so I
20      don't know --
21  Q. Let me clarify then.
22  A. Yes, please do.
23  Q. I'm not talking about the individual portions of the
24      document, which we'll get to in a minute, but the whole
25      document itself, Exhibit 63 with all its constituent parts,

70

1   do you have an understanding of what purpose it served?
2   A. I think so. I think it would -- it talks about what the
3       executive committee thought, what the drug safety and
4       monitoring board thought and what the GI events committee
5       thought. So in that sense I think that's what it is, right.
6   Q. And is this a document that would be submitted to the FDA or
7       for internal use?
8   A. I don't know.
9   Q. Okay. Were you on the executive committee of the CLASS
10      trial?
11  A. I was.
12  Q. Were you the chairman of the committee?
13  A. I was.
14  Q. And what was the function of the executive committee?
15  A. The function of the executive committee was really to oversee
16      the trial and to -- in the event that something went wrong,
17      as I see it, if something went wrong, for example, under drug
18      safety and monitoring and if that person had contacted the
19      executive committee and saying, We're seeing a signal that
20      suggests that something is happening here that we don't like,
21      it would have been the executive committee's responsibility
22      along with everybody else to say, We better stop the trial
23      because we're seeing something that we're worried about.
24          And I think that really is the main responsibility of
25      the executive committee. Plus to be sure that -- you see,

71

1   the -- I don't understand the drug safety and monitoring
2   functions overly well because that's not an expertise of
3   mine. There are people who are experts in studying drug
4   toxicity. How do you study renal effects? How do you study
5   hepatic effects? I know some about it, but I'm not an expert
6   about that.
7       I am an expert on GI events. And the reason I was in
8   this whole trial was GI events. The reason I didn't sit on a
9   chair at the gastrointestinal events committee was I didn't
10  have time. My other responsibilities in life were -- didn't
11  leave me enough time, because it's extremely time-consuming
12  to look at each event and then to try to adjudicate whether
13  it in fact constitutes one of the complications. And
14  although it may not be what anybody wants to hear, in fact,
15  these events are not always as easy to say yes or no as you
16  might think.
17      So the executive committee -- I think I've answered
18  your question. I think -- I feel that the executive
19  committee had to overlook the trial, be sure nothing had gone
20  wrong, be sure the blind hadn't been broken, to find out that
21  some center had opened the blind my mistake, and then to see
22  if there were any things happening. I mean it's also
23  possible the gastrointestinal events committee could have
24  found something that was worrisome and gone to the executive
25  committee and said, Something is happening and we better stop

72

1   the trial until we figure out what it is. It could have been
2   of any nature. So that's my concept of what an executive
3   committee does.
4   Q. Okay. Would you take a look at the second and third pages of
5       Exhibit 63, please.
6   A. Right.
7   Q. These would be Bates numbers ending in 099 and 100.
8   A. Right.
9   Q. Is this a letter that you wrote to James Lefkowith dated
10      February 9th, 2000?
11  A. That's correct.
12  Q. And why did you write this letter?
13  A. It was actually at Dr. Lefkowith's suggestion and with input
14      from him that we clarified the fact that there were these
15      committees and so that it was run properly that we had the
16      executive committee, the adverse effects committee and the
17      drug -- you know, the three, the GI event committee and the
18      drug safety monitoring board, and I believe it also -- just
19      one second, that the blind had been maintained.
20          In other words, I think in any one of these studies, if
21      the blind has been opened, it calls immediately into question
22      the integrity of the study. Not integrity meaning the
23      morality of it, but rather whether you can really count on
24      the study. And I was sure -- I said because I was told
25      repeatedly that the study was conducted in an exemplary way,



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

73

1    nobody had broken the blind, no idea how any of the groups
2    were doing prior to the study being completed and opened.
3    Q.  Okay.  Would you take a look at the second paragraph on the
4    first page of your February 9th, 2000 letter.
5    A.  Yes.
6    Q.  It starts -- the paragraph that starts, "The charter of the
7    executive committee," do you see that?
8    A.  Yes, yes.
9    Q.  All right.  About two-thirds of the way down in that
10   paragraph do you see on the left side you refer to the two
11   CLASS trials?
12   A.  Yes.
13   Q.  Why did you characterize them as two separate trials in this
14   letter?
15   A.  Okay.  Just a moment.  Let me read that.
16   Q.  Sure, take your time.
17   A.  (Witness complies.)
18       Okay.  You may be asking a question about whether we
19   called it two separate trials.  I would say that that wasn't
20   the point of what I was saying.  What I was saying was that
21   the gastrointestinal events committee was in fact very, very
22   careful about how they used the definitions that we came up
23   with as to whether to include or not to include a patient as
24   an event.  And I will give you a chance to ask me a question
25   if I'm getting it wrong but -- but the point I want to make

74

1    is, to you a GI bleed is a GI bleed.  To me that's not the
2    case.  And I'll give you an example.  Somebody who comes in
3    and vomits up a quart of blood and has red blood in their
4    stool, that's a GI bleed.  Probably a GI bleed.  Could
5    occasionally be something strange like an attachment between
6    the aorta and the small bowel where the blood is coming right
7    out of the aorta through a fistula.  But that's going to be
8    very rare.
9        So if somebody vomits blood and they have dark stools
10   or red stools, you would say that's an upper GI bleed.  But
11   what about a person who comes in a little light-headed and
12   has black stools which you test and has a little bit of blood
13   in it, but their blood level is normal?  Or what about the
14   patient who comes in who vomits up blood and their blood
15   level is normal but they fainted?  The point I'm making is
16   that it's a whole continuum of signs and symptoms that
17   patients present with and it's not easy to say whether
18   something is or is not an event.  And this is critical
19   because as you know, the number of events was actually very
20   small, so just one or two events could have the effect of
21   changing the outcome or interpretation of the study.
22       So this issue about the committee adhered strictly to
23   the definitions and the precise definitions were used, I was
24   involved with the evolution of those definitions, as I
25   remember.  I certainly was involved with that in the mucosa

75

1    trial.  But again, it sounds like it's simple, but it's
2    simple to somebody who's never done it.  To those of us who
3    have actually done it it's almost an -- it's an unanswerable
4    question, and I know that because in that ASGE study I did in
5    1980 it was very difficult.  I mean how many units of blood?
6        How about this:  A patient comes in and vomits blood
7    but never needs a blood transfusion?  Or a patient comes in
8    and has a slightly low hematocrit and blood in their stool,
9    the stool is brown, hematocrit -- the stool hemoccult is
10   positive, but they don't need a blood transfusion.  Is that a
11   GI bleed?
12       So the easy ones are easy, the difficult ones are in
13   fact very difficult.  And the point I was making there was --
14   where I say the primary outcome of the trials -- obviously
15   the trial against diclofenac and the trial against
16   ibuprofen -- was the care was taken to review the records of
17   any patient thought to have an ulcer complication,
18   definitions were used and they were stuck to.  And again, I
19   tell you that I sat in a room once when I was doing this ASGE
20   trial with hundreds of pounds of paper trying to figure some
21   of this out and we just do the best you can.
22   Q.  All right.  I think my question is a little simpler, which
23   is:  Earlier I think -- I believe you testified that you
24   thought it was a single trial, that the CLASS was a single
25   trial because it was answering one question.

76

1    A.  Yeah.
2    Q.  And here you refer to it as two trials, and I'm wondering why
3    that is?
4    A.  Oh, I -- it's a fair enough question.  I think it's two
5    trials together to answer one question.  That's why.  I mean
6    I think it was that.  I understand why you asked it but
7    that's what I think is the answer.  But the point of the
8    paragraph --
9    Q.  Right.  I understand.
10   A.  -- is what I went into.
11   Q.  Okay.  When you wrote this letter February 9th, 2000, had the
12   executive committee finished its work?
13   A.  This is 10 years ago and I don't exactly remember.  I believe
14   that is the case.
15   Q.  Okay.
16   A.  And I think the purpose of this was to codify that no --
17   blind wasn't broken, we were very careful about monitoring
18   for serious data and also very careful with the GI events.
19   Q.  All right.  Did the executive committee have a charter?
20   A.  It did.
21   Q.  All right.  And you see in the first sentence of the third
22   paragraph of your February 9th, 2000 letter it says that "The
23   executive committee adhered to its charter"?
24   A.  I believe that's right.
25   Q.  And -- you think that's accurate?

Toll Free: 800.300.1214
Facsimile: 619.239.4117

ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

77

1   A. Yes.
2   Q. So there were no violations in the charter that you're aware
3   of?
4   A. That is correct.
5   Q. Was the charter ever amended?
6   A. I don't remember.
7   Q. Okay. Can you turn to the fourth page of Exhibit 63, Bates
8   number ending 101. I don't think you're there.
9   A. I'm sorry. Oh, the signatures?
10  Q. 101.
11  A. Okay, just a minute. This one.
12  Q. Yes. Is this the signature page of the executive committee
13  charter?
14  A. It looks that way to me, yes.
15  Q. And is that your signature at the top?
16  A. It is.
17  Q. All right. Unfortunately the copy of the executive committee
18  charter that's in this document is partial, some pages were
19  missing. So I'm going to show you what's previously been
20  marked as Exhibit 69 to fill in the blanks.
21      Does this appear to you to be an unsigned version of
22  the executive committee charter?
23  A. It does.
24  Q. All right. Would you turn to Page 2 of the document.
25  A. Okay.

78

1   Q. In Exhibit 69. Do you see Section 3.1 there, The
2   Responsibilities of the Executive Committee?
3   A. Yes.
4   Q. Would you take a look at those responsibilities. My question
5   is: To your recollection did the executive committee fulfill
6   those responsibilities?
7   A. Okay. I read it. I'm sorry; ask the question again.
8   Q. Does Section 3.1 here set out the responsibilities of the
9   executive committee?
10  A. It does.
11  Q. And did the executive committee fulfill those
12  responsibilities?
13  A. To the best of my knowledge, yes.
14  Q. Okay. Do you see Section 3.2 below that?
15  A. Yes.
16  Q. "Functions of the EC"?
17  A. Yes.
18  Q. Does EC stand for executive committee?
19  A. It does.
20  Q. Do you see the first bullet point there says, "Review and
21  approve the EC charter"?
22  A. Yes.
23  Q. That's the document we're looking at, correct?
24  A. Yes.
25  Q. And did you in fact, as the executive committee, review and

79

1   approve the EC charter?
2   A. Yes.
3   Q. All right. Going back above to Section 3.1, do you see in
4   the bottom bullet point, No. 2, it says "To prepare the
5   primary manuscript of each study"?
6       Do you see that?
7   A. Yes.
8   Q. Is it your understanding that at least at the time this
9   charter was finalized that the executive committee was
10  expecting to write a separate manuscript for each arm of the
11  CLASS study?
12  A. No.
13  Q. Okay. Why does it say that?
14  A. Oh, excuse me. I didn't see the part that says "of each
15  study." I think that it's making recommendations regarding
16  the publication of data collected so it's making
17  recommendations to prepare the primary manuscript of each
18  study. It looks as if it's dividing it up into two studies
19  but that was not my -- not my knowledge of it at the time. I
20  missed that.
21  Q. Okay. Could you turn the page to Page 3 of Exhibit 69. Do
22  you see Section 5.3, Voting, there?
23  A. Yes.
24  Q. Was Dr. Lefkowith a member of the executive committee?
25  A. I believe he was a nonvoting member but I don't exactly

80

1   remember. He was certainly the Searle representative and he
2   certainly was very much involved with this trial. I don't
3   remember whether he was a formal member of the committee. He
4   may have been a nonvoting Searle representative.
5   Q. All right. Is there any -- well, can you look at Section 5.3
6   on Page 3 of Exhibit 69? Is there anything in there that
7   would indicate that Dr. Lefkowith was not allowed to vote?
8   A. (Witness complies.)
9       I don't think it addresses it one way or the other. It
10  certainly does not say that he was not allowed to vote. I
11  don't think it addresses it.
12  Q. All right. Would you turn the page, please, Page 4 of
13  Exhibit 69. Do you see Section 5.4, "Procedures for
14  recommendations to Searle," at the top of the page?
15  A. I do.
16  Q. All right. I'm going to read this section into the record.
17  "Duly voted and passed EC recommendations will be transferred
18  in writing to Searle within seven working days of the meeting
19  of which the recommendation was formulated and passed."
20      Do you see that?
21  A. I do.
22  Q. And to your knowledge did the executive committee comply with
23  this portion of the charter?
24  A. I -- to my knowledge we did, but --
25  Q. I'm sorry.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

81

1   A.  I'm sorry.  Excuse me.

2   Q.  Go ahead.

3   A.  But I'm not positive that it was always in writing.  I think

4       it was -- I don't know if it was always in writing.  I can't

5       remember.

6   Q.  Okay.  Do you have any recollection of any recommendations

7       that the executive committee made to Searle that weren't in

8       writing?

9   A.  No.

10  Q.  Okay.

11  A.  And furthermore, I don't have any recommendations made to

12      Searle by the executive committee that were sort of in any

13      way pertinent.  I mean it's not as if we, Uh-oh, we've got

14      something going on here, I don't want to put it in writing,

15      I'll tell you; that to my knowledge never happened.  So I

16      don't think the executive committee -- earlier we saw

17      somewhere that it would look at the data safety and efficacy

18      and would alert Searle if something was happening.  I don't

19      think that ever happened.

20  Q.  All right.  Let's look at Exhibit 5 -- I'm sorry; Section 5.6

21      of Exhibit 69.  Do you see that, "Summary notes"?

22  A.  Yes.

23  Q.  I'm going to read the first sentence into the record.  It

24      says, "Summary notes are prepared for each meeting of the EC

25      and distributed in a timely manner after each meeting and

82

1       reviewed and approved at the subsequent meeting."

2           Do you see that?

3   A.  I do.

4   Q.  And to your knowledge did the executive committee comply with

5       that?

6   A.  I don't remember.

7   Q.  Do you remember summary notes being created?

8   A.  To some degree but I don't exactly remember that minutes were

9       collected and circulated.  They may well have?  I just -- in

10      the middle of all the things that were going on I just don't

11      remember.

12  Q.  Do you remember any specific instances where minutes -- first

13      of all, strike that question.

14          So do you understand summary notes to be the same thing

15      as meeting minutes?

16  A.  Yes.

17  Q.  Okay.  And do you have any specific recollection of any

18      instances where there was a meeting of the executive

19      committee but where minutes or summary notes were not

20      created?

21  A.  A lot of negatives in that, but I do not remember whether

22      every meeting had minutes and whether every set of minutes

23      was circulated.

24  Q.  Right.  I'm asking a slightly different question now --

25  A.  Right, please.

83

1   Q.  -- which is:  Do you have a recollection of any specific

2       instances where there was a meeting of the executive

3       committee but minutes were not created?

4   A.  I do not.

5   Q.  Okay.  If I ever ask a question you don't understand, let me

6       know and I'll try it again.

7   A.  No, you're doing fine.

8   Q.  Can you look at the last page of Exhibit 69?  Do you see at

9       the top of that page it talks about, "Exemptions by the EC

10      chairperson for conflicts of interest"?

11  A.  Yes.

12  Q.  You were the chairperson, correct?

13  A.  Correct.

14  Q.  Did you grant any exemptions?

15  A.  I believe that each of the three people on the committee were

16      paid consultants to Searle and were exempted and I don't

17      remember if that was done in writing, but I think -- to the

18      best of my knowledge we never discussed any parts of

19      remuneration or compensation, but as far as I know Gerry

20      Faich and Lee Simon were consultants to Searle and were part

21      of the executive committee and that was fine with me.

22  Q.  Were you compensated for serving on the executive committee?

23  A.  Only in the sense that I each month would total up the number

24      of hours I spent working on the CLASS trial and would bill

25      Searle pursuant of all the financial data that exists

84

1       somewhere, and that would have included the time that I

2       was -- that I spent on the executive committee.  But I don't

3       remember that as being a large amount of time.

4   Q.  Did you have any participation in the conduct of the CLASS

5       study other than serving on the executive committee?

6   A.  You know, not really because I should have been on the GI

7       events committee because that is truly where my expertise is,

8       but I couldn't be because of time constraints.  So I would

9       say if you want to know where my time came out, it was in the

10      area of the functioning of the executive committee, not in

11      the data drug safety and monitoring.  And it wasn't in the

12      events committee because those folks were spending hundreds

13      of hours looking at every case and trying -- I occasionally

14      spoke to them about it, they would consult with me because of

15      my expertise in GI bleeding clinically, but I would say most

16      of it was the executive committee, my participation.

17  Q.  So just to clarify, as far as you understand it, you were

18      compensated for serving on the executive committee of the

19      CLASS study?

20  A.  Yes.

21  Q.  Okay.  Do you remember the GM article we talked about

22      earlier?

23  A.  Yes.

24  Q.  Were you -- you were one of the authors of that letter -- I'm

25      sorry; that article, correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                        September 29, 2010

85

1   A. I was.

2   Q. And were you compensated for being an author of that article?

3   A. I don't remember. I would probably say no, that that was

4      not -- it was sort of the end of the trial and here was the

5      paper and I was not compensated specifically for that, no.

6      To the best of my knowledge.

7   Q. Okay. Would you turn to Page -- we're going back to the big

8      document now, Exhibit 63. Would you turn to page Bates

9      number ending 9105 of Exhibit 63.

10  A. (Witness complies.)

11  Q. All right. Are these the minutes of a March 3rd, 1999

12     executive committee meeting?

13  A. So it would appear, yes.

14  Q. Okay. Now, having looked at this do you recall whether or

15     not you saw the minutes after each meeting?

16  A. Yes, I guess. There's a lot of paper, but yes, I would say

17     yes, I was aware of this.

18  Q. All right. Would you turn the page, please, to Bates number

19     ending 106 of Exhibit 63?

20  A. Yes.

21  Q. Are these the minutes of the June 6th, 1999 executive

22     committee meeting?

23  A. Yes.

24  Q. Okay. Turn the page again to the page Bates ending 107 of

25     Exhibit 63. Are these the minutes of a September 21st, 1999

86

1      executive committee meeting?

2   A. Yes.

3   Q. Would you look at the third paragraph in the discussion

4      summary?

5   A. Yes.

6   Q. And do you see a reference to "the new 48-hour censoring

7      rules"?

8   A. Yes.

9   Q. And do you know what that refers to?

10  A. You know, I don't exactly remember. I know the concept is

11     this: If patients come into a trial, the cleanest way to do

12     the trial is to endoscope them and say they're clear of

13     ulcers and then start them on the drug and really endoscope

14     them and say whether or not they have an ulcer. If you don't

15     have either of those the question comes up as to whether the

16     person came on to the study and had an ulcer caused by a

17     different drug they were on at a remote period and how do you

18     deal with that, and I think -- I think that's what the

19     censoring rule was. I would like to see the definition of

20     censoring rules. I don't remember precisely what that

21     referred to.

22  Q. Why don't you take a look at the protocol, Exhibit 61 I

23     believe, Bates number ending 857 of Exhibit 61.

24  A. Just a moment. I have it.

25  Q. All right. You see Section 5.5 on that page?

87

1   A. I do.

2   Q. All right. Take a look at the second paragraph there and

3      then let me know if that refreshes your recollection --

4   A. Okay.

5   Q. -- about the censoring rule.

6   A. (Witness complies.)

7      Yes. I mean I was right. That's exactly what it's

8      talking about. It's the fear that you're going to confound

9      the data because of therapy the person was on prior to coming

10     on the trial, an illness they may have suffered. So you want

11     to take that out as long as possible but you don't want to

12     miss events related to the study so it's a bit of a quandary.

13     You know, you want to go longer or endoscope the people and

14     say, Okay, she's clean, she doesn't have an ulcer, she can

15     come on. But if you don't do that -- and there are reasons

16     not to do that, as I said. Endoscopy, even as an older

17     endoscopist who's done maybe 25,000 endoscopies, endoscopy is

18     not entirely safe and any time you do it on a patient you're

19     putting him to a risk. So it's a ying and a yang of we would

20     prefer to have an endoscopy but that carries its own risk.

21        So you say, Okay, we're going to go seven days. We're

22     going to say that -- that's what this is saying, we'll go

23     seven days and any event that occurs before then will be not

24     considered, and then apparently it was changed to two days in

25     the article you showed me.

88

1   Q. Okay. So just to clarify: Per the protocol, any ulcer

2      complications that happened in the study within seven days of

3      a patient starting the study were censored and didn't count

4      basically, correct?

5   A. Correct.

6   Q. And then later that was changed from seven days to two days,

7      correct?

8   A. Correct.

9   Q. And why was that?

10  A. I don't remember.

11  Q. All right. We'll look at some minutes in a minute.

12  A. Okay.

13  Q. I'll follow up with that.

14        For now let's turn the page, please, to Bates number

15     ending 108 of Exhibit 63.

16  A. (Witness complies.)

17  Q. And are these minutes of a December 2nd, 1999 meeting of the

18     executive committee, the DSMV, the GEC, and people from

19     Searle and Pfizer?

20  A. Yes.

21  Q. Okay. And why was there a joint meeting of all the

22     committees?

23  A. Getting all these people together in person is a challenge.

24     Most of us were very busy -- as a matter of fact, correct,

25     every one of us was very busy and getting us to travel to one



ESQUIRE

an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                              September 29, 2010

89

1   spot is -- was difficult, and therefore, when we had a chance
2   to get everybody together that was a good thing.  I don't
3   remember whether the whole meeting was everybody together or
4   whether it was -- and therefore the executive committee was
5   represented by myself, Simon and Faich, the DSMV by Makuch
6   and Pincus and Faich, et cetera.  But I think that's what
7   happened.  I think we all got together to review what was
8   happening.
9   Q.  I guess my question is why the previous minutes were of
10  individual meetings of just the executive committee.  This is
11  a joint meeting of all three committees plus some other
12  people.  Do you have an understanding of why this particular
13  meeting was everyone?
14  A.  I don't.
15  Q.  Okay.  Was this the last meeting of the executive committee?
16  A.  I don't know.
17  Q.  Okay.  At this meeting did the executive committee and the
18  other committees decide to stop the CLASS study earlier than
19  the protocol called for?
20  A.  I believe that's true.
21  Q.  And why did they do that, or you do that?
22  A.  Right.  I believe what had happened was that there was a
23  dramatic drop off in the number of events occurring -- still
24  blinded, to my knowledge still blinded, and it looked as if
25  we were getting one or two, or we were getting an event every

90

1   one or two months and that it was going to take a long time
2   to get -- I think the original -- there was a number of
3   patients stipulated as being the total number we wanted to
4   get and we weren't quite there, short by I think three, but
5   that it looked like it was going to take a long time to get
6   those three.  And I think that's what we're saying:  "The
7   review of the clinical events show the observed study 35
8   deviated from prediction with no events for three months and
9   102, only one event in the past two months."
10      So far that reason it was decided to stop the study.
11          THE VIDEOGRAPHER:  Counsel, the page is
12  partially blocking.  Yeah, just a little bit lower.  Thanks.
13  Q.  (BY MR. MONTGOMERY) All right.  Do you recall any specific
14  executive committee meetings after December 2nd, 1999?
15  A.  I do not.
16  Q.  Do you remember the executive committee doing anything as a
17  committee after deciding to terminate the study?
18  A.  I don't remember.  Again, this was in a time when lots of
19  things were going on and I just don't remember.
20  Q.  Okay.  Would you turn to page Bates ending 127 of Exhibit 63.
21  A.  Yes.
22  Q.  All right.  The top of the page reads "The historical
23  incidence," do you see that?
24  A.  Yes.
25  Q.  If you look at the second paragraph there that starts, "The

91

1   UGI event censoring rules."
2   A.  Yes.
3   Q.  Would you read that paragraph to yourself and let me know
4   when you're done.
5   A.  (Witness complies.)  Okay.
6   Q.  All right.  Having looked at that, does that refresh your
7   memory about why the censoring rule was changed from a week
8   to 48 hours?
9   A.  No, because -- may I just --
10  Q.  Sure.  Go ahead.
11  A.  Because it looked as if it was saying -- it was taking as a
12  given that it was going to be 48 hours and then saying, Okay,
13  in light of the 48 hours, any event occurring within the
14  first 48 hours of the first dose of study medication I guess
15  would not be allowed and any event occurring more than
16  48 hours after the last dose, except that any event occurring
17  within two weeks would be looked at by the gastrointestinal
18  events committee.
19  Q.  All right.  And at this time --
20  A.  But that doesn't -- I'm sorry.  It doesn't address the
21  question of why they went from seven days to two days.
22  Q.  Okay.  And you don't know?
23  A.  I don't remember.
24  Q.  Okay.  At this time period, so 1999, did you have an
25  understanding whether or not NSAIDs were more likely to cause

92

1   ulcer complications within the first seven days than
2   Celebrex?
3   A.  No, I do not remember that.
4   Q.  Do you have an understanding about that now?
5   A.  I do not.
6   Q.  Okay.
7   A.  If you look at the -- if you look at the demography of what
8   happens with these events, and having done it myself because
9   I've endoscoped lots of people on trials and clinical people,
10  you wouldn't expect too many things to happen within just a
11  few days.  Now, that's -- that was the whole issue is if it
12  happened, you know, within a few days was it related to
13  previous stuff or was it related to the current drugs?
14      Are we done with this thing for now?
15  Q.  Yes, for now.
16          MR. MONTGOMERY:  At this point I'd like
17  to show the witness what's been previously marked as
18  Exhibit 66.
19  Q.  (BY MR. MONTGOMERY)  Is this the final report for the CLASS
20  study?
21  A.  Yes.
22  Q.  And have you seen it before?
23  A.  I -- I'm sorry.  I believe I have.
24  Q.  What's the purpose of a final report?
25  A.  To record what happened in the study so that later if you



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

93

1    need to go back and figure out what happened you'd have one
2    place to put it.  It's probably never easier to put this together
3    than right after the study is done.  You wait two or three
4    years it's more and more difficult to figure out what
5    happened.  So it's -- the obvious would be it's a way of
6    explaining how the trial was conducted and what happened and
7    how the data was interpreted.
8    Q.  And is it your understanding that a final report is for
9    internal use or to give to the FDA?
10   A.  I don't know.  I know the FDA gets everything.  Whether they
11   get this report or not, I don't know.  But data-wise they get
12   all the data.
13   Q.  Okay.  On the first page do you see the study dates?
14   A.  I do.
15   Q.  All right.  And do you see the date March 17, 2000 there?
16   A.  (Witness nods head up and down.)
17   Q.  You have to answer audible.
18   A.  Yes.  I'm sorry.  I do.
19   Q.  What does that date represent?
20   A.  I don't know.  I would assume looking at this that it's the
21   date of the last -- the date in which we would still accept a
22   patient; that after that we would say the study is over, so
23   studies were accepted until that day.  That's what I would
24   assume from looking at this.
25   Q.  Okay.  Would you turn to the fifth page of Exhibit 66 Bates

94

1    number ending 116.
2    A.  (Witness complies.)  Okay.
3    Q.  Do you see the Statistical Methods at the top of the page?
4    A.  I do.
5    Q.  All right.  Under the first bullet do you see the paragraph
6    that reads, "The primary reason"?
7    A.  Yes.
8    Q.  All right.  Can you read that to yourself and let me know
9    when you're done.
10   A.  Yes, I will.  (Witness complies.)  Okay.  I've read it.
11   Q.  Does that paragraph describe the primary reason for analysis
12   at six months?
13   A.  I believe it does.
14   Q.  Okay.  And can we refer to that generally as informative
15   censoring?
16   A.  Partly.  I mean it's partly informative censoring and it's
17   partly talking about the confounding effect of taking low
18   dose aspirin, which is not informative censoring as I see it.
19   Q.  Let's just talk about the --
20   A.  So it's both.
21   Q.  -- informative censoring part.
22   A.  Okay.
23   Q.  Can you explain to me in your own words what informative
24   censoring refers to in this context of the CLASS study?
25   A.  Yes.  So it gets back to this question about -- in a study

95

1    you want the study groups to be comparable.  So, for example,
2    you would not want -- if you take a study A versus B, you
3    would not want 90 percent of the patients in A to be male and
4    10 percent of the patients in B to be male.  You'd like the
5    groups to be comparable.  And a lot of time was spent on this
6    trial to look at the demographics and assure the fact that
7    the different groups were comparable in terms of age,
8    diagnosis, underlying risk factors, et cetera.
9        My concept is that the question arose as to why did
10   some of the NSAID comparators stop having adverse events?
11   What happened?  I mean is it known that you can take a drug
12   and if you get by six months that you somehow are now
13   protected against an adverse event?  And I think the answer
14   is no to that.  I don't think that's the case.  I don't think
15   anybody has any evidence to that being true.
16       So I feel that you want to be as sure as possible that
17   as the study moves along the groups are comparable and
18   therefore that conclusions one draws for any time period are
19   relevant because the groups were comparable.  And my concept
20   of what happened was that during the six months there was a
21   change in the nature of the groups because people with
22   symptoms and symptomatic ulcers were being dropped
23   disproportionally from the NSAID arms of the study rather
24   than the Celebrex arms, and therefore, at six months, if
25   you've gotten rid of the patients who have symptoms and the

96

1    patients who have symptomatic ulcers in let's say the
2    diclofenac group, that therefore, the chance of that person
3    developing an ulcer complication in the ensuing six months of
4    that group of patients is different.
5        In other words, you have depleted the susceptibles.
6    The susceptibles are the people with ulcers and with ulcer
7    symptoms and they're out of the study.  And surely we know
8    that -- I told you that if you have 100 people taking NSAIDs,
9    not all of them develop symptoms and not all of them develop
10   symptomatic ulcers and surely not all of them develop ulcer
11   complications.  There are some people who can take these
12   drugs with impunity and they get by fine.  But there are some
13   people in whom they do develop symptoms and those people were
14   being -- as I understand it, those people were not
15   proportionate in the Celebrex versus the NSAID groups, and
16   therefore, the data after six months was not comparing
17   comparable groups.
18       Sorry.  That's a winding answer, but...
19   Q.  What you just said, though, that's your understanding of the
20   informative censoring theory?
21   A.  That's right.
22   Q.  Okay.  All right.  So correct me if I'm wrong.  You said it's
23   the withdrawal of people that either get a symptomatic ulcer
24   or a GI symptom, correct?
25   A.  Correct.  And I think -- please, I'm sorry.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                          September 29, 2010

97

1   Q.  So with regard to the symptomatic ulcers, can you correct for
2       that by using a combined end point that uses complicated
3       ulcers as well as symptomatic ulcers?
4   A.  Can you correct for it?  Well, you certainly can look at the
5       data.  I mean you can change the end point from just
6       complications, you know, perforation, bleeding and
7       obstruction, and you can add symptomatic ulcers.  Yes, that
8       would be one way to say, We have a little better feel for
9       what's happening.
10  Q.  Right.  I mean to the extent that you add symptomatic ulcers
11      to the end point then --
12  A.  Yes, you're right.
13  Q.  -- the withdrawal of them is no longer relevant as to
14      informative censoring, correct?
15  A.  It's already considered as a data point.
16  Q.  Right.  So let me say it again for the record to be clear.
17          So if you used a combined end point of complicated
18      ulcers and symptomatic ulcers, then the withdrawal of people
19      that got symptomatic ulcers is no longer a concern as to
20      informative censoring?
21  A.  What you're saying is logical.  I am not completely sure that
22      I understand the definition of informative censoring.  It's
23      something that I'm -- I'm not a statistician and I'm not a
24      clinical trial designer and so I'm not completely comfortable
25      with the definition of that.  So, for example, if -- it may

98

1       be that if a patient -- I don't know what it means.  It
2       doesn't even logically make sense to me.  What does informed
3       censoring mean?  If it means the patient has a symptom and is
4       then informed that that might be an ulcer developing and they
5       drop, I guess that would be one definition of it; that is,
6       you're taking out patients partly because you're informing
7       them and they're saying, Well, gee, if this symptom might be
8       an ulcer, I'd like to come off the trial.
9           I think one of the problems with this trial, with
10      recent trials, is that because of the earlier work that was
11      done, partially by me and partially by hundreds of other
12      people, we got a pretty good idea for what happens to these
13      patients.  And people got a little skittish about putting
14      people on these trials.  You know, you don't want a doctor to
15      put just anybody on, and if somebody defined like, My
16      goodness, the guy's 88, he's had a severe heart
17      attack, he's had bleeding ulcers, I don't want him on the
18      trial, that's what happened increasingly in these trials
19      compared to trials that were done 20 years before.  But my
20      concept would be that if you include symptomatic ulcers then
21      you're correcting for that part of the informative censoring,
22      but I'm not an expert in that.
23  Q.  Okay.  So you have some understanding of informative
24      censoring but you're not sure that it's a comprehensive
25      understanding?

99

1   A.  Correct.
2   Q.  Okay.  But pursuant to your understanding of informative
3       censoring then, would the inclusion of symptomatic ulcers as
4       a combined end point correct for any informative censoring
5       due to withdrawal of people that had symptomatic ulcers?
6           MR. WEISS:  Object to the form of the
7       question.
8           THE WITNESS:  I'm afraid you have to ask
9       the question again.
10  Q.  (BY MR. MONTGOMERY)  All right.  Let me ask you again.
11          Pursuant to your understanding of informative
12      censoring, would including symptomatic ulcers in a combined
13      end point correct for any informative censoring caused by the
14      withdrawal of patients who suffered symptomatic ulcers?
15          MR. WEISS:  Object to the form of the
16      question.
17          THE WITNESS:  Well, I was thinking that
18      you still wind up at the end of six months having dropped out
19      a bunch of patients.  You would have to say that you would
20      have to look after six months at end points including
21      symptomatic ulcers because you have just dropped a bunch of
22      the people who could get -- who could get the complicated
23      ulcer, right?
24  Q.  (BY MR. MONTGOMERY)  Right.  But if you include a symptomatic
25      ulcer as part of your end point, it doesn't matter whether

100

1       you got a complicated ulcer or a symptomatic ulcer, correct?
2       It still counts as one, so --
3   A.  But you're asking does that affect informative censoring?
4   Q.  Well, does it correct for it to the extent that there is
5       informative censoring that you can ascribe to people dropping
6       out because of symptomatic ulcers?
7   A.  Well, I guess my answer would be yeah, as long as you
8       continue looking at the symptoms.
9   Q.  Okay.
10  A.  If you say, Hey, in the first six months we're going to look
11      at symptoms and complications, then at the end of six months
12      we're just going to look at complications, I would say no,
13      you still have the problem because you've taken out all the
14      symptomatic ulcers.  If you say, From six to 12 months or
15      beyond six months we're going to look at symptomatic ulcers
16      and ulcer complications, I think it does, logically to me,
17      does go some way to correcting for the problem.
18  Q.  Okay.  And is it your understanding that that's what you did
19      in fact did, you looked at the combined end point for the entire
20      study period?
21  A.  Yes.
22  Q.  So --
23  A.  I'm not saying when we did, but at some point the combined
24      end point was looked at at six months and for the entire
25      study period.

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

101

1   Q.  And so pursuant to what you just testified for, then that, to

2      your understanding, would correct for any informative

3      censoring that you can ascribe to symptomatic ulcers?

4          MR. WEISS:  Objection to the form of the

5      question.

6          MR. BUSHOFSKY:  Objection to the form of

7      the question.

8          THE WITNESS:  I suspect I'm not exactly

9      following where everybody is.

10         MR. BUSHOFSKY:  You can go ahead and

11     answer.

12         THE WITNESS:  So I would say that it

13     would -- it would help the portion of informative censoring

14     which is occurring because of symptomatic ulcers, yes, it

15     would improve that problem.

16  Q.  (BY MR. MONTGOMERY) Okay.  Now let's talk about the censoring

17     that's caused by the GI symptoms.

18         The informative censoring theory with regard to GI

19     symptoms is premised on the idea that people that suffer GI

20     symptoms would have been more likely to go on and suffer

21     ulcer complications, correct?

22         MR. WEISS:  Object to the form of the

23     question.

24         THE WITNESS:  I would look at it --

25     again, I'm looking at it back the other way; that if the

102

1      people have complications that somewhere between, you know,

2      30 and 90 percent of them have symptoms, and therefore if you

3      eliminate all the patients that have symptoms you are going

4      to reduce the number of people with complications.

5   Q.  (BY MR. MONTGOMERY) Okay.  But now I'm asking you to look at

6      it my way, which is:  For the informative censoring to be a

7      valid theory with regard to GI symptoms, is it necessary that

8      people that suffer GI symptoms would have been more likely to

9      go on and suffer an ulcer complication?

10         MR. WEISS:  Object to the form of the

11     question.

12         THE WITNESS:  Yes.

13  Q.  (BY MR. MONTGOMERY) All right.  And at the time of this

14     report, were you -- did you have an understanding that that

15     was in fact true?

16         MR. BUSHOFSKY:  Objection; form.

17         THE WITNESS:  I'm sorry.  "True" meaning?

18  Q.  (BY MR. MONTGOMERY) Let me just say it a different way.

19         At the time of the final report, for example, did you

20     have an understanding that in fact people who suffered

21     symptom -- I'm sorry.

22         At the time of the final report did you have an

23     understanding that people who in fact suffered GI symptoms

24     would in fact be more likely to go on and get an ulcer

25     complication?

103

1          MR. WEISS:  Object to the form of the

2      question.

3          THE WITNESS:  Yes.

4   Q.  (BY MR. MONTGOMERY) Okay.  And what was that based on?

5   A.  The same thing I've been saying, which is, looked at it the

6      other way, when you look at patients who have the

7      complications and you say that, let's say 50 percent of them

8      have had symptoms, if you eliminate patients with symptoms

9      you're going to be reducing the number of patients that

10     develop any complication.

11         And therefore, if you're eliminating all the people

12     with symptoms, you're removing the susceptible group.  And in

13     addition to that, I told you earlier that I think symptoms

14     are, in the purpose of sitting in this room, are easy to

15     define.  They're not that easy to define when you're dealing

16     with a patient.  Every one of these patients is different.

17     Picture somebody in your family and you're asking them

18     questions and having them go around in circles about whether

19     you have it.

20         So I think that if you do a careful question that

21     people with these ulcer complications, probably even more

22     than 40 or 50 percent have symptoms, antecedent symptoms in

23     the 30 days prior to presenting with a complication.

24         THE VIDEOGRAPHER:  Counsel, there's about

25     10 minutes left on the tape.

104

1          MR. MONTGOMERY:  Okay.

2   Q.  (BY MR. MONTGOMERY) Do you know whether any empirical

3      analysis was done of the CLASS data to see if in fact the

4      people in the study who suffered GI symptoms were more likely

5      to suffer ulcer complications?

6          MR. WEISS:  Object to the form of the

7      question.

8          THE WITNESS:  That's a reasonable

9      question but by definition can't be answered, because if they

10     were taken off the study then you don't know what would

11     happen to them and that's what happened.

12  Q.  (BY MR. MONTGOMERY) But not everybody that suffered GI

13     symptoms withdrew from the study, correct?

14  A.  I don't know that.  I don't remember that.  Perhaps you can

15     find that somewhere.  I know everybody with a symptomatic

16     ulcer withdrew from the trial.  I don't remember how many

17     people with symptoms withdrew and how many people with

18     symptoms stayed on the trial.

19  Q.  I think we're going to go back to Exhibit 61 to answer that

20     question but it's going to take me a second to find it.

21         All right.  I think it's on page Bates ending 855 of

22     Exhibit 61.

23  A.  I have 855.

24  Q.  All right.  Do you see the first full paragraph at the top

25     there?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

105

1    A.  I'm sorry.  Oh, 854.  Excuse me.  I was on the wrong page.
2        Yes.
3    Q.  All right.  Do you see the first full paragraph that starts
4        "GI complaints"?
5    A.  Oh, this -- I'm sorry.  This document is out of order.  It's
6        not -- maybe my brain is out of order.  I am now on 855.  I'm
7        sorry.  "GI complaints will be collected and analyzed."
8            Yes, I see that paragraph.
9    Q.  Why don't you read that paragraph to yourself and let me know
10       when you're done.
11   A.  (Witness complies.)  Okay.
12   Q.  Does this refresh your memory about whether or not people
13       with GI symptoms would remain in the study?
14   A.  Well, I think what it says is that patients who report GI
15       symptoms, if they're endoscoped to have an x-ray and there's
16       no evidence of an ulcer, can then participate, but it doesn't
17       address the issue about how often it happened.  They may
18       continue to participate, but somebody may have said, Look, I
19       don't care whether you saw an ulcer or not, I want to come
20       off the study because I don't feel well.  And I don't know
21       how often that happened.
22   Q.  Okay.  We'll pursue that later on in the final report then.
23       All right.  Going back to final report, Exhibit 66, please.
24   A.  Yes.
25           THE VIDEOGRAPHER:  About seven minutes.

106

1            MR. MONTGOMERY:  Let's just go off the
2        record and change the tape.
3            THE VIDEOGRAPHER:  We are going off the
4        record.  The time is 11:39 a.m.  This is the end of Tape
5        No. 2.
6            (Recess 11:39-11:46.)
7            THE VIDEOGRAPHER:  All right.  We are
8        back on the record.  The time is 11:46 a.m.  This is the
9        beginning of Tape No. 3.
10
11           EXAMINATION (Continuing)
12   BY MR. MONTGOMERY:
13   Q.  You understand you're still under oath?
14   A.  I do.
15   Q.  All right.  Let's go back to Exhibit 66.  We were talking
16       about the page Bates number ending 116 that discusses
17       informative censoring.  Do you recall that?
18   A.  Yes, I do.
19   Q.  All right.  So part of informative censoring, the discussion
20       here is as a reason for the six-month analysis?
21   A.  Yes.
22   Q.  And did the executive committee ever make a decision that the
23       six-month analysis -- or that a six-month analysis should be
24       performed of the CLASS data?
25   A.  I believe we did.

107

1    Q.  And when did that happen?
2    A.  I don't remember.
3    Q.  Did it happen before or after the unblinding of the data?
4    A.  I think actually before, but I don't exactly remember, but
5        sometime in that period of time it was said, We'll do a
6        six-month analysis.
7    Q.  Before the data was unblinded, why would you think that a
8        six-month analysis was a good idea?
9    A.  Because the -- it was clear that something had happened.
10       That was the whole reason for stopping the trial that
11       something had changed and I think that the idea would be,
12       Let's look at six months.  Let's look at the rest of it.  I
13       mean we got to figure out why there seems to be a change in
14       the curve.
15   Q.  And is that something that the executive committee
16       communicated to Pharmacia?
17   A.  I don't remember that.  I think it was pretty obvious to
18       everybody, and I don't remember specifically communicating
19       that to Pharmacia.
20   Q.  Well, if you're going to do a six-month analysis, was the
21       executive committee going to do it itself --
22   A.  Oh, no.
23   Q.  -- or was it going to have Pharmacia do it?
24   A.  Oh, no.  I'm sorry.  No, it would have Pharmacia do it but I
25       think Pharmacia also wanted to do it.  So -- I don't remember

108

1        that we told them to do something that they wanted to do too,
2        they just did it.
3    Q.  All right.  So going back to this page, you said the reasons
4        that are enumerated we talked about before, there's
5        informative censoring and then there's aspirin use as well,
6        correct?
7    A.  Correct.
8    Q.  Are there any other aspects or results of the trial that
9        justify a six-month analysis?
10           MR. WEISS:  Sorry.  Could you just repeat
11       that question?
12           (Question on Page 108, Lines 8
13           through 9, read by the
14           reporter.)
15           MR. MONTGOMERY:  Let me ask the question
16       again because I didn't mean to say adjustments.  Did I say
17       that?
18           THE REPORTER:  That's what I heard.
19           MR. MONTGOMERY:  That's okay.
20   Q.  (BY MR. MONTGOMERY) Were there any other aspects or results
21       of the CLASS study that justified a six-month analysis?
22           MR. WEISS:  Object to the form of the
23       question.
24           THE WITNESS:  It was my understanding
25       from the get-go that it would be analysis done at six months,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                           September 29, 2010

109

1    before even the trial occurred that there would be an
2    analysis at six months.  And then there was the issue about
3    why it had changed, what had happened, and wanting to look
4    back over the first six months versus the additional data.
5    But you also mentioned aspirin, and I don't think aspirin is
6    part of -- the problem with aspirin is not part of the
7    informative censoring as I understand.  So you kind of put
8    that in your lead in to the question.
9    Q.  (BY MR. MONTGOMERY) Let me ask it a different way then.
10        Is aspirin a different reason besides informative
11   censoring that you believe the data from the first six months
12   of the study is superior to the data after six months?
13            MR. WEISS:  Object to the form of the
14   question.
15            THE WITNESS:  No, I don't think so, at
16   least not as I understand it.  The issue with aspirin --
17   should we talk about that for a moment or do you want to do
18   that later?
19   Q.  (BY MR. MONTGOMERY) Not really.  Okay.
20   A.  Well, you know.
21   Q.  All right.  Then is it your understanding that as a result of
22   the informative censoring that the data -- the results of the
23   CLASS study are better before six months than after six
24   months?
25            MR. WEISS:  Object to the form of the

110

1    question.
2            THE WITNESS:  Yes, that's correct.
3    Q.  (BY MR. MONTGOMERY) Okay.  Other than informative censoring
4    is there any reason to believe that the data after six months
5    is better than the data -- let me do it again.
6        Other than informative censoring is there any reason
7    that you know of to believe that the data before six months
8    is better than the data after six months?
9            MR. WEISS:  Object to the form of the
10   question.
11            THE WITNESS:  The only thing that occurs
12   to me is the fact that the benchmark that we have for these
13   studies is in fact six months, and I think subsequent to the
14   CLASS trial, which of course doesn't answer your question
15   directly, that's been borne out that I think most of the
16   trials have in fact been six months.  So in other words, what
17   I'm saying is I think I, for example, am most comfortable
18   with six months of data.  We did that in the mucosa trial and
19   at six months in the CLASS trial I was comfortable with that.
20   I don't know of any other -- unless I'm blocking it out, I
21   don't know of any other reason than informed censoring -- it
22   was that -- it was that patients were dropping out of the
23   trial in disproportionate numbers in the first six months
24   such that the groups were no longer comparable.  I'm trying
25   to remember in my brain whether that's all informative

111

1    censoring or whether there were other reasons for people
2    dropping out.
3        For example, lack of efficacy.  I think there was some
4    mention made that -- and I haven't read about this recently,
5    but that the ibuprofen wasn't working for patients with
6    arthritis and therefore they were taken off the study.  So
7    that -- that was another reason that the groups were changing
8    at six months but not related to informative censoring
9    because of symptoms.  That's the best I can come up with.
10   Q.  (BY MR. MONTGOMERY) Let me try this a different way:  Is it
11   your understanding that as a result of informative censoring
12   the data after six months from the CLASS trial is more biased
13   than the data before six months?
14   A.  Yes.
15   Q.  Okay.  Other than informative censoring, do you have any
16   reason to believe -- I'm sorry.
17        Do you have any other reason besides informative
18   censoring to believe that the data after six months was more
19   biased than the data before six months?
20   A.  Well, the other factor would be lack of efficacy of the drug
21   from a rheumatologic standpoint, and therefore people with
22   worse arthritis -- and one of the factors in GI bleeding that
23   we learned from these previous studies I told you about is
24   that the patient's underlying condition is related to the
25   risk of bleeding and is related to the outcome of the

112

1    bleeding episode, and therefore somebody with worse arthritis
2    for whom the ibuprofen wasn't working might come off the
3    study.  And that might be somebody who in fact was at
4    increased susceptibility.
5        So the informative censoring I would say would be the
6    symptoms; dropping the patients off of the study because they
7    weren't responding to the medication would have the effect of
8    potentially dropping patients with worse underlying arthritis
9    who might also be at increased risk of developing a
10   complication.
11   Q.  Okay.  So other than informative censoring and the efficacy
12   issue that you just described, do you have any reason to
13   believe that the data after six months from the CLASS study
14   was more biased than the data before six months?
15   A.  No.
16   Q.  Okay.  Would -- does the fact that patients were required to
17   take a minimum of six months of the drug make the six-month
18   data more reliable than the entire study data?
19            MR. WEISS:  Object to the form of the
20   question.
21            THE WITNESS:  Well, let me think.  Well,
22   I don't see why that would be because you would have the
23   first six months data on the people who continued to be on
24   six months anyway.  I mean I told you that I'm comfortable
25   with six months but I don't see -- I don't see -- if you had



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                September 29, 2010

113

1   all the data you would know what happened in six months.  So
2   I'm not sure exactly what the question was but it's not clear
3   to me.
4   Q.  (BY MR. MONTGOMERY) All right.  Let me ask it again.
5   A.  Okay.
6   Q.  The patients -- in order to be counted in the study, patients
7       had to take whatever drug they were on for at least six
8       months, correct?
9   A.  Correct.
10          MR. WEISS:  Object to the form of the
11      question.
12          MR. BUSHOFSKY:  Objection.
13  Q.  (BY MR. MONTGOMERY) And is there any reason why that fact
14      alone would make the analysis of the six-month data superior
15      to the entire data set?
16          MR. WEISS:  Object to the form of the
17      question.
18          THE WITNESS:  Well, you know, it -- from
19      a nonexpert in statistics and nonexpert in clinical trial
20      design, which I am purporting to be, it would make better
21      sense that if everybody made it to six months, we'll look at
22      six months.  Rather than people who made it to eight months,
23      nine months, 12 months, you know -- so in that sense I'm
24      comfortable with the first six months of data.
25  Q.  (BY MR. MONTGOMERY) My question is not, A, whether you're

114

1   comfortable, or B, about seven or nine months or 10 months.
2   My question is very specific as to:  Does the fact that there
3   was a minimum treatment period of six months make the
4   six-month analysis in any way better or more reliable than
5   the entire data set based on that fact alone?
6          MR. WEISS:  Object to the form of the
7      question.
8          THE WITNESS:  You know, I -- I have to
9      say I don't know.  I don't know the answer to that.  It's a
10     fair question but I don't know the answer.
11  Q.  (BY MR. MONTGOMERY) Let me ask you a different way then.
12     Do you have any reason to believe that just because
13     there was a six-month minimum treatment period that that
14     would make the six-month analysis any better than the entire
15     data set analysis?
16         MR. WEISS:  Object to the form of the
17     question.
18         THE WITNESS:  No.  I don't.  I don't.
19  Q.  (BY MR. MONTGOMERY) All right.  Can you turn to Page -- let's
20     go to page Bates number ending 117 of Exhibit 66.
21  A.  Okay.
22  Q.  Do you see Tables 1 and 2 on that page?
23  A.  I do.
24  Q.  All right.  And do these summarize some of the results of the
25     CLASS study?

115

1   A.  Yes.
2   Q.  All right.  And I'd like you to take a look on Table 1, the
3       bottom, the number on the bottom right-hand corner 0.037; do
4       you see that?
5   A.  I do.
6   Q.  Can you tell me what that number represents?
7   A.  Well, with my earlier disclaimers about statistics, I guess
8       it's the P value for the 26-week group rate comparing
9       celecoxib to diclofenac and ibuprofen for both together.
10  Q.  And that's in patients not taking aspirin during the first
11      six months; is that right?
12  A.  No, no.  Where -- I don't know that that's the case.
13  Q.  Just take a look at Table 1, where it says Table 1 at the
14      top.
15  A.  Right.
16  Q.  Summary of CSUGIE incidence for six months.
17  A.  I see that, but I don't see where the -- oh, no.  I'm sorry.
18      Excuse me.  I see it now.
19  Q.  That's no problem.
20  A.  All patients and patients not taking aspirin, yes.  So it is
21      statistically significant for both groups below .05, P value
22      of .05, okay.
23  Q.  So this is -- just to restate:  That result shows that there
24      was a statistically significant difference between Celebrex
25      and the combined NSAIDs in the first six months in the

116

1   subgroup of patients taking aspirin, right?
2   A.  Not taking aspirin.
3   Q.  I'm sorry.  Let me say it again.
4          That number shows that there's a statistically
5      significant difference between Celebrex and the combined
6      NSAIDs in the first six months in patients not taking
7      aspirin, correct?
8   A.  Yes.
9   Q.  Okay.  Now let's look at Table 2.  Do you see that that's --
10      has the results from the entire study period?
11  A.  Yes.
12  Q.  All right.  I'd like you to take a look at the same result in
13      the lower right-hand corner, .185; do you see that?
14  A.  Yes, I do.
15  Q.  And that's not statistically significant, correct?
16  A.  That is correct.
17  Q.  And so for the entire study period in patients not taking
18      aspirin, there was no statistically significant difference
19      between Celebrex and the combined NSAIDs, correct?
20  A.  I guess that's true, yes.
21  Q.  All right.  And then on -- take a look at the next page,
22      please, Bates ending 11 --
23  A.  Although I --
24  Q.  Sure.
25  A.  It's not exactly what my memory is.  I'd like to -- let me



Toll Free: 800.300.1214
Facsimile: 619.239.4117

ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                      September 29, 2010

117

1    read the bottom of that table.
2    Q. Sure.
3    A. Okay. All right. It doesn't change what you said.
4    Q. Okay. Would you take a look at the next page, Bates ending
5       118 of Exhibit 66.
6    A. Okay.
7    Q. Do you see there are two more tables there, Table 3 and
8       Table 4?
9    A. I do.
10   Q. And those are more summary results of the study?
11   A. Correct.
12   Q. All right. So all the tables that we've looked at have
13      comparisons between diclofenac specifically and Celebrex,
14      don't they?
15   A. Yes.
16   Q. All right. And so in total there's eight different
17      comparisons in the tables we just looked at between Celebrex
18      specifically and diclofenac, correct?
19   A. Yes.
20   Q. All right. And are any of those comparisons statistically
21      significant?
22   A. Nope.
23   Q. Okay.
24   A. That's not the way I read it.
25   Q. Okay. Would you turn to page Bates ending 120 of Exhibit 66,

118

1    please.
2    A. (Witness complies.)
3    Q. Do you see Table 8 at the bottom?
4    A. Yes.
5    Q. All right. And does Table 8 display the five most frequently
6       reported adverse events for the entire study period?
7    A. Yes.
8    Q. And one of those events is a URTI; is that right?
9    A. Yes.
10   Q. What is that?
11   A. I think it's upper respiratory tract infection, but I don't
12      know. TGDMA. I'm sorry; that means too many abbreviations.
13      I think it would be okay to write out the word. So I assume
14      this is an upper respiratory tract infection.
15   Q. Let's just look at headache, for example, then.
16   A. Okay.
17   Q. We both at least know what that is, right?
18   A. I think so.
19   Q. Okay. First of all, the adverse events in Table 8 are for
20      the entire study period, correct?
21   A. Correct.
22   Q. And is there any reason to believe that the adverse events
23      for headache, for example, became biased at all after six
24      months?
25   A. Only in the sense that if the person in the first six months

119

1    had terrible headaches on a drug they'd be off the study. I
2    mean that -- and that would cause a bias. Perhaps you're
3    trying to pick something which is obvious, but...
4    Q. No, that's fine. All right. Would you take a look at
5       dyspepsia?
6    A. Right.
7    Q. Adverse events for Celebrex?
8    A. Yes.
9    Q. And that's 16.5, correct?
10   A. Yes.
11   Q. And do you know what that number represents? Is it a
12      percentage?
13   A. I believe it's a percent of patients.
14   Q. Okay. Would you turn the page now to Table 9.
15   A. Okay.
16   Q. And Table 9 display adverse events causing withdrawal with
17      incidents greater than one percent in any treatment group?
18   A. Yep.
19   Q. Okay. And do you see, let's see, under dyspepsia for
20      Celebrex --
21   A. Right.
22   Q. -- it's 3.8 percent?
23   A. Right.
24   Q. So does that mean that, comparing these two numbers, that
25      somewhat over 12 percent of the people who suffered dyspepsia

120

1    as an adverse event stayed in the study, or at least didn't
2    withdraw as a result of dyspepsia?
3    A. Let me see if I agree with you about that.
4       So Table 8 shows that in the entire study 16 percent of
5       people reported dyspepsia on celecoxib, and Table 9 shows
6       that in the entire -- I assume it's the entire study, it
7       doesn't say, that 4.3 percent of patients on Celebrex came
8       off the study because of dyspepsia.
9    Q. Actually I believe the number is 3.8.
10   A. Oh, excuse me -- 3.8, right, correct.
11   Q. Okay.
12   A. Okay.
13   Q. So my question is then: Does that indicate to you that there
14      were people who had dyspepsia in the study that didn't
15      withdraw because of dyspepsia?
16   A. Well, I'm not sure that's true. And what I mean is events
17      causing withdrawal, so you could say that 3.8 percent of
18      people on Celebrex came off the trial because of dyspepsia,
19      but they might have come off the trial for something else.
20      In other words, if a person with -- but come off the trial
21      because of diarrhea. So in other words, I'm saying I'm not
22      completely clear that because you have the event and because
23      you come off the event you can exactly say that's the same
24      thing. It's saying that 16 percent of people had dyspepsia, but is
25      3.8 percent of people withdrew because of dyspepsia, but is



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                        September 29, 2010

121

1    it possible that a bunch of those people with dyspepsia
2    withdrew but not because of the dyspepsia, they withdrew
3    because of a gastric ulcer or abdominal pain?
4         So that's why I'm saying I can't make the simple
5    mathematical jump that you proposed.
6    Q. Let me ask it in a more common sense way.
7         Based on these numbers, would you expect that there
8    were people that completed the study despite suffering
9    dyspepsia at some point during?
10        MR. WEISS: Object to the form of the
11   question.
12             THE WITNESS: You know, because of what
13   I'm saying I don't know that I can say that.  I don't know
14   that.
15   Q. (BY MR. MONTGOMERY) Okay.
16   A. That's a fair question, but I don't think I can look at this
17   data and tell you that.
18   Q. All right.  Could you look at page Bates ending 145 of
19   Exhibit 66.
20   A. (Witness complies.) Okay.
21   Q. Do you see the bottom section discusses the treatment period?
22   A. Yes.
23   Q. And according to the final report what's the treatment
24   period?
25   A. Excuse me one second.  Are these duplexed?  I got these a

122

1    little screwed up.  Just give me one second.  Okay.  I'm not
2    sure that's in order.  Excuse me.  So the treatment period.
3    So what is the question, please?
4    Q. Pursuant to the final report what is the treatment period?
5    A. It was the period during which the medication was taken.
6    Q. And what was that?
7    A. Well, at least six months and for some people longer than six
8    months, or until the trial concluded.
9    Q. All right.  Would you turn to page Bates ending 168 of
10   Exhibit 66.
11   A. (Witness complies.) Okay.
12   Q. Do you see Figure 7 A?
13   A. I do.
14   Q. And what does Figure 7 A show?
15   A. So it looks at what happened to patients coming in, where
16   they went in the first six months, and it shows that there
17   were a total of 8059 patients randomized, almost all of
18   those, 7968 took the study medication.  They were divided up
19   into celecoxib, diclofenac and ibuprofen in the numbers
20   shown, approximately 4,000, 2,000, 2,000.  It shows that 2300
21   of the 3900 completed six months with celecoxib.  1148
22   completed six months on diclofenac and 1049 completed six
23   months on ibuprofen.  And I don't have a calculator with me
24   but I don't know the percentages of that from this.  And then
25   we looked at -- of the people who, for example, on Celebrex

123

1    who came in, 1600 were withdrawn and of those adverse --
2    Q. You don't have to read all the numbers if you don't want to.
3    A. Okay.
4    Q. But generally speaking, does Figure 7 A show what happened to
5    all the people that entered the study?
6    A. Yes, I think so.
7    Q. Okay.  At the bottom it says?  N equals 4573 patients
8    completing six months."
9         Do you see that?
10   A. Yes.
11   Q. And what does that mean?
12   A. That takes the boxes, the three boxes that say N equals 2376,
13   1148 and 1049, that adds up to 4573.
14   Q. So does that mean that 4573 patients completed at least six
15   months of the study?
16   A. That's what it looks like to me.
17   Q. But some of them would have gone on to have more than six
18   months of exposure, correct?
19   A. Correct.
20   Q. Okay.  And can you look at page Bates number ending 170 of
21   Exhibit 66.
22   A. Right.
23   Q. And do you see Figure 7 B there?
24   A. I do.
25   Q. And so Figure 7 A that we just looked at, does that show the

124

1    disposition of patients just for the first six months?
2    A. Yes.
3    Q. And Figure B shows the same information but for the entire
4    study period, correct?
5    A. Yes.
6    Q. At the bottom there it says "N equals 3409 patients
7    completing the study."
8         Do you see that?
9    A. I do.
10   Q. And what does that represent?
11   A. The number of people who made it through the entire study
12   period which means they came off because of an adverse event
13   or they completed at least six months and then went sometime
14   beyond that which was I believe unspecified, or they made it
15   to 13 months and -- beyond 12 months and they were taken
16   off the study, or the study closed after they had completed
17   six months.
18   Q. Okay.  And the fact that you did a six-month analysis of the
19   data doesn't change the fact that only 3409 patients
20   completed the study, correct?
21        MR. WEISS: Object to the form of the
22   question.
23             THE WITNESS: I'm sorry; ask the question
24   again.
25   Q. (BY MR. MONTGOMERY) Sure.  The fact that you chose to perform



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

125

1    a six-month analysis doesn't change the fact that 3409
2    patients completed the study?
3    A. No.
4          MR. WEISS: Same objection.
5    Q. (BY MR. MONTGOMERY) All right. Would you look at page Bates
6    number ending 177 of Exhibit 66.
7    A. Okay.
8    Q. Do you see Figure 8 A?
9    A. I do.
10   Q. All right. In the lower right-hand portion of Figure 8 A do
11   you see, "N equals 260, reviewed by all GEC members"?
12   A. I'm sorry. No, I don't see that. Where is that?
13   Q. You have Figure 8 A, right?
14   A. I'm at Figure 8 A.
15   Q. The lower -- on the right side of it there's -- there are
16   three boxes; do you see that?
17   A. Yeah.
18   Q. The top box says --
19   A. Oh, 260 reviewed by all GEC members. But I don't know what
20   that is yet so let me look and just see. So potential
21   complications in 1100 people. In 900 they were reviewed by
22   one person and in 260 they were reviewed by everybody. Of
23   the 900 almost all were felt to not be events and only one
24   made it across. Okay.
25   Q. Okay. So what does that box mean, "N equals 260 reviewed by

126

1    all GEC members"?
2    A. Right. Well, I think you have to go back up one or two
3    phases. I think that where the doctor or the patient
4    reported a possible complication they had to be adjudicated.
5    The doctors didn't know what we were calling a complication.
6    So the person might have had belly pain or they might have
7    vomited up a little blood or they might have had a hemoccult
8    positive stool then they referred that patient in as a
9    potential complication.
10         At first screening a thousand of them were felt
11   probably not to have it because they didn't have the data,
12   and in fact they were -- almost all of them were thought to
13   be negative events. So if the person, for example, had three
14   hemoccult stools and one was positive and two were negative
15   and never needed a transfusion, never had black stools, never
16   vomited blood, never had an endoscopy showing an ulcer, that
17   was considered negative. But the 260 were the ones who were
18   adjudicated by the whole committee and they were thought to
19   be -- possibly be a complication, and then the next, the
20   bottom one suggests that 35 were thought to be and 225 were
21   thought to not be.
22   Q. So what does GEC stand for?
23   A. The Gastrointestinal Events Committee.
24   Q. So did the box that I showed you indicate that the GEC
25   reviewed the cases of 260 patients?

127

1    A. Well, no. The GEC, entire GEC reviewed those. One member at
2    least reviewed the other thousand as well.
3    Q. All right. Let me put it -- or correct it then.
4          So does this mean that the entire GEC reviewed the
5    records of 260 patients?
6    A. That's correct.
7    Q. Okay. Can you turn to Bates number ending 288, please, of
8    Exhibit 66.
9    A. Okay.
10   Q. Do you see Table 10b?
11   A. Oh, 288. Excuse me. I thought you meant 188. Table 10b,
12   okay.
13   Q. And does Table 10b disclose the adverse events with incidence
14   greater than or equal to three percent in any treatment group
15   for the entire study period?
16   A. Yes.
17   Q. All right. Is there any reason to believe that the
18   information set forth in this table is in any sense more
19   reliable at six months rather than in the entire study
20   period?
21         MR. WEISS: Object to the form of the
22   question.
23         THE WITNESS: Is there any evidence that
24   the data in this table would be more reliable at six months
25   than at the entire study period? No, not reliable. I mean

128

1    the data should be the data.
2    Q. (BY MR. MONTGOMERY) All right. I'm done with Exhibit 66 for
3    now but we're probably going to go back to it occasionally so
4    you want to keep that one handy.
5    A. Okay.
6          MR. BUSHOFSKY: It's quarter after.
7    Q. (BY MR. MONTGOMERY) Do you recall after the CLASS study was
8    complete when you first saw the results?
9    A. You know, I don't.
10   Q. Do you recall how, in what form you first saw the results?
11   A. No.
12   Q. Was there a big meeting that you can recall where you
13   discussed the results for the first time?
14   A. Well, there was a meeting that I could not attend and I don't
15   know if that qualifies -- no, there was not a big meeting
16   where we saw the results for the first time. I think I heard
17   about them prior to that. But there was a meeting of the
18   whole group and, you know, your division into the three
19   different committees pursuant to that final report is fine,
20   but it really was a bunch of consultants who were committed
21   to putting a lot of work into making the study work. And
22   there was a meeting I could not attend so I missed it, in
23   which the data was considered for a whole day and I did not
24   attend that meeting, but the answer to your question about
25   whether there was a meeting in which the data was, here it



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                      September 29, 2010

129

1   is, I don't remember.  I don't think there was.
2   Q.  I'm going to show you what's previously been marked as
3       Exhibit 65.  Have you ever seen Exhibit 65 before?
4   A.  I don't think so.
5   Q.  Okay.  Do you see on the bottom right-hand corner of the
6       first slide it says March 20th, 2000?
7   A.  The right hand of the first slide.
8   Q.  The slide, not the page.
9   A.  Oh, I'm sorry.  Yes.
10  Q.  Okay.  And do you recall -- you can look at it on the top of
11      your pile there, the study date, according to the final
12      report, ended March 17, 2000?
13  A.  Okay.
14  Q.  All right.  I'd like you to look at the third page of
15      Exhibit 65, Bates number ending 864.
16  A.  Okay.
17  Q.  Do you see the slide says "Dissemination of CLASS data"?
18  A.  I do.
19  Q.  And under Consultants, were you a consultant?
20  A.  I was.
21  Q.  All right.  And do you see it says "Subgroup by March 31st,
22      committee chairs by April 6th"?
23  A.  I see it.
24  Q.  Okay.  Does that sound about right to you of when you would
25      have received the results of the CLASS study?

130

1   A.  Yes.
2   Q.  So it's on or about those days?
3   A.  I think so.
4   Q.  Okay.  And did you make a presentation of the CLASS results
5       to the American College of Physicians?
6   A.  I did.
7   Q.  Is that also spelled the ACP?
8   A.  Yes, it is.
9   Q.  Would you turn to the sixth page of Exhibit 65, 867.
10  A.  The sixth page.  I'm sorry.  I'm lost.  Oh, 867, yes.
11  Q.  Do you see the slide there, it says Presentation Strategy?
12      First entry says "ACP, Fred Silverstein, six-month efficacy
13      and safety"?
14  A.  I do.
15  Q.  So does this indicate to you that the company had already
16      decided that you were going to present six months of the
17      CLASS data at ACP before you had even seen the results?
18          MR. WEISS:  Object to the form of the
19      question.
20          THE WITNESS:  No.
21  Q.  (BY MR. MONTGOMERY)  Why is that?
22  A.  Because I don't think that's what happened.  I mean they may
23      have said that they wanted me to present the six months of
24      the data to the ACP, but I think at that point I already had
25      the data.

131

1   Q.  At what point?
2   A.  The point at which I went to the ACP.
3   Q.  Oh, yes, I understand that.  I'm talking about the date of
4       this document where --
5   A.  So what was the date that we decided when I had heard that --
6       we all heard the results of the trial?
7   Q.  Let's take a look.  It's three pages back.  Bates number
8       ending 864 of Exhibit 65.
9   A.  Yes.
10  Q.  And you see it says, "Consultants, subgroup by 3/31,
11      committee chairs by 4/6"?
12  A.  Yes.
13  Q.  All right.  So this document which is dated March 28th,
14      2000 --
15  A.  Right.
16  Q.  -- that's before you had the results of the CLASS study,
17      correct?
18          MR. WEISS:  Object to the form of the
19      question.
20          THE WITNESS:  No, I'm not sure that's
21      correct because I -- I don't remember when I got the results
22      and it may have been prior to what's listed on this 864
23      slide.  I don't know that that's what happened.  They may say
24      it here but it doesn't mean that's what happened.  This is a
25      slide and I don't remember exactly when I heard about it.  I

132

1   suspect I heard about it before then.  So I have never seen
2   this before and therefore I don't know exactly what this is.
3   Q.  (BY MR. MONTGOMERY)  All right.  Would you turn to page Bates
4       number ending 884 of Exhibit 65.
5   A.  Okay.
6   Q.  Do you see this slide says, "GI symptoms are a risk factor
7       for a GI event"?
8   A.  Yes.
9   Q.  And then you see the relative risk numbers underneath that?
10  A.  I do.
11  Q.  Do you remember ever seeing this analysis before?
12  A.  No, I don't specifically remember seeing this.  It's
13      interesting but I don't specifically remember seeing it.
14  Q.  All right.
15  A.  I don't remember.
16  Q.  You're not an expert statistician, correct?
17  A.  Correct.
18  Q.  But you are an expert with regard to gastrointestinal --
19  A.  I am.
20  Q.  -- issues, correct?  Okay.  Can you explain to me under the
21      relative risk -- well, let's start with the first one, the
22      NSAIDS it says 5.5.  Do you know what that represents?
23  A.  You know, I'm not going to give you a definition of relative
24      risk because I'm not sure I know it.
25  Q.  Okay.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                          September 29, 2010

133

1   A. Perhaps I should know it but at this point in my life I'm not
2      sure I can tell you exactly what a relative risk means
3      significantly.  It's obvious an increase in risk.
4   Q. Yeah, let me ask it that way then, skip the fancy statistical
5      analysis.
6   A. Okay.
7   Q. But for the NSAIDs it says 5.5, correct?
8   A. I think what it means is that there's a 5.5 times risk of a
9      GI event in patients with GI symptoms versus patients without
10     GI symptoms on NSAIDs.
11  Q. On NSAIDs.  And then the celecoxib or Celebrex it's 2.4,
12     right?
13  A. Correct.
14  Q. As a -- and the numbers for diclofenac are different from the
15     numbers for ibuprofen; is that correct?
16  A. Correct.
17  Q. Now, as a gastroenterologist do you know of any reason to
18     believe that the risk of a GI event in somebody with GI
19     symptoms should be higher in diclofenac as opposed to
20     ibuprofen?
21  A. Yes, and the reason is that diclofenac is more injurious than
22     ibuprofen is.  And so, for example, if you were to say that
23     people who take NSAIDs can develop symptoms partially because
24     of a motility abnormality and/or a cerebral effect which I
25     mentioned, in two percent of people, in three percent of

134

1      people, but that in diclofenac the seven percent more who get
2      it from real irritation of the stomach or duodenum then you
3      could say that diclofenac has got the moderately severe GI
4      symptoms caused both by motility and by inflammation,
5      ibuprofen is just the motility.
6          So in other words, I don't think you can say -- it's
7      clearly because diclofenac is more injurious but -- I have to
8      go back to your question again.  I lost myself a little bit.
9   Q. Sure.  We're talking about the association between GI
10     symptoms and ulcer complications.
11  A. Yes, what I'm saying is GI symptoms are not the same
12     necessarily; that if somebody is complaining, My stomach is
13     gurgling and I feel an unease in my stomach, it's not as
14     severe as somebody saying, I've got a burrowing pain right
15     here in my epigastrium, or, The top of my stomach is killing
16     me.  So I'm saying that I think that it means that diclofenac
17     is more injurious and more likely to cause a GI event than
18     ibuprofen is, which is what the common knowledge was going
19     into this trial.
20  Q. Right.  I understand that diclofenac is more likely to cause
21     a GI event but is diclofenac -- are patients -- I'm sorry.
22     Are GI symptoms a better predictor of ulcer complications on
23     patients with -- taking diclofenac?
24  A. Well, I don't know if I can answer it from this slide.  This
25     is saying that if you have moderate to severe GI symptoms

135

1      you've got a very high risk of developing significant -- of a
2      GI event on diclofenac much more than ibuprofen.  So
3      therefore it's more of a predictor on diclofenac than it is
4      on ibuprofen.  I'm sorry; that's as best I can do.  I don't
5      know if that answered your question exactly.  If not, ask it
6      again.
7   Q. Let me ask it a different way.  All right.
8          We have -- pursuant to this slide, the relative risk
9      for the NSAIDs combined is 5.5, correct?
10  A. Right.
11  Q. And then the relative risk for diclofenac is 10.1, correct?
12  A. Right.
13  Q. Ibuprofen is 3.4, right?
14  A. Right.
15  Q. All right.  If you personally were going to try and look at
16     this informative censoring theory and investigate the
17     association between symptoms and ulcer complications, which
18     of those numbers would you use?
19         MR. WEISS:  Object to the form of the
20     question.
21         THE WITNESS:  Well, it's most clear for
22     diclofenac.  I mean what you can say is if patients who have
23     moderate symptoms of diclofenac are really at risk of
24     developing an adverse GI event more so than ibuprofen.
25     That's what I would say, and more so than celecoxib.

136

1          MR. MONTGOMERY:  Okay.  What's our time?
2          MS. McPHEE:  About 12:30.
3          MR. MONTGOMERY:  All right.  Let's go off
4      the record, please.
5          THE VIDEOGRAPHER:  We are going off the
6      record.  The time is 12:29 p.m.
7          (Recess 12:29-1:21.)
8          THE VIDEOGRAPHER:  Okay.  We are back on
9      the record.  The time is 1:21 p.m.
10
11         EXAMINATION (Continuing)
12  BY MR. MONTGOMERY:
13  Q. You understand you're still under oath?
14  A. I do.
15  Q. All right.  Going back to informative censoring theory that
16     we were talking about earlier.  Is it your understanding that
17     GI symptoms are predictive of ulcer complications?
18         MR. BUSHOFSKY:  Object to the form.
19         THE WITNESS:  No, not if -- you're asking
20     me if I feel that way?
21  Q. (BY MR. MONTGOMERY) Yeah.
22  A. Not really because -- let's go over it again, at least in my
23     head.
24     100 patients, 50 of them have GI symptoms, 50 don't.
25     One person is going to get -- or two people are going to get

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com



ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                      September 29, 2010

137

1    a complication.  It's more likely to occur in the group of

2    symptoms but most of the people with symptoms aren't going to

3    get a complication.  So that's why it throws everybody off,

4    that's why -- but again, looking at it the other way, if

5    you've had a complication odds are you did have symptoms.  So

6    you could say if you eliminated everybody with symptoms you

7    should be eliminating or reducing the number of complications

8    that occur.

9    Q.  All right.  Let me ask it a different way then.

10             Pursuant to informative censoring as you understand it,

11   the CLASS results for ulcer complications became more biased

12   as the trial went on; is that fair to say?

13             MR. WEISS:  Object to the form of the

14   question.

15             THE WITNESS:  Yes.

16   Q.  (BY MR. MONTGOMERY) Okay.  Is the same thing true with regard

17   to symptomatic ulcers?

18             MR. WEISS:  Object to the form of the

19   question.

20             THE WITNESS:  You have to rephrase that.

21   I don't understand the question.

22   Q.  (BY MR. MONTGOMERY) Sure.  Did the -- as the CLASS trial went

23   on did informative censoring render the results biased --

24   sorry.  Let me do it again.  Strike that.

25             As the CLASS study progressed, did it become more and

138

1    more biased with regard to symptomatic ulcers as a result of

2    informative censoring?

3             MR. WEISS:  Object to the form of the

4    question.

5             THE WITNESS:  Well, I think if -- the

6    question then is, if you have -- I'd say if you have an ulcer

7    complication there's a good chance that you had symptoms

8    before.  The question is if you have a symptomatic ulcer was

9    there a good chance you had symptoms before you developed a

10   symptomatic ulcer, and that's a little bit more difficult for

11   me to define.  I don't know if I can say that.  It's almost,

12   you know, symptoms to predict symptoms and that's why it's

13   not quite as clear to me.

14             MR. MONTGOMERY:  At this point I'd like

15   to show the witness what's previously been marked as

16   Exhibit 67.

17             THE WITNESS:  Okay.

18   Q.  (BY MR. MONTGOMERY) Is Exhibit 67 an April 17th, 2000 press

19   release?

20   A.  It looks like it, yes.

21   Q.  Have you ever seen it before?

22   A.  I have seen it before.

23   Q.  Did you see it before it was issued?

24   A.  I did not.

25   Q.  So you saw it afterwards?

139

1    A.  I saw it recently.  I have never seen this until recently.

2    Q.  Okay.

3    A.  To my knowledge.  Again, it was 10 years ago but I don't

4    remember seeing it.

5    Q.  Fair enough.  Can you turn to the second page of Exhibit 67,

6    please.

7    A.  (Witness complies.)

8    Q.  The third paragraph that starts, "The study," do you see

9    that?

10   A.  Uh-huh.

11   Q.  I'm going to read that sentence into the record.  It says,

12   "The study funded by Searle and Pfizer, Inc. found that

13   Celebrex patients experienced significantly fewer GI ulcers

14   and ulcer complications compared with ibuprofen or

15   diclofenac."

16   A.  No, you forgot the word "symptomatic."

17   Q.  Oh, I did?  I'm sorry.

18   A.  Unless you're reading a different sentence than I am.

19   Q.  No, I must have just missed it.  Let me try it again.

20   A.  Yes.

21   Q.  "The study funded by Searle and Pfizer, Inc. found that

22   Celebrex patients experienced significantly fewer symptomatic

23   GI ulcers and ulcer complications compared with ibuprofen or

24   diclofenac."

25             Do you see that?

140

1    A.  I do.

2    Q.  And is it accurate to say that they experienced fewer

3    symptomatic or complicated ulcers than ibuprofen or

4    diclofenac?

5    A.  Let's see what this sentence says.  Compared with ibuprofen

6    or diclofenac.  So there were no circumstances in which the

7    patients were on both so "and/or" would be inappropriate.  So

8    I'm just trying -- maybe it's okay.  I mean I can see the

9    question -- but the study found there were fewer GI

10   symptomatic ulcers and also complications compared with

11   patients on ibuprofen or diclofenac.  I guess the sentence

12   reads okay to me.  That reads okay.

13   Q.  All right.  So would you agree with me that the --

14   A.  You know, it's patients who are on one or the other and then

15   there were fewer.  So I think that's reasonable.

16   Q.  There were not fewer symptomatic or complicated ulcers

17   compared to diclofenac, correct?

18   A.  Now, are you referring back to what we looked at earlier?

19   Q.  Yes.

20   A.  Because I got a lot of stuff in my head.

21   Q.  Sure.  You can look at the final report again too, if you

22   want to refresh your memory.

23   A.  Now, and we're talking about which time period?

24   Q.  You mean the six-month or the entire study?

25   A.  No, the study.  Found that patients experienced fewer



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

141

1    symptomatic GI ulcers and ulcer complications compared with
2    ibuprofen or diclofenac, and I guess this is talking about
3    six months, right?  Because that's what the whole thing is
4    talking about?
5    Q.  I don't know.  Let's take a look at the first page of
6    Exhibit 67.  Do you see the third paragraph there that says,
7    "The celecoxib long-term arthritis safety study at
8    approximately 13 months," et cetera?
9    A.  Right.  Okay.
10   Q.  So does that lead you to believe that the press release is
11   talking about the 13th month data or the six-month data?
12   Take your time.  You can read the whole thing if you want.
13   A.  Yeah.  Well, it would look like it's talking about 13-month
14   here because I don't see six months.  Again, I did not see
15   this at the time and I have not had a chance to study it when
16   I saw it recently, I'm kind of aware of it.  Let me just read
17   it a little bit.  Matt, give me a second.
18   Q.  Actually I'm going to ask you to read the entire thing.  Read
19   the whole thing and then let me know when you're done.
20   A.  Okay.  (Witness complies.)  Okay.
21   Q.  All right.
22   A.  So it looks to me as if it is talking about --
23   Q.  Let me ask a question first.
24   A.  Okay.  I'm sorry.
25   Q.  Now you've had an opportunity to read the entirety of

142

1    Exhibit 67, the April 17th, 2000 press release, correct?
2    A.  Correct.
3    Q.  And having done that, is it your understanding that this
4    press release is describing the six-month or 13-month results
5    of the CLASS study?
6    A.  13 months, to my read.
7    Q.  Okay.  All right.  Do you have the final report handy?
8    A.  Yes.
9    Q.  All right.  Would you please turn to page Bates number ending
10   117 of Exhibit 66, the final report?
11   A.  Yes.
12   Q.  All right.  I'd like to direct you to the numbers that we
13   looked at earlier in Tables 1 and 2.
14   A.  Yes.
15   Q.  Do these indicate that at six months in patients not taking
16   aspirin there's a statistically significant difference
17   between Celebrex and the NSAIDs?
18   A.  Correct.
19   Q.  But at 12 months there is not a statistically significant
20   difference, correct?  I'm sorry; of the entire study period
21   there's not a statistically significant difference, correct?
22   A.  Well, we're doing categories within categories.  So the first
23   one looks at the first six months, patients not taking
24   aspirin, it's significant.  In the second one, the entire
25   study period, patients not taking aspirin it is not

143

1    significant.
2    Q.  Right.
3    A.  Okay?
4    Q.  Okay.  Now, would you turn back to the press release.
5    A.  Right.
6    Q.  Let's look at the second page, Bates number ending 978.
7    A.  Right.
8    Q.  I'd like you to look at the sentence after the one that we
9    read before that says, "Celebrex was also associated with
10   numerically fewer ulcer complications than the NSAID
11   comparators among all patients and 64 percent fewer of these
12   serious events among nonaspirin users, a statistically
13   significant difference."
14       Do you see that?
15   A.  I do.
16   Q.  So that statement is only true as to the six-month data, not
17   the 13-month data, correct?
18   A.  No, that -- before I agree to that I've got to look at this.
19   Q.  Sure.  Take your time.
20   A.  (Witness reading.)
21       So numerically fewer than the comparators among all
22   patients.  So they're not talking about -- they're talking
23   about all patients numerically.
24   Q.  The focus of my question is really on the second part of that
25   sentence where it says, "64 percent fewer of the serious" --

144

1    A.  Okay.
2    Q.  -- "events among nonaspirin users, a statistically
3    significant difference."
4    Q.  Okay.  Hold on that.  The first part of the sentence would
5    appear to be correct, "The numerically fewer ulcer
6    complications than the NSAID comparators among all patients,"
7    so I think that is accurate.
8    Q.  And to both the six-month and the entire data?
9    A.  Yeah, by my reading.
10   Q.  Okay.  And then the second part of the sentence?
11   A.  Then the second part of the sentence I'm looking at,
12   "64 percent fewer of these serious events among nonaspirin
13   users," so now we have to look at nonaspirin users.
14       So you want to know -- it is true at six months, the
15   question is it also true at 12 months.  And what this thing
16   says is that Celebrex is .44, diclofenac is .48, and
17   ibuprofen is 1.14, right?
18   Q.  I'm sorry.  Oh, I see where you're pointing.
19   A.  I'm trying to look at -- we agree that what they said is true
20   for the first six months; that is, in nonaspirin users there
21   is a statistically significant difference.  That's the .037.
22   You asked whether that difference was also true at 12 months
23   or are they referring now to only six months?
24   Q.  That's correct.
25   A.  And what I'm saying is so .48 and .48 and 1.14 -- well, I



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                    September 29, 2010

145

1    don't think it's accurate to say it was a statistically
2    significant difference at 12 -- in the whole data study
3    period, although if you combine diclofenac and ibuprofen it
4    was less.
5    Q.  All right.  So for the sentence that we were discussing from
6    the April 17th, 2000 press release, it can only be true if
7    you're talking about the six-month data, not the entire study
8    period; is that correct?
9    A.  Well, "associated numerically fewer ulcer complications than
10   the NSAID comparators among all patients and 64 percent fewer
11   among nonaspirins," nonaspirin users.
12       So it was a lot fewer in the nonaspirin users at six
13   months and it was fewer but not as big a difference in the
14   entire study period and didn't reach statistical
15   significance.  So I -- the way I'm reading it, it doesn't
16   look like it's correct.  64 percent of these serious
17   adverse events among nonaspirin users.  So how many events
18   were there?  So if you look at the patients not taking
19   aspirin, at the crude numbers, there were 18 patients on
20   celecoxib and -- let's see, 15 on -- or total nine, total of
21   nine versus a total of 13.  So were they saying that 13 to 9
22   is a 65 percent drop?  It's not that much.
23       So I would say, based on what I'm looking at right
24   here, it would be more accurate to say it was statistically
25   significant for the six months.

146

1    Q.  Okay.  So would you say that the statement -- let me read it
2    into the record again.  It says, "64 percent fewer of these
3    serious events among nonaspirin users, a statistically
4    significant difference."
5        That's inaccurate?
6            MR. WEISS:  Object to the form of the
7    question.
8            THE WITNESS:  Yeah, they don't
9    specifically say whether it's six or 12 months.  And without
10   that I think it's not -- it's not accurate compared to this.
11   Q.  (BY MR. MONTGOMERY) Okay.  Let's go back --
12   A.  Unless I'm misreading the data.  I think it is true for the
13   patients in six months that is a statistically significant
14   reduction.
15   Q.  Let's go to the sentence -- the first sentence in that
16   paragraph we were just looking at.  You think that sentence
17   is accurate; is that correct?  I'll read it again.  "The
18   study funded by Searle and Pfizer, Inc. found that Celebrex
19   patients experienced significantly fewer symptomatic GI
20   ulcers and ulcer complications compared with ibuprofen or
21   diclofenac."
22       Do you see that one?
23   A.  Yes.
24   Q.  Okay.  And your testimony is that that statement is accurate?
25           MR. BUSHOFSKY:  Objection to form.

147

1            THE WITNESS:  To my knowledge that is
2    accurate if you're saying that compared with patients who are
3    on ibuprofen or diclofenac, a group of patients who are one
4    or the other.
5    Q.  (BY MR. MONTGOMERY) And the way you're interpreting the
6    phrase "ibuprofen or diclofenac," would it change the meaning
7    of the sentence at all if we substituted "and" for "or"?  So
8    if the sentence read "ibuprofen and diclofenac" would it
9    still be accurate?
10           MR. WEISS:  Object to the form of the
11   question.
12           THE WITNESS:  No, because it would
13   suggest that the patients were on ibuprofen and diclofenac,
14   whereas in fact they were on one or the other.  I don't think
15   you can say "and."  I mean I think the way to correct it to
16   make it super clear would be to add at the end of the sentence,
17   "compared with a group of patients who are either on
18   ibuprofen or diclofenac."  So I don't think "and" would
19   clarify it.
20   Q.  (BY MR. MONTGOMERY) But you're saying -- you think if it said
21   "and" instead of "or" it would actually be inaccurate then?
22   A.  I think it could be misleading.
23   Q.  All right.  Let's look at the first page of Exhibit 67, the
24   April 17th, 2000 press release.
25   A.  Well -- please finish your question.

148

1    Q.  Sure.  I'd like to direct you to the second full paragraph,
2    I'm going to read into the record.  The first sentence in any
3    event.  "Also, in comparison to Celebrex, ibuprofen and
4    diclofenac were associated with a significantly greater GI
5    blood loss."
6        I'm sorry; that's not the one I wanted to read.
7    Scratch that.
8        It's the first sentence of the press release.  "In a
9    landmark study to assess the overall long-term safety of the
10   COX-2 specific inhibitor Celebrex (celecoxib capsules)
11   arthritis patients taking four times the recommended
12   osteoarthritis (OA) dose of the drug experienced fewer
13   symptomatic gastrointestinal (GI) ulcers and ulcer
14   complications than patients taking ibuprofen and diclofenac,
15   a difference that was statistically significant based on a
16   combined analysis of Celebrex versus these two traditional
17   nonsteroidal anti-inflammatory drugs (NSAIDs)."
18       Now, that sentence says ibuprofen "and" diclofenac,
19   correct?
20   A.  That's correct; however, the part that follows it says "on a
21   combined analysis."
22   Q.  Right.  So it's your understanding that that sentence is
23   accurate then?
24   A.  Yes.
25   Q.  All right.



ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

149

1   A. Although I'm not an English major.

2        MR. MONTGOMERY: I'd like to ask the

3   court reporter to mark what will be Exhibit 198.

4            (Exhibit No. 198 marked

5             for identification.)

6   Q. (BY MR. MONTGOMERY) Feel free to look at the entire exhibit.

7   I'm only going to ask you about the contents of the e-mail at

8   the very bottom of the first page.

9   A. Okay. (Witness complies.) Okay.

10  Q. So this e-mail refers to a teleconference with yourself,

11  Dr. Geis, Dr. Simon and Dr. Welton on April 17th, 2000; is

12  that correct?

13  A. That's what it says.

14  Q. And did you participate in a teleconference on that date?

15  A. I don't think so. Perhaps somebody here who's smarter than I

16  am can figure it out but I don't think I did.

17       MR. MONTGOMERY: I'd like to ask the

18  court reporter to mark what will be Exhibit 199.

19           (Exhibit No. 199 marked

20            for identification.)

21  Q. (BY MR. MONTGOMERY) For the record, Exhibit 199 is an e-mail

22  dated April 24th, 2000, that attaches an article from the

23  pink sheet dated April 24th, 2000, Bates No. DEFS 00390944

24  through 46.

25       Have you read all of Exhibit 199 now?

150

1   A. I have.

2   Q. Okay. Are you familiar with the pink sheet?

3   A. No. I -- kind of vaguely, but I guess it's a fax sheet about

4   the pharmaceutical industry is all I know about it.

5   Q. Okay. Having read this article does it refresh your

6   recollection at all about participating in a conference call?

7   A. No.

8   Q. Okay. Do you see in the first paragraph of the story it

9   refers to a CLASS 13-month trial?

10  A. I do.

11  Q. And then in the second paragraph do you see the reference to

12  an April 17th conference call?

13  A. Yes.

14  Q. Now I'd like to direct you to the paragraph at the bottom of

15  the page, near the bottom of the page that starts, "Data from

16  the first six months of the trial."

17      Do you see that?

18  A. Yes, yeah.

19  Q. I'm going to read that into the record. It says, "Data from

20  the first six months of the trial were used for the

21  head-to-head comparison of NSAIDs because patients were not

22  required to remain on their assigned drug after the six

23  months, study investigator Fred Silverstein, M.D., University

24  of Washington explained."

25      Do you see that?

151

1   A. I do.

2   Q. And do you believe that you said that?

3   A. You know, it's not in quotes. You know, when Lee Simon is

4   being quoted it's in quotes. If you look at the -- on the

5   second page, 945, halfway down it says, "This data set,

6   because it demonstrates the incidence of complications of

7   bleeding perforation, obstruction, et cetera," is in quotes.

8   What they said I said is not in quotes. Because that is not

9   familiar to me. And it was, you know, albeit true that the

10  six months patients were required to stay on for six months,

11  but there were other reasons for the head-to-head comparison.

12  So that's the best I can do. If they had quoted me, then,

13  you know, assuming they were accurate then it's what I said,

14  but I don't remember this. It does hit some of the cogent

15  points, though.

16  Q. All right. So you don't believe you said what the article

17  attributes to you?

18  A. You know, I don't remember.

19  Q. Okay. You don't remember one way or the other?

20  A. Correct.

21  Q. Let me ask you then: Separate from the quote, were data from

22  the first six months of the trial used because patients were

23  not required to remain on their assigned drug after six

24  months?

25  A. Ask that one again.

152

1   Q. All right. You're familiar with the six-month data analysis

2   of the CLASS study?

3   A. Yes.

4   Q. Was one of the reasons for that six-month analysis because

5   patients were only required to be on the drug for six months?

6        MR. WEISS: Object to the form of the

7   question.

8        THE WITNESS: Yes, but it was not one of

9   the overwhelming reasons. And I just want to make one point.

10  If you look at the paragraph that starts at the very bottom

11  of that first page, "While the incidence of complications

12  were cut in half, the rate of serious ulcer complications was

13  the primary end point of the study. 'The issue here is you

14  are dealing with relatively small numbers of people so it did

15  not reach a significant level of .05.'"

16      And that's in quotes. So -- and that I would say,

17  that's the kind of thing I would say. So I don't know why

18  they didn't put it in quotes and I don't know if they were

19  accurate on that earlier paragraph.

20  Q. (BY MR. MONTGOMERY) All right. My question, though, is:

21  Regardless of whether you said it or not, is that statement

22  accurate that the first six months of the trial were used for

23  the head-to-head comparison because patients were not

24  required to remain on their assigned drug after six months?

25       MR. WEISS: Objection; asked and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                      September 29, 2010

153

1    answered.
2              THE WITNESS:  You know I would say no, it
3    would be more complete if we talked about other things that
4    happened.
5    Q.  (BY MR. MONTGOMERY)  Such as?
6    A.  Such as informative censoring.
7              THE VIDEOGRAPHER:  Counsel, there's about
8    five minutes left on the tape.
9    Q.  (BY MR. MONTGOMERY)  Without including a discussion of
10   informative censoring, could that statement on its own
11   potentially mislead the reader?
12             MR. WEISS:  Object to the form of the
13   question.
14             THE WITNESS:  I don't know.
15   Q.  (BY MR. MONTGOMERY)  Informative censoring was a more
16   important reason to use the six-month analysis compared to
17   the minimum exposure; isn't that right?
18             MR. WEISS:  Object to the form of the
19   question.
20             THE WITNESS:  Well, I would say it was
21   equally, equally important or more important.
22   Q.  (BY MR. MONTGOMERY)  But at least according to this it wasn't
23   mentioned; is that right?
24   A.  Not that I see.
25             MR. MONTGOMERY:  All right.  Let's go off

154

1    the record.
2              THE VIDEOGRAPHER:  We are going off the
3    record.  The time is 1:55 p.m.
4        (Recess 1:55-2:05.)
5              THE VIDEOGRAPHER:  Okay.  We are back on
6    the record.  The time is 2:05 p.m.  This is the beginning of
7    Tape No. 4.
8
9              EXAMINATION (Continuing)
10   BY MR. MONTGOMERY:
11   Q.  You understand you're still under oath?
12   A.  Yes.
13             MR. MONTGOMERY:  I'd like to ask the
14   court reporter to mark what will be Exhibit 200.
15             (Exhibit No. 200 marked
16             for identification.)
17   Q.  (BY MR. MONTGOMERY)  Take your time and read it and let me
18   know when you're done.  For the record, Exhibit 200 is an
19   April 18th, 2000 e-mail from Mona Wahba attaching an
20   April 18th, 2000 article from Health News Daily.
21   A.  (Witness complies.)  Okay.
22   Q.  Does this appear to be another news article about an
23   April 17th, 2000 conference call?
24   A.  Well, how can you say that?  I don't understand.  Tuesday,
25   April 18th.  I'm sorry; where do you see that this was the

155

1    conference call?
2    Q.  Oh, in the second paragraph it says --
3    A.  Okay.  Okay.
4    Q.  All right.  So --
5    A.  Yes, I guess that --
6    Q.  Let me ask the question again then.
7    A.  Right.
8    Q.  Do you understand this to be another article in part about an
9    April 17, 2000 conference call?
10   A.  Yes.
11   Q.  All right.  Do you see the seventh paragraph down that starts
12   "Data"?
13   A.  Yes.
14   Q.  All right.  I'll read this into the record.  "Data from the
15   first six months of the trial were considered to be the most
16   consistent because patients were not required to remain on
17   their assigned drugs after the six-month period, Fred
18   Silverstein, M.D., University of Washington explained."
19        Do you see that?
20   A.  I do.
21   Q.  And do you remember making that statement on a conference
22   call?
23   A.  No, I do not.  And once again, I would point out that in the
24   first and the second and third, at least the second paragraph
25   they're using quotes, and they're not using quotes around

156

1    this.  It's virtually the same paragraph that's in the other
2    news article.
3    Q.  And you still don't remember --
4    A.  I don't.
5    Q.  Let me finish the question.  Sorry.
6        You still don't remember participating in a conference
7    call on or about these dates; is that right?
8    A.  I do not clearly remember, no.
9    Q.  Okay.  All right.  Do you recall the JAMA article we talked
10   about earlier?
11   A.  The -- yes.
12   Q.  You were an author of that article, correct?
13   A.  Correct.
14   Q.  Did you write the first draft?
15   A.  No.
16   Q.  Do you know who did?
17   A.  I think Dr. Lefkowith did, but I'm not sure.
18   Q.  At some point, though, you received a draft?
19   A.  I did.
20   Q.  Okay.  And then did you make comments and provide those to
21   someone?
22   A.  I did.
23   Q.  And to whom did you provide them?
24   A.  Dr. Lefkowith.
25   Q.  And was he in charge of incorporating or not incorporating



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                                    September 29, 2010

157

1    your comments?

2    A.  He was.

3    Q.  Do you recall any suggestions or comments that you made that

4        he did not incorporate?

5    A.  I do.

6    Q.  What were they?

7    A.  I thought that the article needed a section that dealt with

8        this issue about why we included six months and not the

9        entire data set.

10   Q.  So you wanted a section discussing informative censoring and

11       the justification for the six-month analysis?

12   A.  Correct.

13   Q.  And was that suggestion adhered to?

14   A.  No.

15   Q.  And why not?

16   A.  I don't know.  I -- we discussed it several times, but I

17       remember very clearly telling Dr. Geis that we had to get a

18       section in to the paper to explain why we were presenting the

19       six months of data and not the 12 months.  And I think we

20       talked about it twice and I think the second time, or at

21       least in one of the conversations, the last one we had prior

22       to publication he said absolutely he told Lefkowith to get

23       the section and it was going to be done.

24   Q.  But it wasn't?

25   A.  Correct.

158

1    Q.  And did you sign off on the JAMA article without that section

2        before publication?

3    A.  Well, it's hard to say because when you say "sign off" it

4        sounds as if I approved of it and in fact what I said was the

5        article is fine but I want this other section included.

6        That's what happened.  It was not a question of my saying,

7        Oh, yes, this is fine the way it is.

8    Q.  Right.  I guess let me ask it a different way.

9            Did you approve -- communicate your approval of the

10       JAMA article to anyone at Pharmacia based on the version that

11       was ultimately printed in JAMA?

12               MR. WEISS:  Object to the form of the

13       question.

14               THE WITNESS:  Yeah, hard to answer.  I

15       would probably say no because I thought it was going to have

16       another section added to it.  Otherwise I thought it was

17       fine.

18   Q.  (BY MR. MONTGOMERY) And why did you think that it should have

19       a section concerning the six-month analysis and the

20       justifications therefor?

21   A.  Well, it seemed to me that the six-month analysis was clear.

22       It corresponded to other studies that had been done like the

23       mucosa trial.  It did not suffer from something weird that

24       was happening to the diclofenac and ibuprofen patients.  It

25       was more readily understood so I felt -- and informative

159

1    censoring is part of that and I felt that that was logical to

2    pursue that.  I mean it was logical to have that be the main

3    thrust of the paper, but I thought that it was reasonable to

4    let the reader know that the trial -- you know, as in these

5    news articles where it's stated very clearly that it was a

6    13-month trial, I thought it would have been reasonable to

7    put a section in to that effect.

8    Q.  And why did you think it would be reasonable to do that?

9    A.  I thought it would be important to let the reader know that

10       this was the first six months of a trial that went on a

11       couple of months longer.

12           I would like to add something to that.  May I?

13   Q.  Yes, you may.

14   A.  In addition, what I was told, and this is a situation where,

15       you know, I am not a full-time employee of Searle or Pfizer,

16       I'm a consultant, and I was told that the six-month missed

17       the primary end point and so did the full data set, no

18       difference there.  I was told that there were no difference

19       in serious adverse events from the standpoint of

20       cardiovascular, cerebral vascular, renal hypertensive, any of

21       those events.  So there was not a reason to -- it wasn't as

22       if things were happening after six months that were not

23       happening before six months and therefore we had to say it

24       because otherwise you're not letting the reader know about

25       something that was very important that was happening after

160

1    six months than before six months.

2            And several times I asked Dr. Geis, Were there any

3    adverse events that were apparent after six months that were

4    not apparent in the first six months?  And he said -- every

5    time I asked him he said no.  So I felt that it was okay to

6    look at the six months of data but I did feel that it would

7    be more complete to let the reader know that there was more

8    data and that -- and why it was not included.

9    Q.  When you say that you asked whether there were any adverse

10       events after six months, do you mean that there were adverse

11       events single after six months that didn't exist or that

12       there were literally no adverse events that happened after

13       the six-month period?

14   A.  Right, I'm not talking about serious adverse GI events, I'm

15       talking about other events.  So, for example, if at seven

16       months there were, you know, a series of patients who had

17       strokes or had myocardial infarctions, then, you know, you

18       can't -- how can you not present that data?  That would be

19       essential to present.

20           What I was told was that was not the case.  There were

21       no signals that there were cardiovascular, cerebral vascular,

22       renal vascular events in the six to whatever that weren't

23       already reported in the zero to six.

24   Q.  And is it your understanding that that's true?

25   A.  Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                September 29, 2010

161

1  Q.  Notwithstanding that, do you still think that the JAMA
2     article should have included a section explaining the reasons
3     for the six-month analysis?
4  A.  Yes.
5  Q.  Were you concerned that the reader might, "a" reader of the
6     JAMA article might be misled if they read a description of
7     the six-month results without knowing what the 13-month
8     results were or why the six months had been presented?
9          MR. WEISS:  Object to the form of the
10     question.
11  Q.  (BY MR. MONTGOMERY) Let me ask it again.
12  A.  Yeah.
13  Q.  I'm going to ask it differently.
14  A.  Yeah.
15  Q.  Were you concerned that without the section that you wanted
16     put in that -- concerning informative censoring, that a
17     reader of the JAMA article might be misled?
18          MR. WEISS:  Object to the form of the
19     question.
20          THE WITNESS:  I would have to answer yes
21     and no.  No, because I think that what the first six months
22     showed was consistent with all the other data we had and
23     showed that Celebrex and paradox with data that's been
24     published since then, but that showed that Celebrex is less
25     injurious to the GI tract than the other two comparator

162

1     NSAIDs.  So I would say no, I don't think the reader was
2     misread; however, I do think it should have been included.
3  Q.  (BY MR. MONTGOMERY) So is it your understanding that
4     generally speaking the six-month results and the 13-month
5     results are the same?
6  A.  I know that there are one or two differences but the answer
7     is yes, I think they are very close to each other and the
8     differences are -- relate back to the change in the baseline
9     population caused by informative censor.
10  Q.  But if the results of the study are the same in six months
11     and the entire data set, why not just publish the entire data
12     set?
13  A.  Because it wasn't that simple.  The patients dropped off in
14     the other two groups so the question was what was happening,
15     and it wasn't clear to us what was happening.  It's like
16     there's something going on, it's almost as if somebody -- I
17     don't know, it wasn't clear what was happening.  So it was
18     clear for the first six months.  It was not clear for the
19     period after that.  But there was no fundamental difference
20     according to the way the data was presented to me.  It was
21     not a question of -- you know, if it had been -- if the
22     primary end point had been statistically significant at six
23     months but not at 12 months, then I would have said, You
24     can't do that.  You know, you got to present it both ways.
25     But what I was told was that it was not significant at

163

1     either.
2  Q.  What about secondary end points?  If one secondary end point
3     is statistically significant at six months but not 12 months,
4     would that change your perspective?
5          MR. WEISS:  Object to the form of the
6     question.
7          THE WITNESS:  I would have to know what
8     kind of secondary end point that was because what I was told,
9     again, was that although -- you see, this gets back a little
10     bit to the conundrum of how to design a trial like this.  The
11     decision was made not to include symptomatic ulcers.  In the
12     Vioxx trial they did include symptomatic ulcers.  Here they
13     didn't.  So when Steve Geis told me about the data he said it
14     wasn't -- we didn't make significance for six months or for
15     the whole data set.
16          However, when you add symptomatic ulcers, we did make
17     significance for six months and the whole data set.  And then
18     there was also this interesting correlation with aspirin
19     where we expected from previous trials that the rate of using
20     aspirin would be about 10 percent and in the CLASS trial it
21     turned out to be 22 percent.  And the problem with aspirin is
22     that it inhibits both the COX-1 and COX-2 enzyme systems and
23     therefore kind of undo -- undoes the physiological benefit of
24     having a selective inhibitor.
25  Q.  (BY MR. MONTGOMERY) All right.  Just to be clear:  So you --

164

1     it your position that a section should be included in the
2     JAMA article disclosing the reasons for the six-month
3     analysis?
4  A.  Correct.
5          MR. WEISS:  Object to the form of the
6     question.
7          THE WITNESS:  Correct.
8  Q.  (BY MR. MONTGOMERY) And you communicated those to Dr. Geis;
9     is that correct?
10  A.  That's correct.
11  Q.  And approximately how many times did you tell him that?
12  A.  Well, I know it was -- we discussed it but I remember very
13     clearly one conversation when the paper was, you know, in the
14     final stages and I said, We've got to get that section in.
15     So that's the conversation I remember.  And he said,
16     Absolutely, I've told JAMA it's going to go in.
17  Q.  Was that a phone conversation or in person?
18  A.  It was -- a phone.
19  Q.  Was anybody else on the call?
20  A.  I don't think so.
21  Q.  Did you ever talk to any of the other authors of the JAMA
22     article regarding the inclusion of a section about
23     informative censoring and the six-month analysis?
24  A.  No, but I did ask Dr. Geis -- remember I had told you I had
25     missed a meeting?  And that was a meeting in which they had a



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

165

1   discussion for a whole day about how to present the data and
2   the benefits of six months versus longer data, and I missed
3   that.  So I asked Dr. Geis, How -- how are Lee Simon and Bob
4   Makuch and the other people about presenting the data in this
5   form?  And he said it was -- as I remember he said that was
6   fine with them.  They thought it was the way to go.
7   Q.  During the drafting process of the JAMA article when comments
8   were being submitted, did you ever see the comments of any of
9   the other authors?
10  A.  I don't remember.  Because the corresponding author was
11  Lefkowith and he really was the pivot person with the paper.
12  We all had input.  We all knew what was going on.  We all
13  knew where the data was.  It was all open amongst all the
14  authors.  So if Jim were alive, it's unfortunate that he died
15  prematurely, but if he were alive, he would be the person who
16  would have seen everybody's comments.  It would not
17  necessarily, and I don't believe they did come to me, even as
18  first author.
19  Q.  Did Dr. Simon ever tell you that he thought the median
20  exposure to the drugs should be included in the JAMA article?
21  A.  I don't remember.  He's a very bright guy but I just don't
22  remember that specific issue.
23  Q.  So as far as you knew when the JAMA article was submitted, it
24  included the section that you suggested about informative
25  censoring, correct?

166

1           MR. WEISS:  Object to the form of the
2   question.
3           THE WITNESS:  No.
4   Q.  (BY MR. MONTGOMERY) Let me put it a different way.
5   A.  Okay.
6   Q.  At the time the submission was made, you didn't actually see
7   the final product, correct?
8           MR. WEISS:  Object to the form of the
9   question.
10          THE WITNESS:  At the time the submission
11  was made, well, I saw a product that was putatively a final
12  product and I said, You've got to add a section to that, and
13  I didn't see what happened after that.  I was told it would
14  be added and I didn't see that section added.
15  Q.  (BY MR. MONTGOMERY) Okay.  So subsequent to that conversation
16  the final manuscript was submitted to JAMA, correct?
17  A.  I don't know that.  It may well have -- it probably had been
18  submitted to JAMA.  When you submit a manuscript it goes
19  through a process of going to page proofs and comes back as a
20  draft and page proofs, and it was somewhere in there that I
21  saw it and said, Where is the section that we talked about
22  adding on informative censoring?  And Geis said, I talked to
23  Steve, he's going to -- to Jim, he's going to be sure it's
24  there.
25  Q.  Then at some point you discovered that the section in fact

167

1   wasn't included in the final JAMA article, correct?
2   A.  That's correct.
3   Q.  And when did you discover that?
4   A.  When I saw the paper.
5   Q.  When it was published?
6   A.  That's correct.
7   Q.  And how did you feel when you saw that the section that you
8   wanted was no longer -- was not included?
9   A.  I was not happy about it.
10  Q.  And did you talk to anybody about that?
11  A.  I did.
12  Q.  Who did you talk to?
13  A.  Dr. Geis.
14  Q.  And -- on the phone?
15  A.  On the phone.
16  Q.  And what did you say?
17  A.  Well, I asked him, What happened?  I thought you said you
18  were going to put in the section on what happened to the data
19  after six months?  And what I learned was that -- what I took
20  away from the conversation was that the article went on a
21  fast track because the JAMA -- the New England Journal had
22  just published the Vioxx trial and it was implied that JAMA
23  wanted to get the Celebrex trial out quickly and it sort of
24  took a life of its own and went through and was published
25  before this other section could be added to it; that one of

168

1   the editors at JAMA knew that there was more data than there
2   was longer data, so JAMA was not unaware of that.  And then
3   the most compelling argument was, this is all in the hands of
4   the FDA.  It is all going to be aired -- you know, this is
5   now we're talking about October of 2000.  It is -- in two or
6   three months this is going to be aired in front of hundreds
7   of people and all the data is going to be discussed, the
8   six-month data, the whole data set.  Nothing has been hidden,
9   it's all open at the FDA presentation which CNN and all these
10  other networks come to.
11  Q.  Did you find that explanation satisfactory?
12  A.  That's a very -- calls for a very subjective response.
13  Q.  I'm asking for your subjective responses.
14  A.  Yeah.  It was not the answer I wanted in the sense that I
15  wanted to know that it actually was in the journal.  It
16  explained to some degree what happened and I guess I felt
17  that the compelling part of it was that all the data was at
18  the FDA, was all going to be aired in a whole day session and
19  that nobody would feel that the data was obfuscated or
20  important data was withheld, and therefore, I didn't insist
21  that we do something about it.
22  Q.  Did you ever talk to Dr. Lefkowith about it?
23  A.  I don't remember.  I don't remember.  Most of the contact I
24  had from that time was with Geis.
25  Q.  After the publication of the JAMA article did you ever talk



ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                    September 29, 2010

169

1    to any of the other -- any of your other co-authors about the
2    omission of the section you wanted regarding informative
3    censoring?
4    A. Not that I remember.
5    Q. Did you believe Dr. Geis's representation to you that the
6    publication of the article was so short tracked that there
7    was no way to get in the section that you wanted before
8    publication?
9                MR. WEISS: Object to the form of the
10   question, mischaracterizes the witness's testimony.
11               THE WITNESS: To answer that, I have to
12   do a little short diversion and it won't be a long
13   digression. If you were -- if you were doing these studies,
14   the amount of data would fill this room. The thought that
15   any one person, me or anybody else who's doing this on a
16   consulting basis which means I've got another job, can verify
17   every piece of information is just not reality, is not what
18   happens. It will never be what happens. You have to trust
19   the people you work with and if you don't you shouldn't work
20   with them. You should never be in a situation where you
21   don't trust somebody and you continue working with them.
22       So I had experience of working with Steve Geis going
23   back to about 1983 when I first went to the FDA when that guy
24   Andre Robert was talking about Misoprostol and trying to get
25   Misoprostol approved. I think it was 1984 or something like

170

1    that. And at this point I had 15 years plus or minus
2    experience with Geis. He is an extremely intense, extremely
3    bright M.D., Ph.D. who works all the time. I attended many
4    meetings with him and heard him talk to the investigators,
5    the people who are really doing the work, the guys who -- men
6    and women who enroll the patients in the studies. And I held
7    him in nothing but the highest regard as a scientist and as a
8    colleague.
9        So in that sense, I did believe him, yes, I believed
10   him. I feel like -- I still feel like Steve Geis, with what
11   I know, Steve Geis is exemplary in clinical research. He is
12   just one of the hardest working people I've ever met. And I
13   never had cause to feel as if he was misleading me, never,
14   and he never asked me ever to mislead anybody else. It
15   was -- it was always handled in what I considered to be the
16   most kosher, if you will, representation and relationship.
17   So I did not feel that Dr. Geis had done something that was
18   unfair to me or unfair to the medical community or patients.
19   Q. (BY MR. MONTGOMERY) Did you ever work with Dr. Geis again
20   after the CLASS study?
21   A. No.
22   Q. Why is that?
23   A. Well, you know, it wasn't a positive experience. What
24   happened wasn't positive. It took a little bit of a life of
25   its own. The media got involved. I mean, the entire study

171

1    was discussed as -- pretty much as completely as you can
2    discuss it at that FDA regulatory meeting in February of
3    2001, and everybody in the back of the room -- and the whole
4    room was filled because everybody's there, all the companies
5    that have H 2 blockers and everybody is there for a GI
6    presentation like this, and I felt that it had been well
7    vetted in terms of anybody saying that I had withheld
8    something is like, I don't understand how you could say that,
9    at that meeting.
10       At the same time I was getting busier with other things
11   I was doing and I was at the point of saying, I'm done
12   consulting. I'm done consulting with this project and I'm
13   done with most of the consulting I was doing outside of --
14   well, most of the consulting I was doing. And so I -- you
15   know, somewhere we looked back there and it had Silverstein
16   will present at these. I never presented at these things
17   because I basically said, I'll go to the FDA, I'll do the
18   best I can to explain the rationale for six months, the
19   rationale for why celecoxib is a superior drug to the other
20   NSAIDs, and then that's probably going to be the end of my
21   involvement.
22   Q. So would it be fair to say that you came in for some
23   criticism because the JAMA article -- some public criticism
24   because the JAMA article didn't include the section that you
25   requested regarding informative censoring?

172

1    A. Yeah, but -- yes, that's fair to say. But -- go ahead.
2        Finish your question.
3    Q. So in that case why did you never publicly say, I asked for
4    it to be in there but they didn't include it? Wouldn't that
5    have gotten you off the hook publicly?
6                MR. WEISS: Object to the form of the
7    question.
8                MR. BUSHOFSKY: Object.
9                THE WITNESS: I don't feel like I was
10   attacked personally. I felt like the whole paper was
11   attacked. I was not a statistician of the paper. I was not
12   a clinical trial expert. I was not a design expert. I was
13   an expert in GI bleeding. Probably one of the experts in the
14   world in GI bleeding if only by the fact that I'm old and
15   I've done a lot of stuff, okay? So in therapy and diagnosis
16   and epidemiology, and I know a lot about GI bleeding. I
17   don't know these other things.
18       So I never felt that I was attacked personally. You
19   know, I never felt that -- I mean perhaps other people would
20   say, Yeah, you were, but I didn't feel that way. And once it
21   had been laid out to -- at the FDA, I felt it was clear and
22   it was not necessary for me to go public and say something
23   else because I felt it was -- it was there. It was there for
24   everybody to read.
25       Now, I did get involved again when the whole thing



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

173

1   heated up that next summer because initially there was -- you
2   know, to me, I don't know how you could have had more data
3   about what happened than at the February meeting, but then
4   later in that year in July it heated up again when several
5   people, two or three people wrote letters to the editor of
6   JAMA and they wanted to know about how come apparently the
7   study was longer than was in the JAMA article.  And then I
8   got involved again intensively because I felt like everybody
9   was kind of going like this (indicating) and they needed
10  somebody to come in and say, Let's figure out what we should
11  do.  And I wrote the letter to the -- the response to the
12  letter to the editor in JAMA which was published in about
13  October in which we said, In retrospect yeah, we should have
14  made it clear.  We should have -- I didn't say, Hey, I didn't
15  do that.  I chose not to do that.  I didn't do that, because
16  I felt like, you know, we were a team doing this.  But what I
17  did say was, Yeah, it would have been better if we had let
18  people know the exact timing of the study.  And then we
19  answered a couple of other questions -- and so I was involved
20  then.  And after that, that was the end in 199 -- in 2001 of
21  my consulting for Searle Pfizer Pharmacia.
22  Q.  (BY MR. MONTGOMERY) So why would it have been better if you
23  had included the information concerning the post six-month
24  data?
25  A.  Rephrase the question.  Why --

174

1   Q.  Let me ask it differently.
2       You said, and correct me if I'm wrong, that in your
3   letter to the editor you conceded it would have been better
4   if you had included other information, correct?
5   A.  Right.
6   Q.  What information are you talking about?
7   A.  Okay.  I'm talking about a section that explained why we used
8   six months instead of the whole data.  Because -- because I
9   feel -- and this may not be intuitively obvious to you, that
10  the CLASS paper is a good paper, that the amount of effort
11  that went into this was thousands of hours, mostly on the
12  part of the patients, but then on the individual doctors and
13  then -- I mean this was not Steve Geis and me.  I mean there
14  were thousands of hours that went into this.  It was a huge
15  trial of a really significant new approach to the problem of
16  arthritis which continues to become an increasing problem in
17  our society as, you know, the aging of the population.  I
18  have a new hip.  I have an artificial hip on the right side.
19  So I mean this is something that is getting more -- it's not
20  diminishing, it's becoming more important.  We have learned
21  the importance of the nonsteroidal anti-inflammatory drugs.
22      So I'm sorry; I distracted myself.  You were asking?
23  Q.  Why you thought it would have been better had the JAMA
24  article --
25  A.  Oh, yes.

175

1   Q.  Let me finish that.
2   A.  I'm sorry.
3   Q.  Why did you believe it would have been better if the JAMA
4   article included the information that you suggested it
5   contain?
6   A.  Okay.  Because if I had included -- or if we had included
7   that, it might have stopped the lay press from going, Whew,
8   this is hidden data, you know, these folks are not being
9   forthcoming about all the data.  And my feeling is if that
10  had not happened, the paper would have -- would have been
11  okay.  Maybe not perfect.  Life is not perfect.  You know, in
12  retrospect the people who pick through things can sometimes
13  find things that would be better done.  But this study was an
14  unbelievable effort on the part of a huge number of people
15  and I think the data was important.  But I feel that if we
16  had put in that section -- and then it's, you know, then you
17  know.  You know, I don't believe it, because they didn't give
18  me the other data.  Well, you could say, Well, yeah, okay,
19  they said the data after six months had some problems in it
20  because of this other phenomena.  But I felt like that would
21  have precluded some of what became a little bit out of
22  control.
23          MR. MONTGOMERY:  I'd like to show the
24  witness what's previously been marked as Wolfe Exhibit 3.
25  Q.  (BY MR. MONTGOMERY) Is Exhibit 3 the JAMA -- I'm sorry; Wolfe

176

1   Exhibit 3 is the JAMA article we've been talking about?
2   A.  Yes.
3   Q.  Could you take a look at the Main Outcome Measure section on
4   the first page?
5   A.  Yes.
6   Q.  Do you see the reference to the six-month treatment period?
7   A.  Yes.
8   Q.  Why is it that the treatment period is called six-month here
9   but is described differently in the documents that we looked
10  at earlier?
11          MR. WEISS:  Object to the form of the
12  question.
13          THE WITNESS:  Which documents?  Those
14  press releases?  I mean the pink slips?
15          MR. MONTGOMERY:  No, no, no.  No.
16  Q.  (BY MR. MONTGOMERY) Why don't you take a look at the final
17  report.  I'm pretty sure that has it.  Yeah, it's page Bates
18  number ending 145 of Exhibit 66.
19  A.  Okay.  I have 145.
20  Q.  Yes.  Do you see the Treatment Period section at the bottom?
21  A.  Yes, I do.  I do.
22  Q.  I'll read into the record an excerpt of the first sentence.
23  It says, "The treatment period was the period during which
24  study medication was taken.  For each patient this period was
25  scheduled to last for 52 or 65 weeks," et cetera.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                      September 29, 2010

177

1    So that's how it's described here in the final report,
2    and in the JAMA article it's called the six-month treatment
3    period. I'm wondering, why the disparity?
4         MR. WEISS: Object to the form of the
5    question.
6         THE WITNESS: I think it's the issue
7    we're discussing. I mean the decision was made to talk about
8    the six-month treatment period which was a piece of the
9    entire period and had there been another section it would
10   have been clear.
11   Q. (BY MR. MONTGOMERY) As it stands could a reader of the JAMA
12   article have reasonably believed that the CLASS study only
13   lasted six months?
14        MR. WEISS: Object to the form of the
15   question.
16        THE WITNESS: Yes.
17   Q. (BY MR. MONTGOMERY) All right. Would you turn to page Bates
18   number ending 881?
19        MR. BUSHOFSKY: Which document?
20        MR. MONTGOMERY: I'm sorry; of Wolfe
21   Exhibit 3.
22        THE WITNESS: (Complies.)
23   Q. (BY MR. MONTGOMERY) Do you see Figure 1 at the top of the
24   page?
25   A. I do.

178

1    Q. And is that a flow chart of patient disposition at six
2    months?
3    A. I can't read it.
4    Q. Even the top part?
5    A. Oh, it says, "Flow chart of patient disposition at six
6    months," yes. But I can't read anything that's below it.
7    Q. Okay. Do you recall our discussion of the number of patients
8    that completed the study from the final report earlier?
9    A. Not specifically.
10   Q. All right. Let's take a look at it.
11   A. Okay.
12   Q. Let's look at the final report and I believe it's Page 57.
13   Actually it's Page 59. I'm sorry; Bates number ending 170 of
14   Exhibit 66.
15        MS. McPHEE: 170?
16        MR. MONTGOMERY: Yes.
17        THE WITNESS: Okay.
18   Q. (BY MR. MONTGOMERY) And do you see Figure 7 B there?
19   A. Yes.
20   Q. All right. At the bottom it says 3409 patients completed the
21   study.
22   A. Yes.
23   Q. All right. In Figure 1 of the JAMA article, how many
24   patients should it have said completed the study?
25        MR. WEISS: Object to the form of the

179

1    question.
2         THE WITNESS: Well, it's talking about
3    the six-month period so it would be talking about -- I
4    believe there was an earlier chart which looked at six
5    months, so 4573.
6    Q. (BY MR. MONTGOMERY) So it would be appropriate to say that
7    4573 patients completed the study?
8         MR. WEISS: Object to the form of the
9    question.
10        MR. BUSHOFSKY: Object to the form.
11        THE WITNESS: No, completed six months.
12   Q. (BY MR. MONTGOMERY) So do you believe it would be inaccurate
13   to say -- to represent that over 4,000 patients completed the
14   study when -- let me rephrase.
15        Would it be inaccurate to say in the JAMA article that
16   over 4,000 patients completed the study?
17   A. It would not be inaccurate if you defined the study as the
18   six months.
19   Q. Do you believe that the JAMA article did that?
20   A. I think it did define it as six months.
21   Q. So then you think it's appropriate for the JAMA article to
22   represent that over 4,000 patients completed the study?
23        MR. WEISS: Object to the form of the
24   question.
25        THE WITNESS: Completed the six months of

180

1    the study.
2    Q. (BY MR. MONTGOMERY) Right. That's -- it could have said
3    that; I'm asking you would it be appropriate to say that over
4    4,000 patients completed the study?
5    A. And where does it say that? You're adding up the two boxes
6    on the bottom that I can't read of that flow chart?
7    Q. That's correct.
8    A. Well, this is what happened at six months. I feel like
9    that's accurate. Again, I would have preferred an additional
10   section.
11   Q. So you think it was accurate if it's -- strike that question.
12        You think it would be accurate to represent in the JAMA
13   article that over 4,000 patients completed the study, without
14   qualification?
15        MR. BUSHOFSKY: Object to the form.
16        THE WITNESS: My answer remains the same
17   as defined in this paper; six months, yes, it was over 4,000
18   patients who completed six months. I don't know how to say
19   it any differently.
20   Q. (BY MR. MONTGOMERY) Okay. Let's look at another page of the
21   final report, Bates number ending 177 of Exhibit 66.
22   A. Okay. Are we talking about Figure 8 A?
23   Q. Yes. Hold on one second. Actually let's turn to page Bates
24   number ending Page 182 of Exhibit 66. Do you see Figure 8 B
25   there?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

181

1   A. I do.

2   Q. All right. Do you see the box in the lower right-hand

3      portion of Figure 8 B that says, "N equals 384 reviewed by

4      all GEC members"?

5   A. Yes.

6   Q. And does that mean that for the entire study period the GEC

7      reviewed the records of 384 patients?

8   A. I believe that's right.

9   Q. Let's look back at the JAMA article.

10  A. Yeah.

11  Q. Which is Wolfe Exhibit 3 at the page you're on, ending Bates

12     No. 881. Do you see in the lower right-hand corner it

13     says -- there's a section titled GI Toxicity?

14  A. Yes.

15  Q. All right. I'll read the first sentence of that into the

16     record. "A total of 260 cases were selected by the GI events

17     committee for adjudication."

18        Do you see that?

19  A. I do.

20  Q. And is that an accurate statement?

21  A. Well, I want to go back to the other flow chart.

22  Q. Sure. That's on Bates No. 177 of Exhibit --

23  A. Right.

24  Q. -- 66?

25  A. "A total of 260 cases were selected for adjudication."

182

1      That is correct in the first six-month analysis.

2      That's -- the N is equal to 260. Reviewed by the GEC

3      members.

4   Q. Right. Now, does the JAMA article say that 260 cases were

5      reviewed in the first six months?

6   A. It just says they were reviewed. It does not say in the

7      first six months.

8   Q. So would you expect a reader to take that to mean in the

9      entire study 260 cases were reviewed?

10       MR. BUSHOFSKY: Object to the form.

11       MR. WEISS: Object to the form.

12       THE WITNESS: I would think that the

13     reader would think in the six months that's the number of

14     cases that were reviewed. So I didn't follow exactly but

15     that's my answer.

16  Q. (BY MR. MONTGOMERY) Do you think that the representation that

17     260 cases were selected by the GI events committee for

18     adjudication was misleading without the section that you

19     wanted included about informative censoring?

20       MR. WEISS: Object to the form of the

21     question.

22       THE WITNESS: I think it's accurate

23     because this paper is about six months. I feel it would have

24     been better if there had been the other section added to it.

25  Q. (BY MR. MONTGOMERY) All right. Let's take a look at Figure 2

183

1      on Wolfe Exhibit 3, Bates number ending 882. Do you see

2      Figure 2?

3   A. I do.

4   Q. Do you see Subsection B of Figure 2?

5   A. I do.

6   Q. All right. The first comparison there as between celecoxib

7      and NSAIDs, do you see that?

8   A. Right, I do.

9   Q. And the P value is .04, correct?

10  A. Correct.

11  Q. And that's statistically significant, right?

12  A. Correct.

13  Q. Now, that result wouldn't be significantly significant if the

14     data from the entire study period were included; is that

15     right?

16  A. That's my understanding.

17  Q. Do you think it was misleading to represent this result

18     without the section that you suggested be included concerning

19     informative censoring?

20       MR. WEISS: Object to the form of the

21     question.

22       THE WITNESS: I'm sorry. That -- I

23     didn't follow the logic of what you said. This is looking at

24     patients not taking aspirin and saying that in the six months

25     of the trial that was presented here, there was a significant

184

1      reduction in the incidence of upper GI complications in the

2      patients not taking aspirin, so --

3   Q. (BY MR. MONTGOMERY) Sure. Let me explore.

4   A. Yeah.

5   Q. This particular result was statistically significant at six

6      months but not at the full data set, correct?

7   A. Ah, I think you're addressing the fact that this was the only

8      finding I believe that was significant at six months but

9      not -- is that right? Not significant at the whole data set?

10  Q. That's my understanding. You're free to -- you can look at

11     the final report or any other document if you want to refresh

12     your memory.

13  A. Yeah, I think that's the case, okay.

14  Q. So my question is, Figure 2 of the JAMA article, Wolfe

15     Exhibit 3, displays a result that's only statistically

16     significant at six months but not in the entire data set,

17     correct?

18  A. I -- okay. I'll take that as correct.

19  Q. All right. In your opinion was it misleading to present this

20     result without your, the section that you suggested be

21     included explaining the reasons for the six-month analysis?

22  A. No, because I feel like this is what happened at six months.

23     This is what happened. In people not taking aspirin there

24     was a significant improvement when you didn't have aspirin

25     bollixing up the selectivity of the celecoxib. So I feel

Toll Free: 800.300.1214
Facsimile: 619.239.4117



ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                          September 29, 2010

185

1    like that's appropriate. However, I still would have
2    preferred to have that section in saying that this was the
3    first six months of what was a longer study. I don't think
4    it makes this wrong. I think this is correct. And if I had
5    to design the trial, I wouldn't have put -- I wouldn't have
6    allowed patients on aspirin in the first place. I think.
7    Q. All right. If you can turn the page on Wolfe Exhibit 3 to
8    the next page I think, it's a Bates number ending 883.
9    There's Table 4 there, do you see that?
10   A. I do.
11   Q. And I'd like you to compare that to the table in the final
12   report which is Exhibit 66 on Bates number ending 288.
13   A. I'm lost.
14   Q. All right.
15   A. I know you're saying you want me to compare this to the final
16   report.
17   Q. Right. Bates number ending 288.
18   A. 288, okay. Okay.
19   Q. All right. Do you see Table 10b in the final report?
20   A. I do.
21   Q. All right. And you see Table 4 in the JAMA article?
22   A. I do.
23   Q. All right. Now, Table 4 in the JAMA article discloses
24   adverse effects during the six-month treatment period,
25   correct?

186

1    A. Correct.
2    Q. And Table 10b in the final report discloses adverse events
3    with incidence greater or equal to three percent in any
4    treatment group for the entire study period, correct?
5    A. Correct.
6    Q. Now, why not include the adverse effects in the JAMA article
7    that happened after six months?
8    A. Like, for example?
9    Q. Sure. Rash, for example?
10   A. Just a moment. So you're saying rash is included in 10b in
11   the final report but not included --
12   Q. Oh, no, I'm sorry.
13   A. -- in Table 4?
14   Q. No, no, no. My question is, Table 4 of the JAMA article
15   contains information regarding adverse rash events --
16   A. Right.
17   Q. -- during the first six months --
18   A. Right.
19   Q. -- of the study.
20   A. Right.
21   Q. Is there any reason not to have included rash adverse events
22   that happened after six months in the study?
23   A. The study represents six months and this rash information is
24   complete. The Table 10b represents the entire study period
25   and the data is very similar, as I read it. So I don't

187

1    understand -- it's not as if something appeared in the entire
2    data set on Table 4 -- excuse me -- on Table 10b that was not
3    included in Table 4. So what I'm saying is Table 4 contained
4    rash that occurred within six months. Table 10b mentioned a
5    rash that occurred in the entire study period.
6       So you're asking why not put the entire study period
7    rash information into the article, but the article was about
8    six months and there wasn't to me a significant difference,
9    so why would you?
10   Q. All right. Let me ask it a different way.
11      If informative censoring is correct then the
12   gastrointestinal results of the study became biased
13   especially after six months, correct?
14   A. Right.
15   Q. But the -- is there any reason to believe that the safety
16   results became biased after six months except with regard to
17   GI events?
18   A. Not to my knowledge.
19   Q. So is there any reason to have excluded the non GI adverse
20   event data from the post six-month period of the CLASS study?
21   A. That's a very complicated sentence.
22      MR. MONTGOMERY: She can read it back. I
23   don't want to try it again.
24   ////
25   ////

188

1       (Question on Page 187, Lines 19
2        through 20, read by the
3        reporter.)
4       THE WITNESS: Right. What I would say is
5    that would be a bit confusing because it wasn't the same
6    period as the period for which the paper was written, and
7    since there wasn't any substantial or important clinical
8    difference, I don't see why you would do that. I don't see
9    why you would make the paper about six months and write the
10   adverse effects about the entire treatment period.
11      MR. MONTGOMERY: I'd like to show the
12   witness what's previously been marked Exhibit 4. I'm sorry;
13   Wolfe Exhibit 4.
14      MR. BUSHOFSKY: Before you get into that
15   can we take a break?
16      MR. MONTGOMERY: Sure. Let's go off the
17   record, please.
18      THE VIDEOGRAPHER: We're going off the
19   record. The time is 2:59 p.m.
20      (Recess 2:59-3:08.)
21      THE VIDEOGRAPHER: We are back on the
22   record. The time is 3:08 p.m. This is the beginning of Tape
23   No. 5.
24   ////
25   ////



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

189

1           EXAMINATION (Continuing)
2     BY MR. MONTGOMERY:
3  Q. You understand you're still under oath?
4  A. I do.
5  Q. Okay. When we left we were looking at Wolfe Exhibit 4. Have
6     you seen Wolfe Exhibit 4 before?
7  A. I have.
8  Q. And it's an editorial written by David R. Lichtenstine and M.
9     Michael Wolfe concerning the JAMA article?
10  A. Correct.
11  Q. All right. Would you take a look on the first page of Wolfe
12     Exhibit 4 -- well, before -- before we get there, did you see
13     this editorial at the time it was published?
14  A. You know, I think I did. I probably did. I don't remember
15     studying it.
16  Q. All right. Would you take a look on the first page of Wolfe
17     Exhibit 4, the second column, so the column on the right,
18     first full paragraph?
19  A. Right.
20  Q. Do you see in basically the middle of that paragraph there's
21     a reference to the CLASS study as a six-month study?
22  A. Right.
23  Q. And is that an accurate description of the CLASS study?
24  A. It says that in the journal I am reporting the results of a
25     six-month randomized trial. That is true. That's what I

190

1     reported in the journal. The trial obviously went on longer,
2     so it could be, you know.
3  Q. So would it be fair to say that you reported six months of a
4     randomized trial? I'm sorry; let me ask it differently.
5     Would it be fair to say that in the JAMA article you
6     reported the results -- six months -- strike that.
7     Would it be fair to say that in the JAMA article you
8     reported six months of the results of the CLASS study?
9  A. Yes.
10     MR. WEISS: Object to the form of the
11     question.
12  Q. (BY MR. MONTGOMERY) Would it be fair to say that in the JAMA
13     article you reported the results of a six-month study?
14     MR. WEISS: Object to the form of the
15     question.
16     THE WITNESS: Was that a different
17     question than the one you asked first?
18  Q. (BY MR. MONTGOMERY) Yes. Let me -- I'll ask them both
19     again --
20  A. Okay.
21  Q. -- so you can -- would it be fair to say that in the JAMA
22     article you reported six months of the results of the CLASS
23     study?
24     MR. WEISS: Object to the form of the
25     question.

191

1     THE WITNESS: Yes.
2  Q. (BY MR. MONTGOMERY) Would it be fair to say that in the JAMA
3     article you reported the results of a six-month study?
4     MR. WEISS: Object to the form of the
5     question.
6     THE WITNESS: You're shaving the
7     semantics a little bit for me, but I would think yes, that's
8     true as well.
9  Q. (BY MR. MONTGOMERY) Okay. So did you attend an advisory
10     committee meeting at the FDA regarding Celebrex in February
11     of 2001?
12  A. I did.
13  Q. And did you participate in rehearsals in anticipation of that
14     meeting?
15  A. I don't remember. I remember the meeting but I don't
16     remember whether we had any rehearsals. I don't believe that
17     we did but I don't remember it clearly.
18     MR. MONTGOMERY: I'd like to ask the
19     court reporter to mark what will be Exhibit 201.
20     (Exhibit No. 201 marked
21     for identification.)
22     MR. MONTGOMERY: Oh, shoot. I think
23     there's an e-mail stapled to the back of this that's not part
24     of it. So that's what I'd ask people to do. So for the
25     record Exhibit 201 is Bates No. DEFS 00656585 through

192

1     00656587.
2  Q. (BY MR. MONTGOMERY) Does Exhibit 201 appear to be notes by
3     you regarding an advisory committee rehearsal on January 9th,
4     2001?
5  A. No.
6  Q. Okay. Well, what do you think it is, if you know?
7  A. I have no idea. I don't know where that Fred came from.
8     It's like, Below are notes of observations. I hope these are
9     helpful, Fred. Or, Below are some notes or observations I
10     made. I hope these are helpful. Fred. Because later on it
11     talks about things that doesn't sound like it's me talking,
12     consultant comment. Consultant can't say you're safer,
13     consultant makes more use of the 12-month data. So no, I
14     don't remember this. Lee Simon doesn't -- how can it say
15     Fred when it says Lee Simon does endoscopy services as a
16     surrogate marker for outcomes? So I don't know what this is.
17  Q. Okay.
18     MR. MONTGOMERY: I'd like to ask the
19     court reporter to mark Exhibit 202, please.
20     (Exhibit No. 202 marked
21     for identification.)
22  Q. (BY MR. MONTGOMERY) For the record, Exhibit 202 is Bates No.
23     DEFS 00392205 through Bates number ending 246.
24     MR. WEISS: And Matt, I don't know if it
25     matters but wasn't this marked at Weiner already?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                          September 29, 2010

193

1        MR. MONTGOMERY:  It could have been.

2        THE WITNESS:  It's a nice presentation.

3    Q.  (BY MR. MONTGOMERY) So you presented the results of the CLASS

4        study at the American College of Physicians; is that correct?

5    A.  That is correct, as I remember.

6    Q.  And that was April 17th, 2000?

7    A.  I guess.  It was 10 years ago, but that's what I gather.

8    Q.  All right.  And Exhibit 202, there's an e-mail on the first

9        page and after that there's a slide presentation.  Are those

10       your slides from the APC?

11   A.  These are the slides I showed.  They are a combination of my

12       slides and slides from the company.

13   Q.  And in these slides did you just discuss the six-month data

14       or the entire data set?

15   A.  I discussed the six-month data; however, at the beginning of

16       my presentation I stood up and said, This study went on for

17       longer than six months but the data after six months is very

18       difficult to interpret and therefore I'm going to focus on

19       the six-month data.

20   Q.  So you put in basically orally the section that you wanted to

21       include in the JAMA article?

22   A.  Yeah, it was a little brief from the standpoint of explaining

23       why, but yes, I did do that.  And Searle knew I was going to

24       do it and nobody objected.

25   Q.  And did you -- beyond what you just said, did you disclose

194

1        any of the results of the study after six months --

2    A.  No.

3    Q.  -- or just that there existed results after six months?

4    A.  Correct.

5    Q.  So just to make sure the record is clear, so you disclosed

6        the existence of some results after six months but not what

7        those results were?

8    A.  That's correct.  What I said was the data was very difficult

9        to interpret and therefore I'm going to focus on the first

10       six months of the study.

11   Q.  All right.  Would you turn to page Bates number ending 236 of

12       Exhibit 202.

13   A.  (Witness complies.)

14   Q.  And is that a slide entitled Most Common Adverse Events?

15   A.  It is.

16   Q.  All right.  And is this slide reporting adverse events from

17       the first six months of the trial or the entire data set?

18   A.  As I recall the first six months of the trial.

19   Q.  All right.  And can you take a look at the final report,

20       please, which is Exhibit 66 at Page 177.

21   A.  Okay.

22   Q.  All right.  Would you compare -- and I can take you through

23       them one by one, but will you just compare --

24   A.  I must be in the wrong place.  177?

25   Q.  I'm sorry; Bates number ending 288.  It's the internal

195

1    Page 177.  I apologize.

2    A.  Oh, I see.  Okay.  Okay.

3    Q.  All right.  So we're looking at Exhibit 66, Bates number

4        ending 288, Table 10b, correct?

5    A.  Yes.

6    Q.  Okay.  And that has adverse events for the entire study

7        period, correct?

8    A.  It does.

9    Q.  Now, we can go through it one by one if you want, but why

10       don't you take a minute and compare the results or the

11       information in Figure 10b in the final report to your slide

12       and tell me whether you think that these are the six-month or

13       complete study results.

14   A.  Matt, could you take me back to the slide that has the

15       adverse events in the six-month period, the corollary of 10b?

16       I forgot where that is.  I think there's another slide, isn't

17       there, that looks just like that?

18   Q.  I will take a look and see if I can find it for you.

19   A.  Somewhere I thought we saw that.

20   Q.  All right.  I'm not sure if you're referring to the

21       information in the JAMA article?

22   A.  No, I thought we were looking at this.  We had a comparison

23       of the six-month data and the 12 and the entire study data.

24       I got a lot of stuff here in front of me so I'm not exactly

25       clear about it.  Of course the numbers are not exactly the

196

1    same.  I mean they're very close but they're not exactly the

2    same.  For example -- let's see.  Entire study period.  We're

3    trying to compare it to 10d?  What's that slide under your

4    left hand?

5    Q.  It's Table 10b from the final report.

6    A.  B, okay.

7    Q.  Bates number ending 288.

8    A.  I mean the numbers are not identical.  They're very close but

9        they're not identical.  For example, any event is 81.8 and

10       81.7.  Diclofenac -- I mean celecoxib.  Diclofenac is 82.8

11       and 82.9, so the numbers are not identical but I don't

12       know --

13   Q.  Okay.  Why don't you do me a favor and take a look at the

14       JAMA article again.

15   A.  Okay.

16   Q.  Which is Wolfe Exhibit 3.

17   A.  Okay.

18   Q.  On Bates number ending 883.

19   A.  Yes, okay.  I have it now.

20   Q.  Table 4.

21   A.  Well, it doesn't have it broken down.  Table 4 does not have

22       it broke -- to my read does not have it broken down to

23       diclofenac versus ibuprofen.  It has celecoxib versus the

24       NSAID group.

25   Q.  Right.  The percentages in Table 4 of the JAMA article,



ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                    September 29, 2010

197

1    though, the percentages for the celecoxib group should
2    correspond --
3    A. For the celecoxib group should correspond, so they're
4    different.  Okay.
5    Q. So does this lead you to conclude that you reported the
6    adverse events for the entire study period at ACP?
7    A. It doesn't because I haven't -- I'm seeing that it's not the
8    same as the six-month period.  I haven't seen that it's the
9    same as the entire data set unless I'm -- my brain is going
10   in a circle.  Do you have the adverse events during the
11   entire data set?
12   Q. That should be -- I understand it to be Figure 10b from the
13   final report.
14           MR. BUSHOFSKY:  To move things along, you
15   might want to draw his attention to this thing at the bottom
16   of the slide in the presentation about the nine months.
17           MR. MONTGOMERY:  Okay.  Good point.
18           THE WITNESS:  All right.  Thank you,
19   Jeff.
20           MR. BUSHOFSKY:  Sure.
21           MR. MONTGOMERY:  That's the best
22   objection ever.  All right.
23           MR. BUSHOFSKY:  Some objections are meant
24   to move things along.
25   Q. (BY MR. MONTGOMERY) All right.  So we're on Exhibit 202,

198

1    we're looking at page number ending 236 -- Bates Number.
2    A. Yes.
3    Q. So now do you believe that you're reporting adverse events
4    from the entire -- entire study period?
5    A. Just one moment.  Yes.  It's slightly different than the six
6    months, so yes, and especially with Jeff's note that it says
7    exposure nine months, right.
8    Q. Okay.  So in your slide presentation to the ACP --
9    A. Right.
10   Q. -- you reported the ulcer results for six months, correct?
11   A. Correct.
12   Q. But the rest of the adverse events for the entire data set,
13   correct?
14   A. That's correct.
15   Q. And in the JAMA article you reported the ulcer results for
16   six months, correct?
17   A. Right.
18   Q. But in the JAMA article you reported the adverse events for
19   only six months?
20   A. Right.
21   Q. Why the difference?
22   A. I don't know.
23   Q. Do you know who made the determination -- well, do you know
24   who made the determination to report the adverse events for
25   the entire study period at the ACP?

199

1    A. No.
2    Q. And who made the decision?
3    A. This is -- can I explain one thing?
4    Q. Sure.
5    A. This is the kind of slide I can't make because I don't have
6    the data so somebody has to make up the slide and they gave
7    me the slide to present.  I can't make up the slide myself.
8    So one would assume that Geis, Lefkowith, you know, Ken
9    Verburg were the people who put this together and I either
10   wasn't aware or forgot that this was the data for the entire
11   study.
12   Q. Okay.  And do you know, in the JAMA article, who made the
13   determination to put the adverse event information just for
14   six months?
15   A. I do not, except that was easier to understand since the
16   whole paper was about six months than this one why we went to
17   the full data set for the adverse events.  It is a nice talk,
18   though.  I'd love to take you through the entire talk.
19   Q. I'm sure you would.
20   A. Actually the reason I would is that it puts me on the bones
21   of what I said earlier about the other studies that have been
22   done about celecoxib.  Okay.
23   Q. So did you attend the advisory committee meeting in February
24   of 2001?
25   A. I did.

200

1    Q. Did you help present the CLASS information?
2    A. I did.
3    Q. Did you use slides at that presentation?
4    A. I did.
5    Q. Okay.
6           MR. MONTGOMERY:  I'd like to ask the
7    court reporter to mark what is Exhibit 203.
8           THE WITNESS:  I would note that I got ill
9    during the presentation.  I had the flu and I actually had to
10   step off the podium and go vomit.  And so I really was sick
11   and so I was not there for the entire presentation of the --
12   I don't remember if I presented the GI part and then during
13   the discussion had to excuse myself but I was ill.
14   Q. (BY MR. MONTGOMERY) Okay.
15           (Exhibit No. 203 marked
16           for identification.)
17   Q. (BY MR. MONTGOMERY) Were these the slides presented by
18   Dr. Needleman, Geis, Lefkowith and yourself at the advisory
19   committee meeting?
20   A. It looks like that, yes.
21   Q. All right.  Would you turn to Page 78 of Exhibit 203.
22   A. I don't have page numbers.  Oh, yes, maybe I do.
23   Q. In the lower left-hand corner.
24   A. Yeah, I do.  Sorry.  Okay.
25   Q. Do you see the slide entitled CLASS Committees?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                      September 29, 2010

201

1    A. I do.

2    Q. And on the executive committee Dr. Lefkowith isn't listed; do

3       you see that?

4    A. I do.

5    Q. Do you know why that is?

6    A. I do not.

7    Q. Was he still a member of the executive committee at this

8       point?

9    A. It's not clear to me.  He may have been a member, a non

10      voting member.  As we said earlier this morning, I read

11      something that said he was a non voting member.  So I don't

12      know why his name wasn't on there.  I did not make up that

13      slide.

14   Q. Okay.  Let's -- will you turn to Page 97 of Exhibit --

15   A. Just let me make one comment in this regard.  The role of

16      Searle in this study was very obvious in the sense that they

17      were half the authors on the paper and I think it said that

18      we were paid consultants to Searle and I think it said that

19      Searle paid for the study.  So I mean there was never an

20      attempt to obfuscate the fact that Searle was involved in the

21      study.  It was never an attempt to say that this was just all

22      of us doing the study without Searle.  I'm sorry; what page?

23   Q. 97 of Exhibit 203.

24   A. Okay.

25   Q. Is that a slide entitled Ulcer Complications?

202

1    A. Yes, it is.

2    Q. All right.  And is that the results from six months or the

3       entire study period?

4    A. I don't know.

5    Q. All right.  Let's take a look at --

6    A. Maybe there's a concomitant slide that shows the other period

7       of time.

8    Q. All right.  Let's take a look at the final report and I think

9       we can figure it out.

10   A. Okay.

11   Q. So final report, Bates number ending 117.

12   A. Okay.  So Ulcer Complications, All Patients.

13   Q. So I direct you to Table 2 for all patients, all the way to

14      the right is the comparison between celecoxib and the

15      combined NSAIDs.  Do you see that?

16   A. Yes.

17   Q. And that P value is .45?

18   A. Right.

19   Q. And is that the same as shown on the slide from Exhibit --

20   A. It is but I'm not sure it's the same slide anyway.  Let me

21      look for a minute.

22   Q. Okay.  Take your time.

23   A. The problem is I don't see anywhere on this chart where -- I

24      see celecoxib coming in at about .75 with the ordinate saying

25      it's about .75, but the bar to the right is about .9 and I

203

1       don't see that anywhere appearing on this -- on this table,

2       because the table is broken out by diclofenac and ibuprofen

3       unless I'm not reading this correctly.

4          Also complications, .4, all patients.

5    Q. Obviously it says what it says, but in the Table 2 under All

6       Patients for the number per 100 patient years, diclofenac

7       is .93, right?

8    A. Wait a minute.  Where are you?

9    Q. Table 2.

10   A. Right.

11   Q. Under All Patients.

12   A. Just a minute.  Okay.

13   Q. And then the bottom of the diclofenac column there.

14   A. So the number per --

15   Q. Is .93?

16   A. -- hundred patient years, so it's .73 for celecoxib which

17      looks about what the bar graph looks like.  And it's .93

18      and .98 for the other two comparators.  And so what you're

19      saying is combined it would have been about .95, so it looks

20      like that's what it is.  It's ulcer complications for all

21      patients, okay.

22   Q. Okay.  So going back to Exhibit 203, the slide on Page 97.

23   A. Right.

24   Q. Is it your belief now that that slide is showing results from

25      the full study period, correct?

204

1    A. Yes, I think so.

2    Q. Now, was there any -- are you aware of any decision by Searle

3       or Pfizer to present the full study data at the advisory

4       committee meeting?

5    A. That's a complicated question because the FDA had all the

6       data.  Dr. Goldkind was the FDA GI reviewer.  He said that he

7       wanted to see all the data.  So I don't think it was an

8       internal discussion on the part of Searle, I think the FDA GI

9       person said he wanted to see all the data, I think.

10   Q. Let me put it a different way.

11         As far as you know, at the advisory committee meeting,

12      did any representative of Pfizer -- I'm sorry.  Strike that.

13         At the advisory committee meeting, did any

14      representative of Pharmacia or Pfizer argue for the validity

15      of the six-month analysis?

16   A. I think so.  As I remember, yes.  Now, but I may be mixing

17      that up with conversations with the FDA prior to the advisory

18      meeting.  Because Goldkind -- there was a question of what

19      Goldkind was going to do and I think he was the one that came

20      out saying he wanted to see all the data.

21   Q. But you could have presented the full results and the

22      six-month results at the same meeting, correct?

23   A. And I don't know that we didn't do that.  I don't know that.

24   Q. I'm just asking you if you could have done that?

25   A. I think so.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                          September 29, 2010

205

1   Q. Okay.

2   A. Because at this meeting it was clear that the data that was

3      presented was the whole trial and that the JAMA article had

4      been the first six months.

5            MR. MONTGOMERY:  I'd like to ask the

6      court reporter to mark Exhibit 204.

7            (Exhibit No. 204 marked

8            for identification.)

9      THE WITNESS:  Yes.  Okay.

10  Q. (BY MR. MONTGOMERY) And did Dr. Goldkind make a presentation

11     at the advisory committee meeting?

12  A. I think so.

13  Q. And do these look like his slides?

14  A. Beats me, but it looks like it.  I don't remember the slides

15     at all.

16  Q. Just take a look through and let me know, is there any reason

17     you think these aren't Dr. Goldkind's slides from the

18     advisory meeting?

19           MR. BUSHOFSKY:  Objection.

20     THE WITNESS:  No.

21  Q. (BY MR. MONTGOMERY) Did Dr. Witter make a presentation at the

22     advisory committee meeting?

23  A. I don't remember -- who is Dr. Witter?  I don't remember.

24  Q. Let me show you this and maybe it will refresh your memory.

25           MR. MONTGOMERY:  I'd like to ask the

206

1      court reporter to mark Exhibit 205.  She's got to mark it.

2            (Exhibit No. 205 marked

3            for identification.)

4      THE WITNESS:  You know what?  It is

5      possible that I was ill when this was presented because I

6      don't remember any picture of any wizard looking -- there's a

7      picture of a wizard in here somewhere, a humorous slide I

8      assume, and it's possible this was presented after I was ill.

9   Q. (BY MR. MONTGOMERY) Okay.  So you don't remember -- you can't

10     tell me whether these are Dr. Witter's slides one way or the

11     other?

12  A. No, I cannot.

13  Q. Okay.  Have you ever seen a transcript of the advisory

14     committee meeting?

15  A. I have not.

16           MR. MONTGOMERY:  I'd like to ask the

17     court reporter to mark what will be Exhibit 207.  I'm sorry;

18     206.

19           (Exhibit No. 206 marked

20           for identification.)

21  Q. (BY MR. MONTGOMERY) All right.  Does this appear to you to be

22     a transcript of the advisory committee meeting?

23  A. That's how it's labeled, yeah.

24  Q. Okay.  Would you take a look at Page 78 of Exhibit 206.

25  A. (Witness complies.)  Okay.

207

1   Q. All right.  Do you see on Page 78 where your name appears?

2   A. Yes, I do.

3   Q. I'm going to -- so is that the beginning of your

4      presentation?

5   A. I don't know.

6   Q. Okay.  Take a look.

7   A. I mean I don't know if I said anything earlier, but clearly

8      this is me talking.

9   Q. Okay.  And then I'd like you to look a couple pages later on

10     Page 81.

11  A. Okay.

12  Q. And according to the transcript this is still you talking,

13     correct?

14  A. Yes.

15  Q. Okay.  And I'd like you to look at the statement starting on

16     Page -- on Line 5 of Page 81.

17  A. Okay.

18  Q. It says, "And we allowed aspirin which I think is critical

19     because you have already seen that it has a dramatic effect

20     and I think it is an important part of a study of this type

21     so I think it is an excellent trial design."

22         Do you see that?

23  A. I do.

24  Q. Now, didn't you testify earlier that you -- in your opinion

25     aspirin should have been excluded from the trial?

208

1   A. My opinion right now is that having aspirin obfuscated the

2      results of the trial.  My opinion then was that I thought it

3      was -- it was important, and let me explain why.  You're

4      trying to look at real world patients and this was a

5      difference in the design of different trials, where here they

6      designed this trial and they said, Let's take the three

7      severe outcomes, let's not take symptomatic ulcers.  Let's

8      include people on aspirin even though it's probably going to

9      obfuscate or make the trial more difficult.  Let's take

10     celecoxib but two to four times the dose which we would use.

11     So they pushed the design on all three parameters or multiple

12     parameters.

13         Now, at the end, had it been successful you could have

14     said, Hey, even in people on aspirin, even in people without

15     symptomatic ulcers, even in people taking two to four times

16     the dose of celecoxib, it was still significant.  But that

17     didn't happen, it was just short of significance.  So you

18     know, this is the art of controlled clinical trial design.

19         I would say at this point in my life, which I'm

20     entitled to have a different opinion than what I felt

21     10 years ago, that it would have been a more clear study had

22     we not permitted aspirin.  Now, again, these older people --

23     I take aspirin, me, Fred Silverstein, I take an 80-milligram

24     aspirin, my wife takes aspirin every day.  So a lot of people

25     take these small dose of aspirin and so there was a rationale



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

209

1  for including aspirin. And if you say -- if you want to make
2  it real world, you should include aspirin. But with all the
3  kerfuffle about the interpretation of the data perhaps, I
4  feel like, wow, if we hadn't included aspirin it would have
5  taken that part out of it.
6  Q. The results of the trial didn't conform to your expectations;
7  is that a fair statement?
8  A. Expectations, I don't know. Did -- I hoped -- you know, the
9  reason I spent all the time on this was not for notoriety and
10 it was not for money. It was because I was 30 years into the
11 topic of gastrointestinal bleeding and all the different ways
12 we've discussed today, and I thought this drug was a
13 significant step forward. I was hoping that the results
14 would be clear and would leave no ambiguity. So in that
15 sense, yes, they were not as good as I was hoping they would
16 be, if that answers your question.
17 Q. Even -- and you knew that at the time of the advisory
18 committee meeting, right?
19         MR. WEISS: Object to the form of the
20 question.
21         THE WITNESS: When you say "that" what do
22 you mean?
23 Q. (BY MR. MONTGOMERY) The results of the study that you just
24 described?
25 A. Yes, yes.

210

1  Q. And even in light of those results, you still thought it was
2  an excellent trial design?
3  A. Well, I think those are two different questions. The result
4  of a trial and the trial design, I mean you don't design a
5  trial to get the results, you know, you don't -- you design a
6  trial because it's answering the question you want to answer,
7  and I felt in that sense, yes, it was a good design. It did
8  not come out the way I wanted it to, but aside from the
9  aspirin issue -- and I would have included symptomatic ulcers
10 as well, I felt overall that the trial design was fine.
11        And remember, there's a huge amount involved in the
12 trial design: Age of patients, number of centers, number of
13 patients, underlying disease, concomitant medications,
14 steroids. I mean there are a thousand variables that have to
15 be considered in a trial design, it's not just, yes, aspirin;
16 yes, no, symptomatic ulcers; yes, no -- you know, there
17 are -- there are literally hundreds of moving parts in the
18 design of a trial like this and I thought it was reasonable
19 even though it didn't come out the way I wanted it to come
20 out.
21        MR. MONTGOMERY: I'd like to ask the
22 court reporter to mark what will be Exhibit 207.
23        (Exhibit No. 207 marked
24        for identification.)
25        THE WITNESS: Just before that, I want to

211

1  go back to what I said in here because I did address what
2  happened. I addressed why the CLASS trial didn't work and I
3  said, for example, that the risk factors were fewer. And I
4  mentioned that earlier today, that doctors have gotten smart
5  about not wanting to put patients at risk, and therefore, the
6  patients coming into the CLASS trial had a different risk
7  profile. So I -- I thought it was a pretty comprehensive
8  discussion of why the trial didn't come out the way we were
9  hoping it would come out. Okay.
10 Q. (BY MR. MONTGOMERY) Do you recognize Exhibit 207?
11 A. Yes.
12 Q. All right. And is this a fax to you from Steve Geis asking
13 you to review the rationale for the six-month analysis?
14 A. This was the point at which I decided that even though I had
15 not been consulting for Pharmacia any longer, I had to get
16 into this. So this is in that month of August where I told
17 you I actually had the month off from my work and I was going
18 to have a month to do other things and I wound up spending
19 the entire month working on this. So Steve -- I don't know
20 if it was a fax, maybe it was a -- I don't know if it was a
21 fax or an e-mail, but he sent this to me with what his
22 thoughts were about the six-month data in preparation for my
23 writing a response. It was one of the things that happened
24 of 50 or 75 things as I began to think about writing a
25 response to the letters to the editor of JAMA.

212

1  Q. Was there any information in Exhibit 207 that you didn't have
2  at the time the JAMA article was published?
3  A. I have to review it for a moment.
4  Q. Take your time.
5  A. (Witness complies.)
6        You know, I don't know that I had seen every one of
7  these slides in this format but I did not feel at the time,
8  and I can't comment on it now because I don't have any basis
9  for which to make a comparison, but I did not feel at the
10 time that they surprised me with any data, if that answers
11 your question.
12 Q. It sounds like the best we're going to do 10 years later.
13 A. Yeah. Literally more than 10 years. Well, nine plus.
14 Q. Did you have a call with Barbara DeAngeles at some point
15 before --
16 A. I did.
17 Q. Let me finish the question. Did you have a call with Barbara
18 DeAngeles about the JAMA paper at some point before you
19 submitted your letter to the editor?
20 A. I did. My response to the letter of the editor.
21 Q. And what precipitated that call?
22 A. Dr. DeAngeles heard sometime in the late spring, early summer
23 that there was this issue being raised about whether all the
24 data was presented in the CLASS paper, and as I remember a
25 couple of Searle people went to JAMA to discuss it with her



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

213

1    in person and what she said is, Where is Dr. Silverstein?  He
2    was the first author of the paper, why isn't he here?  So I
3    felt that at a minimum I needed to call her and then maybe
4    potentially to go to Philadelphia to meet with her in person.
5    So either she called me or I called her and we talked for
6    about a half-hour.
7    Q.  Why weren't you at the meeting between Searle and
8    Dr. DeAngeles?
9    A.  I don't think I knew it was about to happen.  I don't
10   remember.
11   Q.  Okay.
12           MR. MONTGOMERY:  I'd like to ask the
13   court reporter mark what will be Exhibit 208.
14              (Exhibit No. 208 marked
15              for identification.)
16   THE WITNESS:  Okay.  Yes.
17   Q.  (BY MR. MONTGOMERY) Is Exhibit 208 a fax regarding your call
18   with Dr. DeAngeles?
19   A.  No.  Exhibit 208 has a brief fax on the front but the
20   majority of the document are the notes that I made for myself
21   while I was talking to Dr. DeAngeles.
22   Q.  Okay.
23   A.  And that's just a -- some people need to make notes while
24   they're doing something and I'm one of them and I wrote these
25   notes down.  And I included it in the documents that I sent

214

1    for this because you had asked for everything and so I sent
2    everything.
3    Q.  Yeah, you know, I'm glad you mentioned that because I see
4    there's some irregularity here anyway.  So just take off the
5    first page.  They're not consecutive for some reason.
6    A.  Okay.
7    Q.  And I'm going to call Exhibit 208 the fax that you described
8    which is Silverstein 00077.
9            MR. MONTGOMERY:  Then I'm going to ask
10   the court reporter to mark as Exhibit 209 the notes that you
11   were discussing.
12              (Exhibit No. 209 marked
13              for identification.)
14   Q.  (BY MR. MONTGOMERY) All right.  So Exhibit 209 are the notes
15   you took during your conversation with Dr. DeAngeles?
16   A.  Correct.
17   Q.  Okay.  Would you look at the third page, Bates No. 092
18   Silverstein?
19   A.  Of 209?
20   Q.  Yes.
21   A.  Okay.
22   Q.  Do you see towards the top of the page where it starts,
23   "Wants new letter"?
24   A.  Yes.
25   Q.  All right.  Could you read that section all the way through

215

1    the middle that ends I believe, "Not want" --
2    A.  Erroneous or incomplete I think.
3    Q.  Okay.  Could you just read that into the record?
4    A.  I'm a doctor so my handwriting is unintelligible to me,
5    myself.  So I think she said, "Where is Fred?"  And then she
6    said, "I want a new letter on Fred's letterhead mentioning
7    both the clinical faculty at UW and a partner of Fraser &
8    Company," that's a company of which I was a partner.  "Two
9    issues."  I don't remember what 2G was.  I don't remember why
10   I used that abbreviation.  But one, "Did we have the 12-month
11   data at the time we submitted the paper and why we didn't
12   submit the 12-month data?"
13           And then she said Dr. -- that "Fred's reputation is
14   very good."  She doesn't want an article to be incomplete --
15   erroneous or incomplete.  So that's what you asked me to read
16   through.
17   Q.  Yep, that's fine.  Thank you.
18           MR. MONTGOMERY:  At this point I'd like
19   to ask the court reporter to mark what will be marked
20   Exhibit 210.
21              (Exhibit No. 210 marked
22              for identification.)
23   Q.  (BY MR. MONTGOMERY) Is Exhibit 210 a letter from
24   Dr. Lefkowith to you dated -- well, undated letter?
25   A.  Yeah, it's undated.

216

1            THE WITNESS:  Do you know the date of the
2    letter?  Did this come from me when I sent the whole clump of
3    stuff or do you know what the origin of it was?
4    Q.  (BY MR. MONTGOMERY)  According to the Bates number, it was
5    produced by you.
6    A.  Okay.  So I had this in my file and sent it to you, but I
7    don't know what the date is.
8    Q.  All right.  Do you see on the first page of Exhibit 210 the
9    third paragraph starting at, "Special communication"?
10   A.  Yes.  I don't know what year that was.
11   Q.  All right.  Let's look at the second page.  This is the
12   second page of Exhibit 210, Bates number ending 129.  Do you
13   see the third full paragraph or the third paragraph on the
14   page starting, "Recent commentaries"?
15   A.  Yes.
16   Q.  And it talks about the September 13th, 2000 edition of JAMA?
17   A.  Correct.
18   Q.  So does that lead you to believe it was after the publication
19   of the JAMA article?
20   A.  Yeah.  That, yes.  When, I don't know.
21   Q.  And do you have any idea why Dr. Lefkowith sent you this
22   letter?
23   A.  You know, I -- I looked at this.  I think it was a letter
24   that wasn't just sent to me.  It was sent to -- somewhere I
25   thought it said it was -- "Given your" -- on the first page,



ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

217

1    first paragraph, "Given your important role as a consultant
2    to Pharmacia, we would like to take this opportunity to
3    provide relevant data to you.  We regret any confusion that
4    may have arisen and hope this information will enable you to
5    more effectively respond to queries in your role as a
6    consultant."
7        And it's from Jim and I don't know when Jim died so
8    that would be one way to know it was obviously pre mortem.
9        Do you know when he died?
10   Q.  I don't.
11              THE WITNESS:  Anybody?  I don't know when
12   he died, so...
13   Q.  (BY MR. MONTGOMERY)  Let's take a look at the third page of
14   Exhibit 210, Bates No. Silverstein 00130.  And do you see in
15   the top paragraph there it refers to the advisory committee
16   meeting, February 7, 2001?
17   A.  Yes.
18   Q.  So do you take that to mean --
19   A.  Yes.  Sorry.
20   Q.  -- that the letter was written after that meeting?
21   A.  Yes.
22   Q.  Okay.  I'd like you to take a look at the tables that are
23   attached and my question to you is whether they contain any
24   information that you didn't already have after the advisory
25   committee meeting?

218

1    A.  Okay.  You know, I think that these reports were derived from
2    the NDA summary to the FDA, but I don't remember seeing -- I
3    think the issue was -- there was a question about the
4    cardiovascular safety, as a matter of fact that's in this,
5    the beginning of the paper, and that they then put together
6    tables about the cardiovascular safety.  So to answer your
7    question, the data was available; I'm not sure I saw it in
8    this form until I saw this.
9    Q.  All right.  Now, having gone through it, do you have any idea
10   why Dr. Lefkowith was sending you this information?
11   A.  That's the reason I would love to know what the date is,
12   because at the time of the FDA presentation and at the time
13   of my response to JAMA in August there was no indication or
14   signal that there was a problem with myocardial infarction,
15   stroke, clotting, et cetera.  And I know that somebody had
16   written an editorial, somebody from the Cleveland Clinic or
17   something had written an editorial about COX-2 inhibitors
18   saying, you know, maybe there's an increased risk and that it
19   was worse for Vioxx than it was for Celebrex.
20       I don't remember the timing of that, and I think that
21   this is to the -- yeah, I would suspect this was kind of late
22   at the end of 2001 or in the beginning of 2002 but I don't
23   know for sure.  I don't know.  Addressing whether we did know
24   or not that there was any risk, and what he's concluding from
25   the bottom of each of these slides, because it's a little

219

1    hard in this environment for me to pour over each one, is
2    that there was no difference between comparators for
3    thromboembolic events, et cetera.
4    Q.  All right.
5              MR. MONTGOMERY:  I'd like to ask the
6    court reporter to mark what will be Exhibit 211.
7              (Exhibit No. 211 marked
8              for identification.)
9    Q.  (BY MR. MONTGOMERY)  Exhibit 211, more handwritten notes by
10   you?
11   A.  Yes.
12   Q.  And do you know what these notes are about?
13   A.  Yes.
14   Q.  What are they about?
15   A.  The whole thing we've been talking about today.  But I felt,
16   and I didn't date it because it was to myself, this was not
17   something that I intended anybody else to read, but this
18   whole episode was upsetting to me and I felt I needed to
19   write down the rationale for several things that we've
20   discussed today and that's what this is.  Again, in the
21   interest of complete disclosure, I sent it to you guys even
22   though it was not something I intended.  I didn't destroy it.
23   I sent it to you.
24   Q.  Okay.  What prompted you to write this down?
25   A.  Nothing special, just me saying, I better -- you know, no

220

1    threat, no -- you know, nothing, just me saying, I think I
2    better write down what my thought process was in the process
3    of writing the response to the letters to the editor of JAMA.
4    I believe that's when I wrote it.
5    Q.  Okay.  So you think you wrote this during the process of
6    drafting your letter to JAMA --
7    A.  Yeah.
8    Q.  -- about the JAMA article?
9    A.  Yeah, I mean, for example, I wanted to remember that, you
10   know, if somebody asked me -- I didn't know that I'd be here
11   today, but if somebody asked me, Why wasn't the outcome as
12   clear -- look at No. 7 on the first page, Why wasn't the
13   outcome as clear as anticipated?  And there were several
14   unpredicted factors:  Aspirin use we talked about; fewer
15   patients as risk factors, we talked about; more patients
16   dropped out; and it looked like the complications virtually
17   stopped occurring, et cetera.  So in other words, it was to
18   codify and refresh my memory about my thoughts about the
19   CLASS trial.
20   Q.  Okay.  Would you look at the second page of your notes,
21   Exhibit 211?
22   A.  Sure.
23   Q.  Can you read into the record, please, the note at the bottom
24   of the page that says K something?
25   A.  Yes.



ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

221

1   Q. Do you see that?

2   A. Yes.

3   Q. Can you just read that into the record through the end of the

4      page?

5   A. Sure. "K, several consultants and others wanted to add a

6      section regarding timing of the first six months."

7         I don't know what that word is. Hold on a minute. It

8      was a rapid track and some confusion led to not including

9      this section. That was the best that I could remind myself

10     about why it wasn't included. I don't remember what --

11     regarding timing, I don't know what I meant there.

12  Q. All right. Do you understand that's a note to refer to the

13     section you talked about earlier that you wanted in --

14  A. Yes.

15  Q. Let me finish the question.

16  A. Okay.

17  Q. Do you understand this note to refer to the section you

18     talked about earlier wanting to include in the JAMA article

19     regarding the justification for only publishing six months?

20  A. Yes.

21  Q. Okay. Are you one of the consultants you're referring to in

22     that note?

23  A. Yes.

24  Q. Who are the other ones?

25  A. Don't remember.

222

1   Q. Okay. Having seen this do you think there are other

2      consultants that had that position?

3   A. These were notes for myself. Lying to myself would be

4      difficult. Yes, I do think so, yes. I think that Lee and

5      Faich, several of us wanted that section to be added.

6   Q. Okay.

7   A. But again, this is 10 years ago and -- but I wanted to write

8      this down for this very reason.

9   Q. Okay. And then the "other" that you're referring to there,

10     are those Pharmacia and Pfizer employees?

11  A. I would think so.

12  Q. And do you recall who any of those were?

13  A. No, but I remember Geis said, Yes, we want to put it in,

14     because that's how he responded to me. And then I don't know

15     about Verburg and Lefkowith because I never corresponded with

16     them directly about it back then.

17  Q. Okay. Would you look at the last page of Exhibit 211, Bates

18     number ending 127.

19  A. Yes.

20  Q. Do you see at the top near the top of the page it says, "Try

21     to" -- something?

22  A. Yes.

23  Q. Could you read that section --

24  A. Sure.

25  Q. -- through the cross hatching a little below it?

223

1   A. Okay. I don't see cross hatching.

2   Q. The lining --

3   A. Yes, okay. So it stops with -- no bias. There was no reason

4      for us to be unethical. Nobody owned stock, et cetera.

5   Q. Excuse me. You can of course explain whatever you want, but

6      can you just read it into the record first so we know what

7      your handwriting is and then you can expound if you want.

8   A. "Tried to get the section in about the six months, greater

9      than six months. It was a rapid track. There must have been

10     a miscommunication. In the letters to the editor we said it

11     would have been better."

12        And that in fact is what I said. In retrospect it

13     would have been better if we included a section explaining

14     that.

15  Q. Okay. Could you read the first of the page then?

16  A. "Having greater than six months did not change the

17     conclusion. The decision" -- "the decision to buy 30,000

18     reprints had nothing to do with the consultants. There was

19     no reason to be" -- I don't know what that -- inflammatory, I

20     don't know what that means. "And even if we made a mistake

21     it does not mean we were unethical. It could be it was" --

22     "it could be you can have an error and it's not intentional."

23            MR. MONTGOMERY: I'd like to ask the

24     court reporter to now mark what will be Exhibit 212.

25     ////

224

1            (Exhibit No. 212 marked

2            for identification.)

3            THE WITNESS: Okay.

4   Q. (BY MR. MONTGOMERY) Is Exhibit 212 another set of notes by

5      you?

6   A. Yes, it is.

7   Q. And do you know what prompted you to write these notes?

8   A. No, I don't.

9   Q. Okay. Do you see maybe a quarter of the way down the page on

10     the first page it starts, "We should"?

11  A. Yes.

12  Q. Could you read that through the end of the page, please.

13  A. Yes. "We should have let the reader and the editor know what

14     our process was. We were so focused on aspirin symptoms, et

15     cetera, et cetera, the issue of six months versus 12 months

16     got lost, was our fault. FS and others didn't see the need

17     to not only present the six months but also why not the

18     12 months. There was no data hidden as two to three months

19     later everything was discussed at the FDA. We were all proud

20     of the JAMA paper. We didn't see the six and 12-month

21     clearly or we would have shared with the reader and the

22     editor. Why not? Nothing was hidden. The FDA session had

23     both. What reason" -- I can't read that word -- "to hide it.

24     It wasn't hidden. But we didn't appreciate the importance of

25     sharing not just Y6 but also 12."



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                    September 29, 2010

225

1   Q. All right. And when you said FS, do you mean yourself?

2   A. I don't remember where I said FS.

3   Q. Okay. It should be right after "our fault" towards the top.

4   A. Let me look. Yes, me. I and others didn't see the need to

5   not only present the six-month, but why not the 12-month. I

6   think this was -- I think this was around the response to the

7   letters to the editor of JAMA.

8   Q. Okay. Didn't you in fact see the need to explain --

9   A. I did.

10  Q. -- that? So --

11  A. Yeah, I don't think --

12  Q. Let me ask the question and then you can answer it.

13  A. Okay.

14  Q. I mean I know it's just a note, but is that statement

15  regarding yourself and others accurate do you think regarding

16  your thoughts when you were working on the JAMA article?

17  A. You know, I think it was. I think that we didn't focus on

18  the importance of that. And I think this was in preparation

19  for the response because it has on the second page, We

20  acknowledge that, "in retrospect we would have avoided

21  confusion by explaining why we chose to prevent the six-month

22  analysis."

23        So in other words the providence of this I believe is

24  when I was starting to think and making notes about how we

25  would describe what happened, I don't remember how much of

226

1   this got into our actual response, but that we didn't -- we

2   didn't focus on the importance of that. The data after 12 --

3   after six months. We didn't hide anything because we're not

4   that crazy. I mean three months later every bit of

5   information is going to be aired in the most public of public

6   presentations, but we were so focused on the 500 other moving

7   parts of the study that the issue of the six months versus

8   the 12 months got relatively lost. And that's what I'm

9   saying that we -- it would have been better if we had.

10        Now, I did want to. I told you. What I told was

11  accurate that I called Geis and said, We got to get that in.

12  But I think this is addressing more how did it happen. And

13  we were so focused on the other 750 moving parts that the

14  12-month -- the six- and 12-month issue got lost.

15  Relatively.

16  Q. But it's your understanding -- well, strike that.

17        You told Dr. Geis that you wanted a section concerning

18  informative censoring in the paper; is that right?

19  A. Absolutely.

20        MR. WEISS: Object to the form of the

21  question.

22  Q. (BY MR. MONTGOMERY) Okay. And it's your understanding that

23  he then told Dr. Lefkowith to put that section in the paper;

24  is that right?

25  A. Well, I can't say it was about informative censoring. I

227

1   wanted him to put in a section about the fact that the study

2   went longer than six months and why we limited the data to

3   six months, it wasn't limited to just to informative

4   censoring. And my understanding was that he told

5   Dr. Lefkowith and then I don't know what happened.

6   Q. So do you actually know personally why it is that

7   Dr. Lefkowith didn't put in that information in the JAMA

8   manuscript?

9   A. No. And furthermore, I don't know that that's true. In

10  other words, you implied that he didn't put it in the JAMA

11  manuscript. Well, it's possible that he wrote it and he was

12  ready to send it and, boom, in the same afternoon here

13  arrives your reprints of the paper. So the part about the

14  fast communication is literally, they were moving very fast,

15  and you've seen it five or six times in my notes. Like here,

16  "JAMA fast track," it went fast. It moved very fast. So I

17  don't know that Jim decided not to do it. He may well have

18  decided to do it, but then boom, the thing arrived. It was

19  unpredictable. The author has no control over when the thing

20  is going to see the light of day.

21  Q. Okay. But you don't know either way how it is after you told

22  Dr. Geis that you wanted the section in that it didn't get

23  in?

24  A. Correct.

25        MR. MONTGOMERY: That's all I have for

228

1   now. Do you want to go off the record for a few minutes?

2        MR. WEISS: Yeah, let's go off the record

3   for a few minutes.

4        THE VIDEOGRAPHER: We are going off the

5   record. The time is 4:15 p.m.

6        (Recess 4:15-4:24.)

7        THE VIDEOGRAPHER: We are back on the

8   record. The time is 4:24 p.m. This is the beginning of Tape

9   No. 6.

10

11        EXAMINATION

12  BY MR. WEISS:

13  Q. Good afternoon, Dr. Silverstein. Can I ask you to pick up

14  Exhibit 211 which is part of your handwritten notes?

15  A. I have it.

16  Q. Okay. I'll ask you to turn to the second page of that

17  document which ends in the Bates Nos. 125.

18  A. I have that.

19  Q. And I will ask you to take a look at about the bottom third

20  of the page there's a No. 6. Do you see that?

21  A. I do.

22  Q. Okay. And could you read that section into the record,

23  please.

24  A. It's actually I think a G and it says --

25  Q. Oh, thank you.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                           September 29, 2010

229

1   A.  Okay.  The decision was made by the entire team to focus on
2       the first six months.  The paper was written by the entire
3       team.  Each consultant stated that -- each consultant
4       stated -- had made a statement about the conflict of interest
5       statement.  No consultant had any reason to mislead the
6       readers about the results.  The results were the same at six
7       months and the entire study, six months and the entire study.
8       Several consultants and others wanted to add a section
9       regarding the timing of the first six months.  The fact that
10      it was a rapid track, some confusion led to not including
11      this section.
12  Q.  Okay.  And the section that you just read, which is I guess
13      G, then you have H, I, and then there appears to be --
14  A.  A J and a K.
15  Q.  J, there we go, thank you.  And I think you just read, "No
16      consultant had any reason to mislead readers about the
17      results."
18          Do you still believe that's true?
19  A.  Absolutely.
20  Q.  Okay.  With respect to the employees of Searle and/or
21      Pharmacia who were co-authors of the JAMA article, do you
22      believe that they had any reason to mislead readers about the
23      results?
24          MR. MONTGOMERY:  Objection to form.
25          THE WITNESS:  No, I have no reason to

230

1       believe that.  I knew them.  As you heard me say, I had
2       worked with Steve Geis for 14 years and held him in the
3       highest esteem as a clinical investigator who was probably --
4       is probably one of the best clinical investigators I've ever
5       met.  And I was -- never even crossed my mind that there
6       would be any manipulation of any part of this nor did anybody
7       at any point tell me that something like that was necessary.
8   Q.  (BY MR. WEISS) After all that has transpired in the
9       aftermath of the publication of the JAMA article, has that
10      changed your opinion of Dr. Geis?
11  A.  No.
12          MR. MONTGOMERY:  Objection to form.
13          THE WITNESS:  No, it hasn't.
14  Q.  (BY MR. WEISS) I think you testified earlier about the extent
15      to which you trusted Dr. Geis.  Do you recall that testimony?
16  A.  I do.
17  Q.  And do you still trust him to the same extent today?
18  A.  I do.
19  Q.  I'll ask you to turn to the next page of Exhibit 211 and it
20      is Bates No. 00126, and could you read the top of that page
21      through about two-thirds of the way down.
22  A.  Yes.  "The feeling was we were off to the FDA in three months
23      and all the data would be presented in open forum.  People
24      who wrote the paper also were involved in the FDA panel."
25          And in fact I think almost all the authors were there

231

1       sitting in the side section at the FDA aside from the FDA
2       panel itself.
3           How could anybody say data was intentionally hidden
4       when four months later with an open forum, press,
5       competitors, et cetera, all to be discussed.
6           So we didn't want to hide -- nobody wanted to hide the
7       data and not wanted to have actions misinterpreted since the
8       data was soon to go public.  It makes no sense.
9   Q.  Okay.  Thank you.  Do you have an understanding of when --
10      well, strike that.
11          The advisory committee took place in February, correct?
12  A.  Correct.
13  Q.  And do you have an understanding of when the SNDA in
14      connection with that advisory committee hearing was submitted
15      to the FDA?
16  A.  Well, as far as I understand it, it was almost a year before.
17      It was in the year 2000, in March or something of 2000.  I
18      don't know exactly.
19  Q.  Do you have an understanding of the relationship between the
20      timing of the submission of the SNDA and the submission of
21      the JAMA manuscript to JAMA?
22  A.  I think the SNDA was submitted to the FDA first and then the
23      manuscript went to JAMA.  I think.
24  Q.  And do you have an understanding of the extent of the data
25      that was contained in the SNDA that was submitted to the FDA?

232

1   A.  Yeah, and I read it when Matt showed me the full text,
2       180,000 pages.  I mean this was a humongous deposit of
3       information.
4   Q.  And -- but in terms of the length of the data that was
5       submitted six months or 12 months, do you have an
6       understanding of what the SNDA contained in that regard?
7   A.  12 months.  It may have dealt with the issue about why they
8       thought six months was more valid because six months was the
9       way you would make the point that it seemed like this is
10      tracking on all the other studies that were done.  You know,
11      we flashed by several of these presentations, but in it
12      you'll see the other NSAIDs causing complications, causing
13      ulcers, et cetera.  That's all the data I was talking about,
14      I've been talking about all day, and the six-month data
15      really confirmed -- conformed much more closely to that,
16      especially -- especially if you include symptomatic ulcers.
17          So I think -- I don't know, I never read the whole NDA,
18      but I assumed they declared all the data and said, Look, we
19      want to focus on the first six months and I think Goldkind
20      came back and said, No, no, I don't want to do that, I want
21      to look at all the data.
22  Q.  Okay.  I'd like you to take a look at Exhibit 202 which is a
23      cover e-mail with slides that were presented by you at ACP.
24  A.  Is this -- this?
25  Q.  Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

233

1   A. I don't have the e-mail here anymore.  I have the slides.
2   Q. That's fine, I'm not going to ask you about the e-mail.
3        Before we dive into the document I think you testified
4   earlier in sum and in substance that you discussed with
5   representatives of Searle or Pharmacia that in connection
6   with your presentation you would explain the fact that the
7   study went longer than six months but for certain reasons you
8   decided to only look at six months of data.
9        Is that an accurate statement of your earlier
10  testimony?
11  A. It is, and I discussed it with Steve Geis and I don't
12  remember -- and Steve I think discussed it with Phil
13  Needleman who really was the spiritual head and literal head
14  of this whole effort.  And it was -- I said, I want to do
15  this, and Phil came by and he suggested that one way to
16  phrase it would be, The study lasted longer than six months
17  but the data after six months was very difficult to interpret
18  and therefore we decided to focus on the first six months of
19  this presentation.
20  Q. Was there any resistance on the part of either Dr. Geis or
21  Dr. Needleman to your presentation of those facts?
22  A. There was none.
23  Q. At any point in time did any representative of Searle or
24  Pharmacia discourage you or attempt to prohibit you from
25  disclosing the extent of the data or the results of the CLASS

234

1   study?
2   A. They did not.
3   Q. I'm going to ask you to take a look, going back to
4   Exhibit 202, at Side No. 12.
5   A. (Witness complies.)  Okay.
6   Q. And I'll ask you to take a look under the heading Design, the
7   second bullet says, "Minimum six months exposure."
8        Do you see that?
9   A. Yes.
10  Q. What would that -- well, strike that.
11       Would that indicate anything to somebody seeing this
12  presentation as to the extent of the data from the CLASS
13  trial?
14       MR. MONTGOMERY:  Objection to form.
15       THE WITNESS:  In fact, it would suggest
16  that the trial went longer than six months, and now that I'm
17  looking at that slide, I remember -- with the caveat of a
18  68-year-old brain thinking about something that happened
19  10 years ago -- that I may have said something like, you
20  know, that's what I said when I started that it was -- it
21  went longer than six months but we're focused on the six
22  months.
23  Q. (BY MR. WEISS) I'll ask you to take a look at Slide 14 and if
24  you could tell me what it is this Slide 14 describes.
25  A. So this is talking about the primary end point, What do we

235

1   consider to be an upper GI ulcer complication?  And that this
2   was designed prospectively.  It would be totally invalid if
3   we tried to design it in retrospect because then you could
4   say, C'mon, you know, you talked about the hematocrit being
5   seven percent points down after you looked at the data.  That
6   didn't happen.
7        This was all designed prospectively with the input of
8   me as an experienced clinical gastroenterologist and all the
9   other stuff you were forced to listen to about what I've done
10  over the last 30 years, and the other gastroenterologists.
11  Because in fact there is a great group of gastroenterologists
12  on this study.  Jay Goldstein.  Naurang Agrawal is one of the
13  nicest people in the whole world.  And we all put input.
14  Because it was this question of, What is significant?  And I
15  know for you folks it might be, Well, c'mon, is it GI?  No,
16  it's not that way, trust me.  It's very complicated to say
17  whether something is a significant bleed or not.  And you
18  don't want to include something that's not significant but
19  equally you don't want to exclude something that is
20  significant.  And so that's why we said it's got to be a
21  certain change in the hematocrit, a certain change in pulse
22  rate, a certain change in blood pressure to define that the
23  person was having a significant bleed.  This is one of the
24  most important parts of these studies and I believe that
25  every clinical trial that does it has to do that.

236

1   Q. Was this primary end point as described in Slide 14 the same
2   primary end point that is described in the study protocol?
3   A. Yes, I believe so.
4   Q. I'll ask you to take a look at Slide 20.
5   A. Okay.
6   Q. And I'll ask you to take a look at the first set of bar
7   graphs which are labeled Complications.  Do you see that?
8   A. I do.
9   Q. What does that reflect?
10  A. What it said was that -- I'm color-blind but in this
11  particular instance I don't think there are any colors here.
12  These are vacant bars, a pet peeve of mine.  But anyway, it
13  says that when you looked at complications which I defined
14  earlier, that there were about .7 percent complications on
15  the celecoxib and about 1.4 percent complications on the
16  comparator NSAIDs, but that was not statistically
17  significantly different.
18       And here you get into a whole consideration of, What do
19  you mean by statistically significantly different?  And it is
20  not so easy.  You know, if you want to be sure, make it .01,
21  but .01 maybe you need 16,000 patients.  If you want to make
22  it .1 instead of .05, maybe you can get by with 2,000
23  patients, but it means that one time in 10 you're going to
24  draw a conclusion that something's significant and it's not.
25  That's the whole nature.  I should't lecture about



ESQUIRE
an Alexander Gallo Company

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                September 29, 2010

237

1    statistics as I told you several times today, but it's not
2    that easy.  And it could be one or two more patients and it
3    wouldn't have been .09.  I never did that calculation because
4    nobody wants to hear that.  It's the kind of thing people
5    don't like to listen to.  Yeah, right.  But if it were one or
6    two more patients it might have been .04.  That's the problem
7    with an event that's so rare.
8    Q.  Okay.  Could you turn to Slide 33?
9    A.  (Witness complies.)
10   Q.  And I'll ask you to take a look at the middle column which is
11   diclofenac and the last line of the -- the last row reads
12   withdrawals and there is a number there, 16.6 with a star
13   next to it.  Do you see that?
14   A.  I do.
15   Q.  What does that reflect?
16   A.  That means that there were significantly -- at a .05 P value
17   significantly more withdrawals for the diclofenac group than
18   from the celecoxib group.
19   Q.  Is that fact related to the informative censoring theory?
20   A.  I think it is.
21   Q.  And in presenting this slide was there any discussion about
22   this withdrawal rate influencing or impacting the study
23   results?
24   A.  I don't remember.  That's a fair question.  In other words,
25   when I -- this is -- what we're looking at, this is my

238

1    presentation that I made to the ACP, right?
2    Q.  Yes.
3    A.  So the question is when I said that -- you know, I don't
4    remember.  It would have been a logical place to say, Hey,
5    this is part of what confused it, but I don't remember if I
6    said it or not.
7    Q.  And the star -- I'm sorry if you said this already, but the
8    star next to the 16.6 indicates what?
9    A.  That the P value is less than or equal to .05 versus
10   celecoxib.
11   Q.  So that the difference in the withdrawals between the two
12   groups --
13   A.  Were clinical -- were statistically significant.
14   Q.  Now --
15   A.  You know, just if I may, one comment?
16   Q.  Sure.
17   A.  Joan actually clarified my thinking about some of this.  What
18   we went through was, What happened?  You know, what happened?
19   And it was that's what happened.  You know, we were looking
20   at the data and saying, you know, it went along just the way
21   we would have sort of predicted it would go and then it got
22   funny and that's when the fact that so many more people had
23   withdrawn from the diclofenac group, it was like that looks
24   like something is changing in that group.  And that was the
25   genesis of the consideration of informative censoring or part

239

1    of it.
2    Q.  I'm going to ask you to go back to Slide 31.
3    A.  (Witness complies.)
4    Q.  And at the bottom of the slide above the line, the P value of
5    0.05, it says, "versus celecoxib/median exposure nine
6    months."
7        Do you see that?
8    A.  I do.
9    Q.  Would that indicate anything to somebody seeing or listening
10   to this presentation about the extent of the data from the
11   CLASS study?
12       MR. MONTGOMERY:  Object to form.
13       THE WITNESS:  I think it would.  I mean I
14   think it suggests that this wasn't a six-month study, it went
15   longer, which is consistent with what I clearly said at the
16   beginning of the presentation.  And there was no attempt to
17   hide anything.  I mean there it was.
18   Q.  (BY MR. WEISS)  And then when you were discussing these slides
19   with Mr. Montgomery earlier there was some discussion about
20   who prepared these slides or this slide in particular.  Do
21   you recall that?
22   A.  Yes.  It was prepared by -- by the company, because I didn't
23   have the data to do it; however, the talk -- and already it's
24   probably enough to make you sick to your stomach -- the talk
25   you can see is my talk because this is the stuff that I

240

1    felt -- you know, my slides are -- I'm a very, very, very
2    experienced lecturer and my slides look like that.  I mean
3    they look like that.  They don't have -- they're not covered
4    with data the way some people are where you have to sit back
5    and go, Oh, crap, is this person going to read them?  Are
6    they going to look at them?  Am I going to read them?  Mine
7    are straightforward.  This is the presentation that I worked
8    on for years with how to look at this.  So here's the data
9    about also complications with NSAIDs, and then the COX-2,
10   some of the data that it's better than Naproxen, et cetera.
11   Q.  But prior to presenting these slides you reviewed them?
12   A.  I believe I did.
13   Q.  And you approved --
14   A.  Yes.
15   Q.  -- using them?
16   A.  I did.
17   Q.  I think we can put 202 away.
18       I'd like to take a look at Exhibit 199 which is the
19   e-mail containing the pink sheet article.
20   A.  Okay.  Okay.
21   Q.  And Mr. Montgomery pointed you to a paragraph at the bottom
22   of the page which begins, "Data from the first six months of
23   the trial were used for the head-to-head comparison of
24   NSAIDs," et cetera, et cetera.
25       And I think your testimony was you weren't sure whether



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

241

1    or not that was something that you specifically -- well,
2    strike that.
3        I think you said that you don't recall whether what is
4    reflected here was something you actually said; is that fair?
5    A. That is correct.
6    Q. Okay. Now, notwithstanding whether or not you used these
7    actual words that are here in this article, is what is
8    reflected here about the use of the first six months of data
9    from the trial for analysis consistent with your recollection
10   of the presentation that you gave?
11   A. So, I'm sorry. You're saying that this came after I
12   presented to the ACP?
13   Q. Well, let's just take a step back. Do you see up at the top
14   that this is dated April 24, 2000?
15   A. Right, right.
16   Q. Okay. And do you recall that the presentation that was at
17   ACP took place on or about April 15th or --
18   A. Okay.
19   Q. Okay. So does that suggest to you that this came out -- that
20   this article was published after your presentation?
21   A. Yes.
22   Q. And does it suggest to you that this article was informed by
23   your presentation?
24   A. This article was informed -- yes, I would think so.
25   Q. Okay. Now, again looking at this paragraph which reads,

242

1    "Data from the first six months of the trial were used for
2    the head-to-head comparison of NSAIDs," my question is: Even
3    assuming that you didn't use those exact words in your
4    presentation, is what is reflected here consistent with your
5    recollection of what you said in substance about the use of
6    six months of data?
7        MR. MONTGOMERY: Object to form.
8        THE WITNESS: It is possible that I said
9    that but not -- but not only that. That's the part, you
10   know -- I might have said everybody had to be on this -- the
11   drugs for six months, therefore six months was a reasonable
12   place to do an analysis. But I -- you know, this is a
13   summary of what I said, it's not a quote. And I would assume
14   I said there were other factors that led us to believe that
15   the six-month was better data than the data after six months,
16   including informed.
17   Q. (BY MR. WEISS) Let's just focus on the first part of the
18   sentence which states that, "Data from the first six months
19   of the trial were used for the head-to-head comparison of
20   NSAIDs."
21   A. Okay.
22   Q. Is that consistent with your recollection of what you said in
23   substance in your presentation?
24   A. Yes, it's just not -- I'm sorry; it's just not complete.
25   Q. Okay. No, that's fair.

243

1    A. It's as if I felt like there was three reasons and here's one
2    of them and then the person didn't put the other two down, if
3    I said that.
4    Q. Okay. Now, I'd like you to take a look at the JAMA article
5    which has previously been marked as Wolfe Exhibit 3.
6    A. I don't know where that is. I've got the editorial. I got
7    it. Okay. Here we are.
8    Q. And so, Dr. Silverstein, in your view is there anything in
9    the JAMA article which discloses the fact that there is more
10   than 13 months of data from the CLASS study -- I'm sorry.
11   Strike that.
12       In your review is there anything in the JAMA article
13   which reflects the fact that there's more than six months of
14   data from the CLASS study?
15   A. Yeah. I mean in the study protocol it says, "Patients were
16   provided an opportunity to complete a minimum of six months
17   of treatment but could go longer than that."
18   Q. Okay.
19   A. And I think it says four, 13 and 26 weeks, which would be six
20   months, right? Half a year. And then every 13 weeks
21   thereafter, also addressing the fact that the study went
22   longer than six months.
23   Q. Okay. Are you referring to --
24   A. I'm sorry.
25   Q. -- Bates No. 78879 under the heading in the column of the

244

1    middle of the page labeled Study Protocol?
2    A. Yes.
3    Q. And that reads, "After baseline visit, follow up clinic
4    visits took place at Weeks 4, 13 and 26 after the initial
5    dose of medication and every 13 weeks thereafter"?
6        That's what you were referring to?
7    A. That's correct. And then it says patients were provided an
8    opportunity to complete a minimum of six weeks of
9    treatment -- six weeks.
10   Q. Now, based on various of the things that we've just looked
11   at, is it your belief or understanding that at the time that
12   the JAMA article was submitted for publication, the fact that
13   there was more than six months of data from the CLASS trial
14   had been publicly disclosed?
15       MR. MONTGOMERY: Object to form.
16       THE WITNESS: Well, it certainly had
17   been -- it certainly had been submitted to the FDA so the FDA
18   knew about that. I don't -- can you tell me when the article
19   was submitted, when the manuscript was submitted?
20   Q. (BY MR. WEISS) I'll represent to you it was submitted in mid
21   June of 2000.
22   A. So it was a month or two after my ACP presentation where I
23   said it?
24   Q. That's my understanding.
25   A. And so I guess -- I guess it was what I said at the American



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

245

1   College of Physicians that the study went longer, so to that
2   audience I said that the study went longer than six months.
3   The FDA knew it went longer than six months.  I don't know
4   other potential venues where that would have come up.
5   Q.  Well, was there -- to your knowledge was there news coverage
6   of the presentation at the American College of Physicians?
7         MR. MONTGOMERY:  Object to form.
8         THE WITNESS:  I gathered that that's what
9   we were looking at with the pink slips or the pink sheet or
10  whatever it is, slips.
11  Q.  (BY MR. WEISS)  Did the fact that the -- did the fact that
12  there was more than six months of data -- well, strike that.
13        Did the fact that that more than six months of data was
14  available from the CLASS -- well, strike that.  That's a
15  difficult question to ask.  It's much easier to lead them
16  but --
17        Did the fact that it was publicly disclosed that more
18  than six months of data was available from the CLASS study --
19  well, strike that.  I'm going to have to formulate that
20  better.  I'll move on and come back to it.
21        Earlier there was some discussion and some testimony
22  about your view that you would have preferred that the JAMA
23  article included a section discussing the six-month issue; is
24  that accurate?
25  A.  Yes, it is.

246

1   Q.  Now, when the article came out and was published and you saw
2   it for the first time, as you testified, that that section
3   didn't make it into the final version of the article, you
4   didn't make any attempt to retract the article or correct the
5   article at that point in time?
6   A.  I did not.
7   Q.  Okay.  Was that due in part to your understanding that the
8   existence of more than six months of data had been publicly
9   disclosed prior to the submission of the JAMA article to
10  JAMA?
11        MR. MONTGOMERY:  Object to form.
12        THE WITNESS:  To JAMA?
13  Q.  (BY MR. WEISS)  Yes.
14  A.  Yes.  At least it appeared from what I was told that the
15  JAMA -- one of the JAMA editors knew that there was more data
16  and didn't say, Wait a second, hold it, let's hold
17  publication until we clarify this issue.  So it was one of
18  the factors that the FDA having said publicly at the ACP that
19  the study went for longer than six months, the fact that I
20  still thought that the six-month data was the better data
21  were the factors I guess that went through my mind.
22  Q.  Now, I think you testified earlier that you don't have a
23  complete understanding of the term "informative censoring" or
24  that you're not all that comfortable with it.  Do you recall
25  that?

247

1   A.  I do.
2   Q.  Okay.  And notwithstanding that testimony, did you fully
3   understand the basis for the decision to publish only six
4   months of data way back in June of 2000?
5   A.  Yes, I think so.
6   Q.  Do you have -- do you understand that in this lawsuit the
7   plaintiffs are alleging that the defendants defrauded the
8   investing public?
9   A.  That's what I understand.
10  Q.  And do you understand that they claim that part of that fraud
11  was the JAMA article of which you were the primary author?
12  A.  I do.
13  Q.  Do you have any reaction to those allegations?
14  A.  Well, maybe two parts.  One is would I have done that and the
15  answer is absolutely no, not, never would I have done that.
16  There was no reason for me to do it.  It made no sense at all
17  why I would be involved in defrauding anybody.  I have never
18  owned a stock -- a share share of Pfizer, Pharmacia or
19  Searle.  I don't know even know if they still exist or are
20  they all part of Pfizer?  Literally.  If I have a mutual
21  fund, which I have two, which has 2700 companies, perhaps one
22  is Pfizer.  I never looked at that.
23        I never looked at the Pfizer share price.  I don't know
24  what happened to the Pfizer share price.  You know, with this
25  kerfuffle, you know, that is the basis of the lawsuit.  So

248

1   from a personal standpoint I just had absolutely no reason to
2   do that.  It just -- and that's what I told Cathy DeAngeles
3   and she said, Yeah, why would you do that?  And second of
4   all, the second part was asking me if anybody from the
5   company -- and what were you asking about that?
6   Q.  Well, I guess the same question with respect to the company
7   authors, which is -- you said you had two reactions?
8   A.  Yes.  That was to that.  But first I wanted to deal with
9   whether I would do it.  The second reaction is whether they
10  would do it and I had absolutely no indication that they
11  would do that.  Not from Needleman, who is respected as a
12  first class scientist, you know, I won't even -- well, maybe
13  I will.  I mean the talk was he's going to win a Nobel prize
14  for this COX-2 stuff.  I mean that's what the talk was, not
15  that something was going on that would be embarrassing.
16        Geis is a first rate clinical investigator.  Verburg is
17  a smart, good investigator.  Jim Lefkowith was a great
18  investigator.  Aimee Burr, I mean that whole group, and I
19  never once saw any indication that anybody was attempting to
20  manipulate stock prices or anything like that.  I -- I had no
21  experience seeing that at all, ever.
22  Q.  Have you read the editorial that was published in the British
23  Medical Journal in June of 2002 by Peter Juni, Paul Dieppe
24  and Anne Rutjes?
25  A.  Uh-huh.  (Witness nods head up and down.)



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

249

1    Q.  And do you have an understanding of the criticisms that they
2        offered of the JAMA article?
3    A.  Uh-huh.  (Witness nods head up and down.)
4    Q.  What do you understand those criticisms to be, generally?
5    A.  Well, I got so annoyed when I read it that I don't exactly
6        remember specifically what happened.  What I felt was here
7        were two fellows in rheumatology, which means they are two or
8        three years out of medical school, two of them, and this
9        other person that I didn't know at all, going off on dredging
10       data, ethical misconduct.  I mean I didn't think there was a
11       basis for any of this.  And I don't know anything about Juni,
12       but I was looking after GI bleeders when these two fellows
13       weren't born.  Literally.  I was taking care of GI bleeders
14       and using lasers and using heater probes in 1972 and I'll bet
15       they were just in the birthing process or were a few years
16       old.  And it really bothered me.  It didn't bother me back
17       then because I was sort of in the, you know, Here it goes,
18       here's another group.  But when I read it recently it was
19       like, I can't believe that they said that.  I mean there were
20       no grounds on which to make those accusations.
21            And a metaanalysis?  I mean I have done this research
22       with my hands.  I am an animal lover and I have sacrificed a
23       lot of animals to try to get real data about what happens to
24       bleeding and how you can stop bleeding.  So I'm talking about
25       really being involved in this.  I looked at every one of

250

1        these complications in the mucosa trial.  Every single
2        patient I reviewed, every one to be sure that they
3        adjudicated to be clear.  I was very much involved in the
4        adjudication here, and for somebody to sit back and say, This
5        is terrible, you know, these people didn't do a good job at
6        all and what we need is a good metaanalysis which means a
7        gamish of stuff thrown into a pot, you know, none of which is
8        comparable to anything else.  So I didn't respond really
9        positively to that.
10   Q.  Okay.  And earlier when you were talking with Mr. Montgomery
11       about the intentional inclusion of another section in the
12       JAMA article and you said that you thought that you could
13       have avoided some confusion by including that section, do you
14       think that the failure to include that section renders the
15       JAMA article fraudulently misleading?
16   A.  No.
17            MR. MONTGOMERY:  Object to form.
18            THE WITNESS:  You know, I don't think so.
19       As a matter of fact, I think had that section been in there
20       so people would understand how we did it, the article stands
21       on its own.  I mean it's a huge amount of data, of
22       interesting data about what happened to these people.  And
23       the thought that it was all undone by the exclusion of that
24       paragraph, you know, is enough to make me nauseated.  This
25       was a huge -- I mean I -- you know, I know I've said it five

251

1        or six times today but I mean what I'm saying.  The amount of
2        data and the amount of work that goes into these trials, just
3        the patient effort, just the patients who say, Yes, I'll be
4        willing to go into a placebo control trial, or, I'm willing
5        to take this new medication and have a comparison to these
6        other medications; the amount of work that the patients do is
7        immense.
8             And no, I don't think that the whole study was negated
9        and I think in fact that the study is positive.  I think -- I
10       think it's positive and fits into the -- and perhaps I'm
11       guilty of seeing what I think it should be and then seeing
12       that it is that.  But I think the data -- you know, you look
13       at these things like this (indicating) and you can say
14       it's .09.  Well, maybe if it was this it would be .03.  I
15       mean it's -- sometimes just one or two cases will change
16       that.  And again, when you're dealing with a problem so
17       big -- this is why I started out today talking about how you
18       could find surrogate markers.  It sounded like esoteric
19       nonsense from an academic airhead perhaps, but it's not.  It
20       is the essence of how you design these trials.
21            It is extremely difficult -- 8,000 patients.  I mean
22       imagine how much effort and cost goes into that.  And do you
23       know who's going to pay for it?  Nobody's going to pay for it
24       but the pharmaceutical industry, because under any government
25       they're not going to come up with enough money to pay for

252

1        these trials.  And furthermore, how do you find out, Well,
2        maybe we shouldn't have used that same dose of celecoxib,
3        let's go at a half dose?  How are you going to do that?  Are
4        you going to go do another 8,000 patient trial?  And then
5        that's the whole reason for doing the surrogate trials where
6        you say, Hey, no ulcer, no complicated ulcer.
7             Now, I mean the FDA -- I told you -- I think the FDA is
8        a great organization and I don't criticize them.  I think
9        they have the same problems everybody has, you know, trying
10       to figure out what the best thing to do is.  And they toed
11       the line on saying, No, if you want to say there's less
12       bleeding, you prove there's less bleeding.  But the
13       problem -- if I were a statistician I could more eloquently
14       explain that when you're dealing with these huge number of
15       patients and the incidence of the event is so small, just a
16       few one way or the other changes -- changes this
17       magical .05 -- which I don't think is magical anyway.
18            You talk to most statisticians and they'll tell you if
19       the difference is significant you don't need P values.  Just
20       look at it and you'll say, Yeah, I buy that.  It went from .7
21       to 1.5, that's good for me.  So if with an incidence of
22       one percent, you go from 1.5 to .75, I'll accept that.  The
23       more formal people will say, Well, you got to give this .05
24       mathematical consideration of that.  Fine.  But I know some
25       wonderful statisticians who say if it's really significant



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

253

1    you don't need statistics, you don't need P values.  You look
2    at it and it tells you what's happening.
3        I'm not proposing that that's the way this study should
4    have been done.  I'm just telling you that it's not simple.
5    And the multiple look issue hasn't come up, you know, where
6    you take multiple looks.  You've got to get more stringent in
7    your P value because every time you take a look there's a one
8    in 20 chance that it's going to look significant and it's
9    not.  So the next time you look -- every time you look you're
10   increasing the likelihood of a false interpretation.  You've
11   got to make the P value more stringent.
12   Q.  (BY MR. WEISS) Do you have an understanding in the context of
13   ulcer complications what are sentinel symptoms?
14   A.  I have to go back.  There are sentinel findings on endoscopy
15   which -- I don't remember how the word "sentinel" was used.
16   I remember I've heard it, it's just like CSUGIEs is one of
17   the words that I've never used.  CSUGIEs I don't think helps
18   anybody understand what's going on.  And I don't think
19   sentinel symptoms make a lot of sense to me.
20       There are findings at endoscopy, you can look at an
21   ulcer and say, This is a problem ulcer.  If the ulcer has a
22   protruding vessel, if it has a clot attached or if it's
23   actively bleeding, the odds of that ulcer being a problem
24   clinically for the patient are much higher than just a single
25   ulcer sitting there.  But I don't remember -- you can refresh

254

1    my memory, I don't remember how people used sentinel
2    symptoms.
3    Q.  Sure.  Well, in the context of the debate about whether a
4    symptom -- GI adverse -- GI symptoms correlate to ulcer
5    complications, is there some debate around the time period by
6    which symptoms precede an ulcer complication in order to be
7    supportive of that correlation?
8        MR. MONTGOMERY:  Object to form.
9        THE WITNESS:  Well, the study that I did
10   looked at 30 days before or 24 hours before.  24 hours before
11   when somebody's presenting vomiting blood you can find out
12   what color their socks are.  I mean stuff is going on so fast
13   and so furiously, you're trying to save the patient's life.
14   Looking back 30 days when the person is stable, if you can
15   stabilize them, they can answer that question.  I think you
16   might say, Are there some symptoms that are worse than
17   others?  Oh, clearly there are.  I mean it depends on a
18   symptom.  Is it a symptom if you vomit blood?  Is it a
19   symptom if you have black tarry stools?  Is it a symptom if
20   you have penetrating pain here and it goes through to your
21   back?
22       And then there's nausea.  Nausea is much less specific.
23   Nausea can occur for a variety of reasons.  But somebody
24   vomits blood or somebody has what we call a coffee ground
25   emesis where somebody has black stools or red stools, you

255

1    know, these are signs and symptoms that are much more
2    worrisome.
3    Q.  (BY MR. WEISS) Do you have a recollection that in his review
4    Dr. Goldkind suggested that the class data didn't demonstrate
5    a correlation between symptomatic ulcers and ulcer
6    complications because in the cases of ulcer complications
7    where the patients were symptomatic, those symptoms occurred
8    too close in time to discovery of the ulcer complication such
9    that his conclusion was the symptoms were actually the result
10   of the complication, they didn't precede the complication?
11   A.  Yeah, I don't remember that --
12       MR. MONTGOMERY:  Object to form.
13       THE WITNESS:  -- I don't remember that
14   discussion.
15       MR. WEISS:  Okay.  I have no further --
16       THE WITNESS:  Not a bad thought but I
17   don't remember that conversation.
18       MR. WEISS:  I have no further questions.
19   Thank you very much, Dr. Silverstein.
20       MR. MONTGOMERY:  Okay.  I just have
21   probably some, three more.
22
23       FURTHER EXAMINATION
24   BY MR. MONTGOMERY:
25   Q.  Can you turn to your notes again, Exhibit 211.

256

1    A.  Okay.  (Witness complies.)  Yes.
2    Q.  On the second page of Exhibit 211 --
3    A.  Right.
4    Q.  -- which is Silverstein 00125 Bates No.
5    A.  Yes.
6    Q.  Do you see Item K at the bottom there?
7    A.  Yes.
8    Q.  And it talks about consultants in that note, do you recall
9    that?
10   A.  Yes.
11   Q.  And do you understand the consultants there to be your
12   co-authors on the JAMA paper who were not employees of
13   Pharmacia?
14   A.  Correct.
15   Q.  Okay.  Would you look at Exhibit 67 again.  That's the press
16   release dated April 17th, 2000.
17   A.  Press release.  This one?
18   Q.  Yes.
19   A.  Okay.
20   Q.  When we were -- when I had you read through that press
21   release earlier did you make some handwritten notes on the --
22   A.  I did.
23   Q.  Are there any handwritten notes on there other than the ones
24   you made?
25   A.  No, I just went through and circled a couple of things and



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

Fred Silverstein                                    September 29, 2010

257

1  there are no handwritten notes.

2  Q. Can I take a look at what you wrote down?

3  A. Let me look first.

4  Q. Sure.

5  A. (Witness reviewing document.) Yes.

6  Q. Okay.

7          MR. MONTGOMERY: Josh, do you want to

8  look at it?

9          MR. WEISS: No.

10 Q. (BY MR. MONTGOMERY) Okay. Do you recall your discussion with

11 Mr. Weiss about the BMJ editorial?

12 A. Uh-huh.

13 Q. You have to respond.

14 A. Yes.

15 Q. And I take it that you -- from your discussion that you were

16 not entirely pleased with the content of that editorial?

17 A. That's correct.

18 Q. And did you read it at the time that it came out?

19 A. I don't remember.

20 Q. Okay. Did you write any public response to that editorial?

21 A. I did not.

22 Q. And why not?

23 A. Well, two possibilities: One is -- three -- that I didn't

24 read it and there was so much flying around that I just, you

25 know, it was just another set of comments. I did read some

258

1  of the lay press and I read some of the other medical

2  comments. I don't remember that -- this one specifically.

3  And why not? There's a certain degree of when you're playing

4  in the mud, you know, you're going to get covered with mud

5  too. I don't operate by insulting somebody. I did here

6  but -- and I apologize, but I don't operate in that kind

7  of -- you know, I might fantasize about giving him a call and

8  saying, Hey, you know, what was the basis of this? And, Was

9  that really fair? And, you know, Should you retract that

10 because that's -- but I didn't do it. That isn't the way I

11 operate, Matt.

12 Q. Okay.

13         MR. MONTGOMERY: Let's go off the record.

14         THE VIDEOGRAPHER: We are going off the

15 record. The time is 5:07 p.m.

16         (Recess 5:07-5:09.)

17         THE VIDEOGRAPHER: Okay. We are back on

18 the record. The time is 5:09 p.m.

19         MR. MONTGOMERY: Dr. Silverstein, I don't

20 have any further questions for you. I'd like to thank you

21 for appearing here today. Thank you for your time and your

22 candor and we're going to end the deposition now. Thank you.

23 Off the record.

24         THE WITNESS: Thank you very much.

25 Thanks for all of you.

259

1          THE VIDEOGRAPHER: Going off the record.

2  The time is 5:09 p.m. This is the end of Tape No. 6.

3          (Signature reserved.)

4          (Deposition concluded at 5:09 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

260

1  STATE OF WASHINGTON )
                       ) ss
2  County of Snohomish )
       I, the undersigned Washington Certified Court
3  Reporter, pursuant to RCW 5.28.010 authorized to
   Administer oaths and affirmations in and for the State of
4  Washington, do hereby certify:

5       That the annexed and foregoing deposition of FRED
6  SILVERSTEIN, M.D. was taken before me and completed on
   September 29, 2010, and thereafter was transcribed under my
7  direction;
        I further certify that according to CR 30 (e) the
8  witness was given the opportunity to examine, read and sign
   the deposition after the same was transcribed, unless
9  indicated in the record that the review was waived;

10      I further certify that I am not a relative or employee
   of any such attorney or counsel, and that I am not
11 financially interested in the said action or the outcome
   thereof;
12      I further certify that the witness before examination
13 was by me duly sworn to testify the truth, the whole truth
   and nothing but the truth;
14      I further certify that the deposition, as transcribed,
15 is a full, true and correct transcript of the testimony,
   including questions and answers, and all objections, motions
16 and exceptions of counsel made and taken at the time of the
   foregoing examination and was prepared pursuant to Washington
17 Administrative Code 308-14-135, the transcript preparation
   format guideline;
18      I further certify that I am herewith securely sealing
19 the said deposition and promptly delivering the same to
   Attorney MATTHEW MONTGOMERY.
20      IN WITNESS WHEREOF, I have hereunto set my hand this
21 6th day of October, 2010.

22

23  _____
24  Connie Recob, Certified Court Reporter No. 2631
    in and for the State of Washington,
25       residing at Stanwood, Washington.
    My CCR certification expires 4/8/11.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Fred Silverstein                                    September 29, 2010

261

1         DEPOSITION ERRATA SHEET

2

3    Our Assignment No.  Seattle 16128/San Diego 335512

4    Case Caption:  ALASKA ELECTRICAL PENSION FUND vs. PHARMACIA

5

6         DECLARATION UNDER PENALTY OF PERJURY

7

8         I declare under penalty of perjury

9         that I have read the entire transcript of

10        my Deposition taken in the captioned matter

11        or the same has been read to me, and

12        the same is true and accurate, save and

13        except for changes and/or corrections, if

14        any, as indicated by me on the DEPOSITION

15        ERRATA SHEET hereof, with the understanding

16        that I offer these changes as if still under oath.

17

18        Signed on the _____ day of _____, 2010.

19

20        _____

21

22        FRED SILVERSTEIN, M.D.

23

24

25

263

1         DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24        SIGNATURE:_____DATE:_____

25        FRED SILVERSTEIN, M.D.

262

1         DEPOSITION ERRATA SHEET

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24        SIGNATURE:_____DATE:_____

25        FRED SILVERSTEIN, M.D.



Toll Free: 800.300.1214
Facsimile: 619.239.4117

Suite 1600
402 West Broadway
San Diego, CA 92101
www.esquiresolutions.com