EXHIBIT 156

▨▨▨ EDITORIALS

Editorials represent the opinions of the authors and THE JOURNAL and not those of the American Medical Association.

EXHIBIT: 4
M Michael Wolfe
DATE: 12-8-04
RPTR: LAURIE J. DRIGGERS

# COX-2–Selective NSAIDs
## New and Improved?

David R. Lichtenstein, MD

M. Michael Wolfe, MD

GASTROINTESTINAL (GI) TOXICITY INDUCED BY NON-steroidal anti-inflammatory drugs (NSAIDs) is among the most common serious adverse drug events in the industrialized world. Gastroduodenal ulcers can be demonstrated by endoscopy in 10% to 20% of patients who take NSAIDs on a regular basis, and the annual incidence of clinically important GI complications approaches 2%.[1] The impact of NSAIDs on public health is significant and has provided the impetus to search for safer but equally effective anti-inflammatory agents.

Damage to the gastroduodenal mucosa associated with use of NSAIDs occurs as a result of both the topical and systemic properties attributed to these agents.[1] The latter appears to play the predominant role, largely through decreased synthesis of mucosal prostaglandins. These compounds are ubiquitous 20-carbon molecules that are derived from the catalytic conversion of arachidonic acid via the cyclooxygenase (COX) pathway. More than a decade has elapsed since 2 related but unique COX isoforms were discovered, each encoded by a separate gene and exhibiting a discrete pattern of tissue-specific expression. COX-1 is predominantly expressed constitutively and functions as a physiologic "housekeeping" enzyme in most tissues, including the gastric mucosa, the kidneys, and platelets.[2] COX-2 expression, especially in macrophages and synovial cells, is induced by inflammation and mitogen stimulation,[3] and it has been proposed that the anti-inflammatory properties of NSAIDs are mediated through COX-2 inhibition, whereas adverse effects occur as a result of their effects on COX-1.

Traditional NSAIDs differ in their relative inhibitory potency against COX-1 and COX-2. The important role of COX-1 in protecting the gastroduodenal mucosa is supported by studies showing that the greatest degree of damage is generally caused by NSAIDs that preferentially inhibit COX-1. Although the definition and methods for assessing selectivity continue to be controversial, the World Health Organization has categorized COX-2–selective drugs as a new subclass of NSAIDs (coxibs). The 2 coxibs currently available, rofecoxib and celecoxib, maintain their anti-inflammatory properties while preserving the biosynthesis of protective COX-1–derived prostaglandins. Although rofecoxib is the more selective of the 2,[4] both agents appear to be as effective as nonselective NSAIDs in suppressing inflammation and providing analgesia, while reducing the incidence of endoscopic ulcers to levels similar to those seen with placebo.[5-7]

Previous studies examining the prostaglandin $E_1$ analog misoprostol have suggested a correlation between endoscopic ulcers and clinical outcomes.[8] However, it is imperative that a decrease in the clinically evident ulcer complications termed POBs (perforation, gastric outlet obstruction, and bleeding) likewise be demonstrated prior to establishing the safety of these new NSAIDs. In this issue of THE JOURNAL, Silverstein et al[9] report the results of a 6-month randomized, double-blind, controlled trial comparing the ulcerogenic potential and upper GI toxicity of celecoxib in individuals with osteoarthritis (OA) or rheumatoid arthritis (RA). The study involved 7968 patients who were randomly assigned to receive 400 mg of celecoxib twice per day (2 and 4 times the maximum RA and OA dosages approved for labeling by the US Food and Drug Administration, respectively); ibuprofen, 800 mg 3 times per day; or diclofenac, 75 mg twice per day. Baseline characteristics of the treatment groups were similar with regard to risk factors previously shown to predispose individuals to ulcer complications, including age, primary rheumatologic disorder, prior history of GI bleeding or ulcer, Helicobacter pylori infection, tobacco or alcohol use, and concurrent use of aspirin, corticosteroids, or anticoagulants.

The authors conclude that celecoxib at supratherapeutic dosages was associated with a lower incidence of symptomatic ulcers and ulcer complications than the comparator NSAIDs given at standard dosages. However, even though the combined incidence of symptomatic ulcers or POBs associated with celecoxib was significantly lower than with the comparator drugs, careful examination of the data shows that the rate of ulcer complications alone, the primary end point of the study, was not. The annualized incidence of POBs plus symptomatic ulcers with celecoxib was 2.08% vs 3.54%

See also p 1247.

Author Affiliations: Section of Gastroenterology, Boston University School of Medicine, and Boston Medical Center, Boston, Mass.
Corresponding Author and Reprints: M. Michael Wolfe, MD, Boston Medical Center, Section of Gastroenterology, 650 Albany St, Boston, MA 02118-2393 (e-mail: michael.wolfe@bmc.org).

©2000 American Medical Association. All rights reserved.

WOLFE 00001

EDITORIALS

for patients taking ibuprofen or diclofenac ($P=.02$). The annualized incidence rates of ulcer complications alone for celecoxib and nonselective NSAIDs were 0.76% and 1.45%, respectively ($P=.09$), a trend favoring celecoxib that did not achieve statistical significance.

The annualized ulcer complication rate in the celecoxib group was substantially greater than the previously cited incidence of 0.2% to 0.4%,[4,10] which was used in the study by Silverstein et al[9] to calculate the sample size required for randomization. This increased ulcer complication rate for celecoxib can be partially attributed to the supratherapeutic dosage of celecoxib used in the study but more likely was a result of including patients taking concurrent low-dosage ($\leq$325 mg/d) aspirin for cardiovascular prophylaxis. Of patients enrolled in this trial, 20.6% were taking low-dosage aspirin, twice the rate reported in other celecoxib clinical trials.[11] This dosage of aspirin has been shown in several previous studies to increase the risk of upper GI hemorrhage[12-14] and appears to have offset any potential protective effect of COX-2 selectivity for celecoxib in this trial. Within the celecoxib group, the relative risk of an ulcer complication was 4.5 when low-dosage aspirin was taken ($P=.01$). Moreover, for patients taking aspirin, the annualized incidence rates of POBs alone for celecoxib and nonselective NSAIDs were 2.01% and 2.12% ($P=.92$), respectively; for POBs combined with symptomatic ulcers, the rates were 4.7% and 6.0% ($P=.49$), respectively. Therefore, a small ulcer risk reduction for celecoxib among patients taking low-dosage aspirin may exist that cannot be conclusively discerned by the study due to the small number of patients taking aspirin (type II error).

In contrast, for patients not taking aspirin, the annualized incidence of POBs was significantly lower with celecoxib compared with ibuprofen and diclofenac: 0.44% vs 1.27% ($P=.04$). Similarly, the annualized incidence of ulcer complications combined with symptomatic ulcers in patients not taking aspirin was also significantly lower with celecoxib than with the comparator drugs: 1.40% vs 2.91% ($P=.02$). The ulcer complication rate in nonaspirin users who received celecoxib (0.44%) is similar to the background rate of ulcer complications observed in patients not taking NSAIDs or aspirin in the general population. Thus, because a placebo group was not included in this study, it is not possible to calculate accurately an ulcer complication risk attributable to celecoxib.

In addition, the safety of celecoxib relative to nonselective NSAIDs cannot be attributed entirely to the COX-2 selectivity of this agent. For example, COX-1–deficient mice do not develop spontaneous GI injury,[15] and the administration of a traditional NSAID produces typical mucosal lesions in these animals. Other factors, such as nitric oxide, calcitonin gene-related peptide, and trefoil peptides,[16,17] may play a critical role in maintaining gastroduodenal mucosal integrity. Such redundancy in preserving normal physiologic function is not unique, and it constitutes the ratio-

nale for the future development of potentially gastroprotective NSAID formulations that promote nitric oxide release. Furthermore, COX-2 is expressed at the borders of gastric ulcers and has been implicated as a critical factor in promoting the reparative process.[18] This issue raises the possibility that individuals with preexisting gastroduodenal ulcers who take COX-2–selective NSAIDs may be at risk for delayed ulcer healing and the potential development of a complication.

The data presented in this issue of *JAMA* by Silverstein et al[9] generally support the overall safety of celecoxib, despite the nonsignificant difference in the primary outcome measure. This COX-2–selective inhibitor was better tolerated than nonselective NSAIDs as evident from a decreased incidence of GI symptoms and lower rates of secondary study withdrawal. The decrease in GI symptoms may have resulted in fewer endoscopic evaluations in the celecoxib group and could partly account for the lower detection rate of ulcers in the group. Celecoxib was also associated with a lower incidence of clinically meaningful reductions in hematocrit, even when patients with ulcer complications, symptomatic ulcers, and other GI disease were excluded from the analysis. In theory, COX-2–selective inhibitors might increase the risk for thromboembolic cardiovascular events because of the preferential inhibition of endothelial prostacyclin synthesis without corresponding inhibition of platelet thromboxane synthesis.[19] However, the overall incidence of cardiovascular events, and specifically cerebrovascular accidents and myocardial infarction, were similar in the 2 treatment groups.

The clinical consequences of NSAIDs on renal function are heterogeneous, as the relative importance of COX-1 and COX-2 in the human kidney is not well defined.[20] Nevertheless, in the study by Silverstein et al,[9] the incidence of adverse renal events and hypertension was significantly lower in the celecoxib group than in the groups treated with ibuprofen or diclofenac. Another important question is whether coxibs in general will incite or exacerbate preexisting inflammatory bowel disease, since experimental colitis may be induced both in COX-2–deficient mice and in rats treated with COX-2–selective inhibitors.[21] That COX-2 may play other important physiologic roles is further supported by the finding that COX-2–deficient mice have demonstrated defects in renal function,[22] female reproductive physiology,[23] and regulation of bone resorption.[1] These theoretical concerns must be balanced against other potential beneficial effects of COX-2 selective inhibition. For example, enhanced COX-2 expression has been found in human colorectal neoplasia, and selective COX-2 inhibition may thereby reduce the development of colorectal and other GI malignancies.[24,25]

Although COX-2–selective NSAIDs appear to be "new and improved," they certainly are less than perfect. These agents have become and will continue to constitute a welcome addition to the therapeutic armamentarium for the treatment

©2000 American Medical Association. All rights reserved.

WOLFE 00002

of inflammatory arthritides and for analgesia. The results of this important study by Silverstein et al[9] provide promising data to suggest that celecoxib and possibly other COX–2–selective NSAIDs are effective in reducing, but not eliminating, the risk of symptomatic ulcers and ulcer complications in the enormous number of individuals who might benefit from these drugs, at least among individuals who do not take aspirin. However, because this prospective analysis was limited to 6 months, careful postmarketing surveillance and future large-scale outcome analyses of COX–2–selective NSAIDs will be required to determine their ultimate benefit and safety profile.

## REFERENCES

1. Wolfe M, Lichtenstein D, Singh G. Gastrointestinal toxicity of nonsteroidal antiinflammatory drugs. N Engl J Med. 1999;340:1888-1899.
2. Kargman S, Charleson S, Cartwright M, et al. Characterization of prostaglandin G/H synthase 1 and 2 in rat, dog, monkey, and human gastrointestinal tracts. Gastroenterology. 1996;111:445-454.
3. Needelman P, Isakson PC. The discovery and function of COX-2. J Rheumatol. 1997;24:6-8.
4. Feldman M, McMahon AT. Do cyclooxygenase-2 inhibitors provide benefits similar to those of traditional nonsteroidal anti-inflammatory drugs, with less gastrointestinal toxicity? Ann Intern Med. 2000;132:134-143.
5. Simon LS, Weaver AL, Graham DY, et al. Anti-inflammatory and upper gastrointestinal effects of celecoxib in rheumatoid arthritis: a randomized controlled trial. JAMA. 1999;282:1821-1828.
6. Langman MJ, Jensen DM, Watson DJ, et al. Adverse upper gastrointestinal effects of rofecoxib compared with NSAIDs. JAMA. 1999;282:1929-1933.
7. Laine L, Harper S, Simon T, et al. A randomized trial comparing the effect of rofecoxib, a cyclooxygenase 2-specific inhibitor, with that of ibuprofen on the gastroduodenal mucosa of patients with osteoarthritis. Gastroenterology. 1999;117:776-783.
8. Silverstein FE, Graham DY, Senior JR, et al. Misoprostol reduces serious gastrointestinal complications in patients with rheumatoid arthritis receiving nonsteroidal anti-inflammatory drugs: a randomized, double-blind, placebo-controlled trial. Ann Intern Med. 1995;123:241-249.
9. Silverstein FE, Faich G, Goldstein JL, et al. Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis: the CLASS study: a randomized controlled trial. JAMA. 2000;284:1247-1255.
10. Goldstein JL, Silverstein FE, Agrawal NM, et al. Reduced risk of upper gastrointestinal ulcer complications with celecoxib, a novel COX-2 inhibitor. Am J Gastroenterol. 2000;95:1681-1690.
11. Physician advice and individual behaviors about cardiovascular disease risk reduction–seven states and Puerto Rico, 1997. MMWR Morb Mortal Wkly Rep. 1999;48:74-77.
12. Lee M, Cryer B, Feldman M. Dose effects of aspirin on gastric prostaglandins and stomach mucosal injury. Ann Intern Med. 1994;120:184-189.
13. Weil J, Colin JD, Langman M, et al. Prophylactic aspirin and risk of peptic ulcer bleeding. BMJ. 1995;310:827-830.
14. Stalnikowicz DR. Gastrointestinal bleeding during low-dose aspirin administration for prevention of arterial occlusive events: a critical analysis. J Clin Gastroenterol. 1995;21:13-16.
15. Langenbach R, Morham SG, Tiano HF, et al. Prostaglandin synthase 1 gene disruption in mice reduces arachidonic acid–induced inflammation and indomethacin-induced gastric ulceration. Cell. 1995;83:483-492.
16. Davies NM, Roseth AG, Appleyard CB, et al. NO-naproxen vs naproxen: ulcerogenic, analgesic and anti-inflammatory effects. Aliment Pharmacol Ther. 1997;11:69-79.
17. Hawkey CJ. Future treatments for arthritis—new NSAIDs, NO-NSAIDs or no NSAIDs? Gastroenterology. 1995;109:614-616.
18. Mizuno H, Sakamoto C, Matsuda K, et al. Induction of cyclooxygenase 2 in gastric mucosal lesions and its inhibition by the specific antagonist delays healing in mice. Gastroenterology. 1997;112:387-397.
19. McAdam BF, Catella-Lawson F, Mardini IA, et al. Systemic biosynthesis of prostacyclin by cyclooxygenase (COX)-2: the human pharmacology of a selective inhibitor of COX-2. Proc Natl Acad Sci U S A. 1999;96:272-277.
20. Swan SK, Rudy DW, Lasseter KC, et al. Effect of cyclooxygenase-2 inhibition on renal function in elderly persons receiving a low-salt diet. Ann Intern Med. 2000;133:1-9.
21. Reuter BK, Asfaha S, Buret A, et al. Exacerbation of inflammation-associated colonic injury in rat through inhibition of cyclooxygenase-2. J Clin Invest. 1996;98:2076-2085.
22. Morham SG, Langenbach R, Loftin CD, et al. Prostaglandin synthase 2 gene disruption causes severe renal pathology in the mouse. Cell. 1995;83:473-482.
23. Lim H, Paria BC, Das SK, et al. Multiple female reproductive failures in cyclooxygenase 2-deficient mice. Cell. 1997;91:197-208.
24. Steinbach G, Lynch PM, Phillips RKS, et al. The effect of celecoxib, a cyclooxygenase-2 inhibitor in familial adenomatous polyposis. N Engl J Med. 2000;342:1946-1952.
25. Janne PA, Mayer RJ. Chemoprevention of colorectal cancer. N Engl J Med. 2000;342:1958-1968.

©2000 American Medical Association. All rights reserved.

WOLFE 00003

# EXHIBIT 157

| | |
|---|---|
| **From:** | Burken, Menno van |
| **Sent:** | Friday, September 08, 2000 2:27 AM |
| **To:** | Byer, Alicia; Ahmed, Hussein; Bahrt, Kenneth; Condon, Irene; Denton, James; Dicker, Joy; Gandelman, Mitchell; Haupt, Solveig; Leishman, Valarie; Lymburner, Jeffrey; Meppen, Michelle; Nelson, Rooney; Plofchan, Jennifer N; Prestel, Betina; Scheuer, Nazanine; Sirota, Eric; Tive, Leslie |
| **Cc:** | Pena, Betty M.; Pettitt, Dan; Jelich, Vicki; Kitsis, Elizabeth; Bercetche, Martin |
| **Subject:** | RE: JAMA Editorial - Confidential? |

Thanks Alicia for forwarding this.

Clearly this editorial might be more important than the actual publication. It underscores some of the issues and also strengths of the data. When Jim Lefkowitz is sharing his Q&A with us (22 questions), at least the issues outlined in this editorial need to be addressed. Countries need to be trained in both pieces our study pub. AND this editorial.

Menno

> -----Original Message-----
> **From: Byer, Alicia**
> **Sent:** Thursday, September 07, 2000 2:03 PM
> **To:** Ahmed, Hussein; Bahrt, Kenneth; Burken, Menno van; Byer, Alicia; Condon, Irene; Denton, James; Dicker, Joy; Gandelman, Mitchell; Haupt, Solveig; Leishman, Valarie; Lymburner, Jeffrey; Meppen, Michelle; Nelson, Rooney; Plofchan, Jennifer; Prestel, Betina; Scheuer, Nazanine; Sirota, Eric; Tive, Leslie
> **Cc:** Pena, Betty M.; Pettitt, Dan; Jelich, Vicki
> **Subject:** FW: JAMA Editorial - Confidential?
>
> << File: AMAEDITO.DOC >> Team,
>
> Below please find a copy of the upcoming JAMA editorial that I believe will be found in the Sept. 13th JAMA where the CLASS study will be published. Please do not distribute this as I am unsure if it is embargoed until publication.
>
> Thanks,
>
> Alicia
> -----Original Message-----
> From: JAMES B. LEFKOWITH at Exchange
> Sent: Thursday, September 07, 2000 11:13 AM
> To: Byer, Alicia; Wahba, Mona M
> Subject: FW: JAMA Editorial

MICHAEL FRIEDMAN
CCR

NO.: 306

-----Original Message-----
From: SCHEFF, LISA R [FND/1820]
Sent: Thursday, September 07, 2000 8:58 AM
To: KOVITZ, CLAUDIA R. [FND/1820]; LEFKOWITH, JAMES B. [PHR/1825]
Subject: JAMA Editorial
Importance: High

Here it is!
-----Original Message-----
From: Nicole Symon [mailto:NSymon@mslpr.com]
Sent: Wednesday, September 06, 2000 7:27 PM
To: diana.e.smith@monsanto.com; lisa.r.scheff@monsanto.com;
sally.b.young@monsanto.com; Celeste.torello@pfizer.com

1

Confidential - Subject To Protective Order

DEFS 01899370

Cc: Helen Tarleton; Tracy Vandervalk; Cristina Biro; Harold Silverman;
Laura Webber; Michael Echter; MaryEllen O'Donohue; Stephanie Marchesi;
Sarah Townend; Wendy Lund
Subject: AMA Editorial

COX-2-Selective NSAIDs
New and Improved?

David R. Lichtenstein, MD
M. Michael Wolfe, MD

Gastrointestinal (GI) Toxically Induced by Nonsteroidal anti-inflammatory drugs
(NSAIDs) is among the most common serious adverse drug events in the
industrialized world.  Gastroduodenal ulcers can be demonstrated by endoscopy in
10% to 20% of patients who take NSAIDs on a regular basis, and the annual
incidence of clinically important GI complications approaches 2%.  The impact of
NSAIDS on public health is significant and has provided the impetus to search
for safer but equally effective anti-inflammatory agents.

Damage to the gastoduuodenal mucosa associated with use of NSAIDs occurs as a
result of both the topical and systemic properties attributed to these agents.
The latter appears to play the predominant role, largely through decreased
synthesis of mucosal prostaglandins.  These compounds are ubiquitous 20-carbon
molecules that are derived from the catalytic conversion of arachidonic acid via
the cyclooxygenase (COX) pathway.  More than a decade has elapsed since 2
related but unique COX isoforms were discovered, each encoded by a separate gene
and exhibiting a discrete pattern of tissue-specific expression.  COX-1 is
predominantly expressed constitutively and functions as a physiologic
"housekeeping" enzyme in most tissues, including the gastric mucosa, the
kidneys, and platelets.   COX-2 expression, especially in macrophages and
synovial cells, is induced by inflammation and mitogen stimulation, and it has
been proposed that the anti-inflammatory properties of NSAIDS are mediated
through COX-2 inhibition, whereas adverse effects occur as a result of their
effects on COX-1.

Traditional NSAIDs differ in their relative inhibitory potency against COX-1 and
COX 2.  The important role of COX-1 in protecting the gastoduodenal mucosa is
supported by studies showing that the greatest degree of damage is generally
caused by NSAIDs that preferentially inhibit COX 1.  Although the definition and
methods for assessing selectivity continue to be controversial, the World Health
Organization has categorized COX 2 selective drugs as a new subclass of NSAIDs
(coxibs).  The 2 coxibs currently available, rofecoxib and celecoxib, maintain
their anti-inflammatory properties while preserving the biosynthesis of
protective COX-1-derived prostaglandins.  Although rofecoxib is the more
selective of the 2, both agents appear to be as effective as nonselective NSAIDs
in suppressing inflammation and providing analgesia, while reducing the
incidence of endoscopic ulcers to levels of similar to those seen with placebo.

Previous studies examining the prostaglandin E, analog misoprostol have
suggested a correlation between endoscopic ulcers and clinical outcomes.
However, it is imperative that a decrease in the clinically evident ulcer
complications termed POBs (perforation, gastric outlet obstruction and bleeding)
likewise be demonstrated prior to establishing the safety of these new NSAIDs.
In this issue of THE JOURNAL, Silverstein et al report the results of a 6-month
randomized, double-blind, controlled trial comparing the ulcerogenic potential
and upper GI toxicity of celecoxib in individuals with osteoarthritis (OA) or
rheumatoid arthritis (RA).  The study involved 7,968 patients who were randomly
assigned to receive 400 mg of celecoxib twice per day (2 and 4 times the maximum
RA and OA dosages approved for labeling by the US Food and Drug Administration,
respectively); ibuprofen, 800 mg 3 times per day; or diclofenac, 75 mg twice per
day. Baseline characteristics of the treatment groups were similar with regard

2

Confidential - Subject To Protective Order

DEFS 01899371

to risk factors previously shown to predispose individuals to ulcer complications, including age, primary rheumatologic disorder, prior history of GI bleeding or ulcer, Helicobacter pylori infection, tobacco or alcohol use, and concurrent use of aspirin, corticosteroids, or anticoagulants.

The authors conclude that celecoxib at supratherapeutic dosages was associated with a lower incidence of symptomatic ulcers and ulcer complications than the comparator NSAIDs given at standard dosages. However, even though the combined incidence of symptomatic ulcers or POBs associated with celecoxib was significantly lower than with the comparator drugs, careful examination of the data shows that the rate of ulcer complications alone, the primary end point of the study, was not. The annualized incidence of POBs plus symptomatic ulcers with celecoxib was 2.08% vs. 3.54 % for patients taking ibuprofen or diclofenac (P£ .02). The annualized incidence rates of ulcer complications alone for celecoxib and nonselective NSIDS were 0.76% and 1.45%, respectively (P = .09), a trend favoring celecoxib that did not achieve statistical significance.

The annualized ulcer complication rate in the celecoxib group was substantially greater than the previously cited incidence of 0.2% to 0.4%, which was used in the study by Silverstein et al to calculate the sample size required for randomization. This increased ulcer complication rate for celecoxib can be partially attributed to the suprathapeutic dosage of celecoxib used in the study but more likely was result of including patients taking concurrent low-dosage (less than or equal to 325mg/d) aspirin for cardiovascular prophylaxis. Of patients enrolled in this trial, 20.6% were taking low-dosage aspirin, twice the rate reported in other celecoxib clinical trials. This dosage of aspirin has been shown in several previous studies to increase the risk of upper GI hemorrhage and appears to have offset any potential protective effect of COX-2 selectivity for celecoxib in this trial. Within the celecoxib group, the relative risk of an ulcer complication was 4.5 when low-dosage apsirin was taken (P=.01). Moreover, for patients taking aspirin, the annualized incidence rates for POBs alone for celecoxib and nonselective NSAIDs were 2.01% and 2.12% (P= .92), respectively; for POBs combined with symptomatic ulcers, the rates were 4.7% and 6.0% (P=.49), respectively. Therefore, a small ulcer risk reduction for celecoxib among patients taking low-dosage aspirin may exist that cannot be conclusively discerned by the study due to the small number of patients taking aspirin (type II error).

In contrast, for patients not taking aspirin, the annualized incidence of POBs was significantly lower with celecoxib compared with ibuprofen and diclofenac: 0.44% vs. 1.27% (P = .04). Similarly, the annualized incidence of ulcer complications combined with symptomatic ulcers in patients not taking aspirin was also significantly lower with celecoxib than with the comparator drugs: 1.40% vs. 2.91% (P= .02). The ulcer complication rate in nonaspirin users who received celecoxib (0.44%) is similar to the background rate of ulcer complications observed in patients not taking NSAIDs or aspirin in the general population. Thus, because a placebo group was not included in this study, it is not possible to calculate accurately an ulcer complication risk attributable to celecoxib.

In addition, the safety of celecoxib relative to nonselective NSAIDs cannot be attributed entirely to the COX-2 selectivity of this agent. For example, COX-1-deficient mice do not develop spontaneous GI injury, and the administration of a traditional NSAID produces typical mucosal lesions in these animals. Other factors, such as nitric oxide, calcitonin gene-related peptide, and trefoil peptides, may play a critical role in maintaining gastroduodenal mucosal integrity. Such redundancy in preserving normal physiologic function is not unique, and it constitutes the rationale for the future development of potentially gastroprotective NSAID formulations that promote nitric oxide release. Furthermore, COX-2 is expressed at the borders of gastric ulcers and has been implicated as a critical factor in promoting the reparative process. This issue raises the possibility that individuals with preexisting

3

Confidential - Subject To Protective Order

gastroduodenal ulcers who take COX-2-selective NSAIDs may be at risk for delayed ulcer healing and the potential development of a complication.

The data presented in this issue of JAMA by Silverstein et al generally support the overall safety of celecoxib, despite the nonsignificant difference in the primary outcome measure. This COX-2 - selective inhibitor was better tolerated than nonselective NSAIDs as evident from a decreased incidence of GI symptoms and lower rates of secondary study withdrawal. The decrease in GI symptoms may have resulted in fewer endoscopic evaluations in the celecoxib group and could partly account for the lower detection rate of ulcers in the group. Celecoxib was also associated with a lower incidence of clinically meaningful reductions in hematocrit, even when patients with ulcer complications, symptomatic ulcers, and other GI disease were excluded from the analysis. In theory, COX-2-selective inhibitors might increase the risk for thromboembolic cardiovascular events because of the preferential inhibition of endothelial prostacyclin synthesis without corresponding inhibition of platelet thromboxane synthesis. However, the overall incidence of cardiovascular events, and specifically cerebrovascular accidents and myocardial infarction, were similar in the 2 treatment groups.

The clinical consequences of NSAIDs on renal function are heterogeneous, as the relative importance of COX-1 and COX-2 in the human kidney is not well defined. Nevertheless, in the study by Silverstein et al, the incidence of adverse renal events and hypertension was significantly lower in the celecoxib group than in the groups treated with ibuprofen or diclofenac. Another important question is whether coxibs in general will incite or exacerbate preexisting inflammatory bowel disease, since experimental colitis may be induced both in COX-2-deficient mice and in rats treated with COX-2-selective inhibitors. That COX-2 may play other important physiologic roles is further supported by the finding that COX-2 - deficient mice have demonstrated defects in renal function, female reproductive physiology, and regulation of bone resorption. These theoretical concerns must be balanced against other potential beneficial effects of COX-2 selective inhibition. For example, enhanced COX-2 expression has been found in human colorectal neoplasia, and selective COX-2 inhibition may thereby reduce the development of colorectal and other GI malignancies.

Although COX-2 - selective NSAIDs appear to be "new and improved," they certainly are less than perfect. These agents have become and will continue to constitute a welcome addition to the therapeutic armanamentarium for the treatment of inflammatory arthritides and for analgesia. The results of this important study by Silverstein et al provide promising data to suggest that celecoxib and possibly other COX-2-selective NSAIDs are effective in reducing, but not eliminating, the risk of symptomatic ulcers and ulcer complications in the enormous number of individuals might benefit from these drugs, at least among individuals who do not take aspirin. However, because this prospective analysis was limited to 6 months, careful postmarking surveillance and future large-scale outcome analyses of COX-2 selective NSAIDs will be required to determine their ultimate benefit and safety profile.

Confidential - Subject To Protective Order

DEFS 01899373

# EXHIBIT 158

From:       CETERA, PASQUALE [PNU/USCHQPO3]
Sent:       Wednesday, October 25, 2000 3:11 PM
To:         HOPKINS, ANNE M [PHR/5430]
Cc:         NUGENT, MARILYN E [PHR/5430]; HERTERICH, ROLAND [PHR/5287]; BEGLEY,
            WINIFRED M. [FND/1825]; FORREST, DAVID [PNU/GBMKEPO1]; WOLF, NEIL
            [PNU/USCHQPO1]
Subject:    CBX-0280215_RE: Celebrex EU SPC and CLASS

Anne,
        thank you for your comments. We have discussed in the past few
days this issue and there is an agreement to follow your
recommendation and do not submit a Type II variation.
However, in the meantime, a "review" document is being prepared by our

R&D colleagues to be submitted to the FDA to further clarify/support
the safety of Celebrex and the differences from NSAIDs as well as
Vioxx. My recommendation is that when this "whitepaper" will be
available, we should regroup and discuss what regulatory strategy we
want to develop in Europe. I tend to believe that this final document
will offer a better understanding of our opportunities than just the
CLASS study report.
Thanks again
Pasquale


_____ Reply Separator
_____

Subject: RE: Celebrex EU SPC and CLASS
Author:  ANNE M HOPKINS at Exchange
Date:    10/25/00 8:34 AM


Pasquale, thank you for sending the draft from Jim, I had not seen it
before.

My response became rather long!



I assume this is the draft addendum to an expert report that Jim was
working on.
After discussion with the Swedish agency we agreed to submit CLASS
without an
addendum to the expert report. I do not really find the document
provides much
more transparency or explanation to the original internal study report.

Topline CLASS results provide positives and negatives. On the positive
side it
clearly shows no signal for cardiovascular risk - the reason for our
undertaking
to provide it. On the negative side the UGI event rates are higher than
in the
original controlled studies and statistical significance vs comparators
is only
achieved by selection and combining of data. There is the high focus on
aspirin
co-use which is prevalent in the group treated with the product. There
is the
confounding factor of the dose which is supratherapeutic. There is also



1

Confidential - Subject To Protective Order                                    DEFS 00655210

the
environment - whether we like it or not - the perception of the
regulators that
COX2 science continues to evolve and is it really proven that there is
no COX1
effect at higher doses.(Need to take account that regulators take the
conservative approach and the UK MCA at the recent valdecoxib meeting
said -
there is still a question mark as to whether coxibs do have a safer GI
profile -
this may well be driven by rofecixib PMS data but it indicates where
they start
from).
Currently our strategy is that CLASS is a safety study which shows no
new safety
concerns and therefore requires no change to SPC. However we need to
prepare for
a different position being taken by the regulators since we do decsribe
data at
a 400bd dose in our SPC at the moment.

Overall I have a number of reservations about some of the statements
made in the
document.

One example, the draft document states that the CLASS study results
establish
conclusively that celecoxib is associated with a significantly lower
incidence
of symptomatic ulcers and ulcer complications than NSAID comparators -
this is a
very absolute statement. I do not see how the data support this
statement or
other similar ones. Statistical significance is only achieved when
selecting
and/or combining results eg when selecting non-aspirin takers for
serious events
and comparing celecoxib with the NSAID groups combined at the 6 month
time point
or when combining serious GI events with GD ulcers in all patients at 6
months
vs ibuprofen or NSAID combined. The study also only looked at
symptomatic
patients, when such events may be asymptomatic, not discussed.


The primary objective of the CLASS study was to compare the incidence of

clinially significant UGI adverse events, a composite safety endpoint
comprised
of perforation, bleeding or gastric outlet obstrution. Incidence of GD
ulcers
would fall into a secondary objective, yet the study report and
publication
report combined figures for serious events and ulcers. There is nothing
wrong
with combining but the numbers of serious events was so low that we did
not
reach the study endpoint, therefore alone the data are not so robust and
the
actual percentage incidence for both the serious GI events and the
ulcers is
quite a lot higher than we saw across the previous controlled studies,
albeit

2

Confidential - Subject To Protective Order                                          DEFS 00655211

that these were not sepcifically looking at the serious events in these.
? Is
there a dose effect after all??? How will this affect the SPC? There is
no
discussion as to why - eg no endoscopy in CLASS etc

I know Jim does not understand why we have concerns in Europe in
relation to the
potential impact of CLASS on our SPC. And I don't beleive that we have
propoerly
consolidated our position of concerns across EU. The meeting we had here
was not
the most appropriate forum to properly discuss these. Clearly we need to
fully
explore these implications so that we have fully reasoned information to

suppport our posiiton when the time comes to meet with the agency. CLASS
study
is not without its biases and a statistical nightmare. Fundamnetally the
EU
regulators will not take CLASS at face value they will want sound
explanations
for any selections or combining that we have done in stats analyses, for
example
we have combined data from 2 studies; can we really refer to 'NSAIDs'
when there
were only 2 comparators and in the rest of the study data on the SPC we
name
individual NSAID etc

I beleive we must start with why we undertook to provide the CLASS study
report
- i.e. to provide reassurance that there was no problem with
cardiovascular
safety - and CLASS does support this, there are no new safety signals
and also
no evidence of increased thrombotic events. However the dose of
celecoxib in
CLASS is 400bd - double the maximum recommended, so there could still be
a
question how does this therefore relate to therapeutic use at lower
doses
(potential to revive the COX 1 effect at higher doses aspect). I hope
that
SUCCESS which uses therapeutic doses will address this dose question and

although a shorter study will also show no particular safety signals.

Of course CLASS provides a lot of other information and its in this area
we need
to agree our psoition. We have to decide what we want in relation to
aspirin on
which there is a lot of focus in CLASS analyses and public domain in the
JAMA
publication. I would want to look at all aspirin co-use across all the
studies
and doses of celecoxib. Accepting that aspirin is an independent risk
factor for
GI events we still wish to retain our differentiation from conventional
NSAID in
the SPC, and rofecoxib, obviously reflecting the evidence bearing in
mind that
our patient group will include aspirin takers.

To my mind CLASS raises the matter of risk factors for GI events and it

3

Confidential - Subject To Protective Order

DEFS 00655212

is
suggested in the draft document that in this regard celecoxib is no different to
other NSAID, so GI history is a risk factor – I would like to thoroughly explore
this, again across all doses of celecoxib and all the data. Again differentiation from conventional NSAID. CLASS only looked at symptomatic
patients yet for many years we have been saying that most serious events are
asymptomatic, indeed until CLASS in the US label we stated (and still do till
CLASS is assessed by FDA) that 'Only one in five patients who develop a serious
upper GI adverse event on NSAID therapy is syptomatic' Perhaps this fact that we
looked only at syptomatic patients has bearing on the findings. There is no
discusssion of this aspect in the draft.

I don't want to minimalise the undertaking of doing the CLASS study but in my
view at best CLASS, as a safety study, which is what it was, raises no new
safety signals. The study is complicated by the fact that the dose of celecoxib
used is double the max recommended( FDA imposed it) therefore what meaning do
the findings have for therapeutic use particularly in the minds of the
regulators who are not so ready to just see safety at double the dose (indeed
this is just what the German agency does not want to see – they don't want
doctors to feel secure enough to increase the dose beyond 400 a day max). The
doses of the comparators are in my view inconsistent for Europe i.e. diclo 75 bd
is on the whole a commonly used therapeutic dose, ibu 2400 day is probably
double that generllay used in EU.

Tolerabilty data are of course favourable to celecoxib but we cannot argue a
400bd dose is supratherapeutic on the one hand for some data and yet use it to
our benefit on the other.

These are my thoughts, regards, Anne

-----Original Message-----
From: CETERA, PASQUALE [PNU/USCHQPO3]
Sent: 10 October 2000 00:27
To: HOPKINS, ANNE M [PHR/5430]
Cc: FORREST, DAVID [PNU/GBMKEPO1]
Subject: FW: Celebrex EU SPC and CLASS

    Anne,
        have you seen the attached documents from Jim? Any comment?
    Pasquale

4

Confidential - Subject To Protective Order                                                          DEFS 00655213

_____ Forward Header

Subject:  FW: Celebrex EU SPC and CLASS
Author:   JAMES B. LEFKOWITH at Exchange
Date:     10/8/00 3:21 PM


Pasquale-
I think that part of the reason for the negative response is a fundamental lack
of understanding of CLASS.  I have attached an early draft of an expert analysis
or report which may make things clearer to you and your colleagues.
Nonetheless, I understand that the EU is not the US.  If there is a lack of
enthusiasm in the EU regarding amending the SPC, we can surely provide more
manuscripts from this study which you can use commercially.  ▮Non-Resp.▮

▮Non-Resp.▮

JL

-----Original Message-----
From: CETERA, PASQUALE [PNU/USCHQPO3]
Sent: Sunday, October 08, 2000 2:46 PM
To: LEFKOWITH, JAMES B. [PHR/1825]; WOLF, NEIL [PNU/USCHQPO1]
Subject: RE: Celebrex EU SPC and CLASS


    Neil, Jim,
              this is one example of the negative response of our
    colleagues in Europe about the submission of CLASS data.
    As I said, it seems that we significant risks
    Pasquale


_____ Forward Header

Subject:  RE: Celebrex EU SPC and CLASS
Author:   MARCO RENOLDI at Exchange
Date:     10/8/00 8:15 AM


Dear Roland,

given the limited time available and concomitant engagements (people travelling
etc) please find attached consolidated feedback from the following functions:
arthritis franchise (Searle Business Unit), medical department (arthritis lead),
HEAT-pharmacoeconomic affairs.  We trust the same request was sent by Marylin to
her regulatory contacts in the different affiliates. Anyhow, I am copying
regulatory affairs and business development colleagues on this reply.

The general comment was we should NOT attempt submitting a Type II variation
based on the CLASS study data as the probable risks in Europe outweigh any
potential advantages, in particular the risk that a negative statement regarding
concomitant use with aspirin is introduced is deemed very high, which

5

Confidential - Subject To Protective Order                                                    DEFS 00655214

might have
very serious consequences on the profiling and positioning of our
compound.
Also, if - as it appears likely - we were requested to describe the
CLASS data
by differentiating between ASA and non-ASA users we may have to include
in our
SPC a statement whereas in patients taking celecoxib and low-dose ASA no

statistical difference was observed between celecoxib and comparative
NSAIDs in
the rate of symptomatic ulcers and ulcer complications, which is
something we
would have a hard time selling to our customers.
Moreover, despite the CLASS study shows an advantage over conventional
NSAIDs
regarding the incidence of ███████████████████████████████████████
██████████████████████ Non-Resp. ███████████████
███ Non-Resp. ████
█████████████████████████ Non-Resp. █████████████████████
███████ Non-Resp. ████████         which might lead to a rewording of the
side-effects
paragraph (these adverse events would be considered as "common" rather
than
"uncommon" as they are today).

Hope this helps.  By means of this email I also invite my regulatory
colleagues
to forward to Roland any additional input on the matter (I understand
the new
deadline is Tuesday).

Best regards,

Marco Renoldi
Team Leader, Searle Division
Pharmacia MCI

-----Original Message-----
From:      HERTERICH, ROLAND [PHR/5287]
Sent:      venerdì 6 ottobre 2000 17.24
To:        RENOLDI, MARCO [PHR/6073]; GOETZ, MARKUS [PHR/6015]; FORREST,
DAVID
[PNU/GBMKEPO1]; DELEUZE, CHRISTIAN [PHR/5160]
Cc:        CETERA, PASQUALE [PNU/USCHQPO3]; NUGENT, MARILYN E [PHR/5430]
Subject:      RE: Celebrex EU SPC and CLASS
Importance:      High


All,

you have received this e-mail a couple of days ago.

We really want you input on your assessment regarding
 - potential risks
 - potential benefits
when submitting and discussing the CLASS results with the MPA.

We would like to get your perspective on potential wording, improvements
in the
SmPC. We do not want to miss any opportunity when discussing with the
authorities.

I am glad if you come back with your perspective by Thursday, October
12.

6

Confidential - Subject To Protective Order                                            DEFS 00655215

Thanks and regards
Roland

　-----Original Message-----
From:      HERTERICH, ROLAND [PHR/5287]
Sent:      Dienstag, 3. Oktober 2000 19:47
To:        RENOLDI, MARCO [PHR/6073]; GOETZ, MARKUS [PHR/6015]; FORREST, DAVID
[PNU/GBMKEPO1]; DELEUZE, CHRISTIAN [PHR/5160]
Cc:        CETERA, PASQUALE [PNU/USCHQPO3]; NUGENT, MARILYN E [PHR/5430]
Subject:    FW: Celebrex EU SPC and CLASS
Importance:    High


All,

please have a look on the communication below regarding CLASS submission
to MPA.
We would like to get your input on commercial assessment regarding the
most
probable changes in the SmPC.

If you can send your feedback by end of the week, it would be very much
appreciated.

Thanks and regards
Roland

　-----Original Message-----
From:      NUGENT, MARILYN E [PHR/5430]
Sent:      Dienstag, 3. Oktober 2000 11:00
To:        CETERA, PASQUALE [PNU/USCHQPO3]; HERTERICH, ROLAND [PHR/5287]
Cc:        HOPKINS, ANNE M [PHR/5430]
Subject:    Celebrex EU SPC and CLASS

Dear Pasquale and Roland

US colleagues are pushing us to submit a Type II variation to add a
statement in
the EU Celebrex SPC regarding the results from CLASS. We are taking a
cautious
approach because by submitting this variation all EU agencies will be
involved
in reviewing the CLASS data and there may be some detrimental effects on

existing statements regarding concomitant use with aspirin.

I prepared the attached table to give an idea of best case/worst case
scenarios
for the SPC. Unlike the US labelling, we will not be able to describe
the CLASS
results in great detail and are likely to be confined to a few sentences
in
section 5.1. We expect that we will not be able to lump together the
NSAID
results and will have to talk about significance versus individual
NSAIDs, so
this will confine us to mention ibuprofen only since results vs
diclofenac did
not reach significance. Although in my best case scenario in 5.1. I have
a
sentence explaining why no signif difference was seen vs diclo I think
that this
won't be allowed. There is also a danger that we might lose the present

7

                           DEFS 00655216

positive
short-term statement regarding diclo,ibu and naproxen comparators - they may
argue that the diclo statement here is not valid since a longer term study
showed no dfference vs diclo.

My biggest worry is that we will have to amend the advice that we give regarding
use with low dose aspirin and even go so far as to say that Celebrex should not
be used with aspirin.

I do not want to arrange a meeting to discuss CLASS with the MPA without first
having the go-ahead from EU commercial. I would be grateful for your assessment
of the commercial risk, do you think that this is something that we should be
pursuing for the SPC?

Best wishes

Marilyn

Confidential - Subject To Protective Order                                                   DEFS 00655217

EXHIBIT 159

DRAFT – FOR INTERNAL REVIEW ONLY
May 18   2:00 pm  Incorporates first round of RAC edits
CE19836M
Media Contact:   Claudia Kovitz, 847-581-6786
Investor Contact: Craig Tooman, 908-901-8853

**FOR IMMEDIATE RELEASE**

## FINDINGS FROM CELEBREX® SAFETY STUDY SHOW TRADITIONAL NSAID COMPARATORS CAN CAUSE SERIOUS GI COMPLICATIONS WITHIN FIRST DAYS OF TREATMENT
### *No increased risk of GI complications for H. pylori positive patients on Celebrex*

SAN DIEGO, May 23, 2000 – New data from a long-term safety study presented during Digestive Disease Week (DDW) revealed that the risk for serious gastrointestinal complications with the NSAID comparators ibuprofen and diclofenac can start within the first few days after treatment begins. Further, study patients who were *H. pylori* positive had a two times greater risk of developing both symptomatic ulcers and ulcer complications when taking the NSAID comparators than *H. pylori* negative patients. No such increase was shown with patients taking Celebrex® (celecoxib capsules), regardless of *H. pylori* status.

"This study reinforces what gastroenterologists have always suspected – that even short term therapy carries risks. Many physicians feel that patients requiring short-term administration of traditional NSAIDs are not at risk for a serious gastrointestinal event. These results tell a different story, highlighting that many of the events caused by traditional NSAIDs occurred within the first few weeks, said Jay Goldstein, Associate Director of Medicine at the University of Illinois at Chicago and Chairman of the GI Events committee of the Celebrex long-term arthritis safety study, who presented the findings at a satellite symposium sponsored by Searle and Pfizer Inc during DDW.

The Celecoxib Long-term Arthritis Safety Study, an approximately 13-month, multi-center, randomized, double-blind outcomes trial of about 8,000 arthritis patients – 5,800 with OA and 2,200 with rheumatoid arthritis (RA) – was designed to mirror everyday clinical practice by enrolling a broad spectrum of patients, including adult patients of all ages and disease severity, and patients taking low-dose aspirin for cardioprotection. The study, designed to obtain a rigorous assessment of Celebrex safety, compared four times the recommended OA dose of Celebrex (800 mg daily) to typical daily doses of ibuprofen (2400 mg daily) and diclofenac (150 mg daily). The Celebrex study dose is twice the highest recommended RA dose.

**Impact on Required Medical Care Studied**



DEPOSITION
EXHIBIT
2SS
PENGAD 800-631-6989

Confidential - Subject To Protective Order

DEFS 01015664

DRAFT – FOR INTERNAL REVIEW ONLY
May 18   2:00 pm  Incorporates first round of RAC edits
CE19836M

Under the "real-world" conditions of the study, significant decreases in the use of medical resources were shown in the Celebrex group versus the other NSAIDs studied.  Sixteen percent of patients on usual doses of the NSAID comparators required office visits for blood work and evaluation versus 12.6 percent of Celebrex patients taking four times the recommended OA dose.  Twenty percent of these patients were referred to a specialist, most requiring endoscopy and a complex medical work-up.  This amounted to 25 percent fewer office visits and complex work-ups for patients taking Celebrex.  "This is an important finding with respect to the increased burden on our medical system and the healthcare resources needed to treat these patients – especially given the finding that serious complications can occur early in treatment," noted Dr. Goldstein.


**New Treatment Withdrawal Findings**

Withdrawal from the study due to GI symptoms for patients on Celebrex versus traditional NSAIDs was also assessed in the trial.  Tolerability data was presented that indicate diclofenac patients had a more difficult time remaining on treatment due to increases in moderate to severe GI symptoms.  Significantly more patients on diclofenac were forced to withdraw from treatment as a result of these side effects.  Significantly more patients on ibuprofen were forced to withdraw from treatment due to lack of efficacy.  Improved tolerability suggest that patients are able to stay on therapy longer with Celebrex to achieve effective relief of pain and inflammation.

In addition, the study found that patients on Celebrex experienced significantly fewer ulcer complications compared with ibuprofen and diclofenac among non-aspirin users.  Patients who needed aspirin were allowed to participate in this study since a large number of patients with arthritis take low-dose aspirin for cardioprotection, as did one-in-five patients in this study.  Excluding aspirin patients from the analysis, however, offers a clearer picture of the impact of Celebrex on GI safety since aspirin is an independent risk factor for GI complications.  These patients experienced three-fold fewer (64 percent) ulcer complications, a statistically significant difference from the NSAID comparators.   When patients taking aspirin for cardioprotection were added to the analysis, those on Celebrex experienced two-fold fewer ulcer complications versus the traditional NSAID comparators, narrowly missing statistical significance.


**Blood Loss Data has Broader Implications**

As reported, study data show that there was an increased incidence of blood loss – equivalent to two pints or more – among patients on the NSAID comparators versus Celebrex, even among those without

DRAFT – FOR INTERNAL REVIEW ONLY
May 18   2:00 pm  Incorporates first round of RAC edits
CE19836M

bleeding ulcers. The rate of blood loss with Celebrex was 2.1. The rate of blood loss with placebo in the original Celebrex clinical trials was 1.8.

Importantly, the lower incidence of GI blood loss has implications for a patient's overall health, Dr. Goldstein noted.  Chronic GI blood loss, which often goes undetected, can result in anemia. Less total blood in the body means less oxygen is circulating through the body.  To compensate, a patient's heart must work harder and faster to pump more blood through the system. Left untreated, anemia can exacerbate underlying coronary artery disease and precipitate heart attacks and heart failure.

According to Dr. Goldstein, "Blood loss of this kind is often difficult to pinpoint. When discovered, however, patients may be forced to discontinue treatment, thereby preventing them from getting effective relief from their arthritis symptoms.  Obviously we'd prefer to avoid such an outcome."

Non-Resp.

Non-Resp.   Seventy percent of the aspirin group and 50 percent of non-aspirin users had cardiovascular risk factors such as hypertension, high cholesterol, tobacco use and a history of heart attacks.   Non-Resp.

Non-Resp.

Celebrex is not a substitute for low-dose aspirin used for cardioprotection.

Patients who have a known allergic reaction to celecoxib, certain sulfa drugs called sulfonamides, aspirin or NSAIDs, or who are in their third trimester of pregnancy should not use Celebrex. As with all NSAIDs, serious GI tract ulcerations can occur without warning symptoms. Physicians and patients should remain alert to the signs and symptoms of GI bleeding. As with all NSAIDs, Celebrex should be used with caution in patients with fluid retention, hypertension, or heart failure.  The most common side effects of Celebrex were dyspepsia, diarrhea and abdominal pain, which were generally mild to moderate.

Celebrex is co-promoted by Searle, now part of Pharmacia Corporation, and Pfizer Inc. Pharmacia Corporation (NYSE:PHA) is a leading global pharmaceutical company created through the merger of Pharmacia & Upjohn with Monsanto Company and its G.D. Searle unit. Pharmacia has a broad product portfolio, a robust pipeline of new medicines, and an annual investment of more than $2 billion in pharmaceutical research and development.

Pfizer Inc (NYSE: PFE) is a research-based, global pharmaceutical company that discovers, develops, manufactures and markets innovative medicines for humans and animals. The company reported

Confidential - Subject To Protective Order

**DRAFT – FOR INTERNAL REVIEW ONLY**
**May 18   2:00 pm  Incorporates first round of RAC edits**
**CE19836M**

revenues of more than $16 billion in 1999 and expects to spend about $3.2 billion on research and

development this year. For more information on Pfizer, access www.pfizer.com.


### ###

For complete prescribing information on Celebrex, access www.celebrex.com or call toll-free 888-735-3214.

Confidential - Subject To Protective Order

DEFS 01015667

EXHIBIT 160

1

```
        UNITED STATES DISTRICT COURT
        DISTRICT OF NEW JERSEY
        CASE NO. 03-1519 (AET)
        ALASKA ELECTRICAL PENSION      )
        FUND, et al., On Behalf of     )
        Themselves and All Others      )
        Similarly Situated,            )
                                       )
                    Plaintiffs,        )
                                       )
               VS.                     )
                                       )
        PHARMACIA CORPORATION, et      )
        al.,                           )
                                       )
                    Defendants.        )
        -------------------------------)


        VIDEOTAPED DEPOSITION OF PHILIP NEEDLEMAN
                  New York, New York
              Wednesday, December 8, 2010




        Reported by:
        Robert X. Shaw, CSR
        CSR NO. 817
        JOB NO. 315763
```

3

```
1
2    A P P E A R A N C E S:
3      MOTLEY RICE LLC
4      Attorneys for Plaintiffs
5        28 Bridgeside Blvd.
6        Mt. Pleasant, S.C. 29464
7      BY:  LANCE V. OLIVER, ESQ.
8        843.216.9061
9
10     SCOTT & SCOTT LLP
11     Attorneys for Plaintiffs
12       707 Broadway, Suite 1000
13       San Diego, Ca. 92101
14     BY:  MATTHEW MONTGOMERY, ESQ.
15
16     ROBBINS GELLER RUDMAN & DOWD LLP
17     Attorneys for Plaintiffs
18       655 West Broadway
19       San Diego, Ca. 92101
20     BY:  LUCAS OLTS, ESQ.
21
22
23
24
25
```

2

```
1
2
3
4              December 8, 2010
5                 9:15 a.m.
6
7      Deposition of PHILIP NEEDLEMAN,
8    held at the offices of Cadwalader Wickersham
9    & Taft LLP, One World Financial Center, New
10   York, New York 10281, pursuant to Notice,
11   before Robert X. Shaw, CSR, a Notary Public
12   of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1
2    A P P E A R A N C E S (Contd):
3
4      CADWALADER WICKERSHAM & TAFT LLP
5      Attorneys for Defendants
6        One World Financial Center
7        New York, New York 10281
8      BY:  JONATHAN HOFF, ESQ.
9        JARED S. SUNSHINE, ESQ.
10       212.504.5739
11
12   ALSO PRESENT:
13       John Proko, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```


ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

5

1
2          THE VIDEOGRAPHER:  Please stand by.
3      This is tape number 1 of the
4      videotaped deposition of Philip
5      Needleman in the matter of Alaska
6      Electrical Pension Fund v. Pharmacia
7      Corporation, being heard before the
8      United States District Court of New
9      Jersey, Case File 03-1519.
10         This deposition is being held at
11     One World Financial Center, New York,
12     New York on December 8th, 2010 at
13     approximately 9:12 a.m.
14         My name is John Proko, and I am the
15     videographer.  The court reporter is
16     Robert Shaw.
17         Counsel, will you please introduce
18     yourselves and affiliations, and the
19     witness will be sworn.
20         MR. OLIVER:  Lance Oliver, with the
21     law firm of Motley Rice, for the
22     Plaintiffs.
23         MR. MONTGOMERY:  Matthew Montgomery
24     with Scott and Scott, for the
25     Plaintiffs.

6

1          MR. OLTS:  Lucas Olts, Robbins
2      Geller, for the Plaintiffs.
3          MR. HOFF:  Jonathan Hoff,
4      Cadwalader Wickersham & Taft, for the
5      Defendants.
6          MR. SUNSHINE:  Jared Sunshine,
7      Cadwalader Wickersham, for the
8      Defendants.
9          THE WITNESS:  Philip Needleman.
10     P H I L I P   N E E D L E M A N,  having
11     been first duly sworn by the Notary
12     Public, testified as follows:
13         THE WITNESS:  I do.
14     EXAMINATION BY
15     MR. OLIVER:
16     Q.  Mr. Needleman, can you just state
17     your name for the record.
18     A.  Philip Needleman.
19     Q.  What's your current address?
20     A.  326 New Salem Drive, Creve Coeur,
21     St. Louis, a suburb of Missouri, 63141.
22     Q.  Are you currently employed?
23     A.  Yes.
24     Q.  What is your job?
25     A.  I am president of the Donald

7

1      Danforth Planned Sciences Institute.
2      Q.  Is that affiliated with a
3      university?
4      A.  It's a private research institute.
5      Q.  Is it a nonprofit?
6      A.  Yes.
7      Q.  Are you here in your official
8      capacity or your personal capacity?
9      A.  I'm here because I'm subpoenaed.
10     Q.  And you're represented by counsel?
11     A.  Yes.
12     Q.  Your counsel is Mr. Hoff?
13     A.  Yes.
14     Q.  Have you ever been deposed before?
15     A.  Yes.
16     Q.  So, you're aware that there are
17     some ground rules that we'd like to follow in
18     these depositions?
19     A.  Yes.
20     Q.  I'd like to go over those, if you
21     wouldn't mind, as a formality.
22     A.  Please do.
23     Q.  Please answer audibly.  Can you
24     agree to do that?
25     A.  Ah, maybe.

8

1      Q.  Do your best, then, under the
2      circumstances.
3      A.  That's a fair approximation.
4      Q.  No head nods, unless you're
5      physically unable to do anything else.
6          If you will, please wait until the
7      question I'm asking is finished, and I'll do
8      you the same courtesy, and I will wait until
9      your answer is finished before I start a new
10     question.  Can we agree to that?
11     A.  Yes.
12     Q.  If you don't understand a question,
13     will you agree to ask me to repeat it?
14     A.  Yes.
15     Q.  And would you agree that if your
16     lawyer objects, you may still respond to the
17     question?
18     A.  That's my choice.
19     Q.  Well, we may have to talk about
20     that later.  Unless he instructs you not to
21     answer, will you agree to answer the
22     question?
23     A.  Yes.
24     Q.  Thank you.
25          Are you on any medications today or



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

9

1  do you have any physical conditions that
2  impair your ability to answer truthfully and
3  completely?
4       A.  No.
5       (Needleman Exhibit 231, deposition
6       notice, marked for identification as of
7       this date.)
8       Q.  I'd like to show you what's going
9  to be Exhibit 231.
10       Actually, let me give you a clean
11  copy here.
12       Do you recognize this document as
13  your deposition notice?
14       A.  I'll have to look at it.
15       (Pause.)
16       A.  They spelled my name wrong.  One L.
17       We didn't start on time.
18       Q.  Other than those minor issues, do
19  you recognize this as your deposition notice?
20       A.  I recognize this as a deposition
21  notice.  I don't know that I've seen it
22  before.
23       Q.  But you do understand that that's
24  the document that brought you here today?
25       A.  Yes.

10

1       Q.  All right.
2       Doctor, you said you'd been deposed
3  before.
4       Can you tell me the cases in which
5  you've been deposed, briefly?
6       A.  There was a patent case with the
7  University of Rochester.
8       There was a similar case with
9  Brigham Young University.
10       Many years ago there was a case
11  with a contractor for the conduct of an
12  Alzheimer's trial.
13       And then there was the case
14  involving Celebrex and Bextra, which was a
15  complex state case.  That was about a year
16  and a half ago.
17       So, that's the four or five cases.
18       Q.  The Celebrex and Bextra litigation
19  that you were referring to, was that a
20  products liability case?
21       A.  I don't know if I would call it
22  products liability.
23       There was a lot of questions at
24  those times about the side effects of Vioxx
25  and how they influence the case, and there

11

1  was a lot of litigations of Merck and the
2  small spillover of Celebrex and Bextra.
3       Q.  Were any of the other cases you
4  mentioned, or do any of the other cases you
5  mentioned involve Celebrex?
6       A.  They all do.
7       Q.  Are they still pending?
8       A.  The Celebrex Bextra was settled by
9  Pfizer.  The Rochester case was thrown out by
10  the judge.
11       The BYU case, I think, is
12  tentatively going to a jury trial in
13  September, 2011.
14       I don't know whatever happened
15  about the Alzheimer contract case.  I never
16  heard about it again.
17       Q.  Are you a named defendant in the
18  BYU case?
19       A.  Explain to me the difference
20  between being subpoenaed and being the
21  defendant.
22       Q.  In this case you understand that
23  you are not a defendant?
24       A.  So, I think that would apply to the
25  others, too.

12

1       Q.  Okay.  Did you do anything to
2  prepare for today's deposition?
3       A.  Yes.
4       Q.  What did you do to prepare?
5       A.  We met yesterday, and I was
6  re-familiarized, especially with dates,
7  because this happened --
8       MR. HOFF:  You don't have to
9  describe the content of the discussion.
10       THE WITNESS:  Yes.
11       MR. HOFF:  He is asking just what
12  you did, generally.
13       Q.  Sir, you said "we met."  Who is
14  "we"?
15       A.  My attorney, and also Joshua Weiss.
16       Q.  Was there anybody else there?
17       A.  No.
18       Q.  How long did you meet?
19       A.  Um, from 10 to about 4 yesterday.
20       Q.  Did you review any documents?
21       A.  Yes.
22       Q.  How many documents?
23       A.  Who knows.  Um, one to two dozen.
24       Q.  They all fit in one banker's box?
25       A.  What's a worn banker's box?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

13

1    Q.  One.  Did they all fit in one box
2  like this?
3    A.  Less than that, but they were bound
4  notebooks.
5    Q.  Can you generally describe for me
6  what you reviewed, the content?
7    A.  The issue is, especially for me, is
8  familiarizing myself especially about --
9    MR. HOFF: Move to strike.
10    I'm going to instruct you not to
11  discuss the content.
12    What he wants to know is what
13  documents you used and I think the way
14  he asked the question in terms of what
15  content, is just to give him an idea of,
16  if you can, identify the specific
17  document, the type of document it was;
18  is that fair?
19    Is that what you're getting at?
20    Because I don't want -- if you're
21  asking him to discuss the content of the
22  discussions we had, then I'm going to
23  direct him not to answer.
24    MR. OLIVER:  I'm not asking for the
25  content of the discussions.

14

1    MR. HOFF:  Okay.
2    MR. OLIVER:  I just want to know
3  the type of documents he reviewed.
4    MR. HOFF:  He just wants to know
5  the type of documents you looked at.
6  You can tell him that.
7    A.  There was the label that was
8  finally produced by the FDA.
9    There was some of the slides that
10  was the presentation at the FDA.
11    There was the JAMA article.  Those
12  are kind of the main things, and things
13  related to that.
14    Q.  Before yesterday's meeting, had you
15  personally searched for any documents,
16  yourself, in order to produce them in this
17  case to the Plaintiffs?
18    A.  No, I didn't
19    Q.  Did your attorneys do that kind of
20  search for you?
21    A.  You'll have to ask them.
22    Q.  Were you asked to destroy anything
23  or hide anything before today's deposition?
24    A.  No.
25    Q.  Prior to today's deposition, other

15

1  than your attorneys in yesterday's meeting,
2  had you talked to any other person who was
3  involved with this case?
4    A.  I was called by Goran Ando from
5  Europe.
6    Q.  When was that?
7    A.  A few weeks ago.
8    Q.  Was it November 10th, 2010?
9    A.  I don't remember the date.
10    Q.  Does that sound close to when it
11  probably was?
12    A.  Well, that's a few weeks ago.
13    Q.  How many times did you talk to Dr.
14  Ando?
15    A.  Once.
16    Q.  Was that before his deposition?
17    A.  Yes.
18    Q.  What did you talk about?
19    A.  The only question he had was, um,
20  about the trial design of the CLASS trial.
21    Q.  What was his question about the
22  trial design?
23    A.  Um, he wasn't clear about, um, the
24  end-point determination.
25    Q.  What wasn't he clear about?

16

1    A.  Um, he really wasn't actively
2  involved in the trial, and didn't know that
3  it was an event-driven trial instead of a
4  time-driven trial.
5    Q.  Did you talk to him about anything
6  else?
7    A.  I think that was the main point.
8    Q.  Were there any other minor points
9  that you can remember?
10    A.  He was asking me how I was doing.
11    Q.  Did you tell him you were doing
12  well?
13    A.  I haven't seen him in a long time.
14    I said, well, except when I waste
15  my time in depositions.
16    Q.  Have you spoken to Dr. Ando since
17  that time?
18    A.  No.
19    Q.  Have you spoken to anyone else
20  involved in the case since that time?
21    A.  No.
22    Q.  What about before that?
23    A.  No.
24    Q.  Nobody other than Ando?
25    A.  No.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

17

1    Q.   Did you exchange any documents or
2  e-mails with Dr. Ando?
3    A.   No.
4    Q.   What about anybody else?
5    A.   Some years ago, when the wave of
6  Celebrex cases were starting, Dick O'Malley
7  of Sidley Austin asked me to collect all my
8  documents, all my slides, all information of
9  any sort, and they were then produced and
10 scrutinized, and that was some years ago.  My
11 files were cleared and -- so.
12   Q.   Do you know if those documents have
13 been produced to the Plaintiffs in this case?
14   A.   I have no idea.
15   Q.   I want to talk a little bit about
16 your employment history.  I don't want to get
17 too deep into it, but just for the record I'd
18 like to talk a little bit about that.
19      Tell me about your education.
20   A.   I have a bachelor's degree in
21 pharmacy.
22      I have a master's degree in
23 pharmacology.
24      I have a Ph.D. in pharmacology.
25      And I had three years of post

18

1  doctoral training.
2    Q.   Where are those degrees from, what
3  universities?
4    A.   My bachelor's and pharmacy degree
5  were from --
6       You know, I never had a cold like
7  this.  Do you think it's New York?
8       Before I -- so, I've never been
9  five miles west of the Hudson River until I
10 went to St. Louis.
11      My bachelor's and master's degree
12 was in Philadelphia, Philadelphia College of
13 Pharmacy.
14      My Ph.D. was the University of
15 Maryland Medical School.
16      And I then went to St. Louis to be
17 a post doctoral fellow at Washington
18 University Medical School.  I've been in St.
19 Louis since 1964.
20   Q.   What was your first, after your
21 education, what was your first job?
22   A.   Assistant professor of pharmacology
23 at Washington University Medical School.
24   Q.   How long did you hold that
25 position?

19

1    A.   In -- that was '67.
2       In 1976 I became chairman of the
3  department, and I was chairman of the
4  department until 1989.
5    Q.   What happened in 1989?
6    A.   I became chief scientist of
7  Monsanto Corporation.
8    Q.   Why did you make that change from
9  academia to Monsanto?
10   A.   In academia I had made many
11 discoveries that had profound therapeutic
12 implications, and in academia you don't
13 finish and develop drugs.
14      So, in Washington University I
15 discovered a new endocrine system, and then
16 when I discovered the target COX-2, I saw its
17 potential and knew I ought to see one project
18 all the way through to the end; so, I went as
19 chief scientist to Monsanto.
20      You know, we may have trouble
21 getting through this day.  We'll limp along,
22 but you may have to visit me in St. Louis.
23   Q.   I have a close friend who lives in
24 St. Louis --
25   A.   Who is that?

20

1    Q.   I don't have any problems.  I don't
2  think you know him, Doctor.
3       So, you discovered, you were
4  talking about discovering, I guess, the COX-2
5  inhibitor?
6    A.   No.  First it was the target.
7    Q.   Explain that to me.  Tell me about
8  the target.
9    A.   The enzyme COX is an enzyme that
10 converts a fat, arachadonic acid into
11 prostaglandins.  There's a whole family of
12 prostaglandins, some that are beneficial,
13 some that are related to inflammation.
14      The whole history of the treatment
15 of pain and arthritis is built on drugs,
16 first, that came from the bark of trees,
17 salicylic acid, and then aspirin.
18      And they were used for 75 years
19 before it was discovered that all
20 aspirin-like drugs, all non-steroid
21 anti-inflammatories, block the production of
22 prostaglandins, and it's the prostaglandin in
23 the joint, it's the prostaglandin that causes
24 the pain.  The discovery won the Nobel Prize
25 for John Vane.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Philip Needleman                                    December 8, 2010

21

1    What he discovered was the doses
2  that cause relief of the pain were the same
3  doses that caused the side effects,
4  especially the bleeding ulcers, perforation,
5  and the thrombosis.
6    It was subsequently found that the
7  mucous lining the stomach and in the gut,
8  which protects the stomach from acid and the
9  things that broke down protein, is produced
10  because of prostaglandin.
11    So, the aspirin-like drugs
12  destroyed the ability to make mucous, and
13  that predisposes it to aspirin.
14    So, with that discovery, it was
15  believed that it was a mechanism-based side
16  effect.  You block COX.
17    Over the next ten or more years I
18  found the existence, that there were two
19  forms of COX, until different genes, and from
20  that I surmised that one was tied to the
21  inflammation, and a different one was to the
22  side effect.
23    With that knowledge, we predicted
24  you could have a magic bullet that would hit
25  the inflammation without causing the

22

1  mechanism-based side effects.  And that's why
2  I left Washington U to discover the agents
3  that could make that possible.
4    Q.  Well, let's go back to your
5  employment history.
6    In 1989 you went to Monsanto.  What
7  was your position there?
8    A.  Chief scientist.
9    Q.  How high up in the organization
10  were you?
11    A.  I reported directly to the CEO.
12    Q.  So, that's pretty high?
13    A.  Pretty high.
14    Q.  And did that company, did Monsanto
15  later merge with Searle?
16    A.  Monsanto is a conglomerate
17  agricultural company, chemical company,
18  nutrition company, and it had a core of
19  science that had the skills in molecular
20  biology, cell biology, chemistry, some of the
21  things that support.
22    There was an acquisition of a small
23  pharmaceutical company in Belgium.
24    Later, there was the acquisition of
25  Searle, which also brought Nutrasweet.

23

1    The chief scientist had
2  responsibilities to look at all the science,
3  but to run this core of sciences that were
4  necessary for all of the companies.
5    In 1993 I was also asked not only
6  to be chief scientist, to become the head of
7  R&D of the Searle arm of Monsanto, which was
8  the pharmaceutical arm.
9    Q.  How long did you keep that
10  position?
11    A.  From 1993 to 2000, when then there
12  was a merger of Pharmacia and Monsanto, and
13  then I became chief scientist and head of R&D
14  of the Pharmacia R&D arm, which was the
15  conglomerate.
16    Q.  Do you remember who you reported to
17  while you were the head of R&D for Searle?
18    A.  The CEO of Monsanto was a Richard
19  DeSchutter, until about 1999, and then the
20  CEO was a Bob Shapiro of Monsanto; so, he was
21  the final tip of the pyramid.
22    In Searle, there was a CEO, Shelly
23  Gilgor.
24    But ultimately in the Shapiro
25  model, it was kind of a co-run Searle between

24

1  the head of the business and the head of R&D.
2  In Pharmacia it all reported to Fred Hassan.
3    Q.  So, when you were at Searle you
4  basically shared responsibility for running
5  the company with Mr. DeSchutter or Mr.
6  Shapiro?
7    A.  No.  Shapiro was the final, as head
8  of the corporation, was the final leader of
9  the corporation.
10    Q.  But you had said that there was
11  some type of shared responsibility for
12  leading the company?
13    A.  But we still reported to Shapiro.
14    Q.  Okay.
15    MR. HOFF:  I think the confusion is
16  that the share was with Shelly --
17    THE WITNESS:  Gilgor.
18    MR. HOFF:  That's who you shared
19  the responsibility with?
20    THE WITNESS:  No.  No.  Gilgor was
21  gone, and then I shared it with
22  DeSchutter.
23    MR. HOFF:  All right.
24    Q.  So, you and Mr. DeSchutter shared
25  responsibility for running the Searle arm of



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

25

1  the company?
2      A.  Reporting to Shapiro.
3      Q.  Okay.  You said that when it, when
4  Pharmacia merged with Searle, your superior
5  became Fred Hassan, he was the CEO at the
6  time?
7      A.  Right.
8      Q.  Did you know Mr. Hassan before the
9  merger?
10     A.  No.  Well, only in the pre merger
11  discussions.
12     Q.  Do you remember when that, when
13  those discussions began, generally?
14     A.  Somewhere around 2000.
15     Q.  So, that would be the first time
16  you met Mr. Hassan.
17     A.  That's right.
18     Q.  What kind of working relationship
19  did you have with Mr. Hassan?
20     A.  I had good relationships with all
21  of the CEOs.
22     Q.  Did you work in the same building?
23     A.  The pharmaceutical arm of Pharmacia
24  was located in St. Louis, San Francisco,
25  Kalamazoo, Nerviano, Italy.

26

1      So, the research sites were widely
2  distributed.  The corporate offices were in
3  Peapack, New Jersey.
4      I would spend some time in Peapack,
5  the majority of the time at their R&D sites.
6      Q.  Mr. Hassan had an office in
7  Peapack, as well?
8      A.  Only in Peapack.
9      Q.  How often did you speak to Mr.
10  Hassan?
11     A.  We had a regular monthly, ah, we
12  would have a prolonged lunch.
13     And then, once a month, yes, that
14  was the major, that was the major meeting I
15  had with him.
16     Q.  That was once a month?
17     A.  Yes.  Then they would have, um,
18  some kind of executive management committee
19  that would review all things, business and
20  sales, and so on, and that would happen once
21  a month also.
22     Q.  So, there were -- and at least
23  twice a month you had a fairly long meeting
24  with Mr. Hassan?
25     A.  The first one was one-on-one, the

27

1  other would be a meeting like this.
2      Q.  At the second type of meeting, a
3  meeting like this, were there a lot of people
4  in the room, was Carey Cox there?
5      A.  Yes.
6      Q.  And what was Mr. Cox's role in the
7  company?
8      A.  Ms. Cox.
9      Q.  Ms. Cox, sorry.
10     A.  I'll tell her about this if I ever
11  see her.
12     Q.  You can do that.
13     A.  I see.
14     She was the head of the U.S.
15  business, the sales force, and the business
16  strategy.
17     Q.  Did you meet with Ms. Cox, other
18  than this monthly meeting that you had with
19  Mr. Hassan?
20     A.  No.
21     Q.  Who else would be at these
22  meetings, besides Ms. Cox and Mr. Hassan?
23     A.  There would be international sales,
24  there would be law -- the chief counsel --
25     THE REPORTER: I did not hear you.

28

1      Law?
2      A.  That's like people who make a
3  living worried about litigations.
4      Contracts.
5      Head of manufacturing.  You know.
6  All the people who would be involved in the
7  head of HR.
8      Q.  How many, roughly, people?
9      A.  Eight or 10.  It was like an OTC
10  business.  There was an information
11  technology officer.
12     Q.  What types of things would you
13  discuss at these meetings?
14     A.  I would mostly listen.  By and
15  large, it's the review of business strategy,
16  sales, contract negotiations in licensing,
17  the blocking and tackling of a big
18  corporation.
19     Q.  During these meetings, what would
20  they rely on you to provide, what type of
21  information would you provide to the group?
22     A.  If there was, for example, a review
23  of an in license product, I would give a
24  technical review.
25     Q.  When you say "technical review,"



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                        December 8, 2010

29

1  tell me what that means.
2      A.  You have a disease, you have
3  certain symptoms.
4          You have a potential therapeutic
5  agent.
6          And the questions are its efficacy.
7          Is it orally biovailable?
8          Is it long-lasting?
9          What are its cost of goods?
10         What is the level of side effects?
11         What is the ratio of benefit/risk?
12         What is the state of the
13  competition?
14         What is the regulatory hurdle?
15         So, for example, is it a trial that
16  will take six months with 200 patients that
17  are on, or is it going to take five years and
18  12,000 patients?  So, I analyze the pros and cons of
19         So, I analyze the pros and cons of
20  the benefit/risk ratio, the trial, the
21  expectations, the competitive position.
22     Q.   The answer you just gave me seemed
23  to be you were talking prospectively.
24     A.  You asked me what I would talk
25  about.  That's what I would talk about when

30

1  there was a product.
2      Q.  Right.  And I appreciate your
3  answer.
4          But your answer was prospective.
5  I mean, you were telling them about something
6  that was going to happen in the future,
7  should we invest in that drug.  Is that a
8  fair characterization of what you just told
9  me?
10     A.  That's correct.
11     Q.  Did you ever, if you had a drug
12  that was developed and approved, did they
13  also ask you questions about the science of
14  that drug, if there was a question about it?
15     A.  Not at those meetings.
16     Q.  Now, you also mentioned trials, you
17  would discuss trials in the meetings.
18         Were you only discussing trials
19  that Pharmacia was going to run, or did you
20  sometimes discuss trials that had already
21  been run?
22     A.  As you just established, it was
23  prospective projections.  Often, when you in
24  license, a drug has been through Phase I
25  safety, Phase II small trial, you're usually

31

1  asking the question, are you going to do the
2  big multiple site, multiple nation trial.
3          And you would discuss what is the
4  design to get the effect that you want.
5      Q.  When did these meetings begin?
6      A.  Pharmacia and Searle merged in 2000
7  -- do you remember if they started
8  immediately?
9      A.  This was a custom already present
10  in Pharmacia.  So, we just snapped right into
11  the system.
12     Q.  So, as soon as the merger started,
13  or excuse me, as soon as the merger closed,
14  you would have been present at the first such
15  meeting?
16     A.  Correct.
17     Q.  And Mr. Hassan would have been
18  there?
19     A.  Correct.
20     Q.  And Ms. Cox would have been there?
21     A.  Correct.
22     Q.  Did you always attend these
23  meetings?
24     A.  Always?  Always is perfection.
25         I might have missed one or two, if

32

1  I was engaged in something.
2      Q.  They were important meetings?
3          (Phone - handheld - chiming)
4      A.  My phone doesn't think so.
5      Q.  Would you call them a command
6  performance?
7      A.  I think it was useful to have a
8  discussion with multiple viewpoints.  It was
9  a useful way to run a company.
10     Q.  Are you currently doing any work
11  for Pharmacia?
12     A.  No.  There is no Pharmacia.
13     Q.  Are you currently doing any work
14  for Pfizer?
15     A.  Only sitting here, and that's
16  because I was subpoenaed.
17     Q.  Pfizer is not paying you to be
18  here; are they?
19     A.  I do get a consultation fee.
20     Q.  Are you getting a consultation fee
21  for anything other than this deposition?
22     A.  From Pfizer?
23     Q.  Yes.
24     A.  No.
25     Q.  What consultation fee are you



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Philip Needleman                                    December 8, 2010

33

1  getting for being here at this deposition?
2    A.  Do I answer that?  It's not enough.
3       MR. HOFF:  I think we have to talk
4  about that.
5    Q.  Well, is it more than $100?
6       THE WITNESS:  Is that their
7  business?  It doesn't seem like it --
8       MR. HOFF:  I'd like to talk about
9  that.  When we take a break, we'll come
10  back to that issue.
11      MR. OLIVER:  Do you have an
12  objection?
13      MR. HOFF:  I want to find out a
14  little bit more about that.
15      MR. OLIVER:  Well, if you've got an
16  objection, raise the objection.  I want
17  him to answer the question now.  If you
18  want to take a break and talk about it,
19  we'll --
20      MR. HOFF:  Why don't we do that,
21  if you want.  Let's take a break then.
22      MR. OLIVER:  Well, actually there's
23  a question pending.
24  DI      MR. HOFF:  All right.  I'll object
25  to the question, and I direct you not to

34

1  answer it.
2       MR. OLIVER:  And what's the ground
3  for your objection?
4       MR. HOFF:  Privileged.
5  Let's go off the record.
6       MR. OLIVER:  All right.
7       THE VIDEOGRAPHER:  Off the video
8  record at 9:44.
9       (Recess)
10      MR. OLIVER:  Back on the record.
11      THE VIDEOGRAPHER:  Stand by.  Back
12  on the video record at 9:47.
13    Q.  Doctor, I think the last question I
14  asked you before the break was what
15  consultation fee are you getting for being
16  here at this time.
17    A.  In all the previous depositions
18  I've given, my consultation fee was $500 an
19  hour.
20    Q.  Are you getting that same
21  consultation fee for this deposition?
22    A.  Um, I don't know if there's any
23  restrictions about that.  I had assumed that.
24  I don't know if there's something special
25  about the reason that it is or isn't the case

35

1  here.
2    Q.  But are you, are you getting that
3  fee?
4    A.  I don't know that answer yet.  I
5  had expected one, but if there's a problem,
6  I'll hear about it.
7    Q.  Before I asked you the question --
8  excuse me, after I had asked you the
9  question, you went and talked to your
10  attorney about this matter.  Is that correct?
11    A.  (Indicating).
12    Q.  What did you discuss with him?
13  DI   MR. HOFF:  I'll direct him not to
14  answer that question.
15    Q.  Did he instruct you on how to
16  answer a question?
17    A.  I'll pay attention when he tells me
18  not to answer a question.
19    Q.  If you are getting paid a
20  consultation fee in this particular case, who
21  is paying it?
22    A.  Ultimately, Pfizer.
23    Q.  You say "ultimately."  Is there
24  some --
25    A.  I send the bill to someone who

36

1  passes it to Pfizer.
2    Q.  You send the bill to somebody at
3  Pfizer?
4    A.  No.  The clearinghouse person was
5  that -- Dick O'Malley, Sidley Austin.
6    Q.  You said it was $500 an hour?
7    A.  Um-hum.
8    Q.  Have you talked to anybody about
9  that fee before --
10    A.  This session?
11    Q.  -- this session?
12    A.  No.
13    Q.  Why did you assume you would get
14  it?
15    A.  Because I got it in all the other
16  depositions.
17    Q.  Were you employed by the company at
18  the time of the other depositions?
19    A.  No.
20    Q.  Nobody has talked to you about it
21  before this deposition?
22    A.  No.
23    Q.  You don't know if you're going to
24  get it for this deposition?
25    A.  No.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

37

1   Q.  Are you going to ask for it?
2   A.  Yes.  But I wouldn't screw up the
3   case over a small issue like that.  I'm here
4   because I believe in COX-2 and Celebrex.
5       Q.  Well, that merges nicely into what
6   I want to talk about now, which is COX-2 and
7   Celebrex.
8       What is Celebrex?
9   A.  Celebrex is a selective COX-2
10  inhibitor that, at fully efficacious doses,
11  relieves the signs and symptoms of arthritis
12  by inhibiting COX-2 and not COX-1.
13      Q.  You described your role in this, in
14  the discovery of Celebrex.
15      Can you, it seemed to me you were
16  focusing on the discoveries that happened
17  while you were at the university.  Can you
18  tell me about your work at Monsanto and then
19  Searle, on Celebrex?
20  A.  Your statement wasn't correct.
21      Q.  I'm sorry, what was incorrect?
22  A.  The target was discovered in
23  academia.  All the work for the discovery,
24  the optimization and the testing of the drug,
25  was done in Monsanto/Searle.

38

1   Q.  So, you began that work in 1989
2   when you joined Monsanto?
3   A.  The drug part.
4       Q.  When you started at Monsanto, did
5   you have a timeline of how long this would
6   take to develop this into a drug?
7   A.  No.  You can't know that answer.
8       Don't forget, this is a brand new
9   hypothesis that's a uniquely different
10  enzyme.  In my experience, it's often taken
11  10 or 20 years to go from a target to a drug.
12      Q.  How long did it take with Celebrex?
13  A.  It went on to the market in 1999.
14      Q.  Why was a company like Monsanto
15  interested in this particular enzyme?
16  A.  I think there might be 40 or 50
17  million arthritis patients in the United
18  States.
19      The insets that I told about, there
20  was a study from Stanford by a Dr. Singh, the
21  ARAMIS study.
22      It works out that NSAIDs are the
23  biggest single cause of drug-induced
24  hospitalizations and caused 16,500 deaths a
25  year in over 100,000 severe hospitalizations

39

1   from the GI side effects.
2       So, it was an important drug, and a
3   lot of arthritic patients couldn't take it.
4   So, if we could find a selective agent, it
5   would have had a very significant safety
6   advantage over existing NSAIDs.
7       Q.  It would have also been hugely
8   profitable, I assume?
9   A.  If it met expectations, it would
10  have been an important drug.
11      Q.  What expectations would it have had
12  to meet?
13  A.  As I explained to you before,
14  maintaining the treatment of the signs and
15  symptoms of arthritis, but with less side
16  effects.
17      Q.  Less side effects in general, or
18  less GI side effects?
19  A.  Both the GI and bleeding side
20  effects, because COX-1 also inhibits a
21  cycloxygenase in platelets.
22      There it doesn't make
23  prostaglandin, it makes thromboxin, and
24  that's what causes platelets to clump.
25      So, the difference between an

40

1   aspirin, and which hits COX-1 and COX-2, and
2   a COX-2 inhibitor is COX-2 inhibitor won't
3   inhibit platelet aggregation and, therefore,
4   have a bleeding tendency.
5       Q.  Is it fair to say that given your
6   answers, is it fair to say that Celebrex was
7   meant to compete with or take over part of
8   the market that NSAIDs operated in or
9   covered?
10  A.  What I think is fair to say was,
11  Celebrex had a chance to be a superior
12  therapeutic agent, with an improved efficacy
13  to risk ratio.
14      Q.  Have you ever heard Celebrex called
15  super aspirin?
16  A.  Yes.
17      Q.  Do you know who coined that phrase?
18  A.  The guy who wrote the New Yorker
19  article.
20      Q.  What New Yorker article?
21  A.  There's a New Yorker article called
22  "Superaspirin."
23      Q.  Was the superaspirin article before
24  the approval of Celebrex?  The FDA approval
25  of Celebrex.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

41

1    A.  You know, I'm not sure.  I'm not
2  sure.
3    Q.  When did the FDA approval Celebrex?
4    A.  December 31st, 1998.  Kind of
5  interfered with my New Years Eve.
6    Q.  You remember that date?
7    A.  It screwed up my New Years Eve.
8    Q.  Why?
9    A.  You see, the FDA has kind of a
10  mandated set of targets that they want to
11  approve; so, they were finally, the advisory
12  committee was earlier for the NDA; and so,
13  they were, that was part of their last day of
14  the year activities.
15    Q.  What company were you with when
16  they approved Celebrex?
17    A.  Searle.  I was with Searle in '98,
18  which is Monsanto.
19    Q.  Were any other companies
20  participating with Searle in the development
21  and marketing of Celebrex?
22    A.  There was a joint development and
23  marketing agreement with Pfizer which started
24  in about, about a year before the approval.
25    Q.  What did the approval of Celebrex

42

1  mean for Searle as a company?
2    A.  When you ask me what Celebrex
3  meant, I recited the first line of the FDA
4  NDA approval.
5       And the fact that the FDA was
6  satisfied that Celebrex improves the signs
7  and symptoms of arthritis at doses that
8  inhibit COX-2 and COX-1.  That really
9  positioned the drug to be understandable by
10  any practitioner that it had a
11  therapeutically improved benefit/risk ratio.
12    Q.  But for the company Searle, as a
13  business, what did the approval of Celebrex
14  mean?
15    A.  It meant that it could really be a
16  significant player in arthritis.
17    Q.  Did that actually happen?
18    A.  Yes.
19    Q.  Was Celebrex a successful launch?
20    A.  Yes.
21    Q.  How successful!
22    A.  I think, at its time, it was the
23  most successful launch of all times.
24    Q.  Do you know if it still remains the
25  most successful launch of all time?

43

1    A.  I don't pay much attention.
2       Um, some of these antibodies for
3  oncology must do pretty well.  If you talk
4  about the slope, I don't know.
5    Q.  Was Celebrex Searle's most
6  important product at the time?
7    A.  Yes.
8    Q.  Was it the largest profit driver
9  after approval?
10    A.  It was -- as a single product, it
11  was.
12    Q.  "As a single product."  Explain
13  that.
14    A.  A drug company has a lot of
15  products.  The aggregate sales of other
16  things would have been as great as Celebrex.
17    Q.  But if you broke it down product by
18  product, Celebrex was the biggest?
19    A.  Um-hum.
20    Q.  By how much?
21    A.  Yes.  I don't remember numbers.
22    Q.  Can you give me a guess?
23    A.  No.
24    Q.  What, when the FDA originally
25  approved Celebrex, what did the label say?  I

44

1  understand you're not going to know exactly.
2    A.  I recited it to you twice.
3    Q.  Well, you didn't recite the whole
4  label to me.
5    A.  That's the most important part.
6    Q.  Well, let me finish my question.
7       What did the label say about GI
8  side effects?
9    A.  I don't remember the language.
10    Q.  Can you tell me generally what it
11  said about GI side effects?
12    A.  I don't remember the language.
13    Q.  Did it say that Celebrex is better
14  than NSAIDs?
15    A.  Perhaps you could give me the
16  label, so I could read it to you.  I don't
17  remember.
18       MR. OLIVER:  I guess this will be
19  Exhibit 232.
20       (Needleman Exhibit 232, documents
21  Bates Nos. 1767 to 68, marked for
22  identification as of this date.)
23    Q.  Do you recognize this document?
24    A.  I could tell you it's not the
25  label.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

45

1    MR. HOFF:  Do you have another
2  copy?
3    MR. OLIVER:  Yes.
4    Q.  Doctor, when he gives you the
5  document, take a minute to look it over and
6  familiarize yourself with it.  Take as much
7  time as you need.
8    A.  May I take this?
9    MR. HOFF:  Is that previously
10  marked?
11    THE WITNESS:  It says Exhibit 2,
12  but then it says Exhibit 232, also.
13    MR. OLIVER:  I don't think so,
14  Doctor.
15    MR. HOFF:  Okay.  So, we're going
16  to ignore this Plaintiff's Exhibit 2
17  label?
18    MR. OLIVER:  Yes.  I'm sorry.
19  I explained this to the court
20  reporter earlier.
21    That's just linked to me.
22    MR. HOFF:  I just wanted to be
23  clear.
24    MR. OLIVER:  Those numbers are
25  irrelevant, as long as he puts the new

46

1  stickers on there.
2    MR. HOFF:  Okay.  Go ahead.
3    Q.  Let me know when you've had a
4  chance to just briefly read over that,
5  Doctor.
6    (Pause.)
7    A.  Thanks, I've read it now.
8    Q.  What does the document appear to be
9  to you?
10    A.  This seems to be someone who took
11  minutes of the proceedings of the FDA
12  sessions after the advisory committee in the
13  review for the preparat' agreements about the
14  final label.
15    Q.  You were at that meeting; correct?
16    A.  Yes.
17    Q.  Would you look in the second
18  paragraph with me.  It says, "Needleman" --
19  that's you; correct?
20    A.  We've wasted a lot of time if it's
21  not.
22    Q.  Okay.
23    "Needleman stressed that data are
24  still being suppressed in the label despite
25  the size of the database, and that this did

47

1  not provide a level playing field."
2    Can you explain that statement to
3  me?
4    A.  As I recall, the initial label
5  proposed by the FDA wanted to call Celebrex
6  an NSAID, in spite of the advisory committee.
7    DeLap said to me, you don't know
8  the mechanism of action.
9    I then listed 10 points that
10  established the mechanism of action.
11    And from that discussion was the
12  agreement it inhibits COX-2 at an efficacious
13  dose, but not COX-1.  That's a mechanism of
14  action statement.
15    The size of the trial, the last
16  NSAID that was approved before it, a drug
17  like Relafin at 1400 patients.
18    The Celebrex trial had 13,400
19  patients, and 5,000 endoscopies, the largest
20  trial of its kind.  And so, um, the
21  discussion was to reflect that.
22    Q.  You wanted Celebrex in the final
23  label to be separate from NSAIDs?
24    A.  Correct.
25    Q.  Did you want the label to also say

48

1  that it was superior from a GI standpoint?
2    A.  This note refreshes some part of
3  the label, which I wished you could show.
4    But the FDA finally permitted a bar
5  graph of endoscopy, and it showed that the
6  doses of Celebrex, there was no endoscopic
7  signal, it was baseline, but conventional
8  NSAIDs caused an incidence of something like
9  20 percent of endoscopic lesions.
10    That graph, indeed, showed the
11  differentiation from NSAIDs.  And as this
12  document said, the FDA took out the comments
13  that said "like NSAIDs, Celebrex X."  So,
14  that was the discussion.
15    Q.  Will you look at the -- there are
16  some bullet point there; do you see those?
17    A.  Yes.
18    Q.  I guess, number 5.  The last
19  sentence under bullet number 5 says, "The
20  NSAID comparison table" --
21    A.  Wait.  Number 5 starts with
22  "Clinical studies"?  That's 4.
23    And then it starts with the
24  discussion of serious side effects.  Starting with
25    Q.  That's correct.  Starting with



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

49

1  discussion.  The last sentence of that
2  paragraph says, "The NSAID comparison table
3  would be eliminated.  See discussion of GI
4  warning below."
5       Do you have a recollection of what
6  NSAID comparison table they were talking
7  about?
8       A.  My recollection was they already
9  agreed to the bar graph; so, you don't also
10 need a table.
11      Q.  Remind me.  What did the bar graph
12 compare again?
13      A.  Endoscopy of the doses of Celebrex
14 versus other conventional NSAIDs.
15      Q.  If you look at the seventh bullet
16 point with me.
17      This is the language that the FDA
18 ultimately agreed to put in the label; isn't
19 that correct?
20      A.  My willingness to say Yes would be
21 a lot better with the label in my hand.  This
22 is minutes of the label.
23      Q.  Well, at least that's what this
24 document indicates that language is.
25      A.  It doesn't tell you the final label

50

1  at all.  There were a number of negotiations.
2       Q.  It says, "FDA ultimately arrived
3  with us at wording like this to be inserted
4  underneath the standard warning."
5       A.  I would have liked to have seen the
6  label.  I understand the context.
7       Q.  So, you agree at least that it
8  would be wording that is very similar to this
9  that ended up in the final label?
10      MR. HOFF:  Objection to form.
11      A.  Let me play back the way I read
12 this.
13      Because it's important for this
14 discussion.
15      NSAIDs have an event rate of 1 to 2
16 percent of GI effects.  Celebrex in this
17 trial with 5,000 patients had an event rate
18 of 0.06 percent.
19      If the label reflected that, that
20 shows the differentiation projected from the
21 5,000 patients.
22      Q.  Okay.  If you look with me at the
23 last sentence in that paragraph, it says
24 "prospective long-term studies require to
25 compare the incidence of seriously clinically

51

1  GI adverse events in patients taking Celebrex
2  versus comparator NSAIDs have not been
3  performed."
4       A.  Correct.
5       Q.  Do you know if that language
6  ultimately ended up in the label, or
7  something like that?
8       A.  I don't remember.
9       Q.  If you turn the page, the same
10 paragraph, about the middle of that paragraph
11 beginning with "FDA still strongly feels"; do
12 you see that?
13      A.  Yes.  Let me read that sentence.
14      Yes.
15      Q.  I'm going to read that to you.
16      "FDA still strongly feels that
17 direct comparison to NSAIDs data obtained the
18 same way as Celebrex data would constitute a
19 claim of superiority to NSAID and they will
20 not let us have such a direct comparison
21 until the CLASS studies are completed
22 successfully."
23      Does that accurately reflect that
24 FDA did not allow a comparison of Celebrex
25 and NSAIDs in the final label?

52

1       A.  I think that's accurate.  I think
2  that's an accurate description of the need
3  for CLASS studies.
4       Q.  That class study, tell me what that
5  is.
6       A.  It's, um, based on an experience
7  going back to an earlier anti-arthritis drug
8  developed by Searle, which was a combination
9  of diclofenac and a prostaglandin known as
10 misoprostol.
11      As I told you, there was a
12 mechanism-based side effect of causing ulcers
13 when you have COX-1 inhibition.
14      Until you had a selective inhibitor
15 like COX-2, you try to overcome the damage by
16 adding prostaglandin back with a tube, with a
17 tablet.
18      That led to a trial known as
19 MUCOSA, and MUCOSA was a long-term trial of
20 GI events comparing diclofenac to arthrotec,
21 which is a combination of diclofenac plus
22 misoprostol.  So, that became a, that became
23 the comparative standard on which the CLASS
24 trial was designed.
25      Q.  You gave me the background of



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                          December 8, 2010

53

1  CLASS, but I'm still not sure I got what
2  CLASS is.
3      A.  It's designed to do a comparative
4  trial to go beyond what was in the NDA
5  submission looking for more serious GI events
6  than the endoscopic changes.
7         That's part of it.
8         But you had to go on to actually
9  bleeds, ulcers, perforations, obstruction.
10 Longer study.  Bigger doses.
11        A more comprehensive focused kind
12 of Phase IV trial to allow the superiority
13 claim.
14     Q.  So, the FDA had the MUCOSA data
15 when they approved the original label for
16 Celebrex?
17     A.  The MUCOSA data preceded it by some
18 years.
19     Q.  But that was part of FDA's analysis
20 of the entire issue in the labeling for
21 Celebrex?
22     A.  No.  I never heard mention of
23 MUCOSA at all in the negotiations about the
24 NDA approval of Celebrex.
25     Q.  Well, I'm sorry, maybe I'm using

54

1  the wrong, maybe I'm getting MUCOSA confused
2  with another study.
3         You were talking about a study that
4  had proceeded CLASS.  Was that MUCOSA?
5      A.  Different drug.  Arthrotec --
6      Q.  Okay.
7      A.  -- combination --
8      Q.  Okay.
9      A.  -- of misoprostol prostaglandin
10 with diclofenac.
11     Q.  When Celebrex was approved, FDA has
12 the data from the Celebrex trials that were
13 submitted with the NDA?
14     A.  Correct.
15     Q.  They say you can't make a claim of
16 superiority over NSAIDs; correct?
17     A.  That's correct -- not entirely,
18 though.  Understand, they published in the
19 NDA the bar graph of the endoscopic data.
20        They also published that the
21 incidence of GI side effects was .06 versus
22 1.2.  They didn't want bigger claims until
23 you did the long-term study just focused on
24 that.
25     Q.  And CLASS was that long-term study?

55

1      A.  That was our projected.  CLASS is
2  an acronym for Celebrex long-term kind of
3  study.  So, we always intended to do a
4  long-term study.
5      Q.  Who is "we"?
6      A.  Searle.
7      Q.  Was Pfizer involved in that at the
8  time?
9      A.  We were largely responsible for the
10 design.  It was Searle that did the MUCOSA
11 trial.
12     Q.  What role did you play in designing
13 the CLASS trial?
14     A.  I certainly would have heard the
15 design, reviewed the assumptions.
16        It would have been reviewed with my
17 executive committee, which would have a head
18 of clinical and regulatory and other people.
19     Q.  Sitting here today, can you recall
20 the primary end-point for CLASS?
21     A.  I think the primary end-point was
22 perforation of gastric obstruction bleeds.
23        There was a series of primary and
24 secondary, but -- I think also in the design
25 was attention to bleeding markers such as

56

1  hemoglobin, hemolysis, hematocrit.
2         They also embedded in such a trial
3  -- it became very important later -- is,
4  since you're at an exaggerated dose at a long
5  period of trial, they required all systems
6  safety, including liver, kidney, heart.
7         So, somewhere in the primary and
8  secondary, that was part of the agreed
9  design.
10     Q.  Do you recall whether aspirin users
11 were allowed to participate in the study?
12     A.  Interestingly, that's a decision
13 that was up to the company.
14        And our design allowed all comers,
15 which would include people who were on
16 aspirin, but if they were on NSAIDs, they had
17 to withdraw, but they could have free use of
18 aspirin.
19     Q.  Was that a significant decision?
20     A.  Um, by hindsight it was an enormous
21 decision.
22     Q.  If you can recall, at the time,
23 what was the thinking for allowing aspirin
24 patients into the study?
25     A.  In the MUCOSA trial, there were



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                          December 8, 2010

57

1  only about 10 percent of the patients who
2  were on aspirin.
3        Projecting that, which has the
4  potential for a confounding effect,
5  anticipating the same low population of
6  aspirin patients was the design. That was,
7  that was the prospective design.
8        By hindsight, that was a wrong
9  assumption.
10    Q. Why was it a wrong assumption?
11    A. Because during the ensuing years
12 cardiovascular disease exploded, the use of
13 aspirin got lots of attention. There were
14 very many more aspirin users who also implied
15 cardiovascular risk. So, there's very many
16 more.
17        Merck, for example, excluded all
18 aspirin patients in the Vioxx trial.
19    Q. But Searle decided to include
20 aspirin users at the beginning of the CLASS
21 trial, because at that time it seemed like a
22 more real-world, realistic assumption?
23    A. It was based on an incidence rate.
24        You designed trials based on your
25 relevant therapeutic population.

58

1        You understand from what I said
2  earlier that aspirin is both a COX-1 and
3  COX-2 inhibitor.
4     Q. Correct.
5     A. You do trials to understand your
6  drug. If you would have known you had a very
7  high level, the design isn't appropriate.
8     Q. So, Searle decides to allow
9  aspirin -- you tell me if this is a correct
10 statement -- Searle decides to use aspirin,
11 allow aspirin patients into the class study,
12 because, at the time, there were a lot of
13 people in the relevant population who would
14 be treated with Celebrex, who would also be
15 on aspirin?
16    A. The design was --
17        MR. HOFF: Objection to form.
18    A. The design, as I said, was based on
19 the experience of the MUCOSA trial.
20        When you design trials, there have
21 to be inclusion, exclusion.
22        So, for example, if a patient has
23 compromised renal function, if a patient has
24 compromised liver function, they would be
25 excluded in the design.

59

1        So, that's just one of the
2  parameters.
3     Q. Who participated --
4     A. If they had glucocorticoids, if
5  there are -- remember, we also opened up the
6  trial to all arthritics, both osteo and
7  rheumatoid.
8        If we really wanted to fine-tune
9  and bias it, we would have just done osteo.
10 Rheumatoid arthritis have lots of other
11 symptomatology and side effects.
12    Q. At Searle who helped, other than --
13 I understand your role -- who else helped you
14 design the CLASS study at the higher level of
15 the company?
16        MR. HOFF: Objection to form.
17    A. It's the responsibility of R&D to
18 design the trial. Other people in the
19 corporation aren't particularly influential.
20        The influential group is the key
21 opinion leaders in clinical or academic
22 practice.
23        Therefore, when you design a trial,
24 you will often assemble a panel of people who
25 are experienced practitioners in the disease,

60

1  in the conduct of clinical trials, and
2  understanding the therapeutic agents. Those
3  are the people, not the upper management; so,
4  it's an R&D decision, influenced by key
5  opinion leaders.
6        It's also influenced by discussions
7  with the FDA itself.
8     Q. Did Mr. DeSchutter have any role in
9  designing CLASS?
10    A. No.
11    Q. Did he have to approve the CLASS
12 study?
13    A. No.
14    Q. Do you remember briefing Mr.
15 DeSchutter on the CLASS study, before it was
16 started?
17    A. I don't remember.
18    Q. He was the CEO at the time?
19    A. This was my decision. It wasn't a
20 matter of the CEO or --
21    Q. You were the final decision-maker
22 for CLASS?
23    A. (Indicating).
24    Q. Everything had to pass through you?
25        MR. HOFF: Objection to form.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                           December 8, 2010

61

1    A.  That's correct.
2        MR. OLIVER:  What's the objection?
3    What's wrong with that.
4        MR. HOFF:  Everything.  What does
5    that mean?
6    Q.  All significant decisions that
7    related to the CLASS trial had to receive
8    your review and approval; is that correct?
9    A.  If I was against it, it would have
10   had trouble going forward.
11       The nature of the decision is not a
12   regal decision all or none, it's a constant
13   analysis of the input of the science, the
14   clinicians, the issues, it's a balanced study
15   that you reach a reasonable consensus.  And
16   it also involves the FDA.
17       The FDA, if they weren't satisfied,
18   could greatly influence the trial.
19   Q.  Do you recall whether the FDA
20   greatly influenced CLASS?
21   A.  There were pre, pre-trial meetings
22   with the FDA.
23   Q.  Do you recall any particular way in
24   which the FDA had a role in how CLASS was
25   structured?

62

1    A.  I pause because ultimately the
2    design is their understanding of our
3    approach, which they would have given
4    feedback about.
5        The guidance is a discussion of our
6    design and theirs.  I don't recall if they
7    had some specifics.  The reason -- in the
8    end, the trial by Merck was not the same
9    trial as this trial by Searle.  So, there's
10   differential feedback.
11       But the FDA did not object to our
12   design, and there were discussions, more than
13   one discussion, about what the trial would
14   be.
15   Q.  Doctor, I'd like to show you what
16   is going to be Exhibit 233.
17       (Needleman Exhibit 233, documents
18   Bates Nos. 7112 to 7327, marked for
19   identification as of this date.)
20       MR. OLIVER:  John, this is Exhibit
21   66.  The final CLASS report doesn't have
22   the appendices in it.  That's the only
23   thing that's missing from it.  It's just
24   a matter of size.
25       MR. HOFF:  233 doesn't have the

63

1    appendices?
2        MR. OLIVER:  Yes.  Do you -- I
3    mean, do you want to refer to it as 66,
4    or 233?
5        MR. HOFF:  Why don't you just say
6    on the record that it's also been marked
7    Exhibit -- just say what you just said,
8    and then we'll -- when we go back to it
9    later on, we'll -- if that works for
10   you.
11   Q.  Doctor, the court reporter is
12   handing you what's previously been marked as
13   Exhibit 66.
14       It's now being marked as 233.  This
15   version does not have the appendices that go
16   with this exhibit; but otherwise, it is
17   exactly the same as Exhibit 66.
18       Can you tell me what this is?
19   A.  Not until I look at it.
20   Q.  Take your time.
21       (Pause.)
22   A.  So, this looks like the final
23   report submitted to the FDA of the CLASS data
24   by the lead clinician on it, Jim Lefkowith.
25   Q.  What's the date on it?  If you look

64

1    at the first page, what's the date on the
2    document?
3    A.  The document date is May 25th,
4    2000.
5    Q.  And this was post merger of
6    Pharmacia and Searle?
7    A.  I think that's correct.
8    Q.  At that time do you recall who the
9    head of the company was?
10   A.  Fred Hassan.
11   Q.  Where was Ms. Cox in that
12   structure?
13   A.  She always was just the person who
14   ran the U.S. business.
15   Q.  What about Mr. DeSchutter, was he
16   still there?
17   A.  Um, he left pretty quickly after
18   the merger.
19   Q.  Would you -- what role, if any,
20   would you have played in preparing this
21   report?
22   A.  Preparing the report, um, I think
23   no particular role.
24   Q.  Would you have reviewed drafts of
25   it?



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

65

1     A.  I don't think so.
2     Q.  So, tell me how the process works.
3         You have these clinicians who are
4  doing the CLASS study, they just show up at
5  your door one day with this class report?  Is
6  that how it works?
7     A.  No.
8     Q.  How does it work?
9     A.  It is, there are many reviews of
10 the data and discussions of issues.  The
11 data, the data comes in waves.
12    Q.  Take your time and get some water
13 if you need it.
14    A.  This day is not getting better.
15 You know, I've never had this.  Do you think
16 it's you?
17        MR. OLIVER:  I think it is.  I
18    think maybe I brought it up here for
19    you, Doc.
20        THE WITNESS:  Maybe it's being back
21    close to New Jersey and New York.
22        MR. OLIVER:  You don't think I put
23    a hex on you; do you?
24    A.  I'm not worried about you raising
25 my very low blood pressure.

66

1         Data comes in.  There's more and
2  more scrutiny of the data.
3         Do you understand the complexity of
4  the data is millions and millions of data
5  points, confirmations, you saw that's from
6  386 sites.
7         So, the scrubbing of the data and the
8  understanding of the data goes on over a
9  certain period of time, both internally and
10 with experts.
11        So, I would have been privy to
12 those discussions, but not involved in
13 scrutiny of the document; but understand the
14 context of the document.
15    Q.  Who would have reported the -- you
16 said that --
17        I'm sorry.  Strike that.
18        You said that there were summaries
19 of the data and scrutiny of the data
20 internally.
21    A.  You said the word "summaries."
22        At various times I had data
23 presentations --
24    Q.  Fair enough.  Who gave you the data
25 presentations?

67

1     A.  It would have involved Jim
2  Lefkowith, Steve Geis, Rich Spivey, the head
3  of regulatory.  By then, the head of clinical
4  was Michael Friedman.
5         Some statisticians.  Those kinds of
6  people.
7     Q.  How many of these types of
8  presentations would you have had before the
9  final report was issued?
10    A.  I can't recall.
11    Q.  Would you have had these types of
12 discussions before the unblinding of the
13 data?
14    A.  No.
15    Q.  Would you have had --
16    A.  These types of discussions that
17 lead to the submitted document; that's your
18 question?
19    Q.  Yes.
20    A.  No.
21    Q.  Would you have had Dr. Lefkowith or
22 Dr. Geis tell you general information about
23 the study before the unblinding?
24    A.  The most important discussion
25 before was this was an event-driven trial.

68

1     Q.  I'm sorry, Doctor, I told you I
2  wouldn't interrupt you.  Before what?
3     A.  You said did I have discussions
4  before the submission.
5         The target event rate reached a
6  point where it wasn't hitting, it wasn't
7  progressing to the final number, and there
8  was a considerable period of time.
9         So, the discussion was should the
10 trial be stopped with the number of events we
11 had.
12        Blinded data.
13        And those meetings, without
14 breaking of the blind, led ultimately to the
15 termination of the trial.  It was not a
16 specific time target, it was an event target.
17    Q.  Was Mr. Hassan involved in any of
18 those discussions?
19    A.  No.
20    Q.  What about Ms. Cox?
21    A.  No.
22    Q.  Why not?
23    A.  They never would have been.
24        Ms. Cox was never involved in
25 anything.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

69

1        Hassan did not in any way engage in
2    the design in that kind of a discussion.
3        Q.   What about after the unblinding,
4    you mentioned some, you called them data
5    presentations, to use your words.  After the
6    unblinding --
7        A.   To me.
8        Q.   Okay.
9             Well, do you remember when the
10   unblinding was?
11       A.   No.
12       Q.   If I tell you that it was March
13   17th --
14       A.   It wouldn't mean a thing to me.
15       Q.    -- 2000?
16            If you'll look at the first page of
17   this exhibit, where it says "study dates."
18       A.   Yes.
19       Q.   It says 17 March, 2000.
20       A.   Yes.
21       Q.   Does that refresh your memory?
22       A.   No.  Because a clinical trial
23   involves a certain target number of patients.
24   I think there might have been 4,000 in the
25   two-arm trial.

70

1             The enrollment time before you hit
2    the full number is spread out over a number
3    of months.
4             The termination time is off of the
5    last patient.  There's then a period where
6    the data is analyzed.  It's not analyzed
7    before.
8             I would assume that the data was
9    not analyzed by March 17th; that's the last
10   time the patient got a treatment.
11            So, analysis usually starts after
12   the last patient.
13       Q.   But I'm asking about unblinding.
14       A.   Well, that's the beginning of the
15   data analysis.
16            It wouldn't have been, in my
17   opinion, before March 17th, but afterwards.
18       Q.   Okay.
19            Let's back up.
20            Between unblinding, whatever date
21   that happened to be, between unblinding and
22   the date of this report, May 25th, 2000, you
23   said there were data presentations about,
24   ultimately, what would go into this report.
25       A.   Correct.

71

1        Q.   Who was present, besides yourself,
2    at those data presentations?
3        A.   I listed that already.  Maybe your
4    court reporter should say it again.
5        Q.   Can you go ahead and answer the
6    question?
7        A.   The clinical people would have been
8    Lefkowith, Geis, probably Michael Friedman,
9    who was the head of clinical.
10            Regulatory, Rich Spivey.
11            Some statisticians.
12            It probably also involved the rest
13   of my senior staff.  So, the head of
14   pre-clinical would have been Larry Hanson.
15            The head of discovery, John McKern.
16   Whoever my senior staff was.
17       Q.   Mr. Hassan would not have been
18   there?
19       A.   Absolutely not.
20       Q.   What about Ms. Cox?
21       A.   Absolutely not.
22       Q.   How did they find out about what
23   was happening with the CLASS trial, if they
24   weren't at these meetings?
25       A.   I would say, eventually, when we

72

1    understood the data, it's most likely that
2    Hassan would know from my monthly meeting
3    with him.
4        Q.   So, at the monthly meeting you
5    would give him an update on whatever it was
6    you had learned about CLASS in the most
7    recent data presentation?
8        A.   Sometime or other I would review
9    whatever was significant in our portfolio of
10   products.
11       Q.   Do you recall any particular
12   discussion you had with Mr. Hassan on this
13   issue?
14       A.   No.
15       Q.   You said earlier that this report
16   went to the FDA, this final report.
17       A.   That's what the report looks like.
18   It says "final report."  I assume it went to
19   the FDA.
20       Q.   Who else would it have gone to,
21   other than the, you, and the FDA, within the
22   company, who would have gotten a copy of
23   this?
24       A.   Um, what I'm not sure of is, um,
25   what the Pfizer people would have gotten.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

73

1    So, it's -- it seems to me that it
2  could have gone to the clinical people in
3  Pfizer.
4    And I have to think, in my earlier
5  answer, if any of the Pfizer people sat in on
6  the meetings, um, I actually don't think so.
7    So, these meetings would have been
8  conducted in Skokie.  Hassan, Cox, I don't
9  think were ever in Skokie.  I don't think the
10  Pfizer people came to Skokie.
11    But they would have been appraised
12  of this, and there would have been
13  discussions with the Pfizer R&D people, not
14  with the business people or the marketing
15  people.
16    Q.  Who would have apprised Mr. Hassan
17  and Ms. Cox of this information?
18    A.  For me I know of no connection with
19  Ms. Cox, and I would have been the one that
20  discussed it with Hassan.
21    Q.  Do you remember discussing it with
22  Mr. Hassan?
23    A.  Not the specific, but I discussed
24  the entire portfolio with Hassan, when I
25  would meet with him.

74

1    Q.  Do you know if he got a copy of
2  this report?
3    A.  It seems illogical that he would
4  have gotten a copy of this report.
5    Q.  Well, that wasn't my question.
6    Do you know if he got a copy of it?
7    A.  Neither -- I don't know, nor could
8  I see any reason to send it to him.
9    Q.  What about Ms. Cox?
10    A.  The same answer.
11    Q.  Doctor, if you will go to the third
12  page of this exhibit with me.  Midway down
13  the page there's a chart that says
14  "synopsis"; do you see that?
15    A.  No.  My third page has objectives.
16    Do you mean the fourth page?
17    MR. HOFF:  Here.
18    A.  Oh.  Up here.  Got it.
19    Q.  Yes, sir.  Do you see that
20  synopsis?
21    A.  Yes.
22    Q.  Okay.  If you go down to the middle
23  of the page, where it says "objectives," it
24  says "primary, to compare the incidence of
25  clinically significant upper gastrointestinal

75

1  events (CSUGIEs) associated with celecoxib
2  400 milligrams BID, to that associated with
3  Ibuprofen 800 milligrams TID or diclofenac,
4  75 milligrams BID in patients with
5  osteo-arthritis or rheumatoid arthritis."
6    Do you agree that that's the
7  primary end-point of the CLASS study?
8    A.  That's what it says.
9    Q.  Can you explain that to me?
10    A.  This is the trial that we discussed
11  earlier, modeled on MUCOSA.
12    It's describing, um, a dose that's
13  extremely high, four times the dose of the
14  osteo-arthritis, and it has the two
15  comparators, and it's looking at the
16  parameters that would mark the
17  gastrointestinal events, upper GI trend.
18    I agree that's, that's the primary.
19    Q.  This primary end-point, is it fair
20  to characterize this as ulcer complications?
21    A.  I'm sorry?
22    Q.  Is it fair to characterize the
23  primary end-point as ulcer complications?
24    A.  It's more than ulcers.
25    Q.  I said "ulcer complications."

76

1    A.  Well, I don't know.
2    I mean, obstruction is not
3  necessarily an ulcer complication.  I think
4  that's just part of the whole scenario of the
5  GI events.
6    So, it's -- it's, ah, it's looking
7  at perforation, that's ulcer.  It's looking
8  at obstruction.  It's also looking at bleeds,
9  and bleeds could well be more than upper GI,
10  it could be the whole GI.
11    So, just a question of your
12  terminology.  But the generality is that
13  would be an aggregate describing -- not quite
14  accurate, but it would be the aggregate.
15    Q.  Would it include symptomatic
16  ulcers?
17    A.  No, it wouldn't.
18    If symptomatic ulcers meant --
19    Well, maybe tell me what you mean
20  by symptomatic ulcers.
21    Q.  Well, Doctor, this is your study.
22  You tell me what symptomatic ulcers means in
23  the context of CLASS.
24    A.  You raised the question.  There's a
25  lot of parameters in symptomatic ulcers --



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

77

1  dyspepsia, pain, abdominal cramps, and
2  endoscopy.  So.
3      Q.  A non-bleeding ulcer identified by
4  endoscopy would not be included in the
5  primary end-point of the CLASS study; is that
6  correct?
7      A.  But there are other symptoms
8  besides bleed or not, as I told you.
9          It's heartburn, gas, and so on.
10         So, that would be the aggregate of
11  symptomatic.
12     Q.  If you'll look down with me on the
13  same page, under "methodology," go about to
14  the middle of the paragraph beginning with
15  "treatment duration."
16     A.  Yes.
17     Q.  "Treatment duration lasted for at
18  least 26 weeks with a maximum potential
19  treatment period of 52 or 65 weeks."
20         Is that an accurate
21  characterization of the treatment period?
22     A.  That's an accurate regurgitation of
23  what's written here.
24         The relevant thing, for me, is "at
25  least 26 weeks."  Remember, it's an event

78

1  trial, not a time trial.
2          So, you set the minimum and then
3  the question is:  When do you accrue enough
4  events?
5      Q.  This document is the final report
6  that went to the FDA and was circulated
7  internally, and it defines "treatment period"
8  in the way that I just read it to you.  You
9  would agree with that?
10     A.  It says "at least 26 weeks"; so, it
11  sets the baseline parameter and also sets the
12  maximum, if you need it.
13     Q.  But it doesn't say if you need it
14  in the document; does it?
15     A.  It says -- you read the statement
16  -- "lasted for at least 26 weeks."
17         And then it says, "with a maximum."
18  So, 26 weeks would have been enough, if you
19  had the events.
20     Q.  But that's not my question.
21         My question was, you added some
22  words in there, "if you need it."
23         It doesn't say that.
24         MR. HOFF:  Objection.  Arguing with
25         the witness.

79

1      A.  Treatment duration lasted for at
2  least 26 weeks, with a maximum potential of
3  52 or 65 -- that's what it says.  I agree
4  with what it says, not what you say.
5      Q.  Fair enough.  You agree with what's
6  on the paper.  If you will turn with me to
7  page 34 of the exhibit, please.
8      A.  So, looking at the numbers on the
9  top?
10     A.  Yes, sir.  On top of the page.
11  Page 34 of 24,295.  And we're about a couple
12  thousand pages short, I think, here.
13     A.  Maybe tens of thousand of pages
14  short.
15     Q.  Perhaps.  I'm trying to lighten the
16  load.  Have you made it to page 34?
17     A.  Yes.
18     Q.  If you look down at the bottom of
19  the page, do you see where it says "treatment
20  period"?
21     A.  Yes.
22     Q.  Can you read that first sentence
23  for me.
24     A.  Let me read the whole thing, so I
25  see what the context is.

80

1      Q.  Take your time.
2          (Pause.)
3      A.  Okay, please repeat your question.
4      Q.  Can you read the first sentence
5  under "treatment period" for me.
6      A.  Yes, I can.  "The treatment period
7  was the period during which medication was
8  taken."  You wanted just the first paragraph?
9      Q.  I'm sorry, the first two sentences.
10     A.  "For each patient, this period was
11  scheduled to last for 52 or 65 weeks, or
12  until the trial officially concluded."
13     Q.  Is it fair to say that this
14  document defines the treatment period as 52
15  or 65 weeks?
16     A.  You're ignoring the end of the
17  sentence:  "The trial could have been
18  concluded when we accrued enough events."
19  I think the target events was 40,
20  in the design.  If we, whenever we would have
21  accrued the number, or approached the number,
22  that would have concluded the trial.
23     Q.  Do you recall when you approached
24  the number?
25     A.  That was the discussion that led us

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Philip Needleman                                      December 8, 2010

81

1   to terminate the trial, and I think that had
2   reached 38 at the time, some number like
3   that.
4       Q.   But it was longer than six months.
5   You didn't conclude the trial at six months?
6       A.   As I recall some part of this, you
7   remember I told you the trial time is
8   determined by a sliding rate of enrollment.
9       I actually think the -- and that
10  was refreshed for me that the mean number of
11  days at the end of the trial during treatment
12  was something like around six or seven
13  months, 180 or 200 days.
14      But it's a spread, because of the
15  differential enrollment rate.  Some go on
16  longer, some less, because there's a
17  differential in the enrollment rate.
18      I think, in the end, the average
19  that the FDA took was nine months.
20      Q.   Doctor, if you will turn back to
21  page 3 with me, where we were originally.
22      Take a second to read the number of
23  patients section at the bottom.
24      (Pause.)
25      A.   I've read it.

82

1       Q.   Okay.  I'm looking at the second
2   sentence:  "A total of 8,059 patients were
3   enrolled, of whom 4,573 completed six months
4   of treatment --
5       A.   Yes.
6       Q.   -- and 3,409 completed the study."
7       A.   Yes.
8       Q.   At least there you would agree with
9   me that there's a clear distinction between
10  six months of treatment and the study?
11      A.   Yes.
12      Q.   Turn with me to page 6.
13      You see the summaries of the CSUGIE
14  incidence?
15      A.   I do.
16      Q.   Tables 1 and 2.  You would agree
17  that CSUGIE, CSUGIEs, was the primary
18  end-point of the study?
19      A.   Yes, I do.
20      Q.   Okay.  I would like to go over
21  this, but before that, I want to get a firm
22  grasp of, just generally, how the study was
23  run, in terms of what drugs were involved and
24  what you were comparing.
25      I don't want a whole lot, just, you

83

1   know, what drugs are we talking about,
2   Celebrex versus what?
3       A.   Celebrex dosage, 400 milligrams
4   BID, that's four times the osteo arthritis
5   dose.
6       The commonly used dose of
7   diclofenac, 75 milligrams BID.
8       The commonly used dose of
9   Ibuprofen, 800 milligrams, BID.
10      Those are the prescribed initial
11  doses.  Actually those doses are used at
12  higher levels of patients.
13      And it was a -- so, there was a
14  comparison of those three drugs, divided into
15  kind of a two-arm study -- Celebrex, versus
16  one, Celebrex versus the other.
17      Q.   Did you also compare Celebrex to
18  both of them combined?
19      A.   You mean, did a patient get both
20  drugs?
21      Q.   No.  No.  I'm sorry.
22      At the end of the study, did you
23  compare Celebrex -- you said you compared
24  Celebrex with Ibuprofen, you compared
25  Celebrex with diclofenac.

84

1       Did you also compare Celebrex to
2   diclofenac and Ibuprofen together?
3       A.   As I recall, in the NIH-agreed
4   design, there was a sequence of analysis and
5   criteria for going through the data, the
6   first level of which is Celebrex versus the
7   combined.
8       Only if positive, you can go to the
9   further analysis of Celebrex versus each
10  individual.
11      Q.   What's the NIH?
12      A.   I'm sorry.  Freud lives.
13      It's the FDA.
14      The NIH is a whole world that
15  describes science, to the other half of my --
16      Q.   You didn't mean the NIH, you meant
17  the FDA?
18      A.   I meant the FDA.
19      If you don't know what the NIH is,
20  I'm worried about you.
21      Q.   Look at table 1 with me; would you.
22  Take a look at it and take your time to
23  familiarize yourself with it.
24      (Pause.)
25      A.   I'm just looking at table 1.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

85
1      Q.  You can go ahead and look at table
2  2, as well.
3      A.  Okay.
4      Q.  You see, in the fifth column, the
5  one on the far right, it says "log rank P
6  values for celecoxib."  What's a P value?
7      A.  It's a statistical calculation of
8  events to try and ascertain if there's a
9  significant difference between two bodies of
10  data.
11      Q.  It's a measure of statistical
12  significance?
13      A.  It's a value that -- the criteria
14  for significance is that 95 out of 100 times
15  you hit the result.
16         So, that means, a P value of 0.05
17  is regarded as statistically significant.
18      Q.  So, anything above, in this chart,
19  anything above .05 would indicate that there
20  is not a statistically significant result?
21      A.  Correct.
22      Q.  Okay.  Do you see, at the top of
23  table 1, it says, "summary of CSUGIE
24  incidence first six months."
25      A.  I do.

86
1      Q.  Okay.  On table 2 it says "summary
2  of CSUGIE incidence entire study period."
3      A.  Yes.
4      Q.  What does it mean when it says
5  "entire study period there"?  How much time
6  are we talking about?
7      A.  It's those patients longer than six
8  months.
9      Q.  I'd like to go through this one by
10  one.
11         If you look at table 1, for the
12  first six months, under the log rank P values
13  for celecoxib, do you see the column that
14  says diclofenac, and then you see a P value,
15  point 264?
16      A.  Yes.
17      Q.  That number indicates that the
18  comparison between diclofenac and celecoxib
19  was not statistically significant in terms of
20  the number of CSUGIEs that showed up?
21      A.  Is there a question?
22      Q.  Is that correct, am I correct?
23      A.  That's correct.
24      Q.  I'm reading it correctly?
25      A.  Um-hum.

87
1      Q.  If you go down to the next column,
2  and you take out -- it says "patients not
3  taking aspirin."
4      A.  Yes.
5      Q.  Am I correct that that little part
6  summarizes, if you just take out all of the
7  patients who weren't on aspirin, you're going
8  to get a different number?
9      A.  Correct.
10      Q.  And for diclofenac versus celecoxib
11  or Celebrex, that number was also not
12  statistically significant?
13      A.  Correct.
14      Q.  And do the same thing for
15  Ibuprofen.
16         Ibuprofen versus Celebrex, for all
17  patients, again, not statistically
18  significant?
19      A.  You mean the .073 number?
20      Q.  Yes, sir.
21      A.  Correct.
22      Q.  Okay.  Now if you take out patients
23  who are not taking aspirin, the .005
24  indicates that that was statistically
25  significant?

88
1      A.  It's actually very highly
2  significant.
3      Q.  Okay.  Now, if you combine
4  diclofenac and Ibuprofen over the six-month
5  period and you compare them to Celebrex, and
6  you're talking about all patients?
7      A.  Correct.
8      Q.  You get .092 P value?
9      A.  Correct.
10      Q.  That indicates that there is no
11  statistically significant difference between
12  the combined NSAIDs and Celebrex in the study
13  for CSUGIEs; correct?
14      A.  Correct.
15      Q.  Okay.  So, it failed the primary
16  end-point there?
17      A.  And also, with aspirin, it would
18  meet the primary end-point.
19      Q.  Right.  But you have to take out
20  that has to be patients not taking aspirin,
21  and that's .037; correct?
22      A.  Correct.
23      Q.  Okay.  Now you go down to the
24  entire study period.
25      A.  Correct.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                December 8, 2010

89

1    Q.  And look at that column for
2  Celebrex versus both NSAIDs, diclofenac and
3  Ibuprofen.
4    A.  Yes.
5    Q.  Okay.  For the entire study period
6  for all patients, there is no statistical
7  difference -- statistically significant
8  difference between both NSAIDs and Celebrex
9  in terms of the number of CSUGIEs?
10    A.  Are you talking about the upper all
11  patients first?
12    Q.  Yes.
13    A.  Correct.
14    Q.  Okay.  And the same is true if you
15  go to the patients not taking aspirin?
16    A.  No significance in diclofenac,
17  significant difference with Ibuprofen, not
18  significant with both.
19    Q.  Okay.  In fact, if you look at
20  diclofenac, there was no statistically
21  significant difference for any portion of the
22  study between Celebrex and diclofenac?
23    A.  Correct.
24    Q.  And the only statistically
25  significant difference in this column for

90

1  both was when you took six months of data and
2  you had patients who were not taking aspirin?
3    A.  Correct.
4    Q.  Doctor, we had gotten into the
5  discussion about the primary end-point
6  earlier.
7    If you would turn to page 46 with
8  me.  Would you look at the fourth paragraph
9  under -- there are some -- A, B, C, some
10  bullet points.  The first sentence in that
11  fourth paragraph under those bullet points.
12    A.  As stated?
13    Q.  Right.  So, it's --
14    Let me read it.
15    Q.  Go ahead.  Take your time.
16    (Pause.)
17    A.  Okay, I read it.
18    Q.  Okay.  So, the primary end-point
19  means upper GI bleeding perforation or
20  obstruction?
21    A.  Yes.
22    Q.  I mean, that's a fair
23  characterization?  I think we were a little
24  confused earlier.
25    A.  Yes.

91

1    Q.  Okay.  If you will look at page 177
2  with me.
3    A.  No other question on that
4  paragraph?
5    Q.  No.
6    A.  177?
7    Q.  Yes.  There's a table.  It's table
8  10B.  It deals with adverse events.
9    If you look at the title, it says
10  "for the entire study period."  This data is
11  not for six months; is it?
12    A.  That seems correct.  May I peek at
13  the data for a minute?
14    Thank you.  I have.
15    Q.  So that when it says "entire study
16  period" there, it means more than six months;
17  it means the whole, the entire period, the
18  whole amount of time?
19    A.  Correct.
20    MR. OLIVER:  You can change the
21  tapes now.
22    THE VIDEOGRAPHER:  Off the video
23  record at 11:07.
24    (Recess.)
25    THE VIDEOGRAPHER:  Stand by.  We're

92

1  back on the video record at 11:19.
2    MR. OLIVER:  I will show you what
3  is going to be marked as 234.  Is that
4  where we are?
5    (Needleman Exhibit 234, documents
6  Bates Nos. 0219 to 0230, marked for
7  identification as of this date.)
8    Q.  Doctor, take a minute to look at
9  this and familiarize yourself with it
10  briefly.
11    (Pause.)
12    Q.  Tell me when you're ready.
13    A.  Okay.  I reviewed it.
14    Q.  This is an e-mail from George Geis
15  to a number of people, including you.
16    It summarizes thoughts or ideas
17  about the CLASS trial, prior to the actual
18  start of the trial; is that correct?
19    A.  Correct.
20    Q.  Does it also indicate that there
21  were discussions with FDA about the format of
22  the trial?
23    A.  The second paragraph says there
24  were at least three discussions.
25    Q.  Does it also indicate that the



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

93

1  CLASS trial was originally planned to be six
2  months?
3       A.  Yes.
4       Q.  Why did that change?
5       A.  I still think it was an
6  event-driven trial.  So, one part of it, um,
7  as described --
8       Q.  Doctor, let me stop you.  I'm going
9  to move to strike as not responsive.
10       My question is:  Looking at this
11  document, do you have any idea why the trial
12  went from six months to 12 months?
13       MR. HOFF:  Objection to the form.
14       MR. OLIVER:  What's wrong with the
15  form?
16       MR. HOFF:  It misstates.
17  A.  I don't agree.
18       MR. HOFF:  It misstates the
19  evidence in the case, which he's told
20  you 40 times.  I can't even believe
21  we're debating this issue right now, at
22  this point in the case.
23       Are you actually seriously
24  contesting that it's an event-driven
25  study?

94

1       MR. OLIVER:  I don't really think
2  that's the issue.  I'm asking a question
3  about this document.
4       MR. HOFF:  Yes, it is the issue.
5  And you asked why I objected.
6       MR. OLIVER:  This is not
7  productive.  Let's start over, Doc.
8       Could you read back the question
9  that was pending.
10       (Record read.)
11       A.  I think it was an event-driven
12  trial and that didn't change from this
13  document to what the trial was.
14       Q.  Would you look with me at the
15  third page.
16       Actually, I'm sorry.  Start on the
17  first page.  I'm going to read something to
18  you.  "The original design for the CLASS
19  trial is shown in slides 1 and 2.  It was
20  planned as a six-month trial."
21       Do you agree with that statement?
22       A.  You're reading -- I agree you read
23  it correctly.
24       Q.  Do you agree that that's what
25  George Geis said in this document to you?

95

1       A.  The document says a lot more than
2  that line.
3       It describes an early stop, which
4  would be the event, and it describes stopping
5  the study when nearly all the patients have
6  completed six months.  That's what it says.
7       Q.  Turn with me to the third page, if
8  you would.  The second paragraph.
9       A.  I have two copies of the first
10  page.  Do you mean this page?
11       Q.  No, I mean the actual third page if
12  you're just flipping.  I have two copies of
13  the first page, too.  That's an e-mail chain.
14       A.  The one that has "however."
15       Q.  Precisely.  "However, primarily due
16  to the increase in the total number of
17  patients and the requirement for a total of
18  2,000 patients participating for 12 months,
19  the total cost of the two trials together is
20  predicted to be $57,000,000."
21       Whose requirement was it that the
22  study last 12 months?
23       A.  I have to divide my answer.
24       Understand that's only 2,000 out of
25  8,000, not that the 8,000 go for more than 12

96

1  months.
2       And the FDA doesn't require, in
3  those discussions, there's a discussion --
4  and just like Merck could choose to do only
5  one dose and one NSAID, that would be it.
6       So it is not a requirement in this,
7  there's a discussion.
8       What's clear to me was not that the
9  full 8,000 were going to 12 months, but just
10  that some of the patients, 1/4th of the
11  patients would go.
12       Q.  The document does characterize it
13  as a requirement, though; doesn't it?
14       A.  It says that here, but that's not
15  my perception of what the FDA says.
16       Q.  Fair enough.
17       Do you remember any of this, the
18  Power Point slides that -- does this ring a
19  bell?
20       A.  The specific slides don't, but this
21  would be like many discussions we would have
22  had.
23       Q.  Okay.  If you'll look with me at --
24  do you mean what I mean when I say a -- well,
25  it's the fourth page, if you're just



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

                                                                    97
1    counting.  Look at the fourth page.  It says
2    "original proposal."
3        A.  Yes.
4        Q.  And then, down the middle of the
5    page, it says parallel group six-month trial.
6        A.  Yes.
7        Q.  So, this slide is summarizing what
8    Searle originally envisioned the CLASS study
9    to be?
10       A.  But there are a lot of iterations
11   of the design.
12           If you look, for example, there's
13   an "approxinon."  That's not part of the
14   ultimate trial.  So, this is the beginning of
15   the discussions.
16       Q.  And if you turn -- let's see, that
17   was four, five, six, to the seventh page, it
18   says celecoxib long-term arthritis safety
19   study CLASS revised."
20       A.  Okay.
21       Q.  Are you with me?
22       A.  Yes.
23       Q.  So, this slide reflects -- as
24   opposed to the original design, this slide
25   reflects revisions to the CLASS trial that

                                                                    98
1    Searle implemented because of FDA's comments?
2        A.  I don't think this is the final
3    design.  This is ongoing discussions.
4        Q.  Okay.  I accept that.  But, at
5    least at this point in time, there has been a
6    revision to the study?
7        A.  Part of the ongoing.  And notice
8    the word "FDA requests."  That deals with
9    your requirement earlier question.
10       Q.  But it says FDA requests complete
11   blinding of the study.
12       A.  But it's not -- it's requires.
13   That's just advice.
14       Q.  FDA does have the power to require
15   certain things; doesn't it?
16       A.  No.  In the end what they actually
17   do is they say well, it depends upon the
18   data.  So, you have a certain latitude, as
19   Merck did, in, for example, rejecting the
20   aspirin patients.
21       Q.  But the FDA has the ultimate
22   authority to approve or disapprove of the
23   label; correct?
24       A.  They approve --
25           Did you finish?

                                                                    99
1        Q.  Yes.
2        A.  They approve or disapprove the
3    final NDA.
4        Q.  So, if Searle wants to get a drug
5    approved, they would be wise to have listened
6    to the FDA?
7        A.  Advice is advice, and you decide,
8    based on what you think about the trial.
9        Q.  Okay.  Flip the page with me.  We
10   were talking about the revised study.  Flip
11   two pages.
12           Do you see, at the top of the page,
13   where it says new A?
14       A.  I'm sorry?  Yes.
15       Q.  Are on the right page?
16       A.  Yes.
17       Q.  So, we're talking about, this slide
18   is talking about the revisions as a result of
19   the discussions with the FDA, and it's
20   talking about the new A arm of the study.  Is
21   that accurate?
22       A.  Yes.
23       Q.  And then, under "design," it says
24   what, first bullet point?
25       A.  "Demonstrate that the risk of

                                                                   100
1    clinically significant UGIs."
2        Q.  I'm sorry.  Under the, by the word
3    design.
4        A.  Oh, design.  "Double blind
5    parallel, six to 12 months, OARA, no ulcer, h
6    pylori status determined."
7        Q.  So, this slide indicates, again,
8    that there was a discussion with the FDA, and
9    that discussion resulted in the trial being
10   lengthened to 12 months.
11           MR. HOFF:  Objection to form.
12       A.  We established in the earlier page
13   that the only discussion was 1/4th of the
14   patients reaching 2,000 patients, that there
15   was an event criteria, and the minimum was
16   6,000.
17       Q.  Let's -- FDA required, or
18   requested, depending on how you look at it,
19   that some portion of the patients go 12
20   months?
21       A.  I don't know who said that, but
22   only 2,000 go, not the full, not the 6,000.
23       Q.  According to this document?
24       A.  According to the document.
25       Q.  Okay.  Flip to the last page.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

101

1    This slide is talking about the
2  negatives and positives of the revisions that
3  FDA had suggested; is that correct?
4    A.  Yes.
5    Q.  Look under "negatives," the second
6  bullet point.  "Risk that the pooled analysis
7  will not be accepted by the FDA."
8    A.  Yes.
9    Q.  Do you have an understanding of
10  what it means when it says "pooled analysis"
11  there?
12    A.  What I do know, if you're asking me
13  my opinion is, the FDA did accept the rank
14  order of analysis of the data, the first of
15  which was pooled, that is Celebrex versus the
16  combined, and if positive, then they would
17  have done the unpooled.
18    Q.  If you know, in this slide, why is
19  it indicating that there was a risk that the
20  FDA would not accept that?
21    A.  FDA meetings are ambiguous, and
22  each time you go -- and there were three
23  meetings -- there's a different head of the
24  FDA arthritis group, and there's different
25  people.

102

1    So, we take it as advice and we
2  understand the risks, and the key risk, and
3  the only firm decision comes on the NDA
4  approval.
5    MR. OLIVER:  This is going to be
6  Exhibit 235.
7    (Needleman Exhibit 235, Power
8  Point, Bates Nos. 11311 to 369, marked
9  for identification as of this date.)
10    Q.  Just looking at the first --
11    A.  May I look at the document?
12    Q.  Sure.
13    (Pause.)
14    A.  Okay, I have the context.  Let me
15  just look and see if they have a Celebrex
16  section.
17    MR. MONTGOMERY:  It starts on the
18  23rd page of the document.
19    A.  Why don't you go ahead now.  I've
20  got it.
21    Q.  Okay.  Do you remember this Power
22  Point?
23    A.  No.  Not at all.
24    Q.  But apparently, according to the
25  first slide, Mr. DeSchutter was giving part

103

1  of the presentation?
2    A.  Mr. DeSchutter was not in Pharmacia
3  very long.  So, um, he took change of control
4  and he, I was the only person within about
5  six months who was a former Pharmacia
6  Monsanto employee.
7    So, this must have been a very
8  early, I think I remember just -- a couple of
9  months and then he left.  Maybe a month,
10  even.
11    Q.  If you'll look down at the bottom
12  of the page, it says January 29, 2000.
13    A.  Yes.
14    Q.  That was before the merger of
15  Searle and Pharmacia; wasn't it?
16    A.  I'm not sure of the dates.
17    I think it was March.  It was the
18  merger date.
19    Q.  So, Mr. DeSchutter was
20  participating in this presentation before the
21  merger?
22    A.  Correct.
23    Q.  As was Ms. Cox?
24    A.  I'm just surmising from the dates.
25    Q.  Okay.  If you will turn to page 3.

104

1    The top of the slide says
2  "questions on your mind."
3    Is it a fair characterization of
4  this slide to say that it's discussing or
5  talking about the merger between Searle and
6  Pharmacia?
7    A.  You know, I had nothing to do with
8  this document, and I don't know what people
9  were thinking in the document.
10    Q.  Just based on your reading of it
11  right now.
12    A.  I don't know what to make of this.
13    Q.  Okay.  If you'll look at number 4,
14  it says "Celebrex is a one-trick pony."  Does
15  that mean anything to you?
16    A.  I don't know what these people are
17  thinking about.
18    Q.  At the time, January, 2000, do you
19  recall what was happening with Celebrex's
20  sales?
21    A.  Are you asking me what I think was
22  happening in general?
23    I think Celebrex has even greater
24  potential than arthritis, and by that time we
25  realized that COX-2 was expressed in every



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

                                                              105
1  epithelial tumor.
2       So, I would have never agreed with
3  the one-trick pony.  I thought there were
4  many other possibilities to Celebrex.
5       Q.  But somebody obviously thought that
6  was a possible impression?
7       A.  I don't know what they thought.
8       Q.  You don't have any idea why they
9  would think that?
10      A.  That -- I don't know why people
11  think anything.
12      Q.  Doctor, I'd like you to toss that
13  exhibit.  Put it aside.
14          I'd like to talk about the time
15  period when the CLASS trial was coming to an
16  end and you and others within the company,
17  Searle and Pharmacia, were beginning to see
18  the results of that trial.  Earlier we had
19  talked about the unblinding date of the CLASS
20  data.
21          Has anything come back to you about
22  that date?  Can you tell me what that date
23  was?
24      A.  I don't know.  All I know is you
25  showed me the trial ended in March.  Sometime

                                                              106
1  after that.
2       Q.  Okay.  If I represent to you that
3  the CLASS data was unblinded on March 17th,
4  2000.
5       A.  I couldn't believe it if the last
6  patient was March 17th.
7       Q.  Well, do you have any reason to
8  believe that I'm not telling you the truth?
9       A.  Yes, because it's just impossible
10  to crunch that much data on the day the trial
11  ends.
12          You know, you have to go back and
13  test the validity with so many sites, and
14  there's a lot of things you do to scrutinize
15  the quality of the data, and there are
16  millions of case report forms.
17          It seems highly unlikely that on
18  the day of trials you could break the blind,
19  to me.
20      Q.  Is it fair to say that the CLASS
21  trial data was unblinded in the spring of
22  2000?
23      A.  I don't know when it was.  It was
24  after the last patient.
25      Q.  Was it in the year 2000?

                                                              107
1       A.  Sure.
2       Q.  Was it at the end of the year 2000?
3       A.  I don't know when it was unblinded.
4       Q.  Okay.
5           Prior to unblinding, how was Searle
6  tracking the data?
7       A.  What I knew about was they knew the
8  number of events and the data was blinded.
9       Q.  Did somebody tell you that number
10  on a regular basis?
11      A.  I don't know a regular basis, but I
12  know, as it reached a point in the upper
13  numbers, there was a question of, does it, is
14  there a rationale for going longer than what
15  I thought reached 38 events.
16          So, I might have known the rate of
17  events at some time.
18      Q.  Do you recall having quarterly
19  meetings about CLASS prior to unblinding?
20      A.  No.
21      Q.  Would it surprise you if there were
22  quarterly meetings about the CLASS trial
23  before unblinding?
24      A.  I don't see the value, beyond the
25  -- because you'll never break the blind.  So,

                                                              108
1  I don't see the value of quarterly meetings.
2       Q.  Do you recall when you learned
3  about the results of CLASS?
4       A.  No.  I mean, I don't know the date.
5       Q.  Give me your best --
6       A.  I don't know the date.
7       Q.  Was it before June, 2000?
8       A.  I don't know the date.  It must be
9  when the data was.
10      Q.  How soon after unblinding would you
11  have learned about the results?
12      A.  I would guess when the data had
13  been completely analyzed by statisticians,
14  clinicians, and other people poring over the
15  data and all the side effects, because it's
16  not just efficacy, it's also all the side
17  effects.  So, some time period when the data
18  was pretty well scrutinized.
19      Q.  How long after -- I mean, give me
20  an estimate of how long that would have
21  taken.
22      A.  I can't.  Each kind of trial
23  depends upon the end points in something.
24      Q.  If the data is unblinded, is it
25  going to be two weeks before you learn about



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                        December 8, 2010

109

1  the results?
2      A.  Maybe I should be clearer for you,
3  because we're not making progress.  It's
4  8,000 patients.  Each patient has hundreds of
5  pages of data that's generated.
6      So, that all has to be analyzed,
7  including the side effects.  That's different
8  with each kind of trial, and I don't, there
9  is no cookie cutter number of days that I
10 could tell you.
11     Q.  Would you have learned about --
12     When you learned about the data,
13 how long would it be before you would have
14 shared that information with Mr. Hassan?
15     A.  At some point, I knew we didn't hit
16 the primary end-point.
17     That would have certainly come up
18 in a discussion with Hassan.
19     Q.  Would you have shared that before
20 you had your monthly meeting with him?
21     A.  I don't know.
22     Don't forget, when I'm in New
23 Jersey, we're down the hall and see each
24 other.  So, I don't know.
25     Q.  So, it's --

110

1      A.  It would be, um, sufficiently
2  pertinent that when I would see him in New
3  Jersey, after I had scrutinized and
4  understood the data, that I would have told
5  him about it.
6      Q.  So, for sure, you would have told
7  him at the monthly meeting, at the very
8  least?
9      A.  After the data was satisfactorily
10 analyzed.
11     Q.  But, it's possible that you even
12 told him before that?
13     A.  I don't remember.
14     Q.  But, I mean, that's not my
15 question.
16     A.  I don't remember.  I don't
17 remember, because it would have required --
18 I'm in New Jersey, and most of the time I
19 wasn't, I was either in -- so, I don't know.
20     Q.  But that's a Yes to my question
21 that it is possible; that's all I'm asking:
22 Is it possible?
23     A.  It's also impossible.  I mean, it's
24 a possibility.  That's all.
25     Q.  Okay.  It's a possibility.  We

111

1  agree.
2      MR. OLIVER:  I think we're on
3  Exhibit 235.
4      (Needleman Exhibit 236, documents
5  Bates Nos. 0614 to 27, marked for
6  identification as of this date.)
7      A.  I've looked at this.
8      Q.  Do you see that the date is June,
9  1999?
10     A.  I see that on the bottom.
11     Q.  That was before the unblinding of
12 the CLASS data?
13     A.  What was the date that you showed
14 me before?  Wasn't that 2000 was the last --
15     Q.  March 17, 2000 was the date.
16     A.  So, the trial was still under way.
17     Q.  So, that's a Yes?
18     A.  Yes.
19     Q.  Do you recognize this slide deck?
20     A.  No.
21     Q.  Turn with me to page 4.
22     A.  Okay.
23     Q.  It says "key challenges," and one
24 of the key challenges, from an external
25 standpoint, is the equivocal results of the

112

1  CLASS trial.
2      Do you have any reason to
3  understand why somebody would call the
4  results of the CLASS trial "equivocal" in
5  June of 1999?
6      A.  No.
7      Q.  Does it surprise you that somebody
8  is talking about the results of the CLASS
9  trial before the study is finished?
10     A.  This is someone making a guess.
11     Q.  How do you know that?
12     A.  Because the data is unblinded and
13 nobody could know the data.
14     Q.  You said you don't remember this
15 Power Point?
16     A.  You asked me if someone before the
17 data could make an assumption that is
18 equivocal or not.  That's purely a blind
19 guess.
20     Q.  So, it's not possible that the
21 person making this presentation knew about
22 the data of the CLASS trial?
23     A.  No one --
24     MR. HOFF:  Can I make a suggestion
25     to clear this up?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                      December 8, 2010

113

1    MR. OLIVER:  Sure.
2    MR. HOFF:  When was the date of the
3  Pharmacia Monsanto merger?  May of --
4  March of 2000; right?
5    MR. OLIVER:  It was April 3rd,
6  2000, I believe.
7    MR. HOFF:  Well, actually it closed
8  March 31st.  But that's not --
9    Why is this, then, you say
10  Pharmacia?  Pharmacia had nothing to do
11  with it.  I think the document is
12  misdated.
13    MR. OLIVER:  I think you're
14  testifying, and I'm going to call the
15  magistrate.
16    MR. HOFF:  I'm just telling you --
17  you know what -- okay, fine.  You know,
18  ask your questions, because it's your
19  minutes.
20    MR. OLIVER:  That's right.  It's my
21  minutes.
22    MR. HOFF:  What a waste of time.
23    THE WITNESS:  The last page?
24    MR. HOFF: Right. Go ahead, ask your
25  question.

114

1    A.  My answer was -- my answer is:  No
2  one knows the data until the data is
3  unblinded.  No one.
4    Q.  Would you look at page 9, slide
5  deck 9.
6    Are you there with me?
7    A.  Yes.
8    Q.  It says "governance structure," and
9  it indicates, under PHA, Fred Hassan, Phil
10  Needleman, Carey Cox and Tim Rothwell; is
11  that correct?
12    A.  It certainly says it was after the
13  Pharmacia merger.  Yes, that --
14    Q.  I'm asking you what it says there.
15    A.  The governance -- it shows two
16  sides.  It has the people on the Pfizer side,
17  people on the Pharmacia side.
18    Q.  Okay.  And you were under the
19  Pharmacia label at that point?
20    A.  That's what this slide would
21  suggest.
22    Q.  Even though it says "corporate
23  strategic plan, June, 1999," which, as your
24  lawyer testified, was before the merger?
25    A.  This can't be right (holding

115

1  exhibit).  Because it doesn't even have
2  deSchutter.  You could keep going after on
3  that.  If it wasn't after the merger, it
4  would have had deSchutter.  You just are
5  wrong.
6    Q.  But, I mean, you don't have any
7  reason to --
8    Strike that.  You can't tell me how
9  this document is wrong?
10    A.  I certainly can.
11    Q.  You're not aware of, nor have you
12  talked to anybody who has told you that they
13  modified this document?
14    A.  You're the one who presented the
15  document.  It says, under the Pharmacia side,
16  does not include deSchutter.  If it was
17  beforehand, it would have been deSchutter.
18    Q.  I want to strike that answer as --
19    A.  And it wouldn't have had Tim
20  Rothwell on this.
21    Q.  I'll move to strike that answer as
22  non-responsive.
23    Listen to my question.
24    Do you have any specific evidence
25  that someone misdated this document?

116

1    A.  No.
2    Q.  You can put that one aside, now.
3    Doctor, if you will pick up the
4  final report for me again.  On page 1 you had
5  indicated that it says study dates, September
6  23rd, 1998 to March 17, 2000.  Do you see
7  that?
8    A.  Yes.
9    Q.  And you had said that that meant
10  that March 17 was the last patient date, I
11  guess.
12    A.  That's what I assume.
13    Q.  Okay.  Would you turn with me to
14  page 55.  Take a second just to read that
15  page.
16    (Pause.)
17    A.  Okay.  I've read the paragraph.
18    Q.  Okay.  If you'll look at the, that
19  large paragraph in the middle, the last two
20  sentences, you mentioned earlier that Searle
21  decided to end the study early.  The sentence
22  beginning with "Therefore" --
23    A.  Yes.
24    Q.  That's what that sentence is
25  talking about, the decision to end it early?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

117

1    A.   Yes.  I don't remember what GEC is.
2    Q.   Look at that last sentence:  "All
3    investigative sites were notified of this
4    decision on December 9, 1999."  When it says
5    "this decision," it means the decision to end
6    the study early?
7    A.   I think that's what that means.
8    Q.   Okay.  And then it says, "And ask
9    to schedule final visits for all remaining
10   patients to take place by January 7, 2000."
11   A.   Yes.
12   Q.   So, if all patients had their final
13   visit by in or around January 7, 2007 --
14   sorry -- January 7, 2000, is it possible that
15   the data was unblinded in March of 2000?
16   A.   I don't know the dates.  It's
17   possible.  As long as all the data was in,
18   and then it was crunched, it's possible.
19   Q.   Okay.  We can put that down for
20   now.  What exhibit are we on, 237?
21       MR. HOFF:  That's the next one.
22       (Needleman Exhibit 237, document
23   Bates No. 02847743 , marked for
24   identification as of this date.)
25   Q.   Let me know when you're ready,

118

1    Doctor.
2    A.   Okay, I've read the document.
3    Q.   This is an e-mail, March 26th,
4    2000, from George Geis to a number of people.
5    A.   Yes.
6    Q.   And you're on the e-mail chain down
7    below; is that correct?
8    A.   Yes.
9        MR. HOFF:  You're referring to the
10   last --
11   A.   This is an earlier --
12       MR. OLIVER:  Correct.
13   A.   I wouldn't have seen the above note
14   that was not to me.  The lower note was just
15   the scheduled meeting.
16   Q.   Right.  Okay.  For the March 26th
17   e-mail, the title, or the subject, says
18   "special SMB meeting."
19   A.   Yes.
20   Q.   What's the SMB?
21   A.   Senior management board.
22   Q.   Who was on the senior management
23   board?
24   A.   The heads of the R&D functions who
25   reported to me, clinical, discovery,

119

1    regulatory, pre-clinical, that kind of
2    safety.
3    Q.   What about Mr. DeSchutter?
4    A.   No.
5    Q.   Mr. Hassan?
6    A.   No.
7    Q.   Ms. Cox?
8    A.   No.  This is an R&D committee.
9    Q.   You see the first sentence, it says
10   "As per the note below, Phil wants us to
11   present CLASS on Wednesday."
12   A.   Is there a question?
13   Q.   Is Phil referring to you?
14   A.   I think so.
15   Q.   So, that means you wanted this
16   group of people to present the CLASS data on
17   Wednesday, March 29th?
18   A.   Yes.
19   Q.   So, the CLASS data would have had
20   to have been unblinded by March 29th, at the
21   very least?
22   A.   Correct.
23       MR. OLIVER:  You can put that aside
24   for a second.
25       I'm sorry, Doctor.  Pick that up

120

1    again.
2    Q.   Do you see where it says, "Jim, do
3    you want to distribute the main presentation
4    to the addressees of this note"?
5    A.   Yes.
6    Q.   What does he mean "the main
7    presentation"?
8    A.   I don't know.
9    Q.   Is it possible he's referring to a
10   Power Point?
11   A.   I don't know.
12   Q.   Is it likely?
13   A.   I don't know.
14   Q.   In your experience?
15   A.   I don't know.
16   Q.   Okay, you can put it aside now.
17       Doctor, this information was ready
18   for a presentation to the senior management
19   board by at least March 29; correct?
20   A.   Correct.
21   Q.   At that point, would the
22   information have been polished enough to
23   present to Mr. Hassan?
24   A.   I don't know until I see the data.
25       It would not have been the place



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

121

1  for Hassan.  It would be a pretty deep
2  technical review.
3        It would probably be the beginning
4  of several.  So, I could only, um, suggest
5  that it would be much earlier than a
6  discussion with Hassan.
7     Q.  You would have probably talked to
8  him about it at your monthly meeting, though?
9     A.  Um, I would have first studied the
10  data.
11        (Exhibit 65, CLASS vignettes 3/28
12     version (previously marked), marked for
13     identification as of this date.)
14        MR. HOFF:  Let's just call it
15     Exhibit 65.
16        MR. OLIVER:  That's fine.
17        MR. HOFF:  And we'll take it back.
18     Q.  Tell me when you're ready, Doctor.
19        (Pause.)
20     A.  I just scanned the early part.
21        If you dig into the later part,
22  I'll have to look at it a little more
23  closely.
24     Q.  Perfectly okay.  I understand that.
25        The e-mail that we just discussed,

122

1  I believe it was the former Exhibit 66, when
2  Mr. Geis talked about a March 29
3  presentation.
4        This presentation is dated, or this
5  version of this presentation is dated March
6  28, 2000.
7        Is it possible that this is the
8  same presentation that was discussed in the
9  e-mail?
10     A.  Um, I don't understand why they
11  would say "vignettes," and there's much more
12  here than would come up in my request for a
13  data analysis.  So, a lot of this would have
14  been inappropriate for my request.
15        The parts of it where they have
16  data would have been the objective of the
17  meeting, not planning about meetings,
18  presentations, and that kind of thing.
19        And it wouldn't have been called
20  "CLASS vignettes."
21     Q.  But it does deal with the CLASS
22  data?
23     A.  Some of it does.
24     Q.  Turn to page 3 with me, if you
25  will.

123

1        MR. HOFF:  Did you say that the
2     e-mail was formerly marked as 66?
3        MR. OLIVER:  Wasn't that 66?  Or is
4     that 66?
5        MR. HOFF:  No.  No.  No.
6        MR. OLIVER:  Or is it 66?
7        MR. HOFF:  The vignettes are 65.
8        You guys have got to talk to each
9     other.
10        The e-mail is 237.  I just want to
11     make sure that the record is clear.
12        MR. OLIVER:  Okay.  That's fine.
13     Q.  Slide 7, Doctor, "dissemination of
14     CLASS data."
15        This slide indicates that the CLASS
16     data would be disseminated to Searle
17     Pharmacia CLASS study team by April 3rd,
18     2000; do you see that?
19     A.  Yes.
20     Q.  Commercial leadership by April 7th,
21     2000?
22     A.  I see that written there.
23     Q.  And all clinical by April 5th,
24     2000?
25     A.  I see that written.

124

1     Q.  When it says "commercial
2     leadership," who would that refer to?
3     A.  Um, I don't know who is writing
4     this, but I would guess it's the people
5     involved with sales, marketing, and so on.
6        But this seems to be a document
7     presuming what would happen in my data
8     review, and then that would have been the
9     decision how much we understand it before it
10     moves forward.
11     Q.  At least at this point, the plan
12     was to disseminate the data on these dates?
13     A.  I don't know who wrote this; so, I
14     don't know what they're thinking.  I think
15     they're probably assuming that the data will
16     be so clear that everything would move
17     forward.
18     Q.  Would Mr. Hassan be included in the
19     commercial leadership?
20     A.  Yes, I would say that would be a
21     fair assumption.
22     Q.  What about Ms. Cox?
23     A.  Yes.
24     Q.  Which group were you in?
25     A.  Um, if you look in 237, I'm still



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                        December 8, 2010

125

1    the head of R&D, and there's going to be a
2    data analysis --
3        Q.   No, but would you have been in one
4    of those groups in the bullet points, or had
5    you seen the data by the time this was
6    drafted?
7        A.   It looks like I don't see the data,
8    except from your Exhibit 237, in the meeting
9    that was going to be on March 29th.
10       Q.   So, by at least March 29th you had
11   seen the data?
12       A.   I'm presuming that meeting came
13   forward --
14       Q.   Okay.
15       A.   -- but this would not have been the
16   document.
17           MR. HOFF:  And when you say "this,"
18   you're referring to Exhibit 65?
19           THE WITNESS:  65.
20           MR. HOFF:  It's the vignettes.
21           THE WITNESS:  Mine says 29 or 238.
22           MR. HOFF:  But we're calling it 65,
23   but it's the vignettes.
24           THE WITNESS:  May I have a new
25   label?

126

1            MR. OLIVER:  You tell him what's
2    going on.
3            MR. HOFF:  Off the record.
4            (Discussion off the record.)
5    BY MR. OLIVER:
6        Q.   Would you look at slide 4, if you
7    would, Doctor.  It says "publication
8    strategy."
9            Tell me what you think this slide
10   is talking about.
11       A.   I think that this team is making a
12   guesstimate of where to submit the data.
13       Q.   Why would they submit the data to
14   anyone?
15       A.   It's a very important therapeutic
16   issue, and there are certain things buried in
17   the data, either beforehand or afterwards,
18   which are very, very important.
19       Q.   Important from a clinical
20   standpoint?
21       A.   Important from a clinical
22   standpoint.
23       Q.   What about a commercial standpoint?
24       A.   It's the clinical part that's more
25   important than the commercial part.

127

1        Q.   Does the clinical drive the
2    commercial?
3        A.   Why don't we zero in on what I
4    think is important then, that aspirin data is
5    very profound.
6        Q.   But, Doctor, let me interrupt you.
7    I'm sorry, that's not my question.
8            Does the clinical practice of
9    physicians drive the commercial success of
10   the drug?
11       A.   Of any drug it does.
12       Q.   So, it's important to submit the
13   data for publication to let the doctors know
14   what's going on for clinical reasons, but
15   also for commercial reasons?
16       A.   The doctors don't decide because of
17   commercial reasons.  And this is a journal
18   where they want to know the clinical data.
19       Q.   You're telling me no doctor makes a
20   decision about treatment based on commercial
21   reasons?
22       A.   Yes.  That's what I believe.  That
23   would be the proper, the proper practice of
24   medicine:  what's good for my patients, not
25   who makes money.

128

1        Q.   But that doesn't mean that every
2    doctor follows that?
3        A.   That's -- you asked me a question,
4    and I answered it.
5        Q.   Sure.  If you'll look at the second
6    bullet point under JAMA, what is JAMA?
7        A.   The Journal of the American Medical
8    Association.
9        Q.   The second bullet point says
10   "six-month efficacy general safety and labs."
11           Is it fair to say that whoever was
12   presenting this had decided that JAMA was
13   going to get six months of data?
14       A.   You're asking me to guess about the
15   -- I think this is the beginning of the
16   discussion of what should be in that data.
17       Q.   So, at this point, on March 28th,
18   somebody had suggested that it be six months
19   of data?
20       A.   Correct.
21       Q.   Was that person you?
22       A.   No.
23       Q.   Were you involved in that decision?
24       A.   Are we talking --
25           MR. HOFF:  Which decision?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                          December 8, 2010

129

1    Q.   The decision to submit six months
2  of data to JAMA.
3    A.   Are you talking about this
4  document, or the discussion about the JAMA?
5  So, I need more from you.
6    Q.   I need more from me sometimes, too,
7  Doctor.
8    A.   Life is hard.
9    Q.   The decision, in general, to use
10 six months of data for JAMA, were you
11 involved in that decision?
12   A.   Um, I was ultimately aware of what
13 was submitted, and I was aware that it was
14 the six-month data.
15   Q.   Were you involved in the decision
16 to submit six months of data?
17   A.   Um, the way publications work, um,
18 and especially because publications also
19 involve clinicians and scientists outside of
20 Searle, I let them decide, I just have to be
21 satisfied about the data and the correct --
22 and the decisions in the data.
23       So, that's, that's a decision that
24 also involves external, the external
25 advisers, who the authors are.

130

1    Q.   So, if there were meetings to
2  discuss the use of the six-month data, for
3  the JAMA article, you would have been at
4  those meetings?
5    A.   It would have been at some meeting
6  where that was a discussion.
7    Q.   You would have contributed to the
8  discussion?
9    A.   If I had something to contribute,
10 or I would see if I was convinced or not.
11   Q.   Do you recall expressing an opinion
12 on six months of data versus 12 months of
13 data for the JAMA article?
14   A.   I have an opinion about the six- or
15 12-month that has, it's not just the JAMA
16 article; so, that would have been a
17 discussion.
18   Q.   That's not my question.  I move to
19 strike that as non-responsive.
20       My question is:  Do you recall
21 expressing an opinion about that for JAMA,
22 for the JAMA article?
23   A.   I don't recall.
24   Q.   Do you recall any meeting at all
25 where -- I mean, specifically recall any

131

1  meeting where you discussed that?
2    A.   Would you say if you are talking
3  about JAMA or not?
4    Q.   I'm talking about JAMA?
5    A.   I don't recall that discussion.
6    Q.   If I'm not talking about JAMA, do
7  you specifically recall discussing it?
8    A.   I understood the issues about six
9  months versus 12 months with time.
10       I don't know when that happens
11 relevant to when they're preparing the JAMA
12 document.
13   Q.   Do you think you would have
14 received a draft of the JAMA article before
15 it was submitted?
16   A.   Probably so.  Yes.
17   Q.   The same exhibit, if you will look
18 with me at slide 7.  This slide is entitled
19 "regulatory strategy."
20       Why is the regulatory strategy
21 different from the publication strategy?
22   A.   I can only guess.
23       We missed the primary end-point,
24 and we were well aware of it.
25   Q.   Why do you have a different

132

1  strategy for publications than you do for
2  regulatory bodies?
3    A.   I don't know that that's true.
4    Q.   Okay.  This slide is at least
5  talking about regulatory strategies; correct?
6    A.   Different than the Journal, yes.
7    Q.   And it deals with discussions of
8  FDA -- excuse me, with FDA.
9    A.   Yes.  And that's not the NIH.
10   Q.   That's right; it's not.
11       If you look down at the second
12 bullet point, it says, "appropriateness of
13 six-month sensoring."
14   A.   That -- mine says "achieved
15 agreement on revising analytical" -- am I on
16 the right page?
17       MR. HOFF:  He's talking about the
18       bullet point, rather than the dash
19       point.
20   A.   What are you talking about?
21   Q.   The very bottom bullet point, the
22 last writing on the page.
23       MR. HOFF:  Yes.
24   A.   Yes.
25   Q.   Did somebody question the



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

133

1   appropriateness of submitting six months of
2   data to the FDA?
3      A.  Somewhere in the --
4         MR. HOFF:  Objection to the form.
5      A.  -- in the analysis --
6      Q.  You can answer, Doctor.
7      A.  Somewhere in the rigorous analysis
8   of the data after the blind, the data clearly
9   suggested a higher dropout rate of diclofenac
10  patients, based on some of the symptomatic
11  data, and the realization that that data
12  could have caused the loss of the high risk
13  patients.
14        And so, that whole question is how
15  you handle that dropout rate, would, for me,
16  have been embedded in the sensoring question.
17     Q.  The question that was asked in that
18  slide at least, as reflected in your
19  discussion, was whether it's appropriate to
20  use the six months of data or not.
21     A.  The question in that slide is about
22  the discussion with the FDA, which, in fact,
23  ensued about the appropriateness of that
24  selection, the appropriateness of that
25  sensoring of data.

134

1      Q.  You will agree with me, then, that
2   there was at least some concern that this may
3   be appropriate, it may be inappropriate, we
4   need to talk about it?
5      A.  We had no belief that we ever hit
6   the primary end-point.  We also, and the FDA,
7   didn't understand several issues.  This was
8   one.  The other was the very confounding
9   effect of aspirin.
10        We felt that the data speaks for
11  itself and the FDA should review the data,
12  and that should be the basis of their
13  decision.
14        Therefore, we thought that there
15  was a possibility that we could still get
16  approval on that label.
17     Q.  Your strategy was, then, to present
18  the full gamut of data to the FDA, six
19  months, 12 months, everything, and let them
20  make the decision?
21     A.  There should be no surprise.  Every
22  bit of data must be presented to the FDA.
23     Q.  Would that be different for
24  publications?
25     A.  Sure.  Publication doesn't have to

135

1   do with what's submitted to the FDA.
2      Q.  What about -- so, you're telling me
3   FDA gets the full data, but the public does
4   not get the full data?
5      A.  Manuscripts have a mission, a
6   target, a set of scientific event that
7   doesn't have to do with the FDA.  That has to
8   do with -- the FDA has a different kind of
9   criteria.
10        They absolutely have to have a
11  consideration of what should go into general
12  practice.
13        People who read journals want to
14  understand mechanism, side effect, and the
15  totality; and so, it's a different question
16  about what's in a publication and what's in
17  the FDA.
18     Q.  You have to submit the full data to
19  the FDA, as you just said?
20     A.  Correct.
21     Q.  But you don't have to submit all of
22  that data to the public?
23     A.  You don't.  Publications aren't
24  equal to the FDA submission.  They're some
25  part of what you want to present about the

136

1   patients and data.
2         So, I've never seen a publication
3   that has the FDA submission -- never, as
4   something that's in a journal like JAMA or
5   any other journal.
6      Q.  We'll come back to this.
7         Look at slide 16, if you would.
8         Tell me when you get there.
9      A.  It says 12-month data.
10     Q.  At this point, on March 28th, the
11  date of this draft presentation, you agree
12  that there was a clear dichotomy between
13  six-month data and 12-month data?
14     A.  That's an incomplete question.
15        I understood what the six-month
16  data, I understood the 12-month data, and I
17  understood the implications.
18     Q.  On March 28th, 2000?
19     A.  I don't know the date.
20     Q.  That's the date of this Power
21  Point.
22     A.  I don't know this Power -- I don't
23  know something that would say "vignettes";
24  so, this may or may not be what I saw on your
25  237.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                  December 8, 2010

137

1    Q.  Well, whether you saw this Power
2  Point or not on March 28th, by March 29th you
3  would have certainly known about the
4  difference between the six- and the 12-month
5  data?
6    A.  Whenever that was presented.  Yes.
7  I think that would be right.
8    MR. OLIVER:  Do you know when you
9  want to take a lunch break.
10   MR. HOFF:  We ordered food in.
11   Off the record.
12   (Discussion off the record.)
13   MR. OLIVER:  This was previously
14  marked in another deposition, I'm
15  certain of it.  But we may just have to
16  mark it again, unless you know what
17  number it is.
18   ( Needleman Exhibit 238, documents
19  Bates Nos. 8910 to 9013, marked for
20  identification as of this date.)
21   Q.  Take a minute to look at this
22  document.  I think it will probably go
23  quicker if you wait to just generally look
24  over it and see if you read it.
25   A.  I'm going to first look it over a

138

1  little bit.
2    MR. OLIVER:  Good.
3    (Pause.)
4    Q.  Doctor, while you're looking at
5  that, you had said earlier that you were not
6  sure if the data for the SMB meeting on March
7  29th would have been polished enough to
8  present to Mr. Hassan?
9    A.  Yes.  That would have been
10  premature.
11   Q.  Okay.  Was the data in the Power
12  Point that you just saw --
13   A.  I'll have to --
14   Q.  The previous one.  Was that
15  polished enough to present to Mr. Hassan?
16   A.  I didn't study it that hard.
17   My kinds of meetings are much more
18  intense; so, we would have needed a lot more.
19   There would have been a lot of
20  discussion, and I would have not had, it
21  would not have not been ready to present to
22  Hassan.
23   Q.  You would have discussed it with
24  him?
25   A.  Only when I was satisfied that we

139

1  understood all the data and we had
2  scrutinized the data.
3    And his kind of meeting -- at some
4  time or other, the information that's
5  pertinent for him is we missed the primary
6  and we're analyzing the data.
7    I'm sure you'll have a lot of
8  specific questions that we'll have to go
9  into.
10   Q.  Do you recall this Power Point?
11   A.  You know, I don't remember specific
12  ones.  It looks like the kind of
13  presentations that I would be a recipient of.
14   Q.  So, is it possible that this was
15  the Power Point that they were talking about,
16  or version of the Power Point that they were
17  talking about in that e-mail?
18   A.  It is, but I do notice it's April
19  the 3rd, instead of March the 29th, but it's
20  possible.
21   Q.  If you'll look at slide 71 really
22  quick with me.
23   A.  I'm sorry.  But some -- I've lost
24  the numbering in these things.
25   MR. HOFF:  It will be here.

140

1    MR. OLIVER:  Off the record.
2    (Discussion off the record.)
3    MR. HOFF:  There you go.
4    A.  So, it says "Phil."  I know that
5  guy.
6    Q.  And that's you?
7    A.  I guess.
8    Q.  Does that indicate to you that you
9  saw this presentation, or participated in it?
10   A.  That could indicate that's what
11  they're going to present to me; so,
12  otherwise, I don't think you'd have to put my
13  name on it.
14   Q.  Is it safe to say that, one way or
15  another, you saw this?
16   A.  I'm familiar with some of the data,
17  yes; so, sometime or another, I would have
18  reviewed data like this.
19   Q.  Do you know if Mr. Hassan would
20  have seen something like this?
21   A.  I don't think he would have.
22   Q.  Why do you say that?
23   A.  It's too technical.
24   Q.  What about Ms. Cox?
25   A.  No.  Definitely not.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

141

1      This data is terribly interesting.
2  Take a look at this -- (pointing)
3          MR. HOFF:  Answer the questions.
4      Q.  If you will look at slide 39 with
5  me.
6      A.  I'm at a loss about numbering.
7      Q.  It's down in the lower-left-hand
8  corner under the line.
9      A.  Well, there are many pages I have
10  haven't got any number under there.  It picks
11  up at page 75 again, so --
12          MR. HOFF:  Can you refer to the
13      Bates number?
14          MR. OLIVER:  It's Bates number --
15      do you know what I mean when I say Bates
16      number, Doctor?
17          MR. HOFF:  It's the other number,
18      and every page will have that.
19      A.  These things, no.
20      Q.  If you go to 01238948.
21      A.  8948.
22      Q.  Yes, 8948.
23      A.  Got it.  It just says "12-month
24  data."
25      Q.  So, that's the same or similar

142

1  slide that we saw in the last Power Point?
2      A.  I don't remember.  Do you want me
3  to look?
4      Q.  No.  That's okay.  Turn the page.
5      A.  Okay.
6      Q.  So, once again, we've got 12-month
7  data; correct?
8      A.  Yes.
9      Q.  And each little star on these bar
10  graphs indicates that there was a
11  statistically significant difference; is that
12  correct?
13      A.  Correct.
14      Q.  -- between Celebrex and whatever
15  the bar graph happens to be comparing it to?
16      A.  Yes.
17      Q.  And when you go to "UGI
18  complications," which was the primary
19  end-point, there's no star because it wasn't
20  statistically significant?
21      A.  Correct.
22      Q.  And you go to "complications plus
23  ulcers," and there is a star?
24      A.  Correct.
25      Q.  And you're talking -- you have a

143

1  graph that does all patients, and you have a
2  graph that does non-aspirin users?
3      A.  Yes.
4      Q.  At what point do you remember
5  making a decision to combine the analysis to
6  look at UGI complications plus ulcers?
7      A.  At some time or other, when the
8  team brought the data forth and showed
9  including ulcers, to explain the data we
10  missed the primary, we really thought it
11  should work.
12          And then they brought forth more of
13  the sub-analysis, the withdrawal rate, the
14  symptomatic; so, that would have been a
15  discussion when --
16      Q.  You missed the primary end-point,
17  and after you figured out that you missed the
18  primary end-point, you decided to look at
19  something else?
20      A.  Yes -- you do a deeper analysis of
21  why did you miss.
22      Q.  Why did you combine ulcers and
23  ulcer complications?
24      A.  Looking back, especially knowing
25  about the high withdrawal rate in dilofenec,

144

1  they were quite aggressive in dropping out
2  patients who had symptomatic ulcers.
3          So, it was before they reached what
4  you're calling here "UGI complications."
5      Q.  Would you look at slide 76 with me.
6      A.  Give me your -- what do you call it
7  the Bates number?
8      Q.  Bates number.
9      A.  B-A-T-E-S?
10      Q.  B-A-T-E-S.  The Bates number is
11  01238985.  8985.
12      A.  Okay.
13      Q.  Do you see the third bullet point,
14  it says, "FDA may be reluctant to accept the
15  data for a label change."
16      A.  Yes.
17      Q.  Can you recall why somebody thought
18  that the FDA would be reluctant to accept the
19  data?
20      A.  Let me look.
21          I think any time you miss a primary
22  end-point the FDA would be reluctant to
23  change.
24          You'd have to really make a pretty
25  compelling case to get them, when you --



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

145

1  because it's a prospective design.  It would
2  be true of any drug.
3      Q.  This was a significant issue for
4  Celebrex, the getting the label change?
5      A.  It's a significant on any drug
6  where you miss the primary.
7      Q.  Is this the kind of issue that Mr.
8  Hassan would have discussed with you?
9      A.  No.  This is my job.
10      Q.  You wouldn't even have told him
11  about it, given him the heads-up?
12      A.  Um, there might have been a
13  discussion.
14          I ultimately am pretty convinced
15  it's a fair discussion of two issues with the
16  FDA, and the two issues are, confounding data
17  of the aspirin, because it was a much higher
18  rate than we previously experienced.
19          And the withdrawal of the high-risk
20  patients with diclofenac.
21      Q.  And these are issues you would have
22  discussed with Mr. Hassan?
23      A.  No.  With the FDA.
24      Q.  What would you have told Mr. Hassan
25  about the prospects of a label change?

146

1      A.  We missed the primary end-point and
2  we're continuing to analyze the data, and
3  it's my belief that we have a sound
4  scientific reason to come and debate with the
5  FDA and the advisory committee, about what we
6  thought was the important reason.
7          You see, you go into a trial and
8  there are unknowns.
9      Q.  So, you would have told him that
10  there were important issues that you had to
11  press or debate with the FDA, you would have
12  discussed those reasons?
13      A.  No.  I don't remember.
14          What still stands out in my mind,
15  is we missed the primary end-point, and we
16  thought that we could really make a case to
17  the FDA, because I believe that the, as
18  reflected in the six-month data and not
19  changed by the 12-month data, there was a
20  rational basis for approval.
21          That's further clarified because
22  the Vioxx data eliminated the aspirin, and
23  that eliminated the major confounding, and
24  they only had one comparative.
25          So, it was my belief -- so, Hassan

147

1  would, he would not have poured over the
2  data.  That's my decision.
3      Q.  You would have told him, though,
4  that the case you would make to the FDA is X?
5      A.  No.  I don't know what I would have
6  -- I would have told him, there's data that's
7  relevant for the FDA.  We wouldn't have
8  poured over the data.
9      Q.  You would have given him the
10  general parameters of the discussion?
11      A.  No.  We missed the primary, and the
12  rest is negotiations with the FDA.
13      Q.  When you say to Mr. Hassan we
14  missed the primary end-point, he doesn't have
15  any follow-up questions?
16      A.  I don't recall.
17          You know, when you do drug trials,
18  it's not a rare event that you miss the
19  primary or the secondary.  That's still a
20  work in progress that goes on for weeks and
21  months with the FDA.
22      Q.  Celebrex was hugely important to
23  the company at the time?
24      A.  Yes.
25      Q.  You tell Mr. Hassan that you missed

148

1  the primary end-point.  You don't think he
2  would have asked you a follow-up question?
3      A.  You could spend all day pursuing
4  this.  I don't think so.
5          I think he would have been
6  satisfied with my judgment, we missed the
7  primary, and we're going to go over the data
8  with the FDA.
9          MR. OLIVER:  That's all I have on
10  this document.  If you want to break for
11  lunch.
12          MR. HOFF:  Yes.  Why don't we do
13  that.
14          THE VIDEOGRAPHER:  Off the video
15  record at 12:43.
16          (Luncheon recess:  12:43 p.m.)
17
18
19
20
21
22
23
24
25



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                          December 8, 2010

149

1           AFTERNOON SESSION
2              1:16 p.m.
3    P H I L I P   N E E D L E M A N,   having
4       been previously sworn, resumed the stand
5       and testified further as follows:
6    EXAMINATION (cont'd)
7    BY MR. OLIVER:
8           THE VIDEOGRAPHER:  Stand by.  Back
9    on the video record at 1:16.
10          MR. OLIVER:  Doctor, take a look at
11   what, I guess, we're going to Exhibit
12   239 now.
13          (Needleman Exhibit 239, documents
14   Bates Nos. 5044 to 45, marked for
15   identification as of this date.)
16   Q.   Tell me when you're ready.
17   A.   Okay, I've looked at it.
18   Q.   If you look, this is an e-mail
19   chain.
20          And if you look at the third e-mail
21   down, dated April 5, 2000, from Goran Ando to
22   you, and Michael Friedman.
23   A.   I see it.
24   Q.   Okay.  I'm sorry.  Look up at the
25   top, the very first e-mail.  It says,

150

1    "Everyone FYI after the presentation at
2    Peapack."
3          Do you see that?
4    A.   Yes.
5    Q.   And that refers to Peapack, New
6    Jersey, the head of Pharmacia's operations?
7    A.   Peapack is where -- but that also
8    could have been where I had the SMB meeting.
9    I don't know that.
10   Q.   Okay.  But it would have been at
11   the corporate headquarters?
12   A.   Yes.
13   Q.   Okay.
14          And there was, obviously, a
15   presentation of the CLASS trial data at
16   Peapack?
17   A.   Yes.  That's what it looks like.
18   Q.   Okay.  Now, back to the e-mail.
19   This is Mr. Ando, or Dr. Ando providing some
20   thoughts on the data that was presented to
21   him; is that correct?
22   A.   Yes.
23   Q.   Look at number 2.
24          He says, "For the first public
25   disclosure of data it might be worthwhile

151

1    thinking through whether:  A, only showing
2    results of NSAIDs combined; or B, only
3    showing results versus Ibuprofen makes sense.
4    I guess the answer is probably No, but it's
5    worth going through the exercise formally."
6          First, do you remember this e-mail?
7    A.   No.
8    Q.   Do you agree with me that, at this
9    point, there had been no public disclosure of
10   the CLASS data?
11   A.   I think that's correct, yes.
12   Q.   Mr., Dr. Ando, Mister or Dr.,
13   whatever he is, is suggesting a certain way
14   to release the information for the first
15   time?
16   A.   Yes.
17   Q.   Why does he suggest only showing
18   the results of "NSAIDs combined"?
19   A.   I don't know why he makes
20   suggestions.
21   Q.   What does that mean to you, that A?
22   A.   This whole note is about how to
23   strategically handle it.
24          Some parts of his suggestions I
25   would agree with, some parts on the whole

152

1    thing, some I wouldn't.  This is just the
2    beginning of the discussion.
3    Q.   Do you remember, at the time,
4    agreeing with A?
5    A.   You know, I'm more familiar with
6    agreeing with what went into the JAMA paper
7    than his note.
8    Q.   Okay, look at --
9    A.   And parts I disagree with.  But I
10   actually agree with number 3, very much.
11   Q.   But we're talking about number 2
12   now.
13   A.   I know.  Parts of it I agree,
14   parts not.  This is advice that goes into the
15   discussion.
16   Q.   Look at B, "only showing results
17   versus Ibuprofen."
18   A.   Um-hum.
19   Q.   Why would he make that suggestion?
20   A.   Looking at the data, if you looked
21   at Ibuprofen, and took out the aspirin, it
22   would look like you did find, I think that's
23   overzealous, and it's a -- misrepresents the
24   data.  So, I don't think that's a -- for me,
25   that wouldn't be scientifically acceptable.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

153

1    Q.  Do you recall rejecting this
2  suggestion?
3    A.  I don't even recall this whole
4  note.
5    Q.  But from what you're telling me
6  now, you would have rejected that suggestion,
7  because it --
8    A.  That would have been a discussion,
9  yes.
10    Q.  Is that why he said --
11    A.  I would have rejected just talking
12  about the thing that only worked, and I think
13  we never, ever didn't agree that we missed
14  the primary end point, and I think that's the
15  important thing.
16    Q.  I think that's it for that one.
17      MR. OLIVER:  67.
18    Q.  Take a second to review this and
19  let me know when you're ready.
20      (Pause.)
21    A.  Okay.  I've read it.
22    Q.  What is it?
23    A.  It looks, to me, like some kind of
24  a press release, it looks like, from investor
25  relations, from the top of it.

154

1    Q.  What's the subject matter of it?
2    A.  It's some kind of a report from the
3  top on the CLASS trial.
4    Q.  In the e-mail we looked at a moment
5  ago there was discussion about the first
6  public disclosure of the CLASS data.
7      Do you know if this was the first
8  public disclosure of the CLASS data?
9    A.  I have no idea.  I don't know.  The
10  dates, over here it says April 17th.
11    Q.  Is this something you would have
12  reviewed?
13    A.  No.
14    Q.  Are you sure about that?
15    A.  Yes.  I'm pretty sure.
16    Q.  Why do you say you wouldn't have
17  reviewed it?
18    A.  I'm not interested in the marketing
19  and business parts, I'm interested in the FDA
20  part and the scientific journal part.
21    Q.  Is this something that Mr. Hassan
22  would have reviewed?
23    A.  I don't know.
24    Q.  Is this something that Ms. Cox
25  would have reviewed?

155

1    A.  I don't know.  I would guess, maybe
2  so.
3    Q.  Based on your experience, is that
4  maybe so for both Mr. Hassan and Ms. Cox?
5    A.  No.
6    Q.  Just for Ms. Cox?
7    A.  I'm only guessing, because she's
8  the head of U.S. business.  It's just a
9  guess.  I don't know what she reviewed and
10  what she didn't.
11    Q.  Why do you think Mr. Cox -- I mean,
12  excuse me, Mr. Hassan would not have reviewed
13  this?
14    A.  I think that's below his screen,
15  also.  He knows that there's going to be an
16  FDA advisory committee meeting at some time
17  or other, so.
18    Q.  Look at the third paragraph with
19  me, under the heading "groundbreaking study
20  reflects real world practice."
21      It says, "The CLASS safety study,"
22  or -- it says --
23    A.  The whole paragraph?
24    Q.  The third paragraph, first page,
25  the third whole paragraph under that bold

156

1  heading, "The cellecoxib long-term arthritis
2  safety study" -- that's CLASS -- "an
3  approximately 13-month, multicenter,
4  randomized, double-blind outcomes trial of
5  about 8,000 arthritis patients was designed
6  to mirror everyday clinical practice by
7  enrolling a broad spectrum of patients," and
8  it goes on.
9      So, you would agree with me that
10  this press release says CLASS lasted 13
11  months?
12    A.  No.  Where do you see that?
13      Oh.  Oh.
14      Look, I know the trial stopped
15  because of the number of events.  There might
16  have been some patients that reached 13
17  months, but a lot of them that didn't.
18    Q.  So, do you agree with me, or do you
19  not agree with me?
20    A.  Say it again.
21    Q.  Do you agree with me that this
22  press release characterizes CLASS as a
23  13-month study?
24    A.  Um, all I can do is see what I
25  read.  That's not what -- the FDA is the real



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

157

1    arbiter, and they will see the data for what
2    it is.
3        Q.  Let me ask the question again.
4        Do you agree with me that this
5    press release characterizes the study, CLASS,
6    as a 13-month study?
7        A.  All I can tell you is what I read,
8    and that's what it says, but that doesn't
9    reflect the data, as I know it.
10       Q.  Do you see anything in there that
11   talks about the six-month data?  Take a
12   minute and review it.
13       A.  In that paragraph?
14       Q.  No.  I'm sorry, in the whole thing.
15       A.  I can't tell what, when it's
16   talking about it.
17       I can't tell in here how you would
18   decide what duration that he's talking about.
19       Q.  But take a minute and just tell me
20   if you see anything in there that says
21   anything about the six-month data that you
22   were talking about.
23       A.  I don't know what it -- you know, I
24   don't know where it says how long the data
25   is.  I'm looking for it, and I'm not finding

158

1    it.  Do you want to point it to me so that I
2    can see it, where it says --
3        Q.  I already pointed you to the only
4    part.
5        A.  Well, that's someone who doesn't
6    know very much about, and that's not someone
7    who would have been writing papers or
8    presenting to the FDA.
9        Q.  So, they've gotten it wrong in this
10   press release?
11       A.  If they think it's a 13-month
12   trial, they've got it wrong.
13       Q.  Okay.  Turn to the second page, if
14   you don't mind, with me.  This is the third
15   paragraph on the second page.
16       And this is -- I'm not a scientist,
17   so this is going to be tough for me, I'm
18   going to need you to walk me through it; all
19   right?
20       A.  We'll try.
21       Q.  Okay.  I want you to look at the
22   first sentence.
23       A.  The study?
24       Q.  Right.  I'm going to read that out
25   loud:  "The study funded by Searle and Pfizer

159

1    Incorporated found that Celebrex patients
2    experienced significantly fewer symptomatic
3    GI ulcers and ulcer complications compared
4    with Ibuprofen or diclofenac."
5        What does that sentence mean to
6    you?  Explain it to me.
7        A.  The sentence is combining the
8    end-point, and they're comparing it to the
9    two NSAIDs -- that's what it kind of means,
10   somewhere else I had read it said the
11   combined data.
12       So, I might have written it
13   differently at the end, but fortunately in
14   the earlier part I read something that, here
15   in the -- a difference that was statistically
16   --
17       Q.  Doctor --
18       A.  -- it was on the combined data.
19       You asked me what I thought, so --
20   I read it in the context of what I read in
21   the beginning, which is, they looked at a
22   combined end-point, including symptomatic,
23   and I understood it in the context of the
24   earlier statement.  That's what I thought.
25       Q.  Give me that one more time.

160

1        I've completely missed your answer.
2    I didn't get your answer to my question:
3    What does it mean to you?
4        A.  It means to me that --
5        Q.  I'm sorry, Doctor.  Strike that.
6        A.  Start all over.
7        Q.  What are they comparing, Celebrex
8    versus what?  What does that sentence
9    indicate there's a comparison of?
10       A.  I read that sentence in the context
11   of the whole document.  And the whole earlier
12   document said they did the combined data.
13       If I were writing that sentence, I
14   would write it differently.  I think it's not
15   a good choice of language, that sentence.
16       Q.  What would you do differently, if
17   you were writing it?
18       A.  I would re-emphasize that it's the
19   combined data.  I would have said "and"
20   instead of "or."  They said it in the
21   beginning, but it would have been worth
22   re-emphasizing it, if I were writing it.
23       Q.  Why would you reemphasize that, if
24   you were writing it?
25       A.  Because it's, it's not the context



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

161

1   of what the actual measurements are made, as
2   described in the opening sentences.
3       Q.   So, it's confusing.
4       A.   Yes.  It's not a good choice of
5   language.
6       Q.   If you look at Celebrex for the
7   combined end-point, the GI ulcer
8   complications plus symptomatic ulcers, if you
9   look at Celebrex for the combined end-point
10  and you compare it with Ibuprofen, was there
11  a statistically significant difference?
12      A.   With or without aspirin?
13      Q.   Let's start with the six-month
14  data.
15      A.   Without aspirin, the answer is Yes.
16      Q.   With aspirin?
17      A.   Um, I think not.
18           I think with aspirin, the Ibuprofen
19  was -- I mean, so, I think without aspirin is
20  where it had the -- no, the significance got
21  better.  I'm not sure we went over those
22  numbers.
23           But Ibuprofen, all patients.
24      Q.   If you want to look back at
25  exhibit, it's Exhibit 65.

162

1           MR. MONTGOMERY:  66.
2           MR. OLIVER:  The final report, it's
3   page 6.  It's tables 1 and 2.
4           THE WITNESS:  Good.
5       A.   It was .09.
6       Q.   I'm sorry.  Dockets.  It's page 7.
7   It's, I said tables 1 and 2, it's tables 3
8   and 4.  It's the next page.
9           (Referring to Exhibit 14)
10      Q.   That's the combined end-point data.
11      A.   So, it is significant with
12  Ibuprofen at six months.  P.005.
13           Thanks for pointing that out.  And
14  with aspirin it's even better.
15      Q.   And with diclofenac --
16      A.   It's not significant.
17      Q.   So, if you look at them separately,
18  and you compare them, diclofenac, there's no
19  statistical significance with the combined
20  end-point when you compare diclofenac?
21      A.   That's correct.
22      Q.   Okay.  Look at the second sentence
23  for me.  Keep that near you, if you need to
24  refer to it.
25      A.   The second paragraph?

163

1       Q.   The same paragraph, right, the next
2   sentence right after that.
3       A.   I'm sorry.  Get me back there.
4       Q.   You're on the second page of the
5   press release, it's the --
6       A.   The one that says "the study"?
7       Q.   The third paragraph, "the study,"
8   and you want to go to the second sentence,
9   which is:  "Celebrex was associated with."
10      A.   "Numerically fewer ulcer
11  complications compared to -- a statistically
12  significant difference."
13           Okay.  What's the question?
14      Q.   I want you to focus on the second
15  part of the sentence.
16           It says, "64 percent fewer of these
17  serious events among non-aspirin users, a
18  statistically significant difference."
19           In that sentence, when it says,
20  "these serious events," it's referring to
21  ulcer complications; correct?
22      A.   I don't know.  Let me --
23           So, you want to refer me now to a
24  table?
25      Q.   No.  I want you to read the

164

1   sentence first.  This question is just -- in
2   that sentence, when it says, "64 percent
3   fewer of these serious events," it's
4   referring to ulcer complications?
5       A.   I think you're right.  It says
6   Celebrex was associated with fewer ulcer
7   complications; I think that's correct.
8       Q.   Among non-aspirin users.
9       A.   Yes.
10      Q.   Look at tables 1 and 2, with me.
11  That was page 6, again.
12      A.   Okay.
13      Q.   Can you tell me if that sentence is
14  referring to the six-month data or the
15  12-month data?  Table 1 versus table 2.
16      A.   I guess I have to figure out the 64
17  percent number.  And that would be a third,
18  64 percent.
19      Q.   64 percent.
20      A.   If I'm understanding that -- um,
21  even looking at diclofenac -- let's start at
22  the top of the table -- "all patients .76" --
23  or even look at the combined.  If you
24  combined -- let's make a ballpark guess --
25  .27 and .46, it's about .4, .5.  It's



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Philip Needleman                                    December 8, 2010

165

1  somewhere around 50 percent in the all
2  patients.
3      Q.   But remember, this sentence is
4  talking about non-aspirin users.
5      A.   Yes.  That's all patients.
6      Q.   Yes.
7      A.   Okay.
8      Q.   No.  No.  No.  I'm sorry.
9      A.   Because, below it, it says "not
10  taking aspirin"; so, up on top you're looking
11  at .76, and it doesn't show me the combined
12  data, but it must be about .4, .5.
13      It's somewhere around half at the
14  six months.
15      If I look --
16      Q.   Okay.
17      A.   If I look at the bottom, it's .7
18  versus .93.
19      So, from that sentence, it must be
20  the six-month data, not the 12-month data I
21  think that they're talking about.
22      Q.   But in the 12-month data, if you
23  look down at table 2, the far right-hand
24  column, the cell that is on the
25  lower-right-hand corner, it compares both

166

1  NSAIDs for 12 months in non-aspirin users.
2      It's point -- the P value is .185;
3  correct?
4      A.   But you can't compare percentage
5  based on P value.  You'd have to do it on the
6  actual number.
7      Q.   But that is not -- that's not the
8  question I'm asking.
9      That column shows that at the
10  12-month data, there was no statistically
11  significant difference between the NSAIDs and
12  Celebrex for the primary end-point of
13  CSUGIEs?
14      A.   Well, you've got me confused,
15  because you asked me about my comments about
16  this sentence that said in 64 percent of
17  fewer side effects on non-aspirin.
18      Do you want to ask me something
19  else?  So, I was calculating that.
20      Q.   And you agreed with me that, or
21  you pointed out that this must refer to the
22  six-month data?
23      A.   I think that must be true.
24      Q.   Because at the 12-month point there
25  was no statistical significance?

167

1      A.   It wasn't talking about statistical
2  significance, it was talking about percentage
3  of events in that sentence that said 64
4  percent.
5      Q.   If you'll go back and look at the
6  sentence, Doctor, at the very end of the
7  sentence it says "a statistically significant
8  difference."
9      Do you see that?
10      A.   Okay.  But then I can't equate that
11  to the 64 percent difference; that's a
12  different question.
13      If you're asking me about
14  significance, it's obviously correct, but you
15  don't get 64 percent by calculating off P
16  values.
17      Q.   Right.  And I understand that.  So,
18  put the 64 percent out of your mind.
19      That sentence, at the end, it says
20  "a statistically significant difference."
21      If you compare NSAIDs and Celebrex,
22  taking out aspirin users, at six months there
23  was a statistically significant difference;
24  correct?
25      A.   Correct.

168

1      Q.   At 12 months there was not a
2  statistically significant difference?
3      A.   Correct.
4      Q.   Would you reword that sentence in
5  any way?
6      A.   Well, I don't prepare documents
7  like this.  If I were doing a scientific
8  description, I would talk about the
9  specifics, just that they were listed in the
10  table.  So, I would do a more technical
11  analysis about what this was about.  So, it's
12  imprecise for me.
13      Q.   Would you explain the difference
14  between the six- and the 12-month data in
15  this document?
16      A.   I would explain a lot of things.
17      I would have explained the, with
18  and without aspirin.
19      Q.   Would you have explained the reason
20  for the focus on the six-month data in this
21  press release?
22      A.   I think I believed then, as I do
23  now, that after those events accrued, the
24  design of the trial of the subsequent six
25  months are flawed by the overactive dropout


ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

169

1   rate in the diclofenac.
2        So, the rigor of the design really
3   falls off, so that the fundamental data, as
4   you see in the six months, was the most
5   accurate way to look at the data.
6        And what troubles me, actually, in
7   your favorite tables is the end on all of
8   these tables reflects the original number,
9   not the dropout rate number.
10       So, the end is very different
11  between six and 12 months, because of the
12  dropout rate.
13       So, the relevant scientific place
14  to compare it, for me, was the six-month
15  place.
16       Q.   You would have explained all of
17  that to make that more clear in this press
18  release?
19       A.   I would have explained the dropout
20  rate.  I would have explained a lot more.
21       But I don't -- but I think it would
22  bore people in a press release.
23       Q.   Do you think it would bore people
24  in a journal article?
25       A.   No.

170

1        Q.   It would be appropriate, then --
2        A.   Again, it depends on the journal.
3        Q.   It would be appropriate, then, in a
4   journal article to include the discussion
5   that you were talking about there?
6        A.   I would think so.
7        Q.   I'd like to show you -- gosh, Mr.
8   Hoff is going to have a problem there.
9        MR. HOFF:  I've just given up on
10  you.
11       MR. OLIVER:  Off the record.
12       (Discussion off the record.)
13       (Needleman Exhibit 240, documents
14  Bates Nos. 9404 to 12, marked for
15  identification as of this date.)
16       Q.   Let me know that you have reviewed
17  it.
18       A.   Okay.
19       Q.   Is this a draft of the press
20  materials that we just looked at, dated April
21  7th, 2000?
22       A.   It looks like it.
23       Wait a minute.
24       I threw it in this never-ending
25  pile.

171

1        It says "draft," and it looks
2   similar to it; so, that would be fine.
3        Q.   Are you copied on the e-mail?
4        A.   Yes.
5        Q.   If you were copied on an e-mail
6   like this, would you have reviewed it?
7        A.   I might have scanned it, and not
8   been too interested in it.
9        Q.   Is this press release different
10  than the final one that we looked at?
11       A.   I guess I better look at it again.
12       Q.   Yes, take some time to compare
13  them.
14       A.   Let me see where I threw it.
15       I guess I have to throw away things
16  in order, if we're going to go back.
17       This is new findings; so, it's a
18  different title.
19       But it has, it looks like it has
20  some of the same language.  So, I think
21  there's definitely a relationship between
22  these two documents.
23       Q.   Safe to say that this was an
24  earlier draft of the one that finally went
25  out?

172

1        A.   It looks that way, yes.
2        Q.   Can you tell me if those two
3   sentences we just discussed are in this
4   draft?
5        A.   Would you point me to them again.
6        Q.   Go back to the exhibit we were
7   looking at.
8        A.   The 67?
9        Q.   That's right.  If you look at the
10  second page, third paragraph.  Starting with
11  "the study funded by Searle and Pfizer."
12       A.   Okay.  You want me to find that in
13  this?
14       Q.   Yes.
15       A.   It has differences.  Okay.
16       So, it's not the same, but it's got
17  some relationship to the other.  What's the
18  question?
19       Q.   You would agree with me, that those
20  exact two sentences that we read are not in
21  this draft, this April 7th draft?
22       A.   Which two sentences?
23       Q.   The two sentences on page 2 of the
24  final, third paragraph, page 2.
25       A.   Which sentence?



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

173

1      Q.  Beginning with "the study funded by
2  Searle and Pfizer."
3      A.  What I see is, instead of saying 64
4  percent, they've broken it apart.  They come
5  up with a 50 percent and a 70 percent.
6      Q.  Where are you --
7      A.  And I see -- I'm reading the one
8  that -- the earlier one, "the study."
9      Q.  Where?
10     A.  You said, "the study funded by."
11     Q.  Right.
12     A.  And so, they've, in this earlier
13  version, they broke up some of the data, and
14  also in this earlier version, they explained
15  -- remember, we found the 50 percent number.
16       They explained they're also
17  figuring in things that weren't in that
18  table, like the dyspepsia, the pain, and the
19  nausea.
20       And here -- they're just saying
21  complications -- well, down here they say,
22  dyspepsia, nausea, and they broke it up in a
23  different way, but it looks like it's just
24  differentially, it's not so remarkably
25  different.  You see that last sentence.

174

1  That's where they capture the dyspepsia.
2       So, ask me a question again.
3      Q.  It doesn't have those exact same
4  sentences that were in the final press
5  release -- more specifically, it doesn't say,
6  a statistically significant difference; does
7  it?
8      A.  No, it doesn't.
9          Oh, wait, wait.
10       "Current at a significantly higher
11  rate" is the last part of that earlier
12  paragraph.
13       A scientist or a clinician would
14  say significant means P .05.
15       So, that's -- so, when you say
16  "significantly higher rate," that would have
17  buried, for me, would be buried in that
18  statement.
19     Q.  For you as an expert in this field?
20     A.  No.  As a scientist or a clinician,
21  also.
22     Q.  So, every time they say
23  "significantly," you're telling me they mean
24  statistically significantly?
25     A.  That's what it means to me.

175

1      Q.  And it means that to you because of
2  your experience as a clinician or researcher?
3      A.  Maybe so.
4      Q.  Let's look at Exhibit 241.
5        (Needleman Exhibit 241, documents
6  Bates Nos. 62 to 75, marked for
7  identification as of this date.)
8      Q.  Doctor, take a moment when he gives
9  that to you, and let me know when you've had
10  a chance to look at it.
11       (Pause.)
12     Q.  Doctor, I can actually help you
13  out.  If you'll look at the second, third,
14  there's a part that says "fact sheet."
15       I'm not going to ask you questions
16  about that.  You can skip past that to the
17  draft press release, which starts on about
18  the sixth page.  I'm just going to ask you
19  about the e-mail and the draft press release,
20  not the fact sheet.
21     A.  Okay.  I'm at the beginning of what
22  looks like the draft on April 11th of what
23  looks like a press release.
24     Q.  Right.  You're copied at the top of
25  the e-mail.  I'm sorry, the second e-mail,

176

1  the April 11th, two --
2      A.  If you want me to go back to the
3  front page.
4      Q.  Yes. You're copied on that e-mail;
5  correct?
6      A.  Let me take a look.  There are a
7  million names here.  Yes, I am.
8      Q.  Okay.  So, you received a draft of
9  the press release on April 7th; is that
10  correct?  That was the previous one.
11     A.  We saw a previous e-mail, yes.
12     Q.  And you received another draft on
13  April 11th?
14     A.  It looks correct, yes.
15     Q.  Did you review this draft, the
16  April 11th draft?
17     A.  I don't know.  I might have scanned
18  it.  I don't remember.  It's not high on my
19  list.
20       (Needleman Exhibit 242, documents
21  Bates Nos. 5807 to 26, marked for
22  identification as of this date.)
23     Q.  The same as the last time, I'm not
24  going to ask you about the fact sheet, just
25  the press releases.  So, you can skip the



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

177

1    fact sheet.
2        A.   Okay.
3        Q.   This is a third draft of the press
4    release, circulated on April 14th; is that
5    correct?
6        A.   That's what it looks like, yes.
7        Q.   You received a copy of it?
8        A.   I think I'm on the list.  Yes.
9        Q.   The subject of the second e-mail in
10   the chain, actually all the e-mails in the
11   chain, it says "RAC approved CLASS press
12   materials."  What is the RAC?
13       A.   I don't know.  I don't know what
14   RAC is.
15       Q.   Does it sound like it might be
16   the --
17            Excuse me.  Strike that.
18            Could it be the regulatory affairs
19   committee?
20       A.   There was no such committee.
21       Q.   There was no regulatory affairs
22   committee?
23       A.   No.
24       Q.   Would you have been on the RAC?
25       A.   It could have been research.

178

1            It could have been Research
2    Advisory Committee, not regulatory.  But I'm
3    -- I don't know that abbreviation.
4        Q.   Were you on the research advisory
5    committee?
6        A.   I don't understand what that is.
7    I'm the head of research.
8            The people, the people who report
9    to me meet with me regularly.  So, I'm not
10   sure what this is.
11           Who knows, what is it called when
12   everyone reports to me?
13       Q.   Do you know if Mr. Hassan would
14   have gotten of a copy of this draft press
15   release?
16       A.   I do not know.
17       Q.   What about Ms. Cox?
18       A.   I do not know.
19       Q.   Look with me at -- go to the press
20   release, the draft press release in this
21   stack, right.
22           And go to the second page.
23           And the third paragraph.
24       A.   Yes.
25       Q.   Those are the same sentences that

179

1    ultimately we talked about, and that
2    ultimately made it into the final press
3    release?
4        A.   Question?
5        Q.   Are they?
6        A.   I don't know what the final press
7    release looks like.
8        Q.   That's the one that we looked at,
9    the first press release.
10       A.   Oh, that was it?
11       Q.   That was it.  Yes.
12       A.   It looks like it ends with "at a
13   significantly lower rate," and I think we saw
14   that before.  It looked like "at a
15   significantly" -- so, I don't know if that's
16   exactly the same.
17            It looks pretty close.  Yes, it
18   looks pretty close.
19       Q.   These are the sentences where you
20   said you would have reworded or modified?
21       A.   No.  Where I would have reworded it
22   was that business about "or" instead of
23   "and"; so, I would have clarified it as
24   combined NSAIDs.
25       Q.   Look at that sentence again with

180

1    me, Doctor.  Its the press release, second
2    page, third paragraph, "the study" -- the
3    same sentence that you would have reworded,
4    but I want to focus on a different part of
5    it.
6            MR. HOFF:  Are you looking at the
7    final, or the --
8        Q.   I am looking at the one that he has
9    in his hand.  It's the April 14, 2000.  It's
10   not materially different from the final.
11           MR. HOFF:  I just want to make sure
12   we know what we're looking at.
13           Go ahead.
14       Q.   Never mind, Doctor, scratch that.
15           We're done with that one for the
16   moment.
17           At what point would the company
18   have submitted this CLASS data to FDA?
19       A.   When it was all assembled.
20           So, you know, you go through all
21   the data, and then there's all the write-ups,
22   there's all the proofing.  So, just when it's
23   all done.
24       Q.   Am I correct that the point of that
25   exercise would be to get the label changed?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

181

1    A.  That's right.
2    Q.  You would have been involved in the
3  discussions after --
4        Excuse me, strike that.
5        After the company submitted all of
6  the data to the FDA, there would have been
7  preparation to make a presentation to the FDA
8  about the data?
9    A.  Yes.
10   Q.  How long did that gap last in this
11 case?  How long was it before the FDA held
12 the arthritis committee meeting?
13   A.  From what, when they received it?
14   Q.  From May 25th, 2000.
15   A.  Oh, I don't know.
16   Q.  Was it a long time, a year?
17   A.  Um, I don't know.  It's not -- I
18 guess, let's backtrack.
19       Do we know the date of the advisory
20 committee meeting?
21   Q.  It was February 7th, 2001, I think.
22   A.  So, somewhere between May and
23 February; so, that's the kind of time.
24       Our preparations for the advisory
25 committee would go on maybe a month, or so,

182

1  before the advisory committee.
2    Q.  Is that something you would discuss
3  with Mr. Hassan?
4    A.  No.  I mean, he would have known --
5  it's a -- it's appropriate that he would have
6  known that there is an advisory committee.
7        And the other thing that's
8  interesting is, I believe that we submitted
9  before Merck, but the FDA decided, instead of
10 doing separate advisory committees, that they
11 would do both Vioxx and Celebrex at the same
12 advisory committee.  That would have been
13 pertinent.
14       And also, by then, I think we would
15 have known about the strokes and the
16 myocardial infarctions that were seen with
17 Vioxx, which would have influenced our
18 preparation for the meeting.
19       He would have known, at that level,
20 not at documents or --
21   MR. OLIVER:  This is 243.
22   (Needleman Exhibit 243, document
23 Bates No. 358, marked for identification
24 as of this date.)
25   A.  I have looked at the document.

183

1        I must say I don't know what a lot
2  of the abbreviations are.
3    Q.  Well, that's great, because that's
4  what I was going to ask you about.
5    A.  Yes.  Could you tell me what CAIP
6  is?
7    Q.  Can you tell me what the "impact
8  notes cellecoxib registration task force" is?
9    A.  No, I can't.
10   Q.  You would agree with me that, down
11 at the bottom, it says "revised CLASS time
12 lines," you would agree with me that this
13 looks like a schedule for when the report is
14 going to be circulated to different groups of
15 people?
16   A.  It looks like that to me, too.
17   Q.  If you look under "final report,"
18 it has your name.  So, is it fair to say that
19 at least by May, excuse me, May 10th, 2000,
20 you had received a draft of the report?
21   A.  That's what they hoped, whoever
22 wrote this on April the 20th.
23   Q.  Do you know what ESS stands for,
24 right under that?
25   A.  No, I don't.

184

1    Q.  Do you know if Mr. Hassan or Ms.
2  Cox would have received this report?
3    A.  It doesn't look like they're on the
4  list; does it?
5    Q.  But that wasn't my question.
6    A.  Well, that's all I would know who
7  would get it would be the people on this
8  list.
9    Q.  You don't have any idea, based on
10 your experience, whether they would take a
11 look to this before it was submitted to the
12 FDA?
13   A.  I would think this is way below the
14 level of their screen.
15   Q.  You reported directly to them;
16 right?
17   A.  No.  I reported to Fred Hassan.
18   Q.  That's who I asked you about.
19   A.  No.  You said "them."  I didn't
20 report to Carrie Cox.
21   Q.  You reported to Mr. Hassan, you
22 were right under Mr. Hassan?
23   A.  That's correct.
24   Q.  So, this was important enough to go
25 to you, but not Mr. Hassan?

ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

185

1    A.  That's correct.
2    Q.  Why is that?
3    A.  Because I'm running R&D and he's
4    running the global business.
5        MR. OLIVER:  This is Exhibit 94.
6    A.  You know that Jim Lefkowith died; I
7    guess you know that?
8    Q.  Sorry to hear that.
9    A.  It's always strange to see his name
10   on these things.
11   Q.  Tell me when you're ready.
12       (Pause.)
13   A.  Okay, I've read the abstract.
14   Q.  Is this a draft of the JAMA article
15   that was ultimately submitted in June of 2000
16   for publication regarding CLASS?
17   A.  I think it must be because I see
18   Silverstein is the first author; so, I think
19   it must be.
20   Q.  You received a copy of this?
21   A.  Yes.  I probably, yes -- I did
22   receive a copy of the draft.
23   Q.  Do you recall reviewing it?
24   A.  I reviewed -- yes, I would review
25   it.

186

1    Q.  Did the JAMA article focus on the
2    six-month data or the 12-month data?
3    A.  I think it focused on the six-month
4    data.
5    Q.  Was there an explanation in the
6    JAMA article of why it focused on the
7    six-month data?
8    A.  Um, I don't remember it then.
9    Q.  Would -- would it have been
10   appropriate to do that, to have an
11   explanation of that?
12   A.  I believe that the six-month data
13   is really representative of the real data.
14   Q.  But that's not my question.
15       Would it have been appropriate to
16   include in the article an explanation of the
17   difference between the 12-month data and the
18   six-month data?
19   A.  If you ask me, knowing what I know
20   now, it would have been better, but it
21   wouldn't have changed the fundamental
22   conclusions of the data.
23   Q.  Were you aware that Fred
24   Silverstein had asked George Geis to include
25   such an explanation in the JAMA article?

187

1    A.  No, I was not.
2    Q.  Would that surprise you?
3    A.  Um, by hindsight or foresight?
4    Q.  Either one.
5    A.  Um, if he went through the analysis
6    that showed the differential dropout rate for
7    diclofenac, and the aspirin confounding data,
8    I would have been interested in why he still
9    wanted to know.
10       So -- so, the simple answer is, I
11   don't know, I didn't know that he asked for
12   the 12-month data.
13   Q.  You never had a discussion with Dr.
14   Geis about that?
15   A.  While I don't know the time,
16   because questions started to be raised by
17   12-month data, I was aware that there was
18   going to be a quick follow-up paper, with Lee
19   Simon as the lead author, that would have
20   then handled the 12-month data, showing the
21   context of its relationship.
22       And so, I thought that they were
23   right on top of each other.  But I don't know
24   specific times of the events.
25   Q.  Did Dr. Geis ever say to you, Phil,

188

1    Fred Silverstein wants an explanation of the
2    difference between the six-month data and the
3    12-month data in the JAMA article?
4    A.  I don't recall that ever.
5    Q.  Is it possible that you just
6    forgot?
7    A.  I don't know if he would have
8    called me Phil.
9    Q.  What would he have called you?
10   A.  Hey you.
11   Q.  Is it possible that you just forgot
12   the conversation because he said hey you?
13   A.  I think it's an important question.
14       I think Fred Silverstein is an
15   important person, who I respect.  He
16   respected us.  And I would have wanted a full
17   dialogue.
18       I'm only surprised that if he did
19   or didn't have a full dialogue.  There was
20   really a lot of involvement of those key
21   opinion-layers in the analysis of the data.
22       I even believe, you'll correct me
23   if I'm wrong, that when issues were raised
24   later in some journals, that he was part of
25   the response group of the external key

Toll Free: 877.495.0777
Facsimile: 404.495.0766

ESQUIRE
an Alexander Gallo Company

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                      December 8, 2010

189
1  opinionators that explained why the six-month
2  data was used.
3        So, the question seems odd to me.
4     Q.  Do you understand why people raise
5  concerns about the data that was in the JAMA
6  article?
7     A.  Um, I became aware of that there
8  would be a suspicion that there was something
9  being hidden, and that they didn't know the
10 reasons about the exclusion rate or the
11 aspirin rate.
12       So, with a, you know, 50/50
13 hindsight, I would like to have explained, so
14 they saw and knew what we knew.  So, yes,
15 that was raised.
16       Again, if you want context, the
17 main issue is all of the data goes to the
18 FDA, and I'm expecting an FDA advisory
19 committee, just on CLASS, right away.
20       The FDA delays and waits for Vioxx.
21       So, I thought the world would know
22 what we know about the 12-month and the
23 six-month data.
24    Q.  As it turns out, the world did not
25 know?

190
1     A.  No.
2     Q.  -- for quite some time.
3     A.  Because the CLASS data, the -- the
4  FDA review was pushed off waiting for Merck.
5        However, I believe that there was
6  an eminent additional journal, article then
7  that was supposed to come by Lee Simon that
8  would present it all.
9     Q.  Did that ultimately happen?
10    A.  It got put off by Lee for a long
11 time.  I don't think it appeared for years.
12       But remember, he's external to
13 Searle, and he's the one who's writing the
14 paper.
15       We supply the data.
16       We'll supply our opinions.
17       But there's no leverage that you
18 can force an independent person to write a
19 paper.
20       I wish he wrote it the same day.
21    Q.  Would you have discussed this JAMA
22 article with Mr. Hassan?
23    A.  No.  I don't think so.
24    Q.  Do you think he would have reviewed
25 it on his own?

191
1     A.  Oh, no.
2     Q.  Why do you say that?
3     A.  Um, I actually don't know that he
4  reads JAMA or New England Journal or any
5  other.
6     Q.  Would it be unreasonable for the
7  CEO of a pharmaceutical company to read a
8  JAMA article about one of his key products?
9     A.  If he already knows we've missed
10 the primary end point.  We think that's a
11 scientific case.
12       To do the harder lifting, which is
13 convince the FDA that we should get the
14 label, I wouldn't think the JAMA article is
15 too interesting.
16    Q.  Was the JAMA article relevant to
17 the advisory committee meeting?
18    A.  No.
19    Q.  Why do you say that?
20    A.  Because they have every bit of
21 data.  They have the six-month data, they
22 have the 12-month data.  They have
23 everything.  You can't do even an animal
24 experiment without giving the FDA all the
25 data.

192
1     Q.  Would the data that you had given
2  the FDA, the full 12-month data, have been
3  relevant to the clinical community?
4     A.  A journal article is different than
5  an FDA submission.
6        The FDA has thousands, if not
7  millions, of more data points to consider,
8  and they wouldn't take a subset just based on
9  the journal article.
10    Q.  That wasn't my question.  You had
11 said the JAMA article would not be relevant
12 to the advisory committee because they've
13 already got all of that; correct?
14    A.  The FDA, you said?
15    Q.  Yes.
16    A.  Correct.
17    Q.  The public, on the other hand, did
18 not have all that information; correct?
19       MR. HOFF:  Objection to the form.
20    A.  The JAMA article is different from
21 the FDA.  The people who read JAMA saw the
22 data that was relevant to the submission of
23 that paper to make its main point.
24    Q.  They didn't see the 12-month data
25 that was submitted to the FDA?



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

193

1    A.  They didn't see 99 percent of the
2  data.
3    Q.  This was data that the FDA thought
4  was very, very significant to make a labeling
5  decision?
6        MR. HOFF:  Objection to the form.
7    A.  Actually, as you recall, the final
8  FDA data was not based on the 12-month data.
9    Q.  That wasn't my question.
10    A.  No.  No.  I'm saying what is
11  relevant to the FDA?  They see it all.
12        And they pick what's important.
13    Q.  Some --
14    A.  And they did not pick the 12-month
15  data.
16    Q.  They picked something more than six
17  months, though; correct?
18    A.  They picked a nine-month figure.
19    Q.  So, the FDA determined that, for
20  labeling purposes, something greater than six
21  months of data was relevant?
22    A.  The FDA, um, didn't agree about
23  allowing the dropout rate from diclofenac to
24  be adequate to change the label.  That's a
25  scientific argument.  They make a choice for

194

1  a different criteria.
2        So, they incorporated all of the
3  data in the nine-month data.
4        And by the way, as you know, they
5  took some of the arguments we presented and
6  put it in the label.
7        MR. OLIVER:  I move to strike that
8  last sentence as non-responsive.
9    Q.  This is going to be 244.
10        (Needleman Exhibit 244, documents
11  Bates Nos. 1491 to 1516, marked for
12  identification as of this date.)
13    Q.  Tell me when you've had a chance to
14  look at it.
15        (Pause.)
16    A.  I have a bunch of "black" pages on
17  mine.
18    Q.  Probably the same ones that I have
19  that have been redacted.  Yes.
20    A.  Okay.
21    Q.  The Bear, Stearns healthcare
22  conference, does that mean anything to you?
23    A.  I think this was a California
24  conference that we were invited, the heads of
25  R&D were invited to present.

195

1        It's an analyst and pharmaceutical
2  R&D presentation.
3    Q.  Was it an annual thing?
4    A.  I don't think I went every year.  I
5  think it was a specific invitation.
6    Q.  Does it, looking at the front of
7  this, this appears to be something you
8  presented at the healthcare conference; is
9  that correct?
10    A.  Yes, it does.
11    Q.  Do you remember making this
12  presentation?
13    A.  I remember making the presentation.
14    Q.  It was after the class data had
15  been sent to the FDA; correct?
16    A.  Um, you have to help me with the
17  dates.
18    Q.  Do you remember when we -- the
19  final report went to FDA on May 25th.
20    A.  So, yes.
21    Q.  It was after the JAMA article was
22  published?
23    A.  Yes, I think so.
24    Q.  But before the FDA had released all
25  of the full data?

196

1    A.  Yes.  Before the FDA review, which
2  I think was much later.
3    Q.  This conference was about, it was
4  about investments, it wasn't about
5  healthcare?
6    A.  It was about investors and
7  pharmaceutical companies.
8    Q.  But it wasn't a clinical thing?
9    A.  No.
10    Q.  It was geared towards investment.
11        Look with me at slide, page 5.
12    A.  Yes.
13    Q.  That second bullet point, is it
14  fair to say you were pumping up the JAMA
15  article to investors?
16    A.  I think, in fact, that made this
17  setting that I presented the JAMA data in
18  this talk.
19    Q.  So, you only presented the
20  six-month data to investors?
21    A.  I think that probably is right.
22    Q.  Look at slide 9, page 9.
23        There's a slide that says, "The
24  most successful launch in history," and below
25  the slide there are some notes.  Are those



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

197

1  your notes?
2      A.   Actually, I don't think so.
3          This might have been suggested
4  notes.  I mean, I don't have arguments about
5  this, but I wouldn't -- and I always choose
6  to say what I want about the slides; so, the
7  slides would be what I presented.
8          I wouldn't talk about managed care
9  formularies, or anything like that.
10     Q.   Would you have said that you were
11 confident the FDA would find the CLASS data
12 compelling?
13     A.   Yes.
14     Q.   Did they ultimately find it
15 compelling?
16     A.   Enough to put some of it into the
17 label.
18     Q.   But not enough to do what Searle
19 wanted, or Pharmacia wanted?
20     A.   They didn't give us, they didn't
21 overcome the primary, but they put a number
22 of important things into the label.
23     Q.   Did they remove the NSAID class GI
24 warning?
25     A.   No.  But they included the aspirin

198

1  data.
2      Q.   Look with me at slide 11.
3      A.   Okay.
4      Q.   That's the six-month data; isn't
5  that correct?
6      A.   Yes.
7      Q.   Did you explain, at this
8  conference, the difference between the
9  six-month and the 12-month data?
10     A.   No.
11     Q.   Why not?
12     A.   I would have had to give a long
13 explanation of the withdrawal rates, the
14 aspirin rate, and something else that became
15 clear:  the dose of diclofenac was too low.
16         So, this is really functionally
17 giving the data of the JAMA article.
18     Q.   What would the appropriate forum --
19 what --
20         Excuse me, strike that.
21         What forum would have been the
22 appropriate place to explain the six-month
23 data versus the 12-month data?
24     A.   Um, a major publication in a major
25 journal.

199

1      Q.   Isn't JAMA a major publication and
2  a major journal?
3      A.   So few people go to a meeting, so
4  that I viewed, knowing what we know, getting
5  the 12-month into JAMA, or someplace else,
6  compared to the six, showing the relevance of
7  the six, and then actually zeroing in on the
8  importance of the hemoglobin hematocrit, the
9  best place for that would be a leading,
10 rigorously reviewed journal.
11     Q.   Is JAMA a leading and rigorously
12 reviewed journal?
13     A.   It's a good journal.
14     Q.   That's a Yes?
15     A.   Yes.
16         MR. OLIVER:  This is 245.
17         (Needleman Exhibit 245, documents
18 Bates Nos. 6061 to 65 , marked for
19 identification as of this date.)
20         (Pause.)
21     A.   Okay.
22     Q.   Tell me what this e-mail is about.
23     A.   Um, I think somewhere along the way
24 there's a letter to the editor, and the bulk
25 of this is Jim Lefkowith's point-by-point

200

1  response to the letter to the editor.  Ah --
2      Q.   This was --
3          I'm sorry.
4      A.   And I don't know if both the letter
5  and the response, sometimes they appear in
6  the same journal.
7      Q.   This was after the FDA had released
8  all of the information about CLASS?
9      A.   I think so, because it said
10 somewhere in here -- the comments by one of
11 the letter writers didn't reflect the FDA's
12 review of the CLASS and the advisory
13 committee.
14     Q.   If you look at the second page --
15 well, you were closely following this
16 discussion?
17     A.   I remember it.
18     Q.   Is this something that you would
19 have discussed with Fred Hassan?
20     A.   I don't remember that discussion at
21 all.
22     Q.   That wasn't my question.
23         Is this something you would have
24 likely discussed with him?
25     A.   Um --



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Philip Needleman                                          December 8, 2010

201

1          MR. HOFF:  Excuse me.
2     A.  Probably not.
3          MR. OLIVER:  A little different
4     question.
5     A.  Probably not.  This is already
6     after the FDA review.
7          So, that's not germane to the key
8     issues.  What's germane was is FDA agreeing
9     with our scientific argument or not.  Will
10    they change the label?  He would have been
11    more interested in that than letters to the
12    editor.
13         The answer is No.
14    Q.  Wasn't this a significant public
15    policy issue for the company?
16         MR. HOFF:  Objection to the form.
17    A.  No.  It's not anywhere near as
18    important as the FDA decisions.
19    Q.  Look at the second page of the
20    exhibit, it's the first full paragraph,
21    starting with "accordingly."
22    A.  Yes.
23    Q.  And then, go down to the next to
24    the last sentence in that paragraph that
25    begins "This conclusion."

202

1          "This conclusion is true for both
2     the six-month analysis and the entire study
3     analysis."
4     A.  I'll have to go up and see what the
5     antecedent for this is.
6     Q.  Sure.
7          (Pause.)
8     Q.  Tell me when you're finished
9     reading.
10    A.  Okay.
11    Q.  That sentence clearly makes a
12    distinction between the six-month analysis
13    and the entire study analysis; correct?
14    A.  No, I think it said -- just the
15    opposite; doesn't it?  Doesn't it say the
16    conclusion is true for both the six-month and
17    the entire study analysis?  It says that --
18    Q.  Yes.  I'm saying --
19    A.  It says to me it's the same.
20    Q.  I'm not talking about the data.
21    I'm not talking about this conclusion.
22         I'm talking about the sentence
23    makes a distinction between six months and
24    the entire study.
25    A.  It does not.  It does just the

203

1     opposite.
2     Q.  According to this sentence, there
3     are six months of data, and then there's an
4     entire study.
5     A.  May I read the sentence to you
6     again?
7     Q.  Sure.
8     A.  "This conclusion is true both for
9     the six-month and the entire study analysis."
10    Q.  What I'm asking you --
11    A.  No distinction between six and 12.
12    Q.  I'm not asking if there's a
13    distinction in the conclusion.  I'm not
14    asking you if there's a difference between
15    the six-month data and the entire study
16    analysis substantively.  I'm asking you if
17    those are two different groups of data,
18    six-month and the entire study analysis.
19    A.  This conclusion is true for both.
20    So, even if there are two bodies of data, it
21    clearly shows that the 12 agrees with the
22    six.  And the six is relevant to publish.
23    Q.  But you agree with me that there's
24    a 12 and a six, and the 12, at least
25    according to this letter, constitutes the

204

1     entire study analysis?
2     A.  I agree that there's no difference
3     between the conclusion between the six and
4     the 12.
5     Q.  But do you agree with me that, when
6     you read this letter, and it says "entire
7     study analysis," it's referring to 12 months
8     of data?
9     A.  Do you want to ask the question
10    again?  You asked me about the sentence.
11    Q.  And I just --
12         MR. OLIVER:  Can you read the
13    question back.
14         (Record read.)
15    A.  I think the entire study is 12
16    months.  I think this sentence says the six
17    and 12 are the same.
18    Q.  So, the entire study is 12 months?
19    A.  Sure -- well, it actually isn't 12
20    months.  It's really cut off at an end point,
21    and only a small fraction of the entire
22    population got the 12 months.
23    Q.  So, this letter is incorrect?
24    A.  No, it's perfect.  This conclusion
25    is true for both the six and the 12-month in



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                         December 8, 2010

205

1   the entire study.
2        MR. OLIVER:  This will be Exhibit
3   246.
4        (Needleman Exhibit 246, documents
5   Bates Nos. 6454 to 57, marked for
6   identification as of this date.)
7        MR. OLIVER:  Do you all mind if we
8   take a short break?
9        MR. HOFF:  All right.
10       THE VIDEOGRAPHER:  Off the record
11   at 2:40.
12       (Recess.)
13       THE VIDEOGRAPHER:  Stand by.  Back
14   on the video record at 2:53.
15   BY MR. OLIVER:
16       Q.  Doctor, I gave you what I think has
17   now been marked as Exhibit 246.
18       Would you take a moment and read
19   over it, and tell me when you're ready.
20       (Pause.)
21       A.  Okay, I've read it.
22       Q.  First of all, just looking at the
23   subject line, this is an e-mail that you
24   received on June 4th, 2002, or you sent on
25   June 4th, 2002.  What does the subject line

206

1   mean, BMJ editorial?
2        A.  I think that's the British, the
3   British Medical Journal.  So, it -- it was an
4   editorial comment, it looks like, about the
5   CLASS data.
6        Q.  Do you remember that particular
7   editorial?
8        A.  I remember that there was an
9   editorial.
10       Q.  Was it critical of CLASS, or was it
11   positive for CLASS?
12       A.  I think it was, um, critical
13   bringing the issue of 12-month, I think,
14   addressing the 12-month versus six-month
15   issue.
16       Q.  You see, below, that Dr. Geis is
17   making some comments and you are responding
18   to those comments in your e-mail.
19       You say, it's important to
20   understand the numbers.  If most of the
21   events in the second six months were
22   celecoxib Celebrex, it is difficult to
23   rationalize because there were still plenty
24   of NSAID patients left.
25       And then you go on to say some

207

1   more.  What does that sentence mean to you?
2        A.  I was confused at this time about
3   the hazard rate -- that is, the ulcer rate of
4   different drugs.
5        There are some predictions -- this
6   may be more complex than you want.
7        But if you graph versus time, the
8   argument is:  Do the events of the ulcers go
9   up and flatten out, or do they keep climbing?
10       And I had to understand why would
11   Celebrex keep climbing and, for example,
12   diclofenac flattened out.
13       I also had to understand, if that
14   was true, why did the number of the events
15   stop at the end of the trial.  So, we had to
16   do the event trial.
17       And, in fact, with time, they
18   convinced me that the diclofenac dropout rate
19   was taking out the population at risk.
20       Remember, even in the old mucosa
21   data, the real risk rate is only 1 or 2
22   percent.  Now, that sounds like a -- a small
23   number.  Except there are 40,000,000
24   patients.  So, the risk rate is a low number.
25       And so, in fact, if you pulled out

208

1   the diclofenac responders, then you'd be
2   flat.
3        So, that was the analysis.
4        I was thoroughly convinced about
5   the six-month data.  That wasn't the issue.
6        I was trying to understand why it
7   was there.
8        Now, if the other two dropped out,
9   Celebrex will continue that rate.
10       So, it never reaches a plateau.
11   So, that's what this argument of the hazard
12   rate is.  But buried behind it, for me, much
13   more significantly, and why I believe in the
14   data, was there's really important data about
15   the real problem with diclofenac, even
16   without keeping them on the trial, after the
17   symptomatic ulcer was found.
18       Q.  If you look at the second sentence
19   at the end of the paragraph, you called this
20   "one of those hot seat times"?
21       A.  Yes.
22       Q.  Can you explain what you meant
23   there?
24       A.  I always felt if we were wrong, we
25   would explain it.  So, that's a big deal, to



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

209
1  explain.
2      And if, in fact, we were not
3  correct, then that would have to be
4  disclosed, and that was also my job.
5      So, I would have been in the hot
6  seat to explain it.
7      Q.  Were you not correct; is that what
8  happened?
9      A.  No.  In fact, it was reviewed by
10 the FDA, and they pored over it, and it was
11 pretty clear, we had a scientific, I think we
12 had a scientific case.
13     They had a higher regulatory
14 barrier.  So, they wouldn't change the label.
15     They did put into the label the
16 aspirin data, and actually, what I came to
17 believe the most important thing was, the
18 hemoglobin hematocrit.
19     Q.  They didn't put the six-month data
20 there, then, did they, the label?
21     A.  Um, the conclusion was on the nine.
22     But I think what they said about
23 the hemoglobin hematocrit is the same
24 six-month, is the same, the same as 12-month
25 and, in fact, since the dropout rate of

210
1  diclofenac was so high, that any comment
2  relating to diclofenac and hematocrit and
3  hemoglobin would have had to have been the
4  six-month data.
5      Q.  But they ultimately based the label
6  on nine months of data; isn't that right?
7      A.  But there are different parts of
8  the label.
9      So, if you then go and look at the
10 hemolysis, hematocrit, that's not saying nine
11 months, or 12 months, or six months, it's
12 saying what's the primary event.
13     Q.  But I'm not talking about that.
14 I'm talking about the GI --
15     (Interrupted)
16     A.  That's in the label.  The label has
17 different parts.
18     It's efficacy parts and there are
19 side affects and nearby organ systems.
20     So, there are comments in there
21 about cardiac, cardiovascular, and bleed.
22 That's also in the label.
23     Q.  For GI events they use nine months
24 of data?
25     A.  That's correct.

211
1      Q.  What was the real problem with
2  diclofenac?
3      A.  It would be funny for me to lead
4  you to a page and to a graph.
5      The trial is directed at upper GI,
6  because you can't see the lower GI.  You
7  can't do endoscopy.
8      The marker of the whole intestinal
9  tract is hemoglobin hematocrit.
10     Because if you bleed, it's bleeding
11 from the whole system.  At six months and at
12 12 months, even diclofenac dropped out, is
13 two to three times higher bleed with
14 hemoglobin and hematocrit.
15     In fact, the calculation is
16 diclofenac is causing the patients to lose
17 two pints more blood than the celebrex
18 patient.  And that's compelling and reflects
19 the whole intestinal tract, not the part you
20 can see with endoscopy or see the
21 perforations.
22     Q.  Why was that important to the CLASS
23 analysis?  What's the significance of what
24 you just told me?
25     A.  Because for the first time you had

212
1  an ability to see the whole tract, not just
2  the upper GI.
3      And Celebrex blew away diclofenac
4  or Ibuprofen, with or without aspirin, on
5  hematocrit hemoglobin.
6      Q.  Why was that important in the
7  choice of six months of data versus 12 months
8  of data?
9      A.  The six-month of data is just as
10 good as the 12-month on hematocrit
11 hemoglobin, and the importance is, up to two
12 pints of blood in a patient.
13     MR. OLIVER:  It's going to be 247.
14     (Needleman Exhibit 247, documents
15 Bates Nos. 2897 to 2906, marked for
16 identification as of this date.)
17     Q.  Tell me when you've had a chance to
18 review this.
19     A.  Thank you.
20     (Pause.)
21     A.  Okay.  There are a lot of parts,
22 and you can lead me through the wilderness.
23     Q.  I will do my best.
24     If you turn to page 2, the heading
25 of the document says "CLASS advisory



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

213

1    committee rehearsal minutes."
2        A.  Yes.
3        Q.  Is this a meeting where you all
4    were preparing for the FDA the presentation
5    to the FDA of the CLASS data?
6        A.  We would have had several
7    rehearsals to get ready.
8        Q.  This is just one of those
9    rehearsals?
10       A.  I think that's right.  It looks
11   like it's -- I don't know who did the
12   minutes, some regulatory person or something.
13       Q.  Do you remember this meeting in
14   particular?
15       A.  No.  There were several -- several,
16   um, including in Skokie, and then even in
17   Bethesda.  Even before we went in, we would
18   have a meeting the day before.
19       Q.  Would Mr. Hassan have been at these
20   meetings?
21       A.  Never.
22       Q.  Would you have discussed these
23   meetings with Mr. Hassan?
24       A.  No.  He would have been aware that
25   we are preparing for the FDA advisory

214

1    committee.  But no, none of the substance.
2        Q.  Look at your comment -- we're still
3    on the same page -- you say --
4        A.  Page 2.
5        Q.  Yes, page 2.  The first comment
6    that you make, it says, "Do we need external
7    experts so that it is not just in our own
8    interest?"
9            What are you suggesting there?
10       A.  It's very, very hard when you're
11   the accused drug company to say that these
12   facts are right.
13           If someone out -- who's respected
14   and who has a reputation of being critical
15   says it, it's even better.
16       Q.  You say, "We need to focus on
17   changing the mind-set of the people who read
18   the booklet."  What booklet?
19       A.  I would think this is the advanced
20   booklet that you send to the FDA, which then
21   gets published the night before, as does the
22   FDA's own booklet.
23           The recipient target is both the
24   FDA and the advisory committee.  The issue is
25   overcoming, we missed the primary end-point.

215

1        Q.  So, you're changing their mind-set
2    from what to what?
3        A.  We would like them to understand
4    that when you prospectively design a trial,
5    you don't anticipate what a trial with 8,000
6    patients will come up with.
7            And there are scientific issues
8    that if you knew it, you would have had a
9    different prospective design and gotten the
10   label, just as Vioxx did, that Merck did with
11   Vioxx, exclude the aspirin patients, do one
12   comparative.
13           So, we thought the data was a basis
14   for the change, and we didn't know it before
15   the trial, we knew it retrospectively.
16       Q.  So, you present 12 months of data
17   to the FDA, and you explain to them why you
18   thought six months was more important?
19       A.  We present everything to the FDA.
20           They, then, do their analysis, and
21   the committee goes after anything they want.
22       Q.  But to you, and the other folks at
23   Pharmacia, this reason for choosing the six
24   months of data was a significantly important
25   issue?

216

1        A.  No, no.  You're missing the point.
2            The only way to change the primary
3    was showing that the dropout rate was due to,
4    in fact, that you couldn't have statistical
5    power in the second six months, because the
6    diclofenac's high risk patients were being
7    excluded.  So, that's intimate to the
8    discussion with the FDA.
9        Q.  That part about the dropout rate in
10   the second six months was very, very
11   important?
12       A.  Secondly, aspirin data.
13           Thirdly, hemoglobin hematocrit.
14           And we got two and tree into the
15   label.
16       Q.  So, the most important data, from
17   what you've just told me, was the dropout
18   rate data in the second six months?
19       A.  Hemoglobin hematocrit, aspirin, all
20   three.  Big three for us.  It's the weight of
21   the science argument.
22           We had never said that we hit the
23   primary.  We had to get them to think that
24   knowing what you know now, it would have been
25   better to have a different design.



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                         December 8, 2010

217

1    Q.  So, understanding the importance of
2  the six-month data, from, from your
3  standpoint, it was critical to know about
4  this, the three things you just told me, the
5  dropout rate, the aspirin, and the hematocrit
6  data?
7    A.  In the context that the six-month
8  data is the correct analysis of what you had,
9  and here's how you could improve it to change
10  the label.
11    Q.  So, you agree that those three
12  things you mentioned were critical to
13  understanding the six months of data?
14    A.  In the context that the six-month
15  was the correct interpretation.
16    Q.  Okay.
17    A.  Yes.
18    Q.  So, in order to understand and
19  accept why the six months was the correct
20  interpretation, you had to have this
21  discussion about these three critical things
22  that happened in the second six months of
23  data?
24    A.  That's right.
25      Only to change the label.

218

1      Now, there were sensitivities about
2  not seeing the 12-month, and I accept that,
3  and that's why I wanted a second publication.
4      But we were after the label change.
5    Q.  Look back on this document.  Go to
6  page 4.
7    MR. HOFF:  What's the Bates number?
8    A.  What's the Bates number.
9    Q.  It's 900.  Actually, while you're
10  looking for that, while you get to page 900,
11  I'd like to follow up on something you --
12      You mentioned that second
13  publication again.
14      Why did you want a second
15  publication?
16    A.  Because people were -- there was a
17  British medical journal, there were people
18  who thought we were being selective, and
19  didn't realize that we thought that was the
20  best, that was a fair representation of the
21  data.
22    Q.  Now, I thought earlier you said
23  that, even before the JAMA article was
24  published, you thought there would be a
25  follow-up publication.

219

1    A.  I don't know when that was.
2      Um, I don't know when -- there was
3  nervousness about the 12 versus the 6.
4    Q.  And you always thought there was
5  going to be a second publication explaining
6  this?
7    A.  Yes.  I thought there was going to
8  be a close-on when I heard the issues.
9    Q.  And, in fact, there never was a
10  second publication?
11    MR. HOFF:  Objection to form.
12    A.  It was out of our control.  It was
13  up to Lee Simon, who doesn't work for Searle
14  or Pharmacia.  He was a major player.
15      In fact, such a major player, he
16  eventually went from Harvard to the FDA.
17    Q.  You didn't, Pharmacia and you, you
18  all didn't speak out and say something?
19    MR. HOFF:  Objection to form.
20    A.  What's your question?  To Lee
21  Simon?
22    Q.  Mr. Simon didn't do the second
23  publication, and you're saying that he --
24    A.  Dr. Simon said he was going to do
25  it, kept saying that he was going to do it,

220

1  and didn't get it done.
2    Q.  And Pharmacia and -- you guys did
3  not step out and say, hey, we wanted Dr.
4  Simon to do this publication, but since he
5  hasn't done it, we're going to tell you about
6  it?
7    MR. HOFF:  Objection to form.
8    A.  Well, that's silly.  I mean, that's
9  not the way publications are done.
10      And that's not data that's
11  published.  You needed, as we identified
12  before, someone who is respected who put it
13  in a respected journal.
14    Q.  So, the first time that that data
15  that we just talked about ended up in the
16  public sphere was after the FDA's arthritis
17  committee meeting?
18    MR. HOFF:  Objection to form.
19    A.  The full data went to the FDA right
20  away.
21      The FDA then delayed waiting until
22  the Vioxx data was in.  But that is correct,
23  that the rest of the data was public from the
24  FDA release.
25    Q.  Look with me at the, back to where



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

221
1   we were, Bates number 900.
2       A.  Page 2?
3       Q.  Yes, sir.
4           MR. HOFF:  4.
5       Q.  Yeah, 4.  It's the --
6           MR. HOFF:  4, if you include the
7   cover e-mail.
8       Q.  Ending in 900.  It should look like
9   that, with the --
10      A.  Thank you.
11      Q.  With the blackouts.
12      A.  All right.  Got it.
13      Q.  There's someone named Finman here.
14  Who is Finman?
15      A.  I don't know.  Finman?
16          MR. HOFF:  We're at the top.
17      Q.  There's Lee Simon talking, and then
18  there's Mr. or Mrs. Finman.
19      A.  Could that be a Pfizer person
20  sitting there?  I don't know who that is.
21      Q.  Finman asks -- Finman says,
22  "Briefing document does not show a
23  significant difference in endoscopy for
24  diclofenac and celecoxib" -- Celebrex --
25  "looks like cherry-picking data."

222
1           Do you have any idea what that
2   means?
3       A.  No.  Nor do I know who that is.
4       Q.  Was Pharmacia later accused of
5   cherry-picking data?
6       A.  I think the only accusation that
7   came up was the concern about 12 versus six
8   months.
9       Q.  Was that ever characterized as
10  cherry-picking, that you're aware of?
11      A.  I don't know.
12      Q.  Turn the page, if you don't mind.
13          Down at the bottom of this page
14  you just turned to, you make a comment.  You
15  say, "What did we learn?  Risk factors.  Give
16  the answer from a clinical point, then go
17  into statistical aspects.  Answer less from
18  the statistical standpoint."
19          Why did you suggest answering less
20  from the statistical standpoint?
21      A.  I don't know what that means.
22          Some of the data you don't need to
23  say P05 when there's a tripling of the
24  difference.
25          So, if I would get you to look at

223
1   the hematocrit, there's a threefold
2   difference.  That would be .0001.
3           So, you don't have to say it's
4   significant or not.  It's compelling and
5   therapeutically important.  So, that's what
6   I'm guessing.
7       Q.  Turn one or two pages to Bates
8   number ending with 903.  And if you could,
9   read -- starting with your comment that says,
10  "Why did the FDA say there was no
11  difference?"; do you see that?
12      A.  Okay.
13      Q.  Read that paragraph there, that
14  grouping of --
15      A.  "Why did the FDA say there was no
16  difference in diclofenac versus Celebrex.
17  Start off with the answer, then show the data
18  and restate the data.  Slide 72 -- "
19          I don't know what it has --
20          "Do you have the same slide for all
21  cause" --
22      Q.  You don't have to read it out loud.
23      A.  All right.  I don't know.
24      Q.  Just familiarize yourself with that
25  whole paragraph there.

224
1       A.  I can't, without seeing slide 72 or
2   433.
3       Q.  Well, go ahead and read all the
4   comments.  I'm actually going to ask you
5   about a comment later on down the page.
6       A.  The next one is, to me, one of the
7   most important pieces of data.
8           Needleman, surprised that aspirin
9   had an effect on diclofenac.  This is great.
10  Stop for a minute.  Diclofenac is a COX-1 and
11  COX-2 inhibitor.  Celebrex is just COX-2.
12  You add aspirin to Celebrex, you'll get more
13  bleeds, you'll get more hematocrit.
14          If you add aspirin to either
15  Ibuprofen or diclofenac, you should get no
16  difference, if you had the right dose,
17  because you inhibit COX-1 and COX-2.
18          The dosage of diclofenac picked for
19  this trial was too low because you had as big
20  a response to aspirin with diclofenac as you
21  did with Celebrex.
22          That's why the trial failed,
23  because you didn't have enough diclofenac,
24  but it was still enough diclofenac to raise
25  the hemoglobin and hematocrit.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

225

1      Q.   Well, what you just explained to
2  me, was that in the JAMA article?
3      A.   No.  It's not in any article.
4          I wish that was.  That's a pretty
5  compelling -- but it was in the FDA.
6          And so, in the category "knocks my
7  socks off," two things do:  Hematocrit and
8  hemoglobin.
9          And second is the realization that
10 diclofenac still has no side effects, even
11 though it's not the maximum effective dose
12 for an arthritic.
13     Q.   Look down -- you make another
14 comment.  You say, "too much data massaging."
15     A.   Where are we?
16     Q.   Yes.  Right down the page there.
17     A.   Oh, yes.
18     Q.   Can you tell me what you meant.
19     A.   All I can guess above it is, Jim
20 showed a slide which showed other variables
21 that could have caused this.
22          You know, I think with a hematocrit
23 with the symptomatic, that you have enough.
24          If you start saying let's pull out
25 dyspepsia, heartburn, gas, flatulence,

226

1  abdominal pain, it's a little too much.  So,
2  that's my guess of what this is.
3      Q.   Look -- flip the page, if you don't
4  mind.  You say, "As designed, we did not meet
5  our primary outcome, and we believe it is
6  inappropriate to ignore the practice of
7  medicine by excluding ASA."  ASA is aspirin;
8  correct?
9      A.   Yes.
10     Q.   Why do you make this statement?
11     A.   So, the Vioxx is approved, gets the
12 label, and they excluded aspirin.
13          We didn't, and we didn't get the
14 label.  That's what this says.  Our data is
15 the same as Vioxx in the patients without
16 aspirin.  So, I think that has to be said.
17     Q.   Don't you rely on statistics
18 excluding aspirin in the JAMA article?
19     A.   We're talking about the label now,
20 and we're talking the FDA, and that wasn't a
21 prospective design.
22          We took all comers, and instead of
23 10 percent, we had, I think, 22 percent of
24 the patients on aspirin.
25     Q.   What I want to know is:  Why is

227

1  something as significant as this aspirin
2  issue in front of the FDA, but not in the
3  JAMA article?
4      A.   I don't remember about aspirin in
5  the JAMA article.  I think there is some -- I
6  think there's aspirin data in there.
7          Of course, in the JAMA article, we
8  can't talk about the Vioxx data.  We haven't
9  seen it.  That's to the FDA.  We didn't even
10 know what their prospective design was.
11 They'd published nothing, said nothing, until
12 it was the FDA review.
13          It was already -- the word on the
14 street about the big cardiovascular events
15 might have been out there, but we didn't know
16 about the GI events.
17          By the time the FDA committee came,
18 it was deaths and myocardial infarction.
19          If you look at the composition of
20 the advisory committee, they were loaded with
21 people who focus on cardiovascular.
22     Q.   Look at the next comment down by
23 Finman.  It says, "Provided justification for
24 the six-month analysis period."
25          When did you determine to do the

228

1  six-month, before or after the blind was
2  broken?
3      A.   We didn't determine to do six
4  months, we said it would be a minimum of six
5  months, but it's an events trial.
6          So, that's the minimum, because the
7  FDA would want to know more than just an
8  acute appearance.
9      Q.   You're telling me there was no
10 point in time at which you decided to focus
11 on the six months versus the 12-month data?
12     A.   There was no point in time that we
13 said, all the patients will only be six
14 months.  We said that was the minimum.
15     Q.   That's not what I'm asking you.
16     A.   Then ask it again.
17     Q.   Was there a point in time between
18 the end of the trial and the April 14th press
19 release, for example, that you, there was a
20 decision to focus on the six months of data?
21     A.   We can't do that.  We have to
22 submit all the data.
23          When the trial is over, it's all
24 the data.  We can't, we can't, we can't
25 eliminate patients, we can't eliminate data,



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

ESQUIRE
an Alexander Gallo Company

Philip Needleman                                    December 8, 2010

229

1    we can't change the primary end-point.
2        Q.  To do that would be unethical and
3    misleading?
4        A.  That's right.  With the FDA, you
5    can't change it.
6        Q.  Can you do it with the public?
7            MR. HOFF:  Objection to the form.
8        A.  The public is not analyzing the
9    trial.  And we never did it.  We said, in the
10   design, minimum of six months, and it's an
11   event trial.
12       Q.  What about healthcare analysts?
13           Can you cut the data off with
14   healthcare analysts?
15       A.  If I were a healthcare analyst, I
16   would be concerned what comes out of the FDA
17   meeting.  That's the real market for them.
18       Q.  Wouldn't you pay attention to what
19   the head R&D guy at Pharmacia said?
20       A.  Are we asking about health analysts
21   and what's important to them?
22           They sit down and say what are the
23   sales next year and the year after, and
24   what's the competitive position.
25           What a head of R&D says is

230

1    irrelevant compared to what the FDA decides.
2        Q.  Why did you give a presentation at
3    the Bear, Stearns healthcare conference if
4    what you say is irrelevant to healthcare
5    analysts?
6        A.  Because the analysts want to
7    analyze the totality of the Pfizer portfolio.
8            I presented oncology targets.
9            I presented antibiotics.  I
10   presented many other things.  They're trying
11   to guess what are our aggregate sales going
12   to be.
13       Q.  Turn over to the end, Bates label
14   905.  I think it's two pages over.  No, it's
15   just one page over.
16       A.  Yes.
17       Q.  If you'll look down about the
18   middle of the page, Lee Simon makes a
19   comment.
20           He says, "Advisory committee is
21   theater, not science.  Remember, the first
22   time you won was based on fear."
23           What does he mean?
24       A.  Ask Lee Simon.  I think that's
25   cute.  I have no idea what he meant.

231

1        Q.  Do you think presenting to the FDA
2    advisory committee is theater, not science?
3        A.  I think the FDA voted eight to
4    nothing to give us the approval.
5            I think some years before Pfizer
6    brought an NSAID and they voted eight to
7    nothing against it.  I think that they're
8    solid clinicians.
9            The theater part might be that
10   first there's a public commentary, then the
11   analysts are there.
12           The analysts sit with their
13   computers, and they hear the FDA, and they
14   buy and sell, and then you present, they buy
15   and sell.  But the advisory committee vote is
16   about the data.
17       Q.  I want to go over a couple points,
18   and clarify some things that we talked about
19   earlier.
20           Am I correct that you said you met
21   with Hassan on a monthly basis?
22       A.  Yes.
23       Q.  These meetings were a part of the
24   process at Pharmacia, and as soon as Searle
25   merged with Pharmacia, they continued?

232

1        A.  Well, my meetings with -- you're
2    talking about a different meeting.
3            My meetings with Fred Hassan, we'd
4    have lunch together, we would put our feet at
5    a table, and talk about what you think is
6    important.
7        Q.  Did any of these meetings ever
8    happen before the merger?
9        A.  No.  My meetings with him before
10   the merger would always be with a group, we
11   compared our portfolios, we -- we talked
12   about the totality of our portfolio.
13           And there would be lots of people
14   there.
15       Q.  Did you ever talk about the CLASS
16   study?
17       A.  I would have talked about
18   everything that is going on.
19           Let's talk about COX-2 inhibitors.
20           At that time we thought that COX-2
21   was a platform.  We thought it was not going
22   to be just good on arthritis.  We knew
23   already it was going to be good on cancer.
24           We thought that there was a chance
25   that it would be good in Alzheimer's.  We



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                      December 8, 2010

233

1  thought about a second generation called
2  Valdecoxib, or Bextra.
3      We thought about an injectable form
4  called Parecoxib.  This would be a
5  non-narcotic injectable that didn't inhibit
6  platelets.
7      So, I would have talked about the
8  whole platform of opportunities with COX-2.
9  Q.   And that would have included the
10  CLASS trial?
11  A.   That's right.
12  Q.   And the prospects for the change in
13  Celebrex's labeling?
14  A.   Um, I have to think about when
15  those discussions were.
16      He certainly would have heard the
17  generality that we did not hit the primary
18  end-point.
19      I can say, somewhere along the
20  line, maybe even after the FDA, I might have
21  considered, I would have considered doing a
22  second CLASS trial.
23      I'm that convinced that the
24  six-month data is correct.  And now I would
25  have done it without aspirin and a single

234

1  comparative, and there was no reason to go
2  four times the OA dose, and I would have
3  changed the label.  That's what I thought.
4  Q.   Did they do that?
5  A.   No, they didn't do it.  We would
6  have had that discussion.
7      But don't forget the outcome.
8      Pfizer swoops in, gobbles up
9  Pharmacia, and I don't want to come and live
10  in New York.  Why would anybody come to New
11  York if they could stay in St. Louis?
12  Q.   Now, these individual meetings that
13  you had with Mr. Hassan, how soon after the
14  merger did you begin having those meetings?
15  A.   Right away.
16  Q.   Right away, like a week?
17  A.   Oh, I don't know when it was
18  scheduled, but -- and it evolved.  Pretty
19  soon it was clear that we liked each other.
20      He knew I was a pain in the ass,
21  but he knew I was honest and we could discuss
22  anything.
23      He also taught me things about the
24  pharmaceutical industry in development that
25  were very helpful.

235

1  Q.   Such as?
2  A.   Um, you have a new drug, a new
3  target, don't go for the giant use, get the
4  minimum use that proves its efficacy, even if
5  it's a small market.
6      Then you know the dose, you know
7  the safety, and then you could explode it.
8  It's a very interesting lesson.
9  Q.   So, at one of these individual
10  meetings that you had with Mr. Hassan was
11  when you raised the results of the CLASS
12  study?
13  A.   Sometime or other he knew that we
14  failed the primary.  We were working the
15  data.
16      And as I said to the Bear, Stearns,
17  my belief:  Stretch, we may be able to change
18  the FDA.
19      In fact, in my opinion, when deLap
20  was heading that group of the FDA, he seemed
21  to really understand the implication of the
22  aspirin data, but the leadership of the FDA
23  changed in the arthritis group.
24  Q.   So, you had shared with Mr. Hassan,
25  at some point, the significance of the

236

1  aspirin data?
2  A.   Um, I don't know that I shared that
3  specific.  I think I just thought, we have
4  compelling scientific answers and data that
5  could sway, we believed, an advisory
6  committee and the FDA.
7  Q.   You said he understood that data,
8  though.  You just said, a moment ago you said
9  he understood the significance of the ASA
10  data.
11  A.   Well, I don't know the specifics of
12  what he understood.
13      I think he understood that we
14  didn't get the primary, and that we thought
15  we had arguments.
16      I could have explained the aspirin
17  data.  You know, it's not something that
18  registers.  I would have been glad if he knew
19  the aspirin data.
20  Q.   So, it's possible that you talked
21  to him about it?
22  A.   It's possible.
23  Q.   Is it possible that you talked to
24  him about the difference between, with the
25  diclofenac dropout rate?



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

237

1      A.   You're getting into too much
2  detail.  I doubt that the discussion would
3  have gotten there.
4      Q.   But is it possible?
5      A.   It's possible.  You talk to him
6  about it.  No, it's possible.
7      Q.   I think I was calling him Ms.
8  Hassan before we got here.
9           MR. HOFF:  Or Mr. Cox.
10     Q.   So, that's a Yes, it is possible?
11     A.   It's possible that you talked to
12  him, yes.
13     Q.   No, it's possible that you talked
14  to him about it?
15     A.   I don't remember.
16     Q.   Did you tell Mr. Hassan that the
17  study became biased after six months?
18     A.   I don't think so.  I don't think we
19  had that discussion at all.
20     Q.   Is it possible that you discussed
21  that?
22     A.   It's possible that you did, too.
23     Q.   So, you agree with me, yes?
24     A.   No.  I don't think so.
25     Q.   The answer is yes?

238

1      A.   I think no.  It doesn't sound like
2  I conversation I'd have had with him.
3      Q.   So -- well, was it possible that
4  you had that conversation?
5      A.   I don't think so.  I don't recall
6  it.
7      Q.   Searle and Pharmacia merged in
8  April of 2000.
9           As soon as that merger was done,
10  you would have had one of your, within a
11  month, you would have had your lunch with Mr.
12  Hassan.
13     A.   We evolved a relationship.  I don't
14  know if it started immediately, but pretty
15  quickly we had weekly lunches.
16     Q.   You would have talked to him at
17  those initial --
18     A.   In fact, I think it might have
19  taken some time, because I then launched into
20  a review of the entire portfolio of Pharmacia
21  and Searle.
22           All of the trial, all of the
23  companies, and that review probably took a
24  couple of months.
25           And then, from that review, we shut

239

1  down some of the development projects, both
2  in Searle and Pharmacia.
3           So, I would think sometime after
4  that was the evolution.  So, my job was to
5  combine the two, to decide what do we want to
6  bet on, and what do we put a bullet in the
7  head into.
8      Q.   Is it possible that you discussed
9  the results of the CLASS trial with him in
10  May of 2000?
11     A.   I don't think I discussed the
12  details of the trial with him.
13           I would have discussed some of the
14  generalities we talked about.
15           The key point:  We didn't hit the
16  primary; we're going to have an advisory
17  committee; I probably would have added when
18  it became -- that we don't have strokes, or
19  cardiovascular, or congestive heart failure,
20  Vioxx does; and that we could make a rational
21  science argument that might bend them to give
22  us the label.
23     Q.   Could that have happened in May of
24  2000?
25     A.   I don't know when.

240

1      Q.   When you say you would have had a
2  rational science argument that would persuade
3  the FDA, would you have explained that
4  argument to him?
5      A.   I don't think so.
6      Q.   Is it possible that he asked about
7  it?
8      A.   I don't remember.
9      Q.   But it is possible?  You don't
10  remember it happening, but is it possible?
11          MR. HOFF:  Objection to form.
12     A.   If possible, I can only answer in
13  the context of my long-term relations and
14  what we covered, and I don't think we would
15  have drilled into those issues.  I don't
16  remember them.
17     Q.   You testified earlier that you
18  think that the 12 months study data was very
19  important for the FDA advisory committee.
20          MR. HOFF:  Objection to form.
21     A.   I thought, what I really -- the
22  point I was trying to make is, the FDA
23  analyzes everything.
24     Q.   Why is it important that they get
25  everything?



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                    December 8, 2010

241

1      A.   That's the law.  They have to
2   analyze --
3           And, you know, if you look at the
4   paper, it fills a room like this.
5           And then they get all these
6   specialists, safety, oncology,
7   teratogeneticists, clinical trials.  And they
8   don't want to trust what the drug company
9   says.
10          They analyze, they go over the
11  data.  That's the way I read a paper, I read
12  the data.  I don't read the discussion.
13          So, the reality is that they have
14  to understand the totality of the data
15  because they have a higher standard to
16  approve a drug that's going to reach a lot of
17  people.  It's a higher standard than a
18  journal.
19     Q.   They need the entire totality of
20  the data, as you call it, so that they can
21  make an accurate, unbiased determination
22  about the drug?
23     A.   Yes.
24     Q.   Doesn't the public have a right to
25  make the same kind of assessment?

242

1        MR. HOFF:  Objection to form.
2      A.   The data in the six-month is an
3   accurate reflection.  So, I think that was an
4   accurate reflection of the data.
5      Q.   But it's not the totality of the
6   data.
7      A.   But that's a publication, not a
8   regulatory approval.
9      Q.   So, you agree that you did not give
10  the totality of the data to the public?
11     A.   We did not give them the FDA
12  application as the publication.
13     Q.   FDA ultimately gave that to them on
14  FDA's Website; correct?
15     A.   The night before they released the
16  material.  And they don't divide it into 12
17  and six months, they drew a conclusion.
18     Q.   We've talked about a lot of things,
19  we've talked about the importance of the
20  diclofenac dropout rate, and the aspirin, and
21  the focus on the six months --
22     A.   And the hematocrit hemoglobin.
23     Q.   Right.  In order to understand the
24  significance of all of this stuff at the
25  six-month point, isn't it fair to say that

243

1   you had to know what was happening in the
2   second six months, in the 12 months?
3        MR. HOFF:  Objection to form.
4      A.   The dropout rate already shut down
5   the trial.
6           So, you've got -- you see, you lost
7   statistical power for the second six months.
8   So, you had to emphasize the six-month data.
9           What's wrong with the tables you
10  showed me is they kept showing 3900 patients.
11  When you're saying the second six months,
12  that was the enrollment numbers.
13          Show me what the final numbers are
14  on diclofenac, then you begin to understand
15  the impact of it.  So, you can't do
16  statistical analysis, because you had too
17  high a loss of the high-risk patient.
18     Q.   So, in order to understand the
19  significance of what you're telling me is
20  you've got to talk about this diclofenac
21  issue and what happened with the dropout
22  rate?
23        MR. HOFF:  Objection to form.
24     A.   The six-month data accurately
25  reflects the outcome of the trial.

244

1      Q.   But that's not my question.
2           My question is:  You talked about
3   the importance of this diclofenac dropout
4   rate, and you've explained to me very
5   eloquently why you need to talk about this to
6   understand the significance and importance of
7   the six-month data.
8           Am I telling you what you -- is
9   that accurate?
10     A.   Of course.
11        MR. HOFF:  Objection to form.
12     A.   We're not talking to each other,
13  we're talking around.
14          There are two issues.
15          One, I have to cope with we missed
16  the primary, and always said we did.  And we
17  want to change the label.
18          You know, the second thing on my
19  mind is, we now have learned how to do the
20  trial correctly.  That's on my mind.
21          I have a real conviction that the
22  six-month data information in JAMA reflected
23  the trial and the reality of it -- different
24  than what's in the FDA, but reflected the
25  right data.



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

245

1       You know, eventually the 12-month
2   data did come out.  It was later.  It didn't
3   change anything.
4       Q.  What do you mean it didn't change
5   anything?
6       A.  Didn't change the world; didn't
7   change the reality of the six-month data;
8   didn't change the marketplace.
9       MR. OLIVER:  If we can take a short
10  break, I'm probably done.
11      THE VIDEOGRAPHER:  Off the video
12  record at 3:44.
13      (Recess.)
14      MR. OLIVER:  Thank you.
15      Nothing further.
16      (Time noted:  3:52 p.m.)
17
18      ---------------------
19          PHILIP NEEDLEMAN
20
21  Subscribed and sworn to before me
22  this       day of            20___.
23
24  ---------------------------------------
25

246

1          C E R T I F I C A T E
2   STATE OF NEW YORK   )
3               ) ss.
4   COUNTY OF NEW YORK   )
5       I, ROBERT X. SHAW, CSR, a Notary
6   Public within and for the State of New
7   York, do hereby certify:
8       That PHILIP NEEDLEMAN, the
9   witness whose deposition is hereinbefore
10  set forth, was duly sworn by me and that
11  such deposition is a true record of the
12  testimony given by such witness.
13      I further certify that I am not
14  related to any of the parties to this
15  action by blood or marriage; and that I
16  am in no way interested in the outcome
17  of this matter.
18      IN WITNESS WHEREOF, I have hereunto
19  set my hand this 20 day of December,
20  2010.
21
22
23      _____
24          ROBERT X. SHAW, CSR
25

247

1   -------------- I N D E X --------------
2   WITNESS       EXAMINATION BY  PAGE
3   P. NEEDLEMAN     MR. OLIVER        6
4   -------- INFORMATION REQUESTS ----------
5   DIRECTIONS: 35, 36.
6   TO BE FURNISHED:
7   REQUESTS:
8   ---------------- EXHIBITS --------------
9   NEEDLEMAN                  FOR ID.
10   Needleman Exhibit 231, deposition   9
11   notice
12   Needleman Exhibit 232, documents    46
13   Bates Nos. 1767 to 68
14   Needleman Exhibit 233, documents    65
15   Bates Nos. 7112 to 7327
16   Needleman Exhibit 234, documents    95
17   Bates Nos. 0219 to 0230
18   Needleman Exhibit 235, Power       106
19   Point, Bates Nos. 11311 to 369
20   Needleman Exhibit 236, documents   115
21   Bates Nos. 0614 to 27
22   Needleman Exhibit 237, document    122
23   Bates No. 02847743
24   Exhibit 65, CLASS vignettes 3/28   126
25

248

1   version (previously marked)
2    Needleman Exhibit 238, documents   143
3   Bates Nos. 8910 to 9013
4    Needleman Exhibit 239, documents   155
5   Bates Nos. 5044 to 45
6    Needleman Exhibit 240, documents   177
7   Bates Nos. 9404 to 12
8    Needleman Exhibit 241, documents   182
9   Bates Nos. 62 to 75
10   Needleman Exhibit 242, documents   183
11  Bates Nos. 5807 to 26
12   Needleman Exhibit 243, document    190
13  Bates No. 358
14   Needleman Exhibit 244, documents   202
15  Bates Nos. 1491 to 1516
16   Needleman Exhibit 245, documents   207
17  Bates Nos. 6061 to 65
18   Needleman Exhibit 246, documents   213
19  Bates Nos. 6454 to 57
20   Needleman Exhibit 247, documents   221
21  Bates Nos. 2897 to 2906
22
23
24
25



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

Philip Needleman                                December 8, 2010

249

1        DEPOSITION ERRATA SHEET
2
3
4    Our Assignment No.: 315763, File 17433.
5    Case Caption: Alaska v Pharmacia
6
7        DECLARATION UNDER PENALTY OF PERJURY
8
9        I declare under penalty of perjury
10   that I have read the entire transcript of my
11   Deposition taken in the captioned matter or
12   the same has been read to me, and the same is
13   true and accurate, save and except for
14   changes and/or corrections, if any, as
15   indicated by me on the DEPOSITION ERRATA
16   SHEET hereof, with the understanding that I
17   offer these changes as if still under oath.
18       _____
19           Philip Needleman
20   Subscribed and sworn to on the ____ day of
21   _____, 20 ____ before me.
22   _____
23   Notary Public,
24   in and for the State of
25   _____.

251

1        DEPOSITION ERRATA SHEET
2    Page No.____Line No.____Change to:_____
3    _____
4    Reason for change:_____
5    Page No.____Line No.____Change to:_____
6    _____
7    Reason for change:_____
8    Page No.____Line No.____Change to:_____
9    _____
10   Reason for change:_____
11   Page No.____Line No.____Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____Line No.____Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____Line No.____Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____Line No.____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25       Philip Needleman

250

1        DEPOSITION ERRATA SHEET
2    Page No.____Line No.____Change to:_____
3    _____
4    Reason for change:_____
5    Page No.____Line No.____Change to:_____
6    _____
7    Reason for change:_____
8    Page No.____Line No.____Change to:_____
9    _____
10   Reason for change:_____
11   Page No.____Line No.____Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____Line No.____Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____Line No.____Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____Line No.____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25       Philip Needleman



Toll Free: 877.495.0777
Facsimile: 404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

EXHIBIT 161

**alex rolle**

| | |
|---|---|
| **From:** | JORDAN, DAVID C. [PHR/1825] |
| **Sent:** | Wednesday, April 05, 2000 8:52 AM |
| **To:** | MAURATH, CLEMENT [PHR/1825]; COUGHLIN, OLIVIA A. [PHR/1825]; BEGLEY, WINIFRED M. [FND/1825]; ZHAO, WILLIAM W [PHR/1825] |
| **Subject:** | FW: CLASS Trial |

Everyone - fyi after the presentation at Peapak     Dave

-----Original Message-----
From: FRIEDMAN, MICHAEL A [PHR/1825]
Sent: Wednesday, April 05, 2000 7:54 AM
To: GEIS, GEORGE S. [PHR/1825]; LEFKOWITH, JAMES B. [PHR/1825]; JORDAN, DAVID C. [PHR/1825]
Subject: FW: CLASS Trial

Some suggestions from Goran.
MAF

-----Original Message-----
From:        Goran.Ando@pw15mg.kzo.us.pnu.com
[mailto:Goran.Ando@pw15mg.kzo.us.pnu.com]
Sent: Wednesday, April 05, 2000 7:29 AM
To:    michael.a.friedman@monsanto.com; philip.needleman@monsanto.com
Cc:    Susan.Reiner@pw15mg.kzo.us.pnu.com
Subject:     CLASS Trial


    Phil/Mike,

Some further thoughts on this trial for your info.  Please adopt or
discard as you see fit; these are sent in a spirit of cooperation and
help rather than trying to be critical.
1.    Verify that ibuprofen 2400 mg/day is generally accepted as the
safest of NSAIDs.  Due to poor compliance, my experience has been that
many patients actually take less.  Also, I suspect many still prescribe
1200-1800 mg for OA.  I suspect Merck might attack this point to try to
shake the credibility of the CLASS trial outcome.  Certainly the
ibuprofen dose is an issue in Europe.
2.    For the FIRST public disclosure of the data, it might be
worthwhile thinking through whether (a) only showing results of NSAIDs
combined or (b) only showing results vs. ibuprofen makes sense.  I guess
the answer is probably no, but it's worth going through the exercise
formally.
3.    To me, the hematocrit data is by far the most compelling - and
interesting.  Maybe the storyline in presentation should be to start by
showing that followed by PUBs and then POBs rather than the reverse
order.  Apart from making more of the hematocrit story through use of
more slides, it might also be worthwhile trying to show all key results
on one summary; as ALL results go in the right direction.  Visual
impression of that is usually powerful.
4.    There is an almost separate message of the overall excellent
toleration of Celebrex and that should not be forgotten - although it
may need a separate forum to present the full story.  The renal, hepatic
and CV complications of NSAID are rarely discussed but do exist and are
clinically very important.
5.    You may also want to "model" what can be expected from Merck in
response to the presentation of the CLASS trial.  In my book they are
desperate and will attack everything.  An immediate thought would then
be for us to focus on the non-ASA results; this is the comparable group
to Merck's own study and thus cannot be attacked.    Non-Resp.
                                                          1

EXHIBIT
220
NOV 11TH 2010

Confidential - Subject To Protective Order

DEFS 01615044

Non-Resp.

I have not seen much data from Merck's own study and (premature) announcement but I'm sure there is significant knowledge in the company of known and predicted outcome of their study.  This will give pointers as to where the attacks will come.
6.    The regulatory process to change labeling needs a separate strategy, which will need to be clear by the time of submission.  The CLASS study has sufficient novelty in my mind to get FDA actually to sit and listen to a presentation upfront should that be seen as helpful.  Maybe worth considering.

I would have thought an advisory committee will be helpful; at least my experience is that it is easier to get the discussion focused on what is clinically relevant; clearly in my mind the findings in CLASS are clinically relevant.  This strategy could be high risk as it is not unlikely that FDA will consider both CLASS and Merck's outcome study at the same meeting.  Probably still worth it though.
7.    Would suggest a Q&A document should be prepared to ensure PR/IR give the same answers as the presenters.  Internal communications is probably also a good idea.

Apologies for a rambling email but tried to give you some of my thoughts.
All the best,

Göran

2

# EXHIBIT 162

EDGAR pro
by EDGAR Online

# PHARMACIA CORP /DE/

Reported by

# SHAPIRO ROBERT B

# FORM 4
(Statement of Changes in Beneficial Ownership)

## Filed 03/12/01 for the Period Ending 02/28/01

| | |
|---|---|
| Address | 100 ROUTE 206 NORTH |
| | PEAPACK, NJ 07977 |
| Telephone | 9089018000 |
| CIK | 0000067686 |
| SIC Code | 2800    - Chemicals & Allied Products |
| Industry | Major Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2012, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

**OMB APPROVAL**
OMB Number
Expires:
Estimated average burden
hours per response ....... 0.5

# U.S. SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 4

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public Utility Holding Company Act of 1935 or
Section 30(f) of the Investment Company Act of 1940

[X] Check box if no longer subject of Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

1. Name and Address of Reporting Person*

| Shapiro | Robert | B. |
|---|---|---|
| (Last) | (First) | (Middle) |

800 North Lindbergh Blvd.

(Street)

| St. Louis | Missouri | 63167 |
|---|---|---|
| (City) | (State) | (Zip) |

2. Issuer Name and Ticker or Trading Symbol

## Pharmacia Corporation
### PHA

3. IRS Identification Number of Reporting Person, if an Entity (Voluntary)

4. Statement for Month/Year

February 2001

5. If Amendment, Date of Original (Month/Year)

6. Relationship of Reporting Person to Issuer
(Check all applicable)

[X] Director * [_] 10% Owner
[_] Officer (give title below) [_] Other (specify below)

* Retired on February 21, 2001

7. Individual or Joint/Group Filing (Check applicable line)

[X] Form filed by one Reporting Person
[_] Form filed by more than one Reporting Person

Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.<br>Title of Security<br>(Instr. 3) | 2.<br>Transaction<br>Date<br>(mm/dd/yy) | 3.<br>Transaction<br>Code<br>(instr. 8)<br>Code | V | 4.<br>Securities Acquired (A) or<br>Disposed of (D)<br>(Instr. 3, 4 and 5)<br>Amount | (A)<br>or<br>(D) | Price | 5.<br>Amount of<br>Securities<br>Beneficially<br>Owned at End<br>of Month<br>(instr. 3<br>and 4) | 6.<br>Owner-<br>ship<br>Form:<br>Direct<br>(D) or<br>Indirect<br>(I)<br>(Instr.4) | 7.<br>Nature of<br>Indirect<br>Beneficial<br>Ownership<br>(Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| Common Stock | 2/15/01 | M | | 215,000 | A | $27.64 | | | |
| Common Stock | 2/15/01 | S | | 251,500 | D | $51.498 | | | |
| Common Stock | 2/15/01 | F | | 32,196 | D | $51.70 | 31,894(1) | D | |

* If the Form is filed by more than one Reporting Person, see Instruction 4(b)(v).

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

(Print or Type Responses)

(Over)

(Form 4-07/98)

FORM 4 (continued)

Table II -- Derivative Securities Acquired, Disposed of, or Beneficially Owned

(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/ Day/ Year) | 4. Transaction Code (Instr. 8) Code V | 5. Number of Derivative Securities Acquired (A) or Disposed of(D) (Instr. 3, 4 and 5) (A)    (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Option (right to buy) | $27.64 | 2/15/01 | M | 215,000 (2) | 4/25/06 | | Common Stock | 215,000 | | 1,791,276 | D | |

Explanation of Responses:
(1) Includes 3,046 shares acquired through Pharmacia Corporation's Dividend Reinvestment Plan.
(2) On or prior to March 31, 2000

/s/ Don M. Schmitz                                                      3/12/01
-----------------------------------------------                 -----------------------
   **Signature of Reporting Person                                      Date

*Don M. Schmitz, attorney-in-fact for Robert B. Shapiro

* Executed pursuant to a Power of Attorney ** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.

See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
If space provided is insufficient, see Instruction 6 for procedure.

Page 2

**End of Filing**

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

EDGAR*pro
by EDGAR Online

# PHARMACIA CORP /DE/

Reported by

## SHAPIRO ROBERT B

## FORM 4
(Statement of Changes in Beneficial Ownership)

## Filed 09/11/00 for the Period Ending 08/31/00

| | |
|---|---|
| Address | 100 ROUTE 206 NORTH |
| | PEAPACK, NJ 07977 |
| Telephone | 9089018000 |
| CIK | 0000067686 |
| SIC Code | 2800     - Chemicals & Allied Products |
| Industry | Major Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2012, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

**OMB APPROVAL**
OMB Number
Expires:
Estimated average burden
hours per response ....... 0.5

# U.S. SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 4

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public Utility Holding Company Act of 1935 or
Section 30(f) of the Investment Company Act of 1940

[_] Check box if no longer subject of Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

1. Name and Address of Reporting Person*

| Shapiro | Robert | B. |
|---|---|---|
| (Last) | (First) | (Middle) |

800 North Lindbergh Blvd.

(Street)

| St. Louis | Missouri | 63167 |
|---|---|---|
| (City) | (State) | (Zip) |

2. Issuer Name and Ticker or Trading Symbol

# Pharmacia Corporation
#### PHA

3. IRS Identification Number of Reporting Person, if an Entity (Voluntary)

4. Statement for Month/Year

August 2000

5. If Amendment, Date of Original (Month/Year)

6. Relationship of Reporting Person to Issuer
(Check all applicable)

[X] Director [_] 10% Owner
[_] Officer (give title below) [_] Other (specify below)

**Chairman of the Board**

7. Individual or Joint/Group Filing (Check applicable line)

[X] Form filed by one Reporting Person
[_] Form filed by more than one Reporting Person

Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1.<br>Title of Security<br>(Instr. 3) | 2.<br>Transaction<br>Date<br>(mm/dd/yy) | 3.<br>Transaction<br>Code<br>(Instr. 8)<br>Code   V | 4.<br>Securities Acquired (A) or<br>Disposed of (D)<br>(Instr. 3, 4 and 5) | | | 5.<br>Amount of<br>Securities<br>Beneficially<br>Owned at End<br>of Month<br>(Instr. 3<br>and 4) | 6.<br>Owner-<br>ship<br>Form:<br>Direct<br>(D) or<br>Indirect<br>(I)<br>(Instr.4) | 7.<br>Nature of<br>Indirect<br>Beneficial<br>Ownership<br>(Instr. 4) |
|---|---|---|---|---|---|---|---|---|
| | | | Amount | (A)<br>or<br>(D) | Price | | | |
| Common Stock | 8/9/00 | S | 86,770 | D | $58.08 | | | |
| Common Stock | 8/22/00 | M | 670,000 | A | $27.64 | | | |
| Common Stock | 8/23/00 | S | 87,241 | D | $56.54 | | | |
| Common Stock | 8/23/00 | S | 633,500 | D | $56.71 | 100,571(1) | D | |

* If the Form is filed by more than one Reporting Person, see Instruction 4(b)(v).

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

(Print or Type Responses)

(Over)

(Form 4-07/98)

FORM 4 (continued)

Table II -- Derivative Securities Acquired, Disposed of, or Beneficially Owned

(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 4. Transaction Code (Instr. 8) Code V | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) (A)   (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable   Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title   Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| Option (right to buy) | $27.64 | 8/22/00 | M | 670,000 (2) | 4/25/06 | Common Stock   670,000 | | 2,006,276 | D | |

Explanation of Responses:
(1) Includes 3,027 shares acquired through Pharmacia Corporation's Dividend Reinvestment Plan.
(2) On or prior to March 31, 2000

```
        /s/ Janet L. Horgan                              9/11/00
------------------------------------------       ------------------------
        **Signature of Reporting Person                  Date
```

*Janet L. Horgan, attorney-in-fact for Robert B. Shapiro

* Executed pursuant to a Power of Attorney ** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.

See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
If space provided is insufficient, see Instruction 6 for procedure.

End of Filing

Powered By EDGAR Online

© 2005 | EDGAR Online, Inc.

EDGAR®pro
by EDGAR®Online®

# PHARMACIA CORP /DE/

Reported by

# SHAPIRO ROBERT B

# FORM 4
(Statement of Changes in Beneficial Ownership)

## Filed 08/10/00 for the Period Ending 07/31/00

| | |
|---|---|
| Address | 100 ROUTE 206 NORTH |
| | PEAPACK, NJ 07977 |
| Telephone | 9089018000 |
| CIK | 0000067686 |
| SIC Code | 2800    - Chemicals & Allied Products |
| Industry | Major Drugs |
| Sector | Healthcare |
| Fiscal Year | 12/31 |

http://access.edgar-online.com
© Copyright 2012, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

**OMB APPROVAL**
OMB Number
Expires:
Estimated average burden
hours per response ....... 0.5

# U.S. SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 4

### STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934,
Section 17(a) of the Public Utility Holding Company Act of 1935 or
Section 30(f) of the Investment Company Act of 1940

[_] Check box if no longer subject of Section 16. Form 4 or Form 5 obligations may continue. See Instruction 1(b).

1. Name and Address of Reporting Person*

| Shapiro | Robert | B. |
|---|---|---|
| (Last) | (First) | (Middle) |

800 North Lindbergh Blvd.

(Street)

| St. Louis | Missouri | 63167 |
|---|---|---|
| (City) | (State) | (Zip) |

2. Issuer Name and Ticker or Trading Symbol

# Pharmacia Corporation
#### PHA

3. IRS Identification Number of Reporting Person, if an Entity (Voluntary)

4. Statement for Month/Year

July 2000

5. If Amendment, Date of Original (Month/Year)

6. Relationship of Reporting Person to Issuer
(Check all applicable)

[X] Director [_] 10% Owner
[_] Officer (give title below) [_] Other (specify below)

#### Chairman of the Board

7. Individual or Joint/Group Filing (Check applicable line)

[X] Form filed by one Reporting Person
[_] Form filed by more than one Reporting Person

Table I -- Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (mm/dd/yy) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned at End of Month (Instr. 3 and 4) | 6. Owner-ship Form: Direct (D) or Indirect (I) (Instr.4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|
| | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 4/12/00 | I(1) | V | 4,274 | D | $54.562 | | | |
| Common Stock | 7/28/00 | S | | 447,600 | D | $56.181 | | | |
| Common Stock | 7/31/00 | S | | 352,400 | D | $55.4628 | 238,082(2) | D | |

\* If the Form is filed by more than one Reporting Person, see Instruction 4(b)(v).

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

(Print or Type Responses)

(Over)

(Form 4-07/98)

**FORM 4** (continued)

### Table II -- Derivative Securities Acquired, Disposed of, or Beneficially Owned

(e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/ Day/ Year) | 4. Transaction Code (Instr. 8) Code V | 5. Number of Derivative Securities Acquired (A) or Disposed of(D) (Instr. 3, 4 and 5) (A) (D) | 6. Date Exercisable and Expiration Date (Month/Day/Year) Date Exercisable | Expiration Date | 7. Title and Amount of Underlying Securities (Instr. 3 and 4) Title | Amount or Number of Shares | 8. Price of Derivative Security (Instr. 5) | 9. Number of Derivative Securities Beneficially Owned at End of Month (Instr. 4) | 10. Ownership Form of Derivative Security: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Option (right to buy) | $52.8125 | 6/23/00 | M  V | 6,600 | 6/23/00 | 6/22/10 | Common Stock | 6,600 | | 2,676,276 | D | |

Explanation of Responses:
(1) Disposition of shares held indirectly through 401(k) account
(2) Includes 3,027 shares acquired through Pharmacia Corporation's Dividend Reinvestment Plan.

/s/ Janet L. Horgan                                         8/9/00
--- ------------------------------------------        -----------------------
   **Signature of Reporting Person                            Date

*Janet L. Horgan, atorney-in-fact for
Robert B. Shapiro

* Executed pursuant to a Power of Attorney

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations.

### See 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed.
If space provided is insufficient, see Instruction 6 for procedure.

Page 2

**End of Filing**

Powered By 

© 2005 | EDGAR Online, Inc.

EXHIBIT 163

**From:** Bahrt, Kenneth
**Sent:** Wednesday, January 10, 2001 6:27 PM
**To:** Gandelman, Mitchell; Kitsis, Elizabeth
**Subject:** FW: 1/9 CLASS AC prep rehearsal meeting notes
ch and Liz.  I think this sums it up pretty well.  Ken

-----Original Message-----
**From:** Weiner, Ethan
**Sent:** Wednesday, January 10, 2001 1:24 PM
**To:** Wahba, Mona M; Shafner, Lori S; Cristo, Stephen; Gavigan, Michael; Bahrt, Kenneth; Finman, Jeffrey; Frost, R Wayne ; Lan, Gordon; Dieck, Gretchen
**Cc:** Loose, Leland D
**Subject:** RE: 1/9 CLASS AC prep rehearsal meeting notes

It looks as if many of the questions: study design 4; ASA 1,2,3,5; Rash 3,4,5; Renal (all) require new analyses or dredging up old analyses and all are quite answerable so this should not be problematic.  Answers to questions such as OA vs RA 3,4; <span>Non-Res</span> Rash 1,2 should have been known at the presentation.  This leaves Study design questions 1,2,3,5,6; ASA 4; OA vs RA 1,2 which should have been made very clear by the presentation itself.  The fact that these things remain unclear to me indicates that the presentation has to be carefully gone over.  Certain things should be openly stated, not "buried" in the presentation, i.e.

- we did not achieve our primary efficacy parameter, but here's why the results are still good
- we did not see any difference between celecoxib and NSAID after 6 months, but here is why and here is why the initial 6 month analysis is the critical one, and so on

The fact that somebody would have to ask what the primary endpoint is, or why things went on beyond six months but only a six month analysis is shown indicates shortcomings with the presentation that need to be fixed.  I think those of us familiar with the project would not easily pick up on this since we already know the answers, but clearly the presentation does not make this clear enough to the uninitiated.  We'll see how things go next week.
-E

-----Original Message-----
**From:** Wahba, Mona M
**Sent:** Wednesday, January 10, 2001 12:35 PM
**To:** Wahba, Mona M; Shafner, Lori S; Cristo, Stephen; Gavigan, Michael; Bahrt, Kenneth; Finman, Jeffrey; Frost, R Wayne ; Lan, Gordon; Dieck, Gretchen
**Cc:** Weiner, Ethan; Loose, Leland D
**Subject:** 1/9 CLASS AC prep rehearsal meeting notes

Dear Team,

Ken, Wayne, Jeff and i  from Pfizer attended the subject meeting yesterday.
The panel was chaired by Dr. Michelle Petri, please find attached the names of the consultants who attended the meeting.

The following questions were raised by the panel after reviewing the BD and hearing Jim's presentation (the slides were forwarded to you last week):

**Study design:**
1. Where is the entire 12 m analysis for the primary and secondary objectives? P values? Did the study meet its primary endpoint?
2. Was the 6 m analysis planned in the protocol?
3. Why did the CLASS committees decide to stop the study early? What were the preplanned criteria for ending the study?  Need to be clarified in the presentation.
4. Is there any correlation between GI symptoms and incidence of GI ulcers in pts tx with NSAIDs in general and diclo in specific (epi data) to support the "depletion of susceptible" rationale? Did the McDonalds PUB (BMJ 11/23/87)have a diclo arm to evaluate the constant hazard ratio? did that study had a high drop out for GI symptoms?
5.  How can you label CLASS as a long term study if you are showing only 6 m results?
6. What is the definition used for GI ulcers, depth?size? How were they documented films? videotapes?

**ASA:**
1. Did you analyze the data by ASA dose (81 mg vs 325mg)?
2. Does the NDA data support CLASS outcomes re use of low dose ASA as a con med with Cx?
3. In clinical practice based on the CLASS data, what is the # of pts to treat to prevent one event for pts on Cx and low dose ASA?
4. Are you willing to accept a label change for GI warning for only ASA users?
5. Did you analyze the Hg and Hct changes for ASA vs non ASA users?

**OA vs RA:**
1. Why did you combine the 2 dz in the study? Did you stratify by dz?
2. How did you define OA?
3. Any difference in GI event incidence by dz?
4. Age difference in OA vs RA pts?

 <span>Non-Resp.</span>


PLAINTIFF'S
EXHIBIT NO. 131
FOR IDENTIFICATION
DATE: 8/18/10 RPTR: 7D

Confidential - Subject To Protective Order

DEFS 02561540

Rash:

1. Why there is a high incidence of rash in CLASS vs the NDA? Any explanations? is it significant enough to add to the label?
2. Did you exclude pts with sulfonamide allergy?
3. Is sulfa allergy relevant in terms of rash?
4. What is the incidence of rash within the first 28 days of tx?
5. What is the mechanism of rash? how does it look like?

Renal:

1. Did pts with edema have inc in Cr?
2. Did pts with edema have HTN?
3. What is the impact of fluid retention on HTN and renal functions? make sure to have into consideration the pt's age, wt and gender not only Cr Cl.
4. What is the time course of renal events? first month?

**Non-Resp.**

PMS data

2000 data?

Other:

Is endoscopy a surrogate marker for GI events based on CLASS data?

The joint clinical/biometrics team will be working on preparing new analysis and slides to address the above questions.
If you think of any other questions, please forward them to me ASAP.

Jeff, Ken, Wayne,

Please feel free to add any additional comments i might have missed.

*Mona M. Wahba, M.D.*
*Pfizer Global Research and Development*
*Tel. 860 441 8950*
*Fax 860 715 8463* email: *mona_m_wahba@groton.pfizer.com*

Confidential - Subject To Protective Order                    DEFS 02561541

EXHIBIT 164

CLASS Sr. Management Rehearsal
01-17-01

Spivey: Submitted last year to the FDA, Spivey will change in his opening comments currently stated this year.

*General Slide Comments (Sarah and Paula findings)
1   Rick Spivey's slide should go into Jim's presentation since Jim introduces the consultants.
2   B-deck slide #451- 35 ulcer complication shsould this be 38?
3   Number of renal cases to renal events by treatment group-(Slide needed)
4   Slide #27 started mentioning study numbers
5   Slide #40 anticoagulants were used by a small group and mentioned steroid use was less.
6   Slide #57 talked about relative risks but how many total AE's?
7   Slide #53 said people or NSAIDS are 7 fold more likely to develop complications does not speak to slide
8   Slide #64 p-values are needed
9   Slide #69 change title to be the same as slide #53
10  Slides #71 to #74 drug names need a change for format
11  Slide #89 what is mg%?
12  Slide 101 no ASA data on this slide

Questions and Answers (Possible Slides needed)
1   Slide with dates of DSMB meetings
        define that they were blinded throughout study
        Define why they unblinded study
2   Other reasons for blood loss
3   How many patients developed liver failure (Possible slide needed)
4   Update slides #476 and #477 to include 2000
5   Endoscopy by treatment group (possible slides)
6   Bone density slide from 024 (Possible slides)
7   B-Deck Slide #99 through #101 into Steve's main presentation
8   Is there any Pharmacoeconomic data?
9   Jim's slide with background rates ARAMIS, MUCOSA, CLASS learnings missing from this presentation.

Geis:
*Slide #4, first bar graph appears more like 17-18%, Geis indicated about 15%
*Slide 23 Missing "Accident" for cerebrovascular

Lefkowith:
Andrew Whelton should be introduced as Andrew, not Andy that is his preference.
Slide 23 need to spell out EC the first time it shows up
Slide 35 Can't read the p value of 0.09
Slide 46, Jim said .8 slide shows .185, Needleman: Last point on the slide should have +/- aspirin

Clarification: none went right into Q/A

Q/A





Confidential - Subject To Protective Order

DEFS 00109674

Spivey:  Was there criteria for ulcer depth?

Lefkowitz: Slide 20, prospectively defined.  No specified depth in the protocol, this is a clinical outcome trial.

Wahbah:  How many events were censored?  Where all ulcers examined by the same examiner?

> A:  4 events were censored

In asking about the consistency about the judgment of the ulcer was it the same person reviewing.  Where the events adjudicated in the same manner?  How where the data presented to the committee?

Eisen: Where ulcer complications and ulcers pre-defined as a specific endpoint?

Weiner: Did events committee use discretionary power to keep events that occurred within two weeks out of the trial?

Weiner: Was the cut off at the first six months an aproxy cutoff or was that determined after the results were known?

Slide #3, pre-specified that risk factors were to be analyzed, as a result of the data it was determined that 6 month was the best analysis

Stand: What were your estimates for ASA use prospectively?  Slide 184, 185, 186 ASA use was much higher than expected, this reflects real practice.  Possibly the greater use of ASA was the prolonged study

Strand: Were the distribution of risk factors in this study different than expected from the NDA database?  Slide 136  over time clinical practice patterns have changed, enrolling patients at higher risk

Isakson: Renal data you had pre-specified definition from the FDA, were there any other pre-specified definitions for risk factors/AE?

Was there a pre-specified definition of what defined a renal event?

 A: no Formal definition, investigator driven.

Jordan: ASA higher than the NDA trials, what part was for prophy use vs occasional use for aches and pains?

A: Slide 210  Broken out ASA use for CV vs other

Jordan: Slide 64 What is relative risk relative to?  Yellow bar is the reference population.  Needs to be further clarified.

Loose: Algorithm for suspected event, what number was not confirmed by endoscopy or X-ray.   Of the events that were called an event, not confirmed by endoscopy or Xray.  How many negative findings were there in patients who were worked up.  Of the events that went to the committee what % did not meet the criteria for endo or xray.  Slide 451.

Loose. Did these analyses vary by Center?

Stenson. If the investigator did not call it HTN, it wasn't HTN? A: all events are as reported by the Investigator. We have done analysis of pts pressure at baseline and end of study?
Strand: Did you see mean changes in those analyses? Slide 353

*Weiner: What is the ratio of events reported to the committee and those deemed an event?
A: we do not have the ratio of those events

*Pincus: referring to slide #64, would it be helpful to have p values on that slide. Gies agreed.

*Pincus: Did you analysis ASA use and Steriod use? Combination treatment ulcer complication rates?
A: We don't have that analysis but do have information on that, steroid use was not a risk factor on ulcer complication rate. Very small cohort of patients taking ASA and Steriods. Need a slide
Pincus: The literature emphasized this combination therapy.
Strand: this is an important point, varient risk factors in RA pts in NDA, CLASS and MUCOSA
Pincus: 15% of OA taking steroid for other reasons than OA, need to know why, ie asthma.
Strand: In the CLASS study more than 80% used ASA, How did you define ASA use in the NDA study, it looks different in the NDA study vs CLASS.
A: 12% of the patients were using ASA, 80% of those were using it chronically for CV prophy

How is the ASA use similar and different in the NDA?
What is the ASA exposure in the different populations?

Strand: What was ASA use in the Trial?
A: Slide 184 and 185,186. These are not different from the general use in the population.
Spivey: Seeing approximately 14% in class and 10% in NDA, can you really predict an increased risk? Slide 202: 16% using for CV prophy use which compares to 10% in the NDA. More pts were using ASA for CV use in the CLASS trial.

Spivey: ASA use confusing, what was the duration of low dose ASA use. Is that really different from the low dose ASA use in the NDA?
**Of the 12% ASA use in the NDA, what % was used for prophylactic use?
Weiner: if you change your defintion of low dose ASA, then you can answer the question?
*Strand have a definition for ASA use  Follow it up with OA information.
Weiner: Does the duration of ASA use change the analysis? Slide 191.

Confidential - Subject To Protective Order

When is the patient at risk when they use ASA?  Geis: Did that data answer the question (slide 191)?  Strand: Yes

Whelton: Separation of the primary endpoint from the secondary endpoint is troubling. Soft definition of what is symptomatic.  Was there enough judgment by the PI at the site that it could have affected whether the event was considered complication vs an ulcer? Geis A: endo or contrast study.  In the CLASS study they were endoscoping more frequently than in the NDA or MUCoSa.  And more often the patient was more often treated early and did not go on to have a ulcer in that the PI were more apt to scope for symptoms and treat before the ulcer complication arose.

Strand: Suggest having the Consultants answering these questions, as they would pull more weight.

Pincus: Do we have data analyzed for periods shorter than the 6 months.  Dr. Goldstein to review K-M graphs for the entire period.  Short term steroidal more common than long term.  Slide 43
Why is the 6 month analysis the most appropriate one?  At 30 days there were no events. Dr. Mackuch: A:  Inappropriate to say you looked at data month by month.  Executive committee reviewing data made the observation prior to reviewing analyses.
*Clarify how the decision was made to stop the study and why the 6 month data was the analysis.
Silverstein: Looked at study progress and determined that they would not obtain enough events within a reasonable period of time.  The first 6 months was most uniform

Strand: Where protocols compared separately?

Strand:  Why was there no interim analysis?

Freidman: Credibility of the study will be called into question, by FDA or committee members.  Need a crisp answer, you will be accused of picking an arbitrary time to stop the studies, data dredging, post hoc analyses on risk factors.  Did the company know what the data were and that contributed to the stopping of the study?

In the main presentation, nail and clarify what the rules were and how the company was out of the decision.  Pincus liked Makuch's response.
* Have a slide with the dates and what the committee communicated to you as a sponsor.

Spivey: Not as troubled by stopping the study, there is a sense of what data are you analyzing and what data are you throwing away.

Pincus: In general, in science, you present the raw data then show the analysis visa versa from what you are doing.  May not be well received.

Stenson: Did you make the statistical comparison between diclofenac and ibuprophen? Your assumption is that the toxicity of NSAIDs is comparable, this is not the case. Brings into question the validity of calling NSAIDs the same and the pooling of the data. Question the statistical appropriateness of comparing the NSAIDs.

Did we assume that the NSAID complications would be the same? The overall event rate for NSAIDs was 1.3. The analysis plan was combined going in. Goldstein: Slide 263

Strand: Don't the endoscopy studies show differences between diclo and ibuprophen? Strand: Why did you use diclofenac rather than naproxen? A: In discussions with FDA, diclofenac is the most widely prescribed NSAID around the world. Goldstein: Utilization of NSAIDs over time, Slide Time to Withdrawl Due to GI Aes # 70

Loose: Discuss types of formulations used in your study compared to the commercial formulations. Do the formulations used in the study match those in the market? *C-max data, not achieved. Strand: Diclofenac/placebo: need to clean this up. Friedman: Is there an NSAID compartor, how can we grant you label changes when you appear to have to different data. It is not clear that there is a difference in NSAID comparators. Strand: Outcome shows that your drug is as good as diclo and less safe than ibu?

Strand: why did you use diclo as a comparitor? Silverstein: Answer: first issue of GI tolerance. Second, endoscopic studies show 8-7 time reduction in incident of ulceration. Freidman: It appears that you failed your primary endpoint? A: Like to look at this from Statistical point of view and a clinical point of view  slide 56, 57, 58, 59 Suggested answer; When we correct for the unexpected compounding factor of aspirin, the answer is no. Silverstein: when we take ASA out, we have met our endpoint. Clinically significant reduction in GI bleeding.

Strand: In view of changing medical practice, did you meet your endpoint? Silverstein: Why did the comparator not behave the way we expected it to.   There were changes in practice.

Jordan: If you look at page 100 in briefing document figure f, there still would be a question if the primary analysis was met. Polish this section of the talk, highlight changing medical practice.

Weiner:  Figure 4A on page 36 Friedman: there are incredibly few GI events 34 in 8000, what is the medical benefit of your drug. Geis: 16,5000 deaths d/t NSAID complications. Dr. Goldstein: Good answer.

Isakson: Should Celebrex be reserved for patients over the age of 75 and have no CV risk factors? Dr Goldstein, slide 189.
How does this compare to other pts not taking non-steroidals and ASA, slide 83 is the slide he wants to see.
Needleman: No addition of asa can affect an nsaid because it blocks Cox 1 already.

Might discuss the topical effect of ASA.
*Show us the rates of ulcer complications for Ibu and Diclo in ASA and Non-ASA users. Slide 200, does not get at the answer   Slide 82   The study was not powered to answer the question.   Slide 83 slide 84, 87, 88.   Ando: feels Geis was onto something with this response shown in these slides.

Spivey: the original question minimized the pt population that would benefit from this drug. Get your talk above into the main presentation.

Strand: I am not convinced by iron and h/h factors that there isn't another source of blood loss. Slide 91. Do not infer that it is GI related source.   Slide 92, how do we know this is GI blood loss, event rate increases chronic blood loss in all groups,
Bone marrow density, dysplasia   We have data that is suggestive.

Do not make a claim against NSAIDs,  we are trying to differentiate the drug from NSAIDs
Eisen: Where there any cases where the event would have met criteria but did not have proof of a lesion.  And were they equal among treatment groups?
Dr. Goldstein responded.  No slide to show
*Have slide of cases that went to adj but did not have findings.

Eisen: Where there more endoscopies in one group? Significantly more patients in the NsAId treatment arm were evaluated for complications.

Spivey: simplify the answer, symptomatic presentation so more Aes in the NSAId so there were more workups in the NSAId

Jordan:  given more endos in the NSAID group b/c there were more symptoms could that have increased the number of ulcers found, an introduced a bias against the NSAID groups.  Does this off set the biased of the drop out rate for symptoms in NSAID group.

Wabah: Have you seen any effect on the female reproductive system?

Loose: Do you have any evidence of bone demineralization with celecoxib?  Slide 342 looking at hypophospatemia or accidental fracture, no observed effect.
Strand: Where's the Long-term safety with respect to liver failure.

Confidential - Subject To Protective Order

*Strand: A post marking update would be very helpful, post marketing surveillence data, slide 476 -  Update the slide to indicate it is through 2000 as well as bone demineralization.

Needleman: 20-25% of the NSAID data base, where is the evidence that there are 5000 less deaths and 30,000 less hospitalizations since bring Cox-1 to the market.
*Need to get these data. Geis: Aramins database has been updated, seen this data, knows the incident of hospitalization reduced but no sure about death rate.

Needleman: Are you powered in this trial to make the call of lower incidence of thromboembolic events?  Dr. Zhao, data to small, trend seen.
Needleman: Is that ulcer rate due to ASA alone or is celebrex making ASA worse.
Slide 83, No combined effect.  Geis: we could pull the high dose ASA users in the NDA to support no risk in taking ASA and Celecoxib.
Jordan: only 10% of patients were on ASA.
Ando: This data though not statistical shows there is no combined effect of ASA and celebrex.
Needleman: Relationship of endoscopic ulcers to ulcer complication? Slide 99, 100 Dr. Goldstein.
Up front in main presentation to answer why we did the class study, serogate marker.
Pincus: Events are not predicted by symptoms.

Presentation Critique
Needleman:
Jim: don't adjust data, it took you 18 minutes to get to the data which was rich, you need to get there.
Validating the stop rule,
Steve: pick and choose, shave 5 minutes out of history
Good strenght in liver, CV benefit of  Celebrex

Establish the 6 month period, muttled by ASA answers.  The whole data moved based on ASA.
*Simple clear, how many patients were on prophy ASA.
Practice with consultants each weeks

Ando: helpful to go through each section and pull out conclusions at each sections. Then pull them all together at the end.
Use a tighter link from the original NDA submission since the advisory will not be familiar with this data.
When you talk NSAID, include naproxen
General safety
*Blow up each system ie hepatic, easier to work with rather than the entire body system on one slide
Design of class trial: attention span is short, have a table with overall features, then some other features you want to look at.

DEFS 00109680

Answer with data, not our opinions, use the consultants.
Spivey: Hown in on controversy during the 1/26 meeting

Naurang: Make the point that the committees are blinded throughout,
And reiterate that doses of celebrex were Supratherapeutic doses
Jim had a slide to answer what we accomplished, today it was piecemeal
*Slide showed background rate, what we learned from Aramis, class and mucosa, when
you look at celecoxib alone you get as close to background rate as you possibly could.
Whelton: Jim remarks about DSMB as a member of the board, in our discussion that was
appropriate, we assumed most complications were occurring in the comparator. Ethically
the committee felt the study should be stopped.

* Slide 64, compare 0 risk to 1 and 2, that one risk might be age 75 which is not as
significant as a prior ulcer.
* There were 35 serious events, could only count 31 events. 6 months vs entire trial,
wasn't clear.
Pincus: agrees about the ethics of the DSMB reason for ethics
All the possibilities of outcome were considered

Confidential - Subject To Protective Order

EXHIBIT 165

From: LEFKOWITH, JAMES B. [PHR/1825]
Sent: Friday, January 26, 2001 6:40 AM
To: GEIS, GEORGE S. [PHR/1825]; VERBURG. KENNETH M [PHR/1825]
Subject: FW: comments

fyi

-----Original Message-----
From: Vstrand@aol.com [mailto:Vstrand@aol.com]
Sent: Friday, January 26, 2001 6:21 AM
To: LEFKOWITH, JAMES B. [PHR/1825]
Cc: JAIN, RITA I [R&D/1825]; WESZT, SUSAN M. [PHR/1825]
Subject: comments

I'm sure you've heard more than enough from your internal and external
consultants, but I spent the time reading the FDA briefing doc, and have some
perspective as I know what the document for Friday's meeting looks like as
well.

Clearly the division has drawn a "line in the sand" and seems to be wanting a
"bloodbath" each of the three days. I'm not exactly sure why they've chosen
to be so confrontational, but that appears to be the plan, and not modifiable.

I have not seen the briefing document for Merck but I expect it isn't any
better, and. in some ways worse, as I expect they will be criticized over
"new and different" safety data rather than failing to meet their primary
endpoint.

Regardless, [and the agency really is looking at each product individually],
you can't try to convince the panel that your 'alternative' analyses were
either prospectively defined and/or appropriate, since you failed to meet
your primary endpoint.

I think your presentation [last week, as I missed this week's] was solid,
appropriately objective, etc etc, but failed to tell the truth. You didn't
prospectively define a "combined" endpoint of complications + symptomatic
ulcers; and if you prospectively allowed the subset analysis of ASA users vs
non -users you need to make this point more convincingly. More importantly,
since the FDA has called into question even censored GI complications, you
need to have ALL of your independent panel members defend the conduct of the
study, and you need to have Dr. Goldstein take a back seat when explanations
regarding adjudication of GI events are offered. Better to let Drs.
Silverstein and/or Aggarwal field the questions, because, for better or
worse, Jay (and I like and respect him alot] is perceived as *just about a*
Pharmacia/Searle employee, esp given his geographic location. Better to let
him answer a different question; or even to have your external statisticians
defend conduct of the study.

You and Steve need to "field" the questions, but avoid answering any
regarding conduct of the study. Otherwise the external monitoring committees
are perceived as not truly external, or independent.

The other point is to emphasize "change in practice" over time. This is hard
to predict, and you can openly admit that your projections and sample size
calculations were wrong in several aspects. This is the major reason many of
the sepsis trials failed.....after one confirmatory trial, the subsequent
trial showed different results, in part because physicians now believed the





EXHIBIT

~~279~~

284

Confidential - Subject To Protective Order

product was efficacious and treated different patients, earlier in the process, perhaps more severe; whatever.

Certainly the huge number of Celebrex prescriptions, including a previously untreated population indicated that physicians were convinced of a different tolerability trial.  And the hype and marketing probably also made them far more aware of potential GI side effects, and more aggressive identification of GI pathology in the presence of symptoms.

Rather than trying to convince the panel that informed dropout occurred with Diclofenac, I'd emphasize that changes in practice resulted in:
---higher ASA use
---earlier and more aggressive work up of UGI symptoms, thus altering dropout rates as well as identification of UGI complications
and that protocol mandated discontinuations for LFT elevations added to DICLO discontinuations.

in general physician investigators were much more aware of potential NSAID toxicities now that they perceived that a therapeutic alternative was available, just as we now listen to our patients and report MTX toxicities since we have several new therapeutic alternatives.

that is not to defend the trial, rather to offer a reasoned, measured explanation for why the CLASS trial failed.  Most clinical trials are flawed, because of the heterogeneity and unpredictability of human disease etc etc.

I know this is risky but you may want to discuss whether diclofenac was, in fact, a reasonable choice for a NSAID comparator.  You have a failed endoscopy trial, ostensibly because generic Diclo was poorly absorbed [or so I remember, but I'm prepared to be incorrect on that fact].  Regardless, diclofenac was a poor choice, and you might make a few points by showing the disparate results using it as a comparator in the NDA supporting trials.
[I'm not suggesting you say that it was a poor choice prospectively, but that inview of previous results, it could have been anticipated that it might be problematic.  This doesn't allow you to use 'informative censoring' to fully explain results, but does put this trial in the context of a large number of clinical studies which yield unanticipated results.

Finally, I'm not a gastroenterologist, but I'm not entirely clear that I agree with the censoring of UGI events.  Ostensibly it doesn't change the results, but one of your more "hands off" gastroenterologists need to defend their committees decisions, and neither you nor Steve should go near this explanation.

In the end, if you offer a reasonable, measured explanation of "your interpretation" of the data; admitting openly that you didn't meet the primary endpoint, that the combined endpoint is a post hoc analysis, etc etc....you may be able to convince the panel that you are potentially better than Ibuprofen, which, obviously, is less GI toxic than diclofenac......you won't have a chance if you don't openly concede that the events in the trial, outcomes, etc were a surprise; that you abided by external monitoring decisions, etc etc.....

That would be quite an accomplishment.....Then you still have to explain why the events in the Celecoxib group continued whereas the other NSAID treatment groups stabilized.

Perhaps the best outcome would be that you avoid additional labeling concerns

Confidential - Subject To Protective Order

regarding cardiovascular and renal events.

It is clear to me this division is out for blood.  you won't win such a
battle.  even if you did, I'm almost sure the division would ignore any
recommendations from the panel, as they often do.
better to present the data as they occurred, analyses as prospectively
defined, and subsequent analyses as supportive only and to leave with your
respect in tact.  That way you will be able to return with subsequent data
with this product, or to defend a follow on product, and you will not risk
losing credibility.

FDA always understands we physicians do what we are forced to do based on our
corporate culture [and biotech in the early days was a real lesson in this
respect], but they are far more cooperative in subsequent interactions if you
haven't tried to convince them or the panel that posthoc analyses validate an
already flawed trial.

Remember, they helped design the trial, in a fully collaborative fashion.
they must bear some of the "blame" that it failed to show the expected
results.  Be open about this, I see this as the only way you may be able to
salvage any of the positive findings.

Other "supportive", suggested points:

   Emphasize the "flat dose response" with Celecoxib [also apparently true
for Vioxx]; already clearly demonstrated, and mechanistically rationally
explained.  Take Dr. Witter's argument and turn it around: since Diclo was
less well tolerated, what would it have been if  used in
"supra-pharmacologic" doses?  only speculative, but that's one of the
positives: dose creep does NOT result in better efficacy, yet the same safety
profile with Celecoxib, compared with traditional NSAIDs.

   Change in practice includes change in perception of prescribing MDs.  now
go to GI workup sooner. etc etc

   Can you prove that risk factor analysis was sufficiently prospectively
defined to allow the ASA and nonASA subset analyses? without invoking the
"post hoc analysis" argument?

   You've shown that UGI symptoms appear to "predict" events, and confirm
the endoscopy trials supporting the NDA.  Can you show their temporal
relationship?

   CLASS is a large "simple" [ha! ha!] clinical trial designed to mimic
clinical practice.  If non-GI AEs in this trial are numerically but not
statistically different between treatment groups of approximately 2000 over 6
or more months, then how can it be argued that there are differences?

Confidential - Subject To Protective Order                                                    DEFS 00112634

EXHIBIT 166



| | |
|---|---|
| **From:** | Zwillich, Samuel H |
| **Sent:** | Tuesday, May 02, 2000 4:03 PM |
| **To:** | Loose, Leland D |
| **Subject:** | CBX-0078830_ Comments on CLASS draft report |

CBX-0O78831_
CLASS report.doc

Samuel H. Zwillich
Clinical Research / CRAII



PLAINTIFF'S
EXHIBIT NO. 122
FOR IDENTIFICATION
DATE: 8/18/10 RPTR: TD

1

Confidential - Subject To Protective Order

DEFS 03256242

Although conclusions like "The increase in the observed rate associated with celecoxib is clearly attributable to concurrent low-dose aspirin use." may be overstated, I am basically comfortable with the analysis of aspirin's effects. The increased use of aspirin in CLASS compared to previous celecoxib studies may account for some of the unexpectedly increased rate of CSUGIEs/GDUs: "Of note, the incidence of low-dose aspirin use in this trial was approximately twice that seen in the previous celecoxib controlled trials, but similar comparable to that observed in the general population. (13)". It should, however, be possible to estimate CSUGIE/GDU rates attributable to low dose aspirin from the literature and compare those with the rate of excess events.

I am less comfortable with blaming the lack of difference in CSUGIE rates between celecoxib and diclofenac on the higher withdrawal rates on diclo for GI AEs that would have otherwise evolved into GDUs then CSUGIEs. About half of all CSUGIEs in CLASS (and the literature) were **not** preceded by warning symptoms, so, on that basis, diclo assigned subjects should have experienced excess events at about half the predicted rate. And while it is true that AE withdrawal rates on diclo were higher than on celecoxib (27.1% vs. 22.7% over entire study period, T2.3), if you look at T42.1, AEs causing withdrawal, Gastro-intestinal System Disorders, and add up those terms that represent UGI AEs that should not have been CSUGIEs/GDUs (abdominal fullness, abdominal pain, dyspepsia, eructation, esophagitis, gastritis, GE reflux, hiatal hernia, nausea and vomiting), the absolute numbers are small: 455/3987 or 11.4% celecoxib vs. 315/1996 or 15.8% diclo. It seems a stretch to imply that ~10 of those ~80 excess diclo subjects with GI AEs would have gone on to CSUGIE/GDUs had they remained on diclo. Further, if our message then is that the real difference between celecoxib and diclo is tolerability, not safety, (because diclo GI intolerant patients D/C the diclo before their CSUGIE/GDUs) then aren't we feeding into the school of thought that argues COX2SI are unnecessary before patients get symptoms on NSAIDs?

I am uncomfortable with the statement: "Moreover, celecoxib's association with the same risk factors as NSAIDs is in part by virtue of concomitant aspirin use, which would be predicted to cause events in those with NSAID risk factors." Since aspirin explains only part of the shared association, does that imply that the other part of the association is due to an intrinsic UGI toxicity shared between celecoxib and NSAIDs, which is not the message we want to send?

In the Vioxx SBA, at least one FDA reviewer stated a belief in the reality of GI mucosal adaptation to the effects of NSAIDs, leading to a flattening of (the equivalent of) CSUGIE incidence curves after the first month or so of Rx. Perhaps we need the data on how many subjects were on NSAIDs at Baseline to handle this issue, since a number of uncensored CSUGIEs occurred during the first month of the study (1 on celecoxib, 5 diclo, 4 ibu, Table T14.1) which they agency may want to "discount" or analyze separately.

It's interesting that steroid use didn't appear as a significant risk factor for CSUGIE/GDUs (T30.1-4). I always found attractive the model that steroids delay wound healing and therefore amplify the risk that NSAID erosions will not heal and instead will grow into ulcers.

The number of unreported/unadjudicated and therefore presumably uninvestigated subjects with extreme drops in H/H is large (Text Table 10.p). These drops are blamed on GI bleeding, rather than hemodilution, etc, and therefore raise the possibility that many UGI events were clinically silent bleeds that the event analysis algorithm missed and that only showed up as drops in H/H, which the PIs also missed! Not only does this call into question the premise of CLASS, to capture all GI events prospectively, but the missed events may have been distributed differently than those which were recognized and counted. For example, in the same analysis of extreme lab values, it is written (page 188): "The analyses performed according to aspirin status were distinct from the results presented in the "**Error! Reference source not found.**" section, namely, the addition of aspirin increased the incidence rate (of extreme drops in H/H) in all treatment groups, but preserved the differences among the groups."

Smaller issues:

Page 6, SYNOPSIS, Table 4: mislabeled 26 instead of 52 weeks

DEFS 03256243

Page 50, Table 6.d, ferritin values don't distinguish patients with active inflammation (RA) and those who don't (OA)

Case 1099, subject is on "Triamterene/hematocritZ"instead of "Triamterene/HCTZ"!

Case 1343 had gastrectomy, was enrolled in violation of the protocol and had an event.  That was the only blatant violation I caught in the cases, but I may have missed others while skimming.

SAEs (T43): Cellulitis in 8 on celecoxib vs. only 1 each on diclo and ibu (4 times the rate), although, fortunately, events classified as "resistance mechanism disorders" were similar in all 3 treatment groups. Cardiac failure was seen in only 0.4% (9) celecoxib subjects, ½ the rate on ibu, which is reassuring in light of recent publicity about NSAIDs Non-Resp.

The small fall in mean WBC and platelet counts on celecoxib compared to the small rise on the comparators (Table T44.1) may reflect a modestly increased anti-inflammatory effect of celecoxib at the high dose compared to diclo and ibu.

Confidential - Subject To Protective Order

EXHIBIT 167



DEPOSITION
EXHIBIT
90
8/6/10   TD

| | |
|---|---|
| From: | NEEDLEMAN, PHILIP [EXC/1005] |
| Sent: | Tuesday, June 04, 2002 2:47 PM |
| To: | GEIS, GEORGE S. [R&D/1820]; VERBURG, KENNETH M [R&D/1825]; LEFKOWITH, JAMES B. [R&D/1825] |
| Cc: | JOHNSON, WILLIAM J. [R&D/1825] |
| Subject: | CBX-0345478_RE: BMJ editorial |

How can we explain this more simply-otherwise the message will be lost? Actually I don't understand why there would be a difference in hazard rates. It is important to understand the numbers-if most of the events in the second 6 mo were celecoxib it is difficult to rationalize because there still were plenty of NSAID patients left (the drop depletion numbers while signif different weren't that profoundly different).

This is one of those "hot seat" times that comes with such a big drug-which is such an attractive target for reporters, analysts and esp HMOs.

-----Original Message-----
From:      GEIS, GEORGE S. [R&D/1820]
Sent:      Monday, June 03, 2002 8:55 PM
To:        NEEDLEMAN, PHILIP [EXC/1005]; VERBURG, KENNETH M [R&D/1825]; LEFKOWITH, JAMES B. [R&D/1825]
Cc:        GEIS, GEORGE S. [R&D/1820]
Subject:   RE: BMJ editorial

Phil,
I spoke with Ken as he was boarding a plane for Peapack today and agreed that I'd respond to your queries.

I will get the detailed data tomorrow and forward it to you - however, in the interim note the following:

1. I need to confirm the numbers - but if it is true that almost all the ulcer complicationS in the second half of the trial were with celeocoxib - this would not be unexpected         since the biases of the study had the greatest impact after 6 months.  The explanation of this is al follows"

    a. The hazard rate for NSAID complications was expected to be constant over time.  See Slide # 1 of the attached deck.  We also assumed that hazard
        rate in the celecoxib treated group would be constand over time, as well.

    b. Based on PHA analyses, the hazard rate for the NSAIDS  did NOT remain constant in CLASS.  However, the hazard rate did remain constant in the celecoxib         group. (Slide # 2. Of note - Bob Makuch confirmed  the analysis for the external authors preparing the longer term manuscript.)

    c. The decrease in the hazard rate for NSAIDs in CLASS was due to higher depletion of the susceptible patients with time in the NSAID group versus the celecoxib         group.  One of the most susceptilbe patient groups was the group of patients who had an ulcer.  As seen in Slide # 3 - a significantly higher proportion of NSAID      patients were withdrawn due to the presence of a symptomatic ulcer.  The p-value on the slide compares the two curves overall but you can see that the curves         separate more after 6 months.

    d. Another factor that contributes to the apparent higher rate of complications in the celecoxib group after 6 months is the proportion of patients taking low dose ASA         (~22%).

        (1) Low dose ASA causes ulcer complications (Slide # 4).

        (2) Our endoscopy data suggested that low dose ASA is a risk factor for ulcers in celecoxib users but NOT in NSAID users (Slide # 5) .

        (2) Makuch performed an analysis showing that the hazard rate of ulcer complications in the celecoxib group not taking ASA was constant with time but         was lower than the combined group ASA and non-ASA users.

2. For your second question I need to check the numbers. However, the issue is the withdrawl of **susceptible** patients - not the withdrawls for any reason.

1

Give me a call if you want to go over this in detail.
<< File: CLASS Questions.ppt >>
Steve

-----Original Message-----
**From:**    NEEDLEMAN, PHILIP [EXC/1005]
**Sent:**    Monday, June 03, 2002 3:36 PM
**To:**      VERBURG, KENNETH M [R&D/1825]; LEFKOWITH, JAMES B. [R&D/1825]; GEIS, GEORGE S. [R&D/1820]
**Subject:** RE: BMJ editorial

ken-what is the data and the appropriate answer to the authors claim that: 1) almost all the ulcer complications in the second half of the trial were with celecoxib; and 2) their assertion that the withdrawal rates were essentially the same across groups and were gradual in the second half of the study?

-----Original Message-----
**From:**         VERBURG, KENNETH M [R&D/1825]
**Sent:**         Monday, June 03, 2002 2:31 PM
**To:** NEEDLEMAN, PHILIP [EXC/1005]; LEFKOWITH, JAMES B. [R&D/1825]; GEIS, GEORGE S. [R&D/1820]
**Subject:**      RE: BMJ editorial

Phil-
we don't have a formal response prepared (maybe PR does however).  I have attached the Silverstein Letter to JAMA and below are the responses the Steve that gave to NY times. Need more - let me know.

<< File: Final Silverstein JAMA Letter 1121.pdf >>

Study Finding Celebrex Safer Was Flawed, Journal Says

June 1, 2002
By MELODY PETERSEN

An editorial in the June 1 issue of The British Medical Journal harshly criticizes a scientific study that the drug company Pharmacia used to promote Celebrex, the arthritis drug that is its best-selling product.

Its authors said the study, which concluded that Celebrex, which had $3 billion in sales last year, was safer than other widely used pain relievers because it caused fewer ulcers, had "serious irregularities."

They also said Pharmacia's previous explanation for discrepancies in the study was "inadequate." Doctors should be informed, they added, that the conclusion that Celebrex was safer than drugs like ibuprofen had been contradicted.

"The flawed findings published in the original article appear to be widely distributed and believed," wrote Dr. Peter Juni, a senior researcher at the University of Berne in Switzerland, and two other doctors. If Pharmacia is not required to inform doctors that the study's conclusion was invalid, they said, "the pharmaceutical industry will feel no need to put the record straight in this or any future instances."

Dr. Steve Geis, Pharmacia's vice president for clinical research, said yesterday that the company disagreed with the editorial. The Celebrex study used "appropriate scientific judgment," and the company stands by its conclusion, Dr. Geis said.

2

Confidential - Subject To Protective Order

DEFS 00156455

Celebrex and Vioxx, a similar medication sold by Merck & Company, are some of the most heavily advertised prescription medicines.

The drugs, known as Cox-2 inhibitors, have grown increasingly controversial because they have not been shown to reduce pain better than drugs like ibuprofen and naproxen, which are available in generic and over-the-counter versions, at a fraction of the cost.

The companies have said the new drugs are worth their high price because they are safer for the stomach and appear to cause fewer ulcers, a dangerous side effect of anti-inflammatory pain relievers like ibuprofen and aspirin.

The popularity of the two drugs has alarmed health insurers, as the cost of caring for arthritis patients has increased greatly. A month's prescription of either Celebrex or Vioxx costs about $80, many times the cost of generic pain relievers.

Many insurers and doctors say the new drugs should be prescribed only for people at risk for ulcers.

But Pharmacia is still struggling to convince the Food and Drug Administration that Celebrex is easier on the stomach. The agency and the company are discussing whether Celebrex's label should be changed to say the drug causes fewer ulcers and allow to advertise that claim. Much of the data that Pharmacia has presented to the agency to prove Celebrex is safer are those that the editorial's authors criticize.

The editorial focuses on a study reported in 2000 in The Journal of the American Medical Association. The study concluded that patients taking Celebrex suffered fewer serious ulcer complications than those taking ibuprofen or diclofenac.

About a year later, an article in The Washington Post disclosed that Pharmacia's published study included only the first six months of data in a study that had lasted a year. When all the data are analyzed, Dr. Juni and his colleagues said, much of Celebrex's safety advantage appears to disappear because almost all of the ulcer complications in the last six months occurred in Celebrex users.

Pharmacia and the doctors it hired to prepare the study, including professors from Harvard and Yale medical schools and six others, have said they omitted the last six months of data because many patients dropped out in that time, skewing the results. The high drop-out rate, they said, left more patients at risk of ulcers in the Celebrex group than in the groups taking the other drugs.

But Dr. Juni and his colleagues called that explanation "inadequate." The patients who dropped out, they said, did so gradually over the year of the study, without a sudden increase after six months.

Dr. Juni and the other authors said Pharmacia appeared to have widely distributed reprints of the Celebrex study.

3

Confidential - Subject To Protective Order

Thirty thousand reprints were purchased from the publisher, and the study was cited in 169 other medical articles, they said.

Dr. Geis said he did not know how many reprints the company distributed, but he said it regularly distributed copies of medical journal articles about its products if doctors requested them.

The doctors Pharmacia hired to help it perform the study are working on a more detailed explanation of why the study was appropriate, Dr. Geis said. Even as the study was being designed, he said, the company and the outside investigators believed that six months of data would provide the best answer about Celebrex's safety. The study continued, he said, to determine what happened over a year.

"The most meaningful answer," he said, "is in the first six months."

|  |  |
|---|---|
| -----Original Message----- | |
| **From:** | NEEDLEMAN, PHILIP [EXC/1005] |
| **Sent:** | Monday, June 03, 2002 2:22 PM |
| **To:** | LEFKOWITH, JAMES B. [R&D/1825]; VERBURG, KENNETH M [R&D/1825]; GEIS, GEORGE S. [R&D/1820] |
| **Subject:** | BMJ editorial |
| **Importance:** | High |

Do we have a quick response to the editorial? If so can you pls email me a version.

Confidential - Subject To Protective Order                                                      DEFS 00156457

EXHIBIT 168

**FOR INTERNAL USE ONLY; NOT TO BE SHOWN OR GIVEN TO ANY EXTERNAL AUDIENCES – FEBRUARY 9, 2001**

## Q&A:  FDA ADVISORY COMMITTEE HEARING ON PROPOSED GI SAFETY LABEL REVISIONS FOR CELEBREX®

**Q.    What was the role of the U.S. Food and Drug Administration (FDA) Arthritis Advisory Committee?**

**A.**    The role of the FDA Arthritis Advisory Committee was to provide guidance and recommendations on modifications to the CELEBREX label based on the findings from the Celecoxib Long-term Arthritis Safety Study (CLASS). The committee's recommendation is one piece of input that the FDA will take under advisement when making a decision regarding the CELEBREX label in the United States. It is important to realize that the advisory committee's recommendation is part of a continuing discussion we will be having with the FDA regarding CELEBREX label modifications.

**Q.    What was the Arthritis Advisory Committee's recommendation regarding the CELEBREX label?**

A.    Due to the complexity of the CLASS data, the advisory panel on day one (February 7) experienced difficulty interpreting the results.

After reviewing data from VIGOR study on February 8, the Committee subsequently provided guidance that the labels for both CELEBREX and VIOXX should reflect data showing gastrointestinal safety advantages versus specific comparator NSAIDs studied.



DEPOSITION EXHIBIT
262

1

Confidential - Subject To Protective Order                                                                          DEFS 00754326

**Q.**    **Will there be label modifications resulting from the CLASS findings with diclofenac?**

**A.**    In CLASS, CELEBREX, at four times the recommended osteoarthritis (OA) dose, demonstrated significantly fewer symptomatic ulcers and ulcer complications in a pooled analysis of the NSAID comparators (ibuprofen and diclofenac), as well as ibuprofen on its own. We will work with the FDA to include these data in the CELEBREX label.

**Q.**    **What was the recommendation of the committee regarding the VIOXX label in relation to GI safety?** ▇▇▇▇Non-Resp.▇▇▇▇

A.    The committee provided guidance to the FDA that the labels for VIOXX, <u>as well as CELEBREX</u>, should reflect data showing gastrointestinal safety advantages versus specific comparator NSAIDs studied. ▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇Non-Resp.▇▇▇▇▇

**Q.**    **What did Merck ask the committee for in terms of amendments to their label and did this differ from Pharmacia's request?**

A.    As with Pharmacia, Merck requested label modifications that reflected long-term GI safety data from the VIGOR trial. The requests from the companies reflected differences in study design.

The CLASS study was rigorous and reflected "real world" clinical practice by enrolling both OA and rheumatoid arthritis (RA) patients regardless of age and disease severity and allowing use of low-dose aspirin—a known ulcer-causing agent—for cardioprotection.

On the other hand, VIGOR studied RA patients only and did not allow for prophylactic use of aspirin. Additionally, the primary endpoints and comparators in each trial were different.

2

Confidential - Subject To Protective Order                                                    DEFS 00754327

**Q.**  **How will the FDA Arthritis Advisory Committee's discussions affect the promotion of CELEBREX?**

**A.**  Nothing has changed in our promotion due to the advisory committee meeting. Discussions with media and customers should reinforce that CELEBREX is as effective as NSAIDs with significantly improved GI safety and tolerability. Previous studies comparing CELEBREX to traditional NSAIDs in approximately 20,000 patients, post-marketing surveillance in more than 12 million patients and nearly 2 million patient years of exposure have demonstrated that CELEBREX is effective, well-tolerated and offers an excellent GI safety profile.

**Q.**  **What is Pharmacia's reaction to the Advisory Committee's recommendation?**

**A.**  We believe that the data from CLASS present a compelling case that warrants inclusion of the CLASS data in the CELEBREX label.

The recommendation from the committee is an important part of the on-going process of review that the FDA Advisory Committee will take into account when considering changes to the CELEBREX label in the U.S.

**CLASS Q&A:**

**Q.**  **How was CLASS designed to replicate "real world" clinical practice?**

**A.**  Celecoxib Long-Term Arthritis Safety Study (CLASS) was designed as a "real world" study to replicate everyday clinical practice by prospectively studying 8,000 patients regardless of age, disease severity or prophylactic aspirin use—a known ulcer-causing agent.

**Q.**  **What are the key implications for CLASS?**

**A.**  CELEBREX® (celecoxib capsules), at four times the recommended OA dose, was effective and showed significantly fewer symptomatic ulcers and ulcer complications than the NSAIDs studied (ibuprofen and diclofenac combined) as well as ibuprofen alone, one of the most commonly prescribed and well tolerated traditional NSAIDs.

CELEBREX-treated patients experienced significantly less GI blood loss as compared to the NSAIDs studied, regardless of aspirin use, a known ulcer-causing agent.


Non-Resp.

3

Confidential - Subject To Protective Order

DEFS 00754328

**Q.      Does CELEBREX offer any safety advantages for patients taking aspirin?**

A.      Aspirin is a known ulcer-causing agent, and as such did increase the rate of symptomatic ulcers and ulcer complications in CELEBEX and ibuprofen patients. Regardless of aspirin use, CELEBREX-treated patients experienced significantly fewer symptomatic ulcers and ulcer complications, less GI blood loss and fewer effects on the kidney such as hypertension and edema as compared to ibuprofen.

**Q.      Should the CLASS results apply to other COX-2 inhibitors like VIOXX?**

A.      No.  Results from CLASS are exclusive to CELEBREX and cannot be generalized to VIOXX because of the differences in study design and in the clinical profiles of each drug.

**Q.      Why did more patients taking diclofenac withdraw from the study than patients taking CELEBREX?**

A.      In CLASS, significantly more patients taking diclofenac withdrew from the study due to a GI adverse event than did patients taking CELEBREX. Although statistically significant comparisons between CELEBREX and diclofenac could not be determined, this finding suggests that patients are more likely to continue with chronic CELEBREX treatment than chronic treatment with diclofenac because they find it more tolerable.

# # #

4

Confidential - Subject To Protective Order

DEFS 00754329

| BEGNO | ENDNO | DATETIME | DOCDATE | AUTHORNAME | CUSTODIAN |
|---|---|---|---|---|---|
| DEFS 00754326 | DEFS 00754329 | | 03/12/2001 | Greg Lugliani | Geis, Steve |

# EXHIBIT 169

*Q4 2000*

**Pharmacia Corporation**
**Moderator: Hakan Astrom**
**February 12, 2001**
**11:00 a.m. EST**

**OPERATOR:** Good morning, ladies and gentlemen, and welcome to the Pharmacia fourth quarter earnings release teleconference. All participants are on a listen-only mode and the floor will be open for questions and comments following the presentation.

It is now my pleasure to turn the floor over to your host, Senior Vice President Strategy and Corporate Affairs, Mr. Hakan Astrom. Sir, the floor is yours.

**HAKAN ASTROM, SVP STRATEGY/CORPORATE AFFAIRS, PHARMACIA CORP.:** Thank you, operator. Hello, and welcome to our fourth quarter conference call, and thank you for joining us today. Today, for the first time, we are also webcasting this conference call, and this can be accessed at our web site, www.pharmacia.com.

Before proceeding, counsel has asked that I refer you to the final page of the release for information regarding any forward-looking statements made during this call.

Joining me this morning for the call here in our Peapack headquarters are Fred Hassan, CEO; Chris Coughlin, our Chief Financial Officer; and Carrie Cox, President of Global Business Management. I'll now turn the call over to Fred Hassan for opening remarks.

**FRED HASSAN, CHIEF EXECUTIVE OFFICER, PHARMACIA CORP.:** Thank you, Hakan, and good morning, everyone. It's a real pleasure today to be reporting on an exceptional first year for Pharmacia Corporation. This was a year of transformation, providing a solid foundation for long-term growth. It was just over 13 months ago that we announced the creation of this new company.

At that time, you'll recall that we promised a lot. We predicted that our merger would create a new, top-tier competitor delivering top-tier growth. As you know, it took some time for our conviction to be shared. We worked very hard to gain the trust of our investors. So it's very satisfying for me to report that during 2000, we achieved our goal. We kept our promise. We rewarded the trust of our shareowners. We delivered a 72 percent increase in our share price during 2000. This ranks us first among the big pharmas.

As you'll see from this morning's release, we've delivered 31 percent growth in EPS for 2000. That growth puts us at the top of the big pharma league. In the fourth quarter, we delivered 33 percent EPS growth. This puts us ahead of all of our piers for the quarter. The fourth quarter performance also continued the robust growth we achieved in each quarter of 2000 while we carried out one of the fastest global mergers on record. We are particularly pleased that our EPS growth was driven by double-digit sales growth for the corporation overall.

L:\CCOXPRES\2001\Cox\Investor Materials\Analyst Calls\02 12 2001 -\Final Transcript\021201final.doc

Confidential - Subject To Protective Order

DEFS 01221420

PLAINTIFF'S EXHIBIT 401 HASSAN DAC 2/20/11

As we had planned, the main engine of our sales growth was our human prescription pharmaceuticals business, which grew by 17 percent for the year, led by very strong 26 percent increase in the United States. We now get 56 percent of our Rx sales from the U.S. This is right in line with our strategic goal.

Meantime, our Ag business was also the leader in its peer group. In the face of a very difficult environment in 2000, Monsanto recorded seven percent sales growth for the fourth quarter and five percent growth for the full year, well ahead of its closest competitors.

As you will recall, when we first announced our merger, there was considerable pressure on the Ag business. In response, management of Pharmacia and Monsanto have taken actions to resize the Ag business and refocus our Ag R&D around four key crops. I'm pleased to report these actions have put the Ag business on a strong financial footing.

So we feel we can be very pleased with the growth story of Pharmacia in 2000. Even more importantly, however, we believe that we've built a very strong foundation for long-term strength and long-term growth. As you know, most mergers fail. Of those that survive, many do not deliver on their promise. By contrast, the long-term picture for Pharmacia is very exciting. We have put together two smaller companies and created a global powerhouse. As we promised at the time of the merger announcement, one plus one truly does equal more than two at Pharmacia.

Over the past year, we have swiftly integrated our pharmaceutical business into one strong global operation. Our successful limited IPO of the Ag business last fall reflects the teamwork and execution focus of our management group. We are very pleased that we're beginning to see the value upgrades we anticipated in the Monsanto business at the time of the merger. This is visible in Monsanto's share price, which has appreciated by more than 50 percent since the IPO in October. Exceptional teamwork across the organization has kept our registrations and filings on track. Our R&D organization is functioning well, and we're seeing a good product flow picture.

I would like to emphasize something very special about Pharmacia's profile. We have an unusual dual strength. We have a top-tier exclusivity profile on all of our long-term growth products, and we also have a top-tier freshness index; that is, a percentage of our important products that have been on the market for less than 10 years. This is a unique advantage for Pharmacia going forward.

As you know, we have filed parecoxib, our injectable pain medication. We continue to feel very comfortable with the profile of parecoxib. It's another demonstration of the exceptional strength of our COX-2 platform. And valdecoxib is right on track.

This quarter, we're continuing the successful rollout of our revolutionary hospital antibiotic, Zyvox, with our first European launch in the U.K. We're also very pleased with the approval of Detrol LA in the U.S. Detrol LA is our once-daily treatment for overactive bladder, and it will further enhance our leadership in this area.

Confidential - Subject To Protective Order

DEFS 01221421

I would like to take just a moment to comment on some recent developments regarding Celebrex. We had an interesting two days last week when the U.S. Food and Drug Administration advisory committee, the arthritis advisory committee, met to review the request to remove the classical, non-steroidal anti-inflammatory drug warning from the Celebrex and Vioxx labels. At the end of the two days, the committee did not accept that the warnings should be removed, but it did recommend that the additional positive safety data versus older products, such as ibuprofen, be added to the labels for both products.

We also noted that the committee took the position that our competitor's product should have data on potential cardiovascular side effects included in their labeling. There was no such action regarding Celebrex. As many of you have seen, there were early incorrect reports from the committee hearings suggesting that they gave an advantage to our competitor's product. However, we're pleased to see that recent reports by many of you on the line are beginning to present a fuller picture. As those reports suggest, we feel very good about the hearing and we can also feel very good about the competitive position of Celebrex in the COX-2 marketplace.

We now look forward to working with the FDA on an improved label for Celebrex, and we feel confident that Celebrex will now grow into an even bigger and more important treatment for patients and physicians around the world. As you know, not long ago, many people were predicting that the sales leadership held by Celebrex over our competition would be eliminated, and even that we would be overtaken in the United States. We're pleased to prove that that prediction was not accurate. Over the past month, we have retained our leadership in the COX-2 market.

Now we're also focusing on Europe. One of the key benefits we saw in our merger was the opportunity to create a very strong competitor outside the U.S. by combining our Searle and Pharmacia and Upjohn teams. We're glad to see this happening. Although we entered the COX-2 arena later than our competition in Europe, in market after market we're now overtaking our competition. We expect that momentum to continue.

This growth of Celebrex reflects the long-term strength we're building within the Pharmacia organization. We are creating a distinctive culture at Pharmacia - a culture that I believe will give us a real competitive advantage for the long run. We are creating a highly collaborative way of working in teams across units and geography. We're intent on making this dynamic, collaborative, trust-based approach a hallmark of our relations with our customers and other stakeholders. This way of working is driving our success in the U.S. and our core markets. It's what makes me personally so excited about our long-term prospects.

Finally, let me comment on our outlook for 2001. As we've said many times before, we remain committed to our goal of 20 percent annual compounded earnings growth from '99 through 2002. This remains our goal for 2001, despite the much more challenging environments that we face.

One very important external factor will be the U.S. political and policy situation over the coming year. It will be essential that our industry build a much better understanding of the enormous value of pharmaceuticals to society and to individuals. We must also build public understanding

Confidential - Subject To Protective Order                                                      DEFS 01221422

of the importance of sustaining pharmaceutical innovation. In particular, we must ensure an understanding that price controls would deeply undermine this innovation.

To achieve these goals, we in the pharmaceutical industry must visibly take an active role in resolving some of the key issues surrounding health care access. That includes, as a top priority, securing drug coverage for seniors in the U.S. who currently lack such coverage. We must help build a consensus that the issue is not drug prices. The real issue is coverage.

So we're cautiously hopeful that our industry will be able to work with the new administration and the new Congress to achieve drug coverage for all seniors while preserving the free market system in the U.S. that sustains innovation. I personally will be devoting substantial time to this effort because I believe it's a key to delivering on the exciting promise of our industry – that is, to create a new golden age of health and wellness in the coming decade.

And now I'll turn over the call to Chris Coughlin, our CFO – Chris.

**CHRISTOPHER COUGHLIN, EVP/CFO, PHARMACIA CORP.**: Thank you, Fred. As I discuss our performance for the fourth quarter and for the year, I will be referring, as usual, to our results on an adjusted basis. This adjusted basis provides more clarity on our operating results as it excludes items like restructuring, merger-related costs, and the impacts of accounting changes.

As you have heard, Pharmacia finished the year with a strong quarter in both its pharmaceutical business and its Monsanto Ag business. Our 33 percent growth in net income for the year has been driven by three main factors - sales growth of our prescription medicines business, synergies from the merger, and cost reduction initiatives at Monsanto.

Looking at our fourth quarter results, the sales increase of eight percent was negatively impacted by foreign exchange of five percent. In local currency, our prescription business continued its strong growth at 16 percent. Our U.S. prescription product sales grew 20 percent. For the full year, our prescription medicine sales grew 17 percent in U.S. dollars and 20 percent excluding the negative impact of foreign exchange, well in line with our aggressive merger targets. For the quarter, our earnings before interest and tax, or EBIT, grew 32 percent, and our earnings before tax grew 44 percent over last year. This increase in earnings before tax reflects reduced debt levels from a year ago.

Our earnings per share grew 33 percent for the quarter and 31 percent for the full year. While all quarters of 2000 will have to be restated to reflect the impact of changes in revenue recognition within our Monsanto Ag business, this accounting change due to SAB 101 has no impact - again, it has no impact - on our full-year EPS of $1.45. The change only impacts individual quarters. We will issue fully restated P&Ls for the four quarters of 2000 later this month.

Our fourth quarter performance continued to reflect an improved profit margin picture for the company. Our pharmaceutical gross margin improved 200 basis points to 78.7 percent, offsetting gross margin declines in Monsanto. Our total company EBIT margin improved by 2.5

Confidential - Subject To Protective Order

DEFS 01221423

percentage points to 13.8 percent in the quarter, while for the full year the company improved its EBIT margin by 200 basis points to 16.3 percent.

Our Monsanto business had an EBIT of $46 million in the quarter versus a loss a year ago. This reflects impact of our cost-containment efforts as well as the termination of certain research and development projects done earlier this year.

I will also point out that our pharmaceutical EBIT growth in the fourth quarter of 14 percent was impacted by a milestone payment included in the fourth quarter of 1999. Excluding that milestone, our pharmaceutical EBIT grew 22 percent in the fourth quarter of 2000. As noted in the release, aggregate merger and restructuring charges totaled $327 million in the quarter and $1.2 billion for the full year.

I am pleased to say we are well ahead of our merger plan, both in terms of timing and in cost savings. We are confident that when completed, we will be well within our estimated costs of $2 to $2.5 billion, while exceeding our cost-reduction targets. In fact, for the year 2000, we realized pretax savings from our merger of $290 million, more than double our original estimate. In addition, restructuring activities in our Monsanto business generated an additional savings of more than $80 million.

I would also like to highlight that we are well ahead of our debt reduction targets. You will recall, at the time of the merger, we established a target to reduce our net debt from $6.5 billion at the end of 1999 to $4.5 billion at the end of 2000. This target did not include any anticipated proceeds from the Monsanto IPO. As of December 31, 2000, our net debt was $3.2 billion, which includes the impact of approximately $700 million in IPO proceeds. So you can see, we beat our target by $600 million.

Looking forward to 2001, we expect another year of significant growth. Sales growth should continue at the double-digit level in our pharmaceutical business, led by our Rx business, which will continue to grow faster than our overall pharma business. We anticipate that the top-line growth of the Ag business in 2001 will be in line with its 2000 growth rate. We anticipate an improved environment for product approvals from Monsanto, which will improve our sales growth prospects post-2001.

On the earnings front, we again look for a very strong growth from Pharmacia in 2001. We anticipate that our earnings from continuing operations - that is, before the minority interest of our Monsanto business - will grow in excess of 20 percent. We also expect that our 2001 earnings per share, including the dilutive impact of the minority interest in Monsanto, will grow in the range of 20 percent. This aggressive growth outlook is right in line with our merger plan.

I should also point out that, in both 1999 and 2000, Pharmacia's pretax earnings included approximately $145 million of income recognized from partnership payments on COX-2 collaborations. These collaboration payments were not impacted by the new SAB101 guidelines. It should also be noted that these COX-2 collaboration payments will not repeat in 2001 or

Confidential - Subject To Protective Order

thereafter. So if you exclude these payments from our 2000 base, we would estimate our consolidated income will grow in the range of 25 to 30 percent in 2001.

2001 will also be the last full year of our U.S. marketing agreement with Sanofi-Synthelabo for Ambien. The profit split on this business reduces from 60 percent to Pharmacia in 2000 to 53 percent in 2001. In April 2002, Sanofi-Synthelabo will regain its full rights to Ambien and will make a final settlement payment to Pharmacia. Our income in 2002 from Ambien will actually increase due to this final settlement. Pharmacia will continue reporting 100 percent of sales through this year and the first quarter of next year. The Sanofi portion of the profit will continue to be reported as an expense in other income and expense. There will be no income reported from this product after 2002.

In anticipation of losing the full-year sales and earnings from Ambien in 2003, it is our intention to continue to aggressively pursue licensing and product acquisition opportunities. As you know, these investments may require up-front payments that are not included in our current earnings guidance.

In summary, we are pleased with our outstanding 2000 results, the rapid execution of our merger, and the integration of our new organization. These actions position us very well for future growth. We therefore continue to be confident in our ability to meet our aggressive target of 20 percent compound annual growth rate in earnings through 2002.

Now let me turn the discussion over to Carrie Cox for more details about our pharmaceutical business.

**CARRIE COX, PRESIDENT, GLOBAL BUSINESS MANAGEMENT, PHARMACIA CORP.:** Thank you, and good morning.

As you've heard, Pharmacia has had an exception year. Our total commercial Rx sales increased 17 percent over last year to $10.8 billion. The fundamentals of our global Rx business remain strong, with significant growth by our top products - Celebrex, Xalatan, Ambien, Detrol, Camptosar, and Zyvox. Fourth quarter sales of these six products amounted to $1.4 billion, a 40 percent increase over the fourth quarter last year, and annual sales were $4.9 billion, a 58 percent increase over 1999. Our five long-term growth drivers - Celebrex, Xalatan, Detrol, Camptosar, and Zyvox - comprised 42 percent of prescription pharmaceutical sales compared to only 32 percent a year ago.

Global sales of Celebrex for the quarter totaled $772 million, up 55 percent over the same period last year. For the year, Celebrex reported sales of $2.6 billion, about a half-billion dollars ahead of its closest competitor; a spread that has been maintained consistently since the merger, reflecting the strength of the new Pharmacia.

Celebrex continued its strong growth as the world's best-selling prescription arthritis drug, also now coming on strong in Europe. Celebrex is the best choice for arthritis patients because it is

L:\COXPRES\2001\Cox\Investor Materials\Analyst Calls\02 12 2001 -\Final Transcript\021201\final.doc

Confidential - Subject To Protective Order

DEFS 01221425

effective and better tolerated, with fewer long-term safety trade-offs, than either traditional NSAIDs or Vioxx.

I'd also like to add some context to the recent FDA advisory committee discussions around the Celebrex outcomes trial data. Our goal is to have the data included in the label, and we believe FDA will support that as the committee did.

Celebrex was proven safer than older NSAIDs in its NDA trials, through endoscopy measures, and now again in long-term clinical use. Patients who took even four times the normal dose of Celebrex still have two- to threefold fewer serious gastrointestinal complications compared to those receiving standard doses of traditional NSAIDs. Celebrex met the same end points as Vioxx did against the older NSAIDs, ████████████████████ Non-Resp. ████████████ ████████ Non-Resp. ██████████

Celebrex represents a major advance in the treatment of arthritis. It can be used without unnecessary concern in older patients, and can be used appropriately in the more than 40 percent of arthritis patients who also have hypertension. We are quite confident in our product, our data, and in the future. And if there's any further questions about the data I actually might refer you to the publication of the long-term outcomes data in the September of *JAMA* or the pivotal NDA trial against Naproxen, which was also published in *JAMA* in November of '99.

We're delighted with the excellent progress and momentum of Celebrex in Europe. Despite almost a year's head start for Vioxx in many markets, our recent launches have propelled Celebrex to be the number one coxib product in France, Italy, and Spain in sales and units after only three months on the market. In fact, Celebrex is setting a trajectory that already makes it one of the most successful launches ever in the French market. We believe we have delivered the anticipated positive impact of our merger on the performance of Celebrex in Europe.

We're very optimistic about the long-term potential for Celebrex in Europe as we focus on penetration into the NSAID market. The most important growth opportunity for both Europe and the U.S. is to gain and hold market share of the coxib segment while converting the NSAID market.

Turning to the U.S., Celebrex sales increased by 35 percent to $597 million for the quarter. For the year, Celebrex U.S. sales totaled $2.2 billion, up 63 percent. In the U.S., Celebrex is the clear sales leader, and during the past quarter we have significantly slowed Vioxx growth. Our goal now is to maintain our sales leadership position while expanding the use of Celebrex due to its significant benefits over the older, non-selective NSAIDs.

In December, the coxibs accounted for less than half of the total prescriptions in the anti-arthritis and pain market in the U.S., and we believe there's tremendous potential to grow market share by increasing awareness of the distinct benefits of Celebrex versus the traditional, non-selective NSAIDs. Our goal over the next several years is to focus on growing the coxib segment to approximately two-thirds of the total market.

Confidential - Subject To Protective Order                                                    DEFS 01221426

With Celebrex, we were first to introduce this major innovation and we will also be the first to market with another significant advance, a second-generation coxib drug and the first and only injectable parecoxib. Recently presented safety and efficacy data on parecoxib showed it to be superior to morphine four milligrams, with comparable efficacy in longer duration of action compared to the recommended dose of the injectable NSAID cotorolac. Parecoxib does not seem to show the usual injectable analgesic side effects such as respiratory depression, increased bleeding, or CNS toxicity.

The launch of parecoxib will allow us to expand our coxib franchise into a new and under served market, and will complement Celebrex without competing with it.

As Fred mentioned, our second-generation oral product valdecoxib also remains on track.

Xalatan, our growth driver for the treatment of glaucoma continued to perform extremely well in the fourth quarter. It remains the world's top selling branded prescription glaucoma product, with more than 50 million prescriptions written to date. It is currently the most effective product on the market for lowering IOP, requiring only one drop once a day.

Worldwide sales of Xalatan for the fourth quarter were $196 million, an increase of 23 percent over the fourth quarter last year. Annual sales totaled $693 million, a 37 percent increase over 1999. Xalatan's value share has grown to 32 percent globally and to 36 percent in the U.S., where it is by far the number one branded glaucoma treatment, outselling all forms of timolol and exceeding Alphagan sales by a two to one margin. During 2000, Xalatan in the U.S. grew faster than at any time since its initial launch, gaining four total prescription market share points during the year. In 2001 Xalatan may come under increased competitive pressure, but we plan to vigorously defend our intellectual property in this very important area.

Xalatan's growth in Japan has been particularly impressive. In that market, Xalatan has captured the number one spot from timolol in just 21 months and has overtaken the beta blocker medications, the traditional standard, to capture a 25 percent market share, selling more than $100 million in the year 2000.

Xalcom, our new combination product for glaucoma patients who require more aggressive therapy, was approved in Sweden on December 18th. European launches we hope will begin this fall, upon completion of Mutual Recognition. And we continue to work with FDA towards obtaining U.S. approval for Xalcom.

Detrol/Detrusitol, the world's leading brand for overactive bladder achieved global fourth quarter sales of $113 million, a 21 percent increase over the same quarter a year ago. Worldwide sales for the year total $432 million, a 31 percent increase over 1999. And we're pleased to note that sales for the full year in Europe approached the $100 million mark.

Detrol sales in the U.S. totaled $84 million for the quarter, up 20 percent over Q4 1999, and annual U.S. sales were $324 million, up 27 percent over last year. Detrol continues to grow faster than the market in the U.S. in both new prescriptions and total prescriptions, with fourth

Confidential - Subject To Protective Order

quarter new Rx growth up two share points over the same period last year. This is almost double the market growth rate of five percent.

With the December approval of Detrol LA, our new once-daily sustained release product for overactive bladder, the best product on the market just got better. Detrol LA is not just a line extension of Detrol, but a new brand with an improved clinical profile that is superior to the competition. Detrol LA improves the efficacy of the immediate release form by 18 percent and further reduced the incidence of dry mouth by an additional 23 percent.

In terms of overall adverse events, results in patients receiving Detrol LA and placebo were comparable. In addition, Detrol LA offers the convenience of once a day dosing. Detrol LA was launched in the U.S. last month and had no impact on fourth quarter sales. We're pleased to report that, in only three weeks on the market, Detrol LA has already captured a nine percent share of new prescriptions, boosting our share of the OAB market to over 50 percent. We expect Detrol LA to accelerate our already strong growth rates. European launches are expected in the second half of this year.

Turning to our next growth driver, Camptosar, the new gold standard for the treatment of colorectal cancer, fourth quarter sales were up 40 percent over the same period last year to $116 million. Sales for the year totaled $441 million, a 50 percent increase over 1999. Colorectal cancer remains the second leading cause of cancer death, with an estimated 130,000 new cases each year in the U.S. alone. The treatment for first-line colorectal cancer for which we received FDA approval in April currently is providing the main growth for Camptosar. Camptosar penetration into the pool of first-line patients is already over 50 percent. The drug is also being actively studied in the adjuvant setting as a treatment for earlier stage colorectal cancer immediately following surgery.

The presentation of Camptosar phase three data from Japan has created a growing awareness and interest in the use of the drug in treating small cell lung cancer as a second line therapy. Global clinical trials are underway, and preliminary results have been very encouraging. Camptosar is the star in our oncology franchise and represents the kind of growth and momentum we plan to bring to field of oncology in coming years. We call ourselves the "New Oncology Challenger", and plan to be a major force in oncology.

Zyvox, our revolutionary new antibiotic for the treatment of a wide range of significant Gram-positive infections, also continued to perform well and above the standard for most new hospital products. Sales for the eight months since its launch totaled $48 million, including $18 million in the fourth quarter. It appears that Zyvox is being used appropriately, but early in treatment of seriously ill patients. To date, about 30,000 patients have been treated with Zyvox, and the majority were treated in hospitals while many were able to go home and continue treatment on an outpatient basis. Zyvox offers both IV and oral formulations so it provides an opportunity for early discharge from the hospital.

Seven more countries approved Zyvox in the fourth quarter, including the U.K., which is the Reference Member in the European Union. The launch in the U.K. is now taking place with

L:\CCOXPRES\2001\Cox\Investor Materials\Analyst Calls\02 12 2001 -\Final Transcript\021201final.doc

Confidential - Subject To Protective Order

good pre-marketing and thought-leader support to position Zyvox for appropriate, but not restricted use. We expect to roll out Zyvox in the EU later this year following the Mutual Recognition Process. Singapore, Brazil, and Chile have also approved the product.

Another recent development you should be aware of is the filing of an NDA for Somavert, a growth hormone receptor antagonist for the treatment of a rare condition called acromegaly, or gigantism, filed by Sensus Drug Development Corporation. There are about 40,000 patients in the U.S., Europe, and Japan suffering from acromegaly. The FDA has granted Somavert Orphan Drug Status and designated it for priority review. Somavert represents an attractive opportunity for us and is a very good strategic fit with our existing Genotropin business.

To sum up, we are very pleased with our results in 2000 and with the progress we've made since our merger. Overall, we believe we are one of the few large pharmaceutical companies to maintain robust growth throughout the merger and integration process, and to actually increase market share. Pharmacia has now moved up two positions and ranks ninth in the U.S. in the pharmaceutical sales volume, up from 11th a year ago. As you know, we have met our goal set at the time of the merger to become one of the top 10 companies in our industry.

I'd like now to turn the call over to Hakan Astrom, who will lead our Q&A segment – Hakan.

**HAKAN ASTROM**: Thank you, Carrie. For the Q&A session, we are joined on line by Dr. Phil Needleman, Chairman of R&D. Operator, we can now start to take the questions, please.

OPERATOR: Thank you. The floor is now open for questions and comments. If you do have a question or a comment, please press the numbers one, followed by four on your touch-tone telephone at this time. If at any point your question has been answered, you may remove yourself from queue by pressing the pound key. Questions will be taken in the order received. We do encourage all participants to please utilize their handset for optimum sound quality.

Please hold as we poll for questions.

Our first question is coming from Mario Corso of ABN AMRO. Please go ahead, sir.

**MARIO CORSO, ABN AMRO**: Yes. Good afternoon. On the third quarter conference call, an earnings range of $1.75 to $1.80 was given for this year. Can you confirm if that's still the expectation, or if there's deviance from that? And Celebrex was very strong in the fourth quarter internationally. Is that a reasonable run-rate for the product as we head into 2001? Thank you.

**HAKAN ASTROM**: Chris will take the first question. Can you repeat the second question, please?

**MARIO CORSO**: Celebrex sales were very strong internationally in the fourth quarter, and I was wondering if this is a reasonable run-rate for 2001?

L:\CCOXPRES\2001\Cox\Investor Materials\Analyst Calls\02 12 2001 -\Final Transcript\021201 final.doc

Confidential - Subject To Protective Order                                                      DEFS 01221429

**CHRISTOPHER COUGHLIN:** Let me take the first question regarding guidance. I don't recall that we gave a specific range, but we gave a growth rate. And let me say that our guidance has not changed and it's consistent with our prior discussions. As you know, we have said consistently that our goal is a 20 percent compound annual growth target for earnings. We exceeded that, obviously, in 2000 with a growth rate of over 30 percent. So in 2001, we anticipate our earnings growth will be in excess of 20 percent. The dilutive impact of our Ag IPO and the increase in the number of shares will reduce our EPS growth rate below the income growth rate.

As I indicated, we had income from collaboration payments of some $145 million in each of the last two years. Therefore, the base business earnings must increase by over 25 percent to meet these aggressive targets. We're also watching the yen quite closely, as it has weakened over the past few months. We're on track, and we'll be supplying more information in the next couple of weeks which should continue to help tighten this guidance going forward.

**HAKAN ASTROM:** Carrie take the second question.

**CARRIE COX:** We are delighted with the momentum that we're building with Celebrex sales in Europe, and are making significant penetration into some of the top markets. In terms of market share now, we are beginning to hold a significant position. I think what you'll see going forward is less ongoing growth in market share, because we've done extremely well, but more of an expansion of the coxib segment of the overall arthritis market.

We'll hold a strong leadership position, which we believe will continue to grow in Europe, but the future really is going to be in converting the older NSAID business across Europe into Celebrex business.

**HAKAN ASTROM:** Thank you, Carrie. We can take the next question, please.

**OPERATOR:** Our next question is coming from Jami Rubin of Morgan Stanley Dean Witter. Please go ahead.

**JAMI RUBIN, MORGAN STANLEY DEAN WITTER:** Thank you. I actually have two questions for Carrie. Carrie, the first question is on Celebrex. If the FDA does allow you to add the additional CLASS safety data in the label, what does that mean in terms of marketing? What can you additionally say in your marketing pitches that you can't say already? My understanding is that this is already in the public domain and you're already utilizing the CLASS data for your marketing pitches.

The second question has to do with the outlook for Xalatan. If Lumigan gets first-line therapy, what does that mean for the outlook of Xalatan? Thanks.

**CARRIE COX:** In terms of the situation for Celebrex moving forward, the *JAMA* paper, as I mentioned, was published in September, and that contains the results from the long-term outcomes studies. I think we've had a lot of benefit in the marketplace of being able to use the

Confidential - Subject To Protective Order

data.  Going forward, the labeling changes are yet to be enacted, so I think it's not appropriate to predict what that might entail.  But we do have access to the data and have had for some period of time.

If we look at the Lumigan and Xalatan situations in the future, that's another one where I think the strength of the performance of Xalatan has become very well established in the market.  You might recall that, in the U.S., we see over 40 percent of the use of the product is in early disease as monotherapy.  It is very well established as an early agent in appropriate patients.  I think that there's nothing that can replace that kind of hands-on experience that the doctors have and that patients have.

As you know, we hope to bring Xalcom forward in the future, and that will continue to expand the franchise as we have an even greater use of Xalatan in combination segments of the market.  I think we remain in a very strong leadership position with Xalatan.

**HAKAN ASTROM:**  Thank you, Carrie.  Is that OK, Jami?

**JAMI RUBIN:**  Oh, yeah.  Thank you very much.

**HAKAN ASTROM:**  Next question, please.

**OPERATOR:**  Thank you.  Our next question is coming from Mark Striker of Salomon Smith Barney.  Please go ahead, sir.

**MARK STRIKER, SALOMON SMITH BARNEY:**  Hi.  Thank you.  I had two questions on Xalatan.  Could you comment a little bit more on your status with the FDA for Xalcom?  I see you've gotten the approval in Sweden, which was good news, but you have two approvable letters in the U.S.  Will the FDA require more studies there?

Could you also talk a little bit more about your patent – I think it's the Columbia University patent?  Do you think that can actually block some of your future competitors from the market in the class?  Thank you.

**HAKAN ASTROM:**  Carrie.

**CARRIE COX:**  The Xalcom approvable letter, as you said, has been received from FDA and at this point we do not believe there are additional studies required, but we continue to have discussions with FDA towards approval.  And in terms of Xalatan, we remain quite confident in our intellectual property, and as I said, we're going to defend it pretty vigorously.

**HAKAN ASTROM:**  Thanks, Carrie.  Could we take the next question, please?

**OPERATOR:**  Thank you.  Our next question is coming from Steve Tighe of Merrill Lynch.  Please go ahead, sir.

Confidential - Subject To Protective Order

DEFS 01221431

**STEVE TIGHE, MERRILL LYNCH:** Good morning. I don't want to beat a dead horse, but I just want to make sure that I understand this clearly. In the third quarter press release, it says the company expects EPS to grow 20 percent to 25 percent. In today's press release, it says earnings per share expected to grow approximately 20 percent. Am I supposed to interpret this as nothing more than a change in language, but the same exact outlook that you had in the third quarter?

Moving on to my next question. It looks like there was approximately $80 million in wholesaler stocking for Celebrex in the fourth quarter. I think we were looking at something like $40 to $50 million in the third quarter. Does that add up cumulatively to about $120 million? When do you expect this to come out of the channel. Thank you.

**HAKAN ASTROM:** This question is for Chris.

**CHRISTOPHER COUGHLIN:** OK. You may have to repeat the second part of that, Steve. In terms of the guidance, what we're trying to do right now is tighten the guidance a little bit. So our guidance has not changed from what it has been in the past. It's very similar. And again, we're looking out a year, with things like foreign exchange and other non-controllable factors. We're still in that range, and we're still in the range that we put out at the time of the merger. I think as you get more information in the next week or so it will help people with the guidance going forward.

I'm sorry, I missed the second part of your question, Steve.

**STEVE TIGHE:** It looks like there was approximately $80 million in Celebrex wholesaler stocking in the fourth quarter. And I think we were estimating something like $40 to $50 million in the third quarter. Do you now have a cumulative stocking issue of around $120 million, or is my math wrong on Celebrex? When can we expect that to come back out of the trade?

It seems to me you probably want to get your inventories down to a more normalized level, so that's got to come back out at some point in time.

**CHRISTOPHER COUGHLIN:** Steve, I think your math is probably pretty close. I mean, I think that we would estimate that across our product lines, we have about $100 million of inventory in the pipeline. We'll see much of that come out in the first quarter. We've explained the reasons why, in both the third and the fourth quarter, there were some pipeline issues. We see a fair amount of that coming out in the first quarter.

**STEVE TIGHE:** Thanks, Chris.

**HAKAN ASTROM:** Next question, please.

**OPERATOR:** Our next question is coming from Barbara Ryan of Deutsche Bank. Please go ahead.

Confidential - Subject To Protective Order                                          DEFS 01221432

**BARBARA RYAN, DEUTSCHE BANK:**  Good morning.  My question is for Carrie.  If we can go back to the Celebrex review, having listened to that review in painful detail during the two days, I guess I'm a little confused by your statement.  One thing that was discussed, I guess broadly, both days in relation to both studies was that the committee felt that there was an increased trend towards cardiovascular events, which in their view, was equal in size to the trend towards improved GI safety.  There was also a discussion that neither study was obviously powered or designed to detect any cardiovascular outcomes.  Therefore, the committee felt that they couldn't say.

The committee seemed to agree on language which said that these drugs are not cardio-protective.  Therefore, patients at risk for cardiovascular events should be on aspirin, and that aspirin may in fact offset the GI benefits.

Additionally, the committee did discuss, on Thursday afternoon, that Celebrex was better than ibuprofen, but not better than diclofenac.  I'm just wondering how you square those statements with the statements you're making relative to Vioxx and cardiovascular risk.  I didn't detect any distinction by the committee, at least, it was a COX-2 issue in their opinion.

**HAKAN ASTROM:**  Barbara, I would like Dr. Needleman to respond to this question and if there's anything to add from Carrie, we can see after that.  Phil, can you take this question?

Have we lost Phil from the line?

**DR. PHIL NEEDLEMAN:**  Hello?  Have you got me?

**HAKAN ASTROM:**  Yes, we can hear you now.

**DR. NEEDLEMAN:**  Hi.  I certainly agree about the painful part, to sit there for two days.

Let's go in order.  What the committee said about cardiovascular events, and also what they said about GI safety improvement, is that the data warrants inclusion.  They gave guidance to the FDA that the data warrants inclusion in the label.  If you notice the way an advisory committee works, after the FDA reviewed both documents, they gave guidance to the committee in the form of questions.  The Celebrex questions had no cardiovascular issues or events.  There was no cardiovascular signal at all, so their questions related to GI.  On the second day, questions for Vioxx were largely around the GI events and cardiovascular and thrombotic issues.  In fact, there was no signal, no change of signal, nor issue raised by the FDA even in their presentation to the committee that Celebrex has cardiovascular or thrombotic events.  The concern of the committee was those that were reported in the Vioxx presentation and they wanted that complete picture to have balance of GI versus cardiovascular.

**BARBARA RYAN:**  On the second day, didn't they also put together a separate discussion which was on COX-2s and this cardiovascular issue?

Confidential - Subject To Protective Order    DEFS 01221433

**DR. NEEDLEMAN:** Well, now I'll go to the second part. It is certainly true that COX-2 inhibitors, by design, don't inhibit platelets and are not cardio-protective, so people should still take low-dose aspirin. That was the only commonality. There were no increases in myocardial infarctions or angina or anything else with Celebrex, and so their concern was about the Vioxx side effects. The agency will review both drugs separately. And I would anticipate, in both cases, you'll see the GI safety enhancements and then the change in side effects. In fact...

**BARBARA RYAN:** For both drugs, right?

**DR. NEEDLEMAN:** For both drugs, but both drugs have individual side effects, so they won't be tarred together with one brush.

Now regarding your question about Celebrex and ibuprofen. It is true that Celebrex didn't hit its primary objective, but as the two days went forward, ultimately the committee gave advice that recognizes the GI superiority of Celebrex, even at four times that OA dose. When you take out the influence of aspirin and use the combined end-points, Celebrex beat both of the NSAIDs, and specifically, very strongly beat ibuprofen. It also beat diclofenac on especially in hematocrit/hemoglobin, which reflects lower GI bleeding.

It had improved GI effects, and it also was better in endoscopy in the NDA. In aggregate of all of the side effects, Celebrex was especially strong on ibuprofen and was selectively strong in diclofenac, so we expect all of that to be reflected in the discussions and negotiations to label.

**BARBARA RYAN:** Thanks, Dr. Needleman.

**DR. NEEDLEMAN:** Thank you.

**HAKAN ASTROM:** Thank you, Phil. Operator, we will take two more questions.

**OPERATOR:** Our next question is coming from Norman Fidel of Alliance Capital. Please go ahead, sir.

**NORMAN FIDEL, ALLIANCE CAPITAL:** Yes, thank you. Could I ask you to look at '99, '00, and expectations in '01, and again go over the impact of these milestones and related payments, which I assume are in the Searle wagon, not elsewhere. Can you give us pretax and after-tax impact in '99, '00, and expectations in '01 for these types of items? Thanks.

**CHRISTOPHER COUGHLIN:** Norman, I'll take that. As I've said, in the last two years, there have been collaboration payments that have been included in our income of $145 million in both 1999 and in 2000. Those will not repeat going forward. There are other milestone payments that we talked about. And again, these all relate to Searle and how they have accounted for these things historically. You will see, going forward, some milestone payments that were taken in income back as early as 1996 that, under SAB101, have to be restated going forward. There is a very immaterial impact of that going forward. $145 million in both '99 and 2000 that do not

Confidential - Subject To Protective Order

repeat. You can use sort of an average tax rate, I think, on those of about 35 percent to get a reasonable estimate.

**NORMAN FIDEL**: Thank you.

**HAKAN ASTROM**: Thank you, Chris. The final question, please.

**OPERATOR**: Our final question is coming from Stephen Wickholm of Oris Mason. Please go ahead, sir.

**STEPHEN WICKHOLM, ORIS MASON**: Thank you. I have some questions regarding the sales growth. If you look at that you can see that the sales growth is driven by Celebrex and Ambien, but looking at some of the other rather big products, we can see in the figures that the growth is slowing down. The question is, why? Is it the currency effect, because it may be more important in Europe? In that case, what is your assumption for the 2000 year when it comes to currency, when you're talking about double-digit sales growth.

**HAKAN ASTROM**: Thank you, Stephen. Carrie will answer that question.

**CARRIE COX**: We have suffered the impact of currency fluctuations across the broad base of sales that are in Europe. The actual local currency and unit sales have been very strong, and we are expecting to see that begin to right itself in the second half of this year.

**CHRIS COUGHLIN**: And I will also just comment in terms of how does that impact our guidance going forward. We're confident that, at reasonable levels now of the Euro and the yen, that we will still meet that commitment. Again, we have a much larger percentage of our business coming from the U.S. now, where we continue to expect strong growth. So we're confident in that revenue guidance.

**STEPHEN WICKHOLM**: OK. May I also then ask about Zyvox? How is Zyvox prescribed and used in the hospitals today? Is it used as a last resort product when you cannot treat an infection with something else, or is it used more broadly, as the way you would like to see it be used? As a matter of fact, the sales growth for the product is not that impressive, even if Carrie gave a very positive description of the situation. Is it really living up to your expectations?

**HAKAN ASTROM**: Carrie will answer the question.

**CARRIE COX**: Zyvox is, in fact, developing very well in terms of the sales picture for a hospital product, and that's an important thing to note – that this is a product that is really to be used for seriously ill patients in the hospital. However, within that, we are very pleased that the product is being used appropriately and is not being restricted. It's used as it should be, in hospitalized patients, but used early, and not being held for salvage therapy.

We'd like to continue to see more use in patients who might otherwise get vancomycin, so there's still significant room for growth. The trajectory that's been established in the first eight months

Confidential - Subject To Protective Order

DEFS 01221435

in the U.S. market is very good, and in fact, better than most hospital products where there's typically a much slower uptake. We are launching now in February in the U.K. The label there is fairly strong, and our expectation is that we'll be able to have appropriate use and not have Zyvox saved for salvage use. That is simply not the best way to help patients and maximize the product.

**STEPHEN WICKHOLM:** Thank you very much.

**HAKAN ASTROM:** Thank you, Carrie. And that concludes our Q&A session, and I'll turn the call back over to Fred Hassan for some final remarks.

**FRED HASSAN:** Thank you, Hakan, and thanks to you all of you for the opportunity to respond to your questions. Let me make just a few concluding comments. As we look at our results for 2000, we really feel gratified that we've not only produced exceptional results, we've also done our merger right. We've created a unified motivated organization, and we have a powerful product portfolio and an exciting pipeline of new innovation. We have the strength we need to compete as a top tier player on a global basis. Most importantly of all, we are creating a culture and work processes that we are convinced will give us a competitive edge. We have a unique combination of assets and dynamism in Pharmacia, and we're also uniquely positioned to meet the new challenges our industry will face. Again, thank you for joining us today. Goodbye.

**OPERATOR:** Thank you. This concludes today's teleconference. Have a wonderful day.

Confidential - Subject To Protective Order

# EXHIBIT 170

| From: | Weiner, Ethan |
|---|---|
| Sent: | Monday, August 20, 2001 12:21 PM |
| To: | Shafner, Lori S; Fletcher, Mark P; Gandelman, Mitchell; Kitsis, Elizabeth; Crosbie-Foote, Holly; Gavigan, Michael; Sirota, Eric |
| Cc: | Finman, Jeffrey; Ting, Naitee; Loose, Leland D; Cristo, Stephen; Wahba, Mona M |
| Subject: | RE: JAMA response |
| | |
| Sensitivity: | Confidential |

As stated in my comments, I think the letter should also talk alittle
about process, not just the data.  The process was that six month data
were deemed best due to informative censoring (as expressed).
Therefore, the six month analysis was shared with FDA and others as well
as used for the manuscript.  FDA preferred the 12 month analysis despite
informative sensoring and so that is what was discussed at the advisory
committee.  This does not mean the six month analysis was wrong, as the
authors of the letter to the editor implied.  More importantly, it shows
that we did not use one analysis for publication, another for FDA.  Had
the reviewers for JAMA agreed with FDA regarding 6 and 12 month
analyses, they would have requested the change as well from one to the
other. I think the letter needs to stress this as much as the data.
Right now the response mentions it, but the message I get is "we used
six month in the journal publication and it really isn't different from
the 12 month data FDA used in their analysis".  That's fine for step 1,
but step 2 is that we need also to give the  message "we feel the six
month analysis is more valid. This is the analysis we sent to FDA as
well as was used for the JAMA article.  FDA preferred the 12 month
analysis and we provided it for them.  JAMA stuck with the 6 month
analysis".  Without step 2, the reader will still assume that somehow we
selectively sent one analysis to JAMA and another to FDA and this is NOT
the case.

-----Original Message-----
From: Shafner, Lori S
Sent: Sunday, August 19, 2001 7:59 PM
To: Fletcher, Mark P; Weiner, Ethan; Gandelman, Mitchell; Kitsis,
Elizabeth; Crosbie-Foote, Holly; Gavigan, Michael; Sirota, Eric
Cc: Finman, Jeffrey; Ting, Naitee; Loose, Leland D; Cristo, Stephen;
Wahba, Mona M
Subject: RE: JAMA response
Sensitivity: Confidential


Dear all,

I will leave comments on the technical merits of the response letter to
the experts. However, I would offer the general comment that the tone of
the draft response is a bit harsh/tense and leaves the reader feeling
alienated instead of convinced.

Point #7 should be removed as it is not relevant to the key arguments.

Additionally, the last paragraph should be expanded to specify why Dr.
Wright's comments are inaccurate instead of referring the reader to
transcripts which take days to review.

Lori

-----Original Message-----
From: Fletcher, Mark P

1

PLAINTIFF'S
EXHIBIT NO. 190
FOR IDENTIFICATION
PENGAD 800-631-6989
DATE:          RPTR:

DEFS 03752026

Sent: Friday, August 17, 2001 2:47 PM
To: Weiner, Ethan; Gandelman, Mitchell; Kitsis, Elizabeth;
Crosbie-Foote, Holly; Gavigan, Michael; Sirota, Eric
Cc: Finman, Jeffrey; Ting, Naitee; Loose, Leland D; Cristo, Stephen;
Wahba, Mona M; Shafner, Lori S
Subject: FW: JAMA response
Importance: High
Sensitivity: Confidential


Ethan,Mitch, and Liz

After hearing some indirect rumors from PHA R&D people over the last
week re: a JAMA article issue but them not sharing anything with me (
thought it was related to the Washington Post article last week with
focus on role of Pharma on peer-reviwed manuscripts, etc.)I received a
call from Ken Verburg midday today indicating the following:

PHA had received 2 letters to the editor from JAMA re: concern about the
JAMA CLASS article not correctly or fully representing the data (as
found on the FDA Web site) and asking for corrective action and how this
happended, etc.

PHA R&D has apparently been crafting a response (many drafts- none ever
sent to us or even let me know what was happening until now) and wants
me to review this and OK it by the end of the day today.

Told him that I found this situation very unfortunate and upsetting that
they haven't shared any of this (especially early drafts of responses)
with us until the 11th hour.

Is this one of the issues you have been working on the past few days or
is it another?

Please let me know ASAP and advise one way or the other.  Unless I hear
otherwise, I am going to tell Ken that I cannot agree to sending this in
until Pfizer can review it appropriately- would shoot for EOB by Monday,
but will know better by Monday AM.

Call me at 203-291-5762 today or over the weekend.

Mark P. Fletcher, MD
Global Clinical Leader, COX-2 Alliance
Pfizer Global Research and Development
Groton, CT
(W) 860-715-0246
(Priv) 860-715-4828
(Fax) 860-441-3219
(TopCall): 860-715-8479
(Mobil): 860-625-9250
e-mail: mark_p_fletcher@groton. pfizer.com


-----Original Message-----
From: VERBURG, KENNETH M [R&D/1820]
[mailto:kenneth.m.verburg@pharmacia.com]
Sent: Friday, August 17, 2001 1:31 PM
To: Fletcher, Mark P
Subject: JAMA response

2

Confidential - Subject To Protective Order                                    DEFS 03752027

Mark-
here you go.
Ken

  <<hrachovec.doc>>  <<jmwright.doc>>  <<JAMA responses to letters to the
editor 08-17-01.doc>>

3

Confidential - Subject To Protective Order

DEFS 03752028