EXHIBIT 171

**From:** Fletcher, Mark P
**Sent:** Tuesday, August 28, 2001 3:55 PM
**To:** Weiner, Ethan
**Subject:** RE: Summary of third telecon on CLASS II issues.
Agree on your points ( others made them re: lack of credibility of a 3mo program). ▮▮▮▮▮▮▮▮▮ Non-Resp. ▮▮▮▮▮▮▮▮▮
Non▮ ( trying to get the study to have Not and GI endpoints may be tough in one study, but probably needs a stat analysisi to see
what power to detect events given expected rates would be for GI endpoint ▮▮▮▮▮▮▮▮ Non-Resp. ▮▮▮▮▮▮▮▮

**Mark P. Fletcher, MD**
*Global Clinical Leader, COX-2 Alliance*
*Pfizer Global Research and Development*
NEW LOCATION AS OF August 20, 2001
*New London, CT*
(W) 860-732-0246
(Priv) 860-732-4828
(Fax) 860- 732-7049
(TopCall) 860-715-8479
(Mobil) 860-625-9250
e-mail: mark_p_fletcher@groton. pfizer.com



PLAINTIFF'S
EXHIBIT NO. I 7-6
FOR IDENTIFICATION
DATE:          RPTR:
PENGAD 800-631-6989

-----Original Message-----
**From:** Weiner, Ethan
**Sent:** Tuesday, August 28, 2001 9:55 AM
**To:** Fletcher, Mark P
**Subject:** RE: Summary of third telecon on CLASS II issues.

▮▮▮▮▮▮▮ Non-Resp. ▮▮▮▮▮▮▮ (with or without GI).  The study will have no credibility without it.  Second, a
three month study is worthless.  Having shown with CLASS that six month results can look different from one year results,
will anything less than a year (especially three months) ever be taken seriously?  I doubt it.
-----Original Message-----
**From:** Fletcher, Mark P
**Sent:** Monday, August 27, 2001 1:27 PM
**To:** Crosbie-Foote, Holly; Gavigan, Michael; Sirota, Eric; Gandelman, Mitchell
**Cc:** Shafner, Lori S; Weiner, Ethan
**Subject:** Summary of third telecon on CLASS II issues.

Brief summary of discussion re: CLASS II design:
Participants:
( Steven Cristo, Fred Begley, Jim Lefkowith, Frank Musat  for a few early minutes only).

Discussed  3 possible GI outcome approaches ( the latter one recently coming to Jim from Phil Needleman with positive
thoughts from Carrie Cox):

Do study similar to CLASS but in non-ASA and with ibu and/or naproxen and combined endpoint- most expensive and long
(4000/grp ,9mo median exposure $64M)

Do a shorter cheaper study ( based on same pop and endpoints but 3mo median exposure[- 4,500 -6,000/arm and FPI-last
event 6 mo; power 80-90%] ; $36- 48M)

Smaller shorter study with change in Hb/Hct( or other surrogate GI outcome measure) as primary endpoint with supporting
data to argue the clinical meaningfulness of of this endpoint.

All agreed that the value and need for another events trial must be driven by what the commercial needs are for
celecoxib/SCI brand and that the R&D could design and execute a trial based on what type of info( change in label,
promotion only, publication, etc.) commercial feels is needed taking into consideration the overall market environment over
the next 12-24 mo.

I put forward the point that I was not sure of the value of expending such a large amount of resource in the GI area vs other
safety areas, but if commercials groups from both companies felt that GI safety data must be obtained and can lay out what
they need, the best overall approach would be the first choice above.

As no commercial people from PFE were present I wanted to pass on what I heard.

Confidential - Subject To Protective Order

We all agreed that additional telecon's are needed in the near future to get commercial's combined opinion on what they are looking for before we can make a final recommendation on the technical aspects of such a study.

Mark

PS,

Fred Begely also forwarded Regulatory comment on the CLASS to approach( below)

—--Original Message—--
> From: BEGLEY, WINIFRED M. [R&D/1825]
> Sent: Monday, August 27, 2001 6:47 AM
> To: MUSAT, FRANK [GPB/USCHQP17]
> Subject: FW: Draft CLASS II comments from RA
>
> Comments from RA for today's telecon. Stephen Cristo (Pfizer) had nothing
> further to add.
> Fred
>
> -----Original Message-----
> From: ESSIG, EVA C. [R&D/1825]
> Sent: Sunday, August 26, 2001 6:06 PM
> To: BEGLEY, WINIFRED M. [R&D/1825]
> Subject: RE: Draft CLASS II comments from RA
>
> Fred,
>
> I agree with the statements below. However with regards to replication, in
> terms of endpoints I think that it could be a replicate study in the sense
> that it would be considered pivotal and the CLASS I would be considered
> supportive (since it was the "hypothesis" generating study). The fact that
> the study is only 3 months may make limit its ability to be a replicate
> study especially because FDA is as concerned about general safety as it is
> GI safety. Such a short study may not enable them to make an appropriate
> "risk/benefit analysis".
>
> Eva
> —--Original Message—--
> From: BEGLEY, WINIFRED M. [R&D/1825]
> Sent: Friday, August 24, 2001 7:18 AM
> To: ESSIG, EVA C. [R&D/1825]
> Subject: FW: Draft CLASS II comments from RA
>
> Eva,
>
> This will be discussed Monday at the telecon. Since you are out do you
> have anything to add or change?
>
> Fred
>
> —--Original Message—--
> From: BEGLEY, WINIFRED M. [R&D/1825]
> Sent: Tuesday, August 21, 2001 3:05 PM
> To: ESSIG, EVA C. [R&D/1825]
> Cc: CRISTO, STEPHEN [PFIZER/Off-Site]
> Subject: Draft CLASS II comments from RA
>
> Eva, << File: CLASS II.ppt >>
> Items in bold come from the Clinical presentation to RDMC attached
> These are the draft points Stephen and I came up with, (Stephen feel free
> to modify if not adequately captured):
>
> Need for replication
> CLASS I was a large, robust trial that alone would have allowed for claims
> against tested NSAIDs had we reached the primary endpoint.

Confidential - Subject To Protective Order

DEFS 03825680

> CLASS II would not be replication since the "combined endpoint" has thus
> far not been allowed for CLASS I as it was not pre-specified, therefore it
> is not correct to state that doing CLASS II would provide replication of
> this endpoint.
>
> CLASS II could for a label change to be more definitive vs NSAIDs
> CLASS I was a huge real-life study, it is unlikely that the CLASS II data
> would negate findings in CLASS I.
>
> FDA may not be into the CLASS II study design:
> CLASS I was a real-life study and the design was considered to be
> appropriate by FDA because of the following:
> OA and RA represented
> ASA patients included
> Hard primary endpoint of UGI complications
> Long term study > 6 months allowed for seeing AEs that occur over a long
> period
>
> CLASS II may be considered inferior in design:

**Non-Resp.**

> Primary endpoint of combined SU and UC not a rigorous as CLASS I UGI
> complications
> Study of 3 months may not be considered long enough to see general AEs of
> importance, not just GI AEs.
> FDA has a concern that celecoxib may not show the possibility of ulcer
> complications in the long term if we only do a 3 month study (i.e.
> diclofenac patients dropped due to symptoms but celecoxib didn't and went
> on to complications, FDA are concerned that with celecoxib there is no
> early warning as there is for diclofenac).

**Non-Resp.**

>
> Diclofenac as a comparator
> Diclofenac was included mainly for ex-US use. CLASS data has not been
> embraced by ex-US markets so why repeat?
>
> Time to an approval
> Time to decision and study start, unknown?
> Estimate clinical study 6-12 months
> FDA review time 10-12 months
> Therefore time to changed label could be 2-3 years off. Commercial to
> assess value given this timing.
>
> Anything you can add?

> Fred

*********************************************************

**Mark P. Fletcher, MD**
*Global Clinical Leader, COX-2 Alliance*
*Pfizer Global Research and Development*
NEW LOCATION AS OF August 20, 2001
*New London, CT*
(W) 860-732-0246
(Priv) 860-732-4828
(Fax) 860- 732-7049
(TopCall): 860-715-8479
(Mobil): 860-625-9250
e-mail: mark_p_fletcher@groton. pfizer.com

Confidential - Subject To Protective Order

DEFS 03825681

Confidential - Subject To Protective Order

DEFS 03825682

# EXHIBIT 172

| | |
|---|---|
| **From:** | Weiner, Ethan |
| **Sent:** | Tuesday, February 05, 2002 1:01 AM |
| **To:** | Loose, Leland D; Zwillich, Samuel H; Gilbertsen, Richard |
| **Cc:** | 'Jing Cao (E-mail)' |
| **Subject:** | CBX-0051397_ RE: Ethan's clinical plan for S2474 |

PLAINTIFF'S
EXHIBIT NO. 127
FOR IDENTIFICATION
DATE: 8/18/10 RPTR: TO
PENGAD 800-631-6989

Agree -- would not do them for a new candidate at this time.

-----Original Message-----
| | |
|---|---|
| From: | Loose, Leland D |
| Sent: | Monday, February 04, 2002 4:10 PM |
| To: | Zwillich, Samuel H; Gilbertsen, Richard |
| Cc: | 'Jing Cao (E-mail)'; Weiner, Ethan |
| Subject: | RE: Ethan's clinical plan for S2474 |

As has been reported to the agency and in the lay press, CLASS had about 8,000 patients and ran for about a year with a cut of data at 6 months, cost much greater than your 30M though.   If you look at labels all of these big ticket studies got a big goose egg so I don't see their value yet.   Leland

-----Original Message-----
| | |
|---|---|
| From: | Zwillich, Samuel H |
| Sent: | Monday, January 28, 2002 3:28 PM |
| To: | Gilbertsen, Richard; Loose, Leland D |
| Cc: | 'Jing Cao (E-mail)'; Weiner, Ethan |
| Subject: | RE: Ethan's clinical plan for S2474 |

Rick:

In light of the publicly available outcomes of the CLASS (Celebrex vs. diclofenac and ibuprofen) and VIGOR (Vioxx vs. naproxen) studies, this study outline from 1998 would need to be re-thought, including phase, population, comparators, endpoints.  But I agree that costs would likely be > $30 million.  As Ethan wrote : "Much has happened since then," and time wounds all heels and all good CDPs, too.  Let's first see how badly it has wounded S2474!

Samuel H. Zwillich
Clin Dev / PII
Tel  (860) 732-4645
Fax (860) 715-8618

-----Original Message-----
| | |
|---|---|
| From: | Gilbertsen, Richard |
| Sent: | Monday, January 28, 2002 1:38 PM |
| To: | Loose, Leland D; Zwillich, Samuel H |
| Cc: | Jing Cao (E-mail) |
| Subject: | Ethan's clinical plan for S2474 |

Leland, Sam,

Just curious about a couple of aspects of the clinical trials.  In Study 4b(1), which is a Phase III GI study in RA and OA, the total number of patients on drug (any of the controls or S) is 6,000 for 6 months.  For one thing, shouldn't there be a placebo group here or are historic data sufficient for GI effects?

Of more interest to me, is 6,000 the number of patients who must complete the 6-month trial, or the number enrolled, which takes into consideration a certain expected dropout rate?  I was looking at the cost figures and wondering how much patients are paid who drop out during a study...probably more $$ the longer they last (???). If the dropout rate was higher than expected (perhaps solely because of, e.g., endoscopy), and if the number 6,000 is the number of patients who must complete the trial, then the total number of patients and total cost could be well above $ 30M. Is this correct?  This obviously applies to patient numbers for all the studies.

Thanks for any feedback.

1

Rick

**Tracking:**

| Recipient | Message Status |
|---|---|
| Loose, Leland D | Read: 2/5/2002 4:59 PM |
| Zwillich, Samuel H | Read: 2/5/2002 3:15 PM |
| Gilbertsen, Richard | Read: 2/5/2002 1:07 PM |
| 'Jing Cao (E-mail)' | Delivery Failed: 2/5/2002 12:01 PM |

2

Confidential - Subject To Protective Order

DEFS 00029317

# EXHIBIT 173

12 of 28 DOCUMENTS

Copyright 2001 Times Newspapers Limited
Sunday Times (London)

**August** 12, 2001, Sunday

**SECTION:** Home news

**LENGTH:** 286 words

**HEADLINE:** Move to open all drug test results

**BYLINE:** Jonathan Leake and Kevin Dowling

**BODY:**

THE world's most prominent medical journals, including The Lancet and the British Medical Journal, have joined forces to stop drug firms "cheating" on medical studies and refusing to publish bad results.

The move follows a case where Pharmacia, which owns Monsanto, the GM seed firm, last year was accused of duping the Journal of the American Medical Association (JAMA) into publishing favourable results from a study of the arthritis drug **Celebrex.**

The six-month study on 8,000 patients claimed **Celebrex** was associated with lower rates of stomach and intestinal ulcers than two other older arthritis medicines. In fact, the study took a year and the final results showed that almost all of the ulcer complications occurring in the second, unpublished half, were in **Celebrex** users.

Medical editors around the world will now refuse from next month to print drug-company sponsored studies unless the researchers involved are guaranteed scientific independence. One described the action as an attempt to "give scientists clout with drug companies".

Dr **Michael Wolfe,** an American expert in the field, who had given the study a favourable review in the JAMA, said: "I thought I was looking at a completely different study. The politically correct term is data discrepancy -but I call it scientific fraud. I believe Pharmacia cheated."

Steven Geis, a vice-president for clinical research of Pharmacia and one of the authors of the study, said that only the first six months of data were presented because, after that, more patients withdrew from the comparison groups than from the **Celebrex** group, biasing later findings. "The intention really was not to be deceptive in any way," he said.

**LOAD-DATE:** August 13, 2001


EXHIBIT 9
M. Michael Wolfe
DATE: 12-18-06
RPTR: LAURIE J. DRIGGERS

# EXHIBIT 174



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville MD 20857

NDA 20-998/S-009



G.D. Searle L.L.C.
Attention: Eva Essig, Ph.D.
Associate Director, Global Regulatory Affairs
4901 Searle Parkway
Skokie, IL 60077

Dear Dr. Essig:

Please refer to your supplemental new drug application dated June 12, 2000, received June 14, 2000, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Celebrex™ (celecoxib capsules) Capsules, 100 mg and 200 mg.

We acknowledge receipt of your submissions dated February 04; March 21; April 08, 17, and 23; May 01, 09, and 17, 2002. Your submission of December 20, 2001 constituted a complete response to our April 12, 2001 action letter.

This supplemental new drug application provides for changes to the **Warnings, Precautions, Adverse Events,** and **Clinical Studies** sections of the labeling based on a large gastrointestinal outcome study for Celebrex.

We have completed the review of this supplemental application, as amended, and have concluded that adequate information has been presented to demonstrate that the drug product is safe and effective for use as recommended in the agreed upon enclosed labeling text. Accordingly, the supplemental application is approved effective on the date of this letter.

The final printed labeling (FPL) must be identical to the enclosed labeling (text for the package insert).

Please submit the copies of final printed labeling (FPL) electronically according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format - NDA* (January 1999). Alternatively, you may submit 20 paper copies of the FPL as soon as it is available but no more than 30 days after it is printed. Please individually mount ten of the copies on heavy-weight paper or similar material. For administrative purposes, this submission should be designated "FPL for approved supplement NDA 20-998/S-009." Approval of this submission by FDA is not required before the labeling is used.

NDA 20-998/S-009
Page 2

If a letter communicating important information about this drug product (i.e., a "Dear Health Care Professional" letter) is issued to physicians and others responsible for patient care, we request that you submit a copy of the letter to this NDA and a copy to the following address:

> MEDWATCH, HF-2
> FDA
> 5600 Fishers Lane
> Rockville, MD 20857

Please submit one market package of the drug product when it is available.
We remind you that you must comply with the requirements for an approved NDA set forth under 21 CFR 314.80 and 314.81.

If you have any questions, call Barbara Gould, Project Manager, at (301) 827-2090.

> Sincerely,
>
> *{See appended electronic signature page}*
>
> Lawrence Goldkind, M.D.
> Deputy Division Director
> Division of Anti-Inflammatory, Analgesic and Ophthalmic Drug Products
> Office of Drug Evaluation V
> Center for Drug Evaluation and Research

Enclosure

---------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---------------------------------------------------------------------------------------------

 /s/
--------------------

Lawrence Goldkind
6/7/02 09:16:32 AM

NDA 20-998/S-009
Page 3

## CELEBREX®
(celecoxib capsules)

## DESCRIPTION

CELEBREX (celecoxib) is chemically designated as 4-[5-(4-methylphenyl)-3-(trifluoromethyl)-1H-pyrazol-1-yl] benzenesulfonamide and is a diaryl-substituted pyrazole. It has the following chemical structure:



The empirical formula for celecoxib is $C_{17}H_{14}F_3N_3O_2S$, and the molecular weight is 381.38.

CELEBREX oral capsules contain 100 mg and 200 mg of celecoxib.

The inactive ingredients in CELEBREX capsules include: croscarmellose sodium, edible inks, gelatin, lactose monohydrate, magnesium stearate, povidone, sodium lauryl sulfate and titanium dioxide.

## CLINICAL PHARMACOLOGY

**Mechanism of Action:** CELEBREX is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of CELEBREX is believed to be due to inhibition of prostaglandin synthesis, primarily via inhibition of cyclooxygenase-2 (COX-2), and at therapeutic concentrations in humans, CELEBREX does not inhibit the cyclooxygenase-1 (COX-1) isoenzyme. In animal colon tumor models, celecoxib reduced the incidence and multiplicity of tumors.

NDA 20-998/S-009
Page 4

## Pharmacokinetics:

### *Absorption*
Peak plasma levels of celecoxib occur approximately 3 hrs after an oral dose. Under fasting conditions, both peak plasma levels (Cmax) and area under the curve (AUC) are roughly dose proportional up to 200 mg BID; at higher doses there are less than proportional increases in Cmax and AUC (see Food Effects). Absolute bioavailability studies have not been conducted. With multiple dosing, steady state conditions are reached on or before day 5.

The pharmacokinetic parameters of celecoxib in a group of healthy subjects are shown in Table 1.

**Table 1: Summary of Single Dose (200 mg) Disposition Kinetics of Celecoxib in Healthy Subjects[1]**

| Mean (%CV) PK Parameter Values | | | | |
|---|---|---|---|---|
| Cmax, ng/mL | Tmax, hr | Effective $t_{1/2}$, hr | Vss/F, L | CL/F, L/hr |
| 705 (38) | 2.8 (37) | 11.2 (31) | 429 (34) | 27.7 (28) |

[1] Subjects under fasting conditions (n=36, 19-52 yrs.)

### *Food Effects*
When CELEBREX capsules were taken with a high fat meal, peak plasma levels were delayed for about 1 to 2 hours with an increase in total absorption (AUC) of 10% to 20%. Under fasting conditions, at doses above 200 mg, there is less than a proportional increase in $C_{max}$ and AUC, which is thought to be due to the low solubility of the drug in aqueous media. Coadministration of CELEBREX with an aluminum- and magnesium-containing antacid resulted in a reduction in plasma celecoxib concentrations with a decrease of 37% in Cmax and 10% in AUC. CELEBREX, at doses up to 200 mg BID can be administered without regard to timing of meals. Higher doses (400 mg BID) should be administered with food to improve absorption.

### *Distribution*
In healthy subjects, celecoxib is highly protein bound (~97%) within the clinical dose range. *In vitro* studies indicate that celecoxib binds primarily to albumin and, to a lesser extent, $\alpha_1$-acid glycoprotein. The apparent volume of distribution at steady state ($V_{ss}/F$) is approximately 400 L, suggesting extensive distribution into the tissues. Celecoxib is not preferentially bound to red blood cells.

### *Metabolism*
Celecoxib metabolism is primarily mediated via cytochrome P450 2C9. Three metabolites, a primary alcohol, the corresponding carboxylic acid and its glucuronide conjugate, have been identified in human plasma. These metabolites are inactive as COX-1 or COX-2 inhibitors. Patients who are known or suspected to be P450 2C9 poor metabolizers based on a previous history should be administered celecoxib with caution as they may have abnormally high plasma levels due to reduced metabolic clearance.

NDA 20-998/S-009
Page 5

*Excretion*
Celecoxib is eliminated predominantly by hepatic metabolism with little (<3%) unchanged drug recovered in the urine and feces. Following a single oral dose of radiolabeled drug, approximately 57% of the dose was excreted in the feces and 27% was excreted into the urine. The primary metabolite in both urine and feces was the carboxylic acid metabolite (73% of dose) with low amounts of the glucuronide also appearing in the urine. It appears that the low solubility of the drug prolongs the absorption process making terminal half-life ($t_{1/2}$) determinations more variable. The effective half-life is approximately 11 hours under fasted conditions. The apparent plasma clearance (CL/F) is about 500 mL/min.

## Special Populations

*Geriatric:* At steady state, elderly subjects (over 65 years old) had a 40% higher $C_{max}$ and a 50% higher AUC compared to the young subjects. In elderly females, celecoxib $C_{max}$ and AUC are higher than those for elderly males, but these increases are predominantly due to lower body weight in elderly females. Dose adjustment in the elderly is not generally necessary. However, for patients of less than 50 kg in body weight, initiate therapy at the lowest recommended dose.

*Pediatric*: CELEBREX capsules have not been investigated in pediatric patients below 18 years of age.

*Race*: Meta-analysis of pharmacokinetic studies has suggested an approximately 40% higher AUC of celecoxib in Blacks compared to Caucasians. The cause and clinical significance of this finding is unknown.

*Hepatic Insufficiency*: A pharmacokinetic study in subjects with mild (Child-Pugh Class I) and moderate (Child-Pugh Class II) hepatic impairment has shown that steady-state celecoxib AUC is increased about 40% and 180%, respectively, above that seen in healthy control subjects. Therefore, the daily recommended dose of CELEBREX capsules should be reduced by approximately 50% in patients with moderate (Child-Pugh Class II) hepatic impairment. Patients with severe hepatic impairment have not been studied. The use of CELEBREX in patients with severe hepatic impairment is not recommended.

*Renal Insufficiency*: In a cross-study comparison, celecoxib AUC was approximately 40% lower in patients with chronic renal insufficiency (GFR 35-60 mL/min) than that seen in subjects with normal renal function. No significant relationship was found between GFR and celecoxib clearance. Patients with severe renal insufficiency have not been studied. Similar to other NSAIDs, CELEBREX is not recommended in patients with severe renal insufficiency (see WARNINGS - Advanced Renal Disease).

## Drug Interactions

NDA 20-998/S-009
Page 6

Also see **PRECAUTIONS – Drug Interactions.**

*General:* Significant interactions may occur when celecoxib is administered together with drugs that inhibit P450 2C9. *In vitro* studies indicate that celecoxib is not an inhibitor of cytochrome P450 2C9, 2C19 or 3A4.

Clinical studies with celecoxib have identified potentially significant interactions with fluconazole and lithium. Experience with nonsteroidal anti-inflammatory drugs (NSAIDs) suggests the potential for interactions with furosemide and ACE inhibitors. The effects of celecoxib on the pharmacokinetics and/or pharmacodynamics of glyburide, ketoconazole, methotrexate, phenytoin, tolbutamide have been studied *in vivo* and clinically important interactions have not been found.

## CLINICAL STUDIES

**Osteoarthritis (OA):** CELEBREX has demonstrated significant reduction in joint pain compared to placebo. CELEBREX was evaluated for treatment of the signs and the symptoms of OA of the knee and hip in approximately 4,200 patients in placebo- and active-controlled clinical trials of up to 12 weeks duration. In patients with OA, treatment with CELEBREX 100 mg BID or 200 mg QD resulted in improvement in WOMAC (Western Ontario and McMaster Universities) osteoarthritis index, a composite of pain, stiffness, and functional measures in OA. In three 12-week studies of pain accompanying OA flare, CELEBREX doses of 100 mg BID and 200 mg BID provided significant reduction of pain within 24-48 hours of initiation of dosing. At doses of 100 mg BID or 200 mg BID the effectiveness of CELEBREX was shown to be similar to that of naproxen 500 mg BID. Doses of 200 mg BID provided no additional benefit above that seen with 100 mg BID. A total daily dose of 200 mg has been shown to be equally effective whether administered as 100 mg BID or 200 mg QD.

**Rheumatoid Arthritis (RA):** CELEBREX has demonstrated significant reduction in joint tenderness/pain and joint swelling compared to placebo. CELEBREX was evaluated for treatment of the signs and symptoms of RA in approximately 2,100 patients in placebo- and active-controlled clinical trials of up to 24 weeks in duration. CELEBREX was shown to be superior to placebo in these studies, using the ACR20 Responder Index, a composite of clinical, laboratory, and functional measures in RA. CELEBREX doses of 100 mg BID and 200 mg BID were similar in effectiveness and both were comparable to naproxen 500 mg BID.

Although CELEBREX 100 mg BID and 200 mg BID provided similar overall effectiveness, some patients derived additional benefit from the 200 mg BID dose. Doses of 400 mg BID provided no additional benefit above that seen with 100-200 mg BID.

**Analgesia, including primary dysmenorrhea:** In acute analgesic models of post-oral surgery pain, post-orthopedic surgical pain, and primary dysmenorrhea, CELEBREX relieved pain that was rated by patients as moderate to severe. Single doses (see DOSAGE AND ADMINISTRATION) of CELEBREX provided pain relief within 60 minutes.

NDA 20-998/S-009
Page 7

**Familial Adenomatous Polyposis (FAP):** CELEBREX was evaluated to reduce the number of adenomatous colorectal polyps. A randomized double-blind placebo-controlled study was conducted in 83 patients with FAP. The study population included 58 patients with a prior subtotal or total colectomy and 25 patients with an intact colon. Thirteen patients had the attenuated FAP phenotype.

One area in the rectum and up to four areas in the colon were identified at baseline for specific follow-up, and polyps were counted at baseline and following six months of treatment. The mean reduction in the number of colorectal polyps was 28% for CELEBREX 400 mg BID, 12% for CELEBREX 100 mg BID and 5% for placebo. The reduction in polyps observed with CELEBREX 400 mg BID was statistically superior to placebo at the six-month timepoint (p=0.003). (See Figure 1.)



### Figure 1
### Percent Change from Baseline in Number of Colorectal Polyps (FAP Patients)

\* p=0.003 versus placebo

**Special Studies**
*Endoscopic studies:* Scheduled upper GI endoscopic evaluations were performed in over 4,500 arthritis patients who were enrolled in five controlled randomized 12-24 week trials using active comparators, two of which also included placebo controls. There was no consistent relationship between the incidence of gastroduodenal ulcers and the dose of CELEBREX over the range studied.

NDA 20-998/S-009
Page 8

Table 2 summarizes the incidence of endoscopic ulcers in two 12-week studies that enrolled patients in whom baseline endoscopies revealed no ulcers.

**Table 2**
**Incidence of Gastroduodenal Ulcers from Endoscopic Studies**
**in OA and RA Patients**

| | 3-Month Studies | |
| | Study 1 (n = 1108) | Study 2 (n= 1049) |
|---|---|---|
| Placebo | 2.3% (5/217) | 2.0% (4/200) |
| Celebrex 50 mg BID | 3.4% (8/233) | --- |
| Celebrex 100 mg BID | 3.1% (7/227) | 4.0% (9/223) |
| Celebrex 200 mg BID | 5.9% (13/221) | 2.7% (6/219) |
| Celebrex 400 mg BID | --- | 4.1% (8/197) |
| Naproxen 500 mg BID | 16.2% (34/210)* | 17.6% (37/210)* |

* $p \leq 0.05$ vs. all other treatments

Table 3 summarizes data from two 12-week studies that enrolled patients in whom baseline endoscopies revealed no ulcers. Patients underwent interval endoscopies every 4 weeks to give information on ulcer risk over time.

NDA 20-998/S-009
Page 9

## Table 3
## Incidence of Gastroduodenal Ulcers from 3-Month Serial Endoscopy Studies
## in OA and RA Patients

|  | Week 4 |  | Week 8 | Week 12 | Final |
|---|---|---|---|---|---|
| **Study 3 (n=523)** |  |  |  |  |  |
| Celebrex | 4.0% | 2.2% | 1.5% | 7.5% |  |
| 200 mg BID | (10/252)* | (5/227)* | (3/196)* | (20/266)* |  |
| | | | | | |
| Naproxen | 19.0% | 14.2% | 9.9% | 34.6% |  |
| 500 mg BID | (47/247) | (26/182) | (14/141) | (89/257) |  |
| **Study 4 (n=1062)** |  |  |  |  |  |
| Celebrex | 3.9% | 2.4% | 1.8% | 7.0% |  |
| 200 mg BID | (13/337)† | (7/296)† | (5/274)† | (25/356)† |  |
| | | | | | |
| Diclofenac | 5.1% | 3.3% | 2.9% | 9.7% |  |
| 75 mg BID | (18/350) | (10/306) | (8/278) | (36/372) |  |
| | | | | | |
| Ibuprofen | 13.0% | 6.2% | 9.6% | 23.3% |  |
| 800 mg TID | (42/323) | (15/241) | (21/219) | (78/334) |  |

*$p \leq 0.05$ Celebrex vs. naproxen based on interval and cumulative analyses
†$p \leq 0.05$ Celebrex vs. ibuprofen based on interval and cumulative analyses

One randomized and double-blind 6-month study in 430 RA patients was conducted in which an endoscopic examination was performed at 6 months. The incidence of endoscopic ulcers in patients taking CELEBREX 200 mg BID was 4% vs 15% for patients taking diclofenac SR 75 mg BID ($p<0.001$).

In 4 of the 5 endoscopic studies, approximately 11% of patients (440/4,000) were taking aspirin ( $\leq$ 325 mg/day). In the CELEBREX groups, the endoscopic ulcer rate appeared to be higher in aspirin users than in non-users. However, the increased rate of ulcers in these aspirin users was less than the endoscopic ulcer rates observed in the active comparator groups, with or without aspirin.

The correlation between findings of endoscopic studies, and the relative incidence of clinically significant serious upper GI events has not been established. Serious clinically significant upper GI bleeding has been observed in patients receiving CELEBREX in controlled and open-labeled trials, albeit infrequently (see *Use with Aspirin* and WARNINGS-Gastrointestinal (GI) Effects).

*Use with Aspirin:* The Celecoxib Long-Term Arthritis Safety Study (CLASS) was a prospective long-term safety outcome study conducted postmarketing in approximately 5,800 OA patients and 2,200 RA patients. Patients received CELEBREX 400 mg BID (4-fold and 2-fold the recommended OA and RA doses, respectively, and the approved dose for FAP), ibuprofen 800 mg TID or diclofenac 75 mg BID (common therapeutic doses). Median exposures for CELEBREX (n = 3,987) and diclofenac (n = 1,996) were 9 months while ibuprofen (n = 1,985) was 6 months. The Kaplan-Meier cumulative rates at 9 months are provided for all analyses. The

NDA 20-998/S-009
Page 10

primary endpoint of this outcome study was the incidence of *complicated ulcers* (gastrointestinal bleeding, perforation or obstruction). Patients were allowed to take concomitant low-dose (≤ 325 mg/day) aspirin (ASA) for cardiovascular prophylaxis (ASA subgroups: CELEBREX, n = 882; diclofenac, n = 445; ibuprofen, n = 412). Differences in the incidence of *complicated ulcers* between CELEBREX and the combined group of ibuprofen and diclofenac were not statistically significant. Those patients on CELEBREX and concomitant low-dose ASA experienced 4-fold higher rates of *complicated ulcers* compared to those not on ASA (see WARNINGS-Gastrointestinal (GI) Effects). The results for CELEBREX are displayed in Table 4. For *complicated and symptomatic ulcer* rates, see WARNINGS-Gastrointestinal (GI) Effects- Risk of GI Ulceration, Bleeding, and Perforation).

**Table 4**
**Effects of Co-Administration of Low-Dose Aspirin on *Complicated Ulcer* Rates with CELEBREX 400 mg BID**
**(Kaplan-Meier Rates at 9 months [%])**

|  | Non-Aspirin Users n=3105 | Aspirin Users n=882 |
|---|---|---|
| Complicated Ulcers | 0.32 | 1.12 |

***Platelets:*** In clinical trials, CELEBREX at single doses up to 800 mg and multiple doses of 600 mg BID for up to 7 days duration (higher than recommended therapeutic doses) had no effect on platelet aggregation and bleeding time. Comparators (naproxen 500 mg BID, ibuprofen 800 mg TID, diclofenac 75 mg BID) significantly reduced platelet aggregation and prolonged bleeding time.

**Because of its lack of platelet effects, CELEBREX is not a substitute for aspirin for cardiovascular prophylaxis.**

## INDICATIONS AND USAGE

CELEBREX is indicated:

1) For relief of the signs and symptoms of osteoarthritis.

2) For relief of the signs and symptoms of rheumatoid arthritis in adults.

3) For the management of acute pain in adults (see CLINICAL STUDIES).

4) For the treatment of primary dysmenorrhea.

5) To reduce the number of adenomatous colorectal polyps in familial adenomatous polyposis (FAP), as an adjunct to usual care (e.g., endoscopic surveillance , surgery).

NDA 20-998/S-009
Page 11

It is not known whether there is a clinical benefit from a reduction in the number of colorectal polyps in FAP patients . It is also not known whether the effects of CELEBREX treatment will persist after CELEBREX is discontinued. The efficacy and safety of CELEBREX treatment in patients with FAP beyond six months have not been studied (See CLINICAL STUDIES, WARNINGS, and PRECAUTIONS sections).

## CONTRAINDICATIONS

CELEBREX is contraindicated in patients with known hypersensitivity to celecoxib.

CELEBREX should not be given to patients who have demonstrated allergic-type reactions to sulfonamides.

CELEBREX should not be given to patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients (see WARNINGS - Anaphylactoid Reactions, and PRECAUTIONS - Preexisting Asthma).

## WARNINGS

**Gastrointestinal (GI) Effects- Risk of GI Ulceration, Bleeding, and Perforation:**
Serious gastrointestinal toxicity such as bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, can occur at any time, with or without warning symptoms, in patients treated with nonsteroidal anti-inflammatory drugs (NSAIDs). Minor upper gastrointestinal problems, such as dyspepsia, are common and may also occur at any time during NSAID therapy. Therefore, physicians and patients should remain alert for ulceration and bleeding, even in the absence of previous GI tract symptoms (see PRECAUTIONS-Hematological Effects). Patients should be informed about the signs and/or symptoms of serious GI toxicity and the steps to take if they occur. The utility of periodic laboratory monitoring has not been demonstrated, nor has it been adequately assessed. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. It has been demonstrated that upper GI ulcers, gross bleeding or perforation, caused by NSAIDs, appear to occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue thus, increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

NSAIDs should be prescribed with extreme caution in patients with a prior history of ulcer disease or gastrointestinal bleeding. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore special care should be taken in treating this population. **To minimize the potential risk for an adverse GI event, the lowest effective dose should be used for the shortest possible duration.** For high risk patients, alternate therapies that do not involve NSAIDs should be considered.

NDA 20-998/S-009
Page 12

Studies have shown that patients with a *prior history of peptic ulcer disease and/or gastrointestinal bleeding* and who use NSAIDs, have a greater than 10-fold higher risk for developing a GI bleed than patients with neither of these risk factors. In addition to a past history of ulcer disease, pharmacoepidemiological studies have identified several other co-therapies or co-morbid conditions that may increase the risk for GI bleeding such as: treatment with oral corticosteroids, treatment with anticoagulants, longer duration of NSAID therapy, smoking, alcoholism, older age, and poor general health status.

**CLASS Study:** The estimated cumulative rates at 9 months of *complicated and symptomatic ulcers* (an adverse event similar but not identical to the "upper GI ulcers, gross bleeding or perforation" described in the preceding paragraphs) for patients treated with CELEBREX 400 mg BID (see Special Studies- *Use with Aspirin*) are described in Table 5. Table 5 also displays results for patients less than or greater than or equal to the age of 65 years. The differences in rates between the CELEBREX alone and CELEBREX with ASA groups may be due to the higher risk for GI events in ASA users.

**Table 5**
*Complicated and Symptomatic Ulcer* **Rates in Patients Taking CELEBREX 400 mg BID (Kaplan-Meier Rates at 9 months [%]) Based on Risk Factors**

|  | *Complicated and Symptomatic Ulcer* Rates |
|---|---|
| All Patients | |
| Celebrex alone (n=3105) | 0.78 |
| Celebrex with ASA (n=882) | 2.19 |
| | |
| Patients < 65 Years | |
| Celebrex alone (n=2025) | 0.47 |
| Celebrex with ASA (n=403) | 1.26 |
| | |
| Patients ≥ 65 Years | |
| Celebrex alone (n=1080) | 1.40 |
| Celebrex with ASA (n=479) | 3.06 |

In a small number of patients with a history of ulcer disease, the *complicated and symptomatic ulcer* rates in patients taking CELEBREX alone or CELEBREX with ASA were, respectively, 2.56% (n=243) and 6.85% (n=91) at 48 weeks. These results are to be expected in patients with a prior history of ulcer disease (see WARNINGS- Gastrointestinal (GI) Effects- Risk of GI Ulceration, Bleeding, and Perforation).

**Anaphylactoid Reactions**
As with NSAIDs in general, anaphylactoid reactions have occurred in patients without known prior exposure to CELEBREX. In post-marketing experience, rare cases of anaphylactic reactions and angioedema have been reported in patients receiving CELEBREX. CELEBREX should not be given to patients with the aspirin triad. This symptom complex typically occurs in asthmatic

NDA 20-998/S-009
Page 13

patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs (see CONTRAINDICATIONS and PRECAUTIONS - Preexisting Asthma). Emergency help should be sought in cases where an anaphylactoid reaction occurs.

**Advanced Renal Disease**
No information is available from controlled clinical studies regarding the use of CELEBREX in patients with advanced kidney disease. Therefore, treatment with CELEBREX, is not recommended in these patients with advanced kidney disease. If CELEBREX therapy must be initiated, close monitoring of the patient's kidney function is advisable (see PRECAUTIONS - Renal Effects).

**Pregnancy**
In late pregnancy CELEBREX should be avoided because it may cause premature closure of the ductus arteriosus.

**Familial Adenomatous Polyposis (FAP): Treatment with CELEBREX in FAP has not been shown to reduce the risk of gastrointestinal cancer or the need for prophylactic colectomy or other FAP-related surgeries. Therefore, the usual care of FAP patients should not be altered because of the concurrent administration of CELEBREX. In particular, the frequency of routine endoscopic surveillance should not be decreased and prophylactic colectomy or other FAP-related surgeries should not be delayed.**

## PRECAUTIONS

**General:** CELEBREX cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-responsive illness. Patients on prolonged corticosteroid therapy should have their therapy tapered slowly if a decision is made to discontinue corticosteroids.

The pharmacological activity of CELEBREX in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting infectious complications of presumed noninfectious, painful conditions.

**Hepatic Effects:** Borderline elevations of one or more liver associated enzymes may occur in up to 15% of patients taking NSAIDs, and notable elevations of ALT or AST (approximately 3 or more times the upper limit of normal) have been reported in approximately 1% of patients in clinical trials with NSAIDs. These laboratory abnormalities may progress, may remain unchanged, or may be transient with continuing therapy. Rare cases of severe hepatic reactions, including jaundice and fatal fulminant hepatitis, liver necrosis and hepatic failure (some with fatal outcome) have been reported with NSAIDs, including CELEBREX (see ADVERSE REACTIONS – post-marketing experience). In controlled clinical trials of CELEBREX, the incidence of borderline elevations (greater than or equal to 1.2 times and less than 3 times the upper limit of normal) of liver associated enzymes was 6% for CELEBREX and 5% for placebo,

NDA 20-998/S-009
Page 14

and approximately 0.2% of patients taking CELEBREX and 0.3% of patients taking placebo had notable elevations of ALT and AST.

A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be monitored carefully for evidence of the development of a more severe hepatic reaction while on therapy with CELEBREX. If clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, etc.), CELEBREX should be discontinued.

**Renal Effects:** Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of a nonsteroidal anti-inflammatory drug may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly. Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state. Clinical trials with CELEBREX have shown renal effects similar to those observed with comparator NSAIDs.

Caution should be used when initiating treatment with CELEBREX in patients with considerable dehydration. It is advisable to rehydrate patients first and then start therapy with CELEBREX. Caution is also recommended in patients with pre-existing kidney disease (see WARNINGS-Advanced Renal Disease).

**Hematological Effects:** Anemia is sometimes seen in patients receiving CELEBREX. In controlled clinical trials, the incidence of anemia was 0.6% with CELEBREX and 0.4% with placebo. Patients on long-term treatment with CELEBREX should have their hemoglobin or hematocrit checked if they exhibit any signs or symptoms of anemia or blood loss. CELEBREX does not generally affect platelet counts, prothrombin time (PT), or partial thromboplastin time (PTT), and does not inhibit platelet aggregation at indicated dosages (see CLINICAL STUDIES-Special Studies-Platelets).

**Fluid Retention, Edema, and Hypertension:** Fluid retention and edema have been observed in some patients taking CELEBREX (see ADVERSE REACTIONS). In the CLASS study (see Special Studies-*Use with Aspirin*), the Kaplan-Meier cumulative rates at 9 months of peripheral edema in patients on CELEBREX 400 mg BID (4-fold and 2-fold the recommended OA and RA doses, respectively, and the approved dose for FAP), ibuprofen 800 mg TID and diclofenac 75 mg BID were 4.5%, 6.9% and 4.7%, respectively. The rates of hypertension in the CELEBREX, ibuprofen and diclofenac treated patients were 2.4%, 4.2% and 2.5%, respectively. As with other NSAIDs, CELEBREX should be used with caution in patients with fluid retention, hypertension, or heart failure.

NDA 20-998/S-009
Page 15

**Preexisting Asthma:** Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm which can be fatal. Since cross reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, CELEBREX should not be administered to patients with this form of aspirin sensitivity and should be used with caution in patients with preexisting asthma.

**Information for Patients:** CELEBREX can cause discomfort and, rarely, more serious side effects, such as gastrointestinal bleeding, which may result in hospitalization and even fatal outcomes. Although serious GI tract ulcerations and bleeding can occur without warning symptoms, patients should be alert for the signs and symptoms of ulcerations and bleeding, and should ask for medical advice when observing any indicative signs or symptoms. Patients should be apprised of the importance of this follow-up (see WARNINGS, Gastrointestinal (GI) Effects-Risk of Gastrointestinal Ulceration, Bleeding, and Perforation).

Patients should promptly report signs or symptoms of gastrointestinal ulceration or bleeding, skin rash, unexplained weight gain, or edema to their physicians.
Patients should be informed of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms). If these occur, patients should be instructed to stop therapy and seek immediate medical therapy.

Patients should also be instructed to seek immediate emergency help in the case of an anaphylactoid reaction (see WARNINGS).

In late pregnancy CELEBREX should be avoided because it may cause premature closure of the ductus arteriosus.

Patients with familial adenomatous polyposis (FAP) should be informed that CELEBREX has not been shown to reduce colorectal, duodenal or other FAP-related cancers, or the need for endoscopic surveillance, prophylactic or other FAP-related surgery. Therefore, all patients with FAP should be instructed to continue their usual care while receiving CELEBREX.

**Laboratory Tests:** Because serious GI tract ulcerations and bleeding can occur without warning symptoms, physicians should monitor for signs or symptoms of GI bleeding.

In controlled clinical trials, elevated BUN occurred more frequently in patients receiving CELEBREX compared with patients on placebo. This laboratory abnormality was also seen in patients who received comparator NSAIDs in these studies. The clinical significance of this abnormality has not been established.

**Drug Interactions**
*General:* Celecoxib metabolism is predominantly mediated via cytochrome P450 2C9 in the liver. Co-administration of celecoxib with drugs that are known to inhibit 2C9 should be done with caution.

NDA 20-998/S-009
Page 16

*In vitro* studies indicate that celecoxib, although not a substrate, is an inhibitor of cytochrome P450 2D6. Therefore, there is a potential for an *in vivo* drug interaction with drugs that are metabolized by P450 2D6.

***ACE-inhibitors:*** Reports suggest that NSAIDs may diminish the antihypertensive effect of Angiotensin Converting Enzyme (ACE) inhibitors. This interaction should be given consideration in patients taking CELEBREX concomitantly with ACE-inhibitors.

***Furosemide:*** Clinical studies, as well as post marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. This response has been attributed to inhibition of renal prostaglandin synthesis.

***Aspirin:*** CELEBREX can be used with low-dose aspirin. However, concomitant administration of aspirin with CELEBREX increases the rate of GI ulceration or other complications, compared to use of CELEBREX alone (see CLINICAL STUDIES - Special Studies – *Use with Aspirin* and WARNINGS – Gastrointestinal (GI) Effects – Risk of GI Ulceration, Bleeding, and Perforation – CLASS Study).

**Because of its lack of platelet effects, CELEBREX is not a substitute for aspirin for cardiovascular prophylaxis.**

***Fluconazole:*** Concomitant administration of fluconazole at 200 mg QD resulted in a two-fold increase in celecoxib plasma concentration. This increase is due to the inhibition of celecoxib metabolism via P450 2C9 by fluconazole (see Pharmacokinetics - Metabolism). CELEBREX should be introduced at the lowest recommended dose in patients receiving fluconazole.

***Lithium:*** In a study conducted in healthy subjects, mean steady-state lithium plasma levels increased approximately 17% in subjects receiving lithium 450 mg BID with CELEBREX 200 mg BID as compared to subjects receiving lithium alone. Patients on lithium treatment should be closely monitored when CELEBREX is introduced or withdrawn.

***Methotrexate:*** In an interaction study of rheumatoid arthritis patients taking methotrexate, CELEBREX did not have a significant effect on the pharmacokinetics of methotrexate.

***Warfarin:*** Anticoagulant activity should be monitored, particularly in the first few days after initiating or changing CELEBREX therapy in patients receiving warfarin or similar agents, since these patients are at an increased risk of bleeding complications. The effect of celecoxib on the anti-coagulant effect of warfarin was studied in a group of healthy subjects receiving daily doses of 2-5 mg of warfarin. In these subjects, celecoxib did not alter the anticoagulant effect of warfarin as determined by prothrombin time. However, in post-marketing experience, bleeding events have been reported, predominantly in the elderly, in association with increases in prothrombin time in patients receiving CELEBREX concurrently with warfarin.

**Carcinogenesis, mutagenesis, impairment of fertility:** Celecoxib was not carcinogenic in rats

NDA 20-998/S-009
Page 17

given oral doses up to 200 mg/kg for males and 10 mg/kg for females (approximately 2- to 4-fold the human exposure as measured by the $AUC_{0-24}$ at 200 mg BID) or in mice given oral doses up to 25 mg/kg for males and 50 mg/kg for females (approximately equal to human exposure as measured by the $AUC_{0-24}$ at 200 mg BID) for two years.

Celecoxib was not mutagenic in an Ames test and a mutation assay in Chinese hamster ovary (CHO) cells, nor clastogenic in a chromosome aberration assay in CHO cells and an *in vivo* micronucleus test in rat bone marrow.

Celecoxib did not impair male and female fertility in rats at oral doses up to 600 mg/kg/day (approximately 11-fold human exposure at 200 mg BID based on the $AUC_{0-24}$).

**Pregnancy**
*Teratogenic effects:* Pregnancy Category C. Celecoxib at oral doses ≥150 mg/kg/day (approximately 2-fold human exposure at 200 mg BID as measured by $AUC_{0-24}$), caused an increased incidence of ventricular septal defects, a rare event, and fetal alterations, such as ribs fused, sternebrae fused and sternebrae misshapen when rabbits were treated throughout organogenesis. A dose-dependent increase in diaphragmatic hernias was observed when rats were given celecoxib at oral doses ≥30 mg/kg/day (approximately 6-fold human exposure based on the $AUC_{0-24}$ at 200 mg BID) throughout organogenesis. There are no studies in pregnant women. CELEBREX should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

*Nonteratogenic effects:* Celecoxib produced pre-implantation and post-implantation losses and reduced embryo/fetal survival in rats at oral dosages ≥50 mg/kg/day (approximately 6-fold human exposure based on the $AUC_{0-24}$ at 200 mg BID). These changes are expected with inhibition of prostaglandin synthesis and are not the result of permanent alteration of female reproductive function, nor are they expected at clinical exposures. No studies have been conducted to evaluate the effect of celecoxib on the closure of the ductus arteriosus in humans. Therefore, use of CELEBREX during the third trimester of pregnancy should be avoided.

**Labor and delivery:** Celecoxib produced no evidence of delayed labor or parturition at oral doses up to 100 mg/kg in rats (approximately 7-fold human exposure as measured by the $AUC_{0-24}$ at 200 mg BID). The effects of CELEBREX on labor and delivery in pregnant women are unknown.

**Nursing mothers:** Celecoxib is excreted in the milk of lactating rats at concentrations similar to those in plasma. It is not known whether this drug is excreted in human milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from CELEBREX, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use**

NDA 20-998/S-009
Page 18

Safety and effectiveness in pediatric patients below the age of 18 years have not been evaluated.

**Geriatric Use**
Of the total number of patients who received CELEBREX in clinical trials, more than 3,300 were 65-74 years of age, while approximately 1,300 additional patients were 75 years and over. No substantial differences in effectiveness were observed between these subjects and younger subjects. In clinical studies comparing renal function as measured by the GFR, BUN and creatinine, and platelet function as measured by bleeding time and platelet aggregation, the results were not different between elderly and young volunteers. However, as with other NSAIDs, including those that selectively inhibit COX-2, there have been more spontaneous post-marketing reports of fatal GI events and acute renal failure in the elderly than in younger patients (see WARNINGS – Gastrointestinal (GI) Effects -Risk of GI Ulceration, Bleeding, and Perforation).

## ADVERSE REACTIONS

Of the CELEBREX treated patients in the premarketing controlled clinical trials, approximately 4,250 were patients with OA, approximately 2,100 were patients with RA, and approximately 1,050 were patients with post-surgical pain. More than 8,500 patients received a total daily dose of CELEBREX of 200 mg (100 mg BID or 200 mg QD) or more, including more than 400 treated at 800 mg (400 mg BID). Approximately 3,900 patients received CELEBREX at these doses for 6 months or more; approximately 2,300 of these received it for 1 year or more and 124 of these received it for 2 years or more.

**Adverse events from CELEBREX premarketing controlled arthritis trials:** Table 6 lists all adverse events regardless of causality, occurring in ≥2% of patients receiving CELEBREX from 12 controlled studies conducted in patients with OA or RA that included a placebo and/or a positive control group.

NDA 20-998/S-009
Page 19

Table 6
Adverse Events Occurring in ≥ 2% Of Celebrex Patients From
CELEBREX Premarketing Controlled Arthritis Trials

| | Celebrex (100-200 mg BID or 200 mg QD) (n=4146) | Placebo (n=1864) | Naproxen 500 mg BID (n=1366) | Diclofenac 75 mg BID (n=387) | Ibuprofen 800 mg TID (n=345) |
|---|---|---|---|---|---|
| **Gastrointestinal** | | | | | |
| Abdominal pain | 4.1% | 2.8% | 7.7% | 9.0% | 9.0% |
| Diarrhea | 5.6% | 3.8% | 5.3% | 9.3% | 5.8% |
| Dyspepsia | 8.8% | 6.2% | 12.2% | 10.9% | 12.8% |
| Flatulence | 2.2% | 1.0% | 3.6% | 4.1% | 3.5% |
| Nausea | 3.5% | 4.2% | 6.0% | 3.4% | 6.7% |
| **Body as a whole** | | | | | |
| Back Pain | 2.8% | 3.6% | 2.2% | 2.6% | 0.9% |
| Peripheral edema | 2.1% | 1.1% | 2.1% | 1.0% | 3.5% |
| Injury-accidental | 2.9% | 2.3% | 3.0% | 2.6% | 3.2% |
| **Central and peripheral nervous system** | | | | | |
| Dizziness | 2.0% | 1.7% | 2.6% | 1.3% | 2.3% |
| Headache | 15.8% | 20.2% | 14.5% | 15.5% | 15.4% |
| **Psychiatric** | | | | | |
| Insomnia | 2.3% | 2.3% | 2.9% | 1.3% | 1.4% |
| **Respiratory** | | | | | |
| Pharyngitis | 2.3% | 1.1% | 1.7% | 1.6% | 2.6% |
| Rhinitis | 2.0% | 1.3% | 2.4% | 2.3% | 0.6% |
| Sinusitis | 5.0% | 4.3% | 4.0% | 5.4% | 5.8% |
| Upper respiratory tract infection | 8.1% | 6.7% | 9.9% | 9.8% | 9.9% |
| **Skin** | | | | | |
| Rash | 2.2% | 2.1% | 2.1% | 1.3% | 1.2% |

In placebo- or active-controlled clinical trials, the discontinuation rate due to adverse events was 7.1% for patients receiving CELEBREX and 6.1% for patients receiving placebo. Among the most common reasons for discontinuation due to adverse events in the CELEBREX treatment groups were dyspepsia and abdominal pain (cited as reasons for discontinuation in 0.8% and 0.7% of CELEBREX patients, respectively). Among patients receiving placebo, 0.6% discontinued due to dyspepsia and 0.6% withdrew due to abdominal pain.

The following adverse events occurred in 0.1 - 1.9% of patients regardless of causality.

Celebrex
(100 - 200 mg BID or 200 mg QD)

| | |
|---|---|
| **Gastrointestinal:** | Constipation, diverticulitis, dysphagia, eructation, esophagitis, gastritis, gastroenteritis, gastroesophageal reflux, hemorrhoids, hiatal hernia, melena, dry mouth, stomatitis, tenesmus, tooth disorder, vomiting |
| **Cardiovascular:** | Aggravated hypertension, angina pectoris, coronary artery disorder, myocardial infarction |
| **General:** | Allergy aggravated, allergic reaction, asthenia, chest pain, cyst NOS, edema generalized, face edema, fatigue, fever, hot flushes, influenza-like symptoms, pain, peripheral pain |

NDA 20-998/S-009
Page 20

| | |
|---|---|
| **Resistance mechanism disorders:** | Herpes simplex, herpes zoster, infection bacterial, infection, fungal, infection soft tissue, infection viral, moniliasis, moniliasis genital, otitis media |
| **Central, peripheral nervous system:** | Leg cramps, hypertonia, hypoesthesia, migraine, neuralgia, neuropathy, paresthesia, vertigo |
| **Female reproductive:** | Breast fibroadenosis, breast neoplasm, breast pain, dysmenorrhea, menstrual disorder, vaginal hemorrhage, vaginitis |
| **Male reproductive:** | Prostatic disorder |
| **Hearing and vestibular:** | Deafness, ear abnormality, earache, tinnitus |
| **Heart rate and rhythm:** | Palpitation, tachycardia |
| **Liver and biliary system:** | Hepatic function abnormal, SGOT increased, SGPT increased |
| **Metabolic and nutritional:** | BUN increased, CPK increased, diabetes mellitus, hypercholesterolemia, hyperglycemia, hypokalemia, NPN increase, creatinine increased, alkaline phosphatase increased, weight increase |
| **Musculoskeletal:** | Arthralgia, arthrosis, bone disorder, fracture accidental, myalgia,   neck stiffness, synovitis, tendinitis |
| **Platelets (bleeding or clotting):** | Ecchymosis, epistaxis, thrombocythemia |
| **Psychiatric:** | Anorexia, anxiety, appetite increased, depression, nervousness, somnolence |
| **Hemic:** | Anemia |
| **Respiratory:** | Bronchitis, bronchospasm, bronchospasm aggravated, coughing, dyspnea, laryngitis, pneumonia |
| **Skin and appendages:** | Alopecia, dermatitis, nail disorder, photosensitivity reaction, pruritus, rash erythematous, rash, maculopapular, skin disorder, skin dry, sweating increased, urticaria |
| **Application site disorders:** | Cellulitis, dermatitis contact, injection site reaction, skin nodule |
| **Special senses:** | Taste perversion |
| **Urinary system:** | Albuminuria, cystitis, dysuria, hematuria, micturition,  frequency, renal calculus, urinary incontinence, urinary tract infection |
| **Vision:** | Blurred vision, cataract, conjunctivitis, eye pain, glaucoma |

**Other serious adverse reactions which occur rarely (estimated <0.1%), regardless of causality:**
The following serious adverse events have occurred rarely in patients taking CELEBREX. Cases reported only in the post-marketing experience are indicated in italics.

| | |
|---|---|
| **Cardiovascular:** | Syncope, congestive heart failure, ventricular fibrillation, pulmonary embolism, cerebrovascular accident, peripheral gangrene, thrombophlebitis, *vasculitis* |

NDA 20-998/S-009
Page 21

| | |
|---|---|
| **Gastrointestinal:** | Intestinal obstruction, intestinal perforation, gastrointestinal bleeding, colitis with bleeding, esophageal perforation, pancreatitis, ileus |
| **Liver and biliary system:** | Cholelithiasis, *hepatitis, jaundice, liver failure* |
| **Hemic and lymphatic:** | Thrombocytopenia, *agranulocytosis, aplastic anemia, pancytopenia, leukopenia* |
| **Metabolic:** | *Hypoglycemia, hyponatremia* |
| **Nervous system:** | *Aseptic meningitis,* ataxia, suicide; |
| **Renal:** | Acute renal failure, *interstitial nephritis* |
| **Skin:** | *Erythema multiforme, exfoliative dermatitis, Stevens-Johnson syndrome, toxic epidermal necrolysis* |
| **General:** | Sepsis, sudden death, *anaphylactoid reaction, angioedema* |

## Safety Data from CLASS Study:

*Hematological Events:*
During this study (see Special Studies-*Use with Aspirin*), the incidence of clinically significant decreases in hemoglobin (>2 g/dL) confirmed by repeat testing was lower in patients on CELEBREX 400 mg BID (4-fold and 2-fold the recommended OA and RA doses, respectively, and the approved dose for FAP) compared to patients on either diclofenac 75 mg BID or ibuprofen 800 mg TID: 0.5%, 1.3% and 1.9%, respectively. The lower incidence of events with CELEBREX was maintained with or without ASA use (see CLINICAL STUDIES- Special Studies- Platelets).

*Withdrawals/Serious Adverse Events:*
Kaplan-Meier cumulative rates at 9 months for withdrawals due to adverse events for CELEBREX, diclofenac and ibuprofen were 24%, 29%, and 26%, respectively. Rates for serious adverse events (i.e. those causing hospitalization or felt to be life threatening or otherwise medically significant) regardless of causality were not different across treatment groups, respectively, 8%, 7%, and 8%.

Based on Kaplan-Meier cumulative rates for investigator-reported serious cardiovascular thromboembolic adverse events*, there were no differences between the CELEBREX, diclofenac or ibuprofen treatment groups. The rates in all patients at 9 months for CELEBREX, diclofenac and ibuprofen were 1.2%, 1.4%, and 1.1%, respectively. The rates for non-ASA users in each of the three treatment groups were less than 1%. The rates for myocardial infarction in each of the three non-ASA treatment groups were less than 0.2%.

*includes myocardial infarction, pulmonary embolism, deep venous thrombosis, unstable angina, transient ischemic attacks or ischemic cerebrovascular accidents.

**Adverse events from analgesia and dysmenorrhea studies:** Approximately 1,700 patients were treated with CELEBREX in analgesia and dysmenorrhea studies. All patients in post-oral surgery

NDA 20-998/S-009
Page 22

pain studies received a single dose of study medication. Doses up to 600 mg/day of CELEBREX were studied in primary dysmenorrhea and post-orthopedic surgery pain studies. The types of adverse events in the analgesia and dysmenorrhea studies were similar to those reported in arthritis studies. The only additional adverse event reported was post-dental extraction alveolar osteitis (dry socket) in the post-oral surgery pain studies.

**Adverse events from the controlled trial in familial adenomatous polyposis:** The adverse event profile reported for the 83 patients with familial adenomatous polyposis enrolled in the randomized, controlled clinical trial was similar to that reported for patients in the arthritis controlled trials. Intestinal anastomotic ulceration was the only new adverse event reported in the FAP trial, regardless of causality, and was observed in 3 of 58 patients (one at 100 mg BID, and two at 400 mg BID) who had prior intestinal surgery.

## OVERDOSAGE

No overdoses of CELEBREX were reported during clinical trials. Doses up to 2400 mg/day for up to 10 days in 12 patients did not result in serious toxicity.

Symptoms following acute NSAID overdoses are usually limited to lethargy, drowsiness, nausea, vomiting and epigastric pain, which are generally reversible with supportive care. Gastrointestinal bleeding can occur. Hypertension, acute renal failure, respiratory depression and coma may occur, but are rare. Anaphylactoid reactions have been reported with therapeutic ingestion of NSAIDs, and may occur following an overdose.

Patients should be managed by symptomatic and supportive care following an NSAID overdose. There are no specific antidotes. No information is available regarding the removal of celecoxib by hemodialysis, but based on its high degree of plasma protein binding (>97%) dialysis is unlikely to be useful in overdose. Emesis and/or activated charcoal (60 to 100 g in adults, 1 to 2 g/kg in children) and/or osmotic cathartic may be indicated in patients seen within 4 hours of ingestion with symptoms or following a large overdose. Forced diuresis, alkalinization of urine, hemodialysis, or hemoperfusion may not be useful due to high protein binding.

## DOSAGE AND ADMINISTRATION

For osteoarthritis and rheumatoid arthritis, the lowest dose of CELEBREX should be sought for each patient. These doses can be given without regard to timing of meals.

**Osteoarthritis:** For relief of the signs and symptoms of osteoarthritis the recommended oral dose is 200 mg per day administered as a single dose or as 100 mg twice per day.

**Rheumatoid arthritis:** For relief of the signs and symptoms of rheumatoid arthritis the recommended oral dose is 100 to 200 mg twice per day.

NDA 20-998/S-009
Page 23

**Management of Acute Pain and Treatment of Primary Dysmenorrhea:** The recom-mended dose of CELEBREX is 400 mg initially, followed by an additional 200 mg dose if needed on the first day. On subsequent days, the recommended dose is 200 mg twice daily as needed.

**Familial adenomatous polyposis (FAP):** Usual medical care for FAP patients should be continued while on CELEBREX. To reduce the number of adenomatous colorectal polyps in patients with FAP, the recommended oral dose is 400 mg (2 X 200 mg capsules) twice per day to be taken with food.

**Special Populations**

*Hepatic insufficiency:* The daily recommended dose of CELEBREX capsules in patients with moderate hepatic impairment (Child-Pugh Class II) should be reduced by approximately 50% (see CLINICAL PHARMACOLOGY – Special Populations).

**HOW SUPPLIED**

CELEBREX 100-mg capsules are white, reverse printed white on blue band of body and cap with markings of 7767 on the cap and 100 on the body, supplied as:

| NDC Number | Size |
| --- | --- |
| 0025-1520-31 | bottle of 100 |
| 0025-1520-51 | bottle of 500 |
| 0025-1520-34 | carton of 100 unit dose |

CELEBREX 200-mg capsules are white, with reverse printed white on gold band with markings of 7767 on the cap and 200 on the body, supplied as:

| NDC Number | Size |
| --- | --- |
| 0025-1525-31 | bottle of 100 |
| 0025-1525-51 | bottle of 500 |
| 0025-1525-34 | carton of 100 unit dose |

**Store at 25°C (77°F); excursions permitted to 15-30°C (59-86°F)** [see USP Controlled Room Temperature]

**Rx only**          **Revised:  6/7/02**

NDA 20-998/S-009
Page 24


*Manufactured for:  G.D. Searle LLC*
*A subsidiary of Pharmacia Corporation*
*Chicago, IL  60680, USA*
*Pfizer Inc.*
*New York, NY  10017, USA*
*by:        Searle Ltd.*
*Caguas, PR  00725*


©2002, G.D. Searle & Co.        Printed in USA

**Searle        Pfizer**

**CELEBREX®**
(celecoxib capsules)

(A05264-)

---

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

---

/s/
--------------------
Lawrence Goldkind
6/7/02 09:16:32 AM

# EXHIBIT 175

22 of 25 DOCUMENTS

Copyright 2002 The McGraw-Hill Companies, Inc.  www.mcgraw-hill.com
All rights reserved

**BusinessWeek**

Business Week

June 24, 2002

**SECTION:** SCIENCE & TECHNOLOGY; COMMENTARY; Number 3788; Pg. 78

**LENGTH:** 845 words

**HEADLINE:** THE CREDIBILITY GAP IN DRUG RESEARCH

**BYLINE:** By Paul Raeburn; Raeburn covers science and medicine in New York.

**BODY:**

It's supposed to be the gold standard of medical research: Doctors randomly split research subjects into two groups, with some getting a new drug, others a sugar pill. To avoid any bias, the researchers don't know who's getting what. This ritual -- the randomized, double-blind clinical trial -- often takes years and costs tens of millions of dollars, but it produces clear, unbiased data on the benefits of drugs.

At least that's the way it's supposed to work. In fact, the reports of those results are often misleading or incomplete. On June 1, the British Medical Journal published a report critical of a Pharmacia Corp.-funded study of its $ 3 billion-dollar-a-year arthritis drug, **Celebrex.** The report claimed the study's favorable results omitted contradictory data. And on June 5, The Journal of the American Medical Assn. (JAMA) published a series of reports critical of the way trials are done and reported, and the way conclusions are often couched to make new treatments seem better than they are.

The **Celebrex** case illustrates one such problem. The study, reported in JAMA by company-funded researchers two years ago, concluded the drug was associated with fewer ulcers and ulcer complications than two other drugs, ibuprofen and diclofenac. The British Medical Journal says the article was misleading because it omitted data that found no safety benefit for **Celebrex.** (The additional data were later made public at a Food & Drug Administration advisory committee meeting.)

G. Steven Geis, Pharmacia's vice-president for research, says information was omitted only because it was not reliable. On June 7, however, the FDA decided, using all the data, that the study "did not show a safety advantage in upper gastrointestinal events for **Celebrex.**"

Critics blame industry sponsorship for these problems. It is not only the published studies that cause concern but also the studies that never appear, says Dr. **Drummond Rennie,** a deputy editor at JAMA and professor at the University of California at San Francisco. When a study starts going wrong, its sponsor may be tempted "to stomp on the investigators and say, 'You must keep this quiet.'" And "companies have yielded to that temptation," he says. Others agree. "In situations when there are large economic interests, you just cannot be sure whether the problems in the trial have been resolved in a fair way," says the author of the British Medical Journal article, Dr. Peter Juni of the University of Bristol in Britain and the University of Berne in Switzerland.

"That's not true," says Mark Grayson, a spokesman for the Pharmaceutical Research & Manufacturers of America. Drugmakers support efforts to assure the independence of academic researchers who participate in industry-sponsored trials, he says.

Rennie thinks editors at the prestigious medical journals are getting better at policing these issues. He is still rankled, however, by JAMA's publication of the **Celebrex** study. The study's authors, including Pharmacia, "were not open with us," he says. "They signed letters saying the studies have all the relevant stuff," but "they had contradictory results



PLAINTIFF'S DEPOSITION
EXHIBIT
# 417
DH 1/18/07

THE CREDIBILITY GAP IN DRUG RESEARCH  Business Week June 24, 2002

when they sent us this paper, and they should have revealed them to us. And they didn't." Says Pharmacia's Geis: "We've tried to work real hard with JAMA to resolve any misunderstanding. We value JAMA."

Rennie says universities and their researchers must insist on guarantees from company sponsors that the results can be freely reported. Juni says the industry could fund an independent agency to finance studies. The FDA, which often has more data than the journals, does point out discrepancies, says Dr. Sandra Kweder, deputy director of the FDA's Office of New Drugs. But "it's difficult for us to police every potential journal," she says. "We don't have a department of journal review to catch those things."

The aim is to restore confidence in the findings of medical studies. As was the case with **Celebrex,** these studies are often widely circulated in the medical community. Many doctors begin prescribing drugs based on the findings, before the FDA rules on whether the studies have met its standards. If confidence in the veracity of medical research is lost, however, it is the pharmaceutical industry that will suffer.

```
Weird Science
Here are some of the criticisms made by research authorities who, in the June 5
Journal of the American Medical Assn., reviewed the quality of current medical
research literature
 -- Studies often fail to put results in the context of previous studies
 -- Authors of studies do not adequately address legitimate scientific criti-
cism after publication, and journal editors do not require them to do so
 -- Study collaborators frequently disagree about their study's conclusions,
and the published reports often fail to represent the full range of authors'
opinions
 -- Guidelines showing how results ought to be reported are often ignored or
badly applied
```

URL: http://www.businessweek.com/index.html

**GRAPHIC:**  Photograph: **CELEBREX** A Pharmacia-funded study is under fire

**LOAD-DATE:** June 20, 2002

EXHIBIT 176

| From: | lsimon@bidmc.harvard.edu |
|---|---|
| Sent: | Tuesday, December 09, 2003 10:10 PM |
| To: | Gail.Cawkwell@pfizer.com |
| Subject: | BXT-0282979_RE: CLASS |



BXT-0282980_newc
elecoxibmanusc...

well, Gail the CLASS trial data has been submitted and here it is, I hope you like it,
Lee

-----Original Message-----
From: Cawkwell, Gail
To: 'lsimon@bidmc.harvard.edu'
Sent: 12/9/2003 1:17 PM
Subject: CLASS

    Lee, I seem to communicate with you from lovely European capitols only....  I am this in
Rome this week on business, and hoping for an update of the CLASS manuscript.  We last
talked a month ago at which point some tables/figures needed some work but it was close to
submission!
    I also have a request.  We have a submission due to the UK NICE commission late in
January, and we are hoping that we can include a copy of the submitted manuscript to them,
as a confidential document, noting that it has been submitted but not yet reviewed.  I am
happy to provide you with any additional details, but would like your permission along
with the other authors, to do this.
    Looking forward to hearing from you!
Best wishes,

Gail D. Cawkwell, MD, PhD
Medical Director, Pain and Inflammation
Medical Team Leader, Celebrex World Wide Pfizer, Inc New York, NY

212-733-2920
gail.cawkwell@pfizer.com



EXHIBIT
156
976-10 DR

1

Confidential - Subject To Protective Order                                                    DEFS 03608521

CLASS: The Celecoxib Long Term Arthritis Safety Study: An Assessment of Analytical Methods

Lee S. Simon, MD[1], Vibeke Strand MD[2], Gerald Faich, MD[3], Jay L Goldstein MD[4], Fred Silverstein MD[5], Andrew Whelton, MD[6] , Robert Makuch, PhD[7]

Affiliations
1 Beth Israel Deaconess Hospital, Harvard Medical School, Boston, MA
2 Stanford University School of Medicine, Palo Alto, CA
3 Pharmaceutical Safety Assessments, Inc., Narberth PA
4 University of Illinois at Chicago, Chicago IL
5 University of Washington, Seattle, Washington
6 Universal Clinical Research Center, Inc, Hunt Valley, MD
7 Yale University School of Medicine, New Haven, CT

Running Title: CLASS: An Assessment of Analytical Methods

Address all Correspondence to:

    Lee S. Simon, MD
    Department of Medicine
    Beth Israel Deaconess Medical Center
    Harvard Medical School
    110 Francis St. Suite 5A
    Boston, MA 02215
    lsimon@caregroup.harvard.edu
    FAX: 617-527-3682
    Phone: 617-901-1631

Key words:  celecoxib nonsteroidal anti-inflammatory drugs gastrointestinal safety

Word count: 2430

Confidential - Subject To Protective Order

Abstract

Context:

The Celecoxib Long-Term Arthritis Safety Study (CLASS), a double blind, multicenter, RCT comparing incidence of ulcer complications (POB's: primary outcome) and secondary, symptomatic ulcers (PUB's) in 7968 osteoarthritis and rheumatoid arthritis patients receiving celecoxib 400 mg BID, diclofenac 75 mg BID or ibuprofen 800 mg TID,

Objective:

Comparison of primary and secondary endpoints over entire trial (median exposure of 9 months) with published data at 6 months.

Methods:

Analyses used the intent to treat population, chi-square for categorical data, non-parametric tests for continuous variables and log rank test for time to event curves.  Hazard and cumulative hazard function analyses examined the extent to which risk of an event changed over time.

Results:

With celecoxib: POB's over entire trial and 6 months were 0.73 vs. 0.76 events /100 patient years, respectively, p=NS; in combined NSAID groups: POB's declined after 6 months [1.45 at 6 months vs. 0.95 events/100 patient years (p=0.016)].  POB's with celecoxib vs combined NSAIDs: at 6 months, p=0.09; over entire trial p=0.45.   PUB's with celecoxib were 2.08/100 patient years at 6 months vs 1.85 over entire trial. (p=0.010); in combined NSAIDs: PUB's 3.54/100 patient years at 6 months; 2.81 over entire trial (p$\leq$0.04, celecoxib vs. NSAIDs at both timepoints). A statistical difference between celecoxib and NSAIDs for PUB's at 6 months was sustained over the entire trial (p=0.04). Early withdrawals occurred with diclofenac treatment for GI adverse events [22%], liver function tests > 3XULN [3.5%], and ibuprofen for lack of efficacy [17%].

Conclusions:

 CLASS  failed to demonstrate statistical significance between celecoxib  and combined NSAIDs by  POBs, although statistically significant for PUBs at 6

DEFS 03608523

months and trial endpoint.  These study results are likely due to 3 flaws in trial design: insufficient power; increased use of low dose aspirin and unexpected early withdrawals in NSAID treatment arms.

WORD COUNT: 297

Confidential - Subject To Protective Order

DEFS 03608524

Introduction

Non-steroidal anti-inflammatory drugs (NSAIDs) are among the most widely used class of therapeutics.  Effective as analgesics, anti-inflammatory and anti-pyretic agents, they are believed predominantly to act by inhibiting the cyclooxygenase (COX) enzymes.  Inhibition of COX activity may also lead to their well-characterized risk profile (1-3).

Since 1989 it has been established that at least two COX enzymes result in prostaglandin formation (4-6).  In general, COX-2 activity is inducible and is important in mediating pain and inflammation; whereas COX-1 activity is constitutive in most organ systems and includes maintenance of homeostasis in the gastrointestinal (GI) mucosa.  In certain tissues, COX-2 production is also constitutive (7,8).  Although endoscopy studies demonstrated that fewer gastro-duodenal ulcers occurred with COX-2 selective NSAIDs than active comparators including diclofenac, naproxen, and ibuprofen in patients with osteoarthritis [OA] and rheumatoid arthritis [RA] (9-11), it remains to be proven that endoscopic results predict fewer clinically important GI adverse outcomes. Therefore the first approved selective COX-2 inhibitors, celecoxib and rofecoxib were studied in large GI outcome trials, CLASS and VIGOR, respectively (12, 13).

In the CLASS trial, 7968 patients with OA or RA were enrolled in two large, double blind randomized controlled trials (RCTs) and received 2-4 times the recommended dose of celecoxib (400 mg BID) or standard doses of NSAIDs: ibuprofen 800 mg TID or diclofenac 75 mg BID using equal randomization.  It was prospectively defined that data from both RCTs would be combined.  Cardiovascular prophylaxis with low dose aspirin (ASA) ($\leq$ 325 mgs/day) was allowed.  The primary endpoint was time to occurrence of GI complications including perforations, obstructions, or bleeds (POBs). A secondary outcome was time to occurrence of symptomatic ulcers, perforations, obstructions and bleeds (PUBs).  The intent to treat population was all patients randomized who received

Confidential - Subject To Protective Order

at least one dose of study medication.  Data Safety Monitoring and GI Adjudication Committees reported to a supervisory Executive Committee, each of which adjudicated GI events in blinded fashion.

The trial was designed to provide at least 6 months exposure for all patients and was expected to result in approximately 12 months treatment in the majority of the patients.  Documentation of ulcers were based on symptomatic reports as no formal screening with endoscopy was required before or during the trial. The statistical analysis plan predefined comparison of primary and secondary outcomes in patients receiving aspirin compared with non-ASA users.

When accumulation of new GI complications slowed and few events were noted over a 3-month period both DSMC and Executive Committees recommended early termination of the trial.  Based on blinded review of the combined data across treatment groups, it was evident that the GI event rate had become negligible and the drop-out rate past 6 months exceeded 50%.  It was determined that data from the first 6 months of the RCT were most representative for determining the causal association between treatment and adverse GI outcomes. Prior to unblinding, both oversight committees recommended that 6 month data be the primary analysis for publication The median duration of protocol participation was 9 months, although some patients received treatment as long as 15 months.  As published (12) at 6 months there was a non-significant trend (p=0.09) for a lower incidence of GI complications (POBs) with celecoxib than combined NSAID treatment.  The secondary endpoint of symptomatic ulcers, perforations, and bleeds (PUBs) significantly favored treatment with celecoxib (p=0.04), compared with combined NSAIDs.

The rationale for selecting 6 month data for initial publication included: 1) few GI complications were reported after 6 months of protocol participation when drop out rates exceeded 50%, 2) only a limited number of patients with risk factors for NSAID-induced upper GI complications remained in the trial after that time, 3) the

Confidential - Subject To Protective Order

DEFS 03608526

enrolled patient population had fewer risk factors for GI complications than anticipated, and 4) more were receiving cardiovascular doses of aspirin (ASA).

Furthermore, after the blinded review was completed, it was subsequently discovered that more than the expected treatment discontinuations for GI adverse events occurred in patients receiving diclofenac and for lack of efficacy in the ibuprofen treatment group. As data after 6 months of protocol treatment were not derived from the same patient population as initially enrolled, there was concern that the integrity of the randomization process would not be preserved when comparing causality in the remaining patient population. This has been referred to as informative censoring (15-17).

Experimental Methods

The primary outcome in the CLASS trial was the incidence of ulcer complications: perforation, obstructions, and bleeds (POBs). (12) The secondary outcome measure: incidence of symptomatic ulcers (perforations, ulcers and bleeding (PUBs) was identical to the primary endpoint in the VIGOR trial (13). The predetermined statistical analysis plan included evaluating the results in patients with and without the use of concomitant low dose aspirin  The following analyses report data over the entire treatment period.

Analysis of the intent to treat population used standard methods for comparison between groups including chi-square tests for categorical data and non-parametric tests for comparative analyses of continuous variables. Time to event data were displayed using the Kaplan Meier method.  Start time used date of randomization and end date onset of a predefined GI outcome if it occurred (i.e. uncensored value). Last date of follow-up was utilized when additional data were censored due to trial completion (censored value). Hazard and cumulative hazard function analysis examined the extent to which risk of an event increased or decreased (remained constant) over time (18). Hazard functions were

Confidential - Subject To Protective Order

smoothed to aid in identifying the true risk pattern while reducing random variation (18,19) Comparisons of time to event curves were performed using log-rank tests (17-20). Annualized incidence rates summarize the information for each treatment group. Within group comparisons of event rates for different time periods are based on conditional independent increments in a Poisson process. All p values are two sided.

This manuscript has been prepared by clinical investigators and members of the DSMC and the Executive Committee for CLASS. No one who was an employee of the sponsor of this trial participated in the overall analysis of these data or the preparation of this report.

Results

Treatment disposition is presented in Table 1. Patient demographics and known risk factors are shown in Table 2. Fewer patients than expected were enrolled with identified risks for GI complications.

Figure 1 (top panel) shows results for the primary endpoint at 6 months and over the entire trial shows a non-statistically significant trend for a lower incidence of GI complications: POBs, the primary outcome, in the celecoxib versus combined NSAID treatment groups (p=0.45) over the entire trial [long term results] compared with published 6 month data (p=0.09) (12). Within the celecoxib treatment group, the incidence of POBs over the entire trial and at 6 months were nearly identical (0.73 vs 0.76 events per 100 patients years). In contrast, there was a decline in the incidence of POBs after 6 months in the combined NSAID treatment group (1.45 at 6 months vs 0.95 events per 100 patient years over the entire trial [p=0.016]), also evident when the NSAID treatment groups are examined separately [data not shown]. The incidence of POBs in patients who were not receiving ASA (78% of the ITT population) is shown at the bottom panel of Figure 1. In this predefined analysis of non aspirin users, the incidence of POB's with celecoxib was 0.44/100 patient years at 6 months and trial endpoint

Confidential - Subject To Protective Order

vs. 1.27 and 0.82, respectively with combined NSAIDs. A statistically significant treatment difference between celecoxib and NSAID treatment groups is not evident over the entire trial (log rank p=0.19) although different at 6 months (log-rank p=0.04).

A decline in the rate of POBs over time is evident in the active comparator but not celecoxib treatment groups. Reanalysis of these data explored the extent to which early treatment discontinuations explain this differential decline. As shown in the Kaplan-Meier curves in Figure 2, no further POBs were observed in the diclofenac treatment group after 80 days (top panel) and in those not receiving ASA after 60 days (bottom panel).

Figure 3 presents the secondary endpoint, PUBs, in the ITT population (top panel) and non-ASA users (bottom panel), respectively. Over the entire trial and at 6 months, celecoxib administration was associated with a statistically significant lower incidence of PUBs compared with combined NSAID treatment groups ($p \leq 0.04$ for both comparisons). The rate for PUBs in all patients receiving celecoxib was 1.85 over the entire trial and 2.08 per 100 patient years at 6 months (p=NS). In the combined NSAID group the rate for PUBs was 2.81 over the entire trial; less than 3.54 per 100 patient years observed at 6 months (p=0.010).

In patients receiving celecoxib without low dose ASA, the event rate of POBs over the entire trial was 0.32 and PUBs: 0.78 per 100 patient years (21). In the combined NSAID group, the incidence of POBs was 0.95 and PUBs, 1.85 per 100 patient years, compared with an expected rate of 1-2% for POBs and 2-4% for PUBs with non-selective NSAIDs,.

A higher proportion of patients discontinued treatment early in the combined NSAID group when compared with celecoxib treatment (Figure 4). Specifically, more patients withdrew with diclofenac treatment due to the adverse events,

Confidential - Subject To Protective Order

primarily due to complaints of abdominal pain (a), dyspepsia (b), nausea (c), and diarrhea (data not shown) (Figure 5). Overall 22% of patients receiving diclofenac discontinued protocol treatment associated with adverse GI events, and an additional 3.5% due to liver function test elevations > 3 times the upper limit of normal, as required by protocol.  Both withdrawal rates were statistically significant compared with celecoxib and ibuprofen treatment arms.  In contrast, 17% of patients in the ibuprofen group withdrew due to lack of efficacy (Figure 5).

It appears that patients at risk for GI complications differentially discontinued treatment early, and were thereby "prevented" from developing a primary or secondary GI outcome.  Figures 6 and 7 indicated that time from patient reported abdominal pain or dyspepsia to treatment discontinuation was very short (most patients withdrew within 2.5 weeks of onset of symptoms), and the 45 degree line (panel B in each figure) indicates the two events (onset of symptomatic GI adverse event and drop out) coincide with each other.  The nature and extent to which this "informative censoring" altered the patient population at risk over time in the protocol, and whether it could account for failure to achieve the primary outcome at p<0.05 was examined.  The prognostic significance of early discontinuations due to abdominal pain and/or dyspepsia across all treatment arms is presented in Figure 8.

Discussion

These analyses present the complete data set of the CLASS trial over the entire treatment period, a median duration of 9 months. The data were compared with 6-month results published in the original CLASS report, in view of concerns that it presented a biased point of view.  Analyses confirm that results over the first 6 months of treatment accurately reflect differences in the incidence of GI complications between celecoxib and NSAIDs due to differential drop out rates and potential "informative censoring".

Confidential - Subject To Protective Order

Data from the entire CLASS trial presented here, compared with previously published results at 6 months as well as those presented in the celecoxib package label over 9 months of protocol participation do not differ (12,20). Although celecoxib treatment did not statistically differ from the combined NSAID group by the predefined primary outcome of POB's at any timepoint, the secondary outcome: PUBs, significantly favored celecoxib treatment over the entire trial and at 6 months (p<0.04). Accounting for changes in practice and patient expectations, the combined outcome of PUB's did not suffer from an inadequate sample size and/or informed censoring; As PUB's represent the same endpoint predefined as the primary outcome measure in the VIGOR trial, it may be concluded that both rofecoxib and celecoxib administration are associated with a clinically meaningful reduction in symptomatic ulcers and ulcer complications.

Despite these re-analyses, the predefined primary outcome in the CLASS trial POB's, fails to differentiate celecoxib treatment from the combined NSAID groups; subanalyses differentiate it only from ibuprofen, not diclofenac, whether data from the entire trial or 6 months treatment are examined.  Yet, these observations are not consistent with published reports that the rate of endoscopically confirmed ulcers with diclofenac administration is similar to other non-selective NSAIDs (21,22).  Whether the failure to discriminate the effects of celecoxib from diclofenac is due to the possibility that diclofenac's effects are similar to a selective COX-2 inhibitor (not supported by accumulated endoscopic evidence) or is due to too few patients at risk remaining in that treatment arm as a result of informed censoring as described is unfortunately impossible to determine with this trial.   In the second 6 months of the study there were unexpectedly high withdrawal rates for GI symptoms than expected leading to too few patients including those at increased risk remaining in the diclofenac treatment arm to answer the question.

Confidential - Subject To Protective Order

Importantly, the risk for symptomatic ulcers and ulcer complications [PUB's] remained constant with celecoxib treatment at 6 months and over the entire trial. In contrast, the incidence of PUB's in the combined NSAID group was significantly less over the entire CLASS trial than at 6 months, and is inconsistent with published data with nonselective NSAIDs. Importantly, the incidence of PUB's in the combined NSAID group in CLASS does reflect results with naproxen treatment in the VIGOR trial (13).

Although "large simple trials" were designed to confirm an improved GI safety profile, suggested in short term endoscopy studies, it is clear they are not "simple". Results from the CLASS trial illustrate that design and execution of a RCT may fail due to changes in clinical practice; use of CV doses of ASA; expectations on the part of patients and physicians leading to early treatment discontinuations, and accrual of a patient population with less risk factors than expected, in part because the test agent was now available by prescription. (23,24)

Conclusions

Analysis of the complete data set of the CLASS trial over the entire treatment period, a median of 9 months, confirmed published results at 6 months. Although it failed to demonstrate statistical significance for celecoxib compared with combined NSAIDs by the primary outcome measure of POBs, the secondary combined outcome of PUBs statistically favored celecoxib over the entire trial and at 6 months. Analyses presented indicate this failure predominantly due to three flaws in trial design: (1) the study was underpowered because fewer patients with risk factors for GI events were recruited than expected; and (2) changes in medical practice: more patients were receiving cardiovascular prophylaxis with ASA and (3) expectations: unexpected early withdrawals for GI tolerability issues with diclofenac and lack of efficacy with ibuprofen.

Confidential - Subject To Protective Order

References

1.    Simon LS. Actions and toxicity of nonsteroidal anti-inflammatory drugs. Curr Opin Rheumatol. 1996;8:169-175.

2.    Wolfe MM, Lichtenstein DR, Singh G.  Gastrointestinal toxicity of nonsteroidal anti-inflammatory drugs. N Engl J Med 1999;340:1888-1899.

3.    Verburg KM, Maziasz TJ, Weiner E, Loose L, Geis GS, Isakson PC.  COX-2-specific inhibitors: definition of a new therapeutic concept.  Am J Therap 2001;8:49-64.

4.    Xie W, Chipman JG, Robertson DL, Erikson RL, Simmons DL. Expression of a mitogen-responsive gene encoding prostaglandin synthase is regulated by mRNA splicing.  Proc Natl Acad Sci USA 1991;88:2692-2696.

5.    Kujubu DA, Fletcher BS, Varnum BC, Lim RW, Herschman HR.  TIS10, a phorbol ester tumor promoter-inducible mRNA from Swiss 3T3 cells, encodes a novel prostglandin synthase/cyclooxygenase homologue.  J Biol Chem 1991;266:12866-72.

6.    O'Banion MK, Sadowski HB, Winn V, Young DA.  A serum- and glucocorticoid-regulated 4-kilobase mRNA encodes a cyclooxygenasse-related protein.  J Biol Chem 1991;266:23261-7.

7.    Crofford LJ.  COX-1 and COX-2 tissue expression: implications and predictions.  J Rheumatol 1997;(suppl 49)24:15-19.

8.    Lipsky PE.  Role of cyclooxygenase-1 and –2 in health and disease.  Am J Orthop 1999;28(Suppl 3):8-12.

Confidential - Subject To Protective Order

9.    Emery P, Zeidler H, Kvien TK, et al.  Celecoxib versus diclofenac in long-term management of rheumatoid arthritis: randomised double-blind comparison.  Lancet 1999;354:2106-2111.

10.   Simon LS, Weaver AL, Graham DY, et al.  Anti-inflammatory and upper gastrointestinal effects of celecoxib in rheumatoid arthritis: a randomized controlled trial.  JAMA 1999;282:1921-1928.

11.   Laine L, Harper S, Simon T, et al.  A randomized trial comparing the effect of rofecoxib, a cyclooxygenase 2-specific inhibitor, with that of ibuprofen on the gastoduodenal mucosa of patients with osteoarthritis. Rofecoxib Osteoarthritis Endoscopy Study Group.  Gastroenterol 1999;117:776-83.

12.   Silverstein FE, Faich G, Goldstein JL, et al. Gastrointestinal toxicity with celecoxib vs nonsteroidal anti-inflammatory drugs for osteoarthritis and rheumatoid arthritis, the CLASS study: a randomized controlled trial.  JAMA 2000;284(10):1247-1255.

13.   Bombardier C, Laine L, Reicin A, et al. Comparison of upper gastrointestinal toxicity of rofecoxib and naproxen in patients with rheumatoid arthritis.  N Engl J Med 2000;343;1520-8.

14.   Weil J, Colin JD, Langman M, et al. Prophylactic aspirin and risk of peptic ulcer bleeding [see comments].  BMJ 1995;310:827-830.

15.   Yola M, Lucien A.  Evidence of depletion of susceptibles effect in non-experimental pharmacoepidemiological research.  J Clin Epidemiol 1994;47:731-737.

Confidential - Subject To Protective Order

16. Scharfstein D, Robins JM, Eddings W, Rotnitzky A  Inference in randomized studies of informative censoring and discrete time-to-event endpoints Biometrics 2001; 57: 404-413,

17. Robins JM, Finklestein D Correcting for non-compliance and dependant censoring in an AIDS Clinical  Trial with inverse probability of censoring weighted (IPCW) log-rank tests Biometrics 2000; 56: 779-788

18. Miller RG Jr Survival Analysis John Wiley and Sons New York 1981

19. Mantel N Evaluation of survival data and two new rank order statistics arising in its consideration Cancer Chemo Reports 1966; 50: 163-170

20.  www.pdr.net/display.jsp?url=62950540.html/celebrex+capsules

21. Geis GS, Stead H, Wallemark CB, Nicholson PA Prevalence of mucosal lesions in the stomach and duodenum due to chronic use of NSAID in patients with rheumatoid arthritis or osteoarthritis, an interim report on prevention by misoprostol in diclofenac associated lesions J Rheumatol Suppl 1991 28: 11-14

22. Bolten W, Gomes JA, Stead H, Geis GS The gastrointestinal safety and efficacy of the fixed combination of diclofenac and misoprostol in the treatment of osteoarthritis Br J Rheumatol 1992 31: 753-758

23. Goldstein JL, Silverstein FE, Agrawal NM, Hubbard RC, Kaiser J, Maurath CJ, Verburg KM, Geis GS.  Reduced risk of upper gastrointestinal ulcer complications with celecoxib, a novel COX-2 inhibitor.  Am J Gastroenterol, 2000; 95(7):1681-1690.

Confidential - Subject To Protective Order

DEFS 03608535

24. Silverstein FD, Graham DY, Senior JR, et al.  Misoprostol reduced serious serious gastrointestinal complications in patients with rheumatoid arthritis receiving nonsteroidal anti-inflammatory drugs: a randomized double-blind, placebo-controlled trial.  Ann Intern Med 1995;123:241-9.

Confidential - Subject To Protective Order

DEFS 03608536

| Table 1. Patient Disposition; Number (%) of Patients | | | |
|---|---|---|---|
| | Celecoxib 400 mg BID (n=3987) | Diclofenac 75 mg BID (n=1996) | Ibuprofen 800 mg TID (n=1985) |
| Completed treatment | 2054 (51.5) | 994 (49.8) | 895 (45.1) |
| Withdrawn | 1933 (48.5) | 1002 (50.2) | 1090 (54.9) |
| Reasons for Withdrawal | | | |
| Lost to Follow-up | 0   (0.0) | 0   (0.0) | 0   (0.0) |
| Pre-existing Violation | 27   (0.7) | 11   (0.6) | 11   (0.6) |
| Protocol Noncompliance | 446 (11.2) | 177   (8.9) | 254 (12.8) |
| Treatment Failure | 617 (15.5) | 296 (14.8) | 403 (20.3) |
| Adverse Event | 843 (21.1) | 518 (26.0) | 422 (21.3) |

| Table 2. Percent of Patients with Risk Factors | | | |
|---|---|---|---|
| A priori protocol estimate | Celecoxib 400 mg BID (n=3987) | Diclofenac 75 mg BID (n=1996) | Ibuprofen 800 mg TID (n=1985) |
| >75 years (~ 15%) | 12.2 | 11.8 | 10.9 |
| Hx GI Bleed (~ 3%) | 1.7 | 1.5 | 1.4 |
| Hx of Ulcer (~ 15%) | 8.4 | 8.5 | 7.6 |
| Hx of CV Disease (~ 55%) | 40.2 | 40.3 | 40.0 |
| | | | |
| ASA Use (~ 12%) | 21.0 | 22.0 | 19.0 |

Confidential - Subject To Protective Order

DEFS 03608537

Figure Legends

Figure 1: *Incidence of Ulcer Complications (POB's) over the entire CLASS trial and at 6 months with (top panel) and without (bottom panel) concomitant ASA therapy*

The incidence of POB's with celecoxib treatment over the entire trial and at 6 months are 0.73 vs. 0.76 events per 100 patient years, respectively (p=NS). In comparison, the incidence of POB's after 6 months treatment in the combined NSAID group, 1.45 events per 100 patient years decreased to 0.95 events per 100 patient years over the entire trial (p=0.016).   The ITT population is presented in the top panel and patients not receiving ASA in the bottom panel.


Figure 2: *Time to Ulcer Complications (POB's) over the entire trial and at 6 months*

In the Kaplan-Meier time to event curve, ITT population (2a) accrual of new GI adverse events slows markedly after 125 days in the NSAID treatment groups but continues through 10 months in the celecoxib treatment arm.  In patients not receiving ASA (2b), the incidence of POB's was less than expected, and no events were evident with diclofenac treatment after approximately 60 days of exposure..

Figure 3: *Incidence of Ulcer Complications and Symptomatic Ulcers (PUB's) over the entire trial and at 6 months*

The incidence of PUBs with celecoxib treatment remains constant over the entire trial and at 6 months in the ITT population (3a) and those not receiving ASA (3b).  A reduced incidence of PUBS over the entire trial is evident with combined NSAID administration over the entire trial, compared with 6 months

Confidential - Subject To Protective Order

Figure 4: *Incidence of Early Protocol Discontinuation By Cause and Treatment Duration Patients Receiving Celecoxib (top panel), Diclofenac (middle panel) and Ibuprofen (bottom panel).*

Patients randomized to celecoxib treatment continued protocol participation over a longer period of time than either NSAID comparator groups.

Figure 5: *Time to First Patient Report of Mild/Moderate/Severe Abdominal Pain and Treatment Discontinuation (5a); Report of Severe Abdominal Pain and Treatment Discontinuation. (5b).*

The majority of patients discontinued protocol participation within 2.5 weeks of onset of abdominal pain (5a); more evident when these symptoms are reported to be severe.  In panel B the x-axis represents the last dosing day, or the treatment discontinuation date while the y axis is the day of onset of symptoms, date of occurrence of abdominal pain. The 45-degree line suggests there was significant correlation between onset of symptoms and the last dose of medication.

Figure 6: *Time to First Patient Report of Mild/Moderate/Severe Dyspepsia and Treatment Discontinuation (6a)*

*Report of Severe Dyspepsia and Treatment Discontinuation. (6b).*

The majority of patients discontinued protocol participation within 2.5 weeks of onset of dyspepsia (top panel); more evident when these symptoms are reported to be severe.

In 6b the x-axis represents the last doing day or the treatment discontinuation date while the y axis is the day of onset of symptoms in this context it is the date of occurrence of severe abdominal pain.  The 45-degree line suggests there was significant correlation between onset of symptoms and the last dose of medication.

Confidential - Subject To Protective Order

DEFS 03608539

Figure 7: *Comparison of Early Treatment Discontinuations in Patients with or without Abdominal Pain Over Time.* [mild, moderate, severe combined]

Patients continued protocol treatment for a longer period of time in the absence of abdominal pain (solid line) than when reporting this GI adverse event (dashed line).

In these data the y-axis represents the proportion of patients not failing and the x-axis represent the days.

Confidential - Subject To Protective Order

Figure 1





Confidential - Subject To Protective Order

DEFS 03608541

Figure 2A



celecoxib vs diclofenac; p=0.64
celecoxib vs ibuprofen; p=0.41

Confidential - Subject To Protective Order

DEFS 03608542

**Figure 2 B**



Confidential - Subject To Protective Order

DEFS 03608543

Figure 3 A



Confidential - Subject To Protective Order

DEFS 03608544

**Figure 3 B**



Confidential - Subject To Protective Order

DEFS 03608545

**Figure 4**

Celecoxib (n=3987)
Adverse Event
Completed Study
NonCompliance
Treatment Failure
Violation
Number of Patients
1000
900
800
700
600
500
400
300
200
100
0
0 to 1
>1 to 3
>3 to 6
>6 to 9
>9 to 12
>12 to 15
>15
Time Interval (Months)

Ibuprofen (n=1985)
Adverse Event
Completed Study
NonCompliance
Treatment Failure
Violation
Number of Patients
1000
900
800
700
600
500
400
300
200
100
0
0 to 1
>1 to 3
>3 to 6
>6 to 9
>9 to 12
>12 to 15
>15
Time Interval (Months)

Diclofenac (n=1996)
Adverse Event
Completed Study
NonCompliance
Treatment Failure
Violation
Number of Patients
1000
900
800
700
600
500
400
300
200
100
0
0 to 1
>1 to 3
>3 to 6
>6 to 9
>9 to 12
>12 to 15
>15
Time Interval (Months)

**Figure 5a**



**Figure 5b**



Confidential - Subject To Protective Order

DEFS 03608547

**Figure 6a**





**Figure 6b**

Confidential - Subject To Protective Order

DEFS 03608549

**Figure 7**



Days

Confidential - Subject To Protective Order

DEFS 03608550

EXHIBIT 177

## EDITORIALS

Editorials represent the opinions of the authors and *JAMA* and not those of the American Medical Association.

EXHIBIT
40
1.12.07      DS

# Update on *JAMA's* Conflict of Interest Policy

Annette Flanagin, RN, MA

Phil B. Fontanarosa, MD, MBA

Catherine D. DeAngelis, MD, MPH

SINCE THE MID-1980s, *JAMA* AND OTHER MEDICAL JOURnals have encouraged authors to disclose conflicts of interest that they may have in the subject matter of their manuscripts.[1] In 1989, *JAMA* began requiring authors to sign a statement declaring all potential financial conflicts of interest and began including all such disclosures in published articles.[2] Since that time, the journal's conflict of interest policy has continued to evolve with the goal of improving disclosures and transparency for all involved.[3,4] For example, the policy applies to all types of manuscripts, including letters and book reviews, and to all individuals involved in the review, editorial evaluation, and publication process, including peer reviewers, editorial board members, and editors. Most recently, *JAMA* began requiring authors to specifically indicate if they have no conflicts of interest in the subject matter of their manuscript.[4] The International Committee of Medical Journal Editors (ICMJE),[5] the Council of Science Editors (CSE),[6] and the World Association of Medical Editors (WAME)[7] have similar policies.

However, biomedical journals have a wide range of conflict of interest policies (eg, some request disclosures, some require disclosures, and some publish disclosures and some do not).[8,9] Journals also define *relevant* conflicts of interest in different terms to include financial and nonfinancial conflicts or only financial interests, and for financial interests, may define relevance in different monetary amounts or lengths of time. Perhaps because of these different policies, some authors may not fully understand *JAMA's* requirements for reporting potential conflicts of interest and might not fully disclose their conflicts of interest to *JAMA* at the time they submit their manuscripts. For example, some authors completely disclose all relevant conflicts of interest in the submitted manuscript, whereas other authors disclose relevant interests in a cover letter or only in the authorship form. The result is an inconsistent approach whereby for some authors, the disclosure is completely transparent to all involved in the manuscript evaluation process, including peer reviewers; but for other authors, the disclosure is made public only at the time of publication. In addition, some authors continue to misunderstand what is expected and provide inaccurate or incomplete disclosures that are discovered after publication and result in a published correction or letter of explanation.[10-14]

To further improve the transparency of reporting of potential conflicts of interest and to encourage more accurate and complete disclosures, an important new policy is that *JAMA* will begin requiring all authors to disclose all potential conflicts of interest in the Acknowledgment section of the manuscript at the time of submission. This includes specific financial interests and relationships and affiliations relevant to the subject of the manuscript. Between now and the end of 2006, *JAMA* will permit submissions of manuscripts in which authors' conflict of interest information is not yet included in the manuscript, but with the understanding that this information will be obtained and submitted promptly—and definitely before any revisions are considered. Beginning January 2007, *JAMA* will require that complete disclosures of conflicts of interest from all authors, including declaration of no conflicts of interest, are included in the Acknowledgment section of the manuscript. *JAMA's* Web-based manuscript submission system will require the corresponding author to indicate that this information is included in the manuscript at the time of submission. Authors will continue to complete and sign an authorship responsibility form that includes statements on conflict of interest as well as funding and support.

Conflicts of interest in biomedical science continue to be under intense and increasing scrutiny. To help ensure transparency and complete reporting of this information, *JAMA's* policies on conflicts of interest have been updated (as noted below).[15] All authors are encouraged to read these policies carefully and to follow them completely. By doing so, peer reviewers and editors can expect full disclosure of potential conflicts of interest in manuscripts submitted to *JAMA*, and physicians, other health care professionals, and the public can expect complete reporting of conflict of interest information in articles published in *JAMA*.

**Author Affiliations:** Ms Flanagin (annette.flanagin@jama-archives.org) is Managing Deputy Editor, Dr Fontanarosa is Executive Deputy Editor, and Dr DeAngelis is Editor in Chief, *JAMA*.

©2006 American Medical Association. All rights reserved.

Downloaded from www.jama.com on January 5, 2007

## JAMA Conflict of Interest Policy

"A conflict of interest may exist when an author (or the author's institution or employer) has financial or personal relationships or affiliations that could influence (or bias) the author's decisions, work, or manuscript. All authors are required to disclose all potential conflicts of interest, including specific financial interests and relationships and affiliations (other than those affiliations listed in the title page of the manuscript) relevant to the subject of their manuscript. Authors should err on the side of full disclosure and should contact the editorial office if they have questions or concerns.

All such disclosures should be listed in the Acknowledgment section at the end of the manuscript. Authors without conflicts of interest, including specific financial interests and relationships and affiliations relevant to the subject of their manuscript, should include a statement of no such interests in the Acknowledgment section of the manuscript. Failure to include this information in the manuscript may delay evaluation and review of the manuscript.

Authors are expected to provide detailed information about all relevant financial interests and relationships or financial conflicts within the past 5 years and for the foreseeable future (eg, employment/affiliation, grants or funding, consultancies, honoraria, stock ownership or options, expert testimony, royalties, or patents filed, received, or pending), particularly those present at the time the research was conducted and through publication, as well as other financial interests (such as patent applications in preparation) that represent potential future financial gain. Although many universities and other institutions have established policies and thresholds for reporting financial interests and other conflicts of interest, *JAMA* requires *complete* disclosure of all relevant financial relationships and potential financial conflicts of interest, regardless of amount or value. For example, authors of a manuscript about hypertension should report all financial relationships they have with all manufacturers of products used in the management of hypertension, not only those relationships with companies whose specific products are mentioned in the manuscript. If authors are uncertain about what constitutes a relevant financial interest or relationship, they should contact the editorial office.

For all accepted manuscripts, each author's disclosures of conflicts of interest and relevant financial interests and affiliations and declarations of no such interests will be published. Decisions about whether such information provided by authors should be published, and thereby disclosed to readers, are usually straightforward. Although editors are willing to discuss disclosure of specific conflicts of interest with authors, *JAMA*'s policy is one of complete disclosure of all potential conflicts of interest, including specific financial interests and relationships and affiliations (other than those affiliations listed in the title page of the manuscript) relevant to the subject of their manuscript. The policy requesting disclosure of conflicts of interest applies for all manuscript submissions, including letters to the editor and book reviews. If an author's disclosure of potential conflict of interest is determined to be inaccurate or incomplete after publication, a correction will be published to rectify the original published disclosure statement.

Authors also are required to report detailed information regarding all financial and material support for the research and work, including but not limited to grant support, funding sources, and provision of equipment and supplies in the Acknowledgment section of the manuscript.

All authors must also complete and sign a statement on financial disclosures, funding, and support that is part of the Authorship Form."

**Financial Disclosures:** None reported.

### REFERENCES

1. Lundberg GD, Flanagin A. New requirements for authors: signed statements of authorship responsibility and financial disclosure. *JAMA*. 1989;262:2003-2004.
2. Rennie D, Flanagin A, Glass RM. Conflicts of interest in the publication of science. *JAMA*. 1991;266:266-267.
3. DeAngelis CD, Fontanarosa PB, Flanagin A. Reporting financial conflicts of interest and relationships between investigators and research sponsors. *JAMA*. 2001; 286:89-91.
4. Fontanarosa PB, Flanagin A, DeAngelis CD. Reporting conflicts of interest, financial aspects of research, and role of sponsors in funded studies. *JAMA*. 2005; 294:110-111.
5. International Committee of Medical Journal Editors. Uniform requirements for manuscripts submitted to biomedical journals: updated October 2005. http://www .icmje.org. Accessibility verified June 15, 2006.
6. Council of Science Editors. Conflicts of interest and the peer review process. http://www.councilscienceeditors.org/services/draft_approved.cfm. Accessibility verified June 15, 2006.
7. World Association of Medical Editors. WAME recommendations on publication ethics policies for medical journals. http://www.wame.org/pubethicrecom .htm. Accessibility verified June 15, 2006.
8. Krimsky S, Rothenberg LS. Conflict of interest policies in science and medical journals: editorial practices and author disclosures. *Sci Eng Ethics*. 2001;7:205-218.
9. Ancker J, Flanagin A. A comparison of conflict of interest policies at peer-reviewed journals in multiple scientific disciplines. Paper presented at: The Fifth International Congress on Peer Review and Biomedical Publication; September 17, 2005; Chicago, Ill. http://www.ama-assn.org/public/peer/program.html. Accessed June 13, 2006.
10. Incorrect statements on funding/support and role of the sponsors and incorrect and incomplete financial disclosures [published correction online May 16, 2006]. *JAMA*. 2006;295:2482. http://jama.ama-assn.org/cgi/content/full/295/21 /2482-c. Accessed June 13, 2006.
11. Ridker PM. Incomplete financial disclosure for study of funding and outcomes in major cardiovascular trials [letter]. *JAMA*. 2006;295:2725-2726.
12. Incomplete financial disclosure [correction]. *JAMA*. 2006;295:2726.
13. Cohen LS, Nonacs R, Viguera AC, et al. Antidepressant treatment and relapse of depression during pregnancy [letter]. *JAMA*. 2006;296:165-167.
14. Incomplete financial disclosure [correction]. *JAMA*. 2006;296:170.
15. Instructions for authors. *JAMA*. 2006;296:107-116.

©2006 American Medical Association. All rights reserved.

Downloaded from www.jama.com on January 5, 2007

# EXHIBIT 178

## HIGHLIGHTS OF PRESCRIBING INFORMATION

These highlights do not include all the information needed to use CELEBREX safely and effectively. See full prescribing information for CELEBREX.

CELEBREX® (celecoxib) capsules
Initial U.S. Approval: 1998

---

**WARNING: CARDIOVASCULAR AND GASTROINTESTINAL RISKS**
*See full prescribing information for complete boxed warning*

**Cardiovascular Risk**
- **CELEBREX, may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal. All NSAIDs may have a similar risk. This risk may increase with duration of use. Patients with cardiovascular disease or risk factors for cardiovascular disease may be at greater risk. *(5.1,14.7)***
- **CELEBREX is contraindicated for the treatment of peri-operative pain in the setting of coronary artery bypass graft (CABG) surgery. *(4, 5.1)***

**Gastrointestinal Risk**
- **NSAIDs, including CELEBREX, cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal. These events can occur at any time during use and without warning symptoms. Elderly patients are at greater risk for serious gastrointestinal (GI) events. *(5.4)***

---

**-----------------INDICATIONS AND USAGE-----------------**
CELEBREX is a nonsteroidal anti-inflammatory drug indicated for:
- Osteoarthritis (OA) (1.1)
- Rheumatoid Arthritis (RA) (1.2)
- Juvenile Rheumatoid Arthritis (JRA) in patients 2 years and older (1.3)
- Ankylosing Spondylitis (AS) (1.4)
- Acute Pain (AP) (1.5)
- Primary Dysmenorrhea (PD) (1.6)
- Familial Adenomatous Polyposis (FAP)-adjunct to usual care) (1.7)

**-----------------DOSAGE AND ADMINISTRATION-----------------**
Use lowest effective dose for the shortest duration consistent with treatment goals for the individual patient. (1, 5.1, 5.4)
- OA: 200 mg once daily or 100 mg twice daily (2.1, 14.1)
- RA: 100 to 200 mg twice daily (2.2, 14.2)
- JRA: 50 mg twice daily in patients 10-25 kg. 100 mg twice daily in patients more than 25 kg (2.3, 14.3)
- AS: 200 mg once daily single dose or 100 mg twice daily. If no effect is observed after 6 weeks, a trial of 400 mg (single or divided doses) may be of benefit (2.4, 14.4)
- AP and PD: 400 mg initially, followed by 200 mg dose if needed on first day. On subsequent days, 200 mg twice daily as needed (2.5, 14.5)
- FAP: 400 mg twice daily with food, as an adjunct to usual care (2.6, 14.6)

Reduce daily dose by 50% in patients with moderate hepatic impairment (Child-Pugh Class B).

Consider a dose reduction by 50% (or alternative management for JRA) in patients who are known or suspected to be CYP2C9 poor metabolizers, (2.7, 8.4, 8.8, 12.3).

**-----------------DOSAGE FORMS AND STRENGTHS-----------------**
Capsules: 50 mg, 100 mg, 200 mg and 400 mg (3)

**-----------------CONTRAINDICATIONS-----------------**
- Known hypersensitivity to celecoxib or sulfonamides (4)
- History of asthma, urticaria, or other allergic-type reactions after taking aspirin or other NSAIDs (4, 5.7, 5.8, 5.13)
- Use during the perioperative period in the setting of coronary artery bypass graft (CABG) surgery (4, 5.1)

**-----------------WARNINGS AND PRECAUTIONS-----------------**
- Serious and potentially fatal cardiovascular (CV) thrombotic events, myocardial infarction, and stroke. Patients with known CV disease/risk factors may be at greater risk (5.1, 14.7, 17.2).
- Serious gastrointestinal (GI) adverse events, which can be fatal. The risk is greater in patients with a prior history of ulcer disease or GI bleeding, and in patients at high risk for GI events, especially the elderly. CELEBREX should be used with caution in these patients (5.4, 8.5, 14.7, 17.3).
- Elevated liver enzymes and, rarely, severe hepatic reactions. Discontinue use of CELEBREX immediately if abnormal liver enzymes persist or worsen (5.5, 17.4).
- New onset or worsening of hypertension. Blood pressure should be monitored closely during treatment with CELEBREX (5.2, 7.4, 17.2).
- Fluid retention and edema. CELEBREX should be used with caution in patients with fluid retention or heart failure (5.3, 17.6).
- Renal papillary necrosis and other renal injury with long term use. Use CELEBREX with caution in the elderly, those with impaired renal function, heart failure, liver dysfunction, and those taking diuretics, ACE-inhibitors, or angiotensin II antagonists (5.6, 7.4, 8.7, 17.6).
- Anaphylactoid reactions. Do not use CELEBREX in patients with the aspirin triad (5.7, 10, 17.7).
- Serious skin adverse events such as exfoliative dermatitis, Stevens-Johnson syndrome (SJS), and toxic epidermal necrolysis (TEN), which can be fatal and can occur without warning even without known prior sulfa allergy. Discontinue CELEBREX at first appearance of rash or skin reactions (5.8, 17.5).

**-----------------ADVERSE REACTIONS-----------------**
Most common adverse reactions in arthritis trials (>2% and >placebo): abdominal pain, diarrhea, dyspepsia, flatulence, peripheral edema, accidental injury, dizziness, pharyngitis, rhinitis, sinusitis, upper respiratory tract infection, rash (6.1).

**To report SUSPECTED ADVERSE REACTIONS, contact Pfizer at 1-800-438-1985 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch**

**-----------------DRUG INTERACTIONS-----------------**
- Concomitant use of CELEBREX and warfarin may result in increased risk of bleeding complications. (7.1)
- Concomitant use of CELEBREX increases lithium plasma levels. (7.2)
- Concomitant use of CELEBREX may reduce the antihypertensive effect of ACE Inhibitors and angiotensin II antaonists (7.4)
- Use caution with drugs known to inhibit P450 2C9 or metabolized by 2D6 due to the potential for increased plasma levels (2.7, 8.4, 8.8, 12.3)

**-----------------USE IN SPECIFIC POPULATIONS-----------------**
- Pregnancy Category C prior to 30 weeks gestation; Category D starting at 30 weeks gestation (5.9, 8.1, 17.8)

See 17 for PATIENT COUNSELING INFORMATION and Medication Guide

Revised: June 2009



**FULL PRESCRIBING INFORMATION: CONTENTS\***

**BOXED WARNING**

1. **INDICATIONS AND USAGE**
   1.1 Osteoarthritis
   1.2 Rheumatoid Arthritis
   1.3 Juvenile Rheumatoid Arthritis
   1.4 Ankylosing Spondylitis
   1.5 Acute Pain
   1.6 Primary Dysmenorrhea
   1.7 Familial Adenomatous Polyposis
2. **DOSAGE AND ADMINISTRATION**
   2.1 Osteoarthritis
   2.2 Rheumatoid Arthritis
   2.3 Juvenile Rheumatoid Arthritis
   2.4 Ankylosing Spondylitis
   2.5 Management of Acute Pain and Treatment of Primary Dysmenorrhea
   2.6 Familial Adenomatous Polyposis
   2.7 Special Populations
3. **DOSAGE FORMS AND STRENGTHS**
4. **CONTRAINDICATIONS**
5. **WARNINGS AND PRECAUTIONS**
   5.1 Cardiovascular Thrombotic Events
   5.2 Hypertension
   5.3 Congestive Heart Failure and Edema
   5.4 Gastrointestinal (GI) Effects
   5.5 Hepatic Effects
   5.6 Renal Effects
   5.7 Anaphylactoid Reactions
   5.8 Skin Reactions
   5.9 Pregnancy
   5.10 Corticosteroid Treatment
   5.11 Hematological Effects
   5.12 Disseminated Intravascular Coagulation (DIC)
   5.13 Preexisting Asthma
   5.14 Laboratory Tests
   5.15 GI Cancer in Familial Adenomatous Polyposis
   5.16 Inflammation
   5.17 Concomitant NSAID Use
6. **ADVERSE REACTIONS**
   6.1 Pre-marketing Controlled Arthritis Trials
   6.2 The Celecoxib Long-Term Arthritis Safety Study
   6.3 Juvenile Rheumatoid Arthritis Study
   6.4 Other Pre-Approval Studies
   6.5 The APC and PreSAP Trials
7. **DRUG INTERACTIONS**
   7.1 Warfarin
   7.2 Lithium
   7.3 Aspirin
   7.4 ACE-Inhibitors and Angiotensin II Antagonists
   7.5 Fluconazole
   7.6 Furosemide
   7.7 Methotrexate
   7.8 Concomitant NSAID Use
8. **USE IN SPECIFIC POPULATIONS**
   8.1 Pregnancy
   8.2 Labor and Delivery
   8.3 Nursing Mothers
   8.4 Pediatric Use
   8.5 Geriatric Use
   8.6 Hepatic Insufficiency
   8.7 Renal Insufficiency
   8.8 Poor Metabolizers of CYP2C9 Substrates
10. **OVERDOSAGE**
11. **DESCRIPTION**
12. **CLINICAL PHARMACOLOGY**
    12.1 Mechanism of Action
    12.2 Pharmacodynamics
    12.3 Pharmacokinetics

13. **NONCLINICAL TOXICOLOGY**
    13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
    13.2 Animal Toxicology
14. **CLINICAL STUDIES**
    14.1 Osteoarthritis
    14.2 Rheumatoid Arthritis
    14.3 Juvenile Rheumatoid Arthritis
    14.4 Ankylosing Spondylitis
    14.5 Analgesia, Including Primary Dysmenorrhea
    14.6 Familial Adenomatous Polyposis
    14.7 Special Studies
16. **HOW SUPPLIED/STORAGE AND HANDLING**
17. **PATIENT COUNSELING INFORMATION**
    17.1 Medication Guide
    17.2 Cardiovascular Effects
    17.3 Gastrointestinal Effects
    17.4 Hepatic Effects
    17.5 Adverse Skin Reactions
    17.6 Weight Gain and Edema
    17.7 Anaphylactoid Reactions
    17.8 Effects During Pregnancy
    17.9 Preexisting Asthma
    17.10 GI Cancer in Familial Adenomatous Polyposis

\* Sections or subsections omitted from the Full Prescribing Information are not listed.

**FULL PRESCRIBING INFORMATION**

> **WARNING: CARDIOVASCULAR AND GASTROINTESTINAL RISKS**
>
> **Cardiovascular Risk**
> - **CELEBREX may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal.  All nonsteroidal anti-inflammatory drugs (NSAIDs) may have a similar risk.  This risk may increase with duration of use.  Patients with cardiovascular disease or risk factors for cardiovascular disease may be at greater risk. (5.1,14.7)**
>
> - **CELEBREX is contraindicated for the treatment of peri-operative pain in the setting of coronary artery bypass graft (CABG) surgery. (4, 5.1)**
>
> **Gastrointestinal Risk**
> - **NSAIDs, including CELEBREX, cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.  These events can occur at any time during use and without warning symptoms.  Elderly patients are at greater risk for serious gastrointestinal events. (5.4)**

1.  **INDICATIONS AND USAGE**
    Carefully consider the potential benefits and risks of CELEBREX and other treatment options before deciding to use CELEBREX.  Use the lowest effective dose for the shortest duration consistent with individual patient treatment goals [*see Warnings and Precautions (5)*]

1.1 **Osteoarthritis (OA)**
    CELEBREX is indicated for relief of the signs and symptoms of OA [*see Clinical Studies (14.1)*]

1.2 **Rheumatoid Arthritis (RA)**
    CELEBREX is indicated for relief of the signs and symptoms of RA [*see Clinical Studies (14.2)*]

1.3 **Juvenile Rheumatoid Arthritis (JRA)**
    CELEBREX is indicated for relief of the signs and symptoms of JRA in patients 2 years and older [*see Clinical Studies (14.3)*]

1.4 **Ankylosing Spondylitis (AS)**
    CELEBREX is indicated for the relief of signs and symptoms of AS [*see Clinical Studies (14.4)*]

1.5 **Acute Pain (AP)**
    CELEBREX is indicated for the management of AP in adults [*see Clinical Studies (14.5)*]

1.6 **Primary Dysmenorrhea (PD)**
    CELEBREX is indicated for the treatment of PD [*see Clinical Studies (14.5)*]

1.7 **Familial Adenomatous Polyposis (FAP)**
    CELEBREX is indicated to reduce the number of adenomatous colorectal polyps in FAP, as an adjunct to usual care (e.g., endoscopic surveillance, surgery). It is not known whether there is a clinical benefit from a reduction in the number of colorectal polyps in FAP patients. It is also not known whether the effects of CELEBREX treatment will persist after CELEBREX is discontinued. The efficacy and safety of CELEBREX treatment in patients with FAP beyond six months have not been studied [*see Warnings and Precautions (5.15), Clinical Studies (14.6)*]

2.  **DOSAGE AND ADMINISTRATION**
    Use lowest effective dose for the shortest duration consistent with treatment goals for the individual patient.

    These doses can be given without regard to timing of meals.

2.1 **Osteoarthritis**
    For relief of the signs and symptoms of OA the recommended oral dose is 200 mg per day administered as a single dose or as 100 mg twice daily.

2.2 **Rheumatoid Arthritis**
    For relief of the signs and symptoms of RA the recommended oral dose is 100 to 200 mg twice daily.

2.3 **Juvenile Rheumatoid Arthritis**
    For the relief of the signs and symptoms of JRA the recommended oral dose for pediatric patients (age 2 years and older) is based on weight. For patients $\geq$10 kg to $\leq$25 kg the recommended dose is 50 mg twice daily. For patients >25 kg the recommended dose is 100 mg twice daily.

    For patients who have difficulty swallowing capsules, the contents of a CELEBREX capsule can be added to applesauce. The entire capsule contents are carefully emptied onto a level teaspoon of cool or room temperature applesauce and ingested immediately with water. The sprinkled capsule contents on applesauce are stable for up to 6 hours under refrigerated conditions (2-8° C/ 35-45° F).

2.4 **Ankylosing Spondylitis**
    For the management of the signs and symptoms of AS, the recommended dose of CELEBREX is 200 mg daily in single (once per day) or divided (twice per day) doses.   If no effect is observed after 6 weeks, a trial of 400 mg daily may be worthwhile.  If no effect is observed after 6 weeks on 400 mg daily, a response is not likely and consideration should be given to alternate treatment options.

2.5 **Management of Acute Pain and Treatment of Primary Dysmenorrhea**
    The recommended dose of CELEBREX is 400 mg initially, followed by an additional 200 mg dose if needed on the first day.  On subsequent days, the recommended dose is 200 mg twice daily as needed.

2.6 **Familial Adenomatous Polyposis**
    Usual medical care for FAP patients should be continued while on CELEBREX.  To reduce the number of adenomatous colorectal polyps in patients with FAP, the recommended oral dose is 400 mg twice per day to be taken with food.

2.7 **Special Populations**
    ***Hepatic insufficiency:***  The daily recommended dose of CELEBREX capsules in patients with moderate hepatic impairment (Child-Pugh Class B) should be reduced by 50%.  The use of CELEBREX in patients with severe hepatic impairment is not recommended [*see Warnings and Precautions (5.5), Use in Specific Populations (8.6) and Clinical Pharmacology (12.3)*].

    ***Poor Metabolizers of CYP2C9 Substrates:***  Patients who are known or suspected to be poor CYP2C9 metabolizers based on previous history/experience with other CYP2C9 substrates (such as warfarin, phenytoin) should be administered celecoxib with caution.  Consider starting treatment at half the lowest recommended dose in poor metabolizers.  Consider using alternative management in JRA patients who are poor metabolizers.  [*see Use in Specific populations (8.8), and Clinical Pharmacology (12.3)*].

3.  **DOSAGE FORMS AND STRENGTHS**
    Capsules: 50 mg, 100 mg, 200 mg and 400 mg

4.  **CONTRAINDICATIONS**
    CELEBREX is contraindicated:

    - In patients with known hypersensitivity to celecoxib, aspirin, or other NSAIDs.

    - In patients who have demonstrated allergic-type reactions to sulfonamides.

    - In patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe anaphylactoid reactions to NSAIDs, some of them fatal, have been reported in such patients [*see Warnings and Precautions (5.7, 5.13)*].

    - For the treatment of peri-operative pain in the setting of coronary artery bypass graft (CABG) surgery [*see Warnings and Precautions (5.1)*].

## 5. WARNINGS AND PRECAUTIONS

### 5.1 Cardiovascular Thrombotic Events

Chronic use of CELEBREX may cause an increased risk of serious adverse cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal. In the APC (Adenoma Prevention with Celecoxib) trial, the hazard ratio for the composite endpoint of cardiovascular death, MI, or stroke was 3.4 (95% CI 1.4 – 8.5) for CELEBREX 400 mg twice daily and 2.8 (95% CI 1.1 – 7.2) with CELEBREX 200 mg twice daily compared to placebo. Cumulative rates for this composite endpoint over 3 years were 3.0% (20/671 subjects) and 2.5% (17/685 subjects), respectively, compared to 0.9% (6/679 subjects) with placebo treatment. The increases in both celecoxib dose groups versus placebo-treated patients were mainly due to an increased incidence of myocardial infarction [see Clinical Studies (14.7)].

All NSAIDs, both COX-2 selective and non-selective, may have a similar risk. Patients with known CV disease or risk factors for CV disease may be at greater risk. To minimize the potential risk for an adverse CV event in patients treated with CELEBREX, the lowest effective dose should be used for the shortest duration consistent with individual patient treatment goals. Physicians and patients should remain alert for the development of such events, even in the absence of previous CV symptoms. Patients should be informed about the signs and/or symptoms of serious CV toxicity and the steps to take if they occur.

There is no consistent evidence that concurrent use of aspirin mitigates the increased risk of serious CV thrombotic events associated with NSAID use. The concurrent use of aspirin and CELEBREX does increase the risk of serious GI events [see Warnings and Precautions (5.4)].

Two large, controlled, clinical trials of a different COX-2 selective NSAID for the treatment of pain in the first 10-14 days following CABG surgery found an increased incidence of myocardial infarction and stroke [see Contraindications (4)].

### 5.2 Hypertension

As with all NSAIDs, CELEBREX can lead to the onset of new hypertension or worsening of preexisting hypertension, either of which may contribute to the increased incidence of CV events. Patients taking thiazides or loop diuretics may have impaired response to these therapies when taking NSAIDs. NSAIDs, including CELEBREX, should be used with caution in patients with hypertension. Blood pressure should be monitored closely during the initiation of therapy with CELEBREX and throughout the course of therapy. The rates of hypertension from the CLASS trial in the CELEBREX, ibuprofen and diclofenac-treated patients were 2.4%, 4.2% and 2.5%, respectively [see Clinical Studies (14.7)].

### 5.3 Congestive Heart Failure and Edema

Fluid retention and edema have been observed in some patients taking NSAIDs, including CELEBREX [see Adverse Reactions (6.1)]. In the CLASS study [see Clinical Studies (14.7)], the Kaplan-Meier cumulative rates at 9 months of peripheral edema in patients on CELEBREX 400 mg twice daily (4-fold and 2-fold the recommended OA and RA doses, respectively, and the approved dose for FAP), ibuprofen 800 mg three times daily and diclofenac 75 mg twice daily were 4.5%, 6.9% and 4.7%, respectively. CELEBREX should be used with caution in patients with fluid retention or heart failure.

### 5.4 Gastrointestinal (GI) Effects

#### Risk of GI Ulceration, Bleeding, and Perforation

NSAIDs, including CELEBREX, can cause serious gastrointestinal events including bleeding, ulceration, and perforation of the stomach, small intestine or large intestine, which can be fatal. These serious adverse events can occur at any time, with or without warning symptoms, in patients treated with NSAIDs. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. Complicated and symptomatic ulcer rates were 0.78% at nine months for all patients in the CLASS trial, and

2.19% for the subgroup on low-dose ASA. Patients 65 years of age and older had an incidence of 1.40% at nine months, 3.06% when also taking ASA [see Clinical Studies (14.7)]. With longer duration of use of NSAIDs, there is a trend for increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

NSAIDs should be prescribed with extreme caution in patients with a prior history of ulcer disease or gastrointestinal bleeding. Patients with a prior history of peptic ulcer disease and/or gastrointestinal bleeding who use NSAIDs have a greater than 10-fold increased risk for developing a GI bleed compared to patients with neither of these risk factors. Other factors that increase the risk of GI bleeding in patients treated with NSAIDs include concomitant use of oral corticosteroids or anticoagulants, longer duration of NSAID therapy, smoking, use of alcohol, older age, and poor general health status. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore special care should be taken in treating this population.

To minimize the potential risk for an adverse GI event, the lowest effective dose should be used for the shortest duration consistent with individual patient treatment goals. Physicians and patients should remain alert for signs and symptoms of GI ulceration and bleeding during CELEBREX therapy and promptly initiate additional evaluation and treatment if a serious GI adverse event is suspected. For high-risk patients, alternate therapies that do not involve NSAIDs should be considered.

### 5.5 Hepatic Effects

Borderline elevations of one or more liver-associated enzymes may occur in up to 15% of patients taking NSAIDs, and notable elevations of ALT or AST (approximately 3 or more times the upper limit of normal) have been reported in approximately 1% of patients in clinical trials with NSAIDs. These laboratory abnormalities may progress, may remain unchanged, or may be transient with continuing therapy. Rare cases of severe hepatic reactions, including jaundice and fatal fulminant hepatitis, liver necrosis and hepatic failure (some with fatal outcome) have been reported with NSAIDs, including CELEBREX [see Adverse Reactions (6.1)]. In controlled clinical trials of CELEBREX, the incidence of borderline elevations (greater than or equal to 1.2 times and less than 3 times the upper limit of normal) of liver associated enzymes was 6% for CELEBREX and 5% for placebo, and approximately 0.2% of patients taking CELEBREX and 0.3% of patients taking placebo had notable elevations of ALT and AST.

A patient with symptoms and/or signs suggesting liver dysfunction, or in whom an abnormal liver test has occurred, should be monitored carefully for evidence of the development of a more severe hepatic reaction while on therapy with CELEBREX. If clinical signs and symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, etc.), CELEBREX should be discontinued.

### 5.6 Renal Effects

Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of an NSAID may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics, ACE-inhibitors, angiotensin II receptor antagonists, and the elderly. Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state. Clinical trials with CELEBREX have shown renal effects similar to those observed with comparator NSAIDs.

No information is available from controlled clinical studies regarding the use of CELEBREX in patients with advanced renal disease. Therefore, treatment with CELEBREX is not

recommended in these patients with advanced renal disease. If CELEBREX therapy must be initiated, close monitoring of the patient's renal function is advisable.

**5.7 Anaphylactoid Reactions**

As with NSAIDs in general, anaphylactoid reactions have occurred in patients without known prior exposure to CELEBREX. In post-marketing experience, rare cases of anaphylactic reactions and angioedema have been reported in patients receiving CELEBREX. CELEBREX should not be given to patients with the aspirin triad. This symptom complex typically occurs in asthmatic patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs [see Contraindications (4), Warnings and Precautions (5.7)]. Emergency help should be sought in cases where an anaphylactoid reaction occurs.

**5.8 Skin Reactions**

CELEBREX is a sulfonamide and can cause serious skin adverse events such as exfoliative dermatitis, Stevens-Johnson syndrome (SJS), and toxic epidermal necrolysis (TEN), which can be fatal. These serious events can occur without warning and in patients without prior known sulfa allergy. Patients should be informed about the signs and symptoms of serious skin manifestations and use of the drug should be discontinued at the first appearance of skin rash or any other sign of hypersensitivity.

**5.9 Pregnancy**

In late pregnancy, starting at 30 weeks gestation, CELEBREX should be avoided because it may cause premature closure of the ductus arteriosus [see Use in Specific Populations (8.1)].

**5.10 Corticosteroid Treatment**

CELEBREX cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-responsive illness. Patients on prolonged corticosteroid therapy should have their therapy tapered slowly if a decision is made to discontinue corticosteroids.

**5.11 Hematological Effects**

Anemia is sometimes seen in patients receiving CELEBREX. In controlled clinical trials the incidence of anemia was 0.6% with CELEBREX and 0.4% with placebo. Patients on long-term treatment with CELEBREX should have their hemoglobin or hematocrit checked if they exhibit any signs or symptoms of anemia or blood loss. CELEBREX does not generally affect platelet counts, prothrombin time (PT), or partial thromboplastin time (PTT), and does not inhibit platelet aggregation at indicated dosages [see Clinical Pharmacology (12.2)].

**5.12 Disseminated Intravascular Coagulation (DIC)**

CELEBREX should be used only with caution in pediatric patients with systemic onset JRA due to the risk of disseminated intravascular coagulation.

**5.13 Preexisting Asthma**

Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm, which can be fatal. Since cross reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, CELEBREX should not be administered to patients with this form of aspirin sensitivity and should be used with caution in patients with preexisting asthma.

**5.14 Laboratory Tests**

Because serious GI tract ulcerations and bleeding can occur without warning symptoms, physicians should monitor for signs or symptoms of GI bleeding. Patients on long-term treatment with NSAIDs should have a CBC and a chemistry profile checked periodically. If abnormal

liver tests or renal tests persist or worsen, CELEBREX should be discontinued.

In controlled clinical trials, elevated BUN occurred more frequently in patients receiving CELEBREX compared with patients on placebo. This laboratory abnormality was also seen in patients who received comparator NSAIDs in these studies. The clinical significance of this abnormality has not been established.

**5.15 GI Cancer in Familial Adenomatous Polyposis**

Treatment with CELEBREX in FAP has not been shown to reduce the risk of gastrointestinal cancer or the need for prophylactic colectomy or other FAP-related surgeries. Therefore, the usual care of FAP patients should not be altered because of the concurrent administration of CELEBREX. In particular, the frequency of routine endoscopic surveillance should not be decreased and prophylactic colectomy or other FAP-related surgeries should not be delayed.

**5.16 Inflammation**

The pharmacological activity of CELEBREX in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting infectious complications of presumed noninfectious, painful conditions.

**5.17 Concomitant NSAID Use**

The concomitant use of CELEBREX with any dose of a non-aspirin NSAID should be avoided due to the potential for increased risk of adverse reactions.

**6.   ADVERSE REACTIONS**

Of the CELEBREX-treated patients in the pre-marketing controlled clinical trials, approximately 4,250 were patients with OA, approximately 2,100 were patients with RA, and approximately 1,050 were patients with post-surgical pain. More than 8,500 patients received a total daily dose of CELEBREX of 200 mg (100 mg twice daily or 200 mg once daily) or more. including more than 400 treated at 800 mg (400 mg twice daily). Approximately 3,900 patients received CELEBREX at these doses for 6 months or more; approximately 2,300 of these have received it for 1 year or more and 124 of these have received it for 2 years or more.

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice. The adverse reaction information from clinical trials does, however, provide a basis for identifying the adverse events that appear to be related to drug use and for approximating rates.

**6.1 Pre-marketing Controlled Arthritis Trials**

Table 1 lists all adverse events, regardless of causality, occurring in ≥2% of patients receiving CELEBREX from 12 controlled studies conducted in patients with OA or RA that included a placebo and/or a positive control group. Since these 12 trials were of different durations, and patients in the trials may not have been exposed for the same duration of time, these percentages do not capture cumulative rates of occurrence.

**Table 1:  Adverse Events Occurring in >2% of CELEBREX Patients from Pre-marketing Controlled Arthritis Trials**

|  | CBX N=4146 | Placebo N=1864 | NAP N=1366 | DCF N=387 | IBU N=345 |
|---|---|---|---|---|---|
| **Gastrointestinal** | | | | | |
| Abdominal Pain | 4.1% | 2.8% | 7.7% | 9.0% | 9.0% |
| Diarrhea | 5.6% | 3.8% | 5.3% | 9.3% | 5.8% |
| Dyspepsia | 8.8% | 6.2% | 12.2% | 10.9% | 12.8% |
| Flatulence | 2.2% | 1.0% | 3.6% | 4.1% | 3.5% |
| Nausea | 3.5% | 4.2% | 6.0% | 3.4% | 6.7% |
| **Body as a whole** | | | | | |
| Back Pain | 2.8% | 3.6% | 2.2% | 2.6% | 0.9% |
| Peripheral Edema | 2.1% | 1.1% | 2.1% | 1.0% | 3.5% |
| Injury-Accidental | 2.9% | 2.3% | 3.0% | 2.6% | 3.2% |
| **Central, Peripheral Nervous system** | | | | | |
| Dizziness | 2.0% | 1.7% | 2.6% | 1.3% | 2.3% |
| Headache | 15.8% | 20.2% | 14.5% | 15.5% | 15.4% |
| **Psychiatric** | | | | | |
| Insomnia | 2.3% | 2.3% | 2.9% | 1.3% | 1.4% |
| **Respiratory** | | | | | |
| Pharyngitis | | | | | |
| Rhinitis | 2.3% | 1.1% | 1.7% | 1.6% | 2.6% |
| Sinusitis | 2.0% | 1.3% | 2.4% | 2.3% | 0.6% |
| Upper Respiratory Infection | 5.0% | 4.3% | 4.0% | 5.4% | 5.8% |
|  | 8.1% | 6.7% | 9.9% | 9.8% | 9.9% |
| **Skin** | | | | | |
| Rash | 2.2% | 2.1% | 2.1% | 1.3% | 1.2% |

CBX = CELEBREX 100 – 200 mg twice daily or 200 mg once daily;
NAP = Naproxen 500 mg twice daily;
DCF = Diclofenac 75 mg twice daily;
IBU = Ibuprofen 800 mg three times daily.

In placebo- or active-controlled clinical trials, the discontinuation rate due to adverse events was 7.1% for patients receiving CELEBREX and 6.1% for patients receiving placebo. Among the most common reasons for discontinuation due to adverse events in the CELEBREX treatment groups were dyspepsia and abdominal pain (cited as reasons for discontinuation in 0.8% and 0.7% of CELEBREX patients, respectively). Among patients receiving placebo, 0.6% discontinued due to dyspepsia and 0.6% withdrew due to abdominal pain.

**The following adverse reactions occurred in 0.1 - 1.9% of patients treated with CELEBREX (100 - 200 mg twice daily or 200 mg once daily):**

*Gastrointestinal:* Constipation, diverticulitis, dysphagia, eructation, esophagitis, gastritis, gastroenteritis, gastroesophageal reflux, hemorrhoids, hiatal hernia, melena, dry mouth, stomatitis, tenesmus, vomiting

*Cardiovascular:* Aggravated hypertension, angina pectoris, coronary artery disorder, myocardial infarction

*General:* Allergy aggravated, allergic reaction, chest pain, cyst NOS, edema generalized, face edema, fatigue, fever, hot flushes, influenza-like symptoms, pain, peripheral pain

*Central, peripheral nervous system:* Leg cramps, hypertonia, hypoesthesia, migraine, paresthesia, vertigo

*Hearing and vestibular:* Deafness, tinnitus

*Heart rate and rhythm:* Palpitation, tachycardia

*Liver and biliary:* Hepatic function abnormal, SGOT increased, SGPT increased

*Metabolic and nutritional:* BUN increased, CPK increased, hypercholesterolemia, hyperglycemia, hypokalemia, NPN increased, creatinine increased, alkaline phosphatase increased, weight increased

*Musculoskeletal:* Arthralgia, arthrosis, myalgia, synovitis, tendinitis

*Platelets (bleeding or clotting):* Ecchymosis, epistaxis, thrombocythemia,

*Psychiatric:* Anorexia, anxiety, appetite increased, depression, nervousness, somnolence

*Hemic:* Anemia

*Respiratory:* Bronchitis, bronchospasm, bronchospasm aggravated, coughing, dyspnea, laryngitis, pneumonia

*Skin and appendages:* Alopecia, dermatitis, photosensitivity reaction, pruritus, rash erythematous, rash maculopapular, skin disorder, skin dry, sweating increased, urticaria

*Application site disorders:* Cellulitis, dermatitis contact

*Urinary:* Albuminuria, cystitis, dysuria, hematuria, micturition frequency, renal calculus

**The following serious adverse events (causality not evaluated) occurred in <0.1% of patients (cases reported only in post-marketing experience are indicated in *italics*):**

*Cardiovascular:* Syncope, congestive heart failure, ventricular fibrillation, pulmonary embolism, cerebrovascular accident, peripheral gangrene, thrombophlebitis, *vasculitis, deep venous thrombosis*

*Gastrointestinal:* Intestinal obstruction, intestinal perforation, gastrointestinal bleeding, colitis with bleeding, esophageal perforation, pancreatitis, ileus

*Liver and biliary:* Cholelithiasis, *hepatitis, jaundice, liver failure*

*Hemic and lymphatic:* Thrombocytopenia, *agranulocytosis, aplastic anemia, pancytopenia, leucopenia*

*Metabolic:* Hypoglycemia, hyponatremia

*Nervous:* Ataxia, suicide, *aseptic meningitis, ageusia, anosmia, fatal intracranial hemorrhage [see Drug Interactions (7.1)]*

*Renal:* Acute renal failure, *interstitial nephritis*

*Skin:* *Erythema multiforme, exfoliative dermatitis, Stevens-Johnson syndrome, toxic epidermal necrolysis*

*General:* Sepsis, sudden death, *anaphylactoid reaction, angioedema*

**6.2 The Celecoxib Long-Term Arthritis Safety Study [see *Special Studies* (14.7)]**

*Hematological Events:* The incidence of clinically significant decreases in hemoglobin (>2 g/dL) was lower in patients on CELEBREX 400 mg twice daily (0.5%) compared to patients on either diclofenac 75 mg twice daily (1.3%) or ibuprofen 800 mg three times daily 1.9%. The lower incidence of events with CELEBREX was maintained with or without ASA use [see *Clinical Pharmacology* (12.2)].

*Withdrawals/Serious Adverse Events:* Kaplan-Meier cumulative rates at 9 months for withdrawals due to adverse events for CELEBREX, diclofenac and ibuprofen were 24%, 29%, and 26%, respectively.  Rates for serious adverse events (i.e., causing hospitalization or felt to be life-threatening or otherwise medically significant), regardless of causality, were not different across treatment groups (8%, 7%, and 8%, respectively).

**6.3 Juvenile Rheumatoid Arthritis Study**

In a 12-week, double-blind, active-controlled study, 242 JRA patients 2 years to 17 years of age were treated with celecoxib or naproxen; 77 JRA patients were treated with celecoxib 3 mg/kg BID, 82 patients were treated with celecoxib 6 mg/kg BID, and 83 patients were treated with naproxen 7.5 mg/kg BID. The most commonly occurring (≥5%) adverse events in celecoxib treated patients were headache, fever (pyrexia), upper

abdominal pain, cough, nasopharyngitis, abdominal pain, nausea, arthralgia, diarrhea and vomiting.  The most commonly occurring (≥5%) adverse experiences for naproxen-treated patients were headache, nausea, vomiting, fever, upper abdominal pain, diarrhea, cough, abdominal pain, and dizziness (Table 2).  Compared with naproxen, celecoxib at doses of 3 and 6 mg/kg BID had no observable deleterious effect on growth and development during the course of the 12-week double-blind study. There was no substantial difference in the number of clinical exacerbations of uveitis or systemic features of JRA among treatment groups.

In a 12-week, open-label extension of the double-blind study described above, 202 JRA patients were treated with celecoxib 6 mg/kg BID.  The incidence of adverse events was similar to that observed during the double-blind study; no unexpected adverse events of clinical importance emerged.

**Table 2: Adverse Events Occurring in ≥5% of JRA Patients in Any Treatment Group, by System Organ Class (% of patients with events)**

| System Organ Class Preferred Term | All Doses Twice Daily | | |
|---|---|---|---|
| | Celecoxib 3 mg/kg N=77 | Celecoxib 6 mg/kg N=82 | Naproxen 7.5 mg/kg N=83 |
| Any Event | 64 | 70 | 72 |
| Eye Disorders | 5 | 5 | 5 |
| Gastrointestinal | 26 | 24 | 36 |
| Abdominal pain NOS | 4 | 7 | 7 |
| Abdominal pain upper | 8 | 6 | 10 |
| Vomiting NOS | 3 | 6 | 11 |
| Diarrhea NOS | 5 | 4 | 8 |
| Nausea | 7 | 4 | 11 |
| General | 13 | 11 | 18 |
| Pyrexia | 8 | 9 | 11 |
| Infections | 25 | 20 | 27 |
| Nasopharyngitis | 5 | 6 | 5 |
| Injury and Poisoning | 4 | 6 | 5 |
| Investigations* | 3 | 11 | 7 |
| Musculoskeletal | 8 | 10 | 17 |
| Arthralgia | 3 | 7 | 4 |
| Nervous System | 17 | 11 | 21 |
| Headache NOS | 13 | 10 | 16 |
| Dizziness (excl vertigo) | 1 | 1 | 7 |
| Respiratory | 8 | 15 | 15 |
| Cough | 7 | 7 | 8 |
| Skin & Subcutaneous | 10 | 7 | 18 |

\* Abnormal laboratory tests, which include:  Prolonged activated partial thromboplastin time, Bacteriuria NOS present, Blood creatine phosphokinase increased, Blood culture positive, Blood glucose increased, Blood pressure increased, Blood uric acid increased, Hematocrit decreased, Hematuria present, Hemoglobin decreased, Liver function tests NOS abnormal, Proteinuria present, Transaminase NOS increased, Urine analysis abnormal NOS

**6.4 Other Pre-Approval Studies**

***Adverse Events from Ankylosing Spondylitis Studies:*** A total of 378 patients were treated with CELEBREX in placebo- and active-controlled AS studies.  Doses up to 400 mg once daily were studied.  The types of adverse events reported in the AS studies were similar to those reported in the OA/RA studies.

***Adverse Events from Analgesia and Dysmenorrhea Studies:*** Approximately 1,700 patients were treated with CELEBREX in analgesia and dysmenorrhea studies.  All patients in post-oral surgery pain studies received a single dose of study medication. Doses up to 600 mg/day of CELEBREX were studied in primary dysmenorrhea and post-orthopedic surgery pain studies.  The types of adverse events in the analgesia and dysmenorrhea studies were similar to those reported in arthritis studies.  The only

additional adverse event reported was post-dental extraction alveolar osteitis (dry socket) in the post-oral surgery pain studies.

***Adverse Events from the Familial Adenomatous Polyposis Study:***  The adverse event profile reported for the 83 patients with familial adenomatous polyposis enrolled in the randomized, controlled clinical trial was similar to that reported for patients in the arthritis-controlled trials.  Intestinal anastomotic ulceration was the only new adverse event reported in the FAP trial, regardless of causality, and was observed in 3 of 58 patients (one at 100 mg twice daily, and two at 400 mg twice daily) who had prior intestinal surgery.

**6.5 The APC and PreSAP Trials**

***Adverse reactions from long-term, placebo-controlled polyp prevention studies***: Exposure to CELEBREX in the APC and PreSAP trials was 400 to 800 mg daily for up to 3 years [*see Special Studies Adenomatous Polyp Prevention Studies (14.7)*].

Some adverse reactions occurred in higher percentages of patients than in the arthritis pre-marketing trials (treatment durations up to 12 weeks; see *Adverse events from CELEBREX pre-marketing controlled arthritis trials*, above).  The adverse reactions for which these differences in patients treated with CELEBREX were greater as compared to the arthritis pre-marketing trials were as follows:

| | CELEBREX (400 to 800 mg daily) N = 2285 | Placebo N=1303 |
|---|---|---|
| Diarrhea | 10.5% | 7.0% |
| Gastroesophageal reflux disease | 4.7% | 3.1% |
| Nausea | 6.8% | 5.3% |
| Vomiting | 3.2% | 2.1% |
| Dyspnea | 2.8% | 1.6% |
| Hypertension | 12.5% | 9.8% |

The following additional adverse reactions occurred in ≥0.1% and <1% of patients taking CELEBREX, at an incidence greater than placebo in the long-term polyp prevention studies and were either not reported during the controlled arthritis pre-marketing trials or occurred with greater frequency in the long-term, placebo-controlled polyp prevention studies:

*Nervous system disorders:*  Cerebral infarction

*Eye disorders:*  Vitreous floaters, conjunctival hemorrhage

*Ear and labyrinth:*  Labyrinthitis

*Cardiac disorders:*  Angina unstable, aortic valve incompetence, coronary artery atherosclerosis, sinus bradycardia, ventricular hypertrophy

*Vascular disorders:* Deep vein thrombosis

*Reproductive system and breast disorders:*  Ovarian cyst

*Investigations:*  Blood potassium increased, blood sodium increased, blood testosterone decreased

*Injury, poisoning and procedural complications:*  Epicondylitis, tendon rupture

**7. DRUG INTERACTIONS**

**General:**  Celecoxib metabolism is predominantly mediated via cytochrome P450 (CYP) 2C9 in the liver.  Co-administration of celecoxib with drugs that are known to inhibit CYP2C9 should be done with caution. Significant interactions may occur when celecoxib is administered together with drugs that inhibit CYP2C9.

*In vitro* studies indicate that celecoxib, although not a substrate, is an inhibitor of CYP2D6.  Therefore, there is a

potential for an *in vivo* drug interaction with drugs that are metabolized by CYP2D6.

### 7.1 Warfarin

Anticoagulant activity should be monitored, particularly in the first few days, after initiating or changing CELEBREX therapy in patients receiving warfarin or similar agents, since these patients are at an increased risk of bleeding complications. The effect of celecoxib on the anticoagulant effect of warfarin was studied in a group of healthy subjects receiving daily 2-5 mg doses of warfarin. In these subjects, celecoxib did not alter the anticoagulant effect of warfarin as determined by prothrombin time. However, in post-marketing experience, serious bleeding events, some of which were fatal, have been reported, predominantly in the elderly, in association with increases in prothrombin time in patients receiving CELEBREX concurrently with warfarin.

### 7.2 Lithium

In a study conducted in healthy subjects, mean steady-state lithium plasma levels increased approximately 17% in subjects receiving lithium 450 mg twice daily with CELEBREX 200 mg twice daily as compared to subjects receiving lithium alone. Patients on lithium treatment should be closely monitored when CELEBREX is introduced or withdrawn.

### 7.3 Aspirin

CELEBREX can be used with low-dose aspirin. However, concomitant administration of aspirin with CELEBREX increases the rate of GI ulceration or other complications, compared to use of CELEBREX alone [*see Warnings and Precautions (5.1, 5.4) and Clinical Studies (14.7)*]. **Because of its lack of platelet effects, CELEBREX is not a substitute for aspirin for cardiovascular prophylaxis [*see Clinical Pharmacology (12.2)*].**

### 7.4 ACE-inhibitors and Angiotensin II Antagonists

Reports suggest that NSAIDs may diminish the antihypertensive effect of Angiotensin Converting Enzyme (ACE) inhibitors and angiotensin II antagonists. This interaction should be given consideration in patients taking CELEBREX concomitantly with ACE-inhibitors and angiotensin II antagonists [*see Clinical Pharmacology (12.2)*].

### 7.5 Fluconazole

Concomitant administration of fluconazole at 200 mg once daily resulted in a two-fold increase in celecoxib plasma concentration. This increase is due to the inhibition of celecoxib metabolism via P450 2C9 by fluconazole [*see Clinical Pharmacology (12.3)*]. CELEBREX should be introduced at the lowest recommended dose in patients receiving fluconazole.

### 7.6 Furosemide

Clinical studies, as well as post-marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. This response has been attributed to inhibition of renal prostaglandin synthesis.

### 7.7 Methotrexate

In an interaction study of rheumatoid arthritis patients taking methotrexate, CELEBREX did not have an effect on the pharmacokinetics of methotrexate [*see Clinical Pharmacology (12.3)*].

### 7.8 Concomitant NSAID Use

The concomitant use of CELEBREX with any dose of a non-aspirin NSAID should be avoided due to the potential for increased risk of adverse reactions.

## 8. USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

Pregnancy Category C. Pregnancy category D from 30 weeks of gestation onward.

*Teratogenic effects:* Celecoxib at oral doses ≥150 mg/kg/day (approximately 2-fold human exposure at 200 mg twice daily as measured by $AUC_{0-24}$), caused an increased incidence of ventricular septal defects, a rare event, and fetal alterations, such as ribs fused, sternebrae fused and sternebrae misshapen when rabbits were treated throughout organogenesis. A dose-dependent increase in diaphragmatic hernias was observed when rats were given celecoxib at oral doses ≥30 mg/kg/day (approximately 6-fold human exposure based on the $AUC_{0-24}$ at 200 mg twice daily) throughout organogenesis. There are no studies in pregnant women. CELEBREX should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

*Nonteratogenic effects:* Celecoxib produced pre-implantation and post-implantation losses and reduced embryo/fetal survival in rats at oral dosages ≥50 mg/kg/day (approximately 6-fold human exposure based on the $AUC_{0-24}$ at 200 mg twice daily). These changes are expected with inhibition of prostaglandin synthesis and are not the result of permanent alteration of female reproductive function, nor are they expected at clinical exposures. No studies have been conducted to evaluate the effect of celecoxib on the closure of the ductus arteriosus in humans. Therefore, use of CELEBREX during the third trimester of pregnancy should be avoided.

### 8.2 Labor and Delivery

Celecoxib produced no evidence of delayed labor or parturition at oral doses up to 100 mg/kg in rats (approximately 7-fold human exposure as measured by the $AUC_{0-24}$ at 200 mg BID). The effects of CELEBREX on labor and delivery in pregnant women are unknown.

### 8.3 Nursing Mothers

Limited data from 3 published reports that included a total of 12 breastfeeding women showed low levels of CELEBREX in breast milk. The calculated average daily infant dose was 10-40 mcg/kg/day, less than 1% of the weight-based therapeutic dose for a two-year old-child. A report of two breastfed infants 17 and 22 months of age did not show any adverse events. Caution should be exercised when CELEBREX is administered to a nursing woman.

### 8.4 Pediatric Use

CELEBREX is approved for relief of the signs and symptoms of Juvenile Rheumatoid Arthritis in patients 2 years and older. Safety and efficacy have not been studied beyond six months in children. The long-term cardiovascular toxicity in children exposed to CELEBREX has not been evaluated and it is unknown if long-term risks may be similar to that seen in adults exposed to CELEBREX or other COX-2 selective and non-selective NSAIDs [(*see Boxed Warning, Warnings and Precautions (5.12), and Clinical Studies (14.3)*].

The use of celecoxib in patients 2 years to 17 years of age with pauciarticular, polyarticular course JRA or in patients with systemic onset JRA was studied in a 12-week, double-blind, active controlled, pharmacokinetic, safety and efficacy study, with a 12-week open-label extension. Celecoxib has not been studied in patients under the age of 2 years, in patients with body weight less than 10 kg (22 lbs), and in patients with active systemic features. Patients with systemic onset JRA (without active systemic features) appear to be at risk for the development of abnormal coagulation laboratory tests. In some patients with systemic onset JRA, both celecoxib and naproxen were associated with mild prolongation of activated partial thromboplastin time (APTT) but not prothrombin time (PT). NSAIDs including celecoxib should be used only with caution in patients with systemic onset JRA, due to the risk of disseminated intravascular coagulation. Patients with systemic onset JRA should be monitored for the development of abnormal coagulation tests [*see Dosage and Administration (2.3), Warnings and Precautions (5.12), Adverse Reactions (6.3), Animal Toxicology (13.2), Clinical Studies (14.3)*].

Alternative therapies for treatment of JRA should be considered in pediatric patients identified to be CYP2C9 poor metabolizers [*see Poor Metabolizers of CYP2C9 substrates (8.8)*].

### 8.5 Geriatric Use

Of the total number of patients who received CELEBREX in pre-approval clinical trials, more than 3,300 were 65-74 years of age, while approximately 1,300 additional patients were 75 years and over. No substantial differences in

effectiveness were observed between these subjects and younger subjects. In clinical studies comparing renal function as measured by the GFR, BUN and creatinine, and platelet function as measured by bleeding time and platelet aggregation, the results were not different between elderly and young volunteers. However, as with other NSAIDs, including those that selectively inhibit COX-2, there have been more spontaneous post-marketing reports of fatal GI events and acute renal failure in the elderly than in younger patients [*see Warnings and Precautions (5.4, 5.6)*].

### 8.6 Hepatic Insufficiency

The daily recommended dose of CELEBREX capsules in patients with moderate hepatic impairment (Child-Pugh Class B) should be reduced by 50%. The use of CELEBREX in patients with severe hepatic impairment is not recommended [*see Dosage and Administration (2.7) and Clinical Pharmacology (12.3)*].

### 8.7 Renal Insufficiency

CELEBREX is not recommended in patients with severe renal insufficiency [*see Warnings and Precautions (5.6) and Clinical Pharmacology (12.3)*].

### 8.8 Poor Metabolizers of CYP2C9 Substrates

Patients who are known or suspected to be poor CYP2C9 metabolizers based on previous history/experience with other CYP2C9 substrates (such as warfarin, phenytoin) should be administered celecoxib with caution. Consider starting treatment at half the lowest recommended dose. Alternative management should be considered in JRA patients identified to be CYP2C9 poor metabolizers. [*see Dosage and Administration (2.7) and Clinical Pharmacology (12.3)*].

## 10. OVERDOSAGE

No overdoses of CELEBREX were reported during clinical trials. Doses up to 2400 mg/day for up to 10 days in 12 patients did not result in serious toxicity. Symptoms following acute NSAID overdoses are usually limited to lethargy, drowsiness, nausea, vomiting, and epigastric pain, which are generally reversible with supportive care. Gastrointestinal bleeding can occur. Hypertension, acute renal failure, respiratory depression and coma may occur, but are rare. Anaphylactoid reactions have been reported with therapeutic ingestion of NSAIDs, and may occur following an overdose.

Patients should be managed by symptomatic and supportive care following an NSAID overdose. There are no specific antidotes. No information is available regarding the removal of celecoxib by hemodialysis, but based on its high degree of plasma protein binding (>97%) dialysis is unlikely to be useful in overdose. Emesis and/or activated charcoal (60 to 100 g in adults, 1 to 2 g/kg in children) and/or osmotic cathartic may be indicated in patients seen within 4 hours of ingestion with symptoms or following a large overdose. Forced diuresis, alkalinization of urine, hemodialysis, or hemoperfusion may not be useful due to high protein binding.

## 11. DESCRIPTION

CELEBREX (celecoxib) is chemically designated as 4-[5-(4-methylphenyl)- 3-(trifluoromethyl)-1H-pyrazol-1-yl] benzenesulfonamide and is a diaryl-substituted pyrazole. The empirical formula is $C_{17}H_{14}F_3N_3O_2S$, and the molecular weight is 381.38; the chemical structure is as follows:



CELEBREX oral capsules contain either 50 mg, 100 mg, 200 mg or 400 mg of celecoxib, together with inactive ingredients including: croscarmellose sodium, edible inks, gelatin, lactose monohydrate, magnesium stearate, povidone and sodium lauryl sulfate.

## 12. CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

CELEBREX is a nonsteroidal anti-inflammatory drug that exhibits anti-inflammatory, analgesic, and antipyretic activities in animal models. The mechanism of action of CELEBREX is believed to be due to inhibition of prostaglandin synthesis, primarily via inhibition of cyclooxygenase-2 (COX-2), and at therapeutic concentrations in humans, CELEBREX does not inhibit the cyclooxygenase-1 (COX-1) isoenzyme. In animal colon tumor models, CELEBREX reduced the incidence and multiplicity of tumors.

### 12.2 Pharmacodynamics

*Platelets:* In clinical trials using normal volunteers, CELEBREX at single doses up to 800 mg and multiple doses of 600 mg twice daily for up to 7 days duration (higher than recommended therapeutic doses) had no effect on reduction of platelet aggregation or increase in bleeding time. Because of its lack of platelet effects, CELEBREX is not a substitute for aspirin for cardiovascular prophylaxis. It is not known if there are any effects of CELEBREX on platelets that may contribute to the increased risk of serious cardiovascular thrombotic adverse events associated with the use of CELEBREX.

*Fluid Retention:* Inhibition of PGE2 synthesis may lead to sodium and water retention through increased reabsorption in the renal medullary thick ascending loop of Henle and perhaps other segments of the distal nephron. In the collecting ducts, PGE2 appears to inhibit water reabsorption by counteracting the action of antidiuretic hormone.

### 12.3 Pharmacokinetics

*Absorption:* Peak plasma levels of celecoxib occur approximately 3 hrs after an oral dose. Under fasting conditions, both peak plasma levels ($C_{max}$) and area under the curve (AUC) are roughly dose-proportional up to 200 mg BID; at higher doses there are less than proportional increases in $C_{max}$ and AUC [*see Food Effects*]. Absolute bioavailability studies have not been conducted. With multiple dosing, steady-state conditions are reached on or before Day 5. The pharmacokinetic parameters of celecoxib in a group of healthy subjects are shown in Table 3.

**Table 3**
**Summary of Single Dose (200 mg) Disposition Kinetics of Celecoxib in Healthy Subjects[1]**

| Mean (%CV) PK Parameter Values | | | | |
|---|---|---|---|---|
| $C_{max}$, ng/mL | $T_{max}$, hr | Effective $t_{1/2}$, hr | $V_{ss}/F$, L | CL/F, L/hr |
| 705 (38) | 2.8 (37) | 11.2 (31) | 429 (34) | 27.7 (28) |

[1] Subjects under fasting conditions (n=36, 19-52 yrs.)

*Food Effects:* When CELEBREX capsules were taken with a high fat meal, peak plasma levels were delayed for about 1 to 2 hours with an increase in total absorption (AUC) of 10% to 20%. Under fasting conditions, at doses above 200 mg, there is less than a proportional increase in $C_{max}$ and AUC, which is thought to be due to the low solubility of the drug in aqueous media.

Coadministration of CELEBREX with an aluminum- and magnesium-containing antacids resulted in a reduction in plasma celecoxib concentrations with a decrease of 37% in $C_{max}$ and 10% in AUC. CELEBREX, at doses up to 200 mg twice daily, can be administered without regard to timing of meals. Higher doses (400 mg twice daily) should be administered with food to improve absorption.

In healthy adult volunteers, the overall systemic exposure (AUC) of celecoxib was equivalent when celecoxib was administered as intact capsule or capsule contents sprinkled on applesauce. There were no significant alterations in $C_{max}$, $T_{max}$ or $t_{1/2}$ after administration of capsule contents on applesauce [see Dosage and Administration (2)].

**Distribution**: In healthy subjects, celecoxib is highly protein bound (~97%) within the clinical dose range. In vitro studies indicate that celecoxib binds primarily to albumin and, to a lesser extent, $\alpha_1$-acid glycoprotein. The apparent volume of distribution at steady state ($V_{ss}/F$) is approximately 400 L, suggesting extensive distribution into the tissues. Celecoxib is not preferentially bound to red blood cells.

**Metabolism**: Celecoxib metabolism is primarily mediated via CYP2C9. Three metabolites, a primary alcohol, the corresponding carboxylic acid and its glucuronide conjugate, have been identified in human plasma. These metabolites are inactive as COX-1 or COX-2 inhibitors.

CYP2C9 activity is reduced in individuals with genetic polymorphisms that lead to reduced enzyme activity, such as those homozygous for the CYP2C9*2 and CYP2C9*3 polymorphisms. Limited data from 4 published reports that included a total of 8 subjects with the homozygous CYP2C9*3/*3 genotype showed celecoxib systemic levels that were 3- to 7-fold higher in these subjects compared to subjects with CYP2C9*1/*1 or *I/*3 genotypes. The pharmacokinetics of celecoxib have not been evaluated in subjects with other CYP2C9 polymorphisms, such as *2, *5, *6, *9 and *11. It is estimated that the frequency of the homozygous *3/*3 genotype is 0.3% to 1.0% in various ethnic groups. [see Dosage and Administration (2.7), Use in Specific Populations (8.8)].

**Excretion**: Celecoxib is eliminated predominantly by hepatic metabolism with little (<3%) unchanged drug recovered in the urine and feces. Following a single oral dose of radiolabeled drug, approximately 57% of the dose was excreted in the feces and 27% was excreted into the urine. The primary metabolite in both urine and feces was the carboxylic acid metabolite (73% of dose) with low amounts of the glucuronide also appearing in the urine. It appears that the low solubility of the drug prolongs the absorption process making terminal half-life ($t_{1/2}$) determinations more variable. The effective half-life is approximately 11 hours under fasted conditions. The apparent plasma clearance (CL/F) is about 500 mL/min.

**Geriatric**: At steady state, elderly subjects (over 65 years old) had a 40% higher $C_{max}$ and a 50% higher AUC compared to the young subjects. In elderly females, celecoxib $C_{max}$ and AUC are higher than those for elderly males, but these increases are predominantly due to lower body weight in elderly females. Dose adjustment in the elderly is not generally necessary. However, for patients of less than 50 kg in body weight, initiate therapy at the lowest recommended dose [see Dosage and Administration (2.7) and Use in Specific Populations (8.5)].

**Pediatric**: The steady state pharmacokinetics of celecoxib administered as an investigational oral suspension was evaluated in 152 JRA patients 2 years to 17 years of age weighing ≥10 kg with pauciarticular or polyarticular course JRA and in patients with systemic onset JRA. Population pharmacokinetic analysis indicated that the oral clearance (unadjusted for body weight) of celecoxib increases less than proportionally to increasing weight, with 10 kg and 25 kg patients predicted to have 40% and 24% lower clearance, respectively, compared with a 70 kg adult RA patient.

Twice-daily administration of 50 mg capsules to JRA patients weighing ≥12 kg to ≤25 kg and 100 mg capsules to JRA patients weighing >25 kg should achieve plasma concentrations similar to those observed in a clinical trial that demonstrated the non-inferiority of celecoxib to naproxen 7.5 mg/kg twice daily (see Dosage and Administration (2.3). Celecoxib has

not been studied in JRA patients under the age of 2 years, in patients with body weight less than 10 kg (22 lbs), or beyond 24 weeks.

**Race**: Meta-analysis of pharmacokinetic studies has suggested an approximately 40% higher AUC of celecoxib in Blacks compared to Caucasians. The cause and clinical significance of this finding is unknown.

**Hepatic Insufficiency**: A pharmacokinetic study in subjects with mild (Child-Pugh Class A) and moderate (Child-Pugh Class B) hepatic impairment has shown that steady-state celecoxib AUC is increased about 40% and 180%, respectively, above that seen in healthy control subjects. Therefore, the daily recommended dose of CELEBREX capsules should be reduced by approximately 50% in patients with moderate (Child-Pugh Class B) hepatic impairment. Patients with severe hepatic impairment (Child-Pugh Class C) have not been studied. The use of CELEBREX in patients with severe hepatic impairment is not recommended [see Dosage and Administration (2.7) and Use in Specific Populations (8.6)].

**Renal Insufficiency**: In a cross-study comparison, celecoxib AUC was approximately 40% lower in patients with chronic renal insufficiency (GFR 35-60 mL/min) than that seen in subjects with normal renal function. No significant relationship was found between GFR and celecoxib clearance. Patients with severe renal insufficiency have not been studied. Similar to other NSAIDs, CELEBREX is not recommended in patients with severe renal insufficiency [see Warnings and Precautions (5.6)].

**Drug interactions:**

In vitro studies indicate that celecoxib is not an inhibitor of cytochrome P450 2C9, 2C19 or 3A4.

In vivo studies have shown the following:

**Lithium**: In a study conducted in healthy subjects, mean steady-state lithium plasma levels increased approximately 17% in subjects receiving lithium 450 mg twice daily with CELEBREX 200 mg twice daily as compared to subjects receiving lithium alone [see Drug Interactions (7.2)].

**Fluconazole**: Concomitant administration of fluconazole at 200 mg once daily resulted in a two-fold increase in celecoxib plasma concentration. This increase is due to the inhibition of celecoxib metabolism via P450 2C9 by fluconazole [see Drug Interactions (7.5)].

**Other Drugs**: The effects of celecoxib on the pharmacokinetics and/or pharmacodynamics of glyburide, ketoconazole, methotrexate [see Drug Interactions (7.7)], phenytoin, and tolbutamide have been studied in vivo and clinically important interactions have not been found.

## 13. NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Celecoxib was not carcinogenic in rats given oral doses up to 200 mg/kg for males and 10 mg/kg for females (approximately 2-to 4-fold the human exposure as measured by the $AUC_{0-24}$ at 200 mg twice daily) or in mice given oral doses up to 25 mg/kg for males and 50 mg/kg for females (approximately equal to human exposure as measured by the $AUC_{0-24}$ at 200 mg twice daily) for two years.

Celecoxib was not mutagenic in an Ames test and a mutation assay in Chinese hamster ovary (CHO) cells, nor clastogenic in a chromosome aberration assay in CHO cells and an in vivo micronucleus test in rat bone marrow.

Celecoxib did not impair male and female fertility in rats at oral doses up to 600 mg/kg/day (approximately 11-fold human exposure at 200 mg twice daily based on the $AUC_{0-24}$).

### 13.2 Animal Toxicology

An increase in the incidence of background findings of spermatocele with or without changes such as epididymal hypospermia as well as minimal to slight dilation of the seminiferous tubules was seen in the juvenile rat. These

reproductive findings while apparently treatment-related did not increase in incidence or severity with dose and may indicate an exacerbation of a spontaneous condition.  Similar reproductive findings were not observed in studies of juvenile or adult dogs or in adult rats treated with celecoxib.  The clinical significance of this observation is unknown.

## 14.  CLINICAL STUDIES

### 14.1 Osteoarthritis

CELEBREX has demonstrated significant reduction in joint pain compared to placebo.  CELEBREX was evaluated for treatment of the signs and the symptoms of OA of the knee and hip in placebo- and active-controlled clinical trials of up to 12 weeks duration.  In patients with OA, treatment with CELEBREX 100 mg twice daily or 200 mg once daily resulted in improvement in WOMAC (Western Ontario and McMaster Universities) osteoarthritis index, a composite of pain, stiffness, and functional measures in OA.  In three 12-week studies of pain accompanying OA flare, CELEBREX doses of 100 mg twice daily and 200 mg twice daily provided significant reduction of pain within 24-48 hours of initiation of dosing.  At doses of 100 mg twice daily or 200 mg twice daily the effectiveness of CELEBREX was shown to be similar to that of naproxen 500 mg twice daily.  Doses of 200 mg twice daily provided no additional benefit above that seen with 100 mg twice daily.  A total daily dose of 200 mg has been shown to be equally effective whether administered as 100 mg twice daily or 200 mg once daily.

### 14.2 Rheumatoid Arthritis

CELEBREX has demonstrated significant reduction in joint tenderness/pain and joint swelling compared to placebo.  CELEBREX was evaluated for treatment of the signs and symptoms of RA in placebo- and active-controlled clinical trials of up to 24 weeks in duration.  CELEBREX was shown to be superior to placebo in these studies, using the ACR20 Responder Index, a composite of clinical, laboratory, and functional measures in RA.  CELEBREX doses of 100 mg twice daily and 200 mg twice daily were similar in effectiveness and both were comparable to naproxen 500 mg twice daily.

Although CELEBREX 100 mg twice daily and 200 mg twice daily provided similar overall effectiveness, some patients derived additional benefit from the 200 mg twice daily dose.  Doses of 400 mg twice daily provided no additional benefit above that seen with 100-200 mg twice daily.

### 14.3 Juvenile Rheumatoid Arthritis

In a 12-week, randomized, double-blind active-controlled, parallel-group, multicenter, non-inferiority study, patients from 2 years to 17 years of age with pauciarticular, polyarticular course JRA or systemic onset JRA (with currently inactive systemic features), received one of the following treatments: celecoxib 3 mg/kg (to a maximum of 150 mg) twice daily; celecoxib 6 mg/kg (to a maximum of 300 mg) twice daily; or naproxen 7.5 mg/kg (to a maximum of 500 mg) twice daily.  The response rates were based upon the JRA Definition of Improvement greater than or equal to 30% (JRA DOI 30) criterion, which is a composite of clinical, laboratory, and functional measures of JRA.  The JRA DOI 30 response rates at week 12 were 69%, 80% and 67% in the celecoxib 3 mg/kg BID, celecoxib 6 mg/kg BID, and naproxen 7.5 mg/kg BID treatment groups, respectively.

The efficacy and safety of CELEBREX for JRA have not been studied beyond six months.  The long-term cardiovascular toxicity in children exposed to CELEBREX has not been evaluated and it is unknown if the long-term risk may be similar to that seen in adults exposed to CELEBREX or other COX-2 selective and non-selective NSAIDs [(see Boxed Warning, Warnings and Precautions (5.12)].

### 14.4 Ankylosing Spondylitis

CELEBREX was evaluated in AS patients in two placebo- and active-controlled clinical trials of 6 and 12 weeks duration.  CELEBREX at doses of 100 mg twice daily, 200 mg once daily and 400 mg once daily was shown to be statistically superior to placebo in these studies for all three co-primary efficacy measures assessing global pain intensity (Visual Analogue Scale), global disease activity (Visual Analogue Scale) and functional impairment (Bath Ankylosing Spondylitis Functional Index).  In the 12-week study, there was no difference in the extent of improvement between the 200 mg and 400 mg CELEBREX doses in a comparison of mean change from baseline, but there was a greater percentage of patients who responded to CELEBREX 400 mg, 53%, than to CELEBREX 200 mg, 44%, using the Assessment in Ankylosing Spondylitis response criteria (ASAS 20).  The ASAS 20 defines a responder as improvement from baseline of at least 20% and an absolute improvement of at least 10 mm, on a 0 to 100 mm scale, in at least three of the four following domains:  patient global pain, Bath Ankylosing Spondylitis Functional Index, and inflammation.  The responder analysis also demonstrated no change in the responder rates beyond 6 weeks.

### 14.5 Analgesia, including Primary Dysmenorrhea

In acute analgesic models of post-oral surgery pain, post-orthopedic surgical pain, and primary dysmenorrhea, CELEBREX relieved pain that was rated by patients as moderate to severe.  Single doses [see Dosage and Administration (2.5)] of CELEBREX provided pain relief within 60 minutes.

### 14.6 Familial Adenomatous Polyposis

CELEBREX was evaluated to reduce the number of adenomatous colorectal polyps.  A randomized, double-blind, placebo-controlled study was conducted in patients with FAP.  The study population included 58 patients with a prior subtotal or total colectomy and 25 patients with an intact colon.  Thirteen patients had the attenuated FAP phenotype.

One area in the rectum and up to four areas in the colon were identified at baseline for specific follow-up, and polyps were counted at baseline and following six months of treatment.  The mean reduction in the number of colorectal polyps was 28% for CELEBREX 400 mg twice daily, 12% for CELEBREX 100 mg twice daily and 5% for placebo.  The reduction in polyps observed with CELEBREX 400 mg twice daily was statistically superior to placebo at the six-month timepoint (p=0.003).  (See Figure 1)

**Figure 1**
**Percent Change from Baseline in Number of Colorectal Polyps (FAP Patients)**



\* p=0.003 versus placebo

**14.7 Special Studies**

*Adenomatous Polyp Prevention Studies:*
Cardiovascular safety was evaluated in two randomized, double-blind, placebo-controlled, three year studies involving patients with Sporadic Adenomatous Polyps treated with CELEBREX: the APC trial (Adenoma Prevention with Celecoxib) and the PreSAP trial (Prevention of Spontaneous Adenomatous Polyps). In the APC trial, there was a dose-related increase in the composite endpoint (adjudicated) of cardiovascular death, myocardial infarction, or stroke with celecoxib compared to placebo over 3 years of treatment. The PreSAP trial did not demonstrate a statistically significant increased risk for the same composite endpoint (adjudicated):

- In the APC trial, the hazard ratios compared to placebo for a composite endpoint (adjudicated) of cardiovascular death, myocardial infarction, or stroke were 3.4 (95% CI 1.4 - 8.5) with celecoxib 400 mg twice daily and 2.8 (95% CI 1.1 - 7.2) with celecoxib 200 mg twice daily. Cumulative rates for this composite endpoint over 3 years were 3.0% (20/671 subjects) and 2.5% (17/685 subjects), respectively, compared to 0.9% (6/679 subjects) with placebo treatment. The increases in both celecoxib dose groups versus placebo-treated patients were mainly due to an increased incidence of myocardial infarction.

- In the PreSAP trial, the hazard ratio for this same composite endpoint (adjudicated) was 1.2 (95% CI 0.6 - 2.4) with celecoxib 400 mg once daily compared to placebo. Cumulative rates for this composite endpoint over 3 years were 2.3% (21/933 subjects) and 1.9% (12/628 subjects), respectively.

Clinical studies of other COX-2 selective and non-selective NSAIDs of up to three-years duration have shown an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal. As a result, all NSAIDs are considered potentially associated with this risk.

*Celecoxib Long-Term Arthritis Safety Study (CLASS):*
This was a prospective, long-term, safety outcome study conducted post-marketing in approximately 5,800 OA patients and 2,200 RA patients. Patients received CELEBREX 400 mg twice daily (4-fold and 2-fold the recommended OA and RA doses, respectively, and the approved dose for FAP), ibuprofen 800 mg three times daily or diclofenac 75 mg twice daily (common therapeutic doses). Median exposures for CELEBREX (n = 3,987) and diclofenac (n = 1,996) were 9 months while ibuprofen (n = 1,985) was 6 months. The primary endpoint of this outcome study was the incidence of complicated ulcers (gastrointestinal bleeding, perforation or obstruction). Patients were allowed to take concomitant low-dose (≤ 325 mg/day) aspirin (ASA) for cardiovascular prophylaxis (ASA subgroups: CELEBREX, n = 882; diclofenac, n = 445; ibuprofen, n = 412). Differences in the incidence of complicated ulcers between CELEBREX and the combined group of ibuprofen and diclofenac were not statistically significant.

Patients on CELEBREX and concomitant low-dose ASA (N=882) experienced 4-fold higher rates of complicated ulcers compared to those not on ASA (N=3105). The Kaplan-Meier rate for complicated ulcers at 9 months was 1.12% versus 0.32% for those on low-dose ASA and those not on ASA, respectively [see Warnings and Precautions (5.4)].

The estimated cumulative rates at 9 months of complicated and symptomatic ulcers for patients treated with CELEBREX 400 mg twice daily are described in Table 4. Table 4 also displays results for patients less than or greater than 65 years of age. The difference in rates between CELEBREX alone and CELEBREX with ASA groups may be due to the higher risk for GI events in ASA users.

**Table 4: Complicated and Symptomatic Ulcer Rates in Patients Taking CELEBREX 400 mg Twice Daily (Kaplan-Meier Rates at 9 months [%]) Based on Risk Factors**

| | |
|---|---|
| **All Patients** | |
| CELEBREX alone (n=3105) | 0.78 |
| CELEBREX with ASA (n=882) | 2.19 |
| **Patients <65 Years** | |
| CELEBREX alone (n=2025) | 0.47 |
| CELEBREX with ASA (n=403) | 1.26 |
| **Patients ≥65 Years** | |
| CELEBREX alone (n=1080) | 1.40 |
| CELEBREX with ASA (n=479) | 3.06 |

In a small number of patients with a history of ulcer disease, the complicated and symptomatic ulcer rates in patients taking CELEBREX alone or CELEBREX with ASA were, respectively, 2.56% (n=243) and 6.85% (n=91) at 48 weeks. These results are to be expected in patients with a prior history of ulcer disease [see Warnings and Precautions (5.4) and Adverse Reactions (6.1)].

Cardiovascular safety outcomes were also evaluated in the CLASS trial. Kaplan-Meier cumulative rates for investigator-reported serious cardiovascular thromboembolic adverse events (including MI, pulmonary embolism, deep venous thrombosis, unstable angina, transient ischemic attacks, and ischemic cerebrovascular accidents) demonstrated no differences between the CELEBREX, diclofenac, or ibuprofen treatment groups. The cumulative rates in all patients at nine months for CELEBREX, diclofenac, and ibuprofen were 1.2%, 1.4%, and 1.1%, respectively. The cumulative rates in non-ASA users at nine months in each of the three treatment groups were less than 1%. The cumulative rates for myocardial infarction in non-ASA users at nine months in each of the three treatment groups were less than 0.2%. There was no placebo group in the CLASS trial, which limits the ability to determine whether the three drugs tested had no increased risk of CV events or if they all increased the risk to a similar degree.

*Endoscopic Studies:* The correlation between findings of short-term endoscopic studies with CELEBREX and the relative incidence of clinically significant serious upper GI events with long-term use has not been established. Serious clinically significant upper GI bleeding has been observed in patients receiving CELEBREX in controlled and open-labeled trials [see Warnings and Precautions (5.4) and Clinical Studies (14.7)].

A randomized, double-blind study in 430 RA patients was conducted in which an endoscopic examination was performed at 6 months. The incidence of endoscopic ulcers in patients taking CELEBREX 200 mg twice daily was 4% vs. 15% for patients taking diclofenac SR 75 mg twice daily. However, CELEBREX was not statistically different than diclofenac for clinically relevant GI outcomes in the CLASS trial [see Clinical Studies (14.7)].

The incidence of endoscopic ulcers was studied in two 12-week, placebo-controlled studies in 2157 OA and RA patients in whom baseline endoscopies revealed no ulcers. There was no dose relationship for the incidence of gastroduodenal ulcers and the dose of CELEBREX (50 mg to 400 mg twice daily). The incidence for naproxen 500 mg twice daily was 16.2 and 17.6% in the two studies, for placebo was 2.0 and 2.3%, and for all doses of CELEBREX the incidence ranged between 2.7%-5.9%. There have been no large, clinical outcome studies to compare clinically relevant GI outcomes with CELEBREX and naproxen.

In the endoscopic studies, approximately 11% of patients were taking aspirin (≤ 325 mg/day). In the CELEBREX groups, the endoscopic ulcer rate appeared to be higher in aspirin users than in non-users. However, the increased rate of ulcers in these aspirin users was less than the endoscopic ulcer rates observed in the active comparator groups, with or without aspirin.

**16. HOW SUPPLIED/STORAGE AND HANDLING**
CELEBREX 50 mg capsules are white, with reverse printed white on red band of body and cap with markings of 7767 on the cap and 50 on the body, supplied as:

| NDC Number | Size |
|---|---|

0025-1515-01          bottle of 60

CELEBREX 100 mg capsules are white, with reverse printed white on blue band of body and cap with markings of 7767 on the cap and 100 on the body, supplied as:

| NDC Number | Size |
|---|---|
| 0025-1520-31 | bottle of 100 |
| 0025-1520-51 | bottle of 500 |
| 0025-1520-34 | carton of 100 unit dose |

CELEBREX 200 mg capsules are white, with reverse printed white on gold band with markings of 7767 on the cap and 200 on the body, supplied as:

| NDC Number | Size |
|---|---|
| 0025-1525-31 | bottle of 100 |
| 0025-1525-51 | bottle of 500 |
| 0025-1525-34 | carton of 100 unit dose |

CELEBREX 400 mg capsules are white, with reverse printed white on green band with markings of 7767 on the cap and 400 on the body, supplied as:

| NDC Number | Size |
|---|---|
| 0025-1530-02 | bottle of 60 |
| 0025-1530-01 | carton of 100 unit dose |

**Storage**: Store at 25°C (77°F); excursions permitted to 15-30°C (59-86°F) [see USP Controlled Room Temperature]

## 17. PATIENT COUNSELING INFORMATION

Patients should be informed of the following information before initiating therapy with CELEBREX and periodically during the course of ongoing therapy.

### 17.1 Medication Guide
Patients should be informed of the availability of a Medication Guide for NSAIDs that accompanies each prescription dispensed, and should be instructed to read the Medication Guide prior to using CELEBREX.

### 17.2 Cardiovascular Effects
Patients should be informed that CELEBREX may cause serious CV side effects such as MI or stroke, which may result in hospitalization and even death. Patients should be informed of the the signs and symptoms of chest pain, shortness of breath, weakness, slurring of speech, and to seek immediate medical advice if they observe any of these signs or symptoms. [see Warnings and Precautions (5.1)].

Patients should be informed that CELEBREX can lead to the onset of new hypertension or worsening of preexisting hypertension, and that CELEBREX may impair the response of some antihypertensive agents. Patients should be instructed on the proper follow up for monitoring of blood pressure. [see Warnings and Precautions (5.2) and Drug Interactions (7.4)].

### 17.3 Gastrointestinal Effects
Patients should be informed that CELEBREX can cause gastrointestinal discomfort and more serious side effects, such as ulcers and bleeding, which may result in hospitalization and even death. Patients should be informed of the signs and symptoms of ulcerations and bleeding, and to seek immediate medical advice if they observe any signs or symptoms that are indicative of these disorders, including epigastric pain, dyspepsia, melena, and hematemesis. [see Warnings and Precautions (5.4)].

### 17.4 Hepatic Effects
Patients should be informed of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms)  Patients should be instructed that they should stop therapy and seek immediate medical therapy if these signs and symptoms occur [see Warnings and Precautions (5.5), Use in Specific Populations (8.6)].

### 17.5 Adverse Skin Reactions
Patients should be informed that CELEBREX is a sulfonamide and can cause serious skin side effects such as exfoliative dermatitis, SJS, and TEN, which may result in hospitalizations and even death. Although serious skin

reactions may occur without warning. patients should be informed of the signs and symptoms of skin rash and blisters, fever, or other signs of hypersensitivity such as itching, and seek immediate medical advice when observing any indicative signs or symptoms.

Patients should be advised to stop CELEBREX immediately if they develop any type of rash and contact their physician as soon as possible.

Patients with prior history of sulfa allergy should not take CELEBREX [see Warnings and Precautions (5.8)].

### 17.6 Weight Gain and Edema
Long-term administration of NSAIDs including CELEBREX has resulted in renal injury. Patients at greatest risk are those taking diuretics, ACE-inhibitors, angiotensin II antagonists, or with renal or liver dysfunction, heart failure, and the elderly [see Warnings and Precautions (5.3, 5.6), Use in Specific Populations (8)].

Patients should be instructed to promptly report to their physicians signs or symptoms of unexplained weight gain or edema following treatment with CELEBREX [see Warnings and Precautions (5.3)].

### 17.7 Anaphylactoid Reactions
Patients should be informed of the signs and symptoms of an anaphylactoid reaction (e.g., difficulty breathing, swelling of the face or throat). Patients should be instructed to seek immediate emergency assistance if they develop any of these signs and symptoms [see Warnings and Precautions (5.7)].

### 17.8 Effects During Pregnancy
Patients should be informed that in late pregnancy CELEBREX should be avoided because it may cause premature closure of the ductus arteriosus [see Warnings and Precautions (5.9), Use in Specific Populations (8.1)].

### 17.9 Preexisting Asthma
Patients should be instructed to tell their physicians if they have a history of asthma or aspirin-sensitive asthma because the use of NSAIDs in patients with aspirin-sensitive asthma has been associated with severe bronchospasm, which can be fatal.  Patients with this form of aspirin sensitivity should be instructed not to take Celebrex.  Patients with preexisting asthma should be instructed to seek immediate medical attention if their asthma worsens after taking Celebrex [see Warnings and Precautions (5.13)].

### 17.10 GI Cancer in Familial Adenomatous Polyposis
Patients with FAP should be informed that CELEBREX has not been shown to reduce colorectal, duodenal or other FAP-related cancers, or the need for endoscopic surveillance, prophylactic or other FAP-related surgery.  Therefore, all patients with FAP should be instructed to continue their usual care while receiving CELEBREX [see Warnings and Precautions (5.15)].

*Distributed by*

 **G.D. Searle LLC**
Division of Pfizer Inc, NY, NY 10017

LAB-0036-13.0
June 2009

<u>**Medication Guide**</u>
<u>**for**</u>
<u>**Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)**</u>
<u>(See the end of this Medication Guide for a list of prescription NSAID medicines.)</u>

**What is the most important information I should know about medicines called Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?**

**NSAID medicines may increase the chance of a heart attack or stroke that can lead to death.**
This chance increases:
- with longer use of NSAID medicines
- in people who have heart disease

**NSAID medicines should never be used right before or after a heart surgery called a "coronary artery bypass graft (CABG)."**

**NSAID medicines can cause ulcers and bleeding in the stomach and intestines at any time during treatment. Ulcers and bleeding:**
- can happen without warning symptoms
- may cause death

**The chance of a person getting an ulcer or bleeding increases with:**
- taking medicines called "corticosteroids" and "anticoagulants"
- longer use
- smoking
- drinking alcohol
- older age
- having poor health

**NSAID medicines should only be used:**
- exactly as prescribed
- at the lowest dose possible for your treatment
- for the shortest time needed

**What are Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?**
NSAID medicines are used to treat pain and redness, swelling, and heat (inflammation) from medical conditions such as:
- different types of arthritis
- menstrual cramps and other types of short-term pain

**Who should not take a Non-Steroidal Anti-Inflammatory Drug (NSAID)?**
**Do not take an NSAID medicine:**
- if you had an asthma attack, hives, or other allergic reaction with aspirin or any other NSAID medicine
- for pain right before or after heart bypass surgery

**Tell your healthcare provider:**
- about all of your medical conditions.
- about all of the medicines you take. NSAIDs and some other medicines can interact with each other and cause serious side effects. **Keep a list of your medicines to show to your healthcare provider and pharmacist.**
- if you are pregnant. **NSAID medicines should not be used by pregnant women late in their pregnancy.**
- if you are breastfeeding. **Talk to your doctor.**

**What are the possible side effects of Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?**

| Serious side effects include: | Other side effects include: |
|---|---|
| • heart attack<br>• stroke<br>• high blood pressure<br>• heart failure from body swelling (fluid retention)<br>• kidney problems including kidney failure<br>• bleeding and ulcers in the stomach and intestine<br>• low red blood cells (anemia)<br>• life-threatening skin reactions<br>• life-threatening allergic reactions<br>• liver problems including liver failure<br>• asthma attacks in people who have asthma | • stomach pain<br>• constipation<br>• diarrhea<br>• gas<br>• heartburn<br>• nausea<br>• vomiting<br>• dizziness |

**Get emergency help right away if you have any of the following symptoms:**

- shortness of breath or trouble breathing
- chest pain
- weakness in one part or side of your body
- slurred speech
- swelling of the face or throat

**Stop your NSAID medicine and call your healthcare provider right away if you have any of the following symptoms:**

- nausea
- more tired or weaker than usual
- itching
- your skin or eyes look yellow
- stomach pain
- flu-like symptoms
- vomit blood
- there is blood in your bowel movement or it is black and sticky like tar
- skin rash or blisters with fever
- unusual weight gain
- swelling of the arms and legs, hands and feet

These are not all the side effects with NSAID medicines. Talk to your healthcare provider or pharmacist for more information about NSAID medicines.

**Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.**

**Other information about Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)**

- Aspirin is an NSAID medicine but it does not increase the chance of a heart attack. Aspirin can cause bleeding in the brain, stomach, and intestines. Aspirin can also cause ulcers in the stomach and intestines.

- Some of these NSAID medicines are sold in lower doses without a prescription (over –the –counter). Talk to your healthcare provider before using over –the –counter NSAIDs for more than 10 days.

**NSAID medicines that need a prescription**

| Generic Name | Tradename |
|---|---|
| Celecoxib | Celebrex |
| Diclofenac | Cataflam, Voltaren, Arthrotec (combined with misoprostol) |
| Diflunisal | Dolobid |
| Etodolac | Lodine, Lodine XL |
| Fenoprofen | Nalfon, Nalfon 200 |
| Flurbiprofen | Ansaid |
| Ibuprofen | Motrin, Tab-Profen, Vicoprofen* (combined with hydrocodone), Combunox (combined with oxycodone) |
| Indomethacin | Indocin, Indocin SR, Indo-Lemmon, Indomethagan |
| Ketoprofen | Oruvail |
| Ketorolac | Toradol |
| Mefenamic Acid | Ponstel |
| Meloxicam | Mobic |
| Nabumetone | Relafen |
| Naproxen | Naprosyn, Anaprox, Anaprox DS, EC-Naproxyn, Naprelan, Naprapac (copackaged with lansoprazole) |
| Oxaprozin | Daypro |
| Piroxicam | Feldene |
| Sulindac | Clinoril |
| Tolmetin | Tolectin, Tolectin DS, Tolectin 600 |

* Vicoprofen contains the same dose of ibuprofen as over-the-counter (OTC) NSAIDs, and is usually used for less than 10 days to treat pain. The OTC NSAID label warns that long term continuous use may increase the risk of heart attack or stroke.

*This Medication Guide has been approved by the U.S. Food and Drug Administration.*

# EXHIBIT 179

2 of 24 DOCUMENTS

Copyright 2005 National Public Radio (R)
All Rights Reserved
National Public Radio (NPR)

**SHOW:** Talk of the Nation/Science Friday 2:00 PM EST NPR

December 16, 2005 Friday

**LENGTH:** 2019  words

**HEADLINE:** Peer review

**ANCHORS:** JOE PALCA

> **EXHIBIT**
> _34_
> _1·12·07_   _DS_

**BODY:**

JOE PALCA, host:

This is TALK OF THE NATION/SCIENCE FRIDAY from NPR News. And I'm Joe Palca, sitting in for Ira Flatow.

You know, the term `breakthrough' gets tossed around pretty casually in the popular media, but in May of this year South Korean scientists published a paper in the journal Science that really lived up to the term. Hwang Woo-suk and his colleagues reported that they had used cloning techniques to create 11 embryonic stem cell lines tailored to match individual human donors. Scientists around the world hailed the remarkable achievement. This wasn't Hwang's first cloning triumph. He had created cloned cows and was the first to create embryonic stem cells from a cloned human embryo. So while his announcement in May was remarkable, there was no reason to doubt its veracity. Well, that was then.

Last month Hwang came under criticism for failing to disclose that eggs used in the research were donated by two junior women in his lab. That type of donation is frowned upon since there is the possibility that women might feel coerced into donating. And this week one of Hwang's co-authors, University of Pittsburgh researcher Gerald Schatten, asked that his name be taken off the paper, citing concerns about the data. Following that, another of Hwang's collaborators said Hwang had admitted to him that he had fabricated some of the data. Today, Hwang asked that the paper be retracted due to errors. He says he stands by the work and plans to repeat it. Science magazine is planning to have a teleconference on Hwang's request later this afternoon, and we'll bring that to you and tell you what the journal editors say later in this broadcast.

So far, charges that he fabricated results have not been proved. Lots of questions remain about what actually happened and who's telling the truth. Could a study using fabricated data make its way into a prestigious scientific journal? That's what we'll be talking about first this hour. If you want to get in on the conversation, I invite you to give us a call. Our number is (800) 989-8255; that's 1 (800) 989-TALK. And if you want more information about what we'll be talking about this hour, go to our Web site at www.sciencefriday.com, where you'll find links to our topic.

And now let me introduce my first guest this hour. First, **Catherine DeAngelis** is the editor in chief of the Journal of the American Medical Association. She joins us by phone from Chicago.

Thanks for talking with us today, Dr. DeAngelis.

Dr. **CATHERINE DeANGELIS** (Editor in Chief, Journal of the American Medical Association): You're welcome, Joe. Thanks for asking me to join you.

PALCA: And my second guest is Philip Campbell, the editor in chief for the journal Nature. He joins us by phone from London.

Thanks for being with us, Dr. Campbell.

Peer review National Public Radio (NPR) December 16, 2005 Friday

Dr. PHILIP CAMPBELL (Editor in Chief, Nature): It's a pleasure, Joe.

PALCA: So, Phil Campbell, you have to leave in a few minutes, so I'd like to start with you. First of all, I think it's important that people understand that Nature and Science duke it out tooth and nail for the best scientific papers and so, you know, I would imagine that you would have been happy to receive this paper, but would you have been able, or can a scientific journal figure out in a peer review process that there was something so terribly wrong?

Dr. CAMPBELL: In principle, the answer is yes, but it's only on a minority of occasions that that seems to have happened in the history of fraud. There have been--there is quite an extensive history of fraud in the biological litera-ture. There was a very notable case of fraud in the physics literature not so long ago, and in many of those cases a care-ful study shows that the peer refereeing process could not possibly have picked up what was fabricated because the peer reviewers do not go away and replicate the work before the paper is published, and, in many cases, it is only then, if then, that you'd be able to tell that something was drastically awry.

But then there are occasions, and we've certainly had our occasions, when we have been, perhaps, anonymously tipped off, or when a referee has actually spotted during the peer review process something suspicious about the data and that has led us to in the end reject a paper. And that has certainly happened to us.

PALCA: Well...

Dr. CAMPBELL: There are very few occasions, I have to say, when after publication in Nature a fraud has become clear to us and we've had to withdraw the paper.

PALCA: Well, maybe you can explain what a peer review--what a peer reviewer does. First of all, I guess, people should understand that a peer reviewer is somebody familiar with the field of literature that the paper is coming from and knows the science, but what does that person actually do when the paper is sent in?

Dr. CAMPBELL: It's a unique aspect of science as a discipline, as far as I'm aware, that people in science are will-ing to spend their time checking the work of colleagues to make sure that it's OK before it gets out into the light of day, as it were. But that is indeed what they do. Yes, they tend to be experts in one or another aspect of a piece of research. It could be a technical expert in terms of the technology being used; it could be a conceptual expert, if you like, looking at whether this represents a conceptual advance compared to what's been published before. Editors of journals have to supervise that process. They have to select the referees and they have to judge the comments made, and it's ultimately the editors that have to decide whether to publish the paper or not, so they do take responsibility but it is up to the refe-rees, more often than not, anyway, to just be as sure as they can be, just based on what they see in front of them, in the written paper, whether or not this work looks credible, and I think that's the important point to make. All they can really do is to tell 'Is this work credible based on everything I know?' What they're not doing, as I say, is going away and actu-ally validating the work.

PALCA: But I'm just curious because if you look at some of the data, now that it's all post hoc, I grant you, but people have called attention to some of the figures in this paper by Dr. Hwang where two things that are said to be com-pletely different, if you superimpose them, one on top of the other, you can see that they're identical. And, I mean, how does something like that slip past? Is it just because scientists say, 'Well, I mean, I'm never going to question the data. The data must be accurate so I'm just trying to see if the results are accurate'?

Dr. CAMPBELL: Yes, well, of course, what I can't say is exactly what happened here because I don't think Science has actually made any statement yet and apparently they may do later on today as to exactly what is the nature of the data that they published in the terms that you've just said. It's certainly true that there seems to be--the data do seem to be suspicious just on sight. But as you also said, that is with the benefit of hindsight. It may be that exactly the right specialty was not available to the editors at the time that they assessed this paper. I mean, I'm not trying to let anyone off the hook here.

I mean, if I were in the editor's shoes here, I would certainly be going back through the process with a fine-tooth comb and just seeing exactly who was asked to assess the papers and whether or not they should indeed have spotted that and whether the editors themselves bear some of the responsibility here. It is possible that they do. But I have to say this is with the benefit of hindsight and I know from my own experience of cases where allegations have been made, or, indeed, we've published by mistake a paper that we shouldn't have because it wasn't peer-reviewed carefully enough. These things can slip through the net. And the only thing you can then do is to quickly acknowledge the mistake and cor-rect the literature.

Peer review National Public Radio (NPR) December 16, 2005 Friday

PALCA: All right. So, Dr. DeAngelis, you're the editor of a medical journal which doesn't tend to publish quite as many basic science papers, but are the problems that you face with your referees and the papers that you get similar, or do you have a different set of problems?

Dr. DeANGELIS: Well, many of our problems are similar to my colleagues' in the basic sciences. We are the clinical sciences. The differences, I believe, are only in the scope of what we cover. Essentially, the papers we receive, especially those that are most open to fraud, if you will, are those that--from the clinical trials, for example. Those are very expensive to conduct. They involve numerous human beings. And therefore the statistics involved are sometimes the mechanism for fraud--for either deliberate or innocent reporting of something that isn't true.

So with us, the process is essentially the same as with my basic science colleague editors except that we--I don't know any large clinical science journal that would publish data-based articles without a basic science reviewer. And that isn't always necessary in the basic sciences because they are more descriptive, they often do not involve human beings and the numbers involved are small enough so that they're describing a process. That--those are the only differences. But we certainly, in the clinical sciences, the editors in the clinical sciences, have certainly found ourselves in positions where we discover by various mechanisms that what we've published is not the truth.

I mean, we have many examples. The **Celebrex** issue, which involved my own journal, where the report on a COX-2 inhibitor, the celecoxib, **Celebrex**--the report came out after six months. We knew, because of the protocol that we asked for, that the study was to go on for 12 months. We asked the authors did they have the 12-month data because the six-month data looked really interesting and something that physicians should know about because it showed that this drug worked and caused much less bleeding in the GI tract than...

PALCA: And so did the authors of--in this case, did they try not to tell you--did they say, `Well, we don't have the six...'

Dr. DeANGELIS: Well...

PALCA: ...`We don't have the 12-month data'?

Dr. DeANGELIS: They deliberately--they didn't try anything. They deliberately lied. We asked them...

PALCA: Ah.

Dr. DeANGELIS: ...three times and they said, `No,' and we published the paper as a preliminary. We stated...

PALCA: Right.

Dr. DeANGELIS: ...that it was a 12-month study, but we reported it as a preliminary study, but it was one that was--we put out very fast because if it were true it was...

PALCA: It would have been quite remarkable. I take your point.

Dr. DeANGELIS: It--yes, but the problem was...

PALCA: I take your point. Dr. Campbell...

Dr. DeANGELIS: I'm sorry. When they went out to 12 months, it turned out there was no difference. And then we got into trouble and we made them write a letter describing what they had done and admitting that they had lied to us.

PALCA: OK. Dr. Campbell, quickly, before you have to leave, one of the papers on the--one of the authors on the Hwang paper actually said he had very little to do with the paper. He was just the person who helped to present the manuscript. In about 15 seconds, can you tell me, is that a proper procedure? Can authors just have that little input?

Dr. CAMPBELL: I think that can be a matter of agreement between the authors, though--and I haven't actually read the statement that he made. It does sound a little bit too little, to me, to feel comfortable with. But it is certainly true that the role of co-authors and the responsibilities of co-authors is repeatedly shown to be a danger zone in this sort of area, and in the physics example that I mentioned where a whole string of papers turned out to be totally fraudulent, the work had been left--the central work had been left very much in the hands of one man. And that person is someone who's had to leave the field since. And the co-authors have...

PALCA: OK. Well, Phil Campbell, we have to stop you there. I'm really sorry. Have a good trip and thanks for joining us today.

Peer review National Public Radio (NPR) December 16, 2005 Friday

This is TALK OF THE NATION from NPR News.

**LOAD-DATE:** December 17, 2005

# EXHIBIT 180

Unknown

| From: | GEIS, GEORGE S. [PHR/1825] |
|---|---|
| Sent: | Sunday, March 26, 2000 1:12 PM |
| To: | LEFKOWITH, JAMES B. [PHR/1825]; BURR, AIMEE M. [PHR/1825]; KENT, JEFFREY D [PHR/1825]; VERBURG, KENNETH M [PHR/1825]; JORDAN, DAVID C. [PHR/1825]; ZHAO, WILLIAM W [PHR/1825] |
| Cc: | GEIS, GEORGE S. [PHR/1825] |
| Subject: | FW: Special SMB Meeting |

As per the note below, Phil wants us to present CLASS on Wednesday.  Everyone has done a great job in putting together the interpretation, slide set and backup information.  My suggestion is that we rehearse over the next couple of days so that we are all on the same page as we go into the meeting. Some of us will be in St. Louis over in the next day but we can go over things by phone.

Jim - do you want to distribute the main presentation to the addressees of this note?
Steve

-----Original Message-----

| From: | ISAKSON, PETER C [PHR/1005] |
|---|---|
| Sent: | Saturday, March 25, 2000 12:52 PM |
| To: | GEIS, GEORGE S. [PHR/1825] |
| Subject: | FW: Special SMB Meeting |

Sorry I will miss it, but I'm on vacation then.
PI

-----Original Message-----

| From: | MARKS, RICHARD A. [PHR/1825] |
|---|---|
| Sent: | Friday, March 24, 2000 9:22 AM |
| To: | GUALTIERI, ANN K. [FND/1820]; YOUNG, SALLY B [FND/1820]; PAPA, JOSEPH C [PHR/1820]; RASMUSSEN, NANCY D. [PHR/1820]; EDICK, PAUL R. [PHR/1820]; FORD, MIKE M [PHR/5430]; HAMELIN, PAUL R [PHR/1820]; JORDAN, DAVID C. [PHR/1825]; HAMELIN, PAUL R. [PHR/1820]; COUGHLIN, OLIVIA; GEIS, GEORGE; ISAKSON, PETER; MONTWILL, RICH; SCHAAF, JILL; FRIEDMAN, MICHAEL; HANSEN, LARRY; HELLER, ALAN; ISAKSON, PETER; JOHNSON, WILLIAM; MC KEARN, JOHN; MILLER, ARNI; MORRISON, CYNTHIA; NEEDLEMAN, PHILIP; SPIVEY, RICHARD; WARSCHAUSKY, CARL |
| Subject: | Special SMB Meeting |

## NOTE:  This meeting is only open to the people listed on this e-mail and the people Steve Geis invites from the clinical group.

There will be a special SMB meeting on Wednesday, March 29, from 9:30 - 12:00.

The purpose of the meeting is to have the CLASS data presented

The meeting will be in the Tundra Conference Room, A-Basement, Parkway

We have set up a teleconference access.

Teleconference number: 888-422-7109
Code: 942970

Rick Marks



Confidential - Subject To Protective Order

DEFS 02847743

# EXHIBIT 181

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL NO. 03-1519 (AET)
(Consolidated)
CLASS ACTION

ALASKA ELECTRICAL PENSION FUND, CITY OF     :
SARASOTA FIREFIGHTERS' PENSION FUND,        :
INTERNATIONAL UNION OF OPERATING ENGINEERS  :
LOCAL 132 PENSION PLAN, NEW ENGLAND HEALTH  :
CARE EMPLOYEES PENSION FUND, CHEMICAL       :
VALLEY PENSION FUND OF WEST VIRGINIA, and   :
PACE INDUSTRY UNION-MANAGEMENT PENSION      :
FUND, On Behalf of Themselves and All       :
Others Similarly Situated,                  :
     Plaintiffs,                            :
                                            :
VS.                                         :
                                            :
PHARMACIA CORPORATION, FRED HASSAN, G.      :
STEVEN GEIS, CARRIE COX, and PFIZER, INC.,  :
     Defendants.                            :
     ************************************************
              ORAL & VIDEOTAPED DEPOSITION OF
                   DAVID Y. GRAHAM, M.D.
                     DECEMBER 21, 2011
     ************************************************

     ORAL & VIDEOTAPED DEPOSITION OF DAVID Y. GRAHAM,

M.D., produced as a witness at the instance of

DEFENDANTS, and duly sworn, was taken in the

above-styled and numbered cause on the 21st day of

December, 2011, from 9:15 a.m. to 4:48 p.m., before

LORI A. BELVIN, CSR, and Notary Public in and

for the State of Texas, reported by videographic and

stenographic means, at the Law Offices of DLA Piper,

L.L.P., 1000 Louisiana Street, Suite 2800,

Houston, Texas, 77002, pursuant to the provisions of the

Federal Rules of Civil Procedure.

## Page 2

1          A P P E A R A N C E S :
2
COUNSEL FOR THE PLAINTIFFS:
3    Mr. Scott H. Saham, Esq.
     ROBBINS GELLER RUDMAN & DOWD, L.L.P.
4    655 West Broadway, Suite 1900
     San Diego, California  92101
5        Telephone:  (619) 231.1058
         Facsimile:  (619) 231.7423
6        Email:  ssaham@rgrdlaw.com
7
COUNSEL FOR DEFENDANTS:
     Mr. John Caleb Dougherty, Esq.
9    DLA PIPER, L.L.C.
     6225 Smith Avenue, Suite 200
10   Baltimore, Maryland  21209-3600
         Telephone:  (410) 580.4140
11       Facsimile:  (713) 580.3001
         Email:  john.dougherty@dlapiper.com
12
     AND
13
     Mr. Michael S. Wigotsky, Esq.
14   DLA PIPER, L.L.C.
     1251 Avenue of the Americas
15   New York, New York  10020-1104
         Telephone:  (212) 335.4789
16       Facsimile:  (212) 335.4501
         Email:  michael.wigotsky@dlapiper.com
17
18  ALSO PRESENT:
19   Mr. Dan Lapeyrouse, Videographer
20   Ms. Lori A. Belvin, Texas CSR No. 2572
21
22
23
24
25

## Page 3

1                I N D E X
2                               PAGE
3  Stipulations.......................................  1
4  Appearances......................................  2
5  WITNESS:  DAVID Y. GRAHAM, M.D.
6     Examination by MR. DOUGHERTY.................  5
7  Witness Signature Page...........................  266
8  Witness Changes and/or Amendments Page..........  265
9  Reporter's Certificate Page......................  267
10
11
12
13                EXHIBITS
14  NO.        DESCRIPTION        PAGE REFERRED
15  Exh 1054 - Rebuttal Report of David Y. Graham, M.D...41
16  Exh 1055 - "Gastroduodenal Mucosa and Dyspeptic
               Symptoms in Arthritic Patients during
17             Chronic Nonsteroidal Anti-Inflammatory Drug
               Use" article............................124
18
19
20
21
22
23
24
25

## Page 4

1                P R O C E E D I N G S
2       (The time is 9:15 a.m.)
3            THE VIDEOGRAPHER:  We're now on the record.
4  My name is Dan Lapeyrouse, CLVS, of
5  Veritext.  Today's date is December 21st, 2011.  The
6  time is, approximately, 9:15.  This deposition is being
7  held in the offices of DLA Piper, L.L.P., located at
8  1000 Louisiana Street, Suite 2800, Houston, Texas,
9  77002.
10           The caption of this case is Alaska
11 Electrical Pension Fund, et al vs. Pharmacia
12 Corporation, et al in the U.S. District Court,
13 District of New Jersey, No. 03-1519.  The name of the
14 witness is Dr. Graham.
15           At this time, the attorneys will identify
16 themselves and the parties they represent, after which,
17 our court reporter, Lori Belvin, of Veritext will swear
18 in the witness and we can proceed.
19           MR. SAHAM:  Scott Saham for the
20 Plaintiffs.
21           MR. DOUGHERTY:  John Dougherty with Mike
22 Wigotsky at DLA Piper for the Defendants.
23           (Witness sworn under oath by the reporter.)
24           THE REPORTER:  On the record.
25                   *  *  *

## Page 5

1            DAVID Y. GRAHAM, M.D., M.D.,
2  having been first duly sworn, testified as follows:
3                   *  *  *
4            E X A M I N A T I O N
5  BY MR. DOUGHERTY:
6     Q.  Good morning, Dr. Graham.  Sorry it took -- it's
7  difficult to find this place.  So I apologize for that.
8         You've been deposed before, I take it?
9     A.  Yes.
10    Q.  Okay.  How many times do you think?
11    A.  Five or six.
12    Q.  Okay.  So, you know the ground rules.  I'm going
13 to get a chance to ask you questions.  You get a chance
14 to answer.  All of your answers have to be verbalized so
15 that the court reporter can take them down.
16         Let me ask you about your work as an expert
17 witness.  You've been designated as an expert witness in
18 this case; is that correct?
19    A.  Yes.
20    Q.  And have you been designated as an expert witness
21 in any other case --
22    A.  Yes.
23    Q.  -- in your career?  And can you just describe
24 those assignments for me?
25    A.  Well, I've been an expert witness in a Rofecoxib

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 6

1  trial against the State of Louisiana, against Rofecoxib
2  against Merck.
3    Q.  Right.
4    A.  And, then, I've been expert witness in several
5  patent cases in Canada, where the drug companies were
6  seeking patents or extensions and the other companies
7  were arguing against that.
8    Q.  Okay.  Any other expert witness assignments that
9  you recall, sir?
10   A.  Well, years ago, I did some -- one pharmaceutical
11 company suing another over advertisements.
12   Q.  Okay.  All right.  Has that been more than ten
13 years ago, do you think?
14   A.  More than ten years ago.
15   Q.  Okay.  In the Vioxx case, that was a case where
16 the State of Louisiana was suing Merck and there was a
17 trial in that case, was there not?
18   A.  There was a trial.
19   Q.  And that trial was in Louisiana?
20   A.  In New Orleans, right.
21   Q.  In New Orleans?
22   A.  (Witness nods head.)
23   Q.  And you appeared as an expert witness in that
24 case for the plaintiff, did you not?
25   A.  Right.

Page 7

1    Q.  Okay.  And can you describe for us, just
2  generally, what the opinions were that you offered in
3  that case or what you understood your assignment to be?
4    A.  My assignment was related to the -- the question
5  about whether the drug was effective as had been
6  reported in a paper, published in the New England
7  Journal.
8    Q.  Was that the VIGOR trial?
9    A.  The VIGOR -- the Vioxx trial, yeah --
10   Q.  But which --
11   A.  -- the VIGOR study.
12   Q.  The VIGOR study as published in the New England
13 Journal of Medicine?
14   A.  Right.
15   Q.  And that involved Vioxx?
16   A.  Yes.
17   Q.  And did you offer the opinion in the Vioxx case,
18 Dr. Graham, that Vioxx was no better than traditional
19 NSAIDs when it comes to efficacy?
20   A.  That's what I offered, yes.
21   Q.  Do you believe that?
22   A.  That was what the data say.
23   Q.  No, but I'm asking you, sir:  Do you believe it?
24   A.  I didn't know that medicine and science worked in
25 the "belief" business.  We're evidenced-based and the

Page 8

1  evidence did not support that.
2    Q.  So, it's your opinion that Vioxx is no better
3  than traditional NSAIDs when it comes to efficacy?
4    A.  That's what the data showed.
5    Q.  I understand that's what the data shows; but,
6  Dr. Graham, I'm asking you if that's your opinion?
7    A.  That's my opinion.
8    Q.  And does that opinion hold true for all patients
9  or only some patients?
10   A.  I don't understand the question.
11   Q.  Are there some patients that take Vioxx and have
12 better results from an efficacy standpoint than other
13 patients?
14   A.  Oh, any drug, yeah, there's some variation among
15 patients' perception or their actual benefit.  Even
16 placebo has a 40 percent response rate in many trials.
17   Q.  But you -- are you -- do you treat patients, sir?
18   A.  Yes.
19   Q.  If somebody came into you complaining about the
20 signs and symptoms of arthritis, would you give them
21 placebo or Vioxx, if those are your only two choices?
22   A.  That would be hard a decision now, considering
23 I'd have to worry about their cardiovascular risks and
24 other problems.  It may well be that placebo might be a
25 better choice.

Page 9

1    Q.  Do you prescribe placebo to your patients,
2  Doctor, ever?
3    A.  Probably all the time not knowingly.
4    Q.  Not knowingly.
5    A.  It may well be.
6    Q.  And do you have a script for placebo that you
7  write?
8    A.  No, no.
9    Q.  And did you offer any opinions in that Merck
10 trial, Doctor, about the gastrointestinal safety of
11 Vioxx relative to traditional NSAIDs?
12   A.  That's what the trial was about, basically -- at
13 least my part of the trial was about.
14   Q.  So, the answer to my question would be, "yes,"
15 you did offer those opinions?
16   A.  Yes, yes.
17   Q.  Okay.  And.  Can you summarize for us what those
18 opinions are?
19   A.  Well, they had done a large trial to ask whether
20 or not it was safer as far as major GI events; and they
21 had reported that they had found a difference and that
22 question -- that hypothesis or conclusion was called
23 into question when the data were analyzed in a more
24 appropriate way.
25   Q.  Analyzed by who?

3  (Pages 6 to 9)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 10

1    A.  Well, by the statisticians and by many people.  I
2  mean, I think it's pretty well accepted now that that
3  was an incorrect interpretation of data.
4    Q.  Did you offer an opinion in the Vioxx trial,
5  Dr. Graham, that Vioxx, based upon the results of the
6  VIGOR trial, did not show a GI advantage over Naproxen?
7    A.  I -- for safety?
8    Q.  Correct.
9    A.  All of the benefit that they had showed was in
10  one group, which was those taking -- concomitantly
11  taking corticosteroids.  And the other group, people not
12  taking corticosteroids, there was no evidence of
13  benefit.
14    Q.  And did you conduct an analysis to support that
15  opinion in connection with your assignment in the Vioxx
16  case?
17    A.  I don't do those kind of analyses, no.
18    Q.  Okay.  But you did publish the results of such an
19  analyses, didn't you?
20    A.  Right.
21    Q.  So, describe to me when you did, if that was not
22  part of your assignment in the Vioxx trial?
23    A.  Well, there were three authors in the paper,
24  including the statistician who actually did the
25  analysis.

Page 11

1    Q.  So, what was your contribution to that paper?
2    A.  The analysis of the -- was one part of that
3  paper.  That paper discussed the whole approach to how
4  one answers the question and not only was restricted to
5  that one question, but to other events, for example,
6  lower gastrointestinal bleeding, which was another claim
7  that the paper that had been written said that it was
8  safer for lower gastrointestinal bleeding and that was
9  made on an inappropriate way.
10    Q.  Inappropriate according to you?
11    A.  I think inappropriate according to anyone.  I
12  mean, the person who chose to subgroup, which it was
13  statistically significant only did so after the code was
14  broken and it was not the original subgroup that was
15  chosen, if you like, blindly.  So it was a -- it was
16  just not the way science is done.
17    Q.  Is it your opinion, Dr. Graham, that the results
18  that you present in the paper that you're a co-author
19  on, on Vioxx, is more scientifically reliable than the
20  New England Journal of Medicine's presentation of those
21  data?
22    A.  I think the New England Journal paper actually
23  should be withdrawn and -- because it was flawed,
24  greatly flawed.  The reviewers of the paper had had
25  asked similar questions that we addressed and did not

Page 12

1  get honest answers for Merck.
2    MR. DOUGHERTY:  Madam Reporter, can you read
3  back my question for the witness, please?
4    (Question read back for the record.)
5    MR. SAHAM:  Objection, asked and answered.
6    Q.  (BY MR. DOUGHERTY)  Can you answer my question,
7  Dr. Graham?
8    A.  The conclusions of the New England Journal paper
9  we showed were in error.  And if you say that's the
10  definition of "scientifically accurate" would be they
11  were in error and we showed that that was in error, then
12  they were inaccurate.
13    Q.  Do you believe that your analysis of the VIGOR
14  data as presented in the paper that you co-authored is
15  more scientifically reliable than the New England
16  Journal of Medicine article?
17    MR. SAHAM:  Objection, asked and answered.
18    And if he's asking the question again, you
19  can answer it again, Doctor.
20    A.  Yes.
21    Q.  (BY MR. DOUGHERTY)  Okay.  Thank you, sir.
22    The patent cases that you were an expert in,
23  do you recall who you were testifying or who you were
24  retained in by those cases?
25    A.  Different generic companies.

Page 13

1    Q.  And in each case, was that generic company
2  challenging the patent of another pharmaceutical
3  company?
4    A.  Yes.
5    Q.  And you were working on behalf of the company
6  that was trying to either get around or invalidate those
7  patents?
8    A.  I was giving opinions about the validity of the
9  patents, yes.
10    Q.  Okay.  And can you tell me what the results were
11  in each of those cases where you testified for the
12  generic?
13    A.  I don't remember exactly how many there were, but
14  the generic company prevailed or won in all but one.
15    Q.  Okay.  Can you tell us what the medicines or
16  drugs were in those cases?
17    A.  They were proton pump inhibitors, like
18  omeprazole.
19    Q.  In each case each, you're -- each patent case
20  you've been in you were testifying on behalf of a
21  generic company challenging patents covering PPIs?
22    A.  In all their cases into Canada, yes.
23    Q.  And in the Vioxx case, just to move back to that
24  really quickly, do you recall what the result was in the
25  Vioxx trial, whether the plaintiffs prevailed in that

4  (Pages 10 to 13)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 14

1  case?
2    A.  My understanding is that the judge said that the
3  State of Louisiana had no choice, if their data were
4  right or wrong, if the FDA had approved the drug, they
5  had to pay for it, no matter what.
6    Q.  So that means the plaintiffs lost in that case;
7  is that your understanding?
8    A.  That's my understanding.
9    Q.  Are there any other expert witness assignments,
10  other than the ones we've just discussed, that you've
11  been involved in, obviously?
12    A.  Not in the last ten years.
13    Q.  Have you ever acted as an expert witness on
14  behalf of a pharmaceutical company that's not a generic
15  pharmaceutical company?
16    A.  Ye.
17    Q.  And can you describe those assignments?
18    A.  Well, I did another patent, if you like, about a
19  drug called Slow-K and one called Micro-K, potassium
20  preparations.  There was one called Micro-K.  It was the
21  Robbins company at the time had it.
22    Q.  And you testified on behalf or you acted as an
23  expert on behalf of the non-generic pharmaceutical
24  company in that case?
25    A.  They were both non-generic companies, yes.

Page 15

1    Q.  Okay.  And those are the Robins cases, is
2  that --
3    A.  The Robins, it was non-- it was a regular
4  company; and the other one, I think, was CSUGIE, the one
5  that I was testifying for.
6    Q.  Okay.  And how long ago were those assignments?
7    A.  15 or more years.
8    Q.  Dr. Graham, have you done any original research
9  on COX-2's?
10    A.  I've done pharmaceutical companies and original
11  research on COX-2's, yes.
12    Q.  Okay.  And can you describe that work?
13    A.  Well, I did some of the clinical trials, where we
14  gave people coded blinded drugs and, you know, turned in
15  the data.  And I did my own studies where I fed people
16  different NSAIDs and looked at the effect on ulcer
17  healing in the stomach.
18    Q.  Anything else?
19    A.  Not specifically, I think, for COX-2's.
20    Q.  Okay.  So with respect to COX-2's, the original
21  research that you've done has either been clinical
22  trials funded presumably by the sponsoring company and
23  some studies that you've done on your own; is that -- do
24  I have that correct?
25    A.  Right.

Page 16

1    Q.  Okay.  And the clinical trials that you've been
2  involved in that were sponsored by the company, can you
3  identify those for us, please?
4    A.  Not specifically.  I mean, I can't give you the
5  name or number of the trial.  There were many of those
6  trials that were done early on when they were first
7  doing these drugs, and we did drug trials both with
8  Celecoxib and with Rofecoxib.
9    Q.  Now, you used the term "we."  Is that referring
10  to you and others, or is that the "Royal We" when you're
11  referring only to yourself?
12    A.  Well, there's more than one of us that does
13  clinical trials, I mean, in a group at Baylor.  I mean,
14  I would be the PI.
15    Q.  Okay.  You'd be the principal investigator on
16  these trials?
17    A.  Right.
18    Q.  And you said that you were involved in conducting
19  clinical trials involving both Celebrex and Vioxx; is
20  that correct?
21    A.  I think so, yes.
22    Q.  And tell us what you can remember about your
23  involvement in any clinical trials involving Celebrex.
24    A.  Well, that I was involved in some of the very
25  early trials when we were testing it against other

Page 17

1  NSAIDs and placebos for endoscopic ulcers.  I'm actually
2  involved in a current trial with Celebrex.
3    Q.  The Precision trial, sir?
4    A.  The Precision trial.
5    Q.  And the primary endpoint in that trial is -- it
6  has to do with a cardiovascular risk; is that right?
7    A.  Cardiovascular.
8    Q.  Okay.
9    A.  It's looking at all aspects, but it focuses on
10  cardiovascular.
11    Q.  And what is the primary endpoint of Precision,
12  Dr. Graham?
13    A.  I mean, the main question is "Do the drugs differ
14  in their cardiovascular safety?"
15    Q.  And what is the primarily endpoint in Precision?
16    A.  It's events like heart attacks, strokes.
17    Q.  Just thrombotic events or other events, other
18  cardiovascular events?
19    A.  The focus is on, I mean, heart attacks; but it's
20  any cardiovascular event.
21    Q.  Well, the primary endpoint isn't any
22  cardiovascular event, is it?
23    A.  If you want the exact primary endpoint, I cannot
24  give it to you.
25    Q.  Okay.  That's fair.  And if you don't know, you

5  (Pages 14 to 17)

c6105f33-bf73-43f2-8d74-cddba22a4f76

**Page 18**

1  can say you don't know.
2      A. I have no problem with "I don't know."
3      Q. Okay. So let's talk about the Vioxx trials for a
4  second. What clinical trials have you been involved in
5  relating to Vioxx?
6      A. I don't remember any details. I just remember
7  that we did some studies where we've had, you know, two
8  coded drugs to people and did endoscopic procedures.
9      Q. Was that similar to what you did for Celebrex?
10     A. Similar model.
11     Q. Okay. Do you recall how many clinical trials you
12  were involved in for either Celebrex or Vioxx?
13     A. No.
14     Q. Were you involved in the CLASS trial?
15     A. I don't think so -- "no."
16     Q. What about the VIGOR trial?
17     A. No.
18     Q. So, is it fair to say that your recollection of
19  the clinical trials that you've been involved in using
20  either Celebrex or Vioxx have been endoscopy studies?
21     A. Mostly endoscopy studies.
22     Q. And, in fact, one of those trials, Dr. Graham,
23  resulted in a publication in JAMA where you're listed as
24  a co-author; isn't that right?
25     A. Yes.

**Page 19**

1      Q. What role, if any, did you have, Dr. Graham, in
2  designing those endoscopy trials for Celebrex?
3      A. The actual trial?
4      Q. Correct.
5      A. Very little. I mean, the trial design is -- by
6  that time was pretty standardized, a cookie-cutter type
7  of approach to these questions.
8      Q. Did you review the protocol before agreeing --
9      A. Oh, absolutely.
10     Q. -- to become an investigator on any of those
11  trials?
12     A. Oh, absolutely.
13     Q. Did you have any problem with the protocol?
14     A. Not that I remember.
15     Q. Did you remember having any problem with the
16  design of those clinical trials?
17     A. They were standard clinical trials for those
18  questions.
19     Q. I appreciate that, but my question was: Do you
20  recall having any problems with the design?
21     A. I don't recall.
22     Q. Okay. Do you recall what the results of the
23  endoscopy trials for Celebrex was?
24     A. It was shown that for endoscopic ulcers that
25  Celebrex was less likely to cause endoscopic ulcers and

**Page 20**

1  less likely to cause symptoms than traditional NSAIDs.
2  That was, at least, the comparatives and the doses used.
3      Q. Is that what the data showed?
4      A. That's what the data showed.
5      Q. Did you have any reason to question the validity
6  of those data?
7      A. No.
8      Q. And, today, do you have any reason to question
9  the validity of those data?
10     A. No.
11     Q. And, so, you stand behind the paper that you
12  co-authored in JAMA regarding the results of Celecoxib
13  in the endoscopy trial that you were involved in?
14     A. Yes.
15     Q. And do you recall working with any employees or
16  scientists, sir, from G.D. Searle on those trials?
17     A. I mean, I interacted with the people at Searle
18  because I was involved before that with Misoprostol,
19  which was the predecessor drug, if you like, same
20  people.
21     Q. In your work on Misoprostol, Dr. Graham, can you
22  describe for us what that involved?
23     A. Same. I only did endoscopic trials and they
24  were -- it addressed whether it was useful as a safe
25  drug.

**Page 21**

1      Q. And what were the results of those endoscopy
2  trials --
3      A. I mean it showed --
4      Q. -- involving Misoprostol?
5      A. -- it showed Misoprostol was effective in
6  reducing or preventing ulceration from NSAID-induced
7  ulcers. It was good hypothesis that was proven.
8      Q. And do you still believe those data are valid?
9      A. Absolutely.
10     Q. And do you recall whether there was more than one
11  trial involving Misoprostol that you were involved in?
12     A. Yes.
13     Q. More than one endoscopy trial?
14     A. Right.
15     Q. Do you recall whether the primary endpoints in
16  those trials were the same or different?
17     A. Not specifically. Presumably they were all very
18  similar because that was -- it's a model.
19     Q. In your opinion, Dr. Graham, were those trials
20  clinically useful at all?
21     A. I don't understand the question.
22     Q. Sure. The data that came out of those trials
23  involving Misoprostol, were they of any clinical use?
24     A. Oh, unquestionably. We --
25     Q. How so?

6 (Pages 18 to 21)

Page 22

1    A. Well, that was the MUCOSA trial that was done,
2  which was the first trial to show that you could prevent
3  or reduce the frequency of these serious adverse
4  effects.
5    Q. And could you describe how that information was
6  clinically useful?
7    A. Well, the main problem with the use of NSAIDs is
8  that people have major GI events, bleeding, perforation,
9  obstruction; and the trial was done to ask whether the
10  co-therapy with Misoprostol would reduce those untoward
11  effects, and it showed that it did.
12    Q. Turning now to the endoscopy trials that you did
13  on Celebrex, was there any clinically useful information
14  coming out of those endoscopy trials?
15    A. The hypothesis for Celebrex was that the COX-2
16  inhibitors would -- selective COX-2 inhibitors would not
17  cause GI damage or would markedly have reduce rates of
18  GI damage. And, so, the original trials were designed
19  to see if that hypothesis was supported by the data.
20      So, yes, they were very useful because they
21  showed that it tended to support that hypothesis, which
22  led to the next -- designed next studies.
23    Q. So just to make sure that we have a common
24  foundation here, Dr. Graham, isn't it fair to say that
25  the endoscopy trials involving Celebrex showed a GI

Page 23

1  advantage for Celebrex over the NSAIDs that were tested
2  in those trials?
3      MR. SAHAM: Objection, misstates prior
4  testimony.
5    A. Within the parameters of the trials and their
6  weaknesses, et cetera, and their doses, et cetera, they
7  tended to show -- they routinely showed that there was a
8  difference.
9    Q. (BY MR. DOUGHERTY) Are you aware of any
10  endoscopy data comparing Celebrex to a traditional NSAID
11  that doesn't always favor Celebrex over the traditional
12  NSAID?
13    A. Companies never tend to want to do a study that
14  predictably is going to come out and not show what they
15  want to show. So I don't know if such studies were
16  done. I know such studies were done with Vioxx and that
17  they were not published, at least, initially. I don't
18  know if similar studies were done with Celebrex and not
19  shared. I wouldn't be surprised.
20    Q. So, the short answer to my question is you're not
21  aware of any studies comparing Celebrex to an NSAID and
22  any endoscopy studies comparing Celebrex to an NSAID
23  that don't favor Celebrex in the results of those
24  trials?
25      MR. SAHAM: Objection, form, asked and

Page 24

1  answered, misstates prior testimony.
2    A. I know personally of no such trials.
3    Q. (BY MR. DOUGHERTY) Any do you believe that those
4  endoscopy data coming from the endoscopy trials
5  involving Celebrex, do you believe those data are
6  clinically useful?
7    A. Clinically useful? I don't know -- I don't
8  really understand the question. They're clinically
9  useful, only in that they support the hypothesis and
10  leads you to continue the research.
11    Q. Do you believe that those endoscopy trials proved
12  any GI advantage for Celebrex over traditional NSAIDs?
13    A. No.
14    Q. And, yet, you're a co-author on a JAMA article
15  presenting the results of one of those trials; isn't
16  that correct?
17    A. Oh, yes.
18    Q. And you understood that when you published that
19  article that practicing physicians would read it?
20    A. Yes.
21    Q. And you understood that -- and you attempted to
22  communicate in that article information that would be
23  clinically relevant to those physicians, did you not?
24    A. Well, they're clinically relevant as far as the
25  hypothesis we were testing were concerned, yes.

Page 25

1    Q. I don't understand what you mean "the hypothesis
2  we were testing."
3    A. The hypothesis was that the COX-2 hypothesis was
4  correct, that hypothesis COX-2's didn't -- wouldn't
5  cause the same side effects that the NSAIDs --
6  traditional NSAIDs caused.
7    Q. That was the hypothesis going into those trials,
8  correct?
9    A. Going into the trials.
10    Q. And that relates back to the work that was done
11  in the late '80's and early '90's that developed the
12  so-called the COX-2's hypothesis, correct?
13    A. Right.
14    Q. And the clinical trials in Celebrex that you were
15  involved with confirmed that hypothesis based upon the
16  endoscopy data?
17    A. Based upon the endoscopic model.
18    Q. And you believe those data are valid still today?
19    A. They were good studies.
20    Q. And you believe those data are still valid today,
21  correct?
22    A. They're still valid today within the context that
23  they were done, yes.
24    Q. And it's still important for physicians to
25  understand the results of those trials, don't you agree?

7 (Pages 22 to 25)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 26

1    A.  Well, I'm not sure of that.  I mean, the world's
2  moved on beyond there to test the other hypotheses.
3    Q.  Fair enough.
4        For the time you published the JAMA article
5  in one of those trials, you thought it was important for
6  physicians to understand that the data confirmed the
7  hypothesis, correct?
8    A.  Oh, sure.
9    Q.  Can we talk about the clinical studies you,
10  yourself, have done involving COX-2's?  Is it okay if we
11  shift to that now?
12    A.  (Witness nods head.)
13    Q.  Okay.
14    A.  Whatever you want.
15    Q.  What COX-2's have you tested yourself?
16    A.  Celebrex.
17    Q.  Okay.  And did you publish the results of any of
18  those tests?
19    A.  Well, we have -- we published in an abstract
20  format.  The paper's been written, but not been
21  submitted yet.
22    Q.  Could you just explain that a little bit further?
23    A.  Well, you do the study and you analyze the data
24  and then you, typically, present it somewhere as an
25  abstract paper, you know, a poster or something at a

Page 27

1  national meeting.  And, then, you finish it up and you
2  submit it to a journal and it's published.
3    Q.  And has the abstract for that -- first of all,
4  how many trials have you done yourself involving
5  Celebrex?
6    A.  That weren't supported by Celebrex?
7    Q.  That weren't supported by the company that
8  marketed the medicine.
9    A.  Only one.
10    Q.  And what is that trial?
11    A.  And that was a trial asking about ulcer healing
12  and experimental ulcer healing in humans.
13    Q.  I'm sorry.  "Experimental ulcer healing," I don't
14  know what that means.  Can you describe it for me,
15  please?
16    A.  Well, you take big biopsy forceps and you do a
17  biopsy which causes an acute ulcer and then you give the
18  patient drugs and you endoscope them every few days and
19  you measure the rate of healing.
20    Q.  How many -- was this conducted on humans?
21    A.  Yes.
22    Q.  And how many people were in that trial?
23    A.  Maybe 50.
24    Q.  Were these patients at Baylor?
25    A.  Volunteers.

Page 28

1    Q.  Can you -- and you went in and caused them an
2  ulcer so that you could study the ulcer healing process
3  in them?
4    A.  Yes.
5    Q.  What was the inclusion/exclusion criteria for
6  those patients?
7    A.  Healthy.
8    Q.  NSAID users?
9    A.  No.
10    Q.  What was the average age of those folks?
11    A.  30's.
12    Q.  Not the traditional kind of people that take
13  Celebrex, wouldn't you agree?
14    A.  I mean, the question was a different question
15  than -- and you wouldn't do that same question in a
16  person who, if they had a problem, would have an
17  untoward event.  But, normally, when we take a gastric
18  mucosa biopsy with large forceps, you actually cause an
19  ulcer.
20    Q.  In fact, that's what you wanted to do in that
21  trial, is cause an ulcer and study the healing process?
22    A.  That's right.  We cause ulcers every day, but
23  they're acute and heal right up.
24    Q.  Other than Celebrex, were there any other
25  therapies studied in that trial?

Page 29

1    A.  Yes, yes.
2    Q.  And what were they?
3    A.  We looked at Nabumetone.
4    Q.  What is that?
5    A.  That's another NSAID.
6    Q.  Does anybody ever use it in the United States?
7    A.  Relafen, it's very widely used.  It's considered
8  the safest of the NSAIDs.
9    Q.  We'll come back to that, because you're going to
10  need to support that statement.
11    A.  And I think Naproxen, a placebo.
12    Q.  Naproxen is "over the counter," is it not?
13    A.  Yes.
14    Q.  Is Relafen "over the counter"?
15    A.  I think so now.
16    Q.  Do you know what the trade name for it is?
17    A.  Huh?
18    Q.  Do you know what the trade or brand name is?
19    A.  Relafen is the trade name.  Nabumetone is what
20  its real name is.  It's an old SmithKline, I think,
21  drug.
22    Q.  And do you have a proto- -- is there a protocol
23  for this trial somewhere?
24    A.  Sure.
25    Q.  And who else was involved in this trial?

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 30

1    A.  I mean, the people that work with me.  It was
2  published in Gastroenterology last year.
3    Q.  And what did the trial show?
4    A.  It showed that --
5    Q.  Let me put it that another way.  Let me withdraw
6  that question.
7    A.  Yeah.
8    Q.  What did the trial prove?
9    A.  (No audible response.)
10    Q.  You're smiling.
11        MR. SAHAM:  Objection to form.
12    A.  It -- I don't know if it proved anything.  It
13  showed that ulcer healing occurred irrespective of the
14  NSAIDs that we were giving and they all seemed about the
15  same as far as one another.  And it was actually
16  supported by the people who made Nabumetone, who didn't
17  like the answers.
18    Q.  (BY MR. DOUGHERTY)  I was just going to ask who
19  funded this study?
20    A.  Nabumetone.
21    Q.  And what's the company's name?
22    A.  I think it was SmithKline at the time or it may
23  have been somebody else.  I don't know who did it.  It
24  was about ten years ago.
25    Q.  The study was about ten years ago?

Page 31

1    A.  Yes.
2    Q.  Okay.  I thought you said it had been presented,
3  but not published.  Maybe I misunderstood you.
4    A.  We finally presented it this year.
5    Q.  Presented it to which journal?
6    A.  Well, we presented it at the DDW.  It's published
7  in Gastroenterology, and we'll submit the paper right
8  after the first of the year.
9    Q.  And I just want to make sure I got it.  You did a
10  clinical trial ten years ago?
11    A.  Right.
12    Q.  And only this year did you present the results?
13    A.  Right.
14    Q.  Why did you wait so long?
15    A.  The sponsor was very unenthusiastic about the
16  data and negative about the data and we just let the
17  world -- since no one else is doing that experiment,
18  there's no rush and we take a few turns and
19  then people retire and then we present the data.
20    Q.  But you could have presented that data when you
21  completed the trial, right, Dr. Graham?
22    A.  Could have.
23    Q.  But you didn't?
24    A.  Didn't.
25    Q.  How much did the trial cost to conduct?

Page 32

1    A.  I don't remember.  It wasn't much.  I mean, it
2  was probably 20, $30,000; and we did it at cost.
3    Q.  Was there any important information coming out of
4  that trial, clinically important information?
5    A.  No data that were -- I mean that was going to
6  change practice.
7    Q.  Okay.  Is that the reason why you waited ten
8  years to publish?
9    A.  Yeah, it's just kind of an interesting fun study
10  that will get published and like the rest of the papers,
11  just kind of disappear somewhere.
12    Q.  Dr. Graham, does H. Pylori cause peptic ulcers?
13    A.  Yes.
14    Q.  Is that your scientific opinion?
15    A.  Well, it's considered dogma now.  It may not be
16  true, but that's the current dogma.
17    Q.  Forget about dogma.  I actually want to know what
18  your opinion is, Doctor.  Does H. Pylori cause peptic
19  ulcers?
20    A.  Yes.
21    Q.  Have you always held that view?
22    A.  Well, after the data became evident, yes.
23    Q.  But before the data become evident, you actually
24  took the opposite position, didn't you, rather publicly
25  in questioning whether H. Pylori caused peptic ulcers?

Page 33

1        MR. SAHAM:  Objection to form.
2    A.  I took the position that it was a hypothesis, it
3  was testable, and that -- that's different than what you
4  said.
5    Q.  (BY MR. DOUGHERTY)  Well, we can pull out your
6  article --
7    A.  Yeah.
8    Q.  -- and look at it.
9    A.  I'll be happy to do that.
10    Q.  Okay.  Wouldn't it be fair to say -- if I asked
11  some of your colleagues who have known you for a long
12  time, that you were very skeptical of whether or not
13  H. Pylori caused peptic ulcers and you were very vocal
14  on that question back in the '80's; isn't that fair?
15        MR. SAHAM:  Objection to form, foundation.
16    A.  I don't think so.
17    Q.  (BY MR. DOUGHERTY)  Have you ever conducted a
18  clinical trial, Dr. Graham, or been involved in the
19  conduct of a clinical trial that uses perforations,
20  obstructions, and bleeding as a primary endpoint --
21  perforations, obstructions, and bleeding?
22    A.  I was involved in the MUCOSA trial.
23    Q.  Other than that?
24    A.  No.
25    Q.  Other than the VIGOR trial and the CLASS trial,

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 34

1  Dr. Graham, are you aware of any other large clinical
2  trials conducted involving NSAIDs that use perforations,
3  obstructions, and bleeding as an endpoint?
4      A. I presume that the other -- the other -- as a
5  different endpoint? "Probably not." I mean, this is a
6  requirement to get approval to eliminate the CLASS
7  labeling. And I don't know if the other companies that
8  make COX-2's went out to prove that CLASS labeling or
9  not.
10     Q. Just to make sure I understand your answer, other
11  than CLASS and VIGOR, the CLASS and VIGOR trials, you're
12  unaware of any large scale clinical trial conducted that
13  uses perforations and obstructions and bleeding as an
14  endpoint; is that fair to say?
15     A. They may exist, but I don't know any
16  specifically.
17     Q. Dr. Graham, how many clinical trials have you
18  been involved in that use death as an endpoint for a
19  gastrointestinal safety?
20     A. I would assume all trials use death as an
21  endpoint, but not as a prespecified, I mean, endpoint
22  because all studies are interested in deaths that might
23  occur. But they're not set out to measure death as an
24  outcome.
25     Q. Perhaps you and I should just kind of have a

Page 35

1  common vocabulary. What's an "endpoint"?
2      A. Start with "What is a clinical trial?"
3      Q. No, just tell me what an "endpoint" is.
4      A. An "endpoint" is a word that says it's an
5  outcome.
6      Q. Okay. And what's an endpoint when we talk about
7  that -- use that term in the context of clinical trials?
8  What does that mean?
9      A. Any clinical trial you get to define 1) outcome,
10  that is, your primary outcome that decides what the
11  trial succeeds or fails.
12     Q. And in the vocabulary of scientists and doctors
13  and clinical trialists, you agree that there's only one
14  endpoint for each clinical trial? Is that what you're
15  saying?
16     A. There's one major endpoint for each clinical
17  trial, the one that use that's prespecified, yes. And I
18  think that I have involved in trials that used death as
19  an endpoint.
20     Q. Okay. Tell me which trials those were.
21     A. Those would be trials looking at treatments for
22  bleeding, such as variceal bleeding, soft GI varices.
23  And my unit has done a bunch of those with early banding
24  and sclerotherapy where death was one outcome.
25     Q. Well, there can only be one outcome, right,

Page 36

1  according to you. So using the definition, the "one
2  outcome" definition, are you saying that you were
3  involved in trials where the outcome being studied was
4  death?
5          MR. SAHAM: Objection to form, misstates
6  prior testimony.
7      A. That's a very complicated outcome, okay? For
8  example, if you were doing a bleeding study for a
9  variceal bleeder and you'd say that one of the outcomes
10  would be -- was your therapy effective and, then, what
11  proportion of your patient died within this time frame.
12  It's like a cancer outcome. It has a very high
13  mortality rate for the disease. And, so, if it's a
14  dichotomy, survival versus death or re-bleed versus no
15  re-bleed or rebleed with death, it becomes -- you know,
16  the outcomes become very complicated.
17     Q. (BY MR. DOUGHERTY) "The outcomes," is that what
18  you said?
19     A. The individual trial becomes very complicated.
20     Q. Okay. So, going back to my question: What
21  trials are you aware of that are testing GI safety where
22  the outcome -- because you said it could only be one
23  outcome in each trial -- the outcome is death?
24          MR. SAHAM: Objection, form.
25     Q. (BY MR. DOUGHERTY) Just name them for me.

Page 37

1          MR. SAHAM: Objection, form.
2      A. It would be studies having to do -- most of them
3  would have to do with GI bleeding.
4      Q. (BY MR. DOUGHERTY) And what you don't do -- I'm
5  sorry?
6      A. Treatment of bleeding ulcers or bleeding varices.
7      Q. Okay. Would those involve the study of the --
8  any of those involve the study of the effects of NSAIDs
9  on that outcome?
10     A. I don't know of any studies of the effect of
11  NSAIDs on those outcomes, no.
12     Q. Do you believe that it would be ethical,
13  Dr. Graham, to conduct a clinical trial comparing the
14  relative GI safety of NSAIDs where the outcome being
15  studied is death?
16     A. I don't know if it would be ethical or not, but I
17  cannot imagine the design. That would be the primary
18  outcome.
19     Q. Would you sign up for such a study?
20     A. I would have to read the protocol, but I would be
21  very hard-pressed to sign up for that study.
22     Q. Because the outcome is death?
23     A. Well, no, the outcome is irrelevant; but it's --
24  you could say -- it's hard to imagine what you would do
25  that had that outcome that would be a clinically

10  (Pages 34 to 37)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 38

1  valuable study that people would want to know.
2       Now, we're not that far away looking at
3  cardiovascular risks, though, with NSAIDs now, that one
4  of the outcomes of that will be death or myocardial
5  infarction, which is considered by many equally death.
6  So, you could say, therefore, possibly we're looking at
7  that in an indirect way right now.
8       Q. I agree with you in an indirect way, but not in a
9  direct way. Your event -- your events that you're
10 studying in Precision are not death. You're looking for
11 thrombotic events, correct?
12      A. Well, death is one you're going to measure. I
13 mean, it's clear that when you gave people cardiotoxic
14 drugs that you have more deaths because of the drug than
15 you would have if you didn't give the drug and NSAIDs
16 were responsible for those deaths. And that's what
17 we're trying to reduce, is deaths basically because of
18 the use of NSAIDs. So, in reality, we're doing those
19 studies today.
20      Q. Even if that's not the endpoint of the study?
21      A. I'm sure it's one of the endpoints.
22      Q. I thought we agreed there could only be one
23 endpoint?
24      MR. SAHAM: Objection, misstates prior
25 testimony.

Page 39

1       A. You can have multiple endpoints. You only get
2  one at the outset that count whether the study won or
3  failed.
4       Q. (BY MR. DOUGHERTY) Okay. But you can collect
5  data on other events that get observed in the conduct of
6  the trial, correct?
7       A. That's right.
8       Q. And those data may be clinically relevant and in
9  some cases extremely relevant to clinicians, correct?
10      MR. SAHAM: Objection to form.
11      Q. (BY MR. DOUGHERTY) Go ahead.
12      A. They might be, yes.
13      Q. For example, death as an event, it's -- would be
14 relevant, correct?
15      A. It's collected in every trial because it would be
16 relevant.
17      Q. And it's reported in every trial, even if that's
18 not the primary endpoint, correct?
19      A. Yes.
20      Q. And there are other information that you're
21 collecting in a clinical trial that are going to be
22 relevant to clinicians even if it's not the primary
23 endpoint, correct?
24      A. Well, it may be relevant and it may not be. You
25 know, you hate to throw away information. The question

Page 40

1  is how do you use the information.
2       Q. All right. Fair enough.
3       In fact, you've published a lot, Dr. Graham,
4  and isn't it fair to say that a lot of your publications
5  are describing the results of clinical trials and
6  focusing on results that are not, in fact, the primary
7  endpoint of that study?
8       A. Well, I don't know if they focus on the things
9  that are not the primary endpoint; but they certainly
10 would describe some of them.
11      Q. And in some cases you describe them in great
12 detail, do you not?
13      A. Well, you'd have to give me some examples, but I
14 might.
15      Q. All right. Well, you have a long list and I'm
16 sure there's plenty in there.
17      A. (Witness nods head.)
18      Q. And if you want to fight me on it, we can go and
19 look at them; but I think you've given me the answer
20 that's the honest answer, which is, "yes," you do talk
21 about that?
22      MR. SAHAM: Objection, form, foundation,
23 misstates prior testimony.
24      Q. (BY MR. DOUGHERTY) Do you believe the CLASS
25 trials should have had death as the outcome, the primary

Page 41

1  endpoint?
2       A. No.
3       Q. Dr. Graham, we're going to mark your report that
4  you submitted in this case as an exhibit so that you
5  have it in front of you -- and you may have it already
6  next to you, but we've got to make this official.
7       MR. DOUGHERTY: Could you mark that as 1054?
8       Scott (hands document to Mr. Saham).
9       MR. SAHAM: Thanks.
10      (Exhibit No. 1054 marked.)
11      MR. SAHAM: Oh, this is the rebuttal -- oh,
12 well, I'm sorry.
13      MR. DOUGHERTY: He's only submitted one.
14      MR. SAHAM: Yeah, that's right.
15      Q. (BY MR. DOUGHERTY) Dr. Graham, you have in front
16 of you what's been marked as 1054. It's entitled the
17 "Rebuttal Report of David Y. Graham, M.D." That's you,
18 right?
19      A. That's me.
20      Q. And did you write this report, sir?
21      A. Yes.
22      Q. And does this report contain the opinions that
23 you intend to offer in this case?
24      A. I mean, that's my opinions, yes.
25      Q. All right. And, Dr. Graham, since writing this

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 42

1 report -- and I'll just note that you dated it July 7th
2 of this year -- other than the opinions offered in this
3 report, do you intend to offer any other expert opinions
4 in this case?
5    A. I don't intend to.  I mean, I might; but I don't
6 intend to.
7    Q. Well, you realize that I would have the
8 opportunity to kind of understand and question you about
9 those opinions.  So, sitting here today, other than the
10 opinions expressed in this report, are there any other
11 opinions that you intend to offer in this matter?
12    A. No.
13    Q. Dr. Graham, if you go to Page 20 of your report.
14    A. (Witness complies with request.)
15    Q. There is a -- I'm going read a sentence of your
16 report into the record -- and it really starts,
17 actually, on the bottom of Page 19.  Do you see that
18 sentence that says "This was an exercise in futility"?
19    A. Yes.
20    Q. Okay.  So I'm going to continue reading there,
21 quote "...as clinical trials can have only one
22 endpoint."  And that's what we were just talking about
23 earlier; right, that clinical trials can have only one
24 endpoint; is that right?
25    A. One endpoint for, yes, for validity -- for the

Page 43

1 trial, "win" or "lose."
2    Q. Right, and that's -- we get to the next sentence
3 in your report; and I'll read it you now.  Quote, "If
4 one fails to disprove the null hypothesis," the studies
5 fail -- the study fails and any other analyses and, as
6 noted above, any conclusions become hypothesis
7 generating subgroups that can either be prespecified or
8 that appear interesting following data inspection."
9        Did I read that correctly?
10    A. Yes.
11    Q. That's your opinion?
12    A. Yes, that's my opinion.
13    Q. You stand by that opinion?
14    A. Yes.
15    Q. In all of the research that you've co-authored or
16 co-author on, do you ever discuss in any of those
17 publications what you're calling "hypothesis generating
18 subgroups"?
19    A. Yes.
20    Q. And would you agree with me, Dr. Graham, that the
21 reason that you're publishing these so-called
22 "hypothesis generating subgroups" is that you think that
23 information is potentially relevant?
24    A. Yes.
25    Q. And in some instances, over the course of time,

Page 44

1 those hypothesis, what you call the hypothesis
2 generating subgroups can either be confirmed or
3 disproven, correct?
4    A. Well, that's -- they are hypotheses.  They're to
5 be tested.
6    Q. Was the COX-2 hypothesis tested before CLASS?
7    A. Was the hypothesis tested before CLASS?  CLASS
8 was the test of the hypothesis, right.
9    Q. No, I'm asking you a different question,
10 Dr. Graham.  I'm asking you whether the hypothesis, the
11 COX-2 hypothesis, had been tested before CLASS?
12    A. I'll answer you the same way:  The hypothesis was
13 that the COX-2 inhibitors would not damage the mucosa
14 and that the major complications that we see with
15 NSAIDs, bleeding, perforation, obstruction would,
16 therefore, effectively, the hypothe-- -- they would not
17 occur, which in scientific basis which would be that
18 they would be statistically less prevalent than even
19 with placebo.
20    Q. Are you saying that the COX-2 hypothesis is that
21 GI adverse events would never occur in a COX-2 inhibitor
22 population?
23    A. Well, under the hypothesis, you would think they
24 would never occur; but, then, you say, "Well, there are
25 other causes so, therefore, there's some background."

Page 45

1    Q. Fair enough.
2        And, in fact, Dr. Graham, you were involved
3 in testing that hypothesis before CLASS, correct?
4    A. We were doing -- collecting data to not
5 necessarily test the hypothesis.  In fact, I think the
6 paper, in the JAMA paper, makes it very clear that we
7 were not comparing against placebo.  We were collecting
8 data to support that building up to this study, which
9 actually tested it.
10    Q. Are you familiar with the FDA's approval of
11 Celebrex?
12    A. No.
13        MR. SAHAM: Objection, form.
14    Q. (BY MR. DOUGHERTY) That's a broad question.  Let
15 me -- are you aware of whether or not the FDA had
16 accepted as proven the COX-2 hypothesis prior to
17 approving Celebrex for marketing in the United States?
18        MR. SAHAM: Objections, form, foundation.
19    A. I am not aware of that.
20    Q. (BY MR. DOUGHERTY) Are you familiar with all the
21 studies that were supported in -- or submitted in
22 support of the approval of Celebrex?
23    A. I am aware of the studies that were supported in
24 approval of Celebrex, yes.
25    Q. And do you -- is it your opinion, Dr. Graham,

12  (Pages 42 to 45)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 46

1  that the COX-2 hypothesis had not been confirmed by the
2  study results?
3     A.  The study results primarily asked whether
4  Celebrex was an effective NSAID, safe and effective
5  NSAID within the framework of other NSAIDs; and it
6  proved that.
7     Q.  And that was -- you agree with me that was no
8  longer as against the other NSAIDs, a hypothesis, by the
9  time the FDA approved Celebrex?
10    A.  Well, it wasn't a COX-2 hypothesis.  It's an
11 NSAID hypothesis.
12    Q.  I see.
13    A.  I mean similar data and similar endoscopic
14 studies were done with your -- the drug we just talked
15 about before, Relafen --
16    Q.  Yeah.
17    A.  -- showing it doesn't cause as much damage,
18 et cetera, all the same kinds of studies.  It was done
19 with other NSAIDs, and that just showed it was a safe
20 NSAID.
21        And the FDA said there's a CLASS label and
22 you get the CLASS label that says "bleeding,
23 perforation, obstruction," serious problems associated
24 with NSAIDs.  And if the COX-2 hypothesis is really
25 true, then, you can get that label removed.

Page 47

1     Q.  There's a lot in that answer that we need to
2  unpack.  So I want to kind of go back to my question,
3  which is -- and I think you answered it -- but you would
4  agree with me that Celebrex's relative safety, GI safety
5  against other traditional NSAIDs, that that had been
6  proven before the FDA approved Celebrex for marketing in
7  the United States?
8         MR. SAHAM:  Objection, form, misstates prior
9  testimony, and asked and answered.
10    A.  I think your answer had too many dependent parts
11 to it.  They showed that if you brought another NSAID
12 out, let's say a traditional NSAID, and you can get
13 approval for that traditional NSAID because it is an
14 effective NSAID and it doesn't cause any more adverse
15 effects than other NSAIDs, so the FDA is going to
16 approve it.  I mean, they've got a model for that.  You
17 just go down the blanks.  And Celebrex proved to be as
18 effective as other NSAIDs, no better.
19    Q.  You keep focusing on efficacy.  I'm asking
20 questions about safety.
21        So, we'll go back to my question:  Do you
22 agree with me by the time that FDA approved Celebrex
23 that the studies that had been done comparing Celebrex
24 against traditional NSAIDs had proven Celebrex had a
25 relative GI safety advantage over those traditional

Page 48

1  NSAIDs?
2         MR. SAHAM:  Objection to form.
3     A.  Safety is measured -- first of all, safety is
4  measured by "how."  I mean, are we measuring it for
5  renal flux, are we measuring it for hypertension, are we
6  measuring it for allergies and skin lesions, are we it
7  measuring for endoscopic ulceration, are we measuring
8  against Relafen, which no one's ever beaten, which is a
9  traditional NSAID, what NSAID, what dose, et cetera.
10        You know, what was done is they show that if
11 you took high doses of the really toxic -- gastro-toxic
12 NSAIDs that you got fewer endoscopic ulcers, which have
13 no known clinical relevance with this drug, the same as
14 you got with Relafen.  So I don't think that your
15 answer's really factual.
16        I think the answer is:  They got approval
17 for another NSAID and the FDA left them with the same
18 claim, that they have to -- that it has to have the
19 CLASS claim as all other NSAIDs for safety, which is
20 perforation, obstruction, bleeding.
21    Q.  (BY MR. DOUGHERTY)  My question, Doctor, was
22 focused specifically on GI safety.  So I'm not sure why
23 your answer contained a lot of other things, but let me
24 ask it again:
25        Do you agree with me that prior to the

Page 49

1  approval of Celebrex by the FDA for marketing in the
2  United States that it had been proven that Celebrex had
3  a relative GI safety advantage over traditional NSAIDs?
4         MR. SAHAM:  Objection, asked and answered.
5     A.  No.
6     Q.  (BY MR. DOUGHERTY)  You disagree with that
7  statement?
8     A.  That broad statement, yes --
9     Q.  Okay.
10    A.  -- and I gave you the disclaimers that go around
11 that statement, dosing, drug, et cetera, et cetera.
12    Q.  On the endoscopy data -- and assume for purposes
13 of this question and I know that you've got some
14 opinions here about the utility of the endoscopic
15 data -- but just assume for purpose of my question that
16 the endoscopy data is useful data.  You would agree with
17 me that prior to the FDA approving Celebrex for
18 marketing in the United States that it had been proven
19 on the basis of the endoscopy data that Celebrex had a
20 GI safety advantage over traditional NSAIDs?
21        MR. SAHAM:  Objection, form, foundation,
22 incomplete hypothetical.
23    A.  No.  I mean, you see, your question is
24 "traditional NSAIDs."  So if you said it's better than
25 high dose Naproxen, I'm saying "Okay.  It causes fewer

Page 50

1  ulcers than high dose Naproxen."  But all NSAIDs,
2  including in the FDA claim said lowest dose, shortest
3  time.  So which NSAID, what dose, what duration?
4          (Discussion off the record.)
5          MR. SAHAM:  Do you want to take a break?
6          THE WITNESS:  No, I'm fine.
7          MR. SAHAM:  Okay.  Just let us know if you
8  want to take a break, go to the bathroom or whatnot.
9          (Discussion off the record.)
10     Q.  (BY MR. DOUGHERTY)  Let me try it another way
11  Dr. Graham:  Do you agree with me that the endoscopy
12  studies showed that patients taking Celebrex had a
13  substantially lower risk of ulcers detected by endoscopy
14  compared to other patients who took other NSAIDs?
15     A.  No --
16     Q.  Okay.
17     A.  -- when others that took specific NSAIDs at
18  specific doses.
19     Q.  Okay.  Did you know that the statement I just
20  read to you, Dr. Graham, is from the FDA?
21     A.  It doesn't make any difference.  It doesn't
22  change the truth.
23     Q.  Do you believe that -- let's take a step back
24  here, Dr. Graham, and let's talk about the totality of
25  the evidence on Celebrex.  Are you familiar with the

Page 51

1  totality of the GI safety data on Celebrex, as you sit
2  here today?
3          MR. SAHAM:  Objection to form.
4     A.  I could never be aware of the totality of
5  anything.
6     Q.  (BY MR. DOUGHERTY)  Do you intend to offer any
7  opinions in this case that Celebrex does not have a GI
8  safety advantage over traditional NSAIDs?
9     A.  For that broad question -- I mean the answer that
10  you just gave me for all traditional NSAIDs of all doses
11  of all types, I would say that is not a factual
12  statement.
13     Q.  I'm going to ask the reporter to read back my
14  question, because I think you may be anticipating
15  something in my question that actually isn't there.  So
16  I'm going to have her read it back.  And if you could
17  just focus on what I've asked, that would be great.
18          (Question read back for the record.)
19          MR. SAHAM:  I'd object to asked and answered
20  and I'd ask you to read the answer back as well, since
21  this is an identical question.
22          MR. DOUGHERTY:  No, this is my deposition.
23  We're not reading the answer back.  I'll ask it again.
24     Q.  (BY MR. DOUGHERTY)  Do you intend to offer any
25  opinions in this case, Dr. Graham, that Celebrex does

Page 52

1  not offer a GI safety advantage over traditional NSAIDs?
2          MR. SAHAM:  Objection, asked and answered.
3     A.  And, again, I think that the concept of
4  traditional NSAIDs is a very broad concept and there are
5  many drugs and there are many doses; and there are drugs
6  and doses for which there is no advantage of one drug
7  over another.
8          In fact, all of the drugs, when they came
9  out, even ibuprofen, did endoscopic studies to show they
10  were safer and had an advantage over other drugs; and
11  you can choose a dose and a duration and you can prove
12  that.
13          The best one that I talk about that's in
14  some of my papers was sulindac, which doesn't cause
15  damage in endoscopic studies.  It doesn't cause damage.
16  So if you did that same model, it would look better than
17  Celebrex.
18     Q.  (BY MR. DOUGHERTY)  Doctor, the opinion that I
19  asked you about doesn't appear anywhere in your report,
20  so I'm going to ask my question again.
21     A.  It does appear in my report.  I talk about doses
22  and I talk about how one games a system in my report and
23  the importance of dosing and -- in interpreting data.
24     Q.  Okay.  I'm actually not asking about dosing,
25  Dr. Graham.  I'm --

Page 53

1     A.  You are asking about dosing.  When you tell me
2  about traditional NSAIDs, dosing is the key element to
3  safety.
4     Q.  Let me try it another way, Dr. Graham, because
5  maybe you and I can find common ground.  You'll have
6  plenty a chance to say what you want to say, but I also
7  have a right to ask questions.  And I'm assuming that --
8     A.  Absolutely.  I'm enjoying your questions.
9     Q.  -- as a former Army officer, you actually feel
10  duty-bound to answer questions that are put to you
11  straight, right?
12     A.  Absolutely.
13     Q.  Okay.  Are you offering any opinions in this
14  matter that Celebrex is not safer than traditional
15  NSAIDs?
16     A.  I know of no data that it's safer than
17  traditional NSAIDs.
18     Q.  My question, though, is:  Are you offering
19  opinions in this case -- are you going to get to trial
20  and say "Celebrex is not safer than traditional NSAIDs"?
21          MR. SAHAM:  Objection, asked and answered,
22  calls for a legal conclusion; but you can answer.
23     A.  The data -- when one asked the question for
24  outcome, bleeding, perforation, obstruction, compared to
25  traditional NSAIDs, it proved not to be safer.

14  (Pages 50 to 53)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 54

1    Q. (BY MR. DOUGHERTY)  Is that the extent of the
2  opinions you're going to offer on that question?
3    A. No, that was the answer to your question.
4    Q. Okay.  I guess I'm trying to figure out,
5  Dr. Graham, whether you've actually done the work
6  necessary to offer an opinion on whether the evidence --
7  the total evidence on Celebrex shows that it has a
8  superior GI safety profile to traditional NSAIDs.  Have
9  you done that work necessary to offer that kind of an
10  opinion?
11        MR. SAHAM:  Objection to form.
12    A. I don't understand what the work would consist
13  of.
14    Q. (BY MR. DOUGHERTY)  How about reviewing all the
15  clinical trial data involving Celebrex and focusing
16  specifically on GI outcomes, have you done that as part
17  of your assignment in this case?
18        MR. SAHAM:  Objection, vague as to time.
19    A. The important GI outcome are perforations,
20  bleeding, and obstruction.
21    Q. (BY MR. DOUGHERTY)  Are you offering any opinions
22  in this case -- all right.  I appreciate that, but
23  that's not really my question.
24        Are you offering any opinions in this case
25  related to the results of the Success trial?

Page 55

1    A. Say again.
2    Q. Are you offering any opinions in this case
3  regarding the results of the Success trial?
4    A. Which is -- well, do you want to describe the
5  Success trial to me?
6    Q. Have you ever heard of the Success trial?
7    A. I've heard the name.
8    Q. Do you know what it is?
9    A. I can't give you details.
10    Q. Would it be fair to say, then, you're not going
11  to be offering opinions about the Success trial, if you
12  don't know what it is?
13    A. I don't know the details.
14    Q. What about the CONDOR study, are you going to
15  offer any opinions in this case about the results of the
16  CONDOR study?
17    A. There are two kinds of studies that are done
18  and -- basically -- two basic kinds of studies.  There
19  are marketing studies which are designed to get a
20  marketing advantage that are, if you like biased in many
21  ways; and most of the trials, the big names, are
22  marketing studies and don't address the question of
23  safety.
24        So if you ask me about the safety issues in
25  a marketing study, then I can easily have opinions.  But

Page 56

1  I don't normally get involved in those kinds of studies
2  because they really have -- they're really not
3  scientific studies.  They're marketing studies.
4    Q. Are you done with your ques- -- are you done with
5  your answer?
6    A. Yes.
7    Q. What's the CONDOR trial?
8    A. The CONDOR trial was a big study to look at,
9  among other things, hematocrit changes.
10    Q. And did you review the results of the CONDOR
11  trial as part of your assignment in this case?
12    A. No.
13    Q. Do you mention the CONDOR trial anywhere in your
14  report?
15    A. No.
16    Q. Do you intend to --
17    A. I do actually mention the CONDOR trial, if you
18  like, in part of my report indirectly.
19    Q. Are you going to testify at the trial in this
20  matter about what the results of the CONDOR trial showed
21  with respect to Celebrex's GI profile?
22    A. I wasn't planning on it.  I mean, to me, it was a
23  marketing study of marketing value only.
24    Q. Have you looked at the minute analysis done for
25  Celebrex on the question of GI safety?

Page 57

1    A. There have been a number of minute analyses done
2  about GI safety of NSAIDs.
3    Q. Are you -- did you -- are you going to
4  testify about those results in the trial of this case?
5        MR. SAHAM:  Objection, calls for a legal
6  conclusion.
7    A. I'm going to testifying about what people --
8  questions people ask me.  And I'm not planning on that.
9  That is not in my report.
10    Q. (BY MR. DOUGHERTY)  So, you don't have any
11  current plans to testify about those analyses?
12    A. I do not.
13    Q. Do you know a Francis Chan?
14    A. Yes.
15    Q. Is he a friend of yours?
16    A. A friend of mine, yes.
17    Q. Is he a good scientist?
18    A. Good man.
19    Q. Can you trust him?
20    A. Huh?
21    Q. Do you trust him?
22    A. As much as I trust other people.
23    Q. Comparing Mr. Saham to me, where do we come out
24  on that scale?
25    A. Much higher.

VERITEXT REPORTING COMPANY
(212) 279-9424      www.veritext.com      (212) 490-3430

c6105f33-bf73-43f2-8d74-cddba22a4f76

|  | Page 58 |
|---|---|

1  Q. So, I mean, do you think that -- have you
2  reviewed the results of the work that he's done on
3  Celebrex?
4  A. Yes.
5  Q. And do you think he did good work?
6  A. Well, he has a very good research unit in Hong
7  Kong.
8  Q. Have you re- -- do you question the validity of
9  the conclusions that he's researched about his work
10  researching Celebrex?
11      MR. SAHAM: Objection, form, foundation.
12  A. Which conclusions?
13  Q. (BY MR. DOUGHERTY) Do you even know what his
14  conclusions are?
15      MR. SAHAM: Objection, form, foundation.
16  Q. (BY MR. DOUGHERTY) You see, here's where we're
17  getting a disconnect. You either know the stuff and you
18  have an opinion about it or you know it and you don't
19  have an opinion about it or you don't know about it?
20  A. I know --
21      MR. SAHAM: Wait, Doctor. Objection, form.
22  I mean, I'm not sure that that's a question. It's a
23  speech.
24  Q. (BY MR. DOUGHERTY) So, I'll ask my question
25  again: Are you aware of his work relating to Celebrex

|  | Page 59 |
|---|---|

1  and the conclusion that he's drawn regarding Celebrex?
2  A. I suspect that I'm more aware of his work and his
3  conclusions than you are.
4  Q. Does that make you feel better? Can you --
5  A. No, no, but it might --
6  Q. Can you answer my question now?
7      MR. SAHAM: Well, your question is compound,
8  for one.
9  A. Let's take his trial where he gave Celebrex or
10  Diclofenac and PPI to high risk patients and published
11  in the New England Journal, where he showed that there
12  was no advantage to Celebrex. The patients re-bled at
13  an unacceptably high rate on Celebrex.
14      So what would be the conclusion that I
15  should take from that for Dr. Chan, the hypothesis that
16  if they put a patient in high risk who had bled from an
17  ulcer on Celebrex, he would have a safer NSAID. The
18  answer was he did not. It was a very disappointing
19  result. Now, which one do you want me to use?
20  Q. (BY MR. DOUGHERTY) Do you intend to testify
21  about any of his work at the trial of this case?
22      MR. SAHAM: Objection, calls for a legal
23  conclusion.
24  Q. (BY MR. DOUGHERTY) Dr. Graham, you can answer my
25  question.

|  | Page 60 |
|---|---|

1  A. I don't specifically plan to testify regarding
2  his work at the trial.
3  Q. You talk about things being hypothesis
4  generating. Are you using that term and distinction to
5  the term that you use in your report, which I think is
6  "proven"? Are you distinguishing between something
7  being proven and something being hypothesis generating?
8  A. In general, yes.
9  Q. And when you talk about something being proven,
10  can you just define for us what you mean by "proven"?
11  What are the criteria that you use?
12  A. In the context of a clinical trial, one makes a
13  null hypothesis and states clearly that they hypothesize
14  that A will be the same as B. And, then, they do a
15  randomized control trial, randomizing for all the
16  relevant factors; and they finish their study and they
17  show that either A was different than B or A and B were
18  not different.
19      If A and B are different, then by convention
20  you have proven that within some statistical
21  predetermined range. So that would be how you prove
22  something.
23      Now, the hypothesis generating is data that
24  already exists in the trial. Patients are entered and
25  it turned out for some reason that there are more

|  | Page 61 |
|---|---|

1  red-headed ladies than brown-headed ladies and they have
2  a different outcome; and that is not proven. That is an
3  outcome of the study that was, if you don't mind, might
4  likely be pre-determined by the population entered and,
5  therefore, generates the hypothesis that red-headed
6  ladies and brown-headed ladies have different outcomes.
7  It has to be tested in a randomized -- another
8  prospective randomized controlled trial.
9  Q. So, is it your testimony that -- in terms of
10  clinical trials -- that it you don't meet the primary
11  endpoint, if the null hypothesis, for example, is not
12  rejected, that all the other results from that trial are
13  simply hypothesis generating?
14  A. Generally, that pretty is much the case. There
15  are some waffling examples, but generally that's the
16  case.
17  Q. Give me some waffling examples.
18  A. Well, the question you would have about the data
19  would be "it depends somewhat on the magnitude of the
20  difference you find and whether it's biologically
21  plausible." But even then -- even then, most often they
22  would need to be tested. There are many, many examples
23  of data that pop out in a trial that actually get
24  focused on by the authors that subsequent trials prove
25  that it was wrong. In fact, it went in an entirely

16  (Pages 58 to 61)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 62

1  wrong direction.
2  Q. And the contrary is also true, there are things
3  that people focus on that have subsequently been proven
4  to be true, correct?
5  A. That's why you have to do the studies.
6  Q. The conclusions that you reached about the VIGOR
7  trial in the paper that you published with Dr. Jewel,
8  are the results that you present there proven or simply
9  hypothesis generating using the dichotomy that you just
10  described?
11  A. More likely, they're on the proven side in
12  that -- in that that the area that was listed as an
13  important potential problem before they did a study and
14  they had designed how they would analyze it and they
15  fudged how they analyzed it; because it showed, if you
16  like, a statistical significant difference and that they
17  had planned on examining before the studies so that at
18  least it would change the conclusions or how one dealt
19  with the conclusions. And this was, again, picked up by
20  one of the reviewers and not handled appropriately by
21  Merck.
22  Q. So, we're taking your dichotomy between something
23  being proven in a clinical trial and data that simply
24  what you call "hypothesis generating" and you've
25  explained that dichotomy to me.

Page 63

1       And, then, we're now shifting gears and
2  talking about the results that you present in your Vioxx
3  paper that you co-authored with another plaintiffs'
4  expert in this case, Dr. Jewel, and you said that you
5  believe the conclusions that you reached in that paper
6  were more on the proven side. Did I understand that
7  correctly?
8       MR. SAHAM: Objection to the form of the
9  question.
10  Q. (BY MR. DOUGHERTY) Is that your testimony?
11  A. That's what I said.
12  Q. Does that mean that there's some sliding scale
13  between "proven" and "hypothesis generating" and that
14  you put yourself closer to proven in your Vioxx paper?
15  A. There -- everything we do in life has got some
16  gray. And when you start like they did by defining the
17  parameters that you think will influence the outcome and
18  that say you're going to do subgroup analysis for them
19  to see if they determine or if they affect the outcome
20  and, then, you fudge that analysis, that's what we said
21  they did.
22  Q. You said that you believe that your Vioxx paper
23  was more on the proven side rather than the hypothesis
24  generating side because what you were studying had been
25  planned -- that there had been a plan in the clinical

Page 64

1  trial to examine those events and that plan existed
2  before the data was unblinded. Did I -- is that what
3  slides it towards the proven side of the scale?
4       MR. SAHAM: Objection to form.
5  A. Not exactly.
6  Q. (BY MR. DOUGHERTY) Okay. Can you just give us
7  the factors that are influencing your opinion that your
8  own work in the Vioxx paper is more towards proven
9  rather than hypothesis generating?
10  A. The Vioxx paper, the -- it was known that
11  corticosteroid users had higher risks.
12  Q. Okay. So --
13       MR. SAHAM: Are you going to let him finish
14  his answer?
15  Q. (BY MR. DOUGHERTY) okay. So we're going to --
16  we're going to have to change the tape in a second, so I
17  just --
18       MR. SAHAM: Well, no. Are you done with his
19  answer?
20       MR. DOUGHERTY: No, he's not done with his
21  answer. He's got more to go, but I want to just take
22  these one at a time because the tape is going to have to
23  cut off.
24  Q. (BY MR. DOUGHERTY) So, the first thing that you
25  said --

Page 65

1       MR. SAHAM: Are you withdrawing the prior
2  question, because he didn't finish his answer?
3       MR. DOUGHERTY: No, no, he's going to give
4  me some factors. I'm just getting clarification.
5       MR. SAHAM: Well, he's not done answering
6  this last question then.
7  Q. (BY MR. DOUGHERTY) One of the factors you said,
8  Dr. Graham, you said that there was information about
9  the relationship between corticosteroid users and the
10  events that you were studying and that information
11  predated the trial; is that --
12  A. Right.
13  Q. Okay. So preexisting information is one factor
14  that would slide it more towards "proven" rather than
15  "hypothesis generating"; is that right?
16       MR. SAHAM: Objection, form.
17  A. I -- maybe.
18  Q. (BY MR. DOUGHERTY) Okay. What are the other
19  factors?
20  A. No. We're discussing the Vioxx trial, right?
21  And, so, this was known and, so, they said "This is
22  known and this could influence our outcome. And, so, we
23  are going to -- a part of our analysis we are going to
24  look at this question. We're not going to subgroup now.
25  We're going to look at this question. And there's a

17 (Pages 62 to 65)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 66

1  term "interaction" and we're going to look for
2  interaction to see if there is an interaction and does
3  that affect our data.
4       And the answer was:  Yes, there was an
5  interaction.  It was significant and all their events
6  were in that one subgroup, 100 percent of them,
7  basically.
8       So, they were offered, basically, by the
9  reviewer to say they didn't -- they didn't want to have
10 a claim that said it's only good in patients who take --
11 that had rheumatoid arthritis and take steroids.  And
12 that was -- they could have -- they had that data from
13 their trial.
14     Q.  So, again, what we're focused on here is why you
15 believed that your and Dr. Jewel's analysis of the VIGOR
16 results are more "proven" than they are "hypothesis
17 generating"; and I think you're given me at least two
18 factors.  One is that there was some preexisting
19 information or it was known that there could be an
20 association.  And I think the second thing you said is
21 the trial was designed to look for that interaction.  Is
22 that fair?
23     A.  Right.
24     Q.  Any other factors that move your Vioxx paper
25 towards the "proven" side of the scale rather than the

Page 67

1  "hypothesis generating" side?
2      A.  We did the analysis that they should have done.
3          MR. DOUGHERTY:  Okay.  We're going to have
4  to change the tape.  This might be a good time to take a
5  quick break.
6          THE VIDEOGRAPHER:  This is now the end of
7  tape No. 1 of the deposition of David Graham.  We're off
8  the record at, approximately, 10:36.
9          (Whereupon, a recess was taken
10             from 10:36 a.m. to 11:02 a.m.)
11         THE VIDEOGRAPHER:  We're now back on the
12 record with tape No. 2 of the deposition of Dr. David
13 Graham.  The time is, approximately, 11:03.
14     Q.  (BY MR. DOUGHERTY)  Dr. Graham, would you agree
15 with me that subgroup analyses of data coming from a
16 clinical trial can be clinically important?
17     A.  Of course, anything can be clinically important.
18 It's not hard to know that.  It's hard to know that
19 prospectively.
20     Q.  So, the answer to my question is "it depends"?
21     A.  It depends.
22     Q.  Okay.  The subgroup analyses that you presented
23 in your Vioxx paper with Dr. Jewel, did you believe that
24 that information was clinically important?
25     A.  Again, what we did, basically, was repeat the

Page 68

1  analysis that they had planned to do, but do it
2  correctly.  So, I mean, it wasn't a new analysis.  It
3  was the analysis that they had described, but that they
4  had, if you like, fudged part of the data.
5      Q.  It was a subgroup analysis, though, wasn't it,
6  Dr. Graham?
7      A.  Part of it was a subgroup analysis, yes.
8      Q.  And do you believe that the information that you
9  and Dr. Jewel presented in your paper was clinically
10 important?
11     A.  Well, it showed that the understanding of the
12 outcome of the trial was different than had been
13 presented.
14     Q.  That was your opinion?
15     A.  Those are what the data, at least as we analyzed
16 them, showed, yes.
17     Q.  Okay.  And, again, do you think it was important
18 for people to know that information?
19     A.  I think it was important to know that the study
20 results were different than had been presented.
21     Q.  And that's why you published those results?
22     A.  Yes.
23     Q.  And did you get paid to do that work?
24     A.  No.
25     Q.  Did that work come out of the your Vioxx

Page 69

1  engagement?
2      A.  I mean, it came out of the -- having done the
3  Vioxx study the same way with, hopefully, that these
4  data will be released by the judge and we can write up
5  these data.
6      Q.  What data are those, Dr. Graham?
7      A.  The CLASS trial.
8      Q.  You don't believe those data have been made
9  available already?
10     A.  The data that comes out in the various
11 depositions has not been made available.  I mean, the
12 internal documents about what people were thinking and
13 doing, et cetera, has not been made available.  If it
14 is, then we'll just write up now.
15     Q.  Do you some plan to write up as part of the
16 assignment in this case some article?
17     A.  If possible, yes.
18     Q.  And who have you had those discussions with,
19 Dr. Graham?
20     A.  No one.  I mean, you know, this is what we do in
21 academic medicine, is "we write."
22     Q.  Well, that's not exactly what you're describing
23 here.  You're describing using an assignment as an
24 expert for plaintiffs' lawyers and to use the
25 information that you get as part of that assignment to

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 70

1  write some article that you want to get published
2  somewhere?
3      MR. SAHAM:  Objection, form.
4      Q.  (BY MR. DOUGHERTY)  Isn't that what you just
5  described?
6      A.  Yeah, that's -- I mean, I think that the truth is
7  the truth.  And if you think that the data are incorrect
8  and that they were -- then someone should set the record
9  straight.
10     Q.  So that's your current intention, is to take the
11 information you've gained as part of this assignment and
12 write an article?
13     MR. SAHAM:  Objection, misstates prior
14 testimony.
15     A.  My objective -- my intention would be if the data
16 are all released by the judge, is to write up about what
17 the CLASS trial really showed and what the analysis
18 really was or should have been.
19     Q.  (BY MR. DOUGHERTY)  And, so, now I'm going to
20 come back to my original question because in your answer
21 you gave me some reference to emails.
22     Do you believe that the CLASS study data has
23 not been released already to the public?
24     MR. SAHAM:  Objection, form, foundation,
25 vague as to "CLASS data."

Page 71

1      A.  Do I think it's not been released?  I think that
2  the JAMA article, understanding of the background,
3  et cetera, the JAMA article is not the generally known
4  among clinicians -- among physicians, right.
5      Q.  (BY MR. DOUGHERTY)  That's really not my
6  question.  You said the background of the JAMA article.
7  You keep talking about the JAMA article.  I'm talking
8  about the CLASS data, because -- maybe we have a
9  disconnect here.
10     Do you not know, Dr. Graham, that the
11 entirety of the CLASS study data has been in the public
12 domain for quite awhile?
13     MR. SAHAM:  Objection, form, foundation --
14     Q.  (BY MR. DOUGHERTY)  Did you not know that?
15     MR. SAHAM:  -- vague.
16     A.  I know that the CLASS data has been in the public
17 domain for a long time.
18     Q.  (BY MR. DOUGHERTY)  So, what you want to publish
19 is not something about the CLASS data.  You want to
20 publish something about -- that would include emails
21 that have been produced by the Defendants in this
22 litigation?  That's what you want your article to
23 include?
24     A.  It would, yes.
25     Q.  And have you talked with the Plaintiffs' lawyers

Page 72

1  about that intention?
2      A.  I mean, I've mentioned it to them.
3      Q.  And when did you first mention that to them?
4      A.  Well, I have no idea.
5      Q.  When were you first contacted about being an
6  expert in this litigation?
7      A.  Maybe a month before this was written (witness
8  pointing to Exhibit No. 1054).
9      Q.  And who contacted you?
10     A.  Somebody from their office.
11     Q.  Had you heard about this litigation before that
12 first contact?
13     A.  I don't think so.
14     Q.  Have you talked with Dr. Jewel about this case?
15     A.  Not specifically.
16     Q.  Have you talked with anyone about this case,
17 other than the Plaintiffs' lawyers?
18     A.  No.
19     Q.  Have you shared any information that's been made
20 available to you in this case with anyone?
21     A.  No.
22     Q.  Where is that information currently stored,
23 Dr. Graham?
24     A.  You mean the documents?
25     Q.  The documents that have been provided to you

Page 73

1  under protective order in this case, where are they?
2      A.  They are in a pile on a chair in my home.
3      Q.  And has anybody other than you seen those
4  documents?
5      A.  No.
6      Q.  Have you spoken with Dr. Abramson about this
7  case?
8      A.  Never.
9      Q.  Have you ever met him?
10     A.  I -- once or twice in the past, yes, not --
11 except just in passing.
12     Q.  You mean when you were both acting as experts for
13 plaintiffs in other cases?
14     A.  No.
15     Q.  Did you know that he's acted as an expert for
16 plaintiffs' lawyers in some of the cases that you have?
17     A.  I had heard his name.
18     Q.  But you didn't meet him in connection with that?
19     A.  No.
20     Q.  Have you performed any independent analysis of
21 the CLASS data, Dr. Graham?
22     A.  No.
23     Q.  What was your assignment in this case?
24     A.  My assignment was to read what Dr. Wang had
25 written and to write a rebuttal.

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 74

1    Q. Okay. So, you're not going to offer any opinions
2  in this case based upon your own analysis of the CLASS
3  data; is that correct?
4         MR. SAHAM: Objection to form, foundation.
5    A. I'll answer the questions that people ask me.
6    Q. (BY MR. DOUGHERTY) How about answering the
7  question that I just asked you?
8    Q. Well, I --
9         MR. SAHAM: He just did. Objection to form.
10   A. I just thought I had.
11   Q. (BY MR. DOUGHERTY) No, I asked you whether you
12 intended to testify in this case about any analysis that
13 you, yourself, performed of the CLASS data?
14   A. No.
15   Q. Because you haven't -- you haven't analyzed those
16 data yet; is that fair?
17   A. I have not done a specific analysis of the CLASS
18 data.
19   Q. You're waiting for this assignment to be over for
20 you to do that, to write this article that you want to
21 publish?
22        MR. SAHAM: Objection, form, foundation.
23   A. I'm not going to waste a bunch of time if the
24 judge keeps it all locked up.
25   Q. (BY MR. DOUGHERTY) Do you intend to offer any

Page 75

1  opinions in this case about the design of the CLASS
2  trial?
3    A. No.
4    Q. So, therefore, we will not hear you at trial
5  testify about criticisms of the CLASS trial design; is
6  that fair?
7    A. My assignment was Dr. Wang and his rebuttal.
8    Q. So the answer to my question is you're not going
9  to testify --
10   A. I don't plan to.
11   Q. -- about the design of the trial?
12   A. (Witness shakes head.)
13   Q. Okay. And you're familiar with the VIGOR trial,
14 are you not?
15   A. Yes.
16   Q. And do you believe that the endpoint selected for
17 the VIGOR trial was clinically relevant?
18   A. I think the endpoint of bleeding, perforation,
19 obstruction were clinically relevant.
20   Q. What was the endpoint for the VIGOR trial,
21 Dr. Graham?
22   A. Well, VIGOR had broader endpoints. They were --
23 they like ulcers; but the main endpoint is bleeding,
24 perforation, obstruction.
25   Q. Your testimony is, is that the main endpoint for

Page 76

1  the VIGOR trial was bleeding --
2    A. The main endpoint for -- as the FDA decided and
3  clinically, I believe, it would be bleeding,
4  perforation, obstruction.
5    Q. But that's not actually what the protocol
6  specifies as the primary endpoint?
7    A. That's a different question.
8    Q. So, let's stick with that question. What was the
9  primary endpoint of the VIGOR trial?
10   A. I cannot tell you exactly what it was. We can
11 look it up.
12   Q. Do you agree that it was -- included events other
13 than bleeding, perforations, and obstructions?
14   A. It included other events that they looked at.
15   Q. They looked at a lot of events, Dr. Graham?
16   A. They did.
17   Q. And I'm really just trying to drill down on the
18 primary endpoint; and if you don't know what the primary
19 endpoint is of the VIGOR trial, then just say you don't
20 know.
21   A. I don't know exactly what their primary endpoint
22 was.
23   Q. So, you can't answer any questions about whether
24 the primary endpoint in the VIGOR trial was clinically
25 important because you don't know what that primary

Page 77

1  endpoint is; is that fair?
2         MR. SAHAM: Objection to form, misstates
3  prior testimony, assumes facts not in evidence.
4    Q. (BY MR. DOUGHERTY) You can answer the question,
5  Dr. Graham.
6    A. I don't think that's fair.
7    Q. What, the question?
8    A. Your answer -- your question was "is that fair"
9  the -- your summary.
10   Q. I'll come back. I've been trying to get to the
11 same thing for a couple of minutes here.
12        Since you don't know the primary endpoint of
13 the VIGOR trial, you can express no opinion, Doctor,
14 about whether the primary endpoint was clinically
15 important or not?
16        MR. SAHAM: Objection to form, misstates
17 prior testimony, assumes facts not in evidence.
18   A. If you'll define what endpoint you want to
19 discuss, then we can discuss whether I think that's
20 clinically relevant.
21   Q. (BY MR. DOUGHERTY) But you can't answer that
22 today?
23   A. Not today.
24   Q. Okay. There must have been a point at which you
25 recalled the primary endpoint of the VIGOR trial because

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 78

1  you wrote on article on it, right?
2    A.  Absolutely.
3    Q.  Would looking at that article help refresh your
4  memory about what the primarily endpoint of the VIGOR
5  trial was?
6    A.  It might.
7    Q.  We'll get that and come back.
8       Do you believe that the only clinically
9  important information in either the VIGOR trial or the
10  CLASS trial were the results on perforations,
11  obstructions, and bleeding?
12    A.  Clinically important information is an
13  extraordinarily broad term.  The hypothesis that COX-2
14  inhibitors would be somehow different than traditional
15  NSAIDs was that they would be void of or remarkably less
16  of these events.  So that is the important scientific
17  question.
18       Now many, many clinical questions could come
19  out that would be of interest and some of them might
20  even be important.
21    Q.  Are you finished?
22    A.  Finished.
23    Q.  So what are the other things that might be
24  clinically important, other than perforations, bleeding,
25  and obstructions?

Page 79

1    A.  Well, they're interested in, for example,
2  cardiovascular events came out to be a very important
3  question.
4    Q.  I'm talking about all GI safety trials involving
5  COX-2's.  That's the frame that I'm using for my
6  question.  And, so, will you accept that frame for
7  purposes of my question?
8       MR. SAHAM:  Objection, form, foundation
9  assumes facts not in evidence.
10    A.  Yes.
11    Q.  (BY MR. DOUGHERTY)  Okay.  So, is it your
12  opinion, Dr. Graham, that the only clinically important
13  information in all COX-2 GI safety trials is the results
14  on perforations, bleeding, and obstructions?
15       MR. SAHAM:  Objection to form, misstates
16  prior testimony.
17    A.  Obviously, there could be a tremendous amount of
18  potentially clinically important information come out
19  any trial.
20    Q.  (BY MR. DOUGHERTY)  Why don't you list for us the
21  clinically important information that would come out of
22  GI safety trials involving COX-2's, other than
23  perforations, bleeding, and obstruction and, again,
24  focusing on the GI safety question?
25       MR. SAHAM:  Object to the form of the

Page 80

1  question.
2    A.  That are COX-2-specific or that differentiate
3  COX-2's from other NSAIDs?
4    Q.  (BY MR. DOUGHERTY)  Yes, sir.
5    A.  That's about it.
6    Q.  Perforations, bleeds, and obstructions, that's
7  about it?
8    A.  That's about it.
9    Q.  So, is it your opinion, then, that there is
10  really no utility to any clinical trial investigating
11  the question of GI safety involving COX-2's that doesn't
12  have as its primary endpoint perforations, obstructions,
13  and bleeding?
14    A.  That would differentiate COX-2's from traditional
15  NSAIDs?
16    Q.  Yes, sir.
17    A.  Maybe you can come up with some examples, but I
18  can't think of one at the moment.
19    Q.  Let's take a look at what I'm going to show you
20  has previously been marked in this litigation as
21  Exhibit 1016.  I promised you we'd pull out your and
22  Dr. Jewel's article.
23       Dr. Graham, is this the article that you
24  published after your assignment as a plaintiffs' expert
25  in the Vioxx litigation?

Page 81

1    A.  Yes.
2    Q.  And with reference to the article now,
3  Dr. Graham, can you remind yourself with reference to
4  your own work what the primary endpoint was in VIGOR?
5    A.  I don't know if we stated it, like I stated
6  here, that whether Rofecoxib was less likely to cause
7  clinically important ulcer complications than
8  traditional NSAIDs was specifically evaluated in the
9  VIGOR study.
10    Q.  What page are you on there, Dr. Graham?
11    A.  359.
12    Q.  And where on that page where the reader of this
13  article find the primary endpoint of VIGOR?
14    A.  I don't know if we listed the primary endpoint,
15  but it says here it included symptomatic ulcers -- and I
16  don't think -- I don't know if we listed actually the
17  primary endpoint as listed in the protocol.
18    Q.  Dr. Graham, if I could take -- turn your
19  attention to that page that you're on, 359, and there's
20  a heading there that says "Rofecoxib Compared with
21  TNSAIDS."  Do you see that heading?
22    A.  Right, right.  I just read that to you.
23    Q.  That first paragraph down -- I'm just going to
24  quote to you what you've written here, quote:  "The
25  primary endpoint was confirmed clinical upper GI events

21  (Pages 78 to 81)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 82

1  (gastroduodenal perforation or obstruction, upper GI
2  bleeding and symptomatic gastroduodenal ulcers)."
3      A.  Okay.  I found it.
4      Q.  So, was that the primary endpoint of the VIGOR?
5      A.  That presumably was.
6      Q.  Okay.  And was that a -- was that primary
7  endpoint of clinical importance?
8      A.  I mean, obviously, it's of importance.  The least
9  important one that we discussed that to was symptomatic
10 gastroduodenal ulcers.  We discussed that that is an
11 inconvenience.  The others are life-threatening.
12     Q.  Would you agree with me that this combined
13 endpoint of the VIGOR trial was capturing clinically
14 important information?
15     A.  It could.  It's also one that was very
16 "gameable," that you could capture clinically
17 unimportant information and put it into there, which is
18 one of the reasons that we felt that it was a -- not a
19 good endpoint because it was clinically not
20 interpretable as being meaningful.
21     Q.  Doctor, are you trying to tell me that you're
22 criticizing the primary endpoint in this article?
23         MR. SAHAM:  Objection to form.
24     A.  I criticize the inclusion of that endpoint.
25     Q.  (BY MR. DOUGHERTY)  Do you criticize the

Page 83

1  selection of the VIGOR primary endpoint in this article?
2      A.  I would criticize that particular endpoint as
3  being clinically unequivocal unimportant.
4      Q.  So, if you had designed the VIGOR trial, you
5  would not have included symptomatic gastroduodenal
6  ulcers?
7      A.  Correct.
8      Q.  And do you know why the FDA accepted that
9  combined endpoint for the VIGOR trial?
10     A.  No.
11     Q.  I'm sorry.  Did you answer?
12     A.  I answered "no."  Yes, I answered "no."
13     Q.  Okay.  Thank you.
14         Do you remember giving testimony in that
15 case, Dr. Graham?
16         MR. SAHAM:  Objection to form, vague.
17     Q.  (BY MR. DOUGHERTY)  In the Vioxx case?  I'm
18 sorry.
19         MR. DOUGHERTY:  Thank you, Scott.
20     A.  I remember giving testimony.
21     Q.  (BY MR. DOUGHERTY)  And you recall, Dr. Graham,
22 that when you gave testimony in the Vioxx trial you were
23 under oath, right?
24     A.  I thought I was under oath now.
25     Q.  Well, I was just going to say you're under oath

Page 84

1  now; but you were under oath when you gave the Vioxx
2  testimony, correct?
3      A.  Right.
4      Q.  And did you tell the truth when you gave that
5  testimony?
6      A.  Best I could.
7      Q.  Did you give that testimony before you were hired
8  as an expert in this case?
9      A.  I gave that testimony before I was hired as an
10 expert in this case.
11     Q.  I'm going to read you a portion of the testimony
12 that you gave in the Vioxx case, Dr. Graham; and I want
13 to see whether you stand by what you said or whether
14 your views have changed.
15         MR. SAHAM:  John, I object, if you're going
16 to read some testimony.  I think you could show it to
17 him and make sure it's being read correctly, because he
18 doesn't have the foundation if it's not.
19         MR. DOUGHERTY:  I can do that, but let me
20 just -- let me just read what we've got here.
21     Q.  (BY MR. DOUGHERTY)  Let me withdraw the question.
22 We'll come back to it.  I need to do a foundational
23 piece that I haven't done yet.  So I'm going to withdraw
24 that question and then we'll come back.  I'm sorry about
25 that.

Page 85

1      A.  No problem.
2      Q.  We're going to come back to that after a break
3  because I need to -- I didn't have the full document in
4  front of me.
5      A.  As you wish.
6      Q.  Thank you, sir.
7         Okay.  So, your view is that the VIGOR --
8  your view now is that the VIGOR trial primary endpoint
9  by including symptomatic gastroduodenal ulcers made that
10 primary endpoint less clinically relevant; is that fair
11 to say?
12         MR. SAHAM:  Objection to form.
13     A.  It made it less clinically relevant.  That was an
14 ambiguous primary endpoint.
15     Q.  (BY MR. DOUGHERTY)  And you would have preferred
16 just simply to see the perforations, obstructions, and
17 bleeding be the primary endpoint?
18     A.  I would have preferred that.
19     Q.  And in -- how long have you been practicing
20 medicine?
21     A.  Since 1966.
22     Q.  And you've been treating patients pretty much
23 since then?
24     A.  Yes.
25     Q.  And in this last year, how many patients in your

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 86

1  practice do you see, just on an average year?
2    A. I don't know, not that many, maybe 3 or 400.
3    Q. In the general population, Dr. Graham, do you
4  know how often someone experiences either perforation,
5  obstruction or bleed?
6    A. In the general population?
7    Q. Correct.
8    A. It's, in part, age-related so that it would be
9  dependent on age.  For example, 80-year-olds, it would
10 probably be about 2 percent per year, maybe 3.
11   Q. And they're at higher risk for those?
12   A. They're at higher risk.
13   Q. So for a younger population, the rate's going to
14 be lower, correct?
15   A. Remarkably lower.
16   Q. And, in fact, perforations and obstructions and
17 bleeds are, thankfully, pretty rare events?
18   A. Rare events in the -- per patient, but not per
19 population.  We have about half a million bleeds per
20 year in America.  So it's a big problem.
21   Q. Well, I'm not arguing whether it's a big problem.
22 I'm actually asking you the question of how often do
23 they occur in the general population as a percentage?
24   A. In the general population -- an average
25 walking-talking general population, it's not very

Page 87

1  common.  It's less than 1 percent.
2    Q. And do you in your practice of medicine, do you
3  routinely scope your patients -- and by "scope" I mean
4  in upper endoscopy?
5    A. Well, I don't routinely do that anymore; but I
6  did that until recently.
7    Q. And why did you stop?
8    A. I outgrew it.
9    Q. I see.  Fair enough.
10   A. There are other people to do that busy work.
11   Q. How many endoscopies do you think you've
12 performed in your career?
13   A. Tens of thousands.
14   Q. And do you perform those endoscopies -- well,
15 when you will perform an endoscopy?  Describe to me what
16 a patient would present in order for you to go through
17 the time and presumably the expense to the patient of
18 doing an endoscopy?
19   A. Well, I'm frequently going to do that either
20 because they have symptoms that suggests there's a
21 problem -- and we're talking about upper
22 gastrointestinal endoscopy.
23   Q. Correct.
24   A. Symptoms suggestive of something erroneous --
25 going wrong in the upper gastrointestinal tract, an

Page 88

1  ulcer or whatnot, or because they have a complication,
2  such as a bleed that would -- or something I want to
3  treat specifically or that they did, swallowed something
4  that I want to go remove.  I mean lots of indications.
5    Q. Okay.  So, let's kind of break that down.  You
6  have patients that present to you that either because of
7  the blood work or because they're complaining of a dark
8  stool or blood in the stool, you've got a blood loss
9  issue, and that would be one motivation and a strong
10 motivation for you to scope that patient; is that
11 correct?
12   A. That would be one indication, yes.
13   Q. Okay.  So let's take blood loss and put that off
14 to the side, and let's put off to the side somebody that
15 swallowed something or inhaled something or other
16 reasons for you to go in and take a look and see what's
17 down there.
18       Let's focus on people that are presenting to
19 you with symptoms.  What was your practice when you were
20 doing endoscopies in evaluating whether a patient should
21 go through the time and expense of an endoscopy based
22 upon the symptoms that they were presenting?  Just
23 describe that for us.
24   A. Well, it's a -- you're dealing with a referral
25 practice, primarily.  So patients are often referred to

Page 89

1  you from some other physician because they're concerned
2  and they would like the patient to have a procedure for
3  evaluation so that it's somewhat different than if it's
4  your patients.
5    Q. I see.
6    A. But --
7    Q. And if you had gotten -- if I could just
8  interrupt, if that's okay -- on a referral basis, if say
9  a primary care physician sent somebody over for referral
10 because they were concerned, they would ask you to do an
11 endoscopy and they'd come to your office or whenever you
12 would perform those.  Is that fair?
13   A. That's fair.
14   Q. And would you refuse to do the endoscopy because
15 you would second-guess the judgment of the referer?
16   A. Sometimes.
17   Q. Okay.  When you -- so taking the referral piece
18 out for a second and focusing on just when you would do
19 it, so you weren't asked to do it, but you had to make
20 the independent clinical judgment as to whether to
21 scope, describe the kind of symptoms that would cause
22 you to want to scope a patient.
23   A. Recurrent abdominal pain, weight loss or they
24 could have classical symptoms of something.  For
25 example, they could have classical symptoms for

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 90

1  gastroesophageal reflux because I know what the
2  diagnosis is, but I want to see if there's a
3  complication present.
4        Remember gastroenterologists, that's what we
5  do, is scope people.  So, we think about it like shining
6  a flashlight in a person's throat that has a sore throat
7  and you just -- and I do almost all of mine unsedated.
8  So it's just a quickie.  "Did you have breakfast?"
9        "No."
10       "Let's take a quick look."
11  Q.  All right.  And how often when you would scope
12  patients that were presenting with any kinds of GI
13  symptoms, whether it be blood loss, abdominal pain, how
14  often would the endoscopy procedure confirm the
15  existence of some ulceration?
16       MR. SAHAM:  Could you read that back?
17       (Question read back for the record.)
18       MR. SAHAM:  Objection, form, compound.
19  A.  That's an error-type question.  For example, if
20  you go back 30 years, 20 years when Helicobacter was
21  common and ulcers were common, you would be pretty
22  reliable about seeing that there's an ulcer.  Today, it
23  would be pretty infrequent.
24  Q.  (BY MR. DOUGHERTY)  How common was it, I mean
25  just as a percentage of the people that you scoped that

Page 91

1  you would confirm they had an ulcer?
2  A.  Oh, many of them had ulcers before.  And, so, in
3  that kind of patient, it'd probably be 50, 60, 70
4  percent.
5  Q.  What about the ones you had not already
6  documented the existence of an ulcer?
7  A.  Today, it'd be less than 1 percent.
8  Q.  And I'm not talking about today.  I'm talking
9  about, say, ten years ago?
10  A.  Well, it still would still be a low percentage.
11  Q.  And, yet, you would do the endoscopy just to make
12  sure, correct?
13  A.  Well, there's a lot of reasons to do the
14  endoscopy, among which is we say to each patient "The
15  benefit's not only from what you find, but that you
16  didn't find"; because they're concerned often that they
17  have cancer or something else.
18  Q.  Okay.  So -- just so that there's no ambiguity
19  about this later, Dr. Graham, do you agree with me
20  that endoscopies are an important tool for a
21  gastroenterologist?
22  A.  It's what we do.
23  Q.  And you would agree with me that scoping a
24  patient can confirm or rule out the existence of an
25  ulcer?

Page 92

1  A.  It can.
2  Q.  And, in fact, for a patient presenting symptoms
3  of some kind of gastrointestinal distress, endoscopy is
4  a common way to rather quickly confirm or rule out an
5  ulcer as the contributing cause of those symptoms; is
6  that fair?
7  A.  It's frequently used that way in patients.
8  Q.  And you don't want anybody misreading your
9  opinions in this case as saying that you don't believe
10  that endoscopies are an important tool for clinicians?
11  A.  Endoscopy is an important tool for clinicians.
12  Q.  And endoscopies are the quickest way for us to
13  confirm clinically the existence of an ulcer, correct?
14  A.  Absolutely.
15  Q.  And you would agree with me that the rates of
16  ulceration, to pick up on one of your previous answers,
17  have gone down in recent years; is that correct?
18  A.  The rates of ulcers as clinically significant
19  problems has gone down over the years.
20  Q.  And you attribute that to what, Dr. Graham?
21  A.  I attribute that to getting rid of Helicobacter,
22  primarily.
23  Q.  Okay.  And how do you as a gastroenterologist get
24  rid of H. Pylori?
25  A.  It's an infectious disease.  You treat it with

Page 93

1  antibiotics.
2  Q.  Okay.  And when did you first become a believer
3  in treating H. Pylori with antibiotics?
4  A.  When we had the data that it made a benefit,
5  which would be in the late '80's.
6  Q.  Okay.  And do you believe that treating H. Pylori
7  with antibiotics is the main reason that ulceration
8  rates have gone down?
9  A.  That and the widespread use of proton pump
10  inhibitors.
11  Q.  PPIs?
12  A.  PPIs.
13  Q.  Now, PPIs don't do anything to protect the lower
14  GI tract; is that fair?
15  A.  Well, we don't know that for sure; but that's
16  what our belief is, yes.
17  Q.  Okay.  And you can have ulcerations in the lower
18  GI tract, can you not?
19  A.  Certainly.
20  Q.  An endoscopy, the classical kind of upper GI
21  endoscopy is not going to reveal those ulcers?
22  A.  Not -- upper endoscopy is not going to reveal
23  those ulcers.
24  Q.  You could do a capsule study these days, right?
25  A.  You could.

24  (Pages 90 to 93)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 94

1    Q.  And when did it become common to do capsule
2  studies to detect ulcers in the lower GI tract?
3    A.  Oh, in the last ten years.
4    Q.  And you would agree with me that lower GI tract
5  ulcers are as significant clinically as upper GI ulcers
6  with respect to patient health?
7    A.  Oh, I don't think I would agree with that.
8    Q.  You don't -- you wouldn't agree with that?
9    A.  No.
10    Q.  Do NSAIDs have any effect on the lower GI tract,
11  Dr. Graham?
12    A.  They can have an effect on the entire GI tract.
13    Q.  Okay.  Do you -- and, so, taking a PPI with a
14  traditional NSAID is not going to reduce your risk of
15  having a lower GI tract ulceration; is that fair?
16    A.  It shouldn't.
17    Q.  And have there been advances in the last ten
18  years in treating lower GI tract problems?
19    A.  Probably not, I mean, beyond Misoprostol.
20    Q.  If you have a patient that's presenting with
21  blood loss and you scope that patient and you do not
22  find an ulcer, is one of the things that's going through
23  your mind as a treating physician the possibility of a
24  lower gastrointestinal ulcer?
25    A.  Of course.

Page 95

1    Q.  And you intervene as a physician at that point,
2  do you not?
3    A.  Say again.
4    Q.  You intervene in the patient's care at that
5  point, do you not?
6    A.  I might.
7    Q.  In fact, if a patient comes to you -- for
8  example, if I walked into your office later today and I
9  presented to you kind of classic gastrointestinal
10  distress, would you treat me?
11    A.  As we said before, if you walk into a
12  gastroenterologist's office with symptoms, you're going
13  to get endoscopy.
14    Q.  Okay.
15    A.  If you walk into your general practitioner's
16  office with the same symptoms, you're probably not going
17  to get endoscopy.  You're probably going to get
18  symptomatic therapy to see if it would respond or not.
19    Q.  Okay.  And what you're simply pointing out there
20  is the tools available to a gastroenterologist are
21  different than the tools available to a primary care
22  physician?
23    A.  Well, hopefully, most patients will go to their
24  primary care physician and be triaged and so they won't
25  get unnecessary procedures.

Page 96

1    Q.  And if a patient comes to you complaining of
2  gastrointestinal distress and tells you that they're on
3  an NSAID, would you advise them to stop taking the NSAID
4  or to take a PPI to see whether or not that could
5  alleviate their symptoms?
6    A.  It depends on the patient, I mean, if it's a new
7  patient or an old patient, et cetera, et cetera.  Now
8  when you get down to specific patients, then one does
9  patient-specific therapy, so....
10        If you came to me from New York City and sat
11  down, "I've got a severe discomfort and I'm taking a" --
12  and I say "Are you taking an NSAID," then I would
13  probably evaluate you.
14    Q.  And you would ask the question to a patient
15  whether or not they're taking an NSAID, correct?
16    A.  I would ask the question "What medicines are you
17  taking," yes.
18    Q.  And you would focus specifically in your list on
19  NSAIDs because NSAIDs are known to have GI toxic
20  effects, correct?
21    A.  No, I wouldn't necessarily say that.  I would ask
22  them about all drugs, but that would be on my list
23  aspirin and NSAIDs.  Many people take aspirin, for
24  example.
25    Q.  Yeah.  So the ordinary person, like the members

Page 97

1  of the jury in this case, Dr. Graham, they likely
2  believe that aspirin can burn a hole in your stomach.
3  Would you want to dis-abuse them of that belief?
4        MR. SAHAM:  Objection to form, foundation,
5  assumes facts not in evidence.
6    A.  Patients have lots of beliefs.  I tend not to try
7  and dis-abuse them of their beliefs.
8    Q.  (BY MR. DOUGHERTY)  But they would actually have
9  a scientific and medical basis for believing that
10  aspirin can cause an ulcer, correct?
11        MR. SAHAM:  Objection, form, foundation,
12  assumes facts not in evidence.
13    Q.  (BY MR. DOUGHERTY)  Go ahead.
14    A.  Aspirin can definitely cause ulcers.
15    Q.  And so can ibuprofen, can it not?
16    A.  Any NSAID.
17    Q.  Naproxen?
18    A.  Celebrex.
19    Q.  Do you believe that the ulcer rates for Celebrex
20  are equivalent to Naproxen and Diclofenac and ibuprofen?
21    A.  Now, the analyses, when we get into murky water,
22  because we're talking clinical ulcers and endoscopic
23  ulcers and endoscopic ulcers are frequently not ulcers.
24  They are frequently -- in fact, we used to code those in
25  the studies as "ulcer for study purposes only."  If we

25  (Pages 94 to 97)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 98

1  had seen it clinically, we wouldn't have called it an
2  "ulcer."
3       So, that's when you get into -- why I say
4  the symptomatic ulcer are real problems; because, as I
5  point out in my report and in my paper, that symptoms
6  are very common in patients taking NSAIDs, ulcers
7  aren't.  Endoscopic ulcers are quite common.  Clinical
8  ulcers aren't.  So many patients have symptoms and
9  little -- what I call "ditzels," little things, that
10 would meet the criteria for an endoscopic ulcer and be
11 clinically thought to be or equated in the naive mind as
12 a clinical condition of some known significance.  And,
13 so, this ambiguity has been used by Pharma greatly in
14 their marketing.
15     Q.  What have you done personally, Doctor, to inform
16 the medical community about the opinion that you just
17 expressed on the difference between symptomatic and
18 clinical ulcers?  What research have you done and
19 published?
20          MR. SAHAM:  Objection to form.
21     A.  I've written a bunch of papers about that, even
22 to the fact that I took the videotape used in one of the
23 clinical trials and took off all the words so you
24 couldn't read what they were calling it and sent it
25 coded and blinded to Dr. Chan's group and had them look

Page 99

1  at it and see if they agreed with what the clinician --
2  what the study wanted you to call "ulcers" and "not
3  ulcers" and they're in very, very poor agreement.
4      Q.  (BY MR. DOUGHERTY)  What -- in the VIGOR trial,
5  were patients scoped as a matter of routine in that
6  trial?
7      A.  The VIGOR trial was designed to encourage
8  endoscopy.  Every time the patient was communicated with
9  by phone or any other way, they listed its symptoms.
10 And any time they listed its symptoms, they encouraged
11 endoscopy because presumably they knew that endoscopic
12 ulcers were more common in the NSAIDs and that they
13 would, therefore, bias the study towards more ulcers,
14 more endoscopic ulcers in the NSAIDs versus Rofecoxib.
15     Q.  Well, how would that help the Rofecoxib group?
16     A.  Because they want to show they're different.  So
17 if they can increase the number, then in the
18 non-Rofecoxib group, then they look better, even though
19 it's clinically irrelevant.
20     Q.  I need to explore that with you a little bit,
21 Dr. Graham, because the trial designed for VIGOR did not
22 differentiate.  You say it was biased in favor of
23 endoscopies, but that was across both treatment groups,
24 right?
25          MR. SAHAM:  Objection to form.

Page 100

1      A.  If you -- from the studies that they have done
2  before at those doses, they knew that VIGOR, I mean, the
3  COX-2, Rofecoxib, had a lower symptomatic rate than the
4  other two drugs or at least ibuprofen.  And they knew it
5  had a lower endoscopic ulcer rate than ibuprofen,
6  because ibuprofen is a topically toxic drug.  And, so,
7  therefore, they could predict that by chance they were
8  going to identify more endoscopic ulcers in the
9  traditional NSAID group than in the Rofecoxib group.
10         They're not dummies.  So they knew and
11 before they started the study that they could bias it.
12 So they went out of their way to make sure they biased
13 it as much as they could.
14     Q.  (BY MR. DOUGHERTY)  Who went out of their way?
15     A.  The protocol.
16     Q.  The protocol.  How did a doctor who was -- you
17 say was encouraged to scope -- that doctor had no idea
18 what therapy the patient was taking, correct?
19     A.  No, he didn't have any idea or she different have
20 any idea.
21     Q.  Right.
22     A.  But they knew that they were more likely to have
23 endoscopic ulcers and more likely to have symptoms; and
24 so, therefore, they could have more endoscopic ulcers in
25 their group, the comparator group.

Page 101

1      Q.  So, you're saying that because the prior studies
2  of Vioxx had showed that NSAID patients would have more
3  endoscopic and symptomatic ulcers on tradi- --
4      A.  No, more symptoms and more endoscopic ulcers
5  independently.
6      Q.  Okay.  So kind of breaking this down a little
7  bit, the prior studies of Vioxx had shown that patients
8  taking traditional NSAIDs would have more symptoms than
9  patients on Vioxx; is that --
10     A.  Right.
11     Q.  -- is that what you're saying?
12     A.  That's right.
13     Q.  And you're saying that the data before VIGOR also
14 showed that patients taking traditional NSAIDs would
15 have more endoscopic ulcers than those taking Vioxx?
16     A.  Yeah, independent of the symptoms, so that it's
17 true, true and unrelated.
18     Q.  Okay.  So, it's your opinion, then, Doctor -- it
19 must be your opinion -- that that those data that show
20 NSAIDs users have more symptoms and more endoscopic
21 ulcers than Vioxx users that that data must be accurate,
22 correct?
23          MR. SAHAM:  Objection to form --
24     A.  From the studies they did --
25          MR. SAHAM:  -- assumes facts not in

26  (Pages 98 to 101)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 102

1 evidence.
2    A. -- with the doses they did, and the same holds
3 for Celecoxib, that the "coxibs" with those doses,
4 et cetera, caused fewer endoscopic ulcers and fewer
5 symptoms.
6    Q. (BY MR. DOUGHERTY) So, do you believe that prior
7 to the VIGOR trial that it had been proven that
8 traditional NSAID users would have more symptoms than
9 Vioxx users?
10    A. No, it had been shown that those NSAIDs at those
11 doses -- remember when they did Rofecoxib, they found
12 absolutely no difference. So when you say traditional
13 NSAIDs, you must talk about drug and dose.
14    Q. Fair enough. Let me ask you a different way.
15       We know that Naproxen was the comparator arm
16 in the VIGOR trial, correct?
17    A. Which is the most gastro-toxic of the drugs that
18 we normally use.
19    Q. Okay. So, are you saying that it had been proven
20 prior to the VIGOR trial that Naproxen users would have
21 more symptoms and more endoscopic ulcers at the doses
22 used in the VIGOR trial than those taking Vioxx, that
23 that had been proven?
24    A. That was what the data showed. So they had
25 allowed one to "game" the study.

Page 103

1    Q. I want to stay with the "proven." So, do you
2 believe that it had been proven as opposed to hypothesis
3 generating?
4    A. Proven in the clinical endoscopic study.
5    Q. So, using the measures of just endoscopic ulcers
6 and symptoms, you believe that even before the VIGOR
7 trial had begun that it had been proven that Vioxx users
8 had fewer endoscopic ulcers and fewer symptoms than
9 Naproxen users. Is that fair?
10    A. At that dose, right.
11    Q. And -- now moving over to the CLASS trial, same
12 questions: Do you believe that prior to the start of
13 the CLASS trial it had been proven that Celecoxib was
14 superior to either Diclofenac and ibuprofen using
15 endoscopic ulcers and symptoms as the events?
16    A. I can't speak about Diclofenac. I mean, Naproxen
17 at that dose -- I mean -- pardon me -- ibuprofen at that
18 dose is, again, very gastro-toxic. So, I mean, you're
19 taking the worst drug at the worst dose and for
20 endoscopic ulcers and comparing it to your drug. And,
21 so, that I could take ten other NSAIDs and show they
22 were -- in fact, that all the other NSAIDs they came out
23 proved they were better and safer and less symptomatic
24 than ibuprofen by using the same kind of model --
25    Q. Right.

Page 104

1    A. -- for symptomatic -- for endoscopic ulcers.
2    Q. Prior to the start of the CLASS trial -- so you
3 can't offer any opinion on the data with respect to --
4    A. The CLASS trial was like other NSAIDs. I can
5 offer the same data.
6    Q. I know we're getting conversational here, but let
7 me finish my question, please.
8    A. All right.
9    Q. Prior to the start of the CLASS trial --
10 withdrawn.
11       You're not familiar enough with the
12 Diclofenac data to offer an opinion about what had been
13 shown pre-CLASS; is that fair?
14    A. With Diclofenac.
15    Q. Okay. Is that fair to say?
16    A. Diclofenac versus --
17    Q. -- Celecoxib?
18    A. -- Celecoxib.
19    Q. You can't offer an opinion on that?
20    A. I can't offer an opinion.
21    Q. All right. And as it relates to ibuprofen, you
22 believe that before the start of the CLASS trial it had
23 been proven that ibuprofen produced more endoscopic
24 ulcers and more symptoms than Celecoxib, correct?
25    A. At those doses.

Page 105

1    Q. And, so, any of the data that came out of the
2 CLASS comparing Celecoxib to ibuprofen on the measure of
3 endoscopic ulcers and symptoms, you would agree with me,
4 according to the dichotomy that you presented to us
5 before, might be hypothesis generating but just further
6 data on something that had already been proven. Is that
7 fair?
8    A. It would be a way to potentially game the study
9 if that was one of your outcome measurements.
10    Q. You keep saying "game" and I'm actually trying to
11 be neutral and you keep trying to inject motivation and
12 I'm going to ask you about that in a second. But I'm
13 going to have the court reporter read back my question
14 and I'm wondering whether you can just answer the
15 question that I've asked.
16       MR. SAHAM: And I would object, asked and
17 answered. He just answered it.
18       (Question read back for the record.)
19       MR. SAHAM: And I would read back his answer
20 as well, please.
21       (Answer read back for the record.)
22       MR. DOUGHERTY: So you need to read back my
23 question again so that the witness can focus on my
24 question.
25       MR. SAHAM: She just read your question and

27 (Pages 102 to 105)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 106

1   his answer.
2        MR. DOUGHERTY:  Scott, just let me take my
3   deposition here.
4        (Question read back for the record.)
5   Q.  (BY MR. DOUGHERTY)  You can answer the question
6        MR. SAHAM:  Objection, asked and answered.
7   The record reflects an answer to that question.
8   Q.  (BY MR. DOUGHERTY)  Go ahead, Dr. Graham.  You
9   can answer.
10   A.  You would not know on an individual trial how --
11   you know, for the outcome.  But the fact that those
12   doses it was known, proven, if you like, that Celecoxib
13   was less likely to cause dyspepsia, one problem, and
14   endoscopic ulcers than the high doses of ibuprofen that
15   were being used.
16   Q.  And that had been proven even before CLASS was
17   finished?
18   A.  Even before CLASS was started.
19   Q.  Okay.  All right.  And some of the data that
20   comes out of CLASS relates exactly to that question, you
21   agree?
22   A.  Indirectly.
23   Q.  And nothing in CLASS disproves what had already
24   been proven on the dyspepsia and endoscopic ulcers
25   compared to ibuprofen, correct?

Page 107

1   A.  Well, CLASS didn't really set out to look for
2   endoscopic ulcers or -- but it did set out to look for
3   symptoms; because the endoscopic ulcers implies that you
4   endoscope at a regular interval.
5   Q.  Right.  So the answer to my question is that
6   nothing in CLASS disproved what had already been proven
7   as it relates to ibuprofen, correct?
8        MR. SAHAM:  Objection, form, foundation.
9   A.  It didn't test the hypothesis, so it couldn't
10   disprove.
11   Q.  (BY MR. DOUGHERTY)  The -- you've raised an
12   important distinction and I think we ought to just
13   explore to make sure we have a common understanding.
14        All of the endoscopy trials that you were
15   involved in involving COX-2's required per the protocol
16   for the investigators to scope at regular intervals,
17   correct.
18   A.  Correct.
19   Q.  There wasn't a clinical judgment being made about
20   whether or not to scope a patient, correct?
21   A.  It was, generally, also a clinical judgment about
22   whether to scope; and you scoped at intervals and then
23   you could scope at other intervals.
24   Q.  In between, okay, right.  But you understand that
25   in the CLASS trial there was no periodic scoping

Page 108

1   requirement, correct?
2   A.  Right.
3   Q.  The investigators, including maybe some of the
4   people that worked for you, scoped only when they made a
5   clinical judgment to scope, correct?
6   A.  Correct.
7   Q.  Okay.  And when they scoped, they did not know
8   whether they were scoping a patient that was on
9   Diclofenac, ibuprofen or Celecoxib, correct?
10   A.  Not quite -- not absolutely correct about that,
11   but not quite about the other, about why they decided to
12   scope.  They were encouraged to scope.  So it's
13   different in a trial than it is in a clinical practice.
14        So in a trial you have a protocol that says
15   you talk to the patient and if there's any question you
16   go do this.  So they're encouraging you to do that.
17        Now, in the Rofecoxib one, they really
18   encourage you to do that.  This one was much more open,
19   but you were encouraged to ask.  You were encouraged to
20   look.  I like to say they weren't as smart as the Vioxx
21   people, but that's -- you know, they didn't go all out
22   to game it; but they couldn't help it but get some false
23   positive results.
24   Q.  What in the CLASS protocol, Dr. Graham, do you
25   believe constitutes the encouragement to scope?

Page 109

1   A.  We can go read through the protocol.
2   Q.  You used --
3   A.  It talks about when you see the patient, you
4   know, you ask them, et cetera, in that it gives kind of
5   the judgment that, you know, when you're in any doubt,
6   you should take a look.  And it's not pushed hard like
7   the other one and they didn't push hard.
8   Q.  They didn't push hard?
9   A.  (Witness nods head.)
10   Q.  Well, what set of symptoms were the investigators
11   asked to consider making an independent judgment about
12   whether or not to scope?  What were the factors?
13   A.  It -- I mean, it's difficult to explain the
14   different way that you manage a patient in a clinical
15   trial versus real practice.  The threshold is clearly
16   different depending on kind of what the -- what
17   expectations of someone else is.
18   Q.  And I'm just asking you to --
19   A.  I can --
20   Q.  Let me put it to you this way.
21   A.  I can find those for you.
22   Q.  Hang on a second.
23        Do you intend to offer an opinion in this
24   case that the site investigators of the CLASS trial were
25   encouraged to scope patients?  Are you going to offer

28  (Pages 106 to 109)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 110

1 that opinion in this case?
2    A. I wasn't planning on it.
3    Q. Okay. And right -- you have no way to point to
4 anything right now in the protocol that would support
5 any opinion that they were encouraged to scope,
6 correct?
7       MR. SAHAM: Objection, form, foundation.
8 You won't put the protocol in front of him, John, and he
9 says he has no basis, I mean.
10    A. I'm confident I could find it in the protocol.
11    Q. (BY MR. DOUGHERTY) But you don't intend to offer
12 any opinions in this case that the investigators in
13 CLASS were encouraged to scope, correct?
14    A. Not unless you ask me the question.
15    Q. Well, it doesn't really work that way,
16 Dr. Graham. The question is: Do you intend to testify
17 in this trial --
18    A. No.
19    Q. -- that the CLASS investigators were encouraged
20 to scope?
21    A. No.
22    Q. Dr. Graham, do you believe -- and I think I know
23 the answer to this, but I'll ask it to you, anyways: Is
24 it your opinion that endoscopic ulcers are not
25 biomarkers for complicated ulcers?

Page 111

1    A. Endoscopic ulcers do not have clinical
2 significance for prediction of clinical ulcers, right.
3    Q. If you confirm that a patient has an endoscopic
4 ulcer in your practice, Doctor, isn't it fair to say
5 that one of the things that you are worried about is
6 whether or not that patient is going to develop a
7 life-threatening complicated ulcer?
8    A. No.
9    Q. So, do you want every patient that comes to you
10 and do you want all of your colleagues in the medical
11 community to believe that it's your position that when a
12 patient presents to them and they confirm through
13 endoscopy that that patient has an ulcer that that
14 doctor should not worry about that patient developing a
15 complicated ulcer?
16       MR. SAHAM: Objection, form, incomplete
17 hypothetical --
18    Q. (BY MR. DOUGHERTY) Go ahead.
19       MR. SAHAM: -- assumes facts not in
20 evidence.
21    A. What we teach is that when you endoscope a
22 patient and you see these little mucosal abnormalities
23 because they're taking aspirin or something else, that
24 you ignore them.
25    Q. (BY MR. DOUGHERTY) But you're not treating that

Page 112

1 patient based upon the confirmation that they have an
2 ulcer, you're not treating them as if they could develop
3 a complicated ulcer?
4       MR. SAHAM: Objection to form.
5    A. Remember, an ulcer frequently what was called an
6 endoscopic ulcer is for study only; and they would never
7 be called an "ulcer" clinically. You would call it an
8 erosion and you would say "You're taking aspirin, aren't
9 you?"
10       "Yes, I am."
11       "Thank you very much, no problem."
12       If I take 100 people and I give them two
13 aspirins or three aspirins and I scope them,
14 essentially, 100 percent will have mucosal abnormalities
15 when I scope them the next morning.
16    Q. (BY MR. DOUGHERTY) So your advice to all the
17 medical -- all medical professionals is: You should
18 ignore -- let me put it this way: Your advice to all
19 medical professionals is "Even if you confirm that your
20 patient has an endoscopic ulcer, an ulcer viewed in the
21 endoscope, that they should not treat that patient as if
22 they are at a higher risk for complicated ulcer." Is
23 that your position?
24    A. That is not the definition of an endoscopic
25 ulcer.

Page 113

1       MR. SAHAM: Objection, form, foundation, in
2 completed hypothetical.
3       MR. DOUGHERTY: All right. Let's take a
4 break.
5       THE VIDEOGRAPHER: We're now going off the
6 record. The time is, approximately, 12:05.
7       (Whereupon, a lunch recess was taken
8        from 12:05 p.m. to 12:54 p.m.)
9       THE VIDEOGRAPHER: We're now back on the
10 record with tape No. 3 with the deposition of Dr. David
11 Graham. The time is, approximately, 12:54.
12    Q. (BY MR. DOUGHERTY) Dr. Graham, it's your opinion
13 that -- is it your opinion that symptomatic ulcers are
14 not predictive of complicated ulcers?
15    A. Symptomatic endoscopic ulcers or symptomatic --
16 what kind of ulcers?
17    Q. If you want to make a distinction for the
18 purposes of the answer between symptomatic ulcers and
19 endoscopic ulcers, that's fine.
20    A. Yes, there's no prediction.
21    Q. And is that based upon your review of clinical
22 trial study data?
23    A. It's based upon, in part, my own research.
24    Q. And, just briefly, summarize what that research
25 shows.

29 (Pages 110 to 113)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 114

1    A.  Well, we did two trials that -- where we looked
2  at endoscope patients who were chronic NSAID users and
3  we compared the frequency of symptoms and the frequency
4  of ulcers and we found that symptoms were common, ulcers
5  were uncommon, and most of the ulcers were in
6  asymptomatic people.
7    Q.  Were you looking specifically at endoscopic
8  ulcers there?
9    A.  No, we were looking at clinical ulcers -- real
10  ulcers.
11    Q.  Are those the trials that you mentioned in your
12  report, Dr. Graham?
13    A.  Right, same ones Dr. Wang mentioned.
14    Q.  Could you pick up your report, Doctor?
15    A.  I have it right here.
16    Q.  I want to go to where you mentioned those trials
17  in your report and make sure we're on the same page.
18  Can you turn to the discussion that begins on Page 21?
19    A.  Okay.
20    Q.  And if you take a look at Paragraph 32.  And let
21  me just ask you this as a preface to getting into the
22  discussion.  You write in Paragraph 32, quote:  "It was
23  known at the time of the CLASS study that NSAID use is
24  one of the most common causes of drug-induced dyspepsia,
25  such that any trial of patients receiving NSAIDs is

Page 115

1  expected to have a considerable number with what
2  Dr. Wang calls the dyspeptic syndrome."  Do you see
3  that?
4    A.  Yes.
5    Q.  And is that your opinion?  Do you stand by that?
6    A.  Yes.
7    Q.  So that by the time the CLASS trial had started,
8  it was known that NSAID use is one of the most common
9  causes of drug-induced dyspepsia?
10    A.  Yes.
11    Q.  And you think that's been proven or was proven
12  even before CLASS started?
13    A.  Oh, it's probably been known since the early
14  '60's.
15    Q.  Okay.  And I'm making a distinction in my
16  question, Doctor, between "known" and "proven," using
17  the dichotomy that you had kind of laid out for us
18  before.  Do you think that it had been proven prior to
19  the time of the CLASS study that NSAID use is one of the
20  most common causes of drug-induced dyspepsia?
21    A.  Yes.
22    Q.  Okay.  And is it common, Doctor, that dyspepsia
23  is not predictive of either symptomatic or endoscopic
24  ulcers?
25    A.  Yes.

Page 116

1    Q.  And do you believe that that opinion is widely
2  shared among gastroenterologists?
3    A.  Yes.  And, actually, it's -- it was part of the
4  study design.  On Page 24, I quote from the study design
5  where they say exactly the same thing; and the FDA says
6  it in their book, also.  I mean, everyone says it.
7    Q.  Can you just tell me where you're pointing to,
8  Doctor, so that we can -- so that I can be sure?
9    A.  Page 24.
10    Q.  Yes.
11    A.  You see the quote?
12    Q.  Yes.
13    A.  That is a quote from the Searle/Pfizer.
14    Q.  Just so the record is clear, are you talking
15  about the block, quote, that you put on Page 24 of your
16  report that begins --
17    A.  That is right.
18    Q.  -- with "Burning epigastric pain"?
19    A.  Right.
20    Q.  And you highlighted and italicized that sentence
21  in the middle of that quote?
22    A.  Well, they may have, too.  I don't know if I did
23  that separately, but okay.  But, yes, that's the one.
24    Q.  And this statement says "It is important to
25  note" -- I'm quoting now -- "It is important to note

Page 117

1  that there is a lack of concordance between symptoms and
2  GI ulcers or serious events i.e., many patients who
3  exhibit symptoms do not have ulcers, while many who have
4  endoscopic ulcers do not have symptoms."  Is that what
5  you're referring to?
6    A.  That's right.
7    Q.  And can I complete the actual quote there?
8  Because it goes on to say -- which you didn't bold and
9  highlight -- "Despite this fact, these symptoms are
10  sufficiently distressing in that at least 10 percent of
11  patients receiving NSAIDs to cause discontinuation of
12  drug use, thereby losing the benefit of continued
13  treatment."
14        Do you see that?
15    A.  Right.
16    Q.  And do you agree with that statement, sir?
17    A.  Yes.
18    Q.  Okay.  Do you believe that it is -- that it is
19  commonly accepted among gastroenterologists in the
20  United States that dyspepsia is not predictive of an
21  ulcer or do you think that question's still being
22  debated?
23    A.  The most common of dyspepsia in the United States
24  is called the "non-ulcer" dyspepsia.
25    Q.  I know.  I'd like you to answer my question,

30  (Pages 114 to 117)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 118

1  though.
2      A. It's called "non-ulcer" dyspepsia because they
3  have dyspepsia and no ulcers.
4      Q. You're still not answering my question. Should
5  we ask -- should we have I read --
6      A. Yes -- the answer to your question is: Yes, most
7  gastroenterologists believe that dyspepsia is not a
8  common -- ulcers -- that dyspepsia is not a predictor --
9  a common predictor of an ulcer.
10     Q. I want to make sure that I --
11     A. People with ulcers, not NSAID ulcers, but people
12  with real ulcers commonly have dyspepsia. Most people
13  with dyspepsia do not have ulcers.
14     Q. Right. But isn't it fair to say, Dr. Graham,
15  that people with dyspepsia are at a higher risk of
16  developing an ulcer than people who don't have
17  dyspepsia?
18     A. In our study in patients that had -- NSAID users
19  with ulcers, more ulcers were in patients without
20  dyspepsia and more non-ulcers were in patients with
21  dyspepsia.
22     Q. So, let me go back to my question -- and I
23  appreciate that -- and we're going to get to those two
24  studies that you reference.
25          Is it your opinion that people with

Page 119

1  dyspepsia are not at a higher risk of developing an
2  ulcer than people without dyspepsia?
3      A. Yes.
4      Q. And would you -- and that's based upon your
5  review of the clinical trial data and your own studies?
6      A. That's just clinical medicine.
7      Q. If a -- so, just to be clear, if a patient
8  prevents to you with dyspepsia --
9      A. An NSAID user?
10     Q. -- an NSAID user in a clinical setting, not in a
11  clinical trial setting, but in a real world clinical
12  setting, if a patient prevents to you with dyspepsia,
13  are you going to tell that patient that they are not at
14  a higher risk of developing an ulcer?
15     A. I'm not going to bring up their risk. I mean,
16  they either have an ulcer or they don't have an ulcer.
17  "Risk" is a different question entirely. "Risk" is a
18  predictive thing.
19     Q. Let me try it another way: Are you going to
20  treat a patient with dyspepsia as if they could develop
21  an ulcer?
22     A. Dyspepsia ulcer correlation is people with ulcers
23  often have dyspepsia. Dyspepsia is one of the symptoms
24  of an ulcer. So it's not predictive that "I will
25  develop an ulcer." It is predictive of "You have an

Page 120

1  ulcer."
2      Q. So dyspepsia is predictive of an ulcer?
3      A. It is one of the symptoms of an ulcer, but
4  dyspepsia is very common.
5      Q. So people with dyspepsia because it's a symptom
6  of an ulcer may, in fact, have an ulcer at a higher rate
7  than people that don't have dyspepsia?
8          MR. SAHAM: Objection, misstates prior
9  testimony.
10     A. That's not what I said. And, more importantly,
11  NSAID users often have ulcers with no dyspepsia. They
12  have ulcer complications with no dyspepsia. That is
13  explained and not understood, but it's explained because
14  they're taking a pain medicine. So they have the ulcer
15  and no pain and, yet, they have a complication.
16          So one of the clinical dictums is lack of
17  symptoms does not help you in the patient taking NSAIDs
18  that has an ulcer complication.
19     Q. (BY MR. DOUGHERTY) Let's just agree that an
20  asymptomatic patient can develop an ulcer. Let's just
21  agree with that, okay, for purposes of this question.
22     A. And they're more likely to be NSAID users.
23     Q. Now, my question is: Is an NSAID user who has
24  dyspepsia more likely to have an ulcer than an NSAID
25  user without dyspepsia?

Page 121

1          MR. SAHAM: Objection, asked and answered.
2      A. And the data are that -- if there's either no
3  data on the question or the data would say "no."
4      Q. (BY MR. DOUGHERTY) So, now let's explore what
5  the basis for that opinion is; because you're taking the
6  position that, "no," a dyspeptic NSAID user is not at a
7  higher risk of having an ulcer. What data supports that
8  opinion?
9      A. It was -- we were reading it on Page 21. You
10  were about to read it to me.
11     Q. Okay. On Page 21 and 22 you talk about two
12  trials that you've conducted, correct?
13     A. Correct.
14     Q. I'm asking about other data that supports your
15  opinion?
16          MR. SAHAM: In addition to what's on 21 and
17  22?
18     Q. (BY MR. DOUGHERTY) Yeah, we're going to talk
19  about the two studies that you reference here.
20     A. If you go to the literature, these are the
21  studies they recom-- that they quote. These are the
22  studies that your consultant quoted.
23     Q. I'm going to ask again: Other than these two
24  studies, Doctor, what data would you point to support
25  your opinion that dyspeptic NSAID users are not at a

VERITEXT REPORTING COMPANY
(212) 279-9424      www.veritext.com      (212) 490-3430

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 122

1   higher risk of having an ulcer than non-dyspeptic users?
2      A. I would -- I mean, it's one of those things that
3   may be wrong, but everyone knows; and the FDA even puts
4   into their package inserts.
5      Q. Well, the package insert doesn't mention
6   dyspepsia.
7      A. And these --
8      Q. You can see that.
9      A. -- these are two studies that I know about that
10  most people quote, so....
11     Q. Okay. You're unaware of any other data?
12     A. There may be others, but these are the ones I
13  know.
14     Q. Are you aware of data that contradicts your
15  opinion?
16     A. From -- am I aware of studies that have data that
17  contradict my opinion?
18     Q. Correct.
19     A. No. I mean, I know that from the -- from the
20  CLASS study they found some correlation, but that's --
21  remember, that's data from within the study, not from an
22  outside study. It wasn't a prospective, a study, a
23  study, a study. It was -- it came out of the study, so
24  you have to throw it out.
25     Q. Well, you're not suggesting they throw it out.

Page 123

1   It might be of interest, right?
2      A. It might be, but it doesn't fit with what's known
3   so you tend to throw it out.
4      Q. And you can see that, I think, in your earlier
5   answer that your opinion about dyspeptic NSAID users
6   that that could be wrong, correct?
7         MR. SAHAM: Objection to form.
8      A. I hope not.
9      Q. (BY MR. DOUGHERTY) It could be, right?
10     A. Anything could be.
11     Q. Well, you only cite the two studies, Doctor, and
12  are aware of no studies contradicting?
13     A. These are two studies to answer -- to address --
14  prospectively done to address that question.
15     Q. So, let's look at these two studies.
16     A. All right.
17     Q. And I reference one of them, I think, had 65
18  patients in it?
19     A. Right.
20     Q. And the other one had 245 patients in it?
21     A. Right.
22     Q. So, let's talk about the 65 patients. What
23  percentage of the patients in that trial who were
24  dyspeptic NSAID users developed ulcers?
25     A. We don't know anything about developing. This

Page 124

1   was a cross-sectional study.
2      Q. So, let me ask the question in a slightly
3   different way, maybe, to get to where you want to be.
4         How many of the 65 patients in the trial
5   that you reference here on Pages 21 and 22 of your
6   report were NSAID users with dyspepsia who were
7   confirmed to have an ulcer?
8      A. Well, I'd point out that only 32 percent --
9   one-third of the patients had normal stomachs. And it
10  says "dyspeptic symptoms are present in 19 percent of
11  those with complete normal endoscopy, but only 9 percent
12  of those with abnormal endoscopic findings."
13     Q. Why don't we mark the -- you published the
14  results of that study, did you not?
15     A. Oh, yeah.
16        MR. DOUGHERTY: Let's make this as 1055.
17        (Exhibit No. 1055 marked.)
18        MR. DOUGHERTY: Here you go, Scott.
19        MR. SAHAM: Thank you very much.
20     Q. (BY MR. DOUGHERTY) Doctor, you have in front of
21  you Exhibit 1055. Is that the publication that contains
22  the results of the study referenced on Page 21 and 22 of
23  your report?
24     A. Yes.
25     Q. And, in fact, if you look at footnote 21 of your

Page 125

1   report, just confirm that the article cited is the same
2   that you have in your hand at 1055 the article
3   referenced in footnote 21?
4      A. Same.
5      Q. Do you believe that a clinical trial involving
6   65 patients was sufficiently powered to answer the
7   question of whether or not dyspeptic NSAID users were at
8   greater risk of having an ulcer than non-dyspeptic NSAID
9   users?
10     A. You get the answer to that question by more than
11  one study.
12     Q. Well, why don't we just focus on the question
13  that I asked. Was this study sufficiently powered to
14  answer that question?
15     A. This study was not sufficiently powered to answer
16  that question.
17     Q. And, in fact, that question was not the primary
18  endpoint of this study, correct?
19     A. That question was not the primary endpoint of
20  this study.
21     Q. So, the conclusions that you reach on the basis
22  of this study are, to use your dichotomy, simply
23  hypothesis generating, correct?
24     A. Well, I would refer you to Page 1155 and the
25  discussion in the middle of the first paragraph. It

32  (Pages 122 to 125)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 126

1  said "Overall 12.3 percent of our patients had dyspeptic
2  symptoms, which is similar to the 15.9 percent recorded
3  by Gibberd among 515 rheumatoid arthritis patients
4  attending a Rheumatology Clinic."  Is 515 a better
5  number?
6      Q.  Are you finished with your answer, sir?
7      A.  Yes.
8      MR. DOUGHERTY:  Madam Reporter, would you
9  please read back my question to the witness?
10     (Question read back for the record.)
11     MR. SAHAM:  Objection, asked and answered.  I
12 believe the transcript will represent a multi-line
13 answer to that very question that was read by the court
14 reporter.
15     Q.  (BY MR. DOUGHERTY)  You're required to answer my
16 question, Doctor.
17     A.  My answer is that in this paper in the discussion
18 there are a review of the other literature related this,
19 including patients with 500 patients and other patients
20 with 300 subjects, all coming up with the same answers,
21 which would seem to me that that would be reasonable
22 confirmation of the findings in the study.
23     Q.  Let me try it another way, Doctor:  Do you
24 believe that this study proved that dyspeptic NSAID
25 users were not at a greater risk of having an ulcer than

Page 127

1  non-dyspeptic NSAID users?  Did it prove that?
2      A.  It showed this and the other studies that the
3  presence of symptoms was not predictive of the presence
4  of an ulcer.
5      Q.  I'm not asking about other studies.  We'll get to
6  that in a minute.  I'm asking about this clinical trial
7  that you've conducted.  Did it prove that dyspeptic
8  NSAID users were not at greater risks for ulcers than
9  non-dyspeptic NSAID users?
10     MR. SAHAM:  Objection, form, asked and
11 answered.
12     A.  There are no non-NSAID users here.
13     Q.  (BY MR. DOUGHERTY)  So, the answer to my question
14 it didn't prove that point at all?
15     MR. SAHAM:  Objection, form, foundation.
16     A.  I don't understand.  You'd have to define to me
17 what proof would be --
18     Q.  (BY MR. DOUGHERTY)  Well, you know --
19     A.  -- or come as close you can get.
20     Q.  I find it interesting, Doctor, and I just want to
21 give you the opportunity to explain to the jury why
22 you're now implying a double standard; because your
23 report is critical of the JAMA publication of the CLASS
24 trial on the basis that it didn't prove what the author
25 said it proved.  You said "at most it's hypothesis

Page 128

1  generating" because the data presented in the JAMA
2  included things that were not in the primary endpoint.
3  And, yet, when we apply that criticism to your own
4  paper, sir, you are reluctant to apply the same standard
5  equally to what the results of your own than clinical
6  trial were?
7      MR. SAHAM:  Objection, form, foundation,
8  assumes facts not in evidence, incomplete hypothetical.
9      Q.  (BY MR. DOUGHERTY)  So, go ahead.
10     A.  I see what the problem is, is that it's you
11 misunderstand the papers.  One was a clinical trial,
12 you know, with a comparative group.  This is a
13 cross-sectional descriptive study that describes a -- an
14 event.  That's all.  And it relates to the other
15 cross-sectional descriptive studies.
16     And a cross-sectional descriptive study, if
17 you like, can never prove anything.  What it does is
18 describe.  It describes that most people in America with
19 skirts are women.  That doesn't prove that everyone in a
20 skirt is a woman.
21     So these data, when you look and you say
22 then "How does it relate to the previously published
23 data" and you find it's completely consistent.  Now, for
24 a cross-sectional study you can never get proof; but
25 it's as close as you can come.

Page 129

1      Q.  So what data do you rely on, other than this
2  study and the other study that we're going to look at in
3  a second, to support your opinion that dyspeptic NSAID
4  users are not at greater risk of having an ulcer than
5  non-dyspeptic NSAID users?
6      MR. SAHAM:  Objection, asked and answered.
7      A.  I would think that my relying on the moment is
8  not only on studies, but this is conventional wisdom
9  that is in every textbook and every review et cetera,
10 et cetera, so that I only know of one exception -- and
11 it's not even a good exception -- because in that study
12 that you're discussing the patient didn't necessarily
13 have to have symptoms to have a symptomatic ulcer.
14     Q.  (BY MR. DOUGHERTY)  Okay.  Let's take a look at
15 your study results that were published here in 1055.
16 You referenced a Table 4, Dr. Graham, of the patients --
17 of the 65 patients in this trial who presented with
18 symptoms.  How many of them as a percentage, when
19 scoped, were determined to have an ulcer?
20     A.  Well, it was 10 out of 65.  So it's about, what,
21 19 percent, I think, is what we said.
22     Q.  19 percent shows a normal endoscopy, though,
23 Doctor.
24     A.  Oh, whatever it is.  It's 10 out of 65, one out
25 of six.  That's about 17 percent.

VERITEXT REPORTING COMPANY
(212) 279-9424      www.veritext.com      (212) 490-3430

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 130

1    Q.  Doesn't your Table 4 show that of those with
2  symptoms present --
3    A.  Oh, no, ulcers.  There were 10 ulcers, most had
4  no symptoms.
5    Q.  Doctor, let's keep focused back on my question.
6    A.  Okay.  I'm sorry.
7    Q.  Just tell the jury in this study of the patients
8  with symptoms present, what percentage of them were
9  confirmed to have an ulcer by endoscopy?  It's right
10  there in Table 4, Doctor.
11    A.  I'm after the count.  It's seven out of eleven --
12  I mean three out of eleven.
13    Q.  Well, actually, what you say in your article --
14  and I don't know why you're reluctant to just say it --
15  is that 30 percent of those presenting with symptoms
16  were confirmed by endoscopy to have an ulcer.  Am I
17  misreading that table, sir?
18    A.  That's what I said.  It's three out of --
19  whatever that is -- numbers -- three out of eleven,
20  30 percent.
21    Q.  We don't have to guess because you actually
22  concluded the percentage.  Just tell the jury what the
23  percentage is.
24    A.  30 percent.
25    Q.  That wasn't hard.

Page 131

1         MR. SAHAM:  Objection, argumentative.
2    Q.  (BY MR. DOUGHERTY)  So, 30 percent of those with
3  symptoms were confirmed to have an ulcer.  That's what
4  your own research shows, correct?
5    A.  Right.  And 70 percent of those with ulcers did
6  not have symptoms -- or percentages.
7    Q.  So, since your own study shows that 30 percent of
8  the patients in this trial who presented with symptoms,
9  in fact, had ulcers, do you stand by your opinion that
10  ulcers -- that patients on an NSAID with dyspepsia are
11  not more likely to have peptic ulcer disease --
12         MR. SAHAM:  Objection, misstates prior
13  testimony and form.
14    Q.  (BY MR. DOUGHERTY)  -- than patients on NSAIDs
15  without dyspepsia?
16         MR. SAHAM:  Same objection.
17    A.  Which is what the data shows, 70 percent versus
18  30 percent
19    Q.  (BY MR. DOUGHERTY)  Doctor, is it your opinion,
20  in light of your own research here, that patients on an
21  NSAID with dyspepsia are not more likely to have peptic
22  ulcer disease than patients on NSAIDs without dyspepsia?
23    A.  Yes.
24    Q.  A work-up for dyspepsia -- do you work up
25  patients with dyspepsia?

Page 132

1    A.  Of course.
2    Q.  Doesn't that work-up include looking for peptic
3  ulcers among the more likely causes?
4    A.  There's arguments about that.
5    Q.  Let's ask -- let me ask about your
6  practice because I was --
7    A.  My practice would be -- remember, when you come
8  to a gastroenterologist, you get scoped.
9    Q.  So, you're actually not in a position -- because
10  you scope when they arrive -- you're not in position to
11  offer an opinion?
12    A.  No.  I mean, I'm just saying if you go to the
13  family doctor, it will be a different question.  They
14  list -- here's an algorithm for working up dyspepsia and
15  it doesn't list endoscopy is the first thing to do.  It
16  lists the clinical trials the first thing to give them,
17  some PPIs and see what happens.
18    Q.  Isn't every medical student in the United States
19  been taught for the last 30 years that if a patient
20  presents with dyspepsia, they are at risk of having an
21  ulcer --
22         MR. SAHAM:  Objection, form, foundation.
23    Q.  (BY MR. DOUGHERTY)  -- and that the ulcer is more
24  likely -- is among more likely causes of that dyspepsia?
25         MR. SAHAM:  Same objection.

Page 133

1    A.  They are taught that most patients that present
2  with dyspepsia have nothing that you will find.  Of the
3  causes of the patients with ulcers and with dyspepsia,
4  peptic ulcer disease is definitely one of the more
5  common causes.
6    Q.  (BY MR. DOUGHERTY)  Right.
7    A.  It may be an exception with an NSAID user.
8    Q.  What basis do you have to believe that there's an
9  exception to that rule for NSAID users, Dr. Graham?
10    A.  Well, one of the questions that comes above, what
11  you do is "are they taking NSAIDs, are they taking
12  symptomatic drugs that are commonly associated with
13  symptoms"; and, then, you say that's likely to be
14  drug-induced and not necessarily due to a structural
15  abnormality.
16    Q.  Ulcers -- dyspepsia is a symptom of an ulcer, is
17  it not?
18    A.  It's a symptom of which one of the causes is an
19  ulcer.
20    Q.  And one of the causes of that could be the taking
21  of NSAIDs, correct?
22    A.  Could be.
23    Q.  Is there a difference in dyspepsia rates between
24  traditional NSAIDs and COX-2's in your opinion?
25    A.  It's dose-related.

c6105f33-bf73-43f2-8d74-cddba22a4f76

## Page 134

1  Q. So, is there a difference?
2  A. If I were taking a patient that I was giving him,
3 let's say, one Aleve a day or two Aleves a day, probably
4 not. If I were giving him a full arthritis dose for
5 rheumatoid arthritis, definitely.
6  Q. I appreciate that, but let's separate the world
7 into COX-2's and traditional NSAIDs for a moment. Can
8 you accept that framework for my question?
9      MR. SAHAM: Objection, form, foundation.
10  A. No.
11  Q. (BY MR. DOUGHERTY) No, I'm asking you to,
12 Doctor. You're the expert. I'm asking you a
13 hypothetical question.
14  A. Okay. We will make your NSAID Diclofenac.
15  Q. Is there a difference in the dyspepsia rates
16 between traditional NSAIDs and COX-2's?
17      MR. SAHAM: Objection, form, foundation,
18 assumes facts not in evidence.
19  A. Well, if I answer it now being Diclofenac.
20  Q. (BY MR. DOUGHERTY) Let me try it another way --
21  A. We can look at the CLASS study and we can ask,
22 "Well, there's a difference in dyspepsia between the
23 Diclofenac and the Celebrex."
24  Q. Do you know what that data shows?
25  A. No.

## Page 135

1  Q. Because you haven't done that?
2  A. No, I have seen that data. But I don't know what
3 it shows, but I think it shows that they're the same --
4  Q. Are you aware of any research --
5  A. -- I think so.
6  Q. -- are you aware of any research that attempts to
7 answer the question of whether or not there is a
8 difference in the rate of dyspepsia between traditional
9 NSAIDs and COX-2's?
10  A. That's not a marketing study? A marketing study
11 means the doses are not equivalent that are using the
12 highest dose of one versus an average dose of another.
13 The neat thing about Celecoxib is you don't get more
14 symptoms as you go up on dose.
15      MR. DOUGHERTY: Can you read back my
16 question, please?
17      (Question read back for the record.)
18      MR. SAHAM: Objection, asked and answered.
19  Q. (BY MR. DOUGHERTY) Please answer my question,
20 Dr. Graham.
21  A. Yes.
22  Q. And what is that?
23  A. It shows a remarkable difference in rates and
24 related to dose, in particular, and the drug.
25  Q. Just, generally, describe those differences,

## Page 136

1 please.
2  A. There are certain NSAIDs, such as Nabumetone,
3 that has rare symptoms. And, so, there are low
4 symptomatic NSAIDs and then there's high symptomatic
5 NSAIDs and there's a dose-related phenomenon. That's,
6 in general, the answer; though I could pick an outcome
7 of a study, if I wanted to do a study, by choosing the
8 doses and the drugs.
9  Q. Do you believe that it has been proven that the
10 rate of dyspepsia among traditional NSAID users is
11 higher as a CLASS versus the rate of dyspepsia for COX-2
12 users as a CLASS?
13  A. I know the marketing studies would suggest that
14 I don't know the answer to that question, because I
15 would have to look at individual studies. I know the
16 marketing people would like to say that, but I'm not
17 sure that it's factual.
18  Q. You keep talking about marketing studies, and I
19 just want to kind of peel that back a little bit because
20 I detect some cynicism in there.
21      You are drawing a distinction between trials
22 done for marketing purposes and trials done for other
23 purposes. And I'm assuming that you only do research
24 for the other purposes; is that right?
25  A. Currently, yeah.

## Page 137

1  Q. And do you believe that no marketing study, using
2 your definition, can be relied on?
3  A. No, it has to be looked at with a grain of salt.
4  Q. Just as your research needs to be looked at with
5 a grain of salt, right?
6  A. Mine was a cross-sectional study confirming ten
7 other studies.
8  Q. Not that research, your entire body of research?
9  A. Oh, I don't think so. I think our studies are --
10 try and ask what reality is.
11  Q. Name me one Celebrex marketing study that you
12 believe cannot be relied on?
13  A. CONDOR.
14  Q. Why is that, Doctor? I thought you didn't know
15 anything about the CONDOR trial when I asked you earlier
16 about it?
17  A. Well, you just asked me to name one. I gave you
18 one, "CONDOR."
19  Q. Why is that?
20  A. Well, because they -- remember, they didn't ask
21 dose equivalents. They asked high dose, low dose,
22 enteric-coated products, which tend to cause damage
23 downstream in the small bowel, et cetera.
24  Q. So, you're criticizing the design of that study
25 or you're criticizing the results of that study?

Page 138

1    A.  No, I'm just saying it's a marketing study.  You
2  decide what the results are and then you set up a study
3  to get you those results.  That's marketing study.
4  You're not asking reality.  You're asking "I want these
5  results and I could use them with my drugs.  So I'll
6  go them.  Can I get them?"  And if you don't get them,
7  then you don't publish.
8    Q.  Sir, do you believe that the people involved in
9  the CONDOR study, the scientists involved in the CONDOR
10  study that their papers can't be trusted because they're
11  so-called marketing studies, using the Graham framework?
12         MR. SAHAM:  Objection to the form of the
13  question, foundation, incomplete hypothetical.
14    A.  The conclusions are -- I mean, they can be
15  trusted.  They found what they found.  But are they
16  interpretable and for as "reality," and the answer is
17  "usually not."
18    Q.  (BY MR. DOUGHERTY)  Just as a general rule or are
19  you being specific to CONDOR now, Dr. Graham?
20    A.  No, this is "general rule."  This is what
21  marketing studies are all about.  That's how they --
22  that Tylenol killed off aspirin, by showing endoscopic
23  studies.
24    Q.  And you don't think that's a good thing?
25    A.  It's not "good" or "bad."  This is what marketing

Page 139

1  is all about.  My Chevy truck is better than your Ford
2  truck because I found something it could do, but that
3  yours couldn't; and I made a television commercial about
4  it.  I mean, that's what marketing is about.  But is it
5  really different?  And people have learned when you read
6  marketing, you just take it with a grain of salt.
7    Q.  So your friend Francis Chan, do you know him?
8    A.  Very well.
9    Q.  Did you know that he was the lead author on the
10  CONDOR study --
11    A.  Yeah.
12    Q.  -- article?
13    A.  Yeah.
14    Q.  Do you think that he's been duped and that the
15  results of the CONDOR study that he published are
16  somehow unreliable?
17    A.  He knows how reliable they are.
18    Q.  Do you want to take a look at his article?
19    A.  Huh?
20    Q.  Do you want to take a look at his article and
21  point to me some part of this article that's not
22  reliable or valid and can't be trusted?
23    A.  It's not reliable and valid.  It's how you set
24  the study up to get the answer you get.
25    Q.  You don't think this answer that he published in

Page 140

1  the CONDOR study in the Lancet you don't think that
2  answer is important clinically?
3    A.  No.
4    Q.  You think the Lancet just published a marketing
5  study because they didn't have anything else to do that
6  day?
7    A.  No, I think they sold 300,000 reprints.
8    Q.  Is there any limit to your cynicism, Dr. Graham?
9         MR. SAHAM:  Objection, form, argumentative.
10    A.  How many reprints did they sell of the CLASS
11  study?
12         MR. SAHAM:  There's already a stipulated
13  fact on that, if you want to tell him.
14    Q.  (BY MR. DOUGHERTY)  So, you're not rejecting
15  so-called marketing studies out of hand.  You need to
16  look at them a little more carefully to see whether or
17  not they meet your test; is that right?
18    A.  Whether they -- yeah, that's right.  Well,
19  they're not my tests, but whether they are clinically
20  relevant.
21    Q.  You conduct post-hoc analyses as part of your
22  practice, do you not, Doctor?
23    A.  You always look at all the data with the idea to
24  help you design the next study better.
25    Q.  And, in fact, many of your publications present

Page 141

1  post-hoc analyses, do they not?
2    A.  They sure do.
3    Q.  And you would agree that in connection with the
4  CLASS trial it was reasonable for the company and the
5  JAMA authors to conduct post-hoc analyses?
6    A.  Absolutely.
7    Q.  You're not criticizing them for doing that, are
8  you?
9    A.  Absolutely not.
10    Q.  Because there could be in those post-hoc analyses
11  some important differences shown between Celebrex and
12  the comparators in the CLASS trial, correct?
13    A.  There could be important differences suggested
14  that you'd want to follow up on.
15    Q.  And you agree that some of that -- that that
16  information should be shared, correct?
17    A.  Well, it depends if you want to share it or not.
18  It depends on the -- but, yes, in general, it's nice to
19  tell people what you find.
20    Q.  And, in fact, those findings could be important
21  to physicians who are prescribing Celebrex or Diclofenac
22  or ibuprofen, correct?
23    A.  It might be.
24    Q.  And you're not testifying in this case that that
25  information was not important to physicians, correct?

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 142

1    A.  I'm not going to testify whether it was or was
2  not.
3    Q.  In a couple of places in your report, Doctor, you
4  reference the idea of multiple comparisons.  Do you
5  remember doing that?
6    A.  Yes.
7    Q.  And in one place in your report, you refer the
8  reader of your report to a report by Dr. Jewel?
9    A.  Yes.
10    Q.  Do you remember doing that?
11    A.  Yes.
12    Q.  So I just want to make sure I understand what
13  you're going to do versus Dr. Jewel, because we've
14  already deposed him.  Are you offering expert opinions
15  in this case as to whether or not multiple adjustments
16  needed to be done on the CLASS data in the JAMA article
17  or are you leaving that for Dr. Jewel?
18    A.  No, no, I would testify that they needed to be
19  done; but I would not necessarily testify what they
20  specifically need to be.  I mean, we all know that -- and
21  we're taught as medical a student if you ask 20
22  questions, the chances are one in five that will be
23  falsely positive.  That's just statistics.
24        And, so, we all learned that when you ask
25  multiple questions because of that, you need to make

Page 143

1  adjustments to statistical significance.  That's just
2  motherhood, "apple pie."
3        And, so, they did multiple comparisons, you
4  know, that they either need to do adjustments or they
5  need to tell me why they don't need to do the
6  adjustments because everyone knows that they should
7  normally need to do adjustments.
8        Now, what those adjustments are for the
9  individual study, that's when you call the statistician
10  and say "What adjustment should I make here?"  And we
11  all would routinely use Bonferroni's or one of those
12  kind of rules that says you double or triple --
13    Q.  Bonferroni's (Italian), is that what you meant to
14  say?
15    A.  Bonferroni's, that Italian name.  But if you ask
16  me, you know, for the individual case what is indicated.
17  I don't know.  The concept is every medical student
18  knows that.
19    Q.  But you're not bringing any special expertise to
20  the concept, are you?
21    A.  No.
22    Q.  And whether or not multiple adjustments needed to
23  be done on the CLASS data presented in the JAMA article
24  you're not going to offer any opinions on that issue,
25  are you?

Page 144

1        MR. SAHAM:  Objection, misstates prior
2  testimony.
3    A.  I can offer that they -- that they either need to
4  be done or explain why they weren't necessary.
5    Q.  (BY MR. DOUGHERTY)  But you wouldn't know how to
6  do it yourself?
7        MR. SAHAM:  Objection to form.
8    Q.  (BY MR. DOUGHERTY)  Or put another way:  You're
9  not offering any opinions on how that would be done?
10    A.  I would not offer an opinion upon how the
11  technical expertise technique that one would use to do
12  that.  But, you know, that the P value that you have is
13  most likely a better estimate than what reality should
14  be.
15    Q.  So, let's get to the opinion that you want to
16  express, that multiple adjustments should have been done
17  in the JAMA article, even if you're not prepared to say
18  what adjustments or how to do them.
19        Would you concede with me, Dr. Graham, that
20  there are times when you do subgroup analyses where
21  there is no need to correct for multiplicity?
22    A.  There's exceptions to every rule.
23    Q.  Well that's a truism, Doctor.  I'm actually
24  asking you an important question that, I think, is a
25  little bit more than a truism.

Page 145

1        Would you agree with me that there are
2  subgroup analyses that do not need to be corrected for
3  multiplicity.
4        MR. SAHAM:  Objection, asked and answered,
5  form.
6    A.  There must be some, yes.  I mean, the --
7    Q.  (BY MR. DOUGHERTY)  In all the subgroup analyses
8  that you've published, do you want the jury to believe
9  that you and your co-authors corrected for multiplicity
10  in those papers when you were presenting your P values?
11        MR. SAHAM:  Objection, assumes facts not in
12  evidence, form, foundation, incomplete hypothetical.
13    Q.  (BY MR. DOUGHERTY)  Go ahead.
14    A.  I don't know if we have or we haven't.  We often,
15  when we do subgroup analyses, don't provide them with
16  statistical data to go with them.  So it's --
17    Q.  So, you don't even give them the chance --
18        MR. SAHAM:  Are you done with your answer?
19    Q.  (BY MR. DOUGHERTY)  -- to do a multiplicity
20  adjustment?
21    A.  That's the answer, frequently.
22    Q.  So, you and your colleagues author papers where
23  you do subgroup analyses where you, yourself, have done
24  no multiplicity adjustment as a result of the subgroup
25  analyses; is that fair?

37  (Pages 142 to 145)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 146

1    A.  I can't answer that one way or the other, but I
2  would presume that would be -- that there would be
3  examples of that.
4    Q.  In fact, there are many examples, Doctor, in your
5  published work where you're doing subgroup analyses in
6  presenting P values, but not correcting for
7  multiplicity; isn't that true, sir?
8    A.  I don't know one way or the other.  I would
9  presume so.  I mean, we become more sophisticated as we
10  go along.
11    Q.  Is this another case where you've got two
12  different standards, one you're applying to the CLASS
13  trial and one you're applying to your own work?
14        MR. SAHAM:  Objection, form, argumentative,
15  assumes facts not in evidence, foundation.
16    Q.  (BY MR. DOUGHERTY)  Go ahead and --
17    A.  Just show me a recent work that's got a subgroup
18  analysis and it's not corrected of mine.
19    Q.  Why don't you tell me the last time you published
20  a paper where you did a multiplicity adjustment for a
21  subgroup analyses?
22    A.  I don't know right now the last time I did a
23  paper with a significant subgroup analysis.
24    Q.  Do you want to offer opinion testimony in this
25  case, Dr. Graham, in light of your own practice that the

Page 147

1  JAMA authors needed to do a multiplicity adjustment on
2  the CLASS data in the JAMA article?
3        MR. SAHAM:  Objection, form.
4    A.  Either they should do it or they should explain
5  why it wasn't necessary.
6    Q.  (BY MR. DOUGHERTY)  And are you willing to apply
7  that same standard to your own work, sir?
8    A.  It would -- the first answer to that question
9  would be -- we'll say "no," that my work and their work
10  are entirely separate.  If I -- if I'm a bad guy and run
11  around on my wife, it doesn't mean that I would have to
12  condone it in everyone else.
13    Q.  Well, that's what we call a "hypocrite," right,
14  Dr. Graham?
15    A.  We're all hypocrites at one time or another.
16    Q.  You're being paid to be a hypocrite in this case,
17  aren't you?
18    A.  I'm not being paid.
19        MR. SAHAM:  Objection, form, argumentative.
20    Q.  (BY MR. DOUGHERTY)  Oh, because you're giving the
21  fee away, you feel like it's okay to be a hypocrite?
22        MR. SAHAM:  Objection, form, foundation --
23    Q.  (BY MR. DOUGHERTY)  Is that what you're saying?
24        MR. SAHAM:  -- assumes facts not in
25  evidence.

Page 148

1    A.  If someone tell us me they've never been a
2  hypocrite, then they, obviously, have some problem with
3  their memory or their mind.
4    Q.  (BY MR. DOUGHERTY)  I'm wondering whether you're
5  taking this assignment seriously, Dr. Graham, in light
6  of what you just said.
7        MR. SAHAM:  Objection, argumentative, form.
8    Q.  (BY MR. DOUGHERTY)  Do you believe it's a proper
9  role for an expert to just come in and say whatever it
10  is that he or she wants to say without with regard to
11  whether it's consistent with his own behavior?
12        MR. SAHAM:  Objection, form, argumentative,
13  foundation.
14    A.  I'm not sure I understand what you just said.
15  That means that the Supreme Court Judge cannot judge
16  unless he has a perfect life.
17    Q.  (BY MR. DOUGHERTY)  "He who is without sin should
18  cast the first stone," are you familiar with that?
19    A.  Yeah.
20    Q.  Do you try to live by that principle?
21    A.  In general.
22    Q.  But not in this case?
23        MR. SAHAM:  Objection, form, argumentative,
24  assumes facts not in evidence.
25    A.  In this case also.

Page 149

1    Q.  (BY MR. DOUGHERTY)  So, you bear your assignment
2  in this case as simply providing you with an opportunity
3  to criticize people for not doing something that you,
4  yourself, have not done --
5    A.  You know --
6    Q.  -- but at the end --
7        MR. SAHAM:  Stop.
8    Q.  (BY MR. DOUGHERTY)  -- and at the end of the
9  assignment, you want to take confidential shall
10  information that's produced in this case and write an
11  article about it?
12        MR. SAHAM:  Objection --
13    Q.  (BY MR. DOUGHERTY)  Is that not -- do I have your
14  assignment --
15        MR. SAHAM:  Objection, form.
16    Q.  (BY MR. DOUGHERTY)  -- your understanding of your
17  assignment correct?
18        MR. SAHAM:  Objection, form.  Just give me a
19  chance to object because it's an objectionable question.
20  Objection, form, foundation, assumes facts not in
21  evidence, argumentative, incomplete hypothetical; but
22  you can answer.
23    A.  We have not shown that I have not always done
24  corrections upon my subgroup analyses.
25    Q.  (BY MR. DOUGHERTY)  What is the difference

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 150

1 between a primary endpoint, Dr. Graham, and a
2 prespecified endpoint?
3     A.  A primary endpoint is the endpoint for which the
4 study is dependent upon whether it succeeds or fails.
5 Prespecified endpoints are making a list of things that
6 you think might be important that you plan to look at.
7 They are theoretically a little bit more important than
8 other things that you happen to dredge up that you
9 decide to look at.
10    Q.  What -- using that definition, what were the
11 prespecified endpoints in the CLASS trial?
12    A.  We'd have to look at those exactly, but there
13 were some.
14    Q.  Yeah, I know you're the expert.  Tell me what
15 they were.
16    A.  You'll have to show me the trial.  I don't -- I
17 didn't make a list for this purpose.  I can tell you one
18 that was not that is often said to be and that was
19 aspirin use.
20    Q.  You don't think the protocol required the site
21 investigators to record aspirin use?
22    A.  No, it didn't list that as a prespecified
23 endpoint that they were going to analyze.  It listed
24 that in the garbage things that they might consider to
25 think about.

Page 151

1     Q.  Wait a minute.  Are you saying that in a
2 gastrointestinal safety trial that it isn't important to
3 understand the role that aspirin is playing in the
4 events that you're studying?  Is that what you're
5 saying?
6     A.  No.
7     Q.  You agree that it is important to understand
8 that --
9     A.  I'm saying that it got in the protocol late and
10 it got in the big long list, alcohol, smoking, anything
11 else they happen to think about that day.  It wasn't
12 listed as a prespecified endpoint.  "We think this is
13 important and we're going to analyze it."
14         There was a list that says at the end if it,
15 kinda like "In consideration we're going to go on with
16 the rest of this stuff, whether dogs had hair or not."
17 I mean just anything that they thought about they stuck
18 in there.
19    Q.  Anything they thought about.  I'm sorry,
20 Dr. Graham, let's just be clear.  You're not an expert
21 on the state of mind of any of the people at Searle or
22 Pharmacia, are you?  You're not offering opinions about
23 this case about their state of mind, are you?
24    A.  Oh, no.  I'm offering opinions about the format
25 that you list prespecified analyses versus where you

Page 152

1 just don't prespecify what you're going to do, but you
2 make a list of other things you might look at.
3     Q.  In looking at aspirin use, you would agree,
4 because aspirin is a known toxic agent to the GI system
5 is reasonable, correct?
6     A.  It should have gotten in there earlier, though.
7     Q.  That's not what I asked you, Doctor.  You agree
8 with me that looking at the --
9     A.  Oh, absolutely.
10    Q.  -- that it was reasonable for the JAMA authors --
11    A.  Absolutely.
12    Q.  -- to look at aspirin use in the CLASS study
13 results?
14    A.  Absolutely.
15    Q.  And you're not criticizing anybody in this case
16 for looking --
17    A.  Absolutely not.
18    Q.  -- at aspirin use?
19    A.  I wouldn't criticize them for anything they
20 looked at.
21    Q.  Do you believe that the aspirin use data
22 presented in the JAMA article is not reliable?
23    A.  Is not reliable?  I mean, I think that's the data
24 that they got.  Those are the data that came from the
25 trial.

Page 153

1     Q.  But is the data on aspirin use as presented in
2 the JAMA article reliable or not reliable?
3         MR. SAHAM:  Objection, form.
4     A.  If you did the study again, would you get the
5 same answer?  That would be what I would call
6 "reliable"; otherwise, it's a -- it's data that came
7 from the trial and, therefore, data derived and,
8 therefore, are hypotheses to be tested, not definite
9 conclusions to be believed.
10    Q.  (BY MR. DOUGHERTY)  One doesn't need to
11 hypothesize about the toxic effect of aspirin on the GI
12 system, though, correct?  That's been proven.  Do you
13 agree with me?
14    A.  The hypothesis was from the data that aspirin
15 completely negated the beneficial effect, if there were
16 one, from the coxib, not that it was damaging; but it
17 negated the effect, if there were one.
18    Q.  So, let's just go back to my question:  Prior to
19 the CLASS trial, it had already been proven that aspirin
20 had a toxic effect on the GI system, correct?
21    A.  Aspirin is an NSAID.
22    Q.  Correct?
23    A.  Dose-related effect.
24    Q.  Aspirin has a toxic effect on the GI system.
25 That's been established for decades, hasn't it?

39  (Pages 150 to 153)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 154

1    A. The 1900's or so.
2    Q. Right. Okay. And, so, going into the CLASS
3  trial in looking for aspirin use, you're not actually
4  hypothesizing about aspirin's toxic effect. You'd agree
5  with me, correct?
6         MR. SAHAM: Objection, form, foundation.
7    A. You're not hypothesizing it whether aspirin is
8  toxic, right.
9    Q. (BY MR. DOUGHERTY) And the presentation of the
10 aspirin results in the JAMA paper, you would agree with
11 me that those results as presented in JAMA are valid,
12 correct?
13        MR. SAHAM: Objection --
14   Q. (BY MR. DOUGHERTY) You're not questioning those
15 data?
16        MR. SAHAM: Objection, form, foundation.
17   A. I am not questioning that those are the results
18 of the study.
19   Q. (BY MR. DOUGHERTY) What you're questioning is
20 the conclusions that you can draw from those results; is
21 that what you're saying?
22   A. I am questioning that -- yes, whether they would
23 be reproducible. You see, at the outset you would not
24 predict, I don't think, that aspirin had this tremendous
25 effect on the coxib, but not on the NSAID.

Page 155

1    Q. Do you believe that that's what the JAMA authors
2  were suggesting?
3    A. That's what they showed.
4    Q. Are you believing that that's what they were
5  suggesting in the JAMA article?
6    A. Those are the data. They didn't suggest
7  anything. The authors did a study and they had a null
8  hypothesis and you would expect them to say "We did a
9  study. We've got this null hypothesis. We didn't get
10 it. Sorry about that. And, so, we did a bunch of
11 subgroup analyses, which is very reasonable; and we got
12 these new hypotheses. And now we're going to repeat the
13 study and test these new hypotheses to see if we get the
14 right answer."
15   Q. Do you remember how the JAMA authors -- and we
16 can pull out the article -- how they presented the
17 aspirin data in the JAMA article and what they said
18 about it?
19        MR. SAHAM: Well, why don't you pull out the
20 article?
21        MR. DOUGHERTY: We can pull it out if
22 Dr. Graham needs it in order to answer the question.
23   A. For patients not taking aspirin, the annualized
24 incidence rates of GI complications alone and combined
25 with symptomatic ulcers are 0.44 versus 1.27 and 1.4

Page 156

1  versus 2.91 for patients taking aspirin. And, then,
2  they continue on and then they published that the
3  difference was somewhere was not -- there was a
4  difference with a coxib than not with among the NSAID
5  users upon the amount of -- the proportion with damage.
6    Q. (BY MR. DOUGHERTY) You just -- you were reading
7  from the JAMA article, Doctor?
8    A. Right.
9    Q. The JAMA article on the CLASS trial?
10   A. Right, the results.
11   Q. Do you think it's reasonable to conclude that
12 patients not taking aspirin would have a lower rate of
13 gastrointestinal events than people taking aspirin? Do
14 you think that's reasonable?
15   A. Not from this article. I mean because when you
16 actually look at the data, you'll find that -- we can go
17 find the actual data since you're interested in it --
18 that the -- well, I don't see that (witness reading
19 article). Now what was your question? I'm sorry.
20        MR. DOUGHERTY: Could you read my question
21 back?
22        (Question read back for the record.)
23   A. It's feasible. I mean, they didn't predict it
24 beforehand or it wouldn't have let them in there like
25 the other guys didn't. But the -- I mean, it's

Page 157

1  certainly what they found when they got the data.
2    Q. (BY MR. DOUGHERTY) Prior to CLASS, Dr. Graham
3  how many articles had been published showing aspirin's
4  toxic effect on the GI system?
5    A. Lots.
6    Q. How many articles had been published showing the
7  increased incidence of GI toxicity in patients taking
8  both aspirin and NSAIDs compared to those taking NSAIDs,
9  but not aspirin?
10   A. I can't answer that question. It was -- in
11 general, people felt that low-dose aspirin didn't make
12 much of an effect on NSAID users.
13   Q. Do you believe that today?
14   A. Yeah.
15   Q. Would you allow a patient to take prescription
16 strength ibuprofen for her arthritis and take low-dose
17 aspirin without putting them on a PPI?
18   A. Yeah.
19   Q. You would?
20   A. What's prescription strength?
21   Q. You tell me.
22   A. Is that 1,200 milligrams? There's no such thing
23 as prescription strength/non-prescription strength for
24 ibuprofen. Ibuprofen has got maximum anti-inflammatory
25 activity at 400 milligrams, basically.

40  (Pages 154 to 157)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 158

1    Q. 400 milligrams how often?
2    A. One dose.  But if you give it three times a day,
3 that's a big dose.
4    Q. I'm sorry.  I just want to -- I don't want to get
5 distracted with this, but I want to make sure I
6 understood what you just said.
7        You said that ibuprofen has no effect above
8 400 milligrams per dose?
9    A. No, I'm saying that the ibuprofen -- the amount
10 of ibuprofen given here was much more than most people
11 need, unless they have rheumatoid arthritis.  And the
12 analgesic effect is 200 or 400 milligrams.
13        So, really, the -- the patient -- it depends
14 on what the patient has and I'm going to rationally give
15 them the drug to the lowest dose for the shortest
16 duration like you're supposed and is aspirin going to
17 make a real difference on that, am I going to make a
18 relationship between them and -- so I'm going to do a
19 basic risk calculation.  I'm going to take their age
20 into it, high risk, et cetera, cardiovascular, et cetera,
21 et cetera to making my decisions.
22    Q. So you, in your own practice, don't prescribe
23 ibuprofen above 400 milligrams?
24    A. Rarely, if ever --
25    Q. What's the basis for you having said --

Page 159

1    A. -- but I don't treat rheumatoid arthritis.
2    Q. Right.  What's the basis for your testimony that
3 the dose of Celebrex used was low compared to the dose
4 of ibuprofen and Diclofenac used?
5    A. No, this was a high dose of Celebrex.  These are
6 very high doses.  The difference between Celebrex, I
7 said, and the other drugs is that the risk doesn't seem
8 to go up with Celebrex.
9    Q. The risk of what?
10    A. The GI risk.
11    Q. Doesn't seem to go up with the dose of Celebrex;
12 is that what you're saying?
13    A. With the dose.  But with ibuprofen and Naproxen
14 and Diclofenac, it clearly is dose-related.
15    Q. And prior to CLASS, Dr. Graham, what evidence are
16 you familiar with or that you would cite to support your
17 opinion that it is known that Celebrex's affect on the
18 GI system does not increase with dose?
19    A. Well, you'd go back to the other trials that were
20 done with endoscopic ulcers that found that it didn't
21 seem to make a difference when you went up on dose.
22    Q. That what didn't seem to make any difference?
23    A. They didn't seem to get more endoscopic ulcers.
24    Q. Any other evidence, other than the endoscopy
25 trials?

Page 160

1    A. That's the only other ones I know.
2        MR. DOUGHERTY: Let's take a five-minute
3 break. I'm going to stay in place if you guys want to
4 walk around.
5        MR. SAHAM: Sure, sure.
6        THE VIDEOGRAPHER: We're now going off the
7 record. The time is 1:56.
8        (Whereupon, a recess was taken
9         from 1:56 p.m. to 2:05 p.m.)
10        THE VIDEOGRAPHER: We're now back on the
11 record with tape No. 4 of the deposition of David
12 Graham. The time is, approximately, 2:05.
13    Q. (BY MR. DOUGHERTY) Dr. Graham, in your report
14 you make -- you draw a distinction between symptomatic
15 ulcers and endoscopic ulcers, correct?
16    A. Probably.
17    Q. And we talked earlier about endoscopic ulcers in
18 the context of ulcer -- or of endoscope -- endoscopies,
19 excuse me, being done even when the patient is
20 asymptomatic, for example, in the clinical trials that
21 you were involved in for the early Celebrex studies?
22    A. Right.
23    Q. And one of your opinions in this case and
24 expressed elsewhere is that that endoscopic data,
25 because it's asymptomatic or can be asymptomatic, is not

Page 161

1 a reliable predictor of complicated ulcers, correct?
2    A. Not -- no, not really.
3    Q. "No, not really," that's not your opinion?
4    A. That's a misstatement.
5    Q. Okay.
6    A. Endoscopic ulcers are more complicated.
7 Endoscopic ulcers are kind of a made-up concept and in
8 many instances they are lesions, which if seen at
9 routine endoscopy with a normal person, would never be
10 called an "ulcer."
11    Q. Are you talking about this in the nature of
12 endoscopy trials?
13    A. Endoscopy trials or in a patient, yeah,
14 undergoing an endoscopy that's taking NSAIDs, you know,
15 acutely and he has a -- and then they say -- or if you
16 come in to see me and you have symptoms and I scope you
17 and I see a big ulcer, that I say "that's a clinical
18 ulcer." And, then, I ask, "Is it due to NSAIDs, is it
19 due to HP?" I know it's liable get complicated,
20 25 percent over the lifetime, et cetera, et cetera.
21        That's entirely different than what an
22 endoscopic ulcer is defined by a trial. Those are
23 made-up definitions; and most of those are acute, most
24 of those are small, most of those are not actually
25 ulcers.

VERITEXT REPORTING COMPANY
(212) 279-9424     www.veritext.com     (212) 490-3430

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 162

1    They're called "ulcers," but they're not
2  really ulcers. So, they're endoscopic mucosal damage
3  that meets some arbitrary definition that got smaller
4  and smaller over time and less and less meaningful over
5  time. And, as I pointed, out when we took new data that
6  they used to make those decisions and showed it to the
7  people in Hong Kong; and they said in many instances
8  they would not agree that they were actually ulcers.
9  And, so, that's an endoscopic ulcer.
10    It's -- as I used to say -- as I said, when
11 I coded those in trials, I would code it "for ulcer for
12 study purposes only," which meant if I'd have seen it
13 clinically, I wouldn't have called it an "ulcer." And,
14 so, you're dealing with a concept of something with no
15 clinical -- known clinical significance and then you can
16 add symptoms on top of that.
17 Q. The people in Hong Kong, what were you referring
18 to there?
19 A. Your friend Chan, I took a tape -- a videotape --
20 Q. Oh, what you said -- you told me that earlier.
21 A. -- and sent it that were used in the Merck
22 studies to define endoscopic ulcers to train the
23 doctors. You remember the doctors that do this are not
24 often trained in ulcers. And the companies, by
25 definition, every time I see an ulcer, I can photograph

Page 163

1  it and I can video it. They don't do this. They don't
2  want to go back and look at those again. And, in fact,
3  when they did the studies, they find there's a very high
4  false positive rate for things that aren't there
5  probably. So it's a -- at best, it's a very soft
6  endpoint.
7    So when you say "ulcer," you have a
8  meaning- -- you think about something deep and
9  meaningful and, I'm thinking about something superficial
10 and meaningless frequently. There's an atlas that I
11 even have published about this. And so, therefore, a
12 clinical ulcer, that's the nice thing about bleeding,
13 perforation, obstruction, those are clinical disease, no
14 "ifs, ands, or buts" about them. All the rest of them
15 are figments of people's imagination frequently.
16 Q. But, Doctor, if you're measuring GI safety and
17 you want to use an primary endpoint other than
18 perforations, bleeding, and obstructions, what would you
19 use?
20 A. Why would you want to use any other ones besides
21 the clinically relevant one? The only reason that you'd
22 want to use it is because you -- it's difficult and they
23 are not manipulable. They are real. The others you can
24 all manipulate and try and get the answer you want. And
25 so -- and you can do them quickly and cheaply.

Page 164

1  Q. You're not -- so, let's just make sure we're
2  clear here. Are you accusing site investigators or the
3  designers of the CLASS trial of manipulating the ulcer
4  data?
5    MR. SAHAM: Objection, form.
6  Q. (BY MR. DOUGHERTY) Are you offering that opinion
7  in this case?
8  A. Say again.
9  Q. Are you offering an opinion in this case that the
10 ulcer data from the CLASS trial was manipulated by the
11 designers of the trial or the site investigators?
12 A. I didn't say that at all.
13 Q. You're not testifying --
14 A. And I didn't say that at all. I said that
15 endoscopic ulcers were a soft endpoint. They're not a
16 hard endpoint and that they are one that you can
17 manipulate.
18    And so, therefore, that's why I stand with
19 the FDA saying "Let's use what happens to real people."
20 The risk of NSAIDs is not little endoscopic ditzels.
21 It's bleeding, perforation, obstructions. So if you
22 want to say we're safer than traditional NSAIDs, prove
23 it with the things that count that are not manipulable
24 and that are clinically real.
25 Q. Again, are you going to testify in this case that

Page 165

1  the ulcer data from the CLASS trial, any of it, was
2  manipulated?
3    MR. SAHAM: Objection, asked and answered.
4  A. Any of it in the CLASS trial or the previous
5  trials done before that?
6  Q. (BY MR. DOUGHERTY) The CLASS trial, sir.
7  A. I think that the symptomatic ulcer data in the
8  CLASS trial is irrelevant and it was not one of the
9  endpoints of the study and the study was a
10 straightforward study. It was three endpoints. It was
11 one year and they did it and they got "no" for the
12 answer and then they cut the data at 6 months and they
13 didn't tell me the real data and they hid it. And, so,
14 if you say if what's in that study represent what they
15 did, "no."
16    MR. DOUGHERTY: Can you just read my
17 question back, because I think the witness forgot it?
18    (Question read back for the record.)
19    MR. SAHAM: Objection, asked and answered;
20 and as the transcript indicates, there's a multiple line
21 answer to that very question that was just reread.
22 Q. (BY MR. DOUGHERTY) Answer the question,
23 Dr. Graham.
24    MR. SAHAM: Objection, asked and answered,
25 argumentative.

42 (Pages 162 to 165)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 166

1    A.  We'd have to define "manipulated," because the
2  data -- the ulcer data in this study of symptomatic
3  ulcers is not part of the trial.
4    Q.  Do you want me to have her read back the question
5  again, or do you remember what I asked you?
6        MR. SAHAM:  Is that a question that you want
7  him to answer?
8        MR. DOUGHERTY:  Yes.
9    A.  I understood the question you asked.
10    Q.  (BY MR. DOUGHERTY)  Are you testifying in this
11  case that the ulcer data from the CLASS trial was
12  manipulated, "yes" or "no"?
13    A.  I don't understand the question.  I don't
14  understand the use of the word "manipulated."
15    Q.  It's the word that you've been using, Dr. Graham.
16  That's the definition I want you to apply.
17    A.  Do I say that that they manipulated the data for
18  the ulcers?  "No."
19    Q.  You see how easy that was?
20    A.  Using my definition.
21    Q.  The ulcer data in the CLASS trial, let's focus
22  on that for a second.  In the CLASS trial, were they
23  doing -- were the ulcers observed there endoscopic
24  ulcers or were they symptomatic ulcers that were then
25  confirmed by endoscopy?

Page 167

1    A.  According to what I read, the protocol, whenever
2  they found an ulcer, it was called a "symptomatic ulcer"
3  whether the patient had symptoms due to the ulcer or
4  not.
5    Q.  What were the rules for the investigators about
6  when to scope?
7    A.  The rules were pretty thin about when to scope.
8  I mean, they were encouraged to scope; but they weren't
9  overencouraged to scope.  The ones that counted were the
10  ones that had -- that they really had to scope is when
11  they had a bleed, a major bleed.
12    Q.  In fact, Doctor, wasn't it left to the judgment
13  of the site investigator whether or not to scope
14  dependent upon the symptoms that the patient was
15  complaining about?  Isn't that what the rules of the
16  road were for the CLASS trial?
17        MR. SAHAM:  Objection to form.
18    A.  You always scope for some reason.  I mean, it
19  didn't have "If you have symptoms for 1 hour and 27
20  minutes, it's 'yes' and 1 hour and 12 minutes, it's
21  'no.' I mean, there was no definition of what symptoms
22  led you to endoscope the patient.
23    Q.  (BY MR. DOUGHERTY)  Right.  So unlike the ulcer
24  data out of the endoscopic ulcer trial, the ulcer data
25  from the CLASS trial is different because they weren't

Page 168

1  being scoped asymptomatically.  They were only being
2  scoped when symptoms were present, correct?
3        MR. SAHAM:  Objection, form, assumes facts
4  not in evidence, foundation.
5    A.  That's not what I -- when I read the individual
6  cases, that's not the facts.
7    Q.  (BY MR. DOUGHERTY)  What's not the facts, Doctor?
8    A.  When I read the individual cases about the
9  ulcers, patients had all kinds of reasons that they got
10  scoped.  And, interestingly, there was no predetermined
11  definition of what an ulcer was that you saw.  And a
12  number of the things that they saw would meet no one's
13  definition of an ulcer.
14    Q.  Is it your testimony that the protocol for the
15  CLASS trial did not define the criteria for the site
16  investigator on whether to call an ulcer or not call an
17  ulcer?
18        MR. SAHAM:  Objection to form.
19    A.  The -- most studies will define an ulcer.  And
20  we've argued for months and years over whether it's got
21  to be more than 5 millimeters, et cetera.  And it didn't
22  have to be an ulcer.  It could be a large erosion.  But
23  that really wasn't -- there was no definition,
24  endoscopic definitions.  There were no photographs.
25  There was no atlas.  There were just a few words.  And

Page 169

1  in many of them, when you read what they saw at
2  endoscopy and called an ulcer would not be ulcers.
3    Q.  (BY MR. DOUGHERTY)  Who called -- when you say
4  "they called an ulcer," who called?
5    A.  The committee that made a decision.
6    Q.  So, let's get to this:  There's -- you agree with
7  me the patients in CLASS did not have to be scoped,
8  correct?
9        MR. SAHAM:  Objection to form.
10    Q.  (BY MR. DOUGHERTY)  They did not have to be
11  scoped on some periodic basis, correct?
12    A.  They didn't have to be scoped.
13    Q.  And the decision to scope was left to the
14  clinical judgment of the investigator, correct?
15    A.  Right.
16    Q.  And, then, whatever the investigator saw was --
17  and reported out in terms of the existence of an ulcer,
18  was ultimately sent to a committee to evaluate, correct?
19    A.  Right.
20    Q.  Do you know who was on that committee?
21    A.  I know who their names are, sure.
22    Q.  All right.  Do you have any opinions of those
23  gentlemen?
24    A.  Nice guys.
25    Q.  Good doctors?

43  (Pages 166 to 169)

c6105f33-bf73-43f2-8d74-cddba22a4f76

| Page 170 | Page 172 |
|---|---|

**Page 170**

1  A.  Well, they're endoscopists.  They know what
2  they're doing.
3  Q.  They do know what they're doing?
4  A.  Yeah.
5  Q.  And they adjudicated all of those findings?
6  A.  Right.
7  Q.  And the data was unblinded --
8  A.  Right.
9  Q.  -- or the data was blinded, correct?
10  A.  Right.
11  Q.  Blinded, correct?
12  A.  Blinded.
13  Q.  So they didn't know whether they were calling an
14  ulcer in a Diclofenac patient or an ibuprofen patient or
15  a Celebrex patient?
16  A.  Absolutely.
17  Q.  They did not know, correct?
18  A.  They did not know.
19  Q.  And what they were studying in the CLASS trial
20  was, in fact, ulcer, was it not?
21  A.  Many times, no.
22  Q.  "Many times, no"?
23  A.  It's not important because it wasn't an out- --
24  it wasn't an important outcome variable.  Remember, the
25  outcome variable was bleeding, perforation, obstruction

**Page 171**

1  to win the trial.  So, these so-called symptomatic
2  ulcers that you want to argue about, if you want to
3  proceed with that, we can do it.  And I can -- we can
4  pull the cases and I can show you the ones and you can
5  show it to anybody in the world; and they'll say "This
6  is not an ulcer."
7      There's one, the lesion is called "minute."
8  In one, it's called "2 millimeters."  The definition in
9  the trial minimum was 3 millimeters with apparent depth;
10  and they describe it -- your adjudicators -- as
11  2 millimeters.
12  Q.  Why did they do that?
13  A.  I have no idea.
14  Q.  Could it be because the whole trial was actually
15  "find ulcers"?
16  A.  It made no difference because they didn't get
17  bleeding -- no, it ws defined "bleeding, perforation,
18  obstruction."  You guys or somebody at Searle decided to
19  make ulcers there because they thought they had a bunch
20  of them.  But they didn't even get that when they looked
21  in their outcome.  And, then, when they went to a year,
22  they lost even that.  They got nothing.
23      So what they took was nothing and tried
24  to -- take their sow's ear and they ended up with a
25  sow's ear.  It may have looked like a silk purse

**Page 172**

1  briefly.
2  Q.  Well, I'm glad we're getting your opinions; and
3  you will not be surprised to find that you might be
4  alone in those opinions.  Let's stay with the ulcers,
5  okay?
6  A.  "In quotes."
7  Q.  You can put it in quotes all you want,
8  Dr. Graham.  Did you go through and re-adjudicate all
9  the ulcer calls in the CLASS trial?
10  A.  Sure did.
11  Q.  Every single one of them?
12  A.  I went through every one of those cases.
13  Q.  How many ulcers were there in the CLASS trial?
14  A.  I didn't count them.
15  Q.  Why isn't that in your report, Dr. Graham?
16  A.  Huh?
17  Q.  Why isn't that in your report?
18  A.  Why would it be in my report?  I mean, they asked
19  me to adjudicate -- I mean to rebut what he did.
20  Q.  Are you offering opinions in this case about the
21  adjudications of ulcers in the CLASS trial --
22      MR. SAHAM:  Objection, calls for a legal
23  conclusion --
24  Q.  (BY MR. DOUGHERTY)  -- when that's not in your
25  report?

**Page 173**

1      MR. SAHAM:  -- foundation.
2  Q.  (BY MR. DOUGHERTY)  I just want to know.
3      MR. SAHAM:  Same objection.
4  A.  I wasn't planning to bring that up at their
5  trial.  If you would like to bring it up, I'd be happy
6  to bring it up and go over them with you.
7  Q.  (BY MR. DOUGHERTY)  Your assignment was to rebut
8  Tim Wang and you just told me that you re-adjudicated
9  all of the ulcer calls in the CLASS trial, but didn't
10  include those in your report.  Do I have that right so
11  far?
12  A.  I reviewed --
13      MR. SAHAM:  Objection to form.
14  Q.  (BY MR. DOUGHERTY)  Do I have that right so far?
15  A.  I reviewed all of the ulcers in the CLASS trial,
16  right.  I reviewed --
17  Q.  As part of your assignment in this case, Doctor,
18  or as part of this article you plan on writing?
19      MR. SAHAM:  Objection, form, foundation,
20  argumentative.
21  A.  I did it for just interest.
22  Q.  (BY MR. DOUGHERTY)  Did you do that before or
23  after you wrote your report?
24  A.  I did it before I wrote my report.  Dr. Wang said
25  that, basically -- that no one, basically -- he said no

VERITEXT REPORTING COMPANY
(212) 279-9424      www.veritext.com      (212) 490-3430

Page 174

1 one in their right mind would conceive that these ulcers
2 were not clinically important. I mean, that just was
3 beyond any figment of his imagination. So I went to
4 look at what the ulcer looked like and I found it and I
5 didn't agree with that.
6    Q. But you didn't include that in your report?
7    A. Well, it didn't seem to be important. I mean, to
8 me, the report that they -- what the answer was is that
9 they had -- the trial was tasked, very straightforward
10 "bleeding, perforation, obstruction." They didn't get
11 it.
12       So they brought up extraneous things.
13 Aspirin, well, they got that for the 6 months, but they
14 didn't get it at 12 months. Because they cut 6 months
15 because it looked pretty. Come on.
16    Q. "Come on" what, Dr. Graham?
17    A. I mean, it's just amazing what they did with
18 these data. You know, you start -- you read it. They
19 fooled me when they read it when I first got it -- I
20 mean when I quoted this thing for fact. You know, you
21 assume that the guys that are doing this are honestly
22 describing what they did to their co-professionals; and
23 that wasn't the case.
24    Q. I'm sorry. Are you offering opinions in this
25 case -- I need to make sure I understand what you're

Page 175

1 saying, Dr. Graham, because you seem to be on a little
2 bit of a roll this afternoon and you're talking about
3 stuff that you never included in your expert report.
4       So what I'm trying to figure out is whether
5 or not you intend to testify at trial about some of the
6 answers your giving today. And if you are, you need to
7 tell me; and we'll take it from there and talk with
8 Scott about what you're trying to do here today. But if
9 you're not, you just need to tell me you're not, and we
10 can stick to your report, okay?
11    MR. SAHAM: Objection, form.
12    Q. (BY MR. DOUGHERTY) So, here's my question --
13 here's my question. I have a series of questions. Are
14 you intending to testify at trial about the adjudication
15 of the ulcer data in the CLASS trial --
16    MR. SAHAM: Objection to form.
17    Q. (BY MR. DOUGHERTY) -- "yes" or "no"?
18    A. No.
19    Q. Are you intending to testify at trial that the
20 authors of JAMA article were attempting to mislead
21 anyone, "yes" or "no"?
22    A. I think that's self-evident.
23    Q. Answer my question, Dr. Graham. Are you
24 intending to testify at trial that the authors of the
25 JAMA article were intending to mislead anyone, "yes" or

Page 176

1 "no"?
2    A. I will answer that a slightly different way. I
3 will say, in my opinion, that I don't know what their
4 intention was. I'll just say that the article came that
5 out it's very misleading in relationship to what the
6 study design was and the outcome was.
7    Q. And where do you cover that in your report,
8 Dr. Graham?
9    A. I mean that's what it seems to me when I talk
10 about fatal flaws, et cetera, et cetera, and --
11    Q. Now, you just used the word "misleading." Just
12 tell me where in your report you describe -- you used
13 the word "misleading." Tell me where you say that in
14 your report.
15    A. If you look at almost anyplace -- take 31 --
16    Q. Paragraph 31, sir?
17    A. Yeah.
18    Q. Yes.
19    A. It talks about what the study was about. In
20 several places, I talk about what the study was about,
21 what the protocol was designed to do and, therefore, you
22 can easily see what you would expect from that if that
23 was the study design. And when you say, "Okay. This is
24 the study design, that these are the outcome variables."
25 You look at the study and you say "Where are those"; and

Page 177

1 they're not there.
2    Q. What's not there, Dr. Graham?
3    A. The outcome variables you expect to see.
4    Q. Yeah, just list them for me.
5    A. Huh?
6    Q. Go ahead and list them.
7    A. You expect to see a year's worth of data.
8    Q. Why?
9    A. Because that's what the study was.
10    Q. Who told you that the year's worth of data was
11 valid, Dr. Graham?
12    A. No, no. In a clinical trial -- you tell me in a
13 clinical trial "This is what we set out to do," okay?
14 And, then, "This is the answers we got." And, then, you
15 say "But, you know, part of this is invalid. For the
16 following reasons, it's invalid." But you don't tell me
17 that you -- that this was the study we did.
18 You're saying that they had the right to take what they
19 really did and not tell anybody or not tell me what they
20 had done and what answers they got.
21    Q. You didn't know, Dr. Graham, that the CLASS trial
22 went for 12 months?
23    A. Huh?
24    Q. You didn't know that the CLASS trial went for
25 12 months?

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 178

1    A.  I think when this study came out --
2    Q.  Did you know or not know that the CLASS trial
3  went for 12 months?
4    A.  When this study came out, it was a 6-month study.
5    Q.  No, no.  That's not my question, sir.  Did you
6  not know that the CLASS trial went for 12 months?
7    A.  When the study was published, I did not know that
8  it went for 12 months.
9    Q.  When the results of the trial were announced in
10  April --
11    A.  When the study --.
12    Q.  -- in April of 2000?
13    A.  When this paper came out, when it was presented
14  on the DDW, I did not know that it was not 6 months.
15    Q.  You're saying that paper was presented at DDW?
16    A.  Wherever it was presented.
17    Q.  You didn't --
18    A.  The only time that I became really aware that it
19  wasn't is when the FDA came out and said "Wait a minute,
20  guys.  You know, there are more here than meets the eye"
21  and it didn't hold up.
22    Q.  Can you not tell from reading the JAMA article
23  that it went longer than 6 months?  Is that your
24  testimony?
25    A.  I'm saying that it's obfuscated or whatever, that

Page 179

1  it went longer than 6 months.
2    Q.  No, I didn't ask you whether anything was
3  obfuscated.  I'm asking whether or not you can tell from
4  reading the JAMA article that the trial went for longer
5  than 6 months?
6    A.  With difficulty.
7    Q.  With difficulty?
8    A.  Yeah.  I mean, it turned out that when you knew
9  it -- after you knew it, you could go back and you can
10  say "This is a new way to write a paper."  You put a
11  little -- a few little single word codes in it and say
12  to someone "Can you find them?"
13    Q.  Do you know why the study authors did not publish
14  the second 6 months' worth of data?
15    MR. SAHAM:  Objection, form.
16    A.  How would I know why they did not?  I would
17  suspect that they didn't because I know Steven Geis and
18  that he wanted to win, just like on the MUCOSA study.
19  But the answer is:  I don't know why they didn't.  I
20  know they should have, no matter what, or they shouldn't
21  have to publish it.  They've got to tell me it exists
22  and they've got to tell me the results, because those
23  are the results of their trial.
24    Q.  (BY MR. DOUGHERTY)  So, you're not offering any
25  opinions in this case about whether the second 6 months

Page 180

1  worth of data is valid or invalid; is that correct?
2    MR. SAHAM:  Objection, form, foundation.
3    A.  Say again.
4    Q.  (BY MR. DOUGHERTY)  You're not offering any
5  opinions in this case about whether or not the second
6  6 months' worth of data is valid or invalid, correct?
7    MR. SAHAM:  Objection, form, vague as to
8  valid.
9    A.  Now, my presumption would be before -- when I get
10  the study, is that it was the study; and I get to see
11  the study.
12    MR. DOUGHERTY:  Can you read back my
13  question, please?
14    A.  Who decides it's valid or not.
15    MR. DOUGHERTY:  Can you read back my
16  question to him, please?
17    MR. SAHAM:  Objection, asked and answered as
18  the transcript indicates.
19    Q.  (BY MR. DOUGHERTY)  Answer the question, please.
20    A.  I don't know the answer to that question.
21    Q.  Well, this is the day to answer it.
22    THE WITNESS:  Read me the question.
23    (Question read back for the record.)
24    MR. SAHAM:  Objection, vague as to "valid,"
25  form, asked and answered.

Page 181

1    A.  And the answer to that that would be a -- I would
2  have to depend upon the statisticians to tell me.
3    Q.  (BY MR. DOUGHERTY)  So, you're not offering any
4  opinions on that issue in this case, correct?
5    MR. SAHAM:  Same objections.
6    A.  I have no personal opinion that I can derive
7  without the help of the statisticians.
8    Q.  (BY MR. DOUGHERTY)  I want you to really just
9  focus on my question, because I never want to hear you
10  at trial talk about the second 6 months of data, unless
11  you tell me today that you intend to talk to about the
12  second 6 months worth of data.
13    A.  (Witness shakes head.)
14    Q.  Do you intend to offer any testimony in this
15  trial about the second 6 months worth of data, "yes" or
16  "no"?
17    MR. SAHAM:  Objection, form, foundation,
18  assumes facts not in evidence.
19    Q.  (BY MR. DOUGHERTY)  If you're leaving that for
20  another expert, fine.  I just want to know what you're
21  going to do?
22    A.  I will not exclude the fact the study went for
23  one year.  If you ask me about the individual outcome,
24  which is what you mean, the results of the study for one
25  year, I will not testify as to that.  I will testify to

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 182

1  the fact that the study did go one year and it had
2  results.  Now, whether they are valid or not is for
3  someone to discuss.
4      Q.  So, you're not ruling out the possibility,
5  Dr. Graham, that the second 6 months worth of data was
6  invalid, correct?
7          MR. SAHAM:  Objection, form, foundation.
8      A.  I'm not ruling out whether it was valid or
9  invalid.
10     Q.  (BY MR. DOUGHERTY)  Okay.  And you have heard the
11 reasons that the authors have given, right, for why they
12 did not publish the second 6 months worth of data?  You
13 looked at those reasons as part of your assignment in
14 this case or not?
15     A.  I looked at that.
16     Q.  Okay.  Are you offering opinion about the
17 validity of the reasons offered by the JAMA authors as
18 to why they didn't publish the second 6 months worth of
19 data or are you leaving that for somebody else?
20     A.  Well, those are statistical questions, again,
21 too.
22     Q.  So, you're not going to testify about the
23 reasons?
24     A.  The actual reasons that they use, no.
25     Q.  No.  Your evaluation of those reasons, you're not

Page 183

1  going to evaluate those reasons in your testimony,
2  correct?
3          MR. SAHAM:  Objection, form, foundation,
4  calls for a legal conclusion.
5      A.  I'm not going to evaluate those reasons.
6      Q.  (BY MR. DOUGHERTY)  In the last sentence of your
7  report or Paragraph 36 of your report, Dr. Graham, you
8  say -- and I'll wait until to you get there so you can
9  follow along with me.
10     A.  Okay.
11     Q.  I'm sorry, sir.  If you could turn to the page
12 prior and start at the bottom.
13     A.  (Witness complies with request.)
14     Q.  If -- I'm reading now from Paragraph 36:  "If,
15 for the sake of argument, one took the view that
16 depletion of susceptibles occurred (and parenthetically
17 I reject that notion) one would still need to justify
18 why the second 6 -- why the 6-month data set was a valid
19 representation of the study."  Do you see that?
20     A.  Yeah.
21     Q.  So your parenthetical rejection of the depletion
22 of susceptibles -- I'm just trying to -- because you
23 didn't detail any of that in your report and I just want
24 to confirm today that you are not going to offer any
25 opinions in the trial of this matter on whether or not

Page 184

1  the depletion of susceptibles actually occurred and
2  affected the second 6 months worth of data?
3          MR. SAHAM:  Objection, form, foundation,
4  incomplete hypothetical.
5      A.  That is, again, a statistical question.  I don't
6  do that.  But I will be willing to talk about the need
7  to present the entire data set, et cetera, as it says in
8  the next paragraph -- part of that paragraph.
9      Q.  (BY MR. DOUGHERTY)  Whether it's valid or
10 invalid?
11     A.  Whether it's valid or invalid.
12         MR. SAHAM:  Objection, form, foundation --
13     Q.  (BY MR. DOUGHERTY)  Because Dr. David --
14         MR. SAHAM:  Let me make my objection, John,
15 so we have it on the record.
16         MR. DOUGHERTY:  He's already answered the
17 question.
18         MR. SAHAM:  Well -- and I would --
19         MR. DOUGHERTY:  Go ahead.  Go ahead, Scott.
20 I'll give you that courtesy.  I'm sorry.
21         MR. SAHAM:  -- I would caution the witness,
22 Dr. Graham, the way this works, I need to make my
23 objection so it can be ruled on.  And we're all driving
24 the court reporter crazy by talking over her.  So if you
25 could just pause so I can make my objection.

Page 185

1          And my objection to the last question was
2  form, foundation, and assumes facts not in evidence.
3      Q.  (BY MR. DOUGHERTY)  Okay.  So I want to make sure
4  I know where we are.  I think I've got it.
5          So in the rest of that article or the rest
6  of that Paragraph 32 of your expert report -- or 36 of
7  your expert report you say that -- and I think you've
8  confirmed here today.  You're not going to talk --
9  you're not going to testify in this case about whether
10 or not the depletion of susceptibles occurred because in
11 your opinion regardless of whether the second 6 months
12 worth of data was good or not good, you believe that the
13 JAMA authors should have included some statement in the
14 article about the data at 12 months.  Is that what
15 you're saying?
16     A.  They should have presented the study they did.
17     Q.  That's a little bit different from what I asked
18 you, Dr. Graham.  So it's really important that we kind
19 of nail this down.
20         All you say about the second 6 months of
21 data here is that the entire data set, statistical or
22 otherwise, and the reasoning must be presented along
23 with the reasons for truncating the data.  Do you see
24 that?
25     A.  "... for excluding less favorable data, and why a

VERITEXT REPORTING COMPANY
(212) 279-9424      www.veritext.com      (212) 490-3430

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 186

1  subset analysis was being offered as a more
2  representative analysis," right.
3      Q.  Right.  That's the opinion you want to offer?
4      A.  Right.
5      Q.  Okay.  And you haven't actually looked at the
6  second 6 months worth of data, correct?
7          MR. SAHAM:  Objection, misstates prior
8  testimony, assumes facts not in evidence, incomplete
9  hypothetical, form, and foundation.
10     Q.  (BY MR. DOUGHERTY)  In other words, you don't
11 know whether the second 6 months worth of data is valid
12 or invalid?
13     A.  I've looked at all the data.  But the question
14 about "valid" or "invalid" is a whole area of
15 statistics.
16     Q.  That you don't want to express on?
17     A.  That I -- that I don't do.
18     Q.  Okay.  So you don't know -- when you say that the
19 second 6 months worth of data excluded less favorable
20 data, it would only be less favorable, Doctor, if that
21 data was reliable and invalid, correct?
22         MR. SAHAM:  Objection, form, foundation,
23 assumes facts not found in evidence, and misstates prior
24 testimony.
25     Q.  (BY MR. DOUGHERTY)  Right?

Page 187

1      A.  Only valid data is reliable.
2      Q.  Okay.  So, you can't say one way or the other
3  whether not presenting the second 6 months worth of data
4  excluded less favorable data because you can't express
5  an opinion as to whether or not that second 6 months
6  worth of valid is valid; is that fair?
7          MR. SAHAM:  Objection, form, misstates prior
8  testimony, assumes facts not in evidence.
9      Q.  (BY MR. DOUGHERTY)  Is that fair?
10     A.  Sounds fair.
11     Q.  And you'll abide by that for the rest of this
12 case?
13     A.  Probably.
14     Q.  I can depend on you for that, can't I,
15 Dr. Graham?
16     A.  Possibly.
17     Q.  You're not going to go back on your word on that
18 one, are you?
19     A.  Maybe.
20         MR. SAHAM:  Objection, argumentative,
21 misstates testimony --
22     Q.  (BY MR. DOUGHERTY)  You may?  No, you won't?
23     A.  (No audible response.)
24         MR. SAHAM:  -- form, foundation.
25         MR. DOUGHERTY:  You may indicate that the

Page 188

1  witness has said "no."
2          Let's take a five-minute break, please.
3          THE VIDEOGRAPHER:  We're now going off the
4  record.  The time is 2:39.
5          (Whereupon, a recess was taken
6           from 2:39 p.m. to 2:56 p.m.)
7          THE VIDEOGRAPHER:  We're back on the record.
8  The time is, approximately, 2:56.
9      Q.  (BY MR. DOUGHERTY)  Dr. Graham, one of your
10 previous answers you mentioned "Dr. Geis."  Do you
11 intend testify in this case about Dr. Geis?
12     A.  I hope not.
13     Q.  Do you intend to testify about the motivations or
14 desires of anyone employed by Searle or Pharmacia as it
15 relates to the CLASS trial?
16     A.  I have no way of knowing what they were thinking.
17 All I can know is what they did.
18     Q.  But my question to you, sir, is:  Do you intend
19 to testify about the motivations of any scientists
20 working for G.D. Searle or Pharmacia?
21     A.  No.
22     Q.  Do you intend to testify about the motivations of
23 any of the JAMA authors?
24     A.  No.
25     Q.  Do you intend to testify about the actions of any

Page 189

1  company scientist or JAMA authors --
2          MR. SAHAM:  Objection to form.
3      Q.  (BY MR. DOUGHERTY)  -- in connection with the
4  CLASS trial?
5          MR. SAHAM:  Objection to form.
6      A.  No.
7      Q.  (BY MR. DOUGHERTY)  And you're not going to
8  testify about the reasons why they might have done this
9  or that, correct?
10         MR. SAHAM:  Objection, form.
11     A.  I don't plan to; but, you know, I don't want to
12 disappoint you.  When we were discussing this 6-month
13 data and I agreed that I wasn't going to discuss the
14 validity of it, that's the statistical validity I
15 focused on; but I'm still very set on the concept that
16 they should have told the world about the entire data
17 set and those statistical otherwise that I listed in
18 this paragraph.  So that's not that it's going to
19 exclude 6 months' data, I'm just excluding the
20 statistical validity of that data.
21     Q.  But you're not going to offer any testimony about
22 whether it was not -- whether or not it was reasonable
23 for the JAMA authors and the company scientists to
24 conclude that the data after 6 months were not
25 reliable --

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 190

1    MR. SAHAM: Objection, form, foundation.
2    A. I --
3    Q. (BY MR. DOUGHERTY) -- putting aside the
4 disclosure issue, sir?
5    A. Yeah, they should have told us that it existed
6 and then explained to us why they thought it was
7 excludable.
8    Q. I understand and I'm calling that the "disclosure
9 issue," but I want to get back to the -- my question.
10    MR. DOUGHERTY: Madam Reporter, could you
11 read it back, please?
12    (Question read back for the record.)
13    MR. SAHAM: Objection, form, vague as to
14 "reasonable."
15    Q. (BY MR. DOUGHERTY) You can answer the question,
16 Dr. Graham.
17    A. I don't see that that's different than what I
18 said. That's statistical validity that they would base
19 it on or at least -- and I'm not going to address the
20 statistical validity of that data.
21    Q. You're not going to testify that it was
22 unreasonable for them to have concluded that the second
23 6 months worth of data was not valid?
24    A. I'm not going to testify to that, but I will
25 testify it was unreasonable that they excluded it.

Page 191

1    Q. And just so that we understand the kind of --
2    A. Disclosure of it.
3    Q. Okay. Just so that we understand your disclosure
4 rule that you're applying in this case, Dr. Graham, so
5 that we can test whether or not you have applied it in
6 your own life, is it your opinion that in publications
7 of clinical trial data that the authors of that
8 publication must always publish the full data set from
9 the trial whether or not they believe all of it is valid
10 or must explain why they are not discussing that data in
11 the article?
12    A. I --
13    MR. SAHAM: Objection, form, foundation --
14    Q. (BY MR. DOUGHERTY) Is that your opinion?
15    MR. SAHAM: -- incomplete hypothetical.
16    A. That's, basically, my opinion. It's important
17 never to mislead.
18    Q. (BY MR. DOUGHERTY) Well, you're not offering
19 opinions in this case about whether anybody was misled,
20 right, Dr. Graham?
21    A. Well, if you don't do that, then by my philosophy
22 you're definitely "misleading" about what did you.
23    Q. You're not offering any opinions in this case or
24 any testimony in this case, Dr. Graham, that anybody was
25 misled by the JAMA article, are you?

Page 192

1    A. Well, I personally know I was; but whether they
2 intended that is another question.
3    Q. And you say that you were misled by the JAMA
4 article because -- and I think you gave us some of the
5 reasons, so let's make sure we have a complete list --
6 was the absence of a discussion of the 12-month data.
7 Is that one of the things that you -- that caused you to
8 be misled?
9    MR. SAHAM: Objection, form, vague.
10    A. I was misled in that the study was not described
11 in a forthright manner, you know, "This is what we set
12 out to do. This was our endpoint. These are our
13 results."
14    Q. (BY MR. DOUGHERTY) Well, sir, I want to get as
15 complete a list as possible, Dr. Graham, just so that
16 the jury understands the basis for your testimony that
17 you were misled by the JAMA article. So, can you just
18 list for us the things that were either in the JAMA
19 article or not in the JAMA article that caused you
20 personally to be misled?
21    MR. SAHAM: Objection, form.
22    A. Do you want me to send you a list?
23    Q. (BY MR. DOUGHERTY) I want you to give us that
24 list today.
25    A. Well, that -- I think that would not be

Page 193

1 practical.
2    Q. Well, you better do the best you can, Dr. Graham,
3 if you don't mind.
4    A. I'll state it again, that I would expect their
5 article to tell me that this was the protocol, that this
6 was the primary analysis, and these are the results and,
7 then, to clearly identify what was the subgroup
8 analysis, what was the post-hoc subgroup analysis, and
9 so that I would understand where the data stood and how
10 to analyze it.
11    I mean, many people, as you know, would say
12 that you shouldn't even do the analysis after you fail
13 on your original hypothesis or null hypothesis, but I
14 would expect them to give me those data in a way that's
15 very clear. And that would be the minimum.
16    Q. You said that many people say you don't even do
17 an analysis once you've failed the primary endpoint; is
18 that right?
19    A. That's one of the big arguments when people talk
20 about subgroup analyses, whether you should even do
21 them.
22    Q. But you don't agree with that, correct?
23    A. I think it's worthwhile to do the analysis and to
24 be honest about what the results are.
25    Q. And, so, you believe it was fair for the JAMA

49  (Pages 190 to 193)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 194

1  authors to present the analysis of the CLASS data that
2  they felt was the most valid.  Your objection to the way
3  that they did it was the failure to disclose the primary
4  endpoint and the fact that the analyses were post hoc
5  and the fact that there was 12 months worth of data.  Do
6  I have that right?
7      A.  That's reasonable.
8      Q.  And Dr. Graham --
9      A.  -- and the -- and either the 12 month data was
10  less favorable with the proviso that they could explain
11  why that's not valid.
12      Q.  Okay.  Anything else?
13      A.  That's enough.
14      Q.  All right.  This is the chance to put it all in.
15  Is that all you've got?
16      A.  That's fine.
17      Q.  I just don't want to hear any other explanations
18  later, okay?
19      A.  I'll try not.
20      Q.  I'll hold you to that.
21          You would agree with me, Dr. Graham, that
22  the results of the primary primary endpoint are
23  disclosed in the JAMA article?
24      A.  In retrospect, if you know what they are -- if
25  you know the protocol, you can find it in there.  It's

Page 195

1  kind of a hidden code, but you can.
2      Q.  Well, there's nothing hidden about it,
3  Dr. Graham.  You'd agree with me that they disclosed
4  that the study was powered to look for ulcer
5  complications, correct?
6          MR. SAHAM:  Objection, form, assumes fact
7  not in evidence.
8      A.  The results of the study were that the analyzed
9  incidence rates for upper GI complications were
10  "bang-bang."  That's the -- that is the outcome, all
11  right?  Everything else is subgroup.
12      Q.  (BY MR. DOUGHERTY)  And what P value did they
13  assign to that outcome, Dr. Graham?
14      A.  They assigned 0.9.
15      Q.  So, they disclosed right there -- and you're
16  pointing -- just --
17      A.  No, they didn't disclose it that way.
18      Q.  Let me finish my --
19      A.  They disclosed --
20      Q.  Let me finish my question, Dr. Graham, if you
21  don't mind.
22      A.  All right.
23      Q.  Just so the record is clear, you're pointing to
24  the abstract portion of the article?
25      A.  Yeah.

Page 196

1      Q.  Okay.  And ulcer complications were a primary
2  primary endpoint of the CLASS trial, correct?
3      A.  I know that, but I would not know that by reading
4  the paper.
5      Q.  And in the abstract itself on the first page of
6  the article, the authors tell everyone who reads the
7  article that as against ulcer complications there was
8  not a statistically significant difference between
9  Celebrex and the pooled NSAIDs, correct?
10          MR. SAHAM:  Objection, form, foundation,
11  assumes facts not in evidence.
12      A.  The -- what one would expect them to say is that
13  the primary hypothesis was against these complications
14  and we got this result, "period."  And, then, we get a
15  bunch of subgroup analyses and we found some interesting
16  data.  And we didn't, if you'd like, we didn't do
17  corrections for multiple comparisons.  But that -- I
18  mean, that's what how you would say this in a scientific
19  paper to be honest and not misleading or not potentially
20  mislead.
21          And, so, when you read this, you get one
22  P value that's a little off and then you start getting
23  good P values and good comparisons.  Now, that just has
24  to be unusual way to present data.
25      Q.  (BY MR. DOUGHERTY)  Let me ask you this,

Page 197

1  Dr. Graham:  If someone reading the JAMA article wanted
2  to answer the question as to whether or not Celebrex was
3  statistically different from the pooled NSAIDs against
4  ulcer complications, you would agree with me that the
5  answer to that question is revealed in the abstract on
6  the first page of the article by the disclosure of the
7  .09 P value, correct?
8          MR. SAHAM:  Objection, form, foundation,
9  assumes facts not in evidence, incomplete hypothetical.
10      Q.  (BY MR. DOUGHERTY)  You can answer.
11      A.  Only if you had read the protocol would you come
12  away with -- that that was the answer to the study, that
13  the study failed.
14      Q.  That wasn't my question, Dr. Graham.
15      A.  They didn't ever tell me what the question was.
16      Q.  No.  Let's focus on my question for a second --
17      A.  Right.
18      Q.  -- okay?
19          You would agree with me that in the abstract
20  right on the first page of the JAMA article if someone
21  wanted to know whether the CLASS study showed Celebrex
22  being statistically significantly better than the pooled
23  NSAIDs against ulcer complications, that the answer to
24  that question is right there in the abstract on the
25  first page; and the answer is "It is not statistically

50  (Pages 194 to 197)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 198

1  significant because we disclosed a .09
2  P value"? You would agree with me, correct?
3       MR. SAHAM: Same objections.
4  Q. (BY MR. DOUGHERTY) That is right -- stated right
5  there on the front page?
6       MR. SAHAM: Same objections.
7  Q. (BY MR. DOUGHERTY) That question is answered, is
8  it not?
9  A. That answer is answerable on the first page if
10 you know the question.
11 Q. But the question as against ulcer complications,
12 putting aside whether or not you have to read further to
13 find the primary endpoint, if the practitioner simply
14 wanted to know whether or not Celecoxib is statistically
15 significantly better than the pooled NSAIDs on the ulcer
16 complications, that question, you would agree with me,
17 is answered right there on the first page?
18 A. Well, then, I'll read the "conclusion."
19 Q. Just answer my question first.
20 A. But I'm saying I can go -- if you have set little
21 codes for me like people doing Easter egg hunts and you
22 say "Can I go look and find an Easter egg here and can I
23 go find one there" and the answer is "yes," if I know
24 that I'm looking for Easter eggs.
25 Q. Dr. Graham, I think -- and I'm going to ask you

Page 199

1  the question again because --
2  A. And I'm going to give you the same kind of
3  answer.
4  Q. I just -- I want to have a sense of mutual
5  respect here, Dr. Graham: If a doctor wanted to know
6  whether or not Celebrex was statistically significantly
7  better than the pooled NSAIDs on the question of ulcer
8  complications, you would agree with me that the answer
9  to that is on the first page of the JAMA article,
10 correct?
11      MR. SAHAM: Asked and answered.
12 A. Yeah, it says right here -- (witness pointing) --
13 it says "In this study, Celecoxib, at dosages greater
14 than those indicated clinically, was associated with a
15 lower incidence of symptomatic ulcers and ulcer
16 complications combined, as well as other clinically
17 important toxic effects, compared with NSAIDs at
18 standard doses." That's what it says.
19      That's the conclusion that you take home
20 from the message from this paper. That's the conclusion
21 statement. "The decrease in upper GI toxicity was
22 strongest among patients not taking aspirin
23 concomitantly." I mean, you read the conclusion for the
24 conclusion. That's where I get it.
25 Q. (BY MR. DOUGHERTY) I'm focusing on the "Results"

Page 200

1  section, Dr. Graham.
2  A. You're focusing saying there's a P value stuck in
3  there that I can take out of the context of the rest of
4  it and make meaningful and knowing what I know, yes,
5  can do that. At the time, no.
6  Q. But when you saw a P value in the "Results"
7  section that was greater than .05, wouldn't that tell
8  you that this study failed to prove Celecoxib was
9  statistically significantly better?
10 A. And that's why the conclusion says that it is
11 associated with a lower incidence to say "We failed on a
12 study and we only could do some subgroups."
13 Q. Earlier today you said that the only -- from the
14 vantage point of your experience in the field that the
15 only clinically relevant endpoint are ulcer
16 complications?
17 A. Absolutely.
18 Q. And, so, a sophisticated person like you,
19 Dr. Graham, who wants to know "how did this study do
20 against ulcer complications" would be able to tell by
21 doing nothing more than reading the "Results" section
22 that against what you have defined as the most
23 clinically important endpoint "Celebrex failed," right?
24      MR. SAHAM: Object to form.
25 A. I didn't at the time and I haven't read this

Page 201

1  editorial in a couple of years. We could go back and
2  see if the editorial picked it up.
3  Q. (BY MR. DOUGHERTY) We're talking about the JAMA
4  article?
5  A. And we're talking about the editorial to the JAMA
6  article. Did they pick it up that they failed?
7  Q. (BY MR. DOUGHERTY) You testified earlier today
8  that ulcer complications are the only important measure
9  of GI safety in a study like this and that the rest is
10 noise. Those are the words that you used, correct?
11 A. Well, not in all those words. I like it. I
12 should have said that, if I didn't.
13 Q. Okay. And, again, it's obvious to you that --
14 A. Today.
15 Q. Well, did you not see the .09 or appreciate what
16 .09 meant, Dr. Graham?
17 A. I didn't appreciate it in the context of an
18 abstract. In fact, I'm sure there are many papers --
19 several papers of mine written said that this was a
20 successful study.
21 Q. But, Dr. Graham, let's make sure that you're not
22 having it both ways because you, again, took the
23 position earlier today rather strongly -- I don't agree
24 with it, but it's your opinion -- that complicated
25 ulcers are the only clinically relevant information to

51  (Pages 198 to 201)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 202

1  come out of this kind of a trial and that the rest is
2  noise.
3          And so when you read the "Conclusions"
4  section, Doctor, when it's talking about the combination
5  of symptomatic ulcers and ulcer complications, you would
6  have ignored that because it's just noise, right?
7          MR. SAHAM: Objection, form, foundation.
8      A. I should have.
9      Q. (BY MR. DOUGHERTY) Would there be any reason for
10 you to even read any further in this article, given the
11 position that you've taken for the purposes, presumably
12 of this litigation, that anything other than ulcer
13 complication is noise?  There would have been no reason
14 for you to read further, correct?
15         MR. SAHAM: Objection, form.
16     A. There should have been no more reason for me to
17 read further, you know, that -- unfortunately, we are --
18 we tend to trust what our colleagues do, thinking that
19 it's always in good faith and it's been peer-reviewed
20 and the data are reliable and we can take it to the bank
21 and just read it and kind of see, you know, how
22 interesting it is.  As it turns out, that this is not
23 one of those papers.
24     Q. (BY MR. DOUGHERTY) Well, I challenge you on that
25 a little bit further, Dr. Graham.  If you'd just turn to

Page 203

1  the article and go to Figure 2 --
2      A. Where at?
3      Q. -- which presents --
4          MR. SAHAM: Could you -- if we're going to
5  talk about the article, could you give me a copy?
6          MR. DOUGHERTY: Oh, Scott, of course.  I
7  didn't realize you didn't carry one around in your back
8  pocket.  Here, take mine.
9          MR. SAHAM: I'll give it back.  I gave the
10 court reporter the extra one.
11     Q. (BY MR. DOUGHERTY) It's the JAMA article that
12 has been marked previously in this litigation as
13 Exhibit 3.
14         MR. DOUGHERTY: Is that right, Scott?
15         MR. SAHAM: Yeah, Wolf Exhibit 3.
16         MR. DOUGHERTY: Wolf 3.
17     Q. (BY MR. DOUGHERTY) So, let's take a look,
18 Doctor, in light of the position you've taken in this
19 case that complicated ulcers are the only important
20 thing to look at.  Why don't we look at where the
21 results of the study are presented in Figure 2.  Do you
22 understand, Doctor, that Figure 2 contains three
23 different charts, Dr. Graham?
24     A. I can see Figure 2, yes.
25     Q. And do you understand that the three different

Page 204

1  charts present the ulcer complication data on the left
2  and the symptomatic ulcer is an ulcer complications
3  combined on the right?
4      A. Right.
5      Q. Do you see that?  And, so, a person like you, a
6  gastroenterologist, could have easily looked at
7  Figure 2, Table A and seen all patients against ulcer
8  complications shows a lack of statistical significance,
9  right?
10     A. Yeah, but you're saying what I could have done,
11 not -- and maybe what I should have done, but not what I
12 did do at the time.
13     Q. And isn't it --
14     A. And that's a fact.  You know, I stuck with what I
15 did at the time and life's like that.
16     Q. But isn't it true, Dr. Graham, that the reason
17 that you didn't stop reading the JAMA article at the
18 time is because you were actually quite interested in
19 what the data showed beyond the measure of simple ulcer
20 complications and that you're only taking the position
21 now that ulcer complications are the most important
22 because you've been retained as an expert in this case?
23         MR. SAHAM: Objection, form, foundation,
24 argumentative, assumes facts not, incomplete
25 hypothetical.

Page 205

1      A. I think I can show you papers of mine going back
2  for 15 years that makes that same point.
3      Q. (BY MR. DOUGHERTY) Makes what same point?
4      A. That the only significant correlate is ulcer
5  complications and everything else is irrelevant.
6      Q. So it would have been really simple for you,
7  based upon just the two things that we've seen so far,
8  for you to consider this JAMA article to be just noise
9  because the authors were pretty clear that against the
10 only endpoint that you think is clinically relevant
11 Celebrex did not prove statistical significance,
12 correct?
13         MR. SAHAM: Objection, form, foundation,
14 assumes facts not in evidence.
15     A. I had bought into the hypothesis, like many had,
16 and, you know, we got to see the data presented before
17 the paper appeared, et cetera, and learned about it.
18 And I would say that when the paper came out, you
19 skimmed it and kind of accepted what they tell you
20 and --
21     Q. (BY MR. DOUGHERTY) Did you accept that they had
22 told you that they were -- that the -- against ulcer
23 complications that it was not statistically
24 significantly better?
25     A. They didn't make it clear -- clearly that -- what

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 206

1  the protocol was, nor the fact that they had failed to
2  meet their objective and that they were now, you know,
3  data dredging subgroups in order show the data in the
4  best possible light.
5    Q. All right. But for a man who believes that only
6  ulcer complications -- that ulcer complications are the
7  only important data, you would agree with me that the
8  JAMA article clearly displays the results against that
9  measure, correct?
10   A. That's not -- you used the word "clearly," but
11 it -- the data can be identified within the paper.
12   Q. All you've got to do is look at Figure 2, right,
13 even if you don't read the abstract, "agreed"?
14   A. You can find the data.
15   Q. It's not hidden like an Easter egg here in
16 Table 2. It's actually the first set of bars in that
17 entire table, isn't it?
18   A. It's -- you show the table. It's there,
19 self-evident.
20   Q. It is self-evident, isn't it?
21   A. Once you look for it.
22   Q. Well, you would be looking for it because you're
23 the guy that thinks that's the only thing worth looking
24 for, right?
25   A. Right.

Page 207

1    Q. So, it wouldn't have been hard for you to find,
2  would it?
3    A. Must have been.
4    Q. "Must have been"? I'm trying to understand. Are
5  you --
6    A. I mean, I could find you papers where I misquoted
7  this paper.
8    Q. Papers that you wrote that misquote this paper?
9    A. Yeah, the outcome.
10   Q. In fact, you've written papers that focus on the
11 combined endpoint, do you not?
12   A. On what endpoint?
13   Q. The combined endpoint of symptomatic ulcers and
14 ulcer complications?
15   A. Only to say bad things about them, never to say
16 positive things about them. And I can show you those
17 papers going back for years, showing that that's a bad
18 thing. The only primary endpoint that counts is A, B,
19 C.
20   Q. So why would you even spend any time reading an
21 article that's --
22   A. I didn't spend a lot of time or effort. It's
23 just a hypothesis.
24   Q. Let me finish the question. Why would you spend
25 any time reading an article that, according to you, your

Page 208

1  own writings have rejected a combined endpoint and the
2  article is self-evident, that it didn't meet the primary
3  endpoint? Why would you spend any time reading this?
4    A. How do I know what the primary endpoint is? It
5  says here --
6    Q. Well, the only important primary endpoint --
7        MR. SAHAM: Let him finish his answer.
8    Q. (BY MR. DOUGHERTY) -- the only important primary
9  endpoint --
10       MR. SAHAM: Let him finish. You cut him
11 off. Let him --
12   Q. (BY MR. DOUGHERTY) All right. Go ahead.
13   A. I mean, I read you the conclusion. It says
14 Celebrex at dosages greater than, et cetera, et cetera.
15 It's a very positive article.
16   Q. But you believed these complicated ulcers are the
17 only reliable endpoint, correct?
18   A. I believe that and so does the FDA,
19 unfortunately, for them.
20   Q. You believe that these CSUGIE's here are the only
21 reliable endpoint, correct?
22   A. I think they are the reliable endpoint, to
23 distinguish one from another, yes.
24   Q. Is it your testimony in this case that you only
25 read the conclusion of the JAMA article?

Page 209

1    A. I don't remember what I read at the time.
2    Q. Are you going to testify about your recollections
3  of reading the JAMA article in this case?
4    A. Not unless you ask me.
5    Q. You don't intend to testify about that?
6    A. My testimony is going to be related to Dr. Wang's
7  testimony.
8    Q. So, let's just go through this again. You
9  believe that these CSUGIE's are the only reliable
10 endpoint?
11   A. I think that the main problem with NSAIDs is
12 bleeding, perforation, and obstruction; and that for
13 someone to have a safer drug, it has to show that it has
14 a significant effect preventing those complications.
15   Q. And your recollection is that -- well, you're not
16 sure what part of the JAMA article you read or whether
17 you read it all; is that fair?
18   A. That's fair.
19   Q. And, so, after this was published in the year
20 2000, Dr. Graham, you knew that this big study had taken
21 place, correct?
22   A. We knew -- I knew that the big study had taken
23 place and they were out presenting it all over.
24   Q. Well --
25   A. Dr. Goldstein was going around the world giving

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 210

1  talks.
2  Q. Well, are you going to testify about those talks
3  in this trial?
4  A. No.
5  Q. Are you going to talk about -- or testify about
6  any of the company's presentation of the CLASS data,
7  other than what's in this JAMA article?
8  A. No.
9  Q. And you understood even before the company
10  presented the results of the CLASS trial -- I'm assuming
11  you knew the CLASS trial was going on, didn't you?
12  A. Everyone knew the CLASS trial was going on.
13  Q. And it was pretty unprecedented in terms of the
14  number of patients they had in there, correct?
15  A. Well, it wasn't unprecedented. We'd already done
16  the MUCOSA trial which had lots of patients. I mean,
17  this had a big number of patients because they needed a
18  big number of patients to show small differences.
19  Q. Did you know before the JAMA article was
20  published that there was a big number of patients in the
21  CLASS trial? Did you know how big it was?
22  A. I'm sure it was presented here and there, what
23  they were doing --
24  Q. And --
25  A. -- but you just assume it's a lot.

Page 211

1  Q. -- were you eager to see the results of the CLASS
2  trial?
3  A. Well, I -- in the VIGOR trial, everybody was very
4  interested in what was going to happen to those.
5  Q. And you personally were very interested?
6  A. Yes.
7  Q. And when the results of the CLASS trial were
8  presented, did you have to wait to read the JAMA article
9  to know that the study had not shown statistical
10  significance on complicated ulcers?
11  MR. SAHAM: Could you read that back?
12  (Question read back for the record.)
13  MR. SAHAM: Objection, form.
14  A. When I learned that the study had failed was when
15  the FDA made their announcement.
16  Q. (BY MR. DOUGHERTY) In 2001?
17  A. Whenever that was.
18  Q. February 2001?
19  A. Right.
20  Q. So, you knew that this big trial was going on.
21  You knew the VIGOR trial was going on. You were eager
22  to see the results. And you're testifying here today
23  under oath that you didn't know the results of the CLASS
24  trial until February of 2001 when the FDA released its
25  commentary on the results?

Page 212

1  A. I was not aware that it failed, no.
2  Q. That's not my question.
3  Are you testifying here today under oath
4  that you didn't know the results of the CLASS trial
5  against complicated ulcers prior to the FDA's
6  disclosures in February of 2001?
7  A. I just said I did not know that it had failed
8  until the FDA made their disclosure.
9  Q. So, you were not part of any discussions at
10  professional meetings or otherwise discussing the
11  results of the CLASS trial and the fact that it had
12  failed against ulcer complications. You were not part
13  of any of those discussions between March of 2000 and
14  February of 2001?
15  A. I was out of the NSAID business.
16  Q. You were out of the NSAID business?
17  A. Right.
18  Q. But you were still treating patients on NSAIDs,
19  correct?
20  A. Well, some.
21  Q. And you were treating patients, Doctor, who
22  presented to you with ulcer complications as defined in
23  the CLASS trial, correct?
24  A. Well, yeah, we see lots of bleeds.
25  Q. And is it your testimony here today under oath

Page 213

1  that you were unaware of the performance of Celecoxib
2  and the other NSAIDs in the CLASS trial on the issue
3  ever complicated ulcers or CSUGIE's until February of
4  2001?
5  MR. SAHAM: Objection to form, foundation.
6  A. I was aware of the aspirin data, that aspirin had
7  negated the effect.
8  Q. (BY MR. DOUGHERTY) Is it your testimony here
9  today under oath that you were not aware of the primary
10  endpoint of complicated ulcers until February of 2001?
11  A. Right.
12  MR. SAHAM: Objection, form, foundation.
13  Q. (BY MR. DOUGHERTY) Is that what you're saying?
14  A. That's what I said, so you can read it back
15  whenever you want to hear it again.
16  Q. When you say you were out of the NSAID business,
17  I want to make sure I understand that. Did you not
18  attend any professional meetings or conferences of other
19  gastroenterologists between March of 2000 and February
20  of 2001?
21  A. Of course, I attended those.
22  Q. And wasn't the CLASS and VIGOR trials a subject
23  of discussion at those conferences?
24  A. They were often presented, yes; and they were
25  typically presented by the spokesperson for the

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 214

1  companies at that time and with a very positive spin,
2  first announcing typically they had no conflicts of
3  interest, but not in what I would call, in retrospect, a
4  reasonable way.  I mean --
5      Q.  But you didn't --
6          MR. SAHAM:  Let him finish his answer.
7      Q.  (BY MR. DOUGHERTY)  Yeah, go ahead.  Go ahead.  I
8  didn't mean to cut you off.
9      A.  Back in the Misoprostol days, I was one of the
10 spokespersons for Misoprostol.  But when they went with
11 a different company Pharmacia, they decided they didn't
12 need my services because they couldn't control what I
13 said.
14     Q.  Did you know, Doctor, before the JAMA article was
15 published that the CLASS trial was looking at the
16 question of complicated ulcers?
17     A.  Well, they knew that it was modeled on the MUCOSA
18 trial.
19     Q.  I'm not sure that helps answer the question,
20 Doctor.
21     A.  The MUCOSA trial looked at complicated ulcers.
22 It was the first one, the only one.
23     Q.  So, you knew that -- even before the JAMA article
24 was published, you knew that there was a trial out there
25 involving Celebrex and looking at the question of

Page 215

1  complicated ulcers, but that you didn't know the results
2  of that trial until February of 2001?
3      A.  I knew the positive results.  I knew the aspirin,
4  et cetera, and the nice beautiful curves that they like
5  to show.  I mean, they show that stuff all the time.
6  But if they had presented upfront that "We did a study.
7  These were the criteria and the outcome and we failed on
8  that and all we're going to show you is some odd
9  subgroup analysis," they wouldn't have sold 50 dollars
10 more of the drug.
11     Q.  Do you want the jury to believe, Dr. Graham, that
12 you knew that the CLASS trial was looking for
13 complicated ulcers and that you believed that that is
14 the only measure of interest in a trial like the CLASS
15 trial and that you never asked the question between
16 March of 2000 and February of 2001 "How did Celebrex do
17 against complicated ulcers"?  Is that what you want the
18 jury to believe?
19         MR. SAHAM:  Objection, form, foundation,
20 incomplete hypothetical, assumes facts not in evidence.
21     A.  Sure, they believe what they'd like to believe.
22 If you remember, we're dealing with a very positive
23 hypothesis.  We have two studies, two drugs that are
24 running against each other, both have the same
25 hypothesis.  The VIGOR study says, you know, "We won."

Page 216

1  They say, if you like, "We won."
2          And that says the hypothesis is true -- may
3  be true, that COX-2 inhibitors are safer; and there are
4  probably a thousand papers out there that say that the
5  side -- that the events in COX-2 inhibitors are
6  50 percent of that of traditional NSAIDs.  And there are
7  still papers being written that way.  And they're not
8  written that way because the data was cleared, God and
9  everybody, from those -- this study and the other study.
10 They came out, you know, very similar times and similar
11 results and seemed to confirm the hypothesis.
12     Q.  Did you know the results of the VIGOR trial
13 before it was published in the New England Journal of
14 Medicine?
15     A.  Did I see them before or after?  "I don't know."
16     Q.  Did you read the New England Journal of Medicine
17 article at the time it came out?
18     A.  Right.
19     Q.  You did?
20     A.  I read the New England Journal article -- at
21 least looked at the New England Journal article when it
22 came out.
23     Q.  And did you know what the endpoint was from
24 reading the New England Journal of Medicine for the
25 VIGOR trial?

Page 217

1      A.  The New England Journal article explained the
2  endpoints.
3      Q.  And why did you read the article?
4      A.  I read the article because it's one of those
5  things of interest.
6      Q.  Why would it be of interest, Dr. Graham, when the
7  endpoint that was being studied in the VIGOR trial was a
8  combined endpoint of complicated --
9      A.  I didn't agree --
10     Q.  -- and symptomatic ulcers?
11     A.  I don't agree, necessarily with them; but I read
12 them.
13     Q.  Oh, so, you would have continued to read even
14 though the endpoint being studied was not just
15 complicated ulcers?
16     A.  Well, you're going to read it, anyway.
17     Q.  Are you testifying here today under oath that you
18 are interested in reading the results of a paper even if
19 the trial being discuss in that paper did not have a
20 primary endpoint of complicated ulcers, but had a
21 composite endpoint like VIGOR?
22     A.  My wife says I'm a pathologic reader, which means
23 I read cereal bowls and anything around.  And, so, I
24 read, you know.  It's just what we do in medicine.
25     Q.  Are you -- do you want the jury in this case to

55  (Pages 214 to 217)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 218

1  believe, Dr. Graham, that you were in the dark until
2  February of 2001 on whether CLASS had shown a
3  statistically significant advantage for Celebrex over
4  the pooled NSAIDs on complicated ulcers?
5      A. Can you --
6      Q. Do you want the jury to believe that you were in
7  the dark on the answer to that question until February
8  of 2001?
9          MR. SAHAM: Objection, form, vague.
10     A. They can believe that until the FDA came out with
11 their data I felt that this was a positive study, that
12 they had, if you like, at least, in part, confirmed the
13 hypothesis. It wasn't a perfect study -- there's no
14 perfect studies -- but that's what I believed.
15     Q. (BY MR. DOUGHERTY) If you were out of the
16 NSAID business at the time that the JAMA article was
17 published -- well, let me ask you something, Dr. Graham:
18 Do you actually remember ready reading the New England
19 Journal article on the VIGOR trial?
20     A. I remember having it -- I mean getting copies,
21 yes. I don't know if I sat down and read every single
22 word, but I know that I got copies. I mean, you could
23 not get -- not get copies because these two articles
24 they were coming to your office every day and giving you
25 things and drugs, et cetera.

Page 219

1      Q. Were you treating patients between March of 2000
2  and February 2001?
3      A. I've treated patients for -- every day for years.
4      Q. Did you owe your patients an obligation to
5  actually find out the answer to the question of whether
6  or not CLASS had proven Celecoxib being statistically
7  significantly better on ulcer complications than the
8  other NSAIDs? Did you owe that to your patients to know
9  the answer to that question?
10         MR. SAHAM: Objection, form, incomplete
11 hypothetical, foundation.
12     A. I don't think so. I mean, I don't use -- I don't
13 treat patients that require NSAIDs. And when they do
14 require NSAIDs, I take them off of NSAIDs because
15 they've had a complication.
16     Q. (BY MR. DOUGHERTY) You take them off because
17 NSAIDs are toxic, right?
18     A. No, because I see the patients with the
19 complication. So what I do is take them off of NSAIDs.
20     Q. I'm just finding it difficult, Dr. Graham, to
21 accept your testimony that you did not know the
22 results -- the ulcer complication results of CLASS until
23 February of 2001.
24     A. I --
25     Q. Are you standing behind your testimony, sir --

Page 220

1          THE WITNESS: Do you want to read him some
2  of my answers (asking court reporter to read back)?
3      Q. (BY MR. DOUGHERTY) Do you -- let me just finish
4  my question, Dr. Graham.
5      A. This is the last time I'm going to answer same
6  question, okay? You can ask it more, but you got one
7  answer and that is: I agreed that I did not in that
8  time period. And you can ask it 4 more times or 25 more
9  times and you're going to get the same answer.
10     Q. So, you didn't know until February of 2001?
11     A. I did not know it had failed until the FDA
12 presented their data.
13     Q. And do you want the jury to believe, Dr. Graham,
14 that between March of 2000 and February of 2001 when
15 you're listening to the presentation of the CLASS data
16 and for a guy who claims that ulcer complications is the
17 only thing of interest that you didn't raise your hand
18 and ask the question "How did you go against ulcer
19 complications"? Is that what you want the jury to
20 believe?
21         MR. SAHAM: Objection, form, foundation
22 assumes facts not in evidence incomplete hypothetical.
23     Q. (BY MR. DOUGHERTY) Is that what you want the
24 jury to believe?
25         MR. SAHAM: Same objections.

Page 221

1      A. And you've had my answer to all these questions.
2  You can take it as many times as you want. Do you want
3  to read him back my answer (asking the court reporter to
4  read back)?
5      Q. (BY MR. DOUGHERTY) Is that what you want the
6  jury to believe, that you never asked?
7          MR. SAHAM: Same objection.
8      A. You know, if I had asked, that I would remember;
9  and I'm the nasty guy that asks questions like that.
10     Q. (BY MR. DOUGHERTY) You are.
11     A. Yeah --
12     Q. You have a reputation --
13     A. -- right.
14     Q. -- for being a bit of a -- what's the right word?
15     A. Any one you like.
16     Q. "Provocateur"; is that fair?
17     A. Could be, could be.
18     Q. Would you agree that you've been characterized
19 that way?
20     A. I've been asked -- I ask difficult questions --
21     Q. So, here we have a gentleman --
22     A. -- but I tend not to go to places where -- I go
23 to the national meetings and I hear what they say. But
24 where the down and dirty stuff is that the drug
25 companies are putting on, dinners and symposiums, I

56  (Pages 218 to 221)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 222

1  don't go to those.
2      Q. Dr. Graham, here's what I'm -- here's my question
3  to you, sir --
4      A. If it's the same question, the answer's the same.
5      Q. Why don't you give me the courtesy of letting me
6  ask the question?
7      A. Well, why don't you give me the courtesy of
8  asking a different question?
9      Q. I'm just trying to explore --
10     A. I gave you the answer --
11     Q. -- the plausibility of your answer.
12     A. -- and the jury can believe whatever they want.
13  Those are the facts.
14     Q. So, at none of these conferences or presentations
15  did you ever ask a colleague or the presenter, even
16  though you have a reputation for being a provocateur,
17  you never asked how the CLASS trial did on the ulcer
18  complications; is that true?
19         MR. SAHAM: Objection, form --
20     Q. (BY MR. DOUGHERTY) You never asked?
21         MR. SAHAM: -- form, foundation, assumes
22  facts not in evidence, incomplete hypothetical.
23     A. I have no memory of any asking like that.
24  Remember, I'm an HP guy.
25     Q. (BY MR. DOUGHERTY) You testified that your take

Page 223

1  away from the CLASS presentations was positive. Are you
2  saying that you didn't actually try and get behind those
3  presentations at all?
4         MR. SAHAM: Objection, form, foundation,
5  assumes facts not in evidence.
6      Q. (BY MR. DOUGHERTY) I mean, you're not saying
7  that you were gullable and were duped by anything, are
8  you?
9         MR. SAHAM: Same objections, argumentative.
10     A. I must have been.
11     Q. (BY MR. DOUGHERTY) Really? Is that your
12  testimony, that you must have been -- a smart guy like,
13  a provocateur, a guy who knew that these results were
14  out there, that you were fooled?
15         MR. SAHAM: Objection, form, foundation,
16  assumes facts not in evidence.
17         I think we've got to change the tape, John.
18         MR. DOUGHERTY: Yeah.
19         MR. SAHAM: Is this a good break time?
20         THE VIDEOGRAPHER: This is now the end of
21  tape No. 4 of the deposition of Dr. David Graham. We're
22  off the record. The time is, approximately, 3:40.
23         (Whereupon, a recess was taken
24          from 3:40 p.m. to 3:51 p.m.)
25         THE VIDEOGRAPHER: We're now back on the

Page 224

1  record with tape No. 5 of the deposition of Dr. David
2  Graham. The time is, approximately, 3:51.
3      Q. (BY MR. DOUGHERTY) Dr. Graham, you testified
4  that you had some recollection of attending conferences
5  or other talks where the CLASS data was presented prior
6  to February of 2001; is that right?
7      A. Yes.
8      Q. And that your recollection of those presentations
9  was that the outcome of the trial was, generally,
10  positive; is that correct?
11     A. Yes.
12     Q. And, Doctor, do you remember whether those
13  presentations were presenting the combination endpoint
14  of complicated ulcers and symptomatic ulcers?
15     A. Presumably so. I mean, they would present the
16  data, at least, as presented in the paper by the
17  pharmaceutical company. Most of them were probably
18  using pharmaceutical company slides.
19     Q. But, Dr. Graham, you've already testified in this
20  case that you don't believe that symptomatic ulcers and
21  ulcer complications combined is a relevant endpoint to
22  study, correct?
23     A. Right.
24     Q. So, given the fact that you have a recollection
25  of being at presentations where the results of one of

Page 225

1  the largest clinical trials ever done on the question of
2  NSAID versus COX-2's gastrointestinal safety that you
3  took away a positive message even though they were
4  presenting an outcome that you don't even believe is
5  relevant. Is that what you're saying?
6         MR. SAHAM: Could you read that back?
7  Sorry.
8         (Question read back for the record.)
9         MR. SAHAM: Objection to form.
10     A. Yeah, they were focused particularly on the
11  aspirin/non-aspirin story and show that the aspirin/
12  non-aspirin users, the drug, you know, looked, if you
13  like, wonderful. They didn't bother to tell me that in
14  the 6-month data that looked wonderful; and the year
15  data, it looked not wonderful and that that went away.
16  But that was what the FDA had to tell me, too, that the
17  positive things -- the really good-looking positive
18  things disappeared over time. But they're very good
19  about giving a positive spin on the data.
20     Q. (BY MR. DOUGHERTY) My question to you, though,
21  is, sir: When you were at the presentations of the
22  CLASS data before February of 2001 and you took away a
23  positive impression, you were taking away a positive
24  impression of presentations on a combined endpoint that
25  you believe was not relevant, correct?

57 (Pages 222 to 225)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 226

1   A. I don't know what -- I mean that I would take
2  away a positive impression, which is an impression of
3  what they said and what -- you know, did the study work
4  and did they have positive data. And I don't think I
5  was looking at it or caring so much at the time about
6  the individual aspects of the presentation.
7       I wasn't -- the real question was "were you
8  using the drug" and "almost never"; and the other
9  question was "which one was the better choice, Celecoxib
10 or Rofecoxib" and that was the big argument in the
11 world, is which one was the superior drug, not only in
12 the -- since they both said they were safe and had some
13 benefit for patients with -- taking NSAIDs compared to
14 the others.
15      And it came down to other issues like
16 Rofecoxib causing hypertension and edema, kidney changes
17 much more commonly than Celecoxib. And, of course,
18 they had Bextra at the same time, too. So, it's a
19 complicated time when everybody's bringing out new
20 things and we're hearing about Lumiracoxib and other
21 drugs. So this was a time that was going to be the
22 solution to our problems.
23  Q. So for a guy like you when you're hearing
24 presentations and there's a bunch of data coming out all
25 around the same time, wasn't that the time for you to

Page 227

1  actually start paying attention to those results?
2      MR. SAHAM: Objection, form, foundation,
3  incomplete hypothetical.
4   A. Not particularly.
5   Q. (BY MR. DOUGHERTY) And, so, it's true that you
6  weren't actually paying careful attention to what the
7  results were that were being presented before February
8  of 2001 about CLASS?
9   A. I was paying attention to them. And it's like
10 any other gastroenterologist or like a
11 gastroenterologist with a more special interest in the
12 area; but, I mean, it wasn't one that I was going to be
13 out on the road and talk about and have to be the
14 world's expert.
15  Q. In fact, you actually did nothing, Dr. Graham, to
16 investigate the results of the CLASS trial prior to
17 February of 2001; is that correct?
18      MR. SAHAM: Objection, form, foundation --
19  A. I don't understand the question.
20      MR. SAHAM: -- assumes facts not in
21 evidence.
22  Q. (BY MR. DOUGHERTY) You didn't do anything to
23 investigate the results of the CLASS trial prior to
24 February of 2001; is that fair?
25      MR. SAHAM: Same objection.

Page 228

1   A. I don't know what I would do to investigate them.
2   Q. (BY MR. DOUGHERTY) Ask questions, write the
3  company a letter, pull aside a colleague, ask a question
4  about how they did against the only endpoint that you
5  considered to be relevant. You didn't do any of that;
6  is that right?
7       MR. SAHAM: Objection to form, foundation.
8   A. It's a long time ago. I don't know what I did.
9  I know I had a lot of their drug people come see me, but
10 they would -- they had their spiel.
11  Q. (BY MR. DOUGHERTY) So, the answer to my question
12 is you didn't do anything?
13  A. I didn't do anything special.
14      MR. SAHAM: Objection, form, foundation,
15 assumes facts not in evidence.
16  Q. (BY MR. DOUGHERTY) You didn't do anything
17 special, which leads you to testify that it was only in
18 February of 2001 that you learned what the results were
19 versus ulcer complications; is that right?
20      MR. SAHAM: Same objection.
21  A. I'd say that in 2001 I learned that the FDA did
22 not agree with their analysis and felt that -- at least
23 presented that the data they -- the analyses they
24 presented were incomplete or inaccurate and that they
25 weren't going to get their hope for elimination of the

Page 229

1  exclusion based upon CLASS labeling.
2   Q. (BY MR. DOUGHERTY) "Their hope for," the
3  company's hoped for; is that what you're saying?
4   A. Yes. I mean, that was the whole goal to put this
5  money into it, is to get that exclusion removed.
6   Q. Are you going to be offering any testimony in
7  this case about what the company's goals were with
8  CLASS?
9       MR. SAHAM: Form, foundation.
10  A. I don't think the company hid it. That's the
11 reason that they were doing the study, is to get rid of
12 the CLASS labeling.
13  Q. (BY MR. DOUGHERTY) Are you going to be
14 testifying at the trial in this matter about what the
15 company's goals were with CLASS?
16  A. I would give -- I would testify if someone asked
17 me what my impression was, but I don't know what -- I
18 was not privy to their internal documents and their
19 discussions. But they're certainly not crazy and that's
20 what they needed.
21  Q. How did the presentations that you heard on the
22 CLASS data or the JAMA article affect your practice as a
23 gastroenterologist, if at all?
24  A. It didn't.
25  Q. So none of the data presented either in the JAMA

58  (Pages 226 to 229)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 230

1  article or at any of the presentations that you attended
2  had any impact on the way that you practice medicine; is
3  that correct?
4       MR. SAHAM:  Objection, form, foundation.
5   A.  Not that I -- not that I think, no.
6   Q.  (BY MR. DOUGHERTY)  Dr. Graham, you have read the
7  final study report that was submitted to the FDA in June
8  of 2000?
9   A.  Not every word, no.
10   Q.  But you looked at the tables in there and you
11  looked at the comparison between the 6-month and
12  12-month data; is that fair?
13   A.  I looked through the data that was in it, and I
14  looked at the FDA person's analysis.
15   Q.  Okay.  And, so, you were able to see the results
16  at 12 months, correct?
17   A.  I was able to see the results at 12 months.
18   Q.  Okay.  Is it fair to say that the results at 12
19  month, also, didn't impact your practice of medicine in
20  any way?
21       MR. SAHAM:  Form, foundation.
22   Q.  (BY MR. DOUGHERTY)  Go ahead.
23   A.  No -- I mean, it didn't change what I do.  I
24  don't deal with that kind of patient.
25   Q.  So looking at the 6-month data in the JAMA

Page 231

1  article didn't affect your practice of medicine one way
2  or the other and looking at the 12-month data later,
3  again, didn't affect your practice of medicine one way
4  or the other; is that fair?
5       MR. SAHAM:  Objection, form, foundation.
6   A.  It made me increasingly leery of what Pharma does
7  and the honesty that comes from Pharma.
8   Q.  (BY MR. DOUGHERTY)  Doctor, if you can answer my
9  question, please.
10   A.  It affects my practice of medicine to have a
11  diminished opinion of the people who are telling me
12  things and what they write and the papers they give me.
13   Q.  Dr. Graham, I want you to look at me or look at
14  the camera, but just look up and answer this question:
15  Do you want the jury to believe that looking at this
16  12-month data affected your practice of medicine, but
17  looking at the 6-month data did not?
18       MR. SAHAM:  Objection, asked and answered.
19   A.  The 6-month data, if we go back again to the fact
20  that this was a great hypothesis, the data suggested the
21  hypothesis was going to be true.  The 6-month data went
22  along with the hypothesis may be true that asked for
23  data which was this, if you like, ad hoc/post-hoc
24  subgroup analysis seemed very reasonable; and, then, you
25  start having that disappear.

Page 232

1   Q.  (BY MR. DOUGHERTY)  Did the 12-month data impact
2  the way that you practiced medicine, Dr. Graham --
3       MR. SAHAM:  Objection, asked and answered.
4   Q.  (BY MR. DOUGHERTY)  -- "yes" or "no"?
5   A.  Very little affects the way I practice medicine.
6   Q.  So, the answer to my question is seeing the
7  12-month data did not affect the way you practice
8  medicine, correct?
9       MR. SAHAM:  Objection, misstates prior
10  testimony, asked and answered.
11   Q.  (BY MR. DOUGHERTY)  You can answer the question,
12  please.
13   A.  I would think that if they had gotten the best
14  possible result that would also not have influenced the
15  way I practice medicine.
16   Q.  So, the answer to my question for the third time,
17  Dr. Graham, is:  The 12-month data did not impact your
18  practice of medicine, correct?
19   A.  Either way, right.
20   Q.  Your report, Dr. Graham, talks a lot about the --
21  a lot about endoscopic ulcers, right?
22   A.  Yes.
23   Q.  And you'd agree with me that the endoscopic --
24  that endoscopic ulcers are different from symptomatic
25  ulcers confirmed by endoscopy, correct?

Page 233

1   A.  No.
2   Q.  You think those are equivalent?
3   A.  I make the point that you can have ulcers in
4  patients with symptoms and you can have endoscopic
5  ulcers in patients with symptoms; and that in these kind
6  of studies, it's impossible to tell if it's a real ulcer
7  or an endoscopic ulcer.  And it's even more difficult
8  here because what an endoscopic ulcer was or a real
9  ulcer were not defined.
10   Q.  So, for purposes of your opinions in this case,
11  you're treating symptomatic ulcers and endoscopic ulcers
12  as the same?
13   A.  I'm treating symptomatic ulcers as a form
14  probably of mostly endoscopic ulcers.
15   Q.  Dr. Graham, if you could pick up your report,
16  please?
17   A.  Got it.
18   Q.  If you could turn to Page 11 of your report.
19   A.  (Witness complies with request.)  Okay.
20   Q.  On Page 11, you're talking about symptomatic
21  ulcers and you're also talking about endoscopic ulcers.
22  And if you go from the top of the page, third line down,
23  you say "Clinically symptomatic ulcers are a fourth but
24  very problematic type of upper GI NSAID-induced
25  complication."  Do you see that?

59  (Pages 230 to 233)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 234

1    A. Right.
2    Q. And, then, you go on to describe why you think
3 they're problematic; and we'll get to that in a second.
4         But just for purposes of establishing a
5 common vocabulary with you or a common understanding, is
6 it your opinion that clinically symptomatic ulcers are a
7 type of upper GI NSAID-induced complication?
8    A. Can be.
9    Q. They can be. And in your practice are they?
10   A. Can be. Yeah, I see those.
11   Q. And it's not unreasonable for somebody to assume
12 that a clinically symptomatic ulcer is a type of upper
13 GI NSAID-induced complication, correct?
14   A. Correct.
15   Q. And it's not unreasonable for somebody to draw
16 the association between NSAID use and a clinically
17 symptomatic ulcer, correct?
18   A. Well -- and this is when you get wishy-washy or
19 difficult. I pointed out earlier when they were first
20 starting these studies they had put together an advisory
21 group and one of the gurus of NSAID damages, Mike
22 Langman, and Mike said and his group said -- he was
23 working for Merck at the time, I think -- said "how do
24 we tell whether an ulcer, a symptomatic ulcer is
25 clinically relevant or whether it's one of these trivial

Page 235

1 things?"
2         And, so, he said "I'm going to it on size."
3 And he did it on ulcers that, I think, were 3
4 centimeters in the stomach and 2 centimeters in the
5 duodenum and said that would be a reasonable approach in
6 order to identify something that would have clinically
7 significance -- clinical significance and medical
8 significance. That wasn't taken up by any other
9 companies.
10        Now, traditionally after that, it was
11 decided that an ulcer was 3 millimeters with so-called
12 apparent depth and that wasn't -- that could be 3
13 millimeters by half a millimeter -- and that 3
14 millimeter definition actually came from -- the FDA got
15 stuck with this one -- a study I think with Cimetidine,
16 an old Cimetidine study that they wanted to approval for
17 400 milligrams twice a day because Ranitidine had a BID
18 indication. They had a four times a day indication and
19 they knew their drug was very weak.
20        So the product manager made up a new
21 definition of ulcer of 3 millimeters; and he got the FDA
22 to accept it, which stuck the FDA with a 3 millimeter
23 ulcer. So, you'd say what is the absolute minimum
24 definition of an ulcer; and it would be 3 millimeters
25 with apparent depth. Now that's a very, very weak

Page 236

1 definition; and it's going to -- if you look in my
2 atlas, it shows you how that can be wrong, many, if not
3 most of the time.
4         This study had no definition for what an
5 ulcer was or whether -- the definition of a symptomatic
6 was "it was an ulcer you found." Any ulcer you found by
7 definition was symptomatic; otherwise, you want to look
8 at whatever the symptoms were. They could have been
9 rectal bleeding. It still would be a symptomatic ulcer.
10   Q. But they only looked when there was a symptom in
11 the CLASS trial?
12   A. Rectal bleeding was the symptom that you would
13 look.
14   Q. But they only looked when there was a symptom?
15   A. But rectal bleeding would not be a symptom that
16 you would say would be a symptomatic ulcer, but it would
17 fit your definition of a symptomatic ulcer. So, it
18 wouldn't be a symptom of the ulcer. It would be a
19 symptom and an ulcer. It just happened to be the way it
20 works out.
21        So I'm saying that they made a lot of those
22 kind of mistakes by not making definitions. Be that as
23 it may, this is what we're talking about here. So when
24 you say to yourself "symptomatic ulcer," you're thinking
25 something of a size and an importance. And when I see

Page 237

1 one, I'm seeing a great big nasty ulcer that God and
2 everyone would call an ulcer in a patient with symptoms.
3 That is a complicated ulcer with symptoms.
4         A 3 millimeter ditzel in a patient with a
5 little bit of dyspepsia is more than likely completely
6 unrelated and the 3 millimeter little thing has no
7 clinical significance. And you can't tell them apart
8 from the way that they defined them in this study,
9 unless you look at each one individually, like I did and
10 find out that most of them are the little bitty
11 "nothings."
12   Q. Did you actually look at the films?
13   A. They don't have any film.
14   Q. Are you sure?
15   A. They don't have any film that I can see --
16   Q. Okay.
17   A. -- but they do have descriptions.
18   Q. So I want to make sure I understand your
19 testimony right here, because in your report at Page 11
20 you say "The incidence of endoscopic ulcer, whether
21 symptomatic or not, is also subject to bias and
22 manipulation." Do you see that?
23   A. Uh-huh.
24   Q. When you're talking about the incidence of
25 endoscopic ulcer, is that the type of ulcer that was

60  (Pages 234 to 237)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 238

1  being observed in the CLASS trial?
2     A.  Most of them.
3     Q.  And, so, you're saying whether it's symptomatic
4  or asymptomatic that the calling of that as an "ulcer"
5  is subject to bias and manipulation?  Is that what
6  you're saying?
7     A.  No, not the calling of it.  The calling is
8  subject to bias.  I'll give you another good example of
9  the bias.  If you were to take 100 people, normal
10  healthy people asymptomatic and I were to scope them
11  all, how many would have ulcers, "none."
12         And, so, then I put them on placebo and I
13  scope them after four weeks, what proportion have an
14  ulcer, endoscopic ulcer, well, the answer should be
15  "none."  But it's about 8 percent.
16     Q.  What if you put those same people on an NSAID?
17     A.  It's more than 8 percent -- 10 percent.
18     Q.  It sure is more than 8 percent.
19     A.  No, but it's 8 percent when there's nothing
20  there.  There can't be anything there.  Placebo doesn't
21  cause ulcers.  We're talking about big structural
22  abnormalities.  And, so you know there's a background.
23     Q.  Of course.
24     A.  No, no.  Why of course?  Now, if I do that same
25  study --

Page 239

1     Q.  Because NSAIDs aren't the only things that cause
2  ulcers.
3     A.  No, no, we're talking about them and nothing
4  else.  These are normally healthy people.  If I'm doing
5  that study or Frank Lanza's doing that study, experts in
6  this field -- and this has been done.  When the experts
7  did the studies, they find the frequency of ulcers in
8  placebo group, "zero."  When you go out and hire local
9  doctors and you pay them a bunch to do those procedures,
10  "8, 10 percent."  So there's a bias for things being
11  present absent, et cetera, size.  All those kind of
12  things are bias.
13     Q.  But I'm trying to get behind the bias issue.
14     A.  Then --
15     Q.  No.  Wait.  Don't go on yet.
16     A.  I'm going to go on to the part of the bias.
17  Remember, if I give you 200-and -- 2.4 grams of
18  ibuprofen, I'm going to get a lot of these local toxic
19  small things.  I'm not going to see those in Celebrex.
20  They're acute damage caused by the acute toxic injury.
21  So, you have those.
22         And, then, I know that you've got more
23  common symptoms.  So I look more often and I find those
24  things that are otherwise asymptomatic and meaningless.
25  They have to be there, because A goes with B.  So I

Page 240

1  can -- before I start the study, I know I'm going to
2  have -- I'm going to win on this outcome whether or not
3  it's real.  That's what Vioxx did, was try and increase
4  those numbers.
5         They did that less here, but they did it;
6  and they're going to find it the same way.  So, then,
7  you have to go down and look at the ulcer, how big is
8  it, is it meaningful, et cetera, et cetera.  And you can
9  do that, and you'll find out there's a real problem
10  here.
11     Q.  Well, you're not substituting your personal
12  judgment for the judgment of the committee that was
13  adjudicating these events, are you?
14         MR. SAHAM:  Objection, form, foundation.
15     Q.  (BY MR. DOUGHERTY)  I think you've already stated
16  you're not going to testify about that at trial, right?
17         MR. SAHAM:  Objection, calls for a legal
18  conclusion, form,
19     A.  I'm not.
20     Q.  (BY MR. DOUGHERTY)  Okay.  So, I want to get -- I
21  want to separate out the bias and manipulation, because
22  those are loaded terms.  I want to make sure I --
23     A.  I wrote a whole paper on that that you have, a
24  whole paper.
25     Q.  Time out --

Page 241

1     A.  -- full of details.
2     Q.  -- time out.  I want to make sure I understand
3  how you're using these terms in this report, okay?
4     A.  Uh-huh.
5     Q.  You've talked about bias, that there is a
6  definitional bias; is that fair?
7     A.  Right.
8     Q.  So there's a definitional bias and there's also
9  some bias that's introduced by the people that are
10  performing the endoscopy; is that fair?
11     A.  Right.
12     Q.  What other bias?
13     A.  And the other bias is that the asymptomatic
14  damage is going to be more common in the NSAID that --
15  and, particularly, in the ibuprofen group.
16     Q.  So people taking NSAIDs and, in particular,
17  ibuprofen are going to -- based upon the data that we
18  talked about this morning -- are going to have a higher
19  rate of --
20     A.  -- of symptoms and ulcers --
21     Q.  -- of symptoms and ulcers?
22     A.  -- and whether they're related or not.  So,
23  they're going to get more scopes because they have
24  symptoms and they're going to find more ulcers because
25  they're there.

VERITEXT REPORTING COMPANY
(212)  279-9424      www.veritext.com      (212)  490-3430

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 242

1    Q.  Right.
2    A.  But they're not causing symptoms and they're not
3  clinically significant and they don't predict outcome.
4    Q.  But the NSAIDs are causing the ulcers?
5    A.  The NSAID caused -- is what caused an ulcer, but
6  it didn't cause the symptoms and it's got no predictive
7  value.
8    Q.  The NSAID is causing the ulcer that they found?
9    A.  The NSAID caused what they found, but not the
10  symptoms; and it has no predictive value.  And, so,
11  that's why we got away from endoscopic studies.
12    Q.  Let's keep going on bias.  There's a definitional
13  "slash" measurement bias.  There's a bias introduced by
14  the person performing it and their relative expertise.
15  There's a bias introduced by the fact that the patients
16  that you're examining by scope are on NSAIDs, correct?
17    A.  Right.
18    Q.  And NSAID patients are going to have a higher
19  rate of endoscopically-observed ulcers than non-NSAID
20  patients?
21    A.  Well, particularly the ibuprofen.
22    Q.  And particularly the ibuprofen.  All right.  Any
23  other bias that you're referring to in this sentence?
24    A.  Well, then, I'm pointing out in the next sentence
25  that none of this stuff is not standardized.

Page 243

1    Q.  I'm sorry, none of this is --
2    A.  Is not standardized.  It's all arbitrary.
3    Q.  Okay.  Manipulation, I want to -- we're done with
4  bias.  I want to move to your choice of the word
5  "manipulation."  Are you using that word advisedly, in
6  other words, it means something different from bias?
7    A.  Well, it's a form of bias, if you like.  You say
8  that "I know this is going to happen and so, therefore,
9  I can -- you know, if a high dose gives you more,"
10  et cetera, et cetera, so I can predict outcome, whether
11  or not -- if it's true, true, and related.
12    Q.  But you're not suggesting that there was any
13  manipulation in the CLASS trial, are you?
14    A.  They did not, to the best that I know, accept and
15  design saying "This is going to give us -- increase
16  their events and not ours."  They knew that and so
17  they -- you know, they just took us.
18    Q.  So the answer to my question is and -- for
19  example -- in contradistinction to what you described in
20  the VIGOR trial, the CLASS trial, there's no
21  manipulation of the endoscopic ulcer data.  Is that
22  fair?
23    A.  They were much less pushy, yeah.  They were not
24  as smart.
25    Q.  Okay.  Is it reasonable for a physician to draw

Page 244

1  an association between symptomatic ulcers and the
2  development of complicated ulcers?  Is it reasonable?
3    A.  No.
4    Q.  Should they practice medicine as if one can lead
5  to the other?
6    A.  The ulcer complications by and large occur in
7  chronic ulcers and large single ulcers and they're just
8  different than what they typically see.  Now, a skilled
9  endoscopist, a skilled ulcer person can do better; but
10  we don't have those doing these.
11    Q.  Let's talk about the primary care physician.  Is
12  it reasonable for the primary care physician to treat a
13  patient with a symptomatic ulcer to treat them as if
14  they're at risk for a complicated ulcer?  Is that good
15  practice?
16    A.  Today most people when they see something that
17  the endoscopist calls an ulcer is going to stop the
18  NSAID and treat them for the ulcer, no matter what.  So
19  that as Dr.- -- whatever the FDA guy said, you know,
20  that -- and, I mean, it could be another bias and, that
21  is, if people had symptoms and they were at risk, they'd
22  stop the drug and then their risk goes away.  So it
23  would be a benefit to the person to have symptoms.  But
24  I don't think there are any data to support that
25  hypothesis.

Page 245

1      In the old days when we found ulcers we
2  didn't know were there, we didn't even treat them;
3  because we said we didn't know it was there and you
4  found it.  "Doctor Clair Voyant," do you know her?  A
5  famous woman.
6    Q.  I do know Dr. Voyant.
7    A.  Well, she's the one that -- the only one that can
8  predict the future.
9    Q.  So coming back to kind of the real world, because
10  I understand kind of from a clinical trialist
11  perspective the positions that you've taken, but I
12  really want to kind of drill down into the ordinary
13  physician.  Isn't it reasonable for a physician to treat
14  a patient with a symptomatic ulcer as if it's a
15  possibility of them getting a complicated ulcer exists?
16      MR. SAHAM:  Form.
17    A.  Again, a physician -- when -- if a physician
18  sends a patient to get an endoscopy and they say they
19  have an ulcer of any kind, they're going to stop the
20  NSAID and treat that ulcer.
21    Q.  (BY MR. DOUGHERTY)  Because one of the things
22  they don't want to have happen is have that patient
23  develop a --
24    A.  Well, that and they're worried --
25    Q.  -- complicated --

62  (Pages 242 to 245)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 246

1    A.  -- about the symptoms.
2    Q.  Let me finish?
3    A.  They're not worried about the complication,
4  because it's unlikely to occur anyway.  Most ulcers
5  don't -- if you have ulcer disease, okay, that means you
6  have an ulcer there all the time and when they look.
7  Your chances of having a complication is 1 percent per
8  year.
9    Q.  So why even study it in a clinical trial?
10    A.  Huh?
11    Q.  Why even study it in a clinical trial?
12    A.  Well, because those are peptic ulcer disease.
13  Real peptic ulcer disease that's there most of the time
14  has only a 1 percent per year complication.  And so --
15  in fact, in Dr. Chan's study, when they looked at the
16  complicated ulcers and they put them on therapy and then
17  they looked at them again, even the asymptomatic ones
18  frequently still had an ulcer.
19    Q.  Were the endoscopic -- were the symptomatic
20  ulcers observed in the CLASS trial at a rate more or
21  greater than or less than you would expect to see in
22  clinical practice?
23    A.  They're about what you're going to see if you
24  scope people at, you know, intervals.  I mean, they had
25  a -- the rate of complicated ulcer was about what you

Page 247

1  will expect to see.
2    Q.  Among those who were scoped in the CLASS trial,
3  would you expect similar rates of ulcers across all
4  treatment groups?
5    A.  Well, you expect fewer endoscopic ulcers in the
6  Celebrex group, so -- because you expect fewer symptoms
7  and fewer ulcers and so, therefore, you expect if you
8  use that as an outcome to see a difference.
9    Q.  How do you know that?
10    A.  You know that from the endoscopic studies.
11    Q.  The --
12    A.  I can't say that -- I can't say that about
13  Diclofenac, because I don't know about Diclofenac; but I
14  can say that about ibuprofen.
15    Q.  Do you know what the rate was in any of the
16  treatment arms of Class 4 symptomatic ulcers?
17    A.  No, but I know that if I just scoped them all, I
18  would find ulcers in 30, 40, 50 percent.
19    Q.  So when you were answering my question about the
20  differential rate of symptomatic ulcers in CLASS, you
21  were not actually relying on the CLASS data to answer
22  that question.  You were relying on the endoscopic
23  studies that had been done.  Is that fair?
24    A.  The ones you expect from the studies, the data
25  that you have before you start the study.

Page 248

1    Q.  Would looking at the actual rates in the CLASS
2  trial change your opinion?
3    A.  Yeah, I mean they had fewer than if you would
4  have done regular endoscopy, because they didn't do
5  regular endoscopy.
6    Q.  Are the rates of symptomatic ulcers observed in
7  the CLASS trial higher than you would have expected?
8    A.  No, no, I don't -- but I'd have to look at the
9  proportion of the patients who underwent an endoscopy
10  had an ulcer to get the proportion that I expect to know
11  what their proportion is, because you have to be tested
12  to know.  And the data we have are from people who all
13  got tested.
14    Q.  So what -- just as a percentage-wise -- what
15  would you expect the rate of symptomatic ulcers to be in
16  CLASS for the Celebrex treatment arm?
17    A.  If I looked at everybody?
18    Q.  Well, no, in the actual Class data itself.
19  Because they didn't look at everybody, right?
20    A.  Then I don't know what they should be.
21    Q.  Well, what about Diclofenac or ibuprofen, what
22  should they be?
23    A.  It should be relative to the people who underwent
24  endoscopy.  I mean, it should be higher in the ibuprofen
25  than in the Diclofenac, but that's all you know.  I mean

Page 249

1  you can't say what it's going to be because it depends
2  on did the doctor look and that sort of thing.
3    Q.  The question of bias that you discussed before,
4  potential manipulation, wouldn't you expect those
5  factors to -- if those factors were present in the CLASS
6  trial, wouldn't you expect that the rates of symptomatic
7  ulcers in the class trial would be higher?
8    A.  It really depends on your doctors.  You expect
9  them to be -- since it's randomized, you can expect it
10  to be -- because you have more symptoms in the people
11  who are taking ibuprofen, you expect them to be highest.
12  And you have less symptoms in the patients taking
13  Celebrex, you expect them to be lowest.  And you expect
14  Diclofenac to be probably more like Celebrex because
15  it's thought to be a safer drug.
16    Q.  I understand that answer and I appreciate it.
17  What I'm trying to do is get you from those assumptions
18  to what the actual results of CLASS were.  And I'm
19  trying to understand whether or not the actual rates in
20  the CLASS trial were higher, lower, or about what you
21  would expect outside of the clinical trial setting?
22    A.  I can't -- I don't know what I would really
23  expect.  I mean, it's just -- it's hard to know.  I
24  think you could only expect the difference between the
25  three groups, not necessarily what the actual number

63  (Pages 246 to 249)

Page 250

1  would be.
2    Q.  Would you expect to look -- would you expect
3  the -- well, let me put it this way:  Would you expect
4  the symptomatic ulcer rate in the CLASS trial for
5  Celebrex to be greater than, say, 10 percent?
6    A.  Again, it depends on if I looked at everybody, it
7  should be in that range, 10 or 15 percent.  Remember,
8  background is going to be 8 or 9 percent.
9    Q.  The background is going to be 8 or 9 percent?
10    A.  Just because of the flaw in the way they do it.
11    Q.  So, you think because of the bias that you
12  described earlier at a minimum you should see
13  symptomatic ulcer rates in the CLASS data at -- at least
14  8 percent?
15    A.  If you looked at everybody --
16    Q.  Okay.
17    A.  -- but you're not looking at everybody.  The
18  other problem that you have is one more bias in the
19  study, there's a design flaw.  I mean, it was a design
20  flaw that came from their mind.  You see, they -- and we
21  all -- not just they.  They really believed this was
22  going to work.
23        According to the hypothesis of the
24  preliminary data, this should have worked.  And so,
25  therefore, they were willing to take what's called a

Page 251

1  "real life" situation without adding all the biases that
2  the other guys in Rofecoxib did and one of the flaws was
3  that it didn't have to be scoped to get into the study.
4  So there was a portion of patients that already had
5  peptic ulcers because they were taking NSAIDs before
6  they got into the study and they -- that was a flaw
7  that, again, is going to increase the number that
8  they're going to see.  You'd like to have pristine
9  patients going into your study.
10        But they really wanted to be able to say
11  "In a real life situation, ignore everything, ignore
12  aspirin, ignore X, Y, Z, that they had H. Pylori, that
13  they had ulcers in the past.  This is a completely safe
14  drug."  And that's what the hypothesis said.  And they
15  tested that hypothesis.  You've got to give them credit
16  for that.
17    Q.  Let's talk about the rates.
18    A.  It failed.
19    Q.  Let's talk about the rates.  If you assume --
20  when you read your report, you assumed a background rate
21  of about 8 percent as the starting point for all the
22  treatment groups?
23    A.  If you looked at everybody.
24    Q.  Well, you know that they didn't look at
25  everybody?

Page 252

1    A.  So, then, you don't have the numbers.  You don't
2  know what they are.
3    Q.  Okay.  So, would you expect that the rates in the
4  CLASS trial for Celebrex would be above 10 percent?
5        MR. SAHAM:  Objection, form, foundation --
6    A.  I'd have --
7        MR. SAHAM:  -- assumes facts --
8    A.  -- I'd have no way to know.  It could be
9  anything.  It depends on how often they decided to look.
10  I would suspect that they would be less than ibuprofen
11  and probably less or the same with Diclofenac that's all
12  I can say.
13    Q.  (BY MR. DOUGHERTY)  But based upon all your
14  experience, Doctor, and the work that you've done on the
15  endoscopy trials, wouldn't you expect that every single
16  treatment arm is going to have an ulcer -- a symptomatic
17  ulcer rate above 10 percent?
18        MR. SAHAM:  Objection, form, foundation,
19  assumes facts not in evidence.
20    A.  No.  Remember that in a clinical trial is done by
21  gastroenterologists.  So, they're coming back and seeing
22  the gastroenterologist who will scope you because it's a
23  Wednesday.  In this kind of study, they're being seen by
24  a rheumatologists, who's got to refer you over to the
25  gastroenterologist.

Page 253

1        Rheumatologists are very conservative
2  people.  And, so, you've introduced a different
3  mechanism to manage and to decide when to endoscope the
4  patient.  So, you may never see an ulcer just because
5  that's the way rheumatologists are.
6    Q.  I thought you said that you would expect in the
7  CLASS trial the rates of symptomatic ulcers to be
8  similar to the rates that you saw in the endoscopy
9  trials?
10    A.  They would be if I looked.  Remember I'm not
11  looking.  When we did our studies and you'd ask the
12  rheumatologists "how often do you see the real ulcers,
13  big ulcers in your patients" and then they'd say "we
14  never see it."  "How often do they have complications?
15  We never see it."  So, we scope them on that day and
16  15 percent had big ulcers.
17    Q.  But, Dr. Graham, before you can say anything
18  about whether or not the CLASS trial has any bias on the
19  symptomatic ulcer data, wouldn't you need to know the
20  rates, the actual rate?  Wouldn't that be important for
21  your opinion?
22    A.  I'm saying that because they're clinically
23  meaningless findings, typically, and because there's
24  this potential for bias, there's no -- and because that
25  the other three events are all real and life-threatening

Page 254

1  and the reason that we worry about NSAIDs, you know,
2  this is over here.  All this gives you is noise.  It
3  doesn't help you decide this drug, Celecoxib, is better
4  than this drug, which is Diclofenac.
5       MR. DOUGHERTY:  Could you read back my
6  question, please?
7       (Question read back for the record.)
8       MR. SAHAM:  Objection, asked and answered.
9  Q.  (BY MR. DOUGHERTY)  Go ahead, Dr. Graham
10  A.  It would not be important for the opinion that it
11  would -- that as an outcome variable it's subject to
12  bias, "period."  And it's a meaningless outcome
13  variable, et cetera, et cetera, et cetera.  So, it
14  really -- you know, I don't care about the actual
15  numbers.  Meaningless things are meaningless things.
16  Q.  So, you spent all of your time in this report
17  talking about symptomatic ulcers only to say here today
18  that it's all meaningless?
19  A.  Well, no, that's what he spent all of his time
20  about symptomatic ulcers.  So I'm rebutting what he
21  said.
22  Q.  I see.
23  A.  I mean he spent -- that's all he had, I guess.
24  So he spent all of his time about symptoms and ulcers,
25  not important and everybody knows it and, then, you've

Page 255

1  got to be stupid, if you don't believe me.  And that's
2  his report.  So I say "Well, okay.  If that's his
3  report, I'll spend my time saying 'No.'"
4       I mean, he's a very good rat doctor, a good
5  scientist; but he tended to rock symptomatic ulcers.
6  Q.  I see.  So, you want the jury to believe that you
7  can criticize Dr. Wang's report even though you,
8  yourself, have not even done the work to determine what
9  the rate of symptomatic rates were in CLASS?
10       MR. SAHAM:  Objection, form, foundation,
11  assumes facts not in evidence.
12  A.  We know from other similar studies -- many other
13  similar studies what they should be.
14  Q.  (BY MR. DOUGHERTY)  What studies are those?
15  A.  The endoscopic studies.
16  Q.  So, you think that the rates observed in the
17  endoscopy studies should be similar to the rates
18  observed in CLASS?
19  A.  No, the proportion should be similar because you
20  have a different reason to look.  So if you just took
21  the people in the symptomatic -- in the regular studies
22  and you asked only the ones who went and got off of
23  scheduled time endoscopy, it'd probably be similar to
24  that.
25  Q.  Okay.  Doctor, so you're offering opinions

Page 256

1  against Dr. Wang's report -- and, again, we've
2  established that you don't even know what the rates are
3  in CLASS, but you would expect them to be similar to the
4  endoscopy studies; is that right?
5  A.  The actual rates, not the ones they measured.
6  Q.  The actual rates meaning "after"?
7  A.  If it were -- if you asked me -- if I had to
8  predict, if you just asked me to predict, so I would
9  predict -- it's a hypothesis -- that the rates would be
10  the same as the endoscopy studies in the patients who
11  were scoped not at a scheduled time.
12  Q.  The patients in the endoscopy studies who were
13  scoped not at the --
14  A.  Not at the scheduled -- or the off-scheduled
15  because they were symptomatic.
16  Q.  And what would you predict those rates to be?
17  A.  A few percent.
18  Q.  Is that 10 or is that 20?  What is a "few"?
19  A.  I don't know, probably less than 10.
20  Q.  Less than 10?
21  A.  5, something like that; but I don't know.  It's
22  just made-up numbers.
23  Q.  Okay.
24  A.  You could look it up.
25       MR. DOUGHERTY:  Scott, can we take five?

Page 257

1       MR. SAHAM:  Sure.
2       THE VIDEOGRAPHER:  We're now going off the
3  record.  The time is, approximately, 4:35.
4       (Whereupon, a recess was taken
5        from 4:35 p.m. to 4:39 p.m.)
6       THE VIDEOGRAPHER:  Back on the record.  The
7  time is, approximately, 4:39.
8  Q.  (BY MR. DOUGHERTY)  Dr. Graham, in the -- at the
9  time that the -- well, let's do it this way:  In the
10  last ten years, have you received any money from any
11  pharmaceutical companies outside the context of your
12  expert litigation/expert witness work?  And I'm not
13  talking about you personally.  I meant to include in
14  that your lab or your work group.
15  A.  Sure.
16  Q.  And can you just list for us the companies that
17  you've been paid by?
18  A.  Well, I'm a consultant for Otsuka, who makes a
19  breath test for Helicobacter pylori.
20  Q.  Do you have a financial interest in the sales of
21  that breath test?
22  A.  I used to get royalties.  I don't get royalties
23  anymore.
24  Q.  How much have you made off that urea breath test?
25  A.  Well, a lot.

65 (Pages 254 to 257)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 258

1   Q. What's that?
2   A. I don't know, all together, maybe 8 or $900,000.
3   Who knows?  And we've gotten small potato money from
4   different companies, like -- that help sponsor trials,
5   like we got a couple of thousand dollars from Takeda.
6   Q. What's your relationship with Novartis?
7   A. I'm a non-paid consultant to Novartis on their
8   vaccine development.  They've actually spent 2 or $3,000
9   in our lab applying reagents and things.  That's,
10  basically, it.
11  Q. Other than the royalties you received on the
12  Urea breath test and the compensation that you receive
13  in connection with your position at Baylor, do you have
14  any other sources of financial -- do you have any other
15  financial -- any sources of income over the last ten
16  years?
17  A. My wife works.
18  Q. I mean based upon your work?
19  A. Oh, I have other -- we have other patents.  We
20  have a patent on the Norwalk vaccine.  I just had a
21  paper in the New England Journal last week about that.
22  Q. Are you getting royalties on that vaccine?
23  A. Yeah, I've probably gotten 4 or $500.
24  Q. 4 or $500?
25  A. So far.  Come on.  It's only --

Page 259

1   Q. You need a better lawyer, Dr. Graham.
2   A. Well, no, these are all patents that are at --
3   Baylor owns the patents.
4   Q. Baylor does.  Okay.
5   A. We don't own anything personally.
6   Q. I gotcha.
7   A. But everything we do is small potatoes.
8   Q. We talked at the beginning of the deposition
9   about the times that you've been retained and provided
10  expert testimony, and I want to make sure I ask you this
11  question:  Have you been retained as an expert in any
12  other litigation, even if you have not yet submitted a
13  report or testified?
14  A. I've been retained -- they hadn't paid me
15  anything -- for another Canadian one.
16  Q. Another generic drug company?
17  A. It's one that I did before that they settled and
18  now unsettled.
19  Q. Okay.  Any other engagements?
20  A. (Witness nods head.)
21  Q. "No"?
22  A. I usually just say "no."
23  Q. Did you speak with Dr. Patel at any point in
24  connection with your assignment in this case?
25  A. Who?

Page 260

1   Q. Dr. Patel, do you know who he is?
2   A. No.  I mean I know that Patel means "Gujarati."
3   There's about 50,000 of them probably in Houston here,
4   but I don't know "Patel."
5   Q. Derek Patel?
6   A. Huh?
7   Q. Derek Patel, the gastroenterologist, you don't
8   know him?
9   A. I know a lot of gastroenterologists named
10  "Patel."
11  Q. So, I take it, you haven't read Dr. Patel's
12  report submitted on behalf of the Plaintiffs in this
13  case?
14  A. (Witness shakes head.)
15  Q. So, you don't know what the other
16  gastroenterologists that the Plaintiffs have hired
17  has said in this case; is that correct?
18  A. Right.  My sanctity is "to tell the truth."
19  Q. Do you prescribe Diclofenac?
20  A. I don't think I've ever prescribed Diclofenac.
21  Q. Okay.
22  A. You know, it's good for Mickey Mantle, but --
23  Q. Do you know Dr. Moore, whose paper you refer to
24  in your report?
25  A. I've met Dr. Moore, but I don't know him.

Page 261

1   Q. Okay.  And you took issue with the Moore paper in
2   your report; that is correct?
3   A. I wrote an editorial about the Moore paper.  It
4   was actually the Pfizer paper that Moore and those guys
5   rewrote.
6   Q. Yeah, you're critical of that aspect of it,
7   Doctor, and if I can just make sure I understand your
8   criticism.  Your criticism is that Moore was -- Moore's
9   study was funded by the company?
10  A. No, no.  The company went out and got a vendor to
11  write a paper and, then, they gave it to their advisory
12  committee and asked them if they wanted to turn it into
13  a publishable paper.  So, Dr. Moore rewrote it and --
14  into a more publishable paper or what he thought was a
15  more publishable paper.  And the other authors all, at
16  least, read it once.
17      But it was not necessarily a good paper.  It
18  was based upon a compilation of weak correlations and
19  not a carefully reasoned paper.  It was one of those
20  ways a drug company is trying to, you know, get messages
21  across.
22  Q. Well, remember, you're not going to talk about
23  what drug companies are trying to do in this case
24  We --
25  A. Well, about that paper, it was very clear.

66  (Pages 258 to 261)

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 262

1    Q.  But your criticisms of the paper, Dr. Graham,
2  just so we don't have kind of a drive-by character
3  assassination here, your opinions about that paper are
4  based upon the substance of the paper, not the way it
5  was written, correct?
6    A.  It was well written in English, but it was the
7  substance.
8    Q.  You're criticizing the substance of the paper,
9  not the process by which it came to be published,
10  correct?
11    A.  Absolutely.
12        (Discussion off the record.)
13    A.  I don't think Dr. Moore is from here.  I think
14  he's a Brit.
15    Q.  (BY MR. DOUGHERTY)  But that doesn't make him
16  less credible, just because --
17    A.  It makes him less to like when you run into --
18    Q.  An a priori, right?
19    A.  Maybe less like what you see, though.
20    Q.  All right.  Did -- Dr. Graham, did the FDA
21  consult you at all in connection with the labeling on
22  Celebrex?
23    A.  They don't consult people about that sort of
24  thing that I know about.
25    Q.  So, the answer to my question is "no"?

Page 263

1    A.  No.
2    Q.  And are you familiar with the endoscopic ulcer
3  data included in the Celebrex label?
4    A.  I'm -- I'm -- I was in some of the studies.
5    Q.  Excuse me?
6    A.  I participated in some of the studies.
7    Q.  No, I'm talking specifically about the label.
8  Are you familiar with the FDA's conclusion of the
9  endoscopy data in the Celebrex label?
10    A.  I -- I read it once.
11    Q.  Okay.  And are you familiar, sir, with the CLASS
12  data that's included in the Celebrex label?
13    A.  I read it once.  I didn't pay much attention to
14  it.
15    Q.  Are you offering any opinions in this case about
16  the labeling of Celebrex?
17    A.  I'm not going to offer any opinions currently
18  about the labeling of Celebrex.
19    Q.  Either what's in there or what's not in there?
20    A.  Well, they're all highly negotiated statements.
21    Q.  Do you -- as a matter of practice, Dr. Graham, do
22  you pay much attention to the labels of the drugs you
23  prescribe?
24        MR. SAHAM:  Objection, form.
25    A.  Do I pay much attention?  "No."

Page 264

1        MR. DOUGHERTY:  Okay.  Maybe we'll see you
2  again, but thank you for your time, unless Scott has any
3  questions.
4        MR. SAHAM:  No, I think I'll wait.
5        MR. DOUGHERTY:  Wait for trial.  Nice
6  meeting you.
7        THE WITNESS:  You guys aren't going to
8  trial, are you?
9        MR. DOUGHERTY:  Not after today.  I'm
10  teasing you.
11        THE VIDEOGRAPHER:  This is now the end of
12  tape No. 5 of the deposition of Dr. David Graham.  We're
13  off the record.  The time is, approximately, 4:48.
14        (Deposition concluded at 4:48 p.m.)
15        -- SIGNATURE REQUIRED --
16
17
18
19
20        *  *  *  *  *
21
22
23
24
25

Page 265

1        CERTIFICATE OF DEPONENT
2
3        I have read the foregoing transcript of
4  my deposition and except for any corrections or
5  changes noted on the errata sheet, I hereby
6  subscribe to the transcript as an accurate record
7  of the statements made by me.
8
9
10  _____
        DAVID Y. GRAHAM, M.D.
11
12        SUBSCRIBED AND SWORN before and to me
13  this _____ day of _____, 20___.
14
15
16
17  _____
        NOTARY PUBLIC
18
19
20  My Commission expires:
21
22
23
24
25

c6105f33-bf73-43f2-8d74-cddba22a4f76

Page 266

```
1         E R R A T A  S H E E T
2   PAGE  LINE      CORRECTION AND REASON
3   _____ _____ _____
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23
24  _____    _____
25   (DATE)       DAVID Y. GRAHAM, M.D.
```

Page 268

1   all parties and/or the witness shown herein on
2   _____.
3       I further certify that pursuant to FRCP Rule
4   30(f)(1) that the signature of the deponent:
5       ____ was requested by the deponent or a party
6   before the completion of the deposition and that the
7   signature is to be before any notary public and returned
8   within 30 days from date of receipt of the transcript.
9   If returned, the attached Changes and Signature Page
10  contains any changes and the reasons therefore:
11      ____ was not requested by the deponent or a
12  party before the completion of the deposition.
13      I further certify that I am neither counsel for,
14  related to, nor employed by any of the parties or
15  attorneys in the action in which this proceeding was
16  taken, and further that I am not financially or
17  otherwise interested in the outcome of the action.
18      Certified to by me on this, the 27th day of
19  December, 2011.
20
21
22  _____
    Lori A. Belvin, Texas CSR No. 2572
23  Firm Registration No. 521
    Expiration Date:  12-31-2013
24  Notary Public Expiration:  7-10-2014
25

Page 267

```
1          UNITED STATES DISTRICT COURT
2            DISTRICT OF NEW JERSEY
             CIVIL NO. 03-1519 (AET)
                 (Consolidated)
3               CLASS ACTION
4  ALASKA ELECTRICAL PENSION FUND, CITY OF   :
   SARASOTA FIREFIGHTERS' PENSION FUND,
5  INTERNATIONAL UNION OF OPERATING ENGINEERS :
   LOCAL 132 PENSION PLAN, NEW ENGLAND HEALTH :
6  CARE EMPLOYEES PENSION FUND, CHEMICAL
   VALLEY PENSION FUND OF WEST VIRGINIA, and  :
7  PACE INDUSTRY UNION-MANAGEMENT PENSION      :
   FUND, On Behalf of Themselves and All      :
8  Others Similarly Situated,                  :
        Plaintiffs,                            :
9                                              :
   VS.                                         :
10                                             :
   PHARMACIA CORPORATION, FRED HASSAN, G.      :
11 STEVEN GEIS, CARRIE COX, and PFIZER, INC.,  :
        Defendants.                            :
12
13   REPORTER'S CERTIFICATION OF THE ORAL/VIDEOTAPED
        DEPOSITION OF DAVID Y. GRAHAM, M.D.
14           DECEMBER 21, 2011
15
16     I, Lori A. Belvin, a Certified Shorthand
17 Reporter and Notary Public in and for the State of
18 Texas, hereby certify to the following:
19     That the witness, DAVID Y. GRAHAM, M.D., was duly
20 sworn by the officer and that the transcript of the oral
21 deposition is a true record of the testimony given by
22 the witness;
23     That the original deposition was delivered to
24 MR. JOHN CALEB DOUGHERTY, ESQ..
25     That a copy of this certificate was served on
```

Page 269

1   COUNTY OF HARRIS  )
2   STATE OF TEXAS    )
3       I hereby certify that the witness was notified
4   on _____ that the witness has 30 days or
5   (_____ days per agreement of counsel) after being
6   notified by the officer that the transcript is available
7   for review by the witness and if there are changes in
8   the form or substance to be made, then the witness shall
9   sign a statement reciting such changes and the reasons
10  given by the witness for making them;
11      That the witness' signature was/was not returned as
12  of _____.
13      Subscribed and sworn to on this, the _____ day of
14  _____, 2012.
15
16
17
18
19  _____
    Lori A. Belvin, Texas CSR No. 2572
    Firm Registration No. 521
20  Expiration Date:  12-31-2014
    Notary Public Expiration:  7-10-2014
21
22
23
24
25

# EXHIBIT 182

| | |
|---|---|
| **From:** | Wahba, Mona M |
| **Sent:** | Wednesday, May 03, 2000 11:25 PM |
| **To:** | Forster, Eliot R |
| **Subject:** | CBX-0201375_RE: Draft report |

You are right on the money.  we'll let know tomorrow what is the
outcome.

Mona M. Wahba, M.D.
Pfizer Central Research, CRAII
Tel. 860 441 8950
Fax 860 441 3219
Email mona_m_wahba@groton.pfizer.com


-----Original Message-----
From: Forster, Eliot R
Sent: Wednesday, May 03, 2000 3:57 AM
To: Loose, Leland D
Cc: Wahba, Mona M
Subject: FW: Draft report


Leland,

A few comments enclosed int he body of the text.

Generally looks pretty comprehensive. I'm not clear where the line is
drawn between those analyses which were pre-defined by the protocol and
AP and those added (if any) on seeing the data.  If there is a
sdifference this should be stated somewhere in the report.

I would like to see more data supporting the assumption that early
diclofenac withdrawal due to symptoms reduced the potential for more
CSUGIEs in this group as this is central to the agrument about the
differential from celecoxib.

Eliot

-----Original Message-----
From: Loose, Leland D
Sent: 30 April 2000 16:23
To: Wahba, Mona M; Weiner, Ethan; Zwillich, Samuel H; Christesen,
Phyllis M; Finman, Jeffrey; Forster, Eliot R; Frost, R Wayne
Subject: FW: Draft report


Please forward comments to me and I will collate to Searle.  Leland

-----Original Message-----
From: DANIEL R. KNIGHT at Exchange
Sent: Friday, April 28, 2000 4:48 PM
To: Loose, Leland D
Subject: Draft report


Leland,

Good afternoon.  Aimee and Jim asked me to send you an electronic copy
of the



PLAINTIFF'S
EXHIBIT NO. 119
FOR IDENTIFICATION
DATE: 8/18/10 RPTR: TD
PENGAD 800-631-6989

1

draft of the CLASS report, so it is attached to this message.  As I understand,
you will receive the tables by Fed Ex.

I hope all is well in Connecticut (my home state).

Dan

2

Confidential - Subject To Protective Order

DEFS 00122862