COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
ARTHUR C. LEAHY
SCOTT H. SAHAM
LUCAS F. OLTS
MATTHEW I. ALPERT
JENNIFER L. GMITRO
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALASKA ELECTRICAL PENSION FUND, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>PHARMACIA CORPORATION, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-1519 (AET)<br>**(Consolidated)**<br><br>CLASS ACTION<br><br>PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1 |

**CONFIDENTIAL – FILED UNDER SEAL**

686525_1

## A.   The Parties

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 1.   Pfizer is a pharmaceutical company headquartered in New York, New York, whose common stock is listed on the New York Stock Exchange.   Hynes Decl., Ex. 6 (Consolidated Complaint) ¶ 26. 1.[1] | **Undisputed**. |
| 2.   During the Class Period, Pharmacia was a pharmaceutical company headquartered in Peapack, New Jersey, whose common stock was listed on the New York Stock Exchange.  Hynes Decl., Ex. 6 ¶ 25. | **Undisputed**. |
| 3.   On December 19, 1999, St. Louis-based Monsanto Company ("Monsanto") announced its merger with Pharmacia & Upjohn Inc. ("Pharmacia & Upjohn"), a pharmaceutical company based in Peapack, New Jersey. Hynes Decl., Ex. 16.  Pharmacia became the eleventh largest pharmaceutical company in the world, with $10 billion in annual prescription drug sales.  Ex. 15.  The merger took "quite a few months to be implemented."  Hynes Decl., Ex. 17 at 32:18-19. | **Undisputed**. |

---

[1]     Defendants' exhibit citations contained herein refer to the exhibits attached to the Declaration of Michael Hynes in Support of Defendants' Motion for Summary Judgment, dated January 31, 2012 (Dkt. No. 324-1) ("Hynes Decl.").

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 4.      Monsanto launched the arthritis medication Celebrex in 1999 through G.D. Searle & Co. ("Searle"), a Chicago-based subsidiary. *See* Hynes Decl., Ex. 15.  Prior to the merger, Pharmacia & Upjohn was best known for its glaucoma medication, Xalatan, and had no involvement with Celebrex. *Id*. | **Undisputed**. |
| 5.      Approximately two weeks before the start of the Class Period, Defendant Hassan, the former Chief Executive Officer of Pharmacia & Upjohn Inc., became President and Chief Executive Officer of Pharmacia.  Hynes Decl., Ex. 16. | **Undisputed**. |
| 6.      Approximately two weeks before the start of the Class Period, Defendant Cox, formerly a senior executive at Pharmacia & Upjohn Inc., became President of Global Prescriptions at Pharmacia.  Hynes Decl., Ex. 6 ¶ 29. | **Undisputed**. |

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 7.    Prior to the merger of Monsanto and Pharmacia & Upjohn Inc., Defendant Geis was a vice president of drug development for arthritis, inflammation, and pain at Searle. Hynes Decl., Ex. 22 at 6-8 (Geis Tr.). He retained that title following the merger. *See, e.g.*, Hynes Decl., Ex. 12 (Pink Sheet) (quoting "Searle VP-Arthritis Drug Clinical Development Steve Geis"). Later during the Class Period, Dr. Geis became a Global Vice President of Pharmacia. *See* Hynes Decl., Ex. 6 ¶ 28. | **Undisputed**. |
| 8.    On or about April 16, 2003, Pharmacia was acquired by Pfizer, as a result of which, Pharmacia's stock is no longer publicly traded. Hynes Decl., Ex. 5 ¶ 25. On that date, Pharmacia merged with Pilsner Acquisition Sub Corp., with Pharmacia emerging as the surviving entity and a wholly owned subsidiary of Pfizer. Hynes Decl., Ex. 53. | **Undisputed**. |
| 9.    Plaintiffs purport to be pension funds that bought and sold Pharmacia common stock during 2000 and 2001. Hynes Decl., Ex. 6 ¶¶ 19-24. | **Undisputed**. |

686525_1

### B.   <u>Celebrex</u>

| <u>DEFENDANTS' ALLEGED</u><br><u>UNDISPUTED FACTS</u> | <u>PLAINTIFFS' RESPONSE</u> |
|---|---|
| 10.     Celecoxib is the generic name for Celebrex. Hynes Decl., Ex. 1 at 1 (Witter Medical Officer Review). Celebrex is a COX-2 specific inhibitor, a kind of NSAID (nonsteroidal anti-inflammatory drug), and is used primarily to alleviate pain and inflammation caused by arthritis. Hynes Decl., Ex. 6 ¶ 2 (Consolidated Complaint). | **Undisputed**. |
| 11.     After reviewing early Celebrex clinical trial data, the FDA medical officer concluded that the available data "suggest the rate for clinically relevant UGI [upper gastrointestinal] events is less with [Celebrex] than that of traditional NSAIDs." Hynes Decl., Ex. 1 at 2 (FDA Medical Officer Review Executive Summary, July 8, 1998). | **Disputed**:    Hynes Decl., Ex. 1 lacks evidentiary foundation and has not been authenticated.  The quoted statement itself is not accurate.<br><br>**Supporting Evidence**: Ex. 120 (July 7, 2011 Rebuttal Report of David Y. Graham, M.D. ("Graham Rebuttal")) at 9-14, 24-27;[2] Ex. 181 (December 21, 2011 Deposition Transcript of David Y. Graham, M.D. ("Graham Depo.")) at 24:11-13, 47:19-50:22. |

---

[2]     Plaintiffs' exhibits referred to herein are attached to the Declaration of Scott H. Saham in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, unless otherwise noted.

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 12.    The FDA requires that all NSAIDs carry a warning label alerting physicians and consumers to, among other things, the potential gastrointestinal side-effects associated with those medications (the "Standard GI Warning"). Hynes Decl., Ex. 6 ¶ 3 (Consolidated Complaint). | **Undisputed**. |
| 13.    When Celebrex was launched as the first COX-2 specific inhibitor in 1999, its label contained the warning found on non-specific COX inhibitors (i.e., traditional NSAIDs), though with a distinct qualifier: the Celebrex label referenced results from 14 studies showing a lower incidence of clinically significant UGI events with Celebrex versus traditional NSAIDs.    Hynes Decl., Ex. 2. | **Disputed**:    Hynes Decl., Ex. 2 lacks evidentiary foundation and has not been authenticated. The quoted statement itself is not accurate.<br><br>**Supporting Evidence**: Ex. 120 (Graham Rebuttal) at 9-14, 24-27; Ex. 181 (Graham Depo.) at 24:11-13, 47:19-50:22. |
| 14.    To support a supplemental New Drug Application ("sNDA") for FDA approval of revised labeling without the Standard    GI    Warning,    Searle commissioned the Celecoxib Long-Term    Arthritis    Safety    Study ("CLASS"). Hynes Decl., Ex. 6, ¶ 4. | **Undisputed**. |

## C.   The CLASS Study

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 15.   The CLASS study enrolled over eight thousand arthritis patients. Hynes Decl., Ex. 3 at 3 (CLASS Final Study Report, May 25, 2000). | **Undisputed.** |
| 16.   The protocol or design for CLASS specified that Celebrex would be compared to two commonly used traditional NSAIDs, ibuprofen and diclofenac. Hynes Decl., Ex. 6 ¶5. | **Undisputed.** |
| 17.   The trial was designed to continue until the anticipated number of clinically significant UGI adverse events were observed. Hynes Decl., Ex. 4 at 3 (Revised CLASS Clinical Protocol). | **Undisputed.** |
| 18.   The diclofenac protocol called for patient follow-up visits at 4, 13, 26, 39, and 52 weeks after the first dose of study medication. Hynes Decl., Ex. 4 at 20. | **Undisputed.** |
| 19.   The ibuprofen protocol called for patient follow-up-up visits at 4, 13, 26, 39 and 65 weeks after the first dose of study medication. Hynes Decl., Ex. 5 at 4. | **Undisputed.** |

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|

20.     The minimum study period was pre-specified as 26 weeks (six months), and the maximum study participation was 52 weeks for patients taking diclofenac and 65 weeks for patients taking ibuprofen. Hynes Decl., Ex. 4 at 3; Ex. 5 at 3.

**Undisputed**.

21.     The CLASS protocol contemplated both primary and secondary "endpoints," or bases for comparison of Celebrex to ibuprofen and diclofenac. Hynes Decl., Ex. 2 at 14 (FDA Medical Officer Review by James Witter, hereinafter "Witter Medical Officer Review").     The primary endpoint was to be made by reference to the incidence of "ulcer complications" – defined, for purposes of CLASS, as upper gastrointestinal bleeding, perforation or gastric outlet obstruction in patients with osteoarthritis ("OA") or rheumatoid arthritis ("RA"). *Id*.; Ex. 8 at 14 (April 15, 2000 presentation by Fred Silverstein at the American College of Physicians, hereinafter "ACP Presentation").     A secondary pre-defined endpoint was the incidence of "symptomatic ulcers" – defined, for purposes of CLASS, as ulcers identified based on upper gastrointestinal symptoms such as abdominal pain, dyspepsia, nausea, diarrhea or vomiting, and confirmed by endoscopic observation of the gastrointestinal tract. Hynes Decl., Ex. 13 at 1249 (Fred E. Silverstein, et al., *Gastrointestinal*

**Disputed**:  Hynes Decl., Exs. 2 and 8 lack an evidentiary foundation and have not been authenticated. Hynes Decl., Ex. 8 does not reflect what was said during the April 15, 2000 presentation. The CLASS protocols only defined two co-primary endpoints: (1) the traditional definition of CSUGIEs; and (2) the FDA alternative definition of CSUGIEs.  The reporting of a combined endpoint including less serious symptomatic ulcers violated the protocol and was an improper post-hoc presentation of data that violated appropriate scientific reporting.

**Supporting Evidence**:  Exs. 114, 121; Ex. 120 (Graham Rebuttal) at 15-27; Ex. 113 (June 1, 2011 Expert Report of John Abramson, M.D. ("Abramson Report")) at 24-30; Ex. 59 (May 25, 2011 Expert Report of Debra Bowen, M.D., FACAAI ("Bowen Report")) at 15-20; Ex. 72 (May 13, 2011 Expert Report of Nicholas P. Jewell, Ph.D. ("Jewell Report")) at 25-27; Ex. 66 (October 18, 2010 Affidavit of Howard R. Philips ("Philips Affidavit")), Attachments A-D.

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| *Toxicity With Celecoxib vs. Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis*, 284 J. Am. Med. Ass'n 1247-55 (2000), hereinafter the "JAMA Article"). | |
| 22.   The study ran from approximately September 1998 to March 2000. Hynes Decl., Ex. 13 at 1247 (JAMA Article). | **Undisputed**. |
| 23.   The CLASS results showed that Celebrex did not meet the primary endpoint.  Hynes Decl., Ex. 6¶ 46; Ex. 13 at 1254 (JAMA Article); Ex. 8 at 20 (ACP Presentation); Ex. 12 (J.P. Morgan Securities Report dated April 17, 2000); id., Ex. 11 (The Pink Sheet, dated April 24, 2000).  In other words, when considering the entirety of the data, there was no statistically significant difference in the incidence of ulcer complications between the group of patients taking Celebrex and the group of patients taking the NSAIDs. Hynes Decl., Ex. 6 ¶ 46 (Consolidated Complaint); *id.*, Ex. 13 at 1254 *(*JAMA Article); *id.*, Ex. 8 at 20 (ACP Presentation). | **Disputed**:  The fact is not disputed, but plaintiffs do dispute that the JAMA article stated that the primary endpoint was missed. Hynes Decl., Exs. 8 and 11 are hearsay, lack an evidentiary foundation and have not been authenticated.  Hynes Decl., Ex. 8 does not reflect what was said during the April 15, 2000 presentation.  *See also* Plaintiffs' Response to Fact No. 21.<br><br>**Supporting Evidence**: Ex. 30; Ex. 2 (September 22, 2010 Deposition Transcript of Pfizer Vice President Ethan Weiner ("Weiner Depo.")) at 204:19-24; Ex. 23 (January 20, 2011 Deposition Transcript of Pfizer Medical Director Mitchell Gandelman, M.D. ("Gandelman Depo.")) at 82:8-15, 176:10-16. |

686525_1

### D.    Announcement of the CLASS Results

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 24.    On or about April 15, 2000 – approximately five months before publication of the JAMA Article – the results of CLASS were announced at the annual meeting of the American College of Physicians. Hynes Decl., Ex. 6 ¶ 36. Dr. Fred Silverstein publicly disclosed to the audience that the CLASS primary endpoint was ulcer complications. Hynes Decl., Ex. 8 at 14 (ACP Presentation). Dr. Silverstein further publicly disclosed that Celebrex failed to reach statistical significance for ulcer complications for the first six months and that data existed after six months. *Id*. at 20; *see also id*., Ex. 22, 149:21-150:2 (Steven Geis Dep.) ("Fred Silverstein presented numbers related to the 6-month analysis, however, acknowledged that there was data beyond six months. But due to confounding issues related to how this study was conducted, the data beyond six months was not considered valid."). | **Disputed**:  Hynes Decl., Ex. 8 is hearsay, lacks evidentiary foundation, has not been authenticated and is not evidence of the fact asserted. Hynes Decl., Ex. 8 is not evidence of what was said or shown at the presentation. Geis' testimony in this regard turns on his credibility and bias.  *See Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir. 1999) (summary judgment is not allowed where resolution of a factual dispute "turn[s] crucially on the credibility of witnesses' testimony"). Hynes Decl., Ex. 8 at 20 overstates Celebrex's difference with the comparator drugs for ulcer complications, stating that the p value was 0.09 when it was in fact 0.45.<br><br>**Supporting Evidence**: *See* Ex. 21 at 117 (Tables 1-2); s*ee also* Plaintiffs' Supplemental Statement of Disputed Material Facts ("Plaintiffs' Disputed Facts"), ¶¶26-30. |

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|

25.    On April 17, 2000, a press release concerning the results of the CLASS study was issued. *Id.* According to that Release:

> In a landmark study to assess the overall long-term safety of the COX-2 specific inhibitor Celebrex® (celexocib capsules), arthritis patients taking four times the recommended osteoarthritis (OA) dose of the drug experienced fewer symptomatic gastrointestinal (GI) ulcers and ulcer complications than patients taking ibuprofen and diclofenac – a difference that was statistically significant based on a combined analysis of Celebrex® versus these two traditional nonsteroidal anti-inflammatory drugs (NSAIDs). Hynes Decl., Ex. 9 at 1 (April 17, 2000, press release issued jointly by Pharmacia and Pfizer, hereinafter "ACP Press Release").

Plaintiffs agree that Hynes Decl., Ex. 9 is a copy of the "April 17, 2000, press release issued jointly by Pharmacia and Pfizer." The press release was false and misleading for all of the reasons stated in Hynes Decl., Ex. 7. *See also* Plaintiffs' Disputed Facts, ¶¶26-30, 107-114.

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 26.    The ACP Press Release did not claim that CLASS demonstrated that Celebrex was superior to the NSAIDs with respect to the incidence of ulcer complication alone (the pre-specified primary endpoint), and stated that the conclusions were based on the expanded endpoint of the combined incidence of symptomatic ulcers and ulcer complications. *Id.* | Plaintiffs agree that Hynes Decl., Ex. 9 is a copy of the "April 17, 2000, press release issued jointly by Pharmacia and Pfizer." The press release was false and misleading for all of the reasons stated in Hynes Decl., Ex. 7. *See also* Plaintiffs' Disputed Facts, ¶¶26-30, 107-114. |
| 27.    The ACP Press Release also disclosed that CLASS was "an approximately 13-month study" that "included a large number of patients who received four times the recommended [osteoarthritis] dose of Celebrex for up to 13 months." *Id.* at 2-3. | Plaintiffs agree that Hynes Decl., Ex. 9 is a copy of the "April 17, 2000, press release issued jointly by Pharmacia and Pfizer." The press release was false and misleading for all of the reasons stated in Hynes Decl., Ex. 7. *See also* Plaintiffs' Disputed Facts, ¶¶26-30, 107-114. |
| 28.    The April 24, 2000 edition of the *Pink Sheet*, a widely-utilized and publicly-available Pharmaceuticals industry newsletter, reported that although CLASS was a "13-month double-blind . . . trial . . . Data from the first six months of the trial were used for the head-to-head comparison of NSIADs . . . ." Hynes Decl., Ex. 11. This Pink Sheet article also stated that the "rate of serious ulcer complications was the primary endpoint of the study" and that, "while the incidence of [ulcer] complications was cut in half, the difference was not statistically significant, with a p-value of .09." *Id.* | **Disputed**:  Hynes Decl., Ex. 11 is hearsay. |

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|

29.   On May 23, 2000, another press release was issued that reiterated the Company's prior disclosure that CLASS spanned 13 months.  Hynes Decl., Ex. 10 at 2.

**Undisputed**.

30.   On April 17, 2000, J.P. Morgan Securities reported on CLASS that "[f]or the endpoint 'ulcers and complications' . . . Celebrex was statistically superior . . . . However for the higher hurdle, 'complications' only, Celebrex . . . miss[ed] statistical significance . . . .  Unfortunately, this was the predefined 'primary endpoint' of the trial."  Hynes Decl., Ex. 12.

Plaintiffs agree that Hynes Decl., Ex. 12 appears to be a copy of the April 17, 2000 J.P. Morgan analyst report.

### E.    Submission of CLASS Data to the FDA

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|

31.   In June 2000, in connection with Pharmacia's application to the FDA to modify the Standard GI Warning Label for NSAIDs in the Celebrex label, Pharmacia submitted all of the data from CLASS to the FDA. Pharmacia also submitted a "Briefing Document" that set forth its analysis of CLASS data to the FDA Arthritis Advisory Committee ("AAC"), a panel of independent experts tasked with advising the FDA on the proposed modification to the Celebrex label. Hynes Decl., Ex. 24 (CLASS Briefing Document).

**Disputed**:  Defendants did not submit the Briefing Document in June 2000.  They submitted the CLASS Final Report, a 25,000 page document containing raw data as well as analysis.  The Briefing Document was still being reviewed/edited by the company in December 2000.

**Supporting Evidence**:  Exs. 21, 64, 116, 182-183.

- 12 -

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 32.     The Briefing Document, among other things, presented several analyses of the CLASS data, including: (1) an analysis as specified in the original study protocol, that is, based upon data from the entire study period and the original primary endpoint, and (2) an alternative analysis based upon six months of data and the expanded primary endpoint (symptomatic ulcers and ulcer complications).  *Id*. | Plaintiffs agree that Hynes Decl., Ex. 24 appears to be a copy of the company's CLASS Advisory Committee Briefing Document.  This document was not made public until February 6, 2001 when it was posted on the Internet by the FDA. |
| 33.     The Briefing Document explained that the alternative analysis at six months minimized the bias introduced in the CLASS data over time by a disproportionately larger number of patients in the NSAID arms who dropped out of the study for GI events that did not amount to a complicated ulcer: | Plaintiffs agree that Hynes Decl., Ex. 24 appears to be a copy of the company's CLASS Advisory Committee Briefing Document.  This document was not made public until February 6, 2001 when it was posted on the Internet by the FDA. |

> The GI safety data presented are for the six-month treatment timepoint based on the analysis of risk factors prespecified in the protocol. In brief, a disproportionate withdrawal of patients at high risk of an ulcer complication from the entire study was observed after six months (depletion of susceptibles). Additionally, a significantly greater withdrawal of patients on

- 13 -

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| diclofenac for GI intolerance occurred during the initial six months of the study. The withdrawal of patients for GI intolerance prematurely removed a group at high risk for ulcer complications and symptomatic ulcers from the diclofenac treatment arm (informative censoring). | |

*Id*. at 28.

## F.    The JAMA Article

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 34.   On September 13, 2000, Defendant Geis and 15 other doctors and scientists published an article in JAMA regarding the results of CLASS. The article is entitled, "Gastrointestinal Toxicity With Celecoxib vs. Nonsteroidal Anti-Inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis, The CLASS Study: A Randomized Controlled Trial."  Hynes Decl., Ex. 6 ¶ 45 (Consolidated Complaint); Ex. 13 (JAMA Article). | **Undisputed**. |

- 14 -

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 35.   Consistent with the alternative analysis presented in the Briefing Document, the JAMA Article stated that the "Main Outcome Measure" being used was the "[i]ncidence of . . . symptomatic upper GI ulcers and ulcer complications . . . during the 6-month treatment period." Hynes Decl., Ex. 13 at 1247.   On that basis, the article concluded that "[t]he study determined that [Celebrex] when used for 6 months . . . is associated with lower incidence of combined clinical upper GI events than Comparator NSAIDs (ibuprofen and diclofenac) . . . ." *Id.* at 1253-54. The JAMA Article, however, acknowledged that "the rate for ulcer complications did not differ" significantly between the Celebrex patients and the NSAID patients – in other words, that Celebrex failed to demonstrate statistically significant superiority in terms of the primary endpoint. *Id.* at 1254. | **Disputed**:  The JAMA article provided no explanation as to why the six-month data was presented and failed to reveal the existence of the post-six-month data.  The JAMA article did not reference the company's Briefing Document, a document that was not made public until February 6, 2001, when the FDA posted it to its website. The JAMA article also did not mention the supposed bias in the CLASS data, as it was required to do.<br><br>**Supporting Evidence**:  Exs. 30, 64, 66, 125. |
| 36.   The JAMA Article described the duration of study participation as follows: "After a baseline visit, follow-up clinic visits took place at weeks 4, 13, and 26 after the initial dose of medication, and *every 13 weeks thereafter*."   *Id.* at 1248   (JAMA Article) (emphasis added). | **Disputed**:   Plaintiffs agree that Hynes Decl., Ex. 13 appears to be a copy of the JAMA article, but dispute that the JAMA article accurately described study duration. In fact, the JAMA article falsely states: "A total of 4573 patients received treatment for 6 months" and "Main Outcome Measures" looked at adverse events for the "6-month treatment period."<br><br>**Supporting Evidence**: Ex. 30 at 878. |

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 37.    The JAMA Article also discussed (and illustrated with graphs) the six-month results for both the primary endpoint of ulcer complications and the combined endpoint of symptomatic ulcers and ulcer complications.  *Id*. at 1251. | **Disputed**:    The JAMA article did not identify the primary end point of the study. In fact, it misrepresented the "Main Outcome Measures" as the "[i]ncidence of prospectively defined symptomatic upper GI ulcers and ulcer complications (bleeding, perforation, and obstruction) and other adverse effects during the 6-month treatment period."<br><br>**Supporting Evidence**: Ex. 30 at 878; Ex. 2 (Weiner Depo.) at 204:19-24; Ex. 23 (Gandelman Depo.) at 82:8-15; 176:10-16; *see also* Plaintiffs' Disputed Facts, ¶¶26-30, 107-114. |
| 38.    The primary endpoint of CLASS was identified in the statistical analysis section of the article, which disclosed that the sample size calculation was based on the annualized incidence of "upper GI ulcer complications."  *Id*. at 1249. | **Disputed**:    The JAMA article did not identify the primary end point of the study. In fact, it misrepresented the "Main Outcome Measures" as the "[i]ncidence of prospectively defined symptomatic upper GI ulcers and ulcer complications (bleeding, perforation, and obstruction) and other adverse effects during the 6-month treatment period."<br><br>**Supporting Evidence**: Ex. 30 at 878; Ex. 2 (Weiner Depo.) at 204:19-24; Ex. 23 (Gandelman Depo.) at 82:8-15, 176:10-16; *see also* Plaintiffs' Disputed Facts, ¶¶26-30, 107-114. |

### G.   The Release of the Full CLASS Data

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 39.   On December 27, 2000 the FDA announced, through a notice in the Federal Register, that it would hold a public meeting of the AAC on February 7 to consider whether to recommend a labeling change for Celebrex based on CLASS data. *See* Hynes Decl., Ex. 25. The notice also informed the public that the AAC would meet on February 8 to consider a labeling change for Vioxx, an NSAID produced by Merck & Co. *Id*. | **Disputed**:  Hynes Decl., Ex. 25 lacks an evidentiary foundation and has not been authenticated. |
| 40.   On the morning of February 6, 2001, and in advance of the prescheduled February 7 AAC hearing, the FDA posted to its website the Briefing Document and reports by two medical officers employed by the FDA (the "FDA Medical Officers") and a statistician employed by the FDA (the "FDA Statistician"), who analyzed CLASS data from the entire study period that had been submitted to the FDA.   At 10:05 a.m., Bloomberg published an article on its newswire that quoted directly from the FDA Staff Review Documents.   The article included a hyperlink to the website where the FDA had published the Briefing Document along with documents prepared by FDA reviewers earlier that morning. *See* Hynes Decl., Ex. 27. | **Disputed**:  The reference to the Bloomberg article is hearsay and lacks an evidentiary foundation. |

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 41.   The Bloomberg article reported that, according to the FDA reviewers, "the study didn't show significantly fewer stomach problems in patients taking Celebrex . . . than in those taking ibuprofen or diclofenac . . . .  Only by looking at selected parts of the data – a practice discouraged by the agency – was the company able to show a benefit [for Celebrex]." *Id*. | **Disputed**: The reference to the Bloomberg article is hearsay and lacks an evidentiary foundation. |
| 42.   Plaintiffs' expert, Dr. Stephen Feinstein, testified that "prior to the 7 February 2001 FDA's Arthritis Advisory Committee meeting, on or about February 6 2001, reports written by FDA reviewers that contained and analyzed CLASS data from the entire study were posted on the FDA's website. The new information provided to the market was voluminous and complex scientific, medical, and statistical information, but corrected Defendants' prior false or misleading statements about the CLASS study." Hynes Decl., Ex. 28 ¶ 246.  He has further testified that the full CLASS data was not available "until the posting of the FDA reports on February 6, 2001." Hynes Decl., Ex. 46 at 26:19-23; *see also id*. at 26:8-12. | **Disputed**: Hynes Decl., Ex. 28 does not contain the language quoted in Fact No. 42. |

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 43.   Consistent with the graph below, Plaintiffs' and Defendants' experts agree that there was no statistically significant decline in Pharmacia's stock price on February 6.  *See* Hynes Decl., Ex. 49 (Ex. 12 to Feinstein Report, Pharmacia Stock Event Study Results); Ex. 50 ¶ 74 (Lehn Report). | **Disputed**:  There is no evidentiary basis for the included graph.  Neither Dr. Lehn nor any other expert in this case has done any analysis of the intraday stock price movement of Pharmacia for February 6, 2001, nor has any data been submitted into the evidentiary record.  If an analysis had been done similar to that which Dr. Lehn did for Pharmacia's February 8, 2001 intraday stock price movement, it would lack a scientific, as well as an evidentiary, basis as the analysis performed by Dr. Lehn of the Pharmacia intraday data fails to control for market and peer group effects and the noise and errors of intraday price data.  The graph also improperly eliminates the stock price decline at the beginning of the trading day. |
| | **Supporting Evidence**:  *See* Ex. 7 (July 15, 2011 Rebuttal Report of Steven P. Feinstein, Ph.D., CFA ("Feinstein Rebuttal")) at 32-35. |



DEFENDANTS' ALLEGED UNDISPUTED FACTS

PLAINTIFFS' RESPONSE

44.    After the close of trading on February 6, the FDA posted to its website a warning letter addressed to Fred Hassan concerning Pharmacia's "repeated promotional activities that minimize the potentially serious risk of using Celebrex and Coumadin [a common blood thinning medication] concomitantly." Ex. 28.    The letter warned that failure to respond "may result in regulatory action, including seizure or injunction, without further notice." *Id.*

**Disputed**:  Hynes Decl., Ex. 28 appears to be a letter dated February 1, 2001.  Hynes Decl., Ex. 28 does not provide any evidentiary support for the assertion that it was posted on the FDA website.  Hynes Decl., Ex. 28 lacks an evidentiary foundation and has not been authenticated.

45.    On the evening of February 6, the public press reported on Pharmacia's receipt of the warning letter. *See, e.g.*, Hynes Decl., Ex. 29 (Feb. 6 Reuters News Article).

**Disputed**:  Hynes Decl., Ex. 29 is hearsay, lacks any evidentiary foundation and has not been authenticated.

## H.   The February 7, 2001 FDA Arthritis Advisory Committee Meeting

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 46.    Before the market open on February 7, 2001, the FDA published FDA review materials concerning Merck's VIGOR study on Vioxx. Hynes Decl., Ex. 30.   The FDA reviewers also recommended that the cardiovascular risks be added to the Vioxx label, thus signaling to the market for the first time the FDA's possible concerns about the cardiovascular risks associated with Vioxx, a member of the COX-2 inhibitor class of drugs. *Id.* The FDA reviewers recommended against a modification to the Standard GI Warning, although the VIGOR trial had met its primary endpoint. *Id.* at 22-23; Ex. 29 (Feb. 7, 9:03 a.m. Bloomberg News Article, "Merck's Safety Warning Should Remain, FDA Review Says"). | **Disputed**: No evidentiary foundation has been provided for Hynes Decl., Exs. 29 or 30, nor have these documents been properly authenticated.   Hynes Decl., Ex. 29 is hearsay. |
| 47.    As shown in the graph below, Pharmacia stock opened trading at 9:30 a.m. on February 7 at $56.30, $1.35 below the closing price on February 6. | **Disputed**:   No evidentiary support is provided for this assertion.   Defendants' graph also improperly eliminates the $1.50 stock drop that occurred during the morning of February 7.   Dr. Lehn did not analyze Pharmacia's intraday trading for February 7, 2001, thus defendants lack an evidentiary basis for any assertion made in the graph.

**Supporting Evidence:**   Ex. 7 (Feinstein Rebuttal), Ex. 9, refutes defendants' incomplete graph, as follows; *id.* at 32-33. |

## Defendants' Graph

**Pharmacia Corp. 2/7/01 Intraday Stock Price**



Note:  Stock price data represents the last transaction price of a five minute increment.

## Plaintiffs' Graph

**Exhibit-9**
**Pharmacia Pharmaceuticals**
**Intraday Stock Price: 7 Febraury 2001**



Source: TAQ.
Note: For comparison purposes the stock price data represents the last transaction price of each five minute increment.

he

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 48.    In a February 7, 2001 report, J.P. Morgan Securities reported that the FDA Staff Review Documents were "more negative than anticipated, raising the possibility of a contentious Advisory Panel review today." Hynes Decl., Ex. 43 at 1.  The report further explained that, according to the FDA Reviewers, "Pharmacia's analysis of data at only the 26 week [6 month] time point, rather than the 52 week time point, is unjustified and invalid . . . . Both the Gastrointestinal Reviewer [Goldkind] and the Statistical Reviewer [Lu] so strongly disagreed with Pharmacia's analysis of the data at the 26 week time point that both specifically did not discuss or treat those results, focusing instead on their entire discussion on the end-of-study data." *Id*. at 2-3. | **Undisputed**. |
| 49.    On February 7, 2001, the AAC held a public hearing (the "AAC hearing") to consider the results of CLASS in connection with Pharmacia's request to modify the Standard GI Warning on the Celebrex label.  Hynes Decl., Ex. 32 (Feb. 7 AAC Transcript). | **Undisputed**. |

- 23 -

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 50.    At the February 7, 2001 AAC hearing, representatives from Pharmacia and from the FDA staff made presentations to the AAC regarding results of CLASS. *Id*. The presentations made clear that CLASS lasted longer than six months, the original primary endpoint did not include symptomatic ulcers, and when analyzed according to the original protocol, there was no statistically significant difference between Celebrex and the comparator NSAIDs with respect to the primary endpoint. Members of the public were also permitted to attend and comment. *Id*. at 56-60, 104, 108-09, 115, 169-70, 175-76. | **Undisputed**. |
| 51.    At the conclusion of the public hearing, the AAC recommended that the Standard NSAID GI Warning remain in the Celebrex label.  At 2:25 p.m. on February 7, Dow Jones News Service reported the AAC recommendation. Hynes Decl., Ex. 33. | **Disputed**:  To the extent this assertion relies on Hynes Decl., Ex. 33, it is disputed as Hynes Decl., Ex. 33 is hearsay, lacks an evidentiary foundation and has not been authenticated. |
| 52.    As shown in the graph at ¶ 48 *supra*, from 2:20 p.m. to 2:28 p.m. on February 7, Pharmacia's stock price dropped nearly $1.00.  At the close of trading on February 7, Pharmacia's stock was valued at $56.13, $1.52 below the previous day's closing price. | **Disputed**:   The graph at ¶47 lacks any evidentiary support and is inadmissible. |

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 53. The parties' experts agree that the cumulative two-day decline in Pharmacia's stock price on February 6 and February 7 was not statistically significant. Hynes Decl., Ex. 46 at 91:18-24 (Feinstein Dep.); *id*. Ex. 51 ¶ 79 (Lehn Report). | **Disputed**: Plaintiffs' expert has opined that the Pharmacia stock price drop on February 7, 2001 is statistically significant.<br><br>**Supporting Evidence**: Ex. 6 (June 6, 2011 Report on Market Efficiency, Loss Causation, and Damages, Steven P. Feinstein ("Feinstein Report")), Ex. 12. |
| 54. Merck & Co.'s stock price declined on February 7 by $2.51. Hynes Decl., Ex. 35, (Ex. 7 to Feinstein Rebuttal Report). | **Disputed**: Hynes Decl., Ex. 35 is a Newswire article, not Ex. 7 to the Feinstein Rebuttal. To the extent Hynes Decl., Ex. 35 is relied upon to support this assertion, it is disputed as Hynes Decl., Ex. 35 is hearsay, lacks an evidentiary foundation and has not been authenticated. |
| 55. The AAC's recommendation and the substance of the presentations were widely reported in analyst reports and the press. *See, e.g.*, Hynes Decl., Exs. 38-42 (Feb. 7 Bear Stearns Report, Feb. 7 Salomon Smith Barney Report, Feb. 8 CIBC World Markets Report, Feb. 8 UBS Warburg Report, Feb. 8 Credit Suisse First Boston Report). | Plaintiffs agree that multiple analyst reports were published regarding CLASS on February 7 and 8, 2001.<br><br>**Supporting Evidence**: Ex. 4 (June 6, 2011 Rebuttal Expert Report of Dr. Anthony Fiorino in Response to the Expert Report of Dr. Steven P. Feinstein ("Fiorino Rebuttal")), Appendix C; Exs. 5, 86, 89, 184-187. |

## I.   The February 8, 2001 FDA Arthritis Advisory Committee Hearing

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 56.   On February 8, 2001, the AAC reconvened to consider the results of VIGOR in connection with Merck's request to modify the Standard GI Warning on the Vioxx label.  At the conclusion of the hearing, the AAC voted to incorporate positive gastrointestinal data into the Vioxx label.  Dow Jones Newswire reported the vote at 3:06 p.m. Hynes Decl., Ex. 35. | **Disputed**:  Hynes Decl., Ex. 35 is hearsay and cannot be offered for the truth of the matter asserted. |
| 57.   The AAC recommendation was widely reported by securities analysts. Hynes Decl., Exs. 36-37 (Feb. 8 Salomon Smith Barney Report, Feb. 8 CIBC World Markets Report). | Plaintiffs agree that Hynes Decl., Exs. 36, 37 and 38 appear to be copies of analyst reports. |
| 58.   A February 8, 2001 Salomon Smith Barney Analyst Report entitled "Vioxx & Celebrex at FDA (Day 2)" reported that "[Merck's Vioxx] had a good day at FDA.  The FDA committee recommended the inclusion of gastrointestinal safety data on the Vioxx label."  Hynes Decl., Ex. 36. | Plaintiffs agree that Hynes Decl., Exs. 36, 37 and 38 appear to be copies of analyst reports. |
| 59.   A February 8, 2001 CIBC World Markets Report also reported that the AAC "voted to add data to Vioxx's label regarding gastrointestinal safety . . . , handing [Merck] a victory."  Hynes Decl., Ex. 37. | Plaintiffs agree that Hynes Decl., Exs. 36, 37 and 38 appear to be copies of analyst reports. |

## DEFENDANTS' ALLEGED UNDISPUTED FACTS

60.   As shown in the graph below, at the close of trading on February 8, Pharmacia stock was valued at $53.00, $3.13 below the closing price the previous day. In the last hour of trading on February 8, Pharmacia stock declined by approximately $2.40.

## PLAINTIFFS' RESPONSE

**Disputed**:   Dr. Lehn's analysis of the intraday data fails to control for market and peer group effects and the noise and errors of intraday price data.    Moreover, Pharmacia's stock price dropped approximately $2.00 during the morning of February 8, 2001.

**Supporting Evidence**:   Ex. 7 (Feinstein Rebuttal) at 32-35 & Ex. B.



Pharmacia Corp. 2/8/01 Intraday Stock Price

## DEFENDANTS' ALLEGED UNDISPUTED FACTS

61.   As shown in the graph below, on February 8, Merck's stock price increased from $80.85 at the market open to $82.97 at market close.

## PLAINTIFFS' RESPONSE

**Disputed**:  There is no evidentiary basis for the included graph, as neither Dr. Lehn nor any other expert in this case has done any analysis of the intraday stock price movement of Merck, for February 8, 2001 or any other day.  If an analysis had been done similar to that which Dr. Lehn did for Pharmacia's February 8, 2001 intraday

- 27 -

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| | stock price movement, it would lack a scientific, as well as an evidentiary, basis as the analysis performed by Dr. Lehn of the Pharmacia intraday data fails to control for market and peer group effects and the noise and errors of intraday price data.  Dr. Lehn testified that he did no event study or regression analysis regarding Merck's stock price and that he did not even eyeball Merck's price movement as it was not important to his opinions being offered in this case.<br><br>**Supporting Evidence**:  Ex. 7 (Feinstein Rebuttal) at 32-35; Ex. 3 (October 28, 2011 Deposition Transcript of Defendants' Causation Expert Kenneth Lehn ("Lehn Depo.")) at 252:9-19; 254:20-255:3. |

**Merck & Co., Inc. 2/8/01 Intraday Stock Price**



686525_1

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 62.    Plaintiffs' expert has stated that all "artificial inflation" in Pharmacia's stock price dissipated by February 8, 2001.  Hynes Decl., Ex. 27 ¶¶ 251-55, 275 (Feinstein Report). | **Undisputed** to the extent February 8, 2001 refers to the close of trading on that day. |

### J.    Washington Post Article

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 63.    On August 5, 2001, the *Washington Post* published claims by the editors of JAMA that they were unaware that the CLASS results reported in the September 13, 2000 JAMA Article were based on an incomplete data set.  Hynes Decl., Ex. 45. | **Undisputed**. |

### K.    The Revised Warning Label

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 64.    On June 7, 2002, the FDA approved a change to the Celebrex label that incorporated data from CLASS at nine months and based on both the primary endpoint of complicated ulcers and the expanded endpoint of symptomatic ulcers and complicated ulcers combined.  Ex. 52 (June 2002 FDA Talk). | **Disputed**:  Hynes Decl., Ex. 52 lacks an evidentiary foundation and has not been authenticated. |

## L.   The Individual Defendants

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| 65.   At the start of the Class Period, Mr. Hassan's primary focus was implementing the "massive," global merger of Pharmacia and Monsanto. Hynes Decl., Ex. 18 at 52:6-9.   Mr. Hassan had no personal knowledge of or involvement with Celebrex's NDA or the design or statistical methods used in the CLASS study, which predated his instatement as CEO of Pharmacia. *Id.* at 36:21-22. | **Disputed**:  Geis briefed Hassan regarding the entire study CLASS data, including the post 6- month data, days after the merger and prior to the issuance of the April 17, 2000 press release that presented only the truncated more-favorable six-month data set.   Celebrex was Pharmacia's largest selling drug.  Hassan conceded in a June 22, 2000 e-mail that "Celebrex is critical to the success of our company.  It is our leading engine of growth."  Hassan was reportedly very involved in Cox II decisions.  Defendants failed to preserve Hassan's Class Period custodial files, a period for which Hassan testified that he received massive quantities of e-mail.   Hassan's testimony in this regard turns on his credibility and bias. *See Abraham*, 183 F.3d at 287 (summary judgment is not allowed where resolution of a factual dispute "turn[s] crucially on the credibility of witnesses' testimony").  Furthermore, at his deposition Hassan was unable to recall many of the events of this time period, including whether or not he reviewed the April 17, 2000 press release before it went out. |
| | **Supporting Evidence**:  Ex. 8 (December 10, 2010 Deposition Transcript of Pharmacia Vice President Steven Geis ("Geis Depo.")) at 171-74; Ex. 38 (February 22, 2011 Deposition Transcript of CEO of Pharmacia Fred Hassan, Vols. I-II ("Hassan Depo.")) at 9:2-13, 20:8-22:1, 23:17-24:19, 28:2-20, 31:12-32:18, 45:14-25, 54:5-25, |

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| | 56:23-57:10, 64:1-18, 85:23-86:5, 96:8-12, 99:15-100:5, 109:5-18, 136:1-12, 139:23-140:9, 144:4-145:2, 146:14-20, 181:2-19, 182:16-183:11, 188:2-189:2, 192:6-193:10, 193:12-194:7, 197:2-23, 203:23-204:5, 211:24-212:17, 220:11-22, 222:15-223:4, 241:4-23, 244:2-7, 268:6-19; Exs. 20, 34-37, 44, 73-74, 79; Ex. 76 (February 28, 2011 Deposition Transcript of Edward Gramling ("Gramling Depo.")) at 43:18-44:18; Ex. 109 at 314, 351. |
| 66.    Mr. Hassan was informed during an early April 2000 briefing that "a wide spectrum of scientists and physicians . . . all had agreed that th[e] 6-month[] [CLASS data] was the most valid [to be presented]." Hynes Decl., Ex. 22 at 174:3-5. | **Disputed**:  Pharmacia, Pfizer and FDA medical experts, including Pharmacia Medical Director Emilio Arbe and Pfizer scientists Mona Wahba and Samuel Zwillich disagreed that the six-month data was the most valid data.<br><br>**Supporting Evidence**:  Exs. 11-12; Ex. 24 (October 19, 2010 Deposition Transcript of Pharmacia Associate Medical Director of Rheumatology and Pain Emilio Arbe, M.D. ("Arbe Depo.")) at 84-85; Ex. 17 (August 18, 2010 Deposition Transcript of Pfizer Global Candidate Team Leader Leland Loose, Ph.D. ("Loose Depo.")) at 183-85, 216, 224; Ex. 2 (Weiner Depo.) at 122-23, 145; Ex. 69; Ex. 66 (Philips Affidavit), Attachments A-D. |

686525_1

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 67.    On an April 25, 2000 earnings conference call, Mr. Hassan stated: "With Celebrex, we now have exciting new data that shows that Celebrex has a truly exceptional safety profile.  This makes us feel good at a time when other products have been affected by safety concerns."  Hynes Decl., Ex. 20 at 2.  Any reference Mr. Hassan may have made regarding the CLASS data was based on what was presented to him by those involved in its design and execution, on whose scientific judgment he relied.  *Id*. at 55:1-6. | **Disputed**:  Hassan made this statement with actual knowledge of the undisclosed less-favorable post-six-month CLASS results.  Hassan's testimony in this regard turns on his credibility and bias.  *See Abraham*, 183 F.3d at 287 (summary judgment is not allowed where resolution of a factual dispute "turn[s] crucially on the credibility of witnesses' testimony").  Furthermore, at his deposition Hassan was unable to recall this event.  *See* Plaintiffs' Response and Supporting Evidence to Fact Nos. 65 and 66.  **Supporting Evidence**:  Ex. 8 (Geis Depo.) at 170-74; Exs. 34-37, 132; Ex. 38 (Hassan Depo.) at 9:2-13, 20:8-22:1, 23:17-24:19, 28:2-20, 31:12-32:18, 45:14-25, 54:5-25, 56:23-57:10, 64:1-18, 85:23-86:5, 96:8-12, 99:15-100:5, 109:5-18, 136:1-12, 139:23-140:9, 144:4-145:2, 146:14-20, 181:2-19, 182:16-183:11, 188:2-189:2, 192:6-193:10, 193:12-194:7, 197:2-23, 203:23-204:5, 211:24-212:17, 220:11-22, 222:15-223:4, 241:4-23, 244:2-7, 268:6-19; Exs. 20, 40, 73-74, 79; Ex. 76 (Gramling Depo.) at 43:18-44:18; Ex. 109 at 314, 351. |
| 68.    Mr. Hassan did not trade in company stock during the Class Period.  Hynes Decl., Ex. 21 (Hassan Dep., Ex. 405). | **Undisputed**. |

- 32 -

| DEFENDANTS' ALLEGED UNDISPUTED FACTS | PLAINTIFFS' RESPONSE |
|---|---|
| 69.   Prior to the merger of Pharmacia and Monsanto, Ms. Cox had always worked within sales and marketing. Hynes Decl., Ex. 17 at 13:12-20, 97:5-15.  During the Class Period, Ms. Cox served as Pharmacia's senior "sales and marketing" executive, responsible for "managing sales forces" and developing the "overall strategies for products and the promotional approaches." *Id.* at 30:2-13.  Ms. Cox was separated from, and did not control, the research and development group, which was "accountable for reviewing the data and providing what was appropriate to be used" and it was outside her chain of command. *Id.* at 78:24-79:7; 98:17-21. | **Disputed**:  Cox was involved from at least March 17, 2000 with the CLASS rollout strategy.  This strategy included the use of the six-month data at ACP in April 2000 and DDW in May 2000.  Geis presented the entire CLASS study data, including the data beyond six months, to Cox in early April 2000.  Cox's testimony in this regard turns on her credibility and bias.  *See Abraham*, 183 F.3d at 287 (summary judgment is not allowed where resolution of a factual dispute "turn[s] crucially on the credibility of witnesses' testimony").  Furthermore, at her deposition Cox was unable to recall the events in question.<br><br>**Supporting Evidence**:  Ex.44 at 030; Ex. 46 (February 9, 2011 Deposition Transcript of President of Pharmacia Carrie Cox ("Cox Depo.")) at 27:21-28:22, 29:1-15, 31:12-21, 57:2-10, 146:2-147:10, 163:16-166:5, 168:1-16, 222:1-223:4, 288:24-290:6, 341:3-342:2, 353:1-7, 378:20-380:7; Ex. 8 (Geis Depo.) at 171-74; Exs. 34-37. |
| 70.   Ms. Cox sold company stock on three occasions during the Class Period: August 25, 2000; November 2, 2000; and November 7, 2000.  These sales were executed pursuant to a "financial plan and diversification strategy" developed by her financial planner who had been urging her "not to have everything tied up in one company," and at a time when due to merger-related restrictions, Ms. Cox had not had an opportunity to sell for "close to a year." *Id.* at 292:10-293:4; 295:8-9. | **Disputed**:  Cox sold company stock while in possession of material, non-public information, namely the post-six-month CLASS results and the unfavorable diclofenac results.  Cox's testimony in this regard turns on her credibility and bias.  *See Abraham*, 183 F.3d at 287 (summary judgment is not allowed where resolution of a factual dispute "turn[s] crucially on the credibility of witnesses' testimony").  Furthermore, at her deposition Cox was unable to recall these transactions. |

- 33 -

686525_1

| **DEFENDANTS' ALLEGED UNDISPUTED FACTS** | **PLAINTIFFS' RESPONSE** |
|---|---|
| | **Supporting Evidence**: Ex. 8 (Geis Depo.) at 170-74; Exs. 34-37; Ex. 40 at 030; Ex. 46 (Cox Depo.) at 27:21-28:22, 29:1-15, 31:12-21, 57:2-10, 146:2-147:10, 163:16-166:5, 168:1-16, 222:1-223:4, 288:24-290:6, 291:20-24, 341:3-342:2, 353:1-7, 378:20-380:7. |
| 71.   Dr. Geis sold company stock on three dates during the Class Period: August 16, 2000; September 29, 2000; and October 2, 2000.  Hynes Decl., Ex. 23 (Geis Dep., Ex. 264).  These sales were made pursuant to a plan developed by his wealth managers in early 2000. Hynes Decl., Ex. 22 at 242:17-243:9. | **Disputed**:  Geis sold company stock while in possession of material, non-public information, namely the post-six-month CLASS results and the unfavorable diclofenac results.  Geis' testimony in this regard turns on his credibility and bias.  *See Abraham*, 183 F.3d at 287 (summary judgment is not allowed where resolution of a factual dispute "turn[s] crucially on the credibility of witnesses' testimony"). |
| | **Supporting Evidence**: Exs. 51-53; Ex. 34 at 480-81, 514; Exs. 37, 188; Ex. 35 at 874; Ex. 21 at 117-18 (Tables 1-4); Exs. 37, 132. |

DATED:  March 2, 2012

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN

_____
        s/ Peter S. Pearlman
        PETER S. PEARLMAN

686525_1

Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
ARTHUR C. LEAHY
SCOTT H. SAHAM
LUCAS F. OLTS
MATTHEW I. ALPERT
JENNIFER L. GMITRO
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

SCOTT + SCOTT LLP
CHRISTOPHER M. BURKE
MATTHEW P. MONTGOMERY
DAVID H. GOLDBERGER
707 Broadway, 10th Floor
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)

MOTLEY RICE LLC
JOSEPH F. RICE
LANCE OLIVER
JOSHUA C. LITTLEJOHN
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)

Counsel for Plaintiffs

- 35 -

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
2801 Ponce De Leon Blvd., Suite 750
Coral Gables, FL  33314
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiffs