COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
ARTHUR C. LEAHY
SCOTT H. SAHAM
LUCAS F. OLTS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Counsel for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALASKA ELECTRICAL PENSION FUND, et al., On Behalf of Themselves and All Others Similarly Situated, | ) ) ) | No. 03-1519 (AET) **(Consolidated)** |
| Plaintiffs, | ) ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR |
| PHARMACIA CORPORATION, et al., | ) ) ) | FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION |
| Defendants. | ) ) | |

DATE:    January 30, 2013
TIME:    10:00 a.m.
CTRM:   The Honorable
           Anne E. Thompson

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ..........................................................................1

II.  THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS
ACTION SETTLEMENTS ...........................................................5

III.  THE SETTLEMENT IS PRESUMPTIVELY FAIR BECAUSE IT IS
THE PRODUCT OF ARM'S-LENGTH NEGOTIATIONS AND IS
SUPPORTED BY COUNSEL .......................................................9

IV.  AN ANALYSIS OF THE *GIRSH* FACTORS CONFIRMS THAT
THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE........11

    A.  The Complexity, Expense and Duration of This Litigation
Warrant Approval of the Settlement ....................................11

    B.  The Absence of Objections is Evidence of the Reasonableness
of the Settlement.................................................................13

    C.  The Stage of the Proceedings Weighs in Favor of Approval .............14

    D.  The Risks of Establishing Liability Weigh in Favor of Approval......15

    E.  The Settlement Is Reasonable in Light of All the Attendant
Risks of Litigation..............................................................19

V.  THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION.......21

VI.  CONCLUSION ........................................................................23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anixter v. Home-Stake Prod. Co.,*
  77 F.3d 1215 (10th Cir. 1996) ...................................................................21

*Armstrong v. Bd. of Sch. Dirs.,*
  616 F.2d 305 (7th Cir. 1980) ....................................................................10

*Backman v. Polaroid Corp.,*
  910 F.2d 10 (1st Cir. 1990)........................................................................21

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
  603 F.2d 263 (2d Cir. 1979) .....................................................................21

*Bryan v. Pittsburgh Plate Glass Co.,*
  494 F.2d 799 (3d Cir. 1974) .......................................................................7

*Carson v. Am. Brands, Inc.,*
  450 U.S. 79 (1981)........................................................................................7

*Cotton v. Hinton,*
  559 F.2d 1326 (5th Cir. 1977) ..................................................................11

*Eichenholtz v. Brennan,*
  52 F.3d 478 (3d Cir. 1995) ..........................................................................8

*Fickinger v. C.I. Planning Corp.,*
  646 F. Supp. 622 (E.D. Pa. 1986)................................................................7

*Fisher Bros., Inc. v. Mueller Brass Co.,*
  630 F. Supp. 493 (E.D. Pa. 1985)................................................................7

*Fisher Bros. v. Phelps Dodge Indus., Inc.,*
  604 F. Supp. 446 (E.D. Pa. 1985)................................................................6

*Girsh v. Jepson,*
  521 F.2d 153 (3d Cir. 1975) .........................................................8, 11, 14

*Hubbard v. BankAtlantic Bancorp, Inc.,*
  688 F.3d 713 (11th Cir. 2012) ..................................................................19

789884_1

**Page**

*In re Am. Bank Note Holographics, Inc., Sec. Litig.*,
   127 F. Supp. 2d 418 (S.D.N.Y. 2001) ........................................................12, 18

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002) ........................................................................13

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ..................................................................7, 14, 21

*In re Chambers Dev. Sec. Litig.*,
   912 F. Supp. 822 (W.D. Pa. 1995) ................................................................12

*In re Computron Software*,
   6 F. Supp. 2d 313 (D.N.J. 1998) ....................................................................18

*In re Delphi Corp. Sec.*,
   248 F.R.D. 483 (E.D. Mich. 2008) ................................................................10

*In re Gen. Pub. Utils. Sec. Litig.*,
   No. 79-1420, 1983 WL 22362
   (D.N.J. Nov. 16, 1983) ...................................................................................13

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ......................................................................6, 8, 9

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   277 F.3d 658 (3d Cir. 2002) ..........................................................................15

*In re Philips/Magnavox TV Litig.*,
   No. 09-3072 (CCC), 2012 U.S. Dist. LEXIS 67287
   (D.N.J. May 14, 2012) ...........................................................................6, 9, 13

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998) ............................................................................5

*In re Rent-Way Sec. Litig.*,
   305 F. Supp. 2d 491 (W.D. Pa. 2003) ......................................................10, 14

*In re SmithKline Beckman Corp. Sec. Litig.*,
   751 F. Supp. 525 (E.D. Pa. 1990)..................................................................13

- iii -

**Page**

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) ............................................................9, 10

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985),
    *aff'd*, 798 F.2d 35 (2d Cir. 1986)....................................................18

*McCoy v. Health Net, Inc.*,
    569 F. Supp. 2d 448 (D.N.J. 2008)..................................................10

*Phillips v. Scientific-Atlanta, Inc.*,
    No. 10-15910, 2012 U.S. App. LEXIS 18737
    (11th Cir. Sept. 6, 2012) ....................................................................19

*Protective Comm. for Indep. Stockholders of TMT
Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)...........................................................................6

*Robbins v. Koger Props.*,
    116 F.3d 1441 (11th Cir. 1997) .......................................................20

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000) ............................................................17

*Sherin v. Gould*,
    679 F. Supp. 473 (E.D. Pa. 1987).....................................................5

*Stoetzner v. United States Steel Corp.*,
    897 F.2d 115 (3d Cir. 1990) .........................................................8, 13

*Trans World Airlines, Inc. v. Hughes*,
    312 F. Supp. 478 (S.D.N.Y. 1970), *modified*,
    449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363 (1973)....................21

*Varacallo v. Mass. Mut. Life Ins. Co.*,
    226 F.R.D. 207 (D.N.J. 2005) .........................................................10

*Walsh v. Great Atl. & Pac. Tea Co.*,
    726 F.2d 956 (3d Cir. 1983) ..............................................................9

789884_1

Page

*Walsh v. Great Atl. & Pac. Tea Co.*,
  96 F.R.D. 632 (D.N.J.),
  *aff'd*, 726 F.2d 956 (3d Cir. 1983).......................................................................7

*Williams v. First Nat'l Bank*,
  216 U.S. 582 (1910)...........................................................................................5

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78j(b)..........................................................................................................15, 17

Federal Rules of Civil Procedure
  Rule 23(e) ....................................................................................................1, 6, 8

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Alaska Electrical Pension Fund ("Alaska"), City of Sarasota Firefighters' Pension Fund ("Sarasota"), International Union of Operating Engineers Local 132 Pension Plan ("Local 132"), New England Health Care Employees Pension Fund ("New England"), and PACE Industry Union-Management Pension Fund ("PACE") (collectively, "Lead Plaintiffs") respectfully submit this memorandum in support of their motion for final approval of the settlement of this class action for $164,000,000 in cash and approval of the Plan of Allocation of settlement proceeds. The terms of the settlement are set forth in the Stipulation of Settlement dated as of October 5, 2012 (the "Stipulation"). Dkt. No. 321.[1] Lead Plaintiffs and their counsel believe that the settlement is an excellent result for the Class and merits the approval of the Court.

## I.   INTRODUCTION

This case has been vigorously litigated for nearly ten years, and at the time the parties reached an agreement-in-principle, was only weeks away from trial. At every stage of the litigation, counsel for Defendants asserted aggressive defenses and expressed their belief that Lead Plaintiffs would not prevail on the claims asserted. By the time the settlement was reached, Lead Plaintiffs had (a) reviewed and analyzed

---

[1]     Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in the Stipulation. The Stipulation was previously provided to the Court in connection with Lead Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement. Dkt. No. 386.

789884_1

over 4.2 million pages of documents produced by Defendants and third parties, (b) deposed or defended 39 fact witnesses, (c) deposed or defended 12 expert witness in the complex areas of gastroenterology, the standard of care in clinical trial development and reporting, regulatory approval of pharmaceutical products, statistics, loss causation, and damages, (d) litigated multiple complex discovery motions, (e) responded to two summary judgment motions and one motion for judgment on the pleadings, (f) successfully appealed to the United States Court of Appeals for the Third Circuit an adverse summary judgment ruling regarding the statute of limitations, and (g) comprehensively prepared for trial.  Further, the parties participated in two in-person mediation sessions with Judge Layn R. Phillips (Ret.), a nationally recognized and well-respected mediator, and with the assistance of Judge Phillips, worked tirelessly to negotiate this settlement.

As discussed herein and in the Declaration of Scott H. Saham in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds, and Award of Attorneys' Fees and Expenses and Plaintiffs' Expenses ("Saham Decl."), Lead Plaintiffs faced significant risks in proceeding to trial and obtaining a favorable jury verdict but have, nonetheless, obtained an excellent result for the Class.[2]

---

[2]    The Saham Declaration contains a detailed description of the history of the litigation, including the claims asserted, the proceedings during the course of the

Though Lead Plaintiffs believed that the evidence would support a denial of Defendants' pending summary judgment motion and would allow them to prove their claims at trial, Lead Plaintiffs were also cognizant of the fact that there were many risks and uncertainties in proving the case and that Defendants aggressively opposed each and every claim asserted by Lead Plaintiffs throughout the litigation – and would have surely continued to do so at trial and on appeal if Lead Plaintiffs were successful. For instance, Defendants argued that the statements they made regarding the Celecoxib Long-term Arthritis Safety Study ("CLASS") results were all technically accurate and therefore were not false and misleading, and that those statements were not made with fraudulent intent (or "scienter") because Defendants relied on "company scientists and statisticians." Saham Decl., ¶9. According to Defendants, Lead Plaintiffs could at best establish that there was a "good-faith" dispute over how to interpret the scientific data, which would be insufficient to establish scienter. *Id.* Although Lead Plaintiffs disputed Defendants' assertions, Defendants offered both evidence and legal arguments to bolster their arguments at summary judgment and the defenses they would have asserted at trial.

The parties also vigorously disputed the issues of loss causation and the amount of any damages suffered by the Class. Defendants pointed to the fact that the post-six-

---

litigation, the investigation and discovery undertaken, the settlement negotiations, and the substantial risks of continued litigation.

- 3 -

month CLASS data had been published on the U.S. Food and Drug Administration ("FDA") website on February 6, 2001, with little initial market reaction. Defendants further argued that a variety of factors other than disclosure of the entire CLASS data caused Pharmacia's stock price declines on February 7 and 8, 2001. Defendants put forward expert testimony in support of their claim that this decline was unrelated to the alleged fraud and was, instead, the result of a FDA decision to grant a positive label change to Vioxx, one of Celebrex's competitor drugs. Saham Decl., ¶10. While Lead Plaintiffs disputed these contentions with evidence and expert testimony of their own, there was a substantial risk of recovering limited or no damages if the Court, at summary judgment or in a pretrial ruling, or a jury after hearing the evidence at trial, agreed with *any* of Defendants' arguments regarding causation or the scope of damages.

Lead Plaintiffs' claims not only involved complex legal issues, they also involved difficult medical and scientific issues. Both Lead Plaintiffs and Defendants retained experts in the areas of gastroenterology, the standard of care in clinical trial development and reporting, regulatory approval of pharmaceutical products, and biostatistics. Accordingly, even if Lead Plaintiffs prevailed at summary judgment, a trial would no doubt turn into an extremely complex "battle of the experts" whereupon the jury would be forced to decide complex scientific and economic issues based on the intricate testimony of expert witnesses. This created the possibility that the Class would receive nothing at trial as a result of the jury finding in favor of Defendants.

- 4 -

Accordingly, based on factors which included, among other things, a complete analysis of the evidence, including the expert testimony, the legal and factual issues, as well as the risks of this action, Lead Counsel, who have extensive experience in prosecuting securities class actions, have concluded that the $164,000,000 settlement is an excellent result and clearly in the best interests of the Class. Significantly, Lead Plaintiffs, who were appointed by the Court and actively involved in this litigation, fully support this conclusion and also believe the settlement represents an outstanding recovery on behalf of the Class. *See* accompanying declarations of Gregory R. Stokes for Alaska, Thomas J. Broom for Sarasota, Tommy Plymale for Local 132, Cassandra Cloud for New England, and Maria Wieck for PACE; and also the accompanying declaration of Class Representative Scott Brewer for Chemical Valley Pension Fund of West Virginia. For the reasons set forth herein, Lead Plaintiffs and the Class Representative and their counsel respectfully submit that the proposed settlement is eminently fair, reasonable and adequate to the Class, and should be approved by the Court. Moreover, the Plan of Allocation of settlement proceeds is based on a reasonable theory of damages and is also fair, reasonable, and adequate.

## II.   THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS

It is well settled that "[c]ompromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 317 (3d Cir. 1998); *Sherin*

- 5 -

*v. Gould*, 679 F. Supp. 473, 474 (E.D. Pa. 1987).  This is especially true here, as "settlement of litigation is especially favored by courts in the class action setting." *In re Philips/Magnavox TV Litig.*, No. 09-3072 (CCC), 2012 U.S. Dist. LEXIS 67287, at *23 (D.N.J. May 14, 2012).  Settlement spares the litigants the uncertainty, delay and expense of a continued trial and appeals while simultaneously reducing the burden on judicial resources.

Federal Rule of Civil Procedure 23(e) provides that a class action shall not be dismissed or compromised without the approval of the court.  *See also In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995) ("*GMC Trucks*").  In a class action, the "court plays the important role of protector of the [absent members'] interests, in a sort of fiduciary capacity." *Id.* at 784.  The ultimate determination whether a proposed class action settlement warrants approval, resides in the court's discretion.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).

While this Court has discretion to approve the settlement, it should be hesitant to substitute its judgment for that of the parties who negotiated the settlement. *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985).  "Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the

settlement. They do not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981);[3] *Walsh v. Great Atl. & Pac. Tea Co.*, 96 F.R.D. 632, 642-43 (D.N.J.), *aff'd*, 726 F.2d 956 (3d Cir. 1983). The court may rely on the judgment of experienced counsel and should avoid transforming the hearing on the settlement into a trial on the merits. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 804 (3d Cir. 1974); *Walsh*, 96 F.R.D. at 642.

In determining the adequacy of a proposed settlement, a court should ascertain whether the settlement is within a range that responsible and experienced attorneys could accept, considering all relevant risks. *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 630 (E.D. Pa. 1986). That analysis "'recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'" *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985). In sum, the court must determine whether the proposed settlement is "fair, reasonable, and adequate." *In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001).

---

[3] Citations are omitted and emphasis is added unless otherwise noted.

789884_1

In *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), the Third Circuit advised district courts to consider the following factors (hereinafter the "*Girsh* factors") in deciding whether to approve a proposed settlement of a class action under Rule 23(e):

> "(1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . ."

*Id.* at 157. *See also GMC Trucks*, 55 F.3d at 782; *Eichenholtz v. Brennan*, 52 F.3d 478, 488 (3d Cir. 1995); *Stoetzner v. United States Steel Corp.*, 897 F.2d 115, 118 (3d Cir. 1990).

As set forth below and in the Saham Declaration, the settlement is an excellent result, is presumptively fair, reasonable and adequate, and clearly satisfies the *Girsh* factors. Substantial doubt exists as to whether any recovery could have been obtained against Defendants in the absence of settlement, especially in light of Defendants' claims that they relied on scientists and statisticians whom they considered well qualified in their fields to evaluate the CLASS results and that only a good faith dispute existed over how to interpret and report the results. Moreover, Lead Plaintiffs faced serious hurdles in proving loss causation and the scope of any damages suffered by the Class. Defendants, through their causation and damage expert, continually pointed to the fact that the post-six-month CLASS data was publicly reported on the

- 8 -

FDA website on February 6, 2001, with little initial market reaction, and that the significant stock price decline that occurred two days later on February 8, 2001 was the result of other factors completely unrelated to the alleged fraud, including positive news regarding Vioxx, Celebrex's main competitor drug which was manufactured by another company. Given these facts, the settlement is superior to another very real possibility – a protracted and expensive trial potentially resulting in little or no recovery.

## III.  THE SETTLEMENT IS PRESUMPTIVELY FAIR BECAUSE IT IS THE PRODUCT OF ARM'S-LENGTH NEGOTIATIONS AND IS SUPPORTED BY COUNSEL

A proposed class action settlement is considered presumptively fair, where, as here, the parties, through capable counsel informed by meaningful discovery, have engaged in arm's-length negotiations. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004); *GMC Trucks*, 55 F.3d at 785; *Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 965 (3d Cir. 1983); *See also Philips/Magnavox TV*, 2012 U.S. Dist. LEXIS 67287, at *22-*23 ("a presumption of fairness exists where a settlement has been negotiated at arm's length, discovery is sufficient, the settlement proponents are experienced in similar matters, and there are few objectors"). This action was fiercely contested for nearly ten years, and an agreement-in-principle to resolve this action was only reached after the parties were weeks away from a jury trial on the merits and fully informed concerning the merits and risks. The settlement resulted from arm's-length negotiations between highly experienced and

- 9 -

capable counsel after comprehensive discovery with the substantial assistance of former federal District Court Judge Layn R. Phillips (Ret.), a nationally recognized mediator. *See In re Delphi Corp. Sec.*, 248 F.R.D. 483, 498 (E.D. Mich. 2008) (recognizing "the outstanding work done by Judge Phillips" in settlement negotiations and noting "the added benefit of the insight and considerable talents of [this] former federal judge who is one of the most prominent and highly skilled mediators of complex actions"). Indeed, Lead Plaintiffs negotiated vigorously to benefit the Class with a firm understanding of the strengths and weaknesses of Lead Plaintiffs' claims and the significant risks of proceeding with the trial.

"[T]he court is [also] entitled to rely heavily on the opinion of competent counsel." *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 325 (7th Cir. 1980). Plaintiffs' counsel's "assessment of the settlement as fair and reasonable is entitled to considerable weight." *In re Rent-Way Sec. Litig.*, 305 F. Supp. 2d 491, 509 (W.D. Pa. 2003); *Warfarin*, 391 F.3d at 535 (a presumption of fairness exists where experienced counsel have reached a settlement after sufficient discovery and arm's-length negotiation); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 458 (D.N.J. 2008) (same); *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 235 (D.N.J. 2005) (same). Lead Counsel, who have extensive experience prosecuting securities class actions, believe that the settlement is an outstanding result and in the best interest of the Class. In reaching this conclusion, Lead Counsel considered the strength of Lead Plaintiffs' claims, the risks of establishing liability, loss causation, and damages, as

- 10 -

well as the risks that the Court at summary judgment or the jury at trial may have ruled in favor of Defendants on some or all of the major issues resulting in no or a very limited recovery for the Class.

## IV.   AN ANALYSIS OF THE *GIRSH* FACTORS CONFIRMS THAT THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.   The Complexity, Expense and Duration of This Litigation Warrant Approval of the Settlement

There is no doubt that this litigation, like all securities class actions, is complex. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("class action suits have a well deserved reputation as being most complex").   The result of a potential trial in this action might well have turned on close questions of law, evidence, and fact.   As discussed herein and in the Saham Declaration, there clearly were substantial risks to Lead Plaintiffs' obtaining a favorable judgment if the trial had commenced.   Further, the allegations brought by Lead Plaintiffs involved complex medical and scientific issues in the areas of gastroenterology, the standard of care in clinical trial development and reporting, regulatory approval of pharmaceutical products, and biostatistics.

Indeed, both parties intended to lean heavily on their experts' testimony at trial. Lead Plaintiffs would have had to establish that Defendants misrepresented results from the CLASS and did so with fraudulent intent, *i.e.*, scienter.   Moreover, Lead Plaintiffs would have had to establish that Defendants' alleged misrepresentations and

- 11 -

omissions caused Lead Plaintiffs' damages and the amount of damages that the Lead Plaintiffs and the Class suffered.  These issues involved complicated theories and statistical models and competing expert reports and testimony.  The reaction of a jury to such expert testimony is highly unpredictable and "[i]n such a battle, [Lead] Counsel recognize the possibility that a jury could be swayed by experts for Defendants." *See In re Am. Bank Note Holographics, Inc., Sec. Litig.*, 127 F. Supp. 2d 418, 426-27 (S.D.N.Y. 2001).

While Lead Plaintiffs have already expended substantial amounts of time and money to reach this point of the litigation, further significant time and expense would be incurred to continue to prepare for, and complete, the trial.  Moreover, even if the case had reached trial and the jury returned a favorable verdict, there is no question that any verdict would be the subject of numerous post-trial motions and a complex, multi-year appellate process.  This is especially true because Private Securities Litigation Reform Act of 1995 ("PSLRA") cases rarely proceed to trial, and many of the issues specific to the application and effect of certain provisions of the PSLRA are novel, with no appellate authority interpreting them.  Thus, even though the Court had an October 2012 trial date scheduled in this action, "[i]t is safe to say, in a case of this complexity, the end of that road might be miles and years away." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 837 (W.D. Pa. 1995). As a result, the settlement secures a substantial, certain, and immediate recovery for the Class undiminished by

- 12 -

further expenses and without the delays, risks, and uncertainties of continued litigation.

**B.     The Absence of Objections is Evidence of the Reasonableness of the Settlement**

It is well settled that the absence of objections to a proposed class settlement is strong evidence that the settlement is fair and reasonable. *See Philips/Magnavox TV*, 2012 U.S. Dist. LEXIS 67287, at *49-*50 (the "absence of substantial objections by Settlement Class Members . . . strongly supports approval"). *See In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 124 (D.N.J. 2002). *See also Stoetzner*, 897 F.2d at 118, 119 (concluding that, when "only" 29 members of a class of 281 objected, the response of the class as a whole "strongly favors settlement"); *In re SmithKline Beckman Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990); *In re Gen. Pub. Utils. Sec. Litig.*, No. 79-1420, 1983 WL 22362, at *8 (D.N.J. Nov. 16, 1983).

In accordance with the Court's Order dated October 12, 2012, the Court-appointed Claims Administrator, Gilardi & Co. LLC ("Gilardi"), has mailed copies of the Notice of Proposed Settlement of Class Action ("Notice") to 160,157 potential Class Members, published summary notice of the class action settlement and hearing in *Investor's Business Daily* and over the *Business Wire*, and posted the relevant documents on Gilardi's website. The Notice informed potential Class Members of

- 13 -

their right to object to any aspect of the settlement.  The time period for objecting

expires on January 3, 2013, and, to date, no Class Members have filed objections.[4]

### C.    The Stage of the Proceedings Weighs in Favor of Approval

The third *Girsh* factor requires the Court "to consider the degree to which the

litigation has developed prior to settlement." *Rent-Way*, 305 F. Supp. 2d at 502.  "The

goal here is to determine 'whether counsel had an adequate appreciation of the merits

of the case before negotiating.'" *Id*. (citing *Cendant*, 264 F.3d at 235).  Here, Lead

Counsel unquestionably had a firm understanding of the merits of the case at the time

the settlement was reached.

This case has been vigorously litigated from start to finish for almost a decade.

By the time the settlement was reached, Lead Plaintiffs had conducted comprehensive

discovery, reviewed and analyzed over 4.2 million pages of documents produced by

Defendants and third parties, interviewed or supervised investigators who interviewed

dozens of witnesses, deposed approximately 39 fact witnesses, took or defended 12

expert witness depositions, engaged in extensive motion practice, successfully

appealed adverse summary judgment and class certification opinions to the Third

---

[4]    Pursuant to the Court's Order Preliminarily Approving Settlement and
Providing for Notice, objectors have until January 3, 2013, to file their objections,
with such date being subsequent to the date this Memorandum was filed.
Accordingly, should any objections to any aspect of the settlement or Plan of
Allocation be received, they will be addressed by Lead Counsel in their reply brief in
accordance with the Court's preliminary approval order.

- 14 -

Circuit, and were preparing for a trial on the merits.  The substantial discovery, motions practice, appellate work, and trial preparation gave Lead Counsel a full understanding of the strengths and the weaknesses of the Class's claims as well as the difficulties they would face in obtaining a favorable jury verdict.  Having sufficient information to thoroughly evaluate the strengths and weaknesses of the Class's claims, Lead Counsel were able to settle this litigation on terms very favorable to the Class.

**D.      The Risks of Establishing Liability Weigh in Favor of Approval**

Lead Plaintiffs believe that they had a strong case as to liability.  However, as in every complex case of this kind, they faced formidable obstacles to proving Defendants' liability.  In order to establish a §10(b) claim, plaintiffs must prove that defendants: (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiffs reasonably relied; and (5) that proximately caused their injuries. *In re Ikon Office Solutions, Inc. Sec. Litig.*, 277 F.3d 658, 667 (3d Cir. 2002).

In establishing their §10(b) allegations, Lead Plaintiffs claimed that Defendants participated in an allegedly fraudulent scheme to misrepresent to investors the results of a clinical trial of Pharmacia's largest-selling product, an arthritis drug called Celebrex.  Saham Decl., ¶7.  Lead Plaintiffs allege that the clinical trial, called the Celecoxib Long-term Arthritis Safety Study, was designed to last over one year, and was designed to show that Celebrex caused fewer complicated ulcers than two older

- 15 -

competitor drugs, ibuprofen and diclofenac. *Id.* Lead Plaintiffs allege that Defendants misrepresented the findings of the CLASS to investors by disclosing only the favorable results from the first six months of the study while concealing the unfavorable results from the entire study, which lasted as long as 13 months for some patients. *Id.* Lead Plaintiffs also allege that Defendants concealed the fact that Celebrex showed no safety advantage over diclofenac at all. *Id.*

Though Lead Counsel firmly believed that the evidence supported their claims, Defendants' vigorously disputed these allegations. For example, in response to Lead Plaintiffs' claims that Defendants misrepresented and failed to disclose unfavorable CLASS results, Defendants argued that their statements were in fact accurate and were not made with the requisite scienter because Defendants relied on "company scientists and statisticians" to report the CLASS results. Saham Decl., ¶9. Defendants further asserted that they repeatedly disclosed that Celebrex did not meet its primary endpoint in the CLASS and that their announcements regarding the CLASS were not misstatements, but instead were good-faith scientific judgments supported by sound analysis that were properly reported to the FDA and disclosed to investors. *Id.* And although Lead Plaintiffs disputed Defendants' assertions, Defendants offered both percipient testimony and expert opinions to bolster their defenses throughout the litigation and would surely do the same at trial.

Even if Lead Plaintiffs were successful in establishing liability, they also faced substantial risks in proving loss causation and damages. The determination of

- 16 -

damages is a complicated and uncertain process, involving the analysis of many complex factors.   Damages in a §10(b) action are measured by "the difference between the purchase price and the 'true value' of the security [*i.e.*, value absent the fraud] at the time of the purchase." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir. 2000).  Lead Plaintiffs must also show that the alleged false statements legally caused the damages.

With respect to loss causation, Lead Plaintiffs relied upon the three-day price decline of Pharmacia stock following the public posting of the entire study data by the FDA on February 6, 2001.  Defendants, however, argued that there was hardly any stock price decline on February 6, 2001, and repeatedly pointed out that the majority of the decline occurred on February 8, 2001, two days after the disclosure at issue. Defendants, through their experts, asserted that this delayed price decline showed that Defendants' alleged misstatements were not the cause of Lead Plaintiffs' alleged damages and was thus fatal to Lead Plaintiffs' loss causation position.  Saham Decl., ¶10.  Defendants further asserted that the Class was not entitled to damages resulting from the stock price decline that occurred on February 7 or 8, 2001, because that decline was caused by news unrelated to Defendants' alleged misstatements. Although Lead Plaintiffs' damage expert disputed these contentions, the possibility that the case would again be dismissed or damages greatly reduced was real.

Given the differing conclusions reached by the parties' respective damage experts, it is impossible to predict how the jury would react to the evidence presented.

- 17 -

Accordingly, even if Lead Plaintiffs prevailed at summary judgment and at trial in proving Defendants made fraudulent misrepresentations, there was a real possibility of a very limited damage award or no damages at all. *See Am. Bank Note Holographics*, 127 F. Supp. 2d at 426-27 ("In such a battle, [Lead] Counsel recognize the possibility that a jury could be swayed by experts for Defendants."); *See also, e.g.*, *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985) ("it is virtually impossible to predict with any certainty which [experts'] testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions"), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

Furthermore, there was no assurance that Lead Plaintiffs' damage expert would be allowed to testify at trial, as *Daubert* motions, including one seeking to preclude Lead Plaintiffs' experts' testimony, were soon to be filed and had yet to be decided by the Court. While Lead Counsel believed in their experts, they realized that in the "battle of experts" it was certainly possible that the Court could have excluded Lead Plaintiffs' damage expert or the jury could have sided with Defendants and found no damages, or only a fraction of the damages Lead Plaintiffs claimed. *See In re Computron Software*, 6 F. Supp. 2d 313, 320 (D.N.J. 1998).

Indeed, the risks inherent in proceeding with this action were not just nebulous concerns. Rather, they were serious obstacles that jeopardized the potential for successfully achieving a meaningful recovery in this action. To illustrate, in the last

- 18 -

few months alone, two Court of Appeals opinions have disposed of plaintiffs' claims

on loss causation grounds, after years of litigation.  In *Phillips v. Scientific-Atlanta,*

*Inc.*, No. 10-15910, 2012 U.S. App. LEXIS 18737, at *17 (11th Cir. Sept. 6, 2012),

after 11 years of litigation, the Eleventh Circuit affirmed the district court's decision

to grant defendants' motion for summary judgment on loss causation grounds.

Similarly, in *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 730 (11th Cir.

2012), the appellate court affirmed the district court's post-trial order granting

defendants' motion for judgment notwithstanding the verdict for failure to prove loss

causation, stripping plaintiffs of a jury verdict after a four-week trial.  If the instant

case had gone to trial, the issue of loss causation would have been one of the major

issues.  Defendants argued, and would have continued to argue, that the two-day delay

in the decline in Pharmacia's stock price following the publication of the entire study

established the absence of loss causation.   As demonstrated by the two recent

decisions above, proving loss causation was a significant risk going forward, with the

very real prospect of the Class receiving nothing.

### E.     The Settlement Is Reasonable in Light of All the Attendant Risks of Litigation

The settlement must be balanced against all the risks of continued litigation.

Here, the settlement was entered into after the parties had fully briefed summary

judgment, completed extensive fact and expert discovery, and substantially prepared

for a trial on the merits.  As discussed herein, summary judgment was still pending,

- 19 -

with the outcome uncertain.  There, as well as at trial (assuming the case proceeded beyond summary judgment), Lead Plaintiffs faced significant hurdles in proving both liability and loss causation, and Lead Plaintiffs faced the real possibility of receiving no recovery or a greatly reduced recovery depending on the amount of damages.

With respect to liability in general, Lead Plaintiffs recognized that the jury could place substantial weight upon the testimony of Pharmacia's fact and expert witnesses regarding Defendants' good faith and scientific judgment.  Defendants asserted that the alleged misstatements were not made with the requisite scienter, but instead were simply good-faith scientific judgments supported by sound analysis and properly reported to the FDA.  Saham Decl., ¶9.  Indeed, Lead Plaintiffs recognized the possibility that the jury could find in favor of Defendants that no liability existed or, even if liability existed, that there were small or no damages.

Moreover, as discussed above, within the past couple of months, at least two securities cases were lost on appeal on the same issues that existed in this case. Additionally, there are numerous complex, securities cases over the years that have been lost at trial, on post-trial motion, or on appeal.  For example, in *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997), the Eleventh Circuit overturned a $81 million jury verdict for the plaintiff class on loss causation grounds and ordered the entire litigation dismissed.  In another action, the class won a $38 million jury verdict (exclusive of prejudgment interest) and a motion for judgment notwithstanding the verdict was denied.  However, on appeal the judgment was reversed and the case

- 20 -

dismissed, a total loss after ten years of active litigation. *See Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990); *see also Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial); *Trans World Airlines, Inc. v. Hughes*, 312 F. Supp. 478 (S.D.N.Y. 1970), *modified*, 449 F.2d 51 (2d Cir. 1971), *rev'd*, 409 U.S. 363 (1973) (reversing $145 million judgment after years of appeals and on a theory that defendant had not raised, or argued). Accordingly, in light of the real possibility of the Class receiving nothing whatsoever, the proposed settlement is an excellent result.

## V.    THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

The Plan of Allocation establishes the method by which the Net Settlement Fund will be distributed to Class Members submitting valid Proofs of Claim. This plan – contained in the Notice – was created by Lead Counsel, with the assistance of their damage experts, and was based on calculations by Lead Plaintiffs' damage experts.

Approval of a plan of allocation is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, adequate, and reasonable. *Cendant*, 264 F.3d at 231. Here, the Plan of Allocation reflects a reasonable estimation of the amount of inflation in the price of Pharmacia common

- 21 -

stock during the Class Period. Accordingly, the plan is based on a reasonable estimation of the losses of Class Members, which in turn depends on the date the stock was purchased and when the stock was sold during the Class Period or held through the end of the Class Period.

Upon approval of the Plan of Allocation by the Court, the Claims Administrator will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "allowed loss" as calculated in accordance with the formula set forth in the Plan of Allocation. Each Authorized Claimant will be allocated a *pro rata* share of the Net Settlement Fund based on his, her or its allowed loss as compared to the total allowed loss of all Authorized Claimants.[5]

In light of the foregoing, the proposed Plan of Allocation is a fair, reasonable, and adequate method for allocating the Net Settlement Fund among the various Members of the Class and should be approved by the Court.

---

[5]   The favorable reaction of the Class supports approval of the proposed Plan of Allocation. To date, no Class Member has objected to the Plan of Allocation, although Notices have been distributed to over 160,000 Class Members.

789884_1

## VI.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the settlement and the Plan of Allocation as fair, reasonable and adequate, and in the best interests of the Class.

DATED:  December 14, 2012                  Respectfully submitted,

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN


                                                  s/ Peter S. Pearlman
                                        _____
                                              PETER S. PEARLMAN

Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
ARTHUR C. LEAHY
SCOTT H. SAHAM
LUCAS F. OLTS
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

- 23 -

SCOTT + SCOTT LLP
CHRISTOPHER M. BURKE
MATTHEW P. MONTGOMERY
DAVID H. GOLDBERGER
707 Broadway, 10th Floor
San Diego, CA  92101
Telephone:  619/233-4565
619/233-0508 (fax)

MOTLEY RICE LLC
JOSEPH F. RICE
LANCE OLIVER
JOSHUA C. LITTLEJOHN
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)

Counsel for Plaintiffs

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
2801 Ponce De Leon Blvd., Suite 750
Coral Gables, FL  33314
Telephone:  305/529-2801
305/447-8115 (fax)

Additional Counsel for Plaintiffs